# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LEHMAN BROTHERS HOLDINGS INC.,      Court File No.

       Plaintiff,

v.                             **COMPLAINT**

LENDINGTREE, LLC and
LENDINGTREE, INC.

       Defendants.

Plaintiff Lehman Brothers Holdings Inc. ("LBHI" or "Plaintiff"), the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), by and through its attorneys, for its Complaint against LendingTree, Inc. ("LendingTree Parent") and LendingTree, LLC ("LendingTree Sub" and with LendingTree Parent, the "Defendants"), alleges with knowledge as to itself and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.    This action seeks to establish the liability of Defendants LendingTree Parent and LendingTree Sub for the substantial damages caused by the selling of defective mortgage loans through LendingTree Sub's wholly owned subsidiary, Home Loan Center, Inc. ("HLC") to LBHI. Defendants controlled HLC at all relevant times, and reaped substantial profits from its activities. Defendant LendingTree

Parent expressly assumed all relevant liabilities of HLC, and thus is liable as its successor.  Moreover, Defendants are liable as alter egos of HLC.

2.      In this action, LBHI now seeks to enforce an allowed claim[1] for contractual indemnification for liabilities, losses, damages, claims, judgments, and any other costs, fees, and expenses LBHI incurred as a result of HLC's sale and/or submission of defective mortgage loans in breach of HLC's representations, warranties, obligations, and/or covenants and/or for which LBHI incurred liability due to HLC's acts, failures to act and/or omissions (the "Defective Loans") against the bankruptcy estate.

3.      LBHI sold the Defective Loans to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and/or various RMBS trusts under agreements that included representations and warranties about the Defective Loans that were coextensive with those made by HLC.  LBHI retained the right to seek indemnification from HLC in the event it became liable for certain indemnification events.  After Fannie Mae, Freddie Mac, and the relevant RMBS trustees discovered that the mortgage loans breached certain of those representations and warranties, they made claims upon LBHI for losses suffered on the Defective Loans.  In January and February 2014, respectively, the United States Bankruptcy Court for the Southern District of New

---

[1] The order allowing the claim is expected to be entered imminently.

York (the "Bankruptcy Court") approved settlements between (i) LBHI and Fannie
Mae (ECF No. 42153), and (ii) LBHI and Freddie Mac (ECF No. 42754).  On March
15, 2018, the Bankruptcy Court entered an Order Estimating Claim Pursuant to
RMBS Settlement, resolving a majority of the RMBS trustee claims.  LBHI also
settled several other RMBS trustee claims in the ordinary course.  These settlements
triggered LBHI's indemnification claims under the Agreements, as defined below,
with HLC.

4.    In December 2013, ResCap Liquidating Trust ("ResCap") sued HLC for
losses and liabilities incurred based on the defective loans that HLC sold to ResCap's
predecessor, Residential Funding Company, LLC ("RFC").  A jury found HLC liable
in November 2018, and this Court entered judgment against HLC for approximately
$68.5 million in June 2019.  Within a month after the June 2019 judgment, however,
HLC filed for bankruptcy, claiming that it did not have resources left even to bond
the appeal.

5.    At the time HLC filed for bankruptcy, it was defending an adversary
proceeding for indemnification brought by LBHI before the Bankruptcy Court.  As
that proceeding was stayed by HLC's bankruptcy filing, LBHI filed a proof of claim
in HLC's bankruptcy case.  LBHI and the Chapter 7 Trustee for HLC settled the claim
for a liquidated amount of $13.3 million (the "Allowed Claim").  The order allowing

the claim is expected to be signed and entered imminently, constituting an enforceable judgment on the part of LBHI against the HLC estate.

6.  However, HLC's obligations to LBHI, as fixed in the Allowed Claim, are enforceable against Defendants as well.  By way of background, in May 2003, LendingTree Sub (then known as LendingTree, Inc.) entered into an Agreement and Plan of Merger with IAC/InterActiveCorp (then known as USA Interactive) ("IAC") and Forest Merger Corp., pursuant to which IAC acquired full ownership of LendingTree Sub.  LendingTree Sub changed its name to Tree, LLC in December 2004.

7.  In 2004, LendingTree Sub acquired HLC, a residential mortgage loan originator that was incorporated in California.  HLC operated as a wholly owned subsidiary of LendingTree Sub, which in turn is now a wholly owned subsidiary of LendingTree Parent.  At all relevant times, both LendingTree Sub and HLC were controlled by Douglas Lebda, who was also the founder of the "LendingTree" business and is the chairman and chief executive officer of LendingTree Parent.

8.  Following the acquisition, LendingTree Sub controlled every aspect of HLC's business.  It caused HLC to source mortgage loans from LendingTree's family of websites under the "LendingTree Loans" name.  Moreover, it caused HLC to continue to sell loans to purchasers in the secondary market, including to LBHI.  In

addition, Defendants also guaranteed the funding critical to the LendingTree Loans business.

9.    In August 2008, LendingTree Sub spun off from IAC (the "<u>Spin-Off</u>"). As part of the Spin-Off, Defendant LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub.  LendingTree Parent expressly agreed to assume HLC's liabilities, including those related to "LendingTree Loans."

10.    By 2011, HLC faced a growing number of repurchase demands from purchasers based on misrepresentations it had made concerning the credit quality of mortgage loans it had sold in the secondary market.  In response to this growing liability, Defendants caused HLC to sell all of its operating assets, rendering it a mere shell that would conduct no further business, and whose principal activity would be distributing cash to Defendants and defending the claims for which Defendants were co-liable.

11.    In late 2013, RFC filed a complaint against HLC in Minnesota state court, bringing claims for breach of contract and contractual indemnification in connection with the defective loans sold to RFC in the secondary market.  The action was removed to this Court in 2014, and ResCap was substituted for RFC as the plaintiff.  LBHI filed an adversary proceeding against HLC in the Bankruptcy Court in December 2016.

12.     Defendants caused HLC to litigate the claims against it, including by LBHI, for several years.  During that time, the majority of HLC's cash was distributed to Defendants or spent on professional fees defending those litigations.  While the HLC litigations were ongoing, Defendants paid numerous lawyers and other professionals in connection with the contemplated bankruptcy of HLC.  HLC did not inform LBHI or the Bankruptcy Court that HLC did not have adequate funds to pay any judgment.  Instead, just one month after entry of ResCap's judgment against HLC for approximately $68.5 million, HLC filed for bankruptcy, for the first time disclosing that it had no more than approximately $5.4 million in cash remaining.

13.     Defendants, however, cannot escape the fact that LendingTree Parent expressly assumed all of HLC's relevant liabilities, including LBHI's Allowed Claim, and controlled and profited handsomely from HLC, before HLC became an empty shell and ultimately filed for bankruptcy.

14.     By this action, LBHI seeks to enforce its $13.3 million Allowed Claim against Defendants.

## **PARTIES**

15.     On September 15, 2008, Plaintiff LBHI commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  LBHI is a Delaware corporation with its principal place of business in New York, New York.

16.    Defendant LendingTree Sub is a Delaware limited liability company
with its principal place of business at 11115 Rushmore Drive, Charlotte, North
Carolina 28277.  LendingTree Sub was originally incorporated as LendingTree, Inc.
in June 1996.  In May 2003, LendingTree Sub entered into an Agreement and Plan of
Merger with IAC and Forest Merger Corp., pursuant to which IAC acquired all of
LendingTree Sub's stock.  LendingTree Sub converted to Tree, LLC in December
2004, and is now called LendingTree, LLC.

17.    In August 2008, LendingTree Sub spun off from IAC.  As part of that
transaction, Defendant LendingTree Parent was incorporated as a publicly traded
company named Tree.com, Inc. and became the parent of LendingTree Sub.
Tree.com, Inc. subsequently changed its name to Tree, Inc., and is now called
LendingTree, Inc.

18.    Defendant LendingTree Parent is a publicly traded corporation
incorporated in Delaware with its principal place of business at 11115 Rushmore
Drive, Charlotte, North Carolina 28277.

19.    LendingTree Parent is the sole member of LendingTree Sub.
LendingTree Sub is the sole shareholder of HLC and owns 100% of HLC's stock.
Lebda is the chief executive officer, chairman of the board, and a shareholder of
LendingTree Parent, the sole manager of LendingTree Sub, and until February 2019,

was the sole director of HLC. In February 2019, Lebda appointed Kyle Everett of Development Specialists, Inc. as HLC's sole director.

20.     Non-party HLC is a California corporation with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277. HLC is a second-generation Internet-based direct mortgage lender that was incorporated in California in September 2000 under the name FreeApprovalFinder.com, Inc. It changed its name to Home Loan Center, Inc. on March 8, 2002. HLC sold substantially all of its operating assets to Discover Bank ("Discover") in 2012. However, Tree.com, Inc. (now LendingTree Parent) kept all pre-closing liabilities and repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans. Since 2012, HLC has conducted no new business, and its principal and essentially only activity has been the litigation of claims arising from its origination of residential mortgage loans. On July 21, 2019, HLC filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California.[2] On September 16, 2019, HLC's chapter 11 case was converted into a chapter 7 case, and its estate is currently in liquidation.

21.     LBHI brought an adversary proceeding against HLC in December 2016 in the United States Bankruptcy Court for the Southern District of New York for

---

[2] For the avoidance of doubt, this Complaint does not name HLC as a party, nor does it assert any claim against or seek any relief from HLC or its bankruptcy estate. Nor does this Complaint assert any claims of or on behalf of HLC or its bankruptcy estate, or any trustee or debtor in possession in HLC's bankruptcy case.

breach of contract and indemnification in connection with HLC's sale of defective mortgage loans to LBHI in the secondary market.

22.   Non-party Douglas Lebda is an individual who, on information and belief, is and has been a resident of North Carolina at all times relevant to this Complaint.

## JURISDICTION AND VENUE

23.   The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) because it is related to LBHI's chapter 11 bankruptcy case, in that LBHI brings this claim as Plan Administrator to recover amounts owed to the Estate, which currently remains in administration.

24.   Defendants consented to personal jurisdiction before the courts in Minnesota, including this Court, by appointing an agent for receipt of service of process in Minnesota.

25.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (i) all defendants are subject to the Court's personal jurisdiction and, thus, reside in this District for purposes of venue, (ii) the cause of action arose, in part, in Minnesota, since certain of the mortgage loans sold to LBB originated in Minnesota, (iii) Defendant LendingTree Parent expressly assumed all repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans, and (iv) litigating the case in this Court would be convenient for the parties and witnesses because the case *ResCap Liquidating Trust v. LendingTree, LLC and LendingTree,*

*Inc.*, Court File No. 19-cv-02360, that is pending before this Court is substantially identical to this action, in that both actions seek to enforce HLC's fixed indemnification liabilities for defective mortgage loans against Defendants in their capacity as successors, alter egos, and/or principals of HLC. Laying venue in this District would promote efficiency and coordination, and it would obviate the risk of inconsistent judgments.

## FACTUAL BACKGROUND

### A. LendingTree acquired HLC and subsequently controlled its operations.

26. HLC, then FreeApprovalFinder.com, was incorporated in California in 2000 and was headquartered in Irvine, California. It changed its name to Home Loan Center, Inc. on March 8, 2002. HLC made mortgage loans directly to consumers as the industry's first full spectrum online retail mortgage lender. It was a top ten online direct lender, approved in all 50 states.

27. In September 2004, LendingTree Sub (then LendingTree, Inc.) entered into an agreement to acquire all of HLC's outstanding stock. The transaction was completed in December 2004. After LendingTree Sub acquired HLC, LendingTree Sub operated its lending business through HLC. The business consisted of originating mortgage loans and selling those loans to secondary market purchasers, including LBHI's affiliates.

28.     LendingTree Sub controlled every aspect of HLC's business and exploited HLC for its own gain.  LendingTree Sub's domination and exploitation of HLC is demonstrated by, among other things, the following:

a.  LendingTree Sub operated HLC under the brand name "LendingTree Loans," and HLC did business as "LendingTree Loans."

b.  HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans."  "LendingTree Loans"-branded loan originations were primarily sourced from consumer loan requests received by the LendingTree family of websites and phone platforms.

c.  Most of HLC's customer leads were generated by the LendingTree network and originated under the name "LendingTree Loans."

d.  Only a small portion of HLC's customer leads were sourced from non-LendingTree channels, such as third-party lead aggregators, direct mail marketing campaigns, and HLC's own website.  HLC only used its own brand name—Home Loan Center—when offering loans through third-party resources.

e.  LendingTree Sub funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.

f.  LendingTree Sub would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days.

### B. Defendants expressly assumed all of HLC's liabilities.

29. In May 2003, LendingTree Sub (then LendingTree, Inc.) entered into an Agreement and Plan of Merger with IAC, pursuant to which IAC acquired all of LendingTree Sub's stock.

30. In August 2008, LendingTree Sub spun off from IAC. As part of the Spin-Off, LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub. In addition, as part of the Spin-Off, Defendant LendingTree Parent expressly agreed to assume all of HLC's liabilities, including those related to "LendingTree Loans."

31. In a 2008 S-1 filing following the Spin-Off, LendingTree Parent (then Tree.com, Inc.) disclosed (at page F-32) that "Tree.com will assume all of the liabilities related to the Tree.com Businesses," and defined "Tree.com Businesses" as "LendingTree Loans," which was the dba for HLC (at 58-59). A copy of the 2008 S-1 is attached as Exhibit 1.

32. In the same 2008 S-1 filing (at page 58), LendingTree Parent stated that its financial statements and disclosures "reflect the contribution or other transfer to Tree.com of all the subsidiaries and assets *and the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses* in connection with the spin-off" (emphasis added).

12

33.     The Separation and Distribution Agreement implementing the Spin-Off confirms that LendingTree Parent assumed all of HLC's liabilities relating to LendingTree Loans.  That agreement is attached as Exhibit 2.

34.     That agreement provides, in section 2.03(b), that: "Each Spinco agrees to accept, assume and faithfully perform, discharge and fulfill all of its Corresponding Liabilities . . . ."  "Spinco" was defined (at 1) to include "Tree Spinco," which is LendingTree Parent (then Tree.com, Inc.).  "Corresponding Liabilities" was defined (at 6) as "with respect to Tree Spinco, any Tree Entity or the Tree Group . . . the Tree Liabilities."

35.     Section 2.10(g) defined "Tree Liabilities" as including "any Liability of a Spun Entity, whether arising or accruing prior to, on or after the Effective Time . . . shall be a Corresponding Liability of such Spun Entity's Corresponding Group." Section 2.10(h) defined "Tree Liabilities" to include "any Liability relating to, arising out of, or resulting from the conduct of, a Spun Business . . . whether arising or accruing prior to, on or after the Effective Time and whether the facts on which it is based occurred on, prior to or after the Effective Time . . . shall be a Corresponding Liability of such Spun Business' Corresponding Group."

36.     "Corresponding Group" means "with respect to the Lending and Real Estate Business . . . the Tree Group."  *Id.* at 5.  "Tree Group" means Tree Spinco, the

Tree Entities, and each other person "that is a direct or indirect Subsidiary of Tree Spinco . . . ." *Id.* at 19.

37.     Public filings following the Spin-Off confirm that LendingTree Parent assumed HLC's liabilities, including those relating to the LendingTree Loans and, specifically, repurchase and indemnification obligations.

38.     For example, in its 2008 10-K filing on February 27, 2009 (at page 50), LendingTree Parent stated that "[t]he historical consolidated financial statements of Tree.com and its subsidiaries reflect the contribution or other transfer of Tree.com of all the subsidiaries and assets and ***the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses*** in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses" (emphasis added).   A copy of the 2008 annual 10-K filing is attached as Exhibit 3.   Similar disclosures were included in other LendingTree Parent filings with the Securities and Exchange Commission ("<u>SEC</u>") through at least 2011.

39.     Moreover, in its 2011 annual 10-K filed April 16, 2012 (at page 81), LendingTree Parent stated:     "Tree.com will ***continue to be liable*** for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. . . .   We plan to negotiate with

14

secondary market purchasers to settle any then-existing and future contingent liabilities" (emphasis added).  *See also id.* at 11 ("We [defined as LendingTree Parent] will continue to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of our LendingTree Loans business to Discover.").  A copy of 2011 10-K filing is attached as Exhibit 4.

C. **Defendants forced HLC to sell all of its operating assets but retained certain liabilities.**

40.    In connection with the sales of residential mortgage loans to secondary market purchasers, HLC would routinely make representations to those purchasers regarding, among other things, borrower credit information, loan documentation, and collateral.  The secondary market purchasers included LBHI's affiliates; those LBHI affiliates transferred the mortgage loans to LBHI and assigned to LBHI their rights vis-à-vis HLC under the applicable agreements.

41.    HLC's representations to purchasers were consistently false and subjected HLC to a significant number of repurchase demands.  Indeed, by early 2011, HLC was subject to a growing number of repurchase demands based on defective mortgage loans it had sold to secondary market purchasers.  As set forth in their own SEC filings, Defendants realized that they could be subject to significant liabilities in connection with the origination and sale of defective mortgage loans by HLC.

42. In May 2011, LendingTree Parent, LendingTree Sub, and HLC entered into an asset purchase agreement ("APA") with Discover Bank. Pursuant to the APA, HLC sold all of its operating assets to Discover for $55.9 million (the "Sale Proceeds"). The sale closed in June 2012 (the "2012 Sale"). $17.1 million of the $55.9 million Sale Proceeds were held in escrow "pending the resolution of certain actual and/or contingent liabilities that remain[ed] [LendingTree Parent's] responsibility following such sale." A copy of the APA is attached as Exhibit 5.

43. In the APA, Discover expressly disclaimed the assumption of pre-closing liabilities and repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans. The APA provided that these "Excluded Liabilities" would "remain the sole responsibility of . . . Parent and its Affiliates (as applicable)," and defined the Excluded Liabilities as "every Liability of Parent and its Affiliates (including the Subsidiaries)," including the repurchase, warranty, and indemnification obligations associated with HLC's mortgage loans. The APA defined the "Parent" as LendingTree Parent (then called Tree.com, Inc.).

44. Since 2012, HLC has operated as a shell company and has not conducted any business. It has no inventory, real property, equipment, or employees. HLC substantially completed its "wind down" in or around the beginning of 2015, and since that time, its activities have been limited to disputing claims brought by plaintiffs concerning its defective mortgages, and occasionally

releasing legacy recorded interests on properties for which it had assigned away any interest in the applicable mortgage years ago.  Following the 2012 Sale, HLC's assets primarily consisted of the Sale Proceeds.  HLC's sole director, Lebda, was the CEO and Chairman of LendingTree Parent, which was the sole member of LendingTree Sub.

### D.    LBHI asserts claims for contractual indemnification against HLC.

45.    By way of background, at all relevant times, LBHI engaged in the purchase and sale of mortgage loans directly or through affiliates, including Lehman Brothers Bank, FSB ("LBB"), then sold the loans to third parties, including Fannie Mae, Freddie Mac, and RMBS trusts.

46.    At all relevant times, HLC engaged in mortgage origination, as well as the sale of mortgage loans on the secondary market to entities such as LBB and LBHI.

### a.    The agreements governing HLC's relationship with LBB and LBHI.

47.    LBHI's claims for contractual indemnification arose out of HLC's sale of residential mortgage loans to LBHI's assignor, LBB, under on or more Loan Purchase Agreements with LBB (each a "LPA").[3]

48.    The LPAs specifically incorporated the terms and conditions of the Seller's Guide of loan administrator, Aurora Loan Services LLC (the "Seller's Guide,"

---

[3] Although the language of certain agreements referenced in this Complaint (such as the LPAs and the Seller's Guide, as updated from time to time) may vary slightly, they were generally consistent in all material respects of relevance to the claims asserted by LBHI against HLC.

together with the LPAs, the "Agreements") which set forth additional duties and obligations of HLC. The Seller's Guide in its entirety was valid and binding on HLC.

49. The Agreements set forth the duties and obligations of the parties with respect to the purchase and sale of mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.

50. The Agreements also set forth HLC's duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold or submitted; and HLC's indemnification obligations.

51. Pursuant to the Agreements, HLC sold Defective Loans to LBB that resulted in LBHI being exposed to and incurring liability, as described further below.

52. The parties agreed that HLC's obligations would extend to any subsequent purchasers and/or assignees, such as, in this case, LBHI. The Seller's Guide defined the "Purchaser" as LBB and, among others, its "successors and/or assigns." *See* Seller's Guide § 8.

53. In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the Defective Loans.

54.    Further, the Seller's Guide provided that LBHI, as a subsequent holder

of any Mortgage Loan, "shall be a third party beneficiary" of the LPAs.

      b.    <u>HLC makes representations and warranties to LBB.</u>

55.    Accordingly, LBHI as the "assignee" and third-party beneficiary of the

LPAs, and as "subsequent holder" of the Defective Loans, was entitled to all the

benefits of the Agreements, including the right to contractual indemnification.

56.    With respect to each of the loans sold to LBHI (as, among other

things, LBB's assignee) under the LPAs, HLC made a number of representations,

warranties, and covenants concerning the quality, characteristics, and

underwriting of the mortgage loans; the property securing the mortgage loans; and

the borrowers.

57.    Specific examples of HLC's representations, warranties and covenants

included, but were not limited to, the following:

> No document, report or material furnished to Purchaser
> in any Mortgage Loan File or related to any Mortgage Loan
> (including, without limitation, the Mortgagor's
> application for the Mortgage Loan executed by the
> Mortgagor), was falsified or contains any untrue
> statement of fact or omits to state a fact necessary to make
> the statements contained therein not misleading.  Seller's
> Guide § 703(1).

> Seller . . . has duly and faithfully complied with and will
> continue to comply with:  (i) all applicable laws, rules,
> regulations, decrees, pronouncements, directives, orders
> and contractual requirements with respect to the
> origination, closing, underwriting, processing and

servicing of each Mortgage Loan . . . . Seller's Guide §
703(8).

The documents, instruments and agreements submitted
for loan underwriting were not falsified and contain no
untrue statement of material fact or omit to state a
material fact required to be stated therein or necessary to
make the information and statements therein not
misleading. No fraud was committed in connection with
the origination of the Mortgage Loan. The Seller has
reviewed all of the documents constituting the Mortgage
Loan File and has made such inquiries as it deems
necessary to make and confirm the accuracy of the
representations set forth herein. Seller's Guide § 703(12).

There is no default, breach, violation or event of
acceleration existing under the Mortgage or the Note and,
no event has occurred or condition exists that, with the
passage of time or with notice and the expiration of any
grace or cure period, would constitute a default, breach,
violation or event of acceleration and neither Seller nor its
predecessors has waived any default, breach, violation or
event of acceleration. Seller's Guide § 703(18).

The Mortgage Loan has been originated and processed by
Seller or Seller's correspondent in accordance with, and
conforms with, the terms of this Seller's Guide and the
Loan Purchase Agreement, and the Mortgage Loan has
been underwritten in accordance with Underwriting
Guidelines in effect as of the date of the Delivery
Commitment applicable to the Mortgage Loan. The
Mortgage Loan complies with all the requirements of the
related Program Profile applicable to such Mortgage Loan
. . . . Seller's Guide § 703(21).

The Mortgaged Property is lawfully occupied under
applicable law, unless properly disclosed to Purchaser. All
inspections, licenses and certificates required to be made
or issued with respect to all occupied portions of the
Mortgaged Property, or with respect to the use and

occupancy of the same (including, without limitation, certificates of occupancy and fire underwriting certificates), have been made or obtained by Seller or Seller's correspondent from the appropriate authorities. The Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence, if applicable. Seller's Guide § 703(24).

Notwithstanding anything contained elsewhere in this Seller's Guide or the Loan Purchase Agreement, Seller hereby represents and warrants that all appraisals and other forms of real estate valuation conducted in connection with each Mortgage Loan comply with applicable federal and state law, including without limitation, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 as applicable, and the requirements of Fannie Mae or Freddie Mac and the Seller's Guide and were conducted and delivered prior to approval of the Mortgage Loan application by either (i) in the case of an appraisal, by a qualified appraiser, duly appointed by the Seller, or (ii) a valuation method meeting the requirements of the Seller's Guide. The fair market value of the Mortgaged Property as indicated by the property appraisal or valuation is materially accurate. Any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property has no interest, direct or indirect, in the Mortgaged Property or in any security thereof. The compensation of any appraiser, inspector or other real estate professional engaged in the valuation of the Mortgaged Property was not affected by the approval or disapproval of the Mortgage Loan. Seller's Guide § 703(36).

58.   To the extent HLC was also the underwriter of certain loans as permitted under the Seller's Guide or other applicable agreements, HLC

additionally represented, warranted, and covenanted in Section 717(1) of the Seller's

Guide that with respect to such loans:

> All underwriting performed by Seller hereunder shall be
> in strict compliance with the underwriting guidelines and
> product descriptions contained in the Seller's Guide and
> such other guidelines and requirements as may be
> provided to Seller in writing from time to time.

59.     HLC represented and/or warranted in Section 702(5) of the Seller's

Guide that it had the ability to perform its obligations under, and satisfy all

requirements of, the LPAs.

60.     LBHI (as, among other things, LBB's assignee) relied upon the

representations and warranties contained in the Agreements in purchasing the

Defective Loans.  Specifically, Section 701 of the Seller's Guide provides that:

> Seller acknowledges that Mortgage Loans are purchased
> in reliance upon: (i) the truth and accuracy of Seller's
> representations and warranties set forth in the Loan
> Purchase Agreement and this Seller's Guide, each of which
> representations and warranties relates to a matter
> material to such purchase; and (ii) Seller's compliance
> with each of the agreements, requirements, terms,
> covenants and conditions set forth in the Loan Purchase
> Agreement and this Seller's Guide.

> c.     HLC owes indemnification obligation to LBHI under the LPAs.

61.     HLC agreed to indemnify LBHI (as, among other things, LBB's

assignee) from liabilities, claims, judgments, losses and expenses it might sustain

as a result of the Defective Loans, including attorneys' fees.  Section 711 of the

Seller's Guide, entitled "Indemnification and Third Party Claims," provides, in

pertinent part, as follows:

> In addition to any repurchase and cure obligations of
> Seller . . . Seller shall indemnify Purchaser and Purchaser's
> designee (including, without limitation, any subsequent
> holder of any Note) from and hold them harmless against
> all claims, losses, damages, penalties, fines, claims,
> forfeitures, lawsuits, court costs, reasonable attorney's
> fees, judgments and any other costs, fees and expenses
> that the Purchaser may sustain in any way related to or
> resulting from any act or failure to act or any breach of any
> warranty, obligation, representation or covenant
> contained in or made pursuant to this Seller's Guide or the
> Loan Purchase Agreement by any agent, employee,
> representative or officer of Seller or Seller's
> correspondent. In addition to any and all other obligations
> of Seller hereunder, Seller agrees that it shall pay the
> reasonable attorney's fees of Purchaser incurred in
> enforcing Seller's obligations hereunder . . . .

   d.   <u>LBHI settles its liabilities with Fannie Mae, Freddie Mac, and the
        RMBS trusts.</u>

62.    When LBB acquired loans from HLC and others, it typically did not

hold those loans on its books.  The loans it acquired from HLC and other entities,

including the Defective Loans, were sold to LBHI, and then sold to other industry

participants, including Fannie Mae, Freddie Mac, and various RMBS trusts.

63.    When LBHI sold the Defective Loans to these entities, it relied on

information provided to LBB by HLC, and LBHI itself made representations and

warranties to Fannie Mae, Freddie Mac, and/or the RMBS trusts based, in part, on

the representations HLC made to LBB.

64.    Eventually, Fannie Mae, Freddie Mac, and various RMBS trusts discovered breaches of representations, warranties, and/or covenants in the Defective Loans.

65.    Fannie Mae, Freddie Mac, and the RMBS trusts filed proofs of claim in LBHI's bankruptcy proceeding to recover for losses on the Defective Loans and other loans sold to LBB.

66.    Many of the loans at issue in the proofs of claims, and all of the Defective Loans, contained defects which caused LBHI to incur losses, judgments, costs, expenses, attorneys' fees, and liability to Fannie Mae, Freddie Mac, and the RMBS trusts.

67.    LBHI was forced to defend against and eventually settle with Fannie Mae, Freddie Mac, and the RMBS trusts.

68.    The Bankruptcy Court approved LBHI's settlements, including loan-level damages amounts for each Defective Loan, finding the settlements to be "reasonable and appropriate."

69.    The types of defects which caused LBHI to incur expenses, costs, losses, judgments, attorneys' fees, and liability to Fannie Mae, Freddie Mac, and the RMBS trusts include but are not limited to defects concerning the quality and characteristics of the loans, the creditworthiness of the borrowers, and the value and characteristics of the collateral, such as with respect to the income, employment,

assets, and debt obligations of the borrowers, the intended and actual occupancy status of the properties, the appraised value of the properties and compliance with appraisal standards, among other things; defects concerning underwriting and the collection and review of the loan application and supporting documentation; and defects concerning origination practices generally, including compliance with applicable laws, rules, regulations, decrees, pronouncements, directives, orders, and guidelines.

70.     The liability incurred by LBHI to Fannie Mae, Freddie Mac, and/or the RMBS trusts was the result of HLC's acts, failures, omissions, and breaches of its representations, warranties, obligations, and/or covenants, which representations, warranties, obligations, and/or covenants are co-extensive with the representations and warranties LBHI made to Fannie Mae, Freddie Mac, and the RMBS trusts.

       e.   <u>HLC was obligated to indemnify LBHI.</u>

71.     HLC agreed to indemnify LBHI (as, among other things, LBB's assignee) from liabilities, claims, judgments, losses, attorneys' fees, and expenses it might sustain as a result of the Defective Loans.

72.     LBHI demanded that HLC indemnify LBHI for its share of LBHI's liability to Fannie Mae, Freddie Mac, and/or the RMBS trusts, which demands were refused by HLC in breach of is contractual indemnification obligations. Accordingly, LBHI filed an adversary proceeding against HLC in the Bankruptcy Court to recover the amounts owed by HLC to the LBHI estate.

### E.  **HLC files for bankruptcy.**

73.     On June 21, 2019, the Court entered a judgement in favor of ResCap against HLC for $68,484,502.06.  On July 19, 2019, HLC filed a notice of appeal.  On July 21, 2019, HLC filed a chapter 11 petition in the Northern District of California.  *In re Home Loan Center, Inc.*, 5:19-bk-51455 (MEH).   HLC disclosed that it had approximately $11 million in assets.  Of that $11 million, about $5.4 million was cash. The rest consisted of retainers paid to various restructuring professionals, an ownership interest in HLC Escrow, Inc., and certain tax attributes.

74.     On September 16, 2019, HLC's chapter 11 case was converted to a chapter 7 case, and the estate entered into liquidation.

75.     The United States Bankruptcy Court overseeing HLC's bankruptcy case is expected to enter an order allowing LBHI's claim in the amount of $13.3 million. This Allowed Claim will have the same force and effect as a court judgment.

### F.  **Defendants continue to recognize that they are responsible for HLC's liabilities.**

76.     At all relevant times, Defendants have represented to the public that they were responsible for HLC's liabilities.

77.     From 2011 to 2018, LendingTree Parent's annual filings with the SEC explicitly acknowledged its responsibility for HLC's liabilities.

78.     In its 2011 10-K (at 81), LendingTree Parent (then Tree.com, Inc.) stated: "Tree.com will continue to be liable for indemnification obligations, repurchase

obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. . . . We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities . . . ."

79.    In its 2013 10-K (at 8), LendingTree Parent disclosed that:  "[w]e continue to be liable for [HLC's] indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business [HLC]."  In the same filing, LendingTree Parent disclosed (at 29) estimates of "*our* exposure related to *our* obligation to repurchase loans previously sold to investors" and referenced its difficulties in estimating "*our* maximum exposure for breaches of the representations and warranties *LendingTree Loans* made to the investors" (emphasis added).  A copy of the 2013 10-K is attached as Exhibit 6.

80.    In its 2018 10-K, LendingTree Parent disclosed that ResCap had obtained a jury verdict of $28.7 million against HLC and that it was seeking both prejudgment interest and attorney fees.  LendingTree Parent stated (at 13): "*We* have incurred substantial legal fees in this matter," and "[t]he ultimate outcome of the [ResCap Litigation] and the outcomes of other pending of indemnification claims, repurchase obligations or premium repayments beyond *our* reserves for these contingencies, including legal fees *we* incur, may have a material and adverse

effect on *our* business, financial condition and results of operations" (emphasis added).  LendingTree Parent also made a provision of $1 million for the claims asserted by LBHI on the consolidated balance sheet.  A copy of the 2018 10-K is attached as Exhibit 7.

81.    In its 2019 10-K, which was filed on July 25, 2019—four days after HLC's bankruptcy—LendingTree Parent (at 30) continued to estimate a liability of $1 million for LBHI's claims as of June 30, 2019.  LendingTree Parent also attributed (at 41) losses to its "LendingTree Loans business formerly operated by our [HLC] subsidiary."  And, LendingTree Parent disclosed (at 45) that HLC's creditors could assert claims "directly against *our* company [which] could result in losses to *us*" (emphasis added).  A copy of the 2019 10-Q is attached as Exhibit 8.

## COUNT ONE
## (DECLARATORY RELIEF AGAINST LENDINGTREE PARENT)

82.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 81 as if fully set forth herein.

83.    An actual controversy has arisen and now exists between LBHI and LendingTree Parent.  LBHI contends, but is informed and believes that LendingTree Parent denies, that LendingTree Parent is liable to LBHI for the amounts due under the Allowed Claim because it has expressly assumed HLC's repurchase and indemnification liabilities, including, specifically, the liabilities reflected in the Allowed Claim.

84.    The following facts (among other facts alleged above and to be developed in discovery) evidence LendingTree Parent's express agreement and acknowledgement that it has assumed responsibility for HLC's liabilities, including to LBHI:

a.    When Lending Tree Sub was spun off from IAC, LendingTree Parent (then Tree.com, Inc.) expressly agreed to assume all of HLC's liabilities related to "LendingTree Loans," which was HLC's dba.

b.    From 2008 to 2018, LendingTree Parent's filings with the SEC explicitly acknowledged responsibility for HLC's repurchase and indemnification liabilities.

c.    During the 2012 sale of HLC's assets to Discover, LendingTree Parent acknowledged that it was liable for repurchase, warranty, and indemnification obligations.

d.    Defendants guaranteed repurchase agreements and warehouse credit facilities between HLC and Citibank, and between HLC and Credit Suisse, which provided financing for HLC until the completion of the sale to Discover.  Upon information and belief, Defendants guaranteed HLC's agreements because they knew they were responsible for HLC's obligations.  Upon information and belief, Discover knew Defendants had guaranteed HLC's repurchase agreements and warehouse credit facilities,

and any reasonable purchaser would expect the reason for those guarantees was that Defendants were responsible for HLC's losses.

85.     LBHI seeks a judicial determination of the respective rights and duties of LBHI and LendingTree Parent with respect to the foregoing.  In particular, LBHI seeks a declaration that LendingTree Parent expressly assumed the liabilities of HLC and as such, LendingTree Parent is liable to LBHI for the amounts due under the Allowed Claim.  Such a declaration is necessary and appropriate at this time in order to ensure that LBHI may ascertain its rights with respect to the Allowed Claim.

## COUNT TWO
## (DECLARATORY RELIEF AGAINST LENDINGTREE SUB AND LENDINGTREE PARENT)

86.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 85 as if fully set forth herein.

87.     An actual controversy has arisen and now exists between LBHI and Defendants.  LBHI contends, but is informed and believes that Defendants deny, that each of the Defendants is liable to LBHI for the amounts due under the Allowed Claim because they are HLC's alter egos.

88.     There was such unity of interest between Defendants and HLC that their separate personalities did not in reality exist.  The unity of interest is demonstrated by the following facts (among other facts alleged above and to be developed in discovery):

a.  LendingTree Parent wholly owns LendingTree Sub, which wholly owns
    HLC.  Lebda, who is the founder, chairman of the board, chief executive
    officer, and stockholder of LendingTree Parent, is the sole manager of
    LendingTree Sub and until February 2019, was the sole director of HLC.

b.  Defendants and HLC all operated at the same address—11115 Rushmore
    Drive, Charlotte, North Carolina 28277.

c.  Defendants branded HLC as "LendingTree Loans" and integrated it into
    LendingTree's online exchange platform.  That is because, on information
    and belief, HLC's lending platform was an integral part of Defendants'
    business strategy of creating competition and making loans on
    LendingTree's exchange platform.  Nearly all of HLC's loans were
    originated using leads generated from the LendingTree network.

d.  Defendants represented in numerous filings with the SEC that they were
    liable for HLC's repurchase and indemnification obligations.

e.  Defendants guaranteed debts vital to HLC's mortgage business—the
    credit warehousing facilities that allowed HLC to remain in operation.

f.  Defendants manipulated HLC's assets and liabilities, ensuring that HLC
    was undercapitalized at all times so that they would not have to own up
    for their wrongdoing.  Defendants ensured that HLC lacked sufficient
    capital to hold onto loans for more than 30 days.

89.     It would be inequitable if the acts of HLC are treated as those of HLC alone.  That is because if the acts of HLC are treated as those of HLC alone, Defendants will have been allowed to abuse the corporate form to funnel funds out of HLC to try and insulate themselves from liability.

90.     LBHI seeks a judicial determination of the respective rights and duties of LBHI and the Defendants with respect to the foregoing.  In particular, LBHI seeks a declaration that each of the Defendants is liable to LBHI for the amounts due under the Allowed Claim.  Such a declaration is necessary and appropriate at this time in order to ensure that LBHI may ascertain its rights with respect to the Allowed Claim.

## COUNT THREE
## (DECLARATORY RELIEF AGAINST LENDINGTREE SUB AND LENDINGTREE PARENT)

91.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 90 as if fully set forth herein.

92.     An actual controversy has arisen and now exists between LBHI and Defendants.  LBHI contends, but is informed and believes that Defendants deny, that each of the Defendants is liable to LBHI for the amounts due under the Allowed Claim because (i) Defendants were each principals who dominated and controlled their agent, HLC; (ii) HLC was acting within the scope of its agency when it sold the Defective Loans to LBB; and (iii) Defendants represented to the world that they were

liable for repurchase and indemnification obligations based on contracts entered into by their agent, HLC.

93.     After LendingTree Sub (then LendingTree, Inc.) acquired HLC, it operated its own lending business, which consisted of originating loans and selling those loans to secondary market purchasers, including to LBHI's assignor, LBB, through HLC.

94.     On information and belief, Defendants controlled every aspect of HLC's business, exploited HLC for its own gain, and caused HLC to originate loans and sell them to purchasers in the secondary market, including to LBHI's assignor, LBB.

95.     Defendants' domination and exploitation of HLC is demonstrated by the following facts (among other facts alleged above and to be developed in discovery):

a.   Defendants caused HLC to operate under the brand name "LendingTree Loans."

b.   HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans."

c.   "LendingTree Loans" were primarily sourced from consumer loan requests received by LendingTree websites and phone platforms.

d.   Most of HLC's customer leads were generated by the LendingTree network.

e.   LendingTree Sub, at the direction of LendingTree Parent, funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.

f.   Defendants would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days.

96.   As alleged above, Defendants announced publicly on numerous occasions that HLC was their agent and was acting within the scope its agency when it originated and sold loans to purchasers in the secondary market, including LBB. As alleged above, Defendants marketed HLC as their agent to prospective customers and secondary market purchasers.

97.   LBHI seeks a judicial determination of the respective rights and duties of LBHI and the Defendants with respect to the foregoing.  In particular, LBHI seeks a declaration that each of the Defendants is liable, as HLC's principal, to LBHI for the amounts due under the Allowed Claim.  Such a declaration is necessary and appropriate at this time in order to ensure that LBHI may ascertain its rights with respect to the Allowed Claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor and against the

Defendants as follows:

(A)   A declaratory judgment that Defendants assumed HLC's

indemnification liabilities, including the liabilities to LBHI that were

fixed in the Allowed Claim;

(B)   A declaratory judgment that Defendants are responsible to pay the

Allowed Claim as HLC's alter egos;

(C)   A declaratory judgment that Defendants are liable for HLC's

indemnification liabilities, specifically the liabilities to LBHI that were

fixed in the Allowed Claim, as the principals of their agent, HLC,

which was acting within the scope of its agency when it sold defective

mortgage loans to LBB, and because Defendants caused the world to

believe they were liable for such repurchase and indemnification

liabilities.

(D)   An award of attorneys' fees, interest, and costs to the fullest extent

permitted by law; and

(E)   All such further relief as the Court deems necessary or proper.

Dated:  June 11, 2020                    GREENE ESPEL PLLP

                                          s/John B. Orenstein
                                         John B. Orenstein, Reg. No. 020903X
                                         Matthew D. Forsgren, Reg. No. 0246694
                                         222 S. Ninth Street, Suite 2200
                                         Minneapolis, MN  55402
                                         jorenstein@greeneespel.com
                                         mforsgren@greeneespel.com
                                         (612) 373-0830


                                         WOLLMUTH MAHER & DEUTSCH LLP

                                         William A. Maher (*pro hac vice
                                         application forthcoming*)
                                         James N. Lawlor (*pro hac vice application
                                         forthcoming*)
                                         Adam M. Bialek (*pro hac vice application
                                         forthcoming*)
                                         Brant D. Kuehn (*pro hac vice application
                                         forthcoming*)
                                         Brad J. Axelrod (*pro hac vice application
                                         forthcoming*)
                                         500 Fifth Avenue
                                         New York, NY 10110
                                         Telephone: (212) 382-3300
                                         Facsimile: (212) 382-3300
                                         wmaher@wmd-law.com
                                         jlawlor@wmd-law.com
                                         abialek@wmd-law.com
                                         bkuehn@wmd-law.com
                                         baxelrod@wmd-law.com

                                         *Attorneys for Lehman Brothers Holdings Inc.*

# EXHIBIT 1

S-1/A 1 a2187231zs-1a.htm S-1/A

QuickLinks -- Click here to rapidly navigate through this document

**As filed with the Securities and Exchange Commission on August 8, 2008**

Registration No. 333-152700

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 1
## to
## Form S-1
### REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

## TREE.COM, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **6163** | **26-2414818** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**11115 Rushmore Drive**
**Charlotte, NC 28277**
**(704) 541-5351**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Scott Cammarn**
**Senior Vice President and General Counsel**
**Tree.com, Inc.**
**11115 Rushmore Drive**
**Charlotte, NC 28277**
**(704) 541-5351**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*With a copy to:*

**Pamela S. Seymon**
**Wachtell, Lipton, Rosen & Katz**
**51 West 52nd Street**
**New York, NY 10019**
**(212) 403-1000**

**Approximate date of commencement of proposed sale to the public:**
As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☑

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☑ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering | Amount of Registration Fee(3) |
|---|---|---|---|---|

| | | | |
|---|---|---|---|
| Common stock, par value $0.01 per share | 16,654,428 shares | N/A | $244,545 | $9.61 |

(1)    This registration statement relates to shares of common stock, par value $0.01 per share, of Tree.com, Inc. (the "Registrant"), which will be distributed pursuant to a spin-off transaction to the holders of common stock and Class B common stock of IAC/InterActiveCorp ("IAC"). The amount of the Registrant's common stock to be registered represents the sum of (i) 9,302,842 shares of common stock to be distributed to the holders of IAC common stock and IAC Class B common stock upon consummation of the spin-off, (ii) up to 5,051,586 shares of common stock to be issued in respect of certain restricted stock units, or stock options, in each case, previously issued pursuant to IAC's equity incentive plans and that will be converted, in whole or in part, in connection with the spin-off into stock options and restricted stock units to be issued under the Tree.com, Inc. 2008 Stock and Annual Incentive Plan (the "Stock and Annual Incentive Plan"), (iii) up to 2,200,000 shares of common stock issuable in respect of stock options, restricted stock units and other equity-based awards that may be granted from time to time following the spin-off pursuant to the Stock and Annual Incentive Plan and (iv) up to 100,000 shares of common stock issuable pursuant to the Tree.com, Inc. Deferred Compensation Plan for Non-Employee Directors. To the extent additional shares of common stock may be issued or become issuable as a result of a stock split, stock dividend, or similar transaction involving the common stock while this registration statement is in effect, this registration statement hereby is deemed to cover all such additional shares of common stock in accordance with Rule 416 under the Securities Act of 1933, as amended. In connection with the spin-off, one thirtieth of one share of the Registrant's common stock will be distributed for each share of IAC common stock or Class B common stock outstanding on the record date for the spin-off and each share of IAC common stock issued in connection with the exercise of IAC stock options and the settlement of IAC restricted stock units between the record date for the spin-off and the date of the spin-off. Because it is not possible to accurately state the number of shares of IAC common stock and Class B common stock that will be outstanding as of the spin-off date, this calculation is based on the number of shares of IAC common stock and IAC Class B common stock outstanding as of April 30, 2008, vested options to purchase shares of IAC common stock and IAC restricted units in respect of shares of IAC common stock as of December 31, 2008 that may settle prior to the date of the spin-off.

(2)    Estimated solely for the purpose of determining the registration fee pursuant to Rule 457(f)(2) and Rule 457(h)(1) under the Securities Act, based on the book value of the common stock as of March 31, 2008, the most recent practicable date.

(3)    Calculated by multiplying 0.00003930 by the proposed maximum aggregate offering price. Previously paid.

     **The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to Section 8(a), may determine.**

**EXPLANATORY NOTE**

     This Registration Statement has been prepared on a prospective basis on the assumption that, among other things, the spin-off of the Registrant from IAC/InterActiveCorp (as described in the Prospectus which is a part of this Registration Statement) and the related transactions contemplated to occur prior to or contemporaneously with the spin-off will be consummated as contemplated by the Prospectus. There can be no assurance, however, that any or all of such transactions will occur or will occur as so contemplated. Any significant modifications to or variations in the transactions contemplated will be reflected in an amendment or supplement to this Registration Statement.

The information in this prospectus is not complete and may be changed. We may not issue these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to Completion, dated August 8, 2008

**PROSPECTUS**

### TREE.COM, INC.

---

**16,654,428 Shares of Common Stock, Par Value $0.01 Per Share**

This prospectus is being furnished to you as a stockholder of IAC in connection with the spin-off by IAC/InterActiveCorp to its stockholders of HSN, Inc. ("HSNi"), Interval Leisure Group, Inc. ("ILG"), Ticketmaster and Tree.com, Inc. ("Tree.com" or the "Company") (each, a "Spinco" and collectively, the "Spincos"), each a wholly-owned subsidiary of IAC that at the time of its spin-off will hold directly or indirectly the assets and liabilities associated with the following businesses:

- HSNi: HSN TV, *HSN.com,* and the Cornerstone Brands, Inc. portfolio of catalogs, websites and retail locations;

- ILG: the businesses currently comprising IAC's Interval segment;

- Ticketmaster: Ticketmaster's primary domestic and international operations, as well as certain investments in unconsolidated affiliates; and

- Tree.com: the businesses currently comprising IAC's Lending and Real Estate segments.

To implement the spin-offs, IAC, the Company and the other Spincos will effect a series of restructuring transactions following which IAC will distribute all of the outstanding shares of common stock of the Spincos to the holders of IAC common stock and/or Class B common stock. Each of you, as a holder of IAC common stock and/or Class B common stock, will receive one-fifth of a share of common stock of HSNi, one-fifth of a share of common stock of ILG, one-fifth of a share of common stock of Ticketmaster and one-thirtieth of a share of common stock of Tree.com for every share of IAC common stock and/or Class B common stock that you held at the close of business on August 11, 2008, the record date for the spin-offs. The spin-offs will be effective as of [ • ], 2008, unless otherwise determined by IAC's board of directors.

Immediately after the spin-off of Tree.com is completed, Tree.com will be a separate public company. All of the outstanding shares of the common stock of Tree.com are currently owned by IAC. Accordingly, there currently is no public trading market for the common stock of Tree.com. Tree.com has been approved to list its common stock under the ticker symbol "TREE" on the NASDAQ Stock Market.

**No vote of IAC stockholders is required in connection with the Tree.com spin-off.** Neither IAC nor the Company is asking you for a proxy, and you are not requested to send us a proxy. IAC stockholders will not be required to pay any consideration for the shares of common stock of the Company they receive in the spin-off, and they will not be required to surrender or exchange shares of their IAC common stock and/or Class B common stock or take any other action in connection with the spin-off.

**In reviewing this prospectus, you should carefully consider the matters described under the caption "Risk Factors" beginning on page 8 of this prospectus.**

---

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

The date of this prospectus is [ • ], 2008.

# TABLE OF CONTENTS

| | Page |
|---|---:|
| Summary | 2 |
| Questions and Answers about Tree.com and the Spin-Offs | 4 |
| Risk Factors—Risk Factors Relating to Our Spin-Off From IAC | 8 |
| Risk Factors—Risk Factors Relating to Our Business Following Tree.com's Spin-Off From IAC | 11 |
| Forward-Looking Statements | 20 |
| The Separation | 22 |
| General | 22 |
| The Number of Shares You Will Receive in the Tree.com Spin-Off | 22 |
| When and How You Will Receive the Dividend | 22 |
| Results of the Separation | 23 |
| Material U.S. Federal Income Tax Consequences of the Spin-Offs | 23 |
| Market for Common Stock of Tree.com | 27 |
| Trading Before the Distribution Date | 27 |
| Conditions to the Spin-Offs | 28 |
| Reasons for the Separation | 29 |
| Litigation with Liberty Media Corporation | 30 |
| Financial Advisor | 30 |
| Treatment of Outstanding IAC Compensatory Equity-Based Awards | 31 |
| Dividend Policy | 32 |
| Transfers to IAC and Financing | 33 |
| Certain Information With Respect To Tree.com | 34 |
| Business of Tree.com | 34 |
| Capitalization | 49 |
| Selected Historical Financial Data | 50 |
| Unaudited Pro Forma Condensed Combined Financial Statements | 51 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations of Tree.com | 58 |
| Quantitative and Qualitative Disclosures about Market Risk | 84 |
| Management of Tree.com | 85 |
| Tree.com Executive Compensation | 89 |
| Tree.com Security Ownership of Certain Beneficial Owners and Management | 101 |
| Description of Capital Stock of Tree.com | 103 |
| Certain Relationships and Related Party Transactions | 107 |
| Description of the Stock and Annual Incentive Plan | 115 |
| Use of Proceeds | 118 |
| Determination of Offering Price | 118 |
| Legal Matters | 118 |
| Experts | 118 |
| Where You Can Find More Information | 119 |
| Tree.com, Inc. and Subsidiaries Consolidated Financial Statements Table of Contents | F-1 |

i

This prospectus describes the businesses of the Company as though they were its businesses for all historical periods described. However, the Company is a newly formed entity that has not conducted any operations prior to the spin-off and instead will have had such businesses transferred to it prior to the spin-off. References in this prospectus to the historical assets, liabilities, products, businesses or activities of the businesses of the Company are intended to refer to the historical assets, liabilities, products, businesses or activities of the relevant businesses as those businesses were conducted as part of IAC prior to the spin-off. Following the spin-off, the Company will be a separate, publicly traded company, and IAC will have no continuing stock ownership in the Company. The historical consolidated financial information of the Company as part of IAC contained in this prospectus is not necessarily indicative of its future financial position, future results of operations or future cash flows, nor does it reflect what the financial position, results of operations or cash flows of the Company would have been had it been operated as a stand-alone company during the periods presented.

You should not assume that the information contained in this prospectus is accurate as of any date other than the date set forth on the cover. Changes to the information contained in this prospectus may occur after that date and the Company does not undertake any obligation to update the information unless required to do so by law.

1

## SUMMARY

This summary highlights selected information from this prospectus and may not contain all the information that may be important to you. Accordingly, you are encouraged to read carefully the entire prospectus, its annexes and the documents filed as exhibits to the Company's registration statement on Form S-1, of which this prospectus is a part.

Except as otherwise indicated or unless the context otherwise requires, (i) "Spinco" refers to any of HSNi, ILG, Ticketmaster and Tree.com and their respective subsidiaries, (ii) "Spincos" refers to all of the foregoing collectively, (iii) "IAC/InterActiveCorp" and "IAC" refer to IAC/InterActiveCorp and its consolidated subsidiaries other than, for all periods following the spin-offs, the Spincos, (iv) "HSNi" refers to HSN, Inc., (v) "ILG" refers to Interval Leisure Group, Inc., (vi) "Tree.com," the "Company," "we," "our" or "us" refers to Tree.com, Inc. and (vii) "Spin-Off," "spin-off" or "distribution" refers to the distribution by IAC of the common stock of the Company, and the "spin-offs," the "distributions" or the "separation" refers collectively to the distribution by IAC of the common stock of the Company and the other Spincos, as more fully described in this prospectus.

### Company Information

Tree.com was incorporated in Delaware in April 2008. Its principal offices are located at 11115 Rushmore Drive, Charlotte, NC 28277. Its main telephone number is 704-541-5351.

### Business of Tree.com

Through its various subsidiaries, Tree.com currently operates a lending business (the "Lending Business") and a real estate business (the "Real Estate Business"). The Lending Business consists of online networks, principally LendingTree.com and GetSmart.com, as well as call centers, which match consumers with lenders and loan brokers. In addition, the Lending Business originates, processes, approves and funds various types of residential real estate loans under two brand names, LendingTree Loans® and HomeLoanCenter.com®, and offers residential mortgage loan settlement services under the name LendingTree Settlement Services. The Real Estate Business consists primarily of an internet-enabled national residential real estate brokerage that currently operates offices in 14 markets under the brand name "RealEstate.com, REALTORS." The Real Estate Business also consists of a brokerage that matches residential home buyers interested in newly constructed homes with builders and currently operates under the brand name "iNest®."

### Businesses of the Other Spincos

*HSNi.*　HSNi owns and operates, through its subsidiaries, HSN, a retailer and interactive lifestyle network offering a broad assortment of products through television home shopping programming on the HSN television network and HSN.com. HSN strives to transform the shopping experience by incorporating experts, entertainment, inspiration, solutions, tips and ideas in connection with the sale of products through the HSN television network and HSN.com. HSNi also owns and operates, through its subsidiaries, the Cornerstone Brands portfolio of catalogs and related websites, including *Frontgate, Ballard Designs, Garnet Hill, Smith+Noble, The Territory Ahead, TravelSmith* and *Improvements*, as well as a limited number of retail stores.

*ILG.*　ILG is a leading provider of membership services to the vacation ownership industry, which is a segment of the broader hospitality industry. Vacation ownership is a term used to describe the shared ownership of vacation real estate and includes those businesses which develop, manage, operate and sell vacation interests (*i.e.,* the ownership or use of accommodations at a given property or properties, together with associated amenities and facilities for a specified period of time). ILG's principal business segment, Interval, makes available vacation ownership membership services to individual members of its exchange networks, which allows such members to exchange the use and

2

occupancy of their vacation interest for comparable, alternative accommodations at the same or another resort participating in an Interval exchange network and provides such members with certain value-added products and services depending on the program and country of residence. Interval also makes available related services to developers of the resorts participating in its exchange networks worldwide. ILG's other business segment, RQH, was acquired in May 2007 and is a provider of vacation rental and property management services to vacationers and vacation property owners across Hawaii.

*Ticketmaster.*   As the world's leading live entertainment ticketing and marketing company, Ticketmaster connects the world to live entertainment. Ticketmaster currently operates in 20 countries worldwide, providing ticket sales, ticket resale services, marketing and distribution through *www.ticketmaster.com* and related proprietary Internet and mobile channels, independent sales outlets and call centers worldwide. Established in 1976, Ticketmaster serves clients across multiple live event categories, providing exclusive ticketing services for leading arenas, stadiums, amphitheaters, music clubs, concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters.

**Overview of the Separation**

On July 1, 2008, the Board of Directors of IAC approved a plan to separate IAC into five separate, publicly traded companies via the distribution of all of the outstanding shares of common stock of the Spincos, each a wholly-owned subsidiary of IAC, with each Spinco having a single class of common stock. At the time of the spin-offs, the Spincos will hold directly or indirectly the assets and liabilities associated with the following businesses:

- HSNi: HSN TV, *HSN.com*, and the Cornerstone Brands, Inc. portfolio of catalogs, websites and retail locations;

- ILG: the businesses currently comprising IAC's Interval segment;

- Ticketmaster: Ticketmaster's primary domestic and international operations, as well as certain investments in unconsolidated affiliates; and

- Tree.com: the businesses currently comprising IAC's Lending and Real Estate segments.

Unless otherwise indicated or the context otherwise requires, references in this prospectus to the businesses of HSNi, ILG, Ticketmaster and Tree.com respectively refer to the businesses described above.

Immediately following the spin-offs, IAC primarily will be engaged in the business and operations relating to (i) Ask.com, Citysearch, IAC Advertising Solutions, Evite and Funweb Products; (ii) Match.com, ServiceMagic and Shoebuy.com; (iii) its emerging businesses, including Black Web Enterprises, BustedTees, CollegeHumor, GarageGames, Gifts.com, Green.com, InstantAction, Primal Ventures, Pronto, Very Short List, Vimeo and 23/6; and (iv) certain investments in unconsolidated entities.

Prior to the spin-offs, we will enter into a Separation and Distribution Agreement and several other agreements with IAC and the other Spincos to effect the separation of the Spincos and provide a framework for the relationships of the Spincos with IAC and each other. Immediately following the spin-offs, IAC stockholders will own 100% of the outstanding common stock of each of the Spincos.

3

### QUESTIONS AND ANSWERS ABOUT TREE.COM AND THE SPIN-OFFS

| | |
|---|---|
| *Why are the spin-offs structured as dividends?* | IAC believes that a tax-free distribution of shares of the Spincos to IAC stockholders is a tax-efficient way to separate HSNi, ILG, Ticketmaster and Tree.com from the rest of IAC in a manner that will create long-term value for IAC stockholders. |
| *How will the Tree.com spin-off occur?* | IAC will distribute to its stockholders via dividend all of the outstanding shares of common stock of Tree.com owned by IAC, which will be 100% of the common stock of Tree.com outstanding immediately prior to the spin-off. |
| *How many shares of Tree.com will I receive?* | Unless otherwise determined by the IAC Board of Directors prior to the distribution date, for every share of IAC common stock or Class B common stock held by you as of the record date, you will receive one-thirtieth of a share of common stock of Tree.com. IAC will not distribute any fractional shares of Tree.com common stock to its stockholders. Instead, the distribution agent will aggregate fractional shares into whole shares, sell the whole shares in the open market at prevailing market prices and distribute the aggregate net cash proceeds of the sales pro rata to each holder who otherwise would have been entitled to receive a fractional share in the spin-off. Recipients of cash in lieu of fractional shares will not be entitled to any interest on the amounts of payment made in lieu of fractional shares. The number of shares that IAC will distribute to its stockholders will be reduced to the extent that cash payments are to be made in lieu of the issuance of fractional shares of Tree.com common stock. |
| *Can IAC decide not to complete the Tree.com spin-off?* | Yes. The IAC Board of Directors has reserved the right, in its sole discretion, to amend, modify or abandon the spin-offs and related transactions at any time prior to the distribution date. This means that IAC has the right not to complete the spin-off of any or all of the Spincos if, at any time, the IAC Board of Directors determines, at its sole discretion, that the spin-off is not in the best interests of IAC or its stockholders. Alternatively, the IAC Board of Directors may determine to delay the spin-off of one or more of the Spincos, in which event the spin-offs may not occur simultaneously. In addition, the spin-offs are subject to the satisfaction or waiver of a number of conditions. See "The Separation—Conditions to the Spin-offs." |
| *What is the record date for the Tree.com spin-off?* | The record date for determining stockholders entitled to receive the shares of Tree.com in the spin-off is the close of business on August 11, 2008. |
| *What is the distribution date for the Tree.com Spin-off?* | The distribution date for distributing the shares of common stock of Tree.com under the spin-off is [          ], 2008. However, the IAC Board of Directors may determine to delay the spin-off. |

4

| | |
|---|---|
| ***What other transactions affecting Tree.com are occurring with the spin-off?*** | It is currently expected that, at the time of the spin-off, Tree.com will have approximately $110 million in cash, which would mean a $55 million cash contribution by IAC based upon March 31, 2008 balances. See "Transfers to IAC and Financing." |
| | In addition, IAC expects to effect a reverse stock split following the spin-offs, as described under "The Separation—Results of the Separation." |
| ***What are the U.S. federal income tax consequences of the spin-offs to IAC stockholders?*** | In addition to the opinion set forth in "The Separation—Material U.S. Federal Income Tax Consequences of the Spin-Offs", IAC has requested and expects to receive, prior to effecting any of the spin-offs, a private letter ruling from the Internal Revenue Service (the "IRS") and/or an opinion of counsel satisfactory to the IAC Board of Directors regarding the qualification of the spin-offs, together with certain related transactions, as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Internal Revenue Code of 1986, as amended (the "Code"). If the private letter ruling is received prior to the spin-offs, IAC expects to receive an opinion of counsel regarding certain aspects of the transaction that are not covered by the private letter ruling. If the private letter ruling is not received prior to the spin-offs, IAC expects to receive an opinion of counsel regarding the qualification of the spin-offs as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code. Assuming the spin-offs qualify as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code, for U.S. federal income tax purposes, no gain or loss will be recognized by you, and no amount will be included in your income, upon the receipt of shares of Spinco common stock pursuant to the spin-offs, except with respect to any cash received in lieu of a fractional share of Spinco common stock. For more information, see "The Separation—Material U.S. Federal Income Tax Consequences of the Spin-Offs," included elsewhere in this prospectus. |
| ***What will the relationships among IAC and each of the Spincos be following the spin-offs?*** | Prior to the spin-offs, we will enter into a Separation and Distribution Agreement and several other agreements with IAC and the other Spincos to effect the spin-offs and provide a framework for the relationships of each of the Spincos with IAC and the other Spincos. These agreements will govern our relationships with IAC and the other Spincos subsequent to the completion of the spin-off. See "Certain Relationships and Related Party Transactions—Relationships Among IAC and the Spincos." |

5

| | |
|---|---|
| *Will I receive physical certificates representing shares of common stock of Tree.com following the separation?* | No. Following the separation, neither IAC nor Tree.com will be issuing physical certificates representing shares of the common stock of Tree.com. Instead, IAC, with the assistance of The Bank of New York, the distribution agent, will electronically issue shares of Tree.com common stock to you or to your bank or brokerage firm on your behalf by way of direct registration in book-entry form. The Bank of New York will mail you a book-entry account statement that reflects your shares of Tree.com common stock, or your bank or brokerage firm will credit your account for the shares. |
| *What if I want to sell my IAC common stock or my common stock in Tree.com?* | You should consult with your financial advisors, such as your stockbroker or bank. Neither IAC nor Tree.com makes any recommendations on the purchase, retention or sale of shares of IAC common stock or the Spinco common stock to be distributed. |
| | If you decide to sell any shares before the spin-offs, you should make sure your stockbroker, bank or other nominee understands whether you want to sell your IAC shares or Spinco shares you will receive in the spin-offs or both. |
| *Where will I be able to trade shares of the common stock of Tree.com?* | There is not currently a public market for the common stock of Tree.com. We have been approved to list our common stock on the NASDAQ Stock Market, or "NASDAQ," under the symbol "TREE." We anticipate that trading in shares of our common stock will begin on a "when-issued" basis prior to the distribution date and will continue up to and including through the distribution date and that "regular-way" trading in shares of our common stock will begin on the first trading day following the distribution date. If trading begins on a "when-issued" basis, you may purchase or sell your Tree.com common stock up to and including through the distribution date, but your transaction will not settle until after the distribution date. You will not be required to make any payment, surrender or exchange your shares of IAC common stock and/or Class B common stock or take any other action to receive your shares of Tree.com common stock. |
| *Will the number of IAC shares I own change as a result of the spin-offs?* | No. The number of shares of IAC common stock you own will not change as a result of the spin-offs. However, in connection with the spin-offs, and as described under "The Separation—Results of the Separation," IAC expects to effect a reverse stock split following the spin-offs. |
| *What will happen to the listing of IAC common stock?* | Nothing. IAC common stock will continue to be traded on NASDAQ under the symbol "IACI." |

6

| | |
|---|---|
| *Which businesses will be retained by IAC following the spin-offs?* | Immediately following the spin-offs, IAC primarily will be engaged in the business and operations relating to (i) Ask.com, Citysearch, IAC Advertising Solutions, Evite, and Funweb Products; (ii) Match.com, ServiceMagic and Shoebuy.com; (iii) its emerging businesses, including Black Web Enterprises, BustedTees, CollegeHumor, GarageGames, Gifts.com, Green.com, InstantAction, Primal Ventures, Pronto, Very Short List, Vimeo and 23/6; and (iv) certain investments in unconsolidated entities. |
| *Are there risks to owning Tree.com common stock?* | Yes. Our business is subject to both general and specific risks relating to our business, leverage, relationship with IAC and being a separate publicly traded company. Our business is also subject to risks relating to the separation. These risks are described in the "Risk Factors" section of this prospectus beginning on page 8. You are encouraged to read that section carefully. |
| *Is there any additional financial information available for the Company?* | Yes. IAC has filed with the SEC a Form 10-Q for the Quarter Ended June 30, 2008. The IAC 10-Q contains more detailed information about the Company's financial results for the three month and six month periods then ended. You can obtain this information by contacting IAC Investor Relations as indicated below. However, you should be aware that the financial information about the Company in the IAC filing has not been prepared on the same basis as the financial information included elsewhere in this Prospectus. |
| *Where can IAC stockholders get more information?* | Before the spin-offs, if you have any questions relating to the spin-offs, you should contact:<br><br>IAC<br>Investor Relations<br>555 West 18th Street<br>New York, NY 10011<br>Tel: (212) 314-7400<br>Fax: (212) 314-7379<br>*ir@iac.com* |
| *Is Liberty Media Corporation challenging the spin-offs?* | No. Liberty Media Corporation and IAC have agreed to a single-tiered voting structure for each of the Spincos and the Spinco governance provisions as set forth under "Certain Relationships and Related Party Transactions—Agreements with Liberty Media Corporation." |

7

### RISK FACTORS

### RISK FACTORS RELATING TO OUR SPIN-OFF FROM IAC

***After our spin-off from IAC, we may be unable to make the changes necessary to operate effectively as a separate public entity.***

Following our spin-off from IAC, IAC will have no obligation to provide financial, operational or organizational assistance to us, other than limited services pursuant to a transition services agreement that we will enter into with IAC and the other Spincos in connection with the spin-offs. As a separate public entity, we will be subject to, and responsible for, regulatory compliance, including periodic public filings with the SEC and compliance with NASDAQ's continued listing requirements, as well as generally applicable tax and accounting rules. We may be unable to implement successfully the changes necessary to operate as an independent public entity.

***We expect to incur increased costs relating to operating as an independent company that could cause our cash flow and results of operations to decline.***

We expect that the obligations of being a public company, including substantial public reporting and investor relations obligations, will require new expenditures, place new demands on our management and will require the hiring of additional personnel. We may need to implement additional systems that require new expenditures in order to adequately function as a public company. Such expenditures could adversely affect our business, financial condition and results of operations.

In addition, IAC's businesses, by virtue of being under the same corporate structure, currently share economies of scope and scale in costs, human capital, vendor relationships and customer relationships with the businesses that we and the other Spincos will own following the spin-offs. The increased costs resulting from the loss of these benefits could have an adverse effect on us.

***If one or more spin-offs, together with certain related transactions, were to fail to qualify as a transaction that is generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code, IAC, the Spincos and IAC stockholders may be subject to significant tax liabilities.***

In addition to the opinion set forth in "The Separation—Material U.S. Federal Income Tax Consequences of the Spin-Offs", IAC expects to receive a private letter ruling from the IRS and/or an opinion of counsel satisfactory to the IAC Board of Directors regarding the qualification of the spin-offs, together with certain related transactions, as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code. If the private letter ruling is received prior to the spin-offs, IAC expects to receive an opinion of counsel regarding certain aspects of the transaction that are not covered by the private letter ruling. If the private letter ruling is not received prior to the spin-offs, IAC expects to receive an opinion of counsel regarding the qualification of the spin-offs as transactions that are generally tax free for U.S. federal income tax purposes under Section 355 and/or Section 368(a)(1)(D) of the Code, and opinions from its external tax advisors regarding the U.S. federal income tax consequences to IAC of certain related matters and transactions, and certain state tax consequences to IAC of the spin-offs. The IRS private letter ruling and the opinions will be based on, among other things, certain assumptions as well as the accuracy of certain representations and statements that IAC and the Spincos make to the IRS and to counsel or IAC's external tax advisors. If any of these representations or statements are, or become, inaccurate or incomplete, or if IAC or the Spincos breach any of their respective covenants, the IRS private letter ruling and/or the opinions may be invalid.

Moreover, as noted above, the IRS private letter ruling would not address all the issues that are relevant to determining whether the spin-offs qualify as transactions that are generally tax free for U.S. federal income tax purposes. Notwithstanding the IRS private letter ruling and/or opinion of counsel,

8

the IRS could determine that one or more of the spin-offs should be treated as a taxable distribution if it determines that any of the representations, assumptions or undertakings that were included in the request for the IRS private letter ruling is false or has been violated or if it disagrees with the conclusions in the opinion of counsel that are not covered by the IRS ruling.

If one or more spin-offs were to fail to qualify as a transaction that is generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code, then IAC generally would recognize gain in an amount equal to the excess of (i) the fair market value of the Spinco common stock distributed to the IAC stockholders in such taxable spin-off over (ii) IAC's tax basis in the common stock of such Spinco. In addition, each IAC stockholder who received Spinco common stock in such taxable spin-off generally would be treated as having received a taxable distribution in an amount equal to the fair market value of the Spinco common stock received (including any fractional share sold on behalf of the stockholder) in such spin-off, which would be taxable as a dividend to the extent of the stockholder's ratable share of IAC's current and accumulated earnings and profits (as increased to reflect any current income, including any gain, recognized by IAC on the taxable spin-off). The balance, if any, of the distribution would be treated as a nontaxable return of capital to the extent of the IAC stockholder's tax basis in its IAC stock, with any remaining amount being taxed as capital gain. For more information, see "The Separation—Material U.S. Federal Income Tax Consequences of the Spin-Offs," included elsewhere in this prospectus.

Under the Tax Sharing Agreement that we will enter into with IAC and the other Spincos, each Spinco generally would be required to indemnify IAC and the other Spincos for any taxes resulting from the spin-off of such Spinco (and any related interest, penalties, legal and professional fees, and all costs and damages associated with related stockholder litigation or controversies) to the extent such amounts resulted from (i) any act or failure to act by such Spinco described in the covenants in the Tax Sharing Agreement, (ii) any acquisition of equity securities or assets of such Spinco or a member of its group, or (iii) any breach by such Spinco or any member of its group of any representation or covenant contained in the separation documents or in the documents relating to the IRS private letter ruling and/or tax opinions. The ability of IAC or the other Spincos to collect under these indemnity provisions will depend on the financial position of the indemnifying party. See "Certain Relationships and Related Party Transactions—Tax Sharing Agreement."

In addition, the IRS could disagree with or challenge the conclusions reached in one or more of the tax opinions that IAC expects to receive with respect to certain related matters and transactions. In such case, IAC could recognize material amounts of taxable income or gain.

***The market price and trading volume of Tree.com securities may be volatile and may face negative pressure.***

There is currently no trading market for any Tree.com securities. Investors may decide to dispose of some or all of the Tree.com securities that they receive in the Tree.com spin-off. Tree.com securities issued in the Tree.com spin-off will be trading publicly for the first time. Until, and possibly even after, orderly trading markets develop for these securities, there may be significant fluctuations in price. It is not possible to accurately predict how investors in Tree.com's securities will behave after the Tree.com spin-off. The market price for Tree.com's securities following the Tree.com spin-off may be more volatile than the market price of IAC securities before the spin-off. The market price of Tree.com's securities could fluctuate significantly for many reasons, including the risks identified in this prospectus or reasons unrelated to our performance. These factors may result in short- or long-term negative pressure on the value of the Tree.com securities.

9

---

*After our spin-off from IAC, our securities may not qualify for placement in investment indices. In addition, our securities may fail to meet the investment guidelines of institutional investors. In either case, these factors may negatively impact the price of our securities and may impair our ability to raise capital through the sale of securities.*

Some of the holders of IAC securities are index funds tied to NASDAQ or other stock or investment indices, or are institutional investors bound by various investment guidelines. Companies are generally selected for investment indices, and in some cases selected by institutional investors, based on factors such as market capitalization, industry, trading liquidity and financial condition. As an independent company, we will initially have a lower market capitalization than IAC has today. As a result, our securities may not qualify for those investment indices. In addition, the securities that are received in the Tree.com spin-off may not meet the investment guidelines of some institutional investors. Consequently, these index funds and institutional investors may have to sell some or all of the securities they receive in the Tree.com spin-off, and the price of our securities may fall as a result. Any such decline could impair our ability to raise capital through future sales of securities.

*Financing—We may have future capital needs and may not be able to obtain additional financing on acceptable terms.*

The current uncertainties surrounding the industries in which operate, as well as other factors, may constrain our financing abilities. Our ability to secure additional financing and satisfy our financial obligations under indebtedness outstanding from time to time will depend upon our future operating performance, which is subject to then prevailing general economic and credit market conditions, including interest rate levels and the availability of credit generally, and financial, business and other factors, many of which are beyond our control. The prolonged continuation or worsening of current credit market conditions would have a material adverse effect on our ability to secure financing on favorable terms, if at all.

We may be unable to secure additional financing or financing on favorable terms or our operating cash flow may be insufficient to satisfy our financial obligations under indebtedness outstanding from time to time (if any). Furthermore, if financing is not available when needed, or is available on unfavorable terms, we may be unable to develop new or enhance our existing services, complete acquisitions or otherwise take advantage of business opportunities or respond to competitive pressures, any of which could have a material adverse effect on our business, financial condition and results of operations. If additional funds are raised through the issuance of equity securities, our stockholders may experience significant dilution.

*The spin-off agreements were not the result of arm's length negotiations. In addition, the Tax Sharing Agreement restricts our ability to enter into certain transactions that might otherwise be beneficial to us and our stockholders.*

The agreements that we will enter into with IAC and the other Spincos in connection with the spin-offs, including the separation and distribution agreement, tax sharing agreement, employee matters agreement and transition services agreement, were established by IAC, in consultation with the Spincos, with the intention of maximizing the value to current IAC's shareholders. Accordingly, the terms for us may not be as favorable as would have resulted from negotiations among unrelated third parties.

We and the other Spincos will enter into a Tax Sharing Agreement with IAC that will restrict our ability to enter into certain transactions that might be advantageous to us and our stockholders. In particular, the Tax Sharing Agreement will limit our ability to issue securities to satisfy financial needs, repurchase equity securities, dispose of certain assets, engage in mergers and acquisitions and, under certain circumstances, acquire businesses or assets with equity securities or agree to be acquired. See "The Separation—Material U.S. Federal Income Tax Consequences of the Spin-Offs" and "Certain Relationships and Related Party Transactions—Tax Sharing Agreement."

10

### RISK FACTORS RELATING TO OUR BUSINESS FOLLOWING
### TREE.COM'S SPIN-OFF FROM IAC

***Adverse Events and Trends—Adverse conditions in the primary and secondary mortgage markets, as well as the economy generally, could materially and adversely affect our business, financial condition and results of operations.***

The primary and secondary mortgage markets have been (and are currently) experiencing unprecedented and continuing disruption, which have had, and are expected to continue to have, an adverse effect on our business, financial condition and results of operations. These conditions, coupled with adverse economic conditions and continuing declines in residential real estate prices generally, have resulted, and are expected to continue to result, in decreased consumer demand for the lending and real estate offerings provided by our networks and other businesses. Generally, increases in interest rates adversely affect the ability of the Lending Business and Network Lenders to close loans, while adverse economic trends limit the ability of the Lending Business and Network Lenders to offer home loans other than low margin conforming loans. Likewise, adverse economic trends have reduced, and are expected to continue to reduce, the number of prospective home purchasers and home prices, which adversely affects our Real Estate Business. Our businesses may experience a further decline in demand for their offerings due to decreased consumer demand as a result of the conditions described above now or in the future. Conversely, during periods of robust consumer demand, which are typically associated with decreased interest rates, some Network Lenders may have less incentive to use our networks. Prolonged declines in demand for offerings of our businesses could have a material adverse effect on our business, financial condition and results of operations.

The secondary mortgage markets have also been (and are currently) experiencing unprecedented and continued disruptions resulting from reduced investor demand for mortgage loans and mortgage-backed securities and increased investor yield requirements for those loans and securities. These conditions may continue for a prolonged period of time or worsen in the future. Home Loan Center, Inc. does not have the capital resources or credit necessary to retain the loans it funds and closes, and as a result sells substantially all such loans within 30 days of funding as discussed above. Accordingly, a prolonged period of secondary market illiquidity may force the Lending Business to significantly reduce the volume of loans that it originates and funds through Home Loan Center, Inc., which could have an adverse effect on our business, financial condition and results of operations.

***Adverse Events and Trends—Adverse conditions in the credit markets could materially and adversely affect our business, financial condition and results of operation.***

The credit markets, in particular those financial institutions that provide warehouse financing and similar arrangements to mortgage lenders have been (and are currently) experiencing unprecedented and continued disruptions resulting from instability in the mortgage and housing markets. As previously discussed, Tree.com's Lending Business originates, processes, approves and funds various consumer mortgage loans through Home Loan Center, Inc., which operates primarily under the brand name "LendingTree Loans®." These direct lending operations have significant financing needs that are currently being met through borrowings under warehouse lines of credit or repurchase agreements to fund and close loans, followed by the sale of substantially all loans funded to investors in the secondary mortgage markets. Current credit market conditions, such as significantly reduced and limited availability of credit, increased credit risk premiums for certain market participants and increased interest rates generally, increase the cost and reduce the availability of debt and may continue for a prolonged period of time or worsen in the future.

As of December 31, 2007, LendingTree Loans had committed lines of credit, primarily warehouse lines, totaling $550 million, of which $500 million expired on January 31, 2008, and $50 million expires on October 31, 2008, and an uncommitted line of $150 million. Borrowings under these lines of credit

11

are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid from proceeds from the sales of loans held for sale by LendingTree Loans. The interest rate under these lines of credit is 30-day LIBOR plus 75 to 100 basis points, but may be higher under certain circumstances. The committed line that expired on January 31, 2008 was subsequently renewed at a reduced size of $50 million and will expire on January 24, 2009 and can be cancelled at the option of the lender without default upon sixty days notice. However, if the lender determines at any time prior to January 24, 2009 the spin-off materially and adversely affects us, the lender reserves the right to deem the line of credit expired prior to January 24, 2009. The interest rate under this line of credit increased at the renewal date to 30-day LIBOR plus 140 basis points, but may be higher under certain circumstances. The $50 million committed line of credit that expires on January 24, 2009 and the $150 million uncommitted line are provided by the same lender. The $50 million committed line that expires on October 31, 2008 is provided by one other lender. LendingTree Loans is highly dependent on the availability of credit to finance its operations.

Although we believe that our lines of credit are sufficient for our current operations, further reductions in our available credit, or the inability to renew or replace these lines, could have an adverse effect on our business, financial condition and results of operations. The Lending Business attempts to mitigate the impact of current conditions and future credit market disruptions by maintaining committed and uncommitted warehouse lines of credit (currently, two committed warehouse lines of credit) with financial institutions. However, both of these financial institutions, like all financial institutions, are subject to the same adverse market conditions and may be affected by recent market disruptions, which may affect the decision to reduce or renew these lines, or the pricing for these lines. As a result, current committed warehouse lines of credit may be inadequate to support operations or the cost of debt may not allow Home Loan Center, Inc. to operate at profitable levels. Because Home Loan Center, Inc. is highly dependent on the availability of credit to finance its operations, the continuation of current credit market conditions for a prolonged period of time or worsening of such conditions could have an adverse effect on our business, financial condition and results of operations, particularly over the next few years.

***Contingent Liabilities—Litigation and Indemnification of Secondary Market Purchasers—Litigation and indemnification of secondary market purchasers could have a material adverse effect on our business, financial condition, results of operations and liquidity.***

In connection with the sale of loans to secondary market purchasers, Home Loan Center, Inc. makes certain representations regarding related consumer credit information, loan documentation and collateral. To the extent that these representations are incorrect, Home Loan Center, Inc. may be required to repurchase loans or indemnify secondary market purchasers for losses due to borrower defaults. While Home Loan Center, Inc. seeks to ensure that loans it originates comply with these representations and warranties, secondary market purchasers may take a contrary position. In connection with the sale of loans to secondary market purchasers, Home Loan Center, Inc. also agrees to repurchase loans or indemnify secondary market purchasers for losses due to early payment defaults (*i.e.,* late payments during a limited time period immediately following origination). In connection with the sale of a majority of its loans to secondary market purchasers, Home Loan Center, Inc. also agrees to repay all or a portion of the initial premiums paid by secondary market purchasers in instances where loans are prepaid prior to the end of relevant prepayment penalty periods.

We and our businesses are also parties to litigation involving a variety of matters, many of which involve damage claims for substantial amounts (see "Business of Tree.com—Legal Proceedings").

We believe that following the spin-offs we will have adequate resources to satisfy our obligations relating to the potential exposures described above. However, it is possible that these liabilities will be greater than anticipated. Given that we may have limited access to the credit markets following the spin-offs, if the liabilities are in excess of expectations, our ability to satisfy such obligations may be

dependent upon our ability to raise capital in the equity markets, which may be uncertain and is subject to limitations under the tax sharing agreement.

*Third-Party Relationships—We depend on relationships with Network Lenders, real estate professionals, credit providers and secondary market investors and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.*

Our success depends, in significant part, on the quality and pricing of services provided by, and/or the continued financial stability of, Network Lenders and real estate professionals participating on our networks, credit providers and secondary market investors. Network Lenders or real estate professionals could, for any reason, cease participating on the networks operated by (or otherwise choose not to enter into relationships with) our businesses, fail to pay matching and/or closing fees when due and/or cease providing quality services on competitive terms. In addition, credit providers and/or secondary market investors could, for any reason, choose not to make credit available to (or otherwise enter into relationships with) Home Loan Center, Inc., and in the case of secondary market investors only, cease purchasing loans from Home Loan Center, Inc. In particular, revenues attributable to purchases of loans by two such entities, Countrywide and CitiMortgage, represented approximately 28% and 13%, respectively, of our consolidated revenues in 2007. The occurrence of one or more of these events by a significant number of Network Lenders, real estate professionals, credit providers and/or secondary market investors, particularly Countrywide and CitiMortgage, could, alone or in combination, have a material adverse effect on our business, financial condition and results of operations.

*Network Security—A breach of our network security or the misappropriation or misuse of personal consumer information may have an adverse impact on our business, financial condition and results of operations.*

Any penetration of network security or other misappropriation or misuse of personal consumer information maintained by us could cause interruptions in the operations of our businesses and subject us to increased costs, litigation and other liabilities. Claims could also be made against us for other misuse of personal information, such as for unauthorized purposes or identity theft, which could result in litigation and financial liabilities, as well as administrative action from governmental authorities. Security breaches could also significantly damage our reputation with consumers and third parties with whom we do business. In that regard, on April 21, 2008, we announced that several mortgage companies had gained unauthorized access to LendingTree's customer information database and had used the information to solicit mortgage loans directly from our customers. We promptly reported the situation to the Federal Bureau of Investigation and have been cooperating fully with the FBI's investigation. While LendingTree does not believe this situation resulted in any fraud on the consumer or identity theft, LendingTree notified affected consumers as required by applicable law. Notwithstanding the foregoing, following our announcement, several putative class action lawsuits were filed against LendingTree, seeking to recover damages for consumers allegedly injured by this incident (see "Business of Tree.com—Legal Proceedings").

As in the case of any financial services company, we may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. We also face risks associated with security breaches affecting third parties with which we are affiliated or otherwise conduct business online. Consumers are generally concerned with security and privacy of the internet, and any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

<div style="text-align:center">13</div>

*Failure to Provide Competitive Service—Network Lenders and real estate professionals may not provide competitive levels of service to consumers, which could adversely affect our brands and businesses and their ability to attract consumers.*

The ability of our businesses to provide consumers with a high-quality experience depends, in part, on consumers receiving competitive levels of convenience, customer service, price and responsiveness from Network Lenders and real estate professionals with whom they are matched through our networks. If Network Lenders and real estate professionals do not provide consumers with competitive levels of convenience, customer service, price and responsiveness, the value of our various brands may be harmed, the ability of our businesses to attract consumers to our websites may be limited and the number of consumers ultimately matched through our networks may decline, which could have a material adverse effect on our business, financial condition and results of operations.

*Brand Recognition—Failure to maintain brand recognition and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.*

In order to attract visitors to their websites, convert these visitors into paying customers and capture repeat business from existing customers, our businesses must promote and maintain their various brands successfully, which involves the expenditure of considerable money and resources for online and offline advertising, marketing and related efforts, as well as the continued provision and introduction of high-quality products and services.

We believe that continuing to build and maintain the recognition of our various brands is critical to achieving increased demand for the services provided by our businesses, given that brand recognition is a key differentiating factor among providers of online services. Accordingly, we have spent, and expect to continue to spend, significant amounts of money on, and devote significant resources to, branding, advertising and other marketing initiatives, which may not be successful or cost-effective. We believe that rates for desirable online and offline advertising and marketing are likely to increase in the foreseeable future. The failure of our businesses to maintain the recognition of their respective brands and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.

Lastly, publicity from legal proceedings against us or our businesses, particularly governmental proceedings, consumer class action litigation or the disclosure of information security breaches, could negatively impact our various brands, which could adversely affect our business, financial condition and results of operations.

*Third-Party Relationships Are Not Exclusive—Network Lenders and real estate professionals affiliated with our networks are not precluded from offering products and services outside of these networks.*

Because our businesses do not have exclusive relationships with Network Lenders and real estate professionals, consumers may obtain loans and real estate offerings directly from these third-party service providers without having to go through our networks. Network Lenders can offer loans (and real estate professionals can offer services) directly to consumers through marketing campaigns or other traditional methods of distribution, such as referral arrangements, brick and mortar operations or, in the case of lending, broker agreements. Network Lenders and real estate professionals can also offer loans and services to prospective customers online directly or through one or more online competitors of our businesses or both. If a significant number of consumers seek loans and services directly from Network Lenders and real estate professionals as opposed to through our networks, our business, financial conditions and results of operations would be adversely affected.

14

***Compliance and Changing Laws, Rules and Regulations—Failure to comply with existing laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations.***

The failure of our businesses to comply with existing laws, rules and regulations, or to obtain required licenses, could result in administrative fines and/or proceedings against us or our businesses by governmental agencies and/or litigation by consumers, which could adversely affect our business, financial conditions and results of operations. Our businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States. As a result, they are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, which are subject to change at any time.

Our businesses conduct marketing activities via the telephone, the mail and/or through online marketing channels, which activities are governed by numerous federal and state regulations, such as the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and its accompanying regulations and guidelines, among others. While we believe that the practices of our businesses have been structured in a manner to ensure compliance with these laws and regulations, federal or state regulatory authorities may take a contrary position.

Most states require licenses to solicit, broker or make loans secured by residential mortgages and other consumer loans to residents of those states, as well as to operate real estate referral and brokerage services, and in many cases require the licensure or registration of individual employees engaged in aspects of these businesses. Currently, Congress, many state legislatures and state agencies are proposing to adopt, or have recently implemented, additional licensing requirements on mortgage lenders, brokers and their employees. While our businesses have endeavored to comply with applicable requirements, the application of these licensing requirements to persons operating online is not always clear. Moreover, any of the licenses or rights currently held by our businesses or their employees may be revoked prior to, or may not be renewed upon, their expiration. In addition, our businesses or their employees may not be granted new licenses or rights for which they may be required to apply from time to time in the future.

Our businesses are also subject to various state, federal and/or local laws, rules and regulations that regulate the amount and nature of fees that may be charged for transactions and incentives, such as rebates, that may be offered to consumers by our businesses, as well as the manner in which these businesses may offer, advertise or promote transactions. For example, the Real Estate Settlement Procedures Act, or RESPA, generally prohibits the payment or receipt of referral fees and fee shares or splits in connection with residential mortgage loan transactions, subject to certain exceptions. The applicability of referral fee and fee sharing prohibitions to lenders and real estate providers, including online networks, may have the effect of reducing the types and amounts of fees that may be charged or paid in connection with real estate-secured loan offerings or activities, including mortgage brokerage, lending and real estate brokerage services, or otherwise limiting the ability to conduct marketing and referral activities. Although we believe that our businesses have been structured in such a way so as to comply with RESPA, the relevant regulatory agency may take a contrary position.

In addition, some states have regulations that prohibit real estate brokers from providing consumers with rebates or other incentives in connection with real estate transactions. Additional states could promulgate similar regulations or interpret existing regulations in a way that limits the ability of online networks to offer consumer incentives in connection with real estate transactions, thereby limiting the attractiveness of real estate brokerage activities offered by our Real Estate Business.

Additional federal, state and in some instances, local, laws regulate residential lending and real estate brokerage activities. These laws generally regulate the manner in which lending, lending-related and real estate brokerage activities are made available, including advertising and other consumer

15

disclosures, payments for services and record keeping requirements, and include RESPA, the Fair Credit Reporting Act, the Truth in Lending Act, the Equal Credit Opportunity Act and the Fair Housing Act. In addition, state laws often restrict the amount of interest and fees that may be charged by a lender or mortgage broker, or otherwise regulate the manner in which lenders or mortgage brokers operate or advertise. Furthermore, Congress, many state legislatures and state agencies are proposing, or have recently implemented, additional restrictions on mortgage lending practices. Failure to comply with applicable laws and regulatory requirements may result in, among other things, revocation of required licenses or registrations, loss of approval status, termination of contracts without compensation, administrative enforcement actions and fines, class action lawsuits, cease and desist orders and civil and criminal liability. While we believe that our businesses have been structured in such a way so as to comply with existing and new laws, the relevant regulatory authorities may take a contrary position or future legislation may adversely affect our business, financial condition and results of operations.

Likewise, states or municipalities may adopt statutes or regulations making it unattractive, impracticable, or infeasible for our businesses to continue to conduct business in that jurisdiction. The withdrawal from any jurisdiction due to emerging legal requirements could adversely affect our business, financial condition and results of operations.

Federal, state and in some instances, local, laws also prohibit unfair and deceptive sales practices generally. While we have adopted appropriate policies and procedures to address these requirements (such as appropriate consumer disclosures and call scripting, call monitoring, pricing controls and other quality assurance and compliance measures, which have evolved and improved over time), employees do not always comply with policies and procedures, and therefore, liability and brand injury could result from such employee misconduct.

As employers, our businesses are subject to federal and state employment laws. In particular, the Fair Labor Standards Act and California wage and hour laws govern the treatment of "non-exempt" employees, which may include loan officers and loan processors at Home Loan Center, Inc. Failure to comply with applicable employment laws may result in, among other things, administrative fines, class action lawsuits, damages awards and injunctions, any of which could adversely affect our business, financial condition and results of operations.

Parties with whom our businesses conduct business similarly may be subject to federal and state regulation. These parties typically act as independent contractors and not as agents in their solicitations and transactions with consumers. Consequently, we cannot ensure that these entities will comply with applicable laws and regulations at all times. Failure on the part of a lender, real estate professional, website operator or other third party to comply with these laws or regulations could result in, among other things, claims of vicarious liability or a negative impact on the reputation of Tree.com and its businesses. The occurrence of one or more of these events could have an adverse effect on our business, financial condition and results of operation.

Our Real Estate Business is subject to rules and regulations of various real estate boards, as well as the rules of various non-governmental associations and organizations, including but, not limited to, local and regional Multiple Listing Services that provide real estate listing data. Our Real Estate Business is dependent on real estate listing data made available through Multiple Listing Services and other sources. While we believe that our Real Estate Business is structured to comply with these rules and regulations, the relevant organization may take a contrary position, which could adversely affect our business, financial condition and results of operations.

16

***Third Party Compliance—If Network Lenders fail to produce required documents for examination by, or other affiliated parties fail to make certain filings with, state regulators, Tree.com may be subject to fines, forfeitures and the revocation of required licenses.***

Some of the states in which our businesses maintain licenses require them to collect various loan documentation from Network Lenders and produce this documentation for examination by state regulators. While Network Lenders are contractually obligated to provide these documents upon request, these measures may be insufficient. Failure to produce required documents for examination could result in fines, as well as the revocation of our businesses' licenses to operate in key states, which could have a material adverse affect on our business, financial condition and results of operations.

Regulations promulgated by some states may impose compliance obligations on directors, executive officers, large customers and any person who acquires a certain percentage (for example, 10% or more) of our common stock, including requiring such persons to periodically file financial and other personal and business information with state regulators. If any such person refuses or fails to comply with these requirements, our businesses may be unable to obtain a license, and existing licensing arrangements may be jeopardized, in particular states. The inability to obtain, or the loss of, required licenses could have a material adverse effect on our business, financial conditions and results of operations.

***Maintenance of Systems and Infrastructure—Our success depends, in part, on the integrity of our systems and infrastructures. System interruption and the lack of integration and redundancy in these systems and infrastructures may have an adverse impact on our business, financial conditions and results of operations.***

Our success depends, in part, on our ability to maintain the integrity of our systems and infrastructures, including websites, information and related systems, call centers and distribution and fulfillment facilities. System interruption and the lack of integration and redundancy in our information systems and infrastructures may adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. We may experience occasional system interruptions that make some or all systems or data unavailable or prevent our businesses from efficiently providing services or fulfilling orders. We also rely on affiliate and third-party computer systems, broadband and other communications systems and service providers in connection with the provision of services generally, as well as to facilitate, process and fulfill transactions. Any interruptions, outages or delays in our systems and infrastructures, our businesses, our affiliates and/or third parties, or deterioration in the performance of these systems and infrastructures, could impair the ability of our businesses to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, acts of war or terrorism, acts of God and similar events or disruptions may damage or interrupt computer, broadband and other communications systems and infrastructures at any time. Any of these events could cause system interruption, delays and loss of critical data, and could prevent our businesses from providing services, fulfilling orders and/or processing transactions. While our businesses have backup systems for certain aspects of their operations, these systems are not fully redundant and disaster recovery planning is not sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these adverse events were to occur, it could adversely affect our business, financial conditions and results of operations.

In addition, any penetration of network security or other misappropriation or misuse of personal consumer information could cause interruptions in the operations of our businesses and subject us to increased costs, litigation and other liabilities. Claims could also be made against us for other misuse of personal information, such as for unauthorized purposes or identity theft, which could result in litigation and financial liabilities, as well as administrative action from governmental authorities. Security breaches could also significantly damage our reputation with consumers and third parties with whom we do business. It is possible that advances in computer capabilities, new discoveries, undetected fraud, inadvertent violations of company policies or procedures or other developments could result in a

17

compromise of information or a breach of the technology and security processes that are used to protect consumer transaction data. As a result, current security measures may not prevent any or all security breaches. We may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. We also faces risks associated with security breaches affecting third parties with which we are affiliated or otherwise conduct business online. Consumers are generally concerned with security and privacy of the Internet, and any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

*Privacy—The processing, storage, use and disclosure of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights.*

In the processing of consumer transactions, our businesses receive, transmit and store a large volume of personally identifiable information and other user data. The sharing, use, disclosure and protection of this information are governed by the privacy and data security policies maintained by us and our businesses. Moreover, there are federal, state and international laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data. Specifically, personally identifiable information is increasingly subject to legislation and regulations in numerous jurisdictions around the world, the intent of which is to protect the privacy of personal information that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if legislation or regulations are expanded to require changes in business practices or privacy policies, or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations.

Our businesses may also become exposed to potential liabilities as a result of differing views on the privacy of consumer and other user data collected by these businesses. Our failure, and/or the failure by the various third party vendors and service providers with which we do business, to comply with applicable privacy policies or federal, state or similar international laws and regulations or any compromise of security that results in the unauthorized release of personally identifiable information or other user data could damage the reputation of these businesses, discourage potential users from trying our products and services and/or result in fines and/or proceedings by governmental agencies and/or consumers, one or all of which could adversely affect our business, financial condition and results of operations.

*Intellectual Property—We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.*

We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties. We regard our intellectual property rights, including patents, service marks, trademarks and domain names, copyrights, trade secrets and similar intellectual property (as applicable), as critical to our success. Our businesses also rely heavily upon software codes, informational databases and other components that make up their products and services.

We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use trade secret or copyrighted intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

We have generally registered and continue to apply to register, or secure by contract when appropriate, our trademarks and service marks as they are developed and used, and reserve and register domain names as we deem appropriate. We generally consider the protection of our

18

trademarks to be important for purposes of brand maintenance and reputation. While we vigorously protect our trademarks, service marks and domain names, effective trademark protection may not be available or may not be sought in every country in which products and services are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names and limit our ability of to control marketing on or through the internet using our various domain names or otherwise, which could adversely affect our business, financial condition and results of operations.

Some of our businesses have been granted patents and/or have patent applications pending with the United States Patent and Trademark Office and/or various foreign patent authorities for various proprietary technologies and other inventions. We consider applying for patents or for other appropriate statutory protection when we develop valuable new or improved proprietary technologies or inventions are identified, and will continue to consider the appropriateness of filing for patents to protect future proprietary technologies and inventions as circumstances may warrant. The status of any patent involves complex legal and factual questions, and the breadth of claims allowed is uncertain. Accordingly, any patent application filed may not result in a patent being issued or existing or future patents may not be adjudicated valid by a court or be afforded adequate protection against competitors with similar technology. In addition, third parties may create new products or methods that achieve similar results without infringing upon patents that we own. Likewise, the issuance of a patent to us does not mean that our processes or inventions will not be found to infringe upon patents or other rights previously issued to third parties.

From time to time, we are subject to legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of the trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. Patent litigation tends to be particularly protracted and expensive.

19

---

https://www.sec.gov/Archives/edgar/data/1434621/000104746908009036/a2187231zs-1a.htm

### FORWARD-LOOKING STATEMENTS

Forward-looking statements in this prospectus, the public filings or other public statements of the Company are subject to known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements or other public statements. Forward-looking statements include the information regarding future financial performance, business prospects and strategy, including the completion of the spin-offs and the realization of related anticipated benefits, anticipated financial position, liquidity and capital needs and other similar matters, in each case relating to the Company.

Statements preceded by, followed by or that otherwise include the words "believes," "expects," "anticipates," "intends," "projects," "estimates," "plans," "may increase," "may fluctuate," and similar expressions or future or conditional verbs such as "will," "should," "would," "may" and "could" are generally forward-looking in nature and not historical facts. You should understand that the following important factors could affect future results and could cause actual results to differ materially from those expressed in such forward-looking statements:

- adverse changes in economic conditions generally or in any of the markets or industries in which the businesses of the Company operate;

- changes in senior management at the Company;

- adverse changes to, or interruptions in, relationships with third parties;

- changes affecting the ability of the Company to efficiently maintain and grow the market share of its various brands, as well as to extend the reach of these brands through a variety of distribution channels and to attract new (and retain existing) customers;

- consumer acceptance of new products and services offered by the Company;

- the rates of growth of the Internet and the e-commerce industry;

- changes adversely affecting the ability of the Company to adequately expand the reach of its businesses into various international markets, as well as to successfully manage risks specific to international operations and acquisitions, including the successful integration of acquired businesses;

- future regulatory and legislative actions and conditions affecting the Company, including:

  - the promulgation of new, and/or the amendment of existing laws, rules and regulations applicable to the Company and its businesses; and

  - changes in the application or interpretation of existing laws, rules and regulations in the case of the businesses of the Company. In each case, laws, rules and regulations include, among others, those relating to sales, use, value-added and other taxes, software programs, consumer protection and privacy, intellectual property, the Internet and e-commerce;

- competition from other companies;

- changes adversely affecting the ability of the Company and its businesses to adequately protect intellectual property rights, as well as to obtain licenses or other rights with respect to intellectual property in the future, which may or may not be available on favorable terms (if at all);

- the substantial indebtedness of the Company and the possibility that the Company may incur additional indebtedness;

20

- third-party claims alleging infringement of intellectual property rights by the Company or its businesses, which could result in the expenditure of significant financial and managerial resources, injunctions or the imposition of damages, as well as the need to enter into formal licensing or other similar arrangements with such third parties, which may or may not be available on favorable terms (if at all); and

- natural disasters, acts of terrorism, war or political instability.

Certain of these factors and other factors, risks and uncertainties are discussed in the "Risk Factors" section of this prospectus. Other unknown or unpredictable factors may also cause actual results to differ materially from those projected by the forward-looking statements. Most of these factors are difficult to anticipate and are generally beyond the control of IAC and the Company.

You should consider the areas of risk described above, as well as those set forth under the heading "Risk Factors," in connection with considering any forward-looking statements that may be made by the Company generally. Except for the ongoing obligations of the Company to disclose material information under the federal securities laws, the Company does not undertake any obligation to release publicly any revisions to any forward-looking statements, to report events or to report the occurrence of unanticipated events unless required to do so by law.

21

### THE SEPARATION

**General**

On July 31, 2008, the IAC Board of Directors approved the separation of IAC into five separate, publicly traded companies, with each Spinco having a single class of common stock: (1) IAC, (2) HSNi, (3) ILG, (4) Ticketmaster and (5) Tree.com. The separation will be accomplished through the distribution by IAC of all of the shares of the common stock of the Spincos held by IAC to holders of IAC common stock on the record date. Immediately following the distributions, IAC stockholders will own 100% of the outstanding common stock of IAC and the Spincos. You will not be required to make any payment, surrender or exchange your shares of IAC common stock and/or Class B common stock or take any other action to receive your shares of Tree.com common stock.

The Board of Directors of IAC has reserved the right to modify, delay or abandon the spin-off of any or all of the Spincos. In addition, the spin-offs are subject to the satisfaction or waiver of a number of conditions described under "—Conditions to the Spin-Offs."

**The Number of Shares You Will Receive in the Tree.com Spin-off**

For every share of IAC common stock and/or Class B common stock that you owned at the close of business on August 11, 2008, the record date, you will receive one-thirtieth of a share of common stock of Tree.com on the distribution date. As described below under "—When and How You Will Receive the Dividend," IAC will not distribute any fractional shares of Tree.com common stock to its stockholders.

**When and How You Will Receive the Dividend**

IAC will distribute the shares of Tree.com common stock on [  •  ], 2008, the distribution date. However, the IAC Board of Directors may determine to delay the Tree.com spin-off. The Bank of New York, which currently serves as the transfer agent and registrar for IAC's common stock, will serve as transfer agent and registrar for the Tree.com common stock and as distribution agent in connection with the spin-offs.

If you own IAC common stock and/or Class B common stock as of the close of business on the record date, the shares of Spinco common stock that you are entitled to receive in the spin-off will be issued electronically, as of the distribution date, to you or to your bank or brokerage firm on your behalf by way of direct registration in book-entry form. Registration in book-entry form refers to a method of recording stock ownership when no physical share certificates are issued to stockholders, as is the case in the spin-off.

Commencing on or shortly after the distribution date, if you hold physical stock certificates that represent your shares of IAC common stock and/or Class B common stock and you are the registered holder of the IAC shares represented by those certificates, the distribution agent will mail to you an account statement that indicates the number of shares of Spinco common stock that have been registered in book-entry form in your name. If you have any questions concerning the mechanics of having shares of Tree.com common stock registered in book-entry form, you are encouraged to contact The Bank of New York by mail at 480 Washington Blvd, Jersey City, NJ 07310 or PO Box 358015, Pittsburgh, PA 15252-8015, by phone at 866-203-6218 (US and Canada) or 201-680-6685 (International), or by email at *shrrelations@bnymellon.com*.

Most IAC stockholders hold their shares of IAC common stock through a bank or brokerage firm. In such cases, the bank or brokerage firm would be said to hold the stock in "street name" and ownership would be recorded on the bank or brokerage firm's books. If you hold your IAC common stock through a bank or brokerage firm, your bank or brokerage firm will credit your account for the shares of common stock of the Spincos that you are entitled to receive in the spin-offs. If you have any

22

questions concerning the mechanics of having shares of Tree.com common stock held in "street name," you are encouraged to contact your bank or brokerage firm.

The Bank of New York, as distribution agent, will not deliver any fractional shares of Tree.com common stock in connection with the spin-off. Instead, The Bank of New York will aggregate all fractional shares and sell them on behalf of the holders who otherwise would be entitled to receive fractional shares. If you physically hold IAC common stock certificates and are the registered holder, you will receive a check from the distribution agent in an amount equal to your pro rata share of the aggregate net cash proceeds of the sales. We estimate that it will take approximately two weeks from the distribution date for the distribution agent to complete the distributions of the aggregate net cash proceeds. If you hold your IAC stock through a bank or brokerage firm, your bank or brokerage firm will receive on your behalf your pro rata share of the aggregate net cash proceeds of the sales and should electronically credit your account for your share of such proceeds.

### Results of the Separation

After the spin-off, we will be a separate publicly traded company. Immediately following the spin-offs, based on the number of registered stockholders of IAC common stock and Class B common stock on February 25, 2008, and without giving effect to "when-issued" trading, we expect to have approximately 1,500 stockholders of record.

The actual number of shares to be distributed will be determined based on the number of shares of IAC common stock and class B common stock outstanding on the record date and will reflect the issuance of IAC common stock in connection with any exercise of IAC options, vesting of restricted share units or conversion of other convertible IAC securities between the date the IAC Board of Directors declares the dividend for the distribution and the record date for the spin-off and the issuance of IAC shares under vested IAC equity-based awards between the record date for the spin-off and the distribution date.

The spin-offs will not affect the number of outstanding shares of IAC common stock and/or Class B common stock or any rights of IAC stockholders. However, in connection with the spin-offs, as more fully described in IAC's proxy statement under Schedule 14A under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), filed on July 10, 2008, IAC has sought approval from its stockholders of a proposal to amend its Restated Certificate of Incorporation to effect a 1-for-2 reverse stock split of its common stock and Class B common stock, which may be implemented by IAC's Board of Directors in its sole discretion immediately following the completion of the spin-offs or, if not all of the spin-offs are effected substantially simultaneously, immediately following the first spin-off. If the reverse stock split is approved by IAC's stockholders and implemented by IAC's Board of Directors, each two shares of IAC common stock or Class B common stock will be combined into one share of IAC common stock or Class B common stock, respectively. The purpose of implementing the reverse stock split would be to seek to increase the per share trading price of IAC's common stock following the spin-offs relative to what the per share trading price would be if the reverse stock split were not implemented. An increased trading price could increase interest from institutional investors, investment funds and brokerage firms in IAC common stock, lower the transaction costs involved in purchasing IAC common stock and improve the trading liquidity of IAC common stock. There can be no assurance that the reverse stock split would have the effect of increasing the per share trading price of IAC common stock following the spin-offs relative to what the per share trading price would be if the reverse stock split were not implemented.

### Material U.S. Federal Income Tax Consequences of the Spin-Offs

Subject to the limitations and qualifications described herein, the discussion entitled "*Certain U.S. Federal Income Tax Consequences: Each of the Spin-Offs Qualifies as a Transaction that Is Generally Tax*

23

*Free under Sections 355 and/or 368(a)(1)(D) of the Code"* constitutes the opinion of Wachtell, Lipton, Rosen & Katz as to the material U.S. federal income tax consequences of the spin-offs to "U.S. holders" (as defined below) of IAC common stock. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "Code"), final, temporary or proposed U.S. Treasury regulations promulgated thereunder, judicial opinions, published positions of the IRS and all other applicable authorities, all as in effect as of the date of this document and all of which are subject to change, possibly with retroactive effect. Any such change could affect the accuracy of the statements and conclusions set forth in this document.

For purposes of this discussion, the term "U.S. holder" means a beneficial owner of IAC common stock that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If an entity or arrangement that is treated as a partnership for U.S. federal income tax purposes holds IAC common stock, the tax treatment of a partner in such entity generally will depend on the status of the partners and the activities of the partnership. If you are a partner in a partnership holding IAC common stock, please consult your tax advisor.

This discussion only addresses holders of IAC common stock that are U.S. holders and hold such stock as a capital asset within the meaning of Section 1221 of the Code. Further, this summary does not address all aspects of U.S. federal income taxation that may be relevant to a holder in light of the holder's particular circumstances or that may be applicable to holders subject to special treatment under U.S. federal income tax law (including, for example, persons that are not U.S. holders, financial institutions, dealers in securities, traders in securities that elect mark-to-market treatment, insurance companies, mutual funds, tax-exempt organizations, partnerships or other flow-through entities and their partners or members, U.S. expatriates, holders liable for the alternative minimum tax, holders whose functional currency is not the U.S. dollar, and holders who hold their IAC common stock as part of a hedge, straddle, constructive sale or conversion transaction, or holders who acquired IAC common stock pursuant to the exercise of employee stock options or otherwise as compensation). This discussion does not address the tax consequences to any person who actually or constructively owns more than 5% of IAC common stock. In addition, no information is provided herein with respect to the tax consequences of the spin-offs under applicable state, local or non-U.S. laws or federal laws other than those pertaining to the federal income tax.

**IAC STOCKHOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE SPIN-OFFS TO THEM, INCLUDING THE EFFECTS OF U.S. FEDERAL, STATE AND LOCAL, FOREIGN AND OTHER TAX LAWS.**

It is a condition to the spin-offs that IAC shall have received an opinion of Wachtell, Lipton, Rosen & Katz, in form and substance satisfactory to the IAC Board of Directors, regarding the qualification of the spin-offs as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code (to the extent such qualification is not addressed by an Internal Revenue Service private letter ruling received by IAC), which opinion (and, in

24

the event IAC shall have received the IRS private letter ruling, the private letter ruling) shall not have been withdrawn or modified.

IAC has requested and expects to receive, prior to effecting any of the spin-offs, a private letter ruling from the IRS and/or an opinion of counsel satisfactory to the IAC board of directors regarding the qualification of the spin-offs, together with certain related transactions, as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code. If the private letter ruling is received prior to the spin-offs, IAC expects to receive an opinion of counsel regarding certain aspects of the transaction that are not covered by the private letter ruling. If the private letter ruling is not received prior to the spin-offs, IAC expects to receive an opinion of counsel regarding the qualification of the spin-offs as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code, and opinions from its external tax advisors regarding the U.S. federal income tax consequences to IAC of certain related matters and transactions, and certain state tax consequences to IAC of the spin-offs.

IAC does not intend to waive the receipt of a private letter ruling and/or an opinion of Wachtell, Lipton, Rosen & Katz as a condition to its obligation to complete the spin-offs and IAC will not waive the receipt of this private letter ruling and/or opinion as a condition to its obligation to complete the spin-offs without recirculating this document.

*Certain U.S. Federal Income Tax Consequences: Each of the Spin-Offs Qualifies as a Transaction that Is Generally Tax Free under Sections 355 and/or 368(a)(1)(D) of the Code*

The U.S. federal income tax consequences of the spin-offs are as follows:

- no gain or loss will be recognized by, and no amount will be includible in the income of IAC as a result of the spin-offs, other than gain or income arising in connection with certain internal restructurings undertaken in connection with the spin-offs and with respect to any "excess loss account" or "intercompany transaction" required to be taken into account by IAC under U.S. Treasury regulations relating to consolidated federal income tax returns;

- an IAC stockholder will not recognize income, gain, or loss as a result of the receipt of Spinco common stock pursuant to the spin-offs, except with respect to any cash received in lieu of fractional shares of Spinco common stock;

- an IAC stockholder's aggregate tax basis in such stockholder's Spinco common stock received in the spin-offs (including any fractional share interests in Spinco common stock for which cash is received) will equal such stockholder's aggregate tax basis in its IAC common stock immediately before the spin-offs, allocated between the IAC common stock and the common stock of each Spinco (including any fractional share interest of Spinco common stock for which cash is received) in proportion to their relative fair market values on the date of the spin-offs;

- an IAC stockholder's holding period for Spinco common stock received in the spin-offs (including any fractional share interests of Spinco common stock for which cash is received) will include the holding period for that stockholder's IAC common stock; and

- an IAC stockholder who receives cash in lieu of a fractional share of Spinco common stock in the spin-offs will be treated as having sold such fractional share for cash, and will generally recognize capital gain or loss in an amount equal to the difference between the amount of cash received and the IAC stockholder's adjusted tax basis in the fractional share of Spinco common stock. Such gain or loss will be long-term capital gain or loss if the stockholder's holding period for its Spinco common stock exceeds one year.

If an IAC stockholder holds different blocks of IAC common stock (generally, shares of IAC common stock acquired on different dates or at different prices), such holder should consult its tax

25

advisor regarding the determination of the basis and holding period of shares of Spinco common stock received in the spin-offs in respect of particular blocks of IAC common stock.

U.S. Treasury regulations require IAC stockholders who receive Spinco common stock in the spin-offs to attach to their U.S. federal income tax returns for the year in which the Spinco stock is received a detailed statement setting forth such data as may be appropriate to demonstrate the applicability of Section 355 of the Code to the spin-offs.

*Certain U.S. Federal Income Tax Consequences If One or More of the Spin-Offs Were Taxable*

The IRS private letter ruling and/or the opinion of counsel will be based on, among other things, certain assumptions as well as on the accuracy of certain representations and statements that IAC and the Spincos make to the IRS and to counsel. If any of these representations or statements are, or become, inaccurate or incomplete, or if IAC or the Spincos breach any of their respective covenants, the IRS private letter ruling and/or the opinion of counsel may be invalid.

Moreover, the IRS private letter ruling would not address all the issues that are relevant to determining whether the spin-offs qualify as transactions that are generally tax free for U.S. federal income tax purposes. Notwithstanding the IRS private letter ruling and/or opinion, the IRS could determine that one or more of the spin-offs should be treated as a taxable distribution if it determines that any of the representations, assumptions or undertakings that were included in the request for the private letter ruling is false or has been violated or if it disagrees with the conclusions in the opinion of counsel that are not covered by the IRS ruling.

If the IRS were to assert successfully that one or more of the spin-offs were taxable, the above consequences would not apply with respect to such spin-off and both IAC and holders of IAC common stock who received shares of Spinco common stock in such spin-off could be subject to tax, as described below. In addition, certain events that may or may not be within the control of IAC or a Spinco, including extraordinary purchases of IAC common stock or Spinco common stock, could cause one or more of the spin-offs not to qualify as tax free to IAC and/or holders of IAC common stock. Depending on the circumstances, a Spinco may be required to indemnify IAC and the other Spincos for some or all of the taxes and certain related losses resulting from the spin-off of such Spinco not qualifying as tax free under Sections 355 and/or 368(a)(1)(D) of the Code. See "Certain Relationships and Related Party Transactions—Tax Sharing Agreement." If a spin-off were taxable, then:

- IAC would recognize gain in an amount equal to the excess of the fair market value of Spinco common stock on the date of the spin-off distributed to IAC stockholders over IAC's adjusted tax basis in the stock of such Spinco, and IAC may also recognize income or gain with respect to certain restructuring transactions undertaken in connection with such spin-off;

- each IAC stockholder who received Spinco common stock in the taxable spin-off would be treated as having received a taxable distribution in an amount equal to the fair market value of such Spinco stock (including any fractional shares sold on behalf of the stockholder) on the spin-off date. That distribution would be taxable to the stockholder as a dividend to the extent of IAC's current and accumulated earnings and profits (as increased to reflect any current income, including any gain, recognized by IAC on the taxable spin-off). Any amount that exceeded IAC's earnings and profits would be treated first as a non-taxable return of capital to the extent of the IAC stockholder's tax basis in its IAC common stock with any remaining amounts being taxed as capital gain;

- certain stockholders could be subject to additional special rules, such as rules relating to the dividends received deduction and extraordinary dividends; and

26

• a stockholder's tax basis in Spinco common stock received generally would equal the fair market value of Spinco common stock on the spin-off date, and the holding period for that stock would begin the day after the spin-off date.

Even if one or more spin-offs otherwise qualify as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code, they could be taxable to IAC under Section 355(e) of the Code if one or more persons were to acquire directly or indirectly stock representing a 50% or greater interest, by vote or value, in IAC or one of the Spincos during the four-year period beginning on the date which is two years before the date of the spin-off, as part of a plan or series of related transactions that includes the spin-off. If such an acquisition of IAC stock or Spinco stock were to trigger the application of Section 355(e), IAC would recognize taxable gain as described above, but the spin-offs would be tax free to IAC stockholders. In addition, the IRS could disagree with or challenge the conclusions reached in one or more of the tax opinions that IAC expects to receive with respect to certain related matters and transactions. In such case, IAC could recognize material amounts of taxable income or gain.

In connection with the spin-offs, IAC and the Spincos will enter into a Tax Sharing Agreement. Under the Tax Sharing Agreement, each Spinco will have to indemnify IAC and the other Spincos for any taxes resulting from the spin-off of such Spinco (and any related interest, penalties, legal and professional fees, and all costs and damages associated with related stockholder litigation or controversies) to the extent such amounts result from (i) any act or failure to act by such Spinco described in the covenants in the Tax Sharing Agreement, (ii) any acquisition of equity securities or assets of such Spinco or a member of its group, or (iii) any breach by such Spinco or any member of its group of any representation or covenant contained in the separation documents or in the documents relating to the IRS private letter ruling and/or tax opinions. The ability of IAC or any of the Spincos to collect under these indemnity provisions will depend on the financial position of the indemnifying party. See "Certain Relationships and Related Party Transactions—Tax Sharing Agreement."

**THE FOREGOING IS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE SPIN-OFFS UNDER CURRENT LAW. THE FOREGOING DOES NOT PURPORT TO ADDRESS ALL U.S. FEDERAL INCOME TAX CONSEQUENCES OR TAX CONSEQUENCES THAT MAY ARISE UNDER THE TAX LAWS OF OTHER JURISDICTIONS OR THAT MAY APPLY TO PARTICULAR CATEGORIES OF STOCKHOLDERS. EACH IAC STOCKHOLDER SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES OF THE SPIN-OFFS TO SUCH STOCKHOLDER, INCLUDING THE APPLICATION OF U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS, AND THE EFFECT OF POSSIBLE CHANGES IN TAX LAWS THAT MAY AFFECT THE TAX CONSEQUENCES DESCRIBED ABOVE.**

**Market for Common Stock of Tree.com**

There is currently no public market for the Tree.com common stock. We have been approved to list our common stock on NASDAQ under the symbol "TREE." The Tree.com common stock has been approved for inclusion in the global market tier of the Nasdaq Stock Market.

**Trading Before the Distribution Date**

Beginning on or shortly before the record date and continuing through the distribution date, it is expected that there will be two markets in IAC common stock: a "regular-way" market and an "ex-distribution" market. Shares of IAC common stock that trade on the regular way market will trade with an entitlement to shares of the common stock of the Spincos distributed pursuant to the spin-offs. Shares that trade on the ex-distribution market will trade without an entitlement to shares of the common stock of the Spincos distributed pursuant to the spin-offs. Therefore, if you sell shares of IAC

27

common stock in the "regular-way" market up to and including through the distribution date, you will be selling your right to receive shares of the common stock of the Spincos in the spin-offs. If you own shares of IAC common stock at the close of business on the record date and sell those shares on the "ex-distribution" market, up to and including through the distribution date, you will still receive the shares of the common stock of the Spincos that you would be entitled to receive pursuant to your ownership of the shares of IAC common stock.

Furthermore, beginning shortly before the distribution date and continuing up to and including through the distribution date, it is expected that there will be a "when-issued" market in the common stock of each of the Spincos. "When-issued" trading refers to a sale or purchase made conditionally because the security has been authorized but not yet issued. The "when-issued" trading market will be a market for shares of Spinco common stock that will be distributed to IAC stockholders on the distribution date. If you owned shares of IAC common stock at the close of business on the record date, you would be entitled to shares of the Spincos' common stock distributed pursuant to the spin-offs. You may trade this entitlement to shares of common stock of all or any of the Spincos, without the shares of IAC common stock you own, on the "when-issued" market. On the first trading day following the distribution date, "when-issued" trading with respect to Spinco common stock will end and "regular-way" trading will begin.

## Conditions to the Spin-Offs

The IAC Board of Directors has reserved the right, in its sole discretion, to amend, modify or abandon the spin-offs and the related transactions at any time prior to the distribution date. This means IAC may cancel or delay the planned distribution of common stock of all or any of the Spincos if at any time the Board of Directors of IAC determines that the distribution of such common stock is not in the best interests of IAC and its stockholders. If IAC's Board of Directors determines to cancel the spin-off of a Spinco, stockholders of IAC will not receive any dividend of common stock of such Spinco and IAC will be under no obligation whatsoever to its stockholders to distribute such shares.

Absent a determination of IAC's Board of Directors to the contrary, the Spincos expect that the spin-offs will be effective on [   •   ], 2008, the distribution date. In addition, the spin-offs and related transactions are subject to the satisfaction or waiver (by IAC's Board of Directors in its sole discretion) of the following conditions:

- the registration statement on Form S-1 filed by each of the Spincos with respect to its common shares shall have been declared effective by the SEC or become effective under the Securities Act of 1933, as amended (the "Securities Act"), no stop order suspending the effectiveness of such registration statement shall have been issued and no proceedings for that purpose shall have been instituted or threatened by the SEC;

- the common stock of each of the Spincos shall have been accepted for listing on NASDAQ, subject to compliance with applicable listing requirements;

- no order or other legal restraint or prohibition preventing the consummation of any of the spin-offs or related transactions shall be threatened, pending or in effect;

- any material consents and governmental authorizations necessary to complete the spin-offs shall have been obtained and be in full force and effect;

- the stockholders of IAC shall have approved, in accordance with the Delaware General Corporation Law (the "DGCL"), a merger agreement providing for the merger of a wholly-owned subsidiary of IAC with and into IAC pursuant to which all of the outstanding shares of preferred stock of IAC shall be converted into the right to receive cash;

28

- the IAC Board of Directors shall have received a written solvency opinion, in form and substance acceptable to the IAC Board of Directors, from Duff & Phelps regarding the spin-offs and related transactions, which opinion shall not have been withdrawn or modified;

- IAC shall have received an opinion of Wachtell, Lipton, Rosen & Katz, in form and substance satisfactory to the IAC Board of Directors, regarding the qualification of the spin-offs as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code (to the extent such qualification is not addressed by an Internal Revenue Service private letter ruling (the "IRS Ruling") received by IAC), which opinion (and, in the event IAC shall have received the IRS Ruling, the IRS Ruling) shall not have been withdrawn or modified;

- IAC shall have received opinions from its external tax advisors, in form and substance satisfactory to the IAC Board of Directors regarding the U.S. federal income tax consequences to IAC of certain related matters and transactions (to the extent such matters are not addressed by the IRS Ruling) and certain state tax consequences to IAC of the spin-offs, which opinions shall not have been withdrawn or modified; and

- IAC shall have received an opinion of Delaware counsel to IAC, in form and substance satisfactory to the IAC Board of Directors, to the effect that the spin-offs do not require approval of the stockholders of IAC under Section 271 of the DGCL.

**Reasons for the Separation**

During the fall of 2007, IAC's management, in reviewing the strategic agendas and prospects of its various businesses, concluded that a separation of IAC into five separately traded public companies would best facilitate growth of the businesses. After discussion with the IAC Board of Directors, the Board agreed. Among the factors considered in arriving at this determination were:

- While the Spincos share common attributes, both with each other and with IAC, they generally face different strategic and competitive challenges. As a result, IAC management and the IAC Board determined that, in IAC's current configuration, when facing strategic and operating issues for a particular business, whether having to do with transactional alternatives, capital investment, new business initiatives, compensation or otherwise, considerations of the other businesses and of the company as a whole had the potential to lead to different decisions than might be made by standalone companies. IAC concluded, therefore, that the current structure may not be the most responsive to the exigencies of each business and that the spin-offs will enhance the success of each business by enabling IAC and the Spincos to resolve the problems that arise from the operation of different businesses within the IAC group.

- The lack of a liquid equity currency linked directly to the individual businesses constrained each business' ability to transact in its own industry and to provide equity-based incentive programs for employees that were entirely dependent on the performance of the specific business.

- While efforts were underway to increase the benefits to each business resulting from being a part of IAC, including through cost savings, better talent development and deployment, increased business opportunities, and other initiatives, the common attributes of the Spincos were more limited than initially believed, and there was therefore a limit to the benefits to be realized from such integration and the time horizon for realizing such benefits was substantially longer than IAC had initially believed.

- IAC believed that its stock performance during recent years did not reflect its operating performance or the true value of its businesses. IAC believed that this was in part because of the complexity involved in understanding a variety of businesses represented by a single equity investment, and that increased transparency and clarity into the different businesses of IAC

29

would allow investors to more appropriately value the merits, performance and future prospects of the companies.

Because IAC concluded that the separation of these businesses would over time enhance their operating performance, open up strategic alternatives that may otherwise not have been readily available to them, and facilitate investor understanding and better target investor demand, IAC believes that following the spin-offs, the common stock of the five publicly traded companies will have a higher aggregate market value than would IAC if it were to remain in its current configuration. No assurances, however, can be given that such higher aggregate market value will be achieved. The IAC Board of Directors believes that such value increase would further facilitate growth of the separated businesses by reducing the costs of equity compensation and acquisitions undertaken with equity consideration, in each case resulting in a real and substantial benefit for the companies.

The IAC Board of Directors considered a number of other potentially negative factors in evaluating the separation, including loss of synergies from operating as one company, potential disruptions to the businesses as a result of the separation, the potential impact of the separation on the anticipated credit ratings of the Spincos, risks of being unable to achieve the benefits expected to be achieved by the separation and the reaction of IAC stockholders to the separation, the risk that the plan of execution might not be completed and the one-time and ongoing costs of the separation. The IAC Board of Directors concluded that the anticipated benefits of the spin-offs outweighed these factors. In view of the wide variety of factors considered in connection with the evaluation of the separation and the complexity of these matters, the IAC Board of Directors did not find it useful to, and did not attempt to, quantify, rank or otherwise assign relative weights to the factors considered. The individual members of the IAC Board of Directors likely may have given different weights to different factors.

## Litigation with Liberty Media Corporation

In January 2008, IAC, Barry Diller and Liberty Media Corporation ("Liberty") commenced actions in the Delaware Chancery Court in which Liberty asserted, among other things, that Mr. Diller, the Chairman and CEO of IAC, had breached an agreement between Liberty and him and that therefore Liberty had assumed the right to exercise voting control over IAC. The basis for this claim was that IAC did not have the right to consummate the spin-offs with a single class voting structure and therefore acts in furtherance of the transaction had breached the agreement. After a chancery court decision in IAC and Mr. Diller's favor on March 28, 2008, the parties agreed, on May 13, 2008, to settle that litigation pursuant to the "Spinco Agreement." As described in more detail below under "Certain Relationships and Related Party Transactions—Agreements with Liberty Media Corporation," the Spinco Agreement also contains, among other things, provisions that will become effective at the time of the spin-off of each Spinco with a single class of common stock, including provisions providing Liberty the right to nominate directors to the Spinco's Board of Directors so long as Liberty maintains specified ownership levels, restrictions on acquisitions and transfers of the securities of the Spinco by Liberty and its affiliates, certain standstill restrictions on Liberty and its affiliates and registration rights to be granted to Liberty.

## Financial Advisor

Allen & Company LLC provided financial advice in connection with the spin-offs. Allen & Company was retained in connection with the transaction because of the firm's familiarity with the businesses and assets of IAC and the Spincos and the firm's qualifications and reputation. IAC and Allen & Company have not yet determined the amount of fees to be paid to Allen & Company in connection with its engagement. IAC expects to pay Allen & Company a customary fee.

30

## TREATMENT OF OUTSTANDING IAC COMPENSATORY EQUITY-BASED AWARDS

In November of 2007, IAC's Compensation and Human Resources Committee (the "Committee") made determinations regarding the treatment in the spin-offs of IAC's compensatory equity-based awards granted on or prior to December 31, 2007. The various adjustments the Committee has determined to make are described below:

(1)    All unvested IAC restricted stock units ("RSUs") granted prior to August 2005 will vest immediately prior to the spin-offs, with awards thereafter settled, in accordance with applicable law, in shares of common stock of IAC, HSNi, ILG, Ticketmaster and Tree.com, in each case as though the equity holder owned the number of shares of IAC common stock underlying the IAC RSU award immediately prior to the spin-offs. Based on the most recent available information, it is expected that at the time of the spin-offs HSNi employees, ILG employees, Ticketmaster employees and Tree.com employees will hold 225,233 RSUs, 116,008 RSUs, 328,887 RSUs and 394,110 RSUs, respectively, subject to this treatment.

(2)    All unvested IAC RSUs scheduled to vest through February 2009 will vest immediately prior to the spin-offs, with awards thereafter settled, in accordance with applicable law, in shares of common stock of IAC, HSNi, ILG, Ticketmaster and Tree.com, in each case as though the equity holder owned the number of shares of IAC common stock underlying the IAC RSU award immediately prior to the spin-offs. Based on the most recent available information, it is expected that at the time of the spin-offs HSNi employees, ILG employees, Ticketmaster employees and Tree.com employees will hold 78,772 RSUs, 39,685 RSUs, 98,306 RSUs and 32,816 RSUs, respectively, subject to this treatment.

(3)    Performance-based IAC RSUs granted in 2007, or Growth Shares, will be converted into non-performance-based IAC RSUs based on "target" value with the same vesting schedule and will thereafter be subject to the other adjustment and conversion provisions described below. Based on the most recent available information, it is expected that at the time of the spin-offs Tree.com employees will hold 157,948 RSUs subject to this treatment.

(4)    With respect to each IAC RSU award that provides for vesting of 100% of the award following passage of a multi-year period (cliff vesting awards), the portion of the unvested IAC RSU award that would have vested through February 2009 if the award had vested on an annual basis will convert into five separate RSU awards with respect to IAC and each of the Spincos, based on the applicable distribution ratios in the spin-offs and the two-for-one reverse stock split at IAC, but will otherwise have the same vesting terms and other applicable terms and conditions. Based on the most recent available information, it is expected that at the time of the spin-offs HSNi employees, ILG employees, Ticketmaster employees and Tree.com employees will hold 164,907 RSUs, 118,035 RSUs, 193,104 RSUs and 110,203 RSUs, respectively, subject to this treatment (inclusive of converted Growth Shares).

(5)    With respect to all other IAC RSUs that do not vest or convert pursuant to paragraphs (1), (2) or (4) above, the IAC RSUs will convert into an RSU award with respect to shares of common stock of the company that continues to employ the equity holder following the spin-offs, with appropriate adjustments to the number of shares of common stock underlying each such award to maintain pre- and post spin-off values, but otherwise preserving the same vesting terms and other applicable terms and conditions. Based on the most recent available information, it is expected that at the time of the spin-offs Tree.com employees will hold 161,424 RSUs subject to this treatment (inclusive of converted Growth Shares); and

(6)    All unexercised option awards, whether vested or unvested, will be split among IAC and each of the Spincos based on relative value at the time of the spin-offs, with appropriate adjustments to the number of shares of common stock underlying each such award and the

31

per share exercise price of each such award to maintain pre- and post spin-off values, but otherwise preserving the same vesting terms and other applicable terms and conditions. Based on the most recent available information, it is expected that at the time of the spin-offs HSNi employees, ILG employees, Ticketmaster employees and Tree.com employees will hold 734,633 options, 0 options, 816,784 options and 451,885 options, respectively, subject to this treatment.

With respect to any IAC compensatory equity-based awards granted after December 31, 2007, those awards will convert into awards with respect to shares of common stock of the company that continues to employ the equity holder following the spin-offs, with appropriate adjustments to the number of shares underlying each such award and the per share exercise price of each such award (with respect to options) to maintain pre- and post spin-off values, but otherwise preserving the same vesting terms and other applicable terms and conditions. Based on the most recent available information, it is expected that at the time of the spin-offs Tree.com employees will hold 6,451 RSUs and 0 options subject to this treatment. With respect to stock options, the number of shares of common stock subject to any adjusted stock option will be rounded down to the nearest whole share. With respect to restricted stock units that do not vest in connection with the spin-offs, the number of shares of common stock subject to any adjusted restricted stock unit will be rounded up to the nearest whole share. With respect to restricted stock units that vest in connection with the spin-offs, the number of shares of common stock that an individual will be entitled to receive in connection with the spin-offs will be rounded up to the nearest whole share.

In the event that IAC abandons the spin-off with respect to one or more Spincos, the adjustments set forth above will apply as described above except that there will be no conversion of IAC equity awards into equity awards of a Spinco that IAC does not spin-off and employees of any such Spinco will be treated as employees of IAC for purposes of the foregoing adjustments.

The treatment of IAC compensatory equity-based awards held by persons who will be employed by IAC immediately following the spin-offs is generally similar to that described above, with certain adjustments intended to provide retention incentives for IAC corporate employees.

The principal objective of the Committee in making these adjustments was one of fairness, with some of the particular considerations being:

- A desire to reward service prior to the spin-offs with stock of the companies that made up IAC before the spin-offs, and reward service after the spin-offs with stock of the company for which an employee will work after the spin-offs;

- A recognition that the primary motivation for the Growth Share grants, which was to provide increased incentives for employees to focus on the total performance of the entire IAC conglomerate as opposed to the individual businesses for which they worked through increased volatility of potential rewards, no longer was present given the determination to do the spin-offs;

- An interest in eliminating the complexities that would be associated with adjusting the 2007 performance conditions among five separate public companies and the possibility that such adjustments would not be equitable to all holders of the awards; and

- Compliance with the terms of the applicable equity plans, tax laws and accounting requirements.

## DIVIDEND POLICY

We do not currently expect to pay a regular cash dividend. The declaration and payment of future dividends to holders of common stock of the Company will be at the discretion of our board of directors and will depend upon many factors, including our financial condition, earnings, capital requirements of our businesses, covenants associated with certain debt obligations, legal requirements, regulatory constraints, industry practice and other factors that our board of directors deems relevant.

32

### TRANSFERS TO IAC AND FINANCING

It is currently expected that in connection with the spin-offs, HSNi, Ticketmaster and an entity that will become a subsidiary of ILG prior to the spin-offs will make certain distributions to IAC. To fund these distributions, each of these Spincos has entered into certain financing arrangements. Additionally, each of these companies may distribute some amount of cash on hand, but these amounts are not presently knowable and are unlikely to be material. HSNi, the borrowing subsidiary of ILG and Ticketmaster are each also expected to dividend to IAC prior to the spin-offs all net receivables owed them by IAC and its affiliates.

Tree.com is expected to have $110 million at the time of the separation, which would mean a $55 million cash contribution by IAC based upon March 31, 2008 balances.

These dividends and cash contributions were determined by IAC after an assessment of the optimal capital structure for Tree.com and for IAC, taking into account each company's cash flow prospects, working capital and other cash needs, potential acquisition agenda and other relevant factors.

<div align="center">33</div>

CERTAIN INFORMATION WITH RESPECT TO TREE.COM

## BUSINESS OF TREE.COM

When used with respect to any periods following the spin-offs and unless otherwise indicated, the term "Tree.com" refers to Tree.com, Inc., a Delaware corporation that was incorporated in connection with the spin-offs in April 2008 to hold IAC's lending and real estate businesses, subsidiaries and investments, the results of which were previously reported in the Lending and Real Estate reporting segments of IAC's Transactions reporting sector immediately prior to the completion of the spin-offs. The following disclosure regarding Tree.com's business assumes completion of the spin-offs.

For information regarding the results of operations of Tree.com and its segments on a historical basis, see the Consolidated Financial Statements of Tree.com and the disclosure set forth under the caption "—Management's Discussion and Analysis of Financial Condition and Results of Operations of Tree.com." For information regarding the results of operations of Tree.com on a pro forma basis to give effect to the completion of the spin-offs, see the Unaudited Pro Forma Condensed Consolidated Financial Statements for Tree.com.

### History and Overview

Tree.com is the parent of LendingTree, LLC and is the indirect parent of several companies owned by LendingTree, LLC. LendingTree, LLC (formerly, LendingTree, Inc.) was incorporated in the state of Delaware in June 1996 and commenced nationwide operations in July 1998. LendingTree, Inc. was acquired by IAC in 2003 and converted to a Delaware limited liability company (LendingTree, LLC) in December 2004. Through its various subsidiaries, Tree.com currently operates a lending business (the "Lending Business") and a real estate business (the "Real Estate Business"). Tree.com's main website address is *www.lendingtree.com*.

The Lending Business consists of online networks, principally LendingTree.com and GetSmart.com, as well as call centers, which match consumers with lenders and loan brokers. In addition, the Lending Business originates, processes, approves and funds various types of residential real estate loans under two brand names, LendingTree Loans® and HomeLoanCenter.com, and offers residential mortgage loan settlement services under the name LendingTree Settlement Services.

The Real Estate Business consists primarily of an internet-enabled national residential real estate brokerage that currently operates offices in 14 markets under the brand name "RealEstate.com, REALTORS." Outside of these 14 markets, RealEstate.com maintains relationships with a network of third-party brokerages that receive leads from RealEstate.com and pay a referral fee on closed transactions. The Real Estate Business also consists of a brokerage that matches residential home buyers interested in newly constructed homes with builders and currently operates under the brand name "iNest®."

### Lending Business

#### *Our Lending Networks*

Consumers can access Tree.com's nationwide network of more than 200 banks, lenders and loan brokers online (via *www.lendingtree.com* or *www.getsmart.com*) or by calling 1-800-555-TREE. Loans offered by these banks, lenders and loan brokers (the "Network Lenders") consist primarily of home mortgages (in connection with refinancings and purchases) and home equity loans.

Tree.com selects lenders throughout the country in an effort to provide full geographic lending coverage of the country and to offer a complete suite of loan offerings available in the market. Frequently, before a lender joins the Network, Tree.com performs credit and financial reviews on the lender. In addition, as a further quality assurance measure, Tree.com recently began checking new

34

lenders against a national antifraud database maintained by the Mortgage Asset Research Institute. All Network Lenders are required to enter into a contract that generally may be terminated upon notice by either party. No individual Network Lender accounted for more than 5% of the Lending Business revenue in any period.

Consumers seeking mortgage loans through one of Tree.com's lending networks can receive multiple conditional loan offers from Network Lenders, or from Tree.com's subsidiary doing business under the name "LendingTree Loans" (as described below), in response to a single loan request form.

The process by which the Lending Business matches consumers and Network Lenders, which is referred to in the document as the "matching process," is innovative and customer-friendly. This matching process consists of the following steps:

- **Credit Request.** Consumers complete a single loan request form for the selected loan with information regarding their income, assets and liabilities, loan preferences and other data. Consumers also consent to the retrieval of their credit report.

- **Loan Request Form Matching and Transmission.** Tree.com matches a given consumer's loan request form data, credit profile and geographic location against certain pre-established creditworthiness criteria of Network Lenders, which may be modified from time to time. Once a given loan request passes through the matching process, the loan request is automatically transmitted to up to four or five Network Lenders.

- **Lender Evaluation and Response.** Network Lenders who receive a loan request form evaluate the information in the loan request to determine whether to make a conditional loan offer. If a given Network Lender does not respond with a conditional loan offer, the loan request form is directed through the matching process a second time in an attempt to match the consumer with another Network Lender.

- **Communication of a Conditional Offer.** If one or more Network Lenders make a conditional offer, the consumer is automatically notified via e-mail, typically within minutes after the submission of the loan request form. Through these e-mails, consumers may access a dedicated webpage where they can view the proposed terms of each conditional offer, including: interest rate, closing costs, monthly payment amount, lender fees and other information. If a consumer does not have access to e-mail, conditional offers are provided to the consumer by phone or fax.

- **Loan Processing.** Consumers work offline with the relevant Network Lender to provide additional information bearing on creditworthiness to the Network Lender. If the Network Lender approves a consumer, it will then underwrite and originate the loan.

- **Ongoing Consumer and Lender Support.** Active e-mail and telephone follow-up and support is provided to both Network Lenders and consumers during the loan transaction process. This follow-up and support is designed to provide technical assistance and increase overall satisfaction of Network Lenders, as well as increase the percentage of consumers who close a loan through financial institutions found through the Lending Business.

The Lending Business also offers a short-form matching process under the LendingTree® and GetSmart® brands. This process, which provides consumers with lender contact information only, typically requires the consumer to submit less data than that required in connection with the matching process described above.

The Lending Business does not charge consumers a fee to use its lending networks. Substantially all revenues from lending networks are derived from both up-front matching fees paid by Network Lenders who receive a loan request form and closing fees paid by Network Lenders who close a transaction with the consumer. Since a given loan request form can be matched with more than one Network Lender, multiple match fees may be generated from the same form. Matching fees are

35

recognized at the time the loan request form is transmitted and closing fees are recognized at the time the Network Lender reports that it has closed the loan, which may be several months after the time the loan request form is transmitted.

### *LendingTree Loans/Home Loan Center, Inc.*

The Lending Business also originates, processes, approves and funds various consumer mortgage loans through a Tree.com subsidiary, Home Loan Center, Inc., which operates primarily under the brand name "LendingTree Loans®." For these purposes, the Lending Business maintains loan origination offices in California and is able to provide a broad range of mortgage loan offerings to consumers in most states, primarily conforming and prime loans, and, to a lesser extent, non-conforming, Alt-A and subprime loans. Products available include both adjustable loans and fixed rate loans.

A summary of loans sold by type of loan for each of the three years in the period ended December 31, 2007 and the three months ended March 31, 2008 and 2007 and the loans held as of the periods then ended is presented below (in millions):

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2007 | 2008 |
| **Loans Sold** | | | | | |
| Conforming | $ 3,462 | $ 3,773 | $ 4,210 | $ 1,132 | $ 523 |
| % of Total | 48.2% | 47.9% | 69.3% | 58.6% | 86.3% |
| Non-Conforming /Alt-A | $ 2,291 | $ 2,386 | $ 1,323 | $ 504 | $ 83 |
| % of Total | 31.9% | 30.0% | 21.8% | 26.1% | 13.7% |
| SubPrime | $ 269 | $ 251 | $ 51 | $ 44 | $ — |
| % of Total | 3.7% | 3.2% | 0.8% | 2.3% | — |
| Home equity | $ 1,161 | $ 1,461 | $ 489 | $ 252 | $ 0.2 |
| % of Total | 16.2% | 18.6% | 8.1% | 13.1% | — |
| **Total** | $ 7,183 | $ 7,871 | $ 6,073 | $ 1,932 | $ 606 |

| | December 31, | | | March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2007 | 2008 |
| **Loans Held For Sale** | | | | | |
| Conforming | $ 124 | $ 147 | $ 76 | $ 219 | $ 74 |
| % of Total | 33.0% | 42.2% | 82.2% | 53.0% | 79.1% |
| Non-Conforming /Alt-A | $ 140 | $ 102 | $ 10 | $ 119 | $ 13 |
| % of Total | 37.5% | 29.2% | 10.5% | 28.8% | 14.0% |
| SubPrime | $ 32 | $ 22 | $ 2 | $ 6 | $ 2 |
| % of Total | 8.7% | 6.3% | 2.7% | 1.5% | 2.5% |
| Home equity | $ 78 | $ 78 | $ 4 | $ 69 | $ 4 |
| % of Total | 20.8% | 22.3% | 4.6% | 16.7% | 4.4% |
| **Total** | $ 374 | $ 349 | $ 92 | $ 413 | $ 93 |

All LendingTree Loans® -branded loan originations are derived from consumer loan requests received through *www.lendingtree.com*, *www.getsmart.com* or 1-800-555-TREE. A portion of all consumer loan request forms received through these channels are referred to LendingTree Loans. LendingTree Loans offers those consumers a choice among various loan alternatives, with loan pricing based upon different wholesale offerings received by LendingTree Loans from the secondary market investors who purchase the loans (plus a fixed margin to cover internal costs). LendingTree Loans maintains controls to ensure that its consumer loan pricing correlates to secondary market pricing and to ensure that its consumers receive multiple loan alternatives, thus maintaining the competition and choice elements

36

inherent in the LendingTree brand. Tree.com believes that LendingTree Loans provides value to consumers who do not wish to negotiate with multiple lenders, but still wish to obtain loan alternatives.

LendingTree Loans® -branded loans are funded and closed using proceeds from borrowings under available warehouse lines of credit or repurchase agreements. Substantially all of the loans funded are sold, along with the accompanying loan servicing rights, to investors in the secondary market, generally within 30 days of funding, with the proceeds from such sales being used to repay borrowings under the warehouse lines of credit or repurchase agreements. For terms of the warehouse lines of credit and repurchase agreements see "Financial Position, Liquidity and Capital Resources."

Although most of Home Loan Center, Inc.'s consumer leads are sourced through *www.lendingtree.com* or 1-800-555-TREE and originated under the LendingTree Loans® brand, a small portion of Home Loan Center, Inc.'s leads are sourced from a variety of non-LendingTree channels, including third-party online lead aggregators, direct mail marketing campaigns and *www.homeloancenter.com*. When obtaining leads from third-party sources, Home Loan Center, Inc. operates under its traditional name and brand (HomeLoanCenter). Consumers who request loans through the HomeLoanCenter brand typically receive single loan offers. HomeLoanCenter -branded loans are funded, closed and sold into the secondary market in the same manner, and on substantially the same terms, as LendingTree Loans -branded loans.

Revenues from direct lending operations are derived from the sale of loans to secondary market investors and from origination and other fees paid by borrowers. Of Home Loan Center, Inc.'s seventeen secondary market investors in 2007, the two largest, Countrywide and CitiMortgage, represented approximately 28% and 13%, respectively, of Tree.com's consolidated revenue in 2007. See "Risk Factors Relating to the Business of Tree.com Following the Spin-Offs—Adverse Events and Trends."

### LendingTree Settlement Services

The Lending Business also provides loan settlement services, including title insurance, appraisal and other collateral evaluation products, flood insurance, escrow, and closing services, through LendingTree Settlement Services, Inc., which provides services to Network Lenders, as well as to Home Loan Center, Inc. (including when doing business as LendingTree Loans®). In addition, Home Loan Center, Inc. offers escrow and sub-escrow services through its subsidiary, HLC Escrow, Inc.

Revenues from LendingTree Settlement Services are derived from service fees paid by lenders, which fees may or may not be passed on by the lender to the loan customer. Revenues from escrow and sub-escrow services are derived from fees charged to the consumer by the lender or by Home Loan Center, Inc.

### Other Businesses

Through the LendingTree.com and GetSmart.com websites, Tree.com's Lending Business also offers:

- unsecured loans, through which consumers are matched with multiple lenders using a network-based process similar to the mortgage loan matching process described above;

- automobile loans, through which consumers are linked with one or more third-party automobile lenders;

- credit cards, through which consumers can search various credit card offerings through a third-party vendor;

- student loans, through which consumers receive initial student loan offers through a third-party vendor; and

37

- various consumer insurance products, pursuant to which consumers are linked with licensed insurance agents and insurance lead aggregators to obtain insurance offers.

Revenues from these businesses are derived either from matching and closing fees, or in some cases, volume-based marketing fees. While the revenues from these businesses do not currently represent a significant portion of the revenues of the Lending Business, these revenues are expected to grow over time.

### Competition

Tree.com's Lending Business, particularly its lending networks, competes with other lead aggregators, including online intermediaries that operate network-type arrangements. In the case of the direct lending operations, Tree.com believes that the primary competitors of its Lending Business are traditional lending institutions, including those that are developing their own direct, online lending channels. While these financial institutions do not operate lending networks, they process, close and fund loans as direct lenders through well-recognized, national brands, many of which are industry leaders. Tree.com's Lending Business also faces additional competition from direct lending websites owned and operated by other online lenders that originate the bulk of their loans through their websites or by phone. These companies typically operate a consumer-branded website and attract consumers via online banner ads, key word placement on search engines, partnering with affiliates and business development arrangements with other properties, including major online portals.

## Real Estate Business

### Real Estate Brokerage

RealEstate.com, REALTORS is Tree.com's proprietary real estate brokerage business, which currently operates in the following 14 markets: Greater Portland, Seattle, Denver, Salt Lake City, San Diego, Las Vegas, Phoenix, Tucson, Sierra Vista (AZ), Charlotte, New York, New Jersey, Philadelphia and Boston. Most of the business for the proprietary real estate brokerage is internally generated based on consumers accessing *www.realestate.com* or by calling 1-800-REALESTATE. The brokerage recruits agents to join as independent contractors, for whom it then generates leads, with the brokerage retaining a significant share of the gross commission on closed transactions originating from company-generated leads (and a lesser share in the case of agent-generated leads). Tree.com uses both a central agent recruiting group in Charlotte, as well as local recruiting efforts, to identify agents who fit its model and would be willing to join the company. Third-party brokerage services provided by approximately 300 real estate brokerage firms are also available through *www.realestate.com* or by calling 1-800-REALESTATE. The Real Estate Business has developed relationships with brokers over the years, and targets prospective companies based on available lead flow by geography, their willingness to work with a lead generation company under Tree.com's terms and conditions, and the belief that such brokerage firms would generate an acceptable closing conversion rate. These third-party brokerage services are available nationwide, as well as in the 14 markets in which RealEstate.com, REALTORS currently operates. Once the consumer and the real estate professional are matched and agree to work together, the remainder of the transaction is completed locally.

The proprietary real estate brokerage business earns revenues through the real estate brokerage commissions it collects in connection with company- and agent-generated transactions. The Real Estate Business also earns revenue from referral fees paid by participating real estate brokerages.

### Other Real Estate Services

The Real Estate Business also owns and operates *www.inest.com*, a website that matches potential purchasers of newly constructed homes with new home builders. iNest.com is currently available in 28 states and allows consumers to view new home community information (new home listings) on the

38

iNest website. From the iNest website a consumer can print a coupon to present to builders that participate in the iNest.com network upon his or her first visit to a home site, which signifies that iNest.com will act as the buyer's real estate broker for a new home purchase from that builder. Upon closing, the builder pays a commission to iNest, which in turn is split between iNest, the licensed iNest real estate broker representing the consumer, and the consumer.

### *Competition*

Tree.com's Real Estate Business competes with all real estate brokerages within the RealEstate.com, REALTORS fourteen markets. These brokerages are comprised mainly of traditional real estate companies operating as independent brands or franchisees, as well as non-traditional models, such as salaried-agent, fee-for-service, flat-fee, discount, or rebate commission models, many of which generate leads from the Internet. In addition, the Real Estate Business competes for customers with companies that are not brokerages, such as websites that aggregate real estate broker listings without related services and customer support. Given the downturn in the credit and mortgage markets, and the decline in the number of housing transactions, competition in this segment has increased.

### Regulation and Legal Compliance

Tree.com businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States (see "Risk Factors Relating to the Business of Tree.com Following the Spin-Offs—Compliance and Changing Laws, Rules and Regulations"). As a result, they are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, including:

- Restrictions on the amount and nature of fees or interest that may be charged in connection with a loan, in particular, state usury and fee restrictions;

- Restrictions on the manner in which consumer loans are marketed and originated, including the making of required consumer disclosures, such the federal Truth-in-Lending Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the federal Fair Housing Act, the federal Real Estate Settlement Procedures Act (RESPA), and similar state laws;

- Restrictions on the amount and nature of fees that may be charged lenders and real estate professionals for providing or obtaining consumer leads, in particular, RESPA;

- Restrictions on the amount and nature of fees that may be charged consumers for real estate brokerage transactions, including any incentives and rebates, that may be offered to consumers by Tree.com businesses;

- State, and in some instances, federal, licensing or registration requirements applicable to both individuals or businesses engaged in the making or brokerage of loans (or certain kinds of loans, such as loans made pursuant to the Federal Housing Act), or the brokering of real estate transactions; and

- State and federal restrictions on the marketing activities conducted by telephone, the mail or by email, or over the internet, including the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and its accompanying regulations and guidelines.

### Employees

As of December 31, 2007, Tree.com had approximately 1,000 full-time employees. None of Tree.com's employees are represented under collective bargaining agreements. Tree.com considers its relations with its employees and independent contractors to be good.

39

**Properties**

Tree.com's principal executive offices, together with certain personnel and operations of its Lending and Real Estate Businesses, are currently located in approximately 89,000 square feet of office space in Charlotte, North Carolina under leases that expire in 2015. 95,500 square feet of office space in Irvine, California is utilized by Home Loan Center, Inc. under a lease expiring in 2010, and 31,667 square feet of office space in Jacksonville, Florida is utilized by LendingTree Settlement Services under leases that expire in 2009.

**Tree.com Legal Proceedings**

In the ordinary course of business, Tree.com and its subsidiaries are parties to litigation involving property, personal injury, contract, intellectual property and other claims. The amounts that may be recovered in such matters may be subject to insurance coverage. Tree.com does not believe that such ordinary course litigation will have a material effect on its business, financial condition or results of operations.

Rules of the Securities and Exchange Commission require the description of material pending legal proceedings, other than ordinary, routine litigation incident to the registrant's business, and advise that proceedings ordinarily need not be described if they primarily involve damage claims for amounts (exclusive of interest and costs) not exceeding 10% of the current assets of the registrant and its subsidiaries on a consolidated basis. Certain of the pending litigation matters described below, which management believes are the material litigations that Tree.com now faces, could involve amounts of the magnitude described above.

**Patent Litigation**

*Block Financial Corp. v. LendingTree, Inc.*, No. 01-cv-1007 ODS (U.S. Dist. Ct., W.D. Mo.); *LendingTree, LLC v. Block Financial LLC*, No. 08-cv-164 ODS (U.S. Dist. Ct., W.D. Mo.). On September 14, 2001, Block Financial Corporation ("Block") filed suit against LendingTree, LLC in the U.S. District Court for the Western District of Missouri, alleging that LendingTree, LLC's loan-matching process infringes U.S. Patent No. 6,014,645 (the "'645 patent"), which generally claims a real-time application system for financial cards. Block seeks damages, attorneys' fees and injunctive relief.

In 2002, LendingTree, LLC filed a petition to reexamine the '645 patent with the United States Patent and Trademark Office. The Patent Office agreed to reexamine the '645 patent, and the court stayed the litigation pending reexamination. In December 2006, the Patent Office republished the patent, with certain modifications. The court then lifted its stay of the litigation. On September 27, 2007, the court issued a claim construction order.

In February 2008, Block provided LendingTree, LLC with notice of a recently issued patent, U.S. Patent No. 7,310,617 (the "'617 patent"), a continuation of the '645 patent that purports to claim a real-time application system for financial offerings (as opposed to only financial cards). On March 6, 2008, LendingTree, LLC filed suit in the U.S. District Court for the Western District of Missouri seeking a declaration that the '617 patent is invalid. On April 14, 2008, Block filed an answer and counterclaim. Block asserts that LendingTree, LLC's loan-matching process infringes the '617 patent. Block seeks damages, attorneys' fees and injunctive relief.

On June 24, 2008, the court consolidated the two cases and approved a schedule setting a trial date of October 26, 2009. The consolidated case is currently in discovery.

*IMX, Inc. v. E-Loan, Inc., et al.,* No. 03-CV-1067 (U.S. Dist. Ct., D. Del.). On November 24, 2003, IMX, Inc. ("IMX") filed suit against LendingTree, LLC and several other companies in the U.S. District Court for the District of Delaware, alleging infringement of U.S. Patent No. 5,995,947 (the

40

"'947 patent"), which generally claims an interactive real-time trading system for loans. In its complaint, IMX sought damages, attorneys' fees and injunctive relief. On January 26, 2004, LendingTree, LLC filed a counterclaim seeking a declaration that the '947 patent is invalid and unenforceable.

On December 14, 2005, the court (i) construed the claims of the '947 patent, (ii) granted partial summary judgment to LendingTree, LLC, limiting recoverable damages to the period commencing after the filing of suit due to IMX's failure to "mark" its website with its patent and (iii) denied the parties' cross-motions for summary judgment on the issues of infringement and invalidity.

The case against LendingTree, LLC went to trial, and on January 23, 2006, the jury returned a verdict finding infringement and awarding IMX approximately $5.8 million in damages. The jury also found that the infringement was willful and that the asserted claims of the '947 patent are valid. LendingTree, LLC subsequently designed and implemented a work-around to avoid further infringement of the '947 patent.

On January 10, 2007, the court, ruling on various post-trial motions, (i) denied IMX's motion for a permanent injunction and its request for attorneys' fees, (ii) enhanced the damages award by 50% in light of the jury's finding of willful infringement, (iii) awarded IMX pre- and post-judgment interest, (iv) rejected LendingTree, LLC's counterclaim alleging inequitable conduct by IMX and (v) entered judgment in favor of IMX for approximately $8.7 million plus interest.

On July 27, 2007, the court, ruling on additional motions, (i) denied IMX's renewed request for an injunction, (ii) awarded IMX approximately $2.7 million in supplemental damages for the post-verdict, pre-design-around period, (iii) denied IMX's request to enhance those supplemental damages and (iv) awarded IMX approximately $1.0 million in pre-judgment interest and approximately $0.2 million in post-judgment interest to date. On August 9, 2007, an amended judgment was entered in favor of IMX for the foregoing amounts.

LendingTree, LLC appealed from this judgment to the U.S. Court of Appeals for the Federal Circuit. IMX cross-appealed from the District Court's order prohibiting recovery of damages attributable to the period prior to the filing of the complaint, and from the court's refusal to award enhanced damages for post-verdict infringement. Briefing on the appeals has been completed. Oral argument has not yet been scheduled.

As of December 31, 2007, LendingTree, LLC's reserve for this matter was approximately $12.8 million. In connection with the appeal, IAC executed a guarantee in favor of LendingTree, LLC in the amount of $13.5 million in lieu of LendingTree, LLC posting a bond. Before the spin-off of Tree.com is consummated, LendingTree, LLC will have to put in place a bond or similar security.

On July 24, 2008, LendingTree and IMX reached a settlement in principle concerning this matter. The parties are currently negotiating a definitive settlement agreement, which LendingTree expects to execute prior to the spin-off of Tree.com.

***Source Search Technologies, LLC v. LendingTree, LLC,*** No. 2:04-CV-04420 (U.S. Dist. Ct., D.N.J.). On September 13, 2004, Source Search Technologies, LLC ("SST") filed suit against LendingTree, LLC and other companies in the U.S. District Court for the District of New Jersey, alleging infringement of U.S. Patent No. 5,758,328 (the "'328 patent"), which generally claims a computerized procurement system. SST seeks damages, attorneys' fees and injunctive relief. On November 10, LendingTree, LLC filed a counterclaim seeking a declaration that the '328 patent is invalid and unenforceable.

The court issued claim construction orders on October 16 and November 13, 2007. Following the completion of discovery, LendingTree, LLC and SST filed cross-motions for summary judgment on the issues of infringement and invalidity. LendingTree, LLC also filed a motion for summary judgment on the ground that any infringement was not willful. The court heard oral argument on these motions on November 13, 2007 and February 4, 2008.

41

On July 9, 2008, the court entered an opinion regarding the parties' motions for summary judgment. The court granted LendingTree's motion that the asserted claims of the '328 patent are invalid for obviousness, granted SST's motion that LendingTree infringes the asserted '328 claims, granted SST's motion that the '328 claims are not invalid for indefiniteness, dismissed LendingTree's motion for summary judgment of no willful infringement as moot, and denied SST's motion to strike the supplemental report of LendingTree's expert. On July 10, 2008, the court entered an order consistent with the rulings in its opinion and closed the case. LendingTree has not received notice from SST regarding whether it intends to appeal the court's ruling on obviousness.

**Employment (Wage-and-Hour) Litigation**

*Gonzalez v. Home Loan Center, Inc.,* **No. CV06-5007 (U.S. Dist. Ct., C.D. Cal.).** On August 9, 2006, Daniel Gonzalez filed this putative class action against Home Loan Center, Inc. (hereinafter, for the purpose of this section, "HLC") in the U.S. District Court for the Central District of California. Plaintiff, a former HLC loan officer, asserts that HLC: failed to pay overtime; failed to pay wages due upon termination; failed to provide proper wage statements; failed to reimburse employees for expenses and/or improperly deducted wages for business-related expenses; and failed to provide meal and rest periods. Based upon these factual allegations, Plaintiff asserts violations of various California wage and hour laws, conversion, and violations of California Business & Professions Code § 17200. Plaintiff purports to represent a class of loan officers employed by HLC in California since August 9, 2002, and seeks damages, restitution, attorneys' fees and injunctive relief.

On December 27, 2006, Plaintiff filed a second amended complaint, adding two additional plaintiffs, David Nottingham and Jeffrey Howerton. Because these new plaintiffs had signed agreements with HLC to arbitrate all employment-related claims, HLC filed a motion to compel arbitration.

Following a mediation held in September 2007, the parties entered into an agreement to settle this action. Under the settlement agreement, HLC has agreed to pay a maximum of $4.0 million, inclusive of payments to class members as well as attorneys' fees and costs. The settlement agreement must be approved by the court in order to become effective. On May 13, 2008, Plaintiffs filed a motion for preliminary approval of the settlement. On June 13, 2008, the court, following a hearing, granted Plaintiffs' motion and preliminarily approved the settlement. The court also scheduled a final approval hearing for December 16, 2008.

As of December 31, 2007, LendingTree, LLC's reserve for this matter was approximately $2.1 million. This figure reflects Tree.com's estimates as to the minimum percentage of class members likely to submit claims for payment and the contractual indemnity obligations of former HLC shareholders for liability that arose prior to LendingTree, LLC's acquisition of HLC.

*Richardson v. Home Loan Center, Inc.,* **No. 07CC01337 (Cal. Super. Ct., Orange Cty.).** On August 2, 2007, Angela Richardson filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiff, a former HLC loan processor, alleges that HLC: failed to pay overtime; failed to provide meal and rest periods; failed to pay wages due upon termination; and failed to provide proper wage statements. Based upon these factual allegations, plaintiff asserts that HLC violated various California wage and hour laws as well as California Business & Professions Code § 17200. Plaintiff purports to represent all loan processors, funders and underwriters employed by HLC since August 2, 2003, and seeks damages, restitution, attorneys' fees and injunctive relief.

On December 21, 2007, plaintiff filed a second amended complaint. On February 15, 2008, HLC filed a demurrer and a motion to strike portions of the second amended complaint. On April 3, 2008, the court overruled the demurrer and denied the motion to strike. On April 23, 2008, HLC filed an answer to the second amended complaint. A mediation is scheduled for August 15, 2008.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

42

As of December 31, 2007, LendingTree, LLC's reserve for this matter was approximately $0.4 million. This reserve was established in connection with a settlement offer by HLC. No settlement has been reached to date.

*Primanto v. Home Loan Center, Inc.,* **No. 07CC01382 (Cal. Super. Ct., Orange Cty.).** On September 28, 2007, William Primanto filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiff, a former HLC loan officer, alleges that HLC failed to pay overtime and asserts violations of various California wage and hour laws and of California Business & Professions Code § 17200. Plaintiff purports to represent all loan officers employed by HLC in California since September 28, 2003, and seeks compensatory damages, statutory penalties, restitution and attorneys' fees.

On December 13, 2007, the court, at the request of the parties, entered an order staying the action pending resolution of the *Gonzalez* action (discussed above). The case remains stayed.

*Johanson v. Home Loan Center, Inc.,* **No. 07CC01405 (Cal. Super. Ct., Orange Cty.).** On November 8, 2007, Brian Johanson and Brendan Dwyer filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiffs, former HLC loan officers, assert that HLC: failed to pay overtime, compensation, commission wages and bonus wages; failed to provide proper wage statements; failed to provide rest periods and meal periods or compensation in lieu thereof; and failed to pay wages due employees upon termination. Based upon these factual allegations, Plaintiffs assert violations of various California wage and hour laws and of California Business & Professions Code § 17200. Plaintiffs purport to represent a class of all persons employed by HLC in California since November 8, 2003, and seek compensatory damages, statutory penalties, restitution and attorneys' fees.

On February 21, 2008, HLC filed an answer to the complaint. A mediation is scheduled for August 15, 2008. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*D'Asero v. Home Loan Center, Inc.,* **No. SACV08-384 (U.S. Dist. Ct., C.D. Cal.).** On April 9, 2008, Frank D'Asero, Ezekial Mohammed, Pouria Safabakhsh and Michael McCarver filed this putative class action against HLC in the U.S. District Court for the Central District of California. Plaintiffs, former HLC loan officers, allege that HLC: denied overtime compensation in violation of federal labor law; denied overtime compensation in violation of California labor law; failed to pay wages for compensable meal breaks in violation of California labor law; made unauthorized deductions from earned wages, failed to indemnify employees and coerced purchases in violation of California labor law; made unauthorized deductions from wages in violation of North Carolina labor law; failed to pay timely wages in violation of California labor law; failed to pay wages in violation of North Carolina labor law; failed to furnish itemized wage statements in violation of California labor law; and based upon the foregoing, committed unfair business practices in violation of California Business & Professions Code § 17200.

Plaintiffs purport to represent all loan officers employed by HLC in California since April 9, 2004 and all loan officers employed by HLC in North Carolina since April 9, 2006. Plaintiffs also purport to bring a collective action under the federal Fair Labor Standards Act on behalf of all loan officers employed by HLC since April 9, 2005. Plaintiffs seek declaratory relief, an injunction, liquidated damages, compensatory damages, attorneys' fees, restitution and penalties.

On May 30, 2008, HLC filed a motion to compel arbitration of Plaintiffs' claims based upon their signed agreements with HLC to arbitrate all employment-related claims.

On June 10, 2008, Plaintiffs filed a first amended complaint, which added a new claim for violation of California's Private Attorneys General Act of 2004. In addition, on June 10, 2008, Plaintiffs filed a motion for conditional class certification. A hearing date on Plaintiffs' motion is scheduled for July 1, 2008.

43

On June 17, 2008, the parties executed a joint stipulation and proposed order staying all proceedings for 90 days to facilitate mediation. The parties have filed the joint stipulation and proposed order with the court for approval. A mediation is scheduled for August 15, 2008.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

**Privacy/Information Security Litigation**

*Miller v. LendingTree, LLC,* No. 08cv2300 (U.S. Dist. Ct., N.D. Ill.). On April 22, 2008, Eugene Miller filed this putative class action against LendingTree, LLC in the U.S. District Court for the Northern District of Illinois. The case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree, LLC is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also asserts claims for negligence, breach of implied contract, invasion of privacy and misappropriation of confidential information. Plaintiff purports to represent all LendingTree, LLC customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

LendingTree has filed a motion to dismiss this action and to compel arbitration, or, in the alternative, to dismiss for improper venue. Plaintiffs have not yet filed a motion for class action certification. No trial date has been set.

*Mitchell v. Home Loan Center, Inc.,* No. 08-303-RJC (U.S. Dist. Ct., W.D. N.C.). On April 28, 2008, Angela Mitchell filed this putative class action against Home Loan Center, Inc. and LendingTree, LLC in the U.S. District Court for the Western District of Oklahoma. On LendingTree's demand, Plaintiff transferred this case to the Western District of North Carolina. As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff asserts claims for breach of contract, negligence and negligence per se. Plaintiff purports to represent all similarly situated persons, and seeks damages, attorneys' fees and injunctive relief.

LendingTree has filed a motion to dismiss this action and to compel arbitration. Plaintiffs have not yet filed a motion for class action certification. No trial date has been set.

*Constance Spinozzi v. LendingTree, LLC,* No. 3:08-cv-229 (U.S. Dist. Ct., W.D.N.C.). On May 15, 2008, Constance Spinozzi filed this putative class action against LendingTree, LLC in the U.S. District Court for the Western District of North Carolina. As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree, LLC is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also asserts claims for negligence and breach of implied contract. Plaintiff purports to represent all LendingTree, LLC customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

On June 11, 2008, Plaintiff and the plaintiff in the *Carson* case (discussed below) filed a motion with the Judicial Panel on Multidistrict Litigation requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina.

LendingTree has filed a motion to dismiss this action and to compel arbitration. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

44

*Marvin Garcia v. LendingTree, LLC,* No. 08 Civ. 4547 (U.S. Dist. Ct., S.D.N.Y.). On May 16, 2008, Marvin Garcia filed this putative class action against LendingTree, LLC in the U.S. District Court for the Southern District of New York. As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff asserts claims for breach of contract and negligence. Plaintiff purports to represent all LendingTree, LLC customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*Sylvia Carson v. LendingTree, LLC,* No. 3:08-cv-247 (U.S. Dist. Ct., W.D.N.C.). On May 30, 2008, Sylvia Carson filed this putative class action against LendingTree,  LLC in the U.S. District Court for the Western District of North Carolina. As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree, LLC is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also asserts claims for negligence and breach of implied contract. Plaintiff purports to represent all LendingTree, LLC customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

As set forth in the *Spinozzi* discussion (above), on June 11, 2008, Plaintiff and the *Spinozzi* plaintiff filed a motion with the Judicial Panel on Multidistrict Litigation requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) transfer and consolidate all such cases in the U.S. District Court for the Western District of North Carolina.

LendingTree has filed a motion to dismiss this action and to compel arbitration. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*Amy Bercaw v. LendingTree, LLC,* No. SACV08-660 (U.S. Dist. Ct., C.D. Cal.). On June 13, 2008, Amy Bercaw, Russell Winsett and Ty Woods filed this putative class action against LendingTree, LLC in the U.S. District Court for the Central District of California. As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiffs allege that LendingTree, LLC is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiffs also assert claims against LendingTree, LLC for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California Civil Code § 17980.89, and violation of California Business and Professions Code § 17200. Plaintiff purports to represent all LendingTree, LLC customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*Bradley v. LendingTree, LLC, et al., SACV08-755 (U.S. Dist. Ct. C.D. Cal.).* On July 10, 2008, Geraldine Bradley, Joy Paxton-Collis, James Larson and Mark Swearingen filed this putative class action against LendingTree, LLC in the U.S. District Court for the Central District of California.

As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiffs allege that LendingTree, LLC is a "consumer reporting agency" within the meaning of the FCRA. According to Plaintiffs, LendingTree, LLC has intentionally violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports.

45

Plaintiffs also allege LendingTree, LLC negligently violated the FCRA by failing to maintain reasonable procedures to protect Plaintiffs' personal and financial information. Plaintiffs also assert claims against LendingTree, LLC for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California statute, and violation of California's unfair competition law.

Plaintiffs purport to represent all similarly situated persons, and seeks damages, attorneys' fees and injunctive relief.

Plaintiffs have not yet filed a motion for class action certification. No trial date has been set.

***Shaver v. LendingTree, LLC, et al., SACV08-755 (U.S. Dist. Ct. C.D. Cal.).*** On July 10, 2008, Paul Shaver filed this putative class action against LendingTree, LLC in the U.S. District Court for the Central District of California.

As in the *Miller* case (discussed above), the case arises out of LendingTree, LLC's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree, LLC is a "consumer reporting agency" within the meaning of the FCRA. According to Plaintiff, LendingTree, LLC has intentionally violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also alleges LendingTree, LLC negligently violated the FCRA by failing to maintain reasonable procedures to protect Plaintiff's personal and financial information. Plaintiff also asserts claims against LendingTree, LLC for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California statute, and violation of California's unfair competition law.

Plaintiff purports to represent all similarly situated persons, and seeks damages, attorneys' fees and injunctive relief.

Plaintiff has not yet filed a motion for class action certification. No trial date has been set.

## Other Litigation

***Boschma v. Home Loan Center, Inc.*, No. SACV07-613 (U.S. Dist. Ct., C.D. Cal.).** On May 25, 2007, Clarence and Shirley Boschma filed this putative class action against HLC in the U.S. District Court for the Central District of California. Plaintiffs allege that HLC sold them an option ARM (adjustable-rate mortgage) loan but failed to disclose in a clear and conspicuous manner, among other things, that the interest rate was not fixed, that negative amortization could occur and that the loan had a prepayment penalty. Based upon these factual allegations, Plaintiffs assert violations of the federal Truth in Lending Act (the "TILA"), violations of California Business and Professions Code § 17200 (the "UCL"), breach of contract, breach of the covenant of good faith and fair dealing and violations of California's Consumer Legal Remedies Act (the "CLRA"). Plaintiffs purport to represent a class of all individuals who between June 1, 2003 and May 31, 2007 obtained through HLC an option ARM loan on their primary residence located in California, and seek rescission, damages, attorneys' fees and injunctive relief. On August 10, 2007, Plaintiffs filed a first amended complaint that dropped their CLRA claim.

On September 11, 2007, HLC filed a motion to dismiss and a motion to strike the amended complaint. In its motion to dismiss, HLC argued that Plaintiffs' UCL claim should be dismissed because they fail to properly allege that they or the putative class members suffered injury as a result of HLC's alleged misrepresentations. The motion to dismiss also requests dismissal of Plaintiffs' claims for breach of contract and for breach of the implied covenant of good faith and fair dealing. HLC's motion to strike requests that the court strike Plaintiffs' demand for class-wide rescission under the TILA and demand for disgorgement the UCL. Plaintiffs opposed both motions. On May 27, 2008, the court granted HLC's motion to dismiss, denied HLC's motion to strike as moot, and granted Plaintiffs

46

leave to file a second amended complaint. On June 16, 2008, Plaintiffs filed a second amended complaint, which added a claim for fraudulent omissions. In response, HLC raised the issue that the class representatives had no standing to assert any claims for rescission under the TILA based on the fact that they had since refinanced their loan. Plaintiffs have agreed to substitute a new class representative and intend to file a third amended complaint.

The parties have agreed not to conduct discovery until after the court rules on HLC's motions. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*Gaines v. Home Loan Center, Inc.,* **No. SACV08-667 (U.S. Dist. Ct., C.D. Cal.).** On June 13, 2008, Joanne Gaines and Johnnie Cave filed this putative class action against HLC and LendingTree, LLC in the U.S. District Court for the Central District of California. Plaintiffs allege, in essence, that (1) HLC failed to disclose that the bundled amount for certain loan closing services (called the "TrueCost") that HLC charged to Plaintiffs was greater than HLC's actual costs for those services; (2) HLC's option ARM (adjustable rate mortgage) note failed to tell Plaintiffs that the stated interest rate and payment amounts would change after the first month and that the payment amount stated in the note was not sufficient to pay interest charges, resulting in negative amortization; and (3) HLC misrepresented that Plaintiffs would have to obtain a home equity line of credit in order to obtain a low interest rate on their option ARM loans. Based upon these factual allegations, Plaintiffs assert violations of the federal Racketeer Influenced and Corrupt Organizations Act, the federal Truth in Lending Act, California Business and Professions Code §§ 17200 and 17500, California's Consumers Legal Remedies Act, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, and money had and received.

Plaintiffs purport to represent all HLC customers who, since December 14, 2004 (1) were charged by HLC and paid a TrueCost amount that exceeded HLC's actual costs for the TrueCost services; and/or (2) entered into option ARM loan agreements with HLC; and/or (3) were misled into taking out a home equity line of credit along with their option ARM mortgage. Plaintiffs seek restitution, disgorgement, damages, attorneys' fees and injunctive relief.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*Schnee v. LendingTree, LLC and Home Loan Center, Inc.,* **No. 06CC00211 (Cal. Super. Ct., Orange Cty.).** On October 11, 2006, four individual plaintiffs filed this putative class action against LendingTree, LLC and HLC in the California Superior Court for Orange County. Plaintiffs allege that they used the LendingTree.com website to find potential lenders and without their knowledge were referred to LendingTree, LLC's direct lender, HLC; that Lending Tree, LLC and HLC did not adequately disclose the relationship between them; and that HLC charged Plaintiffs higher rates and fees than they otherwise would have been charged. Based upon these allegations, Plaintiffs assert that LendingTree, LLC and HLC violated California Business and Professions Code §§ 17200 and 17500 and California's Consumer Legal Remedies Act. Plaintiffs purport to represent a nationwide class of consumers who sought lender referrals from LendingTree, LLC and obtained loans from HLC since December 1, 2004. Plaintiffs seek damages, restitution, attorneys' fees and injunctive relief.

On November 27, 2006, LendingTree, LLC and HLC filed demurrers and a motion to strike portions of the complaint, arguing, among other things, that the complaint did not adequately allege that the named class representatives read and relied upon the allegedly deceptive representations on LendingTree, LLC's website. On January 25, 2007, the court sustained the demurrers and granted the motion to strike on the reliance issue, but otherwise overruled the demurrers and denied the motion to strike. On February 14, 2007, Plaintiffs filed their first amended complaint.

On March 12, 2007, LendingTree, LLC and HLC filed demurrers and a motion to strike portions of the first amended complaint. On May 17, 2007, the court overruled the demurrers and denied the

47

motion to strike. On June 11, 2007, LendingTree, LLC and HLC filed an answer to the first amended complaint.

The case is currently in discovery. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

***Mortgage Store, Inc. v. LendingTree Loans d/b/a Home Loan Center, Inc.,*** **No. 06CC00250 (Cal. Super. Ct., Orange Cty.).** On November 30, 2006, The Mortgage Store, Inc. and Castleview Home Loans, Inc. filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiffs, two former Network Lenders, allege that HLC interfered with LendingTree, LLC's contracts with Network Lenders by taking referrals from LendingTree, LLC. The complaint is largely based upon the factual allegations made in the *Schnee* complaint (described above). Based upon these factual allegations, Plaintiffs assert claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and violation of California Business and Professions Code §§ 17200 and 17500. Plaintiffs purport to represent all Network Lenders from December 14, 2004 to date, and seek damages, restitution, attorneys' fees, and punitive damages.

On February 8, 2007, HLC filed a demurrer and a motion to strike portions of Plaintiffs' complaint. On March 15, 2007, the court overruled the demurrer but granted the motion to strike in part, striking the portion of the complaint that sought restitution and disgorgement of all profits made by HLC from December 14, 2004 to date.

The case is currently in discovery. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

48

## CAPITALIZATION

The following table presents Tree.com's cash and cash equivalents and capitalization as of March 31, 2008 on an historical basis and on an unaudited pro forma basis for the separation. Pro forma for the separation includes the transfer of $55 million in cash from IAC to Tree.com. IAC determined to contribute additional capital in anticipation of the separation to help Tree.com, which has recently experienced operating losses and negative cash flow from operations, weather continued uncertainties in the industries in which it operates. Tree.com is expected to have $110 million at the time of the separation. The separation of Tree.com is described in the notes to the Unaudited Pro Forma Condensed Consolidated Balance Sheet under the Unaudited Pro Forma Condensed Consolidated Financial Statements as if the separation and the related transactions and events had been consummated on March 31, 2008.

The assumptions used and pro forma adjustments derived from such assumptions are based on currently available information and Tree.com believes such assumptions are reasonable under the circumstances. Such adjustments are subject to change based upon the finalization of the terms of the separation and the underlying separation agreements.

This table should be read in conjunction with "Selected Historical Financial Data," "Transfers to IAC and Financing," "Description of Capital Stock of Tree.com," "Management's Discussion and Analysis of Financial Condition and Results of Operations of Tree.com" the consolidated financial statements of Tree.com and the "Unaudited Pro Forma Condensed Consolidated Financial Statements" and accompanying notes included in this Prospectus.

The table below is not necessarily indicative of Tree.com's cash and cash equivalents and capitalization had the separation and the related transactions been completed on the date assumed. The capitalization table below may not reflect the capitalization or financial condition which would have resulted had Tree.com been operating as an independent, publicly-traded company at March 31, 2008 and is not necessarily indicative of Tree.com's future capitalization or financial condition.

| | As of March 31, 2008 | |
| --- | --- | --- |
| | Historical | Unaudited Pro Forma for the Separation |
| | (In millions) | |
| Cash and cash equivalents, including restricted cash and cash equivalents | $ 55 | $ 110 |
| Indebtedness: | | |
| Short term borrowings: | | |
| Lines of credit (primarily warehouse lines) | $ 79 | $ 79 |
| Total indebtedness | 79 | 79 |
| Shareholders' equity | 245 | 300 |
| Total capitalization | $ 324 | $ 379 |

49

## SELECTED HISTORICAL FINANCIAL DATA

The following table presents summary selected historical consolidated financial information for Tree.com, Inc. ("Tree.com"). This data was derived, in part, from the historical consolidated financial statements of Tree.com included elsewhere in this document and reflects the operations and financial position of Tree.com at the dates and for the periods indicated. The information in this table should be read in conjunction with the consolidated financial statements and accompanying notes and other financial data pertaining to Tree.com included herein. However, this information does not necessarily reflect what the historical financial position and results of operations of Tree.com would have been had Tree.com been a stand-alone company during the periods presented.

| | | Year Ended December 31, | | | | Three Months Ended March 31, | |
| | 2007[1] | 2006 | 2005 | 2004[2] (unaudited) | 2003[3] (unaudited) | 2008 (unaudited) | 2007 (unaudited) |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| **Statement of Operations Data:** | | | | | | | |
| Revenue | $ 346,378 | $ 476,478 | $ 421,355 | $ 189,783 | $ 55,795 | $ 70,193 | $ 109,999 |
| Operating (loss) income | (540,440) | 14,171 | 19,254 | (12,067) | (18,068) | (9,488) | (8,404) |
| Net (loss) income | (550,402) | 8,693 | 5,851 | (9,187) | (11,359) | (9,799) | (5,123) |

| | | December 31, | | | | March 31, |
| | 2007[1] | 2006 | 2005 (unaudited) | 2004[2] (unaudited) | 2003[3] (unaudited) | 2008 (unaudited) |
|---|---|---|---|---|---|---|
| | | | (In thousands) | | | |
| **Balance Sheet Data (end of period):** | | | | | | |
| Working capital (deficit) | $ (16,487) | $ 79,463 | $ 74,754 | $ 35,784 | $ 10,540 | $ 18,662 |
| Total assets | 443,587 | 1,261,045 | 1,326,961 | 1,074,896 | 745,400 | 442,810 |
| Long-term obligations, net of current maturities | — | 19,347 | 28,894 | 36,755 | 375 | — |
| Shareholders' equity | 214,624 | 773,453 | 766,486 | 753,674 | 707,948 | 244,545 |

(1)    Net loss includes impairment charges of $475.7 million related to the write-down of Tree.com's Lending segment goodwill and intangible assets.

(2)    Includes the results of Home Loan Center since its acquisition on December 14, 2004.

(3)    Includes the results of LendingTree since its acquisition by IAC on August 8, 2003.

50

**TREE.COM, INC. AND SUBSIDIARIES**

**UNAUDITED PRO FORMA**
**CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

The following Unaudited Pro Forma Condensed Consolidated Financial Statements of Tree.com, Inc. and subsidiaries ("Tree.com") reflect adjustments to the historical consolidated financial statements of Tree.com to give effect to the separation and related transactions described in the notes to the Unaudited Pro Forma Condensed Consolidated Financial Statements as of March 31, 2008 for the Unaudited Pro Forma Condensed Consolidated Balance Sheet and as of January 1, 2007 and January 1, 2008 for the Unaudited Pro Forma Condensed Consolidated Statement of Operations for the year ended December 31, 2007 and the three months ended March 31, 2008, respectively.

The assumptions used and pro forma adjustments derived from such assumptions are based on currently available information and Tree.com believes such assumptions are reasonable under the circumstances. At this time Tree.com does not expect material changes to the separation agreements.

The following Unaudited Pro Forma Condensed Consolidated Financial Statements should be read in conjunction with the historical consolidated financial statements of Tree.com and "Management's Discussion and Analysis of Financial Condition and Results of Operations" of Tree.com included in this Prospectus.

These Unaudited Pro Forma Condensed Consolidated Financial Statements are not necessarily indicative of Tree.com's results of operations or financial condition had the separation and related transactions been completed on the dates assumed. Also, they may not reflect the results of operations or financial condition which would have resulted had Tree.com been operating as an independent publicly-traded company during such periods. In addition, they are not necessarily indicative of Tree.com's future results of operations or financial condition.

51

**TREE.COM, INC. AND SUBSIDIARIES**

**UNAUDITED PRO FORMA**
**CONDENSED CONSOLIDATED BALANCE SHEET**

**MARCH 31, 2008**

| | Historical | | Pro Forma Adjustments | | Notes | | Pro Forma |
|---|---|---|---|---|---|---|---|
| | | | (In thousands, except share data) | | | | |
| **ASSETS** | | | | | | | |
| Cash and cash equivalents, including restricted cash and cash equivalents | $ 54,958 | | $ 55,042 | | (a) | $ | 110,000 |
| Other current assets | 121,672 | | — | | | | 121,672 |
| Total current assets | 176,630 | | 55,042 | | | | 231,672 |
| Non-current assets | 266,180 | | — | | | | 266,180 |
| **TOTAL ASSETS** | $ 442,810 | | $ 55,042 | | | $ | 497,852 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | |
| **LIABILITIES:** | | | | | | | |
| Current liabilities | $ 157,968 | | $ — | | | $ | 157,968 |
| Long-term liabilities | 40,297 | | — | | | | 40,297 |
| **SHAREHOLDERS' EQUITY:** | | | | | | | |
| Common shares, $0.01 par value, 50,000,000 authorized; 9,291,185 issued and outstanding on a pro forma basis | — | | 93 | | (a) | | 93 |
| Additional paid-in capital | — | | 863,560 | | (a) | | 863,560 |
| Invested capital | 766,374 | | (766,374) | | (a) | | — |
| Payables to IAC and subsidiaries | 42,237 | | (42,237) | | (a) | | — |
| Accumulated deficit | (564,066) | | — | | | | (564,066) |
| Total shareholders' equity | 244,545 | | 55,042 | | | | 299,587 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 442,810 | | $ 55,042 | | | $ | 497,852 |

The accompanying Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements are an integral part of these statements.

52

**TREE.COM, INC. AND SUBSIDIARIES**

**UNAUDITED PRO FORMA**
**CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**

**THREE MONTHS ENDED MARCH 31, 2008**

| | Historical | Pro Forma Adjustments | Notes | Pro Forma |
|---|---|---|---|---|
| | | **(In thousands, except per share data)** | | |
| Revenue | $ 70,193 | $ — | | $ 70,193 |
| Operating expenses | 79,681 | 1,379 | (b) | 82,166 |
| | | 1,106 | (c) | |
| Operating loss | (9,488) | (2,485) | | (11,973) |
| Other income (expense): | | | | |
| Interest income | 9 | — | | 9 |
| Interest expense | (109) | 32 | (d) | (77) |
| Other expense | (2) | — | | (2) |
| Total other expense, net | (102) | 32 | | (70) |
| Loss before income taxes | (9,590) | (2,453) | | (12,043) |
| Income tax (provision) benefit | (209) | 1,016 | (e) | 807 |
| **Net loss** | $ (9,799) | $ (1,437) | | $ (11,236) |
| Pro forma loss per share:(f)(g) | | | | |
| Basic loss per share | | | | $ (1.21) |
| Diluted loss per share | | | | $ (1.21) |

The accompanying Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements are
an integral part of these statements.

53

**TREE.COM, INC. AND SUBSIDIARIES**

**UNAUDITED PRO FORMA
CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**

**YEAR ENDED DECEMBER 31, 2007**

| | Historical | Pro Forma Adjustments | Notes | Pro Forma |
|---|---|---|---|---|
| | | (In thousands, except per share data) | | |
| Revenue | $ 346,378 | $ — | | $ 346,378 |
| Operating expenses | 886,818 | 5,351 | (b) | 896,595 |
| | | 4,426 | (c) | |
| Operating loss | (540,440) | (9,777) | | (550,217) |
| Other income: | | | | |
| Interest income | 1,171 | (1,000) | (d) | 171 |
| Interest expense | (986) | — | | (986) |
| Other income | 14 | — | | 14 |
| Total other income (expense), net | 199 | (1,000) | | (801) |
| Loss before income taxes | (540,241) | (10,777) | | (551,018) |
| Income tax provision | (10,161) | 4,462 | (e) | (5,699) |
| **Net loss** | $ (550,402) | $ (6,315) | | $ (556,717) |
| Pro forma loss per share:(f)(g) | | | | |
| Basic loss per share | | | | $ (58.46) |
| Diluted loss per share | | | | $ (58.46) |

The accompanying Notes to Unaudited Pro Forma Condensed Consolidated Financial Statements are
an integral part of these statements.

54

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO UNAUDITED PRO FORMA
CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

(a)    To effect the terms of the separation as follows:

     (i)    the transfer of $55.0 million in cash from IAC to Tree.com to bring Tree.com's cash balance to $110.0 million upon its separation from IAC;

     (ii)    the extinguishment of the payable to IAC and subsidiaries; and

     (iii)    the issuance of 9.3 million Tree.com shares to effect the transfer of its ownership from IAC to IAC's shareholders based on an expected exchange ratio of $1/30^{th}$ of a share of Tree.com for each share of IAC and the number of IAC common shares outstanding as of March 31, 2008 before giving effect to the 1 for 2 reverse stock split of IAC shares that is expected to be effected in connection with the spin-off.

(b)    Tree.com expects to incur additional costs related to being a stand-alone, public company. These costs have been estimated to be $6.3 million on an annual basis. These costs relate to the following:

     •    additional personnel including accounting, tax, treasury, internal audit and legal personnel;

     •    professional fees associated with audits, tax and other services;

     •    increased insurance premiums;

     •    increased health and welfare benefit costs;

     •    costs associated with a board of directors;

     •    increased franchise taxes, stock exchange listing fees, fees for preparing and distributing periodic filings with the Securities and Exchange Commission; and

     •    other administrative costs and fees.

The total costs referred to above were compared to the corporate allocations from IAC for the three months ended March 31, 2008 and for the year ended December 31, 2007 in order to determine the incremental costs expected to be incurred for each period as follows:

| | Three Months Ended March 31, 2008 | | Year Ended December 31, 2007 |
|---|---|---|---|
| | (In thousands) | | |
| Estimated stand-alone, public company costs | $ 1,569 | $ | 6,344 |
| Less: corporate allocations | (190) | | (993) |
| Incremental costs of being a stand-alone, public company | $ 1,379 | $ | 5,351 |

The significant assumptions underlying the determination of these estimates include:

     •    the number of additional personnel required to operate as a public company and the compensation level with respect to each position;

     •

the level of additional assistance Tree.com will require from professional service providers;

- the increase in insurance premiums as a stand-alone public company;

- the increase in health and welfare costs as a stand-alone entity; and

55

**TREE.COM, INC. AND SUBSIDIARIES**

## NOTES TO UNAUDITED PRO FORMA
## CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)

- the type and level of other costs expected to be incurred in connection with being a stand-alone public company.

This amount excludes $0.6 million of estimated one-time recruiting fees, professional fees for legal and tax services (e.g. initial benefit plan design) and other costs (e.g. initial stock exchange listing fees) expected to be incurred in initially establishing Tree.com as a stand-alone public company. These costs are therefore not expected to recur.

The information presented above in note (b), with respect to the costs that Tree.com expects to incur as a stand-alone, public company, is forward looking information within the meaning of "Forward-Looking Statements" as described on pages 21-22 of this Prospectus.

(c)    To reflect the additional compensation expense associated with equity-based awards that will be granted upon consummation of the separation.

The awards related to the consummation of the separation were granted to the Chairman and Chief Executive Officer in connection with the employment agreement that was executed upon his appointment to that role. The issuance of these awards are contingent upon the consummation of the separation. The expense related to these awards is included as a pro forma adjustment because they will vest over periods ranging from one to five years and will therefore have an impact on the ongoing operations of Tree.com. The amount was determined using a Black Scholes calculation for the stock option awards and an assumed value for the restricted stock award. The aggregate estimated value of these awards is being amortized to expense on a straight-line basis over the vesting period of the awards. This does not reflect non-recurring compensation expense related to modifications of existing equity-based awards that will be made in connection with the separation described below.

Vested stock options to purchase shares of IAC common stock will be modified as follows in connection with the separation:

Each option will convert into an option to purchase shares of common stock of all five companies, with adjustments to the number of shares subject to each option and the option exercise prices based on the relative values of IAC and the other four companies following the separation, with the intent to generally maintain equivalent value immediately pre and post the transaction.

A calculation of the estimated value of the vested options immediately prior to the separation and immediately after the separation was performed using the Black Scholes model. The incremental charge of $0.1 million resulted from the higher estimated value of the vested stock options after the separation. This higher value is due to higher estimated weighted average volatility of the stock price of the five companies after the separation than the expected volatility of IAC's stock price. The expense is a one-time charge because the options are fully vested and there is no future service requirement.

The modification related to IAC restricted stock units ("RSUs") relates to the accelerated vesting, upon the consummation of the separation, of all RSUs granted prior to August 8, 2005 and all awards that were scheduled to vest prior to February 28, 2009. The estimated expense of $3.1 million is the previously unrecognized compensation expense associated with these awards. The expense is treated as non-recurring because after the separation no future service is required with respect to these awards.

56

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO UNAUDITED PRO FORMA**
**CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

There may be additional stock-based awards granted in connection with the separation but the amount of such awards, if any, has not yet been determined and no expense with respect thereto has been reflected herein.

(d)    To reflect the elimination of intercompany interest expense for the three months ended March 31, 2008 and intercompany interest income for the year ended December 31, 2007 allocated by IAC to Tree.com.

(e)    To reflect the tax effect of the pro forma adjustments at an assumed effective tax rate of 41.4% which represents a federal statutory tax rate of 35% and a state effective statutory rate of 6.4%.

(f)    Loss per share and weighted average shares outstanding reflect the historical number of IAC common shares used to calculate IAC's earnings per share, adjusted based on an expected exchange ratio of $^{1}/30^{th}$ of a share of Tree.com for each share of IAC before giving effect to the 1 for 2 reverse stock split for IAC shares that is expected to be effected in connection with the separation. These amounts reflect the outstanding equity-based awards that were included in IAC's dilutive earnings per share calculation. Pro forma loss per share is calculated using the following:

| | Three Months Ended March 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|
| | (In thousands) | |
| Net loss | $ (11,236) | $ (556,717) |
| Basic shares outstanding—weighted average shares | 9,292 | 9,523 |
| Other dilutive securities including stock options, warrants and restricted stock and share units(g) | — | — |
| Diluted shares outstanding—weighted average shares | 9,292 | 9,523 |

(g)    The effect of dilutive securities would be antidilutive due to the net loss and are therefore excluded from the calculation of diluted earnings per share.

57

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF TREE.COM

*The following discussion describes the financial condition and results of operations of Tree.com, Inc. ("Tree.com") as though Tree.com were a separate company as of the dates and for the periods presented and includes the businesses, assets and liabilities that will comprise Tree.com following the spin-off.*

### Spin-Off

On November 5, 2007, IAC/InterActiveCorp ("IAC") announced that its Board of Directors approved a plan to separate IAC into five publicly traded companies, identifying Tree.com as one of those five companies. We refer to the separation transaction herein as the "spin-off." In connection with the spin-off, Tree.com was incorporated as a Delaware corporation in April 2008. Tree.com currently does not have any material assets or liabilities, nor does it engage in any business or other activities and, other than in connection with the spin-off, will not acquire or incur any material assets or liabilities, nor will it engage in any business or other activities. Upon completion of the spin-off, Tree.com will consist of the businesses that formerly comprised IAC's Lending and Real Estate segments. We refer herein to these businesses as the "Tree.com Businesses," which include LendingTree.com, RealEstate.com, GetSmart.com, LendingTree Loans, iNest and Domania.

### Basis of Presentation

The historical consolidated financial statements of Tree.com and its subsidiaries and the disclosure set forth in this Management's Discussion and Analysis of Financial Condition and Results of Operations of Tree.com reflect the contribution or other transfer to Tree.com of all of the subsidiaries and assets and the assumption by Tree.com of all of the liabilities relating to the Tree.com Businesses in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses. Accordingly, the historical consolidated financial statements of Tree.com reflect the historical financial position, results of operations and cash flows of the Tree.com Businesses since their respective dates of acquisition by IAC, based on the historical consolidated financial statements and accounting records of IAC and using the historical results of operations and historical bases of the assets and liabilities of the Tree.com Businesses with the exception of accounting for income taxes, which have been computed for Tree.com on an as if stand-alone, separate tax return basis. Intercompany transactions and accounts have been eliminated.

In the opinion of Tree.com's management, the assumptions underlying the historical consolidated financial statements of Tree.com are reasonable. However, this financial information does not necessarily reflect what the historical financial position, results of operations and cash flows of Tree.com would have been had Tree.com been a stand-alone company during the periods presented.

<center>58</center>

### MANAGEMENT OVERVIEW

Tree.com's Lending segment consists of online networks (principally LendingTree.com and GetSmart.com) and call centers that connect consumers and financial providers in the lending industry (the "lending networks"). Tree.com also originates, processes, approves and funds various residential real estate loans through Home Loan Center, which does business as LendingTree Loans in certain jurisdictions. The Home Loan Center and LendingTree Loans brand names are collectively referred to in this report as "LendingTree Loans". Additionally, Tree.com provides mortgage settlement services, including title search, appraisals, flood certification and closing transactions, under the name "LendingTree Settlement Services".

Tree.com's Real Estate segment primarily consists of a proprietary full-service real estate brokerage that operates in 14 U.S. markets, *www.RealEstate.com*, an online network that connects consumers with real estate brokerages around the country, iNest, an online network that matches buyers and builders of new homes, and Domania, an online lead provider for banks, mortgage lenders and real estate professionals (the "real estate networks").

**Sources of Revenue**

Lending is generally compensated on a fee basis by the lenders who participate in its online lending networks, with LendingTree Loans principally deriving revenue from the origination and sale in the secondary markets of various residential real estate loans. Real Estate is generally compensated from subscription and cooperative brokerage fees paid by real estate professionals participating in its real estate networks and from commissions paid by consumers for its agents closing a real estate transaction on their behalf.

**Channels of Distribution; Marketing Costs**

Tree.com markets and offers services directly to customers through branded websites allowing customers to transact directly with Tree.com in a convenient manner. Tree.com has made, and expects to continue to make, substantial investments in online and offline advertising to build its brands and drive traffic to its businesses.

Tree.com also pays to market and distribute services on third-party distribution channels, such as internet portals and search engines. In addition, some of the Tree.com Businesses manage affiliate marketing programs, pursuant to which the Tree.com businesses pay commissions and fees to third parties based on the number of leads generated or the revenue earned. These distribution channels might also offer their own products, as well as those of other third parties, that compete with those made available and offered by Tree.com businesses.

The cost of acquiring new customers through online and offline third-party distribution channels has increased, particularly in the case of online channels as internet commerce continues to grow and competition in the housing market increases. Tree.com expects sales and marketing expense as a percentage of revenue to continue to increase. Sales and marketing expense as a percentage of revenue increased to approximately 54% in 2007 from approximately 46% in 2006 and 42% in 2005.

**Access to Supply**

Tree.com provides lending and real estate network partners with important customer acquisition channels. Tree.com believes that the ability of its partners to reach a large qualified audience through its brands and businesses is a significant benefit. Tree.com offers its customers the choice of multiple suppliers in one setting.

59

**Recent Developments; 2008 Second Quarter Results**

IAC has released its consolidated earnings for the three months ended June 30, 2008 and filed its Form 10-Q for the quarter ended June 30, 2008 with the Commission. The financial information for Tree.com presented therein is not prepared on a basis consistent with that used in the preparation of the consolidated financial information of Tree.com included herein because the financial information of Tree.com presented in this Prospectus includes:

- allocations of stock based compensation expense;

- allocation of IAC corporate expenses;

- the calculation of income taxes on a stand-alone, separate return basis; and

- footnotes and other disclosures required for this information to be presented in accordance with generally accepted accounting principles.

The preparation and review of the allocations related to stock-based compensation expense and IAC corporate expenses and the calculation of income taxes and the preparation of the required footnotes and other disclosures is not yet completed as IAC's financial personnel have been principally focused on IAC's reporting requirements for the quarter ended June 30, 2008.

The reported financial results for Tree.com, as presented below, are as reported in IAC's consolidated financial statements, and will differ from those presented in this Prospectus for Tree.com on a standalone basis as explained above.

| | Three Months Ended June 30, 2008 | | Three Months Ended June 30, 2007 | | Change |
|---|---|---|---|---|---|
| | ($ in millions, except for transmitted QFs and Closings—units) | | | | |
| **Revenue** | | | | | |
| Origination and sale of loans | $ | 23.1 | $ | 47.1 | (51)% |
| Other lending | | 26.7 | | 51.5 | (48)% |
| Total Lending | | 49.8 | | 98.6 | (50)% |
| Real Estate | | 10.2 | | 15.4 | (33)% |
| Total revenue | $ | 60.0 | $ | 114.0 | (47)% |
| **Operating Loss** | | | | | |
| Lending | $ | (111.1) | $ | (1.3) | (8,368)% |
| Real Estate | | (65.6) | | (8.7) | (652)% |
| | $ | (176.7) | $ | (10.0) | (1,659)% |
| **Operating metrics** | | | | | |
| Lending | | | | | |
| Transmitted QFs (000s)(a) | | 561.6 | | 889.5 | (37)% |
| Closings—units (000s)(b) | | 28.1 | | 59.2 | (52)% |
| Closings—dollars(b) | $ | 4,323 | $ | 7,673 | (44)% |
| Real Estate | | | | | |
| Closings—units (000s) | | 2.2 | | 3.1 | (30)% |
| Closings—dollars | $ | 541 | $ | 796 | (32)% |

(a)    Customer "Qualification Forms" (QFs) transmitted to at least one exchange lender (including LendingTree Loans) plus QFs transmitted to at least one GetSmart lender.

(b)    Loan closings consist of loans closed by exchange lenders and directly by LendingTree Loans

https://www.sec.gov/Archives/edgar/data/1434621/000104746908009036/a2187231zs-1a.htm

*Lending*

Lending revenue in the three months ending June 30, 2008 decreased $48.8 million, or 50%, from the same period in 2007. Revenue generated from the origination and sale of loans in the secondary market declined $24.0 million, or 51%, primarily due to fewer loans being originated and sold into the secondary market as well as a market driven shift to lower margin conforming loans, higher costs per loan sold as a result of lower close rates and stricter underwriting criteria as compared to the prior year. Revenue from other lending services declined $24.8 million, or 48%, due to fewer Qualification Forms transmitted to and loans closed on the lending networks. Lower revenue and margins more than offset $35.9 million in lower year-over-year marketing and other operating expenses. Charges associated with restructuring initiatives aggregated $1.2 million versus $3.8 million in the year ago period. Operating loss in the second quarter of 2008 includes a $104.9 million impairment charge related to goodwill and an indefinite-lived intangible asset, reflecting Tree.com's assessment of the likely profitability of the Lending segment in light of the persistent adverse mortgage market conditions.

*Real Estate*

Revenue declines reflect fewer closings at the builder and broker networks and the absence of revenue from the agent network business which closed in December 2007, partially offset by increased closings at the company owned brokerage. The company owned brokerage, now operating in 14 markets, grew revenue 24% during the period. Operating losses in the second quarter of 2008 reflect lower marketing expenses and lower administrative costs resulting, in part, from the restructuring of the business during 2007 and 2008. Operating loss in the second quarter of 2008 includes a $61.0 million impairment charge related to goodwill, reflecting Tree.com's assessment of the likely profitability of the Real Estate segment in light of the persistent adverse mortgage market conditions.

**Economic and Other Trends and Events; Industry Specific Factors**

The credit and secondary mortgage markets have been experiencing unprecedented and continuing disruption, which had an adverse effect on Tree.com's business, financial condition and results of operations in 2007 and 2008. These conditions, coupled with adverse economic conditions and continuing declines in residential real estate prices generally, have resulted in decreased consumer demand for the lending and real estate offerings provided by Tree.com's networks and other businesses. Generally, increases in interest rates adversely affect the ability of the Lending Business and Network Lenders to close loans, while adverse economic trends limit the ability of the Lending Business and Network Lenders to offer home loans other than low margin conforming loans. The number of Network Lenders also decreased in 2007 and 2008 as many lenders exited the business due to the difficult economic conditions. Likewise, adverse economic trends have reduced the number of prospective home purchasers and home prices, which adversely affected Tree.com's Real Estate Business.

Tree.com recognized impairment charges of $475.7 million related to the write-down of its Lending segment goodwill and intangible assets in the fourth quarter of 2007. These impairments resulted from Tree.com's reassessment of the likely future profitability of Lending in light of the persistent adverse mortgage market conditions and the operational strategies Tree.com has undertaken in response to these market realities. These adverse conditions include, among others, constrained liquidity, lender focus on low margin conforming loans, uncertainty as to the eventuality and timing of the return of higher margin mortgage products, the decline in real estate values and a high rate of delinquency for existing mortgages. Tree.com has significantly reduced its mortgage origination operations in response to these conditions which will reduce or slow its ability to react to possible improvements in the market. The impairments at the Lending segment occurred during the fourth quarter of 2007 as Tree.com completed an updated assessment of mortgage market conditions and the development and implementation of Lending's responsive operational strategies, and quantified these considerations in

61

Lending's future forecasted results. In addition, in response to these persistent adverse mortgage market conditions, Tree.com restructured its operations in 2007 and recorded $22.9 million in restructuring expense. This restructuring affected all departments and locations within Tree.com but were principally related to the mortgage origination operations.

These restructuring efforts described above may be insufficient to allow Tree.com to weather these continuing adverse market conditions. Continued protracted adverse market conditions may require additional restructuring of Tree.com's operations and could give rise to additional restructuring charges and additional impairment charges.

### *Results of Operations for the Years Ended December 31, 2007, 2006 and 2005*

### *Revenue*

| | | | | Years Ended December 31, | | | |
|---|---|---|---|---|---|---|---|
| | | 2007 | % Change | 2006 | % Change | | 2005 |
| | | | | (Dollars in thousands) | | | |
| Lending | $ | 294,626 | (30)% $ | 419,657 | 15% | $ | 363,800 |
| Real Estate | | 51,752 | (9)% | 56,821 | (1)% | | 57,555 |
| Total revenue | $ | 346,378 | (27)% $ | 476,478 | 13% | $ | 421,355 |

Revenue in 2007 decreased $130.1 million, or 27%, from 2006 primarily due to fewer loans sold into the secondary market, lower revenue per loan sold, fewer loans closed on the lending networks and an increase of $13.5 million in the liability for losses on previously sold loans. Also contributing to the decrease in revenue is a decrease of $13.1 million related to the Real Estate builder and broker networks, which decreased closings year over year. Lenders' narrowing focus on traditional mortgages in reaction to changes in the mortgage market contributed to lower close rates, a shift to lower margin products, and lower revenue per loan sold at LendingTree Loans. Revenue from home equity loans fell 58% due in part to an exit from certain home equity loans at LendingTree Loans and as a result of deteriorating market conditions. Additionally, purchase mortgage revenue and refinance mortgage revenue declined 21% and 16%, respectively. The dollar value of loans closed by network lenders and directly by LendingTree Loans in 2007 decreased 23% to $24.9 billion. This includes refinance mortgages of $13.0 billion, purchase mortgages of $6.9 billion and home equity loans of $4.2 billion. The dollar value of closed loans in 2006 was $32.1 billion, including refinance mortgages of $16.9 billion, purchase mortgages of $8.3 billion and home equity loans of $5.9 billion.

Partially offsetting the revenue decrease in 2007 is an increase of $9.7 million in revenue from our company-owned brokerage business, which increased closings by 190%. The company-owned brokerage business began closing transactions in the first quarter of 2006 and now operates in fourteen metropolitan markets. Similar to closing loans in our own name, through LendingTree Loans, the company-owned brokerage enables Real Estate to capture a larger portion of the transaction revenue.

LendingTree Loans originates mortgage loans on property located throughout the United States, with no one location representing more than 10% of Tree.com's consolidated revenue for any periods presented. Revenue from loans originated for property located in California and Florida in the aggregate totaled approximately 10%, 14% and 14% of Tree.com's consolidated revenue for the years ended December 31, 2007, 2006 and 2005, respectively.

Revenue in 2006 increased $55.1 million, or 13%, from 2005 driven primarily by higher revenue per loan, increased sales of loans into the secondary market and increased match fee revenue due to both growth in loan request form volume and higher prices on the networks. Increased revenue from settlement services also impacted revenue growth in 2006. Revenue from refinance mortgage, home equity loans and purchase mortgage loans grew 15%, 16% and 26%, respectively, from the prior year, despite the difficult market conditions in 2006. The dollar value of loans closed by exchange lenders

and directly by LendingTree Loans in 2006 decreased 8% to $32.1 billion. This includes refinance mortgages of $16.9 billion, purchase mortgages of $8.3 billion and home equity loans of $5.9 billion. The dollar value of closed loans in 2005 was $34.7 billion, including refinance mortgages of $19.8 billion, purchase mortgages of $8.0 billion and home equity loans of $5.8 billion.

### *Cost of revenue*

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | (Dollars in thousands) | | | | |
| Lending | $47,264 | (0)% | $47,412 | 22% | $38,904 |
| Real Estate | 25,850 | 0% | 25,805 | (6)% | 27,438 |
| Cost of revenue | $73,114 | (0)% | $73,217 | 10% | $66,342 |
| As a percentage of total revenue | 21% | 574 bp | 15% | (38) bp | 16% |
| Gross margins | 79% | (574) bp | 85% | 38 bp | 84% |

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | (Dollars in thousands) | | | | |
| Cost of revenue—Lending | $47,264 | (0)% | $47,412 | 22% | $38,904 |
| As a percentage of Lending revenue | 16% | 474 bp | 11% | 60 bp | 11% |
| Lending gross margins | 84% | (474) bp | 89% | (60) bp | 89% |
| Cost of revenue—Real Estate | $25,850 | 0% | $25,805 | (6)% | $27,438 |
| As a percentage of Real Estate revenue | 50% | 453 bp | 45% | (226) bp | 48% |
| Real Estate gross margins | 50% | (453) bp | 55% | 226 bp | 52% |

Cost of revenue consists primarily of costs associated with unsuccessful loan origination attempts, compensation and other employee-related costs (including stock-based compensation) related to customer call centers, real estate network support staff and loan officers, as well as credit scoring fees, consumer incentive costs, real estate agent commissions and website network hosting and server fees.

Cost of revenue in 2007 was relatively unchanged from 2006 despite the significant revenue decline. The increase in cost of revenue as a percentage of total revenue is principally due to the reduced revenue discussed above, and a $5.5 million increase in costs associated with unsuccessful loan originations. If a loan funds, these costs are deferred until the loan is sold to an investor and are included in revenue on a net basis. However, costs associated with all unsuccessful loan origination attempts are expensed as incurred. This increase was partially offset by a $3.5 million decrease in compensation and other employee-related costs as Tree.com reduced its personnel costs associated with its customer call center, settlement services operation and portions of its loan processing department. Cost of revenue also increased as a percentage of revenue due to an increase of $5.0 million in commission expense primarily related to the increase in closings at company-owned brokerage business, partially offset by a decrease of $4.6 million in consumer incentive rebates related to decreased closings at the Real Estate builder and broker network businesses.

Cost of revenue in 2006 increased $6.9 million from 2005 primarily due to increases of $4.5 million in compensation and other employee-related costs, $3.9 million in commission expense related to the company-owned brokerage business and $3.0 million in direct costs associated with the growth in the settlement services business. These increases were partially offset by a decrease of $2.8 million in customer incentive rebates at Real Estate related to the builder and broker network businesses.

63

*Selling and marketing expense*

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **% Change** | **2006** | **% Change** | **2005** |
|  |  |  | (Dollars in thousands) | | |
| Lending | $168,436 | (14)% | $195,245 | 32% | $148,227 |
| Real Estate | 19,176 | (19)% | 23,665 | (17)% | 28,522 |
| Selling and marketing expense | $187,612 | (14)% | $218,910 | 24% | $176,749 |
| As a percentage of total revenue | 54% | 822 bp | 46% | 400 bp | 42% |

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **% Change** | **2006** | **% Change** | **2005** |
|  |  |  | (Dollars in thousands) | | |
| Selling and marketing expense—Lending | $168,436 | (14)% | $195,245 | 32% | $148,227 |
| As a percentage of Lending revenue | 57% | 1,064 bp | 47% | 578 bp | 41% |
| Selling and marketing expense—Real Estate | $ 19,176 | (19)% | $ 23,665 | (17)% | $ 28,522 |
| As a percentage of Real Estate revenue | 37% | (460) bp | 42% | (791) bp | 50% |

Selling and marketing expense consists primarily of advertising and promotional expenditures, fees paid to affiliates and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in the sales function. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

Selling and marketing expense in 2007 decreased $31.3 million from 2006 primarily due to a decrease of $27.2 million in advertising and promotional expenditures. In 2007, Tree.com experienced decreases in advertising of $13.1 million, $8.8 million and $7.7 million associated with print, television and online advertising, respectively. The increase in selling and marketing expense as a percentage of revenue is due to decreased conversions of consumer leads into closed transactions. Tree.com anticipates that selling and marketing expense will continue to represent a high percentage of revenue as it continues to promote its brands both online and offline.

Selling and marketing expense in 2006 increased $42.2 million from 2005 primarily due to an increase of $37.7 million in advertising and promotional expenditures as Tree.com shifted to online marketing to drive lead volume in more difficult mortgage market conditions. Selling and marketing expense as a percentage of revenue increased due in part to lower close rates.

*General and administrative expense*

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **% Change** | **2006** | **% Change** | **2005** |
|  |  |  | (Dollars in thousands) | | |
| Lending | $79,172 | (18)% | $ 96,888 | 12% | $ 86,272 |
| Real Estate | 20,072 | (10)% | 22,396 | 43% | 15,703 |
| General and administrative expense | $99,244 | (17)% | $119,284 | 17% | $101,975 |
| As a percentage of total revenue | 29% | 362 bp | 25% | 83 bp | 24% |

64

| | Years Ended December 31, | | | |
| | 2007 | % Change | 2006 | % Change | 2005 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | |
| General and administrative expense—Lending | $79,172 | (18)% | $96,888 | 12% | $86,272 |
| As a percentage of Lending revenue | 27% | 378 bp | 23% | (63) bp | 24% |
| | | | | | |
| General and administrative expense—Real Estate | $20,072 | (10)% | $22,396 | 43% | $15,703 |
| As a percentage of Real Estate revenue | 39% | (63) bp | 39% | 1,213 bp | 27% |

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, human resources and executive management functions, facilities and infrastructure costs and fees for professional services.

General and administrative expense in 2007 decreased $20.0 million from 2006 primarily due to a decrease of $13.2 million in compensation and other employee-related costs, due principally to a reduction in workforce, and a decrease of $2.5 million in professional fees. Refer to "Restructuring expense" below for additional information on the reduction in workforce. Tree.com expects to incur increased costs related to the additional financial and legal requirements associated with being a separate public company, as well as increased non-cash compensation associated with the modification of existing stock-based compensation awards in connection with the spin-off and the grant of new awards post spin-off.

General and administrative expense in 2006 increased $17.3 million from 2005 primarily due to an increase of $11.1 million in compensation and other employee-related costs and an increase of $2.8 million in facilities and infrastructure costs. The increase in compensation and other employee-related costs was due in part to an increase in headcount. General and administrative expense in 2006 and 2005 were negatively impacted by accruals of $3.5 million and $5.8 million, respectively, related to an adverse legal judgment.

Effective January 1, 2006, Tree.com adopted Statement of Financial Accounting Standards ("SFAS") No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"), using the modified prospective transition method. There was no impact to the amount of stock-based compensation recorded in the consolidated statement of operations for the years ended December 31, 2006 and 2005 as a result of adopting SFAS 123R. Tree.com has been recognizing expense for all stock-based grants since its acquisition by IAC on August 8, 2003, in accordance with SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). The majority of stock-based compensation expense is reflected in general and administrative expense. As of December 31, 2007, there was approximately $10.2 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.8 years.

*Product development*

| | Years Ended December 31, | | | |
| | 2007 | % Change | 2006 | % Change | 2005 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | |
| Lending | $ 9,720 | (6)% | $10,301 | (5)% | $10,803 |
| Real Estate | 5,271 | 8% | 4,867 | 16% | 4,198 |
| | | | | | |
| Product development | $14,991 | (1)% | $15,168 | 1% | $15,001 |
| | | | | | |
| As a percentage of total revenue | 4% | 114 bp | 3% | (38) bp | 4% |

65

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | | | (Dollars in thousands) | | |
| Product development—Lending | $9,720 | (6)% | $10,301 | (5)% | $10,803 |
| As a percentage of Lending revenue | 3% | 84 bp | 2% | (51) bp | 3% |
| | | | | | |
| Product development—Real Estate | $5,271 | 8% | $ 4,867 | 16% | $ 4,198 |
| As a percentage of Real Estate revenue | 10% | 162 bp | 9% | 127 bp | 7% |

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in product development, which include costs related to the design, development, testing and enhancement of technology that are not capitalized.

Product development expense in 2007 decreased $0.2 million from 2006, primarily due to decreased compensation and other employee-related costs.

Product development expense in 2006 increased $0.2 million from 2005, primarily due to increased compensation and other employee-related costs related to modifying, maintaining and enhancing its technology and web-pages.

*Restructuring expense*

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | | | (Dollars in thousands) | | |
| Lending | $21,566 | N/A | $— | — | $— |
| Real Estate | 1,301 | N/A | — | — | — |
| | | | | | |
| Restructuring expense | $22,867 | N/A | $— | — | $— |
| | | | | | |
| As a percentage of total revenue | 7% | N/A | — | — | — |

In response to persistent adverse mortgage market conditions, Tree.com completed a restructuring of its operations and recorded $22.9 million in restructuring expense. As a part of this restructuring, approximately 800 positions across all departments and locations of its business were eliminated, however the restructuring principally related to the mortgage origination operations of LendingTree Loans. In addition, Tree.com ceased use of space in six of its facilities previously used by LendingTree Loans. In connection with this reduction in workforce and facilities restructuring, Tree.com recorded $9.3 million in employee termination costs, $5.0 million for liabilities associated with exiting the lease obligations, $8.0 million for write-offs of fixed assets and other projects in progress and $0.6 million for other items.

*Depreciation*

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | | | (Dollars in thousands) | | |
| Lending | $ 8,905 | (4)% | $ 9,309 | 68% | $5,540 |
| Real Estate | 1,153 | (52)% | 2,401 | 104% | 1,180 |
| | | | | | |
| Depreciation | $10,058 | (14)% | $11,710 | 74% | $6,720 |
| | | | | | |
| As a percentage of total revenue | 3% | 45 bp | 2% | 86 bp | 2% |

66

https://www.sec.gov/Archives/edgar/data/1434621/000104746908009036/a2187231zs-1a.htm

| | | Years Ended December 31, | | |
| | 2007 | % Change | 2006 | % Change | 2005 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | |
| Depreciation—Lending | $8,905 | (4)% | $9,309 | 68% | $5,540 |
| As a percentage of Lending revenue | 3% | 80 bp | 2% | 70 bp | 2% |
| | | | | | |
| Depreciation—Real Estate | $1,153 | (52)% | $2,401 | 104% | $1,180 |
| As a percentage of Real Estate revenue | 2% | (200) bp | 4% | 218 bp | 2% |

Depreciation in 2007 decreased $1.7 million from 2006 primarily due to the write-off of fixed assets referred to above and certain fixed assets becoming fully depreciated and decreased capital expenditures as Tree.com scaled back its spending in light of mortgage market conditions.

Depreciation in 2006 increased $5.0 million from 2005 primarily due to the incremental depreciation associated with capital expenditures made throughout 2006 and 2005, partially offset by certain fixed assets becoming fully depreciated during the period.

### *Operating Income Before Amortization*

Operating Income Before Amortization is a Non-GAAP measure and is defined in "Tree.com's Principles of Financial Reporting".

| | | Years Ended December 31, | | |
| | 2007 | % Change | 2006 | % Change | 2005 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | |
| Lending | $(23,524) | NM | $ 61,873 | (22)% | $ 78,883 |
| Real Estate | (20,059) | 7% | (21,507) | (27)% | (16,930) |
| | | | | | |
| Operating Income Before Amortization | $(43,583) | NM | $ 40,366 | (35)% | $ 61,953 |
| | | | | | |
| As a percentage of total revenue | (13)% | NM | 8% | (623) bp | 15% |

| | | Years Ended December 31, | | |
| | 2007 | % Change | 2006 | % Change | 2005 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | |
| Operating Income Before Amortization—Lending | $(23,524) | NM | $61,873 | (22)% | $78,883 |
| As a percentage of Lending revenue | (8)% | NM | 15% | (694) bp | 22% |
| | | | | | |
| Operating Income Before Amortization—Real Estate | $(20,059) | 7% | $(21,507) | (27)% | $(16,930) |
| As a percentage of Real Estate revenue | (39)% | (91) bp | (38)% | (844) bp | (29)% |

Operating Income Before Amortization in 2007 decreased $83.9 million to a loss of $43.6 million, declining at a faster rate than revenue due to higher costs per loan sold resulting from a shift to lowering margin products, lower close rates and stricter underwriting criteria, and $22.9 million in restructuring costs, due in part to a reduction in workforce, partially offset by a decrease of $31.3 million in selling and marketing expense. Operating Income Before Amortization was adversely impacted by a $20.2 million provision for loan losses in 2007, compared to $6.6 million in 2006. The 2007 provision reflects the increased losses Tree.com is experiencing related to obligations to investors with respect to previously sold loans. Operating Income Before Amortization benefited by $12.9 million due to the net impact of a favorable legal settlement and an increase in certain legal reserves.

Operating Income Before Amortization in 2006 decreased $21.6 million from 2005, negatively impacted by increased marketing expenses, an increase of $17.3 million in general and administrative expenses, $11.1 million of which relates to an increase in compensation and other employee-related costs, and higher costs associated with the origination of loans sold into the secondary market.

*Operating (loss) income*

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | **(Dollars in thousands)** | | | | |
| Lending | $(512,584) | NM | $ 44,091 | (13)% | $ 50,605 |
| Real Estate | (27,856) | 7% | (29,920) | 5% | (31,351) |
| Operating (loss) income | $(540,440) | NM | $ 14,171 | (26)% | $ 19,254 |
| As a percentage of total revenue | (156)% | NM | 3% | (160) bp | 5% |

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2007** | **% Change** | **2006** | **% Change** | **2005** |
| | **(Dollars in thousands)** | | | | |
| Operating (loss) income—Lending | $(512,584) | NM | $ 44,091 | (13)% | $ 50,605 |
| As a percentage of Lending revenue | (174)% | NM | 11% | (340) bp | 14% |
| Operating (loss)—Real Estate | $ (27,856) | 7% | $(29,920) | 5% | $(31,351) |
| As a percentage of Real Estate revenue | (54)% | (117) bp | (53)% | 181 bp | (54)% |

Operating income decreased $554.6 million to a loss of $540.4 million in 2007, resulting primarily from a goodwill impairment charge of $459.5 million which was recorded in the fourth quarter of 2007 in the accompanying consolidated statements of operations as a component of operating income. The write-down was determined by comparing the fair value of the business and the implied value of the goodwill with the carrying amounts on the balance sheet. In addition, an impairment charge of $16.2 million was recorded in the fourth quarter of 2007 in connection with the write-down of certain intangible assets which has been included in amortization of intangibles in the accompanying consolidated statement of operations. These impairments were identified in connection with Tree.com's annual impairment assessment which is performed as of October 1st. Also contributing to the increase in operating loss was the decrease in Operating Income Before Amortization described above and an increase in non-cash compensation expense.

As discussed above in the management overview, in response to adverse mortgage market conditions, Tree.com has significantly reduced its mortgage origination operations, incurred substantial restructuring charges, recorded significant provisions for loan losses and recorded substantial impairment charges. Given that overall conditions in the credit markets and the mortgage market continue to evolve rapidly, no assurances can be made that the changes Tree.com has undertaken will be sufficient or that Tree.com will not be required to take additional impairment or restructuring charges. In addition, these actions will reduce or slow its ability to react to possible improvements in the market.

Operating income in 2006 decreased $5.1 million from 2005 primarily due to the decrease in Operating Income Before Amortization described above, partially offset by an $11.3 million decrease in amortization of intangibles resulting from certain intangible assets being fully amortized in 2005 and 2006, as well as a $5.2 million decrease in non-cash compensation expense. The decrease in non-cash compensation expense is primarily due to the transfer of Tree.com's founder and Chief Executive Officer to IAC, effective January 1, 2006.

*Income tax provision*

In 2007, Tree.com recorded an income tax provision of $10.2 million, despite a loss from operations, due principally to the impairment of goodwill that is largely non-deductible for income tax purposes and an increase in the valuation allowance on deferred tax assets. In light of the reassessment of the likely future profitability of Tree.com, it has been determined that it is not more likely than not that deferred tax assets at December 31, 2007 will be realized. In 2006, Tree.com recorded a tax

68

provision of $5.0 million which represents an effective tax rate of 37%. The 2006 tax rate is higher than the federal statutory rate of 35% due principally to state and local income taxes. In 2005, Tree.com recorded a tax provision of $11.4 million which represents an effective tax rate of 66%. The 2005 tax rate is higher than the federal statutory rate of 35% due principally to state and local income taxes which included an increase in net deferred tax liabilities due to a change in the effective state tax rate and an increase in the valuation allowance on deferred tax assets related to state net operating losses.

Tree.com adopted the provisions of FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48") effective January 1, 2007. There was no effect to Tree.com's accumulated deficit as a result of the adoption. As of January 1, 2007 and December 31, 2007, Tree.com had unrecognized tax benefits of approximately $0.5 million and $5.8 million, respectively, which included accrued interest at December 31, 2007 of $1.4 million.

By virtue of the previously filed separate company and consolidated tax returns with IAC, Tree.com is routinely under audit by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by Tree.com are recorded in the period they become known.

The Internal Revenue Service ("IRS") is currently examining the IAC consolidated tax returns for the years ended December 31, 2001 through 2003, which includes the operations of Tree.com from August 8, 2003, its date of acquisition by IAC. The statute of limitations for these years has been extended to December 31, 2008. Tax filings in various state, local and foreign jurisdictions are currently under examinations, the most significant of which are Florida, New York state and New York City, for various tax years after December 31, 2001. These examinations are expected to be completed by late 2008. Tree.com believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $2.6 million within twelve months of the current reporting date due to the reversal of deductible temporary differences which will result in a corresponding increase in net deferred tax liabilities. An estimate of other changes in unrecognized tax benefits cannot be made, but are not expected to be significant.

Under the terms of the tax sharing agreement, which will be executed in connection with the spin-off, IAC will generally retain the liability related to federal and state tax returns filed on a consolidated or unitary basis for all periods prior to the spin-off.

<div align="center">69</div>

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2007, Tree.com had $60.9 million of cash and cash equivalents and restricted cash and cash equivalents.

Net cash provided by operating activities was $233.0 million and $74.9 million in 2007 and 2006, respectively. The increase of $158.1 million in net cash provided by operating activities primarily reflects an increase in net proceeds from the sale of loans held for sale of $153.2 million.

Net cash used in investing activities in 2007 and 2006 of $10.9 million and $16.4 million, respectively, primarily resulted from capital expenditures of $9.4 million and $13.3 million, respectively.

Net cash used in financing activities in 2007 of $275.6 million was primarily due to net payments under various lines of credit, primarily warehouse lines, of $259.0 million at LendingTree Loans, payments on notes payable and capital lease obligations of $11.7 million and cash transfers of $7.1 million to IAC. The net payments under various lines of credit, primarily warehouse lines, is directly related to the net proceeds from sales of loans held for sale included within cash flows from operating activities. The cash transfers to IAC relate primarily to the transfer of Tree.com's excess cash to IAC in connection with IAC's centrally managed U.S. treasury function. Net cash used in financing activities in 2006 of $45.9 million was primarily due to net payments under various lines of credit, primarily warehouse lines, of $23.8 million at LendingTree Loans, payments on notes payable and capital lease obligations of $11.5 million and cash transfers of $3.9 million to IAC.

As of December 31, 2007, LendingTree Loans had committed lines of credit, primarily warehouse lines, totaling $550 million, of which $500 million expired on January 31, 2008, and $50 million expires on October 31, 2008, and an uncommitted line of $150 million. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid from proceeds from the sales of loans held for sale by LendingTree Loans. The interest rate under these lines of credit is 30-day LIBOR plus 75 to 100 basis points, but may be higher under certain circumstances. The committed line that expired on January 31, 2008 was subsequently renewed at a reduced size of $50 million and will expire on the earlier of sixty days prior to the spin-off or January 24, 2009 and can be cancelled at the option of the lender without default upon sixty days notice. On June 25, 2008, certain terms of the warehouse line of credit were waived in order for the line of credit not to expire 60 days prior to the spin-off. However, if the lender determines at any time prior to January 24, 2009 the spin-off materially and adversely affects Tree.com, the lender reserves the right to deem the line of credit expired prior to January 24, 2009. The interest rate under this line of credit increased at the renewal date to 30-day LIBOR plus 140 basis points, but may be higher under certain circumstances. The $50 million committed line of credit that expires on January 24, 2009 and the $150 million uncommitted line are provided by the same lender. The $50 million committed line that expires on October 31, 2008 is provided by one other lender. LendingTree Loans is highly dependent on the availability of credit to finance its operations. Its inability to renew or replace existing facilities upon expiration or termination, which could be impacted by continuing disruptions in the credit market, would adversely impact its results of operations and financial condition. At December 31, 2007 there was $79.4 million outstanding under the committed lines of credit. Under the terms of the committed lines of credit, LendingTree Loans is required to maintain various financial and other covenants. These financial covenants include, but are not limited to, maintaining (i) minimum levels of tangible net worth, cash on hand with a certain lender and liquid assets, (ii) a maximum ratio of total liabilities to net worth and (iii) positive pre-tax net income on a quarterly basis. During the fourth quarter, LendingTree Loans was not in compliance with the quarterly positive pre-tax net income covenant set forth in one of its lines of credit. LendingTree Loans received a waiver of this covenant breach on February 8, 2008. The breach and the subsequent waiver did not have an impact on LendingTree Loans' other lines of credit and Tree.com does not expect it to have an impact on LendingTree Loans' ability to secure lines of credit in the future. Borrowings under all of LendingTree Loans' lines of credit are non-recourse to Tree.com.

70

**CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS**

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| Contractual Obligations | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| | (In thousands) | | | | |
| Short-term and current portion of long-term obligations | $ 99,350 | $ 99,350 | $ — | $ — | $ — |
| Capital lease obligations | 272 | 272 | — | — | — |
| Purchase obligations(a) | 330 | 330 | — | — | — |
| Operating leases | 27,633 | 7,168 | 9,674 | 4,983 | 5,808 |
| Total contractual cash obligations | $ 127,585 | $ 107,120 | $ 9,674 | $ 4,983 | $ 5,808 |

(a)     The purchase obligations primarily relate to marketing event contracts in 2008.

| | Amount of Commitment Expiration Per Period | | | | |
|---|---|---|---|---|---|
| Other Commercial Commitments* | Total Amounts Committed | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| | (In thousands) | | | | |
| Surety bonds and letters of credit | $ 8,182 | $ 7,477 | $ 705 | $ — | $ — |

*     Commercial commitments are funding commitments that could potentially require performance in the event of demands by third parties or contingent events, such as under lines of credit extended or under guarantees of debt.

### Off-Balance Sheet Arrangements

Other than the items described above, Tree.com does not have any off-balance sheet arrangements as of December 31, 2007.

71

*Results of Operations for the Three Months Ended March 31, 2008 Compared to the Three Months Ended March 31, 2007*

*Revenue*

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | **2008** | **% Change** | **2007** |
| | (Dollars in thousands) | | |
| Lending | $ 61,811 | (36)% | $ 96,768 |
| Real Estate | 8,382 | (37)% | 13,231 |
| Total revenue | $ 70,193 | (36)% | $ 109,999 |

Revenue in 2008 decreased $39.8 million, or 36%, from 2007 primarily due to fewer loan originations and sales into the secondary market and fewer loans closed on the lending networks. Also contributing to the decrease in revenue is a decrease of $3.9 million related to the Real Estate builder and broker networks, which experienced decreased closings year over year, as well as the absence of revenue from the agent network business which ceased operations in December 2007. Lenders' continued narrow focus on traditional mortgage products contributed to lower close rates and a shift to lower margin products as compared to the prior year. The dollar value of loans closed by network lenders and directly by LendingTree Loans in 2008 decreased 42% to $4.3 billion. This includes refinance mortgages of $2.7 billion, purchase mortgages of $1.0 billion and home equity loans of $0.5 billion. The dollar value of loans closed by network lenders in 2007 was $7.4 billion, including refinance mortgages of $4.1 billion, purchase mortgages of $1.8 billion and home equity loans of $1.3 billion. Revenue from all home loan offerings declined with home equity loans, purchase mortgage revenue and refinance mortgage revenue declining 75%, 38% and 22%, respectively.

Partially offsetting the revenue decrease from fewer loans sold in 2008 is higher revenue per loan sold and an increase of $1.2 million in revenue from Tree.com's company-owned brokerage business, which increased closings by 40%. The company-owned brokerage business began closing transactions in the first quarter of 2006 and now operates in fourteen markets. Similar to closing loans through LendingTree Loans, the company-owned brokerage enables Real Estate to capture a larger portion of the transaction revenue.

LendingTree Loans originates mortgage loans on property located throughout the United States, with no one location representing more than 10% of Tree.com's consolidated revenue for any periods presented. Revenue from loans originated for property in California and Florida in the aggregate totaled approximately 8% and 11% of Tree.com's consolidated revenue for the three months ended March 31, 2008 and 2007, respectively.

*Cost of revenue*

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2008 | % Change | 2007 |
| | (Dollars in thousands) | | |
| Lending | $12,796 | (11)% | $14,312 |
| Real Estate | 4,970 | (20)% | 6,184 |
| Cost of revenue | $17,766 | (13)% | $20,496 |
| As a percentage of total revenue | 25% | 668  bp | 19% |
| Gross margins | 75% | (668)  bp | 81% |

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2008 | % Change | 2007 |
| | (Dollars in thousands) | | |
| Cost of revenue—Lending | $12,796 | (11)% | $14,312 |
| As a percentage of Lending revenue | 21% | 591  bp | 15% |
| Lending gross margins | 79% | (591)  bp | 85% |
| Cost of revenue—Real Estate | $4,970 | (20)% | $6,184 |
| As a percentage of Real Estate revenue | 59% | 1,256  bp | 47% |
| Real Estate gross margins | 41% | (1,256)  bp | 53% |

Cost of revenue consists primarily of costs associated with loan originations, compensation and other employee-related costs (including stock-based compensation) related to customer call centers, real estate network support staff and loan officers, as well as credit scoring fees, consumer incentive costs, real estate agent commissions and website network hosting and server fees.

Cost of revenue in 2008 decreased $2.7 million from 2007 primarily due to decreases of $1.5 million in consumer incentive rebates related to decreased closings at the Real Estate builder and broker network businesses, $1.2 million in direct costs associated with the settlement services business and $1.2 million in compensation and other employee-related costs. Offsetting these decreases in cost of revenue were increases of $0.6 million in costs associated with loan originations and $0.5 million in commission expense primarily related to the increase in closings at company-owned brokerage business. The decrease in compensation and other employee-related costs is primarily due to reduced personnel costs associated with Tree.com's customer call center, settlement services operation and portions of its loan processing department. Included in cost of revenue in 2008 is the impact of Tree.com's adoption of Statement of Financial Accounting Standards ("SFAS") No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities Including an amendment of FASB Statement No. 115" ("SFAS 159"). Upon adoption of SFAS 159, Tree.com elected to account for all loans held for sale issued after January 1, 2008 at fair value. Electing the fair value option requires loan origination fees and costs to be recorded in earnings as incurred instead of being deferred until the loan is sold as in prior year periods. In 2008, all loan origination costs are recognized in cost of revenue. Prior to 2008, Tree.com applied the provisions of SFAS 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases", effectively deferring loan origination fees and costs until the underlying loan was sold. Upon sale of the loan, the origination fees and costs were recognized as a component of the gain on sale of the loan in revenue.

73

*Selling and marketing expense*

| | Three Months Ended March 31, | | |
| | 2008 | % Change | 2007 |
| --- | --- | --- | --- |
| | | (Dollars in thousands) | |
| Lending | $31,028 | (39)% | $50,795 |
| Real Estate | 2,169 | (62)% | 5,683 |
| Selling and marketing expense | $33,197 | (41)% | $56,478 |
| As a percentage of total revenue | 47% | (405) bp | 51% |

| | Three Months Ended March 31, | | |
| | 2008 | % Change | 2007 |
| --- | --- | --- | --- |
| | | (Dollars in thousands) | |
| Selling and marketing expense—Lending | $31,028 | (39)% | $50,795 |
| As a percentage of Lending revenue | 50% | (229) bp | 52% |
| Selling and marketing expense—Real Estate | $2,169 | (62)% | $5,683 |
| As a percentage of Real Estate revenue | 26% | (1,708) bp | 43% |

Selling and marketing expense consists primarily of advertising and promotional expenditures, fees paid to affiliates and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in the sales function. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

Selling and marketing expense in 2008 decreased $23.3 million from 2007 primarily due to a decrease of $22.3 million in advertising and promotional expenditures. In 2008, Tree.com experienced decreases in advertising of $11.9 million, $6.1 million and $4.1 million associated with online marketing, print and television advertising, respectively. Tree.com anticipates that selling and marketing expense will continue to represent a high percentage of revenue as it continues to promote its brands both online and offline.

*General and administrative expense*

| | Three Months Ended March 31, | | |
| | 2008 | % Change | 2007 |
| --- | --- | --- | --- |
| | | (Dollars in thousands) | |
| Lending | $16,454 | (31)% | $23,869 |
| Real Estate | 4,310 | (30)% | 6,177 |
| General and administrative expense | $20,764 | (31)% | $30,046 |
| As a percentage of total revenue | 30% | 227 bp | 27% |

| | Three Months Ended March 31, | | |
| | 2008 | % Change | 2007 |
| --- | --- | --- | --- |
| | | (Dollars in thousands) | |
| General and administrative expense—Lending | $16,454 | (31)% | $23,869 |
| As a percentage of Lending revenue | 27% | 195 bp | 25% |
| General and administrative expense—Real Estate | $4,310 | (30)% | $6,177 |

As a percentage of Real Estate revenue      51%      473   bp      47%

      General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, human resources and executive management functions, facilities and infrastructure costs and fees for professional services.

<div align="center">74</div>

General and administrative expense in 2008 decreased $9.3 million from 2007 primarily due to a decrease of $7.5 million in compensation and other employee-related costs, due principally to a reduction in workforce that occurred in 2007, subsequent to the first quarter. Offsetting this decrease in general and administrative expense is a charge of approximately $1.4 million associated with legal and regulatory costs. Tree.com expects to incur increased costs related to the additional financial and legal requirements associated with being a separate public company, as well as increased non-cash compensation associated with the modification of existing stock-based compensation awards in connection with the spin-off and the grant of new awards in connection with and subsequent to the spin-off.

General and administrative expense includes non-cash compensation expense of $0.5 million in 2008 compared with $1.0 million in 2007. The decrease in non-cash compensation expense is primarily due to a reduction in workforce that occurred in 2007, subsequent to the first quarter and various equity grants fully vesting throughout 2007. As of March 31, 2008, there was approximately $8.2 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is currently expected to be recognized over a weighted average period of approximately 2.7 years (exclusive of the impact of the modification related to the spin-off, which consists of the accelerated vesting of certain restricted stock units and the modification of vested stock options).

### *Product development*

|  | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
|  | **2008** | **% Change** | **2007** |
|  | (Dollars in thousands) | | |
| Lending | $1,454 | (47)% | $2,766 |
| Real Estate | 655 | (56)% | 1,504 |
| Product development | $2,109 | (51)% | $4,270 |
| As a percentage of total revenue | 3% | (88) bp | 4% |

|  | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
|  | **2008** | **% Change** | **2007** |
|  | (Dollars in thousands) | | |
| Product development—Lending | $1,454 | (47)% | $2,766 |
| As a percentage of Lending revenue | 2% | (51) bp | 3% |
| Product development—Real Estate | $655 | (56)% | $1,504 |
| As a percentage of Real Estate revenue | 8% | (356) bp | 11% |

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in product development, which include costs related to the design, development, testing and enhancement of technology that are not capitalized.

Product development expense in 2008 decreased $2.2 million from 2007, due to decreased compensation and other employee-related costs associated with a reduction in workforce that occurred in 2007, subsequent to the first quarter.

75

*Depreciation*

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2008 | % Change | 2007 |
| | (Dollars in thousands) | | |
| Lending | $1,366 | (46)% | $2,530 |
| Real Estate | 409 | 32% | 309 |
| Depreciation | $1,775 | (37)% | $2,839 |
| As a percentage of total revenue | 3% | (5) bp | 3% |

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2008 | % Change | 2007 |
| | (Dollars in thousands) | | |
| Depreciation—Lending | $1,366 | (46)% | $2,530 |
| As a percentage of Lending revenue | 2% | (40) bp | 3% |
| Depreciation—Real Estate | $409 | 32% | $309 |
| As a percentage of Real Estate revenue | 5% | 255 bp | 2% |

Depreciation in 2008 decreased $1.1 million from 2007 primarily due to certain fixed assets becoming fully depreciated and decreased capital expenditures made in 2008 and 2007 and the write-off of certain assets subsequent to the first quarter of 2007 as Tree.com scaled back its operations in response to mortgage market conditions.

*Operating Income Before Amortization*

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2008 | % Change | 2007 |
| | (Dollars in thousands) | | |
| Lending | $(1,298) | NM | $3,239 |
| Real Estate | (3,966) | 37% | (6,248) |
| Operating Income Before Amortization | $(5,264) | (75)% | $(3,009) |
| As a percentage of total revenue | (7)% | (476) bp | (3)% |

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2008 | % Change | 2007 |
| | (Dollars in thousands) | | |
| Operating Income Before Amortization—Lending | $(1,298) | NM | $3,239 |
| As a percentage of Lending revenue | (2)% | NM | 3% |
| Operating Income Before Amortization—Real Estate | $(3,966) | 37% | $(6,248) |
| As a percentage of Real Estate revenue | (47)% | (9) bp | (47)% |

Operating Income Before Amortization in 2008 decreased $2.3 million to a loss of $5.3 million, declining at a faster rate than revenue due to higher costs per loan sold resulting from lower close rates and stricter underwriting criteria, partially offset by decreases of $23.3 million in selling and marketing expense and $9.3 million in general and administrative expense. Operating Income Before

Amortization was adversely impacted in 2008 by charges, aggregating $3.1 million, associated with legal and regulatory costs and restructuring initiatives.

76

*Operating loss*

|  | Three Months Ended March 31, | | |
|---|---|---|---|
|  | 2008 | % Change | 2007 |
|  | (Dollars in thousands) | | |
| Lending | $(4,249) | (980)% | $(393) |
| Real Estate | (5,239) | 35% | (8,011) |
| Operating loss | $(9,488) | (13)% | $(8,404) |
| As a percentage of total revenue | (14)% | (588) bp | (8)% |

|  | Three Months Ended March 31, | | |
|---|---|---|---|
|  | 2008 | % Change | 2007 |
|  | (Dollars in thousands) | | |
| Operating loss—Lending | $(4,249) | (980)% | $(393) |
| As a percentage of Lending revenue | (7)% | (647) bp | (0)% |
| Operating loss—Real Estate | $(5,239) | 35% | $(8,011) |
| As a percentage of Real Estate revenue | (63)% | (195) bp | (61)% |

Operating loss in 2008 increased $1.1 million from 2007, primarily due to the decrease in Operating Income Before Amortization described above, partially offset by a $0.6 million decrease in both non-cash compensation expense and amortization of intangibles.

*Income tax provision*

For the three months ended March 31, 2008, Tree.com recorded a tax provision of $0.2 million despite a loss from operations, due principally to an increase in valuation allowance on deferred tax assets. For the three months ended March 31, 2007, Tree.com recorded a tax benefit of $3.5 million on a pre-tax loss of $8.6 million, which represents an effective tax rate of 41%. This tax benefit is higher than the federal statutory rate of 35% due principally to state taxes.

As of December 31, 2007 and March 31, 2008, Tree.com had unrecognized tax benefits of approximately $4.4 million. Included in unrecognized tax benefits at March 31, 2008 is approximately $3.6 million for tax positions included in IAC's consolidated tax return filings that will remain a liability of IAC after the spin-off. Tree.com recognizes interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. There were no material accruals for interest for 2008. At March 31, 2008, Tree.com has accrued $1.5 million for the payment of interest. There are no material accruals for penalties.

By virtue of previously filed separate company and consolidated tax returns with IAC, Tree.com is routinely under audit by federal, state, local and foreign authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by Tree.com are recorded in the period they become known. Tree.com believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $2.7 million within twelve months of the current reporting date due to the reversal of deductible temporary differences which will result in a corresponding increase in net deferred tax liabilities. An estimate of other changes in unrecognized tax benefits cannot be made, but are not expected to be significant.

Under the terms of the tax sharing agreement, which will be executed in connection with the spin-off, IAC will generally retain the liability related to federal and state returns filed on a consolidated or unitary basis for all periods prior to the spin-off.

77

### FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

As of March 31, 2008, Tree.com had $55.0 million of cash and cash equivalents and restricted cash and cash equivalents.

Net cash used in operating activities improved by $69.0 million to $5.6 million in 2008 from $74.6 million in 2007. The improvement is primarily due to a $64.2 million increase in loans held for sale in 2007 compared to $4.4 million in 2008 reflecting significantly higher net loan originations in 2007. Also impacting net cash used in operations is an increase in accounts payable as Tree.com aggressively managed working capital in the first quarter of 2008.

Net cash used in investing activities in 2008 of $16.0 million primarily resulted from the payment of contingent consideration associated with the Home Loan Center acquisition and capital expenditures of $1.5 million. Net cash used in investing activities in 2007 of $3.7 million primarily resulted from capital expenditures.

Net cash provided by financing activities in 2008 of $28.2 million was primarily due to cash transfers of $21.8 million from IAC, capital contributions of $14.5 million from IAC and a decrease of $12.5 million in restricted cash, partially offset by payments on notes payable and capital lease obligations of $20.0 million. The cash transfers from IAC relate to IAC's centrally managed U.S. treasury function. Net cash provided by financing activities in 2007 of $69.6 million was primarily due to net borrowings under various lines of credit of $62.4 million at LendingTree Loans and payments on notes payable and capital lease obligations of $10.4 million, partially offset by cash transfers of $18.0 million from IAC. The net borrowings under various lines of credit in 2007 is related to the increase in loans held for sale included within cash flow from operations.

As of March 31, 2008, LendingTree Loans had committed lines of credit totaling $100 million, of which $50 million expires on October 31, 2008, and another $50 million is set to expire on the earlier of sixty days prior to the spin-offs or January 24, 2009, and an uncommitted line of credit of $150 million. The committed line of credit that expires sixty days prior to the spin-offs or January 24, 2009 can be cancelled at the option of the lender without default upon sixty days notice. The $50 million committed line of credit that expires on January 24, 2009 and the $150 million uncommitted line are provided by the same lender. The $50 million committed line that expires on October 31, 2008 is provided by one other lender. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid from proceeds from the sales of loans held for sale by LendingTree Loans. The interest rate under these lines of credit is 30-day LIBOR plus 75 to 140 basis points, but may be higher under certain circumstances. At March 31, 2008, there was $78.7 million outstanding under the committed lines of credit. Under the terms of the committed lines of credit, LendingTree Loans is required to maintain various financial and other covenants. These financial covenants include, but are not limited to, maintaining (i) minimum levels of tangible net worth, cash on hand with a certain lender and liquid assets, (ii) a maximum ratio of total liabilities to net worth and (iii) positive pre-tax net income on a quarterly basis. During the first quarter of 2008, LendingTree Loans was in compliance with all covenants. Borrowings under all of LendingTree Loans' lines of credit are non-recourse to Tree.com.

Tree.com anticipates that it will need to make capital and other expenditures in connection with the development and expansion of its overall operations.

Tree.com has considered its anticipated operating cash flows in 2008, cash and cash equivalents, current borrowing capacity under lines of credit, its expected capitalization upon completion of the spin-off and access to capital markets, subject to restrictions in the tax sharing agreement, and believes that these are sufficient to fund its operating needs, including debt requirements, commitments and contingencies and capital and investing commitments for the foreseeable future. LendingTree Loans is highly dependent on the availability of credit to finance its operations. Its inability to renew or replace

78

existing facilities upon expiration or termination, which could be impacted by continuing disruptions in the credit market, would adversely impact its results of operations and financial condition. In connection with the completion of the spin-off, intercompany payable balances will be extinguished. It is expected that IAC will transfer to Tree.com an amount of cash that will be sufficient for its initial capitalization.

## CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

| Contractual Obligations | Total | | Less Than 1 Year | | 1-3 Years | | 3-5 Years | | More Than 5 Years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | | | |
| Short-term and current portion of long-term obligations | $ | 78,739 | $ | 78,739 | $ | — | $ | — | $ | — |
| Capital lease obligations | | 15 | | 15 | | — | | — | | — |
| Purchase obligations(a) | | 587 | | 587 | | — | | — | | — |
| Operating leases | | 27,724 | | 7,395 | | 8,723 | | 5,669 | | 5,937 |
| Total contractual cash obligations | $ | 107,065 | $ | 86,736 | $ | 8,723 | $ | 5,669 | $ | 5,937 |

(a)    The purchase obligations primarily relate to marketing event contracts in 2008.

<center>79</center>

## TREE.COM'S PRINCIPLES OF FINANCIAL REPORTING

Tree.com reports Operating Income Before Amortization as a supplemental measure to generally accepted accounting principles ("GAAP"). This measure is one of the primary metrics by which Tree.com evaluates the performance of its businesses, on which its internal budgets are based and by which management is compensated. Tree.com believes that investors should have access to the same set of tools that it uses in analyzing its results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. Tree.com provides and encourages investors to examine the reconciling adjustments between the GAAP and non-GAAP measure which are discussed below.

### Definition of Tree.com's Non-GAAP Measure

*Operating Income Before Amortization* is defined as operating income excluding, if applicable: (1) non-cash compensation expense, (2) amortization of intangibles and goodwill impairment, (3) pro forma adjustments for significant acquisitions, and (4) one-time items. Tree.com believes this measure is useful to investors because it represents the operating results from the Tree.com Businesses, taking into account depreciation, which Tree.com believes is an ongoing cost of doing business, but excluding the effects of any other non-cash expenses. Operating Income Before Amortization has certain limitations in that it does not take into account the impact to Tree.com's statement of operations of certain expenses, including non-cash compensation, and acquisition-related accounting. Tree.com endeavors to compensate for the limitations of the non-GAAP measure presented by also providing the comparable GAAP measure with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measure.

### Pro Forma Results

Tree.com will only present Operating Income Before Amortization on a pro forma basis if it views a particular transaction as significant in size or transformational in nature. For the periods presented in this report, there are no transactions that Tree.com has included on a pro forma basis.

### One-Time Items

Operating Income Before Amortization is presented before one-time items, if applicable. These items are truly one-time in nature and non-recurring, infrequent or unusual, and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented in this report, there are no one-time items.

### Non-Cash Expenses That Are Excluded From Tree.com's Non-GAAP Measure

*Non-cash compensation* expense consists principally of expense associated with the grants, including unvested grants assumed in acquisitions, of restricted stock, restricted stock units and stock options. These expenses are not paid in cash, and Tree.com will include the related shares in its future calculations of fully diluted shares outstanding. Upon vesting of restricted stock and restricted stock units and the exercise of certain stock options, the awards will be settled, at Tree.com's discretion, on a net basis, with Tree.com remitting the required tax withholding amount from its current funds.

*Amortization of intangibles* is a non-cash expense relating primarily to acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives. Tree.com believes that since intangibles represent costs incurred by the acquired company to build value prior to acquisition, they were part of transaction costs.

80

Reconciliation of Operating Income Before Amortization

For a reconciliation of Operating Income Before Amortization to operating (loss) income for Tree.com's operating segments and to net (loss) income in total for the years ended December 31, 2007, 2006 and 2005, see Note 8 to the consolidated financial statements. For a reconciliation of Operating Income Before Amortization to operating loss for Tree.com's operating segments and to net loss for the three months ended March 31, 2008 and 2007, see Note 5 to the unaudited interim financial statements.

**Critical Accounting Policies and Estimates**

The following disclosure is provided to supplement the descriptions of Tree.com's accounting policies contained in Note 2 to the consolidated financial statements in regard to significant areas of judgment. Tree.com's management is required to make certain estimates and assumptions during the preparation of its consolidated financial statements in accordance with GAAP. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net income during any period. Actual results could differ from those estimates. Because of the size of the financial statement elements to which they relate, some of Tree.com's accounting policies and estimates have a more significant impact on its consolidated financial statements than others. What follows is a discussion of some of Tree.com's more significant accounting policies and estimates.

     **Recoverability of Long-Lived Assets**

Tree.com reviews the carrying value of all long-lived assets, primarily property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may be impaired. In accordance with SFAS 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS 144"), impairment is considered to have occurred whenever the carrying value of a long-lived asset exceeds the sum of the undiscounted cash flows that is expected to result from the use and eventual disposition of the asset. The determination of cash flows is based upon assumptions that may not occur. The value of long-lived assets that is subject to assessment for impairment in accordance with SFAS 144 is $41.3 million at December 31, 2007.

     **Recoverability of Goodwill and Indefinite-Lived Intangible Assets**

Goodwill impairment is determined using a two-step process. The first step of the process is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, Tree.com determines the fair value of its reporting units by using a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived

81

intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a "relief from royalty" methodology in estimating the fair value of its trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates and the terminal growth rates.

Goodwill and indefinite-lived intangible assets, primarily trade names and trademarks, are tested annually for impairment as of October 1 or earlier upon the occurrence of certain events or substantive changes in circumstances. The annual assessment for 2007 identified impairment charges for the Lending reporting unit as more fully described above in "Results of Operations for the Years Ended December 31, 2007, 2006 and 2005." Tree.com's reporting units are currently operating in dynamic and challenged industry segments. To illustrate the magnitude of potential impairment charges relative to future changes in estimated fair value, had the estimated fair value of Tree.com's reporting units and their respective indefinite-lived intangible assets been hypothetically lower by 10% as of October 1, 2007 the aggregate book value of goodwill and indefinite-lived intangible assets would have exceeded fair value by approximately $7.0 million at Lending and $8.0 million at Real Estate. Had the estimated fair values of Tree.com's reporting units and their respective indefinite-lived intangible assets been hypothetically lower by 20% as of October 1, 2007, the book value of goodwill and indefinite-lived intangible assets would have exceeded fair value by approximately $21.0 million at Lending and $18.0 million at Real Estate.

### Income Taxes

Estimates of deferred income taxes and the significant items giving rise to the deferred assets and liabilities are shown in Note 7, and reflect management's assessment of actual future taxes to be paid on items reflected in the consolidated financial statements, giving consideration to both timing and the probability of realization. As of December 31, 2007, the balance of deferred tax liabilities, net, is $30.3 million. Actual income taxes could vary from these estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of IAC's tax returns by the IRS, as well as actual operating results of Tree.com that vary significantly from anticipated results. Effective January 1, 2007, Tree.com adopted the provisions of FIN 48. As a result of the adoption of FIN 48, Tree.com recognizes liabilities for uncertain tax positions based on the two-step process prescribed by the interpretation. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. Tree.com considers many factors when evaluating and estimating its tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes.

### Loans Held for Sale

Loans held for sale consist primarily of residential first and second mortgage loans that are secured by residential real estate throughout the United States. LendingTree Loans originates residential loans with the intent to sell them in the secondary market. Loans held for sale are carried at the lower of cost or market value in accordance with SFAS No. 65, "Accounting for Certain Mortgage Banking Activities." The lower of cost or market value is determined on an individual basis for loans that have been impaired and on an aggregate basis for loans that have not been impaired. The cost basis of loans held for sale includes the capitalized cost associated with the interest rate lock commitments, deferred origination fees, deferred origination costs and prior to April 1, 2007 the effects of hedge accounting. The market value of loans held for sale is determined using current secondary

82

market prices for loans with similar coupons, maturities and credit quality. The December 31, 2007 consolidated balance sheet includes $86.8 million of loans held for sale, which is net of an associated valuation allowance of $4.3 million. The valuation allowance is the amount by which the cost of loans held for sale exceeds the market value of loans held for sale.

LendingTree Loans sells loans it originates to investors on a servicing released basis so the risk of loss or default by the borrower is generally transferred to the investor. However, LendingTree Loans is required by these investors to make certain representations relating to credit information, loan documentation and collateral. To the extent LendingTree Loans does not comply with such representations, or there are early payment defaults, LendingTree Loans may be required to repurchase loans or indemnify the investors for any losses from borrower defaults. As such, LendingTree Loans records a liability for the estimated obligation related to this exposure based, in part, on historical and projected loss frequency and loss severity, the original principal amount of the loans previously sold, the year the loans were sold, and loan type. There are four loan types used in this analysis which are determined based on the extent of the documentation received (full or limited) and the lien position of the mortgage in the underlying property (first or second position). In the case of early payment payoffs, which occurs when a borrower prepays a loan prior to the end of the prepayment penalty period, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor. The estimated obligation associated with early loan payoffs is calculated based on historical loss experience by type of loan. Specific circumstances may also cause management to estimate and record additional liabilities specific to a situation based on certain assumptions of future losses as a result of current activity. Because LendingTree Loans does not service the loans it sells, it does not maintain nor have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. As such, LendingTree Loans is unable to determine its maximum loss exposure. For the year ended December 31, 2007 LendingTree Loans increased its liability for losses on previously sold loans by approximately $15.5 million as a reduction to revenue. In 2007, $5.4 million was paid or written off against the liability. The related liability at December 31, 2007 is $13.9 million.

## Seasonality

Lending and Real Estate revenue is subject to the seasonal and cyclical trends of the U.S. housing market. On a seasonal basis, home sales typically rise during the spring and summer months and decline during the fall and winter months. The current cyclical trends have impacted and are expected to continue to impact typical seasonal trends. Refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values.

## New Accounting Pronouncements

Refer to Note 2 to the consolidated financial statements for a description of recent accounting pronouncements.

83

## QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest Rate Risk**

Tree.com's exposure to market rate risk for changes in interest rates relates primarily to its loans held for sale, and LendingTree Loans' lines of credit.

### Loans Held for Sale

LendingTree Loans' mortgage banking operations expose Tree.com to interest rate risk for loans originated until those loans are sold in the secondary market ("loans held for sale"). The fair value of loans held for sale is subject to change primarily due to changes in market interest rates. LendingTree Loans hedges the changes in fair value of certain loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continues to enter into derivatives for risk management purposes, effective April 1, 2007 management determined these derivative instruments would no longer qualify for the hedge accounting provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities."

When hedge accounting was discontinued, the affected loans held for sale were no longer adjusted for changes in fair value. However, the changes in fair value of the derivative instruments continue to be recognized in current earnings as a component of revenue. For the year ended December 31, 2007 Tree.com recognized losses of $1.1 million related to the changes in fair value of derivative instruments related to loans held for sale. For the three months ended March 31, 2008, Tree.com recognized losses of less than $0.1 million related to the changes in fair value of derivative instruments related to loans held for sale.

In addition, LendingTree Loans provides interest rate lock commitments ("IRLCs") to fund mortgage loans at interest rates previously agreed upon with the borrower for specified periods of time, which also expose it to interest rate risk. IRLCs are considered derivative instruments and, therefore, are recorded at fair value, with changes in fair value reflected in current period earnings. To manage the interest rate risk associated with the IRLCs, Tree.com uses derivative instruments, including mortgage forward delivery contracts. These instruments do not qualify for hedge accounting. The net change in the fair value of these derivatives for the year ended December 31, 2007 resulted in losses of $0.8 million which have been recognized as a component of revenue in the accompanying consolidated statements of operations.

On January 1, 2008, Tree.com adopted the provisions of SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"). Prior to the adoption of SFAS 157 the recognition of gains and losses at the inception of a derivative contract were prohibited unless the fair value of the contract was evidenced by a quoted price in an active market. As no active market exists for IRLCs, such day one gains and losses were not recognized until the related loan was sold. Prior to January 1, 2008, guidance also prohibited including the value of servicing the loan in calculating the fair value of an IRLC. Such guidance was rescinded by Staff Accounting Bulletin No. 109, "Written Loan Commitments Recorded at Fair Value Through Earnings" ("SAB 109"). Accordingly, with the adoption of SFAS No. 157 and SAB 109 on January 1, 2008, the day one gains and servicing value, adjusted by the loan funding probability, are included in the value of IRLCs. The net change in the fair value of the IRLCs and related forward delivery contracts, including the impact of day one gains and servicing value, for the three months ended March 31, 2008 resulted in gains of $14.8 million which have been recognized as a component of revenue in the accompanying consolidated statements of operations.

The fair values of derivative financial instruments at LendingTree Loans are impacted by movements in market interest rates. Changes in the fair value of the derivative financial instruments would substantially be offset by changes in the fair value of the items for which risk is being mitigated. As of March 31, 2008 and December 31, 2007, if market interest rates had increased by 100 basis points, the aggregate fair value of the derivative financial instruments and the hedged items at LendingTree Loans would have increased by $0.1 million and decreased by $0.2 million, respectively. As of March 31, 2008 and December 31, 2007, if market interest rates had decreased by 100 basis points, the aggregate fair value of the derivative financial instruments and the hedged items at LendingTree Loans would have decreased by $0.8 million and $0.3 million, respectively.

84

Management of Tree.com

### Tree.com Board of Directors and Executive Officers

The following table sets forth information as to persons who are expected to serve as Tree.com directors and executive officers following the spin-offs. The Tree.com Board of Directors, the composition of which complies with the independence requirements under the current standards imposed by the Marketplace Rules, including the transitional rules set forth therein, is currently expected to consist of five directors.

| Name | Age | Position(s) |
| --- | --- | --- |
| Douglas Lebda | 38 | Chairman, Chief Executive Officer and Director of Tree.com |
| Scott Cammarn | 47 | Senior Vice President and General Counsel of Tree.com |
| Robert Harris | 48 | President, LendingTree Exchange |
| Peter C. Horan | 53 | Director of Tree.com |
| Joseph Levin | 28 | Director of Tree.com |
| Lance Melber* | 46 | Director of Tree.com |
| David Norris | 43 | President of Home Loan Center, Inc. |
| Steven Ozonian* | 53 | Director of Tree.com |
| Matthew Packey | 40 | Senior Vice President and Chief Financial Officer of Tree.com |
| Bret Violette | 41 | President of Real Estate |

\*     Independent Directors

### Directors

Background information about those individuals who are expected to serve as directors of Tree.com appears below. Liberty Media Corporation has chosen not to immediately exercise its right to nominate directors at Tree.com, but retains its ability to do so in the future. See "Certain Relationships and Related Party Transactions—Agreements with Liberty Media Corporation."

*Douglas Lebda*, age 38, will serve as Chairman, Chief Executive Officer and director of Tree.com upon completion of the spin-offs and has served in such capacity for LendingTree since January 2008. Mr. Lebda has also served as President and Chief Operating Officer of IAC since the end of 2005. Prior to assuming his current roles, Mr. Lebda served as the Chief Executive Officer of LendingTree, which he founded, since September 1998. Prior to his tenure as Chief Executive Officer of LendingTree, Mr. Lebda served as Chairman of the Board and President of LendingTree since June 1996. Before founding LendingTree in June 1996, Mr. Lebda worked as an auditor and consultant for PriceWaterhouseCoopers. Mr. Lebda is a member of the Board of Directors of Eastman Kodak.

*Peter C. Horan*, age 53, currently serves as CEO of GoodmailSystems, Inc. Prior to that, he served as CEO of IAC Media & Advertising from January 2007 to June 2008. Mr. Horan previously served as CEO of AllBusiness.com, Inc. Prior to that, Mr. Horan was CEO of About.com. Prior to About.com, he served as President and Chief Executive Officer of DevX.com, Inc., an Internet media company. Mr. Horan spent 10 years at International Data Group, a leading global technology media company, where he spearheaded relationships with top advertisers on a worldwide basis, and also served as Senior Vice President and Publisher of Computerworld. Prior to that Mr. Horan spent more than 15 years in senior account management roles at leading advertising agencies, including BBDO and Ogilvy & Mather.

85

*Joseph Levin*, age 28, currently serves Senior Vice President, Mergers & Acquisitions and Finance for IAC. Prior to his current position, Mr. Levin served as Vice President, Finance. In his four years at IAC, Mr. Levin has worked in Strategic Planning, M&A, and Finance. Prior to joining IAC, Mr. Levin worked in the Technology Mergers & Acquisitions group for Credit Suisse First Boston (now Credit Suisse) in San Francisco.

*Lance Melber*, age 46, served as Senior Vice President for Capital One from early 2005 until March of 2008. Prior to that, Mr. Melber founded eSmartloan.com and served as its CEO from 2001 until it was sold to Capital One in early 2005. Prior to founding eSmartloan.com, Mr. Melber served as the Managing Director of Oneloan.com working for First Horizon National Corp. Mr. Melber has a technology background with over 25 years experience in the industry.

*Steven Ozonian*, age 53, is currently the Executive Chairman of Global Mobility Solutions. In 2004, Mr. Ozonian founded Spinnaker Capital Partners in 2004. Prior to that he was a senior executive at Re/Max and Bank of America where he worked in the business development and real estate brokerage acquisition activities.

**Executive Officers**

Background about Tree.com's executive officers who are not expected to serve as directors appears below.

*Scott Cammarn*, age 47, will serve as Senior Vice President and General Counsel of Tree.com upon the completion of the spin-offs and has served in such capacity for LendingTree since May 2006. Prior to joining LendingTree, Mr. Cammarn worked for Bank of America for eleven years, during which he served in various legal capacities, most recently as Associate General Counsel, Global Marketing and Global Corporate Affairs. Before joining Bank of America, Mr. Cammarn was a partner at the law firm of Zeiger, Dreher & Carpenter, where he represented a number of leading consumer lending institutions.

*Robert L. Harris*, age 48, will serve as President of Tree.com's LendingTree Exchange business upon completion of the spin-offs and has served in such capacity for LendingTree since June 2008. Mr. Harris previously served as President and Chief Operating Officer of the Lending Business from May 2007 through January 2008 and Vice Chairman from January 2008 through June 2008. Mr. Harris joined LendingTree as Vice President of Marketing in June 2000 and served as Chief Marketing Officer of LendingTree from September 2003 through April 2007. Prior to joining LendingTree, Mr. Harris served as Managing Director, Consumer Marketing of The Coca-Cola Company and worked at McCormick & Company, where he was responsible for leading brand marketing, new products and sales initiatives within the U.S. Consumer Products Group.

*David Norris*, age 43, will serve as President of Home Loan Center, Inc., Tree.com's mortgage subsidiary, upon the spin-off and has served in such capacity since June 2008. Mr. Norris previously served as Senior Vice President of Home Loan Center and LendingTree, LLC, with responsibility for several areas, including Business Planning & Intelligence, Project Management, Call Center, Customer Experience, Six Sigma, and Sales Training. Mr. Norris joined LendingTree in September, 2006 as Vice President of Corporate Quality. Prior to joining LendingTree, Mr. Norris served as Vice President of Service and Solutions for Toshiba America's Digital Products Division where he was responsible for delivering customer solutions and all post-sale product support. Within Toshiba, Mr. Norris also served as Vice President of Management Innovation.

*Matthew Packey*, age 40, will serve as Senior Vice President and Chief Financial Officer of Tree.com upon completion of the spin-offs and has served in such capacity for LendingTree since September 2007. Mr. Packey previously served as LendingTree's Chief Accounting Officer from August

86

2005 to September 2007 and Controller from January 2000 to August 2005. Prior to joining LendingTree, Mr. Packey served as Vice President and Controller of Broadway & Seymour, Inc., and as a Manager at Deloitte & Touche, LLP. Mr. Packey is a certified public accountant.

*Bret A. Violette*, age 41, will serve as President of Tree.com's Real Estate Business and has served in such capacity for LendingTree since April 2007. Mr. Violette previously served as Senior Vice President and General Manager of LendingTree's real estate brokerage business from June 2005. Before joining LendingTree, Mr. Violette served as President of Weichert Lead Network, Inc. and Weichert Rental Network, Inc. from 2002 to June 2005. Prior to that time, Mr. Violette served as Chief Financial Officer and Vice President of Business Development of YHD Foxtons, Vice President of Business Development at CMP Media Inc. and as a Group Business Director of Ziff-Davis.

## Committees of the Board of Directors

Concurrent with the completion of the spin-offs, the Tree.com Board of Directors will establish the following committees: the Audit Committee, the Compensation Committee and the Nominating Committee. The composition of each such committee will satisfy the independence requirements and current standards of the SEC, Marketplace Rules and Internal Revenue Service rules (as applicable), including the transitional rules set forth therein.

*Audit Committee.* The Audit Committee of the Tree.com Board of Directors will consist of Messrs. Melber, Ozonian and Horan. IAC has concluded, subject to confirmation by the Tree.com Board of Directors, that Mr. Ozonian is an "audit committee financial expert," as such term is defined in applicable SEC rules.

The Audit Committee will function pursuant to a written charter adopted by the Tree.com Board of Directors, pursuant to which it will be granted the responsibilities and authority necessary to comply with Rule 10A-3 of the Securities Exchange Act of 1934, as amended. The Audit Committee will be appointed by the Tree.com Board of Directors to assist the Tree.com Board with a variety of matters, including monitoring (1) the integrity of Tree.com's financial statements, (2) the effectiveness of Tree.com's internal control over financial reporting, (3) the qualifications and independence of Tree.com's independent registered public accounting firm, (4) the performance of Tree.com's internal audit function and independent registered public accounting firm and (5) the compliance by Tree.com with legal and regulatory requirements.

*Compensation Committee.* The Compensation Committee will be comprised of Messrs. Melber and Ozonian and will be authorized to exercise all of the powers of the Tree.com Board of Directors with respect to matters pertaining to compensation and benefits, including, but not limited to, salary matters, incentive/bonus plans, stock compensation plans, retirement programs and insurance plans.

*Nominating Committee.* The Nominating Committee will be comprised of Messrs. Melber and Ozonian and will be responsible for identifying individuals qualified to become members of Tree.com's Board of Directors, recommending to the Board director nominees for the annual meeting of shareholders and otherwise on an as needed basis.

*Other Committees.* In addition to the foregoing committees, the Tree.com Board of Directors, by resolution, may from time to time establish other committees of the Tree.com Board of Directors, consisting of one or more of its directors.

87

**Director Compensation**

*Non-Employee Director Arrangements.*    Each member of the Tree.com Board of Directors will receive an annual retainer in the amount of $40,000. Each member of the Audit or Compensation Committee will receive an additional annual retainer in the amount of $10,000, although the chair of the Audit Committee will receive an additional annual chairperson retainer in the amount of $15,000.

In addition, each non-employee director will receive a grant of restricted stock units with a dollar value of $50,000 upon his or her initial election to the Tree.com Board of Directors and annually thereafter upon re-election on the date of Tree.com's annual meeting of stockholders. The terms of these restricted stock units provide for (i) vesting in two equal annual installments commencing on the first anniversary of the grant date, (ii) cancellation and forfeiture of unvested units in their entirety upon termination of service with the Tree.com Board of Directors and (iii) full acceleration of vesting upon a change in control of Tree.com. Directors will be able to elect to receive their cash payments in restricted stock at a fixed discount to the market price at the grant date. Non-employee directors are also reimbursed for all reasonable expenses incurred in connection with attendance at Tree.com Board and Committee meetings.

The Compensation Committee will have primary responsibility for establishing non-employee director compensation arrangements, which are designed to provide competitive compensation necessary to attract and retain high quality non-employee directors and to encourage ownership of Tree.com stock to further align directors' interests with those of Tree.com's stockholders. When considering non-employee director compensation arrangements, Tree.com management will provide the Compensation Committee with information regarding various types of non-employee director compensation arrangements and practices of select peer companies.

*Deferred Compensation Plan for Non-Employee Directors.* Under Tree.com's Deferred Compensation Plan for Non-Employee Directors, non-employee directors will be able to defer all or a portion of their Board and Board Committee fees. Eligible directors who defer all or any portion of these fees can elect to have such fees applied to the purchase of share units, representing the number of shares of Tree.com common stock that could have been purchased on the relevant date, or credited to a cash fund. If any dividends are paid on Tree.com common stock, dividend equivalents will be credited on the share units. The cash fund will be credited with deemed interest at an annual rate equal to the weighted average prime lending rate of JPMorgan Chase Bank. After a director ceases to be a member of the Tree.com Board of Directors, he or she will receive (i) with respect to share units, such number of shares of Tree.com common stock as the share units represent and (ii) with respect to the cash fund, a cash payment in an amount equal to deferred amounts, plus accrued interest. These payments will be made in either one lump sum or up to five installments, as previously elected by the eligible director at the time of the related deferral election.

**Director Independence**

Under the Marketplace Rules, Tree.com's Board will have a responsibility to make an affirmative determination that those members of its Board that serve as independent directors do not have any relationships with Tree.com and its businesses that would impair their independence. In connection with these determinations, Tree.com's Board will review information regarding transactions, relationships and arrangements involving Tree.com and its businesses and each director that it deems relevant to independence, including those required by the Marketplace Rules. This information is obtained from director responses to a questionnaire circulated by Tree.com management, Tree.com records and publicly available information. Following these determinations, Tree.com management will monitor those transactions, relationships and arrangements that are relevant to such determinations, as well as solicit updated information potentially relevant to independence from internal personnel and directors, to determine whether there have been any developments that could potentially have an adverse impact on Tree.com's prior independence determinations.

88

**Compensation Committee Interlocks and Insider Participation**

Tree.com's Board of Directors will have a Compensation Committee comprised of Messrs. Melber and Ozonian, neither of whom will be or has been in the past an officer or employee of Tree.com or any of its businesses at the time of their respective service on the Committee.

**Tree.com Executive Compensation**

*Compensation Discussion and Analysis*

*Roles and Responsibilities*

To date, the compensation of Tree.com's executive officers has been predominantly determined by IAC, acting in effect as Tree.com's compensation committee. IAC's compensation process is principally driven by IAC's General Counsel, who has primary responsibility for administering compensation and making compensation recommendations, with all material decisions approved by IAC's Chairman and Chief Executive Officer and, where appropriate, the Compensation Committee of IAC's Board of Directors (specifically with respect to all awards of IAC equity).

This Compensation Discussion and Analysis deals exclusively with historical information while Tree.com has been a part of IAC. Following the spin-off, Tree.com will have an independent board of directors, which will in turn have a compensation committee with responsibility for establishing Tree.com's compensation philosophy and programs and determining appropriate payments and awards to its executive officers. Because Tree.com's compensation committee has not yet been established, Tree.com cannot predict what compensation philosophies and programs will be adopted following the spin-off, and therefore this historical report is not necessarily indicative of the practices it will follow when it is an independent public company.

In general, IAC has been responsible for establishing bonus pools and equity pools for Tree.com, and then such pools are allocated throughout Tree.com, with IAC directly establishing all compensation elements for Tree.com's CEO, while the Tree.com CEO makes the determinations for Tree.com's other executive officers, subject to IAC's review and approval.

Neither Tree.com nor IAC has an ongoing relationship with any particular compensation consulting firm, though IAC has from time to time retained the services of consultants on specific occasions regarding broad-based IAC compensation programs. At no time has a consultant been engaged with respect to compensation of any of Tree.com's executive officers.

Until January 2008, Mr. Lebda was an executive officer of IAC, and not of Tree.com, and as such all decisions relating to Mr. Lebda's compensation were made by the IAC Compensation Committee with respect to IAC's performance overall, and his performance in his capacity as President and Chief Operating Officer of IAC.

As of the end of 2007, C.D. Davies served in the capacity of CEO, Lending Tree LLC, and as such was an executive officer of the Company. In 2008, Mr. Davies accepted a new role with the Company as Vice Chairman, a part time position in which he serves in primarily an advisory capacity, and as such is no longer considered an executive officer of the Company. Accordingly, his 2008 compensation is discussed in this Compensation Discussion and Analysis, and is reflected in the compensation tables, but he is not listed as an executive officer of the Company.

*Philosophy and Objectives*

Tree.com's executive officer compensation program is designed to increase long-term stockholder value by attracting, retaining, motivating and rewarding leaders with the competence, character, experience and ambition necessary to enable Tree.com to meet its growth objectives.

When establishing compensation packages for a given executive, Tree.com has followed a flexible approach, and has made decisions based on a host of factors particular to a given executive situation, including its firsthand experience with the competition for recruiting and retaining executives,

89

negotiation and discussion with the relevant individual, competitive survey data, internal equity considerations and other factors it deems relevant at the time.

Similarly, Tree.com has not followed an arithmetic approach to establishing compensation levels and measuring and rewarding performance for its executive officers, as these often fail to adequately take into account the multiple factors that contribute to success at the individual and business level. In any given period, Tree.com may have multiple objectives, and these objectives, and their relative importance, often change as the competitive and strategic landscape shifts, even within a given compensation cycle. As a result, formulaic approaches often over-compensate or under-compensate a given performance level. Accordingly, Tree.com has historically avoided the use of strict formulas in its compensation practices and has relied primarily on a discretionary approach.

### Compensation Elements

Tree.com's compensation packages for executive officers have primarily consisted of salary, annual bonuses, long term incentives (typically equity awards) and other benefits. Prior to making specific decisions related to any particular element of compensation, Tree.com typically reviews the total compensation of each executive, evaluating the executive's total near and long-term compensation in the aggregate. Tree.com determines which element or combinations of compensation elements (salary, bonus or equity) can be used most effectively to further its compensation objectives. However, all such decisions are subjective, and made on a facts and circumstances basis without any prescribed relationship between the various elements of the total compensation package.

### Salary

*General.*    Tree.com typically negotiates a new executive officer's starting salary upon arrival, based on the executive's prior compensation history, prior compensation levels for the particular position within Tree.com, Tree.com's location, salary levels of other executives within Tree.com, salary levels available to the individual in alternative opportunities, reference to certain survey information and the extent to which Tree.com desires to secure the executive's services.

Once established, salaries can increase based on a number of factors, including the assumption of additional responsibilities, internal equity, periodic market checks and other factors which demonstrate an executive's increased value to Tree.com.

Tree.com utilizes the Towers Perrin Executive Compensation Data Bank when referring to survey data in formulating its compensation packages.

*2007.*    In 2007, Mr. C.D. Davies (who served as CEO of the Lending business as of the end of 2007, but no longer serves as an executive of Tree.com), Mr. Violette, Mr. Harris and Mr. Packey each received salary increases in connection with the assumption of new roles within Tree.com. To reflect his promotion to Chief Executive Officer of the company's Lending business, Mr. Davies received a salary increase from $300,000 to $450,000. Mr. Violette was promoted to President of the company's Real Estate business in April 2007 and received a salary increase from $312,000 to $400,000. Mr. Harris was promoted to President and Chief Operating Officer of the Lending business in May 2007 and received a salary increase from $255,000 to $325,000. Mr. Packey was promoted to Chief Financial Officer in October 2007 and received an increase from $210,000 to $241,500. All of these increases were the result of conversations between the company and the relevant executives, and in making its determinations Tree.com took into account a variety of factors, including internal pay structure, its assessment of market salaries, and, in certain instances, survey data.

*2008.*    In connection with the employment agreement pursuant to which Mr. Lebda returned to Tree.com as its Chairman and Chief Executive Officer (the "New Lebda Employment Agreement"), Mr. Lebda agreed to a salary of $750,000, which is the same as the salary he had been receiving as President and Chief Operating Officer of IAC.

90

*Annual Bonuses*

*General.*    Tree.com's bonus program is designed to reward performance on an annual basis. Because of the variable nature of the bonus program, and because in any given year bonuses have the potential to make up a significant portion of an executive's total compensation, the bonus program provides an important incentive tool to achieve Tree.com's annual objectives.

After consultation with Tree.com management, IAC establishes the annual bonus pool for the Lending and Real Estate businesses based on its assessment of their respective performances during the completed year. Both the Lending and Real Estate businesses have generally been measured by growth in profitability, but this is measured subjectively both in absolute terms over the prior year and in comparison to their competitors, taking into account economic and other factors, without any pre-established targets. Additionally, consideration has sometimes been given to achievement of various strategic objectives over the course of the year and other factors IAC and Tree.com's management deem relevant. No quantified weight has been given to any particular consideration and there has generally been no formulaic calculation. Rather, IAC has engaged in an overall assessment of appropriate bonus levels based on a subjective interpretation of all the relevant criteria.

IAC determines the bonus amounts for the Presidents of the Lending and Real Estate businesses, based largely on the same considerations used in establishing the bonus pools for the businesses generally.

The Presidents of each business then establish the bonus payments to the other executive officers out of the bonus pool. Specific bonus payouts are determined based loosely on Tree.com's actual bonus pool and the relative role and importance of each executive, with individualized adjustments in certain instances for an executive's individual performance. With the exception of Mr. Violette, none of the executives at Tree.com have target bonus opportunities.

Tree.com generally pays bonuses shortly after year-end following finalization of financial results for the prior year.

*2007.*    Lending and Real Estate each had difficult years in extremely challenging environments, and bonuses generally reflected these factors. In 2007, Mr. Davies and Mr. Violette each received guaranteed minimum bonuses under the terms of their employment agreements. Given disappointing financial results, IAC determined not to make bonus payments in excess of those minimums. Mr. Davies received a bonus of $350,000 and Mr. Violette received a bonus of $500,000. Tree.com's overall 2007 performance did not warrant reward bonuses, but concerned about turmoil in the lending industry, Tree.com determined to pay guaranteed bonuses to certain key performers, as determined by Mr. Davies and Mr. Lebda. Mr. Harris and Mr. Packey were included in this group. For each individual receiving a bonus, an amount was established, with 50% guaranteed to be paid in February 2008 and 50% in July 2008, in each case based on continued employment with Tree.com. For purposes of this compensation disclosure, Tree.com has considered the 50% payout made in February 2008 to Messrs. Harris and Packey as being bonuses paid with respect to 2007. Mr. Harris and Mr. Packey received payouts of $75,000 and $50,000, respectively, in each of February and July. These amounts were established based on a subjective determination by Mr. Davies, in consultation with Mr. Lebda, of the amounts necessary to retain these individuals, given the limited amount of cash provided by IAC for the retention program company-wide.

No bonuses were paid to IAC executive officers on account of 2007 as a result of poor performance of IAC as a whole, and consequently Mr. Lebda was not paid a bonus for 2007.

*Long-Term Incentives*

*General.*    Tree.com believes that ownership shapes behavior, and that by providing a meaningful portion of an executive officer's compensation in stock, the executive's incentives are aligned with stockholder interests in a manner that drives better performance over time. As part of IAC, that led to Tree.com's executive officers receiving IAC equity awards on a regular basis.

91

In setting particular award levels, the predominant objectives are providing the recipient with effective retention incentives, appropriate reward for past performance, and incentives for strong future performance. Appropriate levels to meet these goals may vary from year to year, and from individual to individual, based on a variety of factors.

The annual corporate performance factors relevant to setting bonus amounts that were discussed above, while taken into account, are generally less relevant in setting annual equity awards, as the awards tend to be more forward looking, and are a longer-term retention and reward instrument than Tree.com's annual bonuses.

Awards to the Presidents of Lending and Real Estate have been made by IAC. Additionally, IAC establishes a pool for annual equity awards which the Presidents then allocate to the rest of their businesses, including the other executive officers, subject to IAC's approval. Additionally, IAC approves any equity grants recommended to be made to Tree.com executives outside of the annual process. Executive officers receive grants that are subjectively determined based on IAC's (or the Presidents') view of how best to allocate the equity pool for retention, reward and motivation based on a host of subjective factors (including past contribution, retention risk, contribution potential, and market data).

Except where otherwise noted, Tree.com grants equity awards following year-end after finalization of financial results for the prior year. The meeting of the Compensation Committee of the IAC Board at which the awards are made is generally scheduled months in advance and without regard to the timing of the release of earnings or other material information.

*Restricted Stock Units.* Until 2008, IAC used restricted stock units, or RSUs, as its exclusive equity compensation tool for Tree.com's executive officers. Through 2006, these awards generally vested in equal annual installments over 5 years (annual vesting RSUs), or cliff vested at the end of five years (cliff-vesting RSUs). Annual awards were intended to provide frequent rewards and near-term retention incentives, while cliff-vesting RSUs provided more of a long-term retention mechanism.

In February 2007, IAC implemented a new equity instrument, Growth Shares, which were RSU grants that cliff vested at the end of three years in varying amounts depending upon growth in IAC's publicly reported metric, Adjusted Earnings Per Share, with certain modifications.

These awards were introduced throughout IAC to more closely link long-term reward with IAC's overall performance and to provide greater retentive effect by providing the opportunity to earn greater amounts through increased IAC performance. However, in connection with the spin-off, these awards will be converted into three-year cliff-vesting awards at the "target" value (or 50% of the shares actually granted), without variability based on performance. For information regarding the reasons behind this conversion, see "The Separation—Treatment of Outstanding IAC Compensatory Equity-Based Awards."

*LendingTree Equity.* At the time of IAC's acquisition of LendingTree, a wholly owned subsidiary of Tree.com which contains Tree.com's operating assets, Mr. Lebda, Mr. Harris and Mr. Packey were granted awards representing 4.25%, 0.7% and 0.075% of LendingTree's common equity. In addition to common equity, LendingTree has outstanding another class of equity with a liquidation preference equal to the price IAC paid for LendingTree plus accreted dividends since the acquisition. At the time Mr. Lebda became President and Chief Operating Officer of IAC, he exchanged 25% of his LendingTree award for 200,000 shares of restricted stock of IAC, and acquired a right to exchange 25% of his award for 300,000 shares of IAC stock in 2009. All these LendingTree awards are fully vested, and subject to a put right to Tree.com in 2009 (and annually thereafter) and a call right by Tree.com in 2011 (and annually thereafter). Tree.com believes the liquidation preference of the senior equity is significantly greater than the value of LendingTree, and therefore believes it is highly unlikely that these equity awards will ever result in value to the holders. Additionally, Tree.com expects Mr. Lebda to exercise his exchange right for 300,000 shares of IAC, which right will be accelerated at the time of the spin-off.

*2007.* Mr. Davies received 10,659 RSUs when he joined Tree.com and also received 7,500 Growth Shares (at target) to reflect his promotion to Chief Executive Officer of Tree.com. Mr. Harris received 2,509 RSUs and 15,056 Growth Shares (at target) in connection with the annual grant process and also received 5,738 Growth Shares (at target) related to his promotion to President and Chief Operating Officer of Tree.com. Mr. Violette received 10,000 Growth Shares (at target) in connection with his assuming the role of President of the Real Estate business. Each of these awards were arrived at as a result of negotiations relating to the entering into of new employment agreements by the recipients. Mr. Packey also received 5,833 Growth Shares (at target) and 2,447 annual vesting RSUs in connection with the annual grant process.

Mr. Lebda received 62,735 Growth Shares (at target), the same amount received by the other IAC executive officers (other than the CEO).

*2008.* Mr. Packey received 12,000 RSUs with a five year annual vesting schedule in recognition of his promotion to Chief Financial Officer of Tree.com. This grant was agreed upon in 2007, but not granted until 2008, and was based on the assumption of additional responsibilities, a review of competitive data, internal equity considerations, and discussions with Mr. Packey.

Under the New Lebda Employment Agreement, Mr. Lebda was granted the right to receive, upon consummation of the spin-off, RSUs in Tree.com equal to 2% of the fully diluted equity of the company, as well as four grants of options, each of which represented the right to acquire 2.5% of the fully diluted equity at exercise prices representing a total equity value of the company of $250 million, $300 million, $400 million and $450 million, with possible upward adjustments based on the initial trading value in the spin-off. Fully diluted equity will be measured at the time of the spin-off. The restricted stock units vest equally over five years, while the stock options all cliff vest at the end of five years. The New Lebda Employment Agreement also provides that all of Mr. Lebda's outstanding IAC equity awards will vest immediately prior to the spin-off.

Tree.com plans to grant stock options to the other executive officers at the time of the spin-off, although the size of such grants have not yet been determined.

*Spin-Off Adjustments.* In the spin-off, equity awards denominated in IAC stock will be adjusted as described in "Treatment of Outstanding IAC Compensatory Equity-Based Awards."

Presuming the spin-off transactions occur prior to February 2009, the following table reflects the effect of these adjustments on all equity awards held by Tree.com's executive officers:

| | | Upon Completion of the Spin-Off* | | |
| Name | RSUs that will vest (#) | RSUs that will be converted exclusively into RSUs of Tree.com and vest on regular schedule (#) | RSUs that will be split among the post-transaction companies and vest after February 2009 on regular schedule (#) | Options outstanding at December 31, 2007—all of which will be split among the post-transaction companies (#) |
| --- | --- | --- | --- | --- |
| Doug Lebda | 192,235(1) | — | | — |
| C.D. Davies | — | 13,528 | 2,500 | — |
| Bret Violette | 39,029 | 6,667 | 3,333 | — |
| Robert Harris | 19,354 | 17,538 | 22,728 | 10,848 |
| Matt Packey | 1,994 | 16,850 | 3,890 | — |

\*    Excludes 7,186, 2,131, 39,027, 501 and 1,525 RSUs that vested since December 31, 2007 or will vest prior to August 1, 2008 for Messrs. Lebda, Davies, Violette, Harris and Packey, respectively.

(1)    In addition, 500,000 shares of restricted stock held (or to be received by) Mr. Lebda will vest at the time of the spin-offs.

93

*Violette Long Term Cash Bonus Plan.* In connection with his agreement to serve as the President of Tree.com's Real Estate business, the company agreed to pay a one-time bonus if the Real Estate business' 2009 revenues are at least $130 million and 2009 operating income before amortization is at least $10 million (in which case the bonus shall be $1 million) or at least $20 million (in which case the bonus shall be $2 million). This bonus structure was put in place to provide an incentive for Mr. Violette to grow both the business' top and bottom lines.

### Change of Control and Severance

Tree.com believes that providing executives with severance and change of control protection is critical to allowing executives to fully value the forward looking elements of their compensation packages, and therefore limit retention risk during uncertain times. Accordingly, Tree.com's employment agreements and equity awards generally provide for salary continuation in the event of certain employment terminations beyond the control of the executive, as well as varying degrees of accelerated vesting in the event of a change of control of the company.

### Other Compensation

Under limited circumstances, certain Tree.com executive officers have received non-cash and non-equity compensatory benefits. The values of these benefits are reported under the heading "Other Annual Compensation" in this filing pursuant to applicable rules. The executive officers do not participate in any deferred compensation or retirement program other than IAC's 401(k) plan.

### Tax Deductibility

IAC's practice has been to structure Tree.com's compensation program in such a manner so that the compensation it pays is deductible by IAC for federal income tax purposes. Because Tree.com's executive officers will now be subject to the limitations on deductibility under Section 162(m) of the Internal Revenue Code of 1986, as amended, and were not previously, certain compensatory arrangements established prior to the spin-off but that will be paid following the spin-off may not result in deductible compensation for Tree.com.

### Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Douglas R. Lebda(2) | 2007 | 750,000 | — | 6,392,587 | 7,750(4) | 7,150,337 |
| Chairman and CEO | 2006 | 750,000 | 1,300,000 | 5,483,376 | 602,974 | 8,136,350 |
| C. D. Davies(3) | 2007 | 377,885 | 350,000 | 123,105 | 4,689(3) | 855,679 |
| Vice Chairman | | | | | | |
| Bret Violette | 2007 | 375,631 | 500,000 | 1,175,887 | 6,750(4) | 2,058,268 |
| President, Real Estate | | | | | | |
| Robert Harris(5) | 2007 | 299,423 | 75,000 | 482,163 | 6,750(4) | 863,336 |
| President, LendingTree Exchange | | | | | | |
| Matthew Packey | 2007 | 218,692 | 50,000 | 122,617 | 6,750(4) | 398,059 |
| CFO | | | | | | |

(1) Reflects the dollar amount recognized by IAC for financial statement reporting purposes for the applicable fiscal years ended December 31, in accordance with SFAS 123R, for IAC restricted stock units ("RSUs") awarded in and prior to the applicable year under IAC's stock and annual incentive plans. These amounts do not, therefore, represent the value of IAC equity compensation awarded or realized in the applicable year. For further discussion of IAC's accounting for its equity compensation plans, see note 4 of IAC's audited financial statements for the fiscal year ended

94

December 31, 2007 included in its Annual Report on Form 10-K filed with the SEC on February 29, 2008. For information on awards made and realized in 2007, see the Grants of Plan-Based Awards and Option Exercises and Stock Vested tables below.

(2)    Reflects compensation received by Mr. Lebda in his capacity as President and Chief Operating Officer of IAC.

(3)    Reflects compensation received in his capacity as CEO, LendingTree.

(4)    Reflects matching contributions under IAC's 401(k) plan.

(5)    Reflects compensation received as President of the Lending Business.

### Grants of Plan-Based Awards

The table below provides information regarding IAC equity awards granted to Tree.com's named executives in 2007.

| Name | Grant Date | Estimated Future Payouts Under Equity Incentive Plan Awards(1)(2) | | | All other stock awards: number of shares of stock or units (#)(2) | Grant Date Fair Value of Stock and Option Awards ($)(3) |
| | | Threshold (#) | Target (#) | Maximum (#) | | |
|---|---|---|---|---|---|---|
| Douglas R. Lebda | 2/16/07 | 3,488 | 62,735 | 125,470 | — | 2,499,990 |
| C.D. Davies | 6/18/07 | 417 | 7,500 | 15,000 | 10,659 | 623,762 |
| Bret Violette | 6/18/07 | 556 | 10,000 | 20,000 | — | 343,500 |
| Robert Harris | 2/16/07 | 837 | 15,056 | 30,112 | 2,509 | 699,965 |
| | 6/18/07 | 319 | 5,738 | 11,476 | — | 197,101 |
| Matthew Packey | 2/16/07 | 324 | 5,833 | 11,666 | 2,447 | 329,958 |

(1)    Reflects performance-based RSU awards which cliff vest at the end of three years in varying amounts depending upon growth in IAC's publicly reported metric, Adjusted Earnings Per Share, with certain modifications. The threshold amount represents 5.56% of the target payout, which amount will vest upon achieving the minimum growth threshold. These awards will be converted into three year cliff-vesting awards in the spin-offs as described under "The Separation—Treatment of Outstanding IAC Compensatory Equity-Based Awards."

(2)    RSU award recipients would be credited with amounts for cash dividends paid on IAC common stock, with such additional amounts vesting concurrently with the related RSU award. For information on the treatment of RSU awards granted to Tree.com's named executives upon a termination of employment or a change in control, see the discussion under "Potential Payments Upon Termination or Change in Control" below.

(3)    The fair value of equity incentive plan awards is based on the target payout.

<div align="center">95</div>

*Outstanding Equity Awards at Fiscal Year-End*

The table below provides information regarding various IAC equity awards held by Tree.com's named executives as of December 31, 2007. The market value of all RSU and restricted stock awards is based on the closing price of IAC common stock as of December 31, 2007 ($26.92), the last trading day of 2007.

| | Option Awards(1) | | | Stock Awards(1)(2) | | | |
|---|---|---|---|---|---|---|---|
| Name | Number of securities underlying unexercised options (#)(3) | Option exercise price ($) | Option expiration date | Number of shares or units of stock that have not vested (#)(4) | Market value of shares or units of stock that have not vested ($)(4) | Equity incentive plan awards: Number of unearned shares, units or other rights that have not vested (#)(4) | Equity incentive plan awards: Market or payout value of unearned shares, units or other rights that have not vested ($)(4) |
| | (Exercisable) | | | | | | |
| Douglas R. Lebda(5) | 17,892 | 9.30 | 12/28/08 | — | — | — | — |
| | 52,304 $ | 10.87 | 9/2/09 | — | — | — | — |
| | 49,204 $ | 16.58 | 1/7/10 | — | — | — | — |
| | 49,592 $ | 5.01 | 12/6/10 | — | — | — | — |
| | 61,990 $ | 6.16 | 4/2/11 | — | — | — | — |
| | 54,241 $ | 14.11 | 3/8/12 | — | — | — | — |
| | 38,744 $ | 23.62 | 12/20/12 | — | — | — | — |
| | — $ | — | — | 200,000 | 5,384,000 | — | — |
| | — | — | — | 136,686(6) | 3,679,587(6) | 3,488 | 93,897 |
| C. D. Davies | — | — | — | 10,659 | 286,940 | 417 | 11,226 |
| Bret Violette | — | — | — | 78,056 | 2,101,268 | 556 | 14,968 |
| Robert Harris(5) | 10,848 $ | 23.62 | 12/20/12 | 39,327 | 1,058,683 | 1,156 | 31,120 |
| Matthew Packey(5) | — | — | — | 6,426 | 172,988 | 324 | 8,722 |

(1) For a discussion regarding how these equity awards will be treated in the spin-offs, see under "Treatment of Outstanding IAC Compensatory Equity-Based Awards."

(2) Amounts shown for equity incentive plan awards are based on achieving the minimum growth threshold in accordance with SEC rules.

(3) On August 9, 2005, IAC completed the separation of its travel and travel-related businesses and investments (other than Interval and TV Travel Shop) into an independent public company (the "Expedia Spin-Off"). In connection with the Expedia Spin-Off, each then-vested option to purchase shares of IAC common stock was converted into an option to purchase shares of IAC common stock and an option to purchase shares of Expedia common stock. Adjustments were made to the number of shares subject to each IAC and Expedia stock option to give effect to the one-for-two reverse stock split effected in connection with the Expedia Spin-Off and to the corresponding exercise prices based on the relative market capitalizations of IAC and Expedia at the time of the Expedia Spin-Off. The adjusted IAC and Expedia stock options otherwise have the same terms and conditions, including exercise periods, as the corresponding vested IAC stock options outstanding immediately prior to the Expedia Spin-Off.

96

For the named executives, any value realized upon the exercise of Expedia stock options is treated for tax purposes as compensation payable to them in their respective capacities as executive officers of Tree.com. Accordingly, information regarding Expedia stock options held by Tree.com's named executives as of December 31, 2007 appears in the table immediately below and information regarding any exercises of Expedia stock options by such named executives is reported in the Option Exercises and Stock Vested table below.

| Name | Number of Options (#) | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|
| Douglas R. Lebda | 38,744 | $ 18.91 | 12/20/12 |
| Robert Harris | 10,848 | $ 18.91 | 12/20/12 |

(4) The table below provides the following information regarding RSU awards held by Tree.com's named executives as of December 31, 2007: (i) the grant date of each award, (ii) the number of RSUs outstanding (on an aggregate and grant-by-grant basis), (iii) the market value of RSUs outstanding as of December 31, 2007, (iv) the vesting schedule for each award and (v) the total number of RSUs that vested or are scheduled to vest in each of the fiscal years ending December 31, 2008, 2009, 2010, 2011 and 2012.

| Grant Date | Number of Unvested RSUs as of 12/31/07 (#) | Market Value of Unvested RSUs as of 12/31/07 ($) | Vesting Schedule (#) | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2008 | 2009 | 2010 | 2011 | 2012 |
| Douglas R. Lebda | | | | | | | |
| 8/8/03(a) | 11,255 | 302,985 | 11,255 | — | — | — | — |
| 2/4/04(b) | 58,982 | 1,587,795 | — | 58,982 | — | — | — |
| 2/10/05(b) | 37,703 | 1,014,965 | — | — | 37,703 | — | — |
| 2/6/06(c) | 28,746 | 773,842 | 7,186 | 7,186 | 7,187 | 7,187 | — |
| 2/16/07(d) | 62,735 | 1,688,826 | — | — | 62,735 | — | — |
| *Total* | 199,421 | 5,368,413 | 18,441 | 66,168 | 107,625 | 7,187 | — |
| C.D. Davies | | | | | | | |
| 6/18/07(e) | 10,659 | 286,940 | 2,131 | 2,132 | 2,132 | 2,132 | 2,132 |
| 6/18/07(d) | 7,500 | 201,900 | — | — | 7,500 | — | — |
| *Total* | 18,159 | 488,840 | 2,131 | 2,132 | 9,632 | 2,132 | 2,132 |
| Bret Violette | | | | | | | |
| 6/15/05(c) | 78,056 | 2,101,268 | 39,027 | 39,029 | — | — | — |
| 6/18/07(d) | 10,000 | 269,200 | — | — | 10,000 | — | — |
| *Total* | 88,056 | 2,370,468 | 39,027 | 39,029 | 10,000 | — | — |
| Robert Harris | | | | | | | |
| 2/10/05(b) | 18,852 | 507,496 | — | — | 18,852 | — | — |
| 2/6/06(b) | 17,966 | 483,645 | — | — | — | 17,966 | — |
| 2/16/07(c) | 2,509 | 67,542 | 501 | 502 | 502 | 502 | 502 |
| 2/16/07(d) | 15,056 | 405,308 | — | — | 15,056 | — | — |
| 6/18/07(d) | 5,738 | 154,467 | — | — | 5,738 | — | — |
| *Total* | 60,121 | 1,618,458 | 501 | 502 | 40,148 | 18,468 | 502 |
| Matthew Packey | | | | | | | |
| 9/30/03(a) | 152 | 4,092 | 152 | — | — | — | — |
| 2/10/05(c) | 952 | 25,628 | 317 | 317 | 318 | — | — |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2/6/06(c) | 2,879 | 74,395 | 719 | 718 | 719 | 719 | — |
| 2/16/07(c) | 2,447 | 65,873 | 489 | 489 | 490 | 489 | 490 |
| 2/16/07(d) | 5,833 | 157,024 | — | — | 5,833 | — | — |
| *Total* | 12,259 | 330,012 | 1,677 | 1,524 | 7,360 | 1,208 | 490 |

(a)  These awards vest in four equal installments, beginning on the second anniversary of the grant date, subject to continued employment.

97

(b)    These awards vest in one lump sum installment on the fifth anniversary of the grant date, subject to continued employment.

(c)    These awards vest in five equal annual installments on each of the first five anniversaries of the grant date, subject to continued employment.

(d)    Represents the initial "target" awards. See the Grant of Plan-Based Awards table and footnote (1) thereto.

(e)    These awards vest in five equal annual installments on each of the first five anniversaries of January 22, 2007, Mr. Davies' date of hire.

(5)    Excludes LendingTree units held as of December 31, 2007 and, in the case of Mr. Lebda, also excludes 300,000 shares of IAC common stock receivable upon the exercise of contractual right to exchange certain LendingTree units in early 2009 (or, if earlier, at the time of the spin-off). These units have no current market value and are instead subject to appraisal at the time of certain put-call rights. Tree.com believes that these awards have no value. For more information regarding these equity arrangements, see the discussion under the "Compensation Discussion and Analysis" and "Potential Payments Upon Termination or Change in Control" sections, and the Option Exercises and Stock Vested table.

(6)    Reflects shares of restricted stock received by Mr. Lebda upon the effective date of the 2006 agreement relating to his promotion to President and Chief Operating Officer of IAC in exchange for certain of his LendingTree units.

### Option Exercises and Stock Vested

The table below provides information regarding the number of shares acquired by Tree.com's named executives in 2007 upon the exercise of stock options and the vesting of RSU awards and the related value realized, in each case, excluding the effect of any applicable taxes. The dollar value realized upon exercise of stock options represents the difference between (i) the sale price of the shares acquired on exercise for simultaneous exercise and sale transactions and (ii) the exercise price of the stock option, multiplied by the number of stock options that were exercised. The dollar value realized upon vesting of RSUs represents the closing price of IAC common stock on the applicable vesting date multiplied by the number of RSUs so vesting.

| | Option Awards | | Stock Awards | |
| --- | --- | --- | --- | --- |
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| Douglas R. Lebda(1) | 70,832(2) | 1,318,126 | 18,440 | 582,789 |
| C.D. Davies | — | — | — | — |
| Bret Violette | — | — | 39,027 | 1,358,140 |
| Robert Harris(1) | — | — | — | — |
| Matthew Packey(1) | — | — | 1,134 | 43,693 |

(1)    In addition, 1.42, 1.4, and 0.15 LendingTree units held by Messrs. Lebda, Harris and Packey, respectively, vested in 2007, which number represents less than 1% of the total outstanding common units of LendingTree. These awards were granted to certain LendingTree employees at the time of its acquisition by IAC in 2003, became fully vested in February 2008, and are subject to put and call rights beginning in 2009. This table also excludes, in the case of Mr. Lebda, LendingTree units held by him that are subject to the 2009 exchange right, as discussed under Compensation Discussion and Analysis. These units are significantly out of the money and are not expected to result in any value.

(2)    Includes 49,204 Expedia shares acquired upon the exercise of Expedia stock options received in connection with the Expedia Spin-Off.

98

*Potential Payments Upon Termination or Change in Control*

### Change of Control

Pursuant to the terms of IAC's (and, following the spin-off, Tree.com's) equity compensation plans and the award agreements thereunder, upon a change of control the named executive officers are generally entitled to accelerated vesting of (i) equity awards made prior to 2006 and (ii) equity awards made thereafter if, following such change in control, their employment is terminated by the Company for any reason other than death, disability or cause (as defined in the relevant employment agreement), or by the executive for good reason (as defined in the relevant plan or employment agreement) (a "Qualifying Termination").

### Severance

*Cash.* Upon a Qualifying Termination, Mr. Lebda and Mr. Violette shall be entitled to salary continuation for the remainder of the terms of their employment agreements, provided Mr. Lebda shall not receive such continuation for more than three years. Mr. Harris would receive salary continuation for twelve months following a Qualifying Termination. Upon a Qualifying Termination, Mr. Violette would also be entitled to a pro rated portion of his long-term cash bonus plan if any such payout is ultimately earned and his remaining guaranteed bonuses of $500,000 payable in July of 2008 and 2009.

*Equity.* Upon a Qualifying Termination, Mr. Lebda will receive full acceleration of his equity awards outstanding immediately following the spin-off, Mr. Violette will receive full acceleration of any unvested RSUs he received in 2005, and Mr. Harris will receive acceleration of a portion of the cliff-vesting RSU awards granted in 2005 and 2006 equal to 20% of each such award for each full year of service from the date of grant to the date of termination.

*Obligations.* The amounts payable upon a Qualifying Termination are all subject to the execution of a general release and to compliance with confidentiality, non-compete, non-solicitation of employees and non-solicitation of customer covenants set forth in the relevant employment agreements. Salary continuation payments will be offset by the amount of any compensation earned by an executive from other employment during the severance payment period.

The amounts shown in the table assume that the termination or change in control was effective as of December 31, 2007 and that the price of IAC common stock on which certain calculations are based was the closing price of $26.92 on The Nasdaq Stock Market on that date. These amounts are estimates of the incremental amounts that would have been paid out to the executive upon such terminations/change in control, and do not take into account equity grants made, and contractual

99

obligations entered into, after December 31, 2007. The actual amounts to be paid out can only be determined at the time the event actually occurs.

| Name and Benefit | Termination without cause | Resignation for good reason | Death or Disability | Change in Control of IAC | Termination w/o cause or for good reason in connection with Change in Control |
|---|---|---|---|---|---|
| **Douglas Lebda(1)** | | | | | |
| Cash Severance (salary) | 750,000 | 750,000 | — | — | 750,000 |
| RSUs (vesting accelerated) | 13,762,985 | 13,762,985 | 9,130,860 | 10,752,413 | 16,225,654 |
| Total estimated value | 14,512,985 | 14,512,985 | 9,130,860 | 10,752,413 | 16,975,654 |
| **C.D. Davies(2)** | | | | | |
| Cash Severance (salary) | 450,000 | — | — | — | 450,000 |
| RSUs (vesting accelerated) | — | — | — | — | 488,840 |
| Total estimated value | 450,000 | — | — | — | 938,840 |
| **Bret Violette** | | | | | |
| Cash Severance (salary) | 800,000 | 800,000 | — | — | 800,000 |
| Guaranteed Bonus | 1,000,000 | 1,000,000 | — | — | 1,000,000 |
| RSUs (vesting accelerated) | 2,101,268 | 2,101,268 | — | 2,101,268 | 2,370,468 |
| Total estimated value | 3,901,268 | 3,901,268 | — | 2,101,268 | 4,170,468 |
| **Robert Harris(1)(2)** | | | | | |
| Cash Severance (salary) | 325,000 | 325,000 | — | — | 325,000 |
| RSUs (vesting accelerated) | 299,700 | 299,700 | — | 507,496 | 1,618,457 |
| Total estimated value | 624,700 | 624,700 | — | 507,496 | 1,943,457 |
| **Matthew Packey(1)** | | | | | |
| Cash Severance (salary) | — | — | — | — | — |
| RSUs (vesting accelerated) | 2,073 | — | 1,669 | 29,720 | 330,012 |
| Total estimated value | 2,073 | — | 1,669 | 29,720 | 330,012 |

(1) Excludes, in all cases, LendingTree units held at December 31, 2007 (and, in the case of Mr. Lebda, that would accelerate upon the events set forth above), given that the value of these units as of that date was zero.

(2) One year's salary also payable upon a change in control of LendingTree.

100

**Tree.com Security Ownership of Certain Beneficial Owners and Management**

As of the date hereof, all of Tree.com's outstanding shares of common stock are owned by IAC. After the distribution, IAC will no longer own any shares of Tree.com common stock. The following table presents information relating to the expected beneficial ownership of shares of Tree.com common stock, assuming completion of the distribution as if it occurred on April 30, 2008, by (i) each individual or entity expected to own beneficially more than 5% of the outstanding shares of Tree.com common stock, assuming that there are 278,735,546 shares of common stock and Class B common stock of IAC outstanding and a distribution ratio of one-thirtieth of a share of Tree common stock for every share of IAC common stock and/or Class B common stock, (ii) each director of Tree.com (iii) the Chief Executive Officer, the Chief Financial Officer and the other three named executive officers in the Tree.com summary compensation table (see "Tree.com Executive Compensation") and (iv) all of Tree.com's executive officers and directors as a group.

Unless otherwise indicated, beneficial owners listed here may be contacted at Tree.com's corporate headquarters at 11115 Rushmore Drive, Charlotte, North Carolina 28277. For each listed person, the number of shares of Tree.com common stock and percent of such class listed assumes the conversion or exercise of any Tree.com equity securities owned by such person that are or will become convertible or exercisable, and the exercise of stock options and the vesting of restricted stock units, if any, that will vest, within 60 days of April 30, 2008, but does not assume the conversion, exercise or vesting of any such equity securities owned by any other person.

The share amounts for each beneficial owner listed here are based on each such individual's beneficial ownership of shares of IAC common stock and/or Class B common stock as of April 30, 2008, and assuming a distribution ratio of one thirtieth of a share of Tree.com common stock for every share of IAC common stock and/or Class B common stock. To the extent that Tree.com directors and executive officers own shares of IAC common stock at the time of the distribution, they will participate in the distribution on the same terms as other holders of IAC common stock. In addition, following the distribution, Tree.com expects that all IAC stock-based awards held by these individuals will be adjusted to become awards relating to common stock of all five companies resulting from the spin-offs. Those awards that will relate to Tree.com common stock are reflected in the table below based upon the expected adjustment formula described under the caption "The Separation—Treatment of Outstanding IAC Compensatory Equity-Based Awards."

The actual number of shares of Tree.com capital stock outstanding as of the date of the distribution may differ due, among other things, to the exercise of stock options or warrants or the

101

vesting of restricted stock units, in each case, between April 30, 2008 and the date of the distribution and to the extent the other assumptions set forth above differ from actual developments.

| Name and Address of Beneficial Owner | Tree.com Common Stock | |
|---|---|---|
| | Shares | % |
| Clearbridge Advisors, LLC, *et al.*(1)(2) | 441,885 | 4.75 |
| 399 Park Avenue | | |
| New York, NY 10022 | | |
| Lord Abbett & Co. LLC(1)(2) | 1,306,628 | 14.06 |
| 90 Hudson Street, 11th Floor | | |
| Jersey City, NJ 07302 | | |
| Liberty Media Corporation(4)(5) | 2,773,993 | 29.86 |
| 12300 Liberty Boulevard | | |
| Englewood, CO 80112 | | |
| Scott Cammarn(5) | 45 | * |
| Robert Harris(5) | 10 | * |
| Peter C. Horan | 207 | * |
| Douglas Lebda(5) | 13,743 | * |
| Joseph Levin(5) | 85 | * |
| Lance Melber | — | — |
| David Norris(5) | — | — |
| Steven Ozonian | — | — |
| Matthew Packey(5) | 65 | * |
| Bret Violette(5) | 878 | * |
| All executive officers and directors as a group (10 persons) | 15,033 | * |

* The percentage of shares beneficially owned does not exceed 1%.

(1) We have not been able to determine the person or persons controlling the fund through publicly available information.

(2) Based upon information regarding IAC holdings reported on a Schedule 13G, as amended, which was filed with the SEC on February 14, 2008 and a distribution ratio of one-thirtieth of a share of Tree common stock for every share of IAC common stock and/or Class B common stock.

(3) Liberty Media Corporation is a publicly traded corporation. According to Liberty Media Corporation's Schedule 14A, filed April 24, 2008, Liberty's chairman, John C. Malone, controls 33% of the voting power of Liberty Media Corporation.

(4) Based on 58,796,381 shares of IAC common stock held by Liberty and 4,000,000, 15,618,230, 4,005,190 and 800,006 shares of IAC Class B common stock held by each of BDTV Inc., BDTV II Inc., BDTV III Inc. and BDTV IV Inc., respectively and a distribution ratio of one-thirtieth of a share of Tree common stock for every share of IAC common stock and/or Class B common stock.

(5) Excludes any equity awards that will vest upon completion of the spin-offs.

102

## DESCRIPTION OF CAPITAL STOCK OF TREE.COM

**General**

The following is a summary of information concerning the capital stock of the Company. The summaries and descriptions below do not purport to be complete statements of the relevant provisions of the Amended and Restated Certificate of Incorporation of the Company or its by-laws. The summary is qualified by reference to these documents, which you must read for complete information on the capital stock of the Company. The Amended and Restated Certificate of Incorporation and by-laws of the Company are included as exhibits to the Company's registration statement on Form S-1, of which this prospectus is a part.

**Distributions of Securities**

In the past three years, the Company has not sold any securities, including sales of reacquired securities, new issues, securities issued in exchange for property, services, or other securities, and new securities resulting from the modification of outstanding securities, that were not registered under the Securities Act.

**Common Stock**

Immediately following the spin-off, our authorized capital stock will consist of 50,000,000 shares of common stock, par value $0.01 per share, and the preferred stock described below.

*Shares Outstanding.* Immediately following the spin-off, we expect that the number of shares of common stock that we will have issued and outstanding will be approximately 9.29 million shares of common stock, par value $0.01 per share (based on a distribution ratio of one-thirtieth of a share of Tree.com for each share of IAC common stock and Class B common stock outstanding). This is based upon approximately 253,135,548 shares of IAC common stock and 25,599,998 shares of IAC Class B common stock outstanding as of March 31, 2008.

*Dividends.* Subject to prior dividend rights of the holders of any preferred shares, holders of shares of common stock of the Company are entitled to receive dividends when, as and if declared by its board of directors out of funds legally available for that purpose.

*Voting Rights.* Each share of common stock is entitled to one vote on all matters submitted to a vote of stockholders. Holders of shares of common stock do not have cumulative voting rights. In other words, a holder of a single share of our common stock cannot cast more than one vote for each position to be filled on our board of directors.

*Other Rights.* In the event of any liquidation, dissolution or winding up of the Company after the satisfaction in full of the liquidation preferences of holders of any preferred shares, holders of shares of our common stock are entitled to ratable distribution of the remaining assets available for distribution to stockholders. Shares of common stock are not subject to redemption by operation of a sinking fund or otherwise. Holders of shares of common stock are not currently entitled to preemptive rights.

*Fully Paid.* The issued and outstanding shares of our common stock are fully paid and non-assessable. This means the full purchase price for the outstanding shares of common stock has been paid and the holders of such shares will not be assessed any additional amounts for such shares. Any additional shares of common stock that we may issue in the future will also be fully paid and non-assessable.

103

**Preferred Stock**

Tree.com is authorized to issue up to 5,000,000 shares of preferred stock, par value $.01 per share. Our board of directors, without further action by the holders of our common stock, may issue shares of preferred stock. The board of directors is vested with the authority to fix by resolution the designations, preferences and relative, participating, optional or other special rights, and such qualifications, limitations or restrictions thereof, including, without limitation, redemption rights, dividend rights, liquidation preferences and conversion or exchange rights of any class or series of preferred stock, and to fix the number of classes or series of preferred stock, the number of shares constituting any such class or series and the voting powers for each class or series.

The authority possessed by our board of directors to issue preferred stock could potentially be used to discourage attempts by third parties to obtain control of the Company through a merger, tender offer, proxy contest or otherwise by making such attempts more difficult or more costly. Our board of directors may issue preferred stock with voting rights or conversion rights that, if exercised, could adversely affect the voting power of the holders of our common stock. There are no current agreements or understandings with respect to the issuance of preferred stock and the board of directors does not have a present intention to issue any shares of preferred stock.

**Restrictions on Payment of Dividends**

The Company is incorporated in Delaware and is governed by Delaware law. Delaware law allows a corporation to pay dividends only out of surplus, as determined under Delaware law.

**Section 203 of the Delaware General Corporation Law**

Section 203 ("Section 203") of the Delaware General Corporation Law prohibits certain transactions between a Delaware corporation and an "interested stockholder." Generally, an "interested stockholder" for this purpose is a stockholder who is directly or indirectly a beneficial owner of 15% or more of the outstanding voting power of a Delaware corporation. This provision, if applicable, prohibits certain business combinations between an interested stockholder and a corporation for a period of three years after the date on which the stockholder became an interested stockholder, unless: (1) the transaction which resulted in the stockholder becoming an interested stockholder is approved by the corporation's board of directors before the stockholder became an interested stockholder, (2) the interested stockholder acquired at least 85% of the voting power (as calculated pursuant to Section 203) of the corporation in the transaction in which the stockholder became an interested stockholder, or (3) the business combination is approved by a majority of the board of directors and the affirmative vote of the holders of two-thirds of the outstanding voting power not owned by the interested stockholder at or subsequent to the time that the stockholder became an interested stockholder. These restrictions do not apply in certain circumstances, including if the corporation's certificate of incorporation contains a provision expressly electing not to be governed by Section 203. If such a provision is adopted by an amendment to the corporation's certificate of incorporation, the amendment will be effective immediately if, among other requirements, the corporation has never had a class of voting stock listed on a national securities exchange or held of record by more than 2,000 stockholders. If this and other requirements are not satisfied, the amendment will not be effective until 12 months after its adoption and will not apply to any business combination between the corporation and any person who became an interested stockholder on or prior to such adoption.

In accordance with Section 203, the restrictions on certain business combinations in Section 203 will not apply in respect of the Company following the spin-off.

104

**Anti-takeover Effects of the Certificate of Incorporation and By-laws of 1Tee.com and Delaware Law**

Some provisions of our Amended and Restated Certificate of Incorporation and by-laws and certain provisions of Delaware law could make the following more difficult:

- acquisition of the Company by means of a tender offer;

- acquisition of the Company by means of a proxy contest or otherwise; or

- removal of incumbent officers and directors of the Company.

### Size of Board and Vacancies

Our Amended and Restated Certificate of Incorporation and by-laws provide that the number of directors on the Company's board of directors will be fixed exclusively by the board of directors. Newly created directorships resulting from any increase in the authorized number of directors will be filled by a majority of the directors then in office, provided that a majority of the entire board of directors, or a quorum, is present and any vacancies in the board of directors resulting from death, resignation, retirement, disqualification, removal from office or other cause will be filled generally by the majority vote of the remaining directors in office, even if less than a quorum is present.

### Elimination of Stockholder Action by Written Consent

Our Amended and Restated certificate of incorporation and by-laws expressly eliminate the right of stockholders to act by written consent. Stockholder action must take place at the annual or a special meeting of the Company's stockholders.

### Stockholder Meetings

Under our Amended and Restated Certificate of Incorporation and by-laws, stockholders are not entitled to call special meetings of stockholders; only a majority of our board of directors or specified individuals may call such meetings.

### Requirements for Advance Notification of Stockholder Nominations and Proposals

Our by-laws establish advance notice procedures with respect to stockholder proposals and nomination of candidates for election as directors other than nominations made by or at the direction of the board of directors or a committee of the board of directors. In particular, stockholders must notify the corporate secretary in writing prior to the meeting at which the matters are to be acted upon or directors are to be elected. The notice must contain the information specified in our Amended and Restated by-laws. To be timely, the notice must be received at the Company's principal executive office not later than 60 or more than 90 days prior to the first anniversary of the date for the preceding year's annual meeting of stockholders. However, if the date of the annual meeting is advanced more than 30 days prior to or delayed by more than 30 days after the anniversary of the preceding year's annual meeting, notice by the stockholder, to be timely, must be delivered no later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made. Moreover, in the event that the number of directors to be elected to the board of directors is increased and there is no public announcement by the Company naming all of the nominees for director or specifying the size of the increased board of directors at least 55 days prior to the first anniversary of the date on which the Company first mailed its proxy materials for the preceding year's annual meeting of stockholders, the stockholder's notice will be considered timely, but only with respect to nominees for any new positions created by such increase, if it is delivered to the corporate secretary at the principal executive offices of the Company not later than the close of business on the 10th day following the day on which such public announcement is first made by the Company.

105

*Undesignated Preferred Stock*

The authorization in our Amended and Restated Certificate of Incorporation with respect to the issuance of undesignated preferred stock makes it possible for the our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change control of the Company. The provision in our Amended and Restated Certificate of Incorporation authorizing such preferred stock may have the effect of deferring hostile takeovers or delaying changes of control of the Company's management.

### NASDAQ Listing

The Company has been approved to list its shares of common stock on NASDAQ and expects that its shares will trade under the ticker symbol "TREE."

### Resale of Tree.com Common Stock

As security holders, you will be subject to applicable provisions of the Exchange Act and the rules and regulations thereunder, which provisions may limit the timing of purchases and sales of our securities by you. In addition, if you are deemed an "affiliate" of Tree.com (as defined in Rule 405 of the Securities Act), the securities offered hereby may be deemed "restricted securities" (as defined in Rule 144 under the Securities Act) notwithstanding their registration under this registration statement. As a result you will not be able to sell the securities offered hereby absent an effective registration statement covering such sales or an available exemption from registration under the Securities Act.

106

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Agreements with Liberty Media Corporation**

In May 2008, in connection with the settlement of litigation relating to the proposed spin-offs, IAC entered into a "Spinco Agreement" with Liberty and affiliates of Liberty that hold shares of IAC common stock and/or Class B common stock (together with Liberty, the "Liberty Parties"), among others. At the time of the spin-offs, each Spinco will assume from IAC all of those rights and obligations under the Spinco Agreement providing for post-spin-off governance arrangements at the Spincos. As of April 30, 2008, Liberty may be deemed to beneficially own (within the meaning of Rule 13d-3 under the Exchange Act) 83,219,807 shares of IAC common stock that consists of shares of common stock and Class B common stock. Such shares constitute 29.9% of the outstanding shares of IAC common stock. Immediately following the spin-offs, it is expected that Liberty will beneficially own shares of common stock in each of the Spincos representing approximately 29.9% of the outstanding common stock of each of the Spincos. The following summary describes the material terms of those governance arrangements and related matters and is qualified by reference to the full Spinco Agreement, which has been filed as an exhibit to each of the Form S-1 registration statements of the Spincos. The Spinco Agreement also requires each Spinco to enter into a registration rights agreement with the Liberty Parties at the time of the spin-offs, as described below.

### Spinco Agreement

*Representation of Liberty on the Spinco Boards of Directors*

The Spinco Agreement generally provides that so long as Liberty beneficially owns securities of a Spinco representing at least 20% of the total voting power of the Spinco's equity securities, Liberty has the right to nominate up to 20% of the directors serving on the Spinco Board of Directors (rounded up to the nearest whole number). Any director nominated by Liberty must be reasonably acceptable to a majority of the directors on the Spinco's Board who were not nominated by Liberty. All but one of Liberty's nominees serving on the Spinco Board of directors must qualify as "independent" under applicable stock exchange rules. In addition, the Nominating and/or Governance committee of the Spinco Board may include only "Qualified Directors," namely directors other than any who were nominated by Liberty, are officers or employees of the Spinco or were not nominated by the Nominating and/or Governance Committee of the Spinco's Board in their initial election to the Board and for whose election any Liberty Party voted shares.

Until the second anniversary of the spin-off of a Spinco, the Liberty Parties agreed to vote all of the equity securities of a Spinco beneficially owned by them in favor of the election of the full slate of director nominees recommended to stockholders by the Spinco Board of Directors so long as the slate includes the director-candidates that Liberty has the right to nominate.

*Acquisition Restrictions*

The Liberty Parties have agreed in the Spinco Agreement not to acquire beneficial ownership of any equity securities of a Spinco (with specified exceptions) unless:

- the acquisition was approved by a majority of the Qualified Directors;

- the acquisition is permitted under the provisions described in "Competing Offers" below; or

- after giving effect to the acquisition, Liberty's ownership percentage of the equity securities of the Spinco, based on voting power, would not exceed the Applicable Percentage.

The "Applicable Percentage" initially is Liberty's ownership percentage upon the spin-off of a Spinco, based on voting power (expected to be approximately 30%), plus 5%, but in no event more than 35%. Following a spin-off, the Applicable Percentage for the Spinco will be reduced for specified

107

transfers of equity securities of the Spinco by the Liberty Parties. During the first two years following the spin-off of a Spinco, acquisitions by the Liberty Parties are further limited to specified extraordinary transactions and, otherwise, to acquisitions representing no more than one-third of the Spinco Common Stock received by the Liberty Parties in the spin-off.

*Standstill Restrictions*

Until the second anniversary of the spin-off, unless a majority of the Qualified Directors consent or to the extent permitted by the provisions described under "Acquisition Restrictions" or "Competing Offers" or in certain other limited circumstances, no Liberty Party may:

- offer to acquire beneficial ownership of any equity securities of such Spinco;

- initiate or propose any stockholder proposal or seek or propose to influence, advise, change or control the management, Board of Directors, governing instruments or policies or affairs of such Spinco;

- offer, seek or propose, collaborate on or encourage any merger or other extraordinary transaction;

- subject any equity securities of such Spinco to a voting agreement;

- make a request to amend any of the provisions described under "Acquisition Restrictions", "Standstill Restrictions" or "Competing Offers";

- make any public disclosure, or take any action which could reasonably be expected to require such Spinco to make any public disclosure, with respect to any of the provisions described under "Standstill Restrictions"; or

- enter into any discussions, negotiations, arrangements or understandings with any third party with respect to any of the provisions described under "Standstill Restrictions".

*Transfer Restrictions*

Unless a majority of the Qualified Directors consent, the Spinco Agreement prohibits transfers by the Liberty Parties of any equity securities of a Spinco to any person except for certain transfers, including:

- transfers under Rule 144 under the Securities Act (or, if Rule 144 is not applicable, in "broker transactions");

- transfers pursuant to a third party tender or exchange offer or in connection with any merger or other business combination, which merger or business combination has been approved by the Spinco;

- transfers in a public offering in a manner designed to result in a wide distribution, provided that no such transfer is made, to the knowledge of the Liberty Parties, to any person whose ownership percentage (based on voting power) of the Spinco's equity securities, giving effect to the transfer, would exceed 15%;

- a transfer of all of the equity securities of the Spinco beneficially owned by the Liberty Parties and their affiliates in a single transaction if the transferee's ownership percentage (based on voting power), after giving effect to the transfer, would not exceed the Applicable Percentage and only if the transferee assumes all of the rights and obligations (subject to limited exceptions) of the Liberty Parties under the Spinco Agreement relating to the Spinco;

108

-   specified transfers in connection with changes in the beneficial ownership of the ultimate parent company of a Liberty Party or a distribution of the equity interests of a Liberty Party or certain similar events; and

-   specified transfers relating to certain hedging transactions or stock lending transactions in respect of the Liberty Parties' equity securities in the Spinco, subject to specified restrictions.

During the first two years following the applicable spin-off, transfers otherwise permitted by the first and third bullets above will be prohibited, and transfers otherwise permitted by the fourth and sixth bullets above in respect of which IAC and the Spinco do not make certain determinations with respect to the transferee will be prohibited, unless such transfers represent no more than one-third of the Spinco Common Stock received by the Liberty Parties in the spin-off.

### Competing Offers

During the period when Liberty continues to have the right to nominate directors to a Spinco's Board of Directors, if the Spinco's Board of Directors determines to pursue certain types of transactions on a negotiated basis (either through an "auction" or with a single bidder), Liberty is granted certain rights to compete with the bidder or bidders, including the right to receive certain notices and information, subject to specified conditions and limitations. In connection with any such transaction that the Spinco is negotiating with a single bidder, the Spinco's Board must consider any offer for a transaction made in good faith by Liberty but is not obligated to accept any such offer or to enter into negotiations with Liberty.

If a third party (x) commences a tender or exchange offer for at least 35% of the capital stock of the Spinco other than pursuant to an agreement with the Spinco or (y) publicly discloses that its ownership percentage (based on voting power) exceeds 20% and the Spinco's Board fails to take certain actions to block such third party from acquiring an ownership percentage of the Spinco (based on voting power) exceeding the Applicable Percentage, the Liberty Parties generally will be relieved of the obligations described under "Standstill Restrictions" and "Acquisition Restrictions" above to the extent reasonably necessary to permit Liberty to commence and consummate a competing offer. If Liberty's ownership percentage (based on voting power) as a result of the consummation of a competing offer in response to a tender or exchange offer described in (x) above exceeds 50%, any consent or approval requirements of the Qualified Directors in the Spinco Agreement will be terminated, and, following the later of the second anniversary of the applicable spin-off and the date that Liberty's ownership percentage (based on voting power) exceeds 50%, the obligations described under "Acquisition Restrictions" will be terminated.

### Other

Following the spin-off of a Spinco, amendments to the Spinco Agreement and determinations required to be made thereunder (including approval of transactions between a Liberty Party and the Spinco that would be reportable under the proxy rules) will require the approval of the Qualified Directors.

### Registration Rights Agreement

As indicated above under "Spinco Agreement," each Spinco will grant to Liberty the registration rights described below at the time of its spin-off.

Under the registration rights agreement, the Liberty Parties and their permitted transferees (the "Holders") will be entitled to three demand registration rights (and unlimited piggyback registration rights) in respect of the shares of Spinco common stock received by the Liberty Parties as a result of the Spinco's spin-off and other shares of Spinco common stock acquired by the Liberty Parties

<div align="center">109</div>

consistent with the Spinco Agreement (collectively, the "Registrable Shares"). The Holders will be permitted to exercise their registration rights in connection with certain hedging transactions that they may enter into in respect of the Registrable Shares.

The Spinco will be obligated to indemnify the Holders, and each selling Holder will be obligated to indemnify the Spinco, against specified liabilities in connection with misstatements or omissions in any registration statement.

## Relationships Among IAC and the Spincos

Following the spin-offs, the relationships among IAC and the Spincos will be governed by a number of agreements. These agreements include, among others:

- a Separation and Distribution Agreement;

- a Tax Sharing Agreement;

- an Employee Matters Agreement; and

- a Transition Services Agreement (collectively, the "Spin-Off Agreements").

The Spin-Off Agreements will be filed as exhibits to the respective registration statement on Form S-1 of each of the Spincos, of which this prospectus is a part, and the summaries of each such agreement are qualified by reference to the full text of the applicable agreement.

### Separation and Distribution Agreement

The Separation and Distribution Agreement will set forth the arrangements among IAC and each of the Spincos regarding the principal transactions necessary to separate each of the Spincos from IAC, as well as govern certain aspects of the relationship of a Spinco with IAC and other Spincos after the completion of the spin-offs.

Each Spinco will agree to indemnify, defend and hold harmless (and to cause the other members of its respective group to indemnify, defend and hold harmless), under the Separation and Distribution Agreement, IAC and each of the other Spincos, and each of their respective current and former directors, officers and employees, from and against any losses arising out of any breach by such indemnifying companies of the Spin-Off Agreements, any failure by such indemnifying company to assume and perform any of the liabilities allocated to such company and any liabilities relating to the indemnifying company's financial and business information included in filings made with the SEC in connection with the spin-offs. IAC will agree to indemnify, defend and hold harmless each of the Spincos, and each of their respective current and former directors, officers and employees, from and against losses arising out of any breach by IAC of the Spin-Off Agreements, and any failure by IAC to perform its obligations under the Separation and Distribution Agreement or any Spin-Off Agreement.

In addition, the Separation and Distribution Agreement will also govern insurance and related reimbursement arrangements, provision and retention of records, access to information and confidentiality, cooperation with respect to governmental filings and third party consents and access to property.

### Tax Sharing Agreement

The Tax Sharing Agreement governs the respective rights, responsibilities and obligations of IAC and each Spinco after the spin-off of such Spinco with respect to taxes for periods ending on or before the spin-off of such Spinco. In general, pursuant to the Tax Sharing Agreement, IAC will prepare and file the consolidated federal income tax return, and any other tax returns that include IAC (or any of its subsidiaries) and a Spinco (or any of its subsidiaries) for all taxable periods ending on or prior to, or

110

including, the distribution date of such Spinco with the appropriate tax authorities, and, except as otherwise set forth below, IAC will pay any taxes relating thereto to the relevant tax authority (including any taxes attributable to an audit adjustment with respect to such returns; provided that IAC will not be responsible for audit adjustments relating to the business of a Spinco (or any of its subsidiaries) with respect to pre-spin off periods if such Spinco fails to fully cooperate with IAC in the conduct of such audit). Each Spinco will prepare and file all tax returns that include solely such Spinco and/or its subsidiaries and any separate company tax returns for such Spinco and/or its subsidiaries for all taxable periods ending on or prior to, or including, the distribution date of such Spinco, and will pay all taxes due with respect to such tax returns (including any taxes attributable to an audit adjustment with respect to such returns). In the event an adjustment with respect to a pre-spin off period for which IAC is responsible results in a tax benefit to a Spinco in a post-spin off period, such Spinco will be required to pay such tax benefit to IAC. In general, IAC controls all audits and administrative matters and other tax proceedings relating to the consolidated federal income tax return of the IAC group and any other tax returns for which the IAC group is responsible.

Under the Tax Sharing Agreement a Spinco generally (i) may not take (or fail to take) any action that would cause any representation, information or covenant contained in the separation documents or the documents relating to the IRS private letter ruling and the tax opinion regarding the spin-off of such Spinco to be untrue, (ii) may not take (or fail to take) any other action that would cause the spin-off of such Spinco to lose its tax free status, (iii) may not sell, issue, redeem or otherwise acquire any of its equity securities (or equity securities of members of its group), except in certain specified transactions for a period of 25 months following the spin-off of such Spinco and (iv) may not, other than in the ordinary course of business, sell or otherwise dispose of a substantial portion of its assets, liquidate, merge or consolidate with any other person for a period of 25 months following the spin-off.

Because IAC has an unrealized loss, for federal income tax purposes, in the stock of Tree.com, it is not necessary to subject Tree.com to the same restrictions as the other Spincos with respect to acquisitions of Spinco equity securities after 12 months following the spin-off. Nonetheless, Tree.com will be subject to other restrictions that apply to the Spincos during the 25-month period following the spin-off (such as disposing certain assets, engaging in mergers and acquisitions, agreeing to be acquired, and, under certain circumstances, acquiring businesses or assets with equity securities), which restrictions are designed to preserve the tax-free nature of the spin-offs to IAC shareholders.

During the 25-month period, a Spinco may take certain actions prohibited by these covenants if (i) it obtains IAC's prior written consent, (ii) it provides IAC with an IRS private letter ruling or an unqualified opinion of tax counsel to the effect that such actions will not affect the tax free nature of the spin-off of such Spinco, in each case satisfactory to IAC in its sole discretion, or (iii) IAC obtains a private letter ruling at such Spinco's request. In addition, with respect to actions or transactions involving acquisitions of Spinco stock entered into at least 18 months after the distribution of such Spinco, such Spinco will be permitted to proceed with such transaction if it delivers an unconditional officer's certificate establishing facts evidencing that such acquisition satisfies the requirements of a specified safe harbor set forth in applicable U.S. Treasury Regulations, and IAC, after due diligence, is satisfied with the accuracy of such certification.

Notwithstanding the receipt of any such IRS ruling, tax opinion or officer's certificate, generally each Spinco must indemnify IAC and each other Spinco for any taxes and related losses resulting from (i) any act or failure to act by such Spinco described in the covenants above, (ii) any acquisition of equity securities or assets of such Spinco or any member of its group, and (iii) any breach by such Spinco or any member of its group of any representation or covenant contained in the separation documents or the documents relating to the IRS private letter ruling or tax opinion concerning the spin-off of such Spinco.

Under U.S. federal income tax law, IAC and the Spincos are severally liable for all of IAC's federal income taxes attributable to periods prior to and including the current taxable year of IAC,

<center>111</center>

which ends on December 31, 2008. Thus, if IAC failed to pay the federal income taxes attributable to it under the Tax Sharing Agreement for periods prior to and including the current taxable year of IAC, the Spincos would be severally liable for such taxes. In the event a Spinco is required to make a payment in respect of a spin-off related tax liability of the IAC consolidated federal income tax return group under these rules for which such Spinco is not responsible under the Tax Sharing Agreement and full indemnification cannot be obtained from the Spinco responsible for such payment under the Tax Sharing Agreement, IAC will indemnify the Spinco that was required to make the payment from and against the portion of such liability for which full indemnification cannot be obtained from the Spinco responsible for such payment under the Tax Sharing Agreement.

The Tax Sharing Agreement also contains provisions regarding the apportionment of tax attributes of the IAC consolidated federal income tax return group, the allocation of deductions with respect to compensatory equity interests, cooperation, and other customary matters. In general, tax deductions arising by reason of exercises of options to acquire IAC or Spinco stock, vesting of "restricted" IAC or Spinco stock, or settlement of restricted stock units with respect to IAC or Spinco stock held by any person will be claimed by the party that employs such person at the time of exercise, vesting or settlement, as applicable (or in the case of a former employee, the party that last employed such person).

*Employee Matters Agreement*

The employee matters agreement covers a wide range of compensation and benefit issues related to the spin-offs. In general, under the employee matters agreement:

- IAC will assume or retain (i) all liabilities with respect to IAC employees, former IAC employees (excluding any former employees of the Spincos) and their dependents and beneficiaries under all IAC employee benefit plans, and (ii) all liabilities with respect to the employment or termination of employment of all IAC employees, former IAC employees (excluding any former employees of the Spincos) and their dependents and beneficiaries.

- Each Spinco will assume or retain (i) all liabilities under its employee benefit plans, and (ii) all liabilities with respect to the employment or termination of employment of all such Spinco's employees, former employees and their dependents and beneficiaries.

Subject to a transition period through the end of 2008 with respect to health and welfare benefits, after the spin-offs, the Spincos no longer will participate in IAC's employee benefit plans, but will have established their own employee benefit plans that are currently expected to be substantially similar to the plans sponsored by IAC prior to the spin-offs. Through the end of 2008, IAC will continue to provide health and welfare benefits to employees of the Spincos and each Spinco will bear the cost of this coverage with respect to its employees. Assets and liabilities from the IAC Retirement Savings Plan relating to Spinco employees and former employees will be transferred to the applicable, newly established Spinco Retirement Savings Plan as soon as practicable following the spin-offs. For a description of the treatment of outstanding IAC equity awards pursuant to the employee matters agreement, see "The Separation—Treatment of Outstanding IAC Compensatory Equity-Based Awards."

*Transition Services Agreement*

Pursuant to a transition services agreement among IAC and the Spincos, each of IAC and the Spincos currently expect that some combination of the following services, among others, will be provided by/to the parties (and/or their respective businesses) as set forth below on an interim, transitional basis following completion of the spin-offs:

- assistance with certain legal, finance, internal audit, human resources, insurance and tax affairs, including assistance with certain public company functions, from IAC to the Spincos;

112

- continued coverage/participation for employees of the Spincos under IAC health and welfare plans on the same basis as immediately prior to the distribution;

- the leasing/subleasing of office and/or data center space by IAC and its businesses to various Spincos (and vice versa);

- assistance with the implementation and hosting of certain software applications by/from IAC and its businesses for various Spincos (and vice versa);

- call center and customer relations services by Ticketmaster to IAC's Reserve America business and Tree.com;

- payroll processing services by Ticketmaster to certain IAC businesses and an ILG business and by HSNi to IAC;

- tax compliance services by HSNi to ILG and accounting services by Ticketmaster to IAC; and

- such other services as to which any Spinco(s) and IAC may agree.


The charges for these services will be on a cost plus fixed percentage or hourly rate basis to be agreed upon prior to the completion of the spin-offs. In general, the services to be provided by/to the parties (and/or their respective businesses) will begin on the date of the completion of the spin-offs and will cover a period generally not expected to exceed 12 months following the spin-offs. Any party may terminate the agreement with respect to one or more particular services being received by it upon such notice as will be provided for in the transition services agreement.

*Commercial Agreements*

Each of the Spincos currently, and for the foreseeable future, expect to provide certain services to each other pursuant to certain commercial relationships with IAC and/or other Spincos. Additionally, in connection with the spin-offs, each Spinco is expected to enter or has entered into various commercial agreements, primarily in the form of leases and distribution and services agreements, between their subsidiaries, on the one hand, and subsidiaries of IAC and/or one or more other Spincos, on the other hand, many of which will memorialize (in most material respects) pre-existing arrangements in effect prior to the spin-offs and which are intended to reflect arm's length terms and none of which is expected to constitute a material contract to the applicable Spinco. Below is a brief description of such agreements that, individually or together with similar agreements, involve revenues to either IAC or a Spinco in excess of $120,000. Distribution agreements generally involve the payment of fees (usually on a fixed-per-transaction, revenue sharing or commission basis) from the party seeking distribution of the product or service to the party that is providing the distribution.

*HSNi.*    Certain subsidiaries of HSNi distribute their respective products and services via arrangements with certain subsidiaries of IAC and/or other Spincos (and vice versa). For example, HSNi sells merchandise on behalf of Shoebuy through HSN and various Cornerstone brands.

Aggregate revenues earned in respect of commercial agreements between HSNi and IAC by HSNi subsidiaries from businesses that IAC will own following the distribution were approximately $320,000 in 2007. Aggregate payments made by HSNi subsidiaries to IAC subsidiaries in respect of these commercial agreements were approximately $1.8 million in 2007. Such numbers include payments to and received from Entertainment Publications, Inc., which was sold by IAC subsequent to December 31, 2007.

*ILG.*    Certain subsidiaries of ILG distribute their respective products and services via arrangements with certain subsidiaries of IAC and/or other Spincos (and vice versa). For example, Interval promotes and distributes ticketing services for certain events, either through advance access or by passing along a deeper discount to its members via a link to the Ticketmaster booking engine.

113

Aggregate revenues earned in respect of commercial agreements between ILG and IAC by ILG subsidiaries from businesses that IAC will own following the distribution were not material in 2007. Aggregate payments made by ILG subsidiaries to IAC subsidiaries in respect of these agreements were approximately $2.1 million in 2007. Such numbers include payments to and received from Entertainment Publications, Inc., which was sold by IAC subsequent to December 31, 2007.

*Ticketmaster.*   Certain subsidiaries of Ticketmaster (i) distribute their respective products and services via arrangements with certain subsidiaries of IAC and/or other Spincos (and vice versa), (ii) provide certain subsidiaries of IAC and/or other Spincos with various services (and vice versa) and/or (iii) lease office space from IAC. For example:

- Ticketmaster leases its corporate headquarters in California, as well as office space for its New York City operations at IAC's headquarters, from IAC; and

- IAC's Advertising Solutions business acts as a sales agent for Ticketmaster in connection with the sale of advertising on *www.ticketmaster.com* and websites of other Ticketmaster businesses.

Aggregate revenues earned in respect of commercial agreements between Ticketmaster and IAC by Ticketmaster subsidiaries from businesses that IAC will own following the distribution were approximately $12.2 million in 2007. Aggregate payments made by Ticketmaster subsidiaries to IAC and its subsidiaries in respect of commercial agreements were approximately $4.2 million in 2007. Such numbers include payments to and received from Entertainment Publications, Inc., which was sold by IAC subsequent to December 31, 2007.

*Tree.com.*   Certain subsidiaries of Tree.com (i) distribute their respective products and services via arrangements with certain subsidiaries of IAC and/or other Spincos (and vice versa), (ii) provide certain subsidiaries of IAC and/or other Spincos with various services (and vice versa) and/or (iii) lease office space from IAC. For example:

- Tree.com licenses certain real estate information to IAC's Ask.com business for use in connection with real estate related search results;

- IAC's Ask.com and Citysearch businesses provide search engine marketing services and advertising to Tree.com businesses; and

- Tree.com has agreed to provide certain mortgage brokerage services to a joint venture in which IAC is a party.

Aggregate revenues earned in respect of commercial agreements between Tree.com and IAC by Tree.com subsidiaries from businesses that IAC will own following the distribution were approximately $300,000 in 2007. Aggregate payments made by Tree.com subsidiaries to IAC subsidiaries in respect of these commercial agreements were approximately $400,000 in 2007. Such numbers include payments to and received from Entertainment Publications, Inc., which was sold by IAC subsequent to December 31, 2007.

## Certain Other Relationships and Related Person Transactions

We are currently subject to the policies and procedures of IAC regarding the review and approval of related person transactions. Immediately prior to the spin-off, we will adopt a formal written policy governing the review and approval of related person transactions. We expect that the policies we implement will require the management of the Company to determine whether any proposed transaction, arrangement or relationship with a related person fell within the definition of "transaction" set forth in Item 404(a) of Regulation S-K under the Securities Act, and if so, will require management to submit such transaction to the Company's Audit Committee for approval. The Audit Committee, in considering whether to approve related person transactions, would then consider all facts and circumstances that it deemed relevant.

114

## DESCRIPTION OF THE STOCK AND ANNUAL INCENTIVE PLAN

**Introduction**

Prior to the completion of the spin-off, Tree.com expects to adopt the Tree.com, Inc. 2008 Stock and Annual Incentive Plan. The purpose of the plan will be to assist Tree.com in attracting, retaining and motivating officers and employees, and to provide Tree.com with the ability to provide incentives more directly linked to the profitability of our businesses and increases in stockholder value. In addition, the plan is expected to provide for the assumption of awards pursuant to the adjustment of awards granted under current plans of IAC and its subsidiaries. See "The Separation—Treatment of Outstanding IAC Compensatory Equity Based Awards." Tree.com was incorporated in 2008 and has not yet completed its first fiscal year.

**Description**

The Stock and Annual Incentive Plan is expected to contain important features that are summarized below.

**Administration**

The Stock and Annual Incentive Plan will be administered by the Compensation Committee or such other committee of the Board as the Tree.com Board of Directors may from time to time designate (the "Committee"). Among other things, the Committee will have the authority to select individuals to whom awards may be granted, to determine the type of award as well as the number of shares of Tree.com common stock to be covered by each award, and to determine the terms and conditions of any such awards.

**Eligibility**

In addition to individuals who hold outstanding adjusted awards, persons who serve or agree to serve as officers, employees, non-employee directors or consultants of Tree.com and its subsidiaries and affiliates will be eligible to be granted awards under the Stock and Annual Incentive Plan (other than adjusted awards that are assumed in connection with the spin-offs).

**Shares Subject to the Plan**

The Stock and Annual Incentive Plan with will authorize the issuance of up to 2,200,000 shares of Tree.com common stock pursuant to new awards under the plan, plus shares to be granted pursuant to the assumption of outstanding adjusted awards. No single participant may be granted awards covering in excess of 1,466,666 shares of Tree.com common stock over the life of the Stock and Annual Incentive Plan.

The shares of Tree.com common stock subject to grant under the Stock and Annual Incentive Plan are to be made available from authorized but unissued shares or from treasury shares, as determined from time to time by the Tree.com Board. Other than adjusted awards, to the extent that any award is forfeited, or any option or stock appreciation right terminates, expires or lapses without being exercised, or any award is settled for cash, the shares of Tree.com common stock subject to such awards not delivered as a result thereof will again be available for awards under the plan. If the exercise price of any option and/or the tax withholding obligations relating to any award are satisfied by delivering shares of Tree.com common stock (by either actual delivery or by attestation), only the number of shares of Tree.com common stock issued net of the shares of Tree.com common stock delivered or attested to will be deemed delivered for purposes of the limits in the plan. To the extent any shares of Tree.com common stock subject to an award are withheld to satisfy the exercise price (in the case of an option) and/or the tax withholding obligations relating to such award, such shares of Tree.com common

115

stock will not generally be deemed to have been delivered for purposes of the limits set forth in the plan.

In the event of certain extraordinary corporate transactions, the Committee or the Tree.com Board will be able to make such substitutions or adjustments as it deems appropriate and equitable to (1) the aggregate number and kind of shares or other securities reserved for issuance and delivery under the plan, (2) the various maximum limitations set forth in the plan, (3) the number and kind of shares or other securities subject to outstanding awards; and (4) the exercise price of outstanding options and stock appreciation rights.

As indicated above, several types of stock grants can be made under the Stock and Annual Incentive Plan. A summary of these grants is set forth below. The Stock and Annual Incentive Plan will govern options and restricted stock units that convert from existing IAC options and IAC restricted stock units in connection with the spin-offs, as well as other award grants made following the spin-offs pursuant to such plans. Notwithstanding the foregoing, the terms that govern IAC options and IAC restricted stock units that convert into options and restricted stock units of Tree.com in connection with the spin-offs will govern such options and restricted stock units to the extent inconsistent with the terms described below.

### Stock Options and Stock Appreciation Rights

Stock options granted under the Stock and Annual Incentive Plan may either be incentive stock options or nonqualified stock options. Stock appreciation rights granted under the plan may either be granted alone or in tandem with a stock option. The exercise price of options and stock appreciation rights cannot be less than 100% of the fair market value of the stock underlying the options or stock appreciation rights on the date of grant. Optionees may pay the exercise price in cash or, if approved by the Committee, in Tree.com common stock (valued at its fair market value on the date of exercise) or a combination thereof, or by "cashless exercise" through a broker or by withholding shares otherwise receivable on exercise. The term of options and stock appreciation rights will be as determined by the Committee, but an ISO may not have a term longer than ten years from the date of grant. The Committee will determine the vesting and exercise schedule of options and stock appreciation rights, and the extent to which they will be exercisable after the award holder's employment terminates. Generally, unvested options and stock appreciation rights terminate upon the termination of employment, and vested options and stock appreciation rights will remain exercisable for one year after the award holder's death, disability or retirement, and 90 days after the award holder's termination for any other reason. Vested options and stock appreciation rights will also terminate upon the optionee's termination for cause (as defined in the plan). Stock options and stock appreciation rights are transferable only by will or by the laws of descent and distribution, or pursuant to a qualified domestic relations order or in the case of nonqualified stock options or stock appreciation rights, as otherwise expressly permitted by the Committee including, if so permitted, pursuant to a transfer to the participant's family members, to a charitable organization, whether directly or indirectly or by means of a trust or partnership or otherwise.

### Restricted Stock

Restricted stock may be granted with such restriction periods as the Committee may designate. The Committee may provide at the time of grant that the vesting of restricted stock will be contingent upon the achievement of applicable performance goals and/or continued service. In the case of performance-based awards that are intended to qualify under Section 162(m)(4) of the Internal Revenue Code of 1986, as amended, (i) such goals will be based on the attainment of one or any combination of the following: specified levels of earnings per share from continuing operations, net profit after tax, EBITDA, EBITA, gross profit, cash generation, unit volume, market share, sales, asset quality, earnings per share, operating income, revenues, return on assets, return on operating assets,

116

return on equity, profits, total shareholder return (measured in terms of stock price appreciation and/or dividend growth), cost saving levels, marketing-spending efficiency, core non-interest income, change in working capital, return on capital and/or stock price, with respect to Tree.com or any subsidiary, division or department of Tree.com. Such performance goals also may be based upon the attaining of specified levels of Tree.com, subsidiary, affiliate or divisional performance under one or more of the measures described above relative to the performance of other entities, divisions or subsidiaries. Performance goals based on the foregoing factors are hereinafter referred to as "Performance Goals." The terms and conditions of restricted stock awards (including any applicable Performance Goals) need not be the same with respect to each participant. During the restriction period, the Committee may require that the stock certificates evidencing restricted shares be held by Tree.com. Restricted stock may not be sold, assigned, transferred, pledged or otherwise encumbered, and is forfeited upon termination of employment, unless otherwise provided by the Committee. Other than such restrictions on transfer and any other restrictions the Committee may impose, the participant will have all the rights of a stockholder with respect to the restricted stock award.

**Restricted Stock Units**

The Committee may grant restricted stock units payable in cash or shares of Tree.com common stock, conditioned upon continued service and/or the attainment of Performance Goals determined by the Committee. The terms and conditions of restricted stock unit awards (including any Performance Goals) need not be the same with respect to each participant.

**Other Stock-Based Awards**

Other awards of Tree.com common stock and other awards that are valued in whole or in part by reference to, or are otherwise based upon, Tree.com common stock, including (without limitation), unrestricted stock, dividend equivalents and convertible debentures, may be granted under the plan.

**Bonus Awards**

Bonus awards granted to eligible employees of Tree.com and its subsidiaries and affiliates under the Stock and Annual Incentive Plan will be based upon the attainment of the Performance Goals established by the Committee for the plan year or such shorter performance period as may be established by the Committee. Bonus amounts earned by any individual will be limited to $10 million for any plan year, pro rated (if so determined by the Committee) for any shorter performance period. Bonus amounts will be paid in cash or, in the discretion of Tree.com, in Tree.com common stock, as soon as practicable following the end of the plan year. The Committee may reduce or eliminate a participant's bonus award in any year notwithstanding the achievement of Performance Goals.

**Change in Control**

In the event of a Change of Control (as defined in the Stock and Annual Incentive Plan), the Committee will have the discretion to determine the treatment of awards granted under the Stock and Annual Incentive Plan, including providing for the acceleration of such awards upon the occurrence of the Change of Control and/or upon a qualifying termination of employment (*e.g.*, without cause or for good reason) following the Change of Control.

**Amendment and Discontinuance**

The Stock and Annual Incentive Plan may be amended, altered or discontinued by the Tree.com Board, but no amendment, alteration or discontinuance may impair the rights of an optionee under an option or a recipient of an SAR, restricted stock award, restricted stock unit award or bonus award previously granted without the optionee's or recipient's consent. Amendments to the Stock and Annual

117

Incentive Plan will require stockholder approval to the extent such approval is required by law or agreement.

**Federal Income Tax Consequences**

The following discussion is intended only as a brief summary of the federal income tax rules that are generally relevant to stock options. The laws governing the tax aspects of awards are highly technical and such laws are subject to change.

*Nonqualified Options.*    Upon the grant of a nonqualified option, the optionee will not recognize any taxable income and IAC will not be entitled to a deduction. Upon the exercise of such an option or related SAR, the excess of the fair market value of the shares acquired on the exercise of the option or SAR over the exercise price or the cash paid under an SAR (the "spread") will constitute compensation taxable to the optionee as ordinary income. Tree.com, in computing its U.S. federal income tax, will generally be entitled to a deduction in an amount equal to the compensation taxable to the optionee, subject to the limitations of Code Section 162(m).

*ISOs.*    An optionee will not recognize taxable income on the grant or exercise of an ISO. However, the spread at exercise will constitute an item includible in alternative minimum taxable income, and, thereby, may subject the optionee to the alternative minimum tax. Such alternative minimum tax may be payable even though the optionee receives no cash upon the exercise of the ISO with which to pay such tax.

Upon the disposition of shares of stock acquired pursuant to the exercise of an ISO, after the later of (i) two years from the date of grant of the ISO or (ii) one year after the transfer of the shares to the optionee (the "ISO Holding Period"), the optionee will recognize long-term capital gain or loss, as the case may be, measured by the difference between the stock's selling price and the exercise price. Tree.com is not entitled to any tax deduction by reason of the grant or exercise of an ISO, or by reason of a disposition of stock received upon exercise of an ISO if the ISO Holding Period is satisfied. Different rules apply if the optionee disposes of the shares of stock acquired pursuant to the exercise of an ISO before the expiration of the ISO Holding Period.

### USE OF PROCEEDS

We will not receive any proceeds from the distribution of our common stock in the spin-off. Any proceeds received by us from the exercise of the stock options covered by the Stock and Annual Incentive Plan will be used for general corporate purposes.

### DETERMINATION OF OFFERING PRICE

No consideration will be paid for the shares of common stock distributed in the spin-off.

### LEGAL MATTERS

The validity of the shares of our common stock issued in the spin-off will be passed upon by the General Counsel of IAC/InterActiveCorp. Certain tax matters will be passed upon by Wachtell, Lipton, Rosen & Katz.

### EXPERTS

The consolidated financial statements of Tree.com at December 31, 2007 and 2006 and for each of the three years in the period ended December 31, 2007 and the related financial statements schedule included in this prospectus have been so included in reliance on the reports of Ernst & Young LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

118

**WHERE YOU CAN FIND MORE INFORMATION**

We have filed a registration statement on Form S-1 with the SEC with respect to the shares of our common stock being registered hereunder. This prospectus, which is a part of such registration statement, does not include all of the information that you can find in such registration statement or the exhibits to such registration statement. You should refer to the registration statement, including its exhibits and schedules, for further information about us and our common stock. Statements contained in this prospectus as to the contents of any contract or document are not necessarily complete and, if the contract or document is filed as an exhibit to a registration statement, is qualified in all respects by reference to the relevant exhibit.

After the spin-off, we will file annual, quarterly and current reports, proxy statements and other information with the SEC. The registration statement is, and any of these future filings with the SEC will be, available to the public over the Internet on the SEC's website at *www.sec.gov*. You may read and copy any filed document at the SEC's public reference rooms in Washington, D.C. at 100 F Street, N.E., Washington, D.C. 20549 and at the SEC's regional offices in New York at 233 Broadway, New York, New York 10279 and in Chicago at Citicorp Center, 500 W. Madison Street, Suite 1400, Chicago, Illinois 60661. Please call the SEC at 1-800-SEC-0330 for further information about the public reference rooms.

119

## TREE.COM, INC. AND SUBSIDIARIES
## CONSOLIDATED FINANCIAL STATEMENTS

### TABLE OF CONTENTS

|  | PAGE |
|---|---|
| Audited Financial Statements: |  |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Operations for the years ended December 31, 2007, 2006 and 2005 | F-3 |
| Consolidated Balance Sheets as of December 31, 2007 and 2006 | F-4 |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2007, 2006 and 2005 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2007, 2006 and 2005 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| Schedule II—Valuation and Qualifying Accounts | F-35 |
| Unaudited Interim Financial Statements |  |
| Consolidated Statements of Operations for the three months ended March 31, 2008 and 2007 | F-36 |
| Consolidated Balance Sheets as of March 31, 2008 and December 31, 2007 | F-37 |
| Consolidated Statements of Shareholders' Equity for the three months ended March 31, 2008 | F-38 |
| Consolidated Statements of Cash Flows for the three months ended March 31, 2008 and 2007 | F-39 |
| Notes to Unaudited Consolidated Financial Statements | F-40 |

F-1

**Report of Independent Registered Public Accounting Firm**

We have audited the accompanying consolidated balance sheets of Tree.com, Inc. and subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. Our audits also included the financial statement schedule on page F-35. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tree.com, Inc. and subsidiaries at December 31, 2007 and 2006, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

/s/ Ernst & Young LLP

Los Angeles, California
May 5, 2008

F-2

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| | (In thousands) | | |
| Revenue | | | |
| Lending | | | |
| Origination and sale of loans | $ 130,151 | $ 221,400 | $ 179,026 |
| Other lending | 164,475 | 198,257 | 184,774 |
| Total Lending | 294,626 | 419,657 | 363,800 |
| Real Estate | 51,752 | 56,821 | 57,555 |
| Total revenue | 346,378 | 476,478 | 421,355 |
| Cost of revenue | | | |
| Lending | 47,264 | 47,412 | 38,904 |
| Real Estate | 25,850 | 25,805 | 27,438 |
| Total cost of revenue (exclusive of depreciation shown separately below) | 73,114 | 73,217 | 66,342 |
| Gross margin | 273,264 | 403,261 | 355,013 |
| Selling and marketing expense | 187,612 | 218,910 | 176,749 |
| General and administrative expense | 99,244 | 119,284 | 101,975 |
| Product development | 14,991 | 15,168 | 15,001 |
| Proceeds from a litigation settlement | (15,000) | — | — |
| Amortization of intangibles | 34,469 | 24,018 | 35,314 |
| Restructuring expense | 22,867 | — | — |
| Depreciation | 10,058 | 11,710 | 6,720 |
| Goodwill impairment | 459,463 | — | — |
| Operating (loss) income | (540,440) | 14,171 | 19,254 |
| Other income (expense): | | | |
| Interest income | 1,171 | 1,307 | 195 |
| Interest expense | (986) | (1,556) | (2,195) |
| Other income (expense) | 14 | (207) | (35) |
| Total other income (expense), net | 199 | (456) | (2,035) |
| (Loss) earnings before income taxes and minority interest | (540,241) | 13,715 | 17,219 |
| Income tax provision | (10,161) | (5,022) | (11,420) |
| Minority interest in losses of consolidated subsidiaries | — | — | 52 |
| Net (loss) income | $ (550,402) | $ 8,693 | $ 5,851 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-3

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2007 | December 31, 2006 |
|---|---|---|
|  | (In thousands) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 45,940 | $ 99,498 |
| Restricted cash and cash equivalents | 14,953 | 15,467 |
| Accounts receivable, net of allowance of $322 and $1,129, respectively | 12,433 | 21,581 |
| Loans held for sale | 86,754 | 345,896 |
| Deferred income taxes | 6,420 | 12,406 |
| Prepaid and other current assets | 6,011 | 10,090 |
| Total current assets | 172,511 | 504,938 |
| Property and equipment, net | 21,466 | 30,677 |
| Goodwill | 140,892 | 582,295 |
| Intangible assets, net | 108,440 | 142,781 |
| Other non-current assets | 278 | 354 |
| **TOTAL ASSETS** | $ 443,587 | $ 1,261,045 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **LIABILITIES:** | | |
| Current maturities of long-term obligations and short-term borrowings | $ 99,622 | $ 350,072 |
| Accounts payable, trade | 3,335 | 8,989 |
| Deferred revenue | 1,435 | 2,908 |
| Income taxes payable | 993 | 616 |
| Accrued expenses and other current liabilities | 83,613 | 62,890 |
| Total current liabilities | 188,998 | 425,475 |
| Long-term obligations, net of current maturities | — | 19,347 |
| Income taxes payable | 730 | — |
| Other long-term liabilities | 2,529 | 3,794 |
| Deferred income taxes | 36,706 | 38,976 |
| Commitments and contingencies | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Invested capital | 751,923 | 750,331 |
| Payables to IAC and subsidiaries | 20,067 | 29,126 |
| Accumulated deficit | (557,366) | (6,004) |
| Total shareholders' equity | 214,624 | 773,453 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 443,587 | $ 1,261,045 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-4

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

| | Total | Invested Capital | Payables to IAC and Subsidiaries | Accumulated Deficit |
|---|---|---|---|---|
| | | | (In thousands) | |
| **Balance as of December 31, 2004** | $ 753,674 | $ 751,646 | $ 22,576 | $ (20,548) |
| Comprehensive income: | | | | |
|    Net income for the year ended December 31, 2005 | 5,851 | — | — | 5,851 |
| Comprehensive income | 5,851 | | | |
| Net transfers from IAC (principally related to equity awards) | 3,127 | 3,127 | — | |
| Net change in payables to IAC and subsidiaries | 3,834 | — | 3,834 | — |
| **Balance as of December 31, 2005** | 766,486 | 754,773 | 26,410 | (14,697) |
| Comprehensive income: | | | | |
|    Net income for the year ended December 31, 2006 | 8,693 | — | — | 8,693 |
| Comprehensive income | 8,693 | | | |
| Net transfers to IAC (principally tax adjustments related to equity awards) | (4,442) | (4,442) | — | |
| Net change in payables to IAC and subsidiaries | 2,716 | — | 2,716 | — |
| **Balance as of December 31, 2006** | 773,453 | 750,331 | 29,126 | (6,004) |
| Comprehensive loss: | | | | |
|    Net loss for the year ended December 31, 2007 | (550,402) | — | — | (550,402) |
| Comprehensive loss | (550,402) | | | |
| Cumulative effect of adoption of EITF 06-2 | (960) | — | — | (960) |
| Net transfers from IAC (principally tax adjustments related to equity awards) | 1,592 | 1,592 | — | — |
| Net change in payables to IAC and subsidiaries | (9,059) | — | (9,059) | — |
| **Balance as of December 31, 2007** | $ 214,624 | $ 751,923 | $ 20,067 | $ (557,366) |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-5

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (In thousands) | | |
| **Cash flows from operating activities:** | | | |
| Net (loss) income | $ (550,402) | $ 8,693 | $ 5,851 |
| Adjustments to reconcile net (loss) income to net cash provided by (used in) operating activities: | | | |
| Amortization of intangibles | 34,469 | 24,018 | 35,314 |
| Depreciation | 10,058 | 11,710 | 6,720 |
| Goodwill impairment | 459,463 | — | — |
| Non-cash compensation expense | 2,925 | 2,177 | 7,385 |
| Non-cash restructuring expense | 8,403 | — | — |
| Deferred income taxes | 2,764 | 206 | 543 |
| Excess tax benefits from stock-based awards | — | — | 3,075 |
| Gain on sales of loans held for sale | (147,546) | (221,400) | (179,026) |
| Provision for loans losses | 19,321 | 6,637 | 4,649 |
| Bad debt expense | 1,925 | 1,768 | 560 |
| Non-cash interest expense | 903 | 1,345 | 1,824 |
| Minority interest in losses of consolidated subsidiaries | — | — | (52) |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | 9,364 | (1,254) | (372) |
| Origination of loans held for sale | (5,822,599) | (7,841,607) | (7,381,439) |
| Proceeds from sales of loans held for sale | 6,223,363 | 8,089,128 | 7,394,209 |
| Prepaid and other current assets | 4,110 | (4,761) | (3,337) |
| Accounts payable and other current liabilities | (20,612) | (3,594) | 21,207 |
| Income taxes payable | (702) | 582 | 947 |
| Deferred revenue | (1,785) | 1,603 | (142) |
| Other, net | (437) | (337) | 268 |
| **Net cash provided by (used in) operating activities** | 232,985 | 74,914 | (81,816) |
| **Cash flows from investing activities:** | | | |
| Acquisitions, net of cash acquired | (1,559) | (3,059) | (3,760) |
| Capital expenditures | (9,421) | (13,251) | (17,827) |
| Proceeds from sales of marketable securities | — | — | 2,416 |
| Other, net | 33 | (100) | 806 |
| **Net cash used in investing activities** | (10,947) | (16,410) | (18,365) |
| **Cash flows from financing activities:** | | | |
| Borrowing under lines of credit | 5,651,803 | 7,700,842 | 7,217,327 |
| Repayments of lines of credit | (5,910,849) | (7,724,663) | (7,054,488) |
| Principal payments on long-term obligations | (11,654) | (11,530) | (1,717) |
| Transfers (to) from IAC | (7,083) | (3,870) | 3,090 |
| Excess tax benefits from stock-based awards | 1,673 | 1,214 | — |
| Decrease (increase) in restricted cash | 514 | (7,908) | (1,181) |
| **Net cash (used in) provided by financing activities** | (275,596) | (45,915) | 163,031 |
| **Net (decrease) increase in cash and cash equivalents** | (53,558) | 12,589 | 62,850 |
| Cash and cash equivalents at beginning of period | 99,498 | 86,909 | 24,059 |
| **Cash and cash equivalents at end of period** | $ 45,940 | $ 99,498 | $ 86,909 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-6

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1—ORGANIZATION AND BASIS OF PRESENTATION

**Spin-Off**

On November 5, 2007, IAC/InterActiveCorp ("IAC") announced that its Board of Directors approved a plan to separate IAC into five publicly traded companies, identifying Tree.com, Inc. ("Tree.com") as one of those five companies. In these consolidated financial statements, we refer to the separation transaction herein as the "spin-off". In connection with the spin-off, Tree.com was incorporated as a Delaware corporation in April 2008. Tree.com currently does not have any material assets or liabilities, nor does it engage in any business or other activities and, other than in connection with the spin-off, will not acquire or incur any material assets or liabilities, nor will it engage in any business or other activities. Upon completion of the spin-off, Tree.com will consist of the businesses that formerly comprised IAC's Lending and Real Estate segments. We refer herein to these businesses as the "Tree.com Businesses," which include LendingTree.com, RealEstate.com, GetSmart.com, LendingTree Loans, iNest and Domania.

**Basis of Presentation**

The historical consolidated financial statements of Tree.com and its subsidiaries reflect the contribution or other transfer to Tree.com of all of the subsidiaries and assets and the assumption by Tree.com of all of the liabilities relating to the Tree.com Businesses in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses. Accordingly, the historical consolidated financial statements of Tree.com reflect the historical financial position, results of operations and cash flows of the Tree.com Businesses since their respective dates of acquisition by IAC, based on the historical consolidated financial statements and accounting records of IAC and using the historical results of operations and historical bases of the assets and liabilities of the Tree.com Businesses with the exception of accounting for income taxes. For purposes of these financial statements, income taxes have been computed for Tree.com on an as if stand-alone, separate tax return basis. Intercompany transactions and accounts have been eliminated.

In the opinion of Tree.com's management, the assumptions underlying the historical consolidated financial statements of Tree.com are reasonable. However, this financial information does not necessarily reflect what the historical financial position, results of operations and cash flows of Tree.com would have been had Tree.com been a stand-alone company during the periods presented.

**Company Overview**

*Lending*

Lending consists of online networks (principally LendingTree.com and GetSmart.com) and call centers that connect consumers and financial providers in the lending industry. Tree.com also originates, processes, approves and funds various residential real estate loans through Home Loan Center ("HLC"), which does business as LendingTree Loans in certain jurisdictions. The HLC and LendingTree Loans brand names are collectively referred to in these consolidated financial statements as "LendingTree Loans." Additionally, Tree.com provides mortgage settlement services, including title search, appraisals, flood certification and closing transactions, under the name "LendingTree Settlement Services."

F-7

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 1—ORGANIZATION AND BASIS OF PRESENTATION (Continued)**

*Real Estate*

Real Estate consists of a proprietary full service real estate brokerage that operates in fourteen U.S. markets, *www.RealEstate.com*, an online network that connects consumers with real estate brokerages around the country, iNest, an online network that matches buyers and builders of new homes, and Domania, an online lead provider for banks, mortgage lenders and real estate professionals.

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Revenue Recognition**

*Lending*

Lending's network revenue principally represents match fees and closed-loan fees paid by lenders that received a transmitted loan request or closed a loan for a consumer that originated through one of Lending's websites or affiliates. Match fees are recognized at the time qualification forms are transmitted, while closed-loan fees are recognized at the time the lender reports the closed loan to Lending, which may be several months after the qualification form is transmitted.

LendingTree Loans' revenue is primarily derived from the origination and sale of mortgage loans. Mortgage loans are funded through lines of credit, primarily warehouse lines, and sold to investors typically within thirty days. The gain or loss on the sale of loans to investors is recognized at the date the loans are sold and is based on the difference between the sale proceeds received and the carrying value of the loans, which includes deferred loan origination fees less certain direct origination costs and other processing costs. LendingTree Loans sells its loans on a servicing released basis in which LendingTree Loans gives up the right to service the loan on an ongoing basis, thereby earning an additional premium upon sale. The recognition of gain or loss on the sale of loans is accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("SFAS No. 140").

*Real Estate*

Real Estate earns revenue from subscription and cooperative brokerage fees paid by real estate professionals participating in its real estate networks and from commissions paid by consumers for closing a real estate transaction on their behalf. Subscription fees are recognized over the subscription period. Cooperative brokerage fees are recognized when the transmission of a consumer's information results in the purchase or sale of a home and the transaction is reported closed by the participating real estate professional. Commissions are recognized at the time the real estate transaction is closed.

**Cash and Cash Equivalents**

Cash and cash equivalents include cash and money market instruments.

**Restricted Cash**

Restricted cash at December 31, 2007 and 2006 primarily includes minimum required balances that LendingTree Loans maintains in connection with its various lines of credit, primarily warehouse lines.

F-8

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

**Accounts Receivable**

Accounts receivable are stated at amounts due from customers, primarily lending and real estate service providers participating on our networks, net of an allowance for doubtful accounts.

Accounts receivable outstanding longer than the contractual payment terms are considered past due. Tree.com determines its allowance for doubtful accounts by considering a number of factors, including the length of time accounts receivable are past due, Tree.com's previous loss history, the specific customer's current ability to pay its obligation to Tree.com and the condition of the general economy and the customer's industry. Tree.com writes off accounts receivable when management deems them uncollectible.

**Loans Held for Sale**

LendingTree Loans originates residential loans with the intent to sell them in the secondary market. Loans held for sale consist primarily of residential first and second mortgage loans that are secured by residential real estate throughout the United States. Loans held for sale are carried at the lower of cost or market value in accordance with SFAS No. 65, "Accounting for Certain Mortgage Banking Activities." The lower of cost or market value is determined on an aggregate basis, except for loans that management has deemed to be impaired, in which case the determination is made on an individual basis. The cost basis of loans held for sale includes the capitalized cost associated with the interest rate lock commitments, deferred origination fees and deferred origination costs. The market value of loans held for sale is determined using current secondary market prices for loans with similar coupons, maturities and credit quality. The amount by which the cost of loans held for sale exceeds the market value of loans held for sale is accounted for as a valuation allowance. Loans held for sale are pledged as collateral under LendingTree Loans' various lines of credit, which are primarily warehouse lines. LendingTree Loans relies substantially on the secondary mortgage market as all of the loans that are funded are intended to be sold into this market.

Loan origination fees (income) and costs related to funded loans held for sale (including direct costs of origination as well as payroll and administration costs associated with the origination process) are deferred until the loan is sold. Upon sale of the loan, the origination fees and costs are recognized as a component of the gain on sale of the loan. Origination costs related to unsuccessful loan origination efforts are recorded as operating expenses in the period incurred.

Interest on mortgage loans held for sale is recorded in income as earned. Interest is only accrued if deemed collectible. Interest is generally deemed uncollectible when a loan is delinquent for three months or more or when a loan has a defect affecting its salability evidencing a lack of collectability of amounts when contractually due. Delinquency is calculated based on the contractual due date of the loan. The amount of loans on nonaccrual status at December 31, 2007 and 2006 was $7.2 million and $1.6 million, respectively.

LendingTree Loans sells loans it originates to investors on a servicing released basis, so that the economic risk of loss or default by the borrower is generally transferred to the investor. LendingTree Loans, however, is required by these investors to make certain representations relating to credit information, loan documentation and collateral. To the extent that LendingTree Loans does not comply with such representations, which may be evidenced by early payment defaults, LendingTree Loans may be required to repurchase loans or indemnify these investors for any loss from borrower defaults. As

F-9

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

such, LendingTree Loans records a liability for the estimated obligation related to this exposure based, in part, on historical and projected loss frequency and loss severity, the original principal amount of the loans previously sold, the year the loans were sold, and loan type. There are four loan types used in this analysis which are determined based on the extent of the documentation received (full or limited) and the lien position of the mortgage in the underling property (first or second position). In connection with a majority of its loan sales agreements, LendingTree Loans is also responsible for a minimum number of payments to be made on each loan. In the case of early payment payoffs, which occurs when a borrower prepays a loan prior to the end of the prepayment penalty period, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor. The estimated obligation associated with early loan payoffs is calculated based on historical loss experience by type of loan. As of December 31, 2007 and 2006, the loan loss liability was $13.9 million and $3.8 million, respectively. For the years ended December 31, 2007, 2006 and 2005, LendingTree Loans increased its liability for losses on previously sold loans by approximately $15.5 million, $6.0 million and $4.7 million, respectively, as a reduction in revenue. In 2007, 2006 and 2005, $5.4 million, $5.3 million and $2.7 million was paid or written off against the liability, respectively, thereby reducing the liability. Actual losses are charged to the loss liability when incurred and management evaluates the adequacy of the liability calculations quarterly. Because LendingTree Loans does not service the loans it sells, it does not maintain nor have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. As such, LendingTree Loans is unable to determine its maximum loss exposure.

For the years ended 2007, 2006 and 2005 LendingTree Loans sold approximately 36,000 55,000 and 48,000 loans, respectively, with initial loan values of $6.1 billion, $7.9 billion and $7.2 billon, respectively. From loans sold in those periods, LendingTree Loans has experienced repurchase and indemnification losses resulting from lack of compliance with certain representations relating to loans sold to investors which may be evidenced by early payment defaults on 57, 84 and 46 loans, respectively. The initial value of loans on which losses have been incurred was $6.4 million, $9.9 million and $6.6 million, respectively. The loss amounts incurred on those loans were $1.2 million, $3.3 million and $1.1 million, respectively, or less than 0.019%, 0.042% and 0.016%, respectively, of the initial loan value of the total loans sold for 2007, 2006 and 2005.

**Property and Equipment**

Property and equipment, including significant improvements, are recorded at cost. Repairs and maintenance and any gains or losses on dispositions are included in operations.

Depreciation is recorded on a straight-line basis to allocate the cost of depreciable assets to operations over their estimated service lives. Amortization of assets recorded under capital leases is included in depreciation expense.

| Asset Category | Depreciation Period |
|---|---|
| Computer equipment and capitalized software | 3 to 5 Years |
| Leasehold improvements | 1 to 10 Years |
| Furniture and other equipment | 7 Years |

F-10

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

**Goodwill and Indefinite-Lived Intangible Assets**

In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"), goodwill acquired in business combinations is assigned to the reporting units that are expected to benefit from the combination as of the acquisition date.

Goodwill impairment is determined using a two-step process. The first step of the process is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, Tree.com determines the fair value of its reporting units by using a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a "relief from royalty" methodology in estimating the fair value of its trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates and the terminal growth rates.

Goodwill and indefinite-lived intangible assets, primarily trade names and trademarks, are tested annually for impairment as of October 1 or earlier upon the occurrence of certain events or substantive changes in circumstances. Tree.com's 2007 annual impairment assessment identified significant impairments as described in Note 4. Tree.com's reporting units are currently operating in dynamic and challenged industry segments. To illustrate the magnitude of potential impairment charges relative to future changes in estimated fair value, had the estimated fair value of Tree.com's reporting units and their respective indefinite-lived intangible assets been hypothetically lower by 10% as of October 1, 2007 the aggregate book value of goodwill and indefinite-lived intangible assets would have exceeded fair value by approximately $7.0 million at Lending and $8.0 million at Real Estate. Had the estimated fair values of Tree.com's reporting units and their respective indefinite-lived intangible assets been hypothetically lower by 20% as of October 1, 2007, the book value of goodwill and indefinite-lived intangible assets would have exceeded fair value by approximately $21.0 million at Lending and $18.0 million at Real Estate.

**Long-Lived Assets and Intangible Assets with Definite Lives**

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"), long-lived assets, including property and equipment and intangible assets with definite lives, are tested for recoverability whenever events or changes in circumstances indicate

F-11

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

that their carrying amount may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is deemed to not be recoverable, an impairment loss is recorded as the amount by which the carrying amount of the long-lived asset exceeds its fair value. Amortization of definite lived intangible assets is recorded on a straight-line basis over their estimated lives.

**Derivative Instruments**

Tree.com is exposed to certain risks in connection with its mortgage banking operations. LendingTree Loans is exposed to interest rate risk for loans it originates until those loans are sold in the secondary market ("loans held for sale"). The fair value of loans held for sale is subject to change primarily due to changes in market interest rates. LendingTree Loans hedges the changes in fair value of certain loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continues to enter into derivatives for risk management purposes, effective April 1, 2007 it no longer designates these derivative instruments as hedges and thus the relationships no longer qualify for the hedge accounting provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS No. 133"). See Note 10 for a description of Tree.com's derivative financial instruments.

**Advertising**

Advertising costs are expensed in the period incurred (when the advertisement first runs for production costs that are initially capitalized) and principally represent offline costs, including television and radio advertising, and online advertising costs, including fees paid to search engines and distribution partners. Advertising expense was $172.6 million, $204.4 million and $161.6 million for the years ended December 31, 2007, 2006 and 2005, respectively. Prepaid advertising totaled $0.6 million and $1.1 million at December 31, 2007 and 2006, respectively, and is included in "Prepaid and other current assets" in the accompanying consolidated balance sheets.

**Income Taxes**

Tree.com accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. Tree.com records interest on potential tax contingencies as a component of income tax expense and records interest net of any applicable related income tax benefit.

Effective January 1, 2007, Tree.com adopted the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48"). As a result of the adoption of FIN 48, Tree.com recognizes liabilities for uncertain tax positions based on the two-step process prescribed by the interpretation. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including

F-12

**TREE.COM, INC. AND SUBSIDIARIES**

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement.

**Stock-Based Compensation**

Effective January 1, 2006, Tree.com adopted the provisions of SFAS No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"), using the modified prospective transition method and therefore has not restated results for prior periods. See Note 3 for a further description of the impact of the adoption of SFAS 123R and Staff Accounting Bulletin No. 107 ("SAB 107").

**Minority Interest**

Minority interest in 2005 represents minority ownership in LendingTree Settlement Services. Tree.com obtained 100% ownership in September 2005.

**Accounting Estimates**

Tree.com's management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements include: reserves for losses associated with loans held for sale and loans that have been previously sold; recoverability of long-lived assets; recovery of goodwill and intangible assets; income taxes payable and deferred income taxes, including related valuation allowances; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

**Certain Risks and Concentrations**

Tree.com's business is subject to certain risks and concentrations including dependence on third party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject Tree.com to concentration of credit risk, consist primarily of cash and cash equivalents. Cash and cash equivalents are maintained with quality financial institutions of high credit and are in excess of Federal Deposit Insurance Corporation ("FDIC") insurance limits.

Due to the nature of the mortgage lending industry, interest rate increases may significantly impact revenue from services related to originating and processing mortgages and subsequent sales of loans to investors, which are the primary source of income for LendingTree Loans. LendingTree Loans originates mortgage loans on property located throughout the United States, with no one location representing more than 10% of Tree.com's consolidated revenue for any periods presented. Revenue from loans originated for property located in California and Florida in the aggregate totaled approximately 10%, 14% and 14% of Tree.com's revenue in 2007, 2006 and 2005, respectively.

F-13

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

LendingTree Loan's two largest investors (purchasers of the loans originated) represented approximately 28% and 13% of Tree.com's revenue for 2007, 30% and 15% of Tree.com's revenue for 2006, and 35% and 8% of Tree.com's revenue for 2005. LendingTree Loans monitors its relationships with investors and, from time to time, makes adjustments in the amount it sells to any one investor based upon a number of factors, including but not limited to, price, loan review time and funding turnaround, underwriting guidelines and the overall efficiency of its relationship with the investor.

LendingTree Loans funds loans through various lines of credit, primarily warehouse lines. As of December 31, 2007, 73% of the total balance due on the lines of credit was payable to one lender. The decision regarding how to allocate this balance amongst lenders is based on several factors, including the interest rate and commitment fee.

Due to the nature of the mortgage lending industry, interest rate increases may negatively impact future revenue from our lending networks as well as revenue from originating and selling loans.

Further, lenders participating on our lending networks can offer their products directly to consumers through brokers, mass marketing campaigns, or through other traditional methods of credit distribution. These lenders can also offer their products online, either directly to prospective borrowers, through one or more of our online competitors, or both. If a significant number of potential consumers are able to obtain loans from our participating lenders without utilizing our service, our ability to generate revenue may be limited. Because we do not have exclusive relationships with the lenders whose loan offerings are offered on our online marketplace, consumers may obtain offers and loans from these lenders without using our service.

**Recent Accounting Pronouncements**

On June 15, 2006, the Emerging Issues Task Force ratified Issue 06-2, "Accounting for Sabbatical Leave and Other Similar Benefits Pursuant to FASB Statement No. 43" ("EITF 06-2"), which requires entities to recognize the expense of employee sabbatical leave in the periods the sabbatical leave vests or accumulates. EITF 06-2 is effective for fiscal years beginning after December 15, 2006. The cumulative effect of applying EITF 06-2 was recorded as an adjustment to the opening balance of accumulated deficit as of January 1, 2007.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS No. 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other assets and liabilities at fair value with the objective of reducing both the complexity in the accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. Tree.com adopted SFAS No. 159 effective January 1, 2008 and elected the fair value option on loans funded after December 31, 2007. Therefore there was no cumulative effect related to the adoption of SFAS No. 159.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" (SFAS No. 157"), which provides enhanced guidance for using fair value to measure assets and liabilities. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements and the effect of the measurements on earnings or changes in net assets. Among other things, SFAS No. 157 clarifies the principle that fair value should be based

F-14

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

on the assumptions that market participants would use when pricing the asset or liability and establishes a fair value hierarchy that prioritizes the information used to develop those assumptions. The most significant financial impact of adopting the provisions of SFAS No. 157 is related to the valuing of interest rate lock commitments (related to loans intended to be held for sale). Under SFAS No. 157, the fair value of a closed loan includes the embedded cash flows that are ultimately realized as servicing value or through the sale of a loan on a servicing released basis. The valuation of loan commitments includes assumptions related to the likelihood that a commitment will ultimately result in a closed loan ("expected close rates"). These expected close rates are based on Tree.com's historical data, which is a significant unobservable assumption. Prior accounting requirements precluded the recognition of any day one gains and losses if fair value was not based on observable market data. Rather, these gains and losses were recognized when the interest rate lock commitment expired or when the underlying loan was ultimately sold. The change in valuation methodology under SFAS No. 157 accelerates the recognition of these day one gains and losses. The cumulative effect of adopting the provisions of SFAS No. 157 is required to be reported as an adjustment to beginning retained earnings in the year of adoption. Accordingly, upon adoption of SFAS No. 157 on January 1, 2008, Tree.com recorded a $3.1 million reduction to accumulated deficit.

In November 2007, the SEC issued Staff Accounting Bulletin No. 109, "Written Loan Commitments Recorded at Fair Value Through Earnings" ("SAB 109"). SAB 109 supersedes Staff Accounting Bulletin No. 105, "Application of Accounting Principles to Loan Commitments" ("SAB 105"). It clarifies that the expected net future cash flows related to the associated servicing of a loan should be included in the measurement of all written loan commitments that are accounted for at fair value through earnings. However, it retains the guidance in SAB 105 that internally-developed intangible assets should not be recorded as part of the fair value of a derivative loan commitment. The guidance is effective on a prospective basis to derivative loan commitments issued or modified in fiscal quarters beginning after December 15, 2007.

The adoption of SFAS No. 157, SFAS No. 159, and SAB 109 generally results in higher fair values of loans held for sale being recorded at loan origination. Prior to adoption certain aspects of the loan value associated with the cash flows related to the servicing of a loan, origination fees and day one gains on derivative transactions would be deferred until the sale of the loan. However, as loans are typically sold within thirty days of origination, Tree.com has determined that adoption of SFAS No. 157, SFAS No. 159 and SAB 109 will not have a material impact on the its consolidated financial position, results of operations or cash flows.

In December 2007, the FASB issued SFAS No. 141 (revised 2007), "Business Combinations" ("SFAS No. 141R"), which replaces FASB Statement No. 141. SFAS No. 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. The Statement also establishes disclosure requirements that will enable users to evaluate the nature and financial effects of the business combination. SFAS No. 141R applies prospectively to business combinations in fiscal years beginning after December 15, 2008. Early adoption is not permitted. Tree.com is currently assessing the impact of the adoption of SFAS No. 141R on its consolidated financial position, results of operations and cash flows.

F-15

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION

The equity awards described below principally relate to awards to Tree.com employees that were granted under various IAC stock and annual incentive plans.

Effective January 1, 2006, Tree.com adopted SFAS 123R using the modified prospective transition method and has applied the classification provisions of SAB 107 regarding the SEC's interpretation of SFAS 123R and the valuation of share-based payments for public companies in its adoption of SFAS 123R.

The adoption of SFAS 123R did not impact the amount of stock-based compensation expense recorded in the accompanying consolidated statements of operations as Tree.com had previously adopted the expense recognition provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123").

Prior to the adoption of SFAS 123R, the entire tax benefit from stock-based compensation was reported as a component of operating cash flows. Upon the adoption of SFAS 123R, tax benefits resulting from tax deductions in excess of the stock-based compensation expense recognized in the consolidated statement of operations are reported as a component of financing cash flows. For the years ended December 31, 2007 and 2006, excess tax benefits from stock-based compensation of $1.7 million and $1.2 million, respectively, are included as a component of financing cash flows. For the year ended December 31, 2005, excess tax benefits from stock-based compensation of $3.1 million is included as a component of operating cash flows.

Non-cash stock-based compensation expense related to equity awards is included in the following line items in the accompanying consolidated statements of operations for the years ended December 31, 2007, 2006 and 2005 (in thousands):

| | Years Ended December 31, | | |
| | 2007 | 2006 | 2005 |
| --- | ---: | ---: | ---: |
| Cost of revenue | $ 248 | $ 263 | $ 317 |
| Selling and marketing expense | 272 | 289 | 333 |
| General and administrative expense | 2,403 | 1,603 | 6,620 |
| Product development | 2 | 22 | 115 |
| Non-cash stock-based compensation expense before income taxes | 2,925 | 2,177 | 7,385 |
| Income tax benefit | (1,228) | (1,169) | (1,219) |
| Non-cash stock-based compensation expense after income taxes | $ 1,697 | $ 1,008 | $ 6,166 |

The form of awards granted to Tree.com employees principally have been restricted stock units ("RSUs") and performance stock units ("PSUs"). RSUs and PSUs are awards in the form of phantom shares or units, denominated in a hypothetical equivalent number of shares of IAC common stock and with the value of each award equal to the fair value of IAC common stock at the date of grant. Each RSU, PSU and restricted stock grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests, and certain grants also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests. Tree.com recognizes expense for all RSUs, PSUs and restricted stock for which vesting is considered probable. For RSU and restricted stock grants the accounting charge is measured at the grant date as the fair value of IAC common stock and expensed ratably as non-cash compensation over

F-16

**TREE.COM, INC. AND SUBSIDIARIES**

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION (Continued)**

the vesting term. For PSU grants the expense is measured at the grant date as the fair value of IAC common stock and expensed as non-cash compensation when the performance targets are considered probable of being achieved.

The amount of stock-based compensation expense recognized in the consolidated statement of operations is reduced by estimated forfeitures, as the amount recorded is based on awards ultimately expected to vest. The forfeiture rate is estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if the actual forfeiture rate differs from the estimated rate.

As of December 31, 2007, there was approximately $10.2 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards. This cost is expected to be recognized over a weighted-average period of approximately 2.8 years.

In connection with the acquisition of LendingTree by IAC in 2003 certain members of LendingTree's management were granted restricted common equity in LendingTree. These awards were granted on August 8, 2003 and were initially measured at fair value, which is being amortized to expense over the vesting period. These awards vest ratably over four and a half years, or earlier based upon the occurrence of certain prescribed events. The awards vest in non-voting restricted common shares of LendingTree.

These shares are subject to a put right by the holders, which is not exercisable until the first quarter of 2009 and annually thereafter, and a call right by IAC, which is not exercisable until the first quarter of 2012 and annually thereafter. The value of these shares upon exercise of the put or call is equal to their fair market value, determined by negotiation or arbitration, reduced by the accreted value of the preferred interest that was taken by IAC upon the purchase of LendingTree. The initial value of the preferred interest was equal to the acquisition price of LendingTree. The preferred interest accretes value at a 10% annual rate. Upon exercise of the put or call the consideration is payable in IAC shares or cash or a combination thereof at IAC's option. As of December 31, 2007, these awards are significantly out of the money and are not expected to result in any value. Prior to the separation, this put and call arrangement will be modified so that the consideration payable in IAC's shares will be replaced with Tree.com shares.

The unrecognized compensation cost related to these equity awards is $0.2 million at December 31, 2007.

**NOTE 4—GOODWILL AND INTANGIBLE ASSETS**

In connection with its annual impairment assessment in 2007, which was prepared in connection with the preparation of its annual financial statements, Tree.com identified and recorded impairment charges related to the goodwill and intangible assets of the Lending segment of $459.5 million and $16.2 million, respectively. The intangible asset impairment charges are included in amortization of intangibles in the accompanying consolidated statement of operations. The write-downs were determined by comparing the fair values of Lending reporting unit's goodwill and intangible assets with the carrying amounts. The fair values were determined using a discontinued cash flow approach.

The impairments associated with the Lending segment resulted from Tree.com's reassessment of the likely future profitability of Lending in light of the persistent adverse mortgage market conditions and the operational strategies Tree.com has undertaken in response to these market realities. These adverse conditions include, among others, constrained liquidity, lender focus on low margin conforming

F-17

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE 4—GOODWILL AND INTANGIBLE ASSETS (Continued)

loans, uncertainty as to the eventuality and timing of the return of higher margin mortgage products, the decline in real estate values and a higher rate of delinquency for existing mortgages. Tree.com has significantly reduced its mortgage origination operations in response to these conditions which will reduce or slow its ability to react to possible improvements in the market. The impairments at the Lending segment occurred during the fourth quarter of 2007 as Tree.com completed an updated assessment of mortgage market conditions and the development and implementation of Lending's responsive operational strategies, and quantified these considerations in Lending's future forecasted results.

The balance of goodwill and intangible assets, net is as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| Goodwill | $ 140,892 | $ 582,295 |
| Intangible assets with indefinite lives | 88,607 | 104,826 |
| Intangible assets with definite lives, net | 19,833 | 37,955 |
| Total goodwill and intangible assets, net | $ 249,332 | $ 725,076 |

Intangible assets with indefinite lives relate principally to trade names and trademarks acquired in various acquisitions. At December 31, 2007, intangible assets with definite lives relate to the following (in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted-Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 76,117 | $ (59,212) | $ 16,905 | 5.7 |
| Technology | 29,100 | (28,663) | 437 | 3.0 |
| Customer lists | 6,607 | (6,607) | — | 2.8 |
| Other | 8,928 | (6,437) | 2,491 | 4.9 |
| Total | $ 120,752 | $ (100,919) | $ 19,833 | |

At December 31, 2006, intangible assets with definite lives relate to the following (in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted-Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 79,417 | $ (46,771) | $ 32,646 | 5.7 |
| Technology | 29,100 | (28,138) | 962 | 3.0 |
| Customer lists | 6,607 | (6,607) | — | 2.8 |
| Other | 8,827 | (4,480) | 4,347 | 4.9 |
| Total | $ 123,951 | $ (85,996) | $ 37,955 | |

F-18

**TREE.COM, INC. AND SUBSIDIARIES**

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 4—GOODWILL AND INTANGIBLE ASSETS (Continued)**

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on December 31, 2007 balances, such amortization for the next five years is estimated to be as follows (in thousands):

| Years Ending December 31, | |
| --- | --- |
| 2008 | $ 10,883 |
| 2009 | 4,138 |
| 2010 | 2,768 |
| 2011 | 1,218 |
| 2012 | 826 |
| | $ 19,833 |

The following table presents the balance of goodwill by segment, including the changes in carrying amount of goodwill, for the year ended December 31, 2007 (in thousands):

| | Balance as of January 1, 2007 | Additions | (Deductions) | Impairment | Balance as of December 31, 2007 |
| --- | --- | --- | --- | --- | --- |
| Lending | $ 513,405 | $ 18,914 | $ (2,090) | $ (459,463) | $ 70,766 |
| Real Estate | 68,890 | 1,367 | (131) | — | 70,126 |
| Total | $ 582,295 | $ 20,281 | $ (2,221) | $ (459,463) | $ 140,892 |

Additions principally relate to estimated contingent consideration payable to former shareholders of HLC under the terms of the purchase agreement. Deductions principally relate to the income tax benefit realized pursuant to the exercise of stock options assumed in business acquisitions that were vested at the transaction date and are treated as a reduction in goodwill when the income tax deductions are realized, and adjustments to the carrying value of goodwill based upon the finalization of the valuation of goodwill and intangible assets and their related deferred tax impacts.

The following table presents the balance of goodwill by segment, including the changes in carrying amount of goodwill, for the year ended December 31, 2006 (in thousands):

| | Balance as of January 1, 2006 | Additions | (Deductions) | Balance as of December 31, 2006 |
| --- | --- | --- | --- | --- |
| Lending | $ 515,346 | $ 1,329 | $ (3,270) | $ 513,405 |
| Real Estate | 65,870 | 3,412 | (392) | 68,890 |
| Total | $ 581,216 | $ 4,741 | $ (3,662) | $ 582,295 |

Additions principally relate to acquisitions. Deductions principally relate to adjustments to the carrying value of goodwill based upon the finalization of the valuation of intangible assets and their related deferred tax impacts and the income tax benefit realized pursuant to the exercise of stock options assumed in business acquisitions that were vested at the transaction date and are treated as a reduction in goodwill when the income tax deductions are realized.

F-19

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### NOTE 5—PROPERTY AND EQUIPMENT

The balance of property and equipment, net is as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| Computer equipment and capitalized software | $ 35,183 | $ 36,175 |
| Leasehold improvements | 3,076 | 6,095 |
| Furniture and other equipment | 3,737 | 5,297 |
| Projects in progress | 5,002 | 7,024 |
|  | 46,998 | 54,591 |
| Less: accumulated depreciation and amortization | (25,532) | (23,914) |
| Total property and equipment, net | $ 21,466 | $ 30,677 |

### NOTE 6—ACCRUED EXPENSES AND OTHER CURRRENT LIABILITIES

Accrued expenses and other current liabilities consists of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| Contingent consideration payable related to HLC acquisition | $ 18,914 | $ — |
| Accrued loan loss liability related to loans previously sold | 13,886 | 3,820 |
| Litigation accruals | 15,285 | 12,456 |
| Accrued advertising expense | 11,492 | 11,125 |
| Accrued compensation and benefits | 8,407 | 18,683 |
| Accrued restructuring costs | 5,560 | — |
| Derivatives related to loans held for sale and interest rate lock commitments | 1,185 | 2,470 |
| Other accrued expenses | 8,884 | 14,336 |
| Total accrued expenses and other current liabilities | $ 83,613 | $ 62,890 |

### NOTE 7—INCOME TAXES

Tree.com is a member of IAC's consolidated federal and state tax returns. In all periods presented, current and deferred tax expense has been computed for Tree.com on a separate return basis. Tree.com's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statements of cash flows.

F-20

**TREE.COM, INC. AND SUBSIDIARIES**

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE 7—INCOME TAXES (Continued)

The components of the provision for income taxes attributable to continuing operations are as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Current income tax provision:** | | | |
| Federal | $ 5,533 | $ 2,113 | $ 7,497 |
| State | 1,864 | 2,703 | 3,380 |
| Current income tax provision | 7,397 | 4,816 | 10,877 |
| **Deferred income tax provision (benefit):** | | | |
| Federal | 6,327 | 1,644 | (4,139) |
| State | (3,563) | (1,438) | 4,682 |
| Deferred income tax provision | 2,764 | 206 | 543 |
| Income tax provision | $ 10,161 | $ 5,022 | $ 11,420 |

Current income taxes payable has been reduced by $1.7 million, $1.2 million and $3.1 million for the years ended December 31, 2007, 2006 and 2005, respectively, for tax deductions attributable to stock-based compensation. The related income tax benefits of this stock-based compensation were recorded as amounts charged or credited to invested capital or a reduction in goodwill.

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities at December 31, 2007 and 2006 are presented below (in thousands). The valuation allowance is related to items for which it is more likely than not that the tax benefit will not be realized.

|  | December 31, | |
|  | 2007 | 2006 |
|---|---|---|
| **Deferred tax assets:** | | |
| Provision for accrued expenses | $ 19,647 | $ 12,365 |
| Net operating loss carryforwards | 32,041 | 13,770 |
| Goodwill | 15,290 | — |
| Other | 7,303 | 4,974 |
| Total deferred tax assets | 74,281 | 31,109 |
| Less valuation allowance | (68,830) | (5,835) |
| Net deferred tax assets | 5,451 | 25,274 |
| **Deferred tax liabilities:** | | |
| Intangible and other assets | (34,581) | (48,689) |
| Other | (1,156) | (3,155) |
| Total deferred tax liabilities | (35,737) | (51,844) |
| Net deferred tax liability | $ (30,286) | $ (26,570) |

https://www.sec.gov/Archives/edgar/data/1434621/000104746908009036/a2187231zs-1a.htm

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 7—INCOME TAXES (Continued)**

At December 31, 2007, Tree.com had consolidated federal and state net operating losses ("NOLs") of approximately $58.9 million and $16.6 million, respectively. These NOL carryforwards have been fully utilized in the IAC consolidated federal and state return filings and will not be available to Tree.com following the spin-off. In addition, Tree.com had separate company state NOLs of approximately $159.0 million that will expire at various times between 2008 and 2027.

At December 31, 2007, Tree.com had tax credit carryforwards of approximately $1.9 million. This entire amount is related to federal credits for increasing research activities. These credits have been fully utilized in the IAC consolidated federal tax return and will not be available to Tree.com following the spin-off.

During 2007, Tree.com's valuation allowance increased by approximately $63.0 million. This increase related to NOLs and other deferred tax assets including accrued expenses and goodwill. At December 31, 2007, Tree.com had a valuation allowance of approximately $68.8 million related to the portion of tax operating loss carryforwards and other deferred tax assets for which it is more likely than not that the tax benefit will not be realized.

A reconciliation of total income tax provision to the amounts computed by applying the statutory federal income tax rate to earnings from continuing operations before income taxes and minority interest is shown as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2007** | **2006** | **2005** |
| Income tax (benefit) provision at the federal statutory rate of 35% | $ (189,084) | $ 4,800 | $ 6,027 |
| State income taxes, net of effect of federal tax benefit | (1,099) | 839 | (241) |
| Change in state effective tax rate | (4) | (17) | 2,940 |
| Non-deductible non-cash compensation expense | (125) | (332) | 1,444 |
| Impairment of non-deductible goodwill and intangible assets | 145,665 | — | — |
| Change in valuation allowance | 54,960 | — | 2,542 |
| Other, net | (152) | (268) | (1,292) |
| Income tax provision | $ 10,161 | $ 5,022 | $ 11,420 |

Tree.com adopted the provisions of FIN 48 effective January 1, 2007. FIN 48 clarifies the accounting for income taxes by prescribing the minimum recognition threshold a tax position is required to meet before being recognized in the financial statements. FIN 48 provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. The adoption had no impact on Tree.com's accumulated deficit. A reconciliation of the

F-22

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 7—INCOME TAXES (Continued)**

beginning and ending amount of unrecognized tax benefits, excluding interest, is as follows (in thousands):

| | | |
|---|---|---:|
| Balance at January 1, 2007 | $ | 541 |
| Additions based on tax positions related to the current year | | 1,645 |
| Additions for tax positions of prior years | | 2,203 |
| Reductions for tax positions of prior years | | — |
| Settlements | | — |
| Balance at December 31, 2007 | $ | 4,389 |

As of January 1, 2007 and December 31, 2007, the unrecognized tax benefits, including interest, were $0.5 million and $5.8 million, respectively. Included in unrecognized tax benefits is approximately $3.7 million for tax positions included in IAC's consolidated tax return filings. Included within "Payables to IAC and subsidiaries" in the accompanying consolidated balance sheet at December 31, 2007 is approximately $5.0 million of unrecognized tax benefits and related interest that will remain a liability of IAC after the spin-off. Also included in unrecognized tax benefits at December 31, 2007 is approximately $2.6 million for tax positions which the ultimate deductibility is highly certain but for which there is uncertainty about the timing of such deductibility.

Tree.com recognizes interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. Included in income tax expense from continuing operations for the year ended December 31, 2007 is $0.9 million, net of related deferred taxes of $0.5 million, for interest on unrecognized tax benefits. At December 31, 2007, Tree.com has accrued $1.4 million for the payment of interest. There were no material accruals for interest as of January 1, 2007. There are no material accruals for penalties.

By virtue of previously filed separate company and consolidated tax returns with IAC, Tree.com is routinely under audit by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by Tree.com are recorded in the period they become known.

The Internal Revenue Service ("IRS") is currently examining the IAC consolidated tax returns for the years ended December 31, 2001 through 2003, which includes the operations of LendingTree from August 8, 2003, its date of acquisition by IAC. The statute of limitations for these years has been extended to December 31, 2008. Various IAC consolidated tax returns filed with state and local jurisdictions are currently under examination, the most significant of which are Florida, New York state and New York City, for various tax years after December 31, 2001. These examinations are expected to be completed by late 2008.

Tree.com believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $2.6 million within twelve months of the current reporting date due to the reversal of deductible temporary differences which will result in a corresponding increase in net deferred tax liabilities. An estimate of other changes in unrecognized tax benefits cannot be made, but are not expected to be significant.

F-23

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 8—SEGMENT INFORMATION**

The overall concept that Tree.com employs in determining its operating segments and related financial information is to present them in a manner consistent with how the chief operating decision maker and executive management view the businesses, how the businesses are organized as to segment management, and the focus of the businesses with regards to the types of products or services offered or the target market.

Tree.com's primary metric is Operating Income Before Amortization, which is defined as operating income excluding, if applicable: (1) non-cash compensation expense, (2) amortization of intangibles and goodwill impairment, (3) pro forma adjustments for significant acquisitions, and (4) one-time items. Tree.com believes this measure is useful to investors because it represents the consolidated operating results from Tree.com's segments, taking into account depreciation, which it believes is an ongoing cost of doing business, but excluding the effects of any other non-cash expenses. Operating Income Before Amortization has certain limitations in that it does not take into account the impact to Tree.com's statement of operations of certain expenses, including non-cash compensation and acquisition-related accounting.

The following tables reconcile Operating Income Before Amortization to operating income (loss) for Tree.com's operating segments and to net (loss) income in total (in thousands):

| | Year Ended December 31, 2007 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Operating Income Before Amortization | Non-Cash Compensation Expense | Amortization of Intangibles | Goodwill Impairment | Operating Loss |
| Lending | $ (23,524) | $ (1,914) | $ (27,683) | $ (459,463) | $ (512,584) |
| Real Estate | (20,059) | (1,011) | (6,786) | — | (27,856) |
| Total | $ (43,583) | $ (2,925) | $ (34,469) | $ (459,463) | (540,440) |
| Other income, net | | | | | 199 |
| Loss before income taxes | | | | | (540,241) |
| Income tax provision | | | | | (10,161) |
| Net loss | | | | | $ (550,402) |

| | Year Ended December 31, 2006 | | | |
| --- | --- | --- | --- | --- |
| | Operating Income Before Amortization | Non-Cash Compensation Expense | Amortization of Intangibles | Operating Income (Loss) |
| Lending | $ 61,873 | $ (1,370) | $ (16,412) | $ 44,091 |
| Real Estate | (21,507) | (807) | (7,606) | (29,920) |
| Total | $ 40,366 | $ (2,177) | $ (24,018) | 14,171 |
| Other expense, net | | | | (456) |
| Earnings before income taxes | | | | 13,715 |
| Income tax provision | | | | (5,022) |
| Net income | | | | $ 8,693 |

F-24

TREE.COM, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 8—SEGMENT INFORMATION (Continued)**

| | Year Ended December 31, 2005 | | | |
| --- | --- | --- | --- | --- |
| | Operating Income Before Amortization | Non-Cash Compensation Expense | Amortization of Intangibles | Operating Income (Loss) |
| Lending | $ 78,883 | $ (4,829) | $ (23,449) | $ 50,605 |
| Real Estate | (16,930) | (2,556) | (11,865) | (31,351) |
| Total | $ 61,953 | $ (7,385) | $ (35,314) | 19,254 |
| Other expense, net | | | | (2,035) |
| Earnings before income taxes and minority interest | | | | 17,219 |
| Income tax provision | | | | (11,420) |
| Minority interest in losses of consolidated subsidiaries | | | | 52 |
| Net income | | | | $ 5,851 |

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | (In thousands) | | |
| **Revenue:** | | | |
| Origination and sale of loans | $ 130,151 | $ 221,400 | $ 179,026 |
| Match fees | 80,792 | 83,930 | 68,981 |
| Closed loan fees | 65,227 | 85,022 | 90,665 |
| Other | 18,456 | 29,305 | 25,128 |
| Lending | 294,626 | 419,657 | 363,800 |
| Real Estate | 51,752 | 56,821 | 57,555 |
| **Total** | $ 346,378 | $ 476,478 | $ 421,355 |

| | December 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| | (In thousands) | |
| **Assets:** | | |
| Lending(a) | $ 345,810 | $ 1,127,397 |
| Real Estate(a) | 97,777 | 133,648 |
| **Total** | $ 443,587 | $ 1,261,045 |

| | Years Ended December 31, | | |
| --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | (In thousands) | | |

**Depreciation, amortization of intangibles and goodwill impairment:**

| | | | | | | |
|---|---:|---|---:|---|---:|
| Lending(a) | $ | 496,052 | $ | 25,721 | $ | 28,989 |
| Real Estate(a) | | 7,938 | | 10,007 | | 13,045 |
| | | | | | | |
| **Total** | $ | 503,990 | $ | 35,728 | $ | 42,034 |

F-25

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 8—SEGMENT INFORMATION (Continued)**

|  | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2007** | | **2006** | | **2005** | |
|  | (In thousands) | | | | | |
| **Capital expenditures:** | | | | | | |
| Lending and Real Estate(b) | $ | 9,421 | $ | 13,251 | $ | 17,827 |
| **Total** | $ | 9,421 | $ | 13,251 | $ | 17,827 |

(a)    Assets related to the Real Estate segment only include goodwill and intangible assets, net as it is impracticable to allocate the remaining jointly used assets between the Lending and Real Estate segments. Accordingly, assets related to the Lending segment include goodwill and intangible assets, net and the remaining jointly used assets comprising both the Lending and Real Estate segments. However, depreciation expense, which Tree.com believes is an ongoing cost of doing business and is included in the calculation of both operating income (loss) and Operating Income Before Amortization, is allocated between the Lending and Real Estate segments.

(b)    All capital expenditures related to the Lending and Real Estate segments are included in one segment as it is impracticable to allocate capital expenditures between the Lending and Real Estate segments.

Tree.com maintains operations solely in the United States.

**NOTE 9—SHORT-TERM BORROWINGS AND LONG-TERM OBLIGATIONS**

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2007** | | **2006** | |
|  | (In thousands) | | | |
| Lines of credit (primarily warehouse lines) | $ | 79,426 | $ | 338,472 |
| Installment Note Payable due January 31, 2008 | | 20,000 | | 30,000 |
| Other long-term obligations maturing through 2008 | | 272 | | 1,923 |
| Total gross obligations | | 99,698 | | 370,395 |
| Total unamortized discount | | (76) | | (976) |
| Total long-term obligations and short-term borrowings | | 99,622 | | 369,419 |
| Less current maturities of long-term obligations and short-term borrowings | | (99,622) | | (350,072) |
| Long-term obligations, net of current maturities | $ | — | $ | 19,347 |

At December 31, 2007 and 2006, current maturities of long-term obligations and short-term borrowings consist primarily of the lines of credit and the installment note payable.

LendingTree Loans has various lines of credit, primarily warehouse lines, that it uses to fund the origination of consumer residential mortgage loans. As of December 31, 2007, LendingTree Loans had committed lines of credit totaling $550 million, of which $500 million expired on January 31, 2008 and $50 million expires on October 31, 2008, and an uncommitted line of credit of $150 million. As of December 31, 2006, LendingTree Loans had committed lines of credit in the aggregate amount of $750 million, which had been scheduled to expire from August 31, 2007 to October 31, 2007, and uncommitted lines of credit aggregating $250 million. Total borrowings under these lines of credit are secured by outstanding mortgage loans held for sale. The interest rate under these lines of credit was 30-day LIBOR plus 75 to 100 basis points, but may have been higher under certain circumstances. Under the terms of the committed lines of

08-13555-mg-1 Doc 51418-1 Filed 04/01/21 Entered 04/01/71 14:23:28 Exhibit
Complaint Pg 196 of 1033

credit, LendingTree Loans is required to maintain various financial and other covenants. These financial covenants include maintaining (i) minimum levels of

F-26

**TREE.COM, INC. AND SUBSIDIARIES**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 9—SHORT-TERM BORROWINGS AND LONG-TERM OBLIGATIONS (Continued)

tangible net worth, cash on hand with a certain lender and liquid assets, (ii) a maximum ratio of total liabilities to net worth and (iii) positive pre-tax net income on a quarterly basis. During the fourth quarter of 2007, LendingTree Loans was not in compliance with the quarterly positive pre-tax net income covenant set forth in one of its lines of credit. LendingTree Loans received a waiver of this covenant breach on February 8, 2008. The breach and the subsequent waiver did not have an impact on LendingTree Loans' other lines of credit and Tree.com does not expect it to have an impact on LendingTree Loans' ability to secure lines of credit in the future. Borrowings under all of LendingTree Loans' lines of credit are non-recourse to Tree.com. In the case of committed lines, LendingTree Loans pays a facility fee based on the size of the lines. There were $79.4 million and $338.5 million outstanding under these lines of credit as of December 31, 2007 and 2006, respectively. The weighted-average interest rates on outstanding borrowings under these lines of credit at December 31, 2007 and 2006 were 5.53% and 6.35%, respectively. Subsequent to December 31, 2007, the committed line of credit which expired on January 31, 2008 was renewed at a reduced size of $50 million and an increased base rate of LIBOR plus 140 basis points and will expire on the earlier of sixty days prior to the spin-off or January 24, 2009. The renewed committed line of credit can be canceled at the option of the lender without default upon sixty days notice.

In connection with the acquisition of LendingTree Loans, Tree.com committed to pay a portion of the purchase price payments to former shareholders under an installment note payable in three installments. The final payment of $20.0 million, due January 31, 2008, is recorded net of imputed interest of $0.1 million at December 31, 2007.

At December 31, 2007 and 2006, Tree.com leased certain equipment under capital leases with interest rates ranging from approximately 6.8% to 9.5%. Included in other long-term obligations above as of December 31, 2007 are capital lease obligations totaling approximately $0.3 million. Included in other long-term obligations above as of December 31, 2006 are capital lease obligations totaling approximately $1.9 million, net of interest of $0.1 million. Total fixed assets under capital leases at December 31, 2007 and 2006 approximate $4.5 million and $6.5 million, respectively, with accumulated depreciation of approximately $2.7 million and $3.6 million, respectively.

### NOTE 10—DERIVATIVE INSTRUMENTS

Tree.com is exposed to certain interest rate risks in connection with its mortgage banking operations because the fair value of loans held for sale is subject to change primarily due to changes in market interest rates until those loans are sold in the secondary market. LendingTree Loans hedges the changes in fair value of loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continues to enter into forward delivery contracts for risk management purposes, effective April 1, 2007 it no longer designates these derivatives as hedges for accounting purposes.

Prior to April 1, 2007, the fair value of loans held for sale was determined using current secondary market prices for loans with similar coupons, maturities and credit quality and the carrying value of the loans held for sale and the related derivative instruments were adjusted for changes in fair value during the time the hedge was deemed to be highly effective. If it was determined that the hedging relationship was no longer highly effective, hedge accounting was discontinued. When hedge accounting was discontinued, the affected loans held for sale were no longer adjusted for changes in fair value. However, the changes in fair value of the forward delivery contracts continued to be recognized in current earnings as a component of revenue. The fair value of the forward delivery contracts is recorded in "Prepaid and other current assets" and/or "Accrued expenses and other current liabilities"

F-27

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 10—DERIVATIVE INSTRUMENTS (Continued)**

in the accompanying consolidated balance sheets. For the year ended December 31, 2007, Tree.com recognized losses of $1.1 million related to the changes in fair value of derivative instruments. For the years ended December 31, 2006 and 2005, Tree.com recognized losses of $0.3 million and 1.4 million, respectively, related to hedge ineffectiveness and gains of $0.1 million and $0.1 million, respectively, related to changes in the fair value of derivative instruments when hedge accounting was discontinued.

LendingTree Loans enters into commitments with consumers to originate loans at a locked in interest rate (interest rate lock commitments—"IRLCs"). Tree.com reports IRLCs as derivative instruments in accordance with SAB 105 and SFAS No. 133 and determines the fair value of IRLCs using current secondary market prices for underlying loans with similar coupons, maturity and credit quality, subject to the anticipated loan funding probability, or fallout factor. The fair value of IRLCs is subject to change primarily due to changes in interest rates and fallout factors. Under LendingTree Loans' risk management policy, LendingTree Loans hedges the changes in fair value of IRLCs primarily by entering into mortgage forward delivery contracts which can reduce the volatility of economic outcomes. Neither the IRLCs nor the related hedging instrument qualify for hedge accounting and both are recorded at fair value with changes in fair value being recorded in current earnings as a component of revenue in the statement of operations. The IRLCs are recorded in "Prepaid and other current assets" and/or "Accrued expenses and other current liabilities" in the accompanying consolidated balance sheets. The net change in the fair value of these derivative instruments for the years ended December 31, 2007, 2006 and 2005 resulted in losses of $0.8 million, gains of $0.2 million and losses of $0.4 million, respectively, which have been recognized in the accompanying consolidated statements of operations. At December 31, 2007, there was $157.8 million of IRLC's notional value outstanding.

**NOTE 11—COMMITMENTS**

Tree.com leases office space, equipment and services used in connection with its operations under various operating leases, many of which contain escalation clauses.

Future minimum payments under operating lease agreements are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---|
| 2008 | $ | 7,168 |
| 2009 | | 6,565 |
| 2010 | | 3,109 |
| 2011 | | 2,655 |
| 2012 | | 2,328 |
| Thereafter | | 5,808 |
| Total | $ | 27,633 |

Expenses charged to operations under these agreements were $6.9 million, $6.7 million and $6.1 million for the years ended December 31, 2007, 2006 and 2005, respectively.

F-28

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 11—COMMITMENTS (Continued)**

Tree.com also has funding commitments that could potentially require its performance in the event of demands by third parties or contingent events, such as under letters of credit extended or under surety bonds, as follows (in thousands):

| | Total Amounts Committed | | Amount of Commitment Expiration Per Period | | | | |
| | | | Less Than 1 Year | | 1-3 Years | 3-5 Years | More Than 5 Years |
|---|---|---|---|---|---|---|---|
| Surety bonds and letters of credit | $ | 8,182 | $ | 7,477 | $ 705 | $ — | $ — |
| Purchase obligations | | 330 | | 330 | — | — | — |
| Total commercial commitments | $ | 8,512 | $ | 7,807 | $ 705 | $ — | $ — |

The total commercial commitments above primarily consist of surety bonds relating to guarantees with mortgage brokers. The purchase obligations primarily relate to marketing event contracts in 2008.

**NOTE 12—CONTINGENCIES**

On November 24, 2003, IMX, Inc. ("IMX") filed suit against Tree.com alleging infringement of a patent held by IMX and seeking damages related to the alleged infringement. A trial was conducted in January 2006 and a verdict was returned finding infringement by Tree.com and awarding IMX $5.8 million in damages. Tree.com established a reserve of $5.8 million in its 2005 financial statements related to this claim. In January 2007 the court enhanced the damages award and rejected Tree.com's counterclaim. During 2006, Tree.com increased the reserve by $6.3 million to $12.1 million at December 31, 2006. During 2007, the court awarded IMX supplemental damages and pre-judgment and post-judgment interest. During 2007, Tree.com increased the reserve by $0.8 million to $12.8 million at December 31, 2007. Tree.com has appealed this judgment to the U.S. Court of Appeals for the Federal Circuit. Tree.com intends to continue to contest this case through all available means. In connection with the appeal, Tree.com's parent, IAC, executed a guarantee of $13.5 million in lieu of posting a bond. Before IAC completes the spin-off, Tree.com will have to post a bond in a like amount.

HLC is party to various employment related lawsuits. During 2006, Tree.com established a reserve of $0.4 million for certain of these actions. During 2007, an additional reserve of $2.1 million was recorded. The balance of the related liability was $0.4 million and $2.5 million at December 31, 2006 and 2007, respectively.

In addition, during 2007 the Company settled a lawsuit (as the plaintiff) and received a payment of $15.0 million, which is reflected as a separate line in the accompanying consolidated statement of operations.

In the ordinary course of business, Tree.com is a party to various lawsuits. Tree.com establishes reserves for specific legal matters when it determines that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where it believes an unfavorable outcome is not probable and, therefore, no reserve is established. Although management currently believes that an unfavorable resolution of claims against Tree.com, including claims where an unfavorable outcome is reasonably possible, will not have a material impact on the liquidity, results of operations, or financial condition of Tree.com, these matters are subject to inherent uncertainties and management's view of these matters may change in the future. It is possible that an unfavorable outcome of one or more of these lawsuits could have a material impact on the liquidity, results of operations, or financial condition of Tree.com. Tree.com also

F-29

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 12—CONTINGENCIES (Continued)**

evaluates other contingent matters, including tax contingencies, to assess the probability and estimated extent of potential loss. See Note 7 for discussion related to income tax contingencies.

**NOTE 13—FINANCIAL INSTRUMENTS**

The additional disclosure below of the estimated fair value of financial instruments has been determined by Tree.com using available market information and appropriate valuation methodologies when available. Tree.com's financial instruments include letters of credit and surety bonds. These commitments are in place to facilitate the commercial operations of certain Tree.com subsidiaries.

|  | December 31, 2007 | | December 31, 2006 | |
|---|---|---|---|---|
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|  | (In thousands) | | | |
| Cash and cash equivalents | $ 45,940 | $ 45,940 | $ 99,498 | $ 99,498 |
| Restricted cash and cash equivalents | 14,953 | 14,953 | 15,467 | 15,467 |
| Accounts receivable, net | 12,433 | 12,433 | 21,581 | 21,581 |
| Loans held for sale | 86,754 | 89,397 | 345,896 | 357,859 |
| Long-term obligations and short-term borrowings | (99,622) | (99,622) | (369,419) | (369,419) |
| Derivative asset related to loans held for sale and interest rate lock commitments | 719 | 719 | 3,859 | 3,859 |
| Derivative liability related to loans held for sale and interest rate lock commitments | (1,185) | (1,185) | (2,470) | (2,470) |
| Surety bonds and letters of credit | N/A | (8,182) | N/A | (7,489) |

The carrying amounts of cash and cash equivalents reflected in the accompanying consolidated balance sheets approximate fair value as they are redeemable at par upon notice or maintained with various high-quality financial institutions. Restricted cash and cash equivalents are primarily maintained with credit line providers, primarily warehouse lines, for the purpose of maintaining financial covenants. Accounts receivable, net, are short-term in nature and are generally settled shortly after the sale. The market value of loans held for sale, net, was estimated using current secondary market prices for loans with similar coupons, maturities and credit quality, subject to the anticipated loan funding probability, or fallout factor. The fair values of derivative asset and liability contracts were estimated based on the difference between the current value of similar loans and the price at which Tree.com has committed to originate the loans, subject to the expected close rate of the loans, or fallout factor. The carrying amounts for the remaining long-term obligations and short-term borrowings and all other financial instruments approximate their fair value.

**NOTE 14—SUPPLEMENTAL CASH FLOW INFORMATION**

**Supplemental Disclosure of Cash Flow Information:**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
|  | (In thousands) | | |
| Cash paid during the period for: | | | |
|    Interest | $ 14,888 | $ 19,056 | $ 12,626 |
|    Income tax payments including amounts paid to IAC for Tree.com's share of IAC's consolidated tax liability | 6,426 | 3,046 | 7,258 |
|    Income tax refunds | — | (26) | (403) |

F-30

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 15—RELATED PARTY TRANSACTIONS**

Tree.com has various agreements with Microsoft Corporation ("Microsoft"), which was the beneficial owner of more than 5% of IAC's outstanding common stock during 2006 and 2005. These agreements include partner agreements, licensing agreements and support agreements. Total fees paid related to these agreements in 2006 and 2005 were approximately $21.8 million and $8.5 million, respectively. Amounts payable related to these various agreements at December 31, 2006 were $1.2 million and are included in "Accrued expenses and other current liabilities" in the accompanying consolidated balance sheets. In the first quarter of 2007, Microsoft publicly disclosed that it was no longer the beneficial owner of 5% or more of IAC's outstanding common stock, and as a result, it is no longer a related party.

During the period from January 1, 2005 through June 6, 2005, Tree.com paid $6.9 million to the National Broadcasting Company, a subsidiary of GE, related to television advertising. As a result of the sale of IAC's common and preferred interests in VUE on June 7, 2005, GE and its subsidiaries are no longer related parties.

Tree.com's expenses include allocations from IAC of costs associated with IAC's accounting, treasury, legal, tax, corporate support, human resources and internal audit functions. These expenses were allocated based on the ratio of Tree.com's revenue as a percentage of IAC's total revenue. Allocated costs were $1.0 million, $1.2 million and $1.1 million in 2007, 2006 and 2005, respectively, and are included in "General and administrative expense" in the accompanying consolidated statements of operations. It is not practicable to determine the amounts of these expenses that would have been incurred had Tree.com operated as an unaffiliated entity. In the opinion of management, the allocation method is reasonable.

The portion of interest income reflected in the consolidated statements of operations that is intercompany in nature, was $1.0 million and $1.1 million for the years ended December 31, 2007 and 2006, respectively. This intercompany interest arose from the transfer of cash from Tree.com to IAC that occurred in connection with IAC's treasury operations.

An analysis of Tree.com's payables to IAC and subsidiaries is as follows (in thousands):

|  | 2007 | 2006 |
|---|---|---|
| Payables to IAC and subsidiaries, beginning of year | $ (29,126) | $ (26,410) |
| Cash transfers related to IAC's centrally managed U.S. treasury function | 35,652 | 34,079 |
| Interest income | 1,000 | 1,062 |
| Employee equity instruments and associated tax withholdings | 1,253 | 894 |
| Taxes (excludes tax withholdings associated with employee equity instruments) | 5,158 | (3,041) |
| Allocation of non-cash compensation expense | (3,139) | (3,501) |
| Administrative expenses and other | (30,865) | (32,209) |
| Payables to IAC and subsidiaries, end of year | $ (20,067) | $ (29,126) |

**Relationship Between IAC and Tree.com after the Spin-Off**

For purposes of governing certain of the ongoing relationships between Tree.com and IAC at and after the spin-off, and to provide for an orderly transition, Tree.com and IAC are expected to enter into a separation agreement, a tax sharing agreement, an employee matters agreement and a transition services agreement (the "Spin-Off Agreements"), among other agreements.

F-31

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 15—RELATED PARTY TRANSACTIONS (Continued)**

*Separation Agreement*

The separation agreement is expected to provide generally that (i) immediately prior to the spin-off, IAC will contribute or otherwise transfer to Tree.com all of the subsidiaries and assets comprising the Tree.com Businesses, (ii) Tree.com will assume all of the liabilities related to the Tree.com Businesses, (iii) each party will indemnify the other and its respective affiliates, current and former directors, officers and employees for any losses arising out of any breach of any of the Spin-Off Agreements and (iv) Tree.com will indemnify IAC for its failure to assume and perform any assumed liabilities and any liabilities relating to Tree.com, financial and business information included in the SEC documentation filed with respect to the spin-off, as well as such other terms as to which IAC and Tree.com mutually agree.

*Tax Sharing Agreement*

The tax sharing agreement will govern the respective rights, responsibilities and obligations of IAC and Tree.com after the spin-off with respect to taxes for the periods ending on or before the spin-off. Generally, IAC will pay taxes with respect to Tree.com income included on its consolidated, unitary or combined federal or state tax returns including audit adjustments with respect thereto. Other pre-distribution taxes that are attributable to the Tree.com Businesses, including taxes reported on separately-filed returns and audit adjustments with respect thereto, will be borne solely by Tree.com. The tax sharing agreement is expected to contain certain customary restrictive covenants that generally prohibit Tree.com (absent a supplemental IRS ruling or an unqualified opinion of counsel to the contrary, in each case, in a form and substance satisfactory and acceptable to IAC in its sole discretion) from taking actions that could jeopardize the tax free nature of the spin-off. Tree.com is expected to agree to indemnify IAC for any taxes and related losses resulting from its non-compliance with these restrictive covenants, as well as for the breach of certain representations in the Spin-Off Agreements and other documentation relating to the tax-free nature of the spin-off.

*Employee Matters Agreement*

The employee matters agreement will generally provide that Tree.com will be responsible for, among other obligations, all employment and benefit-related obligations and liabilities related to its employees immediately prior to the spin-off (and their dependents and beneficiaries) and former employees who most recently worked for the Tree.com Businesses. This agreement is also expected to provide that assets and liabilities from the IAC Retirement Savings Plan of Tree.com employees will be transferred to a newly established Tree.com Retirement Savings Plan as soon as practicable following the spin-off.

*Transition Services Agreement*

Under the transition services agreement, beginning on the date of the completion of the spin-off, IAC will provide to Tree.com on an interim, transitional basis, various services, which are expected to relate primarily to public company and operational matters, and such other services as to which IAC and Tree.com mutually agree. The agreed upon charges for these services will generally allow IAC to recover fully the allocated costs of providing the services, plus all out-of-pocket costs and expenses. Tree.com may terminate the agreement with respect to one or more particular services upon prior written notice.

F-32

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 15—RELATED PARTY TRANSACTIONS (Continued)**

*Commercial Agreements*

IAC and Tree.com currently, and for the foreseeable future, expect to provide certain services to each other pursuant to certain commercial relationships. In connection with the spin-off, IAC and Tree.com will enter into a number of commercial agreements between subsidiaries of IAC, on the one hand, and subsidiaries of Tree.com, on the other hand, many of which will memorialize (in most material respects) pre-existing arrangements in effect prior to the spin-off and all of which are intended to reflect arm's length terms. In addition, IAC and Tree.com believe that such agreements, whether taken individually or in the aggregate, do not constitute a material contract to either IAC or Tree.com.

Aggregate revenue earned with respect to these commercial agreements by the Tree.com Businesses was not material in 2007, 2006 and 2005. The Tree.com Businesses incurred approximately $0.4 million, $1.9 million and $0.9 million in 2007, 2006 and 2005, respectively, in expenses related to these commercial agreements with IAC subsidiaries.

**NOTE 16—BENEFIT PLANS**

During the three years ended December 31, 2007, Tree.com either participated in a retirement savings plan sponsored by IAC or had a retirement savings plan in the United States that was qualified under Section 401(k) of the Internal Revenue Code. Subsequent to the spin-off, the net assets available for benefits of the employees of Tree.com are expected to be transferred from the IAC plan to a newly created Tree.com plan. Under the IAC plan, participating employees may contribute up to 16% of their pretax earnings, but not more than statutory limits. Tree.com's match under the IAC plan is fifty cents for each dollar a participant contributes in this plan, with a maximum contribution of 3% of a participant's eligible earnings. Matching contributions for all plans were approximately $2.7 million, $3.0 million and $2.3 million in 2007, 2006, and 2005, respectively. The decrease in matching contributions in 2007 is primarily due to the reduction in workforce associated with the current year restructuring. The increase in matching contributions in 2006 is primarily due to increased participation in the plan. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. Investment options in the plan include IAC common stock, but neither participant nor matching contributions are required to be invested in IAC common stock.

**NOTE 17—RESTRUCTURING CHARGES**

Restructuring charges were approximately $22.9 million in 2007. Costs that relate to ongoing operations are not part of restructuring charges.

The restructuring charges primarily relate to Tree.com's significant reduction in its mortgage origination operations in response to the persistent adverse mortgage market conditions. Restructuring charges by segment and type are as follows:

| | For the Year Ended December 31, 2007 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Employee Termination Costs** | | **Continuing Lease Obligations** | | **Asset Write-offs** | | **Other** | | **Total** | |
| | | | | (In thousands) | | | | | | |
| Lending | $ | 8,973 | $ | 5,004 | $ | 7,510 | $ | 80 | $ | 21,567 |
| Real Estate | | 333 | | — | | 493 | | 474 | | 1,300 |
| Total | $ | 9,306 | $ | 5,004 | $ | 8,003 | $ | 554 | $ | 22,867 |

F-33

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 17—RESTRUCTURING CHARGES (Continued)**

Restructuring charges and spending against liabilities are as follows:

| | For the Year Ended December 31, 2007 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| | (In thousands) | | | | |
| Balance, beginning of period | $ — | $ — | $ — | $ — | $ — |
| Restructuring charges | 9,306 | 5,004 | 8,003 | 554 | 22,867 |
| Payments | (7,242) | (1,633) | — | — | (8,875) |
| Write-offs | — | 514 | (8,003) | — | (7,489) |
| Balance, end of period | $ 2,064 | $ 3,885 | $ — | $ 554 | $ 6,503 |

At December 31, 2007, restructuring liabilities of $5.6 million are included in "Accrued expenses and other current liabilities" and $0.9 million are included in "Other long-term liabilities" in the accompanying consolidated balance sheet. Tree.com does not expect to incur significant additional costs related to the 2007 restructuring.

**NOTE 18—QUARTERLY RESULTS (UNAUDITED)**

| | Quarter Ended March 31, | Quarter Ended June 30, | Quarter Ended September 30, | Quarter Ended December 31,(a) |
| --- | --- | --- | --- | --- |
| | (In thousands) | | | |
| **Year Ended December 31, 2007** | | | | |
| Revenue | $ 109,999 | $ 110,639 | $ 74,953 | $ 50,787 |
| Gross margin | 89,503 | 89,697 | 56,674 | 37,390 |
| Operating loss | (8,404) | (11,756) | (11,916) | (508,364) |
| Net loss | (5,123) | (7,492) | (6,293) | (531,494) |
| **Year Ended December 31, 2006** | | | | |
| Revenue | $ 122,658 | $ 120,747 | $ 120,230 | $ 112,843 |
| Gross margin | 104,749 | 101,910 | 100,844 | 95,758 |
| Operating income | 922 | 1,455 | 5,811 | 5,983 |
| Net income | 386 | 746 | 3,240 | 4,321 |

(a)     The fourth quarter of 2007 includes an impairment charge of $475.7 million related to the write-down of Lending's goodwill and intangible assets.

F-34

<div align="right">**Schedule II**</div>

## TREE.COM AND SUBSIDIARIES

## VALUATION AND QUALIFYING ACCOUNTS

| Description | Balance at Beginning of Period | | Charges to Earnings | | Charges to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | | |
| **2007** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 1,129 | $ | 1,925 | $ | — | $ | (2,732)[2] | $ | 322 |
| Deferred tax valuation allowance | | 5,835 | | 62,995[1] | | — | | — | | 68,830 |
| **2006** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 727 | $ | 1,768 | $ | — | $ | (1,366)[2] | $ | 1,129 |
| Deferred tax valuation allowance | | 3,652 | | 2,183[1] | | — | | — | | 5,835 |
| **2005** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 594 | $ | 560 | $ | — | $ | (427)[2] | $ | 727 |
| Deferred tax valuation allowance | | 735 | | 2,917[1] | | — | | — | | 3,652 |

(1)　Amount is primarily related to Tree.com net operating losses and other deferred tax assets including accrued expenses and goodwill which impacted the income tax provision.

(2)　Write-off of uncollectible accounts receivable.

<div align="center">F-35</div>

**TREE.COM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| | (In thousands) | |
| Revenue | | |
| Lending | | |
| Origination and sale of loans | $ 28,007 | $ 48,617 |
| Other lending | 33,804 | 48,151 |
| Total Lending | 61,811 | 96,768 |
| Real Estate | 8,382 | 13,231 |
| Total revenue | 70,193 | 109,999 |
| Cost of revenue | | |
| Lending | 12,796 | 14,312 |
| Real Estate | 4,970 | 6,184 |
| Total cost of revenue (exclusive of depreciation shown separately below) | 17,766 | 20,496 |
| Gross margin | 52,427 | 89,503 |
| Selling and marketing expense | 33,197 | 56,478 |
| General and administrative expense | 20,764 | 30,046 |
| Product development | 2,109 | 4,270 |
| Restructuring expense | 402 | — |
| Amortization of intangibles | 3,668 | 4,274 |
| Depreciation | 1,775 | 2,839 |
| Operating loss | (9,488) | (8,404) |
| Other income (expense): | | |
| Interest income | 9 | 70 |
| Interest expense | (109) | (280) |
| Other (expense) income | (2) | 1 |
| Total other expense, net | (102) | (209) |
| Loss before income taxes | (9,590) | (8,613) |
| Income tax (provision) benefit | (209) | 3,490 |
| **Net loss** | $ (9,799) | $ (5,123) |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-36

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

|  | March 31, 2008 | December 31, 2007 |
|---|---|---|
|  | (unaudited) | (audited) |
|  | (In thousands) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 52,516 | $ 45,940 |
| Restricted cash and cash equivalents | 2,442 | 14,953 |
| Accounts receivable, net of allowance of $382 and $322, respectively | 14,460 | 12,433 |
| Loans held for sale | 91,185 | 86,754 |
| Deferred income taxes | 6,420 | 6,420 |
| Prepaid and other current assets | 9,607 | 6,011 |
| Total current assets | 176,630 | 172,511 |
| Property and equipment, net | 20,582 | 21,466 |
| Goodwill | 140,619 | 140,892 |
| Intangible assets, net | 104,772 | 108,440 |
| Other non-current assets | 207 | 278 |
| **TOTAL ASSETS** | $ 442,810 | $ 443,587 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **LIABILITIES:** | | |
| Short-term borrowings and current maturities of long-term obligations | $ 78,754 | $ 99,622 |
| Accounts payable, trade | 6,991 | 3,335 |
| Deferred revenue | 1,397 | 1,435 |
| Income taxes payable | 913 | 993 |
| Accrued expenses and other current liabilities | 69,913 | 83,613 |
| Total current liabilities | 157,968 | 188,998 |
| Income taxes payable | 819 | 730 |
| Other long-term liabilities | 2,257 | 2,529 |
| Deferred income taxes | 37,221 | 36,706 |
| Commitments and contingencies | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Invested capital | 766,374 | 751,923 |
| Payables to IAC and subsidiaries | 42,237 | 20,067 |
| Accumulated deficit | (564,066) | (557,366) |
| Total shareholders' equity | 244,545 | 214,624 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 442,810 | $ 443,587 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-37

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY**

**(Unaudited)**

| | Total | | Invested Capital | | Payables to IAC and Subsidiaries | | Accumulated Deficit | |
|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | |
| **Balance as of December 31, 2007** | $ | 214,624 | $ | 751,923 | $ | 20,067 | $ | (557,366) |
| Comprehensive loss: | | | | | | | | |
|    Net loss for the three months ended March 31, 2008 | | (9,799) | | — | | — | | (9,799) |
| Comprehensive loss | | (9,799) | | | | | | |
| Cumulative effect of adoption of SFAS No. 157 | | 3,099 | | — | | — | | 3,099 |
| Net transfers from IAC (principally funding of contingent consideration paid to former shareholders of Home Loan Center) | | 14,451 | | 14,451 | | — | | — |
| Net change in payables to IAC and subsidiaries | | 22,170 | | — | | 22,170 | | — |
| **Balance as of March 31, 2008** | $ | 244,545 | $ | 766,374 | $ | 42,237 | $ | (564,066) |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-38

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| | (In thousands) | |
| **Cash flows from operating activities:** | | |
| Net loss | $ (9,799) | $ (5,123) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Amortization of intangibles | 3,668 | 4,274 |
| Depreciation | 1,775 | 2,839 |
| Non-cash compensation expense | 556 | 1,121 |
| Non-cash restructuring expense | 337 | — |
| Deferred income taxes | 192 | (4,535) |
| Gain on sales of loans held for sale | (23,573) | (48,617) |
| Provision for loans losses | 784 | 1,548 |
| Bad debt expense | 238 | 613 |
| Non-cash interest expense | 76 | 249 |
| Changes in current assets and liabilities: | | |
| Accounts receivable | (1,233) | (4,481) |
| Origination of loans held for sale | (611,490) | (1,997,623) |
| Proceeds from sales of loans held for sale | 628,501 | 1,981,313 |
| Prepaid and other current assets | (424) | (2,663) |
| Accounts payable and other current liabilities | 4,767 | (2,930) |
| Income taxes payable | 310 | (392) |
| Deferred revenue | (127) | 177 |
| Other, net | (181) | (359) |
| **Net cash used in operating activities** | (5,623) | (74,589) |
| | | |
| **Cash flows from investing activities:** | | |
| Contingent consideration paid to former shareholders of Home Loan Center | (14,487) | — |
| Capital expenditures | (1,470) | (3,698) |
| Other, net | 4 | 1 |
| **Net cash used in investing activities** | (15,953) | (3,697) |
| | | |
| **Cash flows from financing activities:** | | |
| Borrowing under lines of credit | 553,141 | 1,947,302 |
| Repayments of lines of credit | (553,828) | (1,884,903) |
| Principal payments on long-term obligations | (20,031) | (10,449) |
| Transfers from IAC | 21,774 | 17,960 |
| Capital contributions from IAC | 14,487 | — |
| Excess tax benefits from stock-based awards | 98 | 484 |
| Decrease (increase) in restricted cash | 12,511 | (843) |
| **Net cash provided by financing activities** | 28,152 | 69,551 |
| | | |
| **Net increase (decrease) in cash and cash equivalents** | 6,576 | (8,735) |
| Cash and cash equivalents at beginning of period | 45,940 | 99,498 |
| **Cash and cash equivalents at end of period** | $ 52,516 | $ 90,763 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

F-39

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1—ORGANIZATION**

**Spin-Off**

On November 5, 2007, IAC/InterActiveCorp ("IAC") announced that its Board of Directors approved a plan to separate IAC into five publicly traded companies, identifying Tree.com, Inc. ("Tree.com") as one of those five companies. In these consolidated financial statements, we refer to the separation transaction as the "spin-off." In connection with the spin-off, Tree.com was incorporated as a Delaware corporation in April 2008. Tree.com currently does not have any material assets or liabilities, nor does it engage in any business or other activities and, other than in connection with the spin-off, will not acquire or incur any material assets or liabilities, nor will it engage in any business or other activities. Upon completion of the spin-off, Tree.com will consist of the businesses that formerly comprised IAC's Lending and Real Estate segments. We refer herein to these businesses as the "Tree.com Businesses," which include LendingTree.com, RealEstate.com, GetSmart.com, LendingTree Loans, iNest and Domania.

**Basis of Presentation**

The historical consolidated financial statements of Tree.com and its subsidiaries reflect the contribution or other transfer to Tree.com of all of the subsidiaries and assets and the assumption by Tree.com of all of the liabilities relating to the Tree.com Businesses in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses. Accordingly, the historical consolidated financial statements of Tree.com reflect the historical financial position, results of operations and cash flows of the Tree.com Businesses since their respective dates of acquisition by IAC, based on the historical consolidated financial statements and accounting records of IAC and using the historical results of operations and historical bases of the assets and liabilities of the Tree.com Businesses with the exception of accounting for income taxes. For purposes of these financial statements, income taxes have been computed for Tree.com on an as if stand-alone, separate tax return basis. Intercompany transactions and accounts have been eliminated.

In the opinion of Tree.com's management, the assumptions underlying the historical consolidated financial statements of Tree.com are reasonable. However, this financial information does not necessarily reflect what the historical financial position, results of operations and cash flows of Tree.com would have been had Tree.com been a stand-alone company during the periods presented.

The accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and notes required by U.S. generally accepted accounting principles for complete financial statements. In the opinion of Tree.com's management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. Interim results are not necessarily indicative of the results that may be expected for a full year. The accompanying unaudited consolidated financial statements should be read in conjunction with Tree.com's audited consolidated financial statements and notes thereto for the year ended December 31, 2007.

F-40

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 1—ORGANIZATION (Continued)**

**Company Overview**

*Lending*

Lending consists of online networks (principally LendingTree.com and GetSmart.com) and call centers that connect consumers and financial providers in the lending industry. Tree.com also originates, processes, approves and funds various residential real estate loans through Home Loan Center ("HLC"), which does business as LendingTree Loans in certain jurisdictions. The HLC and LendingTree Loans brand names are collectively referred to in these consolidated financial statements as "LendingTree Loans." Additionally, Tree.com provides mortgage settlement services, including title search, appraisals, flood certification and closing transactions, under the name "LendingTree Settlement Services."

*Real Estate*

Real Estate consists of a proprietary full service real estate brokerage that operates in fourteen U.S. markets, *www.RealEstate.com*, an online network that connects consumers with real estate brokerages around the country, iNest, an online network that matches buyers and builders of new homes, and Domania, an online lead provider for banks, mortgage lenders and real estate professionals.

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES**

**Accounting Estimates**

Tree.com's management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles. These estimates and assumptions impact the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements include: reserves for losses associated with loans held for sale and loans that have been previously sold; the fair value of loans held for sale and related derivatives; the recoverability of long-lived assets; the recovery of goodwill and intangible assets; the determination of income taxes payable and deferred income taxes, including related valuation allowances; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

**Recent Accounting Pronouncements**

In December 2007, the Financial Accounting Standards Board ("FASB") issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements—an amendment of Accounting Research Bulletin No. 51" ("SFAS No. 160"). SFAS No. 160 establishes accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. The Statement also establishes reporting requirements that provide sufficient disclosures that clearly identify and distinguish between the interests of the parent and the

F-41

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)

interests of the noncontrolling owners. SFAS No. 160 is effective for fiscal years beginning after December 15, 2008. SFAS No. 160 will be applied prospectively, except as it relates to disclosures, for which the effects will be applied retrospectively for all periods presented. Early adoption is not permitted. Tree.com is currently assessing the impact of SFAS No. 160 on its consolidated financial position, results of operations and cash flows.

In December 2007, the FASB issued SFAS No. 141 (revised 2007), "Business Combinations" ("SFAS No. 141R"), which replaces FASB Statement No. 141. SFAS No. 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. The Statement also establishes disclosure requirements that will enable users to evaluate the nature and financial effects of the business combination. SFAS No. 141R applies prospectively to business combinations in fiscal years beginning after December 15, 2008. Early adoption is not permitted. Tree.com is currently assessing the impact of the adoption of SFAS No. 141R on its consolidated financial position, results of operations and cash flows.

## NOTE 3—GOODWILL AND INTANGIBLE ASSETS

The balance of goodwill and intangible assets, net is as follows (in thousands):

|  | March 31, 2008 | December 31, 2007 |
|---|---|---|
| Goodwill | $ 140,619 | $ 140,892 |
| Intangible assets with indefinite lives | 88,607 | 88,607 |
| Intangible assets with definite lives, net | 16,165 | 19,833 |
| Total goodwill and intangible assets, net | $ 245,391 | $ 249,332 |

Intangible assets with indefinite lives relate principally to trade names and trademarks acquired in various acquisitions. At March 31, 2008, intangible assets with definite lives relate to the following (in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 76,117 | $ (62,544) | $ 13,573 | 5.7 |
| Technology | 29,100 | (28,794) | 306 | 3.0 |
| Customer lists | 6,607 | (6,607) | — | 2.8 |
| Other | 8,928 | (6,642) | 2,286 | 4.9 |
| Total | $ 120,752 | $ (104,587) | $ 16,165 | |

F-42

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 3—GOODWILL AND INTANGIBLE ASSETS (Continued)**

At December 31, 2007, intangible assets with definite lives relate to the following (in thousands):

| | Cost | Accumulated Amortization | Net | Weighted Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 76,117 | $ (59,212) | $ 16,905 | 5.7 |
| Technology | 29,100 | (28,663) | 437 | 3.0 |
| Customer lists | 6,607 | (6,607) | — | 2.8 |
| Other | 8,928 | (6,437) | 2,491 | 4.9 |
| Total | $ 120,752 | $ (100,919) | $ 19,833 | |

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on December 31, 2007 balances, such amortization for the next five years is estimated to be as follows (in thousands):

| Years Ending December 31, | |
|---|---|
| 2008 | $ 10,883 |
| 2009 | 4,138 |
| 2010 | 2,768 |
| 2011 | 1,218 |
| 2012 | 826 |
| | $ 19,833 |

The following table presents the balance of goodwill by segment, including changes in the carrying amount of goodwill, for the three months ended March 31, 2008 (in thousands):

| | Balance as of January 1, 2008 | Additions | (Deductions) | Balance as of March 31, 2008 |
|---|---|---|---|---|
| Lending | $ 70,766 | $ — | $ (262) | $ 70,504 |
| Real Estate | 70,126 | — | (11) | 70,115 |
| Total | $ 140,892 | $ — | $ (273) | $ 140,619 |

Deductions principally relate to the establishment of deferred tax assets related to acquired tax attributes and the income tax benefit realized pursuant to the exercise of stock options assumed in a business acquisition that were vested at the transaction date and are treated as a reduction in goodwill when the income tax deductions are realized.

F-43

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 4—PROPERTY AND EQUIPMENT

The balance of property and equipment, net is as follows (in thousands):

|  | March 31, 2008 | December 31, 2007 |
|---|---|---|
| Computer equipment and capitalized software | $ 35,278 | $ 35,183 |
| Leasehold improvements | 3,204 | 3,076 |
| Furniture and other equipment | 3,923 | 3,737 |
| Projects in progress | 4,728 | 5,002 |
|  | 47,133 | 46,998 |
| Less: accumulated depreciation and amortization | (26,551) | (25,532) |
| Total property and equipment, net | $ 20,582 | $ 21,466 |

### NOTE 5—SEGMENT INFORMATION

The overall concept that Tree.com employs in determining its operating segments and related financial information is to present them in a manner consistent with how the chief operating decision maker and executive management view the businesses, how the businesses are organized as to segment management, and the focus of the businesses with regards to the types of products or services offered or the target market.

Tree.com's primary metric is Operating Income Before Amortization, which is defined as operating income excluding, if applicable: (1) non-cash compensation expense, (2) amortization of intangibles and goodwill impairment, (3) pro forma adjustments for significant acquisitions, and (4) one-time items. Tree.com believes this measure is useful to investors because it represents the operating results from Tree.com's segments taking into account depreciation, which it believes is an ongoing cost of doing business, but excluding the effects of any other non-cash expenses. Operating Income Before Amortization has certain limitations in that it does not take into account the impact to Tree.com's statement of operations of certain expenses, including non-cash compensation, and acquisition related accounting.

The following tables reconcile Operating Income Before Amortization to operating loss for Tree.com's operating segments and to net loss in total (in thousands):

|  | For the Three Months Ended March 31, 2008: | | | |
|---|---|---|---|---|
|  | Operating Income Before Amortization | Non-Cash Compensation Expense | Amortization of Intangibles | Operating Loss |
| Lending | $ (1,298) | $ (391) | $ (2,560) | $ (4,249) |
| Real Estate | (3,966) | (165) | (1,108) | (5,239) |
| Total | $ (5,264) | $ (556) | $ (3,668) | $ (9,488) |
| Other expense, net |  |  |  | (102) |
| Loss before income taxes |  |  |  | (9,590) |
| Income tax provision |  |  |  | (209) |
| Net loss |  |  |  | $ (9,799) |

F-44

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 5—SEGMENT INFORMATION (Continued)

|  | For the Three Months Ended March 31, 2007: | | | |
|  | Operating Income Before Amortization | Non-Cash Compensation Expense | Amortization of Intangibles | Operating Loss |
|---|---|---|---|---|
| Lending | $ 3,239 | $ (742) | $ (2,890) | $ (393) |
| Real Estate | (6,248) | (379) | (1,384) | (8,011) |
| Total | $ (3,009) | $ (1,121) | $ (4,274) | (8,404) |
| Other expense, net |  |  |  | (209) |
| Loss before income taxes |  |  |  | (8,613) |
| Income tax benefit |  |  |  | 3,490 |
| Net loss |  |  |  | $ (5,123) |

Non-cash compensation expense in the tables above is included in the following line items in the accompanying consolidated statements of operations for the three months ended March 31, 2008 and 2007 (in thousands):

|  | Three Months Ended March 31, | |
|  | 2008 | 2007 |
|---|---|---|
| Cost of revenue | $ 37 | $ 79 |
| Selling and marketing expense | 41 | 85 |
| General and administrative expense | 477 | 956 |
| Product development | 1 | 1 |
| Non-cash compensation expense | $ 556 | $ 1,121 |

|  | Three Months Ended March 31, | |
|  | 2008 | 2007 |
|  | (In thousands) | |
|---|---|---|
| **Revenue:** |  |  |
| Origination and sale of loans | $ 28,007 | $ 48,617 |
| Match fees | 19,858 | 23,749 |
| Closed loan fees | 10,741 | 18,823 |
| Other | 3,205 | 5,579 |
| Lending | 61,811 | 96,768 |
| Real Estate | 8,382 | 13,231 |
| **Total** | $ 70,193 | $ 109,999 |

Tree.com maintains operations solely in the United States.

**NOTE 6—FAIR VALUE MEASUREMENTS**

Effective January 1, 2008, Tree.com adopted SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"). In accordance with SFAS No. 157, Tree.com categorizes its assets and liabilities measured at

F-45

TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 6—FAIR VALUE MEASUREMENTS (Continued)**

fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- Level 1: Observable inputs such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- Level 2: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

- Level 3: Unobservable inputs for which there is little or no market data and require Tree.com to develop its own assumptions, based on the best information available in the circumstances, about the assumptions market participants would use in pricing the asset or liability.

The following table presents Tree.com's assets and liabilities that are measured at fair value on a recurring basis at March 31, 2008 (in thousands):

| | Recurring Fair Value Measurements Using | | | |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
|---|---|---|---|---|
| Loans held for sale | $ — | $ 87,532 | $ — | $ 87,532 |
| Net derivatives related to loans held for sale and interest rate lock commitments | — | (1,612) | 5,264 | 3,652 |
| Total | $ — | $ 85,920 | $ 5,264 | $ 91,184 |

The following table presents the changes in Tree.com's assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

| | Net Derivatives Related to Loans Held for Sale and Interest Rate Lock Commitments |
|---|---|
| Balance at January 1, 2008 | $ 3,465 |
| Total net gains or losses (realized and unrealized): | |
| Included in earnings | 15,361 |
| Included in other comprehensive income | — |
| Transfers of IRLCs to closed loans | (13,094) |
| Transfers in and/or out of Level 3 | (468) |
| Balance at March 31, 2008 | $ 5,264 |

F-46

TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 6—FAIR VALUE MEASUREMENTS (Continued)**

The following table presents the gains and losses included in earnings for the three months ended March 31, 2008 relating to Tree.com's assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

|  | Net Derivatives Related to Loans Held for Sale and Interest Rate Lock Commitments |
|---|---|
| Total gains included in earnings for the three months ended March 31, 2008, which are included in revenue | $ 15,361 |
| Change in unrealized gains relating to assets and liabilities still held at March 31, 2008, which are included in revenue | $ 5,264 |

**Net derivatives related to loans held for sale and interest rate lock commitments**

LendingTree Loans hedges the changes in fair value of certain loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continues to enter into forward delivery contracts for risk management purposes, effective April 1, 2007 it no longer designates these derivatives as hedges for accounting purposes. When hedge accounting was discontinued, the affected loans held for sale were no longer adjusted for changes in fair value. However, the changes in fair value of the forward delivery contracts continued to be recognized in current earnings as a component of revenue. The fair value of the forward delivery contracts is recorded in "Prepaid and other current assets" and/or "Accrued expenses and other current liabilities" in the accompanying consolidated balance sheets. For the three months ended March 31, 2008, Tree.com recognized losses of less than $0.1 million related to the changes in fair value of forward delivery contracts related to loans held for sale.

LendingTree Loans enters into commitments with consumers to originate loans at a locked in interest rate (interest rate lock commitments—"IRLCs"). Tree.com reports IRLCs as derivative instruments at fair value in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS No. 133"). Accordingly, LendingTree Loans determines the fair value of IRLCs using current secondary market prices for underlying loans with similar coupons, maturity and credit quality, subject to the anticipated loan funding probability, or fallout factor. The fair value of IRLCs is subject to change primarily due to changes in interest rates and fallout factors. Under LendingTree Loans' risk management policy, LendingTree Loans hedges the changes in fair value of IRLCs primarily by entering into mortgage forward delivery contracts which can reduce the volatility of economic outcomes. Neither the IRLCs nor the related hedging instrument qualify for hedge accounting and both are recorded at fair value with changes in fair value being recorded in current earnings as a component of revenue in the statement of operations.

Prior to the adoption of SFAS No. 157 the recognition of gains and losses at the inception of a derivative contract were prohibited unless the fair value of the contract was evidenced by a quoted price in an active market. As no active market exists for IRLCs, such day one gains and losses were not recognized until the related loan was sold. Prior to January 1, 2008, guidance also prohibited including the value of servicing the loan in calculating the fair value of an IRLC. Such guidance was rescinded by Staff Accounting Bulletin No. 109, "Written Loan Commitments Recorded at Fair Value Through

F-47

TREE.COM, INC. AND SUBSIDIARIES

#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

#### NOTE 6—FAIR VALUE MEASUREMENTS (Continued)

Earnings" ("SAB 109"). Accordingly, with the adoption of SFAS No. 157 and SAB 109 on January 1, 2008, the day one gains and servicing value, adjusted by the loan funding probability, are included in the value of IRLCs.

The net change in fair value of the IRLCs and related forward delivery contracts for the three months ended March 31, 2008 and 2007 resulted in gains of $14.8 million and losses of $0.3 million, respectively, which have been recognized in the accompanying consolidated statements of operations. The significant change year over year is due principally to the inclusion of day one gains and the value of servicing the loan in 2008 associated with the adoption of SFAS No. 157 and SAB 109. The IRLCs are recorded in "Prepaid and other current assets" and/or "Accrued expenses and other current liabilities" in the accompanying consolidated balance sheets. At March 31, 2008, there was $254.1 million of IRLCs notional value outstanding.

Effective January 1, 2008 Tree.com adopted SFAS No. 159 "The Fair Value Option for Financial Assets and Financial Liabilities Including an amendment of FASB Statement No. 115" ("SFAS No. 159"). SFAS No. 159 permits entities to choose to measure certain financial instruments at fair value with the objective of reducing both the complexity in the accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. Upon adoption, Tree.com elected to account for loans held for sale issued after January 1, 2008 at fair value. Electing the fair value option allows a better offset of the changes in fair values of the loans and the forward delivery contracts used to economically hedge them without the burden of complying with the requirements for hedge accounting under SFAS No. 133.

Tree.com did not elect the fair value option on loans held for sale of $3.7 million originated prior to January 1, 2008. These loans are carried at the lower of cost or market value determined on an aggregate basis except for loans that are impaired, which are assessed on an individual basis. The fair value of impaired loans at March 31, 2008, measured based on significant unobservable inputs (Level 3) was $2.9 million. The fair value of impaired loans is measured on a non-recurring basis and is based on management's best estimate of the market value of such loans and considers reprice bids received from the investors prior to repurchase, if applicable, or current bids in the secondary market for similar loans and represent management's best estimate of the market value of such loans.

During the three months ended March 31, 2008, the change in fair value of loans held for sale for which the fair value option has been elected was a loss of $0.1 million and is included as a component of revenue in the accompanying consolidated statement of operations.

The following table presents the difference between the aggregate fair value and the aggregate unpaid principal balance of loans held for sale at March 31, 2008 for which the fair value option has been elected (in thousands):

|  | Aggregate Fair Value | Aggregate Unpaid Principal Balance | Difference |
|---|---|---|---|
| Loans held for sale | $ 87,532 | $ 84,952 | $ 2,580 |

For the quarter ended March 31, 2008 and 2007, LendingTree Loans sold approximately 3,100 and 12,700 loans, respectively, with initial loan values of $606.4 million and $1.9 billion, respectively. From loans sold in those periods, LendingTree Loans has not experienced any repurchase and indemnification losses.

F-48

TREE.COM, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 7—INCOME TAXES**

Tree.com calculates its interim income tax provision in accordance with Accounting Principles Board Opinion No. 28 and FASB Interpretation No. 18. At the end of each interim period, Tree.com makes its best estimate of the annual expected effective tax rate and applies that rate to its ordinary year-to-date earnings or loss. The tax or benefit related to significant, unusual, or extraordinary items that will be separately reported or reported net of their related tax effect are individually computed and recognized in the interim period in which those items occur. In addition, the effect of changes in enacted tax laws or rates, tax status, or judgment on the realizability of a beginning-of-the-year deferred tax asset in future years is recognized in the interim period in which the change occurs.

The computation of the annual expected effective tax rate at each interim period requires certain estimates and assumptions including, but not limited to, the expected operating income for the year, permanent and temporary differences, and the likelihood of recovering deferred tax assets generated in the current year. The accounting estimates used to compute the provision for income taxes may change as new events occur, more experience is acquired, additional information is obtained or Tree.com's tax environment changes. To the extent that the estimated annual effective tax rate changes during a quarter, the effect of the change on prior quarters is included in tax expense for the current quarter.

For the three months ended March 31, 2008, Tree.com recorded a tax provision of $0.2 million despite a loss from operations, due principally to an increase in valuation allowance on deferred tax assets. For the three months ended March 31, 2007, Tree.com recorded a tax benefit of $3.5 million on a pre-tax loss of $8.6 million, which represents an effective tax rate of 41%. This tax benefit is higher than the federal statutory rate of 35% due principally to state taxes.

As of December 31, 2007 and March 31, 2008, Tree.com had unrecognized tax benefits of approximately $4.4 million. Included in unrecognized tax benefits at March 31, 2008 is approximately $3.6 million for tax positions included in IAC's consolidated tax return filings that will remain a liability of IAC after the spin-off. Tree.com recognizes interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. There were no material accruals for interest for the quarter ended March 31, 2008. At March 31, 2008, Tree.com has accrued $1.5 million for the payment of interest. There are no material accruals for penalties.

By virtue of previously filed separate company and consolidated tax returns with IAC, Tree.com is routinely under audit by federal, state, local and foreign authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by Tree.com are recorded in the period they become known.

The Internal Revenue Service is currently examining the IAC consolidated tax returns for the years ended December 31, 2001 through 2003, which includes the operations of Tree.com from August 8, 2003, the date which Tree.com joined the IAC consolidated tax return. The statute of limitations for these years has been extended to December 31, 2008. Various IAC consolidated tax returns filed with state, local and foreign jurisdictions are currently under examination, the most significant of which are California, Florida, New York state and New York City, for various tax years after December 31, 2001. These examinations are expected to be completed by late 2008.

F-49

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 7—INCOME TAXES (Continued)**

Tree.com believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $2.7 million within twelve months of the current reporting date due to the reversal of deductible temporary differences which will result in a corresponding increase in net deferred tax liabilities. An estimate of other changes in unrecognized tax benefits cannot be made, but are not expected to be significant.

**NOTE 8—CONTINGENCIES**

On November 24, 2003, IMX, Inc. ("IMX") filed suit against Tree.com alleging infringement of a patent held by IMX and seeking damages related to the alleged infringement. A trial was conducted in January 2006 and a verdict was returned finding infringement by Tree.com and awarding IMX $5.8 million in damages. Tree.com established a reserve of $5.8 million in its 2005 financial statements related to this claim. In January 2007, the court enhanced the damages award and rejected Tree.com's counterclaim. During 2006, Tree.com increased the reserve by $6.3 million to $12.1 million at December 31, 2006. During 2007, the court awarded IMX supplemental damages and pre-judgment and post-judgment interest. During 2007, Tree.com increased the reserve by $0.8 million to $12.8 million at December 31, 2007. During 2008, Tree.com increased the reserve by $0.1 million to $12.9 million at March 31, 2008. Tree.com has appealed this judgment to the U.S. Court of Appeals for the Federal Circuit. Tree.com intends to continue to contest this case through all available means. In connection with the appeal, Tree.com's parent, IAC, executed a guarantee of $13.5 million in lieu of posting a bond. Before IAC completes the spin-off, Tree.com will be required to post a bond in a like amount.

HLC is party to various employment related lawsuits. During 2006, Tree.com established a reserve of $0.4 million for certain of these actions. During 2007, an additional reserve of $2.1 million was recorded. The balance of the related liability was $2.5 million at March 31, 2008 and December 31, 2007, respectively.

In the ordinary course of business, Tree.com is a party to various lawsuits. Tree.com establishes reserves for specific legal matters when it determines that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where it believes an unfavorable outcome is not probable and, therefore, no reserve is established. Although management currently believes that an unfavorable resolution of claims against Tree.com, including claims where an unfavorable outcome is reasonably possible, will not have a material impact on the liquidity, results of operations, or financial condition of Tree.com, these matters are subject to inherent uncertainties and management's view of these matters may change in the future. It is possible that an unfavorable outcome of one or more of these lawsuits could have a material impact on the liquidity, results of operations, or financial condition of Tree.com. Tree.com also evaluates other contingent matters, including tax contingencies, to assess the probability and estimated extent of potential loss. See Note 7 for discussion related to income tax contingencies.

**NOTE 9—RELATED PARTY TRANSACTIONS**

Tree.com's expenses include allocations from IAC of costs associated with IAC's accounting, treasury, legal, tax, corporate support, human resources and internal audit functions. These expenses were allocated based on the ratio of Tree.com's revenue as a percentage of IAC's total revenue. Allocated costs were $0.2 million and $0.3 million for the three months ended March 31, 2008 and 2007, respectively, and are included in "General and administrative expense" in the accompanying

F-50

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 9—RELATED PARTY TRANSACTIONS (Continued)**

consolidated statements of operations. It is not practicable to determine the amounts of these expenses that would have been incurred had Tree.com operated as an unaffiliated entity. In the opinion of management, the allocation method is reasonable.

An analysis of Tree.com's payables to IAC and subsidiaries is as follows (in thousands):

|  | March 31, 2008 |
|---|---:|
| Payables to IAC and subsidiaries at December 31, 2007 | $ (20,067) |
| Cash transfers related from IAC's centrally managed U.S. treasury function | (17,402) |
| Interest expense | (32) |
| Employee equity instruments and associated tax withholdings | 330 |
| Taxes (excludes tax withholdings associated with employee equity instruments) | 73 |
| Allocation of non-cash compensation expense | (471) |
| Administrative expenses and other | (4,668) |
| Payables to IAC and subsidiaries at March 31, 2008 | $ (42,237) |

**Relationship Between IAC and Tree.com after the Spin-Off**

For purposes of governing certain of the ongoing relationships between Tree.com and IAC at and after the spin-off, and to provide for an orderly transition, Tree.com and IAC are expected to enter into a separation agreement, a tax sharing agreement, an employee matters agreement and a transition services agreement (the "Spin-Off Agreements"), among other agreements. See Tree.com's consolidated financial statements for the year ended December 31, 2007 for descriptions of the Spin-Off Agreements.

F-51

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

### Item 13.   Other Expenses Of Issuance And Distribution

The following is a statement of the expenses (all of which are estimated other than the SEC registration fee) to be incurred by the Registrant in connection with the distribution of the securities registered under this registration statement:

| Item | Amount |
|------|-------:|
| SEC Registration Fee | $ 9.61 |
| Printing Fees and Expenses | 100,000 |
| Nasdaq Listing Fee | 100,000 |
| Legal Fees and Expenses | 250,000 |
| Accounting Fees and Expenses | 20,000 |
| Miscellaneous | — |
| Total | $ 520,009.61 |

\*      All fees are estimates except SEC registration fee and Nasdaq listing fee.

### Item 14.   Indemnification Of Directors And Officers

Section 145 of the DGCL provides that a corporation may indemnify directors and officers as well as other employees and individuals against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, in which such person is made a party by reason of the fact that the person is or was a director, officer, employee or agent of the corporation (other than an action by or in the right of the corporation—a "derivative action"), if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. A similar standard is applicable in the case of derivative actions, except that indemnification only extends to expenses (including attorneys' fees) incurred in connection with the defense or settlement of such action, and the statute requires court approval before there can be any indemnification where the person seeking indemnification has been found liable to the corporation. The statute provides that it is not exclusive of other indemnification that may be granted by a corporation's by-laws, disinterested director vote, stockholder vote, agreement or otherwise.

Our Amended and Restated Certificate of Incorporation provides that no director shall be liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation on liability is not permitted under the DGCL, as now in effect or as amended. Currently, Section 102(b)(7) of the DGCL requires that liability be imposed for the following:

- any breach of the director's duty of loyalty to the Company or its stockholders;

- any act or omission not in good faith or which involved intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL; and

- any transaction from which the director derived an improper personal benefit.

Our by-laws provide that, to the fullest extent authorized by the DGCL, as now in effect or as amended, we will indemnify any person who was or is a party or is threatened to be made a party to any action, suit or proceeding by reason of the fact that such person, or a person of whom he or she is

the legal representative, is or was a director or officer of the Company or by reason of the fact such person, or a person of whom he or she is the legal representative is or was serving, at the Company's request, as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans maintained or sponsored by the Company. To the extent authorized by the DGCL, the Company will indemnify such persons against all expenses, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such persons in connection with such service. Any amendment of these provisions will not reduce the indemnification obligations of the Company relating to actions taken before such amendment.

The Company intends to obtain policies that insure its directors and officers and those of its subsidiaries against certain liabilities they may incur in their capacity as directors and officers. Under these policies, the insurer, on behalf of the Company, may also pay amounts for which the Company has granted indemnification to the directors or officers.

## Item 15.  Recent Sales of Registered Securities

None.

## Item 16.  Exhibits and Financial Statement Schedules

(a)      See Exhibit Index.

(b)      See Schedule II—Valuation and Qualifying Accounts.

## Item 17.  Undertakings

The undersigned Registrant hereby undertakes:

(1)   To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)      To include any prospectus required by section 10(a)(3) of the Securities Act of 1933;

(ii)     To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) under the Securities Act of 1933 if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement.

(iii)    To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

(2)   That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)   To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

II-2

(4)   That, for the purpose of determining liability under the Securities Act of 1933 to any purchaser:

If the registrant is subject to Rule 430C under the Securities Act of 1933, each prospectus filed pursuant to Rule 424(b) under the Securities Act of 1933 as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A under the Securities Act of 1933, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. *Provided, however,* that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(5)   That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities:

The undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)   Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424 under the Securities Act of 1933;

(ii)   Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii)   The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv)   Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(6)   Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

II-3

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on August 8, 2008.

TREE.COM, INC.

By:                       /s/  GREGORY R. BLATT
_____

Gregory R. Blatt
*Vice President and Assistant Secretary*

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| *<br>_____<br>Douglas R. Lebda | Chairman, Chief Executive Officer and Director (Principal executive officer) | August 8, 2008 |
| *<br>_____<br>Matthew Packey | Chief Financial Officer and Chief Accounting Officer (Principal financial officer and principal accounting officer) | August 8, 2008 |

*By:          /s/  GREGORY R. BLATT
_____

Gregory R. Blatt,
*Attorney-in-fact*

II-4

## INDEX TO EXHIBITS

| Exhibit | Description |
|---|---|
| 2.1 | Form of Separation and Distribution Agreement by and among HSN, Inc., Interval Leisure Group, Inc., Ticketmaster, Tree.com, Inc. and IAC/InterActiveCorp** |
| 3.1 | Form of Amended and Restated Certificate of Incorporation of Tree.com, Inc. |
| 3.2 | Form of By-laws of Tree.com, Inc.** |
| 5.1 | Opinion of the General Counsel of IAC/InterActiveCorp regarding the legality of the securities being issued |
| 8.1 | Opinion of Wachtell, Lipton, Rosen & Katz regarding tax matters |
| 10.1 | Form of Tax Sharing Agreement among HSN, Inc., Interval Leisure Group, Inc., Ticketmaster, Tree.com, Inc. and IAC/InterActiveCorp** |
| 10.2 | Form of Transition Services Agreement among HSN, Inc., Interval Leisure Group, Inc., Ticketmaster, Tree.com, Inc. and IAC/InterActiveCorp** |
| 10.3 | Form of Employee Matters Agreement among HSN, Inc., Interval Leisure Group, Inc., Ticketmaster, Tree.com, Inc. and IAC/InterActiveCorp** |
| 10.4 | Spinco Agreement, dated as of May 13, 2008, between IAC/InterActiveCorp, Liberty Media Corporation, LMC Silver King, Inc., Liberty HSN II, Inc., LMC USA VIII, Inc., LMC USA IX, Inc., LMC USA XI, Inc., LMC USA XII, Inc., LMC USA XIII, Inc., LMC USA XIV, Inc., LMC USA XV, Inc., Liberty Tweety, Inc., BDTV Inc., BDTV II Inc., BDTV III Inc., BDTV IV Inc. and Barry Diller (filed as Exhibit 10.1 to IAC/InterActiveCorp's Current Report on Form 8-K (SEC File No. 0-20570) dated May 16, 2008 and incorporated herein by reference) |
| 10.5 | Employment Agreement between Robert L. Harris and LendingTree, LLC, dated as of June 30, 2008†** |
| 10.6 | Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of January 7, 2008†** |
| 10.7 | Employment Agreement between Bret A. Violette and IAC/InterActiveCorp, dated as of April 11, 2007†** |
| 10.8 | Amended and Restated Restricted Share Grant and Shareholders' Agreement, dated as of July 7, 2003, by and among Forest Merger Corp., LendingTree, Inc., InterActiveCorp and the Grantees named therein, as amended (filed as Exhibit 99.4 to Amendment No. 1 to IAC/InterActiveCorp's Registration Statement on Form S-4 (SEC File No. 333-105876) filed on July 10, 2003 and incorporated herein by reference)† |
| 10.9 | Correspondent Loan Purchase Agreement, dated as of April 26, 2004, between CitiMortgage, Inc. and Home Loan Center, Inc.** |
| 10.10 | Loan Purchase Agreement, dated as of April 16, 2002, between Countrywide Home Loans, Inc. and Home Loan Center, Inc.** |
| 10.11 | Tree.com, Inc. 2008 Stock and Annual Incentive Plan†** |
| 10.12 | Warehousing Credit Agreement, dated as of November 26, 2007, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein)** |
| 10.13 | Master Repurchase Agreement, dated as of January 25, 2008, by and among Countrywide Bank, FSB and Home Loan Center, Inc. (the "Master Repurchase Agreement")** |

| 10.14 | Notice, dated June 25, 2008, issued by Countrywide Warehouse Lending, regarding certain amendments to the Master Repurchase Agreement** |
|---|---|
| 10.15 | Deferred Compensation Plan for Non-Employee Directors†** |
| 10.16 | Employment Agreement between Matt Packey and LendingTree, LLC, dated as of August 3, 2008† |
| 21.1 | Subsidiaries of Tree.com, Inc.** |
| 23.1 | Consent of Ernst & Young LLP |
| 23.2 | Consent of the General Counsel of IAC/InterActiveCorp (included in Exhibit 5.1) |
| 23.3 | Consent of Wachtell, Lipton, Rosen & Katz (included in Exhibit 8.1) |
| 24.1 | Power of Attorney (included in signature page)** |
| 99.1 | Consent of Peter C. Horan to being named as a director** |
| 99.2 | Consent of Joseph Levin to being named as a director** |
| 99.3 | Consent of Lance Melber to being named as a director** |
| 99.4 | Consent of Steven Ozonian to being named as a director** |
| 99.5 | Letter to stockholders of IAC/InterActiveCorp |
| 99.6 | Supplemental Quarterly Financial Data for the Year Ended December 31, 2007** |

†      Reflects management contracts and management and director compensatory plans

**     Previously filed

QuickLinks

EXPLANATORY NOTE
TREE.COM, INC.
16,654,428 Shares of Common Stock, Par Value $0.01 Per Share
TABLE OF CONTENTS
SUMMARY
QUESTIONS AND ANSWERS ABOUT TREE.COM AND THE SPIN-OFFS
RISK FACTORS
RISK FACTORS RELATING TO OUR SPIN-OFF FROM IAC
RISK FACTORS RELATING TO OUR BUSINESS FOLLOWING TREE.COM'S SPIN-OFF FROM IAC
FORWARD-LOOKING STATEMENTS
THE SEPARATION
TREATMENT OF OUTSTANDING IAC COMPENSATORY EQUITY-BASED AWARDS
DIVIDEND POLICY
TRANSFERS TO IAC AND FINANCING
CERTAIN INFORMATION WITH RESPECT TO TREE.COM
BUSINESS OF TREE.COM
CAPITALIZATION
SELECTED HISTORICAL FINANCIAL DATA
TREE.COM, INC. AND SUBSIDIARIES UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
TREE.COM, INC. AND SUBSIDIARIES UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET MARCH 31, 2008
TREE.COM, INC. AND SUBSIDIARIES UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS THREE MONTHS ENDED MARCH 31, 2008
TREE.COM, INC. AND SUBSIDIARIES UNAUDITED PRO FORMA CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS YEAR ENDED DECEMBER 31, 2007
TREE.COM, INC. AND SUBSIDIARIES NOTES TO UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF TREE.COM
MANAGEMENT OVERVIEW
FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES
CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS
FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES
CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS
TREE.COM'S PRINCIPLES OF FINANCIAL REPORTING
QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
Tree.com Security Ownership of Certain Beneficial Owners and Management
DESCRIPTION OF CAPITAL STOCK OF TREE.COM
CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS
DESCRIPTION OF THE STOCK AND ANNUAL INCENTIVE PLAN
USE OF PROCEEDS
DETERMINATION OF OFFERING PRICE
LEGAL MATTERS
EXPERTS
WHERE YOU CAN FIND MORE INFORMATION
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS
TABLE OF CONTENTS
Report of Independent Registered Public Accounting Firm
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF OPERATIONS
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
TREE.COM, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Schedule II

TREE.COM AND SUBSIDIARIES VALUATION AND QUALIFYING ACCOUNTS
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY (Unaudited)
TREE.COM, INC. AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)
TREE.COM, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
PART II
INFORMATION NOT REQUIRED IN PROSPECTUS

Item 13. Other Expenses Of Issuance And Distribution
Item 14. Indemnification Of Directors And Officers
Item 15. Recent Sales of Registered Securities
Item 16. Exhibits and Financial Statement Schedules
Item 17. Undertakings

SIGNATURES
INDEX TO EXHIBITS

Exhibit 3.1

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### TREE.COM, INC.

Tree.com, Inc. (the "Corporation"), a corporation organized and existing under the laws of the State of Delaware, hereby certifies that:

1.    The original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on April 14, 2008.

2.    The name under which the Corporation was initially incorporated is Tree.com, Inc.

3.    This Amended and Restated Certificate of Incorporation restates and amends in its entirety the Certificate of Incorporation of the Corporation.

4.    This Amended and Restated Certificate of Incorporation was duly adopted by the Board of Directors of the Corporation and by the sole stockholder of the Corporation in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware (the "DGCL").

5.    The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in full as follows:

FIRST:       The name of the corporation is Tree.com, Inc. (the "Corporation").

SECOND:      The address of the registered office of the Corporation in the State of Delaware is c/o National Registered Agents, Inc., 160 Greentree Drive, Suite 101, City of Dover, County of Kent, State of Delaware 19904. The name of the registered agent of the Corporation at that address is National Registered Agents, Inc.

THIRD:      The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State

<center>1</center>

of Delaware (the "DGCL").

FOURTH:    A.    The total number of shares of all classes of stock which the Corporation shall have authority to issue is fifty-five million (55,000,000), consisting of fifty million (50,000,000) shares of Common Stock, par value one cent ($.01) per share (the "Common Stock") and five million (5,000,000) shares of Preferred Stock, par value one cent ($.01) per share (the "Preferred Stock").

B.    The board of directors (the "Board") is authorized, subject to any limitations prescribed by law, to provide for the issuance of shares of Preferred Stock in series, and by filing a certificate pursuant to the applicable law of the State of Delaware (such certificate being hereinafter referred to as a "Preferred Stock Designation"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences, and rights of the shares of each such series and any qualifications, limitations or restrictions thereof. The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the then-outstanding shares of capital stock of the Corporation entitled to vote thereon, without a vote of the holders of the Preferred Stock, or of any series thereof, unless a vote of any such holders is required pursuant to the terms of any Preferred Stock Designation.

C.    Each outstanding share of Common Stock shall entitle the holder thereof to one vote on each matter properly submitted to the stockholders of the Corporation for their vote; provided, however, that, except as otherwise required by law, holders of Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any Preferred Stock Designation relating to any series of Preferred

<center>2</center>

Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Preferred Stock Designation relating to any series of Preferred Stock).

FIFTH:      The Corporation elects not to be governed by Section 203 of the DGCL.

SIXTH:      The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

A.    The business and affairs of the Corporation shall be managed by or under the direction of the Board. In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the by-laws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

B.    The directors of the Corporation need not be elected by written ballot unless the by-laws so provide.

C.    Subject to the rights of the holders of any series of Preferred Stock, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by such stockholders.

D.    Except as otherwise required by law and subject to the rights of the holders

<center>3</center>

of any series of Preferred Stock, special meetings of the stockholders of the Corporation may be called only by or at the direction of the Board or by a person specifically designated with such authority by the Board.  Stockholders are not entitled to call special meetings.

<span style="padding-left:6em">SEVENTH</span>:          A.          Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, the number of directors shall be fixed from time to time exclusively by the Board pursuant to a resolution adopted by a majority of the Board.

B.          Subject to the rights of the holders of any series of Preferred Stock then outstanding, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board resulting from death, resignation, retirement, disqualification, removal from office or other cause shall, unless otherwise required by law or by resolution of the Board, be filled only by a majority vote of the directors then in office, though less than a quorum (and not by stockholders). Any director so chosen shall hold office for a term expiring at the next annual meeting of stockholders and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, retirement, disqualification, removal from office or other reason.

C.          Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the by-laws of the Corporation.

<span style="padding-left:3em">EIGHTH</span>:          The Board is expressly empowered to adopt, amend or repeal by-laws of the Corporation.

<span style="padding-left:3em">NINTH</span>:          A director of the Corporation shall not be personally liable to the

<div align="center">4</div>

Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

Any repeal or modification of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

<span style="padding-left:3em">TENTH</span>:          The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation.

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed by its duly authorized officer this [     ] day of August, 2008.

<div align="center">TREE.COM, INC.</div>

By:          Scott A. Cammarn
Title:          Corporate Secretary

<div align="center">5</div>

EX-5.1 3 a2187231zex-5_1.htm EXHIBIT 5.1

Exhibit 5.1

August 8, 2008

Tree.com, Inc.
11115 Rushmore Drive
Charlotte, NC 28277

Re:    Registration Statement on Form S-1 of Tree.com, Inc.

Ladies and Gentlemen:

I am the Executive Vice President, General Counsel and Secretary of IAC/InterActiveCorp, a Delaware corporation ("IAC"). This opinion is being delivered in connection with the preparation and filing of a Registration Statement on Form S-1 (the "Registration Statement") relating to the registration under the Securities Act of 1933, as amended (the "Securities Act"), which relates to 16,654,428 shares (the "Securities") of common stock ("Common Stock"), par value $.01 per share, of Tree.com, Inc.  (the "Company"), which will be issued (i) in connection with spin-off transaction, (ii) in respect of certain equity-based awards previously issued pursuant to IAC's equity incentive plans that will be converted, in whole or in part, in connection with the spin-off into equity-based awards under the Tree.com, Inc. 2008 Stock and Annual Incentive Plan (the "Stock and Annual Incentive Plan"), (iii) in respect of equity-based awards that may be granted from time to time following the spin-off pursuant to the Stock and Annual Incentive Plan and (iv) pursuant to the Tree.com, Inc. Deferred Compensation Plan for Non-Employee Directors (such IAC equity incentive plans, the Stock and Annual Incentive Plan and the Tree.com, Inc. Deferred Compensation Plan for Non-Employee Directors, the "Plans").

In rendering this opinion, I have (i) examined such corporate records and other documents (including the Company's charter and bylaws as currently in effect, the Company's charter and bylaws that will take effect upon the consummation of the spin-off transaction and the Registration Statement and the exhibits thereto), and have reviewed such matters of law, as I have deemed necessary or appropriate, (ii) assumed the genuineness of all signatures or instruments relied upon by me, and the conformity of certified copies submitted to me with the original documents to which such certified copies relate, and (iii) have further assumed that there will be no changes in applicable law between the date of effectiveness of the Registration Statement and the dates on which the Securities are issued or sold pursuant to the Registration Statement.

The Company is a Delaware corporation, and while I am not engaged in the practice of law in the State of Delaware, I am generally familiar with the Delaware General Corporation Law as presently in effect and have made such inquires as I considered necessary to render this opinion.  I am a member of the Bar of the State of New York and express no opinion as to the laws of any jurisdiction other than the federal laws of the United States, the laws of the State of New York and the Delaware General Corporation Law.

Based on and subject to the foregoing, I am of the opinion that the Securities will be, upon issuance and delivery pursuant to the terms and conditions as set forth in the Registration Statement, legally issued, fully paid and nonassessable.

I hereby consent to be named in the Registration Statement and in the related prospectus contained therein as the attorney who passed upon the legality of the Securities and to the filing of a copy of this opinion as Exhibit 5.1 to the Registration Statement. In giving such consent, I do not thereby admit that I am in the category of persons whose consent is required under Section 7 of the Securities Act of 1933.

Very truly yours,

/s/ Gregory R. Blatt

Executive Vice President, General
Counsel and Secretary of IAC/InterActiveCorp

EX-8.1 4 a2187231zex-8_1.htm EXHIBIT 8.1

Exhibit 8.1

[WLRK Letterhead]

August 8, 2008

Tree.com, Inc.
11115 Rushmore Drive
Charlotte, NC 28277

Ladies and Gentlemen:

Reference is made to the Registration Statement on Form S-1 (as amended through the date hereof, the "Registration Statement") of Tree.com, Inc., a Delaware corporation ("Tree.com"), including the Prospectus, forming a part thereof, relating to the proposed spin-off of Tree.com from IAC/InterActiveCorp ("IAC") and the related transactions contemplated to occur prior to or contemporaneously with the spin-off of Tree.com.

We hereby confirm that, subject to the limitations and qualifications set forth therein, the section of the Registration Statement entitled "The Separation—Material U.S. Federal Income Tax Consequences of the Spin-Offs" contains our opinion as to the material U.S. federal income tax consequences of the spin-offs to U.S. holders of IAC common stock (the "Opinion").

In providing the Opinion, we have assumed that (i) the transactions contemplated by the "Request for Rulings pursuant to Sections 301, 332, 355, 368(a)(1)(D) and related provisions of the Code with respect to the proposed distributions by IAC/InterActiveCorp that will effectuate the separation of the IAC group into five publicly-traded corporations" submitted by IAC to the Internal Revenue Service on April 11, 2008, together with the appendices and exhibits thereto, and any supplemental filings or other materials subsequently submitted to the Internal Revenue Service through the date hereof (the "Ruling Request") will be consummated in accordance therewith and as described in the Registration Statement (and no transaction or condition described therein and affecting the Opinion will be waived by any party), (ii) the

statements concerning the transactions and the parties thereto set forth in the Ruling Request and in the Registration Statement are true, complete and correct, (iii) the facts and representations (other than conclusions of law, if any) made in the Ruling Request are true, complete and correct and will remain true, complete and correct at all times up to and including the date of the spin-offs, and (iv) IAC and Tree.com (and each of the other Spincos) and their respective subsidiaries will report the spin-offs for U.S. federal income tax purposes in a manner consistent with the Opinion. If any of the above described assumptions are untrue for any reason or if the spin-offs are consummated in a manner that is different from the manner in which they are described in the Ruling Request or the Registration Statement, the Opinion may be adversely affected.

We hereby confirm the Opinion in the Registration Statement and consent to the filing of this opinion with the Securities and Exchange Commission as an exhibit to the Registration Statement, and to the references therein to us. In giving such consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Securities Act of 1933, as amended.

Very truly yours,

/s/ Wachtell, Lipton, Rosen & Katz

2

**Exhibit 10.16**

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT ("Agreement") is entered into by and between Matt Packey ("Executive") and LendingTree, LLC, a Delaware limited liability company (the "Company"), and is effective as of August 3, 2008 (the "Effective Date").

WHEREAS, the Company desires to establish its right to the services of Executive, in the capacity described below, on the terms and conditions hereinafter set forth, and Executive is willing to accept such employment on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, Executive and the Company have agreed and do hereby agree as follows:

1.    <u>EMPLOYMENT</u>.  During the Term (as defined below), the Company shall employ Executive, and Executive shall be employed, as Senior Vice President and Chief Financial Officer of the Company.  During Executive's employment with the Company, Executive shall do and perform all reasonable services and acts necessary or advisable to fulfill the duties and responsibilities as are commensurate and consistent with Executive's position and shall render such services on the terms set forth herein.  During Executive's employment with the Company, Executive shall report directly and solely to the Chief Executive Officer of the Company (hereinafter referred to as the "Reporting Officer").  Executive shall have such powers and duties with respect to LendingTree as may reasonably be assigned to Executive by the Reporting Officer, to the extent consistent with Executive's position.  Executive agrees to devote all of Executive's working time, attention and efforts to LendingTree and to perform the duties of Executive's position in accordance with Company reasonable policies applicable to all employees of the Company and its subsidiaries and/or affiliates, as well as LendingTree's reasonable policies (or the policies of such other businesses for which Executive has direct or indirect responsibility under this Agreement) as in effect from time to time.  Executive's principal place of employment shall be the principal offices of LendingTree, located in Charlotte, North Carolina; provided, however, that travel to the Company's other offices in Jacksonville or Irvine may occasionally be required.  Executive acknowledges that the Company may, in its sole discretion from time to time, change the Executive's responsibilities or his direct / indirect reports without any effect hereunder, provided, that Executive shall be responsible for managing substantially all of the Company's accounting, auditing, or other financial management functions as they currently exist.

2.    <u>TERM</u>.  The term of this Agreement, which shall commence on the Effective Date, shall continue until and including June 30, 2010 (the "Term") unless terminated earlier as set forth in the Standard Terms and Conditions; provided, that certain provisions herein may specify a greater period of effectiveness.

3.    <u>COMPENSATION</u>.

(a)    <u>BASE SALARY</u>.  During the period that Executive is employed with the Company hereunder, the Company shall pay Executive an annual base salary of $312,500 (the

---

"Base Salary"), payable in equal biweekly installments (or, if different, in accordance with the Company's payroll practice as in effect from time to time), or such higher salary as shall be agreed to in writing by Executive and the Company from time to time.  Notwithstanding the foregoing, if the proposed spin-off of the Company from IAC/InterActive Corp does not occur on or prior to September 30, 2008, Executive's Base Salary shall be immediately reduced to $285,000, but shall thereafter be increased to $312,500 if the spin-off occurs after September 30, 2008.  For all purposes under this Agreement, the term "Base Salary" shall refer to the Base Salary as in effect from time to time.  Upon the Executive's request, the Company and Executive agree to review and discuss the Executive's Base Salary on the first anniversary of this Agreement, or upon the announcement of any anticipated Change in Control; provided, that any adjustment in Executive's Base Salary shall remain within the sole discretion of the Company.

(b)    <u>EQUITY INCENTIVES</u>.  During the period that Executive is employed with the Company hereunder, Executive shall be eligible to receive a discretionary equity incentives, including but not limited to restricted stock unit awards and/or stock options, which incentives shall be granted to Executive at the time the Company normally grants such incentives generally and otherwise in accordance with applicable policies, practices, terms, and conditions (including but not limited to vesting requirements), and provided further, that Executive is employed by the Company on the date such incentives are awarded.

(c)    <u>DISCRETIONARY BONUS</u>.  During the period that Executive is employed with the Company hereunder, Executive shall be eligible to receive a discretionary annual bonus in an amount determined by the Reporting Officer in accordance with the Company's policies and procedures regarding bonus computations, which bonus shall be payable to Executive at the time the Company pays year-end bonuses generally and otherwise in accordance with applicable policies and practices, provided, that Executive is employed by Company on the date such bonuses are paid.

(d)    <u>BENEFITS</u>.  From the Effective Date through the date of termination of Executive's employment with the Company for any reason, Executive shall be entitled to participate in any welfare, health and life insurance and pension benefit programs as may be adopted from time to time by the Company on the same basis as that provided to similarly situated employees of the Company.  Without limiting the generality of the foregoing, Executive shall be entitled to the following benefits:

(i)    <u>Reimbursement for Business Expenses</u>.  During the period that Executive is employed with the Company hereunder, the Company shall reimburse Executive for all reasonable, necessary and documented expenses incurred by Executive in performing Executive's duties for the Company, on the same basis as similarly situated employees and in accordance with applicable policies in effect from time to time.

(ii)    <u>Vacation and other Paid Time Off</u>.  During the period that Executive is employed with the Company hereunder, Executive shall be entitled to paid vacation and other paid time off each year, in accordance with applicable plans, policies, programs and practices applicable to similarly situated employees generally.

2

---

4.    <u>NOTICES</u>.  All notices and other communications under this Agreement shall be in writing and shall be given by first-class mail, certified or registered with return receipt requested, or by hand delivery, or by overnight delivery by a nationally recognized carrier, in each case to the applicable address set forth below, and any such notice is deemed

effectively given when received by the recipient (of if receipt is refused, on the date of such refusal), with a copy as follows:

| | |
|---|---|
| If to the Company: | LendingTree, LLC<br>11115 Rushmore Drive<br>Charlotte, NC 28277<br>Attention: Senior Vice President, Human Resources |
| If to Executive: | At the most recent address for Executive on file at the Company. |

Either party may change such party's address for notices by notice duly given pursuant hereto.

5.    GOVERNING LAW; JURISDICTION.  This Agreement and the legal relations thus created between the parties hereto (including, without limitation, any dispute arising out of or related to this Agreement) shall be governed by and construed under and in accordance with the internal laws of the State of North Carolina without reference to its principles of conflicts of laws.  Any such dispute will be heard exclusively and determined before an appropriate federal court located in the State of North Carolina in the Western District, or, if not maintainable therein, then in an appropriate state court located in Mecklenburg County, North Carolina, and each party hereto submits itself and its property to the exclusive jurisdiction of the foregoing courts with respect to such disputes.  Each party hereto (i) agrees that service of process may be made by mailing a copy of any relevant document to the address of the party set forth above, (ii) waives to the fullest extent permitted by law any objection which it may now or hereafter have to the courts referred to above on the grounds of inconvenient forum or otherwise as regards any dispute between the parties hereto arising out of or related to this Agreement, (iii) waives to the fullest extent permitted by law any objection which it may now or hereafter have to the laying of venue in the courts referred to above as regards any dispute between the parties hereto arising out of or related to this Agreement and (iv) agrees that a judgment or order of any court referred to above in connection with any dispute between the parties hereto arising out of or related to this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction.

6.    COUNTERPARTS.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

7.    STANDARD TERMS AND CONDITIONS.  Executive expressly understands and acknowledges that the Executive Standard Terms and Conditions attached hereto are incorporated herein by reference, deemed a part of this Agreement and are binding and enforceable provisions of this Agreement.  References to "this Agreement" or the use of the term "hereof" shall refer to this Agreement and the Executive Standard Terms and Conditions attached hereto, taken as a whole.

3

8.    SECTION 409A OF THE INTERNAL REVENUE CODE.  This Agreement is not intended to constitute a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended, and the rules and regulations issued thereunder ("Section 409A").  Notwithstanding the foregoing, if this Agreement or any benefit paid to Executive hereunder is subject to Section 409A and if the Executive is a "Specified Employee" (as defined under Section 409A) as of the date of Executive's termination of employment hereunder, then the payment of benefits, if any, scheduled to be paid by the Company to Executive hereunder during the first six (6) month period beginning on the date of a termination of employment hereunder shall be delayed during such six (6) month period and shall commence immediately following the end of such six (6) month period (and, if applicable, the period in which such payments were scheduled to be made if not for such delay shall be extended accordingly).  In no event shall the Company be required to pay Executive any "gross-up" or other payment with respect to any taxes or penalties imposed under Section 409A with respect to any benefit paid to Executive hereunder.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed and delivered by its duly authorized officer and Executive has executed and delivered this Agreement as of August 3, 2008.

LendingTree, LLC

/s/ Claudette Hampton
By:      Claudette Hampton
Title:    Senior Vice President, Human Resources

/s/ Matt Packey
Matt Packey

4

EXECUTIVE STANDARD TERMS AND CONDITIONS

1.    TERMINATION OF EXECUTIVE'S EMPLOYMENT.

(a)  DEATH.  In the event Executive's employment is terminated by reason of Executive's death, the Company shall pay Executive's designated beneficiary or beneficiaries, within thirty (30) days of Executive's death in a lump sum in cash, (i) Executive's Base Salary through the end of the month in which death occurs and (ii) any Other Accrued Obligations (as defined in Section 1(e) below).

(b)  DISABILITY.  If, as a result of Executive's incapacity due to physical or mental illness ("Disability"), Executive shall have been absent from the full-time performance of Executive's duties with the Company for a period of four (4) consecutive months and, within thirty (30) days after written notice is provided to Executive by the Company (in accordance with Section 4 of the Employment Agreement), Executive shall not have returned to the full-time performance of Executive's duties, Executive's employment under this Agreement may be terminated by the Company for Disability.  During any period prior to such termination during which Executive is absent from the full-time performance of Executive's duties with the Company due to Disability, the Company shall continue to pay Executive's Base Salary at the rate in effect at the commencement of such period of Disability, offset by any amounts payable to Executive under any disability insurance plan or policy provided by the Company.  Upon termination of Executive's employment due to Disability, the Company shall pay Executive within thirty (30) days of such termination (i) Executive's Base Salary through the end of the month in which termination occurs in a lump sum in cash, offset by any amounts payable to Executive under any disability insurance plan or policy provided by the Company; and (ii) any Other Accrued Obligations (as defined in paragraph 1(e) below).

(c)  TERMINATION FOR CAUSE.  Upon the termination of Executive's employment by the Company for Cause (as defined below), the Company shall have no further obligation hereunder, except for the payment of any Other Accrued Obligations (as defined in paragraph 1(e) below).  As used herein, "Cause" shall mean:  (i) the Executive's plea of guilty or nolo contendere to, or conviction for, the commission of (A) a felony offense, or (B) a misdemeanor offense involving any breach of trust or fiduciary duty by Executive or involving any moral turpitude; provided, however, that after indictment, the Company may suspend Executive from the rendition of services, but without limiting or modifying in any other way the Company's obligations under this Agreement; (ii) a material breach by Executive of a fiduciary duty owed to the Company; (iii) a material breach by Executive of any of the covenants made by Executive in Section 2 hereof; (iv) the willful or gross neglect by Executive of the material duties required by this Agreement; or (v) a material violation by Executive of any reasonable Company policy pertaining to ethics, wrongdoing or conflicts of interest.

(d)  TERMINATION OR BREACH BY THE COMPANY OTHER THAN FOR DEATH, DISABILITY OR CAUSE OR RESIGNATION BY EXECUTIVE UPON A CHANGE IN CONTROL.  If (i) Executive's employment hereunder is terminated by the Company or the Company commits a material breach of this Agreement prior to the expiration of the Term for

any reason other than Executive's death or Disability or for Cause, or (ii) Executive resigns within ninety (90) days following the consummation of any Change in Control of the Company, then the Company shall pay Executive the following:

(i)  Within thirty (30) days following such termination, breach, or resignation, an amount equal to all Other Accrued Obligations (as defined herein); and

(ii)  An amount equal to one (1) year's Base Salary, payable in equal installments on the Company's regularly scheduled paydays over the one (1) year period following the date of such termination, breach, or resignation (the "Severance Period").

(iii)  If Executive properly elects COBRA continuation for medical, dental and/or vision coverage, Company shall subsidize the cost of Executive's COBRA benefits through the end of the Severance Period or until such time as Executive becomes eligible for group coverage pursuant to another policy or program, whichever comes first.  The subsidy provided by Company for the COBRA benefits shall be the total amount owed for COBRA benefits less the amount of Executive's current employee contribution for these benefits.  Should, within the period eligible for subsidy, Executive elect more costly benefits options, the Company subsidy will remain the same with Executive responsible for the difference.  Should, within the period eligible for subsidy, Executive elect less costly benefits, the contribution by both Company and Executive shall be reduced proportionally.

If Executive obtains other employment or is otherwise compensated for services provided during this Severance Period, the Company's obligation to make future payments to Executive under these subparagraphs (d)(ii) and (d)(iii) and shall be offset against any compensation earned by Employee as a result of employment with or services provided to a third party.  Executive agrees to inform the Company promptly of his employment status and any amounts so earned during the Severance Period.  Executive's right to the payments under these subparagraphs (d)(ii) and (d)(iii) shall be subject to Executive's execution and non-revocation of a reasonable general release of the Company and its affiliates, in a form substantially similar to that used for similarly situated executives of the Company and its affiliates, and Executive's compliance with the restrictive covenants set forth in Section 2 of these Standard Terms and Conditions.  Executive acknowledges and agrees that the payments described in this Section 1(d) constitutes good and valuable consideration for such release.

For purposes of this Agreement, a "Change in Control" means

(i)  the acquisition, by any means, by any individual entity or group, within the meaning of Section 13 (d)(3) or 14 (d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), other than IAC/InterActiveCorp, Barry Diller, Liberty Media Corporation, and their respective affiliates (a "Person"), directly or indirectly, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of equity securities of LendingTree, LLC representing more than 50% of the voting power of the then outstanding equity securities of LendingTree, LLC entitled to vote generally in the election of directors or managing members (as applicable) of the entity

2

(the "Outstanding Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change in Control: (1) any acquisition by any employee benefit plan (or trust related to such employee benefit plan) sponsored or maintained by LendingTree, LLC or any corporation controlled by LendingTree, LLC or (2) any acquisition by any Person pursuant to a transaction which complies with clauses (A) and (B) of subsection (ii) of this definition; or

(ii)  the consummation of a reorganization, merger or consolidation or sale or other disposition, directly or indirectly of all or substantially all of the assets of LendingTree, LLC or the purchase of assets or stock or another entity (a "Business Combination") in each case, unless immediately following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners of the Outstanding Voting Securities immediately prior to such Business

Combination beneficially own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, managing members or other required persons (as applicable) of the entity resulting from such Business Combination (including, without limitation, an entity which as a result of such transaction owns LendingTree, LLC or all or substantially all of the assets of LendingTree, LLC either directly or through one or more subsidiaries) in substantially the same proportion as their ownership immediately prior to such Business Combination of the outstanding voting securities, and (B) no person (excluding IACInteractiveCorp, Barry Diller, Liberty Media Corporation and their respective affiliates, any employee benefit plan (or related trust) of LendingTree, LLC or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, more than a majority of the combined voting power of the then Outstanding Voting Securities of such entity except to the extent that such ownership of LendingTree, LLC existed prior to the Business Combination; or

(iii) the approval by the members, stockholders or other required persons (as applicable) of LendingTree, LLC of a complete liquidation or dissolution of LendingTree, LLC.

(e) OTHER ACCRUED OBLIGATIONS. As used in this Agreement, "Other Accrued Obligations" shall mean the sum of (i) any portion of Executive's accrued but unpaid Base Salary or Bonus through the date of death or termination of employment for any reason, as the case may be; (ii) any compensation previously earned but deferred by Executive (together with any interest or earnings thereon) that has not yet been paid and that is not otherwise to be paid at a later date pursuant to the executive deferred compensation plan of the Company, if any, and (iii) any reimbursements that Executive is entitled to receive under Section 3(d) of the Agreement.

2. CONFIDENTIAL INFORMATION; NON-COMPETITION; NON-SOLICITATION; AND PROPRIETARY RIGHTS.

(a) CONFIDENTIALITY. Executive acknowledges that, while employed by the Company, Executive will occupy a position of trust and confidence. The Company, its

3

subsidiaries and/or affiliates shall provide Executive with "Confidential Information" as referred to below. Executive shall not, except as may be required to perform Executive's duties hereunder or as required by applicable law, without limitation in time, communicate, divulge, disseminate, disclose to others or otherwise use, whether directly or indirectly, any Confidential Information regarding the Company and/or any of its subsidiaries and/or affiliates.

"Confidential Information" shall mean information about the Company or any of its subsidiaries or affiliates, and their respective businesses, employees, consultants, contractors, clients and customers that is not disclosed by the Company or any of its subsidiaries or affiliates for financial reporting purposes or otherwise generally made available to the public (other than by Executive's breach of the terms hereof) and that was learned or developed by Executive in the course of employment by the Company or any of its subsidiaries or affiliates, including (without limitation) any proprietary knowledge, trade secrets, data, formulae, information and client and customer lists and all papers, resumes, and records (including computer records) of the documents containing such Confidential Information. Executive acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Company and its subsidiaries or affiliates, and that such information gives the Company and its subsidiaries or affiliates a competitive advantage. Executive agrees to deliver or return to the Company, at the Company's request at any time or upon termination or expiration of Executive's employment or as soon thereafter as possible, all documents, computer tapes and disks, records, lists, data, drawings, prints, notes and written information (and all copies thereof) furnished by the Company and its subsidiaries or affiliates or prepared by Executive in the course of Executive's employment by the Company and its subsidiaries or affiliates. As used in this Agreement, "subsidiaries" and "affiliates" shall mean any company controlled by, controlling or under common control with the Company. For purposes of this Agreement, "Confidential Information" shall not include any information that is now or hereafter becomes known to the public or otherwise is in the public domain other than through Executive's fault, breach, disclosure, or other act of Executive.

(b) NON-COMPETITION. In consideration of this Agreement, and other good and valuable consideration provided hereunder, the receipt and sufficiency of which are hereby acknowledged by Executive, Executive hereby agrees and covenants that, during Executive's employment hereunder and for a period of twelve (12) months thereafter (the "Restricted Period"), Executive shall not, without the prior written consent of the Company, directly or indirectly, engage in or become associated with a Competitive Activity.

For purposes of this Section 2(b), (i) a "Competitive Activity" means any business or other endeavor involving Similar Products if such business or endeavor is in a country (including the United States) in which the Company (or any of its businesses) provides or planned to provide during Executive's employment hereunder such Similar Products; (ii) "Similar Products" means any products or services that are the same (or substantially the same) as any of the (A) types of products or services that the online loan origination, online loan brokerage, or online real estate brokerage businesses of LendingTree and/or the Company or (B) significant types of products or services that any other business for which Executive has direct or indirect responsibility hereunder, in each case, provides, has provided or planned to provide during Executive's employment hereunder; and (iii) Executive shall be considered to have become

4

"associated with a Competitive Activity" if Executive becomes directly or indirectly involved as an owner, principal, employee, officer, director, independent contractor, representative, stockholder, financial backer, agent, partner, member, advisor, lender, consultant or in any other individual or representative capacity with any individual, partnership, corporation or other organization that is engaged in a Competitive Activity.

Notwithstanding the foregoing, Executive may make and retain investments during the Restricted Period, for investment purposes only, in less than five percent (5%) of the outstanding capital stock of any publicly-traded corporation engaged in a Competitive Activity if the stock of such corporation is either listed on a national stock exchange or on the NASDAQ National Market System if Executive is not otherwise affiliated with such corporation. Executive acknowledges that Executive's covenants under this Section 2(b) are a material inducement to the Company's entrance into this Agreement.

(c) NON-SOLICITATION OF EMPLOYEES. Executive recognizes that he or she will possess Confidential Information about other employees, consultants and contractors of the Company and its subsidiaries or affiliates relating to their education, experience, skills, abilities, compensation and benefits, and inter-personal relationships with suppliers to and customers of the Company and its subsidiaries or affiliates. Executive recognizes that the information he or she will possess about these other employees, consultants and contractors is not generally known, is of substantial value to the Company and its subsidiaries or affiliates in developing their respective businesses and in securing and retaining customers, and will be acquired by Executive because of Executive's business position with the Company. Executive agrees that, during Executive's employment hereunder and for a period of twelve (12) months thereafter, (i) Executive will not, directly or indirectly, hire or solicit or recruit any person then employed by the Company and/or

any of its subsidiaries and/or affiliates with whom Executive has had a working relationship during his employment hereafter, in all cases, for the purpose of being employed by Executive or by any business, individual, partnership, firm, corporation or other entity on whose behalf Executive is acting as an agent, representative or employee; and (ii) Executive will not convey any such Confidential Information or trade secrets about employees of the Company or any of its subsidiaries or affiliates to any other person except within the scope of Executive's duties hereunder.  Notwithstanding the foregoing, the restrictions set forth immediately above shall, in the case of employees with whom Executive had a direct working relationship prior to his employment with the Company, its subsidiaries and/or affiliates, (i) upon a termination of Executive's employment by the Company for any reason other than for Cause, shall apply for a period of nine (9) months following such termination, or (ii) if Executive terminates his employment hereunder, apply for a period of twelve (12) months following such termination.

(d)   NON-SOLICITATION OF CUSTOMERS.  During Executive's employment hereunder and for a period of twelve (12) months thereafter, Executive shall not solicit any Customers of LendingTree or encourage (regardless of who initiates the contact) any such Customers to use the facilities or services of any competitor of LendingTree. For the purposes of this subsection, "Customers" means any persons or entities that purchased products or services from the Company within twelve (12) calendar months of the termination of Executive's employment.

5

(e)   PROPRIETARY RIGHTS; ASSIGNMENT.  All Employee Developments (defined below) shall be considered works made for hire by Executive for the Company or, as applicable, its subsidiaries or affiliates, and Executive agrees that all rights of any kind in any Employee Developments belong exclusively to the Company.  In order to permit the Company to exploit such Employee Developments, Executive shall promptly and fully report all such Employee Developments to the Company.  Except in furtherance of his obligations as an employee of the Company, Executive shall not use or reproduce any portion of any record associated with any Employee Development without prior written consent of the Company or, as applicable, its subsidiaries or affiliates.  Executive agrees that in the event actions of Executive are required to ensure that such rights belong to the Company under applicable laws, Executive will cooperate and take whatever such actions are reasonably requested by the Company, whether during or after the Term, and without the need for separate or additional compensation.  "Employee Developments" means any idea, know-how, discovery, invention, design, method, technique, improvement, enhancement, development, computer program, machine, algorithm or other work of authorship, whether developed, conceived or reduced to practice during or following the period of employment, that (i) concerns or relates to the actual or anticipated business, research or development activities, or operations of LendingTree (or any other Company business for which Executive has direct or indirect responsibility during his employment hereunder), or (ii) results from or is suggested by any undertaking assigned to Executive or work performed by Executive for or on behalf of the Company or any of its subsidiaries or affiliates, whether created alone or with others, during or after working hours, or (iii) uses, incorporates or is based on Company equipment, supplies, facilities, trade secrets or inventions of any form or type.  All Confidential Information and all Employee Developments are and shall remain the sole property of the Company or any of its subsidiaries or affiliates.  Executive shall acquire no proprietary interest in any Confidential Information or Employee Developments developed or acquired during the Term.  To the extent Executive may, by operation of law or otherwise, acquire any right, title or interest in or to any Confidential Information or Employee Development, Executive hereby assigns and covenants to assign to the Company all such proprietary rights without the need for a separate writing or additional compensation.  Executive shall, both during and after the Term, upon the Company's request, promptly execute, acknowledge, and deliver to the Company all such assignments, confirmations of assignment, certificates, and instruments, and shall promptly perform such other acts, as the Company may from time to time in its discretion deem necessary or desirable to evidence, establish, maintain, perfect, enforce or defend the Company's rights in Confidential Information and Employee Developments.

(f)   COMPLIANCE WITH POLICIES AND PROCEDURES.  During the period that Executive is employed with the Company hereunder, Executive shall adhere to the reasonable policies and standards of professionalism set forth in the Company's Policies and Procedures applicable to all employees of the Company and its subsidiaries and/or affiliates, as well as LendingTree's reasonable policies (or the reasonable policies of such other businesses for which Executive has direct or indirect responsibility under this Agreement) as they may exist from time to time.

(g)   SURVIVAL OF PROVISIONS.  The obligations contained in this Section 2 shall, to the extent provided in this Section 2, survive the termination or expiration of Executive's

6

employment with the Company and, as applicable, shall be fully enforceable thereafter in accordance with the terms of this Agreement.  If it is determined by a court of competent jurisdiction that any restriction in this Section 2 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by applicable law.

3.   TERMINATION OF PRIOR AGREEMENTS.  This Agreement constitutes the entire agreement between the parties and, as of the Effective Date, terminates and supersedes any and all prior agreements and understandings (whether written or oral) between the parties with respect to the subject matter of this Agreement.  Executive acknowledges and agrees that neither the Company nor anyone acting on its behalf has made, and is not making, and in executing this Agreement, Executive has not relied upon, any representations, promises or inducements except to the extent the same is expressly set forth in this Agreement.  Executive hereby represents and warrants that by entering into this Agreement, Executive will not rescind or otherwise breach an employment agreement or other agreement with Executive's current employer prior to the natural expiration date of such agreement.  Notwithstanding the foregoing, nothing in this Agreement shall alter the Executive's rights to (i) any grant of RSUs or other equity interests, or the vesting rights or conditions of termination and/or expiration thereof, granted in any prior agreement (including, without limitation, the rights granted to Executive under that certain Restricted Shares Grant and Shareholders' Agreement dated as of May 5, 2003, as amended from time to time), or (ii) the payment of any cash bonus, whether guaranteed or discretionary, attributable to the Company's 2007 fiscal year and awarded in any prior agreement.

4.   ASSIGNMENT; SUCCESSORS.  Without limiting the provisions of Section 2(d) of this Agreement, the parties agree that this Agreement is personal in its nature and that none of the parties hereto shall, without the consent of the others, assign or transfer this Agreement or any rights or obligations hereunder; provided, that the Company may assign this Agreement to, or allow any of its obligations to be fulfilled by, or take actions through, any affiliate of the Company and, in the event of the merger, consolidation, transfer, or sale of all or substantially all of the assets of the Company (a "Transaction") with or to any other individual or entity, this Agreement shall, subject to the provisions hereof, be binding upon and inure to the benefit of such successor and such successor shall discharge and perform all the promises, covenants, duties, and obligations of the Company hereunder, and in the event of any such assignment or Transaction, all references herein to the "Company" shall refer to the Company's assignee or successor hereunder.

5.   <u>WITHHOLDING</u>.  The Company shall make such deductions and such withholdings from each payment and benefit made or provided to Executive hereunder, as may be required from time to time by applicable law, governmental regulation or order.

6.   <u>HEADING REFERENCES</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  References to "this Agreement" or the use of the term "hereof" shall refer to these Standard Terms and Conditions and the Employment Agreement attached hereto, taken as a whole.

<div style="text-align:center">7</div>

---

7.   <u>REMEDIES FOR BREACH</u>.  Executive expressly agrees and understands that Executive will notify the Company in writing of any alleged breach of this Agreement by the Company, and the Company will have thirty (30) days from receipt of Executive's notice to cure any such breach.  Executive expressly agrees and understands that in the event of any termination of Executive's employment by the Company during the Term, the Company's contractual obligations to Executive shall be fulfilled through compliance with its obligations under Section 1 of the Standard Terms and Conditions.

Executive expressly agrees and understands that the remedy at law for any breach by Executive of Section 2 of the Standard Terms and Conditions will be inadequate and that damages flowing from such breach are not usually susceptible to being measured in monetary terms.  Accordingly, it is acknowledged that, upon Executive's violation of any provision of such Section 2, the Company shall be entitled to obtain from any court of competent jurisdiction immediate injunctive relief and obtain a temporary order restraining any threatened or further breach as well as an equitable accounting of all profits or benefits arising out of such violation.  Nothing shall be deemed to limit the Company's remedies at law or in equity for any breach by Executive of any of the provisions of this Agreement, including Section 2, which may be pursued by or available to the Company.

8.   <u>WAIVER; MODIFICATION</u>.  Failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof shall not be deemed a waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of, or failure to insist upon strict compliance with, any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.  This Agreement shall not be modified in any respect except by a writing executed by each party hereto.

9.   <u>SEVERABILITY</u>.  In the event that a court of competent jurisdiction determines that any portion of this Agreement is in violation of any law or public policy, only the portions of this Agreement that violate such law or public policy shall be stricken.  All portions of this Agreement that do not violate any statute or public policy shall continue in full force and effect.  Further, any court order striking any portion of this Agreement shall modify the stricken terms as narrowly as possible to give as much effect as possible to the intentions of the parties under this Agreement.

10.   <u>INDEMNIFICATION</u>.  The Company shall indemnify and hold Executive harmless for acts and omissions in Executive's capacity as an officer, director or employee of the Company to the maximum extent permitted under applicable law; <u>provided</u>, <u>however</u>, that neither the Company, nor any of its subsidiaries or affiliates shall indemnify Executive for any losses incurred by Executive as a result of acts described in Section 1(c) of this Agreement.

<div style="text-align:center">8</div>

---

EX-23.1 6 a2187231zex-23_1.htm EXHIBIT 23.1

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated May 5, 2008, in Amendment No. 1 to the Registration Statement (Form S-1 No. 333-152700) and related Prospectus of Tree.com, Inc. dated August 8, 2008.

/s/ Ernst & Young LLP

Los Angeles, California
August 8, 2008

QuickLinks

Exhibit 23.1

Consent of Independent Registered Public Accounting Firm

**Exhibit 99.5**



[     ]

Dear IAC/InterActiveCorp Stockholder:

I am pleased to inform you that on July 1, 2008, the Board of Directors of IAC/InterActiveCorp approved the spin-offs of HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. (each, a "Spinco" and collectively, the "Spincos") via the distribution of all of the outstanding shares of common stock of each Spinco to IAC's stockholders. As a result of the spin-offs, IAC will be separated into five separate, publicly traded companies.

At the time of the spin-offs, the Spincos will collectively hold all of the assets and liabilities associated with IAC's Retailing, Interval, Ticketmaster, Lending and Real Estate segments. We believe that the separation of these businesses will over time enhance their operating performance, provide each of them with a liquid equity currency linked directly to its businesses, open up strategic alternatives that may otherwise not have been readily available to them and facilitate investor understanding and better target investor demand. We expect the spin-offs of each of the Spincos to occur simultaneously, unless otherwise determined by IAC's Board of Directors. Immediately after each spin-off, IAC stockholders will own 100% of the common stock of the company being distributed.

The spin-offs of each of the Spincos will occur on [     ], 2008 by way of a dividend to IAC stockholders, unless otherwise determined by IAC's board of directors. Each IAC stockholder will be entitled to receive one-fifth of a share of common stock of HSN, Inc., one-fifth of a share of common stock of Interval Leisure Group, Inc., one-fifth of a share of common stock of Ticketmaster and one-thirtieth of a share of common stock of Tree.com, Inc. for every share of IAC common stock and/or Class B common stock held by such stockholder at the close of business on August 11, 2008, the record date for the spin-offs. IAC will not distribute any fractional shares of common stock of the Spincos to its stockholders, as more fully described in the accompanying prospectus. Stockholder approval of the spin-offs is not required, nor are you required to take any action to receive your shares of common stock of the Spincos.

The enclosed prospectus, which is being mailed to all IAC stockholders, describes the spin-offs of the common stock of each of the Spincos in detail and contains important information about each of the Spincos. We urge you to read this information statement carefully.

I want to thank you for your continued support of IAC, and each of the Spincos looks forward to your support in the future.

Sincerely,

Barry Diller
*Chairman of the Board and Chief Executive Officer*

# EXHIBIT 2

EX-10.1 4 a08-22125_1ex10d1.htm EX-10.1

**Exhibit 10.1**

SEPARATION AND DISTRIBUTION AGREEMENT

by and among

IAC/INTERACTIVECORP,

HSN, INC.,

INTERVAL LEISURE GROUP, INC.,

TICKETMASTER

and

TREE.COM, INC.

DATED AS OF AUGUST 20, 2008

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE I | INTERPRETATION | 2 |
| 1.01. | Definitions | 2 |
| 1.02. | Schedules | 19 |
| 1.03. | Effective Time; Suspension | 20 |
| | | |
| ARTICLE II | THE SEPARATION | 20 |
| 2.01. | Separation | 20 |
| 2.02. | Implementation | 21 |
| 2.03. | Transfer of Spun Assets; Assumption of Spun Liabilities | 21 |
| 2.04. | TM Assets | 21 |
| 2.05. | Interval Assets | 22 |
| 2.06. | HSN Assets | 23 |
| 2.07. | Tree Assets | 24 |
| 2.08. | Deferred Spun Assets | 25 |
| 2.09. | Excluded Assets | 25 |
| 2.10. | Liabilities | 25 |
| 2.11. | Third Party Consents and Government Approvals | 27 |
| 2.12. | Preservation of Agreements | 27 |
| 2.13. | Ancillary Agreements | 27 |
| 2.14. | Resignations | 28 |
| 2.15. | Cooperation | 28 |
| 2.16. | Intercompany Accounts Among Groups | 28 |
| 2.17. | Disclaimer of Representations and Warranties | 28 |
| | | |
| ARTICLE III | DEFERRED SEPARATION TRANSACTIONS | 29 |
| 3.01. | Deferred Transfer Assets | 29 |
| 3.02. | Unreleased Liabilities | 30 |
| 3.03. | No Additional Consideration | 30 |
| | | |
| ARTICLE IV | COVENANTS | 31 |
| 4.01. | General Covenants | 31 |
| 4.02. | Covenants of the Spincos | 31 |
| 4.03. | Spinco Common Stock Escrow Accounts | 32 |
| 4.04. | Cash Balance True-Ups | 33 |

| 4.05. | Non-Solicitation | 35 |

| ARTICLE V | THE DISTRIBUTION | 35 |
| 5.01. | Conditions to the Distribution | 35 |
| 5.02. | Distribution of Spinco Common Stock | 36 |
| 5.03. | Fractional Shares | 37 |
| 5.04. | Actions in Connection with the Distributions | 37 |
| 5.05 | Treatment of Integrated Warrant | 38 |

i

| ARTICLE VI | MUTUAL RELEASES; INDEMNIFICATION | 39 |
| 6.01. | Release of Pre-Distribution Claims | 39 |
| 6.02. | Indemnification by Spincos | 43 |
| 6.03. | Indemnification by IAC | 43 |
| 6.04. | Procedures for Indemnification of Third Party Claims | 44 |
| 6.05. | Procedures for Indemnification of Direct Claims | 46 |
| 6.06. | Adjustments to Liabilities | 46 |
| 6.07. | Payments | 47 |
| 6.08. | Contribution | 47 |
| 6.09. | Remedies Cumulative | 47 |
| 6.10. | Survival of Indemnities | 47 |
| 6.11. | Shared Liabilities | 47 |

| ARTICLE VII | INSURANCE | 48 |
| 7.01. | Insurance Matters | 48 |

| ARTICLE VIII | EXCHANGE OF INFORMATION; CONFIDENTIALITY | 49 |
| 8.01. | Agreement for Exchange of Information; Archives | 49 |
| 8.02. | Ownership of Information | 50 |
| 8.03. | Compensation for Providing Information | 51 |
| 8.04. | Record Retention | 51 |
| 8.05. | Other Agreements Providing for Exchange of Information | 51 |
| 8.06. | Production of Witnesses; Records; Cooperation | 51 |
| 8.07. | Confidentiality | 52 |
| 8.08. | Protective Arrangements | 53 |
| 8.09. | Disclosure of Third Party Information | 53 |

| ARTICLE IX | DISPUTE RESOLUTION | 54 |
| 9.01. | Interpretation; Agreement to Resolve Disputes | 54 |
| 9.02. | Dispute Resolution; Mediation | 54 |
| 9.03. | Arbitration | 55 |
| 9.04. | Costs | 56 |
| 9.05. | Continuity of Service and Performance | 56 |

| ARTICLE X | FURTHER ASSURANCES | 56 |
| 10.01 | Further Assurances | 56 |

| ARTICLE XI | CERTAIN OTHER MATTERS | 57 |
| 11.01. | Auditors and Audits; Annual and Quarterly Financial Statements and Accounting | 57 |

| ARTICLE XII | SOLE DISCRETION OF IAC; TERMINATION | 59 |
| 12.01. | Sole Discretion of IAC | 59 |
| 12.02. | Termination | 59 |

| ARTICLE XIII | MISCELLANEOUS | 60 |
| 13.01. | Limitation of Liability | 60 |

| | | |
|---|---|---|
| 13.02. | Counterparts | 60 |
| 13.03. | Entire Agreement | 60 |
| 13.04. | Construction | 60 |
| 13.05. | Signatures | 61 |
| 13.06. | Assignability | 61 |
| 13.07. | Third Party Beneficiaries | 61 |
| 13.08. | Payment Terms | 62 |
| 13.09. | Governing Law | 62 |
| 13.10. | Notices | 62 |
| 13.11. | Severability | 63 |
| 13.12. | Publicity | 63 |
| 13.13. | Survival of Covenants | 64 |
| 13.14. | Waivers of Default; Conflicts | 64 |
| 13.15. | Amendments | 64 |

iii

## SEPARATION AND DISTRIBUTION AGREEMENT

     This SEPARATION AND DISTRIBUTION AGREEMENT, dated as of AUGUST 20, 2008, is entered into by and among IAC/InterActiveCorp, a Delaware corporation ("IAC"), HSN, Inc., a Delaware corporation and wholly owned subsidiary of IAC ("HSN Spinco"), Interval Leisure Group, Inc., a Delaware corporation and wholly owned subsidiary of IAC ("Interval Spinco"), Ticketmaster, a Delaware corporation and wholly owned subsidiary of IAC ("TM Spinco"), and Tree.com, Inc., a Delaware corporation and wholly owned subsidiary of IAC ("Tree Spinco"; together with TM Spinco, Interval Spinco and HSN Spinco, the "Spincos"; the Spincos and IAC, collectively, the "Separate-cos" or "Parties").

## RECITALS:

     WHEREAS, IAC, acting through its direct and indirect Subsidiaries, currently conducts a number of businesses, including (i) the Ticketing Business (as defined herein), (ii) the Vacations Business (as defined herein), (iii) the Retailing Business (as defined herein), (iv) the Lending and Real Estate Business (as defined herein) (together with the Ticketing Business, the Vacations Business and the Retailing Business, the "Spun Businesses") and (v) the Remaining Business (as defined herein);

     WHEREAS, the Board of Directors of IAC (the "IAC Board") has determined that it is appropriate, desirable and in the best interests of IAC and its stockholders to separate IAC into five publicly-traded companies (the "Separation"): (i) TM Spinco, which following the Separation will own and conduct, directly or indirectly, the Ticketing Business, (ii) Interval Spinco, which following the Separation will own and conduct, directly or indirectly, the Vacations Business, (iii) HSN Spinco, which following the Separation will own and conduct, directly or indirectly, the Retailing Business, (iv) Tree Spinco, which following the Separation will own and conduct, directly or indirectly, the Lending and Real Estate Business, and (v) IAC, which following the Separation will own and conduct, directly or indirectly, the Remaining Business;

     WHEREAS, following the merger on August 8, 2008 of a wholly owned subsidiary of IAC with and into IAC, the outstanding shares of capital stock of IAC consist solely of common stock, par value $0.001 per share, of IAC (" IAC Common Stock") and Class B common stock, par value $0.001 per share, of IAC ("IAC Class B Common Stock");

     WHEREAS, in order to effect the Separation, the IAC Board has determined that it is appropriate, desirable and in the best interests of IAC and its stockholders: (i) for IAC and its Subsidiaries to enter into a series of transactions as set forth in the Transactions Memorandum dated of even date herewith (the "Transactions Memo") as a result of which one or more members of each Group (as defined herein) will, collectively, own all of such Group's Corresponding Assets (as defined herein) and assume (or retain) all of such Group's Corresponding Liabilities (as defined herein); and, thereafter (ii) for IAC to distribute to the holders of IAC Common Stock and the holders of IAC Class B Common Stock (in each case without consideration being paid by such stockholders), on a pro rata basis, all of the issued and

1

outstanding shares of Spinco Common Stock (as defined herein) of each Spinco;

WHEREAS, each of the Separate-cos has determined that it is necessary and desirable, on or prior to the Effective Time (as defined herein), to allocate and transfer to the applicable Group those Assets, and to allocate and assign to the applicable Group responsibility for those Liabilities, in respect of the activities of the Corresponding Businesses (as defined herein) of such Group;

WHEREAS, it is the intention of the Parties that each of the Distributions (as defined herein) qualify as a transaction that is generally tax free for United States federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Internal Revenue Code of 1986, as amended (the "Code");

WHEREAS, in connection with the Distributions, each of HSN Spinco and/or its Subsidiaries, Interval Spinco and/or its Subsidiaries and TM Spinco and/or its Subsidiaries will, subject to the terms and provisions of this Agreement, enter into separate credit facilities and/or issue new debt securities, all or a portion of the cash proceeds of borrowings under which shall be distributed to IAC;

WHEREAS, (a) IAC has entered into an agreement with certain holders of its 7% Senior Notes due 2013 (the "IAC Notes") providing for, among other things, (i) IAC to exchange (the "Exchange") new 9.5% Senior Notes due 2016 of Interval Acquisition Corp. (as defined herein) that it will receive from Interval Acquisition Corp. as set forth in the Transactions Memorandum (the "Interval Senior Notes") and (ii) the simultaneous closing of the Exchange and the cash tender offer being made by IAC for any and all of the outstanding IAC Notes (the "IAC Notes Tender Offer") and (b) it is intended that the issuance of the Interval Senior Notes to IAC and the Exchange, together with the IAC Notes Tender Offer, are in connection with the Interval Distribution and are intended to give rise to a succession event (with Interval as the sole successor to IAC) for credit derivatives purposes; and

WHEREAS, the Parties wish to set forth in this Agreement the terms on which, and the conditions subject to which, they intend to implement the measures described above.

NOW THEREFORE, in consideration of the mutual agreements, covenants and other provisions set forth in this Agreement, the Parties hereby agree as follows:

## ARTICLE I
## INTERPRETATION

1.01.    Definitions.  The capitalized words and expressions and variations thereof used in this Agreement or in its schedules, unless a clearly inconsistent meaning is required under the context, shall have the meanings set forth below:

"2008 Internal Control Audit and Management Assessments" has the meaning set forth in Section 11.01(b).

"AAA" has the meaning set forth in Section 9.03.

<div align="center">2</div>

"Accounts Receivable" means in respect of any Person, (a) all trade accounts and notes receivable and other rights to payment from customers and all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or otherwise disposed of or services rendered to customers, (b) all other accounts and notes receivable and all security for such accounts or notes, and (c) any claim, remedy or other right relating to any of the foregoing.

"Action" means any demand, action, suit, countersuit, arbitration, inquiry, proceeding or investigation by any Person or any Governmental Authority or before any Governmental Authority or any arbitration or mediation tribunal.

"Affiliate" of any Person means any other Person that, directly or indirectly, controls, is controlled by, or is under common control with such first Person as of the date on which or at any time during the period for when such determination is being made.  For purposes of this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by contract or otherwise, and the terms "Controlling" and "Controlled" have meanings correlative to the foregoing.

"Agent" has the meaning set forth in Section 5.02(b).

"Agreement" means this Separation and Distribution Agreement, including all of the Schedules hereto.

"Ancillary Agreements" has the meaning set forth in Section 2.13.

"Applicable Law" means any applicable law, statute, rule or regulation of any Governmental Authority or any outstanding order, judgment, injunction, ruling or decree by any Governmental Authority.

"Appurtenances" means, in respect of any Land, all privileges, rights, easements, servitudes, hereditaments and appurtenances and similar interests belonging to or for the benefit of such Land, including all easements and servitudes appurtenant to and for the benefit of any Land (a "Dominant Parcel") for, and as the primary means of, access between, the Dominant Parcel and a public way, or for any other use upon which lawful use of the Dominant Parcel for the purposes for which it is presently being used is dependent, and all rights existing in and to any streets, alleys, passages and other rights-of-way included therein or adjacent thereto.

"Asset-Related Claims" means, in respect of any Asset, all claims of the owner against Third Parties relating to such Asset, whether choate or inchoate, known or unknown, absolute or contingent, disclosed or non-disclosed.

"Assets" means assets, properties and rights (including goodwill), wherever located (including in the possession of owners or Third Parties or elsewhere), whether real, personal or mixed, tangible or intangible, movable or immovable, in each case whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of a Person, including the following:

3

| (a) | Real Property; |
| (b) | Tangible Personal Property; |
| (c) | Inventories; |
| (d) | Accounts Receivable; |
| (e) | Contractual Assets; |
| (f) | Governmental Authorizations; |
| (g) | Business Records; |
| (h) | Intangible Property Rights; |
| (i) | Insurance Benefits; |
| (j) | Asset-Related Claims; and |
| (k) | Deposit Rights. |

"Authorized Auditor" has the meaning set forth in Section 11.01(c)(i).

"Authorizing Spinco" has the meaning set forth in Section 11.01(c)(i).

"Business Concern" means any corporation, company, limited liability company, partnership, joint venture, trust, unincorporated association or any other form of association.

"Business Day" means any day excluding (a) Saturday, Sunday and any other day which, in New York City is a legal holiday or (b) a day on which banks are authorized by Applicable Law to close in New York City.

"<u>Business Records</u>" means, in respect of any Person, all data and Records relating to such Person, including client and customer lists and Records, referral sources, research and development reports and Records, cost information, sales and pricing data, customer prospect lists, customer and vendor data, production reports and Records, service and warranty Business, equipment logs, operating guides and manuals, financial and accounting Records, personnel Records (subject to Applicable Law), creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records.

"<u>Claim Notice</u>" has the meaning set forth in Section 6.04(b).

"<u>Claimant Party</u>" has the meaning set forth in Section 9.02(a).

"<u>Code</u>" has the meaning set forth in the recitals hereto.

"<u>Confidential Information</u>" has the meaning set forth in Section 8.07(a).

4

"<u>Consent</u>" means any approval, consent, ratification, waiver or other authorization.

"<u>Contract</u>" means any contract, agreement, lease, purchase and/or commitment, license, consensual obligation, promise or undertaking (whether written or oral and whether express or implied) that is legally binding on any Person or any part of its property under Applicable Law, including all claims or rights against any Person, choses in action and similar rights, whether accrued or contingent with respect to any such contract, agreement, lease, purchase and/or commitment, license, consensual obligation, promise or undertaking, but excluding this Agreement and any Ancillary Agreement save as otherwise expressly provided in this Agreement or in any Ancillary Agreement.

"<u>Contractual Asset</u>" means, in respect of any Person, any Contract of, or relating to, such Person, any outstanding offer or solicitation made by, or to, such Person to enter into any Contract, and any promise or undertaking made by any other Person to such Person, whether or not legally binding.

"<u>Corresponding Annual Report</u>" has the meaning set forth in Section 11.01(d).

"<u>Corresponding Assets</u>" (a) with respect to HSN Spinco, any HSN Entity or the HSN Group, means the HSN Assets, (b) with respect to Interval Spinco, any Interval Entity or the Interval Group, means the Interval Assets, (c) with respect to TM Spinco, any TM Entity or the TM Group, means the TM Assets, (d) with respect to Tree Spinco, any Tree Entity or the Tree Group, means the Tree Assets and (e) with respect to IAC or the IAC Group, means the Retained Assets.

"<u>Corresponding Business</u>" (a) with respect to HSN Spinco, any HSN Entity or the HSN Group, means the Retailing Business, (b) with respect to Interval Spinco, any Interval Entity or the Interval Group, means the Vacations Business, (c) with respect to TM Spinco, any TM Entity or the TM Group, means the Ticketing Business, (d) with respect to Tree Spinco, any Tree Entity or the Tree Group, means the Lending and Real Estate Business and (e) with respect to IAC or the IAC Group, means the Remaining Business.

"<u>Corresponding Distribution Ratio</u>" (i) with respect to HSN Spinco, means the HSN Distribution Ratio, (ii) with respect to Interval Spinco, means the Interval Distribution Ratio, (iii) with respect to TM Spinco, means the TM Distribution Ratio and (iv) with respect to Tree Spinco, means the Tree Distribution Ratio.

"<u>Corresponding Escrow Shares</u>" has the meaning set forth in Section 4.03.

"<u>Corresponding Group</u>" (a) with respect to the Retailing Business, HSN Spinco or any HSN Entity, means the HSN Group, (b) with respect to the Vacations Business, Interval Spinco or any Interval Entity, means the Interval Group, (c) with respect to the Ticketing Business, TM Spinco or any TM Entity, means the TM Group, (d) with respect to the Lending and Real Estate Business, Tree Spinco or any Tree Entity, means the Tree Group and (e) with respect to the Remaining Business, IAC or any Remaining IAC Entity, means the IAC Group.

5

"Corresponding Group Balance Sheet" (a) with respect to the Retailing Business, HSN Spinco, any HSN Entity or the HSN Group, means the HSN Group Balance Sheet, (b) with respect to the Vacations Business, Interval Spinco, any Interval Entity or the Interval Group, means the Interval Group Balance Sheet, (c) with respect to the Ticketing Business, TM Spinco, any TM Entity or the TM Group, the TM Group Balance Sheet, and (d) with respect to the Lending and Real Estate Business, Tree Spinco, any Tree Entity or the Tree Group, means the Tree Group Balance Sheet.

"Corresponding Liabilities" (a) with respect to HSN Spinco, any HSN Entity or the HSN Group, means the HSN Liabilities, (b) with respect to Interval Spinco, any Interval Entity or the Interval Group, means the Interval Liabilities, (c) with respect to TM Spinco, any TM Entity or the TM Group, means the TM Liabilities, (d) with respect to Tree Spinco, any Tree Entity or the Tree Group, means the Tree Liabilities and (e) with respect to IAC or the IAC Group, means the Retained Liabilities.

"Corresponding Opening Balance Sheet" (a) with respect to the Retailing Business, HSN Spinco, any HSN Entity or the HSN Group, means the HSN Opening Balance Sheet, (b) with respect to the Vacations Business, Interval Spinco, any Interval Entity or the Interval Group, means the Interval Opening Balance Sheet, (c) with respect to the Ticketing Business, TM Spinco, any TM Entity or the TM Group, means the TM Opening Balance Sheet and (d) with respect to the Lending and Real Estate Business, Tree Spinco, any Tree Entity or the Tree Group, means the Tree Opening Balance Sheet.

"Corresponding Other Separate-cos Indemnified Parties" has the meaning set forth in Section 6.02.

"Corresponding Separate-co" (a) with respect to the Retailing Business, any HSN Entity or the HSN Group, means HSN Spinco, (b) with respect to the Vacations Business, any Interval Entity or the Interval Group, means Interval Spinco, (c) with respect to the Ticketing Business, any TM Entity or the TM Group, means TM Spinco, (d) with respect to the Lending and Real Estate Business, any Tree Entity or the Tree Group, means Tree Spinco and (e) with respect to the Remaining Business, any Remaining IAC Entity or the IAC Group, means IAC.

"Corresponding Spinco" (a) with respect to the Retailing Business, any HSN Entity or the HSN Group, means HSN Spinco, (b) with respect to the Vacations Business, any Interval Entity or the Interval Group, means Interval Spinco, (c) with respect to the Ticketing Business, any TM Entity or the TM Group, means TM Spinco and (d) with respect to the Lending and Real Estate Business, any Tree Entity or the Tree Group, means Tree Spinco.

"Deferred Beneficiary" has the meaning set forth in Section 3.01(b).

"Deferred Corresponding Asset" has the meaning set forth in Section 3.01(a).

"Deferred Excluded Asset" has the meaning set forth in Section 3.01(a).

"Deferred Spun Asset" has the meaning set forth in Section 3.01(a).

"Deferred Transactions" has the meaning set forth in Section 10.01(a)(ii).

6

"Deferred Transfer Asset" has the meaning set forth in Section 3.01(a).

"Deposit Rights" means rights relating to deposits and prepaid expenses, claims for refunds and rights of set-off in respect thereof.

"DGCL" means the General Corporation Law of the State of Delaware.

"Disclosing Party" has the meaning set forth in Section 8.08.

"Dispute" has the meaning set forth in Section 9.02(a).

"Dispute Notice" has the meaning set forth in Section 9.02(a).

"Dispute Parties" has the meaning set forth in Section 9.02(a).

"Distribution Date" means the HSN Distribution Date, the Interval Distribution Date, the TM Distribution Date or the Tree Distribution Date, as applicable.

"Distribution Record Date" means the HSN Distribution Record Date, the Interval Distribution Record Date, the TM Distribution Record Date or the Tree Distribution Record Date, as applicable

"Distributions" means the HSN Distribution, the Interval Distribution, the TM Distribution and the Tree Distribution, and each of them a "Distribution."

"Effective Time" means (a) 9:00 a.m., New York City time, on the earliest to occur of one or more of the HSN Distribution Date, the Interval Distribution Date, the TM Distribution Date and the Tree Distribution Date if IAC determines to effect the applicable Distribution(s) prior to the opening of trading on NASDAQ or (b) otherwise, 4.01 p.m., New York City time, on such earliest date to occur.

"EHS Liabilities" means any Liability arising from or under any Environmental Law or Occupational Health and Safety Law.

"Employee Matters Agreement" means the Employee Matters Agreement among the Parties to be dated as of even date herewith.

"Encumbrance" means, with respect to any asset, mortgages, liens, hypothecations, pledges, charges, security interests or encumbrances of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under Applicable Law.

"Environmental Law" means any Applicable Law from any Governmental Authority (a) relating to the protection of the environment (including air, water, soil and natural resources) or (b) the use, storage, handling, release or disposal of Hazardous Substances.

"Escrow Agent" has the meaning set forth in Section 4.03(a).

"Escrow Agreement" has the meaning set forth in Section 4.03(a).

7

---

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Excluded Assets" has the meaning set forth in Section 2.09(a).

"GAAP" has the meaning set forth in Section 2.04(d).

"Governmental Authority" means any court, arbitration panel, governmental or regulatory authority, agency, stock exchange, commission or body.

"Governmental Authorization" means any Consent, license, certificate, franchise, registration or permit issued, granted, given or otherwise made available by, or under the authority of, any Governmental Authority or pursuant to any Applicable Law.

"Ground Lease" means any long-term lease (including any emphyteotic lease) of Land in which most of the rights and benefits comprising ownership of the Land and the Improvements thereon or to be constructed thereon, if any, and the Appurtenances thereto for the benefit thereof, are transferred to the tenant for the term thereof.

"Ground Lease Property" means, in respect of any Person, any Land, Improvement or Appurtenance of such Person that is subject to a Ground Lease.

"Group" means the IAC Group, the HSN Group, the Interval Group, the TM Group or the Tree Group, as the context requires.

"Guaranteed Entities" has the meaning set forth in Section 4.02(c).

"Guaranteed Group" has the meaning set forth in Section 4.02(c).

"Guaranteed Spinco" has the meaning set forth in Section 4.02(c).

"Guaranteeing Group" has the meaning set forth in Section 4.02(c).

"Guaranteeing Separate-co" has the meaning set forth in Section 4.02(c).

"Hazardous Substance" means any substance to the extent presently listed, defined, designated or classified as hazardous, toxic or radioactive under any applicable Environmental Law, including petroleum and any derivative or by-products thereof.

"HSN Assets" has the meaning set forth in Section 2.06.

"HSN Claims" has the meaning set forth in Section 6.01(c).

"HSN Common Stock" means the common stock, par value $0.01 per share, of HSN Spinco.

"HSN Distribution" means the distribution on the HSN Distribution Date, to holders of record of shares of IAC Common Stock and IAC Class B Common Stock as of the HSN Distribution Record Date, of the HSN Common Stock owned by IAC on the basis of a

8

fraction of a share of HSN Common Stock equal to the HSN Distribution Ratio for every one share of IAC Common Stock or IAC Class B Common Stock.

"HSN Distribution Date" means the date on which IAC distributes all of the issued and outstanding shares of HSN Common Stock to the holders of IAC Common Stock and IAC Class B Common Stock.

"HSN Distribution Ratio" means 1/5, subject to adjustment pursuant to Section 5.02(a).

"HSN Distribution Record Date" means such date as may be determined by the IAC Board as the record date for the HSN Distribution.

"HSN Effective Time Cash Balance" has the meaning set forth in Section 4.04(c).

"HSN Entities" means those Business Concerns forming part of the IAC Group which are identified on Schedule 2.06(b) and which on and after the Effective Time form part of the HSN Group.

"HSN Group" means HSN Spinco, the HSN Entities and each other Person (other than any member of any other Group) that is a direct or indirect Subsidiary of HSN Spinco immediately after the Effective Time, and each Person that becomes a Subsidiary of HSN Spinco after the Effective Time.

"HSN Group Balance Sheet" has the meaning set forth in Section 2.06(c).

"HSN Liabilities" has the meaning set forth in Section 2.10.

"HSN Opening Balance Sheet" has the meaning set forth in Section 2.06(e).

"HSN Releasors" has the meaning set forth in Section 6.01(c).

"HSN Spinco" has the meaning set forth in the preamble hereto.

"HSN Target Cash Balance" has the meaning set forth in Section 4.04(c).

"IAC" has the meaning set forth in the preamble hereto.

"IAC Auditor" has the meaning set forth in Section 11.01(a).

"IAC Board" has the meaning set forth in the recitals hereto.

"IAC Claims" has the meaning set forth in Section 6.01(e).

"IAC Class B Common Stock" has the meaning set forth in the recitals hereto.

"IAC Common Stock" has the meaning set forth in the recitals hereto.

9

"IAC Group" means IAC, its Subsidiaries (subject to Section 1.04(b), other than any member of any Spinco Group) and their respective domestic and international businesses, assets and liabilities.

"IAC Notes" has the meaning set forth in the recitals hereto.

"IAC Record Date Share Number" with respect to any Distribution means the aggregate number of shares of IAC Common Stock and IAC Class B Common Stock outstanding on the applicable Distribution Record Date.

"IAC Releasors" has the meaning set forth in Section 6.01(e).

"Improvements" means, in respect of any Land, all buildings, structures, plants, fixtures and improvements located on such Land, including those under construction.

"Indemnified Party" has the meaning set forth in Section 6.04(a).

"Indemnifying Party" has the meaning set forth in Section 6.04(b).

"Information" means any information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including studies, reports, test procedures, research, records, books, contracts, instruments, surveys, discoveries, ideas, concepts, know-how, techniques, manufacturing techniques, manufacturing variables, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, products, product plans, flow charts, data, computer data, disks, diskettes, tapes, computer programs or other software, marketing plans, customer information, customer services, supplier information, communications by or to attorneys (including attorney-client privileged communications), memos and other materials prepared by attorneys or under their direction (including attorney work product), and other technical, financial, employee or business information or data.

"Insurance Benefits" means, in respect of any Asset or Liability, all insurance benefits, including rights to Insurance Proceeds, arising from or relating to such Asset or Liability.

"Insurance Proceeds" means those monies (in each case net of any costs or expenses incurred in the collection thereof and net of any applicable premium adjustments (including reserves and retrospectively rated premium adjustments)):

(a)        received by an insured from an insurance carrier; or

(b)        paid by an insurance carrier on behalf of the insured.

"Intangible Property Rights" means, in respect of any Person, all intangible rights and property of such Person, including IT Assets, going concern value and goodwill.

10

"Intercompany Accounts" means all balances related to indebtedness, including any intercompany indebtedness, loan, guaranty, receivable, payable or other account between a member of any Group, on the one hand, and a member of any other

Group, on the other hand.

"Interval Acquisition Corp." means Interval Acquisition Corp., a Delaware corporation and wholly owned subsidiary of IAC that, at the time of the Interval Distribution, will be a wholly owned subsidiary of Interval Spinco.

"Interval Assets" has the meaning set forth in Section 2.05.

"Interval Claims" has the meaning set forth in Section 6.01(b).

"Interval Common Stock" means the common stock, par value $0.01 per share, of Interval Spinco.

"Interval Distribution" means the distribution on the Interval Distribution Date, to holders of record of shares of IAC Common Stock and IAC Class B Common Stock as of the Interval Distribution Record Date, of the Interval Common Stock owned by IAC on the basis of a fraction of a share of Interval Common Stock equal to the Interval Distribution Ratio for every one share of IAC Common Stock or IAC Class B Common Stock.

"Interval Distribution Date" means the date on which IAC distributes all of the issued and outstanding shares of Interval Common Stock to the holders of IAC Common Stock and IAC Class B Common Stock.

"Interval Distribution Ratio" means 1/5, subject to adjustment pursuant to Section 5.02(a).

"Interval Distribution Record Date" means such date as may be determined by the IAC Board as the record date for the Interval Distribution.

"Interval Effective Time Cash Balance" has the meaning set forth in Section 4.04(b).

"Interval Entities" means those Business Concerns forming part of the IAC Group which are identified on Schedule 2.05(b) and which on and after the Effective Time form part of the Interval Group.

"Interval Group" means Interval Spinco, the Interval Entities and each other Person (other than any member of any other Group) that is a direct or indirect Subsidiary of Interval Spinco immediately after the Effective Time, and each Person that becomes a Subsidiary of Interval Spinco after the Effective Time.

"Interval Group Balance Sheet" has the meaning set forth in Section 2.05(c).

"Interval Liabilities" has the meaning set forth in Section 2.10.

"Interval Opening Balance Sheet" has the meaning set forth in Section 2.05(e).

11

---

"Interval Releasors" has the meaning set forth in Section 6.01(b).

"Interval Spinco" has the meaning set forth in the preamble hereto.

"Interval Target Cash Balance" has the meaning set forth in Section 4.04(b).

"Inventories" means, in respect of any Person, all inventories of such Person wherever located, including all finished goods, (whether or not held at any location or facility of such Person or in transit to or from such Person), work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by the Person in production of finished goods.

"IT Assets" means computers, computer software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, all other information technology equipments and all associated documentation.

"Land" means, in respect of any Person, all parcels and tracts of land in which the Person has an ownership interest.

"Lending and Real Estate Business" means (a) the businesses and operations of Tree Spinco and its subsidiaries described in the Information Statement included as an exhibit to Tree Spinco's Registration Statement, (b) any other business

conducted primarily through the use of the Tree Assets prior to the Effective Time and (c) the businesses and operations of Business Concerns acquired or established by or for Tree Spinco or any of its Subsidiaries after the date of this Agreement.

"<u>Liberty Spinco Agreement</u>" means that certain Spinco Agreement, dated as of May 13, 2008, among IAC, Barry Diller, Liberty Media Corporation and certain subsidiaries of Liberty Media Corporation that hold IAC Common Stock and/or IAC Class B Common Stock.

"<u>Liberty Spinco Assumption Agreement</u>" means an agreement substantially in the form of Exhibit 5 to the Liberty Spinco Agreement.

"<u>Liberty Registration Rights Agreement</u>" means an agreement substantially in the form of Exhibit 4 to the Liberty Spinco Agreement.

"<u>Liability</u>" means, with respect to any Person, any and all losses, claims, charges, debts, demands, actions, causes of action, suits, damages, obligations, payments, costs and expenses, sums of money, accounts, reckonings, bonds, specialties, indemnities and similar obligations, exoneration covenants, contracts, controversies, agreements, promises, doings, omissions, variances, guarantees, make whole agreements and similar obligations, and other liabilities and requirements, including all contractual obligations, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, joint or several, whenever arising, and including those arising under any Applicable Law, Action, threatened or contemplated Action (including the costs and expenses of demands, assessments, judgments, settlements and compromises relating thereto and attorneys' fees and any and all costs and expenses, whatsoever reasonably incurred in investigating, preparing or defending against any such Actions or threatened or contemplated Actions) or Order of any

12

Governmental Authority or any award of any arbitrator or mediator of any kind, and those arising under any contract, commitment or undertaking, in each case, whether or not recorded or reflected or otherwise disclosed or required to be recorded or reflected or otherwise disclosed, on the books and records or financial statements of any Person, including any Specified Financial Liability, EHS Liability or Liability for Taxes.

"<u>NASDAQ</u>" means the Nasdaq Stock Market.

"<u>New IAC Integrated Warrant</u>" has the meaning set forth in Section 5.05(a)(i).

"<u>Non-IAC Indemnified Parties</u>" has the meaning set forth in Section 6.03.

"<u>Non-IAC Parties</u>" has the meaning set forth in Section 6.01(e).

"<u>Non-Interval Parties</u>" has the meaning set forth in Section 6.01(b).

"<u>Non-HSN Parties</u>" has the meaning set forth in Section 6.01(c).

"<u>Non-Tree Parties</u>" has the meaning set forth in Section 6.01(d).

"<u>Non-TM Parties</u>" has the meaning set forth in Section 6.01(a).

"<u>Notice Period</u>" has the meaning set forth in Section 6.04(b).

"<u>Occupational Health and Safety Law</u>" means any Applicable Law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"<u>Old IAC Integrated Warrant</u>" means the outstanding warrant to purchase shares of IAC Common Stock identified on <u>Schedule 1.01(a)</u>.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"Ordinary Course of Business" means any action taken by a Person that is in the ordinary course of the normal, day-to-day operations of such Person and is consistent with the past practices of such Person.

"Parties" has the meaning set forth in the preamble hereto.

"Person" means any individual, Business Concern or Governmental Authority.

"Post-Record Date IAC Shares" has the meaning set forth in Section 5.02(a)

"Potential Contributor" has the meaning set forth in Section 6.06(a).

<div align="center">13</div>

"Prime Rate" means the rate which JPMorgan Chase & Co. (or any successor thereto or other major money center commercial bank agreed to by the Parties hereto) announces from time to time as its prime lending rate, as in effect from time to time.

"Prospectus" with respect to a Registration Statement means the prospectus forming a part of such Registration Statement, as the same may be amended or supplemented from time to time.

"Providing Party" has the meaning set forth in Section 8.08.

"Real Property" means any Land and Improvements and all Appurtenances thereto and any Ground Lease Property.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Registration Statement" means, for each Spinco, the Registration Statement on Form S-1 first filed by such Spinco with the SEC on August 1, 2008 (together with all amendments and supplements thereto) in connection with the registration under the Securities Act of such Spinco's Spinco Common Stock.

"Regulation S-K" means Regulation S-K of the General Rules and Regulations promulgated by the SEC pursuant to the Securities Act.

"Relevant Time" means (a) as between any two Spincos, on the date of the later Distribution Date to occur with respect to such Spincos if such Distribution Dates are not the same date or, otherwise, on such Distribution Date and (b) as between IAC and any Spinco, on the Distribution Date with respect to such Spinco, in either such case (i) 9:00 a.m., New York City time, if IAC determines to effect the applicable Distribution(s) prior to the opening of trading on NASDAQ or (b) otherwise, 4:01 p.m., New York City time, on such earliest date to occur.

"Remaining Business" means all IAC Businesses other than the Spun Businesses.

"Remaining IAC Entity" means any Business Concern that is a member of the IAC Group on and after the Effective Time.

"Representatives" means, with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants or attorneys.

"Requesting Party" has the meaning set forth in Section 8.01(a).

"Response" has the meaning set forth in Section 9.02(a).

"Responding Parties" has the meaning set forth in Section 9.02(a).

"Responsible Group" has the meaning set forth in Section 3.02(b).

<div align="center">14</div>

"<u>Responsible Separate-co</u>" has the meaning set forth in Section 3.02.

"<u>Retailing Business</u>" means (a) the businesses and operations of HSN Spinco and its Subsidiaries as described in the Prospectus forming a part of HSN Spinco's Registration Statement, (b) any other business conducted primarily through the use of the HSN Assets prior to the Effective Time and (c) the businesses and operations of Business Concerns acquired or established by or for HSN Spinco or any of its Subsidiaries after the date of this Agreement.

"<u>Retained Liabilities</u>" has the meaning set forth in Section 2.10.

"<u>Retaining Person</u>" has the meaning set forth in Section 3.01(b).

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Securities Act</u>" means the United States Securities Act of 1933, as amended.

"<u>Senior Party Representatives</u>" has the meaning set forth in Section 9.02(a).

"<u>Separate-cos</u>" has the meaning set forth in the preamble hereto.

"<u>Separation</u>" has the meaning set forth in the recitals hereto.

"<u>Separation Transactions</u>" means the transactions to effect the Separation as described in the Transactions Memo and, in the singular, means any one of them.

"<u>Shared Liability</u>" of a Spinco means any Liability from, relating to, arising out of, or derivative of any matter, claim or litigation, whether actual or potential, associated with any securities law litigation relating to any public disclosure (or absence of public disclosure) with respect to such Spinco's Spun Business or the Spun Entities in such Spinco's Corresponding Group made by IAC prior to the Effective Time, including the fees and expenses of outside counsel retained by IAC in connection with the defense and/or settlement of any such matter.  For purposes of this definition, the phrase "securities law litigation" shall include claims alleging any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact in alleged violation of the Securities Act, the Exchange Act or any similar state law and any claims premised on, related to or derivative of such alleged statements, omissions or violations, whether payable to any current, past or future holders of IAC securities or any Spinco securities, to any of the co-defendants in such action or to any Governmental Authority.  Notwithstanding anything in Section 6.06 to the contrary, the amount of any Shared Liability shall be net of any insurance proceeds actually recovered by or on behalf of any member of any Group.

"<u>Specified Financial Liabilities</u>" means, in respect of any Person, all liabilities, obligations, contingencies, instruments and other Liabilities of a financial nature with Third Parties of, or relating to, such Person, including any of the following:

    (a)       foreign exchange contracts;

    (b)       letters of credit;

15

    (c)       guarantees of Third Party loans;

    (d)       surety bonds (excluding surety for workers' compensation self-insurance);

    (e)       interest support agreements on Third Party loans;

    (f)        performance bonds or guarantees issued by Third Parties;

    (g)       swaps or other derivatives contracts;

    (h)       recourse arrangements on the sale of receivables or notes; and

(i)        indemnities for damages for any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant, undertaking or obligation.

"Spinco" has the meaning set forth in the preamble hereto.

"Spinco Auditor" has the meaning set forth in Section 11.01(a).

"Spinco Common Stock" means the HSN Common Stock, the Interval Common Stock, the TM Common Stock and/or the Tree Common Stock, as applicable.

"Spinco Common Stock Escrow Account" has the meaning set forth in Section 4.03.

"Spinco Group" means any of the HSN Group, the Interval Group, the TM Group and the Tree Group.

"Spun Businesses" has the meaning set forth in the recitals hereto.

"Spun Assets" means the HSN Assets, the Interval Assets, the TM Assets and the Tree Assets.

"Spun Entities" means the HSN Entities, the Interval Entities, the TM Entities and the Tree Entities.

"Spun Liabilities" means the HSN Liabilities, the Interval Liabilities, the TM Liabilities and the Tree Liabilities.

"Subsidiary" of any Person means any corporation, partnership, limited liability entity, joint venture or other organization, whether incorporated or unincorporated, of which a majority of the total voting power of capital stock or other interests entitled (without the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof, is at the time owned or controlled, directly or indirectly, by such Person.

"Tangible Personal Property" means, in respect of any Person, all machinery, equipment, tools, furniture, office equipment, supplies, materials, vehicles and other items of

16

tangible personal or movable property (other than Inventories and IT Assets) of every kind and wherever located that are owned or leased by the Person, together with any express or implied warranty by the manufacturers, sellers or lessors of any item or component part thereof and all maintenance Records and other documents relating thereto.

"Tax" means Income Taxes and Other Taxes as defined in the Tax Sharing Agreement.

"Tax Sharing Agreement" means the Tax Sharing Agreement among the Parties to be dated as of even date herewith.

"Third Party" means a Person (a) that is not a Party to this Agreement, other than a member of any Group and (b) that is not an Affiliate thereof.

"Third Party Claim" has the meaning set forth in Section 6.04(b).

"Third Party Consent" has the meaning set forth in Section 2.11.

"Ticketing Business" means (a) the businesses and operations of TM Spinco and its subsidiaries as described in the Prospectus forming a part of TM Spinco's Registration Statement, (b) any other business conducted primarily through the use of the TM Assets prior to the Effective Time and (c) the businesses and operations of Business Concerns acquired or established by or for TM Spinco or any of its Subsidiaries after the date of this Agreement.

"TM Assets" has the meaning set forth in Section 2.04.

"TM Claims" has the meaning set forth in Section 6.01(a).

"TM Common Stock" means the common stock, par value $0.01 per share, of TM Spinco.

"TM Distribution" means the distribution on the TM Distribution Date, to holders of record of shares of IAC Common Stock and IAC Class B Common Stock as of the TM Distribution Record Date, of the TM Common Stock owned by IAC on the basis of a fraction of a share of TM Common Stock equal to the TM Distribution Ratio for every one share of IAC Common Stock or IAC Class B Common Stock.

"TM Distribution Date" means the date on which IAC distributes all of the issued and outstanding shares of TM Common Stock to the holders of IAC Common Stock and IAC Class B Common Stock.

"TM Distribution Ratio" means 1/5, subject to adjustment pursuant to Section 5.02(a).

"TM Distribution Record Date" means such date as may be determined by the IAC Board as the record date for the TM Distribution.

"TM Effective Time Cash Balance" has the meaning set forth in Section 4.04(a).

<center>17</center>

"TM Entities" means those Business Concerns forming part of the IAC Group which are identified on Schedule 2.04(b) and which on and after the Effective Time form part of the TM Group.

"TM Group" means TM Spinco, the TM Entities and each other Person (other than any member of any other Group) that is a direct or indirect Subsidiary of TM Spinco immediately after the Effective Time, and each Person that becomes a Subsidiary of TM Spinco after the Effective Time.

"TM Group Balance Sheet" has the meaning set forth in Section 2.04(c).

"TM Liabilities" has the meaning set forth in Section 2.10.

"TM Opening Balance Sheet" has the meaning set forth in Section 2.04(e).

"TM Releasors" has the meaning set forth in Section 6.01(a).

"TM Spinco" has the meaning set forth in the preamble hereto.

"TM Target Cash Balance" has the meaning set forth in Section 4.04(a).

"Transfer Impediment" has the meaning set forth in Section 3.01(a).

"Transactions Memo" has the meaning set forth in the recitals hereto.

"Transition Services Agreement" means the Transition Services Agreement among the Parties to be dated as of even date herewith.

"Tree Assets" has the meaning set forth in Section 2.07.

"Tree Claims" has the meaning set forth in Section 6.01(d).

"Tree Common Stock" means the common stock, par value $0.01 per share, of Tree Spinco.

"Tree Distribution" means the distribution on the Tree Distribution Date, to holders of record of shares of IAC Common Stock and IAC Class B Common Stock as of the Tree Distribution Record Date, of the Tree Common Stock owned by IAC on the basis of a fraction of a share of Tree Common Stock equal to the Tree Distribution Ratio for every one share of IAC Common Stock or IAC Class B Common Stock.

"Tree Distribution Date" means the date on which IAC distributes all of the issued and outstanding shares of Tree Common Stock to the holders of IAC Common Stock and IAC Class B Common Stock.

"Tree Distribution Ratio" means P50, subject to adjustment pursuant to Section 5.02(a).

18

"Tree Distribution Record Date" means such date as may be determined by the IAC Board as the record date for the Tree Distribution.

"Tree Effective Time Cash Balance" has the meaning set forth in Section 4.04(d).

"Tree Entities" means those Business Concerns forming part of the IAC Group which are identified on Schedule 2.07(b) and which on and after the Effective Time form part of the Tree Group.

"Tree Group" means Tree Spinco, the Tree Entities and each other Person (other than any member of any other Group) that is a direct or indirect Subsidiary of Tree Spinco immediately after the Effective Time, and each Person that becomes a Subsidiary of Tree Spinco after the Effective Time.

"Tree Group Balance Sheet" has the meaning set forth in Section 2.07(c).

"Tree Liabilities" has the meaning set forth in Section 2.10.

"Tree Opening Balance Sheet" has the meaning set forth in Section 2.07(e).

"Tree Releasors" has the meaning set forth in Section 6.01(d).

"Tree Spinco" has the meaning set forth in the preamble hereto.

"Tree Target Cash Balance" has the meaning set forth in Section 4.04(d).

"Unreleased Group" has the meaning set forth in Section 3.02.

"Unreleased Liabilities" has the meaning set forth in Section 3.02.

"Unreleased Person" has the meaning set forth in Section 3.02.

"Unreleased Separate-co" has the meaning set forth in Section 3.02.

"Vacations Business" means (a) the businesses and operations of Interval Spinco and its subsidiaries as described in the Prospectus forming a part of Interval Spinco's Registration Statement, (b) any other business conducted primarily through the use of the Interval Assets prior to the Effective Time and (c) the businesses and operations of Business Concerns acquired or established by or for Interval Spinco or any of its Subsidiaries after the date of this Agreement.

"Warrant Share Number" has the meaning set forth in Section 5.05(a)(i).

1.02. Schedules. The following schedules are attached to this Agreement and form a part hereof:

| Schedule 1.01(a) | Old IAC Integrated Warrant |
| Schedule 2.04(a) | TM Assets |
| Schedule 2.04(b) | TM Entities |

19

| Schedule 2.04(c) | TM Group Balance Sheet |
| Schedule 2.05(a) | Interval Assets |
| Schedule 2.05(b) | Interval Entities |
| Schedule 2.05(c) | Interval Group Balance Sheet |
| Schedule 2.06(a) | HSN Assets |

| | |
|---|---|
| Schedule 2.06(b) | HSN Entities |
| Schedule 2.06(c) | HSN Group Balance Sheet |
| Schedule 2.07(a) | Tree Assets |
| Schedule 2.07(b) | Tree Entities |
| Schedule 2.07(c) | Tree Group Balance Sheet |
| Schedule 2.09(a) | Excluded Assets |
| Schedule 2.10(a) | TM Liabilities |
| Schedule 2.10(b) | Interval Liabilities |
| Schedule 2.10(c) | HSN Liabilities |
| Schedule 2.10(d) | Tree Liabilities |
| Schedule 2.10(e) | Retained Liabilities |
| Schedule 2.14(a) | IAC Resignation Exceptions |

1.03.    <u>Effective Time; Suspension</u>. (a) This Agreement shall be effective as of the Effective Time.

(b)    Notwithstanding Section 1.03(a) above, as between any two of the Parties, the provisions of, and the obligations under, this Agreement shall be suspended as between such Parties until the applicable Relevant Time (and, as the context requires, references to the Effective Time shall be deemed to refer to the Relevant Time), other than Sections 2.01, 2.02, 2.03, 2.04, 2.05, 2.06, 2.07, 2.09 and 2.10, each of which shall be effective as of the Effective Time. For the avoidance of doubt, in the event that one or more of the Distributions shall not be effected on the first Distribution Date to occur, then for purposes of determining the rights and obligations between IAC and any Spinco the Spinco Common Stock of which shall have been distributed on such date, until the Distribution Date, if any, for each Spinco not so distributed, such undistributed Spinco and the members of its Corresponding Group shall continue to be treated as members of the IAC Group and shall not, upon its Distribution Date, bear any Liability for any Retained Liabilities.

<div align="center">

**ARTICLE II**
**THE SEPARATION**

</div>

2.01.    <u>Separation</u>. To the extent not already complete, IAC and the Spincos agree to implement the Separation and to cause the Corresponding Businesses of each Spinco to be transferred to such Spinco and its Subsidiaries and the Remaining Business to be held by IAC and its Subsidiaries (other than the Spincos and their Subsidiaries) as of the Effective Time, on the terms and subject to the conditions set forth in this Agreement. The Parties acknowledge that the Separation is intended to result in each Spinco, directly or indirectly, operating its Corresponding Business, owning its Corresponding Assets and assuming its Corresponding Liabilities as set forth in this Article II.

<div align="center">20</div>

2.02.    <u>Implementation</u>. The Separation shall be completed in accordance with the agreed general principles, objectives and other provisions set forth in this Article II and shall be implemented in the following manner:

(a)    through the completion of the steps described in the Transactions Memo;

(b)    through the transfer from time to time following the Effective Time of the Deferred Transfer Assets as described in Article III;

(c)    through the completion from time to time following the Effective Time of the Deferred Transactions, as described in Section 10.01(a); and

(d)    through the performance by the Parties of all other provisions of this Agreement.

2.03.    <u>Transfer of Spun Assets; Assumption of Spun Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, and in furtherance of the Separation, with effect as of the Effective Time:

(a)    To the extent not already complete, IAC agrees to cause the Corresponding Assets of each Spinco to be contributed, assigned, transferred, conveyed and delivered, directly or indirectly, to such Spinco, and each Spinco agrees to accept all of its obligations and all of the rights, title and interest in and to all its Corresponding Assets owned, directly or indirectly, by IAC which, except with respect to Deferred Corresponding Assets and Unreleased Liabilities, will result in such Spinco owning, directly or indirectly, its Corresponding Business.

(b)    Each Spinco agrees to accept, assume and faithfully perform, discharge and fulfill all of its Corresponding Liabilities in accordance with their respective terms.

2.04.    TM Assets.  For the purposes of this Agreement, "TM Assets" shall mean, without duplication, those Assets whether now existing or hereinafter acquired, used or contemplated to be used or held for use exclusively or primarily in the ownership, operation or conduct of the Ticketing Business or relating exclusively or primarily to the Ticketing Business or to a TM Entity including the following:

(a)    all Assets expressly identified in this Agreement or in any Ancillary Agreement or in any Schedule hereto or thereto, including those, if any, listed on Schedule 2.04(a), as Assets to be transferred to, or retained by, TM Spinco or any other member of the TM Group;

(b)    the outstanding capital stock, units or other equity interests of the TM Entities, as listed on Schedule 2.04(b), and the Assets owned by such TM Entities;

(c)    all Assets properly reflected on Schedule 2.04(c) (the "TM Group Balance Sheet"), excluding Assets disposed of by IAC or any other Subsidiary or entity controlled by IAC subsequent to the date of the TM Group Balance Sheet;

21

(d)    all Assets that have been written off, expensed or fully depreciated by IAC or any Subsidiary or entity controlled by IAC that, had they not been written off, expensed or fully depreciated, would have been reflected on the TM Group Balance Sheet in accordance with accounting principles generally accepted in the United States ("GAAP");

(e)    all Assets acquired by IAC or any Subsidiary or entity controlled by IAC after the date of the TM Group Balance Sheet and that would be reflected on the balance sheet of TM Spinco as of the Effective Time (the "TM Opening Balance Sheet"), if such balance sheet were prepared in accordance with GAAP; and

(f)    all Assets transferred to TM Spinco or any member of the TM Group pursuant to Section 10.01(a); provided, however, that any such transfer shall take effect under Section 10.01(a) and not under this Section 2.04.

Notwithstanding the foregoing, there shall be excluded from the definition of TM Assets under this Section 2.04 Business Records to the extent they are included in or primarily relate to any Excluded Asset or Retained Liability or the Remaining Business or their transfer is prohibited by Applicable Law or by agreements between any other Separate-co or any member of another Separate-co's Corresponding Group and Third Parties or otherwise would subject any other Separate-co or any member of any other Corresponding Group to liability for such transfer.  Access to such excluded Business Records shall be governed by Article VIII.

2.05.    Interval Assets.  For the purposes of this Agreement, "Interval Assets" shall mean, without duplication, those Assets whether now existing or hereinafter acquired, used or contemplated to be used or held for use exclusively or primarily in the ownership, operation or conduct of the Vacations Business or relating exclusively or primarily to the Vacation Business or to an Interval Entity including the following:

(a)    all Assets expressly identified in this Agreement or in any Ancillary Agreement or in any Schedule hereto or thereto, including those, if any, listed on Schedule 2.05(a), as Assets to be transferred to, or retained by, Interval Spinco or any other member of the Interval Group;

(b)    the outstanding capital stock, units or other equity interests of the Interval Entities, as listed on Schedule 2.05(b), and the Assets owned by such Interval Entities;

(c)    all Assets properly reflected on Schedule 2.05(c) (the "Interval Group Balance Sheet"), excluding Assets disposed of by IAC or any other Subsidiary or entity controlled by IAC subsequent to the date of the Interval Group Balance Sheet;

(d)    all Assets that have been written off, expensed or fully depreciated by IAC or any Subsidiary or entity controlled by IAC that, had they not been written off, expensed or fully depreciated, would have been reflected on the Interval Group Balance Sheet in accordance with GAAP;

(e)　　all Assets acquired by IAC or any Subsidiary or entity controlled by IAC after the date of the Interval Group Balance Sheet and that would be reflected on the balance

22

sheet of Interval Spinco as of the Effective Time (the "Interval Opening Balance Sheet"), if such balance sheet were prepared in accordance with GAAP; and

(f)　　all Assets transferred to Interval Spinco or any member of the Interval Group pursuant to Section 10.01(a); provided, however, that any such transfer shall take effect under Section 10.01(a) and not under this Section 2.05.

Notwithstanding the foregoing, there shall be excluded from the definition of Interval Assets under this Section 2.05 Business Records to the extent they are included in or primarily relate to any Excluded Asset or Retained Liability or the Remaining Business or their transfer is prohibited by Applicable Law or by agreements between any other Separate-co or any member of another Separate-co's Corresponding Group and Third Parties or otherwise would subject any other Separate-co or any member of any other Corresponding Group to liability for such transfer.  Access to such excluded Business Records shall be governed by Article VIII.

2.06.　　HSN Assets.  For the purposes of this Agreement, "HSN Assets" shall mean, without duplication, those Assets whether now existing or hereinafter acquired, used or contemplated to be used or held for use exclusively or primarily in the ownership, operation or conduct of the Retailing Business or relating exclusively or primarily to the Retailing Business or to an HSN Entity including the following:

(a)　　all Assets expressly identified in this Agreement or in any Ancillary Agreement or in any Schedule hereto or thereto, including those, if any, listed on Schedule 2.06(a), as Assets to be transferred to, or retained by, HSN Spinco or any other member of the HSN Group;

(b)　　the outstanding capital stock, units or other equity interests of the HSN Entities, as listed on Schedule 2.06(b), and the Assets owned by such HSN Entities;

(c)　　all Assets properly reflected on Schedule 2.06(c) (the "HSN Group Balance Sheet"), excluding Assets disposed of by IAC or any other Subsidiary or entity controlled by IAC subsequent to the date of the HSN Group Balance Sheet;

(d)　　all Assets that have been written off, expensed or fully depreciated by IAC or any Subsidiary or entity controlled by IAC that, had they not been written off, expensed or fully depreciated, would have been reflected on the HSN Group Balance Sheet in accordance with GAAP;

(e)　　all Assets acquired by IAC or any Subsidiary or entity controlled by IAC after the date of the HSN Group Balance Sheet and that would be reflected on the balance sheet of HSN as of the Effective Time (the "HSN Opening Balance Sheet"), if such balance sheet were prepared in accordance with GAAP; and

(f)　　all Assets transferred to HSN Spinco or any member of the HSN Group pursuant to Section 10.01(a); provided, however, that any such transfer shall take effect under Section 10.01(a) and not under this Section 2.06.

23

Notwithstanding the foregoing, there shall be excluded from the definition of HSN Assets under this Section 2.06 Business Records to the extent they are included in or primarily relate to any Excluded Asset or Retained Liability or the Remaining Business or their transfer is prohibited by Applicable Law or by agreements between any other Separate-co or any member of another Separate-co's Corresponding Group and Third Parties or otherwise would subject any other Separate-co or any member of any other Corresponding Group to liability for such transfer.  Access to such excluded Business Records shall be governed by Article VIII.

2.07.　　Tree Assets.  For the purposes of this Agreement, "Tree Assets" shall mean, without duplication, those Assets whether now existing or hereinafter acquired, used or contemplated to be used or held for use exclusively or primarily in the ownership, operation or conduct of the Lending and Real Estate Business or relating exclusively or primarily to the Lending and Real Estate Business or to a Tree Entity including the following:

(a)     all Assets expressly identified in this Agreement or in any Ancillary Agreement or in any Schedule hereto or thereto, including those, if any, listed on Schedule 2.07(a), as Assets to be transferred to, or retained by, Tree Spinco or any other member of the Tree Group;

(b)     the outstanding capital stock, units or other equity interests of the Tree Entities, as listed on Schedule 2.07(b), and the Assets owned by such Tree Entities;

(c)     all Assets properly reflected on Schedule 2.07(c) (the "Tree Group Balance Sheet"), excluding Assets disposed of by IAC or any other Subsidiary or entity controlled by IAC subsequent to the date of the Tree Group Balance Sheet;

(d)     all Assets that have been written off, expensed or fully depreciated by IAC or any Subsidiary or entity controlled by IAC that, had they not been written off, expensed or fully depreciated, would have been reflected on the Tree Group Balance Sheet in accordance with GAAP;

(e)     all Assets acquired by IAC or any Subsidiary or entity controlled by IAC after the date of the Tree Group Balance Sheet and that would be reflected on the balance sheet of Tree Spinco as of the Effective Time (the "Tree Opening Balance Sheet"), if such balance sheet were prepared in accordance with GAAP; and

(f)     all Assets transferred to Tree Spinco or any member of the Tree Group pursuant to Section 10.01(a); provided, however, that any such transfer shall take effect under Section 10.01(a) and not under this Section 2.07.

Notwithstanding the foregoing, there shall be excluded from the definition of Assets under this Section 2.07 Business Records to the extent they are included in or primarily relate to any Excluded Asset or Retained Liability or the Remaining Business or their transfer is prohibited by Applicable Law or by agreements between any other Separate-co or any member of another Separate-co's Corresponding Group and Third Parties or otherwise would subject any other Separate-co or any member of any other Corresponding Group to liability for such transfer. Access to such excluded Business Records shall be governed by Article VIII.

24

2.08.    Deferred Spun Assets.  Notwithstanding anything to the contrary contained in Section 2.04, 2.05, 2.06 or 2.07 or elsewhere in this Agreement, the Spun Assets shall not include any Deferred Spun Assets.  The transfer to a Spinco or its Corresponding Group of any such Deferred Spun Asset shall only be completed at the time, in the manner and subject to the conditions set forth in Article III.

2.09.    Excluded Assets.  (a) Notwithstanding anything to the contrary contained in Section 2.04, 2.05, 2.06 or 2.07 or elsewhere in this Agreement, the following Assets of IAC (or of any other relevant member of the IAC Group) that would otherwise be included among the Corresponding Assets of a Spinco shall not be transferred to such Spinco (or any other member of its Corresponding Group), shall not form part of its Corresponding Assets and shall remain the exclusive property of IAC (or the relevant member of the IAC Group) on and after the Effective Time (the "Excluded Assets"):

(i)     any Asset expressly identified on Schedule 2.09(a); and

(ii)    any Asset transferred to IAC or to any other relevant member of the IAC Group pursuant to Section 10.01(a); provided, however, that any such transfers shall take effect under Section 10.01(a) and not under this Section 2.09.

(b)     Notwithstanding anything to the contrary in this Agreement, Excluded Assets shall not include Deferred Excluded Assets.  The transfer to IAC (or to the relevant member of the IAC Group) or to another Spinco (or to the relevant member of its Corresponding Group) of any such Asset shall be completed at the time, in the manner and subject to the conditions set forth in Article III.

2.10.    Liabilities.  For the purposes of this Agreement, Liabilities shall be identified as "TM Liabilities," "Interval Liabilities," "HSN Liabilities,"  "Tree Liabilities or "Retained Liabilities" under the following principles:

(a)     any Liability which is expressly identified on Schedule 2.10(a) shall be a TM Liability;

(b)     any Liability which is expressly identified on Schedule 2.10(b) shall be an Interval Liability;

(c)    any Liability which is expressly identified on Schedule 2.10(c) shall be an HSN Liability;

(d)    any Liability which is expressly identified on Schedule 2.10(d) shall be a Tree Liability;

(e)    any Liability which is expressly identified on Schedule 2.10(e) shall be a Retained Liability;

(f)    (i) 50% of any Shared Liability of Ticketmaster Spinco shall be a Ticketmaster Liability and 50% shall be a Retained Liability, (ii) 50% of any Shared Liability of Interval Spinco shall be an Interval Liability and 50% shall be a Retained Liability, (iii) 50% of

25

any Shared Liability of HSN Spinco shall be an HSN Liability and 50% shall be a Retained Liability and (iv) 50% of any Shared Liability of Tree Spinco shall be a Tree Liability and 50% shall be a Retained Liability;

(g)    any Liability of a Spun Entity, whether arising or accruing prior to, on or after the Effective Time and whether the facts on which it is based occurred on, prior to or after the Effective Time and whether or not reflected on the Corresponding Group Balance Sheet or on the Corresponding Opening Balance Sheet, shall be a Corresponding Liability of such Spun Entity's Corresponding Group, unless it is expressly identified in this Agreement (including on any Schedule) or in any Ancillary Agreement as a Liability to be assumed or retained by IAC (or any other member of the IAC Group) or by a Spinco that is not included in such Spun Entity's Corresponding Group (or any other relevant member of such other Spinco's Corresponding Group), in which case it shall be a Retained Liability or a Spun Liability of such other Spinco's Corresponding Group, as applicable;

(h)    any Liability relating to, arising out of, or resulting from the conduct of, a Spun Business (as conducted at any time prior to, on or after the Effective Time) or relating to a Spun Asset or a Deferred Spun Asset and whether arising or accruing prior to, on or after the Effective Time and whether the facts on which it is based occurred on, prior to or after the Effective Time and whether or not reflected on the Corresponding Group Balance Sheet or the Corresponding Opening Balance Sheet, shall be a Corresponding Liability of such Spun Business' Corresponding Group, unless it is expressly identified in this Agreement (including on any Schedule) or in any Ancillary Agreement as a Liability to be assumed or retained by IAC (or any other member of the IAC Group) or by a Spinco that is not included in such Spun Entity's Corresponding Group (or any other relevant member of such other Spinco's Corresponding Group), in which case it shall be a Retained Liability or Spun Liability of such other Spinco's Corresponding Group, as applicable;

(i)    any Liability which is reflected or otherwise disclosed as a liability or obligation of any Spinco Group on its Corresponding Group Balance Sheet shall be a Corresponding Liability of such Spinco Group;

(j)    any Liability which would be reflected or otherwise disclosed on the Corresponding Group Balance Sheet of any Spinco Group, if such balance sheet were prepared under GAAP, shall be a Corresponding Liability of such Spinco Group;

(k)    any Liability pursuant to contracts entered into by IAC and/or any member of the IAC Group (i) in connection with the acquisition, by IAC and/or any member of the IAC Group, of any Spun Entity and/or Spun Business or (ii) otherwise relating primarily to a Spun Entity and/or the conduct of a Spun Business, shall be a Corresponding Liability of such Spun Entity's or Spun Business's Corresponding Group, unless it is expressly identified in this Agreement (including on any Schedule) or in any Ancillary Agreement as a Liability to be assumed or retained by IAC (or any other member of the IAC Group) or by a Spinco that is not included in such Spun Entity's Corresponding Group (or any other relevant member of such other Spinco's Corresponding Group), in which case it shall be a Retained Liability or Spun Liability of such other Spinco's Corresponding Group, as applicable;

26

(l)    any Liability of a Remaining IAC Entity, whether arising or accruing prior to, on or after the Effective Time and whether the facts on which it is based occurred on, prior to or after the Effective Time, shall be Retained Liability, unless it is determined to be a Spun Liability pursuant to clause (a), (b), (c), (d), (f), (g), (h), (i),  (j) or (k) above, in which case it shall be a Spun Liability as set forth thereunder;

(m)    any Liability relating to, arising out of, or resulting from the conduct of, a Remaining IAC Business (as conducted at any time prior to, on or after the Effective Time) or relating to an Excluded Asset and whether arising or accruing prior to,

on or after the Effective Time and whether the fact on which it is based occurred on, prior to or after the Effective Time, shall be a Retained Liability, unless it is determined to be a Spun Liability pursuant to clause (a), (b), (c), (d), (f), (g), (h), (i),  (j) or (k) above, in which case it shall be a Spun Liability as set forth thereunder; and

(n)        any Liability of any Spinco or any other member of any Spinco Group under this Agreement or any Ancillary Agreement shall be a Corresponding Liability of such Spinco Group and any Liability of IAC or any other member of the IAC Group under this Agreement or any Ancillary Agreement shall be a Retained Liability.

2.11.    <u>Third Party Consents and Government Approvals</u>.  To the extent that the Separation or any transaction contemplated thereby requires a Consent from any Third Party (a "<u>Third Party Consent</u>") or any Governmental Authorization, the Parties will use commercially reasonable efforts to obtain all such Third Party Consents and Governmental Authorizations prior to the Effective Time.  If the Parties fail to obtain any such Third Party Consent or Governmental Authorization prior to the Effective Time, the matter shall be dealt with in the manner set forth in Article III.

2.12.    <u>Preservation of Agreements</u>.  The Parties each agree that all written agreements, arrangements, commitments and understandings between any member or members of its Corresponding Group, on the one hand, and any member or members of any other Group, on the other hand, shall remain in effect in accordance with their terms from and after the Effective Time, unless otherwise terminated by the relevant Parties.

2.13.    <u>Ancillary Agreements</u>.  On or prior to the Effective Time, the Parties shall execute and deliver or, as applicable, cause the appropriate members of their respective Groups to execute and deliver, each of the following agreements (collectively, the "<u>Ancillary Agreements</u>"):

(a)        the Employee Matters Agreement;

(b)        the Tax Sharing Agreement;

(c)        the Transition Services Agreement; and

(d)        the Transactions Memorandum, and such other agreements and instruments as may relate to or be identified in any of the foregoing agreements.

27

2.14.    <u>Resignations</u>.  (a)  IAC agrees to cause each Person who is a director or an officer of any Spun Entity and who will not be or become an employee of such Spun Entity's Spinco Group (or any member thereof) at the Effective Time to resign from such position with effect as of the Effective Time; <u>provided</u>, <u>however</u>, that this Section 2.14(a) shall not apply to the persons in the capacities set forth on Schedule 2.14(a).

(b)        Each Spinco agrees to cause each Person (i) who is a director or an officer of a Remaining IAC Entity or any Spun Entity that is not a member of such Spinco's Corresponding Group and (ii) who will become an employee of such Spinco's Corresponding Group (or any member thereof) at the Effective Time to resign from such position with effect as of the Effective Time.

(c)        Each Separate-co agrees to obtain all such letters of resignation or other evidence of such resignations as may be necessary or desirable in performing their respective obligations under this Section 2.14.

2.15.    <u>Cooperation</u>.  The Parties shall cooperate in all aspects of the Separation and shall sign all such documents and perform all such other acts as may be necessary or desirable to give full effect to the Separation; and each Separate-co shall cause each other member of its Corresponding Group to do likewise.

2.16.    <u>Intercompany Accounts Among Groups</u>.  Except as otherwise expressly provided in any Ancillary Agreement, from and after the Effective Time, each Separate-co agrees to cause any Intercompany Account payable by any member of its Corresponding Group to any member of any other Group to be satisfied in full.

2.17.    <u>Disclaimer of Representations and Warranties</u>.  (a)  Each of the Parties (on behalf of itself and each other member of its respective Corresponding Group) understands and agrees that, except as expressly set forth herein or in any Ancillary Agreement, no Party to this Agreement, any Ancillary Agreement or any other agreement or document contemplated by this Agreement, any Ancillary Agreement or otherwise, makes any representation or warranty, express or implied, regarding any of the

Spun Assets, Spun Entities, Spun Businesses, Excluded Assets, Spun Liabilities or Retained Liabilities including any warranty of merchantability or fitness for a particular purpose, or any representation or warranty regarding any Consents or Governmental Authorizations required in connection therewith or their transfer, regarding the value or freedom from Encumbrances of, or any other matter concerning, any Spun Asset or Excluded Asset, or regarding the absence of any defense or right of setoff or freedom from counterclaim with respect to any claim or other Spun Asset or Excluded Asset, including any Account Receivable of any Party, or as to the legal sufficiency of any assignment, document or instrument delivered hereunder to convey title to any Spun Asset or Excluded Asset upon the execution, delivery and filing hereof or thereof.

(b)        Except as may expressly be set forth herein or in any Ancillary Agreement, all Spun Assets and Excluded Assets are being transferred on an "as is, where is" basis, at the risk of the respective transferees without any warranty whatsoever on the part of the transferor, formal or implicit, legal, statutory or conventional (and, in the case of any Real Property, by means of a quitclaim or similar form deed or conveyance).

28

# ARTICLE III
## DEFERRED SEPARATION TRANSACTIONS

3.01.        Deferred Transfer Assets.  (a)  If the transfer to, or retention by, any member of a Spinco Group of any Asset that would otherwise constitute its Corresponding Asset (a "Deferred Spun Asset"; with respect to such Spinco, a "Deferred Corresponding Asset") or the transfer to, or retention by, any member of the IAC Group of any Asset that would otherwise constitute an Excluded Asset (a "Deferred Excluded Asset," and together with a Deferred Spun Asset, a "Deferred Transfer Asset") cannot be accomplished without giving rise to a violation of Applicable Law, or without obtaining a Third Party Consent or a Governmental Authorization (collectively, a "Transfer Impediment") and any such Third Party Consent or Governmental Authorization has not been obtained prior to the Effective Time, then such Asset shall be dealt with in the manner described in this Section 3.01.

(b)        Pending removal of such Transfer Impediment, the Person holding the Deferred Transfer Asset (the "Retaining Person") shall hold such Deferred Transfer Asset for the use and benefit, insofar as reasonably possible, of the Party to whom the transfer of such Asset could not be made at the Effective Time (the "Deferred Beneficiary").  The Retaining Person shall use commercially reasonable efforts to preserve such Asset and its right, title and interest therein and take all such other action as may reasonably be requested by the Deferred Beneficiary (in each case, at such Deferred Beneficiary's expense) in order to place such Deferred Beneficiary, insofar as reasonably possible, in the same position as it would be in if such Asset had been transferred to it or retained by it with effect as of the Effective Time and so that, subject to the standard of care set forth above, all the benefits and burdens relating to such Deferred Transfer Asset, including possession, use, risk of loss, potential for gain, enforcement of rights against third parties and dominion, control and command over such Asset, are to inure from and after the Effective Time to such Deferred Beneficiary and the members of its Group.  The provisions set forth in this Article III contain all the obligations of the Retaining Person vis-à-vis the Deferred Beneficiary with respect to the Deferred Transfer Asset and the Retaining Person shall not be bound vis-à-vis the Deferred Beneficiary by any other obligations under Applicable Law.

(c)        The Parties shall continue on and after the Effective Time to use commercially reasonable efforts to remove all Transfer Impediments; provided, however, that no Party shall be required to make any unreasonable payment or assume any material obligations therefor.  As and when any Transfer Impediment is removed, the relevant Deferred Transfer Asset shall forthwith be transferred to its Deferred Beneficiary at no additional cost and in a manner and on terms consistent with the relevant provisions of this Agreement and the Ancillary Agreements, including Section 2.17(b) hereof, and any such transfer shall take effect as of the date of its actual transfer.

(d)        Notwithstanding the foregoing or any provision of Applicable Law, a Retaining Person shall not be obligated, in connection with the foregoing, to expend any money in respect of a Deferred Transfer Asset unless the necessary funds are advanced by the Deferred Beneficiary of such Deferred Transfer Asset, other than reasonable attorneys' fees and recording or similar fees, all of which shall be promptly reimbursed by the Deferred Beneficiary of such Deferred Transfer Asset.

29

3.02.        Unreleased Liabilities.  If at any time on or after the Effective Time, any member of any Group shall remain obligated to any Third Party in respect of any Corresponding Liability not its own — i.e., a Corresponding Liability of another Separate-co (such other Separate-co with respect such Unreleased Liability and such Unreleased Person, the "Responsible Separate-

co") — the following provisions shall apply.   The Liabilities referred to in this Section 3.02 are hereinafter referred to as the "Unreleased Liabilities," the Person remaining obligated for such Liability in a manner contrary to what is intended under this Agreement is hereinafter referred to as the "Unreleased Person," such Unreleased Person's Corresponding Separate-co, the "Unreleased Separate-co" and such Unreleased Person's Corresponding Group, the "Unreleased Group".

(a)        Each Unreleased Person shall remain obligated to Third Parties for such Unreleased Liability as provided in the relevant Contract, Applicable Law or other source of such Unreleased Liability and shall pay and perform such Unreleased Liability as and when required, in accordance with its terms.

(b)        Each Responsible Separate-co shall indemnify, defend and hold harmless each Other Separate-Co Indemnified Party that is an Unreleased Person from and against any Liabilities arising in respect of each Unreleased Liability of such Unreleased Person that is a Corresponding Liability of such Responsible Separate-co. Each Responsible Separate-co shall take, and shall cause the members of its Corresponding Group (the "Responsible Group") to take, such other actions as may be reasonably requested by the applicable Unreleased Separate-co in accordance with the provisions of this Agreement in order to place the applicable Unreleased Group, insofar as reasonably possible, in the same position as it would be in if such Unreleased Liability had been fully contributed, assigned, transferred, conveyed, and delivered to, and accepted and assumed or retained, as applicable, by such Responsible Separate-co (or any relevant member of the Responsible Group) with effect as of the Effective Time and so that all the benefits and burdens relating to such Unreleased Liability, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Unreleased Liability, are to inure from and after the Effective Time to the member or members of the Responsible Group.

(c)        Each Responsible Separate-co shall continue on and after the Effective Time to use commercially reasonable efforts to cause the applicable Unreleased Persons to be released from their respective Unreleased Liabilities.

(d)        If, as and when it becomes possible to delegate, novate or extinguish any Unreleased Liability in favor of an Unreleased Person, the relevant Parties shall promptly sign all such documents and perform all such other acts, and shall cause each member of their respective Groups, as applicable, to sign all such documents and perform all such other acts, as may be necessary or desirable to give effect to such delegation, novation, extinction or other release without payment of any further consideration by the Unreleased Person.

3.03.    No Additional Consideration.  For the avoidance of doubt, the transfer or assumption of any Assets or Liabilities under this Article III shall be effected without any additional consideration by any Party hereunder.

<center>30</center>

---

<center>

**ARTICLE IV**
**COVENANTS**

</center>

4.01.    General Covenants.  Each Party covenants with and in favor of the other Parties that it shall, subject, in the case of IAC, to Article XII:

(a)        do and perform all such acts and things, and execute and deliver all such agreements, assurances, notices and other documents and instruments as may reasonably be required of it to facilitate the carrying out of the intent and purpose of this Agreement;

(b)        cooperate with and assist the other Parties, both before and after the Effective Time, in dealing with transitional matters relating to or arising from the Separation, the Distributions, this Agreement or the Ancillary Agreements; and

(c)        cooperate in preparing and filing all documentation (i) to effect all necessary applications, notices, petitions, filings and other documents; and (ii) to obtain as promptly as reasonably practicable all Consents and Governmental Authorizations necessary or advisable to be obtained from any Third Party and/or any Governmental Authority in order to consummate the transactions contemplated by this Agreement (including all approvals required under applicable antitrust laws).

4.02.    Covenants of the Spincos.  In addition to the covenants of the Spincos provided for elsewhere in this Agreement, each Spinco covenants and agrees with, and in favor of, the other Parties that it shall:

(a)        use commercially reasonable efforts and do all things reasonably required of it to cause the Separation and the Distributions to be completed, including cooperating with IAC to obtain:  the approval for the listing of such Spinco's Spinco

Common Stock on NASDAQ or such other securities exchange or inter-dealer quotation system as is reasonably acceptable to IAC;

(b)       use its commercially reasonable efforts to take all such action as may be necessary or desirable under applicable state securities and blue sky laws of the United States (and any comparable laws under any foreign jurisdictions) in connection with the Separation and the Distributions;

(c)       use its commercially reasonable efforts to cause any member of another Group to be released, as soon as reasonably practicable, from any guarantees given by any member of such other Group (the "Guaranteeing Group"; its Corresponding Separate-co, the "Guaranteeing Separate-co") for the benefit of such Spinco (the "Guaranteed Spinco"; its Corresponding Group, the "Guaranteed Group"; its Corresponding Entities, the "Guaranteed Entities") or any Guaranteed Entities and (to the extent necessary to secure such releases) to cause itself or one or more members of the Guaranteed Group to be substituted in all respects for any member of the Guaranteeing Group in respect of such guarantees, provided, that in the event that, notwithstanding the commercially reasonable efforts of the Guaranteed Spinco, the Guaranteed Spinco is unable to obtain such guarantee releases, the Guaranteed Spinco hereby agrees to indemnify and hold the Guaranteeing Separate-co and the other members of the

<div align="center">31</div>

Guaranteeing Group harmless from and against all Liabilities incurred by them in connection with, arising out of or resulting from such guarantees; and

(d)       perform and, as applicable, cause each member of its Corresponding Group to perform each of its and their respective obligations under each Ancillary Agreement.

4.03.    Spinco Common Stock Escrow Accounts.  (a)  Immediately following the Effective Time, each Spinco shall deposit a number of shares of its Spinco Common Stock as is equal to the product of (x) its Corresponding Distribution Ratio and (y) the number of shares of IAC Common Stock deliverable upon the exercise of the Old IAC Integrated Warrant if such warrant were to be exercised immediately prior to the Effective Time (such Spinco's "Corresponding Escrow Shares") into an escrow account (a "Spinco Common Stock Escrow Account") to be established by each Spinco with The Bank of New York Mellon (the "Escrow Agent") to be held by the Escrow Agent pursuant to the terms of an escrow agreement in customary form to be agreed upon by each of the Spincos and the Escrow Agent prior to the Effective Time (an "Escrow Agreement").  The Spinco Common Stock Escrow Accounts will serve as a source of shares of Spinco Common Stock deliverable upon the exercise of the New IAC Integrated Warrant. Under the terms of the Escrow Agreements, any shares of Spinco Common Stock designated for delivery upon exercise of the New IAC Integrated Warrant shall be returned to the applicable Spinco upon the expiration without exercise of the New IAC Integrated Warrant in accordance with its terms.  IAC and each Spinco acknowledge that IAC's obligation to issue shares of IAC Common Stock to the holder of the Old IAC Integrated Warrant relates to the businesses that were conducted by the IAC Group and the Spinco Groups prior to the Effective Time.  Accordingly, from and after the Effective Time, upon an exercise of the New IAC Integrated Warrant, as between IAC and the Spincos, each Spinco will exclusively bear the obligation to deliver shares of its Spinco Common Stock.  The issuance and delivery by each Spinco of its Corresponding Escrow Shares to the applicable Spinco Common Stock Escrow Account is intended to further such Spinco's satisfaction of such obligations following the Separation and the Distributions; provided, however, that if for any reason such Spinco Common Stock Escrow Account does not satisfy such obligations, the transfer of shares by such Spinco to the Spinco Common Stock Escrow Account under this Section 4.03 is not in substitution of the obligations of such Spinco under the immediately preceding sentence to deliver shares of its Spinco Common Stock.  For the avoidance of doubt, any obligations with respect to the delivery of any Spinco Common Stock on account of the New IAC Integrated Warrant shall be a Corresponding Liability of such Spinco.  If, at any time or from time to time following the Effective Time,

(X)       IAC reasonably determines in good faith (which determination, absent manifest error, shall be final and binding) in its sole discretion that, for any Spinco, its Corresponding Escrow Shares are insufficient to satisfy the obligations with respect to the New IAC Integrated Warrant, IAC shall provide to such Spinco written notice indicating the number of additional shares of such Spinco Common Stock necessary to satisfy the obligations pursuant to the New IAC Integrated Warrant and such Spinco shall promptly deposit into the applicable Spinco Common Stock Escrow Account the number of shares of such Spinco Common Stock indicated in the written notice from IAC; or

<div align="center">32</div>

(Y)        any Spinco undertakes any action, or any event shall occur, that either (i) results in an adjustment to the number of shares of its Spinco Common Stock with respect to which the New IAC Integrated Warrant is exercisable or (ii) causes that portion of the New IAC Integrated Warrant that would otherwise have been exercisable for shares of such Spinco Common Stock to become exercisable into another form of consideration (including, without limitation, in conjunction with a merger of such Spinco or a reclassification of such Spinco Common Stock), then, in each case, such Spinco shall promptly deposit into the applicable Spinco Common Stock Escrow Account the number of additional shares of such Spinco Common Stock and/or the other consideration with respect to which the New IAC Integrated Warrant is exercisable.

(b)    Notwithstanding the foregoing, in lieu of issuing any fractional shares of its Spinco Common Stock upon the exercise of the New IAC Integrated Warrant, the applicable Spinco shall promptly deposit into the applicable Spinco Common Stock Escrow Account cash in lieu of such fractional share in an amount computed in accordance with the terms of the New IAC Integrated Warrant.

4.04.    Cash Balance True-Ups.  (a)  In the event that, after review and reconciliation, the amount of cash and cash equivalents and marketable securities reflected in the bank statements (or their equivalents) including instruments deposited and interest accrued but not yet collected of the domestic operations of TM Spinco and its subsidiaries as of the close of business on the TM Distribution Date (the "TM Effective Time Cash Balance") is greater than $0 after reducing the TM Effective Time Cash Balance for the aggregate amount of any Revolving Facility Borrowings outstanding under the TM Credit Agreement dated July 25, 2008 (the "TM Target Cash Balance"), TM Spinco shall make one or more payments to IAC as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the Effective Time, totaling an amount equal to the excess of the TM Effective Time Cash Balance over the TM Target Cash Balance.  In the event that, after review and reconciliation, the TM Effective Time Cash Balance is less than the TM Target Cash Balance, IAC shall make one or more payments to TM Spinco as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the Effective Time, totaling an amount equal to the excess of the TM Target Cash Balance over the TM Effective Time Cash Balance.  Notwithstanding Section 13.08, payments pursuant to this Section 4.04(a) shall not bear any interest.  For the avoidance of doubt, (i) non-client cash and cash equivalents and marketable securities reflected in the bank statements (or their equivalents) of TM Spinco's domestic client bank statements (or their equivalents) will be included in the calculation of the TM Target Cash Balance and (ii) client cash designated for payment to clients representing the face amount of tickets sold will not be included in the calculation of the TM Target Cash Balance.

(b)    In the event that, after review and reconciliation, the amount of cash and cash equivalents and marketable securities reflected in the bank statements (or their equivalents) including instruments deposited and interest accrued but not yet collected of the domestic operations of Interval Spinco and its subsidiaries as of the close of business on the Interval Distribution Date (the "Interval Effective Time Cash Balance") is greater than $50,000,000 (the "Interval Target Cash Balance"), Interval Spinco shall make one or more payments to IAC as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after

33

the Effective Time, totaling an amount equal to the excess of the Interval Effective Time Cash Balance over the Interval Target Cash Balance.  In the event that, after review and reconciliation, the Interval Effective Time Cash Balance is less than the Interval Target Cash Balance, IAC shall make one or more payments to Interval Spinco as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the Effective Time, totaling an amount equal to the excess of the Interval Target Cash Balance over the Interval Effective Time Cash Balance.  Notwithstanding Section 13.08, payments pursuant to this Section 4.04(b) shall not bear any interest.  For the avoidance of doubt, cash and cash equivalents and marketable securities reflected in the bank statements (or their equivalents) of Interval Spinco's ResortQuest operations designated as Trust accounts and restricted cash and cash equivalents and marketable securities of Interval Spinco's Meridian Financial Services subsidiary will not be included in the calculation of the Interval Target Cash Balance.

(c)    In the event that, after review and reconciliation, the amount of cash and cash equivalents and marketable securities reflected in the bank statements (or their equivalents) including instruments deposited and interest accrued but not yet collected of HSN Spinco and its subsidiaries as of the close of business on the HSN Distribution Date (the "HSN Effective Time Cash Balance") is greater than $50,000,000 (the "HSN Target Cash Balance"), HSN Spinco shall make one or more payments to IAC as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the Effective Time, totaling an amount equal to the excess of the HSN Effective Time Cash Balance over the HSN Target Cash Balance.  In the event that, after review and reconciliation, the HSN Effective Time Cash Balance is less than the HSN Target Cash Balance, IAC shall make one or more payments to HSN Spinco as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the

Effective Time, totaling an amount equal to the excess of the HSN Target Cash Balance over the HSN Effective Time Cash Balance. Notwithstanding Section 13.08, payments pursuant to this Section 4.04(c) shall not bear any interest.

(d)    In the event that, after review and reconciliation, the amount of cash and cash equivalents and marketable securities in the bank statements (or their equivalents) including instruments deposited and interest accrued but not yet collected of Tree Spinco and its subsidiaries as of the close of business on the Tree Distribution Date (the "Tree Effective Time Cash Balance") is greater than $98,250,000 less any amounts placed (or required to be placed) in escrow in connection with a Tree lease with The Irvine Company (the "Tree Target Cash Balance"), Tree Spinco shall make one or more payments to IAC as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the Effective Time, totaling an amount equal to the excess of the Tree Effective Time Cash Balance over the Tree Target Cash Balance.  In the event that, after review and reconciliation, the Tree Effective Time Cash Balance is less than the Tree Target Cash Balance, IAC shall make one or more payments to Tree Spinco as promptly as practicable after the Effective Time, but in no event more than ninety (90) days after the Effective Time, totaling an amount equal to the excess of the Tree Target Cash Balance over the Tree Effective Time Cash Balance.  Notwithstanding Section 13.08, payments pursuant to this Section 4.04(d) shall not bear any interest.

34

4.05.  Non-Solicitation.

(a)    IAC and each of the Spincos shall not, and each of them shall cause the other members of its respective Corresponding Group not to, from the applicable Distribution Date of a Spinco (the "Subject Spinco") through and including the eighteen-month anniversary of such Distribution Date, without the prior written consent of the Subject Spinco, either directly or indirectly, on their own behalf or in the service or on behalf of others, solicit for employment or solicit, aid, induce or encourage any person who is an employee of the Subject Spinco's respective Corresponding Group as of such Distribution Date to leave his or her employment.

(b)    No Spinco shall, and each of them shall cause the other members of its respective Corresponding Group not to, from the applicable Distribution Date of such Spinco through and including the eighteen-month anniversary of such Distribution Date, without the prior written consent of IAC, either directly or indirectly, on their own behalf or in the service or on behalf of others, solicit for employment or solicit, aid, induce or encourage any person who is an employee of IAC's Corresponding Group as of such Distribution Date to leave his or her employment.

(c)    Nothing in this Section 4.05 shall be deemed to prohibit any general solicitation for employment through advertisements and search firms not specifically directed at employees of another Party, provided that the applicable Party has not encouraged or advised such firm to approach any such employee.

**ARTICLE V**
**THE DISTRIBUTIONS**

5.01.    Conditions to the Distributions.  (a) In addition to, and without in any way limiting, IAC's rights under Section 12.1, completion of each Distribution is conditioned on:

(i)    the IAC Board not having determined that such Distribution is not in the best interests of IAC and its stockholders;

(ii)    no stop order suspending the effectiveness of the Registration Statements with respect to such Spinco's common shares shall have been issued and no proceedings for that purpose shall have been instituted or threatened by the SEC;

(iii)    the applicable Spinco Common Stock shall have been accepted for listing on NASDAQ, subject to compliance with applicable listing requirements;

(iv)    no Order or other legal restraint or prohibition preventing the consummation of any of the Distributions, or any of the transactions contemplated by this Agreement or any Ancillary Agreement, including the transactions to effect the Separation, shall be threatened, pending or in effect;

(v)    any material Consents and Governmental Authorizations necessary to complete the Separation and the Distributions shall have been obtained and be in full force and effect;

(vi)     the written solvency opinion delivered to the IAC Board by Duff & Phelps regarding the Separation, the Distributions and other transactions contemplated hereby shall not have been withdrawn or modified;

(vii)     IAC shall have received an opinion of Wachtell, Lipton, Rosen & Katz, in form and substance satisfactory to the IAC Board, regarding the qualification of the Distributions, as transactions that are generally tax free for U.S. federal income tax purposes under Sections 355 and/or 368(a)(1)(D) of the Code (to the extent such qualification is not addressed by an Internal Revenue Service private letter ruling (the "IRS Ruling") received by IAC), which opinion (and, in the event IAC shall have received the IRS Ruling, the IRS Ruling) shall not have been withdrawn or modified; and

(viii)     IAC shall have received opinions from its external tax advisors, in form and substance satisfactory to the IAC Board, regarding the U.S. federal income tax consequences to IAC of certain related matters and transactions (to the extent such matters are not addressed by the IRS Ruling) and certain state tax consequences to IAC of the Distributions, which opinions shall not have been withdrawn or modified.

(b)     The foregoing conditions are for the sole benefit of IAC and shall not give rise to or create any duty on the part of IAC or the IAC Board to waive or not to waive such conditions or in any way limit IAC's right to terminate this Agreement in whole or in part as set forth in Article XII or alter the consequences of any such termination from those specified in such Article XII. Any determination made by IAC prior to the Separation and the Distributions concerning the satisfaction or waiver of the conditions set forth in this Section 5.01 shall be final and conclusive.

5.02.     Distribution of Spinco Common Stock.  (a) Prior to the Effective Time and in accordance with the Transactions Memo, each Spinco shall issue to IAC such additional shares of its Spinco Common Stock (or shall take or cause to be taken such other appropriate actions to ensure that IAC has the requisite number of shares of Spinco Common Stock) to cause the number of shares of such Spinco Common Stock issued and outstanding immediately prior to the Effective Time to equal the product of (x) the sum of (i) the applicable IAC Record Date Share Number and (ii) the number of shares of IAC Common Stock issued or issuable pursuant to (A) the exercise of outstanding IAC Stock Options following the applicable Distribution Record Date and prior to August 18, 2008 or (B) pursuant to the settlement of IAC Restricted Stock Units (as such terms are defined in the Employee Matters Agreement), following the applicable Distribution Record Date and prior to the Effective Time (in each case giving effect to any cashless exercise of IAC Stock Options or withholding of shares of IAC Common Stock to satisfy tax withholding obligations) ("Post-Record Date IAC Shares") (y) the Corresponding Distribution Ratio.  The Corresponding Distribution Ratio with respect to any Spinco shall be appropriately adjusted in the event of any stock split, reverse stock split or similar event in respect of the IAC Common Stock and/or IAC Class B Common Stock following the date of this Agreement and prior to the Effective Time.

(b)     On the terms and subject to the conditions in this Agreement, with respect to each Distribution, IAC will cause the applicable distribution or transfer agent (the "Agent") at the Effective Time to distribute all of the outstanding shares of the applicable Spinco Common

36

Stock then owned by IAC to holders of IAC Common Stock and IAC Class B Common Stock as of the applicable Distribution Record Date and, in accordance with the Employee Matters Agreement, to holders of Post-Record Date IAC Shares, and to credit the number of such shares of Spinco Common Stock to book entry accounts for each such holder or designated transferee or transferees of such holder of IAC Common Stock or IAC Class B Common Stock.  On the terms and subject to the conditions in this Agreement, each holder of IAC Common Stock or IAC Class B Common Stock on the applicable Distribution Record Date (or such holder's designated transferee or transferees) will be entitled to receive in the applicable Distribution a fraction of a share of the applicable Spinco's Spinco Common Stock equal to the applicable Distribution Ratio for each share of IAC Common Stock or IAC Class B Common Stock so held by such stockholder as of the applicable Distribution Record Date.  No action by any such stockholder shall be necessary for such stockholder (or such stockholder's designated transferee or transferees) to receive the applicable number of shares of Spinco Common Stock (and, if applicable, cash in lieu of any fractional shares) that such stockholder is entitled to receive in the applicable Distribution.

5.03.     Fractional Shares.  With respect to each Distribution, IAC stockholders holding a number of shares of IAC Common Stock or IAC Class B Common Stock on the applicable Distribution Record Date which would entitle such stockholders to receive other than a whole number of shares of the applicable Spinco Common Stock in such Distribution, will receive cash in lieu of

such fractional shares. Fractional shares of Spinco Common Stock will not be distributed in any Distribution nor credited to book-entry accounts. The Agent shall, as soon as practicable after the applicable Distribution Date: (a) determine the number of whole shares and fractional shares of the applicable Spinco Common Stock to each holder of record as of close of business on the applicable Distribution Record Date, (b) aggregate all such fractional shares into whole shares and sell the whole shares obtained thereby in open market transactions as soon as practicable after the applicable Distribution Date, in each case, at then prevailing trading prices on behalf of holders who would otherwise be entitled to fractional share interests, and (c) distribute to each such holder, or for the benefit of each such beneficial owner, such holder or owner's ratable share of the net proceeds of such sale, based upon the average gross selling price per share of applicable Spinco Common Stock, after making appropriate deductions for any amount required to be withheld for United States federal income tax purposes. Each Spinco shall bear the cost of brokerage fees incurred in connection with the sales of fractional shares of its Spinco Common Stock, which sales shall occur as soon after the applicable Distribution Date as practicable and as determined by the Agent. None of the Parties nor the Agent will guarantee any minimum sale price for fractional shares of Spinco Common Stock. None of the Parties will pay any interest on the proceeds from the sale of fractional shares. The Agent acting on behalf of the applicable Spinco will have the sole discretion to select the broker-dealers through which to sell the aggregated fractional shares and to determine when, how and at what price to sell such shares. Neither the Agent nor the broker-dealers through which the aggregated fractional shares are sold will be Affiliates of IAC or the applicable Spinco.

5.04. <u>Actions in Connection with the Distributions</u>. (a) Each Spinco shall file such amendments and supplements to its respective Registration Statement as IAC may reasonably request, and such amendments as may be necessary in order to cause the same to become and remain effective as required by Applicable Law, including filing such amendments and supplements to its respective Registration Statement as may be required by the SEC or

<div align="center">37</div>

federal, state or foreign securities laws. IAC shall mail to the holders of IAC Common Stock and IAC Class B Common Stock, at such time on or prior to the applicable Distribution Date as IAC shall determine, the Prospectus forming a part of the applicable Registration Statement, as well as any other information concerning any of the Spincos, their business, operations and management, the Separation and such other matters as IAC shall reasonably determine are necessary and as may be required by Applicable Law.

(b)    Each of the Spincos shall also cooperate with IAC in preparing, filing with the SEC and causing to become effective registration statements or amendments thereof which are required to reflect the establishment of, or amendments to, any employee benefit and other plans necessary or appropriate in connection with the Separation or other transactions contemplated by this Agreement and the Ancillary Agreements. Promptly after receiving a request from IAC, to the extent requested, each of HSN Spinco, Interval Spinco, TM Spinco and Tree Spinco, as applicable, shall prepare and, in accordance with Applicable Law, file with the SEC any such documentation that IAC determines is necessary or desirable to effectuate the Distributions, and IAC, HSN Spinco, Interval Spinco, TM Spinco and Tree Spinco shall each use commercially reasonable efforts to obtain all necessary approvals from the SEC with respect thereto as soon as practicable.

(c)    Nothing in this Section 5.04 shall be deemed, by itself, to shift Liability for any portion of any Registration Statement or Prospectus to IAC.

(d)    In addition to the covenants of the Spincos provided for elsewhere in this Agreement, each Spinco covenants and agrees with, and in favor of, IAC that it shall (i) cooperate with IAC in connection with IAC's performance of its obligations under the Liberty Spinco Agreement with respect to such Spinco to be performed by IAC prior to the Effective Time, (ii) enter into a Liberty Spinco Assumption Agreement and a Liberty Registration Rights Agreement as contemplated by the Liberty Spinco Agreement and (iii) indemnify and hold IAC and the other members of the IAC Group harmless from and against all Liabilities incurred by them in connection with, arising out of or resulting from such Spinco's performance or failure to perform its obligations under such agreements following the Effective Time.

5.05. <u>Treatment of Integrated Warrant</u>. Immediately following the Effective Time:

(a)    the Old IAC Integrated Warrant shall by its terms, effective as of the Effective Time be adjusted (as so adjusted, the "<u>New IAC Integrated Warrant</u>), represent the right to receive upon due exercise (x) a number of shares of IAC Common Stock equal to the number of shares of IAC Common Stock subject to the Old IAC Integrated Warrant immediately prior the Effective Time (the "<u>Warrant Share Number</u>"); (y) a number of shares of Spinco Common Stock (or substitutions therefor) of each Spinco, if any, the Distribution Date of which shall have occurred prior to such Effective Time; and (z) such number of shares of Spinco Common Stock of each Spinco whose Distribution is effected at such Effective Time as a given holder of IAC Common Stock would be entitled at the Effective Time had such holder held, on the applicable Distribution Record Date, a number of shares of IAC Common Stock equal to the Warrant Share Number; and

(b)        the exercise price of the New IAC Integrated Warrant will not change.

## ARTICLE VI
## MUTUAL RELEASES; INDEMNIFICATION

6.01.    <u>Release of Pre-Distribution Claims</u>.  (a) Except as provided in Section 6.01(f), effective as of the Effective Time, TM Spinco does hereby, on behalf of itself and each other member of the TM Group, their respective Affiliates (other than any member of any other Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders (other than any member of any other Group), directors, officers, agents or employees of any member of the TM Group (in each case, in their respective capacities as such) (the "<u>TM Releasors</u>"), unequivocally, unconditionally and irrevocably release and discharge each of the other Separate-cos, the other members of the other Groups, their respective Affiliates (other than any member of the TM Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders, directors, officers, agents or employees of any member of any other Group (in each case, in their respective capacities as such), and their respective heirs, executors, trustees, administrators, successors and assigns (the "<u>Non-TM Parties</u>"), from any and all Actions, causes of action, choses in action, cases, claims, suits, debts, dues, damages, judgments and liabilities, of any nature whatsoever, in law, at equity or otherwise, whether direct, derivative or otherwise, which have been asserted against a Non-TM Party or which, whether currently known or unknown, suspected or unsuspected, fixed or contingent, and whether or not concealed or hidden, the TM Releasors ever could have asserted or ever could assert, in any capacity, whether as partner, employer, agent or otherwise, either for itself or as an assignee, heir, executor, trustee, administrator, successor or otherwise for or on behalf of any other Person, against the Non-TM Parties, relating to any claims or transactions or occurrences whatsoever, up to but excluding the Effective Time, including in connection with the transactions and all activities to implement the Separation and the Distributions ("<u>TM Claims</u>"); and the TM Releasors hereby unequivocally, unconditionally and irrevocably agree not to initiate proceedings with respect to, or institute, assert or threaten to assert, any TM Claim.

(b)        Except as provided in Section 6.01(f), effective as of the Effective Time, Interval Spinco does hereby, on behalf of itself and each other member of the Interval Group, their respective Affiliates (other than any member of any other Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders (other than any member of any other Group), directors, officers, agents or employees of any member of the Interval Group (in each case, in their respective capacities as such) (the "<u>Interval Releasors</u>"), unequivocally, unconditionally and irrevocably release and discharge each of the other Separate-cos, the other members of the other Groups, their respective Affiliates (other than any member of the Interval Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders, directors, officers, agents or employees of any member of any other Group (in each case, in their respective capacities as such), and their respective heirs, executors, trustees, administrators, successors and assigns (the "<u>Non-Interval Parties</u>"), from any and all Actions, causes of action, choses in action, cases, claims, suits, debts, dues, damages, judgments and liabilities, of any nature whatsoever, in law, at equity or otherwise, whether direct, derivative or otherwise, which have been asserted against a Non-Interval Party or which, whether currently known or unknown, suspected or unsuspected, fixed or contingent, and

whether or not concealed or hidden, the Interval Releasors ever could have asserted or ever could assert, in any capacity, whether as partner, employer, agent or otherwise, either for itself or as an assignee, heir, executor, trustee, administrator, successor or otherwise for or on behalf of any other Person, against the Non-Interval Parties, relating to any claims or transactions or occurrences whatsoever, up to but excluding the Effective Time, including in connection with the transactions and all activities to implement the Separation and the Distributions ("<u>Interval Claims</u>"); and the Interval Releasors hereby unequivocally, unconditionally and irrevocably agree not to initiate proceedings with respect to, or institute, assert or threaten to assert, any Interval Claim.

(c)        Except as provided in Section 6.01(f), effective as of the Effective Time, HSN Spinco does hereby, on behalf of itself and each other member of the HSN Group, their respective Affiliates (other than any member of any other Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders (other than any member of any other Group), directors, officers, agents or employees of any member of the HSN Group (in each case, in their respective capacities as such) (the "<u>HSN Releasors</u>"), unequivocally, unconditionally and irrevocably release and discharge each of the other Separate-cos, the other members of the other Groups, their respective Affiliates (other than any member of the HSN Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders, directors, officers, agents or employees of any

member of any other Group (in each case, in their respective capacities as such), and their respective heirs, executors, trustees, administrators, successors and assigns (the "<u>Non-HSN Parties</u>"), from any and all Actions, causes of action, choses in action, cases, claims, suits, debts, dues, damages, judgments and liabilities, of any nature whatsoever, in law, at equity or otherwise, whether direct, derivative or otherwise, which have been asserted against a Non-HSN Party or which, whether currently known or unknown, suspected or unsuspected, fixed or contingent, and whether or not concealed or hidden, the HSN Releasors ever could have asserted or ever could assert, in any capacity, whether as partner, employer, agent or otherwise, either for itself or as an assignee, heir, executor, trustee, administrator, successor or otherwise for or on behalf of any other Person, against the Non-HSN Parties, relating to any claims or transactions or occurrences whatsoever, up to but excluding the Effective Time, including in connection with the transactions and all activities to implement the Separation and the Distributions ("<u>HSN Claims</u>"); and the HSN Releasors hereby unequivocally, unconditionally and irrevocably agree not to initiate proceedings with respect to, or institute, assert or threaten to assert, any HSN Claim.

(d) Except as provided in Section 6.01(f), effective as of the Effective Time, Tree Spinco does hereby, on behalf of itself and each other member of the Tree Group, their respective Affiliates (other than any member of any other Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders (other than any member of any other Group), directors, officers, agents or employees of any member of the Tree Group (in each case, in their respective capacities as such) (the "<u>Tree Releasors</u>"), unequivocally, unconditionally and irrevocably release and discharge each of the other Separate-cos, the other members of the other Groups, their respective Affiliates (other than any member of the Tree Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders, directors, officers, agents or employees of any member of any other Group (in each case, in their respective capacities as such), and their respective heirs, executors, trustees, administrators, successors and assigns (the "<u>Non-Tree Parties</u>"), from any and all Actions, causes

<div align="center">40</div>

of action, choses in action, cases, claims, suits, debts, dues, damages, judgments and liabilities, of any nature whatsoever, in law, at equity or otherwise, whether direct, derivative or otherwise, which have been asserted against a Non-LT Party or which, whether currently known or unknown, suspected or unsuspected, fixed or contingent, and whether or not concealed or hidden, the Tree Releasors ever could have asserted or ever could assert, in any capacity, whether as partner, employer, agent or otherwise, either for itself or as an assignee, heir, executor, trustee, administrator, successor or otherwise for or on behalf of any other Person, against the Non-LT Parties, relating to any claims or transactions or occurrences whatsoever, up to but excluding the Effective Time, including in connection with the transactions and all activities to implement the Separation and the Distributions ("<u>Tree Claims</u>"); and the Tree Releasors hereby unequivocally, unconditionally and irrevocably agree not to initiate proceedings with respect to, or institute, assert or threaten to assert, any Tree Claim.

(e) Except as provided in Section 6.01(f), effective as of the Effective Time, IAC does hereby, on behalf of itself and each other member of the IAC Group, their respective Affiliates (other than any member of any Spinco Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders, directors, officers, agents or employees of any member of the IAC Group (in each case, in their respective capacities as such) (the "<u>IAC Releasors</u>"), unequivocally, unconditionally and irrevocably release and discharge each of the Spincos, the other members of the Spinco Groups, their respective Affiliates (other than any member of the IAC Group), successors and assigns, and all Persons who at any time prior to the Effective Time have been stockholders (other than any member of the IAC Group), directors, officers, agents or employees of any member of any Spinco Group (in each case, in their respective capacities as such), and their respective heirs, executors, trustees, administrators, successors and assigns (the "<u>Non-IAC Parties</u>"), from any and all Actions, causes of action, choses in action, cases, claims, suits, debts, dues, damages, judgments and liabilities, of any nature whatsoever, in law, at equity or otherwise, whether direct, derivative or otherwise, which have been asserted against an Non-IAC Party or which, whether currently known or unknown, suspected or unsuspected, fixed or contingent, and whether or not concealed or hidden, the IAC Releasors ever could have asserted or ever could assert, in any capacity, whether as partner, employer, agent or otherwise, either for itself or as an assignee, heir, executor, trustee, administrator, successor or otherwise for or on behalf of any other Person, against the Non-IAC Parties, relating to any claims or transactions or occurrences whatsoever, up to but excluding the Effective Time including in connection with the transactions and all activities to implement the Separation and the Distributions ("<u>IAC Claims</u>"); and the IAC Releasors hereby unequivocally, unconditionally and irrevocably agree not to initiate proceedings with respect to, or institute, assert or threaten to assert, any IAC Claim.

(f) Nothing contained in Section 6.01(a), 6.01(b),  6.01(c), 6.01(d) or 6.01(e) shall impair any right of any Person to enforce this Agreement, any Ancillary Agreement or, any agreement, arrangement, commitment or understanding that is contemplated by Section 2.12 or any other agreement, arrangement, commitment or understanding that is entered into after the Effective Time among any member of any Group, on the one hand, and any member of any other Group, on the other hand, nor shall anything contained in those sections be interpreted as terminating as of the Effective Time any rights under any such agreements,

contracts, commitments or understandings.  For purposes of clarification, nothing contained in Section 6.01(a), 6.01(b), 6.01(c), 6.01(d) or 6.01(e) shall release any Person from:

41

(i)        any Liability provided in or resulting from this Agreement or any of the Ancillary Agreements;

(ii)       any Liability provided in or resulting from any agreement among any members of any Group that is contemplated by Section 2.13 (including for greater certainty, any Liability resulting or flowing from any breaches of such agreements that arose prior to the Effective Time);

(iii)      any Liability provided in or resulting from any other agreement, arrangement, commitment or understanding that is entered into after the Effective Time between any member of any Group, on the one hand, and any member of any other Group, on the other hand;

(iv)      (A) with respect to each Spinco, any Corresponding Liability of such Spinco and (B) with respect to IAC, any Retained Liability;

(v)       any Liability that the Parties may have with respect to indemnification or contribution pursuant to Article III or Section 5.04(d) of this Agreement or this Article VI for Third Party Claims;

(vi)      any Liability for unpaid Intercompany Accounts; or

(vii)     any Liability the release of which would result in the release of any Person other than a Person released pursuant to this Section 6.01.

In addition, nothing contained in Section 6.01(a), 6.01(b),  6.01(c), 6.01(d) or 6.01(e) hereof shall release any Separate-co from honoring its existing obligations to indemnify any director, officer or employee of any Group who was a director, officer or employee of such Separate-co on or prior to the Effective Time, to the extent that such director, officer or employee becomes a named defendant in any litigation involving such Separate-co and was entitled to such indemnification pursuant to then existing obligations.

(g)       TM Spinco shall not make, and shall not permit any other member of the TM Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any other Separate-co or any member of any other Group or any other Person released pursuant to Section 6.01(a), with respect to any Liabilities released pursuant to Section 6.01(a).

(h)       Interval Spinco shall not make, and shall not permit any other member of the Interval Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any other Separate-co or any member of any other Group or any other Person released pursuant to Section 6.01(b), with respect to any Liabilities released pursuant to Section 6.01(b).

(i)       HSN Spinco shall not make, and shall not permit any other member of the HSN Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any other Separate-co

42

or any member of any other Group or any other Person released pursuant to Section 6.01(c), with respect to any Liabilities released pursuant to Section 6.01(c).

(j)       Tree Spinco shall not make, and shall not permit any other member of the Tree Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any other Separate-co or any member of any other Group or any other Person released pursuant to Section 6.01(d), with respect to any Liabilities released pursuant to Section 6.01(d).

(k)     IAC shall not make, and shall not permit any other member of the IAC Group to make, any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against any Spinco or any other member of any Spinco Group or any other Person released pursuant to Section 6.01(e), with respect to any Liabilities released pursuant to Section 6.01(e).

6.02.     Indemnification by Spincos.  Except as provided in Sections 6.04 and 6.05 and subject to Section 13.01, each Spinco shall, and shall cause the other members of its Corresponding Group to, fully indemnify, defend and hold harmless each other Separate-co, each other member of each other Group and each of their respective current and former directors, officers and employees, and each of the heirs, executors, trustees, administrators, successors and assigns of any of the foregoing (collectively, such Spinco's "Corresponding Other Separate-cos Indemnified Parties"), from and against any and all Liabilities of its Corresponding Other Separate-cos Indemnified Parties relating to, arising out of or resulting from any of the following items (without duplication):

(a)     with respect to such Spinco, the Corresponding Business, any Corresponding Entity, any Corresponding Asset, any Corresponding Liability or, subject to Article III, any Deferred Spun Asset;

(b)     any breach of, or failure to perform or comply with, any covenant, undertaking or obligation of, this Agreement or any of the Ancillary Agreements, by such Spinco or any other member of it Corresponding Group, subject to any limitation on liability set forth in any Ancillary Agreement for any such breach or failure to perform or comply with any covenant, undertaking or obligation under such Ancillary Agreement; and

(c)     any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent relating to such Spinco's Corresponding Group or Corresponding Business contained in any Registration Statement or any other filings made with the SEC in connection with the Separation and the Distributions.

6.03.     Indemnification by IAC.  Except as provided in Sections 6.04 and 6.05 and subject to Section 13.01, IAC shall indemnify, defend and hold harmless each Spinco, each other member of each Spinco Group and each of their respective current and former directors, officers and employees, and each of the heirs, executors, trustees, administrators, successors and assigns of any of the foregoing (collectively, the "Non-IAC Indemnified Parties"), from and

43

against any and all Liabilities of the Non-IAC Indemnified Parties relating to, arising out of or resulting from any of the following items (without duplication):

(a)     any Remaining IAC Business or any Retained Liability;

(b)     any breach of, or failure to perform or comply with, any covenant, undertaking or obligation of, this Agreement or any of the Ancillary Agreements, by IAC or any other member of the IAC Group, subject to any limitation on liability set forth in any Ancillary Agreement for any such breach or failure to perform or comply with any covenant, undertaking or obligation under such Ancillary Agreement;

(c)     except to the extent set forth in Section 6.02(c), any untrue statement or alleged untrue statement of a material fact or omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, contained in any Registration Statement or Prospectus forming a part thereof; provided that, notwithstanding anything in Section 6.02(c), IAC shall also indemnify the Non-IAC Indemnified Parties from any Liability arising as a result of any disclosure contained in the Prospectus contained in any Registration Statement which disclosure was not in the Registration Statement on Form 10 for any Spinco as filed with the SEC on July 22, 2008 other than (y) information relating to financial results for the second quarter of 2008 and 2007 and (z) any information specifically reviewed and/or approved by the Spinco; and

(d)     any determination by a court of competent jurisdiction (whether or not in a final, non-appealable judgment) that any of the Spincos has any liability (whether direct or indirect) for the payment of the IAC Notes; it being understood that in the event of any such determination, IAC shall be entitled to elect either of the following options: (1) IAC shall make arrangements that are reasonably satisfactory to any such Spinco to provide assurance that IAC has the financial wherewithal to promptly satisfy the IAC Notes or (2) IAC shall repay, redeem, satisfy and discharge, or otherwise retire the IAC Notes; provided, that if such determination could reasonably be expected to result in a default under any of such Spinco's indebtedness, then such Spinco shall be entitled to require IAC to exercise option (2) above.

6.04.     <u>Procedures for Indemnification of Third Party Claims</u>. (a) All claims for indemnification relating to a Third Party Claim by any indemnified party (an "<u>Indemnified Party</u>") hereunder shall be asserted and resolved as set forth in this Section 6.04.

        (b)     In the event that any written claim or demand for which an indemnifying party (an "<u>Indemnifying Party</u>") may have liability to any Indemnified Party hereunder, is asserted against or sought to be collected from any Indemnified Party by a Third Party (a "<u>Third Party Claim</u>"), such Indemnified Party shall promptly, but in no event more than ten (10) days following such Indemnified Party's receipt of a Third Party Claim, notify the Indemnifying Party in writing of such Third Party Claim, the amount or the estimated amount of damages sought thereunder to the extent then ascertainable (which estimate shall not be conclusive of the final amount of such Third Party Claim), any other remedy sought thereunder, any relevant time constraints relating thereto and, to the extent practicable, and any other material details pertaining thereto (a "<u>Claim Notice</u>"); provided, however, that the failure to timely give a Claim Notice shall affect the rights of an Indemnified Party hereunder only to the extent that such

<div align="center">44</div>

failure has a material prejudicial effect on the defenses or other rights available to the Indemnifying Party with respect to such Third Party Claim. The Indemnifying Party shall have thirty (30) days (or such lesser number of days set forth in the Claim Notice as may be required by court proceeding in the event of a litigated matter) after receipt of the Claim Notice (the "<u>Notice Period</u>") to notify the Indemnified Party whether it desires to defend the Indemnified Party against such Third Party Claim; provided that in the event a Claim Notice in respect of indemnification sought pursuant to Section 6.02(c) so specifies, the Indemnified Party shall have the right to require the Indemnifying Party, and in such event the Indemnifying Party shall be required, to defend the Indemnified Party against such Third Party Claim at the Indemnifying Party's expense.

        (c)     In the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that it desires to defend the Indemnified Party against a Third Party Claim, the Indemnifying Party shall have the right to defend the Indemnified Party by appropriate proceedings and shall have the sole power to direct and control such defense, with counsel reasonably satisfactory to the Indemnified Party at the Indemnifying Party's expense. Once the Indemnifying Party has duly assumed the defense of a Third Party Claim, the Indemnified Party shall have the right, but not the obligation, to participate in any such defense and to employ separate counsel of its choosing. The Indemnified Party shall participate in any such defense at its expense, provided that such expense shall be the responsibility of the Indemnifying Party if (i) the Indemnifying Party and the Indemnified Party are both named parties to the proceedings and the Indemnified Party shall have reasonably concluded that representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them (in which case the Indemnifying Party shall not be responsible for expenses in respect of more than one counsel for the Indemnified Party in any single jurisdiction), or (ii) the Indemnified Party assumes the defense of a Third Party Claim after the Indemnifying Party has failed to diligently defend a Third Party Claim it has assumed the defense of, as provided in the first sentence of this Section 6.04(c). The Indemnifying Party shall not, without the prior written consent of the Indemnified Party, settle, compromise or offer to settle or compromise any Third Party Claim on a basis that would result in (i) the imposition of a consent order, injunction or decree that would restrict the future activity or conduct of the Indemnified Party or any of its Affiliates, (ii) a finding or admission of a violation of Applicable Law or violation of the rights of any Person by the Indemnified Party or any of its Affiliates or (iii) a finding or admission that would have an adverse effect on other claims made or threatened against the Indemnified Party or any of its Affiliates.

        (d)     If the Indemnifying Party (i) elects not to defend the Indemnified Party against a Third Party Claim, whether by not giving the Indemnified Party timely notice of its desire to so defend or otherwise or (ii) after assuming the defense of a Third Party Claim or after receiving a Claim Notice specified in the proviso to the last sentence of Section 6.04(b), fails to take reasonable steps necessary to defend diligently such Third Party Claim within ten (10) days after receiving written notice from the Indemnified Party to the effect that the Indemnifying Party has so failed, the Indemnified Party shall have the right but not the obligation to assume its own defense; it being understood that the Indemnified Party's right to indemnification for a Third Party Claim shall not be adversely affected by assuming the defense of such Third Party Claim. The Indemnified Party shall not settle a Third Party Claim without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

<div align="center">45</div>

        (e)     The Indemnified Party and the Indemnifying Party shall cooperate in order to ensure the proper and adequate defense of a Third Party Claim, including by providing access to each other's relevant business records and other documents, and employees; it being understood that the reasonable costs and expenses of the Indemnified Party relating thereto shall be Liabilities, subject to indemnification.

(f)    The Indemnified Party and the Indemnifying Party shall use commercially reasonable efforts to avoid production of confidential information (consistent with Applicable Law), and to cause all communications among employees, counsel and others representing any party to a Third Party Claim to be made so as to preserve any applicable attorney-client or work-product privileges.

6.05.    <u>Procedures for Indemnification of Direct Claims</u>.  Any claim for indemnification made directly by the Indemnified Party against the Indemnifying Party that does not result from a Third Party Claim shall be asserted by written notice from the Indemnified Party to the Indemnifying Party specifically claiming indemnification hereunder.  Such Indemnifying Party shall have a period of 45 days after the receipt of such notice within which to respond thereto.  If such Indemnifying Party does not respond within such 45-day period, such Indemnifying Party shall be deemed to have accepted responsibility to make payment and shall have no further right to contest the validity of such claim.  If such Indemnifying Party does respond within such 45-day period and rejects such claim in whole or in part, such Indemnified Party shall be free to pursue resolution as provided in Article IX.

6.06.    <u>Adjustments to Liabilities</u>.  (a)  If an Indemnified Party receives any payment from an Indemnifying Party in respect of any Liabilities and the Indemnified Party could have recovered all or a part of such Liabilities from a Third Party (a "<u>Potential Contributor</u>") based on the underlying claim or demand asserted against such Indemnifying Party, such Indemnified Party shall, to the extent permitted by Applicable Law, assign such of its rights to proceed against the Potential Contributor as are necessary to permit such Indemnifying Party to recover from the Potential Contributor the amount of such payment.

(b)    If notwithstanding Section 6.06(a) an Indemnified Party receives an amount from a Third Party in respect of a Liability that is the subject of indemnification hereunder after all or a portion of such Liability has been paid by an Indemnifying Party pursuant to this Agreement, the Indemnified Party shall promptly remit to the Indemnifying Party the excess (if any) of (i) the amount paid by the Indemnifying Party in respect of such Liability, plus the amount received from the Third Party in respect thereof, over (ii) the full amount of the Liability.

(c)    An insurer who would otherwise be obligated to pay any claim shall not be relieved of the responsibility with respect thereto or, solely by virtue of the indemnification provisions hereof, have any subrogation rights with respect thereto, it being expressly understood and agreed that no insurer or any other Third Party shall be entitled to a "wind-fall" (i.e., a benefit they would not be entitled to receive in the absence of the indemnification provisions) by virtue of the indemnification provisions hereof.

46

6.07.    <u>Payments</u>.  The Indemnifying Party shall pay all amounts payable pursuant to this Article VI by wire transfer of immediately available funds, promptly following receipt from an Indemnified Party of a bill, together with all accompanying reasonably detailed backup documentation, for a Liability that is the subject of indemnification hereunder, unless the Indemnifying Party in good faith disputes the Liability, in which event it shall so notify the Indemnified Party.  In any event, the Indemnifying Party shall pay to the Indemnified Party, by wire transfer of immediately available funds, the amount of any Liability for which it is liable hereunder no later than three (3) days following any final determination of such Liability and the Indemnifying Party's liability therefor.  A "final determination" shall exist when (a) the parties to the dispute have reached an agreement in writing, (b) a court of competent jurisdiction shall have entered a final and non-appealable order or judgment, or (c) an arbitration or like panel shall have rendered a final non-appealable determination with respect to disputes the parties have agreed to submit thereto.

6.08.    <u>Contribution</u>.  If the indemnification provided for in this Article VI shall, for any reason, be unavailable or insufficient to hold harmless the Indemnified Party hereunder in respect of any Liability, then each Indemnifying Party shall, in lieu of indemnifying such Indemnified Party, contribute to the amount paid or payable by such Indemnified Party as a result of such Liability, in such proportion as shall be sufficient to place the Indemnified Party in the same position as if such Indemnified Party were indemnified hereunder, the Parties intending that their respective contributions hereunder be as close as possible to the indemnification under Sections 6.02 and 6.03.  If the contribution provided for in the previous sentence shall, for any reason, be unavailable or insufficient to put the Indemnified Party in the same position as if it were indemnified under Section 6.02 or 6.03, as the case may be, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liability, in such proportion as shall be appropriate to reflect the relative benefits received by and the relative fault of the Indemnifying Party on the one hand and the Indemnified Party on the other hand with respect to the matter giving rise to the Liability.

6.09.    <u>Remedies Cumulative</u>.  The remedies provided in this Article VI shall be cumulative and, subject to the provisions of Article IX, shall not preclude assertion by any Indemnified Party of any other rights or the seeking of any and all other remedies against any Indemnifying Party.

6.10.    <u>Survival of Indemnities</u>.  The rights and obligations of each of the Separate-cos and their respective Indemnified Parties under this Article VI shall survive the distribution, sale or other transfer by any Party of any Assets or the delegation or assignment by it of any Liabilities.

6.11.    <u>Shared Liabilities</u>.  Notwithstanding anything to the contrary contained in this Agreement:

(a)    In order to facilitate the defense of any Shared Liability, the Parties agree that (i) the relevant Parties shall cooperate in the defense of any Shared Liability; (ii) each relevant Party shall be responsible for the costs of its own in-house counsel and other internal personnel in the defense of any Shared Liability; (iii) IAC shall be entitled to control the defense and/or settlement of any Shared Liability, although each relevant Spinco shall be entitled to

47

observe with counsel of its own selection and at its own expense; <u>provided</u>, <u>however</u>, that after the Effective Time IAC shall not settle all or any portion of any Shared Liability unless any remaining Liability of any Spinco and its Affiliates and their respective current and former officers and directors relating to the Shared Liability will be fully released as a result of such settlement.

(b)    The Parties agree to act in good faith and to use their reasonable best efforts to preserve and maximize the insurance benefits due to be provided under all policies of insurance and to cooperate with one another as necessary to permit each other to access or obtain the benefits under those policies; <u>provided</u>, <u>however</u>, that nothing hereunder shall be construed to prevent any party or any other Person from asserting claims for insurance benefits or accepting insurance benefits provided by the policies.  The Parties agree to exchange information upon reasonable request of the other Party regarding requests that they have made for insurance benefits, notices of claims, occurrences and circumstances that they have submitted to the insurance companies or other entities managing the policies, responses they have received from those insurance companies or entities, including any payments they have received from the insurance companies and any agreements by the insurance companies to make payments, and any other information that the Parties may need to determine the status of the insurance policies and the continued availability of benefits thereunder.

(c)    If any Party receives notice or otherwise learns of the assertion by any person or entity (including a Governmental Authority) of a Shared Liability, that Party shall give the other Parties written notice of such Shared Liability, providing notice of such Shared Liability in reasonable detail.  The failure to give notice under this subsection shall not relieve any Party of its Liability for any Shared Liability except to the extent the Party is actually prejudiced by the failure to give such notice.  The Parties shall be deemed to be on notice of any Shared Liability pending prior to the Effective Time.

## ARTICLE VII
## INSURANCE

7.01.    <u>Insurance Matters</u>.  (a)  Each Spinco does hereby, for itself and each other member of its Corresponding Group, agree that no member of the IAC Group or any IAC Indemnified Party shall have any liability whatsoever as a result of the insurance policies and practices of IAC and its Affiliates as in effect at any time prior to the Effective Time, including as a result of the level or scope of any such insurance, the creditworthiness of any insurance carrier, the terms and conditions of any policy, the adequacy or timeliness of any notice to any insurance carrier with respect to any claim or potential claim or otherwise; provided this Section 7.01(a) shall not negate IAC's agreement under Section 7.01(b).

(b)    IAC agrees to use its reasonable best efforts to cause the interest and rights of each Spinco and the other members of its Corresponding Group as of the Relevant Time as insureds or beneficiaries or in any other capacity under occurrence-based insurance policies and programs (and under claims-made policies and programs to the extent a claim has been submitted prior to the Relevant Time) of IAC or any other member of the IAC Group in respect of periods prior to the Relevant Time to survive the Relevant Time for the period for which such interests and rights would have survived without regard to the transactions contemplated hereby

48

to the extent permitted by such policies, and IAC shall continue to administer such policies and programs on behalf of the relevant Spincos and the other relevant members of the Spinco Groups, subject to such Spinco's reimbursement to IAC and the other relevant members of the IAC Group for the actual out-of-pocket costs of such ongoing administration and the internal costs (based on the proportion of the amount of time actually spent on such matter to such employee's normal working time) of any employee or agent of

IAC of any other relevant member of the IAC Group will be required to spend at least ten percent of his or her normal working time over any ten (10) Business Days working with respect to any such matter on behalf of a Spinco or any member of its Corresponding Group. Any proceeds received by IAC or any other member of the IAC Group after the Relevant Time under such policies and programs in respect of a Spinco or other members of its Corresponding Group shall be for the benefit of such Spinco and such other members.

(c)    This Agreement is not intended as an attempted assignment of any policy of insurance or as a contract of insurance and shall not be construed to waive any right or remedy of any member of the IAC Group in respect of any insurance policy or any other contract or policy of insurance.

(d)    Nothing in this Agreement shall be deemed to restrict any member of any Spinco Group from acquiring at its own expense any other insurance policy in respect of any Liabilities or covering any period.

## ARTICLE VIII
## EXCHANGE OF INFORMATION; CONFIDENTIALITY

8.01.    Agreement for Exchange of Information; Archives.  (a)  Without limiting any rights or obligations under any Ancillary Agreement between the Parties and/or any other member of their respective Groups relating to confidentiality, each Party agrees to provide, and to cause its Representatives, its Group members and its respective Group members' Representatives to provide, to the other Groups and any member thereof (a "Requesting Party"), at any time before, on or after the Effective Time, subject to the provisions of Section 8.04 and as soon as reasonably practicable after written request therefor, any Information within the possession or under the control of such Party or one of such Persons which the Requesting Party reasonably needs (i) to comply with reporting, disclosure, filing or other requirements imposed on the Requesting Party (including under applicable securities laws) by a Governmental Authority having jurisdiction over the Requesting Party, (ii) for use in any other judicial, regulatory, administrative or other proceeding or in order to satisfy audit, accounting, claims, regulatory, litigation or similar requirements of the Requesting Party, in each case other than claims or allegations that one Party to this Agreement or any of its Group members has or brings against the other Party or any of its Group members, or (iii) subject to the foregoing clause (ii) above, to comply with its obligations under this Agreement or any Ancillary Agreement; provided, however, that in the event that any Party determines that any such provision of Information could be commercially detrimental, violate any Applicable Law or agreement, or waive any attorney-client privilege, the Parties shall take all reasonable measures to permit the compliance with such obligations in a manner that avoids any such harm or consequence.  More particularly, and without limitation to the generality of the foregoing sentence, the Parties agree

49

that the provisions of the Tax Sharing Agreement shall govern with respect to the sharing of Information relating to Tax.

(b)    After the Effective Time, each Spinco and the other members of its Spinco Group shall have access during regular business hours (as in effect from time to time), and upon reasonable advance notice, to the documents and objects of historical significance that relate to the Spun Businesses, the Spun Assets or the Spun Entities with respect to such Spinco and that are located in archives retained or maintained by (i) IAC or any other member of the IAC Group or (ii) by another Spinco or any other member of another Spinco Group.  Each Spinco and the other members of its Spinco Group may obtain copies (but not originals) of documents for bona fide business purposes and may obtain objects for exhibition purposes for commercially reasonable periods of time if required for bona fide business purposes, provided that (i) such Spinco shall cause any such objects to be returned promptly, at such Spinco's expense, in the same condition in which they were delivered to such Spinco or to any member of its Spinco Group and (ii) such Spinco and the other members of its Spinco Group shall comply with any rules, procedures or other requirements, and shall be subject to any restrictions (including prohibitions on removal of specified objects), that are then applicable to such other Separate-co or such other member of such other Separate-co's Group.  In any event, the foregoing shall not be deemed to restrict the access of IAC or any other member of the IAC Group to any such documents or objects.  Nothing herein shall be deemed to impose any Liability on IAC or any other member of the IAC Group if documents or objects referred to in this Section 9.01 are not maintained or preserved by IAC or any other member of the IAC Group.  Alternatively, IAC, acting reasonably, may request from any Spinco and any other member of such Spinco's Group that they provide IAC with reasonable advance notice, with a list of the requested Information that relates to the relevant Spun Businesses, the Spun Assets or the Spun Entities and IAC shall use, and shall cause the other members of the IAC Group that are in possession of the Information requested to use, commercially reasonable efforts to locate all requested Information that is owned or possessed by IAC or any of its Group members or Representatives.  IAC will make available all such Information for inspection by the relevant Spincos or any other relevant member of any Spinco Group during normal business hours at the place of business reasonably designated by IAC.  Subject to such confidentiality or security obligations as IAC or the other relevant members of its Group may reasonably deem necessary, the Spincos and the other relevant members of the Spinco Groups may have all requested Information duplicated.  Alternatively, IAC or the other relevant members of the IAC Group may choose to deliver to a Spinco, at such

Spinco's expense, all requested Information in the form reasonably requested by such Spinco or any other member of its Group. At IAC's request, such Spinco shall cause such Information when no longer needed to be returned to IAC at such Spinco's expense.

(c)    With respect to the other Spinco Groups and the IAC Group, each Spinco shall make available and shall cause its Corresponding Group to make available to the other Spinco Groups and the IAC Group at least the level of access provided by the IAC Group under Section 8.01(b) to all Spinco Groups.

8.02.    <u>Ownership of Information</u>.  Any Information owned by a Party or any of its Group members and that is provided to a Requesting Party pursuant to Section 8.01 shall be deemed to remain the property of the providing party.  Unless specifically set forth herein or in

50

any Ancillary Agreement, nothing contained in this Agreement shall be construed as granting or conferring rights of license or otherwise in any such Information.

8.03.    <u>Compensation for Providing Information</u>.  The Party requesting Information agrees to reimburse the providing Party for the reasonable costs, if any, of creating, gathering and copying such Information, to the extent that such costs are incurred for the benefit of the Requesting Party.  Except as may be otherwise specifically provided elsewhere in this Agreement, in the Ancillary Agreements, or in any other agreement between the Parties, such costs shall be computed in accordance with the providing Party's standard methodology and procedures.

8.04.    <u>Record Retention</u>.  To facilitate the possible exchange of Information pursuant to this Article VIII and other provisions of this Agreement after the Effective Time, the Parties agree to use commercially reasonable efforts to retain, and to cause the members of their respective Group to retain, all Information in their respective possession or control at the Effective Time in accordance with the policies of the IAC Group as in effect at the Effective Time (or such other policies as may be reasonably adopted by the appropriate Party after the Effective Time.  No Party will destroy, or permit any member of its Group to destroy, any Information which another Party or any member of its Group may have the right to obtain pursuant to this Agreement prior to the fifth (5th) anniversary of the Effective Time without first using commercially reasonable efforts to notify such other Party of the proposed destruction and giving such other Party the opportunity to take possession of such Information prior to such destruction.

8.05.    <u>Other Agreements Providing for Exchange of Information</u>.  The rights and obligations granted or created under this Article VIII are subject to any specific limitations, qualifications or additional provisions on the sharing, exchange, retention or confidential treatment of Information set forth in any Ancillary Agreement.

8.06.    <u>Production of Witnesses; Records; Cooperation</u>.  (a)  After the Effective Time, but only with respect to a Third Party Claim, each Party hereto shall use commercially reasonable efforts to, and shall cause the other relevant members of its Group to use commercially reasonable efforts to, make available to a requesting Party or any member of the Group to which such Requesting Party belongs, upon written request, its then former and current Representatives (and the former and current Representatives of its respective Group members) as witnesses and any books, records or other documents within its control (or that of its respective Group members) or which it (or its respective Group members) otherwise has the ability to make available, to the extent that any such person (giving consideration to business demands of such Representatives) or books, records or other documents may reasonably be required in connection with any Action in which the Requesting Party may from time to time be involved, regardless of whether such Action is a matter with respect to which indemnification may be sought hereunder. The Requesting Party shall bear all costs and expenses in connection therewith.

(b)    If a Party, being entitled to do so under this Agreement, chooses to defend or to seek to settle or compromise any Third Party Claim, the other relevant Party or Parties shall use commercially reasonable efforts to make available to such Party, upon written request, its or their then former and current Representatives and those of its or their respective Group members

51

as witnesses and any books, records or other documents within its or their control (or that of its or their respective Group members) or which it or they (or its or their respective Group members) otherwise has or have the ability to make available, to the extent that any such Person (giving consideration to business demands of such Representatives) or books, records or other documents may reasonably

be required in connection with such defense, settlement, compromise, as the case may be, and shall otherwise cooperate in such defense, settlement or compromise, as the case may be.

(c)      Without limiting the foregoing, the Parties shall cooperate and consult, and shall cause their respective Group members to cooperate and consult, to the extent reasonably necessary with respect to any Actions (except in the case of an Action by one Party against another).

(d)      The obligation of the Parties to provide witnesses pursuant to this Section 8.06 is intended to be interpreted in a manner so as to facilitate cooperation and shall include the obligation to provide as witnesses inventors and other employees without regard to whether the witness or the employer of the witness could assert a possible business conflict (subject to the limitation set forth in the first sentence of Section 8.06(a) regarding Third Party Claims).

(e)      In connection with any matter contemplated by this Section 8.06, the relevant Parties will enter into, and shall cause all other relevant members of their respective Groups to enter into, a mutually acceptable joint defense agreement so as to maintain to the extent practicable any applicable attorney-client privilege or work-product privileges of any member of any Group.

8.07.    <u>Confidentiality</u>. (a) Subject to Section 8.08, each Separate-co shall hold, and shall cause its respective Group members and its respective Affiliates (whether now an Affiliate or hereafter becoming an Affiliate) and its Representatives to hold, in strict confidence, with at least the same degree of care that applies to IAC's confidential and proprietary Information pursuant to policies in effect as of the Effective Time, all confidential and proprietary Information concerning another Group (or any member thereof) that is either in such Separate-co's possession (including Information in its possession prior to the date hereof) or furnished by any other Group (or any member thereof) or by any of such other Group's Affiliates (whether now an Affiliate or hereafter becoming an Affiliate) or their respective Representatives at any time pursuant to this Agreement or any Ancillary Agreement or the transactions contemplated hereby or thereby (any such Information referred to herein as "<u>Confidential Information</u>"), and shall not use, and shall cause its respective Group members, Affiliates and Representatives not to use, any such Confidential Information other than for such purposes as shall be expressly permitted hereunder or thereunder. Notwithstanding the foregoing, Confidential Information shall not include Information that is or was (i) in the public domain other than by the breach of this Agreement or by breach of any other agreement relating to confidentiality between or among the relevant Parties and/or their respective Group members, their respective Affiliates or Representatives, (ii) lawfully acquired by such disclosing Party (or any member of the Group to which such Party belongs or any of such Party's Affiliates) from a Third Party not bound by a confidentiality obligation, or (iii) independently generated or developed by Persons who do not have access to, or descriptions of, any such confidential or

52

proprietary Information of the other Parties (or any member of the Group to which such other Party belongs).

(b)      Each Party shall maintain, and shall cause its respective Group members to maintain, policies and procedures, and develop such further policies and procedures as will from time to time become necessary or appropriate, to ensure compliance with Section 8.07(a).

(c)      Each Party agrees not to release or disclose, or permit to be released or disclosed, any Confidential Information to any other Person, except its Representatives who need to know such Confidential Information (who shall be advised of their obligations hereunder with respect to such Confidential Information), except in compliance with Section 8.08. Without limiting the foregoing, when any Information furnished by another Party after the Effective Time pursuant to this Agreement or any Ancillary Agreement is no longer needed for the purposes contemplated by this Agreement or any Ancillary Agreement, such Party will promptly, after request of the furnishing Party and at the election of the Party receiving such request, destroy or return to the furnishing Party all such Information in a printed or otherwise tangible form (including all copies thereof and all notes, extracts or summaries based thereon), and destroy all Information in an electronic or otherwise intangible form and certify to the furnishing Party that it has destroyed such Information (and such copies thereof and such notes, extracts or summaries based thereon). Notwithstanding the foregoing, the Parties agree that to the extent some Information to be destroyed or returned is retained as data or records for the purpose of business continuity planning or is otherwise not accessible in the Ordinary Course of Business, such data or records shall be destroyed in the Ordinary Course of Business in accordance, if applicable, with the business continuity plan of the applicable Party.

8.08.    <u>Protective Arrangements</u>. In the event that any Party or any member of its Group or any Affiliate of such Party or any of their respective Representatives either determines that it is required to disclose any Confidential Information (the "<u>Disclosing Party</u>") pursuant to Applicable Law or receives any demand under lawful process or from any Governmental Authority to disclose or provide Confidential Information of another Party (or any member of the Group to which such other Party belongs) (the "<u>Providing Party</u>"), the Disclosing Party shall, to the extent permitted by Applicable Law, promptly notify the Providing Party prior to

the Disclosing Party disclosing or providing such Confidential Information and shall use commercially reasonable efforts to cooperate with the Providing Party so that the Providing Party may seek any reasonable protective arrangements or other appropriate remedy and/or waive compliance with this Section 8.08. All expenses reasonably incurred by the Disclosing Party in seeking a protective order or other remedy will be borne by the Providing Party. Subject to the foregoing, the Disclosing Party may thereafter disclose or provide such Confidential Information to the extent (but only to the extent) required by such Applicable Law (as so advised by legal counsel) or by lawful process or by such Governmental Authority and shall promptly provide the Providing Party with a copy of the Confidential Information so disclosed, in the same form and format as disclosed, together with a list of all Persons to whom such Confidential Information was disclosed.

8.09. <u>Disclosure of Third Party Information</u>. Each Spinco acknowledges that it and the other members of its respective Group may have in its or their possession confidential or proprietary Information of Third Parties that was received under confidentiality or non-disclosure

<div align="center">53</div>

agreements with such Third Party while it or they were part of the IAC Group. Each Spinco will hold, and will cause the other members of its Group and its and their respective Representatives to hold, in strict confidence the confidential and proprietary Information of Third Parties to which such Spinco or any other member of its respective Group has access, in accordance with the terms of any agreements entered into prior to the Effective Time between one or more members of another Group (whether acting through, on behalf of, or in connection with, the Spun Businesses) and such Third Parties.

<div align="center">

**ARTICLE IX**
**DISPUTE RESOLUTION**

</div>

9.01. <u>Interpretation; Agreement to Resolve Disputes</u>.

(a) In the event of any ambiguous provision in this Agreement or in any Ancillary Agreement, or any inconsistency or conflict between or among the provisions of this Agreement and one or more Ancillary Agreements or between or among the provisions of the Ancillary Agreements, IAC's interpretation of such ambiguity or resolution of such inconsistency or conflict shall be final and binding unless such interpretation or resolution is unreasonable or clearly erroneous; it being understood and agreed that the reasonableness of an interpretation or resolution shall be assessed without regard to whether such interpretation or resolution happens to be in IAC's self-interest.

(b) Except as otherwise specifically provided in any Ancillary Agreement, the procedures for discussion, negotiation and dispute resolution set forth in this Article IX shall apply to all disputes, controversies or claims (whether sounding in contract, tort or otherwise) that may arise out of or relate to, or arise under or in connection with this Agreement or any Ancillary Agreement, or the transactions contemplated hereby or thereby (including all actions taken in furtherance of the transactions contemplated hereby or thereby on or prior to the date hereof), or the commercial or economic relationship of the Parties relating hereto or thereto, between or among any member of any Group on the one hand and any other Group on the other hand. Each Party agrees on behalf of itself and each member of its respective Group that the procedures set forth in this Article IX shall be the sole and exclusive procedures in connection with any dispute, controversy or claim relating to any of the foregoing matters and irrevocably waives any right to commence any Action in or before any Governmental Authority, except as otherwise required by Applicable Law.

9.02. <u>Dispute Resolution; Mediation</u>. (a) Any Party (a "<u>Claimant Party</u>") may commence the dispute resolution process of this Section 9.02 by giving the other Party or Parties with whom there is such a controversy, claim or dispute written notice (a "<u>Dispute Notice</u>") of any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement or the breach, termination, enforceability or validity thereof (a "<u>Dispute</u>") which has not been resolved in the normal course of business. The relevant Parties shall attempt in good faith to resolve any Dispute by negotiation among executives of such Parties ("<u>Senior Party Representatives</u>") who have authority to settle the Dispute and who are at a higher level of management than the persons who have direct responsibility for the administration of this Agreement. Within 15 days after delivery of the Dispute Notice, the receiving Party or Parties (the "<u>Responding Parties</u>" and, together with the Claimant Party, the "<u>Dispute Parties</u>") shall

<div align="center">54</div>

submit to the other Dispute Party or Parties a written response (the "<u>Response</u>"). The Dispute Notice and the Response shall include (i) a statement setting forth the position of the Dispute Party giving such notice and a summary of arguments supporting such position

and (ii) the name and title of such Dispute Party's Senior Party Representative and any other persons who will accompany the Senior Party Representative at the meeting at which the Dispute Parties will attempt to settle the Dispute. Within 30 days after the delivery of the Dispute Notice, the Senior Party Representatives of the Dispute Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute. The Dispute Parties shall cooperate in good faith with respect to any reasonable requests for exchanges of information regarding the Dispute or a Response thereto.

(b) If the Dispute has not been resolved within 60 days after delivery of the Dispute Notice, or if the Dispute Parties fail to meet within 30 days after delivery of the Dispute Notice as hereinabove provided, the Dispute Parties shall make a good faith attempt to settle the Dispute by mediation pursuant to the provisions of this Section 9.02 before resorting to arbitration contemplated by Section 9.03 or any other dispute resolution procedure that may be agreed by the Dispute Parties.

(c) All negotiations, conferences and discussions pursuant to this Section 9.02 shall be confidential and shall be treated as compromise and settlement negotiations. Nothing said or disclosed, nor any document produced, in the course of such negotiations, conferences and discussions that is not otherwise independently discoverable shall be offered or received as evidence or used for impeachment or for any other purpose in any current or future arbitration.

(d) Unless the Dispute Parties agree otherwise, the mediation shall be conducted in accordance with the CPR Institute for Dispute Resolution Model Procedure for Mediation of Business Disputes in effect on the date of this Agreement by a mediator selected by the Dispute Parties.

(e) Within 30 days after the mediator has been selected as provided above, all Dispute Parties and their respective attorneys shall meet with the mediator for one mediation session of at least four hours, it being agreed that each representative of a Dispute Party attending such mediation session shall be a Senior Party Representative with authority to settle the Dispute. If the Dispute cannot be settled at such mediation session or at any mutually agreed continuation thereof, any of the Dispute Parties may give the other and the mediator a written notice declaring the mediation process at an end.

9.03. <u>Arbitration</u>. If the Dispute has not been resolved by the dispute resolution process described in Section 9.02, the Dispute Parties agree that any such Dispute shall be settled by binding arbitration before the American Arbitration Association ("<u>AAA</u>") in Wilmington, Delaware pursuant to the Commercial Rules of the AAA. Any arbitrator(s) selected to resolve the Dispute shall be bound exclusively by the laws of the State of Delaware without regard to its choice of law rules. Any decisions of award of the arbitrator(s) will be final and binding upon the Dispute Parties and may be entered as a judgment by the Dispute Parties hereto. Any rights to appeal or review such award by any court or tribunal are hereby waived to the extent permitted by law.

<div align="center">55</div>

---

9.04. <u>Costs</u>. The costs of any mediation or arbitration pursuant to this Article IX shall be shared equally among the Dispute Parties.

9.05. <u>Continuity of Service and Performance</u>. Unless otherwise agreed in writing, the Dispute Parties will continue to provide service and honor all other commitments under this Agreement and each Ancillary Agreement during the course of dispute resolution pursuant to the provisions of this Article IX with respect to all matters not subject to such dispute, controversy or claim.

<div align="center">

**ARTICLE X**
**FURTHER ASSURANCES**

</div>

10.01. <u>Further Assurances</u>. (a) Except as provided in Section 12.01, each Party covenants with and in favor of the other Parties as follows:

(i) prior to, on and after the Effective Time, each Party hereto shall, and shall cause the other relevant members of its Group to, cooperate with the other Parties, and without any further consideration, but at the expense of the requesting Party, to execute, acknowledge and deliver, or use commercially reasonable efforts to cause to be executed and delivered, all instruments, assurances or documents, including instruments of conveyance, assignments and transfers, and to make all filings with, and to obtain all consents, approvals or authorizations of, any Governmental Authority or any other Person under any permit, license, agreement, indenture or other instrument (including any Consents or Governmental Authorizations), and to take all such other actions as such Party may reasonably be requested to take by the requesting Party (or any member of its Group) from time to time, consistent with the terms of this Agreement and the Ancillary Agreements, in order to give effect to the provisions, obligations and purposes of this Agreement and the Ancillary Agreements and the

transfers of the Spun Businesses and of the Spun Assets and the assignment and assumption of the Spun Liabilities and the other transactions contemplated hereby and thereby; and

(ii)    to the extent that IAC or any Spinco discovers at any time following the Effective Time any Asset that was intended to be transferred to any Separate-co or any other member of another Spinco Group pursuant to this Agreement was not so transferred at the Effective Time, IAC and the Spincos shall, or shall cause the other relevant members of their Corresponding Groups to promptly, assign and transfer to such Separate-co or another member of such Separate-co's Group reasonably designated by such Separate-co such Asset and all right, title and interest therein in a manner and on the terms consistent with the relevant provisions of this Agreement, including, without limitation, Section 2.17(b).  Similarly, to the extent that IAC or any Spinco discovers at any time following the Effective Time any Asset that was intended to be retained by IAC or any other member of the IAC Group was not so retained at the Effective Time, the relevant Spinco shall, or shall cause the other relevant members of its Group to promptly to, assign and transfer to IAC or any other member of the IAC Group reasonably designated by IAC such Asset and all right, title and interest therein in a manner and on the terms consistent with the relevant provisions of this Agreement, including, without limitation, Section 2.17(b).  For the avoidance of doubt, the transfer of any Assets under

<div align="center">56</div>

this paragraph (a) shall be effected without any additional consideration by any Party hereunder (such deferred transfers being referred to as "<u>Deferred Transactions</u>").

(b)    On or prior to the Effective Time, each of the Separate-cos, in their respective capacities as direct and indirect parent companies of the members of their respective Groups, shall each approve or ratify any actions of the members of their respective Groups as may be necessary or desirable to give effect to the transactions contemplated by this Agreement and the Ancillary Agreements.

(c)    Prior to the Effective Time, if a Party identifies any commercial or other service that is needed to assure a smooth and orderly transition of the businesses in connection with the consummation of the transactions contemplated hereby, and that is not otherwise governed by the provisions of this Agreement or any Ancillary Agreement, the relevant Parties will cooperate in determining whether there is a mutually acceptable arms' length basis on which the such Party can provide such service.

<div align="center">

**ARTICLE XI**
**CERTAIN OTHER MATTERS**

</div>

11.01.    <u>Auditors and Audits; Annual and Quarterly Financial Statements and Accounting</u>.  Each Party agrees that during the one hundred and eighty (180) days following the Effective Time and in any event solely with respect to the preparation and audit of each of IAC's and each Spinco's financial statements for the year ended December 31, 2008, the printing, filing and public dissemination of such financial statements, the audit of IAC's internal control over financial reporting and management's assessment thereof and management's assessment of IAC's disclosure controls and procedures, in each case made as of December 31, 2008:

(a)    <u>Date of Spinco Auditors' Opinions</u>.  Each Spinco shall use commercially reasonable efforts to enable such Spinco's auditors (in each case, such auditors, the "<u>Spinco Auditor</u>") to complete their audit such that they will date their opinion on such Spinco's audited annual financial statements on the same date that the IAC's auditors (the "<u>IAC Auditor</u>") date their opinion on IAC's audited annual financial statements (except to the extent an earlier date is necessary to comply with SEC rules), and to enable IAC to meet its timetable for the printing, filing and public dissemination of IAC's annual financial statements.

(b)    <u>Annual Financial Statements</u>.  Each (i) Separate-co shall provide to the other Separate-cos on a timely basis all Information reasonably required to meet such Separate-co's schedule for the preparation, printing, filing, and public dissemination of its annual financial statements and for management's assessment of the effectiveness of its disclosure controls and procedures in accordance with Item 307 of Regulation S-K and (ii) each Spinco shall provide to the IAC on a timely basis all Information reasonably required to meet IAC's schedule for  its report on internal control over financial reporting in accordance with Item308 of Regulation S-K and its auditor's audit of its internal control over financial reporting and management's assessment thereof in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 and the SEC's and Public Company Accounting Oversight Board's rules and auditing standards thereunder (such assessments and audit being referred to as the "<u>2008 Internal Control Audit and Management Assessments</u>").  Without limiting the generality of the foregoing, each Separate-co

<div align="center">57</div>

will provide all required financial and other Information with respect to such Separate-co and its Subsidiaries to its respective auditors in a sufficient and reasonable time and in sufficient detail to permit its respective auditors to take all steps and perform all reviews necessary to provide sufficient assistance to the IAC Auditor and each other Spinco Auditor with respect to respective Information to be included or contained in the annual financial statements of such other Separate-co and to permit the IAC Auditor and IAC's management to all complete the 2008 Internal Control Audit and Management Assessments.

        (c)    <u>Access to Personnel and Books and Records</u>.

        (i)    Each Spinco (an "<u>Authorizing Spinco</u>") shall authorize its respective Spinco Auditor (the "<u>Authorized Auditor</u>") to make available to each of the IAC Auditor and the Spinco Auditor of each other Spinco both the personnel who performed or are performing the annual audits of the Authorizing Spinco and work papers related to the annual audits of the Authorizing Spinco, in all cases within a reasonable time prior to the Authorized Auditor's opinion date, so that (A) the IAC Auditor is able to perform the procedures it considers necessary to take responsibility for the work of the Authorized Auditor as it relates to the IAC Auditor's report on IAC's financial statements, all within sufficient time to enable IAC to meet its timetable for the printing, filing and public dissemination of IAC's annual financial statements; and (B) each such other Spinco Auditor is able to perform the procedures it considers necessary to take responsibility for the work of the Authorized Auditor as it relates to the relevant Spinco Auditor's report on such Spinco's financial statements, all within sufficient time to enable such Spinco to meet its timetable for the printing, filing and public dissemination of such Spinco's annual financial statements.

        (ii)    IAC shall authorize the IAC Auditor to make available to each Spinco Auditor both the personnel who performed or are performing the annual audits of IAC and work papers related to the annual audits of IAC, in all cases within a reasonable time prior to the IAC Auditor's opinion date, so that each Spinco Auditor is able to perform the procedures it considers necessary to take responsibility for the work of the IAC Auditor as it relates to such Spinco Auditor's report on the relevant Spinco's financial statements, all within sufficient time to enable such Spinco to meet its timetable for the printing, filing and public dissemination of such Spinco's annual financial statements.

        (iii)    Each Spinco shall make available to the IAC Auditor and IAC's management such Spinco's personnel and such Spinco's books and records in a reasonable time prior to the IAC Auditor's opinion date and IAC's management's assessment date so that the IAC Auditor and IAC's management are able to perform the procedures they consider necessary to conduct the 2008 Internal Control Audit and Management Assessments.

        (d)    <u>Spinco Annual Reports</u>.  Each Spinco will deliver to IAC a substantially final draft, as soon as the same is prepared, of the first report to be filed with the SEC that includes such Spinco's audited financial statements for the year ended December 31, 2008 (such Spinco's "<u>Corresponding Annual Report</u>"); provided, however, that a Spinco may continue to

<div align="center">58</div>

revise such Corresponding Annual Report prior to the filing thereof, which changes will be delivered to IAC as soon as reasonably practicable; provided, further, that the respective personnel of IAC and each Spinco will actively consult with each other regarding any changes which a Spinco may consider making to its Corresponding Annual Report and related disclosures prior to the anticipated filing with the SEC, with particular focus on any changes which would have an effect upon IAC's financial statements or related disclosures.

        Nothing in this Section 11.01 shall require any Party to violate any agreement with any Third Party regarding the confidentiality of confidential and proprietary Information relating to that Third Party or its business; provided, however, that in the event that a Party is required under this Section 11.01 to disclose any such Information, such Party shall use commercially reasonable efforts to seek to obtain such Third Party Consent to the disclosure of such Information.

<div align="center">

**ARTICLE XII**
**SOLE DISCRETION OF IAC; TERMINATION**

</div>

        12.01.    <u>Sole Discretion of IAC</u>.  Notwithstanding any other provision of this Agreement, until the occurrence of the applicable Relevant Time, IAC shall have the sole and absolute discretion:

        (a)    to determine whether to proceed with all or any part of the Separation, including any Separation Transaction, or any or all of the Distributions, and to determine the timing of and any and all conditions to the completion of the

Separation and the Distributions or any part thereof or any other transaction contemplated by this Agreement; and

(b)     to amend or otherwise change, delete or supplement, from time to time, any term or element of the Separation, including any Separation Transaction, or any or all of the Distributions or any other transaction contemplated by this Agreement.

12.02.   Termination. (a)  This Agreement and all Ancillary Agreements may be terminated and the transactions contemplated hereby may be amended, supplemented, modified or abandoned in any respect at any time prior to the Effective Time of the first Distribution to occur, by and in the sole and absolute discretion of IAC without the approval of any Spinco or of the stockholders of IAC.  In the event of such termination, no Party shall have any liability of any kind to any other Party or any other Person.

(b)     After the Effective Time of the first Distribution to occur, this Agreement may not be terminated to the extent the rights and obligations provided for hereunder are between and among IAC and those Spincos the Distribution of which shall have previously occurred except by an agreement in writing signed by the relevant Parties; provided, that IAC in its sole discretion may abandon one or more of the Distributions the Distribution date of which shall not yet have occurred and, by notice to the other Spincos, shall have the right to terminate (subject to the last sentence of Section 1.04(b)) this Agreement and the Ancillary Agreements to the extent of the rights and obligations provided between the Spinco(s) the Distribution of which shall have been abandoned and the Spincos the Distribution of which shall have previously occurred.

59

---

## ARTICLE XIII
## MISCELLANEOUS

13.01.   Limitation of Liability.  In no event shall any member of any Group be liable to any member of any other Group for any special, consequential, indirect, collateral, incidental or punitive damages or lost profits or failure to realize expected savings or other commercial or economic loss of any kind, however caused and on any theory of liability (including negligence) arising in any way out of this Agreement, whether or not such Person has been advised of the possibility of any such damages; provided, however, that the foregoing limitations shall not limit any Party's indemnification obligations for Liabilities with respect to Third Party Claims as set forth in Article VI.  The provisions of Article IX shall be the Parties' sole recourse for any breach hereof or any breach of the Ancillary Agreements.

13.02.   Counterparts.  This Agreement and each Ancillary Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties thereto and delivered to the other party or parties.

13.03.   Entire Agreement.  This Agreement, the Ancillary Agreements, and the Schedules and Exhibits hereto and thereto and the specific agreements contemplated hereby or thereby contain the entire agreement between the Parties with respect to the subject matter hereof and supersede all previous agreements, oral or written, negotiations, discussions, writings, understandings, commitments and conversations with respect to such subject matter.  No agreements or understandings exist between the Parties other than those set forth or referred to herein or therein.

13.04.   Construction.  In this Agreement and each of the Ancillary Agreements, unless a clear contrary intention appears:

(a)     the singular number includes the plural number and vice versa;

(b)     reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement or the relevant Ancillary Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(c)     reference to any gender includes each other gender;

(d)     reference to any agreement, document or instrument means such agreement, document or instrument as amended, modified, supplemented or restated, and in effect from time to time in accordance with the terms thereof subject to compliance with the requirements set forth herein or in the relevant Ancillary Agreement;

(e)        reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Applicable Law means that provision of such Applicable Law from time to time

in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or provision;

(f)        "herein," "hereby," "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement or to the relevant Ancillary Agreement as a whole and not to any particular article, section or other provision hereof or thereof;

(g)        "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)        the Table of Contents and headings are for convenience of reference only and shall not affect the construction or interpretation hereof or thereof;

(i)        with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding;" and

(j)        references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

13.05.    Signatures.  Each Party acknowledges that it and the other Party (and the other members of their respective Groups) may execute certain of the Ancillary Agreements by facsimile, stamp or mechanical signature.  Each Party expressly adopts and confirms each such facsimile, stamp or mechanical signature made in its respective name (or that of the applicable member of its Group) as if it were a manual signature, agrees that it will not assert that any such signature is not adequate to bind such Party to the same extent as if it were signed manually and agrees that at the reasonable request of the other Party at any time it will as promptly as reasonably practicable cause each such Ancillary Agreement to be manually executed (any such execution to be as of the date of the initial date thereof).

13.06.    Assignability.  Except as set forth in any Ancillary Agreement, this Agreement and each Ancillary Agreement shall be binding upon and inure to the benefit of the Parties hereto and thereto, respectively, and their respective successors and assigns; provided, however, that except as specifically provided in any Ancillary Agreement, no Party hereto or thereto may assign its respective rights or delegate its respective obligations under this Agreement or any Ancillary Agreement without the express prior written consent of the other parties hereto or thereto.

13.07.    Third Party Beneficiaries.  Except for the indemnification rights under this Agreement of any Corresponding Indemnified Party in its capacity as such and for the release under Section 6.01 of any Person provided therein and except as specifically provided in any Ancillary Agreement, (a) the provisions of this Agreement and each Ancillary Agreement are solely for the benefit of the parties hereto and thereto and their respective successors and permitted assigns and are not intended to confer upon any Person, except the parties hereto and thereto and their respective successors and permitted assigns, any rights or remedies hereunder and (b) there are no third party beneficiaries of this Agreement or any Ancillary Agreement; and neither this Agreement nor any Ancillary Agreement shall provide any Third Party with any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement or any Ancillary Agreement.

13.08.    Payment Terms.  (a)  Except as expressly provided to the contrary in this Agreement or in any Ancillary Agreement, any amount to be paid or reimbursed by one Party to the other under this Agreement shall be paid or reimbursed hereunder within thirty (30) days after presentation of an invoice or a written demand therefor and setting forth, or accompanied by, reasonable documentation or other reasonable explanation supporting such amount.

(b)        Except as expressly provided to the contrary in this Agreement or in any Ancillary Agreement, any amount not paid when due pursuant to this Agreement (and any amount billed or otherwise invoiced or demanded and properly payable that is not paid within thirty (30) days of such bill, invoice or other demand) shall bear interest at a rate per annum equal to the Prime Rate plus 2% (or the maximum legal rate, whichever is lower), calculated for the actual number of days elapsed, accrued from the date on which such payment was due up to the date of the actual receipt of payment.

13.09.   <u>Governing Law</u>.  Except as set forth in Article IX, this Agreement and each Ancillary Agreement, shall be governed by and construed and interpreted in accordance with the internal laws of the State of Delaware, irrespective of the choice of laws principles of the State of Delaware, as to all matters, including matters of validity, construction, effect, enforceability, performance and remedies.

13.10.   <u>Notices</u>.  All notices or other communications under this Agreement and, unless expressly provided therein, each Ancillary Agreement, shall be in writing and shall be deemed to be duly given when delivered in person or successfully transmitted by facsimile, addressed as follows:

If to IAC, to:

IAC/InterActiveCorp
555 West 18th Street
New York, NY  10011
Attention:  General Counsel
Telecopier:  (212) 632-9642

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
Attention:  Pamela S. Seymon, Esq.
Telecopier:  (212) 403-2000

If to TM Spinco:

Ticketmaster
8800 Sunset Boulevard
West Hollywood, California 90069
Attention: General Counsel
Telecopier:  (310) 360-3373

62

If to Interval Spinco:

Interval Leisure Group, Inc.
6262 Sunset Drive
Miami, Florida 33143
Attention: General Counsel
Telecopier:  (305) 667-2072

If to HSN Spinco:

1 HSN Drive
St. Petersburg, Florida 33729
Attention: General Counsel
Telecopier:  (727) 872-6866

If to Tree Spinco:

11115 Rushmore Drive
Charlotte, North Carolina 28277
Attention: General Counsel
Telecopier:  (949) 255-5139

Any Party may, by notice to the other Parties as set forth herein, change the address or fax number to which such notices are to be given.

13.11.   <u>Severability</u>.  If any provision of this Agreement or any Ancillary Agreement or the application thereof to any Person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof or thereof, or the application of such provision to Persons or circumstances or in jurisdictions other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby or thereby, as the case may be, is not affected in any manner adverse to any party hereto or thereto.  Upon such determination, the relevant Parties shall negotiate in good faith in an effort to agree upon such a suitable and equitable provision to effect the original intent of the Parties.

13.12.   <u>Publicity</u>.  Prior to the Effective Time, IAC shall be responsible for issuing any press releases or otherwise making public statements with respect to this Agreement, the Separation, the Distributions or any of the other transactions contemplated hereby and thereby, and no Spinco shall make such statements without the prior written consent of IAC.  Prior to the Effective Time, the Separate-cos shall each consult with the other prior to making any filings with any Governmental Authority with respect thereto.

63

13.13.   <u>Survival of Covenants</u>.  Except as expressly set forth in this Agreement or any Ancillary Agreement, any covenants, representations or warranties contained in this Agreement and each Ancillary Agreement shall survive the Separation and the Distributions and shall remain in full force and effect.

13.14.   <u>Waivers of Default; Conflicts</u>.  (a) Waiver by any Party of any default by the other Party of any provision of this Agreement or any Ancillary Agreement shall not be deemed a waiver by the waiving Party of any subsequent or other default, nor shall it prejudice the rights of the other Party.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(b)   Each Party acknowledges that each of the Parties and each member of their respective Group are all currently represented by members of IAC's legal department and IAC's outside counsel.  IAC (on behalf of itself and every member of its Group), on the one hand, and each Spinco (on behalf of itself and every member of its Group), on the other hand, waives any conflict with respect to such common representation that may arise before, at or after the Effective Time.

13.15.   <u>Amendments</u>.  After the Effective Time, no provisions of this Agreement or any Ancillary Agreement shall be deemed waived, amended, supplemented or modified by any Party, unless such waiver, amendment, supplement or modification is in writing and signed by the authorized representative of the Party against whom it is sought to enforce such waiver, amendment, supplement or modification.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

64

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

IAC/INTERACTIVECORP

By:  /s/ Gregg Winiarski
     Name:   Gregg Winiarski

Title: Vice President

HSN, INC.


By: /s/ Mindy Grossman
      Name: Mindy Grossman
      Title: Chief Executive Officer

INTERVAL LEISURE GROUP, INC.


By: /s/ Craig Nash
      Name: Craig M. Nash
      Title: Chairman, President &
            Chief Executive Officer

TICKETMASTER


By: /s/ Sean Moriarty
      Name: Sean P. Moriarty
      Title: President and Chief Executive
            Officer

TREE.COM, INC.


By: /s/ Douglas R. Lebda
      Name: Douglas R. Lebda
      Title: Chairman and Chief
            Executive Officer

65

# EXHIBIT 3

10-K 1 a2190858z10-k.htm 10-K

Use these links to rapidly review the document
TABLE OF CONTENTS

Table of Contents

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the Fiscal Year Ended December 31, 2008

*or*

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from                    to

### Commission File No. 001-34063

---

# TREE.COM, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2414818** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**11115 Rushmore Drive, Charlotte, North Carolina 28277**
(Address of Registrant's principal executive offices)

**(704) 541-5351**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Common Stock, $0.01 Par Value | Registered on the NASDAQ Exchange |
|---|---|

**Securities registered pursuant to Section 12(g) of the Act:**

None

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐    No ☒

Indicated by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "accelerated filer," "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☒     Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☒

As of June 30, 2008, there was no established public market for the registrant's common stock. Shares began trading August 21, 2008 after completion of the Spin-Off from IAC/ InterActiveCorp ("IAC").

As of February 24, 2009, there were 9,980,388 shares of the Registrant's common stock, par value $.01 per share, outstanding.

**Documents Incorporated By Reference:**

Portions of the Registrant's proxy statement for its 2009 Annual Meeting of Stockholders are incorporated by reference into Part III herein.

# TABLE OF CONTENTS

|  |  | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 17 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 28 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 29 |
| Item 6. | Selected Financial Data | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 31 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 43 |
| Item 8. | Financial Statements and Supplementary Data | 45 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 88 |
| Item 9A(T). | Controls and Procedures | 88 |
| Item 9B. | Other Information | 88 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 89 |
| Item 11. | Executive Compensation | 89 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 89 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 89 |
| Item 14. | Principal Accountant Fees and Services | 89 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 90 |

Table of Contents

# PART I

**Item 1.  Business**

## History and Overview

Tree.com is the parent of LendingTree, LLC and is the indirect parent of several companies owned by LendingTree, LLC. LendingTree, LLC (formerly, LendingTree, Inc.) was incorporated in the state of Delaware in June 1996 and commenced nationwide operations in July 1998. LendingTree, Inc. was acquired by IAC/InterActiveCorp ("IAC") in 2003 and converted to a Delaware limited liability company (LendingTree, LLC) in December 2004. On August 20, 2008, Tree.com, Inc. (along with its subsidiary, LendingTree, LLC) was spun off from IAC into a separate publicly traded company. We refer to the separation transaction as the "spin-off." Tree.com was originally incorporated as a Delaware corporation in April 2008, in anticipation of the spin-off.

Through its various subsidiaries, Tree.com currently operates a lending business (the "Lending Business") and a real estate business (the "Real Estate Business").

The Lending Business consists of online networks and call centers, principally LendingTree.com and GetSmart.com, which match consumers with lenders and loan brokers. In addition, the Lending Business originates, processes, approves and funds various types of residential real estate loans under two brand names, LendingTree Loans® and HomeLoanCenter.com.

The Real Estate Business consists primarily of an internet-enabled national residential real estate brokerage that currently operates offices in 20 markets under the brand name "RealEstate.com, REALTORS®." Outside of these 20 markets, RealEstate.com maintains relationships with a network of third-party brokerages that receive leads from RealEstate.com and pay a referral fee on closed transactions. The Real Estate Business also consists of a brokerage that matches residential home buyers interested in newly constructed homes with builders and currently operates under the brand name "iNest®."

## Lending Business

### Our Lending Networks

Consumers can access Tree.com's nationwide network of more than 200 banks, lenders and loan brokers online (via *www.lendingtree.com* or *www.getsmart.com*) or by calling 1-800-555-TREE. Loans offered by these banks, lenders and loan brokers (the "Network Lenders") consist primarily of home mortgages (in connection with refinancings and purchases) and home equity loans.

Tree.com selects lenders throughout the country in an effort to provide full geographic lending coverage of the country and to offer a complete suite of loan offerings available in the market. Typically, before a lender joins the Network, Tree.com performs credit and financial reviews on the lender. In addition, as a further quality assurance measure, Tree.com checks new lenders against a national antifraud database maintained by the Mortgage Asset Research Institute. All Network Lenders are required to enter into a contract that generally may be terminated upon notice by either party. No individual Network Lender accounted for more than 5% of the Lending Business revenue in any period.

Consumers seeking mortgage loans through one of Tree.com's lending networks can receive multiple conditional loan offers from Network Lenders, or from Tree.com's subsidiary doing business under the name "LendingTree Loans" (as described below), in response to a single loan request form.

The process by which the Lending Business matches consumers and Network Lenders is referred to in the document as the "matching process." This matching process consists of the following steps:

- **Credit Request.**  Consumers complete a single loan request form for the selected loan with information regarding their income, assets and liabilities, loan preferences and other data. Consumers also consent to the retrieval of their credit report.

1

[Table of Contents](#)

- **Loan Request Form Matching and Transmission.** Tree.com proprietary technology matches a given consumer's loan request form data, credit profile and geographic location against certain pre-established creditworthiness criteria of Network Lenders, which may be modified from time to time. Once a given loan request passes through the matching process, the loan request is automatically transmitted to available Network Lenders, not exceeding five.

- **Lender Evaluation and Response.** Network Lenders who receive a loan request form evaluate the information in the loan request to determine whether to make a conditional loan offer. If a given number of Network Lenders do not respond with a conditional loan offer, the loan request form is directed through the matching process a second time in an attempt to match the consumer with another Network Lender.

- **Communication of a Conditional Offer.** If one or more Network Lenders make a conditional offer, the consumer is automatically notified via e-mail to return to the site and log in to a web-page reflecting their customized loan offers ("My Account"). Through the My Account web-page consumers may access and compare the proposed terms of each conditional offer, including: interest rate, closing costs, monthly payment amount, lender fees and other information. If a consumer does not have access to e-mail, conditional offers are provided to the consumer by phone or fax.

- **Loan Processing.** Consumers work offline with the relevant Network Lender to provide property information and additional information bearing on creditworthiness to the Network Lender. If the Network Lender approves a consumer, it will then underwrite and originate the loan.

- **Ongoing Consumer and Lender Support.** Active e-mail and telephone follow-up and support is provided to both Network Lenders and consumers during the loan transaction process. This follow-up and support is designed to provide technical assistance and increase overall satisfaction of Network Lenders, as well as increase the percentage of consumers who close a loan through financial institutions found through the Lending Business.

The Lending Business also offers a short-form matching process under the LendingTree® and GetSmart® brands. This process, which provides consumers with lender contact information only, typically requires the consumer to submit less data than that required in connection with the matching process described above.

The Lending Business does not charge consumers a fee to use its lending networks. Substantially all revenues from lending networks are derived from both up-front matching fees paid by Network Lenders who receive a loan request form and closing fees paid by Network Lenders who close a transaction with the consumer. Because a given loan request form can be matched with more than one Network Lender, up to five match fees may be generated from the same form. Matching fees are recognized at the time the loan request form is transmitted and closing fees are recognized at the time the Network Lender reports that it has closed the loan, which may be several months after the time the loan request form is transmitted.

### *LendingTree Loans/Home Loan Center, Inc.*

The Lending Business also originates, processes, approves and funds various consumer mortgage loans through a Tree.com subsidiary, Home Loan Center, Inc., which operates primarily under the brand name "LendingTree Loans®." For these purposes, the Lending Business maintains loan origination offices in California and is able to provide a broad range of mortgage loan offerings to consumers in most states, primarily conforming and prime loans, and, to a lesser extent, non-conforming and FHA/Alt-A loans. Products available include both adjustable loans and fixed rate loans.

LendingTree Loans®-branded loan originations are principally derived from consumer loan requests received through *www.lendingtree.com, www.getsmart.com* or 1-800-555-TREE. A portion of all consumer loan request forms received through these channels are referred to LendingTree Loans.

2

Table of Contents

LendingTree Loans offers those consumers a choice among various loan alternatives, with loan pricing based upon different wholesale offerings received by LendingTree Loans from the secondary market investors who purchase the loans (plus a margin to cover internal costs). LendingTree Loans maintains controls to ensure that its consumer loan pricing correlates to secondary market pricing and to ensure that its consumers receive multiple loan alternatives, thus maintaining the competition and choice elements inherent in the LendingTree brand. Tree.com believes that LendingTree Loans provides value to consumers who do not wish to negotiate with multiple lenders, but still wish to obtain loan alternatives.

LendingTree Loans®-branded loans are funded and closed using proceeds from borrowings under available warehouse lines of credit or repurchase agreements. Substantially all of the loans funded are sold, along with the accompanying loan servicing rights, to investors in the secondary market, generally within 30 days of funding, with the proceeds from such sales being used to repay borrowings under the warehouse lines of credit or repurchase agreements. For terms of the warehouse lines of credit and repurchase agreements see "Financial Position, Liquidity and Capital Resources."

Although most of Home Loan Center, Inc.'s consumer leads are sourced through *www.lendingtree.com* or 1-800-555-TREE and originated under the LendingTree Loans® brand, a small portion of Home Loan Center, Inc.'s leads are sourced from a variety of non-LendingTree channels, including third-party online lead aggregators, direct mail marketing campaigns and *www.homeloancenter.com*. When obtaining leads from third-party sources, Home Loan Center, Inc. operates under its traditional name and brand (HomeLoanCenter). Consumers who request loans through the HomeLoanCenter brand typically receive single loan offers. HomeLoanCenter-branded loans are funded, closed and sold into the secondary market in the same manner, and on substantially the same terms, as LendingTree Loans-branded loans.

Revenues from direct lending operations are derived from the sale of loans to secondary market investors and from origination and other fees paid by borrowers. Of Home Loan Center, Inc.'s six secondary market investors in 2008, the two largest, Countrywide and CitiMortgage, represented approximately 12% and 11%, respectively, of Tree.com's consolidated revenue in 2008. See "Risk Factors Relating to the Business of Tree.com Following the Spin-Offs—Adverse Events and Trends."

### Other Businesses

Through the LendingTree.com and GetSmart.com websites, Tree.com's Lending Business also offers:

- unsecured loans, through which consumers are matched with multiple lenders using a network-based process similar to the mortgage loan matching process described above;

- automobile loans, through which consumers are linked with one or more third-party automobile lenders;

- credit cards, through which consumers can search various credit card offerings through a third-party vendor;

- reverse mortgage loans, through which consumers are linked with one or more third party providers; and

- various consumer insurance products, pursuant to which consumers are linked with licensed insurance agents and insurance lead aggregators to obtain insurance offers.

Revenues from these businesses are derived either from matching and closing fees, or in some cases, volume-based marketing fees. While the revenues from these businesses do not currently represent a significant portion of the revenues of the Lending Business, these revenues are expected to grow over time.

3

Table of Contents

### Competition

Tree.com's Lending Business, particularly its lending networks, competes with other lead aggregators, including online intermediaries that operate network-type arrangements. In the case of the direct lending operations, Tree.com believes that the primary competitors of its Lending Business are traditional lending institutions, including those that are developing their own direct, online lending channels. While these financial institutions do not operate lending networks, they process, close and fund loans as direct lenders through well-recognized, national brands, many of which are industry leaders. Tree.com's Lending Business also faces additional competition from direct lending websites owned and operated by other online lenders that originate the bulk of their loans through their websites or by phone. These companies typically operate a consumer-branded website and attract consumers via online banner ads, key word placement on search engines, partnering with affiliates and business development arrangements with other properties, including major online portals.

## Real Estate Business

### Real Estate Brokerage

RealEstate.com, REALTORS® is Tree.com's proprietary real estate brokerage business, which currently operates in 20 markets across the United States. Business for the proprietary real estate brokerage is generated internally based on consumers accessing *www.realestate.com* or by calling 1-800-REALESTATE, and generated externally by agents. The brokerage recruits agents to join as independent contractors, for whom it then generates leads, with the brokerage retaining a significant share of the gross commission on closed transactions originating from company-generated leads (and a lesser share in the case of agent-generated leads). Tree.com uses both a central agent recruiting group in Charlotte, as well as local recruiting efforts, to identify agents who fit its model and would be willing to join the company. Third-party brokerage services provided by approximately 300 real estate brokerage firms are also available through *www.realestate.com* or by calling 1-800-REALESTATE. The Real Estate Business has developed relationships with brokers over the years, and targets prospective companies based on available lead flow by geography, their willingness to work with a lead generation company under Tree.com's terms and conditions, and the belief that such brokerage firms would generate an acceptable closing conversion rate. These third-party brokerage services are available nationwide, as well as in the 20 markets in which RealEstate.com, REALTORS currently operates. Once the consumer and the real estate professional are matched and agree to work together, the remainder of the transaction is completed locally.

The RealEstate.com, REALTORS business earns revenues through the real estate brokerage commissions it collects in connection with company- and agent-generated transactions. For its third party brokerage referral services, the Real Estate Business also earns revenue from cooperative brokerage fees paid by participating real estate brokerages.

### Other Real Estate Services

The Real Estate Business also owns and operates *www.inest.com*, a website that matches potential purchasers of newly constructed homes with new home builders. iNest.com is currently available in 30 states and allows consumers to view new home community information (new home listings) on the iNest website. From the iNest website a consumer can print a coupon to present to builders that participate in the iNest.com network upon his or her first visit to a home site, which signifies that iNest.com will act as the buyer's real estate broker for a new home purchase from that builder. Upon closing, the builder pays a commission to iNest, which in turn is split between iNest, the licensed iNest real estate broker representing the consumer, and the consumer.

### Competition

Tree.com's Real Estate Business competes with all real estate brokerages within the RealEstate.com, REALTORS® 20 markets. These brokerages are comprised mainly of traditional real

4

Table of Contents

estate companies operating as independent brands or franchisees, as well as non-traditional models, such as salaried-agent, fee-for-service, flat-fee, discount, or rebate commission models, many of which generate leads from the Internet. In addition, the Real Estate Business competes for customers with companies that are not brokerages, such as websites that aggregate real estate broker listings without related services and customer support. Given the downturn in the credit and mortgage markets and the decline in the number of housing transactions, competition in this segment has increased.

**Regulation and Legal Compliance**

Tree.com businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States (see "Risk Factors Relating to the Business of Tree.com Following the Spin-Offs—Compliance and Changing Laws, Rules and Regulations"). As a result, they are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, including:

- Restrictions on the amount and nature of fees or interest that may be charged in connection with a loan, in particular, state usury and fee restrictions;

- Restrictions on the manner in which consumer loans are marketed and originated, including the making of required consumer disclosures, such the federal Truth-in-Lending Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the federal Fair Housing Act, the federal Real Estate Settlement Procedures Act (RESPA), and similar state laws;

- Restrictions on the amount and nature of fees that may be charged lenders and real estate professionals for providing or obtaining consumer leads, in particular, RESPA;

- Restrictions on the amount and nature of fees that may be charged consumers for real estate brokerage transactions, including any incentives and rebates, that may be offered to consumers by Tree.com businesses;

- State, and in some instances, federal, licensing or registration requirements applicable to both individuals or businesses engaged in the making or brokerage of loans (or certain kinds of loans, such as loans made pursuant to the Federal Housing Act), or the brokering of real estate transactions; and

- State and federal restrictions on the marketing activities conducted by telephone, the mail or by email, or over the internet, including the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and its accompanying regulations and guidelines.

**Employees**

As of December 31, 2008, Tree.com had approximately 700 full-time employees. None of Tree.com's employees are represented under collective bargaining agreements. Tree.com considers its relations with its employees and independent contractors to be good.

**Additional Information**

*Company Website and Public Filings.* The Company maintains a website at *www.tree.com*. None of the information on the Company's website is incorporated by reference in this report, or in any other filings with, or in any information furnished or submitted to, the SEC.

The Company makes available, free of charge through its website, its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K (including related amendments) as soon as reasonably practicable after they have been electronically filed with, or furnished to, the SEC.

5

Table of Contents

*Code of Business Conduct and Ethics.* The Company's code of business conduct and ethics, which applies to all employees, including all executive officers and senior financial officers and directors, is posted on the Company's website at *investor-relations.tree.com/governance.cfm*. The code of conduct and ethics complies with Item 406 of SEC Regulation S-K and the rules of The Nasdaq Stock Market. Any changes to the code of conduct and ethics that affect the provisions required by Item 406 of Regulation S-K, and any waivers of the code of conduct and ethics for Tree.com's executive officers, directors or senior financial officers, will also be disclosed on Tree.com's website.

**Item 1A.**  *Risk Factors*

**Cautionary Statement Regarding Forward-Looking Information**

This Annual Report on Form 10-K contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. The use of words such as "anticipates," "estimates," "expects," "projects," "intends," "plans" and "believes," among others, generally identify forward-looking statements. These forward-looking statements include, among others, statements relating to: Tree.com's anticipated financial performance, Tree.com's business prospects and strategy, anticipated trends and prospects in the various industries in which Tree.com businesses operate, new products, services and related strategies and other similar matters. These forward looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict.

Actual results could differ materially from those contained in the forward looking statements included in this report for a variety of reasons, including, among others, the risk factors set forth below. Other unknown or unpredictable factors that could also adversely affect Tree.com's business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward looking statements discussed in this report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward looking statements, which only reflect the views of Tree.com management as of the date of this report. Tree.com does not undertake to update these forward-looking statements.

**Risk Factors**

Tree.com's business, financial condition and results of operations are subject to certain risks that are described below. The risks and uncertainties described below are not the only ones facing Tree.com. Additional risks and uncertainties not presently known or that are currently deemed immaterial may also impair Tree.com's business, financial condition and results of operations.

**Risk Factors Relating to Spin-off from IAC**

***As a result of our spin-off from IAC in August 2008, we may be unable to operate effectively as a separate public entity.***

We were spun off from IAC on August 20, 2008. IAC has no continuing obligation to provide financial, operational or organizational assistance to us, other than limited services pursuant to a transition services agreement. As a separate public entity, we are subject to, and responsible for, regulatory compliance, including periodic public filings with the SEC and compliance with NASDAQ's continued listing requirements, as well as generally applicable tax and accounting rules. We may be unable to implement successfully the changes necessary to operate effectively as an independent public entity.

***We are incurring increased costs relating to operating as an independent company that are impacting our cash flow and results of operations.***

The obligations of being a public company, including substantial public reporting and investor relations obligations, are requiring new expenditures, placing new demands on our management and

6

Table of Contents

necessitating the hiring of additional personnel. We may need to implement additional systems that require new expenditures in order to adequately function as a public company. Such expenditures could adversely affect our business, financial condition and results of operations.

In addition, prior to the spin-off, by virtue of being under the same corporate structure, IAC's businesses shared economies of scope and scale in costs, human capital, vendor relationships and customer relationships with the businesses that we own following the spin-off. The increased costs resulting from the loss of these benefits have had, and could continue to have, an adverse effect on us.

***The market price and trading volume of our common stock may be volatile and may face negative pressure.***

Following the spin-off, our common stock became publicly traded for the first time. The market price for our common stock has been volatile, especially in light of recent market instability. The market price for our common stock could continue fluctuate significantly for many reasons, including the risks identified herein or reasons unrelated to our performance. These factors may result in short- or long-term negative pressure on the value of our common stock.

***Financing—We may have future capital needs and may not be able to obtain additional financing on acceptable terms.***

As a standalone company, we are no longer able to rely on IAC to satisfy any of our financing needs and must rely on external sources of credit. The current uncertainties surrounding the industries in which we operate, general reductions in the availability of credit, as well as other factors, may constrain our financing abilities. Our ability to secure additional financing and satisfy our financial obligations under indebtedness outstanding from time to time will depend upon our future operating performance, which is subject to then-prevailing general economic and credit market conditions, including interest rate levels and the availability of credit generally, and financial, business and other factors, many of which are beyond our control. The prolonged continuation or worsening of current credit market conditions would have a material adverse effect on our ability to secure financing on favorable terms, if at all.

We may be unable to secure additional financing or financing on favorable terms or our operating cash flow may be insufficient to satisfy our financial obligations under indebtedness outstanding from time to time. Furthermore, if financing is not available when needed, or is available on unfavorable terms, we may be unable to develop new or enhance our existing services, complete acquisitions or otherwise take advantage of business opportunities or respond to competitive pressures, any of which could have a material adverse effect on our business, financial condition and results of operations. If additional funds are raised through the issuance of equity securities, our stockholders may experience significant dilution.

***The spin-off agreements were not the result of arm's length negotiations. In addition, the tax sharing agreement restricts our ability to enter into certain transactions that might otherwise be beneficial to us and our stockholders.***

The agreements that we entered into with IAC in connection with the spin-off, including the separation and distribution agreement, tax sharing agreement, employee matters agreement and transition services agreement, were established by IAC. Accordingly, the terms for us may not be as favorable as would have resulted from negotiations among unrelated third parties.

The tax sharing agreement with IAC restricts our ability to enter into certain transactions that might be advantageous to us and our stockholders. In particular, the tax sharing agreement limits our ability to repurchase equity securities, dispose of certain assets, engage in mergers and acquisitions and, under certain circumstances, acquire businesses or assets with equity securities or agree to be acquired by a third party.

7

Table of Contents

**Risk Factors Relating to our Business**

*Adverse Events and Trends—Adverse conditions in the primary and secondary mortgage markets, as well as the economy generally, could materially and adversely affect our business, financial condition and results of operations.*

The primary and secondary mortgage markets have been experiencing unprecedented and continuing disruption, which has had, and is expected to continue to have, an adverse effect on our business, financial condition and results of operations. These conditions, coupled with adverse economic conditions and continuing declines in residential real estate prices generally, have resulted, and are expected to continue to result, in decreased consumer demand for the lending and real estate offerings provided by our networks and other businesses. Generally, increases in interest rates adversely affect the ability of the Lending Business and Network Lenders to close loans, while adverse economic trends limit the ability of the Lending Business and Network Lenders to offer home loans other than low margin conforming loans. Likewise, adverse economic trends have reduced, and are expected to continue to reduce, the number of prospective home purchasers and home prices, which adversely affects our Real Estate Business. Our businesses may experience a further decline in demand for their offerings due to decreased consumer demand as a result of the conditions described above now or in the future. Conversely, during periods of robust consumer demand, which are typically associated with decreased interest rates, some Network Lenders may have less incentive to use our networks, or in the case of sudden increases in consumer demand, our Network Lenders may lack the ability to support sudden increases in volume. Prolonged declines in demand for offerings of our businesses could have a material adverse effect on our business, financial condition and results of operations.

The secondary mortgage markets have also been experiencing unprecedented and continued disruptions resulting from reduced investor demand for mortgage loans and mortgage-backed securities and increased investor yield requirements for those loans and securities. These conditions may continue for a prolonged period of time or worsen in the future. Home Loan Center, Inc. ("HLC") does not have the capital resources or credit necessary to retain the loans it funds and closes and, as a result, sells substantially all such loans within 30 days of funding as discussed above. Accordingly, a prolonged period of secondary market illiquidity may force the Lending Business to significantly reduce the volume of loans that it originates and funds through HLC, which could have an adverse effect on our business, financial condition and results of operations.

These disruptions and volatility in the capital and credit markets have resulted in rapid and steep declines in prevailing stock prices, particularly in the financial services sector, as well as downward pressure on credit availability. These adverse conditions adversely affect our Network Lenders, secondary market purchasers, and third-party real estate professionals, and may render them unwilling or unable to continue business relationships with us. If current levels of market disruption and volatility continue or worsen, there can be no assurance that we will not experience an adverse effect on our business relationships and on our business, financial condition and results of operations.

*Adverse Events and Trends—Difficult market conditions have adversely affected our industry.*

Declines in the housing market over the past year, with falling home prices and increasing foreclosures, unemployment and under-employment, have negatively impacted the credit performance of mortgage loans and resulted in significant write-downs of asset values by financial institutions, including government-sponsored entities as well as major commercial and investment banks. These write-downs, initially of mortgage-backed securities but spreading to other asset-backed securities, credit default swaps and other derivative and cash securities, in turn, have caused many financial institutions to seek additional capital, to merge with larger and stronger institutions and, in some cases, to fail. Reflecting concern about the stability of the financial markets generally and the strength of counterparties, many lenders and institutional investors have reduced or ceased providing funding to

8

Table of Contents

borrowers, including to other financial institutions. This market turmoil and tightening of credit have led to an increased level of commercial and consumer delinquencies, lack of consumer confidence, increased market volatility and widespread reduction of business activity generally. The resulting economic pressure on consumers and lack of confidence in the financial markets may have an adverse effect on our business, financial condition and results of operations.

We do not expect that the difficult conditions in the financial markets will likely improve in the near future. A worsening of these conditions would likely exacerbate the adverse effects of these difficult market conditions on us and others in the financial services industry. Further, our business could be adversely affected by the actions and commercial soundness of other businesses in the financial services sector. As a result, defaults by, or even rumors or questions about, one or more of these entities, or the financial services industry generally, have led to market-wide liquidity problems and could lead to losses or defaults by us or by other institutions. Any such losses or defaults could have an adverse effect on our business, financial condition and results of operations.

*Adverse Events and Trends—Adverse conditions in the credit markets could materially and adversely affect our business, financial condition and results of operations.*

The credit markets, in particular those financial institutions that provide warehouse financing and similar arrangements to mortgage lenders, have been experiencing unprecedented and continued disruptions resulting from instability in the mortgage and housing markets. Our Lending Business originates, processes, approves and funds various consumer mortgage loans through HLC, which operates primarily under the brand name "LendingTree Loans®." These direct lending operations have significant financing needs that are currently being met through borrowings under warehouse lines of credit or repurchase agreements to fund and close loans, followed by the sale of substantially all loans funded to investors in the secondary mortgage markets. Current credit market conditions, such as significantly reduced and limited availability of credit, increased credit risk premiums for certain market participants and increased interest rates generally, increase the cost and reduce the availability of debt and may continue for a prolonged period of time or worsen in the future.

As of December 31, 2008, LendingTree Loans had committed lines of credit totaling $100 million, of which $50 million is scheduled to expire on December 29, 2009, and another $50 million was scheduled to expire on January 24, 2009, and an uncommitted line of credit of $150 million. The $50 million committed line of credit that was scheduled to expire on January 24, 2009 and the $150 million uncommitted line were provided by the same lender. The $50 million committed line of credit that was scheduled to expire on January 24, 2009 has been extended to April 30, 2009 while both parties work to finalize terms of an annual renewal, and, at the time of extension, the size of the $150 million uncommitted line was reduced to $50 million. The interest rate under the $50 million committed line that expires on December 29, 2009 is 30-day LIBOR plus 125 basis points. The interest rate under the $50 million committed line of credit that was extended to April 30, 2009 is 30-day LIBOR plus 225 basis points. The interest rate under the $50 million uncommitted line of credit is 30-day LIBOR plus 150 basis points. The $50 million committed line of credit expiring on April 30, 2009 can be cancelled at the option of the lender without default upon sixty days notice. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid from proceeds from the sales of loans held for sale by LendingTree Loans. Borrowings under all of LendingTree Loans' lines of credit are non-recourse to Tree.com. LendingTree Loans is highly dependent on the availability of credit to finance its operations.

Although we believe that our existing lines of credit are adequate for our current operations, further reductions in our available credit, or the inability to renew or replace these lines, could have an adverse effect on our business, financial condition and results of operations. The Lending Business attempts to mitigate the impact of current conditions and future credit market disruptions by

9

Table of Contents

maintaining committed and uncommitted warehouse lines of credit with several financial institutions. However, these financial institutions, like all financial institutions, are subject to the same adverse market conditions and may be affected by recent market disruptions, which may affect the decision to reduce or renew these lines, or the pricing for these lines. As a result, current committed warehouse lines of credit may be reduced or not renewed, and alternative financing may be unavailable or inadequate to support operations or the cost of such alternative financing may not allow HLC to operate at profitable levels. Because HLC is highly dependent on the availability of credit to finance its operations, the continuation of current credit market conditions for a prolonged period of time or the worsening of such conditions could have an adverse effect on our business, financial condition and results of operations, particularly over the next few years.

***Adverse Events and Trends—Our financial results fluctuate as a result of seasonality, which may make it difficult to predict our future performance and may affect our common stock price.***

Our business is generally subject to seasonal trends. These trends reflect the general patterns of housing sales, which typically peak in the spring and summer seasons. As a result, our quarterly operating results may fluctuate, which may negatively impact the price of our common stock.

***Contingent Liabilities—Litigation and Indemnification of Secondary Market Purchasers—Litigation and indemnification of secondary market purchasers could have a material adverse effect on our business, financial condition, results of operations and liquidity.***

In connection with the sale of loans to secondary market purchasers, HLC makes certain representations regarding related borrower credit information, loan documentation and collateral. To the extent that these representations are incorrect, HLC may be required to repurchase loans or indemnify secondary market purchasers for losses due to borrower defaults. While HLC seeks to ensure that loans it originates comply with these representations, secondary market purchasers may take a contrary position. In connection with the sale of loans to secondary market purchasers, HLC also agrees to repurchase loans or indemnify secondary market purchasers for losses due to early payment defaults (*i.e.,* late payments during a limited time period immediately following HLC's origination of the loan). In connection with the sale of a majority of its loans to secondary market purchasers, HLC also agrees to repay all or a portion of the initial premiums paid by secondary market purchasers in instances where the borrower prepays the loan within a specified period of time.

We and our businesses are also parties to litigation involving a variety of matters, many of which involve damage claims for substantial amounts (see Part II, Item 3 above).

We believe that we will have adequate resources to satisfy our obligations relating to the potential exposures described above. However, it is possible that these liabilities will be greater than anticipated. If the liabilities are in excess of expectations, our ability to satisfy such obligations may be dependent upon our ability to raise capital in the debt or equity markets, which may be uncertain.

***Third-Party Relationships—We depend on relationships with Network Lenders, real estate professionals, credit providers and secondary market investors and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

Our success depends, in significant part, on the quality and pricing of services provided by, and/or the continued financial stability of, Network Lenders and real estate professionals participating on our networks, credit providers and secondary market investors. Network Lenders or real estate professionals could, for any reason, cease participating on the networks operated by (or otherwise choose not to enter into relationships with) our businesses, fail to pay matching and/or closing fees when due and/or cease providing quality services on competitive terms. In addition, credit providers and/or secondary market investors could, for any reason, choose not to make credit available to (or

10

Table of Contents

otherwise enter into relationships with) HLC, and in the case of secondary market investors only, cease purchasing loans from HLC. In particular, revenues attributable to purchases of loans by two such entities, Countrywide and CitiMortgage, represented approximately 12% and 11%, respectively, of our consolidated revenues in 2008. The occurrence of one or more of these events by a significant number of Network Lenders, real estate professionals, credit providers and/or secondary market investors could, alone or in combination, have a material adverse effect on our business, financial condition and results of operations.

***Network Security—A breach of our network security or the misappropriation or misuse of personal consumer information may have an adverse impact on our business, financial condition and results of operations.***

Any penetration of network security or other misappropriation or misuse of personal consumer information maintained by us could cause interruptions in the operations of our businesses and subject us to increased costs, litigation and other liabilities. Claims could also be made against us for other misuse of personal information, such as for unauthorized purposes or identity theft, which could result in litigation and financial liabilities, as well as administrative action from governmental authorities. Security breaches could also significantly damage our reputation with consumers and third parties with whom we do business. In that regard, on April 21, 2008, we announced that several mortgage companies had gained unauthorized access to LendingTree's customer information database and had used the information to solicit mortgage loans directly from our customers. We promptly reported the situation to the Federal Bureau of Investigation and have been cooperating fully with the FBI's investigation. While LendingTree does not believe this situation resulted in any fraud on the consumer or identity theft, LendingTree notified affected consumers as required by applicable law. Notwithstanding the foregoing, following our announcement, several putative class action lawsuits were filed against LendingTree, seeking to recover damages for consumers allegedly injured by this incident (see Part II, Item 1 above).

As in the case of any financial services company, we may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. We also face risks associated with security breaches affecting third parties with which we are affiliated or otherwise conduct business online. Consumers are generally concerned with security and privacy of the Internet, and any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

***Failure to Provide Competitive Service—Network Lenders and real estate professionals may not provide competitive levels of service to consumers, which could adversely affect our brands and businesses and their ability to attract consumers.***

The ability of our businesses to provide consumers with a high-quality experience depends, in part, on consumers receiving competitive levels of convenience, customer service, price and responsiveness from Network Lenders and real estate professionals with whom they are matched through our networks. If Network Lenders and real estate professionals do not provide consumers with competitive levels of convenience, customer service, price and responsiveness, the value of our various brands may be harmed, the ability of our businesses to attract consumers to our websites may be limited and the number of consumers ultimately matched through our networks may decline, which could have a material adverse effect on our business, financial condition and results of operations.

***Brand Recognition—Failure to maintain brand recognition and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.***

In order to attract visitors to their websites, convert these visitors into paying customers and capture repeat business from existing customers, our businesses must promote and maintain their

11

Table of Contents

various brands successfully, which involves the expenditure of considerable money and resources for online and offline advertising, marketing and related efforts, as well as the continued provision and introduction of high-quality products and services.

We believe that continuing to build and maintain the recognition of our various brands is critical to achieving increased demand for the services provided by our businesses, given that brand recognition is a key differentiating factor among providers of online services. Accordingly, we have spent, and expect to continue to spend, significant amounts of money on, and devote significant resources to, branding, advertising and other marketing initiatives, which may not be successful or cost-effective. The failure of our businesses to maintain the recognition of their respective brands and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.

Lastly, publicity from legal proceedings against us or our businesses, particularly governmental proceedings, consumer class action litigation or the disclosure of information security breaches, could negatively impact our various brands, which could adversely affect our business, financial condition and results of operations.

***Technology—We depend on search engines and other online sources to attract visitors to our websites, and if we are unable to attract these visitors and convert them into customers in a cost-effective manner, our business and financial results may be harmed.***

Our success depends on our ability to attract online consumers to our websites and convert them into customers in a cost-effective manner. We depend, in part, on search engines and other online sources for our website traffic. We are included in search results as a result of both paid search listings, where we purchase specific search terms that will result in the inclusion of our listing, and algorithmic searches that depend upon the searchable content on our sites. Search engines and other online sources revise their algorithms from time to time in an attempt to optimize their search results.

If one or more of the search engines or other online sources on which we rely for website traffic were to modify its general methodology for how it displays our websites, resulting in fewer consumers clicking through to our websites, our business, financial condition and results of operations could suffer. If any free search engine on which we rely begins charging fees for listing or placement, or if one or more of the search engines or other online sources on which we rely for purchased listings, modifies or terminates its relationship with us, our expenses could rise, we could lose customers and traffic to our websites could decrease, all of which could have a material adverse effect on our business, financial condition and results of operations.

***Technology—If we are unable to continually enhance our products and services and adapt them to technological changes and customer needs, including the emergence of new computing devices and more sophisticated online services, we may lose market share and revenue and our business could suffer.***

We need to anticipate, develop and introduce new products, services and applications on a timely and cost-effective basis that keeps pace with technological developments and changing customer needs. For example, the number of individuals who access the internet through devices other than a personal computer, such as personal digital assistants, mobile telephones, televisions and set-top box devices, has increased dramatically, and this trend is likely to continue. Our websites were designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the access and use of our websites through such devices difficult. Because each manufacturer or distributor may establish unique technical standards for its devices, our websites may not be functional or viewable on these devices. Additionally, new devices and new platforms are continually being released. Accordingly, it is difficult to predict the problems we may encounter in improving our websites' functionality with

12

Table of Contents

these alternative devices, and we may need to devote significant resources to the improvement, support and maintenance of our websites. If we fail to develop our websites to respond to these or other technological developments and changing customer needs cost effectively, we may lose market share, which could adversely affect our business, financial condition and results of operations.

***Third-Party Relationships Are Not Exclusive—Network Lenders and real estate professionals affiliated with our networks are not precluded from offering products and services outside of our networks.***

Because our businesses do not have exclusive relationships with Network Lenders and real estate professionals, consumers may obtain loans and real estate offerings directly from these third-party service providers without having to use our networks. Network Lenders can offer loans (and real estate professionals can offer services) directly to consumers through marketing campaigns or other traditional methods of distribution, such as referral arrangements, brick and mortar operations or, in the case of lending, broker agreements. Network Lenders and real estate professionals can also offer loans and services to prospective customers online directly, through one or more online competitors of our businesses, or both. If a significant number of consumers seek loans and services directly from Network Lenders and real estate professionals as opposed to through our networks, our business, financial condition and results of operations would be adversely affected.

***Compliance and Changing Laws, Rules and Regulations—Failure to comply with existing or evolving laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations.***

The failure of our businesses to comply with existing laws, rules and regulations, or to obtain required licenses, could result in administrative fines and/or proceedings against us or our businesses by governmental agencies and/or litigation by consumers, which could adversely affect our business, financial condition and results of operations. Our businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States. As a result, our businesses are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, which are subject to change at any time.

Our businesses conduct marketing activities via the telephone, the mail and/or through online marketing channels, which general marketing activities are governed by numerous federal and state regulations, such as the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and its accompanying regulations and guidelines, among others. While we believe that the practices of our businesses have been structured in a manner to ensure compliance with these laws and regulations, federal or state regulatory authorities may take a contrary position.

Additional federal, state and in some instances, local, laws regulate residential lending and real estate brokerage activities in particular. These laws generally regulate the manner in which lending, lending-related and real estate brokerage activities are marketed or made available, including advertising and other consumer disclosures, payments for services and record keeping requirements; these laws include the Real Estate Settlement Procedures Act ("RESPA"), the Fair Credit Reporting Act, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act and various state laws. In addition, state laws often restrict the amount of interest and fees that may be charged by a lender or mortgage broker, or otherwise regulate the manner in which lenders or mortgage brokers operate or advertise. Furthermore, Congress, many state legislatures and state agencies are proposing, or have recently implemented, additional restrictions on mortgage lending practices. Compliance with these new requirements may render it more difficult to operate or may raise our internal costs. Failure to comply with applicable laws and regulatory requirements may result in, among other things, revocation of required licenses or registrations, loss of approval status, termination of contracts without compensation, administrative enforcement actions and fines, class action lawsuits, cease and desist

13

Table of Contents

orders and civil and criminal liability. While we believe that our businesses have been structured in such a way so as to comply with existing and new laws, the relevant regulatory authorities may take a contrary position or future legislation may adversely affect our business, financial condition and results of operations.

Most states require licenses to solicit, broker or make loans secured by residential mortgages and other consumer loans to residents of those states, as well as to operate real estate referral and brokerage services, and in many cases require the licensure or registration of individual employees engaged in aspects of these businesses. In 2008, Congress mandated that all states adopt certain minimum standards for the licensing of individuals involved in mortgage lending or loan brokering, and many state legislatures and state agencies are in the process of adopting or implementing additional licensing, continuing education, and similar requirements on mortgage lenders, brokers and their employees. Compliance with these new requirements may render it more difficult to operate or may raise our internal costs. While our businesses have endeavored to comply with applicable requirements, the application of these requirements to persons operating online is not always clear. Moreover, any of the licenses or rights currently held by our businesses or our employees may be revoked prior to, or may not be renewed upon, their expiration. In addition, our businesses or our employees may not be granted new licenses or rights for which they may be required to apply from time to time in the future.

Likewise, states or municipalities may adopt statutes or regulations making it unattractive, impracticable, or infeasible for our businesses to continue to conduct business in that jurisdiction. The withdrawal from any jurisdiction due to emerging legal requirements could adversely affect our business, financial condition and results of operations.

Our businesses are also subject to various state, federal and/or local laws, rules and regulations that regulate the amount and nature of fees that may be charged for transactions and incentives, such as rebates, that may be offered to consumers by our businesses, as well as the manner in which these businesses may offer, advertise or promote transactions. For example, RESPA generally prohibits the payment or receipt of referral fees and fee shares or splits in connection with residential mortgage loan transactions, subject to certain exceptions. The applicability of referral fee and fee sharing prohibitions to lenders and real estate providers, including online networks, may have the effect of reducing the types and amounts of fees that may be charged or paid in connection with real estate-secured loan offerings or activities, including mortgage brokerage, lending and real estate brokerage services, or otherwise limiting the ability to conduct marketing and referral activities. Although we believe that our businesses have been structured in such a way so as to comply with RESPA, the relevant regulatory agency may take a contrary position.

Our Real Estate Business is subject to rules and regulations of various real estate boards, as well as the rules of various non-governmental associations and organizations, including but, not limited to, local and regional Multiple Listing Services that provide real estate listing data. Our Real Estate Business is dependent on real estate listing data made available through Multiple Listing Services and other sources. While we believe that our Real Estate Business is structured to comply with these rules and regulations, the relevant organization may take a contrary position, which could adversely affect our business, financial condition and results of operations.

In addition, some states have regulations that prohibit real estate brokers from providing consumers with rebates or other incentives in connection with real estate transactions. Additional states could promulgate similar regulations or interpret existing regulations in a way that limits the ability of online networks to offer consumer incentives in connection with real estate transactions, thereby limiting the attractiveness of real estate brokerage activities offered by our Real Estate Business.

Federal, state and in some instances, local, laws also prohibit unfair and deceptive sales practices generally. While we have adopted appropriate policies and procedures to address these requirements (such as appropriate consumer disclosures and call scripting, call monitoring, and other quality assurance and compliance measures), employees do not always comply with policies and procedures, and therefore, liability and brand injury could result from such employee misconduct.

14

As employers, our businesses are subject to federal and state employment laws. In particular, the Fair Labor Standards Act and California wage and hour laws govern the treatment of "non-exempt" employees, which may include loan officers, underwriters, and loan processors at Home Loan Center, Inc. Failure to comply with applicable employment laws may result in, among other things, administrative fines, class action lawsuits, damages awards and injunctions, any of which could adversely affect our business, financial condition and results of operations.

Parties through which our businesses conduct business similarly may be subject to federal and state regulation. These parties typically act as independent contractors and not as agents in their solicitations and transactions with consumers. Consequently, we cannot ensure that these entities will comply with applicable laws and regulations at all times. Failure on the part of a lender, secondary market purchaser, real estate professional, website operator or other third party to comply with these laws or regulations could result in, among other things, claims of vicarious liability or a negative impact on the reputation of Tree.com and its businesses. The occurrence of one or more of these events could have an adverse effect on our business, financial condition and results of operations.

***Third Party Compliance—If Network Lenders fail to produce required documents for examination by, or other affiliated parties fail to make certain filings with, state regulators, Tree.com may be subject to fines, forfeitures and the revocation of required licenses.***

Some of the states in which our businesses maintain licenses require them to collect various loan documents from Network Lenders and produce these documents for examination by state regulators. While Network Lenders are contractually obligated to provide these documents upon request, these measures may be insufficient. Failure to produce required documents for examination could result in fines, as well as the revocation of our businesses' licenses to operate in key states, which could have a material adverse affect on our business, financial condition and results of operations.

Regulations promulgated by some states may impose compliance obligations on directors, executive officers, large customers and any person who acquires a certain percentage (for example, 10% or more) of our common stock, including requiring such persons to periodically file financial and other personal and business information with state regulators. If any such person refuses or fails to comply with these requirements, our businesses may be unable to obtain a license, and existing licensing arrangements may be jeopardized. The inability to obtain, or the loss of, required licenses could have a material adverse effect on our business, financial condition and results of operations.

***Maintenance of Systems and Infrastructure—Our success depends, in part, on the integrity of our systems and infrastructures. System interruption and the lack of integration and redundancy in these systems and infrastructures may have an adverse impact on our business, financial condition and results of operations.***

Our success depends, in part, on our ability to maintain the integrity of our systems and infrastructures, including websites, information and related systems, call centers and distribution and fulfillment facilities. System interruption and the lack of integration and redundancy in our information systems and infrastructures may adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. We may experience occasional system interruptions that make some or all systems or data unavailable or prevent our businesses from efficiently providing services or fulfilling orders. We also rely on affiliate and third-party computer systems, broadband and other communications systems and service providers in connection with the provision of services generally, as well as to facilitate, process and fulfill transactions. Any interruptions, outages or delays in our systems and infrastructures, our businesses, our affiliates and/or third parties, or deterioration in the performance of these systems and infrastructures, could impair the ability of our businesses to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, acts of war or terrorism, acts of God, unauthorized intrusions or computer viruses, and similar events or disruptions may damage or interrupt computer, broadband or other communications systems and infrastructures at any time. Any of these events could cause system interruption, delays and loss of critical data, and

15

Table of Contents

could prevent our businesses from providing services, fulfilling orders and/or processing transactions. While our businesses have backup systems for certain aspects of their operations, these systems are not fully redundant and disaster recovery planning is not sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these adverse events were to occur, it could adversely affect our business, financial condition and results of operations.

In addition, any penetration of network security or other misappropriation or misuse of personal consumer information could cause interruptions in the operations of our businesses and subject us to increased costs, litigation and other liabilities. Claims could also be made against us for other misuse of personal information, such as for unauthorized purposes or identity theft, which could result in litigation and financial liabilities, as well as administrative action from governmental authorities. Security breaches could also significantly damage our reputation with consumers and third parties with whom we do business. It is possible that advances in computer capabilities, new discoveries, undetected fraud, inadvertent violations of company policies or procedures or other developments could result in a compromise of information or a breach of the technology and security processes that are used to protect consumer transaction data. As a result, current security measures may not prevent any or all security breaches. We may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. We also face risks associated with security breaches affecting third parties with which we are affiliated or otherwise conduct business online. Any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

### *Privacy—The processing, storage, use and disclosure of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights.*

In the processing of consumer transactions, our businesses receive, transmit and store a large volume of personally identifiable information and other user data. The sharing, use, disclosure and protection of this information are governed by the privacy and data security policies maintained by us and our businesses. Moreover, there are federal, state and international laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data. Specifically, personally identifiable information is increasingly subject to legislation and regulations in numerous jurisdictions around the world, the intent of which is to protect the privacy of personal information that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if legislation or regulations are expanded to require changes in business practices or privacy policies, or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations.

Our businesses may also become exposed to potential liabilities as a result of differing views on the privacy of consumer and other user data collected by these businesses. Our failure, and/or the failure by the various third party vendors and service providers with which we do business, to comply with applicable privacy policies or federal, state or similar international laws and regulations or any compromise of security that results in the unauthorized release of personally identifiable information or other user data could damage the reputation of these businesses, discourage potential users from our products and services and/or result in fines and/or proceedings by governmental agencies and/or consumers, one or all of which could adversely affect our business, financial condition and results of operations.

### *Intellectual Property—We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.*

We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties. We regard our intellectual property rights, including patents, service marks, trademarks and domain names, copyrights, trade secrets and similar intellectual property

16

Table of Contents

(as applicable), as critical to our success. Our businesses also rely heavily upon software codes, informational databases and other components that make up their products and services.

We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use trade secret or copyrighted intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

We have generally registered and continue to apply to register, or secure by contract when appropriate, our principal trademarks and service marks as they are developed and used, and reserve and register domain names when and where we deem appropriate. We generally consider the protection of our trademarks to be important for purposes of brand maintenance and reputation. While we vigorously protect our trademarks, service marks and domain names, effective trademark protection may not be available or may not be sought in every country in which products and services are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names and limit our ability to control marketing on or through the Internet using our various domain names or otherwise, which could adversely affect our business, financial condition and results of operations.

Some of our businesses have been granted patents and/or have patent applications pending with the United States Patent and Trademark Office and/or various foreign patent authorities for various proprietary technologies and other inventions. We consider applying for patents or for other appropriate statutory protection when we develop valuable new or improved proprietary technologies or inventions are identified, and will continue to consider the appropriateness of filing for patents to protect future proprietary technologies and inventions as circumstances may warrant. The status of any patent involves complex legal and factual questions, and the breadth of claims allowed is uncertain. Accordingly, any patent application filed may not result in a patent being issued or existing or future patents may not be adjudicated valid by a court or be afforded adequate protection against competitors with similar technology. In addition, third parties may create new products or methods that achieve similar results without infringing upon patents that we own. Likewise, the issuance of a patent to us does not mean that our processes or inventions will be found not to infringe upon patents or other rights previously issued to third parties.

From time to time, in the ordinary course of business we are subjected to legal proceedings and claims, or threatened legal proceedings or claims, including allegations of infringement of the trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. Patent litigation tends to be particularly protracted and expensive.

**Item 1B.**   *Unresolved Staff Comments*

Not applicable.

**Item 2.**   *Properties*

Tree.com's principal executive offices, together with certain personnel and operations of its Lending and Real Estate Businesses, are currently located in approximately 75,000 square feet of office space in Charlotte, North Carolina under leases that expire in 2015, and 95,000 square feet of office space in Irvine, California utilized by Home Loan Center, Inc. under a lease expiring in 2010. In

<div align="center">17</div>

Table of Contents

addition, the Real Estate Business has 26 offices located throughout the United States under leases that expire through 2013.

**Item 3.**   *Legal Proceedings*

In the ordinary course of business, the Company and its subsidiaries are parties to litigation involving property, personal injury, contract, intellectual property and other claims. The amounts that may be recovered in such matters may be subject to insurance coverage.

Rules of the Securities and Exchange Commission require the description of material pending legal proceedings, other than ordinary, routine litigation incident to the registrant's business, and advise that proceedings ordinarily need not be described if they primarily involve damages claims for amounts (exclusive of interest and costs) not exceeding 10% of the current assets of the registrant and its subsidiaries on a consolidated basis. In the judgment of management, none of the pending litigation matters which the Company and its subsidiaries are defending, including those described below, involves or is likely to involve amounts of that magnitude. The litigation matters described below involve issues or claims that may be of particular interest to the Company's shareholders, regardless of whether any of these matters may be material to the financial position or operations of the Company based upon the standard set forth in the SEC's rules.

**Patent Litigation**

*Source Search Technologies, LLC v. LendingTree, LLC,* **No. 2:04-CV-04420 (U.S. Dist. Ct., D.N.J.).** *Source Search Technologies, LLC v. LendingTree, LLC,* **No. 2:04-CV-04420 (U.S. Dist. Ct., D.N.J.).** On September 13, 2004, Source Search Technologies, LLC ("SST") filed suit against LendingTree, LLC ("LendingTree") and other companies in the U.S. District Court for the District of New Jersey, alleging infringement of U.S. Patent No. 5,758,328 (the "'328 patent"), which generally claims a computerized procurement system. SST seeks damages, attorneys' fees and injunctive relief. On November 10, 2004, LendingTree filed a counterclaim seeking a declaration that the '328 patent is invalid and unenforceable.

The court issued claim construction orders on October 16 and November 13, 2007. Following the completion of discovery, LendingTree and SST filed cross-motions for summary judgment on the issues of infringement and invalidity. LendingTree also filed a motion for summary judgment on the ground that any infringement was not willful. The court heard oral argument on these motions on November 13, 2007 and February 4, 2008.

On July 9, 2008, the court entered an opinion regarding the parties' motions for summary judgment. The court granted LendingTree's motion that the asserted claims of the '328 patent are invalid for obviousness, granted SST's motion that LendingTree infringes the asserted '328 claims, granted SST's motion that the '328 claims are not invalid for indefiniteness, dismissed LendingTree's motion for summary judgment of no willful infringement as moot, and denied SST's motion to strike the supplemental report of LendingTree's expert. On July 10, 2008, the court entered an order consistent with the rulings in its opinion and closed the case.

On August 22, 2008, SST appealed the court's finding of invalidity and LendingTree cross appealed on the judgments of infringement and indefiniteness. LendingTree has not received notice from SST regarding whether it intends to appeal the court's ruling on obviousness. Opening briefs were filed in January 2009. Oral argument is expected in third quarter 2009.

*Block Financial Corp. v. LendingTree, Inc.,* **No. 01-cv-1007 ODS (U.S. Dist. Ct., W.D. Mo.);** *LendingTree, LLC v. Block Financial LLC,* **No. 08-cv-164 ODS (U.S. Dist. Ct., W.D. Mo.).** On September 14, 2001, Block Financial Corporation ("Block") filed suit against LendingTree in the U.S. District Court for the Western District of Missouri, alleging that LendingTree's loan-matching process infringes U.S. Patent No. 6,014,645 (the "'645 patent"), which generally claims a real-time application system for financial cards. Block seeks damages, attorneys' fees and injunctive relief.

18

In 2002, LendingTree, LLC filed a petition to reexamine the '645 patent with the United States Patent and Trademark Office. The Patent Office agreed to reexamine the '645 patent, and the court stayed the litigation pending reexamination. In December 2006, the Patent Office republished the patent, with certain modifications. The court then lifted its stay of the litigation. On September 27, 2007, the court issued a claim construction order.

In February 2008, Block provided LendingTree with notice of a recently issued patent, U.S. Patent No. 7,310,617 (the "'617 patent"), a continuation of the '645 patent that purports to claim a real-time application system for financial offerings (as opposed to only financial cards). On March 6, 2008, LendingTree filed suit in the U.S. District Court for the Western District of Missouri seeking a declaration that the '617 patent is invalid. On April 14, 2008, Block filed an answer and counterclaim. Block asserts that LendingTree's loan-matching process infringes the '617 patent. Block seeks damages, attorneys' fees and injunctive relief.

On June 24, 2008, the court consolidated the two cases and approved a schedule setting a trial date of October 26, 2009. The consolidated case is currently in discovery.

## Employment (Wage/Hour) Litigation

*Gonzalez v. Home Loan Center, Inc.*, **No. CV06-5007 (U.S. Dist. Ct., C.D. Cal.).** On August 9, 2006, Daniel Gonzalez filed this putative class action against Home Loan Center, Inc. ("HLC") in the U.S. District Court for the Central District of California. Plaintiff, a former HLC loan officer, asserted that HLC: failed to pay overtime; failed to pay wages due upon termination; failed to provide proper wage statements; failed to reimburse employees for expenses and/or improperly deducted wages for business-related expenses; and failed to provide meal and rest periods. Based upon these factual allegations, Plaintiff asserted violations of various California wage and hour laws, conversion, and violations of California Business & Professions Code § 17200 (the "UCL"). Plaintiff purported to represent a class of loan officers employed by HLC in California since August 9, 2002, and seeks damages, restitution, attorneys' fees and injunctive relief.

On December 27, 2006, Plaintiff filed a second amended complaint, adding two additional plaintiffs, David Nottingham and Jeffrey Howerton. Because these new plaintiffs had signed agreements with HLC to arbitrate all employment-related claims, HLC filed a motion to compel arbitration.

Following a mediation held in September 2007, the parties entered into an agreement to settle this action, subject to court approval. Under the settlement agreement, HLC agreed to pay a maximum of $4.0 million, inclusive of payments to class members as well as attorneys' fees and costs. On May 13, 2008, Plaintiffs filed a motion for preliminary approval of the settlement. On June 13, 2008, the court, following a hearing, granted Plaintiffs' motion and preliminarily approved the settlement. The court also scheduled a final approval hearing for December 16, 2008.

As of September 30, 2007, LendingTree, LLC's reserve for this matter was approximately $2.1 million. This figure reflected Tree.com's estimates as to the minimum percentage of class members likely to submit claims for payment and the contractual indemnity obligations of former HLC shareholders for liability that arose prior to LendingTree, LLC's acquisition of HLC. The number of class members actually submitting claims for payment was higher than expected, resulting in a larger overall settlement than originally forecasted. As a final settlement, in December 2008, HLC disbursed $3.4 million to the class members collectively, of which approximately $1.0 million is subject to contractual indemnification by the former HLC stockholders. Plaintiffs' claims were then dismissed on December 18, 2008.

*Artzi v. LendingTree, LLC, IAC/InterActiveCorp, and Home Loan Center, Inc.,* **No. 00180037 (Cal. Super. Ct., Orange Cty.).** In September 2008, Elion Artzi and Shannon Kostadinov served this putative class action against LendingTree, IAC/InterActiveCorp and HLC in the Superior Court of California, County of Orange. Plaintiffs, former HLC underwriting clerks, allege that HLC: denied overtime compensation in violation of California labor law; failed to pay wages for compensable meal breaks in violation of California labor law; failed to pay timely wages in violation of California labor law; failed

19

Table of Contents

to furnish itemized wage statements in violation of California labor law; and based upon the foregoing, committed unfair business practices in violation of the UCL. Plaintiffs purport to represent all underwriting clerks employed by HLC in California since July 27, 2004.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set. A status conference is set for March 9, 2009.

*Richardson v. Home Loan Center, Inc.,* **No. 07CC01337 (Cal. Super. Ct., Orange Cty.).** On August 2, 2007, Angela Richardson filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiff, a former HLC loan processor, alleges that HLC: failed to pay overtime; failed to provide meal and rest periods; failed to pay wages due upon termination; and failed to provide proper wage statements. Based upon these factual allegations, plaintiff asserts that HLC violated various California wage and hour laws as well as the UCL. Plaintiff purports to represent all loan processors, funders and underwriters employed by HLC since August 2, 2003, and seeks damages, restitution, attorneys' fees and injunctive relief.

After mediation on August 15, 2008, the parties entered into a tentative agreement for settlement of these three cases. Under the settlement agreement, HLC has agreed to pay a maximum of $2.5 million for the *Richardson*, *Johanson*, and *D'Asero* cases, inclusive of payments to class members as well as attorneys' fees and costs. The settlement agreement must be approved by the court in order to become effective. The final approval hearing will be March 10, 2009. Settlement funds must be deposited into escrow by March 15, 2009.

As of January 9, 2009, LendingTree's reserve for this matter, and the *Johanson* and *D'Asero* matters below, was $2.0 million, net of any amount subject to indemnification by the former HLC stockholders.

*Primanto v. Home Loan Center, Inc.,* **No. 07CC01382 (Cal. Super. Ct., Orange Cty.).** On September 28, 2007, William Primanto filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiff, a former HLC loan officer, alleges that HLC failed to pay overtime and asserts violations of various California wage and hour laws and of the UCL. Plaintiff purports to represent all loan officers employed by HLC in California since September 28, 2003, and seeks compensatory damages, statutory penalties, restitution and attorneys' fees.

On December 13, 2007, the court, at the request of the parties, entered an order staying the action pending resolution of the *Gonzalez* action (discussed above). The case remains stayed.

On January 8, 2009 the Plaintiff filed a dismissal with the court because Plaintiff will be participating in the *Richardson* settlement.

*Johanson v. Home Loan Center, Inc.,* **No. 07CC01405 (Cal. Super. Ct., Orange Cty.).** On November 8, 2007, Brian Johanson and Brendan Dwyer filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiffs, former HLC loan officers, assert that HLC: failed to pay overtime, compensation, commission wages and bonus wages; failed to provide proper wage statements; failed to provide rest periods and meal periods or compensation in lieu thereof; and failed to pay wages due employees upon termination. Based upon these factual allegations, Plaintiffs assert violations of various California wage and hour laws and of the UCL. Plaintiffs purport to represent a class of all persons employed by HLC in California since November 8, 2003, and seek compensatory damages, statutory penalties, restitution and attorneys' fees.

After mediation on August 15, 2008, the parties entered into a tentative agreement for settlement of these three cases. Under the settlement agreement, HLC has agreed to pay a maximum of $2.5 million for the *Richardson*, *Johanson*, and *D'Asero* cases, inclusive of payments to class members as well as attorneys' fees and costs. The settlement agreement must be approved by the court in order to become effective. The final approval hearing will be March 10, 2009. Settlement funds must be deposited into escrow by March 15, 2009.

20

Table of Contents

As of January 9, 2009, LendingTree's reserve for this matter, and the *Richardson* and *D'Asero* matters was $2.0 million, net of any amount subject to indemnification by the former HLC stockholders.

*D'Asero v. Home Loan Center, Inc.,* **No. SACV08-384 (U.S. Dist. Ct., C.D. Cal.).** On April 9, 2008, Frank D'Asero, Ezekial Mohammed, Pouria Safabakhsh and Michael McCarver filed this putative class action against HLC in the U.S. District Court for the Central District of California. Plaintiffs, former HLC loan officers, allege that HLC: denied overtime compensation in violation of federal labor law; denied overtime compensation in violation of California labor law; failed to pay wages for compensable meal breaks in violation of California labor law; made unauthorized deductions from earned wages, failed to indemnify employees and coerced purchases in violation of California labor law; made unauthorized deductions from wages in violation of North Carolina labor law; failed to pay timely wages in violation of California labor law; failed to pay wages in violation of North Carolina labor law; failed to furnish itemized wage statements in violation of California labor law; and based upon the foregoing, committed unfair business practices in violation of the UCL.

Plaintiffs purport to represent all loan officers employed by HLC in California since April 9, 2004 and all loan officers employed by HLC in North Carolina since April 9, 2006. Plaintiffs also purport to bring a collective action under the federal Fair Labor Standards Act on behalf of all loan officers employed by HLC since April 9, 2005. Plaintiffs seek declaratory relief, an injunction, liquidated damages, compensatory damages, attorneys' fees, restitution and penalties.

On May 30, 2008, HLC filed a motion to compel arbitration of Plaintiffs' claims based upon their signed agreements with HLC to arbitrate all employment-related claims.

On June 10, 2008, Plaintiffs filed a first amended complaint, which added a new claim for violation of California's Private Attorneys General Act of 2004. In addition, on June 10, 2008, Plaintiffs filed a motion for conditional class certification. A hearing date on Plaintiffs' motion is scheduled for July 1, 2008.

After mediation on August 15, 2008, the parties entered into a tentative agreement for settlement of these three cases. Under the settlement agreement, HLC has agreed to pay a maximum of $2.5 million for the *Richardson*, *Johanson*, and *D'Asero* cases, inclusive of payments to class members as well as attorneys' fees and costs. The settlement agreement must be approved by the court in order to become effective. The final approval hearing will be March 10, 2009. Settlement funds must be deposited into escrow by March 15, 2009.

As of January 9, 2009, LendingTree's reserve for this matter, and the *Richardson* and *Johanson* matters above, was $2.0 million, net of any amount subject to indemnification by the former HLC stockholders.

### Privacy / Information Security Litigation

*Miller v. LendingTree, LLC,* **No. 08cv2300 (U.S. Dist. Ct., N.D. Ill.).** On April 22, 2008, Eugene Miller filed this putative class action against LendingTree in the U.S. District Court for the Northern District of Illinois. The case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree is a "consumer reporting agency" within the meaning of the federal Fair Credit Reporting Act ("FCRA") and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also asserts claims for negligence, breach of implied contract, invasion of privacy and misappropriation of confidential information. Plaintiff purports to represent all LendingTree customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

21

Table of Contents

On June 11, 2008, the plaintiffs in the *Spinozzi* and *Carson* cases (discussed below) filed a motion with the Judicial Panel on Multidistrict Litigation (the "MDL Panel"), requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

While this motion was pending before the MDL Panel, on June 23, 2008, LendingTree moved to dismiss the lawsuit and compel arbitration. On October 7, 2008, the MDL Panel granted the motion before it, transferring the *Miller* lawsuit to the Western District of North Carolina.

On February 5, 2009, a hearing was held on LendingTree's June 2008 motion to dismiss and to compel arbitration. At the hearing, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

The *Miller* case is currently pending arbitration.

**Mitchell v. Home Loan Center, Inc., No. 08-303-RJC (U.S. Dist. Ct., W.D. N.C.).** On April 28, 2008, Angela Mitchell filed this putative class action against HLC and LendingTree in the U.S. District Court for the Western District of Oklahoma. As in the *Miller* case (discussed above), the case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff asserts claims for breach of contract, negligence and negligence per se. Plaintiff purports to represent all similarly situated persons, and seeks damages, attorneys' fees and injunctive relief.

On LendingTree's demand, Plaintiff filed a motion requesting transfer of the lawsuit to the Western District of North Carolina on June 18, 2008. The motion was granted and the lawsuit was transferred to the Western District of North Carolina on June 26, 2008.

On June 11, 2008, the plaintiffs in the *Spinozzi* and *Carson* cases (discussed below) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

While this motion was pending before the MDL Panel, on July 8, 2008, LendingTree moved to dismiss the lawsuit and compel arbitration. On August 21, 2008, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

On October 7, 2008, the MDL Panel granted Plaintiff's motion, transferring all of the related lawsuits to the Western District of North Carolina.

The *Mitchell* case is currently pending arbitration.

**Constance Spinozzi v. LendingTree, LLC, No. 3:08-cv-229 (U.S. Dist. Ct., W.D.N.C.).** On May 15, 2008, Constance Spinozzi filed this putative class action against LendingTree in the U.S. District Court for the Western District of North Carolina. As in the *Miller* case (discussed above), the case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also asserts claims for negligence and breach of implied contract. Plaintiff purports to represent all LendingTree customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

22

Table of Contents
Complaint   Pg 322 of 1033

On June 11, 2008, Plaintiff Spinozzi and the plaintiff in the *Carson* case (discussed below) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

While this motion was pending before the MDL Panel, on July 8, 2008, LendingTree moved to dismiss the lawsuit and compel arbitration. On August 21, 2008, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

On October 7, 2008, the MDL Panel granted Plaintiff's motion, transferring all of the related lawsuits to the Western District of North Carolina.

The *Spinozzi* case is currently pending arbitration.

**Sylvia Carson v. LendingTree, LLC, No. 3:08-cv-247 (U.S. Dist. Ct., W.D.N.C.).** On May 30, 2008, Sylvia Carson filed this putative class action against LendingTree in the U.S. District Court for the Western District of North Carolina. As in the *Miller* case (discussed above), the case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also asserts claims for negligence and breach of implied contract. Plaintiff purports to represent all LendingTree customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

On June 11, 2008, Plaintiff Carson and the plaintiff in the *Spinozzi* case (discussed above) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

While this motion was pending before the MDL Panel, on July 8, 2008, LendingTree moved to dismiss the lawsuit and compel arbitration. On August 21, 2008, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

On October 7, 2008, the MDL Panel granted Plaintiff's motion, transferring all of the related lawsuits to the Western District of North Carolina.

The *Carson* case is currently pending arbitration.

**Marvin Garcia v. LendingTree, LLC, No. 08 Civ. 4551 (U.S. Dist. Ct., S.D.N.Y.).** On July 29, 2008, Marvin Garcia filed this putative class action against LendingTree in the U.S. District Court for the Central District of California. Plaintiff previously had sued LendingTree in the Southern District of New York (*Marvin Garcia v. LendingTree, LLC,* No. 08 Civ. 4551 (U.S. Dist. Ct., S.D.N.Y.)), but on July 28, 2008 Plaintiff voluntarily dismissed that action and subsequently filed the present suit in federal court in California.

As in the *Miller* case (referenced above), the case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree is a "consumer reporting agency" within the meaning of the FCRA. According to Plaintiff, LendingTree has intentionally violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also alleges LendingTree negligently violated the FCRA by failing to maintain reasonable procedures to

23

Table of Contents

protect Plaintiff's personal and financial information. Plaintiff also asserts claims against LendingTree, for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California statute, and violation of California's UCL. Plaintiff purports to represent all similarly situated persons, and seeks damages, attorneys' fees and injunctive relief.

On June 11, 2008, the plaintiffs in the *Carson* and *Spinozzi* case (discussed above) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

On September 12, 2008, LendingTree moved to dismiss the case or transfer it to the Western District of North Carolina in Charlotte to be consolidated with the *Spinozzi*, *Carson* and *Mitchell* cases discussed above. While this motion was pending, on October 7, 2008, the MDL Panel granted the motion before it, transferring the *Garcia* lawsuit to the Western District of North Carolina.

On February 5, 2009, a hearing was held on LendingTree's September 2008 motion to dismiss and to compel arbitration. At the hearing, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

The *Garcia* case is currently pending arbitration.

**Amy Bercaw v. LendingTree, LLC, No. SACV08-660 (U.S. Dist. Ct., C.D. Cal.).** On June 13, 2008, Amy Bercaw, Russell Winsett and Ty Woods filed this putative class action against LendingTree in the U.S. District Court for the Central District of California. As in the *Miller* case (discussed above), the case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiffs allege that LendingTree is a "consumer reporting agency" within the meaning of the FCRA and has violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiffs also assert claims against LendingTree for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California Civil Code § 17980.89, and violation of the California UCL. Plaintiff purports to represent all LendingTree customers affected by the information security breach, and seeks damages, attorneys' fees and injunctive relief.

On June 11, 2008, the plaintiffs in the *Carson* and *Spinozzi* cases (discussed above) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

On September 12, 2008, LendingTree moved to dismiss the case or transfer it to the Western District of North Carolina in Charlotte to be consolidated with the *Spinozzi*, *Carson* and *Mitchell* cases discussed above. While this motion was pending, on October 7, 2008, the MDL Panel granted the motion before it, transferring the *Bercaw* lawsuit to the Western District of North Carolina.

On February 5, 2009, a hearing was held on LendingTree's September 2008 motion to dismiss and to compel arbitration. At the hearing, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

The *Bercaw* case is currently pending arbitration.

**Bradley v. LendingTree, LLC, et al., SACV08-755 (U.S. Dist. Ct. C.D. Cal.).** On July 10, 2008, Geraldine Bradley, Joy Paxton-Collis, James Larson and Mark Swearingen filed this putative class action against LendingTree in the U.S. District Court for the Central District of California. As in the *Miller* case (discussed above), the case arises out of LendingTree's April 21, 2008 announcement that

24

Table of Contents

unauthorized persons had gained access to non-public information relating to its customers. Plaintiffs allege that LendingTree is a "consumer reporting agency" within the meaning of the FCRA. According to Plaintiffs, LendingTree has intentionally violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiffs also allege LendingTree negligently violated the FCRA by failing to maintain reasonable procedures to protect Plaintiffs' personal and financial information. Plaintiffs also assert claims against LendingTree for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California statute, and violation of California's unfair competition law.

On June 11, 2008, the plaintiffs in the *Carson* and *Spinozzi* cases (discussed above) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

On September 12, 2008, LendingTree moved to dismiss the case or transfer it to the Western District of North Carolina in Charlotte to be consolidated with the *Spinozzi*, *Carson* and *Mitchell* cases discussed above. While this motion was pending, on October 7, 2008, the MDL Panel granted the motion before it, transferring the *Bradley* lawsuit to the Western District of North Carolina.

On February 5, 2009, a hearing was held on LendingTree's September 2008 motion to dismiss and to compel arbitration. At the hearing, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

The *Bradley* case is currently pending arbitration.

***Shaver v. LendingTree, LLC, et al., SACV08-755 (U.S. Dist. Ct. C.D. Cal.).*** On July 10, 2008, Paul Shaver filed this putative class action against LendingTree in the U.S. District Court for the Central District of California. As in the *Miller* case (discussed above), the case arises out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiff alleges that LendingTree is a "consumer reporting agency" within the meaning of the FCRA. According to Plaintiff, LendingTree has intentionally violated the FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiff also alleges LendingTree negligently violated the FCRA by failing to maintain reasonable procedures to protect Plaintiff's personal and financial information. Plaintiff also asserts claims against LendingTree for negligence, breach of implied contract, invasion of privacy, misappropriation of confidential information in violation of California statute, and violation of California's unfair competition law. Plaintiff purports to represent all similarly situated persons, and seeks damages, attorneys' fees and injunctive relief.

On June 11, 2008, the plaintiffs in the *Carson* and *Spinozzi* cases (discussed above) filed a motion with the MDL Panel requesting that it (1) exercise jurisdiction over all actions arising out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers; and (2) consolidate all such cases and transfer them to the U.S. District Court for the Western District of North Carolina. On July 3, 2008, LendingTree joined the *Spinozzi* and *Carson* plaintiffs in support of this motion.

On September 12, 2008, LendingTree moved to dismiss the case or transfer it to the Western District of North Carolina in Charlotte to be consolidated with the *Spinozzi*, *Carson* and *Mitchell* cases discussed above. While this motion was pending, on October 7, 2008, the MDL Panel granted the motion before it, transferring the *Shaver* lawsuit to the Western District of North Carolina.

On February 5, 2009, a hearing was held on LendingTree's September 2008 motion to dismiss and to compel arbitration. At the hearing, the court granted LendingTree's motion, ordering the Plaintiff to arbitration and staying the litigation pending outcome of the arbitration proceeding.

25

Table of Contents

The *Shaver* case is currently pending arbitration.

**South Carolina Mortgage Broker Litigation**

Cases Pending in United States District Court of the District of South Carolina: ***Adams v. LendingTree,*** No. 2008-CP-04-03021 (S.C. Common Pleas, 10th Judicial Cir. filed Sept. 9, 2008), No. 8:08-cv-03496-HFF (removed Oct. 15, 2008); *Ariail v. LendingTree*, No. 2008-CP-23-5834 (S.C. Common Pleas, 13th Judicial Cir. filed Aug. 1, 2008), No. 6:08-cv-03044-HFF (removed Sept. 3, 2008); ***Brackett v. LendingTree,*** No. 2008-CP-46-3450 (S.C. Common Pleas, 16th Judicial Cir. filed Sept. 4, 2008), No. 0:08-cv-03504-HFF (removed Oct. 15, 2008); *Clements v. LendingTree,* No. 2008-CP-21-1730 (S.C. Common Pleas, 12th Judicial Cir. filed Sept. 4, 2008), No. 4:08-cv-03508-HFF (removed Oct. 15, 2008); *Gowdy v. LendingTree,* No. 2008-CP-42-4666 (S.C. Common Pleas, 7th Judicial Cir. filed Sept. 4, 2008), No. 7:08-cv-03495-HFF (removed Oct. 15, 2008); *Hembree v. LendingTree,* No. 2008-CP-26-7100 (S.C. Common Pleas, 15th Judicial Cir. filed Sept. 8, 2008), No. 4:08-cv-03499-HFF (removed Oct. 15, 2008); *Hodge v. LendingTree,* No. 2008-CP-13-356 (S.C. Common Pleas, 4th Judicial Cir. filed Sept. 4, 2008), No. 4:08-cv-03507-HFF (removed Oct. 15, 2008); *Morgan v. LendingTree,* No. 2008-CP-02-1529 (S.C. Common Pleas, 2nd Judicial Cir. filed Sept. 8, 2008), No. 1:08-cv-03503-HFF (removed Oct. 15, 2008); *Stone v. LendingTree,* No. 2008-CP-07-03458 (S.C. Common Pleas, 14th Judicial Cir. filed Sept. 8, 2008), No. 9:08-cv-03505-HFF (removed Oct. 15, 2008); *Wilson v. LendingTree,* No. 2008-CP-10-5451 (S.C. Common Pleas, 9th Judicial Cir. filed Sept. 24, 2008), No. 2:08-cv-03677-HFF (removed Oct. 20, 2008).

Cases Pending in South Carolina State Court: *Giese v. LendingTree*, No. 2008-CP-40-6714 (S.C. Common Pleas, 5th Judicial Cir. filed Sept. 17, 2008); *Myers v. LendingTree*, No. 2008-CP-32-03841 (S.C. Common Pleas, 11th Judicial Cir. filed Sept. 17, 2008); *Pascoe v. LendingTree*, No. 2008-CP-09-00136 (S.C. Common Pleas, 1st Judicial Cir. filed Sept. 18, 2008).

These thirteen lawsuits were filed between August 1, 2008 and the end of September 2008 by the State of South Carolina, through its various circuit solicitors, against LendingTree. These lawsuits allege that LendingTree failed to provide certain disclosures required by the South Carolina Registration of Mortgage Loan Brokers Act. The complaint seeks relief on behalf of all residents of various counties in South Carolina who agreed to the terms of use of LendingTree's website. The complaint requests an award of statutory penalties, forfeiture of all fees paid and recovery of actual costs, including attorneys' fees.

Between September 3 and October 15, 2008, LendingTree removed ten of these cases to federal court, and on October 22, 2008 filed motions to dismiss and to stay discovery in those actions. Plaintiffs have filed motions to remand in these same cases and LendingTree is awaiting rulings on those motions from the federal court.

On January 6, 2009, the Supreme Court of South Carolina assigned exclusive jurisdiction over the three remaining cases and any similar cases that might be subsequently filed in or remanded to the state court system to a single circuit judge to promote the effective and expeditious disposition of the litigation. The judge will supervise and coordinate discovery and dispose of all pretrial motions and other pretrial matters including, where appropriate, motions for summary judgment, but not for trial. Prior to the Supreme Court's assignment of the cases to a single judge, on November 3, 2008, LendingTree moved to dismiss the three remaining state court actions and requested a stay of discovery. The Plaintiffs in the three state court cases have moved to compel discovery. The state court judge has not scheduled a hearing on the pending motions.

No trial date is set.

**Other Litigation**

***Boschma v. Home Loan Center, Inc., No. SACV07-613 (U.S. Dist. Ct., C.D. Cal.).*** On May 25, 2007, Clarence and Shirley Boschma filed this putative class action against HLC in the U.S. District Court

26

Table of Contents

for the Central District of California. Plaintiffs allege that HLC sold them an option "ARM" (adjustable-rate mortgage) loan but failed to disclose in a clear and conspicuous manner, among other things, that the interest rate was not fixed, that negative amortization could occur and that the loan had a prepayment penalty. Based upon these factual allegations, Plaintiffs assert violations of the federal Truth in Lending Act (the "TILA"), violations of the UCL, breach of contract, breach of the covenant of good faith and fair dealing and violations of California's Consumer Legal Remedies Act (the "CLRA"). Plaintiffs purport to represent a class of all individuals who between June 1, 2003 and May 31, 2007 obtained through HLC an option ARM loan on their primary residence located in California, and seek rescission, damages, attorneys' fees and injunctive relief. On August 10, 2007, Plaintiffs filed a first amended complaint that dropped their CLRA claim.

On September 11, 2007, HLC filed a motion to dismiss and a motion to strike the amended complaint. In its motion to dismiss, HLC argued that Plaintiffs' UCL claim should be dismissed because they fail to properly allege that they or the putative class members suffered injury as a result of HLC's alleged misrepresentations. The motion to dismiss also requests dismissal of Plaintiffs' claims for breach of contract and for breach of the implied covenant of good faith and fair dealing. HLC's motion to strike requests that the court strike Plaintiffs' demand for class-wide rescission under the TILA and demand for disgorgement under the UCL. HLC opposed both motions. On May 27, 2008, the court granted HLC's motion to dismiss, denied HLC's motion to strike as moot, and granted Plaintiffs leave to file a second amended complaint. On June 16, 2008, Plaintiffs filed a second amended complaint, which added a claim for fraudulent omissions. In response, HLC raised the issue that the class representatives had no standing to assert any claims for rescission under the TILA based on the fact that they had since refinanced their loan. On July 24, 2008, Plaintiffs filed a third amended complaint. In response, on September 8, 2008 HLC filed a motion to dismiss and a motion to strike

The parties have agreed not to conduct discovery until after the court rules on HLC's motions. The court has taken the HLC's motions to dismiss and strike under submission. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

***Gaines v. Home Loan Center, Inc., No. SACV08-667 (U.S. Dist. Ct., C.D. Cal.).*** On June 13, 2008, Joanne Gaines and Johnnie Cave filed this putative class action against HLC and LendingTree in the U.S. District Court for the Central District of California. Plaintiffs allege, in essence, that (1) HLC failed to disclose that the bundled amount for certain loan closing services (called the "TrueCost") that HLC charged to Plaintiffs was greater than HLC's actual costs for those services; (2) HLC's option ARM note failed to tell Plaintiffs that the stated interest rate and payment amounts would change after the first month and that the payment amount stated in the note was not sufficient to pay interest charges, resulting in negative amortization; and (3) HLC misrepresented that Plaintiffs would have to obtain a home equity line of credit in order to obtain a low interest rate on their option ARM loans. Based upon these factual allegations, Plaintiffs assert violations of the federal Racketeer Influenced and Corrupt Organizations Act, the TILA, the California UCL, California Business and Professions Code § 17500, the CLRA, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, and money had and received.

Plaintiffs purport to represent all HLC customers who, since December 14, 2004 (1) were charged by HLC and paid an amount that exceeded HLC's actual costs for those services; and/or (2) entered into option ARM loan agreements with HLC; and/or (3) were misled into taking out a home equity line of credit along with their option ARM mortgage. Plaintiffs seek restitution, disgorgement, damages, attorneys' fees and injunctive relief.

On July 28, 2008, HLC filed a motion to dismiss. The court issued an order taking HLC's motion to dismiss under submission and cancelled a scheduled October 6, 2008 hearing. HLC has objected to served discovery and awaits the court's scheduling order.

Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

27

Table of Contents

*Schnee v. LendingTree, LLC and Home Loan Center, Inc., No. 06CC00211 (Cal. Super. Ct., Orange Cty.).* On October 11, 2006, four individual plaintiffs filed this putative class action against LendingTree and HLC in the California Superior Court for Orange County. Plaintiffs allege that they used the LendingTree.com website to find potential lenders and without their knowledge were referred to LendingTree's direct lender, HLC; that Lending Tree, LLC and HLC did not adequately disclose the relationship between them; and that HLC charged Plaintiffs higher rates and fees than they otherwise would have been charged. Based upon these allegations, Plaintiffs assert that LendingTree and HLC violated the California UCL, California Business and Professions Code § 17500, and the CLRA. Plaintiffs purport to represent a nationwide class of consumers who sought lender referrals from LendingTree and obtained loans from HLC since December 1, 2004. Plaintiffs seek damages, restitution, attorneys' fees and injunctive relief.

On November 27, 2006, LendingTree and HLC filed demurrers and a motion to strike portions of the complaint, arguing, among other things, that the complaint did not adequately allege that the named class representatives read and relied upon the allegedly deceptive representations on LendingTree's website. On January 25, 2007, the court sustained the demurrers and granted the motion to strike on the reliance issue, but otherwise overruled the demurrers and denied the motion to strike. On February 14, 2007, Plaintiffs filed their first amended complaint.

On March 12, 2007, LendingTree and HLC filed demurrers and a motion to strike portions of the first amended complaint. On May 17, 2007, the court overruled the demurrers and denied the motion to strike. On June 11, 2007, LendingTree and HLC filed an answer to the first amended complaint.

On July 28, 2008, LendingTree and HLC filed a motion for summary judgment. On September 2, 2008, a Second Amended Complaint was filed, adding a new named plaintiff and naming Tree.com, Inc. and LendingTree's former parent, IAC/InterActiveCorp, as defendants. On November 19, 2008 a Third Amended complaint was filed and the Answer was filed December 22, 2008.

The case remains in discovery. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

*Mortgage Store, Inc. v. LendingTree Loans d/b/a Home Loan Center, Inc., No. 06CC00250 (Cal. Super. Ct., Orange Cty.).* On November 30, 2006, The Mortgage Store, Inc. and Castleview Home Loans, Inc. filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiffs, two former Network Lenders, allege that HLC interfered with LendingTree's contracts with Network Lenders by taking referrals from LendingTree. The complaint is largely based upon the factual allegations made in the *Schnee* complaint (described above). Based upon these factual allegations, Plaintiffs assert claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and violation of the UCL and California Business and Professions Code § 17500. Plaintiffs purport to represent all Network Lenders from December 14, 2004 to date, and seek damages, restitution, attorneys' fees, and punitive damages.

On February 8, 2007, HLC filed a demurrer and a motion to strike portions of Plaintiffs' complaint. On March 15, 2007, the court overruled the demurrer but granted the motion to strike in part, striking the portion of the complaint that sought restitution and disgorgement of all profits made by HLC from December 14, 2004 to date.

In September, 2008 plaintiffs filed a motion to have the discovery in this action consolidated with that in the *Schnee v. LendingTree, LLC.* The motion was denied.

The case remains in discovery. Plaintiffs have not yet filed a motion for class certification. No trial date has been set.

**Item 4.**　*Submission of Matters to a Vote of Security Holders*

There were no matters submitted to a vote of the Company's security holders during the fourth quarter of 2008.

28

Table of Contents

## PART II

**Item 5.**    *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Market for Registrant's Common Equity and Related Stockholder Matters**

Tree.com common stock is quoted on The Nasdaq Stock Market, or "NASDAQ," under the ticker symbol "TREE." The table below sets forth, for the calendar periods indicated, the high and low sales prices per share for Tree.com common stock as reported on NASDAQ, which began trading on August 21, 2008.

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2008** | | |
| Fourth Quarter | $5.80 | $1.42 |
| Third Quarter | 9.03 | 3.57 |

The Company has never declared or paid any cash dividends on its common stock. The Company does not intend to declare or pay any cash dividends on its common stock in the forseeable future. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of the board of directors.

As of February 24, 2009, there were approximately 1,330 holders of record of the Company's common stock and the closing price of Tree.com common stock was $4.20. Because many of the outstanding shares of Tree.com common stock are held by brokers and other institutions on behalf of shareholders, Tree.com is not able to estimate the total number of beneficial shareholders represented by these record holders.

During the quarter ended December 31, 2008, the Company did not issue or sell any shares of its common stock or other equity securities pursuant to unregistered transactions.

On February 9, 2009, the Chairman and CEO agreed to purchase 935,000 newly issued shares of unregistered restricted common stock from the company at $3.91 per share, based on the Friday, February 6, 2009 closing share price. The shares of common stock have not been registered under the Securities Act of 1933 and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

**Issuer Purchases of Equity Securities**

The Company did not purchase any shares of its common stock during the quarter ended December 31, 2008. The Company has not announced any repurchase authorizations.

29

Table of Contents

Item 6.   *Selected Financial Data*

## SELECTED HISTORICAL FINANCIAL DATA

The following table presents summary selected historical consolidated financial information for Tree.com, Inc. This data was derived, in part, from the historical consolidated financial statements of Tree.com included elsewhere in this document and reflects the operations and financial position of Tree.com at the dates and for the periods indicated. The information in this table should be read in conjunction with the consolidated financial statements and accompanying notes and other financial data pertaining to Tree.com included herein. However, this information does not necessarily reflect what the historical financial position and results of operations of Tree.com for periods prior to the spin-off would have been had Tree.com been a stand-alone company during the periods presented.

| | Year Ended December 31, | | | | |
| | 2008(1) | 2007(2) | 2006 | 2005 | 2004(3) (unaudited) |
|---|---|---|---|---|---|
| | (In thousands, except per share amounts) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $ 228,572 | $ 346,378 | $476,478 | $421,355 | $189,783 |
| Operating (loss) income | (215,030) | (540,440) | 14,171 | 19,254 | (12,067) |
| Net (loss) income | (202,276) | (550,402) | 8,693 | 5,851 | (9,187) |
| Net (loss) income per share | (21.59) | (59.00) | 0.93 | 0.63 | (0.98) |

| | December 31, | | | | |
| | 2008 | 2007 | 2006 | 2005 | 2004(3) (unaudited) |
|---|---|---|---|---|---|
| **Balance Sheet Data (end of period):** | | | | | |
| Working capital (deficit) | $ 74,772 | $ (7,380) | $ 79,463 | $ 74,754 | $ 35,784 |
| Total assets | 284,083 | 443,587 | 1,261,045 | 1,326,961 | 1,074,896 |
| Long-term obligations, net of current maturities | — | — | 19,347 | 28,894 | 36,755 |
| Shareholders' equity | 138,128 | 214,624 | 773,453 | 766,486 | 753,674 |

(1)    Net loss includes impairment charges of $103.6 million related to the write-down of Tree.com's Lending segment goodwill and an indefinite-lived intangible asset and $60.8 million related to the write-down of Tree.com's Real Estate segment goodwill.

(2)    Net loss includes impairment charges of $475.7 million related to the write-down of Tree.com's Lending segment goodwill and intangible assets.

(3)    Includes the results of Home Loan Center since its acquisition on December 14, 2004.

30

Table of Contents

**Item 7.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**Management Overview**

On August 20, 2008, Tree.com, Inc. ("Tree.com") (along with its subsidiary, LendingTree, LLC) was spun off from its parent company, IAC/InterActiveCorp ("IAC") into a separate publicly traded company. In this annual report, we refer to the separation transaction as the "spin-off." Tree.com was originally incorporated as a Delaware corporation in April 2008, in anticipation of the spin-off.

Tree.com consists of the businesses that formerly comprised IAC's Lending and Real Estate segments. We refer herein to these businesses as the "Tree.com Businesses," which include LendingTree.com, RealEstate.com, GetSmart.com, Home Loan Center, Inc. (d/b/a LendingTree Loans) and iNest.com.

Tree.com's Lending segment consists of online networks (principally LendingTree.com and GetSmart.com) and call centers that connect consumers and financial providers in the lending industry (the "lending networks"). In addition, the Lending segment originates, processes, approves and funds various types of residential real estate loans under two brand names, LendingTree Loans® and HomeLoanCenter.com.

Tree.com's Real Estate segment consists primarily of an internet-enabled national residential real estate brokerage that currently operates offices in 20 markets under the brand name "RealEstate.com, REALTORS®." Outside of these 20 markets, RealEstate.com maintains relationships with a network of third-party brokerages that receive leads from RealEstate.com and pay a referral fee on closed transactions. The Real Estate Business also consists of a brokerage that matches residential home buyers interested in newly constructed homes with builders and currently operates under the brand name "iNest®."

(REALTORS®—a registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and subscribes to its strict Code of Ethics.)

*Results of operations for the years ended December 31, 2008, 2007 and 2006:*

*Revenue*

| | 2008 | % Change | 2007 | % Change | 2006 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | |
| Lending: | | | | | |
| Origination and sale of loans | $ 88,968 | (32)% | $ 130,151 | (41)% | $ 221,400 |
| Match fees | 57,622 | (29)% | 80,792 | (4)% | 83,930 |
| Closed loan fees | 35,571 | (45)% | 65,227 | (23)% | 85,022 |
| Other lending | 10,484 | (43)% | 18,456 | (37)% | 29,305 |
| Total Lending | 192,645 | (35)% | 294,626 | (30)% | 419,657 |
| Real Estate | 35,927 | (31)% | 51,752 | (9)% | 56,821 |
| Total revenue | $ 228,572 | (34)% | 346,378 | (27)% | $ 476,478 |

Lending revenue in 2008 decreased $102.0 million, or 35%, from the same period in 2007. Revenue generated from the origination and sale of loans in the secondary market declined $41.2 million, or 32%. The primary drivers of the change are decreases in the available supply of suitable loan products for a broad variety of consumer credit categories, lower consumer demand resulting in fewer loans being originated and sold into the secondary market, as well as a market driven shift to lower margin conforming loans as compared to the prior year. Revenue from all other

31

Table of Contents

categories of lending services declined $60.8 million, or 37%, due primarily to fewer consumer loan requests transmitted to and loans closed on the lending networks. Revenue from all home loan offerings declined with home equity loans, purchase mortgage and refinance mortgage revenue declining 74%, 31% and 27%, respectively.

The dollar value of loans closed by network lenders and directly by LendingTree Loans in 2008 decreased 40% to $15.0 billion. This includes refinance mortgages of $8.5 billion, purchase mortgages of $4.5 billion and home equity loans of $1.6 billion. The dollar value of loans closed by network lenders and directly by LendingTree Loans in 2007 was $24.9 billion, including refinance mortgages of $13.0 billion, purchase mortgages of $6.9 billion and home equity loans of $4.2 billion.

Lending revenue in 2007 decreased $125.0 million, or 30%, from the same period in 2006. Revenue generated from the origination and sale of loans in the secondary market declined $91.2 million, or 41%. The primary drivers of the change are fewer loans sold into the secondary market, lower revenue per loan sold, fewer loans closed on the lending networks and an increase of $13.5 million in the liability for losses on previously sold loans. Lenders' narrowing focus on traditional mortgages in reaction to changes in the mortgage market contributed to lower close rates, a shift to lower margin products, and lower revenue per loan sold at LendingTree Loans. Revenue from all other categories of lending services declined $33.8 million, or 17%, primarily due to fewer consumer loan requests transmitted to and loans closed on the lending networks. Revenue from home equity loans fell 58% due in part to an exit from certain home equity loans at LendingTree Loans and as a result of deteriorating market conditions. Additionally, purchase mortgage revenue and refinance mortgage revenue declined 21% and 16%, respectively.

The dollar value of loans closed by network lenders and directly by LendingTree Loans in 2007 decreased 23% from 2006 to $24.9 billion. This includes refinance mortgages of $13.0 billion, purchase mortgages of $6.9 billion and home equity loans of $4.2 billion. The dollar value of closed loans in 2006 was $32.1 billion, including refinance mortgages of $16.9 billion, purchase mortgages of $8.3 billion and home equity loans of $5.9 billion.

LendingTree Loans originates mortgage loans on property located throughout the United States, with no one location representing more than 10% of Tree.com's consolidated revenue for any periods presented. Revenue from loans originated for property in California and Florida in the aggregate totaled approximately 7%, 10% and 14% of Tree.com's consolidated revenue for the year ended December 31, 2008, 2007 and 2006, respectively.

Real Estate revenue in 2008 decreased $15.8 million, or 31%, principally due to a $14.7 million decrease related to the Real Estate builder and broker networks, which experienced decreased closings year over year, as well as a decrease of $6.3 million due to the absence of revenue from the agent network business which ceased operations in December 2007. Partially offsetting the revenue decrease was an increase of $5.0 million in revenue from RealEstate.com, REALTORS®, which increased closings by 45%. RealEstate.com, REALTORS® operates in twenty markets in 2008, compared to ten markets in 2007, and has approximately 1,200 agents in 2008, compared to approximately 800 agents in 2007.

Real Estate revenue in 2007 decreased $5.1 million, or 9%, principally due to a $13.0 million decrease related to the Real Estate builder and broker networks, which experienced decreased closings year over year, as well as a decrease of $1.9 million due to the agent network business winding down and ceasing operations in December 2007. Partially offsetting the revenue decrease was an increase of $9.6 million in revenue from RealEstate.com, REALTORS®, which increased closings by 190%. RealEstate.com, REALTORS® began closing transactions in the first quarter of 2006.

32

Table of Contents

*Cost of revenue*

|  | Year Ended December 31, | | | | |
|  | 2008 | % Change | 2007 | % Change | 2006 |
|---|---|---|---|---|---|
| Lending | $ 43,051 | (9)% | $ 47,264 | 0% | $ 47,412 |
| Real Estate | 21,342 | (17)% | 25,850 | 0% | 25,805 |
| Cost of revenue | $ 64,393 | (12)% | $ 73,114 | 0% | $ 73,217 |
| As a percentage of total revenue | 28% | | 21% | | 15% |
| Gross margin % | 72% | | 79% | | 85% |

|  | Year Ended December 31, | | | | |
|  | 2008 | % Change | 2007 | % Change | 2006 |
|---|---|---|---|---|---|
| Cost of revenue—Lending | $ 43,051 | (9)% | $ 47,264 | 0% | $ 47,412 |
| As a percentage of Lending revenue | 22% | | 16% | | 11% |
| Lending gross margin | 78% | | 84% | | 89% |
| Cost of revenue—Real Estate | $ 21,342 | (17)% | $ 25,850 | 0% | $ 25,805 |
| As a percentage of Real Estate revenue | 59% | | 50% | | 45% |
| Real Estate gross margin | 41% | | 50% | | 55% |

Cost of revenue consists primarily of costs associated with loan originations, compensation and other employee-related costs (including stock-based compensation) related to customer call centers and real estate network support staff, as well as credit scoring fees, consumer incentive costs, real estate agent commissions and website network hosting and server fees.

Cost of revenue in 2008 decreased $8.7 million from 2007 primarily due to decreases of $6.7 million in consumer incentive rebates related to decreased closings at the Lending network and the Real Estate builder and broker network businesses, $2.5 million in compensation and other employee-related costs (net of an increase of $0.6 million in non-cash compensation), $1.3 million in credit scoring and licensing fees, and $3.5 million in direct costs associated with the settlement services business. The decrease in compensation and other employee-related costs is primarily due to reduced personnel costs associated with Tree.com's customer call center, settlement services operation and portions of its loan processing department.

Offsetting these decreases in cost of revenue was an increase of $4.1 million in costs associated with loan originations. This increase in 2008 is related to the impact of Tree.com's adoption of Statement of Financial Accounting Standards ("SFAS") No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities Including an amendment of FASB Statement No. 115" ("SFAS 159"). Upon adoption of SFAS 159, Tree.com elected to account for all loans held for sale originated after January 1, 2008 at fair value. Electing the fair value option requires loan origination fees and costs to be recorded in earnings as incurred instead of being deferred until the loan is sold as in prior year periods. In 2008, all loan origination costs are recognized in cost of revenue. Prior to 2008, Tree.com applied the provisions of SFAS 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases", effectively deferring loan origination fees and costs until the underlying loan was sold. Upon sale of the loan, the origination fees and costs were recognized as a component of the gain on sale of the loan in revenue.

Cost of revenue in 2008 also increased as a percentage of revenue due to an increase of $2.2 million in commission expense primarily related to the increase in closings at the company-owned brokerage business.

Cost of revenue in 2007 was relatively unchanged from 2006 despite the significant revenue decline. The increase in cost of revenue as a percentage of total revenue is principally due to the

33

Table of Contents

reduced revenue discussed above, and a $5.5 million increase in costs associated with unsuccessful loan originations. If a loan funds, these costs were deferred until the loan was sold to an investor and are included in revenue on a net basis. However, costs associated with all unsuccessful loan origination attempts were expensed as incurred. This increase was partially offset by a $3.5 million decrease in compensation and other employee-related costs as Tree.com reduced its personnel costs associated with its customer call center, settlement services operation and portions of its loan processing department, and a $1.4 million decrease in credit scoring and licensing fees.

Cost of revenue in 2007 also increased as a percentage of revenue due to an increase of $5.1 million in commission expense primarily related to the increase in closings at the company-owned brokerage business, partially offset by a decrease of $4.0 million in consumer incentive rebates related to decreased closings at the Lending network and the Real Estate builder and broker network businesses.

### Selling and marketing expense

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | % Change | 2007 | % Change | 2006 |
| Lending | $ 101,993 | (39)% | $ 168,436 | (14)% | $ 195,245 |
| Real Estate | 7,260 | (62)% | 19,176 | (19)% | 23,665 |
| Selling and marketing expense | $ 109,253 | (42)% | $ 187,612 | (14)% | $ 218,910 |
| As a percentage of total revenue | 48% | | 54% | | 46% |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | % Change | 2007 | % Change | 2006 |
| Selling and marketing expense—Lending | $ 101,993 | (39)% | $ 168,436 | (14)% | $ 195,245 |
| As a percentage of Lending revenue | 53% | | 57% | | 47% |
| Selling and marketing expense—Real Estate | $ 7,260 | (62)% | 19,176 | (19)% | $ 23,665 |
| As a percentage of Real Estate revenue | 20% | | 37% | | 42% |

Selling and marketing expense consists primarily of advertising and promotional expenditures, fees paid to lead sources and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in the sales function and loan officers. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

Selling and marketing expense in 2008 decreased $78.4 million from 2007 primarily due to a decrease of $80.6 million in advertising and promotional expenditures. In 2008, total expenses for the major advertising categories of online, broadcast and print were $56.4 million, $24.8 million and $3.8 million, respectively. These represent decreases from 2007 of $48.3 million, $12.9 million and $12.6 million, respectively. Tree.com anticipates that it will continue to adjust selling and marketing expenditures generally in relation to revenue producing opportunities and that selling and marketing will continue to represent a high percentage of revenue as it continues to promote its brands both online and offline.

Selling and marketing expense in 2007 decreased $31.3 million from 2006 primarily due to a decrease of $32.5 million in advertising and promotional expenditures. In 2007, total expenses for the major advertising categories of online, broadcast and print were $104.7 million, $37.7 million and $16.4 million, respectively. These represent decreases from 2006 of $10.0 million, $7.0 million and $13.1 million, respectively. The increase in selling and marketing expense as a percentage of revenue is due to decreased conversions of consumer leads into closed transactions.

34

Table of Contents

*General and administrative expense*

| | Year Ended December 31, | | | | |
| | 2008 | % Change | 2007 | % Change | 2006 |
|---|---|---|---|---|---|
| Lending | $ 55,798 | (30)% | $ 79,172 | (18)% | $  96,888 |
| Real Estate | 19,407 | (3)% | 20,072 | (10)% | 22,396 |
| General and administrative expense | $ 75,205 | (24)% | $ 99,244 | (17)% | $ 119,284 |
| As a percentage of total revenue | 33% | | 29% | | 25% |

| | Year Ended December 31, | | | | |
| | 2008 | % Change | 2007 | % Change | 2006 |
|---|---|---|---|---|---|
| General and administrative expense—Lending | $55,798 | (30)% | $79,172 | (18)% | $ 96,888 |
| As a percentage of Lending revenue | 29% | | 27% | | 23% |
| General and administrative expense—Real Estate | $19,407 | (3)% | $20,072 | (10)% | $ 22,396 |
| As a percentage of Real Estate revenue | 54% | | 39% | | 39% |

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, corporate information technology, human resources and executive management functions, as well as facilities and infrastructure costs and fees for professional services.

General and administrative expense in 2008 decreased $24.0 million from 2007. As a result of restructuring activities that occurred in 2008 and 2007, compensation and other employee-related costs, excluding non-cash compensation, decreased $21.1 million and facilities costs decreased $3.3 million. Other significant decreases during 2008 include $1.6 million in litigation expense and $1.3 million in bad debt expense, partially offset by a charge of $1.0 million associated with legal and regulatory costs.

General and administrative expense includes non-cash compensation expense of $9.5 million in 2008 compared with $2.4 million in 2007. Non-cash compensation in 2008 includes a $5.5 million charge due to the modification of equity-based awards related to the spin-off, which consists of the accelerated vesting of certain restricted stock units and the modification of vested stock options.

As of December 31, 2008, there was approximately $5.8 million and $4.0 million of unrecognized compensation cost, net of estimated forfeitures, related to stock options and restricted stock units and restricted stock, respectively. These costs are expected to be recognized over a weighted-average period of approximately 4.3 years for stock options and 2.0 years for restricted stock units and restricted stock.

General and administrative expense in 2007 decreased $20.0 million from 2006 primarily due to a decrease of $13.2 million in compensation and other employee-related costs, due principally to a reduction in workforce, and a decrease of $2.5 million in professional fees.

*Product development*

| | Year Ended December 31, | | | | |
| | 2008 | % Change | 2007 | % Change | 2006 |
|---|---|---|---|---|---|
| Lending | $ 4,442 | (54)% | $  9,720 | (6)% | $ 10,301 |
| Real Estate | 2,245 | (57)% | 5,271 | 8% | 4,867 |
| Product development expense | $ 6,687 | (55)% | $ 14,991 | (1)% | $ 15,168 |
| As a percentage of total revenue | 3% | | 4% | | 3% |

35

Table of Contents

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **% Change** | **2007** | **% Change** | **2006** |
| Product development—Lending | $ 4,442 | (54)% | $ 9,720 | (6)% | $ 10,301 |
| As a percentage of Lending revenue | 2% | | 3% | | 2% |
| Product development—Real Estate | $ 2,245 | (57)% | $ 5,271 | 8% | $ 4,867 |
| As a percentage of Real Estate revenue | 6% | | 10% | | 9% |

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in product development, which include costs related to the design, development, testing and enhancement of technology that are not capitalized.

Product development expense in 2008 decreased $8.3 million from 2007 due to decreased compensation and other employee-related costs associated with reductions in workforce that occurred in 2008 and 2007.

Product development expense in 2007 decreased $0.2 million from 2006 primarily due to decreased compensation and other employee-related costs.

### Restructuring expense

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **% Change** | **2007** | **% Change** | **2006** |
| Lending | $ 5,279 | (76)% | $ 21,567 | N/A | $— |
| Real Estate | 425 | (67)% | 1,300 | N/A | — |
| Restructuring expense | $ 5,704 | (75)% | $ 22,867 | N/A | $— |
| As a percentage of total revenue | 2% | | 7% | | — |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **% Change** | **2007** | **% Change** | **2006** |
| Restructuring expense—Lending | $ 5,279 | (76)% | $ 21,567 | N/A | $— |
| As a percentage of Lending revenue | 3% | | 7% | | — |
| Restructuring expense—Real Estate | $ 425 | (67)% | $ 1,300 | N/A | $— |
| As a percentage of Real Estate revenue | 1% | | 3% | | — |

In response to adverse developments in mortgage and real estate market conditions, Tree.com recorded restructuring expense of $5.7 million in 2008 compared to $22.9 million in 2007. The restructuring expense in 2008 includes $2.0 million in employee termination costs associated with reductions in workforce, $2.6 million for liabilities associated with exiting facilities and $1.0 million for write-offs of fixed assets. The restructuring expense in 2007 includes $9.3 million in employee termination costs associated with reductions in workforce, $5.0 million for liabilities associated with exiting facilities and $8.0 million for write-offs of fixed assets and other projects in progress and $0.6 million for other items. As a part of these restructurings, positions across all departments and locations of Tree.com's business were eliminated, however the Lending restructuring expenses principally related to the mortgage origination operations of LendingTree Loans.

36

Table of Contents

### *Earnings Before Interest, Taxes, Depreciation and Amortization*

Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") is a non-GAAP measure and is defined in "Tree.com's Principles of Financial Reporting".

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | % Change | 2007 | % Change | 2006 |
| Lending | $ (10,550) | 28% | $ (14,618) | NM | $ 71,181 |
| Real Estate | (10,883) | 42% | (18,906) | 1% | (19,105) |
| EBITDA | $ (21,433) | 36% | $ (33,524) | NM | $ 52,076 |
| As a percentage of total revenue | (9)% | | (10)% | | 11% |

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | % Change | 2007 | % Change | 2006 |
| EBITDA—Lending | $ (10,550) | 28% | $ (14,618) | NM | $ 71,181 |
| As a percentage of Lending revenue | (5)% | | (5)% | | 17% |
| EBITDA—Real Estate | (10,833) | 42% | (18,906) | 1% | (19,105) |
| As a percentage of Real Estate revenue | (30)% | | (37)% | | (34)% |

EBITDA loss in 2008 improved $12.1 million to $21.4 million. However, 2007 EBITDA reflects $15.0 million of proceeds from a litigation settlement, which are shown as a reduction in operating expenses. In 2007, EBITDA loss was further impacted by a $19.3 million provision for loan losses, compared to $0.8 million in 2008. Adjusting for the litigation proceeds, EBITDA improved $27.1 million in 2008, reflecting costs decreasing more rapidly than revenue in 2008 principally due to the marketing reductions and restructuring activities noted above.

EBITDA in 2007 decreased $85.6 million to a loss of $33.5 million, declining at a faster rate than revenue due to higher costs per loan sold resulting from a shift to lower margin products, lower close rates and stricter underwriting criteria, and $22.9 million in restructuring costs, due in part to a reduction in workforce, partially offset by a decrease of $31.3 million in selling and marketing expenses. EBITDA was adversely impacted by a $19.3 million provision for loan losses in 2007, compared to $6.6 million in 2006. The 2007 provision reflected the increased losses Tree.com experienced related to obligations to investors with respect to previously sold loans and the projection of higher loss ratios in future periods related to these loans. EBITDA benefited by $12.9 million due to the net impact of a favorable legal settlement and an increase in certain legal reserves.

### *Operating (loss) income*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2008 | % Change | 2007 | % Change | 2006 |
| Lending | $ (133,340) | 74% | $ (512,584) | NM | $ 44,091 |
| Real Estate | (81,690) | (193)% | (27,856) | 7% | (29,920) |
| Operating (loss) income | $ (215,030) | 60% | $ (540,440) | NM | $ 14,171 |
| As a percentage of total revenue | (94)% | | (156)% | | 3% |

37

Table of Contents

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2008** | **% Change** | **2007** | **% Change** | **2006** |
| Operating (loss) income—Lending | $ (133,340) | 74% | $ (512,584) | NM | $ 44,091 |
| As a percentage of Lending revenue | (69)% | | (174)% | | 11% |
| Operating loss—Real Estate | (81,690) | (193)% $ | (27,856) | 7% $ | (29,920) |
| As a percentage of Real Estate revenue | (227)% | | (54)% | | (53)% |

Operating loss in 2008 improved $325.4 million to a loss of $215.0 million. In addition to the items noted above, the other primary drivers of the change relate to impairment charges on goodwill and an indefinite-lived intangible asset. In 2008, Tree.com recorded impairment charges of $131.0 million and $33.4 million related to goodwill and an indefinite-lived intangible asset, respectively. The charges associated with Lending were $70.2 million related to goodwill and $33.4 million related to an indefinite-lived intangible asset. The charge related to Real Estate was a goodwill impairment charge of $60.8 million. In 2007, Tree.com recorded impairment charges for Lending of $459.5 million and $16.2 million related to goodwill and an indefinite-lived intangible asset, respectively.

These impairments resulted from Tree.com's most recent reassessments of the likely future profitability of Lending and Real Estate in light of the persistent adverse mortgage and real estate market conditions and the operational strategies Tree.com has undertaken in response to these market realities. These adverse conditions include, among others, constrained liquidity, lender focus on low margin conforming loans, uncertainty as to the eventuality and timing of the return of higher margin mortgage offerings, the decline in real estate values and a high rate of delinquency for existing mortgages. Tree.com updated its assessment of mortgage and real estate market conditions and Tree.com's responsive operational strategies during the fourth quarter of 2008 and quantified these considerations in Tree.com's future forecasted results.

Continued adverse market conditions may give rise to continued operating losses and require additional restructuring of Tree.com's operations and could give rise to additional restructuring charges and additional impairment charges.

Operating income in 2007 decreased $554.6 million to a loss of $540.4 million, resulting primarily from a goodwill impairment charge of $459.5 million which was recorded in the fourth quarter of 2007. In addition, an impairment charge of $16.2 million was recorded in the fourth quarter of 2007 in connection with the write-down of certain intangible assets. These impairments were identified in connection with Tree.com's annual impairment assessment which is performed as of October 1st. Also contributing to the increase in operating loss was the decrease in EBITDA described above and an increase in non-cash compensation expense.

### Income tax provision

For the years ended December 31, 2008, 2007 and 2006, Tree.com recorded a tax benefit (provision) of $13.3 million and $(10.2) million and $(5.0) million, respectively, which represents effective tax rates of 6.2%, 1.9% and 36.6%, respectively. The 2008 tax rate is lower than the federal statutory rate of 35% due principally to non-deductible impairment charges and an increase in the valuation allowance on deferred tax assets. The 2007 tax rate is lower than the federal statutory rate of 35% due principally to non-deductible impairment charges and an increase in the valuation allowance on deferred tax assets. The 2006 tax rate is higher than the federal statutory rate of 35% due principally to the impact of state taxes.

As of December 31, 2008 and December 31, 2007, the unrecognized tax benefits, including interest, were $2.3 million and $5.8 million, respectively. Included in unrecognized tax benefits is approximately $1.0 million for tax positions included in IAC's consolidated tax return filings that remain a liability of IAC after the spin-off. Also included in unrecognized tax benefits at December 31,

Table of Contents

2008 is approximately $0.5 million for tax positions which the ultimate deductibility is highly certain but for which there is uncertainty about the timing of such deductibility.

Tree.com recognizes interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. Included in income tax expense for 2008 is $0.1 million for interest on unrecognized tax benefits. At December 31, 2008 and December 31, 2007, Tree.com has accrued $0.1 million and $1.4 million (retained by IAC) for the payment of interest, respectively. There are no material accruals for penalties.

By virtue of previously filed separate company and consolidated tax returns with IAC, Tree.com is routinely under audit by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by Tree.com are recorded in the period they become known.

Tree.com believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $0.5 million within twelve months of the current reporting date due to the reversal of deductible temporary differences which will result in a corresponding increase in net deferred tax liabilities. An estimate of other changes in unrecognized tax benefits cannot be made, but are not expected to be significant.

Under the terms of the tax sharing agreement, which was executed in connection with the spin-off, IAC generally retains the liability related to federal and state returns filed on a consolidated or unitary basis for all periods prior to the spin-off.

<div align="center">39</div>

Table of Contents

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2008, Tree.com had $88.8 million of cash and cash equivalents and restricted cash and cash equivalents.

Net cash used in operating activities was $41.9 million in the year ended December 31, 2008, compared to net cash provided by operating activities of $233.0 million in the same period in 2007. The decrease of $274.9 million is primarily due to a $280.5 million decrease in net proceeds and gains from the sales of loans held for sale.

Net cash used in investing activities in the year ended December 31, 2008 of $18.8 million primarily resulted from the payment of contingent purchase price consideration associated with the Home Loan Center, Inc. acquisition of $14.5 million and capital expenditures of $4.1 million. Net cash used in investing activities in the same period in 2007 of $10.9 million resulted from the payment of contingent consideration associated with certain acquisitions of $1.6 million and capital expenditures of $9.4 million.

Net cash provided by financing activities in 2008 of $88.4 million was primarily due to capital contributions of $111.5 million from IAC in connection with the spin-off, partially offset by payments on notes payable and capital lease obligations of $20.0 million and net repayments of warehouse lines of credit of $3.2 million. Net cash used in financing activities in 2007 of $275.6 million was primarily due to net repayments under warehouse lines of credit of $259.0 million and payments on notes payable and capital lease obligations of $11.7 million. The net repayments under warehouse lines of credit in 2008 and 2007 is related to the decrease in loans held for sale at LendingTree Loans, which is included within cash flows from operating activities.

As of December 31, 2008, LendingTree Loans had committed lines of credit totaling $100 million, of which $50 million is scheduled to expire on December 29, 2009, and another $50 million was scheduled to expire on January 24, 2009, and an uncommitted line of credit of $150 million. The $50 million committed line of credit that was scheduled to expire on January 24, 2009 and the $150 million uncommitted line were provided by the same lender. The $50 million committed line of credit that was scheduled to expire on January 24, 2009 has been extended to April 30, 2009 while both parties work to finalize terms of an annual renewal, and, at the time of extension, the size of the $150 million uncommitted line was reduced to $50 million. The interest rate under the $50 million committed line that expires on December 29, 2009 is 30-day LIBOR plus 125 basis points. The interest rate under the $50 million committed line of credit that was extended to April 30, 2009 is 30-day LIBOR plus 225 basis points. The interest rate under the $50 million uncommitted line of credit is 30-day LIBOR plus 150 basis points. The $50 million committed line of credit expiring on April 30, 2009 can be cancelled at the option of the lender without default upon sixty days notice. Under the terms of the committed lines of credit, LendingTree Loans is required to maintain various financial and other covenants. These financial covenants include, but are not limited to, maintaining (i) minimum levels of tangible net worth, cash on hand with a certain lender and liquid assets, (ii) a maximum ratio of total liabilities to net worth and (iii) pre-tax net income requirements on a quarterly basis. During the year ended December 31, 2008, LendingTree Loans was not in compliance with the quarterly pre-tax net income covenant for the third quarter of 2008. LendingTree Loans received a waiver of this covenant breach on October 28, 2008.

Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid from proceeds from the sales of loans held for sale by LendingTree Loans. At December 31, 2008, there was $76.2 million outstanding under the committed lines of credit. Borrowings under all of LendingTree Loans' lines of credit are non-recourse to Tree.com.

Tree.com anticipates that it will need to make capital and other expenditures in connection with the development and expansion of its overall operations.

40

Table of Contents

Tree.com has considered its anticipated operating cash flows in 2009, cash and cash equivalents, current borrowing capacity under lines of credit, its capitalization subsequent to the spin-off and access to capital markets, subject to restrictions in the tax sharing agreement, and believes that these are sufficient to fund its operating needs, including debt requirements, commitments and contingencies and capital and investing commitments for the foreseeable future. In connection with the completion of the spin-off, intercompany payable balances were extinguished and IAC transferred to Tree.com an amount of cash that is sufficient for its initial capitalization. LendingTree Loans is highly dependent on the availability of credit to finance its operations. Its inability to renew or replace existing facilities upon expiration or termination, which could be impacted by continuing disruptions in the credit market, would adversely impact its results of operations and financial condition.

## CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

| | | Payments Due by Period | | | |
|---|---|---|---|---|---|
| Contractual Obligations as of December 31, 2008 | Total | Less Than 1 Year | 1–3 Years | 3–5 Years | More Than 5 Years |
| | | (In thousands) | | | |
| Short-term borrowings | $ 76,186 | $ 76,186 | $ — | $ — | $ — |
| Purchase obligations(a) | 11,698 | 11,698 | — | — | — |
| Letters of credit and surety bonds(b) | 7,732 | 7,707 | 25 | — | — |
| Operating leases | 23,357 | 7,364 | 7,101 | 5,250 | 3,642 |
| Total contractual cash obligations | $118,973 | $ 102,955 | $ 7,126 | $ 5,250 | $3,642 |

(a)    The purchase obligations primarily relate to marketing event contracts in 2009.

(b)    State licensing requirements for both mortgage and real estate operations require the Company to post surety bonds in order to conduct operations in those states.

## Seasonality

Lending and Real Estate revenue is subject to the cyclical and seasonal trends of the U.S. housing market. Home sales typically rise during the spring and summer months and decline during the fall and winter months. Refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values. The broader cyclical trends in the mortgage and real estate markets have upset the usual seasonal trends.

## New Accounting Pronouncements

Refer to Note 2 to the consolidated financial statements for a description of recent accounting pronouncements.

41

Table of Contents

## TREE.COM'S PRINCIPLES OF FINANCIAL REPORTING

Tree.com reports Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") as a supplemental measure to GAAP. This measure is one of the primary metrics by which Tree.com evaluates the performance of its businesses, on which its internal budgets are based and by which management is compensated. Tree.com believes that investors should have access to the same set of tools that it uses in analyzing its results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. Tree.com provides and encourages investors to examine the reconciling adjustments between the GAAP and non-GAAP measure which are discussed below.

### Definition of Tree.com's Non-GAAP Measures

EBITDA is defined as operating income excluding, if applicable: (1) depreciation expense, (2) non-cash compensation expense, (3) amortization and impairment of intangibles, (4) goodwill impairment, (5) pro forma adjustments for significant acquisitions, and (6) one-time items. Tree.com believes this measure is useful to investors because it represents the operating results from the Tree.com Businesses, but excludes the effects of these non-cash expenses. EBITDA has certain limitations in that it does not take into account the impact to Tree.com's statement of operations of certain expenses, including depreciation, non-cash compensation, and acquisition-related accounting. Tree.com endeavors to compensate for the limitations of the non-GAAP measure presented by also providing the comparable GAAP measure with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measure.

Adjusted EBITDA is defined as EBITDA, which is defined above, excluding (1) restructuring expenses and (2) and proceeds from litigation settlements. Tree.com believes this measure is useful to investors because it represents the operating results from the Tree.com Businesses, but excludes the effects of the expenses. Adjusted EBITDA has certain limitations in that it does not take into account the impact to Tree.com's statement of operations of certain expenses, including depreciation, non-cash compensation, and acquisition-related accounting. Tree.com endeavors to compensate for the limitations of the non-GAAP measure presented by also providing the comparable GAAP measure with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measure.

### Pro Forma Results

Tree.com will only present EBITDA on a pro forma basis if it views a particular transaction as significant in size or transformational in nature. For the periods presented in this report, there are no transactions that Tree.com has included on a pro forma basis.

### One-Time Items

EBITDA is presented before one-time items, if applicable. These items are truly one-time in nature and non-recurring, infrequent or unusual, and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented in this report, there are no one-time items.

### Non-Cash Expenses That Are Excluded From Tree.com's Non-GAAP Measures

Non-cash compensation expense consists principally of expense associated with the grants, including unvested grants assumed in acquisitions, of restricted stock units and stock options. These expenses are not paid in cash, and Tree.com will include the related shares in its future calculations of fully diluted shares outstanding. Upon vesting of restricted stock units and the exercise of certain stock options, the awards will be settled, at Tree.com's discretion, on a net basis, with Tree.com remitting the required tax withholding amount from its current funds.

42

Table of Contents

Amortization of intangibles is a non-cash expense relating primarily to acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives. Tree.com believes that since intangibles represent costs incurred by the acquired company to build value prior to acquisition, they were part of transaction costs.

<div align="center">

**RECONCILIATION OF EBITDA**

</div>

For a reconciliation of EBITDA to operating (loss) income for Tree.com's operating segments and to net (loss) income in total for the years ended December 31, 2008, 2007 and 2006, see Note 8 to the consolidated financial statements.

**Item 7A.** *Quantitative and Qualitative Disclosures about Market Risk*

**Interest Rate Risk**

Tree.com's exposure to market rate risk for changes in interest rates relates primarily to LendingTree Loans' loans held for sale and interest rate lock commitments.

**Loans Held for Sale and Interest Rate Lock Commitments**

LendingTree Loans' mortgage banking operations expose the Company to interest rate risk from the point in time a consumer is given an interest rate lock commitment ("rate lock") until the time when those loans are sold in the secondary market ("loans held for sale"). The fair value of rate locks and loans held for sale is subject to change primarily due to changes in market interest rates. LendingTree Loans hedges the changes in fair value of certain rate locks and loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continues to enter into derivatives for risk management purposes, effective April 1, 2007 management determined these derivative instruments would no longer be designated as hedges and, therefore, would no longer qualify for the hedge accounting provisions of SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities."

When hedge accounting was discontinued, the affected loans held for sale were no longer adjusted for changes in fair value. However, the changes in fair value of the forward delivery contracts continued to be recognized in current earnings as a component of revenue. For the years ended December 31, 2008 and 2007, Tree.com recognized losses of $0.2 million and $1.1 million, respectively, related to the changes in fair value of forward delivery contracts related to loans held for sale. For the year ended December 31, 2006, Tree.com recognized a loss of $0.3 million related to hedge ineffectiveness and a gain of $0.1 million related to changes in the fair value of derivative instruments when hedge accounting was discontinued.

On January 1, 2008, the Company adopted the provisions of SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"). Prior to the adoption of SFAS 157 the recognition of gains and losses at the inception of a derivative contract were prohibited unless the fair value of the contract was evidenced by a quoted price in an active market. As no active market exists for rate locks, such day one gains and losses were not recognized until the related loan was sold. Prior to January 1, 2008, guidance also prohibited including the value of servicing the loan in calculating the fair value of a rate lock. Such guidance was rescinded by Staff Accounting Bulletin No. 109, "Written Loan Commitments Recorded at Fair Value Through Earnings" ("SAB 109"). Accordingly, with the adoption of SFAS No. 157 and SAB 109 on January 1, 2008, the day one gains and servicing value, adjusted by the loan funding probability, are included in the value of rate locks.

The net change in the fair value of the rate locks and related forward delivery contracts, including the impact of day one gains and servicing value, for the years ended December 31, 2008, 2007 and 2006, resulted in gains (losses) of $62.0 million, $(0.8) million and $0.2 million, respectively, which have been recognized as a component of revenue in the accompanying consolidated statements of

<div align="center">43</div>

Table of Contents

operations. The significant change year over year is due principally to the inclusion of day one gains and the value of servicing the loans in 2008 associated with the adoption of SFAS No. 157 and SAB 109. Prior to the adoption of SFAS No. 157 and SAB 109, the recognition of such day one gains and servicing value were proscribed and these gains were not recognized until realized through the sale of the related loans. This change in treatment, therefore, is only related to the timing of revenue recognition.

The fair values of derivative financial instruments at LendingTree Loans are impacted by movements in market interest rates. Changes in the fair value of the derivative financial instruments would substantially be offset by changes in the fair value of the items for which risk is being mitigated. As of December 31, 2008, if market interest rates had increased by 100 basis points, the aggregate fair value of the derivative financial instruments and the hedged items at LendingTree Loans would have decreased by $1.2 million. As of December 31, 2008, if market interest rates had decreased by 100 basis points, the aggregate fair value of the derivative financial instruments and the hedged items at LendingTree Loans would have decreased by $0.6 million.

44

Table of Contents

Item 8.    *Financial Statements and Supplementary Data*

<div align="center">

**Report of Independent Registered Public Accounting Firm**

</div>

The Board of Directors and Shareholders of
Tree.com, Inc.

We have audited the accompanying consolidated balance sheets of Tree.com, Inc. and subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2008. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and the financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tree.com, Inc. and subsidiaries at December 31, 2008 and 2007, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2008, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Notes 2 and 10 to the consolidated financial statements, Tree.com adopted Statement of Financial Accounting Standard 157 "Fair Value Measurements" and Statement of Financial Accounting Standard 159 "The Fair Value Option for Financial Assets and Financial Liabilities Including an Amendment of FASB Statement No. 115" effective January 1, 2008.

<div align="center">

/s/  Ernst & Young LLP

</div>

Los Angeles, California
February 26, 2009

<div align="center">

45

</div>

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| | (In thousands, except per share amounts) | | |
| Revenue | | | |
| Lending: | | | |
| Origination and sale of loans | $ 88,968 | $ 130,151 | $ 221,400 |
| Other lending | 103,677 | 164,475 | 198,257 |
| Total Lending | 192,645 | 294,626 | 419,657 |
| Real Estate | 35,927 | 51,752 | 56,821 |
| Total revenue | 228,572 | 346,378 | 476,478 |
| Cost of revenue | | | |
| Lending | 43,051 | 47,264 | 47,412 |
| Real Estate | 21,342 | 25,850 | 25,805 |
| Total cost of revenue (exclusive of depreciation shown separately below) | 64,393 | 73,114 | 73,217 |
| Gross margin | 164,179 | 273,264 | 403,261 |
| Operating expenses | | | |
| Selling and marketing expense | 109,253 | 187,612 | 218,910 |
| General and administrative expense | 75,205 | 99,244 | 119,284 |
| Product development | 6,687 | 14,991 | 15,168 |
| Proceeds from a litigation settlement | — | (15,000) | — |
| Restructuring expense | 5,704 | 22,867 | — |
| Amortization and impairment of intangibles | 44,361 | 34,469 | 24,018 |
| Depreciation | 7,042 | 10,058 | 11,710 |
| Goodwill impairment | 130,957 | 459,463 | — |
| Total operating expenses | 379,209 | 813,704 | 389,090 |
| Operating (loss) income | (215,030) | (540,440) | 14,171 |
| Other income (expense) | | | |
| Interest income | 134 | 1,171 | 1,307 |
| Interest expense | (650) | (986) | (1,556) |
| Other income (expense) | (4) | 14 | (207) |
| Total other income (expense), net | (520) | 199 | (456) |
| (Loss) income before income taxes | (215,550) | (540,241) | 13,715 |
| Income tax benefit (provision) | 13,274 | (10,161) | (5,022) |
| Net (loss) income | $ (202,276) | $ (550,402) | $ 8,693 |
| Weighted average common shares outstanding | 9,368 | 9,328 | 9,328 |
| Net (loss) income per share available to common shareholders | | | |
| Basic | $ (21.59) | $ (59.00) | $ 0.93 |
| Diluted | $ (21.59) | $ (59.00) | $ 0.93 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

46

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2008 | December 31, 2007 |
|---|---|---|
| | (In thousands, except par value and share amounts) | |
| **ASSETS:** | | |
| Cash and cash equivalents | $ 73,643 | $ 45,940 |
| Restricted cash and cash equivalents | 15,204 | 14,953 |
| Accounts receivable, net of allowance of $367 and $322, respectively | 7,234 | 12,433 |
| Loans held for sale ($85,638 measured at fair value in 2008) | 87,835 | 86,754 |
| Deferred income taxes | — | 6,420 |
| Prepaid and other current assets | 8,960 | 6,011 |
| Total current assets | 192,876 | 172,511 |
| Property and equipment, net | 17,057 | 21,466 |
| Goodwill | 9,285 | 140,892 |
| Intangible assets, net | 64,663 | 108,440 |
| Other non-current assets | 202 | 278 |
| Total assets | $ 284,083 | $ 443,587 |
| **LIABILITIES:** | | |
| Warehouse lines of credit | $ 76,186 | $ 79,426 |
| Notes payable | — | 20,196 |
| Accounts payable, trade | 3,541 | 3,335 |
| Deferred revenue | 1,231 | 1,435 |
| Income taxes payable | — | 993 |
| Accrued expenses and other current liabilities | 37,146 | 74,506 |
| Total current liabilities | 118,104 | 179,891 |
| Income taxes payable | 862 | 730 |
| Other long-term liabilities | 9,016 | 11,636 |
| Deferred income taxes | 17,973 | 36,706 |
| Total liabilities | 145,955 | 228,963 |
| Commitments and contingencies (Notes 14 and 15) | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Preferred stock $.01 par value; authorized 5,000,000 shares; none issued or outstanding | — | — |
| Common stock $.01 par value; authorized 50,000,000 shares; issued and outstanding 9,369,381 and -0- shares, respectively | 94 | — |
| Invested capital | — | 751,923 |
| Additional paid-in capital | 894,577 | — |
| Payables to IAC and subsidiaries | — | 20,067 |
| Accumulated deficit | (756,543) | (557,366) |
| Total shareholders' equity | 138,128 | 214,624 |
| Total liabilities and shareholders' equity | $ 284,083 | $ 443,587 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

47

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY

| | Total | Invested Capital | Common Stock Number of Shares | Amount | Additional Paid-in Capital | Payables to IAC and Subsidiaries | Accumulated Deficit |
|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | |
| **Balance as of December 31, 2005** | $ 766,486 | $ 754,773 | — | $ — | $ — | $ 26,410 | $ (14,697) |
| Comprehensive income: | | | | | | | |
| Net income for the year ended December 31, 2006 | 8,693 | — | — | — | — | — | 8,693 |
| Comprehensive income | 8,693 | — | — | — | — | — | — |
| Net transfers to IAC (principally tax adjustments related to equity awards) | (4,442) | (4,442) | — | — | — | — | — |
| Net change in payables to IAC and subsidiaries | 2,716 | — | — | — | — | 2,716 | — |
| **Balance as of December 31, 2006** | 773,453 | 750,331 | — | — | — | 29,126 | (6,004) |
| Comprehensive loss: | | | | | | | |
| Net loss for the year ended December 31, 2007 | (550,402) | — | — | — | — | — | (550,402) |
| Comprehensive loss | (550,402) | — | — | — | — | — | — |
| Cumulative effect of adoption of EITF 06-2 | (960) | — | — | — | — | — | (960) |
| Net transfers to IAC (principally tax adjustments related to equity awards) | 1,592 | 1,592 | — | — | — | — | — |
| Net change in payables to IAC and subsidiaries | (9,059) | — | — | — | — | (9,059) | — |
| **Balance as of December 31, 2007** | 214,624 | 751,923 | — | — | — | 20,067 | (557,366) |
| Comprehensive loss: | | | | | | | |
|   Net loss for the year ended December 31, 2008 | (202,276) | — | — | — | — | — | (202,276) |
| Comprehensive loss | (202,276) | — | — | — | — | — | — |
| Cumulative effect of adoption of SFAS No. 157 | 3,099 | — | — | — | — | — | 3,099 |
| Non-cash compensation | 11,237 | — | — | — | 11,237 | — | — |
| Spin-off contribution from IAC, net of invested capital and extinguishment of intercompany amounts | 111,423 | (751,923) | — | — | 883,413 | (20,067) | — |
| Issuance of common stock upon spin off | 94 | — | 9,367 | 94 | — | — | — |
| Issuance of common stock upon exercise of stock options and vesting of restricted stock units, net of withholding taxes | 11 | — | 2 | — | 11 | — | — |
| Restricted stock units payable in cash | (84) | — | — | — | (84) | — | — |
| **Balance as of December 31, 2008** | $ 138,128 | $ — | 9,369 | $ 94 | $894,577 | $ — | $ (756,543) |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

48

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 2008 | 2007 | 2006 |
| | | (In thousands) | |
| **Cash flows from operating activities:** | | | |
| Net (loss) income | $ (202,276) | $ (550,402) | $ 8,693 |
| Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities: | | | |
| Amortization and impairment of intangibles | 44,361 | 34,469 | 24,018 |
| Depreciation | 7,042 | 10,058 | 11,710 |
| Goodwill impairment | 130,957 | 459,463 | — |
| Non-cash compensation expense | 11,237 | 2,925 | 2,177 |
| Non-cash restructuring expense | 1,260 | 8,403 | — |
| Deferred income taxes | (13,274) | 2,764 | 206 |
| Gain on origination and sale of loans | (88,968) | (130,151) | (221,400) |
| Loss on impaired loans not sold | 361 | 322 | 43 |
| Loss on real estate acquired in satisfaction of loans | 218 | 210 | — |
| Bad debt expense | 597 | 1,925 | 1,768 |
| Non-cash interest expense | 76 | 903 | 1,345 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | 4,605 | 9,364 | (1,254) |
| Origination of loans | (2,206,065) | (5,812,047) | (7,841,700) |
| Proceeds from sales of loans | 2,291,022 | 6,218,684 | 8,089,716 |
| Principal payments received on loans | 911 | 3,723 | 6,262 |
| Payments to investors for loan repurchases and early payoff obligations | (4,568) | (11,384) | (6,508) |
| Prepaid and other current assets | 3,775 | 7,461 | (6,717) |
| Accounts payable and other current liabilities | (23,329) | (20,780) | 4,708 |
| Income taxes payable | 329 | (702) | 582 |
| Deferred revenue | (519) | (1,784) | 1,603 |
| Other, net | 328 | (439) | (338) |
| **Net cash (used in) provided by operating activities** | (41,920) | 232,985 | 74,914 |
| **Cash flows from investing activities:** | | | |
| Contingent consideration paid to former shareholders of subsidiaries acquired in a purchase business combination | (14,487) | (1,559) | (3,059) |
| Capital expenditures | (4,131) | (9,421) | (13,251) |
| Other, net | (143) | 33 | (100) |
| **Net cash used in investing activities** | (18,761) | (10,947) | (16,410) |
| **Cash flows from financing activities:** | | | |
| Borrowing under warehouse lines of credit | 1,993,938 | 5,651,803 | 7,700,842 |
| Repayments of warehouse lines of credit | (1,997,179) | (5,910,849) | (7,724,663) |
| Principal payments on long-term obligations | (20,045) | (11,654) | (11,530) |
| Transfers to IAC | — | (7,083) | (3,870) |
| Spin-off capital contributions from IAC | 111,517 | — | — |
| Issuance of common stock, net of withholding taxes | 11 | — | — |
| Excess tax benefits from stock-based awards | 393 | 1,673 | 1,214 |
| (Increase) decrease in restricted cash | (251) | 514 | (7,908) |
| **Net cash provided by (used in) financing activities** | 88,384 | (275,596) | (45,915) |
| **Net increase (decrease) in cash and cash equivalents** | 27,703 | (53,558) | 12,589 |
| Cash and cash equivalents at beginning of period | 45,940 | 99,498 | 86,909 |
| **Cash and cash equivalents at end of period** | $ 73,643 | $ 45,940 | $ 99,498 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

49

Table of Contents

<div align="center">

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

## NOTE 1—ORGANIZATION

**Spin-Off**

On August 20, 2008, Tree.com, Inc. ("Tree.com" or the "Company") was spun off from its parent company, IAC/InterActiveCorp ("IAC") into a separate publicly traded company. In these consolidated financial statements, we refer to the separation transaction as the "spin-off." In connection with the spin-off, Tree.com was incorporated as a Delaware corporation in April 2008. Tree.com consists of the businesses that formerly comprised IAC's Lending and Real Estate segments. We refer herein to these businesses as the "Tree.com Businesses," which include LendingTree.com, RealEstate.com, GetSmart.com, Home Loan Center, Inc. (d/b/a LendingTree Loans) and iNest.com.

In conjunction with the spin-off, Tree.com completed the following transactions: (1) extinguished all intercompany payable balances with IAC, which totaled $56.2 million by recording a non-cash contribution from IAC, (2) recapitalized the invested capital balances with common stock in the amount of $0.1 million, whereby holders of IAC stock received one-thirtieth of a share of common stock of Tree.com, and (3) received $55.2 million of cash from IAC.

**Basis of Presentation**

The historical consolidated financial statements of Tree.com and its subsidiaries reflect the contribution or other transfer to Tree.com of all of the subsidiaries and assets and the assumption by Tree.com of all of the liabilities relating to the Tree.com Businesses in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses. Accordingly, the historical consolidated financial statements of Tree.com reflect the historical financial position, results of operations and cash flows of the Tree.com Businesses since their respective dates of acquisition by IAC, based on the historical consolidated financial statements and accounting records of IAC and using the historical results of operations and historical bases of the assets and liabilities of the Tree.com Businesses with the exception of accounting for income taxes. For purposes of these financial statements, income taxes have been computed for Tree.com on an as if stand-alone, separate tax return basis. Intercompany transactions and accounts have been eliminated.

In the opinion of Tree.com's management, the assumptions underlying the historical consolidated financial statements of Tree.com are reasonable. However, this financial information does not necessarily reflect what the historical financial position, results of operations and cash flows of Tree.com would have been had Tree.com been a stand-alone company during the periods presented.

**Company Overview**

*Lending*

Lending consists of online networks and call centers (principally LendingTree.com and GetSmart.com) that connect consumers and financial providers in the lending industry. Tree.com also originates, processes, approves and funds various residential real estate loans through Home Loan Center, Inc. ("HLC"), which does business as LendingTree Loans in certain jurisdictions. The HLC and LendingTree Loans brand names are collectively referred to in these consolidated financial statements as "LendingTree Loans."

*Real Estate*

Real Estate consists of a proprietary full service real estate brokerage (RealEstate.com, REALTORS®) that operates in 20 U.S. markets, as well as an online network accessed at

<div align="center">50</div>

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 1—ORGANIZATION (Continued)**

*www.RealEstate.com*, that connects consumers with real estate brokerages around the country, and iNest.com, an online network that matches buyers and builders of new homes.

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES**

**Consolidation**

The consolidated financial statements include the accounts of the Company and all entities that are wholly-owned by the Company. Intercompany transactions and accounts have been eliminated. Certain prior period amounts have been reclassified to conform with the current year presentation.

**Revenue Recognition**

*Lending Exchange Business*

Lending's exchange revenue principally represents match fees and closed-loan fees paid by lenders that received a transmitted loan request or closed a loan for a consumer that originated through one of LendingTree's websites or affiliates. Match fees are recognized at the time qualification forms are transmitted, while closed-loan fees are recognized at the time the lender reports the closed loan to LendingTree, which may be several months after the loan request is transmitted.

*LendingTree Loans*

LendingTree Loan's revenues are primarily derived from the origination and sale of mortgage loans. Loans are funded through warehouse lines of credit and are sold to investors, typically within thirty days. The gain or loss on the sale of loans is realized on the date the loans are sold. The Company sells its loans on a servicing released basis in which the Company gives up the right to service the loans on an ongoing basis. The recognition of the sale of loans is accounted for in accordance with SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("SFAS No. 140").

Loans funded prior to January 1, 2008 are carried at the lower of cost or market value determined on an aggregate basis except for loans that are impaired, which are assessed on an individual basis. Loans are deemed impaired when they have a significant defect impacting the ability of the Company to sell the loan and recoup substantially all of the balance due. In accordance with Statement of Financial Accounting Standards ("SFAS") No. 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases," loan origination fees and certain direct costs related to the origination of loans prior to January 1, 2008 were capitalized and deferred until the loans were sold. Upon sale of the loans, the origination fees and costs were recognized as a component of the gain on sale of loans.

Subsequent to the adoption of the fair value accounting standards on January 1, 2008 (See Recent Accounting Pronouncements), loans are recorded at fair value at the time of origination. Changes in the fair value of loans are recorded through revenue prior to the sale of the loans to investors. At the time of sale, any difference between the estimated fair value of the loan and the sales price is recorded as an adjustment to the gain.

51

[Table of Contents](#)

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)

*Real Estate*

Real Estate earns revenue from commissions paid by consumers for our agents closing a real estate transaction on their behalf and from subscription and cooperative brokerage fees paid by real estate professionals participating on its exchange. Commissions are recognized at the time the real estate transaction is closed. Subscription fees are recognized over the subscription period. Cooperative brokerage fees are recognized when the transmission of a consumer's information results in the purchase or sale of a home and the transaction is reported closed by the participating real estate professional.

**Cash and Cash Equivalents**

Cash and cash equivalents include cash and short-term, highly liquid money market investments.

**Restricted Cash**

Restricted cash and cash equivalents consists of the following (in thousands):

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Cash in escrow for future operating lease commitments | $ 5,587 | $ — |
| Cash in escrow for surety bonds | 5,016 | — |
| Cash in escrow for corporate purchasing card program | 2,200 | — |
| Minimum required balances for warehouse lines of credit | 1,000 | 13,900 |
| Other | 1,401 | 1,053 |
| Total restricted cash and cash equivalents | $ 15,204 | $ 14,953 |

**Accounts Receivable**

Accounts receivable are stated at amounts due from customers, primarily lending and real estate service providers participating on our networks, net of an allowance for doubtful accounts.

Accounts receivable outstanding longer than the contractual payment terms are considered past due. The Company determines its allowance for doubtful accounts by considering a number of factors, including the length of time accounts receivable are past due, the Company's previous loss history, the specific customer's current ability to pay its obligation to the Company and the condition of the general economy and the customer's industry as a whole. The Company writes off accounts receivable when management deems them uncollectible. Write-offs were $0.6 million, $2.7 million and $1.4 million for the years ended December 31, 2008, 2007 and 2006, respectively.

**Loans Held for Sale**

LendingTree Loans originates all of its residential real estate loans with the intent to sell them in the secondary market. Loans held for sale consist primarily of residential first and second mortgage loans that are secured by residential real estate throughout the United States.

Effective January 1, 2008 the Company adopted Statement of Financial Accounting Standards ("SFAS") No. 159 "The Fair Value Option for Financial Assets and Financial Liabilities Including an amendment of FASB Statement No. 115" ("SFAS No. 159"). SFAS No. 159 permits entities to choose

Table of Contents

<div align="center">

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

</div>

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

to measure certain financial instruments at fair value with the objective of reducing both the complexity in the accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. Upon adoption, the Company elected to account for loans held for sale originated on or after January 1, 2008 at fair value. Management believes that the fair value option allows a better offset of the changes in fair values of the loans and the forward delivery contracts used to economically hedge them without the burden of complying with the requirements for hedge accounting under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS No. 133").

The Company did not elect the fair value option on loans held for sale originated prior to January 1, 2008 or on any loans that have been repurchased from investors. As of December 31, 2008, $2.2 million of such loans were impaired and carried on the balance sheet at the lower of cost or market value assessed on an individual loan basis.

The fair value of loans held for sale is determined using current secondary market prices for loans with similar coupons, maturities and credit quality. Loans held for sale are pledged as collateral under LendingTree Loans' warehouse lines of credit. LendingTree Loans relies substantially on the secondary mortgage market as all of the loans originated are sold into this market.

Fees received from borrowers for a commitment to originate a mortgage loan at a specified rate (interest rate lock commitment or "IRLC") are deferred. Such fees are generally credited toward loan origination fees when the loan is funded or recognized as income upon expiration of the commitment in the case of unexercised commitments.

Interest on mortgage loans held for sale is recognized as earned and is only accrued if deemed collectible. Interest is generally deemed uncollectible when a loan becomes three months or more delinquent or when a loan has a defect affecting its salability. Delinquency is calculated based on the contractual due date of the loan. Loans are written off when deemed uncollectible.

**Loan Loss Obligations**

LendingTree Loans sells loans it originates to investors on a servicing released basis without recourse so that the risk of loss or default by the borrower is generally transferred to the investor. However, LendingTree Loans is required by these investors to make certain representations relating to credit information, loan documentation and collateral. To the extent LendingTree Loans does not comply with such representations or there are early payment defaults, LendingTree Loans may be required to repurchase loans or indemnify the investors for any losses from borrower defaults. The Company initially records the liability for this obligation at fair value. Subsequently, LendingTree Loans maintains a liability for the estimated obligation related to this exposure based, in part, on historical and projected loss frequency and loss severity using its claims history (adjusted for recent trends in claims experience as well as market pricing information on loans repurchased), the original principal amount of the loans previously sold, the year the loans were sold, and loan type. There are four loan types used in this analysis that are determined based on the extent of the documentation received (full or limited) and the lien position of the mortgage in the underling property (first or second position). In the case of early payoffs, which occur when a borrower prepays a loan prior to the end of a specified period, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor. The estimated obligation associated with early payoffs is calculated based on historical loss experience by loan type.

<div align="center">53</div>

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

**Real Estate Properties Acquired in Satisfaction of Loans**

Real estate properties acquired in satisfaction of loans are recorded at the lower of carrying amount or estimated fair value less selling costs on their acquisition dates. Subsequent write-downs, costs to maintain the property, and gains or losses realized upon disposition are included in operating expenses in the accompanying consolidated statements of operations.

**Property and Equipment**

Property and equipment, including significant improvements, are recorded at cost less accumulated depreciation. Repairs and maintenance and any gains or losses on dispositions are included in operations.

Depreciation is recorded on a straight-line basis to allocate the cost of depreciable assets to operations over their estimated service lives. Amortization of assets recorded under capital leases is included in depreciation expense. The following table presents the depreciation period for each asset category:

| Asset Category | Depreciation Period |
| --- | --- |
| Computer equipment and capitalized software | 3 to 5 years |
| Leasehold improvements | Lesser of asset life or life of lease |
| Furniture and other equipment | 3 to 7 years |

**Software Development Costs**

Software development costs primarily include expenses incurred to develop the software that powers our websites. Statement of Position No. 98-1 "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use" ("SOP 98-1") provides guidance regarding when software developed or obtained for internal use should be capitalized. SOP 98-1 requires that certain costs incurred during the application development stage be capitalized, while costs incurred during the preliminary project stage and post-implementation/operation stage should be expensed as incurred. The Company accounts for its website development costs and other internal use software in accordance with SOP 98-1. Capitalized software development costs are amortized over the estimated life of three years.

**Goodwill and Indefinite-Lived Intangible Assets**

In accordance with SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"), goodwill acquired in business combinations is assigned to the reporting units that are expected to benefit from the combination as of the acquisition date.

Goodwill impairment is determined using a two-step process. The first step of the process is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, Tree.com determines the fair value of its reporting units by using a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of

54

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a "relief from royalty" methodology in estimating the fair value of its trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates and the terminal growth rates.

Goodwill and indefinite-lived intangible assets, primarily trade names and trademarks, are tested annually for impairment as of October 1 or earlier upon the occurrence of certain events or substantive changes in circumstances. In light of the substantive changes in the mortgage and real estate markets, Tree.com performed an interim test as of June 30, 2008, in addition to the annual test on October 1, 2008. Tree.com identified significant impairments in both the interim test in 2008 and the annual test in 2007, as described in Note 4.

Subsequent to the interim test as of June 30, 2008, and as of December 31, 2008, the remaining goodwill balance relates only to the Real Estate segment. The annual goodwill impairment test for the Real Estate segment as of October 1, 2008 included the following material assumptions: a discounted cash flow model, utilizing a discount rate of 18%, a perpetual growth rate of 4% and EBITDA margin growth from 3% of revenue in 2010 to 29% in 2018. (See Note 8 for the definition of EBITDA.) As of December 31, 2008, the remaining indefinite-lived intangible assets balance relates to both the Lending and Real Estate segments. The annual indefinite-lived intangible assets impairment test as of October 1, 2008 included the following material assumptions: an assumed relief from royalties model, discount rates of 16% to 18%, perpetual growth rates of 4% to 11%, and royalty rates of 1% to 4%. Management of Tree.com believes that the assumptions used in the impairment test are reasonable. However, Tree.com's reporting units continue to operate in dynamic and challenged industry segments.

**Long-Lived Assets and Intangible Assets with Definite Lives**

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"), long-lived assets, including property and equipment and intangible assets with definite lives, are tested for recoverability whenever events or changes in circumstances indicate that their carrying amount may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is deemed to not be recoverable, an impairment loss is recorded as the amount by which the carrying amount of the long-lived asset exceeds its fair value. Amortization of definite lived intangible assets is recorded on a straight-line basis over their estimated lives.

55

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

**Derivative Instruments and Hedging Activities**

Tree.com is exposed to certain risks in connection with its mortgage banking operations. LendingTree Loans is exposed to interest rate risk for loans it originates until those loans are sold in the secondary market. The fair value of loans held for sale is subject to change primarily due to changes in market interest rates. LendingTree Loans economically hedges the changes in fair value of certain loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continues to enter into derivatives for risk management purposes, effective April 1, 2007 it no longer designates these derivative instruments as hedges and thus the relationships no longer qualify for the hedge accounting provisions of SFAS No. 133. See Note 10 for a description of Tree.com's derivative financial instruments.

**Cost of Revenue**

Cost of revenue consists primarily of costs associated with loan originations, compensation and other employee-related costs (including stock-based compensation) related to customer call centers and real estate network support staff, as well as credit scoring fees, consumer incentive costs, real estate agent commissions and website network hosting and server fees.

**Consumer Promotional Costs**

The Company offers certain consumers that utilize our exchange services promotional incentives to complete a transaction. These include cash payments, gift certificates, airline miles or other discounts or coupons in the event a transaction is completed utilizing our services. The liability is estimated for these consumer promotional costs each period based on the number of consumers that are presented such offers, the cost of the item being offered and the historical trends of consumers qualifying for the offer and our payout rates. The estimated costs of the consumer promotional incentives are charged to cost of revenue each period. Consumer promotional expense was $9.4 million, $16.1 million and $20.1 million for the years ended December 31, 2008, 2007 and 2006, respectively. Consumer promotional costs accrued totaled $0.6 million and $1.0 million at December 31, 2008 and 2007, respectively, and are included in accrued liabilities in the accompanying consolidated balance sheets.

**Product Development**

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in product development, which include costs related to the design, development, testing and enhancement of technology that are not capitalized.

**Advertising**

Advertising costs are expensed in the period incurred (when the advertisement first runs for production costs that are initially capitalized) and principally represent offline costs, including television and radio advertising, and online advertising costs, including fees paid to search engines and distribution partners. Advertising expense was $92.0 million, $172.6 million and $204.4 million for the years ended December 31, 2008, 2007 and 2006, respectively. Prepaid advertising totaled $-0- and $0.6 million at December 31, 2008 and 2007, respectively, and is included in "Prepaid and other current assets" in the accompanying consolidated balance sheets.

56

[Table of Contents](#)

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Income Taxes

Tree.com accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. In estimating future tax consequences, all expected future events, other than enactments of changes in the tax law or rates, are considered. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. Tree.com records interest on potential tax contingencies as a component of income tax expense and records interest net of any applicable related income tax benefit.

Effective January 1, 2007, Tree.com adopted the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48"). As a result of the adoption of FIN 48, Tree.com recognizes liabilities for uncertain tax positions based on the two-step process prescribed by the interpretation. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement.

### Stock-Based Compensation

Effective January 1, 2006, Tree.com adopted the provisions of SFAS No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"), using the modified prospective transition method and therefore has not restated results for prior periods. See Note 3 for a further description of the impact of the adoption of SFAS 123R and Staff Accounting Bulletin No. 107 ("SAB 107").

### Accounting Estimates

Tree.com's management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements include: valuation allowance for impaired loans held for sale; reserve for obligations on loans that have been previously sold; the fair value of loans held for sale and related derivatives; the recoverability of long-lived assets; the recovery of goodwill and intangible assets; the determination of income taxes payable and deferred income taxes, including related valuation allowances; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

57

Table of Contents

<div align="center">

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

</div>

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

**Certain Risks and Concentrations**

Tree.com's business is subject to certain risks and concentrations including dependence on third party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject Tree.com to concentration of credit risk, consist primarily of cash and cash equivalents. Cash and cash equivalents are maintained with quality financial institutions of high credit and are in excess of Federal Deposit Insurance Corporation insurance limits.

Due to the nature of the mortgage lending industry, changes in interest rates may significantly impact revenue from originating mortgages and subsequent sales of loans to investors, which are the primary source of income for LendingTree Loans. LendingTree Loans originates mortgage loans on property located throughout the United States, with no one location representing more than 10% of Tree.com's consolidated revenue for any periods presented. Revenue from loans originated for property located in California and Florida in the aggregate totaled approximately 7%, 10% and 14% of Tree.com's revenue in 2008, 2007 and 2006, respectively.

LendingTree Loan's two largest investors (purchasers of the loans originated) represented approximately 12% and 11% of Tree.com's revenue for 2008, 28% and 13% of Tree.com's revenue for 2007, and 30% and 15% of Tree.com's revenue for 2006. LendingTree Loans monitors its relationships with investors and, from time to time, makes adjustments in the amount it sells to any one investor based upon a number of factors, including but not limited to, price, loan review time and funding turnaround, underwriting guidelines and the overall efficiency of its relationship with the investor.

LendingTree Loans funds loans through warehouse lines of credit. As of December 31, 2008 and 2007, 65% and 73%, respectively, of the total balance due on the lines of credit was payable to one lender. The decision regarding how to allocate this balance amongst lenders is based on several factors, including the interest rate and commitment fee.

Due to the nature of the mortgage lending industry, interest rate increases may negatively impact future revenue from our lending networks as well as revenue from originating and selling loans.

Further, lenders participating on our lending networks can offer their products directly to consumers through brokers, mass marketing campaigns, or through other traditional methods of credit distribution. These lenders can also offer their products online, either directly to prospective borrowers, through one or more of our online competitors, or both. If a significant number of potential consumers are able to obtain loans from our participating lenders without utilizing our service, our ability to generate revenue may be limited. Because we do not have exclusive relationships with the lenders whose loan offerings are offered on our online marketplace, consumers may obtain offers and loans from these lenders without using our service.

The Company maintains operations solely in the United States.

**Recent Accounting Pronouncements**

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("SFAS No. 159"). SFAS No. 159 permits entities to choose to measure many financial instruments and certain other assets and liabilities at fair value with the objective of reducing

<div align="center">58</div>

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

both the complexity in the accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. Tree.com adopted SFAS No. 159 effective January 1, 2008 and elected the fair value option on loans funded after December 31, 2007. Therefore there was no cumulative effect related to the adoption of SFAS No. 159.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" (SFAS No. 157"), which provides enhanced guidance for using fair value to measure assets and liabilities. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements and the effect of the measurements on earnings or changes in net assets. Among other things, SFAS No. 157 clarifies the principle that fair value should be based on the assumptions that market participants would use when pricing the asset or liability and establishes a fair value hierarchy that prioritizes the information used to develop those assumptions. The most significant financial impact of adopting the provisions of SFAS No. 157 is related to the valuing of interest rate lock commitments (related to loans intended to be held for sale). Under SFAS No. 157, the fair value of a closed loan includes the embedded cash flows that are ultimately realized as servicing value or through the sale of a loan on a servicing released basis. The valuation of loan commitments includes assumptions related to the likelihood that a commitment will ultimately result in a closed loan ("expected close rates"). These expected close rates are based on Tree.com's historical data, which is a significant unobservable assumption. Prior accounting requirements precluded the recognition of any day one gains and losses if fair value was not based on observable market data. Rather, these gains and losses were recognized when the interest rate lock commitment expired or when the underlying loan was ultimately sold. The change in valuation methodology under SFAS No. 157 accelerates the recognition of these day one gains and losses. The cumulative effect of adopting the provisions of SFAS No. 157 is required to be reported as an adjustment to beginning retained earnings in the year of adoption. Accordingly, upon adoption of SFAS No. 157 on January 1, 2008, Tree.com recorded a $3.1 million reduction to accumulated deficit.

In November 2007, the SEC issued Staff Accounting Bulletin No. 109, "Written Loan Commitments Recorded at Fair Value Through Earnings" ("SAB 109"). SAB 109 supersedes Staff Accounting Bulletin No. 105, "Application of Accounting Principles to Loan Commitments" ("SAB 105"). It clarifies that the expected net future cash flows related to the associated servicing of a loan should be included in the measurement of all written loan commitments that are accounted for at fair value through earnings. However, it retains the guidance in SAB 105 that internally-developed intangible assets should not be recorded as part of the fair value of a derivative loan commitment. The guidance is effective on a prospective basis to derivative loan commitments issued or modified in fiscal quarters beginning after December 15, 2007.

The adoption of SFAS No. 157, SFAS No. 159, and SAB 109 generally results in higher fair values of loans held for sale being recorded at loan origination. Prior to adoption certain aspects of the loan value associated with the cash flows related to the servicing of a loan, origination fees and day one gains on derivative transactions would be deferred until the sale of the loan. However, as loans are typically sold within thirty days of origination, Tree.com has determined that adoption of SFAS No. 157, SFAS No. 159 and SAB 109 did not have a material impact on its consolidated financial position, results of operations or cash flows.

59

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In December 2007, the FASB issued SFAS No. 141 (revised 2007), "Business Combinations" ("SFAS No. 141R"), which replaces FASB Statement No. 141. SFAS No. 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. The Statement also establishes disclosure requirements that will enable users to evaluate the nature and financial effects of the business combination. SFAS No. 141R applies prospectively to business combinations in fiscal years beginning after December 15, 2008. Early adoption is not permitted. Tree.com does not expect the impact of the adoption of SFAS No. 141R to have a material impact on its consolidated financial position, results of operations and cash flows.

**NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION**

Effective January 1, 2006, Tree.com adopted SFAS 123R using the modified prospective transition method and has applied the classification provisions of SAB 107 regarding the SEC's interpretation of SFAS 123R and the valuation of share-based payments for public companies in its adoption of SFAS 123R.

The adoption of SFAS 123R did not impact the amount of stock-based compensation expense recorded in the accompanying consolidated statements of operations as Tree.com had previously adopted the expense recognition provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123").

Prior to the adoption of SFAS 123R, the entire tax benefit from stock-based compensation was reported as a component of operating cash flows. Upon the adoption of SFAS 123R, tax benefits resulting from tax deductions in excess of the stock-based compensation expense recognized in the consolidated statement of operations are reported as a component of financing cash flows. For the years ended December 31, 2008, 2007 and 2006, excess tax benefits from stock-based compensation of $0.4 million, $1.7 million and $1.2 million, respectively, are included as a component of financing cash flows.

Prior to the spin-off, Tree.com employees received equity awards that were granted under various IAC stock and annual incentive plans. Upon spin-off, these IAC awards were converted into awards of both Tree.com and other former IAC companies. Tree.com will continue to recognize non-cash compensation expense for all of these awards granted to Tree.com employees in accordance with SFAS 123R.

Tree.com currently has one active plan ("Tree.com 2008 Stock and Annual Incentive Plan") under which future awards may be granted, which currently covers outstanding stock options to acquire shares of Tree.com common stock and restricted stock units ("RSUs"), as well as provide for the future grant of these and other equity awards. Under the Tree.com 2008 Stock and Annual Incentive Plan, the Company is authorized to grant stock options, RSUs and other equity based awards for up to 2.2 million shares of Tree.com common stock. The active plan described above authorizes the Company to grant awards to its employees, officers and directors.

In addition, the plan described above has a stated term of ten years and provides that the exercise price of stock options granted will not be less than the market price of the Company's common stock on the grant date. The plan does not specify grant dates or vesting schedules as those determinations have been delegated to the Compensation Committee of Tree.com's Board of Directors (the

60

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION (Continued)**

"Committee"). Each grant agreement reflects the vesting schedule for that particular grant as determined by the Committee.

Non-cash stock-based compensation expense related to equity awards is included in the following line items in the accompanying consolidated statements of operations for the years ended December 31, 2008, 2007 and 2006 (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
| Cost of revenue | $ 803 | $ 248 | $ 263 |
| Selling and marketing expense | 873 | 272 | 289 |
| General and administrative expense | 9,518 | 2,403 | 1,603 |
| Product development | 43 | 2 | 22 |
| Non-cash stock-based compensation expense before income taxes | 11,237 | 2,925 | 2,177 |
| Income tax benefit | (4,438) | (1,228) | (1,169) |
| Non-cash stock-based compensation expense after income taxes | $ 6,799 | $ 1,697 | $ 1,008 |

Non-cash compensation in 2008 includes a $6.6 million charge due to the modification of equity-based awards related to the spin-off, which consists of the accelerated vesting of certain restricted stock units and the modification of vested stock options.

The amount of stock-based compensation expense recognized in the consolidated statement of operations is reduced by estimated forfeitures, as the amount recorded is based on awards ultimately expected to vest. The forfeiture rate is estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if the actual forfeiture rate differs from the estimated rate.

As of December 31, 2008, there was approximately $5.8 million and $4.0 million of unrecognized compensation cost, net of estimated forfeitures, related to stock options and RSUs and restricted stock, respectively. These costs are expected to be recognized over a weighted-average period of approximately 4.3 years for stock options and 2.0 years for RSUs and restricted stock.

61

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION (Continued)**

**Stock Options**

A summary of changes in outstanding stock options is as follows:

| | Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | | | (Intrinsic value in thousands) | |
| Outstanding at January 1, 2008 | — | $ — | | |
| Converted from IAC options to Tree.com options | 364,696 | 12.79 | | |
| Granted | 1,558,950 | 14.65 | | |
| Exercised | (2,253) | 3.11 | | |
| Forfeited | (45,863) | 10.08 | | |
| Expired | (4,823) | 7.77 | | |
| Outstanding at December 31, 2008 | 1,870,707 | $ 14.43 | 8.6 | $    9 |
| Options exercisable | 215,765 | $ 10.37 | 3.0 | $    9 |

The fair value of each stock option award is estimated on the grant date using the Black-Scholes option pricing model. There were 364,696 stock options converted from IAC options to Tree.com options in connection with the spin-off, and 1,558,950 stock options granted by the Company during the year ended December 31, 2008. There were no options granted by IAC during the years ended December 31, 2007 and 2006.

The Black-Scholes option pricing model incorporates various assumptions, including expected volatility and expected term. For purposes of this model, no dividends have been assumed. Expected stock price volatilities are estimated based on the historical volatility of similar companies, as the stock of Tree.com began trading on August 21, 2008, and there was insufficient data at the grant date to calculate its own historical volatility. The risk-free interest rates are based on U.S. Treasury yields for notes with comparable terms as the awards, in effect at the grant date. The expected term of options granted is based on analyses of historical employee termination rates and option exercise patterns, giving consideration to expectations of future employee behavior. The following are the weighted average assumptions used in the Black-Scholes option pricing model for the year ended December 31, 2008: volatility factor of 70%, risk-free interest rate of 3.4%, expected term of 6.7 years, and a dividend yield of zero.

The weighted average fair value of stock options granted during the year ended December 31, 2008 at market prices equal to Tree.com's common stock on the grant date was $5.04.

In connection with the spin-off, the Chairman and CEO was awarded two grants of 589,950 stock options each, which represents the right to acquire 2.5% of the fully diluted equity at exercise prices representing a total equity value of the Company of $100 million and $300 million. The stock options all cliff vest at the end of five years. The weighted average exercise price and the weighted average fair value related to these stock option grants were $16.95 and $4.19, respectively.

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value (the difference between Tree.com's closing stock price on the last trading day of 2008 and the exercise price,

62

Table of Contents

# TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION (Continued)

multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their options on December 31, 2008. This amount changes based on the fair market value of Tree.com's common stock. The total intrinsic value of stock options exercised during the year ended December 31, 2008 was $10,000.

Cash received from stock option exercises and the related actual tax benefit realized for the year ended December 31, 2008 were $7,000 and $4,000, respectively.

The following table summarizes the information about stock options outstanding and exercisable as of December 31, 2008:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Outstanding at December 31, 2008 | Weighted Average Remaining Contractual Life in Years | Weighted Average Exercise Price | Exercisable at December 31, 2008 | Weighted Average Exercise Price |
| $.01 to $4.99 | 24,335 | 3.32 | $ 3.07 | 24,335 | $ 3.07 |
| $5.00 to $7.45 | 24,976 | 3.28 | 6.51 | 24,575 | 6.51 |
| $7.46 to $9.99 | 961,426 | 9.29 | 8.13 | 25,482 | 8.94 |
| $10.00 to $14.99 | 133,211 | 2.95 | 11.85 | 131,108 | 11.86 |
| $15.00 to $19.99 | 87,267 | 6.05 | 15.31 | 7,281 | 18.76 |
| $20.00 to $24.99 | 48,547 | 6.23 | 20.49 | 1,889 | 21.61 |
| Greater than $25.00 | 590,945 | 9.63 | 25.45 | 1,095 | 38.69 |
| | 1,870,707 | 8.56 | $ 14.43 | 215,765 | $ 10.37 |

#### Restricted Stock Units and Restricted Stock

RSUs are awards in the form of units, denominated in a hypothetical equivalent number of shares of Tree.com common stock and with the value of each award equal to the fair value of Tree.com common stock at the date of grant. RSUs may be settled in cash, stock or both, as determined by the Committee at the time of grant. Each RSU and restricted stock grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. Tree.com recognizes expense for all RSUs and restricted stock grants for which vesting is considered probable. For RSU and restricted stock grants the accounting charge is measured at the grant date as the fair value of Tree.com common stock and expensed ratably as non-cash compensation over the vesting term.

63

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 3—SFAS 123R AND STOCK-BASED COMPENSATION (Continued)

Nonvested RSUs and restricted stock outstanding as of December 31, 2008 and changes during the year ended December 31, 2008 were as follows:

| | RSUs | | Restricted Stock | |
| --- | --- | --- | --- | --- |
| | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Nonvested at January 1, 2008 | — | $ — | — | $ — |
| Converted from IAC awards to Tree.com awards | 463,968 | 13.41 | — | — |
| Granted | 46,257 | 5.43 | 117,970 | 7.46 |
| Vested | (97,292) | 12.45 | — | — |
| Forfeited | (32,728) | 14.27 | — | — |
| Nonvested at December 31, 2008 | 380,205 | $11.39 | 117,970 | $ 7.46 |

The total intrinsic value of RSUs that vested during the year ended December 31, 2008 was $-0-. The total fair value of RSUs that vested during the year ended December 31, 2008 was $1.2 million.

In connection with the spin-off, the Chairman and CEO was granted 117,970 shares of restricted stock, which were equal to 1% of the fully diluted equity of the Company at the spin-off date. These shares of restricted stock vest one year from the spin-off date, and their weighted average grant date fair value was $7.46.

### Preferred Stock

In connection with the spin-off, the Chairman and CEO was granted 5,000 shares of preferred stock in LendingTree Holdings Corp., a subsidiary of Tree.com. The shares earn dividends at 12%, vest over 3 years, and have a total fair value of $5.0 million. During the year ended December 31, 2008, $0.6 million was recognized as cash compensation expense related to the preferred stock. The related liability is required to be settled in cash in 2013.

### NOTE 4—GOODWILL AND INTANGIBLE ASSETS

In addition to the annual impairment assessment as of October 1, 2008, Tree.com performed an interim impairment test in the second quarter of 2008 in light of continued adverse developments in the mortgage and real estate markets. In the second quarter of 2008, Tree.com recorded impairment charges of $131.0 million and $33.4 million related to goodwill and an indefinite- lived intangible asset, respectively. The charges associated with Lending were $70.2 million related to goodwill and $33.4 million related to an indefinite-lived intangible asset. The charge related to Real Estate was a goodwill impairment charge of $60.8 million. No further impairment was indicated in the test as of October 1, 2008.

In connection with its annual impairment assessment in 2007, which was prepared in connection with the preparation of its annual financial statements, Tree.com identified and recorded impairment charges related to the goodwill and intangible assets of the Lending segment of $459.5 million and $16.2 million, respectively.

64

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 4—GOODWILL AND INTANGIBLE ASSETS (Continued)**

The impairments at Tree.com resulted from the Company's reassessment of the likely future profitability of Lending and Real Estate in light of the adverse developments in the mortgage and real estate market conditions and the operational strategies Tree.com has undertaken in response to these market realities. These adverse conditions include, among others, constrained liquidity, lender focus on low margin conforming loans, uncertainty as to the eventuality and timing of the return of higher margin mortgage offerings, the decline in real estate values and a high rate of delinquency for existing mortgages. Tree.com updated its assessment of mortgage and real estate market conditions and Tree.com's responsive operational strategies and quantified these considerations in Tree.com's future forecasted results.

The balance of goodwill and intangible assets, net is as follows (in thousands):

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Goodwill | $ 9,285 | $ 140,892 |
| Intangible assets with indefinite lives | 55,229 | 88,607 |
| Intangible assets with definite lives, net | 9,434 | 19,833 |
| Total goodwill and intangible assets, net | $ 73,948 | $ 249,332 |

Intangible assets with indefinite lives relate principally to trade names and trademarks acquired in various acquisitions. At December 31, 2008, intangible assets with definite lives relate to the following ($ in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 76,117 | $ (68,898) | $ 7,219 | 5.7 |
| Technology | 29,100 | (29,100) | — | 3.0 |
| Customer lists | 6,607 | (6,607) | — | 2.8 |
| Other | 9,512 | (7,297) | 2,215 | 4.8 |
| Total | $ 121,336 | $ (111,902) | $ 9,434 | |

At December 31, 2007, intangible assets with definite lives relate to the following (in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 76,117 | $ (59,212) | $ 16,905 | 5.7 |
| Technology | 29,100 | (28,663) | 437 | 3.0 |
| Customer lists | 6,607 | (6,607) | — | 2.8 |
| Other | 8,928 | (6,437) | 2,491 | 4.9 |
| Total | $ 120,752 | $ (100,919) | $ 19,833 | |

65

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 4—GOODWILL AND INTANGIBLE ASSETS (Continued)

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on December 31, 2008 balances, such amortization for the next five years is estimated to be as follows (in thousands):

|  | Amount |
|---|---|
| Year ending December 31, 2009 | $4,559 |
| Year ending December 31, 2010 | 2,818 |
| Year ending December 31, 2011 | 1,231 |
| Year ending December 31, 2012 | 826 |
|  | $9,434 |

The following table presents the balance of goodwill by segment, including changes in the carrying amount of goodwill, for the year ended December 31, 2008 (in thousands):

|  | Balance as of January 1, 2008 | Additions | Deductions | Impairments | Balance as of December 31, 2008 |
|---|---|---|---|---|---|
| Lending | $ 70,766 | $ — | $ (615) | $ (70,151) | $ — |
| Real Estate | 70,126 | — | (35) | (60,806) | 9,285 |
| Total | $ 140,892 | $ — | $ (650) | $ (130,957) | $ 9,285 |

Deductions principally relate to the establishment of deferred tax assets related to acquired tax attributes and the income tax benefit realized pursuant to the exercise of stock options assumed in a business acquisition that were vested at the transaction date and are treated as a reduction in goodwill when the income tax deductions are realized. The impairments are described above.

|  | Balance as of January 1, 2007 | Additions | Deductions | Impairments | Balance as of December 31, 2007 |
|---|---|---|---|---|---|
| Lending | $ 513,405 | $ 18,914 | $(2,090) | $ (459,463) | $ 70,766 |
| Real Estate | 68,890 | 1,367 | (131) | — | 70,126 |
| Total | $ 582,295 | $ 20,281 | $(2,221) | $ (459,463) | $ 140,892 |

Additions principally relate to estimated contingent consideration payable to former shareholders of HLC under the terms of the purchase agreement. Deductions principally relate to the income tax benefit realized pursuant to the exercise of stock options assumed in business acquisitions that were vested at the transaction date and are treated as a reduction in goodwill when the income tax deductions are realized, and adjustments to the carrying value of goodwill based upon the finalization of the valuation of goodwill and intangible assets and their related deferred tax impacts. The impairments are described above.

66

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 5—PROPERTY AND EQUIPMENT**

The balance of property and equipment, net is as follows (in thousands):

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Computer equipment and capitalized software | $    34,416 | $    35,183 |
| Leasehold improvements | 3,184 | 3,076 |
| Furniture and other equipment | 5,088 | 3,737 |
| Projects in progress | 3,169 | 5,002 |
|  | 45,857 | 46,998 |
| Less: accumulated depreciation and amortization | (28,800) | (25,532) |
| Total property and equipment, net | $    17,057 | $    21,466 |

The Company capitalized $2.1 million, $4.4 million and $2.7 million of internal software development costs during the years ended December 31, 2008, 2007 and 2006, respectively. Unamortized capitalized software development costs were $5.0 million and $5.1 million at December 31, 2008 and 2007, respectively. Capitalized software development amortization expense was $1.7 million, $1.4 million, and $1.9 million for the years ended December 31, 2008, 2007 and 2006, respectively.

Total assets under capital leases are $-0- and $4.5 million at December 31, 2008 and 2007, respectively, and are included in computer equipment and capitalized software. Accumulated amortization is $-0- and $2.7 million at December 31, 2008 and 2007, respectively.

**NOTE 6—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

Accrued expenses and other current liabilities consist of the following (in thousands):

|  | December 31, 2008 | December 31, 2007 |
|---|---|---|
| Accrued loan loss liability related to loans previously sold | $    3,972 | $    4,779 |
| Litigation accruals | 2,031 | 15,285 |
| Accrued advertising expense | 5,518 | 11,492 |
| Accrued compensation and benefits | 5,251 | 8,407 |
| Accrued restructuring costs | 3,262 | 5,560 |
| Derivative liabilities | 2,164 | 1,185 |
| Other | 14,948 | 27,798 |
| Total accrued expenses and other current liabilities | $    37,146 | $    74,506 |

The other category above reflects an earnout payable related to the HLC acquisition, deferred rent liabilities, customer security deposits, accrued professional fees and other miscellaneous accrued expenses.

In 2008, Tree.com settled a litigation matter and paid $11.75 million, which was included in the December 31, 2007 accrual balance noted above.

67

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 6—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES (Continued)**

An additional $6.5 million and $9.1 million of accrued loan loss liability related to loans previously sold is classified in other long term liabilities at December 31, 2008 and 2007, respectively.

**NOTE 7—WAREHOUSE LINES OF CREDIT AND NOTES PAYABLE**

Borrowings on warehouse lines of credit were $76.2 million and $79.4 million at December 31, 2008 and December 31, 2007, respectively. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid from proceeds from the sales of loans held for sale by LendingTree Loans. The interest rate under these lines of credit is 30-day LIBOR plus 125 to 225 basis points, but may vary under certain circumstances. The weighted average interest rate on outstanding borrowings under the warehouse lines of credit at December 31, 2008 and 2007 was 2.1% and 5.5%, respectively. The Company pays a facility fee of up to 25 basis points annually based on the size of the committed lines. Borrowings under all of LendingTree Loans' lines of credit are non-recourse to Tree.com.

As of December 31, 2008, LendingTree Loans had committed lines of credit totaling $100 million, of which $50 million is scheduled to expire on December 29, 2009, and another $50 million was scheduled to expire on January 24, 2009, and an uncommitted line of credit of $150 million. The $50 million committed line of credit that was scheduled to expire on January 24, 2009 and the $150 million uncommitted line were provided by the same lender. The $50 million committed line of credit that was scheduled to expire on January 24, 2009 has been extended to April 30, 2009 while both parties work to finalize terms of an annual renewal, and, at the time of extension, the size of the $150 million uncommitted line was reduced to $50 million. The interest rate under the $50 million committed line that expires on December 29, 2009 is 30-day LIBOR plus 125 basis points. The interest rate under the $50 million committed line of credit that was extended to April 30, 2009 is 30-day LIBOR plus 225 basis points. The interest rate under the $50 million uncommitted line of credit is 30-day LIBOR plus 150 basis points. The $50 million committed line of credit expiring on April 30, 2009 can be cancelled at the option of the lender without default upon sixty days notice. Under the terms of the committed lines of credit, LendingTree Loans is required to maintain various financial and other covenants. These financial covenants include, but are not limited to, maintaining (i) minimum levels of tangible net worth, cash on hand with a certain lender and liquid assets, (ii) a maximum ratio of total liabilities to net worth and (iii) pre-tax net income requirements on a quarterly basis. During the year ended December 31, 2008, LendingTree Loans was not in compliance with the quarterly pre-tax net income covenant for the third quarter of 2008. LendingTree Loans received a waiver of this covenant breach on October 28, 2008.

In connection with the acquisition of LendingTree Loans, Tree.com committed to pay a portion of the purchase price payments to former stockholders under an installment note payable in three installments. The liability for the final payment of $20.0 million, due January 31, 2008, is recorded net of imputed interest of $0.1 million in the December 31, 2007 balance sheet as a note payable. Payment was made in January 2008. Included in notes payable, capital leases are $-0- and $0.3 million at December 31, 2008 and 2007, respectively. The capital lease obligation matured in 2008.

**NOTE 8—SEGMENT INFORMATION**

The overall concept that Tree.com employs in determining its operating segments and related financial information is to present them in a manner consistent with how the chief operating decision

68

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 8—SEGMENT INFORMATION (Continued)

maker and executive management view the businesses, how the businesses are organized as to segment management, and the focus of the businesses with regards to the types of products or services offered or the target market.

Tree.com's primary metric is Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), which is defined as operating income excluding, if applicable: (1) depreciation expense, (2) non-cash compensation expense, (3) amortization and impairment of intangibles, (4) goodwill impairment, (5) pro forma adjustments for significant acquisitions, and (6) one-time items. Tree.com believes this measure is useful to investors because it represents the operating results from Tree.com's segments, but excluding the effects of any other non-cash expenses. EBITDA has certain limitations in that it does not take into account the impact to Tree.com's statement of operations of certain expenses, including depreciation, non-cash compensation and acquisition related accounting.

The following tables reconcile EBITDA to operating (loss) income for Tree.com's operating segments and to net (loss) income in total (in thousands):

| | EBITDA | Non-Cash Compensation Expense | Goodwill Impairment | Amortization and Impairment of Intangibles | Depreciation Expense | Operating Loss |
|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2008:** | | | | | | |
| Lending | $ (10,550) | $ (7,367) | $ (70,151) | $(40,014) | $ (5,258) | $(133,340) |
| Real Estate | (10,883) | (3,870) | (60,806) | (4,347) | (1,784) | (81,690) |
| Total | $ (21,433) | $ (11,237) | $ (130,957) | $(44,361) | $ (7,042) | (215,030) |
| Other expense, net | | | | | | (520) |
| Loss before income taxes | | | | | | (215,550) |
| Income tax benefit | | | | | | 13,274 |
| Net loss | | | | | | $(202,276) |

| | EBITDA | Non-Cash Compensation Expense | Goodwill Impairment | Amortization and Impairment of Intangibles | Depreciation Expense | Operating Loss |
|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2007:** | | | | | | |
| Lending | $(14,618) | $ (1,914) | $(459,463) | $(27,683) | $ (8,906) | $(512,584) |
| Real Estate | (18,907) | (1,011) | — | (6,786) | (1,152) | (27,856) |
| Total | $(33,525) | $ (2,925) | $(459,463) | $(34,469) | $(10,058) | (540,440) |
| Other income, net | | | | | | 199 |
| Loss before income taxes | | | | | | (540,241) |
| Income tax expense | | | | | | (10,161) |
| Net loss | | | | | | $(550,402) |

69

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 8—SEGMENT INFORMATION (Continued)**

|  | | For the Year Ended December 31, 2006: | | | | |
|---|---|---|---|---|---|---|
|  | EBITDA | Non-Cash Compensation Expense | Goodwill Impairment | Amortization of Intangibles | Depreciation Expense | Operating Income/(Loss) |
| Lending | $ 71,181 | $ (1,370) | $ — | $ (16,412) | $ (9,308) | $ 44,091 |
| Real Estate | (19,105) | (807) | | (7,606) | (2,402) | (29,920) |
| Total | $ 52,076 | $ (2,177) | $ — | $ (24,018) | $(11,710) | 14,171 |
| Other expense, net | | | | | | (456) |
| Income before income taxes | | | | | | 13,715 |
| Income tax expense | | | | | | (5,022) |
| Net income | | | | | | $ 8,693 |

Significant components of revenue for the years ended December 31, 2008, 2007 and 2006 are as follows (in thousands):

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Lending: | | | |
| Origination and sale of loans | $ 88,968 | $130,151 | $221,400 |
| Match fees | 57,622 | 80,792 | 83,930 |
| Closed loan fees | 35,570 | 65,227 | 85,022 |
| Other | 10,485 | 18,456 | 29,305 |
| Total Lending revenue | 192,645 | 294,626 | 419,657 |
| Real Estate revenue | 35,927 | 51,752 | 56,821 |
| Total | $228,572 | $346,378 | $476,478 |

Total assets by segment at December 31, 2008 and 2007 are as follows (in thousands):

|  | 2008 | 2007 |
|---|---|---|
| Lending(a) | $245,998 | $345,810 |
| Real Estate(a) | 38,085 | 97,777 |
| Total | $284,083 | $443,587 |

(a)    At December 31, 2007, assets related to the Real Estate segment only include goodwill and intangible assets, net, as it was impracticable to allocate the remaining jointly used assets between the Lending and Real Estate segments. Accordingly, assets related to the Lending segment include goodwill and intangible assets, net, and the remaining jointly used assets comprising both the Lending and Real Estate segments.

70

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 8—SEGMENT INFORMATION (Continued)**

Capital expenditures by segment during the year ended December 31, 2008 are as follows (in thousands):

|  | 2008 |
|---|---|
| Capital expenditures: |  |
| Lending(b) | $2,374 |
| Real Estate(b) | 1,757 |
| Total | $4,131 |

(b)    Total capital expenditures for the Lending and Real Estate segments for the years ended December 31, 2007 and 2006 were $9.4 million and $13.3 million, respectively. It was impracticable to allocate capital expenditures between Lending and Real Estate for those years.

**NOTE 9—EARNINGS PER SHARE**

The following table sets forth the computation of Basic and Diluted earnings per share for the years ended December 31, 2008, 2007 and 2006:

|  | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
|  | Basic | Diluted | Basic | Diluted | Basic | Diluted |
|  | (In thousands, except per share data) | | | | | |
| **Numerator:** |  |  |  |  |  |  |
| Net (loss) income available to common shareholders | $(202,276) | $(202,276) | $(540,402) | $(540,402) | $8,693 | $8,693 |
| **Denominator:** |  |  |  |  |  |  |
| Weighted average common shares(a) | 9,368 | 9,368 | 9,328 | 9,328 | 9,328 | 9,328 |
| Net (loss) income per common share | $ (21.59) | $ (21.59) | $ (59.00) | $ (59.00) | $ 0.93 | $ 0.93 |

(a)    The weighted average common shares for the year ended December 31, 2007 and for the period from January 1, 2008 until the spin-off from IAC is equal to the number of shares outstanding immediately following the spin-off from IAC.

Equity awards that could potentially dilute basic earnings per share in the future were not included in the computation of diluted earnings per share because to do so would have been antidilutive for the periods presented. See Footnote 3 for a full description of outstanding equity awards.

On February 9, 2009, the Chairman and CEO of agreed to purchase 935,000 newly issued shares of unregistered restricted common stock from the company at $3.91 per share, based on the Friday, February 6, 2009 closing share price. The shares of common stock have not been registered under the Securities Act of 1933 and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

71

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 10—FAIR VALUE MEASUREMENTS

Tree.com adopted SFAS No. 157 effective January 1, 2008. In accordance with SFAS No. 157, Tree.com categorizes its assets and liabilities measured at fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- Level 1: Observable inputs such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- Level 2: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

- Level 3: Unobservable inputs for which there is little or no market data and require Tree.com to develop its own assumptions, based on the best information available in the circumstances, about the assumptions market participants would use in pricing the asset or liability.

The following table presents Tree.com's assets and liabilities that are measured at fair value on a recurring basis at December 31, 2008 (in thousands):

| | Recurring Fair Value Measurements Using | | | |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| --- | --- | --- | --- | --- |
| Loans held for sale | $ — | $ 84,824 | $ 814 | $ 85,638 |
| Interest rate lock commitments ("IRLCs") and forward delivery contracts | — | (1,884) | 5,884 | 4,000 |
| Total | $ — | $ 82,940 | $ 6,698 | $ 89,638 |

The following table presents the changes in Tree.com's assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

| | Interest Rate Lock Commitments and Forward Delivery Contracts | Loans Held for Sale |
| --- | --- | --- |
| Balance at January 1, 2008 | $ 3,465 | $ — |
| Total net gains (losses) (realized and unrealized) included in earnings | 62,705 | (727) |
| Transfers of IRLCs to closed loans | (34,701) | — |
| Purchase, sales, issuances and settlements, net | (24,023) | (1,399) |
| Transfers in (out) of Level 3 | (1,562) | 2,940 |
| Balance at December 31, 2008 | $ 5,884 | $ 814 |

72

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 10—FAIR VALUE MEASUREMENTS (Continued)

The following table presents the gains included in earnings for the year ended December 31, 2008 relating to Tree.com's assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

| | Interest Rate Lock Commitments and Forward Delivery Contracts | Loans Held for Sale |
|---|---|---|
| Total net gains (losses) included in earnings, which are included in revenue from origination and sale of loans | $ 62,705 | $ (727) |
| Change in unrealized gains (losses) relating to assets and liabilities still held at December 31, 2008, which are included in revenue from origination and sale of loans | $ 5,884 | $ (246) |

LendingTree Loans hedges the changes in fair value of certain loans held for sale primarily by entering into mortgage forward delivery contracts. Although LendingTree Loans continued to enter into forward delivery contracts for risk management purposes, effective April 1, 2007 it no longer designated these derivatives as hedges for accounting purposes. When hedge accounting was discontinued, the affected loans held for sale were no longer adjusted for changes in fair value. However, the changes in fair value of the forward delivery contracts continued to be recognized in current earnings as a component of revenue. The fair value of the forward delivery contracts is recorded in "Prepaid and other current assets" and/or "Accrued expenses and other current liabilities" in the accompanying consolidated balance sheets. For the years ended December 31, 2008 and 2007, Tree.com recognized losses of $0.2 million and $1.1 million, respectively, related to the changes in fair value of forward delivery contracts hedging loans held for sale. For the year ended December 31, 2006, Tree.com recognized a loss of $0.3 million related to hedge ineffectiveness and a gain of $0.1 million related to changes in the fair value of derivative instruments when hedge accounting was discontinued.

LendingTree Loans enters into commitments with consumers to originate loans at a specified interest rate (interest rate lock commitments—"IRLCs"). Tree.com reports IRLCs as derivative instruments at fair value in accordance with SFAS No. 133. Accordingly, LendingTree Loans determines the fair value of IRLCs using current secondary market prices for underlying loans with similar coupons, maturity and credit quality, subject to the anticipated loan funding probability. The fair value of IRLCs is subject to change primarily due to changes in interest rates and the loan funding probability. Under LendingTree Loans' risk management policy, LendingTree Loans hedges the changes in fair value of IRLCs primarily by entering into mortgage forward delivery contracts which can reduce the volatility of economic outcomes. IRLCs and the related hedging instruments are recorded at fair value with changes in fair value being recorded in current earnings as a component of revenue from the origination and sale of loans in the consolidated statement of operations.

Prior to the adoption of SFAS No. 157 the recognition of gains and losses at the inception of a derivative contract were prohibited unless the fair value of the contract was evidenced by a quoted price in an active market. As no active market exists for IRLCs, such day one gains and losses were not recognized until the related loan was sold. Prior to January 1, 2008, guidance also prohibited including the value of servicing the loan in calculating the fair value of an IRLC. Such guidance was rescinded by Staff Accounting Bulletin No. 109, "Written Loan Commitments Recorded at Fair Value Through

73

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 10—FAIR VALUE MEASUREMENTS (Continued)

Earnings" ("SAB 109"). Accordingly, with the adoption of SFAS No. 157 and SAB 109 on January 1, 2008, the day one gains and servicing value, adjusted by the loan funding probability, are included in the value of IRLCs.

The net change in fair value of the IRLCs and related forward delivery contracts for the years ended December 31, 2008, 2007 and 2006 resulted in gains (losses) of $62.0 million, ($0.8) million and $0.2 million, respectively, which have been recognized as a component of revenue from the origination and sale of loans in the accompanying consolidated statements of operations. The significant change from 2007 to 2008 is due principally to the inclusion of day one gains and the value of servicing the loans in 2008 associated with the adoption of SFAS No. 157 and SAB 109. Prior to the adoption of SFAS No. 157 and SAB 109, the recognition of such day one gains and servicing value were prohibited and these gains were not recognized until realized through the sale of the related loans. This change in treatment, therefore, is only related to the timing of revenue recognition. The IRLCs are recorded in "Prepaid and other current assets" and/or "Accrued expenses and other current liabilities" in the accompanying consolidated balance sheets. At December 31, 2008 and 2007, there were $252.9 million and $157.8 million, respectively, of IRLCs notional value outstanding.

Tree.com adopted SFAS No. 159 effective January 1, 2008. SFAS No. 159 permits entities to choose to measure certain financial instruments at fair value with the objective of reducing both the complexity in the accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. Upon adoption, Tree.com elected to account for loans held for sale originated on or after January 1, 2008 at fair value. Electing the fair value option allows a better offset of the changes in fair values of the loans and the forward delivery contracts used to economically hedge them without the burden of complying with the requirements for hedge accounting under SFAS No. 133.

Tree.com did not elect the fair value option on loans held for sale originated prior to January 1, 2008 and on loans that were repurchased from investors on or subsequent to that date. As of December 31, 2008, 60 such loans, all of which were impaired, were included in loans held for sale and were carried at the lower of cost or market ("LOCOM") value assessed on an individual loan basis. The market value (or fair value) of these impaired loans at December 31, 2008, measured on a non-recurring basis using significant unobservable inputs (Level 3), was $2.2 million. This fair value measurement is management's best estimate of the market value of such loans and considers current bids in the secondary market for similar loans.

The following table presents the difference between the aggregate principal balance of loans held for sale for which the fair value option has been elected and for loans measured at LOCOM as of December 31, 2008 (in thousands):

|  | Loans Held for Sale —Measured at Fair Value | Loans Held for Sale— Measured at LOCOM | Total Loans Held For Sale |
|---|---|---|---|
| Aggregate unpaid principal balance | $ 83,094 | $ 5,949 | $ 89,043 |
| Difference between fair value and aggregate unpaid principal balance | 2,544 | — | 2,544 |
| Lower of cost or market valuation allowance | — | (3,726) | (3,726) |
| Deferred loan fees, net of costs | — | (26) | (26) |
| Loans held for sale | $ 85,638 | $ 2,197 | $ 87,835 |

74

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 10—FAIR VALUE MEASUREMENTS (Continued)

During the year ended December 31, 2008, the change in fair value of loans held for sale for which the fair value option has been elected was a loss of $1.2 million and is included as a component of revenue in the accompanying consolidated statements of operations.

### NOTE 11—ORIGINATION AND SALE OF LOANS, LOANS HELD FOR SALE AND LOAN LOSS OBLIGATIONS

**Origination and Sale of Loans**

LendingTree Loans' revenues are primarily derived from the origination and sale of loans. Mortgage loans are funded through warehouse lines of credit and are recorded at fair value at the time of funding. Changes in the fair value of mortgage loans are recorded through revenue prior to the sale of the loans to investors, which typically occurs within thirty days. The gain or loss on the sale of loans is recognized on the date the loans are sold and is based on the difference between the sale proceeds received and the fair value of the loans. The Company sells its loans on a servicing released basis in which the Company gives up the right to service the loans on an ongoing basis. The recognition of the sale of loans is accounted for in accordance with SFAS No. 140.

A summary of the initial unpaid principal balance of loans sold by type of loan for the years ended December 31, 2008, 2007 and 2006 is presented below ($ amounts in millions):

| | Years Ended December 31, | | | | | |
| | 2008 | | 2007 | | 2006 | |
| | Amount | % | Amount | % | Amount | % |
|---|---|---|---|---|---|---|
| Conforming | $1,792 | 81% | $4,210 | 69% | $3,773 | 48% |
| FHA and Alt-A | 413 | 19% | 1,323 | 22% | 2,386 | 30% |
| Subprime | — | — | 51 | 1% | 251 | 3% |
| Home equity | 1 | — | 489 | 8% | 1,461 | 19% |
| **Total** | $2,206 | 100% | $6,073 | 100% | $7,871 | 100% |

**Loans Held for Sale**

LendingTree Loans originates all of its residential real estate loans with the intent to sell them in the secondary market. Loans held for sale consist primarily of residential first mortgage loans that are secured by residential real estate throughout the United States.

The following table represents the loans held for sale by type of loan as of December 31, 2008 and 2007 (amounts in thousands):

| | December 31, 2008 | | December 31, 2007 | |
| | Amount | % | Amount | % |
|---|---|---|---|---|
| Conforming | $74,993 | 86% | $74,701 | 86% |
| FHA and Alt-A | 11,737 | 13% | 9,167 | 11% |
| Subprime | 878 | 1% | 1,872 | 2% |
| Home equity | 227 | —% | 1,014 | 1% |
| **Total** | $87,835 | 100% | $86,754 | 100% |

75

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 11—ORIGINATION AND SALE OF LOANS, LOANS HELD FOR SALE AND LOAN LOSS OBLIGATIONS (Continued)**

The unpaid principal amount of loans on nonaccrual status at December 31, 2008 and 2007 was $7.0 million and $7.2 million, respectively. Real estate properties acquired in satisfaction of loans totaled $0.9 million and $1.5 million at December 31, 2008 and 2007, respectively, and is included in prepaid and other current assets in the accompanying consolidated balance sheets.

**Loan Loss Obligations**

LendingTree Loans sells loans it originates to investors on a servicing released basis so the risk of loss or default by the borrower is generally transferred to the investor. However, LendingTree Loans is required by these investors to make certain representations relating to credit information, loan documentation and collateral. These representations and warranties may extend through the contractual life of the mortgage loan. Subsequent to the sale, if underwriting deficiencies, borrower fraud or documentation defects are discovered in individual mortgage loans, LendingTree Loans may be obligated to repurchase the respective mortgage loan or indemnify the investors for any losses from borrower defaults if such deficiency or defect cannot be cured within the specified period following discovery.

In the case of early loan payoffs, which occurs when a borrower prepays a loan prior to the end of a specified period, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor. The estimated obligation associated with early loan payoffs is calculated based on historical loss experience by type of loan.

The obligation for losses related to the representations and warranties and other provisions discussed above is initially recorded at its estimated fair value, which includes a projection of expected future losses as well as a market based premium. Subsequently, the Company maintains the liability using the estimated obligation related to this exposure based, in part, on historical and projected loss frequency and loss severity using its claims history (adjusted for recent trends in claims experience as well as market pricing information on loans repurchased), the original principal amount of the loans previously sold, the year the loans were sold, and loan type. Accordingly, subsequent adjustments to the obligation, if any, are not made based on changes in the fair value of the obligation, which might include an estimated change in losses that may be expected in the future, but are made once further losses are estimated to be both probable and estimable. As such, given current general industry trends in mortgage loans as well as housing prices, market expectations around losses related to the Company's obligations could vary significantly from the obligation recorded as of the balance sheet date.

Because LendingTree Loans does not service the loans it sells, it does not maintain nor have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, the Company is unable to determine, with precision, its maximum exposure under its representations and warranties. However, LendingTree Loans utilizes the original loan balance (before it was sold to an investor), historical and projected loss frequencies and loss severities by loan segment as well as analyses of loss claims in investor pipelines to estimate its exposure to losses on loans previously sold.

In estimating its exposure to loan losses, LendingTree Loans segments its loan sales into four segments based on the extent of the documentation provided by the borrower to substantiate income and/or assets (full or limited documentation) and the lien position of the mortgage in the underling property (first or second position). Each of these segments has a different loss experience with full

76

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 11—ORIGINATION AND SALE OF LOANS, LOANS HELD FOR SALE AND LOAN LOSS OBLIGATIONS (Continued)

documentation, first lien position loans generally having the lowest loss ratios and limited documentation, second lien position loans generally having the highest loss ratios.

For 2008, LendingTree Loans sold approximately 11,000 loans with an original principal balance of $2.2 billion. Through December 31, 2008 there had been 4 loans from this group with an original balance of $680,000 which had experienced aggregate losses of $21,000.

For 2007, LendingTree Loans sold approximately 36,300 loans with an original principal balance of $6.1 billion. Through December 31, 2008 there had been 87 loans from this group with an original balance of $10.9 million which had experienced aggregate losses of $2.5 million.

For 2006, LendingTree Loans sold approximately 55,000 loans with an original principal balance of $7.9 billion. Through December 31, 2008 there had been 113 loans from this group with an original balance of $13.6 million which had experienced aggregate losses of $5.0 million.

For 2005 and prior years, LendingTree Loans sold approximately 86,700 loans with an original principal balance of $13.0 billion. Through December 31, 2008 there had been 68 loans from this group with an original balance of $9.3 million which had experienced aggregate losses of $2.7 million.

Based on historical experience, it is anticipated that the Company will continue to experience losses on these vintage loans sold for years to come.

At December 31, 2008 and 2007, there were $3.6 million and $4.7 million of repurchased loans with a lower of cost or market valuation allowance of $2.5 million and $3.2 million included in loans held for sale. During the years ended December 31, 2008 and 2007, LendingTree Loans repurchased loans with $1.3 million and $7.6 million of unpaid principal balances, respectively.

The activity related to loss reserves on previously sold loans for the years ended December 31, 2008, 2007 and 2006 is as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Balance, beginning of year | $13,886 | $ 3,820 | $ 3,064 |
| Provisions | 1,344 | 15,539 | 6,193 |
| Charge offs to reserves | (4,779) | (5,473) | (5,437) |
| Balance, end of year | $10,451 | $13,886 | $ 3,820 |

77

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

#### NOTE 11—ORIGINATION AND SALE OF LOANS, LOANS HELD FOR SALE AND LOAN LOSS OBLIGATIONS (Continued)

Based on an analysis of the Company's historical loan loss experience, it has been determined that a portion of the loss claims expected to be made by investors will be made more than twelve months following the initial sale of the underlying loan. Accordingly, the Company has estimated the portion of its Loans Sold Reserve that it anticipates it will be liable for after twelve months and has classified that portion of the reserve as a long-term liability. The liability for losses on previously sold loans is presented in the accompanying consolidated balance sheet as of December 31, 2008 and 2007 as follows (in thousands):

|  | December 31, | |
|  | 2008 | 2007 |
|---|---|---|
| Current portion, included in accrued expenses and other current liabilities | $ 3,972 | $ 4,779 |
| Long term portion, included in other long-term liabilities | 6,479 | 9,107 |
| Total | $10,451 | $13,886 |

#### NOTE 12—INCOME TAXES

Prior to August 21, 2008, Tree.com filed as a member of IAC's consolidated federal and state tax returns. Effective August 21, 2008, Tree.com will file separate consolidated federal and state tax returns. In all periods presented, current and deferred tax expense has been computed for Tree.com on a separate return basis. Tree.com's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statements of cash flows.

The components of the income tax provision (benefit) are as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| **Current income tax provision:** |  |  |  |
| Federal | $    — | $ 5,533 | $ 2,113 |
| State | — | 1,864 | 2,703 |
| Current income tax provision | — | 7,397 | 4,816 |
| **Deferred income tax provision (benefit):** |  |  |  |
| Federal | (11,266) | 6,327 | 1,644 |
| State | (2,008) | (3,563) | (1,438) |
| Deferred income tax provision (benefit) | (13,274) | 2,764 | 206 |
| Income tax provision (benefit) | $(13,274) | $10,161 | $ 5,022 |

Current income taxes payable has been reduced by $0.4 million, $1.7 million and $1.2 million for the years ended December 31, 2008, 2007 and 2006, respectively, for tax deductions attributable to stock-based compensation. The related income tax benefits of this stock-based compensation were recorded as amounts charged or credited to invested capital or a reduction in goodwill.

78

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 12—INCOME TAXES (Continued)

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities at December 31, 2008 and 2007 are presented below (in thousands). The valuation allowance is related to items for which it is more likely than not that the tax benefit will not be realized.

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
| **Deferred tax assets:** | | |
| Provision for accrued expenses | $  9,174 | $ 19,647 |
| Net operating loss carryforwards | 38,015 | 32,041 |
| Goodwill | 16,184 | 15,290 |
| Other | — | 7,303 |
| Total deferred tax assets | 63,373 | 74,281 |
| Less valuation allowance | (62,062) | (68,830) |
| Net deferred tax assets | 1,311 | 5,451 |
| **Deferred tax liabilities:** | | |
| Intangible and other assets | (16,261) | (34,581) |
| Other | (3,023) | (1,156) |
| Total deferred tax liabilities | (19,284) | (35,737) |
| Net deferred tax liability | $(17,973) | $(30,286) |

Deferred income taxes are presented in the accompanying consolidated balance sheets as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2008 | 2007 |
| Deferred tax assets | $    — | $  6,420 |
| Deferred tax liabilities | (17,973) | (36,706) |
| Net deferred taxes | $(17,973) | $(30,286) |

At December 31, 2008 and December 31, 2007, Tree.com had consolidated federal net operating losses ("NOLs") of approximately $75.4 million and $58.9 million, respectively. Of this amount, approximately $30 million is available to Tree.com. NOL's generated before the spin-off have been fully utilized in the IAC consolidated federal return filings and are not available to Tree.com. In addition, Tree.com had separate company state NOLs of approximately $264.5 million that will expire at various times between 2009 and 2028.

During 2008, Tree.com's valuation allowance decreased by approximately $6.7 million. This net decrease is related to the elimination of NOLs which had been fully utilized in prior IAC consolidated returns and an increase for the NOLs generated in 2008. At December 31, 2008, Tree.com had a valuation allowance of approximately $62.0 million related to the portion of tax operating loss carryforwards and other deferred tax assets for which it is more likely than not that the tax benefit will not be realized.

79

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 12—INCOME TAXES (Continued)

A reconciliation of total income tax provision to the amounts computed by applying the statutory federal income tax rate to earnings from continuing operations before income taxes and minority interest is shown as follows (in thousands):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2008 | 2007 | 2006 |
| Income tax (benefit) provision at the federal statutory rate of 35% | $(75,443) | $(189,084) | $4,800 |
| State income taxes, net of effect of federal tax benefit | (2,007) | (1,099) | 839 |
| Change in state effective tax rate | — | (4) | (17) |
| Non-deductible non-cash compensation expense | 154 | (125) | (332) |
| Impairment of non-deductible goodwill and intangible assets | 32,152 | 145,665 | — |
| Change in valuation allowance | 31,922 | 54,960 | — |
| Other, net | (52) | (152) | (268) |
| Income tax provision | $(13,274) | $  10,161 | $5,022 |

Tree.com adopted the provisions of FIN 48 effective January 1, 2007. FIN 48 clarifies the accounting for income taxes by prescribing the minimum recognition threshold a tax position is required to meet before being recognized in the financial statements. FIN 48 provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. The adoption had no impact on Tree.com's accumulated deficit. A reconciliation of the beginning and ending amount of unrecognized tax benefits, excluding interest, is as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Balance, beginning of the period | $  4,389 | $    541 |
| Additions based on tax positions related to the current year | — | 1,645 |
| Additions for tax positions of prior years | — | 2,203 |
| Reductions for tax positions of prior years | (2,178) | — |
| Settlements | — | — |
| Balance, end of the period | $  2,211 | $  4,389 |

As of December 31, 2008 and December 31, 2007, the unrecognized tax benefits, including interest, were $2.3 million and $5.8 million, respectively. Included in unrecognized tax benefits is approximately $1.0 million for tax positions included in IAC's consolidated tax return filings that will remain a liability of IAC after the spin-off. Also included in unrecognized tax benefits at December 31, 2008 is approximately $0.5 million for tax positions which the ultimate deductibility is highly certain but for which there is uncertainty about the timing of such deductibility. The amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate is approximately $0.7 million.

80

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 12—INCOME TAXES (Continued)**

Tree.com recognizes interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. Included in income tax expense for the year ended December 31, 2008 is $0.1 million, for interest on unrecognized tax benefits. At December 31, 2008 and December 31, 2007, Tree.com has accrued $0.1 million and $1.4 million (retained by IAC) for the payment of interest, respectively. There are no material accruals for penalties.

By virtue of previously filed separate company and consolidated tax returns with IAC, Tree.com is routinely under audit by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by Tree.com are recorded in the period they become known.

The Internal Revenue Service ("IRS") is currently examining the IAC consolidated tax returns for the years ended December 31, 2001 through 2006, which includes the operations of LendingTree from August 8, 2003, its date of acquisition by IAC. The statute of limitations for the years 2001-2004 has been extended to December 31, 2009. Various IAC consolidated tax returns filed with state and local jurisdictions are currently under examination, the most significant of which are California, Florida, New York State and New York City, for various tax years after December 31, 2001. These examinations are expected to be completed during 2009.

Tree.com believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $0.8 million within twelve months of the current reporting, $0.5 million date due to the reversal of deductible temporary differences which will result in a corresponding increase in net deferred tax liabilities, and approximately $0.3 million may be recognized in the next twelve months due to the expiration of the statute of limitations which could impact the effective tax rate.

**NOTE 13—SUPPLEMENTAL CASH FLOW INFORMATION**

**Supplemental Disclosure of Cash Flow Information:**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2008** | **2007** | **2006** |
| Cash paid during the period for: |  |  |  |
| Interest(a) | $2,246 | $14,888 | $19,056 |
| Income tax payments (including amounts paid to IAC for Tree.com's share of IAC's consolidated tax liability in 2007 and 2006) | 95 | 6,426 | 3,046 |
| Income tax refunds | — | — | (26) |

(a)    Includes interest expense related to borrowings under warehouse lines of credit. This expense is netted with interest income earned on loans held for sale, both of which are included in revenue in the accompanying consolidated statements of operations.

81

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 14—COMMITMENTS**

The Company leases office space, equipment and services used in connection with its operations under various operating leases, many of which contain escalation clauses.

Future minimum payments under operating lease agreements are as follows (in thousands):

| Years Ending December 31, | |
|---|---|
| 2009 | $ 7,364 |
| 2010 | 3,828 |
| 2011 | 3,273 |
| 2012 | 2,902 |
| 2013 | 2,348 |
| Thereafter | 3,642 |
| Total | $23,357 |

Expenses charged to operations under these agreements were $5.4 million, $6.9 million, and $6.7 million for the years ended December 31, 2008, 2007 and 2006, respectively, and are included in general and administrative expense in the consolidated statement of operations.

The Company also has funding commitments that could potentially require its performance in the event of demands by third parties or contingent events, such as under letters of credit extended or under guarantees of debt, as follows (in thousands):

| | Total Amounts Committed | Less Than 1 year | 1–3 years | 3–5 years | More Than 5 years |
|---|---|---|---|---|---|
| | | | Amount of Commitment Expiration Per Period | | |
| Letters of credit and surety bonds | $ 7,732 | $ 7,707 | $ 25 | $ — | $ — |
| Purchase obligations | 11,698 | 11,698 | — | — | — |
| Total commercial commitments | $ 19,430 | $ 19,405 | $ 25 | $ — | $ — |

The total commercial commitments above primarily consist of surety bonds relating to guarantees with mortgage brokers. The purchase obligations primarily relate to marketing event contracts in 2009.

In conducting its operations, Home Loan Center, Inc., through its wholly-owned subsidiary, HLC Escrow, Inc., routinely holds customers' assets in escrow pending completion of real estate financing transactions. These amounts are maintained in segregated bank accounts and are not included in the accompanying consolidated balance sheets. The balances held for LendingTree Loans'customers totaled $0.8 million and $1.2 million at December 31, 2008 and 2007, respectively.

**NOTE 15—CONTINGENCIES**

HLC is party to various employment related lawsuits. During 2008, 2007 and 2006, provisions of $3.1 million, $2.1 million, and $0.4 million, respectively, were recorded in general and administrative expenses in the accompanying consolidated statements of income. The balance of the related liability was $2.0 million and $2.5 million at December 31, 2008 and 2007, respectively.

82

Table of Contents

# TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 15—CONTINGENCIES (Continued)

During 2007, the Company settled a lawsuit (as the plaintiff) and received a payment of $15.0 million, which is reflected as a separate line in the accompanying consolidated statement of operations.

In the ordinary course of business, Tree.com is a party to various lawsuits. Tree.com establishes reserves for specific legal matters when it determines that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where it believes an unfavorable outcome is not probable and, therefore, no reserve is established. Although management currently believes that an unfavorable resolution of claims against Tree.com, including claims where an unfavorable outcome is reasonably possible, will not have a material impact on the liquidity, results of operations, or financial condition of Tree.com, these matters are subject to inherent uncertainties and management's view of these matters may change in the future. It is possible that an unfavorable outcome of one or more of these lawsuits could have a material impact on the liquidity, results of operations, or financial condition of Tree.com. Tree.com also evaluates other contingent matters, including tax contingencies, to assess the probability and estimated extent of potential loss. See Note 12 for a discussion related to income tax contingencies.

### NOTE 16—FINANCIAL INSTRUMENTS

SFAS No. 107, "Disclosures About Fair Value of Financial Instruments" ("SFAS No. 107"), requires the disclosure of the estimated fair value of financial instruments, including those financial instruments for which the Company did not elect the fair value option. The following disclosures represent financial instruments in which the ending balances at December 31, 2008 and 2007 are not carried at fair value in their entirety on the Company's consolidated balance sheets. The additional disclosure below of the estimated fair value of financial instruments has been determined by the Company using available market information and appropriate valuation methodologies. However, considerable judgment is necessarily required to interpret market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized in a current market exchange. The use of different market assumptions or estimation methodologies may have a material impact on the estimated fair value amounts. The Company's financial instruments include letters of credit and surety bonds. The Company has $5.0 million in restricted cash at December 31, 2008 as collateral for the surety bonds. These commitments are in place to facilitate the commercial operations of certain Tree.com subsidiaries.

| | December 31, 2008 | | December 31, 2007 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Cash and cash equivalents | $ 73,643 | $ 73,643 | $ 45,940 | $ 45,940 |
| Restricted cash | 15,204 | 15,204 | 14,953 | 14,953 |
| Accounts receivable, net | 7,234 | 7,234 | 12,433 | 12,433 |
| Loans held for sale, net | 87,835 | 87,835 | 86,754 | 89,397 |
| Warehouse lines of credit and notes payable | (76,186) | (76,186) | (99,622) | (99,622) |
| Accounts payable | (3,541) | (3,541) | (3,335) | (3,335) |
| Accrued expenses | 37,146 | 37,146 | 74,506 | 74,506 |
| Surety bonds and letters of credit | N/A | (7,732) | N/A | (8,182) |

83

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 16—FINANCIAL INSTRUMENTS (Continued)**

The carrying amounts of cash and cash equivalents and restricted cash reflected in the accompanying consolidated balance sheets approximate fair value as they are maintained with various high-quality financial institutions or in short-term duration high-quality debt securities. Accounts receivable, net, are short-term in nature and are generally settled shortly after the sale, and therefore the carrying amount approximates fair value. The fair value of loans held for sale, net, was estimated using current secondary market prices for underlying loans with similar coupons, maturity and credit quality. The carrying amounts for the remaining warehouse lines of credit and notes payable and all other financial instruments approximate their fair value.

**NOTE 17—RELATED PARTY TRANSACTIONS**

While affiliated with IAC, Tree.com's expenses included allocations from IAC of costs associated with IAC's accounting, treasury, legal, tax, corporate support, human resources and internal audit functions. These expenses were allocated based on the ratio of Tree.com's revenue as a percentage of IAC's total revenue. Allocated costs were $0.3 million, $1.0 million and $1.2 million for the years ended December 31, 2008, 2007 and 2006, respectively and are included in "General and administrative expense" in the accompanying consolidated statements of operations. It is not practicable to determine the amounts of these expenses that would have been incurred had Tree.com operated as an unaffiliated entity. In the opinion of management, the allocation method was reasonable.

Tree.com has various agreements with Microsoft Corporation ("Microsoft"), which was the beneficial owner of more than 5% of IAC's outstanding common stock during 2006. These agreements include partner agreements, licensing agreements and support agreements. Total fees paid related to these agreements in 2006 were approximately $21.8 million. In the first quarter of 2007, Microsoft publicly disclosed that it was no longer the beneficial owner of 5% or more of IAC's outstanding common stock, and as a result, it is no longer a related party.

**Relationship Between Tree.com and IAC after the Spin-Off**

For purposes of governing certain of the ongoing relationships between Tree.com and IAC at and after the spin-off, and to provide for an orderly transition, Tree.com and IAC entered into a separation agreement, a tax sharing agreement, an employee matters agreement and a transition services agreement (the "Spin-Off Agreements"), among other agreements.

**NOTE 18—BENEFIT PLANS**

During the three years ended December 31, 2008, Tree.com participated in a retirement savings plan sponsored by IAC that was qualified under Section 401(k) of the Internal Revenue Code. Under the IAC plan, participating employees may contribute up to 16% of their pretax earnings, but not more than statutory limits. Tree.com's match under the IAC plan is fifty cents for each dollar a participant contributes in this plan, with a maximum contribution of 3% of a participant's eligible earnings. Matching contributions were approximately $1.1 million, $2.7 million and $3.0 million in 2008, 2007, and 2006, respectively. The decrease in matching contributions in 2008 is primarily due to the reduction in workforce associated with the 2007 and 2008 restructuring actions. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. Investment options in the plan include IAC common stock, but neither participant nor matching contributions are required to be invested in IAC common stock. Funds

84

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 18—BENEFIT PLANS (Continued)**

contributed prior to December 31, 2008 are subject to the vesting schedule established by the IAC plan. This vesting schedule is less than two years of service will vest with 0% and two years of service or more will vest with 100%.

Effective January 1, 2009, Tree.com established a retirement savings plan in the United States and, pending approval, will be qualified under Section 401(k) of the Internal Revenue Code. The net assets available for benefits of the employees of Tree.com were transferred from the IAC plan to the newly created Tree.com plan. Employees are eligible to enroll in the plan upon date of hire. Participating employees may contribute up to 50% of their pretax earnings, but not more than statutory limits. Tree.com's match is fifty cents for each dollar a participant contributes to the plan, with a maximum contribution of 3% of a participant's eligible earnings. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. Funds contributed after January 1, 2009 are subject to the Tree.com vesting schedule. This vesting schedule is less than three years of service will vest with 0% and three years of service or more will vest with 100%.

**NOTE 19—RESTRUCTURING CHARGES**

The restructuring charges primarily relate to Tree.com's significant reduction in its mortgage origination operations in response to the adverse developments in mortgage market conditions. Costs that relate to ongoing operations are not part of restructuring charges. Restructuring charges by segment and type are as follows (in thousands):

|  | For The Year Ended December 31, 2008 | | | | |
|  | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| --- | --- | --- | --- | --- | --- |
| Lending | $ 1,601 | $ 2,645 | $ 986 | $ 47 | $ 5,279 |
| Real Estate | 371 | — | 34 | 20 | 425 |
| Total | $ 1,972 | $ 2,645 | $1,020 | $ 67 | $ 5,704 |

|  | For The Year Ended December 31, 2007 | | | | |
|  | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| --- | --- | --- | --- | --- | --- |
| Lending | $ 8,973 | $ 5,004 | $7,510 | $ 80 | $ 21,567 |
| Real Estate | 333 | — | 493 | 474 | 1,300 |
| Total | $ 9,306 | $ 5,004 | $8,003 | $554 | $ 22,867 |

85

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 19—RESTRUCTURING CHARGES (Continued)**

Restructuring charges and spending against liabilities are as follows (in thousands):

| | For The Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| Balance, beginning of period | $ 2,064 | $ 3,885 | $ — | $ 554 | $ 6,503 |
| Restructuring charges | 1,972 | 2,645 | 1,020 | 66 | 5,703 |
| Payments | (3,663) | (2,868) | 97 | (599) | (7,033) |
| Write-offs | 12 | 41 | (1,117) | (21) | (1,085) |
| Balance, end of period | $ 385 | $ 3,703 | $ — | $ — | $ 4,088 |

| | For The Year Ended December 31, 2007 | | | | |
|---|---|---|---|---|---|
| | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| Balance, beginning of period | $ — | $ — | $ — | $ — | $ — |
| Restructuring charges | 9,306 | 5,004 | 8,003 | 554 | 22,867 |
| Payments | (7,242) | (1,633) | — | — | (8,875) |
| Write-offs | — | 514 | (8,003) | — | (7,489) |
| Balance, end of period | $ 2,064 | $ 3,885 | $ — | $554 | $ 6,503 |

At December 31, 2008, restructuring liabilities of $3.3 million are included in "Accrued expenses and other current liabilities" and $0.8 million are included in "Other long-term liabilities" in the accompanying consolidated balance sheet. At December 31, 2007, restructuring liabilities of $5.6 million are included in "Accrued expenses and other current liabilities" and $0.9 million are included in "Other long-term liabilities" in the accompanying consolidated balance sheet. Tree.com does not expect to incur significant additional costs related to the prior restructurings noted above.

86

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 20—QUARTERLY RESULTS (UNAUDITED)**

|  | Quarter Ended March 31, | Quarter Ended June 30,(a) | Quarter Ended September 30, | Quarter Ended December 31, (b) |
|---|---|---|---|---|
|  | (In thousands, except per share amounts) | | | |
| **Year Ended December 31, 2008** | | | | |
| Revenue | $ 70,193 | $ 59,983 | $ 50,258 | $ 48,138 |
| Gross margin | 52,427 | 42,608 | 34,480 | 34,664 |
| Operating loss | (9,488) | (176,754) | (22,455) | (6,333) |
| Net loss | (9,799) | (162,920) | (22,551) | (7,006) |
| Net loss per share | (1.05) | (17.47) | (2.41) | (0.75) |
| **Year Ended December 31, 2007** | | | | |
| Revenue | $ 109,999 | $ 110,639 | $ 74,953 | $ 50,787 |
| Gross margin | 89,503 | 89,697 | 56,674 | 37,390 |
| Operating income | (8,404) | (11,756) | (11,916) | (508,364) |
| Net loss | (5,123) | (7,492) | (6,293) | (531,494) |
| Net loss per share | (0.55) | (0.80) | (0.67) | (56.98) |

(a)    The second quarter of 2008 includes an impairment charge of $164.3 million related to the write-down of goodwill and intangible assets.

(b)    The fourth quarter of 2007 includes an impairment charge of $475.7 million related to the write-down of Lending's goodwill and intangible assets.

87

Table of Contents

**Item 9.**   *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

    Not applicable.

**Item 9A(T).**   *Controls and Procedures*

    We monitor and evaluate on an ongoing basis our disclosure controls and internal control over financial reporting in order to improve our overall effectiveness. In the course of this evaluation, we modify and refine our internal processes as conditions warrant.

    As required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined by Rule 13a-15(e) and 15d-15(e) under the Exchange Act). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of the end of the period covered by this report, our disclosure controls and procedures were effective in providing reasonable assurance that information we are required to disclose in our filings with the Securities and Exchange Commission under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and Forms, and include controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

    As required by Rule 13a-15(d) of the Exchange Act, we, under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, also evaluated whether any changes occurred to our internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, such control. Based on that evaluation, there has been no such change during the period covered by this report.

    This annual report does not include a report of management's assessment regarding internal control over financial reporting or an attestation report of the Company's registered public accounting firm due to a transition period established by the rules of the Securities and Exchange Commission for newly public companies.

**Item 9B.**   *Other Information*

    None.

<div align="center">88</div>

Table of Contents

## PART III

The information required by Part III (Items 10, 11, 12, 13 and 14) has been incorporated herein by reference to Tree.com's definitive Proxy Statement to be used in connection with its 2009 Annual Meeting of Stockholders, (the "2009 Proxy Statement"), as set forth below, in accordance with General Instruction G(3) of Form 10-K.

**Item 10.**    *Directors, Executive Officers and Corporate Governance*

Information included under the following captions in the 2009 Proxy Statement is incorporated by reference herein:

- "Election of Directors—Information Concerning Director Nominees;"

- "Election of Directors—Corporate Governance;"

- "Election of Directors—The Board and Board Committees;"

- "Election of Directors—Stockholder Recommendations of Director Candidates;"

- "Information Concerning Executive Officers Who Are Not Directors;" "Code of Business Conduct and Ethics;" and "Section 16(a) Beneficial Ownership Reporting Compliance."

**Item 11.**    *Executive Compensation*

Information included under the following captions in the 2009 Proxy Statement is incorporated by reference herein:

- "Executive Compensation;"

- "Director Compensation;"

- "Compensation Discussion and Analysis;" and

- "Compensation Committee Interlocks and Insider Participation."

Further, the information included under the caption "Compensation Committee Report" is furnished but shall not be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

**Item 12.**    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

Information included under the following captions in the 2009 Proxy Statement is incorporated by reference herein:

- "Ownership of Certain Beneficial Owners and Management;" and "Securities Authorized for Issuance Under Equity Compensation Plans."

**Item 13.**    *Certain Relationships and Related Transactions, and Director Independence*

Information included under the following captions in the 2009 Proxy Statement is incorporated by reference herein:

- "Certain Relationships and Related Person Transactions;" and

- "Election of Directors—Corporate Governance."

**Item 14.**    *Principal Accountant Fees and Services*

Information included under the following captions in the 2009 Proxy Statement is incorporated by reference herein:

- "Audit Committee Matters—Fees Paid to Our Independent Registered Public Accounting Firm;" and

- "Audit Committee Matters—Audit and Non-Audit Services Pre-Approval Policy."

89

Table of Contents

## PART IV

### Item 15.   *Exhibits and Financial Statement Schedules*

*(a)*    *List of documents filed as part of this Report:*

**(1)**    **Consolidated Financial Statements of Tree.com**

Report of Independent Registered Public Accounting Firm: Ernst & Young LLP.

Consolidated Statements of Operations for the Years Ended December 31, 2008, 2007 and 2006.

Consolidated Balance Sheets as of December 31, 2008 and 2007.

Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2008, 2007 and 2006.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2008, 2007 and 2006.

Notes to Consolidated Financial Statements.

**(2)**    **Consolidated Financial Statement Schedule of Tree.com**

| Schedule Number | |
|---|---|
| II | Valuation and Qualifying Accounts. |

All other financial statements and schedules not listed have been omitted since the required information is included in the Consolidated Financial Statements or the notes thereto, or is not applicable or required.

**(3)**    **Exhibits**

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith or incorporated herein by reference to the location indicated below.

| Exhibit Number | Description | Location |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Tree.com, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 3.2 | Amended and Restated By-laws of Tree.com, Inc. | Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.1 | Separation and Distribution Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.1 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.2 | Tax Sharing Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.3 | Employee Matters Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |

90

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.4 | Transition Services Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.5 | Registration Rights Agreement, dated as of August 20, 2008, among Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC | Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.6 | Spinco Assignment and Assumption Agreement, dated as of August 20, 2008, among IAC/InterActiveCorp, Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC | Exhibit 10.6 to the Registrant's Current Report on Form 8-K file August 25, 2008. |
| 10.7 | Employment Agreement between Robert L. Harris and LendingTree, LLC, dated as of June 30, 2008* | Exhibit 10.5 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.8 | Employment Agreement between Bret A. Violette and IAC/InterActiveCorp, dated as of April 11, 2007* | Exhibit 10.7 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.9 | Amended Employment and Release Agreement entered into as of the 2nd day of February, 2009, by and between Bret Violette and Tree.com, Inc.* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 5, 2009. |
| 10.10 | Amended and Restated Restricted Share Grant and Shareholders' Agreement, dated as of July 7, 2003, by and among Forest Merger Corp., LendingTree, Inc., InterActiveCorp and the Grantees named therein, as amended (filed as Exhibit 99.4 to Amendment No. 1 to IAC/InterActiveCorp's Registration Statement on Form S-4 (SEC File No. 333-105876) filed on July 10, 2003 and incorporated herein by reference)* | Exhibit 10.8 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.11 | Correspondent Loan Purchase Agreement, dated as of April 26, 2004, between CitiMortgage, Inc. and Home Loan Center, Inc. | Exhibit 10.9 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.12 | Loan Purchase Agreement, dated as of April 16, 2002, between Countrywide Home Loans, Inc. and Home Loan Center, Inc. | Exhibit 10.10 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.13 | Tree.com, Inc. 2008 Stock and Annual Incentive Plan* | † |

91

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.14 | Warehousing Credit Agreement, dated as of November 26, 2007, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein) | Exhibit 10.12 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.15 | Second Amendment to Warehousing Credit Agreement, made and entered into as of the 12th day of December, 2008, and to be effective as of the 30th day of December, 2008, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein). | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 17, 2008. |
| 10.16 | Master Repurchase Agreement, dated as of January 25, 2008, by and among Countrywide Bank, FSB and Home Loan Center, Inc. (the "Master Repurchase Agreement") | Exhibit 10.13 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.17 | Notice, dated June 25, 2008, issued by Countrywide Warehouse Lending, regarding certain amendments to the Master Repurchase Agreement | Exhibit 10.14 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.18 | Amendment to Master Repurchase Agreement No. 1 made and entered into as of February 23, 2009 by and between the Warehouse Lending Division of Countrywide Bank, FSB and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 27, 2009. |
| 10.19 | Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.15 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.20 | Employment Agreement between Matt Packey and LendingTree, LLC, dated as of August 3, 2008* | Exhibit 10.16 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.21 | Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of January 7, 2008* | Exhibit 10.6 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.22 | Amendment No. 1 to Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of August 15, 2008* | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed August 20, 2008. |

92

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.23 | Restricted Share Grant and Stockholder's Agreement, dated as of August 15, 2008, by and among IAC/InterActiveCorp, LendingTree Holdings Corp. and Douglas R. Lebda, together with Exhibit A thereto, Amended and Restated Certificate of Incorporation of LendingTree Holdings Corp.* | Exhibits 99.2 and 99.3 to the Registrant's Current Report on Form 8-K filed August 20, 2008. |
| 10.24 | Stock Purchase Agreement, dated February 8, 2009, between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 11, 2009. |
| 21.1 | Subsidiaries of Tree.com, Inc. | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | †† |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | †† |

\*      Reflects management contracts and management and director compensatory plans.

†      Filed herewith

††      Furnished herewith

93

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 26, 2009

<div align="center">

TREE.COM, INC.

By:      /s/ DOUGLAS R. LEBDA
_____

Douglas R. Lebda
*Chairman of the Board and*
*Chief Executive Officer*

</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated, in each case on February 26, 2009:

| Signature | Title |
|---|---|
| /s/ DOUGLAS R. LEBDA<br>_____<br>Douglas R. Lebda | Chairman of the Board, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ MATTHEW A. PACKEY<br>_____<br>Matthew A. Packey | Senior Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) |
| /s/ PETER HORAN<br>_____<br>Peter Horan | Director |
| /s/ W. MAC LACKEY<br>_____<br>W. Mac Lackey | Director |
| /s/ JOSEPH LEVIN<br>_____<br>Joseph Levin | Director |
| /s/ PATRICK MCCRORY<br>_____<br>Patrick McCrory | Director |
| /s/ LANCE MELBER<br>_____<br>Lance Melber | Director |
| /s/ STEVE OZONIAN<br>_____<br>Steve Ozonian | Director |

94

Table of Contents

Schedule II

**TREE.COM, INC. AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS**

| Description | Balance at Beginning of Period | Charges to Earnings | Charges to Other Accounts (In thousands) | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| **2008** | | | | | |
| Allowance for doubtful accounts | $ 322 | $ 597 | $ — | $ (552)(b) | $ 367 |
| Deferred tax valuation allowance | 68,830 | (6,768)(a) | — | — | 62,062 |
| Reserve for losses on previously sold loans | 13,886 | 1,344 | — | (4,779) | 10,451 |
| **2007** | | | | | |
| Allowance for doubtful accounts | $ 1,129 | $ 1,925 | $ — | $(2,732)(b) | $ 322 |
| Deferred tax valuation allowance | 5,835 | 62,995(a) | — | — | 68,830 |
| Reserve for losses on previously sold loans | 3,820 | 15,539 | — | (5,473) | 13,886 |
| **2006** | | | | | |
| Allowance for doubtful accounts | $ 727 | $ 1,768 | $ — | $(1,366)(b) | $ 1,129 |
| Deferred tax valuation allowance | 3,652 | 2,183(a) | — | — | 5,835 |
| Reserve for losses on previously sold loans | 3,064 | 6,193 | — | (5,437) | 3,820 |

(a)   Amount is primarily related to Tree.com net operating losses and other deferred tax assets including accrued expenses and goodwill which impacted the income tax provision.

(b)   Write-off of uncollectible accounts receivable.

95

EX-10.13 2 a2190858zex-10_13.htm EXHIBIT 10.13

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 10.13**

<div align="center">

**AMENDED AND RESTATED**
**TREE.COM, INC.**
**2008 STOCK AND ANNUAL INCENTIVE PLAN**

</div>

**Section 1. Purpose; Definition**

The purpose of this Plan is (a) to give the Company a competitive advantage in attracting, retaining and motivating officers, employees, directors and/or consultants and to provide the Company and its Subsidiaries and Affiliates with a stock and incentive plan providing incentives directly linked to stockholder value and (b) to assume and govern other awards pursuant to the adjustment of awards granted under any IAC Long Term Incentive Plan (as defined in the Employee Matters Agreement) in accordance with the terms of the Employee Matters Agreement ("*Adjusted Awards*"). Certain terms used herein have definitions given to them in the first place in which they are used. In addition, for purposes of this Plan, the following terms are defined as set forth below:

(a)　"*Affiliate*" means a corporation or other entity controlled by, controlling or under common control with, the Company.

(b)　"*Applicable Exchange*" means Nasdaq or such other securities exchange as may at the applicable time be the principal market for the Common Stock.

(c)　"*Award*" means an Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, or other stock-based award granted or assumed pursuant to the terms of this Plan, including Adjusted Awards.

(d)　"*Award Agreement*" means a written or electronic document or agreement setting forth the terms and conditions of a specific Award.

(e)　"*Beneficial Ownership*" shall have the meaning given in Rule 13d-3 promulgated under the Exchange Act.

(f)　"*Board*" means the Board of Directors of the Company.

(g)　"*Bonus Award*" means a bonus award made pursuant to Section 9.

(h)　"*Cause*" means, unless otherwise provided in an Award Agreement, (i) "Cause" as defined in any Individual Agreement to which the applicable Participant is a party, or (ii) if there is no such Individual Agreement or if it does not define Cause: (A) the willful or gross neglect by a Participant of his employment duties; (B) the plea of guilty or *nolo contendere* to, or conviction for, the commission of a felony offense by a Participant; (C) a material breach by a Participant of a fiduciary duty owed to the Company or any of its subsidiaries; (D) a material breach by a Participant of any nondisclosure, non-solicitation or non-competition obligation owed to the Company or any of its Affiliates; or (E) before a Change in Control, such other events as shall be determined by the Committee and set forth in a Participant's Award Agreement. Notwithstanding the general rule of Section 2(c), following a Change in Control, any determination by the Committee as to whether "Cause" exists shall be subject to *de novo* review.

(i)　"*Change in Control*" has the meaning set forth in Section 10(c).

(j)　"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and any successor thereto, the Treasury Regulations thereunder and other relevant interpretive guidance issued by the Internal Revenue Service or the Treasury Department. Reference to any specific section of the Code shall be deemed to include such regulations and guidance, as well as any successor provision of the Code.

(k)　"*Commission*" means the Securities and Exchange Commission or any successor agency.

(l)　"*Committee*" has the meaning set forth in Section 2(a).

(m)　"*Common Stock*" means common stock, par value $0.01 per share, of the Company.

(n)  "*Company*" means Tree.com, Inc., a Delaware corporation, or its successor.

(o)  "*Disability*" means (i) "Disability" as defined in any Individual Agreement to which the Participant is a party, or (ii) if there is no such Individual Agreement or it does not define "Disability," (A) permanent and total disability as determined under the Company's long-term disability plan applicable to the Participant, or (B) if there is no such plan applicable to the Participant or the Committee determines otherwise in an applicable Award Agreement, "Disability" as determined by the Committee. Notwithstanding the above, with respect to an Incentive Stock Option, Disability shall mean Permanent and Total Disability as defined in Section 22(e)(3) of the Code and, with respect to each Award that constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, the foregoing definition shall apply for purposes of vesting of such Award, provided that such Award shall not be settled until the earliest of: (i) the Participant's "disability" within the meaning of Section 409A of the Code, or (ii) the Participant's "separation from service" within the meaning of Section 409A of the Code and (iii) the date such Award would otherwise be settled pursuant to the terms of the Award Agreement.

(p)  "*Disaffiliation*" means a Subsidiary's or Affiliate's ceasing to be a Subsidiary or Affiliate for any reason (including, without limitation, as a result of a public offering, or a spinoff or sale by the Company, of the stock of the Subsidiary or Affiliate) or a sale of a division of the Company and its Affiliates.

(q)  "*EBITA*" means for any period, operating profit (loss) plus (i) amortization, including goodwill impairment, (ii) amortization of non-cash distribution and marketing expense and non-cash compensation expense, (iii) restructuring charges, (iv) non-cash write-downs of assets or goodwill, (v) charges relating to disposal of lines of business, (vi) litigation settlement amounts and (vii) costs incurred for proposed and completed acquisitions.

(r)  "*EBITDA*" means for any period, operating profit (loss) plus (i) depreciation and amortization, including goodwill impairment, (ii) amortization of non-cash distribution and marketing expense and non-cash compensation expense, (iii) restructuring charges, (iv) non-cash write-downs of assets or goodwill, (v) charges relating to disposal of lines of business, (vi) litigation settlement amounts and (vii) costs incurred for proposed and completed acquisitions.

(s)  "*Eligible Individuals*" means directors, officers, employees and consultants of the Company or any of its Subsidiaries or Affiliates, and prospective employees and consultants who have accepted offers of employment or consultancy from the Company or its Subsidiaries or Affiliates.

(t)  "*Employee Matters Agreement*" means the Employee Matters Agreement by and among IAC, Ticketmaster, Interval Leisure Group, Inc., HSN, Inc. and Tree.com, Inc.

(u)  "*Exchange Act*" means the Securities Exchange Act of 1934, as amended from time to time, and any successor thereto.

(v)  "*Fair Market Value*" means, unless otherwise determined by the Committee, the closing price of a share of Common Stock on the Applicable Exchange on the date of measurement, or if Shares were not traded on the Applicable Exchange on such measurement date, then on the next preceding date on which Shares were traded, all as reported by such source as the Committee may select. If the Common Stock is not listed on a national securities exchange, Fair Market Value shall be determined by the Committee in its good faith discretion, taking into account, to the extent appropriate, the requirements of Section 409A of the Code.

(w)  "*Free-Standing SAR*" has the meaning set forth in Section 5(b).

(x)  "*Grant Date*" means (i) the date on which the Committee by resolution selects an Eligible Individual to receive a grant of an Award and determines the number of Shares to be subject to such Award or the formula for earning a number of shares or cash amount, (ii) such later date as the

2

Committee shall provide in such resolution or (iii) the initial date on which an Adjusted Award was granted under the IAC Long Term Incentive Plan.

(y)    "*Group*" shall have the meaning given in Section 13(d)(3) and 14(d)(2) of the Exchange Act.

(z)    "*IAC*" means IAC/InterActiveCorp, a Delaware corporation.

(aa) "*Incentive Stock Option*" means any Option that is designated in the applicable Award Agreement as an "incentive stock option" within the meaning of Section 422 of the Code, and that in fact so qualifies.

(bb) "*Individual Agreement*" means an employment, consulting or similar agreement between a Participant and the Company or one of its Subsidiaries or Affiliates.

(cc) "*Nasdaq*" means the National Association of Securities Dealers Inc. Automated Quotation System.

(dd) "*Nonqualified Option*" means any Option that is not an Incentive Stock Option.

(ee) "*Option*" means an Award granted under Section 5.

(ff) "*Participant*" means an Eligible Individual to whom an Award is or has been granted.

(gg) "*Performance Goals*" means the performance goals established by the Committee in connection with the grant of Restricted Stock, Restricted Stock Units or Bonus Awards or other stock-based awards. In the case of Qualified-Performance Based Awards, (i) such goals shall be based on the attainment of one or any combination of the following: specified levels of earnings per share from continuing operations, net profit after tax, EBITDA, EBITA, gross profit, cash generation, unit volume, market share, sales, asset quality, earnings per share, operating income, revenues, return on assets, return on operating assets, return on equity, profits, total stockholder return (measured in terms of stock price appreciation and/or dividend growth), cost saving levels, marketing-spending efficiency, core non-interest income, change in working capital, return on capital, and/or stock price, with respect to the Company or any Subsidiary, Affiliate, division or department of the Company and (ii) such Performance Goals shall be set by the Committee within the time period prescribed by Section 162(m) of the Code and related regulations. Such Performance Goals also may be based upon the attaining of specified levels of Company, Subsidiary, Affiliate or divisional performance under one or more of the measures described above relative to the performance of other entities, divisions or subsidiaries.

(hh) "*Plan*" means this Tree.com, Inc. 2008 Stock and Annual Incentive Plan, as set forth herein and as hereafter amended from time to time.

(ii)    "*Plan Year*" means the calendar year or, with respect to Bonus Awards, the Company's fiscal year if different.

(jj)    "*Qualified Performance-Based Award*" means an Award intended to qualify for the Section 162(m) Exemption, as provided in Section 11.

(kk) "*Restricted Stock*" means an Award granted under Section 6.

(ll)    "*Restricted Stock Units*" means an Award granted under Section 7.

(mm)  "*Resulting Voting Power*" shall mean the outstanding combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors (or equivalent governing body, if applicable) of the entity resulting from a Business Combination (including, without limitation, an entity which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries).

(nn) "*Retirement*" means retirement from active employment with the Company, a Subsidiary or Affiliate at or after the Participant's attainment of age 65.

<div align="center">3</div>

(oo) "*Section 162(m) Exemption*" means the exemption from the limitation on deductibility imposed by Section 162(m) of the Code that is set forth in Section 162(m)(4)(C) of the Code.

(pp) "*Separation*" has the meaning set forth in the Employee Matters Agreement.

(qq) "*Share*" means a share of Common Stock.

(rr) "*Specified Employee*" shall mean any individual who is a "key employee" (as defined in Section 416(i) of the Code without regard to paragraph (5) thereof) with respect to the Company and its Affiliates, as determined by the Company (or the Affiliate, in the event that the Affiliate and the Company are not considered a single employer under Sections 414(b) or 414(c) of the Code) in accordance with its uniform policy with respect to all arrangements subject to Section 409A of the Code, based upon the twelve (12) month period ending on each December 31st. All individuals who are determined to be key employees under Section 416(i)(1)(A)(i), (ii) or (iii) of the Code (without regard to paragraph (5) thereof) on December 31st shall be treated as Specified Employees for purposes of the Plan during the twelve (12) month period that begins on the following April 1st.

(ss) "*Stock Appreciation Right*" has the meaning set forth in Section 5(b).

(tt) "*Subsidiary*" means any corporation, partnership, joint venture, limited liability company or other entity during any period in which at least a 50% voting or profits interest is owned, directly or indirectly, by the Company or any successor to the Company.

(uu) "*Tandem SAR*" has the meaning set forth in Section 5(b).

(vv) "*Term*" means the maximum period during which an Option or Stock Appreciation Right may remain outstanding, subject to earlier termination upon Termination of Employment or otherwise, as specified in the applicable Award Agreement.

(ww) "*Termination of Employment*" means the termination of the applicable Participant's employment with, or performance of services for, the Company and any of its Subsidiaries or Affiliates. Unless otherwise determined by the Committee, if a Participant's employment with, or membership on a board of directors of the Company and its Affiliates terminates but such Participant continues to provide services to the Company and its Affiliates in a non-employee director capacity or as an employee, as applicable, such change in status shall not be deemed a Termination of Employment. A Participant employed by, or performing services for, a Subsidiary or an Affiliate or a division of the Company and its Affiliates shall be deemed to incur a Termination of Employment if, as a result of a Disaffiliation, such Subsidiary, Affiliate, or division ceases to be a Subsidiary, Affiliate or division, as the case may be, and the Participant does not immediately thereafter become an employee of (or service provider for), or member of the board of directors of, the Company or another Subsidiary or Affiliate. Temporary absences from employment because of illness, vacation or leave of absence and transfers among the Company and its Subsidiaries and Affiliates shall not be considered Terminations of Employment. Notwithstanding the foregoing, with respect to any Award that constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, "Termination of Employment" shall mean a "separation from service" as defined under Section 409A of the Code. For the avoidance of doubt, the Separation shall not constitute a Termination of Employment for purposes of any Adjusted Award.

### Section 2. Administration

(a) *Committee.*   The Plan shall be administered by the Compensation Committee of the Board or such other committee of the Board as the Board may from time to time designate (the "*Committee*"), which shall be composed of not less than two directors, and shall be appointed by and serve at the pleasure of the Board. The Committee shall, subject to Section 11, have plenary authority to grant Awards pursuant to the terms of the Plan to Eligible Individuals. Among other things, the Committee

4

shall have the authority, subject to the terms and conditions of the Plan and the Employee Matters Agreement (including the original terms of the grant of the Adjusted Award):

    (i)      to select the Eligible Individuals to whom Awards may from time to time be granted;

    (ii)      to determine whether and to what extent Incentive Stock Options, Nonqualified Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, other stock-based awards, or any combination thereof, are to be granted hereunder;

    (iii)      to determine the number of Shares to be covered by each Award granted hereunder;

    (iv)      to determine the terms and conditions of each Award granted hereunder, based on such factors as the Committee shall determine;

    (v)      subject to Section 12, to modify, amend or adjust the terms and conditions of any Award;

    (vi)      to adopt, alter and repeal such administrative rules, guidelines and practices governing the Plan as it shall from time to time deem advisable;

    (vii)      subject to Section 11, to accelerate the vesting or lapse of restrictions of any outstanding Award, based in each case on such considerations as the Committee in its sole discretion determines;

    (viii)      to interpret the terms and provisions of the Plan and any Award issued under the Plan (and any agreement relating thereto);

    (ix)      to establish any "blackout" period that the Committee in its sole discretion deems necessary or advisable;

    (x)      to determine whether, to what extent, and under what circumstances cash, Shares, and other property and other amounts payable with respect to an Award under this Plan shall be deferred either automatically or at the election of the Participant;

    (xi)      to decide all other matters that must be determined in connection with an Award; and

    (xii)      to otherwise administer the Plan.

(b)    *Procedures*.

    (i)      The Committee may act only by a majority of its members then in office, except that the Committee may, except to the extent prohibited by applicable law or the listing standards of the Applicable Exchange and subject to Section 11, allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities and powers to any person or persons selected by it.

    (ii)      Subject to Section 11(c), any authority granted to the Committee may also be exercised by the full Board. To the extent that any permitted action taken by the Board conflicts with action taken by the Committee, the Board action shall control.

(c)    *Discretion of Committee*.    Subject to Section 1(h), any determination made by the Committee or by an appropriately delegated officer pursuant to delegated authority under the provisions of the Plan with respect to any Award shall be made in the sole discretion of the Committee or such delegate at the time of the grant of the Award or, unless in contravention of any express term of the Plan, at any time thereafter. All decisions made by the Committee or any appropriately delegated officer pursuant to the provisions of the Plan shall be final and binding on all persons, including the Company, Participants, and Eligible Individuals.

(d)    *Award Agreements*.    The terms and conditions of each Award, as determined by the Committee, shall be set forth in an Award Agreement, which shall be delivered to the Participant

<div align="center">5</div>

receiving such Award upon, or as promptly as is reasonably practicable following, the grant of such Award. The effectiveness of an Award shall not be subject to the Award Agreement's being signed by the Company and/or the Participant receiving the Award unless specifically so provided in the Award Agreement. Award Agreements may be amended only in accordance with Section 12 hereof. Notwithstanding any provision of the Plan or an Award Agreement to the contrary, in the event that any term of an Award Agreement conflicts with any provision of the Plan that specifically pertains to Section 409A of the Code, the provision of the Plan shall govern.

### Section 3. Common Stock Subject to Plan

(a)  *Plan Maximums*.   The maximum number of Shares that may be delivered pursuant to Awards under the Plan shall be the sum of (a) the number of Shares that may be issuable upon exercise or vesting of the Adjusted Awards and (b) 2,200,000. The maximum number of Shares that may be granted pursuant to Options intended to be Incentive Stock Options shall be 1,466,666 Shares. Shares subject to an Award under the Plan may be authorized and unissued Shares or may be treasury Shares.

(b)  *Individual Limits*.   No Participant may be granted Awards covering in excess of 1,466,666 Shares during the term of the Plan; *provided* that Adjusted Awards shall not be subject to this limitation.

(c)  *Rules for Calculating Shares Delivered.*

   (i)     With respect to Awards other than Adjusted Awards, to the extent that any Award is forfeited, or any Option and the related Tandem SAR (if any) or Free-Standing SAR terminates, expires or lapses without being exercised, or any Award is settled for cash, the Shares subject to such Awards not delivered as a result thereof shall again be available for Awards under the Plan.

   (ii)    With respect to Awards other than Adjusted Awards, if the exercise price of any Option and/or the tax withholding obligations relating to any Award are satisfied by delivering Shares to the Company (by either actual delivery or by attestation), only the number of Shares issued net of the Shares delivered or attested to shall be deemed delivered for purposes of the limits set forth in Section 3(a). To the extent any Shares subject to an Award are withheld to satisfy the exercise price (in the case of an Option) and/or the tax withholding obligations relating to such Award, such Shares shall not be deemed to have been delivered for purposes of the limits set forth in Section 3(a).

(d)  *Adjustment Provision*.   In the event of a merger, consolidation, acquisition of property or shares, stock rights offering, liquidation, Disaffiliation, or similar event affecting the Company or any of its Subsidiaries (each, a "*Corporate Transaction*"), the Committee or the Board may in its discretion make such substitutions or adjustments as it deems appropriate and equitable to (i) the aggregate number and kind of Shares or other securities reserved for issuance and delivery under the Plan, (ii) the various maximum limitations set forth in Sections 3(a) and 3(b) upon certain types of Awards and upon the grants to individuals of certain types of Awards, (iii) the number and kind of Shares or other securities subject to outstanding Awards; and (iv) the exercise price of outstanding Options and Stock Appreciation Rights. In the event of a stock dividend, stock split, reverse stock split, separation, spinoff, reorganization, extraordinary dividend of cash or other property, share combination, or recapitalization or similar event affecting the capital structure of the Company (each, a "*Share Change*"), the Committee or the Board shall make such substitutions or adjustments as it deems appropriate and equitable to (i) the aggregate number and kind of Shares or other securities reserved for issuance and delivery under the Plan, (ii) the various maximum limitations set forth in Sections 3(a) and 3(b) upon certain types of Awards and upon the grants to individuals of certain types of Awards, (iii) the number and kind of Shares or other securities subject to outstanding Awards; and (iv) the exercise price of outstanding Options and Stock Appreciation Rights. In the case of Corporate

6

Transactions, such adjustments may include, without limitation, (1) the cancellation of outstanding Awards in exchange for payments of cash, property or a combination thereof having an aggregate value equal to the value of such Awards, as determined by the Committee or the Board in its sole discretion (it being understood that in the case of a Corporate Transaction with respect to which stockholders of Common Stock receive consideration other than publicly traded equity securities of the ultimate surviving entity, any such determination by the Committee that the value of an Option or Stock Appreciation Right shall for this purpose be deemed to equal the excess, if any, of the value of the consideration being paid for each Share pursuant to such Corporate Transaction over the exercise price of such Option or Stock Appreciation Right shall conclusively be deemed valid); (2) the substitution of other property (including, without limitation, cash or other securities of the Company and securities of entities other than the Company) for the Shares subject to outstanding Awards; and (3) in connection with any Disaffiliation, arranging for the assumption of Awards, or replacement of Awards with new awards based on other property or other securities (including, without limitation, other securities of the Company and securities of entities other than the Company), by the affected Subsidiary, Affiliate, or division or by the entity that controls such Subsidiary, Affiliate, or division following such Disaffiliation (as well as any corresponding adjustments to Awards that remain based upon Company securities). The Committee may adjust in its sole discretion the Performance Goals applicable to any Awards to reflect any Share Change and any Corporate Transaction and any unusual or non-recurring events and other extraordinary items, impact of charges for restructurings, discontinued operations, and the cumulative effects of accounting or tax changes, each as defined by generally accepted accounting principles or as identified in the Company's financial statements, notes to the financial statements, management's discussion and analysis or the Company's other SEC filings, *provided* that in the case of Performance Goals applicable to any Qualified Performance-Based Awards, such adjustment does not violate Section 162(m) of the Code. Any adjustment under this Section 3(d) need not be the same for all Participants.

(e)   *Section 409A.*   Notwithstanding the foregoing: (i) any adjustments made pursuant to Section 3(d) to Awards that are considered "deferred compensation" within the meaning of Section 409A of the Code shall be made in compliance with the requirements of Section 409A of the Code; (ii) any adjustments made pursuant to Section 3(d) to Awards that are not considered "deferred compensation" subject to Section 409A of the Code shall be made in such a manner as to ensure that after such adjustment, the Awards either (A) continue not to be subject to Section 409A of the Code or (B) comply with the requirements of Section 409A of the Code; and (iii) in any event, neither the Committee nor the Board shall have the authority to make any adjustments pursuant to Section 3(d) to the extent the existence of such authority would cause an Award that is not intended to be subject to Section 409A of the Code at the Grant Date to be subject thereto as of the Grant Date.

**Section 4. Eligibility**

Awards may be granted under the Plan to Eligible Individuals and, with respect to Adjusted Awards, in accordance with the terms of the Employee Matters Agreement; *provided*, *however*, that Incentive Stock Options may be granted only to employees of the Company and its subsidiaries or parent corporation (within the meaning of Section 424(f) of the Code) and, with respect to Adjusted Awards that are intended to qualify as incentive stock options within the meaning of Section 421 of the Code, in accordance with the terms of the Employee Matters Agreement.

7

**Section 5. Options and Stock Appreciation Rights**

With respect to Adjusted Awards, the provisions below will be applicable only to the extent that they are not inconsistent with the Employee Matters Agreement and the terms of the Adjusted Award assumed under the Employee Matters Agreement:

(a)  *Types of Options*.   Options may be of two types: Incentive Stock Options and Non-qualified Options. The Award Agreement for an Option shall indicate whether the Option is intended to be an Incentive Stock Option or a Nonqualified Option.

(b)  *Types and Nature of Stock Appreciation Rights*.   Stock Appreciation Rights may be "Tandem SARs," which are granted in conjunction with an Option, or "Free-Standing SARs," which are not granted in conjunction with an Option. Upon the exercise of a Stock Appreciation Right, the Participant shall be entitled to receive an amount in cash, Shares, or both, in value equal to the product of (i) the excess of the Fair Market Value of one Share over the exercise price of the applicable Stock Appreciation Right, multiplied by (ii) the number of Shares in respect of which the Stock Appreciation Right has been exercised. The applicable Award Agreement shall specify whether such payment is to be made in cash or Common Stock or both, or shall reserve to the Committee or the Participant the right to make that determination prior to or upon the exercise of the Stock Appreciation Right.

(c)  *Tandem SARs*.   A Tandem SAR may be granted at the Grant Date of the related Option. A Tandem SAR shall be exercisable only at such time or times and to the extent that the related Option is exercisable in accordance with the provisions of this Section 5, and shall have the same exercise price as the related Option. A Tandem SAR shall terminate or be forfeited upon the exercise or forfeiture of the related Option, and the related Option shall terminate or be forfeited upon the exercise or forfeiture of the Tandem SAR.

(d)  *Exercise Price*.   The exercise price per Share subject to an Option or Free-Standing SAR shall be determined by the Committee and set forth in the applicable Award Agreement, and shall not be less than the Fair Market Value of a share of the Common Stock on the applicable Grant Date. In no event may any Option or Free-Standing SAR granted under this Plan be amended, other than pursuant to Section 3(d), to decrease the exercise price thereof, be cancelled in conjunction with the grant of any new Option or Free-Standing SAR with a lower exercise price or otherwise be subject to any action that would be treated, for accounting purposes, as a "repricing" of such Option or Free-Standing SAR, unless such amendment, cancellation, or action is approved by the Company's stockholders.

(e)  *Term*.   The Term of each Option and each Free-Standing SAR shall be fixed by the Committee, but shall not exceed ten years from the Grant Date.

(f)  *Vesting and Exercisability*.   Except as otherwise provided herein, Options and Free-Standing SARs shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee. If the Committee provides that any Option or Free-Standing SAR will become exercisable only in installments, the Committee may at any time waive such installment exercise provisions, in whole or in part, based on such factors as the Committee may determine. In addition, the Committee may at any time accelerate the exercisability of any Option or Free-Standing SAR.

(g)  *Method of Exercise*.   Subject to the provisions of this Section 5, Options and Free-Standing SARs may be exercised, in whole or in part, at any time during the applicable Term by giving written notice of exercise to the Company or through the procedures established with the Company's appointed third-party Option administrator specifying the number of Shares as to which the Option or Free-Standing SAR is being exercised; *provided*, *however*, that, unless otherwise permitted by the Committee, any such exercise must be with respect to a portion of the applicable Option or Free-Standing SAR relating to no less than the lesser of the number of Shares then subject to such Option or Free-Standing SAR or 100 Shares. In the case of the exercise of an Option, such notice shall

8

be accompanied by payment in full of the purchase price (which shall equal the product of such number of Shares multiplied by the applicable exercise price) by certified or bank check or such other instrument as the Company may accept. If approved by the Committee, payment, in full or in part, may also be made as follows:

(i)     Payments may be made in the form of unrestricted Shares (by delivery of such Shares or by attestation) of the same class as the Common Stock subject to the Option already owned by the Participant (based on the Fair Market Value of the Common Stock on the date the Option is exercised); *provided*, *however*, that, in the case of an Incentive Stock Option, the right to make a payment in the form of already owned Shares of the same class as the Common Stock subject to the Option may be authorized only at the time the Option is granted.

(ii)     To the extent permitted by applicable law, payment may be made by delivering a properly executed exercise notice to the Company, together with a copy of irrevocable instructions to a broker to deliver promptly to the Company the amount of sale or loan proceeds necessary to pay the purchase price, and, if requested, the amount of any federal, state, local or foreign withholding taxes. To facilitate the foregoing, the Company may, to the extent permitted by applicable law, enter into agreements for coordinated procedures with one or more brokerage firms. To the extent permitted by applicable law, the Committee may also provide for Company loans to be made for purposes of the exercise of Options.

(iii)     Payment may be made by instructing the Company to withhold a number of Shares having a Fair Market Value (based on the Fair Market Value of the Common Stock on the date the applicable Option is exercised) equal to the product of (A) the exercise price multiplied by (B) the number of Shares in respect of which the Option shall have been exercised.

(h)    *Delivery; Rights of Stockholders*.   No Shares shall be delivered pursuant to the exercise of an Option until the exercise price therefor has been fully paid and applicable taxes have been withheld. The applicable Participant shall have all of the rights of a stockholder of the Company holding the class or series of Common Stock that is subject to the Option or Stock Appreciation Right (including, if applicable, the right to vote the applicable Shares and the right to receive dividends), when the Participant (i) has given written notice of exercise, (ii) if requested, has given the representation described in Section 14(a), and (iii) in the case of an Option, has paid in full for such Shares.

(i)    *Terminations of Employment*.   Subject to Section 10, a Participant's Options and Stock Appreciation Rights shall be forfeited upon such Participant's Termination of Employment, except as set forth below:

(i)     Upon a Participant's Termination of Employment by reason of death, any Option or Stock Appreciation Right held by the Participant that was exercisable immediately before the Termination of Employment may be exercised at any time until the earlier of (A) the first anniversary of the date of such death and (B) the expiration of the Term thereof;

(ii)     Upon a Participant's Termination of Employment by reason of Disability or Retirement, any Option or Stock Appreciation Right held by the Participant that was exercisable immediately before the Termination of Employment may be exercised at any time until the earlier of (A) the first anniversary of such Termination of Employment and (B) the expiration of the Term thereof;

(iii)     Upon a Participant's Termination of Employment for Cause, any Option or Stock Appreciation Right held by the Participant shall be forfeited, effective as of such Termination of Employment;

9

(iv)    Upon a Participant's Termination of Employment for any reason other than death, Disability, Retirement or for Cause, any Option or Stock Appreciation Right held by the Participant that was exercisable immediately before the Termination of Employment may be exercised at any time until the earlier of (A) the 90th day following such Termination of Employment and (B) expiration of the Term thereof; and

(v)    Notwithstanding the above provisions of this Section 5(i), if a Participant dies after such Participant's Termination of Employment but while any Option or Stock Appreciation Right remains exercisable as set forth above, such Option or Stock Appreciation Right may be exercised at any time until the later of (A) the earlier of (1) the first anniversary of the date of such death and (2) expiration of the Term thereof and (B) the last date on which such Option or Stock Appreciation Right would have been exercisable, absent this Section 5(i)(v).

Notwithstanding the foregoing, the Committee shall have the power, in its discretion, to apply different rules concerning the consequences of a Termination of Employment; *provided*, *however*, that if such rules are less favorable to the Participant than those set forth above, such rules are set forth in the applicable Award Agreement. If an Incentive Stock Option is exercised after the expiration of the exercise periods that apply for purposes of Section 422 of the Code, such Option will thereafter be treated as a Nonqualified Option.

(j)    *Nontransferability of Options and Stock Appreciation Rights*.   No Option or Free-Standing SAR shall be transferable by a Participant other than (i) by will or by the laws of descent and distribution, or (ii) in the case of a Nonqualified Option or Free-Standing SAR, pursuant to a qualified domestic relations order or as otherwise expressly permitted by the Committee including, if so permitted, pursuant to a transfer to the Participant's family members or to a charitable organization, whether directly or indirectly or by means of a trust or partnership or otherwise. For purposes of this Plan, unless otherwise determined by the Committee, "family member" shall have the meaning given to such term in General Instructions A.1(a)(5) to Form S-8 under the Securities Act of 1933, as amended, and any successor thereto. A Tandem SAR shall be transferable only with the related Option as permitted by the preceding sentence. Any Option or Stock Appreciation Right shall be exercisable, subject to the terms of this Plan, only by the applicable Participant, the guardian or legal representative of such Participant, or any person to whom such Option or Stock Appreciation Right is permissibly transferred pursuant to this Section 5(j), it being understood that the term "Participant" includes such guardian, legal representative and other transferee; *provided*, *however*, that the term "Termination of Employment" shall continue to refer to the Termination of Employment of the original Participant.

**Section 6. Restricted Stock**

With respect to Adjusted Awards, the provisions below will be applicable only to the extent that they are not inconsistent with the Employee Matters Agreement and the terms of the Adjusted Award assumed under the Employee Matters Agreement:

(a)    *Nature of Awards and Certificates*.   Shares of Restricted Stock are actual Shares issued to a Participant, and shall be evidenced in such manner as the Committee may deem appropriate, including book-entry registration or issuance of one or more stock certificates. Any certificate issued in respect of Shares of Restricted Stock shall be registered in the name of the applicable Participant and, in the case of Restricted Stock, shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Award, substantially in the following form:

"The transferability of this certificate and the shares of stock represented hereby are subject to the terms and conditions (including forfeiture) of the Tree.com, Inc. 2008 Stock and Annual Incentive Plan and an Award Agreement. Copies of such Plan and Agreement are on file at the offices of Tree.com, Inc., 11115 Rushmore Drive, Charlotte, NC 28277."

10

The Committee may require that the certificates evidencing such shares be held in custody by the Company until the restrictions thereon shall have lapsed and that, as a condition of any Award of Restricted Stock, the applicable Participant shall have delivered a stock power, endorsed in blank, relating to the Common Stock covered by such Award.

(b) *Terms and Conditions*. Shares of Restricted Stock shall be subject to the following terms and conditions:

    (i) The Committee shall, prior to or at the time of grant, condition the vesting or transferability of an Award of Restricted Stock upon the continued service of the applicable Participant or the attainment of Performance Goals, or the attainment of Performance Goals and the continued service of the applicable Participant. In the event that the Committee conditions the grant or vesting of an Award of Restricted Stock upon the attainment of Performance Goals or the attainment of Performance Goals and the continued service of the applicable Participant, the Committee may, prior to or at the time of grant, designate such an Award as a Qualified Performance-Based Award. The conditions for grant, vesting, or transferability and the other provisions of Restricted Stock Awards (including without limitation any Performance Goals) need not be the same with respect to each Participant.

    (ii) Subject to the provisions of the Plan and the applicable Award Agreement, during the period, if any, set by the Committee, commencing with the date of such Restricted Stock Award for which such vesting restrictions apply and until the expiration of such vesting restrictions (the "*Restriction Period*"), the Participant shall not be permitted to sell, assign, transfer, pledge or otherwise encumber Shares of Restricted Stock.

    (iii) Except as provided in this Section 6 and in the applicable Award Agreement, the applicable Participant shall have, with respect to the Shares of Restricted Stock, all of the rights of a stockholder of the Company holding the class or series of Common Stock that is the subject of the Restricted Stock, including, if applicable, the right to vote the Shares and the right to receive any cash dividends. If so determined by the Committee in the applicable Award Agreement and subject to Section 14(e), (A) cash dividends on the class or series of Common Stock that is the subject of the Restricted Stock Award shall be automatically deferred and reinvested in additional Restricted Stock, held subject to the vesting of the underlying Restricted Stock, and (B) subject to any adjustment pursuant to Section 3(d), dividends payable in Common Stock shall be paid in the form of Restricted Stock of the same class as the Common Stock with which such dividend was paid, held subject to the vesting of the underlying Restricted Stock.

    (iv) Except as otherwise set forth in the applicable Award Agreement, upon a Participant's Termination of Employment for any reason during the Restriction Period, all Shares of Restricted Stock still subject to restriction shall be forfeited by such Participant; *provided*, *however*, that subject to Section 11(b), the Committee shall have the discretion to waive, in whole or in part, any or all remaining restrictions with respect to any or all of such Participant's Shares of Restricted Stock.

    (v) If and when any applicable Performance Goals are satisfied and the Restriction Period expires without a prior forfeiture of the Shares of Restricted Stock for which legended certificates have been issued, unlegended certificates for such Shares shall be delivered to the Participant upon surrender of the legended certificates.

11

**Section 7. Restricted Stock Units**

With respect to Adjusted Awards, the provisions below will be applicable only to the extent that they are not inconsistent with the Employee Matters Agreement and the terms of the Adjusted Award assumed under the Employee Matters Agreement:

(a)  *Nature of Awards*.  Restricted Stock Units are Awards denominated in Shares that will be settled, subject to the terms and conditions of the Restricted Stock Units, in an amount in cash, Shares or both, based upon the Fair Market Value of a specified number of Shares.

(b)  *Terms and Conditions*.  Restricted Stock Units shall be subject to the following terms and conditions:

    (i)    The Committee shall, prior to or at the time of grant, condition the grant, vesting, or transferability of Restricted Stock Units upon the continued service of the applicable Participant or the attainment of Performance Goals, or the attainment of Performance Goals and the continued service of the applicable Participant. In the event that the Committee conditions the grant or vesting of Restricted Stock Units upon the attainment of Performance Goals or the attainment of Performance Goals and the continued service of the applicable Participant, the Committee may, prior to or at the time of grant, designate such Awards as Qualified Performance-Based Awards. The conditions for grant, vesting or transferability and the other provisions of Restricted Stock Units (including without limitation any Performance Goals) need not be the same with respect to each Participant. Except as otherwise provided in Section 7(b)(iv) or in the applicable Award Agreement, an Award of Restricted Stock Units shall be settled if and when the Restricted Stock Units vest(but in no event later than two and a half months after the end of the fiscal year in which the Restricted Stock Unit vest).

    (ii)    Subject to the provisions of the Plan and the applicable Award Agreement, during the period, if any, set by the Committee, commencing with the date of such Restricted Stock Units for which such vesting restrictions apply and until the expiration of such vesting restrictions (the "*Restriction Period*"), the Participant shall not be permitted to sell, assign, transfer, pledge or otherwise encumber Restricted Stock Units.

    (iii)    The Award Agreement for Restricted Stock Units shall specify whether, to what extent and on what terms and conditions the applicable Participant shall be entitled to receive current or deferred payments of cash, Common Stock or other property corresponding to the dividends payable on the Common Stock (subject to Section 14(e) below).

    (iv)    Except as otherwise set forth in the applicable Award Agreement, upon a Participant's Termination of Employment for any reason during the Restriction Period, all Restricted Stock Units still subject to restriction shall be forfeited by such Participant; *provided*, *however*, that subject to Section 11 (b), the Committee shall have the discretion to waive, in whole or in part, any or all remaining restrictions with respect to any or all of such Participant's Restricted Stock Units, provided, however, if any of such Participant's Restricted Stock Units constitute a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, settled of such Restricted Stock Units shall not occur until the earliest of (1) the date such Restricted Stock Units would otherwise be settled pursuant to the terms of the Award Agreement or (2) the Participant's "separation of service" within the meaning of Section 409A of the Code.

**Section 8. Other Stock-Based Awards**

Other Awards of Common Stock and other Awards that are valued in whole or in part by reference to, or are otherwise based upon or settled in, Common Stock, including (without limitation),

12

unrestricted stock, performance units, dividend equivalents, and convertible debentures, may be granted under the Plan.

### Section 9. Bonus Awards

(a)  *Determination of Awards*.  The Committee shall determine the total amount of Bonus Awards for each Plan Year or such shorter performance period as the Committee may establish in its sole discretion. Prior to the beginning of the Plan Year or such shorter performance period as the Committee may establish in its sole discretion (or such later date as may be prescribed by the Internal Revenue Service under Section 162(m) of the Code), the Committee shall establish Performance Goals for Bonus Awards for the Plan Year or such shorter period; *provided*, that such Performance Goals may be established at a later date for Participants who are not "covered employees" (within the meaning of Section 162(m)(3) of the Code). Bonus amounts payable to any individual Participant with respect to a Plan Year will be limited to a maximum of $10 million. For performance periods that are shorter than a Plan Year, such $10 million maximum may be prorated if so determined by the Committee.

(b)  *Payment of Awards*.  Bonus Awards under the Plan shall be paid in cash or in shares of Common Stock (valued at Fair Market Value as of the date of payment) as determined by the Committee, as soon as practicable following the close of the Plan Year or such shorter performance period as the Committee may establish. It is intended that a Bonus Award will be paid no later than the fifteenth (15th) day of the third month following the later of: (i) the end of the Participant's taxable year in which the requirements for such Bonus Award have been satisfied by the Participant or (ii) the end of the Company's fiscal year in which the requirements for such Bonus Award have been satisfied by the Participant. The Committee may at its option establish procedures pursuant to which Participants are permitted to defer the receipt of Bonus Awards payable hereunder. The Bonus Award for any Plan Year or such shorter performance period to any Participant may be reduced or eliminated by the Committee in its discretion.

### Section 10. Change in Control Provisions

(a)  *Adjusted Awards*.  With respect to all Adjusted Awards, subject Sections 3(d), 3(e), 10(e) and 14(k) unless otherwise provided in the applicable Award Agreement, notwithstanding any other provision of this Plan to the contrary, upon a Participant's Termination of Employment, during the two-year period following a Change in Control, by the Company other than for Cause or Disability or by the Participant for Good Reason (as defined below):

    (i)     any Options outstanding as of such Termination of Employment which were outstanding as of the date of such Change in Control shall be fully exercisable and vested and shall remain exercisable until the later of (i) the last date on which such Option would be exercisable in the absence of this Section 10(a) and (ii) the earlier of (A) the first anniversary of such Change in Control and (B) expiration of the Term of such Option;

    (ii)    the restrictions and deferral limitations applicable to any Restricted Stock shall lapse, and such Restricted Stock outstanding as of such Termination of Employment which were outstanding as of the date of such Change in Control shall become free of all restrictions and become fully vested and transferable; and

    (iii)   all Restricted Stock Units outstanding as of such Termination of Employment which were outstanding as of the date of such Change in Control shall be considered to be earned and payable in full, and any restrictions shall lapse and such Restricted Stock Units shall be settled as promptly as is practicable in the form set forth in the applicable Award Agreement; provided, however, that with respect to any Restricted Stock Unit that constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, the settlement of each such Restricted Stock Unit pursuant to

13

this Section 10(a)(iii) shall not occur until the earliest of (1) the Change in Control if such change in Control constitutes a "change in the ownership of the corporation," a "change in effective control of the corporation" or a "change in the ownership of a substantial portion of the assets of the corporation," within the meaning of Section 409A(a)(2)(A)(v) of the Code, (2) the date such Restricted Stock Units would otherwise be settled pursuant to the terms of the Award Agreement and (3) the Participant's "separation of service" within the meaning of Section 409A of the Code.

(b)   *Impact of Event on Awards other than Adjusted Awards*.   Subject to paragraph (e) of this Section 10, and paragraph (d) of Section 12, unless otherwise provided in any applicable Award Agreement and except as otherwise provided in paragraph (a) of this Section 10, in connection with a Change of Control, the Committee may make such adjustments and/or settlements of outstanding Awards as it deems appropriate and consistent with the Plan's purposes, including, without limitation, the acceleration of vesting of Awards either upon a Change of Control or upon various terminations of employment following a Change of Control. The Committee may provide for such adjustments as a term of the Award or may make such adjustments following the granting of the Award.

(c)   *Definition of Change in Control*.   For purposes of the Plan, unless otherwise provided in an option agreement or other agreement relating to an Award, a "Change in Control" shall mean the happening of any of the following events:

(i)     The acquisition by any individual, entity or Group (a "*Person*"), other than the Company, of Beneficial Ownership of equity securities of the Company representing more than 50% of the voting power of the then outstanding equity securities of the Company entitled to vote generally in the election of directors (the "*Outstanding Company Voting Securities*"); *provided*, *however*, that any acquisition that would constitute a Change in Control under this subsection (i) that is also a Business Combination shall be determined exclusively under subsection (iii) below; or

(ii)    Individuals who, as of the Effective Date, constitute the Board (the "*Incumbent Directors*") cease for any reason to constitute at least a majority of the Board; *provided*, *however*, that any individual becoming a director subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by a vote of at least a majority of the Incumbent Directors at such time shall become an Incumbent Director, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(iii)   Consummation of a reorganization, merger, consolidation, sale or other disposition of all or substantially all of the assets of the Company, the purchase of assets or stock of another entity, or other similar corporate transaction (a "*Business Combination*"), in each case, unless immediately following such Business Combination, (A) more than 50% of the Resulting Voting Power shall reside in Outstanding Company Voting Securities retained by the Company's stockholders in the Business Combination and/or voting securities received by such stockholders in the Business Combination on account of Outstanding Company Voting Securities, and (B) at least a majority of the members of the board of directors (or equivalent governing body, if applicable) of the entity resulting from such Business Combination were Incumbent Directors at the time of the initial agreement, or action of the Board, providing for such Business Combination; or

(iv)   Approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

14

Notwithstanding the foregoing, the Separation shall not constitute a Change in Control. For the avoidance of doubt, with respect to Adjusted Awards, any reference in an Award Agreement or the applicable IAC Long Term Incentive Plan to a "change in control," "change of control" or similar definition shall be deemed to refer to a Change of Control hereunder.

(d)   For purposes of this Section 10, "Good Reason" means (i) "Good Reason" as defined in any Individual Agreement or Award Agreement to which the applicable Participant is a party, or (ii) if there is no such Individual Agreement or if it does not define Good Reason, without the Participant's prior written consent: (A) a material reduction in the Participant's rate of annual base salary from the rate of annual base salary in effect for such Participant immediately prior to the Change in Control, (B) a relocation of the Participant's principal place of business more than 35 miles from the city in which such Participant's principal place of business was located immediately prior to the Change in Control or (C) a material and demonstrable adverse change in the nature and scope of the Participant's duties from those in effect immediately prior to the Change in Control. In order to invoke a Termination of Employment for Good Reason, a Participant shall provide written notice to the Company of the existence of one or more of the conditions described in clauses (A) through (C) within 90 days following the Participant's knowledge of the initial existence of such condition or conditions, and the Company shall have 30 days following receipt of such written notice (the "*Cure Period*") during which it may remedy the condition. In the event that the Company fails to remedy the condition constituting Good Reason during the Cure Period, the Participant must terminate employment, if at all, within 90 days following the Cure Period in order for such Termination of Employment to constitute a Termination of Employment for Good Reason.

(e)   Notwithstanding the foregoing, if any Award is subject to Section 409A of the Code, this Section 10 shall be applicable only to the extent specifically provided in the Award Agreement and as permitted pursuant to Section 14(k).

### Section 11. Qualified Performance-Based Awards; Section 16(b)xxx

(a)   The provisions of this Plan are intended to ensure that all Options and Stock Appreciation Rights granted hereunder to any Participant who is or may be a "covered employee" (within the meaning of Section 162(m)(3) of the Code) in the tax year in which such Option or Stock Appreciation Right is expected to be deductible to the Company qualify for the Section 162(m) Exemption, and all such Awards shall therefore be considered Qualified Performance-Based Awards and this Plan shall be interpreted and operated consistent with that intention (including, without limitation, to require that all such Awards be granted by a committee composed solely of members who satisfy the requirements for being "outside directors" for purposes of the Section 162(m) Exemption ("*Outside Directors*")). When granting any Award other than an Option or Stock Appreciation Right, the Committee may designate such Award as a Qualified Performance-Based Award, based upon a determination that (i) the recipient is or may be a "covered employee" (within the meaning of Section 162(m)(3) of the Code) with respect to such Award, and (ii) the Committee wishes such Award to qualify for the Section 162(m) Exemption, and the terms of any such Award (and of the grant thereof) shall be consistent with such designation (including, without limitation, that all such Awards be granted by a committee composed solely of Outside Directors).

(b)   Each Qualified Performance-Based Award (other than an Option or Stock Appreciation Right) shall be earned, vested and payable (as applicable) only upon the achievement of one or more Performance Goals (as certified in writing by the Committee, except if compensation is attributable solely to the increase in the value of the Common Stock) (but in no event shall such Award be payable later than two and a half months after the end of the fiscal year in which the Qualified Performance-Based Award becomes earned and vested (as applicable)), together with the satisfaction of any other conditions, such as continued employment, as the Committee may determine to be appropriate, and no Qualified Performance-Based Award may be amended, nor may the Committee exercise any

15

discretionary authority it may otherwise have under this Plan with respect to a Qualified Performance-Based Award under this Plan, in any manner that would cause the Qualified Performance-Based Award to cease to qualify for the Section 162(m) Exemption; *provided*, *however*, that (i) the Committee may provide, either in connection with the grant of the applicable Award or by amendment thereafter, that achievement of such Performance Goals will be waived upon the death or Disability of the Participant or under any other circumstance with respect to which the existence of such possible waiver will not cause the Award to fail to qualify for the Section 162(m) Exemption as of the Grant Date, and (ii) the provisions of Section 10 shall apply notwithstanding this Section 11(b).

(c)   The full Board shall not be permitted to exercise authority granted to the Committee to the extent that the grant or exercise of such authority would cause an Award designated as a Qualified Performance-Based Award not to qualify for, or to cease to qualify for, the Section 162(m) Exemption.

(d)   The provisions of this Plan are intended to ensure that no transaction under the Plan is subject to (and not exempt from) the short-swing recovery rules of Section 16(b) of the Exchange Act ("*Section 16(b)*"). Accordingly, the composition of the Committee shall be subject to such limitations as the Board deems appropriate to permit transactions pursuant to this Plan to be exempt (pursuant to Rule 16b-3 promulgated under the Exchange Act) from Section 16(b), and no delegation of authority by the Committee shall be permitted if such delegation would cause any such transaction to be subject to (and not exempt from) Section 16(b).

### Section 12. Term, Amendment and Termination

(a)   *Effectiveness*.   The Plan shall be effective as of the date (the "*Effective Date*") it is adopted by the Board, subject to the approval by the holders of at least a majority of the voting power represented by outstanding capital stock of the Company that is entitled generally to vote in the election of directors.

(b)   *Termination*.   The Plan will terminate on the tenth anniversary of the Effective Date. Awards outstanding as of such date shall not be affected or impaired by the termination of the Plan.

(c)   *Amendment of Plan*.   The Board may amend, alter, or discontinue the Plan, but no amendment, alteration or discontinuation shall be made which would materially impair the rights of the Participant with respect to a previously granted Award without such Participant's consent, except such an amendment made to comply with applicable law, including without limitation Section 409A of the Code, stock exchange rules or accounting rules. In addition, no such amendment shall be made without the approval of the Company's stockholders to the extent such approval is required by applicable law or the listing standards of the Applicable Exchange.

(d)   *Amendment of Awards*.   Subject to Section 5(d), the Committee may unilaterally amend the terms of any Award theretofore granted, but no such amendment shall cause a Qualified Performance-Based Award to cease to qualify for the Section 162(m) Exemption or without the Participant's consent materially impair the rights of any Participant with respect to an Award, except such an amendment made to cause the Plan or Award to comply with applicable law, stock exchange rules or accounting rules.

### Section 13. Unfunded Status of Plan

It is presently intended that the Plan constitute an "unfunded" plan for incentive and deferred compensation. Solely to the extent permitted under Section 409A, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock or make payments; *provided*, *however*, that the existence of such trusts or other arrangements is consistent with the "unfunded" status of the Plan. Notwithstanding any other provision of this Plan to the contrary, with respect to any Award that constitutes a "nonqualified deferred

16

compensation plan" within the meaning of Section 409A of the Code, no trust shall be funded with respect to any such Award if such funding would result in taxable income to the Participant by reason of Section 409A(b) of the Code and in no event shall any such trust assets at any time be located or transferred outside of the United States, within the meaning of Section 409A(b) of the Code.

### Section 14. General Provisions

(a)  *Conditions for Issuance*.   The Committee may require each person purchasing or receiving Shares pursuant to an Award to represent to and agree with the Company in writing that such person is acquiring the Shares without a view to the distribution thereof. The certificates for such Shares may include any legend which the Committee deems appropriate to reflect any restrictions on transfer. Notwithstanding any other provision of the Plan or agreements made pursuant thereto, the Company shall not be required to issue or deliver any certificate or certificates for Shares under the Plan prior to fulfillment of all of the following conditions: (i) listing or approval for listing upon notice of issuance, of such Shares on the Applicable Exchange; (ii) any registration or other qualification of such Shares of the Company under any state or federal law or regulation, or the maintaining in effect of any such registration or other qualification which the Committee shall, in its absolute discretion upon the advice of counsel, deem necessary or advisable; and (iii) obtaining any other consent, approval, or permit from any state or federal governmental agency which the Committee shall, in its absolute discretion after receiving the advice of counsel, determine to be necessary or advisable.

(b)  *Additional Compensation Arrangements*.   Nothing contained in the Plan shall prevent the Company or any Subsidiary or Affiliate from adopting other or additional compensation arrangements for its employees.

(c)  *No Contract of Employment*.   The Plan shall not constitute a contract of employment, and adoption of the Plan shall not confer upon any employee any right to continued employment, nor shall it interfere in any way with the right of the Company or any Subsidiary or Affiliate to terminate the employment of any employee at any time.

(d)  *Required Taxes*.   No later than the date as of which an amount first becomes includible in the gross income of a Participant for federal, state, local or foreign income or employment or other tax purposes with respect to any Award under the Plan, such Participant shall pay to the Company, or make arrangements satisfactory to the Company regarding the payment of, any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount. If determined by the Company, withholding obligations may be settled with Common Stock, including Common Stock that is part of the Award that gives rise to the withholding requirement. The obligations of the Company under the Plan shall be conditional on such payment or arrangements, and the Company and its Affiliates shall, to the extent permitted by law, have the right to deduct any such taxes from any payment otherwise due to such Participant. The Committee may establish such procedures as it deems appropriate, including making irrevocable elections, for the settlement of withholding obligations with Common Stock.

(e)  *Limitation on Dividend Reinvestment and Dividend Equivalents*.   Reinvestment of dividends in additional Restricted Stock at the time of any dividend payment, and the payment of Shares with respect to dividends to Participants holding Awards of Restricted Stock Units, shall only be permissible if sufficient Shares are available under Section 3 for such reinvestment or payment (taking into account then outstanding Awards). In the event that sufficient Shares are not available for such reinvestment or payment, such reinvestment or payment shall be made in the form of a grant of Restricted Stock Units equal in number to the Shares that would have been obtained by such payment or reinvestment, the terms of which Restricted Stock Units shall provide for settlement in cash and for dividend equivalent reinvestment in further Restricted Stock Units on the terms contemplated by this Section 14(e).

17

(f)    *Designation of Death Beneficiary*.    The Committee shall establish such procedures as it deems appropriate for a Participant to designate a beneficiary to whom any amounts payable in the event of such Participant's death are to be paid or by whom any rights of such eligible Individual, after such Participant's death, may be exercised.

(g)    *Subsidiary Employees*.    In the case of a grant of an Award to any employee of a Subsidiary of the Company, the Company may, if the Committee so directs, issue or transfer the Shares, if any, covered by the Award to the Subsidiary, for such lawful consideration as the Committee may specify, upon the condition or understanding that the Subsidiary will transfer the Shares to the employee in accordance with the terms of the Award specified by the Committee pursuant to the provisions of the Plan. All Shares underlying Awards that are forfeited or canceled should revert to the Company.

(h)    *Governing Law and Interpretation*.    The Plan and all Awards made and actions taken thereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to principles of conflict of laws. The captions of this Plan are not part of the provisions hereof and shall have no force or effect.

(i)    *Non-Transferability*.    Except as otherwise provided in Section 5(j) or by the Committee, Awards under the Plan are not transferable except by will or by laws of descent and distribution.

(j)    *Foreign Employees and Foreign Law Considerations*.    The Committee may grant Awards to Eligible Individuals who are foreign nationals, who are located outside the United States or who are not compensated from a payroll maintained in the United States, or who are otherwise subject to (or could cause the Company to be subject to) legal or regulatory provisions of countries or jurisdictions outside the United States, on such terms and conditions different from those specified in the Plan as may, in the judgment of the Committee, be necessary or desirable to foster and promote achievement of the purposes of the Plan, and, in furtherance of such purposes, the Committee may make such modifications, amendments, procedures, or subplans as may be necessary or advisable to comply with such legal or regulatory provisions.

(k)    *Section 409A of the Code*.    It is the intention of the Company that no Award shall be "deferred compensation" subject to Section 409A of the Code, unless and to the extent that the Committee specifically determines otherwise as provided in this Section 14(k), and the Plan and the terms and conditions of all Awards shall be interpreted accordingly. The terms and conditions governing any Awards that the Committee determines will be subject to Section 409A of the Code, including any rules for elective or mandatory deferral of the delivery of cash or Shares pursuant thereto and any rules regarding treatment of such Awards in the event of a Change in Control, shall be set forth in the applicable Award Agreement, and shall comply in all respects with Section 409A of the Code. Notwithstanding any other provision of the Plan to the contrary, with respect to any Award that constitutes a "nonqualified deferred compensation plan" subject to Section 409A of the Code, any payments (whether in cash, Shares or other property) to be made with respect to the Award upon the Participant's Termination of Employment shall be delayed until the earlier of (A) the first day of the seventh month following the Participant's Termination of Employment if the Participant is a "specified employee" within the meaning of Section 409A of the Code and (B) the Participant's death.

(l)    *Employee Matters Agreement*.    Notwithstanding anything in this Plan to the contrary, to the extent that the terms of this Plan are inconsistent with the terms of an Adjusted Award, the terms of the Adjusted Award shall be governed by the Employee Matters Agreement, the applicable IAC Long-Term Incentive Plan and the award agreement entered into thereunder.

18

QuickLinks

[Exhibit 10.13](#)

[AMENDED AND RESTATED TREE.COM, INC. 2008 STOCK AND ANNUAL INCENTIVE PLAN](#)

EX-21.1 3 a2190858zex-21_1.htm EXHIBIT 21.1

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 21.1**

### SUBSIDIARIES OF TREE.COM, INC.

| Name | Jurisdiction of Formation |
|---|---|
| LendingTree Holdings Corp. | DE |
| LendingTree, LLC | DE |
| Home Loan Center, Inc. | CA |
| HLC Escrow, Inc. | CA |
| LendingTree Settlement Services, LLC | DE |
| LendingTree Alabama Title Services, LLC | AL |
| LT Real Estate, Inc. | DE |
| RealEstate.com Oregon, LLC | OR |
| Robin Acquisition Corp. | DE |
| iNest Realty, Inc. | IL |
| iNest Realty Minnesota, Inc. | MN |

QuickLinks

Exhibit 21.1

SUBSIDIARIES OF TREE.COM, INC.

EX-31.1 4 a2190858zex-31_1.htm EXHIBIT 31.1

<u>QuickLinks</u> -- Click here to rapidly navigate through this document

**Exhibit 31.1**

### CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
### PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify that:

1.    I have reviewed this annual report on Form 10-K for the period ended December 31, 2008 of Tree.com, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 26, 2009

/s/ DOUGLAS R. LEBDA
_____

Douglas R. Lebda
*Chairman and Chief Executive Officer*

QuickLinks

Exhibit 31.1

CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

EX-31.2 5 a2190858zex-31_2.htm EXHIBIT 31.2

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 31.2

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**
**PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE**
**SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matthew A. Packey, certify that:

1.    I have reviewed this annual report on Form 10-K for the period ended December 31, 2008 of Tree.com, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 26, 2009

/s/ MATTHEW A. PACKEY
_____

Matthew A. Packey
*Senior Vice President and*
*Chief Financial Officer*

QuickLinks

Exhibit 31.2

CERTIFICATION OF THE CHIEF FINANCIAL OFFICER PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

EX-32.1 6 a2190858zex-32_1.htm EXHIBIT 32.1

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 32.1

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1)    the Annual Report on Form 10-K for the fiscal year ended December 31, 2008 of Tree.com, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Tree.com, Inc.

Dated: February 26, 2009                           /s/ DOUGLAS R. LEBDA

Douglas R. Lebda
*Chairman and Chief Executive Officer*

QuickLinks

Exhibit 32.1

CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

EX-32.2 7 a2190858zex-32_2.htm EXHIBIT 32.2

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 32.2**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matthew A. Packey, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1)    the Annual Report on Form 10-K for the fiscal year ended December 31, 2008 of Tree.com, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Tree.com, Inc.

Dated: February 26, 2009                /s/ MATTHEW A. PACKEY

                             Matthew A. Packey
                             *Senior Vice President and*
                             *Chief Financial Officer*

QuickLinks

Exhibit 32.2

CERTIFICATION OF THE CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

# EXHIBIT 4

10-K 1 a2208170z10-k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2011**

*or*

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from                    to**

**Commission File No. 001-34063**

---

# TREE.COM, INC.
(Exact name of Registrant as specified in its charter)

| **Delaware** | **26-2414818** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**11115 Rushmore Drive, Charlotte, North Carolina 28277**
(Address of principal executive offices)

**(704) 541-5351**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Name of exchange on which registered** |
|---|---|
| Common Stock, $0.01 Par Value | The NASDAQ Stock Market |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐　No ☒

Indicated by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐　No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒　No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☒　No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☒ |
|---|---|---|---|

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐　No ☒

The aggregate market value of the voting common stock held by non-affiliates of the Registrant as of June 30, 2011 was $30,114,386. For the purposes of the forgoing calculation only, all directors and executive officers of the Registrant and third parties that own 10% or more of the voting common stock are assumed to be affiliates of the Registrant.

As of March 30, 2012, there were 11,275,136 shares of the Registrant's common stock, par value $.01 per share, outstanding.

**Documents Incorporated By Reference:**

Portions of the Registrant's proxy statement for its 2012 Annual Meeting of Stockholders are incorporated by reference into Part III herein.

# TABLE OF CONTENTS

| | | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | *Business* | 1 |
| Item 1A. | *Risk Factors* | 10 |
| Item 1B. | *Unresolved Staff Comments* | 26 |
| Item 2. | *Properties* | 26 |
| Item 3. | *Legal Proceedings* | 27 |
| Item 4. | *Mine Safety Disclosures* | 30 |
| | | |
| **PART II** | | |
| Item 5. | *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities* | 31 |
| Item 6. | *Selected Financial Data* | 32 |
| Item 7. | *Management's Discussion and Analysis of Financial Condition and Results of Operations* | 32 |
| Item 7A. | *Quantitative and Qualitative Disclosures About Market Risk* | 44 |
| Item 8. | *Financial Statements and Supplementary Data* | 45 |
| Item 9. | *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure* | 94 |
| Item 9A. | *Controls and Procedures* | 94 |
| Item 9B. | *Other Information* | 95 |
| | | |
| **PART III** | | |
| Item 10. | *Directors, Executive Officers and Corporate Governance* | 97 |
| Item 11. | *Executive Compensation* | 97 |
| Item 12. | *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters* | 97 |
| Item 13. | *Certain Relationships and Related Transactions, and Director Independence* | 97 |
| Item 14. | *Principal Accounting Fees and Services* | 97 |
| | | |
| **PART IV** | | |
| Item 15. | *Exhibits and Financial Statement Schedules* | 98 |

Table of Contents

<div align="center">PART I</div>

**Cautionary Statement Regarding Forward-Looking Information**

This annual report on Form 10-K contains "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. These forward-looking statements also include statements related to our anticipated financial performance, business prospects and strategy; anticipated trends and prospects in the various industries in which our businesses operate; new products, services and related strategies; and other similar matters. These forward-looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. The use of words such as "anticipates," "estimates," "expects," "projects," "intends," "plans" and "believes," among others, generally identify forward-looking statements.

Actual results could differ materially from those contained in the forward-looking statements. Factors currently known to management that could cause actual results to differ materially from those in forward-looking statements include those matters discussed below.

Other unknown or unpredictable factors that could also adversely affect our business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of Tree.com management as of the date of this report. We undertake no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results or expectations, except as required by law.

**Item 1.   Business**

**History and Overview**

Tree.com is the parent of LendingTree, LLC and is the parent of several companies owned by LendingTree, LLC, including Home Loan Center, Inc. LendingTree, Inc. was incorporated in the state of Delaware in June 1996 and commenced nationwide operations in July 1998. LendingTree, Inc. was acquired by IAC/InterActiveCorp in 2003 and converted to a Delaware limited liability company (LendingTree, LLC) in December 2004. On August 20, 2008, Tree.com, Inc. (along with its subsidiary, LendingTree, LLC) was spun off from IAC/InterActiveCorp into a separate publicly-traded company. We refer to the separation transaction as the "spin-off." Tree.com was incorporated as a Delaware corporation in April 2008, in anticipation of the spin-off.

Tree.com is the owner of several brands and businesses that provide information, tools, advice, products and services for critical transactions in consumers' lives. Our family of brands includes: LendingTree.com®, GetSmart®, DegreeTree.com®, LendingTreeAutos.com, DoneRight.com®, ServiceTree.com®, InsuranceTree.com<sup>SM</sup> and HealthTree.com®. Together, these brands serve as an ally for consumers who are looking to comparison shop for loans, real estate and other services from multiple businesses and professionals who will compete for their business. We refer to the collection of these brands and businesses as our Exchanges business, which comprises our continuing operations, as detailed herein.

Our wholly-owned subsidiary Home Loan Center, Inc. dba LendingTree Loans®, which we refer to as HLC or LendingTree Loans, processes, approves and funds various consumer mortgage loans on a principal basis. On May 12, 2011, we entered into a definitive agreement to sell substantially all of the operating assets of HLC, as detailed herein, and, as such, its operations are treated as discontinued operations.

<div align="center">1</div>

Table of Contents

As further discussed below, we made numerous strategic changes to our business in 2011. We exited and divested our Real Estate business and entered into an agreement to sell substantially all of the operating assets of LendingTree Loans. We took these steps in an effort to tighten our business focus on what we believe to be our core competency as a branded performance marketer (see "Exchanges Overview" below).

On March 10, 2011, our management made the decision and finalized a plan to close all of the field offices of the proprietary full-service real estate brokerage business known as RealEstate.com, REALTORS®, which was previously reported within our Real Estate reporting segment. We exited all markets by March 31, 2011. In September 2011, we sold the remaining assets of RealEstate.com, which consisted primarily of internet domain names and trademarks, for $8.3 million and recognized a gain on sale of $7.8 million. Accordingly, the businesses of RealEstate.com and RealEstate.com, REALTORS® (which together represented the former Real Estate segment) are presented as discontinued operations in our consolidated financial statements for all periods.

On May 12, 2011, we entered into an asset purchase agreement with Discover Bank, a wholly-owned subsidiary of Discover Financial Services, providing for the sale of substantially all of the operating assets of HLC to Discover Bank. We refer to Discover Financial Services and/or any of its affiliates, including Discover Bank, as "Discover." On February 7, 2012, we entered into an amendment to this asset purchase agreement. Under the terms of the asset purchase agreement as amended, Discover will pay approximately $55.9 million in cash for the assets, subject to certain conditions. See "Business—Pending Sale of Substantially all Operating Assets of LendingTree Loans" below. The transaction is expected to close by mid-year 2012 and is subject to various closing conditions. Subject to certain exceptions stated in the asset purchase agreement, we have agreed to operate the LendingTree Loans business in the ordinary course until the closing of the transaction.

Through the quarter ended March 31, 2011, we operated in two reportable business segments: LendingTree Loans and Exchanges. In connection with entering into the asset purchase agreement for the sale of substantially all of the operating assets of our LendingTree Loans business, we determined that the LendingTree Loans business should be presented as discontinued operations. Our continuing operations are now one reportable segment, which represents the previous Exchanges segment.

## Exchanges

### Overview

In our Exchanges business, we operate as a branded performance marketer. In this capacity, we serve as an ally to consumers who are looking to make informed purchase decisions and comparison shop for loans and other important transactions, which we refer to as considered purchases. We do so by providing consumers with a broad array of information and tools free of charge, conveniently located on our various websites. In addition, we provide them with access to offers from multiple providers who can compete for their business, through a single inquiry form or application. We also serve as a valued partner to businesses seeking customer acquisition support services whose benefits are directly measurable, by matching the consumer inquiries we generate with these businesses.

Through our strategically designed and executed advertising and marketing campaigns promoting our various brands, we attract consumers to our websites and toll-free telephone numbers, many of whom provide detailed information about themselves and the products or services they are seeking. We refer to such consumer inquiries as leads. We then match these leads with businesses seeking to serve these consumers' needs. In so doing, we generate revenue from these businesses, generally at the time of transmitting a lead to them.

At its inception, our original business was to serve consumers seeking home mortgage loans by matching them with various lenders. We launched the LendingTree brand nationally in 1998 and, over

2

Table of Contents

the last fourteen years, we believe this brand has gained widespread consumer recognition. Beginning in 2009, we sought to expand the range of services we provided by leveraging the "Tree" element of the LendingTree brand to attract consumer inquiries for products and services in other industries. Currently, in addition to mortgage, we are focused primarily on the education industry, where we promote our DegreeTree.com® brand, the automotive industry, where we promote our LendingTreeAutos.com brand and the home services industry, where we promote our DoneRight.com® and ServiceTree brands. We believe that consumers will have a higher propensity to utilize our various services by virtue of their Tree-branded associations than those of other providers whose brands consumers may not recognize.

Going forward, in addition to operating our core mortgage lead generation business, we intend to focus increasingly on growing our existing non-mortgage businesses as well as seeking to penetrate new industry verticals. We intend to capitalize on our expertise in performance marketing and leverage the Tree element of our widely recognized LendingTree brand to pursue this strategy.

### Our Lending Network

Consumers seeking home mortgage loans can access our nationwide network of more than 150 banks, lenders and loan brokers online (via *www.lendingtree.com* or *www.getsmart.com*) or by calling 1-800-555-TREE. We refer to these banks, lenders and loan brokers as our Network Lenders. Loan products offered by Network Lenders consist primarily of home mortgages (in connection with refinancings and purchases) and home equity loans.

We select lenders throughout the country in an effort to provide full geographic lending coverage and to offer a complete suite of loan offerings available in the market. Typically, before a lender joins our Network, we perform credit and financial reviews on the lender. In addition, as a further quality assurance measure, we check new lenders against a national antifraud database maintained by the Mortgage Asset Research Institute. All Network Lenders are required to enter into a contract that generally may be terminated upon notice by either party. No individual Network Lender accounted for more than 10% of the Exchanges revenue in any period.

Consumers seeking mortgage loans through Tree.com's lending network can receive multiple conditional loan offers from Network Lenders, and/or from LendingTree Loans, in response to a single loan request form.

We refer to the process by which we match consumers and Network Lenders the matching process. This matching process consists of the following steps:

- **Credit Request.** Consumers complete a single loan request form with information regarding their income, assets and liabilities, loan preferences and other data. Consumers also consent to the retrieval of their credit report.

- **Loan Request Form Matching and Transmission.** Tree.com's proprietary systems and technology match a given consumer's loan request form data, credit profile and geographic location against certain pre-established creditworthiness criteria of Network Lenders, which may be modified from time to time. Once a given loan request passes through the matching process, the loan request is automatically transmitted to up to five available Network Lenders.

- **Lender Evaluation and Response.** Network Lenders who receive a loan request form evaluate the information contained in it to determine whether to make a conditional loan offer. If a given number of Network Lenders do not respond with a conditional loan offer, the loan request form is directed through the matching process a second time in an attempt to match the consumer with another Network Lender.

3

Table of Contents

- **Communication of a Conditional Offer.** If one or more Network Lenders make a conditional offer, the consumer is automatically notified via e-mail to return to our website and log in to a web page that presents their customized loan offers (My Account). Through the My Account web page, consumers may access and compare the proposed terms of each conditional offer, including interest rates, closing costs, monthly payment amounts, lender fees and other information. If a consumer does not have access to e-mail, conditional offers are provided to the consumer by phone or fax.

- **Loan Processing.** Consumers may then work offline with relevant Network Lenders to provide property information and additional information bearing on their creditworthiness. If a Network Lender approves a consumer's application, it may then underwrite and originate a loan.

- **Ongoing Consumer and Lender Support.** Active e-mail and telephone follow-up and support are provided to both Network Lenders and consumers during the loan transaction process. This follow-up and support is designed to provide technical assistance and increase overall satisfaction of Network Lenders, as well as increase the percentage of consumers who close a loan through our Network Lenders.

Our lending network also offers a short-form matching process which provides consumers with lender contact information rather than conditional offers from Network Lenders. This short-form process typically requires consumers to submit less data than required in connection with the matching process described above.

Our lending network does not charge fees to consumers. Substantially all revenues from our lending network are derived from up-front matching fees paid by Network Lenders who receive a loan request form. Previously, Network Lenders also paid closing fees when they closed a transaction with a consumer, but this closing fee was eliminated in 2011 for all products, with the exception of home equity loans. Because a given loan request form can be matched with more than one Network Lender, up to five match fees may be generated from a single loan request form. Matching fees are recognized at the time a loan request form is transmitted, while closing fees are recognized at the time a Network Lender reports that it has closed a loan, which may be up to several months after a given loan request form is transmitted to Network Lenders.

### *Non-Mortgage Exchanges*

*Education*

We offer referrals to more than 60 top-tier institutions for prospective students seeking institutions of higher education. Supported programs range from associate degrees to doctorate degrees. Our education websites provide information and a variety of resources related to educational opportunities for prospective students.

*Automobile*

We offer automobile loans for both new automobile purchases and existing automobile refinancing. We also offer prospective automobile buyers the opportunity to search for new and used automobiles through access to more than 1,700 dealerships.

*Home Services*

We offer opportunities for consumers to find home improvement professional services through our network of both national and local contractors. We have national coverage in the top-30 most popular home improvement categories and a network of more than 750 local professionals. Through our alliances with third parties, we are able to connect consumers with home service professionals in more than 2,000 locations across the United States. In addition, more than ten million copies of our printed

4

Table of Contents

DoneRight! Directory® of pre-screened home services professionals have been distributed nationwide since its inception.

*Other Products*

Our Exchanges also offer:

- unsecured loans, through which consumers are matched with multiple lenders using a network-based process similar to the mortgage loan matching process described above;

- various consumer insurance products, pursuant to which consumers are linked with licensed insurance agents and insurance lead aggregators to obtain insurance offers, and

- credit cards, through which consumers can search various credit card offerings through a third-party vendor.

Revenues from these businesses are generally derived from matching and/or closing fees. Revenues from our non-mortgage businesses represented approximately 30% of our total 2011 revenues.

*Competition*

Our Exchanges compete with other lead aggregators, including online intermediaries that operate network-type arrangements. Our Exchanges also face additional competition from direct lending websites owned and operated by other online lenders that primarily originate loans through their websites or by phone. These companies typically operate consumer-branded websites and attract consumers via online banner ads, key word placement on search engines, partnering with affiliates, and business development arrangements with other properties, including major online portals.

**LendingTree Loans**

LendingTree Loans originates, processes, approves and funds various consumer mortgage loans through our subsidiary, HLC, which operates primarily under the brand name LendingTree Loans®. LendingTree Loans is able to provide a broad range of mortgage loan offerings to consumers in all fifty states and the District of Columbia, consisting primarily of conforming and prime loans, and, to a lesser extent, non-conforming and FHA loans. Products available include both adjustable and fixed rate loans. In June 2011, LendingTree Loans consolidated its operations into its offices in California and Kentucky, closing its Florida, Indiana and Tennessee offices.

LendingTree Loans® branded loan originations are principally derived from consumer loan requests received through our lending Exchanges. A portion of all consumer loan request forms received through these channels are matched with LendingTree Loans. LendingTree Loans offers those consumers a choice among various loan alternatives, with loan pricing generally based upon different wholesale offerings received by LendingTree Loans from the secondary market investors who purchase the loans. LendingTree Loans maintains controls to ensure that its consumer loan pricing correlates to secondary market pricing and to ensure that its consumers receive multiple loan alternatives, thus maintaining the competition and choice elements inherent in the LendingTree brand. Tree.com believes that LendingTree Loans provides value to consumers who do not wish to negotiate with multiple lenders, but still wish to obtain multiple loan alternatives.

LendingTree Loans® branded loans are funded and closed using proceeds from borrowings under available warehouse lines of credit. Substantially all of the loans funded are sold, along with the accompanying loan servicing rights, to investors in the secondary market, generally within 30 days of funding, with the proceeds from such sales being used to repay borrowings under the warehouse lines of credit. For terms of our warehouse lines of credit, see "Management's Discussion and Analysis of

5

Table of Contents

Financial Condition and Results of Operations—Financial Position, Liquidity and Capital Resources" below.

Although most of HLC Inc.'s consumer leads are sourced through our lending exchanges and originated under the LendingTree Loans® brand, a small portion of HLC's leads are sourced from a variety of non-LendingTree channels, including third-party online lead aggregators, direct mail marketing campaigns and LendingTree Loans' website, *www.homeloancenter.com*. When obtaining leads from third-party sources, HLC operates under its traditional name and brand (Home Loan Center). Consumers who request loans through the Home Loan Center brand typically receive single loan offers. Home Loan Center branded loans are funded, closed and sold into the secondary market in the same manner, and on substantially the same terms, as LendingTree Loans® branded loans.

Revenues from direct lending operations are principally derived from the sale of loans to secondary market investors and from origination and other fees paid by borrowers. Of HLC's six secondary market investors in 2011, the three largest, Wells Fargo, JPMorgan Chase and Bank of America, represented approximately 44%, 33% and 17%, respectively, of LendingTree Loan's revenues in 2011. Bank of America ceased purchasing loans from us in November 2011 in connection with its planned departure from the correspondent lending business. See "Risk Factors—Risks Associated with Discontinued Operations—We depend on relationships with credit providers and secondary market investors and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations" below.

On March 15, 2011, HLC completed its acquisition of certain assets of First Residential Mortgage Network, Inc. dba SurePoint Lending. SurePoint, a LendingTree network lender for eleven years, was a full-service residential mortgage provider licensed in 45 states and employing over 500 people, including more than 300 licensed loan officers. HLC purchased certain specified assets and assumed certain liabilities of SurePoint related to its business of originating, refinancing, processing, underwriting, funding and closing residential mortgage loans; providing title and escrow services; and providing other mortgage related services. The acquired assets also included all of the equity interests of Real Estate Title Services, LLC. HLC paid $8.0 million in cash upon the closing of the transaction, subject to certain adjustments, and $0.2 million in cash for contingent consideration subsequent to the close. We used available cash to fund the acquisition.

### Competition

We believe that the primary competitors of LendingTree Loans are traditional lending institutions, including those that are developing or already operate their own direct, online lending channels. While these financial institutions do not operate lending networks, they process, close and fund loans as direct lenders through well-recognized, national brands, many of which are industry leaders. LendingTree Loans faces additional competition from direct lending websites owned and operated by other online lenders that originate the bulk of their loans through their websites or by phone. These companies typically operate consumer-branded websites and attract consumers via online banner ads, key word placement on search engines and/or partnering with affiliates and business development arrangements with other properties, including major online portals.

### Pending Sale of Substantially all Operating Assets of LendingTree Loans

On May 12, 2011, we entered into an asset purchase agreement with Discover. On February 7, 2012, we entered into an amendment to the asset purchase agreement. The asset purchase agreement provides for the sale of substantially all of the operating assets of our LendingTree Loans business to Discover for approximately $55.9 million in cash.

Under the original agreement, LendingTree Loans or Discover could terminate the agreement if closing did not occur on or before October 9, 2011, subject to certain extension rights, including

6

Table of Contents

Discover's right to require (through the making of extension payments) up to four additional 30-day extensions beyond November 8, 2011 in certain circumstances. To date, Discover has exercised all four extensions, making a total of $5 million in extension payments. All extension payments will be credited against the portion of the purchase price payable at closing. Under the terms of the amendment, Discover could elect to further extend the end date to July 6, 2012, without making further extension payments, subject to certain conditions. Discover made that election on March 6, 2012.

Of the total purchase price of approximately $55.9 million, $5 million will be paid via credit for the extension payments. $3 million was paid on March 6, 2012, $37.9 million is due upon the closing of the transaction and $10 million is due on the first anniversary of the closing. $7 million of the purchase price payment due at closing and the $10 million post-closing payment are subject to certain conditions, including without limitation maintenance through such payment dates of the LendingTree Exchanges and certain financial and operational metrics associated with the LendingTree Exchanges business. As of the date of this report, we have complied with all such financial and operational metrics. $3 million of the purchase price due at closing may be offset for liquidated damages if a key employee does not commence employment with Discover upon the closing. Such employee has accepted an offer letter with Discover and has agreed with us to commence service with Discover upon the closing unless prevented from doing so by death or disability.

Discover generally will not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets included in the purchase. A portion of the initial purchase price payment, currently estimated to be $19 million, will be held in escrow pending the discharge of any then-existing and/or certain future contingent liabilities related to loans sold to secondary market investors that will remain with us. We plan to negotiate with those parties to settle any existing and future continent liabilities, but we cannot assure you we will be able to do so on terms acceptable to us, or at all.

Our stockholders approved the transaction on August 26, 2011.

The transaction is subject to various closing conditions, including the receipt of regulatory approvals by Discover.

The asset purchase agreement, as amended, contains customary representations, warranties, covenants and indemnification obligations of the parties. The assertions embodied in those representations and warranties are made solely for purposes of the asset purchase agreement and may be subject to important qualifications and limitations agreed to by the parties in connection with the negotiated terms of the asset purchase agreement. Moreover, some of those representations and warranties may have only been true at a certain date, may be subject to a contractual standard of materiality or may have been used for purposes of allocating risk between us and Discover rather than establishing matters of facts. Our stockholders are not third party beneficiaries under the asset purchase agreement and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or conditions of our company or of Discover.

The asset purchase agreement, as amended, also includes customary covenants of us and Discover. Subject to certain exceptions stated in the asset purchase agreement, we have agreed to operate the LendingTree Loans business in the ordinary course until the closing of the transaction. Our covenants include requirements to maintain personnel in our LendingTree Loans business, to maintain certain quality thresholds for our loan pipeline, and subject to certain exceptions, not to introduce new loan products without Discover's consent. Subject to certain exceptions, we have also agreed not to solicit or initiate discussion with third parties regarding other proposals to acquire the assets of the LendingTree Loans business or substantial equity interests in our company, and to certain restrictions on our ability to respond to or accept any such proposals.

7

Table of Contents

The asset purchase agreement, as amended, also includes customary termination provisions, including that each of our company and Discover may terminate the asset purchase agreement if the other party has materially breached any representation, warranty or covenant contained in the asset purchase agreement and failed to cure such breach, or if the closing has not occurred prior to July 6, 2012. We must pay Discover a fee of $2.2 million if we or Discover terminate the asset purchase agreement because the closing has not occurred on or before July 6, 2012, and prior to such termination, a written acquisition proposal is proposed or publicly disclosed, and concurrently with or within 12 months following the termination of the agreement, we enter into a definitive agreement for, or consummate, an acquisition proposal with the party that made an acquisition proposal prior to termination of the agreement. We will not be obligated to pay such termination fee if Discover has not obtained required regulatory approval as of the date of termination.

We have also agreed to perform certain services for Discover over a term ending approximately seventeen months following the closing, or such earlier point as the agreed-upon services are satisfactorily completed. Discover has also agreed that it or its affiliate will be a participating lender in the LendingTree Network following the closing of the acquisition.

The transaction is expected to close mid-year 2012.

## Regulation and Legal Compliance

Our businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States (see "Risk Factors—Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations"). As a result, they are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, including:

- Restrictions on the amount and nature of fees or interest that may be charged in connection with a loan, in particular, state usury and fee restrictions;

- Restrictions imposed by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") and current or future rules promulgated thereunder, including limitations on fees charged by mortgage lenders;

- Restrictions on the manner in which consumer loans are marketed and originated, including the making of required consumer disclosures, such as the federal Truth-in-Lending Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the federal Fair Housing Act, the federal Real Estate Settlement Procedures Act (RESPA), and similar state laws;

- Restrictions on the amount and nature of fees that may be charged to lenders and real estate professionals for providing or obtaining consumer leads, in particular, RESPA;

- Restrictions on the amount and nature of fees that may be charged to consumers for real estate brokerage transactions, including any incentives and rebates that may be offered to consumers by Tree.com businesses;

- State, and in some instances, federal, licensing or registration requirements applicable to both individuals or businesses engaged in the making or brokerage of loans (or certain kinds of loans, such as loans made pursuant to the Federal Housing Act), or the brokering of real estate transactions; and

- State and federal restrictions on the marketing activities conducted by telephone, the mail, by email, or over the internet, including the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and its accompanying regulations and guidelines.

Table of Contents

**Intellectual Property**

We believe that our intellectual property rights are vital to our success. To protect our intellectual property rights in our technology, products, improvements and inventions, we rely on a combination of patents, trademarks, trade secret and other laws, and contractual restrictions on disclosure, including confidentiality agreements with strategic partners, employees, consultants and other third parties. As new or improved proprietary technologies are developed or inventions are identified, we seek patent protection in the United States and abroad as appropriate. We have two issued U.S. patents relating to our technologies, including those relating to the method and network for coordinating a loan over the internet. Our various patents expire in 2018. We also have four pending U.S. patent applications.

Many of our services are offered under proprietary trademarks and service marks. We generally apply to register or secure by contract our principal trademarks and service marks as they are developed and used. We have 37 trademarks and service marks registered with the United States Patent and Trademark Office. These registrations can typically be renewed at 10-year intervals. We reserve and register domain names when and where we deem appropriate and we currently have approximately 2,000 registered domain names. We also have agreements with third parties that provide for the licensing of patented and proprietary technology used in our business.

From time to time, we are subjected to legal proceedings and claims, or threatened legal proceedings or claims, including allegations of infringement of third party trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, the use of litigation may be necessary for us to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. See Item 3 below.

**Employees**

As of December 31, 2011, we had approximately 135 employees in our Exchanges business, of which approximately 130 are full-time and 5 are part-time. We had approximately 700 employees in our LendingTree Loans business, of which approximately 695 are full-time and 5 are part-time. None of our employees are represented under collective bargaining agreements and we consider our relations with employees and independent contractors to be good.

**Seasonality**

Revenue is subject to the cyclical and seasonal trends of the U.S. housing market. Home sales typically rise during the spring and summer months and decline during the fall and winter months, while refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values. However, in recent periods the broader cyclical trends in the mortgage and real estate markets have upset the customary seasonal trends.

**Additional Information**

*Website and Public Filings.*    We maintain a website at *www.tree.com*. None of the information on our website is incorporated by reference in this report, or in any other filings with, or in any information furnished or submitted to, the SEC.

9

Table of Contents

We make available, free of charge through our website, our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K (including related amendments) and beneficial ownership reports on Forms 3, 4 and 5 as soon as reasonably practicable after they have been electronically filed with, or furnished to, the SEC.

*Code of Business Conduct and Ethics.* Our code of business conduct and ethics, which applies to all employees, including all executive officers and senior financial officers and directors, is posted on our website at *investor-relations.tree.com/governance.cfm*. The code of business conduct and ethics complies with Item 406 of SEC Regulation S-K and the rules of The NASDAQ Stock Market. Any amendments to or waivers of the code of business conduct and ethics that are of the type described in Item 406(b) and (d) of Regulation S-K, and any waivers of Tree.com's code of business conduct and ethics for our executive officers, directors or senior financial officers, will also be disclosed on our website.

## Item 1A. *Risk Factors*

Our business, financial condition and results of operations are subject to certain risks that are described below.

### Risks Associated with Continuing Operations

*We have incurred significant operating losses in the past, and we may not be able to generate sufficient revenue to be profitable over the long term.*

We have incurred significant net operating losses for the last four fiscal years, and as of December 31, 2011, we had an accumulated deficit of $858.1 million. In order to become profitable, we need to grow revenue while keeping expenses contained to maintain or improve our margins. If we fail to grow our revenue and to manage our expenses, we may continue to incur significant losses in the future and not be able to achieve or maintain profitability.

*Adverse conditions in the primary and secondary mortgage markets, as well as the economy generally, could materially and adversely affect our business, financial condition and results of operations.*

The primary and secondary mortgage markets have been experiencing continued disruption, which has in the past had, and may in the future have, an adverse effect on our business, financial condition and results of operations. These conditions, coupled with adverse economic conditions and continuing declines in residential real estate prices generally, have resulted in and are expected to continue to result in decreased demand for purchase loans and greater difficulty qualifying for refinance and home equity loans. Generally, increases in interest rates adversely affect the ability of the Network Lenders to close loans, and adverse economic trends limit the ability of the lending networks and Network Lenders to offer home loans other than low margin conforming loans. Our businesses may experience a decline in demand for their offerings due to decreased consumer demand as a result of the conditions described above now or in the future. Conversely, during periods of robust consumer demand, which are typically associated with decreased interest rates, Network Lenders have less incentive to use our networks, or in the case of sudden increases in consumer demand, our Network Lenders may lack the ability to support sudden increases in volume.

*Difficult market conditions have adversely affected the mortgage industry.*

Declines in the housing market since 2008, with falling home prices and increasing foreclosures, unemployment and under-employment, have negatively impacted the credit performance of mortgage loans and resulted in significant write-downs of asset values by financial institutions, including government-sponsored entities as well as major commercial and investment banks. These write-downs, initially of mortgage-backed securities but spreading to other asset-backed securities, credit default

10

Table of Contents

swaps and other derivative and cash securities, in turn, have caused many financial institutions to seek additional capital, to merge with larger and stronger institutions and, in some cases, to fail.

Reflecting concern about the stability of the housing markets generally and the strength of counterparties, many lenders and institutional investors have reduced or ceased providing funding to borrowers, including to other financial institutions. This market disruption and tightening of credit have led to an increased level of commercial and consumer delinquencies, lack of consumer confidence and increased market volatility. The resulting economic pressure on consumers and lack of confidence in the financial markets may have an adverse effect on our business, financial condition and results of operations.

We do not expect that the difficult conditions in the housing markets will improve materially in the near future. A worsening of these conditions would likely exacerbate the adverse effects of these difficult market conditions on us and our Network Lenders. Further, our business could be adversely affected by the actions and commercial soundness of other businesses in the financial services sector. As a result, defaults by, or even rumors or questions about, one or more of these entities, or the financial services industry generally, have led to market-wide liquidity problems and could lead to losses or defaults by us or by other institutions. Any such losses or defaults could have an adverse effect on our business, financial condition and results of operations.

***Our financial results fluctuate as a result of seasonality, which may make it difficult to predict our future performance and may affect our common stock price.***

Our business is historically subject to seasonal trends. These trends reflect the general patterns of housing sales, which typically peak in the spring and summer seasons. However, in recent periods, the broader cyclical trends in the mortgage and real estate markets have upset the customary seasonal trends, but seasonal trends may resume and our quarterly operating results may fluctuate, which may negatively impact the price of our common stock.

***Litigation and indemnification of secondary market purchasers could have a material adverse effect on our business, financial condition, results of operations and liquidity. If we cannot settle any then-existing and certain future contingent liabilities to secondary market purchasers, a substantial portion of the purchase price for the sale of LendingTree Loans' assets will remain in escrow indefinitely.***

In connection with the sale of loans to secondary market purchasers, HLC makes certain representations regarding related borrower credit information, loan documentation and collateral. To the extent that these representations are incorrect, HLC may be required to repurchase loans or indemnify secondary market purchasers for losses due to borrower defaults. In connection with the sale of loans to secondary market purchasers, HLC also agrees to repurchase loans or indemnify secondary market purchasers for losses due to early payment defaults (*i.e.,* late payments during a limited time period immediately following HLC's origination of the loan). In connection with the sale of a majority of its loans to secondary market purchasers, HLC also agrees to repay all or a portion of the initial premiums paid by secondary market purchasers in instances where the borrower prepays the loan within a specified period of time. HLC has made payments for these liabilities in the past and expects to make payments for these in the future.

We will continue to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of our LendingTree Loans business to Discover. A portion of the initial purchase price to be paid by Discover, currently estimated to be $19 million, will be held in escrow pending resolution of certain of these contingent liabilities. We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities, but we cannot assure you we will be able to do so on terms acceptable to us, or at all. The occurrence of indemnification claims, repurchase obligations or premium repayments beyond our reserves for these contingencies, or our inability to settle with

11

Table of Contents

secondary market purchasers, may have a material adverse effect on our business, financial condition and results of operations.

***We depend on relationships with Network Lenders, and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

Our success depends, in significant part, on the quality and pricing of services provided by, and/or the continued financial stability of, Network Lenders participating on our networks. Network Lenders could, for any reason, cease participating on the networks operated by (or otherwise choose not to enter into relationships with) our businesses, fail to pay matching and/or closing fees when due and/or cease providing quality services on competitive terms. The occurrence of one or more of these events with a significant number of Network Lenders could, alone or in combination, have a material adverse effect on our business, financial condition and results of operations.

***Network Lenders affiliated with our networks are not precluded from offering products and services outside of our networks.***

Because our businesses do not have exclusive relationships with Network Lenders, consumers may obtain loans directly from these third-party service providers without having to use our networks. Network Lenders can offer loans directly to consumers through marketing campaigns or other traditional methods of distribution, such as referral arrangements, physical store-front operations or broker agreements. Network Lenders can also offer loans and services to prospective customers online directly, through one or more online competitors of our businesses, or both. If a significant number of consumers seek loans and services directly from Network Lenders as opposed to through our networks, our business, financial condition and results of operations would be adversely affected.

***We may not have an increase in the demand for leads necessary to absorb the increase in the supply of leads for sale after the sale of substantially all of the operating assets of LendingTree Loans.***

We currently transmit a substantial portion of the consumer mortgage inquiries generated through our Exchanges to LendingTree Loans. These leads are generally provided to LendingTree Loans on an exclusive basis, meaning that we do not make them available for sale to Network Lenders. Following the completion of the sale of substantially all operating assets of LendingTree Loans, which is anticipated to occur by mid-year 2012, all consumer mortgage inquiries generated through our Exchanges will be made available to Network Lenders, where such leads may each be matched with up to five Network Lenders.

To the extent there is not a sufficient increase in demand from existing or new Network Lenders participating on our Exchanges to absorb the increased supply of leads that will be made available following the sale of assets of LendingTree Loans, our business and future results of operations could be materially and adversely affected.

It is currently contemplated that the purchasing entity will become a participating Network Lender on our Exchanges immediately following acquisition of LendingTree Loans assets. However, the purchasing entity will be under no obligation to purchase any leads from our lending networks at any time. To the extent the purchasing entity does elect to purchase leads from us, each purchase would only represent one match for any given lead. Our business model for the lending networks requires us generally to match each lead with multiple lenders.

All consumer mortgage inquiries generated by our toll-free phone numbers are currently transmitted to LendingTree Loans. We have not finalized our plans for servicing and generating revenues from such consumer inquiries following the sale of substantially all of the operating assets of LendingTree Loans. There are various business, operational, legal, regulatory and other considerations associated with these activities, and we may not be able to operate the telephone Exchange profitably, if at all following such sale. Our failure to do so would adversely affect our revenues and the efficiency

12

Table of Contents

of our marketing expenditures, which could have a material adverse effect on our business, financial condition and results of operations.

***Our non-mortgage Exchanges are new to the market and may fail to achieve or maintain customer acceptance and profitability.***

An increasing percentage of our revenue is derived from our non-mortgage Exchanges, including our education, automobile and home services Exchanges. For the year ended December 31, 2011, revenues from non-mortgage Exchanges represented 30% of our revenues. We expect our non-mortgage Exchanges to experience lower margins than our lending networks for the foreseeable future.

The success of our Exchanges and other new products we may offer will depend on a number of other factors, including:

- implementing at an acceptable cost product features expected by consumers and lead purchasers;

- market acceptance by consumers and lead purchasers;

- offerings by current and future competitors;

- our ability to attract and retain management and other skilled personnel for these Exchanges;

- our ability to develop successful and cost-effective marketing campaigns; and

- our ability to scale marketing expense to changes in demand for the underlying products and services offered by our lead purchasers.

Our business may suffer if we fail to successfully anticipate and manage these issues associated with our non-mortgage Exchanges.

***We rely on the performance of highly skilled personnel, and if we are unable to attract, retain and motivate well-qualified employees, our business could be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our management team and our highly skilled employees, including our software engineers, statisticians, marketing professionals and sales staff. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially adversely affect our ability to build on the efforts they have undertaken and to execute our business plan, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business and results of operations could be harmed.

***A breach of our network security or the misappropriation or misuse of personal consumer information may have an adverse impact on our business, financial condition and results of operations.***

Any penetration of network security or other misappropriation or misuse of personal consumer information maintained by us or our third party marketing partners could cause interruptions in the operations of our businesses and subject us to increased costs, litigation and other liabilities. Claims could also be made against us or our third party marketing partners for other misuse of personal information, such as for unauthorized purposes or identity theft, which could result in litigation and financial liabilities, as well as administrative action from governmental authorities. Security breaches could also significantly damage our reputation with consumers and third parties with whom we do business. In that regard, in 2008, we announced that several mortgage companies had gained unauthorized access to our customer information database and had used the information to solicit mortgage loans directly from our customers. We promptly reported the situation to the Federal Bureau of Investigation and have been cooperating fully with the FBI's investigation. While we do not believe

13

Table of Contents

this situation resulted in any fraud on the consumer or identity theft, we notified affected consumers as required by applicable law. Notwithstanding the foregoing, following our announcement, several putative class action lawsuits were filed against us, seeking to recover damages for consumers allegedly injured by this incident. All of these lawsuits have been dismissed or withdrawn (see "Legal Proceedings" below).

We may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. We also face risks associated with security breaches affecting third parties with which we are affiliated or otherwise conduct business online. Consumers are generally concerned with security and privacy of the Internet, and any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

***Network Lenders and lead purchasers in our other Exchanges may not provide competitive levels of service to consumers, which could adversely affect our brands and businesses and their ability to attract consumers.***

The ability of our businesses to provide consumers with a high-quality experience depends, in part, on consumers receiving competitive levels of convenience, customer service, price and responsiveness from Network Lenders and lead purchasers participating on our other Exchanges with whom they are matched. If these providers do not provide consumers with competitive levels of convenience, customer service, price and responsiveness, the value of our various brands may be harmed, the ability of our businesses to attract consumers to our websites may be limited and the number of consumers matched through our Exchanges may decline, which could have a material adverse effect on our business, financial condition and results of operations.

***Failure to maintain brand recognition and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.***

In order to attract visitors to our websites, convert these visitors into leads for our Network Lenders and lead purchasers on our other Exchanges and generate repeat visits from consumers, our businesses must promote and maintain their various brands successfully. This requires the expenditure of considerable money and resources for online and offline advertising, marketing and related efforts, as well as the continued provision and introduction of high-quality products and services.

Brand recognition is a key differentiating factor among providers of online services. We believe that continuing to build and maintain the recognition of our various brands is critical to achieving increased demand for the services provided by our businesses. Accordingly, we have spent, and expect to continue to spend, significant amounts of operating capital on, and devote significant resources to, branding, advertising and other marketing initiatives, which may not be successful or cost-effective. The failure of our businesses to maintain the recognition of their respective brands and attract and retain customers in a cost-effective manner would adversely affect our business, financial condition and results of operations.

Adverse publicity from legal proceedings against us or our businesses, including governmental proceedings and consumer class action litigation or from the disclosure of information security breaches, could negatively impact our various brands, which could adversely affect our business, financial condition and results of operations. In addition, the actions of our third party marketing partners who engage in advertising on our behalf could negatively impact our various brands.

14

Table of Contents

*We depend on search engines and other online sources to attract visitors to our websites, and if we are unable to attract these visitors and convert them into leads for our Network Lenders and lead purchasers in other Exchanges in a cost-effective manner, our business and financial results may be harmed.*

Our success depends on our ability to attract online consumers to our websites and convert them into customers in a cost-effective manner. We depend, in part, on search engines and other online sources for our website traffic. We are included in search results as a result of both paid search listings, where we purchase specific search terms that will result in the inclusion of our listing, and algorithmic searches that depend upon the searchable content on our sites. Search engines and other online sources revise their algorithms from time to time in an attempt to optimize their search results.

If one or more of the search engines or other online sources on which we rely for website traffic were to modify its general methodology for how it displays our websites, resulting in fewer consumers clicking through to our websites, our business, financial condition and results of operations could suffer. If any free search engine on which we rely begins charging fees for listing or placement, or if one or more of the search engines or other online sources on which we rely for purchased listings, modifies or terminates its relationship with us, our expenses could rise, we could lose customers and traffic to our websites could decrease, all of which could have a material adverse effect on our business, financial condition and results of operations.

*If we are unable to continually enhance our products and services and adapt them to technological changes and customer needs, including the emergence of new computing devices and more sophisticated online services, we may lose market share and revenue and our business could suffer.*

We need to anticipate, develop and introduce new products, services and applications on a timely and cost-effective basis that keeps pace with technological developments and changing customer needs. For example, the number of individuals who access the internet through devices other than a personal computer, such as personal digital assistants, mobile telephones, televisions and set-top box devices has increased significantly, and this trend is likely to continue. Our websites were designed for rich, graphical environments such as those available on desktop and laptop computers. The lower resolution, functionality and memory associated with alternative devices currently available may make the access and use of our websites through such devices difficult. Because each manufacturer or distributor may establish unique technical standards for its devices, our websites may not be functional or viewable on these devices. Additionally, new devices and new platforms are continually being released. Accordingly, it is difficult to predict the problems we may encounter in improving our websites' functionality with these alternative devices, and we may need to devote significant resources to the improvement, support and maintenance of our websites. If we fail to develop our websites to respond to these or other technological developments and changing customer needs cost effectively, we may lose market share, which could adversely affect our business, financial condition and results of operations.

*Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations.*

Our Exchanges businesses market and provide services in heavily regulated industries through a number of different channels across the United States. As a result, our businesses have and remain subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, which are subject to change at any time. The failure of our businesses to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could result in administrative fines and/or proceedings against us or our businesses by governmental agencies and/or litigation by consumers, which could adversely affect our business, financial condition and results of operations and our brand.

Our businesses conduct marketing activities via the telephone, the mail and/or through online marketing channels, which general marketing activities are governed by numerous federal and state

15

Table of Contents

regulations, such as the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and its accompanying regulations and guidelines, among others.

Additional federal, state and in some instances, local, laws regulate residential lending activities. These laws generally regulate the manner in which lending and lending-related activities are marketed or made available, including advertising and other consumer disclosures, payments for services and record keeping requirements; these laws include the Real Estate Settlement Procedures Act (RESPA), the Fair Credit Reporting Act, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act and various state laws. State laws often restrict the amount of interest and fees that may be charged by a lender or mortgage broker, or otherwise regulate the manner in which lenders or mortgage brokers operate or advertise.

Failure to comply with applicable laws and regulatory requirements may result in, among other things, revocation of or inability to renew required licenses or registrations, loss of approval status, termination of contracts without compensation, administrative enforcement actions and fines, private lawsuits, including those styled as class actions, cease and desist orders and civil and criminal liability.

Most states require licenses to solicit, broker or make loans secured by residential mortgages and other consumer loans to residents of those states, as well as to operate real estate referral and brokerage services, and in many cases require the licensure or registration of individual employees engaged in aspects of these businesses. In 2008, Congress mandated that all states adopt certain minimum standards for the licensing of individuals involved in mortgage lending or loan brokering, and many state legislatures and state agencies are in the process of adopting or implementing additional licensing, continuing education, and similar requirements on mortgage lenders, brokers and their employees. Compliance with these new requirements may render it more difficult to operate or may raise our internal costs. While our businesses have endeavored to comply with applicable requirements, the application of these requirements to persons operating online is not always clear. Moreover, any of the licenses or rights currently held by our businesses or our employees may be revoked prior to, or may not be renewed upon, their expiration. In addition, our businesses or our employees may not be granted new licenses or rights for which they may be required to apply from time to time in the future.

Likewise, states or municipalities may adopt statutes or regulations making it unattractive, impracticable or infeasible for our businesses to continue to conduct business in such jurisdictions. The withdrawal from any jurisdiction due to emerging legal requirements could adversely affect our business, financial condition and results of operations.

Our businesses are also subject to various state, federal and/or local laws, rules and regulations that regulate the amount and nature of fees that may be charged for transactions and incentives, such as rebates, that may be offered to consumers by our businesses, as well as the manner in which these businesses may offer, advertise or promote transactions. For example, RESPA generally prohibits the payment or receipt of referral fees and fee shares or splits in connection with residential mortgage loan transactions, subject to certain exceptions. The applicability of referral fee and fee sharing prohibitions to lenders and real estate providers, including online networks, may have the effect of reducing the types and amounts of fees that may be charged or paid in connection with real estate-secured loan offerings or activities, including mortgage brokerage, lending and real estate brokerage services, or otherwise limiting the ability to conduct marketing and referral activities.

Various federal, state and in some instances, local, laws also prohibit unfair and deceptive sales practices. We have adopted appropriate policies and procedures to address these requirements (such as appropriate consumer disclosures and call scripting, call monitoring and other quality assurance and compliance measures), but it is not possible to ensure that all employees comply with our policies and procedures at all times.

16

6/10/2020

08-13555-mg Doc 57441-3 Filed 04/01/21 Entered 04/00/21 14:33:20 Exhibit

Table of Contents

Complaint    Pg 449 of 1033

Compliance with these laws, rules and regulations is a significant component of our internal costs, and new laws, rules and regulations are frequently proposed and adopted, requiring us to adopt new procedures and practices.

Parties through which our businesses conduct business similarly may be subject to federal and state regulation. These parties typically act as independent contractors and not as agents in their solicitations and transactions with consumers. We cannot ensure that these entities will comply with applicable laws and regulations at all times. Failure on the part of a lender, secondary market purchaser, website operator or other third party to comply with these laws or regulations could result in, among other things, claims of vicarious liability or a negative impact on our reputation and businesses.

Regulatory authorities and private plaintiffs may allege that we failed to comply with applicable laws, rules and regulations where we believe we have complied. These allegations may relate to past conduct and/or past business operations, such as our discontinued real estate brokerage operations (which was subject to various state and local laws, rules and regulations). Even allegations that our activities have not complied or do not comply with all applicable laws and regulations may have an adverse effect on our business, financial condition and results of operations. Such allegations typically require legal fee expenditures to defend. We have in the past and may in the future decide to settle allegations of non-compliance with laws, rules and regulations when we determine that the cost of settlement is less than the cost and risk of continuing to defend against an allegation. Settlements may require us to pay monetary fines and may require us to adopt new procedures and practices, which may render it more difficult to operate or may raise our internal costs. The future occurrence of one or more of these events could have an adverse effect on our business, financial condition and results of operations.

***The Dodd-Frank Wall Street Reform and Consumer Protection Act and related legislative and regulatory actions may have a significant impact on our business, results of operations and financial condition.***

In July 2010, the President signed into law the Dodd-Frank Act, which contains a comprehensive set of provisions designed to govern the practices and oversight of financial institutions and other participants in the financial markets. The Dodd-Frank Act requires various federal agencies to adopt a broad range of new rules and regulations, and to prepare numerous studies and reports for Congress, which could result in additional legislative or regulatory action. The federal agencies are given significant discretion in drafting the rules and regulations, and consequently, many of the details and much of the impact of the Dodd-Frank Act may not be known for many months or years.

The Dodd-Frank Act, as well as other legislative and regulatory changes, could have a significant impact on us by, for example, requiring us to change our business practices, limiting our ability to pursue business opportunities, imposing additional costs on us, limiting fees we can charge, impacting the value of our assets, or otherwise adversely affecting our businesses. Among other things, the Dodd-Frank Act established the Bureau of Consumer Financial Protection to regulate consumer financial services and products, including credit, savings and payment products. The effect of the Dodd-Frank Act on our business and operations could be significant, depending upon final implementing regulations, the actions of our competitors and the behavior of other marketplace participants. In addition, we may be required to invest significant management time and resources to address the various provisions of the Dodd-Frank Act and the numerous regulations that are required to be issued under it.

In light of recent conditions in the U.S. financial markets and economy, as well as a heightened regulatory and Congressional focus on consumer lending, regulators have increased their scrutiny of the financial services industry, the result of which has included new regulations and guidance. We are unable to predict the long-term impact of this enhanced scrutiny. We are also unable to predict whether any additional or similar changes to statutes or regulations, including the interpretation or implementation thereof, will occur in the future.

17

Table of Contents

***If Network Lenders fail to produce required documents for examination by, or other affiliated parties fail to make certain filings with, state regulators, Tree.com may be subject to fines, forfeitures and the revocation of required licenses.***

Some of the states in which our businesses maintain licenses require them to collect various loan documents from Network Lenders and produce these documents for examination by state regulators. While Network Lenders are contractually obligated to provide these documents upon request, these measures may be insufficient. Failure to produce required documents for examination could result in fines, as well as the revocation of our businesses' licenses to operate in key states, which could have a material adverse effect on our business, financial condition and results of operations.

Regulations promulgated by some states may impose compliance obligations on directors, executive officers, large customers and any person who acquires a certain percentage (for example, 10% or more) of our common stock, including requiring such persons to periodically file financial and other personal and business information with state regulators. If any such person refuses or fails to comply with these requirements, our businesses may be unable to obtain a license, and existing licensing arrangements may be jeopardized. The inability to obtain, or the loss of, required licenses could have a material adverse effect on our business, financial condition and results of operations.

***Our success depends, in part, on the integrity of our systems and infrastructures. System interruption and the lack of integration and redundancy in these systems and infrastructures may have an adverse impact on our business, financial condition and results of operations.***

Our success depends, in part, on our ability to maintain the integrity of our systems and infrastructures, including websites, information and related systems, call centers and distribution and fulfillment facilities. System interruption and the lack of integration and redundancy in our information systems and infrastructures may adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. We may experience occasional system interruptions that make some or all systems or data unavailable or prevent our businesses from efficiently providing services or fulfilling orders. We also rely on affiliate and third-party computer systems, broadband and other communications systems and service providers in connection with the provision of services generally, as well as to facilitate, process and fulfill transactions. Any interruptions, outages or delays in our systems and infrastructures, our businesses, our affiliates and/or third parties, or deterioration in the performance of these systems and infrastructures, could impair the ability of our businesses to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, acts of war or terrorism, acts of God, unauthorized intrusions or computer viruses, and similar events or disruptions may damage or interrupt computer, broadband or other communications systems and infrastructures at any time. Any of these events could cause system interruption, delays and loss of critical data, and could prevent our businesses from providing services, fulfilling orders and/or processing transactions. While our businesses have backup systems for certain aspects of their operations, these systems are not fully redundant and disaster recovery planning is not sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these adverse events were to occur, it could adversely affect our business, financial condition and results of operations.

***The collection, processing, storage, use and disclosure of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights.***

In the processing of consumer transactions, our businesses receive, transmit and store a large volume of personally identifiable information and other user data. The collection, sharing, use, disclosure and protection of this information are governed by the privacy and data security policies maintained by us and our businesses. Moreover, there are federal, state and international laws

18

Table of Contents

regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data. Specifically, personally identifiable information is increasingly subject to legislation and regulations in numerous jurisdictions around the world, the intent of which is to protect the privacy of personal information that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if legislation or regulations are expanded to require changes in business practices or privacy policies, or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations.

Our businesses may also become exposed to potential liabilities as a result of differing views on the privacy of consumer and other user data collected by these businesses. Our failure, and/or the failure by the various third party vendors and service providers with which we do business, to comply with applicable privacy policies or federal, state or similar international laws and regulations or any compromise of security that results in the unauthorized release of personally identifiable information or other user data could damage the reputation of these businesses, discourage potential users from our products and services and/or result in fines and/or proceedings by governmental agencies and/or consumers, one or all of which could adversely affect our business, financial condition and results of operations.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.***

We regard our intellectual property rights, including patents, service marks, trademarks and domain names, copyrights, trade secrets and similar intellectual property (as applicable), as critical to our success. Our businesses also rely heavily upon software codes, informational databases and other components that make up their products and services.

We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use trade secrets or copyrighted intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

We have generally registered and continue to apply to register, or secure by contract when appropriate, our principal trademarks and service marks as they are developed and used, and reserve and register domain names when and where we deem appropriate. We generally consider the protection of our trademarks to be important for purposes of brand maintenance and reputation. While we vigorously protect our trademarks, service marks and domain names, effective trademark protection may not be available or may not be sought in every country in which products and services are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names and limit our ability to control marketing on or through the Internet using our various domain names or otherwise, which could adversely affect our business, financial condition and results of operations.

We have been granted patents and we have patent applications pending with the United States Patent and Trademark Office and various foreign patent authorities for various proprietary technologies and other inventions. The status of any patent involves complex legal and factual questions, and the breadth of claims allowed is uncertain. Accordingly, any patent application filed may not result in a patent being issued or existing or future patents may not be adjudicated valid by a court or be afforded adequate protection against competitors with similar technology. In addition, third parties may create

19

Table of Contents

new products or methods that achieve similar results without infringing upon patents that we own. Likewise, the issuance of a patent to us does not mean that our processes or inventions will be found not to infringe upon patents or other rights previously issued to third parties.

From time to time, in the ordinary course of business we are subjected to legal proceedings, claims and counterclaims, or threatened legal proceedings, claims or counterclaims, including allegations of infringement of the trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. Patent litigation tends to be particularly protracted and expensive.

***Our framework for managing risks may not be effective in mitigating our risk of loss.***

Our risk management framework seeks to mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, legal and compliance risk, and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures and reporting requirements. Management of our risks in some cases depends upon the use of analytical and/or forecasting models. If the models that we use to mitigate these risks are inadequate, we may incur increased losses. In addition, there may be risks that exist, or that develop in the future, that we have not appropriately anticipated, identified or mitigated. If our risk management framework does not effectively identify or mitigate our risks, we could suffer unexpected losses and could be materially adversely affected.

***Acquisitions or strategic investments that we pursue may not be successful and could disrupt our business and harm our financial condition.***

We may consider or undertake strategic acquisitions of, or material investments in, businesses, products, portfolios of loans or technologies. We may not be able to identify suitable acquisition or investment candidates, or even if we do identify suitable candidates, they may be difficult to finance, expensive to fund and there is no guarantee that we can obtain any necessary regulatory approvals or complete the transactions on terms that are favorable to us. To the extent we pay the purchase price of any acquisition or investment in cash, it would reduce our cash balances and regulatory capital, which may have an adverse effect on our business and financial condition. If the purchase price is paid with our stock, it would be dilutive to our stockholders. In addition, we may assume liabilities associated with a business acquisition or investment, including unrecorded liabilities that are not discovered at the time of the transaction, and the repayment of those liabilities may have an adverse effect on our financial condition.

We may not be able to successfully integrate the personnel, operations, businesses, products or technologies of an acquisition or investment. Integration may be particularly challenging if we enter into a line of business in which we have limited experience and the business operates in a difficult legal, regulatory or competitive environment. We may find that we do not have adequate operations or expertise to manage the new business. The integration of any acquisition or investment may divert management's time and resources from our core business, which could impair our relationships with our current employees, customers and strategic partners and disrupt our operations. Acquisitions and investments also may not perform to our expectations for various reasons, including the loss of key personnel or customers. If we fail to integrate acquisitions or investments or realize the expected benefits, we may lose the return on these acquisitions or investments or incur additional transaction costs and our business and financial condition may be harmed as a result.

20

Table of Contents

*The market price and trading volume of our common stock may be volatile and may face negative pressure.*

The market price for our common stock has been volatile since our spin-off. The market price for our common stock could continue to fluctuate significantly for many reasons, including the risks identified in this report or reasons unrelated to our performance. These factors may result in short or long-term negative pressure on the value of our common stock.

*If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for internet lead-generation companies depends in part on the research and reports that securities or industry analysts publish about the industry and specific companies. If one or more analysts covering us currently or in the future fail to publish reports on us regularly, demand for our common stock could decline, which could cause our stock price and trading volume to decline. If one or more recognized securities or industry analysts that cover our company or our industry in the future downgrades our common stock or publishes inaccurate or unfavorable research about our business or industry, our stock price would likely decline.

*We have identified material weaknesses in our internal control over financial reporting, and we may be unable to develop, implement and maintain appropriate controls in future periods.*

We have identified material weaknesses in our internal control over financial reporting, and as a result of such weaknesses, our management, with the participation of our principal executive officer and principal financial officer, concluded that our disclosure controls and procedures were not effective as of December 31, 2011. The material weaknesses relate to the maintenance of effective controls over the application and monitoring of our accounting for income taxes and the maintenance of effective controls over the timing and amount of impairment of our indefinite-lived intangible assets.

With respect to our controls over the application and monitoring of accounting of our accounting for income taxes, we did not have controls designed and in place to ensure effective oversight of the work performed by, and the accuracy of, financial information provided by third party tax advisors. This material weakness was identified in connection with our assessment of the effectiveness of internal control over financial reporting as of December 31, 2010, and was determined not to have been remediated as of December 31, 2011.

With respect to our controls over the timing and amount of impairment of our indefinite-lived intangible assets, we did not have controls designed and in place to ensure appropriate levels of review over the methodology and complex and judgmental business and valuation assumptions in accordance with generally accepted valuation techniques that were used in our indefinite-lived intangible assets impairment tests during 2011. As a result of this deficiency, management's interim indefinite-lived intangible assets impairment test in the second quarter of 2011 indicated no impairment, and such result led to the performance of an annual impairment test as of October 1, 2011 using improper data inputs, including the starting carrying value of the trade name and trademark assets and the assumed royalty rate, which in turn led to an initial indication of impairment as of October 1, 2011 that was significantly below the $29.0 impairment later determined to exist as of the end of the second quarter of 2011. We have restated our second and third quarter 2011 results of operations and financial position to reflect the $29.0 million impairment charge occurring in the second quarter. See Note 4—Goodwill and Intangible Assets and Note 17—Quarterly Results (Unaudited) to the consolidated financial statements included in this report and "Controls and Procedures" below.

Until remediated, these material weaknesses could result in material misstatements to our interim or annual consolidated financial statements and disclosures that may not be prevented or detected on a timely basis. In addition, we may be unable to meet our reporting obligations or comply with SEC rules

21

and regulations, which could result in the violation of covenants in our warehouse lines, delisting actions by the NASDAQ Stock Market and investigation and sanctions by regulatory authorities. Any of these results could adversely affect our business and the trading price of our common stock.

***Two holders of our common stock own a substantial portion of our outstanding common stock, which concentrates voting control and limits your ability to influence corporate matters.***

As of February 1, 2012, Douglas Lebda, our Chairman and Chief Executive Officer, and Liberty Interactive Corporation beneficially own approximately 20% and 25%, respectively, of our outstanding common stock. Liberty Interactive also has the right to appoint one or more directors under the Spinco Agreement dated May 13, 2008 among IAC/InterActiveCorp and Liberty Interactive and certain others, Liberty Interactive has the right to nominate 20% of the total number of directors serving on the board, rounded up. Liberty Interactive has nominated one director, Mark Sanford, and presently has the right to nominate a second director if it chooses to do so.

Therefore, for the foreseeable future, Mr. Lebda and Liberty Interactive will each have influence over our management and affairs and all matters requiring shareholder approval, including the election or removal (with or without cause) of directors and approval of any significant corporate transaction, such as a merger or other sale of us or our assets. This concentrated control could delay, defer or prevent a change of control, merger, consolidation, takeover or other business combination involving us that other stockholders may otherwise support. This concentrated control could also discourage a potential investor from acquiring our common stock and might harm the market price of our common stock.

***Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of us more difficult, limit attempts by shareholders to replace or remove our management, and affect the market price of our common stock.***

Provisions in our certificate of incorporation and bylaws, as amended and restated, may have the effect of delaying or preventing a change of control or changes in our management. Our amended and restated articles of incorporation and/or amended and restated bylaws include provisions that:

- authorize our board of directors to issue, without further action by our shareholders, up to five million shares of undesignated preferred stock;

- prohibit cumulative voting in the election of directors;

- provide that vacancies on our board of directors may be filled only by the affirmative vote of a majority of directors then in office or by the sole remaining director;

- provide that only our board of directors may change the size of our board of directors;

- specify that special meetings of our stockholders may be called only by or at the direction of our board of directors or by a person specifically designated with such authority by the board; and

- prohibit stockholders from taking action by written consent.

The provisions described above may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for the stockholders to replace members of our board of directors, which is responsible for appointing our management. In addition, because we are incorporated in the State of Delaware, we are governed by the provisions of the Delaware General Corporation Law, which prohibits certain business combinations between us and certain significant shareholders unless specified conditions are met. These provisions may also have the effect of delaying or preventing a change of control of our company, even if stockholders support such a change of control.

22

Table of Contents

**Risks Associated with the Sale of Substantially
All of the Operating Assets of our LendingTree Loans Business**

*The sale of LendingTree Loans assets to Discover may not be completed unless important conditions to the closing are satisfied.*

Completion of the transaction with Discover is subject to certain conditions, including receipt of regulatory approvals. If these conditions are not satisfied or waived (to the extent permitted by law), the transaction may be delayed or may not occur, and we could lose some or all of the intended benefits of the transaction, which could have a material adverse effect on our business, results of operations or financial condition. Discover may not receive the applicable regulatory approvals, or governmental authorities may impose conditions upon the completion of the transaction or require changes in the terms of the transaction. These conditions or changes could result in the termination of the asset purchase agreement or could have the effect of delaying the completion of the transaction or imposing additional costs, which could have a material adverse effect on our business, results of operations or financial condition. For more information on the conditions to the closing, see "Business—Pending Sale of Substantially all Operating Assets of LendingTree Loans" above.

*The failure to complete the pending sale of LendingTree Loans assets may result in a decrease in the market value of our common stock and limit our ability to grow and implement our business strategies.*

If the pending sale of LendingTree Loans' assets is not completed, we may be subject to a number of risks, including the following:

- we may not be able to identify an alternate transaction. If an alternate transaction is identified, such alternate transaction may not result in an equivalent price to what is proposed in the transaction;

- the trading price of our common stock may decline to the extent that the current market price reflects a market assumption that the transaction will be completed;

- our relationships with our customers, suppliers and employees may be damaged and our business may be harmed; and

- we may be required to pay Discover a termination fee of $2.2 million.

The occurrence of any of these events individually or in combination could have a material adverse effect on our business, financial condition and results of operation and the market value of our common stock may decline.

Additionally, we have incurred substantial transaction costs and diversion of management resources in connection with the pending sale of LendingTree Loans assets, and we will continue to do so until the closing. If the pending sale of LendingTree Loans' assets is not completed, we will not be entitled to receive any further payments from Discover.

*If the pending sale of LendingTree Loans assets closes, we may not receive the full $55.9 million purchase price. The pending sale of LendingTree Loans assets creates uncertainty about our future, which could have a material adverse effect on our business, financial condition and results of operations.*

The pending sale of LendingTree Loans assets creates uncertainty about our future. As a result of this uncertainty, our current or potential business partners may decide to delay, defer or cancel entering into new business arrangements with us pending completion or termination of the pending sale of LendingTree Loans assets. In addition, while the transaction is pending, we are subject to a number of risks, including:

- the diversion of management and employee attention from our day-to-day business;

23

Table of Contents

- the potential disruption to business partners and other service providers;

- the loss of employees who may depart due to their concern about losing their jobs following the transaction; and

- our possible inability to respond effectively to competitive pressures, industry developments and future opportunities.

The occurrence of any of these events individually or in combination could have a material adverse effect on our business, financial condition and results of operation.

*The asset purchase agreement limits our ability to pursue alternatives to the LendingTree Loans asset sale transaction.*

The asset purchase agreement contains provisions that make it more difficult for us to sell the LendingTree Loans business to a party other than Discover. These provisions include a non-solicitation provision and provisions obligating us to pay Discover a termination fee of $2.2 million under certain circumstances. These provisions could discourage a third party that might have an interest in acquiring all of or a significant part of the LendingTree Loans business from considering or proposing such an acquisition, even if that party were prepared to pay consideration with a higher value than the consideration to be paid by Discover.

*The asset purchase agreement may expose us to contingent liabilities.*

Under the asset purchase agreement, we have agreed to indemnify Discover for a breach or inaccuracy of any representation, warranty or covenant made by us in the asset purchase agreement, for any liability of ours that is not being assumed, for any claims by our stockholders against Discover and for our failure to comply with any applicable bulk sales law, subject to certain limitations. Significant indemnification claims by Discover could have a material adverse effect on our financial condition.

*We cannot compete in the business of originating, funding or selling of mortgages for three years from the date of closing.*

Subject to specified exceptions, we have agreed we will not establish, own, manage, operate, control, invest in or otherwise engage in the business of origination, funding or sales of mortgages within the United States for three years from the date of closing. Should market conditions or our strategic direction change, we will not be able to re-establish mortgage lending as part of our business during the restricted period.

*If the asset purchase agreement is terminated and prior to such termination a written acquisition proposal is proposed or publicly announced, we may have to pay Discover a fee of $2.2 million if we later consummate the transaction with a party that made such proposal. The requirement to pay such termination fee may discourage third parties from submitting an acquisition proposal.*

Under the terms of the asset purchase agreement, we must pay Discover a fee of $2.2 million if we or Discover terminate the asset purchase agreement because the closing has not occurred on or before July 6, 2012, prior to such termination, a written acquisition proposal is proposed or publicly disclosed, and concurrently with or within 12 months following the termination of the agreement, we enter into a definitive agreement for, or consummate, an acquisition proposal with the party that made an acquisition proposal prior to termination of the agreement. The requirement that we pay Discover the $2.2 million termination fee may discourage third parties from submitting an acquisition proposal.

24

**Risks Associated with Discontinued LendingTree Loans Operations**

*Adverse conditions in the credit markets could materially and adversely affect our business, financial condition and results of operations.*

The credit markets, in particular those financial institutions that provide warehouse financing and similar arrangements to mortgage lenders, have been experiencing continued disruptions resulting from instability in the mortgage and housing markets. LendingTree Loans originates, processes, approves and funds various consumer mortgage loans through HLC, which operates primarily under the brand name "LendingTree Loans®." These direct lending operations have significant financing needs that are currently being met through borrowings under warehouse lines of credit or repurchase agreements to fund and close loans, followed by the sale of substantially all loans funded to investors in the secondary mortgage markets. Current credit market conditions, such as significantly reduced and limited availability of credit, increased credit risk premiums for certain market participants increase the cost and reduce the availability of debt and may continue for a prolonged period of time or worsen in the future.

As of the date of this report, LendingTree Loans had three committed lines of credit totaling $325.0 million of borrowing capacity. One warehouse line with $125.0 million of borrowing capacity expires on the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) April 25, 2012, a second warehouse line with $100.0 million of borrowing capacity expires on the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) August 20, 2012, and a third warehouse line with $100.0 million of borrowing capacity expires on the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) January 4, 2013. Each of these warehouse lines may be terminated by the lender in certain circumstances. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid using proceeds from the sales of loans by LendingTree Loans. At December 31, 2011, there was $197.7 million outstanding under the lines of credit. See "Financial Position, Liquidity and Capital Resources" below for more information on our warehouse lines.

Although we believe that our existing lines of credit are adequate for our current operations, further reductions in our available credit, or the inability to extend, renew or replace these lines before completion of the pending sale of LendingTree Loans assets, could have an adverse effect on our business, financial condition and results of operations. These financial institutions providing warehouse lines of credit to LendingTree Loans are, like all financial institutions, are susceptible to adverse market conditions, which may affect their decisions to reduce or renew these lines or the pricing for these lines. As a result, current warehouse lines of credit may be reduced or not renewed, and alternative financing may be unavailable or inadequate to support our operations or the cost of such alternative financing may not allow LendingTree Loans to operate at profitable levels. Because LendingTree Loans is highly dependent on the availability of credit to finance its operations, the current credit market conditions could have an adverse effect on our business, financial condition and results of operations, particularly over the next few years. In addition, Discover may terminate the asset purchase agreement if, we fail to make a payment when due with respect to any indebtedness outstanding under any warehouse agreement, we breach any other agreement, condition or covenant relating to such indebtedness, or we obtain a waiver of any breach of or failure to satisfy any agreement, condition or covenant contained in such agreement without the prior written consent of Discover, subject to certain exceptions.

25

Table of Contents

*Adverse conditions in the secondary mortgage markets could materially and adversely affect our business, financial condition and results of operations.*

The secondary mortgage markets have been experiencing continued disruptions resulting from reduced investor demand for mortgage loans and mortgage-backed securities and increased investor yield requirements for those loans and securities. For example, Bank of America, one of our three largest secondary market purchasers during 2011, announced in August 2011 its intent to sell its correspondent lending business and ceased purchasing loans from us in November 2011. These conditions may continue for a prolonged period of time or worsen in the future. We do not have the capital resources or credit necessary to retain the loans that LendingTree Loans funds and closes and, as a result, we sell substantially all such loans within 30 days of funding. Accordingly, a prolonged period of secondary market illiquidity could force LendingTree Loans to significantly reduce the volume of loans that it originates and funds, which could have an adverse effect on our business, financial condition and results of operations.

*We depend on relationships with credit providers and secondary market investors, and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.*

Our success depends, in significant part, on the quality and pricing of services provided by, and/or the continued financial stability of, credit providers and secondary market investors. Credit providers and/or secondary market investors could, for any reason, choose not to make credit available to (or otherwise enter into relationships with) us, and in the case of secondary market investors only, cease purchasing loans from us. In particular, revenues attributable to purchases of loans by three such entities, Wells Fargo, JPMorgan Chase and Bank of America, represented approximately 44%, 33% and 17%, respectively, of LendingTree Loans' revenues in 2011. Bank of America ceased purchasing loans from us in November 2011 in connection with its planned departure from the correspondent lending business. Credit providers and secondary loan purchasers may be reluctant to continue to do business with us because of the pending sale of substantially all of the operating assets of LendingTree Loans to Discover. Disruption of any of these relationships could, alone or in combination, have a material adverse effect on our business, financial condition and results of operations.

*Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations.*

As employers, our businesses are subject to federal and state employment laws. In particular, the Fair Labor Standards Act and California wage and hour laws govern the treatment of "non-exempt" employees, which may include loan officers, underwriters, and loan processors at Home Loan Center, Inc. Failure to comply with applicable employment laws may result in, among other things, administrative fines, class action lawsuits, damages awards and injunctions, any of which could adversely affect our business, financial condition and results of operations.

**Item 1B.** *Unresolved Staff Comments*

Not applicable.

**Item 2.** *Properties*

Our principal executive offices, together with certain personnel and operations of our Exchanges business, are currently located in approximately 38,000 square feet of office space in Charlotte, North Carolina, approximately 3,300 square feet of office space in Burlingame, California, and approximately 3,100 square feet of office space in Broomfield, Colorado, under leases that expire through 2015. The operations of LendingTree Loans are currently located in approximately 95,000 square feet of office

26

Table of Contents

space in Irvine, California, and approximately 15,000 square feet of office space in Louisville, Kentucky, under leases that expire through 2015. The leases in Irvine and Louisville will be assumed by Discover upon closing of the pending sale of LendingTree Loans assets.

## Item 3. *Legal Proceedings*

In the ordinary course of business, we are party to litigation involving property, contract, intellectual property and a variety of other claims. The amounts that may be recovered in such matters may be subject to insurance coverage.

### Privacy/Information Security Litigation

*Constance Spinozzi v. LendingTree, LLC, No. 3:08-cv-229 (U.S. Dist. Ct., W.D.N.C.); Sylvia Carson v. LendingTree, LLC, No. 3:08-cv-247 (U.S. Dist. Ct., W.D.N.C.); Mitchell v. Home Loan Center, Inc., No. 08-303-RJC (U.S. Dist. Ct., W.D. N.C.); Miller v. LendingTree, LLC, No. 08cv2300 (U.S. Dist. Ct., N.D. Ill.); Marvin Garcia v. LendingTree, LLC, No. 08 Civ. 4551 (U.S. Dist. Ct., S.D.N.Y.); Amy Bercaw v. LendingTree, LLC, No. SACV08-660 (U.S. Dist. Ct., C.D. Cal.); Shaver v. LendingTree, LLC, et al., SACV08-755 (U.S. Dist. Ct. C.D. Cal.); and Bradley v. LendingTree, LLC, et al., SACV08-755 (U.S. Dist. Ct. C.D. Cal.).* The foregoing putative class actions arose out of LendingTree's April 21, 2008 announcement that unauthorized persons had gained access to non-public information relating to its customers. Plaintiffs alleged that LendingTree is a "consumer reporting agency" within the meaning of the federal Fair Credit Reporting Act (FCRA) and had violated FCRA by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports. Plaintiffs also asserted claims for negligence, breach of implied contract, invasion of privacy and misappropriation of confidential information. Plaintiffs purported to represent all LendingTree customers affected by the information security breach, and sought damages, attorneys' fees and injunctive relief. The cases were transferred for consistent pre-trial treatment into *In re LendingTree, LLC Customer Data Security Breach Litigation* in the Western District of NC Charlotte Division, and the court ordered each case to individual arbitration. The *Carson* case was arbitrated on an individual (non-class) basis and a decision was issued in favor of LendingTree in April 2010. Following this decision, certain of the Plaintiffs in the *Bercaw* case withdrew their filings. Each of the other cases was dismissed on July 8, 2010. On January 13, 2011, Plaintiff in the *Carson* case filed an appeal with the United States Court of Appeals for the Fourth Circuit; on November 17, 2011, the Court of Appeals affirmed the District Court's order compelling arbitration and the arbitration decision in favor of LendingTree. Plaintiffs did not petition the Supreme Court for review by the February 15, 2012 deadline.

### Intellectual Property Litigation

*LendingTree v. Zillow, Inc., et al. Civil Action No. 3:10-cv-439.* On September 8, 2010, the Company filed an action for patent infringement in the US District Court for the Western District of NC against Zillow, Inc., Nextag, Inc., Quinstreet, Inc., Quinstreet Media, Inc., and Adchemy, Inc. The complaint was amended to include Leadpoint, Inc. d/b/a Securerights on September 24, 2010. The Company alleges that each of the defendants infringe one or both of the Company's patents—U.S. Patent No. 6,385,594, entitled "Method and Computer Network for Co-Ordinating a Loan over the Internet," and U.S. Patent No. 6,611,816, entitled "Method and Computer Network for Co-Ordinating a Loan over the Internet." Collectively, the asserted patents cover computer hardware and software used in facilitating business between computer users and multiple lenders on the internet. The defendants in this action have asserted various counterclaims against the Company, including the assertion by certain of the defendants of counterclaims alleging illegal monopolization via our maintenance of the asserted patents. The Company intends to vigorously defend all such counterclaims. In July 2011, the Company reached a settlement agreement with Leadpoint, Inc. On July 20, 2011, all claims against Leadpoint, Inc. and all counter-claims against the Company by Leadpoint, Inc. were dismissed.

27

Table of Contents

**Other Litigation**

*Boschma v. Home Loan Center, Inc., No. SACV07-613 (U.S. Dist. Ct., C.D. Cal.).*     On May 25, 2007, Plaintiffs filed this putative class action against HLC in the U.S. District Court for the Central District of California. Plaintiffs allege that HLC sold them an option "ARM" (adjustable-rate mortgage) loan but failed to disclose in a clear and conspicuous manner, among other things, that the interest rate was not fixed, that negative amortization could occur and that the loan had a prepayment penalty. Based upon these factual allegations, Plaintiffs asserted violations of the federal Truth in Lending Act (the "TILA"), violations of the UCL, breach of contract, and breach of the covenant of good faith and fair dealing. Plaintiffs purport to represent a class of all individuals who between June 1, 2003 and May 31, 2007 obtained through HLC an option ARM loan on their primary residence located in California, and seek rescission, damages, attorneys' fees and injunctive relief. Plaintiffs have not yet filed a motion for class certification. Plaintiffs have filed a total of eight complaints in connection with this lawsuit. Each of the first seven complaints has been dismissed by the federal and state courts. Plaintiffs filed the eighth complaint (a Second Amended Complaint) in Orange County (California) Superior Court on March 4, 2010 alleging only the fraud and UCL claims. As with each of the seven previous versions of Plaintiffs' complaint, the Second Amended Complaint was dismissed in April 2010. Plaintiffs appealed the dismissal and on August 10, 2011, the appellate court reversed the trial court's dismissal and directed the trial court to overrule the demurrer. The case has been remanded to superior court and the parties are presently involved in discovery. We believe plaintiffs' allegations lack merit and we intend to defend against this action vigorously.

*Gaines v. Home Loan Center, Inc., No. SACV08-667 (U.S. Dist. Ct., C.D. Cal.).*     On June 13, 2008, Plaintiffs filed this putative class action against HLC and LendingTree in the U.S. District Court for the Central District of California. Plaintiffs allege, in essence, that (1) HLC failed to disclose that the bundled amount for certain loan closing services (called the "TrueCost") that HLC charged to Plaintiffs was greater than HLC's actual costs for those services; (2) HLC's option ARM note failed to tell Plaintiffs that the stated interest rate and payment amounts would change after the first month and that the payment amount stated in the note was not sufficient to pay interest charges, resulting in negative amortization; and (3) HLC misrepresented that Plaintiffs would have to obtain a home equity line of credit in order to obtain a low interest rate on their option ARM loans. Based upon these factual allegations, Plaintiffs assert violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), the TILA, the California UCL, California Business and Professions Code § 17500, the CLRA, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, and money had and received.

Plaintiffs purport to represent all HLC customers who, since December 14, 2004 (1) were charged by HLC and paid an amount that exceeded HLC's actual costs for those services; and/or (2) entered into option ARM loan agreements with HLC; and/or (3) were misled into taking out a home equity line of credit along with their option ARM mortgage. Plaintiffs seek restitution, disgorgement, damages, attorneys' fees and injunctive relief.

A RICO claim, certain claims alleging problems involving home equity lines of credit and all contract-based claims were dismissed with prejudice in May, 2010. On December 22, 2011, the Court determined that Plaintiffs lacked standing with respect to the remaining claims and granted each of HLC's and LendingTree's motions for summary judgment. The Court denied Plaintiffs' motion for reconsideration of the summary judgment decision on January 26, 2012. The Court entered judgment in favor of HLC and LendingTree and against Plaintiff Joanne Gaines on February 7, 2012. On February 23, 2012 Plaintiff filed a Notice of Appeal. The appeal remains pending. We believe plaintiffs' allegations lack merit and we intend to defend against the appeal vigorously.

*Schnee v. LendingTree, LLC and Home Loan Center, Inc., No. 06CC00211 (Cal. Super. Ct., Orange Cty.).*     On October 11, 2006, four individual plaintiffs filed this putative class action against

28

Table of Contents

LendingTree and HLC in the California Superior Court for Orange County. Plaintiffs alleged that they used the LendingTree.com website to find potential lenders and without their knowledge were referred to LendingTree's direct lender, HLC; that Lending Tree, LLC and HLC did not adequately disclose the relationship between them; and that HLC charged Plaintiffs higher rates and fees than they otherwise would have been charged. Based upon these allegations, Plaintiffs asserted that LendingTree and HLC violated the California UCL, California Business and Professions Code § 17500, and the CLRA. Plaintiffs purported to represent a nationwide class of consumers who sought lender referrals from LendingTree and obtained loans from HLC since December 1, 2004. Plaintiffs sought damages, restitution, attorneys' fees and injunctive relief.

On September 25, 2009, Plaintiffs' motion for class certification was denied in its entirety; Plaintiffs appealed such action. On July 29, 2011, the Court of Appeals issued its opinion denying Plaintiffs' appeal. Remittitur was filed on September 29, 2011.

*Mortgage Store, Inc. v. LendingTree Loans d/b/a Home Loan Center, Inc., No. 06CC00250 (Cal. Super. Ct., Orange Cty.).* On November 30, 2006, The Mortgage Store, Inc. and Castleview Home Loans, Inc. filed this putative class action against HLC in the California Superior Court for Orange County. Plaintiffs, two former Network Lenders, alleged that HLC interfered with LendingTree's contracts with Network Lenders by taking referrals from LendingTree. The complaint was largely based upon the factual allegations made in the *Schnee* complaint (described above). Based upon these factual allegations, Plaintiffs assert claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and violation of the California Unfair Competition Law ("UCL") and California Business and Professions Code § 17500. Plaintiffs purport to represent all Network Lenders from December 14, 2004 to date, and seek damages, restitution, attorneys' fees, and punitive damages.

Plaintiffs' motion for class certification was granted April 29, 2010. On October 17, 2011, the Court granted HLC's motion for summary judgment. Judgment was entered in favor of HLC on April 9, 2012.

*Banxcorp v. LendingTree, LLC, No. 2:10-cv-02467-SDW-MCA (U.S. Dist. Ct., N.J.).* On May 14, 2010, Plaintiff filed this lawsuit against LendingTree, LLC alleging that LendingTree, LLC engaged in antitrust violations, including per se horizontal price fixing. Plaintiff filed a similar case against Bankrate, Inc. in July 2007, alleging, among other things, an antitrust conspiracy between Bankrate and LendingTree. Plaintiff subsequently amended the complaint in June 2010 to add several media entities as defendants and alleged federal and state antitrust violations. All defendants filed motions to dismiss, and in early February 2011, the motions were granted as to the media defendants but denied as to LendingTree, LLC. The case is currently in the discovery phase. Plaintiff seeks injunctive relief and statutory damages. In July 2011, the case was consolidated with the Bankrate litigation referenced above. We believe that plaintiff's allegations lack merit and we intend to defend against this action vigorously.

### Massachusetts Division of Banks

The Massachusetts Division of Banks (the "Division") delivered to LendingTree, LLC on February 11, 2011 a Report of Examination/Inspection which identified various alleged violations of Massachusetts and federal laws, including the alleged insufficient delivery by LendingTree, LLC of various disclosures to its customers. On October 14, 2011, the Division provided a proposed Consent Agreement and Order to settle the Division's allegations, which the Division had shared with other state mortgage lending regulators. Twenty-four of such state mortgage lending regulators (the "Joining Regulators") indicated that if LendingTree, LLC would enter into the Consent Agreement and Order, they would agree not to pursue any analogous allegations that they otherwise might assert. As of the date of this report, none of the Joining Regulators have asserted any such allegations.

29

Table of Contents

The proposed Consent Agreement and Order calls for a fine to be allocated among the Division and the Joining Regulators and for LendingTree, LLC to adopt various new procedures and practices. LendingTree and the Joining Regulators have commenced negotiations toward an acceptable Consent Agreement and Order. We do not believe our lending exchanges violate any federal or state mortgage lending laws; nor do we believe that any past operations of the lending exchanges have resulted in a material violation of any such laws. Should the Division or any Joining Regulator bring any actions relating to the matters alleged in the February 2011 Report of Examination/Inspection, we intend to defend against such actions vigorously.

**Item 4.**    *Mine Safety Disclosures*

Not applicable.

Table of Contents

## PART II

**Item 5.**   *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Market for Registrant's Common Equity and Related Stockholder Matters**

Tree.com common stock is quoted on the NASDAQ Global Market under the ticker symbol "TREE." The table below sets forth, for the calendar periods indicated, the high and low sales prices per share for Tree.com common stock on the NASDAQ Global Market.

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2011** | | |
| Fourth Quarter | $ 5.99 | $ 4.64 |
| Third Quarter | 6.00 | 4.76 |
| Second Quarter | 7.00 | 4.70 |
| First Quarter | 9.50 | 5.64 |

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2010** | | |
| Fourth Quarter | $ 9.45 | $ 6.39 |
| Third Quarter | 7.86 | 6.01 |
| Second Quarter | 9.77 | 6.28 |
| First Quarter | 9.50 | 7.14 |

We have never declared or paid any cash dividends on our common stock. We do not intend to declare or pay any cash dividends on its common stock in the foreseeable future. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of the board of directors.

As of March 30, 2012 there were approximately 1,100 holders of record of our common stock and the closing price of the common stock was $7.63.

During the year ended December 31, 2011, we did not issue or sell any shares of our common stock or other equity securities in transactions that were not registered under the Securities Act of 1933.

**Issuer Purchases of Equity Securities**

The following table provides information about our purchases of equity securities during the quarter ended December 31, 2011.

| Period | Total Number of Shares Purchased(1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs(2) | Maximum Number/Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs (in thousands) |
|---|---|---|---|---|
| 10/01/11 – 10/31/11 | 1,009 | $ — | — | $ 4,274 |
| 11/01/11 – 11/30/11 | 755 | — | — | 4,274 |
| 12/01/11 – 12/31/11 | — | — | — | 4,274 |
| Total | 1,764 | $ — | — | $ 4,274 |

(1)   During the quarter ended December 31, 2011, 1,764 shares of our common stock were delivered by employees to satisfy federal and state withholding obligations upon the vesting of restricted stock awards granted to those individuals under the Tree.com 2008 Stock and Award Incentive Plan. The withholding of those shares does not affect the dollar amount or number of shares that may be purchased under the publicly announced plans or programs described below.

31

Table of Contents

(2)   On January 11, 2010, we announced that our board of directors approved a stock repurchase program for an amount up to $10 million. The program authorizes repurchases of common shares in the open market or through privately-negotiated transactions. We began this program in February 2010 and expect to use available cash to finance these repurchases. We will determine the timing and amount of such repurchases based on its evaluation of market conditions, applicable SEC guidelines and regulations, and other factors. This program may be suspended or discontinued at any time at the discretion of our board of directors.

### Item 6.   *Selected Financial Data*

Under the rules and regulations of the SEC, as a smaller reporting company we are not required to provide the information required by this item.

### Item 7.   *Management's Discussion and Analysis of Financial Condition and Results of Operations*

### Management Overview

Tree.com is the parent of LendingTree, LLC which owns several brands and businesses that provide information, tools, advice, products and services for critical transactions in our consumers' lives. Our family of brands includes: LendingTree.com®, GetSmart.com®, DegreeTree.com®, LendingTreeAutos.com, DoneRight.com®, ServiceTree.com, InsuranceTree.com® and HealthTree.com®. Together, these brands serve as an ally for consumers who are looking to comparison shop for loans and other services from multiple businesses and professionals that will compete for their business.

Through the quarter ended March 31, 2011, we operated in two reportable business segments: LendingTree Loans and Exchanges. In connection with entering into the asset purchase agreement for the sale of substantially all of the operating assets of our LendingTree Loans business, we determined that our LendingTree Loans business should be presented as discontinued operations. Continuing operations are now one reportable segment, which represents the previous "Exchanges" segment. Prior period results have been reclassified to conform with discontinued operations presentation.

Additionally, on March 10, 2011, management of the Company made the decision and finalized a plan to close all of the field offices of the proprietary full service real estate brokerage business known as RealEstate.com, REALTORS®. The Company exited all markets by March 31, 2011. In September 2011, the Company sold the remaining assets of RealEstate.com, which consisted primarily of internet domain names and trademarks, for $8.3 million and recognized a gain on sale of $7.8 million. The businesses of RealEstate.com and RealEstate.com, REALTORS® (which together represent the former Real Estate segment) and LendingTree Loans are presented as discontinued operations in the accompanying consolidated financial statements for all periods presented.

Results of operations, shareholders' equity and cash flows for the 2010 year have been restated to reflect the correction of immaterial errors related to estimating and recording certain expenses. See Note 18—Restatement of Consolidated Financial Statements to the consolidated financial statements included in this report.

The following discussion, unless otherwise noted, excludes information related to our discontinued operations.

#### *Recent Mortgage Interest Rate Trends*

Interest rate and market risks can be substantial in the mortgage lead generation business. Fluctuations in interest rates affect consumer demand for new mortgages and the level of refinancing activity, which in turn affects lender demand for mortgage leads. Typically, a decline in mortgage interest rates will lead to reduced lender demand for leads from third party sources, as there are more consumers in the marketplace seeking refinancings and accordingly, lenders receive more organic lead volume. Conversely, an increase in mortgage interest rates will typically lead to an increase in lender

32

Table of Contents

demand for leads, as there are fewer consumers in the marketplace and the overall supply of mortgage leads decreases.

Average 30-year fixed mortgage rates began 2010 at just above 5.0% and steadily declined to 4.2% through October 2010, but swiftly increased to 5.0% by February 2011. Consequently, the number of mortgage leads dropped off significantly at the end of 2010 and in the first quarter of 2011. Beginning in the second quarter of 2011, mortgage rates declined, ending the year at record low levels, dropping below 4.0%.

### Real Estate Market

Our operations, cash flows and financial position were negatively impacted by the continued deterioration in the housing market in 2010 and 2011. In particular, revenue has been negatively impacted by falling home prices and increased foreclosures. While nationwide sales of existing homes rose in 2011, a portion of the increase is due to a rise in foreclosure sales and distressed transactions. Overall home prices continued to decline during 2011 and most economic forecasts indicate that conditions are unlikely to improve significantly in 2012. Falling home prices also make it more difficult to make accurate home value appraisals and lenders typically require higher loan to value ratios and higher credit scores, which further restricts the pool of prospective borrowers.

### Expenses

As revenues have declined, we have focused on expense savings and are taking various initiatives to reduce costs. During the first quarter of 2011, we commenced a voluntary severance plan for certain corporate employees. In addition, we have taken steps to minimize ineffective marketing expenditures and dynamically align marketing expenses with lender demand for leads on our lending exchanges.

### Discover Asset Sale

On May 12, 2011, we entered into an asset purchase agreement with Discover Bank, a wholly-owned subsidiary of Discover Financial Services. We refer to Discover Financial Services and/or any of its affiliates, including Discover Bank, as "Discover." The asset purchase agreement provides for the sale of substantially all of the operating assets of our LendingTree Loans business to Discover. On February 7, 2012, we entered into an amendment to the asset purchase agreement. Under the terms of the asset purchase agreement as amended, Discover will pay approximately $55.9 million in cash for the assets, subject to certain conditions. See "Business—Pending Sale of Substantially all Operating Assets of LendingTree Loans " above. The transaction is expected to close by mid-year 2012.

Discover generally will not assume liabilities of the LendingTree Loans business that arose before the closing date. A portion of the initial purchase price payment, currently estimated to be $19 million, will be held in escrow for certain actual and/or contingent liabilities that will remain with the Company. The transaction is subject to various closing conditions, including regulatory approvals. Subject to certain exceptions stated in the asset purchase agreement, the Company has agreed to operate the LendingTree Loans business in the ordinary course until the closing of the acquisition.

### Results of operations for the years ended December 31, 2011 and 2010:

#### Revenue

| | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Match fees | $ 51,093 | $ 2,587 | 5% | $ 48,506 |
| Closed loan fees | 2,082 | (6,437) | (76)% | 8,519 |
| Other | 1,442 | (1,451) | (50)% | 2,893 |
| Total revenue | $ 54,617 | $ (5,301) | (9)% | $ 59,918 |

33

Table of Contents

Match fee revenue in 2011 increased by 5% from 2010, even as overall matched requests decreased by 7%, from 1.14 million in 2010 to 1.07 million in 2011. The decline in matched requests reflects a decrease of 10% in home loan matches and an aggregate decline of 3% in matches for the non-mortgage Exchanges, including higher education, home services, automobile and insurance. However, as compared to 2010, the average fee for home loan matches increased by 7%, and the average match fee for the non-mortgage Exchanges increased by 34%, which together more than offset the decline in matched requests. Although revenue from match fees increased, revenue from closed loan fees decreased due to a previously announced shift in pricing structure for home loan related matches to increase the average match fee while eliminating most closed loan fees.

No single network lender accounts for revenue representing more than 10% of revenue for any periods presented.

We do not presently record revenue in our Exchanges business for leads provided to LendingTree Loans. Instead, we use a cost sharing approach for marketing expenses, whereby the Exchanges business and LendingTree Loans share marketing expenses on a pro rata basis, based on the quantity of leads sold to Network Lenders versus matched with LendingTree Loans. Following completion of the sale of LendingTree Loans assets, we anticipate that Discover will purchase leads from our Exchanges business, which would represent an additional source of revenue, with an associated increase in selling and marketing expenses. However, we anticipate that revenue from the sale of leads to Discover would be accretive to both gross and net margins.

### Cost of revenue

|  | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Cost of revenue | $ 4,133 | $ (1,003) | (20)% | $ 5,136 |
| As a percentage of total revenue | 8% | | | 9% |

Cost of revenue consists primarily of costs associated with compensation and other employee related costs (including stock-based compensation) relating to customer call centers, credit scoring fees, consumer incentive costs and website network hosting and server fees.

Cost of revenue in 2011 decreased from 2010 primarily due to a decrease of $0.6 million in compensation and other employee-related costs resulting from reduced headcount as well as a decrease of $0.4 million in consumer incentive rebates related to fewer loan closings.

Following the sale of LendingTree Loans, we anticipate that cost of revenue will decrease as a percentage of revenue due to an increase in revenue from sale of leads currently provided to LendingTree Loans without corresponding increase in cost of revenue.

### Selling and marketing expense

|  | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Selling and marketing expense | $ 46,662 | $ (4,567) | (9)% | $ 51,229 |
| As a percentage of total revenue | 85% | | | 85% |

Selling and marketing expense consists primarily of advertising and promotional expenditures, fees paid to lead sources and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in sales or marketing functions. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

34

Advertising expense is the largest component of selling and marketing expense and is comprised of the following:

| | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Online | $ 23,655 | $ (8,562) | (27)% | $ 32,217 |
| Broadcast | 12,737 | 1,770 | 16% | 10,967 |
| Other | 4,347 | (133) | (3)% | 4,480 |
| Total advertising expense | $ 40,739 | $ (6,925) | (15)% | $ 47,664 |

We reduced advertising expense in the second half of 2011 in response to interest rates that began declining in the second quarter of 2011. In a declining interest rate environment, the incentive for consumers to refinance existing mortgages increases, resulting in a reduced need to drive traffic to our lending exchanges through advertising, as well as lower Network Lender demand for externally-generated leads, further reducing the return on advertising expenditures. Additionally, improvements in marketing efficiencies across several of our marketing channels eliminated approximately $3 million of expense that was incurred in the second quarter of 2011 from the second half of 2011.

The 15% decrease in advertising expense corresponded to only 7% fewer matched requests, as our marketing became more efficient. However, offsetting this overall decrease in advertising expense was an increase in 2011 in expenses associated with expanding our marketing team and investing in marketing tools and technologies, which began in the first quarter of 2011. As a result, selling and marketing expense as a percentage of revenue remained constant at 85% in 2011 and 2010.

We will continue to adjust selling and marketing expenditures dynamically in relation to revenue producing opportunities.

Following the sale of the LendingTree Loans business, selling and marketing expense will increase due to the elimination of pro rata allocation of such expenses to LendingTree Loans. We anticipate that selling and marketing expense will trend to a slightly lower percentage of revenue due to an increase in revenue from sale of leads currently provided to LendingTree Loans, which we expect to be proportionately greater than the increase in selling and marketing expense.

### General and administrative expense

| | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| General and administrative expense | $ 19,751 | $ (4,749) | (19)% | $ 24,500 |
| As a percentage of total revenue | 36% | | | 41% |

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, corporate information technology, human resources and executive management functions, as well as facilities and infrastructure costs and fees for professional services.

General and administrative expense in 2011 decreased from 2010 primarily due to a $4.8 million decrease in compensation and other employee related costs (excluding non-cash compensation) resulting from reduced headcount and incentive compensation. Software costs and professional fees also decreased by $0.8 million and $0.4 million, respectively.

Partially offsetting these factors was a reduction of expense of $0.7 million in 2011 and $0.8 million in 2010, representing post-acquisition adjustments, which were the result of changes in fair value of the estimated contingent consideration to be paid for business acquisitions that were completed in 2009. These adjustments are shown as reductions of general and administrative expense, and are excluded from Adjusted EBITDA.

35

Table of Contents

We expect further reductions in general and administrative expense in 2012. Further, following the sale of LendingTree Loans assets, we anticipate that general and administrative expense will decrease as a percentage of revenue due to an increase in revenue from sale of leads currently provided to LendingTree Loans without corresponding increase in general and administrative expense.

### Product development

| | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Product development | $ 3,203 | $ (200) | (6)% | $ 3,403 |
| As a percentage of total revenue | 6% | | | 6% |

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in the design, development, testing and enhancement of technology that are not capitalized.

Product development expense decreased slightly in 2011, primarily due to reduced compensation and other employee-related costs resulting from lower headcount.

Following the sale of LendingTree Loans assets, we anticipate that product development expense will decrease as a percentage of revenue due to an increase in revenue from sale of leads currently provided to LendingTree Loans without corresponding increase in product development expense.

### Asset impairments

We performed an interim impairment test in the second quarter of 2011 and our annual test as of October 1, 2011, and recorded impairment charges related to indefinite-lived trade names and trademarks of $29.0 million and definite-lived intangible assets of $0.3 million. These impairments resulted from a lower observed market value of our common stock at June 30, 2011 and lower anticipated revenues related to our trademarks as a result of the anticipated sale of substantially all of the operating assets of LendingTree Loans. The impairment of definite-lived assets was recorded in the second quarter of 2011, and we determined in connection with preparation of our annual financial statements that the impairment of the indefinite-lived assets should have also been recorded in the second quarter of 2011. See Note 4—Goodwill and Intangible Assets to the consolidated financial statements included in this report and "Controls and Procedures" below. No additional impairments are recorded as of October 1, 2011.

Impairments related to trade names and trademarks were $0.5 million in 2010, and there were no impairments of definite-lived intangible assets in 2010.

### Litigation settlements and contingencies

During 2011 and 2010, provisions for litigation settlements of $5.7 million and $1.0 million, respectively, were recorded for litigation settlements and contingencies. The increase in 2011 was due primarily to the settlement of the South Carolina mortgage broker litigation.

### Operating loss

| | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Operating loss | $ (61,108) | $ (28,027) | (85)% | $ (33,081) |
| As a percentage of total revenue | (112)% | | | (55)% |

Although we were also able to more than offset the decrease in revenue in 2011 of $5.3 million by reducing cost of revenue, selling and marketing expense, general and administrative expense and product development expense by $10.5 million, asset impairment and litigation settlements and contingencies discussed above resulted in a significant increase in operating loss in 2011 compared to 2010.

36

Table of Contents

*Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization*

Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA") is a non-GAAP measure and is defined in "Tree.com's Principles of Financial Reporting". Below is a reconciliation of Adjusted EBITDA to net income (loss) for both continuing operations and discontinued operations.

|  | 2011 | 2010 |
|---|---|---|
| Adjusted EBITDA from continuing operations | $ (15,696) | $ (22,089) |
| Adjustments to reconcile to net loss from continuing operations: |  |  |
| Amortization of intangibles | (891) | (1,232) |
| Depreciation | (5,023) | (3,216) |
| Restructuring expense | (1,080) | (2,780) |
| Asset impairments | (29,250) | (540) |
| Loss on disposal of assets | (311) | (85) |
| Non-cash compensation | (3,777) | (3,104) |
| Litigation settlements and contingencies | (5,732) | (963) |
| Post-acquisition adjustments | 652 | 928 |
| Other expense, net | (368) | (464) |
| Income tax benefit | 11,766 | 6,941 |
| Net loss from continuing operations | $ (49,710) | $ (26,604) |
| Adjusted EBITDA from discontinued operations | $ 3,330 | $ 31,246 |
| Adjustments to reconcile to net income (loss) from discontinued operations: |  |  |
| Amortization of intangibles | (36) | (1,484) |
| Depreciation | (871) | (2,944) |
| Restructuring expense | (6,567) | (689) |
| Asset impairments | (12,974) | (10,269) |
| Loss on disposal of assets | (62) | (271) |
| Non-cash compensation | (338) | (536) |
| Litigation settlements and contingencies | (27) | (1,588) |
| Post-acquisition adjustments | — | 221 |
| Gain from sale of discontinued operations | 7,752 | — |
| Income tax expense | — | (5,259) |
| Net income (loss) from discontinued operations | $ (9,793) | $ 8,427 |
| Adjusted EBITDA from continuing operations per above | $ (15,696) | $ (22,089) |
| Adjusted EBITDA from discontinued operations per above | 3,330 | 31,246 |
| Total Adjusted EBITDA | (12,366) | 9,157 |
| Adjustments to reconcile to net income (loss): |  |  |
| Amortization of intangibles | (927) | (2,716) |
| Depreciation | (5,894) | (6,160) |
| Restructuring expense | (7,647) | (3,469) |
| Asset impairments | (42,224) | (10,809) |
| Loss on disposal of assets | (373) | (356) |
| Non-cash compensation | (4,115) | (3,640) |
| Litigation settlements and contingencies | (5,759) | (2,551) |
| Post-acquisition adjustments | 652 | 1,149 |
| Other expense, net | (368) | (464) |
| Income tax (expense) benefit | 11,766 | 1,682 |
| Gain from sale of discontinued operations | 7,752 | — |
| Net loss | $ (59,503) | $ (18,177) |

| | 2011 | $ Change | % Change | 2010 |
|---|---|---|---|---|
| Adjusted EBITDA from continuing operations | $ (15,696) | $ 6,393 | 29% | $ (22,089) |
| As a percentage of total revenue | (29)% |  |  | (37)% |

The improvement in Adjusted EBITDA from 2010 to 2011 reflects decreased operating costs, partially offset by the decreased in revenue, as detailed above.

37

Table of Contents

### Income tax provision

For the years ended December 31, 2011 and 2010, we recorded a tax benefit of $11.8 million and $6.9 million, which represents effective tax rates of 19.1% and 20.7%. The 2011 and 2010 tax rates are lower than the federal statutory rate of 35% due principally to providing a full valuation allowance against our deferred tax assets.

As of December 31, 2011 and 2010, unrecognized tax benefits, including interest, were $0.01 million and $0.09 million. The amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate is approximately $0.01 million.

We recognize interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. Included in income tax expense for each of the years ended December 31, 2011 and 2010 is $0.01 million for interest on unrecognized tax benefits. At both December 31, 2011 and 2010, we had accrued $0.01 million for the payment of interest. There are no material accruals for penalties.

We are subject to audits by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, any amounts paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by us are recorded in the period they become known.

The Internal Revenue Service has substantially completed its review of IAC/InterActiveCorp's tax returns for the years ended December 31, 2001 through 2006. The settlement has not yet been submitted to the Joint Committee of Taxation for approval. The IRS began its review of the IAC/InterActiveCorp and Tree federal tax returns for the years ended December 31, 2007 through 2009 in July 2011. The statute of limitations for the years 2001 through 2008 has been extended to December 31, 2012. Various state and local jurisdictions are also currently under examination, the most significant of which are California, New York and New York City for various tax years beginning with 2005.

The North Carolina Department of Revenue conducted an examination of our North Carolina corporate income and franchise tax returns for the years ended December 31, 2006 through 2008, and issued final audit reports to us in 2011. Management has evaluated this matter as a potential loss contingency, and has determined that it is reasonably possible that a loss could be incurred. The range of a possible loss is estimated to be $-0- to $3.6 million. No reserve has been established for this matter as management has determined that the likelihood of a loss is not probable.

### Discontinued Operations

Revenue from discontinued operations in 2011 was $121.4 million, a decrease of 12% as compared to 2010 revenue from discontinued operations of $138.3 million. LendingTree Loans revenue for 2011 was down $6.7 million compared to 2010 on 4% fewer closed units, while revenue from the Real Estate business in 2011 was down $10.2 million compared to 2010, reflecting the shutdown of the company-owned brokerage in early 2011 and sale of the remaining assets of RealEstate.com in September 2011.

Gross margins at LendingTree Loans declined in 2011 due to loan officer compensation regulations which caused a $3.0 million increase in variable compensation costs. Loan officer compensation increased from 23% of total revenue in 2010 to 32% of total revenue in 2011. In addition, general and administrative costs in discontinued operations in 2011 were $29.7 million, or 22% higher than in 2010. This increase was driven largely by the acquisition of certain assets of First Residential Mortgage Network, Inc. dba SurePoint Lending that was completed in the first quarter of 2011, partially offset by lower Real Estate fixed costs after the shutdown of the company-owned brokerage in early 2011. Partially offsetting the above, LendingTree Loans benefited in 2011 from lower marketing expenses as a result of lower interest rates and improved marketing efficiencies.

38

Table of Contents

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

As of December 31, 2011, we had $45.5 million of cash and cash equivalents and $12.5 million of restricted cash and cash equivalents, compared to $68.8 million of cash and cash equivalents and $8.2 million of restricted cash and cash equivalents as of December 31, 2010.

### Cash Flows from Continuing Operations

In summary, our cash flows attributable to continuing operations are as follows:

|  | December 31, 2011 | | December 31, 2010 |
|---|---|---|---|
|  | (In thousands) | | |
| Net cash used in operating activities | $ | (28,052) | $ (31,632) |
| Net cash used in investing activities |  | (8,091) | (3,180) |
| Net cash used in financing activities |  | (3,287) | (9,152) |

Net cash used in operating activities attributable to continuing operations consists of earnings or loss from continuing operations adjusted for non-cash items, including non-cash compensation expense, depreciation, amortization of intangibles, deferred income taxes, asset impairment charges, and the effect of changes in working capital.

Net cash used in operating activities attributable to continuing operations in 2011 was $28.1 million and consisted of losses from continuing operations of $49.7 million, positive adjustments for non-cash items of $27.1 million and cash used for working capital of $5.5 million. Adjustments for non-cash items primarily consisted of $29.3 million of intangible impairment, $5.0 million of depreciation and $3.8 million of non-cash compensation expense, partially offset by $11.6 million of deferred income taxes.

Net cash used in operating activities attributable to continuing operations in 2010 was $31.6 million and consisted of losses from continuing operations of $26.6 million, positive adjustments for non-cash items of $5.7 million and cash used for working capital of $5.5 million. Adjustments for non-cash items primarily consisted of $3.2 million of depreciation, $3.1 million of non-cash compensation expense and $1.2 million of amortization, partially offset by $6.9 million of deferred income taxes. The cash used for working capital primarily reflects litigation payments of $12.8 million that were made in 2010.

Net cash used in investing activities in 2011 of $8.1 million primarily resulted from capital expenditures of $6.1 million, reflecting new technology platforms built for both the mortgage and non-mortgage businesses. Net cash used in investing activities in 2010 of $3.2 million primarily resulted from capital expenditures of $5.1 million, offset by a release of restricted cash of $2.2 million related to our corporate purchasing card program.

Net cash used in financing activities in 2011 of $3.3 million was primarily due to increased restricted cash requirements of $2.3 million related to warehouse lines of credit and the vesting and issuance of stock to employees (less withholding taxes) of $1.0 million. Net cash used by financing activities in 2010 of $9.2 million was primarily due to purchases of treasury stock of $8.5 million.

### Warehouse Lines of Credit for LendingTree Loans

As of December 31, 2011, LendingTree Loans had three committed lines of credit totaling $275.0 million of borrowing capacity. Included in this amount is a $50.0 million line of credit that expired on January 30, 2012. In addition, LendingTree Loans obtained a fourth warehouse line for $100.0 million on January 9, 2012, which is uncommitted. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid using proceeds from the sales of loans by LendingTree Loans.

39

Table of Contents

The $50.0 million first line was scheduled to expire on the earliest of (i) the closing date of the pending sale of LendingTree Loans assets or (ii) January 30, 2012, and it expired on January 30, 2012. This first line included an additional uncommitted credit facility of $25.0 million, which was terminated on October 31, 2011. This first line was guaranteed by Tree.com, Inc., LendingTree, LLC and LendingTree Holdings Corp. The interest rate under the first line was the 30-day London InterBank Offered Rate ("LIBOR") or 2.00% (whichever was greater) plus 2.25%. The interest rate under the $25.0 million uncommitted line was the 30-day LIBOR plus 1.50%.

The second line was previously for $100.0 million and scheduled to expire on October 28, 2011, but was increased to $125.0 million and was extended to the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) April 25, 2012. This line is also guaranteed by Tree.com, Inc., LendingTree, LLC and LendingTree Holdings Corp. Before the extension, the interest rate under this line was the 30-day Adjusted LIBOR or 2.0% (whichever was greater) plus 2.25% to 2.5% for loans being sold to the lender and 30-day Adjusted LIBOR or 2.0% (whichever was greater) plus 2.25% for loans not being sold to the lender. Upon extension of this line, the interest rate was changed to the 30-day Adjusted LIBOR or 2.0% (whichever is greater) plus 1.5% to 1.75% for loans being sold to the lender and 30-day Adjusted LIBOR or 2.0% (whichever is greater) plus 1.5% for loans not being sold to the lender.

The $100.0 million third line was scheduled to expire on December 13, 2011, but following certain interim renewals of the line, the expiration date was extended to the earlier of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) August 20, 2012. This line is guaranteed by Tree.com, Inc. and LendingTree, LLC. The interest rate under this line is 30-day LIBOR plus 3.25% (LIBOR may be adjusted upward for any increase in the reserve requirement of the lender as further described in the Master Repurchase Agreement).

The $100.0 million fourth line is scheduled to expire on the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) January 4, 2013. This line is guaranteed by Tree.com, Inc. and LendingTree, LLC. The interest rate under this line is the overnight interest rate incurred by the lender for borrowing funds plus 3.25% to 3.75% for most loans.

Under the terms of these warehouse lines, LendingTree Loans is required to maintain various financial and other covenants, and is restricted from paying dividends under the terms of the first two lines. These financial covenants include, but are not limited to, maintaining (i) for the first three lines, minimum tangible net worth of $20.0 million, which was increased to $25.0 million upon renewal of the first line in November 2011 and the second line in October 2011, and for the fourth line, minimum adjusted net worth equaling the sum of $20.0 million plus 50% of the positive quarterly net income for the three months prior to any date of determination, (ii) minimum liquidity, (iii) a minimum current ratio, (iv) a maximum ratio of total liabilities to net worth, (v) a minimum unrestricted cash amount, (vi) pre-tax net income requirements, (vii) for the first three lines, a maximum warehouse capacity ratio and (viii) for the fourth line, minimum of one additional warehouse line. LendingTree Loans was not in compliance with the maximum ratio of total liabilities to net worth covenant under the first line at December 31, 2011. However, a waiver was not sought or required because as there were no outstanding borrowings under this line as of December 31, 2011 and the line expired on January 30, 2012. We were in compliance with all other covenants at December 31, 2011, except for the requirement to provide audited financial statements to each of our lenders within 90 days after year end of the fiscal year. We have obtained a waiver for this violation.

The LendingTree Loans business is highly dependent on the availability of these warehouse lines. Although we believe that our existing lines of credit are adequate for our current operations, reductions in our available credit, or the inability to renew or replace these lines, would have a material adverse effect on our business, financial condition and results of operations. Management has determined that we could continue to operate the LendingTree Loans business at a reduced capacity as

40

Table of Contents

long as one of the warehouse lines remains available. We believe that our sources of liquidity are sufficient to fund our operating needs, including operation of the LendingTree Loans business through the pending sale of assets, and including all debt requirements, commitments and contingencies, and capital and investing commitments for the foreseeable future. However, the operations of our LendingTree Loans business through completion of the pending sale of assets could have a significant impact on our liquidity, and the results of such operations are highly dependent on interest rates. If interest rates increase above current levels before completion of the pending sale of assets, or if such transaction is not completed, we may need to take more aggressive actions to manage our working capital, sell certain assets or seek equity or debt financing. We cannot assure you that, in such a situation, we would be able to sell assets or raise equity or debt financing on terms acceptable to us, or at all. Moreover, the asset purchase agreement with Discover contains certain covenants and conditions that may limit our ability to take certain of these actions without the consent of Discover while the sale transaction is pending. Additionally, we anticipate that we will want to make capital and other expenditures in connection with the development and expansion of our overall operations. We intend to use proceeds from the sale of the LendingTree Loans assets to fund these expenditures. If such proceeds are not sufficient after payments of transaction-related expenses and amounts held in escrow or otherwise restricted, we may seek equity or debt financing. We cannot assure you that such financing will be available on terms acceptable to us, or at all.

Upon closing of the pending sale of assets of LendingTree Loans, LendingTree Loans will cease to originate consumer loans and the warehouse lines of credit will no longer provide for additional borrowings. The remaining operations of LendingTree Loans will be wound down, which will include selling the balance of loans held for sale to investors, which historically has occurred within thirty days of funding, and paying off and then terminating the warehouse lines of credit.

We have considered our anticipated operating cash flows in 2012, cash and cash equivalents, current capacity under our warehouse lines of credit and access to capital markets, subject to restrictions in the tax sharing agreement, and believe that these will be sufficient to fund our operating needs, including debt requirements, commitments, contingencies, capital and investing commitments for the foreseeable future.

As discussed in Item 9A—Controls and Procedures, we have identified certain material weaknesses in our internal control over financial reporting related to the valuation and impairment of trademark assets and income taxes. Until remediated, these material weaknesses could result in a misstatement in intangible asset or tax-related accounts that could result in a material misstatement to our interim or annual consolidated financial statements and disclosures that may not be prevented or detected on a timely basis. With the oversight of our management and the audit committee of our board of directors, we have begun taking steps and plan to take additional measures to remediate the underlying causes of these material weaknesses. We have strengthened our processes regarding intangible impairment analysis, which will subsequently include engaging a third party valuation firm for annual analyses and certain interim analyses. We have also undertaken an evaluation of our available resources to provide effective oversight of the work performed by our third party tax advisors and are in the process of identifying necessary changes to our processes as required. Additionally, we are evaluating the resources available and provided to us by the third party tax advisor and identifying changes as required. However, the deficiencies have not been remediated as of the date of this filing. We do not believe this will have a significant impact on liquidity.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The following disclosure is provided to supplement the description of our accounting policies contained in Note 2 to the consolidated financial statements in regard to significant areas of judgment. This disclosure includes accounting policies related to both continuing operations and discontinued operations. Management is required to make certain estimates and assumptions during the preparation

41

Table of Contents

of the consolidated financial statements in accordance with generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated financial statements than others. A discussion of some of our more significant accounting policies and estimates follows.

### Loan Loss Obligations

We make estimates as to our exposure related to our obligation to repurchase loans previously sold to investors or to repay premiums paid by investors in purchasing loans, and reserve for such contingencies accordingly. Such payments to investors may be required in cases where underwriting deficiencies, borrower fraud, documentation defects, early payment defaults and early loan payoffs occurred. The exposure is based on historical and projected loss frequency and loss severity using our loss history (as adjusted for recent trends in loss experience), the original principal amount of loans previously sold, the years the loans were sold, the lien positions of mortgages in the underlying properties, and the extent of documentation received from borrowers. Given current general industry trends in mortgage loans as well as housing prices, market expectations around losses related to our obligations could vary significantly from the reserve of $31.5 million recorded as of December 31, 2011.

### Fair Value Estimates

We make estimates as to the value of our derivatives and loans held for sale, which are carried at fair value. These assets and liabilities are valued using tools such as quantitative risk models and a proprietary database program. The data inputs used in these valuations include market data and quotes as well as our own experience in funding and selling loans. These calculations inherently require management's judgment regarding the valuation methodology and the most relevant data to use in the valuation calculations. Due to volatility in the markets and judgments inherent in our estimates, the actual liquidation value of these assets could differ from their carrying values. See Note 7 to the consolidated financial statements for further discussion of our valuation methodologies and the assumptions.

### Recoverability of Goodwill and Indefinite-Lived Intangible Assets

We review the carrying value of goodwill and indefinite-lived intangible assets on an annual basis as of October 1 or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. We determine the fair value of a reporting unit based upon an evaluation of its expected discounted cash flows and market approach. This discounted cash flow analysis utilizes an evaluation of historical and forecasted operating results. The determination of discounted cash flows is based upon forecasted operating results that may not occur. The assessments for 2011 and 2010 identified impairment charges related to indefinite-lived intangibles of $29.0 million and $0.5 million, respectively. The value of goodwill and indefinite-lived intangible assets that is subject to assessment for impairment is $3.6 million and $10.1 million, respectively, at December 31, 2011.

The interim goodwill impairment test in the second quarter of 2011 included the following material assumptions: a discounted cash flow model utilizing a range of discount rates of 17%-23%, a range of terminal growth rates of 3%-5% and Adjusted EBITDA margin rates of 9%-15% of revenue from the second half of 2011 through 2016. (See "Tree.com's Principles of Financial Reporting" below for the definition of Adjusted EBITDA.) The annual goodwill impairment as of October 1, 2011 included the following material assumptions: a discounted cash flow model utilizing a range of discount rates of

Table of Contents

14%-18%, a range of terminal growth rates of 3%-5% and Adjusted EBITDA margin rates of 14%-15% of revenue from 2012 through 2016. The material assumptions included in the interim indefinite-lived intangible assets impairment test in the second quarter of 2011 were an assumed relief-from royalty model, a range of discount rates of 17%-23%, a range of terminal growth of 3%-5% and a range of royalty rates of 2.3%-3.0%. The material assumptions included in the annual indefinite-lived intangible assets impairment test as of October 1, 2011 were an assumed relief-from royalty model, a range of discount rates of 14%-18%, a range of terminal growth rates of 3%-5% and a range of royalty rates of 2.6%-3.5%. Management believes that the assumptions used in the impairment tests are reasonable.

### Recoverability of Long-Lived Assets

We review the carrying value of all long-lived assets, primarily property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may be impaired. Impairment is considered to have occurred whenever the carrying value of a long-lived asset exceeds the sum of the undiscounted cash flows that is expected to result from the use and eventual disposition of the asset. The determination of cash flows is based upon assumptions that may not occur. The assessment for 2011 identified impairment charges related to definite-lived intangibles of $0.3 million. The assessment for 2010 did not identify any impairment charges. The value of long-lived assets that is subject to assessment for impairment is $9.4 million at December 31, 2011.

### Income Taxes

Estimates of deferred income taxes and the significant items giving rise to the deferred assets and liabilities are shown in Note 9 to the consolidated financial statements, and reflect management's assessment of actual future taxes to be paid on items reflected in the consolidated financial statements, giving consideration to both timing and the probability of realization. Actual income taxes could vary from these estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the IRS, as well as actual operating results that vary significantly from anticipated results. We also recognize liabilities for uncertain tax positions based on the two-step process prescribed by the accounting guidance for uncertainty in income taxes. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes.

### Stock-Based Compensation

As discussed in Note 3 to the consolidated financial statements, we estimated the fair value of options issued in 2011 using a Black-Scholes option pricing model with the following weighted average assumptions: a risk-free interest rate of 3.6%, a dividend yield of zero, a volatility factor of 44% and a weighted average expected life of the options of 7.0 years. We granted no stock options during the year ended December 31, 2010. We also issued restricted stock units and restricted stock, and the value of such awards is measured at their grant dates as the fair value of common stock and amortized ratably as non-cash compensation expense over the vesting term.

43

Table of Contents

### New Accounting Pronouncements

See Note 2 to the consolidated financial statements for a description of recent accounting pronouncements.

<div align="center">

**TREE.COM'S PRINCIPLES OF FINANCIAL REPORTING**

</div>

We report Earnings Before Interest, Taxes, Depreciation and Amortization, adjusted for certain items discussed below (Adjusted EBITDA), as a supplemental measure to GAAP. This measure is one of the primary metrics by which we evaluate the performance of our businesses, on which our internal budgets are based and by which management is compensated. We believe that investors should have access to the same set of tools that we use in analyzing our results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. We provide and encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measure discussed below.

#### Definition of Adjusted EBITDA

We report Adjusted EBITDA as operating income or loss (which excludes interest expense and taxes) adjusted to exclude amortization of intangibles and depreciation, and excluding (1) non-cash compensation expense, (2) non-cash intangible asset impairment charges, (3) gain/loss on disposal of assets, (4) restructuring expenses, (5) litigation settlements and contingencies, (6) pro forma adjustments for significant acquisitions or dispositions, and (7) one-time items. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our statement of operations of certain expenses, including depreciation, non-cash compensation and acquisition-related accounting. We endeavor to compensate for the limitations of the non-GAAP measure presented by also providing the comparable GAAP measure with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measure.

#### One-Time Items

Adjusted EBITDA is adjusted for one-time items, if applicable. Items are considered one-time in nature if they are non-recurring, infrequent or unusual, and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented in this report, there are no adjustments for one-time items.

#### Non-Cash Expenses That Are Excluded From Adjusted EBITDA

Non-cash compensation expense consists principally of expense associated with the grants of restricted stock units and stock options. These expenses are not paid in cash, and we include the related shares in our calculations of fully diluted shares outstanding. Upon vesting of restricted stock units and the exercise of certain stock options, the awards will be settled, at our discretion, on a net basis, with us remitting the required tax withholding amount from our current funds.

Amortization and impairment of intangibles are non-cash expenses relating primarily to intangible assets acquired through acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives.

**Item 7A.**    *Quantitative and Qualitative Disclosures about Market Risk*

Under the rules and regulations of the SEC, as a smaller reporting company we are not required to provide the information required by this item.

<div align="center">44</div>

Table of Contents

Item 8.   *Financial Statements and Supplementary Data*

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of
Tree.com, Inc.
Charlotte, North Carolina

We have audited the accompanying consolidated balance sheets of Tree.com, Inc. and subsidiaries (the "Company") as of December 31, 2011 and 2010, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the two fiscal years in the period ended December 31, 2011. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Tree.com, Inc. and subsidiaries at December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the two fiscal years in the period ended December 31, 2011, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein.

As discussed in Note 1, the Company has recast its consolidated financial statements to reflect the effects of discontinued operations and a change in reportable segments.

/s/ Deloitte and Touche LLP

Charlotte, North Carolina
April 16, 2012

45

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (In thousands, except per share amounts) | |
| Revenue | $ 54,617 | $ 59,918 |
| Costs and expenses (exclusive of depreciation shown separately below) | | |
| Cost of revenue | 4,133 | 5,136 |
| Selling and marketing expense | 46,662 | 51,229 |
| General and administrative expense | 19,751 | 24,500 |
| Product development | 3,203 | 3,403 |
| Litigation settlements and contingencies | 5,732 | 963 |
| Restructuring expense | 1,080 | 2,780 |
| Amortization of intangibles | 891 | 1,232 |
| Depreciation | 5,023 | 3,216 |
| Asset impairments | 29,250 | 540 |
| Total costs and expenses | 115,725 | 92,999 |
| Operating loss | (61,108) | (33,081) |
| Other income (expense) | | |
| Interest income | — | 8 |
| Interest expense | (368) | (472) |
| Total other income (expense), net | (368) | (464) |
| Loss before income taxes | (61,476) | (33,545) |
| Income tax benefit | 11,766 | 6,941 |
| Net loss from continuing operations | (49,710) | (26,604) |
| Gain from sale of discontinued operations, net of tax | 7,752 | — |
| Income (loss) from operations of discontinued operations, net of tax | (17,545) | 8,427 |
| Income (loss) from discontinued operations | (9,793) | 8,427 |
| Net loss attributable to common shareholders | $ (59,503) | $ (18,177) |
| Weighted average common shares outstanding | 10,995 | 11,014 |
| Weighted average diluted shares outstanding | 10,995 | 11,014 |
| Net loss per share from continuing operations | | |
| Basic | $ (4.52) | $ (2.42) |
| Diluted | $ (4.52) | $ (2.42) |
| Net income (loss) per share from discontinued operations | | |
| Basic | $ (0.89) | $ 0.77 |
| Diluted | $ (0.89) | $ 0.77 |
| Net loss per share attributable to common shareholders | | |
| Basic | $ (5.41) | $ (1.65) |
| Diluted | $ (5.41) | $ (1.65) |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

46

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2011 | December 31, 2010 |
|---|---|---|
| | (In thousands, except par value and share amounts) | |
| **ASSETS:** | | |
| Cash and cash equivalents | $ 45,541 | $ 68,819 |
| Restricted cash and cash equivalents | 12,451 | 8,155 |
| Accounts receivable, net of allowance of $86 and $131, respectively | 5,474 | 3,564 |
| Prepaid and other current assets | 1,060 | 1,043 |
| Current assets of discontinued operations | 232,425 | 130,701 |
| Total current assets | 296,951 | 212,282 |
| Property and equipment, net | 8,375 | 7,598 |
| Goodwill | 3,632 | 3,632 |
| Intangible assets, net | 11,189 | 41,319 |
| Other non-current assets | 246 | 116 |
| Non-current assets of discontinued operations | 10,947 | 17,855 |
| Total assets | $ 331,340 | $ 282,802 |
| **LIABILITIES:** | | |
| Accounts payable, trade | $ 9,072 | $ 6,562 |
| Deferred revenue | 176 | 312 |
| Deferred income taxes | 4,335 | 2,358 |
| Accrued expenses and other current liabilities | 16,712 | 23,881 |
| Current liabilities of discontinued operations | 250,030 | 118,220 |
| Total current liabilities | 280,325 | 151,333 |
| Income taxes payable | 7 | 96 |
| Other non-current liabilities | 4,070 | 3,168 |
| Deferred income taxes | 435 | 13,962 |
| Non-current liabilities of discontinued operations | 1,032 | 12,422 |
| Total liabilities | 285,869 | 180,981 |
| Commitments and contingencies (Notes 11 and 12) | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Preferred stock $.01 par value; authorized 5,000,000 shares; none issued or outstanding | — | — |
| Common stock $.01 par value; authorized 50,000,000 shares; issued 12,169,226 and 11,893,468 shares, respectively, and outstanding 11,045,965 and 10,770,207 shares, respectively | 121 | 118 |
| Additional paid-in capital | 911,987 | 908,837 |
| Accumulated deficit | (858,105) | (798,602) |
| Treasury stock 1,123,261 shares | (8,532) | (8,532) |
| Total shareholders' equity | 45,471 | 101,821 |
| Total liabilities and shareholders' equity | $ 331,340 | $ 282,802 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

47

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Total | Common Stock Number of Shares | Common Stock Amount | Additional Paid-in Capital (In thousands) | Accumulated Deficit | Treasury Stock Number of Shares | Treasury Stock Amount |
|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2009** | $ 121,502 | 10,904 | $ 109 | $ 901,818 | $ (780,425) | — | $ — |
| Comprehensive loss: Net loss for the year ended December 31, 2010 | (18,177) | — | — | — | (18,177) | — | — |
| Comprehensive loss | (18,177) | — | — | — | — | — | — |
| Stock-based compensation | 3,640 | — | — | 3,640 | — | — | — |
| Issuance of common stock upon exercise of stock options and vesting of restricted stock units, net of withholding taxes | (570) | 304 | 3 | (573) | — | — | — |
| Issuance of restricted stock | — | 150 | 1 | (1) | — | — | — |
| Exchange of preferred stock issued by a subsidiary to common stock issued by parent | 3,958 | 535 | 5 | 3,953 | — | — | — |
| Purchase of treasury stock | (8,532) | — | — | — | — | 1,123 | (8,532) |
| **Balance as of December 31, 2010** | 101,821 | 11,893 | 118 | 908,837 | (798,602) | 1,123 | (8,532) |
| Comprehensive loss: Net loss for the year ended December 31, 2011 | (59,503) | — | — | — | (59,503) | — | — |
| Comprehensive loss | (59,503) | — | — | — | — | — | — |
| Stock-based compensation | 4,115 | — | — | 4,115 | — | — | — |
| Issuance of common stock upon exercise of stock options and vesting of restricted stock units, net of withholding taxes | (962) | 276 | 3 | (965) | — | — | — |
| **Balance as of December 31, 2011** | $ 45,471 | 12,169 | $ 121 | $ 911,987 | $ (858,105) | 1,123 | $ (8,532) |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

48

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (In thousands) | |
| **Cash flows from operating activities attributable to continuing operations:** | | |
| Net loss | $ (59,503) | $ (18,177) |
| Less loss (income) from discontinued operations, net of tax | 9,793 | (8,427) |
| **Net loss from continuing operations** | (49,710) | (26,604) |
| Adjustments to reconcile net loss from continuing operations to net cash used in operating activities attributable to continuing operations: | | |
| Loss on disposal of fixed assets | 311 | 85 |
| Amortization of intangibles | 891 | 1,232 |
| Depreciation | 5,023 | 3,216 |
| Intangible impairment | 29,250 | 540 |
| Non-cash compensation expense | 3,777 | 3,104 |
| Non-cash restructuring expense | — | 93 |
| Non-cash contingent consideration gain | (652) | (928) |
| Deferred income taxes | (11,551) | (6,943) |
| Bad debt expense | 55 | 24 |
| Changes in current assets and liabilities: | | |
| Accounts receivable | (1,964) | 2,443 |
| Prepaid and other current assets | (148) | 225 |
| Accounts payable and other current liabilities | (4,376) | (10,057) |
| Income taxes payable | (309) | (610) |
| Deferred revenue | (136) | (64) |
| Other, net | 1,487 | 2,612 |
| **Net cash used in operating activities attributable to continuing operations** | (28,052) | (31,632) |
| **Cash flows from investing activities attributable to continuing operations:** | | |
| Capital expenditures | (6,110) | (5,123) |
| Acquisitions | — | (250) |
| Other, net | (1,981) | 2,193 |
| **Net cash used in investing activities attributable to continuing operations** | (8,091) | (3,180) |
| **Cash flows from financing activities attributable to continuing operations:** | | |
| Issuance of common stock, net of withholding taxes | (962) | (570) |
| Purchase of treasury stock | — | (8,532) |
| Increase in restricted cash | (2,325) | (50) |
| **Net cash used in financing activities attributable to continuing operations** | (3,287) | (9,152) |
| **Total cash used in continuing operations** | (39,430) | (43,964) |
| Net cash provided by (used in) operating activities attributable to discontinued operations | (81,723) | 6,651 |
| Net cash provided by (used in) investing activities attributable to discontinued operations | 839 | (2,103) |
| Net cash provided by financing activities attributable to discontinued operations | 97,036 | 22,142 |
| **Total cash provided by discontinued operations** | 16,152 | 26,690 |
| **Net decrease in cash and cash equivalents** | (23,278) | (17,274) |
| Cash and cash equivalents at beginning of period | 68,819 | 86,093 |
| **Cash and cash equivalents at end of period** | $ 45,541 | $ 68,819 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

49

Table of Contents

<div align="center">

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

**NOTE 1—ORGANIZATION**

**Spin-Off**

On August 20, 2008, Tree.com, Inc. ("we", "Tree.com" or the "Company") was spun off from its parent company, IAC/InterActiveCorp ("IAC") into a separate publicly traded company. In these consolidated financial statements, we refer to the separation transaction as the "spin-off." In connection with the spin-off, Tree.com was incorporated as a Delaware corporation in April 2008. Tree.com consists of the businesses that formerly comprised IAC's Lending and Real Estate segments as well as newly acquired or developed brands and businesses.

**Company Overview**

Tree.com, Inc. is the parent of LendingTree, LLC, which owns several brands and businesses that provide information, tools, advice, products and services for critical transactions in our consumers' lives. Our family of brands includes: LendingTree.com®, GetSmart.com®, DegreeTree.com®, LendingTreeAutos.com, DoneRight.com®, ServiceTree®, InsuranceTree.com<sup>SM</sup> and HealthTree.com®. Together, these brands serve as an ally for consumers who are looking to comparison shop for loans and other services from multiple businesses and professionals that will compete for their business.

**Segment Reporting**

The overall concept that management employs in determining its reportable segments and related financial information is to present them in a manner consistent with how the chief operating decision maker and executive management view our businesses, how the businesses are organized as to segment management, and the focus of our businesses with regards to the types of products or services offered or their target markets.

Through the quarter ended March 31, 2011, we operated in two reportable business segments: LendingTree Loans and Exchanges. The LendingTree Loans segment originates, processes, approves and funds various residential real estate loans through Home Loan Center, Inc. dba LendingTree Loans ("HLC"). The HLC and LendingTree Loans brand names are collectively referred to in these consolidated financial statements as "LendingTree Loans." The Exchanges segment consists of online lead generation networks and call centers that connect consumers and service providers principally in the lending, higher education, automobile, home services and insurance marketplaces.

In connection with entering into an agreement in the second quarter of 2011 that provides for the sale of substantially all of the operating assets of our LendingTree Loans segment to Discover Bank, a wholly-owned subsidiary of Discover Financial Services, that is discussed below and in Note 7, management re-evaluated its reporting segments based on our continuing operations. We refer to Discover Financial Services and/or any of its affiliates, including Discover Bank, as "Discover." We have determined that our continuing operations are now one reportable segment, which represents the previous "Exchanges" segment.

**Business Combinations**

In 2010, we purchased certain assets of a company for an aggregate purchase price of $0.8 million in cash and contingent consideration. The contingent consideration amount is based on a percentage of estimated cumulative earnings over a period of thirty-six months from the date of acquisition. The minimum payout under the arrangement is zero and the maximum payout is unlimited. In 2011, there

<div align="center">50</div>

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 1—ORGANIZATION (Continued)

was a reduction of $0.4 million in the amount of contingent consideration recognized since the date of acquisition, which is reflected as a reduction of general and administrative expense. The purchase was part of our strategic initiative to diversify our revenue streams outside of the mortgage and real estate industries.

In 2009, we purchased certain assets of four separate companies, for an aggregate purchase price of $5.7 million in cash and $1.0 million in contingent consideration. The contingent consideration amount related to one of the purchases is based on a percentage of estimated cumulative earnings over a period of thirty-six months from the date of acquisition. The minimum payout under the arrangement is zero and the maximum payout is unlimited. In 2011 and 2010, there were reductions of $0.3 million and $0.8 million, respectively, in the amounts of contingent consideration recognized since the date of acquisition, which is reflected as a reduction of general and administrative expense. All four transactions were part of our strategic initiative to diversify our revenue streams outside of the mortgage and real estate industries.

These asset purchases were accounted for under the acquisition method of accounting. Accordingly, the purchase price was allocated to the acquired assets and liabilities based on their estimated fair values at the acquisition dates. The purchase price for acquisitions in 2010 has been allocated resulting in $0.8 million to be accounted for as goodwill. The purchase price of the 2009 purchases has been allocated as $3.9 million to intangible assets with useful lives of five months to thirteen years and $2.9 million to goodwill. For the 2009 purchases, the goodwill recognized primarily relates to synergies of the combined organizations and intangible assets that do not qualify for separate recognition.

The pro forma effect of the 2010 and 2009 purchases were not material to our results of operations.

**Discontinued Operations**

The businesses of RealEstate.com and RealEstate.com, REALTORS® (which together represent the former Real Estate segment) and LendingTree Loans are presented as discontinued operations in the accompanying consolidated balance sheets and consolidated statements of operations and cash flows for all periods presented. The notes accompanying these consolidated financial statements reflect our continuing operations and, unless otherwise noted, exclude information related to the discontinued operations.

*Real Estate*

On March 10, 2011, management made the decision and finalized a plan to close all of the field offices of the proprietary full service real estate brokerage business known as RealEstate.com, REALTORS®. We exited all markets in which it previously operated by March 31, 2011. In September 2011, we sold the remaining assets of RealEstate.com, which consisted primarily of internet domain names and trademarks, for $8.3 million and recognized a gain on sale of $7.8 million.

*LendingTree Loans*

On May 12, 2011, we entered into an asset purchase agreement with Discover, as amended by that certain Amendment to the Asset Purchase Agreement dated as of February 7, 2012. The asset purchase

51

[Table of Contents]

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE 1—ORGANIZATION (Continued)

agreement provides for the sale of substantially all of the operating assets of our LendingTree Loans business to Discover.

Under the terms of the asset purchase agreement as amended, Discover will pay approximately $55.9 million in cash for the assets, subject to certain conditions. The transaction is subject to various closing conditions. The acquisition is expected to close by mid-year 2012. Subject to certain exceptions stated in the asset purchase agreement, we have agreed to operate the LendingTree Loans business in the ordinary course until the closing of the acquisition.

Discover generally will not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets included in the purchase. A portion of the initial purchase price payment will be held in escrow pending the discharge of certain liabilities that will remain with us.

Our stockholders approved the transaction on August 26, 2011.

The asset purchase agreement contains customary representations, warranties, covenants and indemnification obligations of the parties.

The asset purchase agreement also includes covenants of us (for which we are compliant) and Discover. Subject to certain exceptions stated in the asset purchase agreement, we have agreed to operate the LendingTree Loans business in the ordinary course. Our covenants include requirements to maintain personnel in our LendingTree Loans business, to maintain certain quality thresholds for our loan pipeline, to maintain warehouse line capacity and compliance with our warehouse lending agreement, and subject to certain exceptions, not to introduce new loan products without Discover's consent. If the requirements of these covenants are not met, Discover has the option to terminate the asset purchase agreement. Subject to certain exceptions, we have also agreed not to solicit or initiate discussion with third parties regarding other proposals to acquire the assets of the LendingTree Loans business or substantial equity interests in our company, and to certain restrictions on our ability to respond to or accept any such proposals.

Separate from the asset purchase agreement, we have also agreed to provide certain marketing related services to Discover in connection with its mortgage origination business for approximately seventeen months following the closing, or such earlier point as the agreed-upon services are satisfactorily completed. Discover has also agreed to be a participating lender in the LendingTree Network following the closing of the acquisition.

*Business Combinations*

On March 15, 2011, our wholly-owned subsidiary, HLC, completed its acquisition of certain assets of First Residential Mortgage Network, Inc. dba SurePoint Lending pursuant to an asset purchase agreement dated November 15, 2010. SurePoint, a LendingTree network lender for eleven years, was a full service residential mortgage provider licensed in 45 states and employing over 500 people, including more than 300 licensed loan officers. HLC purchased certain specified assets and assumed certain liabilities of SurePoint related to its business of originating, refinancing, processing, underwriting, funding and closing residential mortgage loans; providing title and escrow services; and providing other mortgage related services, as further described in the Agreement. The acquired assets also include all of the equity interests of Real Estate Title Services, LLC. HLC paid $8.0 million in cash upon the closing of the transaction, subject to certain adjustments as described in the asset purchase agreement,

52

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 1—ORGANIZATION (Continued)**

and $0.2 million in cash for contingent consideration subsequent to the close. HLC used available cash to fund the acquisition.

This asset purchase was accounted for under the acquisition method of accounting. Accordingly, the purchase price is allocated to the acquired assets and liabilities based on their estimated fair values at the acquisition date. The purchase price has been allocated as $5.6 million to goodwill, $0.7 million to intangible assets with useful lives of three months to five years, and $1.7 million to equipment and other assets. The pro forma effect of this purchase was not material to our results of operations.

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES**

**Consolidation**

The consolidated financial statements include the accounts of Tree.com and all entities that are wholly-owned by us. Intercompany transactions and accounts have been eliminated.

**Revenue Recognition**

*Continuing Operations*

Revenue principally represents match fees and closed-loan fees paid by lenders that received a transmitted loan request or closed a loan for a consumer that originated through one of our websites or affiliates. Revenue also includes match fees paid by institutions of higher education and businesses and professionals in the automobile, home services, real estate and insurance industries for a transmitted lead or service request. Match fees are recognized at the time qualification forms are transmitted, while closed-loan fees are recognized at the time the lender reports the closed loan to us, which may be several months after the loan request is transmitted.

*Discontinued Operations*

LendingTree Loans' revenues are primarily derived from the origination and sale of mortgage loans. Loans are funded through warehouse lines of credit and are sold to investors, typically within thirty days. The gain or loss on the sale of loans is realized on the date the loans are sold. LendingTree Loans sells its loans on a servicing-released basis in which it releases the rights to service the loans to the purchasers of such loans.

Loans are recorded at fair value at the time of origination. Changes in the fair value of loans are recorded through revenue prior to the sale of the loans to investors. At the time of sale, any difference between the estimated fair value of the loan and the sales price is recorded as an adjustment to the gain.

Loans funded prior to January 1, 2008 are carried at the lower of cost or market value determined on an aggregate basis except for loans that are impaired, which are assessed on an individual basis. Loans are deemed impaired when they have a significant defect impacting the ability of LendingTree Loans to sell the loan and recoup substantially all of the balance due. Loan origination fees and certain direct costs related to the origination of loans prior to January 1, 2008 were capitalized and deferred until the loans were sold. Upon sale of the loans, the origination fees and costs were recognized as a component of the gain on sale of loans.

53

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)

Real Estate earned revenue from commissions paid by consumers for our agents closing a real estate transaction on their behalf and from cooperative brokerage fees paid by real estate professionals participating on its exchange. Commissions were recognized at the time the real estate transaction was closed. Cooperative brokerage fees were recognized when the transmission of a consumer's information resulted in the purchase or sale of a home and the transaction was reported closed by the participating real estate professional.

### Cash and Cash Equivalents

Cash and cash equivalents include cash and short-term, highly liquid money market investments.

### Restricted Cash

Restricted cash and cash equivalents consists of the following (in thousands):

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Cash in escrow for surety bonds | $ 6,500 | $ 5,030 |
| Cash in escrow for corporate purchasing card program | 800 | 800 |
| Minimum required balances for warehouse lines of credit | 4,250 | 1,925 |
| Other | 901 | 400 |
| Total restricted cash and cash equivalents | $ 12,451 | $ 8,155 |

### Accounts Receivable

Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts.

Accounts receivable outstanding longer than the contractual payment terms are considered past due. We determine our allowance for doubtful accounts by considering a number of factors, including the length of time accounts receivable are past due, our previous loss history, the specific customer's current ability to pay its obligation to us and the condition of the general economy and the customer's industry as a whole. We write off accounts receivable when management deems them uncollectible. Write-offs were $0.1 million and $0.4 million for the years ended December 31, 2011 and 2010, respectively.

### Loans Held for Sale

LendingTree Loans originates all of its residential real estate loans with the intent to sell them in the secondary market. Loans held for sale consist primarily of residential first mortgage loans that are secured by residential real estate throughout the United States.

Loans held for sale are recorded at fair value, with the exception of any loans that have been repurchased from investors or loans originated prior to January 1, 2008 on which we did not elect the fair value option. As of December 31, 2011 and 2010, $-0- and $0.8 million, respectively, of such loans were impaired and carried on our balance sheet at the lower of cost or market value assessed on an individual loan basis.

54

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

The fair value of loans held for sale is determined using current secondary market prices for loans with similar coupons, maturities and credit quality. Loans held for sale are pledged as collateral under LendingTree Loans' warehouse lines of credit. LendingTree Loans relies substantially on the secondary mortgage market as all of the loans originated are sold into this market.

Prior to August 2010, fees received from borrowers for a commitment to originate a mortgage loan at a specified rate (interest rate lock commitment or "IRLC") were deferred. Such fees were generally credited toward loan origination fees when the loan was funded or recognized as income upon expiration of the commitment in the case of unexercised commitments. Effective August 2010, the Company no longer collects commitment fees for IRLCs.

Interest on mortgage loans held for sale is recognized as earned and is only accrued if deemed collectible. Interest is generally deemed uncollectible when a loan becomes three months or more delinquent or when a loan has a defect affecting its salability. Delinquency is calculated based on the contractual due date of the loan. Loans are written off when deemed uncollectible.

**Loan Loss Obligations**

LendingTree Loans sells loans it originates to investors on a servicing released basis and the risk of loss or default by the borrower is generally transferred to the investor. However, LendingTree Loans is required by these investors to make certain representations relating to credit information, loan documentation and collateral. To the extent LendingTree Loans does not comply with such representations or there are early payment defaults, LendingTree Loans may be required to repurchase loans or indemnify the investors for any losses from borrower defaults. LendingTree Loans initially records an estimated liability for this obligation at fair value as a reduction in revenue. Subsequently, LendingTree Loans maintains a liability for the estimated exposure relating to such contingent obligations based, in part, on historical and projected loss frequency and loss severity using its loan loss history (adjusted for recent trends in loan loss experience as well as market pricing information on loans repurchased), the original principal amount of loans previously sold, the years loans were sold and loan types. There are four loan types used in this analysis that are determined based on the extent of the documentation received (full or limited) and the lien position of the mortgage in the underling property (first or second position). In the case of early payoffs, which occur when a borrower prepays a loan prior to the end of a specified period, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor. The estimated obligation associated with early payoffs is calculated based on historical loss experience by loan type.

**Real Estate Properties Acquired in Satisfaction of Loans**

Real estate properties acquired in satisfaction of loans are recorded at the lower of carrying amount or estimated fair value less selling costs on their acquisition dates. Subsequent write-downs, costs to maintain the property, and gains or losses realized upon disposition are included in operating expenses of discontinued operations in the accompanying consolidated statements of operations.

**Property and Equipment**

Property and equipment, including significant improvements, are recorded at cost less accumulated depreciation. Repairs and maintenance and any gains or losses on dispositions are included in operations.

55

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Depreciation is recorded on a straight-line basis to allocate the cost of depreciable assets to operations over their estimated service lives. Amortization of assets recorded under capital leases is included in depreciation expense. The following table presents the depreciation period for each asset category:

| Asset Category | Depreciation Period |
| --- | --- |
| Computer equipment and capitalized software | 1 to 5 years |
| Leasehold improvements | Lesser of asset life or life of lease |
| Furniture and other equipment | 3 to 7 years |

**Software Development Costs**

Software development costs primarily include expenses incurred to develop the software that powers our websites. Certain costs incurred during the application development stage are capitalized based on specific activities tracked on internal timesheets and external invoices (or timesheets), while costs incurred during the preliminary project stage and post-implementation/operation stage are expensed as incurred. Capitalized software development costs are amortized over estimated lives of one to three years.

**Goodwill and Indefinite-Lived Intangible Assets**

Goodwill acquired in business combinations is assigned to the reporting units that are expected to benefit from the combination as of the acquisition date.

Goodwill impairment is determined using a two-step process. The first step of the process is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, we determine the fair value of our reporting units by using a market approach and a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its estimated fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a relief-from royalty methodology in estimating the fair value of trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates perpetual growth rates, and the amount and timing of future revenues.

56

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Goodwill and indefinite-lived intangible assets, primarily trade names and trademarks, are tested annually for impairment as of October 1 or earlier upon the occurrence of certain events or substantive changes in circumstances. We performed interim tests as of March 31, 2011 and June 30, 2011, in addition to the annual test on October 1, 2011 and 2010. We identified impairments in the interim tests in 2011 and in the annual test in 2010, as described in Notes 4 and 7.

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets, including property and equipment and intangible assets with definite lives, are tested for recoverability whenever events or changes in circumstances indicate that their carrying amount may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is deemed to not be recoverable, an impairment loss is recorded as the amount by which the carrying amount of the long-lived asset exceeds its fair value. Amortization of definite-lived intangible assets is recorded on a straight-line basis over their estimated lives. We did not identify any impairment related to such assets in 2011 or 2010.

**Fair Value Measurements**

We categorize our assets and liabilities measured at fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- Level 1: Observable inputs such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- Level 2: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

- Level 3: Unobservable inputs for which there is little or no market data and which require us to develop our own assumptions, based on the best information available in the circumstances, about the assumptions market participants would use in pricing the asset or liability. See Note 7 for a discussion of assets measured at fair value using Level 3 inputs.

Our non-financial assets, such as goodwill, intangible assets and property and equipment are measured at fair value when there is an indicator of impairment, and recorded at fair value only when an impairment charge is recognized. Such fair value measurements are based predominantly on Level 3 inputs. See Note 4 for discussion of goodwill and intangible asset impairment charges.

**Derivative Instruments and Hedging Activities**

LendingTree Loans is exposed to certain risks in connection with its mortgage banking operations. LendingTree Loans is exposed to interest rate risk for loans it originates until those loans are sold in the secondary market. The fair value of interest rate lock commitments ("IRLCs") and loans held for sale are subject to change primarily due to changes in market interest rates. LendingTree Loans economically hedges the changes in fair value of IRLCs and loans held for sale primarily by using derivative instruments that are more fully described in Note 7.

57

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

**Cost of Revenue**

Cost of revenue consists primarily of costs associated with compensation and other employee-related costs (including stock-based compensation) related to customer call centers, credit scoring fees, consumer incentive costs, and website network hosting and server fees.

**Consumer Promotional Costs**

We offer certain consumers that utilize our Exchanges services promotional incentives to complete a transaction. These include gift certificates, airline miles or other coupons in the event a transaction is completed utilizing our services. The liability is estimated for these consumer promotional costs each period based on the number of consumers that are presented such offers, the cost of the item being offered and the historical trends of consumers qualifying for the offer and our payout rates. The estimated costs of consumer promotional incentives are charged to cost of revenue in each period. Consumer promotional expense was $0.7 million and $0.9 million for the years ended December 31, 2011 and 2010, respectively. Consumer promotional costs accrued totaled $0.2 million and $0.4 million at December 31, 2011 and 2010, respectively, and are included in accrued expenses and other current liabilities in the accompanying consolidated balance sheets.

**Product Development**

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in the design, development, testing and enhancement of technology that are not capitalized.

**Advertising**

Advertising costs are expensed in the period incurred (when the advertisement first runs for production costs that are initially capitalized) and principally represent offline costs, including television, print and radio advertising, and online advertising costs, including fees paid to search engines and distribution partners. Advertising expense was $40.7 million and $47.7 million for the years ended December 31, 2011 and 2010, respectively.

**Income Taxes**

We account for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. In estimating future tax consequences, all expected future events are considered. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. We record interest on potential tax contingencies as a component of income tax expense and record interest net of any applicable related income tax benefit.

In accordance with the accounting standard for uncertainty in income taxes, we recognize liabilities for uncertain tax positions based on the two-step process prescribed by the accounting standards. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including

58

Table of Contents

<div align="center">

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

</div>

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement.

**Stock-Based Compensation**

We record stock-based compensation in accordance with the accounting standard for share-based payments. See Note 3 for further information.

**Accounting Estimates**

Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements, including discontinued operations, include: valuation allowance for impaired loans held for sale; loan loss obligations; the fair value of loans held for sale and related derivatives; the recoverability of long-lived assets, goodwill and intangible assets; the determination of income taxes payable and deferred income taxes, including related valuation allowances; restructuring reserves; contingent consideration related to business combinations; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

**Reclassifications**

Certain prior period amounts have been reclassified to conform with the current presentation with no effect on net loss or accumulated deficit. Specifically, certain costs within continuing operations totaling $0.4 million for the year ended December 31, 2010 were reclassified from general and administrative expense to litigation settlements and contingencies. Prior period results have also been reclassified to conform with discontinued operations presentation.

**Certain Risks and Concentrations**

Our business is subject to certain risks and concentrations including dependence on third party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject us to concentration of credit risk, consist primarily of cash and cash equivalents. Cash and cash equivalents are in excess of Federal Deposit Insurance Corporation insurance limits, but are maintained with quality financial institutions of high credit.

Due to the nature of the mortgage lending industry, changes in interest rates may significantly impact revenue from originating mortgages and subsequent sales of loans to investors, which are the primary source of income for LendingTree Loans. LendingTree Loans originates mortgage loans on property located throughout the United States, with revenue from loans originated for property located in California totaling approximately 16% and 18% of LendingTree Loans' revenue in 2011 and 2010, respectively.

<div align="center">59</div>

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

LendingTree Loans monitors its relationships with investors and, from time to time, makes adjustments in the amount it sells to any one investor based upon a number of factors, including but not limited to, price, loan review time and funding turnaround, underwriting guidelines and the overall efficiency of its relationship with the investor.

The following table represents the approximate percentage of LendingTree Loan's revenue for LendingTree Loan's three largest investors (purchasers of the loans originated) for the years ended December 31, 2011 and 2010:

|  | 2011 | 2010 |
|---|---|---|
| Investor 1 | 44% | 18% |
| Investor 2 | 33% | 41% |
| Investor 3 | 17% | 39% |

LendingTree Loans funds loans through warehouse lines of credit. As of December 31, 2011 and 2010, 57% and 68%, respectively, of the total balance due on the lines of credit was payable to one lender. The decision regarding how to allocate this balance amongst lenders is based on several factors, including the interest rate and commitment fee.

Due to the nature of the mortgage lending industry, interest rate increases may negatively impact future revenue from our lending networks as well as revenue from originating and selling loans.

Further, lenders participating on our lending networks can offer their products directly to consumers through brokers, mass marketing campaigns, or through other traditional methods of credit distribution. These lenders can also offer their products online, either directly to prospective borrowers, through one or more of our online competitors, or both. If a significant number of potential consumers are able to obtain loans from our participating lenders without utilizing our service, our ability to generate revenue may be limited. Because we do not have exclusive relationships with the lenders whose loan offerings are offered on our online marketplace, consumers may obtain offers and loans from these lenders without using our service.

We maintain operations solely in the United States.

**Recent Accounting Pronouncements**

In January 2010, we adopted the accounting standard for transfers and servicing of financial assets, with no material impact to our financials. The objective is to improve relevance, representational faithfulness, and comparability of the information that a reporting entity provides in its financial statements about a transfer of financial assets; the effects of a transfer on its financial position, financial performance, and cash flows; and a transferor's continuing involvement, if any, in transferred financial assets. This standard was effective for annual reporting periods beginning after November 15, 2009.

In January 2010, the FASB amended and we adopted the accounting standard for fair value measurements and disclosures, which added new requirements for disclosures about transfers into and out of Level 1 and 2 and separate disclosures about purchases, sales, issuances and settlements relating to Level 3 measurements. The amendment also clarifies existing fair value disclosures about the level of disaggregation and the inputs and valuation techniques used to measure fair value. This amendment is effective for the first reporting period (including interim periods) beginning after December 15, 2009,

60

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 2—SIGNIFICANT ACCOUNTING POLICIES (Continued)**

except for the requirement to provide the Level 3 activity of purchases, sales, issuances and settlements on a gross basis, which is effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years. See Note 7 for further information.

In December 2010, the FASB issued guidance to clarify that if a public entity presents comparative financial statements for business combinations that are material on an individual or aggregate basis, the entity should disclose revenues and earnings of the combined entity as though the business combination had occurred as of the beginning of the comparable prior annual reporting period only. Additionally, the guidance expands the supplemental pro forma disclosures to include a description of the nature and amount of material, nonrecurring, adjustments directly attributable to the business combination included in the reported pro forma revenue and earnings. The guidance is effective prospectively for business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2010. We adopted the guidance on January 1, 2011, and this did not have an impact on our consolidated financial statements for 2011.

In May 2011, the FASB issued amendments to the fair value accounting guidance. The amendments clarify the application of the highest and best use, and valuation premise concepts, preclude the application of blockage factors in the valuation of all financial instruments and include criteria for applying the fair value measurement principles to portfolios of financial instruments. The amendments additionally prescribe enhanced financial statement disclosures for Level 3 fair value measurements. The new amendments were effective on January 1, 2012. The adoption of this guidance will not have a material impact on our consolidated financial statements.

In June 2011, the FASB issued new accounting guidance on the presentation of comprehensive income in financial statements. The new guidance requires entities to report components of comprehensive income in either a continuous statement of comprehensive income or two separate but consecutive statements. In December 2011, the FASB deferred certain provisions of this guidance pertaining to the presentation of reclassification adjustments. This new accounting guidance is effective for the three months ended March 31, 2012. The adoption of this guidance will not have a material impact on our consolidated financial statements.

In September 2011, the FASB issued the updated accounting standard on testing goodwill for impairment. The update simplifies how an entity tests goodwill for impairment. The amendments allow both public and nonpublic entities an option to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test. Under that option, an entity no longer would be required to calculate the fair value of a reporting unit unless the entity determines, based on that qualitative assessment, that it is more likely than not that its fair value is less than its carrying amount. The amendments will be effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011. Early adoption was permitted. We did not adopt early and we believe this will not have a material impact on our consolidated financial statements.

In December 2011, the FASB issued new accounting guidance that requires additional disclosures on financial instruments and derivative instruments that are either offset in accordance with existing accounting guidance or are subject to an enforceable master netting arrangement or similar agreement. The new requirements do not change the accounting guidance on netting, but rather enhance the disclosures to more clearly show the impact of netting arrangements on a company's financial position. This new accounting guidance will be effective, on a retrospective basis for all comparative periods presented, beginning on January 1, 2013. The adoption of this guidance will not have a material impact on our consolidated financial statements.

61

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 3—STOCK-BASED COMPENSATION**

We currently have one active plan ("Tree.com 2008 Stock and Annual Incentive Plan") under which future awards may be granted, which currently covers outstanding stock options to acquire shares of our common stock and restricted stock units ("RSUs"), and provides for the future grant of these and other equity awards. Under the Tree.com 2008 Stock and Annual Incentive Plan, we are authorized to grant stock options, RSUs and other equity based awards for up to 2.75 million shares of Tree.com common stock. Our board of directors has approved an amendment to the Tree.com 2008 Stock and Annual Incentive Plan to increase the number of authorized shares to 3.35 million shares, subject to approval of stockholders. The active plan described above authorizes us to grant awards to its employees, officers and directors. Finally, this active plan also governs certain equity awards of IAC that were converted into equity awards of Tree.com in connection with the spin-off.

In addition, the plan described above has a stated term of ten years and provides that the exercise price of stock options granted will not be less than the market price of our common stock on the grant date. The plan does not specify grant dates or vesting schedules as those determinations have been delegated to the Compensation Committee of our board of directors (the "Committee"). Each grant agreement reflects the vesting schedule for that particular grant as determined by the Committee.

Prior to the spin-off, our employees received equity awards that were granted under various IAC stock and annual incentive plans. Upon spin-off, these IAC awards were converted into awards of both Tree.com and other former IAC companies. We will continue to recognize non-cash compensation expense for all of these awards granted to our employees.

Non-cash stock-based compensation expense related to equity awards is included in the following line items in the accompanying consolidated statements of operations for the years ended December 31, 2011 and 2010 (in thousands):

|  | 2011 | 2010 |
|---|---|---|
| Cost of revenue | $    11 | $    15 |
| Selling and marketing expense | 425 | 200 |
| General and administrative expense | 3,025 | 2,765 |
| Product development | 316 | 124 |
| Non-cash stock-based compensation expense before income taxes | 3,777 | 3,104 |
| Income tax benefit | (1,492) | (1,226) |
| Non-cash stock-based compensation expense after income taxes | $  2,285 | $  1,878 |

The forms of stock-based awards granted to Tree.com employees are principally RSUs, restricted stock and stock options. RSUs are awards in the form of units, denominated in a hypothetical equivalent number of shares of Tree.com common stock and with the value of each award equal to the fair value of Tree.com common stock at the date of grant. RSUs may be settled in cash, stock or both, as determined by the Committee at the time of grant. Each stock-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. Certain restricted stock awards also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests. Tree.com recognizes expense for all stock-based awards for which vesting is considered probable. For stock-based awards, the accounting charge is measured at the grant date as the fair value of Tree.com common stock awarded and expensed ratably as non-cash compensation over the vesting term. For performance-based awards,

62

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 3—STOCK-BASED COMPENSATION (Continued)

the expense is measured at the grant date as the fair value of our common stock awarded and expensed as non-cash compensation over the vesting period if the performance targets are considered probable of being achieved.

The amount of stock-based compensation expense recognized in the consolidated statement of operations is reduced by estimated forfeitures, as the amount recorded is based on awards ultimately expected to vest. The forfeiture rate is estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if the actual forfeiture rate differs from the estimated rate.

Tax benefits resulting from tax deductions in excess of the stock-based compensation expense recognized in the consolidated statement of operations are reported as a component of financing cash flows. There were no excess tax benefits from stock-based compensation for the years ended December 31, 2011 or 2010.

As of December 31, 2011, there was approximately $1.0 million, $3.9 million and $1.1 million of unrecognized compensation cost, net of estimated forfeitures, related to stock options, RSUs and restricted stock, respectively. These costs are expected to be recognized over a weighted-average period of approximately 1.4 years for stock options, 2.1 years for RSUs and 1.1 years for restricted stock.

**Stock Options**

A summary of changes in outstanding stock options is as follows:

| | Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (In years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2011 | 952,669 | $ | 9.58 | | | |
| Granted | 153,868 | | 5.89 | | | |
| Exercised | (5,215) | | 4.10 | | | |
| Forfeited | (7,758) | | 7.46 | | | |
| Expired | (46,818) | | 9.43 | | | |
| Outstanding at December 31, 2011 | 1,046,746 | $ | 9.09 | 6.0 | $ | 30 |
| Options exercisable | 272,997 | $ | 12.39 | 4.0 | $ | 17 |

Substantially all options outstanding at December 31, 2011 are vested or are expected to vest over a weighted-average period of approximately 1.4 years.

The fair value of each stock option award is estimated on the grant date using the Black-Scholes option pricing model. There were 153,868 stock options granted to the Chairman and CEO during the year ended December 31, 2011, which vest over a period of three years. The weighted average exercise price and the weighted average fair value related to these stock option grants were $5.89 and $2.60, respectively. There were no stock options granted during the year ended December 31, 2010.

The Black-Scholes option pricing model incorporates various assumptions, including expected volatility and expected term. For purposes of this model, no dividends have been assumed. The risk-free interest rates are based on U.S. Treasury yields for notes with comparable expected terms as

63

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 3—STOCK-BASED COMPENSATION (Continued)

the awards, in effect at the grant date. The expected term of options granted is based on analyses of historical employee termination rates and option exercise patterns, giving consideration to expectations of future employee behavior. The following are the weighted average assumptions used in the Black-Scholes option pricing model for years ended December 31, 2011: volatility factor of 44%, risk-free interest rate of 3.6%, expected term of 7.0 years, and a dividend yield of zero.

In connection with the spin-off, our Chairman and CEO was awarded two grants of 589,950 stock options, each of which represented the right to acquire 2.5% of the fully diluted equity at exercise prices representing total equity values of the Company of $100 million and $300 million. These stock options all cliff vest at the end of five years. The weighted average exercise price and the weighted average fair value related to these stock option grants were $16.95 and $4.19, respectively. In 2009, we entered into an Option Cancellation Agreement with the Chairman and CEO, in which he surrendered for cancellation in its entirety one stock option award to purchase 589,850 shares of the Company's common stock at an exercise price of $25.43 per share.

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value (the difference between our closing stock price on the last trading day of 2011 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their options on December 31, 2011. This amount changes based on the fair market value of our common stock. The total intrinsic value of stock options exercised during the years ended December 31, 2011 and 2010 was $17,000 and $87,000, respectively.

Cash received from stock option exercises and the related actual tax benefit realized were $21,000 and $7,000 for the year ended December 31, 2011 and $302,000 and $36,000 for the year ended December 31, 2010, respectively.

The following table summarizes the information about stock options outstanding and exercisable as of December 31, 2011:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Outstanding at December 31, 2011 | Weighted Average Remaining Contractual Life in Years | Weighted Average Exercise Price | Exercisable at December 31, 2011 | Weighted Average Exercise Price |
| $.01 to $4.99 | 6,477 | 1.60 | $ 2.94 | 6,477 | $ 2.94 |
| $5.00 to $7.45 | 161,928 | 8.89 | 5.92 | 8,060 | 6.52 |
| $7.46 to $9.99 | 719,166 | 5.99 | 8.31 | 99,285 | 7.56 |
| $10.00 to $14.99 | 31,096 | 1.97 | 12.72 | 31,096 | 12.72 |
| $15.00 to $19.99 | 81,416 | 3.40 | 15.03 | 81,416 | 15.03 |
| $20.00 to $24.99 | 46,663 | 3.44 | 20.19 | 46,663 | 20.19 |
| | 1,046,746 | 6.00 | $ 9.09 | 272,997 | $ 12.39 |

64

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 3—STOCK-BASED COMPENSATION (Continued)**

**Restricted Stock Units and Restricted Stock**

Nonvested RSUs and restricted stock outstanding as of December 31, 2011 and changes during the year ended December 31, 2011 were as follows:

| | RSUs | | Restricted Stock | |
| --- | --- | --- | --- | --- |
| | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Nonvested at January 1, 2011 | 634,771 | $ 7.53 | 412,500 | $ 6.80 |
| Granted | 771,912 | 6.17 | 24,642 | 5.55 |
| Vested | (261,258) | 7.34 | (137,500) | 6.80 |
| Forfeited | (212,374) | 7.56 | — | — |
| Nonvested at December 31, 2011 | 933,051 | $ 6.48 | 299,642 | $ 6.70 |

The weighted average grant date fair value of RSUs granted during the years ended December 31, 2011 and 2010 at market prices equal to Tree.com's common stock on the grant date was $6.17 and $8.09, respectively.

The total fair value of RSUs that vested during the years ended December 31, 2011 and 2010 was $1.9 million and $2.3 million, respectively.

Our Chairman and CEO was granted 350,000 shares of restricted stock in 2009, which was treated as a modification of the cancelled stock option award of 589,850 shares discussed above. These shares of restricted stock had a weighted average grant date fair value of $5.42. The incremental non-cash compensation expense for this modification is $0.7 million, which is being recognized over the vesting period of four years. During the year ended December 31, 2010, our Chairman and CEO was granted 150,000 shares of restricted stock. These shares of restricted stock had a weighted average grant date fair value of $9.21 and a total fair value of $1.4 million. During the year ended December 31, 2011, our Chairman and CEO was granted 24,642 shares of restricted stock. The shares of restricted stock had a weighted average grant date fair value of $5.55 and a total fair value of $0.1 million.

**Equity Instruments Denominated in the Shares of Certain Subsidiaries**

Subsequent to December 31, 2011, we granted common shares in an operating subsidiary to certain members of the subsidiary's management. These equity awards vest over a period of years or upon the occurrence of certain prescribed events. We have taken a preferred interest in the subsidiary with a face value equal to its investment cost or a certain other fixed amount. This preferred interest accretes with paid-in-kind dividends at a prescribed rate of return. The equity awards management receives as a whole generally represent a small minority of the total common stock outstanding of each subsidiary. Accordingly, these interests only have value to the extent the relevant business appreciates in value above the preferred interest (including the accretion of dividends), our investment cost or other fixed amount. These interests can have significant value in the event of significant appreciation. The interests are ultimately settled in our common stock or cash at our sole option, with fair market value determined by negotiation or arbitration, at various dates through 2016. The expense associated with these equity awards is initially measured at fair value at the grant date and is amortized ratably as

65

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 3—STOCK-BASED COMPENSATION (Continued)**

non-cash compensation over the vesting term. The aggregate number of our common shares that would be required to settle these interests at current estimated fair values, including vested and unvested interests, will be included in future calculations of diluted earnings per share if the effect is dilutive.

The operating subsidiary is party to fair value put and call arrangements with respect to these interests. These put and call arrangements allow management of these businesses to require the relevant operating subsidiary to purchase their interests or allow the operating subsidiary to acquire such interests at fair value, respectively. These put and call arrangements become exercisable by the operating subsidiary and the counter-party at various dates through 2016. These put arrangements are exercisable by the counter-party outside the control of us. Accordingly, to the extent that the fair value of these interests exceeds the value determined by normal non-controlling interest accounting, the value of such interests is adjusted to fair value with a corresponding adjustment to additional paid-in capital. Non-controlling interests in our consolidated subsidiaries would typically be reported on our consolidated balance sheets within shareholders' equity, separately from equity. However, in accordance with Accounting Standards Update 2009-04, "Accounting for Redeemable Equity Investments-Amendment to ASC 480-10-599", securities that are redeemable at the option of the holder and not solely within the control of the issuer must be classified outside of shareholders' equity. Since the redemption of the non-controlling interests is outside of our control, these interests will be included in the mezzanine section of future consolidated balance sheets, outside of shareholders' equity.

**NOTE 4—GOODWILL AND INTANGIBLE ASSETS**

The balance of goodwill and intangible assets, net is as follows (in thousands):

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Goodwill | $ 3,632 | $ 3,632 |
| Intangible assets with indefinite lives | $ 10,142 | $ 39,142 |
| Intangible assets with definite lives, net | 1,047 | 2,177 |
| Total intangible assets, net | $ 11,189 | $ 41,319 |

Intangible assets with indefinite lives relate principally to our trademarks. At December 31, 2011, intangible assets with definite lives relate to the following ($ in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 50,411 | $ (50,293) | $ 118 | 5.0 |
| Technology | 25,194 | (25,034) | 160 | 3.0 |
| Customer lists | 6,682 | (6,045) | 637 | 4.2 |
| Other | 1,516 | (1,384) | 132 | 2.5 |
| Total | $ 83,803 | $ (82,756) | $ 1,047 | |

66

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 4—GOODWILL AND INTANGIBLE ASSETS (Continued)

At December 31, 2010, intangible assets with definite lives relate to the following ($ in thousands):

|  | Cost | Accumulated Amortization | Net | Weighted Average Amortization Life (Years) |
|---|---|---|---|---|
| Purchase agreements | $ 50,436 | $ (50,271) | $ 165 | 5.0 |
| Technology | 26,091 | (25,438) | 653 | 3.0 |
| Customer lists | 6,682 | (5,986) | 696 | 4.1 |
| Other | 1,609 | (946) | 663 | 2.5 |
| Total | $ 84,818 | $ (82,641) | $ 2,177 | |

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on balances as of December 31, 2011, such amortization is estimated to be as follows (in thousands):

|  | Amount |
|---|---|
| Year ending December 31, 2012 | $ 358 |
| Year ending December 31, 2013 | 147 |
| Year ending December 31, 2014 | 86 |
| Year ending December 31, 2015 | 60 |
| Year ending December 31, 2016 | 60 |
| Thereafter | 336 |
| Total | $ 1,047 |

The following table presents the balance of goodwill, including changes in the carrying amount of goodwill, for the years ended December 31, 2011 and 2010 (in thousands):

|  | Total |
|---|---|
| **Balance as of January 1, 2010** | |
| Goodwill | $ 485,955 |
| Accumulated impairment losses | (483,088) |
| | 2,867 |
| Goodwill acquired during the year | 765 |
| Impairment losses | — |
| Other deductions | — |
| **Balance as of December 31, 2010** | |
| Goodwill | 486,720 |
| Accumulated impairment losses | (483,088) |
| | 3,632 |
| Goodwill acquired during the year | — |
| Impairment losses | — |
| Other deductions | — |
| **Balance as of December 31, 2011** | |
| Goodwill | 486,720 |
| Accumulated impairment losses | (483,088) |
| | $ 3,632 |

67

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 4—GOODWILL AND INTANGIBLE ASSETS (Continued)

Additions principally relate to business combinations. See Note 1.

We performed an interim impairment test in the second quarter of 2011 and our annual test as of October 1, 2011, and recorded impairment charges related to trade names and trademarks of $29.0 million and definite-lived intangible assets of $0.3 million. These impairments resulted from a lower observed market value of our common stock at June 30, 2011 and lower anticipated revenues related to our trade names and trademarks as a result of the anticipated sale of substantially all of the operating assets of LendingTree Loans. The impairment of definite-lived assets was recorded in the second quarter of 2011, and we determined in connection with preparation of our annual financial statements that the impairment of the indefinite-lived assets should have also been recorded in the second quarter of 2011. No additional impairments are recorded as of October 1, 2011.

Impairments related to trademarks were $0.5 million in 2010, and there were no impairments of definite-lived intangible assets in 2010.

We perform our annual goodwill impairment testing during the fourth quarter in conjunction with our annual financial planning process, with such testing based primarily on events and circumstances existing as of October 1. We determine the fair value of our single reporting unit using a market approach and a discounted cash flow ("DCF") analyses. Determining fair value requires the exercise of significant judgment, including judgment about the amount and timing of expected future cash flows and appropriate discount rates. The expected cash flows used in the DCF analyses are based on our most recent budget and, for years beyond the budget, our estimates, which are based, in part, on forecasted growth rates. The discount rates used in the DCF analyses reflect the risks inherent in the expected future cash flows of the respective reporting units.

We determine the fair values of our indefinite-lived intangible assets using a relief-from royalty DCF valuation analyses. Significant judgments inherent in these analyses include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future revenue. The discount rates used in the DCF analyses reflect the risks inherent in the expected future revenue to be generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license our trade names and trademarks.

### NOTE 5—PROPERTY AND EQUIPMENT

The balance of property and equipment, net is as follows (in thousands):

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Computer equipment and capitalized software | $ 24,940 | $ 19,898 |
| Leasehold improvements | 2,042 | 1,382 |
| Furniture and other equipment | 1,450 | 1,362 |
| Projects in progress | 826 | 2,780 |
|  | 29,258 | 25,422 |
| Less: accumulated depreciation and amortization | (20,883) | (17,824) |
| Total property and equipment, net | $ 8,375 | $ 7,598 |

68

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 5—PROPERTY AND EQUIPMENT (Continued)**

Unamortized capitalized software development costs were $6.4 million and $5.7 million at December 31, 2011 and 2010, respectively. Capitalized software development amortization expense was $2.7 million and $1.8 million for the years ended December 31, 2011 and 2010, respectively.

**NOTE 6—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

Accrued expenses and other current liabilities consist of the following (in thousands):

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Litigation accruals | $    3,077 | $    520 |
| Accrued advertising expense | 2,659 | 8,511 |
| Accrued compensation and benefits | 624 | 2,766 |
| Accrued professional fees | 635 | 1,166 |
| Accrued restructuring costs | 439 | 1,199 |
| Customer deposits and escrows | 2,211 | 2,240 |
| Deferred rent | 186 | 379 |
| Other | 6,881 | 7,100 |
| Total accrued expenses and other current liabilities | $    16,712 | $    23,881 |

The other category above reflects an estimated earnout payable related to an acquisition, franchise taxes, self-insured health claims and other miscellaneous accrued expenses.

An additional $0.9 million and $1.2 million of accrued restructuring liability is classified in other long term liabilities at December 31, 2011 and December 31, 2010, respectively.

**NOTE 7—DISCONTINUED OPERATIONS**

On March 10, 2011, management made the decision and finalized a plan to close all of the field offices of the proprietary full service real estate brokerage business known as RealEstate.com, REALTORS®. We exited all markets by March 31, 2011. In September 2011, we sold the remaining assets of RealEstate.com, which consisted primarily of internet domain names and trademarks. Accordingly, these Real Estate businesses are presented as discontinued operations in the accompanying consolidated balance sheets and consolidated statements of operations and cash flows for all periods presented.

On May 12, 2011, we entered into an asset purchase agreement with Discover, which provides for the sale of substantially all of the operating assets of our LendingTree Loans business to Discover. On February 7, 2012, we entered into an amendment to the asset purchase agreement. We have evaluated the facts and circumstances of the pending transaction and the applicable accounting guidance for discontinued operations, and have concluded that the LendingTree Loans business should be reflected as discontinued operations in the accompanying consolidated balance sheets and consolidated statements of operations and cash flows for all periods presented.

69

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

#### NOTE 7—DISCONTINUED OPERATIONS (Continued)

The revenue and net loss for the Real Estate businesses that are reported as discontinued operations for the years ended December 31, 2011 and 2010 were as follows (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Revenue | $ 3,857 | $ 14,084 |
| Loss before income taxes | $ (16,804) | $ (16,340) |
| Income tax benefit (expense) | — | 6,225 |
| Gain from sale of discontinued operations | 7,752 | — |
| Net loss | $ (9,052) | $ (10,115) |

Net loss for the year ended December 31, 2011 includes goodwill disposal charges totaling $8.0 million, trademark impairment charges of $4.1 million and restructuring expense totaling $2.6 million.

The revenue and net income (loss) for LendingTree Loans that are reported as discontinued operations for the years ended December 31, 2011 and 2010 were as follows (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Revenue | $ 117,509 | $ 124,180 |
| Income (loss) before income taxes | $ (741) | $ 30,026 |
| Income tax benefit (expense) | — | (11,484) |
| Net income (loss) | $ (741) | $ 18,542 |

Net loss for the year ended December 31, 2011 includes restructuring expense totaling $4.0 million.

The assets and liabilities of Real Estate that are reported as discontinued operations as of December 31, 2011 and December 31, 2010 were as follows (in thousands):

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Current assets | $ 33 | $ 305 |
| Property and equipment | — | 2,123 |
| Goodwill | — | 7,967 |
| Other non-current assets | — | 4,285 |
| Non-current assets | — | 14,375 |
| Current liabilities | 702 | 1,213 |
| Non-current liabilities | 54 | 288 |
| Net assets (liabilities) | $ (723) | $ 13,179 |

70

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 7—DISCONTINUED OPERATIONS (Continued)

The assets and liabilities of LendingTree Loans that are reported as discontinued operations as of December 31, 2011 and December 31, 2010 were as follows (in thousands):

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| Loans held for sale | $ 217,467 | $ 116,681 |
| Other current assets | 14,925 | 13,715 |
| Current assets | 232,392 | 130,396 |
| Property and equipment | 4,181 | 3,074 |
| Goodwill | 5,579 | — |
| Other non-current assets | 1,187 | 406 |
| Non-current assets | 10,947 | 3,480 |
| Warehouse lines of credit | 197,659 | 100,623 |
| Other current liabilities | 51,669 | 16,384 |
| Current liabilities | 249,328 | 117,007 |
| Non-current liabilities | 978 | 12,134 |
| Net assets (liabilities) | $ (6,967) | $ 4,735 |

**Significant Assets and Liabilities of LendingTree Loans**

Upon closing of the sale of substantially all of the operating assets of our LendingTree Loans business to Discover, LendingTree Loans will cease to originate consumer loans and will no longer have additional borrowings available under the warehouse lines of credit. The remaining operations will be wound down following the closing of the transaction. These wind-down activities will include, among other things, selling the balance of loans held for sale to investors, which historically has occurred within thirty days of funding, and paying off and then terminating the warehouse lines of credit. Additionally, liability for losses on previously sold loans will remain with LendingTree Loans. Below is a discussion of these significant items.

*Loans Held for Sale*

LendingTree Loans originates all of its residential real estate loans with the intent to sell them in the secondary market. Loans held for sale consist primarily of residential first mortgage loans that are secured by residential real estate throughout the United States.

71

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

#### NOTE 7—DISCONTINUED OPERATIONS (Continued)

The following table represents the loans held for sale by type of loan as of December 31, 2011 and December 31, 2010 ($ amounts in thousands):

| | December 31, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | Amount | % | Amount | % |
| Conforming | $ 171,375 | 79% | $ 86,451 | 74% |
| FHA and Alt-A | 40,433 | 18% | 20,431 | 18% |
| Jumbo | 5,659 | 3% | 9,129 | 8% |
| Subprime | — | —% | 580 | —% |
| Home equity | — | —% | 90 | —% |
| **Total** | $ 217,467 | 100% | $ 116,681 | 100% |

The following presents the difference between the aggregate principal balance of loans on nonaccrual status for which the fair value option has been elected and for loans measured at lower of cost or market valuation as of December 31, 2011 and December 31, 2010 (in thousands):

| | As of December 31, 2011 | | |
|---|---|---|---|
| | Loans on Nonaccrual— Measured at Fair Value | Loans on Nonaccrual— Measured at LOCOM | Total Loans on Nonaccrual |
| Aggregate unpaid principal balance | $ 539 | — | $ 539 |
| Difference between fair value and aggregate unpaid principal balance | (244) | — | (244) |
| Loans on nonaccrual | $ 295 | $ — | $ 295 |

| | As of December 31, 2010 | | |
|---|---|---|---|
| | Loans on Nonaccrual— Measured at Fair Value | Loans on Nonaccrual— Measured at LOCOM | Total Loans on Nonaccrual |
| Aggregate unpaid principal balance | $ 1,380 | $ 2,290 | $ 3,670 |
| Difference between fair value and aggregate unpaid principal balance | (496) | — | (496) |
| Lower of cost or market valuation allowance | — | (1,508) | (1,508) |
| Deferred loan fees, net of costs | — | (9) | (9) |
| Loans on nonaccrual | $ 884 | $ 773 | $ 1,657 |

Included within the loans on nonaccrual status are repurchased loans with a net book value of $-0- and $0.2 million at December 31, 2011 and December 31, 2010, respectively. During the year ended December 31, 2011, LendingTree Loans did not repurchase any loans, but sold fifteen loans on nonaccrual status for $1.2 million, which approximated the net book value. During the year ended December 31, 2010, LendingTree Loans repurchased one loan with a balance of $0.3 million.

72

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 7—DISCONTINUED OPERATIONS (Continued)

### *Fair Value Measurements*

We categorize our assets and liabilities measured at fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- Level 1: Observable inputs such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- Level 2: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

- Level 3: Unobservable inputs for which there is little or no market data and which require us to develop our own assumptions, based on the best information available in the circumstances, about the assumptions market participants would use in pricing the asset or liability.

LendingTree Loans enters into commitments with consumers to originate loans at specified interest rates (interest rate lock commitments—"IRLCs"). LendingTree Loans reports IRLCs as derivative instruments at fair value with changes in fair value being recorded in discontinued operations. IRLCs for loans to be sold to investors using a mandatory or assignment of trade ("AOT") method are hedged using "to be announced mortgage-backed securities" ("TBA MBS") and are valued using quantitative risk models. The IRLCs derive their base value from an underlying loan type with similar characteristics using the TBA MBS market which is actively quoted and easily validated through external sources. The most significant data inputs used in this valuation include, but are not limited to, loan type, underlying loan amount, note rate, loan program, and expected sale date of the loan. IRLCs for loans sold to investors on a best-efforts basis are hedged using best-efforts forward delivery commitments and are valued on an individual loan basis using a proprietary database program. These valuations are based on investor pricing tables stratified by product, note rate and term, and adjusted at the loan level to consider the servicing release premium and loan pricing adjustments specific to each loan. LendingTree Loans applies an anticipated loan funding probability based on its own experience to value IRLCs, which results in the classification of these derivatives as Level 3. The value of the underlying loan and the anticipated loan funding probability are the most significant assumptions affecting the valuation of IRLCs. There were no significant changes to the methods and assumptions for valuing IRLCs in 2011. At December 31, 2011 and 2010, there were $363.8 million and $216.6 million, respectively, of IRLCs notional value outstanding.

Loans held for sale measured at fair value and sold to investors using a mandatory or AOT method are also hedged using TBA MBS and valued using quantitative risk models. The valuations are based on loan amounts, note rates, loan programs, and expected sale dates of the loans. Loans held for sale measured at fair value and sold to investors on a best-efforts basis are hedged using best-efforts forward delivery commitments and are valued using a proprietary database program. The best-efforts valuations are based on daily investor pricing tables stratified by product, note rate and term. These valuations are adjusted at the loan level to consider the servicing release premium and loan pricing adjustments specific to each loan. Loans held for sale, excluding impaired loans, are classified as Level 2. Loans held for sale measured at fair value that become impaired are transferred from Level 2 to Level 3, as the estimate of fair value is based on LendingTree Loans' experience considering lien position and current status of the loan. There were no significant changes to the method and

73

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 7—DISCONTINUED OPERATIONS (Continued)**

assumptions used to estimate the fair value of impaired loans in 2011. LendingTree Loans recognizes interest income separately from other changes in fair value.

Under LendingTree Loans' risk management policy, LendingTree Loans economically hedges the changes in fair value of IRLCs and loans held for sale caused by changes in interest rates by using TBA MBS and entering into best-efforts forward delivery commitments. These hedging instruments are recorded at fair value with changes in fair value recorded in current earnings as a component of revenue from the origination and sale of loans. There were no significant changes to the methods and assumptions for valuing hedging instruments in the period ended December 31, 2011. TBA MBS used to hedge both IRLCs and loans are valued using quantitative risk models based primarily on inputs related to characteristics of the MBS stratified by product, coupon, and settlement date. These derivatives are classified as Level 2. Best-efforts forward delivery commitments are valued using a proprietary database program using investor pricing tables considering the current base loan price. An anticipated loan funding probability is applied to value best-efforts commitments hedging IRLCs, which results in the classification of these contracts as Level 3. The current base loan price and the anticipated loan funding probability are the most significant assumptions affecting the value of the best-efforts commitments. The best-efforts forward delivery commitments hedging loans held for sale are classified as Level 2, so such contracts are transferred from Level 3 to Level 2 at the time the underlying loan is originated. For the purposes of the tables below, we refer to TBA MBS and best-efforts forward delivery commitments collectively as "Forward Delivery Contracts".

The following presents our assets and liabilities that are measured at fair value on a recurring basis at December 31, 2011 and 2010 (in thousands):

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | Recurring Fair Value Measurements Using | | | |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| Loans held for sale | $ — | $ 217,172 | $ 295 | $ 217,467 |
| Interest rate lock commitments ("IRLCs") | — | — | 9,122 | 9,122 |
| Forward delivery contracts | — | (4,107) | 19 | (4,088) |
| Total | $ — | $ 213,065 | $ 9,436 | $ 222,501 |

74

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## NOTE 7—DISCONTINUED OPERATIONS (Continued)

| | As of December 31, 2010 | | | |
| | Recurring Fair Value Measurements Using | | | |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
|---|---|---|---|---|
| Loans held for sale | $ — | $ 115,024 | $ 884 | $ 115,908 |
| Interest rate lock commitments ("IRLCs") | — | — | 5,986 | 5,986 |
| Forward delivery contracts | — | 1,001 | 3 | 1,004 |
| Total | $ — | $ 116,025 | $ 6,873 | $ 122,898 |

The following presents the changes in our assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2011 and 2010 (in thousands):

| | December 31, 2011 | | |
| | Interest Rate Lock Commitments | Forward Delivery Contracts | Loans Held for Sale |
|---|---|---|---|
| Balance at January 1, 2011 | $ 5,986 | $ 3 | $ 884 |
| Transfers into Level 3 | — | — | 859 |
| Transfers out of Level 3 | — | (285) | — |
| Total net gains (losses) included in earnings (realized and unrealized) | 114,889 | 359 | (87) |
| Purchases, sales, and settlements | | | |
| Purchases | 970 | (58) | — |
| Sales | — | — | (1,041) |
| Settlements | (11,977) | — | (320) |
| Transfers of IRLCs to closed loans | (100,746) | — | — |
| Balance at December 31, 2011 | $ 9,122 | $ 19 | $ 295 |

| | December 31, 2010 | | |
| | Interest Rate Lock Commitments | Forward Delivery Contracts | Loans Held for Sale |
|---|---|---|---|
| Balance at January 1, 2010 | $ 3,680 | $ 487 | $ 777 |
| Transfers into Level 3 | — | — | 991 |
| Transfers out of Level 3 | — | (119) | — |
| Total net gains (losses) included in earnings (realized and unrealized) | 107,656 | (365) | (98) |
| Purchases, sales, and settlements | | | |
| Purchases | — | — | — |
| Sales | — | — | (774) |
| Settlements | (17,301) | — | (12) |
| Transfers of IRLCs to closed loans | (88,049) | — | — |
| Balance at December 31, 2010 | $ 5,986 | $ 3 | $ 884 |

75

Table of Contents

TREE.COM, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

NOTE 7—DISCONTINUED OPERATIONS (Continued)

The following presents the gains (losses) included in earnings for the years ended December 31, 2011 and 2010 relating to our assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

| | Year Ended December 31, 2011 | | | Year Ended December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Interest Rate Lock Commitments | Forward Delivery Contracts | Loans Held for Sale | Interest Rate Lock Commitments | Forward Delivery Contracts | Loans Held for Sale |
| Total net gains (losses) included in earnings, which are included in discontinued operations | $ 114,889 | $ 359 | $ (87) | $ 107,656 | $ (365) | $ (98) |
| Change in unrealized gains (losses) relating to assets and liabilities still held at December 31, 2011 and 2010, which are included in discontinued operations | $ 9,122 | $ 19 | $ (38) | $ 5,986 | $ 3 | $ (102) |

The following table summarizes our derivative instruments not designated as hedging instruments as of December 31, 2011 and 2010 (in thousands):

| | Balance Sheet Location | December 31, 2011 Fair Value | December 31, 2010 Fair Value |
|---|---|---|---|
| Interest Rate Lock Commitments | Current assets of discontinued operations | $ 9,282 | $ 5,991 |
| Forward Delivery Contracts | Current assets of discontinued operations | 480 | 2,633 |
| Interest Rate Lock Commitments | Current liabilities of discontinued operations | (160) | (5) |
| Forward Delivery Contracts | Current liabilities of discontinued operations | (4,568) | (1,629) |
| Total Derivatives | | $ 5,034 | $ 6,990 |

The gain (loss) recognized in the consolidated statements of operations for derivatives for the periods ended December 31, 2011 and 2010 was as follows (in thousands):

| | Location of Gain (Loss) Recognized in Income on Derivative | Year Ended December 31, 2011 | Year Ended December 31, 2010 |
|---|---|---|---|
| Interest Rate Lock Commitments | Discontinued operations | $ 114,889 | $ 107,656 |
| Forward Delivery Contracts | Discontinued operations | (4,938) | (1,970) |
| Total | | $ 109,951 | $ 105,686 |

We have elected to account for loans held for sale originated on or after January 1, 2008 at fair value. Electing the fair value option allows a better offset of the changes in fair values of the loans and the forward delivery contracts used to economically hedge them without the burden of complying with the requirements for hedge accounting.

76

Table of Contents

# TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 7—DISCONTINUED OPERATIONS (Continued)

We did not elect the fair value option on loans held for sale originated prior to January 1, 2008 and on loans that were repurchased from investors on or subsequent to that date. As of December 31, 2011 and 2010, -0- and 23 such loans, respectively, all of which were impaired, were included in loans held for sale and were carried at the lower of cost or market ("LOCOM") value assessed on an individual loan basis. The market value (or fair value) of these impaired loans at December 31, 2011 and 2010, measured on a non-recurring basis using significant unobservable inputs (Level 3), was $-0- and $0.8 million, respectively. This fair value measurement is management's best estimate of the market value of such loans and considers the lien position and loan status. During the year ended December 31, 2011, fifteen impaired loans were sold for $1.2 million, which approximated the net book value.

The following presents the difference between the aggregate principal balance of loans held for sale for which the fair value option has been elected and for loans measured at LOCOM as of December 31, 2011 and 2010 (in thousands):

| | As of December 31, 2011 | | |
| | Loans Held for Sale—Measured at Fair Value | Loans Held for Sale—Measured at LOCOM | Total Loans Held For Sale |
| --- | --- | --- | --- |
| Aggregate unpaid principal balance | $ 208,918 | $ — | $ 208,918 |
| Difference between fair value and aggregate unpaid principal balance | 8,549 | — | 8,549 |
| Loans held for sale | $ 217,467 | $ — | $ 217,467 |

| | As of December 31, 2010 | | |
| | Loans Held for Sale—Measured at Fair Value | Loans Held for Sale—Measured at LOCOM | Total Loans Held For Sale |
| --- | --- | --- | --- |
| Aggregate unpaid principal balance | $ 113,116 | $ 2,290 | $ 115,406 |
| Difference between fair value and aggregate unpaid principal balance | 2,792 | — | 2,792 |
| Lower of cost or market valuation allowance | — | (1,508) | (1,508) |
| Deferred loan fees, net of costs | — | (9) | (9) |
| Loans held for sale | $ 115,908 | $ 773 | $ 116,681 |

During the years ended December 31, 2011 and 2010, the change in fair value of loans held for sale for which the fair value option was elected was a gain of $4.7 million and $4.8 million, respectively, and is included in discontinued operations in the accompanying consolidated statements of operations.

### *Loan Loss Obligations*

LendingTree Loans sells loans it originates to investors on a servicing-released basis so the risk of loss or default by the borrower is generally transferred to the investor. However, LendingTree Loans is required by these investors to make certain representations relating to credit information, loan documentation and collateral. These representations and warranties may extend through the contractual

77

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 7—DISCONTINUED OPERATIONS (Continued)**

life of the mortgage loan. Subsequent to the sale, if underwriting deficiencies, borrower fraud or documentation defects are discovered in individual mortgage loans, LendingTree Loans may be obligated to repurchase the respective mortgage loan or indemnify the investors for any losses from borrower defaults if such deficiency or defect cannot be cured within the specified period following discovery.

In the case of early loan payoffs and early defaults on certain loans, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor. The estimated obligation associated with early loan payoffs and early defaults is calculated based on historical loss experience by type of loan.

The obligation for losses related to the representations and warranties and other provisions discussed above is initially recorded at its estimated fair value, which includes a projection of expected future losses as well as a market-based premium. Because LendingTree Loans does not service the loans it sells, it does not maintain nor have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, the Company is unable to determine, with precision, its maximum exposure under its representations and warranties. However, LendingTree Loans utilizes the original loan balance (before it was sold to an investor), historical and projected loss frequency and loss severity ratios by loan type as well as analyses of losses in process to estimate its exposure to losses on loans previously sold. LendingTree Loans maintains a liability related to this exposure based, in part, on historical and projected loss frequency and loss severity using its loan loss history (adjusted for recent trends in loan loss experience), the original principal amount of the loans previously sold, the years the loans were sold and loan types. Accordingly, subsequent adjustments to the obligation, if any, are not made based on changes in the fair value of the obligation, which might include an estimated change in losses that may be expected in the future, but are made once further losses are determined to be both probable and estimable. As such, given current general industry trends in mortgage loans as well as housing prices, market expectations around losses related to LendingTree Loans' obligations could vary significantly from the obligation recorded as of the balance sheet date or the range estimated below. In estimating its exposure to loan losses, LendingTree Loans segments its loan sales into four segments based on the extent of the documentation provided by the borrower to substantiate income and/or assets (full or limited documentation) and the lien position of the mortgage in the underlying property (first or second position). Each of these segments has a different loss experience, with full documentation, first lien position loans generally having the lowest loss ratios, and limited documentation, second lien position loans generally having the highest loss ratios.

Tree.com has guaranteed certain loans sold to two investors in the event that LendingTree Loans is unable to satisfy those repurchase and warranty obligations. The original principal balance of such loans sold to these investors is approximately $1.5 billion as of December 31, 2011. Subsequent to December 31, 2011, Tree.com entered into an agreement to guarantee certain loans sold to a third investor, for which the unpaid principal balance of such loans is approximately $32.4 million.

78

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

#### NOTE 7—DISCONTINUED OPERATIONS (Continued)

The following table represents the loans sold for the period shown and the aggregate loan losses through December 31, 2011:

| | As of December 31, 2011 | | | | |
| Period of Loan Sales | Number of loans sold | Original principal balance | Number of loans with losses | Original principal balance of loans with losses | Amount of aggregate losses |
| | | (in billions) | | (in millions) | (in millions) |
|---|---|---|---|---|---|
| 2011 | 12,500 | $ 2.7 | — | $ — | $ — |
| 2010 | 12,400 | 2.8 | 4 | 1.1 | 0.1 |
| 2009 | 12,800 | 2.8 | 4 | 0.9 | 0.1 |
| 2008 | 11,000 | 2.2 | 28 | 5.8 | 1.5 |
| 2007 | 36,300 | 6.1 | 155 | 21.2 | 7.7 |
| 2006 | 55,000 | 7.9 | 205 | 23.9 | 13.3 |
| 2005 and prior years | 86,700 | 13.0 | 88 | 12.1 | 5.0 |
| Total | 226,700 | $ 37.5 | 484 | $ 65.0 | $ 27.7 |

The pipeline of 289 loan repurchase requests and indemnifications was considered in determining the appropriate reserve amount. The status of these 289 loans varied from an initial review stage, which may result in a rescission of the request, to in process, where the probability of incurring a loss is high, to indemnification, whereby LendingTree Loans has agreed to reimburse the purchaser of that loan if and when losses are incurred. The indemnification may have a specific term, thereby limiting the exposure to LendingTree Loans. The original principal amount of these loans is approximately $54.1 million, comprised of approximately 70% full documentation first liens, 2% full documentation second liens, 23% limited documentation first liens, and 5% limited documentation second liens.

In the fourth quarter of 2009, LendingTree Loans entered into settlement negotiations with two buyers of previously purchased limited documentation loans. The settlement with one buyer was completed in December 2009 and included a payment of $1.9 million related to all second lien loans sold to this buyer, including both full and limited documentation. The settlement was included as a charge-off to the reserve in 2009. Negotiations with the second buyer were completed in January 2010. This settlement of $4.5 million, which was paid in four equal quarterly installments in 2010, relates to all future losses on limited documentation second lien loans sold to this buyer. LendingTree Loans was also required to pay an additional amount of up to $0.3 million in conjunction with this settlement since it did not sell a certain volume of loans to this buyer in 2010. This amount is included in the total settlement amount and was included as a charge-off to the reserve in 2010. These settlement amounts were not determined on an individual loan basis and are, therefore, not included in the loss amounts disclosed above for the years such loans were sold.

In December 2011, LendingTree Loans agreed to a $1.2 million settlement related to specific loans, and such losses were charged to the reserve in 2011. Hence, these losses are included in the table above. The $0.3 million settlement amount discussed above and this $1.2 million settlement were recorded as liabilities separate from the loss reserve at December 31, 2011, and were paid in January 2012.

79

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 7—DISCONTINUED OPERATIONS (Continued)

Based on historical experience, it is anticipated that LendingTree Loans will continue to receive repurchase requests and incur losses on loans sold in prior years. However, the two global settlements discussed above will eliminate future repurchase requests from those buyers for the loan types included in those settlements. As of December 31, 2011, LendingTree Loans estimated the range of remaining possible losses due to representations and warranty issues based on the methodology described above, excluding the $0.3 million and the $1.2 million settlements paid in January 2012, as $27 million to $37 million. We believe that we have adequately reserved for these losses.

The activity related to loss reserves on previously sold loans for the years ended December 31, 2011 and 2010, is as follows (in thousands):

|  | December 31, | |
|  | 2011 | 2010 |
|---|---|---|
| Balance, beginning of period | $ 16,984 | $ 16,985 |
| Provisions | 16,798 | 12,390 |
| Charge-offs to reserves(a) | (2,270) | (12,391) |
| Balance, end of period | $ 31,512 | $ 16,984 |

(a)    The year ended December 31, 2011 includes a charge-off for the amount of $1.2 million that is tracked separately from the loan loss reserve (see table below) and was paid in January 2012. The year ended December 31, 2010 includes a charge-off for the amount of the $4.5 million loan loss settlement plus the $0.3 million additional accrual discussed above. The remaining settlement payment due of $0.3 million is tracked as a liability separate from the loan loss reserve (see table below) and was also paid in January 2012.

Based on an analysis of the LendingTree Loans' historical loan loss experience, it was determined as of December 31, 2010 that a portion of the loan losses expected to be made by investors will be made more than twelve months following the initial sale of the underlying loans. Accordingly, LendingTree Loans estimated the portion of its loans sold reserve that it anticipated it would be liable for after twelve months and has classified that portion of the reserve as a long-term liability as of December 31, 2010. In anticipation of the pending sale of the LendingTree Loans assets, we have classified the entire reserve as a current liability as of December 31, 2011. The liability for losses on previously sold loans is presented in the accompanying consolidated balance sheet as of December 31, 2011 and 2010 as follows (in thousands):

|  | As of December 31, 2011 | As of December 31, 2010 |
|---|---|---|
| Current portion related to settlements discussed above, included in current liabilities of discontinued operations | $ 1,500 | $ 300 |
| Other current portion, included in current liabilities of discontinued operations | 31,512 | 5,459 |
| Long-term portion, included in non-current liabilities of discontinued operations | — | 11,525 |
| Total | $ 33,012 | $ 17,284 |

80

Table of Contents

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 7—DISCONTINUED OPERATIONS (Continued)**

Tree.com will continue to be liable for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. A portion of the initial purchase price to be paid by Discover will be held in escrow pending resolution of certain of these contingent liabilities. We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities, but we may not be able to do so on terms acceptable to it, or at all.

*Warehouse Lines of Credit*

Borrowings on warehouse lines of credit were $197.7 million and $100.6 million at December 31, 2011 and 2010, respectively.

As of December 31, 2011, LendingTree Loans had three committed lines of credit totaling $275.0 million of borrowing capacity. The $50.0 million first line expired on January 30, 2012. LendingTree Loans also had a $25.0 million uncommitted line with this lender, which was terminated on October 31, 2011. In addition, LendingTree Loans obtained a fourth warehouse line for $100.0 million on January 9, 2012, which is uncommitted, bringing its total borrowing capacity to $325.0 million. Borrowings under these lines of credit are used to fund, and are secured by, consumer residential loans that are held for sale. Loans under these lines of credit are repaid using proceeds from the sales of loans by LendingTree Loans.

The $50.0 million first line was scheduled to expire on the earliest of (i) the closing date of the pending sale of LendingTree Loans assets or (ii) January 30, 2012, and it expired on January 30, 2012. On November 1, 2011, the terms of this line were amended so that it could be cancelled at the option of the lender at any time upon notice. This first line included an additional uncommitted credit facility of $25.0 million, which was terminated on October 31, 2011. This first line was guaranteed by Tree.com, Inc., LendingTree, LLC and LendingTree Holdings Corp. The interest rate under the first line was the 30-day London InterBank Offered Rate ("LIBOR") or 2.00% (whichever was greater) plus 2.25%. The interest rate under the $25.0 million uncommitted line was the 30-day LIBOR plus 1.50%.

The second line was previously for $100.0 million and scheduled to expire on October 28, 2011, but was increased to $125.0 million and is scheduled to expire on the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) April 25, 2012. This line is also guaranteed by Tree.com, Inc., LendingTree, LLC and LendingTree Holdings Corp. The interest rate under this second line is the 30-day Adjusted LIBOR or 2.0% (whichever is greater) plus 1.5% to 1.75% for loans being sold to the lender and 30-day Adjusted LIBOR or 2.0% (whichever is greater) plus 1.5% for loans not being sold to the lender.

The $100.0 million third line was scheduled to expire on December 13, 2011, but upon certain interim renewals of the line, the expiration date was extended to the earlier of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) August 20, 2012. This line is guaranteed by Tree.com, Inc. and LendingTree, LLC. The interest rate under this line is 30-day LIBOR plus 3.25% (LIBOR may be adjusted upward for any increase in the reserve requirement of the lender as further described in the Master Repurchase Agreement).

The $100.0 million fourth line is scheduled to expire on the earliest of (i) forty-five days after the closing date of the pending sale of LendingTree Loans assets or (ii) January 4, 2013. This line is guaranteed by Tree.com, Inc., LendingTree, LLC and LendingTree Holdings Corp. The interest rate

81

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 7—DISCONTINUED OPERATIONS (Continued)**

under this line is the overnight interest rate incurred by the lender for borrowing funds plus 3.25% to 3.75% for most loans.

Under the terms of these warehouse lines, LendingTree Loans is required to maintain various financial and other covenants, and is restricted from paying dividends under the terms of the first two lines. These financial covenants include, but are not limited to, maintaining (i) for the first three lines, minimum tangible net worth of $20.0 million, which was increased to $25.0 million upon renewal of the first line in November 2011 and the second line in October 2011, or for the fourth line, minimum adjusted net worth equaling the sum of $20.0 million plus 50% of the positive quarterly net income for the three months prior to any date of determination, (ii) minimum liquidity, (iii) a minimum current ratio, (iv) a maximum ratio of total liabilities to net worth, (v) a minimum unrestricted cash amount, (vi) pre-tax net income requirements, (vii) for the first three lines, a maximum warehouse capacity ratio and (viii) for the fourth line, minimum of one additional warehouse line. LendingTree Loans was not in compliance with the maximum ratio of total liabilities to net worth covenant under the first line at December 31, 2011. However, a waiver was not obtained as there was no outstanding borrowing under this line as of December 31, 2011 and the line expired on January 30, 2012. We were in compliance with all other covenants at December 31, 2011, except for the requirement to provide audited financial statements to each of our lenders within 90 days after the end of the fiscal year. We have obtained a waiver for this violation.

The LendingTree Loans business is highly dependent on the availability of these warehouse lines. Although we believe that our existing lines of credit are adequate for our current operations, reductions in our available credit, or the inability to extend, renew or replace these lines before completion of the pending sale of the operating assets of LendingTree Loans, would have a material adverse effect on our business, financial condition, results of operations and cash flows. Management has determined that it could continue to operate the LendingTree Loans business at a reduced capacity as long as one of the warehouse lines remains available.

**NOTE 8—EARNINGS PER SHARE**

The following table sets forth the computation of basic and diluted earnings per share for the years ended December 31, 2011 and 2010:

| | 2011 | | 2010 | |
| | Basic | Diluted | Basic | Diluted |
| --- | --- | --- | --- | --- |
| **Numerator:** | | | | |
| Loss from continuing operations | $ (49,710) | $ (49,710) | $ (26,604) | $ (26,604) |
| Income (loss) from discontinued operations, net of tax | $ (9,793) | $ (9,793) | $ 8,427 | $ 8,427 |
| Net loss attributable to common shareholders | $ (59,503) | $ (59,503) | $ (18,177) | $ (18,177) |
| **Denominator:** | | | | |
| Weighted average common shares | 10,995 | 10,995 | 11,014 | 11,014 |
| **Loss per Share:** | | | | |
| Loss from continuing operations | $ (4.52) | $ (4.52) | $ (2.42) | $ (2.42) |
| Income (loss) from discontinued operations, net of tax | $ (0.89) | $ (0.89) | $ 0.77 | $ 0.77 |
| Net loss per common share | $ (5.41) | $ (5.41) | $ (1.65) | $ (1.65) |

82

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 8—EARNINGS PER SHARE (Continued)**

For the years ended December 31, 2011 and 2010, we had losses from continuing operations and as a result, no potentially dilutive securities were included in the denominator for computing dilutive earnings per share because the impact would have been anti-dilutive. Accordingly, the weighted average basic shares outstanding were used to compute all earnings per share amounts. For the years ended December 31, 2011 and 2010, approximately 0.1 million and 0.3 million shares, respectively, related to potentially dilutive securities were excluded from the calculation of diluted earnings per share because their inclusion would have been anti-dilutive.

See Note 3 for a full description of outstanding equity awards.

**Common Stock Repurchases**

On January 11, 2010, our board of directors authorized the repurchase of up to $10 million of our common stock. During 2010, we purchased 810,922 shares of our common stock for aggregate consideration of $5.7 million. At December 31, 2010, we had approximately $4.3 million remaining in our share repurchase authorization.

In addition, during the fourth quarter of 2010 we suspended our share repurchase program in lieu of a "Dutch auction" tender offer. The completion of the tender offer was announced on December 23, 2010. During the offer period, which expired on December 17, 2010, we accepted for purchase 312,339 shares of our common stock at a price of $7.75 per share, for an aggregate purchase price of approximately $2.4 million, excluding fees and expenses related to the tender offer.

We made no stock repurchases in 2011.

**NOTE 9—INCOME TAXES**

The components of the income tax provision (benefit) are as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| **Current income tax provision (benefit):** | | |
| Federal | $       3 | $       6 |
| State | (218) | (4) |
| Current income tax provision (benefit) | (215) | 2 |
| **Deferred income tax benefit:** | | |
| Federal | (9,766) | (6,765) |
| State | (1,785) | (178) |
| Deferred income tax benefit | (11,551) | (6,943) |
| Income tax benefit | $ (11,766) | $ (6,941) |

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities at December 31, 2011 and 2010 are presented below (in

83

Table of Contents

# TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 9—INCOME TAXES (Continued)

thousands). The valuation allowance is related to items for which it is more likely than not that the tax benefit will not be realized.

| | December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| **Deferred tax assets:** | | |
| Provision for accrued expenses | $ 15,886 | $ 10,487 |
| Net operating loss carryforwards | 31,842 | 21,636 |
| Goodwill | 14,405 | 14,879 |
| Intangible and other assets | 4,222 | 4,843 |
| Other | 2,377 | 3,170 |
| Total deferred tax assets | 68,732 | 55,015 |
| Less valuation allowance | (68,138) | (52,285) |
| Net deferred tax assets | 594 | 2,730 |
| **Deferred tax liabilities:** | | |
| Intangible and other assets | — | (15,182) |
| Other | (5,364) | (3,868) |
| Total deferred tax liabilities | (5,364) | (19,050) |
| Net deferred tax liability | $ (4,770) | $ (16,320) |

Deferred income taxes are presented in the accompanying consolidated balance sheets as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| Deferred tax assets | $ — | $ — |
| Deferred tax liabilities | (4,770) | (16,320) |
| Net deferred taxes | $ (4,770) | $ (16,320) |

At December 31, 2011 and 2010, we had pre-tax consolidated federal net operating losses ("NOLs") of $50.9 million and $27.4 million, respectively. In addition, we had separate state NOLs of approximately $308 million at December 31, 2011 that will expire at various times between 2012 and 2031.

During 2011, the valuation allowance increased by $15.8 million, primarily due to increased net operating losses resulting in deferred tax assets requiring a valuation allowance. At December 31, 2011, we had a valuation allowance of $68.1 million related to the portion of tax operating loss carryforwards and other deferred tax assets for which it is more likely than not that the tax benefit will not be realized.

84

# TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 9—INCOME TAXES (Continued)

A reconciliation of total income tax provision to the amounts computed by applying the statutory federal income tax rate to earnings from continuing operations before income taxes and minority interest is shown as follows (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Income tax benefit at the federal statutory rate of 35% | $ (21,517) | $ (11,741) |
| State income taxes, net of effect of federal tax benefit | (5,231) | (1,093) |
| Non-deductible non-cash compensation expense | 101 | 245 |
| Change in valuation allowance | 14,724 | 5,324 |
| Other, net | 157 | 324 |
| Income tax benefit | $ (11,766) | $ (6,941) |

A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding interest, is as follows (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Balance, beginning of the period | $ 66 | $ 991 |
| Additions based on tax positions related to the current year | — | — |
| Deductions based on tax positions related to the current year | — | (599) |
| Reductions for tax positions of prior years | — | — |
| Lapse of statute of limitations | (63) | (326) |
| Balance, end of the period | $ 3 | $ 66 |

As of December 31, 2011 and 2010, unrecognized tax benefits, including interest, were $0.01 million and $0.09 million, respectively. In 2011, unrecognized tax benefits decreased due to lapse of statute of limitations. The amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate is approximately $0.01 million.

We recognize interest and, if applicable, penalties related to unrecognized tax benefits in income tax expense. Included in income tax expense for each of the years ended December 31, 2011 and 2010 is $0.01 million for interest on unrecognized tax benefits. At both December 31, 2011 and 2010, we have accrued $0.01 million for the payment of interest, respectively. There are no material accruals for penalties.

We believe that it is reasonably possible that our unrecognized tax benefits could decrease by $0.01 million within twelve months of the current reporting. This amount may be recognized in the next twelve months due to the expiration of the statute of limitations which could impact the effective tax rate.

We are subject to audits by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay

85

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 9—INCOME TAXES (Continued)

assessments that may result from examination of prior year returns; however, any amounts paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by us are recorded in the period they become known.

The Internal Revenue Service has substantially completed its review of IAC/InterActiveCorp's tax returns for the years ended December 31, 2001 through 2006. The settlement has not yet been submitted to the Joint Committee of Taxation for approval. The IRS began its review of the IAC/InterActiveCorp and Tree federal tax returns for the years ended December 31, 2007 through 2009 in July 2011. The statute of limitations for the years 2001 through 2008 has been extended to December 31, 2012. Various state and local jurisdictions are also currently under examination, the most significant of which are California, New York and New York City for various tax years beginning with 2005.

The North Carolina Department of Revenue conducted an examination of our North Carolina corporate income and franchise tax returns for the years ended December 31, 2006 through 2008, and issued final audit reports to us in 2011. We have evaluated this matter as a potential loss contingency, and have determined that it is reasonably possible that a loss could be incurred. The range of a possible loss is estimated to be $-0- to $3.6 million. No reserve has been established for this matter as we have determined that the likelihood of a loss is not probable.

### NOTE 10—SUPPLEMENTAL CASH FLOW INFORMATION

Supplemental Disclosure of Cash Flow Information:

|  | Years Ended December 31, | |
|  | 2011 | 2010 |
|---|---|---|
| Equipment acquired through capital lease | $ — | $ 89 |
| Cash paid during the period for: |  |  |
| Interest | $ 78 | $ 1,153 |
| Income tax payments | 281 | 260 |
| Income tax refunds | 3 | 14 |

### NOTE 11—COMMITMENTS

We lease office space, equipment and services used in connection with our operations under various operating leases, many of which contain escalation clauses.

Future minimum payments under operating lease agreements are as follows (in thousands):

| Years Ended December 31, | Amount |
|---|---|
| 2012 | $ 1,516 |
| 2013 | 1,522 |
| 2014 | 1,486 |
| 2015 | 837 |
| Total | $ 5,361 |

86

# TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 11—COMMITMENTS (Continued)

We also sublease certain office space to third parties. The total amount of minimum rentals to be received in the future under non-cancelable subleases is $0.4 million as of December 31, 2011.

Expenses charged to operations under these agreements were $1.0 million for each of the years ended December 31, 2011 and 2010, and are included in general and administrative expense in the consolidated statements of operations.

We also have funding commitments that could potentially require performance in the event of demands by third parties or contingent events, as follows (in thousands):

| | Total Amounts Committed | Less Than 1 year | 1-3 years | 3-5 years | More Than 5 years |
|---|---|---|---|---|---|
| | | **Amount of Commitment Expiration Per Period** | | | |
| Surety bonds | $ 5,487 | $ 5,412 | $ 75 | $ — | $ — |

### NOTE 12—CONTINGENCIES

During 2011 and 2010, provisions for litigation settlements of $5.7 million and $1.0 million, respectively, were recorded in litigation settlements and contingencies in the accompanying consolidated statements of operations. The balance of the related liability was $3.1 million and $0.5 million at December 31, 2011 and 2010, respectively. The litigation matters were either settled, or we extended a firm offer for settlement, thereby establishing an accrual amount that is both probable and reasonably estimable.

The Massachusetts Division of Banks (the "Division") delivered to LendingTree, LLC on February 11, 2011 a Report of Examination/Inspection which identified various alleged violations of Massachusetts and federal laws, including the alleged insufficient delivery by LendingTree, LLC of various disclosures to its customers. On October 14, 2011, the Division provided a proposed Consent Agreement and Order to settle the Division's allegations, which the Division had shared with other state mortgage lending regulators. Twenty-four of such state mortgage lending regulators (the "Joining Regulators") indicated that if LendingTree, LLC would enter into the Consent Agreement and Order, they would agree not to pursue any analogous allegations that they otherwise might assert. As of the date of this report, none of the Joining Regulators have asserted any such allegations.

The proposed Consent Agreement and Order calls for a fine to be allocated among the Division and the Joining Regulators and for LendingTree, LLC to adopt various new procedures and practices. We have commenced negotiations toward an acceptable Consent Agreement and Order. We do not believe our lending exchanges violates any federal or state mortgage lending laws; nor do we believe that any past operations of the lending exchanges have resulted in a material violation of any such laws. Should the Division or any Joining Regulator bring any actions relating to the matters alleged in the February 2011 Report of Examination/Inspection, we intend to defend against such actions vigorously. The range of possible loss is estimated to be between $0.5 million and $7.1 million, and a reserve of $0.5 million has been established for this matter as of December 31, 2011.

87

[Table of Contents](#)

## TREE.COM, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 12—CONTINGENCIES (Continued)

In the ordinary course of business, we are party to various lawsuits. We establish reserves for specific legal matters when we determine that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where it believes an unfavorable outcome is not probable and, therefore, no reserve is established. We also evaluate other contingent matters, including tax contingencies, to assess the probability and estimated extent of potential loss. See Note 9 for a discussion related to income and franchise tax contingencies.

### NOTE 13—RELATED PARTY TRANSACTIONS

In connection with the spin-off, our Chairman and CEO was granted 5,000 shares of Series A Redeemable Preferred Stock, par value $0.01 per share (the "Preferred Stock"), of LendingTree Holdings Corp., a Delaware corporation and wholly-owned subsidiary of the Company. The Preferred Stock has a liquidation preference of $1,000 per share and cumulative cash dividends accrue on the Preferred Stock at the rate of 12% of the liquidation preference per share per year and unpaid dividends compound at a rate per annum equal to the dividend rate.

On August 30, 2010, we entered into and consummated a Share Exchange Agreement (the "Share Exchange Agreement") with our Chairman and CEO. Pursuant to the Share Exchange Agreement, he exchanged 2,902.33 currently outstanding shares of Preferred Stock owned by him, together with $1.1 million in accrued and unpaid dividends in respect of such shares, for a total of 534,900 newly-issued shares of our common stock. The value of the common stock issued pursuant to the Share Exchange Agreement was approximately $4.0 million and was determined based on the closing price on the NASDAQ Global Market on the trading day preceding the closing of the exchange.

During the years ended December 31, 2011 and 2010, $1.1 million and $1.7 million, respectively, was recognized as cash compensation expense, and $0.3 million and $0.5 million, respectively, was recognized as interest expense related to accreting the preferred stock to its redemption value. The related liability is required to be settled in cash in 2013 for $3.1 million.

### NOTE 14—BENEFIT PLANS

We operate a retirement savings plan for our employees in the United States that is qualified under Section 401(k) of the Internal Revenue Code. Employees are eligible to enroll in the plan upon date of hire. Participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits (generally $16,500 for 2011 and 2010). Our match is fifty cents for each dollar a participant contributes to the plan, with a maximum contribution of 3% of a participant's eligible earnings. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. Our stock is not included in the available investment options or the plan assets. Funds contributed to our plan vest according to the participant's years of service, with less than three years of service vesting at 0%, and three years or more of service vesting at 100%. Matching contributions were approximately $0.2 million and $0.4 million for the years ended December 31, 2011 and 2010, respectively. Matching contributions were suspended in June of 2011, and began again in January of 2012.

88

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 15—RESTRUCTURING EXPENSE**

Restructuring expense in 2011 primarily relates to severance costs for headcount reductions in the corporate infrastructure departments. Restructuring expense in 2010 primarily relates to continuing lease obligations on facilities previously used for call center operations, for which management had a plan to exit at December 31, 2009, but the cease-use date did not occur until January 2010. Costs that relate to ongoing operations are not part of restructuring charges. Restructuring expense and payments against liabilities are as follows (in thousands):

| | For The Year Ended December 31, 2011 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| Balance, beginning of period | $ 20 | $ 2,339 | $ — | $ — | $ 2,359 |
| Restructuring expense | 921 | 49 | 16 | 94 | 1,080 |
| Payments | (812) | (1,194) | — | (94) | (2,100) |
| Write-offs | — | 13 | (16) | — | (3) |
| Balance, end of period | $ 129 | $ 1,207 | $ — | $ — | $ 1,336 |

| | For The Year Ended December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Employee Termination Costs | Continuing Lease Obligations | Asset Write-offs | Other | Total |
| Balance, beginning of period | $ 1,204 | $ 590 | $ — | $ — | $ 1,794 |
| Restructuring expense | 203 | 2,484 | 93 | — | 2,780 |
| Payments | (1,387) | (971) | — | — | (2,358) |
| Write-offs | — | 236 | (93) | — | 143 |
| Balance, end of period | $ 20 | $ 2,339 | $ — | $ — | $ 2,359 |

At December 31, 2011, restructuring liabilities of $0.4 million are included in accrued expenses and other current liabilities and $0.9 million are included in other long-term liabilities in the accompanying consolidated balance sheet. At December 31, 2010, restructuring liabilities of $1.2 million are included in accrued expenses and other current liabilities and $1.2 million are included in other long-term liabilities in the accompanying consolidated balance sheet. We do not expect to incur significant additional costs related to the restructurings noted above.

**NOTE 16—FAIR VALUE MEASUREMENTS**

Our non-financial assets, such as goodwill, intangible assets and property and equipment are measured at fair value when there is an indicator of impairment, and recorded at fair value only when an impairment charge is recognized. See Note 4 for discussion of goodwill and intangible asset impairment charges.

The following disclosures represent financial instruments in which the ending balances at December 31, 2011 and 2010 are not carried at fair value in their entirety on our consolidated balance sheets. The additional disclosure below of the estimated fair value of financial instruments has been determined by us using available market information and appropriate valuation methodologies. However, considerable judgment is necessarily required to interpret market data to develop the

89

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 16—FAIR VALUE MEASUREMENTS (Continued)**

estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized in a current market exchange. The use of different market assumptions or estimation methodologies may have a material impact on the estimated fair value amounts. Our financial instruments also include letters of credit and surety bonds, for which we had $6.5 million and $5.0 million in restricted cash at December 31, 2011 and 2010, respectively, as collateral for the surety bonds. These commitments remain in place to facilitate certain of our commercial operations.

|  | December 31, 2011 | | December 31, 2010 | |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| --- | --- | --- | --- | --- |
| Cash and cash equivalents | $ 45,541 | $ 45,541 | $ 68,819 | $ 68,819 |
| Restricted cash and cash equivalents | 12,451 | 12,451 | 8,155 | 8,155 |
| Accounts receivable, net | 5,474 | 5,474 | 3,564 | 3,564 |
| Accounts payable | (9,072) | (9,072) | (6,562) | (6,562) |
| Accrued expenses | (16,712) | (16,712) | (23,881) | (23,881) |
| Surety bonds | — | (5,487) | — | (5,487) |

The carrying amounts of cash and cash equivalents and restricted cash and cash equivalents reflected in the accompanying consolidated balance sheets approximate fair value as they are maintained with various high-quality financial institutions or in short-term duration high-quality debt securities. Accounts receivable, net, are short-term in nature and are generally settled shortly after the sale, and therefore the carrying amount approximates fair value. The carrying amounts for all other financial instruments approximate their fair value.

**NOTE 17—QUARTERLY RESULTS (UNAUDITED)**

The second and third quarters of 2011 have been restated to reflect a non-cash impairment related to indefinite-lived trade name and trademark assets that occurred in the second quarter of 2011 and reductions in depreciation and amortization expense related to discontinued operations in the last three quarters of 2011. Financial data for these quarters as previously reported and as restated is as follows:

|  | Quarter Ended March 31, | Quarter Ended June 30, | Quarter Ended September 30, | Quarter Ended December 31, |
|  | | (In thousands, except per share amounts) | | |
| --- | --- | --- | --- | --- |
| **As previously reported:** | | | | |
| Revenue | $ 13,919 | $ 16,931 | $ 13,101 | $ 10,666 |
| Operating loss | (15,743) | (7,968) | (3,760) | (4,637) |
| Net loss from continuing operations | (16,087) | (8,081) | (3,685) | (5,102) |
| Income (loss) from discontinued operations | (23,408) | (9,737) | 16,283 | 6,284 |
| Net income/(loss) attributable to common shareholders | (39,495) | (17,818) | 12,598 | 1,182 |
| Net income/(loss) per share attributable to common shareholders: | | | | |
| Basic | (3.63) | (1.62) | 1.14 | 0.11 |
| Diluted | (3.63) | (1.62) | 1.13 | 0.11 |

90

Table of Contents

### TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**NOTE 17—QUARTERLY RESULTS (UNAUDITED) (Continued)**

| | Quarter Ended March 31, | Quarter Ended June 30, | Quarter Ended September 30, | Quarter Ended December 31, |
|---|---|---|---|---|
| | | (In thousands, except per share amounts) | | |
| **As restated:** | | | | |
| Revenue | $ 13,919 | $ 16,931 | $ 13,101 | $ 10,666 |
| Operating loss | (15,743) | (36,968) | (3,760) | (4,637) |
| Net loss from continuing operations | (16,087) | (25,116) | (3,406) | (5,102) |
| Income (loss) from discontinued operations | (23,408) | (9,389) | 16,721 | 6,284 |
| Net income/(loss) attributable to common shareholders | (39,495) | (34,505) | 13,315 | 1,182 |
| Net income/(loss) per share attributable to common shareholders: | | | | |
| Basic | (3.63) | (3.13) | 1.21 | 0.11 |
| Diluted | (3.63) | (3.13) | 1.20 | 0.11 |

The 2011 unaudited consolidated financial statements will be prospectively restated in the quarterly reports filed on Form 10-Q for the second and third quarters of 2012.

**NOTE 18—RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS**

Subsequent to the issuance of our 2010 consolidated financial statements, we determined that errors related to estimating and recording certain expenses existed in the consolidated statement of operations, statement of shareholders' equity and statement of cash flows for the year ended December 31, 2010. As a result of these errors, approximately $0.6 million of expenses, net of tax, were recorded in the year ended December 31, 2009 rather than the year ended December 31, 2010, resulting in accumulated deficit at December 31, 2009 being overstated by approximately $0.6 million and net loss for the year ended December 31, 2010 being understated by approximately $0.6 million. We assessed the materiality of these errors on our financial statements for the year ended December 31, 2010 in accordance with the SEC's Staff Accounting Bulletin ("SAB") No. 99 and concluded that the errors were not material to that period. In accordance with SAB No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements," we concluded to restate the consolidated statement of operations, statement of shareholders' equity and statement of cash flows for the year ended December 31, 2010 to correct these errors. The effects of the restatement on our consolidated statement of operations, statement of shareholders' equity and statement of cash flows for the year ended December 31, 2010 are shown below:

### CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY
### YEAR ENDED DECEMBER 31, 2010

| | As Previously Presented | Adjustments | As Restated |
|---|---|---|---|
| | | (In thousands) | |
| Accumulated deficit balance as of December 31, 2009 | $ (781,017) | $ 592 | $ (780,425) |
| Net loss for the year ended December 31, 2010 | (17,585) | (592) | (18,177) |
| Accumulated deficit balance as of December 31, 2010 | $ (798,602) | $ — | $ (798,602) |

91

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 18—RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**CONSOLIDATED STATEMENT OF OPERATIONS
YEAR ENDED DECEMBER 31, 2010**

| | As Previously Presented | Adjustments | As Restated |
|---|---|---|---|
| | (In thousands, except per share amounts) | | |
| Revenue | $ 59,918 | $ — | $ 59,918 |
| Costs and expenses (exclusive of depreciation shown separately below) | | | |
| Cost of revenue | 4,980 | 156 | 5,136 |
| Selling and marketing expense | 50,061 | 1,168 | 51,229 |
| General and administrative expense | 24,522 | (22) | 24,500 |
| Product development | 3,488 | (85) | 3,403 |
| Litigation settlements and contingencies | 963 | — | 963 |
| Restructuring expense | 2,780 | — | 2,780 |
| Amortization of intangibles | 1,232 | — | 1,232 |
| Depreciation | 3,216 | — | 3,216 |
| Asset impairments | 540 | — | 540 |
| Total costs and expenses | 91,782 | 1,217 | 92,999 |
| Operating loss | (31,864) | (1,217) | (33,081) |
| Other income (expense) | | | |
| Interest income | 8 | — | 8 |
| Interest expense | (472) | — | (472) |
| Total other income (expense), net | (464) | — | (464) |
| Loss before income taxes | (32,328) | (1,217) | (33,545) |
| Income tax benefit | 6,195 | 746 | 6,941 |
| Net loss from continuing operations | (26,133) | (471) | (26,604) |
| Gain from sale of discontinued operations, net of tax | — | — | — |
| Income (loss) from operations of discontinued operations, net of tax | 8,548 | (121) | 8,427 |
| Income (loss) from discontinued operations | 8,548 | (121) | 8,427 |
| Net loss attributable to common shareholders | $ (17,585) | $ (592) | $ (18,177) |
| Weighted average common shares outstanding | 11,014 | — | 11,014 |
| Weighted average diluted shares outstanding | 11,014 | — | 11,014 |
| Net loss per share from continuing operations | | | |
| Basic | $ (2.38) | $ (0.04) | $ (2.42) |
| Diluted | $ (2.38) | $ (0.04) | $ (2.42) |
| Net income (loss) per share from discontinued operations | | | |
| Basic | $ 0.78 | $ (0.01) | $ 0.77 |
| Diluted | $ 0.78 | $ (0.01) | $ 0.77 |
| Net loss per share attributable to common shareholders | | | |
| Basic | $ (1.60) | $ (0.05) | $ (1.65) |
| Diluted | $ (1.60) | $ (0.05) | $ (1.65) |

92

Table of Contents

## TREE.COM, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 18—RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### CONSOLIDATED STATEMENT OF CASH FLOWS
### YEAR ENDED DECEMBER 31, 2010

| | As Previously Presented | Adjustments | As Restated |
|---|---|---|---|
| | (In thousands, except per share amounts) | | |
| **Cash flows from operating activities attributable to continuing operations:** | | | |
| Net loss | $ (17,585) | $ (592) | $ (18,177) |
| Less loss (income) from discontinued operations, net of tax | (8,548) | 121 | (8,427) |
| **Net loss from continuing operations** | (26,133) | (471) | (26,604) |
| Adjustments to reconcile net loss from continuing operations to net cash used in operating activities attributable to continuing operations: | | | |
| Loss on disposal of fixed assets | 85 | — | 85 |
| Amortization of intangibles | 1,232 | — | 1,232 |
| Depreciation | 3,216 | — | 3,216 |
| Intangible impairment | 540 | — | 540 |
| Non-cash compensation expense | 3,104 | — | 3,104 |
| Non-cash restructuring expense | 93 | — | 93 |
| Non-cash contingent consideration gain | (928) | — | (928) |
| Deferred income taxes | (6,529) | (414) | (6,943) |
| Bad debt expense | 24 | — | 24 |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | 2,443 | — | 2,443 |
| Prepaid and other current assets | 225 | — | 225 |
| Accounts payable and other current liabilities | (11,394) | 1,337 | (10,057) |
| Income taxes payable | (278) | (332) | (610) |
| Deferred revenue | (64) | — | (64) |
| Other, net | 2,612 | — | 2,612 |
| **Net cash provided by (used in) operating activities attributable to continuing operations** | (31,752) | 120 | (31,632) |
| **Cash flows from investing activities attributable to continuing operations:** | | | |
| Capital expenditures | (5,123) | — | (5,123) |
| Acquisitions | (250) | — | (250) |
| Other, net | 2,193 | — | 2,193 |
| **Net cash used in investing activities attributable to continuing operations** | (3,180) | — | (3,180) |
| **Cash flows from financing activities attributable to continuing operations:** | | | |
| Issuance of common stock, net of withholding taxes | (570) | — | (570) |
| Purchase of treasury stock | (8,532) | — | (8,532) |
| Increase in restricted cash | (50) | — | (50) |
| **Net cash used in financing activities attributable to continuing operations** | (9,152) | — | (9,152) |
| **Total cash provided by (used in) continuing operations** | (44,084) | 120 | (43,964) |
| Net cash provided by (used in) operating activities attributable to discontinued operations | 6,771 | (120) | 6,651 |

| | | | |
|---|---:|---:|---:|
| Net cash used in investing activities attributable to discontinued operations | (2,103) | — | (2,103) |
| Net cash provided by financing activities attributable to discontinued operations | 22,142 | — | 22,142 |
| **Total cash provided by discontinued operations** | 26,810 | — | 26,690 |
| **Net decrease in cash and cash equivalents** | (17,274) | — | (17,274) |
| Cash and cash equivalents at beginning of period | 86,093 | — | 86,093 |
| **Cash and cash equivalents at end of period** | $ 68,819 | $ — | $ 68,819 |

93

Table of Contents

**Item 9.**    *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

Not applicable.

**Item 9A.**    *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

We monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, we modify and refine our internal processes as conditions warrant.

As required by Rule 13a-15(b) of the Exchange Act, management, with the participation of our principal executive officer and principal financial officer, evaluated, as of the end of the period covered by this report, the effectiveness of our disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Based upon that evaluation, our principal executive officer and principal financial officer concluded that due to material weaknesses in our internal control over financial reporting, our disclosure controls and procedures were not effective as of December 31, 2011. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses in our internal control over financial reporting relate to the maintenance of effective controls over the application and monitoring of our accounting for income taxes and the maintenance of effective controls over the timing and amount of impairment of our indefinite-lived intangible assets.

With respect to our controls over the application and monitoring of accounting of our accounting for income taxes, we did not have controls designed and in place to ensure effective oversight of the work performed by, and the accuracy of, financial information provided by third party tax advisors. This material weakness was identified in connection with our assessment of the effectiveness of internal control over financial reporting as of December 31, 2010, and was determined not to have been remediated as of December 31, 2011.

With respect to our controls over the timing and amount of impairment of our indefinite-lived intangible assets, we did not have controls designed and in place to ensure appropriate levels of review over the methodology and complex and judgmental business and valuation assumptions in accordance with generally accepted valuation techniques that were used in our indefinite-lived intangible assets impairment tests during 2011. As a result of this deficiency, management's interim indefinite-lived intangible assets impairment test in the second quarter of 2011 indicated no impairment, and such result led to the performance of an annual impairment test as of October 1, 2011 using improper data inputs, including the starting carrying value of the trade name and trademark assets and the assumed royalty rate, which in turn led to an initial indication of impairment as of October 1, 2011 that was significantly below the $29.0 million impairment later determined to exist as of the end of the second quarter of 2011. We have restated our second and third quarter 2011 results of operations and financial position to reflect the $29.0 million impairment charge occurring in the second quarter. See Note 4—Goodwill and Intangible Assets and Note 17—Quarterly Results (Unaudited) to the consolidated financial statements included in this report.

Notwithstanding the identified material weaknesses described above, management believes that the financial statements and other financial information included in this report present fairly in all material respects our financial condition, results of operations and cash flows at and for the periods presented in accordance with accounting principles generally accepted in the United States.

With the oversight of our management and the audit committee of our board of directors, we have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weaknesses described above. With respect to the material weakness related to the application

94

Table of Contents

and monitoring of our accounting for income taxes, we have undertaken an evaluation of our available resources to provide effective oversight of the work performed by our third party tax advisors and are in the process of identifying necessary changes to our processes as required. Additionally, we are evaluating the resources available and provided to us by the third party tax advisor and identifying changes as required. With respect to the material weakness related to the timing and amount of impairment of our indefinite-lived intangible assets, we have strengthened our processes regarding intangible impairment analysis, which will subsequently include engaging a third party valuation firm for annual analyses and certain interim analyses. While we believe that these steps and measures will remediate the material weaknesses, there is a risk that these steps and measures will not be adequate to remediate the material weaknesses. Until we can provide reasonable assurance that these material weaknesses have been remediated, these material weaknesses could result in a misstatement in intangible asset or tax related accounts that could result in a material misstatement to our interim or annual consolidated financial statements and disclosures that may not be prevented or detected on a timely basis. In addition, we may be unable to meet our reporting obligations or comply with SEC rules and regulations, which could result in the violation of covenants in our warehouse lines, delisting actions by the NASDAQ Stock Market and investigation and sanctions by regulatory authorities. See Risk Factors—We have identified material weaknesses in our internal control over financial reporting, and we may be unable to develop, implement and maintain appropriate controls in future periods, above.

## Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2011. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has determined that due to the material weaknesses described above, our internal control over financial reporting was not effective as of December 31, 2011.

## Changes in Internal Control Over Financial Reporting

There was no change in our internal control over financial reporting that occurred during our fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B.   *Other Information*

On April 13, 2012, the board of directors elected Mark Sanford as a director effective as of April 17, 2012. Mr. Sanford will also serve as a member of the Compensation Committee. Mr. Sanford, 51, served as Governor of the State of South Carolina from 2003 to 2011. Prior to his election as Governor, Mr. Sanford served as Congressman representing the First Congressional District of South Carolina from 1995 to 2001. Prior to holding public office, Mr. Sanford spent ten years in various positions with commercial real estate companies. Mr. Sanford will stand for election at our 2012 Annual Meeting of Stockholders as a nominee for director to serve until our 2013 Annual Meeting of Stockholders.

<center>95</center>

[Table of Contents](#)

In consideration of his service on the board and the Compensation Committee, Mr. Sanford will be compensated in accordance with the compensation plan for outside directors previously approved by the board.

Mr. Sanford was nominated to the board of directors by Liberty Interactive Corporation in accordance with the terms of the Spinco Agreement dated May 13, 2008 by and among IAC/Interactive Corp, Liberty Interactive and certain other parties. The Spinco Agreement generally provides that so long as Liberty Interactive beneficially owns securities of our company representing at least 20% of the total voting power, Liberty Interactive has the right to nominate up to 20% of the directors (rounded up). Any director nominated by Liberty Interactive must be reasonably acceptable to a majority of the directors on our board who were not nominated by Liberty Interactive. All but one of Liberty Interactive's nominees serving on our board must qualify as independent under applicable stock exchange rules. Our board determined that Mr. Sanford is independent under the rules of the NASDAQ Stock Market.

Except as described above, there are no arrangements or understandings between Mr. Sanford and any other person pursuant to which Mr. Sanford was selected as a director.

<center>96</center>

Table of Contents

## PART III

As set forth below, the information required by Part III (Items 10, 11, 12, 13 and 14) is incorporated herein by reference to Tree.com's definitive proxy statement to be used in connection with its 2012 Annual Meeting of Stockholders and which will be filed with the Securities and Exchange Commission not later than 120 days after the end of the Company's fiscal year ended December 31, 2011 (the "2012 Proxy Statement"), in accordance with General Instruction G(3) of Form 10-K.

**Item 10.    *Directors, Executive Officers and Corporate Governance***

The information required by Item 10 will be contained in, and is hereby incorporated by reference to, the 2012 Proxy Statement, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the Company's fiscal year ended December 31, 2011.

**Item 11.    *Executive Compensation***

The information required by Item 11 will be contained in, and is hereby incorporated by reference to, the 2012 Proxy Statement, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the Company's fiscal year ended December 31, 2011.

**Item 12.    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required by Item 12 will be contained in, and is hereby incorporated by reference to, the 2012 Proxy Statement, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the Company's fiscal year ended December 31, 2011.

**Item 13.    *Certain Relationships and Related Transactions, and Director Independence***

The information required by Item 13 will be contained in, and is hereby incorporated by reference to, the 2012 Proxy Statement, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the Company's fiscal year ended December 31, 2011.

**Item 14.    *Principal Accounting Fees and Services***

The information required by Item 14 will be contained in, and is hereby incorporated by reference to, the 2012 Proxy Statement, which will be filed with the Securities and Exchange Commission no later than 120 days after the end of the Company's fiscal year ended December 31, 2011.

97

Table of Contents

## PART IV

**Item 15.** *Exhibits, Financial Statement Schedules*

*(a)  List of documents filed as part of this Report:*

**(1)  Consolidated Financial Statements of Tree.com**

Report of Independent Registered Public Accounting Firm: Deloitte & Touche LLP.

Consolidated Statements of Operations for the Years Ended December 31, 2011 and 2010.

Consolidated Balance Sheets as of December 31, 2011 and 2010.

Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2011 and 2010.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2011 and 2010.

Notes to Consolidated Financial Statements.

**(2)  Consolidated Financial Statement Schedules of Tree.com**

| Schedule Number | |
|---|---|
| II | Valuation and Qualifying Accounts |

All other financial statements and schedules not listed have been omitted since the required information is included in the Consolidated Financial Statements or the notes thereto, or is not applicable or required.

**(3)  Exhibits**

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith or incorporated herein by reference to the location indicated below.

| Exhibit Number | Description | Location |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Tree.com, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 3.2 | Amended and Restated By-laws of Tree.com, Inc. | Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.1 | Separation and Distribution Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.1 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.2 | Tax Sharing Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.3 | Employee Matters Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.4 | Transition Services Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.5 | Registration Rights Agreement, dated as of August 20, 2008, among Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC | Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.6 | Spinco Assignment and Assumption Agreement, dated as of August 20, 2008, among IAC/InterActiveCorp, Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC | Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed August 25, 2008. |
| 10.7 | Employment Agreement between Robert L. Harris and LendingTree, LLC, dated as of June 30, 2008* | Exhibit 10.5 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.8 | Amended and Restated Restricted Share Grant and Shareholders' Agreement, dated as of July 7, 2003, by and among Forest Merger Corp., LendingTree, Inc., InterActiveCorp and the Grantees named therein, as amended (filed as Exhibit 99.4 to Amendment No. 1 to IAC/InterActiveCorp's Registration Statement on Form S-4 (SEC File No. 333-105876) filed on July 10, 2003 and incorporated herein by reference)* | Exhibit 10.8 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.9 | Correspondent Loan Purchase Agreement, dated as of April 26, 2004, between CitiMortgage, Inc. and Home Loan Center, Inc. | Exhibit 10.9 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.10 | Loan Purchase Agreement, dated as of April 16, 2002, between Countrywide Home Loans, Inc. and Home Loan Center, Inc. | Exhibit 10.10 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.11 | Second amended and restated Tree.com, Inc. 2008 Stock and Annual Incentive Plan* | Exhibit 10.2 to the Registrant's current report on Form 8-K filed May 1, 2009. |
| 10.12 | Warehousing Credit Agreement, dated as of November 26, 2007, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein) | Exhibit 10.12 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |

99

[Table of Contents]

| Exhibit Number | Description | Location |
|---|---|---|
| 10.13 | Second Amendment to Warehousing Credit Agreement, made and entered into as of the 12th day of December, 2008, and to be effective as of the 30th day of December, 2008, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein). | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 17, 2008. |
| 10.14 | Master Repurchase Agreement, dated as of January 25, 2008, by and among Countrywide Bank, FSB and Home Loan Center, Inc. (the "Master Repurchase Agreement") | Exhibit 10.13 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.15 | Notice, dated June 25, 2008, issued by Countrywide Warehouse Lending, regarding certain amendments to the Master Repurchase Agreement | Exhibit 10.14 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.16 | Amendment to Master Repurchase Agreement No. 1 made and entered into as of February 23, 2009 by and between the Warehouse Lending Division of Countrywide Bank, FSB and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 27, 2009. |
| 10.17 | Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.15 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.18 | Employment Agreement between Matt Packey and LendingTree, LLC, dated as of August 3, 2008* | Exhibit 10.16 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.19 | Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of January 7, 2008* | Exhibit 10.6 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 10.20 | Amendment No. 1 to Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of August 15, 2008* | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed August 20, 2008. |
| 10.21 | Restricted Share Grant and Stockholder's Agreement, dated as of August 15, 2008, by and among IAC/InterActiveCorp, LendingTree Holdings Corp. and Douglas R. Lebda, together with Exhibit A thereto, Amended and Restated Certificate of Incorporation of LendingTree Holdings Corp.* | Exhibits 99.2 and 99.3 to the Registrant's Current Report on Form 8-K filed August 20, 2008. |

100

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.22 | Stock Purchase Agreement, dated February 8, 2009, between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 11, 2009. |
| 10.23 | Amendment No. 2 to the Employment Agreement between Douglas R. Lebda and Tree.com, Inc.* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.24 | Amendment No. 1 to the Employment Agreement between Robert Harris and Tree.com, Inc.* | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.25 | Amendment No. 1 to the Employment Agreement between Matthew Packey and Tree.com, Inc.* | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.26 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.27 | Form of Restricted Stock Award* | Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.28 | Form of Notice of Stock Option Award* | Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.29 | Option Cancellation Agreement, made and entered into as of the 28th day of April, 2009, by and between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed May 1, 2009 |
| 10.30 | Early Purchase Program Addendum to Loan Purchase Agreement, made and entered into as of May 1, 2009 by and between Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed May 6, 2009 |
| 10.31 | Master Repurchase Agreement, made and entered into as of May 1, 2009, by and between Bank of America , N.A. and Home Loan Center, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed May 6, 2009 |
| 10.32 | Transactions Terms Letter for Master Repurchase Agreement, made and entered into as of May 1, 2009, by and between Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed May 6, 2009 |
| 10.33 | Master Repurchase Agreement dated as of October 30, 2009, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 30, 2009 |
| 10.34 | Side Letter dated October 30, 2009 regarding the Master Repurchase Agreement between JPMorgan Chase Bank, and Home Loan Center, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed October 30, 2009 |

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.35 | Third Amendment to Warehousing Credit Agreement, made and entered into as of the 18th day of December, 2009, and to be effective as of the 29th day of December, 2009, by and among Home Loan Center, Inc. d/b/a LendingTree Loans PNC Bank, National Association, successor to National City Bank, its capacity as Agent for the Banks (as defined therein) | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 23, 2009 |
| 10.36 | Fourth Amendment to Warehousing Credit Agreement, made and entered into as of February 15, 2010 by and among Home Loan Center, Inc. d/b/a LendingTree Loans, PNC Bank, National Association (successor to National City Bank) and PNC Bank, National Association (successor to National City Bank), in its capacity as Agent for the Banks (as defined therein). | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 19, 2010 |
| 10.37 | Amendment No. 1 to Stock Purchase Agreement between Tree.com, Inc. and Douglas R. Lebda, dated May 10, 2010* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.38 | Amendment No. 3 to the Employment Agreement between Douglas R. Lebda and Tree.com, Inc., dated May 10, 2010* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.39 | Form of Amendment to Restricted Stock Awards for Douglas R. Lebda* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.40 | Employment Agreement by and between David Norris and LendingTree, LLC, dated June 30, 2008* | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.41 | Amendment to Employment Agreement between David Norris and Tree.com, Inc., dated December 3, 2009* | Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.42 | Amendment No. 2 to Employment Agreement between David Norris and Tree.com, Inc., dated May 10, 2010* | Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.43 | Severance Agreement between Greg Hanson, RealEstate.com and Tree.com, dated April 22, 2009* | Exhibit 10.8 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.44 | Change in Control Letter from Tree.com, Inc. to Greg Hanson, dated March 26, 2010* | Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.45 | Confidential Severance Agreement and Release by and between Robert L. Harris and Tree.com, Inc., dated March 2, 2010* | Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |

[Table of Contents](#)

| Exhibit Number | Description | Location |
|---|---|---|
| 10.46 | Form of Restricted Stock Award Agreement* | Exhibit 10.11 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.47 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.48 | Form of Notice of Stock Option Award* | Exhibit 10.13 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.49 | Amendment No. 1 to Transactions Term Letter, made and entered into as of April 28, 2010 by and between Home Loan Center, Inc. d/b/a LendingTree Loans and Bank of America | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 30, 2010 |
| 10.50 | Amendment No. 1 to the Stock Option Award Agreement between Douglas R. Lebda and Tree.com, Inc., dated May 10, 2010* | Exhibit 10.15 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.51 | Amendment No. 1 to Transactions Term Letter, made and entered into as of April 28, 2010 by and between Home Loan Center, Inc. d/b/a LendingTree Loans and Bank of America | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 30, 2010 |
| 10.52 | Severance Agreement between Tree.com, Inc. and Matthew Packey, dated May 10, 2010* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed August 3, 2010 |
| 10.53 | Letter Agreement between Tree.com, Inc. and Christopher Hayek, dated June 28, 2010* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed August 3, 2010 |
| 10.54 | Amendment No. 1 to Early Purchase Program Addendum to Loan Purchase Agreement, dated July 15, 2010, by and among Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 21, 2010 |
| 10.55 | Mandatory Forward Loan Volume Commitment, dated July 15, 2010, by and among Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 21, 2010 |
| 10.56 | Transaction Terms Letter for Master Repurchase Agreement, dated July 15, 2010, by and among Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed July 21, 2010 |
| 10.57 | Amendment No. 3 to Master Repurchase Agreement, dated July 22, 2010, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 28, 2010 |

103

[Table of Contents](#)

| Exhibit Number | Description | Location |
|---|---|---|
| 10.58 | Amendment No. 4 to Master Repurchase Agreement, dated as of October 29, 2010 by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 25, 2010 |
| 10.59 | Second Amendment to Side Letter dated as of October 29, 2010 with respect to the Home Loan Center, Inc. warehouse facility with JPMorgan Chase Bank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed October 25, 2010. |
| 10.60 | Share Exchange Agreement dated August 30, 2010, between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed September 1, 2010. |
| 10.61 | Amendment No. 1 to the Restricted Share Grant and Stockholder's Agreement, dated August 30, 2010 between Tree.com, Inc., LendingTree Holdings Corp. and Douglas R. Lebda* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed November 12, 2010 |
| 10.62 | Amendment No. 3 to the Master Repurchase Agreement, dated July 22, 2010, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 28, 2010 |
| 10.63 | Employment Agreement between Tree.com, Inc. and Steven Ozonian, dated October 31, 2010* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed November 1, 2010 |
| 10.64 | Amended and Restated Employment Agreement by and between Tree.com, Inc. and Douglas R. Lebda, dated October 26, 2010* | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed November 1, 2010 |
| 10.65 | Asset Purchase Agreement dated November 15, 2010 by and among Home Loan Center, Inc., First Residential Mortgage Network, Inc. dba SurePoint Lending, and the shareholders of First Residential Mortgage Network named therein | Exhibit 2.1 to Registrant's Current Report on Form 8K filed November 16, 2010 |
| 10.66 | Letter Agreement dated as of January 24, 2011 by and between RealEstate.com, Inc. and Steven Ozonian* | Exhibit 10.66 to the Registrant's Annual Report on Form 10-K filed February 28, 2011 |
| 10.67 | Award Letter between Greg Hanson and Tree.com BU Holding Company, Inc. dated January 28, 2011* | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed February 3, 2011 |
| 10.68 | Standard Terms and Conditions to Restricted Stock Award Letters of Tree.com BU Holding Company, Inc.* | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed February 3, 2011 |

104

6/10/2020    08-13555-mg    Doc 6714-3 ... Filed 04/01/24 ... Entered 04/01/24 14:23:28 ... Exhibit
Complaint    Pg 542 of 1033

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.69 | First Amendment to Asset Purchase Agreement dated March 14, 2011 by and among HLC, SurePoint and the shareholders party thereto | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed March 21, 2011 |
| 10.70 | Second Amendment to Asset Purchase Agreement dated March 15, 2011 by and among HLC, SurePoint and the shareholders party thereto | Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed March 21, 2011 |
| 10.71 | Amendment No. 5 to Master Repurchase Agreement, dated March 31, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 6, 2011 |
| 10.72 | Third Amendment to Side Letter, dated March 31, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed April 6, 2011 |
| 10.73 | Confidential Severance Agreement and Release, dated March 31, 2011, by and between Tree.com, Inc. and Steven Ozonian | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed April 6, 2011 |
| 10.74 | Asset Purchase Agreement dated May 12, 2011 by and among Tree.com, Inc., Home Loan Center, Inc., LendingTree, LLC, HLC Escrow, Inc. and Discover Bank.** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.75 | Form of Assignment and Assumption Agreement | Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.76 | Form of Bill of Sale | Exhibit 2.3 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.77 | Escrow Agreement Terms | Exhibit 2.4 to the Registrant's Current Report on Form 8-K/A filed August 12, 2011 |
| 10.78 | Form of Voting and Support Agreement of Douglas R. Lebda | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.79 | Form of Voting and Support Agreement of Liberty Media Corporation | Exhibit 99.2 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.80 | Form of Voting and Support Agreement of Second Curve, LLC | Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.81 | Amendment No. 6 to Master Repurchase Agreement, dated as of June 29, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 6, 2011 |
| 10.82 | Fourth Amendment to Side Letter, dated as of June 29, 2011, with respect to the Home Loan Center, Inc. warehouse facility with JPMorgan Chase Bank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 6, 2011 |

[Table of Contents](#)

| Exhibit Number | Description | Location |
|---|---|---|
| 10.83 | Amendment No. 1 to Transaction Terms Letter dated as of June 29, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed July 6, 2011 |
| 10.84 | Amendment No. 2 to Transactions Terms Letter dated as of July 12, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 15, 2011 |
| 10.85 | Amendment No. 2 to Early Purchase Program Addendum to Loan Purchase Agreement dated as of July 12, 2011, which supplements that certain Loan Purchase Agreement by and between Bank of America, N.A. and Home Loan Center, Inc. dated April 16, 2002. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 15, 2011 |
| 10.86 | Extension Letter Agreement dated as of August 11, 2011, regarding the Master Repurchase Agreement by and between Bank of America, N.A. and Home Loan Center, Inc. dated May 1, 2009 | Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed August 15, 2011 |
| 10.87 | Asset Purchase Agreement dated September 15, 2011 by and among LendingTree, LLC, RealEstate.com, Inc. and Market Leader, Inc.* | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 10.88 | Bill of Sale | Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 10.89 | Assignment and Assumption Agreement | Exhibit 2.3 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 10.90 | Master Repurchase Agreement, dated as of October 13, 2011, by and between Home Loan Center, Inc. and Citibank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 19, 2011 |
| 10.91 | Pricing Side Letter dated as of October 13, 2011, by and between Home Loan Center, Inc. and Citibank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed October 19, 2011 |

106

Table of Contents

| Exhibit Number | Description | Location |
|---|---|---|
| 10.92 | Amendment No. 3 to Transaction Terms Letter dated as of September 30, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 5, 2011 |
| 10.93 | Amendment No. 7 to Master Repurchase Agreement dated as of October 28, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.94 | Amendment No. 5 to Side Letter dated as of October 28, 2011, which supplements that certain Master Repurchase Agreement dated as of October 30, 2009 by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.95 | Amendment No. 2 to Master Repurchase Agreement dated as of November 1, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A | Exhibit 10.11 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.96 | Amendment No. 4 to Transaction Terms Letter dated as of November 1, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A | Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.97 | Amendment Number One dated as of December 13, 2011 to the Master Repurchase Agreement dated as of October 13, 2011 by and between Home Loan Center, Inc. and CitiBank, N.A. | † |
| 21.1 | Subsidiaries of Tree.com, Inc. | † |
| 24.1 | Power of Attorney (included on signature page of this Annual Report on Form 10-K) | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | † |

[Table of Contents](#)

| Exhibit Number | Description | Location |
|---|---|---|
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | †† |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | †† |
| 101.INS | XBRL Instance Document | ††† |
| 101.SCH | XBRL Taxonomy Extension Schema Document | ††† |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | ††† |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | ††† |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | ††† |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | ††† |

†      Filed herewith

††      This certification is being furnished solely to accompany this report pursuant to 18 U.S.C. 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934 and is not to be incorporated by reference into any filing of the registrant, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

†††      Furnished herewith. Pursuant to Rule 406T of Regulation S-T, the Interactive Data Files on Exhibit 101 hereto are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended, and otherwise are not subject to liability under those sections.

*      Management or compensation plan or agreement.

**      Certain schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). The Company agrees to furnish supplementally a copy of all omitted schedules to the SEC upon its request.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: April 16, 2012

<div align="center">

TREE.COM, INC.

By:     /s/ DOUGLAS R. LEBDA
_____

Douglas R. Lebda
*Chairman and*
*Chief Executive Officer*

</div>

KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints Katharine Pierce, and each of them, his true and lawful attorney and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2011, and to file the same with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys and agents, and each of them, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated, in each case on April 16, 2012:

| Signature | Title |
|---|---|
| /s/ DOUGLAS R. LEBDA<br>_____<br>Douglas R. Lebda | Chairman, Chief Executive Officer and Director (Principal Executive Officer) |
| /s/ CHRISTOPHER R. HAYEK<br>_____<br>Christopher R. Hayek | Senior Vice President and Chief Accounting Officer (Principal Financial and Accounting Officer) |
| /s/ PETER HORAN<br>_____<br>Peter Horan | Director |
| /s/ W. MAC LACKEY<br>_____<br>W. Mac Lackey | Director |
| /s/ JOSEPH LEVIN<br>_____<br>Joseph Levin | Director |

<div align="center">

109

</div>

Table of Contents

| Signature | | Title |
|-----------|---|-------|
| /s/ PATRICK MCCRORY | | |
| Patrick McCrory | | Director |
| /s/ LANCE MELBER | | |
| Lance Melber | | Director |
| /s/ STEVEN OZONIAN | | |
| Steven Ozonian | | Director |

110

Table of Contents

**Schedule II**

<div align="center">

**TREE.COM, INC. AND SUBSIDIARIES**
**VALUATION AND QUALIFYING ACCOUNTS**

</div>

| Description | Balance at Beginning of Period | Charges to Earnings | Charges to Other Accounts (In thousands) | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| **2011** | | | | | |
| Allowance for doubtful accounts | $ 131 | $ 55 | $ — | $ (100)(b) | $ 86 |
| Deferred tax valuation allowance | 52,285 | 15,853(a) | — | — | 68,138 |
| **2010** | | | | | |
| Allowance for doubtful accounts | $ 478 | $ 24 | $ — | $ (371)(b) | $ 131 |
| Deferred tax valuation allowance | 46,858 | 5,270(a) | 157 | — | 52,285 |

(a)    Amount is primarily related to Tree.com net operating losses and other deferred tax assets including accrued expenses and goodwill which impacted the income tax provision.

(b)    Write-off of uncollectible accounts receivable.

<div align="center">

111

</div>

EX-10.97 2 a2208170zex-10_97.htm EX-10.97

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 10.97

EXECUTION VERSION

AMENDMENT NUMBER ONE
to the
MASTER REPURCHASE AGREEMENT
Dated as of October 13, 2011,
between
HOME LOAN CENTER, INC.
and
CITIBANK, N.A.

This AMENDMENT NUMBER ONE (this "*Amendment Number One*") is made this 13th day of December, 2011, between HOME LOAN CENTER, INC. ("*Seller*") and CITIBANK, N.A. ("*Buyer*"), to the Master Repurchase Agreement, dated as of October 13, 2011, between Seller and Buyer, as such agreement may be amended from time to time (the "*Agreement*"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

RECITALS

WHEREAS, Seller and Buyer have agreed to amend the agreement to extend the Termination Date and to make certain other changes, each as more specifically set forth herein; and

WHEREAS, as of the date hereof, Seller represents to Buyer that Seller is in full compliance with all of the terms and conditions of the Agreement and each other Program Document and no Default or Event of Default has occurred and is continuing under the Agreement or any other Program Document.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the mutual covenants herein contained, the parties hereto hereby agree as follows:

SECTION 1.　*Amendments.*　Effective as of December 13, 2011:

(a)　Section 1 of the Agreement is hereby amended by deleting the definition of "Commitment Fee" and replacing it with the following:

"*Commitment Fee*" shall have the meaning assigned thereto in the Pricing Side Letter.

(b)　Section 1 of the Agreement is further amended by deleting the definition of "Termination Date" and replacing it with the following:

"*Termination Date*" shall mean January 20, 2012, or such earlier date on which this Agreement shall terminate in accordance with the provisions hereof or by operation of law.

(c)　Section 1 of the Agreement is further amended by adding the following definition immediately before the definition of "Jumbo Loan":

"January 2012 Extension Commitment Fee" shall have the meaning assigned thereto in the Pricing Side Letter.

(d)　Section 4(c) of the Agreement is hereby amended by adding the following new language at the end of such section:

In connection with the extension of the Termination Date from December 13, 2011 to January 20, 2012, Seller agrees to pay to Buyer an additional commitment fee equal to the January 2012 Extension Commitment Fee, such payment to be made in Dollars, in immediately available funds, without deduction, set off or counterclaim on or prior to December 13, 2011. Buyer may, in its sole discretion, net the January 2012 Extension

Commitment Fee from the proceeds of any Purchase Price paid to Seller. The January 2012 Extension Commitment Fee is and shall be deemed to be fully earned as of the date hereof and each installment shall be non-refundable when paid.

SECTION 2.    *Fees and Expenses.*    Seller agrees to pay to Buyer all reasonable out of pocket costs and expenses incurred by Buyer in connection with this Amendment Number One (including all reasonable fees and out of pocket costs and expenses of the Buyer's legal counsel) in accordance with Sections 23 and 25 of the Agreement.

SECTION 3.    *Representations.*    Seller hereby represents to Buyer that as of the date hereof, Seller is in full compliance with all of the terms and conditions of the Agreement and each other Program Document and no Default or Event of Default has occurred and is continuing under the Agreement or any other Program Document.

SECTION 4.    *Binding Effect; Governing Law.*    This Amendment Number One shall be binding and inure to the benefit of the parties hereto and their respective successors and permitted assigns. THIS AMENDMENT NUMBER ONE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

SECTION 5.    *Counterparts.*    This Amendment Number One may be executed by each of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.

SECTION 6.    *Limited Effect.*    Except as amended hereby, the Agreement shall continue in full force and effect in accordance with its terms. Reference to this Amendment Number One need not be made in the Agreement or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to, or with respect to, the Agreement, any reference in any of such items to the Agreement being sufficient to refer to the Agreement as amended hereby.

2

IN WITNESS WHEREOF, Seller and Buyer have caused this Amendment Number One to be executed and delivered by their duly authorized officers as of the day and year first above written.

HOME LOAN CENTER, INC.
(Seller)

By:  /s/ RIAN FUREY
_____

    Name: Rian Furey
    Title: COO

CITIBANK, N.A.
(Buyer)

By:  /s/ SUSAN MILLS
_____

    Name: Susan Mills
    Title: Vice President

3

QuickLinks

[Exhibit 10.97](#)

EX-21.1 3 a2208170zex-21_1.htm EX-21.1

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 21.1

### SUBSIDIARIES OF TREE.COM, INC.

| Name | Jurisdiction of Formation |
|---|---|
| LendingTree Holdings Corp. | DE |
| LendingTree, LLC | DE |
| Tree BU Holding Company, Inc. | DE |
| DegreeTree, Inc. f/k/a Tree Insurance Agency, Inc. | DE |
| Tree Home Services, Inc. | DE |
| Home Loan Center, Inc. | CA |
| HLC Escrow, Inc. | CA |
| HLC Settlement Services, Inc. | CA |
| LendingTree Settlement Services, LLC | DE |
| LendingTree Alabama Title Services, LLC | AL |
| Realestate.com, Inc. | DE |
| LT Real Estate, Inc. | DE |
| Real Estate Title Services, LLC | CA |
| Robin Acquisition Corp. | DE |
| iNest Realty, Inc. | IL |
| iNest Realty Minnesota, Inc. | MN |

QuickLinks

Exhibit 21.1

SUBSIDIARIES OF TREE.COM, INC.

EX-31.1 4 a2208170zex-31_1.htm EX-31.1

<u>QuickLinks</u> -- Click here to rapidly navigate through this document

**Exhibit 31.1**

### CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify that:

1.    I have reviewed this annual report on Form 10-K for the period ended December 31, 2011 of Tree.com, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: April 16, 2012

/s/ DOUGLAS R. LEBDA

Douglas R. Lebda
*Chairman and Chief Executive Officer*
*(principal executive officer)*

QuickLinks

[Exhibit 31.1](#)

EX-31.2 5 a2208170zex-31_2.htm EX-31.2

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 31.2**

<div align="center">

**CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER
PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

</div>

I, Christopher R. Hayek, certify that:

1.    I have reviewed this annual report on Form 10-K for the period ended December 31, 2011 of Tree.com, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: April 16, 2012

/s/ CHRISTOPHER R. HAYEK

Christopher R. Hayek
*Senior Vice President and*
*Chief Accounting Officer*
*(principal financial officer)*

QuickLinks

Exhibit 31.2

CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

EX-32.1 6 a2208170zex-32_1.htm EX-32.1

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 32.1

### CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) the Annual Report on Form 10-K for the fiscal year ended December 31, 2011 of Tree.com, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Tree.com, Inc.

Dated: April 16, 2012 /s/ DOUGLAS R. LEBDA

Douglas R. Lebda
*Chairman and Chief Executive Officer*
*(principal executive officer)*

QuickLinks

Exhibit 32.1

CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

EX-32.2 7 a2208170zex-32_2.htm EX-32.2

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 32.2**

### CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Christopher R. Hayek, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)     the Annual Report on Form 10-K for the fiscal year ended December 31, 2011 of Tree.com, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Tree.com, Inc.

Dated: April 16, 2012                                                /s/ CHRISTOPHER R. HAYEK

                                                      ────────────────────────────────

                                                          Christopher R. Hayek
                                                          *Senior Vice President and*
                                                          *Chief Accounting Officer*
                                                          *(principal financial officer)*

QuickLinks

Exhibit 32.2

CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

# EXHIBIT 5

EX-2.1 2 a11-12364_1ex2d1.htm EX-2.1

**Exhibit 2.1**

Execution Version

ASSET PURCHASE AGREEMENT
by and among

TREE.COM, INC.,
HOME LOAN CENTER, INC.,
LENDINGTREE, LLC,
HLC ESCROW, INC.
and
DISCOVER BANK

Dated May 12, 2011

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1. | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Index of Defined Terms | 10 |
| ARTICLE 2. | PURCHASE AND SALE OF ASSETS | 11 |
| 2.1 | Purchase and Sale of Assets | 11 |
| 2.2 | Excluded Assets | 12 |
| 2.3 | Assumed Liabilities | 13 |
| 2.4 | Excluded Liabilities | 14 |
| ARTICLE 3. | PURCHASE PRICE | 15 |
| 3.1 | Purchase Price | 15 |
| 3.2 | Adjustments | 15 |
| 3.3 | Allocation of Purchase Price | 16 |
| ARTICLE 4. | CLOSING | 16 |
| 4.1 | The Closing | 16 |
| 4.2 | Deliveries at the Closing | 16 |
| ARTICLE 5. | REPRESENTATIONS AND WARRANTIES OF BUYER | 19 |
| 5.1 | Organization; Authority; Enforceability | 19 |
| 5.2 | No Conflicts | 19 |
| 5.3 | No Finders | 19 |
| 5.4 | No Litigation | 19 |
| 5.5 | Financing | 19 |
| 5.6 | Acknowledgment by Buyer | 19 |
| ARTICLE 6. | REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES | 20 |

| | | |
|---|---|---|
| 6.1 | Organization; Authority; Enforceability | 20 |
| 6.2 | No Conflicts | 21 |
| 6.3 | Capitalization | 21 |
| 6.4 | Financial Statements; No Undisclosed Liabilities | 22 |
| 6.5 | Subsequent Events | 23 |
| 6.6 | No Finders | 25 |
| 6.7 | Actions | 25 |
| 6.8 | Legal Compliance | 25 |
| 6.9 | Licenses | 26 |
| 6.10 | Privacy and Data Security Policies | 27 |

i

| | | |
|---|---|---|
| 6.11 | Seller Pipeline Loans | 27 |
| 6.12 | Acquired Assets | 28 |
| 6.13 | Contracts | 28 |
| 6.14 | Employees | 30 |
| 6.15 | Intellectual Property | 32 |
| 6.16 | Tax | 34 |
| 6.17 | Transactions With Affiliates | 35 |
| 6.18 | Employee Benefit Plans; ERISA | 36 |
| 6.19 | Real Property | 37 |
| 6.20 | Vote Required | 37 |
| 6.21 | Solvency | 38 |
| 6.22 | Disclosure | 38 |
| | | |
| ARTICLE 7. | PRE-CLOSING COVENANTS | 38 |
| | | |
| 7.1 | Conduct of Business by Seller Parties | 38 |
| 7.2 | Access to Information | 41 |
| 7.3 | Efforts to Close | 42 |
| 7.4 | Bulk Transfer Compliance | 43 |
| 7.5 | Proxy Statement | 43 |
| 7.6 | Stockholders' Meeting | 45 |
| 7.7 | No Solicitation of Acquisition Proposal | 45 |
| 7.8 | Notice of Events | 50 |
| 7.9 | Directors and Officers | 51 |
| 7.10 | Escrow and Transition Services Agreements | 51 |
| 7.11 | Owned Software | 51 |
| 7.12 | Excludable Contracts | 51 |
| 7.13 | Compliance Certificates | 51 |
| | | |
| ARTICLE 8. | ADDITIONAL COVENANTS | 52 |
| | | |
| 8.1 | Further Assurances | 52 |
| 8.2 | Confidentiality | 52 |
| 8.4 | Non-Competition; Non-Solicitation | 53 |
| 8.4 | Taxes | 55 |
| 8.5 | Employees; Employee Benefit Plans | 56 |
| 8.6 | Seller Parties' Operations After Closing | 60 |
| 8.7 | New Mortgage Loan Applications; Seller Pipeline Loans | 61 |
| 8.8 | Nonassignable Assets | 62 |
| | | |
| ARTICLE 9. | CLOSING CONDITIONS | 62 |
| | | |
| 9.1 | Conditions Precedent to Obligations of Buyer | 62 |
| 9.2 | Conditions Precedent to Obligations of Seller Parties | 64 |

ARTICLE 10.    TERMINATION                                                                65

    10.1    Termination of Agreement                                                       65

ii

    10.2    Effect of Termination                                                          68
    10.3    Termination Fee                                                                68
    10.4    Liquidated Damages                                                             68

ARTICLE 11.    INDEMNIFICATION                                                             69

    11.1    Survival                                                                       69
    11.2    Indemnification by Seller Parties                                              70
    11.3    Indemnification by Buyer                                                       71
    11.4    Third Party Claims                                                             71
    11.5    Other Claims                                                                   73
    11.6    Limitations                                                                    73
    11.7    Mitigation                                                                     73
    11.8    Subrogation                                                                    73
    11.9    Set-off and Withholding                                                        74
    11.10   Materiality                                                                    74

ARTICLE 12.    MISCELLANEOUS                                                               75

    12.1    Entire Agreement                                                               75
    12.2    Notices                                                                        75
    12.3    Modifications; Waiver                                                          77
    12.4    Expenses                                                                       77
    12.5    Access to Records and Employees after Closing                                  77
    12.6    Public Announcements                                                           78
    12.7    Assignments, Successors and No Third Party Rights                              78
    12.8    Severability                                                                   79
    12.9    Governing Law; Arbitration                                                     79
    12.10   Attorneys' Fees                                                                80
    12.11   Time of Essence                                                                80
    12.12   Execution of Agreement                                                         80
    12.13   Interpretation                                                                 80
    12.14   Remedies                                                                       82

iii

**EXHIBIT LIST**

Exhibit A — Assignment and Assumption Agreement
Exhibit B — Bill of Sale
Exhibit C — Escrow Agreement Terms

iv

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of May 12, 2011, is entered into by and among Home Loan Center, Inc., a California corporation ("**HLC Inc.**"), HLC Escrow, Inc., a California corporation ("**HLC Escrow**", and together with HLC Inc., "**Sellers**", and

each a "**Seller**"), LendingTree, LLC, a Delaware limited liability company ("**LendingTree**"), and Tree.com, Inc., a Delaware corporation ("**Parent**", and together with Sellers and LendingTree, "**Seller Parties**", and each a "**Seller Party**"), and Discover Bank, a Delaware banking corporation ("**Buyer**").  Seller Parties and Buyer are sometimes referred to herein together as the "**Parties**", and each as a "**Party**."

## RECITALS

A.       Parent owns or controls, directly or indirectly, each of HLC Inc., LendingTree and HLC Escrow.

B.       Parent and its Affiliates (as defined below) are engaged in the business of (i) originating, refinancing, processing, underwriting, funding and closing residential mortgage loans and (ii) providing title, escrow, settlement and related services (the businesses described in clauses (i) and (ii), collectively, the "**Business**").  For the avoidance of doubt, the Business does not include the Excluded Business (as defined below).

C.       Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties, the Acquired Assets (as defined below), all on the terms and subject to the conditions set forth herein.

D.       Concurrently with the entry into this Agreement, Parent and Buyer have entered into, and delivered to the other party their respective executed counterpart signature pages to, the Marketing Consulting Services Agreement (as defined herein).

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, the Parties agree as follows:

**ARTICLE 1.       DEFINITIONS.**

1.1       <u>Definitions</u>.

"**Action**" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, investigation, arbitration, mediation, hearing or similar event, occurrence, or proceeding.

"**Affiliate**" means, with respect to any specified Person, a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common

1

control with, such specified Person.  For purposes of this definition, "control" means, with respect to any specified Person, the power to direct or cause the direction of the management and policies of such specified Person, whether through the ownership of voting securities, by Contract or otherwise.  The terms "controlled by" and "under common control with" shall have correlative meanings.

"**Affiliated Group**" means any affiliated group within the meaning of Section 1504 of the Code without regard to the limitations contained in Section 1504(b) of the Code and any similar group defined under a similar provision of state, local or foreign Law.

"**Agency**" means any Governmental Authority which regulates or supervises (i) the Business, (ii) the Acquired Assets, (iii) any of the activities of Parent or LendingTree with respect to the Business or the Acquired Assets or (iv) HLC Inc., HLC Escrow or any of the Subsidiaries.

"**Agreement**" means this Asset Purchase Agreement, together with all Exhibits and Schedules (including the Disclosure Schedule) attached hereto, as the same may be amended, supplemented or otherwise modified from time to time in accordance herewith.

"**Applicable Requirements**" means all contractual obligations of, and all requirements of Law and Orders of any Agency or Governmental Authority applicable to, (i) Parent and LendingTree with respect to the Business or the Acquired Assets or (ii) HLC Inc., HLC Escrow or any of the Subsidiaries.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement in the form of <u>Exhibit A</u>.

"***Benefit Plan***" means each plan, program, policy, payroll practice or Contract providing for compensation, bonus, incentive, retention, tax gross up, deferred compensation, severance, termination pay, change of control payments or benefits, performance awards, stock or stock related awards, equity compensation, fringe benefits, pension or retirement benefits, welfare benefits, or other employee benefits of any kind, whether formal or informal, funded or unfunded, written or oral, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"***Bill of Sale***" means the Bill of Sale in the form of <u>Exhibit B</u>.

"***Bona Fide Proposal***" means a binding written proposal from a Tier 1 Investor or Tier 2 Investor, in a form in which such Tier 1 Investor or Tier 2 Investor has indicated it is prepared to execute, to purchase mortgage loans funded by the Business after the Closing that (a) contains terms and conditions that are customary for a bank that is similarly-situated to Buyer (assuming Buyer had a mortgage origination business) and (b) does not contain terms that expressly subject Buyer to liability as a result of transactions or liabilities between HLC Inc. and such investor.

"***Business Day***" means any day other than any Saturday, Sunday or other day on which banks in California or Delaware are required or authorized by law or regulation to close.

<center>2</center>

---

"***Business Employees***" means those employees of Seller Parties or any of their Affiliates that render services as part of their primary job responsibilities for the Business, including the Key Persons.

"***Buyer Disclosure Schedule***" means that certain document identified as the Buyer Disclosure Schedule delivered by Buyer to Sellers in connection with the execution of this Agreement. Each Section in the Buyer Disclosure Schedule shall be deemed to qualify the corresponding Section of this Agreement and any other Section of this Agreement to which the application of such disclosure is readily apparent on the face of such disclosure without further inquiry.

"***Code***" means the Internal Revenue Code of 1986.

"***Collateral***" means any family residence that is encumbered by a Mortgage, including all buildings and fixtures thereon and all accessions thereto, including installations of mechanical, electrical, plumbing, heating and air conditioning systems located in or affixed to such buildings, and all alterations, additions and replacements.

"***Confidential Information***" means (i) trade secrets, (ii) ideas, know-how, concepts, methods, processes, formulae, technology, algorithms, models, reports, data, customer lists, supplier lists, mailing lists, business plans and other proprietary information, in each case, that are non-public and derive value, monetary or otherwise, from being maintained in confidence, and (iii) all non-public personal information of loan applicants.

"***Confidentiality Agreement***" means that certain Mutual Non-Disclosure and Confidentiality Agreement, dated as of July 22, 2010, by and between Discover Financial Services and Parent.

"***Contract***" means any contract, agreement, lease, license, arrangement, bilateral understanding, commitment, obligation or instrument, whether written or oral.

"***Copyrights***" means copyrights, whether registered or unregistered, in published works and unpublished works, and pending applications to register the same.

"***Custodial Account***" means all funds held or directly controlled by any Seller Party or any Subsidiary with respect to any Mortgage Loan, including all principal and interest funds and any other funds due, buydown funds, suspense funds, funds for the payment of Taxes, assessments, insurance premiums, ground rents and similar charges, funds for the payment of bankruptcy and fraud coverage, funds from hazard insurance loss drafts and other mortgage escrow and impound amounts (including interest thereon for the benefit of mortgagors, if applicable); <u>provided</u>, <u>however</u>, that the term "Custodial Account" shall not include any servicing-related funds held or directly controlled by any Seller Party or any Subsidiary with respect to any Mortgage Loan.

"***Disclosure Schedule***" means that certain document identified as the Disclosure Schedule delivered by Sellers to Buyer in connection with the execution of this Agreement. Each Schedule in the Disclosure Schedule shall be deemed to qualify the corresponding Section

3

of this Agreement and any other Section of this Agreement to which the application of such disclosure is readily apparent on the face of such disclosure without further inquiry.

"***Discover Financial Services***" means Discover Financial Services, a Delaware corporation.

"***Encumbrance***" means any security interest, deed of trust, mortgage, pledge, lien, charge, claim, other similar interest, Order, easement, community property interest, equitable interest, right of first refusal, or any other restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"***Enforceable***" means, with respect to a Contract entered into by a Person, that such Contract is the legal, valid, and binding obligation of such Person, enforceable against such Person in accordance with such Contract's terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and to general principles of equity.

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***Escrow Agent***" means The Bank of New York Mellon, in its capacity as escrow agent pursuant to the Escrow Agreement.

"***Escrow Agreement***" means an Escrow Agreement, in form and substance satisfactory to Buyer and Seller Parties, providing for the terms set forth on Exhibit C.

"***Escrow Amount***" means the amount initially deposited on the Closing Date into escrow with the Escrow Agent pursuant to the Escrow Agreement.

"***Excludable Contract***" means each Contract set forth on Schedule 1.1(a) attached hereto.

"***Excluded Business***" means the real estate brokerage business or lending network exchange businesses of Parent and LendingTree as presently conducted, as described in Parent's most recently filed Form 10-K or 10-Q filed prior to the date hereof.

"***Facilities***" means the real property that is leased under the Assumed Office Leases.

"***FDIC***" means the Federal Deposit Insurance Corporation.

"***FDIC Approval***" means the approval of the application to the FDIC by Buyer to acquire the Business or the written notice or written confirmation from the FDIC to Buyer that no application to the FDIC is required by Buyer to acquire all or any portion of the Business.

"***FHA***" means the United States Federal Housing Administration.

"***FRMN***" means First Residential Mortgage Network, Inc., a Kentucky corporation dba SurePoint Lending.

"***GAAP***" means United States generally accepted accounting principles.

4

"***Governmental Authority***" means any foreign, domestic, federal, territorial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government, or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"***HLC Settlement***" means HLC Settlement Services, Inc., a California corporation.

"***HUD***" means the United States Department of Housing and Urban Development.

"**Indebtedness**" of any Person means (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services other than trade accounts arising in the ordinary course of business, (iii) all reimbursement obligations with respect to surety bonds, letters of credit (to the extent not collateralized with cash or cash equivalents), bankers' acceptances and similar instruments (in each case, whether or not matured), (iv) all obligations evidenced by notes, including promissory notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person and (vi) all indebtedness referred to in clauses (i) through (v) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"**Intellectual Property**" means all (a) Patents, (b) Marks, (c) Copyrights, (d) mask works and registrations or applications for registration thereof, (e) Software, (f) Internet web sites, domain names, email addresses and telephone numbers, (g) licenses or franchises from nongovernmental third Persons, (h) Confidential Information, (i) the goodwill of the business associated with or embodied by any of the foregoing, (j) other similar proprietary rights and (k) copies and tangible embodiments of any of the foregoing.

"**Interim Period**" means the period commencing on the date of this Agreement and continuing through and including the Closing Date.

"**Investor**" means any public or private investor who owns or holds beneficial title to any of the Mortgage Loans or otherwise to whose guidelines any Seller has locked any Seller Pipeline Loan.

"**Investor Agreement**" means any agreement between any Seller or any of its Affiliates and any Third Party (a) for the purchase of any residential mortgage loans originated by any Seller or any Subsidiary or any servicing rights with respect thereto or (b) for the purchase of hedging arrangements.

"**Investor Commitment**" means the optional or mandatory commitment of any Seller or any Subsidiary to sell to any Person, and a Person to purchase from any Seller or any Subsidiary, a Mortgage Loan or an interest in a Mortgage Loan owned or to be acquired by any Seller or any

<center>5</center>

Subsidiary, or a Seller Pipeline Loan, but specifically excluding obligations of any Seller or any Subsidiary to repurchase any Mortgage Loan.

"**IRS**" means the United States Internal Revenue Service.

"**Key Person**" means each person listed in <u>Schedule 1.1(b)</u>.

"**Knowledge of Seller Parties**" and similar phrases means the knowledge of Kenneth Block, Claudette Hampton, Christopher Hayek, Dave Norris, Rian Furey, Tamara Kotronis, Tonya Scherer and Douglas Lebda after due inquiry with respect to the underlying subject matter being represented.

"**Law**" means any applicable federal, state, local, municipal, foreign, international, multinational, or other constitution, law, principle of common law, rule, requirement, Order, ordinance, regulation, statute or treaty, including those relating to consumer credit and mortgage lending or brokering.

"**Liability**" means any debt, liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, matured or unmatured, conditional or unconditional, latent or patent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**License**" means any permit, license, certificate, approval, consent, franchise, registration, filing, accreditation, or other similar authorization required by any Law or Governmental Authority.

"**Loan Documents**" means each Contract evidencing or governing, or executed and delivered by a residential home buyer in connection with, any Seller Pipeline Loan.

"***Loan Files***" means, with respect to any Seller Pipeline Loan, any Loan Documents, any books, records, written notes or memoranda, financial statements, credit evaluations and other written documentation maintained by or on behalf of any Seller or any Subsidiary with respect to such Seller Pipeline Loan.

"***Losses***" means all losses, costs (including costs of investigation and reasonable fees and expenses of attorneys, accountants, consultants and other professionals), Taxes, claims, Liabilities, damages, lawsuits, amounts paid in settlement, judgments, fines, penalties, deficiencies, demands and expenses, but excluding any punitive or exemplary damages or losses, except to the extent paid to a Third Party.

"***Marketing Consulting Services Agreement***" means the Master Services Agreement by and between Parent and Buyer <u>dated</u> May 12, 2011.

"***Marks***" means registered or unregistered trademarks, service marks, trade dress, logos, trade names, brand names, corporate names and registrations or applications of the foregoing.

"***Material Adverse Change***" or "***Material Adverse Effect***" means any change, event, effect, development, state of facts, condition, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse change or

6

effect on the business, condition (financial or otherwise), assets, Liabilities, results of operations of the Business or Acquired Assets, taken as a whole; <u>provided</u>, <u>however</u>, that none of the following shall be deemed to constitute or shall be taken into account in determining whether there has been a Material Adverse Change or Effect: any event, circumstance, change or effect arising out of or attributable to (i) general changes in the United States economy, financial markets or any market as to which the pricing of residential asset backed securities is tied or linked, including changes in prevailing interest rates and market conditions, residential mortgage rates or the securities markets, including any disruption thereof and any decline in the price of any security or any market index; (ii) changes that are the result of acts of war or terrorism; (iii) changes or proposed changes in, or in the application of, GAAP or Laws; (iv) changes to the industry or markets in which the Business operates that are not unique to the Business (including changes in the United States housing market); (v) general regulatory or political changes; or (vi) a flood, hurricane, earthquake or other natural disaster, but only to the extent any such circumstance, change or effect arising out of or attributable to the matters set forth in clauses (i), (ii), (iii), (iv), (v) or (vi) does not disproportionately affect Sellers, the Subsidiaries, the Acquired Assets or the Business in comparison to other Persons engaged in mortgage lending.

"***Mortgage***" means any mortgage, deed of trust, security deed or other instrument creating an Encumbrance on real property with respect to a Mortgage Loan.

"***Mortgage Loans***" means all residential mortgage loans owned or originated and closed by any Seller or any Subsidiary prior to the Closing Date.

"***Order***" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Authority, arbitrator or mediator.

"***Organizational Documents***" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"***Parent Stockholder Approval***" means the affirmative vote of the holders of at least a majority of the outstanding shares of common stock, $0.01 par value, of Parent entitled to vote at the Stockholders' Meeting approving this Agreement and the transactions contemplated hereby.

"***Patents***" means United States and non-United States patents, patent applications (including provisional applications), patent disclosures, continuations, continuations-in-part, divisions, reissues, reexaminations, utility models, industrial designs, certificates of invention, inventions (whether or not patentable or reduced to practice), improvements to the foregoing and applications and registrations of the foregoing.

"*Permitted Encumbrances*" means (a) Encumbrances for Taxes not yet due or which can be paid currently with no penalty; (b) mechanics' or materialmen's liens statutorily imposed or other like Encumbrances; (c) Encumbrances arising under original purchase price conditional sales contracts and equipment leases with Third Parties; (d) limitations on the rights of any Seller

7

under any Assumed Contract that are expressly set forth in such Assumed Contract; (e) zoning, building codes and other land use Laws regulating the use or occupancy of the Assumed Office Leases or the activities conducted thereon that are imposed by any Governmental Authority; (f) Encumbrances securing indebtedness repaid and released in connection with the Closing; (g) to the extent disclosed on the Disclosure Schedule, licenses of Company Intellectual Property; (h) transfer restrictions on securities under Law; and (i) Encumbrances which, individually or in the aggregate, do not detract (other than in a *de minimis* manner) from the value, or interfere with (other than in a *de minimis* manner) the present use, of any Acquired Asset.

"*Person*" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization or Governmental Authority.

"*Prepaid Amounts*" means all of the pre-paid fees and expenses and/or deposits as of the Closing Date relating to the Assumed Contracts, Assumed Office Leases or other Acquired Assets (other than the assets described in Section 2.1(a)), excluding any amounts paid or payable to Seller Parties or any of their Affiliates.

"*Representative*" means, with respect to any Person, any officer, director, manager, principal, attorney, accountant, investment banker, agent, employee or other representative of such Person.

"*Restricted Period*" means the period commencing upon the Closing and ending on the third anniversary thereof.

"*RETS*" means Real Estate Title Services, LLC, a Kentucky limited liability company.

"*SEC*" means the United States Securities and Exchange Commission.

"*Seller Pipeline Loan*" means a pending Mortgage Loan submission to be secured by a Mortgage on a 1-4 family residence made by a residential home buyer or homeowner prior to Closing (and all associated rights), which Mortgage Loan submission has not been (a) funded prior to the Closing or (b) canceled or withdrawn by the applicant prior to the Closing.

"*Software*" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (d) all documentation including user manuals and other training documentation related to any of the foregoing.

"*Solvent*" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of Liabilities of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its Liabilities as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its Liabilities as they mature, (d) such Person does not intend to, and does not believe that it will, incur Liabilities

8

beyond such Person's ability to pay as such Liabilities mature, and (e) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute unreasonably small capital.

"*Straddle Period*" means any taxable period beginning on or prior to and ending after the Closing Date.

"*Subsidiary*" means either of HLC Settlement or RETS.

"*SurePoint Purchase Agreement*" means the Asset Purchase Agreement, dated as of November 15, 2010, among HLC Inc., FRMN, Saul Pohn, Jordan Pohn, The Saul L. Pohn Family Trust and The Jordan S. Pohn Family Trust.

"***Tax***" means: (i) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, ad valorem, capital stock, franchise, profits, withholding, social security, unemployment, disability, real or personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not; and (ii) any liability for the payment of amounts with respect to payments of a type described in clause (i) as a result of being a member of an Affiliated Group or a consolidated, combined or unitary group, as a result of any obligation under any Tax sharing arrangement or Tax indemnity agreement, or as a result of being a successor or transferee.

"***Tax Group***" means any Affiliated Group that, at any time on or before the Closing Date, includes or has included any Seller Party or any Subsidiary or any predecessor of or successor to any Seller Party or any Subsidiary (or another such predecessor or successor), or any other group of corporations that, at any time on or before the Closing Date, files or has filed Tax Returns on a combined, consolidated or unitary basis with any Seller Party or any Subsidiary or any predecessor of or successor to any Seller Party or any Subsidiary (or another such predecessor or successor).

"***Tax Return***" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes required to be filed with any Governmental Authority, including any Schedule or attachment thereto, and including any amendment thereof.

"***Third Party***" means a Person that is not (a) a Party to this Agreement or (b) an Affiliate of a Party to this Agreement.

"***Third Party Claim***" means any claim against any Indemnified Person by a Third Party, whether or not involving an Action.

"***Tier 1 Investor***" means any of the four financial institutions set forth on <u>Schedule 1.1(c)</u> under the caption "Tier 1 Investors".

"***Tier 2 Investor***" means any of the four financial institutions set forth on <u>Schedule 1.1(d)</u> under the caption "Tier 2 Investors".

9

"***Transactions***" means the execution, delivery, and performance of the documents, instruments, and agreements to be executed, delivered, and performed in connection with each Transaction Document.

"***Transaction Documents***" mean, as to any Party, this Agreement, the Marketing Consulting Services Agreement and all agreements and instruments to be delivered by such Party pursuant to <u>Section 4.2</u> of this Agreement.

"***VA***" means United States Department of Veterans' Affairs.

"***Warehousing Agreement***" means any agreement between any Seller or any of its Affiliates and any Third Party for a warehouse line of credit to be used, in whole or in part, to obtain funding for the origination of residential mortgage loans by any Seller or any Subsidiary, <u>provided</u> that, for purposes of <u>Section 10.1(g)</u>, "Warehousing Agreement" means only a warehouse line of credit that is a committed facility.

"***WARN Act***" means, collectively, the Worker Adjustment and Retraining Notification Act and any and all comparable state, local and other Laws.

    1.2    <u>Index of Defined Terms</u>. Solely for convenience purposes, the following is a list of certain terms that are defined in this Agreement and the Section numbers where such definitions are contained:

| | |
|---|---|
| AAA | 12.9 |
| AAA Rules | 12.9 |
| Acquired Assets | 2.1 |
| Acquired Subsidiary Employees | 8.5(b) |
| Assumed Contracts | 2.1(b) |
| Assumed Liabilities | 2.3 |
| Assumed Office Leases | 2.1(c) |
| Balance Sheet | 6.4(b) |
| Balance Sheet Date | 6.4(b) |
| Basket Amount | 11.2(b)(i) |

| | |
|---|---|
| Business | Recitals B |
| Business Event | 3.1 |
| Buyer | Preamble |
| Buyer Indemnified Persons | 11.2(a) |
| Buyer Closing Condition Failure | 10.4 |
| Buyer's Plans | 8.5(i) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Closing Payment | 3.1(a) |
| Company Intellectual Property | 6.15(a) |
| Competing Business | 8.3(a) |
| ERISA Affiliate | 6.18(a)) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| FCRA | 8.7(b) |
| Final Stub Period | 3.1 |
| Financial Statements | 6.4(a) |

10

| | |
|---|---|
| First Measurement Period | 3.1 |
| General Cap Amount | 11.2(b)(ii) |
| Hired Employees | 8.5(b) |
| HLC Escrow | Preamble |
| HLC Inc. | Preamble |
| Indemnified Person | 11.4(a) |
| Indemnifying Person | 11.4(a) |
| Lead Sale Agreement | 4.2(a)(x) |
| LendingTree | Preamble |
| Material Contracts | 6.13(a) |
| Measurement Period Revenue | 3.1 |
| Nonassignable Assets | 8.8 |
| Owned Software | 6.15(g) |
| Parent | Preamble |
| Part(ies) | Preamble |
| Permitted Section 8.3 Acquirer | 8.3(a) |
| Permitted Section 8.3 Transaction | 8.3(a) |
| Property Taxes | 8.4(b) |
| Proxy Statement | 7.5(a) |
| Purchase Price | 3.1 |
| Reference Month | 7.13 |
| RETS 401(k) Plan | 8.5(h) |
| Section 338(h)(10) Election | 8.4(e) |
| Seller Benefit Plan | 6.18(a) |
| Seller Indemnified Persons | 11.3(a) |
| Seller Part(ies) | Preamble |
| Seller(s) | Preamble |
| Specified Representations | 11.1(a) |
| Stockholders' Meeting | 7.5(a) |
| Subsequent Measuring Period | 3.1 |
| Survival Period | 11.1(a) |
| Transition Services Agreement | 7.10(b) |
| Wind Down | 8.6(b) |

**ARTICLE 2.        PURCHASE AND SALE OF ASSETS.**

2.1        <u>Purchase and Sale of Assets</u>.  On and subject to the terms and conditions of this Agreement, on the Closing Date, (x) Buyer agrees to purchase from Sellers, and Sellers agree to sell, transfer, convey, and deliver to Buyer, all right, title and interest in

and to all of the assets and properties of Sellers, wherever located, personal or mixed, tangible or intangible, used in, necessary for or relating to the operation of the Business, and (y) Buyer agrees to purchase from Parent and LendingTree, and Parent and LendingTree agree to sell, transfer, convey and deliver to Buyer, all right, title and interest in and to all of the assets of Parent and LendingTree described in <u>Section 2.1(m)</u> and listed in subsection (n) of <u>Schedule 2.1</u>, in each case free and clear of all Encumbrances (other than Permitted Encumbrances) (such assets as described in clauses (x) and (y) above and set forth in paragraphs (a) through (n) below, collectively, the "***Acquired Assets***"), including:

(a)　All Seller Pipeline Loans existing as of the Closing, including those Seller Pipeline Loans listed in subsection (a) of <u>Schedule 2.1</u>, and all interests in and rights and claims arising from or related thereto, including any amounts deposited by or on behalf of borrowers in respect of such Seller Pipeline Loans and any hedging instruments related to Seller Pipeline Loans that bear interest rate guarantees;

(b)　All Contracts listed in subsection (b) of <u>Schedule 2.1</u> (the "***Assumed Contracts***");

11

(c)　All real property leases listed in subsection (c) of <u>Schedule 2.1</u> (the "***Assumed Office Leases***");

(d)　All tangible personal property of Sellers, including the tangible personal property listed in subsection (d) of <u>Schedule 2.1</u> and all computers, servers and other information technology equipment of Sellers, whether or not located at the Facilities, other than any furniture that is not located at the Facilities;

(e)　All Company Intellectual Property, all Confidential Information of the Business and the Acquired Assets and all goodwill associated therewith, including the Internet web sites and domain names listed in subsection (e)(i) of <u>Schedule 2.1</u> and the telephone numbers listed in subsection (e)(ii) of <u>Schedule 2.1</u>;

(f)　All Prepaid Amounts;

(g)　Except to the extent about the Transactions and subject to the attorney-client privilege: all Books, data, files and records relating to the operation of the Business (including, to the extent permitted by Law, personnel records and files maintained by each Seller Party or any of their Affiliates with respect to the Hired Employees, but excluding corporate minute books and stock records of any Seller and originals that any Seller Party is required by Law to retain in its possession) and all Confidential Information associated therewith;

(h)　All of the equity interests of the Subsidiaries;

(i)　All portfolio loans of Sellers listed in subsection (i) of <u>Schedule 2.1</u>;

(j)　All prepaid expenses and deposits of Sellers that relate to Seller Pipeline Loans, including those listed in subsection (j) of <u>Schedule 2.1</u>;

(k)　All claims and causes of action of any Seller Party arising out of the Acquired Assets;

(l)　All rights of Seller Parties arising out of the SurePoint Purchase Agreement and the transactions contemplated thereby;

(m)　All goodwill of Seller Parties associated with the operation of the Business; and

(n)　The assets of Parent and LendingTree listed in subsection (n) of <u>Schedule 2.1</u>.

For purposes of this Agreement, "***Acquired Assets***" shall also be deemed to include all of the assets and properties of the Subsidiaries.

2.2　Excluded Assets.　Notwithstanding <u>Section 2.1</u> to the contrary, Seller Parties will retain ownership of, and the Acquired Assets shall not include, the following assets (collectively, the "***Excluded Assets***"):

12

(a)    Any asset of Parent or LendingTree other than as listed in subsection (n) of <u>Schedule 2.1</u>;

(b)    Except as provided in <u>Sections 2.1(a)</u>, <u>2.1(f)</u> and <u>2.1(j)</u>, all cash, cash equivalents, short term investments and accounts receivable of Sellers or the Subsidiaries;

(c)    All amounts held by Sellers in impound or escrow accounts in respect of any Mortgage Loans that are not transferred to Buyer;

(d)    All bank accounts of each Seller;

(e)    All Mortgage Loans (other than those portfolio loans listed in subsection (i) of <u>Schedule 2.1</u>);

(f)    Sellers' warehouse lines of credit, Investor Commitments, hedging arrangements (including dealer agreements, but not including the hedging instruments described in <u>Section 2.1(a)</u>) and Contracts related to the foregoing;

(g)    All Contracts of Seller Parties and their Affiliates other than Assumed Contracts and Assumed Office Leases;

(h)    All Benefit Plans of Seller Parties and their Affiliates;

(i)    Any assets which are "plan assets" (within the meaning of ERISA) of any Benefit Plan of any Seller Party or any of their Affiliates and any insurance policy to the extent such policy provides benefits under any Benefit Plan of any Seller Party or any of their Affiliates;

(j)    All personnel records and files maintained by Seller Parties or any of their Affiliates with respect to employees other than the Hired Employees;

(k)    All insurance policies of Sellers;

(l)    All Licenses of Sellers;

(m)    The Organizational Documents and Tax Returns of each Seller;

(n)    All attorney-client privileged materials to the extent about the Transactions and subject to the attorney-client privilege;

(o)    Sellers' rights under any Transaction Document;

(p)    All real property owned by Sellers or the Subsidiaries; and

(q)    The other assets set forth on <u>Schedule 2.2(q)</u>.

2.3    <u>Assumed Liabilities</u>.  At the Closing, Buyer will execute and deliver to Sellers the Assignment and Assumption Agreement pursuant to which Buyer will assume and agree to pay, perform and discharge, in accordance with their respective terms, only the following Liabilities

13

---

of Seller Parties (collectively, the "***Assumed Liabilities***"):  (a) Liabilities under the Assumed Contracts, Assumed Office Leases and hedging instruments assumed pursuant to <u>Section 2.1(a)</u>, but solely to the extent that such Liabilities relate to the Business, arise during the period after Closing and do not arise as a result of or in respect of any pre-Closing breach by Seller Parties or any of their Affiliates of an Assumed Contract, Assumed Office Lease or hedging instrument, and (b) Liabilities set forth on <u>Schedule 2.3</u> with respect to the Seller Pipeline Loans.

2.4    <u>Excluded Liabilities</u>.  The Excluded Liabilities will remain the sole responsibility of and will be retained, paid, performed and discharged as and when due solely by Parent and its Affiliates (as applicable).  "***Excluded Liabilities***" means every

Liability of Parent and its Affiliates (including the Subsidiaries) other than the Assumed Liabilities, including the following Liabilities of Parent or any of its Affiliates (including the Subsidiaries):

(a)    All Liabilities, including repurchase, warranty and indemnification obligations, associated with Mortgage Loans (other than portfolio loans listed in subsection (i) of Schedule 2.1 (but solely to the extent such Liabilities arise from acts or omissions by Buyer after Closing));

(b)    All Liabilities of Seller Parties to their Affiliates, including Liabilities of one Seller Party to another Seller Party;

(c)    All Liabilities arising from or in respect of the Excluded Assets;

(d)    All Liabilities relating to or arising from any claims by any stockholders or other securityholders of any Seller Party or any of their Affiliates;

(e)    All Liabilities relating to or arising from any actions or omissions occurring prior to or in connection with the Closing;

(f)    All Liabilities relating to or arising from any of the Actions set forth on Schedule 6.7;

(g)    All Liabilities with respect to the Hired Employees to the extent arising on or prior to Closing;

(h)    All Liabilities with respect to any current or former employee of any Seller Party or any of their Affiliates who is not a Hired Employee;

(i)    All Liabilities arising out of or relating to the WARN Act (i) at any time with respect to any employee of any Seller Party or any of their Affiliates that is not a Hired Employee and (ii) with respect to a Hired Employee for any period of time prior to the Closing;

(j)    All Liabilities with respect to wages, bonuses and commissions and any other compensation and other amounts owed to (i) any employee of any Seller Party or any of their Affiliates that is not a Hired Employee or (ii) any current or former Business Employees that are payable with respect to services performed by such individuals prior to the Closing;

14

(k)    All Liabilities arising out of or relating to any claims by any current or former Business Employees, or any other employee of any Seller Party or any of their Affiliates, with respect to any personal injuries, including workers' compensation or disabilities, allegedly arising during their employment or engagement by any Seller Party or any of their Affiliates, regardless of when any such claim is made or asserted;

(l)    All Liabilities arising out of or relating to any Seller Benefit Plan, including any Seller Benefit Plans that are sponsored by a Subsidiary;

(m)    All Liabilities arising out of or in respect of any Investor Agreement and any transaction contemplated thereby (other than the Assumed Liabilities described in Section 2.3 with respect to the hedging instruments assumed pursuant to Section 2.1(a));

(n)    All Liabilities arising out of or in respect of any Warehousing Agreement and any transaction contemplated thereby;

(o)    All Liabilities arising out of the SurePoint Purchase Agreement and the transactions contemplated thereby; and

(p)    All Liabilities for Taxes, except as provided in Section 8.4.

**ARTICLE 3.    PURCHASE PRICE**

3.1    <u>Purchase Price</u>. Subject to adjustment as provided in this Agreement, in consideration for the sale, transfer and assignment of the Acquired Assets in accordance with the terms and conditions of this Agreement, and the due and full performance by Seller Parties of their respective obligations hereunder (including <u>Section 8.3</u>), Buyer shall assume the Assumed Liabilities and pay to HLC Inc. an amount (the sum of the following, the "***Purchase Price***") equal to:

    (a)    $35,888,536 (the "***Closing Payment***"); <u>plus</u>

    (b)    on the first anniversary of the Closing Date, $10,000,000, unless prior to such date (i) Buyer has properly exercised its right of termination pursuant to <u>Section 8.02(b)</u>, <u>8.02(c)</u> or <u>8.02(d)</u> of the Marketing Consulting Services Agreement or (ii) a Business Event (as defined below) exists or has occurred as of or at any time prior to such date; <u>plus</u>

    (c)    on the second anniversary of the Closing Date, $10,000,000, unless prior to such date (i) Buyer has properly exercised its right of termination pursuant to <u>Section 8.02(b)</u>, <u>8.02(c)</u> or <u>8.02(d)</u> of the Marketing Consulting Services Agreement or (ii) a Business Event exists or has occurred as of or at any time prior to such date.

As used in this Section 3.1, the following terms shall have the meanings ascribed to them below:

"***Business Event***" means the occurrence or existence at any time (i) during the period beginning on the date hereof until the second anniversary of the date hereof, of the daily average number of lenders participating on the mortgage network exchange operated by Parent and its Affiliates, as measured for any calendar quarter, being less than 100, or (ii) during the period beginning on the Closing Date until the second anniversary of the date hereof, Parent's and its Affiliates' Measurement Period Revenue (as defined below) measured as of any of the end of the First Measurement Period, any Subsequent Measurement Period or the Final Stub Period (in each case, as defined below) being less than $20,000,000. For the avoidance of doubt, no failure of the conditions set forth in clauses (i) and (ii)) above shall be subject to cure.

"***First Measurement Period***" means the period of six (6) calendar months beginning on the first day of the calendar month that begins following the conclusion of the calendar month during which the Closing Date falls, provided, however, that if the Closing Date falls on the first day of any calendar month, then the First Measurement Period shall begin on the Closing Date.

"***Subsequent Measurement Period***" means a period of six (6) calendar months beginning on the first day of the calendar month that begins following the conclusion of the First Measurement Period or another Subsequent Measurement Period but not including any Final Stub Period.

"***Final Stub Period***" means any number of full calendar months beginning with the calendar month following the conclusion of a Subsequent Measurement Period or the First Measurement Period, as applicable, and ending with the last day of the last full calendar month ending prior to the month in which the effective date of the termination or expiration of the Marketing Consulting Services Agreement falls (or, if the effective date of the termination or expiration of the Marketing Consulting Services Agreement is the last day of a month, such last day of such last month).

"***Measurement Period Revenue***" means the aggregate revenue from Parent's and its Affiliates' network exchange business for the First Measurement Period, a Subsequent Measurement Period or the Final Stub Period, as applicable; provided that solely with respect to the Final Stub Period, the Measurement Period Revenue shall be the product of (i) the aggregate revenue from Parent's and its Affiliates' network exchange business for such period and (ii) a fraction, the numerator of which is six (6), and the denominator of which is the number of months comprising such Final Stub Period.

Notwithstanding any other provision of the Marketing Consulting Services Agreement, Parent and its Affiliates shall provide a written report to Buyer, in the form of a letter certified by Parent's chief accounting officer, no later than ten (10) days after the end of a calendar quarter, with sufficient data required to demonstrate Parent's and its Affiliates' compliance with the foregoing requirements during the preceding quarter. Buyer shall have the right, at its own expense, to perform an audit on an annual basis of the reports made by Parent and its Affiliates under this paragraph. Such audits shall be conducted prior to each anniversary of the Closing Date and such audits shall be in addition to any other audit rights set forth in Article VI of the Marketing Consulting Services Agreement. Parent also agrees to provide the same level of cooperation to Buyer and its representatives in their conduct of such audit as required pursuant to an audit under Article VI of the Marketing Consulting Services Agreement.

3.2    <u>Adjustments</u>.

    (a)    <u>Utilities</u>. All utility charges, gas charges, electric charges, water charges, water rents and sewer rents under the Assumed Office Leases, if any, shall be apportioned between Buyer and Sellers as of 11:59 P.M. Los Angeles time on the Closing Date, computed on the basis of the most recent meter charges or, in the case of annual charges, on the basis of the established fiscal year. All prorations shall be made and the Purchase Price shall be adjusted insofar as feasible on the Closing Date. During the six-month period subsequent to the

Closing Date, Sellers shall advise Buyer and Buyer shall advise Sellers of any actual changes to such prorations, and the Purchase Price shall be increased or decreased, as applicable, at the end of such six-month period.  In the event Buyer or any Seller receives bills after the Closing Date for expenses incurred prior to the Closing Date that were not prorated in accordance with this Section, then Buyer or such Seller, as the case may be, shall promptly notify the other as to the amount of the expense subject to proration and the responsible Party shall pay its portion of such expense (or, in the event such expense has been paid on behalf of the responsible Party, reimburse the other Party for its portion of such expenses).  Notwithstanding anything to the contrary set forth in this Section, this Section 3.2(a) shall not apply to Prepaid Amounts, which are discussed in Sections 2.1 and 3.2(b).

(b)        Prepaid Amounts.  At least one (1) Business Day prior to the Closing Date, Sellers shall deliver to Buyer a Schedule 3.2(b) which shall set forth the Prepaid Amounts, allocated among the categories set forth in the form of such Schedule 3.2(b) attached hereto, as of the Closing Date.  At the Closing, Buyer shall pay HLC Inc. cash in an amount equal to the Prepaid Amounts.

(c)        Certain Earned Compensation.  At least one (1) Business Day prior to the Closing Date, Sellers shall deliver to Buyer a schedule setting forth all earned but unpaid compensation for Hired Employees employed by a Subsidiary as of the Closing Date and, at the Closing, Seller Parties shall pay to Buyer cash in an amount equal to the aggregate amount of such earned but unpaid compensation.

3.3        Allocation of Purchase Price.  Buyer and Seller Parties shall be permitted to file their respective Tax Returns in a manner consistent with their own independent allocation of the Assumed Liabilities and Purchase Price to the Acquired Assets.  Buyer and Seller Parties shall make such allocations consistent with Sections 338(h)(10) and 1060 of the Code and the Treasury Regulations thereunder.

**ARTICLE 4.        CLOSING**

4.1        The Closing.  The closing of the sale, assignment, transfer and conveyance to Buyer of the Acquired Assets and the assumption by Buyer of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Sheppard, Mullin, Richter & Hampton LLP, 333 South Hope Street, 48th Floor, Los Angeles, CA 90071, at 10:00 a.m. Los Angeles time on the third (3rd) Business Day after the conditions set forth in ARTICLE 9 have been satisfied or waived (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or at such other place and time as shall be agreed upon by Buyer and Sellers.  The date on which the Closing is actually held is referred to herein as the "**Closing Date**."  The Closing shall be deemed effective as of 11:59 p.m. Los Angeles time on the Closing Date.

4.2        Deliveries at the Closing.

(a)        At the Closing, Seller Parties will deliver to Buyer:

(i)        the Bill of Sale, duly executed by each Seller;

(ii)        the Assignment and Assumption Agreement, duly executed by each Seller Party;

(iii)        certificates representing the total issued and outstanding equity interests of each Subsidiary, duly endorsed to Buyer or accompanied by duly executed stock powers;

(iv)        such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Buyer, each in form and substance satisfactory to Buyer and its legal counsel and executed by each Seller, as applicable;

(v)        a certificate of each Seller Party's non-foreign status as set forth in Treasury Regulation 1445-2(b);

(vi)        a certificate of the secretary of each Seller Party, in form and substance reasonably satisfactory to Buyer, certifying (A) that attached thereto are true, correct and complete copies of (1) the certificate or articles of incorporation (or equivalent organizational document) of such Seller Party, certified as of a recent date by the Secretary of the state of such Seller Party's jurisdiction of incorporation and that there have been no amendments to the certificate or articles of incorporation (or equivalent organizational document) of such Seller Party since such date, (2) the bylaws (or equivalent organizational document) of such Seller Party, (3) resolutions duly adopted by the board of directors of such Seller Party authorizing the performance of the Transactions and the execution and delivery of the Transaction Documents to which it is a party and (4) a certificate of existence or good standing as of a recent date of each Seller Party from the state of such Seller Party's jurisdiction of incorporation, (B) that the resolutions referenced in subclause (A)(3) are still in effect and (C) as to the incumbency and signatures of the officers of such Seller Party executing each Transaction Document to which such Seller Party is a party;

(vii)        a certificate of the secretary of each Subsidiary, in form and substance reasonably satisfactory to Buyer, certifying that attached thereto are true, correct and complete copies of (1) the articles of incorporation or articles of formation of such Subsidiary, certified as of a recent date by the Secretary of State of such Subsidiary's jurisdiction of organization, and that there have been no amendments to the articles of incorporation or articles of formation of such Subsidiary since such date, and (2) the bylaws or operating agreement of such Subsidiary;

(viii)        the certificate of Parent contemplated by Section 9.1(f), duly executed by an officer of Parent;

(ix)        the Escrow Agreement, duly executed by HLC Inc. and the Escrow Agent;

(x)        the CLO Services Agreement in the form of Schedule 4.2(a)(x) (the "**Lead Sale Agreement**"), duly executed by Parent;

17

(xi)        the Transition Services Agreement, duly executed by the applicable Seller Parties;

(xii)        the consents, waivers or approvals set forth on Schedule 9.1(d);

(xiii)        such documents, in form and substance reasonably satisfactory to Buyer, as may be necessary to make effective the actions contemplated by Section 9.1(n);

(xiv)        the minute books of each Subsidiary;

(xv)        the stock ledger of each Subsidiary;

(xvi)        a complete report of the Seller Pipeline Loans as of the third (3rd) Business Day prior to the Closing Date;

(xvii)        instruments of assignment, in recordable form, with respect to each of the registered Copyrights, issued Patents, registered Marks (including internet domain names) and pending applications for the registration or issuance of any Copyrights, Patents and Marks (including internet domain names) included in the Acquired Assets, in each case duly executed by the applicable Seller and in form and substance reasonably satisfactory to Buyer; and

(xviii)        such other documents as may be necessary or advisable to consummate the Transactions, as Buyer may reasonably request.

(b)        At the Closing, Buyer will deliver to HLC Inc. (in the case of clause (i) below) and the Seller Parties (in the case of clauses (ii) — (vii) below):

(i)        An amount, by wire transfer of immediately available funds to an account specified in writing by HLC Inc., equal to (A) the Closing Payment, (B) minus the Escrow Amount, (C) plus or minus any amounts owed under Section 3.2 and (D) minus the aggregate amount, if any, paid by Buyer to HLC Inc. pursuant to Section 10.1(b) in connection with extensions of the End Date by Buyer;

(ii)        The Escrow Amount, by wire transfer of immediately available funds to the account specified in the Escrow Agreement;

(iii)      the Bill of Sale, duly executed by Buyer;

(iv)      the Assignment and Assumption Agreement, duly executed by Buyer;

(v)      the certificate of Buyer contemplated by <u>Section 9.2(c)</u>, duly executed by an officer of Buyer;

(vi)      the Escrow Agreement, duly executed by Buyer;

(vii)      the Lead Sale Agreement, duly executed by Buyer; and

(viii)      the Transition Services Agreement, duly executed by Buyer.

18

---

**ARTICLE 5.      REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to the Seller Parties that the statements contained in this <u>ARTICLE 5</u> are correct and complete as of the date hereof and will be correct and complete through, and as of, the Closing Date as though made then.

5.1    <u>Organization; Authority; Enforceability</u>.  Buyer is a banking corporation duly incorporated, validly existing, and in good standing under the Laws of the State of Delaware.  Buyer has the requisite corporate power and authority, and has taken all action necessary, to authorize, execute and deliver the Transaction Documents to which it is a party, to consummate the transactions contemplated thereby and to perform its obligations thereunder.  Each Transaction Document to which Buyer is or will be a party has been duly authorized and has been (or will be at Closing) duly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by a Seller Party or a Key Person, as applicable) constitutes (or upon execution and delivery will constitute) the legal, valid and binding obligation of Buyer, Enforceable against Buyer.

5.2    <u>No Conflicts</u>.  Except as set forth in <u>Section 5.2</u> of the Buyer Disclosure Schedule, the execution and the delivery by Buyer of the Transaction Documents to which Buyer is a party, the performance by Buyer of its obligations thereunder and consummation of the transactions contemplated thereby by Buyer do not and will not:  (a) breach or violate (i) any Law or Order to which Buyer or its assets and properties is subject or (ii) any provision of Buyer's Organizational Documents; (b) breach or conflict with, or constitute a default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, any Contract, Order or License to which Buyer is a party or by which it is bound or to which any of Buyer's assets or properties is subject; or (c) require the approval, consent, authorization or act of, or the making by Buyer of any filing with, any Third Party or Governmental Authority.

5.3    <u>No Finders</u>.  Buyer has no Liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which any Seller Party or any Affiliate thereof could become liable.

5.4    <u>No Litigation</u>.  There is no Action pending or, to the knowledge of Buyer, threatened against Buyer relating to or affecting the Transaction Documents or any of the Transactions.

5.5    <u>Financing</u>.  Buyer has, and at the Closing shall have, sufficient cash, available lines of credit or other sources of immediately available funds or committed capital to enable it to pay the Purchase Price.

5.6    <u>Acknowledgment by Buyer</u>.

(a)      BUYER ACKNOWLEDGES THAT THE REPRESENTATIONS AND WARRANTIES BY SELLER PARTIES  CONTAINED HEREIN AND IN THE OTHER TRANSACTION DOCUMENTS CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, AND BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT

19

ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED (INCLUDING ANY RELATING TO THE FUTURE OR HISTORICAL OPERATIONS OF THE BUSINESS OR THE ACQUIRED ASSETS OR THE QUALITY, QUANTITY OR CONDITION OF THE ACQUIRED ASSETS) ARE SPECIFICALLY DISCLAIMED BY SELLER PARTIES.

(b)        In connection with Buyer's investigation of the Business, Buyer has received from or on behalf of Seller Parties certain projections.  Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties and that subject to the express representations and warranties of Seller Parties set forth herein, Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

## ARTICLE 6.        REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Seller Parties jointly and severally represent and warrant to Buyer that, except as set forth in the Disclosure Schedule, the statements contained in this ARTICLE 6 are correct and complete as of the date hereof and will be correct and complete through, and as of, the Closing Date as though made then; provided, that any statement as of a specific date is correct and complete only as of such specific date.  For purposes of this ARTICLE 6, references in this ARTICLE 6 to a "Seller", "Seller Party", "Sellers" or "Seller Parties", as applicable, shall include each Subsidiary, such that each representation and warranty in this ARTICLE 6 covers, and is made with respect to, each Seller or Seller Party, as the case may be, and each Subsidiary, except that in Sections 6.1, 6.2 and 6.3, "Seller", "Seller Party", "Sellers" or "Seller Parties" does not include any Subsidiary.

6.1        Organization; Authority; Enforceability.

(a)        Each Seller Party is a corporation or other legal entity duly incorporated, organized or formed, validly existing, and in good standing under the Laws of the state of its jurisdiction of incorporation, organization or formation.  Each Seller Party is duly authorized to conduct the Business and is in good standing under the Laws of each jurisdiction where such qualification is required.  Each Seller Party has the requisite power and authority necessary to own or lease the Acquired Assets owned or leased by it and its other properties and to carry on the Business as currently conducted.  Each Seller Party has the corporate or other legal entity power and authority, and has taken all action necessary, to authorize, execute and deliver the Transaction Documents to which it is or will be a party, to consummate the transactions contemplated thereby and to perform its obligations thereunder, and no other action or approval on the part of any Seller Party, or the stockholders or other equity holders of any Seller Party, is necessary to authorize and approve the Transaction Documents and the transactions contemplated thereby, other than the receipt of the Parent Stockholder Approval.  Each Transaction Document to which each Seller Party is a party has been duly authorized and has been (or will be at Closing) duly executed and delivered by such Seller Party and (assuming the due authorization, execution and delivery by Buyer and Parent, as applicable) constitutes the legal, valid and binding obligation of such Seller Party, Enforceable against such Seller Party.

20

(b)        The Board of Directors of Parent, at a meeting duly called and held, has unanimously (i) approved and adopted this Agreement, the other Transaction Documents and the Transaction contemplated hereby and thereby, (ii) determined that transactions contemplated by this Agreement are advisable and fair to, and in the best interests of, the stockholders of Parent and (iii) resolved to submit the transactions contemplated by this Agreement to the stockholders of Parent for approval, file the Proxy Statement with the SEC and, subject to Section 7.7, make the Parent Recommendation.

(c)        Each Subsidiary:

(i)        is a corporation or other legal entity duly incorporated, organized or formed and validly existing under the Laws of the state of its jurisdiction of incorporation, organization or formation;

(ii)        is licensed or qualified to conduct the Business in each jurisdiction where it is required to be so licensed or qualified; and

(iii)        has the requisite power and authority to own or lease its assets and properties and to carry on the Business in the manner currently conducted.

(d)        True and complete copies of the Organizational Documents of each Seller Party and each Subsidiary have been delivered or made available to Buyer.

6.2    <u>No Conflicts</u>.  Except as set forth in <u>Schedule 6.2</u>, the execution and delivery by Seller Parties of the Transaction Documents to which they are a party, the performance by Seller Parties of their respective obligations thereunder and consummation of the transactions contemplated thereby by each Seller Party do not and will not:  (a) breach or violate (i) any Law or Order to which any Seller Party, any Subsidiary, the Acquired Assets or the Business is subject or (ii) any provision of the Organizational Documents of any Seller Party or any Subsidiary; (b) breach in any material respect or conflict with, or constitute a default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, any Contract, Order or License to which any Seller Party or any Subsidiary is a party or by which it is bound or to which any of the Acquired Assets or the Business is subject; (c) permit any Governmental Authority to terminate, revoke, modify or suspend any material License of any Seller Party or any Subsidiary; (d) result in the imposition of any Encumbrance upon the Acquired Assets; or (e)  require the approval, consent, authorization or act of, or the making by any Seller Party or any Subsidiary of any filing with, any Third Party or Governmental Authority.

6.3    <u>Capitalization</u>.

(a)    All of the outstanding equity interests of each Seller Party (other than Parent) are owned, directly or indirectly, by Parent, free and clear of any Encumbrances.

(b)    HLC Inc. does not own equity interests in any Person other than the Subsidiaries and HLC Escrow. <u>Schedule 6.3(b)</u> sets forth the authorized equity interests of each Subsidiary and the number of issued and outstanding equity interests of each Subsidiary, all of which (i) are validly issued, fully paid and nonassessable, (ii) were issued in compliance with all Applicable Requirements, including all preemptive rights, and (iii) are owned, beneficially

<div align="center">21</div>

and of record, by HLC Inc., free and clear of any Encumbrances.  Except for this Agreement, no Contract, including any option, warrant or pre-emptive right, exists that (y) grants any Person any right to acquire any equity interests in any Subsidiary or (z) relates to the issuance, sale, purchase or redemption of any equity interests of any of the Subsidiaries.

6.4    <u>Financial Statements; No Undisclosed Liabilities</u>.

(a)    <u>Schedule 6.4(a)</u> contains the following financial statements (collectively, the "***Financial Statements***"): (i) for each of Parent and HLC Inc.:  (A) the audited consolidated balance sheets and statements of income and cash flows as of and for the fiscal years ended December 31, 2008, 2009 and 2010; and (B) the unaudited balance sheets and statements of income as of and for the months ended January 31, 2011, February 28, 2011 and March 31, 2011; (ii) for HLC Inc.:  (A) the unaudited statement of cash flows for the year-to-date periods ended January 31, 2011, February 28, 2011 and March 31, 2011; and (B) the unaudited balance sheet and statement of income as of and for the three months ended March 31, 2011 in the form of consolidating schedules; and (iii) for FRMN:  (A) the audited consolidated balance sheets and statements of income and cash flows as of and for the fiscal years ended December 31, 2008 and 2009; (B) the unaudited balance sheet and statements of income as of and for the fiscal year ended December 31, 2010; and (C) the unaudited balance sheets and unaudited statements of income as of and for the months ended January 31, 2011 and February 28, 2011.

(b)    For purposes of this Agreement, "***Balance Sheet***" means the audited consolidated balance sheet of HLC Inc. as of the Balance Sheet Date included in the Financial Statements and "***Balance Sheet Date***" means December 31, 2010.  Except as set forth in <u>Schedule 6.4(b)</u>, the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, present fairly in all material respects the financial condition of Parent, HLC Inc. and FRMN, as the case may be, as of such dates and the results of its operations for such periods (except that the unaudited financial statements do not contain normal year-end adjustments and do not contain the materials and disclosures to be found in notes to financial statements prepared in accordance with GAAP), are correct and complete in all material respects, and are consistent with its books and records in all material respects.  Since the Balance Sheet Date, (x) neither Parent nor LendingTree, with respect to the Business, and (y) no Seller, has effected any change in any method of accounting or accounting practice.

(c)    The books and records which form the basis for the Financial Statements (i) are complete and correct in all material respects and (ii) have been maintained in accordance with Applicable Requirements and customary and sound business practices in HLC Inc.'s industry.

(d)    Neither Parent nor LendingTree, with respect to the Business or the Acquired Assets, and no Seller, has any Liability other than (i) Liabilities reflected or reserved against on the face (rather than any notes thereto) of the Balance Sheet, (ii) Liabilities incurred in the ordinary course of the Business since the Balance Sheet Date, which are (A) not material, individually or

in the aggregate, (B) of the same character and nature as the Liabilities on the face of the Balance Sheet and (C) not the result of any breach of any Contract, breach of

<div align="center">22</div>

warranty, tort, infringement or breach of Applicable Requirements, and (iv) fees and expenses incurred in connection with this Agreement and the Transactions.

6.5    Subsequent Events.  Except as set forth in Schedule 6.5 (with an indication on such Schedule as to the approximate date on which any event described in this Section 6.5 shall have occurred):

(a)    Since the Balance Sheet Date, (i) Seller Parties have operated the Business only in the ordinary course of the Business consistent with past practice (except as required by Law) and (ii) there has been no Material Adverse Effect;

(b)    Without limiting Section 6.5(a), since the Balance Sheet Date (x) neither Parent nor LendingTree, with respect to the Business, and (y) no Seller has:

(i)    other than in the ordinary course of the Business consistent with past practice, sold, leased (as lessor or lessee), transferred, abandoned or otherwise disposed of, licensed, mortgaged or pledged, or granted, incurred or suffered any Encumbrance (except for Permitted Encumbrances) on, any of its assets or properties, except for any asset which was obsolete;

(ii)    entered into, amended, canceled or terminated any Contract to which such Seller Party is a party, involving an annual commitment by or to any Seller Party of at least $50,000, other than in the ordinary course of the Business consistent with past practice (except as required by Law);

(iii)    entered into any Contract for the purchase, sale or lease (as lessor or lessee) of real property (excluding for this purpose, real estate acquired following foreclosure in the ordinary course of the Business consistent with past practice), or exercised any option to extend a lease for real property;

(iv)    undertaken or entered into a Contract to undertake capital expenditures in excess of $150,000 individually or in the aggregate;

(v)    (A) instituted any increase in excess of $25,000 in the compensation of any employee, officer, director or consultant of such Seller Party or any other Business Employee (or any accrual for or commitment or agreement to make or pay the same) other than base salary increases in the ordinary course of the Business consistent with past practice (except as required by Law) required by existing agreements, (B) entered into any (x) agreement to pay any severance, change of control or termination pay to any of such Persons, or made any such payment other than as required by existing employment, severance or change of control agreements or by any Law, or (y) other agreements the benefits of which are contingent upon the signing of this Agreement or the Closing, or (C) instituted any increase in or terminated any existing, or entered into or adopted any new, Benefit Plans covering any employees of any Seller Party or any other Business Employees, other than in the ordinary course of the Business consistent with past practice or as required to comply with Law;

(vi)    suffered any damage, destruction or casualty loss in excess of $150,000 (whether or not covered by insurance);

<div align="center">23</div>

(vii)    delayed or postponed the payment of accounts payable or other Liabilities, other than in the ordinary course of the Business consistent with past practice (except as required by Law);

(viii)    accelerated or caused the acceleration of the collection or receipt of any accounts receivable, other than in the ordinary course of the Business consistent with past practice (except as required by Law);

(ix)    created, incurred, assumed or guaranteed any funded debt, other than in the ordinary course of the Business consistent with past practice (except as required by Law);

       (x)      canceled, compromised, waived or released any right or claim (or series of related rights and claims) involving more than $150,000;

       (xi)      made any change in the accounting principles, methods, practices or policies applied in the preparation of the Financial Statements, including policies and practices with respect to loan loss obligations, unless such change was required by Law or GAAP;

       (xii)      changed reserves by more than $1,000,000, including with respect to Mortgage Loan repurchases or Mortgage Loan-related indemnities;

       (xiii)      settled or compromised any Action;

       (xiv)      merged or consolidated with, or acquired all or a material portion of the assets or equity interests of, or otherwise acquired or made any equity investment in, any Person;

       (xv)      granted any option or right to purchase its equity interests; issued or committed to issue any of its equity interests or any security convertible into or exchangeable for such equity interests; granted any registration rights; or purchased, redeemed, or retired any of its equity interests;

       (xvi)      made any loan or advance to any employee, officer, director, consultant, agent or shareholder other than normal advances of reasonable business expenses that will be reimbursed in accordance with Sellers' past practices prior to Closing;

       (xvii)      transferred any Key Person or other Business Employee from the position he or she held as of the Balance Sheet Date, or reassigned any of the material duties of any Key Person or other Business Employee assigned to or otherwise performed by him or her as of the Balance Sheet Date, or received or given notice of the termination of employment of any Key Person or other Business Employee;

       (xviii)      repurchased, or provided indemnification relating to, Mortgage Loans in excess of $1,000,000;

       (xix)      filed any Tax Return with respect to the Business, the Acquired Assets, the Assumed Liabilities or any Subsidiary inconsistent with past practice or, on any such

Tax Return, taken any position, made any election, or adopted any method that is inconsistent with positions taken, elections made or methods used in preparing or filing similar Tax Returns in prior periods (including positions, elections, or methods that would have the effect of deferring income to periods for which Buyer is liable or accelerating deductions to periods for which Seller Parties are liable pursuant to Section 8.4(a)); or

       (xx)      authorized, approved, agreed or committed to do any of the foregoing.

    6.6     No Finders.  Except as set forth in Schedule 6.6, no Seller nor any of their Affiliates has any Liability to pay any compensation to any broker, finder, or agent with respect to the Transactions for which Buyer could become directly or indirectly liable.

    6.7     Actions.  Except as set forth in Schedule 6.7, neither Parent nor LendingTree, with respect to the Business, and no Seller (a) is subject to any outstanding Order, (b) has, since January 1, 2009, been subject to any Order, fine, suspension, settlement, memorandum of understanding, administrative agreement with, or sanction by, or any obligation to indemnify, any Governmental Authority (excluding obligations generally applicable to all participants in HUD and VA lending programs to indemnify HUD or VA for loans insured by FHA or guaranteed by VA, as applicable), or (c) is a party or, to the Knowledge of Seller Parties, threatened to be made a party to any Action relating to or affecting (i) the Acquired Assets, (ii) the Business, (iii) any of the Transaction Documents or (iv) any of the Transactions.

    6.8     Legal Compliance.  Except as set forth in Schedule 6.8:

       (a)      Except with respect to the subject matter of the representations and warranties set forth in Sections 6.9 (Licenses), 6.10 (Privacy Policies), 6.11 (Seller Pipeline Loans), 6.14 (Employees), 6.16 (Tax) and 6.18 (Employee Benefit Plans;

ERISA) which shall solely be subject to such provisions, Sellers, Parent and LendingTree, with respect to the Business, the Business and the Business Employees are, and at all times since January 1, 2009 have been, in compliance in all material respects with all Applicable Requirements and Orders, and no Action is pending or, to the Knowledge of Seller Parties, threatened against any Seller Party alleging any failure to so comply;

(b)     Since January 1, 2009, Sellers and their Affiliates have conducted background checks on their officers, directors, loan originators and other personnel as required by Law.  Neither Parent nor LendingTree, with respect to the Business, and no Seller or any officer, director, loan originator, or other personnel of any Seller or any of their Affiliates is (i) subject to any debarment, suspension or limitation on any participation in connection with any government program or subject to any investigation, examination or other Action that could result in any of the foregoing or (ii) subject to any process or other Action that could lead to the loss, suspension or restriction of any mortgage loan-related License;

(c)     Since January 1, 2009, neither Parent nor LendingTree, with respect to the Business, and no Seller has received from any Person any written or, to the Knowledge of Seller Parties, oral notice or complaint (i) alleging any violation of any Law, (ii) threatening or seeking to revoke, suspend, terminate or limit any License or to take any other action,

25

(iii) alleging any criminal or illegal or impermissible conduct or (iv) involving any material complaints filed against, or statutory fines imposed upon, any Seller Party (or their respective predecessors) by any Governmental Authority.  Schedule 6.8(b) identifies all correspondence sent by any Seller Party to or received by any of them from a Governmental Authority since January 1, 2009 relating to any regulatory or other compliance review, audit or investigation with respect to Parent or LendingTree, with respect to the Business, any Seller, the Business, Acquired Assets or any Business Employee;

(d)     Since January 1, 2009, Parent and LendingTree, with respect to the Business, and each Seller has timely filed all reports, notices, and statements, together with any amendments required to be made with respect thereto, that were required to be filed under any Law with any applicable Governmental Authority.  No material deficiencies have been asserted by a Governmental Authority with respect to such report, notice or statement that have not been cured or satisfied;

(e)     HLC Inc. is (and, at all relevant times since January 1, 2009, was) an FHA-approved and direct endorsement mortgagee in good standing and meets (and, at all relevant times, met) in all material respects all requirements of Law so as to be eligible to originate, refinance and hold FHA-insured Mortgage Loans and conventional Mortgage Loans.  The respective operations of the Business and each of the Subsidiaries are, and have been since January 1, 2009, in compliance in all material respects with all Law; and

(f)     All Custodial Accounts required to be maintained by any Seller Party are maintained in accordance with Applicable Requirements in all material respects, including insurer requirements.

6.9     Licenses.

(a)     Schedule 6.9(a) sets forth all Licenses issued or granted by Governmental Authorities with respect to the Business.  Such Licenses are the only Licenses necessary for or used in the operation of the Business as currently conducted.  For the avoidance of doubt, any License issued or granted by a Governmental Authority in the name of any Business Employee and related to the Business shall be listed in Schedule 6.9(a); however, with respect to any License in the name of any Business Employee, the representations and warranties set forth below shall be deemed made to the Knowledge of Seller Parties.

(b)     With respect to all Licenses listed in Schedule 6.9(a):

(i)     All such Licenses are valid and in full force and effect;

(ii)     Since January 1, 2009, each Seller has been in compliance in all material respects with all of the terms and requirements of each such License; and

(iii)     There are no proceedings pending, or to the Knowledge of Seller Parties, threatened that seek the revocation, cancellation, suspension or adverse modification thereof.

26

https://www.sec.gov/Archives/edgar/data/1434621/000110465911029397/a11-12364_1ex2d1.htm     23/63

6.10     <u>Privacy and Data Security Policies</u>.  Sellers' privacy and data security policies, and such policies of Parent and LendingTree, with respect to the Business, have been made available to Buyer.  Sellers' privacy and data security policies, and such policies of Parent and LendingTree, with respect to the Business, have not been amended, superseded, modified or terminated, whether in writing or orally, and are in full force and effect.  There is no provision of such policies that prohibits the sharing of nonpublic personal information of loan applicants between Seller Parties and Buyer upon consummation of the Transactions or otherwise contravenes 15 U.S.C. § 6802(e)(7) of the Gramm-Leach-Bliley Act of 1999.  Except as set forth in <u>Schedule 6.10</u>, since January 1, 2009, each Seller and each of Parent and LendingTree, with respect to the Business, has been in compliance in all material respects with such privacy and data security policies as in effect from time to time.

6.11     <u>Seller Pipeline Loans</u>.

(a)     The report of Seller Pipeline Loans as of April 30, 2011 attached to <u>Schedule 6.11(a)</u> is true and complete in all material respects.

(b)     Except as set forth in <u>Schedule 6.11(b)</u>, each Seller Pipeline Loan was solicited and originated in accordance with, and the Loan Documents and Loan Files relating to the Seller Pipeline Loans conform to, all Applicable Requirements in all material respects for the stage of processing that had been achieved as of the date hereof and as of Closing Date based on the Investor or insurer program, or Investor Commitment, under which such Seller Pipeline Loan was originated, including procurement of required settlement services (e.g., appraisal, title and insurance).

(c)     Except as set forth in <u>Schedule 6.11(c)</u>, each of the Seller Pipeline Loans arose out of bona fide transactions in the ordinary course of the Business consistent with past practice (except as required by Law).  The Loan Files relating to the Seller Pipeline Loans accurately and completely reflect the terms of the Seller Pipeline Loans, in all material respects.

(d)     Except as set forth in <u>Schedule 6.11(d)</u>, Sellers are the sole owners of, and no other Person has any interest in or rights relating to, the Seller Pipeline Loans.

(e)     Except as set forth in <u>Schedule 6.11(e)</u>, all Persons that had any interest in or rights relating to any Seller Pipeline Loan, whether as broker, mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance in all material respects with any and all Applicable Requirements except where the failure to be in such compliance would not result in Liability to Buyer or limit or impair the enforceability of Seller Pipeline Loans.

(f)     Except as set forth in <u>Schedule 6.11(f)</u>, Seller Parties have complied in all material respects with all Applicable Requirements applicable to the sale of any physical damage, credit life and credit accident and health insurance in connection with each Seller Pipeline Loan.

27

6.12     <u>Acquired Assets</u>.  Except as set forth in <u>Schedule 6.12</u>:

(a)     Seller Parties have good, valid and marketable title to all of the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances, and the transfer of the Acquired Assets hereunder will convey to Buyer good, valid and marketable title to the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.  Except for the Excluded Assets, the Acquired Assets constitute all of the assets, rights and properties used in, or necessary for, the operation of the Business as currently conducted.  Neither Parent nor LendingTree owns any asset, right or property necessary for the operation of the Business as currently conducted, except as listed in subsection (n) of <u>Schedule 2.1</u>.  Other than Seller Parties, no other Affiliate of Parent is engaged in, or owns any assets that are used in or necessary for the operation of, the Business.

(b)     <u>Schedule 6.12(b)</u> sets forth all of the tangible personal property of Seller Parties included in the Acquired Assets having an original cost of $50,000 or more.  The tangible personal property included in the Acquired Assets, whether owned or leased, are in good operating condition (subject to normal wear and tear) and are located at Sellers' premises.

6.13     <u>Contracts</u>.

(a)     <u>Schedule 6.13(a)</u> sets forth a list of the following Contracts (that have not expired or otherwise terminated) as of the date of this Agreement (together with the Assumed Office Leases, the "***Material Contracts***") that Parent or LendingTree,

with respect to the Business, or any Seller is a party to or bound by

(i)        Any Contract (excluding purchase orders) involving payments or other consideration annually by any Seller Party or Seller Parties of more than $50,000 in products, materials, supplies, goods, equipment, other assets or services;

(ii)       Any Contract (including purchase orders) involving the obligation of any Seller Party or Seller Parties, collectively, to sell products or services pursuant to which the aggregate payments to become due to any Seller Party or Seller Parties exceed $50,000, other than in the ordinary course of business;

(iii)      Any Contract for the acquisition of any Person or any business unit thereof or the disposition of any material assets of any Seller Party or Seller Parties;

(iv)      Any Contract that prohibits any Seller Party from competing with any Person or in any business or that otherwise restricts or limits any Seller Party from conducting the Business as currently conducted or as has been historically conducted in the ordinary course consistent with past practice (except as required by Law);

(v)       Any Contract relating to funded debt, including any guarantees thereof;

(vi)      Any guarantee of the obligations of service providers, vendors, officers, directors, employees, Affiliates or others;

(vii)     Any Contract with respect to any partnership or joint venture;

(viii)    Any Contract relating to (A) the use of any Seller Party's Intellectual Property or Software or (B) the use by any Seller Party in the Business of any Intellectual Property or Software of any Third Party;

(ix)      Any Contract (including any Contract providing for employment, severance, retention, change in control, transaction bonus or other similar payments or benefits) between or among any Seller Party, on the one hand, and any Business Employee with a base salary in excess of $25,000;

(x)       Any lease, rental or occupancy agreement, license, installment, conditional sale agreement or Contract under which (A) any Seller Party is the lessee of, or holds or uses, tangible personal property owned by any Third Party for an annual rent in excess of $50,000 or (B) any Seller Party is the lessor of, or makes available for use by any Third Party, any tangible personal property owned by any Seller Party for the annual rent in excess of $50,000;

(xi)      Any Contract that is an Investor Agreement under which a Mortgage Loan has been purchased since January 1, 2009;

(xii)     Any Contract that is a Warehousing Agreement; and

(xiii)    Any other Contract material with respect to the Business to which any Seller Party is a party or by which it is bound, not otherwise covered by this Section 6.13, including any such Contract involving payments to or by any Seller Party or Seller Parties, collectively (and not in the ordinary course) in an aggregate amount in excess of $100,000.

(b)       Except as set forth in Schedule 6.13(b), each of the Material Contracts (including any Assumed Contracts included within the Material Contracts) is a valid and binding obligation of the parties thereto and is in full force and effect.  Each Material Contract may be transferred to Buyer pursuant to this Agreement and will continue in full force and effect after the Closing, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder and without the consent, approval or act of, or the making of any filing with, any other party.  Except as set forth on Schedule 6.13(b), Sellers have delivered or made available to Buyer correct and complete copies of each Material Contract, including all amendments, supplements and waivers with respect thereto.  Seller Parties have fulfilled and performed their respective obligations under each of the Material Contracts, no Seller Party is in, or to the Knowledge of Seller Parties alleged to be in, breach or default under, nor is there or is there, to the Knowledge of Seller Parties, alleged to be any basis for termination of, any of the Material Contracts.  To the Knowledge of Seller Parties, (i) no Third Party to any of the Assumed Contracts has breached or defaulted thereunder, and (ii) no event has occurred and no condition or state of facts exists which, with the passage of time or the giving of notice or both, would constitute a default or breach by any Seller Party or by any such other party thereunder.

6.14    <u>Employees</u>.

(a)     <u>Schedule 6.14(a)</u> contains a complete and accurate list of (i) all Business Employees and (ii) with respect to each Business Employee that has base salary or other compensation (including commissions) that exceeds or is reasonably expected to exceed a total of $50,000 in the current year: employer name; job title; date of hiring or engagement; date of commencement of employment or engagement; and compensation paid or payable (including wages, salaries and actual or anticipated bonuses and commissions) currently and for calendar year 2010.

(b)     Except as set forth in <u>Schedule 6.14(b)</u>, each Business Employee is an "at will" employee and may terminate his or her employment or be terminated from such employment at any time for any lawful reason with or without prior notice, except as required by Law.  Neither the execution and delivery of this Agreement or any of the other Transaction Documents nor the consummation of any of the Transactions will give rise to any right of any Business Employee under any Contract or other Benefit Plan to terminate his or her employment with any Seller Party or any of their Affiliates.

(c)     Except as set forth in <u>Schedule 6.14(c)</u>, to the Knowledge of Seller Parties, no Business Employee is a party to any Contract with a Third Party or any other obligation of any kind (and no Seller Party nor any of their Affiliates has received any notice alleging that any Business Employee is such a party or so subject) that (i) prohibits or otherwise limits in any way (or purports to prohibit or limit in any way) any Business Employee from performing his or her duties with respect to the Business, (ii) restricts or limits in any way the scope or type of work in which he or she may be engaged other than for the benefit of Sellers or (iii) requires him or her to transfer, assign or disclose information concerning his or her work on behalf of Seller Parties or any of their Affiliates to any Third Party.

(d)     Except as set forth in <u>Schedule 6.14(d)</u>, there is no labor strike, dispute, corporate campaign, slowdown, stoppage or lockout or other labor dispute pending or, to the Knowledge of Seller Parties, threatened against or affecting the Business and, since January 1, 2009 there has not been any such action.

(e)     Except as set forth in <u>Schedule 6.14(e)</u>, no Seller Party nor any of their Affiliates is a party to or bound by any collective bargaining or similar agreement, or other agreement or understanding, with any labor organization employee association or other similar organization with respect to any Business Employee.  None of the Business Employees is represented by any labor organization and, to the Knowledge of Seller Parties, there have been no union organizing activities involving any Business Employee pending or threatened at any time since January 1, 2009.  Since January 1, 2009, (i) no labor union has been certified by the National Labor Relations Board as bargaining agent for any Business Employee, (ii) no notice has been received by any Seller Party or any of their Affiliates from any labor union stating that it has been, or is demanding to be, designated or otherwise recognized as the bargaining agent for any Business Employee, (iii) no representation proceeding or petition seeking a representation proceeding has been filed (or threatened to be filed) with respect to any Business Employee and (iv) no Seller Party or any of their Affiliates is or has been negotiating, or has

been asked to negotiate, any collective bargaining agreement or other agreement or understanding with any labor organization with respect to any Business Employee.

(f)     Except as set forth in <u>Schedule 6.14(f)</u>, Parent and LendingTree, with respect to the Business, and each Seller is, and since January 1, 2009, has been, in compliance in all material respects with all Laws covering or otherwise related to employment and employment practices, terms and conditions of employment, immigration and work authorization, affirmative action obligations, equal employment opportunity, leaves of absence, reasonable accommodations, whistleblower, facility closures and layoffs (including the WARN Act), wages, hours of work (including all state and federal requirements regarding compensation for time worked, meal and rest periods, proper payment of bonuses and commissions, compliant record-keeping practices and timely payment of wages), overtime and occupational safety and health, and none of Parent, LendingTree nor any of their Affiliates (other than the other Sellers), with respect to the Business, or any Seller is liable for any arrears of wages or any taxes or penalties for failure to comply with any of the foregoing.

(g)     Except as set forth in Schedule 6.14(g), there is no, and since January 1, 2009, has not been any, unfair labor practice charge or complaint involving the Business Employees pending or, to the Knowledge of Seller Parties, threatened, before the National Labor Relations Board or any similar Governmental Authority.

(h)     Except as set forth in Schedule 6.14(h), there are no, and since January 1, 2009, there have not been any, charges involving any Business Employee pending before the federal Equal Employment Opportunity Commission, the federal Department of Labor or any other Governmental Authority responsible for receiving employment or labor-related claims or the prevention of unlawful employment or wage and hour practices, nor, to the Knowledge of Seller Parties, is there any basis for any of the same.

(i)     Except as set forth in Schedule 6.14(i), no Seller Party nor any of their Affiliates has received notice from any Governmental Authority seeking to conduct an investigation, audit or other inquiry with respect to or involving the Business Employees and no such investigation, audit or inquiry is in progress.

(j)     Except as set forth in Schedule 6.14(j), there are no Actions pending in any forum (including internal investigations or complaints) or threatened, by or on behalf of any present or former Business Employee, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract of employment, any violation of any Laws governing wage and hour requirements of any kind (including claims for unpaid overtime or any other wage and hour violations referenced in this Section 6.14), any violation of any Laws governing employment or the termination thereof or any other discriminatory, wrongful or tortious conduct in connection with the employment relationship or otherwise, nor, to the Knowledge of Seller Parties, is there any basis for any of the same.

(k)     Schedule 6.14(k) sets forth a list of each loan officer involved in the Business as of the date hereof.

31

(l)     Schedule 6.14(l) sets forth (i) a list of all loan officers of any Seller Party that have left their employment for any reason that involves a violation or alleged violation of a Law during the last twelve (12) months and (ii) the volume of Mortgage Loans generated by each such loan officer during the last twelve (12) months.

6.15     Intellectual Property.

(a)     Schedule 6.15(a) contains:  (i) a list and description (showing in each case the registered or other owner, and registration or application number, if any) of all Intellectual Property owned by (A) Sellers or (B) Parent or LendingTree, with respect to the Business (collectively, the "**Company Intellectual Property**"); and (ii) a list and description of all Intellectual Property licensed to or used by Seller Parties that is material to the conduct of the Business, in each case excluding Confidential Information.

(b)     Schedule 6.15(b) contains a list and description (showing in each case any owner, licensor or licensee of) all Software owned by, licensed to or used by a Seller Party or any of their respective Affiliates in connection with the conduct of the Business; provided, that Schedule 6.15(b) does not list mass market Software licensed to any Seller Party that is commercially available and subject to "shrink-wrap" or "click-through" license agreements.

(c)     Schedule 6.15(c) contains a list and description of all agreements, contracts, licenses, sublicenses, assignments and indemnities that relate to:  (i) any Copyrights, Patents, Marks and domain names (excluding standard fee agreements with applicable registrars) required to be identified in Schedule 6.15(a); (ii) any Confidential Information owned by, licensed to or used by Parent, LendingTree or any of their Affiliates (other than the Sellers), in connection with the conduct of the Business, or by any Seller; and (iii) any Software required to be identified in Schedule 6.15(b).

(d)     Except as disclosed in Schedule 6.15(d), Sellers collectively:  (i) own the entire right, title and interest in and to the Company Intellectual Property, free and clear of any Encumbrance; and (ii) have the perpetual, royalty-free right to use all other Intellectual Property that is used in the conduct of the Business.

(e)     Except as disclosed in Schedule 6.15(e):  (i) all registrations for Copyrights, Patents, Marks and domain names required to be identified in Schedule 6.15(a) as being owned by any Seller are valid and in force, and all applications to register any unregistered Copyrights, Patents and Marks so identified are pending and in good standing, all without, to the Knowledge of Seller Parties, challenge of any kind; (ii) none of the Intellectual Property owned by Parent or LendingTree, with respect to the Business, or any Seller has been cancelled or abandoned, and all such Intellectual Property is valid and enforceable (provided that, with respect to Patents, such representation as to validity and enforceability is given based on the Knowledge of Seller Parties); (iii) Sellers

collectively have the sole and exclusive right to bring actions for infringement, misappropriation, dilution, violation or unauthorized use of the Company Intellectual Property, and to the Knowledge of Seller Parties, there is no basis for any such action; (iv) Sellers have taken actions reasonably necessary to protect and, where necessary, to register the Company Intellectual Property; and (v) no Seller is in breach of any agreement affecting the Intellectual Property used by Parent, LendingTree or any of their Affiliates (other

<div align="center">32</div>

than the Sellers), in the conduct of the Business, or by any Seller and has not taken any action that would impair or otherwise adversely affect its rights in such Intellectual Property.  Correct and complete copies of: (A) registrations for all registered Copyrights, Patents, and Marks identified in Schedule 6.15(a) as being owned by any Seller; and (B) all pending applications to register unregistered Copyrights, Patents and Marks identified in Schedule 6.15(a) as being owned by any Seller (together with any subsequent correspondence or filings relating to the foregoing) have heretofore been delivered by Sellers to Buyer.

(f)       Except as set forth in Schedule 6.15(f):  (i) the Company Intellectual Property does not infringe, misappropriate, violate or dilute any Intellectual Property or any rights of publicity or privacy of any Third Party; (ii) no claim of any infringement, misappropriation, violation or dilution of any Intellectual Property has been made or asserted in respect of the operations of the Business; (iii) no claim of invalidity of any Company Intellectual Property has been made by any other Person; (iv) no proceedings are pending or, to the Knowledge of Seller Parties, threatened that challenge the validity, ownership or use of any Company Intellectual Property; and (v) no Seller Party has received written or, to the Knowledge of Seller Parties, oral notice of a claim against any Seller Party that the operations, activities, products, Software, equipment, machinery or processes of the Business infringe, misappropriate, violate or dilute any Intellectual Property of any Third Party.

(g)       Except as disclosed in Schedule 6.15(g):  (i) the Software included in the Acquired Assets is not subject to any transfer, assignment, change of control, site, equipment, or other operational limitations; (ii) each Seller Party, as applicable, has maintained and protected the Software included in the Acquired Assets that it owns (the "**Owned Software**") (including all source code and system specifications) with appropriate proprietary notices (including the notice of copyright in accordance with the requirements of 17 U.S.C. § 401), confidentiality and non-disclosure agreements and such other measures as are reasonably necessary to protect the Copyrights and Confidential Information (if any) contained therein or relating thereto; (iii) the Owned Software has been registered or otherwise meets the requirements for protection and registration under applicable copyright law; (iv) Seller Parties have complete and exclusive right, title and interest in and to the Owned Software; (v) the Owned Software does not infringe, misappropriate, violate or dilute any Intellectual Property of any Third Party; (vi) any Owned Software includes the source code and system documentation sufficient for a computer programmer skilled in the applicable language to maintain and support it; (vii) the Owned Software operates in accordance with and conforms in all material respects to the specifications described in Schedule 6.15(g); (viii) there are no defects in the design of the Owned Software that affect in any material respect the functionality or operation of the Owned Software; (ix) the Owned Software is not licensed pursuant to a so-called "open source" license and does not incorporate and is not based on any Software that is licensed pursuant to a so-called "open source" license; (x) there are no agreements or arrangements in effect with respect to the marketing, distribution, licensing or promotion of the Owned Software by any other Person; and (xi) the Owned Software complies with all applicable Requirements of Laws relating to the export or re-export of the same.  Since January 1, 2009, the Owned Software, computer systems and other information technology infrastructure used by Seller Parties in connection with the conduct of the Business has not been accessed by any Third Party in a manner that has not been authorized.

<div align="center">33</div>

(h)       Except as disclosed in Schedule 6.15(h), all employees, agents, consultants or contractors who have contributed to or participated in the creation or development of any Company Intellectual Property either:  (i) created such materials in the scope of his or her employment; (ii) is a party to a "work-for-hire" agreement under which any Seller Party is deemed to be the original owner/author of all right, title and interest therein; or (iii) has executed an assignment in favor of a Seller Party (or such predecessor in interest, as applicable) of all right, title and interest in such material.

6.16    Tax.  Except as set forth on Schedule 6.16:

(a)       Each Seller Party has filed or caused to be filed on a timely basis all Tax Returns and all reports with respect to Taxes that are or were required to be filed pursuant to Applicable Requirements with respect to the Business, the Acquired Assets, the Assumed Liabilities or the Subsidiaries.  All Tax Returns and reports are true, correct and complete in all material respects and disclose all Taxes required to be paid in respect of the Business, the Acquired Assets, the Assumed Liabilities and the Subsidiaries.  Each Seller Party has timely paid or caused to be timely paid all Taxes related to the Business, the Acquired Assets, the

Assumed Liabilities or the Subsidiaries, whether or not shown on any Tax Return. No Seller Party is the beneficiary of any extension of time within which to file any Tax Return related to the Business, the Acquired Assets, the Assumed Liabilities or the Subsidiaries, and no Seller Party has waived or been requested to waive any statute of limitations in respect of Taxes which waiver is currently in effect.

(b)    Sellers have delivered or made available to Buyer copies of all Tax Returns related to the Business, Acquired Assets, the Assumed Liabilities or the Subsidiaries filed since January 1, 2009. Schedule 6.16(b) sets forth each state, county, local municipal, domestic or foreign jurisdiction or Governmental Authority in or with which, with respect to the Business, the Acquired Assets, the Assumed Liabilities or the Subsidiaries, any Seller Party has at any time since January 1, 2009 (i) filed a Tax Return, (ii) been registered for any Tax purpose, or (iii) been qualified to do business.

(c)    Each of Parent and LendingTree, with respect to the Business, and Sellers have complied in all material respects with all provisions of Tax Law relating to withholding, payment and remittance of Taxes and information reporting with respect thereto, and each of Parent and LendingTree, with respect to the Business, and Sellers have, within the time and in the manner prescribed by Tax Law, paid over to the proper Governmental Authorities all amounts required.

(d)    There is no Tax ruling, request for ruling or settlement, compromise, closing or Tax collection agreement in effect or pending which does or could affect the Liability of any Seller Party or Buyer for Taxes with respect to the Business, the Acquired Assets, the Assumed Liabilities or any Subsidiary for any period after the Closing Date.

(e)    No Acquired Asset or asset of any Subsidiary is (i) "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code or Section 470(c)(2) of the Code, (ii) tax-exempt bond financed property within the meaning of Section 168(g) of the Code, (iii) properly treated as owned by persons other than the applicable Seller for federal income

34

Tax purposes or (iv) subject to a lease under Code Section 7701(h) or any predecessor provision.

(f)    Neither Parent nor LendingTree, with respect to the Business, nor any Seller has in the past 5 years been a party to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1). Each Seller, and each of Parent and LendingTree, with respect to the Business, has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

(g)    There is no Action or assessment pending or, to the Knowledge of Seller Parties, proposed or threatened with respect to Taxes of Parent or LendingTree, with respect to the Business, or any Seller.

(h)    No claim has ever been made by a Governmental Authority in writing in a jurisdiction where any Seller has never paid Taxes or filed Tax Returns asserting that Parent or LendingTree, with respect to the Business, or any Seller is or may be subject to Taxes assessed by such jurisdiction.

(i)    All deficiencies asserted or assessments made as a result of any examination of the Tax Returns referred to in clause (a) have been paid in full.

(j)    All Tax sharing arrangements and tax indemnity agreements relating to Parent or LendingTree, with respect to the Business, or any Seller (other than this Agreement) will terminate prior to the Closing Date and no Seller will have any liability thereunder on or after the Closing Date.

(k)    No Seller has been a member of any Tax Group other than each Tax Group of which it is a member as of the date hereof, and no Seller nor any Subsidiary has had any direct or indirect ownership interest in any corporation, partnership, joint venture or other entity other than the Subsidiaries.

(l)    Neither Parent nor LendingTree, with respect to the Business, nor any Seller has any liability for Taxes of another Person, including under Treasury Regulation § 1.1502-6 (or any similar provision of state, local or foreign law).

(m)    RETS is and at all times since its formation has been properly classified either as a partnership or as an entity disregarded from its owner for federal and applicable state, local and other income Tax purposes.

6.17    Transactions With Affiliates.  Schedule 6.17 sets forth a list of all existing Contracts and other business relationships between Parent or LendingTree, with respect to the Business, or any Seller, on the one hand, and any of such Party's Affiliates, officers or directors, on the other hand, including any Contracts or relationships pursuant to which services provided by Parent or any other Affiliate of any Seller to the Business utilizing assets that are not included in the Acquired Assets, other than "at will" employment arrangements with officers or with any Business Employees that are terminable "at will" by any Seller Party without notice or liability.

<div align="center">35</div>

6.18    Employee Benefit Plans; ERISA.

(a)    Schedule 6.18(a) contains a list of each Benefit Plan to which any Business Employees or their beneficiaries is a party or in which any such Business Employees or their beneficiaries participate, or to which any Seller Party or any trade or business which is, or has been within the past six (6) years, under common control or treated as a single employer with any Seller Party under Section 414(b), (c), (m) or (o) of the Code (an "*ERISA Affiliate*") may have any direct or indirect Liability (each a "*Seller Benefit Plan*").  Schedule 6.18(a) also identifies each Seller Benefit Plan which is sponsored by a Subsidiary.

(b)    Except as set forth in Schedule 6.18(b), Sellers have made available to Buyer, with respect to each Seller Benefit Plan, correct and complete copies, where applicable, of (i) all plan documents, amendments and trust agreements (or written summaries of any Seller Benefit Plan for which there is no plan document) (ii) the most recent IRS determination or opinion letter, (iii) the Annual Reports (Form 5500 Series) and accompanying schedules, as filed, for the most recently complete three Plan years, and (iv) and summary plan descriptions used in connection with such plans.

(c)    Except as set forth in Schedule 6.18(c), with respect to each Seller Benefit Plan, all required payments, premiums, contributions, or distributions for all periods ending through the Closing Date have been made when due, or, if not yet due, have been properly accrued in accordance with the requirements of GAAP and neither the execution or delivery of this Agreement nor the consummation of the Transactions will, either alone or in conjunction with any other event (whether contingent or otherwise), (i) result in any payment or benefit becoming due or payable, or required to be provided, to any Business Employee, (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any Business Employee or (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation.

(d)    Except as set forth in Schedule 6.18(d), each Seller Benefit Plan has been maintained, funded and administered in all material respects in accordance with its terms and in compliance in all material respects with the applicable provisions of ERISA, the Code and other Laws, and there has been no notice issued by any Governmental Authority questioning or challenging such compliance.  Each Seller Benefit Plan that is intended to be tax-qualified under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS as to its tax-qualified status and the tax-exempt status of its accompanying trust established under Section 501(a) of the Code, and, since the issuance of any such determination or opinion letter, no events have occurred nor any circumstances exist that would adversely affect the tax-qualified status of any such Seller Benefit Plan.  There are no Actions (other than routine claims for benefits) pending or, to the Knowledge of Seller Parties, threatened involving any Business Employees with respect to any Seller Benefit Plans.

(e)    Except as set forth in Schedule 6.18(e), no Seller Benefit Plan entitles any Business Employee or beneficiary thereof to any retiree medical or other post-termination welfare benefits, except as specifically required by the continuation requirements of Part 6 of Title I of ERISA.

<div align="center">36</div>

(f)    Except as set forth in Schedule 6.18(f), no Seller Party nor any of their ERISA Affiliates have ever maintained, sponsored, contributed to or been obligated to contribute to (i) a "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Code, (iii) a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

6.19    Real Property.

(a)    Except as set forth in Schedule 6.19(a), neither Parent nor LendingTree, with respect to the Business, and no Seller owns, or holds an option to purchase or acquire, any real property.

(b)      Schedule 6.19(b) contains a complete and accurate list of the following:

(i)      all leases or licenses of real property and interests in real property and the buildings, structures and improvements thereon pursuant to which Parent or LendingTree, with respect to the Business, or any Seller is the lessee or licensee;

(ii)      all Contracts, options (and all amendments, extensions and modifications thereto) or contractual obligations (and all amendments, extensions and modifications thereto) with respect to the Facilities; and

(iii)      all policies of title insurance issued to any Seller Party with respect to the Facilities.

(c)      Except as set forth in Schedule 6.19(c), Seller Parties have the right under valid and existing leases to occupy and use the Facilities.  Neither the whole nor any portion of the Facilities has been condemned, requisitioned or otherwise taken by any Governmental Authority, and no Seller Party has received any notice that any such condemnation, requisition or taking is threatened.  All Facilities have received all required permits (including a certificate of occupancy or other similar certificate permitting lawful occupancy of the Facilities) required in connection with the operation thereof.

(d)      Except as set forth in Schedule 6.19(d), each Assumed Office Lease is in full force and effect.  No Seller Party is in breach of or in default of its obligations under any Assumed Office Lease.  Complete and correct copies of the Assumed Office Leases, including all amendments, extensions, modifications, exhibits, annexes and schedules thereto, have been delivered or made available to Buyer.

(e)      Except as set forth in Schedule 6.19(e), no Seller Party has received any notice that it is in violation of any zoning, use, occupancy, building, wetlands or environmental regulation, ordinance or other Law or requirement relating to the Facilities.

6.20      Vote Required.  Assuming the Parent Stockholder Approval is obtained, no approval of holders of securities of Parent, in their capacity as such, is necessary to approve this Agreement and the transactions contemplated hereby.

37

6.21      Solvency.  Immediately before and immediately after giving effect to the transactions contemplated by this Agreement, including the payment of all fees, expenses and other amounts required to be paid in connection with the consummation of the transactions contemplated hereby, HLC Inc. is and will be Solvent.

6.22      Disclosure.  None of the representations or warranties of Seller Parties contained herein and none of the information contained in the Disclosure Schedule is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect.

**ARTICLE 7.      PRE-CLOSING COVENANTS**

The Parties agree as follows with respect to the Interim Period (or, where expressly so provided, following the Closing):

7.1      Conduct of Business by Seller Parties.

(a)      Except with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed) or as set forth on Schedule 7.1(c), Seller Parties shall, and shall cause the Subsidiaries to:  (i) conduct the Business only in the ordinary course of the Business consistent with past practice (except as required by Law) and in compliance with all Applicable Requirements; (ii) keep and maintain the Acquired Assets in good operating condition and repair consistent with past practice; (iii) use commercially reasonable efforts to maintain the Business intact and to preserve the goodwill of vendors, employees, service providers, borrowers and others having business relations with the Business; and (iv) continue the prior course of dealing among each of the Business and HLC Inc., on the one hand, and each of the other Seller Parties, on the other hand, consistent with past practice (except as required by Law) in all material respects.

(b)      Seller Parties shall, and shall cause the Subsidiaries to, use commercially reasonable efforts to cooperate with Buyer and its Affiliates in connection with their integration and transition planning with respect to the Business, the Acquired Assets and the Hired Employees, including using commercially reasonable efforts to cooperate with respect to integration and transition planning related to (i) business continuity and disaster recovery, (ii) physical security, (iii) policies, procedures,

documentation, testing and risk assessments related to compliance with Law, (iv) information technology, (v) accounting and reporting, (vi) cash management and reconciliation, (vii) data, information and website security, (viii) human resources matters, including pre-employment processing, (ix) marketing (both online and traditional) and branding, including integration between campaign management and lead management systems, interfaces and integration of the pricing engine to the lead generators, re-branding the loan processing site to comply with Buyer look and feel guidelines and testing and integration of websites with Buyer web properties and (x) procuring any Contracts with Third Parties as may be reasonably requested by Buyer. Seller Parties will reasonably cooperate with Buyer's efforts to enhance existing Business policies, procedures, documentation and practices commensurate with requirements for operating the Business within an insured depository institution and bank holding company. Notwithstanding anything to the contrary herein, (A) Seller Parties shall not be obligated to incur any third party costs or expenses in connection with

<div align="center">38</div>

this Section 7.1(b), and (B) Seller Parties shall not be in breach of any provision of this Agreement as a result of any changes implemented by Buyer or at the request of Buyer (and no action or inaction taken at the request of Buyer, or any impact therefrom, shall be used by Buyer as a reason not to close).

      (c)     Without limiting the provisions of Section 7.1(a), but except as otherwise contemplated herein, as set forth in Schedule 7.1(c) or with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), (x) Parent and LendingTree shall not, with respect to the Business, (y) Sellers shall not and (z) Sellers shall cause the Subsidiaries not to:

      (i)     make any capital expenditure or capital expenditures in excess of (A) on or prior to the Initial End Date, $150,000 (individually or in the aggregate) or (B) after the Initial End Date, $300,000 (individually or in the aggregate, including any capital expenditures prior to the Initial End Date);

      (ii)     enter into any Contract for the purchase, sale or lease (as lessor or lessee) of real property or exercise any option to extend an Assumed Office Lease;

      (iii)     other than in the ordinary course of the Business consistent with past practice, sell, lease (as lessor), transfer, abandon or otherwise dispose of, license, mortgage or pledge, or impose or suffer any Encumbrance (other than Permitted Encumbrances) on, any of its assets or properties, except for any asset which is obsolete; provided, that, after the Initial End Date, each of Parent and LendingTree, with respect to the Business, and Sellers and the Subsidiaries may mortgage or pledge, or impose or suffer an Encumbrance on, any of its assets or properties so long as such mortgage, pledge or Encumbrance (to the extent that it affects any Acquired Asset) will by its express terms be automatically released and terminated concurrently with or prior to the Closing;

      (iv)     (A) on or prior to the Initial End Date, enter into any Contract which would have been required to be set forth on Schedule 6.13(a) if in effect on the date hereof, (B) after the Initial End Date, enter into any Contract which would have been required to be set forth on Schedule 6.13(a) (with all dollar amounts set forth in Section 6.13(a) multiplied by two) if in effect on the date hereof, (C) on or prior to the Initial End Date, amend, modify or terminate any Assumed Contract or (D) after the Initial End Date, materially amend or modify, or terminate, any Assumed Contract;

      (v)     enter into, amend, terminate or adopt any Benefit Plan with respect to any Business Employee (including any Contract with respect to any Business Employee), or offer to do any of the foregoing, other than (A) as required by any such existing Benefit Plan or existing Contract or by Law or (B) in connection with any such actions not targeted to the Business Employees and taken in the ordinary course of business of Seller Parties (other than Sellers);

      (vi)     make (or offer to make) any change in the compensation of any Business Employee other than changes made in the ordinary course of the Business consistent

<div align="center">39</div>

with past practice, required by existing Contracts or required by any Law, including any federal Law governing the compensation of loan officers;

(vii)    make (or offer to make) to any Business Employee any offer of employment or other engagement (or continued employment or engagement) with any Seller Party or any Affiliate of any Seller Party, for employment or other engagement at any time following the Closing;

(viii)    transfer or otherwise reassign (or offer to transfer or otherwise reassign) any Key Person to any position other than the position that such Key Person holds as of the date of this Agreement, nor assign any such Key Person to perform any duties other than those duties that such Key Person has as of the date of this Agreement or duties in connection with effectuating the Transactions;

(ix)    induce, solicit, recruit or encourage either individually or indirectly in conjunction with or through any other Person, any Key Person (A) to leave the employ of, or violate the terms of his or her Contract or any other employment arrangement with, any Seller or any of their Affiliates or (B) to negotiate any material terms or to reject any offer of employment or other engagement that such Key Person may receive from Buyer or one of its Affiliates (without limiting or otherwise affecting any other obligation that any Seller has under this Agreement);

(x)    make any written or oral communication regarding the terms and conditions of any offer of employment or other engagement that Buyer or one of its Affiliates may make to any Business Employee;

(xi)    create, incur, assume or guarantee any funded debt, other than in the ordinary course of the Business consistent with past practice (except as required by Law); provided, that, after the Initial End Date, each of Parent and LendingTree, with respect to the Business, and Sellers and the Subsidiaries may create, incur, assume or guarantee any funded debt so long as any mortgage, pledge or Encumbrance on any of the Acquired Assets incurred in connection with such funded debt will by its express terms be automatically released and terminated concurrently with or prior to the Closing;

(xii)    cancel, compromise, waive or release any right or claim (or series of related rights and claims) under or with respect to the Acquired Assets involving more than $50,000 (on or prior to the Initial End Date) or $100,000 (after the Initial End Date);

(xiii)    delay or postpone the payment of accounts payable or other Liabilities under or with respect to any Acquired Asset, other than in the ordinary course of the Business consistent with past practice (except as required by Law);

(xiv)    accelerate or cause the acceleration of the collection or receipt of any accounts receivable under or with respect to any Acquired Asset, other than in the ordinary course of the Business consistent with past practice (except as required by Law);

(xv)    make any material change in the accounting principles, methods, practices or policies applied in the preparation of the Financial Statements of HLC Inc.,

40

including policies and practices with respect to loan loss obligations, unless such change is required by Law or GAAP;

(xvi)    solely to the extent HLC Inc., HLC Escrow or the Subsidiaries are parties to an Action, settle or compromise such Action with respect to Sellers or the Subsidiaries for an amount in excess of $1,000,000, other than (A) litigation or arbitration relating to Taxes attributable to any Pre-Closing Tax Period or (B) repurchase obligations under any Investor Agreement;

(xvii)    amend its Organizational Documents;

(xviii)    merge with or into or consolidate with, or acquire all or a material portion of the assets or equity interests of, or otherwise acquire or make any equity investment in, any Person (it being understood that Parent may enter into a binding agreement for a Permitted Transaction);

(xix)    grant any option or right to purchase any equity interest of HLC Inc., HLC Escrow or the Subsidiaries; issue or commit to issue any equity interest, or any security convertible into or exchangeable for any such equity interest, of HLC Inc., HLC Escrow or the Subsidiaries to any Person other than Parent or a wholly-owned subsidiary of Parent; or grant any registration rights with respect to any equity interest of HLC Inc., HLC Escrow or the Subsidiaries;

(xx)    make any loan or advance to any Business Employee other than normal advances of business expenses that will be reimbursed prior to Closing;

(xxi)    not market, sell or originate any mortgage product or service that was not marketed, sold or originated by HLC Inc. during the 30-day period prior to the date of this Agreement, other than any products that qualify as "prime" and are locked and sold on a committed basis to Tier 1 Investors, or other investors that are consented to by Buyer, such consent not to be unreasonably withheld; or

(xxii)    authorize, approve, agree or commit to do any of the foregoing.

7.2    <u>Access to Information</u>.  Upon reasonable notice, Seller Parties shall, and shall cause their Affiliates to, afford to the Buyer, its Affiliates and their respective Representatives, reasonable access during normal business hours during the Interim Period, coordinated through those persons listed on <u>Schedule 7.2</u>, to the properties, books and records of the Business as Buyer, its Affiliates and their respective Representatives may reasonably request, and Seller Parties shall, and shall cause their Affiliates to, furnish promptly to Buyer, its Affiliates and their respective Representatives such additional information concerning the Business, the Business Employees or the Acquired Assets as Buyer, its Affiliates and their respective Representatives may reasonably request; <u>provided</u>, that no Seller Party nor any of their Affiliates shall have any obligation to provide Buyer with access to, or provide Buyer, its Affiliates and their respective Representatives with, any information the disclosure of which would violate any Applicable Requirement or result in a breach of the confidentiality provisions of any Contract to which any Seller Party or any of their Affiliates is bound; <u>provided</u>, <u>further</u>, that Seller Parties and their Affiliates shall be entitled to withhold only such information that may not be provided without

41

causing such violation or breach.  Buyer shall, and shall cause its Affiliates and their respective Representatives to, use reasonable efforts to prevent such access and inspection from materially interfering with the business operations of Seller Parties.  No investigation made by Buyer, its Affiliates or their respective Representatives hereunder shall affect any of the representations, warranties, covenants and obligations of Seller Parties hereunder.

7.3    <u>Efforts to Close</u>.

(a)    Each Party will use its reasonable efforts to take such actions and do such things necessary, proper, or advisable to consummate, make effective, and comply with all of the terms of this Agreement (including satisfaction, but not waiver, of the Closing conditions for which it is responsible or otherwise in control, as set forth in <u>ARTICLE 9</u>).  Each Party shall cooperate with the others in connection with all actions to be taken in connection with the foregoing sentence (including satisfaction, but not waiver, of the Closing conditions for which it is responsible or otherwise in control, as set forth in <u>ARTICLE 9</u>).  Sellers will, and will cause their Affiliates to, give any notices to Third Parties, and will use their reasonable efforts to obtain any consents of Third Parties, referred to herein or otherwise required to be made or obtained in order to transfer or assign any of the Acquired Assets to Buyer hereunder.  The form and content of all such notices and consents shall be mutually agreeable to the Parties, acting reasonably. Without limiting the foregoing, each Party shall cooperate with the others in order to identify any hedging instruments relating to Seller Pipeline Loans that bear interest rate guarantees and negotiate and enter into, at closing, such instruments of assignment and assumption that may be necessary in order to transfer such hedging instruments to Buyer and to counterparties reasonably acceptable to Buyer.

(b)    Without limiting the generality of <u>Section 7.3(a)</u>, each of the Parties will use its reasonable efforts to obtain all permits, consents, approvals and authorizations of all Governmental Authorities necessary to consummate the transactions contemplated hereby, including the consents and approvals referred to in <u>Section 5.2</u> of the Buyer Disclosure Schedule and <u>Schedule 6.2</u>.  In furtherance (but not in limitation) of the foregoing, Sellers and Buyer shall file any required applications, notice or other filings with Governmental Authorities as soon as reasonably practicable after the execution hereof.  To the extent permitted by Law, each Party shall keep the others apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and shall promptly inform the other Parties of any oral communication with, and provide copies of any written communications with, any Governmental Authority regarding the transactions contemplated under this Agreement.  To the extent permitted by Law, each Party agrees, upon request, to furnish the other Parties with all information concerning itself, its subsidiaries (if applicable), directors, officers and stockholders, and such other matters as may be reasonably necessary or advisable in connection with any filing, notice or application made by or on behalf of such other Parties or any of their respective subsidiaries (if applicable) to any Third Party or Governmental Authority in connection with the Transactions.  The Seller Parties shall reasonably cooperate with the Buyer in connection with Buyer's efforts to enter into new investor agreements; <u>provided</u>, that the foregoing shall not obligate any Seller Party to expend any funds or enter into any Contract.

(c)    Buyer shall apply for the FDIC Approval within 30 days following the date hereof, and if Buyer fails to do so, then, notwithstanding anything to the contrary herein,

42

Buyer shall not have any rights to extend the End Date under Section 10.1(b) (meaning the End Date shall be 150 days following the date hereof unless extended by Parent pursuant to Section 10.1(b)(i)).

(d)    To the extent permitted by Law, Buyer shall provide HLC Inc. with monthly updates (or more frequently as may be reasonably requested by HLC Inc.) related to Buyer's process of obtaining the FDIC Approval and shall promptly inform the Seller Parties if Buyer or its Affiliates become aware that the FDIC Approval is reasonably likely to be materially delayed, conditioned or withheld.

(e)    Within a reasonable period of time following the date hereof, Buyer shall contact each Tier 1 and Tier 2 Investor and, thereafter, shall use its reasonable efforts to submit all requested materials to each Tier 1 or Tier 2 Investor for approval within a reasonable period of time after being requested to do so by such Tier 1 or Tier 2 Investor.

(f)    Buyer shall provide HLC Inc. with a copy of each written proposal, term sheet or other Contract from a Tier 1 or Tier 2 Investor concerning a potential investor agreement and each written proposal, term sheet or other Contract that Buyer provides to a Tier 1 or Tier 2 Investor concerning a potential investor agreement; provided, that Buyer shall have no obligation to provide HLC Inc. with any such materials the disclosure of which would violate any Law or result in a breach of the confidentiality provisions of such proposal, term sheet or other Contract, or any other Contract to which Buyer or any of its Affiliates is a party or bound.  Buyer shall also provide HLC Inc. with monthly updates (or more frequently as may be reasonably requested by HLC Inc.) related to Buyer's process of obtaining the Bona Fide Proposals and shall promptly inform the Seller Parties if Buyer or its Affiliates become aware that satisfaction of the condition set forth in Section 9.1(m) is reasonably likely to be materially delayed, conditioned or withheld.

(g)    Notwithstanding the foregoing or anything else in this Agreement to the contrary, (i) none of any Seller Party, Buyer or any of their respective Affiliates shall have any obligation to offer or pay any consideration (other than customary filing or processing fees with Governmental Authorities) in order to obtain any consents, approvals or authorizations referred to in this Section 7.3 and (ii) Sellers shall not, and shall cause their Affiliates not to, make any agreement or understanding affecting the Acquired Assets, the Assumed Liabilities or the Business as a condition for obtaining any such consents, approvals or authorizations except with the prior written consent of Buyer.

7.4    Bulk Transfer Compliance.  Buyer and Sellers hereby mutually agree to waive compliance with the provisions of any bulk transfer or sales Laws, to the extent applicable to the Transactions.

7.5    Proxy Statement.

(a)    Covenants of Parent with Respect to the Proxy Statement.  As promptly as reasonably practicable following the date of this Agreement, Parent shall prepare and shall cause to be filed with the SEC a proxy statement (together with any amendments thereof or supplements thereto, the "**Proxy Statement**") for use in connection with the meeting of Parent's

43

stockholders to be held for the purpose of voting upon the approval of the transactions contemplated by this Agreement (the "**Stockholders' Meeting**").  Parent shall include in the Proxy Statement, unless the Board of Directors of Parent has made a Permitted Change of Recommendation in compliance with Section 7.7(e), the Parent Recommendation.  Parent shall use all reasonable best efforts to respond to any comments by the SEC staff in respect of the Proxy Statement and to have the Proxy Statement cleared by the SEC as promptly as practicable after its filing with the SEC.  Parent covenants and agrees that none of the information to be included in the Proxy Statement (other than any information supplied by Buyer for use in the Proxy Statement) will, at the time of (i) the mailing of the Proxy Statement or any amendments or supplements thereto and (ii) the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  Parent shall ensure that the Proxy Statement will comply as to form in all material respects with the provisions of the Exchange Act.

(b)      Covenants of Buyer with Respect to the Proxy Statement.  Buyer shall use all reasonable best efforts to cooperate with Parent to respond to any comments by the SEC staff in respect of the Proxy Statement.  Buyer covenants and agrees that none of the information with respect to Buyer or its Affiliates to be included in the Proxy Statement will, at the time of (i) the mailing of the Proxy Statement or any amendments or supplements thereto and (ii) the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(c)      Cooperation.  The Parties shall reasonably cooperate and consult with each other in the preparation of the Proxy Statement and Parent will provide Buyer a reasonable opportunity for review and comment on the draft Proxy Statement (including each amendment or supplement thereto) prior to filing and any responses to comments by the SEC staff on the Proxy Statement or any amendments or supplements to the Proxy Statement.  Parent shall promptly (i) notify Buyer of the receipt of any comments from the SEC with respect to the Proxy Statement and of any request by the SEC for amendments of, or supplements to, the Proxy Statement, and (ii) provide Buyer with copies of all filings made with the SEC and all correspondence between Parent and the SEC with respect to the Proxy Statement.

(d)      Mailing of Proxy Statement; Amendments.  As promptly as reasonably practicable after the Proxy Statement has been cleared by the SEC, Parent shall mail the Proxy Statement to the holders of Parent's common stock as of the record date established for the Stockholders' Meeting and, unless the Board of Directors of Parent has made a Permitted Change of Recommendation in compliance with Section 7.7(d), shall use reasonable best efforts to solicit proxies and votes in favor of the approval of the transactions contemplated by this Agreement and shall take all other action reasonably necessary or advisable to secure the approval of the transactions contemplated by this Agreement.  If, at any time prior to the Closing, any event or circumstance relating to any Seller Party or Buyer or any of their respective Affiliates, or their respective officers or directors, or any false or misleading information in the Proxy Statement, should be discovered by any Seller Party or Buyer, respectively, which, pursuant to the Exchange Act, should be set forth, supplemented or corrected, as the case may be, in an amendment or a supplement to the Proxy Statement, such

44

Party shall promptly inform the other Parties (in which case the Parties shall cooperate to effect the applicable amendment or supplement).

7.6      Stockholders' Meeting.  Parent shall, as promptly as practicable following the date of this Agreement, establish a record date for, duly call, give notice of, convene and hold the Stockholders' Meeting.  Unless the Board of Directors of Parent has made a Permitted Change of Recommendation, Parent shall, through its Board of Directors, recommend to its stockholders the approval of this Agreement and the transactions contemplated by this Agreement (the "**Parent Recommendation**"), and take all other action necessary or advisable to secure the Parent Stockholder Approval.  Notwithstanding anything to the contrary contained in this Agreement, the obligation of Parent to call, give notice of, convene and hold the Stockholders' Meeting and to hold a vote of Parent's stockholders on the approval of this Agreement and the transactions contemplated by this Agreement at the Stockholders' Meeting shall not be limited or otherwise affected by the commencement, disclosure, announcement or submission to it of any Acquisition Proposal (whether or not a Superior Proposal) or by a Change of Recommendation.  In any case in which Parent makes a Change of Recommendation, (a) Parent shall nevertheless submit the transactions contemplated by this Agreement to a vote of its stockholders and (b) the Proxy Statement and any and all accompanying materials (including the proxy card, the "**Proxy Materials**") shall be the same in form and content to that which would have been prepared by Parent had no Change of Recommendation been made, except for changes to the Proxy Materials stating and explaining the reasons for the Change of Recommendation, including, if applicable, describing matters relating to the Superior Proposal or other event giving rise to the Change of Recommendation, and such other changes as are required by Law or which the Board of Directors of Parent determines that the failure to make would constitute, or would be reasonably likely to constitute, a breach of the fiduciary duties of the Board of Directors of Parent to Parent's stockholders under Law.  Parent agrees that, prior to the termination of this Agreement, it shall not submit to the vote of its stockholders any Acquisition Proposal (whether or not a Superior Proposal) or propose to do so.  For the avoidance of doubt, Parent shall not be required to hold the Stockholders' Meeting if this Agreement is validly terminated in accordance with Section 10.1.

7.7      No Solicitation of Acquisition Proposal.

(a)      From and after the date of this Agreement until the earlier of the Closing or the date, if any, on which this Agreement is terminated pursuant to Section 10.1, neither the Seller Parties nor any of their Affiliates shall, and each of the Seller Parties shall use its reasonable best efforts to cause their respective Representatives not to, directly or indirectly:  (i) solicit, initiate, assist or knowingly facilitate or encourage the making of any Acquisition Proposal or any inquiry, offer or proposal that may reasonably be expected to lead to any Acquisition Proposal; (ii) enter into, engage or participate in, or continue any negotiations

regarding any Acquisition Proposal or any inquiry, proposal or offer that may reasonably be expected to lead to, any Acquisition Proposal; (iii) furnish to any person or group (other than Buyer and its Affiliates) any non-public information relating to Parent or any of its Affiliates in connection with an Acquisition Proposal; (iv) engage or participate in discussions with any Person with respect to any Acquisition Proposal or any proposal, inquiry or offer that may reasonably be expected to lead to any Acquisition Proposal; or (v) approve, endorse or recommend, or publicly announce an intention to approve, endorse or recommend, or enter into

any letter of intent or similar document or any agreement, commitment or other Contract relating to any Acquisition Proposal or any inquiry, offer or proposal that may reasonably be expected to lead to, any Acquisition Proposal. Without limiting the foregoing, Seller Parties agree that any breach of this Section 7.7(a) by any Seller Party or any of their Affiliates or any of Seller Parties' or their Affiliates' respective executive officers or directors or any financial advisors, outside legal counsel, accountants or other advisors retained in connection with the Transactions or in connection with a Permitted Transaction, shall constitute a breach of this Section 7.7(a) by Seller Parties.

(b)        Notwithstanding any limitations set forth in this Agreement, if after the date hereof and prior to the receipt of the Parent Stockholder Approval, Parent receives an unsolicited, bona fide written Acquisition Proposal that (i) did not result from a violation of this Section 7.7 and (ii) the Board of Directors of Parent determines in good faith after consultation with Parent's outside legal and financial advisors that (A) such Acquisition Proposal constitutes or would reasonably be likely to result, after the taking of any of the actions referred to in either of clause (x) or (y) below, in a Superior Proposal and (B) the failure to take the actions described in clauses (x) and (y) below would constitute, or would reasonably be likely to constitute, a breach of the fiduciary duties of the Board of Directors of Parent to Parent's stockholders under Law, then Parent may, at any time prior to the receipt of the Parent Stockholder Approval, take the following actions:  (x) furnish non-public information with respect to Parent and its subsidiaries to the third party making such Acquisition Proposal if, and only if, such information has been previously or is promptly (and in any case within 24 hours) provided to Buyer and prior to so furnishing such information, Parent receives from the third party an executed confidentiality agreement with terms no less favorable in the aggregate to the third party than the Confidentiality Agreement is to Buyer and (y) engage or participate in discussions or negotiations with such third party with respect to the Acquisition Proposal; provided, however, that as promptly as reasonably practicable following Parent taking such actions as described in clauses (x) or (y) above (and in any event within 24 hours), Parent shall provide written notice to Buyer of such determination as provided for in clause (ii) above, the identity of the third party making such Acquisition Proposal and the terms and conditions of the Acquisition Proposal. Parent shall keep Buyer reasonably informed on a current basis of the status of any such discussions or negotiations.

(c)        Except as provided or permitted by this Section 7.7, neither Parent nor the Board of Directors of Parent nor any committee thereof shall (i) formally determine to change, qualify, withdraw or modify, or publicly propose to change, qualify, withdraw or modify the Parent Recommendation in a manner adverse to Buyer, (ii) fail to include the Parent Recommendation in the Proxy Statement distributed to stockholders; (iii) make any other statement in connection with the Stockholders' Meeting materially inconsistent with the Parent Recommendation which is not promptly (and in any case no later than 24 hours after the written request by Buyer) retracted and corrected by Parent, together with a reaffirmation of the Parent Recommendation in a press release following the written request by Buyer; (iv) refuse to publicly reaffirm the Parent Recommendation following any written request by Buyer to provide such reaffirmation following receipt or public disclosure of an Acquisition Proposal prior to the earlier of (x) ten (10) days following such request and (y) five (5) Business Days prior to the Stockholders' Meeting; (v) formally determine to recommend, endorse, adopt or approve, or publicly propose to recommend, endorse, adopt or approve, any Acquisition Proposal or any

letter of intent or agreement in principle or any Contract (other than a confidentiality agreement executed in accordance with Section 7.7) providing for, relating to or in connection with, any Acquisition Proposal; or (vi) formally determine to take any action to make the provisions of any anti-takeover Law or any restrictive provision of any applicable anti-takeover provision in Parent's Organizational Documents inapplicable to any transactions contemplated by an Acquisition Proposal ((any of the actions or events described in clauses "(i)," "(ii)", "(iii)", "(iv)", "(v)" or "(vi)" a ***Change of Recommendation***").

(d)        If prior to the receipt of the Parent Stockholder Approval, either:

(i)        Parent receives a written, bona fide Acquisition Proposal and a breach by Parent, its Affiliates or their respective Representatives of this Section 7.7 has not contributed to the making of such Acquisition Proposal, and the Board of Directors of Parent determines in good faith after consultation with outside legal and financial advisors that the proposal is a Superior

Proposal and failure to effect a Change of Recommendation would constitute, or would reasonably be likely to constitute, a breach of the fiduciary duties of the Board of Directors of Parent to Parent's stockholders under Law, or

        (ii)    other than in connection with an Acquisition Proposal, the Board of Directors of Parent determines in good faith, in response to the occurrence of a Parent Intervening Event and after consultation with outside legal and financial advisors, that the failure of the Board of Directors of Parent to effect a Change of Recommendation would constitute, or would reasonably be likely to constitute, a breach of the fiduciary duties of the Board of Directors of Parent to Parent's stockholders under Law,

then the Board of Directors of Parent may effect a Change of Recommendation (a "***Permitted Change of Recommendation***"); provided, that with respect to clause (i), (x) Parent shall have first (A) provided five (5) Business Days' prior written notice (a "***Notice of Superior Proposal***") to Buyer that it is prepared to effect a Permitted Change of Recommendation in response to a Superior Proposal, which notice shall include the terms and conditions of the Superior Proposal, copies of the agreements proposed to effect such Superior Proposal and the identity of the Person making such proposed Superior Proposal (it being understood and agreed that any amendment to the financial terms or any material amendment of any such Superior Proposal shall require a new Notice of Superior Proposal and a new five (5) Business Day period), and (B) during such five (5) Business Day period, if requested by Buyer, engage in good faith negotiations with Buyer to amend this Agreement in such a manner that any Acquisition Proposal which was determined to be a Superior Proposal would no longer constitute a Superior Proposal and (y) at the end of such five (5) Business Day period (or at such earlier time following receipt of a Notice of Superior Proposal that Buyer notifies Parent that it is not interested in pursuing further negotiations to amend this Agreement), such Acquisition Proposal has not been withdrawn and continues to constitute a Superior Proposal (taking into account any changes, which have not been withdrawn, to the terms of this Agreement proposed by Buyer following a Notice of Superior Proposal, as a result of the negotiations required by sub-clause (B) or otherwise) and (2) in the case of clause (ii), (I) Parent shall have first provided

<div align="center">47</div>

five (5) Business Days' prior written notice ("***Notice of a Proposed Change of Recommendation***") to Buyer that it is prepared to effect a Permitted Change of Recommendation in response to a Parent Intervening Event and describing such Parent Intervening Event and during such five (5) Business Day period, if required by Buyer, engage in, and cause its Representatives and Affiliates to engage in, good faith negotiations with Buyer and its Representatives to amend this Agreement and at the end of such five (5) Business Day period, the Board of Directors of Parent, after taking into account all changes, which have not been withdrawn, to the terms of this Agreement proposed by Buyer following such Notice of a Proposed Change of Recommendation, again determines in good faith that the failure to effect a Change of Recommendation would constitute, or would reasonably be likely to constitute, a breach of the fiduciary duties of the Board of Directors of Parent to Parent's stockholders under Law.

        (e)    Parent shall advise Buyer promptly (and in any event within 24 hours) of (i) any Acquisition Proposal or any Permitted Transaction Proposal or indication, inquiry, proposal or offer with respect to or that may reasonably be expected to lead to any Acquisition Proposal or any Permitted Transaction Proposal, (ii) any request for non-public information relating to Parent, any other Seller Party, any Subsidiary, the Business or the Acquired Assets and (iii) any inquiry or request for discussion or negotiation regarding an Acquisition Proposal or a Permitted Transaction Proposal, including in each case the identity of the Person making any such Acquisition Proposal, Permitted Transaction Proposal or indication, inquiry, offer or proposal, and the material terms of any such Acquisition Proposal, Permitted Transaction Proposal or indication, inquiry, offer or proposal. Parent shall keep Buyer reasonably informed on a current basis of any material changes to the terms of any such Acquisition Proposal, Permitted Transaction Proposal or indication or inquiry.

        (f)    Nothing contained in this Agreement shall prohibit Parent or the Board of Directors of Parent from (i) disclosing to Parent's stockholders a position contemplated by Rules 14d-9 and 14e-2(a) promulgated under the Exchange Act or (ii) making any disclosure to its stockholders if the Board of Directors of Parent (or a committee thereof, as applicable) has reasonably determined in good faith, after consultation with outside legal and financial advisors, that the failure to do so would constitute, or would reasonably be likely to constitute, a breach of any Law; provided, however, that (A) any disclosure of a position contemplated by Rule 14e-2(a) or Rule 14d-9 promulgated under the Exchange Act other than a "stop, look and listen", an express rejection of any applicable Acquisition Proposal or an express reaffirmation of the Parent Recommendation shall be deemed to be a Change of Recommendation and (B) neither Parent nor Parent's Board of Directors (nor any committee thereof) shall make any Change of Recommendation except in accordance with the other provisions of this Section 7.7.

https://www.sec.gov/Archives/edgar/data/1434621/000110465911029397/a11-12364_1ex2d1.htm

(g)    As used in this Agreement:

(i)    "*Acquisition Proposal*" means any proposal or offer from any Person or group other than Buyer and its Affiliates to effect:  (A) any direct or indirect acquisition or purchase, in any single transaction or series of related transactions, by any such Person or group of Persons, of any of the Acquired Assets excluding purchases or acquisitions that are not prohibited under Section 7.01(c)(iii); (B) any direct or indirect

48

acquisition or purchase by any Person or group of Persons of 15% or more of the total outstanding voting securities of Parent; (C) any tender offer or exchange offer (including through the filing with the SEC of a Schedule TO), as defined pursuant to the Exchange Act, that if consummated, would result in any Person or group beneficially owning 15% or more of the total outstanding voting securities of Parent; or (D) any merger, consolidation, business combination, recapitalization, issuance of or amendment to the terms of outstanding stock or other securities, liquidation, dissolution or other similar transaction involving Parent or any of its subsidiaries as a result of which any Person or group acting in concert, other than Parent or a subsidiary of Parent, would acquire assets or securities described in clause (A), (B) or (C) above; provided, however, that a Permitted Transaction Proposal shall not be deemed to be an Acquisition Proposal;

(ii)    "*Parent Intervening Event*" means an event or circumstance material to the Parent and its subsidiaries, taken as a whole (other than any event or circumstance resulting from a breach of this Agreement by any Seller Party), that was unknown to or the consequences of which would not be reasonably foreseeable to the Board of Directors of Parent on the date hereof, which event or circumstance becomes known to the Board of Directors of Parent prior to the Parent Stockholder Approval; provided, however, that (A) in no event shall the receipt, existence or terms of an Acquisition Proposal, or any inquiry or matter relating thereto or consequence thereof, constitute a Parent Intervening Event, (B) in no event shall events or circumstances arising from the announcement or the existence of, or any action taken by any Party pursuant to and in compliance with the terms of, this Agreement constitute a Parent Intervening Event and (C) in no event shall any increase in the market price of Parent's common stock, in and of itself, constitute a Parent Intervening Event (provided that the event or circumstance underlying such increase in the market price of Parent's common stock shall not be excluded, and may be taken into account, in determining whether there is a Parent Intervening Event);

(iii)    "*Permitted Transaction Proposal*" means any proposal from any Person or group other than Buyer and its Affiliates that would be an Acquisition Proposal (but for the proviso excluding Permitted Transactions from the definition of Acquisition Proposal) and which contemplates a transaction, or a series of transactions, (A)(w) pursuant to which Parent will merge with or into, or consolidate with, a Third Party or that will result in an acquisition of all or substantially all of the assets (including equity interests of Parent's subsidiaries but other than any Acquired Assets) or equity interests of Parent, (x) that cannot be consummated until the earlier of the Closing hereunder or the termination of this Agreement in accordance with its terms, (y) in which the negotiation, entry into and performance by Parent and its Affiliates of the agreements relating to such transaction, or series of transactions, would not materially impede or delay the consummation of the Transactions and (z) pursuant to which such Third Party unconditionally agrees to assume all post-Closing obligations of Seller Parties pursuant to this Agreement and the other Transaction Documents; or (B) (x) which would result in any direct or indirect acquisition or purchase by any Person or group of Persons of in excess of 15% but less than 50% of the outstanding voting securities of Parent, (y) in which the negotiation, entry into and performance by Parent and its Affiliates of the agreements relating to such transaction, or series of transactions, would not materially

49

impede or delay the consummation of the Transactions and (z) in which all persons who would acquire such outstanding voting securities prior to the receipt of Parent Stockholder Approval would execute a voting and support agreement in a form consistent with the forms executed in connection with this Agreement by Parent's stockholders other than Parent's Chief Executive Officer, but providing that in the event of a Change of Recommendation due to a Superior Proposal, the aggregate percentage of shares required under all voting agreements to be voted in favor of this Agreement and the Transactions shall not exceed 35% of the shares of Parent's common stock outstanding on the record date for the Stockholders' Meeting (each transaction or series of transactions described in clauses (A) or (B) above, a "*Permitted Transaction*"); and

(iv)    "*Superior Proposal*" means any unsolicited, bona fide written Acquisition Proposal (except that the reference in clause (A) thereof to "any of the Acquired Assets" shall be replaced by "50% or more of the fair market value

of the consolidated assets of Parent and its Subsidiaries, taken as a whole" and the references in clauses (B) and (C) thereof to "15%" shall be replaced by "50%") that is (A) on terms that the Board of Directors of Parent determines in good faith, after consultation with outside financial and legal advisors and consideration of all relevant factors, would, if consummated, result in a transaction that is more favorable from a financial point of view to Parent and its stockholders than the transactions contemplated by this Agreement (taking into account any binding proposal to amend the terms of this Agreement), (B) is reasonably capable of being completed on the terms set forth in the proposal within a reasonable period of time, taking into account all financial, legal, regulatory and other aspects thereof, and (C) to the extent external financing is required, includes committed financing.

(h)    During the period from the date of this Agreement through the earlier of the Closing and the date of termination of this Agreement, Parent shall not terminate, amend, modify or waive any provision of any confidentiality agreement relating to an Acquisition Proposal or standstill agreement to which Parent or any of its subsidiaries is a party (other than any involving Buyer) in a manner adverse to Buyer.  During such period, Parent shall use reasonable efforts to enforce the provisions of any such agreement, unless the Board of Directors of Parent determines in good faith, after consultation with its legal counsel, that such action would constitute, or would reasonably be likely to constitute, a breach of the fiduciary duties of the Board of Directors of Parent to Parent's stockholders under Law.  Without limiting the generality of the foregoing, Parent shall promptly request (or, to the extent contractually permitted to do so, require) the return or destruction of any confidential information previously furnished by or on behalf of Seller Parties thereunder.

7.8    Notice of Events.  Each Party shall promptly notify the other Parties of any Action that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality or validity of any of the Transactions.  Seller Parties shall, and shall cause their Affiliates to, promptly notify Buyer of (i) any Action that may be threatened, brought, asserted or commenced against Seller Parties, the Subsidiaries or the Business that would have been listed on Schedule 6.7 if such Action had arisen prior to the date hereof and (ii) any other event or matter that becomes known to any Seller Party or any Subsidiary that would, or would reasonably be expected to, cause any representation or warranty contained in ARTICLE 6 to be

50

untrue in any material respect.  No such notice shall affect any of the representations and warranties of a Party hereunder.  Seller Parties shall, and shall cause their Affiliates to, promptly notify Buyer of the occurrence of any of the events that has given or would give, with or without the passage of time or the giving of notice or both, rise to the right of Buyer to terminate this Agreement pursuant to Section 10.1(g).

7.9    Directors and Officers.  Sellers shall take all necessary action to ensure that, effective as of the Closing, the board of directors (or equivalent governing body) and officers of each Subsidiary shall consist of those individuals identified by Buyer prior to the Closing.

7.10    Escrow and Transition Services Agreements.  Each Seller Party and Buyer agrees that it will negotiate in good faith (a) a definitive Escrow Agreement in a manner consistent with, and containing the terms set forth in, Exhibit C and (b) a definitive transition services agreement in a manner consistent with, and containing the terms set forth in, Schedule 7.10(b) (the "*Transition Services Agreement*"), whereby Parent or its Affiliates will provide certain transition support to Buyer and Buyer will provide certain transition support to Seller Parties, in each case, on other such customary terms to which the Parties may agree, for execution by the applicable Seller Parties and Buyer on the Closing Date.

7.11    Owned Software.  At all times prior to the Closing, Seller Parties will make all modifications to the Owned Software necessary to reflect changes in Applicable Requirements.

7.12    Excludable Contracts.  Subject to the remaining provisions of this Section 7.12, the Parties agree that, except for purposes of Section 2.1(b), each Excludable Contract set forth on Schedule 1.1(a) shall be deemed to be an Assumed Contract hereunder.  Seller Parties shall use their reasonable efforts to obtain, as promptly as practicable following the date hereof, correct and complete copies of each Excludable Contract and shall, within 30 days following the date hereof, deliver to Buyer (a) correct and complete copies of all Excludable Contracts or (b) with respect to any Excludable Contract for which Seller Parties have been unable to obtain a correct and complete copy, a statement to such effect.  Within 30 days following such delivery by Seller Parties, Buyer shall provide to Seller Parties a list of each Excludable Contract that Buyer has determined, in its sole discretion, to be an Assumed Contract for purposes of Section 2.1(b).  On or prior to the Closing Date, the Parties shall amend subsection (b) of Schedule 2.1 to include on such Schedule each Excludable Contract identified by Buyer on such list.  For the avoidance of doubt, any Excludable Contract that is not identified by Buyer on such list shall, for all purposes of this Agreement, be deemed to be an Excluded Asset.

7.13    Compliance Certificates.  Within five (5) Business Days following the end of each calendar month (the "*Reference Month*") during the Interim Period, Parent shall deliver to Buyer a certificate, which shall be signed by the Chief Executive Officer or Chief Financial Officer of Parent, substantially in the form of Schedule 7.13 attached hereto (each a "*Compliance Certificate*"), certifying as to the matters set forth in Schedule 7.13 with respect to the applicable Reference Month.

51

# ARTICLE 8.    ADDITIONAL COVENANTS

8.1    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, at any time and from time to time after the Closing, (i) at Buyer's request and without further consideration, Seller Parties shall, and shall cause their controlled Affiliates to, execute and deliver, or cause to be executed and delivered, to Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, all of the Acquired Assets, and (ii) at any Seller's request and without further consideration, Buyer shall execute and deliver to Sellers such other instruments of transfer, assumption, guarantee and confirmation, provide such materials and information and take such other actions as any Seller may reasonably deem necessary or desirable for Buyer to assume all of the Assumed Liabilities from Seller.

(b)    Without limiting Section 8.1(a), if at any time following the Closing Date, any Party becomes aware of any asset, right, property or Contract that was (i) not included in the Acquired Assets, (ii) not an Excludable Contract, (iii) not an asset of a Seller, (iv) in the case of any Contract, not made available to Buyer, and (v) was necessary for the operation of the Business, then, at Buyer's request and without further consideration, Seller Parties shall, or shall cause an Affiliate of Seller Parties to, take such actions as are necessary to assign, transfer,  convey and deliver to Buyer such asset, right, property or Contract, free and clear of any Encumbrances, other than Permitted Encumbrances.

8.2    Confidentiality.

(a)    Seller Parties shall, and shall cause each of their respective Affiliates to, hold all of the Confidential Information of the Business, the Acquired Assets or the Subsidiaries in the strictest confidence, refrain from using any of such Confidential Information and deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of such Confidential Information that are in the possession of any Seller or any of their respective Affiliates; provided, however, that Seller Parties may retain such Confidential Information to the extent necessary for, and solely for the purpose of, compliance with their obligations under the Investor Agreements and Warehousing Agreements or Law.  If any Seller Party or any of their respective Affiliates is ever requested or required to disclose any such Confidential Information of the Business, the Acquired Assets or the Subsidiaries, then, to the extent not prohibited by Law, Seller Parties shall notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with this Section 8.2.  If, in the absence of a protective order or the receipt of a waiver hereunder, such Person is compelled to disclose any such Confidential Information to any Governmental Authority, then such Person may disclose such Confidential Information (and only such portion of such Confidential Information as is required to be disclosed) to the Governmental Authority; provided, however, that such Person will use its reasonable efforts to obtain, at the request of Buyer, an order or other assurance (as Buyer may designate) that confidential treatment will be given to such portion of such Confidential Information required to be disclosed.  Notwithstanding anything to the contrary herein, nothing herein shall prohibit the ability of a Party or any Affiliate thereof from making disclosures, that such Person is advised by outside legal counsel are required to be disclosed pursuant to Law or the rules or regulations of securities exchanges; provided, however, that prior to making any such disclosure, such Party shall use reasonable best efforts to notify each other Party hereto of such disclosure, provide the

52

other Parties with a reasonable opportunity to review and comment on such disclosure and consider, in good faith, all comments made by such other Parties with respect thereto.  Notwithstanding the foregoing, Seller Parties shall be permitted to disclose Confidential Information relating to the Transactions to any Person owning in excess of five percent (5%) of the outstanding common stock of Parent who has executed a valid and binding confidentiality agreement in form and substance reasonably acceptable to Buyer.

(b)     Seller Parties shall, and shall cause each of their respective Affiliates to, maintain the confidentiality of any Confidential Information of Discover Financial Services and its Affiliates disclosed, furnished or made available to Parent and its Affiliates pursuant to the Confidentiality Agreement using procedures no less rigorous than those used to protect and preserve the confidentiality of their own similar proprietary information.  In no event shall any Seller Party or any of their respective Affiliates use less than a reasonable degree of care to protect and preserve the Confidential Information of Discover Financial Services, including an obligation to not, without Buyer's prior written permission: (i) transfer or disclose any of Discover Financial Services' Confidential Information to any Third Party; (ii) use any of Discover Financial Services' Confidential Information for any purpose other than in furtherance of the Transactions; or (iii) take any other action with respect to Discover Financial Services' Confidential Information inconsistent with the confidential and proprietary nature of such information.  Notwithstanding clause (i) of this Section 8.2(b), Seller Parties and their respective Affiliates may disclose Discover Financial Services' Confidential Information (A) to a Seller Party's Representatives who have a need to know such Confidential Information solely in furtherance of Transactions; provided, however, that if Discover Financial Services' Confidential Information is so disclosed, such Seller Party shall (x) cause its Representatives to comply with this Section 8.2(b) and (y) assume full responsibility for any breach of this Section 8.2(b) caused by any such Representatives and (B) to any Seller Party's or any of their respective Affiliates' federal and state governmental regulators, federal and state governmental examiners, federal and state governmental auditors and their respective Representatives.  If any Seller Party, any of their Affiliates or any of their Representatives is requested or required to disclose any of Discover Financial Services' Confidential Information pursuant to a subpoena, court order, statute, law, rule, regulation, or other similar requirement, Parent shall, if lawfully permitted to do so, provide prompt notice of such request or requirement to Buyer so that Discover Financial Services may seek an appropriate protective order or other appropriate remedy or waive compliance with this Section 8.2(b).  If no such protective order or remedy is obtained, and such Person is, upon the advice of its counsel, compelled to disclose Discover Financial Services' Confidential Information under pain of liability for contempt of court or other censure or Liability, or if Buyer waives compliance with this Section 8.2(b) in writing, such Person may disclose, without Liability, such Confidential Information in accordance with, but solely to the extent necessary, upon the advice of counsel, to comply with such request or requirement.

8.3     Non-Competition; Non-Solicitation.

(a)     In furtherance of the sale of the Acquired Assets and the Business to Buyer hereunder and more effectively to protect the value and goodwill of the Acquired Assets and the Business so sold, during the Restricted Period, except as expressly permitted by Section 8.6(b), Seller Parties, jointly and severally, agree that they will not, and will cause their

53

controlled Affiliates not to, either directly or indirectly in conjunction with or through any other Person, including any of their controlled Affiliates, establish, take any steps to establish, own, manage, operate, control, invest in or otherwise engage in the business of origination, funding or sale of mortgages (collectively, the "**Competing Business**") within the United States.  Notwithstanding anything herein to the contrary, (i) nothing in this Agreement shall prevent, hinder or constrain the operation of the Excluded Business, (ii) the ownership by Parent or any of its Affiliates of not more than five percent (5%) in the aggregate of any class of equity security of any publicly held corporation shall not, of itself, constitute a violation of this Section 8.3 and (iii) the obligations under this Section 8.3 shall not bind any Permitted Section 8.3 Acquirer who acquires Parent in the future in connection with a Permitted Section 8.3 Transaction.  For purposes of this Agreement:  (x) "**Permitted Section 8.3 Transaction**" means (I) any direct or indirect acquisition or purchase by any Permitted Section 8.3 Acquirer of 50% or more of the total outstanding voting securities of Parent, (II) any tender offer or exchange offer (including through the filing with the SEC of a Schedule TO), as defined pursuant to the Exchange Act, that, upon consummation, results in any Permitted Section 8.3 Acquirer beneficially owning 50% or more of Parent's common stock or (III) any merger, consolidation, business combination, recapitalization, issuance of or amendment to the terms of outstanding stock or other securities, liquidation, dissolution or other similar transaction involving Parent or any of its subsidiaries as a result of which any Permitted Section 8.3 Acquirer would acquire securities described in sub-clause (I) or (II) above; and (y) "**Permitted Section 8.3 Acquirer**" means any Third Party that (I) if a Permitted Section 8.3 Transaction is entered into or consummated on or prior to the first anniversary of the Closing Date, derives less than twenty-five percent (25%) of its consolidated revenue from a Competing Business and (II) if a Permitted Section 8.3 Transaction is entered into or consummated after the first anniversary of the Closing Date, derives less than fifty percent (50%) of its consolidated revenue from a Competing Business.

(b)     During the Restricted Period, Seller Parties, jointly and severally, agree that they will not, and will cause their controlled Affiliates not to, either individually or indirectly in conjunction with or through any other Person, (i) to the extent not prohibited by Law, hire, employ or otherwise engage the services of any Hired Employee or (ii) induce, solicit, recruit or encourage any Hired Employee to leave the employ of Buyer or any of its Affiliates (as applicable) or violate the terms of his or her contract or any other employment arrangement with Buyer or any of its Affiliates; provided, that a general solicitation not targeted at Buyer's employees shall not be deemed a breach of clause (ii) of this Section 8.3(b).

(c)　　The Seller Parties acknowledge that (i) the temporal, geographic and scope of activity restrictions in this Section 8.3 are reasonable and appropriate because, among other things, the Parties are engaged in a highly competitive industry, (ii) Seller Parties and their controlled Affiliates have unique access to the trade secrets, know-how and other proprietary information relating to the Business (including the competitive strategic plans with respect to the Business), (iii) this Section 8.3 provides no more protection than is necessary to protect Buyer's interest in the goodwill, trade secrets and Confidential Information of the Acquired Assets and the Business and (iv) Sellers are receiving significant consideration in connection with the Transactions.  The Parties agree that the damages that will accrue to Buyer by reason of any Seller's or any of their respective Affiliates' failure to observe any of their respective obligations under this Section 8.3 may not be measured solely in money and that,

<center>54</center>

notwithstanding Section 12.9, if any Seller or any of their respective Affiliates violates any of its obligations under this Section 8.3, Buyer may be entitled to seek injunctive relief in connection with any such violation, in addition to any other remedies that Buyer may have.  Without limiting Section 12.9, it is the intent and understanding of each Party that if, in any Action before any court or other Governmental Authority legally empowered to enforce this Section 8.3, any term, restrictions, covenant or promise in this Section 8.3 is found to be unreasonable and for that reason unenforceable, then such term, restriction, covenant or promise shall be deemed modified to the extent necessary to make it enforceable by such court or other Governmental Authority.

8.4　　Taxes.

(a)　　Seller Parties will be liable for, will pay, and pursuant to ARTICLE 11 will jointly and severally indemnify and hold harmless Buyer Indemnified Persons and will reimburse Buyer Indemnified Persons for any Losses, arising from or in connection with: (i) all Taxes imposed on any Seller Party or any Subsidiary, or for which any Seller Party or any Subsidiary may otherwise be liable, as a result of having been a member of a Tax Group (including Taxes for which any Seller Party or any Subsidiary may be liable pursuant to Treasury Regulation § 1.1502-6 or any similar provision of state, local or foreign law as a result of having been a member of a Tax Group and any Taxes resulting from any Seller Party or any Subsidiary ceasing to be a member of any Tax Group); and (ii) all Taxes (whether assessed or unassessed) applicable to the Business, the Acquired Assets, the Assumed Liabilities or any Subsidiary, in each case attributable to any taxable year or period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

(b)　　Except as otherwise agreed to by the parties and as provided in the next sentence, whenever it is necessary to determine the liability for Taxes for a Straddle Period, the determination of the Taxes for the portion of the year or period ending on, and the portion of the year or period beginning after the Closing Date shall be determined by assuming that the taxable year or period ended at the close of the Closing Date.  With respect to any Straddle Period, HLC Inc. shall be liable for and pay any real, personal and intangible ad valorem Taxes ("***Property Taxes***") equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on or prior to the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and Buyer shall be liable for and pay any other Property Taxes.

(c)　　Buyer and Sellers shall cooperate in preparing, executing and filing sales, use, real estate, transfer and similar Tax Returns relating to the purchase and sale of the Assets, and also shall cooperate to minimize or avoid any transfer Taxes that might be imposed to the extent permitted by Law (such as, for example and not by way of limitation, Buyer providing Sellers with a copy of Buyer's resale certificate, or such other instruments as will relieve Buyer or any Seller from liability for any transfer Tax).  Buyer and Sellers shall each pay one half of all such transfer Taxes incurred in connection with the purchase and sale of the Acquired Assets.

<center>55</center>

(d)　　Seller Parties, on the one hand, and Buyer, on the other hand, will provide reimbursement for any Tax paid by one Party all or a portion of which is the responsibility of any other Party in accordance with the terms of this Section 8.4.  Within a reasonable time prior to the payment of any said Tax, the Party paying such Tax will give notice to the other Party of the Tax payable and the portion which is the Liability of each Party, although failure to do so will not relieve the other Party from its Liability hereunder.

(e)　　HLC Inc. and Buyer shall make, or cause to be made, a joint election for HLC Settlement under Section 338(h)(10) of the Code and under any applicable similar provisions of state law with respect to the purchase of the equity interests in

HLC Settlement (all such elections being referred to collectively as a "***Section 338(h)(10) Election***") and at Closing HLC Inc. and Buyer shall execute three (3) copies of Internal Revenue Service Form 8023 and any similar state forms. Buyer and Sellers shall cooperate fully in making the Section 338(h)(10) Election, including filing and executing such additional forms, returns, elections, schedules and other documents required to effect and preserve timely elections in accordance with Treasury Regulation Section 1.338(h)(10)-1 (or any comparable provisions of state, local or foreign Tax law) or any successor provisions.

(f)        After the Closing Date, each Seller Party and Buyer shall:

(i)        Make available to the other Parties and to any Taxing authority as reasonably requested all relevant information, records, and documents relating to Taxes with respect to the Acquired Assets or income therefrom, the Liabilities or payments in respect thereof;

(ii)        Provide timely notice to the other in writing of any pending or proposed Tax audits (with copies of all relevant correspondence received from any taxing authority in connection with any Tax audit or information request) or Tax assessments with respect to the Assets or income therefrom, the Liabilities or payments in respect thereof, for taxable periods for which the other may have a liability under this Section 8.4; and

(iii)        The Party requesting assistance or cooperation shall bear any other Party's reasonable out-of-pocket expenses in complying with such request to the extent that those expenses are attributable to fees and other costs of unaffiliated third party service providers.

(g)        For the avoidance of doubt, the limitations contained in Sections 11.2(b)(i), (ii), (iii), (iv) and (v) shall not apply to any claims made pursuant to this Section 8.4. The obligations under Section 8.4(a) are not subject to the limitations and qualifications contained in Section 11.1(a), and shall survive the Closing Date until the sixtieth (60th) day after the expiration of the applicable statute of limitations.

8.5        Employees; Employee Benefit Plans.

(a)        Buyer and its Affiliates shall have the right, but not the obligation, in Buyer's sole and absolute discretion to make offers of employment at any time to any Business Employee. During the Interim Period, and without limiting Section 7.2 hereof in any way, Seller Parties shall, and shall cause their Affiliates to, provide Buyer and its Affiliates with

56

reasonable access to those facilities and personnel records, to the extent not prohibited by Law, in order to permit them to consider for employment, and to conduct employment interviews with, any of the Business Employees, and shall permit Buyer and its Affiliates to conduct employment interviews with any of the Business Employees on terms reasonably acceptable to Seller Parties and Buyer during the Interim Period, regarding prospective employment with Buyer or its Affiliates after the Closing.

(b)        An offer of employment from Buyer or one of its Affiliates to any Business Employee (i) shall not constitute any Contract (expressed or implied) on the part of Buyer or its Affiliates to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Buyer may (in its sole discretion) establish pursuant to individual offers of employment, and (ii) is "at will." Nothing in this Agreement will be deemed to prevent or restrict in any way the right of Buyer or its Affiliates to terminate, reassign, promote or demote any of the Hired Employees at any time or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees unless otherwise provided in any employment agreement entered into between Buyer or one of its Affiliates and a Hired Employee. "***Hired Employees***" means those Business Employees who (A) are employed by either Subsidiary as of the Closing Date and with respect to whom Buyer or one of its Affiliates has not given written notice to any Seller Party or any of their Affiliates prior to the Closing Date that the employment of such individual should not be continued as of or after the Closing Date (the "***Acquired Subsidiary Employees***") or (B) timely accept written offers of employment with Buyer or one of its Affiliates in accordance with the terms of such offers and who actually perform services for, and become employees, of Buyer or one of its Affiliates following the effective termination date of such individual's employment with any Seller Party or any of their Affiliates (as applicable). Seller Parties shall, and shall cause their Affiliates to, (w) use commercially reasonable efforts to cooperate with and assist Buyer and its Affiliates in their efforts to hire any Business Employees to whom they may make (or may seek to make) offers of employment, subject to the terms of this Agreement, (x) not engage in any conduct, either individually or indirectly in conjunction with or through any other Person, that could reasonably be expected to dissuade or prevent any Business Employee from accepting, or that could reasonably be expected to affect any Business Employee's ability to accept, any offer of employment or engagement made by Buyer or one of its Affiliates, (y) accept the resignation or terminate the employment of each Hired Employee

(other than an Acquired Subsidiary Employee) effective as of the Closing Date and (z) take all necessary action to ensure that, effective as of the Closing Date, the only employees of the Subsidiaries are the Acquired Subsidiary Employees.

(c)    During the Interim Period, Seller Parties shall, and shall cause their Affiliates to, (i) provide written notice to Buyer of any oral or written notice of resignation from employment of any Key Person that any Seller Party or any of their Affiliates receives, within three (3) Business Days after receiving such resignation notice; and (ii) in the event that any Seller Party or any of their Affiliates seeks to terminate or to request the resignation from employment of any Key Person, (A) provide advance written notice to Buyer stating the name, job title and a reasonably detailed description of such Key Person's duties and the reasons for such termination or resignation, with such notice to be provided to Buyer at least three (3) Business Days prior to any Seller Party or any of their Affiliates delivering to such Key Person

57

any such oral or written notice or request; and (B) without limiting or otherwise affecting any other obligation of any Seller Party under this Agreement, reasonably cooperate with Buyer and its Affiliates as set forth in Section 8.5(b) if any of them is considering making any offer of employment or other engagement to such Key Person.

(d)    Unless authorized in writing in advance by Buyer, Seller Parties shall not, and shall cause their Affiliates not to, take any action, directly or indirectly (through any Third Party or otherwise), that could reasonably be expected to prevent any Hired Employee (or any Business Employee who has received a written offer of employment from Buyer or one of its Affiliates (that has not expired per its terms or been rejected or withdrawn) or who otherwise reasonably could be eligible to become a Hired Employee) from soliciting or originating loans or other related products for or on behalf of Buyer or any of its Affiliates.  Seller Parties shall not, and shall cause their Affiliates not to, take any action, directly or indirectly, to seek to enforce or threaten to take any action of any kind, and hereby waive (on behalf of themselves and each of their Affiliates) any and all rights to enforce, (i) against Buyer or any of its Affiliates, or any Hired Employee, any confidentiality, non-competition, non-solicitation or other similar obligation with respect to the Business (but not, for the avoidance of doubt, with respect to the Excluded Business) that any Hired Employee has, has had or may have had to any Seller Party or any of their Affiliates under any written agreement, Law or otherwise, and (ii) against any of Buyer, any of its Affiliates, any Key Person or any other Business Employee with respect to any conduct by any of them (and in the case of a Key Person or Business Employee, as may be authorized by Buyer or any of its Affiliates) to solicit or encourage any Business Employee to make, consider or accept an offer of employment or other engagement from Buyer or one of its Affiliates.

(e)    The employment of each Acquired Subsidiary Employee shall be automatically continued on the Closing Date.

(f)    After the Closing Date, Seller Parties shall be responsible for providing continuation coverage under their respective group health plan(s) to any "M&A qualified beneficiary" that experiences a "qualifying event" prior to or in connection with the Transactions contemplated by this Agreement in accordance with Part 6 of Title I of ERISA (and any comparable state law). For purposes of this Section 8.5, the terms "M&A qualified beneficiary" and "qualifying event" shall have the same meanings ascribed to such terms under Treasury Regulations §54.4980B-9, Q&A-4 and §54.4980B-4, Q&A-1, respectively.

(g)    Seller Parties shall, and shall cause their Affiliates to, pay prior to or at the Closing to each Hired Employee (it being agreed that Buyer shall have no Liability or other responsibility therefor), any payments due to such employees, including, to the extent required by Applicable Requirements:  (i) all paid time off, sick time or vacation time that has accrued through the applicable termination date, (ii) all wages, commissions and other remuneration due to Hired Employees (including pursuant to any Applicable Requirement, and in connection with or due with respect to any Mortgage Loan,) with respect to their services as employees of Seller Parties through the applicable termination date, which may include pro rata bonus payments and payments from Seller Benefit Plans as if all benefits were fully vested and due, (iii) all severance payments due to the Hired Employees or other Liability which arises from the termination of the Hired Employees and (iv) any other payments due to a Hired Employee as

58

required under any other Law relating to, resulting from or arising out of such Hired Employee's employment with any Seller Party or any of their Affiliates.

https://www.sec.gov/Archives/edgar/data/1434621/000110465911029397/a11-12364_1ex2d1.htm

(h)	Seller Parties shall, and shall cause their Affiliates to, take all actions as may be necessary prior to the Closing to either (i) terminate the Real Estate Title Services, LLC 401(k) Plan (the "*RETS 401(k) Plan*") and all Seller Benefit Plans that are sponsored by a Subsidiary or (ii) transfer sponsorship of the RETS 401(k) Plan and all other Seller Benefit Plans that are sponsored by a Subsidiary to any Seller Party or any of their Affiliates, other than the Subsidiaries.

(i)	As soon as administratively practicable following the Closing, Buyer shall provide the Hired Employees with benefits (including retirement and welfare benefits) under Buyer's benefit plans (the "*Buyer's Plans*"), which, when considered as a package with the compensation provided by Buyer to the Hired Employees, shall be comparable in the aggregate to either (i) the compensation and benefits package provided to similarly situated employees of Buyer and its Affiliates or (ii) the compensation and benefits package provided to the Hired Employees immediately prior to the Closing.  For purposes of comparing of the compensation and benefits package provided to the Hired Employees by Buyer following the Closing and as in effect immediately prior to the Closing, equity compensation paid by Seller Parties shall be excluded.  For purposes of the foregoing, Buyer shall treat the prior service of the Hired Employees with any Seller Party or any of their Affiliates, but in any case, only to the extent that such service was recognized for the purpose of the Seller Benefit Plans immediately following the closing of the SurePoint Purchase Agreement, as service rendered to Buyer or its Affiliates, as the case may be, for all comparable employment and employee benefits-related purposes, including for purposes of eligibility, participation, years of seniority, and vesting, under the Buyer's Plans in which the Hired Employees are covered after the Closing, except that the foregoing shall not apply (i) with respect to benefit accruals under any defined benefit plans or (ii) for purposes of determining whether a Hired Employee is eligible for subsidized retiree medical benefits.

(j)	If Buyer intends to terminate any Hired Employees within the 60-day period following the Closing, then Buyer shall make or shall cause its Affiliates to make any filings and shall deliver any notices required under the WARN Act in connection with the proposed termination of employment, and no Seller Party shall have any Liability under the WARN Act with respect to any such Hired Employee terminated by Buyer or one of its Affiliates.  Buyer or one of its Affiliates shall be solely responsible for any Liability that may accrue under the WARN Act or otherwise to any Hired Employee as a result of any improper or untimely notice required under the WARN Act for "employment loss" that occurs after the Closing Date as a result of the termination of such Hired Employee's employment with Buyer or one of its Affiliates.

(k)	Without limiting the generality of <u>Section 12.7</u>, nothing herein, express or implied, is intended to, and or shall be construed to, confer or create with respect to any Third Party (including, for the avoidance of doubt, any current or former Business Employee or other employee of any Seller Party or any of their Affiliates) any legal or equitable or other rights or remedies under or by reason of any provision in this Agreement, including any third-party beneficiary rights of any kind or nature, and further including any rights of any Business

<center>59</center>

Employee, Hired Employee or other individual to seek to enforce any right to compensation, benefits, or any other right or privilege of employment with Buyer or any of its Affiliates.  Nothing in this <u>Section 8.5</u> shall amend, or be deemed to amend (or prevent the amendment or termination of) any compensation or benefit plan of Buyer or any of its Affiliates.

(l)	From and after the Closing, to the extent requested by Buyer or one of its Affiliates, Seller Parties shall, and shall cause their Affiliates to, execute and deliver to Buyer or one of its Affiliates such documents or instruments as Buyer or one of its Affiliates may reasonably request in order to effectively transfer and assign to Buyer or one of its Affiliates, to the extent assignable in accordance with Law, all rights of Seller Parties and their Affiliates under any non-solicitation, non-competition and confidentiality agreement entered into between any Seller Party or any of their Affiliates, on the one hand, and any Hired Employee, on the other hand; <u>provided</u>, <u>however</u>, that such transfer or assignment shall be solely to the extent that such non-solicitation, non-competition or confidentiality agreement is with respect to the Business; it being understood and agreed that Seller Parties shall continue to have all rights to enforce any non-solicitation, non-competition and confidentiality agreement to protect the Excluded Business.

(m)	For any Hired Employee that is a loan officer, Buyer shall pay commission to such Hired Employee in accordance with Buyer's policies, as may be in effect from time to time.

8.6	<u>Seller Parties' Operations After Closing</u>.

(a)	Seller Parties shall, and shall cause their Affiliates to, timely satisfy the Excluded Liabilities in full as and when such Excluded Liabilities are due from the applicable Seller Party or its Affiliate unless being disputed by any Seller Party in good faith.

(b)     Sellers shall not, and shall cause their Affiliates not to, engage in the Competing Business after the Closing Date and during the Restricted Period except to (i) liquidate any such Seller's loans held for sale or real estate owned properties, (ii) repay such Seller's warehouse lines of credit and (iii) exercise any creditors' rights (the actions in clauses (i), (ii) and (iii) collectively, the "***Wind Down***"); provided, however, that the Wind Down shall be completed no later than 12 months following the Closing Date or such longer time as is necessary for any Seller to complete any actions permitted under this Section 8.6(b).

(c)     From and after the Closing, (i) no Seller shall use the name "Home Loan Center, Inc." or any variant thereof as part of its name or business or in any other respect except in connection with the Wind Down (including as reasonably necessary for completion of pending foreclosure proceedings), and (ii) Sellers may not sell, assign, license or transfer such names or any variant thereof or any associated trademarks.  At or after the Closing, HLC Inc. shall take all such action as Buyer may reasonably request to transfer the name "Home Loan Center, Inc." or any variant thereof to Buyer.  Within 180 days following Closing, HLC Inc. shall file with the Secretary of State of California and with each state where it is qualified to do business, a separate Certificate of Amendment (or equivalent document under Law) to remove the name "Home Loan Center, Inc." from its name, which Certificate of Amendment (or equivalent document) shall be in form and substance reasonably acceptable to Buyer.

<div align="center">60</div>

(d)     Sellers shall use reasonable efforts to relinquish all of their Licenses with respect to the Business as soon as practicable after the Wind Down, but in no event later than 12 months after the Closing Date, except for those Licenses necessary to maintain any Seller's corporate existence and those Licenses that Buyer otherwise consents to in writing.

(e)     HLC Inc. shall, and Parent shall cause HLC Inc. to, maintain its corporate existence for a period of at least eighteen (18) months following the Closing Date; provided, however, that any dissolution of HLC Inc. after such date shall not affect any of the obligations of Seller Parties hereunder, including under ARTICLE 11.

8.7     New Mortgage Loan Applications; Seller Pipeline Loans.

(a)     Each Seller Pipeline Loan shall be re-processed and re-underwritten by Buyer in accordance with Law.

(b)     The Parties will cooperate with each other to provide any notices, and to obtain any consents, as may be necessary under Law (including the provisions of the Gramm-Leach-Bliley Act of 1999 relating to the confidentiality of non-public information of a loan applicant and the Fair Credit Reporting Act ("***FCRA***") relating to the sharing or transfer of information of a loan applicant contained in a consumer report, as that term is defined under FCRA) in order to transfer and assign the Seller Pipeline Loans, the Loan Files and existing appraisals in respect of Seller Pipeline Loans to Buyer in the manner contemplated by this Agreement and in accordance with the then existing polices and procedures of Buyer related thereto and Law.

(c)     Sellers shall deliver to Buyer at Buyer's request from time to time, any reports under the Home Mortgage Disclosure Act and any underlying data with respect thereto (so long as permitted under Law), to the extent that Buyer deems such information necessary to permit it to comply with the Home Mortgage Disclosure Act with respect to the Business.  Such information shall be delivered as soon as reasonably practicable, but in any event within twenty (20) days of the later of the filing thereof or the Closing Date.

(d)     Buyer and Sellers shall notify each applicant under the Seller Pipeline Loans of the transfer and assignment of the Seller Pipeline Loans in accordance with Laws.  With respect to any potential Seller Pipeline Loan that has had closing documents sent to the borrower, Sellers shall close and fund each such mortgage loan prior to the Closing Date (taking into account any rescission period required by Law).  No Seller shall schedule a closing with respect to any Seller Pipeline Loan during the three (3) Business Days immediately following the Closing Date without the prior written consent of Buyer, which consent shall not be unreasonably withheld.  As promptly as reasonably practicable after the Closing Date or at such other times as may be required by Law, Buyer and Sellers shall jointly notify the appropriate casualty and title insurance companies and agents, escrow companies, credit reporting agencies, appraisers and other service providers that the Seller Pipeline Loans have been transferred, and instruct such entities to deliver all payments, notices, insurance statements and reports to Buyer after the Closing Date.

<div align="center">61</div>

8.8     Nonassignable Assets.  Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to assign any Acquired Asset, including any Assumed Contract, Assumed Office Lease or other certificate,

approval, authorization or other right included in the Acquired Assets, which by its terms or by Law is not assignable without consent (Acquired Assets that cannot be assigned due to lack of consent, "**Nonassignable Assets**") unless and until such consent has been obtained. Sellers shall, and shall cause their Affiliates to, use its reasonable efforts to obtain at the earliest practical date all consents required to consummate the Transactions. To the extent permitted by Law, in the event consents cannot be obtained, such Nonassignable Assets shall be held, as of and from the Closing Date, by any Seller or the applicable Affiliate of Sellers in trust for Buyer and the covenants and obligations thereunder shall be performed by Buyer in such Seller's or such Affiliate's name and all benefits and obligations existing thereunder shall be for Buyer's account. Each Seller or the applicable Affiliate of Sellers shall take or cause to be taken such actions in its name or otherwise as Buyer may reasonably request so as to provide Buyer with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and each Seller or the applicable Affiliate of Sellers shall promptly pay over to Buyer all money or other consideration received by it after the Closing Date in respect of all Nonassignable Assets. As of and from the Closing Date, each Seller, on behalf of itself and its Affiliates, authorizes Buyer, to the extent permitted by Law and the terms of the Nonassignable Assets, at Buyer's expense, to perform all of the obligations and receive all of the benefits of such Seller or its Affiliates under the Nonassignable Assets.

## ARTICLE 9.    CLOSING CONDITIONS

9.1    <u>Conditions Precedent to Obligations of Buyer</u>.  Buyer's obligation to consummate the purchase of the Acquired Assets and the other transactions contemplated to occur in connection with the Closing are subject to the satisfaction of each condition precedent listed below (any or all of which may be waived by Buyer in whole or in part to the extent permitted by Law).

(a)    <u>Accuracy of Representations and Warranties</u>.  Except as would not have, singly or in the aggregate, a Material Adverse Effect, each representation and warranty set forth in <u>ARTICLE 6</u> (disregarding all materiality or "Material Adverse Change (or Effect)" qualifications set forth therein) shall be true and correct as of the date of this Agreement and through and as of the Closing as though made at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date).

(b)    <u>Compliance with Obligations</u>.  Each Seller Party must have performed and complied in all material respects with all of its covenants to be performed or complied with at or prior to Closing.  Sellers must have delivered all items set forth in <u>Section 4.2(a)</u>.

(c)    <u>No Material Adverse Change</u>.  Since the date hereof, there must not have been a Material Adverse Change.

(d)    <u>Consents</u>.  Each consent identified in <u>Schedule 9.1(d)</u> shall have been obtained in a form reasonably acceptable to Buyer and shall be in full force and effect;

<div align="center">62</div>

---

(e)    <u>Licenses</u>.  Each License identified in <u>Schedule 9.1(e)</u> shall have been obtained in a form reasonably acceptable to Buyer and shall be in full force and effect.

(f)    <u>Release of Encumbrances</u>.  Sellers shall have delivered evidence that there are no Encumbrances (other than Permitted Encumbrances) on the Acquired Assets (in form and substance reasonably satisfactory to Buyer).

(g)    <u>Certificate of Parent</u>.  Parent shall have delivered to Buyer a certificate, which shall be signed by an officer of Parent, certifying that the conditions set forth in <u>Sections 9.1(a)</u>, <u>(b)</u> and <u>(c)</u> have been satisfied.

(h)    <u>No Adverse Litigation or Order</u>.  There must not be any pending or threatened Action by or before any Governmental Authority, arbitrator, or mediator which questions the validity of, or seeks to restrain, prohibit, invalidate, or collect material damages arising out of, the Transactions.  There must not be issued and in effect any Law directly or indirectly restraining or prohibiting the Transactions or imposing any material conditions or limitations on the ability of Buyer to exercise its full rights under this Agreement.

(i)    <u>Parent Stockholder Approval</u>.  The Parent Stockholder Approval shall have been obtained.

(j)    <u>Marketing Consulting Services Agreement</u>.  (i) Parent shall not be in breach of the Marketing Consulting Services Agreement such that Buyer could, with notice or the passing of time, terminate the Marketing Consulting Services Agreement pursuant to Sections 8.02(b) — (d) thereof, and (ii) unless terminated by Buyer pursuant to Section 8.02(a) or by Parent due to a breach by Buyer, the Marketing Consulting Services Agreement shall be in full force and effect.

(k)    <u>Hired Employees</u>.  Each of the hiring benchmarks set forth on <u>Schedule 9.1(k)</u> hereto with respect to Business Employees who are offered employment by Buyer or one of its Affiliates prior to Closing shall have been satisfied, including timely acceptance by the relevant Business Employee of his or her written offer of employment with Buyer or one of its Affiliates and successful satisfaction by each such Business Employee of any and all standard preconditions of the offer of employment made to such Business Employee by Buyer or one of its Affiliates.

(l)    <u>Legal Opinion</u>.  Parent shall have delivered to Buyer a legal opinion, dated as of the Closing Date, as to the matters set forth on <u>Schedule 9.1(l)</u>.

(m)    <u>New Investor Arrangements</u>.  Buyer shall have received at least (i) two Bona Fide Proposals from two Tier 1 Investors and (ii) one Bona Fide Proposal from a Tier 2 Investor.

(n)    <u>Directors and Officers</u>.  Sellers shall have taken all necessary action to ensure that, effective as of the Closing, the board of directors (or equivalent governing body) and officers of each Subsidiary shall consist of those individuals identified by Buyer prior to the Closing.

<div align="center">63</div>

(o)    <u>Elapse of Time</u>.  At least 90 days shall have elapsed since the date of this Agreement.

(p)    <u>Compliance Certificate</u>.  Parent shall have delivered to Buyer a Compliance Certificate certifying as to the portion of the month in which the Closing has occurred, and each of the ratios and other metrics set forth in such Compliance Certificate shall satisfy the required ratio or other metric set forth on <u>Schedule 7.13</u> (pro rated, as applicable, based on the number of days elapsed in the month in which the Closing occurs).

9.2    <u>Conditions Precedent to Obligations of Seller Parties</u>.  Seller Parties' obligations to consummate the sale of the Acquired Assets and the other transactions contemplated to occur in connection with the Closing are subject to the satisfaction of each condition precedent listed below (any or all of which may be waived by Parent, in whole or in part to the extent permitted by Law).

(a)    <u>Accuracy of Representations and Warranties</u>.  Except as would not have, singly or in the aggregate, a material adverse effect on the ability of Buyer to consummate the Transactions, each representation and warranty set forth in <u>ARTICLE 5</u> shall be true and correct as of the date of this Agreement and through and as of the Closing as though made at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct, on and as of such earlier date).

(b)    <u>Compliance with Obligations</u>.  Buyer must have performed and complied in all material respects with all of its covenants to be performed or complied with at or prior to Closing.  Buyer must have delivered all items set forth in <u>Section 4.2(b)</u>.

(c)    <u>Certificate of Buyer</u>.  Buyer shall have delivered to Sellers a certificate, which shall be signed by an officer of Buyer, certifying that the conditions set forth in <u>Sections 9.2(a)</u> and <u>(b)</u> have been satisfied.

(d)    <u>No Adverse Litigation or Order</u>.  There must not be any pending or threatened Action by or before any Governmental Authority, arbitrator, or mediator which questions the validity of, or seeks to restrain, prohibit, invalidate, or collect damages arising out of, the Transactions.  There must not be issued and in effect any Law directly or indirectly restraining or prohibiting the Transactions or imposing any material conditions or limitations on the ability of Sellers to exercise their full rights under this Agreement.

(e)    <u>Parent Stockholder Approval</u>.  The Parent Stockholder Approval shall have been obtained.

(f)    <u>Marketing Consulting Services Agreement</u>.  Buyer shall not have elected to terminate the Marketing Consulting Services Agreement pursuant to Section 8.02(a) or be in breach of the Marketing Consulting Services Agreement such that Parent could, with notice or the passing of time, terminate the Marketing Consulting Services Agreement.

<div align="center">64</div>

**ARTICLE 10.**      **TERMINATION**

10.1   <u>Termination of Agreement</u>. The Parties may terminate this Agreement as provided below:

(a)      Buyer and Parent may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)      Subject to the final sentence of this <u>Section 10.1(b)</u>, either Buyer or Parent may terminate this Agreement upon delivery of notice to the other if the Closing has not occurred by the date that is 150 days from the date of this Agreement (the "***Initial End Date***"); <u>provided</u>, <u>however</u>, that if on the Initial End Date either the FDIC Approval or the Parent Stockholder Approval has not been obtained, then either Buyer or Parent may (by notice delivered to the other on or prior to the Initial End Date) extend the Initial End Date to the date that is 180 days from the *date of this Agreement* (the latest date to which the Initial End Date may be extended as set forth in this <u>Section 10.1(b)</u>, the "***End Date***", it being understood that the Initial End Date may also be the End Date if no extensions are made); <u>provided</u>, <u>further</u>, that either Buyer or Parent may terminate this Agreement upon delivery of notice to the other if the Closing has not occurred by any End Date. For the avoidance of doubt, the Initial End Date is extended pursuant to the foregoing proviso, clause (i) below shall not apply.

(i)      If on the Initial End Date Buyer has not received the Bona Fide Proposals required under <u>Section 9.1(m)</u>, then Buyer may (by notice delivered to Parent on or prior to the Initial End Date) extend the Initial End Date to the date that is 180 days after the date of this Agreement; <u>provided</u>, that concurrently with such extension, Buyer shall pay to HLC Inc., by wire transfer of immediately available funds, $2,500,000, which amount shall be credited towards (x) the Closing Payment if the Closing occurs or (y) in the event that the Closing does not occur, the liquidated damages (if any) due to Seller Parties pursuant to <u>Section 10.4</u>; <u>provided further</u> that if on the Initial End Date Buyer has not received the Bona Fide Proposals required under <u>Section 9.1(m)</u> due solely to the failure of clause (b) of the definition of Bona Fide Proposal to be satisfied in one or more proposals received by Buyer, then Buyer may extend the Initial End Date as set forth in this clause (i) without payment of the foregoing amount.

(ii)      If at an End Date that is 180 days after the date of this Agreement Buyer has not received the Bona Fide Proposals required under <u>Section 9.1(m)</u>, then Buyer may (by notice delivered to Parent on or prior to the then-applicable End Date) extend the End Date to the date that is 210 days after the date of this Agreement; <u>provided</u>, that concurrently with such extension, Buyer shall pay to HLC Inc., by wire transfer of immediately available funds, $2,500,000, which amount shall be credited towards (x) the Closing Payment if the Closing occurs or (y) in the event that the Closing does not occur, the liquidated damages (if any) due to Seller Parties pursuant to <u>Section 10.4</u>; <u>provided further</u> that if at an End Date that is 180 days after the date of this Agreement Buyer has not received the Bona Fide Proposals required under <u>Section 9.1(m)</u> due solely to the failure of clause (b) of the definition of Bona Fide Proposal to be satisfied in one or more proposals received by Buyer, then Buyer may extend the End Date as set forth in this clause (ii) without payment of the foregoing amount.

65

(iii)      If at an End Date that is 180 days or more after the date of this Agreement FDIC Approval has not been obtained, then Buyer may (by one or more notices delivered to Parent on or prior to the end of the then-applicable End Date) extend the End Date to the dates that are 210, 240, 270 and 300 days after the date of this Agreement; <u>provided</u>, that such extensions must be exercised one at a time to the next available End Date; and <u>provided further</u>, that concurrently with an extension to the 210th, 240th or 270th day, Buyer shall pay to HLC Inc., by wire transfer of immediately available funds, $1,000,000 (for the avoidance of doubt, such payment is due for each such extension), and concurrently with an extension to the 300th day, Buyer shall pay to HLC Inc., by wire transfer of immediately available funds, $2,000,000 (for the avoidance of doubt, such payment is due in addition to all prior extension payments pursuant to this clause (iii)), each of which amounts shall be credited towards (x) the Closing Payment if the Closing occurs or (y) in the event that the Closing does not occur, the liquidated damages (if any) due to Seller Parties pursuant to <u>Section 10.4</u>. For the avoidance of doubt, if at an End Date that is 180 days after the date of this Agreement Buyer extends the End Date to the 210th day after the date of this Agreement pursuant to this clause (iii), clause (ii) above shall not apply.

Notwithstanding the foregoing, if, on any date on which Buyer has notified Parent of its election to extend the End Date pursuant to this <u>Section 10.1(b)</u>, all of the conditions in <u>Section 9.1</u> (other than the conditions set forth in <u>Sections 9.1(e)</u> and <u>9.1(m)</u>) have not been satisfied or waived by Buyer (or are not capable of being satisfied at the Closing), Buyer shall not be required to pay HLC Inc. the applicable amount specified in clause (i), (ii) or (iii) above with respect to such extension.

The right to terminate this Agreement under <u>Section 10.1(b)</u> shall not be available to any Party whose breach (or whose Affiliate's breach) of a representation, warranty, covenant or obligation contained in this Agreement or the Marketing Consulting Services Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or prior to the End Date.

(c)      Buyer may terminate this Agreement by giving written notice to Parent at any time prior to the Closing if any of the Seller Parties has breached any representation, warranty, covenant or obligation contained in this Agreement in any material respect such that a closing condition cannot be satisfied, and, if reasonably capable of being cured, Seller Parties shall not have cured such breach within fifteen (15) days following written notice from Buyer; provided, that Buyer may not terminate this Agreement under this subclause (c) if Buyer is in material breach of this Agreement.

(d)      Parent may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing if Buyer has breached any representation, warranty, covenant or obligation contained in this Agreement in any material respect such that a closing condition cannot be satisfied, and, if reasonably capable of being cured, Buyer shall not have cured such breach within fifteen (15) days following written notice from Parent; provided, that Parent may not terminate this Agreement under this subclause (d) if a Seller Party is in material breach of this Agreement.

(e)      Either Buyer or Parent may terminate this Agreement if: (i) the Stockholders' Meeting (including any adjournments and postponements thereof) shall have been

66

held and completed and Parent's stockholders shall have taken a final vote on a proposal to adopt this Agreement; and (ii) this Agreement shall not have received Parent Stockholder Approval at such meeting (including at any adjournment or postponement thereof); provided, however, that the right to terminate this Agreement under this subclause (e) shall not be available to any Party whose breach (or whose Affiliate's breach) of a covenant or obligation contained in this Agreement has been the cause of or resulted in the failure to receive Parent Stockholder Approval.

(f)      Buyer may terminate this Agreement if (i) at any time prior to the receipt of Parent Stockholder Approval, a Change of Recommendation has occurred or any Seller Party or any of their Affiliates has materially breached Section 7.7(a) or (ii) as of the Initial End Date, Parent or the Board of Directors of Parent, as applicable, has failed to hold the Stockholders' Meeting, and such failure is due to a material breach by Parent of Section 7.6; provided, however, that the right to terminate this Agreement pursuant to this Section 10.1(f)(ii) shall not be available to Buyer if Buyer is then in material breach of any of its obligations under this Agreement.

(g)      Buyer may terminate this Agreement by giving written notice to Parent at any time prior to the Closing if: (i) any Seller Party or any of their Affiliates (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness outstanding under any Warehousing Agreement or (B) otherwise breaches or fails to observe, perform, maintain or satisfy any other agreement, condition or covenant, including any financial covenant, relating to any such Indebtedness or contained in any Warehousing Agreement or any other instrument or agreement evidencing or securing such Indebtedness or relating thereto, and, in the case of each of sub-clauses (A) and (B), such Seller Party or its Affiliate fails to cure such breach or failure within the applicable grace or cure period with respect thereto, if any, provided that, if the applicable Seller Party or its Affiliate obtains a waiver of, or enters into an amendment to the applicable Warehousing Agreement in order to waive, such breach or failure on terms that are consistent in all material respects with any waiver or amendment received by such Seller Party or its Affiliates since May 1, 2008 under any Warehousing Agreement for similar breaches or failures, Buyer shall not have the right to terminate this Agreement pursuant to this clause (i); (ii) any Seller Party or its Affiliates obtains a waiver of, or enters into any amendment to a Warehousing Agreement that waives, any breach of or failure to observe, perform, maintain or satisfy any agreement, condition or covenant, including any financial covenant, contained in any Warehousing Agreement without the prior written consent of Buyer (such consent not to be unreasonably withheld), other than any waiver (or series of related waivers) that does not materially waive a financial covenant under the applicable Warehousing Agreement for more than one (1) fiscal quarter and any other waiver of, or amendment to, any Warehousing Agreement that is not material to the Business; or (iii) the aggregate amount available for borrowing under the Warehousing Agreements is reduced below $100,000,000 (for purposes of determining availability, utilized credit under the Warehousing Agreements shall not reduce availability).

(h)      Buyer may terminate this Agreement by giving written notice to Parent at any time prior to the Closing if (i) Parent fails to deliver any Compliance Certificate in accordance with Section 7.13 or (ii) any of the ratios or other metrics set forth in a Compliance

67

6/10/2020    08-13555-mg  Doc 58713  Filed 04/01/21  Entered 04/02/21 14:23:28  Exhibit Complaint  Pg 619 of 1033

Certificate delivered by Parent pursuant to <u>Section 7.13</u> with respect to any Reference Month does not satisfy the required ratio or other metric set forth on <u>Schedule 7.13</u>.

10.2 <u>Effect of Termination</u>. Except for <u>Section 8.2</u>, this <u>Section 10.2</u>, <u>Section 10.3</u>, <u>Section 10.4</u> and <u>ARTICLE 12</u>, if this Agreement is terminated under <u>Section 10.1</u>, then all further obligations of the Parties under this Agreement will terminate. If this Agreement is terminated because of a breach of this Agreement by the non-terminating Party or because one or more of the conditions to the terminating Party's obligations under this Agreement are not satisfied as a result of the non-terminating Party's breach of or failure to comply with its obligations under this Agreement, then the terminating Party's right to pursue all legal remedies will survive such termination unimpaired. Each Party's right of termination under <u>Section 10.1</u> is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies.

10.3 <u>Termination Fee</u>.

(a) If (i) this Agreement is terminated by Buyer or Parent pursuant to <u>Section 10.1(b)</u> or <u>Section 10.1(e)</u> and prior to such termination of this Agreement, an Acquisition Proposal is proposed or publicly disclosed or (ii) this Agreement is terminated by Buyer pursuant to <u>Section 10.1(f)</u>, then in any such event Parent shall pay to Buyer a fee of $2,200,000 in cash (the "**Termination Fee**"), such payment to be made promptly upon termination of this Agreement and in any event within two (2) Business Days after the termination of this Agreement, it being understood that in no event shall Parent be required to pay the Termination Fee on more than one occasion.

(b) Each of the Parties acknowledges that (i) the agreements contained in this <u>Section 10.3</u> are an integral part of the transactions contemplated by this Agreement and (ii) without these agreements, the Parties would not enter into this Agreement. It is acknowledged and agreed that the Termination Fee is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Buyer and its Affiliates in the circumstances in which the Termination Fee is payable; <u>provided</u>, <u>however</u>, that the foregoing shall not limit any Party's rights with respect to any liabilities or damages incurred or suffered by such Party as a result of the willful and material breach by another party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

10.4 <u>Liquidated Damages</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF (A) THE CLOSING FAILS TO OCCUR ON OR PRIOR TO THE END DATE (AS IT MAY BE EXTENDED PURSUANT TO <u>SECTION 10.1(b)</u>) DUE SOLELY TO (I) BUYER FAILING TO OBTAIN A LICENSE OR APPROVAL OF A GOVERNMENTAL AUTHORITY SET FORTH ON <u>SCHEDULE 9.1(e)</u>, OR (II) THE CONDITION SET FORTH IN <u>SECTION 9.1(m)</u> FAILING TO BE SATISFIED OTHER THAN AS A RESULT OF THE FAILURE OF CLAUSE (B) OF THE DEFINITION OF BONA FIDE PROPOSAL TO BE SATISFIED IN ONE OR MORE PROPOSALS RECEIVED BY BUYER (CLAUSE (I) OR (II), (A "<u>BUYER CLOSING CONDITION FAILURE</u>") AND (B) PARENT IS ENTITLED TO TERMINATE THIS AGREEMENT PURSUANT TO <u>SECTION 10.1(b)</u> OR <u>10.1(d)</u>, THEN THE PARTIES ACKNOWLEDGE THAT SELLER PARTIES' ACTUAL DAMAGES CAUSED BY A BUYER CLOSING CONDITION FAILURE WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. THEREFORE, THE PARTIES ACKNOWLEDGE AND AGREE THAT $5,000,000 HAS BEEN AGREED UPON, AFTER

<div align="center">68</div>

NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLER PARTIES' DAMAGES THAT WOULD BE CAUSED BY A BUYER CLOSING CONDITION FAILURE, AND THAT AN AWARD OF SUCH LIQUIDATED DAMAGES IN THE AMOUNT OF $5,000,000 SHALL BE SELLER PARTIES' EXCLUSIVE REMEDY AGAINST BUYER AS A RESULT OF A BUYER CLOSING CONDITION FAILURE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT SUCH AMOUNT SHALL BE REDUCED BY THE AGGREGATE AMOUNTS, IF ANY, PAID BY BUYER TO PARENT PURSUANT TO <u>SECTION 10.1(b)</u> IN CONNECTION WITH EXTENSIONS OF THE END DATE BY BUYER. BUYER AND SELLER PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISION COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

**ARTICLE 11. INDEMNIFICATION**

11.1 <u>Survival</u>.

(a) The representations and warranties of Buyer and Seller Parties contained in this Agreement shall survive until December 31, 2013; <u>provided</u>, <u>however</u>, that (i) the representations and warranties contained in <u>Sections 5.1</u> (Organization;

Authority; Enforceability), 5.3 (No Finders), 6.1 (Organization; Authority; Enforceability), 6.3 (Capitalization), 6.6 (No Finders), 6.12 (Acquired Assets), 6.20 (Vote Required) and 6.21 (Solvency) shall survive the Closing Date indefinitely, (ii) the representations and warranties contained in Section 6.16 (Tax) shall survive the Closing Date until the sixtieth (60th) day after the expiration of the applicable statute of limitations and (iii) the representations and warranties contained in Section 6.15 (Intellectual Property) shall survive until December 31, 2015.  The representations and warranties set forth in clauses (i) and (ii) of this Section 11.1(a) shall be referred to herein as the "**Specified Representations**".  The covenants and other agreements of the Parties contained in this Agreement shall survive the Closing Date until the date, if any, on which they terminate in accordance with their terms.  The period of time during which any representation, warranty, covenant or agreement contained herein survives is referred to herein as the "**Survival Period**" for such representation, warranty, covenant or agreement.  The Parties specifically and unambiguously intend that the Survival Periods that are set forth in this Section for the representations and warranties contained herein (unless otherwise provided herein) shall replace any statute of limitations for such representations or warranties that would otherwise be applicable (including the statute of limitations prescribed by the law of the State of Delaware).

(b)    Indemnified Persons shall not be entitled to make any claim in respect of any representation, warranty, covenant or agreement after the expiration of its applicable Survival Period, except that any claim initiated by an Indemnified Person in accordance with the requirements hereof prior to the expiration of the applicable Survival Period shall survive until it is settled or resolved pursuant to this Agreement.

69

11.2    Indemnification by Seller Parties.

(a)    The Seller Parties will jointly and severally indemnify and hold harmless Buyer, its Affiliates and the respective directors, officers and employees of Buyer and its Affiliates (collectively, the "**Buyer Indemnified Persons**") from and against, and will reimburse the Buyer Indemnified Persons for, any Losses incurred by the Buyer Indemnified Persons arising from or in connection with:

(i)    any breach of or inaccuracy in any representation or warranty of any Seller Party contained in this Agreement;

(ii)    any breach of any covenant or agreement of any Seller Party contained in this Agreement;

(iii)    any Excluded Liability;

(iv)    any claims by any stockholders or other securityholders of any Seller Party or any of their Affiliates; and

(v)    the failure of any Seller to comply with any applicable bulk sales law, except that this sub-clause (iv) shall not affect the obligation of Buyer to pay and discharge the Assumed Liabilities.

(b)    Notwithstanding Section 11.2(a):

(i)    The Seller Parties together shall only be obligated to indemnify Buyer Indemnified Persons under Section 11.2(a)(i) if the aggregate amount of Losses claimed under Section 11.2(a)(i) exceeds $500,000 (the "**Basket Amount**"), but if the aggregate of all Losses of the Buyer Indemnified Persons claimed under Section 11.2(a)(i) exceeds the Basket Amount, then the Seller Parties together shall be obligated to indemnify the Buyer Indemnified Persons only to the extent that such Losses exceed the Basket Amount; provided, however, that the Basket Amount shall not apply to any Losses arising out of a breach of or inaccuracy in any of the Specified Representations that are made by Sellers;

(ii)    the maximum aggregate indemnification obligation of the Seller Parties together under Section 11.2(a)(i) (other than for breaches of (A) Specified Representations that are made by Seller Parties, as to which there shall be no limitation, and (B) the representations and warranties contained in Section 6.15, as to which clause (iii) shall apply) shall be $10,000,000 (the "**General Cap Amount**");

(iii)    the maximum aggregate indemnification obligation of the Seller Parties together under Section 11.2(a)(i) with respect to the representations and warranties contained in Section 6.15 shall be $20,000,000;

(iv)        the maximum aggregate indemnification obligation of the Seller Parties together under clauses (ii) and (iii) of this Section 11.2(b) (other than for breaches of Specified Representations that are made by Seller Parties, as to which there shall be no limitation) shall be $20,000,000; and

<center>70</center>

(v)        the maximum aggregate indemnification obligation of the Seller Parties together under Section 11.2(a) (other than with respect to the Excluded Liabilities and the Specified Representations that are made by Seller Parties, as to which there shall be no limitation) shall be the Purchase Price.

11.3        Indemnification by Buyer.

(a)        Buyer will indemnify and hold harmless the Seller Parties and their respective Affiliates, directors, officers and employees (collectively, the "*Seller Indemnified Persons*") from and against, and will reimburse the Seller Indemnified Persons for, any Losses incurred by the Seller Indemnified Persons arising from or in connection with:

(i)        any breach of or inaccuracy in any representation or warranty of Buyer contained in this Agreement;

(ii)        any breach of any covenant or agreement of Buyer contained in this Agreement; and

(iii)        any Assumed Liability.

(b)        Notwithstanding Section 11.3(a)(i):

(i)        Buyer shall only be obligated to indemnify the Seller Indemnified Persons under Section 11.3(a)(i) if the aggregate amount of Losses claimed under Section 11.3(a)(i) exceeds the Basket Amount, but if the aggregate of all Losses of the Seller Indemnified Persons under Section 11.3(a)(i) exceeds the Basket Amount, then Buyer shall be obligated to indemnify the Seller Indemnified Persons only to the extent that such Losses exceed the Basket Amount; provided, however, that the Basket Amount shall not apply to any Losses arising out of a breach of any of the Specified Representations that are made by Buyer; and

(ii)        the maximum aggregate indemnification obligation of Buyer under Section 11.3(a)(i) (other than for breaches of Specified Representations that are made by Buyer) shall be the General Cap Amount; and

(iii)        the maximum aggregate indemnification obligation of Buyer under Section 11.3(a) (other than with respect to the Assumed Liabilities and the Specified Representations that are made by Buyer, as to which there shall be no limitation) shall be the Purchase Price.

11.4        Third Party Claims.

(a)        Promptly after receipt by a Person entitled to indemnity under Section 11.2 or 11.3 (an "*Indemnified Person*") of notice of the assertion of a Third Party Claim against it, such Indemnified Person shall give notice to the Person obligated to indemnify under such Section (an "*Indemnifying Person*") of the assertion of such Third Party Claim; provided, that the failure to notify the Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to any Indemnified Person, except to the extent of actual prejudice due to the Indemnified Person's failure to give such notice.

<center>71</center>

(b)        If an Indemnified Person gives notice to the Indemnifying Person pursuant to Section 11.4(a) of the assertion of a Third Party Claim, then, subject to Section 11.4(c), the Indemnified Person shall be entitled, to the extent that it wishes, to assume the defense and control of such Third Party Claim with counsel of its own choosing.  If the Indemnified Person assumes the defense of a Third Party Claim, then no compromise or settlement of such Third Party Claim may be effected by the Indemnified Person without the Indemnifying Person's consent, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, the Indemnified Person shall have the right to compromise or settle any such Third Party Claim without such consent; provided, that, in such event, the Indemnified Person shall waive any right to indemnity therefor hereunder unless such consent is unreasonably withheld.

(c)      If any Third Party Claim is solely for money damages then the Indemnifying Party shall be entitled, to the extent that it wishes, to assume the defense and control of such Third Party Claim with counsel of its own choosing.  If the Indemnifying Person assumes the defense of a Third Party Claim, then (i) no compromise or settlement of such Third Party Claim may be effected by the Indemnifying Person without the Indemnified Person's consent unless (A) there is no finding or admission of any violation of Law or any violation of the rights of any Person and (B) the sole relief provided is monetary damages that are paid in full by the Indemnifying Person, and (ii) the Indemnifying Person shall not, so long as it diligently conducts such defense, be liable to the Indemnified Person under this ARTICLE 11 for any fees of the Indemnified Person's counsel incurred in connection with the defense of such Third Party Claim following the date on which the Indemnifying Party notifies the Indemnified Person that it is assuming the defense thereof.  Notwithstanding the Indemnifying Person assuming the defense of any such Third Party Claim, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense of such Third Party Claim, and the Indemnifying Party shall bear the fees and expenses of such separate counsel, if the Indemnified Party shall have determined in good faith, based on the advice of counsel, that counsel for the Indemnifying Party could not adequately represent the interests of the Indemnified Party because of an actual or potential conflict of interest.  If notice is given to an Indemnifying Person of the assertion of any such Third Party Claim and the Indemnifying Person does not, within ten (10) days after the Indemnified Person's notice is given, give notice to the Indemnified Person of the Indemnifying Person's election to assume the defense and control of such Third Party Claim, then the Indemnifying Person will be bound by any determination made in such Third Party Claim or any compromise or settlement effected by the Indemnified Person.

(d)      With respect to any Third Party Claim subject to indemnification under this ARTICLE 11:  (i) both the Indemnified Person and the Indemnifying Person, as the case may be, shall keep the other Person fully informed of the status of such Third Party Claim and any related Actions at all stages thereof where such Person is not represented by its own counsel, and (ii) the Parties agree (each at its own expense, subject to the Indemnified Person's right to be reimbursed for such expenses in accordance with this ARTICLE 11) to render to each other such assistance as they may reasonably require of each other and to cooperate in good faith with each other in order to ensure the proper and adequate defense of any Third Party Claim.

---

72

---

(e)      With respect to any Third Party Claim subject to indemnification under this ARTICLE 11, the Parties agree to cooperate in such a manner as to preserve in full (to the extent possible) the confidentiality of all Confidential Information and the attorney-client and work-product privileges of the other Party.  In connection therewith, each Party agrees that:  (i) it will use its reasonable efforts, in respect of any Third Party Claim in which it has assumed or participated in the defense, to avoid production of Confidential Information (consistent with Law and rules of procedure); and (ii) all communications between any Party and counsel responsible for or participating in the defense of any Third Party Claim shall, to the extent possible, be made so as to preserve any applicable attorney-client or work-product privilege.

11.5      Other Claims.  A claim for indemnification for any matter not involving a Third Party Claim may be asserted by notice to the Party from whom indemnification is sought.  No Person shall be liable for any claim for indemnification under Section 11.2 or 11.3 above unless written notice specifying in reasonable detail the nature of the claim for indemnification is delivered by the Person seeking indemnification to the Person from whom indemnification is sought prior to the expiration of the Survival Period, in which case the representation, warranty, covenant or agreement which is the subject of such claim shall survive, to the extent of such claim only, until such claim is resolved, whether or not the amount of the Losses resulting from such breach has been finally determined at the time the notice is given.

11.6      Limitations.

(a)      In calculating any Losses, there shall be deducted any insurance proceeds, indemnification, contribution or other similar payment actually recovered by the Indemnified Person or any Affiliate thereof from any Third Party with respect thereto (net of all costs and expenses, including any deductible amounts and increases in premiums, incurred in connection with such recovery); provided, however, that in no event shall an Indemnified Person be required to pursue any claim under an insurance policy to recover any Losses suffered hereunder.

(b)      Except for claims based on actual fraud or intentional misrepresentation, remedies that cannot be waived as a matter of Law and injunctive relief and provisional relief, if the Closing occurs, then this ARTICLE 11 shall be the sole and exclusive remedy for any breach of any representation, warranty, agreement or covenant contained herein, or otherwise in respect of the Transactions; provided, however, that disputes arising out of the Lead Sale Agreement, Marketing Consulting Services Agreement and Transition Services Agreement shall be handled pursuant to such agreements and not this Agreement.

11.7    <u>Mitigation</u>.  Each of the Parties agrees to take all reasonable steps to mitigate their respective Losses upon and after becoming aware of any event or condition which could reasonably be expected to give rise to any Losses that are indemnifiable hereunder; <u>provided</u>, <u>however</u>, that in no event shall an Indemnified Person be required to pursue any claim under an insurance policy to recover any Losses suffered hereunder.

11.8    <u>Subrogation</u>.  Upon making any payment to an Indemnified Person for any indemnification claim pursuant to this <u>ARTICLE 11</u>, the Indemnifying Person shall be subrogated, to the extent of such payment, to any rights which the Indemnified Person may have

<div align="center">73</div>

against any insurer with respect to the subject matter underlying such indemnification claim and the Indemnified Person shall assign any such rights to the Indemnifying Person.

11.9    <u>Set-off and Withholding</u>.

(a)    If on the first or second anniversary of the Closing Date a Buyer Indemnified Person has an indemnity claim pursuant to this <u>ARTICLE 11</u> that has been resolved in accordance with this Agreement, but which has not been paid by Seller Parties, then Buyer may set-off from the payments owed pursuant to <u>Sections 3.1(b)</u> or <u>3.1(c)</u> an amount equal to the agreed-upon amount of such indemnity claim.

(b)    If on the first or second anniversary of the Closing Date a Buyer Indemnified Person has an indemnity claim pursuant to this <u>ARTICLE 11</u> that has not been resolved in accordance with this Agreement, then Buyer may withhold from the payments owed pursuant to <u>Sections 3.1(b)</u> or <u>(c)</u> an amount equal to Buyer's good faith estimate of the amount of such indemnity claim so long as, by the first anniversary of the Closing Date (if Buyer is withholding such amount from the payment due under <u>Section 3.1(b)</u>) or second anniversary of the Closing Date (if Buyer is withholding such amount from the payment due under <u>Section 3.1(c)</u>), Buyer (a) files a formal arbitration claim with the arbitrator pursuant to <u>Section 12.9</u> and (b) deposits the amount so withheld with the Escrow Agent pursuant to the Escrow Agreement.

11.10    <u>Materiality</u>.  Notwithstanding anything in this Agreement to the contrary, solely for purposes of determining whether a breach of any representation or warranty has occurred, or whether an inaccuracy in any representation or warranty exists, all of the representations and warranties set forth in this Agreement that are qualified as to "material," "materiality," "material respects," "Material Adverse Effect", "Material Adverse Change" or words of similar import or effect shall mean that the representation or warranty is not breached or inaccurate unless the Losses arising from or in connection with such breach of or inaccuracy in such representation or warranty (or the Losses arising from or in connection with a series of breaches or inaccuracies arising from the same facts, events or circumstances) exceeds $50,000.  Notwithstanding anything in this Agreement to the contrary, solely for purposes of determining the amount of Losses arising from or in connection with any breach of, or inaccuracy in, any representation or warranty (or the Losses arising from or in connection with a series of breaches or inaccuracies arising from the same facts, events or circumstances), all of the representations and warranties set forth in this Agreement that are qualified as to "material," "materiality," "material respects," "Material Adverse Effect", "Material Adverse Change" or words of similar import or effect shall be ignored. Notwithstanding anything to the contrary herein, this <u>Section 11.10</u> shall not affect the meaning of "Material Adverse Effect" or "Material Adverse Change" except for the limited purpose of determining indemnity as specified herein.  Without limiting the generality of the immediately preceding sentence, the Parties acknowledge and agree that for purposes of determining whether the conditions set forth in <u>Sections 9.1(a)</u> and <u>9.1(c)</u> have been satisfied, the terms "Material Adverse Effect" and "Material Adverse Change" shall be given the meaning set forth in <u>Section 1.1</u> without regard to anything to the contrary in this <u>Section 11.10</u>.

<div align="center">74</div>

## ARTICLE 12.    MISCELLANEOUS

12.1    <u>Entire Agreement</u>.  This Agreement (together with the Disclosure Schedule, Exhibits and other Transaction Documents) supersedes all prior agreements, representations and warranties, whether written or oral, of the Parties with respect to the subject matter contained herein or therein (including the Confidentiality Agreement, any letter of intent, indication of interest, term sheet or the like between Buyer or any of its Affiliates, on the one hand, and Seller, Parent or any of their Affiliates, on the other hand) and constitutes a complete and exclusive statement of the terms of the agreement among the Parties with respect to its subject matter.

12.2    <u>Notices</u>. All notices, consents and other communications required or permitted by this Agreement shall be in writing and shall be (a) delivered to the appropriate address by hand, by nationally recognized overnight service or by courier service (costs prepaid), (b) sent by facsimile or e-mail, or (c) sent by registered or certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Party):

Buyer:

Discover Bank
12 Read's Way
New Castle, DE 19720
Attention: Mike Rickert
Fax: (302) 323-7393

with copies (which shall not constitute notice) to:

Discover Financial Services
2500 Lake Cook Road
Riverwoods, IL 60015
Attention: Kelly McNamara Corley
Fax: (224) 405-4584

and

Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
Attention:  Paul L. Choi
Fax:  (312) 853-7036
Email:  pchoi@sidley.com

HLC Inc. (prior to the Closing):

Home Loan Center, Inc.
163 Technology Drive
Irvine, California 92618

75

Attention: Doug Lebda
Fax: (949) 579-8677
Email: Doug.Lebda@lendingtree.com

with a copy (which shall not constitute notice) to:

Sheppard, Mullin, Richter & Hampton LLP
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071
Attention: David Sands
Fax:  (213) 620-1398
Email:  dsands@smrh.com

HLC Inc. (after the Closing):

Home Loan Center, Inc.
c/o Tree.com, Inc.
11115 Rushmore Drive

Charlotte, North Carolina 28277
Attention: Douglas Lebda
Fax: 949-255-5155
Email: Douglas.Lebda@lendingtree.com

with a copy (which shall not constitute notice) to:

Sheppard, Mullin, Richter & Hampton LLP
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071
Attention: David Sands
Fax: (213) 620-1398
Email: dsands@smrh.com

Parent:

Tree.com, Inc.
11115 Rushmore Dive.
Charlotte, North Carolina 28277
Attention: Douglas Lebda
Fax: 949-255-5155
Email: Douglas.Lebda@lendingtree.com

with a copy (which shall not constitute notice) to:

Sheppard, Mullin, Richter & Hampton LLP
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071
Attention: David Sands

76

Fax: (213) 620-1398
Email: dsands@smrh.com

All notices, consents, waivers and other communications shall be deemed to have been duly given (as applicable): if delivered by hand, when delivered by hand; if delivered by overnight service, when delivered by nationally recognized overnight service; if delivered by courier, when delivered by courier; if sent via registered or certified mail, five (5) Business Days after being deposited in the mail, postage prepaid; or if delivered by email or facsimile, when received by the recipient prior to 5:00 p.m. local time for the recipient (and if received by the recipient after 5:00 p.m. local time for the recipient, then delivery will be deemed duly given at 9:00 a.m. local time for the recipient on the subsequent Business Day).

12.3    Modifications; Waiver.  No provision of this Agreement may be amended, supplemented or otherwise modified except by a written agreement mutually executed by the Parties (except for assignments as permitted hereunder).  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof.  Any such wavier shall be validly and sufficiently authorized for purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized representative of such Party.  Neither any failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by Law, (a) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party will be deemed to be a waiver of any obligation of that Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the other Transaction Documents.

12.4    Expenses.  Each Party will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of the Transaction Documents and the Transactions, including all fees and expenses of its Representatives.  If this Agreement is terminated, the obligation of each Party to pay its own fees and expenses will be subject to any rights of such Party arising from a breach of this Agreement by the other Party.

12.5    Access to Records and Employees after Closing.

(a)    For a period of seven (7) years after the Closing Date each Party shall have reasonable access to all of the books and records included in the Acquired Assets; provided, however, that a Seller Party shall have such access only to the extent that such access may reasonably be required by such Seller Party in connection with matters relating to the Business prior to the Closing, including the preparation of such Seller Party's financial reports or Tax Returns, any Tax audits and the defense or prosecution of litigation (including arbitration or mediation).  Such access shall be afforded by the other Party upon receipt of reasonable advance notice and during normal business hours.  Each Party, as applicable, shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 12.5(a).  In addition, if any Party desires to dispose of any of such books or records prior to the expiration of such seven (7) year period, then such Party shall, prior to such disposition, give each other

Party a reasonable opportunity, at such other Party's expense, to segregate and remove such books and records as such other Party may select.

(b)    For a period of seven (7) years after the Closing Date, the Seller Parties shall, and shall cause their controlled Affiliates to, provide Buyer and its Affiliates reasonable access to, and to furnish, any books, records and other information retained by Seller Parties or any of their controlled Affiliates relating to the Business, as Buyer or its Affiliates may reasonably request, including any information concerning Business Employees.  Such access shall be afforded by Seller Parties or their controlled Affiliates upon receipt of reasonable advance notice and during normal business hours.  Buyer shall be solely responsible for any reasonable costs or expenses incurred by it pursuant to this Section 12.5(b).  If any Seller Party or any of their Affiliates desires to dispose of any of such books, records or other information prior to the expiration of such seven (7) year period, then Parent shall, prior to such disposition, give Buyer and its Affiliates a reasonable opportunity, at Buyer's expense, to segregate and remove such books, records and other information as Buyer or its Affiliates may select.

(c)    Buyer shall provide to Seller Parties, reasonable assistance, at a Seller Party's actual expense, by providing employees of Buyer to act as witnesses and preparing documents, reports and other information requested by such Seller Party in support of the activities described in Section 12.5(a).

(d)    Notwithstanding anything to the contrary herein, Seller Parties may retain copies of any Contracts, documents or records:  (i) for archival purposes, to the extent required by Seller Parties' document retention policy, (ii) which primarily relate to properties or activities of Seller Parties other than the Business, (iii) which are required to be retained pursuant to any Law or (iv) for financial reporting purposes in order to satisfy applicable requirements of the SEC.

12.6    Public Announcements.  Any public announcement, press release or similar publicity with respect to this Agreement, the other Transaction Documents or the Transactions will be issued only with the prior written consent of Parent and Buyer, except as and to the extent that any Party shall be obligated by Law or applicable securities exchange rules, in which case the other Party shall be advised and the Parties shall use their commercially reasonable efforts to cause a mutually agreeable release or announcement to be issued.

12.7    Assignments, Successors and No Third Party Rights.  Prior to the Closing, no Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, except that Buyer may, so long as Buyer remains liable hereunder:  (i) assign any of its rights and delegate any of its obligations under this Agreement to (A) any Third Party in connection with a sale of all or substantially all of its assets, sale of its equity interests, change of control or similar transaction, or (B) any Affiliate of Buyer, (ii) assign the right to acquire the equity interests of the Subsidiaries and/or the assets of HLC Escrow to an Affiliate of Buyer, and (iii) collaterally assign its rights hereunder to any financial institution providing financing in connection with the Transactions.  Following the Closing, any Party may assign any of its rights hereunder, but no such assignment shall relieve it of its obligations hereunder.  Any other purported assignment without written consent of the other Parties shall be void and of no effect.  Subject to the foregoing, this Agreement will apply to, be

binding in all respects upon and inure to the sole benefit of the successors and permitted assigns of the Parties.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy or claim

under or with respect to any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this <u>Section 12.7</u> and except for the Buyer Indemnified Persons and the Seller Indemnified Persons.

      12.8    <u>Severability</u>.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held invalid, illegal or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid, illegal or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid, illegal or unenforceable, unless such a construction would be unreasonable.  The Parties further agree to replace such invalid or unenforceable provision with a valid and enforceable provision that will achieve, to the extent possible, the economic and business purposes of such invalid or unenforceable provision; <u>provided</u>, that such replacement shall not result in a materially adverse impairment of the rights or obligations of any Party.

      12.9    <u>Governing Law; Arbitration</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to its conflict of law principles.  All disputes, controversies and claims between the Parties, arising out of or relating to this Agreement, including those involving its interpretation, the obligations of a Party hereto, or the breach thereof, will be resolved by binding arbitration, to be administered in Delaware by the American Arbitration Association ("*AAA*") in accordance with the AAA Commercial Arbitration Rules then in effect (the "*AAA Rules*").  Notwithstanding the foregoing, this Section shall not preclude the Parties from seeking interim provisional, injunctive or other equitable remedies.  Each of the Parties irrevocably submits to the jurisdiction of the state and Federal courts, located in Delaware in conjunction with an application for an interim provisional, injunctive or other equitable remedy or for enforcement of this arbitration provision or an award rendered hereunder.  There will be one arbitrator selected pursuant to the AAA Rules.  The arbitrator shall be bound to apply the applicable substantive law set forth herein to each dispute.  The arbitrator shall have the authority to award any remedy that a court of competent jurisdiction could order or grant, including, without limitation, the issuance of an injunction. The arbitrator shall issue a statement of decision in accordance with the express terms of the Agreement and shall take into account usages of the trade applicable to the Agreement.  The arbitrator is not empowered to alter, amend, modify or change any of the terms of this Agreement.  The Parties shall make the arbitrator aware of this <u>Section 12.9</u> before the start of any arbitration proceedings.  The dispute resolution proceedings and discovery shall be conducted expeditiously.  Without limiting the foregoing, to the extent practical and in the interests of justice, it is intended by the Parties that the arbitration hearing for the dispute be completed within ninety (90) days after the selection of the arbitrator.  The costs of the arbitration shall be borne by the non-prevailing Party, as determined by the arbitrator, and the prevailing Party in the arbitration shall be awarded its fees and costs (including reasonable attorneys' fees).  Judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction.  Except as necessary in court proceedings to enforce this arbitration provision or an award rendered hereunder, to obtain an interim remedy or as otherwise required by Law, neither a Party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder

<div align="center">79</div>

without the prior written consent of both Parties.  Notwithstanding the choice of law provision included in this Agreement, the United States Federal Arbitration Act shall govern the interpretation and enforcement of this arbitration provision.

      12.10    <u>Attorneys' Fees</u>.  If any Action is brought for the enforcement of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that Action (including costs of collection), in addition to any other relief to which it may be entitled.

      12.11    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

      12.12    <u>Execution of Agreement</u>.  This Agreement may be executed in two or more counterpart signature pages executed and delivered via facsimile transmission or via email with scan or email attachment.  Any such counterpart executed and delivered via facsimile transmission or via email with scan or email attachment will be deemed an original for all intents and purposes.  All such counterparts shall together constitute one and the same instrument and shall become binding when two or more counterparts have been signed by each of the Parties and delivered to each other Party.

      12.13    <u>Interpretation</u>.

        (a)    Each Party acknowledges that it has consulted with, or has been afforded the opportunity to consult with, counsel of its own choosing in connection with the drafting, negotiation and execution of this Agreement and that it enters into this Agreement of its own free will and as its independent act.  The language used in this Agreement has been chosen by the Parties to

express their mutual intent, and no rule of construction shall be applied against or in favor of either Party, and no Party shall be deemed the drafter of this Agreement, and the Parties all waive any statute, principle or rule of law to the contrary.

       (b)      In this Agreement, unless a clear contrary intention appears:

       (i)      the singular number includes the plural number and vice versa and reference to any gender includes each other gender;

       (ii)      reference to any Person includes such Person's predecessors, successors and assigns but only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity;

       (iii)      the headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation;

       (iv)      all references to "Articles," "Sections," "Schedules" and "Exhibits" refer to the corresponding Articles, Sections, Schedules and Exhibits of this Agreement, unless otherwise stated;

<div align="center">80</div>

       (v)      "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof;

       (vi)      reference to any agreement, document or instrument (including any Transaction Document) means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

       (vii)      reference to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder;

       (viii)      references to documents, instruments or agreements (including this Agreement) shall be deemed to refer as well to all addenda, exhibits, schedules, restatement, supplements or amendments thereto;

       (ix)      "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding the word "including";

       (x)      where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner;

       (xi)      "or" is used in the inclusive sense of "and/or";

       (xii)      with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding";

       (xiii)      the measure of a period of one (1) month or year for purposes of this Agreement shall be the date of the following month or year corresponding to the starting date; provided, that if no corresponding date exists, then the end date of such period being measured shall be the next actual date of the following month or year (for example, one (1) month following February 18 is March 18 and one (1) month following March 31 is May 1);

       (xiv)      references to amounts of money expressed in dollars are references to United States dollars, unless express reference is made to currency of another country;

       (xv)      all references to "made available to Buyer" shall refer to any item in the data site hosted by Deal Interactive as of the date that is three (3) Business Days prior to the date hereof; and

       (xvi)      all accounting terms used herein shall be interpreted, and all accounting determinations hereunder shall be made, in accordance with GAAP.

(c)      The Disclosure Schedule shall be construed with and as an integral part of this Agreement to the same extent as if it was set forth verbatim herein.  Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to vary

81

the definition of "Material Adverse Effect" or to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement.  The inclusion of any specific item in the Disclosure Schedule shall not imply that such item is or is not in the ordinary course of business, and no Party shall use the fact that such item was or was not set forth in the Disclosure Schedule as evidence that such item is or is not in the ordinary course of business.  The disclosures in any Schedule of the Disclosure Schedule, and those in any supplement thereto, relate to the representations and warranties in the Section or paragraph of the Agreement to which such Schedule of the Disclosure Schedule expressly relates and shall be deemed to be disclosed and incorporated into any other Schedule of the Disclosure Schedule to the extent the relevance of such information is readily apparent on its face without further inquiry.

12.14      Remedies. Seller Parties and Buyer acknowledge and agree that irreparable damage would occur in the event any of the provisions of this Agreement required to be performed by any of the Parties were not performed in accordance with their specific terms or were otherwise breached, and that monetary damages, even if available, may not be an adequate remedy therefor. Accordingly, in the event of any breach or threatened breach by any party of any covenant or obligation contained in this Agreement, notwithstanding anything to the contrary herein to the contrary, Seller Parties or Buyer shall be entitled to obtain, without proof of actual damages or the insufficiency of monetary damages (and in addition to any other remedy to which such party may be entitled at law or in equity): (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation; and (b) an injunction restraining such breach or threatened breach.  Seller Parties and Buyer hereby waive any requirement for the securing or posting of any bond in connection with any such remedy.

[Signatures on the Following Page(s)]

82

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be entered into as of the date first above written.

**Discover Bank**

By:   /s/ Christina Favilla
Name:  Christina Favilla
Title:  President

**Home Loan Center, Inc.**

By:   /s/ David Norris
Name: David Norris
Title: President

**Tree.com, Inc.**

By:   /s/ Douglas Lebda
Name: Douglas Lebda

Title: Chairman of the Board and Chief Executive Officer

**HLC Escrow, Inc.**

By:   /s/ David Norris
Name: David Norris
Title: President

**LendingTree, LLC**

By:   /s/ Douglas Lebda
Name: Douglas Lebda
Title: President and Director

83

---

## EXHIBIT A

### Assignment and Assumption Agreement

[Filed Separately as Exhibit 2.2]

84

---

## EXHIBIT B

### Bill of Sale

[Filed Separately as Exhibit 2.3]

85

---

## EXHIBIT C

### Escrow Agreement Terms

[Filed Separately as Exhibit 2.4]

86

# EXHIBIT 6

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2013

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 001-34063



## TREE.COM, INC.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | |
| (State or other jurisdiction of incorporation or organization) | **26-2414818** (I.R.S. Employer Identification No.) |

**11115 Rushmore Drive, Charlotte, North Carolina 28277**
(Address of principal executive offices)

**(704) 541-5351**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $0.01 Par Value | The NASDAQ Stock Market |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☒ |
|---|---|---|---|
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

The aggregate market value of the voting common stock held by non-affiliates of the Registrant as of June 28, 2013 was $108,341,837. For the purposes of the forgoing calculation only, all directors and executive officers of the Registrant and third parties that own 5% or more of the voting common stock are assumed to be affiliates of the Registrant.

As of March 14, 2014, there were 11,305,642 shares of the Registrant's common stock, par value $.01 per share, outstanding.

### Documents Incorporated By Reference:

Portions of the Registrant's proxy statement for its 2014 Annual Meeting of Stockholders are incorporated by reference into Part III herein.

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 7 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 17 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Mine Safety Disclosures | 19 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6. | Selected Financial Data | 21 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 31 |
| Item 8. | Financial Statements and Supplementary Data | 32 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 67 |
| Item 9A. | Controls and Procedures | 67 |
| Item 9B. | Other Information | 68 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 69 |
| Item 11. | Executive Compensation | 69 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 69 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 69 |
| Item 14. | Principal Accounting Fees and Services | 69 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 70 |

i

Table of Contents

<div align="center">

**PART I**

</div>

**Cautionary Statement Regarding Forward-Looking Information**

This annual report on Form 10-K contains "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. These forward-looking statements also include statements related to our anticipated financial performance, business prospects and strategy; anticipated trends and prospects in the various industries in which our businesses operate; new products, services and related strategies; and other similar matters. These forward-looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. The use of words such as "anticipates," "estimates," "expects," "projects," "intends," "plans" and "believes," among others, generally identify forward-looking statements.

Actual results could differ materially from those contained in the forward-looking statements. Factors currently known to management that could cause actual results to differ materially from those in forward-looking statements include those matters discussed below.

Other unknown or unpredictable factors that could also adversely affect our business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of Tree.com management as of the date of this report. We undertake no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results or expectations, except as required by law.

**ITEM 1.  *Business***

**Our Company**

Tree.com is the parent of LendingTree, LLC ("LendingTree") and several companies owned by LendingTree. LendingTree, Inc. was incorporated in the state of Delaware in June 1996 and commenced nationwide operations in July 1998. LendingTree, Inc. was acquired by IAC/InterActiveCorp ("IAC") in 2003 and converted to a Delaware limited liability company (LendingTree, LLC) in December 2004. On August 20, 2008, Tree.com, Inc. (along with its subsidiary, LendingTree) was spun off from IAC/InterActiveCorp into a separate publicly-traded company. We refer to the separation transaction as the "spin-off" in this report. Tree.com was incorporated as a Delaware corporation in April 2008 in anticipation of the spin-off.

Tree.com is the owner of several brands and businesses that provide information, tools, advice, products and services for critical transactions in consumers' lives. Our family of brands includes: LendingTree®, GetSmart®, LendingTree Education[SM], LendingTree Autos[SM], LendingTree Home Pros[SM] and InsuranceTree®. Together, these brands serve as an ally for consumers who are looking to comparison-shop for loans, educational programs, home services providers and other services from multiple businesses and professionals who will compete for their business.

**Our Business**

We operate as a branded performance marketer. In this capacity, we serve as an ally to consumers who are looking to comparison-shop and make informed purchase decisions for loans and other important transactions. We do so by providing consumers with a broad array of information and tools free of charge, conveniently located on our various websites. In addition, we provide consumers with access to offers from multiple providers that can compete for their business, usually through a single inquiry form. We also serve as a valued partner to businesses seeking customer acquisition support services with directly measurable benefits, by matching the consumer inquiries we generate with these businesses.

Through our strategically designed and executed advertising and marketing campaigns promoting our LendingTree and related brands and offerings, we attract consumers to our websites and toll-free telephone numbers. Many consumers then complete inquiry forms, providing detailed information about themselves and the products or services they are seeking. We refer to such consumer inquiries as leads. We then match these leads with businesses seeking to serve these consumers' needs, in a forum we refer to as an exchange. In so doing, we generate revenue from these businesses, generally at the time of transmitting a lead to them, for which we charge a match fee. In certain instances outside our mortgage business, such as our auto business, we charge other kinds of fees, such as a closed loan or closed sale fee.

<div align="center">

1

</div>

Table of Contents

**Evolution and Future Growth of Our Business**

At its inception, our original business was to serve consumers seeking home mortgage loans by matching them with various lenders. We launched the LendingTree brand nationally in 1998 and, over the last sixteen years, we believe this brand has gained widespread consumer recognition.

Currently, in addition to mortgage, we are focused on other personal finance-related offerings, such as personal loans and credit cards, as well as the automotive industry, where we promote our LendingTree Autos[SM] brand, the education industry, where we promote our LendingTree Education[SM] brand and the home services industry, where we promote our LendingTree Home Pros[SM] brand. We believe that consumers will have a higher propensity to utilize our various services by virtue of their LendingTree-branded associations than those of other providers whose brands consumers may not recognize.

Going forward, in addition to operating our core mortgage business, we intend to focus increasingly on growing our existing non-mortgage businesses, seeking to penetrate new industries and developing new product offerings and enhancements to improve the experiences that consumers and businesses have as they interact with us. By expanding our portfolio of product and service offerings, we are seeking to grow and diversify our business and sources of revenue. We intend to capitalize on our expertise in performance marketing, product development and technology, and leverage the widespread recognition of the LendingTree brand to pursue this strategy.

### Our Segments

Our four operating segments are lending, auto, education and home services. We sometimes refer to these operating segments as our "businesses". Of these, only our lending operating segment meets the criteria for a reportable segment. We formerly referred to this reportable segment as our mortgage segment. *See* Note 18—Segment Information to the consolidated financial statements included elsewhere in this report.

### *Lending*

Consumers seeking home mortgage loans can access our nationwide network of more than 300 banks, lenders and loan brokers online (via *www.lendingtree.com* or *www.getsmart.com*) or by calling 1-800-555-TREE. We refer to these banks, lenders and loan brokers as our network lenders. Loan products offered by network lenders consist primarily of home mortgages (in connection with refinancings and purchases), home equity loans and reverse mortgages.

We select lenders throughout the country in an effort to provide full geographic lending coverage and to offer a complete suite of loan offerings available in the market. To participate on our network, lenders are required to enter into contracts with us that state the terms and conditions for such participation, although these contracts generally may be terminated for convenience by either party. We perform certain due diligence procedures on prospective new lenders, including screening against a national anti-fraud database maintained by the Mortgage Asset Research Institute, which helps manage our risk exposure. The data is utilized to determine whether a lender and its principals are eligible to participate on our network and have not been convicted of and/or penalized for fraudulent activity. For the year ended December 31, 2013, one customer accounted for 12% of total revenue and another accounted for 12% of total revenue. For the year ended December 31, 2012, one customer accounted for 14% of total revenue and another accounted for 11% of total revenue.

Consumers seeking mortgage loans through our lender network can receive multiple conditional loan offers from network lenders in response to a single loan request form. We refer to the process by which we match consumers and network lenders as the matching process. This matching process consists of the following steps:

(1) **Loan Request.** Consumers complete a single loan request form with information regarding the type of home loan product they are seeking, loan preferences and other data. Consumers also consent to a soft inquiry regarding their credit.

(2) **Loan Request Form Matching and Transmission.** Our proprietary systems and technology match a given consumer's loan request form data, self-reported credit profile and geographic location against certain pre-established criteria of network lenders, which may be modified from time to time. Once a given loan request passes through the matching process, the loan request is automatically transmitted to up to five participating network lenders.

(3) **Lender Evaluation and Response.** Network lenders that receive a loan request form evaluate the information contained in it to determine whether to make a conditional loan offer. If any of the network lenders initially receiving a loan request do not respond with a conditional loan offer, the loan request form is directed through the matching process a second time in an attempt to match the consumer with other network lenders, up to a maximum of five.

2

Table of Contents

(4) **Communication of a Conditional Offer.** If one or more network lenders make a conditional offer, the consumer is automatically notified via e-mail to return to our website and log in to a web page that presents the customized loan offers ("My Account"). Through the My Account web page, consumers may access and compare the proposed terms of each conditional offer, including interest rates, closing costs, monthly payment amounts, lender fees and other information.

(5) **Loan Processing.** Consumers may then elect to work offline with relevant network lenders to provide property information and additional information bearing on their creditworthiness. If a network lender approves a consumer's application, it may then underwrite and originate a loan.

(6) **Ongoing Consumer and Lender Support.** Active e-mail and telephone support are provided to both network lenders and consumers during the loan transaction process. This support is designed to provide technical assistance and increase overall satisfaction of network lenders and consumers.

We also offer consumers an alternative "short-form" matching process, which provides them with lender contact information rather than conditional offers from network lenders. This short-form process typically requires consumers to submit less data than required in connection with the matching process described above and does not involve consumer consent to an inquiry regarding credit.

In January 2013, we expanded our mortgage offerings by launching LoanExplorer, a "rate table" loan marketplace where consumers can enter their loan and credit profile and dynamically view real-time rates from lenders without entering their contact information. Consumers then have the option of calling lenders directly, clicking through to lenders' websites, or sending data requests for lenders to follow up with them directly. We developed this offering through internal product development efforts.

Other lending offerings include information, tools and access to:

* Reverse mortgage loans, a loan product available to qualifying homeowners age 62 or older; we launched this offering in the first quarter of 2013 through internal product development efforts,

* Personal loans, which are unsecured obligations generally carrying shorter terms and smaller loan amounts than mortgages; we have historically operated a personal loan offering, but launched an enhanced version of this offering in the third quarter of 2013, and

* Credit cards offerings from all the major issuers; we launched this offering in the second quarter of 2013 through internal product development efforts.

We intend to continue adding new lending offerings for consumers and lenders, in order to grow and diversify our sources of revenue. We may develop such new offerings through internal product development efforts, strategic business relationships with third parties and/or acquisitions.

LendingTree does not charge consumers for the use of our services. Substantially all revenues from our lender network are derived from upfront match fees paid by network lenders that receive a lead. Previously, network lenders also paid closing fees when they closed a transaction with a consumer, but this closing fee was eliminated in 2011 for all mortgage products, with the exception of home equity loans. The closing fee on home equity loan products was eliminated in January 2013. Because a given loan request form can be matched with more than one network lender, up to five match fees may be generated from a single consumer loan request form.

### Other Operating Segments

Other operating segments include our auto, education and home services businesses.

_**Auto.**_ We offer a variety of resources to consumers seeking loans for purchasing new and used automobiles and for refinancing existing auto loans. Consumers complete a loan request form and then we match those applications with a national platform of banks, brokers and credit unions seeking to serve these consumers. We also offer prospective automobile buyers the opportunity to search for new and used automobiles through access to more than 4,000 dealerships. We do not charge fees to consumers for use of our auto services; rather, substantially all revenues from our auto customers—banks, credit unions, dealerships and dealer groups—are derived from upfront match fees, closed loan and closed sale fees.

3

*Education*. We offer referrals to more than 30 top-tier institutions and agencies for prospective students seeking institutions of higher education. Supported programs include Associates, Bachelors and Masters degrees across a broad range of subject categories including Business, Education, Healthcare, Nursing, Psychology and Technology, among others. Our education websites provide information and a variety of resources related to educational opportunities for prospective students. We do not charge fees to prospective students for use of our education services; rather, substantially all our revenues are derived from educational institutions and agencies to whom we refer prospective students, in the form of upfront match fees.

*Home Services*. We offer consumers opportunities to research and find home improvement professional services through our network of both local and national contractors. We have local coverage nationwide for many of the most popular home improvement categories, through our direct contractor relationships and partner network. We generate consumer awareness both by offering home improvement referrals during the core LendingTree mortgage loan request form process, as well as through dedicated marketing efforts. In the fall of 2013, we rebranded this business as LendingTree Home Pros$^{SM}$ and launched a new, more user-friendly website. We do not charge fees to consumers for use of our home services offerings; rather, substantially all revenues from our home services customers—independent contractors, national home services and home improvement chains, other lead aggregators and other home services marketing services providers—are derived from upfront match fees.

*Other Products*. Other also includes information, tools and access to:

- Various consumer insurance products, including home and automobile, through which consumers are matched with licensed insurance agents and insurance lead aggregators to obtain insurance offers;

- Personal credit data, through which consumers can gain insights into how prospective lenders and other third parties view their credit profiles;

- Credit repair and debt consolidation services, through which consumers can obtain assistance improving their credit profiles, in order to expand and improve loan and other financial product opportunities available to them; and

- Real estate brokerage services, through which consumers are matched with local realtors who can assist them in their home purchase or sale efforts.

We refer to the various purchasers of leads from our other exchanges as lead purchasers.

**Seasonality**

Revenue in our lending business is subject to the cyclical and seasonal trends of the U.S. housing and credit markets. Home sales typically rise during the spring and summer months and decline during the fall and winter months, while refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values. Revenue in our personal loan and credit card businesses is driven by interest rates and availability of credit in the market.

In our other businesses, our:

- Auto business tends to have a seasonal increase in the spring;

- Education business tends to increase preceding the commencement of new semesters; and

- Home services business tends to increase during the summer.

However, these trends in our businesses are not absolute and there have been exceptions to them.

**Competition**

Our lending and other businesses compete with other lead aggregators, including online intermediaries that operate network-type arrangements. We also face competition from lenders that source consumer loan originations directly through their owned and operated websites or by phone. These companies typically operate consumer-branded websites and attract consumers via online banner ads, keyword placement on search engines, partnerships with affiliates and business development arrangements with other properties, including major online portals.

<div align="center">4</div>

**Table of Contents**

**Regulation and Legal Compliance**

Our businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States (*see* "Item 1A. Risk Factors—*Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations.*"). As a result, they are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, including:

- Restrictions on the amount and nature of fees or interest that may be charged in connection with a loan, such as state usury and fee restrictions;

- Restrictions imposed by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd Frank Act") and current or future rules promulgated thereunder, including, but not limited to, limitations on fees charged by mortgage lenders, mortgage broker disclosures and rules promulgated by the Consumer Financial Protection Bureau, or CFPB, which was created under the Dodd-Frank Act;

- Restrictions on the manner in which consumer loans are marketed and originated, including the making of required consumer disclosures, such as the Federal Trade Commission's Mortgage Advertising Practices ("MAP") Rules, federal Truth-in-Lending Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the federal Fair Housing Act, the federal Real Estate Settlement Procedures Act ("RESPA"), and similar state laws;

- Restrictions on the amount and nature of fees that may be charged to lenders and real estate professionals for providing or obtaining consumer leads, such as RESPA;

- Restrictions on the amount and nature of fees that may be charged to consumers for real estate brokerage transactions, including any incentives and rebates that may be offered to consumers by our businesses;

- Federal and State laws relating to the implementation of the Secure and Fair Enforcement of Mortgage Licensing Act of 2008 (the "SAFE Act") that require us to be licensed in all States and the District of Columbia (licensing requirements are applicable to both individuals and/or businesses engaged in the solicitation of or the brokering of residential mortgage loans and/or the brokering of real estate transactions);

- State and federal restrictions on the marketing activities conducted by telephone, mail, email, mobile device or the internet, including the Telemarketing Sales Rule ("TSR"), Telephone Consumer Protection Act ("TCPA"), state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and their accompanying regulations and guidelines;

- Restrictions imposed by regulations promulgated by the Department of Education with respect to marketing activities and compensation and incentive payments in connection the recruitment and enrollment of students in higher education programs; and

- State "Bird Dog" laws which restrict the amount and nature of fees, if any, that may be charged to consumers for automobile direct and indirect financing.

**Intellectual Property**

We believe that our intellectual property rights are vital to our success. To protect our intellectual property rights in our technology, products, improvements and inventions, we rely on a combination of patents, trademarks, trade secret and other laws, and contractual restrictions on disclosure, including confidentiality agreements with strategic partners, employees, consultants and other third parties. As new or improved proprietary technologies are developed or inventions are identified, we seek patent protection in the United States and abroad, as appropriate. We have two issued U.S. patents relating to our technologies, including those relating to the method and network for coordinating a loan over the internet, which expire in 2018. In March 2014, a federal jury found these two patents invalid. We are considering our legal alternatives with respect to this jury finding. *See* "Item 3. Legal Proceedings—LendingTree v. Zillow, Inc. et al." included elsewhere in this report. In addition to these two issued patents, we also have four pending U.S. patent applications.

Many of our services are offered under proprietary trademarks and service marks. We generally apply to register or secure by contract our principal trademarks and service marks as they are developed and used. We have 32 trademarks and service marks registered with the United States Patent and Trademark Office. These registrations can typically be renewed at 10-year intervals. We reserve and register domain names when and where we deem appropriate and we currently have approximately 1,300 registered domain names. We also have agreements with third parties that provide for the licensing of patented and proprietary technology used in our business.

6/10/2020

08-13555-mg Doc 57148-1 F Document 23.3 Filed 04/00/26 Entered 06/04/00/20 Page 2128 of 13 Exhibit
Complaint Pg 641 of 1033

Table of Contents

From time to time, we are subjected to legal proceedings and claims, or threatened legal proceedings or claims, including allegations of infringement of third-party trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, the use of litigation may be necessary for us to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. *See* "Item 3. Legal Proceedings" included elsewhere in this report for more information.

## Employees

As of December 31, 2013, we had approximately 192 employees, of which approximately 176 are full-time and 16 are temporary or part-time. None of our employees are represented under collective bargaining agreements and we consider our relations with employees and independent contractors to be good.

## Additional Information

### Website and Public Filings

We maintain a corporate website at *www.tree.com* and an investor relations website at *www.investor-relations.tree.com*. None of the information on our website is incorporated by reference in this report, or in any other filings with, or in any information furnished or submitted to, the Securities and Exchange Commission (the "SEC").

We make available, free of charge through our website, our reports on Forms 10-K, 10-Q and 8-K, our proxy statement for the annual shareholders' meeting and beneficial ownership reports on Forms 3, 4 and 5 as soon as reasonably practicable after we file such material with, or furnish such material to, the SEC. Our filings with the SEC are available to the public over the Internet at the SEC's website at *www.sec.gov*, or at the SEC's public reference room located at 100 F Street, N.E., Washington, DC 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference room.

### Code of Business Conduct and Ethics

Our code of business conduct and ethics, which applies to all employees, including all executive officers and senior financial officers and directors, is posted on our website at *www.investor-relations.tree.com/governance.cfm*. This is our code of ethics pursuant to Item 406 of SEC Regulation S-K and the rules of The NASDAQ Stock Market. Any amendments to or waivers of the code of business conduct and ethics that are of the type described in Item 406(b) and (d) of Regulation S-K, will be disclosed on our website.

6

Table of Contents

## ITEM 1A.  *Risk Factors*

Our business, financial condition and results of operations are subject to certain risks that are described below.

***We have incurred significant operating losses in the past and we may not be able to generate sufficient revenue to be profitable over the long term.***

We have a history of incurring operating losses, including for the 2013 and 2012 years, and although our performance over the last few years has been improving, we have an accumulated deficit of $807.5 million at December 31, 2013. If we fail to maintain or grow our revenue and manage our expenses, we may incur significant losses in the future and not be able to maintain profitability.

***Adverse conditions in the primary and secondary mortgage markets, as well as the economy generally, could materially and adversely affect our business, financial condition and results of operations.***

The primary and secondary mortgage markets have been experiencing continued constraints, which have in the past had, and may in the future have, an adverse effect on our business, financial condition and results of operations. These conditions, coupled with economic conditions that are still recovering and residential real estate prices which, despite recent improvements, are still at substantially reduced levels from their last peak in 2006, have resulted in and are expected to continue to result in decreased demand for purchase loans and greater difficulty qualifying for refinance and home equity loans. Generally, increases in interest rates adversely affect the ability of our network lenders to close loans, and adverse economic trends limit the ability of our network lenders to offer home loans other than low-margin conforming loans. Our businesses may experience a decline in demand for their offerings due to decreased consumer demand as a result of the conditions described above, now or in the future. Conversely, during periods with decreased interest rates, network lenders have less incentive to use our networks, or in the case of sudden increases in consumer demand, our network lenders may lack the ability to support sudden increases in volume.

***Difficult market conditions have adversely affected the mortgage industry.***

Declines in the housing market from 2006 through early 2012, as measured by the S&P/Case-Schiller 20-city composite home price index, with home price declines and increased foreclosures, unemployment and under-employment, negatively impacted the credit performance of mortgage loans and resulted in significant write-downs of asset values by financial institutions, including government-sponsored entities as well as major commercial and investment banks. These write-downs, initially of mortgage-backed securities but subsequently to other asset-backed securities, credit default swaps and other derivative and cash securities, in turn, caused many financial institutions to seek additional capital, merge with larger and stronger institutions and, in some cases, to fail.

Reflecting concern about the stability of the housing markets generally and the strength of counterparties, many lenders and institutional investors reduced or ceased providing funding to borrowers, including to other financial institutions. This market disruption and tightening of credit led to an increased level of commercial and consumer delinquencies, lack of consumer confidence and increased market volatility. The resulting economic pressure on consumers and lack of confidence in the financial markets has had in the past and may have in the future an adverse effect on our business, financial condition and results of operations.

While conditions in the housing markets have improved during 2012 and 2013, the failure to sustain such improvements and, thereby, a worsening of these conditions could have adverse effects on us and our network lenders. Further, our business could be adversely affected by the actions and commercial soundness of other businesses in the financial services sector. As a result, defaults by, or even rumors or questions about, one or more of these entities, or the financial services industry generally, have in the past led to market-wide liquidity problems and could lead to disruptions in the mortgage industry. Any such disruption could have an adverse effect on our business, financial condition and results of operations.

7

Table of Contents

***Our financial results fluctuate as a result of seasonality, which may make it difficult to predict our future performance and may adversely affect our common stock price.***

Our lending business is historically subject to seasonal trends. These trends reflect the general patterns of housing sales, which typically peak in the spring and summer seasons. In recent periods, broader cyclical trends in interest rates, as well as the mortgage and real estate markets, have upset the customary seasonal trends. However, seasonal trends may resume and our quarterly operating results may fluctuate. Our other businesses have various seasonality trends which may create further uncertainty in our quarterly operating results if these business become more significant components of our total revenue. *See* "Item 1. Business—Seasonality" included elsewhere in this report for more information, Any of these seasonal trends, or the combination of them, may negatively impact the price of our common stock.

***Litigation and indemnification of secondary market purchasers could have a material adverse effect on our business, financial condition, results of operations and liquidity. If we cannot settle any then-existing and certain future contingent liabilities to secondary market purchasers, a substantial portion of the purchase price for the sale of LendingTree Loans' assets will remain in escrow indefinitely.***

In connection with the sale of loans to secondary market purchasers, HLC may be liable for certain indemnification, repurchase and premium repayment obligations. In connection with the sale of loans to secondary market purchasers, HLC made certain representations regarding related borrower credit information, loan documentation and collateral. To the extent that these representations were incorrect, HLC may be required to repurchase loans or indemnify secondary market purchasers for losses due to borrower defaults. HLC also agreed to repurchase loans or indemnify secondary market purchasers for losses due to early payment defaults (*i.e.,* late payments during a limited time period immediately following HLC's origination of the loan). Further, HLC agreed to repay all or a portion of the initial premiums paid by secondary market purchasers in instances where the borrower prepays the loan within a specified period of time. HLC has made payments for these liabilities in the past and expects to make payments for these liabilities in the future.

We continue to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business. Approximately $21.2 million is being held in escrow pending resolution of certain of these contingent liabilities. We have in the past and intend to continue to negotiate in the future with secondary market purchasers to settle any existing and future contingent liabilities, but we cannot assure you we will be able to do so on terms acceptable to us, or at all. The occurrence of indemnification claims, repurchase obligations or premium repayments beyond our reserves for these contingencies, or our inability to settle with secondary market purchasers, may have a material adverse effect on our business, financial condition and results of operations.

***The asset purchase agreement for the sale of substantially all of the operating assets of our LendingTree Loans business may expose us to contingent liabilities.***

Under the asset purchase agreement, we have agreed to indemnify Discover for a breach or inaccuracy of any representation, warranty or covenant made by us in the asset purchase agreement, for any liability of ours that was not assumed, for any claims by our stockholders against Discover and for our failure to comply with any applicable bulk sales law, subject to certain limitations. Discover submitted a claim for indemnification relating to our sale prior to the closing of certain loans that were listed in the asset purchase agreement as to be conveyed to Discover at closing. In May 2013, the claim was resolved (*see* Note 16—Discontinued Operations to the consolidated financial statements included elsewhere in this report).

***We cannot compete in the business of originating, funding or selling of mortgages until June 2015. These restrictions may prevent certain strategic transactions or discourage potential investors from purchasing our stock.***

Subject to specified exceptions, we have agreed we will not establish, own, manage, operate, control, invest in or otherwise engage in the business of origination, funding or sales of mortgages within the United States for three years from the closing of the sale of substantially all of the operating assets of our LendingTree Loans business. Should market conditions or our strategic direction change, we will not be able to re-establish mortgage lending as part of our business during the restricted period. This non-compete restriction may bind an acquirer of more than fifty percent of our total outstanding voting securities unless such acquirer derives less than fifty percent of its revenue from the business of origination, funding or sales of mortgages.

This non-compete restriction could delay, defer or prevent a change of control, merger, consolidation, takeover or other business combination involving us that our board of directors or our stockholders may otherwise support, and could also discourage a potential investor from acquiring our common stock and might harm the market price of our common stock.

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm                    13/112

Table of Contents

***We depend on relationships with network lenders and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

Our success depends in significant part on the financial strength of lenders participating on our networks. Network lenders could, for any reason, experience financial difficulties and cease participating on our lender network, fail to pay match and/or closing fees when due and/or drop the quality of their services to consumers. The occurrence of one or more of these events with a significant number of network lenders could, alone or in combination, have a material adverse effect on our business, financial condition and results of operations.

***Network lenders affiliated with our networks are not precluded from offering products and services outside of our exchanges.***

Because our businesses do not have exclusive relationships with network lenders, consumers may obtain loans directly from these third-party service providers without having to use our exchanges. Network lenders can offer loans directly to consumers through marketing campaigns or other traditional methods of distribution, such as referral arrangements, physical store-front operations or broker agreements. Network lenders may also offer loans and services to prospective customers online directly, through one or more online competitors of our businesses, or both. If a significant number of consumers seek loans and services directly from network lenders as opposed to through our exchanges, our business, financial condition and results of operations would be adversely affected.

***Some of our lending services are new to the market and may fail to achieve or maintain customer acceptance and profitability.***

In 2013, we expanded our lending offerings by launching LoanExplorer, a "rate table" loan marketplace, and loan marketplaces for reverse mortgages, personal loans and credit card offerings. We do not have as much experience with these products as with the mortgage marketplaces. Accordingly, these new offerings may be subject to greater risks than our more mature mortgage marketplaces.

The success of these and other new products we may offer will depend on a number of factors, including:

- Implementing at an acceptable cost product features expected by consumers and lead purchasers;

- Market acceptance by consumers and lead purchasers;

- Offerings by current and future competitors;

- Our ability to attract and retain management and other skilled personnel for these businesses;

- Our ability to collect amounts owed to us from third parties;

- Our ability to develop successful and cost-effective marketing campaigns; and

- Our ability to timely adjust marketing expenditures in relation to changes in demand for the underlying products and services offered by our lead purchasers.

Our results of operations may suffer if we fail to successfully anticipate and manage these issues associated with new products.

***We rely on the performance of highly skilled personnel and if we are unable to attract, retain and motivate well-qualified employees, our business could be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our management team and our highly skilled employees, including our software engineers, analysts, marketing professionals and sales staff. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially adversely affect our ability to build on the efforts they have undertaken and to execute our business plan, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business and results of operations could be harmed.

9

Table of Contents

***Network lenders and lead purchasers on our exchanges may not provide competitive levels of service to consumers, which could adversely affect our brands and businesses and their ability to attract consumers.***

The ability of our businesses to provide consumers with a high-quality experience depends, in part, on consumers receiving competitive levels of convenience, customer service, price and responsiveness from network lenders and lead purchasers participating on our other exchanges with whom they are matched. If these providers do not provide consumers with competitive levels of convenience, customer service, price and responsiveness, the value of our various brands may be harmed, the ability of our businesses to attract consumers to our websites may be limited and the number of consumers matched through our exchanges may decline, which could have a material adverse effect on our business, financial condition and results of operations.

***Failure to maintain brand recognition and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.***

In order to attract visitors to our websites, convert these visitors into leads for our network lenders and lead purchasers and generate repeat visits from consumers, our businesses must promote and maintain their various brands successfully. Brand promotion and maintenance requires the expenditure of considerable money and resources for online and offline advertising, marketing and related efforts, as well as the continued provision and introduction of high-quality products and services.

Brand recognition is a key differentiating factor among providers of online services. We believe that continuing to build and maintain the recognition of our various brands is critical to achieving increased demand for the services provided by our businesses. Accordingly, we have spent, and expect to continue to spend, significant amounts of operating capital on, and devote significant resources to, branding, advertising and other marketing initiatives, which may not be successful or cost-effective. The failure of our businesses to maintain the recognition of their respective brands and attract and retain customers in a cost-effective manner could adversely affect our business, financial condition and results of operations.

Adverse publicity from legal proceedings against us or our businesses, including governmental proceedings and consumer class action litigation, or from the disclosure of information security breaches, could negatively impact our various brands, which could adversely affect our business, financial condition and results of operations. In addition, the actions of our third-party marketing partners who engage in advertising on our behalf could negatively impact our various brands.

***We depend on search engines and other online sources to attract visitors to our websites, and if we are unable to attract these visitors and convert them into leads for our network lenders and lead purchasers in a cost-effective manner, our business and financial results may be harmed.***

Our success depends on our ability to attract online consumers to our websites and convert them into customers in a cost-effective manner. We depend, in part, on search engines and other online sources for our website traffic. We are included in search results as a result of both paid search listings, where we purchase specific search terms that result in the inclusion of our listing, and algorithmic searches, that depend upon the searchable content on our sites. Search engines and other online sources revise their algorithms from time to time in an attempt to optimize their search results.

If one or more of the search engines or other online sources on which we rely for website traffic were to modify its general methodology for how it displays our websites, resulting in fewer consumers clicking through to our websites, our business, could suffer. If any free search engine on which we rely begins charging fees for listing or placement, or if one or more of the search engines or other online sources on which we rely for purchased listings, modifies or terminates its relationship with us, our expenses could rise, we could lose customers and traffic to our websites could decrease, all of which could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to continually enhance our products and services and adapt them to technological changes and consumer and customer needs, including the emergence of new computing devices and more sophisticated online services, we may lose market share and revenue and our business could suffer.***

We need to anticipate, develop and introduce new products, services and applications on a timely and cost-effective basis that keep pace with technological developments and changing consumer and customer needs. For example, the number of individuals who access the internet through devices other than a personal computer, such as personal digital assistants, mobile telephones, televisions and set-top box devices has increased significantly and this trend is likely to continue. Because each manufacturer or distributor may establish unique technical standards for its devices, our websites may not be functional or viewable on these devices. Additionally, new devices and new platforms are continually being released. Consumers access many traditional web services on mobile devices through applications, or apps.

10

**Table of Contents**

It is difficult to predict the problems we may encounter in improving our websites' functionality with these alternative devices or developing apps for mobile platforms. If we fail to develop our websites or apps to respond to these or other technological developments and changing consumer and customer needs cost effectively, we may lose market share, which could adversely affect our business, financial condition and results of operations.

***Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could adversely affect our business, financial condition and results of operations.***

We market and provide services in heavily regulated industries through a number of different channels across the United States. As a result, our businesses have been and remain subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, which are subject to change at any time. The failure of our businesses to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could result in administrative fines and/or proceedings against us or our businesses by governmental agencies and/or litigation by consumers, which could adversely affect our business, financial condition and results of operations and our brand.

Our businesses conduct marketing activities via the telephone, the mail and/or through online marketing channels, which general marketing activities are governed by numerous federal and state regulations, such as the Telemarketing Sales Rule, state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, the Telephone Consumer Protection Act and the Federal Trade Commission Act and its accompanying regulations and guidelines, among others. Increased regulation by the U.S. Federal Trade Commission (FTC) and Federal Communications Commission (FCC) has resulted in restrictions on telephone calls to residential and wireless telephone subscribers.

Additional federal, state and in some instances, local, laws regulate residential lending activities. These laws generally regulate the manner in which lending and lending-related activities are marketed or made available, including advertising and other consumer disclosures, payments for services and record keeping requirements; these laws include the Real Estate Settlement Procedures Act (RESPA), the Fair Credit Reporting Act, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act and various state laws. State laws often restrict the amount of interest and fees that may be charged by a lender or mortgage broker, or otherwise regulate the manner in which lenders or mortgage brokers operate or advertise.

Failure to comply with applicable laws and regulatory requirements may result in, among other things, revocation of or inability to renew required licenses or registrations, loss of approval status, termination of contracts without compensation, administrative enforcement actions and fines, private lawsuits, including those styled as class actions, cease and desist orders and civil and criminal liability.

Most states require licenses to solicit, broker or make loans secured by residential mortgages and other consumer loans to residents of those states, as well as to operate real estate referral and brokerage services, and in many cases require the licensure or registration of individual employees engaged in aspects of these businesses. In 2008, Congress mandated that all states adopt certain minimum standards for the licensing of individuals involved in mortgage lending or loan brokering, and many state legislatures and state agencies are in the process of adopting or implementing additional licensing, continuing education and similar requirements on mortgage lenders, brokers and their employees. Compliance with these new requirements may render it more difficult to operate or may raise our internal costs. While our businesses have endeavored to comply with applicable requirements, the application of these requirements to persons operating online is not always clear. Moreover, any of the licenses or rights currently held by our businesses or our employees may be revoked prior to, or may not be renewed upon, their expiration. In addition, our businesses or our employees may not be granted new licenses or rights for which they may be required to apply from time to time in the future.

Likewise, states or municipalities may adopt statutes or regulations making it unattractive, impracticable or infeasible for our businesses to continue to conduct business in such jurisdictions. The withdrawal from any jurisdiction due to emerging legal requirements could adversely affect our business, financial condition and results of operations.

Our businesses are also subject to various state, federal and/or local laws, rules and regulations that regulate the amount and nature of fees that may be charged for transactions and incentives, such as rebates, that may be offered to consumers by our businesses, as well as the manner in which these businesses may offer, advertise or promote transactions. For example, RESPA generally prohibits the payment or receipt of referral fees and fee shares or splits in connection with residential mortgage loan transactions, subject to certain exceptions. The applicability of referral fee and fee sharing prohibitions to lenders and real estate providers, including online networks, may have the effect of reducing the types and amounts of fees that may be charged or paid in connection with real estate-secured loan offerings or activities, including mortgage brokerage, lending and real estate brokerage services, or otherwise limiting the ability to conduct marketing and referral activities.

11

Table of Contents

Various federal, state and in some instances, local, laws also prohibit unfair and deceptive sales practices. We have adopted appropriate policies and procedures to address these requirements (such as appropriate consumer disclosures and call scripting, call monitoring and other quality assurance and compliance measures), but it is not possible to ensure that all employees comply with our policies and procedures at all times.

Compliance with these laws, rules and regulations is a significant component of our internal costs, and new laws, rules and regulations are frequently proposed and adopted, requiring us to adopt new procedures and practices. Changes to existing laws, rules and regulations or changes to interpretation of existing laws, rules and regulations could result in further restriction of activities incidental to our business and could have a material adverse effect on our business, results of operation and financial condition.

Parties through which our businesses conduct business similarly may be subject to federal and state regulation. These parties typically act as independent contractors and not as agents in their solicitations and transactions with consumers. We cannot ensure that these entities will comply with applicable laws and regulations at all times. Failure on the part of a lender, secondary market purchaser, website operator or other third party to comply with these laws or regulations could result in, among other things, claims of vicarious liability or a negative impact on our reputation and business.

Regulatory authorities and private plaintiffs may allege that we failed to comply with applicable laws, rules and regulations where we believe we have complied. These allegations may relate to past conduct and/or past business operations, such as our discontinued real estate brokerage operation (which was subject to various state and local laws, rules and regulations). Even allegations that our activities have not complied or do not comply with all applicable laws and regulations may have an adverse effect on our business, financial condition and results of operations. The alleged violation of such laws, rules or regulations may entitle an individual plaintiff to seek monetary damages, or may entitle an enforcing government agency to seek significant civil or criminal penalties, costs and attorneys' fees. Regardless of its merit, an allegation typically requires legal fee expenditures to defend against. We have in the past and may in the future decide to settle allegations of non-compliance with laws, rules and regulations when we determine that the cost of settlement is less than the cost and risk of continuing to defend against an allegation. Settlements may require us to pay monetary fines and may require us to adopt new procedures and practices, which may render it more difficult to operate or may raise our internal costs. The future occurrence of one or more of these events could have an adverse effect on our business, financial condition and results of operations.

***Changes in the regulation of the Internet could negatively affect our business.***

Laws, rules and regulations governing Internet communications, advertising and e-commerce are dynamic and the extent of future government regulation is uncertain. Federal and state regulations govern various aspects of our online business, including intellectual property ownership and infringement, trade secrets, the distribution of electronic communications, marketing and advertising, user privacy and data security, search engines and Internet tracking technologies. Future taxation on the use of the Internet or e-commerce transactions could also be imposed. Existing or future regulation or taxation could hinder growth in or negatively impact the use of the Internet generally, including the viability of Internet e-commerce, which could reduce our revenue, increase or operating expenses and expose us to significant liabilities.

***The Dodd-Frank Wall Street Reform and Consumer Protection Act and related legislative and regulatory actions may have a significant impact on our business, results of operations and financial condition.***

In July 2010, the President signed into law the Dodd-Frank Act, which contains a comprehensive set of provisions designed to govern the practices and oversight of financial institutions and other participants in the financial markets. The Dodd-Frank Act requires various federal agencies to adopt a broad range of new rules and regulations, and to prepare numerous studies and reports for Congress, which could result in additional legislative or regulatory action. The federal agencies are given significant discretion in drafting the rules and regulations and, consequently, many of the details and much of the impact of the Dodd-Frank Act may not be known for many months or years.

The Dodd-Frank Act, as well as other legislative and regulatory changes, could have a significant impact on us by, for example, requiring us to change our business practices, limiting our ability to pursue business opportunities, imposing additional costs on us, limiting fees we can charge, impacting the value of our assets, or otherwise adversely affecting our businesses. Among other things, the Dodd-Frank Act established the Bureau of Consumer Financial Protection to regulate consumer financial services and products, including credit, savings and payment products. The effect of the Dodd-Frank Act on our business and operations could be significant, depending upon final implementing regulations, the actions of our competitors and the behavior of other marketplace participants. In addition, we may be required to invest significant management time and resources to address the various provisions of the Dodd-Frank Act and the numerous regulations that are required to be issued under it.

12

Table of Contents

In light of recent conditions in the U.S. financial markets and economy, as well as a heightened regulatory and Congressional focus on consumer lending, regulators have increased their scrutiny of the financial services industry, the result of which has included new regulations and guidance. We are unable to predict the long-term impact of this enhanced scrutiny. We are also unable to predict whether any additional or similar changes to statutes or regulations, including the interpretation or implementation thereof, will occur in the future.

***If network lenders fail to produce required documents for examination by, or other affiliated parties fail to make certain filings with, state regulators, we may be subject to fines, forfeitures and the revocation of required licenses.***

Some of the states in which our businesses maintain licenses require them to collect various loan documents from network lenders and produce these documents for examination by state regulators. While network lenders are contractually obligated to provide these documents upon request, these measures may be insufficient. Failure to produce required documents for examination could result in fines, as well as the revocation of our licenses to operate in certain states, which could have a material adverse effect on our business, financial condition and results of operations.

Regulations promulgated by some states may impose compliance obligations on directors, executive officers, large customers and any person who acquires a certain percentage (for example, 10% or more) of our common stock, including requiring such persons to periodically file financial and other personal and business information with state regulators. If any such person refuses or fails to comply with these requirements, we may be unable to obtain certain licenses and existing licensing arrangements may be jeopardized. The inability to obtain, or the loss of, required licenses could have a material adverse effect on our business, financial condition and results of operations.

***Our success depends, in part, on the integrity of our systems and infrastructures. System interruption and the lack of integration and redundancy in these systems and infrastructures may have an adverse impact on our business, financial condition and results of operations.***

Our success depends, in part, on our ability to maintain the integrity of our systems and infrastructures, including websites, information and related systems, call centers and distribution and fulfillment facilities. System interruption and the lack of integration and redundancy in our information systems and infrastructures may adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. We may experience occasional system interruptions that make some or all systems or data unavailable or prevent our businesses from efficiently providing services or fulfilling orders. We also rely on affiliate and third-party computer systems, broadband and other communications systems and service providers in connection with the provision of services generally, as well as to facilitate, process and fulfill transactions. Any interruptions, outages or delays in our systems and infrastructures, our businesses, our affiliates and/or third parties, or deterioration in the performance of these systems and infrastructures, could impair the ability of our businesses to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, acts of war or terrorism, acts of God, unauthorized intrusions or computer viruses, and similar events or disruptions may damage or interrupt computer, broadband or other communications systems and infrastructures at any time. Any of these events could cause system interruption, delays and loss of critical data, and could prevent our businesses from providing services, fulfilling orders and/or processing transactions. While our businesses have backup systems for certain aspects of their operations, these systems are not fully redundant and disaster recovery planning is not sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these adverse events were to occur, it could adversely affect our business, financial condition and results of operations.

***A breach of our network security or the misappropriation or misuse of personal consumer information may have an adverse impact on our business, financial condition and results of operations.***

Any penetration of network security or other misappropriation or misuse of personal consumer information maintained by us or our third-party marketing partners could cause interruptions in the operations of our businesses and subject us to increased costs, litigation and other liabilities. Claims could also be made against us or our third-party marketing partners for other misuse of personal information, such as for unauthorized purposes or identity theft, which could result in litigation and financial liabilities, as well as administrative action from governmental authorities. Real or perceived security breaches could also significantly damage our reputation with consumers and third parties with whom we do business. In that regard, in 2008, we announced that several mortgage companies had gained unauthorized access to our customer information database and had used the information to solicit mortgage loans directly from our customers. We promptly reported the situation to the Federal Bureau of Investigation and have been cooperating fully with the FBI's investigation. While we do not believe this situation resulted in any fraud on the consumer or identity theft, we notified affected consumers as required by applicable law. Notwithstanding the foregoing, following our announcement, several putative class action lawsuits were filed against us,

Table of Contents

seeking to recover damages for consumers allegedly injured by this incident. All of these lawsuits have been dismissed or withdrawn (*see* "Item 3. Legal Proceedings" in our 2011 Form 10-K).

We may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. We also face risks associated with security breaches affecting third parties with whom we are affiliated or otherwise conduct business with online. Consumers are generally concerned with security and privacy of the Internet, and any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have an adverse effect on our business, financial condition and results of operations.

***The collection, processing, storage, use and disclosure of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights.***

In the processing of consumer transactions, our businesses receive, transmit and store a large volume of personally identifiable information and other user data. The collection, sharing, use, disclosure and protection of this information are governed by the privacy and data security policies maintained by us and our businesses. Moreover, there are federal, state and international laws regarding privacy and the storing, sharing, use, disclosure and protection of personally identifiable information and user data. Specifically, personally identifiable information is increasingly subject to legislation and regulations in numerous jurisdictions around the world, the intent of which is to protect the privacy of personal information that is collected, processed and transmitted in or from the governing jurisdiction. We could be adversely affected if legislation or regulations are expanded to require changes in business practices or privacy policies, or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations.

Our businesses may also become exposed to potential liabilities as a result of differing views on the privacy of consumer and other user data collected by these businesses. Our failure, and/or the failure by the various third-party vendors and service providers with whom we do business, to comply with applicable privacy policies or federal, state or similar international laws and regulations or any compromise of security that results in the unauthorized release of personally identifiable information or other user data could damage the reputation of these businesses, discourage potential users from our products and services and/or result in fines and/or proceedings by governmental agencies and/or consumers, one or all of which could adversely affect our business, financial condition and results of operations.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.***

We regard our intellectual property rights, including patents, service marks, trademarks and domain names, copyrights, trade secrets and similar intellectual property (as applicable), as critical to our success. Our businesses also rely heavily upon software codes, informational databases and other components that make up their products and services.

We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use trade secrets or copyrighted intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

We have generally registered and continue to apply to register, or secure by contract when appropriate, our principal trademarks and service marks as they are developed and used, and reserve and register domain names when and where we deem appropriate. We generally consider the protection of our trademarks to be important for purposes of brand maintenance and reputation. While we vigorously protect our trademarks, service marks and domain names, effective trademark protection may not be available or may not be sought in every country in which products and services are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names and limit our ability to control marketing on or through the Internet using our various domain names or otherwise, which could adversely affect our business, financial condition and results of operations.

14

Table of Contents

We have been granted patents and we have patent applications pending with the United States Patent and Trademark Office and various foreign patent authorities for various proprietary technologies and other inventions. The status of any patent involves complex legal and factual questions, and the breadth of claims allowed is uncertain. Accordingly, any patent application filed may not result in a patent being issued or existing or future patents may not be adjudicated valid by a court or be afforded adequate protection against competitors with similar technology. In March 2014, a federal jury found our two issued patents invalid. We are considering our legal alternatives with respect to this jury finding. *See* "Item 3. Legal Proceedings—LendingTree v. Zillow, Inc. et al." included elsewhere in this report. In addition, third parties may create new products or methods that achieve similar results without infringing upon patents that we own.

Likewise, the issuance of a patent to us does not mean that our processes or inventions will be found not to infringe upon patents or other rights previously issued to third parties.

From time to time, in the ordinary course of business we are subjected to legal proceedings, claims and counterclaims, or threatened legal proceedings, claims or counterclaims, including allegations of infringement of the trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. Patent litigation tends to be particularly protracted and expensive. During the first quarter of 2014, we participated in a jury trial for the litigation described in Item 3. Legal Proceedings—LendingTree v. Zillow, Inc. et al. The legal expenses associated with this jury trial were material, and will negatively affect our operating income or loss for such quarter.

***Our framework for managing risks may not be effective in mitigating our risk of loss.***

Our risk management framework seeks to mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, legal and compliance risk, and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures and reporting requirements. Management of our risks in some cases depends upon the use of analytical and/or forecasting models. If the models that we use to mitigate these risks are inadequate, we may incur increased losses. In addition, there may be risks that exist, or that develop in the future, that we have not appropriately anticipated, identified or mitigated. If our risk management framework does not effectively identify or mitigate our risks, we could suffer unexpected losses and could be materially adversely affected.

***Acquisitions or strategic investments that we pursue may not be successful and could disrupt our business and harm our financial condition.***

We may consider or undertake strategic acquisitions of, or material investments in, businesses, products or technologies. We may not be able to identify suitable acquisition or investment candidates, or even if we do identify suitable candidates, they may be difficult to finance, expensive to fund and there is no guarantee that we can obtain any necessary regulatory approvals or complete such transactions on terms that are favorable to us. To the extent we pay the purchase price of any acquisition or investment in cash, it would reduce our cash balances, which may have an adverse effect on our business and financial condition. If the purchase price is paid with our stock, it would be dilutive to our stockholders. In addition, we may assume liabilities associated with a business acquisition or investment, including unrecorded liabilities that are not discovered at the time of the transaction, and the repayment of those liabilities may have an adverse effect on our financial condition. There may also be litigation or other claims arising in connection with an acquisition itself.

We may not be able to successfully integrate the personnel, operations, businesses, products or technologies of an acquisition or investment. Integration may be particularly challenging if we enter into a line of business in which we have limited experience and the business operates in a difficult legal, regulatory or competitive environment. We may find that we do not have adequate operations or expertise to manage the new business. The integration of any acquisition or investment may divert management's time and resources from our core business, which could impair our relationships with our current employees, customers and strategic partners and disrupt our operations. Acquisitions and investments also may not perform to our expectations for various reasons, including the loss of key personnel or customers. If we fail to integrate acquisitions or investments or realize the expected benefits, we may lose the return on these acquisitions or investments or incur additional transaction costs and our business and financial condition may be harmed as a result.

15

Table of Contents

*If our goodwill or amortizable intangible assets become impaired, we may be required to record a significant charge to earnings.*

Under GAAP, we review the carrying value of goodwill and indefinite-lived intangible assets on an annual basis as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. Factors that may be considered a change in circumstances, indicating that the carrying value of our goodwill or indefinite-lived intangible assets may not be recoverable, include a decline in stock price and market capitalization, reduced future cash flow estimates and slower growth rates in our industry or our customers' industries. We may be required to record a significant charge in our financial statements during a period in which any impairment of our goodwill or indefinite-lived intangible assets is determined, negatively impacting our results of operations.

*The market price and trading volume of our common stock may be volatile and may face negative pressure.*

The market price for our common stock has been volatile since our spin-off. The market price for our common stock could continue to fluctuate significantly for many reasons, including the risks identified in this report or reasons unrelated to our performance. These factors may result in short- or long-term negative pressure on the value of our common stock.

*If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for internet lead-generation companies depends, in part, on the research and reports that securities or industry analysts publish about the industry and specific companies. If one or more analysts covering us currently or in the future fail to publish reports on us regularly, demand for our common stock could decline, which could cause our stock price and trading volume to decline. If one or more recognized securities or industry analysts that cover our company or our industry in the future downgrades our common stock or publishes inaccurate or unfavorable research about our business or industry, our stock price would likely decline.

*Two holders of our common stock own a substantial portion of our outstanding common stock, which concentrates voting control and limits your ability to influence corporate matters.*

As of March 14, 2014, Douglas Lebda, our Chairman and Chief Executive Officer, and Liberty Interactive Corporation beneficially owned approximately 17% and 25%, respectively, of our outstanding common stock. Liberty Interactive also has the right to nominate 20% of the total number of directors serving on the board, rounded up. Liberty Interactive has nominated one director, Neal Dermer, and presently has the right to nominate a second director if it chooses to do so.

Therefore, for the foreseeable future, Mr. Lebda and Liberty Interactive will each have influence over our management and affairs and all matters requiring shareholder approval, including the election or removal (with or without cause) of directors and approval of any significant corporate transaction, such as a merger or other sale of us or our assets. The interests of Mr. Lebda or Liberty Interactive may not necessarily align with the interests of our other stockholders. This concentrated control could delay, defer or prevent a change of control, merger, consolidation, takeover or other business combination involving us that other stockholders may otherwise support. This concentrated control could also discourage a potential investor from acquiring our common stock and might harm the market price of our common stock.

*Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of us more difficult, limit attempts by shareholders to replace or remove our management and affect the market price of our common stock.*

Provisions in our certificate of incorporation and bylaws, as amended and restated, may have the effect of delaying or preventing a change of control or changes in our management. Our amended and restated articles of incorporation and/or amended and restated bylaws include provisions that:

- Authorize our board of directors to issue, without further action by our shareholders, up to five million shares of undesignated preferred stock;

- Prohibit cumulative voting in the election of directors;

- Provide that vacancies on our board of directors may be filled only by the affirmative vote of a majority of directors then in office or by the sole remaining director;

- Provide that only our board of directors may change the size of our board of directors;

- Specify that special meetings of our stockholders may be called only by or at the direction of our board of directors or by a person specifically designated with such authority by the board; and

Table of Contents

- Prohibit stockholders from taking action by written consent.

The provisions described above may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing our management. In addition, because we are incorporated in the State of Delaware, we are governed by the provisions of the Delaware General Corporation Law, which prohibits certain business combinations between us and certain significant shareholders unless specified conditions are met. These provisions may also have the effect of delaying or preventing a change of control of our company, even if stockholders support such a change of control.

## ITEM 1B.  *Unresolved Staff Comments*

Not applicable.

## ITEM 2.  *Properties*

Our principal executive offices are currently located in approximately 37,800 square feet of office space in Charlotte, North Carolina under a lease that expires in July 2015. Personnel for our lending segment are located in both our office space in Charlotte, North Carolina, as well as approximately 6,100 square feet of office space in Burlingame, California under a lease that expires in March 2015.

## ITEM 3.  *Legal Proceedings*

In the ordinary course of business, we are party to litigation involving property, contract, intellectual property and a variety of other claims. The amounts that may be recovered in such matters may be subject to insurance coverage.

**Intellectual Property Litigation**

*LendingTree v. Zillow, Inc., et al. Civil Action No. 3:10-cv-439.*  On September 8, 2010, we filed an action for patent infringement in the US District Court for the Western District of NC against Zillow, Inc., Nextag, Inc., Quinstreet, Inc., Quinstreet Media, Inc., and Adchemy, Inc. The complaint was amended to include Leadpoint, Inc. d/b/a Securerights on September 24, 2010. The complaint alleges that each of the defendants infringe one or both of U.S. Patent No. 6,385,594, entitled "Method and Computer Network for Co-Ordinating a Loan over the Internet," and U.S. Patent No. 6,611,816, entitled "Method and Computer Network for Co-Ordinating a Loan over the Internet." Collectively, the asserted patents cover computer hardware and software used in facilitating business between computer users and multiple lenders on the internet. The defendants in this action asserted various counterclaims against us, including the assertion by certain of the defendants of counterclaims alleging illegal monopolization via our maintenance of the asserted patents. In July 2011, we reached a settlement agreement with Leadpoint, Inc., pursuant to which all claims against Leadpoint, Inc. and all counter-claims against us by Leadpoint, Inc. were dismissed. In November 2012, we reached a settlement agreement with Quinstreet, Inc. and Quinstreet Media, Inc. (collectively, the "Quinstreet Parties"), pursuant to which all claims against the QuinStreet Parties and all counterclaims against us by the Quinstreet Parties were dismissed. This matter went to trial beginning in February 2014, and on March 12, 2014, the jury returned a verdict. The jury found that the defendants Zillow, Inc., Adchemy, Inc. and NexTag, Inc. did not infringe the two patents referenced above and determined that those patents are invalid due to inventorship defects. The jury found in our favor on the defendants' counterclaims alleging inequitable conduct and antitrust violations. As of March 13, 2014, a formal judgment had not yet been entered in the case and certain issues not before the jury remain to be resolved. We believe we have strong grounds for appeal; however, we have not yet determined what actions we will take with respect to the verdict or the findings of patent invalidity. The verdict will not impact our ability to offer our current suite of products and services, and we do not expect the verdict to affect our business prospects.

*Internet Patents Corporation f/k/a InsWeb v. Tree.com, Inc., No. C-12-6505 (U.S. Dist. Ct., N.D. Cal.).*  In December 2012, the plaintiff filed a patent infringement lawsuit against us seeking a judgment that we had infringed a patent held by the plaintiff. Process was formally served with respect to this matter in April 2013. The plaintiff sought injunctive relief, damages, costs, expenses, pre- and post-judgment interest, punitive damages and attorneys' fees. The plaintiff alleged that we infringe U.S. Patent No. 7,707,505, entitled "Dynamic Tabs for a Graphical User Interface". On October 25, 2013, the court dismissed the suit based on the finding that the plaintiff's claims failed as a matter of law because the asserted patent is invalid for lack of patent-eligible subject matter. The plaintiff filed a notice of appeal on November 7, 2013. We believe the plaintiff's allegations lack merit and intend to defend against this action vigorously.

Table of Contents

*The Money Suite Company v. LendingTree, LLC, No. 1:13-cv-986 (U.S. Dist. Ct, D Del.).* In June 2013, the plaintiff filed a patent infringement lawsuit against LendingTree seeking a judgment that we infringed a patent held by plaintiff. The plaintiff alleges that LendingTree infringes U.S. Patent No. 6,684,189 for "an apparatus and method using front end network gateways and search criteria for efficient quoting at a remote location". The plaintiff seeks damages (including pre- and post- judgment interest thereon), costs and attorneys' fees. In December 2013, the court stayed this case pending review of the patent by the United States Patent and Trademark Office. We believe the plaintiff's allegations lack merit and intend to defend against this action vigorously.

## Other Litigation

*Boschma v. Home Loan Center, Inc., No. SACV07-613 (U.S. Dist. Ct., C.D. Cal.).* On May 25, 2007, the plaintiffs filed this putative class action against HLC in the U.S. District Court for the Central District of California. The plaintiffs allege that HLC sold them an option "ARM" (adjustable-rate mortgage) loan but failed to disclose in a clear and conspicuous manner, among other things, that the interest rate was not fixed, that negative amortization could occur and that the loan had a prepayment penalty. Based upon these factual allegations, the plaintiffs asserted violations of the federal Truth in Lending Act, violations of the Unfair Competition Law, breach of contract, and breach of the covenant of good faith and fair dealing. The plaintiffs purport to represent a class of all individuals who between June 1, 2003 and May 31, 2007 obtained an option ARM loan through HLC on their primary residence located in California, and seek rescission, damages, attorneys' fees and injunctive relief. The plaintiffs have not yet filed a motion for class certification, but have filed a total of eight complaints in connection with this lawsuit. Each of the first seven complaints has been dismissed by the federal and state courts. The plaintiffs filed the eighth complaint (a "Second Amended Complaint") in Orange County (California) Superior Court on March 4, 2010 alleging only the fraud and Unfair Competition Law claims. As with each of the seven previous versions of plaintiffs' complaint, the Second Amended Complaint was dismissed in April 2010. The plaintiffs appealed the dismissal and on August 10, 2011, the appellate court reversed the trial court's dismissal and directed the trial court to overrule the demurrer. The case was remanded to superior court. During 2013, the parties agreed to a $450,000 settlement, which was approved in the fourth quarter of 2013. We expect administration of the settlement to be completed by the third quarter of 2014.

*Mortgage Store, Inc. v. LendingTree Loans d/b/a Home Loan Center, Inc., No. 06CC00250 (Cal. Super. Ct., Orange Cty.).* On November 30, 2006, The Mortgage Store, Inc. and Castleview Home Loans, Inc. filed this putative class action against HLC in the California Superior Court for Orange County. The plaintiffs, two former network lenders, alleged that HLC interfered with LendingTree's contracts with network lenders by taking referrals from LendingTree without adequately disclosing the relationship between them and that HLC charged the plaintiffs higher rates and fees than they otherwise would have been charged. Based upon these factual allegations, the plaintiffs assert claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and violation of the California Unfair Competition Law and California Business and Professions Code §17500. The plaintiffs purport to represent all network lenders from December 14, 2004 to date, and seek damages, restitution, attorneys' fees and punitive damages.

The plaintiffs' motion for class certification was granted April 29, 2010. On October 17, 2011, the court granted HLC's motion for summary judgment. Judgment was entered in favor of HLC on April 9, 2012. On June 15, 2012, the plaintiffs filed a Notice of Appeal. The plaintiffs filed their opening appellate brief on December 17, 2012. We filed HLC's opposition to the plaintiffs' appellate brief in April 2013. Oral arguments were heard on this matter on September 25, 2013. On December 11, 2013, the Court of Appeal affirmed the grant of summary judgment in favor of HLC and the time for plaintiffs to further appeal such decision has expired.

*Lijkel Dijkstra v. Harry Carenbauer, Home Loan Center, Inc. et al., No. 5:11-cv-152-JPB (U.S. Dist. Ct., N.D.WV).* On November 7, 2008, the plaintiff filed this putative class action in Circuit Court of Ohio County, West Virginia against Harry Carenbauer, HLC, HLC Escrow, Inc. et al. The complaint alleges that HLC engaged in the unauthorized practice of law in West Virginia by permitting persons who were neither admitted to the practice of law in West Virginia nor under the direct supervision of a lawyer admitted to the practice of law in West Virginia to close mortgage loans. The plaintiff asserts claims for declaratory judgment, contempt, injunctive relief, conversion, unjust enrichment, breach of fiduciary duty, intentional misrepresentation or fraud, negligent misrepresentation, violation of the West Virginia Consumer Credit and Protection Act ("CCPA"), violation of the West Virginia Lender, Broker & Services Act, civil conspiracy, outrage and negligence. The claims against all defendants other than Mr. Carenbauer, HLC and HLC Escrow, Inc. have been dismissed. The case was removed to federal court in October 2011. On January 3, 2013, the court granted a conditional class certification only with respect to the declaratory judgment, contempt, unjust enrichment and CCPA claims. The conditional class includes consumers with mortgage loans in effect any time after November 8, 2007 who obtained such loans through HLC, and whose loans were closed by persons not admitted to the practice of law in West Virginia or by persons not under the direct supervision of a lawyer admitted to the practice of law in West Virginia. On February 26, 2014, the court granted and denied certain of each party's motions for summary judgment. With respect to the claims subject to class certification, the court granted plaintiff's motions for summary judgment with respect to declaratory judgment, unjust enrichment and violation of the CCPA. The court granted HLC's motion

18

Table of Contents

for summary judgment with respect to contempt. In addition, the court denied HLC's motion to decertify the class. With respect to the claims applicable to the named plaintiff only (the "Individual Claims"), HLC's motions for summary judgment were granted with respect to conversion, breach of fiduciary duty, intentional misrepresentation, negligent misrepresentation and outrage. HLC and the plaintiff have reached a tentative settlement agreement with respect to the remaining Individual Claims. The trial for the claims subject to class certification has not yet been scheduled by the court. We believe that the plaintiffs' allegations lack merit and intend to defend against this action vigorously.

*Massachusetts Division of Banks.* On February 11, 2011, the Massachusetts Division of Banks (the "Division") delivered a Report of Examination/Inspection to LendingTree, which identified various alleged violations of Massachusetts and federal laws, including the alleged insufficient delivery by LendingTree of various disclosures to its customers. On October 14, 2011, the Division provided a proposed Consent Agreement and Order to settle the Division's allegations, which the Division had shared with other state mortgage lending regulators. Thirty-four of such state mortgage lending regulators (the "Joining Regulators") indicated that if LendingTree would enter into the Consent Agreement and Order, they would agree not to pursue any analogous allegations that they otherwise might assert. As of the date of this report, none of the Joining Regulators have asserted any such allegations.

The proposed Consent Agreement and Order calls for a fine to be allocated among the Division and the Joining Regulators and for LendingTree to adopt various new procedures and practices. We commenced negotiations toward an acceptable Consent Agreement and Order. We do not believe our mortgage exchange business violated any federal or state mortgage lending laws; nor do we believe that any past operations of the mortgage business have resulted in a material violation of any such laws. Should the Division or any Joining Regulator bring any actions relating to the matters alleged in the February 2011 Report of Examination/Inspection, we intend to defend against such actions vigorously.

**ITEM 4.** *Mine Safety Disclosures*

Not applicable.

19

Table of Contents

## PART II

**ITEM 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

### General Market Information, Holders and Dividends

Tree.com common stock is quoted on the NASDAQ Global Select Market under the ticker symbol "TREE". The table below sets forth, for the calendar periods indicated, the high and low sales prices per share for Tree.com common stock as reported on the NASDAQ Stock Market. The stock price information is based on published financial sources.

| Year Ended December 31, 2012 | | High | | Low |
|---|---|---|---|---|
| First Quarter | $ | 8.25 | $ | 5.37 |
| Second Quarter | | 11.66 | | 7.21 |
| Third Quarter | | 17.00 | | 11.11 |
| Fourth Quarter | | 18.05 | | 13.02 |

| Year Ended December 31, 2013 | | High | | Low |
|---|---|---|---|---|
| First Quarter | $ | 18.75 | $ | 16.00 |
| Second Quarter | | 21.49 | | 16.33 |
| Third Quarter | | 26.84 | | 16.54 |
| Fourth Quarter | | 33.24 | | 26.30 |

As of March 14, 2014, there were approximately 1,000 holders of record of our common stock and the closing price of the common stock was $31.71.

On December 26, 2012, we paid a special dividend of $1.00 per share to our shareholders of record on December 17, 2012. Other than the special dividend, we have not declared or paid a cash dividend on our common stock during the two most recent fiscal years. We have no current intention to declare or pay cash dividends on our common stock in the foreseeable future. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of our board of directors.

### Performance Graph

Under the rules and regulations of the SEC, as a smaller reporting company, we are not required to provide the information required by this item.

### Unregistered Sales of Equity Securities and Use of Proceeds

During the year ended December 31, 2013, we did not issue or sell any shares of our common stock or other equity securities in transactions that were not registered under the Securities Act of 1933.

### Issuer Purchases of Equity Securities

We did not repurchase any equity securities during the quarter ended December 31, 2013; however, we do have a stock repurchase program that was approved by our board of directors on January 11, 2010. Under this program, we can repurchase stock for an amount up to $10 million in the open market or through privately-negotiated transactions. We began this program in February 2010 and we have used available cash to finance these repurchases. We will determine the timing and amount of any additional repurchases based on our evaluation of market conditions, applicable SEC guidelines and regulations, and other factors. This program may be suspended or discontinued at any time at the discretion of our board of directors. At December 31, 2013, approximately $0.8 million remains authorized for share repurchase.

Additionally, the Tree.com Second Amended and Restated 2008 Stock and Award Incentive Plan allows employees to forfeit shares of our common stock to satisfy federal and state withholding obligations upon the vesting of restricted stock awards granted to those individuals under this plan. The withholding of those shares does not affect the dollar amount or number of shares that may be purchased under the stock repurchase program described above.

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm

Table of Contents

## ITEM 6.  *Selected Financial Data*

Under the rules and regulations of the SEC, as a smaller reporting company, we are not required to provide the information required by this item.

## ITEM 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following Management's Discussion and Analysis of Financial Condition and Results of Operations should be read together with our consolidated financial statements and accompanying notes included elsewhere within this report. This discussion includes both historical information and forward-looking information that involves risks, uncertainties and assumptions. Our actual results may differ materially from management's expectations as a result of various factors, including but not limited to those discussed in the sections entitled "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Information."

**Company Overview**

Tree.com is the parent of LendingTree, LLC which owns several brands and businesses that provide information, tools, advice, products and services for critical transactions in consumers' lives. Our family of brands includes: LendingTree®, GetSmart®, LendingTree Education℠, LendingTree Autos℠, LendingTree Home Pros℠ and InsuranceTree®. Together, these brands serve as an ally for consumers who are looking to comparison-shop for loans and other services from multiple businesses and professionals that will compete for their business.

The businesses of RealEstate.com and RealEstate.com, REALTORS® and LendingTree Loans are presented as discontinued operations in the accompanying consolidated balance sheets and consolidated statements of operations and cash flows for all periods presented. The analysis within Management's Discussion and Analysis of Financial Condition and Results of Operations reflects our continuing operations.

**Reportable and Operating Segments**

Our four operating segments are lending, auto, education and home services. We sometimes refer to these operating segments as our "businesses". Of these, only our lending operating segment meets the criteria for a reportable segment. We formerly referred to this reportable segment as our mortgage segment. The auto, education and home services operating segments are reported in the "Other" category in our segment reconciling information. *See* Note 18—Segment Information to the consolidated financial statements included elsewhere in this report.

**Recent Mortgage Interest Rate Trends**

Interest rate and market risks can be substantial in the mortgage lead generation business. Fluctuations in interest rates affect consumer demand for new mortgages and the level of refinancing activity which, in turn, affects lender demand for mortgage leads. Typically, a decline in mortgage interest rates will lead to reduced lender demand for leads from third-party sources, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic lead volume. Conversely, an increase in mortgage interest rates will typically lead to an increase in lender demand for third-party leads, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases.

According to Freddie Mac, 2012 began the year at what were then record low mortgage interest rates of approximately 3.92% on 30-year fixed rate mortgages. Mortgage interest rates declined throughout the year to new lows, reaching an average of 3.35% in December 2012. As a result, according to Mortgage Bankers Association ("MBA") data, mortgage originations were estimated to have increased by 22% during 2012 as compared with 2011. However, stringent qualification guidelines on the part of lenders and governmental agencies had made it difficult for many consumers seeking mortgage financings to obtain them, notwithstanding the favorable interest rate environment.

Beginning in January 2013, the trend of declining mortgage interest rates reversed and rates rose gradually through the first five months of the year. In June 2013, mortgage interest rates increased more significantly, peaking at 4.49% in September 2013, then dropped more than a quarter-point early in the fourth quarter of 2013 and then increased again to 4.46% by the end of 2013. On average, mortgage interest rates were 3.98% in 2013 as compared to 3.66% in 2012, according to Freddie Mac.

21

Table of Contents

This increase in mortgage interest rates during 2013 resulted in a 14% decline in the total dollar volume of mortgage originations in 2013 as compared to 2012, according to MBA data. During the first nine months of 2013, the total dollar volume of mortgage originations was estimated to have increased 1% as compared to the same period in 2012; however, the total dollar volume of mortgage originations declined sharply in the fourth quarter of 2013, by 27% and 51% as compared to the third quarter of 2013 and the fourth quarter of period in 2012, respectively, resulting in the 14% year-over-year decline, according to MBA data.

In 2014, MBA is projecting the dollar volume of mortgage originations to continue to decline in the first quarter, before rebounding to fourth quarter 2013 levels, on average, for the remainder of 2014. In addition, the mix of mortgage originations will continue to move towards purchase, with estimated refinance share of originations of 63% in 2013 dropping to 39% in 2014, according to MBA data.

### The U.S. Real Estate Market

In 2012, the average nationwide seasonally adjusted annual rate of existing homes sales rose by 9% compared with 2011, according to the National Association of Realtors, while total housing inventory tightened. The demand for homes generally increased, as mortgage interest rates dropped to their lowest levels in the preceding 60 years, whereas the number of homes for sale did not keep pace with actual sales during 2012. Accordingly, prices of existing home sales increased during 2012, with the national median existing home price up 11.5% in December 2012 as compared with the year prior. According to the S&P/Case-Schiller U.S. National Home Price Index, average home prices were similar to levels last seen in the fall of 2003. While distressed homes continued to account for a significant portion of overall home sales in 2012, representing 24% in December 2012, this figure was down from 32% as compared with the year prior period.

In 2013, nationwide sales of existing homes increased another 9% over 2012, according to the National Association of Realtors, as job growth improved and demand drove the market, despite rising mortgage interest rates. In fact, existing home sales for all of 2013 were the highest since 2006 and median prices maintained strong growth, up 11.5% from 2012, partially attributable to the shrinking share of distressed home sales. Although home prices as of December 2013 were up 24% from their March 2012 lows, they were still approximately 20% below their mid-2006 peaks. Additionally, with mortgage interest rates on the rise in 2013, the number of homes for sale rose slightly from 4.5 months supply at December 2012 to 4.6 months at the end of 2013, according to the National Association of Realtors.

### Sale of Assets of LendingTree Loans

On May 12, 2011, we entered into an asset purchase agreement with Discover, as amended on February 7, 2012, for the sale of substantially all of the operating assets of our LendingTree Loans business. The sale was completed on June 6, 2012.

The asset purchase agreement as amended provided for a purchase price of approximately $55.9 million in cash for the assets, subject to certain conditions. Of this total purchase price, $8.0 million was paid prior to the closing, $37.9 million was paid upon the closing and $10.0 million was paid and recognized as a gain from sale of discontinued operations in the second quarter of 2013.

Discover generally did not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets Discover acquired. Of the purchase price paid, as of December 31, 2013, $18.1 million is being held in escrow pending resolution of certain actual and/or contingent liabilities that remain with us following the sale. This escrowed amount was recorded as restricted cash at December 31, 2013.

Separate from the asset purchase agreement, Tree.com agreed to provide certain marketing-related services to Discover in connection with its mortgage origination business for approximately seventeen months following the closing, or such earlier point as the agreed-upon services are satisfactorily completed. The services were satisfactorily completed in the second quarter of 2013. Discover remains a network lender on our mortgage exchange following completion of the services.

22

Table of Contents

**Results of Operations for the Years ended December 31, 2013 and 2012**

### Revenue

| | | | $ Change | | % Change | | | 2012 |
|---|---|---|---|---|---|---|---|---|
| | | 2013 | | | | | | |
| | | | | *(Dollars in thousands)* | | | | |
| Lending | $ | 127,985 | $ | 66,809 | | 109 % | $ | 61,176 |
| Other | | 10,632 | | (3,988) | | (27)% | | 14,620 |
| Corporate | | 623 | | (1,024) | | (62)% | | 1,647 |
| **Total revenue** | $ | **139,240** | $ | **61,797** | | **80 %** | $ | **77,443** |

Following the June 6, 2012 closing of the sale of our LendingTree Loans business to Discover, leads that would previously have been provided to LendingTree Loans became available for sale on our mortgage exchange and such leads, therefore, added to revenue in our mortgage exchange business, with an associated increase in selling and marketing expense. Prior to the sale of our LendingTree Loans business, we did not record revenue in our mortgage exchange business for leads provided to LendingTree Loans. Instead, we used a cost-sharing approach for marketing expenses, whereby the mortgage exchange business and LendingTree Loans shared marketing expenses on a pro rata basis, based on the quantity of leads provided to network lenders versus matched with LendingTree Loans.

Revenue from our lending segment increased in 2013 compared to 2012 through an increase in the sales capacity of both new and existing lenders and the expansion of our marketing channels. In addition, 2013 revenue from our lending segment rose as a result of selling leads at market prices on our mortgage exchange that would have been provided to LendingTree Loans before completion of its sale in June 2012. Consumers matched on our mortgage exchange increased by 89% to 1.4 million in 2013 from 0.8 million in 2012. Additionally, as compared to 2012, our 2013 average revenue earned from network lenders per matched consumer increased by 11%.

Other revenue, which includes our auto, education and home services businesses and other products, decreased in 2013 compared to 2012. The decrease in other revenue was due primarily to our education business, partially offset by an increase in our auto business. Our education business was impacted by the increased regulation affecting clients engaged in for-profit post-secondary education services which, in turn, affected their marketing practices. Revenue from our auto business increased in 2013, primarily as a result of the addition of new lending and marketing partners.

Corporate revenue was primarily related to fees for certain marketing-related services provided in connection with the sale of our LendingTree Loans business. We completed these services in the second quarter of 2013 and, therefore, do not anticipate additional such revenue in future periods.

### Cost of revenue

Cost of revenue consists primarily of costs associated with compensation and other employee-related costs (including stock-based compensation) relating to internally-operated customer call centers, third-party customer call center fees, credit scoring fees, credit card fees and website network hosting and server fees.

| | | 2013 | | $ Change | | % Change | | 2012 |
|---|---|---|---|---|---|---|---|---|
| | | | | *(Dollars in thousands)* | | | | |
| Lending | $ | 5,469 | $ | 2,231 | | 69 % | $ | 3,238 |
| Other | | 613 | | 77 | | 14 % | | 536 |
| Corporate | | 460 | | (61) | | (12)% | | 521 |
| **Total cost of revenue** | $ | **6,542** | $ | **2,247** | | **52 %** | $ | **4,295** |
| *As a percentage of total revenue* | | *5%* | | | | | | *6%* |

Lending cost of revenue increased in 2013 from 2012, primarily due to increases of $0.8 million in credit card fees, $0.4 million compensation and other employee-related costs, $0.4 million in third-party customer service fees, $0.2 million in credit scoring fees, and $0.1 million in server fees. In addition, cost of revenue in 2012 benefited by $0.3 million due to the discontinuance of certain consumer incentive rebates.

Other cost of revenue increased in 2013 from 2012, primarily due to increases in server fees.

23

Table of Contents

Corporate cost of revenue decreased in 2013 from 2012, primarily due to reduced costs associated with the decreases in marketing-related services provided in connection with the sale of our LendingTree Loans business.

The total cost of revenue as a percentage of revenue for 2013 declined as compared to 2012.

### Selling and marketing expense

Selling and marketing expense consists primarily of advertising and promotional expenditures, fees paid to lead sources and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in sales or marketing functions. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

|  | 2013 | | $ Change | | % Change | 2012 |
|---|---|---|---|---|---|---|
|  | *(Dollars in thousands)* | | | | | |
| Lending | $ | 83,694 | $ | 48,444 | 137 % | $ 35,250 |
| Other |  | 7,449 |  | (6,228) | (46)% | 13,677 |
| Corporate |  | (22) |  | (29) | (414)% | 7 |
| **Total selling and marketing expense** | **$** | **91,121** | **$** | **42,187** | **86 %** | **$ 48,934** |
| *As a percentage of total revenue* |  | *65%* | | | | *63%* |

The significant increase in total lending selling and marketing expense in 2013 compared to 2012 is primarily due to an increase of $46.0 million in advertising expense, which is discussed below. The increase in lending advertising expense, in turn, corresponds to the 89% increase in consumers matched with network lenders in 2013.

In addition, lending selling and marketing expense increased immediately following the sale of substantially all of the operating assets of our LendingTree Loans business on June 6, 2012, due to our no longer sharing the cost of such expenses with the former LendingTree Loans business. Selling and marketing expense of $6.3 million was allocated to LendingTree Loans during 2012.

Selling and marketing expense in our other businesses decreased in 2013 from 2012, primarily due to decreases in online and direct marketing.

Total selling and marketing expense as a percentage of revenue increased slightly in 2013, primarily due to the new national advertising campaign for our LendingTree brand launched in the second quarter of 2013, partially offset by a decrease in compensation and other employee-related costs as a percentage of revenue.

Advertising expense is the largest component of selling and marketing expense, and is comprised of the following:

|  | 2013 | | $ Change | | % Change | 2012 |
|---|---|---|---|---|---|---|
|  | *(Dollars in thousands)* | | | | | |
| Online | $ | 61,861 | $ | 28,697 | 87% | $ 33,164 |
| Broadcast |  | 10,615 |  | 7,140 | 205% | 3,475 |
| Other |  | 8,204 |  | 4,088 | 99% | 4,116 |
| **Total advertising expense** | **$** | **80,680** | **$** | **39,925** | **98%** | **$ 40,755** |

We increased our advertising expenditures both online and in traditional media in order to generate additional mortgage lead volume to meet the demand of network lenders on our mortgage exchange. In addition, we further increased our broadcast spend to support the launch of our new national advertising campaign for our LendingTree brand, which commenced in the second quarter of 2013.

We will continue to adjust selling and marketing expenditures dynamically in relation to anticipated revenue opportunities.

24

Table of Contents

**General and administrative expense**

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, corporate information technology, human resources and executive management functions, as well as facilities and infrastructure costs and fees for professional services.

| | | 2013 | | $ Change | | % Change | | 2012 |
|---|---|---|---|---|---|---|---|---|
| | | | | *(Dollars in thousands)* | | | | |
| Lending | $ | 3,629 | $ | 159 | | 5 % | $ | 3,470 |
| Other | | 2,245 | | (643) | | (22)% | | 2,888 |
| Corporate | | 18,784 | | 2,911 | | 18 % | | 15,873 |
| **Total general and administrative expense** | **$** | **24,658** | **$** | **2,427** | | **11 %** | **$** | **22,231** |
| *As a percentage of total revenue* | | *18%* | | | | | | *29%* |

Lending general and administrative expense was relatively consistent in 2013 and 2012.

General and administrative expense in our other businesses decreased in 2013 from 2012 primarily due to a decrease in loss on disposal of assets of $0.3 million and a decrease in computer maintenance of $0.2 million.

Corporate general and administrative expense increased in 2013 due to a compensation charge of $0.9 million related to a discretionary cash bonus payment to employee stock option holders, increases in other compensation and employee-related costs, and a one-time contribution in the fourth quarter of 2013 of $0.4 million to an educational trust.

However, the increased general and administrative expense in 2013 was spread over proportionately greater revenue during the period, resulting in an improvement in general and administrative expense as a percentage of revenue.

**Product development**

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) that are not capitalized, for personnel engaged in the design, development, testing and enhancement of technology.

| | | 2013 | | $ Change | | % Change | | 2012 |
|---|---|---|---|---|---|---|---|---|
| | | | | *(Dollars in thousands)* | | | | |
| Lending | $ | 4,302 | $ | 2,025 | | 89 % | $ | 2,277 |
| Other | | 962 | | (296) | | (24)% | | 1,258 |
| Corporate | | — | | 6 | | 100 % | | (6) |
| **Total product development** | **$** | **5,264** | **$** | **1,735** | | **49 %** | **$** | **3,529** |
| *As a percentage of total revenue* | | *4%* | | | | | | *5%* |

Product development expense increased in 2013 from 2012, primarily due to increases in compensation and other employee-related costs. We launched new offerings in 2013, such as our LoanExplorer rate table, reverse mortgage and credit card comparison offerings, as well as enhanced existing tools and products, such as our personal loan offering and mobile experience, through internal product development efforts.

**Depreciation**

Depreciation expense decreased to $3.5 million in 2013 from $4.1 million in 2012. The decrease was primarily due to certain fixed assets that fully depreciated in 2012.

**Litigation settlements and contingencies**

Litigation settlements and contingencies consists of expenses related to actual or anticipated litigation settlements, in addition to legal fees incurred in connection with various patent litigation claims we pursue against others. During the year ended December 31, 2013, we recorded $9.0 million in expenses. The expenses in 2013 were due primarily to legal fees incurred in connection with patent litigation we were pursuing. In 2012, we recognized income of $3.1 million, a majority of which is attributable to the settlement or our estimation of loss on various legal cases.

Table of Contents

During the first quarter of 2014, we participated in a jury trial for the litigation described in "Item 3. Legal Proceedings—LendingTree v. Zillow, Inc. et al." included elsewhere in this report. The legal expenses associated with this jury trial will materially increase our litigation settlements and contingencies expense for the first quarter of 2014 and, therefore, negatively affect our operating income or loss for such quarter. We are unable to predict the effect of this litigation on full year 2014 litigation settlements and contingencies.

### Operating loss

|  | 2013 | | $ Change | | % Change | | 2012 |
|---|---|---|---|---|---|---|---|
|  | *(Dollars in thousands)* | | | | | | |
| Lending | $ | 29,360 | $ | 13,975 | 91 % | $ | 15,385 |
| Other |  | (2,503) |  | 3,596 | 59 % |  | (6,099) |
| Corporate |  | (27,964) |  | (15,827) | (130)% |  | (12,137) |
| **Operating loss** | **$** | **(1,107)** | **$** | **1,744** | **61 %** | **$** | **(2,851)** |
| *As a percentage of total revenue* |  | *(1)%* |  |  |  |  | *(4)%* |

Operating loss improved by $1.7 million in 2013 as compared with 2012, primarily due to the $61.8 million increase in revenue, a majority of which was offset by significant increases in selling and marketing expense of $42.2 million and in litigation settlements and contingencies of $12.1 million, as well as additional, less substantial increases in cost of revenue, general and administrative expense and product development expense, as discussed above.

### Interest Expense

Interest expense decreased to $19,000 in 2013 from $0.9 million in 2012. Interest expense in 2012 was primarily due to interest on the Series A Redeemable Preferred Stock of our wholly owned subsidiary LendingTree Holdings Corp. that was redeemed in 2012.

### Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization

Adjusted EBITDA is the primary metric by which the chief operating decision maker evaluates the performance of our businesses, on which our internal budgets are based and by which management is compensated. Adjusted EBITDA is defined in "Tree.com's Principles of Financial Reporting" below. The following tables provide a reconciliation of Adjusted EBITDA to net income (loss) from continuing operations by segment.

|  | Year Ended December 31, 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Lending | | Other | | Corporate | | Total | |
|  | *(in thousands)* | | | | | | | |
| **Adjusted EBITDA by segment** | $ | 32,572 | $ | 52 | $ | (13,907) | $ | 18,717 |
| Adjustments to reconcile to net income (loss) from continuing operations: | | | | | | | | |
| Amortization of intangibles |  | — |  | (147) |  | — |  | (147) |
| Depreciation |  | (1,453) |  | (1,642) |  | (406) |  | (3,501) |
| Restructuring and severance |  | (78) |  | (46) |  | (35) |  | (159) |
| Loss on disposal of assets |  | — |  | — |  | (165) |  | (165) |
| Non-cash compensation |  | (1,681) |  | (689) |  | (3,257) |  | (5,627) |
| Discretionary cash bonus |  | — |  | — |  | (920) |  | (920) |
| Trust contribution |  | — |  | — |  | (350) |  | (350) |
| Litigation settlements and contingencies |  | — |  | (31) |  | (8,924) |  | (8,955) |
| Other expense, net |  | — |  | — |  | (19) |  | (19) |
| Income tax benefit |  | — |  | — |  | 453 |  | 453 |
| **Net income (loss) from continuing operations** | **$** | **29,360** | **$** | **(2,503)** | **$** | **(27,530)** | **$** | **(673)** |

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm

Table of Contents

| | Year Ended December 31, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Lending | | Other | | Corporate | | Total | |
| | *(in thousands)* | | | | | | | |
| **Adjusted EBITDA by segment** | $ | 18,316 | $ | (2,887) | $ | (11,650) | $ | 3,779 |
| Adjustments to reconcile to net income (loss) from continuing operations: | | | | | | | | |
| Amortization of intangibles | | — | | (358) | | — | | (358) |
| Depreciation | | (1,536) | | (1,991) | | (578) | | (4,105) |
| Restructuring and severance | | (20) | | (11) | | 88 | | 57 |
| Loss on disposal of assets | | (388) | | (345) | | (5) | | (738) |
| Non-cash compensation | | (987) | | (507) | | (3,093) | | (4,587) |
| Litigation settlements and contingencies | | — | | — | | 3,101 | | 3,101 |
| Other expense, net | | — | | — | | (881) | | (881) |
| Income tax benefit | | — | | — | | 1,483 | | 1,483 |
| **Net income (loss) from continuing operations** | $ | 15,385 | $ | (6,099) | $ | (11,535) | $ | (2,249) |

### Income tax provision

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2013 | | 2012 | |
| | | *(in thousands, except percentages)* | | | |
| Income tax benefit | $ | 453 | $ | 1,483 | |
| *Effective tax rate* | | *40.2%* | | *39.7%* | |

In both 2013 and 2012, the effective tax rate was higher than the 35% federal statutory rate due principally to the effect of state taxes.

### Discontinued Operations

During both 2013 and 2012, income from discontinued operations of $4.6 million and $48.9 million, respectively, is primarily attributable to the LendingTree Loans business, the sale of which was completed on June 6, 2012. As a result, the 2012 results of discontinued operations include approximately five months of results of operations and a gain on the sale of the business of $24.4 million, net of tax. In 2013, the results of discontinued operations was primarily due to a pre-tax gain of $10.0 million for an additional purchase price payment made on the first anniversary of the sale of the business, offset by operating losses relating to the ongoing wind-down of the business.

### Financial Position, Liquidity and Capital Resources

#### General

We expect our cash and cash equivalents and cash flows from operations to be sufficient to fund our operating and other needs for the next twelve months. Except for cash and cash equivalents, we have no material sources of liquidity.

As of December 31, 2013, we had $91.7 million of cash and cash equivalents and $26.0 million of restricted cash and cash equivalents, compared to $80.2 million of cash and cash equivalents and $29.4 million of restricted cash and cash equivalents as of December 31, 2012.

27

Table of Contents

**Cash Flows from Continuing Operations**

Our cash flows attributable to continuing operations are as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | *(in thousands)* | |
| Net cash provided by (used in) operating activities | $ 10,238 | $ (4,722) |
| Net cash provided by (used in) investing activities | 647 | (3,717) |
| Net cash used in financing activities | (5,983) | (11,923) |

*Cash Flows from Operating Activities*

Net cash provided by operating activities attributable to continuing operations in 2013 was $10.2 million and consisted primarily of losses from continuing operations of $0.7 million, positive adjustments for non-cash items of $9.8 million and cash provided by working capital of $1.2 million. Adjustments for non-cash items consisted primarily of $5.6 million in non-cash compensation expense and $3.5 million of depreciation. Accounts receivable increased $3.6 million primarily due to increases in revenue. Accounts payable, accrued expenses and other current liabilities increased $6.8 million, primarily due to increased marketing efforts and a new branding campaign.

Net cash used in operating activities attributable to continuing operations in 2012 was $4.7 million and consisted of losses from continuing operations of $2.2 million, positive adjustments for non-cash items of $9.7 million and cash used for working capital of $12.2 million. Adjustments for non-cash items primarily consisted of $4.6 million of non-cash compensation expense and $4.1 million of depreciation. Accounts receivable increased by $6.0 million, reflecting increased revenue primarily from leads that would formerly have been provided to LendingTree Loans becoming available for sale on our mortgage exchange. Accounts payable and other current liabilities decreased by $6.6 million, as we managed our net working capital position and paid previously incurred expenses from improved cash flow.

*Cash Flows from Investing Activities*

Net cash provided by investing activities attributable to continuing operations in 2013 of $0.6 million consisted primarily of capital expenditures of $2.8 million, which was more than offset by a decrease in restricted cash of $3.4 million. The decrease in restricted cash is associated with a reduction in the collateral requirement for certain of our surety bonds, which are required by the various states in which we currently operate or previously operated. As a result, $4.0 million of cash previously held in escrow was released.

Net cash used in investing activities attributable to continuing operations in 2012 of $3.7 million resulted primarily from capital expenditures of $2.6 million and an increase in restricted cash of $1.1 million.

*Cash Flows from Financing Activities*

Net cash used in financing activities attributable to continuing operations in 2013 of $6.0 million consisted primarily of the vesting and issuance of stock to employees (less withholding taxes) of $2.8 million and the repurchase of Tree.com stock of $3.3 million.

Net cash used in financing activities 2012 of $11.9 million was primarily due to a special dividend of $11.4 million, the repurchase of Tree.com stock of $0.9 million and the issuance of common stock to employees (less withholding taxes) of $0.8 million, partially offset by a decrease in restricted cash requirements of $1.2 million related to warehouse lines of credit.

**Warehouse Lines of Credit for LendingTree Loans**

As a result of the closing of the sale of substantially all of the operating assets of our LendingTree Loans business on June 6, 2012, all three then-existing warehouse lines of credit expired and terminated on July 21, 2012. Borrowings under these lines of credit were used to fund, and were secured by, consumer residential loans that were held for sale. Loans under these lines of credit were repaid using proceeds from the sales of loans by LendingTree Loans.

**Off-Balance Sheet Arrangements**

We do not have any other off-balance sheet arrangements other than our operating lease obligations and funding commitments pursuant to our surety bonds. *See* Note 11—Commitments to the consolidated financial statements included elsewhere in the report for further details.

Table of Contents

### Critical Accounting Policies and Estimates

The following disclosure is provided to supplement the description of our accounting policies contained in Note 2—Significant Accounting Policies to the consolidated financial statements included elsewhere in this report in regard to significant areas of judgment. This disclosure includes accounting policies related to both continuing operations and discontinued operations. Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated financial statements than others. A discussion of some of our more significant accounting policies and estimates follows.

#### Loan Loss Obligations

We make estimates as to our exposure related to our obligation to repurchase loans previously sold to investors or to repay premiums paid by investors in purchasing loans, and reserve for such contingencies accordingly. Such payments to investors may be required in cases where underwriting deficiencies, borrower fraud, documentation defects, early payment defaults and early loan payoffs occurred.

Our HLC subsidiary continues to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business on June 6, 2012. Approximately $21.2 million is being held in escrow pending resolution of certain of these contingent liabilities. We have been negotiating with certain secondary market purchasers to settle any existing and future contingent liabilities, but we may not be able to complete such negotiations on acceptable terms, or at all. Because we do not service the loans LendingTree Loans sold, we do not maintain nor have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, we are unable to determine, with precision, our maximum exposure for breaches of the representations and warranties LendingTree Loans made to the investors that purchased such loans.

We estimate the liability for loan losses using a settlement discount framework. This approach estimates the lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. We then apply a settlement discount factor to the result of the foregoing to reflect publicly announced bulk settlements for similar loan types and vintages, as well as LendingTree Loans' non-operating status, in order to estimate a range of the potential obligation. Changes to any one of these factors could significantly impact the estimate of the liability and could have a material adverse impact on our results of operations for any particular period.

We have considered both objective and subjective factors in our estimation process, but given current general industry trends in mortgage loans as well as housing prices, market expectations and actual losses related to LendingTree Loans' obligations could vary significantly from the obligation recorded as of December 31, 2013 of $28.5 million or the range of remaining loan losses. *See* Note 16 —Discontinued Operations—LendingTree Loans—Loan Loss Obligations to the consolidated financial statements included elsewhere in this report for additional information on the loan loss reserve.

#### Recoverability of Goodwill and Indefinite-Lived Intangible Assets

We review the carrying value of goodwill and indefinite-lived intangible assets on an annual basis as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. We determine the fair value of a reporting unit based upon an evaluation of its expected discounted cash flows and a market approach, with each method being equally weighted in the calculation. The discounted cash flow analysis requires us to make assumptions and judgments related to factors used in the calculation, including, but not limited to, management's expectations for future operations and projected cash flows.

The annual goodwill impairment test as of October 1, 2013 included the following key assumptions: a discounted cash flow model utilizing a discount rate of 13%-20%, a terminal growth rate of 3% and Adjusted EBITDA (*See* "Tree.com's Principles of Financial Reporting" below for the definition of Adjusted EBITDA) margin rates of 10%-15% of revenue from 2014 through 2022. Results of testing indicated a fair value in excess of the carrying value of our goodwill by more than 150%.

29

Table of Contents

The material assumptions included in the annual indefinite-lived intangible assets impairment test as of October 1, 2013 were an assumed relief-from-royalty model, a discount rate of 13%-20%, a terminal growth rate of 3% and a royalty rate of 3%-6%. Results of testing indicated a fair value more than seven times the carrying value of our indefinite-lived intangible assets.

We do not expect any material changes in the near term to the assumptions underlying these tests of impairment at October 1, 2013.

The value of goodwill and indefinite-lived intangible assets that is subject to assessment for impairment is $3.6 million and $10.1 million, respectively, at December 31, 2013.

### Recoverability of Long-Lived Assets

We review the carrying value of all long-lived assets, primarily property and equipment, and definite-lived intangible assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may be impaired. Impairment is considered to have occurred whenever the carrying value of a long-lived asset cannot be recovered from cash flows that are expected to result from the use and eventual disposition of the asset. This recoverability test requires us to make assumptions and judgments related to factors used in a calculation of undiscounted cash flows, including, but not limited to, management's expectations for future operations and projected cash flows. The key assumptions used in this calculation include Adjusted EBITDA, the remaining useful lives of the primary cash flow generating asset in the asset group and, to a lesser extent, the deduction of capital expenditures and taxes paid in cash to arrive at net cash flows.

Due to a history of operating losses, certain of our long-lived asset groups with an aggregate carrying value of $1.7 million were reviewed for impairment at December 31, 2013. Results of testing indicated undiscounted cash flows exceeded the aggregate carrying value of each asset group by a range of 100% to more than 400%. We do not expect any material changes in the near term to the assumptions underlying these tests of impairment. However, if changes in these assumptions do occur, and, should those changes be significant, they could have a material impact on our determination of whether or not there has been an impairment.

The value of long-lived assets subject to assessment for impairment is $5.9 million at December 31, 2013.

### Income Taxes

Estimates of deferred income taxes and the significant items giving rise to the deferred assets and liabilities are shown in Note 9—Income Taxes to the consolidated financial statements included elsewhere in this report, and reflect management's assessment of actual future taxes to be paid on items reflected in the consolidated financial statements, giving consideration to both timing and the probability of realization. Actual income taxes could vary from these estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the IRS, as well as actual operating results that may vary significantly from anticipated results.

We also recognize liabilities for uncertain tax positions based on the two-step process prescribed by the accounting guidance for uncertainty in income taxes. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes.

A valuation allowance is provided on deferred tax assets if it is determined that it is *"more likely than not"* that the deferred tax asset will not be realized.

At December 31, 2013, we have recorded a valuation allowance of $49.7 million.

### Stock-Based Compensation

The forms of stock-based awards granted to our employees are principally restricted stock units ("RSUs"), restricted stock and stock options. The value of RSU and restricted stock awards is measured at their grant dates as the fair value of common stock and amortized ratably as non-cash compensation expense over the vesting term. The value of stock options issued, as discussed in Note 4—Stock-Based Compensation to the consolidated financial statements included elsewhere in this report, is estimated using a Black-Scholes option pricing model. We did not grant any stock options during 2013.

Table of Contents

As of December 31, 2013, there was approximately $0.2 million, $5.6 million, $2.3 million and $0.1 million of unrecognized compensation cost, net of estimated forfeitures, related to stock options, RSUs, restricted stock and restricted stock with a market condition, respectively. These costs are expected to be recognized over a weighted-average period of approximately 1.0 year for stock options, 1.9 years for RSUs, 2.6 years for restricted stock, and 0.1 years for restricted stock with a market condition.

### New Accounting Pronouncements

*See* Note 2—Significant Accounting Policies to the consolidated financial statements included elsewhere in this report for a description of recent accounting pronouncements.

### Tree.com's Principles of Financial Reporting

We report Earnings Before Interest, Taxes, Depreciation and Amortization, adjusted for certain items discussed below (Adjusted EBITDA), as a supplemental measure to GAAP. This measure is one of the primary metrics by which we evaluate the performance of our businesses, on which our internal budgets are based and by which management is compensated. We believe that investors should have access to the same set of tools that we use in analyzing our results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. We provide and encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measure discussed below.

### Definition of Adjusted EBITDA

We report Adjusted EBITDA as operating income or loss (which excludes interest expense and taxes) adjusted to exclude amortization of intangibles and depreciation, and to further exclude (1) non-cash compensation expense, (2) non-cash intangible asset impairment charges, (3) gain/loss on disposal of assets, (4) restructuring and severance expenses, (5) litigation settlements and contingencies and legal fees for certain patent litigation, (6) adjustments for significant acquisitions or dispositions, and (7) one-time items. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our statement of operations of certain expenses, including depreciation, non-cash compensation and acquisition-related accounting. We endeavor to compensate for the limitations of the non-GAAP measures presented by also providing the comparable GAAP measures with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measures. These non-GAAP measures may not be comparable to similarly titled measures used by other companies.

### One-Time Items

Adjusted EBITDA is adjusted for one-time items, if applicable. Items are considered one-time in nature if they are non-recurring, infrequent or unusual and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented in this report, there are no adjustments for one-time items, except for $0.9 million related to a discretionary cash bonus payment to employee stock option holders and a one-time contribution of $0.4 million to an educational trust.

### Non-Cash Expenses that are Excluded from Adjusted EBITDA

Non-cash compensation expense consists principally of expense associated with grants of restricted stock, restricted stock units and stock options. These expenses are not paid in cash, and we include the related shares in our calculations of fully diluted shares outstanding. Upon settlement of restricted stock units, exercise of certain stock options or vesting of restricted stock awards, the awards may be settled, on a net basis, with us remitting the required tax withholding amount from our current funds.

Amortization of intangibles are non-cash expenses relating primarily to intangible assets acquired through acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives.

### ITEM 7A. *Quantitative and Qualitative Disclosures about Market Risk*

Under the rules and regulations of the SEC, as a smaller reporting company, we are not required to provide the information required by this item.

**Table of Contents**

**ITEM 8.** *Financial Statements and Supplementary Data*

<div align="center">

**Report of Independent Registered Public Accounting Firm**

</div>

To the Board of Directors and Shareholders of Tree.com, Inc.

 In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Tree.com, Inc. and its subsidiaries at December 31, 2013 and 2012, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the index appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our audits (which was an integrated audit in 2013). We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

 A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

 Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Charlotte, North Carolina
March 17, 2014

<div align="center">32</div>

**Table of Contents**

**TREE.COM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | **2013** | | **2012** |
| | | *(in thousands, except per share amounts)* | | |
| **Revenue** | $ | **139,240** | $ | **77,443** |
| Costs and expenses: | | | | |
| Cost of revenue *(exclusive of depreciation shown separately below)* | | 6,542 | | 4,295 |
| Selling and marketing expense | | 91,121 | | 48,934 |
| General and administrative expense | | 24,658 | | 22,231 |
| Product development | | 5,264 | | 3,529 |
| Depreciation | | 3,501 | | 4,105 |
| Amortization of intangibles | | 147 | | 358 |
| Restructuring and severance | | 159 | | (57) |
| Litigation settlements and contingencies | | 8,955 | | (3,101) |
| **Total costs and expenses** | | **140,347** | | **80,294** |
| **Operating loss** | | **(1,107)** | | **(2,851)** |
| Other income (expense): | | | | |
| Interest expense | | (19) | | (881) |
| **Loss before income taxes** | | **(1,126)** | | **(3,732)** |
| Income tax benefit | | 453 | | 1,483 |
| **Net loss from continuing operations** | | **(673)** | | **(2,249)** |
| Discontinued operations: | | | | |
| Gain from sale of discontinued operations, net of tax | | 9,561 | | 24,373 |
| Income (loss) from operations of discontinued operations, net of tax | | (4,941) | | 24,501 |
| **Income from discontinued operations** | | **4,620** | | **48,874** |
| **Net income** | $ | **3,947** | $ | **46,625** |
| | | | | |
| **Weighted average shares outstanding:** | | | | |
| Basic | | 11,035 | | 10,695 |
| Diluted | | 11,035 | | 10,695 |
| **Net loss per share from continuing operations:** | | | | |
| Basic | $ | (0.06) | $ | (0.21) |
| Diluted | $ | (0.06) | $ | (0.21) |
| **Net income per share from discontinued operations:** | | | | |
| Basic | $ | 0.42 | $ | 4.57 |
| Diluted | $ | 0.42 | $ | 4.57 |
| **Net income per share attributable to common shareholders:** | | | | |
| Basic | $ | 0.36 | $ | 4.36 |
| Diluted | $ | 0.36 | $ | 4.36 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm

**TREE.COM, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2013 | | December 31, 2012 | |
|---|---|---|---|---|
| | *(in thousands, except par value and share amounts)* | | | |
| **ASSETS:** | | | | |
| Cash and cash equivalents | $ | 91,667 | $ | 80,190 |
| Restricted cash and cash equivalents | | 26,017 | | 29,414 |
| Accounts receivable, net of allowance of $408 and $503, respectively | | 12,850 | | 11,488 |
| Prepaid and other current assets | | 1,689 | | 773 |
| Current assets of discontinued operations | | 521 | | 407 |
| **Total current assets** | | **132,744** | | **122,272** |
| Property and equipment, net | | 5,344 | | 6,155 |
| Goodwill | | 3,632 | | 3,632 |
| Intangible assets, net | | 10,684 | | 10,831 |
| Other non-current assets | | 111 | | 152 |
| Non-current assets of discontinued operations | | 129 | | 129 |
| **Total assets** | $ | **152,644** | $ | **143,171** |
| **LIABILITIES:** | | | | |
| Accounts payable, trade | $ | 4,881 | $ | 2,741 |
| Deferred revenue | | 49 | | 648 |
| Accrued expenses and other current liabilities | | 23,265 | | 19,960 |
| Current liabilities of discontinued operations (Note 16) | | 32,004 | | 31,017 |
| **Total current liabilities** | | **60,199** | | **54,366** |
| Other non-current liabilities | | 334 | | 936 |
| Deferred income taxes | | 4,849 | | 4,694 |
| Non-current liabilities of discontinued operations | | 254 | | 253 |
| **Total liabilities** | | **65,636** | | **60,249** |
| Commitments and contingencies (Notes 11 and 12) | | | | |
| **SHAREHOLDERS' EQUITY:** | | | | |
| Preferred stock $.01 par value; authorized 5,000,000 shares; none issued or outstanding | | — | | — |
| Common stock $.01 par value; authorized 50,000,000 shares; issued 12,619,835 and 12,195,209 shares, respectively, and outstanding 11,250,903 and 11,006,730 shares, respectively | | 126 | | 122 |
| Additional paid-in capital | | 907,148 | | 903,692 |
| Accumulated deficit | | (807,533) | | (811,480) |
| Treasury stock 1,368,932 and 1,188,479 shares, respectively | | (12,733) | | (9,412) |
| **Total shareholders' equity** | | **87,008** | | **82,922** |
| **Total liabilities and shareholders' equity** | $ | **152,644** | $ | **143,171** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

34

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

| | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | |
| | Total | Number of Shares | Amount | | | Number of Shares | Amount |
|---|---|---|---|---|---|---|---|
| | | | | *(in thousands)* | | | |
| **Balance as of December 31, 2011** | $ 45,471 | 12,169 | $ 121 | $ 911,987 | $ (858,105) | 1,123 | $ (8,532) |
| Revision (Note 1) | — | (343) | (3) | 3 | — | — | — |
| **Balance as of December 31, 2011 (Revised)** | $ 45,471 | 11,826 | $ 118 | $ 911,990 | $ (858,105) | 1,123 | $ (8,532) |
| Comprehensive income: | | | | | | | |
| Net income for the year ended December 31, 2012 | 46,625 | — | — | — | 46,625 | — | — |
| Comprehensive income | $ 46,625 | | | | | | |
| Stock-based compensation | 4,756 | — | — | 4,756 | — | — | — |
| Issuance of common stock upon exercise of stock options and vesting of restricted stock units, net of withholding taxes | (814) | 456 | 5 | (819) | — | — | — |
| Purchase of treasury stock | (880) | — | — | — | — | 65 | (880) |
| Dividends | (12,236) | — | — | (12,236) | — | — | — |
| Revision (Note 1) | — | (87) | (1) | 1 | — | — | — |
| **Balance as of December 31, 2012 (Revised)** | $ 82,922 | 12,195 | $ 122 | $ 903,692 | $ (811,480) | 1,188 | $ (9,412) |
| Comprehensive income: | | | | | | | |
| Net income for the year ended December 31, 2013 | 3,947 | — | — | — | 3,947 | — | — |
| Comprehensive income | $ 3,947 | | | | | | |
| Stock-based compensation | 5,629 | — | — | 5,629 | — | — | — |
| Issuance of common stock upon exercise of stock options and vesting of restricted stock units, net of withholding taxes | (2,806) | 425 | 4 | (2,810) | — | — | — |
| Purchase of treasury stock | (3,321) | — | — | — | — | 181 | (3,321) |
| Dividends | 637 | — | — | 637 | — | — | — |
| **Balance as of December 31, 2013** | $ 87,008 | 12,620 | $ 126 | $ 907,148 | $ (807,533) | 1,369 | $ (12,733) |

The accompanying notes to consolidated financial statements are an integral part of these statements.

35

Table of Contents

**TREE.COM, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | **2013** | | **2012** |
| | | *(in thousands)* | | |
| Cash flows from operating activities attributable to continuing operations: | | | | |
| **Net income** | $ | **3,947** | $ | **46,625** |
| Less: Income from discontinued operations, net of tax | | (4,620) | | (48,874) |
| Net loss from continuing operations | | (673) | | (2,249) |
| Adjustments to reconcile net loss from continuing operations to net cash provided by (used in) operating activities attributable to continuing operations: | | | | |
| Loss on disposal of fixed assets | | 165 | | 747 |
| Amortization of intangibles | | 147 | | 358 |
| Depreciation | | 3,501 | | 4,105 |
| Non-cash compensation expense | | 5,627 | | 4,587 |
| Deferred income taxes | | 64 | | (92) |
| Bad debt expense (benefit) | | 248 | | (4) |
| Changes in current assets and liabilities: | | | | |
| Accounts receivable | | (3,614) | | (6,011) |
| Prepaid and other current assets | | (170) | | 620 |
| Accounts payable, accrued expenses and other current liabilities | | 6,832 | | (6,595) |
| Income taxes payable | | (610) | | (98) |
| Deferred revenue | | (675) | | 472 |
| Other, net | | (604) | | (562) |
| **Net cash provided by (used in) operating activities attributable to continuing operations** | | **10,238** | | **(4,722)** |
| Cash flows from investing activities attributable to continuing operations: | | | | |
| Capital expenditures | | (2,750) | | (2,632) |
| Decrease (increase) in restricted cash | | 3,397 | | (1,085) |
| **Net cash provided by (used in) investing activities attributable to continuing operations** | | **647** | | **(3,717)** |
| Cash flows from financing activities attributable to continuing operations: | | | | |
| Issuance of common stock, net of withholding taxes | | (2,806) | | (815) |
| Purchase of treasury stock | | (3,321) | | (879) |
| Dividends | | 144 | | (11,428) |
| Decrease in restricted cash | | — | | 1,199 |
| **Net cash used in financing activities attributable to continuing operations** | | **(5,983)** | | **(11,923)** |
| **Total cash provided by (used in) continuing operations** | | **4,902** | | **(20,362)** |
| Discontinued operations: | | | | |
| Net cash provided by (used in) operating activities attributable to discontinued operations | | (3,425) | | 226,747 |
| Net cash provided by investing activities attributable to discontinued operations | | 10,000 | | 25,923 |
| Net cash used in financing activities attributable to discontinued operations | | — | | (197,659) |
| **Total cash provided by discontinued operations** | | **6,575** | | **55,011** |
| **Net increase in cash and cash equivalents** | | **11,477** | | **34,649** |
| Cash and cash equivalents at beginning of period | | 80,190 | | 45,541 |
| **Cash and cash equivalents at end of period** | $ | **91,667** | $ | **80,190** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1—ORGANIZATION

**Company Overview**

Tree.com, Inc. ("Tree.com" or the "Company") is the parent of LendingTree, LLC, which owns several brands and businesses that provide information, tools, advice, products and services for critical transactions in consumers' lives. Its family of brands includes: LendingTree®, GetSmart®, LendingTree Autos[SM], LendingTree Education[SM], LendingTree Home Pros[SM] and InsuranceTree®. Together, these brands serve as an ally for consumers who are looking to comparison-shop for loans, education programs, home services providers and other services from multiple businesses and professionals that will compete for their business.

The consolidated financial statements include the accounts of Tree.com and all its wholly-owned entities. Intercompany transactions and accounts have been eliminated.

**Spin-Off**

On August 20, 2008, Tree.com was spun off from its parent company, IAC/InterActiveCorp ("IAC"), into a separate publicly-traded company. In connection with the spin-off, Tree.com was incorporated as a Delaware corporation in April 2008.

**Discontinued Operations**

The businesses of RealEstate.com and RealEstate.com, REALTORS® (which, together, represent the former Real Estate segment) and LendingTree Loans are presented as discontinued operations in the accompanying consolidated balance sheets and consolidated statements of operations and cash flows for all periods presented. The notes accompanying these consolidated financial statements reflect the Company's continuing operations and, unless otherwise noted, exclude information related to the discontinued operations.

**Real Estate**

On March 10, 2011, management made the decision and finalized a plan to close all of the field offices of the proprietary full-service real estate brokerage business known as RealEstate.com, REALTORS®. The Company exited all markets in which it previously operated by March 31, 2011. In September 2011, the remaining assets of RealEstate.com were sold, which consisted primarily of internet domain names and trademarks, for $8.3 million, resulting in a gain on sale of $7.8 million.

**LendingTree Loans**

On May 12, 2011, the Company entered into an asset purchase agreement with Discover, as amended on February 7, 2012, for the sale of substantially all of the operating assets of its LendingTree Loans business. The sale was completed on June 6, 2012.

The asset purchase agreement as amended provided for a purchase price of approximately $55.9 million in cash for the assets, subject to certain conditions. Of this total purchase price, $8.0 million was paid prior to the closing, $37.9 million was paid upon the closing and $10.0 million was paid and recognized as a gain from sale of discontinued operations in the second quarter of 2013.

Discover generally did not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets Discover acquired. Of the initial purchase price payment, as of December 31, 2013, $18.1 million is being held in escrow pending resolution of certain actual and/or contingent liabilities that remain with the Company following the sale. This escrowed amount is recorded as restricted cash at December 31, 2013.

Separate from the asset purchase agreement, Tree.com agreed to provide certain marketing-related services to Discover in connection with its mortgage origination business for approximately seventeen months following the closing, or such earlier point as the agreed-upon services are satisfactorily completed. The services were satisfactorily completed in the second quarter of 2013. Discover remains a network lender on the Company's mortgage exchange following completion of the services.

37

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Revisions of Prior Period Financial Statements**

In connection with the preparation of the consolidated financial statements for the first quarter of 2013, it was determined that the number of outstanding shares had been overstated in prior periods due to issuances of unrestricted shares upon satisfaction of vesting conditions on restricted shares from 2009 to 2012, without canceling the original restricted share certificates. This error resulted in double-counting of certain vested restricted shares in the calculation of shares outstanding. Management determined that unrestricted shares issued upon vesting of restricted shares should not have been considered validly issued or outstanding until the associated restricted shares were canceled. All of the restricted stock awards that were double-counted were issued to the Chairman and CEO. This error in shares was not reflected in the Chairman and CEO's filings made under Section 13(d) or Section 16 of the Securities Exchange Act of 1934 or in the disclosures of his holdings in public filings. In addition, the weighted average share calculation erroneously included restricted shares, resulting in errors in the previously reported weighted average shares and earnings per share.

On December 26, 2012, the Company paid a special dividend of $1.00 per share to its shareholders of record on December 17, 2012. The dividend was paid on all shares shown as outstanding in its records, including shares granted to the Chairman and CEO, which management has determined should not have been considered issued or outstanding. As a result, $0.4 million in dividends were unintentionally overpaid to the Chairman and CEO in 2012 and is presented as a financing cash outflow in the consolidated statement of cash flows for the year ended December 31, 2012. The dividend overpayment was repaid by the Chairman and CEO to the Company during 2013 and is presented as a financing cash inflow in the consolidated statement of cash flows for the year ended December 31, 2013. Other than that special dividend, no declarations or payments of any cash dividends on the common stock have occurred.

In addition to the special dividend overpayment, there was also a related error in the dividend accrual recorded for nonvested shares entitled to the special dividend upon vesting, resulting in an over-accrual of $0.2 million in the consolidated balance sheet at December 31, 2012.

In accordance with ASC 250-10, the Company assessed the materiality of these errors and concluded that the errors were not material to any of the previously issued financial statements. Accordingly, all previously issued 2012 interim financial statements were corrected for these share errors and revised prospectively in the 2013 quarterly SEC filings.

The following table presents the effect of these corrections on the Company's annual consolidated statement of operations for the year ended December 31, 2012 *(in thousands, except per share amounts)*:

|  | Year Ended December 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
|  | **As Reported** | | **Adjustment** | | **As Revised** | |
| Weighted average basic shares outstanding |  | 11,313 |  | (618) |  | 10,695 |
| Weighted average diluted shares outstanding |  | 11,313 |  | (618) |  | 10,695 |
| Net loss per share from continuing operations: |  |  |  |  |  |  |
| Basic | $ | (0.20) | $ | (0.01) | $ | (0.21) |
| Diluted | $ | (0.20) | $ | (0.01) | $ | (0.21) |
| Net income per share from discontinuing operations: |  |  |  |  |  |  |
| Basic | $ | 4.32 | $ | 0.25 | $ | 4.57 |
| Diluted | $ | 4.32 | $ | 0.25 | $ | 4.57 |
| Net income attributable to common shareholders per share: |  |  |  |  |  |  |
| Basic | $ | 4.12 | $ | 0.24 | $ | 4.36 |
| Diluted | $ | 4.12 | $ | 0.24 | $ | 4.36 |

For the year ended December 31, 2012, the Company had losses from continuing operations and, as a result, no potentially dilutive securities were included in the denominator for computing diluted earnings per share, because the impact would have been anti-dilutive. Accordingly, the weighted average basic shares outstanding were used to compute all earnings per share amounts.

38

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table presents the effect these errors had on common stock:

| | December 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | As Reported | Adjustment | As Adjusted | As Reported | Adjustment | As Adjusted |
| Issued shares | 12,625,678 | (430,469) | 12,195,209 | 12,169,226 | (342,969) | 11,826,257 |
| Outstanding shares | 11,437,199 | (430,469) | 11,006,730 | 11,045,965 | (342,969) | 10,702,996 |

## NOTE 2—SIGNIFICANT ACCOUNTING POLICIES

### Revenue Recognition

The Company derives its revenue primarily from match fees, which are earned through the delivery of qualified leads that originated through one of its websites or affiliates. The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collectability is reasonably assured. Delivery is deemed to have occurred at the time a qualified lead is delivered to the customer, provided that no significant obligations remain.

In its auto business, the Company also derives revenues from lenders for closing fees on auto products when a transaction is closed with the consumer. Closed loan fees and closed sale fees are recognized at the time the lender reports the closed loan or closed sale to the Company, which could be several months after the original request form is transmitted.

Prior to January 2013, the Company also derived revenue from lenders for closing fees on home equity loan products, which were recognized in the same manner as the closed loan fees on its auto loan products. During the years ended December 31, 2013 and 2012, the Company recognized $0.1 million and $0.6 million, respectively, in closed loan fee revenue on home equity loan products.

In addition, during the years ended December 31, 2013 and December 31, 2012, the Company recognized approximately $0.6 million and $1.9 million of revenue, respectively, from marketing-related services provided to Discover as discussed in Note 1— Organization—Discontinued Operations—LendingTree Loans. Revenue from these services was recognized in the period the services were provided.

### Cash and Cash Equivalents

Cash and cash equivalents include cash and short-term, highly liquid money market investments with original maturities of three months or less.

### Restricted Cash

Cash escrowed or contractually restricted for a specific purpose is designated as restricted cash.

### Accounts Receivable

Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts.

The Company determines its allowance for doubtful accounts by considering a number of factors, including the length of time accounts receivable are past due, previous loss history, the specific customer's current ability to pay its obligation and the condition of the general economy and the customer's industry as a whole. Accounts receivable are considered past due when they are outstanding longer than the contractual payment terms.

Accounts receivable are written off when management deems them uncollectible. The Company's write-offs of accounts receivable during the year ended December 31, 2013 were $0.3 million and immaterial during 2012.

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Loan Loss Obligations**

The Company's HLC subsidiary, which during its period of active operation primarily conducted business as LendingTree Loans, sold loans it originated to investors on a servicing-released basis and the risk of loss or default by the borrower was generally transferred to the investor. However, LendingTree Loans was required by these investors to make certain representations relating to credit information, loan documentation and collateral. To the extent LendingTree Loans did not comply with such representations or there are early payment defaults, LendingTree Loans may be required to repurchase loans or indemnify the investors for any losses from borrower defaults. LendingTree Loans maintains a liability for the estimated exposure relating to such contingent obligations and changes to the estimate are recorded in income from discontinued operations in the periods they occur.

The Company estimates the liability for loan losses using a settlement discount framework. This approach estimates the lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. The Company then applies a settlement discount factor to the result of the foregoing to reflect publicly announced bulk settlements for similar loan types and vintages, as well as LendingTree Loans' non-operating status, in order to estimate a range of potential liability. Changes to any one of these factors could significantly impact the estimate of the liability and could have a material impact on the Company's results of operations for any particular period. *See* Note 16—Discontinued Operations —LendingTree Loans—Loan Loss Obligations for additional information on the loan loss reserve.

**Segment Reporting**

The Company has four operating segments: lending, auto, education and home services. The lending operating segment is in the Company's core business of lead generation in the lending marketplace, matching consumers looking for lending products with network lenders. Similarly, the auto, education and home services businesses match consumers with auto financing providers and dealers, prospective students with educational institutions and agencies, and homeowners with home improvement professionals, respectively.

The Company's review of these operating segments at December 31, 2013 indicates that only its lending operating segment meets the quantitative threshold to be reported as a reportable segment.

**Property and Equipment**

Property and equipment, including internally-developed software and significant improvements, are recorded at cost less accumulated depreciation. Repairs and maintenance and any gains or losses on dispositions are recognized as incurred in current operations.

Depreciation is recorded on a straight-line basis to allocate the cost of depreciable assets to operations over their estimated service lives. The following table presents the estimated useful lives for each asset category:

| Asset Category | Estimated Useful Lives |
|---|---|
| Computer equipment and capitalized software | 1 to 5 years |
| Leasehold improvements | Lesser of asset life or life of lease |
| Furniture and other equipment | 3 to 7 years |

**Software Development Costs**

Software development costs primarily include internal and external labor expenses incurred to develop the software that powers the Company's websites. Certain costs incurred during the application development stage are capitalized based on specific activities tracked on internal time sheets and external invoices (or time sheets), while costs incurred during the preliminary project stage and post-implementation/operation stage are expensed as incurred. Capitalized software development costs are amortized over an estimated useful life of one to three years.

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Goodwill and Indefinite-Lived Intangible Assets**

Goodwill acquired in business combinations is assigned to the reporting units that are expected to benefit from the combination as of the acquisition date. Goodwill and indefinite-lived intangible assets, primarily the Company's trade names and trademarks, are not amortized. Rather, these assets are tested annually for impairment as of October 1, or more frequently upon the occurrence of certain events or substantive changes in circumstances.

Goodwill impairment is determined using a two-step process. The first step is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of its reporting units by using a market approach and a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its estimated fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a relief-from-royalty methodology in estimating the fair value of trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates, perpetual growth rates and the amount and timing of future revenues.

For the October 1, 2013 annual impairment test of goodwill, the fair value of the lending reporting unit was estimated using a DCF analysis and a market comparable method, with each method being equally weighted in the calculation. Results of the October 1, 2013 annual impairment test for goodwill and the indefinite-lived intangible assets indicated that no impairments had occurred.

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets include property and equipment and intangible assets with definite lives. Amortization of definite-lived intangible assets is recorded on a straight-line basis over their estimated lives.

Long-lived assets are tested for recoverability whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is deemed to not be recoverable, an impairment loss is recorded as the amount by which the carrying amount of the long-lived asset exceeds its fair value.

Due to a history of operating losses, certain of the long-lived assets were reviewed for impairment at December 31, 2013 and 2012. Neither of the reviews resulted in impairment charges.

**Fair Value Measurements**

The Company categorizes its assets and liabilities measured at fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- **Level 1**: Observable inputs, such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- **Level 2**: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

- **Level 3**: Unobservable inputs for which there is little or no market data and which require the Company to develop its own assumptions, based on the best information available under the circumstances, about the assumptions market participants would use in pricing the asset or liability. *See* Note 17—Fair Value Measurements for a discussion of assets measured at fair value using Level 3 inputs.

The Company's non-financial assets, such as goodwill, intangible assets and property and equipment are measured at fair value when there is an indicator of impairment and recorded at fair value only when an impairment charge is recognized. Such fair value measurements are based predominantly on Level 3 inputs.

## Cost of Revenue

Cost of revenue consists primarily of expenses associated with compensation and other employee-related costs (including stock-based compensation) related to customer call centers, credit scoring fees and website network hosting and server fees.

## Product Development

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in the design, development, testing and enhancement of technology that are not capitalized.

## Litigation Settlements and Contingencies

Litigation settlements and contingencies consists of expenses related to actual or anticipated litigation settlements, in addition to legal fees incurred in connection with various patent litigation claims the Company pursues against others.

## Advertising

Advertising costs are expensed in the period incurred (except for production costs which are initially capitalized and then recognized as expense when the advertisement first runs) and principally represent offline costs, including television, print and radio advertising, and online advertising costs, including fees paid to search engines and distribution partners. Advertising expense was $80.7 million and $40.8 million for the years ended December 31, 2013 and 2012, respectively, and is included in selling and marketing expense on the consolidated statements of operations.

## Income Taxes

Income taxes are accounted for under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. In estimating future tax consequences, all expected future events are considered. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. Interest is recorded on potential tax contingencies as a component of income tax expense and recorded net of any applicable related income tax benefit. During 2012 and 2013, the Company reported losses from continuing operations and income from discontinued operations. As a result, the Company followed the accounting guidance prescribed in ASC 740-20-45-7, which provides an exception to the "with" and "without" approach to intraperiod tax allocation for determination of the amount of tax benefit to allocate to continuing operations in such circumstances.

In accordance with the accounting standard for uncertainty in income taxes, liabilities for uncertain tax positions are recognized based on the two-step process prescribed by the accounting standards. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount which is more than 50% likely of being realized upon ultimate settlement.

https://www.sec.gov/Archives/edgar/data/1434621/000143462114000015/tree-12312013x10k.htm      58/112

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Stock-Based Compensation**

The forms of stock-based awards granted to Tree.com employees are principally restricted stock units ("RSUs"), stock options and restricted stock. RSUs are awards in the form of units, denominated in a hypothetical equivalent number of shares of Tree.com common stock and with the value of each award equal to the fair value of Tree.com common stock at the date of grant. RSUs may be settled in cash, stock or both, as determined by the Compensation Committee at the time of grant. The Company does not have a history of settling these awards in cash. Each stock-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. Certain restricted stock awards also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests.

Tree.com recognizes as expenses non-cash compensation for all stock-based awards for which vesting is considered probable. The amount of non-cash compensation is reduced by estimated forfeitures, as the amount recorded to the consolidated statement of operations is based on awards ultimately expected to vest. The forfeiture rate is estimated at the grant date, based on historical experience and revised, if necessary, in subsequent periods if the actual forfeiture rate differs from the estimated rate.

For service-based awards, non-cash compensation is measured at fair value on the grant date and expensed ratably over the vesting term. The fair value of each stock option award is estimated using the Black-Scholes option pricing model, while the fair value of an RSU or restricted stock award is measured as the closing common stock price on the day preceding the grant date. For performance-based awards, the fair value is measured on the grant date as the fair value of the Company's common stock awarded and recognized as non-cash compensation, using a graded vesting attribution model that considers the probability of the targets being achieved.

Tax benefits resulting from tax deductions in excess of the non-cash compensation recognized in the consolidated statement of operations are reported as a component of financing cash flows. In 2012, while there were excess tax benefits from non-cash compensation, the tax benefits are not reflected in the consolidated statement of operations because of the utilization of NOLs.

**Litigation Contingencies**

The Company is involved in legal proceedings on an ongoing basis. If the Company believes that a loss arising from such matters is probable and can be reasonably estimated, the estimated liability is accrued in the consolidated financial statements. If only a range of estimated losses can be determined, an amount within the range is accrued that, in the Company's judgment, reflects the most likely outcome; if none of the estimates within that range is a better estimate than any other amount, the low end of the range is accrued. For those proceedings in which an unfavorable outcome is reasonably possible but not probable, an estimate of the reasonably possible loss or range of losses or a conclusion that an estimate of the reasonably possible loss or range of losses arising directly from the proceeding (i.e., monetary damages or amounts paid in judgment or settlement) are not material is disclosed. Legal expenses associated with these matters are recognized as incurred.

**Accounting Estimates**

Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements, including discontinued operations, include: loan loss obligations; the recoverability of long-lived assets, goodwill and intangible assets; the determination of income taxes payable and deferred income taxes, including related valuation allowances; restructuring reserves; contingent consideration related to business combinations; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

**Certain Risks and Concentrations**

Tree.com's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

## TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Financial instruments, which potentially subject us to concentration of credit risk at December 31, 2013, consist primarily of cash and cash equivalents and accounts receivable, as disclosed in the consolidated balance sheet. Cash and cash equivalents are in excess of Federal Deposit Insurance Corporation insurance limits, but are maintained with quality financial institutions of high credit. The Company generally requires certain network lenders to maintain security deposits with the Company, which in the event of non-payment, would be applied against any accounts receivable outstanding.

Due to the nature of the mortgage lending industry, interest rate increases may negatively impact future revenue from the Company's lender network.

For the year ended December 31, 2013, one network lender accounted for revenue representing 12% of total revenue and another network lender accounted for 12% of total revenue. For the year ended December 31, 2012, one network lender accounted for revenue representing 14% of total revenue and another network lender accounted for 11% of total revenue.

Lenders participating on the Company's lender network can offer their products directly to consumers through brokers, mass marketing campaigns or through other traditional methods of credit distribution. These lenders can also offer their products online, either directly to prospective borrowers, through one or more online competitors, or both. If a significant number of potential consumers are able to obtain loans from participating lenders without utilizing the Company's service, its ability to generate revenue may be limited. Because the Company does not have exclusive relationships with the lenders whose loan offerings are offered on its online marketplace, consumers may obtain offers and loans from these lenders without using its service.

The Company maintains operations solely in the United States.

**Recent Accounting Pronouncements**

In December 2011, the Financial Accounting Standards Board ("FASB") issued new accounting guidance that requires additional disclosures on financial instruments and derivative instruments that are either offset in accordance with existing accounting guidance or are subject to an enforceable master netting arrangement or similar agreement. The new requirements do not change the accounting guidance on netting, but rather enhance the disclosures to more clearly show the impact of netting arrangements on a company's financial position. This new accounting guidance is effective on a retrospective basis for all comparative periods presented beginning on January 1, 2013. The adoption of this guidance did not have a material impact on the consolidated financial statements.

In July 2012, the FASB issued new guidance which allows an entity to first assess qualitative factors to determine whether events and circumstances indicate that it is more likely than not that an indefinite-lived intangible asset is impaired. This assessment should be used as a basis for determining whether it is necessary to perform the quantitative impairment test. An entity would not be required to calculate the fair value of the intangible asset and perform the quantitative test unless the entity determines, based upon its qualitative assessment, that it is more likely than not that its fair value is less than its carrying value. The update expands previous guidance by providing more examples of events and circumstances that an entity should consider in determining whether it is more likely than not that the fair value of an indefinite-lived intangible asset is less than its carrying amount. The update also allows an entity the option to bypass the qualitative assessment for any indefinite-lived intangible asset in any period and proceed directly to performing the quantitative impairment test. An entity will be able to resume performing the qualitative assessment in any subsequent period. This update is effective for annual and interim periods beginning after September 15, 2012, with early adoption permitted. The adoption of this guidance did not have a material impact on the consolidated financial statements.

In February 2013, the FASB issued new accounting guidance that requires an entity to measure obligations resulting from joint and several liability arrangements for which the total amount of the obligation within the scope of this guidance is fixed at the reporting date, as the sum of the amount the reporting entity agreed to pay on the basis of its arrangement among its co-obligors and any additional amount the reporting entity expects to pay on behalf of its co-obligors. The guidance also requires an entity to disclose the nature and amount of these obligations, as well as other information about them. The new accounting guidance is effective for fiscal years, and interim periods within those years, beginning after December 15, 2013. The Company is evaluating the impact that the adoption will have on its consolidated financial statements in fiscal 2014.

In July 2013, the FASB issued guidance on the financial statement presentation of an unrecognized tax benefit when a net operating loss carryforward, a similar tax loss, or a tax credit carryforward exists. The new accounting guidance is effective for interim and annual reporting periods beginning after December 15, 2013, with early adoption permitted. Prospective or retrospective application is permitted. The adoption of this guidance is not expected to have a material impact on the consolidated financial statements.

6/10/2020

08-13555-mg 1-01-0025144-RF Doc 51441-8 Filed 04/00/21 Entered 06/04/00/21 Page 2328 11 Exhibit
Complaint     Pg 693 of 1033

44

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 3—RESTRICTED CASH

Restricted cash and cash equivalents consists of the following *(in thousands)*:

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Cash in escrow for surety bonds | $ 2,453 | $ 6,500 |
| Cash in escrow for corporate purchasing card program | 400 | 800 |
| Cash in escrow for sale of LTL (Note 1) | 18,117 | 17,077 |
| Cash in escrow for earnout related to an acquisition | 1,956 | 1,956 |
| Cash restricted for loan loss obligations | 3,051 | 3,051 |
| Other | 40 | 30 |
| **Total restricted cash and cash equivalents** | **$ 26,017** | **$ 29,414** |

## NOTE 4—STOCK-BASED COMPENSATION

The Company currently has one active plan, the Third Amended and Restated Tree.com 2008 Stock and Annual Incentive Plan (the "Equity Award Plan"), under which future awards may be granted, which currently covers outstanding stock options to acquire shares of the Company's common stock and RSUs, and provides for the future grants of these and other equity awards. Under the Equity Award Plan, the Company is authorized to grant stock options, RSUs and other equity-based awards for up to 3.35 million shares of Tree.com common stock to employees, officers and directors. This Equity Award Plan also governs certain equity awards of IAC that were converted into equity awards of Tree.com in connection with the spin-off.

The Equity Award Plan has a stated term of ten years and provides that the exercise price of stock options granted will not be less than the market price of the common stock on the grant date. The Equity Award Plan itself does not specify grant dates or vesting schedules, as those determinations are delegated to the Compensation Committee of the board of directors. Each grant agreement reflects the vesting schedule for that particular grant, as determined by the Compensation Committee.

Prior to the 2008 spin-off from IAC, employees received equity awards that were granted under various IAC stock and annual incentive plans. Upon spin-off, these IAC awards were converted into awards of both Tree.com and other former IAC companies, which vested in 2012.

Non-cash compensation expense related to equity awards is included in the following line items in the accompanying consolidated statements of operations *(in thousands)*:

| | Year Ended December 31, | |
|---|---|---|
| | 2013 | 2012 |
| Cost of revenue | $ 13 | $ 6 |
| Selling and marketing expense | 931 | 750 |
| General and administrative expense | 3,841 | 3,205 |
| Product development | 842 | 626 |
| **Total non-cash compensation expense before income taxes** | **$ 5,627** | **$ 4,587** |
| Income tax benefit | (2,223) | (1,812) |
| **Total non-cash compensation expense after income taxes** | **$ 3,404** | **$ 2,775** |

As of December 31, 2013, there was approximately $0.2 million, $5.6 million, $2.3 million and $0.1 million of unrecognized compensation cost, net of estimated forfeitures, related to stock options, RSUs, restricted stock, and restricted stock with a market condition, respectively. These costs are expected to be recognized over a weighted-average period of approximately 1.0 year for stock options, 1.9 years for RSUs, 2.6 years for restricted stock and 0.1 years for restricted stock with a market condition.

# TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Stock Options**

A summary of the changes in outstanding stock options is as follows:

| | Number of Options | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|---|---|---|
| | | | *(per option)* | | *(in years)* | | *(in thousands)* |
| **Outstanding at December 31, 2012** | **1,072,503** | $ | **8.97** | | | | |
| Granted | — | | — | | | | |
| Exercised [b] | (31,642) | | 8.38 | | | | |
| Forfeited | — | | — | | | | |
| Expired | (1,862) | | 11.53 | | | | |
| **Outstanding at December 31, 2013** | **1,038,999** | $ | **8.98** | | 4.8 | $ | 24,788 |
| **Options exercisable** | **887,707** | $ | **9.34** | | 4.2 | $ | 20,865 |

(a) The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $32.84 on the last trading day of 2013 and the exercise price, multiplied by the number of in-the-money options) that would have been received by the option holders had all option holders exercised their options on December 31, 2013. The intrinsic value changes based on the fair market value of the Company's common stock.

(b) Upon exercise, the intrinsic value represents the pre-tax difference between the Company's closing stock price on the exercise date and the exercise price, multiplied by the number of stock options exercised. During the years ended December 31, 2013 and 2012, the total intrinsic value of stock options that were exercised was $0.4 million and $0.3 million, respectively. Cash received from stock option exercises and the related actual tax benefit realized were $0.3 million and $0.2 million for the year ended December 31, 2013 and $0.7 million and $0.1 million for the year ended December 31, 2012.

All stock options granted during 2012 were granted to the Chairman and CEO with a weighted average grant date fair value per share of $3.63 and vest over a period of three years from their respective grant date. For purposes of determining stock-based compensation expense, the grant date fair value per share of the stock options was estimated using the Black-Scholes option pricing model, which requires the use of various key assumptions, including the following:

| | |
|---|---|
| Expected term [1] | 7.0 years |
| Expected dividend [2] | — |
| Expected volatility [3] | 45% |
| Risk-free interest rate [4] | 2.0% |

(1) The expected term of stock options granted is based on analyses of historical employee termination rates and option exercise patterns, giving consideration to expectations of future employee behavior.

(2) For all stock options granted in 2012, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of common stock of a peer group over the expected term.

(4) The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

Substantially all options outstanding at December 31, 2013 are vested or are expected to vest over a weighted-average period of approximately 1.0 year. During the years ended December 31, 2013 and 2012, the total fair value of options vested was $3.2 million and $0.3 million, respectively.

6/10/2020

Case 1:21-cv-02574-PF    Document 16-3    Entered 04/01/21    Page 2573 of 13    Exhibit
08-1855-mg    Doc 26114-8    Filed 04/08/16    Entered 04/00/21    Page 2373 of 15
Complaint    Pg 697 of 1033

46

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A summary of the information about stock options outstanding and exercisable is as follows:

| Range of Exercise Prices | Options Outstanding | | | | Options Exercisable | |
|---|---|---|---|---|---|---|
| | Outstanding | Weighted Average Remaining Contractual Life | | Weighted Average Exercise Price | Exercisable | Weighted Average Exercise Price |
| | | (in years) | | (per option) | | (per option) |
| $0.01 to $4.99 | 164 | 0.2 | $ | 2.61 | 164 | $ 2.61 |
| $5.00 to $7.45 | 304,183 | 7.7 | | 6.65 | 152,891 | 6.39 |
| $7.46 to $9.99 | 601,783 | 4.0 | | 8.46 | 601,783 | 8.46 |
| $10.00 to $14.99 | 6,081 | 0.7 | | 12.24 | 6,081 | 12.24 |
| $15.00 to $19.99 | 80,125 | 1.4 | | 15.00 | 80,125 | 15.00 |
| $20.00 to $20.19 | 46,663 | 1.4 | | 20.19 | 46,663 | 20.19 |
| **Options at December 31, 2013** | **1,038,999** | **4.8** | **$** | **8.98** | **887,707** | **$ 9.34** |

**Restricted Stock Units and Restricted Stock**

A summary of the changes in outstanding nonvested RSUs and restricted stock is as follows:

| | RSUs | | Restricted Stock | | Restricted Stock Market Condition | |
|---|---|---|---|---|---|---|
| | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| | | (per share) | | (per share) | | (per share) |
| **Nonvested at December 31, 2012** | **757,111** | **$ 9.09** | **187,501** | **$ 7.44** | **—** | **—** |
| Granted [(a)(b)] | 310,445 | 18.75 | 119,500 | 22.47 | 62,500 | 13.93 |
| Vested [(c)(d)] | (357,078) | 8.76 | (187,501) | 7.44 | — | — |
| Forfeited | (111,356) | 10.66 | — | — | — | — |
| **Nonvested at December 31, 2013** | **599,122** | **$ 14.15** | **119,500** | **$ 22.47** | **62,500** | **13.93** |

(a)  The grant date fair value per share of the RSUs and restricted stock is calculated as the closing market price of Tree.com's common stock the day preceding the grant date.

(b)  The grant date fair value per share of the restricted stock with an underlying market condition was calculated using a Monte Carlo simulation model. These shares vest based on the achievement of a market-based performance target within three years, but not earlier than one year from the grant date. The fair value on grant date is recognized over the requisite service period.

(c)  The total fair value of RSUs that vested during the years ended December 31, 2013 and 2012 was $7.5 million and $4.3 million, respectively.

(d)  The total fair value of restricted stock that vested during the years ended December 31, 2013 and 2012 was $3.2 million and $0.8 million, respectively.

47

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### NOTE 5—GOODWILL AND INTANGIBLE ASSETS

The balance of goodwill and intangible assets, net is as follows *(in thousands)*:

| | | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| Goodwill | $ | 486,720 | $ | 486,720 |
| Accumulated impairment losses | | (483,088) | | (483,088) |
| **Net goodwill** | **$** | **3,632** | **$** | **3,632** |
| | | | | |
| Intangible assets with indefinite lives | $ | 10,142 | $ | 10,142 |
| Intangible assets with definite lives, net | | 542 | | 689 |
| **Total intangible assets, net** | **$** | **10,684** | **$** | **10,831** |

**Goodwill and Indefinite-Lived Intangible Assets**

The Company's goodwill is associated with its one reporting unit, lending. There were no changes in the carrying amount of goodwill during the years ended December 31, 2013 and 2012. Results of the annual impairment test as of October 1, 2013 indicated that no impairment had occurred.

Intangible assets with indefinite lives relate to the Company's trademarks. Results of the annual impairment test as of October 1, 2013 indicated that no impairment had occurred.

**Intangible Assets with Definite Lives**

Intangible assets with definite lives relate to the following *(dollars in thousands)*:

| | Weighted Average Amortization Life | | Cost | | Accumulated Amortization | | Net |
|---|---|---|---|---|---|---|---|
| Purchase agreements | *5.0 years* | $ | 236 | $ | (212) | $ | 24 |
| Technology | *3.0 years* | | 25,194 | | (25,194) | | — |
| Customer lists | *4.2 years* | | 6,682 | | (6,166) | | 516 |
| Other | *2.5 years* | | 1,517 | | (1,515) | | 2 |
| **Balance at December 31, 2013** | | **$** | **33,629** | **$** | **(33,087)** | **$** | **542** |

| | Weighted Average Amortization Life | | Cost | | Accumulated Amortization | | Net |
|---|---|---|---|---|---|---|---|
| Purchase agreements | *5.0 years* | $ | 236 | $ | (165) | $ | 71 |
| Technology | *3.0 years* | | 25,194 | | (25,158) | | 36 |
| Customer lists | *4.2 years* | | 6,682 | | (6,106) | | 576 |
| Other | *2.5 years* | | 1,517 | | (1,511) | | 6 |
| **Balance at December 31, 2012** | | **$** | **33,629** | **$** | **(32,940)** | **$** | **689** |

48

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on balances as of December 31, 2013, future amortization is estimated to be as follows *(in thousands)*:

|  | Amortization Expense |
|---|---|
| Year ending December 31, 2014 | $        86 |
| Year ending December 31, 2015 | 60 |
| Year ending December 31, 2016 | 60 |
| Year ending December 31, 2017 | 60 |
| Year ending December 31, 2018 | 60 |
| Thereafter | 216 |
| **Total intangible assets with definite lives, net** | **$       542** |

### NOTE 6—PROPERTY AND EQUIPMENT

The balance of property and equipment, net is as follows *(in thousands)*:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Computer equipment and capitalized software | $      18,130 | $      25,592 |
| Leasehold improvements | 2,096 | 2,055 |
| Furniture and other equipment | 981 | 1,302 |
| Projects in progress | 2,145 | 500 |
| **Total gross property and equipment** | **23,352** | **29,449** |
| Accumulated depreciation | (18,008) | (23,294) |
| **Total property and equipment, net** | **$      5,344** | **$      6,155** |

Unamortized capitalized software development costs, in service or under development, total $4.3 million and $4.8 million at December 31, 2013 and 2012, respectively. Capitalized software development depreciation expense was $3.0 million and $3.1 million for the years ended December 31, 2013 and 2012, respectively.

### NOTE 7—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES

Accrued expenses and other current liabilities consist of the following *(in thousands)*:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Litigation accruals | $        500 | $        535 |
| Accrued advertising expense | 8,837 | 6,638 |
| Accrued compensation and benefits | 3,378 | 2,603 |
| Accrued professional fees | 1,806 | 1,399 |
| Accrued restructuring costs [a] | 284 | 364 |
| Customer deposits and escrows | 4,279 | 2,101 |
| Deferred rent | 245 | 217 |
| Other | 3,936 | 6,103 |
| **Total accrued expenses and other current liabilities** | **$      23,265** | **$      19,960** |

(a)   An additional $0.2 million and $0.5 million of accrued restructuring liability is classified in other long term liabilities on the consolidated balance sheets at December 31, 2013 and December 31, 2012, respectively.

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 8—EARNINGS PER SHARE

The basic and diluted earnings per share were determined based on the following share data *(in thousands)*:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| **Weighted average basic common shares** | **11,035** | **10,695** |
| Effect of stock options | — | — |
| Effect of dilutive share awards | — | — |
| **Weighted average diluted common shares** | **11,035** | **10,695** |

For the years ended December 31, 2013 and 2012, the Company had losses from continuing operations and, as a result, no potentially dilutive securities were included in the denominator for computing diluted earnings per share, because the impact would have been anti-dilutive. Accordingly, the weighted average basic shares outstanding were used to compute earnings per share amounts for these periods. For the years ended December 31, 2013 and 2012, approximately 0.7 million and 0.6 million shares, respectively, related to potentially dilutive securities were excluded from the calculation of diluted earnings per share, because their inclusion would have been anti-dilutive.

*See* Note 4—Stock-Based Compensation for a full description of outstanding equity awards.

### Common Stock Repurchases

On January 11, 2010, the board of directors authorized the repurchase of up to $10 million of Tree.com's common stock. During 2013, the Company purchased 180,453 shares of its common stock for aggregate consideration of $3.3 million. During 2012, the Company purchased 65,218 shares of its common stock for aggregate consideration of $0.9 million. At December 31, 2013, approximately $0.8 million remains authorized for share repurchase.

### Special Dividend

On December 6, 2012, the Company announced a special cash dividend of $1.00 per share. The dividend was paid on December 26, 2012 to shareholders of record on December 17, 2012. The total amount of the dividend was approximately $11.6 million, giving effect to a 2013 correction to the overpayment of dividends totaling $0.4 million, and has been presented as a reduction of additional paid-in capital in the consolidated financial statements. *See* Note 1—Organization—Revisions of Prior Period Financial Statements for additional details regarding the overpayment of dividends in 2012.

## NOTE 9—INCOME TAXES

### Income Tax Provision

The components of the income tax benefit are as follows *(in thousands)*:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Current income tax benefit: | | |
| Federal | $      (425) | $      (1,358) |
| State | (92) | (33) |
| **Current income tax benefit** | **(517)** | **(1,391)** |
| Deferred income tax provision (benefit): | | |
| Federal | 63 | 147 |
| State | 1 | (239) |

| | | | | |
|---|---|---|---|---|
| **Deferred income tax provision (benefit)** | | | **64** | **(92)** |
| **Income tax benefit** | $ | **(453)** | $ | **(1,483)** |

50

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A reconciliation of the income tax benefit to the amounts computed by applying the statutory federal income tax rate to loss from continuing operations before income taxes is shown as follows *(in thousands)*:

| | | Year Ended December 31, | |
| --- | --- | --- | --- |
| | | 2013 | 2012 |
| Income tax benefit at the federal statutory rate of 35% | $ | (394) $ | (1,306) |
| State income taxes, net of effect of federal tax benefit | | (60) | (177) |
| Other, net | | 1 | — |
| **Income tax benefit** | $ | **(453)** $ | **(1,483)** |

**Deferred Income Taxes**

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows *(in thousands)*:

| | | December 31, | |
| --- | --- | --- | --- |
| | | 2013 | 2012 |
| Deferred tax assets: | | | |
| Provision for accrued expenses | $ | 13,009 $ | 11,681 |
| Net operating loss carryforwards [a] | | 26,365 | 28,404 |
| Non-cash compensations expense | | 2,753 | 2,285 |
| Goodwill | | 1,825 | 1,829 |
| Intangible and other assets | | 49 | 811 |
| Other | | 1,125 | 5,442 |
| Total gross deferred tax assets | | 45,126 | 50,452 |
| Less: valuation allowance [b] | | (49,674) | (54,961) |
| **Total deferred tax assets, net of the valuation allowance** | | **(4,548)** | **(4,509)** |
| Deferred tax liabilities: | | | |
| Other | | (194) | (169) |
| **Total gross deferred tax liabilities** | | **(194)** | **(169)** |
| **Net deferred taxes** | $ | **(4,742)** $ | **(4,678)** |

(a) At December 31, 2013 and 2012, the Company had pre-tax consolidated federal net operating losses ("NOLs") of $30.1 million and $24.2 million, respectively. The 2013 carryforward amount excludes $8.0 million of windfall tax benefits, which will be recorded to additional paid in capital when realized. The federal NOLs will expire between 2031 and 2033. In addition, the Company has separate state NOLs of approximately $300.7 million at December 31, 2013 that will expire at various times between 2014 and 2033.

(b) The valuation allowance is related to items for which it is *"more likely than not"* that the tax benefit will not be realized.

Deferred income taxes are presented in the accompanying consolidated balance sheets as follows *(in thousands)*:

| | | December 31, | |
| --- | --- | --- | --- |
| | | 2013 | 2012 |
| Deferred tax assets | $ | 107 $ | 16 |
| Deferred tax liabilities | | (4,849) | (4,694) |

| | | | |
|---|---|---|---|
| **Net deferred taxes** | $ | (4,742) $ | (4,678) |

51

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Valuation Allowance**

The Company had a valuation allowance recorded at December 31, 2013 and 2012 related to the portion of tax operating loss carryforwards and other deferred tax assets for which it is *"more likely than not"* that the tax benefit will not be realized. During 2013, the valuation allowance decreased by $5.3 million to $49.7 million.

**Unrecognized Tax Benefits**

A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding interest and penalties, is as follows *(in thousands)*:

|  | Year Ended December 31, | | | |
|---|---|---|---|---|
|  | 2013 | | 2012 | |
| Balance, beginning of the period | $ | — | $ | 3 |
| Additions based on tax positions of prior years |  | 36 |  | — |
| Lapse of statute of limitations |  | — |  | (3) |
| Balance, end of the period | $ | 36 | $ | — |

Interest and, if applicable, penalties are recognized related to unrecognized tax benefits in income tax expense. Interest and penalties on unrecognized tax benefits included in income tax expense for each of the years ended December 31, 2013 and 2012 is immaterial. There are no significant accruals for interest and penalties at December 31, 2013 and 2012.

As of December 31, 2013 and 2012, the accrual for unrecognized tax benefits, including interest, was $40,000 and $0, respectively, all of which would benefit the effective tax rate if recognized.

**Tax Audits**

Tree.com is subject to audits by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, any amounts paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by us are recorded in the period they become known. As of December 31, 2013, the Company is subject to a federal income tax examination for the tax years 2010 through 2012. In addition, the Company is subject to state and local tax examinations for the tax years 2009 through 2012.

The Company was indemnified by its previous owner for any federal and/or combined state income tax liabilities resulting from years prior to the spin-off in 2008. The Joint Committee of Taxation has completed its review of IAC/InterActiveCorp's tax returns and approved the audit settlement previously agreed to with the Internal Revenue Services for the years ended December 31, 2001 through 2008. The statute of limitations for the years 2001 through 2008 expires on July 1, 2014. Various state and local jurisdictions are also currently under examination, the most significant of which are California, New York and New York City for various tax years beginning with 2006.

## NOTE 10—SUPPLEMENTAL CASH FLOW INFORMATION

Cash paid (received) by the Company is as follows *(in thousands)*:

|  | Year Ended December 31, | | | |
|---|---|---|---|---|
|  | 2013 | | 2012 | |
| Interest | $ | 19 | $ | 1,308 |
| Income tax payments |  | 654 |  | 1,238 |

Income tax refunds                                                              (4)            (25)

52

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 11—COMMITMENTS

### Operating Leases

The Company leases office space, equipment and services used in connection with its operations under various operating leases, many of which contain escalation clauses. The Company's primary operating leases relate to our office space in Charlotte, North Carolina and Burlingame, California, each of which expire in 2015.

Future minimum payments as of December 31, 2013 under operating lease agreements having an initial or remaining non-cancelable lease term in excess of one year are as follows *(in thousands)*:

| Year ending December 31, | | Amount |
|---|---|---|
| 2014 | $ | 1,809 |
| 2015 | | 1,003 |
| **Total** [a] | **$** | **2,812** |

   (a)    The Company subleases certain of its office space to third parties. These future minimum payments have not been reduced by the $0.4 million of minimum sublease rental income to be received in the future under non-cancelable subleases.

Rental expense for all operating leases, except those with terms of a month or less that were not renewed, charged to continuing operations was $1.3 million and $1.1 million, net of $18,000 and $42,000 sublease rental income, for each of the years ended December 31, 2013 and 2012, respectively, and a majority of which is included in general and administrative expense in the consolidated statements of operations.

### Surety Bonds

The Company has funding commitments that could potentially require performance in the event of demands by third parties or contingent events, as follows *(in thousands)*:

| | Commitments Due By Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Total** | | **Less Than 1 year** | | **1-3 years** | | **3-5 years** | | **More Than 5 years** |
| Surety bonds | $ | 4,458 | $ | 4,458 | $ | — | $ | — | $ | — |

## NOTE 12—CONTINGENCIES

### Overview

Tree.com is involved in legal proceedings on an ongoing basis. In assessing the materiality of a legal proceeding, the Company evaluates, among other factors, the amount of monetary damages claimed, as well as the potential impact of non-monetary remedies sought by plaintiffs (e.g., injunctive relief) that may require it to change its business practices in a manner that could have a material adverse impact on the business. With respect to the matters disclosed in this Note 12, unless otherwise indicated, the Company is unable to estimate the possible loss or range of losses that could potentially result from the application of such non-monetary remedies.

As of December 31, 2013 and 2012, the Company has a litigation settlement accrual of $0.5 million and $0.5 million, respectively. The litigation settlement accrual relates to litigation matters that were either settled or a firm offer for settlement was extended, thereby establishing an accrual amount that is both probable and reasonably estimable.

53

## TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Specific Matters**

**Intellectual Property Litigation**

*Zillow*

*LendingTree v. Zillow, Inc., et al. Civil Action No. 3:10-cv-439*. On September 8, 2010, the Company filed an action for patent infringement in the US District Court for the Western District of North Carolina against Zillow, Inc., Nextag, Inc., Quinstreet, Inc., Quinstreet Media, Inc. and Adchemy, Inc. The complaint was amended to include Leadpoint, Inc. d/b/a Securerights on September 24, 2010. The complaint alleges that each of the defendants infringe one or both of the Company's patents—U.S. Patent No. 6,385,594, entitled "Method and Computer Network for Co-Ordinating a Loan over the Internet," and U.S. Patent No. 6,611,816, entitled "Method and Computer Network for Co-Ordinating a Loan over the Internet." Collectively, the asserted patents cover computer hardware and software used in facilitating business between computer users and multiple lenders on the internet. The defendants in this action asserted various counterclaims against the Company, including the assertion by certain of the defendants of counterclaims alleging illegal monopolization via our maintenance of the asserted patents. In July 2011, the Company reached a settlement agreement with Leadpoint, Inc., pursuant to which all claims against Leadpoint, Inc. and all counter-claims against the Company by Leadpoint, Inc. were dismissed. In November 2012, the Company reached a settlement agreement with Quinstreet, Inc. and Quinstreet Media, Inc. (collectively, the "Quinstreet Parties"), pursuant to which all claims against the Quinstreet Parties and all counterclaims against the Company by the Quinstreet Parties were dismissed. This matter went to trial beginning in February 2014, and on March 12, 2014, the jury returned a verdict. The jury found that the defendants Zillow, Inc., Adchemy, Inc., and NexTag, Inc. did not infringe the two patents referenced above and determined that those patents are invalid due to inventorship defects. The jury found in the Company's favor on the defendants' counterclaims alleging inequitable conduct and antitrust violations. As of March 13, 2014, a formal judgment had not yet been entered in the case and certain issues not before the jury remain to be resolved. The Company believes it have strong grounds for appeal; however, the Company has not yet determined what actions it will take with respect to the verdict or the findings of patent invalidity. The verdict will not impact the Company's ability to offer its current suite of products and services, and the Company does not expect the verdict to affect its business prospects.

**Internet Patents Corp.**

*Internet Patents Corporation f/k/a InsWeb v. Tree.com, Inc., No. C-12-6505 (U.S. Dist. Ct., N.D. Cal.)*. In December 2012, the plaintiff filed a patent infringement lawsuit against the Company seeking a judgment that it had infringed a patent held by the plaintiff. Process was formally served with respect to this matter in April 2013. The plaintiff sought injunctive relief, damages, costs, expenses, pre- and post-judgment interest, punitive damages and attorneys' fees. The plaintiff alleged that the Company infringes U.S. Patent No. 7,707,505, entitled "Dynamic Tabs for a Graphical User Interface". On October 25, 2013, the court dismissed the suit based on the finding that the plaintiff's claims failed as a matter of law because the asserted patent is invalid for lack of patent-eligible subject matter. The plaintiff filed a notice of appeal on November 7, 2013. The Company believes the plaintiff's allegations lack merit and intends to defend against this action vigorously.

**Money Suite**

*The Money Suite Company v. LendingTree, LLC, No. 1:13-cv-986 (U.S. Dist. Ct, D Del.)*. In June 2013, the plaintiff filed a patent infringement lawsuit against LendingTree, LLC ("LendingTree") seeking a judgment that it infringed a patent held by plaintiff. The plaintiff alleges that LendingTree infringes U.S. Patent No. 6,684,189 for "an apparatus and method using front end network gateways and search criteria for efficient quoting at a remote location". The plaintiff seeks damages (including pre- and post- judgment interest thereon), costs and attorneys' fees. In December 2013, the court stayed this case pending review of the patent by the United States Patent and Trademark Office. The Company believes the plaintiff's allegations lack merit and intends to defend against this action vigorously.

<div align="center">54</div>

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Other Litigation**

*Boschma*

*Boschma v. Home Loan Center, Inc., No. SACV7-613 (U.S. Dist. Ct., C.D. Cal.).* On May 25, 2007, the plaintiffs filed this putative class action against Home Loan Center, Inc. ("HLC") in the U.S. District Court for the Central District of California. The plaintiffs allege that HLC sold them an option "ARM" (adjustable-rate mortgage) loan but failed to disclose in a clear and conspicuous manner, among other things, that the interest rate was not fixed, that negative amortization could occur and that the loan had a prepayment penalty. Based upon these factual allegations, the plaintiffs asserted violations of the federal Truth in Lending Act, violations of the Unfair Competition Law, breach of contract, and breach of the covenant of good faith and fair dealing. The plaintiffs purport to represent a class of all individuals who between June 1, 2003 and May 31, 2007 obtained an option ARM loan through HLC on their primary residence located in California, and seek rescission, damages, attorneys' fees and injunctive relief. The plaintiffs have not yet filed a motion for class certification, but have filed a total of eight complaints in connection with this lawsuit. Each of the first seven complaints has been dismissed by the federal and state courts. The plaintiffs filed the eighth complaint (a "Second Amended Complaint") in Orange County (California) Superior Court on March 4, 2010 alleging only the fraud and Unfair Competition Law claims. As with each of the seven previous versions of plaintiffs' complaint, the Second Amended Complaint was dismissed in April 2010. The plaintiffs appealed the dismissal and on August 10, 2011, the appellate court reversed the trial court's dismissal and directed the trial court to overrule the demurrer. The case was remanded to superior court. During 2013, the parties agreed to a $450,000 settlement, which was approved in 2013. A nominal payment into the settlement fund was made in late 2013. The Company expects administration of the settlement to be completed by the third quarter of 2014. A provision for the remaining $435,000 is included in current liabilities of discontinued operations at December 31, 2013. The impact of the settlement was not material.

*Mortgage Store, Inc.*

*Mortgage Store, Inc. v. LendingTree Loans d/b/a Home Loan Center, Inc., No. 6CC250 (Cal. Super. Ct., Orange Cty.).* On November 30, 2006, The Mortgage Store, Inc. and Castleview Home Loans, Inc. filed this putative class action against HLC in the California Superior Court for Orange County. The plaintiffs, two former network lenders, alleged that HLC interfered with LendingTree's contracts with network lenders by taking referrals from LendingTree without adequately disclosing the relationship between them and that HLC charged the plaintiffs higher rates and fees than they otherwise would have been charged. Based upon these factual allegations, the plaintiffs assert claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and violation of the California Unfair Competition Law and California Business and Professions Code §17500. The plaintiffs purport to represent all network lenders from December 14, 2004 to date, and seek damages, restitution, attorneys' fees and punitive damages.

The plaintiffs' motion for class certification was granted April 29, 2010. On October 17, 2011, the court granted HLC's motion for summary judgment. Judgment was entered in favor of HLC on April 9, 2012. On June 15, 2012, the plaintiffs filed a Notice of Appeal. The plaintiffs filed their opening appellate brief on December 17, 2012. The Company filed its opposition to the plaintiffs' appellate brief in April 2013. Oral arguments were heard on this matter on September 25, 2013. On December 11, 2013, the Court of Appeal affirmed the grant of summary judgment in favor of HLC and the time for plaintiffs to further appeal such decision has expired.

*Dijkstra*

*Lijkel Dijkstra v. Harry Carenbauer, Home Loan Center, Inc. et al., No. 5:11-cv-152-JPB (U.S. Dist. Ct., N.D.WV).* On November 7, 2008, the plaintiffs filed this putative class action in Circuit Court of Ohio County, West Virginia against Harry Carenbauer, HLC, HLC Escrow, Inc. et al. The complaint alleges that HLC engaged in the unauthorized practice of law in West Virginia by permitting persons who were neither admitted to the practice of law in West Virginia nor under the direct supervision of a lawyer admitted to the practice of law in West Virginia to close mortgage loans. The plaintiffs assert claims for declaratory judgment, contempt, injunctive relief, conversion, unjust enrichment, breach of fiduciary duty, intentional misrepresentation or fraud, negligent misrepresentation, violation of the West Virginia Consumer Credit and Protection Act ("CCPA"), violation of the West Virginia Lender, Broker & Services Act, civil conspiracy, outrage and negligence. The claims against all defendants other than Mr. Carenbauer, HLC and HLC Escrow, Inc. have been dismissed. The case was removed to federal court in October 2011. On January 3, 2013, the court granted a conditional class certification only with respect to the declaratory judgment, contempt, unjust enrichment and CCPA claims. The conditional class includes consumers with mortgage loans in effect any time after November 8, 2007 who obtained such loans

through HLC, and whose loans were closed by persons not admitted to the practice of law in West Virginia or by persons not under the direct supervision of a lawyer admitted

55

## TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

to the practice of law in West Virginia. On February 26, 2014, the court granted and denied certain of each party's motions for summary judgment. With respect to the Class Claims, the court granted plaintiff's motions for summary judgment with respect to declaratory judgment, unjust enrichment and violation of the CCPA. The court granted HLC's motion for summary judgment with respect to contempt. In addition, the court denied HLC's motion to decertify the class. With respect to the claims applicable to the named plaintiff only (the "Individual Claims"), HLC's motions for summary judgment were granted with respect to conversion, breach of fiduciary duty, intentional misrepresentation, negligent misrepresentation and outrage. HLC and the plaintiff have reached a tentative settlement agreement with respect to the remaining Individual Claims. The trial for the Class Claims has not yet been scheduled by the court. The Company believes that the plaintiffs' allegations lack merit and intends to defend against this action vigorously.

The range of possible loss is estimated to be between $0.6 million and $1.95 million, of which some or all may be covered by insurance. A reserve of $0.6 million and a corresponding insurance recoverable of $0.5 million have been established for this matter in the consolidated balance sheet as of December 31, 2013.

### *Massachusetts Division of Banks*

On February 11, 2011, the Massachusetts Division of Banks (the "Division") delivered a Report of Examination/Inspection to LendingTree, which identified various alleged violations of Massachusetts and federal laws, including the alleged insufficient delivery by LendingTree of various disclosures to its customers. On October 14, 2011, the Division provided a proposed Consent Agreement and Order to settle the Division's allegations, which the Division had shared with other state mortgage lending regulators. Thirty-four of such state mortgage lending regulators (the "Joining Regulators") indicated that if LendingTree would enter into the Consent Agreement and Order, they would agree not to pursue any analogous allegations that they otherwise might assert. As of March 14, 2014, none of the Joining Regulators have asserted any such allegations.

The proposed Consent Agreement and Order calls for a fine to be allocated among the Division and the Joining Regulators and for LendingTree to adopt various new procedures and practices. The Company has commenced negotiations toward an acceptable Consent Agreement and Order. It does not believe its mortgage exchange business violated any federal or state mortgage lending laws; nor does it believe that any past operations of the mortgage business have resulted in a material violation of any such laws. Should the Division or any Joining Regulator bring any actions relating to the matters alleged in the February 2011 Report of Examination/Inspection, the Company intends to defend against such actions vigorously. The range of possible loss is estimated to be between $0.5 million and $6.5 million, and a reserve of $0.5 million has been established for this matter in the consolidated balance sheet as of December 31, 2013.

## NOTE 13—RELATED PARTY TRANSACTIONS

On November 7, 2012, the audit committee, compensation committee and board of directors approved an early redemption of 2,097.67 outstanding shares of Series A Redeemable Preferred Stock of the Company's wholly-owned subsidiary LendingTree Holdings Corp. owned by the Chairman and CEO, including all accrued dividends, for $3.3 million in cash. The redemption closed on November 30, 2012. The redemption value of the preferred stock was determined in part based on a valuation of the discounted remaining dividend stream through the mandatory redemption date of August 20, 2013.

During 2013, the Company made a contribution of $0.4 million to an educational trust. The Company's Chairman and CEO is the trustee. However, he will not receive compensation as trustee and neither he nor any of his family members are entitled to distributions from the trust.

## NOTE 14—BENEFIT PLANS

The Company operates a retirement savings plan for its employees in the United States that is qualified under Section 401(k) of the Internal Revenue Code. Employees are eligible to enroll in the plan upon date of hire. Participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits (generally $17,500 for 2013 and $17,000 for 2012). The company match contribution is fifty cents for each dollar a participant contributes to the plan, with a maximum contribution of 6% of a participant's eligible earnings. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. Tree.com stock is not included in the available investment options or the plan assets. Funds contributed to the plan vest according to the participant's years of service, with less than three years of service vesting at 0%, and

three years or more of service vesting at 100%. Matching contributions were approximately $0.2 million and $0.3 million for the years ended December 31, 2013 and 2012, respectively.

56

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 15—RESTRUCTURING EXPENSE**

Accrued restructuring liabilities primarily relate to lease obligations for call center leases exited in 2010, which are expected to be completed by 2015, and severance for headcount reductions in corporate infrastructure departments. Restructuring expense and payments against liabilities are as follows *(in thousands)*:

| | Employee Termination Costs | | Continuing Lease Obligations | | Other | | Total |
|---|---:|---|---:|---|---:|---|---:|
| **Balance at December 31, 2011** | $ 129 | $ | 1,207 | $ | — | $ | 1,336 |
| Restructuring income | (29) | | (47) | | (70) | | (146) |
| Payments | (100) | | (254) | | 70 | | (284) |
| **Balance at December 31, 2012** | $ — | $ | 906 | $ | — | $ | 906 |
| Restructuring expense | — | | 56 | | — | | 56 |
| Payments | — | | (500) | | — | | (500) |
| **Balance at December 31, 2013** | $ — | $ | 462 | $ | — | $ | 462 |

At December 31, 2013, restructuring liabilities of $0.3 million are included in accrued expenses and other current liabilities and $0.2 million are included in other long-term liabilities in the accompanying consolidated balance sheet. At December 31, 2012, restructuring liabilities of $0.4 million are included in accrued expenses and other current liabilities and $0.5 million are included in other long-term liabilities in the accompanying consolidated balance sheet. We do not expect to incur significant additional costs related to the restructuring noted above.

**NOTE 16—DISCONTINUED OPERATIONS**

**Real Estate**

On March 10, 2011, management made the decision and finalized a plan to close all of the field offices of the proprietary full-service real estate brokerage business known as RealEstate.com, REALTORS®. The Company exited all markets by March 31, 2011. In September 2011, the remaining assets of RealEstate.com were sold, which consisted primarily of internet domain names and trademarks. Accordingly, these real estate businesses are presented as discontinued operations in the accompanying consolidated financial statements for all periods presented. No significant future cash flows are anticipated from the disposition of this business.

The revenue and net loss for the real estate businesses that are reported as discontinued operations in the accompanying consolidated statements of operations are as follows *(in thousands)*:

| | Year Ended December 31, | | | |
|---|---|---:|---|---:|
| | | 2013 | | 2012 |
| **Revenue** | $ | 1 | $ | 93 |
| | | | | |
| Loss before income taxes [a] | $ | (20) | $ | (410) |
| Income tax expense | | — | | — |
| **Net loss** | $ | (20) | $ | (410) |

(a)  The loss before income taxes for the year ended December 31, 2012 includes restructuring expense of $0.2 million.

The liabilities of real estate businesses that are reported as discontinued operations in the accompanying consolidated balance sheets are as follows *(in thousands)*:

| | December 31, 2013 | December 31, 2012 |
|---|---|---|

| | | | | |
|---|---|---:|---|---:|
| Current liabilities | | $ | (45) | $ | (206) |
| **Net liabilities** | | **$** | **(45)** | **$** | **(206)** |

57

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**LendingTree Loans**

On May 12, 2011, the Company entered into an asset purchase agreement, later amended on February 7, 2012, that provided for the sale of substantially all of the operating assets of its LendingTree Loans business to Discover. The sale was completed on June 6, 2012. Discover has participated as a network lender since closing of the transaction. An evaluation of the facts and circumstances of the transaction and the applicable accounting guidance for discontinued operations indicates that the LendingTree Loans business should be reflected as discontinued operations in the accompanying consolidated financial statements for all periods presented. The continuing cash flows related to this transaction are not significant and, accordingly, are not deemed to be direct cash flows of the divested business.

The Company agreed to indemnify Discover for a breach or inaccuracy of any representation, warranty or covenant made by it in the asset purchase agreement, for any liability of LendingTree Loans that was not assumed, for any claims by its stockholders against Discover and for its failure to comply with any applicable bulk sales law, subject to certain limitations. Discover submitted a claim for indemnification relating to the sale prior to the closing of certain loans that were listed in the asset purchase agreement as to be conveyed to Discover at closing. In May 2013, this indemnification claim and other miscellaneous items were settled by agreeing to credit Discover for $1.3 million in future services. A majority of these credits were applied against services during the year ended December 31, 2013. The remaining liability for future services is included in current liabilities of discontinued operations in the accompanying consolidated balance sheet at December 31, 2013.

The revenue and net income (loss) for LendingTree Loans that are reported as discontinued operations in the accompanying consolidated statements of operations are as follows *(in thousands)*:

|  | Year Ended December 31, | |
|  | 2013 | 2012 |
|---|---|---|
| **Revenue** | $ (1,521) | $ 86,740 |
| | | |
| Income (loss) before income taxes [a] | $ (4,867) | $ 26,160 |
| Income tax expense | (54) | (1,249) |
| Gain from sale of discontinued operations, net of tax | 9,561 | 24,373 |
| **Net income** | $ 4,640 | $ 49,284 |

(a)  Income before income taxes for the year ended December 31, 2012 includes goodwill and intangible asset impairment charges of $1.4 million and restructuring expense totaling $0.1 million.

The assets and liabilities of LendingTree Loans that are reported as discontinued operations in the accompanying consolidated balance sheets are as follows *(in thousands)*:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Current assets | 521 | 407 |
| Non-current assets | 129 | 129 |
| Current liabilities | (31,959) | (30,811) |
| Non-current liabilities | (254) | (253) |
| **Net liabilities** | $ (31,563) | $ (30,528) |

**Significant Assets and Liabilities of LendingTree Loans**

Upon closing of the sale of substantially all of the operating assets of the LendingTree Loans business on June 6, 2012, LendingTree Loans ceased to originate consumer loans. The remaining operations are being wound down. These wind-down activities have included, among other things, selling the balance of loans held for sale to investors, which has been completed, paying off and then terminating the warehouse lines of credit, which occurred on July 21, 2012, and settling derivative obligations, which has been

completed. Liability for losses on previously sold loans will remain with LendingTree Loans. Below is a discussion of these significant items.

58

## TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Loans Held for Sale*

LendingTree Loans originated all of its residential real estate loans with the intent to sell them in the secondary market. Loans held for sale consisted primarily of residential first mortgage loans that were secured by residential real estate throughout the United States.

Loans held for sale were recorded at fair value, with the exception of any loans that had been repurchased from investors or loans originated prior to January 1, 2008 on which LendingTree Loans did not elect the fair value option. The fair value of loans held for sale was determined using current secondary market prices for loans with similar coupons, maturities and credit quality.

Interest on mortgage loans held for sale was recognized as earned and was only accrued if deemed collectible. Interest was generally deemed uncollectible when a loan became three months or more delinquent or when a loan had a defect affecting its saleability. Delinquency was calculated based on the contractual due date of the loan. Loans were written off when deemed uncollectible.

There were no loans held for sale as of December 31, 2013. As of December 31, 2012, LendingTree Loans maintained one loan with a principal amount of $0.4 million, which has a full offsetting reserve for uncollectibility.

During the year ended December 31, 2012, LendingTree Loans repurchased two loans with a total unpaid principal balance of $0.7 million.

*Fair Value Measurements*

A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Transfers in and out of Level 1, 2 or 3 are recorded at fair value at the beginning of the reporting period.

Following is a description of valuation methodologies used for instruments measured at fair value, as well as the general classification of such instruments pursuant to the fair value hierarchy.

LendingTree Loans entered into commitments with consumers to originate loans at specified interest rates (interest rate lock commitments—"IRLCs"). IRLCs were reported as derivative instruments at fair value, with changes in fair value being recorded in discontinued operations. IRLCs for loans to be sold to investors using a mandatory or assignment of trade ("AOT") method were hedged using "to be announced mortgage-backed securities" ("TBA MBS") and were valued using quantitative risk models. The IRLCs derive their base value from an underlying loan type with similar characteristics using the TBA MBS market, which is actively quoted and easily validated through external sources. The most significant data inputs used in this valuation included, but were not limited to, loan type, underlying loan amount, note rate, loan program and expected sale date of the loan. IRLCs for loans sold to investors on a best-efforts basis were hedged using best-efforts forward delivery commitments and were valued on an individual loan basis using a proprietary database program prior to January 1, 2012. These valuations were based on investor pricing tables stratified by product, note rate and term. The valuations were adjusted at the loan-level to consider the servicing-release premium and loan pricing adjustments specific to each loan. Effective January 1, 2012, LendingTree Loans began valuing IRLCs for loans sold to investors on a best-efforts basis using quantitative risk models on a loan level basis. The decision to modify the valuation calculation for IRLCs for loans sold on a best-efforts basis evolved from a desire to achieve principally two goals: 1) to include this portion of the IRLCs into the main operating system LendingTree Loans used for fair value (known as QRM), allowing it to improve its estimate of loan funding probability and 2) to include elements of the all-in fair value that the Company could not calculate in the previous models. The most significant data inputs used in the valuation of these IRLCs included, but were not limited to, investor pricing tables stratified by product, note rate and term, adjusted for current market conditions. These valuations were adjusted at the loan level to consider the servicing-release premium and loan pricing adjustments specific to each loan. LendingTree Loans applied an anticipated loan funding probability based on its own experience to value IRLCs, which resulted in the classification of these derivatives as Level 3. The value of the underlying loans and the anticipated loan funding probability were the most significant assumptions affecting the valuation of IRLCs. A significant change in the unobservable inputs could have resulted in a significant change in the ending fair value measurement. At December 31, 2013 and 2012, there are no IRLCs outstanding.

59

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Loans held for sale measured at fair value and sold to investors using a mandatory or AOT method were also hedged using TBA MBS and valued using quantitative risk models. The valuation was based on the loan amount, note rate, loan program and expected sale date of the loan. Loans held for sale measured at fair value and sold to investors on a best-efforts basis were hedged using best-efforts forward delivery commitments and were valued using a proprietary database program prior to January 1, 2012. The best-efforts valuations prior to that date were based on daily investor pricing tables stratified by product, note rate and term. These valuations were adjusted at the loan level to consider the servicing-release premium and loan pricing adjustments specific to each loan. Effective January 1, 2012, LendingTree Loans began valuing the loans held for sale and sold to investors on a best-efforts basis using quantitative risk models. The most significant data inputs used in the valuation of these loans included investor pricing tables stratified by product, note rate and term, adjusted for current market conditions. Loans held for sale, excluding impaired loans, were classified as Level 2. Loans held for sale measured at fair value that became impaired were transferred from Level 2 to Level 3, as the estimate of fair value was based on LendingTree Loans' experience considering lien position and current status of the loan. A significant change in the unobservable inputs could have resulted in a significant change in the ending fair value measurement. LendingTree Loans recognized interest income separately from other changes in fair value.

Under LendingTree Loans' risk management policy, LendingTree Loans economically hedged the changes in fair value of IRLCs and loans held for sale caused by changes in interest rates by using TBA MBS and entering into best-efforts forward delivery commitments. These hedging instruments were recorded at fair value with changes in fair value recorded in current earnings as a component of revenue from the origination and sale of loans. TBA MBS used to hedge both IRLCs and loans were valued using quantitative risk models based primarily on inputs related to characteristics of the MBS stratified by product, coupon and settlement date. These derivatives were classified as Level 2. Prior to January 1, 2012, best-efforts forward delivery commitments were valued using a proprietary database program using investor pricing tables considering the current base loan price. Effective January 1, 2012, best-efforts forward delivery commitments were valued using quantitative risk models based on investor pricing tables stratified by product, note rate and term, adjusted for current market conditions. An anticipated loan funding probability was applied to value best-efforts commitments hedging IRLCs, which resulted in the classification of these contracts as Level 3. The current base loan price and the anticipated loan funding probability were the most significant assumptions affecting the value of the best-efforts commitments. A significant change in the unobservable inputs could have resulted in a significant change in the ending fair value measurement. The best-efforts forward delivery commitments hedging loans held for sale were classified as Level 2, so such contracts were transferred from Level 3 to Level 2 at the time the underlying loan was originated. For the purposes of the tables below, we refer to TBA MBS and best-efforts forward delivery commitments collectively as "Forward Delivery Contracts".

*Assets and liabilities measured at fair value on a recurring basis*

There were no assets and liabilities that were measured at fair value on a recurring basis at December 31, 2013 and 2012; however, there were during the year ended December 31, 2012.

The changes in assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the year ended December 31, 2012 are as follows *(in thousands)*:

| | December 31, 2012 | | |
| --- | --- | --- | --- |
| | Interest Rate Lock Commitments | Forward Delivery Contracts | Loans Held for Sale |
| **Balance at January 1, 2012** | $ 9,122 | $ 19 | $ 295 |
| Transfers into Level 3 | — | — | 564 |
| Transfers out of Level 3 | — | (845) | — |
| Total net gains (losses) included in earnings (realized and unrealized) | 73,378 | 846 | (147) |
| Purchases, sales, and settlements: | | | |
| Purchases | — | — | — |
| Sales | (5,640) | (20) | (491) |
| Settlements | (3,401) | — | (221) |
| Transfers of IRLCs to closed loans | (73,459) | — | — |
| **Balance at December 31, 2012** | $ — | $ — | $ — |

## TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following presents the gains (losses) included in earnings for the year ended December 31, 2012 relating to assets and liabilities that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3) *(in thousands)*:

| | Year Ended December 31, 2012 | | |
| --- | --- | --- | --- |
| | Interest Rate Lock Commitments | Forward Delivery Contracts | Loans Held for Sale |
| Total net gains (losses) included in earnings, which are included in discontinued operations | $        73,378 | $        846 | $        (147) |
| Change in unrealized losses relating to assets and liabilities still held at December 31, 2012, which are included in discontinued operations | $        — | $        — | $        (412) |

The gain recognized in the consolidated statements of operations for derivatives for the year ended December 31, 2012 was as follows *(in thousands)*:

| | Location of Gain Recognized in Income on Derivative | Year Ended December 31, 2012 |
| --- | --- | --- |
| Interest Rate Lock Commitments | Discontinued operations | $        73,378 |
| Forward Delivery Contracts | Discontinued operations | 4,244 |
| **Total gain on derivatives** | | **$        77,622** |

*Assets and liabilities under the fair value option*

LendingTree Loans elected to account for loans held for sale originated on or after January 1, 2008 at fair value. Electing the fair value option allowed a better offset of the changes in fair values of the loans and the forward delivery contracts used to economically hedge them, without the burden of complying with the requirements for hedge accounting.

LendingTree Loans did not elect the fair value option on loans held for sale originated prior to January 1, 2008 and on loans that were repurchased from investors on or subsequent to that date. As of December 31, 2013 and 2012, there were no loans held for sale or carried at the lower of cost or market ("LOCOM") value assessed on an individual loan basis.

During the year ended December 31, 2012, the change in fair value of loans held for sale for which the fair value option was elected was a gain of $2.7 million and is included in discontinued operations in the consolidated statement of operations.

### *Loan Loss Obligations*

LendingTree Loans sold loans it originated to investors on a servicing-released basis, so the risk of loss or default by the borrower was generally transferred to the investor. However, LendingTree Loans was required by these investors to make certain representations and warranties relating to credit information, loan documentation and collateral. These representations and warranties may extend through the contractual life of the loan. Subsequent to the loan sale, if underwriting deficiencies, borrower fraud or documentation defects are discovered in individual loans, LendingTree Loans may be obligated to repurchase the respective loan or indemnify the investors for any losses from borrower defaults if such deficiency or defect cannot be cured within the specified period following discovery. In the case of early loan payoffs and early defaults on certain loans, LendingTree Loans may be required to repay all or a portion of the premium initially paid by the investor.

The Company's HLC subsidiary continues to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of its LendingTree Loans business in the second quarter of 2012. As of December 31, 2013, approximately $21.2 million is being held in escrow pending resolution of certain of these contingent liabilities. The Company has been negotiating with certain secondary market purchasers to settle any existing and future contingent liabilities, but it may not be able to complete such negotiations on acceptable terms, or at all. Because LendingTree Loans does not service the loans it sold, it does not maintain nor generally have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, LendingTree Loans is unable to determine, with precision, its maximum exposure for breaches of the representations and warranties it made to the investors that purchased such loans.

### TREE.COM, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

During the fourth quarter of 2013, the Company revised its estimation process for evaluating the adequacy of the reserve for loan losses to use a settlement discount framework. This model estimates the lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. A settlement discount factor is then applied to the result of the foregoing to reflect publicly announced bulk settlements for similar loan types and vintages, as well as LendingTree Loans' non-operating status, in order to estimate a range of potential obligation.

The estimated range of remaining loan losses using this settlement discount framework was determined to be $17 to $31 million at December 31, 2013 and resulted in a range that was similar to the prior methodology employed. As such, no adjustment to the reserve was made in the fourth quarter of 2013 as a result of the change in methodology. The reserve balance recorded as of December 31, 2013 was $28.5 million. Management has considered both objective and subjective factors in the estimation process, but given current general industry trends in mortgage loans as well as housing prices and market expectations, actual losses related to LendingTree Loans' obligations could vary significantly from the obligation recorded as of the balance sheet date or the range estimated above.

Additionally, Tree.com has guaranteed certain loans sold to two investors in the event that LendingTree Loans is unable to satisfy its repurchase and warranty obligations related to such loans.

The following table represents the loans sold for the period shown and the aggregate loan losses through December 31, 2013:

| Period of Loan Sales | December 31, 2013 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Number of Loans Sold | Original Principal Balance | Number of Loans with Losses | Original Principal Balance of Loans with Losses | Amount of Aggregate Losses |
| | | *(in billions)* | | *(in millions)* | *(in millions)* |
| 2013 | — | $        — | — | $        — | $        — |
| 2012 | 9,200 | 1.9 | — | — | — |
| 2011 | 12,500 | 2.7 | 1 | 0.3 | 0.1 |
| 2010 | 12,400 | 2.8 | 4 | 1.1 | 0.1 |
| 2009 | 12,800 | 2.8 | 5 | 1.2 | 0.2 |
| 2008 | 11,000 | 2.2 | 33 | 6.9 | 2.2 |
| 2007 | 36,300 | 6.1 | 160 | 22.1 | 8.2 |
| 2006 | 55,000 | 7.9 | 207 | 24.5 | 13.4 |
| 2005 and prior years | 86,700 | 13.0 | 89 | 12.3 | 5.0 |
| **Total** | **235,900** | **$     39.4** | **499** | **$     68.4** | **$     29.2** |

In the second quarter of 2012, LendingTree Loans completed settlements with two buyers of previously purchased loans. These settlements of $0.5 million and $3.3 million, respectively, relate to all existing and substantially all future losses on loans sold to these buyers. The settlement amounts were included as charge-offs to the reserve in the second quarter of 2012. The settlement amounts for these settlements were not determined on an individual loan basis and are, therefore, not included in the loss amounts disclosed above for the years such loans were sold.

Based on historical experience, it is anticipated that LendingTree Loans will continue to receive repurchase requests and incur losses on loans sold in prior years. However, the two settlements discussed above will substantially eliminate future repurchase requests from those buyers for the loan types included in those settlements.

62

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The activity related to loss reserves on previously sold loans is as follows *(in thousands)*:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| **Loan loss reserve, beginning of period** | $ 27,182 | $ 31,512 |
| Provisions | 1,531 | 6,977 |
| Change in estimate | — | (6,493) |
| Charge-offs to reserves | (170) | (4,814) |
| **Loan loss reserve, end of period** | $ 28,543 | $ 27,182 |

During 2012, in order to reflect the Company's exit from the mortgage loan origination business and its commercial objective to pursue bulk settlements with investors, management revised the estimation process for evaluating the adequacy of the reserve for loan losses. The revised methodology resulted in a $6.5 million reduction to the loss reserve on previously sold loans.

The liability for losses on previously sold loans is included in current liabilities of discontinued operations in the accompanying consolidated balance sheets.

***Warehouse Lines of Credit***

As a result of the closing of the sale of substantially all of the operating assets of the LendingTree Loans business on June 6, 2012, all three then-existing warehouse lines of credit totaling $325.0 million expired and terminated on July 21, 2012. Borrowings under these lines of credit were used to fund, and were secured by, consumer residential loans that were held for sale. Loans under these lines of credit were repaid using proceeds from the sales of loans by LendingTree Loans. The LendingTree Loans business was highly dependent on the availability of these warehouse lines.

## NOTE 17—FAIR VALUE MEASUREMENTS

The following disclosures represent financial instruments in which the December 31, 2013 and 2012 ending balances are not carried at fair value in their entirety on the consolidated balance sheets. The estimated fair value of these financial instruments has been determined by the Company using available market information and appropriate valuation methodologies. However, considerable judgment is required to interpret market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized in a current market exchange. The use of different market assumptions or estimation methodologies may have a material impact on the estimated fair value amounts.

| | December 31, 2013 | | December 31, 2012 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Cash and cash equivalents [a] | $ 91,667 | $ 91,667 | $ 80,190 | $ 80,190 |
| Restricted cash and cash equivalents [a][b] | 26,017 | 26,017 | 29,414 | 29,414 |
| Accrued expenses | (23,265) | (23,265) | (19,960) | (19,960) |

(a)  The carrying amounts of cash and cash equivalents and restricted cash and cash equivalents reflected in the accompanying consolidated balance sheets approximate fair value, as they are maintained with various high-quality financial institutions or in short-term duration high-quality debt securities.

(b)  The Company's restricted cash and cash equivalents financial instruments include letters of credit and surety bonds, for which we had $2.5 million and $6.5 million in restricted cash at December 31, 2013 and 2012, respectively, as collateral for the surety bonds. These commitments remain in place to facilitate certain of the Company's commercial operations.

63

## TREE.COM, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 18—SEGMENT INFORMATION**

The Company has one reportable segment, lending. The Company formerly referred to this reportable segment as its mortgage segment. The auto, education and home services operating segments are included in the "Other" category in the reconciliation of segment information below.

The expenses presented below for the lending segment and the operating segments shown in the Other category include allocations of certain corporate expenses that are identifiable and directly benefit those segments. The unallocated expenses included in the "Corporate" category are those corporate overhead expenses that are not directly attributable to an operating segment and include: finance, legal, executive technology support and human resources.

Adjusted EBITDA is the primary metric by which the chief operating decision maker evaluates the performance of the Company's businesses, on which its internal budgets are based and by which management is compensated. Adjusted EBITDA is defined as operating income or loss (which excludes interest expense and taxes) adjusted to exclude amortization of intangibles and depreciation, and excluding (1) non-cash compensation expense, (2) non-cash intangible asset impairment charges, (3) gain/loss on disposal of assets, (4) restructuring and severance expenses, (5) litigation settlements and contingencies and legal fees for certain patent litigation, (6) adjustments for significant acquisitions or dispositions, and (7) one-time items. For the periods presented in this report, there are no adjustments for one-time items, except for a $0.9 million related to a discretionary cash bonus payment to employee stock option holders and a one-time contribution to an educational trust of $0.4 million.

Assets and other balance sheet information are not used by the chief operating decision maker.

64

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Summarized information by segment and reconciliations to Adjusted EBITDA and income (loss) before income taxes is as follows *(in thousands)*:

| | Year Ended December 31, 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Lending | | Other | | Corporate | | Total | |
| **Revenue** | $ | **127,985** | $ | **10,632** | $ | **623** | $ | **139,240** |
| Costs and expenses: | | | | | | | | |
| Cost of revenue *(exclusive of depreciation shown separately below)* | | 5,469 | | 613 | | 460 | | 6,542 |
| Selling and marketing expense | | 83,694 | | 7,449 | | (22) | | 91,121 |
| General and administrative expense | | 3,629 | | 2,245 | | 18,784 | | 24,658 |
| Product development | | 4,302 | | 962 | | — | | 5,264 |
| Depreciation | | 1,453 | | 1,642 | | 406 | | 3,501 |
| Amortization of intangibles | | — | | 147 | | — | | 147 |
| Restructuring and severance | | 78 | | 46 | | 35 | | 159 |
| Litigation settlements and contingencies | | — | | 31 | | 8,924 | | 8,955 |
| Total costs and expenses | | 98,625 | | 13,135 | | 28,587 | | 140,347 |
| **Operating income (loss)** | | **29,360** | | **(2,503)** | | **(27,964)** | | **(1,107)** |
| Adjustments to reconcile to Adjusted EBITDA: | | | | | | | | |
| Amortization of intangibles | | — | | 147 | | — | | 147 |
| Depreciation | | 1,453 | | 1,642 | | 406 | | 3,501 |
| Restructuring and severance | | 78 | | 46 | | 35 | | 159 |
| Loss on disposal of assets | | — | | — | | 165 | | 165 |
| Non-cash compensation | | 1,681 | | 689 | | 3,257 | | 5,627 |
| Discretionary cash bonus | | — | | — | | 920 | | 920 |
| Trust contribution | | — | | — | | 350 | | 350 |
| Litigation settlements and contingencies | | — | | 31 | | 8,924 | | 8,955 |
| **Adjusted EBITDA** | $ | **32,572** | $ | **52** | $ | **(13,907)** | $ | **18,717** |
| | | | | | | | | |
| **Operating income (loss)** | | | | | | | $ | **(1,107)** |
| Interest expense | | | | | | | | (19) |
| **Income (loss) before income taxes** | | | | | | | $ | **(1,126)** |

65

**TREE.COM, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Year Ended December 31, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Lending | | Other | | Corporate | | Total |
| Revenue | $ | 61,176 | $ | 14,620 | $ | 1,647 | $ | 77,443 |
| Costs and expenses: | | | | | | | | |
| Cost of revenue (exclusive of depreciation shown separately below) | | 3,238 | | 536 | | 521 | | 4,295 |
| Selling and marketing expense | | 35,250 | | 13,677 | | 7 | | 48,934 |
| General and administrative expense | | 3,470 | | 2,888 | | 15,873 | | 22,231 |
| Product development | | 2,277 | | 1,258 | | (6) | | 3,529 |
| Depreciation | | 1,536 | | 1,991 | | 578 | | 4,105 |
| Amortization of intangibles | | — | | 358 | | — | | 358 |
| Restructuring and severance | | 20 | | 11 | | (88) | | (57) |
| Litigation settlements and contingencies | | — | | — | | (3,101) | | (3,101) |
| Total costs and expenses | | 45,791 | | 20,719 | | 13,784 | | 80,294 |
| **Operating income (loss)** | | **15,385** | | **(6,099)** | | **(12,137)** | | **(2,851)** |
| Adjustments to reconcile to Adjusted EBITDA: | | | | | | | | |
| Amortization of intangibles | | — | | 358 | | — | | 358 |
| Depreciation | | 1,536 | | 1,991 | | 578 | | 4,105 |
| Restructuring and severance | | 20 | | 11 | | (88) | | (57) |
| Loss on disposal of assets | | 388 | | 345 | | 5 | | 738 |
| Non-cash compensation | | 987 | | 507 | | 3,093 | | 4,587 |
| Litigation settlements and contingencies | | — | | — | | (3,101) | | (3,101) |
| **Adjusted EBITDA** | $ | **18,316** | $ | **(2,887)** | $ | **(11,650)** | $ | **3,779** |

| | | | |
|---|---|---|---|
| **Operating income (loss)** | | $ | **(2,851)** |
| Interest expense | | | (881) |
| **Income (loss) before income taxes** | | $ | **(3,732)** |

66

Table of Contents

### ITEM 9.  *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

Not applicable.

### ITEM 9A.  *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation, as of the end of the period covered by this report, of the effectiveness of our disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Management necessarily applied its judgment in assessing the costs and benefits of such controls procedures, which by their nature can provide only reasonable assurance regarding management's control objectives. Management does not expect that our disclosure controls and procedures will prevent or detect all errors and fraud. A control system, irrespective of how well it is designed and operated, can only provide reasonable assurance and cannot guarantee that it will succeed in its stated objectives.

Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2013, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act.  Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect our transactions and dispositions of our assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that our receipts and expenditures are being made only in accordance with authorizations of our management and our directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.  Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, with the participation of our Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2013. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on our evaluation under the framework in the Internal Control-Integrated Framework, issued by the COSO, management has concluded that our internal control over financial reporting was effective as of December 31, 2013.  The effectiveness of our internal control over financial reporting as of December 31, 2013 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report appearing under "Item 8. Financial Statements and Supplementary Data" included elsewhere in this annual report.

**Remediation of Previously Identified Material Weakness**

Management previously identified and disclosed a material weakness in our internal control over financial reporting related to the application and monitoring of our accounting for income taxes. Specifically, management determined we did not have controls designed and in place to ensure effective oversight of the work performed by, and the accuracy of financial information provided by, third-party tax advisors.

67

**Table of Contents**

In response to this material weakness, management strengthened our processes over accounting for income taxes. These actions included designing and implementing new controls in our tax processes, redefining the role of the consultants and improving communication with and monitoring of the consultants. Management tested the implemented and improved controls and found them to be effectively designed and operating, leading the Company to conclude that this material weakness had been remediated as of December 31, 2013.

**Changes in Internal Control over Financial Reporting**

As described above under Remediation of Previously Identified Material Weaknesses, there were changes in our internal control over financial reporting (as defined in the Exchange Act, Rules 13a-15(f)) that occurred during the quarter ended December 31, 2013 that have materially affected, or are reasonable likely to materially affect, our internal control over financial reporting.

**ITEM 9B.  *Other Information***

None.

68

Table of Contents

## PART III

As set forth below, the information required by Part III (Items 10, 11, 12, 13 and 14) is incorporated herein by reference to Tree.com's definitive proxy statement to be used in connection with its 2014 Annual Meeting of Stockholders and which will be filed with the Securities and Exchange Commission not later than 120 days after the end of the Company's fiscal year ended December 31, 2013 (the "2014 Proxy Statement"), in accordance with General Instruction G(3) of Form 10-K.

**ITEM 10.  *Directors, Executive Officers and Corporate Governance***

The information required by Item 10 will be contained in, and is hereby incorporated by reference to, the 2014 Proxy Statement.

**ITEM 11.  *Executive Compensation***

The information required by Item 11 will be contained in, and is hereby incorporated by reference to, the 2014 Proxy Statement.

**ITEM 12.  *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

The information required by Item 12 will be contained in, and is hereby incorporated by reference to, the 2014 Proxy Statement.

**ITEM 13.  *Certain Relationships and Related Transactions, and Director Independence***

The information required by Item 13 will be contained in, and is hereby incorporated by reference to, the 2014 Proxy Statement.

**ITEM 14.  *Principal Accounting Fees and Services***

The information required by Item 14 will be contained in, and is hereby incorporated by reference to, the 2014 Proxy Statement.

69

Table of Contents

<div align="center">

**PART IV**

</div>

**ITEM 15.** *Exhibits, Financial Statement Schedules*

*(a)* *List of documents filed as part of this report:*

**(1)** **Consolidated Financial Statements of Tree.com**

Report of Independent Registered Public Accounting Firm: PricewaterhouseCoopers LLP.

Consolidated Statements of Operations for the Years Ended December 31, 2013 and 2012.

Consolidated Balance Sheets as of December 31, 2013 and 2012.

Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2013 and 2012.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2013 and 2012.

Notes to Consolidated Financial Statements.

**(2)** **Consolidated Financial Statement Schedules of Tree.com**

| Schedule Number | |
|---|---|
| II | Valuation and Qualifying Accounts |

All other financial statements and schedules not listed have been omitted since the required information is included in the consolidated financial statements or the notes thereto, or is not applicable or required.

**(3)** **Exhibits**

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith or incorporated herein by reference to the location indicated below.

| Exhibit Number | Description | Location |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Tree.com, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 3.2 | Second Amended and Restated By-laws of Tree.com, Inc. | Exhibit 3.2 to the Registrant's Quarterly Report on Form 10-Q filed November 12, 2013 |
| 10.1 | Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of January 7, 2008* | Exhibit 10.6 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.2 | Employment Agreement by and between David Norris and LendingTree, LLC, dated June 30, 2008* | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.3 | Employment Agreement between Robert L. Harris and LendingTree, LLC, dated as of June 30, 2008* | Exhibit 10.5 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.4 | Employment Agreement between Matt Packey and LendingTree, LLC, dated as of August 3, 2008* | Exhibit 10.16 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.5 | Amendment No. 1 to Employment Agreement between Douglas R. Lebda and IAC/InterActiveCorp, dated as of August 15, 2008* | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed August 20, 2008 |
| 10.6 | Amendment No. 2 to the Employment Agreement between Douglas R. Lebda and Tree.com, Inc.* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |

| Exhibit Number | Description | Location |
|---|---|---|
| 10.7 | Amendment No. 1 to the Employment Agreement between Robert Harris and Tree.com, Inc.* | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.8 | Amendment No. 1 to the Employment Agreement between Matthew Packey and Tree.com, Inc.* | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.9 | Severance Agreement between Greg Hanson, RealEstate.com and Tree.com, dated April 22, 2009* | Exhibit 10.8 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.10 | Amendment to Employment Agreement between David Norris and Tree.com, Inc., dated December 3, 2009* | Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.11 | Confidential Severance Agreement and Release by and between Robert L. Harris and Tree.com, Inc., dated March 2, 2010* | Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.12 | Change in Control Letter from Tree.com, Inc. to Greg Hanson, dated March 26, 2010* | Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.13 | Amendment No. 3 to the Employment Agreement between Douglas R. Lebda and Tree.com, Inc., dated May 10, 2010* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.14 | Amendment No. 2 to Employment Agreement between David Norris and Tree.com, Inc., dated May 10, 2010* | Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.15 | Severance Agreement between Tree.com, Inc. and Matthew Packey, dated May 10, 2010* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed August 3, 2010 |
| 10.16 | Letter Agreement between Tree.com, Inc. and Christopher Hayek, dated June 28, 2010* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed August 3, 2010 |
| 10.17 | Amended and Restated Employment Agreement by and between Tree.com, Inc. and Douglas R. Lebda, dated October 26, 2010* | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed November 1, 2010 |
| 10.18 | Employment Agreement between Tree.com, Inc. and Steven Ozonian, dated October 31, 2010* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed November 1, 2010 |
| 10.19 | Confidential Severance Agreement and Release, dated March 31, 2011, by and between Tree.com, Inc. and Steven Ozonian* | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed April 6, 2011 |
| 10.20 | Letter Agreement dated as of April 20, 2011 by and between Tree.com, Inc. and Gabriel Dalporto. | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 20, 2013 |
| 10.21 | Employment Agreement by and between David Norris and Tree.com, Inc. effective as of February 7, 2012* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed May 15, 2012 |
| 10.22 | Letter Agreement dated as of July 27, 2012 by and between Tree.com, Inc. and Alexander Mandel* | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2012 |
| 10.23 | Severance Letter dated as of September 9, 2012 from Tree.com, Inc. to Gabriel Dalporto. | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 20, 2013 |
| 10.24 | Letter Agreement dated as of December 11, 2012 by and between Tree.com, Inc. and Carla Shumate* | † |
| 10.25 | Transition Services and Separation Agreement and General Release dated as of December 13, 2012 by and between LendingTree, LLC and Christopher Hayek* | † |
| 10.26 | Employment Agreement dated January 9, 2014 by and between Douglas Lebda and Tree.com | † |
| 10.27 | Employment Agreement dated January 9, 2014 by and between Gabe Dalporto and Tree.com | † |

71

| Exhibit Number | Description | Location |
|---|---|---|
| 10.28 | Restricted Share Grant and Stockholder's Agreement, dated as of August 15, 2008, by and among IAC/InterActiveCorp, LendingTree Holdings Corp. and Douglas R. Lebda, together with Exhibit A thereto, Amended and Restated Certificate of Incorporation of LendingTree Holdings Corp.* | Exhibits 99.2 and 99.3 to the Registrant's Current Report on Form 8-K filed August 20, 2008 |
| 10.29 | Amendment No. 1 to the Stock Option Award Agreement between Douglas R. Lebda and Tree.com, Inc., dated May 10, 2010* | Exhibit 10.15 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.30 | Amendment No. 3 to the Master Repurchase Agreement, dated July 22, 2010, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 28, 2010 |
| 10.31 | Amendment No. 1 to the Restricted Share Grant and Stockholder's Agreement, dated August 30, 2010 between Tree.com, Inc., LendingTree Holdings Corp. and Douglas R. Lebda* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed November 12, 2010 |
| 10.32 | Award Letter between Greg Hanson and Tree.com BU Holding Company, Inc. dated January 28, 2011* | Exhibit 10.1 to Registrant's Current Report on Form 8-K filed February 3, 2011 |
| 10.33 | Third Amended and Restated Tree.com, Inc. 2008 Stock and Annual Incentive Plan* | Exhibit 10.86(a) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.34 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.86(b) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.35 | Second amended and restated Tree.com, Inc. 2008 Stock and Annual Incentive Plan* | Exhibit 10.2 to the Registrant's current report on Form 8-K filed May 1, 2009 |
| 10.36 | Form of Restricted Stock Award* | Exhibit 10.86(c) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.37 | Form of Notice of Stock Option Award* | Exhibit 10.86(d) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.38 | Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.15 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.39 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.40 | Form of Restricted Stock Award* | Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.41 | Form of Notice of Stock Option Award* | Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed March 27, 2009 |
| 10.42 | Option Cancellation Agreement, made and entered into as of the 28th day of April, 2009, by and between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed May 1, 2009 |
| 10.43 | Form of Amendment to Restricted Stock Awards for Douglas R. Lebda* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.44 | Form of Restricted Stock Award Agreement* | Exhibit 10.11 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |

72

| Exhibit Number | Description | Location |
|---|---|---|
| 10.45 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.46 | Form of Notice of Stock Option Award* | Exhibit 10.13 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.47 | Standard Terms and Conditions to Restricted Stock Award Letters of Tree.com BU Holding Company, Inc.* | Exhibit 10.2 to Registrant's Current Report on Form 8-K filed February 3, 2011 |
| 10.48 | Master Repurchase Agreement, dated as of January 25, 2008, by and among Countrywide Bank, FSB and Home Loan Center, Inc. (the "Master Repurchase Agreement") | Exhibit 10.13 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.49 | Notice, dated June 25, 2008, issued by Countrywide Warehouse Lending, regarding certain amendments to the Master Repurchase Agreement | Exhibit 10.14 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.50 | Amendment to Master Repurchase Agreement No. 1 made and entered into as of February 23, 2009 by and between the Warehouse Lending Division of Countrywide Bank, FSB and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 27, 2009 |
| 10.51 | Amendment No. 3 to Master Repurchase Agreement, dated July 22, 2010, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 28, 2010 |
| 10.52 | Amendment No. 4 to Master Repurchase Agreement, dated as of October 29, 2010 by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 25, 2010 |
| 10.53 | Warehousing Credit Agreement, dated as of November 26, 2007, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein) | Exhibit 10.12 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.54 | Second Amendment to Warehousing Credit Agreement, made and entered into as of the 12th day of December, 2008, and to be effective as of the 30 th day of December, 2008, by and among Home Loan Center, Inc. d/b/a LendingTree Loans, National City Bank and National City Bank in its capacity as Agent for the Banks (as defined therein). | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 17, 2008 |
| 10.55 | Loan Purchase Agreement, dated as of April 16, 2002, between Countrywide Home Loans, Inc. and Home Loan Center, Inc. | Exhibit 10.10 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.56 | Amended and Restated Restricted Share Grant and Shareholders' Agreement, dated as of July 7, 2003, by and among Forest Merger Corp., LendingTree, Inc., InterActiveCorp and the Grantees named therein, as amended (filed as Exhibit 99.4 to Amendment No. 1 to IAC/InterActiveCorp's Registration Statement on Form S-4 (SEC File No. 333-105876) filed on July 10, 2003 and incorporated herein by reference)* | Exhibit 10.8 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.57 | Correspondent Loan Purchase Agreement, dated as of April 26, 2004, between CitiMortgage, Inc. and Home Loan Center, Inc. | Exhibit 10.9 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.58 | Separation and Distribution Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.1 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |

| Exhibit Number | Description | Location |
|---|---|---|
| 10.59 | Tax Sharing Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 10.60 | Employee Matters Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 10.61 | Transition Services Agreement, dated as of August 20, 2008, by and among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 10.62 | Registration Rights Agreement, dated as of August 20, 2008, among Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC | Exhibit 10.5 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 10.63 | Spinco Assignment and Assumption Agreement, dated as of August 20, 2008, among IAC/InterActiveCorp, Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC | Exhibit 10.6 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 10.64 | Stock Purchase Agreement, dated February 8, 2009, between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 11, 2009 |
| 10.65 | Early Purchase Program Addendum to Loan Purchase Agreement, made and entered into as of May 1, 2009 by and between Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed May 6, 2009 |
| 10.66 | Master Repurchase Agreement, made and entered into as of May 1, 2009, by and between Bank of America , N.A. and Home Loan Center, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed May 6, 2009 |
| 10.67 | Transactions Terms Letter for Master Repurchase Agreement, made and entered into as of May 1, 2009, by and between Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed May 6, 2009 |
| 10.68 | Master Repurchase Agreement dated as of October 30, 2009, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 30, 2009 |
| 10.69 | Side Letter dated October 30, 2009 regarding the Master Repurchase Agreement between JPMorgan Chase Bank, and Home Loan Center, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed October 30, 2009 |
| 10.70 | Third Amendment to Warehousing Credit Agreement, made and entered into as of the 18th day of December, 2009, and to be effective as of the 29th day of December, 2009, by and among Home Loan Center, Inc. d/b/a LendingTree Loans PNC Bank, National Association, successor to National City Bank, its capacity as Agent for the Banks (as defined therein) | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed December 23, 2009 |
| 10.71 | Fourth Amendment to Warehousing Credit Agreement, made and entered into as of February 15, 2010 by and among Home Loan Center, Inc. d/b/a LendingTree Loans, PNC Bank, National Association (successor to National City Bank) and PNC Bank, National Association (successor to National City Bank), in its capacity as Agent for the Banks (as defined therein). | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed February 19, 2010 |

74

| Exhibit Number | Description | Location |
|---|---|---|
| 10.72 | Amendment No. 1 to Transactions Term Letter, made and entered into as of April 28, 2010 by and between Home Loan Center, Inc. d/b/a LendingTree Loans and Bank of America | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 30, 2010 |
| 10.73 | Amendment No. 1 to Transactions Term Letter, made and entered into as of April 28, 2010 by and between Home Loan Center, Inc. d/b/a LendingTree Loans and Bank of America | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 30, 2010 |
| 10.74 | Amendment No. 1 to Stock Purchase Agreement between Tree.com, Inc. and Douglas R. Lebda, dated May 10, 2010* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.75 | Amendment No. 1 to Early Purchase Program Addendum to Loan Purchase Agreement, dated July 15, 2010, by and among Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 21, 2010 |
| 10.76 | Mandatory Forward Loan Volume Commitment, dated July 15, 2010, by and among Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 21, 2010 |
| 10.77 | Transaction Terms Letter for Master Repurchase Agreement, dated July 15, 2010, by and among Bank of America, N.A. and Home Loan Center, Inc. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed July 21, 2010 |
| 10.78 | Share Exchange Agreement dated August 30, 2010, between Tree.com, Inc. and Douglas R. Lebda* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed September 1, 2010 |
| 10.79 | Second Amendment to Side Letter dated as of October 29, 2010 with respect to the Home Loan Center, Inc. warehouse facility with JPMorgan Chase Bank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed October 25, 2010. |
| 10.80 | Asset Purchase Agreement dated November 15, 2010 by and among Home Loan Center, Inc., First Residential Mortgage Network, Inc. dba SurePoint Lending, and the shareholders of First Residential Mortgage Network named therein | Exhibit 2.1 to Registrant's Current Report on Form 8K filed November 16, 2010 |
| 10.81 | Letter Agreement dated as of January 24, 2011 by and between RealEstate.com, Inc. and Steven Ozonian* | Exhibit 10.66 to the Registrant's Annual Report on Form 10-K filed February 28, 2011 |
| 10.82 | First Amendment to Asset Purchase Agreement dated March 14, 2011 by and among HLC, SurePoint and the shareholders party thereto | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed March 21, 2011 |
| 10.83 | Second Amendment to Asset Purchase Agreement dated March 15, 2011 by and among HLC, SurePoint and the shareholders party thereto | Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed March 21, 2011 |
| 10.84 | Amendment No. 5 to Master Repurchase Agreement, dated March 31, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 6, 2011 |
| 10.85 | Third Amendment to Side Letter, dated March 31, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed April 6, 2011 |
| 10.86 | Asset Purchase Agreement dated May 12, 2011 by and among Tree.com, Inc., Home Loan Center, Inc., LendingTree, LLC, HLC Escrow, Inc. and Discover Bank.** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |

| Exhibit Number | Description | Location |
|---|---|---|
| 10.87 | Form of Assignment and Assumption Agreement | Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.88 | Form of Bill of Sale | Exhibit 2.3 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.89 | Escrow Agreement Terms | Exhibit 2.4 to the Registrant's Current Report on Form 8-K/A filed August 12, 2011 |
| 10.90 | Form of Voting and Support Agreement of Douglas R. Lebda | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.91 | Form of Voting and Support Agreement of Liberty Media Corporation | Exhibit 99.2 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.92 | Form of Voting and Support Agreement of Second Curve, LLC | Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 10.93 | Amendment No. 6 to Master Repurchase Agreement, dated as of June 29, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 6, 2011 |
| 10.94 | Fourth Amendment to Side Letter, dated as of June 29, 2011, with respect to the Home Loan Center, Inc. warehouse facility with JPMorgan Chase Bank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 6, 2011 |
| 10.95 | Amendment No. 1 to Transaction Terms Letter dated as of June 29, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed July 6, 2011 |
| 10.96 | Amendment No. 2 to Transactions Terms Letter dated as of July 12, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed July 15, 2011 |
| 10.97 | Amendment No. 2 to Early Purchase Program Addendum to Loan Purchase Agreement dated as of July 12, 2011, which supplements that certain Loan Purchase Agreement by and between Bank of America, N.A. and Home Loan Center, Inc. dated April 16, 2002. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed July 15, 2011 |
| 10.98 | Extension Letter Agreement dated as of August 11, 2011, regarding the Master Repurchase Agreement by and between Bank of America, N.A. and Home Loan Center, Inc. dated May 1, 2009 | Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed August 15, 2011 |
| 10.99 | Asset Purchase Agreement dated September 15, 2011 by and among LendingTree, LLC, RealEstate.com, Inc. and Market Leader, Inc.** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 10.100 | Bill of Sale dated September 16, 2011 by and among LendingTree, LLC, RealEstate.com, Inc. and Market Leader, Inc. | Exhibit 2.2 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 10.101 | Assignment and Assumption Agreement dated September 16, 2011 by and among LendingTree, LLC, RealEstate.com, Inc. and Market Leader, Inc. | Exhibit 2.3 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 10.102 | Amendment No. 3 to Transaction Terms Letter dated as of September 30, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 5, 2011 |

76

| Exhibit Number | Description | Location |
|---|---|---|
| 10.103 | Master Repurchase Agreement, dated as of October 13, 2011, by and between Home Loan Center, Inc. and Citibank, N.A. | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed October 19, 2011 |
| 10.104 | Pricing Side Letter dated as of October 13, 2011, by and between Home Loan Center, Inc. and Citibank, N.A. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed October 19, 2011 |
| 10.105 | Amendment No. 7 to Master Repurchase Agreement dated as of October 28, 2011, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.9 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.106 | Amendment No. 5 to Side Letter dated as of October 28, 2011, which supplements that certain Master Repurchase Agreement dated as of October 30, 2009 by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.10 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.107 | Amendment No. 2 to Master Repurchase Agreement dated as of November 1, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.11 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.108 | Amendment No. 4 to Transaction Terms Letter dated as of November 1, 2011, which supplements that certain Master Repurchase Agreement dated as of May 1, 2009 by and between Home Loan Center, Inc. and Bank of America, N.A. | Exhibit 10.12 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2011 |
| 10.109 | Amendment Number One dated as of December 13, 2011 to the Master Repurchase Agreement dated as of October 13, 2011 by and between Home Loan Center, Inc. and CitiBank, N.A. | Exhibit 10.97 to the Registrant's Annual Report on Form 10-K filed April 16, 2012 |
| 10.110 | Master Repurchase Agreement dated as of January 6, 2012 by and between Credit Suisse First Boston Mortgage Capital LLC and Home Loan Center, Inc. | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed May 15, 2012 |
| 10.111 | Amendment No. 2 dated as of January 20, 2012 to the Master Repurchase Agreement dated as of October 13, 2011 by and between Home Loan Center, Inc. and Citibank, N.A. | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed May 15, 2012 |
| 10.112 | Amendment No. 3 dated as of January 31, 2012 to the Master Repurchase Agreement dated as of October 13, 2011 by and between Home Loan Center, Inc. and Citibank, N.A. | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed May 15, 2012 |
| 10.113 | Amendment to Asset Purchase Agreement dated as of February 7, 2012 by and among Home Loan Center, Inc., HLC Escrow, Inc., LendingTree, LLC, Tree.com, Inc., Discover Bank and Discover Financial Services** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed February 8, 2012 |
| 10.114 | Amended and Restated Master Repurchase Agreement dated as of February 17, 2012 by and between Citibank, N.A. and Home Loan Center, Inc. | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 15, 2012 |
| 10.115 | Amendment No. 8 to Master Repurchase Agreement dated as of April 25, 2012, by and between Home Loan Center, Inc. and JPMorgan Chase Bank, N.A. | Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q filed May 15, 2012 |
| 10.116 | Change in Control Letter dated as of July 27, 2012 by and between Tree.com, Inc. and Alexander Mandel* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed November 14, 2012 |
| 10.117 | Form of Restricted Stock Award Agreement* | † |
| 10.118 | Form of Notice of Restricted Stock Unit Award* | † |

77

| Exhibit Number | Description | Location |
|---|---|---|
| 10.119 | Form of Notice of Stock Option Award* | † |
| 21.1 | Subsidiaries of Tree.com, Inc. | † |
| 23.1 | Consent of independent registered public accounting firm. | † |
| 24.1 | Power of Attorney (included on signature page of this Annual Report on Form 10-K) | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | †† |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | †† |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | ††† |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | ††† |
| 101.INS | XBRL Instance Document | ††† |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | ††† |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | ††† |
| 101.SCH | XBRL Taxonomy Extension Schema Document | ††† |

† Filed herewith

†† This certification is being furnished solely to accompany this report pursuant to 18 U.S.C. 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934 and is not to be incorporated by reference into any filing of the registrant, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

††† Furnished herewith. Pursuant to Rule 406T of Regulation S-T, the Interactive Data Files on Exhibit 101 hereto are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities and Exchange Act of 1934, as amended, and otherwise are not subject to liability under those sections.

* Management or compensation plan or agreement.

** Certain schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). The Company agrees to furnish supplementally a copy of all omitted schedules to the SEC upon its request.

78

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: March 17, 2014

<div align="center">

TREE.COM, INC.

By:    **/s/ DOUGLAS R. LEBDA**
Douglas R. Lebda
*Chairman and Chief Executive Officer*

</div>

KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints Katharine Pierce his true and lawful attorney and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, and to file the same with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney and agent may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **/s/ DOUGLAS R. LEBDA**<br>Douglas R. Lebda | Chairman, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | March 17, 2014 |
| **/s/ ALEXANDER MANDEL**<br>Alexander Mandel | Chief Financial Officer<br>*(Principal Financial Officer)* | March 17, 2014 |
| **/s/ CARLA SHUMATE**<br>Carla Shumate | Senior Vice President and Chief Accounting Officer<br>*(Principal Accounting Officer)* | March 17, 2014 |
| **/s/ PETER HORAN**<br>Peter Horan | Director | March 17, 2014 |
| **/s/ JOSEPH LEVIN**<br>Joseph Levin | Director | March 17, 2014 |
| **/s/ NEAL DERMER**<br>Neal Dermer | Director | March 17, 2014 |
| **/s/ STEVEN OZONIAN**<br>Steven Ozonian | Director | March 17, 2014 |
| **/s/ W. MAC LACKEY**<br>W. Mac Lackey | Director | March 17, 2014 |

08-13555-mg   Doc 26143   Filed 04/08/21   Entered 04/01/21 14:23:28   Exhibit
79

Table of Contents

Schedule II

### TREE.COM, INC. AND SUBSIDIARIES
### VALUATION AND QUALIFYING ACCOUNTS

| Description | Balance at Beginning of Period | | Charges to Earnings | | Charges to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(In thousands)* | | | | |
| **2013:** | | | | | | | | | |
| Allowance for doubtful accounts | $ | **503** | $ | 248 | $ | — | $ | (343) [(b)] | $ | **408** |
| Deferred tax valuation allowance | | **54,961** | | (5,287) [(a)] | | — | | — | | **49,674** |
| **2012:** | | | | | | | | | |
| Allowance for doubtful accounts | $ | **86** | $ | 406 | $ | — | $ | 11 [(b)] | $ | **503** |
| Deferred tax valuation allowance | | **68,138** | | (13,176) [(a)] | | — | | — | | **54,961** |

(a) Amount is primarily related to Tree.com net operating losses and other deferred tax assets, including accrued expenses and goodwill, which impacted the income tax provision.

(b) Write-off of uncollectible accounts receivable.

80

**Exhibit 10.117**

### RESTRICTED STOCK AWARD AGREEMENT

**Important Note:** **You must login to your account at to accept this Award and obtain other important information concerning this Award, such as a copy of the Fourth Amended and Restated Tree.com 2008 Stock and Annual Incentive Plan and the Terms and Conditions for Restricted Stock Awards. Additional copies of these documents are also available on the MyEquity page of the Company intranet or upon request from your Human Resources Department.**

This Restricted Stock Award Agreement (the "Agreement") is made between Tree.com, Inc., a Delaware corporation ("Tree.com"), and [NAME]. The Grant Date for the Restricted Shares awarded under this Agreement is [DATE].

Tree.com sponsors the Tree.com Amended and Restated 2008 Stock and Annual Incentive Plan (the "Plan"). This Agreement represents an award of Shares of Restricted Stock under the Plan. All capitalized terms used herein, to the extent not defined, shall have the same meaning as set forth in the Plan.

The Shares of Restricted Stock covered by this Agreement are being awarded subject to the following terms and provisions:

1.      Subject to the terms and conditions of the Plan and this Agreement, Tree.com awards to you [NUMBER] Shares of Restricted Stock (the "Restricted Shares").

2.      In order for all or any portion of the Restricted Shares to vest, you must be continuously employed by Tree.com (or any of its Subsidiaries or Affiliates) to the vesting date on which the applicable performance conditions are met, as described in Section 3. The actual number of Restricted Shares that vest will be determined based on the extent to which the performance conditions described in Section 3 are met. Nothing in this Agreement or the Plan shall confer upon you any right to continue in the employ or service of Tree.com (or any of its Subsidiaries or Affiliates) or interfere in any way with their rights to terminate your employment or service at any time, [subject to the terms of [EMPLOYMENT AGREEMENT]].

3.      You will earn and become vested in the Restricted Shares in accordance with the conditions of this Section 3. Until they become vested, the Restricted Shares shall be subject to cancellation and forfeiture in accordance with Section 5 below. Until vested, you may not sell, transfer, pledge, assign or otherwise alienate or hypothecate the Restricted Shares (such period during which restrictions apply is the "Restriction Period"). Subject to the Performance Goals set forth below, the Restricted Shares shall vest as follows:

(a)      If Tree.com's EBITDA is $[XXX] or more for the [YEAR] fiscal year, [XXX] Restricted Shares will become vested on [DATE] if you have been in continuous employment or service with Tree.com (or any of its Subsidiaries or Affiliates) to that date.

(b)      If Tree.com's EBITDA is $[XXX] or more for the [YEAR] fiscal year, [XXX] Restricted Shares will become vested on [DATE] if you have been in continuous employment or service with Tree.com (or any of its Subsidiaries or Affiliates) to that date.

(c)      If Tree.com's EBITDA is $[XXX] or more for the [YEAR] fiscal year, [XXX] Restricted Shares will become vested on [DATE] if you have been in continuous employment or service with Tree.com (or any of its Subsidiaries or Affiliates) to that date.

(d)      If Tree.com's EBITDA is less than $[XXX] for either the [YEAR] or the [YEAR] fiscal year, but Tree.com's cumulative EBITDA is $[XXX] or more that fiscal year and the immediately following fiscal year (the "Second Fiscal Year"), [XXX] Restricted Shares will become vested on the [MONTH, DAY] immediately following the Second Fiscal Year if you have been in continuous employment or service with Tree.com (or any of its Subsidiaries or Affiliates) to that date.

(e)      If Tree.com's EBITDA did not equal or exceed $[XXX] for either the [YEAR] or the [YEAR] fiscal year, but its cumulative EBITDA for the [YEAR] through [YEAR] fiscal year period was $[XXX] or more, all [NUMBER] Restricted Shares will become vested on [DATE] if you have been in continuous employment or service with Tree.com (or any of its Subsidiaries or Affiliates) to that date.

[Notwithstanding the foregoing, in the event of a Change in Control while you are still employed by Tree.com (or any of its Subsidiaries or Affiliates), [XXX]% of the then-outstanding unvested Restricted Shares subject to this Award shall vest upon the occurrence of such Change in Control.]

[Notwithstanding the foregoing, in the event you experience a Termination of Employment due to your death or Disability, then all of the then-outstanding unvested Restricted Shares subject to this Award shall vest upon such Termination of Employment.]

Any cash dividends declared on the Shares shall be held subject to the vesting of the underlying Restricted Shares in accordance with this Section (and shall be paid only if and when such vesting conditions are satisfied), and subject to any adjustment pursuant to Section 3(d) of the Plan, dividends payable in Shares shall be paid in the form of Restricted Shares and shall be similarly held subject to the vesting of the underlying Restricted Shares in accordance with this Section.

4.  You agree that you shall comply with (or provide adequate assurance as to future compliance with) all applicable securities laws and income tax laws as determined by Tree.com with respect to your receipt of the Restricted Shares. In addition, you agree that, upon request, you will furnish a letter agreement providing that (a) you will not distribute or resell any of said shares in violation of the Securities Act of 1933, as amended, (b) you will indemnify and hold Tree.com harmless against all liability for any such violation and (c) you will accept all liability for any such violation. You expressly acknowledge and agree to be bound by Section 14(o) of the Plan, which contains provisions addressing the Company's policy on recoupment of equity or other compensation.

You represent and warrant that you understand the federal, state and local income tax consequences of the granting of Restricted Shares. Under Section 83 of the Code, the Fair Market Value of the Restricted Shares on the date any forfeiture restrictions applicable to such Restricted Shares lapse will be reportable as ordinary income at that time. You may voluntarily elect to be taxed at the time the Restricted Shares are acquired to the extent that the Fair Market Value of the Restricted Shares exceeds the amount of consideration paid by you (if any) for such Restricted Shares at that time rather than when such Restricted Shares cease to be subject to such forfeiture restrictions, by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after the Grant Date. YOU ACKNOWLEDGE THAT IT IS YOUR SOLE RESPONSIBILITY, AND NOT TREE.COM'S, TO FILE A TIMELY ELECTION UNDER CODE SECTION 83(b), EVEN IF YOU REQUEST TREE.COM OR ITS REPRESENTATIVES TO MAKE THIS FILING ON YOUR BEHALF. MOREOVER, YOU ARE RELYING SOLELY ON YOUR OWN ADVISORS WITH RESPECT TO THE DECISION AS TO WHETHER OR NOT TO FILE A CODE SECTION 83(b) ELECTION.

5.  You acknowledge and agree that upon your ceasing to be employed by Tree.com or any of its Subsidiaries or Affiliates during the Restriction Period all then outstanding unvested Restricted Shares subject to this Award will be canceled and forfeited without consideration and returned to Tree.com upon your Termination of Employment. For the avoidance of doubt, transfers of employment among Tree.com and its Subsidiaries and Affiliates, without any break in service, is not a Termination of Employment. In order to facilitate the transfer to Tree.com of any Shares pursuant to the terms hereof and as a condition of this Award, you shall timely execute the enclosed stock power (Assignment Separate from Certificate). The stock power may be used by Tree.com to transfer any unvested Shares to Tree.com in accordance with this Section. You further hereby irrevocably appoint (which appointment is coupled with an interest) Tree.com as your agent and attorney-in-fact to take any necessary or appropriate action to cause Shares to be returned to Tree.com in accordance with this Section, including without limitation executing and delivering stock powers and instruments of transfer, making endorsements and/or making, initiating or issuing instructions or entitlement orders, all in your name and on your behalf. Without limiting the foregoing, you expressly acknowledge and agree that any transfer agent for the Shares is fully authorized and protected in relying on, and shall incur no liability in acting on, any documents, instruments, endorsements, instructions, orders or communications from Tree.com in connection with the Shares or the transfer thereof, and that any such transfer agent is a third party beneficiary of this Agreement.

6.  In the event of any conflict between this Agreement and the Plan, the Plan shall control; provided, that an action or provision that is permissive under the terms of the Plan, and required under this Agreement, shall not be deemed a conflict and this Agreement shall control. In the event of any ambiguity in this Agreement, or any matters as to which this Agreement are silent, the Plan shall govern.

7.  Tree.com may modify, amend or waive the terms of your Restricted Shares, prospectively or retroactively, but no such modification, amendment or waiver shall materially impair your rights without your consent, except as required by applicable law, NASDAQ or stock exchange rules, tax rules or accounting rules.

https://www.sec.gov/Archives/edgar/data/1434601/000143462114000015/tree-12312013ex10117.htm    3/6

8.     Your acceptance of the Restricted Shares constitutes your authorization of the release from time to time to Tree.com or any of its Subsidiaries or Affiliates and to the Agent (together, the "Relevant Companies") of any and all personal or professional data that is necessary or desirable for the administration of your Restricted Shares and/or the Plan (the "Relevant Information"). Without limiting the above, this authorization permits your employing company to collect, process, register and transfer to the Relevant Companies all Relevant Information (including any professional and personal data that may be useful or necessary for the purposes of the administration of the Restricted Shares and/or the Plan and/or to implement or structure any further grants of equity awards (if any)). The acceptance of the Restricted Shares also constitutes your authorization of the transfer of the Relevant Information to any jurisdiction in which Tree.com, your employing company or the Agent considers appropriate. You shall have access to, and the right to change, the Relevant Information, which will only be used in accordance with applicable law.

9.     Your Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and the rules and regulations issued thereunder ("Section 409A"). In no event shall Tree.com be required to pay you any "gross-up" or other payment with respect to any taxes or penalties imposed under Section 409A or Code Sections 280G or 4999 with respect to any amounts or benefits paid to you in respect of your Award.

10.    In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement and the Plan, constitutes the final understanding between you and Tree.com regarding the Restricted Shares. Any prior agreements, commitments or negotiations concerning the Restricted Shares are superseded.

11.    Any certificate(s) for the Restricted Shares may, in the discretion of Tree.com, be deposited in escrow with the Secretary of Tree.com (or his/her designee) to be held until vesting. No stock certificates evidencing Shares free from a restrictive legend shall be delivered to you until you have paid to Tree.com the amount that must be withheld with respect to those Shares under federal, state and local income and employment tax laws (the "Applicable Withholding Taxes") or you and Tree.com have made arrangements that are agreed to in writing by Tree.com for the payment of such taxes. Unless you inform Tree.com in writing before the applicable date of vesting that you will timely pay the Applicable Withholding Taxes amount then due with cash, Tree.com shall automatically retain that number of Shares (valued at their Fair Market Value as of the applicable date of vesting of the Restricted Shares) that would satisfy the Applicable Withholding Taxes.

IN WITNESS WHEREOF, Tree.com has caused this Agreement to be executed by its duly authorized officer, and you have hereunto set your hand, all effective as of the Grant Date listed above. By signing below, you are also acknowledging receipt of copies of the Plan and the Plan's prospectus.

TREE.COM, INC.

By:     _____

Title:  _____


        _____

        [NAME]

3

**ASSIGNMENT SEPARATE FROM CERTIFICATE**
(Stock Power)


FOR VALUE RECEIVED, the undersigned does hereby assign and transfer unto

Name:


Address:


Social Security or
Taxpayer Identification Number:

shares of the Stock of

represented by Certificate No(s).

herewith, standing in the name of the undersigned, and does hereby appoint

attorney, with full power of substitution, to transfer said shares on the books of said corporation.


*Signature:*


Date: _____     _____
                                                                    [NAME]


4

Exhibit 10.118

**Notice of Restricted Stock Unit Award Granted Under the**
**Fourth Amended and Restated Tree.com, Inc. 2008 Stock and Annual Incentive Plan**
**(the "2008 Amended Plan")**

**Important Note:** **You must login to your account at to accept this Award and obtain other important information concerning this Award, such as a copy of the Fourth Amended and Restated Tree.com 2008 Stock and Annual Incentive Plan and the Terms and Conditions for Restricted Stock Unit Awards (the "Terms and Conditions"). Additional copies of these documents are also available on the MyEquity page of the Company intranet or upon request from your Human Resources Department. You acknowledge that you have received copies of the Plan and the Plan's prospectus.**

| | |
|---|---|
| **Award Recipient:** | |
| **Restricted Stock Unit Award:** | Restricted stock units ("RSUs") granted under the 2008 Amended Plan. |
| **Award Date:** | |
| **Vesting Schedule:** | Subject to your continuous employment with Tree.com or its Subsidiaries or Affiliates, your RSUs shall, subject to the provisions of the 2008 Amended Plan and the Terms and Conditions, vest and no longer be subject to any restriction as of the vesting dates and the achievement of any applicable performance goals, as set forth below: |
| **Impact of a Termination of Employment:** | Except as otherwise provided in the 2008 Amended Plan or in the Terms and Conditions, or any Individual Agreement, all of your unvested RSUs will be forfeited and canceled without consideration in their entirety upon a Termination of Employment. |
| **Terms and Conditions:** | Capitalized terms used (but not defined) in this Award Notice shall have the meanings set forth in the 2008 Amended Plan. |
| | Your RSUs are subject to the Terms and Conditions and to the 2008 Amended Plan. We strongly encourage you to review the Terms and Conditions and the 2008 Amended Plan. These documents will help provide you with a full understanding of your RSU award. |

**Terms and Conditions for Restricted Stock Unit Award**

**Overview**

These Terms and Conditions apply to the restricted stock units (the "Award") awarded to you by Tree.com, Inc. ("Tree.com" or the "Company") pursuant to Section 7 of the Fourth Amended and Restated Tree.com 2008 Stock and Annual Incentive Plan (the "2008 Amended Plan"). You were notified of your Award by way of an award notice (the "Award Notice"). All capitalized terms used herein, to the extent not defined, shall have the meaning as set forth in the 2008 Amended Plan.

**Continuous Service**

In order for RSUs to vest, you must be continuously employed by Tree.com or any of its Subsidiaries or Affiliates during the Restriction Period (as defined below) or as otherwise provided in the Vesting section below. Nothing in your Award Notice, these Terms and Conditions, or the 2008 Amended Plan shall confer upon you any right to continue in the employ or service of Tree.com or any of its Subsidiaries or Affiliates or interfere in any way with their rights to terminate your employment or service at any time and for any or no reason.

**Vesting**

Subject to the Award Notice, these Terms and Conditions and the 2008 Amended Plan, the RSUs in respect to your Award, shall vest and no longer be subject to satisfaction of any restriction on the dates and subject to any applicable performance conditions (such period during which restrictions apply is the "Restriction Period") as follows:

The vesting of your Award is conditioned upon your continuous employment with Tree.com or its Subsidiaries or Affiliates through each respective vesting date.

[Notwithstanding the foregoing, 100% of your then-outstanding and unvested portion of your Award shall vest upon the occurrence of a Change in Control which occurs during your employment with Tree. Com (or any Subsidiary or Affiliate). The term "Change in Control" is defined in the 2008 Amended Plan, and includes certain events affecting Tree.com (not events only affecting specific businesses of Tree.com).]

[Notwithstanding the foregoing, in the event you experience a Termination of Employment due to your death or Disability, then 100% of your then-outstanding and unvested portion of your Award shall vest upon such Termination of Employment.]

[Include any other specific vesting events approved by the Compensation Committee.]

**Termination of Employment**

Upon the Termination of your Employment with Tree.com or any of its Subsidiaries or Affiliates during the Restriction Period for any reason, any unvested portion of this RSU Award shall be forfeited and canceled in its entirety without consideration effective immediately upon such Termination of Employment.

For the avoidance of doubt, transfers of employment among the Company and its Subsidiaries and Affiliates, without any break in service, is not a Termination of Employment.

**Settlement**

Subject to your satisfaction of the tax obligations described immediately below under "Taxes and Withholding," as soon as practicable after any RSUs in respect of your Award have vested and are no longer subject to the Restriction Period (but in no event later than two and one-half months after the end of the fiscal year in which the RSUs vest), such RSUs shall be settled. For each RSU settled, Tree.com shall issue one Share (or cash equivalent) for each RSU that has vested. Notwithstanding the foregoing, Tree.com shall be entitled to hold the Shares or cash issuable to you upon settlement of all RSUs that have vested until Tree.com or the agent selected by Tree.com to administer the 2008 Amended Plan (the "Agent") has received from you (i) a duly executed Form W-9 or W-8 and (ii) payment for any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such RSUs.

**Taxes and Withholding**

No later than the date as of which an amount in respect of any RSUs first becomes includable in your gross income for federal, state, local or foreign income or employment or other tax purposes, Tree.com or its Subsidiaries and/or Affiliates shall, unless prohibited by law, have the right to deduct any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount due to you, including deducting such amount from the delivery of Shares or cash issued upon settlement of the RSUs that gives rise to the withholding requirement. In the event Shares are deducted to cover tax withholdings, the number of Shares withheld shall generally have a Fair Market Value equal to the aggregate amount of Tree.com's withholding obligation on the date of settlement. If the event that any such deduction and/or withholding is prohibited by law, you shall, prior to or contemporaneously with the settlement of your RSUs, be required to pay to Tree.com, or make arrangements satisfactory to Tree.com regarding the payment of, any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount.

**Non-Transferability of the RSUs**

Until such time as your RSUs are ultimately settled, they shall not be transferable by you by means of sale, assignment, exchange, encumbrance, pledge, hedge or otherwise.

**No Rights as a Stockholder**

Except as otherwise specifically provided in the 2008 Amended Plan, unless and until your RSUs are settled with Shares, you shall not be entitled to any rights of a stockholder with respect to the RSUs (including the right to vote the underlying Shares or receive dividends). Notwithstanding the foregoing, if Tree.com declares and pays dividends on the Common Stock during the Restriction Period for particular RSUs in respect of your Award, you will be credited with additional amounts for each RSU underlying such Award equal to the dividend that would have been paid with respect to such RSU as if it had been an actual share of Common Stock, which amount shall remain subject to restrictions (and as determined by the Committee may be

reinvested in RSUs or may be held in kind as restricted property) and shall vest concurrently with the vesting of the RSUs upon which such dividend equivalent amounts were paid (and shall be settled at the same time as the underlying RSUs and also subject to satisfaction of tax withholding).

**Other Restrictions**

The RSUs shall be subject to the requirement that, if at any time the Committee shall determine that (i) the listing, registration or qualification of the shares of Common Stock subject or related thereto upon any securities exchange or under any state or federal law, or (ii) the consent or approval of any government regulatory body is necessary or desirable as a condition of, or in connection with, the delivery of shares, then in any such event, the award of RSUs shall not be effective unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

**Conflicts and Interpretation**

In the event of any conflict between these Terms and Conditions and the 2008 Amended Plan, the 2008 Amended Plan shall control; provided, that an action or provision that is permissive under the terms of the 2008 Amended Plan, and required under these Terms and Conditions, shall not be deemed a conflict and these Terms and Conditions shall control. In the event of any ambiguity in these Terms and Conditions, or any matters as to which these Terms and Conditions are silent, the 2008 Amended Plan shall govern. In the event of (i) any conflict between the Award Notice (or any information posted on Tree.com's intranet or given to you directly or indirectly through the Agent (including information posted on https://www.benefitaccess.com) and Tree.com's books and records, or (ii) ambiguity in the Award Notice (or any information posted on Tree.com's intranet or given to you directly or indirectly through the Agent (including information posted on https://www.benefitaccess.com), Tree.com's books and records shall control.

**Amendment**

Tree.com may modify, amend or waive the terms of your RSUs, prospectively or retroactively, but no such modification, amendment or waiver shall materially impair your rights without your consent, except as required by applicable law, NASDAQ or stock exchange rules, tax rules or accounting rules.

**Data Protection**

The acceptance of your RSUs constitutes your authorization of the release from time to time to Tree.com or any of its Subsidiaries or Affiliates and to the Agent (together, the "Relevant Companies") of any and all personal or professional data that is necessary or desirable for the administration of your RSUs and/or the 2008 Amended Plan (the "Relevant Information"). Without limiting the above, this authorization permits your employing company to collect, process, register and transfer to the Relevant Companies all Relevant Information (including any professional and personal data that may be useful or necessary for the purposes of the administration of your RSUs and/or the 2008 Amended Plan and/or to implement or structure any further grants of equity awards (if any)). The acceptance of your RSUs also constitutes your authorization of the transfer of the Relevant Information to any jurisdiction in which Tree.com, your employing company or the Agent considers appropriate. You shall have access to, and the right to change, the Relevant Information, which will only be used in accordance with applicable law.

**Sections 409A, 280G and 4999 of the Code**

Your Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and related rules and regulations ("Section 409A"). In no event shall Tree.com be required to pay you any "gross-up" or other payment with respect to any taxes or penalties imposed under Section 409A (or Code Section 280G or 4999) with respect to any amounts or benefits paid to you in respect of your Award.

**Notification of Changes**

Any changes to these Terms and Conditions shall either be posted on Tree.com's intranet or communicated (either directly by Tree.com or indirectly through any of its Subsidiaries, Affiliates or the Agent) to you electronically via e-mail (or otherwise in writing) after such change becomes effective.

-3-

**Exhibit 10.119**

**Notice of [YEAR] Stock Option Award Granted Under the
Fourth Amended and Restated Tree.com, Inc. 2008 Stock and Annual Incentive Plan**

**Important Note:** You must login to your account at to accept this Award and obtain other important information concerning this Award, such as a copy of the Fourth Amended and Restated Tree.com 2008 Stock and Annual Incentive Plan (the "Amended 2008 Plan") and the Terms and Conditions for Option Awards (the "Terms and Conditions"). Additional copies of these documents are also available on the MyEquity page of the Company intranet or upon request from your Human Resources Department. You acknowledge that you have received copies of the Plan and the Plan's prospectus.

| | |
|---|---|
| **Award Recipient:** | |
| **[YEAR] Stock Option Award:** | Under the Amended 2008 Plan: |
| | You have been awarded a nonqualified option to acquire *xxx* Shares of Tree.com common stock at an "Exercise Price" of $*xxx* per Share ("Stock Option"); |
| **Award Date:** | _____, 201___ |
| **Vesting Schedule:** | Subject to your continued employment with Tree.com or its Subsidiaries or Affiliates, your Stock Option shall, subject to the provisions of the Amended 2008 Plan, vest and no longer be subject to any vesting restriction *in three equal annual installments (rounded to nearest whole number) on each of the first three anniversaries of your Award Date, beginning [DATE].* |
| **Expiration Date:** | Once vested, your Stock Option will expire upon the earlier of (i) the expiration of the 12-month period following your Termination of Employment for any reason other than death, Disability or Retirement, (ii) the expiration of the one-year period following your Termination of Employment due to death, Disability or Retirement or (iii) 10 years from your Award Date (the "Expiration Date"), except as otherwise provided in the Amended 2008 Plan or the attached Terms and Conditions. |
| | If you do not exercise your vested Stock Option before the Expiration Date, your unexercised Stock Option will be forfeited and canceled in its entirety. |
| **Impact of a Termination of Employment:** | Except as otherwise provided in the Amended 2008 Plan, and any employment agreement between you and Tree.com, the unvested portion of this Stock Option will be forfeited without consideration and canceled in its entirety upon your Termination of Employment. |
| **Terms and Conditions:** | Capitalized terms used (but not defined) in this Award Notice shall have the meanings set forth in the Amended 2008 Plan. |
| | Your Stock Option is subject to the Terms and Conditions attached hereto and to the Amended 2008 Plan, which are posted on www.benefitaccess.com and incorporated herein by reference, and any employment agreement between you and Tree.com. Copies of these documents are also available upon request from your Human Resources Department. In the event of a conflict between the Terms and Conditions and this Notice, this Notice shall control. |
| | Without a complete review of these documents, you will not have a full understanding of all the material terms of your Stock Option. |

### Terms and Conditions for Stock Option Award

**Overview**

These Terms and Conditions apply to the stock option (the "Award") awarded to you by Tree.com, Inc. ("Tree.com" or the "Company") pursuant to Section 5 of the Fourth Amended and Restated Tree.com 2008 Stock and Annual Incentive Plan (the "2008 Amended Plan"). You were notified of your Award by way of an award notice (the "Award Notice"). All capitalized terms used herein, to the extent not defined, shall have the meaning as set forth in the 2008 Amended Plan.

**Continuous Service**

In order for the Award to vest, you must be continuously employed by Tree.com or any of its Subsidiaries or Affiliates during the Restriction Period (as defined below) or as otherwise provided in the Vesting section below. Nothing in your Award Notice, these Terms and Conditions, or the 2008 Amended Plan shall confer upon you any right to continue in the employ or service of Tree.com or any of its Subsidiaries or Affiliates or interfere in any way with their rights to terminate your employment or service at any time and for any or no reason.

**Vesting**

Subject to the Award Notice, these Terms and Conditions and the 2008 Amended Plan, the Award shall vest and no longer be subject to satisfaction of any restriction on the dates and subject to any applicable performance conditions (such period during which restrictions apply is the "Restriction Period") as set forth in the Vesting Schedule section of the Award Notice.

[Notwithstanding the foregoing, 100% of your then-outstanding and unvested portion of your Award shall vest upon the occurrence of a Change in Control which occurs during your employment with Tree. Com (or any Subsidiary or Affiliate). The term "Change in Control" is defined in the 2008 Amended Plan, and includes certain events affecting Tree.com (not events only affecting specific businesses of Tree.com).]

[Notwithstanding the foregoing, in the event you experience a Termination of Employment due to your Retirement, death or Disability, then 100% of your then-outstanding and unvested portion of your Award shall vest upon such Termination of Employment.]

[Include any other specific vesting events approved by the Compensation Committee.]

**Termination of Employment**

Upon your Termination of Employment with Tree.com or any of its Subsidiaries or Affiliates during the Restriction Period for any reason, any unvested portion of this Award shall be forfeited and canceled in its entirety without consideration effective immediately upon such Termination of Employment. The then vested portion of this Stock Option may remain exercisable after your Termination Employment to the extent permitted under Plan section 5(i).

For the avoidance of doubt, transfers of employment among the Company and its Subsidiaries and Affiliates, without any break in service, is not a Termination of Employment.

**Exercise**

When you wish to exercise this Award, you must notify the Company by filing a "Notice of Exercise" in the form prescribed by Tree.com at the address given on the form. Your notice must specify how many Shares you wish to purchase and is subject to the minimum purchase limitation set forth in Plan section 5(g). The notice can only become effective after it is received and approved by the Company. If someone else wants to exercise this Stock Option after your death, that person must prove to the Company's satisfaction that he or she is entitled to do so.

When you submit your Notice of Exercise, you must include payment of the aggregate Exercise Price for the Shares you are purchasing. Payment may be made in one (or a combination) of (i) certified or bank check or (ii) to the extent approved by the Committee by any of the methods described in Plan sections 5(g)(i), 5(g)(ii), or 5(g)(iii).

-2-

**Taxes and Withholding**

No later than the date as of which an amount in respect of any part of this Award first becomes includable in your gross income for federal, state, local or foreign income or employment or other tax purposes, Tree.com or its Subsidiaries and/or Affiliates shall, unless prohibited by law, have the right to deduct any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount due to you, including deducting such amount from the delivery of Shares or cash issued upon settlement of the Award that gives rise to the withholding requirement. In the event Shares are deducted to cover tax withholdings, the number of Shares withheld shall generally have a Fair Market Value equal to the aggregate amount of Tree.com's withholding obligation on the date of exercise of the Stock Option. If the event that any such deduction and/or withholding is prohibited by law, you shall, prior to or contemporaneously with the settlement of your Award, be required to pay to Tree.com, or make arrangements satisfactory to Tree.com regarding the payment of, any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount. To the extent approved by the Committee, you may satisfy the applicable tax withholding amounts as permitted under Plan section 14(d).

**Non-Transferability of the Award**

Your Award shall not be transferable by you by means of sale, assignment, exchange, encumbrance, pledge, hedge or otherwise except as may be permitted under Plan section 5(j).

**No Rights as a Stockholder**

Until your Award is exercised and settled with Shares, you shall not be entitled to any rights of a stockholder with respect to the Award (including the right to vote the underlying Shares or receive dividends). Moreover, if Tree.com declares and pays dividends on the Common Stock during the Restriction Period, this Award will not be credited with any dividends.

**Other Restrictions**

The Award shall be subject to the requirement that, if at any time the Committee shall determine that (i) the listing, registration or qualification of the Shares of Common Stock subject or related thereto upon any securities exchange or under any state or federal law, or (ii) the consent or approval of any government regulatory body is necessary or desirable as a condition of, or in connection with, the delivery of Shares, then in any such event, the Award and/or any issuance of Shares under the Award shall not be effective unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

**Conflicts and Interpretation**

In the event of any conflict between these Terms and Conditions and the 2008 Amended Plan, the 2008 Amended Plan shall control; provided, that an action or provision that is permissive under the terms of the 2008 Amended Plan, and required under these Terms and Conditions, shall not be deemed a conflict and these Terms and Conditions shall control. In the event of any ambiguity in these Terms and Conditions, or any matters as to which these Terms and Conditions are silent, the 2008 Amended Plan shall govern. In the event of (i) any conflict between the Award Notice (or any information posted on Tree.com's intranet or given to you directly or indirectly through the Agent (including information posted on https://www.benefitaccess.com) and Tree.com's books and records, or (ii) ambiguity in the Award Notice (or any information posted on Tree.com's intranet or given to you directly or indirectly through the Agent (including information posted on https://www.benefitaccess.com), Tree.com's books and records shall control.

**Amendment**

Tree.com may modify, amend or waive the terms of your Awards, prospectively or retroactively, but no such modification, amendment or waiver shall materially impair your rights without your consent, except as required by applicable law, NASDAQ or stock exchange rules, tax rules or accounting rules.

**Data Protection**

The acceptance of your Award constitutes your authorization of the release from time to time to Tree.com or any of its Subsidiaries or Affiliates and to the Agent (together, the "Relevant Companies") of any and all personal or professional data that is necessary or desirable for the administration of your Award and/or the 2008 Amended Plan (the "Relevant Information"). Without limiting the above, this authorization permits your employing company to collect, process, register and transfer to the Relevant Companies all Relevant Information (including any professional and personal data that may be useful or necessary for

the purposes of the administration of your Award and/or the 2008 Amended Plan and/or to implement or structure any further grants of equity awards (if any)). The acceptance of your Award also constitutes your authorization of the transfer of the Relevant Information to any jurisdiction in which Tree.com, your employing company or the Agent considers appropriate. You shall have access to, and the right to change, the Relevant Information, which will only be used in accordance with applicable law.

**Sections 409A, 280G and 4999 of the Code**

Your Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and related rules and regulations ("Section 409A"). In no event shall Tree.com be required to pay you any "gross-up" or other payment with respect to any taxes or penalties imposed under Section 409A (or Code Section 280G or 4999) with respect to any amounts or benefits paid to you in respect of your Award.

**Notification of Changes**

Any changes to these Terms and Conditions shall either be posted on Tree.com's intranet or communicated (either directly by Tree.com or indirectly through any of its Subsidiaries, Affiliates or the Agent) to you electronically via e-mail (or otherwise in writing) after such change becomes effective.

-4-

EX-21.1 5 tree-12312013xex211.htm SUBSIDIARY LISTING

<div align="right">Exhibit 21.1</div>

## SUBSIDIARIES OF TREE.COM, INC.

| Name | Jurisdiction of Formation |
|---|---|
| LendingTree, LLC | DE |
| Tree BU Holding Company, Inc. | DE |
| DegreeTree, Inc. f/k/a Tree Insurance Agency, Inc. | DE |
| Tree Home Services, Inc. | DE |
| Home Loan Center, Inc. | CA |
| HLC Escrow, Inc. | CA |
| LendingTree Settlement Services, LLC | DE |
| Realestate.com, Inc. | DE |
| LT Real Estate, Inc. | DE |
| Robin Acquisition Corp. | DE |
| iNest Realty, Inc. | IL |

EX-23.1 6 tree-12312013xex231.htm CONSENT

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-182670) of Tree.com, Inc. of our report dated March 17, 2014 relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

Charlotte, North Carolina
March 17, 2014

EX-31.1 7 tree-12312013xex311.htm CERTIFICATION

**Exhibit 31.1**

### CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify that:

1.  I have reviewed this annual report on Form 10-K for the period ended December 31, 2013 of Tree.com, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 17, 2014

/s/ **DOUGLAS R. LEBDA**

Douglas R. Lebda
*Chairman and Chief Executive Officer*
*(principal executive officer)*

EX-31.2 8 tree-12312013xex312.htm CERTIFICATION

**Exhibit 31.2**

### CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Alexander Mandel, certify that:

1.      I have reviewed this annual report on Form 10-K for the period ended December 31, 2013 of Tree.com, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 17, 2014

                                                          **/s/ ALEXANDER MANDEL**
                                                          _____
                                                          Alexander Mandel
                                                          *Chief Financial Officer*
                                                          *(principal financial officer)*

EX-32.1 9 tree-12312013xex321.htm CERTIFICATION

**Exhibit 32.1**

## CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)  the Annual Report on Form 10-K for the fiscal year ended December 31, 2013 of Tree.com, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Tree.com, Inc.

Dated:  March 17, 2014

**/s/ DOUGLAS R. LEBDA**

Douglas R. Lebda
*Chairman and Chief Executive Officer*
*(principal executive officer)*

EX-32.2 10 tree-12312013ex322.htm CERTIFICATION

**Exhibit 32.2**

**CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Alexander Mandel, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) the Annual Report on Form 10-K for the fiscal year ended December 31, 2013 of Tree.com, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Tree.com, Inc.

Dated:  March 17, 2014                                                  **/s/ ALEXANDER MANDEL**
                                                                       _____
                                                                        Alexander Mandel
                                                                        *Chief Financial Officer*
                                                                        *(principal financial officer)*

# EXHIBIT 7

6/10/2020    08-1355 em 1g 21-Do 0051743 KPF  Filed 04/01/21 57 cument 1-1 Entered 06/01/202 14:23:28 818 Exhibit
Complaint    Pg 770 of 1033

10-K 1 tree-12312018x10k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2018**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

**Commission File No. 001-34063**

## lendingtree

## LendingTree, Inc.

(Exact name of Registrant as specified in its charter)

| Delaware | 26-2414818 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**11115 Rushmore Drive, Charlotte, North Carolina 28277**
(Address of principal executive offices)

**(704) 541-5351**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 Par Value | The Nasdaq Stock Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐    Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☒

The aggregate market value of the voting common stock held by non-affiliates of the Registrant as of June 29, 2018 was approximately $1,684 million. For the purposes of the foregoing calculation only, all directors and executive officers of the Registrant and the single stockholder who owns

in excess of 20% of the voting common stock are assumed to be affiliates of the Registrant.

As of February 20, 2019, there were 12,830,510 shares of the Registrant's common stock, par value $.01 per share, outstanding.

**Documents Incorporated By Reference:**

Portions of the Registrant's proxy statement for its 2019 Annual Meeting of Stockholders are incorporated by reference into Part III herein.

Table of Contents

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 28 |
| Item 4. | Mine Safety Disclosures | 28 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 29 |
| Item 6. | Selected Financial Data | 31 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 47 |
| Item 8. | Financial Statements and Supplementary Data | 49 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 101 |
| Item 9A. | Controls and Procedures | 101 |
| Item 9B. | Other Information | 102 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 103 |
| Item 11. | Executive Compensation | 103 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 103 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 103 |
| Item 14. | Principal Accounting Fees and Services | 103 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | 104 |
| Item 16. | Form 10-K Summary | 108 |

Table of Contents

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

This annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "Annual Report") contains "forward-looking statements" within the meaning of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended. These forward-looking statements include statements related to our anticipated financial performance, business prospects and strategy; anticipated trends and prospects in the various industries in which our businesses operate; new products, services and related strategies; and other similar matters. These forward-looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. The use of words such as "anticipates," "estimates," "expects," "projects," "intends," "plans" and "believes," among others, generally identify forward-looking statements.

Actual results could differ materially from those contained in the forward-looking statements. Factors currently known to management that could cause actual results to differ materially from those in forward-looking statements include those matters discussed below, including in Item 1A. Risk Factors.

Other unknown or unpredictable factors that could also adversely affect our business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of LendingTree, Inc.'s management as of the date of this report. We undertake no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results or expectations, except as required by law.

### PART I

### ITEM 1. *Business*

#### Our Company

LendingTree, Inc. ("LendingTree", the "Company", "we" or "us") operates what we believe to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. Through multiple branded marketplaces, LendingTree empowers consumers to shop for financial services the same way they would shop for airline tickets or hotel stays, comparing multiple offers from a nationwide network of over 550 partners (which we refer to as "Network Partners") in one simple search, and choose the option that best fits their financial needs. Services include mortgage loans, mortgage refinances, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. In addition, we offer tools and resources, including free credit scores, that facilitate comparison shopping for loans, deposit products, insurance and other offerings. We seek to match consumers with multiple providers, who can offer them competing quotes for the product, or products, they are seeking. We believe our platform, consisting of a deep network of Network Partners across a broad array of financial products, differentiates us from other loan or insurance comparison-shopping marketplaces which may focus on fewer product offerings or partner with fewer service providers.

Our strategically designed and executed advertising and marketing campaigns (which we refer to as performance marketing) span a wide array of digital and traditional media acquisition channels and promote our LendingTree and other brands and product offerings. Our marketing efforts are designed to attract consumers to our websites and toll-free telephone numbers. Interested consumers complete inquiry forms, providing detailed information about themselves and the loans or other offerings they are seeking. We refer to such consumer inquiries as consumer requests. We then match these consumer requests with Network Partners in our marketplace that are seeking to serve these consumers' needs. We generate revenue from our Network Partners, generally at the time of transmitting a consumer request to them, in the form of a match fee. In certain instances outside our mortgage and insurance business, we charge other kinds of fees, such as closed loan or closed sale fees. In addition to our primary consumer request data referral business, LendingTree also matches consumers with Network Partners via website clicks and calls for which partners pay either front-end or back-end fees.

We are continually working to improve the consumer experience. We have made investments in technologically-adept personnel and we use in-market real-time testing to improve our digital platforms. Additionally, we work with our Network Partners, including providing training and other resources, to improve the consumer experience throughout the process. Further, we have been building and improving our My LendingTree platform, which provides a relationship-based consumer experience, rather than just a transaction-based experience.

Table of Contents

**Evolution and Future Growth of Our Business**

At its inception, our original business was to serve consumers seeking home mortgage loans by matching them with various lenders. We launched the LendingTree brand nationally in 1998 and, over the last twenty years, we invested significantly in this brand to gain widespread consumer recognition.

More recently, we have actively sought to expand the suite of financial services offerings we provide to consumers, in order to both leverage the applicability of the LendingTree brand as well as more fully serve the needs of consumers and Network Partners. We believe that consumers with existing LendingTree-branded associations will be more likely to utilize our other service offerings than those of other providers whose brands consumers may not recognize.

In June 2014, we re-launched My LendingTree, a platform that offers a personalized loan comparison-shopping experience, by providing free credit scores and credit score analysis. This platform enables us to observe consumers' credit profiles and then identify and alert them to loans and other offerings on our marketplace that may be more favorable than the terms they have at a given point in time. This is designed to provide consumers with measurable savings opportunities over their lifetimes.

By expanding our portfolio of financial services offerings, we are growing and diversifying our business and sources of revenue. We intend to capitalize on our expertise in performance marketing, product development and technology, and to leverage the widespread recognition of the LendingTree brand to effect this strategy.

We believe the consumer and small business financial services industry is still in the early stages of a fundamental shift to online product offerings, similar to the shift that started in retail and travel many years ago and is now well established. We believe that, like retail and travel, as consumers continue to move towards online shopping and transactions for financial services, suppliers will increasingly shift their product offerings and advertising budgets toward the online channel. We believe the strength of our brands and of our partner network place us in a strong position to continue to benefit from this market shift.

**Recent Business Acquisitions**

On January 10, 2019, we acquired Value Holding Inc., the parent company of ValuePenguin Inc. ("ValuePenguin"), a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards. We believe that combining ValuePenguin's high-quality content and search engine optimization capability with recently acquired proprietary technology and insurance carrier network from QuoteWizard.com, LLC ("QuoteWizard") (discussed below) enables us to provide immense value to carriers and agents. This strategic acquisition positions us to achieve further scale in the insurance space as well as the broader financial services industry.

On October 31, 2018, we acquired QuoteWizard.com, one of the largest insurance comparison marketplaces in the growing online insurance advertising market. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers. We believe this acquisition will establish LendingTree as a leading player in the online insurance advertising industry while continuing our ongoing diversification within the financial services category. *See* "Management's Discussion and Analysis of Financial Condition and Results of Operations - Results of Operations for the Years ended December 31, 2018, 2017, and 2016 - Revenue."

On July 23, 2018, we acquired Student Loan Hero, Inc. ("Student Loan Hero"), a personal finance website dedicated to helping student loan borrowers manage their student debt. Student Loan Hero offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. This strategic transaction allows us to scale our student loan business and provide consumers with the tools and resources to better understand their personal finances and make smarter financial decisions.

On June 11, 2018, we acquired Ovation Credit Services, Inc. ("Ovation"), a leading provider of credit services with a strong customer service reputation. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports. Ovation's experienced management team, strong credit bureau relationships and customized software platform enable us to help more consumers achieve their original financial goals through the LendingTree platform.

On September 19, 2017, we acquired certain assets of Snap Capital LLC ("SnapCap"). SnapCap is a tech-enabled online platform, which connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach. SnapCap's high-touch, high-conversion sales approach with our brand and performance marketing expertise has enabled growth in our small business offering.

On June 20, 2017, we acquired the membership interests of Camino Del Avion (Delaware), LLC, which does business under the name MagnifyMoney. MagnifyMoney is a leading consumer-facing media property that offers editorial content, expert commentary, tools and resources to help consumers compare financial products and make informed financial decisions. The

Table of Contents

MagnifyMoney team brings the expertise and infrastructure to expand content creation and distribution across all of our consumer facing brands, improving our presence and efficacy in acquisition channels such as search engine optimization.

On June 14, 2017, we acquired substantially all of the assets of Deposits Online, LLC, which does business under the name DepositAccounts.com ("DepositAccounts"). DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content. This acquisition represented our first offering to address the asset side of the consumer balance sheet.

On November 16, 2016, we acquired Iron Horse Holdings, LLC, which does business under the name CompareCards. CompareCards is a leading online source for side-by-side credit card comparison shopping. CompareCards provides consumers with one centralized location for pertinent credit card information needed to find the best card for their needs. CompareCards' unique marketing platform and strong relationships with card issuers combined with LendingTree's scale and organizational support have delivered substantial growth in our credit card business. See "Management's Discussion and Analysis of Financial Condition and Results of Operations - Results of Operations for the Years ended December 31, 2018, 2017, and 2016 - Revenue."

These acquisitions continue our diversification strategy.

**Products**

We currently report our revenues in two product categories: (i) mortgage products and (ii) non-mortgage products. Non-mortgage products include credit cards, personal loans, home equity loans, reverse mortgage loans, auto loans, small business loans, student loans and insurance quotes. Non-mortgage products also include deposit accounts, home improvement referrals and other credit products such as credit repair and debt settlement.

Mortgage and non-mortgage product revenue is as follows *(in thousands)*:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| Mortgage products | $ 242,175 | $ 275,910 | $ 219,991 |
| Non-mortgage products | 522,690 | 341,826 | 164,411 |
| **Total revenue** | **$ 764,865** | **$ 617,736** | **$ 384,402** |

LendingTree does not charge consumers or small businesses for the use of our services, except for credit repair services. Revenues from our mortgage products are mostly derived from upfront match fees paid by Network Partners that receive a consumer request, and in some cases upfront fees for clicks or call transfers. Because a given consumer request form can be matched with more than one Network Partner, up to five match fees may be generated from a single consumer request form. Revenues from our non-mortgage products are derived from upfront match fees paid on delivery of a consumer request, click or call and closed loan fees. For our credit card product, we send click traffic to issuers and are paid per card approval. For the year ended December 31, 2018, there were no Network Partners accounting for more than 10% of total revenue. For the years ended December 31, 2017 and 2016, one Network Partner, Quicken Loans, accounted for 11% and 15% of total revenue, respectively. Another Network Partner, loanDepot, LLC, accounted for 13% of total revenue for the year ended December 31, 2016.

**Mortgage Products**

Our mortgage products category includes our purchase and refinance products.

We partner with lenders throughout the United States to provide full geographic lending coverage and to offer a complete suite of loan offerings on our marketplace. To participate on our marketplace, lenders are required to enter into contracts with us that state the terms and conditions for such participation, although these contracts generally may be terminated for convenience by either party. We perform certain due diligence procedures on prospective new lenders, including screening against a national anti-fraud database maintained by the Mortgage Asset Research Institute, which helps manage our risk exposure. The data is utilized to determine whether a lender and its principals are eligible to participate on our marketplace and have not been convicted of and/or penalized for fraudulent activity.

Consumers seeking mortgage loans through our loan marketplace can receive multiple conditional loan offers from participating lenders in response to a single consumer request form. We refer to the process by which we match consumers and Network Partners as the matching process. This matching process consists of the following steps:

(1) **Consumer Request.** Consumers complete a single request form with information regarding the type of mortgage loan product they are seeking, loan preferences and other data. Consumers also consent to a soft inquiry regarding their credit.

Table of Contents

(2) **Consumer Request Form Matching and Transmission.**  Our proprietary systems and technology match a given consumer's request form data, credit profile and geographic location against certain pre-established criteria of Network Partners, which may be modified from time to time. Once a given request passes through the matching process, the request is automatically transmitted to up to five participating Network Partners.

(3) **Lender Evaluation and Response.**  Network Partners that receive a consumer request form evaluate the information contained in it to determine whether to make a conditional loan offer.

(4) **Communication of a Conditional Offer.**  All matched Network Partners and any conditional offers are presented to the consumer upon completion of the consumer request form. Consumers can return to the site and view their offer(s) at any time by logging in to their My LendingTree profile. Additionally, matched lenders and offers are also sent to the email address associated with the consumer request.

We also offer consumers other mortgage products such as:

- an alternative "short-form" matching process, which provides them with lender contact information rather than conditional offers from Network Partners, and

- a "rate table" loan marketplace, where consumers can enter their loan and credit profile and dynamically view real-time rates from lenders without entering their contact information.

***Non-Mortgage Products***

*Lending Products*. Other lending products on our online marketplace include information, tools and access to multiple conditional loan offers for the following:

- Auto, which includes our auto refinance and purchase loan products. Auto loans enable consumers to purchase new or used vehicles or refinance an existing loan secured by an automobile.

- Credit cards, which include offerings from most major card issuers. As described above, during the fourth quarter of 2016, we purchased CompareCards, a leader in the online credit card comparison industry, enhancing this product.

- Home equity loans and lines of credit, which enable home owners to borrow against the equity in their home, as measured by the difference between the market value of the home and any existing loans secured by the home. Home equity loans are one-time lump sum loans, whereas a home equity line of credit reflects a line of revolving credit where the borrower has flexibility to draw down and repay the line over time.

- Personal loans, which are unsecured obligations generally carrying shorter terms and smaller loan amounts than home mortgages.

- Reverse mortgage loans, which are a loan product available to qualifying homeowners age 62 or older.

- Small business loans, which include a broad array of financing types, including but not limited to loans secured by working capital, equipment, real estate and other forms of financing, provided to small and medium-sized businesses. As described above, during the third quarter of 2017, we purchased SnapCap, an online platform with a concierge-based approach to connecting business owners with sources of credit, enhancing this product.

- Student loans, which includes both new loans to finance an education and related expenses, as well as refinancing of existing loans. During the second quarter of 2016, we purchased SimpleTuition, a leading online marketing platform for student loans, and during the third quarter of 2016, we purchased Student Loan Hero, a personal finance website dedicated to helping student loan borrowers manage their student debt, enhancing this product.

We intend to continue adding new offerings for consumers, small businesses and partners on our online marketplace, in order to grow and diversify our sources of revenue. We may develop such new offerings through internal product development efforts, strategic business relationships with third parties and/or acquisitions.

*Other Products*. Other products also includes information, tools and access to the following:

- Deposit accounts, through which consumers can access depository deals and analysis covering all major deposit product categories. On June 14, 2017, we acquired DepositAccounts.com, a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content.

- Credit repair, through which consumers can obtain assistance improving their credit profiles, in order to expand and improve loan and other financial product opportunities available to them. During the second quarter of 2018, we purchased Ovation, a leading provider of credit services with a strong customer service reputation, enhancing this product.

- Debt relief services, through which consumers can obtain assistance negotiating existing loans.

6

Table of Contents

- Home improvement services, through which consumers have the opportunity to research and find home improvement professional services.

- Insurance products, including home and automobile, through which consumers are matched with insurance lead aggregators to obtain insurance offers. We enhanced our insurance products by acquiring QuoteWizard, one of the largest insurance comparison marketplaces in the growing online insurance advertising market, in the fourth quarter of 2018. We also purchased ValuePenguin, a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards, in the first quarter of 2019.

- Personal credit data, through which consumers can gain insights into how prospective lenders and other third parties view their credit profiles.

- Real estate brokerage services, through which consumers are matched with local realtors who can assist them in their home purchase or sale efforts.

- Revenue earned through resale of online advertising space to third parties is also classified in other products.

We refer to the various purchasers of leads from our other marketplaces as lead purchasers. We generate revenue from the deposit account product from a consumer clicking from our website through to a financial institution's website. We generate revenue from insurance products through match fees, fees for website clicks or fees for calls. We generate revenue from real estate brokerage services through match fees paid to us by real estate brokers participating in our online marketplace. We generate revenue from credit repair and debt relief services through subscription fees from consumers that enroll in our credit repair product, or a fee for a customer referral to a service provider partner or through a fee at the time a consumer enrolls in a program with one of our partners. Revenue for home services is derived primarily through matching of leads to other home services lead aggregators.

**Seasonality**

Revenue in our lending business is subject to cyclical and seasonal trends. Home sales (and purchase mortgages) typically rise during the spring and summer months and decline during the fall and winter months, while refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values. However, in certain historical periods additional factors affecting the mortgage and real estate markets, such as the 2008-2009 financial crisis and ensuing recession have impacted customary seasonal trends.

We anticipate revenue in our newer products to be cyclical as well; however, we have limited historical data to predict the nature and magnitude of this cyclicality. Based on industry data, we anticipate that as our personal loan product matures we will experience less consumer demand during the fourth and first quarters of each year. We also anticipate less consumer demand for credit cards in the fourth quarter of each year and we anticipate higher consumer demand for deposit accounts in the first quarter of each year. The majority of consumer demand for in-school student loan products occurs in the third quarter coinciding with collegiate enrollment in late summer. Other factors affecting our businesses include macro factors such as credit availability in the market, interest rates, the strength of the economy and employment.

**Competition**

Our lending and other businesses compete with other online marketing companies, including online intermediaries that operate network-type arrangements. We also face competition from lenders and insurance agents that source consumers directly. These companies typically operate consumer-branded websites and attract consumers via online banner ads, keyword placement on search engines, direct mail, television ads, retail branches, realtors, brokers, radio and other sources, partnerships with affiliates and business development arrangements with others, including major online portals.

**Corporate History**

LendingTree, Inc., is the parent of LendingTree, LLC and several companies owned by LendingTree, LLC. LendingTree, LLC, formerly known as LendingTree, Inc., was incorporated in the state of Delaware in June 1996 and commenced nationwide operations in July 1998. LendingTree, Inc., was acquired by IAC/InterActiveCorp ("IAC") in 2003 and converted to a Delaware limited liability company (LendingTree, LLC) in December 2004. LendingTree, LLC entered the mortgage origination business through the acquisition of Home Loan Center, Inc. in 2004. On August 20, 2008, LendingTree, LLC (along with its parent holding company Tree.com, Inc.) was spun off from IAC/InterActiveCorp into a separate publicly-traded company. We refer to the separation transaction as the "spin-off" in this report. Tree.com was incorporated as a Delaware corporation in April 2008 in anticipation of the spin-off. The Home Loan Center business was sold to Discover Financial Services in 2012. Since then, the Company has operated as a pure online marketplace and does not originate loans. Effective January 1, 2015, we changed our corporate name from Tree.com, Inc. to LendingTree, Inc.

Table of Contents

### Regulation and Legal Compliance

Our businesses market and provide services in heavily regulated industries through a number of different online and offline channels across the United States. As a result, we are subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, including:

- Restrictions on the manner in which consumer loans are marketed and originated, including, but not limited to, the making of required consumer disclosures, such as the Federal Trade Commission's Mortgage Advertising Practices ("MAP") Rules, federal Truth-in-Lending Act, the federal Equal Credit Opportunity Act, the federal Fair Credit Reporting Act, the federal Fair Housing Act, the federal Real Estate Settlement Procedures Act ("RESPA"), and similar state laws;

- Restrictions imposed by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd Frank Act") and current or future rules promulgated thereunder, including, but not limited to, limitations on fees charged by mortgage lenders, mortgage broker disclosures and rules promulgated by the Consumer Financial Protection Bureau ("CFPB"), which was created under the Dodd-Frank Act;

- Restrictions on the amount and nature of fees that may be charged to lenders and real estate professionals for providing or obtaining consumer loan requests, such as under RESPA;

- Federal and State laws relating to the implementation of the Secure and Fair Enforcement of Mortgage Licensing Act of 2008 (the "SAFE Act") that require us to be licensed in all States and the District of Columbia (licensing requirements are applicable to both individuals and/or businesses engaged in the solicitation of or the brokering of residential mortgage loans and/or the brokering of real estate transactions);

- State and federal restrictions on the marketing activities conducted by telephone, mail, email, mobile device or the internet, including the Telemarketing Sales Rule ("TSR"), the Telephone Consumer Protection Act ("TCPA"), state telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, and the Federal Trade Commission Act and their accompanying regulations and guidelines;

- State laws requiring licensure for or otherwise imposing restrictions on the solicitation of or brokering of consumer loans which could affect us in our personal loan, automobile loan, student loan, credit card, or other non-mortgage consumer lending businesses;

- Federal and state laws relating to offering of credit repair services to consumers, such as Credit Repair Organizations Act ("CROA") and state level CROA-type statutes.

- Restrictions on the usage and storage of consumer credit information, such as those contained in the federal Fair Credit Reporting Act and the federal CROA; and

- State "Bird Dog" laws which restrict the amount and nature of fees, if any, that may be charged to consumers for automobile direct and indirect financing.

### Intellectual Property

We believe that our intellectual property rights are vital to our success. To protect our intellectual property rights in our brand, technology, products, improvements and inventions, we rely on a combination of trademarks, trade secrets, patents and other laws, and contractual restrictions on disclosure, including confidentiality agreements with strategic partners, employees, consultants and other third parties. As new or improved proprietary technologies are developed or inventions are identified, we seek patent protection in the United States and abroad, as appropriate. We have one issued U.S. patent related to the system and method for collecting financial information over a global communications network, which expires in 2032.

Many of our services are offered under proprietary trademarks and service marks. We generally apply to register or secure by contract our principal trademarks and service marks as they are developed and used. We have 28 trademarks and service marks registered with the United States Patent and Trademark Office. These registrations can typically be renewed at 10-year intervals.

We reserve and register domain names when and where we deem appropriate and we currently have over 1,500 registered domain names. We also have agreements with third parties that provide for the licensing of patented and proprietary technology used in our business.

From time to time, we may be subjected to legal proceedings and claims, or threatened legal proceedings or claims, including allegations of infringement of third-party trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, the use of litigation and other dispute resolution processes, such as Uniform Domain Name Dispute Resolution, may be necessary for us to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations.

## Employees

As of December 31, 2018, we had 909 employees, of which approximately 892 are full-time and 17 are temporary or part-time. None of our employees are represented under collective bargaining agreements and we consider our relations with employees and independent contractors to be good.

## Additional Information

### Website and Public Filings

We maintain a corporate website at *www.lendingtree.com* and an investor relations website at *investors.lendingtree.com*. None of the information on our website is incorporated by reference in this report, or in any other filings with, or in any information furnished or submitted to, the Securities and Exchange Commission (the "SEC").

We make available, free of charge through our website, our reports on Forms 10-K, 10-Q and 8-K, our proxy statement for the annual shareholders' meeting and beneficial ownership reports on Forms 3, 4 and 5 as soon as reasonably practicable after we file such material with, or furnish such material to, the SEC. Our filings with the SEC are available to the public over the Internet at the SEC's website at *www.sec.gov*.

### Code of Business Conduct and Ethics

Our code of business conduct and ethics, which applies to all employees, including all executive officers and senior financial officers and directors, is posted on our website at *investors.lendingtree.com/governance/board-of-directors*. This is our code of ethics pursuant to Item 406 of SEC Regulation S-K and the rules of The Nasdaq Stock Market. Any amendments to or waivers of the code of business conduct and ethics that are of the type described in Item 406(b) and (d) of Regulation S-K will be disclosed on our website.

9

Table of Contents

## ITEM 1A.  *Risk Factors*

Investing in our common stock involves a high degree of risk. Before making an investment decision, you should carefully consider the risks described below, together with all of the other information included in this annual report and the information incorporated by reference herein. If any of the risks described below, or incorporated by reference into this annual report actually occur, our business, financial condition or results of operations could suffer. In that case, the trading price of our common stock may decline and you may lose all or part of your investment. The risks and uncertainties we have described are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also affect our business, financial condition and results of operations. Certain statements below are forward-looking statements. See the information included under the heading "Cautionary Statement Regarding Forward-Looking Information."

### Risks Related to Our Business and Industry

***Adverse conditions in the primary and secondary mortgage markets, as well as the general economy, could materially and adversely affect our business, financial condition and results of operations.***

Constraints in the primary and secondary mortgage markets have in the past had, and may in the future have, an adverse effect on our business, financial condition and results of operations. Generally, increases in interest rates adversely affect the ability of our mortgage Network Partners to close loans, and adverse economic trends limit the ability of our mortgage Network Partners to offer home loans other than low-margin conforming loans. Our businesses may experience a decline in demand for their offerings due to decreased consumer demand as a result of the conditions described above, now or in the future. The decreased consumer demand for mortgage refinancing typically leads to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. While higher lender demand during these periods often leads to an increase in the amount lenders will pay per matched lead and higher revenue earned per consumer, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment. These factors combined to cause lower revenue earned per consumer in the second half of 2018 compared to the prior year period. Conversely, during periods with decreased interest rates, mortgage Network Partners have less incentive to use our marketplaces, or in the case of sudden increases in consumer demand, our mortgage Network Partners may lack the ability to support sudden increases in volume.

***We depend on relationships with Network Partners and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

Our success depends in significant part on the financial strength of lenders and lead purchasers participating on our marketplaces and continuing relationships with such lenders and lead purchases. Network Partners could, for any reason, experience financial difficulties and cease participating on our marketplaces, fail to pay match and/or closing fees when due and/or drop the quality of their services to consumers. We could also have commercial or other disputes with such Network Partners from time to time. The occurrence of one or more of these events with a significant number of Network Partners could, alone or in combination, have a material and adverse effect on our business, financial condition and results of operations.

***If we fail to meet certain metrics required by Network Partners, then our business and financial results may be harmed.***

We compete against other online marketing companies in significant part based on the quality and convertibility of the leads we generate. Network Partners have expectations as to the quality and conversion rate of the leads that we generate. These expectations sometimes change over time. The leads that we supply to Network Partners may not meet the expectations that they have for such leads. Conversion rates for leads may be impacted by factors other than the lead quality, many of which are outside our control. Such factors include competition in lending and insurance markets and sales practices of Network Partners. Failure to meet the expectations of Network Partners in terms of quality and convertibility of leads may result in reduced fees paid to us by such Network Partners, or in extreme cases, the loss of one or more Network Partners, which could materially and adversely affect our business, financial condition and results of operations.

***Failure to maintain brand recognition and attract and retain consumers in a cost-effective manner could materially and adversely affect our business, financial condition and results of operations.***

In order to attract visitors to our websites, convert these visitors into loan or other financial product requests for our Network Partners and lead purchasers and generate repeat visits from consumers, our businesses must promote and maintain their various brands. Brand promotion and maintenance requires the expenditure of considerable money and resources for online and offline advertising, marketing and related efforts, as well as the continued provision and introduction of high-quality products and services.

Table of Contents

Brand recognition is a key differentiating factor among providers of online services. We believe that continuing to build and maintain the recognition of our various brands is critical to achieving increased demand for the services provided by our businesses. Accordingly, we have spent, and expect to continue to spend, significant amounts on, and devote significant resources to, branding, advertising and other marketing initiatives, which may not be successful or cost-effective. The failure of our businesses to maintain the recognition of their respective brands and attract and retain consumers in a cost-effective manner could materially and adversely affect our business, financial condition and results of operations.

Adverse publicity from legal proceedings against us or our businesses, including governmental proceedings and consumer class action litigation, or from the disclosure of information security breaches, could negatively impact our various brands, which could materially and adversely affect our business, financial condition and results of operations. In addition, the actions of our third-party marketing partners who engage in advertising on our behalf could negatively impact our various brands. Furthermore, adverse publicity and the potential corresponding impact on our reputation may be accelerated and amplified by the widespread use of social media platforms.

***We depend on search engines, online advertising and other online sources to attract visitors to our websites, and if we are unable to attract these visitors and convert them into consumer requests for our Network Partners in a cost-effective manner, our business and financial results may be harmed.***

Our success depends on our ability to attract online consumers to our websites and convert them into customers in a cost-effective manner. We depend, in part, on search engines, online advertising and other online sources for our website traffic. We are included in search results as a result of both paid search listings, where we purchase specific search terms that result in the inclusion of our advertisement, and, separately, organic searches, that depend upon the searchable content on our sites. Search engines and other online sources revise their algorithms, and introduce new advertising products, from time to time in an attempt to optimize their search results.

If one or more of the search engines or other online sources on which we rely for website traffic were to modify its general methodology for how it displays our websites, resulting in fewer consumers clicking through to our websites, our business could suffer. If any free search engine traffic on which we rely begins charging fees for listing or placement, or if one or more of the search engines or other online sources on which we rely for purchased listings, modifies or terminates its relationship with us, our expenses could rise, we could lose customers, and traffic to our websites could decrease, all of which could have a material and adverse effect on our business, financial condition and results of operations. In addition, if our online advertisements are not able to reach certain consumers due to consumers' use of ad-blocking software, our business could suffer.

***We compete with a number of other online marketing companies, and we face the possibility of new competitors.***

We currently compete with a number of other online marketing companies and we expect that competition will intensify. Some of these existing competitors may have more capital or complementary products or services than we do, and they may leverage their greater capital or diversification in a manner that adversely affects our competitive position, including by making strategic acquisitions. In addition, new competitors may enter the market and may be able to innovate and bring products and services to market faster, or anticipate and meet consumer or Network Partner demand before we do. Other newcomers, including major search engines and content aggregators, may be able to leverage their existing products and services or access to data to our disadvantage. We may be forced to expend significant resources to remain competitive with current and potential competitors. If any of our competitors are more successful than we are at attracting and retaining customers or Network Partners, our business, financial condition and results of operations could be materially and adversely affected.

***Our success depends, in part, on the integrity of our systems and infrastructures. System interruption and the lack of integration and redundancy in these systems and infrastructures may have a material and adverse impact on our business, financial condition and results of operations.***

Our success depends, in part, on our ability to maintain the integrity of our systems and infrastructures, including websites, information and related systems, call centers and distribution and fulfillment facilities. System interruption and the lack of integration and redundancy in our information systems and infrastructures may materially and adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. We may experience occasional system interruptions that make some or all systems or data unavailable or prevent our businesses from efficiently providing services or fulfilling orders. We also rely on affiliate and third-party computer systems, broadband and other communications systems and service providers in connection with the provision of services generally, as well as to facilitate, process and fulfill transactions. Any interruptions, outages or delays in our systems and infrastructures, our businesses, our affiliates and/or third parties, or deterioration in the performance of these systems and infrastructures, could impair the ability of our businesses to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, acts of war or terrorism, acts of God, unauthorized intrusions or computer viruses, and similar

Table of Contents

events or disruptions may damage or interrupt computer, broadband or other communications systems and infrastructures at any time. Any of these events could cause system interruption, delays and loss of critical data, and could prevent our businesses from providing services, fulfilling orders and/or processing transactions. While our businesses have backup systems for certain aspects of their operations, these systems are not fully redundant and disaster recovery planning is not sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these events were to occur, it could materially and adversely affect our business, financial condition and results of operations.

We are also in the process of transitioning certain product exchanges to a new technology platform. The risks associated with this transition include, but are not limited to, operational implementation, downtimes, and diversion of management and technical resources. If the transition to the new platform is more challenging or time consuming than expected, then our business, financial condition and results of operations could be materially and adversely affected.

***Breaches or failures of our network and website security, the theft, unauthorized access, acquisition, use, disclosure or misappropriation of personal consumer information, the occurrence of fraudulent activity, or other data security-related incidents may have a material and adverse impact on our business, financial condition and results of operations.***

Breaches or failures of security involving our systems and website or those of any of our affiliated third-parties may occur, and could result in the theft, unauthorized access, acquisition, use, disclosure, or misappropriation of personal consumer information, fraudulent activity, or system disruptions or shutdowns. Any breach, penetration, or failure of network security or theft, unauthorized access, acquisition, use, disclosure or misappropriate of personal consumer information collected, processed, or maintained by us or our affiliated third-parties could cause interruptions in the operations of our businesses and subject us to increased costs, litigation, and other liabilities. The occurrence of any real or attempted breach, penetration, or failure of security, or the reporting of such an incident, whether accurate or not, could result in claims made against us or our third-party affiliates for the theft, unauthorized access, acquisition, use, disclosure, or misappropriation of personal information, which could result in state and/or federal litigation and related financial liabilities, as well as criminal penalties or civil liabilities and regulatory actions from state and/or federal governmental authorities. Real or perceived security breaches or failures could also significantly damage our brand and reputation with consumers and third parties with whom we do business and result in adverse publicity, loss of consumer confidence, and reduced sales and profits.

We may be required to expend significant capital and other resources to protect against, respond to, and recover from any potential, attempted, or existing security breaches or failures and their consequences. We also face risks associated with security breaches affecting third parties with whom we are affiliated or otherwise conduct business. Consumers are generally concerned with security and privacy of the Internet, and any publicized security problems affecting our businesses and/or those of third parties may discourage consumers from doing business with us, which could have a material and adverse effect on our business, financial condition and results of operations.

We are susceptible to fraudulent activity and data security-related incidents that may be committed against us, our Network Partners or external service providers which may result in financial losses or increased costs to us, disclosure or misuse of our information, theft, unauthorized access, acquisition, use, disclosure or misappropriation of personal information, misappropriation of assets, privacy litigation, regulatory actions, or damage to our reputation. Such fraudulent and malicious activity may take many forms, including check fraud, fraudulent inducement, electronic fraud, wire fraud, computer viruses, phishing, social engineering and other dishonest acts, any of which could be the result of a circumvention or failure of our data security processes, procedures, tools, and controls. Information security breaches and failures may include fraudulent or unauthorized access to systems used by us, Network Partners, or external service providers, denial or degradation of service attacks, and malware, such as ransomware, or other cyber-attacks. We rely on a framework of security, processes, procedures, tools, and controls designed to protect our information and assets, but despite our reasonable efforts to ensure the integrity of our systems and website, it is possible that we may not be able to anticipate or implement effective preventative measures against all security breaches or failures and fraudulent activity, especially because the methods of attack and deception change frequently and because such conduct can originate from a wide variety of sources, including third parties such as external service providers. As a result, our business, financial condition or results of operations could be adversely affected.

***Litigation and indemnification of secondary market purchasers, including a pending case brought by Residential Funding Company, LLC, could have a material and adverse effect on our business, financial condition, results of operations and liquidity.***

In connection with the sale of loans to secondary market purchasers, Home Loan Center, Inc. ("HLC") may be liable for certain indemnification, repurchase and premium repayment obligations. For example, in connection with the sale of loans to secondary market purchasers, HLC made certain representations regarding related borrower credit information, loan documentation and collateral. To the extent that these representations were incorrect, HLC may be required to repurchase loans or indemnify secondary market purchasers for losses due to borrower defaults. HLC has made payments for these liabilities in the past and expects to make payments for these liabilities in the future.

Table of Contents

We continue to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business. We have in the past and intend to continue to negotiate in the future with secondary market purchasers to settle any existing and future contingent liabilities, but we cannot assure you we will be able to do so on terms acceptable to us, or at all.

In the fourth quarter of 2018, the case of Residential Funding Company, LLC v Home Loan Center, Inc., went to trial, and the jury returned a verdict of $28.7 million in favor of the plaintiff. The plaintiff is also seeking up to $28.8 million in attorneys' fees and $30.6 million in pre-judgment interest in addition to the jury verdict amount. As of February 28, 2019, the court has not yet entered judgment in favor of the plaintiff. HLC believes it has strong grounds for appeal and further believes that the plaintiff's demand for attorneys' fees and pre-judgment interest is excessive (and, if granted, would be subject to appeal). HLC intends to vigorously pursue an appeal but we cannot assure you that the appeal will be successful or that even if successful on certain theories, the plaintiff would not receive a substantial recovery upon retrial or otherwise. *See* Note 15 - Contingencies, in the notes to the consolidated financial statements included elsewhere in this report. We have incurred substantial legal fees in this matter. *See* Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations-Results of Operations for the Years Ended December 31, 2018, 2017 and 2016-Discontinued Operations.

The ultimate outcome of the Residential Funding Company, LLC matter and the outcomes of other pending of indemnification claims, repurchase obligations or premium repayments beyond our reserves for these contingencies, including legal fees we incur, may have a material and adverse effect on our business, financial condition and results of operations.

***Difficult market conditions have adversely affected the mortgage industry.***

Declines in the housing market from 2006 through early 2012, as measured by the S&P/Case-Schiller 20-city composite home price index, with home price declines and increased foreclosures, unemployment and under-employment, negatively impacted the credit performance of mortgage loans and resulted in significant write-downs of asset values by financial institutions, including government-sponsored entities as well as major commercial and investment banks. These write-downs, initially of mortgage-backed securities but subsequently of other asset-backed securities, credit default swaps and other derivative and cash securities, in turn, caused many financial institutions to seek additional capital, merge with larger and stronger institutions and, in some cases, to fail.

Reflecting concern about the stability of the housing markets generally and the strength of counterparties, many lenders and institutional investors reduced or ceased providing funding to borrowers, including to other financial institutions. This market disruption and tightening of credit led to an increased level of commercial and consumer delinquencies, lack of consumer confidence and increased market volatility. The resulting economic pressure on consumers and lack of confidence in the financial markets has had in the past and may have in the future, an adverse effect on our business, financial condition and results of operations.

While conditions in the housing markets have improved since 2013, the failure to sustain such improvements could have adverse effects on us and our mortgage Network Partners. Further, our business could be adversely affected by the actions and commercial soundness of other businesses in the financial services sector, including our non-lender lead purchasers. As a result, defaults by, or even rumors or questions about, one or more of these entities, or the financial services industry generally, have in the past, and may in the future, lead to market-wide liquidity problems and could lead to disruptions in the financial technology industry. Any such disruption could have a material and adverse effect on our business, financial condition and results of operations.

***A significant portion of our revenue growth in 2017 and 2018 has been driven by our credit card product.***

Our credit card product offering is subject to particular risks:

- adverse conditions in the economy may affect credit card issuers and their willingness to issue new credit;

- credit losses among credit card issuers may increase beyond normal and budgeted levels which could cause a reduction in demand;

- interest rate increases may make balance transfer cards less profitable for issuers;

- credit card issuers and other advertisers in the business verticals in which we operate may be unwilling to advertise on our websites or mobile applications;

- changes in application approval rates by credit card issuer customers;

- increased competition and its effect on our website traffic, click-through rates, advertising rates, revenue, margins, and market share;

- ability to provide competitive service to credit card issuers and to consumers using our online offerings and other platforms;

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm

6/10/2020

08-18555-mg 1-01 Doc 25744-8 PF Filed 04/01/2 Document Entered 06/04/00/2 Page 2332 of 18 Exhibit
Complaint    Pg 791 of 1033

Table of Contents

- credit card issuers may determine that the online digital marketing channel is no longer a viable marketing platform for generating new credit card customers;

- our ability to maintain brand recognition for both LendingTree and CompareCards and to effectively leverage the LendingTree brand with the CompareCards brand; and

- our ability to develop new products and services and enhance existing ones.

If our credit card product is impacted by the risks described above, then our results of operations and future growth prospects could be materially and adversely affected.

*A significant portion of our revenue growth in 2018 has been driven by our insurance leads business through our acquisition of QuoteWizard, which was completed in October 2018.*

The QuoteWizard acquisition poses risks for our ongoing operations, including, among others:

- adverse conditions in the economy may affect insurance carriers and their willingness to issue policies;

- covered losses among insurance carriers may increase beyond normal and budgeted levels which could cause a reduction in demand;

- insurance carriers and other advertisers in the business verticals in which we or QuoteWizard operate may be unwilling to advertise on our or QuoteWizard's websites or mobile applications;

- changes in underwriting approval rates by insurance carrier customers;

- increased competition and its effect on our or QuoteWizard's website traffic, click-through rates, advertising rates, revenue, margins, and market share;

- ability to provide competitive service to insurance carriers and to consumers using QuoteWizard's and our online offerings and other platforms;

- insurance carriers may determine that the online digital marketing channel is no longer a viable marketing platform for generating new insurance customers;

- our ability to maintain brand recognition for both LendingTree and QuoteWizard and to effectively leverage the LendingTree brand with the QuoteWizard brand;

- our ability to develop new products and services and enhance existing ones;

- our ability to retain key employees of QuoteWizard;

- costs and expenses associated with any undisclosed or potential liabilities;

- that the business acquired in the acquisition may not continue to perform as well as anticipated; and

- assumed liabilities associated with QuoteWizard's historical operations, including liabilities arising from privacy and security regulations or security breaches.

If the QuoteWizard business is impacted by the risks described above, then our results of operations and future growth prospects could be materially and adversely affected.

*A portion of our revenue growth in recent years has been driven by personal loan offerings. If lenders participating on our marketplace decide to reduce their offerings of personal loans or if such loans become unattractive to consumers because of higher interest rates demanded by lenders, then our results of operations and future growth prospects could be materially and adversely affected.*

Revenue from personal loan offerings was responsible for a significant portion of the growth in the non-mortgage revenue over the last few years. Revenue from our personal loan product increased $46.0 million in 2018 from 2017 and $21.7 million in 2017 from 2016.

Personal loans are unsecured obligations and generally carry shorter terms and smaller loan amounts than mortgages. Because they are unsecured, they are generally riskier assets for lenders than mortgages or other secured loans. Consumer demand for unsecured

loans offered on our marketplace is often for refinancing of higher interest credit card debt or for a lower interest alternative to credit card debt for a contemplated larger purchase that would otherwise be purchased with a credit card. Lenders

14

Table of Contents

participating on our marketplace may reduce their willingness to make personal loans at more attractive interest rates than credit card debt and may for that reason, or for any other reason, reduce their demand for personal consumer requests generated from our personal loan marketplace. Reasons that lenders might reduce their willingness to make personal loans at attractive interest rates may include regulatory changes, stricter institutional lending criteria, a lack of adequate funding sources or capital for loan originations, or increased borrower default levels, which may occur upon adverse changes in regional, national or global economic conditions. Additionally, lenders may tighten their underwriting standards, making it more difficult for consumers to qualify for personal loans. If lenders participating on our marketplace decide to reduce their offerings of personal loans, tighten their underwriting standards, or if personal loans become unattractive to consumers because of higher interest rates demanded by lenders, then our results of operations and future growth prospects could be materially and adversely affected.

***Network Partners affiliated with our marketplaces are not precluded from offering products and services outside of our marketplaces, or obtaining products and services from our competitors.***

Because our businesses do not have exclusive relationships with Network Partners, consumers may obtain loans and other financial products from these third-party service providers without having to use our marketplaces. Network Partners can offer loans and other financial products directly to consumers through their own marketing campaigns or other traditional methods of distribution, such as referral arrangements, physical store-front operations or broker agreements. Network Partners may also offer loans and other financial products and services to prospective customers online directly, through one or more online competitors of our businesses, or both. If a significant number of consumers seek loans and other financial products and services directly from Network Partners or through our competitors as opposed to through our marketplaces, our business, financial condition and results of operations could be materially and adversely affected.

***Some of our non-mortgage products are new to the market and may fail to achieve or maintain customer acceptance and profitability.***

We have launched a number of new non-mortgage products over the last several years. We do not have as much experience with these new non-mortgage products as with the mortgage products and our other mature non-mortgage products. Accordingly, new non-mortgage products may be subject to greater risks than our more mature products.

The success of new products we may offer will depend on a number of factors, including:

- Implementing, at an acceptable cost, product features offered by our competitors and/or expected by consumers, lenders and lead purchasers;

- Market acceptance by consumers, lenders and lead purchasers;

- Offerings by current and future competitors;

- Our ability to attract and retain management and other skilled personnel for these businesses;

- Our ability to collect amounts owed to us from third parties;

- Our ability to develop successful and cost-effective marketing campaigns; and

- Our ability to timely adjust marketing expenditures in relation to changes in demand for the underlying products and services offered by our Network Partners.

Our results of operations may suffer if we fail to successfully anticipate and manage these issues associated with new products.

***If we are unable to continually enhance our products and services and adapt them to technological changes and consumer and lender and/or lead purchaser needs, including the emergence of new computing devices and more sophisticated online services, we may lose market share and revenue and our business could suffer.***

We need to anticipate, develop and introduce new products, services and applications on a timely and cost-effective basis that keep pace with technological developments and changing consumer and customer needs. For example, the number of individuals who access the internet through devices other than a personal computer, such as tablets, mobile telephones, voice assistants, televisions and set-top box devices has increased significantly and this trend is likely to continue. Because each manufacturer or distributor may establish unique technical standards for its devices, our websites may not be functional or viewable on these devices. Additionally, new devices and new platforms are continually being released. Consumers access many traditional web services on mobile devices through applications, or apps.

It is difficult to predict the problems we may encounter in improving our websites' functionality with these alternative devices or developing apps for mobile platforms. If we fail to develop our websites or apps to respond to these or other technological

6/10/2020

08-13555-mg 31-Doc 26114-4-1F Filed 04/01/27 Document Entered 06/04/00/21 Page 23728 18 Exhibit
Complaint Pg 795 of 1033

15

developments and changing consumer and customer needs cost effectively, or if consumers and customers respond negatively to

Table of Contents

changes, we may lose market share, which could materially and adversely affect our business, financial condition and results of operations.

### We improve our products and services in ways that forego short-term gains.

We are constantly striving to improve the user experience for our consumers who use our websites and applications and for our Network Partners. Some of our changes may have the effect of reducing our short-term revenue or profitability if we believe that the benefits will ultimately improve our financial performance over the long-term. Any short-term reductions in revenue or profitability could be more severe than we anticipate or these decisions may not produce the long-term benefits that we expect, in which case our business and results of operations could be adversely affected.

### We may fail to adequately protect our intellectual property rights or may be accused of infringing intellectual property rights of third parties.

We regard our intellectual property rights, including patents, service marks, trademarks and domain names, copyrights, trade secrets and similar intellectual property (as applicable), as critical to our success. Our businesses also rely heavily upon software codes, informational databases and other components that make up their products and services.

We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use trade secrets or registered intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

We have generally registered and continue to apply to register, or secure by contract when appropriate, our principal trademarks and service marks as they are developed and used, and reserve and register domain names when and where we deem appropriate. We generally consider the protection of our trademarks to be important for purposes of brand maintenance and reputation. While we vigorously protect our trademarks, service marks and domain names, effective trademark protection may not be available or may not be sought in every country in which products and services are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names and limit our ability to control marketing on or through the Internet using our various domain names or otherwise, which could materially and adversely affect our business, financial condition and results of operations.

We have been granted patents and from time to time we may have patent applications pending with the United States Patent and Trademark Office and various foreign patent authorities for various proprietary technologies and other inventions. The status of any patent involves complex legal and factual questions, and the breadth of claims allowed is uncertain. Accordingly, any patent application filed may not result in a patent being issued, or existing or future patents may not be adjudicated valid by a court or be afforded adequate protection against competitors with similar technology. In addition, third parties may create new products or methods that achieve similar results without infringing upon patents that we own.

Likewise, the issuance of a patent to us does not mean that our processes or inventions will be found not to infringe upon patents or other rights previously issued to third parties.

From time to time, in the ordinary course of business we are subjected to legal proceedings, claims and counterclaims, or threatened legal proceedings, claims or counterclaims, including allegations relating to misappropriation of trade secrets or infringement of the trademarks, copyrights, patents and other intellectual property rights of third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could materially and adversely affect our business, financial condition and results of operations. Patent litigation tends to be particularly protracted and expensive.

### Our framework for managing risks may not be effective in mitigating our risk of loss.

Our risk management framework seeks to mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, legal and compliance risk, and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures and reporting requirements. There may be risks that exist, or that develop in the future, that we have not appropriately anticipated, identified or mitigated. If our risk management framework does not effectively identify or mitigate our risks, we could suffer unexpected losses and could be materially and adversely affected.

### The intended benefits of recent acquisitions may not be realized.

Our acquisitions pose risks for our ongoing operations, including, among others:

16

Table of Contents

- that senior management's attention may be diverted from the management of daily operations to the integration of the businesses acquired in the acquisition;

- we may be unable to retain key employees of businesses acquired;

- costs and expenses associated with any undisclosed or potential liabilities;

- that the businesses acquired in the acquisition may not perform as well as anticipated;

- adverse conditions in the economy may affect the lenders or customers of the acquired businesses and their willingness to issue new credit;

- advertisers in the business verticals in which we or the acquired businesses operate may be unwilling to advertise on our websites or mobile applications;

- increased competition and its effect on our or the acquired businesses' website traffic, click-through rates, submitted consumer requests, advertising rates, revenue, margins, and market share;

- our ability to maintain brand recognition for both us and the acquired businesses and to effectively leverage the LendingTree brand with the newly acquired brands;

- our ability to develop new products and services and enhance existing ones;

- assumed liabilities associated with the historical operations of the acquired businesses, including as a result of privacy regulations or data breaches.

As a result of the foregoing, our acquisitions may not be accretive to us in the near term or at all. Furthermore, if we fail to realize the intended benefits of the business acquired in the acquisition, the market price of our common stock could decline to the extent that the market price reflects an expectation of those benefits.

***Other acquisitions or strategic investments that we pursue may not be successful and could disrupt our business and harm our financial condition.***

We may consider or undertake strategic acquisitions of, or material investments in, businesses, products or technologies. We may not be able to identify suitable acquisition or investment candidates, or even if we do identify suitable candidates, they may be difficult to finance, expensive to fund and there is no guarantee that we can obtain any necessary regulatory approvals or complete such transactions on terms that are favorable to us. To the extent we pay the purchase price of any acquisition or investment in cash or through borrowings under our Revolving Credit Facility, it would reduce our cash balances and/or result in indebtedness we must service, which may have a material and adverse effect on our business and financial condition. If the purchase price is paid with our stock, it would be dilutive to our stockholders. In addition, we may assume liabilities associated with a business acquisition or investment, including unrecorded liabilities that are not discovered at the time of the transaction, and the repayment of those liabilities may have a material and adverse effect on our financial condition. There may also be litigation or other claims arising in connection with an acquisition itself.

We may not be able to successfully integrate the personnel, operations, businesses, products or technologies of an acquisition or investment. Integration may be particularly challenging if we enter into a line of business in which we have limited experience and the business operates in a difficult legal, regulatory or competitive environment. We may find that we do not have adequate operations or expertise to manage the new business. The integration of any acquisition or investment may divert management's time and resources from our core business, which could impair our relationships with our current employees, customers and strategic partners and disrupt our operations. Acquisitions and investments also may not perform to our expectations for various reasons, including the loss of key personnel or customers. If we fail to integrate acquisitions or investments or realize the expected benefits, we may lose the return on these acquisitions or investments or incur additional transaction costs and our business and financial condition may be harmed as a result.

***If we fail to manage our growth effectively, our business and results of operations could be harmed.***

We have experienced rapid and significant growth in our headcount and operations, including as a result of acquisitions, which places substantial demand on management and our operational infrastructure. As we continue to grow, we must effectively integrate, develop and motivate a large number of new employees, while maintaining the beneficial aspects of our company culture. If we do not manage the growth of our business and operations effectively, the quality of our services and efficiency of our operations could suffer, which could harm our business and results of operations.

17

Table of Contents

***We rely on the performance of highly skilled personnel and if we are unable to attract, retain and motivate well-qualified employees, our business could be harmed.***

We believe our success has depended, and continues to depend, on the efforts and talents of our management team and our highly skilled employees, including our software engineers, analysts, marketing professionals and sales staff. Our future success depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially and adversely affect our ability to build on the efforts they have undertaken and to execute our business plan, and we may not be able to find adequate replacements. We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business and results of operations could be harmed.

***Network Partners on our marketplaces may not provide competitive levels of service to consumers, which could materially and adversely affect our brands and businesses and their ability to attract consumers.***

The ability of our businesses to provide consumers with a high-quality experience depends, in part, on consumers receiving competitive levels of convenience, customer service, price and responsiveness from Network Partners participating on our other marketplaces with whom they are matched. If these providers do not provide consumers with competitive levels of convenience, customer service, price and responsiveness, the value of our various brands may be harmed, the ability of our businesses to attract consumers to our websites may be limited and the number of consumers matched through our marketplaces may decline, which could have a material and adverse effect on our business, financial condition and results of operations.

***A significant portion of our total revenue is derived from two Network Partners, and our results from operations could be adversely affected and stockholder value harmed if we lose significant business from either of these Network Partners.***

For the years ended December 31, 2017 and 2016, one Network Partner accounted for 11% and 15% of total revenue. For the year ended December 31, 2016, another Network Partner accounted for 13% of total revenue. If either of these significant Network Partners were to cease purchasing consumer requests and we were unable to replace the associated demand, the loss could have a material adverse effect on our results of operations in the short term and potentially also the longer term. Also, if either Network Partner reduces its volume of consumer requests for any reason, our business could be adversely affected.

***Our current lack of geographic diversity exposes us to risk.***

Other than a support services office in India, our operations are geographically limited to and dependent upon the economic condition of the United States. As a result of this geographical concentration, we are more vulnerable to downturns or other conditions that affect the US economy. We may choose to expand our operations in order to increase our geographic diversity, and if we do, such expansion would place increased responsibilities on our management, divert resources from other operations and expose us to new risks of foreign operations.

***We have incurred significant operating losses in the past and we may not be able to generate sufficient revenue to be profitable over the long term.***

We have incurred operating losses from continuing operations at times in our history, and although we were profitable in 2016, 2017 and 2018, we have an accumulated deficit of $610.5 million at December 31, 2018. If we fail to maintain or grow our revenue and manage our expenses, we may incur significant losses in the future and not be able to maintain profitability.

***U.S. federal income tax reform could adversely affect us.***

On December 22, 2017, President Trump signed into law the Tax Cuts and Jobs Act (TCJA), which legislation significantly reforms the Internal Revenue Code of 1986, as amended. This tax legislation significantly reduced the U.S. statutory corporate tax rate and made other changes that could have a favorable impact on our overall U.S. federal tax liability in a given period. However, the tax legislation also included a number of provisions, including, but not limited to, the limitation or elimination of various deductions or credits (including for interest expense and for performance-based compensation under Section 162(m) of the Internal Revenue Code), the changing of the timing of the recognition of certain income and deductions or their character, and the limitation of asset basis under certain circumstances, that could significantly and adversely affect our U.S. federal income tax position. The legislation also made changes to the tax rules applicable to financial institutions and other entities with which we do business.

We revalued deferred tax assets at December 31, 2017 in light of the changes in the TCJA, and we recorded a net tax expense of $9.1 million during the fourth quarter of 2017.

The impact of the TCJA and associated anticipated regulations on future years may be material to our consolidated financial statements. For example, we have historically relied extensively on performance-based compensation for our executive officers. The non-deductibility of future performance-based compensation to executive officers, and the expanded definition of "covered employees" whose compensation is subject to Section 162(m) may have material adverse effects on our effective tax rates. In addition, the limitations on the deductibility of interest may affect our anticipated tax benefits for the convertible note and hedge transactions described in Note 13—Debt to the consolidated financial statements included elsewhere in this report. We continue to examine the impact this tax reform legislation may have on our business. The impact of this tax reform on holders of our common stock is uncertain and could be adverse. Similarly, changes in tax laws and regulations that impact our Network Partners or the economy generally may also impact our financial condition and results of operations.

In addition, tax laws and regulations are complex and subject to varying interpretations, and any significant failure to comply with applicable tax laws and regulations in all relevant jurisdictions could give rise to substantial penalties and liabilities. Any changes in enacted tax laws (such as the recent U.S. tax legislation), rules or regulatory or judicial interpretations; any adverse outcome in connection with any tax audits in any jurisdiction; or any change in the pronouncements relating to accounting for income taxes could materially and adversely impact our effective tax rate, tax payments, financial condition and results of operations.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2018, we had pre-tax consolidated federal net operating losses ("NOLs") of $203.5 million. The federal NOLs no longer expire under the new TCJA. Our NOLs will be available to offset taxable income subject to the limitations found in Internal Revenue Code Sections 382 and 383. In addition, we have state NOLs of approximately $498.5 million at December 31, 2018, that will expire at various times between 2020 and 2038. If we experience one or more ownership changes in the future as a result of future transactions in our stock, our ability to utilize NOLs could be limited. Our ability to use our NOLs was limited by the TCJA. *See* "U.S. federal income tax reform could adversely affect us."

***We will need to relocate our corporate headquarters due to our growth and we may experience costs and risks associated with our ownership of a two-building office complex we purchased in Charlotte, North Carolina.***

Our principal executive offices are currently located in approximately 37,800 square feet of office space in Charlotte, North Carolina under a lease that expires in December 2020. We have determined that we will need to relocate our principal executive offices to accommodate our growth and we are in the process of selecting an alternative site. We will incur relocation costs associated with the movement of employees to a new principal executive office or other sites. We may experience loss of employees or lost employee productivity resulting from this relocation and other work location changes necessitated by our growth. Any of these costs and risks may negatively impact our earnings and cause our stock price to decline.

In December 2016, we completed the purchase of two office buildings in Charlotte, North Carolina for an aggregate purchase price of $23.5 million. We currently lease a portion of this space to other tenants. We acquired these buildings with the intent to use such buildings as our principal executive offices in the future, and rent any unused space. In November 2018, our board of directors approved a plan to sell these two office buildings and they were classified as held for sale. In February 2019, we agreed to sell these buildings to an unrelated third party. For additional information, *see* Item 9B. Other Information and Note 7 - Assets Held For Sale in the notes to the consolidated financial statements included elsewhere in this report. There are costs and risks associated with our leasing and holding this real estate for sale, including:

- real estate taxes and maintenance costs;

- financial difficulties or lease defaults by our tenants;

- tenant turnover and loss of potential tenants to competing landlords;

- actions by competing landlords that may decrease or prevent increases in the occupancy and rental rates of our properties;

- costs of compliance with governmental rules and regulations, including the Americans with Disabilities Act, and zoning laws and potential liability thereunder;

- changes in the cost or availability of adequate insurance, including coverage for mold and asbestos;

- costs associated with environmental conditions or retained liabilities for such conditions;

- costs associated with remodeling the buildings;

- securing required governmental construction, zoning or other approvals and permits;

- management of modifications in the design to the size and scope of the remodeling or other unforeseen engineering problems;

Table of Contents

- exposure to real estate market conditions affecting the marketability and realizable value of the property;

- the risk that binding purchase agreements for the sale of properties such as these buildings customarily have a post-signing inspection period during which the buyer is able to terminate the agreement with limited remedies to us as the seller; and

- the potential for retained liabilities following a sale, such as those imposed under environmental laws or that we may otherwise agree to.

***Our Revolving Credit Facility contains financial covenants and other restrictions on our actions, and it could therefore limit our operational flexibility or otherwise adversely affect our financial condition. Failure to comply with the terms of any such facility could impair our rights to the assets that have been pledged as collateral under the facility.***

On November 21, 2017, our wholly-owned subsidiary LendingTree, LLC entered into an amended and restated $250.0 million five-year senior secured revolving credit facility which matures on November 21, 2022 (the "Revolving Credit Facility"). On October 26, 2018, we amended the Revolving Credit Facility to increase its borrowing capacity by $100.0 million to $350.0 million. Borrowings under the Revolving Credit Facility can be used to finance working capital needs, capital expenditures, and general corporate purposes, including to finance permitted acquisitions. As of February 28, 2019, there was $195.0 million borrowed under the Revolving Credit Facility.

The Revolving Credit Facility contains a restrictive financial covenant, which limits the total consolidated debt to an EBITDA ratio. In addition, the Revolving Credit Facility contains customary affirmative and negative covenants, including, subject to certain exceptions, restrictions on our ability to, among other things:

- incur additional indebtedness;

- grant liens;

- make loans and investments;

- enter into mergers or make certain fundamental changes;

- make certain restricted payments, including dividends, distributions, stock repurchases or redemptions;

- sell assets;

- enter into transactions with affiliates;

- enter into restrictive transactions;

- enter into sale and leaseback transactions;

- enter into hedging transactions; and

- engage in certain other transactions without the prior consent of the lenders.

The Revolving Credit Facility requires LendingTree, LLC to pledge as collateral, subject to certain customary exclusions, substantially all of its assets, including 100% of its equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none). The obligations under this facility are unconditionally guaranteed on a senior basis by LendingTree, Inc. and material domestic subsidiaries of LendingTree, LLC, which guaranties are secured by a pledge as collateral, subject to certain customary exclusions, of 100% of each such guarantor's assets, including 100% of each such guarantor's equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none).

If an event of default occurs or if we otherwise fail to comply with any of the negative or affirmative covenants of the Revolving Credit Facility, the lenders may declare all of the obligations and indebtedness under such facility due and payable. In such a scenario, the lenders could exercise their lien on the pledged collateral, which would have a material adverse effect on our business, operations, financial condition and liquidity. For additional information on the Revolving Credit Facility, *see* Note 13—Debt, in the notes to the consolidated financial statements included elsewhere in this report.

20

Table of Contents

*If our goodwill or indefinite-lived intangible assets become impaired, we may be required to record a significant charge to earnings.*

Under accounting principles generally accepted in the United States of America ("GAAP"), we review the carrying value of goodwill and indefinite-lived intangible assets on an annual basis as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. Factors that may be considered a change in circumstances, indicating that the carrying value of our goodwill and indefinite-lived intangible assets may not be recoverable, include a decline in stock price and market capitalization, reduced future cash flow estimates and slower growth rates in our industry or our customers' industries. We may be required to record a significant charge in our financial statements during a period in which any impairment of our goodwill or indefinite-lived intangible assets is determined, negatively impacting our results of operations.

*Charges to earnings resulting from acquisitions may adversely affect our operating results.*

Under GAAP, when we acquire businesses, we allocate the purchase price to tangible assets and liabilities and identifiable intangible assets acquired at their acquisition date fair values. Any residual purchase price is recorded as goodwill. We also estimate the fair value of any contingent consideration. Our estimates of fair value are based upon assumptions believed to be reasonable but which are uncertain and involve significant judgments by management. After we complete an acquisition, the following factors could result in material charges and adversely affect our operating results and may adversely affect our cash flows:

- costs incurred to combine the operations of companies we acquire, such as transitional employee expenses and employee retention or relocation expenses;

- impairment of goodwill or intangible assets;

- a reduction in the useful lives of intangible assets acquired;

- impairment of long-lived assets;

- identification of, or changes to, assumed contingent liabilities;

- changes in the fair value of any contingent consideration;

- charges to our operating results due to duplicative pre-merger activities;

- charges to our operating results from expenses incurred to effect the acquisition; and

- charges to our operating results due to the expensing of certain stock awards assumed in an acquisition.

Substantially all of these potential charges would be accounted for as expenses that would decrease our net income and earnings per share for the periods in which those costs are incurred. Charges to our operating results in any given period could differ substantially from other periods based on the timing and size of our acquisitions and the extent of acquisition accounting adjustments.

For acquisitions with potential future contingent consideration payments, we assign a fair value to the contingent consideration and reassess this fair value quarterly. Increases or decreases based on the actual performance of the acquired company against the contingent consideration targets or other factors will cause decreases or increases, respectively, in our results of operations. These quarterly adjustments could have a material adverse effect on our results of operations. During 2018 and 2017, we incurred $10.8 million and $23.9 million, respectively, of contingent consideration expense due to the change in estimated fair value of the earnout payments.

### Risks Related to Compliance and Regulation

*Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could materially and adversely affect our business, financial condition and results of operations.*

We market and provide services in heavily regulated industries through a number of different channels across the United States. As a result, our businesses have been and remain subject to a variety of statutes, rules, regulations, policies and procedures in various jurisdictions in the United States, which are subject to change at any time. The failure of our businesses to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could result in administrative fines and/or proceedings against us or our businesses by governmental agencies and/or litigation by consumers, which could materially and adversely affect our business, financial condition and results of operations and our brand.

Our businesses conduct marketing activities via the telephone, the mail and/or through online marketing channels, which general marketing activities are governed by numerous federal and state regulations, such as the Telemarketing Sales Rule, state

Table of Contents

telemarketing laws, federal and state privacy laws, the CAN-SPAM Act, the Telephone Consumer Protection Act and the Federal Trade Commission Act and its accompanying regulations and guidelines, among others. Increased regulation by the U.S. Federal Trade Commission ("FTC") and Federal Communications Commission ("FCC") has resulted in restrictions on telephone calls to residential and wireless telephone subscribers.

Additional federal, state and in some instances, local laws regulate secured and unsecured lending activities, which impacts the marketplace, lenders and consumers. These laws generally regulate the manner in which lending and lending-related activities are marketed or made available, including advertising and other consumer disclosures, payments for services and record keeping requirements; these laws include RESPA, the Fair Credit Reporting Act, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act and various state laws. State laws often restrict the amount (and nature) of interest and fees that may be charged by a lender or mortgage broker, or otherwise regulate the manner in which lenders or mortgage brokers operate or advertise.

State, federal and foreign lending laws and regulations generally require accurate disclosure of the critical components of credit costs so that consumers can readily compare credit terms from various lenders. These laws and regulations also impose certain restrictions on the advertisement of these credit terms. Because we are an aggregator of rate and other information regarding many financial products, including mortgages, deposits and credit cards, we may be subject to some of these laws and regulations and we may be held liable under these laws and regulations for information provided through our online services. The insurance industry is also subject to numerous federal and state laws and regulations, including licensing requirements.

Our operations in India may subject us to the Foreign Corrupt Practices Act of 1977 ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties by U.S. persons and issuers for the purpose of obtaining or retaining business.

Failure to comply with applicable laws and regulatory requirements may result in, among other things, revocation of or inability to renew required licenses or registrations, loss of approval status, termination of contracts without compensation, administrative enforcement actions and fines, private lawsuits, including those styled as class actions, cease and desist orders and civil and criminal liability.

Most states require licenses to solicit, broker or make loans secured by residential mortgages and other consumer loans to residents of those states, as well as to operate real estate referral and brokerage services, and in many cases require the licensure or registration of individual employees engaged in aspects of these businesses. Further, as mandated by the federal Secure and Fair Enforcement for Mortgage Licensing Act (the "SAFE Act"), states adopted certain minimum standards for the licensing of individuals involved in mortgage lending or loan brokering. Compliance with these requirements may render it more difficult for us and our Network Partners to operate or may raise our internal costs or the costs of our Network Partners, which may be passed on to us through less favorable commercial arrangements. While our businesses have endeavored to comply with applicable requirements, the application of these requirements to persons operating online is not always clear. Moreover, any of the licenses or rights currently held by our businesses or our employees may be revoked prior to, or may not be renewed upon, their expiration. In addition, our businesses or our employees may not be granted new licenses or rights for which they may be required to apply from time to time in the future.

Likewise, states or municipalities may adopt statutes or regulations making it unattractive, impracticable or infeasible for our businesses to continue to conduct business in such jurisdictions. The withdrawal from any jurisdiction due to emerging legal requirements could materially and adversely affect our business, financial condition and results of operations.

Our businesses are also subject to various state, federal and/or local laws, rules and regulations that regulate the amount and nature of fees that may be charged for transactions and incentives, such as rebates, that may be offered to consumers by our businesses, as well as the manner in which these businesses may offer, advertise or promote transactions. For example, RESPA generally prohibits the payment or receipt of referral fees and fee shares or splits in connection with residential mortgage loan transactions, subject to certain exceptions. The applicability of referral fee and fee sharing prohibitions to lenders and real estate providers, including online networks, may have the effect of reducing the types and amounts of fees that may be charged or paid in connection with real estate-secured loan offerings or activities, including mortgage brokerage, lending and real estate brokerage services, or otherwise limiting our and our Network Partners' ability to conduct marketing and referral activities.

Various federal, state and, in some instances, local, laws also prohibit unfair and deceptive sales practices. We have adopted appropriate policies and procedures to address these requirements (such as appropriate consumer disclosures and call scripting, call monitoring and other quality assurance and compliance measures), but it is not possible to ensure that all employees comply with our policies and procedures at all times.

Compliance with these laws, rules and regulations is a significant component of our internal costs, and new laws, rules and regulations are frequently proposed and adopted, requiring us to adopt new procedures and practices. Changes to existing laws, rules and regulations or changes to interpretation of existing laws, rules and regulations could result in further restriction of activities incidental to our business and could have a material and adverse effect on our business, results of operation and financial condition.

Parties through which our businesses conduct business similarly may be subject to federal and state regulation. These parties typically act as independent contractors and not as agents in their solicitations and transactions with consumers. We cannot ensure that these entities will comply with applicable laws and regulations at all times. Failure on the part of a lender, website operator or other third party to comply with these laws or regulations could result in, among other things, claims of vicarious liability or a negative impact on our reputation and business.

Regulatory authorities and private plaintiffs may allege that we failed to comply with applicable laws, rules and regulations where we believe we have complied. These allegations may relate to past conduct and our past business operations, such as our discontinued mortgage origination operation (which was subject to various state and local laws, rules and regulations). Even allegations that our activities have not complied or do not comply with all applicable laws and regulations may have a material and adverse effect on our business, financial condition and results of operations. The alleged violation of such laws, rules or regulations may entitle an individual plaintiff to seek monetary damages, or may entitle an enforcing government agency to seek significant civil or criminal penalties, costs and attorneys' fees. Regardless of its merit, an allegation typically requires legal fee expenditures to defend against. We have in the past and may in the future decide to settle allegations of non-compliance with laws, rules and regulations when we determine that the cost of settlement is less than the cost and risk of continuing to defend against an allegation. Settlements may require us to pay monetary fines and may require us to adopt new procedures and practices, which may render it more difficult to operate or may raise our internal costs. The future occurrence of one or more of these events could have a material and adverse effect on our business, financial condition and results of operations.

In response to conditions in the U.S. financial markets and economy, as well as a heightened regulatory and Congressional focus on consumer lending, regulators have increased their scrutiny of the financial services industry, the result of which has included new regulations and guidance. We are unable to predict the long-term impact of this enhanced scrutiny. We are also unable to predict whether any additional or similar changes to statutes or regulations, including the interpretation or implementation thereof, will occur in the future.

***The collection, processing, storage, use and disclosure of personal information could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights.***

In the processing of consumer transactions, our businesses receive, transmit and store a large volume of personally identifiable information and other user data. The collection, sharing, use, disclosure and protection of this information are governed by the privacy and data security policies maintained by us and our businesses. Moreover, there are federal, state and international laws regarding privacy and data security, and the storing, sharing, use, disclosure, protection of, and a natural person's rights relating to and in their personally identifiable information and user data. Specifically, personally identifiable information is increasingly subject to legislation and regulations in numerous jurisdictions around the world, the intent of which is to protect the privacy of personal information that is collected, processed and transmitted in or from the governing jurisdiction. In the United States, regulations and interpretations concerning personally identifiable and data security promulgated by state and federal regulators, including the CFPB and FTC, could conflict or give rise to differing views of personal privacy rights. We could be materially and adversely affected if legislation or regulations are expanded to require changes in business practices or privacy policies, procedures, and controls relating to the privacy and data security of personal information or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively affect our business, financial condition and results of operations.

Our failure, and/or the failure by the various third-party vendors and service providers with whom we do business, or the perceived failure, to comply with applicable privacy and data security policies, procedures, or controls, or federal, state or similar international laws and regulations or any compromise of security that results in the theft, unauthorized access, acquisition, use, disclosure, or misappropriation of personally identifiable information or other user data could damage the reputation of these businesses, discourage potential users from our products and services and/or result in fines and/or proceedings or litigation by governmental agencies and/or consumers, one or all of which could materially and adversely affect our business, financial condition and results of operations.

***Changes in the regulation of the Internet could negatively affect our business.***

Laws, rules and regulations governing Internet communications, advertising and e-commerce are dynamic and the extent of future government regulation is uncertain. Federal and state regulations govern various aspects of our online business, including intellectual property ownership and infringement, trade secrets, the distribution of electronic communications, marketing and advertising, user privacy and data security, search engines and Internet tracking technologies. Future taxation on the use of the Internet or e-commerce transactions could also be imposed. Existing or future regulation or taxation could hinder growth in or negatively impact the use of the Internet generally, including the viability of Internet e-commerce, which could reduce our revenue, increase our operating expenses and expose us to significant liabilities.

https://www.sec.gov/Archives/edgar/data/1434820/000143462119000014/tree-12312018x10k.htm 39/159

Table of Contents

*If Network Partners fail to produce required documents for examination by, or other affiliated parties fail to make certain filings with, state regulators, we may be subject to fines, forfeitures and the revocation of required licenses.*

Some of the states in which our businesses maintain licenses require them to collect various loan documents from Network Partners and produce these documents for examination by state regulators. While Network Partners are contractually obligated to provide these documents upon request, these measures may be insufficient. Failure to produce required documents for examination could result in fines, as well as the revocation of our licenses to operate in certain states, which could have a material and adverse effect on our business, financial condition and results of operations.

Regulations promulgated by some states may impose compliance obligations on directors, executive officers, large customers and any person who acquires a certain percentage (for example, 10% or more) of the equity in a licensed entity, including requiring such persons to periodically file financial and other personal and business information with state regulators. If any such person refuses or fails to comply with these requirements, we may be unable to obtain certain licenses and existing licensing arrangements may be jeopardized. The inability to obtain, or the loss of, required licenses could have a material and adverse effect on our business, financial condition and results of operations.

**Risks Related to an Investment in our Common Stock**

*Fluctuations in our operating results, quarter to quarter earnings and other factors may result in significant decreases in the price of our common stock.*

The market price for our common stock has been volatile since our spin-off. In addition, the trading volume in our common stock has fluctuated and may continue to fluctuate, causing significant price variations to occur. As of December 31, 2018, since our spin-off, the price per share of our common stock has fluctuated from an intra-day low of $1.42 per share to an intra-day high of $404.40 per share. The market price of our common stock may fluctuate or decline significantly in the future. Some of the factors that could negatively affect the price of our common stock or result in fluctuations in the price or trading volume of our common stock include:

- variations in our quarterly operating and financial results;

- variations in our projected operating and financial results;

- failure to meet analysts' earnings estimates;

- publication of research reports about us, our Network Partners or our industry or the failure of securities analysts to cover our common shares or our industry;

- additions or departures of key management personnel;

- adverse market reaction to any indebtedness we may incur or preferred or common shares we may issue in the future;

- actions by stockholders, including "activist" investors;

- changes in market valuations of other companies in our industry, including our customers and competitors;

- announcements by us or our competitors of significant contracts, acquisitions, dispositions, strategic partnerships, joint ventures or capital commitments;

- speculation in the press or investment community, including short selling;

- changes or proposed changes in laws or regulations affecting our industry or enforcement of these laws and regulations, or announcements relating to these matters;

- changes in estimated fair value of contingent consideration related to acquisitions; and

- changes in general economic or market conditions.

Recently, and in the past, the stock market has experienced extreme price and volume fluctuations. These market fluctuations could result in extreme volatility in the trading price of our common stock, which could cause a decline in the value of your investment in our common shares. In addition, the trading price of our common stock could decline for reasons unrelated to our business or financial results, including in reaction to events that affect other companies in our industry even if those events do not directly affect us. You should also be aware that price volatility may be greater if the public float and trading volume of our common stock are low. These factors may result in short-term or long-term negative pressure on the value of our common stock.

24

Table of Contents

*If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.*

The trading market for internet marketplace operators and lead-generation companies depends, in part, on the research and reports that securities or industry analysts publish about the industry and specific companies. If one or more analysts covering us currently or in the future fail to publish reports on us regularly, demand for our common stock could decline, which could cause our stock price and trading volume to decline. If one or more recognized securities or industry analysts that cover our company or our industry in the future downgrades our common stock or publishes inaccurate or unfavorable research about our business or industry, our stock price would likely decline.

*Two holders of our common stock own a substantial portion of our outstanding common stock, which concentrates voting control and limits your ability to influence corporate matters.*

As of February 20, 2019, Douglas Lebda, our Chairman and Chief Executive Officer, beneficially owned approximately 17% of our outstanding common stock. Additionally, Mr. Lebda holds restricted stock unit awards representing 9,896 shares and options to purchase a maximum of 797,082 shares that are not included in beneficial ownership because Mr. Lebda does not have the right to acquire them within 60 days. If these restricted stock units were to settle and these options were exercisable, they would represent additional beneficial ownership of approximately 5% of our outstanding common stock. As of February 20, 2019, GCI Liberty, Inc. beneficially owned approximately 27% of our outstanding common stock. GCI Liberty, Inc. also has the right to nominate 20% of the total number of directors serving on the board, rounded up. Two of our ten directors, Neal Dermer and Craig Troyer, were nominated by Liberty Interactive Corporation, the predecessor in interest of GCI Liberty, Inc.

Therefore, for the foreseeable future, Mr. Lebda and GCI Liberty, Inc. will each have influence over our management and affairs and all matters requiring stockholder approval, including the election or removal (with or without cause) of directors and approval of any significant corporate transaction, such as a merger or other sale of us or our assets. The interests of Mr. Lebda or GCI Liberty, Inc. may not necessarily align with the interests of our other stockholders. Mr. Lebda or GCI Liberty, Inc. could elect to sell a significant interest in us and you may receive less than the then-current fair market value or the price you paid for your shares as a result of such transaction. This concentrated control could delay, defer or prevent a change of control, merger, consolidation, takeover or other business combination involving us that other stockholders may otherwise support. This concentrated control could also discourage a potential investor from acquiring our common stock and might harm the market price of our common stock.

*Future sales of common stock by our existing stockholders may cause our stock price to fall.*

The market price of our common stock could decline as a result of sales by our existing stockholders in the market, or the perception that these sales could occur. These sales might also make it more difficult for us to sell equity securities at a time and price that we deem appropriate.

We may issue additional shares of our common stock in the future pursuant to current or future equity incentive plans, or in connection with current or future acquisitions or financings. If we were to raise capital in the future by selling shares of our common stock, or securities that are convertible into our common stock or issuing shares of our common stock in a business acquisition, their issuance would have a dilutive effect on the percentage ownership of our stockholders and, depending on the prices at which such shares or convertible securities are sold or issued, on their investment in our common stock and, therefore, could have a material adverse effect on the market prices of our common stock.

Under a registration rights agreement with GCI Liberty, Inc., GCI Liberty, Inc. and its permitted transferees are entitled to three demand registrations rights (and unlimited piggyback registration rights) in respect of the shares of our common stock received by GCI Liberty, Inc. as a result of the spin-off and other shares of our common stock acquired by GCI Liberty, Inc. or its affiliates. These holders will also be permitted to exercise their registration rights in connection with certain hedging transactions that they may enter into in respect of the registrable shares. The presence of additional shares of our common stock trading in the public market, as a result of the exercise of such registration rights, may have an adverse effect on the market price of our securities.

*Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of us more difficult, limit attempts by stockholders to replace or remove our management and affect the market price of our common stock.*

Provisions in our certificate of incorporation and bylaws, as amended and restated, may have the effect of delaying or preventing a change of control or changes in our management. Our amended and restated certificate of incorporation and/or amended and restated bylaws include provisions that:

- Authorize our board of directors to issue, without further action by our stockholders, up to five million shares of undesignated preferred stock, sometimes referred to as "blank check preferred";

Table of Contents

- Prohibit cumulative voting in the election of directors;

- Provide that vacancies on our board of directors may be filled only by the affirmative vote of a majority of directors then in office or by the sole remaining director;

- Provide that only our board of directors may change the size of our board of directors;

- Specify that special meetings of our stockholders may be called only by or at the direction of our board of directors or by a person specifically designated with such authority by the board; and

- Prohibit stockholders from taking action by written consent.

The provisions described above may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing our management. These provisions may also have the effect of delaying or preventing a change of control of our company, even if stockholders support such a change of control.

### *We do not intend to pay any cash dividends on our common stock in the foreseeable future.*

We have not declared or paid a cash dividend on our common stock during the six most recent fiscal years. We have no current intention to declare or pay cash dividends on our common stock in the foreseeable future. In addition, the Revolving Credit Facility contains certain restrictions on our ability to pay dividends. *See* Note 13—Debt, in the notes to the consolidated financial statements included elsewhere in this report. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of our board of directors. As a result, capital appreciation, if any, of our common stock will be the sole source of gain for the foreseeable future for holders of our common stock.

### *Our financial results fluctuate as a result of seasonality, which may make it difficult to predict our future performance and may adversely affect our common stock price.*

Our mortgage products business is historically subject to seasonal trends. These trends reflect the general patterns of the mortgage industry and housing sales, which typically peak in the spring and summer seasons. In recent periods, broader cyclical trends in interest rates, as well as the mortgage and real estate markets, have upset the customary seasonal trends. However, seasonal trends may resume and our quarterly operating results may fluctuate. Our non-mortgage products businesses have various seasonality trends which may create further uncertainty in our quarterly operating results. *See* Item 1. Business—Seasonality included elsewhere in this report for more information. Any of these seasonal trends, or the combination of them, may negatively impact the price of our common stock.

### *The conditional conversion feature of the Notes, if triggered, may adversely affect our financial condition and operating results.*

While the conditional conversion feature of the 0.625% Convertible Senior Notes due June 1, 2022 (the "Notes") is triggered, holders of Notes will be entitled to convert the Notes at any time during specified periods at their option. Because of the trading price of our common stock during the measurement period applicable to the quarter ended December 31, 2018, holders of the Notes are not entitled to convert the Notes during the calendar quarter ending March 31, 2019. Convertibility for each quarter thereafter will be determined based on whether the last reported sales price of our common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter, is greater than or equal to 130% of the conversion price under the Notes on each applicable trading day. If so, then the Notes will be convertible during that calendar quarter. The Notes will also be convertible at any time during the five business day period immediately following any five consecutive trading day period in which the trading price per $1,000 principal amount of Notes for each trading Day of such five trading day period is less than 98% of the product of the last reported sale price of our common stock on each such trading day and the conversion ratio under the Notes, as more fully described in the indenture governing the Notes, which is incorporated by reference as an exhibit to this annual report.

If one or more holders elect to convert their Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than paying cash in lieu of delivering any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital.

26

Table of Contents

***We may not have the ability to raise the funds necessary to settle conversions of the Notes in cash or to repurchase the Notes upon a fundamental change, and our future debt may contain limitations on our ability to pay cash upon conversion or repurchase of the Notes.***

Holders of the Notes will have the right to require us to repurchase all or a portion of their Notes upon the occurrence of a fundamental change at a repurchase price equal to 100% of the principal amount of the Notes to be repurchased, plus accrued and unpaid special interest, if any. We may not have enough available cash or be able to obtain financing at the time we are required to make repurchases of Notes surrendered therefore, or pay cash with respect to Notes being converted if we elect not to issue shares, which could harm our reputation and affect the trading price of our common stock.

***Our hedge and warrant transactions may affect the value of the Notes and our common stock.***

In connection with the pricing of the Notes, we entered into convertible note hedge transactions with certain counterparties. The hedge transactions are generally expected to reduce the potential dilution upon conversion of the Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted Notes, as the case may be. We also entered into warrant transactions with such counterparties. However, the warrant transactions could separately have a dilutive effect to the extent that the market price per share of our common stock exceeds the applicable strike price of the warrants. The initial strike price of the warrants is $266.39.

In connection with establishing their initial hedge of the hedge and warrant transactions, the counterparties or their respective affiliates may have purchased shares of our common stock and/or entered into various derivative transactions with respect to our common stock concurrently with or shortly after the pricing of the Notes. In addition, the counterparties or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to our common stock and/or purchasing or selling our common stock or other securities of ours in secondary market transactions prior to the maturity of the Notes (and are likely to do so during any observation period related to a conversion of Notes or following any repurchase of Notes by us on any fundamental repurchase date or otherwise). This activity could cause or avoid an increase or a decrease in the market price of our common stock or the Notes.

***The accounting method for convertible debt securities that may be settled in cash, such as the Notes, could have a material effect on our reported financial results.***

In May 2008, the FASB issued FASB Staff Position No. APB 14-1, Accounting for Convertible Debt Instruments That May Be Settled in Cash Upon Conversion (Including Partial Cash Settlement), which has subsequently been codified as ASC 470-20, Debt with Conversion and Other Options, which we refer to as ASC 470-20. Under ASC 470-20, an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470-20 on the accounting for the Notes is that the equity component is required to be included in the additional paid-in capital section of stockholders' equity on our consolidated balance sheet, and the value of the equity component would be treated as debt discount for purposes of accounting for the debt component of the Notes. As a result, we will be required to record a greater amount of non-cash interest expense in current periods presented as a result of the amortization of the discounted carrying value of the Notes to their face amount over the term of the Notes. We will report lower net income in our financial results because ASC 470-20 will require interest to include the current period's amortization of the debt discount, which could adversely affect our reported or future financial results, the trading price of our common stock and the trading price of the Notes.

***We may still incur substantially more debt in the future or take other actions which would intensify the risks associated with our debt.***

We and our subsidiaries may be able to incur substantial additional debt in the future, subject to the restrictions contained in our debt instruments, some of which may be secured debt. We are not restricted under the terms of the indenture governing the Notes from incurring additional debt, securing existing or future debt, recapitalizing our debt or taking a number of other actions that are not limited by the terms of the indenture governing the Notes that could have the effect of diminishing our ability to make payments on the Notes when due. Our existing credit facility restricts our ability to incur additional indebtedness, including secured indebtedness, but if the facility matures or is repaid, we may not be subject to such restrictions under the terms of any subsequent indebtedness.

**ITEM 1B.** *Unresolved Staff Comments*

Not applicable.

**ITEM 2.** *Properties*

Table of Contents

Our principal executive offices are currently located in approximately 37,800 square feet of office space in Charlotte, North Carolina under a lease that expires in December 2020. We have determined that we will need to relocate our principal executive offices to accommodate our growth and we are in the process of selecting an alternative site. In addition, we have offices located in approximately 9,400 square feet of office space in Burlingame, California under a lease that expires in March 2020 and approximately 9,400 square feet, 13,100 square feet and 27,800 square feet of additional office space in Charlotte, North Carolina under leases that expire in April 2019, December 2020 and September 2021, respectively. As a result of our acquisitions during 2018, 2017 and 2016, we also operate offices in: Charleston, South Carolina; Denver, Colorado; Jacksonville, Florida; New York City, New York; Northbrook, Illinois; Sacramento, California; Seattle, Washington; and Makarba, India.

In December 2016, we completed the acquisition of two office buildings in Charlotte, North Carolina, with approximately 64,000 and 73,000 square feet of office space, respectively. In November 2018, the office buildings were classified as held for sale. In February 2019, we agreed to sell these buildings to an unrelated third party. For additional information, *see* Item 9B. Other Information and *see* Note 7—Assets Held for Sale in the notes to the consolidated financial statements included elsewhere in this report.

## ITEM 3.  *Legal Proceedings*

In the ordinary course of business, we are party to litigation involving property, contract, intellectual property and a variety of other claims. The amounts that may be recovered in such matters may be subject to insurance coverage. *See* Note 15—Contingencies in the notes to the consolidated financial statements included elsewhere in this report for a discussion of our current and recently settled litigation.

## ITEM 4.  *Mine Safety Disclosures*

Not applicable.

28

Table of Contents

## PART II

**ITEM 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

### General Market Information, Holders and Dividends

Our common stock is quoted on the Nasdaq Global Select Market under the ticker symbol "TREE". As of February 20, 2019, there were approximately 660 holders of record of our common stock.

We have no current intention to declare or pay cash dividends on our common stock in the foreseeable future. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of our board of directors.

### Performance Graph

*The performance graph shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or incorporated by reference into any filings under the Securities Act or the Exchange Act, except as otherwise expressly set forth by specific reference in such filing.*

Set forth below is a line graph, for the period from December 31, 2013 through December 31, 2018, comparing the cumulative total stockholder return of $100 invested (assuming that all dividends were reinvested) in (1) our common stock, (2) the cumulative return of all companies listed on the Nasdaq Composite Index and (3) the cumulative total return of the Research Development Group ("RDG") Internet index. Returns over the indicated periods should not be considered indicative of future stock prices or stockholder returns.



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
Among LendingTree, Inc., the NASDAQ Composite Index
and the RDG Internet Composite Index

\*$100 invested on 12/31/13 in stock or index, including reinvestment of dividends.
Fiscal year ending December 31.

**Table of Contents**

**Unregistered Sales of Equity Securities and Use of Proceeds**

During the year ended December 31, 2018, we did not issue or sell any shares of our common stock or other equity securities in transactions that were not registered under the Securities Act.

**Issuer Purchases of Equity Securities**

In each of May 2014, January 2016, February 2016, February 2018 and February 2019, the board of directors authorized and we announced a stock repurchase program which allowed for the repurchase of up to $10.0 million, $50.0 million, $40.0 million, $100.0 million and $150.0 million, respectively, of our common stock. Under this program, we can repurchase stock in the open market or through privately-negotiated transactions. We have used available cash to finance these repurchases. We will determine the timing and amount of any additional repurchases based on our evaluation of market conditions, applicable SEC guidelines and regulations, and other factors. This program may be suspended or discontinued at any time at the discretion of our board of directors. During the quarter ended December 31, 2018, 174,139 shares of common stock were repurchased under the stock repurchase program. As of February 28, 2019, approximately $181.2 million is authorized for future share repurchases.

Additionally, the LendingTree Fifth Amended and Restated 2008 Stock and Award Incentive Plan and the LendingTree 2017 Inducement Grant Plan allow employees to forfeit shares of our common stock to satisfy federal and state withholding obligations upon the exercise of stock options, the settlement of restricted stock unit awards and the vesting of restricted stock awards granted to those individuals under the plans. During the quarter ended December 31, 2018, 8,586 shares were purchased related to these obligations under the LendingTree Fifth Amended and Restated 2008 Stock and Award Incentive Plan and no shares have yet been purchased related to these obligations under the LendingTree 2017 Inducement Grant Plan. The withholding of those shares does not affect the dollar amount or number of shares that may be purchased under the stock repurchase program described above.

The following table provides information about the Company's purchases of equity securities during the quarter ended December 31, 2018.

| Period | Total Number of Shares Purchased [1] | | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs [2] | | Maximum Number/Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|---|---|---|
| | | | | | | | *(in thousands)* |
| 10/1/18 - 10/31/18 | 177,185 | $ | 203.46 | | 174,039 | $ | 35,163 |
| 11/1/18 - 11/30/18 | 4,915 | $ | 231.70 | | — | $ | 35,163 |
| 12/1/18 - 12/31/18 | 625 | $ | 233.24 | | 100 | $ | 35,143 |
| **Total** | 182,725 | $ | 204.32 | | 174,139 | $ | 35,143 |

(1) During October 2018, November 2018 and December 2018, 3,146 shares, 4,915 shares and 525 shares, respectively (totaling 8,586 shares), were purchased to satisfy federal and state withholding obligations of our employees upon the settlement of restricted stock unit awards, all in accordance with our Fifth Amended and Restated 2008 Stock and Award Incentive Plan, as described above.

(2) See the narrative disclosure above the table for further description of our publicly announced stock repurchase program.

30

Table of Contents

## ITEM 6. *Selected Financial Data*

The summary financial data presented below represents portions of our consolidated financial statements and are not complete. The following financial information should be read in conjunction with Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and our consolidated financial statements and notes thereto contained in Item 8. Financial Statements and Supplementary Data included elsewhere in this annual report. Historical results are not necessarily indicative of future performance or results of operations.

| | **Year Ended December 31,** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | | **2015** | | **2014** | |
| | *(in thousands, except per share amounts)* | | | | | | | | | |
| **Results of Operations:** | | | | | | | | | | |
| Revenue[1] | $ | 764,865 | $ | 617,736 | $ | 384,402 | $ | 254,216 | $ | 167,350 |
| Income (loss) from continuing operations [2] | | 109,319 | | 19,418 | | 31,208 | | 51,316 | | (487) |
| (Loss) income from discontinued operations [3] | | (12,820) | | (3,840) | | (3,714) | | (3,269) | | 9,849 |
| Net income and comprehensive income | $ | 96,499 | $ | 15,578 | $ | 27,494 | $ | 48,047 | $ | 9,362 |
| | | | | | | | | | | |
| Weighted average shares outstanding: | | | | | | | | | | |
| Basic | | 12,504 | | 11,945 | | 11,812 | | 11,516 | | 11,188 |
| Diluted | | 14,097 | | 13,682 | | 12,773 | | 12,541 | | 11,188 |
| Income (loss) per share from continuing operations: | | | | | | | | | | |
| Basic | $ | 8.74 | $ | 1.63 | $ | 2.64 | $ | 4.46 | $ | (0.04) |
| Diluted | $ | 7.75 | $ | 1.42 | $ | 2.44 | $ | 4.09 | $ | (0.04) |
| (Loss) income per share from discontinued operations: | | | | | | | | | | |
| Basic | $ | (1.03) | $ | (0.32) | $ | (0.31) | $ | (0.28) | $ | 0.88 |
| Diluted | $ | (0.91) | $ | (0.28) | $ | (0.29) | $ | (0.26) | $ | 0.88 |
| Net income per share: | | | | | | | | | | |
| Basic | $ | 7.72 | $ | 1.30 | $ | 2.33 | $ | 4.17 | $ | 0.84 |
| Diluted | $ | 6.85 | $ | 1.14 | $ | 2.15 | $ | 3.83 | $ | 0.84 |
| Cash dividend per share | $ | — | $ | — | $ | — | $ | — | $ | — |
| | | | | | | | | | | |
| **Financial Position:** | | | | | | | | | | |
| Cash and cash equivalents [4] [5] [6] [7] [8] [9] | $ | 105,102 | $ | 368,550 | $ | 91,131 | $ | 206,975 | $ | 86,212 |
| Total assets [4] [7] | $ | 896,115 | $ | 693,459 | $ | 323,427 | $ | 295,781 | $ | 139,891 |
| Total long-term liabilities [5] [7] [8] [9] | $ | 287,954 | $ | 251,069 | $ | 25,285 | $ | 612 | | 4,889 |
| Total shareholders' equity [4] [7] | $ | 346,208 | $ | 294,874 | $ | 231,435 | $ | 241,142 | $ | 96,366 |

(1) *See* Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2018, 2017 and 2016—Revenue for a discussion of revenue.

(2) In 2015, we released the majority of the valuation allowance, which, along with federal and state income taxes, resulted in a total tax benefit of $23.0 million.

(3) *See* Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2018, 2017 and 2016—Discontinued Operations for a discussion of discontinued operations.

(4) In November 2015, we completed an equity offering of 852,500 shares of our common stock, receiving net proceeds of $91.5 million.

(5) In November 2016, we acquired CompareCards for $80.7 million in cash at closing and contingent consideration payments of up to $22.5 million for each of 2017 and 2018. Total long-term liabilities at the end of 2016 included the fair value of the contingent consideration of $23.1 million. The full potential contingent consideration of $45.0 million was paid in 2018.

6/10/2020

08-18555-mg-1-Doc26174-8-1F Filed 04/01/27 Document-17 Entered 06/04/00/2 Page 23128 18 Exhibit
Complaint    Pg 819 of 1033

31

Table of Contents

(6)   In December 2016, we acquired two office buildings in Charlotte, North Carolina for $23.5 million in cash. In November 2018, the office buildings were classified as held for sale. For additional information, *see* Note 7—Assets Held for Sale and Note 22—Subsequent Events in the notes to the consolidated financial statements included elsewhere in this report.

(7)   In May 2017, we issued $300.0 million aggregate principal amount of our 0.625% Convertible Senior Notes due June 1, 2022 and, in connection therewith, entered into Convertible Note Hedge and Warrant transactions with respect to our common stock. For more information, *see* Note 13—Debt, in the notes to the consolidated financial statements included elsewhere in this report.

(8)   In June 2017, we acquired DepositAccounts for $24.0 million in cash at closing and contingent consideration payments of up to $9.0 million, and acquired MagnifyMoney for $29.6 million in cash at closing. In September 2017, we acquired SnapCap for $11.9 million in cash at closing and up to three additional contingent consideration payments, each ranging from zero to $3.0 million. Total long-term liabilities at the end of 2017 included the fair value of DepositAccounts non-current contingent consideration of $4.3 million and the fair value of SnapCap contingent consideration of $7.0 million. Total long-term liabilities at the end of 2018 included the fair value of SnapCap non-current contingent consideration of $3.7 million.

(9)   In June 2018, we acquired Ovation for $12.2 million in cash at closing and up to two contingent consideration payments, each ranging from zero to $4.375 million. In July 2018, we acquired Student Loan Hero for $60.7 million in cash at closing. In October 2018, we acquired QuoteWizard for $299.9 million in cash at closing, which was funded through $174.9 million of cash on hand and by $125.0 million drawn on our amended and restated revolving credit facility, and up to three contingent consideration payments, each ranging from zero to $23.4 million. In December 2018, we exercised our option to acquire an affiliate of Magnify Money in India for $0.5 million in cash. Total long-term liabilities at the end of 2018 included the fair value of Ovation non-current contingent consideration of $3.3 million and the fair value of QuoteWizard contingent consideration of $20.7 million.

<div align="center">32</div>

Table of Contents

## ITEM 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with our consolidated financial statements and accompanying notes included elsewhere within this report. This discussion includes both historical information and forward-looking information that involves risks, uncertainties and assumptions. Our actual results may differ materially from management's expectations as a result of various factors, including but not limited to those discussed in the sections entitled "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Information."

## Company Overview

LendingTree, Inc. is the parent of LendingTree, LLC and several companies owned by LendingTree, LLC.

LendingTree operates what we believe to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. Our online consumer platform provides consumers with access to product offerings from our Network Partners, including mortgage loans, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. In addition, we offer tools and resources, including free credit scores, that facilitate comparison shopping for loans, deposit products, insurance and other offerings. We seek to match consumers with multiple providers, who can offer them competing quotes for the product, or products, they are seeking. We also serve as a valued partner to lenders and other providers seeking an efficient, scalable and flexible source of customer acquisition with directly measurable benefits, by matching the consumer inquiries we generate with these partners.

Our My LendingTree platform offers a personalized loan comparison-shopping experience by providing free credit scores and credit score analysis. This platform enables us to observe consumers' credit profiles and then identify and alert them to loans and other offerings on our marketplace that may be more favorable than the terms they may have at a given point in time. This is designed to provide consumers with measurable savings opportunities over their lifetimes.

We are focused on developing new product offerings and enhancements to improve the experiences that consumers and Network Partners have as they interact with us. By expanding our portfolio of financial services offerings, we are growing and diversifying our business and sources of revenue. We intend to capitalize on our expertise in performance marketing, product development and technology, and to leverage the widespread recognition of the LendingTree brand to effect this strategy.

We believe the consumer and small business financial services industry is still in the early stages of a fundamental shift to online product offerings, similar to the shift that started in retail and travel many years ago and is now well established. We believe that like retail and travel, as consumers continue to move towards online shopping and transactions for financial services, suppliers will increasingly shift their product offerings and advertising budgets toward the online channel. We believe the strength of our brands and of our partner network place us in a strong position to continue to benefit from this market shift.

The LendingTree Loans business is presented as discontinued operations in the accompanying consolidated balance sheets, consolidated statements of operations and comprehensive income and consolidated cash flows for all periods presented. Except for the discussion under the heading "Discontinued Operations," the analysis within Management's Discussion and Analysis of Financial Condition and Results of Operations reflects our continuing operations.

## Recent Business Acquisitions

On January 10, 2019, we acquired ValuePenguin, a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards, for $105.0 million in cash at the closing of the transaction, subject to adjustments for working capital. We believe that combining ValuePenguin's high-quality content and search engine optimization capability with recently acquired proprietary technology and insurance carrier network from QuoteWizard enables us to provide immense value to carriers and agents. This strategic acquisition positions us to achieve further scale in the insurance space as well as the broader financial services industry.

On October 31, 2018, we acquired QuoteWizard, one of the largest insurance comparison marketplaces in the growing online insurance advertising market, for $299.9 million in cash at the closing of the transaction, subject to post-closing adjustments to working capital and potential contingent consideration payments of up to $70.2 million through October 2021, subject to achieving specific targets. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers. We believe this acquisition will establish LendingTree as a leading player in the online insurance advertising industry, while continuing our ongoing diversification within the financial services category.

33

Table of Contents

On July 23, 2018, we acquired Student Loan Hero for $62.7 million in cash, of which $2.3 million was recognized as severance expense in our consolidated statements of operations and comprehensive income. Student Loan Hero, a personal finance website dedicated to helping student loan borrowers manage their student debt, offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. This strategic transaction allows us to scale our student loan business and provide consumers with the tools and resources to better understand their personal finances and make smarter financial decisions.

On June 11, 2018, we acquired Ovation, a leading provider of credit services with a strong customer service reputation for $12.1 million in cash and potential contingent consideration payments of up to $8.75 million through June 2020, subject to achieving specified targets. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports. Ovation's experienced management team, strong credit bureau relationships and customized software platform enable us to help more consumers achieve their original financial goals through the LendingTree platform.

On September 19, 2017, we acquired certain assets of SnapCap for $11.9 million in cash at closing and contingent consideration payments of up to $9.0 million through March 31, 2020, subject to achieving specific targets. SnapCap is a tech-enabled online platform, which connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach. SnapCap's high-touch, high-conversion sales approach with our brand and performance marketing expertise has enabled growth in our small business offering.

On June 20, 2017, we acquired MagnifyMoney for $29.6 million cash consideration at the closing of the transaction. MagnifyMoney is a leading consumer-facing media property that offers editorial content, expert commentary, tools and resources to help consumers compare financial products and make informed financial decisions. The MagnifyMoney team brings the expertise and infrastructure to expand content creation and distribution across all of our consumer facing brands, improving our presence and efficacy in acquisition channels such as search engine optimization.

On June 14, 2017, we acquired substantially all of the assets of DepositAccounts for $24.0 million in cash at closing and contingent consideration payments of up to $9.0 million through June 30, 2020, subject to achieving specific targets. DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content. This acquisition represented our first offering to address the asset side of the consumer balance sheet.

On November 16, 2016, we acquired CompareCards for $80.7 million in cash at closing and contingent consideration payments of up to $22.5 million for each of 2017 and 2018, subject to achieving specific growth targets. CompareCards is a leading online source for side-by-side credit card comparison shopping. CompareCards provides consumers with one centralized location for pertinent credit card information needed to find the best card for their needs. CompareCards' unique marketing platform and strong relationships with card issuers combined with LendingTree's scale and organizational support have delivered substantial growth in our credit card business.

These acquisitions continue our diversification strategy.

**Recent Mortgage Interest Rate Trends**

Interest rate and market risks can be substantial in the mortgage lead generation business. Short-term fluctuations in mortgage interest rates primarily affect consumer demand for mortgage refinancings, while long-term fluctuations in mortgage interest rates, coupled with the U.S. real estate market, affect consumer demand for new mortgages. Consumer demand, in turn, affects lender demand for mortgage leads from third-party sources, as well as our own ability to attract online consumers to our website.

Typically, when interest rates decline, we see increased consumer demand for mortgage refinancing, which in turn leads to increased traffic to our website and decreased selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically decreases, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic mortgage lead volume. Due to lower lender demand, our revenue earned per consumer typically decreases, but with correspondingly lower selling and marketing costs.

Conversely, when interest rates increase, we typically see decreased consumer demand for mortgage refinancing, leading to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically increases, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases. Due to high lender demand, we typically see an increase in the amount lenders will pay per matched lead, which often leads to higher revenue earned per consumer. However, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue

Table of Contents

earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment. These factors combined to cause lower revenue earned per consumer for mortgage products in 2018 compared to the prior year.

We dynamically adjust selling and marketing expenditures in all interest rate environments to optimize our results against these variables.

According to Freddie Mac, 30-year mortgage interest rates declined from a monthly average of 3.87% in January 2016 to an average of 3.44% in August 2016, the lowest monthly average since January 2013. By December 2016, 30-year mortgage interest rates increased to an average of 4.20%. During 2017, 30-year mortgage interest rates then declined to a monthly average of 3.81% in September 2017, before increasing to 3.95% at the end of 2017. During 2018, 30-year mortgage interest rates generally increased to a monthly average of 4.87% in November 2018, but declined to 4.64% at the end of 2018.

On a full-year basis, 30-year mortgage interest rates increased to an average 4.54% in 2018, as compared to 3.99% and 3.65% in 2017 and 2016, respectively.



HISTORICAL MIX OF MORTGAGE ORIGINATION DOLLARS

Typically, as mortgage interest rates rise, there are fewer consumers in the marketplace seeking refinancings and, accordingly, the mix of mortgage origination dollars will move towards purchase mortgages. According to Mortgage Bankers Association ("MBA") data, total purchase origination dollars increased from 52% of total 2016 mortgage origination dollars to 65% in 2017 and 72% in 2018, as a result of the general increase in average mortgage interest rates.

Looking forward, MBA is projecting 30-year mortgage interest rates to climb in 2019, to an average 4.8% on 30-year fixed rate mortgages. According to MBA projections, as interest rates climb, the mix of mortgage origination dollars will continue to move towards purchase mortgages with the refinance share representing just 24% for 2019.

**The U.S. Real Estate Market**

The health of the U.S. real estate market and interest rate levels are the primary drivers of consumer demand for new mortgages. Consumer demand, in turn, affects lender demand for purchase mortgage leads from third-party sources. Typically, a strong real estate market will lead to reduced lender demand for leads, as there are more consumers in the marketplace seeking financing and, accordingly, lenders receive more organic lead volume. Conversely, a weaker real estate market will typically lead to an increase in lender demand, as there are fewer consumers in the marketplace seeking mortgages.

According to the National Association of Realtors ("NAR"), nationwide existing home sales in 2016 increased approximately 3% over 2015. Growth in 2017 was approximately 2% over 2016 due to limited inventory of homes for sale in 2017. In addition to continued low inventory, rising interest rates contributed to declining home sales in 2018, resulting in nationwide existing home

6/10/2020

08-18555-mg    Doc 571-8    Filed 04/01/27    Entered 06/04/00/27    Page 237 of 18
Case 1:21-cv-02174-RF    Document 1-7    Page 23728    Exhibit
Complaint    Pg 825 of 1033

Table of Contents

sales in 2018 contracting approximately 3% from 2017. The NAR expects an increase in home sales in early 2019 as interest rates decrease from the high in late 2018, but expect an overall annual decrease of 2% compared to 2018.

**Convertible Senior Notes and Hedge and Warrant Transactions**

On May 31, 2017, we issued $300.0 million aggregate principal amount of our 0.625% Convertible Senior Notes due June 1, 2022 and, in connection therewith, entered into Convertible Note Hedge and Warrant transactions with respect to our common stock. For more information, *see* Note 13—Debt, in the notes to the consolidated financial statements included elsewhere in this report.

**North Carolina Office Properties**

In December 2016, we completed the acquisition of two office buildings in Charlotte, North Carolina, for $23.5 million in cash. The buildings were acquired with the intent to use such buildings as our corporate headquarters and rent any unused space. In November 2018, the office buildings were classified as held for sale. In February 2019, we agreed to sell these buildings to an unrelated third party. For additional information, *see* Note 7—Assets Held for Sale and Note 22—Subsequent Events in the notes to the consolidated financial statements included elsewhere in this report.

With our expansion in North Carolina, in December 2016, we received a grant from the state that provides up to $4.9 million in reimbursements over 12 years beginning in 2017 for investing in real estate and infrastructure in addition to increasing jobs in North Carolina at specific targeted levels through 2020, and maintaining the jobs thereafter. Additionally, the city of Charlotte and the county of Mecklenburg provided a grant that will be paid over five years and is based on a percentage of new property tax we pay on the development of a corporate headquarters. In December 2018, we received an additional grant from the state that provides up to $8.4 million in reimbursements over 12 years beginning in 2020 for increasing jobs in North Carolina at specific targeted levels through 2023, and maintaining the jobs thereafter.

36

Table of Contents

### Results of Operations for the Years ended December 31, 2018, 2017 and 2016

| | Year Ended December 31, | | | 2018 vs. 2017 | | 2017 vs. 2016 | |
|---|---|---|---|---|---|---|---|
| | **2018** | **2017** | **2016** | **$ Change** | **% Change** | **$ Change** | **% Change** |
| | | | *(Dollars in thousands)* | | | | |
| Mortgage products | $ 242,175 | $ 275,910 | $ 219,991 | $ (33,735) | (12)% | $ 55,919 | 25 % |
| Non-mortgage products | 522,690 | 341,826 | 164,411 | 180,864 | 53 % | 177,415 | 108 % |
| **Revenue** | **764,865** | **617,736** | **384,402** | **147,129** | **24 %** | **233,334** | **61 %** |
| Costs and expenses: | | | | | | | |
| Cost of revenue (exclusive of depreciation and amortization shown separately below) | 36,399 | 17,223 | 13,764 | 19,176 | 111 % | 3,459 | 25 % |
| Selling and marketing expense | 500,291 | 432,784 | 261,100 | 67,507 | 16 % | 171,684 | 66 % |
| General and administrative expense | 101,219 | 71,541 | 37,227 | 29,678 | 41 % | 34,314 | 92 % |
| Product development | 26,958 | 17,925 | 13,761 | 9,033 | 50 % | 4,164 | 30 % |
| Depreciation | 7,385 | 7,085 | 4,944 | 300 | 4 % | 2,141 | 43 % |
| Amortization of intangibles | 23,468 | 12,992 | 1,243 | 10,476 | 81 % | 11,749 | 945 % |
| Change in fair value of contingent consideration | 10,788 | 23,931 | — | (13,143) | (55)% | 23,931 | n/a |
| Severance | 2,352 | 404 | 122 | 1,948 | 482 % | 282 | 231 % |
| Litigation settlements and contingencies | (186) | 718 | 129 | (904) | (126)% | 589 | 457 % |
| **Total costs and expenses** | **708,674** | **584,603** | **332,290** | **124,071** | **21 %** | **252,313** | **76 %** |
| **Operating income** | **56,191** | **33,133** | **52,112** | **23,058** | **70 %** | **(18,979)** | **(36)%** |
| Other (expense) income, net: | | | | | | | |
| Interest expense, net | (12,437) | (7,028) | (561) | (5,409) | 77 % | (6,467) | 1,153 % |
| Other (expense) income | (10) | (396) | 23 | 386 | 97 % | (419) | (1,822)% |
| **Income before income taxes** | **43,744** | **25,709** | **51,574** | **18,035** | **70 %** | **(25,865)** | **(50)%** |
| Income tax benefit (expense) | 65,575 | (6,291) | (20,366) | 71,866 | 1,142 % | 14,075 | 69 % |
| **Net income from continuing operations** | **109,319** | **19,418** | **31,208** | **89,901** | **463 %** | **(11,790)** | **(38)%** |
| **Loss from discontinued operations, net of tax** | **(12,820)** | **(3,840)** | **(3,714)** | **(8,980)** | **(234)%** | **(126)** | **(3)%** |
| **Net income and comprehensive income** | **$ 96,499** | **$ 15,578** | **$ 27,494** | **$ 80,921** | **519 %** | **$ (11,916)** | **(43)%** |

#### Revenue

Revenue increased in 2018 compared to 2017 due to increases in our non-mortgage products of $180.9 million, partially offset by a decrease in our mortgage products of $33.7 million.

Our non-mortgage products include the following non-mortgage lending products: credit cards, personal loans, home equity loans and lines of credit, small business loans, student loans, reverse mortgage loans and auto loans. Our non-mortgage products also include insurance quotes, deposit accounts, home improvement referrals and other credit products such as credit repair and debt settlement. Revenue earned through resale of online advertising space to third parties is also included in non-mortgage products. Many of our non-mortgage products are not individually significant to revenue. The increase in revenue from our non-mortgage products in 2018 compared to 2017 is primarily due to an increase in our products for personal loans, insurance, credit cards, home equity, small business loans and student loans.

Revenue from our personal loan product increased $46.0 million to $134.2 million in 2018 from $88.2 million in 2017, or 52%. Revenue from our personal loan product increased in 2018 due to increased revenue earned per consumer. Additionally, the number of consumers completing request forms increased as a result of increased lender demand and corresponding increases in selling and marketing efforts.

Revenue from our credit card product increased $18.8 million to $165.8 million in 2018 from $147.0 million in 2017, or 13%. Revenue from our credit card product increased in 2018 primarily due to increases in click traffic sent to issuers, and increased revenue earned per approval.

Table of Contents

For 2018 and 2017, no other non-mortgage product represented more than 10% of revenue, however certain other non-mortgage products experienced notable increases. Revenue from our insurance product increased $31.2 million in 2018 compared to 2017, due to the QuoteWizard acquisition, completed on October 31, 2018. Revenue from our home equity product increased $16.3 million in 2018 compared to 2017, due to increases in the number of consumers completing request forms as a result of increases in lender coverage and lender demand, and corresponding increases in selling and marketing efforts, and increased revenue earned per consumer. Revenue from our small business loans product increased $16.2 million in 2018 compared to 2017, due to increases in the number of consumers seeking business loans, increases in selling and marketing efforts, and increased revenue earned per consumer, primarily due to the acquisition of SnapCap. Revenue from our student loans product increased $14.8 million in 2018 compared to 2017, due to increased consumers and increased revenue earned per consumer, partially due to the acquisition of Student Loan Hero.

We believe the market for our non-mortgage products remains under-penetrated and we believe long-term growth prospects are strong for non-mortgage products. A significant industry-wide contraction in the availability of capital for non-mortgage products would likely adversely affect our non-mortgage product revenues. We expect increases in revenue for non-mortgage products in future periods due to expected increases in many products, most notably insurance product revenue from our acquisitions of QuoteWizard and ValuePenguin.

The decrease in revenue from our mortgage products in 2018 compared to 2017 is due to a decrease in revenue from our refinance product, partially offset by an increase in revenue from our purchase product. The revenue from our refinance product decreased $39.3 million in 2018 from 2017, while the revenue from our purchase product increased $5.6 million. The decrease in revenue from our refinance product is primarily due to a decrease in the number of consumers completing request forms as a result of fewer consumers seeking refinancing in a period of rising interest rates. The increase in revenue from our purchase product is primarily due to an increase in revenue earned per consumer. In 2019, we expect a more moderate year-over-year decline in mortgage revenue.

Revenue increased in 2017 compared to 2016 due to increases in our non-mortgage products of $177.4 million and in our mortgage products of $55.9 million.

The increase in revenue from our non-mortgage products in 2017 compared to 2016 is primarily due to an increase in our credit cards, home equity, and personal loans products.

Revenue from our credit card product increased $107.6 million to $147.0 million in 2017 from $39.4 million in 2016, or 273%. Revenue from our credit card product increased in 2017 primarily due to the CompareCards acquisition, completed on November 16, 2016.

Revenue from our personal loan product increased $21.7 million to $88.2 million in 2017 from $66.5 million in 2016, or 33%. Revenue from our personal loan product increased in 2017 due to the number of consumers completing request forms as a result of increases in lender demand and corresponding increases in selling and marketing efforts, partially offset by decreases in revenue earned per consumer. Certain of our online personal loan lenders experienced well-publicized challenges in 2016, in particular, general unavailability of capital and increased pricing demanded by investors of personal loans, which in some cases led to reductions in marketing spend, and tightening in underwriting standards.

For 2017 and 2016, no other non-mortgage product represented more than 10% of revenue, however certain other non-mortgage products experienced notable increases. Revenue from our home equity product increased $28.3 million in 2017 compared to 2016, due to increases in the number of consumers completing request forms as a result of increases in lender coverage and lender demand, corresponding increases in selling and marketing efforts, and increased revenue earned per consumer.

The increase in revenue from our mortgage products in 2017 compared to 2016 is due to an increase in revenue from both our purchase and refinance products. The revenue from our purchase product increased $33.6 million in 2017 from 2016, while the revenue from our refinance product increased $22.4 million. The increase in revenue from our mortgage products is primarily due to an increase in revenue earned per consumer. Additionally, the number of consumers completing request forms for mortgage products increased in 2017 from 2016, due to an increase in lender demand and a corresponding increase in selling and marketing efforts.

**Cost of revenue**

Cost of revenue consists primarily of costs associated with compensation and other employee-related costs (including stock-based compensation) relating to internally-operated customer call centers, third-party customer call center fees, costs for online advertising resold to third parties, credit scoring fees, credit card fees, website network hosting and server fees.

38

Table of Contents

Cost of revenue increased in 2018 from 2017, primarily due to increases of $8.8 million for the cost of resold advertising space, $6.3 million in compensation and benefits as a result of increases in headcount, $2.1 million in credit scoring fees and $1.2 million in website network hosting and server fees.

Cost of revenue as a percentage of revenue increased to 5% in 2018 compared to 3% in 2017 due to the items above.

Cost of revenue increased in 2017 from 2016, primarily due to increases of $2.1 million in compensation and benefits as a result of increases in headcount, $0.9 million in website network hosting and server fees and $0.8 million in third-party customer call center fees, partially offset by a $0.7 million decrease in credit scoring fees.

Cost of revenue as a percentage of revenue decreased slightly to 3% in 2017 compared to 4% in 2016 due to the items above.

We expect increases in cost of revenue in future periods due to our acquisition of QuoteWizard.

**Selling and marketing expense**

Selling and marketing expense consists primarily of advertising and promotional expenditures and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in sales or marketing functions. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

The increases in selling and marketing expense in 2018 compared to 2017 and in 2017 compared to 2016 were primarily due to increases in advertising and promotional expense of $59.2 million and $167.6 million, respectively, as discussed below. In addition, selling and marketing expense increased in 2018 compared to 2017 and in 2017 compared to 2016 due to an increase in compensation and benefits of $8.3 million and $4.1 million, respectively, as a result of increases in headcount.

Advertising and promotional expense is the largest component of selling and marketing expense, and is comprised of the following:

| | Year Ended December 31, | | | 2018 vs. 2017 | | 2017 vs. 2016 | |
| | 2018 | 2017 | 2016 | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | *(Dollars in thousands)* | | | | | | |
| Online | $ 453,066 | $ 368,004 | $ 210,635 | $ 85,062 | 23 % | $ 157,369 | 75% |
| Broadcast | 5,974 | 35,681 | 28,455 | (29,707) | (83)% | 7,226 | 25% |
| Other | 10,908 | 7,098 | 4,131 | 3,810 | 54 % | 2,967 | 72% |
| **Total advertising expense** | **$ 469,948** | **$ 410,783** | **$ 243,221** | **$ 59,165** | **14 %** | **$ 167,562** | **69%** |

Revenue is primarily driven by Network Partner demand for our products, which is matched to corresponding consumer requests. We adjust our selling and marketing expenditures dynamically in relation to anticipated revenue opportunities in order to ensure sufficient consumer inquiries to profitably meet such demand. An increase in a product's revenue is generally met by a corresponding increase in marketing spend, and conversely a decrease in a product's revenue is generally met by a corresponding decrease in marketing spend. This relationship exists for both mortgage and non-mortgage products.

We increased our advertising expenditures in 2018 compared to 2017 and in 2017 compared to 2016, in order to generate additional consumer inquiries to meet the increased demand of Network Partners on our marketplace. We will continue to adjust selling and marketing expenditures dynamically in relation to anticipated revenue opportunities.

We expect increases in selling and marketing expense in future periods due to our acquisition of QuoteWizard.

**General and administrative expense**

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, corporate information technology, human resources and executive management functions, as well as facilities and infrastructure costs and fees for professional services.

General and administrative expense increased in 2018 compared to 2017, primarily due to increases in compensation and benefits of $26.3 million as a result of increases in headcount and long-term equity awards granted to our Chairman and Chief Executive Officer in the third quarter of 2017 and in the first quarter of 2018, which awards have both time and significant performance-based vesting conditions. We also granted long-term equity awards to certain members of our leadership team in the fourth quarter of 2017

and in the first quarter of 2018. For additional information regarding the awards granted to our Chairman and Chief Executive Officer, *see* Note 11—Stock-Based Compensation in the notes to the consolidated financial statements

39

included elsewhere in this report. Non-cash compensation expense is excluded from Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA"), as discussed below. In addition, the results of operations for 2018 includes a charge of $1.6 million due to the write-off of certain fixed assets.

General and administrative expense as a percentage of revenue increased to 13% in 2018 compared to 12% in 2017 due to the items above.

General and administrative expense increased in 2017 compared to 2016, primarily due to increases in compensation and benefits of $19.4 million as a result of increases in headcount, the long-term equity awards granted to our Chairman and Chief Executive Officer in the third quarter of 2017, and the long-term equity awards granted to certain members of our leadership team in the fourth quarter of 2017.

Included in general and administrative expense in 2017 was a $10.0 million charitable contribution to fund the newly formed LendingTree Foundation in the fourth quarter of 2017. This one-time item is excluded from Adjusted EBITDA, as discussed below.

General and administrative expense as a percentage of revenue increased to 12% in 2017 compared to 10% in 2016 due to the items above.

We expect increases in general and administrative expense in future periods due to our acquisitions of QuoteWizard and ValuePenguin.

### Product development

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) and third-party labor costs that are not capitalized, for employees and consultants engaged in the design, development, testing and enhancement of technology.

Product development expense increased in 2018 compared to 2017 and in 2017 compared to 2016, as we continued to invest in internal development of new and enhanced features, functionality and business opportunities that we believe will enable us to better and more fully serve consumers and lenders.

We expect increases in product development expense in future periods due to our acquisition of QuoteWizard.

### Depreciation

The increases in depreciation expense in 2018 compared to 2017 and in 2017 compared to 2016 were primarily the result of higher investment in internally developed software in recent years, to support the growth of our business.

### Amortization of intangibles

The increases in amortization of intangibles in 2018 compared to 2017 and in 2017 compared to 2016 were primarily due to intangible assets associated with our business acquisitions in 2018, 2017 and 2016.

We expect increases in amortization of intangibles in future periods due to our acquisitions of QuoteWizard and ValuePenguin.

### Contingent consideration

During 2018, we recorded an aggregate of $10.8 million of contingent consideration expense due to adjustments in the estimated fair value of the earnout payments related to our recent acquisitions. For 2018, the contingent consideration expense for the CompareCards acquisition, the DepositAccounts acquisition, the Ovation acquisition and the QuoteWizard acquisition was $0.7 million, $2.0 million, $1.6 million and $6.8 million, respectively. This was partially offset by a contingent consideration gain for the SnapCap acquisition of $0.3 million.

During 2017, we recorded an aggregate of $23.9 million of contingent consideration expense due to adjustments in the estimated fair value of the earnout payments related to our recent acquisitions. For 2017, the contingent consideration expense for the CompareCards acquisition, the DepositAccounts acquisition and the SnapCap acquisition was $21.2 million, $2.0 million and $0.7 million, respectively.

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm                                                                    63/159

Table of Contents

**Income tax expense**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | *(in thousands, except percentages)* | | |
| Income tax (expense) benefit | $ 65,575 | $ (6,291) | $ (20,366) |
| *Effective tax rate* | *(149.9)%* | *24.5%* | *39.5%* |

For 2018, the effective tax rate varied from the federal statutory rate of 21% primarily due to the benefit derived from excess tax deductions from the vesting of restricted stock and exercise of stock options of $77.6 million, including state taxes.

For 2017, the effective tax rate varied from the federal statutory rate of 35% primarily due to the benefit derived from excess tax deductions from the vesting of restricted stock and exercise of stock options of $12.9 million, including state taxes, and the federal tax research credit. Additionally, during the fourth quarter of 2017, a net tax expense of $9.1 million was recorded related to the enactment of the Tax Cuts and Jobs Act ("TCJA"). The expense was primarily related to the remeasurement of deferred tax assets and liabilities considering the TCJA's newly enacted tax rates and certain other impacts.

For 2016, the effective tax rate varied from the federal statutory rate of 35% primarily due to the benefit derived from the federal research tax credit, partially offset by state taxes, including the impact of a reduction in the North Carolina state income tax rate which reduced the value of our deferred tax assets. The federal research tax credit benefit is the result of a study completed during the second quarter for the open tax years of 2011 through 2015, plus an estimate of the benefit from current research activities.

### Discontinued Operations

On June 6, 2012, we sold substantially all of the operating assets of our LendingTree Loans business for approximately $55.9 million in cash to a wholly-owned subsidiary of Discover Financial Services ("Discover").

Discover generally did not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets Discover acquired. Of the purchase price received, a portion was deposited in escrow in accordance with the agreement with Discover for certain loan loss obligations that remain with us following the sale. During the second quarter of 2018, the remaining funds in escrow were released to us in accordance with the terms of the agreement with Discover.

During 2018, 2017 and 2016, loss from discontinued operations of $12.8 million, $3.8 million and $3.7 million, respectively, was attributable to the LendingTree Loans business. In 2018, loss from discontinued operations was primarily due to legal fees and litigation contingencies incurred in the Residential Funding Company, LLC v Home Loan Center, Inc. matter. In 2017 and 2016, loss from discontinued operations was primarily due to litigation settlements and contingencies and legal fees associated with ongoing legal proceedings, primarily for the above matter. For more information, *see* Note 15—Contingencies, in the notes to the consolidated financial statements included elsewhere in this report, and Item 1A. Risk Factors - Litigation and indemnification of secondary market purchasers, including a pending case brought by Residential Funding Company, LLC, could have a material and adverse effect on our business, financial condition, results of operations and liquidity.

### Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization

We report Adjusted EBITDA as a supplemental measure to GAAP. This measure is the primary metric by which we evaluate the performance of our businesses, on which our marketing expenditures and internal budgets are based and by which management and many employees are compensated. We believe that investors should have access to the same set of tools that we use in analyzing our results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. We provide and encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measures discussed below.

#### Definition of Adjusted EBITDA

We report Adjusted EBITDA as net income from continuing operations adjusted to exclude interest, income tax, amortization of intangibles and depreciation, and to further exclude (1) non-cash compensation expense, (2) non-cash impairment charges, (3) gain/loss on disposal of assets, (4) restructuring and severance expenses, (5) litigation settlements and contingencies and legal fees for certain patent litigation, (6) acquisitions and dispositions income or expense (including with respect to changes in fair value of contingent

consideration), and (7) one-time items. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our statement of operations of certain expenses, including depreciation, non-cash compensation and

41

Table of Contents

acquisition-related accounting. We endeavor to compensate for the limitations of the non-GAAP measures presented by also providing the comparable GAAP measures with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measures. These non-GAAP measures may not be comparable to similarly titled measures used by other companies.

*One-Time Items*

Adjusted EBITDA is adjusted for one-time items, if applicable. Items are considered one-time in nature if they are non-recurring, infrequent or unusual and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented in this report, there are no adjustments for one-time items, except for a $10.0 million contribution to fund the LendingTree Foundation in 2017.

*Non-Cash Expenses that are Excluded from Adjusted EBITDA*

Non-cash compensation expense consists principally of expense associated with grants of restricted stock, restricted stock units and stock options, some of which awards have performance-based vesting conditions. These expenses are not paid in cash, and we include the related shares in our calculations of fully diluted shares outstanding. Upon settlement of restricted stock units, exercise of certain stock options or vesting of restricted stock awards, the awards may be settled, on a net basis, with us remitting the required tax withholding amount from our current funds.

Amortization of intangibles are non-cash expenses relating primarily to intangible assets acquired through acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives.

The following table is a reconciliation of net income from continuing operations to Adjusted EBITDA.

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| | | *(in thousands)* | | | | |
| **Net income from continuing operations** | $ | **109,319** | $ | **19,418** | $ | **31,208** |
| Adjustments to reconcile to Adjusted EBITDA: | | | | | | |
| Amortization of intangibles | | 23,468 | | 12,992 | | 1,243 |
| Depreciation | | 7,385 | | 7,085 | | 4,944 |
| Severance | | 2,352 | | 404 | | 122 |
| Loss on impairments and disposal of fixed assets | | 2,210 | | 839 | | 640 |
| Non-cash compensation | | 44,365 | | 23,361 | | 9,647 |
| Contribution to LendingTree Foundation | | — | | 10,000 | | — |
| Change in fair value of contingent consideration | | 10,788 | | 23,931 | | — |
| Acquisition expense | | 6,303 | | 1,595 | | 959 |
| Litigation settlements and contingencies | | (186) | | 718 | | 129 |
| Interest expense, net | | 12,437 | | 7,028 | | 561 |
| Rental amortization of intangibles and depreciation | | 630 | | 1,475 | | — |
| Income tax (benefit) expense | | (65,575) | | 6,291 | | 20,366 |
| **Adjusted EBITDA** | $ | **153,496** | $ | **115,137** | $ | **69,819** |

## Financial Position, Liquidity and Capital Resources

### General

As of December 31, 2018, we had $105.1 million of cash and cash equivalents and $0.1 million of restricted cash and cash equivalents, compared to $368.6 million of cash and cash equivalents and $4.1 million of restricted cash and cash equivalents as of December 31, 2017.

Notable transactions affecting cash and cash equivalents during the reported periods are as follows:

Table of Contents

**Recent Developments**

In January 2019, we acquired ValuePenguin for $105.0 million in cash at closing of the transaction, subject to adjustments for working capital. The acquisition was funded through $90.0 million drawn on our Revolving Credit Facility (defined below) and the balance using cash on hand.

**2018**

In 2018, we purchased an aggregate of 379,449 shares of our common stock pursuant to a stock repurchase program for $92.6 million. Additionally, we paid $1.1 million in the first quarter of 2018 related to common stock repurchases in the fourth quarter of 2017.

In October 2018, we acquired QuoteWizard for $299.9 million in cash at closing of the transaction, subject to post-closing adjustments to working capital, and potential future contingent consideration payments up to $70.2 million through October 2021, subject to achieving specific targets. The acquisition was funded through $174.9 million of cash on hand and by $125.0 million drawn on our Revolving Credit Facility.

In July 2018, we acquired Student Loan Hero for $62.7 million in cash.

In June 2018, we acquired Ovation for $12.1 million in cash at closing and could make potential future contingent consideration payments of up to $8.75 million through June 2020, subject to achieving specified targets.

**2017**

In May 2017, we issued $300.0 million of our 0.625% Convertible Senior Notes for net proceeds of $290.7 million. We used approximately $18.1 million of the net proceeds to enter into Convertible Note Hedge and Warrant transactions.

In 2017, we purchased an aggregate of 75,393 shares of our common stock pursuant to a stock repurchase program for $21.0 million, of which we paid $19.9 million prior to year-end.

In September 2017, we acquired certain assets of SnapCap for $11.9 million in cash at closing and potential future contingent consideration payments of up to $9.0 million through March 31, 2020, subject to achieving specific targets. We made a contingent consideration payment of $3.0 million in January 2019.

In June 2017, we acquired the membership interests of MagnifyMoney for $29.6 million cash consideration at the closing of the transaction.

In June 2017, we acquired substantially all of the assets of DepositAccounts for $24.0 million in cash at closing and potential future contingent consideration payments of up to $9.0 million through June 30, 2020, subject to achieving specified targets. We made contingent consideration payments of $4.0 million and $1.0 million in 2018 and 2017, respectively. In January 2019, we made a payment of $1.0 million, which will be included within cash flows from operating activities on the consolidated statement of cash flows for the first quarter of 2019.

**2016**

In 2016, we purchased an aggregate of 690,218 shares of our common stock pursuant to a stock repurchase program for $48.5 million.

In December 2016, we acquired two office buildings in Charlotte, North Carolina for $23.5 million in cash. In November 2018 the office buildings were classified as held for sale. *See* Item 2. Properties and Item 9B. Other Information for further information.

In November 2016, we acquired CompareCards for $80.7 million in cash at closing and potential future contingent consideration payments of up to $22.5 million for each of 2017 and 2018, subject to achieving specified targets. We made the initial $22.5 million earnout payment in the first quarter of 2018 and paid the remaining $22.5 million earnout in the second quarter of 2018, of which $21.9 million is included within cash flows from operating activities on the consolidated statement of cash flows for 2018.

We expect our cash and cash equivalents and cash flows from operations to be sufficient to fund our operating needs for the next twelve months and beyond. Our Revolving Credit Facility described below is an additional potential source of liquidity.

**Senior Secured Revolving Credit Facility**

On October 26, 2018, we amended our five-year senior secured revolving credit facility which matures on November 21, 2022 (the "Revolving Credit Facility") to increase its borrowing capacity by $100.0 million to $350.0 million. Borrowings under the Revolving Credit Facility can be used to finance working capital needs, capital expenditures and general corporate purposes,

Table of Contents

including to finance permitted acquisitions. As of February 28, 2019, we have $195.0 million of borrowings under the Revolving Credit Facility.

For additional information on the Revolving Credit Facility, *see* Note 13—Debt in the notes to the consolidated financial statements included elsewhere in this report.

**Cash Flows from Continuing Operations**

Our cash flows attributable to continuing operations are as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
|  | *(in thousands)* | | |
| Net cash provided by operating activities | $ 123,948 | $ 103,538 | $ 64,214 |
| Net cash used in investing activities | (383,038) | (74,435) | (119,667) |
| Net cash provided by (used in) financing activities | 4,843 | 253,125 | (52,640) |

*Cash Flows from Operating Activities*

Our largest source of cash provided by our operating activities is revenues generated by our mortgage and non-mortgage products. Our primary uses of cash from our operating activities include advertising and promotional payments. In addition, our uses of cash from operating activities include compensation and other employee-related costs, other general corporate expenditures, litigation settlements and contingencies, certain contingent consideration payments, and income taxes.

Net cash provided by operating activities attributable to continuing operations increased in 2018 from 2017 primarily due to an increase in revenue, partially offset by an increase in selling and marketing expense, and the $21.9 million portion of the CompareCards earnout payment made in the second quarter of 2018 in excess of the contingent consideration liability recognized at the acquisition date. Additionally, there was a net decrease in cash from changes in working capital primarily driven by changes in accounts payable, accrued expenses and other current liabilities and accounts receivable, partially offset by changes in income taxes receivable and prepaids and other current assets.

Net cash provided by operating activities attributable to continuing operations increased in 2017 from 2016 primarily due to an increase in revenue, partially offset by an increase in selling and marketing expense. Additionally, there was a net increase in cash from changes in working capital primarily driven by changes in accounts payable, accrued expenses and other liabilities, partially offset by changes in prepaids and income taxes receivable.

*Cash Flows from Investing Activities*

Net cash used in investing activities attributable to continuing operations in 2018 of $383.0 million consisted primarily of the acquisition of QuoteWizard for $297.1 million, the acquisition of Student Loan Hero for $59.5 million, the acquisition of Ovation for $11.6 million, and capital expenditures of $14.9 million.

Net cash used in investing activities attributable to continuing operations in 2017 of $74.4 million consisted primarily of the acquisition of SnapCap for $11.9 million, the acquisition of DepositAccounts for $25.0 million, the acquisition of MagnifyMoney for $29.5 million and capital expenditures of $8.0 million.

Net cash used in investing activities attributable to continuing operations in 2016 of $119.7 million consisted primarily of the acquisition of CompareCards for $81.2 million, the acquisition of SimpleTuition for $4.5 million, the acquisition of two office buildings in Charlotte, North Carolina for $23.4 million and $10.6 million related to internally developed software and the acquisition of an aircraft.

*Cash Flows from Financing Activities*

Net cash provided by financing activities attributable to continuing operations in 2018 of $4.8 million consisted primarily of $125.0 million of net proceeds from our Revolving Credit Facility, partially offset by $27.6 million of contingent consideration payments for CompareCards, DepositAccounts and SimpleTuition, and $93.7 million for the repurchase of our stock.

Net cash provided by financing activities attributable to continuing operations in 2017 of $253.1 million consisted primarily of $300.0 million of gross proceeds from the issuance of our 0.625% Convertible Senior Notes and $43.4 million of proceeds from the sale of Warrants in connection with our 0.625% Convertible Senior Notes, partially offset by $61.5 million for the payment

Table of Contents

of Convertible Note Hedge transactions, $10.5 million for the payment of debt issuance costs and Revolving Credit Facility issuance costs and $19.9 million for the repurchase of our stock.

Net cash used in financing activities attributable to continuing operations in 2016 of $52.6 million consisted primarily of the repurchase of our stock of $48.5 million and $4.1 million in withholding taxes paid by us upon surrender of shares to satisfy obligations on equity awards.

### Off-Balance Sheet Arrangements

We have no off-balance sheet arrangements other than our operating lease obligations and funding commitments pursuant to our surety bonds, none of which have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. See Note 14—Commitments to the consolidated financial statements included elsewhere in the report for further details.

### Summary of Contractual Obligations

The following table sets forth our contractual obligations and commercial commitments as of December 31, 2018.

| Contractual Obligations [a] | Total | Payments Due By Period as of December 31, 2018 | | | |
| | | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| --- | --- | --- | --- | --- | --- |
| Operating lease obligations [b] | $ 9,652 | $ 4,406 | $ 4,282 | $ 964 | $ — |
| Long-term contractual obligations [c] | 56,563 | 25,908 | 27,125 | 3,530 | — |
| Convertible debt | 300,000 | — | — | 300,000 | — |
| **Total contractual obligations** | $ 366,215 | $ 30,314 | $ 31,407 | $ 304,494 | $ — |

(a)  Excludes potential obligations under surety bonds and the indemnification obligations, repurchase obligations and premium repayment obligations for which our HLC subsidiary continues to be liable following the sale of substantially all of the operating assets of our LendingTree Loans business in the second quarter of 2012. Excludes a $1.2 million accrual related to uncertain tax position, as we are unable to determine when, or if, payments for these taxes will ultimately be made.

(b)  Our operating lease obligations are associated with office space.

(c)  Includes a liability of $38.8 million for the estimated fair value of contingent consideration obligations reflected on the balance sheet for the acquisition of DepositAccounts, SnapCap, Ovation and QuoteWizard. Actual contingent consideration payments could range from $3.0 million to $4.0 million for DepositAccounts, $3.0 million to $9.0 million for SnapCap, zero to $8.75 million for Ovation and zero to $70.2 million for QuoteWizard. Also includes $17.7 million of certain other commitments.

### Critical Accounting Policies and Estimates

The following disclosure is provided to supplement the description of our accounting policies contained in Note 2—Significant Accounting Policies to the consolidated financial statements included elsewhere in this report in regard to significant areas of judgment. This disclosure includes accounting policies related to both continuing operations and discontinued operations. Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated financial statements than others. A discussion of some of our more significant accounting policies and estimates follows.

### Loan Loss Obligations

We make estimates as to our exposure related to our obligation to repurchase loans previously sold to investors or to repay premiums paid by investors in purchasing loans, and reserve for such contingencies accordingly. Such payments to investors may be required in cases where underwriting deficiencies, borrower fraud and documentation defects occurred.

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm                71/159

Table of Contents

Our HLC subsidiary continues to be liable for certain indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business on June 6, 2012. We have been negotiating with certain secondary market purchasers to settle any existing and future contingent liabilities, but we may not be able to complete such negotiations on acceptable terms, or at all. Because we do not service the loans LendingTree Loans sold, we do not maintain nor have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, we are unable to determine, with precision, our maximum exposure for breaches of the representations and warranties LendingTree Loans made to the investors that purchased such loans.

We estimate the liability for loan losses using a settlement discount framework. This approach estimates the lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. We then apply a settlement discount factor to the result of the foregoing to reflect publicly- announced bulk settlements for similar loan types and vintages, our own settlement experience, as well as LendingTree Loans' non-operating status, in order to estimate a range of the potential obligation. Changes to any one of these factors could significantly impact the estimate of the liability and could have a material and adverse impact on our results of operations for any particular period.

We have considered both objective and subjective factors in our estimation process, but given current general industry trends in mortgage loans as well as housing prices, market expectations and actual losses related to LendingTree Loans' obligations could vary significantly from the obligation recorded as of December 31, 2018 of $7.6 million or the range of remaining loan losses of $4.3 million to $7.9 million. *See* Note 19—Discontinued Operations—LendingTree Loans—Loan Loss Obligations to the consolidated financial statements included elsewhere in this report for additional information on the loan loss reserve.

## Income Taxes

Estimates of deferred income taxes and the significant items giving rise to the deferred assets and liabilities are shown in Note 12 —Income Taxes to the consolidated financial statements included elsewhere in this report, and reflect management's assessment of actual future taxes to be paid on items reflected in the consolidated financial statements, giving consideration to both timing and the probability of realization. Actual income taxes could vary from these estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the IRS, as well as actual operating results that may vary significantly from anticipated results.

We also recognize liabilities for uncertain tax positions based on the two-step process prescribed by the accounting guidance for uncertainty in income taxes. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon ultimate settlement. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes.

A valuation allowance is provided on deferred tax assets if it is determined that it is *"more likely than not"* that the deferred tax asset will not be realized. At December 31, 2018, 2017 and 2016, we recorded a partial valuation allowance of $2.2 million, $2.7 million and $2.1 million, respectively, primarily related to state net operating losses, which we do not expect to be able to utilize prior to expiration.

## Stock-Based Compensation

The forms of stock-based awards granted to our employees are principally restricted stock units ("RSUs"), RSUs with performance conditions, restricted stock, stock options and stock options with performance conditions. Further, performance-based stock options with market conditions and time-vested restricted stock with a performance condition have been granted to our Chairman and Chief Executive Officer. The value of RSU and restricted stock awards is measured at their grant dates as the fair value of common stock and amortized ratably as non-cash compensation expense over the vesting term. The value of stock options issued is estimated using a Black-Scholes option pricing model. The value of performance-based awards is measured at their grant dates and recognized as non-cash compensation expense, considering the probability of the targets being achieved. Performance-based awards with a market condition are valued using a Monte Carlo simulation model. If an award is modified, we determine if the modification requires a new calculation of fair value or change in the vesting term of the award. *See* Note 11—Stock-Based Compensation to the consolidated financial statements included elsewhere in this report for additional information on assumptions and inputs to the fair value determination of stock-based awards.

46

Table of Contents

**Evaluation of Goodwill and Indefinite-Lived Intangible Assets Impairment**

We test goodwill and indefinite-lived intangible assets, consisting of certain trade names and trademarks, annually for impairment as of October 1, or more frequently upon the occurrence of certain events or substantive changes in circumstances. As part of our annual impairment testing of goodwill and indefinite-lived intangible assets, in each instance, we may elect to assess qualitative factors as a basis for determining whether it is necessary to perform the traditional quantitative impairment testing. If our assessment of these qualitative factors indicates that it is not more likely than not that the fair value of the reporting unit or indefinite-lived intangible asset is less than its carrying value, then no further testing is required. Otherwise, the goodwill reporting unit or long-lived intangible assets, as applicable, must be quantitatively tested for impairment.

The quantitative test for goodwill impairment is determined using a two-step process. Performing the first step to compare reporting unit fair value with its carrying value using a discounted cash flow ("DCF") analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill (determined in the same manner as the amount of goodwill recognized in a business combination) with the carrying amount of that goodwill. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The quantitative impairment test for indefinite-lived intangible assets involves a DCF valuation analysis that employs a relief-from-royalty methodology in estimating the fair value of trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates, perpetual growth rates and the amount and timing of future revenues. If the carrying value of the indefinite-lived intangible asset exceeds its estimated fair value, an impairment loss is recognized in an amount equal to that excess.

The value of goodwill and indefinite-lived intangible assets subject to assessment for impairment at December 31, 2018 is $348.3 million and $10.1 million, respectively.

**Recoverability of Long-Lived Assets**

We review the carrying value of all long-lived assets, primarily property and equipment, and definite-lived intangible assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may be impaired. Impairment is considered to have occurred whenever the carrying value of a long-lived asset cannot be recovered from cash flows that are expected to result from the use and eventual disposition of the asset. This recoverability test requires us to make assumptions and judgments related to factors used in a calculation of undiscounted cash flows, including, but not limited to, management's expectations for future operations and projected cash flows. The key assumptions used in this calculation include Adjusted EBITDA, the remaining useful lives of the primary cash flow generating asset in the asset group and, to a lesser extent, the deduction of capital expenditures and taxes paid in cash to arrive at net cash flows.

The value of long-lived assets subject to assessment for impairment is $218.7 million at December 31, 2018.

**Business Acquisitions**

When we acquire businesses, we allocate the purchase price to tangible assets and liabilities and identifiable intangible assets acquired at their acquisition date fair values. Any residual purchase price is recorded as goodwill. We also estimate the fair value of any contingent consideration using Level 3 unobservable inputs. Our estimates of fair value are based upon assumptions believed to be reasonable but which are uncertain and involve significant judgments by management.

We reassess the fair value of contingent consideration quarterly until the contingency is resolved, and changes in the fair value are recorded in operating income in the consolidated statements of operations and comprehensive income.

**New Accounting Pronouncements**

*See* Note 2—Significant Accounting Policies to the consolidated financial statements included elsewhere in this report for a description of recent accounting pronouncements.

**ITEM 7A.   *Quantitative and Qualitative Disclosures about Market Risk***

Other than our Revolving Credit Facility, we do not have any financial instruments that are exposed to significant market risk. We maintain our cash and cash equivalents in bank deposits and short-term, highly liquid money market investments. A hypothetical 100-

basis point increase or decrease in market interest rates would not have a material impact on the fair value of our cash equivalents securities, or our earnings on such cash equivalents, but would have an effect on the interest paid on borrowings

47

Table of Contents

under the Revolving Credit Facility, if any. As of February 28, 2019, there was $195.0 million borrowed under the Revolving Credit Facility. Increases in the Federal Funds interest rates may also affect contingent consideration payable to DepositAccounts. *See* Note 8 - Business Acquisition - 2017 Acquisitions - DepositAccounts.

Fluctuations in interest rates affect consumer demand for new mortgages and the level of refinancing activity which, in turn, affects lender demand for mortgage leads. Typically, when interest rates decline, we see increased consumer demand for mortgage refinancing, which in turn leads to increased traffic to our website and decreased selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically decreases, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic lead volume. Due to lower lender demand, our revenue earned per consumer typically decreases but with correspondingly lower selling and marketing costs. Conversely, when interest rates increase, we typically see decreased consumer demand for mortgage refinancing, leading to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically increases, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases. Due to high lender demand, we typically see an increase in the amount lenders will pay per matched lead, which often leads to higher revenue earned per consumer. However, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment.

48

Table of Contents

**ITEM 8.**  *Financial Statements and Supplementary Data*

<div align="center">

**INDEX TO FINANCIAL STATEMENTS**

</div>

| | Page Number |
|---|---|
| LENDINGTREE, INC. AND SUBSIDIARIES: | |
| *Report of Independent Registered Public Accounting Firm* | 50 |
| | |
| CONSOLIDATED FINANCIAL STATEMENTS: | |
| *Consolidated Statements of Operations and Comprehensive Income* | 52 |
| *Consolidated Balance Sheets* | 53 |
| *Consolidated Statements of Shareholders' Equity* | 54 |
| *Consolidated Statements of Cash Flows* | 55 |
| *Notes to Consolidated Financial Statements* | 56 |

<div align="center">

49

</div>

Table of Contents

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of LendingTree, Inc.

#### Opinions on the Financial Statements and Internal Control over Financial Reporting

We have audited the accompanying consolidated balance sheets of LendingTree, Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations and comprehensive income, of shareholders' equity and of cash flows for each of the three years in the period ended December 31, 2018, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

#### Basis for Opinions

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Management's Report on Internal Control over Financial Reporting, management has excluded certain elements of the internal control over financial reporting of QuoteWizard.com, LLC from its assessment of internal control over financial reporting as of December 31, 2018 because it was acquired by the Company in a purchase business combination during 2018. Subsequent to the acquisition, certain elements of QuoteWizard.com, LLC's internal control over financial reporting and related processes were integrated into the Company's existing systems and internal control over financial reporting. Those controls that were not integrated have been excluded from management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2018. We have also excluded these elements of the internal control over financial reporting of QuoteWizard.com, LLC from our audit of the Company's internal control over financial reporting. The excluded elements represent controls over approximately 3% of consolidated assets and 4% of the consolidated revenues.

#### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting

principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain

50

Table of Contents

to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

Charlotte, North Carolina
February 28, 2019

We have served as the Company's auditor since 2012.

Table of Contents

### LENDINGTREE, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| | *(in thousands, except per share amounts)* | | |
| Revenue | $ 764,865 | $ 617,736 | $ 384,402 |
| Costs and expenses: | | | |
| Cost of revenue *(exclusive of depreciation and amortization shown separately below)* | 36,399 | 17,223 | 13,764 |
| Selling and marketing expense | 500,291 | 432,784 | 261,100 |
| General and administrative expense | 101,219 | 71,541 | 37,227 |
| Product development | 26,958 | 17,925 | 13,761 |
| Depreciation | 7,385 | 7,085 | 4,944 |
| Amortization of intangibles | 23,468 | 12,992 | 1,243 |
| Change in fair value of contingent consideration | 10,788 | 23,931 | — |
| Severance | 2,352 | 404 | 122 |
| Litigation settlements and contingencies | (186) | 718 | 129 |
| Total costs and expenses | 708,674 | 584,603 | 332,290 |
| Operating income | 56,191 | 33,133 | 52,112 |
| Other (expense) income, net: | | | |
| Interest expense, net | (12,437) | (7,028) | (561) |
| Other (expense) income | (10) | (396) | 23 |
| Income before income taxes | 43,744 | 25,709 | 51,574 |
| Income tax benefit (expense) | 65,575 | (6,291) | (20,366) |
| Net income from continuing operations | 109,319 | 19,418 | 31,208 |
| Loss from discontinued operations, net of tax | (12,820) | (3,840) | (3,714) |
| Net income and comprehensive income | $ 96,499 | $ 15,578 | $ 27,494 |
| | | | |
| Weighted average shares outstanding: | | | |
| Basic | 12,504 | 11,945 | 11,812 |
| Diluted | 14,097 | 13,682 | 12,773 |
| Income per share from continuing operations: | | | |
| Basic | $ 8.74 | $ 1.63 | $ 2.64 |
| Diluted | $ 7.75 | $ 1.42 | $ 2.44 |
| Loss per share from discontinued operations: | | | |
| Basic | $ (1.03) | $ (0.32) | $ (0.31) |
| Diluted | $ (0.91) | $ (0.28) | $ (0.29) |
| Net income per share: | | | |
| Basic | $ 7.72 | $ 1.30 | $ 2.33 |
| Diluted | $ 6.85 | $ 1.14 | $ 2.15 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

52

Table of Contents

# LENDINGTREE, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

| | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| | *(in thousands, except par value and share amounts)* | | | |
| **ASSETS:** | | | | |
| Cash and cash equivalents | $ | 105,102 | $ | 368,550 |
| Restricted cash and cash equivalents | | 56 | | 4,091 |
| Accounts receivable (net of allowance of $1,143 and $675, respectively) | | 91,072 | | 53,444 |
| Prepaid and other current assets | | 16,428 | | 11,881 |
| Assets held for sale | | 21,328 | | — |
| Current assets of discontinued operations | | 185 | | 75 |
| **Total current assets** | | **234,171** | | **438,041** |
| Property and equipment (net of accumulated depreciation of $13,887 and $13,043, respectively) | | 23,175 | | 36,431 |
| Goodwill | | 348,347 | | 113,368 |
| Intangible assets, net | | 205,699 | | 81,125 |
| Deferred income tax assets | | 79,289 | | 20,156 |
| Other non-current assets | | 2,168 | | 1,910 |
| Non-current assets of discontinued operations | | 3,266 | | 2,428 |
| **Total assets** | $ | **896,115** | $ | **693,459** |
| | | | | |
| **LIABILITIES:** | | | | |
| Revolving credit facility | $ | 125,000 | $ | — |
| Accounts payable, trade | | 15,074 | | 9,250 |
| Accrued expenses and other current liabilities | | 93,190 | | 77,183 |
| Current contingent consideration | | 11,080 | | 46,576 |
| Current liabilities of discontinued operations (Note 19) | | 17,609 | | 14,507 |
| **Total current liabilities** | | **261,953** | | **147,516** |
| Long-term debt, net of current portion | | 250,943 | | 238,199 |
| Non-current contingent consideration | | 27,757 | | 11,273 |
| Other non-current liabilities | | 8,360 | | 1,597 |
| Deferred income tax liabilities | | 894 | | — |
| **Total liabilities** | | **549,907** | | **398,585** |
| Commitments and contingencies (Notes 14 and 15) | | | | |
| **SHAREHOLDERS' EQUITY:** | | | | |
| Preferred stock $.01 par value; 5,000,000 shares authorized; none issued or outstanding | | — | | — |
| Common stock $.01 par value; 50,000,000 shares authorized; 15,428,351 and 14,218,572 shares issued, respectively, and 12,809,764 and 11,979,434 shares outstanding, respectively | | 154 | | 142 |
| Additional paid-in capital | | 1,134,227 | | 1,087,582 |
| Accumulated deficit | | (610,482) | | (708,354) |
| Treasury stock; 2,618,587 and 2,239,138 shares, respectively | | (177,691) | | (85,085) |
| Noncontrolling interest (Note 8) | | — | | 589 |
| **Total shareholders' equity** | | **346,208** | | **294,874** |
| **Total liabilities and shareholders' equity** | $ | **896,115** | $ | **693,459** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

53

Table of Contents

# LENDINGTREE, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Total | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | | Noncontrolling Interest |
|---|---|---|---|---|---|---|---|---|
| | | Number of Shares | Amount | | | Number of Shares | Amount | |
| | | | | *(in thousands)* | | | | |
| **Balance as of December 31, 2015** | **$ 241,142** | **13,866** | **$ 139** | **$ 1,006,688** | **$ (750,124)** | **1,474** | **$ (15,561)** | **$ —** |
| Net income and comprehensive income | 27,494 | — | — | — | 27,494 | — | — | — |
| Non-cash compensation | 9,647 | — | — | 9,647 | — | — | — | — |
| Purchase of treasury stock | (48,524) | — | — | — | — | 690 | (48,524) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | (4,084) | 89 | 1 | (4,085) | — | — | — | — |
| Tax benefit from stock-based award activity | 5,760 | — | — | 5,760 | — | — | — | — |
| **Balance as of December 31, 2016** | **$ 231,435** | **13,955** | **$ 140** | **$ 1,018,010** | **$ (722,630)** | **2,164** | **$ (64,085)** | **$ —** |
| Net income and comprehensive income | 15,578 | — | — | — | 15,578 | — | — | — |
| Non-cash compensation | 23,361 | — | — | 23,361 | — | — | — | — |
| Purchase of treasury stock | (21,000) | — | — | — | — | 75 | (21,000) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | 1,601 | 263 | 2 | 1,599 | — | — | — | — |
| Cumulative effect adjustment due to ASU 2016-09 | 985 | — | — | 2,287 | (1,302) | — | — | — |
| Issuance of 0.625% Convertible Senior Notes, net | 60,415 | — | — | 60,415 | — | — | — | — |
| Convertible note hedge | (61,500) | — | — | (61,500) | — | — | — | — |
| Sale of warrants | 43,410 | — | — | 43,410 | — | — | — | — |
| Noncontrolling interest (Note 8) | 589 | — | — | — | — | — | — | 589 |
| **Balance as of December 31, 2017** | **$ 294,874** | **14,218** | **$ 142** | **$ 1,087,582** | **$ (708,354)** | **2,239** | **$ (85,085)** | **$ 589** |
| Net income and comprehensive income | 96,499 | — | — | — | 96,499 | — | — | — |
| Non-cash compensation | 44,365 | — | — | 44,365 | — | — | — | — |
| Purchase of treasury stock | (92,606) | — | — | — | — | 379 | (92,606) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | 2,217 | 1,210 | 12 | 2,205 | — | — | — | — |
| Cumulative effect adjustment due to ASU 2014-09 | 1,373 | — | — | — | 1,373 | — | — | — |
| Issuance of 0.625% Convertible Senior Notes, net | (4) | — | — | (4) | — | — | — | — |
| Acquisition of noncontrolling interest (Note 8) | (510) | — | — | 79 | — | — | — | (589) |
| **Balance as of December 31, 2018** | **$ 346,208** | **15,428** | **$ 154** | **$ 1,134,227** | **$ (610,482)** | **2,618** | **$(177,691)** | **$ —** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

54

## LENDINGTREE, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | *(in thousands)* | | |
| Cash flows from operating activities attributable to continuing operations: | | | |
| **Net income and comprehensive income** | $ 96,499 | $ 15,578 | $ 27,494 |
| Less: Loss from discontinued operations, net of tax | 12,820 | 3,840 | 3,714 |
| Income from continuing operations | 109,319 | 19,418 | 31,208 |
| Adjustments to reconcile income from continuing operations to net cash provided by operating activities attributable to continuing operations: | | | |
| Loss on impairments and disposal of fixed assets | 2,210 | 840 | 640 |
| Amortization of intangibles | 23,468 | 12,992 | 1,243 |
| Depreciation | 7,385 | 7,085 | 4,944 |
| Rental amortization of intangibles and depreciation | 630 | 1,474 | — |
| Non-cash compensation expense | 44,365 | 23,361 | 9,647 |
| Deferred income taxes | (63,901) | (6,370) | 6,367 |
| Change in fair value of contingent consideration | 10,788 | 23,931 | — |
| Bad debt expense | 880 | 195 | 515 |
| Amortization of debt issuance costs | 1,776 | 1,032 | 245 |
| Write-off of previously-capitalized debt issuance costs | — | 90 | — |
| Amortization of convertible debt discount | 11,397 | 6,385 | — |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | (16,820) | (11,381) | (8,361) |
| Prepaid and other current assets | (2,985) | (5,358) | (1,558) |
| Accounts payable, accrued expenses and other current liabilities | 14,270 | 31,108 | 4,769 |
| Current contingent consideration | (21,912) | — | — |
| Income taxes receivable | 3,669 | (1,104) | 13,385 |
| Other, net | (591) | (160) | 1,170 |
| **Net cash provided by operating activities attributable to continuing operations** | **123,948** | **103,538** | **64,214** |
| Cash flows from investing activities attributable to continuing operations: | | | |
| Capital expenditures | (14,907) | (8,040) | (31,955) |
| Acquisition of intangible assets | — | (5) | (2,030) |
| Acquisition of QuoteWizard, net of cash acquired | (297,072) | — | — |
| Acquisition of Student Loan Hero, net of cash acquired | (59,483) | — | — |
| Acquisition of Ovation, net of cash acquired | (11,566) | — | — |
| Acquisition of SnapCap | (10) | (11,886) | — |
| Acquisition of DepositAccounts | — | (25,000) | — |
| Acquisition of MagnifyMoney, net of cash acquired | — | (29,504) | — |
| Acquisition of CompareCards | — | — | (81,182) |
| Acquisition of other businesses | — | — | (4,500) |
| **Net cash used in investing activities attributable to continuing operations** | **(383,038)** | **(74,435)** | **(119,667)** |
| Cash flows from financing activities attributable to continuing operations: | | | |
| Proceeds from exercise of stock options, net of payments related to net-share settlement of stock-based compensation | 2,217 | 1,602 | (4,085) |
| Contingent consideration payments | (27,588) | — | — |
| Proceeds from revolving credit facility | 125,000 | — | — |
| Acquisition of noncontrolling interest | (499) | — | — |
| Proceeds from the issuance of 0.625% Convertible Senior Notes | — | 300,000 | — |
| Payment of convertible note hedge transactions | — | (61,500) | — |
| Proceeds from the sale of warrants | — | 43,410 | — |
| Proceeds from equity offering, net of offering costs | — | — | (23) |
| Payment of debt issuance costs | (583) | (10,486) | (8) |
| Purchase of treasury stock | (93,704) | (19,901) | (48,524) |
| **Net cash provided by (used in) financing activities attributable to continuing operations** | **4,843** | **253,125** | **(52,640)** |
| **Total cash (used in) provided by continuing operations** | **(254,247)** | **282,228** | **(108,093)** |
| Discontinued operations: | | | |
| Net cash used in operating activities attributable to discontinued operations | (13,236) | (4,807) | (10,203) |
| **Total cash used in discontinued operations** | **(13,236)** | **(4,807)** | **(10,203)** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Net (decrease) increase in cash, cash equivalents, restricted cash, and restricted cash equivalents** | | | (267,483) | | 277,421 | (118,296) |
| Cash, cash equivalents, restricted cash, and restricted cash equivalents at beginning of period | | | 372,641 | | 95,220 | 213,516 |
| **Cash, cash equivalents, restricted cash, and restricted cash equivalents at end of period** | $ | | **105,158** | $ | **372,641** $ | **95,220** |
| **Supplemental cash flow information:** | | | | | | |
| Interest paid | $ | | 3,593 | $ | 1,327 $ | 320 |
| Income tax payments | | | 541 | | 20,359 | 3,095 |
| Income tax refunds | | | 5,678 | | 133 | 22 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

55

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1—ORGANIZATION

### Company Overview

LendingTree, Inc. ("LendingTree" or the "Company"), is the parent of LendingTree, LLC and several companies owned by LendingTree, LLC.

LendingTree operates what it believes to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. The Company offers consumers tools and resources, including free credit scores, that facilitate comparison-shopping for mortgage loans, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. The Company primarily seeks to match in-market consumers with multiple providers on its marketplace who can provide them with competing quotes for loans, deposit products, insurance or other related offerings they are seeking. The Company also serves as a valued partner to lenders and other providers seeking an efficient, scalable and flexible source of customer acquisition with directly measurable benefits, by matching the consumer inquiries it generates with these providers.

The consolidated financial statements include the accounts of LendingTree and all its wholly-owned entities. Intercompany transactions and accounts have been eliminated.

### Discontinued Operations

The LendingTree Loans business is presented as discontinued operations in the accompanying consolidated balance sheets, consolidated statements of operations and comprehensive income and consolidated cash flows for all periods presented. The notes accompanying these consolidated financial statements reflect the Company's continuing operations and, unless otherwise noted, exclude information related to the discontinued operations. *See* Note 19 —Discontinued Operations for additional information.

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC").

Certain prior year amounts have been reclassified to conform to current year presentation. *See* the discussion in Note 2— Significant Accounting Policies for the impact of adopting Accounting Standards Update ("ASU") 2016-18 on the presentation of changes in restricted cash, and ASU 2016-09 on the presentation of excess tax benefits and deficiencies, within the statement of cash flows.

## NOTE 2—SIGNIFICANT ACCOUNTING POLICIES

### Revenue Recognition

The Company derives its revenue primarily from match fees and closing fees. Revenue is recognized when performance obligations under the terms of a contract with a customer are satisfied and promised services have transferred to the customer. In identifying performance obligations, judgment is required around contracts where there was a possibility of bundled services and multiple parties. In applying judgment, the Company considers customer expectations of performance, materiality and the core principles of Accounting Standards Codification ("ASC") Topic 606, Revenue from Contracts with Customers. The Company's services are generally transferred to the customer at a point in time.

Variable consideration is included in revenue if it is probable that a significant future reversal of cumulative revenue under the contract will not occur.

Revenue within the mortgage product category is primarily generated from upfront match fees paid by mortgage Network Partners that receive a loan request, and in some cases upfront fees for clicks or call transfers. Match fees and upfront fees for clicks and call transfers are earned through the delivery of loan requests that originated through the Company's websites or affiliates. The Company recognizes revenue at the time a loan request is delivered to the customer, provided that no significant obligations remain. Revenue recognition on match fees was not impacted by the adoption of ASC Topic 606 in the first quarter of 2018, as

56

LENDINGTREE, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

the Company's contractual right to the match fee consideration is contemporaneous with the satisfaction of the performance obligation to deliver a loan request to the customer.

In addition to match and other upfront fees, revenue within the non-mortgage product category is also generated from closing fees and approval fees.

Closing fees are derived from lenders on certain auto loans, business loans, personal loans and student loans when the lender funds a loan with the consumer. Prior to the adoption of ASC Topic 606, closed loan fees were recognized at the time the lender reported the closed loan to the Company, which could be several months after the original request was transmitted.

Approval fees are derived from credit card issuers when the credit card consumer receives card approval from the credit card issuer. Prior to the adoption of ASC Topic 606, approval fees were recognized at the time the credit card issuer reported the card approval for the consumer to the Company, which is generally within two weeks after the consumer's request was transmitted.

Under ASC Topic 606, the timing of recognizing revenue for closing fees and approval fees is accelerated to the point when a loan request or a credit card consumer is delivered to the customer, as opposed to when the consumer loan is closed by the lender or credit card approval is made by the issuer. The Company's contractual right to closing fees and approval fees is not contemporaneous with the satisfaction of the performance obligation to deliver a loan request or a credit card consumer to the customer. As such, the Company records a contract asset at each reporting period-end related to the estimated variable consideration on closing fees and approval fees for which the Company has satisfied the related performance obligation, but are still pending the loan closing or credit card approval before the Company has a contractual right to payment. This estimate is based on the Company's historical closing rates and historical time between when a consumer request for a loan or credit card is delivered to the lender or card issuer and when the loan is closed by the lender or approved by the card issuer. The time between satisfaction of the Company's performance obligation and when the Company's right to consideration becomes unconditional is generally less than 90 days.

Upfront fees and subscription fees are derived from consumers in the Company's credit services business, which was acquired on June 11, 2018. Upfront fees paid by consumers are recognized as revenue over the estimated time the consumer will remain a customer and receive services. Subscription fees are recognized over the period a consumer is receiving services.

Revenue from the Company's insurance business, which was acquired on October 31, 2018, is primarily generated from match fees, fees for website clicks or fees for calls. Match fees and upfront fees for clicks and call transfers are earned through the delivery of consumer requests that originated through the Company's websites or affiliates. The Company recognizes revenue at the time a consumer request is delivered to the customer, provided that no significant obligations remain. The Company's contractual right to the match fee consideration is contemporaneous with the satisfaction of the performance obligation to deliver a consumer request to the customer.

Both the mortgage and non-mortgage product categories are included in the Company's single reportable segment.

Our payment terms vary by customer and services offered. The term between invoicing and when payment is due is generally 30 days or less.

Sales commissions are incremental costs of obtaining contracts with customers. The Company expenses sales commissions when incurred as the duration of contracts with customers is less than one year, based on the right for either party to terminate the contract with less than one year's notice without compensation to either party. These costs are recorded within selling and marketing expense on the consolidated statements of operations and comprehensive income.

For additional information on the adoption of ASC Topic 606, please see the discussion over ASU 2014-09 in the section titled "Recent Accounting Pronouncements" within this Note.

## Cash and Cash Equivalents

Cash and cash equivalents include cash and short-term, highly liquid money market investments with original maturities of three months or less.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Restricted Cash**

Cash escrowed or contractually restricted for a specific purpose is designated as restricted cash.

**Accounts Receivable**

Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts.

The Company determines its allowance for doubtful accounts by considering a number of factors, including the length of time accounts receivable are past due, previous loss history and the specific customer's current ability to pay its obligation. Accounts receivable are considered past due when they are outstanding longer than the contractual payment terms. Accounts receivable are written off when management deems them uncollectible.

A reconciliation of the beginning and ending balances of the allowance for doubtful accounts is as follows *(in thousands)*:

|  | Year Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| **Balance, beginning of the period** | $ 675 | $ 1,059 | $ 606 |
| Charges to earnings | 880 | 195 | 515 |
| Write-off of uncollectible accounts receivable | (412) | (579) | (62) |
| **Balance, end of the period** | $ 1,143 | $ 675 | $ 1,059 |

**Loan Loss Obligations (Discontinued Operations)**

The Company's Home Loan Center, Inc. ("HLC") subsidiary, which during its period of active operation primarily conducted business as LendingTree Loans, sold loans it originated to investors on a servicing-released basis and the risk of loss or default by the borrower was generally transferred to the investor. However, LendingTree Loans was required by these investors to make certain representations relating to credit information, loan documentation and collateral. To the extent LendingTree Loans did not comply with such representations, LendingTree Loans may be required to repurchase loans or indemnify the investors for any losses from borrower defaults. LendingTree Loans maintains a liability for the estimated exposure relating to such contingent obligations and changes to the estimate are recorded in income from discontinued operations in the periods they occur.

The Company estimates the liability for loan losses using a settlement discount framework. This approach estimates the lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. The Company then applies a settlement discount factor to the result of the foregoing to reflect publicly-announced bulk settlements for similar loan types and vintages, the Company's own settlement experience, as well as LendingTree Loans' non-operating status, in order to estimate a range of potential liability. Changes to any one of these factors could significantly impact the estimate of the liability and could have a material impact on the Company's results of operations for any particular period. *See* Note 19—Discontinued Operations—LendingTree Loans—Loan Loss Obligations for additional information on the loan loss reserve.

**Segment Reporting**

The Company has one reportable segment.

**Property and Equipment**

Property and equipment, including internally-developed software and significant improvements, are recorded at cost less accumulated depreciation. Acquisition and construction costs for land and building is capitalized and depreciated over the applicable useful lives. Due to the rapid advancements in technology and evolution of company products, all internally-developed software is written-off at the end of its useful life. Repairs and maintenance and any gains or losses on dispositions are recognized as incurred in current operations.

58

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Depreciation is recorded on a straight-line basis to allocate the cost of depreciable assets to operations over their estimated service lives. The following table presents the estimated useful lives for each asset category:

| Asset Category | Estimated Useful Lives |
| --- | --- |
| Land | N/A |
| Building | 34 years |
| Site Improvements | 1 to 15 years |
| Computer equipment and capitalized software | 1 to 5 years |
| Leasehold improvements | Lesser of asset life or life of lease |
| Furniture and other equipment | 3 to 7 years |
| Aircraft and automobile | 5 to 10 years |

**Software Development Costs**

Software development costs primarily include internal and external labor expenses incurred to develop the software that powers the Company's websites. Certain costs incurred during the application development stage are capitalized based on specific activities tracked, while costs incurred during the preliminary project stage and post-implementation/operation stage are expensed as incurred. Capitalized software development costs are amortized over an estimated useful life of one to five years.

**Goodwill and Indefinite-Lived Intangible Assets**

Goodwill acquired in business combinations is assigned to the reporting units that are expected to benefit from the combination as of the acquisition date. Goodwill and indefinite-lived intangible assets, consisting of certain trade names and trademarks, are not amortized. Rather, these assets are tested annually for impairment as of October 1, or more frequently upon the occurrence of certain events or substantive changes in circumstances.

As part of its annual impairment testing of goodwill and indefinite-lived intangible assets, in each instance, the Company may elect to assess qualitative factors as a basis for determining whether it is necessary to perform the traditional quantitative impairment testing. If the Company's assessment of these qualitative factors indicates that it is not more likely than not that the fair value of the reporting unit or indefinite-lived intangible asset is less than its carrying value, then no further testing is required. Otherwise, the goodwill reporting unit or long-lived intangible assets, as applicable, must be quantitatively tested for impairment.

The quantitative test for goodwill impairment is determined using a two-step process. The first step is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of its reporting units by using a market approach and a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The quantitative impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its estimated fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a relief-from-royalty methodology in estimating the fair value of trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates, perpetual growth rates and the amount and timing of future revenues.

For the October 1, 2018 and 2017 annual impairment tests of goodwill and indefinite-lived intangible assets, the Company elected to perform qualitative assessments as a precursor to the traditional quantitative tests. Results of the October 1, 2018 and 2017 annual impairment tests indicated that it is not more likely than not that the fair value of the goodwill and the indefinite-lived intangible assets were each less than their respective carrying values. Accordingly, no further testing was required.

59

LEHMAN PRICE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets include property and equipment and intangible assets with definite lives. Amortization of definite-lived intangible assets is recorded on a straight-line basis over their estimated lives.

Long-lived assets are tested for recoverability whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is deemed to not be recoverable, an impairment loss is recorded as the amount by which the carrying amount of the long-lived asset exceeds its fair value.

At December 31, 2018 and 2017, the Company performed its review of impairment triggering events for long-lived assets and determined that a triggering event had not occurred.

**Assets and Liabilities Held for Sale**

The Company classifies assets or disposal groups to be sold as held for sale in the period in which all of the following criteria are met:

- Management, having the authority to approve the action, commits to a plan to sell the asset or disposal group;

- The asset or disposal group is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such assets or disposal groups;

- An active program to locate a buyer and other actions required to complete the plan to sell the asset or disposal group have been initiated;

- The sale of the asset or disposal group is probable, and transfer of the asset or disposal group is expected to qualify for recognition as a completed sale within one year, except if events or circumstances beyond the Company's control extend the period of time required to sell the asset or disposal group beyond one year;

- The asset or disposal group is being actively marketed for sale at a price that is reasonable in relation to its current fair value; and

- Actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn.

A long-lived asset or disposal group that is classified as held for sale is initially measured at the lower of its carrying value or fair value less any costs to sell. Any loss resulting from this measurement is recognized in the period in which the held for sale criteria are met. Conversely, gains are not recognized on the sale of a long-lived asset or disposal group until the date of sale. The fair value of a long-lived asset or disposal group, less any costs to sell, is assessed each reporting period it remains classified as held for sale and any subsequent changes are reported as an adjustment to the carrying value of the asset or disposal group, as long as the new carrying value does not exceed the carrying value of the asset at the time it was initially classified as held for sale.

**Fair Value Measurements**

The Company categorizes its assets and liabilities measured at fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- <u>Level 1</u>: Observable inputs, such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- <u>Level 2</u>: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

- <u>Level 3</u>: Unobservable inputs for which there is little or no market data and which require the Company to develop its own assumptions, based on the best information available under the circumstances, about the assumptions market participants would use in pricing the asset or liability.

60

LENDINGTREE, INC. AND SUBSIDIARIES
LENDINGTREE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company's non-financial assets, such as goodwill, intangible assets and property and equipment are recorded at fair value upon acquisition. These assets are remeasured at fair value when there is an indicator of impairment and recorded at fair value only when an impairment charge is recognized. Such fair value measurements are based predominantly on Level 3 inputs.

Contingent consideration payments related to acquisitions are measured at fair value each reporting period using Level 3 unobservable inputs. The Company's estimates of fair value are based upon assumptions believed to be reasonable but which are uncertain and involve significant judgments by management. Any changes in the fair value of these contingent consideration payments are included in operating income in the consolidated statements of operations and comprehensive income.

**Cost of Revenue**

Cost of revenue consists primarily of expenses associated with compensation and other employee-related costs (including stock-based compensation) related to internally-operated customer call centers, third-party customer call center fees, costs for online advertising resold to third parties, credit scoring fees, credit card fees, website network hosting and server fees.

**Product Development**

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) and third-party labor costs that are not capitalized, for employees and consultants engaged in the design, development, testing and enhancement of technology.

**Advertising**

Advertising costs are expensed in the period incurred (except for production costs which are initially capitalized and then recognized as expense when the advertisement first runs) and principally represent offline costs, including television, print and radio advertising, and online advertising costs, including fees paid to search engines and distribution partners. Advertising expense was $469.9 million, $410.8 million and $243.2 million for the years ended December 31, 2018, 2017 and 2016, respectively, and is included in selling and marketing expense on the consolidated statements of operations and comprehensive income.

**Income Taxes**

Income taxes are accounted for under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. In estimating future tax consequences, all expected future events are considered. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. Interest is recorded on potential tax contingencies as a component of income tax expense and recorded net of any applicable related income tax benefit. For the years ended December 31, 2018, 2017 and 2016, the Company followed the incremental or "with" and "without" approach to intraperiod tax allocation for determination of the amount of tax benefit to allocate to continuing operations as prescribed in Accounting Standards Codification ("ASC") 740-20-45-7.

In accordance with the accounting standard for uncertainty in income taxes, liabilities for uncertain tax positions are recognized based on the two-step process prescribed by the accounting standards. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon ultimate settlement.

Effective January 1, 2018, the Company changed the method used to estimate the deduction for prepaid marketing and advertising costs. This change in methodology impacts the timing of the tax deductibility of these related costs. The Company historically estimated these expenses to be deductible as long as the services were provided within 12 months of payment. Under the proposed method of accounting, the Company will take into account only prepaid marketing and advertising as the Company makes payment for the services to the extent that the payment is due and the services are reasonably expected by the Company to be provided to the applicant within 3 ½-months after the date of payment as authorized by Treas. Reg. §1.461-4(d)(6)(ii). The Company has accounted for this change as a change in accounting method and recorded a cumulative impact of $1.0 million as a deferred tax liability to be recognized over four years.

LENDINGTREE, INC. AND SUBSIDIARIES

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Effective January 1, 2017, the Company changed the method used to estimate the deduction for internally developed software. This change in methodology impacts the timing of the tax deductibility of these related costs. The Company historically capitalized these expenses and amortized them over three years. Under the proposed method of accounting, the Company will treat costs attributable to internally developed software as current expenses and take them into account in full in accordance with Section 5.01(1) of Rev. Proc. 2000-50 and rules similar to those applicable under Section 174(a). The Section 481(a) adjustment is the cumulative difference between the present method and the proposed method of accounting computed as of the first day of the year of change, January 1, 2017 and was reflected in the timely filed income tax return during 2018 related to the period of change.

On December 22, 2017, the SEC staff issued Staff Accounting Bulletin No. 118 ("SAB 118"), which provides guidance on accounting for the tax effect of the Tax Cuts and Jobs Act ("TCJA"). SAB 118 provides a measurement period that should not extend beyond one year from the TCJA enactment date for companies to complete the accounting under ASC 740. In accordance with SAB 118, a company must reflect the income tax effects of those aspects of the TCJA for which the accounting under ASC 740 is complete. To the extent that a company's accounting for certain income tax effects of the TCJA is incomplete but it is able to determine a reasonable estimate, it must record a provisional estimate in the financial statements. In accordance with SAB 118, the Company determined that the $9.1 million of the deferred tax expense recorded in connection with the remeasurement of certain deferred tax assets and liabilities was a provisional amount and a reasonable estimate at December 31, 2017.

During the fourth quarter of the year ended December 31, 2018, the Company finalized the computations of the income tax effects of the Act. As such, in accordance with SAB 118, the Company's accounting for the effects of the Act is complete. The Company did not significantly adjust provisional amounts recorded in the prior year and the SAB 118 measurement period subsequently ended on December 22, 2018. Although the Company no longer considers these amounts to be provisional, the determination of the Act's income tax effects may change following future legislation or further interpretation of the Act based on future guidance from the Internal Revenue Service and state tax authorities.

**Stock-Based Compensation**

The forms of stock-based awards granted to LendingTree employees are principally restricted stock units ("RSUs"), RSUs with performance conditions, restricted stock, stock options and stock options with performance conditions. Further, performance-based stock options with market conditions and time-vested restricted stock with a performance condition have been granted to the Company's Chairman and Chief Executive Officer. RSUs are awards in the form of units, denominated in a hypothetical equivalent number of shares of LendingTree common stock and with the value of each award equal to the fair value of LendingTree common stock at the date of grant. RSUs may be settled in cash, stock or both, as determined by the Company's Compensation Committee at the time of grant. The Company does not have a history of settling these awards in cash. Each stock-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. The Compensation Committee can modify the vesting provisions of an award. Certain awards also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests.

LendingTree recognizes as expense non-cash compensation for all stock-based awards for which vesting is considered probable. Prior to the adoption of ASU 2016-09, the amount of non-cash compensation was reduced by estimated forfeitures, using a rate estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if the actual forfeiture rate differed from the estimated rate. Subsequent to the adoption of ASU 2016-09 in the first quarter of 2017, forfeitures are recognized when they occur.

For service-based awards, non-cash compensation is measured at fair value on the grant date and expensed ratably over the vesting term. The fair value of each stock option award without a market condition is estimated using the Black-Scholes option pricing model, while the fair value of an RSU or restricted stock award is measured as the closing common stock price at the time of grant. For performance-based awards, the fair value is measured on the grant date and recognized as non-cash compensation expense, considering the probability of the targets being achieved. Performance-based awards with a market condition are valued using a Monte Carlo simulation model.

Subsequent to the Company's adoption of ASU 2016-09 in the first quarter of 2017, excess tax benefits and deficiencies that arise due to the difference in the measure of stock compensation and the amount deductible for tax purposes are prospectively recorded in income tax expense within the consolidated statement of operations and comprehensive income, and are retrospectively classified as a component of operating cash flows within the consolidated statements of cash flows. Prior to the adoption of ASU 2016-09, these excess tax benefits were recognized in the consolidated statement of shareholders' equity and reported as a component of financing cash flows. For additional information on the adoption of ASU 2016-09, please see the section titled "Recent Accounting Pronouncements" within this Note.

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm    93/159

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Litigation Settlements and Contingencies**

Litigation settlements and contingencies consists of expenses related to actual or anticipated litigation settlements, in addition to legal fees incurred in connection with various patent litigation claims the Company pursues against others.

The Company is involved in legal proceedings on an ongoing basis. If the Company believes that a loss arising from such matters is probable and can be reasonably estimated, the estimated liability is accrued in the consolidated financial statements. If only a range of estimated losses can be determined, an amount within the range is accrued that, in the Company's judgment, reflects the most likely outcome; if none of the estimates within that range is a better estimate than any other amount, the low end of the range is accrued. For those proceedings in which an unfavorable outcome is reasonably possible but not probable, an estimate of the reasonably possible loss or range of losses or a conclusion that an estimate of the reasonably possible loss or range of losses arising directly from the proceeding (i.e., monetary damages or amounts paid in judgment or settlement) are not material is disclosed. Legal expenses associated with these matters are recognized as incurred.

**Accounting Estimates**

Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with GAAP. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements, including discontinued operations, include: loan loss obligations; the recoverability of long-lived assets, goodwill and intangible assets; the determination of income taxes payable and deferred income taxes, including related valuation allowances; fair value of assets acquired in a business combination; contingent consideration related to business combinations; litigation accruals; contract assets; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

**Certain Risks and Concentrations**

LendingTree's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject the Company to concentration of credit risk at December 31, 2018, consist primarily of cash and cash equivalents and accounts receivable, as disclosed in the consolidated balance sheet. Cash and cash equivalents are in excess of Federal Deposit Insurance Corporation insurance limits, but are maintained with quality financial institutions of high credit. The Company generally requires certain network partners to maintain security deposits with the Company, which in the event of non-payment, would be applied against any accounts receivable outstanding.

Due to the nature of the mortgage lending industry, interest rate fluctuations may negatively impact future revenue from the Company's marketplace.

For the year ended December 31, 2018, there were no network partners accounting for more than 10% of total revenue. For the years ended December 31, 2017 and 2016, one network partner accounted for 11% and 15% of total revenue, respectively. For the year ended December 31, 2016, another network partner accounted for 13% of total revenue.

Lenders and lead purchasers participating on the Company's marketplace can offer their products directly to consumers through brokers, mass marketing campaigns or through other traditional methods of credit distribution. These lenders and lead purchasers can also offer their products online, either directly to prospective borrowers, through one or more online competitors, or both. If a significant number of potential consumers are able to obtain loans and other products from network partners without utilizing the Company's services, the Company's ability to generate revenue may be limited. Because the Company does not have exclusive relationships with the network partners whose loans and other financial products are offered on its online marketplace, consumers may obtain offers from these network partner without using its service.

Other than a support services office in India, the Company's operations are geographically limited to and dependent upon the economic condition of the United States.

**Recent Accounting Pronouncements**

In August 2018, the Financial Accounting Standards Board ("FASB") issued ASU 2018-15 which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing

implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). This ASU is effective for annual and interim reporting periods beginning after December 15, 2019. Early adoption is permitted, including adoption in any interim period. The amendments should be applied either retrospectively or prospectively to all implementation costs incurred after the date of adoption. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In August 2018, the FASB issued ASU 2018-13 which removes, modifies and adds certain disclosure requirements in ASC Topic 820, Fair Value Measurement. This ASU is effective for annual and interim reporting periods beginning after December 15, 2019, with early adoption permitted. Entities are permitted to adopt any removed or modified disclosures and delay adoption of the additional disclosures until the effective date of the ASU. Certain amendments must be applied prospectively while others are to be applied on a retrospective basis to all periods presented. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In June 2018, the FASB issued ASU 2018-07 which simplifies the accounting for nonemployee share-based payments by expanding the scope of ASC Topic 718, Compensation—Stock Compensation, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new guidance, most of the initial and subsequent measurement for such payments to nonemployees is aligned with the requirements for share-based payments to employees. This ASU is effective for annual and interim reporting periods beginning after December 15, 2018, with early adoption permitted. Entities must transition to the new guidance through a cumulative-effect adjustment to retained earnings as of the beginning of the fiscal year of adoption. The Company early-adopted this ASU during the second quarter of 2018, with no impact to its consolidated financial statements.

In May 2017, the FASB issued ASU 2017-09 which clarifies when to account for a change to the terms or conditions of a share-based payment award as a modification. Under the new guidance, modification accounting is required only if the fair value, the vesting conditions or the classification of the award changes as a result of the change in terms or conditions. This ASU is effective prospectively for annual periods beginning on or after December 15, 2017, and early adoption was permitted. The Company adopted this ASU during the first quarter of 2018.

In January 2017, the FASB issued ASU 2017-04 which eliminates the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge (Step 2 of the goodwill impairment test). Instead, an impairment charge will be based on the excess of the carrying amount over the fair value. This ASU is effective for annual and interim impairment tests performed in periods beginning after December 15, 2019. Early adoption is permitted for annual and interim goodwill impairment testing dates after January 1, 2017. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In November 2016, the FASB issued ASU 2016-18 which is intended to reduce the diversity in the classification and presentation of changes in restricted cash in the statement of cash flows, by requiring entities to combine the changes in cash and cash equivalents and restricted cash in one line. As a result, entities will no longer present transfers between cash and cash equivalents and restricted cash in the statement of cash flows. In addition, if more than one line item is recorded on the balance sheet for cash and cash equivalents and restricted cash, a reconciliation between the statement of cash flows and balance sheet is required. This ASU is effective for annual and interim reporting periods beginning after December 15, 2017, and early adoption was permitted. The retrospective transition method, requiring adjustment to all comparative periods presented, is required. The Company adopted this ASU during the first quarter of 2018. The adoption resulted in an immaterial reclassification of cash outflows from investing activities to operating activities for 2017, and a reclassification of $2.5 million of cash inflows from investing activities to operating activities for 2016. *See* Note 4—Cash and Restricted Cash for the reconciliation of cash and cash equivalents and restricted cash reported on the balance sheet to the total of such amounts shown on the statement of cash flows.

In August 2016, the FASB issued ASU 2016-15 which addresses eight cash flow classification issues, eliminating the diversity in practice. This ASU is effective for annual and interim reporting periods beginning after December 15, 2017, and early adoption was permitted. The retrospective transition method, requiring adjustment to all comparative periods presented, is required unless it is impracticable for some of the amendments, in which case those amendments would be prospectively applied as of the earliest date practicable. The Company adopted this ASU during the first quarter of 2018, and there was no adjustment to prior periods. Pursuant to adoption of this ASU, contingent consideration payments made are classified as cash outflows from financing activities up to the amount of the contingent consideration liability recognized at the acquisition date, and the portion of payments in excess of that initial liability are classified as cash outflows from operating activities. *See* Note 8—Business Acquisitions for additional information.

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In March 2016, the FASB issued ASU 2016-09 which simplifies various aspects related to how share-based payments are accounted for and presented in the financial statements, including the income tax consequences, classification of awards as either equity or liabilities, forfeitures and classification of excess tax benefits on the statement of cash flows. This ASU was effective for annual and interim reporting periods beginning after December 15, 2016, and early adoption was permitted. Upon adoption, any adjustments were to be reflected as of the beginning of the fiscal year of adoption. The Company adopted this ASU during the first quarter of 2017.

The new standard required excess tax benefits and deficiencies, which arise due to the difference in the measure of stock compensation and the amount deductible for tax purposes, to be recorded in earnings in income tax expense. These excess tax benefits and deficiencies were generally previously recorded in additional paid-in capital and had no impact on net income. The standard required prospective adoption for this portion of the new guidance. Additionally, the new standard required the excess tax benefits and deficiencies to be classified as an operating activity in the accompanying consolidated statements of cash flows. These excess tax benefits and deficiencies were previously recorded as a financing activity in the statement of cash flows. The standard allowed for either prospective or retrospective adoption for the change in presentation in the statement of cash flows. The Company elected to retrospectively adopt the classification change in the statement of cash flows. Accordingly, prior periods have been adjusted to increase the cash provided by operating activities and decrease the cash provided by financing activities by $5.8 million in 2016 within the accompanying consolidated statements of cash flows. The standard also allows for an election by the Company to either estimate forfeitures, as required under previous guidance, or recognize forfeitures when they occur. The Company elected to recognize forfeitures of stock awards as they occur, with the modified retrospective transition method required. Accordingly, the Company recognized a $1.4 million cumulative-effect adjustment to retained earnings as of January 1, 2017.

In February 2016, the FASB issued ASU 2016-02 related to leases. This ASU introduces ASC Topic 842, Leases, which will supersede the existing lease accounting guidance in ASC Topic 840, Leases. This ASU is effective for annual and interim reporting periods beginning after December 15, 2018, with early adoption permitted. In July 2018, the FASB issued ASU 2018-10 which clarifies certain narrow aspects of implementing ASU 2016-02, including clarifications related to the rate implicit in the lease, lessee reassessment of lease classification, lessor reassessment of lease term and purchase options, variable payments that depend on an index or rate, and impairment of the net investment in the lease. In the same month, the FASB issued ASU 2018-11 which provides an optional transition method that allows entities to initially apply the lease accounting transition requirements at the adoption date and recognize a cumulative effect adjustment to the opening balance of retained earnings in the period of adoption without restating comparative prior periods presented. ASU 2018-11 also includes a practical expedient for lessors to not separate the lease and nonlease components of a contract. In December 2018, the FASB issued ASU 2018-20 which provides certain narrow scope improvements for lessors, including an accounting policy election to not evaluate whether certain sales taxes and other similar taxes are lessor costs or lessee costs. ASU 2018-10, ASU 2018-11 and ASU 2018-20 must be adopted concurrently with the adoption of ASU 2016-02 (collectively, "ASC Topic 842"). The Company does not expect the adoption of ASC Topic 842, which includes the recognition of right-of-use assets and lease liabilities related to operating leases greater than one year in duration for which the Company is the lessee, to have a material effect on its consolidated financial statements. The Company will adopt ASC Topic 842 as of January 1, 2019 using the optional transition method to apply the new requirements at the adoption date without restating comparative prior periods presented, and does not expect a material cumulative effect adjustment, if any, to the opening balance of accumulated deficit in the period of adoption. The Company will elect the package of practical expedients which allows for an entity to not reassess whether expired or existing contracts contain leases, lease classification for expired or existing leases, and initial direct costs for existing leases. Additionally, the Company will elect as accounting policy to not record on the balance sheet leases with a term of twelve months or less.

In May 2014, the FASB issued ASU 2014-09 related to revenue recognition. This guidance introduces ASC Topic 606, Revenue from Contracts with Customers, and supersedes the revenue recognition requirements in ASC Topic 605, Revenue Recognition. In 2016, the FASB issued final amendments clarifying implementation guidance for principal versus agent considerations, identifying performance obligations, assessing collectability, presenting sales taxes, measuring noncash consideration and certain other transition matters. The clarification ASUs must be adopted concurrently with the adoption of ASU 2014-09 (collectively, "ASC Topic 606"). Under the new ASUs, the timing of recognizing revenue for closing fees and approval fees in the Company's non-mortgage product category has been accelerated to the point when a loan request or a credit card consumer is delivered to the customer as opposed to when the consumer loan is closed by the lender or credit card approval is made by the issuer and communicated to the Company.

The Company has adopted ASC Topic 606 as of January 1, 2018 using the modified retrospective transition approach. The Company recognized the cumulative effect of initially applying ASC Topic 606 as an adjustment to the opening balance of accumulated deficit. Under this approach, revenue for 2017 and 2016 is reported in the consolidated statements of operations and comprehensive income on the historical basis, and revenue for 2018 is reported in the consolidated statements of operations and

65

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

comprehensive income under ASC Topic 606. A comparison of revenue for 2018 periods to the historical basis is included below. *See* Note 3—Revenue for additional information.

The cumulative effect of the changes made to the consolidated January 1, 2018 balance sheet for the adoption of ASC Topic 606 were as follows *(in thousands)*:

| | December 31, 2017 | | Adjustments due to ASC Topic 606 | | January 1, 2018 |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Prepaid and other current assets | $ | 11,881 | $ | 1,903 | $ | 13,784 |
| Deferred income tax assets | | 20,156 | | (530) | | 19,626 |
| **Shareholders' equity:** | | | | | |
| Accumulated deficit | $ | (708,354) | $ | 1,373 | $ | (706,981) |

The impact of adoption on the consolidated income statement and balance sheet for the period ended December 31, 2018 was as follows *(in thousands)*:

| | Year Ended December 31, 2018 | | | | | |
|---|---|---|---|---|---|---|
| | As Reported | | Balances without adoption of ASC Topic 606 | | Effect of Change | |
| **Revenue** | $ | 764,865 | $ | 762,739 | $ | 2,126 |
| **Costs and expenses:** | | | | | | |
| Income tax benefit | | 65,575 | | 66,182 | | (607) |
| **Net income from continuing operations** | $ | 109,319 | $ | 107,800 | $ | 1,519 |

| | December 31, 2018 | | | | | |
|---|---|---|---|---|---|---|
| | As Reported | | Balances without adoption of ASC Topic 606 | | Effect of Change | |
| **Assets:** | | | | | | |
| Prepaid and other current assets | $ | 16,428 | $ | 11,627 | $ | 4,801 |
| Deferred income tax assets | | 79,289 | | 79,819 | | (530) |
| **Shareholders' equity:** | | | | | | |
| Accumulated deficit | $ | (610,482) | $ | (614,753) | $ | 4,271 |

66

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 3—REVENUE

Revenue is as follows *(in thousands)*:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| **Revenue:** | | | | | | |
| Mortgage products | $ | 242,175 | $ | 275,910 | $ | 219,991 |
| Non-mortgage products | | | | | | |
| Credit cards | | 165,776 | | 147,028 | | 39,434 |
| Personal loans | | 134,199 | | 88,244 | | 66,457 |
| Other | | 222,715 | | 106,554 | | 58,520 |
| Total non-mortgage products | | 522,690 | | 341,826 | | 164,411 |
| **Total revenue** | $ | **764,865** | $ | **617,736** | $ | **384,402** |

The contract asset recorded within prepaid and other current assets on the consolidated balance sheets related to estimated variable consideration was $1.9 million and $4.8 million on January 1, 2018 and December 31, 2018, respectively. The increase in the contract asset from January 1, 2018 to December 31, 2018 is primarily due to recent business acquisitions. During 2018, the Company established a contract asset for business loans from a recent acquisition, for which the Company has determined it has established sufficient historical information to determine an estimate. Additionally, the Company increased the contract asset balance for the acquisition of Student Loan Hero, Inc. ("Student Loan Hero"), which was acquired on July 23, 2018.

As a result of the acquisition of Ovation Credit Services, Inc. ("Ovation") on June 11, 2018, a $0.4 million contract liability was recorded within accrued expenses and other current liabilities on the December 31, 2018 consolidated balance sheet related to the upfront fees paid by consumers.

Revenue recognized in any reporting period includes estimated variable consideration for which the Company has satisfied the related performance obligations, but are still pending the occurrence or non-occurrence of a future event outside the Company's control (such as lenders providing loans to consumers or credit card approvals of consumers) before the Company has a contractual right to payment. The Company recognized an increase to such revenue from prior periods of $0.7 million in 2018.

## NOTE 4—CASH AND RESTRICTED CASH

Total cash, cash equivalents, restricted cash and restricted cash equivalents consist of the following *(in thousands)*:

| | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 105,102 | $ | 368,550 |
| Restricted cash and cash equivalents | | 56 | | 4,091 |
| **Total cash, cash equivalents, restricted cash and restricted cash equivalents** | $ | **105,158** | $ | **372,641** |

Restricted cash and cash equivalents consists of the following *(in thousands)*:

| | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Cash in escrow from sale of LendingTree Loans [a] | $ | — | $ | 4,034 |
| Other | | 56 | | 57 |
| **Total restricted cash and cash equivalents** | $ | **56** | $ | **4,091** |

(a) HLC, a subsidiary of the Company, continues to be liable for certain indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of its LendingTree Loans business in the second quarter of 2012. Of the purchase price received, a portion was deposited in escrow in accordance with the agreement with Discover for certain loan loss obligations that remain with the Company following the sale. During the second quarter of 2018, the remaining funds in escrow were released to the Company in accordance with the terms of the agreement with Discover.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 5—PROPERTY AND EQUIPMENT

The balance of property and equipment, net is as follows *(in thousands)*:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Land | $ — | $ 5,818 |
| Building | — | 14,984 |
| Site improvements | — | 950 |
| Computer equipment and capitalized software | 22,847 | 16,885 |
| Leasehold improvements | 4,651 | 3,257 |
| Furniture and other equipment | 1,935 | 1,203 |
| Aircraft and automobile | 2,621 | 2,621 |
| Projects in progress | 5,008 | 3,756 |
| **Total gross property and equipment** | **37,062** | **49,474** |
| Accumulated depreciation | (13,887) | (13,043) |
| **Total property and equipment, net** | **$ 23,175** | **$ 36,431** |

*See* Note 7—Assets Held for Sale for property and equipment classified as held for sale during the fourth quarter of 2018.

Unamortized capitalized software development costs, in service or under development, are $16.2 million and $9.5 million at December 31, 2018 and 2017, respectively. Capitalized software development depreciation expense was $6.1 million, $5.7 million and $4.3 million for the years ended December 31, 2018, 2017 and 2016, respectively.

Long-lived assets located outside the United States, the Company's country of domicile, were $0.1 million at December 31, 2018.

## NOTE 6—GOODWILL AND INTANGIBLE ASSETS

The balance of goodwill, net is as follows *(in thousands)*:

| | Goodwill | Accumulated Impairment Loss | Net Goodwill |
|---|---|---|---|
| **Balance at December 31, 2016** | $ 539,545 | $ (483,088) | $ 56,457 |
| Acquisition of DepositAccounts | 19,389 | — | 19,389 |
| Acquisition of MagnifyMoney | 23,784 | — | 23,784 |
| Acquisition of SnapCap | 13,738 | — | 13,738 |
| **Balance at December 31, 2017** | $ 596,456 | $ (483,088) | $ 113,368 |
| Acquisition of Ovation | 11,260 | — | 11,260 |
| Acquisition of Student Loan Hero | 40,856 | — | 40,856 |
| Acquisition of QuoteWizard | 182,863 | — | 182,863 |
| **Balance at December 31, 2018** | $ 831,435 | $ (483,088) | $ 348,347 |

The balance of intangible assets, net is as follows *(in thousands)*:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Intangible assets with indefinite lives | $ 10,142 | $ 10,142 |
| Intangible assets with definite lives, net | 195,557 | 70,983 |
| **Total intangible assets, net** | **$ 205,699** | **$ 81,125** |

68

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Goodwill and Indefinite-Lived Intangible Assets

The Company's goodwill is associated with its one reportable segment. The carrying amount of goodwill increased during the year ended December 31, 2018 due to the acquisitions of Ovation, Student Loan Hero and QuoteWizard, and increased during the year ended December 31, 2017 due to the acquisitions of DepositAccounts, MagnifyMoney and SnapCap. *See* Note 8—Business Acquisitions for a discussion of the acquisitions and associated goodwill. Results of the annual impairment test as of October 1, 2018 indicated that no impairment had occurred.

Intangible assets with indefinite lives relate to the Company's trademarks. Results of the annual impairment test as of October 1, 2018 indicated that no impairment had occurred.

### Intangible Assets with Definite Lives

Intangible assets with definite lives relate to the following *(dollars in thousands)*:

| | Weighted Average Amortization Life | Cost | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|---|
| Technology | *4.2 years* | $ | 112,400 | $ | (21,022) | $ | 91,378 |
| Customer lists | *12.9 years* | | 80,200 | | (7,746) | | 72,454 |
| Trademarks and tradenames | *4.7 years* | | 16,742 | | (3,730) | | 13,012 |
| Website content | *3.0 years* | | 24,900 | | (6,192) | | 18,708 |
| Other | *3.0 years* | | 256 | | (251) | | 5 |
| **Balance at December 31, 2018** | | **$** | **234,498** | **$** | **(38,941)** | **$** | **195,557** |

| | Weighted Average Amortization Life | Cost | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|---|
| Technology | *4.2 years* | $ | 37,500 | $ | (8,694) | $ | 28,806 |
| Customer lists | *11.3 years* | | 33,100 | | (3,239) | | 29,861 |
| Trademarks and tradenames | *4.5 years* | | 6,942 | | (1,992) | | 4,950 |
| Tenant leases | *3.3 years* | | 1,362 | | (504) | | 858 |
| Website content | *3.0 years* | | 7,800 | | (1,300) | | 6,500 |
| Other | *3.0 years* | | 256 | | (248) | | 8 |
| **Balance at December 31, 2017** | | **$** | **86,960** | **$** | **(15,977)** | **$** | **70,983** |

*See* Note 7—Assets Held for Sale for tenant leases classified as held for sale during the fourth quarter of 2018.

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on balances as of December 31, 2018, future amortization is estimated to be as follows *(in thousands)*:

| | Amortization Expense | |
|---|---|---|
| Year ending December 31, 2019 | $ | 45,774 |
| Year ending December 31, 2020 | | 42,819 |
| Year ending December 31, 2021 | | 32,479 |
| Year ending December 31, 2022 | | 24,255 |
| Year ending December 31, 2023 | | 8,442 |
| Thereafter | | 41,788 |
| **Total intangible assets with definite lives, net** | **$** | **195,557** |

*See* Note 8—Business Acquisitions for a discussion of the 2018 and 2017 acquisitions and associated intangibles.

69

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 7—ASSETS HELD FOR SALE

In December 2016, the Company acquired two office buildings in Charlotte, North Carolina for $23.5 million in cash, which included $0.1 million in acquisition-related costs which were capitalized. The buildings were acquired with the intent to use such buildings as the Company's corporate headquarters and rent any unused space. The acquisition was accounted for as an asset purchase and the allocation of the purchase price to the assets acquired was as follows *(in thousands)*:

|  | | Fair Value | Weighted Average Depreciation Life |
|---|---|---|---|
| Land | $ | 5,818 | N/A |
| Building | | 14,679 | 34.0 years |
| Site improvements | | 950 | 6.6 years |
| Tenant leases | | 2,029 | 3.2 years |
| Total purchase price | $ | 23,476 | |

In November 2018, the Company's Board of Directors approved a plan to sell the two office buildings. The properties are expected to be sold in 2019 to an unrelated third-party and are classified as current assets held for sale in the consolidated balance sheet for December 31, 2018. In February 2019, the Company agreed to sell these buildings to an unrelated third party. For additional information, *see* Note 22—Subsequent Events. These properties are associated with the Company's one reportable segment.

Property and equipment classified as held for sale is as follows *(in thousands)*:

|  | | December 31, 2018 |
|---|---|---|
| Land | $ | 5,818 |
| Building | | 14,984 |
| Site improvements | | 950 |
| Computer equipment and capitalized software | | 166 |
| Furniture and other equipment | | 145 |
| **Total gross property and equipment** | | **22,063** |
| Accumulated depreciation | | (1,278) |
| **Total property and equipment, net** | **$** | **20,785** |

Intangible assets classified as held for sale relate to the following *(in thousands)*:

|  | | December 31, 2018 |
|---|---|---|
| Tenant leases | $ | 961 |
| **Total gross intangible assets** | | **961** |
| Accumulated amortization | | (468) |
| **Total intangible assets, net** | **$** | **493** |

70

Future rental income from the building tenants as of December 31, 2018 under operating lease agreements having an initial or remaining non-cancelable lease term in excess of one year are as follows *(in thousands)*:

| Year ending December 31, | | Amount |
|---|---|---|
| 2019 | $ | 657 |
| 2020 | | 673 |
| 2021 | | 269 |
| 2022 | | 59 |
| 2023 | | 56 |
| Thereafter | | 65 |
| **Total** | $ | **1,779** |

Rental income of $0.9 million in 2018 and $1.6 million in 2017 is included in other income on the accompanying consolidated statement of operations and comprehensive income.

## NOTE 8—BUSINESS ACQUISITIONS

### *2018 Acquisitions*

#### QuoteWizard

On October 31, 2018, the Company acquired QuoteWizard.com, LLC ("QuoteWizard"), one of the largest insurance comparison marketplaces in the growing online insurance advertising market. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers.

The Company paid $299.9 million in initial cash consideration, funded through $174.9 million of cash on hand and $125.0 million drawn on the Revolving Credit Facility (defined below), and could make up to three additional earnout payments, each ranging from zero to $23.4 million, based on certain defined operating results during the earnout periods November 1, 2018 through October 31, 2019, November 1, 2019 through October 31, 2020, and November 1, 2020 through October 31, 2021. These additional payments, to the extent earned, will be payable in cash. The Company has estimated a preliminary purchase price of $313.3 million, comprised of the upfront cash payment of $299.9 million, $13.9 million for the estimated fair value of the earnout payments, and an estimated $0.5 million post-closing reduction to working capital.

As of December 31, 2018, the estimated fair value of the contingent consideration totaled $20.7 million, which is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During 2018, the Company recorded $6.8 million of contingent consideration expense in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. The preliminary allocation of purchase price to the assets acquired and liabilities assumed is as follows *(in thousands)*:

| | | Preliminary Fair Value |
|---|---|---|
| Net working capital | $ | 8,535 |
| Fixed assets | | 1,501 |
| Intangible assets | | 120,400 |
| Goodwill | | 182,863 |
| Other noncurrent assets | | 17 |
| **Total preliminary purchase price** | $ | **313,316** |

71

https://www.sec.gov/Archives/edgar/data/1434620/000143462119000014/tree-12312018x10k.htm

08-13555-mg  Doc 2614-3  Filed 04/01/22  Entered 06/04/21 14:23:28  Exhibit

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, customer relationships, content and trademarks and tradenames. The estimated fair values of the developed technology were determined using excess earnings analysis, the customer relationships were determined using the distributor method, the content was determined using cost replacement analysis, and the trademarks and tradenames were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Preliminary Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $ | 68,900 | 4 years |
| Customer lists |  | 42,700 | 14.7 years |
| Content |  | 1,000 | 3 years |
| Trademarks and tradenames |  | 7,800 | 5 years |
| **Total intangible assets** | **$** | **120,400** | **7.9 years** |

As of December 31, 2018, the Company has not completed its determination of the final purchase price or the final allocation of the purchase price to the assets and liabilities of the acquisition. The purchase price and final allocation of purchase price is expected to be finalized in the first quarter of 2019. Any adjustment to the preliminary purchase price or the assets and liabilities assumed with the acquisition will adjust goodwill.

The Company recorded preliminary goodwill of $182.9 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to QuoteWizard as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of QuoteWizard than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible.

As of the acquisition date, the Company's consolidated results of operations include the results of the acquired QuoteWizard business. In 2018, revenue of $31.3 million and net income from continuing operations of $2.2 million, which excludes any contingent consideration expense associated with the acquisition, have been included in the Company's consolidated results of operations. Acquisition-related costs were $4.8 million in 2018 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

The unaudited pro forma financial results for the years ended December 31, 2018 and 2017 below combine the consolidated results of the Company and QuoteWizard, giving effect to the acquisition as if it had been completed on January 1, 2017. This unaudited pro forma financial information is presented for informational purposes only and is not indicative of future operations or results had the acquisition been completed as of January 1, 2017, or any other date.

The unaudited pro forma financial results include adjustments for additional amortization expense based on the fair value of the intangible assets with definite lives and their estimated useful lives, as well as changes in depreciation expense associated with the change in fair value of the property, plant and equipment recorded in relation to the acquisition. Interest expense was adjusted to eliminate historical interest associated with QuoteWizard's revolving credit facility and notes payable that were not assumed with the acquisition, as well as reflect incremental interest expense associated with debt issued to finance the acquisition. The provision for income taxes from continuing operations has also been adjusted to reflect taxes on the historical results of operations of QuoteWizard. QuoteWizard did not pay taxes at the entity level as it was a limited liability company whose members elected for it to be taxed as a partnership.

|  | 2018 | 2017 |
|---|---|---|
|  | *(in thousands)* | |
| Pro forma revenue | $ 900,978 | $ 701,184 |
| Pro forma net income from continuing operations | $ 110,015 | $ 1,164 |

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The unaudited pro forma net income from continuing operations in 2018 includes the aggregate after tax contingent consideration expense associated with the QuoteWizard earnout of $4.9 million. The unaudited pro forma net income from continuing operations for 2017 has been adjusted to include acquisition-related costs of $5.9 million incurred by the Company and QuoteWizard that are directly attributable to the acquisition, which will not have an ongoing impact. Accordingly, these acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for 2018.

**Student Loan Hero**

On July 23, 2018, the Company acquired Student Loan Hero, Inc., a personal finance website dedicated to helping student loan borrowers manage their student debt. Student Loan Hero offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. The Company made an upfront cash payment of $60.7 million at the closing of the transaction, of which $2.3 million was recognized as severance expense in the Company's consolidated statements of operations and comprehensive income. The purchase price of $60.4 million is comprised of the upfront cash payment of $60.7 million less the $2.3 million recognized as severance expense, and a $2.0 million post-closing payment for working capital settlement.

The acquisition has been accounted for as a business combination. During 2018, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
|---|---|
| Net working capital | $ 5,429 |
| Intangible assets | 19,600 |
| Goodwill | 40,856 |
| Deferred tax liabilities | (5,467) |
| **Total purchase price** | **$ 60,418** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of content, customer relationships and trademarks and tradenames. The estimated fair values of the content was determined using excess earnings analysis, the customer relationships were determined using the distributor method and the trademarks and tradenames were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Content | $ 16,100 | 3 years |
| Customer lists | 2,500 | 10 years |
| Trademarks and tradenames | 1,000 | 5 years |
| **Total intangible assets** | **$ 19,600** | **4.0 years** |

The Company recorded goodwill of $40.9 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to Student Loan Hero as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of Student Loan Hero than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will not be tax deductible. Acquisition-related costs were $0.5 million in 2018 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

73

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Ovation**

On June 11, 2018, the Company acquired Ovation Credit Services, Inc., a leading provider of credit services with a strong customer service reputation. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports.

The Company paid $12.2 million in initial cash consideration and could make up to two additional earnout payments, each ranging from zero to $4.375 million, based on certain defined operating metrics during the earnout periods July 1, 2018 through June 30, 2019 and July 1, 2019 through June 30, 2020. These additional payments, to the extent earned, will be payable in cash. The purchase price of $17.9 million is comprised of the upfront cash payment of $12.2 million, $5.8 million for the estimated fair value of the earnout payments, and a $0.1 million post-closing receipt for working capital settlement.

As of December 31, 2018, the estimated fair value of the contingent consideration totaled $7.4 million, of which $4.1 million is included in current contingent consideration and $3.3 million is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During 2018, the Company recorded $1.6 million of contingent consideration expense in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. The preliminary allocation of purchase price to the assets acquired and liabilities assumed is as follows *(in thousands)*:

|  | | Preliminary Fair Value |
|---|---|---|
| Net working capital | $ | 323 |
| Fixed assets | | 76 |
| Intangible assets | | 8,900 |
| Goodwill | | 11,260 |
| Net deferred tax liabilities | | (2,688) |
| **Total purchase price** | **$** | **17,871** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, customer relationships and trademarks and tradenames. The estimated fair values of the developed technology were determined using excess earnings analysis, the customer relationships were determined using cost savings analysis and the trademarks and tradenames were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | | Fair Value | Weighted Average Amortization Life |
|---|---|---|---|
| Technology | $ | 6,000 | 7 years |
| Customer lists | | 1,900 | 1 year |
| Trademarks and tradenames | | 1,000 | 4 years |
| **Total intangible assets** | **$** | **8,900** | **5.4 years** |

As of December 31, 2018, the Company has not completed its determination of the final allocation of the purchase price to the assets and liabilities of the acquisition. The final allocation of purchase price is expected to be finalized in the first quarter of 2019. Any adjustment to the assets and liabilities assumed with the acquisition will adjust goodwill.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company recorded preliminary goodwill of $11.3 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to Ovation as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of Ovation than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will not be tax deductible. Acquisition-related costs were $0.4 million in 2018 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

### *2017 Acquisitions*

### SnapCap

On September 19, 2017, the Company acquired certain assets of Snap Capital LLC, which does business under the name SnapCap ("SnapCap"). SnapCap, a tech-enabled online platform, connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach. The Company paid $11.9 million of initial cash consideration and could make up to three additional contingent consideration payments, each ranging from zero to $3.0 million, based on certain defined operating results during the periods of October 1, 2017 through September 30, 2018, October 1, 2018 through September 30, 2019 and October 1, 2019 through March 31, 2020. These additional payments, to the extent earned, will be payable in cash. The purchase price for the acquisition is $18.2 million, comprised of the upfront cash payment of $11.9 million and $6.3 million for the estimated fair value of the contingent consideration.

As of December 31, 2018, the estimated fair value of the contingent consideration totaled $6.7 million, of which $3.0 million is included in current contingent consideration and $3.7 million is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During 2018 and 2017, the Company recorded a gain of $0.3 million and expense of $0.7 million, respectively, in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

In January 2019, the Company paid $3.0 million related to the earnout payment for the period of October 1, 2017 through September 30, 2018.

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
| --- | --- |
| Net working capital and other assets | $ 42 |
| Fixed assets | 146 |
| Intangible assets | 4,300 |
| Goodwill | 13,738 |
| **Total purchase price** | **$ 18,226** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of developed technology, customer relationships and trade name and trademarks. The estimated fair values of the developed technology were determined using cost savings analysis, the customer relationships were determined using the excess earnings analysis method and the trade name and trademarks were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

75

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm

LENDINGTREE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | | Fair Value | Weighted Average Amortization Life |
|---|---|---|---|
| Technology | $ | 400 | 3 years |
| Customer lists | | 3,300 | 10 years |
| Trade name and trademarks | | 600 | 5 years |
| **Total intangible assets** | **$** | **4,300** | **8.7 years** |

The Company recorded goodwill of $13.7 million, which represents the excess of the purchase price over the estimated fair value of the intangible assets acquired. The goodwill is primarily attributable to SnapCap as a going concern which represents the ability of the Company to earn a higher return on the collection of assets and business of SnapCap than if those assets were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible. Acquisition-related costs were $0.3 million in 2017 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

**MagnifyMoney**

On June 20, 2017, the Company acquired the membership interests of Camino Del Avion (Delaware), LLC, which does business under the name MagnifyMoney ("MagnifyMoney") for $29.6 million cash consideration at the closing of the transaction. Camino del Avion (Delaware), LLC was immediately merged with and into LendingTree, LLC following such acquisition. MagnifyMoney is a leading consumer-facing media property that offers editorial content, expert commentary, tools and resources to help consumers compare financial products and make informed financial decisions. The Company also acquired an option to purchase an affiliate in India, which provides technology and research support to MagnifyMoney under a services agreement, for an estimated fair value of $0.5 million at any time during the three years after the closing. This purchase option was exercised on December 31, 2018.

In addition, the Company issued two key employees of MagnifyMoney restricted stock unit awards for a total of 38,468 shares of Company common stock. In connection with the terms of the purchase option described above, the Company issued a further restricted stock unit award for 19,234 shares to a key employee of technology and research operations in India upon the exercise of the purchase option. The total value of these restricted stock unit awards was $10.0 million on June 20, 2017. All of these restricted stock units will vest, if at all, on the basis of performance conditions following the acquisition.

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

| | | Fair Value |
|---|---|---|
| Net working capital | $ | 921 |
| Intangible assets | | 9,700 |
| Goodwill | | 23,784 |
| Deferred tax liabilities | | (4,176) |
| Noncontrolling interest | | (637) |
| **Total purchase price** | **$** | **29,592** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of content, developed technology, customer relationships and trade name and trademarks. The estimated fair values of the content was determined using excess earnings analysis, developed technology was determined using cost savings analysis, the customer relationships were determined using the distributor method and the trade name and trademarks were determined using relief from royalty analysis.

76

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

| | | Fair Value | Weighted Average Amortization Life |
|---|---|---|---|
| Technology | $ | 200 | 3 years |
| Customer lists | | 1,100 | 9 years |
| Trade name and trademarks | | 600 | 4 years |
| Content | | 7,800 | 3 years |
| **Total intangible assets** | **$** | **9,700** | **3.7 years** |

The Company recorded goodwill of $23.8 million, which represents the excess of the purchase price over the estimated fair value of the tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to MagnifyMoney as a going concern which represents the ability of the Company to earn a higher return on the collection of assets and business of MagnifyMoney than if those assets were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will not be tax deductible. Acquisition-related costs were $0.4 million in 2017 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

Prior to exercising the purchase option to acquire technology and support operations in India on December 31, 2018, the Company determined that this was a variable interest entity which must be consolidated for financial reporting. The Company recorded the assets, liabilities and non-controlling interest in this entity at their estimated fair value as of December 31, 2017.

**DepositAccounts**

On June 14, 2017, the Company acquired substantially all of the assets of Deposits Online, LLC, which does business under the name DepositAccounts.com ("DepositAccounts"). DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content.

The Company paid $24.0 million of initial cash consideration and could make additional contingent consideration payments of up to $9.0 million. The potential contingent consideration payments are comprised of (i) up to seven payments of $1.0 million each based on specified increases in Federal Funds interest rates during the period commencing on the closing date and ending on June 30, 2020 and (ii) a one-time performance payment of up to $2.0 million based on the net revenue of deposit products during the period of January 1, 2018 through December 31, 2018. These additional payments, to the extent earned, will be payable in cash. The purchase price for the acquisition is $29.0 million, comprised of the upfront cash payment of $24.0 million and $5.0 million for the estimated fair value of the contingent consideration at the time of closing the acquisition.

In the third quarter of 2017, the Company made a payment of $1.0 million associated with a specified increase in the Federal Funds rate in June 2017. In each of the four quarters of 2018, the Company paid $1.0 million associated with specified increases in the Federal Funds rate in December 2017, March 2018, June 2018 and September 2018, respectively, which are included within cash flows from financing activities on the consolidated statement of cash flows, except for an immaterial portion of the fourth quarter payment included within cash flows from operating activities. As of December 31, 2018, the estimated fair value of the contingent consideration totaled $4.0 million, which is included in current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the portion of the contingent consideration payments based on increases in interest rates is determined using a scenario approach based on the interest rate forecasts of Federal Open Market Committee participants. The estimated fair value of the portion of the contingent consideration payments potentially earned based on net revenue is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During each of 2018 and 2017, the Company recorded $2.0 million of contingent consideration expense in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

In January 2019, the Company paid $1.0 million associated with a specified increase in the Federal Funds rate in December 2018.

77

LENDINGTREE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

| | | Fair Value |
|---|---|---|
| Intangible assets | $ | 9,600 |
| Goodwill | | 19,389 |
| **Total purchase price** | **$** | **28,989** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of developed technology, customer relationships and trade name and trademarks. The estimated fair values of the developed technology were determined using excess earnings analysis, the customer relationships were determined using the distributor method and the trade name and trademarks were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

| | | Fair Value | Weighted Average Amortization Life |
|---|---|---|---|
| Technology | $ | 8,600 | 5 years |
| Customer lists | | 600 | 8 years |
| Trade name and trademarks | | 400 | 4 years |
| **Total intangible assets** | **$** | **9,600** | **5.2 years** |

The Company recorded goodwill of $19.4 million, which represents the excess of the purchase price over the estimated fair value of the intangible assets acquired. The goodwill is primarily attributable to DepositAccounts as a going concern which represents the ability of the Company to earn a higher return on the collection of assets and business of DepositAccounts than if those assets were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible. Acquisition-related costs were $0.3 million in 2017 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

## *2016 Acquisitions*

### CompareCards

On November 16, 2016, the Company acquired all of the membership interests of Iron Horse Holdings, LLC, which does business under the name CompareCards ("CompareCards"). CompareCards is an online marketing platform for credit cards, which the Company is utilizing to grow its existing credit card business. The Company paid $80.7 million in initial cash consideration and agreed to make two earnout payments, each up to $22.5 million, based on the amount of earnings before interest, taxes, depreciation and amortization CompareCards generates during the periods of January 1, 2017 through December 31, 2017 and January 1, 2018 through December 31, 2018, or up to $45.0 million in aggregate payments. The purchase price for the acquisition is $103.8 million comprised of an upfront cash payment of $80.7 million on November 16, 2016 and $23.1 million for the estimated fair value of the earnout payments at the time of closing the acquisition.

In the first quarter of 2018, the Company paid $22.5 million related to the earnout payment for the period of January 1, 2017 through December 31, 2017, which is included within cash flows from financing activities on the consolidated statement of cash flows. In the second quarter of 2018, the Company paid $22.5 million related to the earnout payment for the period of January 1, 2018 through December 31, 2018, of which $0.6 million is included within cash flows from financing activities and $21.9 million is included within cash flows from operating activities on the consolidated statement of cash flows. During 2018 and 2017, the Company recorded $0.7 million and $21.2 million, respectively, of contingent consideration expense in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the earnout payments.

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of the purchase price with respect to the assets acquired and liabilities assumed as follows *(in thousands)*:

78

08-13555-mg    Doc 61443    Filed 04/01/21    Entered 04/01/21 14:23:28    Exhibit

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Fair Value |
|---|---|
| Accounts receivable | $ 3,538 |
| Intangible assets | 55,400 |
| Goodwill | 52,450 |
| Accounts payable and accrued liabilities | (7,638) |
| **Total purchase price** | **$ 103,750** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of developed technology, customer relationships, and trade name and trademarks. The estimated fair values of the developed technology was determined using excess earnings analysis, the customer relationships were determined using the distributor method and the trade name and trademarks were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $ 27,900 | 4 years |
| Customer lists | 23,200 | 12 years |
| Trade name and trademarks | 4,300 | 5 years |
| **Total intangible assets** | **$ 55,400** | **7.4 years** |

The Company recorded goodwill of $52.5 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to CompareCards as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of CompareCards than if those assets and business were to be acquired and managed separately. The benefit of access to the work force is an additional relevant element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible. Acquisition-related costs of $0.1 million and $0.4 million in 2017 and 2016, respectively, are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

**SimpleTuition, Inc.**

On May 31, 2016, the Company acquired certain assets of SimpleTuition, Inc. ("SimpleTuition"), a leading online marketing platform for student loans, for $5.0 million of cash consideration. Of the purchase price, $4.5 million was funded with available cash on hand and $0.5 million was held-back in satisfaction of any potential claims. The $0.5 million hold-back was paid in full in the second quarter of 2018.

The acquisition has been accounted for as a business combination. During 2016, the Company completed its determination of the final allocation of the purchase price with respect to the acquired assets. The Company has recorded the $5.0 million paid to the tangible and identifiable intangible assets based on their fair value, with the residual recorded to goodwill in the Company's one reportable segment. No liabilities were assumed. Acquisition-related costs were $0.1 million for 2016 and are included in general and administrative expense on the consolidated statements of operations and comprehensive income. The allocation of the purchase price to the assets acquired is as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Accounts receivable | $ 125 | N/A |
| Total intangible assets with definite lives, net | $ 4,500 | 9.2 years |
| Goodwill | $ 375 | N/A |

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm     116/159

08-13555-mg    Doc 2674-13 PF    Filed 04/01/22    Entered 04/01/22 14:23:28    Exhibit
Complaint    Pg 886 of 1033

08-13555-mg    Doc 2674-13 PF    Filed 04/01/22    Entered 04/01/22 14:23:28    Exhibit
Complaint    Pg 886 of 1033

# LENDINGTREE, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The purchase was an asset acquisition for income tax purposes and the Company will deduct the recognized goodwill for income tax purposes. The acquisition of SimpleTuition was not considered significant to the accompanying consolidated financial statements.

*Pro forma Financial Results and Other Information*

The unaudited pro forma financial results for the years ended December 31, 2018, 2017 and 2016 combine the consolidated results of the Company and CompareCards, DepositAccounts, MagnifyMoney, SnapCap, Ovation, Student Loan Hero and QuoteWizard, giving effect to the acquisitions as if the CompareCards acquisition had been completed on January 1, 2015, as if the DepositAccounts, MagnifyMoney and SnapCap acquisitions had been completed on January 1, 2016, and as if the Ovation, Student Loan Hero and QuoteWizard acquisitions had been completed on January 1, 2017. This unaudited pro forma financial information is presented for informational purposes only and is not indicative of future operations or results had the acquisitions been completed as of January 1, 2015, 2016 or 2017, or any other date.

The unaudited pro forma financial results include adjustments for additional amortization expense based on the fair value of the intangible assets with definite lives and their estimated useful lives. Depreciation expense and interest expense was also adjusted for the impact of the QuoteWizard acquisition, as described above. The provision for income taxes from continuing operations has been adjusted to reflect taxes on the historical results of operations of CompareCards, DepositAccounts, SnapCap and QuoteWizard. CompareCards, DepositAccounts, SnapCap and QuoteWizard did not pay taxes at the entity level as these entities were limited liability companies whose members elected for them to be taxed as a partnership.

|  | 2018 | 2017 | 2016 |
|---|---|---|---|
|  | *(in thousands)* | | |
| Pro forma revenue | $ 917,393 | $ 729,370 | $ 461,969 |
| Pro forma net income from continuing operations | $ 111,376 | $ (2,998) | $ 31,139 |

The unaudited pro forma net income from continuing operations in 2018 includes the aggregate after tax contingent consideration expense associated with the CompareCards, DepositAccounts, SnapCap, Ovation and QuoteWizard earnouts of $7.7 million. The unaudited pro forma net income from continuing operations for 2017 has been adjusted to include acquisition-related costs of $6.9 million incurred by the Company, Student Loan Hero and QuoteWizard that are directly attributable to the Ovation, Student Loan Hero and QuoteWizard acquisitions, which will not have an ongoing impact. Accordingly, these acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for 2018.

The unaudited pro forma net income from continuing operations in 2017 include the aggregate after tax contingent consideration expense associated with the CompareCards, DepositAccounts and SnapCap earnouts of $14.4 million. The unaudited pro forma net income from continuing operations for 2016 has been adjusted to include acquisition-related costs of $1.0 million incurred by the Company, DepositAccounts, MagnifyMoney and SnapCap that are directly attributable to the DepositAccounts, MagnifyMoney and SnapCap acquisitions, which will not have an ongoing impact. Accordingly, these acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for 2017.

The Company's consolidated results of operations include the results of the business acquisitions completed in 2018 as of the acquisition dates. In 2018, revenue of $44.8 million and net income from continuing operations of $1.8 million, which excludes any contingent consideration expense associated with the acquisitions, have been included in the Company's consolidated results of operations.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 9—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES

Accrued expenses and other current liabilities consist of the following *(in thousands)*:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Accrued advertising expense | $ 60,268 | $ 40,727 |
| Accrued compensation and benefits | 6,381 | 7,679 |
| Accrued professional fees | 2,549 | 2,072 |
| Customer deposits and escrows | 6,913 | 5,564 |
| Contribution to LendingTree Foundation [a] | 3,333 | 10,000 |
| Other | 13,746 | 11,141 |
| **Total accrued expenses and other current liabilities** | **$ 93,190** | **$ 77,183** |

(a) The Company expects to pay $3.3 million of the $10.0 million contribution in 2019, and the remainder by 2021.

## NOTE 10—SHAREHOLDERS' EQUITY

Basic and diluted net income per share was determined based on the following share data *(in thousands)*:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| **Weighted average basic common shares** | 12,504 | 11,945 | 11,812 |
| Effect of stock options | 1,043 | 1,626 | 886 |
| Effect of dilutive share awards | 153 | 111 | 75 |
| Effect of Convertible Senior Notes and warrants | 397 | — | — |
| **Weighted average diluted common shares** | 14,097 | 13,682 | 12,773 |

For the year ended December 31, 2018, the weighted average shares that were anti-dilutive, and therefore excluded from the calculation of diluted income per share, included options to purchase 0.4 million shares of common stock. For the year ended December 31, 2017, the weighted average shares that were anti-dilutive included options to purchases 0.1 million shares of common stock.

The 0.625% Convertible Senior Notes due June 1, 2022 and the warrants issued by the Company in the second quarter of 2017 could be converted into the Company's common stock in the future, subject to certain contingencies. *See* Note 13—Debt for additional information. Shares of the Company's common stock associated with these instruments were excluded from the calculation of diluted income per share during 2017 as they were anti-dilutive since the conversion price of the Convertible Senior Notes and the strike price of the warrants were greater than the average market price of the Company's common stock.

*See* Note 11—Stock-Based Compensation for a full description of outstanding equity awards.

**Common Stock Repurchases**

In each of January 2010, May 2014, January 2016, February 2016 and February 2018, the board of directors authorized and the Company announced the repurchase of up to $10.0 million, $10.0 million, $50.0 million, $40.0 million and $100.0 million, respectively, of LendingTree's common stock. During the years ended December 31, 2018, 2017 and 2016, the Company purchased 379,449, 75,393 and 690,218 shares, respectively, of its common stock for aggregate consideration of $92.6 million, $21.0 million and $48.5 million, respectively. At December 31, 2018, $35.1 million remains authorized for share repurchase.

81

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 11—STOCK-BASED COMPENSATION

The Company currently has two active plans, the Fifth Amended and Restated LendingTree 2008 Stock and Annual Incentive Plan (the "Equity Award Plan") and the LendingTree 2017 Inducement Grant Plan (the "Inducement Plan"), under which future awards may be granted, which currently covers outstanding stock options to acquire shares of the Company's common stock, restricted stock, restricted stock with performance conditions, RSUs and RSUs with performance conditions, and provides for the future grants of these and other equity awards. Under the Equity Award Plan and the Inducement Plan, the Company is authorized to grant stock options, restricted stock, RSUs and other equity-based awards for up to 5.35 million and 0.5 million shares, respectively, of LendingTree common stock to employees, and, under the Equity Award Plan only, to non-employee consultants and directors.

The Equity Award Plan and Inducement Plan each have a stated term of ten years and provide that the exercise price of stock options granted will not be less than the market price of the common stock on the grant date. The Equity Award Plan and Inducement Plan do not specify grant dates or vesting schedules, as those determinations are delegated to the Compensation Committee of the board of directors. Each grant agreement reflects the vesting schedule for that particular grant, as determined by the Compensation Committee. The Compensation Committee has the authority to modify the vesting provisions of an award.

Non-cash compensation related to equity awards is included in the following line items in the accompanying consolidated statements of operations and comprehensive income *(in thousands)*:

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2018** | | **2017** | | **2016** | |
| Cost of revenue | $ | 378 | $ | 175 | $ | 129 |
| Selling and marketing expense |  | 3,568 |  | 3,973 |  | 2,722 |
| General and administrative expense |  | 34,325 |  | 16,874 |  | 4,699 |
| Product development |  | 6,094 |  | 2,339 |  | 2,097 |
| **Total non-cash compensation** | $ | 44,365 | $ | 23,361 | $ | 9,647 |

For the years ended December 31, 2018, 2017 and 2016, the Company recognized $11.2 million, $9.5 million and $3.7 million of income tax benefit related to non-cash compensation. Additionally, for the years ended December 31, 2018 and 2017, the Company recognized $77.6 million and $12.9 million, respectively, of excess tax benefit, including state taxes, in income tax expense. *See* Note 2 —Significant Accounting Policies—Recent Accounting Pronouncements, for additional information regarding excess tax benefits and deficiencies.

### Stock Options

A summary of the changes in outstanding stock options is as follows:

|  | Number of Options | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|---|---|---|
|  |  |  | *(per option)* | | *(in years)* | | *(in thousands)* |
| **Outstanding at December 31, 2017** | 1,863,739 | $ | 30.70 |  |  |  |  |
| Granted | 77,576 |  | 293.18 |  |  |  |  |
| Exercised | (994,222) |  | 16.83 |  |  |  |  |
| Forfeited | (6,560) |  | 301.51 |  |  |  |  |
| Expired | — |  | — |  |  |  |  |
| **Outstanding at December 31, 2018** | 940,533 | $ | 65.12 |  | 5.17 | $ | 150,897 |
| **Options exercisable** | 766,552 | $ | 28.37 |  | 4.40 | $ | 146,742 |

(a)  The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $219.57 on the last trading day of 2018 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on December 31, 2018. The intrinsic value changes based on the market value of the Company's common stock.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As of December 31, 2018, there was approximately $15.8 million of unrecognized compensation cost related to stock options. These costs are expected to be recognized over a weighted-average period of approximately 2.3 years.

Upon exercise, the intrinsic value represents the pre-tax difference between the Company's closing stock price on the exercise date and the exercise price, multiplied by the number of stock options exercised. During the years ended December 31, 2018, 2017 and 2016, the total intrinsic value of stock options that were exercised was $268.3 million, $27.7 million and $0.3 million, respectively. Cash received from stock option exercises and the related actual tax benefit realized were $16.7 million and $73.3 million, respectively, for the year ended December 31, 2018.

During the years ended December 31, 2018, 2017 and 2016, the Company granted stock options with a weighted average grant date fair value per share of $150.55 , $105.15, and $40.05, respectively, of which the vesting periods include (a) immediately upon grant, (b) five months from the grant date, (c) one year from the grant date, (d) 50% over a period of two years from the grant date, (e) 20% over a period of one and half years to five and half years, (f) 33% over a period of three years from the grant date, (g) 25% and 75% over a period of two years and three years, respectively, (h) four years from the grant date, (i) 25% over a period of four years from the grant date, (j) 8% over a period of five months and 18% in each of the following five years, (k) 25%, 25% and 50% over a period of one year, two years and three years, respectively, and (l) 50%, 31% and 19% over a period of two years, three years and four years, respectively.

For purposes of determining stock-based compensation expense, the weighted average grant date fair value per share of the stock options was estimated using the Black-Scholes option pricing model, which requires the use of various key assumptions. The weighted average assumptions used are as follows:

| | Year Ended December 31, | | |
| | **2018** | **2017** | **2016** |
|---|---|---|---|
| Expected term [1] | 5.00 - 6.71 years | 5.00 - 7.00 years | 5.22 - 6.38 years |
| Expected dividend [2] | — | — | — |
| Expected volatility [3] | 50% - 53% | 51% - 52% | 48% - 53% |
| Risk-free interest rate [4] | 2.33% - 3.06% | 1.74% - 2.24% | 1.10% - 2.18% |

(1) The expected term of stock options granted was calculated using the 'Simplified Method', which utilizes the midpoint between the weighted average time of vesting and the end of the contractual term. This method was utilized for the stock options due to a lack of historical exercise behavior by the Company's employees.

(2) For all stock options granted during the years ended December 31, 2018, 2017 and 2016, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of the Company's common stock.

(4) The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

During the years ended December 31, 2018, 2017 and 2016, the total fair value of options vested was $11.4 million, $4.1 million and $0.9 million, respectively.

83

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Stock Options with Performance Conditions**

A summary of the changes in outstanding stock options with performance conditions is as follows:

| | Number of Options | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|---|
| | | | *(per option)* | *(in years)* | *(in thousands)* |
| **Outstanding at December 31, 2017** | 37,877 | $ | 308.90 | | |
| Granted | — | | — | | |
| Exercised | — | | — | | |
| Forfeited | — | | — | | |
| Expired | — | | — | | |
| **Outstanding at December 31, 2018** | 37,877 | $ | 308.90 | 8.95 | $ — |
| **Options exercisable** | — | $ | — | 0.00 | $ — |

(a) The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $219.57 on the last trading day of 2018 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on December 31, 2018. The intrinsic value changes based on the market value of the Company's common stock.

No stock options with performance conditions were granted in 2018 or 2016. During 2017, the Company granted stock options with performance conditions with a weighted average grant date fair value per share of $152.45, of which vesting periods range from 1.2 years to 2.2 years, pending the attainment of certain performance targets set at the time of grant.

As of December 31, 2018, the performance conditions associated with the performance-based nonqualified stock options had not been met. None of the performance-based nonqualified stock options had been earned, and no compensation cost associated with these options has been recorded, as of December 31, 2018.

For purposes of determining stock-based compensation expense, the weighted average grant date fair value per share of the stock options was estimated using the Black-Scholes option pricing model, which requires the use of various key assumptions. The weighted average assumptions used are as follows:

| | Year ended December 31, 2017 |
|---|---|
| Expected term [1] | 5.50 - 6.00 years |
| Expected dividend [2] | — |
| Expected volatility [3] | 51% |
| Risk-free interest rate [4] | 2.16% - 2.23% |

(1) The expected term of stock options granted was calculated using the 'Simplified Method', which utilizes the midpoint between the weighted average time of vesting and the end of the contractual term. This method was utilized for the stock options due to a lack of historical exercise behavior by the Company's employees.

(2) For all stock options granted during the year ended December 31, 2017, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of the Company's common stock.

(4) The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

84

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Restricted Stock Units**

A summary of the changes in outstanding nonvested RSUs, exclusive of RSUs granted to the Chairman and Chief Executive Officer in 2018 described below, is as follows:

| | RSUs | |
| --- | --- | --- |
| | Number of Units | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at December 31, 2017** | 152,829 | $ 121.68 |
| Granted [a] | 121,751 | 272.93 |
| Vested | (68,915) | 103.56 |
| Forfeited | (13,993) | 213.59 |
| **Nonvested at December 31, 2018** | **191,672** | **$ 217.56** |

(a)  The grant date fair value per share of the RSUs is calculated as the closing market price of LendingTree's common stock at the time of grant.

As of December 31, 2018, there was approximately $30.5 million of unrecognized compensation cost related to these RSUs. These costs are expected to be recognized over a weighted-average period of approximately 2.0 years.

The total fair value of RSUs that vested during the years ended December 31, 2018, 2017 and 2016 was $21.8 million, $11.5 million and $10.1 million, respectively.

**Restricted Stock Units with Performance Conditions**

A summary of the changes in outstanding nonvested RSUs with performance conditions is as follows:

| | RSUs with Performance Conditions | |
| --- | --- | --- |
| | Number of Units | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at December 31, 2017** | 111,205 | $ 160.34 |
| Granted [a] | 19,234 | 178.85 |
| Vested | (30,806) | 121.37 |
| Forfeited | (7,152) | 94.28 |
| **Nonvested at December 31, 2018** | **92,481** | **$ 182.28** |

(a)  The grant date fair value per share of the RSUs with performance conditions is calculated as the closing market price of LendingTree's common stock at the time of grant.

During 2018, 2017 and 2016, the Company granted RSUs with performance conditions to certain employees, of which vesting periods range from 0.33 years to 4.00 years, pending the attainment of certain performance targets set at the time of grant.

As of December 31, 2018, there was approximately $10.3 million of unrecognized compensation cost related to RSUs with performance conditions. These costs are expected to be recognized over a weighted-average period of approximately 1.0 year.

The total fair value of RSUs with performance conditions that vested during the years ended December 31, 2018, 2017, and 2016 was $7.9 million, $0.4 million, and 0.2 million, respectively.

85

LENDINGTREE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Restricted Stock**

Subsequent to the end of 2017, there was no outstanding nonvested restricted stock other than the restricted stock grants to the Chairman and Chief Executive Officer described in the section below.

The total fair value of restricted stock, exclusive of restricted stock granted to the Chairman and Chief Executive Officer in 2018 described below, that vested during the years ended December 31, 2017 and 2016 was $2.1 million and $3.9 million, respectively.

**Chairman and Chief Executive Officer Grants**

*2017 Grants*

On July 25, 2017, the Company's Compensation Committee approved new compensation arrangements for its Chairman and Chief Executive Officer. The new compensation arrangements include the issuance of performance based equity compensation grants with a modeled total grant date value of $87.5 million of which 25% (119,015 shares) would be in the form of time-vested restricted stock awards with a performance condition and 75% (a maximum of 769,376 shares) would be in the form of performance-based nonqualified stock options.

The performance-based nonqualified stock options have a target number of shares that vest upon achieving targeted total shareholder return performance of 110% stock price appreciation and a maximum number of shares for achieving superior performance up to 167% of the target number of shares. No shares will vest unless 70% of the targeted performance is achieved. Time-based service vesting conditions would also have to be satisfied in order for performance-vested shares to become fully vested and no longer subject to forfeiture. On July 26, 2017, an initial grant of performance-based nonqualified stock options with a target number of shares of 402,694 and a maximum number of shares of 672,499 were issued with an exercise price of $183.80, the closing stock price on July 26, 2017. The performance measurement period ends on September 30, 2022. The fair value of the performance-based stock options will be recognized on a straight-line basis through the vest date of September 30, 2022, whether or not any of the total shareholder return targets are met.

The Company's Equity Award Plan imposes a per employee upper annual grant limit of 672,500 shares. As a result, the remaining 58,010 target performance-based nonqualified stock options and potential performance-based restricted stock awards were awarded on January 2, 2018. The form of the awards consisted of 31,336 performance-based nonqualified stock options with a per share exercise price of $340.25, and 26,674 performance-based restricted stock awards, substituting for an equal number of the performance-based options, to compensate for the increase in the exercise price of the performance-based option granted on July 26, 2017. These performance-based nonqualified stock options and performance-based restricted stock awards were issued with respective total grant date fair values of $9.5 million and $1.9 million.

As of December 31, 2018, performance-based nonqualified stock options of 312,008 and performance-based restricted stock awards of 19,175 had been earned, which have a vest date of September 30, 2022. As of December 31, 2018 there was approximately $1.4 million of unrecognized compensation cost related to the performance-based restricted stock awards.

On January 2, 2018, the 119,015 time-vested restricted stock awards with a performance condition were granted. The terms of these awards were fixed in the approved new compensation agreements in July 2017 with a total grant date fair value of $21.9 million. The performance condition was tied to the Company's operating results during the first six months of 2018, and has been met. During 2018, 47,603 of these awards vested at a total fair value of $13.6 million. As of December 31, 2018, there was approximately $13.1 million of unrecognized compensation cost related to these time-vested restricted stock awards. These costs are expected to be recognized through the vest date of December 31, 2021.

*2018 Grants*

On February 16, 2018, the Company's Compensation Committee approved the issuance of performance based equity compensation grants to its Chairman and Chief Executive Officer with a modeled total grant date value of $7.5 million, of which 50% (9,896 shares) would be in the form of time-vested restricted stock units and 50% (a maximum of 21,982 shares) would be in the form of performance-based nonqualified stock options. On February 16, 2018, the 9,896 time-vested restricted stock units were granted with a grant date fair value of $378.95. As of December 31, 2018, there was approximately $2.9 million of unrecognized compensation costs related to these RSUs. These costs ares expected to be recognized through the vest date of February 16, 2022.

The performance-based nonqualified stock options have a target number of shares that vest upon achieving targeted total shareholder return performance of 81% stock price appreciation and a maximum number of shares for achieving superior

86

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

performance up to 167% of the target number of shares. No shares will vest unless 41% of the targeted performance is achieved. Time-based service vesting conditions would also have to be satisfied in order for performance-vested shares to become fully vested and no longer subject to forfeiture. On February 16, 2018, the performance-based nonqualified stock options with a target number of shares of 13,163 and a maximum number of shares of 21,982 were issued with an exercise price of $378.95, the closing stock price on February 16, 2018. The performance measurement period ends on March 31, 2022. The fair value of the performance-based stock options will be recognized on a straight-line basis through the vest date of March 31, 2022, whether or not any of the total shareholder return targets are met. As of December 31, 2018, the performance targets associated with the performance-based nonqualified stock options had not been met.

In 2018 and 2017, the Company recorded $20.5 million and $8.9 million, respectively, in stock-based compensation expense related to the 2017 and 2018 grants to its Chairman and Chief Executive Officer in the consolidated statement of operations and comprehensive income.

A summary of changes in outstanding stock options with market conditions is as follows:

| | Number of Options with Market Conditions | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|---|
| | | | (per option) | (in years) | (in thousands) |
| Outstanding at December 31, 2017 | 402,694 | $ | 183.80 | | |
| Granted [b] | 44,499 | | 351.70 | | |
| Exercised | — | | — | | |
| Forfeited | — | | — | | |
| Expired | — | | — | | |
| Outstanding at December 31, 2018 | 447,193 | | 200.51 | 8.62 | $ 14,404 |
| Options exercisable | — | $ | — | 0.00 | $ — |

(a) The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $219.57 on the last trading day of 2018 and the exercise price, multiplied by the number of shares covered by the in-the-money options) that would have been received by the option holder had the option holder exercised these options on December 31, 2018. The intrinsic value changes based on the market value of the Company's common stock.

(b) During the years ended December 31, 2018 and 2017, the Company granted stock options with a weighted-average grant date fair value per share of $296.80 and $142.45, respectively, calculated using the Monte Carlo simulation model, which have vesting dates of March 31, 2022 and September 30, 2022.

For purposes of determining stock-based compensation expense, the weighted-average grant date fair value per share of the stock options was estimated using the Monte Carlo simulation model, which requires the use of various key assumptions. The weighted-average assumptions used are as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2018 | 2017 |
| Expected term [1] | 7.00 - 7.15 years | 7.50 years |
| Expected dividend [2] | — | — |
| Expected volatility [3] | 50% | 50% |
| Risk-free interest rate [4] | 2.38% - 2.81% | 2.12% |

(1) The expected term of stock options with a market condition granted was calculated using the midpoint between the weighted average time of vesting and the end of the contractual term.

(2) For all stock options with a market condition granted during the years ended December 31, 2018 and 2017, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of the Company's common stock.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(4)  The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

As of December 31, 2018, there was approximately $51.3 million of unrecognized compensation cost related to stock options with market conditions. These costs are expected to be recognized over a weighted-average period of approximately 3.7 years.

## NOTE 12—INCOME TAXES

### Income Tax Provision

The components of the income tax expense (benefit) are as follows *(in thousands)*:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Current income tax expense: |  |  |  |
| Federal | $ (1,470) | $ 10,055 | $ 11,519 |
| State | (204) | 2,606 | 2,480 |
| **Current income tax (benefit) expense** | **(1,674)** | **12,661** | **13,999** |
| Deferred income tax (benefit) provision: |  |  |  |
| Federal | (44,950) | (3,805) | 3,703 |
| State | (18,951) | (2,565) | 2,664 |
| **Deferred income tax (benefit) provision** | **(63,901)** | **(6,370)** | **6,367** |
| **Income tax expense (benefit)** | **$ (65,575)** | **$ 6,291** | **$ 20,366** |

A reconciliation of the income tax expense (benefit) to the amounts computed by applying the statutory federal income tax rate to income from continuing operations before income taxes is shown as follows *(in thousands)*:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Federal statutory income tax | $ 9,186 | $ 8,998 | $ 18,051 |
| State income taxes, net of effect of federal tax benefit | (14,884) | (268) | 4,038 |
| Impact of Tax Cuts and Jobs Act | 270 | 9,062 | — |
| Excess tax deductions on non-cash compensation | (59,601) | (11,134) | — |
| Change in (release of) valuation allowance | (12) | 593 | (416) |
| Research and experimentation tax credit | (2,523) | (1,318) | (2,574) |
| Other, net | 1,989 | 358 | 1,267 |
| **Income tax expense (benefit)** | **$ (65,575)** | **$ 6,291** | **$ 20,366** |

During the fourth quarter of 2017, LendingTree recorded a net tax expense of $9.1 million related to the enactment of the TCJA. The expense is primarily related to the remeasurement of LendingTree's deferred tax assets and liabilities considering the TCJA's enacted tax rates and certain other impacts. Simultaneous with the Act, the SEC Staff released Accounting Bulletin No. 118 ("SAB 118"), which allows the use of provisional amounts (reasonable estimates) if the analysis of the impacts of the Act have not been completed when financial statements are issued. During the fourth quarter of 2018, the Company finalized the computations of the income tax effects of the Act. As such, in accordance with SAB 118, the Company's accounting for the effects of the Act is complete. The Company did not significantly adjust provisional amounts recorded in the prior fiscal year and the SAB 118 measurement period subsequently ended on December 22, 2018. Although the Company no longer considers these amounts to be provisional, the determination of the Act's income tax effects may change following future legislation or further interpretation of the Act based on the publication of recently proposed U.S. Treasury regulations and guidance from the Internal Revenue Service and state tax authorities.

88

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Deferred Income Taxes

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows *(in thousands)*:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2018 | | 2017 |
| Deferred tax assets: | | | |
| Provision for accrued expenses | $ 5,953 | $ | 4,368 |
| Net operating loss carryforwards [a] | 59,817 | | 6,296 |
| Non-cash compensation expense | 12,505 | | 8,929 |
| Interest limitation | 3,532 | | — |
| Contingent liabilities | 3,053 | | 6,666 |
| Other | 4,545 | | 2,138 |
| Total gross deferred tax assets | 89,405 | | 28,397 |
| Less: valuation allowance [b] | (2,229) | | (2,694) |
| **Total deferred tax assets, net of the valuation allowance** | **87,176** | | **25,703** |
| Deferred tax liabilities: | | | |
| Intangible and other assets | (4,623) | | (1,960) |
| Other | (892) | | (1,160) |
| **Total gross deferred tax liabilities** | **(5,515)** | | **(3,120)** |
| **Net deferred taxes** | $ **81,661** | $ | **22,583** |

(a) At December 31, 2018, the Company had pre-tax consolidated federal net operating losses ("NOLs") of $203.5 million. The federal NOLs no longer expire under the new TCJA. The Company's NOLs will be available to offset taxable income subject to the Internal Revenue Code Section 382 annual limitation. In addition, the Company has state NOLs of approximately $498.5 million at December 31, 2018 that will expire at various times between 2020 and 2038.

(b) The valuation allowance is related to items for which it is *"more likely than not"* that the tax benefit will not be realized.

Deferred income taxes are presented in the accompanying consolidated balance sheets as follows *(in thousands)*:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2018 | | 2017 |
| Deferred income tax assets | $ 79,289 | $ | 20,156 |
| Non-current assets of discontinued operations | 3,266 | | 2,427 |
| Deferred income tax liabilities | (894) | | — |
| **Net deferred taxes** | $ **81,661** | $ | **22,583** |

### Valuation Allowance

A valuation allowance is provided on deferred tax assets if it is determined that it is *"more likely than not"* that the deferred tax asset will not be realized. As of each reporting date, management considers both positive and negative evidence regarding the likelihood of future realization of the deferred tax assets.

At December 31, 2018, 2017 and 2016, the Company recorded a partial valuation allowance of $2.2 million, $2.7 million and $2.1 million, respectively, primarily related to state net operating losses, which the Company does not expect to be able to utilize prior to expiration.

89

LENDINGTREE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

A reconciliation of the beginning and ending balances of the deferred tax valuation allowance is as follows *(in thousands)*:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| **Balance, beginning of the period** | $ | 2,694 | $ | 2,101 | $ | 2,341 |
| Charges to earnings | | (465) | | 593 | | (240) |
| **Balance, end of the period** | $ | 2,229 | $ | 2,694 | $ | 2,101 |

### Unrecognized Tax Benefits

A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding interest and penalties, is as follows *(in thousands)*:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2018** | | **2017** | |
| **Balance, beginning of the period** | $ | 748 | $ | 550 |
| Additions based on tax positions of the current period | | 249 | | 198 |
| Additions based on tax positions of the prior period | | 130 | | — |
| **Balance, end of the period** | $ | 1,127 | $ | 748 |

Interest and, if applicable, penalties are recognized related to unrecognized tax benefits in income tax expense. Interest and penalties on unrecognized tax benefits included in income tax expense for each of the years ended December 31, 2018, 2017 and 2016 was immaterial.

As of December 31, 2018, the accrual for unrecognized tax benefits, including interest, was $1.2 million, which would benefit the effective tax rate if recognized. As of December 31, 2017, the accrual for unrecognized tax benefits, including interest, was $0.7 million, which would benefit the effective tax rate if recognized.

### Tax Audits

LendingTree is subject to audits by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, any amounts paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by the Company are recorded in the period they become known. As of December 31, 2018, the Company is subject to a federal income tax examination for the tax years 2014 through 2017. In addition, the Company is subject to state and local tax examinations for the tax years 2014 through 2017.

### NOTE 13—DEBT

### Convertible Senior Notes

On May 31, 2017, the Company issued $300.0 million aggregate principal amount of its 0.625% Convertible Senior Notes due June 1, 2022 (the "Notes") in a private placement. The Notes bear interest at a rate of 0.625% per year, payable semi-annually on June 1 and December 1 of each year, beginning on December 1, 2017. The Notes will mature on June 1, 2022, unless earlier repurchased or converted.

The initial conversion rate of the Notes is 4.8163 shares of Common Stock per $1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately $207.63 per share). The conversion rate will be subject to adjustment upon the occurrence of certain specified events but will not be adjusted for accrued and unpaid interest. In addition, upon the occurrence of a fundamental change prior to the maturity of the Notes, the Company will, in certain circumstances, increase the conversion rate by a specified number of additional shares for a holder that elects to convert the Notes in connection with such fundamental change. Upon conversion, the Notes will settle for cash, shares of the Company's stock, or a combination thereof, at the Company's option. It is the intent of the Company to settle the principal amount of the Notes in cash and any conversion premium in shares of its common stock.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Notes are the Company's senior unsecured obligations and will rank senior in right of payment to any of the Company's indebtedness that is expressly subordinated in right of payment to the Notes; equal in right of payment to any of the Company's unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of the Company's secured indebtedness, including borrowings under the senior secured Revolving Credit Facility, described below, to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of the Company's subsidiaries.

Prior to the close of business on the business day immediately preceding February 1, 2022, the Notes will be convertible at the option of the holders thereof only under the following circumstances:

- during any calendar quarter commencing after the calendar quarter ending on September 30, 2017 (and only during such calendar quarter), if the last reported sale price of the common stock for at least 20 trading days (whether or not consecutive) during the 30 consecutive trading day period ending on, and including the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- during the five business day period after any five consecutive trading day period in which, for each trading day of that period, the trading price (as defined in the Notes) per $1,000 principal amount of Notes for such trading day was less than 98% of the product of the last reported sale price of the Common Stock and the conversion rate on each such trading day; or

- upon the occurrence of specified corporate events including but not limited to a fundamental change.

Holders of the Notes became entitled to convert the Notes on January 1, 2018, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on December 31, 2017, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes continued to have such right until June 30, 2018 based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on March 31, 2018, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes have not been entitled to convert the Notes since July 1, 2018. Holders of the Notes are not entitled to convert the Notes during the calendar quarter ended March 31, 2019 as the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on December 31, 2018, was not greater than or equal to 130% of the conversion price of the Notes on each applicable trading day.

On or after February 1, 2022, until the close of business on the second scheduled trading day immediately preceding the maturity date of the Notes, holders of the Notes may convert all or a portion of their Notes regardless of the foregoing conditions.

The Company may not redeem the Notes prior to the maturity date and no sinking fund is provided for the Notes. Upon the occurrence of a fundamental change prior to the maturity date of the Notes, holders of the Notes may require the Company to repurchase all or a portion of the Notes for cash at a price equal to 100% of the principal amount of the Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

If the market price per share of the Common Stock, as measured under the terms of the Notes, exceeds the conversion price of the Notes, the Notes could have a dilutive effect, unless the Company elects, subject to certain conditions, to settle the principal amount of the Notes and any conversion premium in cash.

The initial measurement of convertible debt instruments that may be settled in cash is separated into a debt and an equity component whereby the debt component is based on the fair value of a similar instrument that does not contain an equity conversion option. The separate components of debt and equity of the Company's Notes were determined using an interest rate of 5.36%, which reflects the nonconvertible debt borrowing rate of the Company at the date of issuance. As a result, the initial components of debt and equity were $238.4 million and $61.6 million, respectively.

Financing costs related to the issuance of the Notes were approximately $9.3 million of which $7.4 million were allocated to the liability component and are being amortized to interest expense over the term of the debt and $1.9 million were allocated to the equity component.

During 2018, the Company recorded interest expense on the Notes of $14.6 million which consisted of $1.9 million associated with the 0.625% coupon rate, $11.4 million associated with the accretion of the debt discount, and $1.3 million associated with the amortization of the debt issuance costs. During 2017, the Company recorded interest expense on the Notes of $8.2 million which consisted of $1.1 million associated with the 0.625% coupon rate, $6.4 million associated with the accretion of the debt

91

08-13555-mg Doc 26713 Filed 04/01/21 Entered 04/01/21 14:23:28 Exhibit Complaint Pg 902 of 1033

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

discount, and $0.7 million associated with the amortization of the debt issuance costs. The debt discount is being amortized over the term of the debt.

As of December 31, 2018, the fair value of the Notes is estimated to be approximately $368.3 million using the Level 1 observable input of the last quoted market price on December 31, 2018.

A summary of the gross carrying amount, unamortized debt cost, debt issuance costs and net carrying value of the liability component of the Notes are as follows *(in thousands)*:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Gross carrying amount | $ 300,000 | $ 300,000 |
| Unamortized debt discount | 43,805 | 55,202 |
| Debt issuance costs | 5,252 | 6,599 |
| **Net carrying amount** | **$ 250,943** | **$ 238,199** |

**Convertible Note Hedge and Warrant Transactions**

On May 31, 2017, in connection with the issuance of the Notes, the Company entered into Convertible Note Hedge (the "Hedge") and Warrant transactions with respect to the Company's common stock. The Company used approximately $18.1 million of the net proceeds from the Notes to pay for the cost of the Hedge, after such cost was partially offset by the proceeds from the Warrant transactions.

On May 31, 2017, the Company paid $61.5 million to the counterparties for the Hedge transactions. The Hedge transactions cover approximately 1.4 million shares of the Company's common stock, the same number of shares initially underlying the Notes, and are exercisable upon any conversion of the Notes. The Hedge Transactions are expected generally to reduce the potential dilution to the Common Stock upon conversion of the Notes and/or offset any cash payments the Company is required to make in excess of the principal amount of the converted Notes, as the case may be, in the event that the market price per share of Common Stock, as measured under the terms of the Hedge transactions, is greater than the strike price of the Hedge transactions, which initially corresponds to the initial conversion price of the Notes, or approximately $207.63 per share of Common Stock. The Hedge transactions will expire upon the maturity of the Notes.

On May 31, 2017, the Company sold to the counterparties, warrants (the "Warrants") to acquire 1.4 million shares of Common Stock at an initial strike price of $266.39 per share, which represents a premium of 70% over the reported sale price of the Common Stock of $156.70 on May 24, 2017. On May 31, 2017, the Company received aggregate proceeds of approximately $43.4 million from the sale of the Warrants.

If the market price per share of the Common Stock, as measured under the terms of the Warrants, exceeds the strike price of the Warrants, the Warrants could have a dilutive effect, unless the Company elects, subject to certain conditions, to settle the Warrants in cash.

The Hedge and Warrant transactions are indexed to, and potentially settled in, the Company's common stock and the net cost of $18.1 million has been recorded as a reduction to additional paid-in capital in the consolidated statement of shareholders' equity.

**Senior Secured Revolving Credit Facility**

On November 21, 2017, the Company's wholly-owned subsidiary, LendingTree, LLC, entered into an amended and restated $250.0 million five-year senior secured revolving credit facility which matures on November 21, 2022 (the "Revolving Credit Facility"). Under certain conditions, the Company will be permitted to add one or more term loans and/or increase revolving commitments under the Revolving Credit Facility by an additional $100.0 million or a greater amount provided that a total consolidated senior secured debt to EBITDA ratio does not exceed 2.50 to 1.00. On October 26, 2018, the Company amended the Revolving Credit Facility to increase the borrowing capacity by $100.0 million to $350.0 million. Pricing and other terms and conditions of the Revolving Credit Facility remain unchanged. Borrowings under the Revolving Credit Facility can be used to finance working capital needs, capital expenditures and general corporate purposes, including to finance permitted acquisitions. As of December 31, 2018, the Company had a $125.0 million, 31-day borrowing outstanding under the Revolving Credit Facility bearing interest at the LIBO rate option of 4.02%. *See* Note 22—Subsequent Events for additional information regarding the Senior Secured Revolving Credit Facility.

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm

08-1355-mg-1   Document 13-1   Filed 04/01/21   Page 136 of 159

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Up to $10.0 million of the Revolving Credit Facility will be available for short-term loans, referred to as swingline loans. Additionally, up to $10.0 million of the Revolving Credit Facility will be available for the issuance of letters of credit.

The Company's borrowings under the Revolving Credit Facility bear interest at annual rates that, at the Company's option, will be either:

- a base rate generally defined as the sum of (i) the greater of (a) the prime rate of SunTrust Bank, (b) the federal funds effective rate plus 0.5% and (c) the LIBO rate (defined below) on a daily basis applicable for an interest period of one month plus 1.0% and (ii) an applicable percentage of 0.25% to 1.0% based on a total consolidated debt to EBITDA ratio; or

- a LIBO rate generally defined as the sum of (i) the rate for Eurodollar deposits in the applicable currency and (ii) an applicable percentage of 1.25% to 2.0% based on a total consolidated debt to EBITDA ratio.

All swingline loans bear interest at the base rate defined above. Interest on the Company's borrowings are payable quarterly in arrears for base rate loans and on the last day of each interest rate period (but not less often than three months) for LIBO rate loans.

The Revolving Credit Facility contains a restrictive financial covenant, which initially limits the total consolidated debt to EBITDA ratio to 4.5, with step downs to 4.0 over time, except that this may increase by 0.5 for the four fiscal quarters following a material acquisition. In addition, the Revolving Credit Facility contains customary affirmative and negative covenants in addition to events of default for a transaction of this type that, among other things, restrict additional indebtedness, liens, mergers or certain fundamental changes, asset dispositions, dividends, stock repurchases and other restricted payments, transactions with affiliates, sale-leaseback transactions, hedging transactions, loans and investments and other matters customarily restricted in such agreements. The Company was in compliance with all covenants at December 31, 2018.

The Revolving Credit Facility requires LendingTree, LLC to pledge as collateral, subject to certain customary exclusions, substantially all of its assets, including 100% of its equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none). The obligations under this facility are unconditionally guaranteed on a senior basis by LendingTree, Inc. and material domestic subsidiaries of LendingTree, LLC, which guaranties are secured by a pledge as collateral, subject to certain customary exclusions, of 100% of each such guarantor's assets, including 100% of each such guarantor's equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none).

The Company is required to pay an unused commitment fee quarterly in arrears on the difference between committed amounts and amounts actually borrowed under the Revolving Credit Facility equal to an applicable percentage of 0.25% to 0.45% per annum based on a total consolidated debt to EBITDA ratio. The Company is required to pay a letter of credit participation fee and a letter of credit fronting fee quarterly in arrears. The letter of credit participation fee is based upon the aggregate face amount of outstanding letters of credit at an applicable percentage of 1.25% to 2.0% based on a total consolidated debt to EBITDA ratio. The letter of credit fronting fee is 0.125% per annum on the face amount of each letter of credit.

The Company recognized $0.1 million in additional interest expense in the fourth quarter of 2017 due to the write-off of certain unamortized debt issuance costs associated with the original revolving credit facility entered into on October 22, 2015. In addition to the remaining unamortized debt issuance costs associated with the original revolving credit facility and the Revolving Credit Facility, debt issuance costs of $0.5 million related to the October 2018 amendment are being amortized to interest expense over the life of the Revolving Credit Facility, and are included in prepaid and other current assets and other non-current assets in the Company's consolidated balance sheet.

During 2018, the Company recorded interest expense related to the Revolving Credit Facility of $2.0 million which consisted of $0.8 million associated with borrowings bearing interest at the base rate and the LIBO rate, $0.8 million in unused commitment fees, and $0.4 million associated with the amortization of the debt issuance costs. During 2017, the Company recorded interest expense related to the Revolving Credit Facility of $0.5 million in unused commitment fees and $0.4 million associated with the amortization of the debt issuance costs.

93

## NOTE 14—COMMITMENTS

### Operating Leases

The Company leases office space used in connection with its operations under various operating leases, which contain escalation clauses. The Company's operating leases relate to its office space in: Charlotte, North Carolina; Burlingame, California; Charleston, South Carolina; New York City, New York; Northbrook, Illinois; Jacksonville, Florida; Seattle, Washington; Sacramento, California; Denver, Colorado; and Makarba, India.

Future minimum payments as of December 31, 2018 under operating lease agreements having an initial or remaining non-cancelable lease term in excess of one year are as follows *(in thousands)*:

| Year ending December 31, | | Amount |
|---|---|---|
| 2019 | $ | 4,406 |
| 2020 | | 3,188 |
| 2021 | | 1,094 |
| 2022 | | 736 |
| 2023 | | 228 |
| **Total** | $ | **9,652** |

Rental expense for all operating leases, except those with terms of a month or less that were not renewed, charged to continuing operations was $3.4 million, $2.0 million and $1.6 million, for each of the years ended December 31, 2018, 2017 and 2016, respectively, which is included in general and administrative expense in the consolidated statements of operations and comprehensive income.

### Bonds

The Company has funding commitments that could potentially require performance in the event of demands by third parties or contingent events, as follows *(in thousands)*:

| | | Commitments Due By Period | | | |
|---|---|---|---|---|---|
| | Total | Less Than 1 year | 1-3 years | 3-5 years | More Than 5 years |
| Surety bonds [a] | $ 4,193 | $ 4,168 | $ 25 | $ — | $ — |

(a) State laws and regulations generally require businesses which engage in mortgage brokering activity to maintain a mortgage broker or similar license. Mortgage brokering activity is generally defined to include, among other things, receiving valuable consideration for offering assistance to a buyer in obtaining a residential mortgage or soliciting financial and mortgage information from the public and providing that information to an originator of residential mortgage loans. All states require that the Company maintain surety bonds for potential claims.

### Other Commitments

The Company has certain other commitments through 2020, where the commitments for these contracts range from $2.9 million to $5.2 million each year throughout the remaining life of the contract.

## NOTE 15—CONTINGENCIES

### Overview

LendingTree is involved in legal proceedings on an ongoing basis. In assessing the materiality of a legal proceeding, the Company evaluates, among other factors, the amount of monetary damages claimed, as well as the potential impact of non-monetary remedies sought by plaintiffs (e.g., injunctive relief) that may require it to change its business practices in a manner that could have a material and adverse impact on the business. With respect to the matters disclosed in this Note 15, unless otherwise indicated, the Company is unable to estimate the possible loss or range of losses that could potentially result from the application of such non-monetary remedies.

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm    137/159

LENDINGTREE, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As of December 31, 2018 and 2017, the Company had litigation settlement accruals of $0.2 million and $0.3 million, respectively, in continuing operations and $8.0 million and $4.0 million, respectively, in discontinued operations. The litigation settlement accruals relate to litigation matters that were either settled or a firm offer for settlement was extended, thereby establishing an accrual amount that is both probable and reasonably estimable.

**Specific Matters**

### Litigation Related to Discontinued Operations

#### Residential Funding Company

*Residential Funding Company, LLC v Home Loan Center, Inc., No. 13-cv-3451 (U.S. Dist. Ct., Minn.).* On or about December 16, 2013, Home Loan Center, Inc. was served in the above captioned matter. Generally, Residential Funding Company, LLC ("RFC") seeks damages for breach of contract and indemnification for certain residential mortgage loans as well as residential mortgage-backed securitizations ("RMBS") containing mortgage loans. RFC asserts that, beginning in 2008, RFC faced massive repurchase demands and lawsuits from purchasers or insurers of the loans and RMBS that RFC had sold. RFC filed for bankruptcy protection in May 2012. Plaintiff alleges that, after RFC filed for Chapter 11 protection, hundreds of proofs of claim were filed, many of which mirrored the litigation filed against RFC prior to its bankruptcy.

In December 2013, the United States Bankruptcy Court for the Southern District of New York entered an Order confirming the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors. Plaintiff then began filing substantially similar complaints against approximately 80 of the loan originators from whom RFC had purchased loans, including HLC, in federal and state courts in Minnesota and New York. In each case, Plaintiff claims that the defendant is liable for a portion of the global settlements in RFC's bankruptcy.

Plaintiff asserts two claims against HLC: (1) breach of contract based on HLC's alleged breach of representations and warranties concerning the quality and characteristics of the mortgage loans it sold to RFC; and (2) contractual indemnification for alleged liabilities, losses, and damages incurred by RFC arising out of purported defects in loans that RFC purchased from HLC and sold to third parties. Plaintiff alleges that the "types of defects" contained in the loans it purchased from HLC included "income misrepresentation, employment misrepresentation, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents." Plaintiff sought damages of up to $61.0 million plus attorney's fees and prejudgment interest.

HLC denied the material allegations of the complaint and asserted numerous defenses thereto. The matter went to trial in October 2018, and the jury returned a verdict of $28.7 million in favor of Plaintiff. Plaintiff is also seeking up to $28.8 million in attorneys' fees and $30.6 million in pre-judgment interest in addition to the jury verdict amount. As of February 28, 2019, the court has not yet entered judgment in favor of Plaintiff. HLC believes it has strong grounds for appeal and further believes that Plaintiff's demand for attorneys' fees and pre-judgment interest is excessive (and, if granted, would be subject to appeal). HLC intends to vigorously pursue an appeal. The Company estimates the range of HLC's potential losses in the RFC matter to be $0.0 million to $88.1 million. An estimated liability of $7.0 million for this matter is included in the accompanying consolidated balance sheet as of December 31, 2018.

#### Lehman Brothers Holdings, Inc.

*Lehman Brothers Holdings Inc. v. Home Loan Center, Inc., Case No. 08-13555 (SCC), Adversary Proceeding No. 16-01342 (SCC) (Bankr. S.D.N.Y.).* In February 2016, Lehman Brothers Holdings Inc. ("LBHI") filed an Adversary Complaint against HLC and approximately 149 other defendants (the "Complaint"). In December 2018, LBHI amended its complaint against HLC. The amended complaint references approximately 370 allegedly defective mortgage loans sold by HLC with purported "Claim Amounts" totaling $40.2 million. LBHI alleges it settled all such claims and is seeking indemnification from HLC for LBHI's purported losses and liabilities associated with such settlements, plus prejudgment interest, attorneys' fees, litigation costs and other expenses. The amended complaint does not specify the amount of LBHI's purported damages. HLC believes that these claims lack merit and intends to defend this action vigorously. An estimated liability of $1.0 million for this matter is included in the accompanying consolidated balance sheet as of December 31, 2018.

## NOTE 16—FAIR VALUE MEASUREMENTS

Other than the Notes and the Warrants, the carrying amounts of the Company's financial instruments are equal to fair value at December 31, 2018. *See* Note 13—Debt for additional information on the Notes and the Warrants.

95

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Contingent consideration payments related to acquisitions are measured at fair value each reporting period using Level 3 unobservable inputs. The changes in the fair value of the Company's Level 3 liabilities during the years ended December 31, 2018, 2017 and 2016 are as follows *(in thousands)*:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| **Contingent consideration, beginning of period** | $ 57,349 | $ 23,100 | $ — |
| Transfers into Level 3 | — | — | — |
| Transfers out of Level 3 | — | — | — |
| Total net (gains) losses included in earnings (realized and unrealized) | 10,788 | 23,931 | — |
| Purchases, sales and settlements: | | | |
| Additions | 19,700 | 11,318 | 23,100 |
| Payments | (49,000) | (1,000) | — |
| **Contingent consideration, end of period** | $ 38,837 | $ 57,349 | $ 23,100 |

The contingent consideration liability at December 31, 2018 is the estimated fair value of the earnout payments of the DepositAccounts, SnapCap, Ovation, and QuoteWizard acquisitions. The contingent consideration liability at December 31, 2017 was the estimated fair value of the earnout payments of the CompareCards, DepositAccounts, and SnapCap acquisitions. The contingent consideration liability at December 31, 2016 was the estimated fair value of the earnout payments of the CompareCards acquisition. The Company will make earnout payments ranging from $3.0 million to $4.0 million based on the achievement of defined milestone and performance targets for DepositAccounts, payments ranging from $3.0 million to $9.0 million based on the achievement of certain defined earnings targets for SnapCap, payments ranging from zero to $8.75 million based on the achievement of certain defined operating metrics for Ovation, and payments ranging from zero to $70.2 million based on the achievement of certain defined performance targets for QuoteWizard. *See* Note 8—Business Acquisitions for additional information on the contingent consideration for each of these respective acquisitions.

The significant unobservable inputs used to calculate the fair value of the contingent consideration are estimated future cash flows for the acquisitions, estimated customer growth rates, estimated date and likelihood of an increase in interest rates and the discount rate. Actual results will differ from the projected results and could have a significant impact on the estimated fair value of the contingent considerations. Additionally, as the liability is stated at present value, the passage of time alone will increase the estimated fair value of the liability each reporting period. Any changes in fair value will be recorded in operating income in the consolidated statements of operations and comprehensive income.

## NOTE 17—RELATED PARTY TRANSACTIONS

One of the Company's board of directors also serves as a director to a marketing partner of the Company. During 2018, 2017 and 2016, the Company recognized $0.7 million, $1.2 million and $1.3 million, respectively, of expenses for this marketing partner through the normal course of business.

In the fourth quarter of 2017, the Company's Board of Directors approved a $10.0 million contribution to fund the newly formed LendingTree Foundation. The Company expects to pay $3.3 million of the $10.0 million contribution in 2019, and the remainder by 2021. Officers of the Company serve as officers of the LendingTree Foundation. The contribution is recorded in general and administrative expense on the consolidated statement of operations and comprehensive income.

96

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 18—BENEFIT PLANS

The Company operates a retirement savings plan for its employees in the United States that is qualified under Section 401(k) of the Internal Revenue Code. Employees are eligible to enroll in the plan upon date of hire. Participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits ($18,000 for 2016 and 2017, and $18,500 for 2018). The company match contribution is fifty cents for each dollar a participant contributes to the plan, with a maximum contribution of 6% of a participant's eligible earnings. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. LendingTree stock is not included in the available investment options or the plan assets. Funds contributed to the plan vest according to the participant's years of service, with less than three years of service vesting at 0%, and three years or more of service vesting at 100%. Matching contributions were approximately $1.4 million, $0.9 million and $0.7 million for the years ended December 31, 2018, 2017 and 2016, respectively.

## NOTE 19—DISCONTINUED OPERATIONS

The revenue and net loss reported as discontinued operations in the accompanying consolidated statements of operations and comprehensive income are as follows *(in thousands)*:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2018 | 2017 | 2016 |
| Revenue | $  — | $  (750) | $  1,325 |
|  |  |  |  |
| Loss before income taxes | $  (16,228) | $  (5,909) | $  (5,728) |
| Income tax benefit | 3,408 | 2,069 | 2,014 |
| **Net loss** | **$  (12,820)** | **$  (3,840)** | **$  (3,714)** |

In 2018, 2017 and 2016, loss from discontinued operations was primarily due to litigation settlements and contingencies and legal fees associated with ongoing legal proceedings.

**LendingTree Loans**

On June 6, 2012, the Company sold substantially all of the operating assets of its LendingTree Loans business for $55.9 million in cash to a wholly-owned subsidiary of Discover Financial Services ("Discover").

Discover generally did not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets Discover acquired. Of the purchase price received, a portion was deposited in escrow in accordance with the agreement with Discover for certain loan loss obligations that remain with the Company following the sale. During the second quarter of 2018, the remaining funds in escrow were released to the Company in accordance with the terms of the agreement with Discover.

### Significant Assets and Liabilities of LendingTree Loans

Upon closing of the sale of substantially all of the operating assets of the LendingTree Loans business on June 6, 2012, LendingTree Loans ceased to originate consumer loans. Liability for losses on previously sold loans will remain with LendingTree Loans and are discussed below.

#### *Loan Loss Obligations*

LendingTree Loans sold loans it originated to investors on a servicing-released basis, so the risk of loss or default by the borrower was generally transferred to the investor. However, LendingTree Loans was required by these investors to make certain representations and warranties relating to credit information, loan documentation and collateral. These representations and warranties may extend through the contractual life of the loan. Subsequent to the loan sale, if underwriting deficiencies, borrower fraud or documentation defects are discovered in individual loans, LendingTree Loans may be obligated to repurchase the respective loan or indemnify the investors for any losses from borrower defaults if such deficiency or defect cannot be cured within the specified period following discovery.

97

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

HLC, a subsidiary of the Company, continues to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of its LendingTree Loans business in the second quarter of 2012.

The following table represents the aggregate loans sold, subsequent settlements and remaining unsettled loans as of December 31, 2018:

|  | Number of Loans | | Original Issue Balance |
|---|---|---|---|
|  | *(in thousands)* | | *(in billions)* |
| Loans sold by HLC | 234 | $ | 38.9 |
| Subsequent settlements | (172) | | (28.8) |
| **Remaining unsettled loans** | 62 | $ | 10.1 |

During the fourth quarter of 2015, LendingTree Loans completed a settlement agreement for $0.6 million with one of the investors to which it had sold loans. This investor accounted for approximately 10% of the total number of loans sold and 12% of the original issue balance. This settlement related to all existing and future losses on loans sold to this investor.

During the fourth quarter of 2014, LendingTree Loans completed a settlement agreement for $5.4 million with the largest investor to which it had sold loans. This investor accounted for approximately 40% of both the total number of loans sold and the original issue balance. This settlement related to all existing and future losses on loans sold to this investor.

In the second quarter of 2014, LendingTree Loans completed settlements with two buyers of previously purchased loans.

The Company has been negotiating with certain of the remaining secondary market purchasers to settle any existing and future contingent liabilities, but it may not be able to complete such negotiations on acceptable terms, or at all. Because LendingTree Loans does not service the loans it sold, it does not maintain nor generally have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, LendingTree Loans is unable to determine, with precision, its maximum exposure for breaches of the representations and warranties it made to the investors that purchased such loans.

The Company uses a settlement discount framework for evaluating the adequacy of the reserve for loan losses. This model estimates lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. A settlement discount factor is then applied to the result of the foregoing to reflect publicly-announced bulk settlements for similar loan types and vintages, the Company's own settlement experience, as well as LendingTree Loans' non-operating status, in order to estimate a range of potential obligation.

The estimated range of remaining loan losses using this settlement discount framework was determined to be $4.3 million to $7.9 million at December 31, 2018. The reserve balance recorded as of December 31, 2018 was $7.6 million. Management has considered both objective and subjective factors in the estimation process, but given current general industry trends in mortgage loans as well as housing prices and market expectations, actual losses related to LendingTree Loans' obligations could vary significantly from the obligation recorded as of the balance sheet date or the range estimated above.

Additionally, LendingTree has guaranteed certain loans sold to two investors in the event that LendingTree Loans is unable to satisfy its repurchase and warranty obligations related to such loans.

Based on historical experience, it is anticipated that LendingTree Loans will continue to receive repurchase requests and incur losses on loans sold in prior years.

The activity related to loss reserves on previously sold loans is as follows *(in thousands)*:

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2018** | | **2017** | | **2016** | |
| **Loan loss reserve, beginning of period** | $ | 7,554 | $ | 6,804 | $ | 8,127 |
| Provision adjustments [a] | | — | | 750 | | (1,323) |
| Charge-offs to reserves | | — | | — | | — |
| **Loan loss reserve, end of period** | $ | 7,554 | $ | 7,554 | $ | 6,804 |

https://www.sec.gov/Archives/edgar/data/1434621/000143462119000014/tree-12312018x10k.htm 141/159

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(a) During 2016, the Company adjusted the loan loss reserve by $1.8 million to remove the estimated liability for loans sold to RFC. The Company is in litigation with RFC and separately reserved for the estimated loss for this litigation. *See* Note 15—Contingencies for additional information about the RFC litigation.

The liability for losses on previously sold loans is presented as current liabilities of discontinued operations in the accompanying consolidated balance sheets as of December 31, 2018 and 2017.

## NOTE 20—SEGMENT INFORMATION

The Company has one reportable segment.

Mortgage and non-mortgage product revenue is as follows *(in thousands)*:

|  | Year Ended December 31, | | |
|  | **2018** | **2017** | **2016** |
|---|---|---|---|
| Mortgage products | $ 242,175 | $ 275,910 | $ 219,991 |
| Non-mortgage products | 522,690 | 341,826 | 164,411 |
| **Total revenue** | $ 764,865 | $ 617,736 | $ 384,402 |

## NOTE 21—QUARTERLY FINANCIAL INFORMATION (UNAUDITED)

The following tables set forth summary financial information for the years ended December 31, 2018 and 2017:

|  | **Q1** | **Q2** | **Q3** | **Q4** |
|---|---|---|---|---|
|  | *(in thousands, except per share amounts)* | | | |
| **2018** | | | | |
| Revenue | $ 181,035 | $ 184,101 | $ 197,057 | $ 202,672 |
| Operating income [1] | 15,350 | 18,123 | 20,290 | 2,428 |
| Income from continuing operations [1] | 35,857 | 44,849 | 28,362 | 251 |
| Loss from discontinued operations | (4,333) | (2,302) | (2,634) | (3,551) |
| Net income (loss) and comprehensive income (loss) | $ 31,524 | $ 42,547 | $ 25,728 | $ (3,300) |
| Income (loss) per share from continuing operations: | | | | |
| Basic | $ 2.97 | $ 3.61 | $ 2.22 | $ 0.02 |
| Diluted | $ 2.41 | $ 3.17 | $ 2.05 | $ 0.02 |
| Loss per share from discontinued operations: | | | | |
| Basic | $ (0.36) | $ (0.19) | $ (0.21) | $ (0.28) |
| Diluted | $ (0.29) | $ (0.16) | $ (0.19) | $ (0.26) |
| Net income (loss) per share: | | | | |
| Basic | $ 2.61 | $ 3.43 | $ 2.01 | $ (0.26) |
| Diluted | $ 2.12 | $ 3.01 | $ 1.86 | $ (0.24) |

(1) The fourth quarter of 2018 includes contingent consideration expense of $6.8 million for the QuoteWizard acquisition due to an increased probability of achievement of certain defined performance targets for QuoteWizard.

99

LENDINGTREE, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

|  | | Q1 | | Q2 | | Q3 | | Q4 |
|---|---|---|---|---|---|---|---|---|
|  | | *(in thousands, except per share amounts)* | | | | | | |
| **2017** | | | | | | | | |
| Revenue | $ | 132,515 | $ | 152,773 | $ | 171,494 | $ | 160,954 |
| Operating income (expense) [1] | | 6,884 | | 8,969 | | 17,455 | | (175) |
| Income (loss) from continuing operations [1][2] | | 7,798 | | 8,007 | | 10,131 | | (6,518) |
| Loss from discontinued operations | | (932) | | (689) | | (1,011) | | (1,208) |
| Net income (loss) and comprehensive income (loss) | $ | 6,866 | $ | 7,318 | $ | 9,120 | $ | (7,726) |
| Income (loss) per share from continuing operations: | | | | | | | | |
| Basic | $ | 0.66 | $ | 0.67 | $ | 0.84 | $ | (0.54) |
| Diluted | $ | 0.58 | $ | 0.59 | $ | 0.74 | $ | (0.54) |
| Loss per share from discontinued operations: | | | | | | | | |
| Basic | $ | (0.08) | $ | (0.06) | $ | (0.08) | $ | (0.10) |
| Diluted | $ | (0.07) | $ | (0.05) | $ | (0.07) | $ | (0.10) |
| Net income (loss) per share: | | | | | | | | |
| Basic | $ | 0.58 | $ | 0.61 | $ | 0.76 | $ | (0.64) |
| Diluted | $ | 0.51 | $ | 0.54 | $ | 0.66 | $ | (0.64) |

(1) In the fourth quarter of 2017, the Company's Board of Directors approved a $10.0 million contribution to fund the newly formed LendingTree Foundation. The contribution is recorded in general and administrative expense on the consolidated statement of operations and comprehensive income.

(2) During the fourth quarter of 2017, the Company recorded a net tax expense of $9.1 million related to the enactment of the TCJA. *See* Note 12—Income Taxes for additional information.

## NOTE 22—SUBSEQUENT EVENTS

**Acquisition of Value Holding Inc.**

On January 10, 2019, the Company acquired Value Holding Inc., the parent company of ValuePenguin Inc., a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards, for $105.0 million in cash at the closing of the transaction, subject to adjustments for working capital. The acquisition was funded through $90.0 million drawn on the Company's Revolving Credit Facility and the balance using cash on hand.

**Common Stock Repurchase Program**

In February 2019, the board of directors authorized and the Company announced the addition of up to $150.0 million under the stock repurchase program. Between January 1, 2019 and February 28, 2019, the Company purchased 17,501 shares of its common stock for aggregate consideration of $3.9 million. As of February 28, 2019, approximately $181.2 million remains authorized for future share repurchases.

**Sale of North Carolina Office Properties**

On February 22, 2019, the Company entered into a real estate purchase and sale agreement for the sale of its two office buildings to an unrelated third party. *See* Item 2. Properties and Note 7—Assets Held For Sale for further information on these buildings. The agreement provides for a sale price of $24.75 million subject to prorations and adjustments. The agreement allows the purchaser a period of inspection through March 28, 2019 during which time it may elect to not proceed with the purchase and receive a return of its earnest money deposit. After such period, an earnest money deposit of $1.0 million would become non-refundable if the purchaser does not purchase the property, subject to certain exceptions.

**Table of Contents**

**ITEM 9.** *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

Not applicable.

**ITEM 9A.** *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), management, with the participation of our principal executive officer (Chief Executive Officer) and our principal financial officer (Chief Financial Officer), evaluated, as of the end of the period covered by this report, the effectiveness of our disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Management necessarily applied its judgment in assessing the costs and benefits of such controls and procedures, which by their nature can provide only reasonable assurance regarding management's control objectives. Management does not expect that our disclosure controls and procedures will prevent or detect all errors and fraud. A control system, irrespective of how well it is designed and operated, can only provide reasonable assurance and cannot guarantee that it will succeed in its stated objectives.

Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2018, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect our transactions and dispositions of our assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that our receipts and expenditures are being made only in accordance with authorizations of our management and our directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, with the participation of our Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). However, the assessment did not include certain elements of the QuoteWizard.com, LLC business, as the acquisition occurred during 2018. Subsequent to the acquisition, certain elements of QuoteWizard.com, LLC's internal control over financial reporting and related processes were integrated into the Company's existing systems and internal control over financial reporting. Those controls that were not integrated have been excluded from management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2018. The excluded elements represent controls over approximately 3% of consolidated assets and 4% of the consolidated revenues. Based on our evaluation under the framework in the Internal Control-Integrated Framework, issued by the COSO, management has concluded that our internal control over financial reporting was effective as of December 31, 2018. The effectiveness of our internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report appearing under "Item 8. Financial Statements and Supplementary Data" included elsewhere in this annual report.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting (as defined in the Exchange Act, Rules 13a-15(f)) that occurred during the quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.** *Other Information*

      On February 22, 2019, our subsidiary Rexford Office Holdings, LLC, entered into a real estate purchase and sale agreement for the sale of its two office buildings to an unrelated third party. *See* Item 2. Properties for further information on these buildings. The agreement provides for a sale price of $24.75 million subject to prorations and adjustments. The agreement allows the purchaser a period of inspection through March 28, 2019 during which time it may elect to not proceed with the purchase and receive a return of its earnest money deposit. After such period, an earnest money deposit of $1.0 million would become non-refundable if the purchaser does not purchase the property, subject to certain exceptions.

<div align="center">102</div>

Table of Contents

## PART III

As set forth below, the information required by Part III (Items 10, 11, 12, 13 and 14) is incorporated herein by reference to the Company's definitive proxy statement to be used in connection with its 2019 Annual Meeting of Stockholders and which will be filed with the Securities and Exchange Commission not later than 120 days after the end of the Company's fiscal year ended December 31, 2018 (the "2019 Proxy Statement"), in accordance with General Instruction G(3) of Form 10-K.

### ITEM 10. *Directors, Executive Officers and Corporate Governance*

The information required by Item 10 will be contained in, and is hereby incorporated by reference to, the 2019 Proxy Statement.

### ITEM 11. *Executive Compensation*

The information required by Item 11 will be contained in, and is hereby incorporated by reference to, the 2019 Proxy Statement.

### ITEM 12. *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The information required by Item 12 will be contained in, and is hereby incorporated by reference to, the 2019 Proxy Statement.

### ITEM 13. *Certain Relationships and Related Transactions, and Director Independence*

The information required by Item 13 will be contained in, and is hereby incorporated by reference to, the 2019 Proxy Statement.

### ITEM 14. *Principal Accounting Fees and Services*

The information required by Item 14 will be contained in, and is hereby incorporated by reference to, the 2019 Proxy Statement.

<div align="center">103</div>

<div align="center">

**PART IV**

</div>

**ITEM 15.**   *Exhibits, Financial Statement Schedules*

*(a)*   *List of documents filed as part of this report:*

**(1)**   **Consolidated Financial Statements of LendingTree, Inc.**

Report of Independent Registered Public Accounting Firm: PricewaterhouseCoopers LLP.

Consolidated Statements of Operations and Comprehensive Income for the Years Ended December 31, 2018, 2017 and 2016.

Consolidated Balance Sheets as of December 31, 2018 and 2017.

Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2018, 2017 and 2016.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2018, 2017 and 2016.

Notes to Consolidated Financial Statements.

**(2)**   **Consolidated Financial Statement Schedules of LendingTree, Inc.**

All financial statements and schedules have been omitted since the required information is included in the consolidated financial statements or the notes thereto, or is not applicable or required.

**(3)**   **Exhibits**

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith or incorporated herein by reference to the location indicated below.

| Exhibit Number | Description | Location |
|---|---|---|
| 2.1 | Separation and Distribution Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 2.1 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008. |
| 2.2 | Tax Sharing Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.3 | Employee Matters Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.4 | Transition Services Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.5 | Spinco Assignment and Assumption Agreement among IAC/InterActiveCorp, Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC, dated August 20, 2008. | Exhibit 10.6 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.6 | Asset Purchase Agreement among Home Loan Center, Inc., First Residential Mortgage Network, Inc. dba SurePoint Lending, and the shareholders of First Residential Mortgage Network named therein, dated November 15, 2010. | Exhibit 2.1 to Registrant's Current Report on Form 8-K (No. 001-34063) filed November 16, 2010 |
| 2.7 | First Amendment to Asset Purchase Agreement among HLC, | Exhibit 2.1 to the Registrant's Current Report on Form 8- |

SurePoint and the shareholders party thereto, dated March
14, 2011.

2.8 Second Amendment to Asset Purchase Agreement among　Exhibit 2.2 to the Registrant's Current Report on Form 8-
HLC, SurePoint and the shareholders party thereto, dated　K filed March 21, 2011
March 15, 2011.

104

| Exhibit Number | Description | Location |
|---|---|---|
| 2.9 | Asset Purchase Agreement among Tree.com, Inc., Home Loan Center, Inc., LendingTree, LLC, HLC Escrow, Inc. and Discover Bank, dated May 12, 2011** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 2.10 | Asset Purchase Agreement among LendingTree, LLC, RealEstate.com, Inc. and Market Leader, Inc., dated September 15, 2011** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 2.11 | Amendment to Asset Purchase Agreement among Home Loan Center, Inc., HLC Escrow, Inc., LendingTree, LLC, Tree.com, Inc., Discover Bank and Discover Financial Services, dated February 7, 2012** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed February 8, 2012 |
| 2.12 | Membership Interest Purchase Agreement, dated as of November 16, 2016, by and among LendingTree, LLC, Iron Horse Holdings, LLC, all of the members of Iron Horse Holdings, LLC and Christopher J. Mettler. ** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed November 22, 2016 |
| 2.13 | Assignment and Assumption Agreement, dated November 2, 2017, by and among General Communication, Inc., Liberty Interactive Corporation, Liberty USA Holdings, LLC, Ventures Holdco, LLC, and LendingTree, Inc. | Exhibit 99.7(D) to the Registrant's Current Report on Form SC 13D/A filed November 3, 2017 |
| 2.14 | Unit Purchase Agreement dated as of October 4, 2018 by and among LendingTree, LLC, QuoteWizard.com, LLC, all of the members of QuoteWizard.com, LLC, and Scott Peyree as the Securityholders Representative. ** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K/A filed October 12, 2018 |
| 2.15 | Stock Purchase Agreement dated as of December 20, 2018 by and among LendingTree, LLC, Value Holding Inc., all of the shareholders of Value Holding Inc., and Jonathan Wu as the Sellers' Representative. ** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed December 27, 2018 |
| 3.1 | Amended and Restated Certificate of Incorporation of LendingTree, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 3.2 | Fourth Amended and Restated By-laws of LendingTree, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed November 15, 2017 |
| 4.1 | Amended and Restated Restricted Share Grant and Shareholders' Agreement, among Forest Merger Corp., LendingTree, Inc., InterActiveCorp and the Grantees named therein, dated July 7, 2003* | Exhibit 10.8 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 4.2 | Registration Rights Agreement among Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC, dated August 20, 2008. | Exhibit 10.5 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 4.3 | Indenture for .0625% Convertible Senior Notes due 2022 | Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.4 | Purchase Agreement for .0625% Convertible Senior Notes due 2022 | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.5 | Base Issuer Warrant Transaction | Exhibit 99.4 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.6 | Additional Issuer Warrant Transaction | Exhibit 99.5 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 10.1 | Amendment No. 1 to the Restricted Share Grant and Stockholder's Agreement between Tree.com, Inc., LendingTree Holdings Corp. and Douglas R. Lebda, dated August 30, 2010* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q (No. 001-34063) filed November 12, 2010 |
| 10.2 | Stock Purchase Agreement between Tree.com, Inc. and Douglas R. Lebda, dated February 8, 2009* | Exhibit 10.1 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed February 11, 2009 |
| 10.3 | Amendment No. 1 to the Stock Option Award Agreement | Exhibit 10.15 to the Registrant's Quarterly Report on |

between Douglas R. Lebda and Tree.com, Inc., dated    Form 10-Q (No. 001-34063) filed May 12, 2010
May 10, 2010*

10.4    Amendment No. 1 to Stock Purchase Agreement between    Exhibit 10.2 to the Registrant's Quarterly Report on
Tree.com, Inc. and Douglas R. Lebda, dated May 10, 2010*    Form 10-Q (No. 001-34063) filed May 12, 2010

105

| Exhibit Number | Description | Location |
|---|---|---|
| 10.5 | Form of Amendment to Restricted Stock Awards for Douglas R. Lebda* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed May 12, 2010 |
| 10.6 | Amendment No. 1 to the Restricted Share Grant and Stockholder's Agreement between Tree.com, Inc., LendingTree Holdings Corp. and Douglas R. Lebda, dated August 30, 2010* | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q (No. 001-34063) filed November 12, 2010 |
| 10.7 | Employment Agreement between Douglas Lebda and the Company, dated September 20, 2017* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed October 26, 2017 |
| 10.8 | Letter Agreement between Tree.com, Inc. and Carla Shumate, dated December 11, 2012* | Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed April 1, 2013 |
| 10.9 | Letter Agreement between LendingTree, Inc. and Carla Shumate, dated March 11, 2015* | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed April 30, 2015 |
| 10.10 | Letter Agreement between LendingTree, Inc. and Carla Shumate, dated December 31, 2015* | Exhibit 10.6 to the Registrant's Annual Report on Form 10-K filed March 1, 2016 |
| 10.11 | Fifth Amended and Restated Tree.com, Inc. 2008 Stock and Annual Incentive Plan* | Exhibit 4.3(A) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.12 | Form of Notice of Stock Option Award Granted Under the 2008 Stock and Annual Incentive Plan* | Exhibit 10.6 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed March 27, 2009 |
| 10.13 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2014 |
| 10.14 | Form of Notice of Restricted Stock Award* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2014 |
| 10.15 | Form of Notice of Stock Option Award Granted Under the 2008 Stock and Annual Incentive Plan* | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2014 |
| 10.16 | LendingTree, Inc. 2017 Inducement Grant Plan* | Exhibit 4.4(A) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.17 | Notice of Restricted Stock Unit Award Granted Under the LendingTree, Inc. 2017 Inducement Plan* | Exhibit 4.4(B) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.18 | Restricted Stock Award Agreement* | Exhibit 4.4(C) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.19 | Notice of [year] Stock Option Award Granted Under the LendingTree, Inc. 2017 Inducement Grant Plan* | Exhibit 4.4(D) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.20 | 2011 Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed April 30, 2015 |
| 10.21 | Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.15 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.22 | Standard Terms and Conditions to Restricted Stock Award Letters of Tree.com BU Holding Company, Inc.* | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed February 3, 2011 |
| 10.23 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.86(b) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.24 | Form of Restricted Stock Award* | Exhibit 10.86(c) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.25 | Form of Notice of Stock Option Award Granted Under the Amended and Restated 2008 Stock and Annual Incentive Plan* | Exhibit 10.86(d) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.26 | Form of Notice of Stock Option Award Granted Under the Second Amended and Restated 2008 Stock and Annual Incentive Plan* | Exhibit 10.13 to the Registrant's Quarterly Report on Form 10-Q (No. 001-34063) filed May 12, 2010 |

| Exhibit Number | Description | Location |
|---|---|---|
| 10.27 | Base Convertible Bond Hedge Transaction | Exhibit 99.2 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 10.28 | Additional Convertible Bond Hedge Transaction | Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 10.29 | Amended and Restated Credit Agreement, dated as of November 21, 2017+ | Exhibit 10.38 to the Registrant's Annual Report on Form 10-K filed February 26, 2018 |
| 10.30 | Joinder to Amended and Restated Credit Agreement, dated as of October 26, 2018 | †+ |
| 10.31 | Agreement of Purchase and Sale, by and among LendingTree, LLC and an affiliate of Greenstreet Real Estate Partners, L.P., dated October 17, 2016 | Exhibit 10.31 to the Registrant's Annual Report on Form 10-K filed February 28, 2017 |
| 10.32 | First Amendment to Purchase and Sale, by and among LendingTree, LLC and an affiliate of Greenstreet Real Estate Partners, L.P., dated November 28, 2016 | Exhibit 10.32 to the Registrant's Annual Report on Form 10-K filed February 28, 2017 |
| 10.33 | Employment Agreement dated December 21, 2017, among John David Moriarty, LendingTree, Inc., and LendingTree, LLC.* | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed April 27, 2018 |
| 10.34 | Employment Agreement, dated January 2, 2018, among Neil Salvage, LendingTree, Inc., and LendingTree, LLC* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed April 27, 2018 |
| 10.35 | Employment Agreement, dated March 27, 2018, among Nikul Patel, LendingTree, Inc., and LendingTree, LLC.* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed April 27, 2018 |
| 21.1 | Subsidiaries of LendingTree, Inc. | † |
| 23.1 | Consent of independent registered public accounting firm. | † |
| 24.1 | Power of Attorney (included on signature page of this Annual Report on Form 10-K) | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | †† |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | †† |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | ††† |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | ††† |
| 101.INS | XBRL Instance Document | ††† |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | ††† |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | ††† |
| 101.SCH | XBRL Taxonomy Extension Schema Document | ††† |

† Filed herewith

†† This certification is being furnished solely to accompany this report pursuant to 18 U.S.C. 1350, and is not being filed for purposes of Section 18 of the Exchange Act and is not to be incorporated by reference into any filing of the registrant, whether made before or

after the date hereof, regardless of any general incorporation language in such filing.

107

††† Furnished herewith. Pursuant to Rule 406T of Regulation S-T, the Interactive Data Files on Exhibit 101 hereto are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act are deemed not filed for purposes of Section 18 of the Exchange Act and otherwise are not subject to liability under those sections.

\* Management contract or compensation plan or arrangement.

\*\* Certain schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). The Company agrees to furnish supplementally a copy of all omitted schedules to the SEC upon its request.

+ Portions of this exhibit have been omitted pursuant to a request for confidential treatment and this exhibit has been submitted separately to the SEC.

### ITEM 16.  Form 10-K Summary

None.

<div align="center">108</div>

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 28, 2019

LendingTree, Inc.

By:     **/s/ DOUGLAS R. LEBDA**

Douglas R. Lebda

*Chairman and Chief Executive Officer*

109

**Table of Contents**

   KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints each of J.D. Moriarty and Ryan Quinn as his or her true and lawful attorney and agent, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2018, and to file the same with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney and agent may lawfully do or cause to be done by virtue hereof.

   Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| **/s/ DOUGLAS R. LEBDA** <br> Douglas R. Lebda | Chairman, Chief Executive Officer and Director <br> *(Principal Executive Officer)* | February 28, 2019 |
| **/s/ J.D. MORIARTY** <br> J.D. Moriarty | Chief Financial Officer <br> *(Principal Financial Officer)* | February 28, 2019 |
| **/s/ CARLA SHUMATE** <br> Carla Shumate | Senior Vice President and Chief Accounting Officer <br> *(Principal Accounting Officer)* | February 28, 2019 |
| **/s/ GABRIEL DALPORTO** <br> Gabriel Dalporto | Director | February 28, 2019 |
| **/s/ THOMAS DAVIDSON** <br> Thomas Davidson | Director | February 28, 2019 |
| **/s/ NEAL DERMER** <br> Neal Dermer | Director | February 28, 2019 |
| **/s/ ROBIN HENDERSON** <br> Robin Henderson | Director | February 28, 2019 |
| **/s/ PETER HORAN** <br> Peter Horan | Director | February 28, 2019 |
| **/s/ STEVEN OZONIAN** <br> Steven Ozonian | Director | February 28, 2019 |
| **/s/ SARAS SARASVATHY** <br> Saras Sarasvathy | Director | February 28, 2019 |
| **/s/ G. KENNEDY THOMPSON** <br> G. Kennedy Thompson | Director | February 28, 2019 |
| **/s/ CRAIG TROYER** <br> Craig Troyer | Director | February 28, 2019 |

EX-10.30 2 tree-12312018xex1030.htm EXHIBIT 10.30

**Exhibit 10.30**

## JOINDER TO AMENDED AND RESTATED CREDIT AGREEMENT

This JOINDER TO AMENDED AND RESTATED CREDIT AGREEMENT (this "Agreement") is entered into as of October 26, 2018, among LENDINGTREE, LLC, a Delaware limited liability company (the "Borrower"), LENDINGTREE, INC., a Delaware corporation ("Parent"), each other Loan Party party hereto, each bank and other financial institution party hereto as a provider of Incremental Revolving Commitments (each, an "Incremental Lender" and, collectively, the "Incremental Lenders"), and SUNTRUST BANK, as administrative agent under the Credit Agreement referred to below (in such capacity and together with its successors, the "Administrative Agent").

### RECITALS:

WHEREAS, the Borrower, the Parent, the Administrative Agent, and the Lenders from time to time party thereto are parties to that certain Amended and Restated Credit Agreement dated as of November 21, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

WHEREAS, in accordance with Section 2.23 of the Credit Agreement, the Borrower notified the Administrative Agent of its request for Incremental Revolving Commitments, and pursuant to Section 2.23 of the Credit Agreement, the Borrower hereby requests that the Incremental Lenders set forth on Annex I hereto make Incremental Revolving Commitments hereunder as additional revolving commitments (the "Incremental Revolving Commitments") in an aggregate principal amount of $100,000,000 to the Borrower on the Incremental Effective Date (as defined below).

WHEREAS, in accordance with Section 2.23 of the Credit Agreement, the Incremental Revolving Commitments shall be effected by, among other things, the execution of an instrument of joinder entered into among the Borrower, the Administrative Agent and the Incremental Lenders, in accordance with the terms and conditions of the Credit Agreement.

WHEREAS, each Incremental Lender is willing to make Incremental Revolving Commitments available to the Borrower on the Incremental Effective Date on the terms set forth in Section 2 and in the Credit Agreement and subject to the conditions set forth herein and to become, if not already, a Lender for all purposes under the Credit Agreement and to bound by all of the terms and conditions thereof and of the Loan Documents.

WHEREAS, the Borrower has also requested, and the Administrative Agent has agreed, to amend the Credit Agreement to give effect to the Incremental Revolving Commitments and certain mechanical changes necessary or advisable in connection therewith, all in accordance with the terms of this Agreement.

### AGREEMENT:

In consideration of the undertakings set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.                  Definitions. Unless otherwise defined herein, each capitalized term used in this Agreement (including the recitals) and not defined herein shall be defined in accordance with the Credit Agreement.

Section 2.                  Incremental Revolving Commitments.

2.1       Incremental Revolving Commitments. Each Incremental Lender hereby agrees, severally and not jointly, on the terms set forth herein and in the Credit Agreement and subject to the conditions set forth herein, to lend and relend to the Borrower, from time to time on any Business Day on or after the Incremental Effective Date and prior to the Revolving Commitment Termination Date, amounts which do not exceed such Incremental Lender's Incremental Revolving Commitment (as set forth opposite such Incremental Lender's name on Annex I hereto) as of such Business Day. The Incremental Revolving Commitments will be added to the existing Revolving Commitments. Subject to the terms and conditions set forth herein and in the Credit Agreement, on or after the Incremental Effective Date and prior to the Revolving Commitment Termination Date, Borrowings under the Incremental Revolving Commitments may be repaid and reborrowed from time to time on a revolving basis. Pursuant to Section 2.23 of the Credit Agreement, upon the effectiveness of the Incremental Revolving Commitments hereunder, the Commitments and Pro Rata Share of each Lender

will be adjusted to give effect to the Incremental Revolving Commitments, and Schedule II to the Credit Agreement shall automatically be deemed amended as set forth on <u>Annex II</u> attached hereto.

2.2    <u>Terms of the Incremental Revolving Commitments Generally</u>. Except as expressly provided herein, the Incremental Revolving Commitments shall have identical terms as the existing Revolving Commitments (including, without limitation, with respect to interest rates, prepayments, and maturity) and shall otherwise be subject to the provisions, including any provisions restricting the rights, or regarding the obligations, of the Loan Parties or any provisions regarding the rights of the Lenders, of the Credit Agreement and the other Loan Documents. Immediately upon this Agreement becoming effective on the Incremental Effective Date, the Incremental Revolving Commitments shall constitute "Revolving Commitments" for all purposes under, and subject to the provisions of, the Loan Documents (and shall be fully fungible with the existing Revolving Commitments). Each reference to a "Revolving Commitment" or "Revolving Commitments" in the Credit Agreement or the other Loan Documents shall be deemed to include the Incremental Revolving Commitments and all other related terms will have correlative meanings *mutatis mutandis*. For the avoidance of doubt, any Borrowings under the Incremental Revolving Commitments shall rank *pari passu* with the other Obligations and all collateral securing any such Borrowings shall secure all other Obligations on a *pari passu* basis, and such Borrowings shall be guaranteed on a *pari passu* basis with the other Obligations.

Section 3.                    <u>New Lenders; Use of Proceeds; Tax Matters</u>.

3.1    <u>New Lenders</u>. Each Incremental Lender that is not, prior to the effectiveness of this Agreement, a Lender under the Credit Agreement, hereby agrees that upon, and subject to, the occurrence of the Incremental Effective Date, such Incremental Lender shall be deemed to be, and shall become, a "Lender" for all purposes of, and subject to all the obligations of a "Lender" under, the Credit Agreement and the other Loan Documents.

3.2    <u>Use of Proceeds</u>. The proceeds of any Borrowings under the Incremental Revolving Commitments shall be used to finance working capital needs, including, without limitation, Permitted Acquisitions and other growth initiatives, capital expenditures, and for other general corporate purposes of the Borrower and its Subsidiaries; <u>provided</u> that, such proceeds shall not be used, directly or indirectly, for any purpose that would violate any rule or regulation of the Board of Governors of the Federal Reserve System, including Regulations T, U or X, or in a manner that would violate <u>Section 7.13</u> of the Credit Agreement.

3.3    <u>Tax Matters</u>. The Borrower and each Lender party hereto hereby acknowledge and agree that the amendments to the Credit Agreement contemplated hereby do not constitute a "significant modification," within the meaning of Section 1.1001-3 of the U.S. Treasury regulations, of the existing Loans for U.S. federal income tax purposes.

Section 4.                    <u>Conditions to Effectiveness</u>. The effectiveness of this Agreement and the obligation of each Incremental Lender to make its Incremental Revolving Commitment available to the Borrower shall become effective on the Business Day on which the following conditions are satisfied or waived (the "<u>Incremental Effective Date</u>"):

(a)    the Administrative Agent (or its counsel) shall have received counterparts of this Agreement that, when taken together, bear the signatures of (i) the Administrative Agent, (ii) each Incremental Lender, (iii) the Borrower, and (iv) each Guarantor;

(b)    at the time of and immediately after giving effect to this Agreement and the Incremental Revolving Commitments, no Default or Event of Default shall exist;

(c)    all representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects);

(d)    Parent and its Subsidiaries shall be in compliance with the financial covenant set forth in Article VI of the Credit Agreement as of the last day of the most recently ended four Fiscal Quarter period for which financial statements are required to have been delivered pursuant to Section 5.1(a) or (b) of the Credit Agreement, calculated on a Pro Forma Basis and as if all such Incremental Revolving Commitments had been established (and fully funded) as of the first day of the relevant period for testing compliance (but calculated without including the cash proceeds of any Incremental Revolving Commitments in the amount of unrestricted cash and Cash Equivalents to be netted in the calculation of Consolidated Total Net Leverage Ratio); <u>provided</u>, that, in the case of any Incremental Revolving Commitments established to finance a Material Acquisition, the Consolidated Total Net Leverage Ratio may be 0.50 greater than the otherwise applicable covenant level set forth in Article VI of the Credit Agreement;

(e)    such evidence of appropriate corporate authorization on the part of the Borrower with respect to the Incremental Revolving Commitments and such opinions of counsel for the Borrower with respect to such Incremental Revolving Commitments as the Administrative Agent may reasonably request;

     (f)        a certificate of the Borrower signed by a Responsible Officer, in form and substance reasonably acceptable to the Administrative Agent, certifying that each of the conditions in Section 2.23(a) of the Credit Agreement has been satisfied;

     (g)        to the extent requested by any Incremental Lender, executed promissory notes evidencing the Incremental Revolving Commitments issued by the Borrower in accordance with Section 2.10 of the Credit Agreement;

     (h)        any other certificates or documents that the Administrative Agent shall reasonably request, in form and substance reasonably satisfactory to the Administrative Agent; and

     (i)        the Borrower shall have paid all fees and other amounts due and payable on or prior to the Incremental Effective Date, including reimbursement or payment of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel to the Administrative Agent) required to be reimbursed or paid by the Borrower hereunder, under any fee letter, or under any other Loan Document.

    Section 5.         <u>Acknowledgments and Affirmations of the Loan Parties</u>. Each Loan Party hereby expressly acknowledges the terms of this Agreement and confirms and reaffirms, as of the date hereof, (i) the covenants and agreements contained in each Loan Document to which it is a party, including, in each case, such covenants and agreements as in effect immediately after giving effect to this Agreement and the transactions contemplated hereby and thereby, (ii) its guarantee of the Guaranteed Obligations (as defined in the Guaranty and Security Agreement) (including, without limitation, any Borrowings under the Incremental Revolving Commitments) and (iii) its grant of Liens on the Collateral to secure the Obligations (including, without limitation, the Obligations with respect to any Borrowings under the Incremental Revolving Commitments) pursuant to the Collateral Documents, all as provided in the Loan Documents as originally executed, and each Loan Party acknowledges and agrees that such guarantee, pledge and/or grant shall continue in full force and effect in respect of, and to secure, such Obligations under the Credit Agreement and the other Loan Documents. Each Loan Party hereby restates and renews each and every representation and warranty heretofore made by it in the Credit Agreement and the other Loan Documents as fully as if made on the date hereof and with specific reference to this Agreement and any other Loan Documents executed or delivered in connection herewith (except with respect to representations and warranties made as of an expressed date, in which case such representations and warranties shall be true and correct as of such date).

    Section 6.         <u>Miscellaneous</u>.

    6.1      <u>Loan Document; Effect of Agreement</u>. For avoidance of doubt, the Loan Parties, the Lenders party hereto, and the Administrative Agent each hereby acknowledges and agrees that this Agreement is a Loan Document. Except as set forth expressly hereinabove, all terms of the Credit Agreement and the other Loan Documents shall be and remain in full force and effect, and shall constitute the legal, valid, binding, and enforceable obligations of the Loan Parties.

    6.2      <u>Counterparts; Integration</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Agreement together with the Credit Agreement, the other Loan Documents, any separate engagement letter and any separate fee letter relating to fees payable to the Administrative Agent and the Incremental Lenders constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters. Delivery of an executed counterpart to this Agreement or any other Loan Document by facsimile transmission or by electronic mail in Adobe Corporation's Portable Document Format (or PDF) shall be as effective as delivery of a manually executed counterpart hereof.

    6.3      <u>Governing Law.</u> This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof) of the State of New York.

<div align="center">[Signature pages follow.]</div>

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the date first above written.

**LENDINGTREE, LLC**, as the Borrower


By: /s/ J.D. Moriarty
Name: J.D. Moriarty
Title: Chief Financial Officer


**LENDINGTREE, INC.**, as the Parent and a Guarantor


By: /s/ J.D. Moriarty
Name: J.D. Moriarty
Title: Chief Financial Officer


**IRON HORSE HOLDINGS, LLC**, as a Guarantor


By: /s/ Carla Shumate
Name: Carla Shumate
Title: Treasurer


**OVATION CREDIT SERVICES, INC.**, as a Guarantor


By: /s/ J.D. Moriarty
Name: J.D. Moriarty
Title: Treasurer

**SUNTRUST BANK**,
as Administrative Agent and an Incremental Lender

By:　/s/ Cynthia W. Burton
Name: Cynthia W. Burton
Title: Director

**Bank of America, N.A.,**
as an Incremental Lender


By:   /s/ Charles R. Dickerson
Name: Charles R. Dickerson
Title: Senior Vice President

---

**ROYAL BANK OF CANADA**,
as an Incremental Lender


By:   /s/ Christian Gutierrez
Name: Christian Gutierrez
Title: Authorized Signatory

**FIFTH THIRD BANK**,
as an Incremental Lender


By:   /s/ Jodie R. Ayres
Name: Jodie R. Ayres
Title: Vice President

**<u>Regions Bank</u>**,
as an Incremental Lender


By:   /s/ Jason Douglas_____
Name: Jason Douglas
Title: Director

---

**GOLDMAN SACHS BANK USA**,
as an Incremental Lender


By:    /s/ Rebecca Kratz
Name: Rebecca Kratz
Title: Authorized Signatory

---

**PNC BANK, NATIONAL ASSOCIATION,**
as an Incremental Lender


By:   /s/ Krutesh Trivedi
Name: Krutesh Trivedi
Title: Vice President

**Annex I**

**Incremental Revolving Commitments**

| Incremental Lender | Incremental Revolving Commitment |
|---|---|
| SunTrust Bank | $[***] |
| Bank of America, N.A. | $[***] |
| Royal Bank of Canada | $[***] |
| Fifth Third Bank | $[***] |
| Regions Bank | $[***] |
| Goldman Sachs Bank USA | $[***] |
| PNC Bank, National Association | $[***] |
| **Total** | **$100,000,000** |

**Annex II**

<div align="right">

**SCHEDULE II**

</div>

**Commitment Amounts**

| Lender | Revolving Commitment Amount |
|---|---|
| SunTrust Bank | $[***] |
| Bank of America, N.A. | $[***] |
| Royal Bank of Canada | $[***] |
| Fifth Third Bank | $[***] |
| Regions Bank | $[***] |
| JPMorgan Chase Bank, N.A. | $[***] |
| Goldman Sachs Bank USA | $[***] |
| PNC Bank, National Association | $[***] |
| **Total** | **$350,000,000** |

Exhibit 21.1

**SUBSIDIARIES OF LENDINGTREE, INC.**

| Name | Jurisdiction of Formation |
|---|---|
| LendingTree, LLC | DE |
| Tree.com BU Holding Company, Inc. | DE |
| DegreeTree, Inc. | DE |
| Rexford Office Holdings, LLC | DE |
| Home Loan Center, Inc. | CA |
| HLC Escrow, Inc. | CA |
| LT Real Estate, Inc. | DE |
| LT India Holding Company, LLC | DE |
| LendingTree Research Services LLP | India |
| Ovation Credit Services, Inc. | FL |
| CM LT Holdings, LLC | DE |
| Value Holding Inc. | DE |
| ValuePenguin Inc. | DE |
| QuoteWizard.com, LLC | DE |

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (No. 333-197952, No. 333-182670 and No. 333-218747) of LendingTree, Inc. of our report dated February 28, 2019 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

Charlotte, North Carolina
February 28, 2019

EX-31.1 5 tree-12312018xex311.htm EXHIBIT 31.1

**Exhibit 31.1**

### CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify that:

1. I have reviewed this annual report on Form 10-K for the period ended December 31, 2018 of LendingTree, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 28, 2019

/s/ **DOUGLAS R. LEBDA**

Douglas R. Lebda
*Chairman and Chief Executive Officer*
*(principal executive officer)*

6/10/2020    08-13555-mg1-cv-02674-PF    Filed 04/01/27 Entered 04/01/21 14:23:28 Exhibit
Complaint    Pg 948 of 1033
EX-31.2 6 tree-12312018xex312.htm EXHIBIT 31.2

**Exhibit 31.2**

### CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER
### PURSUANT TO RULE 13a-14(a) OR RULE 15d-14(a) OF THE
### SECURITIES EXCHANGE ACT OF 1934,
### AS ADOPTED PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, J.D. Moriarty, certify that:

1.  I have reviewed this annual report on Form 10-K for the period ended December 31, 2018 of LendingTree, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 28, 2019

/s/ **J.D. MORIARTY**

J.D. Moriarty
*Chief Financial Officer*
*(principal financial officer)*

EX-32.1 7 tree-12312018xex321.htm EXHIBIT 32.1

**Exhibit 32.1**

**CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Douglas R. Lebda, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) the Annual Report on Form 10-K for the fiscal year ended December 31, 2018 of LendingTree, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of LendingTree, Inc.

Dated: February 28, 2019

**/s/ DOUGLAS R. LEBDA**
_____

Douglas R. Lebda
_Chairman and Chief Executive Officer_
_(principal executive officer)_

**Exhibit 32.2**

### CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, J.D. Moriarty, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   the Annual Report on Form 10-K for the fiscal year ended December 31, 2018 of LendingTree, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of LendingTree, Inc.

Dated:  February 28, 2019

                                                    **/s/ J.D. MORIARTY**
                                                    _____

                                                    J.D. Moriarty
                                                    *Chief Financial Officer*
                                                    *(principal financial officer)*

# EXHIBIT 8

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the Quarterly Period Ended June 30, 2019
### Or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from                to
### Commission File No. 001-34063

# lendingtree®

# LendingTree, Inc.
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **26-2414818** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

### 11115 Rushmore Drive, Charlotte, North Carolina 28277
### (Address of principal executive offices)(Zip Code)

### (704) 541-5351
### (Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value per share | TREE | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

    As of July 19, 2019, there were 12,988,997 shares of the registrant's common stock, par value $.01 per share, outstanding, excluding treasury shares.

# TABLE OF CONTENTS

| | | Page Number |
|---|---|---|
| **PART I—FINANCIAL INFORMATION** | | |
| **Item 1.** | *Financial Statements* | 3 |
| **Item 2.** | *Management's Discussion and Analysis of Financial Condition and Results of Operations* | 34 |
| **Item 3.** | *Quantitative and Qualitative Disclosures About Market Risk* | 44 |
| **Item 4.** | *Controls and Procedures* | 44 |
| **PART II—OTHER INFORMATION** | | |
| **Item 1.** | *Legal Proceedings* | 45 |
| **Item 1A.** | *Risk Factors* | 45 |
| **Item 2.** | *Unregistered Sales of Equity Securities and Use of Proceeds* | 45 |
| **Item 5.** | *Other Information* | 46 |
| **Item 6.** | *Exhibits* | 47 |

2

[Table of Contents]

PART I—FINANCIAL INFORMATION

**Item 1.  Financial Statements**

<div align="center">

**LENDINGTREE, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(Unaudited)**

</div>

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| | (in thousands, except per share amounts) | | | |
| Revenue | $ 278,421 | $ 184,101 | $ 540,811 | $ 365,136 |
| Costs and expenses: | | | | |
| Cost of revenue (exclusive of depreciation and amortization shown separately below) | 16,310 | 6,043 | 33,980 | 11,739 |
| Selling and marketing expense | 191,629 | 123,946 | 366,520 | 249,990 |
| General and administrative expense | 27,951 | 24,759 | 59,068 | 47,573 |
| Product development | 10,175 | 5,967 | 20,341 | 12,227 |
| Depreciation | 2,559 | 1,633 | 5,041 | 3,304 |
| Amortization of intangibles | 14,280 | 3,964 | 27,707 | 7,927 |
| Change in fair value of contingent consideration | 2,790 | (167) | 17,382 | (908) |
| Severance | 403 | 3 | 457 | 3 |
| Litigation settlements and contingencies | 8 | (170) | (199) | (192) |
| **Total costs and expenses** | 266,105 | 165,978 | 530,297 | 331,663 |
| **Operating income** | 12,316 | 18,123 | 10,514 | 33,473 |
| Other (expense) income, net: | | | | |
| Interest expense, net | (5,095) | (2,924) | (10,563) | (5,912) |
| Other income (expense) | 71 | (71) | 139 | (37) |
| **Income before income taxes** | 7,292 | 15,128 | 90 | 27,524 |
| Income tax benefit | 5,689 | 29,721 | 13,441 | 53,182 |
| **Net income from continuing operations** | 12,981 | 44,849 | 13,531 | 80,706 |
| Loss from discontinued operations, net of tax | (763) | (2,302) | (1,825) | (6,635) |
| **Net income and comprehensive income** | $ 12,218 | $ 42,547 | $ 11,706 | $ 74,071 |
| | | | | |
| **Weighted average shares outstanding:** | | | | |
| Basic | 12,805 | 12,416 | 12,762 | 12,254 |
| Diluted | 14,908 | 14,147 | 14,622 | 14,527 |
| **Income per share from continuing operations:** | | | | |
| Basic | $ 1.01 | $ 3.61 | $ 1.06 | $ 6.59 |
| Diluted | $ 0.87 | $ 3.17 | $ 0.93 | $ 5.56 |
| **Loss per share from discontinued operations:** | | | | |
| Basic | $ (0.06) | $ (0.19) | $ (0.14) | $ (0.54) |
| Diluted | $ (0.05) | $ (0.16) | $ (0.12) | $ (0.46) |
| **Net income per share:** | | | | |
| Basic | $ 0.95 | $ 3.43 | $ 0.92 | $ 6.04 |
| Diluted | $ 0.82 | $ 3.01 | $ 0.80 | $ 5.10 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

3

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
#### (Unaudited)

| | June 30, 2019 | December 31, 2018 |
|---|---|---|
| | *(in thousands, except par value and share amounts)* | |
| **ASSETS:** | | |
| Cash and cash equivalents | $ 51,332 | $ 105,102 |
| Restricted cash and cash equivalents | 58 | 56 |
| Accounts receivable (net of allowance of $1,676 and $1,143, respectively) | 139,778 | 91,072 |
| Prepaid and other current assets | 12,440 | 16,428 |
| Assets held for sale (Note 6) | — | 21,328 |
| Current assets of discontinued operations (Note 17) | 2,227 | 185 |
| **Total current assets** | **205,835** | **234,171** |
| Property and equipment (net of accumulated depreciation of $14,449 and $13,887 respectively) | 28,874 | 23,175 |
| Goodwill | 419,984 | 348,347 |
| Intangible assets, net | 209,592 | 205,699 |
| Deferred income tax assets | 93,014 | 79,289 |
| Other non-current assets | 20,033 | 2,168 |
| Non-current assets of discontinued operations | 3,266 | 3,266 |
| **Total assets** | **$ 980,598** | **$ 896,115** |
| | | |
| **LIABILITIES:** | | |
| Revolving credit facility | $ 115,000 | $ 125,000 |
| Accounts payable, trade | 17,447 | 15,074 |
| Accrued expenses and other current liabilities | 130,323 | 93,190 |
| Current contingent consideration | 29,548 | 11,080 |
| Current liabilities of discontinued operations (Note 17) | 15,809 | 17,609 |
| **Total current liabilities** | **308,127** | **261,953** |
| Long-term debt | 257,582 | 250,943 |
| Non-current contingent consideration | 20,671 | 27,757 |
| Deferred income tax liabilities | 711 | 894 |
| Other non-current liabilities | 19,620 | 8,360 |
| **Total liabilities** | **606,711** | **549,907** |
| Commitments and contingencies (Note 14) | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Preferred stock $.01 par value; 5,000,000 shares authorized; none issued or outstanding | — | — |
| Common stock $.01 par value; 50,000,000 shares authorized; 15,603,806 and 15,428,351 shares issued, respectively, and 12,967,718 and 12,809,764 shares outstanding, respectively | 156 | 154 |
| Additional paid-in capital | 1,154,174 | 1,134,227 |
| Accumulated deficit | (598,776) | (610,482) |
| Treasury stock; 2,636,088 and 2,618,587 shares, respectively | (181,667) | (177,691) |
| **Total shareholders' equity** | **373,887** | **346,208** |
| **Total liabilities and shareholders' equity** | **$ 980,598** | **$ 896,115** |

The accompanying notes to consolidated financial statements are an integral part of these statements.

4

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
#### (Unaudited)

| | Total | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Number of Shares | Amount | | | Number of Shares | Amount |
| | | | | *(in thousands)* | | | |
| **Balance as of December 31, 2018** | $ 346,208 | 15,428 | $ 154 | $ 1,134,227 | $ (610,482) | 2,618 | $ (177,691) |
| Net loss and comprehensive loss | (512) | — | — | — | (512) | — | — |
| Non-cash compensation | 14,053 | — | — | 14,053 | — | — | — |
| Purchase of treasury stock | (3,976) | — | — | — | — | 18 | (3,976) |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | (3,585) | 87 | 1 | (3,586) | — | — | — |
| **Balance as of March 31, 2019** | $ 352,188 | 15,515 | $ 155 | $ 1,144,694 | $ (610,994) | 2,636 | $ (181,667) |
| Net income and comprehensive income | 12,218 | — | — | — | 12,218 | — | — |
| Non-cash compensation | 15,982 | — | — | 15,982 | — | — | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | (6,501) | 89 | 1 | (6,502) | — | — | — |
| **Balance as of June 30, 2019** | $ 373,887 | 15,604 | $ 156 | $ 1,154,174 | $ (598,776) | 2,636 | $ (181,667) |

| | Total | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | | Noncontrolling Interest |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Number of Shares | Amount | | | Number of Shares | Amount | |
| | | | | *(in thousands)* | | | | |
| **Balance as of December 31, 2017** | $ 294,874 | 14,218 | $ 142 | $ 1,087,582 | $ (708,354) | 2,239 | $ (85,085) | $ 589 |
| Net income and comprehensive income | 31,524 | — | — | — | 31,524 | — | — | — |
| Non-cash compensation | 11,109 | — | — | 11,109 | — | — | — | — |
| Purchase of treasury stock | (11,000) | — | — | — | — | 30 | (11,000) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | 2,057 | 473 | 5 | 2,052 | — | — | — | — |
| Cumulative effect adjustment due to ASU 2014-09 | 1,373 | — | — | — | 1,373 | — | — | — |
| Noncontrolling interest | (34) | — | — | — | — | — | — | (34) |
| **Balance as of March 31, 2018** | $ 329,903 | 14,691 | $ 147 | $ 1,100,743 | $ (675,457) | 2,269 | $ (96,085) | $ 555 |
| Net income and comprehensive income | 42,547 | — | — | — | 42,547 | — | — | — |
| Non-cash compensation | 11,178 | — | — | 11,178 | — | — | — | — |
| Purchase of treasury stock | (35,003) | — | — | — | — | 127 | (35,003) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | (1,225) | 447 | 4 | (1,229) | — | — | — | — |
| Issuance of 0.625% Convertible Senior Notes, net | (4) | — | — | (4) | — | — | — | — |
| Noncontrolling interest | 32 | — | — | — | — | — | — | 32 |
| **Balance as of June 30, 2018** | $ 347,428 | 15,138 | $ 151 | $ 1,110,688 | $ (632,910) | 2,396 | $ (131,088) | $ 587 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (Unaudited)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| | *(in thousands)* | |
| Cash flows from operating activities attributable to continuing operations: | | |
| **Net income and comprehensive income** | $ 11,706 | $ 74,071 |
| Less: Loss from discontinued operations, net of tax | 1,825 | 6,635 |
| Income from continuing operations | 13,531 | 80,706 |
| Adjustments to reconcile income from continuing operations to net cash provided by operating activities attributable to continuing operations: | | |
| (Gain) loss on impairments and disposal of assets | (1,729) | 1,889 |
| Amortization of intangibles | 27,707 | 7,927 |
| Depreciation | 5,041 | 3,304 |
| Rental amortization of intangibles and depreciation | — | 396 |
| Non-cash compensation expense | 30,035 | 22,287 |
| Deferred income taxes | (13,624) | (56,197) |
| Change in fair value of contingent consideration | 17,382 | (908) |
| Bad debt expense | 1,282 | 513 |
| Amortization of debt issuance costs | 970 | 865 |
| Amortization of convertible debt discount | 5,929 | 5,623 |
| Changes in current assets and liabilities: | | |
| Accounts receivable | (48,396) | (26,841) |
| Prepaid and other current assets | (190) | (787) |
| Accounts payable, accrued expenses and other current liabilities | 28,192 | (3,970) |
| Current contingent consideration | (3,000) | (21,900) |
| Income taxes receivable | 4,388 | 2,522 |
| Other, net | 357 | (165) |
| **Net cash provided by operating activities attributable to continuing operations** | **67,875** | **15,264** |
| Cash flows from investing activities attributable to continuing operations: | | |
| Capital expenditures | (9,769) | (6,747) |
| Proceeds from sale of fixed assets | 24,062 | — |
| Acquisition of ValuePenguin, net of cash acquired | (105,578) | — |
| Acquisition of QuoteWizard, net of cash acquired | 447 | — |
| Acquisition of Ovation, net of cash acquired | — | (11,683) |
| Acquisition of SnapCap | — | (10) |
| Other investing activities | — | (1) |
| **Net cash used in investing activities attributable to continuing operations** | **(90,838)** | **(18,441)** |
| Cash flows from financing activities attributable to continuing operations: | | |
| Payments related to net-share settlement of stock-based compensation, net of proceeds from exercise of stock options | (7,646) | 895 |
| Contingent consideration payments | (3,000) | (25,600) |
| Net repayment of revolving credit facility | (10,000) | — |
| Payment of debt issuance costs | (31) | (84) |
| Purchase of treasury stock | (3,976) | (47,101) |
| **Net cash used in financing activities attributable to continuing operations** | **(24,653)** | **(71,890)** |
| **Total cash used in continuing operations** | **(47,616)** | **(75,067)** |

| | | | | |
|---|---|---:|---|---:|
| Discontinued operations: | | | | |
|   Net cash used in operating activities attributable to discontinued operations | | (6,152) | | (4,224) |
| **Total cash used in discontinued operations** | | **(6,152)** | | **(4,224)** |
| **Net decrease in cash, cash equivalents, restricted cash and restricted cash equivalents** | | **(53,768)** | | **(79,291)** |
| Cash, cash equivalents, restricted cash and restricted cash equivalents at beginning of period | | 105,158 | | 372,641 |
| **Cash, cash equivalents, restricted cash and restricted cash equivalents at end of period** | $ | **51,390** | $ | **293,350** |
| | | | | |
| **Non-cash investing activities:** | | | | |
|   Capital additions from tenant improvement allowance | $ | 1,111 | $ | — |

The accompanying notes to consolidated financial statements are an integral part of these statements.

6

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### (Unaudited)

## NOTE 1—ORGANIZATION

### Company Overview

LendingTree, Inc. ("LendingTree" or the "Company"), is the parent of LendingTree, LLC and several companies owned by LendingTree, LLC.

LendingTree operates what it believes to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. The Company offers consumers tools and resources, including free credit scores, that facilitate comparison-shopping for mortgage loans, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. The Company primarily seeks to match in-market consumers with multiple providers on its marketplace who can provide them with competing quotes for loans, deposit products, insurance or other related offerings they are seeking. The Company also serves as a valued partner to lenders and other providers seeking an efficient, scalable and flexible source of customer acquisition with directly measurable benefits, by matching the consumer inquiries it generates with these providers.

The consolidated financial statements include the accounts of LendingTree and all its wholly-owned entities. Intercompany transactions and accounts have been eliminated.

### Discontinued Operations

The LendingTree Loans business is presented as discontinued operations in the accompanying consolidated balance sheets, consolidated statements of operations and comprehensive income and consolidated cash flows for all periods presented. The notes accompanying these consolidated financial statements reflect the Company's continuing operations and, unless otherwise noted, exclude information related to the discontinued operations. *See* Note 17—Discontinued Operations and Note 18—Subsequent Event for additional information.

### Basis of Presentation

The accompanying unaudited interim consolidated financial statements as of June 30, 2019 and for the three and six months ended June 30, 2019 and 2018, respectively, have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC"). In the opinion of management, the unaudited interim consolidated financial statements have been prepared on the same basis as the audited financial statements, and include all adjustments, consisting only of normal recurring adjustments, necessary for the fair statement of the Company's financial position for the periods presented. The results for the three and six months ended June 30, 2019 are not necessarily indicative of the results to be expected for the year ending December 31, 2019, or any other period. The accompanying consolidated balance sheet as of December 31, 2018 was derived from audited financial statements included in the Company's annual report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report"). The accompanying consolidated financial statements do not include all of the information and footnotes required by GAAP for annual financial statements. Accordingly, they should be read in conjunction with the audited financial statements and notes thereto included in the 2018 Annual Report.

## NOTE 2—SIGNIFICANT ACCOUNTING POLICIES

### Accounting Estimates

Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with GAAP. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements, including discontinued operations, include: loan loss obligations; the recoverability of long-lived assets, goodwill and intangible assets; the determination of income taxes payable

and deferred income taxes, including related valuation allowances; fair value of assets acquired in a business combination; contingent consideration related to business combinations; litigation accruals; contract assets; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

[Table of Contents](#)

# LENDINGTREE, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Certain Risks and Concentrations**

LendingTree's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject the Company to concentration of credit risk at June 30, 2019, consist primarily of cash and cash equivalents and accounts receivable, as disclosed in the consolidated balance sheet. Cash and cash equivalents are in excess of Federal Deposit Insurance Corporation insurance limits, but are maintained with quality financial institutions of high credit. The Company generally requires certain network partners to maintain security deposits with the Company, which in the event of non-payment, would be applied against any accounts receivable outstanding.

Due to the nature of the mortgage lending industry, interest rate fluctuations may negatively impact future revenue from the Company's marketplace.

Lenders and lead purchasers participating on the Company's marketplace can offer their products directly to consumers through brokers, mass marketing campaigns or through other traditional methods of credit distribution. These lenders and lead purchasers can also offer their products online, either directly to prospective borrowers, through one or more online competitors, or both. If a significant number of potential consumers are able to obtain loans and other products from network partners without utilizing the Company's services, the Company's ability to generate revenue may be limited. Because the Company does not have exclusive relationships with the network partners whose loans and other financial products are offered on its online marketplace, consumers may obtain offers from these network partners without using its services.

Other than a support services office in India, the Company's operations are geographically limited to and dependent upon the economic condition of the United States.

**Litigation Settlements and Contingencies**

Litigation settlements and contingencies consists of expenses related to actual or anticipated litigation settlements.

**Recent Accounting Pronouncements**

In August 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2018-15 which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). This ASU is effective for annual and interim reporting periods beginning after December 15, 2019. Early adoption is permitted, including adoption in any interim period. The amendments should be applied either retrospectively or prospectively to all implementation costs incurred after the date of adoption. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In August 2018, the FASB issued ASU 2018-13 which removes, modifies and adds certain disclosure requirements in Accounting Standards Codification ("ASC") Topic 820, Fair Value Measurement. This ASU is effective for annual and interim reporting periods beginning after December 15, 2019, with early adoption permitted. Entities are permitted to adopt any removed or modified disclosures and delay adoption of the additional disclosures until the effective date of the ASU. Certain amendments must be applied prospectively while others are to be applied on a retrospective basis to all periods presented. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In January 2017, the FASB issued ASU 2017-04 which eliminates the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge (Step 2 of the goodwill impairment test). Instead, an impairment charge will be based on the excess of the carrying amount over the fair value. This ASU is effective for annual and interim impairment tests performed in periods beginning after December 15, 2019. Early adoption is permitted for annual and interim goodwill impairment testing dates after January 1, 2017. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In June 2016, the FASB issued ASU 2016-13 which requires entities to measure expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. This ASU introduces ASC Topic 326, Financial Instruments—Credit Losses, which replaces the existing incurred loss model and is applicable to financial assets measured at amortized cost, including trade receivables and certain other financial assets that have the contractual right to

receive cash. This ASU is effective for annual and interim reporting periods beginning after December 15, 2019. Early adoption is permitted beginning after December 15, 2018, including adoption in interim periods. The guidance must be adopted

8

6/10/2020　08-13555-mg Doc 21-1 Doc 60514 3-PDF Filed 04/01/21 Entered 06/04/01/2021 14:23:28 Exhibit
Complaint　Pg 968 of 1033

Table of Contents

# LENDINGTREE, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

using a modified retrospective transition. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In February 2016, the FASB issued ASU 2016-02 related to lease accounting guidance. This ASU introduces ASC Topic 842, Leases, which supersedes ASC Topic 840, Leases. In 2018 and 2019, the FASB issued final amendments clarifying certain narrow aspects of implementing ASU 2016-02, including clarifications related to the rate implicit in the lease, lessee reassessment of lease classification, lessor reassessment of lease term and purchase options, variable payments that depend on an index or rate, transition disclosures and certain other transition matters. The clarification ASUs also provided an optional transition method that allows entities to initially apply the lease accounting transition requirements at the adoption date and recognize a cumulative effect adjustment to the opening balance of retained earnings in the period of adoption without restating comparative prior periods presented. The clarification ASUs must be adopted concurrently with the adoption of ASU 2016-02 (collectively, "ASC Topic 842").

The Company has adopted ASC Topic 842 as of January 1, 2019 using the optional transition method to apply the new requirements at the adoption date without restating comparative prior periods presented. The adoption resulted in the increase in total assets and total liabilities of $8.8 million as of January 1, 2019 related to operating leases greater than one year in duration for which the Company is the lessee, with no cumulative effect adjustment to the opening balance of accumulated deficit. As part of the transition, the Company has elected the package of practical expedients which allows the Company to not reassess whether expired or existing contracts contain leases, lease classification for expired or existing leases, and initial direct costs for existing leases. Additionally, the Company has elected an accounting policy to not record short-term leases, which are leases with an initial term of twelve months or fewer, on the balance sheet.

## NOTE 3—REVENUE

Revenue is as follows *(in thousands)*:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| **Revenue:** | | | | |
| Mortgage products | $ 54,618 | $ 66,948 | $ 100,602 | $ 140,410 |
| Non-mortgage products | | | | |
| Credit cards | 56,045 | 38,747 | 110,551 | 84,879 |
| Personal loans | 41,109 | 36,210 | 73,640 | 62,175 |
| Insurance | 71,941 | 13 | 139,033 | 26 |
| Other | 54,708 | 42,183 | 116,985 | 77,646 |
| Total non-mortgage products | 223,803 | 117,153 | 440,209 | 224,726 |
| **Total revenue** | $ 278,421 | $ 184,101 | $ 540,811 | $ 365,136 |

The Company derives its revenue primarily from match fees and closing fees. Revenue is recognized when performance obligations under the terms of a contract with a customer are satisfied and promised services have transferred to the customer. The Company's services are generally transferred to the customer at a point in time.

Revenue within the mortgage product category is primarily generated from upfront match fees paid by mortgage Network Partners that receive a loan request, and in some cases upfront fees for clicks or call transfers. Match fees and upfront fees for clicks and call transfers are earned through the delivery of loan requests that originated through the Company's websites or affiliates. The Company recognizes revenue at the time a loan request is delivered to the customer, provided that no significant obligations remain. The Company's contractual right to the match fee consideration is contemporaneous with the satisfaction of the performance obligation to deliver a loan request to the customer.

In addition to match and other upfront fees, revenue within the non-mortgage product category is also generated from closing fees and approval fees. Closing fees are derived from lenders on certain auto loans, business loans, personal loans and student loans when

the lender funds a loan with the consumer. Approval fees are derived from credit card issuers when the credit card consumer receives card approval from the credit card issuer. The Company recognizes revenue on closing fees and approval fees

9

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

at the point when a loan request or a credit card consumer is delivered to the customer. The Company's contractual right to closing fees and approval fees is not contemporaneous with the satisfaction of the performance obligation to deliver a loan request or a credit card consumer to the customer. As such, the Company records a contract asset at each reporting period-end related to the estimated variable consideration on closing fees and approval fees for which the Company has satisfied the related performance obligation, but are still pending the loan closing or credit card approval before the Company has a contractual right to payment. This estimate is based on the Company's historical closing rates and historical time between when a consumer request for a loan or credit card is delivered to the lender or card issuer and when the loan is closed by the lender or approved by the card issuer.

Revenue from the Company's insurance business is primarily generated from match fees, fees for website clicks or fees for calls. Match fees and upfront fees for clicks and call transfers are earned through the delivery of consumer requests that originated through the Company's websites or affiliates. The Company recognizes revenue at the time a consumer request is delivered to the customer, provided that no significant obligations remain. The Company's contractual right to the match fee consideration is contemporaneous with the satisfaction of the performance obligation to deliver a consumer request to the customer.

Upfront fees and subscription fees are derived from consumers in the Company's credit services business. Upfront fees paid by consumers are recognized as revenue over the estimated time the consumer will remain a customer and receive services. Subscription fees are recognized over the period a consumer is receiving services.

The contract asset recorded within prepaid and other current assets on the consolidated balance sheets related to estimated variable consideration was $5.3 million and $4.8 million on June 30, 2019 and December 31, 2018, respectively.

The contract liability recorded within accrued expenses and other current liabilities on the consolidated balance sheets related to upfront fees paid by consumers in the Company's credit services business was $0.8 million and $0.4 million at June 30, 2019 and December 31, 2018, respectively. During the second quarter and first six months of 2019, the Company recognized revenue of $0.1 million and $0.4 million, respectively, that was included in the contract liability balance at December 31, 2018.

Revenue recognized in any reporting period includes estimated variable consideration for which the Company has satisfied the related performance obligations, but are still pending the occurrence or non-occurrence of a future event outside the Company's control (such as lenders providing loans to consumers or credit card approvals of consumers) before the Company has a contractual right to payment. The Company recognized an increase to such revenue from prior periods of $0.5 million and $0.2 million in the second quarters of 2019 and 2018, respectively.

### NOTE 4—CASH AND RESTRICTED CASH

Total cash, cash equivalents, restricted cash and restricted cash equivalents consist of the following *(in thousands)*:

|  | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 51,332 | $ | 105,102 |
| Restricted cash and cash equivalents |  | 58 |  | 56 |
| **Total cash, cash equivalents, restricted cash and restricted cash equivalents** | **$** | **51,390** | **$** | **105,158** |

10

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 5—GOODWILL AND INTANGIBLE ASSETS

The balance of goodwill, net is as follows *(in thousands)*:

| | Goodwill | | Accumulated Impairment Loss | | Net Goodwill | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2018 | $ | 831,435 | $ | (483,088) | $ | 348,347 |
| Acquisition of Ovation | | 20 | | — | | 20 |
| Acquisition of QuoteWizard | | 173 | | — | | 173 |
| Acquisition of ValuePenguin | | 71,444 | | — | | 71,444 |
| Balance at June 30, 2019 | $ | 903,072 | $ | (483,088) | $ | 419,984 |

The balance of intangible assets, net is as follows *(in thousands)*:

| | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Intangible assets with indefinite lives | $ | 10,142 | $ | 10,142 |
| Intangible assets with definite lives, net | | 199,450 | | 195,557 |
| Total intangible assets, net | $ | 209,592 | $ | 205,699 |

### Goodwill and Indefinite-Lived Intangible Assets

The Company's goodwill is associated with its one reportable segment. Intangible assets with indefinite lives relate to the Company's trademarks.

### Intangible Assets with Definite Lives

Intangible assets with definite lives relate to the following *(in thousands)*:

| | Cost | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|
| Technology | $ | 116,600 | $ | (35,149) | $ | 81,451 |
| Customer lists | | 80,200 | | (11,800) | | 68,400 |
| Trademarks and tradenames | | 18,042 | | (5,479) | | 12,563 |
| Website content | | 51,000 | | (13,967) | | 37,033 |
| Other | | 256 | | (253) | | 3 |
| Balance at June 30, 2019 | $ | 266,098 | $ | (66,648) | $ | 199,450 |

| | Cost | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|
| Technology | $ | 112,400 | $ | (21,022) | $ | 91,378 |
| Customer lists | | 80,200 | | (7,746) | | 72,454 |
| Trademarks and tradenames | | 16,742 | | (3,730) | | 13,012 |
| Website content | | 24,900 | | (6,192) | | 18,708 |
| Other | | 256 | | (251) | | 5 |
| Balance at December 31, 2018 | $ | 234,498 | $ | (38,941) | $ | 195,557 |

See Note 6—Assets Held for Sale for tenant leases classified as held for sale during 2018, which were sold to an unrelated third party in the second quarter of 2019.

11

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Amortization of intangible assets with definite lives is computed on a straight-line basis and, based on balances as of June 30, 2019, future amortization is estimated to be as follows *(in thousands)*:

|  | | Amortization Expense |
|---|---|---|
| Remainder of current year | $ | 27,564 |
| Year ending December 31, 2020 | | 53,179 |
| Year ending December 31, 2021 | | 42,839 |
| Year ending December 31, 2022 | | 25,356 |
| Year ending December 31, 2023 | | 8,702 |
| Thereafter | | 41,810 |
| **Total intangible assets with definite lives, net** | **$** | **199,450** |

## NOTE 6—ASSETS HELD FOR SALE

In December 2016, the Company acquired two office buildings in Charlotte, North Carolina for $23.5 million in cash, which included $0.1 million in acquisition-related costs which were capitalized. The buildings were acquired with the intent to use such buildings as the Company's corporate headquarters and rent any unused space.

In November 2018, the Company's Board of Directors approved a plan to sell the two office buildings. The properties were classified as current assets held for sale in the consolidated balance sheet for December 31, 2018. In February 2019, the Company agreed to sell these buildings to an unrelated third party, which agreement was amended in March 2019. The sale was finalized in the second quarter of 2019 for a sale price of $24.4 million, and the Company incurred closing fees of $0.3 million. The Company recognized a gain of $2.7 million on the sale within general and administrative expense in the consolidated statement of operations and comprehensive income. The properties were associated with the Company's one reportable segment.

Property and equipment classified as held for sale at December 31, 2018 is as follows *(in thousands)*:

|  | | Amount |
|---|---|---|
| Land | $ | 5,818 |
| Building | | 14,984 |
| Site improvements | | 950 |
| Computer equipment and capitalized software | | 166 |
| Furniture and other equipment | | 145 |
| **Total gross property and equipment** | | **22,063** |
| Accumulated depreciation | | (1,278) |
| **Total property and equipment, net** | **$** | **20,785** |

Intangible assets classified as held for sale at December 31, 2018 is as follows *(in thousands)*:

|  | | Amount |
|---|---|---|
| Tenant leases | $ | 961 |
| **Total gross intangible assets** | | **961** |
| Accumulated amortization | | (468) |
| **Total intangible assets, net** | **$** | **493** |

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 7—BUSINESS ACQUISITIONS

*2019 Acquisition*

**ValuePenguin**

On January 10, 2019, the Company acquired Value Holding, Inc., the parent company of ValuePenguin Inc. ("ValuePenguin"), a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards. The Company made an upfront cash payment of $106.1 million at the closing of the transaction, funded through $90.0 million drawn on the Company's Revolving Credit Facility and the balance using cash on hand. The purchase price of $106.2 million is comprised of the upfront cash payment of $106.1 million and a $0.1 million post-closing payment for working capital settlement.

The acquisition has been accounted for as a business combination. The preliminary allocation of purchase price to the assets acquired and liabilities assumed is as follows (in thousands):

|  | Preliminary Fair Value |
|---|---|
| Net working capital | $ 2,796 |
| Fixed assets | 68 |
| Intangible assets | 31,600 |
| Goodwill | 71,444 |
| Net noncurrent assets | 324 |
| **Total purchase price** | $ 106,232 |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, content and trademarks and tradenames. The estimated fair values of the developed technology were determined using cost replacement analysis, the content was determined using excess earnings analysis, and the trademarks and tradenames were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Preliminary Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $ 4,200 | 3 years |
| Content | 26,100 | 3 years |
| Trademarks and tradenames | 1,300 | 5 years |
| **Total intangible assets** | $ 31,600 | 3.1 years |

As of June 30, 2019, the Company has not completed its determination of the final allocation of the purchase price to the assets and liabilities of the acquisition. The final allocation of purchase price is expected to be finalized in 2019. Any adjustment to the assets and liabilities assumed with the acquisition will adjust goodwill.

The Company recorded preliminary goodwill of $71.4 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to ValuePenguin as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of ValuePenguin than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax

purposes, the Company preliminarily accounted for the acquisition as an asset purchase which would indicate the goodwill will be tax deductible. As of June 30, 2019, the Company has completed the assessment of this election to treat the acquisition as an asset purchase and the election will be timely filed.

13

Table of Contents

# LENDINGTREE, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Subsequent to the acquisition date, the Company's consolidated results of operations include the results of the acquired ValuePenguin business. In the second quarter and first six months of 2019, the Company's consolidated results of operations include revenue of $5.5 million and $10.9 million, respectively, and net income from continuing operations of $1.2 million and $3.1 million, respectively. Acquisition-related costs were $0.1 million in the first six months of 2019 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

*2018 Acquisitions*

**QuoteWizard**

On October 31, 2018, the Company acquired QuoteWizard.com, LLC ("QuoteWizard"), one of the largest insurance comparison marketplaces in the growing online insurance advertising market. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers.

The Company paid $299.9 million in initial cash consideration, funded through $174.9 million of cash on hand and $125.0 million drawn on the Revolving Credit Facility, and could make up to three additional earnout payments, each ranging from zero to $23.4 million, based on certain defined operating results during the earnout periods November 1, 2018 through October 31, 2019, November 1, 2019 through October 31, 2020, and November 1, 2020 through October 31, 2021. These additional payments, to the extent earned, will be payable in cash. The purchase price of $313.4 million is comprised of the upfront cash payment of $299.9 million, $13.9 million for the estimated fair value of the earnout payments, and a $0.4 million post-closing receipt for working capital settlement.

As of June 30, 2019, the estimated fair value of the contingent consideration totaled $37.6 million, of which $22.4 million is included in current contingent consideration and $15.2 million is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During the second quarter and first six months of 2019, the Company recorded $2.5 million and $16.9 million, respectively, of contingent consideration expense in the consolidated statements of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. The preliminary allocation of purchase price to the assets acquired and liabilities assumed is as follows *(in thousands)*:

|  | Preliminary Fair Value |
| --- | --- |
| Net working capital | $ 8,381 |
| Fixed assets | 1,509 |
| Intangible assets | 120,400 |
| Goodwill | 183,036 |
| Other noncurrent assets | 29 |
| **Total purchase price** | **$ 313,355** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

14

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The acquired intangible assets are definite-lived assets consisting of developed technology, customer relationships, content and trademarks and tradenames. The estimated fair values of the developed technology were determined using excess earnings analysis, the customer relationships were determined using the distributor method, the content was determined using cost replacement analysis, and the trademarks and tradenames were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Preliminary Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $ 68,900 | 4 years |
| Customer lists | 42,700 | 14.7 years |
| Content | 1,000 | 3 years |
| Trademarks and tradenames | 7,800 | 5 years |
| **Total intangible assets** | **$ 120,400** | **7.9 years** |

As of June 30, 2019, the Company has not completed its determination of the final allocation of the purchase price to the assets and liabilities of the acquisition. The final allocation of purchase price is expected to be finalized in the third quarter of 2019. Any adjustment to the assets and liabilities assumed with the acquisition will adjust goodwill.

The Company recorded preliminary goodwill of $183.0 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to QuoteWizard as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of QuoteWizard than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible.

The unaudited pro forma financial results for the second quarter and first six months of 2018 below combine the consolidated results of the Company and QuoteWizard, giving effect to the acquisition as if it had been completed on January 1, 2017. This unaudited pro forma financial information is presented for informational purposes only and is not indicative of future operations or results had the acquisition been completed as of January 1, 2017, or any other date.

The unaudited pro forma financial results include adjustments for additional amortization expense based on the fair value of the intangible assets with definite lives and their estimated useful lives, as well as changes in depreciation expense associated with the change in fair value of the property, plant and equipment recorded in relation to the acquisition. Interest expense was adjusted to eliminate historical interest associated with QuoteWizard's revolving credit facility and notes payable that were not assumed with the acquisition, as well as reflect incremental interest expense associated with debt issued to finance the acquisition. The provision for income taxes from continuing operations has also been adjusted to reflect taxes on the historical results of operations of QuoteWizard. QuoteWizard did not pay taxes at the entity level as it was a limited liability company whose members elected for it to be taxed as a partnership.

|  | Three Months Ended June 30, 2018 | | Six Months Ended June 30, 2018 |
|---|---|---|---|
|  | *(in thousands)* | | |
| Pro forma revenue | $ 221,839 | $ | 440,596 |
| Pro forma net income from continuing operations | $ 42,813 | $ | 78,413 |

Acquisition-related costs incurred by the Company and QuoteWizard that are directly attributable to the acquisition, and which will not have an ongoing impact, have been eliminated from the unaudited pro forma net income from continuing operations for the second quarter and first six months of 2018.

**Ovation**

On June 11, 2018, the Company acquired Ovation Credit Services, Inc., a leading provider of credit services with a strong customer service reputation. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports.

15

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company paid $12.2 million in initial cash consideration and could make up to two additional earnout payments, each ranging from zero to $4.375 million, based on certain defined operating metrics during the earnout periods July 1, 2018 through June 30, 2019 and July 1, 2019 through June 30, 2020. These additional payments, to the extent earned, will be payable in cash. The purchase price of $17.9 million is comprised of the upfront cash payment of $12.2 million, $5.8 million for the estimated fair value of the earnout payments, and a $0.1 million post-closing receipt for working capital settlement.

As of June 30, 2019, the estimated fair value of the contingent consideration totaled $7.4 million, of which $4.3 million is included in current contingent consideration and $3.1 million is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During the second quarter of 2019, the Company recorded contingent consideration expense of $0.6 million in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. In the second quarter of 2019, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
| --- | --- |
| Net working capital | $ 303 |
| Fixed assets | 76 |
| Intangible assets | 8,900 |
| Goodwill | 11,280 |
| Net deferred tax liabilities | (2,688) |
| **Total purchase price** | **$ 17,871** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, customer relationships and trademarks and tradenames. The estimated fair values of the developed technology were determined using excess earnings analysis, the customer relationships were determined using cost savings analysis and the trademarks and tradenames were determined using relief from royalty analysis. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
| --- | --- | --- |
| Technology | $ 6,000 | 7 years |
| Customer lists | 1,900 | 1 year |
| Trademarks and tradenames | 1,000 | 4 years |
| **Total intangible assets** | **$ 8,900** | **5.4 years** |

The Company recorded goodwill of $11.3 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to Ovation as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of Ovation than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill is recorded in the Company's one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will not be tax deductible.

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Changes in Contingent Consideration*

**SnapCap**

On September 19, 2017, the Company acquired certain assets of Snap Capital LLC, which does business under the name SnapCap ("SnapCap"). SnapCap, a tech-enabled online platform, connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach.

The Company paid $11.9 million of initial cash consideration and could make up to three additional contingent consideration payments, each ranging from zero to $3.0 million, based on certain defined operating results during the periods of October 1, 2017 through September 30, 2018, October 1, 2018 through September 30, 2019 and October 1, 2019 through March 31, 2020. These additional payments, to the extent earned, will be payable in cash.

In the first quarter of 2019, the Company paid $3.0 million related to the earnout payment for the period of October 1, 2017 through September 30, 2018, which is included within cash flows from financing activities on the consolidated statement of cash flows.

As of June 30, 2019, the estimated fair value of the contingent consideration totaled $5.2 million, of which $2.9 million is included in current contingent consideration and $2.3 million is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During the second quarter and first six months of 2019, the Company recorded a gain of $0.1 million and contingent consideration expense of $1.5 million, respectively, in the consolidated statements of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

**DepositAccounts**

On June 14, 2017, the Company acquired substantially all of the assets of Deposits Online, LLC, which does business under the name DepositAccounts.com ("DepositAccounts"). DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content.

The Company paid $24.0 million of initial cash consideration and could make additional contingent consideration payments of up to $9.0 million. The potential contingent consideration payments are comprised of (i) up to seven payments of $1.0 million each based on specified increases in Federal Funds interest rates during the period commencing on the closing date and ending on June 30, 2020 and (ii) a one-time performance payment of up to $2.0 million based on the net revenue of deposit products during the period of January 1, 2018 through December 31, 2018. These additional payments, to the extent earned, will be payable in cash.

In the third quarter of 2017, the Company made a payment of $1.0 million associated with a specified increase in the Federal Funds rate in June 2017. In each of the four quarters of 2018, the Company paid $1.0 million associated with specified increases in the Federal Funds rate in December 2017, March 2018, June 2018 and September 2018, respectively. In the first quarter of 2019, the Company paid $1.0 million associated with a specified increase in the Federal Funds rate in December 2018. In the second quarter of 2019, the Company paid $2.0 million associated with the one-time performance payment based on the net revenue of deposit products during the period of January 1, 2018 through December 31, 2018. The contingent consideration paid in the first six months of 2019 is included within cash flows from operating activities on the consolidated statement of cash flows.

The estimated fair value of the portion of the contingent consideration payments based on increases in interest rates is determined using a scenario approach based on the interest rate forecasts of Federal Open Market Committee participants. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. As of June 30, 2019, no liability has been recorded in the accompanying consolidated balance sheet for the remaining contingent consideration payment based on Federal Funds interest rates. Accordingly, during the second quarter and first six months of 2019, the Company recorded gains of $0.2 million and $1.0 million, respectively, in the consolidated statements of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Pro forma Financial Results*

The unaudited pro forma financial results for the first six months of 2019 and the second quarter and first six months of 2018 combine the consolidated results of the Company and Ovation, Student Loan Hero, Inc. ("Student Loan Hero"), QuoteWizard and ValuePenguin, giving effect to the acquisitions as if the Ovation, Student Loan Hero and QuoteWizard acquisitions had been completed on January 1, 2017, and as if the ValuePenguin acquisition had been completed on January 1, 2018. This unaudited pro forma financial information is presented for informational purposes only and is not indicative of future operations or results had the acquisitions been completed as of January 1, 2017 or 2018, or any other date.

The unaudited pro forma financial results include adjustments for additional amortization expense based on the fair value of the intangible assets with definite lives and their estimated useful lives. Depreciation expense and interest expense was adjusted for the impact of the QuoteWizard acquisition, as described above. Interest expense was also adjusted to reflect incremental interest associated with debt issued to finance the ValuePenguin acquisition. The provision for income taxes from continuing operations has been adjusted to reflect taxes on the historical results of operations of QuoteWizard. QuoteWizard did not pay taxes at the entity level as it was a limited liability company whose members elected for it to be taxed as a partnership.

| | Three Months Ended June 30, | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2019 | | 2018 | |
| | *(in thousands)* | | | | | |
| Pro forma revenue | $ | 234,264 | $ | 541,326 | $ | 464,148 |
| Pro forma net income from continuing operations | $ | 44,314 | $ | 13,250 | $ | 79,902 |

The unaudited pro forma net income from continuing operations in the first six months of 2019 includes the aggregate after tax contingent consideration expense associated with the DepositAccounts, SnapCap, Ovation and QuoteWizard earnouts of $12.6 million. The unaudited pro forma net income from continuing operations in the second quarter and first six months of 2018 includes the aggregate after tax contingent consideration gain associated with the DepositAccounts and SnapCap earnouts of $0.3 million and $1.1 million, respectively.

The unaudited pro forma net income from continuing operations for the first six months of 2018 has been adjusted to include acquisition-related costs of $0.6 million incurred by the Company that are directly attributable to the ValuePenguin acquisition, and which will not have an ongoing impact. Accordingly, such acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for the first six months of 2019. Acquisition-related costs incurred by the Company, Student Loan Hero and QuoteWizard that are directly attributable to the Ovation, Student Loan Hero and QuoteWizard acquisitions, and which will not have an ongoing impact, have been eliminated from the unaudited pro forma net income from continuing operations for the second quarter and first six months of 2018.

**NOTE 8—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

Accrued expenses and other current liabilities consist of the following *(in thousands)*:

| | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Accrued advertising expense | $ | 77,692 | $ | 60,268 |
| Accrued compensation and benefits | | 14,074 | | 6,381 |
| Accrued professional fees | | 1,619 | | 2,549 |
| Customer deposits and escrows | | 7,029 | | 6,913 |
| Contribution to LendingTree Foundation | | 3,333 | | 3,333 |
| Current lease liabilities | | 5,447 | | — |
| Other | | 21,129 | | 13,746 |
| **Total accrued expenses and other current liabilities** | $ | **130,323** | $ | **93,190** |

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 9—LEASES**

The Company is a lessee to leases of corporate offices and certain office equipment. The majority of leases for corporate offices include one or more options to renew, with renewal terms ranging from one to five years. These renewal options have not been included in the calculation of right-of-use assets and lease liabilities, as the Company is not reasonably certain of the exercise of these renewal options. The Company used its incremental borrowing rate to calculate the right-of-use asset and lease liability for each lease.

As of June 30, 2019, right-of use assets totaling $17.9 million are included in other non-current assets and lease liabilities totaling $20.6 million are included in accrued expenses and other current liabilities and other non-current liabilities in the accompanying balance sheet.

During the second quarter of 2019, the Company recognized an impairment loss of $0.5 million within general and administrative expense on the consolidated statements of operations and comprehensive income, for the right-of-use asset related to an office lease. The Company vacated the office space in the second quarter of 2019 and adjusted the right-of-use asset to its fair value based on estimated sublease income.

Lease expense, which is included in general and administrative expense on the accompanying consolidated statements of operations and comprehensive income, consists of the following *(in thousands)*:

|  | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
|---|---|---|---|---|
| Operating lease cost | $ | 1,467 | $ | 2,730 |
| Short-term lease cost |  | 9 |  | 48 |
| **Total lease cost** | **$** | **1,476** | **$** | **2,778** |

Weighted average remaining lease term and discount rate for operating leases are as follows:

|  | June 30, 2019 |
|---|---|
| Weighted average remaining lease term | 4.2 years |
| Weighted average discount rate | 5.0% |

Supplemental cash flow information related to leases is as follows *(in thousands)*:

|  | Six Months Ended June 30, 2019 | |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: |  |  |
| Operating cash flows from operating leases | $ | 2,581 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ | 11,398 |

Maturities of lease liabilities as of June 30, 2019 is as follows *(in thousands)*:

|  | Operating Leases | |
|---|---|---|
| Remainder of current year | $ | 3,159 |
| Year ending December 31, 2020 |  | 6,152 |
| Year ending December 31, 2021 |  | 4,249 |
| Year ending December 31, 2022 |  | 3,912 |
| Year ending December 31, 2023 |  | 3,560 |
| Thereafter |  | 1,944 |
| **Total lease payments** |  | **22,976** |
| Less: Interest |  | 2,416 |

**Present value of lease liabilities** $ 20,560

19

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Future minimum payments as of December 31, 2018 under operating lease agreements having an initial or remaining non-cancelable lease term in excess of one year are as follows *(in thousands)*:

|  | Amount |
|---|---|
| Year ending December 31, 2019 | $ 4,406 |
| Year ending December 31, 2020 | 3,188 |
| Year ending December 31, 2021 | 1,094 |
| Year ending December 31, 2022 | 736 |
| Year ending December 31, 2023 | 228 |
| **Total** | **$ 9,652** |

The Company operated as a lessor in connection with the office buildings in Charlotte, North Carolina acquired in December 2016. The properties were sold in the second quarter of 2019 to an unrelated third party. *See* Note 6—Assets Held for Sale for further information.

Rental income of $0.1 million and $0.3 million in the second quarter and first six months of 2019, respectively, and $0.3 million and $0.5 million in the second quarter and first six months of 2018, respectively, is included in other income on the accompanying consolidated statements of operations and comprehensive income.

**NOTE 10—SHAREHOLDERS' EQUITY**

Basic and diluted income per share was determined based on the following share data *(in thousands)*:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2019 | 2018 | 2019 | 2018 |
| **Weighted average basic common shares** | **12,805** | **12,416** | **12,762** | **12,254** |
| Effect of stock options | 810 | 1,176 | 777 | 1,363 |
| Effect of dilutive share awards | 194 | 135 | 191 | 177 |
| Effect of Convertible Senior Notes and warrants | 1,099 | 420 | 892 | 733 |
| **Weighted average diluted common shares** | **14,908** | **14,147** | **14,622** | **14,527** |

For each of the three and six months ended June 30, 2019, the weighted average shares that were anti-dilutive, and therefore excluded from the calculation of diluted income per share, included options to purchase 0.1 million shares of common stock. For each of the three and six months ended June 30, 2018, the weighted average shares that were anti-dilutive, and therefore excluded from the calculation of diluted income per share, included options to purchase 0.4 million shares of common stock.

The 0.625% Convertible Senior Notes due June 1, 2022 and the warrants issued by the Company in 2017 could be converted into the Company's common stock in the future, subject to certain contingencies. *See* Note 13—Debt for additional information.

**Common Stock Repurchases**

In each of February 2018 and February 2019, the board of directors authorized and the Company announced the repurchase of up to $100.0 million and $150.0 million, respectively, of LendingTree's common stock. During the first six months of 2019 and 2018, the Company purchased 17,501 and 156,731 shares, respectively, of its common stock for aggregate consideration of $4.0 million and $46.0 million, respectively. At June 30, 2019, approximately $181.2 million of the previous authorizations to repurchase common stock remain available.

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### NOTE 11—STOCK-BASED COMPENSATION

Non-cash compensation related to equity awards is included in the following line items in the accompanying consolidated statements of operations and comprehensive income *(in thousands)*:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | ---: | --- | ---: | --- | ---: | --- | ---: | --- |
| | **2019** | | **2018** | | **2019** | | **2018** | |
| Cost of revenue | $ | 197 | $ | 79 | $ | 350 | $ | 137 |
| Selling and marketing expense | | 2,283 | | 1,433 | | 4,032 | | 2,934 |
| General and administrative expense | | 11,686 | | 8,490 | | 21,907 | | 17,229 |
| Product development | | 1,816 | | 1,176 | | 3,746 | | 1,987 |
| **Total non-cash compensation** | $ | **15,982** | $ | **11,178** | $ | **30,035** | $ | **22,287** |

### Stock Options

A summary of changes in outstanding stock options is as follows:

| | Number of Options | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value[a] |
| --- | ---: | --- | ---: | ---: | ---: |
| | | | *(per option)* | *(in years)* | *(in thousands)* |
| **Options outstanding at January 1, 2019** | **940,533** | $ | **65.12** | | |
| Granted [b] | 42,017 | | 322.17 | | |
| Exercised | (108,418) | | 41.36 | | |
| Forfeited | (25,270) | | 334.52 | | |
| Expired | — | | — | | |
| **Options outstanding at June 30, 2019** | **848,862** | | **72.86** | **4.82** | $ **294,700** |
| **Options exercisable at June 30, 2019** | **701,319** | $ | **35.97** | **3.99** | $ **269,348** |

(a)  The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $420.03 on the last trading day of the quarter ended June 30, 2019 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on June 30, 2019. The intrinsic value changes based on the market value of the Company's common stock.

(b)  During the six months ended June 30, 2019, the Company granted stock options to certain employees and members of the board of directors with a weighted average grant date fair value per share of $166.39, calculated using the Black-Scholes option pricing model, which vesting periods include (a) immediate vesting on grant date (b) 1 year from grant date (c) three years from grant date and (d) four years from grant date.

For purposes of determining stock-based compensation expense, the weighted average grant date fair value per share of the stock options was estimated using the Black-Scholes option pricing model, which requires the use of various key assumptions. The weighted average assumptions used are as follows:

| | |
| --- | ---: |
| Expected term [1] | 5.00 - 6.25 years |
| Expected dividend [2] | — |
| Expected volatility [3] | 51 - 55% |
| Risk-free interest rate [4] | 1.88% - 2.55% |

(1)  The expected term of stock options granted was calculated using the "Simplified Method," which utilizes the midpoint

between the weighted average time of vesting and the end of the contractual term. This method was utilized for the stock options due to a lack of historical exercise behavior by the Company's employees.

21

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

(2)  For all stock options granted in 2019, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3)  The expected volatility rate is based on the historical volatility of the Company's common stock.

(4)  The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

**Stock Options with Performance Conditions**

A summary of changes in outstanding stock options with performance conditions is as follows:

| | Number of Options with Performance Conditions | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|---|---|
| | | | *(per option)* | *(in years)* | | *(in thousands)* |
| Options outstanding at January 1, 2019 | 37,877 | $ | 308.90 | | | |
| Granted | — | | — | | | |
| Exercised | — | | — | | | |
| Forfeited | — | | — | | | |
| Expired | (11,876) | | 308.90 | | | |
| Options outstanding at June 30, 2019 | 26,001 | | 308.90 | 1.08 | $ | 2,889 |
| Options exercisable at June 30, 2019 | — | $ | — | 0.00 | $ | — |

(a)  The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $420.03 on the last trading day of the quarter ended June 30, 2019 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on June 30, 2019. The intrinsic value changes based on the market value of the Company's common stock.

**Stock Options with Market Conditions**

A summary of changes in outstanding stock options with market conditions at target is as follows:

| | Number of Options with Market Conditions | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|---|---|
| | | | *(per option)* | *(in years)* | | *(in thousands)* |
| Options outstanding at January 1, 2019 | 447,193 | $ | 200.51 | | | |
| Granted [b] | 16,247 | | 308.96 | | | |
| Exercised | — | | — | | | |
| Forfeited | — | | — | | | |
| Expired | — | | — | | | |
| Options outstanding at June 30, 2019 | 463,440 | | 204.31 | 8.17 | $ | 99,974 |
| Options exercisable at June 30, 2019 | — | $ | — | 0.00 | $ | — |

(a)  The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $420.03 on the last trading day of the quarter ended June 30, 2019 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on June 30, 2019. The intrinsic value changes based on the market value of the Company's common stock.

6/10/2020

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(b)   During the six months ended June 30, 2019, the Company granted stock options with a grant date fair value per share of $230.81, calculated using the Monte Carlo simulation model, which has a vesting date of March 31, 2023.

For purposes of determining stock-based compensation expense, the grant date fair value per share of the stock options was estimated using the Monte Carlo simulation model, which requires the use of various key assumptions. The assumptions used are as follows:

| | |
|---|---:|
| Expected term [1] | 7.00 years |
| Expected dividend [2] | — |
| Expected volatility [3] | 51% |
| Risk-free interest rate [4] | 2.54% |

(1)   The expected term of stock options with a market condition granted was calculated using the midpoint between the time of vesting and the end of the contractual term.

(2)   For all stock options with a market condition granted in 2019, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3)   The expected volatility rate is based on the historical volatility of the Company's common stock.

(4)   The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

A maximum of 773,945 shares may be earned for achieving superior performance up to 167% of the target number of shares. As of June 30, 2019, performance-based nonqualified stock options with a market condition of 481,669 had been earned, which have a vest date of September 30, 2022.

**Restricted Stock Units**

A summary of changes in outstanding nonvested restricted stock units ("RSUs") is as follows:

| | RSUs | |
|---|---:|---:|
| | Number of Units | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at January 1, 2019** | **201,568** | **$    225.48** |
| Granted | 53,696 | 314.85 |
| Vested | (66,751) | 190.73 |
| Forfeited | (21,905) | 292.43 |
| **Nonvested at June 30, 2019** | **166,608** | **$    259.40** |

23

### LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Restricted Stock Units with Performance Conditions**

A summary of changes in outstanding nonvested RSUs with performance conditions is as follows:

| | RSUs with Performance Conditions | |
|---|---|---|
| | Number of Units | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at January 1, 2019** | **92,481** | **$ 182.28** |
| Granted | — | — |
| Vested | (40,458) | 204.78 |
| Forfeited | (30,956) | 212.35 |
| **Nonvested at June 30, 2019** | **21,067** | **$ 214.19** |

**Restricted Stock Awards with Performance Conditions**

A summary of changes in outstanding nonvested restricted stock awards ("RSAs") with performance conditions is as follows:

| | RSAs with Performance Conditions | |
|---|---|---|
| | Number of Awards | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at January 1, 2019** | **71,412** | **$ 340.25** |
| Granted | — | — |
| Vested | (11,902) | 340.25 |
| Forfeited | — | — |
| **Nonvested at June 30, 2019** | **59,510** | **$ 340.25** |

**Restricted Stock Awards with Market Conditions**

A summary of changes in outstanding nonvested RSAs with market conditions at target is as follows:

| | RSAs with Market Conditions | |
|---|---|---|
| | Number of Awards | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at January 1, 2019** | **26,674** | **$ 340.25** |
| Granted | — | — |
| Vested | — | — |
| Forfeited | — | — |
| **Nonvested at June 30, 2019** | **26,674** | **$ 340.25** |

A maximum of 44,545 shares may be earned for achieving superior performance up to 167% of the target number of shares. As of June 30, 2019, performance-based restricted stock awards with a market condition of 29,601 had been earned, which have a vest date of September 30, 2022.

24

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 12—INCOME TAXES

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | 2018 | | 2019 | 2018 |
| | | *(in thousands, except percentages)* | | | | |
| Income tax benefit | $ | 5,689 | $ 29,721 | $ | 13,441 | $ 53,182 |
| *Effective tax rate* | | *(78.0)%* | *(196.5)%* | | *N/A* | *(193.2)%* |

For the second quarter and first six months of 2019, the effective tax rate varied from the federal statutory rate of 21% primarily due to a tax benefit of $7.7 million and $13.7 million, respectively, recognized for excess tax benefits due to employee exercises of stock options and vesting of restricted stock in accordance with ASU 2016-09 and the effect of state taxes.

For the second quarter and first six months of 2018, the effective tax rate varied from the federal statutory rate of 21% primarily due to a tax benefit of $33.7 million and $60.9 million, respectively, recognized for excess tax benefits due to employee exercises of stock options and vesting of restricted stock in accordance with ASU 2016-09 and the effect of state taxes.

| | | Three Months Ended June 30, | | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | 2018 | | 2019 | 2018 |
| | | *(in thousands)* | | | | |
| Income tax expense - excluding excess tax benefit on stock compensation | $ | (2,034) | $ (3,946) | $ | (284) | $ (7,688) |
| Excess tax benefit on stock compensation | | 7,723 | 33,667 | | 13,725 | 60,870 |
| Income tax benefit | $ | 5,689 | $ 29,721 | $ | 13,441 | $ 53,182 |

## NOTE 13—DEBT

**Convertible Senior Notes**

On May 31, 2017, the Company issued $300.0 million aggregate principal amount of its 0.625% Convertible Senior Notes due June 1, 2022 (the "Notes") in a private placement. The Notes bear interest at a rate of 0.625% per year, payable semi-annually on June 1 and December 1 of each year, beginning on December 1, 2017. The Notes will mature on June 1, 2022, unless earlier repurchased or converted.

The initial conversion rate of the Notes is 4.8163 shares of Common Stock per $1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately $207.63 per share). The conversion rate will be subject to adjustment upon the occurrence of certain specified events but will not be adjusted for accrued and unpaid interest. In addition, upon the occurrence of a fundamental change prior to the maturity of the Notes, the Company will, in certain circumstances, increase the conversion rate by a specified number of additional shares for a holder that elects to convert the Notes in connection with such fundamental change. Upon conversion, the Notes will settle for cash, shares of the Company's stock, or a combination thereof, at the Company's option. It is the intent of the Company to settle the principal amount of the Notes in cash and any conversion premium in shares of its common stock.

The Notes are the Company's senior unsecured obligations and will rank senior in right of payment to any of the Company's indebtedness that is expressly subordinated in right of payment to the Notes; equal in right of payment to any of the Company's unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of the Company's secured indebtedness, including borrowings under the senior secured Revolving Credit Facility, described below, to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of the Company's subsidiaries.

Prior to the close of business on the business day immediately preceding February 1, 2022, the Notes will be convertible at the option of the holders thereof only under the following circumstances:

- during any calendar quarter commencing after the calendar quarter ending on September 30, 2017 (and only during such calendar quarter), if the last reported sale price of the common stock for at least 20 trading days (whether or not consecutive)

25

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

during the 30 consecutive trading day period ending on, and including the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- during the five business day period after any five consecutive trading day period in which, for each trading day of that period, the trading price (as defined in the Notes) per $1,000 principal amount of Notes for such trading day was less than 98% of the product of the last reported sale price of the Common Stock and the conversion rate on each such trading day; or

- upon the occurrence of specified corporate events including but not limited to a fundamental change.

Holders of the Notes became entitled to convert the Notes on January 1, 2018, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on December 31, 2017, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes continued to have such right until June 30, 2018, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on March 31, 2018, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes were not entitled to convert the Notes from July 1, 2018 to March 31, 2019. Holders of the Notes became entitled to convert the Notes on April 1, 2019, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on March 31, 2019, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes will continue to have such right until September 30, 2019, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on June 30, 2019, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day.

On or after February 1, 2022, until the close of business on the second scheduled trading day immediately preceding the maturity date of the Notes, holders of the Notes may convert all or a portion of their Notes regardless of the foregoing conditions.

The Company may not redeem the Notes prior to the maturity date and no sinking fund is provided for the Notes. Upon the occurrence of a fundamental change prior to the maturity date of the Notes, holders of the Notes may require the Company to repurchase all or a portion of the Notes for cash at a price equal to 100% of the principal amount of the Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

If the market price per share of the Common Stock, as measured under the terms of the Notes, exceeds the conversion price of the Notes, the Notes could have a dilutive effect, unless the Company elects, subject to certain conditions, to settle the principal amount of the Notes and any conversion premium in cash.

The initial measurement of convertible debt instruments that may be settled in cash are separated into a debt and equity component whereby the debt component is based on the fair value of a similar instrument that does not contain an equity conversion option. The separate components of debt and equity of the Company's Notes were determined using an interest rate of 5.36%, which reflects the nonconvertible debt borrowing rate of the Company at the date of issuance. As a result, the initial components of debt and equity were $238.4 million and $61.6 million, respectively.

Financing costs related to the issuance of the Notes were approximately $9.3 million of which $7.4 million were allocated to the liability component and are being amortized to interest expense over the term of the debt and $1.9 million were allocated to the equity component.

In the first six months of 2019, the Company recorded interest expense on the Notes of $7.5 million which consisted of $0.9 million associated with the 0.625% coupon rate, $5.9 million associated with the accretion of the debt discount, and $0.7 million associated with the amortization of the debt issuance costs. In the first six months of 2018, the Company recorded interest expense on the Notes of $7.2 million which consisted of $0.9 million associated with the 0.625% coupon rate, $5.6 million associated with the accretion of the debt discount, and $0.7 million associated with the amortization of the debt issuance costs. The debt discount is being amortized over the term of the debt.

As of June 30, 2019, the fair value of the Notes is estimated to be approximately $628.3 million using the Level 1 observable input of the last quoted market price on June 28, 2019.

A summary of the gross carrying amount, unamortized debt cost, debt issuance costs and net carrying value of the liability component of the Notes are as follows *(in thousands)*:

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | June 30, 2019 | December 31, 2018 |
|---|---|---|
| Gross carrying amount | $ 300,000 | $ 300,000 |
| Unamortized debt discount | 37,877 | 43,805 |
| Debt issuance costs | 4,541 | 5,252 |
| **Net carrying amount** | **$ 257,582** | **$ 250,943** |

**Convertible Note Hedge and Warrant Transactions**

On May 31, 2017, in connection with the issuance of the Notes, the Company entered into Convertible Note Hedge (the "Hedge") and Warrant transactions with respect to the Company's common stock. The Company used approximately $18.1 million of the net proceeds from the Notes to pay for the cost of the Hedge, after such cost was partially offset by the proceeds from the Warrant transactions.

On May 31, 2017, the Company paid $61.5 million to the counterparties for the Hedge transactions. The Hedge transactions cover approximately 1.4 million shares of the Company's common stock, the same number of shares initially underlying the Notes, and are exercisable upon any conversion of the Notes. The Hedge Transactions are expected generally to reduce the potential dilution to the Common Stock upon conversion of the Notes and/or offset any cash payments the Company is required to make in excess of the principal amount of the converted Notes, as the case may be, in the event that the market price per share of Common Stock, as measured under the terms of the Hedge transactions, is greater than the strike price of the Hedge transactions, which initially corresponds to the initial conversion price of the Notes, or approximately $207.63 per share of Common Stock. The Hedge transactions will expire upon the maturity of the Notes.

On May 31, 2017, the Company sold to the counterparties, warrants (the "Warrants") to acquire 1.4 million shares of Common Stock at an initial strike price of $266.39 per share, which represents a premium of 70% over the reported sale price of the Common Stock of $156.70 on May 24, 2017. On May 31, 2017, the Company received aggregate proceeds of approximately $43.4 million from the sale of the Warrants.

If the market price per share of the Common Stock, as measured under the terms of the Warrants, exceeds the strike price of the Warrants, the Warrants could have a dilutive effect, unless the Company elects, subject to certain conditions, to settle the Warrants in cash.

The Hedge and Warrant transactions are indexed to, and potentially settled in, the Company's common stock and the net cost of $18.1 million has been recorded as a reduction to additional paid-in capital in the consolidated statement of shareholders' equity.

**Senior Secured Revolving Credit Facility**

On November 21, 2017, the Company's wholly-owned subsidiary, LendingTree, LLC, entered into an amended and restated $250.0 million five-year senior secured revolving credit facility which matures on November 21, 2022 (the "Revolving Credit Facility"). Under certain conditions, the Company will be permitted to add one or more term loans and/or increase revolving commitments under the Revolving Credit Facility by an additional $100.0 million or a greater amount provided that a total consolidated senior secured debt to EBITDA ratio does not exceed 2.50 to 1.00. On October 26, 2018, the Company amended the Revolving Credit Facility to increase the borrowing capacity by $100.0 million to $350.0 million. Pricing and other terms and conditions of the Revolving Credit Facility remain unchanged. Borrowings under the Revolving Credit Facility can be used to finance working capital needs, capital expenditures and general corporate purposes, including to finance permitted acquisitions. As of June 30, 2019, the Company had $115.0 million in borrowings outstanding under the Revolving Credit Facility at the LIBO rate option with a weighted average interest rate of 3.91%, consisting of a $65.0 million 31-day borrowing and a $50.0 million 31-day borrowing. As of December 31, 2018, the Company had a $125.0 million, 31-day borrowing outstanding under the Revolving Credit Facility bearing interest at the LIBO rate option of 4.02%.

Up to $10.0 million of the Revolving Credit Facility will be available for short-term loans, referred to as swingline loans. Additionally, up to $10.0 million of the Revolving Credit Facility will be available for the issuance of letters of credit.

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The Company's borrowings under the Revolving Credit Facility bear interest at annual rates that, at the Company's option, will be either:

- a base rate generally defined as the sum of (i) the greater of (a) the prime rate of SunTrust Bank, (b) the federal funds effective rate plus 0.5% and (c) the LIBO rate (defined below) on a daily basis applicable for an interest period of one month plus 1.0% and (ii) an applicable percentage of 0.25% to 1.0% based on a total consolidated debt to EBITDA ratio; or

- a LIBO rate generally defined as the sum of (i) the rate for Eurodollar deposits in the applicable currency and (ii) an applicable percentage of 1.25% to 2.0% based on a total consolidated debt to EBITDA ratio.

All swingline loans bear interest at the base rate defined above. Interest on the Company's borrowings are payable quarterly in arrears for base rate loans and on the last day of each interest rate period (but not less often than three months) for LIBO rate loans.

The Revolving Credit Facility contains a restrictive financial covenant, which initially limits the total consolidated debt to EBITDA ratio to 4.5, with step downs to 4.0 over time, except that this may increase by 0.5 for the four fiscal quarters following a material acquisition. In addition, the Revolving Credit Facility contains customary affirmative and negative covenants in addition to events of default for a transaction of this type that, among other things, restrict additional indebtedness, liens, mergers or certain fundamental changes, asset dispositions, dividends, stock repurchases and other restricted payments, transactions with affiliates, sale-leaseback transactions, hedging transactions, loans and investments and other matters customarily restricted in such agreements. The Company was in compliance with all covenants at June 30, 2019.

The Revolving Credit Facility requires LendingTree, LLC to pledge as collateral, subject to certain customary exclusions, substantially all of its assets, including 100% of its equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none). The obligations under this facility are unconditionally guaranteed on a senior basis by LendingTree, Inc. and material domestic subsidiaries of LendingTree, LLC, which guaranties are secured by a pledge as collateral, subject to certain customary exclusions, of 100% of each such guarantor's assets, including 100% of each such guarantor's equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none).

The Company is required to pay an unused commitment fee quarterly in arrears on the difference between committed amounts and amounts actually borrowed under the Revolving Credit Facility equal to an applicable percentage of 0.25% to 0.45% per annum based on a total consolidated debt to EBITDA ratio. The Company is required to pay a letter of credit participation fee and a letter of credit fronting fee quarterly in arrears. The letter of credit participation fee is based upon the aggregate face amount of outstanding letters of credit at an applicable percentage of 1.25% to 2.0% based on a total consolidated debt to EBITDA ratio. The letter of credit fronting fee is 0.125% per annum on the face amount of each letter of credit.

In addition to the remaining unamortized debt issuance costs associated with the original revolving credit facility entered into on October 22, 2015 and the Revolving Credit Facility, debt issuance costs of $0.5 million related to the October 2018 amendment are being amortized to interest expense over the life of the Revolving Credit Facility, and are included in prepaid and other current assets and other non-current assets in the Company's consolidated balance sheet.

In the first six months of 2019, the Company recorded interest expense related to the Revolving Credit Facility of $3.8 million, which consisted of $3.2 million associated with borrowings bearing interest at the LIBO rate, $0.3 million in unused commitment fees, and $0.3 million associated with the amortization of the debt issuance costs. In the first six months of 2018, the Company recorded interest expense related to the Revolving Credit Facility of $0.4 million in unused commitment fees and $0.2 million associated with the amortization of the debt issuance costs.

28

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 14—CONTINGENCIES

#### Overview

LendingTree is involved in legal proceedings on an ongoing basis. In assessing the materiality of a legal proceeding, the Company evaluates, among other factors, the amount of monetary damages claimed, as well as the potential impact of non-monetary remedies sought by plaintiffs (e.g., injunctive relief) that may require it to change its business practices in a manner that could have a material and adverse impact on the business. With respect to the matters disclosed in this Note 14, unless otherwise indicated, the Company is unable to estimate the possible loss or range of losses that could potentially result from the application of such non-monetary remedies.

As of June 30, 2019, the Company had litigation settlement accruals of $0.1 million and $8.0 million in continuing operations and discontinued operations, respectively. As of December 31, 2018, the Company had litigation settlement accruals of $0.2 million and $8.0 million in continuing operations and discontinued operations, respectively. The litigation settlement accruals relate to litigation matters that were either settled or a firm offer for settlement was extended, thereby establishing an accrual amount that is both probable and reasonably estimable.

#### Specific Matters

##### Litigation Related to Discontinued Operations

###### Residential Funding Company

*ResCap Liquidating Trust v. Home Loan Center, Inc., Case No. 14-cv-1716 (U.S. Dist. Ct., Minn.),* successor to *Residential Funding Company, LLC v Home Loan Center, Inc., No. 13-cv-3451 (U.S. Dist. Ct., Minn.).* On or about December 16, 2013, Home Loan Center, Inc. was served in the original captioned matter, which involves claims of Residential Funding Company, LLC ("RFC") for damages for breach of contract and indemnification for certain residential mortgage loans as well as residential mortgage-backed securitizations ("RMBS") containing mortgage loans. RFC asserts that, beginning in 2008, RFC faced massive repurchase demands and lawsuits from purchasers or insurers of the loans and RMBS that RFC had sold. RFC filed for bankruptcy protection in May 2012. Plaintiff alleges that, after RFC filed for Chapter 11 protection, hundreds of proofs of claim were filed, many of which mirrored the litigation filed against RFC prior to its bankruptcy.

In December 2013, the United States Bankruptcy Court for the Southern District of New York entered an Order confirming the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors. Plaintiff then began filing substantially similar complaints against approximately 80 of the loan originators from whom RFC had purchased loans, including HLC, in federal and state courts in Minnesota and New York. In each case, Plaintiff claims that the defendant is liable for a portion of the global settlement in RFC's bankruptcy.

Plaintiff asserted two claims against HLC: (1) breach of contract based on HLC's alleged breach of representations and warranties concerning the quality and characteristics of the mortgage loans it sold to RFC; and (2) contractual indemnification for alleged liabilities, losses, and damages incurred by RFC arising out of purported defects in loans that RFC purchased from HLC and sold to third parties. Plaintiff alleged that the "types of defects" contained in the loans it purchased from HLC included "income misrepresentation, employment misrepresentation, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents." Plaintiff sought damages of up to $61.0 million plus attorney's fees and prejudgment interest.

HLC denied the material allegations of the complaint and asserted numerous defenses thereto. The matter went to trial in the fourth quarter of 2018 and the jury returned a verdict of $28.7 million in favor of Plaintiff. On June 21, 2019, the U.S. District Court in Minnesota entered judgment against HLC for $68.5 million. The judgment is comprised of: (i) $28.7 million in damages awarded by the jury; (ii) $14.1 million in pre-verdict interest; (iii) $23.1 million in attorneys' fees and costs, and (iv) $2.6 million in post-verdict, prejudgment interest. On July 21, 2019, at the direction of HLC's sole independent director, HLC voluntarily filed a petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), with the U.S. Bankruptcy Court in the Northern District of California in San Jose, California, in order to preserve assets for the benefit of all creditors of HLC. The filing does not include as debtors LendingTree, Inc., LendingTree, LLC or any of their respective subsidiaries engaged in continuing operations. HLC's filing under the Bankruptcy Code creates an automatic stay of enforcement of the judgment entered against HLC by the U.S. District Court in Minnesota. HLC has filed a motion for relief from stay to appeal that judgement and has asserted that it has strong grounds for such appeal. See Note 18—Subsequent Event to the consolidated financial statements included elsewhere in this report for further information on the bankruptcy filing by HLC.

6/10/2020

08-13555-mg 21-Doc 051143 PF Filed 04/01/21 Document 18 Entered 06/04/2021 14 2328 f 8 Exhibit
Complaint    Pg 1003 of 1033

29

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company estimates the range of HLC's potential losses in the RFC matter to be $0.0 million to $68.5 million. An estimated liability of $7.0 million for this matter is included in the accompanying consolidated balance sheet as of June 30, 2019.

***Lehman Brothers Holdings, Inc.***

*Lehman Brothers Holdings Inc. v. 1st Advantage Mortgage, LLC et al., Case No. 08-13555 (SCC), Adversary Proceeding No. 16-01342 (SCC) (Bankr. S.D.N.Y.).* In February 2016, Lehman Brothers Holdings, Inc. ("LBHI") filed an Adversary Complaint against HLC and approximately 149 other defendants (the "Complaint"). In December 2018, LBHI amended its complaint against HLC. The amended complaint references approximately 370 allegedly defective mortgage loans sold by HLC with purported "Claim Amounts" totaling $40.2 million. LBHI alleges it settled all such claims and is seeking indemnification from HLC for LBHI's purported losses and liabilities associated with such settlements, plus prejudgment interest, attorneys' fees, litigation costs and other expenses. The amended complaint does not specify the amount of LBHI's purported damages. HLC believes that these claims lack merit and intends to defend this action vigorously. An estimated liability of $1.0 million for this matter is included in the accompanying consolidated balance sheet as of June 30, 2019.

## NOTE 15—FAIR VALUE MEASUREMENTS

Other than the 0.625% Convertible Senior Notes and the Warrants, the carrying amounts of the Company's financial instruments are equal to fair value at June 30, 2019. *See* Note 13—Debt for additional information on the 0.625% Convertible Senior Notes and the Warrants.

Contingent consideration payments related to acquisitions are measured at fair value each reporting period using Level 3 unobservable inputs. The changes in the fair value of the Company's Level 3 liabilities during the second quarters and first six months of 2019 and 2018 are as follows *(in thousands)*:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | 2019 | | 2018 |
| **Contingent consideration, beginning of period** | $ | 49,429 | $ | 33,108 | $ | 38,837 | $ | 57,349 |
| Transfers into Level 3 | | — | | — | | — | | — |
| Transfers out of Level 3 | | — | | — | | — | | — |
| Total net losses (gains) included in earnings (realized and unrealized) | | 2,790 | | (167) | | 17,382 | | (908) |
| Purchases, sales and settlements: | | | | | | | | |
| Additions | | — | | 5,800 | | — | | 5,800 |
| Payments | | (2,000) | | (23,500) | | (6,000) | | (47,000) |
| **Contingent consideration, end of period** | $ | 50,219 | $ | 15,241 | $ | 50,219 | $ | 15,241 |

The contingent consideration liability at June 30, 2019 is the estimated fair value of the earnout payments of the DepositAccounts, SnapCap, Ovation and QuoteWizard acquisitions.

The Company will make payments ranging from zero to $1.0 million based on the achievement of defined milestone targets for DepositAccounts, payments ranging from zero to $6.0 million based on the achievement of certain defined earnings targets for SnapCap, payments ranging from $4.4 million to $8.8 million based on the achievement of certain defined operating metrics for Ovation, and payments ranging from zero to $70.2 million based on the achievement of certain defined performance targets for QuoteWizard. *See* Note 7—Business Acquisitions for additional information on the contingent consideration for each of these respective acquisitions.

The significant unobservable inputs used to calculate the fair value of the contingent consideration are estimated future cash flows for the acquisitions, estimated customer growth rates, estimated date and likelihood of an increase in interest rates and the discount rate. Actual results will differ from the projected results and could have a significant impact on the estimated fair value of the contingent considerations. Additionally, as the liability is stated at present value, the passage of time alone will increase the estimated fair value of the liability each reporting period. Any changes in fair value will be recorded in operating income in the consolidated statements of operations and comprehensive income.

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 16—SEGMENT INFORMATION

The Company has one reportable segment.

Mortgage and non-mortgage product revenue is as follows *(in thousands)*:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Mortgage products | $ | 54,618 | $ | 66,948 | $ | 100,602 | $ | 140,410 |
| Non-mortgage products | | 223,803 | | 117,153 | | 440,209 | | 224,726 |
| **Total revenue** | $ | **278,421** | $ | **184,101** | $ | **540,811** | $ | **365,136** |

## NOTE 17—DISCONTINUED OPERATIONS

The revenue and net loss reported as discontinued operations in the accompanying consolidated statements of operations and comprehensive income are as follows *(in thousands)*:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2019 | | 2018 | |
| **Revenue** | $ | — | $ | — | $ | — | $ | — |
| Loss before income taxes | $ | (966) | $ | (2,914) | $ | (2,310) | $ | (8,399) |
| Income tax benefit | | 203 | | 612 | | 485 | | 1,764 |
| **Net loss** | $ | **(763)** | $ | **(2,302)** | $ | **(1,825)** | $ | **(6,635)** |

During the second quarters and first six months of 2019 and 2018, loss from discontinued operations was primarily due to litigation settlements and contingencies and legal fees associated with ongoing legal proceedings.

### LendingTree Loans

On June 6, 2012, the Company sold substantially all of the operating assets of its LendingTree Loans business for $55.9 million in cash to a wholly-owned subsidiary of Discover Financial Services ("Discover"). Discover generally did not assume liabilities of the LendingTree Loans business that arose before the closing date, except for certain liabilities directly related to assets Discover acquired. Of the purchase price received, a portion was deposited in escrow in accordance with the agreement with Discover for certain loan loss obligations that remain with the Company following the sale. During the second quarter of 2018, the remaining funds in escrow were released to the Company in accordance with the terms of the agreement with Discover.

### Significant Assets and Liabilities of LendingTree Loans

Upon closing of the sale of substantially all of the operating assets of the LendingTree Loans business on June 6, 2012, LendingTree Loans ceased to originate consumer loans. Liability for losses on previously sold loans will remain with LendingTree Loans and are discussed below.

### *Loan Loss Obligations*

LendingTree Loans sold loans it originated to investors on a servicing-released basis, so the risk of loss or default by the borrower was generally transferred to the investor. However, LendingTree Loans was required by these investors to make certain representations and warranties relating to credit information, loan documentation and collateral. These representations and warranties may extend through the contractual life of the loan. Subsequent to the loan sale, if underwriting deficiencies, borrower fraud or documentation

defects are discovered in individual loans, LendingTree Loans may be obligated to repurchase the respective loan or indemnify the investors for any losses from borrower defaults if such deficiency or defect cannot be cured within the specified period following discovery.

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

HLC, a subsidiary of the Company, continues to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of its LendingTree Loans business in the second quarter of 2012.

The following table represents the aggregate loans sold, subsequent settlements and remaining unsettled loans.

|  | Number of Loans | Original Issue Balance |
| --- | ---: | ---: |
|  | *(in thousands)* | *(in billions)* |
| Loans sold by HLC | 234 | $ 38.9 |
| Subsequent settlements | (172) | (28.8) |
| **Remaining unsettled balance as of June 30, 2019** | **62** | **$ 10.1** |

During the fourth quarter of 2015, LendingTree Loans completed a settlement agreement for $0.6 million with one of the investors to which it had sold loans. This investor accounted for approximately 10% of the total number of loans sold and 12% of the original issue balance. This settlement related to all existing and future losses on loans sold to this investor.

During the fourth quarter of 2014, LendingTree Loans completed a settlement agreement for $5.4 million with the largest investor to which it had sold loans. This investor accounted for approximately 40% of both the total number of loans sold and the original issue balance. This settlement related to all existing and future losses on loans sold to this investor.

In the second quarter of 2014, LendingTree Loans completed settlements with two buyers of previously purchased loans.

The Company has been negotiating with certain of the remaining secondary market purchasers to settle any existing and future contingent liabilities, but it may not be able to complete such negotiations on acceptable terms, or at all. Because LendingTree Loans does not service the loans it sold, it does not maintain nor generally have access to the current balances and loan performance data with respect to the individual loans previously sold to investors. Accordingly, LendingTree Loans is unable to determine, with precision, its maximum exposure for breaches of the representations and warranties it made to the investors that purchased such loans.

The Company uses a settlement discount framework for evaluating the adequacy of the reserve for loan losses. This model estimates lifetime losses on the population of remaining loans originated and sold by LendingTree Loans using actual defaults for loans with similar characteristics and projected future defaults. It also considers the likelihood of claims expected due to alleged breaches of representations and warranties made by LendingTree Loans and the percentage of those claims investors estimate LendingTree Loans may agree to repurchase. A settlement discount factor is then applied to the result of the foregoing to reflect publicly-announced bulk settlements for similar loan types and vintages, the Company's own settlement experience, as well as LendingTree Loans' non-operating status, in order to estimate a range of potential obligation.

The estimated range of remaining loan losses using this settlement discount framework was determined to be $4.3 million to $7.9 million at June 30, 2019. The reserve balance recorded as of June 30, 2019 was $7.6 million. Management has considered both objective and subjective factors in the estimation process, but given current general industry trends in mortgage loans as well as housing prices and market expectations, actual losses related to LendingTree Loans' obligations could vary significantly from the obligation recorded as of the balance sheet date or the range estimated above.

Additionally, LendingTree has guaranteed certain loans sold to two investors in the event that LendingTree Loans is unable to satisfy its repurchase and warranty obligations related to such loans.

Based on historical experience, it is anticipated that LendingTree Loans will continue to receive repurchase requests and incur losses on loans sold in prior years.

The activity related to loss reserves on previously sold loans is as follows *(in thousands)*:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | ---: | ---: | ---: | ---: |
|  | 2019 | 2018 | 2019 | 2018 |
| **Loan loss reserve, beginning of period** | $ 7,554 | $ 7,554 | $ 7,554 | $ 7,554 |
| Provisions | — | — | — | — |
| Charge-offs to reserves | — | — | — | — |

| Loan loss reserve, end of period | $ | 7,554 | $ | 7,554 | $ | 7,554 | $ | 7,554 |

32

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The liability for losses on previously sold loans is presented as current liabilities of discontinued operations in the accompanying consolidated balance sheets as of June 30, 2019 and December 31, 2018.

*See* Note 18—Subsequent Event for additional information.

### NOTE 18—SUBSEQUENT EVENT

On July 21, 2019, at the direction of the sole independent director of the Company's Home Loan Center, Inc. ("HLC") subsidiary, HLC voluntarily filed a petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), with the U.S. Bankruptcy Court in the Northern District of California in San Jose, California (the "Bankruptcy Court"), in order to preserve assets for the benefit of all creditors of HLC.

On June 21, 2019, the U.S. District Court of Minnesota entered judgment in *ResCap Liquidating Trust v. Home Loan Center, Inc.*, against HLC for $68.5 million, see Note 14—Contingencies. The judgment against HLC exceeded the assets of HLC, which were approximately $11.4 million at July 21, 2019, including cash of approximately $5.9 million, which approximate the assets of HLC as of June 30, 2019.

The bankruptcy filing does not include as debtors LendingTree, Inc., LendingTree, LLC or any of their respective subsidiaries engaged in continuing operations. HLC's filing under the Bankruptcy Code creates an automatic stay of enforcement of the judgment entered against HLC by the Minnesota court in *ResCap Liquidating Trust v. Home Loan Center, Inc.* described in Note 14—Contingencies. HLC's independent director has advised the Company that HLC, as debtor-in-possession in bankruptcy, intends to pursue an appeal of the judgment entered in *ResCap Liquidating Trust v. Home Loan Center, Inc.*

As a result of the voluntary petition, the Company was, as of the July 21, 2019 bankruptcy petition filing date, no longer deemed to have a controlling interest in HLC under applicable accounting standards. As a result, HLC and its consolidated subsidiary will be deconsolidated from the Company's consolidated financial statements beginning with the consolidated financial statements for the third quarter of 2019. The effect of such deconsolidation will be elimination of the consolidated assets and liabilities of HLC (and its consolidated subsidiary) from the Company's consolidated balance sheets and could result in a gain or loss in the third quarter of 2019. Additionally, any successful claims asserted against LendingTree Inc. or LendingTree LLC, such as the claim described below, could also affect any resulting gain or loss upon deconsolidation.

In its filings with the Bankruptcy Court, HLC has indicated that it believes that it has claims against HLC's sole shareholder, the Company's operating subsidiary LendingTree, LLC, and its former sole director (the Company's Chairman and Chief Executive Officer), relating to the declaration of a dividend by HLC in January 2016 of $40.0 million. The Company is obligated to advance any expenses to HLC's former sole director related to these claims and to indemnify such former sole director to the maximum extent permitted by law. The Company believes the declaration of the dividend was proper, that the amounts paid to LendingTree, LLC following such declaration are not subject to recovery by HLC and that any claims by HLC relating to such dividend declaration are without merit. The Company has commenced settlement talks with HLC, and if the Company is not able to settle HLC's claims relating to such dividend declaration on terms the Company deems acceptable, the Company intends to vigorously contest such claims. Any settlement agreement with HLC that the Company might enter into would be subject to approval by the Bankruptcy Court.

HLC's voluntary petition under the Bankruptcy Code does not represent an event of default under LendingTree, LLC's Amended and Restated Credit Agreement dated as of November 21, 2017 or the Company's indenture dated May 31, 2017 with respect to the Company's 0.625% Convertible Senior Notes due 2022.

33

Table of Contents

**Item 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**Cautionary Statement Regarding Forward-Looking Information**

This report contains "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. These forward-looking statements include statements related to our anticipated financial performance, business prospects and strategy; anticipated trends and prospects in the various industries in which our businesses operate; new products, services and related strategies; and other similar matters. These forward-looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. The use of words such as "anticipates," "estimates," "expects," "projects," "intends," "plans" and "believes," among others, generally identify forward-looking statements.

Actual results could differ materially from those contained in the forward-looking statements. Factors currently known to management that could cause actual results to differ materially from those in forward-looking statements include those matters discussed or referenced in Part II, Item 1A. *Risk Factors* included elsewhere in this quarterly report and Part I, Item 1A. *Risk Factors* of the 2018 Annual Report.

Other unknown or unpredictable factors that could also adversely affect our business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of LendingTree, Inc.'s management as of the date of this report. We undertake no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results or expectations, except as required by law.

**Company Overview**

LendingTree, Inc., is the parent of LendingTree, LLC and several companies owned by LendingTree, LLC.

LendingTree operates what we believe to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. Our online consumer platform provides consumers with access to product offerings from our Network Partners, including mortgage loans, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. In addition, we offer tools and resources, including free credit scores, that facilitate comparison shopping for loans, deposit products, insurance and other offerings. We seek to match consumers with multiple providers, who can offer them competing quotes for the product, or products, they are seeking. We also serve as a valued partner to lenders and other providers seeking an efficient, scalable and flexible source of customer acquisition with directly measurable benefits, by matching the consumer inquiries we generate with these partners.

Our My LendingTree platform offers a personalized loan comparison-shopping experience by providing free credit scores and credit score analysis. This platform enables us to observe consumers' credit profiles and then identify and alert them to loans and other offerings on our marketplace that may be more favorable than the terms they may have at a given point in time. This is designed to provide consumers with measurable savings opportunities over their lifetimes.

We are focused on developing new product offerings and enhancements to improve the experiences that consumers and Network Partners have as they interact with us. By expanding our portfolio of financial services offerings, we are growing and diversifying our business and sources of revenue. We intend to capitalize on our expertise in performance marketing, product development and technology, and to leverage the widespread recognition of the LendingTree brand to effect this strategy.

We believe the consumer and small business financial services industry is still in the early stages of a fundamental shift to online product offerings, similar to the shift that started in retail and travel many years ago and is now well established. We believe that like retail and travel, as consumers continue to move toward online shopping and transactions for financial services, suppliers will increasingly shift their product offerings and advertising budgets toward the online channel. We believe the strength of our brands and of our partner network place us in a strong position to continue to benefit from this market shift.

The LendingTree Loans business is presented as discontinued operations in the accompanying consolidated balance sheets, consolidated statements of operations and comprehensive income and consolidated cash flows for all periods presented. Except for the discussion under the heading "Discontinued Operations," the analysis within Management's Discussion and Analysis of Financial Condition and Results of Operations reflects our continuing operations.

Table of Contents

**Recent Business Acquisitions**

On January 10, 2019, we acquired Value Holding, Inc., the parent company of ValuePenguin Inc. ("ValuePenguin"), a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards, for $106.2 million. We believe that combining ValuePenguin's high-quality content and search engine optimization capability with recently acquired proprietary technology and insurance carrier network from QuoteWizard.com, LLC ("QuoteWizard") enables us to provide immense value to carriers and agents. This strategic acquisition positions us to achieve further scale in the insurance space as well as the broader financial services industry.

On October 31, 2018, we acquired QuoteWizard, one of the largest insurance comparison marketplaces in the growing online insurance advertising market, for $299.5 million in cash and potential contingent consideration payments of up to $70.2 million through October 2021, subject to achieving specific targets. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers. This acquisition has established LendingTree as a leading player in the online insurance advertising industry, while continuing our ongoing diversification within the financial services category.

On July 23, 2018, we acquired Student Loan Hero, Inc. ("Student Loan Hero") for $62.7 million in cash, of which $2.3 million was recognized as severance expense in our consolidated statements of operations and comprehensive income. Student Loan Hero, a personal finance website dedicated to helping student loan borrowers manage their student debt, offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. This strategic transaction allows us to scale our student loan business and provide consumers with the tools and resources to better understand their personal finances and make smarter financial decisions.

On June 11, 2018, we acquired Ovation Credit Services, Inc. ("Ovation"), a leading provider of credit services with a strong customer service reputation for $12.1 million in cash and potential contingent consideration payments of up to $8.75 million through June 2020, subject to achieving specified targets. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports. Ovation's experienced management team, strong credit bureau relationships and customized software platform enable us to help more consumers achieve their original financial goals through the LendingTree platform.

These acquisitions continue our diversification strategy.

**North Carolina Office Properties**

In December 2016, we completed the acquisition of two office buildings in Charlotte, North Carolina, for $23.5 million in cash. The buildings were acquired with the intent to use such buildings as our corporate headquarters and rent any unused space. In November 2018, the office buildings were classified as held for sale. In February 2019, the Company agreed to sell these buildings to an unrelated third party, which agreement was amended in March 2019. The sale was finalized in the second quarter of 2019 for a sale price of $24.4 million, and the Company incurred closing fees of $0.3 million. For additional information, see Note 6—Assets Held for Sale in the notes to the consolidated financial statements included elsewhere in this report.

With our expansion in North Carolina, in December 2016, we received a grant from the state that provides up to $4.9 million in reimbursements over 12 years beginning in 2017 for investing in real estate and infrastructure in addition to increasing jobs in North Carolina at specific targeted levels through 2020, and maintaining the jobs thereafter. Additionally, the city of Charlotte and the county of Mecklenburg provided a grant that will be paid over five years and is based on a percentage of new property tax we pay on the development of a corporate headquarters. In December 2018, we received an additional grant from the state that provides up to $8.4 million in reimbursements over 12 years beginning in 2020 for increasing jobs in North Carolina at specific targeted levels through 2023, and maintaining the jobs thereafter.

**Seasonality**

Revenue in our lending business is subject to cyclical and seasonal trends. Home sales (and purchase mortgages) typically rise during the spring and summer months and decline during the fall and winter months, while refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values. However, in certain historical periods additional factors affecting the mortgage and real estate markets, such as the 2008-2009 financial crisis and ensuing recession have impacted customary seasonal trends.

35

Table of Contents

We anticipate revenue in our newer products to be cyclical as well; however, we have limited historical data to predict the nature and magnitude of this cyclicality. Based on industry data, we anticipate as our personal loan product matures we will experience less consumer demand during the fourth and first quarters of each year. We also anticipate less consumer demand for credit cards in the fourth quarter of each year and we anticipate higher consumer demand for deposit accounts in the first quarter of each year. The majority of consumer demand for in-school student loan products occurs in the third quarter coinciding with collegiate enrollment in late summer. Other factors affecting our business include macro factors such as credit availability in the market, interest rates, the strength of the economy and employment.

**Recent Mortgage Interest Rate Trends**

Interest rate and market risks can be substantial in the mortgage lead generation business. Short-term fluctuations in mortgage interest rates primarily affect consumer demand for mortgage refinancings, while long-term fluctuations in mortgage interest rates, coupled with the U.S. real estate market, affect consumer demand for new mortgages. Consumer demand, in turn, affects lender demand for mortgage leads from third-party sources, as well as our own ability to attract online consumers to our website.

Typically, when interest rates decline, we see increased consumer demand for mortgage refinancing, which in turn leads to increased traffic to our website and decreased selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically decreases, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic mortgage lead volume. Due to lower lender demand, our revenue earned per consumer typically decreases, but with correspondingly lower selling and marketing costs.

Conversely, when interest rates increase, we typically see decreased consumer demand for mortgage refinancing, leading to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically increases, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases. Due to high lender demand, we typically see an increase in the amount lenders will pay per matched lead, which often leads to higher revenue earned per consumer. However, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment. These factors combined to cause lower revenue earned per consumer for mortgage products in the second quarter of 2019 compared to the prior quarter.

We dynamically adjust selling and marketing expenditures in all interest rate environments to optimize our results against these variables.

According to Freddie Mac, 30-year mortgage interest rates have decreased steadily during 2019 to a monthly average of 3.80% in June 2019. On a quarterly basis, 30-year mortgage interest rates in the second quarter of 2019 averaged 4.00%, as compared to 4.54% in the second quarter of 2018 and 4.37% in the first quarter of 2019.



Table of Contents

Typically, as mortgage interest rates decline, there are more consumers in the marketplace seeking refinancings and, accordingly, the mix of mortgage origination dollars moves towards refinance mortgages. According to Mortgage Bankers Association ("MBA") data, total refinance origination dollars remained relatively consistent at 29% of total mortgage origination dollars in the second quarter of 2019 compared to 30% in the first quarter of 2019, while total purchase origination dollars was 71% of total mortgage origination dollars in the second quarter of 2019 compared to 70% in the first quarter of 2019. In the second quarter of 2019, total refinance origination dollars increased 24% from the second quarter of 2018 and 51% from the first quarter of 2019.

Looking forward, MBA is projecting 30-year mortgage interest rates to remain relatively consistent through the end of the year. According to MBA projections, refinance origination dollars is projected to increase to 33% of total mortgage origination dollars in the third quarter of 2019. The refinance share of total mortgage origination dollars is projected to represent approximately 30% for 2019, compared to 28% for 2018.

**The U.S. Real Estate Market**

The health of the U.S. real estate market and interest rate levels are the primary drivers of consumer demand for new mortgages. Consumer demand, in turn, affects lender demand for purchase mortgage leads from third-party sources. Typically, a strong real estate market will lead to reduced lender demand for leads, as there are more consumers in the marketplace seeking financing and, accordingly, lenders receive more organic lead volume. Conversely, a weaker real estate market will typically lead to an increase in lender demand, as there are fewer consumers in the marketplace seeking mortgages.

According to the National Association of Realtors ("NAR"), falling interest rates contributed to an increase in home sales in the second quarter of 2019. The NAR expects a minimal increase in existing home sales in 2019 from 2018.

**Results of Operations for the Three and Six Months ended June 30, 2019 and 2018**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | $ Change | % Change | 2019 | 2018 | $ Change | % Change |
| | *(Dollars in thousands)* | | | | | | | |
| Mortgage products | $ 54,618 | $ 66,948 | $ (12,330) | (18)% | $ 100,602 | $ 140,410 | $ (39,808) | (28)% |
| Non-mortgage products | 223,803 | 117,153 | 106,650 | 91 % | 440,209 | 224,726 | 215,483 | 96 % |
| **Revenue** | **278,421** | **184,101** | **94,320** | **51 %** | **540,811** | **365,136** | **175,675** | **48 %** |
| Costs and expenses: | | | | | | | | |
| Cost of revenue *(exclusive of depreciation and amortization shown separately below)* | 16,310 | 6,043 | 10,267 | 170 % | 33,980 | 11,739 | 22,241 | 189 % |
| Selling and marketing expense | 191,629 | 123,946 | 67,683 | 55 % | 366,520 | 249,990 | 116,530 | 47 % |
| General and administrative expense | 27,951 | 24,759 | 3,192 | 13 % | 59,068 | 47,573 | 11,495 | 24 % |
| Product development | 10,175 | 5,967 | 4,208 | 71 % | 20,341 | 12,227 | 8,114 | 66 % |
| Depreciation | 2,559 | 1,633 | 926 | 57 % | 5,041 | 3,304 | 1,737 | 53 % |
| Amortization of intangibles | 14,280 | 3,964 | 10,316 | 260 % | 27,707 | 7,927 | 19,780 | 250 % |
| Change in fair value of contingent consideration | 2,790 | (167) | 2,957 | 1,771 % | 17,382 | (908) | 18,290 | 2,014 % |
| Severance | 403 | 3 | 400 | 13,333 % | 457 | 3 | 454 | 15,133 % |
| Litigation settlements and contingencies | 8 | (170) | 178 | 105 % | (199) | (192) | (7) | (4)% |
| **Total costs and expenses** | **266,105** | **165,978** | **100,127** | **60 %** | **530,297** | **331,663** | **198,634** | **60 %** |
| **Operating income** | **12,316** | **18,123** | **(5,807)** | **(32)%** | **10,514** | **33,473** | **(22,959)** | **(69)%** |
| Other (expense) income, net: | | | | | | | | |
| Interest expense, net | (5,095) | (2,924) | 2,171 | 74 % | (10,563) | (5,912) | 4,651 | 79 % |
| Other income (expense) | 71 | (71) | (142) | (200)% | 139 | (37) | (176) | (476)% |
| **Income before income taxes** | **7,292** | **15,128** | **(7,836)** | **(52)%** | **90** | **27,524** | **(27,434)** | **(100)%** |
| Income tax benefit | 5,689 | 29,721 | (24,032) | (81)% | 13,441 | 53,182 | (39,741) | (75)% |
| **Net income from continuing operations** | **12,981** | **44,849** | **(31,868)** | **(71)%** | **13,531** | **80,706** | **(67,175)** | **(83)%** |
| **Loss from discontinued operations, net of tax** | (763) | (2,302) | (1,539) | (67)% | (1,825) | (6,635) | (4,810) | (72)% |

| Net income and comprehensive income | $ 12,248 | $ 42,347 | $ (30,099) | (71)% | $ 11,706 | $ 74,071 | $ (62,365) | (84)% |

Table of Contents

**Revenue**

Revenue increased in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 due to increases in our non-mortgage products of $106.7 million and $215.5 million, respectively, partially offset by decreases in our mortgage products of $12.3 million and $39.8 million, respectively.

Our non-mortgage products include the following non-mortgage lending products: credit cards, personal loans, home equity loans and lines of credit, small business loans, student loans, reverse mortgage loans and auto loans. Our non-mortgage products also include insurance quotes, deposit accounts, home improvement referrals and other credit products such as credit repair and debt settlement. Revenue earned through resale of online advertising space to third parties is also included in non-mortgage products. Many of our non-mortgage products are not individually significant to revenue. The increase in revenue from our non-mortgage products in the second quarter and first six months of 2019 from the second quarter and first six months of 2018 is primarily due to increases in our insurance, credit cards, personal loans, credit services, student loans and small business loans products, as well as resold advertising space.

Revenue from our insurance product increased to $71.9 million in the second quarter of 2019 and $139.0 million in the first six months of 2019 from immaterial amounts in the second quarter and first six months of 2018, due to the acquisition of QuoteWizard in the fourth quarter of 2018.

Revenue from our credit cards product increased $17.3 million to $56.0 million in the second quarter of 2019 from $38.7 million in the second quarter of 2018, or 45%, and increased $25.7 million to $110.6 million in the first six months of 2019 from $84.9 million in the first six months of 2018, or 30%, due to increases in the number of approvals and an increase in revenue earned per approval.

Revenue from our personal loans product increased $4.9 million to $41.1 million in the second quarter of 2019 from $36.2 million in the second quarter of 2018, or 14%, and increased $11.4 million to $73.6 million in the first six months of 2019 from $62.2 million in the first six months of 2018, or 18%, due to an increased number of consumers completing request forms as a result of increased lender demand and corresponding increases in selling and marketing efforts, partially offset by a decrease in revenue earned per consumer.

For the periods presented, no other non-mortgage product represented more than 10% of revenue, however certain other non-mortgage products experienced notable increases. Revenue from the resale of online advertising space to third parties increased by $5.0 million in the second quarter of 2019 compared to the second quarter of 2018 and $13.4 million in the first six months of 2019 compared to the first six months of 2018. Revenue from our credit services product increased by $4.4 million in the second quarter of 2019 compared to the second quarter of 2018 and increased by $9.6 million in the first six months of 2019 compared to the first six months of 2018, primarily due to the acquisition of Ovation in June 2018. Revenue from our student loans product increased by $3.0 million in the second quarter of 2019 compared to the second quarter of 2018 and increased by $8.2 million in the first six months of 2019 compared to the first six months of 2018, due to increased consumers and increased revenue earned per consumer, primarily due to the acquisition of Student Loan Hero in July 2018. Revenue from our small business loans product increased by $4.3 million in the second quarter of 2019 compared to the second quarter of 2018 and increased by $9.4 million in the first six months of 2019 compared to the first six months of 2018, due to increases in the number of consumers seeking business loans and increases in selling and marketing efforts, partially offset by a decrease in revenue earned per consumer.

We believe the market for our non-mortgage products remains under-penetrated and we believe long-term growth prospects are strong for non-mortgage products. A significant industry-wide contraction in the availability of capital for non-mortgage products would likely adversely affect our non-mortgage product revenues.

Revenue from our mortgage products decreased in the second quarter of 2019 compared to the second quarter of 2018 and in the first six months of 2019 compared to the first six months of 2018 due to decreases in revenue from both our refinance and purchase products. Revenue from our refinance product decreased $2.5 million in the second quarter of 2019 compared to the second quarter of 2018 due to a decrease in revenue earned per consumer and decreased $23.0 million in the first six months of 2019 compared to the first six months of 2018 due to a decrease in the number of consumers completing request forms, as well as a decrease in revenue earned per consumer. Revenue from our purchase product decreased $9.8 million in the second quarter of 2019 compared to the second quarter of 2018 and decreased $16.8 million in the first six months of 2019 compared to the first six months of 2018 due to a decrease in the number of consumers completing request forms, as well as a decrease in revenue earned per consumer.

38

Table of Contents

#### Cost of revenue

Cost of revenue consists primarily of costs associated with compensation and other employee-related costs (including stock-based compensation) relating to internally-operated customer call centers, third-party customer call center fees, costs for online advertising resold to third parties, credit scoring fees, credit card fees, website network hosting and server fees.

Cost of revenue increased in the second quarter of 2019 from the second quarter of 2018, and in the first six months of 2019 from the first six months of 2018, due to increases in compensation and benefits from increased headcount of $3.3 million and $6.4 million, respectively, and increases in website network hosting and server fees of $0.9 million and $1.4 million, respectively. Cost of revenue in the second quarter and first six months of 2019 also includes $5.1 million and $12.4 million for the cost of resold advertising space. Online advertising space resold to third parties in the second quarter and first six months of 2018 was not significant.

Cost of revenue as a percentage of revenue increased to 6% in the second quarter and first six months of 2019 compared to 3% in the second quarter and first six months of 2018, due to the items above.

#### Selling and marketing expense

Selling and marketing expense consists primarily of advertising and promotional expenditures and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in sales or marketing functions. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

The increases in selling and marketing expense in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 were primarily due to increases in advertising and promotional expense of $63.2 million and $107.7 million, respectively, as discussed below. Selling and marketing expense also increased in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 due to increases in compensation and benefits of $4.5 million and $8.8 million, respectively, as a result of increases in headcount.

Advertising and promotional expense is the largest component of selling and marketing expense, and is comprised of the following:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | $ Change | % Change | 2019 | 2018 | $ Change | % Change |
| | *(Dollars in thousands)* | | | | | | | |
| Online | $ 169,779 | $ 113,289 | $ 56,490 | 50% | $ 318,718 | $ 224,709 | $ 94,009 | 42% |
| Broadcast | 6,398 | 195 | 6,203 | 3,181% | 16,933 | 3,435 | 13,498 | 393% |
| Other | 3,373 | 2,891 | 482 | 17% | 6,485 | 6,259 | 226 | 4% |
| **Total advertising expense** | **$ 179,550** | **$ 116,375** | **$ 63,175** | **54%** | **$ 342,136** | **$ 234,403** | **$ 107,733** | **46%** |

Revenue is primarily driven by Network Partner demand for our products, which is matched to corresponding consumer requests. We adjust our selling and marketing expenditures dynamically in relation to anticipated revenue opportunities in order to ensure sufficient consumer inquiries to profitably meet such demand. An increase in a product's revenue is generally met by a corresponding increase in marketing spend, and conversely a decrease in a product's revenue is generally met by a corresponding decrease in marketing spend. This relationship exists for both mortgage and non-mortgage products.

We increased our advertising expenditures in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 in order to generate additional consumer inquiries to meet the increased demand of Network Partners on our marketplace. We will continue to adjust selling and marketing expenditures dynamically in relation to anticipated revenue opportunities.

#### General and administrative expense

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, corporate information technology, human resources and executive management functions, as well as facilities and infrastructure costs and fees for professional services.

39

Table of Contents

General and administrative expense increased in the second quarter of 2019 from the second quarter of 2018, and in the first six months of 2019 from the first six months of 2018, primarily due to increases in compensation and benefits of $2.6 million and $5.9 million, respectively, as a result of increases in headcount. General and administrative expense also increased in the second quarter of 2019 from the second quarter of 2018, and in the first six months of 2019 from the first six months of 2018, due to increases in facilities expense of $1.2 million and $2.1 million, respectively, and increases in technology expense of $1.3 million and $2.2 million, respectively. General and administrative expense in the second quarter and first six months of 2018 includes a charge of $1.6 million due to the write-off of certain fixed assets. The increases in general and administrative expense in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 is partially offset by a $2.7 million gain on the sale of two office buildings in Charlotte, North Carolina.

General and administrative expense as a percentage of revenue decreased to 10% and 11% in the second quarter and first six months of 2019, respectively, compared to 13% in the second quarter and first six months of 2018.

### Product development

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) and third-party labor costs that are not capitalized, for employees and consultants engaged in the design, development, testing and enhancement of technology.

Product development expense increased in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018, as we continued to invest in internal development of new and enhanced features, functionality and business opportunities that we believe will enable us to better and more fully serve consumers and lenders.

### Depreciation

The increase in depreciation expense in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 was primarily the result of higher investment in internally developed software in recent years, to support the growth of our business.

### Amortization of intangibles

Amortization of intangibles increased in the second quarter and first six months of 2019 compared to the second quarter and first six months of 2018 primarily due to intangible assets associated with our business acquisitions in 2018 and 2019.

### Contingent consideration

During the second quarter and first six months of 2019, we recorded aggregate contingent consideration expense of $2.8 million and $17.4 million, respectively, due to adjustments in the estimated fair value of the earnout payments related to our recent acquisitions. For the second quarter of 2019, the contingent consideration expense for the QuoteWizard and Ovation acquisitions was $2.5 million and $0.6 million, respectively. This was partially offset by contingent consideration gains recorded for the SnapCap and DepositAccounts acquisitions of $0.1 million and $0.2 million, respectively. For the first six months of 2019, the contingent consideration expense for the QuoteWizard and SnapCap acquisitions was $16.9 million and $1.5 million, respectively. This was partially offset by a contingent consideration gain recorded for the DepositAccounts acquisition of $1.0 million.

During the second quarter and first six months of 2018, we recorded aggregate gains of $0.2 million and $0.9 million, respectively, primarily due to adjustments in the estimated fair value of the earnout payments related to our recent acquisitions. For the second quarter of 2018, we recorded a $0.8 million gain for the SnapCap acquisition. This was partially offset by contingent consideration expense for the CompareCards and DepositAccounts acquisitions of $0.2 million and $0.4 million, respectively. For the first six months of 2018, we recorded a $2.9 million gain for the SnapCap acquisition. This was partially offset by contingent consideration expense for the CompareCards and DepositAccounts acquisitions of $0.7 million and $1.3 million, respectively.

### Income tax expense

For the second quarter and first six months of 2019, the effective tax rate varied from the federal statutory rate of 21% primarily due to a tax benefit of $7.7 million and $13.7 million, respectively, recognized for excess tax benefits due to employee exercises of stock options and vesting of restricted stock in accordance with ASU 2016-09 and the effect of state taxes.

40

Table of Contents

For the second quarter and first six months of 2018, the effective tax rate varied from the federal statutory rate of 21% primarily due to a tax benefit of $33.7 million and $60.9 million, respectively, recognized for excess tax benefits due to employee exercises of stock options and vesting of restricted stock in accordance with ASU 2016-09 and the effect of state taxes.

There have been no changes to our valuation allowance assessment for the second quarter of 2019.

**Discontinued operations**

Losses from discontinued operations are attributable to losses associated with the LendingTree Loans business formerly operated by our Home Loan Center, Inc., or HLC, subsidiary. The sale of the LendingTree Loans business was completed on June 6, 2012. Losses from discontinued operations were primarily due to litigation settlements and contingencies and legal fees associated with ongoing legal proceedings.

See Note 18—Subsequent Event to the consolidated financial statements included elsewhere in this report for a discussion of the filing under Chapter 11 of the United States Bankruptcy Code by HLC on July 21, 2019, including the anticipated accounting effect of HLC's bankruptcy filing on our future consolidated financial statements.

See also Part II, Item 1A. *Risk Factors* below for further information on risks associated with HLC's bankruptcy filing.

**Adjusted EBITDA**

We report Adjusted EBITDA as a supplemental measure to GAAP. This measure is the primary metric by which we evaluate the performance of our businesses, on which our marketing expenditures and internal budgets are based and by which management and many employees are compensated. We believe that investors should have access to the same set of tools that we use in analyzing our results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. We provide and encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measures discussed below.

*Definition of Adjusted EBITDA*

We report Adjusted EBITDA as net income from continuing operations adjusted to exclude interest, income tax, amortization of intangibles and depreciation, and to further exclude (1) non-cash compensation expense, (2) non-cash impairment charges, (3) gain/loss on disposal of assets, (4) restructuring and severance expenses, (5) litigation settlements and contingencies, (6) acquisitions and dispositions income or expense (including with respect to changes in fair value of contingent consideration) and (7) one-time items. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our statement of operations of certain expenses, including depreciation, non-cash compensation and acquisition-related accounting. We endeavor to compensate for the limitations of the non-GAAP measures presented by also providing the comparable GAAP measures with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measures. These non-GAAP measures may not be comparable to similarly titled measures used by other companies.

*One-Time Items*

Adjusted EBITDA is adjusted for one-time items, if applicable. Items are considered one-time in nature if they are non-recurring, infrequent or unusual and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented in this report, there are no adjustments for one-time items.

*Non-Cash Expenses that are Excluded from Adjusted EBITDA*

Non-cash compensation expense consists principally of expense associated with grants of restricted stock, restricted stock units and stock options, some of which awards have performance-based vesting conditions. These expenses are not paid in cash, and we include the related shares in our calculations of fully diluted shares outstanding. Upon settlement of restricted stock units, exercise of certain stock options or vesting of restricted stock awards, the awards may be settled, on a net basis, with us remitting the required tax withholding amount from our current funds.

Amortization of intangibles are non-cash expenses relating primarily to intangible assets acquired through acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives.

41

Table of Contents

The following table is a reconciliation of net income from continuing operations to Adjusted EBITDA *(in thousands)*.

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2019 | | 2018 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| **Net income from continuing operations** | $ | 12,981 | $ | 44,849 | $ | 13,531 | $ | 80,706 |
| Adjustments to reconcile to Adjusted EBITDA: | | | | | | | | |
| Amortization of intangibles | | 14,280 | | 3,964 | | 27,707 | | 7,927 |
| Depreciation | | 2,559 | | 1,633 | | 5,041 | | 3,304 |
| Severance | | 403 | | 3 | | 457 | | 3 |
| (Gain) loss on impairments and disposal of assets | | (2,196) | | 1,797 | | (1,978) | | 1,889 |
| Non-cash compensation expense | | 15,982 | | 11,178 | | 30,035 | | 22,287 |
| Change in fair value of contingent consideration | | 2,790 | | (167) | | 17,382 | | (908) |
| Acquisition expense | | 60 | | 625 | | 179 | | 687 |
| Litigation settlements and contingencies | | 8 | | (170) | | (199) | | (192) |
| Interest expense, net | | 5,095 | | 2,924 | | 10,563 | | 5,912 |
| Rental amortization of intangibles and depreciation | | — | | 194 | | — | | 396 |
| Income tax benefit | | (5,689) | | (29,721) | | (13,441) | | (53,182) |
| **Adjusted EBITDA** | $ | 46,273 | $ | 37,109 | $ | 89,277 | $ | 68,829 |

## Financial Position, Liquidity and Capital Resources

### General

As of June 30, 2019, we had $51.3 million of cash and cash equivalents compared to $105.1 million of cash and cash equivalents as of December 31, 2018.

In the first six months of 2019, we purchased an aggregate of 17,501 shares of our common stock pursuant to a stock repurchase program for $4.0 million.

In May 2019, we completed the sale of two office buildings in Charlotte, North Carolina to an unrelated third party for a sale price of $24.4 million. We received proceeds of $24.1 million, net of closing fees of $0.3 million.

In January 2019, we acquired ValuePenguin for $106.2 million in cash. The acquisition was funded through $90.0 million drawn on our Revolving Credit Facility and the balance using cash on hand.

During the first six months of 2019, we paid down $100.0 million on our Revolving Credit Facility.

During the first six months of 2019, we made a contingent consideration payment of $3.0 million related to the prior acquisition of SnapCap and total contingent consideration payments of $3.0 million related to the prior acquisition of DepositAccounts.

We could make additional potential contingent consideration payments of up to $1.0 million for DepositAccounts, $6.0 million for SnapCap, $8.8 million for Ovation, and $70.2 million for QuoteWizard.

We expect our cash and cash equivalents and cash flows from operations to be sufficient to fund our operating needs for the next twelve months and beyond. Our amended and restated revolving credit facility described below is an additional potential source of liquidity.

### Senior Secured Revolving Credit Facility

On October 26, 2018, we amended our five-year senior secured revolving credit facility which matures on November 21, 2022 (the "Revolving Credit Facility") to increase its borrowing capacity by $100.0 million to $350.0 million. Borrowings under the Revolving Credit Facility can be used to finance working capital needs, capital expenditures and general corporate purposes, including to finance permitted acquisitions. As of July 26, 2019, we have $100.0 million of borrowings under the Revolving Credit Facility.

Table of Contents

**Cash Flows from Continuing Operations**

Our cash flows attributable to continuing operations are as follows:

| | Six Months Ended June 30, | | |
|---|---|---|---|
| | 2019 | | 2018 |
| | *(in thousands)* | | |
| Net cash provided by operating activities | $ | 67,875 | $ | 15,264 |
| Net cash used in investing activities | | (90,838) | | (18,441) |
| Net cash used in financing activities | | (24,653) | | (71,890) |

### Cash Flows from Operating Activities

Our largest source of cash provided by our operating activities is revenues generated by our mortgage and non-mortgage products. Our primary uses of cash from our operating activities include advertising and promotional payments. In addition, our uses of cash from operating activities include compensation and other employee-related costs, other general corporate expenditures, litigation settlements and contingencies, certain contingent consideration payments and income taxes.

Net cash provided by operating activities attributable to continuing operations increased in the first six months of 2019 from the first six months of 2018 due primarily to an increase in revenue, partially offset by an increase in selling and marketing expense and cost of revenue. Additionally, cash from changes in working capital increased primarily as a result of changes in accounts payable, accrued expenses and other current liabilities, partially offset by changes in accounts receivable. Cash flows from operating activities in the first six months of 2018 also included the $21.9 million portion of the CompareCards earnout payment made in the second quarter of 2018 in excess of the contingent consideration liability recognized at the acquisition date.

### Cash Flows from Investing Activities

Net cash used in investing activities attributable to continuing operations in the first six months of 2019 of $90.8 million consisted primarily of the acquisition of ValuePenguin for $105.6 million, net of cash acquired, and capital expenditures of $9.8 million primarily related to internally developed software. This was partially offset by proceeds of $24.1 million on the sale of two office buildings, net of closing expenses.

Net cash used in investing activities attributable to continuing operations in the first six months of 2018 of $18.4 million consisted primarily of the acquisition of Ovation for $11.7 million, net of cash acquired, and capital expenditures of $6.7 million primarily related to internally developed software.

### Cash Flows from Financing Activities

Net cash used in financing activities attributable to continuing operations in the first six months of 2019 of $24.7 million consisted primarily of $10.0 million of net repayments on our Revolving Credit Facility, $4.0 million for the repurchase of our common stock, $7.6 million in withholding taxes paid upon surrender of shares to satisfy obligations on equity awards, net of proceeds from the exercise of stock options, and $3.0 million of contingent consideration payments for SnapCap.

Net cash used in financing activities attributable to continuing operations in the first six months of 2018 of $71.9 million consisted primarily of $25.6 million of contingent consideration payments for CompareCards, DepositAccounts and SimpleTuition and $47.1 million for the repurchase of our stock.

**Off-Balance Sheet Arrangements**

We have no off-balance sheet arrangements other than our funding commitments pursuant to our surety bonds, none of which have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.

**New Accounting Pronouncements**

For information regarding new accounting pronouncements, *see* Note 2—Significant Accounting Policies, in Part I, Item 1 *Financial Statements*.

43

Table of Contents

**Item 3.** *Quantitative and Qualitative Disclosures about Market Risk*

Other than our Revolving Credit Facility, we do not have any financial instruments that are exposed to significant market risk. We maintain our cash and cash equivalents in bank deposits and short-term, highly liquid money market investments. A hypothetical 100-basis point increase or decrease in market interest rates would not have a material impact on the fair value of our cash equivalents securities, or our earnings on such cash equivalents, but would have an effect on the interest paid on borrowings under the Revolving Credit Facility, if any. As of July 26, 2019, there was $100.0 million borrowed under the Revolving Credit Facility. If the LIBO rate increased by 100-basis points, our annual interest expense would increase by approximately $1.0 million. Increases in the Federal Funds interest rates may also affect potential contingent consideration payments to DepositAccounts. *See* Note 7—Business Acquisitions—Changes in Contingent Consideration—DepositAccounts in Part I, Item 1. *Financial Statements*.

Fluctuations in interest rates affect consumer demand for new mortgages and the level of refinancing activity which, in turn, affects lender demand for mortgage leads. Typically, when interest rates decline, we see increased consumer demand for mortgage refinancing, which in turn leads to increased traffic to our website and decreased selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically decreases, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic lead volume. Due to lower lender demand, our revenue earned per consumer typically decreases but with correspondingly lower selling and marketing costs. Conversely, when interest rates increase, we typically see decreased consumer demand for mortgage refinancing, leading to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically increases, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases. Due to high lender demand, we typically see an increase in the amount lenders will pay per matched lead, which often leads to higher revenue earned per consumer. However, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment. See also the risk factor "Adverse conditions in the primary and secondary mortgage markets, as well as the general economy, could materially and adversely affect our business, financial condition and results of operations," in Part I, Item 1A (Risk Factors) in our 2018 Annual Report.

**Item 4.** *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), management, with the participation of our principal executive officer (our Chief Executive Officer) and principal financial officer (our Chief Financial Officer), evaluated, as of the end of the period covered by this report, the effectiveness of our disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective, as of June 30, 2019, to reasonably ensure that information required to be disclosed and filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified, and that management will be timely alerted to material information required to be included in our periodic reports filed with the Securities and Exchange Commission.

**Changes in Internal Control Over Financial Reporting**

There was no change in our internal control over financial reporting that occurred during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

44

Table of Contents

# PART II—OTHER INFORMATION

### Item 1.  *Legal Proceedings*

In the ordinary course of business, we are party to litigation involving property, contract, intellectual property and a variety of other claims. The amounts that may be recovered in such matters are subject to insurance coverage. We have provided information about certain legal proceedings in which we are involved in Part I, Item 3. *Legal Proceedings* of our 2018 Annual Report and updated that information in Note 14—Contingencies to the consolidated financial statements included elsewhere in this report.

### Item 1A.  *Risk Factors*

Other than the risk factor set forth below, there have been no material changes to the risk factors included in Part I, Item 1A. *Risk Factors* of our 2018 Annual Report.

### *We are subject to risks relating to the bankruptcy of our Home Loan Center, Inc. subsidiary, including risks of claims against us and our operating subsidiaries*

Our subsidiary Home Loan Center, Inc., or HLC, filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, which we refer to as the Bankruptcy Code, in order to preserve assets for the benefit of all creditors of HLC. We refer to HLC's filing and the subsequent process under the Bankruptcy Code as the HLC bankruptcy.

In its filings with the Bankruptcy Court, HLC has indicated that it believes it has claims against HLC's sole shareholder, our operating subsidiary LendingTree, LLC, and its former sole director (our Chairman and Chief Executive Officer), relating to the declaration of a dividend by HLC in January 2016 of $40.0 million. We believe the declaration of the dividend was proper, that the amounts paid to LendingTree, LLC following such declaration are not subject to recovery by HLC and that any claims by HLC relating to the dividend declaration are without merit. We have commenced settlement talks with HLC, and if we are not able to settle HLC's claims relating to such dividend declaration on terms we deem acceptable, we intend to vigorously contest such claims. Any settlement agreement with HLC we might enter into would be subject to approval by the Bankruptcy Court, which may not be obtained. See Note 18—Subsequent Event to the consolidated financial statements included elsewhere in this report for a discussion of the anticipated accounting effect of HLC's bankruptcy filing on our future consolidated financial statements.

It is possible that the HLC bankruptcy will lead other creditors of HLC to assert claims directly against our company or one or more of our wholly-owned subsidiaries not included as debtors in the HLC bankruptcy, which we refer to as non-debtor parties, on various legal theories. While we are not aware of a basis for any material claims of this nature, any such assertions of claims by HLC creditors may require significant effort (including management time), resources and money to defend and could result in losses to us. Moreover, our management may be required to spend a significant amount of time and effort dealing with the HLC bankruptcy, which could have an adverse impact on our ability to execute our business plan and operations.

### Item 2.  *Unregistered Sales of Equity Securities and Use of Proceeds*

### Issuer Purchases of Equity Securities

In each of February 2018 and February 2019, the board of directors authorized and we announced a stock repurchase program which allowed for the repurchase of up to $100.0 million and $150.0 million, respectively, of our common stock. Under this program, we can repurchase stock in the open market or through privately-negotiated transactions. We have used available cash to finance these repurchases. We will determine the timing and amount of any additional repurchases based on our evaluation of market conditions, applicable SEC guidelines and regulations, and other factors. This program may be suspended or discontinued at any time at the discretion of our board of directors. No shares of common stock were repurchased under the stock repurchase program during the quarter ended June 30, 2019. As of July 19, 2019, approximately $181.2 million remains authorized for share repurchase.

45

Table of Contents

Additionally, the LendingTree Sixth Amended and Restated 2008 Stock and Award Incentive Plan and the LendingTree 2017 Inducement Grant Plan allow employees to forfeit shares of our common stock to satisfy federal and state withholding obligations upon the exercise of stock options, the settlement of restricted stock unit awards and the vesting of restricted stock awards granted to those individuals under the plans. During the quarter ended June 30, 2019, 7,741 shares were purchased related to these obligations under the LendingTree Sixth Amended and Restated 2008 Stock and Award Incentive Plan and 14,998 shares were purchased related to these obligations under the LendingTree 2017 Inducement Grant Plan. The withholding of those shares does not affect the dollar amount or number of shares that may be purchased under the stock repurchase program described above.

The following table provides information about the company's purchases of equity securities during the quarter ended June 30, 2019.

| Period | Total Number of Shares Purchased [1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs [2] | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| | | | | *(in thousands)* |
| 4/1/19 - 4/30/19 | 1,715 | $ 367.69 | — | $ 181,167 |
| 5/1/19 - 5/31/19 | 2,026 | $ 379.52 | — | $ 181,167 |
| 6/1/19 - 6/30/19 | 18,998 | $ 412.13 | — | $ 181,167 |
| **Total** | 22,739 | $ 405.88 | — | $ 181,167 |

(1) During April 2019, May 2019 and June 2019, 1,715 shares, 2,026 shares and 18,998 shares, respectively (totaling 22,739 shares), were purchased to satisfy federal and state withholding obligations of our employees upon the settlement of restricted stock units, all in accordance with our Sixth Amended and Restated 2008 Stock and Award Incentive Plan and 2017 Inducement Grant Plan, as described above.

(2) See the narrative disclosure above the table for further description of our publicly announced stock repurchase program.

## Item 5.  *Other Information*

None.

46

Table of Contents

## Item 6. *Exhibits*

| Exhibit | Description | Location |
|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of LendingTree, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed August 25, 2008 |
| 3.2 | Fourth Amended and Restated By-laws of LendingTree, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed November 15, 2017 |
| 10.1 | First Amendment to Credit Agreement | Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed June 28, 2019 |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | †† |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | †† |
| 101.INS | XBRL Instance Document — The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | ††† |
| 101.SCH | XBRL Taxonomy Extension Schema Document | ††† |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | ††† |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | ††† |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | ††† |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | ††† |

† Filed herewith

†† This certification is being furnished solely to accompany this report pursuant to 18 U.S.C. 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934 and is not to be incorporated by reference into any filing of the registrant, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

††† Furnished herewith. Pursuant to Rule 406T of Regulation S-T, the Interactive Data Files on Exhibit 101 hereto are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise are not subject to liability under those sections.

47

Table of Contents

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: July 26, 2019

LENDINGTREE, INC.

By:    /s/ **J.D. MORIARTY**
_____
J.D. Moriarty
*Chief Financial Officer*
*(principal financial officer and duly authorized officer)*

48

EX-31.1 2 tree-2019630x10qexx311.htm EXHIBIT 31.1

**Exhibit 31.1**

**CERTIFICATION**

I, Douglas R. Lebda, certify that:

1. I have reviewed this quarterly report on Form 10-Q for the period ended June 30, 2019 of LendingTree, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: July 26, 2019

/s/ Douglas R. Lebda

Douglas R. Lebda
*Chairman and Chief Executive Officer*
*(principal executive officer)*

EX-31.2 3 tree-2019630x10qexx312.htm EXHIBIT 31.2

**Exhibit 31.2**

**CERTIFICATION**

I, J.D. Moriarty, certify that:

1. I have reviewed this quarterly report on Form 10-Q for the period ended June 30, 2019 of LendingTree, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: July 26, 2019

/s/ J.D. Moriarty

J.D. Moriarty

*Chief Financial Officer*

*(principal financial officer)*

EX-32.1 4 tree-2019630x10qexx321.htm EXHIBIT 32.1

Exhibit 32.1

### CERTIFICATION OF THE PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Douglas R. Lebda, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) the Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019 of LendingTree, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of LendingTree, Inc.

Date: July 26, 2019

/s/ Douglas R. Lebda

Douglas R. Lebda

*Chairman and Chief Executive Officer*

*(principal executive officer)*

EX-32.2 5 tree-2019630x10qexx322.htm EXHIBIT 32.2

Exhibit 32.2

**CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, J.D. Moriarty, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)　the Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019 of LendingTree, Inc. (the "Report") which this statement accompanies fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)　the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of LendingTree, Inc.

Date: July 26, 2019

/s/ J.D. Moriarty

J.D. Moriarty

*Chief Financial Officer*

*(principal financial officer)*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Lehman Brothers Holdings Inc.

**DEFENDANTS**
LendingTree, LLC and LendingTree, Inc.

**(b)** County of Residence of First Listed Plaintiff   New York County, New York
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Mecklenburg County, North Carolina
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John B. Orenstein
Matthew D. Forssgren
Greene Espel PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                        *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1334
Brief description of cause:
Plaintiff seeks declaratory judgment that Defendants assumed liabilities and are responsible to pay Judgment related to In re: Lehman Brothers Holdings Inc., No. 16-01342 (Bankr. S.D.N.Y.).

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE   Susan Richard Nelson

DOCKET NUMBER   19-cv-02360

DATE
06/11/2020

SIGNATURE OF ATTORNEY OF RECORD
s/John B. Orenstein

**FOR OFFICE USE ONLY**

JS 44 Reverse  (Rev. 09/19)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use
**(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the
**(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for:  Nature of Suit Code Descriptions.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.