# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

LEHMAN BROTHERS HOLDINGS INC.,

        Plaintiff,

v.

LENDINGTREE, LLC and
LENDINGTREE, INC.

        Defendants.

Civ. No. 20-cv-1351 (SRN/HB)

---

## DECLARATION OF JOHN B. ORENSTEIN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE, OR TO COMPEL ARBITRATION

I, John B. Orenstein, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1.      I am an attorney at the law firm Greene Espel PLLP, counsel for Plaintiff in the above captioned proceeding. I am familiar with the facts set forth herein on the basis of my personal knowledge and my review of documents in the possession of my firm.

2.      I submit this Declaration in opposition to Defendants' Motion to Dismiss, or in the Alternative, to Transfer Venue, or to Compel Arbitration (the "Motion").

3.      Annexed hereto as Exhibit A is a true and correct copy of the 2020 annual report on Form 10-K filed by LendingTree, Inc. on February 26, 2020.

4.      Annexed hereto as Exhibit B is a true and correct copy of Douglas R. Lebda's Employment Agreement with LendingTree, Inc. and LendingTree, LLC dated September 20, 2017.

5.      Annexed hereto as Exhibit C is a true and correct copy Neil Salvage's

Employment Agreement with LendingTree, Inc. and LendingTree, LLC dated January 2, 2018.

6.      Annexed hereto as Exhibit D is a true and correct copy of John D. Moriarty's

Employment Agreement with LendingTree, Inc. and LendingTree, LLC dated December 21,

2017.

7.      Annexed hereto as Exhibit E is a true and correct copy of the Order Authorizing

Compromise of Claim 20 (Lehman Brothers Holdings, Inc.), entered by the United States

Bankruptcy Court for the Northern District of California in *In re Home Loan Center, Inc*., Case

No. 19-51455-MEH, dated June 11, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Minneapolis, MN
       October 19, 2020


                                                     _/s/John B. Orenstein_____
                                                     John B. Orenstein

# EXHIBIT A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

— **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year Ended December 31, 2019**
OR

— **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from            to**
**Commission File No. 001-34063**

### LendingTree, Inc.
(Exact name of Registrant as specified in its charter)

| Delaware | 26-2414818 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**11115 Rushmore Drive, Charlotte, North Carolina 28277**
(Address of principal executive offices)(Zip Code)

**(704) 541-5351**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value per share | TREE | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes    No

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes    No

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes    No

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes    No

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer    Accelerated filer    Non-accelerated filer    Smaller reporting company    Emerging growth company

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes    No

As of June 28, 2019, the aggregate market value of the voting common stock held by non-affiliates of the Registrant was approximately $3,266 million.

For the purposes of the foregoing calculation only, all directors and executive officers of the Registrant and the single stockholder who owns in excess of 20% of the voting common stock are assumed to be affiliates of the Registrant.

As of February 18, 2020, there were 13,046,043 shares of the Registrant's common stock, par value $.01 per share, outstanding.

**Documents Incorporated By Reference:**

Portions of the Registrant's proxy statement for its 2020 Annual Meeting of Stockholders are incorporated by reference into Part III herein. Such proxy statement will be filed with the U.S. Securities and Exchange Commission within 120 days of the Registrant's fiscal year ended December 31, 2019.

Table of Contents

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 32 |
| Item 4. | Mine Safety Disclosures | 32 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33 |
| Item 6. | Selected Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 51 |
| Item 8. | Financial Statements and Supplementary Data | 52 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 106 |
| Item 9A. | Controls and Procedures | 106 |
| Item 9B. | Other Information | 106 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 107 |
| Item 11. | Executive Compensation | 107 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 107 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 107 |
| Item 14. | Principal Accounting Fees and Services | 107 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 108 |
| Item 16. | Form 10-K Summary | 112 |

Table of Contents

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

This annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "Annual Report") contains "forward-looking statements" within the meaning of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended. These forward-looking statements include statements related to our anticipated financial performance, business prospects and strategy; anticipated trends and prospects in the various industries in which our businesses operate; new products, services and related strategies; and other similar matters. These forward-looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict. The use of words such as "anticipates," "estimates," "expects," "projects," "intends," "plans" and "believes," among others, generally identify forward-looking statements.

Actual results could differ materially from those contained in the forward-looking statements. Factors currently known to management that could cause actual results to differ materially from those in forward-looking statements include those matters discussed below, including in Item 1A. Risk Factors.

Other unknown or unpredictable factors that could also adversely affect our business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of LendingTree, Inc.'s management as of the date of this report. We undertake no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results or expectations, except as required by law.

## PART I

## ITEM 1.  *Business*

### Our Company

LendingTree, Inc. ("LendingTree", the "Company", "we" or "us") operates what we believe to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. Through multiple branded marketplaces, LendingTree empowers consumers to shop for financial services the same way they would shop for airline tickets or hotel stays, comparing multiple offers from a nationwide network of approximately 800 partners (which we refer to as "Network Partners") in one simple search, and choose the option that best fits their financial needs. Services include mortgage loans, mortgage refinances, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. In addition, we offer tools and resources, including free credit scores, that facilitate comparison shopping for loans, deposit products, insurance and other offerings. We seek to match consumers with multiple providers, who can offer them competing quotes for the product, or products, they are seeking. We believe our platform, consisting of a deep network of Network Partners across a broad array of financial products, differentiates us from other loan or insurance comparison-shopping marketplaces which may focus on fewer product offerings or partner with fewer service providers.

Our strategically designed and executed advertising and marketing campaigns (which we refer to as performance marketing) span a wide array of digital and traditional media acquisition channels and promote our LendingTree and other brands and product offerings. Our marketing efforts are designed to attract consumers to our websites, mobile applications and toll-free telephone numbers. Interested consumers complete inquiry forms, providing detailed information about themselves and the loans or other offerings they are seeking. We refer to such consumer inquiries as consumer requests. We then match these consumer requests with Network Partners in our marketplace that are seeking to serve these consumers' needs. We generate revenue from our Network Partners, generally at the time of transmitting a consumer request to them, in the form of a match fee. In certain instances outside our mortgage and insurance business, we charge other kinds of fees, such as closed loan or closed sale fees. In addition to our primary consumer request data referral business, we also match consumers with Network Partners via website clicks and calls for which Network Partners pay either front-end or back-end fees.

We are continually working to improve the consumer experience. We have made investments in technologically-adept personnel and we use in-market real-time testing to improve our digital platforms. Additionally, we work with our Network Partners, including providing training and other resources, to improve the consumer experience throughout the process. Further, we have been building and improving our My LendingTree platform, which provides a relationship-based consumer experience, rather than just a transaction-based experience.

Table of Contents

## Evolution and Future Growth of Our Business

At its inception, our original business was to serve consumers seeking home mortgage loans by matching them with various lenders. We launched the LendingTree brand nationally in 1998 and, over the last twenty-plus years, we have invested significantly in this brand to gain widespread consumer recognition.

More recently, we have actively sought to expand the suite of financial services offerings we provide to consumers, in order to both leverage the applicability of the LendingTree brand as well as more fully serve the needs of consumers and Network Partners. We believe that consumers with existing LendingTree-branded associations will be more likely to utilize our other service offerings than those of other providers whose brands consumers may not recognize.

In June 2014, we re-launched My LendingTree, a platform that offers a personalized comparison-shopping experience, by providing free credit scores and credit score analysis. This platform enables us to observe consumers' credit profiles and then identify and alert them to loans and other offerings on our marketplace that may be more favorable than the terms they have at a given point in time. This is designed to provide consumers with measurable savings opportunities over their lifetimes.

By expanding our portfolio of financial services offerings, we are growing and diversifying our business and sources of revenue. We intend to capitalize on our expertise in performance marketing, product development and technology, and to leverage the widespread recognition of the LendingTree brand to effect this strategy.

We believe the consumer and small business financial services industry is still in the early stages of a fundamental shift to online product offerings, similar to the shift that started in retail and travel many years ago and is now well established. We believe that, like retail and travel, as consumers continue to move towards online shopping and transactions for financial services, suppliers will increasingly shift their product offerings and advertising budgets toward the online channel. We believe the strength of our brands and of our partner network place us in a strong position to continue to benefit from this market shift.

## Recent Business Acquisitions

On January 10, 2019, we acquired Value Holding Inc., the parent company of ValuePenguin Inc. ("ValuePenguin"), a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards. Combining ValuePenguin's high-quality content and search engine optimization capability with proprietary technology and insurance carrier network from QuoteWizard.com, LLC ("QuoteWizard") (discussed below) enables us to provide immense value to carriers and agents. This strategic acquisition positions us to achieve further scale in the insurance space as well as the broader financial services industry.

On October 31, 2018, we acquired QuoteWizard.com, one of the largest insurance comparison marketplaces in the growing online insurance advertising market. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers. This acquisition has established LendingTree as a leading player in the online insurance advertising industry while continuing our ongoing diversification within the financial services category.

On July 23, 2018, we acquired Student Loan Hero, Inc. ("Student Loan Hero"), a personal finance website dedicated to helping student loan borrowers manage their student debt. Student Loan Hero offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. This strategic transaction allows us to scale our student loan business and provide consumers with the tools and resources to better understand their personal finances and make smarter financial decisions.

On June 11, 2018, we acquired Ovation Credit Services, Inc. ("Ovation"), a leading provider of credit services with a strong customer service reputation. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports. Ovation's experienced management team, strong credit bureau relationships and customized software platform enable us to help more consumers achieve their original financial goals through the LendingTree platform.

On September 19, 2017, we acquired certain assets of Snap Capital LLC ("SnapCap"). SnapCap is a tech-enabled online platform, which connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach. SnapCap's high-touch, high-conversion sales approach with our brand and performance marketing expertise has enabled growth in our small business offering.

On June 20, 2017, we acquired the membership interests of Camino Del Avion (Delaware), LLC, which does business under the name MagnifyMoney. MagnifyMoney is a leading consumer-facing media property that offers editorial content, expert commentary, tools and resources to help consumers compare financial products and make informed financial decisions. The MagnifyMoney team brings the expertise and infrastructure to expand content creation and distribution across all of our consumer facing brands, improving our presence and efficacy in acquisition channels such as search engine optimization.

4

Table of Contents

On June 14, 2017, we acquired substantially all of the assets of Deposits Online, LLC, which does business under the name DepositAccounts.com ("DepositAccounts"). DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content. This acquisition represented our first offering to address the asset side of the consumer balance sheet.

On November 16, 2016, we acquired Iron Horse Holdings, LLC, which does business under the name CompareCards. CompareCards is a leading online source for side-by-side credit card comparison shopping. CompareCards provides consumers with one centralized location for pertinent credit card information needed to find the best card for their needs. CompareCards' unique marketing platform and strong relationships with card issuers combined with LendingTree's scale and organizational support have delivered substantial growth in our credit card business.

These acquisitions continue our diversification strategy.

### Segment Reporting

We have three reportable segments: Home, Consumer and Insurance. We changed our reportable segments in the fourth quarter of 2019, and prior period results have been reclassified to conform with this change in reportable segments.

### Products

Our Home segment includes the following products: purchase mortgage, refinance mortgage, home equity loans and lines of credit, reverse mortgage loans, and real estate. Our Consumer segment includes the following products: credit cards, personal loans, small business loans, student loans, auto loans, deposit accounts, and other credit products such as credit repair and debt settlement. Our Insurance segment consists of insurance quote products. Revenue within the Other category includes revenue from the resale of online advertising space to third parties and revenue from home improvement referrals.

Segment revenue is as follows *(in thousands)*:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| Home | $ 277,935 | $ 319,176 | $ 340,377 |
| Consumer | 515,037 | 395,615 | 276,091 |
| Insurance | 284,792 | 31,369 | 136 |
| Other | 28,839 | 18,705 | 1,132 |
| **Total revenue** | **$ 1,106,603** | **$ 764,865** | **$ 617,736** |

LendingTree does not charge consumers for the use of our services, except for credit repair services. Revenues from our Home products are mostly derived from upfront match fees paid by Network Partners that receive a consumer request, and in some cases upfront fees for clicks or call transfers. Because a given consumer request form can be matched with more than one Network Partner, up to five match fees may be generated from a single consumer request form. Revenues from our Consumer products are generally derived from upfront match fees paid on delivery of a consumer request, click or call and closed loan fees. For our credit card product, we send click traffic to issuers and are paid per card approval. Revenues from our Insurance products are primarily derived from upfront match fees, and upfront fees for website clicks or fees for calls, earned through the delivery of consumer requests.

For the year ended December 31, 2019, one Network Partner, Progressive Casualty Insurance, accounted for 12% of total consolidated revenue, all of which was recorded within our Insurance segment. For the year ended December 31, 2018, no Network Partners accounted for more than 10% of total consolidated revenue. For the year ended December 31, 2017, another Network Partner, Quicken Loans, accounted for 11% of total consolidated revenue, which was recorded within our Home and Consumer segments.

#### *Home Segment*

We partner with lenders throughout the United States to provide full geographic lending coverage and to offer a complete suite of loan offerings on our marketplace. To participate on our marketplace, lenders are required to enter into contracts with us that state the terms and conditions for such participation, although these contracts generally may be terminated for convenience by either party. We perform certain due diligence procedures on prospective new lenders, including screening against a national anti-fraud database maintained by the Mortgage Asset Research Institute, which helps manage our risk exposure. The data is utilized to determine whether a lender and its principals are eligible to participate on our marketplace and have not been convicted of and/or penalized for fraudulent activity.

5

Table of Contents

Consumers seeking purchase or refinance mortgages through our loan marketplace can receive multiple conditional loan offers from participating lenders in response to a single consumer request form. We refer to the process by which we match consumers and Network Partners as the matching process. This matching process consists of the following steps:

(1) **Consumer Request.** Consumers complete a single request form with information regarding the type of mortgage loan product they are seeking, loan preferences and other data. Consumers also consent to a soft inquiry regarding their credit.

(2) **Consumer Request Form Matching and Transmission.** Our proprietary systems and technology match a given consumer's request form data, credit profile and geographic location against certain pre-established criteria of Network Partners, which may be modified from time to time. Once a given request passes through the matching process, the request is automatically transmitted to up to five participating Network Partners.

(3) **Lender Evaluation and Response.** Network Partners that receive a consumer request form evaluate the information contained in it to determine whether to make a conditional loan offer.

(4) **Communication of a Conditional Offer.** All matched Network Partners and any conditional offers are presented to the consumer upon completion of the consumer request form. Consumers can return to the site and view their offer(s) at any time by logging in to their My LendingTree profile. Additionally, matched lenders and offers are also sent to the email address associated with the consumer request.

We also offer consumers other mortgage products such as:

- An alternative "short-form" matching process, which provides them with lender contact information rather than conditional offers from Network Partners.

- A "rate table" loan marketplace, where consumers can enter their loan and credit profile and dynamically view real-time rates from lenders without entering their contact information.

Other Home lending products on our online marketplace include the following:

- Home equity loans and lines of credit, which enable home owners to borrow against the equity in their home, as measured by the difference between the market value of the home and any existing loans secured by the home. Home equity loans are one-time lump sum loans, whereas a home equity line of credit reflects a line of revolving credit where the borrower has flexibility to draw down and repay the line over time.

- Reverse mortgage loans, which are a loan product available to qualifying homeowners age 62 or older.

In addition, we offer real estate brokerage services, through which consumers are matched with local realtors who can assist them in their home purchase or sale efforts. We generate revenue from real estate brokerage services through match fees paid to us by real estate brokers participating in our online marketplace.

### Consumer Segment

Consumer lending products on our online marketplace include information, tools and access to multiple conditional loan offers for the following:

- Auto, which includes our auto refinance and purchase loan products. Auto loans enable consumers to purchase new or used vehicles or refinance an existing loan secured by an automobile.

- Credit cards, which include offerings from most major card issuers. During the fourth quarter of 2016, we purchased CompareCards, a leader in the online credit card comparison industry, enhancing this product.

- Personal loans, which are unsecured obligations generally carrying shorter terms and smaller loan amounts than home mortgages.

- Small business loans, which include a broad array of financing types, including but not limited to loans secured by working capital, equipment, real estate and other forms of financing, provided to small and medium-sized businesses. During the third quarter of 2017, we purchased SnapCap, an online platform with a concierge-based approach to connecting business owners with sources of credit, enhancing this product.

- Student loans, which includes both new loans to finance an education and related expenses, as well as refinancing of existing loans. During the second quarter of 2016, we purchased SimpleTuition, a leading online marketing platform for student loans, and during the third quarter of 2018, we purchased Student Loan Hero, a personal finance website dedicated to helping student loan borrowers manage their student debt, enhancing this product.

6

Table of Contents

Non-lending Consumer products also includes information, tools and access to the following:

- Deposit accounts, through which consumers can access depository deals and analysis covering all major deposit product categories. On June 14, 2017, we acquired DepositAccounts.com, a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content.

- Credit repair, through which consumers can obtain assistance improving their credit profiles, in order to expand and improve loan and other financial product opportunities available to them. During the second quarter of 2018, we purchased Ovation, a leading provider of credit services with a strong customer service reputation, enhancing this product.

- Debt relief services, through which consumers can obtain assistance negotiating existing loans.

We refer to the various purchasers of leads from our other marketplaces as lead purchasers. We generate revenue from the deposit account product from a consumer clicking from our website through to a financial institution's website. We generate revenue from credit repair and debt relief services through subscription fees from consumers that enroll in our credit repair product, or a fee for a customer referral to a service provider partner or through a fee at the time a consumer enrolls in a program with one of our Network Partners.

### Insurance Segment

Our Insurance segment includes information, tools and access to insurance quote products, including home and automobile, through which consumers are matched with insurance lead aggregators to obtain insurance offers. We enhanced our insurance products by acquiring QuoteWizard, one of the largest insurance comparison marketplaces in the growing online insurance advertising market, in the fourth quarter of 2018. We also purchased ValuePenguin, a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards, in the first quarter of 2019.

### Other Products

Other products not included in the Home, Consumer and Insurance segments includes:

- Home improvement services, through which consumers have the opportunity to research and find home improvement professional services. Effective in the first quarter of 2019, we no longer offer home improvement services.

- Revenue earned through resale of online advertising space to third parties is also classified in other products. Effective in the first quarter of 2020, we no longer resell online advertising space.

We intend to continue adding new offerings for consumers, small businesses and Network Partners on our online marketplace, in order to grow and diversify our sources of revenue. We may develop such new offerings through internal product development efforts, strategic product business relationships with third parties and/or acquisitions.

## Seasonality

Revenue in our Home segment is subject to cyclical and seasonal trends. Home sales (and purchase mortgages) typically rise during the spring and summer months and decline during the fall and winter months, while refinancing and home equity activity is principally driven by mortgage interest rates as well as real estate values. However, in certain historical periods additional factors affecting the mortgage and real estate markets, such as the 2008-2009 financial crisis and related recession have impacted customary seasonal trends.

We anticipate revenue in our newer products, primarily within the Consumer segment, to be cyclical as well; however, we have limited historical data to predict the nature and magnitude of this cyclicality. Based on industry data, we anticipate that as our personal loan product matures we will experience less consumer demand during the fourth and first quarters of each year. We also anticipate less consumer demand for credit cards in the fourth quarter of each year and we anticipate higher consumer demand for deposit accounts in the first quarter of each year. The majority of consumer demand for in-school student loan products occurs in the third quarter coinciding with collegiate enrollment in late summer. Other factors affecting our businesses include macro factors such as credit availability in the market, interest rates, the strength of the economy and employment.

## Competition

Our businesses compete with other online marketing companies, including online intermediaries that operate network-type arrangements. We also face competition from lenders and insurance agents that source consumers directly. These companies typically operate consumer-branded websites and attract consumers via online banner ads, keyword placement on search engines, direct mail, television ads, retail branches, realtors, brokers, radio and other sources, partnerships with affiliates and business development arrangements with others, including major online portals.

Table of Contents

## Corporate History

LendingTree, Inc. is currently the parent of LendingTree, LLC and several companies owned by LendingTree, LLC. We were originally incorporated in the state of Delaware in June 1996 and commenced nationwide operations in July 1998.

In May 2003, IAC/InterActiveCorp ("IAC") acquired LendingTree, LLC, which at the time of the acquisition was known as LendingTree, Inc. Following the acquisition, in December 2004 , IAC converted LendingTree, Inc. to a Delaware limited liability company, LendingTree, LLC.

In April 2008, IAC formed Tree.com, Inc. (now known as LendingTree, Inc.), a Delaware corporation, which held all of the ownership interests of LendingTree, LLC. In August 2008, Tree.com Inc., including its wholly-owned subsidiary, LendingTree, LLC, was spun off from IAC and became the separately publicly-traded company that we are today.

Effective January 1, 2015, we changed our name from Tree.com, Inc. to LendingTree, Inc.

## Regulation and Legal Compliance

We market and provide services in heavily regulated industries through a number of different online and offline channels across the United States. As a result, we are subject to a variety of federal and state laws and regulations, including:

- The Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Fair Housing Act, the Real Estate Settlement Procedures Act ("RESPA"), and similar state laws, all of which place certain restrictions on the manner in which consumer loans are marketed and originated, and some of which impose restrictions on the amount and nature of fees that may be charged to lenders and real estate professionals for providing or obtaining consumer loan requests;

- The Dodd-Frank Wall Street Reform and Consumer Protection Act, which imposes, among other things, limitations on fees charged by mortgage lenders, and requirements related to mortgage disclosures;

- Federal and State licensing laws such as the Secure and Fair Enforcement of Mortgage Licensing Act of 2008 (the "SAFE Act");

- Federal and state laws, which impose restrictions on activities conducted through telephone, mail, email, mobile device or the Internet, including the Telemarketing Sales Rule ("TSR"), the Telephone Consumer Protection Act ("TCPA"), the CAN-SPAM Act and the Federal Trade Commission Act;

- Federal and state laws relating to offering of credit repair services to consumers, including such laws that impose restrictions on the usage and storage of consumer credit information such as the Credit Repair Organizations Act ("CROA") and the Fair Credit Reporting Act; and

- Federal and state laws and regulations relating to data privacy and security, such as the California Consumer Privacy Act ("CCPA"), which impact how we collect, use, store, share and otherwise process personal information of consumers and other individuals.

## Intellectual Property

We believe that our intellectual property and proprietary rights are vital to our success. To protect our intellectual property and proprietary rights in our brand, technology, products, services, data, improvements and inventions, we rely on a combination of patent, trademark, copyright, trade secret, and other laws, as well as contractual restrictions on disclosure, such as confidentiality agreements with strategic partners, employees, consultants and other third parties. However, we cannot guarantee that such laws or contractual restrictions will provide us with sufficient protection or that we have entered into confidentiality agreements with each party that has or may have had access to our confidential or proprietary information, know-how or trade secrets.

As we develop or identify new or improved proprietary technologies, we seek patent protection in the United States and abroad, as appropriate. As of December 31, 2019, we own one issued U.S. patent related to the system and method for collecting financial information over a global communications network, which expires in 2032.

Many of our services are offered under proprietary trademarks and service marks. We believe that our LendingTree trademark, which is applied to all of our services, including our acquired businesses, creates positive responses in network partners and consumers. We generally apply to register or secure by contract our principal trademarks and service marks as they are developed and used. As of December 31, 2019, we own 34 trademarks and service marks registered with the United States Patent and Trademark Office. These registrations can typically be renewed at 10-year intervals.

**Table of Contents**

In addition, we reserve and register domain names when and where we deem appropriate. As of December 31, 2019, we own over 1,500 registered domain names. We also have agreements with third parties that provide for the licensing of patented, copyrighted and other proprietary technology used in our business.

Our success will significantly depend on our ability to obtain, maintain, enforce and protect our intellectual property and proprietary rights and operate our business without infringing, misappropriating or otherwise violating any intellectual property or proprietary rights of third parties. However, there can be no assurance that our efforts will be successful. Even if our efforts are successful, we may incur significant costs in defending our intellectual property and proprietary rights or combatting allegations by third parties. From time to time, we may be subject to legal proceedings or claims, or threatened legal proceedings or claims, including allegations of infringement, misappropriation or other violations of third-party patents, trademarks, copyrights, trade secrets or other intellectual property or proprietary rights of third parties. In addition, the use of litigation and other dispute resolution processes, such as Uniform Domain Name Dispute Resolution, may be necessary for us to enforce our intellectual property rights, including our trade secrets, or to determine the validity and scope of intellectual property or proprietary rights claimed by others. See "Risk Factors" for a more comprehensive description of risks related to our intellectual property.

**Employees**

As of December 31, 2019, we had 1,107 employees, of which approximately 1,095 are full-time and 12 are temporary or part-time. None of our employees are represented under collective bargaining agreements and we consider our relations with employees and independent contractors to be good.

**Additional Information**

**Website and Public Filings**

We maintain a corporate website at *www.lendingtree.com* and an investor relations website at *investors.lendingtree.com*. None of the information on or accessible through our websites is incorporated by reference in this report, or in any other filings with, or in any information furnished or submitted to, the Securities and Exchange Commission (the "SEC").

We make available, free of charge through our website, our reports on Forms 10-K, 10-Q and 8-K, our proxy statement for the annual shareholders' meeting and beneficial ownership reports on Forms 3, 4 and 5 as soon as reasonably practicable after we file such material with, or furnish such material to, the SEC. Our filings with the SEC are available to the public at the SEC's website at *www.sec.gov*.

**Code of Business Conduct and Ethics**

Our code of business conduct and ethics, which applies to all employees, including all executive officers and senior financial officers and directors, is posted on the investor relations section of our website. This is our code of ethics pursuant to Item 406 of SEC Regulation S-K and the rules of The Nasdaq Stock Market. Any amendments to or waivers of the code of business conduct and ethics that are of the type described in Item 406(b) and (d) of Regulation S-K will be disclosed on our website or in public filings to the extent required by the applicable rules.

Table of Contents

## ITEM 1A.  *Risk Factors*

*Investing in our common stock involves a high degree of risk. Before making an investment decision, you should carefully consider the risks described below, together with all of the other information included in this annual report and the information incorporated by reference herein. If any of the risks described below, or incorporated by reference into this annual report actually occur, our business, financial condition or results of operations could suffer. In that case, the trading price of our common stock may decline and you may lose all or part of your investment. The risks and uncertainties we have described are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also affect our business, financial condition and results of operations. Certain statements below are forward-looking statements. See the information included under the heading "Cautionary Statement Regarding Forward-Looking Information" included elsewhere in this annual report.*

### Risks Related to Our Business and Industry

***Adverse conditions in the primary and secondary mortgage markets, as well as the general economy, could have a material adverse effect on our business, financial condition and results of operations.***

Constraints in the primary and secondary mortgage markets in the past have had, and may in the future have, an adverse effect on our business, financial condition and results of operations. Generally, increases in interest rates adversely affect the ability of our mortgage Network Partners to close loans, and adverse economic trends limit the ability of our mortgage Network Partners to offer home loans other than low-margin conforming loans. Our businesses may experience a decline in demand for their offerings due to decreased consumer demand as a result of the conditions described above, now or in the future. The decreased consumer demand for mortgage refinancing typically leads to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. While higher lender demand during these periods often leads to an increase in the amount lenders will pay per matched lead and higher revenue earned per consumer, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising interest rate environment. Conversely, during periods with decreased interest rates, mortgage Network Partners have less incentive to use our marketplaces, or in the case of sudden increases in consumer demand, our mortgage Network Partners may lack the ability to support sudden increases in volume. Situations like this could have a material adverse effect on our business, financial condition and results of operations.

***We depend on relationships with our Network Partners and any adverse changes in these relationships could adversely affect our business, financial condition and results of operations.***

Our success depends in significant part on the financial strength of lenders and lead purchasers participating on our marketplaces and continuing relationships with such lenders and lead purchases. Network Partners could, for any reason, experience financial difficulties and cease participating on our marketplaces, fail to pay match and/or closing fees when due and/or drop the quality of their services to consumers. We could also have commercial or other disputes with such Network Partners from time to time. The occurrence of one or more of these events with a significant number of Network Partners could, alone or in combination, have a material and adverse effect on our business, financial condition and results of operations.

***If we fail to meet certain metrics required by Network Partners, then our business and financial results may be harmed.***

We compete against other online marketing companies in significant part based on the quality and convertibility of the leads we generate. Network Partners have expectations as to the quality and conversion rate of the leads that we generate, and such expectations could change over time. The leads that we supply to Network Partners may not meet the expectations that they have for such leads. Conversion rates for leads may be impacted by factors other than the lead quality, many of which are outside our control. Such factors include competition in lending and insurance markets and sales practices of Network Partners. Failure to meet the expectations of Network Partners in terms of quality and convertibility of leads may result in reduced fees paid to us by such Network Partners, or in extreme cases, the loss of one or more Network Partners, which could materially and adversely affect our business, financial condition and results of operations.

***Failure to maintain our reputation and brand recognition and attract and retain consumers in a cost-effective manner could materially and adversely affect our business, financial condition and results of operations. As such, adverse publicity from litigation or governmental investigations could impact our business and financial condition and results of operations.***

In order to attract visitors to our websites, convert these visitors into loan or other financial product requests for our Network Partners and lead purchasers and generate repeat visits from consumers, our businesses must promote and maintain their reputations and various brands. Brand promotion and maintenance requires the expenditure of considerable money and resources for online and offline advertising, marketing and related efforts, as well as the continued provision and introduction of high-quality products

Table of Contents

and services that meet the needs of consumers at competitive prices, the ability to maintain consumers' trust, and the ability to successfully differentiate our brand, products and services from those of our competitors.

Brand recognition is a key differentiating factor among providers of online services. We believe that continuing to build and maintain the recognition of our various brands is critical to achieving increased demand for the services provided by our businesses. Accordingly, we have spent, and expect to continue to spend, significant amounts on, and devote significant resources to, branding, advertising and other marketing initiatives, which may not be successful or cost-effective. Our brand promotion activities may not generate consumer awareness or yield increased revenue, and even if they do, any increased revenue may not offset the expenses we incur in building our brand.

Adverse publicity and the potential corresponding impact on our reputation may be accelerated and amplified by the widespread use of social media platforms. Furthermore, adverse publicity, from legal proceedings against us or our businesses, including governmental proceedings and consumer class action litigation, or the disclosure of information from security breaches or other incidents, could negatively impact our reputation and our various brands, which could materially and adversely affect our business and financial condition and results of operations. In addition, the actions of our third-party marketing partners who engage in advertising on our behalf could negatively impact our reputation and our various brands.

The failure of our businesses to maintain or enhance the reputation and recognition of their respective brands and attract and retain consumers in a cost-effective manner could materially and adversely affect our business, financial condition and results of operations.

***We are subject to risks relating to the bankruptcy of our Home Loan Center, Inc. subsidiary, including risks of claims against us and our operating subsidiaries.***

Our subsidiary Home Loan Center, Inc. ("HLC") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in order to preserve assets for the benefit of all creditors of HLC. In September 2019, the Bankruptcy Court converted the bankruptcy to Chapter 7 of the Bankruptcy Code and appointed a Trustee to liquidate HLC's assets. We refer to HLC's filing and the subsequent process under the Bankruptcy Code as the HLC bankruptcy.

In its filings with the Bankruptcy Court, HLC has indicated that it believes it has claims against HLC's sole shareholder, our operating subsidiary LendingTree, LLC, and its former sole director (our Chairman and Chief Executive Officer), relating to the declaration of a dividend by HLC in January 2016 of $40.0 million. We believe the declaration of the dividend was proper, that the amounts paid to LendingTree, LLC following such declaration are not subject to recovery by HLC and that any claims by HLC relating to the dividend declaration are without merit, and we intend to vigorously contest such claims.

As a result of its filings with the Bankruptcy Court, certain creditors have, and it is possible that certain other creditors will, assert claims directly against our company or one or more of our wholly-owned subsidiaries not included as debtors in the HLC bankruptcy, which we refer to as non-debtor parties, on various legal theories. While we are not aware of a basis for any material claims of this nature, any such assertions of claims by HLC creditors may require significant effort, resources and money to defend and could result in losses to us. Moreover, our management may be required to spend a significant amount of time and effort dealing with the HLC bankruptcy, which could have an adverse impact on our ability to execute our business plan and operations. *See* Note 20—Discontinued Operations to the consolidated financial statements included elsewhere in this annual report for a discussion of the accounting for HLC's bankruptcy filing.

***We depend on search engines, online advertising and other online sources to attract visitors to our websites, and if we are unable to attract these visitors and convert them into consumer requests for our Network Partners in a cost-effective manner, our business and financial results may be harmed.***

Our success depends on our ability to attract online consumers to our websites and convert them into customers in a cost-effective manner. We depend, in part, on search engines, online advertising and other online sources for our website traffic. We are included in search results as a result of both paid search listings, where we purchase specific search terms that result in the inclusion of our advertisement, and, separately, organic searches, that depend upon the searchable content on our sites. Search engines and other online sources revise their algorithms, and introduce new advertising products, from time to time in an attempt to optimize their search results.

If one or more of the search engines or other online sources on which we rely for website traffic were to modify its general methodology for how it displays our websites, resulting in fewer consumers clicking through to our websites, our business could suffer. In addition, if our online advertisements are not able to reach certain consumers due to consumers' use of ad-blocking software or other ad-blocking capabilities, our business could suffer. Furthermore, if any free search engine traffic on which we rely begins charging fees for listing or placement, or if one or more of the search engines or other online sources on which we rely for purchased listings, modifies or terminates its relationship with us, our expenses could rise, we could lose customers, and traffic

11

Table of Contents

to our websites could decrease, all of which could have a material adverse effect on our business, financial condition and results of operations.

***We participate in a highly competitive market, and pressure from existing and new competitors may materially and adversely affect our business, results of operations and financial condition. If any of our competitors are more successful than we are at attracting and retaining customers or Network Partners, our business, financial condition and results of operations could be materially and adversely affected.***

We currently compete with a number of other online marketing companies and we expect that competition will intensify. We also face the possibility of new competitors. Some of these existing competitors may have more capital or complementary products or services than we do, and they may leverage their greater capital or diversification in a manner that adversely affects our competitive position, including by making strategic acquisitions. In addition, new competitors may enter the market and may be able to innovate and bring products and services to market faster, or anticipate and meet consumer or Network Partner demand before we do. Other newcomers, including major search engines and content aggregators, may be able to leverage their existing products and services or access to data to our disadvantage. We may be forced to expend significant resources to remain competitive with current and potential competitors. If any of our competitors are more successful than we are at attracting and retaining customers or Network Partners, our business, financial condition and results of operations could be materially and adversely affected.

***Our success depends, in part, on the integrity of our systems and infrastructures. System interruption and the lack of integration and redundancy in these systems and infrastructures may have a material and adverse impact on our business, financial condition and results of operations.***

Our success depends, in part, on our ability to maintain the integrity of our systems and infrastructures, including websites, information and related systems, call centers and distribution and fulfillment facilities. System interruption and the lack of integration and redundancy in our information systems and infrastructures may materially and adversely affect our ability to operate websites, process and fulfill transactions, respond to customer inquiries and generally maintain cost-efficient operations. We may experience occasional system interruptions that make some or all systems or data unavailable or prevent our businesses from efficiently providing services or fulfilling orders. We also rely on affiliate and third-party computer systems, broadband and other communications systems and service providers in connection with the provision of services generally, as well as to facilitate, process and fulfill transactions. Any interruptions, outages or delays in our systems and infrastructures, our businesses, our affiliates and/or third parties, or deterioration in the performance of these systems and infrastructures, could impair the ability of our businesses to provide services, fulfill orders and/or process transactions. Fire, flood, power loss, telecommunications failure, hurricanes, tornadoes, earthquakes, acts of war or terrorism, acts of God, unauthorized intrusions or computer viruses, and similar events or disruptions may damage or interrupt computer, broadband or other communications systems and infrastructures at any time. Any of these events could cause system interruption, delays and loss of critical data, and could prevent our businesses from providing services, fulfilling orders and/or processing transactions. While our businesses have backup systems for certain aspects of their operations, these systems are not fully redundant and disaster recovery planning is not sufficient for all eventualities. In addition, we may not have adequate insurance coverage to compensate for losses from a major interruption. If any of these events were to occur, it could materially and adversely affect our business, financial condition and results of operations.

We are continuously developing, updating, and rewriting critical platforms that support our business. The risks associated with this work includes, but is not limited to, operational implementation, downtimes, and diversion of management and technical resources. If the work is more challenging or time consuming than expected, then our business, financial condition and results of operations could be materially and adversely affected.

***Breaches or failures of our systems or website security, the theft, unauthorized access, acquisition, use, disclosure, modification or misappropriation of personal information, the occurrence of fraudulent activity, or other data security-related incidents may have a material and adverse impact on our business, financial condition and results of operations.***

In the processing of consumer transactions, our businesses collect, use, store, disclose, transfer, and otherwise process a large volume of personal information and other confidential, proprietary and sensitive data. Breaches or failures of security involving our systems or website or those of any of our affiliates, Network Partners or external service providers may occur, and could result in the theft, unauthorized access, acquisition, use, disclosure, modification or misappropriation of personal information of our consumers, employees or third parties with whom we conduct business, or other confidential, proprietary and sensitive data, fraudulent activity, or system disruptions or shutdowns. The occurrence of any actual or attempted breach, failure of security or fraudulent activity, the reporting of such an incident, whether accurate or not, or our failure to make adequate or timely disclosures to the public or law enforcement agencies following any such event, whether due to delayed discovery or a failure to follow existing protocols, could result in claims made against us or our affiliates, Network Partners or external service providers, which could result in state and/or federal litigation and related financial liabilities, as well as criminal penalties or civil liabilities, regulatory

Table of Contents

actions from state and/or federal governmental authorities, and significant fines, orders, sanctions, litigation and claims against us by consumers or third parties and related indemnification obligations. Actual or perceived security breaches or failures could also cause financial losses, increased costs, interruptions in the operations of our business, misappropriation of assets, significant damage to our brand and reputation with consumers and third parties with whom we do business, and result in adverse publicity, loss of consumer confidence, distraction to our management, and reduced sales and profits, any or all of which could have a material and adverse impact on our business, financial condition and results of operations.

Such breaches, failures and fraudulent activity may take many forms, including check fraud, fraudulent inducement, electronic fraud, wire fraud, computer viruses, phishing, social engineering, denial or degradation of service attacks, malware, ransomware or other cyber-attacks, and other dishonest acts, any of which could be the result of a circumvention or failure of our data security processes, procedures, tools, and controls. Our systems are also subject to compromise from internal threats, such as theft, misuse, unauthorized access or other improper actions by employees, external service providers and other third parties with otherwise legitimate access to our systems and website. Data security-related incidents and fraudulent activity are increasing in frequency and evolving in nature. We rely on a framework of security, processes, procedures, tools, and controls designed to protect our information and assets but, given the unpredictability of the timing, nature and scope of data security-related incidents and fraudulent activity, there can be no assurance that any security procedures and controls that we or our external service providers have implemented will be sufficient to prevent data security-related incidents or other fraudulent activity from occurring. Furthermore, because the methods of attack and deception change frequently, are increasingly complex and sophisticated, and can originate from a wide variety of sources, including third parties such as external service providers and even nation-state actors, despite our reasonable efforts to ensure the integrity of our systems and website, it is possible that we may not be able to anticipate, detect, appropriately react and respond to, or implement effective preventative measures against, all security breaches and failures and fraudulent activity. As a result, our business, financial condition or results of operations could be materially and adversely affected.

We also face risks associated with security breaches affecting third parties with whom we are affiliated or otherwise conduct business. Due to applicable laws and regulations or contractual obligations, we may be held responsible for any breach, failure or fraudulent activity attributed to our affiliates, Network Partners or external service providers as they relate to the information we share with them. In addition, because we do not control our Network Partners or external service providers and our ability to monitor their data security is limited, we cannot ensure the security measures they take will be sufficient to protect our information. We may be required to expend significant capital and other resources to protect against, respond to, and recover from any potential, attempted, or existing security breaches or failures and their consequences. As data security-related threats continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any information security vulnerabilities. In addition, our remediation efforts may not be successful. The inability to implement, maintain and upgrade adequate safeguards could have a material and adverse impact on our business, financial condition and results of operations. Moreover, there could be public announcements regarding any data security-related incidents and any steps we take to respond to or remediate such incidents, and if securities analysts or investors perceive these announcements to be negative, it could, among other things, have a substantial adverse effect on the price of our common stock. Consumers are generally concerned with security and privacy of the internet, and any publicized security problems affecting our businesses or those of third parties with whom we are affiliated or otherwise conduct business may discourage consumers from doing business with us, which could have a material and adverse effect on our business, financial condition and results of operations.

While we currently maintain cybersecurity insurance, such insurance may not be sufficient in type or amount to cover us against claims related to breaches, failures or other data security-related incidents, and we cannot be certain that cyber insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material and adverse effect on our business, financial condition and results of operations.

***Difficult market conditions have adversely affected the mortgage industry.***

Declines in the housing market from 2006 through early 2012, as measured by the S&P/Case-Schiller 20-city composite home price index, with home price declines and increased foreclosures, unemployment and under-employment, negatively impacted the credit performance of mortgage loans and resulted in significant write-downs of asset values by financial institutions, including government-sponsored entities as well as major commercial and investment banks. These write-downs, initially of mortgage-backed securities but subsequently of other asset-backed securities, credit default swaps and other derivative and cash securities, in turn, caused many financial institutions to seek additional capital, merge with larger and stronger institutions and, in some cases, to fail.

Reflecting concern about the stability of the housing markets generally and the strength of counterparties, many lenders and institutional investors reduced or ceased providing funding to borrowers, including to other financial institutions. This market disruption and tightening of credit led to an increased level of commercial and consumer delinquencies, lack of consumer confidence

13

and increased market volatility. The resulting economic pressure on consumers and lack of confidence in the financial markets has had in the past and may have in the future, an adverse effect on our business, financial condition and results of operations.

While conditions in the housing markets have improved since 2013, the failure to sustain such improvements could have adverse effects on us and our mortgage Network Partners. Further, our business could be adversely affected by the actions and commercial soundness of other businesses in the financial services sector, including our non-lender lead purchasers. As a result, defaults by, or even rumors or questions about, one or more of these entities, or the financial services industry generally, have in the past, and may in the future, lead to market-wide liquidity problems and could lead to disruptions in the financial technology industry. Any such disruption could have a material and adverse effect on our business, financial condition and results of operations.

***A significant portion of our revenue growth in 2019, 2018 and 2017 has been driven by our credit card product.***

Our credit card product offering is subject to particular risks:

- adverse conditions in the economy may affect credit card issuers and their willingness to issue new credit;
- credit losses among credit card issuers may increase beyond normal and budgeted levels which could cause a reduction in demand;
- interest rate increases may make balance transfer cards less profitable for issuers;
- credit card issuers and other advertisers in the business verticals in which we operate may be unwilling to advertise on our websites or mobile applications;
- changes in application approval rates by credit card issuer customers;
- increased competition and its effect on our website traffic, click-through rates, advertising rates, revenue, margins, and market share;
- ability to provide competitive service to credit card issuers and to consumers using our online offerings and other platforms;
- credit card issuers may determine that the online digital marketing channel is no longer a viable marketing platform for generating new credit card customers;
- our ability to maintain brand recognition for both LendingTree and CompareCards and to effectively leverage the LendingTree brand with the CompareCards brand; and
- our ability to develop new products and services and enhance existing ones.

If our credit card product is impacted by the risks described above, then our results of operations and future growth prospects could be materially and adversely affected.

***A significant portion of our revenue growth in 2019 and 2018 has been driven by our insurance leads business through our acquisition of QuoteWizard, which was completed in October 2018.***

The QuoteWizard acquisition poses risks for our ongoing operations, including, among others:

- adverse conditions in the economy may affect insurance carriers and their willingness to issue policies;
- covered losses among insurance carriers may increase beyond normal and budgeted levels which could cause a reduction in demand;
- insurance carriers and other advertisers in the business verticals in which we or QuoteWizard operate may be unwilling to advertise on our or QuoteWizard's websites or mobile applications;
- major publishers may determine they no longer want QuoteWizard as an advertising partner;
- changes in underwriting approval rates by insurance carrier customers;
- increased competition and its effect on our or QuoteWizard's website traffic, click-through rates, advertising rates, revenue, margins, and market share;
- the cost of media may rise at a faster pace than QuoteWizard's monetization of traffic;
- ability to provide competitive service to insurance carriers and to consumers using QuoteWizard's and our online offerings and other platforms;

14

[Table of Contents](#)

- insurance carriers may determine that the online digital marketing channel is no longer a viable marketing platform for generating new insurance customers;
- government regulatory agencies may hinder or disallow the operation of QuoteWizard's marketplace;
- our ability to maintain brand recognition for both LendingTree and QuoteWizard and to effectively leverage the LendingTree brand with the QuoteWizard brand;
- our ability to develop new products and services and enhance existing ones;
- our ability to retain key employees of QuoteWizard;
- costs and expenses associated with any undisclosed or potential liabilities;
- that the business acquired in the acquisition may not continue to perform as well as anticipated; and
- assumed liabilities associated with QuoteWizard's historical operations, including liabilities arising from privacy and security regulations or security breaches.

If the QuoteWizard business is impacted by the risks described above, then our results of operations and future growth prospects could be materially and adversely affected.

***A portion of our revenue growth in recent years has been driven by personal loan offerings. If lenders participating on our marketplace decide to reduce their offerings of personal loans or if such loans become unattractive to consumers because of higher interest rates demanded by lenders, then our results of operations and future growth prospects could be materially and adversely affected.***

Revenue from personal loan offerings was responsible for a significant portion of the growth in the Consumer segment revenue over the last few years. Revenue from our personal loan product increased $18.5 million in 2019 from 2018 and $46.0 million in 2018 from 2017.

Personal loans are unsecured obligations and generally carry shorter terms and smaller loan amounts than mortgages. Because they are unsecured, they are generally riskier assets for lenders than mortgages or other secured loans. Consumer demand for unsecured loans offered on our marketplace is often for refinancing of higher interest credit card debt or for a lower interest alternative to credit card debt for a contemplated larger purchase that would otherwise be purchased with a credit card. Lenders participating on our marketplace may reduce their willingness to make personal loans at more attractive interest rates than credit card debt and may for that reason, or for any other reason, reduce their demand for personal consumer requests generated from our personal loan marketplace. Reasons that lenders might reduce their willingness to make personal loans at attractive interest rates may include regulatory changes, stricter institutional lending criteria, a lack of adequate funding sources or capital for loan originations, or increased borrower default levels, which may occur upon adverse changes in regional, national or global economic conditions. Additionally, lenders may tighten their underwriting standards, making it more difficult for consumers to qualify for personal loans. Personal loan lenders are increasingly focused on profitability and are attempting to reduce their acquisition costs of new customers. If lenders participating on our marketplace decide to reduce their offerings of personal loans, tighten their underwriting standards, are successful at reducing their acquisition costs of new customers or if personal loans become unattractive to consumers because of higher interest rates demanded by lenders, then our results of operations and future growth prospects could be materially and adversely affected.

***Network Partners affiliated with our marketplaces are not precluded from offering products and services outside of our marketplaces, or obtaining products and services from our competitors.***

Because our businesses do not have exclusive relationships with Network Partners, consumers may obtain loans and other financial products from these third-party service providers without having to use our marketplaces. Network Partners can offer loans and other financial products directly to consumers through their own marketing campaigns or other traditional methods of distribution, such as referral arrangements, physical store-front operations or broker agreements. Network Partners may also offer loans and other financial products and services to prospective customers online directly, through one or more online competitors of our businesses, or both. If a significant number of consumers seek loans and other financial products and services directly from Network Partners or through our competitors as opposed to through our marketplaces, our business, financial condition and results of operations could be materially and adversely affected.

15

Table of Contents

***Some of our products are new to the market and may fail to achieve or maintain customer acceptance and profitability.***

We have launched a number of new products over the last several years. We do not have as much experience with these new products as with the other more mature products. Accordingly, new products may be subject to greater risks than our more mature products.

The success of new products we may offer will depend on a number of factors, including:

- Implementing, at an acceptable cost, product features offered by our competitors and/or expected by consumers, lenders and lead purchasers;
- Market acceptance by consumers, lenders and lead purchasers;
- Offerings by current and future competitors;
- Our ability to attract and retain management and other skilled personnel for these businesses;
- Our ability to collect amounts owed to us from third parties;
- Our ability to develop successful and cost-effective marketing campaigns; and
- Our ability to timely adjust marketing expenditures in relation to changes in demand for the underlying products and services offered by our Network Partners.

Our results of operations may suffer if we fail to successfully anticipate and manage these issues associated with new products.

***If we are unable to continually enhance our products and services and adapt them to technological changes and consumer and lender and/or lead purchaser needs, including the emergence of new computing devices and more sophisticated online services, we may lose market share and revenue and our business could suffer.***

We need to anticipate, develop and introduce new products, services and applications on a timely and cost-effective basis that keep pace with technological developments and changing consumer and customer needs. For example, the number of individuals who access the internet through devices other than a personal computer, such as tablets, mobile telephones, voice assistants, televisions and set-top box devices has increased significantly and this trend is likely to continue. Because each manufacturer or distributor may establish unique technical standards for its devices, our websites may not be functional or viewable on these devices. Additionally, new devices and new platforms are continually being released. Consumers access many traditional web services on mobile devices through applications, or apps.

It is difficult to predict the problems we may encounter in improving our websites' functionality with these alternative devices or developing apps for mobile platforms. If we fail to develop our websites or apps to respond to these or other technological developments and changing consumer and customer needs cost effectively, or if consumers and customers respond negatively to changes, we may lose market share, which could materially and adversely affect our business, financial condition and results of operations.

***We improve our products and services in ways that forego short-term gains.***

We are constantly striving to improve the user experience for our consumers who use our websites and applications and for our Network Partners. Some of our changes may have the effect of reducing our short-term revenue or profitability if we believe that the benefits will ultimately improve our financial performance over the long-term. Any short-term reductions in revenue or profitability could be more severe than we anticipate or these decisions may not produce the long-term benefits that we expect, in which case our business and results of operations could be adversely affected.

***We may fail to adequately obtain, maintain, enforce and protect our intellectual property and similar proprietary rights or may be accused of infringing, misappropriating or otherwise violating intellectual property or similar proprietary rights of third parties.***

We regard our intellectual property rights, including our patents, trademarks, service marks, copyrights, domain names, trade secrets and similar intellectual property and proprietary rights (as applicable), as critical to our success. Our businesses also rely heavily upon software, informational databases and other components that make up their products and services.

We rely on a combination of laws, confidentiality procedures and contractual restrictions with employees, consumers, suppliers, affiliates and others to establish and protect our intellectual property and similar proprietary rights. However, the steps we take to obtain, maintain, enforce and protect our intellectual property and similar proprietary rights may be inadequate. We may not be able to protect our intellectual property and similar proprietary rights if we are unable to enforce our rights or if we do not detect unauthorized use of our intellectual property or similar proprietary rights. If we fail to protect our intellectual property and similar

16

Table of Contents

proprietary rights adequately, third parties, including our competitors, may gain access to our intellectual property and proprietary technology and develop and commercialize substantially identical products, services or technologies, which would harm our business, financial condition and results of operations. Despite the precautions we have in place, it may be possible for a third party to copy or otherwise obtain and use our intellectual property, including our trade secrets, without authorization. In addition, third parties may independently and lawfully develop substantially similar intellectual property.

In some cases, litigation or other actions may be necessary to protect or enforce our intellectual property and similar proprietary rights or to determine the validity and scope of intellectual or proprietary rights claimed by others. Defending, protecting and enforcing our intellectual property and similar proprietary rights might entail significant expense or be time-consuming or distracting to management. Further, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims, and countersuits attacking the validity and enforceability of our intellectual property rights, and if such defenses, counterclaims or countersuits are successful, we could lose valuable intellectual property rights. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential or sensitive information could be compromised by disclosure in the event of litigation.

We have generally registered and continue to apply to register, or secure by contract when appropriate, our principal trademarks and service marks as they are developed and used, and reserve and register domain names when and where we deem appropriate. We generally consider the protection of our trademarks to be important for purposes of brand maintenance and reputation. While we strive to protect our trademarks, service marks and domain names, effective trademark protection may not be available or may not be sought in every country in which our products and services are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of our brand names and reputation, and limit our ability to control marketing on or through the Internet using our various domain names or otherwise, which could materially and adversely impact our business, financial condition and results of operations. The value of our intellectual property could diminish if others assert rights in or ownership of our trademarks and other intellectual property rights, or trademarks that are similar to our trademarks. We may be unable to successfully resolve these types of conflicts to our satisfaction.

We have been granted one U.S. patent and from time to time we may have patent applications pending with the United States Patent and Trademark Office and various foreign patent authorities for various proprietary technologies and other inventions. The status of any patent involves complex legal and factual questions, and the breadth of claims allowed is uncertain. Accordingly, any patent application filed may not result in a patent being issued, or existing or future patents may not be adjudicated valid by a court or be afforded adequate protection against competitors with similar technology. Even if we continue to seek patent protection in the future, we may be unable to obtain or maintain patent protection for our technology. In addition, any patents issued from pending or future patent applications or licensed to us in the future may not provide us with competitive advantages, or may be successfully challenged by third parties. Likewise, the issuance of a patent to us does not mean that our processes or inventions will be found not to infringe upon patents or other intellectual property rights of third parties. There may be issued patents of which we are not aware, held by third parties that, if found to be valid and enforceable, could be alleged to be infringed by our current or future processes or inventions. There also may be pending patent applications of which we are not aware that may result in issued patents, which could be alleged to be infringed by our current or future processes or inventions. Moreover, third parties may create new products or methods that achieve similar results without infringing upon patents that we own.

Any patents, trademarks or other intellectual property rights that we have or may obtain may be challenged or circumvented by others or invalidated or held unenforceable through administrative process, including re-examination, *inter partes* review, interference and derivation proceedings and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings) or litigation. Furthermore, legal standards relating to the validity, enforceability, and scope of protection of intellectual property rights are often uncertain. Patent, trademark, copyright, and trade secret protection may not be available to us in every country in which we do business. In addition, the laws of some foreign countries may not be as protective of intellectual property rights as those in the United States, and mechanisms for enforcement of intellectual property rights may be inadequate. As we expand our activities, our exposure to unauthorized copying and use of our intellectual property and similar proprietary rights will likely increase. Moreover, policing unauthorized use of our intellectual property and similar proprietary rights may be difficult, expensive, and time-consuming, particularly in foreign countries where the laws may not be as protective of intellectual property rights as those in the United States and where mechanisms for enforcement of intellectual property rights may be weak. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing, misappropriating or otherwise violating our intellectual property or similar proprietary rights.

We cannot ensure that all persons and entities contributing to our intellectual property have validly assigned to us all applicable intellectual property rights they may have or that we will be able to enforce our rights under any such agreements. Moreover, we cannot guarantee that we have entered into confidentiality agreements with each party that has or may have had access to our confidential or proprietary information, know-how and trade secrets, or that any such confidentiality agreements will be effective in controlling access to, and distribution, use, misuse, misappropriation, reverse engineering or disclosure of, our confidential or

17

Table of Contents

proprietary information, know-how and trade secrets. These agreements may be breached, and we may not have adequate remedies for any such breach.

***We may become subject to intellectual property disputes, which are costly and may subject us to significant liability and increased costs of doing business.***

From time to time, in the ordinary course of business we are subjected to actual and threatened legal proceedings, claims and counterclaims, including allegations relating to infringement of the patents, trademarks, copyrights and other intellectual property and similar proprietary rights, and misappropriation of trade secrets, of third parties. Our success depends, in part, on our ability to develop and commercialize our products and services without infringing, misappropriating or otherwise violating the intellectual property rights of third parties. However, we may not be aware that our products or services are infringing, misappropriating or otherwise violating third-party intellectual property rights and such third parties may bring claims alleging such infringement, misappropriation or violation. Lawsuits are often time-consuming and expensive to resolve and they may divert management's time and attention. Our technologies may not be able to withstand any third-party claims against their use. In addition, many companies may have the capability to dedicate substantially greater resources to enforce their intellectual property rights and to defend claims that may be brought against them. If a third party is able to obtain an injunction preventing us from accessing third-party intellectual property rights, or if we cannot license or develop alternative technology for any infringing aspect of our business, we may be forced to limit or stop sales of our products and services or cease business activities related to such intellectual property. Our insurance may not cover potential claims of this type or may not be adequate to indemnify us for all liability that may be imposed. We cannot predict the outcome of lawsuits and cannot ensure that the results of any such actions will not have an adverse impact on our business, financial condition or results of operations. Uncertainties resulting from the initiation and continuation of intellectual property-related litigation or proceedings could adversely affect our ability to compete in the marketplace. Any intellectual property litigation to which we might become a party, or for which we are required to provide indemnification, may require us to do one or more of the following:

- cease selling or using products or services that incorporate the intellectual property rights that we allegedly infringe, misappropriate or violate;

- make substantial payments for legal fees, settlement payments or other costs or damages;

- obtain a license, which may not be available on reasonable terms or at all, to sell or use the relevant technology; or

- redesign or rebrand the allegedly infringing products or services to avoid infringement, misappropriation or violation, which could be costly, time-consuming or impossible.

Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could materially and adversely impact our business, financial condition and results of operations. Patent litigation tends to be particularly protracted and expensive. In addition, during the course of litigation there could be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a substantial adverse effect on the price of our common stock or other adverse consequences.

***Our framework for managing risks may not be effective in mitigating our risk of loss. If our risk management framework does not effectively identify or mitigate our risks, we could suffer unexpected losses and could be materially and adversely affected.***

In order to manage the significant risks inherent in our business, management has adopted risk and control frameworks that enable us to identify, monitor and control our exposure to material risks. Our risk management framework seeks to mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, monitor and report the types of risk to which we are subject, including credit, market, liquidity, operational, reputational, legal and compliance, and strategic risks. We seek to monitor and control our risk exposure through a framework of policies, procedures and reporting requirements. Our risk management methods may prove to be ineffective due to their design, their implementation or the degree to which we adhere to them, or as a result of the lack of adequate, accurate or timely information or otherwise. Any failure or circumvention of our controls, processes and procedures or failure to comply with regulations could necessitate changes in those controls, processes and procedures, which may increase our compliance costs, divert management's attention from our business or subject us to regulatory actions and increased regulatory scrutiny. There may also be risks that exist, or that develop in the future, that we have not appropriately anticipated, identified or mitigated. If our risk management framework does not effectively identify or mitigate our risks, we could suffer unexpected losses and our business and results of operations could be materially and adversely affected.

***The intended benefits of recent acquisitions may not be realized.***

Our acquisitions pose risks for our ongoing operations, including, among others:

18

Table of Contents

- that senior management's attention may be diverted from the management of daily operations to the integration of the businesses acquired in the acquisition;

- we may be unable to retain key employees of businesses acquired;

- our ability to fully integrate the businesses acquired;

- costs and expenses associated with any undisclosed or potential liabilities;

- that the businesses acquired in the acquisition may not perform as well as anticipated;

- adverse conditions in the economy may affect the lenders or insurance carriers or other customers of the acquired businesses and their willingness to issue new credit, write new policies or otherwise expand their businesses;

- advertisers in the business verticals in which we or the acquired businesses operate may be unwilling to advertise on our websites or mobile applications;

- increased competition and its effect on our or the acquired businesses' website traffic, click-through rates, submitted consumer requests, advertising rates, revenue, margins, and market share;

- our ability to maintain brand recognition for both us and the acquired businesses and to effectively leverage the LendingTree brand with the newly acquired brands;

- our ability to develop new products and services and enhance existing ones;

- assumed liabilities associated with the historical operations of the acquired businesses, including as a result of privacy regulations or data breaches.

As a result of the foregoing, our acquisitions may not be accretive to us in the near term or at all. Furthermore, if we fail to realize the intended benefits of the business acquired in the acquisition, the market price of our common stock could decline to the extent that the market price reflects an expectation of those benefits.

***Other acquisitions or strategic investments that we pursue may not be successful and could disrupt our business and harm our financial condition.***

We may consider or undertake strategic acquisitions of, or material investments in, businesses, products or technologies. We may not be able to identify suitable acquisition or investment candidates, or even if we do identify suitable candidates, they may be difficult to finance, expensive to fund and there is no guarantee that we can obtain any necessary regulatory approvals or complete such transactions on terms that are favorable to us. To the extent we pay the purchase price of any acquisition or investment in cash or through borrowings under our Amended Revolving Credit Facility (as defined herein), it would reduce our cash balances and/or result in indebtedness we must service, which may have a material and adverse effect on our business and financial condition. If the purchase price is paid with our stock, it would be dilutive to our stockholders. In addition, we may assume liabilities associated with a business acquisition or investment, including unrecorded liabilities that are not discovered at the time of the transaction, and the repayment of those liabilities may have a material and adverse effect on our financial condition. There may also be litigation or other claims arising in connection with an acquisition itself.

We may not be able to successfully integrate the personnel, operations, businesses, products or technologies of an acquisition or investment. Integration may be particularly challenging if we enter into a line of business in which we have limited experience and the business operates in a difficult legal, regulatory or competitive environment. We may find that we do not have adequate operations or expertise to manage the new business. The integration of any acquisition or investment may divert management's time and resources from our core business, which could impair our relationships with our current employees, customers and strategic partners and disrupt our operations. Acquisitions and investments also may not perform to our expectations for various reasons, including the loss of key personnel and/or customers. If we fail to integrate acquisitions or investments or realize the expected benefits, we may lose the return on these acquisitions or investments or incur additional transaction costs and our business and financial condition may be harmed as a result.

***If we fail to manage our growth effectively, our business and results of operations could be harmed.***

We have experienced rapid and significant growth in our headcount and operations, including as a result of acquisitions, which places substantial demand on management and our operational infrastructure. As we continue to grow, we must effectively integrate, develop and motivate a large number of new employees, while maintaining the beneficial aspects of our company culture. If we do not manage the growth of our business and operations effectively, the quality of our services and efficiency of our operations could suffer, which could harm our business and results of operations.

19

Table of Contents

***We rely on the performance of highly skilled personnel and if we are unable to attract, retain, develop and motivate well-qualified employees, our business and results of operations could be harmed.***

We believe our success has depended, continues to and in the future will, depend, on the efforts and talents of our management team and our highly skilled employees and workers, including our software engineers, analysts, marketing professionals and sales staff. Our future success depends on our continuing ability to attract, develop and retain highly qualified and skilled employees. The loss of any of our senior management or key employees could materially and adversely affect our ability to build on the efforts that they have undertaken and to execute our business plan, and we may not be able to find adequate replacements. Despite our current efforts, we cannot ensure that we will be able to retain the services of any members of our senior management or other key employees. If we do not succeed in attracting well-qualified employees or developing, retaining and motivating existing employees, our business and results of operations could be harmed.

***Network Partners on our marketplaces may not provide competitive levels of service to consumers, which could materially and adversely affect our brands and businesses and their ability to attract consumers.***

The ability of our businesses to provide consumers with a high-quality experience depends, in part, on consumers receiving competitive levels of convenience, customer service, price and responsiveness from Network Partners participating on our other marketplaces with whom they are matched. If these providers do not provide consumers with competitive levels of convenience, customer service, price and responsiveness, the value of our various brands may be harmed, the ability of our businesses to attract consumers to our websites may be limited and the number of consumers matched through our marketplaces may decline, which could have a material and adverse effect on our business, financial condition and results of operations.

***A significant portion of our total revenue is derived from two Network Partners, and our results from operations could be adversely affected and stockholder value harmed if we lose significant business from either of these Network Partners.***

For the year ended December 31, 2019, one Network Partner accounted for 12% of total consolidated revenue. For the year ended December 31, 2017, another Network Partner accounted for 11% of total consolidated revenue. If either of these significant Network Partners were to cease purchasing consumer requests and we were unable to replace the associated demand, the loss could have a material adverse effect on our results of operations in the short term and potentially also the longer term. Also, if either Network Partner reduces its volume of consumer requests for any reason, our business could be adversely affected.

***Our current lack of geographic diversity exposes us to risk.***

Other than a support services office in India, our operations are geographically limited to and dependent upon the economic condition of the United States. As a result of this geographical concentration, we are more vulnerable to downturns or other conditions that affect the U.S. economy. We may choose to expand our operations in order to increase our geographic diversity, and if we do, such expansion would place increased responsibilities on our management, divert resources from other operations and expose us to new risks of foreign operations.

***We have incurred significant operating losses in the past and we may not be able to generate sufficient revenue to be profitable over the long term.***

We have incurred operating losses from continuing operations at times in our history, and although we were profitable in 2017, 2018 and 2019, we have an accumulated deficit of $592.7 million at December 31, 2019. If we fail to maintain or grow our revenue and manage our expenses, we may incur significant losses in the future and not be able to maintain profitability.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our operating results and financial condition.***

On December 22, 2017, President Trump signed into law the Tax Cuts and Jobs Act (TCJA), which legislation significantly reforms the Internal Revenue Code of 1986, as amended. This tax legislation significantly reduced the U.S. statutory corporate tax rate and made other changes that could have a favorable impact on our overall U.S. federal tax liability in a given period. However, the tax legislation also included a number of provisions, including, but not limited to, the limitation or elimination of various deductions or credits (including for interest expense and for performance-based compensation under Section 162(m) of the Internal Revenue Code), the changing of the timing of the recognition of certain income and deductions or their character, and the limitation of asset basis under certain circumstances, that could significantly and adversely affect our U.S. federal income tax position. The legislation also made changes to the tax rules applicable to financial institutions and other entities with which we do business.

We revalued deferred tax assets at December 31, 2017 considering the changes in the TCJA, and we recorded a net tax expense of $9.1 million during the fourth quarter of 2017.

20

Table of Contents

The impact of the TCJA and associated anticipated regulations on future years may be material to our consolidated financial statements. For example, we have historically relied extensively on performance-based compensation for our executive officers. The non-deductibility of future performance-based compensation to executive officers, and the expanded definition of "covered employees" whose compensation is subject to Section 162(m) may have material adverse effects on our effective tax rates. In addition, the limitations on the deductibility of interest may affect our anticipated tax benefits for the convertible note and hedge transactions described in Note 14—Debt to the consolidated financial statements included elsewhere in this annual report. Similarly, changes in tax laws and regulations that impact our Network Partners or the economy generally may also impact our financial condition and results of operations.

In addition, tax laws and regulations are complex and subject to varying interpretations, and any significant failure to comply with applicable tax laws and regulations in all relevant jurisdictions could give rise to substantial penalties and liabilities. Any changes in enacted tax laws (such as the recent U.S. tax legislation), rules or regulatory or judicial interpretations; any adverse outcome in connection with tax audits in any jurisdiction; or any change in the pronouncements relating to accounting for income taxes could materially and adversely impact our effective tax rate, tax payments, financial condition and results of operations.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2019, we had pre-tax consolidated federal net operating losses ("NOLs") of $188.2 million. The federal NOLs no longer expire under the new TCJA. Our NOLs will be available to offset taxable income subject to the limitations found in Internal Revenue Code Sections 382 and 383. In addition, we have state NOLs of approximately $484.7 million at December 31, 2019, that will expire at various times between 2021 and 2039. If we experience one or more ownership changes in the future as a result of future transactions in our stock, our ability to utilize NOLs could be limited. Our ability to use our NOLs was limited by the TCJA.

***We plan to relocate our corporate headquarters due to our growth.***

Our principal executive offices are currently located on approximately 37,800 square feet of office space in Charlotte, North Carolina under a lease that expires in December 2020. To accommodate our growth, we are expecting to relocate our principal executive offices and consolidate certain additional office space to a new location in Charlotte, North Carolina, in the first quarter of 2021. We will incur relocation costs associated with the movement of employees to our new principal executive offices or other sites. We may experience loss of employees or lost employee productivity resulting from this relocation and other work location changes necessitated by our growth. Any of these costs and risks may negatively impact our earnings and cause our stock price to decline.

***Our Amended Revolving Credit Facility contains financial covenants and other restrictions on our actions, and it could therefore limit our operational flexibility or otherwise adversely affect our financial condition. Failure to comply with the terms of any such facility could impair our rights to the assets that have been pledged as collateral under the facility.***

On December 10, 2019, our wholly-owned subsidiary LendingTree, LLC entered into an amended and restated $500.0 million five-year senior secured revolving credit facility (the "Amended Revolving Credit Facility"), which amended and restated our previous $350.0 million five-year senior secured revolving credit facility (the "2017 Revolving Credit Facility"). This Amended Revolving Credit Facility matures on December 10, 2024. Borrowings under the Amended Revolving Credit Facility can be used to finance working capital needs, capital expenditures, and general corporate purposes, including to finance permitted acquisitions. As of February 26, 2020, there was $50.0 million borrowed under the Amended Revolving Credit Facility.

The Amended Revolving Credit Facility contains a restrictive financial covenant, which limits the total consolidated debt to an EBITDA ratio. In addition, the Amended Revolving Credit Facility contains customary affirmative and negative covenants, including, subject to certain exceptions, restrictions on our ability to, among other things:

- incur additional indebtedness;

- grant liens;

- make loans and investments;

- enter into mergers or make certain fundamental changes;

- make certain restricted payments, including dividends, distributions, stock repurchases or redemptions;

- sell assets;

- enter into transactions with affiliates;

- enter into restrictive transactions;

Table of Contents

- enter into sale and leaseback transactions;

- enter into hedging transactions; and

- engage in certain other transactions without the prior consent of the lenders.

The Amended Revolving Credit Facility requires LendingTree, LLC to pledge as collateral, subject to certain customary exclusions, substantially all of its assets, including 100% of its equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none). The obligations under this facility are unconditionally guaranteed on a senior basis by LendingTree, Inc. and material domestic subsidiaries of LendingTree, LLC, which guaranties are secured by a pledge as collateral, subject to certain customary exclusions, of 100% of each such guarantor's assets, including 100% of each such guarantor's equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none).

If an event of default occurs or if we otherwise fail to comply with any of the negative or affirmative covenants of the Amended Revolving Credit Facility, the lenders may declare all of the obligations and indebtedness under such facility due and payable. In such a scenario, the lenders could exercise their lien on the pledged collateral, which would have a material adverse effect on our business, operations, financial condition and liquidity. For additional information on the Amended Revolving Credit Facility, *see* Note 14—Debt, in the notes to the consolidated financial statements included elsewhere in this annual report.

***If our goodwill or indefinite-lived intangible assets become impaired, we may be required to record a significant charge to earnings.***

Under accounting principles generally accepted in the United States of America ("GAAP"), we review the carrying value of goodwill and indefinite-lived intangible assets on an annual basis as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. Factors that may be considered a change in circumstances, indicating that the carrying value of our goodwill or indefinite-lived intangible assets may not be recoverable, include a decline in stock price and market capitalization, reduced future cash flow estimates and slower growth rates in our industry or our customers' industries. We may be required to record a significant charge in our financial statements during a period in which any impairment of our goodwill or indefinite-lived intangible assets is determined, negatively impacting our results of operations.

***Charges to earnings resulting from acquisitions may adversely affect our operating results.***

Under GAAP, when we acquire businesses, we allocate the purchase price to tangible assets and liabilities and identifiable intangible assets acquired at their acquisition date fair values. Any residual purchase price is recorded as goodwill. We also estimate the fair value of any contingent consideration. Our estimates of fair value are based upon assumptions believed to be reasonable but which are uncertain and involve significant judgments by management. After we complete an acquisition, the following factors could result in material charges and adversely affect our operating results and may adversely affect our cash flows:

- costs incurred to combine the operations of companies we acquire, such as transitional employee expenses and employee retention or relocation expenses;

- impairment of goodwill or intangible assets;

- a reduction in the useful lives of intangible assets acquired;

- impairment of long-lived assets;

- identification of, or changes to, assumed contingent liabilities;

- changes in the fair value of any contingent consideration;

- charges to our operating results due to duplicative pre-merger activities;

- charges to our operating results from expenses incurred to effect the acquisition; and

- charges to our operating results due to the expensing of certain stock awards assumed in an acquisition.

Substantially all of these potential charges would be accounted for as expenses that would decrease our net income and earnings per share for the periods in which those costs are incurred. Charges to our operating results in any given period could differ substantially from other periods based on the timing and size of our acquisitions and the extent of acquisition accounting adjustments.

22

Table of Contents

For acquisitions with potential future contingent consideration payments, we assign a fair value to the contingent consideration and reassess this fair value quarterly. Increases or decreases based on the actual performance of the acquired company against the contingent consideration targets or other factors will cause decreases or increases, respectively, in our results of operations. These quarterly adjustments could have a material adverse effect on our results of operations. During 2019, 2018 and 2017, we incurred $28.4 million, $10.8 million and $23.9 million, respectively, of contingent consideration expense due to the change in estimated fair value of the earnout payments.

*In the ordinary course of business, we are party to litigation involving contract, intellectual property and a variety of other claims, which could adversely affect our business and financial condition.*

We are involved in various legal proceedings and claims involving taxes, contract, alleged infringement of third-party intellectual property rights, consumer protection, securities laws, and other claims, including, but not limited to, the legal proceedings described in Part I, Item 3, Legal Proceedings. These matters could involve claims for substantial amounts of money or for other relief that might necessitate changes to our business or operations. The defense of these actions has been, and will likely continue to be, both time consuming and expensive, and the outcomes of these actions cannot be predicted with certainty. Determining reserves for pending litigation is a complex, fact-intensive process that requires significant legal judgment. It is possible that unfavorable outcomes in one or more such proceedings could result in substantial payments that could adversely affect our business, consolidated financial position, results of operations, or cash flows in a particular period.

### Risks Related to Compliance and Regulation

*Failure to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could materially and adversely affect our business, financial condition and results of operations.*

We market and provide services in heavily regulated industries through a number of different channels across the United States. As a result, our businesses have been and remain subject to a variety of laws, rules, regulations, statutes, standards, policies and procedures in various jurisdictions in the United States and abroad, which are subject to change at any time. The failure of our businesses to comply with past, existing or new laws, rules and regulations, or to obtain and maintain required licenses, could result in administrative fines or proceedings against us or our businesses by governmental agencies and/or litigation by consumers, which could materially and adversely affect our business, financial condition and results of operations and our brand.

Our businesses conduct marketing activities via telephone, mail and/or through online marketing channels, and these general marketing activities are governed by numerous federal regulations, such as the Telemarketing Sales Rule, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Federal Trade Commission Act, and various state telemarketing laws, federal and state data privacy and security laws and their accompanying regulations and guidelines, among others. Additionally, increased regulation by the U.S. Federal Trade Commission ("FTC") and Federal Communications Commission ("FCC") has resulted in restrictions on telephone calls to residential and wireless telephone subscribers.

Additional federal, state and in some instances, local laws regulate secured and unsecured lending activities, which impacts the marketplace, lenders and consumers. These laws generally regulate the manner in which lending and lending-related activities are marketed or made available, including advertising and other consumer disclosures, payments for services and record keeping requirements; these laws include RESPA, the Fair Credit Reporting Act, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Housing Act and various state laws. State laws often restrict the amount (and nature) of interest and fees that may be charged by a lender or mortgage broker, or otherwise regulate the manner in which lenders or mortgage brokers operate or advertise.

State, federal and foreign lending laws and regulations generally require accurate disclosure of the critical components of credit costs so that consumers can readily compare credit terms from various lenders. These laws and regulations also impose certain restrictions on the advertisement of these credit terms. Because we are an aggregator of rate and other information regarding many financial products, including mortgages, deposits and credit cards, we may be subject to some of these laws and regulations and we may be held liable under these laws and regulations for information provided through our online services.

Our businesses are also subject to various state, federal and/or local laws, rules and regulations that regulate the amount and nature of fees that may be charged for transactions and incentives, such as rebates, that may be offered to consumers by our businesses, as well as the manner in which these businesses may offer, advertise or promote transactions. For example, RESPA generally prohibits the payment or receipt of referral fees and fee shares or splits in connection with residential mortgage loan transactions, subject to certain exceptions. The applicability of referral fee and fee sharing prohibitions to lenders and real estate providers, including online networks, may have the effect of reducing the types and amounts of fees that may be charged or paid in connection with real estate-secured loan offerings or activities, including mortgage brokerage, lending and real estate brokerage services, or otherwise limiting our and our Network Partners' ability to conduct marketing and referral activities.

<div align="center">23</div>

Table of Contents

Various federal, state and, in some instances, local, laws also prohibit unfair and deceptive sales practices. We have adopted appropriate policies and procedures to address these requirements (such as appropriate consumer disclosures and call scripting, call monitoring and other quality assurance and compliance measures), but it is not possible to ensure that all employees comply with our policies and procedures at all times.

Regulatory authorities and private plaintiffs may allege that we failed to comply with applicable laws, rules and regulations where we believe we have complied. These allegations may relate to past conduct and/or past business operations, such as our discontinued mortgage origination operation (which was subject to various state and local laws, rules and regulations). Even allegations that our activities have not complied or do not comply with all applicable laws and regulations may have a material and adverse effect on our business, financial condition and results of operations. The alleged violation of such laws, rules or regulations may entitle an individual plaintiff to seek monetary damages, or may entitle an enforcing government agency to seek significant civil or criminal penalties, costs and attorneys' fees. Regardless of its merit, an allegation typically requires legal fee expenditures to defend against. We have in the past and may in the future decide to settle allegations of non-compliance with laws, rules and regulations when we determine that the cost of settlement is less than the cost and risk of continuing to defend against an allegation. Settlements may require us to pay monetary fines and may require us to adopt new procedures and practices, which may render it more difficult to operate or may raise our internal costs. The future occurrence of one or more of these events could have a material and adverse effect on our business, financial condition and results of operations.

Compliance with these laws, rules and regulations is a significant component of our internal costs, and new laws, rules and regulations are frequently proposed and adopted, requiring us to adopt new procedures and practices. Changes to existing laws, rules and regulations or changes to interpretation of existing laws, rules and regulations could result in further restriction of activities incidental to our business and could have a material and adverse effect on our business, results of operation and financial condition. Failure to comply with applicable laws and regulatory requirements may result in, among other things, revocation of or inability to renew required licenses or registrations, loss of approval status, termination of contracts without compensation, administrative enforcement actions and fines, private lawsuits, including those styled as class actions, cease and desist orders and civil and criminal liability.

***Our reputation, ability to do business and financial statements may be harmed by improper conduct by our business partners.***

Our business partners (or businesses we acquire or partner with) may violate U.S. and/or non-U.S. laws, including the laws governing payments to government officials, bribery, fraud, kickbacks and false claims, pricing, sales and marketing practices, conflicts of interest, competition, employment practices and workplace behavior, export and import compliance, money laundering and data privacy. Our business partners typically act as independent contractors and not as agents in their solicitations and transactions with consumers, and we cannot ensure that these entities will comply with applicable laws and regulations at all times. Failure on the part of a lender, website operator or other third party to comply with applicable laws or regulations could result in, among other things, claims of vicarious liability or a negative impact on our reputation and business.

***Failure to obtain proper business licenses or other documentation or to otherwise comply with local laws and requirements regarding marketing, sales or services, may result in civil or criminal penalties and restrictions on our ability to conduct business in that jurisdiction.***

Most states require licenses to solicit, broker or make loans secured by residential mortgages and other consumer loans to residents of those states, as well as to operate real estate referral and brokerage services, and in many cases require the licensure or registration of individual employees engaged in aspects of these businesses. Further, as mandated by the federal Secure and Fair Enforcement for Mortgage Licensing Act (the "SAFE Act"), states adopted certain minimum standards for the licensing of individuals involved in mortgage lending or loan brokering. Compliance with these requirements may render it more difficult for us and our Network Partners to operate or may raise our internal costs or the costs of our Network Partners, which may be passed on to us through less favorable commercial arrangements. While our businesses have endeavored to comply with applicable requirements, the application of these requirements to persons operating online is not always clear. Moreover, any of the licenses or rights currently held by our businesses or our employees may be revoked prior to, or may not be renewed upon, their expiration. In addition, our businesses or our employees may not be granted new licenses or rights for which they may be required to apply from time to time in the future.

Regulations promulgated by some states may also impose compliance obligations on directors, executive officers, large consumers and any person who acquires a certain percentage (for example, 10% or more) of the equity in a licensed entity, including requiring such persons to periodically file financial and other personal and business information with state regulators. If any such person refuses or fails to comply with these requirements, we may be unable to obtain certain licenses and existing licensing arrangements may be jeopardized. The inability to obtain, or the loss of, required licenses could have a material and adverse effect on our business, financial condition and results of operations.

24

Table of Contents

***If our Network Partners fail to produce required documents for examination by, or other affiliated parties fail to make certain filings with, state regulators, we may be subject to fines, forfeitures and the revocation of required licenses.***

Some of the states in which our businesses maintain licenses require them to collect various loan documents from our Network Partners and produce these documents for examination by state regulators. While our Network Partners are contractually obligated to provide these documents upon request, these measures may be insufficient. Failure to produce required documents for examination could result in fines, as well as the revocation of our licenses to operate in certain states, which could have a material and adverse effect on our business, financial condition and results of operations.

***If we fail to maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable regulations could be impaired.***

In the event that our chief executive officer, chief financial officer, or independent registered public accounting firm determines in the future that our internal control over financial reporting is not effective as defined under Section 404 of the Sarbanes-Oxley Act, we could be subject to one or more investigations or enforcement actions by state or federal regulatory agencies, stockholder lawsuits or other adverse actions requiring us to incur defense costs, pay fines, settlements or judgments, thereby causing investor perceptions to be adversely affected and potentially resulting in restatement of our financial statements for prior periods and a decline in the market price of our stock.

In addition, our current internal controls and any new controls we implement may become inadequate because of changes in conditions in our business or information technology systems or changes in the applicable laws, regulations and standards. We have also recently acquired, and may acquire in future, companies that were not subject to the Sarbanes-Oxley regulations and accordingly were not required to establish and maintain an internal control infrastructure meeting the standards promulgated under the Sarbanes-Oxley Act. Any failure to design or operate effective controls, any difficulties encountered in their implementation or improvement, or any failure to implement adequate internal controls for our acquired companies could harm our operating results or cause us to fail to meet our reporting obligations. Not correctly designing controls nor fully recognizing, understanding or testing the state of or changes in our internal control environment could also adversely affect the results of management evaluations and independent registered public accounting firm audits of our internal control over financial reporting, about which we are required to include in our periodic reports filed with the SEC. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in our reported financial and other information, which would likely have a negative effect on the trading price of our common stock. In addition, if we are unable to continue to meet these requirements, we may not be able to remain listed on the Nasdaq stock market in the future.

***We may be exposed to liabilities under the Foreign Corrupt Practices Act (FCPA), which could have a material adverse effect on our business.***

Our operations in India may subject us to compliance with various laws and regulations, including the FCPA and similar anti-bribery and anti-corruption laws, which generally prohibit companies and their intermediaries from engaging in bribery or making other improper payments to private or public parties for the purpose of obtaining or retaining business or gaining an unfair business advantage. The FCPA also requires proper record keeping and characterization of such payments in our reports filed with the SEC. Violations of these laws could result in severe criminal or civil sanctions and financial penalties and other consequences that may have a material adverse effect on our business, reputation, financial condition or results of operations

***Our collection, use, storage, disclosure, transfer and other processing of personal information could give rise to significant costs and liabilities, including as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights, which may have a material and adverse impact on our business, financial condition and results of operations.***

In the course of our operations and the processing of consumer transactions, our businesses collect, use, store, disclose, transfer and otherwise process a large volume of personal information, including from our consumers, employees and third parties with whom we conduct business, and other user data. The collection, use, storage, disclosure, transfer and other processing of personal information is increasingly subject to a wide array of federal, state and foreign laws and regulations regarding data privacy and security, including comprehensive laws of broad application, such as the EU General Data Protection Regulation, that are intended to protect the privacy of personal information that is collected, used, stored, disclosed, transferred and otherwise processed in or from the governing jurisdiction. Some countries, including India, also are considering or have passed legislation requiring local storage and processing of data, or similar requirements, which could increase the cost and complexity of delivering our products and services. As we seek to expand our business, we are, and may increasingly become, subject to various laws, regulations and standards, as well as contractual obligations, relating to data privacy and security in the jurisdictions in which we operate. In many cases, these laws and regulations apply not only to third-party transactions, but also to transfers of information between or among us, our affiliates and other parties with whom we conduct business. These laws, regulations and standards may be interpreted and applied differently over time and from jurisdiction to jurisdiction, and it is possible that they will be interpreted and applied in

25

Table of Contents

ways that may have a material and adverse impact on our business, financial condition and results of operations. The regulatory framework for data privacy and security worldwide is continuously evolving and developing and, as a result, interpretation and implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future.

In the United States, various federal and state regulators, including governmental agencies like the CFPB and FTC, have adopted, or are considering adopting, laws and regulations concerning personal information and data security. This patchwork of legislation and regulation may give rise to conflicts or differing views of personal privacy rights. For example, certain state laws may be more stringent or broader in scope, or offer greater individual rights, with respect to personal information than federal, international or other state laws, and such laws may differ from each other, all of which may complicate compliance efforts. At the federal level, we may be subject to laws like the Gramm-Leach-Bliley Act of 1999 (along with its implementing regulations) ("GLBA"), which restricts certain collection, processing, storage, use and disclosure by covered companies of certain personal information, requires notice to individuals of privacy practices and provides individuals with certain rights to prevent the use and disclosure of certain non-public or otherwise legally protected information. The GLBA also imposes requirements regarding the safeguarding and proper destruction of personal information through the issuance of data security standards or guidelines. In addition, many states in which we operate have laws that protect the privacy and security of personal information. For example, the California Consumer Privacy Act ("CCPA"), which increases privacy rights for California residents and imposes obligations on companies that process their personal information, came into effect on January 1, 2020. Among other things, the CCPA requires covered companies to provide new disclosures to California consumers and provide such consumers new data protection and privacy rights, including the ability to opt-out of certain sales of personal information. The CCPA provides for civil penalties for violations, as well as a private right of action for certain data breaches that result in the loss of personal information. This private right of action may increase the likelihood of, and risks associated with, data breach litigation. The CCPA was amended in September 2018 and November 2019, and it is possible that further amendments will be enacted, but even in its current form it remains unclear how various provisions of the CCPA will be interpreted and enforced. State laws are changing rapidly and there is discussion in Congress of a new federal data protection and privacy law to which we would become subject if it is enacted. All of these evolving compliance and operational requirements impose significant costs that are likely to increase over time, may require us to modify our data processing practices and policies, divert resources from other initiatives and projects, and could restrict the way products and services involving data are offered, all of which may have a material and adverse impact on our business, financial condition and results of operations.

Many statutory requirements, both in the United States and abroad, include obligations for companies to notify individuals of security breaches involving certain personal information, which could result from breaches experienced by us or our external service providers. For example, laws in all 50 U.S. states require businesses to provide notice to consumers whose personal information has been disclosed as a result of a data breach. These laws are not consistent, and compliance in the event of a widespread data breach is difficult and may be costly. Moreover, states have been frequently amending existing laws, requiring attention to changing regulatory requirements. We also may be contractually required to notify consumers or other counterparties of a security breach. Although we may have contractual protections with our external service providers, any actual or perceived security breach could harm our reputation and brand, expose us to potential liability or require us to expend significant resources on data security and in responding to any such actual or perceived breach. Any contractual protections we may have from our external service providers may not be sufficient to adequately protect us from any such liabilities and losses, and we may be unable to enforce any such contractual protections.

In addition to government regulation, privacy advocates and industry groups have and may in the future propose self-regulatory standards from time to time. These and other industry standards may legally or contractually apply to us, or we may elect to comply with such standards. We expect that there will continue to be new proposed laws and regulations concerning data privacy and security, and we cannot yet determine the impact such future laws, regulations and standards may have on our business. New laws, amendments to or re-interpretations of existing laws, regulations, standards and other obligations may require us to incur additional costs and restrict our business operations. Because the interpretation and application of laws, regulations, standards and other obligations relating to data privacy and security are still uncertain, it is possible that these laws, regulations, standards and other obligations may be interpreted and applied in a manner that is inconsistent with our data processing practices and policies or the features of our products and services. If so, in addition to the possibility of fines, lawsuits, regulatory investigations, public censure, other claims and penalties, and significant costs for remediation and damage to our reputation, we could be materially and adversely affected if legislation or regulations are expanded to require changes in our data processing practices and policies or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively impact our business, financial condition and results of operations. We may be unable to make such changes and modifications in a commercially reasonable manner, or at all. Any inability to adequately address data privacy or security-related concerns, even if unfounded, or to comply with applicable laws, regulations, standards and other obligations relating to data privacy and security, could result in additional cost and liability to us, harm our reputation and brand, damage our relationships with consumers and have a material and adverse impact on our business, financial condition and results of operations.

26

Table of Contents

We make public statements about our use and disclosure of personal information through our privacy policies, information provided on our website and press statements. Although we endeavor to comply with our public statements and documentation, we may at times fail to do so or be alleged to have failed to do so. The publication of our privacy policies and other statements that provide promises and assurances about data privacy and security can subject us to potential government or legal action if they are found to be deceptive, unfair or misrepresentative of our actual practices. Moreover, from time to time, concerns may be expressed about whether our products and services compromise the privacy of consumers and others. Any concerns about our data privacy and security practices, even if unfounded, could damage the reputation of our businesses, discourage potential users from our products and services and have a material and adverse impact on our business, financial condition and results of operations.

Any failure or perceived failure by us or our Network Partners or external service providers to comply with our posted privacy policies or with any applicable federal, state or similar foreign laws, regulations, standards, certifications or orders relating to data privacy, security or consumer protection, or any compromise of security that results in the theft, unauthorized access, acquisition, use, disclosure, or misappropriation of personal information or other user data, could result in fines or proceedings or litigation by governmental agencies or consumers, including class action privacy litigation in certain jurisdictions, which would subject us to significant awards, penalties or judgments, one or all of which could materially and adversely affect our business, financial condition and results of operations. In addition, if our practices are not consistent, or viewed as not consistent, with legal and regulatory requirements, including changes in laws, regulations and standards or new interpretations or applications of existing laws, regulations and standards, we may also become subject to audits, inquiries, whistleblower complaints, adverse media coverage, investigations, loss of export privileges or severe criminal or civil sanctions, all of which may affect our financial condition, operating results and our reputation.

***Changes in the regulation of the Internet, mobile carriers and their partners could negatively affect our business.***

Our business is dependent on the continued growth and maintenance of the Internet's infrastructure, as well as our ability to market products through channels such as e-mail and voice and text messaging. There can be no assurance that the Internet's infrastructure will continue to be able to support the demands placed on it by sustained growth in the number of users and amount of traffic. To the extent that the Internet's infrastructure is unable to support the demands placed on it, our business may be impacted. We may also be disadvantaged by the adverse effect of any delays or cancellations of private sector or government initiatives designed to expand broadband access. The reduction in the growth of, or a decline in, broadband and Internet access poses a risk to us.

In addition, federal, state and international government bodies and agencies have in the past adopted, and may in the future adopt, laws and regulations affecting the use of the Internet as a commercial medium. Changes in these laws or regulations could adversely affect the demand for our products and services or require us to modify our products and services in order to comply with these changes. Laws, rules and regulations governing advertising and e-commerce through Internet communications and mobile carriers and their partners are dynamic, and the extent of future government regulation is uncertain. Federal and state regulations govern various aspects of our online business, including intellectual property ownership, infringement and misappropriation, including with respect to trade secrets, the distribution of electronic communications, marketing and advertising, data privacy and security, search engines and Internet tracking technologies. Future taxation on the use of the Internet or e-commerce transactions could also be imposed. Existing or future regulation or taxation could hinder growth in or negatively impact the use of the Internet generally, including the viability of Internet e-commerce, which could reduce our revenue, increase our operating expenses and expose us to significant liabilities.

***The possibility of additional future regulations, changing rule interpretations and examinations by regulatory agencies may result in more stringent compliance standards and could adversely affect the results of our operations.***

In response to conditions in the U.S. financial markets and economy, as well as a heightened regulatory and Congressional focus on consumer lending, regulators have increased their scrutiny of the financial services industry, the result of which has included new regulations and guidance. We are unable to predict the long-term impact of this enhanced scrutiny. We are also unable to predict whether any additional or similar changes to statutes or regulations, including the interpretation or implementation thereof, will occur in the future. Likewise, states or municipalities may adopt statutes or regulations making it unattractive, impracticable or infeasible for our businesses to continue to conduct business in such jurisdictions. The impact of additional future regulations and/or withdrawal from any jurisdiction due to emerging legal requirements could materially and adversely affect our business, financial condition and results of operations.

27

Table of Contents

**Risks Related to an Investment in our Common Stock**

***Fluctuations in our operating results, quarter to quarter earnings and other factors may result in significant decreases in the price of our common stock.***

The market price for our common stock has been volatile, as the trading volume has fluctuated and may continue to fluctuate, causing significant price variations to occur. From when we became a publicly-traded company to as of December 31, 2019, the price per share of our common stock has fluctuated from an intra-day low of $1.42 per share to an intra-day high of $434.94 per share. The market price of our common stock may fluctuate or decline significantly in the future. Some of the factors that could negatively affect the price of our common stock or result in fluctuations in the price or trading volume of our common stock include:

- our ability to attract new customers and retain existing customers;

- the timing and success of introductions of new services;

- rapid technological change, frequent new product introductions and evolving industry standards;

- variations in our quarterly operating and financial results or our projected operating and financial results;

- failure to meet analysts' earnings estimates;

- publication of research reports about us, our Network Partners or our industry;

- additions or departures of key management personnel;

- adverse market reaction to any indebtedness we may incur or preferred or common stock we may issue in the future;

- actions by stockholders, including "activist" investors;

- changes in market valuations of other companies in our industry, including our customers and competitors;

- announcements by us or our competitors of significant contracts, acquisitions, dispositions, strategic partnerships, joint ventures or capital commitments;

- increased competition from one or more large, well-established technology companies;

- systems, data center and internet failures, breaches and service interruptions;

- speculation in the press or investment community, including the short selling of our common stock;

- our ability to expand internationally;

- changes or proposed changes in laws or regulations affecting our industry or enforcement of these laws and regulations, or announcements relating to these matters;

- threatened or actual ligation;

- loss of key employees;

- changes in estimated fair value of contingent consideration related to acquisitions; and

- changes in general economic or market conditions.

The stock market is subject to frequent price and volume fluctuations. These market fluctuations could result in extreme volatility in the trading price of our common stock, which could cause a decline in the value of your investment in our common shares. In addition, the trading price of our common stock could decline for reasons unrelated to our business or financial results, including in reaction to events that affect other companies in our industry even if those events do not directly affect us. You should also be aware that price volatility may be greater if the public float and trading volume of our common stock are low. These factors may result in short-term or long-term negative pressure on the value of our common stock.

***If securities or industry analysts publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for internet marketplace operators and lead-generation companies depends, in part, on the research and reports that securities or industry analysts publish about the industry and specific companies. If one or more analysts covering us currently or in the future fail to publish reports on us regularly, demand for our common stock could decline, which could cause our stock price and trading volume to decline. If one or more recognized securities or industry analysts that cover our company

Table of Contents

or our industry in the future downgrades our common stock or publishes inaccurate or unfavorable research about our business or industry, our stock price would likely decline.

***Two holders of our common stock own a substantial portion of our outstanding common stock, which concentrates voting control and limits your ability to influence corporate matters.***

As of February 18, 2020, Douglas Lebda, our Chairman and Chief Executive Officer, beneficially owned approximately 17% of our outstanding common stock. Additionally, Mr. Lebda holds restricted stock unit awards representing 9,896 shares and options to purchase a maximum of 791,298 shares that are not included in beneficial ownership because Mr. Lebda does not have the right to acquire them within 60 days. If these restricted stock units were to settle and these options were exercisable, they would represent additional beneficial ownership of approximately 5% of our outstanding common stock. As of February 18, 2020, GCI Liberty, Inc. beneficially owned approximately 26% of our outstanding common stock. GCI Liberty, Inc. also has the right to nominate 20% of the total number of directors serving on the board, rounded up. Two of our ten directors, Neal Dermer and Craig Troyer, were nominated by Liberty Interactive Corporation, the predecessor in interest of GCI Liberty, Inc.

Therefore, for the foreseeable future, Mr. Lebda and GCI Liberty, Inc. will each have influence over our management and affairs and all matters requiring stockholder approval, including the election or removal (with or without cause) of directors and approval of any significant corporate transaction, such as a merger or other sale of us or our assets. The interests of Mr. Lebda or GCI Liberty, Inc. may not necessarily align with the interests of our other stockholders. Mr. Lebda or GCI Liberty, Inc. could elect to sell a significant interest in us and you may receive less than the then-current fair market value or the price you paid for your shares as a result of such transaction. This concentrated control could delay, defer or prevent a change of control, merger, consolidation, takeover or other business combination involving us that other stockholders may otherwise support. This concentrated control could also discourage a potential investor from acquiring our common stock and might harm the market price of our common stock.

***Future sales of common stock by our existing stockholders may cause our stock price to fall.***

The market price of our common stock could decline as a result of sales by our existing stockholders in the market, or the perception that these sales could occur. These sales might also make it more difficult for us to sell equity securities at a time and price that we deem appropriate.

We may issue additional shares of our common stock in the future pursuant to current or future equity incentive plans, or in connection with current or future acquisitions or financings. If we were to raise capital in the future by selling shares of our common stock, or securities that are convertible into our common stock or issuing shares of our common stock in a business acquisition, their issuance would have a dilutive effect on the percentage ownership of our stockholders and, depending on the prices at which such shares or convertible securities are sold or issued, on their investment in our common stock and, therefore, could have a material adverse effect on the market prices of our common stock.

Under a registration rights agreement with GCI Liberty, Inc., GCI Liberty, Inc. and its permitted transferees are entitled to three demand registration rights (and unlimited piggyback registration rights) in respect of the shares of our common stock beneficially owned by GCI Liberty, Inc. or its affiliates. These holders will also be permitted to exercise their registration rights in connection with certain hedging transactions that they may enter into in respect of the registrable shares. The presence of additional shares of our common stock trading in the public market, as a result of the exercise of such registration rights, may have an adverse effect on the market price of our securities.

***Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of us more difficult, limit attempts by stockholders to replace or remove our management and affect the market price of our common stock.***

Provisions in our certificate of incorporation and bylaws, as amended and restated, may have the effect of delaying or preventing a change of control or changes in our management. Our amended and restated certificate of incorporation and/or amended and restated bylaws include provisions that:

- Authorize our board of directors to issue, without further action by our stockholders, up to five million shares of undesignated preferred stock, sometimes referred to as "blank check preferred";

- Prohibit cumulative voting in the election of directors;

- Provide that vacancies on our board of directors may be filled only by the affirmative vote of a majority of directors then in office or by the sole remaining director;

- Provide that only our board of directors may change the size of our board of directors;

29

Table of Contents

- Specify that special meetings of our stockholders may be called only by or at the direction of our board of directors or by a person specifically designated with such authority by the board; and

- Prohibit stockholders from taking action by written consent.

The provisions described above may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing our management. These provisions may also have the effect of delaying or preventing a change of control of our company, even if stockholders support such a change of control.

### We do not intend to pay any cash dividends on our common stock in the foreseeable future.

We have not declared or paid a cash dividend on our common stock during the seven most recent fiscal years. We have no current intention to declare or pay cash dividends on our common stock in the foreseeable future. In addition, the Amended Revolving Credit Facility contains certain restrictions on our ability to pay dividends. *See* Note 14—Debt, in the notes to the consolidated financial statements included elsewhere in this annual report. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of our board of directors. As a result, capital appreciation, if any, of our common stock will be the sole source of gain for the foreseeable future for holders of our common stock.

### Our financial results fluctuate as a result of seasonality, which may make it difficult to predict our future performance and may adversely affect our common stock price.

Several of our products are subject to seasonal trends. Products in our Home segment have seasonal trends that reflect the general patterns of the mortgage industry and housing sales, which typically peak in the spring and summer seasons and decline in the winter. Our quarterly operating results may fluctuate as a result of these seasonal trends. In certain historical periods, broader cyclical trends in interest rates, as well as the mortgage and real estate markets, have upset the customary seasonal trends. Our Consumer and Insurance segments also have certain products with various seasonality trends which may create further uncertainty in our quarterly operating results. *See* Item 1. Business—Seasonality included elsewhere in this annual report for more information. Any of these seasonal trends, or the combination of them, may negatively impact the price of our common stock.

### The conditional conversion feature of our outstanding convertible senior notes, if triggered, may adversely affect our financial condition and operating results.

If the conditional conversion feature of our 0.625% Convertible Senior Notes due June 1, 2022 (the "Notes") is triggered, holders of Notes will be entitled to convert the Notes at any time during specified periods at their option. Because of the trading price of our common stock during the measurement period applicable to the quarter ended December 31, 2019, holders of the Notes became entitled to convert the Notes on January 1, 2020, and will continue to have such right until March 31, 2020. Convertibility for each quarter thereafter will be determined based on whether the last reported sales price of our common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter, is greater than or equal to 130% of the conversion price under the Notes on each applicable trading day. If so, then the Notes will be convertible during that calendar quarter. The Notes will also be convertible at any time during the five business day period immediately following any five consecutive trading day period in which the trading price per $1,000 principal amount of Notes for each trading Day of such five trading day period is less than 98% of the product of the last reported sale price of our common stock on each such trading day and the conversion ratio under the Notes, as more fully described in the indenture governing the Notes, which is incorporated by reference as an exhibit to this annual report.

If one or more holders elect to convert their Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than paying cash in lieu of delivering any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital.

### We may not have the ability to raise the funds necessary to settle conversions of the Notes in cash or to repurchase the Notes upon a fundamental change, and our future debt may contain limitations on our ability to pay cash upon conversion or repurchase of the Notes.

Holders of the Notes will have the right to require us to repurchase all or a portion of their Notes upon the occurrence of a fundamental change at a repurchase price equal to 100% of the principal amount of the Notes to be repurchased, plus accrued and unpaid special interest, if any. We may not have enough available cash or be able to obtain financing at the time we are required

Table of Contents

to make repurchases of Notes surrendered therefore, or pay cash with respect to Notes being converted if we elect not to issue shares, which could harm our reputation and affect the trading price of our common stock.

***Our hedge and warrant transactions may affect the value of the Notes and our common stock.***

In connection with the pricing of the Notes, we entered into convertible note hedge transactions with certain counterparties. The hedge transactions are generally expected to reduce the potential dilution upon conversion of the Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted Notes, as the case may be. We also entered into warrant transactions with such counterparties. However, the warrant transactions could separately have a dilutive effect to the extent that the market price per share of our common stock exceeds the applicable strike price of the warrants. The initial strike price of the warrants is $266.39.

In connection with establishing their initial hedge of the hedge and warrant transactions, the counterparties or their respective affiliates may have purchased shares of our common stock and/or entered into various derivative transactions with respect to our common stock concurrently with or shortly after the pricing of the Notes. In addition, the counterparties or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to our common stock and/or purchasing or selling our common stock or other securities of ours in secondary market transactions prior to the maturity of the Notes (and are likely to do so during any observation period related to a conversion of Notes or following any repurchase of Notes by us on any fundamental repurchase date or otherwise). This activity could cause or avoid an increase or a decrease in the market price of our common stock or the Notes.

***The accounting method for convertible debt securities that may be settled in cash, such as the Notes, could have a material adverse effect on our reported financial results.***

In May 2008, the FASB issued FASB Staff Position No. APB 14-1, Accounting for Convertible Debt Instruments That May Be Settled in Cash Upon Conversion (Including Partial Cash Settlement), which has subsequently been codified as ASC 470-20, Debt with Conversion and Other Options, which we refer to as ASC 470-20. Under ASC 470-20, an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470-20 on the accounting for the Notes is that the equity component is required to be included in the additional paid-in capital section of stockholders' equity on our consolidated balance sheet, and the value of the equity component would be treated as debt discount for purposes of accounting for the debt component of the Notes. As a result, we will be required to record a greater amount of non-cash interest expense in current periods presented as a result of the amortization of the discounted carrying value of the Notes to their face amount over the term of the Notes. We will report lower net income in our financial results because ASC 470-20 will require interest to include the current period's amortization of the debt discount, which could adversely affect our reported or future financial results, the trading price of our common stock and the trading price of the Notes.

***We may need additional equity, debt or other financing in the future, which we may not be able to obtain on acceptable terms, or at all, and any additional financing may result in restrictions on our operations or substantial dilution to our stockholders.***

We may need to raise funds in the future, for example, to develop new technologies, expand our business, respond to competitive pressures and make acquisitions. We may try to raise additional funds through public or private financings, strategic relationships or other arrangements. Although our existing credit facility limits our ability to incur additional indebtedness, these restrictions are subject to a number of qualifications and exceptions and may be amended with the consent of our lenders. Accordingly, under certain circumstances, we may incur substantial additional debt.

Our ability to obtain debt or equity funding will depend on a number of factors, including market conditions, interest rates, our operating performance, our credit rating and investor interest. Additional funding may not be available to us on acceptable terms or at all. If adequate funds are not available, we may be required to reduce expenditures, including curtailing our growth strategies, foregoing acquisitions or reducing our business development efforts. If we succeed in raising additional funds through the issuance of equity or equity-linked securities, then existing stockholders could experience substantial dilution. If we raise additional funds through the issuance of debt securities or preferred stock, these new securities would have rights, preferences and privileges senior to those of the holders of our common stock. In addition, any such issuance could subject us to restrictive covenants relating to our capital raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential acquisitions. Further, to the extent we incur additional indebtedness or such other obligations, the risks associated with our existing debt, including our possible inability to service our existing debt, would increase.

## ITEM 1B.   *Unresolved Staff Comments*

Not applicable.

**Table of Contents**

## ITEM 2.  *Properties*

Our principal executive offices are currently located on approximately 37,800 square feet of office space in Charlotte, North Carolina under a lease that expires in December 2020. We also have offices located on approximately 13,100 square feet, 19,700 square feet and 27,800 square feet of additional office space in Charlotte, North Carolina under leases that expire in December 2020, May 2021 and September 2021, respectively. To accommodate our growth, we are expecting to relocate our principal executive offices and consolidate certain additional Charlotte office space in approximately 176,000 square feet of office space in Charlotte, North Carolina, in the first quarter of 2021.

Primarily as a result of our acquisitions in recent years, we also operate offices in: Charleston, South Carolina; Chicago, Illinois; Denver, Colorado; Jacksonville, Florida; New York City, New York; Rancho Cordova, California; San Mateo, California; Seattle, Washington; and Makarba, India.

Our Charlotte operations support all three of our segments: Home, Consumer and Insurance. Our Home segment is also supported by our San Mateo office. The Consumer segment has personnel in the Charleston, Chicago, Jacksonville, New York City, San Mateo and Makarba offices. The Insurance segment has personnel in the Denver, New York City, Rancho Cordova and Seattle offices.

In December 2016, we completed the acquisition of two office buildings in Charlotte, North Carolina, with approximately 64,000 and 73,000 square feet of office space, respectively. In November 2018, the office buildings were classified as held for sale, and the buildings were sold in May 2019. For additional information, *see* Note 7—Assets Held for Sale in the notes to the consolidated financial statements included elsewhere in this report.

## ITEM 3.  *Legal Proceedings*

In the ordinary course of business, we are party to litigation involving property, contract, intellectual property and a variety of other claims. The amounts that may be recovered in such matters may be subject to insurance coverage. *See* Note 16—Contingencies and Note 20—Discontinued Operations in the notes to the consolidated financial statements included elsewhere in this report for a discussion of our current and recently settled litigation.

## ITEM 4.  *Mine Safety Disclosures*

Not applicable.

Table of Contents

## PART II

**ITEM 5.** *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**General Market Information, Holders and Dividends**

Our common stock is quoted on the Nasdaq Global Select Market under the ticker symbol "TREE". As of February 18, 2020, there were approximately 616 holders of record of our common stock.

We have no current intention to declare or pay cash dividends on our common stock in the foreseeable future. The declaration, payment and amount of future cash dividends, if any, will be at the discretion of our board of directors.

**Performance Graph**

*The performance graph shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or incorporated by reference into any filings under the Securities Act or the Exchange Act, except as otherwise expressly set forth by specific reference in such filing.*

Set forth below is a line graph, for the period from December 31, 2014 through December 31, 2019, comparing the cumulative total stockholder return of $100 invested (assuming that all dividends were reinvested) in (1) our common stock, (2) the cumulative return of all companies listed on the Nasdaq Composite Index and (3) the cumulative total return of the Research Development Group ("RDG") Internet index. Returns over the indicated periods should not be considered indicative of future stock prices or stockholder returns.



COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among LendingTree, Inc., the NASDAQ Composite Index
and the RDG Internet Composite Index

*$100 invested on 12/31/14 in stock or index, including reinvestment of dividends.
Fiscal year ending December 31.

33

Table of Contents

**Unregistered Sales of Equity Securities and Use of Proceeds**

During the year ended December 31, 2019, we did not issue or sell any shares of our common stock or other equity securities in transactions that were not registered under the Securities Act.

**Issuer Purchases of Equity Securities**

In each of February 2018 and February 2019, the board of directors authorized and we announced a stock repurchase program which allowed for the repurchase of up to $100.0 million and $150.0 million, respectively, of our common stock. Under this program, we can repurchase stock in the open market or through privately-negotiated transactions. We have used available cash to finance these repurchases. We will determine the timing and amount of any additional repurchases based on our evaluation of market conditions, applicable SEC guidelines and regulations, and other factors. This program may be suspended or discontinued at any time at the discretion of our board of directors. During the quarter ended December 31, 2019, 4,151 shares of common stock were repurchased under the stock repurchase program. As of February 18, 2020, approximately $179.7 million is authorized for future share repurchases.

Additionally, the LendingTree Sixth Amended and Restated 2008 Stock and Award Incentive Plan and the LendingTree 2017 Inducement Grant Plan allow employees to forfeit shares of our common stock to satisfy federal and state withholding obligations upon the exercise of stock options, the settlement of restricted stock unit awards and the vesting of restricted stock awards granted to those individuals under the plans. During the quarter ended December 31, 2019, 4,007 shares were purchased related to these obligations under the LendingTree Sixth Amended and Restated 2008 Stock and Award Incentive Plan and 1,575 shares were purchased related to these obligations under the LendingTree 2017 Inducement Grant Plan. The withholding of those shares does not affect the dollar amount or number of shares that may be purchased under the stock repurchase program described above.

The following table provides information about the Company's purchases of equity securities during the quarter ended December 31, 2019.

| Period | Total Number of Shares Purchased [1] | | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs [2] | | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs |
|---|---|---|---|---|---|---|
| | | | | | | *(in thousands)* |
| 10/1/19 - 10/31/19 | 4,993 | $ | 316.36 | — | $ | 180,857 |
| 11/1/19 - 11/30/19 | 318 | $ | 366.02 | — | $ | 180,857 |
| 12/1/19 - 12/31/19 | 4,422 | $ | 286.28 | 4,151 | $ | 179,673 |
| **Total** | 9,733 | $ | 304.32 | 4,151 | $ | 179,673 |

(1) During October 2019, November 2019 and December 2019, 4,993 shares, 318 shares and 271 shares, respectively (totaling 5,582 shares), were purchased to satisfy federal and state withholding obligations of our employees upon the settlement of restricted stock units, all in accordance with our Sixth Amended and Restated 2008 Stock and Award Incentive Plan and 2017 Inducement Grant Plan, as described above.

(2) See the narrative disclosure above the table for further description of our publicly announced stock repurchase program.

34

Table of Contents

**ITEM 6.**  *Selected Financial Data*

The summary financial data presented below represents portions of our consolidated financial statements and are not complete. The following financial information should be read in conjunction with Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and our consolidated financial statements and notes thereto contained in Item 8. Financial Statements and Supplementary Data included elsewhere in this annual report. Historical results are not necessarily indicative of future performance or results of operations.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2016** | **2015** |
| | *(in thousands, except per share amounts)* | | | | |
| **Results of Operations:** | | | | | |
| Revenue[1] | $ 1,106,603 | $ 764,865 | $ 617,736 | $ 384,402 | $ 254,216 |
| Income from continuing operations [2] | 39,460 | 109,319 | 19,418 | 31,208 | 51,316 |
| Loss from discontinued operations [3] | (21,632) | (12,820) | (3,840) | (3,714) | (3,269) |
| Net income and comprehensive income | 17,828 | 96,499 | 15,578 | 27,494 | 48,047 |
| | | | | | |
| Weighted average shares outstanding: | | | | | |
| Basic | 12,834 | 12,504 | 11,945 | 11,812 | 11,516 |
| Diluted | 14,619 | 14,097 | 13,682 | 12,773 | 12,541 |
| Income per share from continuing operations: | | | | | |
| Basic | $ 3.07 | $ 8.74 | $ 1.63 | $ 2.64 | $ 4.46 |
| Diluted | $ 2.70 | $ 7.75 | $ 1.42 | $ 2.44 | $ 4.09 |
| Loss per share from discontinued operations: | | | | | |
| Basic | $ (1.69) | $ (1.03) | $ (0.32) | $ (0.31) | $ (0.28) |
| Diluted | $ (1.48) | $ (0.91) | $ (0.28) | $ (0.29) | $ (0.26) |
| Net income per share: | | | | | |
| Basic | $ 1.39 | $ 7.72 | $ 1.30 | $ 2.33 | $ 4.17 |
| Diluted | $ 1.22 | $ 6.85 | $ 1.14 | $ 2.15 | $ 3.83 |
| Cash dividend per share | $ — | $ — | $ — | $ — | $ — |
| | | | | | |
| **Financial Position:** | | | | | |
| Cash and cash equivalents [4] [5] [6] [7] [8] [9] [10] | $ 60,243 | $ 105,102 | $ 368,550 | $ 91,131 | $ 206,975 |
| Total assets [4] [6] [7] | $ 947,969 | $ 896,115 | $ 693,459 | $ 323,427 | $ 295,781 |
| Total long-term liabilities [5] [7] [8] [9] | $ 314,937 | $ 287,954 | $ 251,069 | $ 25,285 | 612 |
| Total shareholders' equity [4] [7] | $ 402,326 | $ 346,208 | $ 294,874 | $ 231,435 | $ 241,142 |

(1)  *See* Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2019 and 2018—Revenue for a discussion of revenue.

(2)  In 2015, we released the majority of the valuation allowance, which, along with federal and state income taxes, resulted in a total tax benefit of $23.0 million.

(3)  *See* Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2019 and 2018—Discontinued Operations for a discussion of discontinued operations.

(4)  In November 2015, we completed an equity offering of 852,500 shares of our common stock, receiving net proceeds of $91.5 million.

(5)  In November 2016, we acquired CompareCards for $80.7 million in cash at closing and contingent consideration payments of up to $22.5 million for each of 2017 and 2018. Total long-term liabilities at the end of 2016 included the fair value of the contingent consideration of $23.1 million. The full potential contingent consideration of $45.0 million was paid in 2018.

Table of Contents

(6)   In December 2016, we acquired two office buildings in Charlotte, North Carolina for $23.5 million in cash. In May 2019, the office buildings were sold to an unrelated third party for a sale price of $24.4 million. For additional information, *see* Note 7—Assets Held for Sale in the notes to the consolidated financial statements included elsewhere in this report.

(7)   In May 2017, we issued $300.0 million aggregate principal amount of our 0.625% Convertible Senior Notes due June 1, 2022 and, in connection therewith, entered into Convertible Note Hedge and Warrant transactions with respect to our common stock. For more information, *see* Note 14—Debt, in the notes to the consolidated financial statements included elsewhere in this report.

(8)   In June 2017, we acquired DepositAccounts for $24.0 million in cash at closing and contingent consideration payments of up to $9.0 million, and acquired MagnifyMoney for $29.6 million in cash at closing. In September 2017, we acquired SnapCap for $11.9 million in cash at closing and up to three additional contingent consideration payments, each ranging from zero to $3.0 million. Total long-term liabilities at the end of 2017 included the fair value of DepositAccounts non-current contingent consideration of $4.3 million and the fair value of SnapCap contingent consideration of $7.0 million. Total long-term liabilities at the end of 2018 included the fair value of SnapCap non-current contingent consideration of $3.7 million.

(9)   In June 2018, we acquired Ovation for $12.2 million in cash at closing and up to two contingent consideration payments, each ranging from zero to $4.4 million. In July 2018, we acquired Student Loan Hero for $60.7 million in cash at closing. In October 2018, we acquired QuoteWizard for $299.9 million in cash at closing, which was funded through $174.9 million of cash on hand and by $125.0 million drawn on our 2017 Revolving Credit Facility, and up to three contingent consideration payments, each ranging from zero to $23.4 million. Total long-term liabilities at the end of 2018 included the fair value of Ovation non-current contingent consideration of $3.3 million and the fair value of QuoteWizard contingent consideration of $20.7 million. Total long-term liabilities at the end of 2019 included the fair value of QuoteWizard contingent consideration of $24.4 million.

(10)  In January 2019, we acquired ValuePenguin for $106.1 million in cash at closing, which was funded through $16.1 million of cash on hand and by $90.0 million drawn on our 2017 Revolving Credit Facility.

Table of Contents

### ITEM 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with our consolidated financial statements and accompanying notes included elsewhere within this report. This discussion includes both historical information and forward-looking information that involves risks, uncertainties and assumptions. Our actual results may differ materially from management's expectations as a result of various factors, including but not limited to those discussed in the sections entitled "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Information."

### Company Overview

LendingTree, Inc. is the parent of LendingTree, LLC and several companies owned by LendingTree, LLC.

We operate what we believe to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. Our online consumer platform provides consumers with access to product offerings from our Network Partners, including mortgage loans, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. In addition, we offer tools and resources, including free credit scores, that facilitate comparison shopping for loans, deposit products, insurance and other offerings. We seek to match consumers with multiple providers, who can offer them competing quotes for the product, or products, they are seeking. We also serve as a valued partner to lenders and other providers seeking an efficient, scalable and flexible source of customer acquisition with directly measurable benefits, by matching the consumer inquiries we generate with these Network Partners.

Our My LendingTree platform offers a personalized comparison-shopping experience by providing free credit scores and credit score analysis. This platform enables us to observe consumers' credit profiles and then identify and alert them to loans and other offerings on our marketplace that may be more favorable than the terms they may have at a given point in time. This is designed to provide consumers with measurable savings opportunities over their lifetimes.

We are focused on developing new product offerings and enhancements to improve the experiences that consumers and Network Partners have as they interact with us. By expanding our portfolio of financial services offerings, we are growing and diversifying our business and sources of revenue. We intend to capitalize on our expertise in performance marketing, product development and technology, and to leverage the widespread recognition of the LendingTree brand to effect this strategy.

We believe the consumer and small business financial services industry is still in the early stages of a fundamental shift to online product offerings, similar to the shift that started in retail and travel many years ago and is now well established. We believe that like retail and travel, as consumers continue to move towards online shopping and transactions for financial services, suppliers will increasingly shift their product offerings and advertising budgets toward the online channel. We believe the strength of our brands and of our partner network place us in a strong position to continue to benefit from this market shift.

The LendingTree Loans business is presented as discontinued operations in the accompanying consolidated balance sheets, consolidated statements of operations and comprehensive income and consolidated cash flows for all periods presented. Except for the discussion under the heading "Discontinued Operations," the analysis within Management's Discussion and Analysis of Financial Condition and Results of Operations reflects our continuing operations.

### Segment Reporting

We have three reportable segments: Home, Consumer and Insurance. We changed our reportable segments in the fourth quarter of 2019, and prior period results have been reclassified to conform with this change in reportable segments.

### Recent Business Acquisitions

On January 10, 2019, we acquired ValuePenguin, a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards for $106.2 million. Combining ValuePenguin's high-quality content and search engine optimization capability with proprietary technology and insurance carrier network from QuoteWizard enables us to provide immense value to carriers and agents. This strategic acquisition positions us to achieve further scale in the insurance space as well as the broader financial services industry.

On October 31, 2018, we acquired QuoteWizard, one of the largest insurance comparison marketplaces in the growing online insurance advertising market, for $299.5 million in cash and potential contingent consideration payments of up to $70.2 million through October 2021, subject to achieving specific targets. QuoteWizard services clients by driving consumers to insurance companies' websites, providing leads to agents and carriers, as well as phone transfers of consumers into carrier call centers. This acquisition has established LendingTree as a leading player in the online insurance advertising industry, while continuing our ongoing diversification within the financial services category.

Table of Contents

On July 23, 2018, we acquired Student Loan Hero for $62.7 million in cash, of which $2.3 million was recognized as severance expense in our consolidated statements of operations and comprehensive income. Student Loan Hero, a personal finance website dedicated to helping student loan borrowers manage their student debt, offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. This strategic transaction allows us to scale our student loan business and provide consumers with the tools and resources to better understand their personal finances and make smarter financial decisions.

On June 11, 2018, we acquired Ovation, a leading provider of credit services with a strong customer service reputation for $12.1 million in cash and potential contingent consideration payments of up to $8.75 million through June 2020, subject to achieving specified targets. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports. Ovation's experienced management team, strong credit bureau relationships and customized software platform enable us to help more consumers achieve their original financial goals through the LendingTree platform.

On September 19, 2017, we acquired certain assets of SnapCap for $11.9 million in cash at closing and contingent consideration payments of up to $9.0 million through March 31, 2020, subject to achieving specific targets. SnapCap is a tech-enabled online platform, which connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach. SnapCap's high-touch, high-conversion sales approach with our brand and performance marketing expertise has enabled growth in our small business offering.

On June 20, 2017, we acquired MagnifyMoney for $29.6 million cash consideration at the closing of the transaction. MagnifyMoney is a leading consumer-facing media property that offers editorial content, expert commentary, tools and resources to help consumers compare financial products and make informed financial decisions. The MagnifyMoney team brings the expertise and infrastructure to expand content creation and distribution across all of our consumer facing brands, improving our presence and efficacy in acquisition channels such as search engine optimization.

On June 14, 2017, we acquired substantially all of the assets of DepositAccounts for $24.0 million in cash at closing and contingent consideration payments of up to $9.0 million through June 30, 2020, subject to achieving specific targets. DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content. This acquisition represented our first offering to address the asset side of the consumer balance sheet.

These acquisitions continue our diversification strategy.

**Recent Mortgage Interest Rate Trends**

Interest rate and market risks can be substantial in the mortgage lead generation business. Short-term fluctuations in mortgage interest rates primarily affect consumer demand for mortgage refinancings, while long-term fluctuations in mortgage interest rates, coupled with the U.S. real estate market, affect consumer demand for new mortgages. Consumer demand, in turn, affects lender demand for mortgage leads from third-party sources, as well as our own ability to attract online consumers to our website.

Typically, when interest rates decline, we see increased consumer demand for mortgage refinancing, which in turn leads to increased traffic to our website and decreased selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically decreases, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic mortgage lead volume. Due to lower lender demand, our revenue earned per consumer typically decreases, but with correspondingly lower selling and marketing costs.

Conversely, when interest rates increase, we typically see decreased consumer demand for mortgage refinancing, leading to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically increases, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases. Due to high lender demand, we typically see an increase in the amount lenders will pay per matched lead, which often leads to higher revenue earned per consumer. However, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment.

We dynamically adjust selling and marketing expenditures in all interest rate environments to optimize our results against these variables.

38

Table of Contents

According to Freddie Mac, 30-year mortgage interest rates declined from a monthly average of 4.15% in January 2017 to a monthly average of 3.81% in September 2017, before increasing to 3.95% at the end of 2017. During 2018, 30-year mortgage interest rates generally increased to a monthly average of 4.87% in November 2018, but declined to 4.64% at the end of 2018. During 2019, 30-year mortgage interest rates steadily decreased from a monthly average of 4.46% in January 2019, ending at a monthly average of 3.72% in December.

On a full-year basis, 30-year mortgage interest rates decreased to an average 3.94% in 2019, as compared to 4.54% and 3.99% in 2018 and 2017, respectively.



**HISTORICAL MIX OF MORTGAGE ORIGINATION DOLLARS**

Typically, as mortgage interest rates decline, there are more consumers in the marketplace seeking refinancings and, accordingly, the mix of mortgage origination dollars will move towards refinance mortgages. According to Mortgage Bankers Association ("MBA") data, total refinance origination dollars decreased from 35% of total 2017 mortgage origination dollars to 28% in 2018, then increased to 38% in 2019 as a result of the general trend in average mortgage interest rates. In 2019, total refinance origination dollars increased by 70% over 2018 and by 29% over 2017.

Looking forward, the MBA is projecting 30-year mortgage interest rates to remain relatively consistent in 2020, at an average 3.7% on 30-year fixed rate mortgages. According to MBA projections, the mix of mortgage origination dollars is expected to move back towards purchase mortgages with the refinance share representing just 33% for 2020.

### The U.S. Real Estate Market

The health of the U.S. real estate market and interest rate levels are the primary drivers of consumer demand for new mortgages. Consumer demand, in turn, affects lender demand for purchase mortgage leads from third-party sources. Typically, a strong real estate market will lead to reduced lender demand for leads, as there are more consumers in the marketplace seeking financing and, accordingly, lenders receive more organic lead volume. Conversely, a weaker real estate market will typically lead to an increase in lender demand, as there are fewer consumers in the marketplace seeking mortgages.

According to the National Association of Realtors ("NAR"), nationwide existing home sales in 2017 increased approximately 2% over 2016 due to limited inventory of homes for sale in 2017. In addition to continued low inventory, rising interest rates contributed to declining home sales in 2018, resulting in nationwide existing home sales in 2018 contracting approximately 3% from 2017. In 2019, existing home sales remained consistent with 2018 levels. The NAR expects an increase in home sales in 2020, particularly if interest rates continue to remain low and employment growth is sustained.

https://www.sec.gov/ix?doc=/Archives/edgar/data/1434621/000143462120000015/tree-12312019x10k.htm[10/12/2020 4:02:55 PM]

Inline XBRL Viewer

Table of Contents

**Convertible Senior Notes and Hedge and Warrant Transactions**

On May 31, 2017, we issued $300.0 million aggregate principal amount of our 0.625% Convertible Senior Notes due June 1, 2022 and, in connection therewith, entered into Convertible Note Hedge and Warrant transactions with respect to our common stock. For more information, *see* Note 14—Debt, in the notes to the consolidated financial statements included elsewhere in this report.

**North Carolina Office Properties**

In December 2016, we completed the acquisition of two office buildings in Charlotte, North Carolina, for $23.5 million in cash. The buildings were acquired with the intent to use such buildings as our corporate headquarters and rent any unused space. In November 2018, the office buildings were classified as held for sale. In May 2019, we sold these buildings to an unrelated third party for a sale price of $24.4 million. For additional information, *see* Note 7—Assets Held for Sale in the notes to the consolidated financial statements included elsewhere in this report.

With our expansion in North Carolina, in December 2016, we received a grant from the state that provides up to $4.9 million in reimbursements over 12 years beginning in 2017 for investing in real estate and infrastructure in addition to increasing jobs in North Carolina at specific targeted levels through 2020, and maintaining the jobs thereafter. Additionally, the city of Charlotte and the county of Mecklenburg provided a grant that will be paid over five years and is based on a percentage of new property tax we pay on the development of a corporate headquarters. In December 2018, we received an additional grant from the state that provides up to $8.4 million in reimbursements over 12 years beginning in 2020 for increasing jobs in North Carolina at specific targeted levels through 2023, and maintaining the jobs thereafter.

40

Table of Contents

### Results of Operations for the Years ended December 31, 2019 and 2018

For information on fiscal 2017 results and similar comparisons, *see* Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations for the Years Ended December 31, 2018, 2017 and 2016 of our Form 10-K for the fiscal year ended December 31, 2018.

| | Year Ended December 31, | | 2019 vs. 2018 | |
| | 2019 | 2018 | $ Change | % Change |
| --- | --- | --- | --- | --- |
| | *(Dollars in thousands)* | | | |
| Home | $ 277,935 | $ 319,176 | $ (41,241) | (13)% |
| Consumer | 515,037 | 395,615 | 119,422 | 30 % |
| Insurance | 284,792 | 31,369 | 253,423 | 808 % |
| Other | 28,839 | 18,705 | 10,134 | 54 % |
| **Revenue** | **1,106,603** | **764,865** | **341,738** | **45 %** |
| Costs and expenses: | | | | |
| Cost of revenue *(exclusive of depreciation and amortization shown separately below)* | 68,379 | 36,399 | 31,980 | 88 % |
| Selling and marketing expense | 735,180 | 500,291 | 234,889 | 47 % |
| General and administrative expense | 116,847 | 101,219 | 15,628 | 15 % |
| Product development | 39,953 | 26,958 | 12,995 | 48 % |
| Depreciation | 10,998 | 7,385 | 3,613 | 49 % |
| Amortization of intangibles | 55,241 | 23,468 | 31,773 | 135 % |
| Change in fair value of contingent consideration | 28,402 | 10,788 | 17,614 | 163 % |
| Severance | 1,026 | 2,352 | (1,326) | (56)% |
| Litigation settlements and contingencies | (151) | (186) | 35 | 19 % |
| **Total costs and expenses** | **1,055,875** | **708,674** | **347,201** | **49 %** |
| **Operating income** | **50,728** | **56,191** | **(5,463)** | **(10)%** |
| Other (expense) income, net: | | | | |
| Interest expense, net | (20,271) | (12,437) | (7,834) | (63)% |
| Other income (expense) | 524 | (10) | 534 | 5,340 % |
| **Income before income taxes** | **30,981** | **43,744** | **(12,763)** | **(29)%** |
| Income tax benefit | 8,479 | 65,575 | (57,096) | (87)% |
| **Net income from continuing operations** | **39,460** | **109,319** | **(69,859)** | **(64)%** |
| **Loss from discontinued operations, net of tax** | **(21,632)** | **(12,820)** | **(8,812)** | **(69)%** |
| **Net income and comprehensive income** | $ **17,828** | $ **96,499** | $ **(78,671)** | **(82)%** |

#### Revenue

Revenue increased in 2019 compared to 2018 due to increases in our Consumer and Insurance segments, partially offset by a decrease in our Home segment.

Our Consumer segment includes the following products: credit cards, personal loans, small business loans, student loans, auto loans, deposit accounts, and other credit products such as credit repair and debt settlement. Many of our Consumer segment products are not individually significant to revenue. Revenue from our Consumer segment increased $119.4 million in 2019 from 2018, or 30%, primarily due to increases in our credit cards, personal loans, small business loans, student loans and credit services products.

Revenue from our credit card product increased $45.5 million to $211.3 million in 2019 from $165.8 million in 2018, or 28%, due to increases in the number of approvals and an increase in revenue earned per approval.

Revenue from our personal loan product increased $18.5 million to $152.7 million in 2019 from $134.2 million in 2018, or 14%, due to an

increased number of consumers completing request form, partially offset against lower revenue earned per consumer.

Table of Contents

For 2019 and 2018, no other products in our Consumer segment represented more than 10% of revenue, however certain other Consumer products experienced notable increases. Revenue from our small business loans product increased $20.5 million in 2019 compared to 2018, due to increases in the number of consumers seeking business loans, partially offset by a decrease in revenue earned per consumer. Revenue from our student loans product increased $15.3 million in 2019 compared to 2018, due to increased consumers, increased lenders on our exchange, and the acquisition of Student Loan Hero in July 2018. Revenue from our credit services product increased $14.6 million in 2019 compared to 2018, primarily due to the acquisition of Ovation in June 2018, as well as an increase in revenue earned per consumer.

We believe the market for our Consumer segment remains under-penetrated and we believe long-term growth prospects are positive for the Consumer segment. While we anticipate growth in the Consumer segment, we do not expect revenue to grow at the rate experienced in 2019. A significant industry-wide contraction in the availability of capital for products in the Consumer segment would likely adversely affect our Consumer product revenues.

Revenue from our Insurance segment increased $253.4 million to $284.8 million in 2019 from $31.4 million in 2018, or 808%, due to the QuoteWizard acquisition, completed on October 31, 2018. As a result, we do not expect revenue in our Insurance segment to increase at the rate experienced in 2019.

Our Home segment includes the following products: purchase mortgage, refinance mortgage, home equity loans and lines of credit, reverse mortgage loans, and real estate. Revenue from our Home segment decreased $41.2 million in 2019 from 2018, or 13%, primarily due to decreases in our purchase mortgage, home equity loans and lines of credit and reverse mortgage products, partially offset by an increase in revenue from our refinance mortgage product. The revenue from our purchase mortgage, home equity loans and lines of credit and reverse mortgage products decreased $33.2 million, $8.8 million and $6.7 million, respectively, in 2019 from 2018, due to decreases in the number of consumers completing request forms as well as a decrease in revenue earned per consumer. The revenue from our refinance mortgage product increased $7.6 million in 2019 from 2018 primarily due to an increase in the number of consumers completing request forms as a result of more consumers seeking refinancing in a period of declining interest rates, partially offset by a decrease in revenue earned per consumer. We expect growth in revenue in our Home segment.

Our Other category includes revenue from the resale of online advertising space to third parties and revenue from home improvement referrals. Revenue in the Other category increased $10.1 million, primarily from the resale of online advertising space to third parties, partially offset by the decrease in revenue from home improvement referrals. Revenue from our Other category will decrease significantly in 2020, as effective in the first quarter of 2019, we no longer offer home improvement referrals and effective in the first quarter of 2020, we will no longer resell online advertising space.

**Cost of revenue**

Cost of revenue consists primarily of costs associated with compensation and other employee-related costs (including stock-based compensation) relating to internally-operated customer call centers, third-party customer call center fees, costs for online advertising resold to third parties, credit scoring fees, credit card fees, website network hosting and server fees.

Cost of revenue increased in 2019 from 2018, primarily due to increases of $13.9 million for the cost of resold advertising space, $10.9 million in compensation and benefits as a result of increases in headcount, $3.8 million in website network hosting and server fees, $1.1 million in credit card fees and $1.0 million in call center technology. We expect a decrease in cost of revenue in 2020 as effective in the first quarter of 2020, we will no longer resell online advertising space.

Cost of revenue as a percentage of revenue increased to 6% in 2019 compared to 5% in 2018 due to the items above.

**Selling and marketing expense**

Selling and marketing expense consists primarily of advertising and promotional expenditures and compensation and other employee-related costs (including stock-based compensation) for personnel engaged in sales or marketing functions. Advertising and promotional expenditures primarily include online marketing, as well as television, print and radio spending. Advertising production costs are expensed in the period the related ad is first run.

The increases in selling and marketing expense in 2019 compared to 2018 was primarily due to increases in advertising and promotional expense of $218.2 million, as discussed below. In addition, selling and marketing expense increased in 2019 compared to 2018 due to an increase in compensation and benefits of $16.7 million as a result of increases in headcount.

**Table of Contents**

Advertising and promotional expense is the largest component of selling and marketing expense, and is comprised of the following:

| | Year Ended December 31, | | | | 2019 vs. 2018 | | |
| | 2019 | | 2018 | | $ Change | | % Change |
|---|---|---|---|---|---|---|---|
| | *(Dollars in thousands)* | | | | | | |
| Online | $ | 653,739 | $ | 453,066 | $ | 200,673 | 44% |
| Broadcast | | 20,972 | | 5,974 | | 14,998 | 251% |
| Other | | 13,469 | | 10,908 | | 2,561 | 23% |
| **Total advertising expense** | $ | **688,180** | $ | **469,948** | $ | 218,232 | 46% |

Revenue is primarily driven by Network Partner demand for our products, which is matched to corresponding consumer requests. We adjust our selling and marketing expenditures dynamically in relation to anticipated revenue opportunities in order to ensure sufficient consumer inquiries to profitably meet such demand. An increase in a product's revenue is generally met by a corresponding increase in marketing spend, and conversely a decrease in a product's revenue is generally met by a corresponding decrease in marketing spend. This relationship exists for our Home, Consumer and Insurance segments.

We increased our advertising expenditures in 2019 compared to 2018 in order to generate additional consumer inquiries to meet the increased demand of Network Partners on our marketplace. We will continue to adjust selling and marketing expenditures dynamically in relation to anticipated revenue opportunities.

**General and administrative expense**

General and administrative expense consists primarily of compensation and other employee-related costs (including stock-based compensation) for personnel engaged in finance, legal, tax, corporate information technology, human resources and executive management functions, as well as facilities and infrastructure costs and fees for professional services.

General and administrative expense increased in 2019 compared to 2018, primarily due to increases in compensation and benefits of $8.7 million as a result of increases in headcount. General and administrative expense also increased due to increases in facilities expense of $4.4 million and technology expense of $4.3 million, partially offset by a decrease in professional fees of $4.5 million. General and administrative expense in 2018 includes a charge of $1.6 million due to the write-off of certain fixed assets. The increase in general and administrative expense in 2019 compared to 2018 is also partially offset by a $2.7 million gain on the sale of two office buildings in Charlotte, North Carolina.

General and administrative expense as a percentage of revenue decreased to 11% in 2019 compared to 13% in 2018.

**Product development**

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) and third-party labor costs that are not capitalized, for employees and consultants engaged in the design, development, testing and enhancement of technology.

Product development expense increased in 2019 compared to 2018 as we continued to invest in internal development of new and enhanced features, functionality and business opportunities that we believe will enable us to better and more fully serve consumers and lenders.

**Depreciation**

The increase in depreciation expense in 2019 compared to 2018 was primarily the result of higher investment in internally developed software in recent years, to support the growth of our business.

**Amortization of intangibles**

The increase in amortization of intangibles in 2019 compared to 2018 was primarily due to intangible assets associated with our business acquisitions in 2019 and 2018.

43

Table of Contents

**Contingent consideration**

During 2019, we recorded an aggregate of $28.4 million of contingent consideration expense due to adjustments in the estimated fair value of the earnout payments related to our recent acquisitions. For 2019, the contingent consideration expense for the QuoteWizard and SnapCap acquisitions were $27.1 million and $2.2 million, respectively. This was partially offset by a contingent consideration gain for the DepositAccounts acquisition of $1.0 million.

During 2018, we recorded an aggregate of $10.8 million of contingent consideration expense due to adjustments in the estimated fair value of the earnout payments related to our recent acquisitions. For 2018, the contingent consideration expense for the CompareCards, DepositAccounts, Ovation and QuoteWizard acquisitions were $0.7 million, $2.0 million, $1.6 million and $6.8 million, respectively. This was partially offset by a contingent consideration gain for the SnapCap acquisition of $0.3 million.

**Income tax expense**

|  | Year Ended December 31, | | | |
|  | 2019 | | 2018 | |
|  | *(in thousands, except percentages)* | | | |
| Income tax benefit | $ | 8,479 | $ | 65,575 |
| *Effective tax rate* | | *(27.4)%* | | *(149.9)%* |

For 2019, the effective tax rate varied from the federal statutory rate of 21% primarily due to the benefit derived from excess tax deductions from the vesting of restricted stock and exercise of stock options of $17.1 million, including state taxes and the benefit of the expected 2019 federal research and development tax credit of $3.5 million, offset by expense due to incremental valuation allowance on state net operating losses of $3.9 million, primarily due to state legislative changes.

For 2018, the effective tax rate varied from the federal statutory rate of 21% primarily due to the benefit derived from excess tax deductions from the vesting of restricted stock and exercise of stock options of $77.6 million, including state taxes.

**Discontinued Operations**

The results of discontinued operations include the results of the LendingTree Loans business formerly operated by our wholly-owned subsidiary, Home Loan Center, Inc., or HLC. The sale of substantially all of the assets of HLC, including the LendingTree Loans business, was completed on June 6, 2012. HLC filed a petition under Chapter 11 of the United States Bankruptcy Code on July 21, 2019, which was converted to Chapter 7 of the United States Bankruptcy Code on September 16, 2019.

As a result of the voluntary bankruptcy petition, as of the initial July 21, 2019 bankruptcy petition filing date, HLC and its consolidated subsidiary were deconsolidated from LendingTree's consolidated financial statements. The effect of such deconsolidation was the elimination of the consolidated assets and liabilities of HLC (and its consolidated subsidiary) from LendingTree's consolidated balance sheets and the recognition of a $4.5 million gain upon deconsolidation in the third quarter of 2019. In addition, LendingTree recognized a loss of $31.0 million in the third quarter of 2019 as a result of a settlement offer to HLC after it filed for bankruptcy related to LendingTree LLC's ownership in HLC.

Prior to the bankruptcy filing, losses from the LendingTree Loans business were primarily due to litigation settlements and contingencies and legal fees associated with ongoing legal proceedings.

The results of discontinued operations include litigation settlements and contingencies and legal fees associated with ongoing legal proceedings against LendingTree Inc. or LendingTree LLC that arose due to the LendingTree Loans business or the HLC bankruptcy filing.

*See* Note 20—Discontinued Operations to the consolidated financial statements included elsewhere in this report for more information, including the accounting effect of HLC's bankruptcy filing on our consolidated financial statements.

Table of Contents

### Segment Profit

| | | Year Ended December 31, | | 2019 vs. 2018 | |
|---|---|---|---|---|---|
| | | **2019** | **2018** | **$ Change** | **% Change** |
| | | *(Dollars in thousands)* | | | |
| Home | $ | 103,121 $ | 104,701 $ | (1,580) | (2)% |
| Consumer | | 213,185 | 187,724 | 25,461 | 14 % |
| Insurance | | 114,639 | 11,358 | 103,281 | 909 % |
| Other | | 1,373 | 1,354 | 19 | 1 % |
| **Segment profit** | $ | **432,318** $ | **305,137** $ | **127,181** | **42 %** |

Segment profit is our primary segment operating metric. Segment profit is calculated as segment revenue less segment selling and marketing expenses attributed to variable costs paid for advertising, direct marketing and related expenses that are directly attributable to the segments' products. See Note 21—Segment Information in the notes to the consolidated financial statements for additional information on segments and a reconciliation of segment profit to pre-tax income from continuing operations.

Home segment profit remained relatively consistent, primarily due to a decrease in revenue generally offset by corresponding decreases in selling and marketing expense.

Consumer segment profit increased $25.5 million during 2019, primarily due to an increase in revenue partially offset by a corresponding increase in selling and marketing expense in the current period for online advertising. Additionally, selling and marketing expenses in our Consumer segment increased as a percentage of revenue in 2019 compared to 2018.

Insurance segment profit increased $103.3 million during 2019, primarily due to the QuoteWizard acquisition completed on October 31, 2018.

### Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization

We report Adjusted EBITDA as a supplemental measure to GAAP. This measure is the primary metric by which we evaluate the performance of our businesses, on which our marketing expenditures and internal budgets are based and by which management and many employees are compensated. We believe that investors should have access to the same set of tools that we use in analyzing our results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. We provide and encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measures discussed below.

*Definition of Adjusted EBITDA*

We report Adjusted EBITDA as net income from continuing operations adjusted to exclude interest, income tax, amortization of intangibles and depreciation, and to further exclude (1) non-cash compensation expense, (2) non-cash impairment charges, (3) gain/loss on disposal of assets, (4) restructuring and severance expenses, (5) litigation settlements and contingencies, (6) acquisitions and dispositions income or expense (including with respect to changes in fair value of contingent consideration), and (7) one-time items. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our statement of operations of certain expenses, including depreciation, non-cash compensation and acquisition-related accounting. We endeavor to compensate for the limitations of the non-GAAP measures presented by also providing the comparable GAAP measures with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measures. These non-GAAP measures may not be comparable to similarly titled measures used by other companies.

*One-Time Items*

Adjusted EBITDA is adjusted for one-time items, if applicable. Items are considered one-time in nature if they are non-recurring, infrequent or unusual and have not occurred in the past two years or are not expected to recur in the next two years, in accordance with SEC rules. For the periods presented below, there are no adjustments for one-time items.

Table of Contents

*Non-Cash Expenses that are Excluded from Adjusted EBITDA*

Non-cash compensation expense consists principally of expense associated with grants of restricted stock, restricted stock units and stock options, some of which awards have performance-based vesting conditions. These expenses are not paid in cash, and we include the related shares in our calculations of fully diluted shares outstanding. Upon settlement of restricted stock units, exercise of certain stock options or vesting of restricted stock awards, the awards may be settled, on a net basis, with us remitting the required tax withholding amount from our current funds.

Amortization of intangibles are non-cash expenses relating primarily to intangible assets acquired through acquisitions. At the time of an acquisition, the intangible assets of the acquired company, such as purchase agreements, technology and customer relationships, are valued and amortized over their estimated lives.

The following table is a reconciliation of net income from continuing operations to Adjusted EBITDA.

| | Year Ended December 31, | |
| | 2019 | 2018 |
| | *(in thousands)* | |
|---|---|---|
| **Net income from continuing operations** | $ 39,460 | $ 109,319 |
| Adjustments to reconcile to Adjusted EBITDA: | | |
| Amortization of intangibles | 55,241 | 23,468 |
| Depreciation | 10,998 | 7,385 |
| Severance | 1,026 | 2,352 |
| (Gain) loss on impairments and disposal of assets | (945) | 2,210 |
| Non-cash compensation | 52,167 | 44,365 |
| Change in fair value of contingent consideration | 28,402 | 10,788 |
| Acquisition expense | 211 | 6,303 |
| Litigation settlements and contingencies | (151) | (186) |
| Interest expense, net | 20,271 | 12,437 |
| Rental amortization of intangibles and depreciation | — | 630 |
| Income tax benefit | (8,479) | (65,575) |
| **Adjusted EBITDA** | $ 198,201 | $ 153,496 |

### Financial Position, Liquidity and Capital Resources

For information on fiscal 2017 results and similar comparisons, *see* Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Financial Position, Liquidity and Capital Resources of our Form 10-K for the fiscal year ended December 31, 2018.

**General**

As of December 31, 2019, we had $60.2 million of cash and cash equivalents, compared to $105.1 million of cash and cash equivalents as of December 31, 2018.

Notable transactions affecting cash and cash equivalents during the reported periods are as follows:

**2019**

In 2019, we purchased an aggregate of 22,731 shares of our common stock pursuant to a stock repurchase program for $5.5 million.

In May 2019, we completed the sale of two office buildings in Charlotte, North Carolina to an unrelated third party for a sale price of $24.4 million. We received proceeds of $24.1 million, net of closing fees of $0.3 million.

In January 2019, we acquired ValuePenguin for $106.2 million in cash. The acquisition was funded through $90.0 million drawn on our 2017 Revolving Credit Facility and the balance using cash on hand.

During 2019, we paid down $140.0 million on our 2017 Revolving Credit Facility.

During 2019, we made contingent consideration payments of $3.0 million, $3.0 million, $4.4 million and $23.4 million related to the prior acquisitions of SnapCap, DepositAccounts, Ovation and QuoteWizard, respectively.

Table of Contents

**2018**

In 2018, we purchased an aggregate of 379,449 shares of our common stock pursuant to a stock repurchase program for $92.6 million. Additionally, we paid $1.1 million in the first quarter of 2018 related to common stock repurchases in the fourth quarter of 2017.

In October 2018, we acquired QuoteWizard for $299.9 million in cash and potential contingent consideration payments of up to $70.2 million through October 2021, subject to achieving specific targets. The acquisition was funded through $125.0 million drawn on our 2017 Revolving Credit Facility and the balance using cash on hand.

In July 2018, we acquired Student Loan Hero for $62.7 million in cash.

In June 2018, we acquired Ovation for $12.1 million in cash and could make potential future contingent consideration payments of up to $8.75 million through June 2020, subject to achieving specified targets.

During 2018, we made contingent consideration payments of $45.0 million and $4.0 million related to the prior acquisitions of CompareCards and DepositAccounts, respectively.

**Recent Developments**

In January 2020, we paid down $25.0 million on our Amended Revolving Credit Facility.

In January 2020, we made a contingent consideration payment of $3.0 million related to the prior acquisition of SnapCap. We could make additional potential contingent consideration payments of up to $1.0 million for DepositAccounts, $3.0 million for SnapCap, $4.4 million for Ovation, and $46.8 million for QuoteWizard.

We expect our cash and cash equivalents and cash flows from operations to be sufficient to fund our operating needs for the next twelve months and beyond. Our revolving credit facility described below is an additional potential source of liquidity.

**Senior Secured Revolving Credit Facility**

On December 10, 2019, we entered into an amended and restated $500.0 million five-year senior secured revolving credit facility, which matures on December 10, 2024 (the "Amended Revolving Credit Facility"). Borrowings under the Amended Revolving Credit Facility can be used to finance working capital needs, capital expenditures and general corporate purposes, including to finance permitted acquisitions. As of February 26, 2020, we have $50.0 million of borrowings and a $0.2 million letter of credit under the Amended Revolving Credit Facility. The remaining borrowing capacity at February 26, 2020 is $449.8 million.

For additional information on the Amended Revolving Credit Facility, *see* Note 14—Debt in the notes to the consolidated financial statements included elsewhere in this report.

**Cash Flows from Continuing Operations**

Our cash flows attributable to continuing operations are as follows:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2019** | | **2018** | |
| | *(in thousands)* | | | |
| Net cash provided by operating activities | $ | 157,174 | $ | 123,948 |
| Net cash used in investing activities | $ | (101,060) | $ | (383,038) |
| Net cash (used in) provided by financing activities | $ | (87,678) | $ | 4,843 |

***Cash Flows from Operating Activities***

Our largest source of cash provided by our operating activities is revenues generated by our products. Our primary uses of cash from our operating activities include advertising and promotional payments. In addition, our uses of cash from operating activities include compensation and other employee-related costs, other general corporate expenditures, litigation settlements and contingencies, certain contingent consideration payments, and income taxes.

Net cash provided by operating activities attributable to continuing operations increased in 2019 from 2018 primarily due to an increase in revenue, partially offset by an increase in selling and marketing expense, and $12.5 million portion of earnout payments made in excess of the contingent consideration liability recognized at the acquisition date. Additionally, there was a net decrease in cash from changes in working capital primarily driven by changes in accounts payable, accrued expenses and other current liabilities and accounts receivable.

Table of Contents

### Cash Flows from Investing Activities

Net cash used in investing activities attributable to continuing operations in 2019 of $101.1 million consisted primarily of the acquisition of ValuePenguin for $105.6 million, net of cash acquired, and capital expenditures of $20.0 million primarily related to internally developed software. This was partially offset by proceeds of $24.1 million on the sale of two office buildings, net of closing expenses.

Net cash used in investing activities attributable to continuing operations in 2018 of $383.0 million consisted primarily of the acquisitions, net of cash acquired, of QuoteWizard for $297.1 million, Student Loan Hero for $59.5 million and Ovation for $11.6 million, as well as capital expenditures of $14.9 million.

### Cash Flows from Financing Activities

Net cash used in financing activities attributable to continuing operations in 2019 of $87.7 million consisted primarily of $50.0 million of net repayments on our 2017 Revolving Credit Facility, $21.3 million of aggregate contingent consideration payments for the prior acquisitions of SnapCap, Ovation and QuoteWizard, $5.5 million for the repurchase of our stock, and $8.4 million in withholding taxes paid upon surrender of shares to satisfy obligations on equity awards, net of proceeds from the exercise of stock options.

Net cash provided by financing activities attributable to continuing operations in 2018 of $4.8 million consisted primarily of $125.0 million of net proceeds from our 2017 Revolving Credit Facility, partially offset by $27.6 million of aggregate contingent consideration payments for the prior acquisitions of CompareCards, DepositAccounts and SimpleTuition, and $93.7 million for the repurchase of our stock.

## Off-Balance Sheet Arrangements

We have no off-balance sheet arrangements other than a letter of credit and our funding commitments pursuant to our surety bonds, none of which have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. *See* Note 15—Commitments to the consolidated financial statements included elsewhere in the report for further details.

## Summary of Contractual Obligations

The following table sets forth our contractual obligations and commercial commitments as of December 31, 2019.

| | | Payments Due By Period as of December 31, 2019 | | | |
| Contractual Obligations [(a)] | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
|---|---|---|---|---|---|
| Operating lease obligations [(b)] | $ 31,767 | $ 8,060 | $ 11,229 | $ 8,667 | $ 3,811 |
| Long-term contractual obligations [(c)] | 176,980 | 15,312 | 43,019 | 17,400 | 101,249 |
| Convertible debt | 299,991 | — | 299,991 | — | — |
| **Total contractual obligations** | **$ 508,738** | **$ 23,372** | **$ 354,239** | **$ 26,067** | **$ 105,060** |

(a)  Excludes potential obligations under surety bonds. Excludes a $2.1 million accrual related to uncertain tax position, as we are unable to determine when, or if, payments for these taxes will ultimately be made.

(b)  Our operating lease obligations are associated with office space and office equipment.

(c)  Includes a liability of $33.5 million for the estimated fair value of contingent consideration obligations reflected on the balance sheet for the acquisitions of SnapCap, Ovation and QuoteWizard. Actual contingent consideration payments could range from zero to $1.0 million for DepositAccounts, $3.0 million to $6.0 million for SnapCap, zero to $4.4 million for Ovation, and zero to $46.8 million for QuoteWizard. Also includes $143.5 million of certain other commitments.

48

Table of Contents

**Critical Accounting Policies and Estimates**

The following disclosure is provided to supplement the description of our accounting policies contained in Note 2—Significant Accounting Policies to the consolidated financial statements included elsewhere in this report in regard to significant areas of judgment. This disclosure includes accounting policies related to both continuing operations and discontinued operations. Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with generally accepted accounting principles. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated financial statements than others. A discussion of some of our more significant accounting policies and estimates follows.

**Income Taxes**

Estimates of deferred income taxes and the significant items giving rise to the deferred assets and liabilities are shown in Note 13—Income Taxes to the consolidated financial statements included elsewhere in this report, and reflect management's assessment of actual future taxes to be paid on items reflected in the consolidated financial statements, giving consideration to both timing and the probability of realization. Actual income taxes could vary from these estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the IRS, as well as actual operating results that may vary significantly from anticipated results.

We also recognize liabilities for uncertain tax positions based on the two-step process prescribed by the accounting guidance for uncertainty in income taxes. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon ultimate settlement. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes.

A valuation allowance is provided on deferred tax assets if it is determined that it is *"more likely than not"* that the deferred tax asset will not be realized. At December 31, 2019, 2018 and 2017, we recorded a partial valuation allowance of $4.1 million, $2.2 million and $2.7 million, respectively, primarily related to state net operating losses, which we do not expect to be able to utilize prior to expiration.

**Stock-Based Compensation**

The forms of stock-based awards granted to our employees are principally restricted stock units ("RSUs"), RSUs with performance conditions, stock options and stock options with performance conditions. Further, stock options with market conditions, restricted stock awards ("RSAs") with performance conditions and RSAs with market conditions have been granted to our Chairman and Chief Executive Officer. The value of RSUs is measured at their grant dates as the fair value of common stock and amortized ratably as non-cash compensation expense over the vesting term. The value of stock options issued is estimated using a Black-Scholes option pricing model. The value of performance-based grants is measured at their grant dates and recognized as non-cash compensation expense, considering the probability of the targets being achieved. Performance-based grants with a market condition are generally valued using a Monte Carlo simulation model. If an award is modified, we determine if the modification requires a new calculation of fair value or change in the vesting term of the award. *See* Note 12—Stock-Based Compensation to the consolidated financial statements included elsewhere in this report for additional information on assumptions and inputs to the fair value determination of stock-based awards.

**Evaluation of Goodwill Impairment**

We test goodwill annually for impairment as of October 1, or more frequently upon the occurrence of certain events or substantive changes in circumstances. As part of our annual impairment testing of goodwill, we may elect to assess qualitative factors as a basis for determining whether it is necessary to perform the traditional quantitative impairment testing. If our assessment of these qualitative factors indicates that it is not more likely than not that the fair value of the reporting unit or indefinite-lived intangible asset is less than its carrying value, then no further testing is required. Otherwise, the goodwill reporting unit must be quantitatively tested for impairment.

Table of Contents

The quantitative test for goodwill impairment is determined using a two-step process. Performing the first step to compare reporting unit fair value with its carrying value using a discounted cash flow ("DCF") analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill (determined in the same manner as the amount of goodwill recognized in a business combination) with the carrying amount of that goodwill. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The value of goodwill subject to assessment for impairment at December 31, 2019 is $420.1 million.

### Recoverability of Long-Lived Assets

We review the carrying value of all long-lived assets, primarily property and equipment, definite-lived intangible assets and operating lease right-of-use assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may be impaired. Impairment is considered to have occurred whenever the carrying value of a long-lived asset cannot be recovered from cash flows that are expected to result from the use and eventual disposition of the asset. This recoverability test requires us to make assumptions and judgments related to factors used in a calculation of undiscounted cash flows, including, but not limited to, management's expectations for future operations and projected cash flows. The key assumptions used in this calculation include Adjusted EBITDA, the remaining useful lives of the primary cash flow generating asset in the asset group and, to a lesser extent, the deduction of capital expenditures and taxes paid in cash to arrive at net cash flows.

The value of long-lived assets subject to assessment for impairment is $228.3 million at December 31, 2019.

### Business Acquisitions

When we acquire businesses, we allocate the purchase price to tangible assets and liabilities and identifiable intangible assets acquired at their acquisition date fair values. Any residual purchase price is recorded as goodwill. We also estimate the fair value of any contingent consideration using Level 3 unobservable inputs. Our estimates of fair value are based upon assumptions believed to be reasonable but which are uncertain and involve significant judgments by management.

We reassess the fair value of contingent consideration quarterly until the contingency is resolved, and changes in the fair value are recorded in operating income in the consolidated statements of operations and comprehensive income.

### New Accounting Pronouncements

*See* Note 2—Significant Accounting Policies to the consolidated financial statements included elsewhere in this report for a description of recent accounting pronouncements.

50

Table of Contents

**ITEM 7A.** *Quantitative and Qualitative Disclosures about Market Risk*

Other than our Amended Revolving Credit Facility, we do not have any financial instruments that are exposed to significant market risk. We maintain our cash and cash equivalents in bank deposits and short-term, highly liquid money market investments. A hypothetical 100-basis point increase or decrease in market interest rates would not have a material impact on the fair value of our cash equivalents securities, or our earnings on such cash equivalents, but would have an effect on the interest paid on borrowings under the Amended Revolving Credit Facility, if any. As of February 26, 2020, there was $50.0 million borrowed under the Amended Revolving Credit Facility. If the LIBO rate increased by 100-basis points, our annual interest expense would increase by approximately $0.5 million. Increases in the Federal Funds interest rates may also affect potential contingent consideration payments to DepositAccounts. *See* Note 8—Business Acquisitions—2017 Acquisitions—DepositAccounts.

Fluctuations in interest rates affect consumer demand for new mortgages and the level of refinancing activity which, in turn, affects lender demand for mortgage leads. Typically, when interest rates decline, we see increased consumer demand for mortgage refinancing, which in turn leads to increased traffic to our website and decreased selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically decreases, as there are more consumers in the marketplace seeking refinancings and, accordingly, lenders receive more organic lead volume. Due to lower lender demand, our revenue earned per consumer typically decreases but with correspondingly lower selling and marketing costs. Conversely, when interest rates increase, we typically see decreased consumer demand for mortgage refinancing, leading to decreased traffic to our website and higher associated selling and marketing efforts associated with that traffic. At the same time, lender demand for leads from third-party sources typically increases, as there are fewer consumers in the marketplace and, accordingly, the supply of organic mortgage lead volume decreases. Due to high lender demand, we typically see an increase in the amount lenders will pay per matched lead, which often leads to higher revenue earned per consumer. However, increases in the amount lenders will pay per matched lead in this situation is limited by the overall cost models of our lenders, and our revenue earned per consumer can be adversely affected by the overall reduced demand for refinancing in a rising rate environment.

51

Table of Contents

**ITEM 8.**  *Financial Statements and Supplementary Data*

<div align="center">

### INDEX TO FINANCIAL STATEMENTS

</div>

|  | Page Number |
|---|---|
| LENDINGTREE, INC. AND SUBSIDIARIES: |  |
| *Report of Independent Registered Public Accounting Firm* | 53 |
|  |  |
| CONSOLIDATED FINANCIAL STATEMENTS: |  |
| *Consolidated Statements of Operations and Comprehensive Income* | 56 |
| *Consolidated Balance Sheets* | 57 |
| *Consolidated Statements of Shareholders' Equity* | 58 |
| *Consolidated Statements of Cash Flows* | 59 |
| *Notes to Consolidated Financial Statements* | 60 |

<div align="center">

52

</div>

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of LendingTree, Inc.

### Opinions on the Financial Statements and Internal Control over Financial Reporting

We have audited the accompanying consolidated balance sheets of LendingTree, Inc. and its subsidiaries (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of operations and comprehensive income, of shareholders' equity and of cash flows for each of the three years in the period ended December 31, 2019, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

### Change in Accounting Principle

As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for leases in 2019.

### Basis for Opinions

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

53

**Table of Contents**

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Valuation of ValuePenguin Inc. Content Intangible Asset*

As described in Note 8 to the consolidated financial statements, in 2019 the Company acquired Value Holding, Inc., the parent company of ValuePenguin Inc., for a purchase price of $106.2 million, which resulted in $31.6 million of intangible assets being recorded, primarily consisting of the content intangible asset of $26.1 million. The estimated fair value of the content intangible asset was determined using the excess earnings method. Management applied significant judgment in determining the fair value of the content intangible asset, which involved the use of significant assumptions including revenue growth rates, the probability weighting of scenarios, and the discount rate.

The principal considerations for our determination that performing procedures relating to the valuation of the ValuePenguin Inc. content intangible asset is a critical audit matter are there was significant judgment by management when developing the fair value measurement of the content intangible asset. This in turn led to a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating audit evidence related to management's significant assumptions, including revenue growth rates, the probability weighting of scenarios, and the discount rate.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to acquisition accounting, including controls over the fair value measurement of the content intangible asset, as well as controls over development of the significant assumptions related to the valuation of the content intangible asset, including revenue growth rates, the probability weighting of scenarios, and the discount rate. These procedures also included, among others, (i) reading the purchase agreement, (ii) testing management's process for estimating the fair value of the content intangible asset, and (iii) evaluating management's significant assumptions used to estimate the fair value of the content intangible asset. Testing management's process included evaluating the appropriateness of the excess earnings method and the reasonableness of the significant assumptions, including revenue growth rates, the probability weighting of scenarios and the discount rate. Evaluating the reasonableness of the revenue growth rates and probability weighting of scenarios involved considering the current and historical results of the acquired business, consistency of the revenue growth in previously acquired businesses, and consistency with external market and industry data. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's excess earnings method and certain significant assumptions, including the discount rate.

*Contingent Consideration - QuoteWizard*

As described in Notes 8 and 17 to the consolidated financial statements, on October 31, 2018 the Company completed the acquisition of QuoteWizard.com, LLC ("QuoteWizard"). During 2019 the Company recorded $27.1 million of contingent consideration expense and as of December 31, 2019, the estimated fair value of the contingent consideration associated with earnout payments totaled $24.4 million. The Company will make payments ranging from zero to $70.2 million based on the achievement of certain defined operating results for QuoteWizard. The estimated fair value of the contingent consideration liability is determined using an option pricing model. Management estimates the fair value of any contingent consideration payments each reporting period using Level 3 unobservable inputs. The significant unobservable inputs used to calculate the fair value of the contingent consideration for QuoteWizard are estimated future cash flows, estimated customer growth rates, and the discount rate.

The principal considerations for our determination that performing procedures relating to the contingent consideration associated with the QuoteWizard acquisition is a critical audit matter are (i) there was a high degree of auditor judgment and subjectivity in performing procedures and evaluating audit evidence related to the fair value measurement of contingent consideration due to the significant amount of judgment by management when developing the estimate, (ii) significant audit effort was required in assessing the estimated customer growth rates assumption, and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

54

Table of Contents

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the accounting for contingent consideration, including controls over the fair value measurement of the contingent consideration. These procedures also included, among others, testing management's process for developing the fair value measurement, evaluating the appropriateness of the option pricing model, and evaluating the reasonableness of the estimated customer growth rates assumption used by management. Evaluating the reasonableness of the estimated customer growth rates involved considering the past performance of the acquired business as well as industry forecasts. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's option pricing model.


/s/ PricewaterhouseCoopers LLP

Charlotte, North Carolina
February 26, 2020

We have served as the Company's auditor since 2012.


<div align="center">55</div>

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | *(in thousands, except per share amounts)* | | |
| **Revenue** | **$1,106,603** | **$764,865** | **$617,736** |
| Costs and expenses: | | | |
| Cost of revenue *(exclusive of depreciation and amortization shown separately below)* | 68,379 | 36,399 | 17,223 |
| Selling and marketing expense | 735,180 | 500,291 | 432,784 |
| General and administrative expense | 116,847 | 101,219 | 71,541 |
| Product development | 39,953 | 26,958 | 17,925 |
| Depreciation | 10,998 | 7,385 | 7,085 |
| Amortization of intangibles | 55,241 | 23,468 | 12,992 |
| Change in fair value of contingent consideration | 28,402 | 10,788 | 23,931 |
| Severance | 1,026 | 2,352 | 404 |
| Litigation settlements and contingencies | 151 | (186 ) | 718 |
| **Total costs and expenses** | **1,055,875** | **708,674** | **584,603** |
| **Operating income** | **50,728** | **56,191** | **33,133** |
| Other (expense) income, net: | | | |
| Interest expense, net | (20,271 ) | (12,437 ) | (7,028 ) |
| Other income (expense) | 524 | 10 | (396 ) |
| **Income before income taxes** | **30,981** | **43,744** | **25,709** |
| Income tax benefit (expense) | 8,479 | 65,575 | (6,291 ) |
| **Net income from continuing operations** | **39,460** | **109,319** | **19,418** |
| **Loss from discontinued operations, net of tax** | **(21,632 )** | **(12,820 )** | **(3,840 )** |
| **Net income and comprehensive income** | **$17,828** | **$96,499** | **$15,578** |
| | | | |
| **Weighted average shares outstanding:** | | | |
| Basic | 12,834 | 12,504 | 11,945 |
| Diluted | 14,619 | 14,097 | 13,682 |
| **Income per share from continuing operations:** | | | |
| Basic | $3.07 | $8.74 | $1.63 |
| Diluted | $2.70 | $7.75 | $1.42 |
| **Loss per share from discontinued operations:** | | | |
| Basic | $(1.69 ) | $(1.03 ) | $(0.32 ) |

| | | | | | |
|---|---|---|---|---|---|
| Diluted | $1.48 | ) | $0.91 | ) | $0.28 | ) |
| **Net income per share:** | | | | | | |
| Basic | $1.39 | | $7.72 | | $1.30 | |
| Diluted | $1.22 | | $6.85 | | $1.14 | |

The accompanying notes to consolidated financial statements are an integral part of these statements.

56

Table of Contents

**LENDINGTREE, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
|  | *(in thousands, except par value and share amounts)* | |
| **ASSETS:** | | |
| Cash and cash equivalents | $60,243 | $105,102 |
| Restricted cash and cash equivalents | 96 | 56 |
| Accounts receivable (net of allowance of $1,466 and $1,143, respectively) | 113,487 | 91,072 |
| Prepaid and other current assets | 15,516 | 16,428 |
| Assets held for sale (Note 7) | — | 21,328 |
| Current assets of discontinued operations (Note 20) | 84 | 185 |
| **Total current assets** | **189,426** | **234,171** |
| Property and equipment (net of accumulated depreciation of $17,979 and $13,887, respectively) | 31,363 | 23,175 |
| Goodwill | 420,139 | 348,347 |
| Intangible assets, net | 181,580 | 205,699 |
| Deferred income tax assets | 87,664 | 79,289 |
| Other non-current assets | 29,849 | 2,168 |
| Non-current assets of discontinued operations (Note 20) | 7,948 | 3,266 |
| **Total assets** | **$947,969** | **$896,115** |
| **LIABILITIES:** | | |
| Revolving credit facility | $75,000 | $125,000 |
| Accounts payable, trade | 2,873 | 15,074 |
| Accrued expenses and other current liabilities | 112,755 | 93,190 |
| Current contingent consideration | 9,028 | 11,080 |
| Current liabilities of discontinued operations (Note 20) | 31,050 | 17,609 |
| **Total current liabilities** | **230,706** | **261,953** |
| Long-term debt | 264,391 | 250,943 |
| Non-current contingent consideration | 24,436 | 27,757 |
| Deferred income tax liabilities | — | 894 |
| Other non-current liabilities | 26,110 | 8,360 |
| **Total liabilities** | **545,643** | **549,907** |
| Commitments and contingencies (Notes 15 and 16) | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Preferred stock $.01 par value; 5,000,000 shares authorized; none issued or outstanding | — | — |
| Common stock $.01 par value; 50,000,000 shares authorized; 15,676,819 and 15,428,351 shares issued, respectively, and 13,035,501 and 12,809,764 shares outstanding, respectively | 157 | 154 |
| Additional paid-in capital | 1,177,984 | 1,134,227 |

| | | | | |
|---|---|---|---|---|
| Accumulated deficit | 592,654 | ( ) | 610,482 | ( ) |
| Treasury stock; 2,641,318 and 2,618,587 shares, respectively | 183,161 | ( ) | 177,691 | ( ) |
| **Total shareholders' equity** | **402,326** | | **346,208** | |
| **Total liabilities and shareholders' equity** | $**947,969** | | $**896,115** | |

The accompanying notes to consolidated financial statements are an integral part of these statements.

57

Table of Contents

## LENDINGTREE, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY

| | Total | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | | Noncontrolling Interest |
|---|---|---|---|---|---|---|---|---|
| | | Number of Shares | Amount | | | Number of Shares | Amount | |
| | | | | *(in thousands)* | | | | |
| Balance as of December 31, 2016 | $231,435 | 13,955 | $140 | $1,018,010 | $(722,630) | 2,164 | $64,085 | $— |
| Net income and comprehensive income | 15,578 | — | — | — | 15,578 | — | — | — |
| Non-cash compensation | 23,361 | — | — | 23,361 | — | — | — | — |
| Purchase of treasury stock | (21,000) | — | — | — | — | 75 | (21,000) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | 1,601 | 263 | 2 | 1,599 | — | — | — | — |
| Cumulative effect adjustment due to ASU 2016-09 | 985 | — | — | 2,287 | (1,302) | — | — | — |
| Issuance of 0.625% Convertible Senior Notes, net | 60,415 | — | — | 60,415 | — | — | — | — |
| Convertible note hedge | (61,500) | — | — | (61,500) | — | — | — | — |
| Sale of warrants | 43,410 | — | — | 43,410 | — | — | — | — |
| Noncontrolling interest | 589 | — | — | — | — | — | — | 589 |
| Balance as of December 31, 2017 | $294,874 | 14,218 | $142 | $1,087,582 | $(708,354) | 2,239 | $(85,085) | $589 |
| Net income and comprehensive income | 96,499 | — | — | — | 96,499 | — | — | — |
| Non-cash compensation | 44,365 | — | — | 44,365 | — | — | — | — |
| Purchase of treasury stock | (92,606) | — | — | — | — | 379 | (92,606) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding taxes | 2,217 | 1,210 | 12 | 2,205 | — | — | — | — |
| Cumulative effect adjustment due to ASU 2014-09 | 1,373 | — | — | — | 1,373 | — | — | — |
| Acquisition of noncontrolling interest | (510) | — | — | 79 | — | — | — | (589) |
| Other | (4) | — | — | (4) | — | — | — | — |
| Balance as of December 31, 2018 | $346,208 | 15,428 | $154 | $1,134,227 | $(610,482) | 2,618 | $(177,691) | $— |
| Net income and comprehensive income | 17,828 | — | — | — | 17,828 | — | — | — |
| Non-cash compensation | 52,167 | — | — | 52,167 | — | — | — | — |
| Purchase of treasury stock | (5,470) | — | — | — | — | 23 | (5,470) | — |
| Issuance of common stock for stock options, restricted stock awards and restricted stock units, net of withholding | | | | ( | | | ( | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| taxes | 8,406 | ) | 249 | | | | | — | — | — | — |
| Other | 1 | ) | — | — | 1 | ) | = | — | — | — | — |
| **Balance as of December 31, 2019** | $ 402,326 | | 15,677 | $ 157 | $ 1,177,984 | $ 592,654 | ( ) | 2,641 | $ 183,161 ) | $ — | |

The accompanying notes to consolidated financial statements are an integral part of these statements.

58

# LENDINGTREE, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | *(in thousands)* | | |
| Cash flows from operating activities attributable to continuing operations: | | | |
| **Net income and comprehensive income** | $ 17,828 | $ 96,499 | $ 15,578 |
| Less: Loss from discontinued operations, net of tax | 21,632 | 12,820 | 3,840 |
| Income from continuing operations | 39,460 | 109,319 | 19,418 |
| Adjustments to reconcile income from continuing operations to net cash provided by operating activities attributable to continuing operations: | | | |
| (Gain) loss on impairments and disposal of assets | 695 | (2,210) | 840 |
| Amortization of intangibles | 55,241 | 23,468 | 12,992 |
| Depreciation | 10,998 | 7,385 | 7,085 |
| Rental amortization of intangibles and depreciation | — | 630 | 1,474 |
| Non-cash compensation expense | 52,167 | 44,365 | 23,361 |
| Deferred income taxes | 8,555 | (63,901) | (6,370) |
| Change in fair value of contingent consideration | 28,402 | 10,788 | 23,931 |
| Bad debt expense | 1,697 | 880 | 195 |
| Amortization of debt issuance costs | 1,974 | 1,776 | 1,032 |
| Write-off of previously-capitalized debt issuance costs | 333 | — | 90 |
| Amortization of convertible debt discount | 12,016 | 11,397 | 6,385 |
| ROU asset amortization, offset by change in operating lease liabilities | 213 | — | — |
| Changes in current assets and liabilities: | | | |
| Accounts receivable | (22,457) | (16,820) | (11,381) |
| Prepaid and other current assets | (3,258) | 2,985 | (5,358) |
| Accounts payable, accrued expenses and other current liabilities | 2,322 | (14,270) | 31,108 |
| Current contingent consideration | 12,500 | (21,912) | — |
| Income taxes receivable | 4,548 | 3,669 | (1,104) |
| Other, net | (88) | 591 | (160) |
| **Net cash provided by operating activities attributable to continuing operations** | **157,174** | **123,948** | **103,538** |
| Cash flows from investing activities attributable to continuing operations: | | | |
| Capital expenditures | (20,041) | (14,907) | (8,040) |
| Proceeds from the sale of fixed assets | 24,077 | — | — |
| Acquisition of intangible assets | — | — | (5) |
| Acquisition of ValuePenguin, net of cash acquired | (105,578) | — | — |

| | | | |
|---|---|---|---|
| Acquisition of QuoteWizard, net of cash acquired | 482 | (297,072) | |
| Acquisition of Student Loan Hero, net of cash acquired | — | 59,483 | |
| Acquisition of Ovation, net of cash acquired | — | 11,566 | |
| Acquisition of SnapCap | — | 10 | (11,886) |
| Acquisition of DepositAccounts | — | — | 25,000 |
| Acquisition of MagnifyMoney, net of cash acquired | — | — | 29,504 |
| **Net cash used in investing activities attributable to continuing operations** | **(101,060)** | **(383,038)** | **(74,435)** |
| Cash flows from financing activities attributable to continuing operations: | | | |
| Payments related to net-share settlement of stock-based compensation, net of proceeds from exercise of stock options | (8,406) | 2,217 | 1,602 |
| Contingent consideration payments | 21,275 | (27,588) | |
| Net (repayment of) proceeds from revolving credit facility | (50,000) | 125,000 | — |
| Acquisition of noncontrolling interest | — | 499 | — |
| Proceeds from the issuance of 0.625% Convertible Senior Notes | — | — | 300,000 |
| Payment of convertible note hedge transactions | — | — | (61,500) |
| Proceeds from the sale of warrants | — | — | 43,410 |
| Payment of debt issuance costs | 2,518 | (583) | (10,486) |
| Purchase of treasury stock | 5,470 | (93,704) | (19,901) |
| Other financing activities | 9 | — | — |
| **Net cash (used in) provided by financing activities attributable to continuing operations** | **(87,678)** | **4,843** | **253,125** |
| **Total cash (used in) provided by continuing operations** | **31,564** | **(254,247)** | **282,228** |
| Discontinued operations: | | | |
| Net cash used in operating activities attributable to discontinued operations | (13,255) | (13,236) | (4,807) |
| **Total cash used in discontinued operations** | **(13,255)** | **(13,236)** | **(4,807)** |
| **Net (decrease) increase in cash, cash equivalents, restricted cash, and restricted cash equivalents** | **(44,819)** | **267,483** | **277,421** |
| Cash, cash equivalents, restricted cash, and restricted cash equivalents at beginning of period | 105,158 | 372,641 | 95,220 |
| **Cash, cash equivalents, restricted cash, and restricted cash equivalents at end of period** | **$ 60,339** | **$ 105,158** | **$ 372,641** |
| | | | |
| **Non-cash investing activities:** | | | |
| Capital additions from tenant improvement allowance | $ 1,111 | $ — | $ — |
| **Supplemental cash flow information:** | | | |
| Interest paid | $ 7,005 | $ 3,593 | $ 1,327 |
| Income tax payments | 25 | 541 | 20,359 |

| | | | |
|---|---|---|---|
| Income tax refunds | 4,743 | 5,678 | 133 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

59

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1—ORGANIZATION

### Company Overview

LendingTree, Inc. is currently the parent of LendingTree, LLC and several companies owned by LendingTree, LLC (collectively, "LendingTree" or the "Company").

LendingTree operates what it believes to be the leading online consumer platform that connects consumers with the choices they need to be confident in their financial decisions. The Company offers consumers tools and resources, including free credit scores, that facilitate comparison-shopping for mortgage loans, home equity loans and lines of credit, reverse mortgage loans, auto loans, credit cards, deposit accounts, personal loans, student loans, small business loans, insurance quotes and other related offerings. The Company primarily seeks to match in-market consumers with multiple providers on its marketplace who can provide them with competing quotes for loans, deposit products, insurance or other related offerings they are seeking. The Company also serves as a valued partner to lenders and other providers seeking an efficient, scalable and flexible source of customer acquisition with directly measurable benefits, by matching the consumer inquiries it generates with these providers.

The consolidated financial statements include the accounts of LendingTree and all its wholly-owned entities, except Home Loan Center, Inc. ("HLC") subsequent to its bankruptcy filing on July 21, 2019 which resulted in the Company's loss of a controlling interest in HLC under applicable accounting standards. Intercompany transactions and accounts have been eliminated.

### Discontinued Operations

The LendingTree Loans business, which consisted of originating various consumer mortgage loans through HLC (the "LendingTree Loans Business"), is presented as discontinued operations in the accompanying consolidated balance sheets, consolidated statements of operations and comprehensive income and consolidated cash flows for all periods presented. The notes accompanying these consolidated financial statements reflect the Company's continuing operations and, unless otherwise noted, exclude information related to the discontinued operations. *See* Note 20 —Discontinued Operations for additional information.

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and pursuant to the rules and regulations of the U.S. Securities and Exchange Commission ("SEC").

Certain prior year amounts have been reclassified to conform to current year presentation. *See* the discussion in Note 2—Significant Accounting Policies for the impact of adopting Accounting Standards Update ("ASU") 2016-18 on the presentation of changes in restricted cash.

## NOTE 2—SIGNIFICANT ACCOUNTING POLICIES

### Revenue Recognition

The Company derives its revenue primarily from match fees and closing fees. Revenue is recognized when performance obligations under the terms of a contract with a customer are satisfied and promised services have transferred to the customer. In identifying performance obligations, judgment is required around contracts where there was a possibility of bundled services and multiple parties. In applying judgment, the Company considers customer expectations of performance, materiality and the core principles of Accounting Standards Codification ("ASC") Topic 606, Revenue from Contracts with Customers. The Company's services are generally transferred to the customer at a point in time.

Variable consideration is included in revenue if it is probable that a significant future reversal of cumulative revenue under the contract will not occur.

Revenue from Home products is primarily generated from upfront match fees paid by mortgage Network Partners that receive a loan request, and in some cases upfront fees for clicks or call transfers. Match fees and upfront fees for clicks and call transfers are earned through the delivery of loan requests that originated through the Company's websites or affiliates. The Company recognizes revenue at the time a loan request is delivered to the customer, provided that no significant obligations remain. Revenue

60

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

recognition on match fees was not impacted by the adoption of ASC Topic 606 in the first quarter of 2018, as the Company's contractual right to the match fee consideration is contemporaneous with the satisfaction of the performance obligation to deliver a loan request to the customer.

Revenue from Consumer products is generated by match and other upfront fees for clicks or call transfers, as well as from closing fees, approval fees and upfront service and subscription fees.

Closing fees are derived from lenders on certain auto loans, business loans, personal loans and student loans when the lender funds a loan with the consumer. Prior to the adoption of ASC Topic 606, closed loan fees were recognized at the time the lender reported the closed loan to the Company, which could be several months after the original request was transmitted.

Approval fees are derived from credit card issuers when the credit card consumer receives card approval from the credit card issuer. Prior to the adoption of ASC Topic 606, approval fees were recognized at the time the credit card issuer reported the card approval for the consumer to the Company, which is generally within two weeks after the consumer's request was transmitted.

Upfront service fees and subscription fees are derived from consumers in the Company's credit services product. Upfront fees paid by consumers are recognized as revenue over the estimated time the consumer will remain a customer and receive services. Subscription fees are recognized over the period a consumer is receiving services.

Under ASC Topic 606, the timing of recognizing revenue for closing fees and approval fees is accelerated to the point when a loan request or a credit card consumer is delivered to the customer, as opposed to when the consumer loan is closed by the lender or credit card approval is made by the issuer. The Company's contractual right to closing fees and approval fees is not contemporaneous with the satisfaction of the performance obligation to deliver a loan request or a credit card consumer to the customer. As such, the Company records a contract asset at each reporting period-end related to the estimated variable consideration on closing fees and approval fees for which the Company has satisfied the related performance obligation, but are still pending the loan closing or credit card approval before the Company has a contractual right to payment. This estimate is based on the Company's historical closing rates and historical time between when a consumer request for a loan or credit card is delivered to the lender or card issuer and when the loan is closed by the lender or approved by the card issuer. The time between satisfaction of the Company's performance obligation and when the Company's right to consideration becomes unconditional varies across products, but is generally less than 90 days for auto loans, personal loans, student loans and credit card approvals. The time between satisfaction of the Company's performance obligation and when the Company's right to consideration becomes unconditional for small business loans is generally less than 27 months.

Revenue from the Company's Insurance products is primarily generated from upfront match fees, and upfront fees for website clicks or fees for calls. Match fees and upfront fees for clicks and call transfers are earned through the delivery of consumer requests that originated through the Company's websites or affiliates. The Company recognizes revenue at the time a consumer request is delivered to the customer, provided that no significant obligations remain. The Company's contractual right to the match fee consideration is contemporaneous with the satisfaction of the performance obligation to deliver a consumer request to the customer.

Our payment terms vary by customer and services offered. The term between invoicing and when payment is due is generally 45 days or less.

Sales commissions are incremental costs of obtaining contracts with customers. The Company expenses sales commissions when incurred as the duration of contracts with customers is less than one year, based on the right for either party to terminate the contract with less than one year's notice without compensation to either party. These costs are recorded within selling and marketing expense on the consolidated statements of operations and comprehensive income.

For additional information on the adoption of ASC Topic 606, *see* the discussion over ASU 2014-09 in the section titled "Recently Adopted Accounting Pronouncements" within this Note.

**Cash and Cash Equivalents**

Cash and cash equivalents include cash and short-term, highly liquid money market investments with original maturities of three months or less.

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Restricted Cash**

Cash escrowed or contractually restricted for a specific purpose is designated as restricted cash.

**Accounts Receivable**

Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts.

The Company determines its allowance for doubtful accounts by considering a number of factors, including the length of time accounts receivable are past due, previous loss history and the specific customer's current ability to pay its obligation. Accounts receivable are considered past due when they are outstanding longer than the contractual payment terms. Accounts receivable are written off when management deems them uncollectible.

A reconciliation of the beginning and ending balances of the allowance for doubtful accounts is as follows *(in thousands)*:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2018** | **2017** |
| **Balance, beginning of the period** | $1,143 | $675 | $1,059 |
| Charges to earnings | 1,697 | 880 | 195 |
| Write-off of uncollectible accounts receivable | 1,374 ) | ( 412 ) | ( 579 ) |
| **Balance, end of the period** | **$1,466** | **$1,143** | **$675** |

**Segment Reporting**

The Company has three reportable segments: Home, Consumer and Insurance. Characteristics which were relied upon in making the determination of the reportable segments include the nature of the products, the organization's internal structure, and the information that is regularly reviewed by the CODM for the purpose of assessing performance and allocating resources.

**Property and Equipment**

Property and equipment, including internally-developed software and significant improvements, are recorded at cost less accumulated depreciation. Due to the rapid advancements in technology and evolution of company products, all internally-developed software is written-off at the end of its useful life. Repairs and maintenance and any gains or losses on dispositions are recognized as incurred in current operations.

Depreciation is recorded on a straight-line basis to allocate the cost of depreciable assets to operations over their estimated service lives. The following table presents the estimated useful lives for each asset category:

| Asset Category | Estimated Useful Lives |
|---|---|
| Computer equipment and capitalized software | 1 to 5 years |
| Leasehold improvements | Lesser of asset life or life of lease |
| Furniture and other equipment | 7 years |
| Aircraft and automobile | 5 to 10 years |

**Software Development Costs**

Software development costs primarily include internal and external labor expenses incurred to develop the software that powers the Company's websites. Certain costs incurred during the application development stage are capitalized based on specific activities tracked, while costs incurred during the preliminary project stage and post-implementation/operation stage are expensed as incurred. Capitalized software development costs are amortized over an estimated useful life of one to five years.

**Goodwill and Indefinite-Lived Intangible Assets**

Goodwill acquired in business combinations is assigned to the reporting units that are expected to benefit from the combination as of the acquisition date. Goodwill and indefinite-lived intangible assets, consisting of certain trade names and trademarks, are not amortized. Rather, these assets are tested annually for impairment as of October 1, or more frequently upon the occurrence of certain events or substantive changes in circumstances.

<center>62</center>

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As part of its annual impairment testing of goodwill and indefinite-lived intangible assets, in each instance, the Company may elect to assess qualitative factors as a basis for determining whether it is necessary to perform the traditional quantitative impairment testing. If the Company's assessment of these qualitative factors indicates that it is not more likely than not that the fair value of the reporting unit or indefinite-lived intangible asset is less than its carrying value, then no further testing is required. Otherwise, the goodwill reporting unit or long-lived intangible assets, as applicable, must be quantitatively tested for impairment.

The quantitative test for goodwill impairment is determined using a two-step process. The first step is to compare the fair value of a reporting unit with its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of its reporting units by using a market approach and a discounted cash flow ("DCF") analysis. Determining fair value using a DCF analysis requires the exercise of significant judgments, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is required to be performed to measure the amount of impairment, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

The quantitative impairment test for indefinite-lived intangible assets involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its estimated fair value, an impairment loss is recognized in an amount equal to that excess. The estimates of fair value of indefinite-lived intangible assets are determined using a DCF valuation analysis that employs a relief-from-royalty methodology in estimating the fair value of trade names and trademarks. Significant judgments inherent in this analysis include the determination of royalty rates, discount rates, perpetual growth rates and the amount and timing of future revenues.

At October 1, 2019, the Company performed the first step of the quantitative goodwill impairment test and found that the fair value of each reporting unit exceeded its carrying amount, indicating no goodwill impairment. The Company changed its operating segments in the fourth quarter of 2019 and accordingly changed its reporting units. At December 31, 2019, the Company performed the first step of the quantitative goodwill impairment test and found that the fair value of each reporting unit exceeded its carrying amount, indicating no goodwill impairment. Results of the October 1, 2019 qualitative annual impairment tests for the indefinite-lived intangible assets indicated that it is not more likely than not that the fair value of the assets were each less than their respective carrying values. Accordingly, no further testing was required.

Results of the October 1, 2018 qualitative annual impairment tests indicated that it is not more likely than not that the fair value of the goodwill and the indefinite-lived intangible assets were each less than their respective carrying values. Accordingly, no further testing was required.

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets include property and equipment, definite-lived intangible assets and operating lease right-of-use assets. Amortization of definite-lived intangible assets is recorded on a straight-line basis over their estimated lives.

Long-lived assets are tested for recoverability whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is deemed to not be recoverable, an impairment loss is recorded as the amount by which the carrying amount of the long-lived asset exceeds its fair value.

At December 31, 2019 and 2018, the Company performed its review of impairment triggering events for long-lived assets and determined that a triggering event had not occurred.

**Assets and Liabilities Held for Sale**

The Company classifies assets or disposal groups to be sold as held for sale in the period in which all of the following criteria are met:

- Management, having the authority to approve the action, commits to a plan to sell the asset or disposal group;

- The asset or disposal group is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such assets or disposal groups;

https://www.sec.gov/ix?doc=/Archives/edgar/data/1434621/000143462120000015/tree-12312019x10k.htm[10/12/2020 4:02:55 PM]

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

- An active program to locate a buyer and other actions required to complete the plan to sell the asset or disposal group have been initiated;

- The sale of the asset or disposal group is probable, and transfer of the asset or disposal group is expected to qualify for recognition as a completed sale within one year, except if events or circumstances beyond the Company's control extend the period of time required to sell the asset or disposal group beyond one year;

- The asset or disposal group is being actively marketed for sale at a price that is reasonable in relation to its current fair value; and

- Actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn.

A long-lived asset or disposal group that is classified as held for sale is initially measured at the lower of its carrying value or fair value less any costs to sell. Any loss resulting from this measurement is recognized in the period in which the held for sale criteria are met. Conversely, gains are not recognized on the sale of a long-lived asset or disposal group until the date of sale. The fair value of a long-lived asset or disposal group, less any costs to sell, is assessed each reporting period it remains classified as held for sale and any subsequent changes are reported as an adjustment to the carrying value of the asset or disposal group, as long as the new carrying value does not exceed the carrying value of the asset at the time it was initially classified as held for sale.

**Fair Value Measurements**

The Company categorizes its assets and liabilities measured at fair value into a fair value hierarchy that prioritizes the assumptions used in pricing the asset or liability into the following three levels:

- **Level 1**: Observable inputs, such as quoted prices for identical assets and liabilities in active markets obtained from independent sources.

- **Level 2**: Other inputs that are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data.

- **Level 3**: Unobservable inputs for which there is little or no market data and which require the Company to develop its own assumptions, based on the best information available under the circumstances, about the assumptions market participants would use in pricing the asset or liability.

The Company's non-financial assets, such as goodwill, intangible assets and property and equipment are recorded at fair value upon acquisition. These assets are remeasured at fair value when there is an indicator of impairment and recorded at fair value only when an impairment charge is recognized. Such fair value measurements are based predominantly on Level 3 inputs.

Contingent consideration payments related to acquisitions are measured at fair value each reporting period using Level 3 unobservable inputs. The Company's estimates of fair value are based upon assumptions believed to be reasonable but which are uncertain and involve significant judgments by management. Any changes in the fair value of these contingent consideration payments are included in operating income in the consolidated statements of operations and comprehensive income.

**Cost of Revenue**

Cost of revenue consists primarily of expenses associated with compensation and other employee-related costs (including stock-based compensation) related to internally-operated customer call centers, third-party customer call center fees, costs for online advertising resold to third parties, credit scoring fees, credit card fees, website network hosting and server fees.

**Product Development**

Product development expense consists primarily of compensation and other employee-related costs (including stock-based compensation) and third-party labor costs that are not capitalized, for employees and consultants engaged in the design, development, testing and enhancement of technology.

64

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Advertising**

Advertising costs are expensed in the period incurred (except for production costs which are initially capitalized and then recognized as expense when the advertisement first runs) and principally represent offline costs, including television, print and radio advertising, and online advertising costs, including fees paid to search engines and distribution partners. Advertising expense was $688.2 million, $469.9 million and $410.8 million for the years ended December 31, 2019, 2018 and 2017, respectively, and is included in selling and marketing expense on the consolidated statements of operations and comprehensive income.

**Income Taxes**

Income taxes are accounted for under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. In estimating future tax consequences, all expected future events are considered. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. Interest is recorded on potential tax contingencies as a component of income tax expense and recorded net of any applicable related income tax benefit. For the years ended December 31, 2019, 2018 and 2017, the Company followed the incremental or "with" and "without" approach to intraperiod tax allocation for determination of the amount of tax benefit to allocate to continuing operations as prescribed in ASC 740-20-45-7.

In accordance with the accounting standard for uncertainty in income taxes, liabilities for uncertain tax positions are recognized based on the two-step process prescribed by the accounting standards. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon ultimate settlement.

Effective January 1, 2018, the Company changed the method used to estimate the deduction for prepaid marketing and advertising costs. This change in methodology impacts the timing of the tax deductibility of these related costs. The Company historically estimated these expenses to be deductible if the services were provided within 12 months of payment. Under the proposed method of accounting, the Company will take into account only prepaid marketing and advertising as the Company makes payment for the services to the extent that the payment is due and the services are reasonably expected by the Company to be provided to the applicant within 3 ½-months after the date of payment as authorized by Treas. Reg. §1.461-4(d)(6)(ii). The Company has accounted for this change as a change in accounting method and recorded a cumulative impact of $1.0 million as a deferred tax liability to be recognized over four years.

Effective January 1, 2017, the Company changed the method used to estimate the deduction for internally developed software. This change in methodology impacts the timing of the tax deductibility of these related costs. The Company historically capitalized these expenses and amortized them over three years. Under the proposed method of accounting, the Company will treat costs attributable to internally developed software as current expenses and take them into account in full in accordance with Section 5.01(1) of Rev. Proc. 2000-50 and rules similar to those applicable under Section 174(a). The Section 481(a) adjustment is the cumulative difference between the present method and the proposed method of accounting computed as of the first day of the year of change, January 1, 2017 and was reflected in the timely filed income tax return during 2018 related to the period of change.

On December 22, 2017, the SEC staff issued Staff Accounting Bulletin No. 118 ("SAB 118"), which provides guidance on accounting for the tax effect of the Tax Cuts and Jobs Act ("TCJA"). SAB 118 provides a measurement period that should not extend beyond one year from the TCJA enactment date for companies to complete the accounting under ASC 740. In accordance with SAB 118, a company must reflect the income tax effects of those aspects of the TCJA for which the accounting under ASC 740 is complete. To the extent that a company's accounting for certain income tax effects of the TCJA is incomplete but it is able to determine a reasonable estimate, it must record a provisional estimate in the financial statements. In accordance with SAB 118, the Company determined that the $9.1 million of the deferred tax expense recorded in connection with the remeasurement of certain deferred tax assets and liabilities was a provisional amount and a reasonable estimate at December 31, 2017.

During the fourth quarter of the year ended December 31, 2018, the Company finalized the computations of the income tax effects of the Act. As such, in accordance with SAB 118, the Company's accounting for the effects of the Act is complete. The Company did not significantly adjust provisional amounts recorded in 2017 and the SAB 118 measurement period subsequently ended on December 22, 2018. Although the Company no longer considers these amounts to be provisional, the determination of the Act's income tax effects may change following future legislation or further interpretation of the Act based on future guidance from the Internal Revenue Service and state tax authorities.

65

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Stock-Based Compensation**

The forms of stock-based awards granted to LendingTree employees are principally restricted stock units ("RSUs"), RSUs with performance conditions, stock options and stock options with performance conditions. Further, stock options with market conditions, restricted stock awards ("RSAs") with performance conditions and RSAs with market conditions have been granted to the Company's Chairman and Chief Executive Officer. RSUs are awards in the form of units, denominated in a hypothetical equivalent number of shares of LendingTree common stock and with the value of each award equal to the fair value of LendingTree common stock at the date of grant. RSUs may be settled in cash, stock or both, as determined by the Company's Compensation Committee at the time of grant. The Company does not have a history of settling these awards in cash. Each stock-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. The Compensation Committee can modify the vesting provisions of an award. Certain awards also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests.

LendingTree recognizes as expense non-cash compensation for all stock-based awards for which vesting is considered probable. Forfeitures are recognized when they occur.

For service-based awards, non-cash compensation is measured at fair value on the grant date and expensed ratably over the vesting term. The fair value of each stock option award without a market condition is estimated using the Black-Scholes option pricing model, while the fair value of an RSU or restricted stock award is measured as the closing common stock price at the time of grant. For performance-based grants, the fair value is measured on the grant date and recognized as non-cash compensation expense, considering the probability of the targets being achieved. Performance-based grants with a market condition are generally valued using a Monte Carlo simulation model.

Excess tax benefits and deficiencies that arise due to the difference in the measure of stock compensation and the amount deductible for tax purposes are recorded in income tax expense within the consolidated statement of operations and comprehensive income, and are classified as a component of operating cash flows within the consolidated statements of cash flows.

**Litigation Settlements and Contingencies**

Litigation settlements and contingencies consists of expenses related to actual or anticipated litigation settlements.

The Company is involved in legal proceedings on an ongoing basis. If the Company believes that a loss arising from such matters is probable and can be reasonably estimated, the estimated liability is accrued in the consolidated financial statements. If only a range of estimated losses can be determined, an amount within the range is accrued that, in the Company's judgment, reflects the most likely outcome; if none of the estimates within that range is a better estimate than any other amount, the low end of the range is accrued. For those proceedings in which an unfavorable outcome is reasonably possible but not probable, an estimate of the reasonably possible loss or range of losses or a conclusion that an estimate of the reasonably possible loss or range of losses arising directly from the proceeding (i.e., monetary damages or amounts paid in judgment or settlement) are not material is disclosed. Legal expenses associated with these matters are recognized as incurred.

**Accounting Estimates**

Management is required to make certain estimates and assumptions during the preparation of the consolidated financial statements in accordance with GAAP. These estimates and assumptions impact the reported amount of assets and liabilities and disclosures of contingent assets and liabilities as of the date of the consolidated financial statements. They also impact the reported amount of net earnings during any period. Actual results could differ from those estimates.

Significant estimates underlying the accompanying consolidated financial statements, including discontinued operations, include: loan loss obligations; the recoverability of long-lived assets, goodwill and intangible assets; the determination of income taxes payable and deferred income taxes, including related valuation allowances; fair value of assets acquired in a business combination; contingent consideration related to business combinations; litigation accruals; HLC ownership related claims; contract assets; various other allowances, reserves and accruals; and assumptions related to the determination of stock-based compensation.

**Certain Risks and Concentrations**

LendingTree's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

https://www.sec.gov/ix?doc=/Archives/edgar/data/1434621/000143462120000015/tree-12312019x10k.htm[10/12/2020 4:02:55 PM]

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Financial instruments, which potentially subject the Company to concentration of credit risk at December 31, 2019, consist primarily of cash and cash equivalents and accounts receivable, as disclosed in the consolidated balance sheet. Cash and cash equivalents are in excess of Federal Deposit Insurance Corporation insurance limits, but are maintained with quality financial institutions of high credit. The Company requires certain Network Partners to maintain security deposits with the Company, which in the event of non-payment, would be applied against any accounts receivable outstanding.

Due to the nature of the mortgage lending industry, interest rate fluctuations may negatively impact future revenue from the Company's marketplace.

For the year ended December 31, 2019, one network partner accounted for 12% of total consolidated revenue, all of which was recorded within the Insurance segment. No Network Partners accounted for more than 10% of total consolidated revenue for the year ended December 31, 2018. For the year ended December 31, 2017, another network partner accounted for 11% of total consolidated revenue, which was recorded within the Home and Consumer segments.

Lenders and lead purchasers participating on the Company's marketplace can offer their products directly to consumers through brokers, mass marketing campaigns or through other traditional methods of credit distribution. These lenders and lead purchasers can also offer their products online, either directly to prospective borrowers, through one or more online competitors, or both. If a significant number of potential consumers are able to obtain loans and other products from Network Partners without utilizing the Company's services, the Company's ability to generate revenue may be limited. Because the Company does not have exclusive relationships with the Network Partners whose loans and other financial products are offered on its online marketplace, consumers may obtain offers from these Network Partners without using its service.

Other than a support services office in India, the Company's operations are geographically limited to and dependent upon the economic condition of the United States.

**Recently Adopted Accounting Pronouncements**

In June 2018, the FASB issued ASU 2018-07 which simplifies the accounting for nonemployee share-based payments by expanding the scope of ASC Topic 718, Compensation—Stock Compensation, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new guidance, most of the initial and subsequent measurement for such payments to nonemployees is aligned with the requirements for share-based payments to employees. This ASU is effective for annual and interim reporting periods beginning after December 15, 2018, and early adoption was permitted. Entities must transition to the new guidance through a cumulative-effect adjustment to retained earnings as of the beginning of the fiscal year of adoption. The Company early-adopted this ASU during the second quarter of 2018, with no impact to its consolidated financial statements.

In May 2017, the FASB issued ASU 2017-09 which clarifies when to account for a change to the terms or conditions of a share-based payment award as a modification. Under the new guidance, modification accounting is required only if the fair value, the vesting conditions or the classification of the award changes as a result of the change in terms or conditions. This ASU is effective prospectively for annual periods beginning on or after December 15, 2017. The Company adopted this ASU during the first quarter of 2018.

In November 2016, the FASB issued ASU 2016-18 which is intended to reduce the diversity in the classification and presentation of changes in restricted cash in the statement of cash flows, by requiring entities to combine the changes in cash and cash equivalents and restricted cash in one line. As a result, entities will no longer present transfers between cash and cash equivalents and restricted cash in the statement of cash flows. In addition, if more than one line item is recorded on the balance sheet for cash and cash equivalents and restricted cash, a reconciliation between the statement of cash flows and balance sheet is required. This ASU is effective for annual and interim reporting periods beginning after December 15, 2017. The retrospective transition method, requiring adjustment to all comparative periods presented, is required. The Company adopted this ASU during the first quarter of 2018. The adoption resulted in an immaterial reclassification of cash outflows from investing activities to operating activities for 2017. See Note 4—Cash and Restricted Cash for the reconciliation of cash and cash equivalents and restricted cash reported on the balance sheet to the total of such amounts shown on the statement of cash flows.

In August 2016, the FASB issued ASU 2016-15 which addresses eight cash flow classification issues, eliminating the diversity in practice. This ASU is effective for annual and interim reporting periods beginning after December 15, 2017. The retrospective transition method, requiring adjustment to all comparative periods presented, is required unless it is impracticable for some of the amendments, in which case those amendments would be prospectively applied as of the earliest date practicable. The Company adopted this ASU during the first quarter of 2018, and there was no adjustment to prior periods. Pursuant to adoption of this ASU, contingent consideration payments made are classified as cash outflows from financing activities up to the amount of the contingent

67

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

consideration liability recognized at the acquisition date, and the portion of payments in excess of that initial liability are classified as cash outflows from operating activities. *See* Note 8—Business Acquisitions for additional information.

In March 2016, the FASB issued ASU 2016-09 which simplifies various aspects related to how share-based payments are accounted for and presented in the financial statements, including the income tax consequences, classification of awards as either equity or liabilities, forfeitures and classification of excess tax benefits on the statement of cash flows. This ASU was effective for annual and interim reporting periods beginning after December 15, 2016. Upon adoption, any adjustments were to be reflected as of the beginning of the fiscal year of adoption. The Company adopted this ASU during the first quarter of 2017.

The new standard required excess tax benefits and deficiencies, which arise due to the difference in the measure of stock compensation and the amount deductible for tax purposes, to be recorded in earnings in income tax expense. These excess tax benefits and deficiencies were generally previously recorded in additional paid-in capital and had no impact on net income. The standard required prospective adoption for this portion of the new guidance. Additionally, the new standard required the excess tax benefits and deficiencies to be classified as an operating activity in the accompanying consolidated statements of cash flows. These excess tax benefits and deficiencies were previously recorded as a financing activity in the statement of cash flows. The standard allowed for either prospective or retrospective adoption for the change in presentation in the statement of cash flows. The Company elected to retrospectively adopt the classification change in the statement of cash flows. The standard also allows for an election by the Company to either estimate forfeitures, as required under previous guidance, or recognize forfeitures when they occur. The Company elected to recognize forfeitures of stock awards as they occur, with the modified retrospective transition method required. Accordingly, the Company recognized a $1.4 million cumulative-effect adjustment to retained earnings as of January 1, 2017.

In February 2016, the FASB issued ASU 2016-02 related to lease accounting guidance. This ASU introduces ASC Topic 842, Leases, which supersedes ASC Topic 840, Leases. In 2018 and 2019, the FASB issued final amendments clarifying certain narrow aspects of implementing ASU 2016-02, including clarifications related to the rate implicit in the lease, lessee reassessment of lease classification, lessor reassessment of lease term and purchase options, variable payments that depend on an index or rate, transition disclosures and certain other transition matters. The clarification ASUs also provided an optional transition method that allows entities to initially apply the lease accounting transition requirements at the adoption date and recognize a cumulative effect adjustment to the opening balance of retained earnings in the period of adoption without restating comparative prior periods presented. The clarification ASUs must be adopted concurrently with the adoption of ASU 2016-02 (collectively, "ASC Topic 842").

The Company has adopted ASC Topic 842 as of January 1, 2019 using the optional transition method to apply the new requirements at the adoption date without restating comparative prior periods presented. The adoption resulted in the increase in total assets and total liabilities of $8.8 million as of January 1, 2019 related to operating leases greater than one year in duration for which the Company is the lessee, with no cumulative effect adjustment to the opening balance of accumulated deficit. As part of the transition, the Company has elected the package of practical expedients, which allows the Company to not reassess whether expired or existing contracts contain leases, lease classification for expired or existing leases, and initial direct costs for existing leases. Additionally, the Company has elected an accounting policy to not record short-term leases, which are leases with an initial term of twelve months or fewer, on the balance sheet.

In May 2014, the FASB issued ASU 2014-09 related to revenue recognition. This guidance introduces ASC Topic 606, Revenue from Contracts with Customers, and supersedes the revenue recognition requirements in ASC Topic 605, Revenue Recognition. In 2016, the FASB issued final amendments clarifying implementation guidance for principal versus agent considerations, identifying performance obligations, assessing collectability, presenting sales taxes, measuring noncash consideration and certain other transition matters. The clarification ASUs must be adopted concurrently with the adoption of ASU 2014-09 (collectively, "ASC Topic 606"). Under the new ASUs, the timing of recognizing revenue for closing fees and approval fees in the Company's Consumer products has been accelerated to the point when a loan request or a credit card consumer is delivered to the customer as opposed to when the consumer loan is closed by the lender or credit card approval is made by the issuer and communicated to the Company.

The Company adopted ASC Topic 606 as of January 1, 2018 using the modified retrospective transition approach. The Company recognized the cumulative effect of initially applying ASC Topic 606 as an adjustment to the opening balance of accumulated deficit. Under this approach, revenue for 2017 is reported in the consolidated statements of operations and comprehensive income on the historical basis, and revenue for 2019 and 2018 is reported in the consolidated statements of operations and comprehensive income under ASC Topic 606. *See* Note 3—Revenue for additional information.

68

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The cumulative effect of the changes made to the consolidated January 1, 2018 balance sheet for the adoption of ASC Topic 606 were as follows *(in thousands)*:

| | December 31, 2017 | Adjustments due to ASC Topic 606 | January 1, 2018 |
|---|---|---|---|
| **Assets:** | | | |
| Prepaid and other current assets | $11,881 | $1,903 | $13,784 |
| Deferred income tax assets | 20,156 | 530 | ( 19,626 ) |
| | | | |
| **Shareholders' equity:** | | | |
| Accumulated deficit | $708,354 ( ) | $1,373 | $706,981 ( ) |

**Recently Issued Accounting Pronouncements**

In December 2019, the Financial Accounting Standards Board ("FASB") issued ASU 2019-12, which simplifies the accounting for income taxes by removing certain exceptions to the general principles in ASC Topic 740, Income Taxes, and clarifies certain aspects of the current guidance to improve consistency among reporting entities. This ASU is effective for annual and interim reporting periods beginning after December 15, 2020. Early adoption is permitted, including adoption in interim periods. Entities electing early adoption must adopt all amendments in the same period. Most amendments must be applied prospectively while others are to be applied on a retrospective basis for all periods presented or a modified retrospective basis through a cumulative-effect adjustment to retained earnings as of the beginning of the fiscal year of adoption. The Company is evaluating the impact this ASU will have on its consolidated financial statements and whether to early adopt.

In August 2018, the FASB issued ASU 2018-15, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). This ASU is effective for annual and interim reporting periods beginning after December 15, 2019. The amendments should be applied either retrospectively or prospectively to all implementation costs incurred after the date of adoption. The Company does not expect this ASU to have a material impact on its consolidated financial statements and will adopt ASU 2018-15 in the first quarter of 2020 using the prospective approach.

In August 2018, the FASB issued ASU 2018-13, which removes, modifies and adds certain disclosure requirements in ASC Topic 820, Fair Value Measurement. This ASU is effective for annual and interim reporting periods beginning after December 15, 2019. Certain amendments must be applied prospectively while others are to be applied on a retrospective basis to all periods presented. The Company will adopt ASU 2018-13 in the first quarter of 2020.

In January 2017, the FASB issued ASU 2017-04, which eliminates the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge based on the excess of the carrying amount over the fair value. This ASU is effective for annual and interim impairment tests performed in periods beginning after December 15, 2019. The Company will adopt ASU 2017-04 in the first quarter of 2020.

In June 2016, the FASB issued ASU 2016-13, which requires entities to measure expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. This ASU introduces ASC Topic 326, Financial Instruments—Credit Losses, which replaces the existing incurred loss model and is applicable to financial assets measured at amortized cost, including trade receivables and certain other financial assets that have the contractual right to receive cash. ASC Topic 326 is effective for annual and interim reporting periods beginning after December 15, 2019. The guidance must be adopted using a modified retrospective transition. The adoption of ASC Topic 326 is not expected to have a material effect on the Company's consolidated financial statements. The Company will adopt ASC Topic 326 as of January 1, 2020, and does not expect a material cumulative effect adjustment to the opening balance of accumulated deficit in the period of adoption.

https://www.sec.gov/ix?doc=/Archives/edgar/data/1434621/000143462120000015/tree-12312019x10k.htm[10/12/2020 4:02:55 PM]

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 3—REVENUE

Revenue is as follows *(in thousands)*:

| | Year Ended December 31, | | |
| | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Revenue:** | | | |
| Home | $277,935 | $319,176 | $340,377 |
| Credit cards | 211,294 | 165,776 | 147,028 |
| Personal loans | 152,729 | 134,199 | 88,244 |
| Other Consumer | 151,014 | 95,640 | 40,819 |
| Consumer | 515,037 | 395,615 | 276,091 |
| Insurance | 284,792 | 31,369 | 136 |
| Other | 28,839 | 18,705 | 1,132 |
| **Total revenue** | **$1,106,603** | **$764,865** | **$617,736** |

The contract asset recorded within prepaid and other current assets on the consolidated balance sheets related to estimated variable consideration in the Company's Consumer business was $6.5 million and $4.8 million on December 31, 2019 and 2018, respectively.

The contract liability recorded within accrued expenses and other current liabilities on the consolidated balance sheets related to upfront fees paid by consumers in the Company's Consumer business was $0.6 million and $0.4 million at December 31, 2019 and 2018, respectively. During 2019, the Company recognized revenue of $0.4 million that was included in the contract liability balance at December 31, 2018.

Revenue recognized in any reporting period includes estimated variable consideration for which the Company has satisfied the related performance obligations, but are still pending the occurrence or non-occurrence of a future event outside the Company's control (such as lenders providing loans to consumers or credit card approvals of consumers) before the Company has a contractual right to payment. The Company recognized increases to such revenue from prior periods of $4.4 million and $0.7 million in 2019 and 2018, respectively.

## NOTE 4—CASH AND RESTRICTED CASH

Total cash, cash equivalents, restricted cash and restricted cash equivalents consist of the following *(in thousands)*:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Cash and cash equivalents | $60,243 | $105,102 |
| Restricted cash and cash equivalents | 96 | 56 |
| **Total cash, cash equivalents, restricted cash and restricted cash equivalents** | **$60,339** | **$105,158** |

70

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 5—PROPERTY AND EQUIPMENT

The balance of property and equipment, net is as follows *(in thousands)*:

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Computer equipment and capitalized software | $28,425 | $22,847 |
| Leasehold improvements | 7,751 | 4,651 |
| Furniture and other equipment | 3,993 | 1,935 |
| Aircraft and automobile | 2,621 | 2,621 |
| Projects in progress | 6,552 | 5,008 |
| **Total gross property and equipment** | **49,342** | **37,062** |
| Accumulated depreciation | (17,979 ) | (13,887 ) |
| **Total property and equipment, net** | **$31,363** | **$23,175** |

*See* Note 7—Assets Held for Sale for property and equipment classified as held for sale during 2018, which were sold to an unrelated third party in 2019.

Unamortized capitalized software development costs, in service or under development, are $19.9 million and $16.2 million at December 31, 2019 and 2018, respectively. Capitalized software development depreciation expense was $8.6 million, $6.1 million and $5.7 million for the years ended December 31, 2019, 2018 and 2017, respectively.

Long-lived assets located outside the United States, the Company's country of domicile, were $0.1 million at each of December 31, 2019 and 2018.

## NOTE 6—GOODWILL AND INTANGIBLE ASSETS

The balance of goodwill, net is as follows *(in thousands)*:

|  | Goodwill | Accumulated Impairment Loss | Net Goodwill |
|---|---|---|---|
| **Balance at December 31, 2017** | $596,456 | $(483,088 ) | $113,368 |
| Acquisition of Ovation | 11,260 | — | 11,260 |
| Acquisition of Student Loan Hero | 40,856 | — | 40,856 |
| Acquisition of QuoteWizard | 182,863 | — | 182,863 |
| **Balance at December 31, 2018** | $831,435 | $(483,088 ) | $348,347 |
| Acquisition of Ovation | 20 | — | 20 |
| Acquisition of QuoteWizard | 33 | — | 33 |
| Acquisition of ValuePenguin | 71,739 | — | 71,739 |
| **Balance at December 31, 2019** | $903,227 | $(483,088 ) | $420,139 |

The balance of intangible assets, net is as follows (in thousands):

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Intangible assets with indefinite lives | $ 10,142 | $ 10,142 |
| Intangible assets with definite lives, net | 171,438 | 195,557 |
| **Total intangible assets, net** | **$ 181,580** | **$ 205,699** |

71

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Goodwill and Indefinite-Lived Intangible Assets**

The Company's goodwill at December 31, 2019 consists of $59.3 million associated with the Home segment, $166.1 million associated with the Consumer segment, and $194.7 million associated with the Insurance segment. Prior to the fourth quarter of 2019, the Company's goodwill was associated with its then one reportable segment. The carrying amount of goodwill increased during the year ended December 31, 2019 primarily due to the acquisition of ValuePenguin and increased during the year ended December 31, 2018 due to the acquisitions of Ovation, Student Loan Hero, and QuoteWizard. *See* Note 8—Business Acquisitions for a discussion of the acquisitions and associated goodwill. Results of the annual impairment test as of October 1, 2019 indicated that no impairment had occurred.

Intangible assets with indefinite lives relate to the Company's trademarks. Results of the annual impairment test as of October 1, 2019 indicated that no impairment had occurred.

**Intangible Assets with Definite Lives**

Intangible assets with definite lives relate to the following *(dollars in thousands)*:

| | Weighted Average Amortization Life | Cost | Accumulated Amortization | | Net |
|---|---|---|---|---|---|
| Technology | 4.2 years | $116,200 | $48,938 | ( ) | $67,262 |
| Customer lists | 13.2 years | 77,300 | 12,452 | ( ) | 64,848 |
| Trademarks and tradenames | 4.9 years | 17,200 | 6,407 | ( ) | 10,793 |
| Website content | 3.0 years | 51,000 | 22,467 | ( ) | 28,533 |
| Other | 3.0 years | 5 | 3 | ( ) | 2 |
| **Balance at December 31, 2019** | | **$261,705** | **$90,267** | **( )** | **$171,438** |

| | Weighted Average Amortization Life | Cost | Accumulated Amortization | | Net |
|---|---|---|---|---|---|
| Technology | 4.2 years | $112,400 | $21,022 | ( ) | $91,378 |
| Customer lists | 12.9 years | 80,200 | 7,746 | ( ) | 72,454 |
| Trademarks and tradenames | 4.7 years | 16,742 | 3,730 | ( ) | 13,012 |
| Website content | 3.0 years | 24,900 | 6,192 | ( ) | 18,708 |
| Other | 3.0 years | 256 | 251 | ( ) | 5 |
| **Balance at December 31, 2018** | | **$234,498** | **$38,941** | **( )** | **$195,557** |

*See* Note 7—Assets Held for Sale for tenant leases classified as held for sale during 2018, which were sold to an unrelated third party in 2019.

Amortization of intangible assets with definite lives is recorded on a straight-line basis and, based on balances as of December 31, 2019, future amortization is estimated to be as follows *(in thousands)*:

|  | Amortization Expense |
|---|---|
| Year ending December 31, 2020 | $53,078 |
| Year ending December 31, 2021 | 42,738 |
| Year ending December 31, 2022 | 25,256 |
| Year ending December 31, 2023 | 8,602 |
| Year ending December 31, 2024 | 6,747 |
| Thereafter | 35,017 |
| **Total intangible assets with definite lives, net** | **$171,438** |

72

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*See* Note 8—Business Acquisitions for a discussion of the 2019 and 2018 acquisitions and associated intangibles.

▶ **NOTE 7—ASSETS HELD FOR SALE**                                                                ◀

In December 2016, the Company acquired two office buildings in Charlotte, North Carolina for $23.5 million in cash, which included $0.1 million in acquisition-related costs which were capitalized. The buildings were acquired with the intent to use such buildings as the Company's corporate headquarters and rent any unused space.

In November 2018, the Company's Board of Directors approved a plan to sell the two office buildings. The properties were classified as current assets held for sale in the consolidated balance sheet for December 31, 2018. The Company sold these buildings to an unrelated third party in the second quarter of 2019 for a sale price of $24.4 million, and the Company incurred closing fees of $0.3 million. The Company recognized a gain of $2.7 million on the sale within general and administrative expense in the consolidated statement of operations and comprehensive income. At the time the buildings were classified as held for sale, and at time of sale, they were associated with the Company's then one reportable segment.

Property and equipment classified as held for sale at December 31, 2018 is as follows *(in thousands)*:

|  | Amount |
|---|---|
| Land | $5,818 |
| Building | 14,984 |
| Site improvements | 950 |
| Computer equipment and capitalized software | 166 |
| Furniture and other equipment | 145 |
| **Total gross property and equipment** | **22,063** |
| Accumulated depreciation | 1,278 ( ) |
| **Total property and equipment, net** | **$20,785** |

Intangible assets classified as held for sale at December 31, 2018 is as follows *(in thousands)*:

|  | Amount |
|---|---|
| Tenant leases | $961 |
| **Total gross intangible assets** | **961** |
| Accumulated amortization | 468 ( ) |
| **Total intangible assets, net** | **$493** |

▶ **NOTE 8—BUSINESS ACQUISITIONS**                                                                ◀

*2019 Acquisition*

**ValuePenguin**

On January 10, 2019, the Company acquired Value Holding, Inc., the parent company of ValuePenguin Inc. ("ValuePenguin"), a personal finance website that offers consumers objective analysis on a variety of financial topics from insurance to credit cards. The Company made an upfront cash payment of $106.1 million at the closing of the transaction, funded through $90.0 million drawn on the Company's revolving credit facility and the balance using cash on hand. The purchase price of $106.2 million is comprised of the upfront cash payment of $106.1 million and a $0.1 million post-closing payment for working capital settlement.

The acquisition has been accounted for as a business combination. In 2019, the Company completed the determination of the final allocation

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Fair Value |
|---|---|
| Net working capital | $2,502 |
| Fixed assets | 68 |
| Intangible assets | 31,600 |
| Goodwill | 71,739 |
| Net noncurrent assets | 323 |
| **Total purchase price** | **$106,232** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, content and trademarks and tradenames. The estimated fair values of the developed technology were determined using the cost replacement method, the content was determined using the excess earnings method, and the trademarks and tradenames were determined using the relief from royalty method. The estimated fair value of the intangible assets are based on estimates for content lifecycles, estimates for revenue growth rates, estimates for future cash flows, the probability weighting of scenarios and discount rates, known at the acquisition date, which management believes are reasonable. The fair value of the intangible assets with definite lives is as follows *(dollars in thousands)*:

| | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $4,200 | 3 years |
| Content | 26,100 | 3 years |
| Trademarks and tradenames | 1,300 | 5 years |
| **Total intangible assets** | **$31,600** | **3.1** years |

The Company recorded goodwill of $71.7 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to ValuePenguin as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of ValuePenguin than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax purposes, the Company accounted for the acquisition as an asset purchase which would indicate the goodwill will be tax deductible.

Subsequent to the acquisition date, the Company's consolidated results of operations include the results of the acquired ValuePenguin business. In 2019, the Company's consolidated results of operations include revenue of $19.8 million attributable to the ValuePenguin business. In the first six months of 2019, net income from continuing operations attributable to the ValuePenguin business was $3.1 million. Due to the integration of the ValuePenguin business subsequent to the acquisition, earnings of the acquired ValuePenguin business beginning in the third quarter of 2019 is impracticable to determine with sufficient accuracy. Acquisition-related costs were $0.1 million in 2019 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

*2018 Acquisitions*

**QuoteWizard**

On October 31, 2018, the Company acquired QuoteWizard.com, LLC ("QuoteWizard"), one of the largest insurance comparison marketplaces in the growing online insurance advertising market. QuoteWizard services clients by driving consumers to insurance companies'

websites, providing leads to agents and carriers, as well as transfers agent calls to carrier call centers.

The Company paid $299.9 million in initial cash consideration, funded through $174.9 million of cash on hand and $125.0 million drawn on the Company's revolving credit facility, and could make up to three additional earnout payments, each ranging

74

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

from zero to $23.4 million, based on certain defined operating results during the earnout periods November 1, 2018 through October 31, 2019, November 1, 2019 through October 31, 2020, and November 1, 2020 through October 31, 2021. These additional payments, to the extent earned, will be payable in cash. The purchase price of $313.4 million is comprised of the upfront cash payment of $299.9 million, $13.9 million for the estimated fair value of the earnout payments, and a $0.4 million post-closing receipt for working capital settlement.

In the fourth quarter of 2019, the Company paid $23.4 million related to the earnout payment for the period of November 1, 2018 through October 31, 2019, of which $13.9 million is included within cash flows from financing activities and $9.5 million is included within cash flows from operating activities on the consolidated statement of cash flows.

As of December 31, 2019, the estimated fair value of the contingent consideration totaled $24.4 million, which is included in non-current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During 2019 and 2018, the Company recorded $27.1 million and $6.8 million, respectively, of contingent consideration expense in the consolidated statements of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. In 2019, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
|---|---|
| Net working capital | $8,521 |
| Fixed assets | 1,509 |
| Intangible assets | 120,400 |
| Goodwill | 182,896 |
| Other noncurrent assets | 29 |
| **Total purchase price** | **$313,355** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, customer relationships, content and trademarks and tradenames. The estimated fair values of the developed technology were determined using the excess earnings method, the customer relationships were determined using the distributor method, the content was determined using the cost replacement method, and the trademarks and tradenames were determined using the relief from royalty method. The fair value of the intangible assets with definite lives is as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $68,900 | 4 years |
| Customer lists | 42,700 | 14.7 years |
| Content | 1,000 | 3 years |
| Trademarks and tradenames | 7,800 | 5 years |
| **Total intangible assets** | **$120,400** | **7.9 years** |

   The Company recorded goodwill of $182.9 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to QuoteWizard as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of QuoteWizard than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax

75

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

purposes, the acquisition was an asset purchase and the goodwill will be tax deductible. Acquisition-related costs were $4.8 million in 2018 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

The unaudited pro forma financial results for the years ended December 31, 2018 and 2017 below combine the consolidated results of the Company and QuoteWizard, giving effect to the acquisition as if it had been completed on January 1, 2017. This unaudited pro forma financial information is presented for informational purposes only and is not indicative of future operations or results had the acquisition been completed as of January 1, 2017, or any other date.

The unaudited pro forma financial results include adjustments for additional amortization expense based on the fair value of the intangible assets with definite lives and their estimated useful lives, as well as changes in depreciation expense associated with the change in fair value of the property, plant and equipment recorded in relation to the acquisition. Interest expense was adjusted to eliminate historical interest associated with QuoteWizard's revolving credit facility and notes payable that were not assumed with the acquisition, as well as reflect incremental interest expense associated with debt issued to finance the acquisition. The provision for income taxes from continuing operations has also been adjusted to reflect taxes on the historical results of operations of QuoteWizard. QuoteWizard did not pay taxes at the entity level as it was a limited liability company whose members elected for it to be taxed as a partnership.

| | 2018 | 2017 |
|---|---|---|
| | *(in thousands)* | |
| Pro forma revenue | $ 900,978 | $ 701,184 |
| Pro forma net income from continuing operations | $ 110,015 | $ 1,164 |

The unaudited pro forma net income from continuing operations in 2018 includes the aggregate after-tax contingent consideration expense associated with the QuoteWizard earnout of $4.9 million. The unaudited pro forma net income from continuing operations for 2017 has been adjusted to include acquisition-related costs of $5.9 million incurred by the Company and QuoteWizard that are directly attributable to the acquisition, which will not have an ongoing impact. Accordingly, these acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for 2018.

**Student Loan Hero**

On July 23, 2018, the Company acquired Student Loan Hero, Inc., a personal finance website dedicated to helping student loan borrowers manage their student debt. Student Loan Hero offers current and former students in-depth financial comparison tools, educational resources, and unbiased, personalized advice. The Company made an upfront cash payment of $60.7 million at the closing of the transaction, of which $2.3 million was recognized as severance expense in the Company's consolidated statements of operations and comprehensive income. The purchase price of $60.4 million is comprised of the upfront cash payment of $60.7 million less the $2.3 million recognized as severance expense, and a $2.0 million post-closing payment for working capital settlement.

The acquisition has been accounted for as a business combination. During 2018, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

| | Fair Value |
|---|---|
| Net working capital | $ 5,429 |
| Intangible assets | 19,600 |
| Goodwill | 40,856 |
| Deferred tax liabilities | (5,467) |
| **Total purchase price** | **$ 60,418** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The acquired intangible assets are definite-lived assets consisting of content, customer relationships and trademarks and tradenames. The estimated fair values of the content was determined using the excess earnings method, the customer relationships were determined using the distributor method and the trademarks and tradenames were determined using the relief from royalty method. The fair value of the intangible assets with definite lives is as follows *(dollars in thousands)*:

| | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Content | $16,100 | 3 years |
| Customer lists | 2,500 | 10 years |
| Trademarks and tradenames | 1,000 | 5 years |
| **Total intangible assets** | **$19,600** | **4.0 years** |

The Company recorded goodwill of $40.9 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to Student Loan Hero as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of Student Loan Hero than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will not be tax deductible. Acquisition-related costs were $0.5 million in 2018 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

**Ovation**

On June 11, 2018, the Company acquired Ovation Credit Services, Inc., a leading provider of credit services with a strong customer service reputation. Ovation utilizes a proprietary software application that facilitates the credit repair process and is integrated directly with certain credit bureaus while educating consumers on credit improvement via ongoing outreach with Ovation case advisors. The proprietary software application offers consumers a simple, streamlined process to identify, dispute, and correct inaccuracies within their credit reports.

The Company paid $12.2 million in initial cash consideration and could make up to two additional earnout payments, each ranging from zero to $4.4 million, based on certain defined operating metrics during the earnout periods July 1, 2018 through June 30, 2019 and July 1, 2019 through June 30, 2020. These additional payments, to the extent earned, will be payable in cash. The purchase price of $17.9 million is comprised of the upfront cash payment of $12.2 million, $5.8 million for the estimated fair value of the earnout payments, and a $0.1 million post-closing receipt for working capital settlement.

In the fourth quarter of 2019, the Company paid $4.4 million related to the earnout payment for the period of July 1, 2018 through June 30, 2019, which is included within cash flows from financing activities on the consolidated statement of cash flows.

As of December 31, 2019, the estimated fair value of the contingent consideration totaled $3.1 million, which is included in current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During 2018, the Company recorded $1.6 million of contingent consideration expense in the consolidated statements of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

77

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The acquisition has been accounted for as a business combination. In 2019, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
|---|---|
| Net working capital | $303 |
| Fixed assets | 76 |
| Intangible assets | 8,900 |
| Goodwill | 11,280 |
| Net deferred tax liabilities | (2,688) |
| **Total purchase price** | **$17,871** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting of developed technology, customer relationships and trademarks and tradenames. The estimated fair values of the developed technology were determined using the excess earnings method, the customer relationships were determined using the cost savings method and the trademarks and tradenames were determined using the relief from royalty method. The fair value of the intangible assets with definite lives is as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $6,000 | 7 years |
| Customer lists | 1,900 | 1 year |
| Trademarks and tradenames | 1,000 | 4 years |
| **Total intangible assets** | **$8,900** | **5.4 years** |

The Company recorded goodwill of $11.3 million, which represents the excess of the purchase price over the estimated fair value of tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to Ovation as a going concern, which represents the ability of the Company to earn a higher return on the collection of assets and business of Ovation than if those assets and business were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will not be tax deductible. Acquisition-related costs were $0.4 million in 2018 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

### *2017 Acquisitions*

**SnapCap**

On September 19, 2017, the Company acquired certain assets of Snap Capital LLC, which does business under the name SnapCap ("SnapCap"). SnapCap, a tech-enabled online platform, connects business owners with lenders offering small business loans, lines of credit and merchant cash advance products through a concierge-based sales approach. The Company paid $11.9 million of initial cash consideration and could make up to three additional contingent consideration payments, each ranging from zero to $3.0 million, based on certain defined operating results during the periods of October 1, 2017 through September 30, 2018, October 1, 2018 through September 30, 2019 and October 1, 2019 through March 31, 2020. These additional payments, to the extent earned, will be payable in cash. The purchase price for the acquisition is $18.2 million, comprised of the upfront cash payment of $11.9 million and $6.3 million for the estimated fair value of the contingent consideration.

In the first quarter of 2019, the Company paid $3.0 million related to the earnout payment for the period of October 1, 2017 through September 30, 2018, which is included within cash flows from financing activities on the consolidated statement of cash

78

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

flows. In January 2020, the Company paid $3.0 million related to the earnout payment for the period of October 1, 2018 through September 30, 2019.

As of December 31, 2019, the estimated fair value of the contingent consideration totaled $5.9 million, which is included in current contingent consideration in the accompanying consolidated balance sheet. The estimated fair value of the contingent consideration payments is determined using an option pricing model. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. During 2019, 2018 and 2017, the Company recorded contingent consideration expense of $2.2 million, a gain of $0.3 million and expense of $0.7 million, respectively, in the consolidated statements of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
|---|---|
| Net working capital and other assets | $42 |
| Fixed assets | 146 |
| Intangible assets | 4,300 |
| Goodwill | 13,738 |
| **Total purchase price** | **$18,226** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of developed technology, customer relationships and trade name and trademarks. The estimated fair values of the developed technology were determined using the cost savings method, the customer relationships were determined using the excess earnings method and the trade name and trademarks were determined using the relief from royalty method. The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $400 | 3 years |
| Customer lists | 3,300 | 10 years |
| Trade name and trademarks | 600 | 5 years |
| **Total intangible assets** | **$4,300** | **8.7 years** |

The Company recorded goodwill of $13.7 million, which represents the excess of the purchase price over the estimated fair value of the intangible assets acquired. The goodwill is primarily attributable to SnapCap as a going concern which represents the ability of the Company to earn a higher return on the collection of assets and business of SnapCap than if those assets were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible. Acquisition-related costs were $0.3 million in 2017 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

**MagnifyMoney**

On June 20, 2017, the Company acquired the membership interests of Camino Del Avion (Delaware), LLC, which does business under the name MagnifyMoney ("MagnifyMoney") for $29.6 million cash consideration at the closing of the transaction. Camino del Avion (Delaware),

LLC was immediately merged with and into LendingTree, LLC, with LendingTree, LLC surviving. MagnifyMoney is a leading consumer-facing media property that offers editorial content, expert commentary, tools and resources to help consumers compare financial products and make informed financial decisions. The Company also acquired an option to purchase an affiliate in India, which provides technology and research support to MagnifyMoney under a services agreement, for

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

an estimated fair value of $0.5 million at any time during the three years after the closing. This purchase option was exercised on December 31, 2018.

In addition, the Company issued two key employees of MagnifyMoney restricted stock unit awards for a total of 38,468 shares of Company common stock. In connection with the terms of the purchase option described above, the Company issued a further restricted stock unit award for 19,234 shares to a key employee of technology and research operations in India upon the exercise of the purchase option. The total value of these restricted stock unit awards was $10.0 million on June 20, 2017. Vesting of these restricted stock units was contingent on the basis of performance conditions following the acquisition.

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows *(in thousands)*:

|  | Fair Value |
|---|---|
| Net working capital | $921 |
| Intangible assets | 9,700 |
| Goodwill | 23,784 |
| Deferred tax liabilities | (4,176) |
| Noncontrolling interest | (637) |
| **Total purchase price** | **$29,592** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of content, developed technology, customer relationships and trade name and trademarks. The estimated fair values of the content was determined using the excess earnings method, developed technology was determined using the cost savings method, the customer relationships were determined using the distributor method and the trade name and trademarks were determined using the relief from royalty method.

The fair value of the intangible assets with definite lives are as follows *(dollars in thousands)*:

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $200 | 3 years |
| Customer lists | 1,100 | 9 years |
| Trade name and trademarks | 600 | 4 years |
| Content | 7,800 | 3 years |
| **Total intangible assets** | **$9,700** | **3.7 years** |

The Company recorded goodwill of $23.8 million, which represents the excess of the purchase price over the estimated fair value of the tangible and intangible assets acquired, net of the liabilities assumed. The goodwill is primarily attributable to MagnifyMoney as a going concern which represents the ability of the Company to earn a higher return on the collection of assets and business of MagnifyMoney than if those assets were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax purposes, the acquisition was an equity purchase and the goodwill will

not be tax deductible. Acquisition-related costs were not material and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

**DepositAccounts**

On June 14, 2017, the Company acquired substantially all of the assets of Deposits Online, LLC, which does business under the name DepositAccounts.com ("DepositAccounts"). DepositAccounts is a leading consumer-facing media property in the depository industry and is one of the most comprehensive sources of depository deals and analysis on the Internet, covering all major deposit product categories through editorial content, programmatic rate tables and user-generated content.

80

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company paid $24.0 million of initial cash consideration and could make additional contingent consideration payments of up to $9.0 million. The potential contingent consideration payments are comprised of (i) up to seven payments of $1.0 million each based on specified increases in Federal Funds interest rates during the period commencing on the closing date and ending on June 30, 2020 and (ii) a one-time performance payment of up to $2.0 million based on the net revenue of deposit products during the period of January 1, 2018 through December 31, 2018. These additional payments, to the extent earned, will be payable in cash. The purchase price for the acquisition is $29.0 million, comprised of the upfront cash payment of $24.0 million and $5.0 million for the estimated fair value of the contingent consideration at the time of closing the acquisition.

In the third quarter of 2017, the Company made a payment of $1.0 million associated with a specified increase in the Federal Funds rate in June 2017. In each of the four quarters of 2018, the Company paid $1.0 million associated with specified increases in the Federal Funds rate in December 2017, March 2018, June 2018 and September 2018, respectively, which are included within cash flows from financing activities on the consolidated statement of cash flows, except for an immaterial portion of the fourth quarter payment included within cash flows from operating activities. In the first quarter of 2019, the Company paid $1.0 million associated with a specified increase in the Federal Funds rate in December 2018. In the second quarter of 2019, the Company paid $2.0 million associated with the one-time performance payment based on the net revenue of deposit products during the period of January 1, 2018 through December 31, 2018. The contingent consideration paid in 2019 is included within cash flows from operating activities on the consolidated statement of cash flows.

The estimated fair value of the portion of the contingent consideration payments based on increases in interest rates is determined using a scenario approach based on the interest rate forecasts of Federal Open Market Committee participants. The estimated value of the contingent consideration is based upon available information and certain assumptions, known at the time of this report, which management believes are reasonable. Any differences in the actual contingent consideration payments will be recorded in operating income in the consolidated statements of operations and comprehensive income. As of December 31, 2019, no liability has been recorded in the accompanying consolidated balance sheet for the remaining contingent consideration payment based on Federal Funds interest rates. Accordingly, during 2019 the Company recorded a gain of $1.0 million in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration. During each of 2018 and 2017, the Company recorded $2.0 million of contingent consideration expense in the consolidated statement of operations and comprehensive income due to the change in estimated fair value of the contingent consideration.

The acquisition has been accounted for as a business combination. During 2017, the Company completed the determination of the final allocation of purchase price to the assets acquired and liabilities assumed as follows (in thousands):

|  | Fair Value |
|---|---|
| Intangible assets | $9,600 |
| Goodwill | 19,389 |
| **Total purchase price** | **$28,989** |

The Company primarily used the income approach for the valuation as appropriate, and used valuation inputs in these models and analyses that were based on market participant assumptions. Market participants are buyers and sellers unrelated to the Company and fair value is determined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction at the measurement date.

The acquired intangible assets are definite-lived assets consisting primarily of developed technology, customer relationships and trade name and trademarks. The estimated fair values of the developed technology were determined using the excess earnings method, the customer relationships were determined using the distributor method and the trade name and trademarks were determined using the relief from royalty method. The fair value of the intangible assets with definite lives are as follows (dollars in thousands):

|  | Fair Value | Weighted Average Amortization Life |
|---|---|---|
| Technology | $8,600 | 5 years |
| Customer lists | 600 | 8 years |
| Trade name and trademarks | 400 | 4 years |
| **Total intangible assets** | **$9,600** | **5.2 years** |

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company recorded goodwill of $19.4 million, which represents the excess of the purchase price over the estimated fair value of the intangible assets acquired. The goodwill is primarily attributable to DepositAccounts as a going concern which represents the ability of the Company to earn a higher return on the collection of assets and business of DepositAccounts than if those assets were to be acquired and managed separately. The benefit of access to the workforce is an additional element of goodwill. The goodwill was recorded in the Company's then one reportable segment. For income tax purposes, the acquisition was an asset purchase and the goodwill will be tax deductible. Acquisition-related costs were $0.3 million in 2017 and are included in general and administrative expense on the consolidated statement of operations and comprehensive income.

*Pro forma Financial Results*

The unaudited pro forma financial results for the years ended December 31, 2019, 2018 and 2017 combine the consolidated results of the Company and DepositAccounts, MagnifyMoney, SnapCap, Ovation, Student Loan Hero, QuoteWizard and ValuePenguin, giving effect to the acquisitions as if the DepositAccounts, MagnifyMoney and SnapCap acquisitions had been completed on January 1, 2016, as if the Ovation, Student Loan Hero and QuoteWizard acquisitions had been completed on January 1, 2017, and as if the ValuePenguin acquisition had been completed on January 1, 2018. This unaudited pro forma financial information is presented for informational purposes only and is not indicative of future operations or results had the acquisitions been completed as of January 1, 2016, 2017 or 2018, or any other date.

The unaudited pro forma financial results include adjustments for additional amortization expense based on the fair value of the intangible assets with definite lives and their estimated useful lives. Depreciation expense and interest expense were adjusted for the impact of the QuoteWizard acquisition, as described above, including incremental interest associated with debt issued to finance the acquisition. Interest expense was also adjusted to reflect incremental interest associated with debt issued to finance the ValuePenguin acquisition. The provision for income taxes from continuing operations has been adjusted to reflect taxes on the historical results of operations of DepositAccounts, SnapCap and QuoteWizard. DepositAccounts, SnapCap and QuoteWizard did not pay taxes at the entity level as these entities were limited liability companies whose members elected for them to be taxed as a partnership.

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
|  | *(in thousands)* | | |
| Pro forma revenue | $1,107,118 | $934,209 | $729,370 |
| Pro forma net income from continuing operations | $39,173 | $104,153 | $2,998 ( ) |

The unaudited pro forma net income from continuing operations in 2019 includes the aggregate after-tax contingent consideration expense associated with the DepositAccounts, SnapCap, Ovation and QuoteWizard earnouts of $21.5 million. The unaudited pro forma net income from continuing operations for 2018 has been adjusted to include acquisition-related costs of $0.6 million incurred by the Company that are directly attributable to the ValuePenguin acquisition, and which will not have an ongoing impact. Accordingly, these acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for 2019.

The unaudited pro forma net income from continuing operations in 2018 includes the aggregate after-tax contingent consideration expense associated with the DepositAccounts, SnapCap, Ovation and QuoteWizard earnouts of $7.2 million. The unaudited pro forma net income from continuing operations for 2017 has been adjusted to include acquisition-related costs of $6.9 million incurred by the Company, Student Loan Hero and QuoteWizard that are directly attributable to the Ovation, Student Loan Hero and QuoteWizard acquisitions, which will not have an ongoing impact. Accordingly, these acquisition-related costs have been eliminated from the unaudited pro forma net income from continuing operations for 2018.

The unaudited pro forma net income from continuing operations in 2017 includes the aggregate after-tax contingent consideration expense associated with the DepositAccounts and SnapCap earnouts of $1.6 million. Acquisition-related costs of $1.0 million incurred by the Company, DepositAccounts, MagnifyMoney and SnapCap that are directly attributable to the DepositAccounts, MagnifyMoney and SnapCap acquisitions, and which will not have an ongoing impact, have been eliminated from the unaudited pro forma net income from continuing operations for 2017.

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 9—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES

Accrued expenses and other current liabilities consist of the following *(in thousands)*:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Accrued advertising expense | $65,836 | $60,268 |
| Accrued compensation and benefits | 10,540 | 6,381 |
| Accrued professional fees | 1,560 | 2,549 |
| Customer deposits and escrows | 6,920 | 6,913 |
| Contribution to LendingTree Foundation | 3,333 | 3,333 |
| Current lease liabilities | 6,885 | — |
| Other | 17,681 | 13,746 |
| **Total accrued expenses and other current liabilities** | **$112,755** | **$93,190** |

## NOTE 10—LEASES

The Company is a lessee to leases of corporate offices and certain office equipment. The majority of leases for corporate offices include one or more options to renew, with renewal terms ranging from two to five years. These renewal options have not been included in the calculation of right-of-use assets and lease liabilities, as the Company is not reasonably certain of the exercise of these renewal options. The Company used its incremental borrowing rate to calculate the right-of-use asset and lease liability for each lease.

As of December 31, 2019, right-of use assets totaling $25.5 million are included in other non-current assets and lease liabilities totaling $28.2 million are included in accrued expenses and other current liabilities and other non-current liabilities in the accompanying balance sheet.

Lease expense, which is included in general and administrative expense on the accompanying consolidated statements of operations and comprehensive income, consists of the following *(in thousands)*:

| | Year Ended December 31, 2019 |
|---|---|
| Operating lease cost | $6,346 |
| Short-term lease cost | 86 |
| **Total lease cost** | **$6,432** |

Weighted average remaining lease term and discount rate for operating leases are as follows:

| | December 31, 2019 | |
|---|---|---|
| Weighted average remaining lease term | 5.0 | years |
| Weighted average discount rate | 4.7 | % |

Supplemental cash flow information related to leases is as follows *(in thousands)*:

| | Year Ended December 31, 2019 |
|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | |
| Operating cash flows from operating leases | $6,779 |

| Right-of-use assets obtained in exchange for new operating lease liabilities | $21,969 |
|---|---|

83

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Maturities of lease liabilities as of December 31, 2019 are as follows *(in thousands)*:

| | Operating Leases |
|---|---|
| Year ending December 31, 2020 | $ 8,060 |
| Year ending December 31, 2021 | 5,731 |
| Year ending December 31, 2022 | 5,498 |
| Year ending December 31, 2023 | 5,191 |
| Year ending December 31, 2024 | 3,476 |
| Thereafter | 3,811 |
| Total lease payments | 31,767 |
| Less: Interest | 3,524 |
| Present value of lease liabilities | $ 28,243 |

Rental expense for all operating leases, except those with terms of a month or less that were not renewed, charged to continuing operations was $3.4 million in 2018 and $2.0 million in 2017, which is included in general and administrative expense in the consolidated statements of operations and comprehensive income.

The Company operated as a lessor in connection with the office buildings in Charlotte, North Carolina acquired in December 2016. The properties were sold in 2019 to an unrelated third party. *See* Note 7—Assets Held for Sale for further information.

Rental income of $0.3 million, $0.9 million and $1.6 million in 2019, 2018, and 2017 respectively, is included in other income on the accompanying consolidated statements of operations and comprehensive income.

## NOTE 11—SHAREHOLDERS' EQUITY

Basic and diluted net income per share was determined based on the following share data *(in thousands)*:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Weighted average basic common shares | 12,834 | 12,504 | 11,945 |
| Effect of stock options | 747 | 1,043 | 1,626 |
| Effect of dilutive share awards | 167 | 153 | 111 |
| Effect of Convertible Senior Notes and warrants | 871 | 397 | — |
| Weighted average diluted common shares | 14,619 | 14,097 | 13,682 |

For the years ended December 31, 2019, 2018 and 2017, the weighted average shares that were anti-dilutive, and therefore excluded from the calculation of diluted income per share, included options to purchase 0.1 million, 0.4 million and 0.1 million shares of common stock, respectively.

The 0.625% Convertible Senior Notes due June 1, 2022 and the warrants issued by the Company in 2017 could be converted into the Company's common stock, subject to certain contingencies. *See* Note 14—Debt for additional information. Shares of the Company's common stock associated with these instruments were excluded from the calculation of diluted income per share during 2017 as they were anti-dilutive since the conversion price of the Convertible Senior Notes and the strike price of the warrants were greater than the average market price of the Company's common stock.

*See* Note 12—Stock-Based Compensation for a full description of outstanding equity awards.

**Common Stock Repurchases**

In each of February 2018 and February 2019, the board of directors authorized and the Company announced the repurchase of up to $100.0 million and $150.0 million, respectively, of LendingTree's common stock. During the years ended December 31, 2019, 2018 and 2017, the Company purchased 22,731, 379,449 and 75,393 shares, respectively, of its common stock for aggregate consideration of $5.5 million, $92.6 million and $21.0 million, respectively. At December 31, 2019, $179.7 million remains authorized for share repurchase.

<div style="text-align:center">84</div>

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 12—STOCK-BASED COMPENSATION

The Company currently has two active plans, the Sixth Amended and Restated LendingTree 2008 Stock and Annual Incentive Plan (the "Equity Award Plan") and the LendingTree 2017 Inducement Grant Plan (the "Inducement Plan"), under which future awards may be granted, which currently covers outstanding stock options to acquire shares of the Company's common stock, restricted stock, restricted stock with performance conditions, RSUs and RSUs with performance conditions, and provides for the future grants of these and other equity awards. Under the Equity Award Plan and the Inducement Plan, the Company is authorized to grant stock options, restricted stock, RSUs and other equity-based awards for up to 6.1 million and 0.5 million shares, respectively, of LendingTree common stock to employees, and, under the Equity Award Plan only, to non-employee consultants and directors.

The Equity Award Plan and Inducement Plan each have a stated term of ten years and provide that the exercise price of stock options granted will not be less than the market price of the common stock on the grant date. The Equity Award Plan and Inducement Plan do not specify grant dates or vesting schedules, as those determinations are delegated to the Compensation Committee of the board of directors. Each grant agreement reflects the vesting schedule for that particular grant, as determined by the Compensation Committee. The Compensation Committee has the authority to modify the vesting provisions of an award.

Non-cash compensation related to equity awards is included in the following line items in the accompanying consolidated statements of operations and comprehensive income *(in thousands)*:

| | Year Ended December 31, 2019 | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Cost of revenue | $755 | $378 | $175 |
| Selling and marketing expense | 5,785 | 3,568 | 3,973 |
| General and administrative expense | 39,177 | 34,325 | 16,874 |
| Product development | 6,450 | 6,094 | 2,339 |
| **Total non-cash compensation** | **$52,167** | **$44,365** | **$23,361** |

For the years ended December 31, 2019, 2018 and 2017, the Company recognized $12.2 million, $11.2 million and $9.5 million of income tax benefit related to non-cash compensation. Additionally, for the years ended December 31, 2019, 2018 and 2017, the Company recognized $17.1 million, $77.6 million and $12.9 million, respectively, of excess tax benefit, including state taxes, in income tax expense. *See* Note 2— Significant Accounting Policies, for additional information regarding excess tax benefits and deficiencies.

### Stock Options

A summary of changes in outstanding stock options is as follows:

| | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|
| | | *(per option)* | *(in years)* | *(in thousands)* |
| **Outstanding at December 31, 2018** | 940,533 | $65.12 | | |
| Granted | 43,704 | 323.82 | | |
| Exercised | 167,686 ) | 52.08 | | |
| Forfeited | 38,680 ) | 318.36 | | |
| Expired | — | — | | |
| **Outstanding at December 31, 2019** | **777,871** | **$69.87** | **4.28** | **$182,809** |

| Options exercisable | 608,976 | $39.13 | 3.61 | $176,710 |

(a) The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $ 303.44 on the last trading day of 2019 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on December 31, 2019 . The intrinsic value changes based on the market value of the Company's common stock.

85

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As of December 31, 2019, there was approximately $10.5 million of unrecognized compensation cost related to stock options. These costs are expected to be recognized over a weighted-average period of approximately 2.2 years.

Upon exercise, the intrinsic value represents the pre-tax difference between the Company's closing stock price on the exercise date and the exercise price, multiplied by the number of stock options exercised. During the years ended December 31, 2019, 2018 and 2017, the total intrinsic value of stock options that were exercised was $50.2 million, $268.3 million and $27.7 million, respectively. Cash received from stock option exercises and the related actual tax benefit realized were $8.7 million and $11.9 million, respectively, for the year ended December 31, 2019.

During the years ended December 31, 2019, 2018 and 2017, the Company granted stock options with a weighted average grant date fair value per share of $167.10, $150.55 and $105.15, respectively, of which the vesting periods include (a) immediately upon grant, (b) one year from the grant date, (c) 50% over a period of two years from the grant date, (d) 33% over a period of three years from the grant date, and (e) certain grants to executive officers that vest over periods of up to five and a half years.

For purposes of determining stock-based compensation expense, the weighted average grant date fair value per share of the stock options was estimated using the Black-Scholes option pricing model, which requires the use of various key assumptions. The weighted average assumptions used are as follows:

|  | Year Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Expected term [1] | 5.00 - 6.25 years | 5.00 - 6.71 years | 5.00 - 7.00 years |
| Expected dividend [2] | — | — | — |
| Expected volatility [3] | 51% - 55% | 50% - 53% | 51% - 52% |
| Risk-free interest rate [4] | 1.46% - 2.55 % | 2.33% - 3.06% | 1.74% - 2.24% |

(1) The expected term of stock options granted was calculated using the 'Simplified Method', which utilizes the midpoint between the weighted average time of vesting and the end of the contractual term. This method was utilized for the stock options due to a lack of historical exercise behavior by the Company's employees.

(2) For all stock options granted during the years ended December 31, 2019, 2018 and 2017, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of the Company's common stock.

(4) The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

During the years ended December 31, 2019, 2018 and 2017, the total fair value of options vested was $6.9 million, $11.4 million and $4.1 million, respectively.

86

Inline XBRL Viewer

08-13555-mg1-cl-D0o2671413P30 DFiikeendO04l/0o3/21 FEentneteoed0l04/l01/221age4:2232:8o0f 1E5xAhibit
Declaration   Pg 115 of 251

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Stock Options with Performance Conditions**

A summary of changes in outstanding stock options with performance conditions is as follows:

| | Number of Options with Performance Conditions | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | | *(per option)* | *(in years)* | *(in thousands)* |
| **Outstanding at December 31, 2018** | 37,877 | $308.90 | | |
| Granted | — | — | | |
| Exercised | — | — | | |
| Forfeited | — | — | | |
| Expired | 37,877 | (308.90) | | |
| **Outstanding at December 31, 2019** | — | $ — | 0.00 | $ — |
| **Options exercisable** | — | $ — | 0.00 | $ — |

No stock options with performance conditions were granted in 2019 or 2018. During 2017, the Company granted stock options with performance conditions with a weighted average grant date fair value per share of $152.45, of which vesting periods range from 1.2 years to 2.2 years, pending the attainment of certain performance targets set at the time of grant. The performance measurement period ended on December 31, 2019. The performance conditions associated with this grant were not met, and the performance-based nonqualified stock options were not earned. No compensation cost associated with these options has been recorded.

For purposes of determining stock-based compensation expense, the weighted average grant date fair value per share of the stock options was estimated using the Black-Scholes option pricing model, which requires the use of various key assumptions. The weighted average assumptions used are as follows:

| | Year ended December 31, 2017 |
|---|---|
| Expected term [1] | 5.50 - 6.00 years |
| Expected dividend [2] | — |
| Expected volatility [3] | 51% |
| Risk-free interest rate [4] | 2.16% - 2.23% |

(1) The expected term of stock options granted was calculated using the 'Simplified Method', which utilizes the midpoint between the weighted average time of vesting and the end of the contractual term. This method was utilized for the stock options due to a lack of historical exercise behavior by the Company's employees.

(2) For all stock options granted during the year ended December 31, 2017, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of the Company's common stock.

(4) The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with comparable expected terms as the awards, in effect at the grant date.

87

https://www.sec.gov/ix?doc=/Archives/edgar/data/1434621/000143462120000015/tree-12312019x10k.htm[10/12/2020 4:02:55 PM]

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Stock Options with Market Conditions**

A summary of changes in outstanding stock options with market conditions at target is as follows:

| | Number of Options with Market Conditions | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value[a] |
|---|---|---|---|---|
| | | *(per option)* | *(in years)* | *(in thousands)* |
| **Outstanding at December 31, 2018** | **447,193** | $200.51 | | |
| Granted | 16,247 | 308.96 | | |
| Exercised | — | — | | |
| Forfeited | — | — | | |
| Expired | — | — | | |
| **Outstanding at December 31, 2019** | **463,440** | **$204.31** | **7.67** | **$48,178** |
| **Options exercisable** | **—** | **$—** | **0.00** | **$—** |

(a) The aggregate intrinsic value represents the total pre-tax intrinsic value (the difference between the Company's closing stock price of $303.44 on the last trading day of 2019 and the exercise price, multiplied by the number of shares covered by in-the-money options) that would have been received by the option holder had the option holder exercised these options on December 31, 2019. The intrinsic value changes based on the market value of the Company's common stock.

As of December 31, 2019, there was approximately $40.5 million of unrecognized compensation cost related to stock options with market conditions. These costs are expected to be recognized over a weighted-average period of approximately 2.8 years. The fair value of the stock options with market conditions will be recognized on a straight-line basis through each grant's vest date, whether or not any of the total shareholder return targets are met.

During the years ended December 31, 2019, 2018 and 2017, the Company granted stock options with a weighted-average grant date fair value per share of $230.81, $296.80 and $142.45, respectively, which have vest dates of March 31, 2023, March 31, 2022 and September 30, 2022, respectively.

For purposes of determining stock-based compensation expense, the weighted-average grant date fair value per share of the stock options with a market condition was estimated using the Monte Carlo simulation model, which requires the use of various key assumptions. The weighted-average assumptions used are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Expected term [1] | 7.00 years | 7.00 - 7.15 years | 7.50 years |
| Expected dividend [2] | — | — | — |
| Expected volatility [3] | 51% | 50% | 50% |
| Risk-free interest rate [4] | 2.54% | 2.38% - 2.81% | 2.12% |

(1) The expected term of stock options with a market condition granted was calculated using the midpoint between the weighted average time of vesting and the end of the contractual term.

(2) For all stock options with a market condition granted during the years ended December 31, 2019, 2018 and 2017, no dividends are expected to be paid over the contractual term of the stock options, resulting in a zero expected dividend rate.

(3) The expected volatility rate is based on the historical volatility of the Company's common stock.

(4) The risk-free interest rate is specific to the date of grant. The risk-free interest rate is based on U.S. Treasury yields for notes with

comparable expected terms as the awards with a service condition on the grant date.

 The stock options with a market condition granted in 2019 have a target number of shares that vest upon achieving a targeted total shareholder return performance of 81% stock price appreciation and a maximum of 27,132 shares for achieving superior

88

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

performance. No shares will vest unless 41% of the targeted performance is achieved. The performance measurement period ends on March 31, 2023.

Certain of the stock options with a market condition granted in 2018 have a target number of shares that vest upon achieving a targeted total shareholder return performance of 110% stock price appreciation and a maximum of 52,332 shares for achieving superior performance. No shares will vest unless 70% of the targeted performance is achieved. The performance measurement period ends on September 30, 2022. The remaining stock options with a market condition granted in 2018 have a target number of shares that vest upon achieving a targeted total shareholder return performance of 81% stock price appreciation and a maximum of 21,982 shares for achieving superior performance. No shares will vest unless 41% of the targeted performance is achieved. The performance measurement period ends on March 31, 2022.

The stock options with a market condition granted 2017 have a target number of shares that vest upon achieving a targeted total shareholder return performance of 110% stock price appreciation and a maximum of 672,499 shares for achieving superior performance. No shares will vest unless 70% of the targeted performance is achieved. The performance measurement period ends on September 30, 2022.

For all stock options with market conditions, time-based service vesting conditions would also have to be satisfied in order for shares to become fully vested and no longer subject to forfeiture.

As of December 31, 2019, stock options with a market condition of 481,669 had been earned, which have a vest date of September 30, 2022.

**Restricted Stock Units**

A summary of changes in outstanding nonvested RSUs is as follows:

| | RSUs | |
|---|---|---|
| | **Number of Units** | **Weighted Average Grant Date Fair Value** |
| | | *(per unit)* |
| **Nonvested at December 31, 2018** | 201,568 | $225.48 |
| Granted [(a)] | 62,248 | 318.04 |
| Vested | 82,020 ( ) | 192.89 |
| Forfeited | 36,857 ( ) | 287.73 |
| **Nonvested at December 31, 2019** | **144,939** | **$267.85** |

(a) The grant date fair value per share of the RSUs is calculated as the closing market price of LendingTree's common stock at the time of grant.

As of December 31, 2019, there was approximately $24.4 million of unrecognized compensation cost related to RSUs. These costs are expected to be recognized over a weighted-average period of approximately 1.6 years.

The total fair value of RSUs that vested during the years ended December 31, 2019, 2018 and 2017 was $27.2 million, $21.8 million and $11.5 million, respectively.

89

https://www.sec.gov/ix?doc=/Archives/edgar/data/1434621/000143462120000015/tree-12312019x10k.htm[10/12/2020 4:02:55 PM]

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Restricted Stock Units with Performance Conditions**

A summary of changes in outstanding nonvested RSUs with performance conditions is as follows:

| | RSUs with Performance Conditions | |
| --- | --- | --- |
| | Number of Units | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at December 31, 2018** | 92,481 | $182.28 |
| Granted | — | — |
| Vested | (46,785 ) | 207.36 |
| Forfeited | (31,049 ) | 212.09 |
| **Nonvested at December 31, 2019** | **14,647** | **$210.55** |

No RSUs with performance conditions were granted in 2019. During 2018 and 2017, the Company granted RSUs with performance conditions to certain employees, of which vesting periods range from 0.50 years to 4.00 years, pending the attainment of certain performance targets set at the time of grant. The grant date fair value per share of the RSUs with performance conditions is calculated as the closing market price of LendingTree's common stock at the time of grant.

As of December 31, 2019, there was approximately $2.8 million of unrecognized compensation cost related to RSUs with performance conditions. These costs are expected to be recognized over a weighted-average period of approximately 1.2 years.

The total fair value of RSUs with performance conditions that vested during the years ended December 31, 2019, 2018, and 2017 was $18.8 million, $7.9 million, and $0.4 million, respectively.

**Restricted Stock Awards with Performance Conditions**

A summary of changes in outstanding nonvested RSAs with performance conditions is as follows:

| | RSAs with Performance Conditions | |
| --- | --- | --- |
| | Number of Awards | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| **Nonvested at December 31, 2018** | 71,412 | $340.25 |
| Granted | — | — |
| Vested | (23,804 ) | 340.25 |
| Forfeited | | |
| **Nonvested at December 31, 2019** | **47,608** | **$340.25** |

No RSAs with performance conditions were granted in 2019 or 2017. During 2018, the Company granted time-vested RSAs with a performance condition to its Chairman and Chief Executive Officer, which vest through December 31, 2021. The terms of this award were fixed in compensation agreements in July 2017 with a total grant date fair value of $21.9 million. The performance condition was tied to the Company's operating results during the first six months of 2018, and has been met.

As of December 31, 2019, there was approximately $8.7 million of unrecognized compensation cost related to RSAs with performance conditions. These costs are expected to be recognized over a period of approximately 2.0 years.

The total fair value of RSAs with performance conditions that vested during the year ended December 31, 2019 and 2018 was $8.2 million and $13.6 million, respectively.

LENDINGTREE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Restricted Stock Awards with Market Conditions**

A summary of changes in outstanding nonvested RSAs with market conditions at target is as follows:

| | RSAs with Market Conditions | |
|---|---|---|
| | Number of Awards | Weighted Average Grant Date Fair Value |
| | | *(per unit)* |
| Nonvested at December 31, 2018 | 26,674 | $340.25 |
| Granted | — | — |
| Vested | — | — |
| Forfeited | — | — |
| Nonvested at December 31, 2019 | 26,674 | $340.25 |

No RSAs with market conditions were granted in 2019 or 2017. During 2018, the Company granted RSAs with market conditions to its Chairman and Chief Executive Officer with a total grant date fair value of $1.9 million. These RSAs with a market condition have a target number of shares that vest upon achieving a targeted total shareholder return performance of 110% stock price appreciation and a maximum of 44,545 shares for achieving superior performance. No shares will vest unless 70% of the targeted performance is achieved. The performance measurement period ends on September 30, 2022. Time-based service vesting conditions would also have to be satisfied in order for shares to become fully vested and no longer subject to forfeiture

As of December 31, 2019, there was approximately $1.0 million of unrecognized compensation cost related to RSAs with market conditions. These costs are expected to be recognized over a weighted-average period of approximately 2.8 years.

As of December 31, 2019, RSAs with a market condition of 29,601 had been earned, which have a vest date of September 30, 2022.

## NOTE 13—INCOME TAXES

**Income Tax Provision**

The components of the income tax expense (benefit) are as follows *(in thousands)*:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| Current income tax expense (benefit): | | | | | | |
| Federal | $201 | | $1,470 | ( ) | $10,055 | |
| State | 125 | ( ) | 204 | ( ) | 2,606 | |
| Current income tax expense (benefit) | 76 | | 1,674 | ( ) | 12,661 | |
| Deferred income tax (benefit) provision: | | | | | | |
| Federal | 10,857 | ( ) | 44,950 | ( ) | 3,805 | ( ) |
| State | 2,302 | | 18,951 | ( ) | 2,565 | ( ) |
| Deferred income tax benefit | 8,555 | ( ) | 63,901 | ( ) | 6,370 | ( ) |

| | | | | | |
|---|---|---|---|---|---|
| | | ( | | ( | |
| **Income tax (benefit) expense** | $8,479 | ) | $65,575 | ) | $6,291 |

91

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A reconciliation of the income tax expense (benefit) to the amounts computed by applying the statutory federal income tax rate to income from continuing operations before income taxes is shown as follows *(in thousands)*:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Federal statutory income tax | $6,506 | $9,186 | $8,998 |
| State income taxes, net | 1,832 | (14,884) | 268 |
| Excess tax deductions on non-cash compensation | 13,971 | (59,601) | (11,134) |
| Research and experimentation tax credit | 5,794 | (2,523) | (1,318) |
| Impact of certain state legislation, net | 3,932 | — | — |
| Nondeductible executive compensation | 988 | 163 | 21 |
| Change in (release of) valuation allowance | 954 | 12 | (593) |
| Uncertain tax positions | 922 | 289 | 170 |
| Nondeductible meals & entertainment | 428 | 310 | 90 |
| Impact of Tax Cuts and Jobs Act | — | 270 | 9,062 |
| Other, net | 612 | (1,227) | 77 |
| **Income tax (benefit) expense** | **$8,479** | **$(65,575)** | **$6,291** |

During the fourth quarter of 2017, LendingTree recorded a net tax expense of $9.1 million related to the enactment of the TCJA. The expense is primarily related to the remeasurement of LendingTree's deferred tax assets and liabilities considering the TCJA's enacted tax rates and certain other impacts. Simultaneous with the Act, the SEC Staff released Accounting Bulletin No. 118 ("SAB 118"), which allows the use of provisional amounts (reasonable estimates) if the analysis of the impacts of the Act have not been completed when financial statements are issued. During the fourth quarter of 2018, the Company finalized the computations of the income tax effects of the Act. As such, in accordance with SAB 118, the Company's accounting for the effects of the Act is complete. The Company did not significantly adjust provisional amounts recorded in 2017 and the SAB 118 measurement period subsequently ended on December 22, 2018. Although the Company no longer considers these amounts to be provisional, the determination of the Act's income tax effects may change following future legislation or further interpretation of the Act based on the publication of recently proposed U.S. Treasury regulations and guidance from the Internal Revenue Service and state tax authorities.

92

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Deferred Income Taxes**

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are as follows *(in thousands)*:

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Deferred tax assets: | | |
| Provision for accrued expenses | $12,234 | $5,953 |
| Leasing [(a)] | 7,299 | — |
| Net operating loss carryforwards [(b)] | 56,450 | 59,817 |
| Non-cash compensation expense | 15,805 | 12,505 |
| Interest limitation | 987 | 3,532 |
| Contingent liabilities | 9,366 | 3,053 |
| Tax credits | 6,124 | 1,569 |
| Other | 1,624 | 2,976 |
| Total gross deferred tax assets | 109,889 | 89,405 |
| Less: valuation allowance [(c)] | (4,102) | (2,229) |
| **Total deferred tax assets, net of the valuation allowance** | **105,787** | **87,176** |
| Deferred tax liabilities: | | |
| Intangible and other assets | (1,744) | (4,623) |
| Leasing [(a)] | (6,596) | — |
| Other | (1,835) | (892) |
| **Total gross deferred tax liabilities** | **(10,175)** | **(5,515)** |
| **Net deferred taxes** | **$95,612** | **$81,661** |

(a) As of December 31, 2019, the adoption of ASC Topic 842 has no material impact to the effective tax rate. Related deferred tax positions are individually disclosed as components of deferred tax as of December 31, 2019.

(b) At December 31, 2019, the Company had pre-tax consolidated federal net operating losses ("NOLs") of $ 188.2 million. The federal NOLs no longer expire under the new TCJA. The Company's NOLs will be available to offset taxable income subject to the Internal Revenue Code Section 382 annual limitation. In addition, the Company has state NOLs of approximately $ 484.7 million at December 31, 2019 that will expire at various times between 2021 and 2039.

(c) The valuation allowance is related to items for which it is *"more likely than not"* that the tax benefit will not be realized.

Deferred income taxes are presented in the accompanying consolidated balance sheets as follows *(in thousands)*:

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |

| | | |
|---|---:|---:|
| Deferred income tax assets | $87,664 | $79,289 |
| Non-current assets of discontinued operations | 7,948 | 3,266 |
| Deferred income tax liabilities | — | 894 ( ) |
| **Net deferred taxes** | **$95,612** | **$81,661** |

**Valuation Allowance**

A valuation allowance is provided on deferred tax assets if it is determined that it is *"more likely than not"* that the deferred tax asset will not be realized. As of each reporting date, management considers both positive and negative evidence regarding the likelihood of future realization of the deferred tax assets.

93

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

At December 31, 2019, 2018 and 2017, the Company recorded a partial valuation allowance of $4.1 million, $2.2 million and $2.7 million, respectively, primarily related to state net operating losses, which the Company does not expect to be able to utilize prior to expiration.

A reconciliation of the beginning and ending balances of the deferred tax valuation allowance is as follows *(in thousands)*:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| Balance, beginning of the period | $2,229 | $2,694 | $2,101 |
| Charges to earnings | 1,873 | 465 | (593) |
| Balance, end of the period | $4,102 | $2,229 | $2,694 |

**Unrecognized Tax Benefits**

A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding interest and penalties, is as follows *(in thousands)*:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| Balance, beginning of the period | $1,127 | $748 |
| Additions based on tax positions of the current period | 525 | 249 |
| Additions based on tax positions of the prior period | 344 | 130 |
| Balance, end of the period | $1,996 | $1,127 |

Interest and, if applicable, penalties are recognized related to unrecognized tax benefits in income tax expense. Interest and penalties on unrecognized tax benefits included in income tax expense for each of the years ended December 31, 2019, 2018 and 2017 is immaterial.

As of December 31, 2019 and 2018, the accrual for unrecognized tax benefits, including interest, was $2.1 million and $1.2 million, respectively, which would benefit the effective tax rate if recognized. Management also believes that it is reasonably possible that the amount of unrecognized income tax benefits may decrease by $0.6 million within the next twelve months due to settlement of audits and expiration of statutes of limitations.

**Tax Audits**

LendingTree is subject to audits by federal, state and local authorities in the area of income tax. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, any amounts paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for tax contingencies and the amounts owed by the Company are recorded in the period they become known. As of December 31, 2019, the Company is subject to a federal income tax examination for the tax years 2014 through 2018. In addition, the Company is subject to state and local tax examinations for the tax years 2014 through 2018.

## NOTE 14—DEBT

**Convertible Senior Notes**

On May 31, 2017, the Company issued $300.0 million aggregate principal amount of its 0.625% Convertible Senior Notes due June 1, 2022 (the "Notes") in a private placement. The Notes bear interest at a rate of 0.625% per year, payable semi-annually on June 1 and December 1 of each year, beginning on December 1, 2017. The Notes will mature on June 1, 2022, unless earlier repurchased or converted.

The initial conversion rate of the Notes is 4.8163 shares of Common Stock per $1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately $207.63 per share). The conversion rate will be subject to adjustment upon the occurrence of certain

specified events but will not be adjusted for accrued but unpaid interest. In addition, upon the occurrence of a fundamental change prior to the maturity of the Notes, the Company will, in certain circumstances, increase the

94

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

conversion rate by a specified number of additional shares for a holder that elects to convert the Notes in connection with such fundamental change. Upon conversion, the Notes will settle for cash, shares of the Company's stock, or a combination thereof, at the Company's option. It is the intent of the Company to settle the principal amount of the Notes in cash and any conversion premium in shares of its common stock.

The Notes are the Company's senior unsecured obligations and will rank senior in right of payment to any of the Company's indebtedness that is expressly subordinated in right of payment to the Notes; equal in right of payment to any of the Company's unsecured indebtedness that is not so subordinated; effectively junior in right of payment to any of the Company's secured indebtedness, including borrowings under the senior secured revolving credit facility, described below, to the extent of the value of the assets securing such indebtedness; and structurally junior to all indebtedness and other liabilities (including trade payables) of the Company's subsidiaries.

Prior to the close of business on the business day immediately preceding February 1, 2022, the Notes will be convertible at the option of the holders thereof only under the following circumstances:

- during any calendar quarter commencing after the calendar quarter ending on September 30, 2017 (and only during such calendar quarter), if the last reported sale price of the common stock for at least 20 trading days (whether or not consecutive) during the 30 consecutive trading day period ending on, and including the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- during the five business day period after any five consecutive trading day period in which, for each trading day of that period, the trading price (as defined in the Notes) per $1,000 principal amount of Notes for such trading day was less than 98% of the product of the last reported sale price of the Common Stock and the conversion rate on each such trading day; or

- upon the occurrence of specified corporate events including but not limited to a fundamental change.

Holders of the Notes became entitled to convert the Notes on January 1, 2018, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on December 31, 2017, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes continued to have such right until June 30, 2018 based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on March 31, 2018, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes were not entitled to convert the Notes from July 1, 2018 to March 31, 2019. Holders of the Notes became entitled to convert the Notes on April 1, 2019, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on March 31, 2019, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day. Holders of the Notes will continue to have such right until March 31, 2020, based on the last reported sales price of the Company's common stock, for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on December 31, 2019, being greater than or equal to 130% of the conversion price of the Notes on each applicable trading day.

On or after February 1, 2022, until the close of business on the second scheduled trading day immediately preceding the maturity date of the Notes, holders of the Notes may convert all or a portion of their Notes regardless of the foregoing conditions.

The Company may not redeem the Notes prior to the maturity date and no sinking fund is provided for the Notes. Upon the occurrence of a fundamental change prior to the maturity date of the Notes, holders of the Notes may require the Company to repurchase all or a portion of the Notes for cash at a price equal to 100% of the principal amount of the Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

If the market price per share of the Common Stock, as measured under the terms of the Notes, exceeds the conversion price of the Notes, the Notes could have a dilutive effect, unless the Company elects, subject to certain conditions, to settle the principal amount of the Notes and any conversion premium in cash.

The initial measurement of convertible debt instruments that may be settled in cash is separated into a debt and an equity component whereby the debt component is based on the fair value of a similar instrument that does not contain an equity conversion option. The separate components of debt and equity of the Company's Notes were determined using an interest rate of 5.36%, which reflects the nonconvertible debt borrowing rate of the Company at the date of issuance. As a result, the initial components of debt and equity were $238.4 million and $61.6

million, respectively.

95

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Financing costs related to the issuance of the Notes were approximately $9.3 million of which $7.4 million were allocated to the liability component and are being amortized to interest expense over the term of the debt and $1.9 million were allocated to the equity component.

During 2019, the Company recorded interest expense on the Notes of $15.3 million which consisted of $1.9 million associated with the 0.625% coupon rate, $12.0 million associated with the accretion of the debt discount, and $1.4 million associated with the amortization of the debt issuance costs. During 2018, the Company recorded interest expense on the Notes of $14.6 million which consisted of $1.9 million associated with the 0.625% coupon rate, $11.4 million associated with the accretion of the debt discount, and $1.3 million associated with the amortization of the debt issuance costs. During 2017, the Company recorded interest expense on the Notes of $8.2 million which consisted of $1.1 million associated with the 0.625% coupon rate, $6.4 million associated with the accretion of the debt discount, and $0.7 million associated with the amortization of the debt issuance costs. The debt discount is being amortized over the term of the debt.

As of December 31, 2019, the fair value of the Notes is estimated to be approximately $469.1 million using the Level 1 observable input of the last quoted market price on December 31, 2019.

A summary of the gross carrying amount, unamortized debt cost, debt issuance costs and net carrying value of the liability component of the Notes are as follows *(in thousands)*:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Gross carrying amount | $299,991 | $300,000 |
| Unamortized debt discount | 31,789 | 43,805 |
| Debt issuance costs | 3,811 | 5,252 |
| **Net carrying amount** | **$264,391** | **$250,943** |

**Convertible Note Hedge and Warrant Transactions**

On May 31, 2017, in connection with the issuance of the Notes, the Company entered into Convertible Note Hedge (the "Hedge") and Warrant transactions with respect to the Company's common stock. The Company used approximately $18.1 million of the net proceeds from the Notes to pay for the cost of the Hedge, after such cost was partially offset by the proceeds from the Warrant transactions.

On May 31, 2017, the Company paid $61.5 million to the counterparties for the Hedge transactions. The Hedge transactions cover approximately 1.4 million shares of the Company's common stock, the same number of shares initially underlying the Notes, and are exercisable upon any conversion of the Notes. The Hedge Transactions are expected generally to reduce the potential dilution to the Common Stock upon conversion of the Notes and/or offset any cash payments the Company is required to make in excess of the principal amount of the converted Notes, as the case may be, in the event that the market price per share of Common Stock, as measured under the terms of the Hedge transactions, is greater than the strike price of the Hedge transactions, which initially corresponds to the initial conversion price of the Notes, or approximately $207.63 per share of Common Stock. The Hedge transactions will expire upon the maturity of the Notes.

On May 31, 2017, the Company sold to the counterparties, warrants (the "Warrants") to acquire 1.4 million shares of Common Stock at an initial strike price of $266.39 per share, which represents a premium of 70% over the reported sale price of the Common Stock of $156.70 on May 24, 2017. On May 31, 2017, the Company received aggregate proceeds of approximately $43.4 million from the sale of the Warrants.

If the market price per share of the Common Stock, as measured under the terms of the Warrants, exceeds the strike price of the Warrants, the Warrants could have a dilutive effect, unless the Company elects, subject to certain conditions, to settle the Warrants in cash.

The Hedge and Warrant transactions are indexed to, and potentially settled in, the Company's common stock and the net cost of $18.1 million has been recorded as a reduction to additional paid-in capital in the consolidated statement of shareholders' equity.

**Senior Secured Revolving Credit Facility**

On December 10, 2019, the Company's wholly-owned subsidiary, LendingTree, LLC, entered into an amended and restated $500.0 million five-year senior secured revolving credit facility (the "Amended Revolving Credit Facility"), which amended and

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

restated the Company's previous $350.0 million five-year senior secured revolving credit facility (the "2017 Revolving Credit Facility"). The Amended Revolving Credit Facility matures on December 10, 2024. Borrowings under the Amended Revolving Credit Facility can be used to finance working capital needs, capital expenditures and general corporate purposes, including to finance permitted acquisitions. As of December 31, 2019, the Company had $75.0 million in borrowings outstanding under the Amended Revolving Credit Facility at the LIBO rate option with a weighted average interest rate of 3.01%, consisting of a $50.0 million 31-day borrowing and a $25.0 million 31-day borrowing. As of December 31, 2018, the Company had a $125.0 million, 31-day borrowing outstanding under the Revolving Credit Facility bearing interest at the LIBO rate option of 4.02%.

Up to $10.0 million of the Amended Revolving Credit Facility will be available for short-term loans, referred to as swingline loans. Under certain conditions, the Company will be permitted to add one or more term loans and/or increase revolving commitments under the Amended Revolving Credit Facility by an additional amount equal to the greater of $185.0 million or 100% of Consolidated EBITDA as defined, or a greater amount provided that a total consolidated senior secured debt to EBITDA ratio does not exceed 2.50 to 1.00. Additionally, up to $10.0 million of the Amended Revolving Credit Facility will be available for the issuance of letters of credit. As of December 31, 2019, the Company has outstanding one letter of credit issued in the amount of $0.2 million.

The Company's borrowings under the Amended Revolving Credit Facility bear interest at annual rates that, at the Company's option, will be either:

- a base rate generally defined as the sum of (i) the greater of (a) the prime rate of Truist Bank, (b) the federal funds effective rate plus 0.5% and (c) the LIBO rate (defined below) on a daily basis applicable for an interest period of one month plus 1.0% and (ii) an applicable percentage of 0.25% to 1.0% based on a total consolidated debt to EBITDA ratio; or

- a LIBO rate generally defined as the sum of (i) the rate for Eurodollar deposits in the applicable currency and (ii) an applicable percentage of 1.25% to 2.0% based on a total consolidated debt to EBITDA ratio.

All swingline loans bear interest at the base rate defined above. Interest on the Company's borrowings are payable quarterly in arrears for base rate loans and on the last day of each interest rate period (but not less often than three months) for LIBO rate loans.

The Amended Revolving Credit Facility contains a restrictive financial covenant, which initially limits the total consolidated debt to EBITDA ratio to 4.5, with step downs to 4.0 over time, except that this may increase by 0.5 for the four fiscal quarters following a material acquisition. In addition, the Amended Revolving Credit Facility contains customary affirmative and negative covenants in addition to events of default for a transaction of this type that, among other things, restrict additional indebtedness, liens, mergers or certain fundamental changes, asset dispositions, dividends, stock repurchases and other restricted payments, transactions with affiliates, sale-leaseback transactions, hedging transactions, loans and investments and other matters customarily restricted in such agreements. The Company was in compliance with all covenants at December 31, 2019.

The Amended Revolving Credit Facility requires LendingTree, LLC to pledge as collateral, subject to certain customary exclusions, substantially all of its assets, including 100% of its equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none). The obligations under this facility are unconditionally guaranteed on a senior basis by LendingTree, Inc. and material domestic subsidiaries of LendingTree, LLC, which guaranties are secured by a pledge as collateral, subject to certain customary exclusions, of 100% of each such guarantor's assets, including 100% of each such guarantor's equity in all of its domestic subsidiaries and 66% of the voting equity, and 100% of the non-voting equity, in all of its material foreign subsidiaries (of which there are currently none).

The Company is required to pay an unused commitment fee quarterly in arrears on the difference between committed amounts and amounts actually borrowed under the Amended Revolving Credit Facility equal to an applicable percentage of 0.25% to 0.45% per annum based on a total consolidated debt to EBITDA ratio. The Company is required to pay a letter of credit participation fee and a letter of credit fronting fee quarterly in arrears. The letter of credit participation fee is based upon the aggregate face amount of outstanding letters of credit at an applicable percentage of 1.25% to 2.0% based on a total consolidated debt to EBITDA ratio. The letter of credit fronting fee is 0.125% per annum on the face amount of each letter of credit.

The Company recognized $0.3 million and $0.1 million in additional interest expense in the fourth quarters of 2019 and 2017, respectively, due to the write-off of certain unamortized debt issuance costs associated with the original revolving credit facility and previous amendments to the credit agreement. In addition to the remaining unamortized debt issuance costs associated with the original revolving credit facility and the Revolving Credit Facility, debt issuance costs of $2.8 million related to the Amended

97

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Revolving Credit Facility entered into on December 10, 2019 are being amortized to interest expense over the life of the Amended Revolving Credit Facility, and are included in prepaid and other current assets and other non-current assets in the Company's consolidated balance sheet.

During 2019, the Company recorded interest expense related to the revolving credit facility of $6.1 million which consisted of $4.9 million associated with borrowings bearing interest at the LIBO rate, $0.6 million in unused commitment fees, and $0.6 million associated with the amortization of the debt issuance costs. During 2018, the Company recorded interest expense related to the revolving credit facility of $2.0 million which consisted of $0.8 million associated with borrowing bearing interest at the base rate and the LIBO rate, $0.8 million in unused commitment fees, and $0.4 million associated with the amortization of the debt issuance costs. During 2017, the Company recorded interest expense related to the revolving credit facility of $0.5 million in unused commitment fees and $0.4 million associated with the amortization of the debt issuance costs.

## NOTE 15—COMMITMENTS

### Bonds

The Company has funding commitments that could potentially require performance in the event of demands by third parties or contingent events, as follows *(in thousands)*:

|  | | Commitments Due By Period | | | |
| --- | --- | --- | --- | --- | --- |
|  | Total | Less Than 1 year | 1-3 years | 3-5 years | More Than 5 years |
| Surety bonds [a] | $5,278 | $5,253 | $25 | $— | $— |

(a) State laws and regulations generally require businesses which engage in mortgage brokering activity to maintain a mortgage broker or similar license. Mortgage brokering activity is generally defined to include, among other things, receiving valuable consideration for offering assistance to a buyer in obtaining a residential mortgage or soliciting financial and mortgage information from the public and providing that information to an originator of residential mortgage loans. All states require that the Company maintain surety bonds for potential claims.

### Other Commitments

The Company has certain other commitments through 2036, where the aggregate commitments for these contracts range from $4.2 million to $11.2 million each year throughout the remaining life of the contract.

## NOTE 16—CONTINGENCIES

### Overview

LendingTree is involved in legal proceedings on an ongoing basis. In assessing the materiality of a legal proceeding, the Company evaluates, among other factors, the amount of monetary damages claimed, as well as the potential impact of non-monetary remedies sought by plaintiffs (e.g., injunctive relief) that may require it to change its business practices in a manner that could have a material and adverse impact on the Company's business. With respect to the matters disclosed in this Note 16, unless otherwise indicated, the Company is unable to estimate the possible loss or range of losses that could potentially result from the application of such non-monetary remedies.

As of December 31, 2019, the Company had litigation settlement accruals of $0.2 million and $31.0 million in continuing operations and discontinued operations, respectively. As of December 31, 2018, the Company had litigation settlement accruals of $0.2 million and $8.0 million in continuing operations and discontinued operations, respectively. The litigation settlement accruals relate to litigation matters that were either settled or a firm offer for settlement was extended, thereby establishing an accrual amount that is both probable and reasonably estimable. *See* Note 20—Discontinued Operations for additional information.

## NOTE 17—FAIR VALUE MEASUREMENTS

Other than the Notes and the Warrants, the carrying amounts of the Company's financial instruments are equal to fair value at December 31, 2019. *See* Note 14—Debt for additional information on the Notes and the Warrants.

98

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Contingent consideration payments related to acquisitions are measured at fair value each reporting period using Level 3 unobservable inputs. The changes in the fair value of the Company's Level 3 liabilities during the years ended December 31, 2019, 2018 and 2017 are as follows *(in thousands)*:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| **Contingent consideration, beginning of period** | $38,837 | $57,349 | $23,100 |
| Transfers into Level 3 | — | — | — |
| Transfers out of Level 3 | — | — | — |
| Total net losses included in earnings (realized and unrealized) | 28,402 | 10,788 | 23,931 |
| Purchases, sales and settlements: | | | |
| Additions | — | 19,700 | 11,318 |
| Payments | (33,775) | (49,000) | (1,000) |
| **Contingent consideration, end of period** | $33,464 | $38,837 | $57,349 |

The contingent consideration liability at December 31, 2019 and 2018 consisted of the estimated fair value of the earnout payments of the DepositAccounts, SnapCap, Ovation, and QuoteWizard acquisitions. The contingent consideration liability at December 31, 2017 was the estimated fair value of the earnout payments of the CompareCards, DepositAccounts, and SnapCap acquisitions. The Company will make earnout payments ranging from zero to $1.0 million based on the achievement of defined milestone targets for DepositAccounts, payments ranging from $3.0 million to $6.0 million based on the achievement of certain defined earnings targets for SnapCap, payments ranging from zero to $4.4 million based on the achievement of certain defined operating metrics for Ovation, and payments ranging from zero to $46.8 million based on the achievement of certain defined performance targets for QuoteWizard. *See* Note 8—Business Acquisitions for additional information on the contingent consideration for each of these respective acquisitions.

The significant unobservable inputs used to calculate the fair value of the contingent consideration are estimated future cash flows for the acquisitions, estimated customer growth rates, estimated date and likelihood of an increase in interest rates and the discount rate. Actual results will differ from the projected results and could have a significant impact on the estimated fair value of the contingent considerations. Additionally, as the liability is stated at present value, the passage of time alone will increase the estimated fair value of the liability each reporting period. Any changes in fair value will be recorded in operating income in the consolidated statements of operations and comprehensive income.

## NOTE 18—RELATED PARTY TRANSACTIONS

One of the Company's board of directors served as a director to a marketing partner of the Company through 2018. During 2018 and 2017, the Company recognized $0.7 million and $1.2 million, respectively, of expenses for this marketing partner through the normal course of business.

In 2017, the Company's Board of Directors approved a $10.0 million contribution to fund the newly formed LendingTree Foundation. The Company paid $3.3 million of the $10.0 million contribution in 2019, and expects to pay the remainder in equal installments in 2020 and 2021. Officers of the Company serve as officers of the LendingTree Foundation. The contribution is recorded in general and administrative expense on the consolidated statement of operations and comprehensive income.

## NOTE 19—BENEFIT PLANS

The Company operates a retirement savings plan for its employees in the United States that is qualified under Section 401(k) of the Internal Revenue Code. Employees are eligible to enroll in the plan upon date of hire. Participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits ($19,000 for 2019, $18,500 for 2018, and $18,000 for 2017). The company match contribution is fifty cents for each dollar a participant contributes to the plan, with a maximum contribution of 6% of a participant's eligible earnings. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the plan. LendingTree stock is not included in the available investment options or the plan assets. Funds contributed to the plan vest according to the participant's years of service, with one year of service vesting at 33%, two years of service vesting at 66%, and three years or more of service vesting at 100%. Matching contributions were approximately $2.0 million, $1.4 million and $0.9 million for the years ended December 31, 2019, 2018 and 2017, respectively.

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 20—DISCONTINUED OPERATIONS

The LendingTree Loans Business is presented as discontinued operations in the accompanying financial statements. The LendingTree Loans Business originated various consumer mortgage loans through HLC. On June 6, 2012, the Company sold substantially all of the operating assets of HLC, including the LendingTree Loans Business, for $55.9 million in cash to a wholly-owned subsidiary of Discover Financial Services ("Discover"). Discover generally did not assume liabilities of HLC that arose before the closing date, except for certain liabilities directly related to assets Discover acquired. Of the purchase price received, a portion was deposited in escrow in accordance with the purchase agreement with Discover for certain loan loss obligations that remained with HLC following the sale. During 2018, the remaining funds in escrow were released to HLC in accordance with the terms of the purchase agreement with Discover.

Upon closing of the sale of substantially all of the operating assets of HLC on June 6, 2012, HLC ceased to originate consumer loans. Liability for losses on previously sold loans remains with HLC and is discussed below.

Litigation settlements and contingencies and legal fees associated with ongoing related bankruptcy and legal proceedings against the Company are included in discontinued operations in the accompanying financial statements.

### Home Loan Center, Inc. Bankruptcy Filing

On June 21, 2019, the U.S. District Court of Minnesota entered judgment in *ResCap Liquidating Trust v. Home Loan Center, Inc.*, against HLC for $68.5 million, *see* Litigation Related to Discontinued Operations below. The judgment against HLC exceeded the assets of HLC, which were $11.2 million at July 21, 2019, including cash of $5.9 million. On July 19, 2019, HLC appealed the judgment to the United States Court of Appeals for the Eighth Circuit.

On July 21, 2019, at the direction of the sole independent director of HLC, HLC voluntarily filed a petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with the U.S. Bankruptcy Court in the Northern District of California in San Jose, California (the "Bankruptcy Court") in order to preserve assets for the benefit of all creditors of HLC. On September 16, 2019, the Bankruptcy Court converted the bankruptcy to Chapter 7 of the Bankruptcy Code and appointed a Trustee to liquidate HLC's assets.

HLC's filing under the Bankruptcy Code creates an automatic stay of enforcement of the judgment entered against HLC by the Minnesota court in *ResCap Liquidating Trust v. Home Loan Center, Inc.* described above and in Litigation Related to Discontinued Operations below. As a result of the voluntary petition, LendingTree, LLC was, as of the initial July 21, 2019 bankruptcy petition filing date, no longer deemed to have a controlling interest in HLC under applicable accounting standards. As a result, HLC and its consolidated subsidiary were deconsolidated from the Company's consolidated financial statements as of July 21, 2019. The effect of such deconsolidation was the elimination of the consolidated assets and liabilities of HLC (and its consolidated subsidiary) from the Company's consolidated balance sheets. Upon deconsolidation, in 2019 the Company recognized a loss of $5.5 million which includes a net gain of $4.5 million related to the removal of HLC's (and its consolidated subsidiary's) assets and liabilities and the recognition of a liability of $10.0 million related to LendingTree LLC's ownership in HLC. No consideration was received by the Company as a result of the deconsolidation. The derecognition of HLC's cash of $5.9 million removed from the consolidated balance sheet on the deconsolidation date of July 21, 2019 is included within cash flows from operating activities attributable to discontinued operations in the accompanying consolidated statement of cash flows.

HLC has indicated that it believes that it has claims against HLC's sole shareholder, LendingTree, LLC, and certain of its officers and directors, relating to the declaration of a dividend by HLC in January 2016 of $40.0 million. The Company is obligated to advance any expenses to the officers and directors related to these claims and to indemnify them to the maximum extent permitted by law. LendingTree, LLC believes the declaration of the dividend was proper, that the amounts paid to LendingTree, LLC following such declaration are not subject to recovery by HLC and that any claims by HLC relating to such dividend declaration are without merit. LendingTree, LLC intends to vigorously contest such claims. During the third quarter of 2019, LendingTree, LLC made a settlement offer to HLC after it filed for bankruptcy for $31.0 million for the release of any and all claims against the Company, including the dividend claim. LendingTree estimates the range of potential losses related to the dividend matter to be $0.0 million to $40.0 million plus a potential award of prejudgment interest. An estimated liability of $31.0 million is included in the accompanying consolidated balance sheet as of December 31, 2019 related to LendingTree LLC's ownership in HLC. HLC's voluntary petition under the Bankruptcy Code does not represent an event of default under LendingTree, LLC's Second Amended and Restated Credit Agreement dated as of December 10, 2019 or the Company's indenture dated May 31, 2017 with respect to the Company's 0.625% Convertible Senior Notes due 2022.

100

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Loan Loss Obligations*

Prior to the sale of its LendingTree Loans Business on June 6, 2012, HLC sold loans it originated through its LendingTree Loans Business to investors on a servicing-released basis, so the risk of loss or default by the borrower was generally transferred to the investor. However, HLC was required by these investors to make certain representations and warranties relating to credit information, loan documentation and collateral. These representations and warranties may extend through the contractual life of the loan. If underwriting deficiencies, borrower fraud or documentation defects, arising prior to the sale of the loan by HLC to such investor, are discovered in individual loans, HLC may be obligated to repurchase the respective loan or indemnify such investor for any losses from borrower defaults if such deficiency or defect cannot be cured within the contractually specified period following discovery.

HLC continues to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of its operating assets, including the LendingTree Loans Business, in the second quarter of 2012. The liability for losses on previously sold loans was presented as current liabilities of discontinued operations in the accompanying consolidated balance sheet as of December 31, 2018.

Additionally, LendingTree guaranteed certain loans sold to investors in the event that HLC is unable to satisfy its repurchase and warranty obligations related to such loans.

## Litigation Related to Discontinued Operations

*Residential Funding Company*

*ResCap Liquidating Trust v. Home Loan Center, Inc., Case No. 14-cv-1716 (U.S. Dist. Ct., Minn.),* successor to *Residential Funding Company, LLC v Home Loan Center, Inc., No. 13-cv-3451 (U.S. Dist. Ct., Minn.).* On or about December 16, 2013, Home Loan Center, Inc. was served in the original captioned matter, which involves claims of Residential Funding Company, LLC ("RFC") for damages for breach of contract and indemnification for certain residential mortgage loans as well as residential mortgage-backed securitizations ("RMBS") containing mortgage loans. RFC asserted that, beginning in 2008, RFC faced massive repurchase demands and lawsuits from purchasers or insurers of the loans and RMBS that RFC had sold. RFC filed for bankruptcy protection in May 2012. Plaintiff alleged that, after RFC filed for Chapter 11 protection, hundreds of proofs of claim were filed, many of which mirrored the litigation filed against RFC prior to its bankruptcy.

In December 2013, the United States Bankruptcy Court for the Southern District of New York entered an Order confirming the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors. Plaintiff then began filing substantially similar complaints against approximately 80 of the loan originators from whom RFC had purchased loans, including HLC, in federal and state courts in Minnesota and New York. In each case, plaintiff claimed that the defendant is liable for a portion of the global settlement in RFC's bankruptcy.

Plaintiff asserted two claims against HLC: (1) breach of contract based on HLC's alleged breach of representations and warranties concerning the quality and characteristics of the mortgage loans it sold to RFC; and (2) contractual indemnification for alleged liabilities, losses, and damages incurred by RFC arising out of purported defects in loans that RFC purchased from HLC and sold to third parties. Plaintiff alleged that the "types of defects" contained in the loans it purchased from HLC included "income misrepresentation, employment misrepresentation, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents." Plaintiff sought damages of up to $61.0 million plus attorney's fees and prejudgment interest.

HLC denied the material allegations of the complaint and asserted numerous defenses thereto. The matter went to trial in the fourth quarter of 2018 and the jury returned a verdict of $28.7 million in favor of plaintiff. On June 21, 2019, the U.S. District Court in Minnesota entered judgment against HLC for $68.5 million. The judgment is comprised of: (i) $28.7 million in damages awarded by the jury; (ii) $14.1 million in pre-verdict interest; (iii) $23.1 million in attorneys' fees and costs, and (iv) $2.6 million in post-verdict, prejudgment interest.

HLC's filing under the Bankruptcy Code discussed above in Home Loan Center, Inc. Bankruptcy Filing creates an automatic stay of enforcement of the judgment entered against HLC by the U.S. District Court in Minnesota. On August 27, 2019, plaintiff filed a lawsuit captioned *ResCap Liquidating Trust v. LendingTree, LCC, et al., Case No. 19-cv-2360 (U.S. Dist. Ct., Minn.),* seeking to hold the Company liable for the judgment against HLC, under assumption of liability, agency and alter ego theories. The Company believes that these claims lack merit and intends to defend this action vigorously. On October 17, 2019, the Company filed a motion to dismiss the liability and agency claims, and oral arguments with respect to such motion were held on January 10, 2020.

101

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Lehman Brothers Holdings, Inc.*

*Lehman Brothers Holdings Inc. v. 1st Advantage Mortgage, LLC et al., Case No. 08-13555 (SCC), Adversary Proceeding No. 16-01342 (SCC) (Bankr. S.D.N.Y.).* In February 2016, Lehman Brothers Holdings, Inc. ("LBHI") filed an Adversary Complaint against HLC and approximately 149 other defendants (the "Complaint"). In December 2018, LBHI amended its complaint against HLC. The amended complaint references approximately 370 allegedly defective mortgage loans sold by HLC with purported "Claim Amounts" totaling $40.2 million. LBHI alleges it settled all such claims and is seeking indemnification from HLC for LBHI's purported losses and liabilities associated with such settlements, plus prejudgment interest, attorneys' fees, litigation costs and other expenses. The amended complaint does not specify the amount of LBHI's purported damages. On December 4, 2019, LBHI filed a $44.7 million proof of claim in HLC's bankruptcy seeking recovery for the claims asserted in the lawsuit. The Company believes that these claims lack merit and understands that HLC intends to defend this action vigorously. HLC's filing under the Bankruptcy Code discussed above in Home Loan Center, Inc. Bankruptcy Filing creates an automatic stay of this proceeding.

**Financial Information of Discontinued Operations**

The components of net loss reported as discontinued operations in the accompanying consolidated statements of operations and comprehensive income are as follows *(in thousands)*:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Revenue | $ — | | $ — | | $ 750 | ( ) |
| Gain from removal of HLC's assets and liabilities | 4,515 | | — | | — | |
| Other operating expenses | 35,002 | ( ) | 16,228 | ( ) | 5,159 | ( ) |
| Loss before income taxes | 30,487 | ( ) | 16,228 | ( ) | 5,909 | ( ) |
| Income tax benefit | 8,855 | | 3,408 | | 2,069 | |
| Net loss | $ 21,632 | ( ) | $ 12,820 | ( ) | $ 3,840 | ( ) |

Losses from discontinued operations included all activity of HLC prior to bankruptcy, including litigation settlements, contingencies and legal fees associated with legal proceedings, as well as a gain upon deconsolidation due to the accounting effect of HLC's bankruptcy filing on the consolidated financial statements.

The results of discontinued operations also include litigation settlements and contingencies and legal fees associated with ongoing legal proceedings against LendingTree Inc. or LendingTree LLC that arose due to the LendingTree Loans Business or the HLC bankruptcy filing.

**NOTE 21—SEGMENT INFORMATION**

The Company manages its business and reports its financial results through the following three operating and reportable segments: Home, Consumer and Insurance. Characteristics which were relied upon in making the determination of the reportable segments include the nature of the products, the organization's internal structure, and the information that is regularly reviewed by the CODM for the purpose of assessing performance and allocating resources. The Company changed its reportable segments in the fourth quarter of 2019 and previously reported segment results have been revised to conform to the Company's reportable segments at December 31, 2019.

The Home segment includes the following products: purchase mortgage, refinance mortgage, home equity loans and lines of credit, reverse mortgage loans, and real estate. The Consumer segment includes the following products: credit cards, personal loans, small business loans, student loans, auto loans, deposit accounts, and other credit products such as credit repair and debt settlement. The Insurance segment consists of insurance quote products. Revenue from the resale of online advertising space to third parties and revenue from home improvement referrals, and the related variable marketing and advertising expenses, are included within the Other category.

Inline XBRL Viewer

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables are a reconciliation of segment profit, which is the Company's primary segment profitability measure, to income before income taxes and discontinued operations. Segment cost of revenue and marketing expense represents the portion of selling and marketing expense attributable to variable costs paid for advertising, direct marketing and related expenses, that are directly attributable to the segments' products. This measure excludes overhead, fixed costs and personnel-related expenses. For the Other category, segment cost of revenue and marketing expense also includes the portion of cost of revenue attributable to costs paid for advertising re-sold to third parties.

| | Year Ended December 31, 2019 | | | | |
|---|---|---|---|---|---|
| | Home | Consumer | Insurance | Other | Total |
| | *(in thousands)* | | | | |
| Revenue | $277,935 | $515,037 | $284,792 | $28,839 | $1,106,603 |
| Segment cost of revenue and marketing expense | 174,814 | 301,852 | 170,153 | 27,466 | 674,285 |
| **Segment profit** | **103,121** | **213,185** | **114,639** | **1,373** | **432,318** |
| Cost of revenue (exclusive of cost of advertising re-sold to third parties included above) | | | | | 45,624 |
| Brand and other marketing expense | | | | | 83,650 |
| General and administrative expense | | | | | 116,847 |
| Product development | | | | | 39,953 |
| Depreciation | | | | | 10,998 |
| Amortization of intangibles | | | | | 55,241 |
| Change in fair value of contingent consideration | | | | | 28,402 |
| Severance | | | | | 1,026 |
| Litigation settlements and contingencies | | | | | (151 ) |
| **Operating income** | | | | | **50,728** |
| Interest expense, net | | | | | (20,271 ) |
| Other income | | | | | 524 |
| **Income before income taxes and discontinued operations** | | | | | **$30,981** |

| | Year Ended December 31, 2018 | | | | |
|---|---|---|---|---|---|
| | Home | Consumer | Insurance | Other | Total |
| | *(in thousands)* | | | | |
| Revenue | $319,176 | $395,615 | $31,369 | $18,705 | $764,865 |
| Segment cost of revenue and marketing expense | 214,475 | 207,891 | 20,011 | 17,351 | 459,728 |
| **Segment profit** | **104,701** | **187,724** | **11,358** | **1,354** | **305,137** |
| Cost of revenue (exclusive of cost of advertising re-sold to third parties included above) | | | | | 27,587 |
| Brand and other marketing expense | | | | | 49,375 |
| General and administrative expense | | | | | 101,219 |
| Product development | | | | | 26,958 |
| Depreciation | | | | | 7,385 |
| Amortization of intangibles | | | | | 23,468 |

| | | |
|---|---:|---|
| Change in fair value of contingent consideration | 10,788 | |
| Severance | 2,352 | |
| Litigation settlements and contingencies | 186 | ( ) |
| **Operating income** | **56,191** | |
| Interest expense, net | 12,437 | ( ) |
| Other expense | 10 | ( ) |
| **Income before income taxes and discontinued operations** | **$43,744** | |

103

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Year Ended December 31, 2017 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **Home** | **Consumer** | **Insurance** | **Other** | **Total** |
| | *(in thousands)* | | | | |
| Revenue | $340,377 | $276,091 | $136 | $1,132 | $617,736 |
| Segment cost of revenue and marketing expense | 204,135 | 160,384 | 70 | 1,756 | 366,345 |
| Segment profit (loss) | 136,242 | 115,707 | 66 | (624) | 251,391 |
| Cost of revenue (exclusive of cost of advertising re-sold to third parties included above) | | | | | 17,223 |
| Brand and other marketing expense | | | | | 66,439 |
| General and administrative expense | | | | | 71,541 |
| Product development | | | | | 17,925 |
| Depreciation | | | | | 7,085 |
| Amortization of intangibles | | | | | 12,992 |
| Change in fair value of contingent consideration | | | | | 23,931 |
| Severance | | | | | 404 |
| Litigation settlements and contingencies | | | | | 718 |
| Operating income | | | | | 33,133 |
| Interest expense, net | | | | | (7,028) |
| Other expense | | | | | (396) |
| Income before income taxes and discontinued operations | | | | | $25,709 |

The CODM does not review information on segment assets and as such, no segment asset information is reported herein.

**NOTE 22—QUARTERLY FINANCIAL INFORMATION (UNAUDITED)**

The following tables set forth summary financial information for the years ended December 31, 2019 and 2018:

| | Q1 | Q2 | Q3 | Q4 |
| --- | --- | --- | --- | --- |
| | *(in thousands, except per share amounts)* | | | |
| **2019** | | | | |
| Revenue | $262,390 | $278,421 | $310,605 | $255,187 |
| Operating (loss) income [1] | (1,802) | 12,316 | 31,193 | 9,021 |
| Income from continuing operations [1] | 550 | 12,981 | 24,463 | 1,466 |
| (Loss) income from discontinued operations | (1,062) | (763) | (20,199) | 392 |
| Net (loss) income and comprehensive (loss) income | $512 | $12,218 | $4,264 | $1,858 |
| Income per share from continuing operations: | | | | |

|  | | | |
|---|---|---|---|
| Basic | $1.01 | $1.90 | $0.11 |
| Diluted | $0.04 | $0.87 | $1.67 | $0.10 |

(Loss) income per share from discontinued operations:

|  | | | |
|---|---|---|---|
| Basic | $0.08 | $(0.06) | $(1.57) | $(0.03) |
| Diluted | $0.07 | $(0.05) | $(1.38) | $(0.03) |

Net (loss) income per share:

|  | | | |
|---|---|---|---|
| Basic | $0.04 | $(0.95) | $0.33 | $0.14 |
| Diluted | $0.04 | $(0.82) | $0.29 | $0.13 |

(1) The first quarter of 2019 includes contingent consideration expense of $14.4 million for the QuoteWizard acquisition due to an increased probability of achievement of certain defined performance targets for QuoteWizard.

104

**LENDINGTREE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*(in thousands, except per share amounts)*

| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| **2018** | | | | |
| Revenue | $181,035 | $184,101 | $197,057 | $202,672 |
| Operating income [1] | 15,350 | 18,123 | 20,290 | 2,428 |
| Income from continuing operations [1] | 35,857 | 44,849 | 28,362 | 251 |
| Loss from discontinued operations | (4,333) | (2,302) | (2,634) | (3,551) |
| Net income (loss) and comprehensive income (loss) | $31,524 | $42,547 | $25,728 | $(3,300) |
| Income per share from continuing operations: | | | | |
| Basic | $2.97 | $3.61 | $2.22 | $0.02 |
| Diluted | $2.41 | $3.17 | $2.05 | $0.02 |
| Loss per share from discontinued operations: | | | | |
| Basic | $(0.36) | $(0.19) | $(0.21) | $(0.28) |
| Diluted | $(0.29) | $(0.16) | $(0.19) | $(0.26) |
| Net income (loss) per share: | | | | |
| Basic | $2.61 | $3.43 | $2.01 | $(0.26) |
| Diluted | $2.12 | $3.01 | $1.86 | $(0.24) |

(1) The fourth quarter of 2018 includes contingent consideration expense of $6.8 million for the QuoteWizard acquisition due to an increased probability of achievement of certain defined performance targets for QuoteWizard.

105

Table of Contents

**ITEM 9.** *Changes in and Disagreements With Accountants on Accounting and Financial Disclosure*

Not applicable.

**ITEM 9A.** *Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), management, with the participation of our principal executive officer (Chief Executive Officer) and our principal financial officer (Chief Financial Officer), evaluated, as of the end of the period covered by this report, the effectiveness of our disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Management necessarily applied its judgment in assessing the costs and benefits of such controls and procedures, which by their nature can provide only reasonable assurance regarding management's control objectives. Management does not expect that our disclosure controls and procedures will prevent or detect all errors and fraud. A control system, irrespective of how well it is designed and operated, can only provide reasonable assurance and cannot guarantee that it will succeed in its stated objectives.

Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2019, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect our transactions and dispositions of our assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that our receipts and expenditures are being made only in accordance with authorizations of our management and our directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, with the participation of our Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on our evaluation under the framework in the Internal Control-Integrated Framework, issued by the COSO, management has concluded that our internal control over financial reporting was effective as of December 31, 2019. The effectiveness of our internal control over financial reporting as of December 31, 2019 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report appearing under "Item 8. Financial Statements and Supplementary Data" included elsewhere in this annual report.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting (as defined in the Exchange Act, Rules 13a-15(f)) that occurred during the quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.** *Other Information*

None.

Table of Contents

## PART III

As set forth below, the information required by Part III (Items 10, 11, 12, 13 and 14) is incorporated herein by reference to the Company's definitive proxy statement to be used in connection with its 2020 Annual Meeting of Stockholders and which will be filed with the Securities and Exchange Commission not later than 120 days after the end of the Company's fiscal year ended December 31, 2019 (the "2020 Proxy Statement"), in accordance with General Instruction G(3) of Form 10-K.

**ITEM 10.** *Directors, Executive Officers and Corporate Governance*

The information required by Item 10 will be contained in, and is hereby incorporated by reference to, the 2020 Proxy Statement.

**ITEM 11.** *Executive Compensation*

The information required by Item 11 will be contained in, and is hereby incorporated by reference to, the 2020 Proxy Statement.

**ITEM 12.** *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The information required by Item 12 will be contained in, and is hereby incorporated by reference to, the 2020 Proxy Statement.

**ITEM 13.** *Certain Relationships and Related Transactions, and Director Independence*

The information required by Item 13 will be contained in, and is hereby incorporated by reference to, the 2020 Proxy Statement.

**ITEM 14.** *Principal Accounting Fees and Services*

The information required by Item 14 will be contained in, and is hereby incorporated by reference to, the 2020 Proxy Statement.

**Table of Contents**

## PART IV

**ITEM 15.** *Exhibits, Financial Statement Schedules*

**(a)** *List of documents filed as part of this report:*

**(1)** **Consolidated Financial Statements of LendingTree, Inc.**

Report of Independent Registered Public Accounting Firm: PricewaterhouseCoopers LLP.

Consolidated Statements of Operations and Comprehensive Income for the Years Ended December 31, 2019, 2018 and 2017.

Consolidated Balance Sheets as of December 31, 2019 and 2018.

Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2019, 2018 and 2017.

Consolidated Statements of Cash Flows for the Years Ended December 31, 2019, 2018 and 2017.

Notes to Consolidated Financial Statements.

**(2)** **Consolidated Financial Statement Schedules of LendingTree, Inc.**

All financial statements and schedules have been omitted since the required information is included in the consolidated financial statements or the notes thereto, or is not applicable or required.

**(3)** **Exhibits**

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith or incorporated herein by reference to the location indicated below.

| Exhibit Number | Description | Location |
| --- | --- | --- |
| 2.1 | Separation and Distribution Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 2.1 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 2.2 | Tax Sharing Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 10.2 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.3 | Employee Matters Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 10.3 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.4 | Transition Services Agreement among IAC/InterActiveCorp, HSN, Inc., Interval Leisure Group, Inc., Ticketmaster and Tree.com, Inc., dated August 20, 2008. | Exhibit 10.4 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.5 | Spinco Assignment and Assumption Agreement among IAC/InterActiveCorp, Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC, dated August 20, 2008. | Exhibit 10.6 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 2.6 | Asset Purchase Agreement among Home Loan Center, Inc., First Residential Mortgage Network, Inc. dba SurePoint Lending, and the shareholders of First Residential Mortgage Network named therein, dated November 15, 2010. | Exhibit 2.1 to Registrant's Current Report on Form 8-K (No. 001-34063) filed November 16, 2010 |
| 2.7 | First Amendment to Asset Purchase Agreement among HLC, SurePoint and the shareholders party thereto, dated March 14, 2011. | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed March 21, 2011 |

2.8    Second Amendment to Asset Purchase Agreement among Equity 3.1.2 to the Registrant's Current Report on Form 8-K
SurePoint and the shareholders party thereto, dated March 15,    filed March 21, 2011
2011.

108

| Exhibit Number | Description | Location |
|---|---|---|
| 2.9 | Asset Purchase Agreement among Tree.com, Inc., Home Loan Center, Inc., LendingTree, LLC, HLC Escrow, Inc. and Discover Bank, dated May 12, 2011** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed May 16, 2011 |
| 2.10 | Asset Purchase Agreement among LendingTree, LLC, RealEstate.com, Inc. and Market Leader, Inc., dated September 15, 2011** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed September 21, 2011 |
| 2.11 | Amendment to Asset Purchase Agreement among Home Loan Center, Inc., HLC Escrow, Inc., LendingTree, LLC, Tree.com, Inc., Discover Bank and Discover Financial Services, dated February 7, 2012** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed February 8, 2012 |
| 2.12 | Membership Interest Purchase Agreement, dated as of November 16, 2016, by and among LendingTree, LLC, Iron Horse Holdings, LLC, all of the members of Iron Horse Holdings, LLC and Christopher J. Mettler. ** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed November 22, 2016 |
| 2.13 | Assignment and Assumption Agreement, dated November 2, 2017, by and among General Communication, Inc., Liberty Interactive Corporation, Liberty USA Holdings, LLC, Ventures Holdco, LLC, and LendingTree, Inc. | Exhibit 99.7(D) to the Registrant's Current Report on Form SC 13D/A filed November 3, 2017 |
| 2.14 | Unit Purchase Agreement dated as of October 4, 2018 by and among LendingTree, LLC, QuoteWizard.com, LLC, all of the members of QuoteWizard.com, LLC, and Scott Peyree as the Securityholders Representative. ** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K/A filed October 12, 2018 |
| 2.15 | Stock Purchase Agreement dated as of December 20, 2018 by and among LendingTree, LLC, Value Holding Inc., all of the shareholders of Value Holding Inc., and Jonathan Wu as the Sellers' Representative. ** | Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed December 27, 2018 |
| 3.1 | Amended and Restated Certificate of Incorporation of LendingTree, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 3.2 | Fourth Amended and Restated By-laws of LendingTree, Inc. | Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed November 15, 2017 |
| 4.1 | Amended and Restated Restricted Share Grant and Shareholders' Agreement, among Forest Merger Corp., LendingTree, Inc., InterActiveCorp and the Grantees named therein, dated July 7, 2003* | Exhibit 10.8 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 4.2 | Registration Rights Agreement among Tree.com, Inc., Liberty Media Corporation and Liberty USA Holdings, LLC, dated August 20, 2008. | Exhibit 10.5 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed August 25, 2008 |
| 4.3 | Indenture for .0625% Convertible Senior Notes due 2022 | Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.4 | Purchase Agreement for .0625% Convertible Senior Notes due 2022 | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.5 | Base Issuer Warrant Transaction | Exhibit 99.4 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.6 | Additional Issuer Warrant Transaction | Exhibit 99.5 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 4.7 | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 | † |
| 10.1 | Employment Agreement between Douglas Lebda and the Company, dated September 20, 2017* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed October 26, 2017 |
| 10.2 | Letter Agreement between Tree.com, Inc. and Carla Shumate, dated December 11, 2012* | Exhibit 10.1 to the Registrant's Annual Report on Form 10-K filed April 1, 2013 |

| 10.3 | Letter Agreement between LendingTree, Inc. and Carla Shumate, dated March 11, 2015* | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed April 30, 2015 |
| 10.4 | Letter Agreement between LendingTree, Inc. and Carla Shumate, dated December 31, 2015* | Exhibit 10.6 to the Registrant's Annual Report on Form 10-K filed March 1, 2016 |

109

| Exhibit Number | Description | Location |
|---|---|---|
| 10.5 | Fifth Amended and Restated 2008 Stock and Annual Incentive Plan* | Exhibit 4.3(A) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.6 | Form of Notice of Stock Option Award Granted Under the 2008 Stock and Annual Incentive Plan* | Exhibit 10.6 to the Registrant's Current Report on Form 8-K (No. 001-34063) filed March 27, 2009 |
| 10.7 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2014 |
| 10.8 | Form of Notice of Restricted Stock Award* | Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2014 |
| 10.9 | Form of Notice of Stock Option Award Granted Under the 2008 Stock and Annual Incentive Plan* | Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q filed May 7, 2014 |
| 10.10 | LendingTree, Inc. 2017 Inducement Grant Plan* | Exhibit 4.4(A) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.11 | Notice of Restricted Stock Unit Award Granted Under the LendingTree, Inc. 2017 Inducement Plan* | Exhibit 4.4(B) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.12 | Restricted Stock Award Agreement* | Exhibit 4.4(C) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.13 | Notice of [YEAR] Stock Option Award Granted Under the LendingTree, Inc. 2017 Inducement Grant Plan* | Exhibit 4.4(D) to the Registrant's Registration Statement on Form S-8 (No. 333-218747), filed June 14, 2017 |
| 10.14 | 2011 Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed April 30, 2015 |
| 10.15 | Deferred Compensation Plan for Non-Employee Directors* | Exhibit 10.15 to the Registrant's Registration Statement on Form S-1 (No. 333-152700), filed August 1, 2008 |
| 10.16 | Standard Terms and Conditions to Restricted Stock Award Letters of Tree.com BU Holding Company, Inc.* | Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed February 3, 2011 |
| 10.17 | Form of Notice of Restricted Stock Unit Award* | Exhibit 10.86(b) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.18 | Form of Restricted Stock Award* | Exhibit 10.86(c) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.19 | Form of Notice of Stock Option Award Granted Under the Amended and Restated 2008 Stock and Annual Incentive Plan* | Exhibit 10.86(d) to the Registrant's Post-Effective Amendment to its Registration Statement on Form S-1 (No. 333-152700), filed July 13, 2012 |
| 10.20 | Form of Notice of Stock Option Award Granted Under the Second Amended and Restated 2008 Stock and Annual Incentive Plan* | Exhibit 10.13 to the Registrant's Quarterly Report on Form 10-Q (No. 001-34063) filed May 12, 2010 |
| 10.21 | Base Convertible Bond Hedge Transaction | Exhibit 99.2 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 10.22 | Additional Convertible Bond Hedge Transaction | Exhibit 99.3 to the Registrant's Current Report on Form 8-K filed May 31, 2017 |
| 10.23 | Amended and Restated Credit Agreement, dated as of November 21, 2017+ | Exhibit 10.38 to the Registrant's Annual Report on Form 10-K filed February 26, 2018 |
| 10.24 | Joinder to Amended and Restated Credit Agreement, dated as of October 26, 2018+ | Exhibit 10.30 to the Registrant's Annual Report on Form 10-K filed February 28, 2019 |
| 10.25 | Agreement of Purchase and Sale, by and among LendingTree, LLC and an affiliate of Greenstreet Real Estate Partners, L.P., dated October 17, 2016 | Exhibit 10.31 to the Registrant's Annual Report on Form 10-K filed February 28, 2017 |
| 10.26 | First Amendment to Purchase and Sale, by and among LendingTree, LLC and an affiliate of Greenstreet Real Estate Partners, L.P., dated November 28, 2016 | Exhibit 10.32 to the Registrant's Annual Report on Form 10-K filed February 28, 2017 |

| Exhibit Number | Description | Location |
|---|---|---|
| 10.27 | Employment Agreement dated December 21, 2017, among John David Moriarty, LendingTree, Inc., and LendingTree, LLC.* | Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed April 27, 2018 |
| 10.28 | Employment Agreement, dated January 2, 2018, among Neil Salvage, LendingTree, Inc., and LendingTree, LLC* | Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed April 27, 2018 |
| 10.29 | Second Amended and Restated Credit Agreement, dated as of December 10, 2019 | Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed December 13, 2019 |
| 10.30 | Sixth Amended and Restated LendingTree, Inc. 2008 Stock and Annual Incentive Plan* | Exhibit 4.3(A) to the Registrant's Registration Statement on Form S-8 (No. 333-233035), filed August 6, 2019 |
| 21.1 | Subsidiaries of LendingTree, Inc. | † |
| 23.1 | Consent of independent registered public accounting firm. | † |
| 24.1 | Power of Attorney (included on signature page of this Annual Report on Form 10-K) | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | †† |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | †† |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | ††† |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | ††† |
| 101.INS | XBRL Instance Document — The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | ††† |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | ††† |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | ††† |
| 101.SCH | XBRL Taxonomy Extension Schema Document | ††† |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document contained in Exhibit 101) | ††† |

† Filed herewith.

†† Furnished herewith. This certification is being furnished solely to accompany this report pursuant to 18 U.S.C. 1350, and is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Registrant, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

††† Furnished herewith. Pursuant to Rule 406T of Regulation S-T, the Interactive Data Files on Exhibit 101 hereto are deemed not filed or part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, are deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise are not subject to liability under those sections.

* Management contract or compensation plan or arrangement.

111

** Certain schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2). The Company agrees to furnish supplementally a copy of all omitted schedules to the SEC upon its request.

+ Portions of this exhibit have been omitted pursuant to a request for confidential treatment and this exhibit has been submitted separately to the SEC.

**ITEM 16.  Form 10-K Summary**

   None.

<div align="center">112</div>

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 26, 2020

LendingTree, Inc.

By:    **/s/ DOUGLAS R. LEBDA**

Douglas R. Lebda
*Chairman and Chief Executive Officer*

113

**Table of Contents**

    KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints each of J.D. Moriarty and Ryan Quinn as his or her true and lawful attorney and agent, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, and to file the same with all exhibits thereto, and all other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney and agent may lawfully do or cause to be done by virtue hereof.

    Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ DOUGLAS R. LEBDA<br>Douglas R. Lebda | Chairman, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 26, 2020 |
| /s/ J.D. MORIARTY<br>J.D. Moriarty | Chief Financial Officer<br>*(Principal Financial Officer)* | February 26, 2020 |
| /s/ CARLA SHUMATE<br>Carla Shumate | Senior Vice President and Chief Accounting Officer<br>*(Principal Accounting Officer)* | February 26, 2020 |
| /s/ GABRIEL DALPORTO<br>Gabriel Dalporto | Director | February 26, 2020 |
| /s/ THOMAS DAVIDSON<br>Thomas Davidson | Director | February 26, 2020 |
| /s/ NEAL DERMER<br>Neal Dermer | Director | February 26, 2020 |
| /s/ ROBIN HENDERSON<br>Robin Henderson | Director | February 26, 2020 |
| /s/ PETER HORAN<br>Peter Horan | Director | February 26, 2020 |
| /s/ STEVEN OZONIAN<br>Steven Ozonian | Director | February 26, 2020 |
| /s/ SARAS SARASVATHY<br>Saras Sarasvathy | Director | February 26, 2020 |
| /s/ G. KENNEDY THOMPSON<br>G. Kennedy Thompson | Director | February 26, 2020 |
| /s/ CRAIG TROYER<br>Craig Troyer | Director | February 26, 2020 |

# EXHIBIT B

EX-10.3 4 tree-2017930x10qexx103.htm EXHIBIT 10.3

**Exhibit 10.3**

<u>**EMPLOYMENT AGREEMENT**</u>

THIS EMPLOYMENT AGREEMENT ("Agreement"), dated as of September 20, 2017 (the "Agreement Date"), is entered into by and between Douglas R. Lebda (the "Employee") and LendingTree, Inc. (the "Company") and LendingTree, LLC ("LTLLC" which as of the Agreement Date is a wholly-owned subsidiary of the Company; LTLLC and the Company are collectively the "Company Group")).

WHEREAS, Employee is currently serving as Chairman and Chief Executive Officer of the Company;

WHEREAS, Employee and the Company were parties to an Employment Agreement, dated January 9, 2014 (the "Prior Agreement") which expired on January 9, 2017;

WHEREAS, Employee and the Company are parties to a Change of Control Letter Agreement, dated March 26, 2010 (the "Prior CiC Agreement");

WHEREAS, on July 25, 2017, the Compensation Committee (the "Committee") of the Company's Board of Directors approved a term sheet (the "Term Sheet") setting forth the proposed terms of Employee's proposed compensation and continued employment with the Company; and

WHEREAS, Employee and the Company Group now wish to enter into this Agreement on the terms and conditions set forth below, which Agreement shall supersede and replace in their entirety the Term Sheet and the Prior CiC Agreement effective as of the Agreement Date.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, Employee, LTLLC and the Company have agreed and do hereby agree as follows:

1.    <u>Employment</u>. During the Term (as defined below), LTLLC agrees to continue to employ Employee and Employee will continue to serve as Company Chairman and Chief Executive Officer as of the Agreement Date and Employee accepts and agrees to such employment. During the Term, Employee will perform all services and acts necessary or advisable to fulfill the duties and responsibilities as are commensurate and consistent with Employee's position and will render such services on the terms set forth herein. During the Term, Employee will report to the Board of Directors of the Company. Employee agrees to devote all of Employee's working time, attention and efforts to the Company Group and to perform the duties of Employee's position in accordance with the Company Group's policies as in effect from time to time.

Notwithstanding anything to the contrary in this Agreement, Employee may (i) serve as a corporate board member for up to two (2) organizations as Employee may reasonably determine from time to time, provided said service does not compete with, or present an actual or apparent conflict of interest for, the Company Group, which will be determined by the Board of Directors of the Company, in its sole, good faith judgment, (ii) serve on civic or charitable boards or committees and (iii) manage his personal investments, in each case, so long as such activities do not interfere with Employee's ability to perform his duties for the Company as contemplated hereunder. The Company acknowledges that as of the Agreement Date, Employee is serving as a corporate board member for StellaService, Inc.

2.    <u>Term of Agreement</u>. The term ("Term") of this Agreement will commence on the Agreement Date and will continue through January 9, 2021, unless sooner terminated in accordance with the provisions of Section 1 of the Standard Terms and Conditions attached hereto; provided, that certain terms and conditions herein may specify a greater period of effectiveness. Employee and the Company Group will enter into good faith negotiations to extend the Term no later than six months prior to the end of the Term, provided, that Employee has provided written notice to the Company between eight and six months prior to the end of the Term which sets forth his interest in entering into such negotiations. For purposes of clarity, if the Agreement is not renewed in accordance with this Section 2, the Agreement will automatically expire at the end of the Term. Such expiration will not entitle Employee to any compensation or benefits except as earned by Employee through the date of expiration of the Term.

3.    <u>Compensation</u>.

(a)    <u>Base Salary</u>. During the Term, LTLLC will pay Employee an annual base salary of $750,000 (the "Base Salary") payable in equal biweekly installments or in such other installments as may be in accordance with LTLLC's standard payroll practices as in effect from time to time. The Base Salary will be reviewed by the

Company as the Company determines to be appropriate or, if requested by Employee in writing, no less frequently than annually in a manner consistent with similarly

situated executives of LTLLC and may be increased but not decreased. For all purposes under this Agreement, the term "Base Salary" will refer to the Base Salary as in effect from time to time.

          (b)    <u>Annual Bonus</u>. During the Term, Employee will be eligible to receive a target annual bonus of up to 125% of his Base Salary with respect to each fiscal year of the Company (each a "Performance Year") during the Term, beginning with the Performance Year that began on January 1, 2017. The terms and conditions of the annual bonus, including the applicable performance criteria for a Performance Year, and the amount of the annual bonus payable to Employee for a Performance Year, if any, will be determined by the Committee in its sole discretion. Except as expressly provided in this Agreement, the annual bonus will be paid in accordance with LTLLC's standard policies and procedures for the payment of annual bonuses to its other similarly situated employees.

          (c)    <u>Equity Compensation</u>. Subject to Employee remaining employed by the Company Group through the applicable grant dates referenced below and to the Company having sufficient shares available on each grant date under a Company stockholder approved equity compensation plan, Employee will receive the Initial Grants and other equity compensation grants under the Company's Fifth Amended and Restated 2008 Stock and Annual Incentive Plan, as may be amended (or replaced) by the Company, (the "2008 Plan") described in this Section 3(c). The share numbers and exercise prices referenced herein will be subject to adjustment in the event there is a "Share Change" (as defined in the 2008 Plan) pursuant to the terms of the 2008 Plan.

          (i)    <u>Definitions</u>. Certain definitions used in this Agreement are provided below in this subsection (i).

"*2018 Price*" means the closing per share price of a Company common share on the Second Grant Date.

"*Base Date*" means July 26, 2017.

"*Base Price*" means $183.80 which was the Company's per common share closing price on the Base Date.

"*Initial Grants*" means the collectively the 2017 Performance Option, the 2018 RSA Grant and the 2018 Performance Awards.

"*Second Grant Date*" means the first business day of January 2018.

"*Termination of Employment*" has the same meaning provided to such term under the 2008 Plan.

"*Total Option Shares*" means 769,376 Company common shares, which the parties hereto acknowledge and agree is the nearest whole number of shares that generates a stock option grant date value of $65.625 million (as measured under the Committee's model) on the Base Date and using the Base Price as the per share exercise price and per share fair market value.

          (ii)    <u>2018 RSA Grant</u>. On the first business day in January 2018, Employee will receive a grant of restricted shares (the "2018 RSA Grant"). The 2018 RSA Grant will be evidenced by the agreement substantially in the form attached as <u>Exhibit A</u> and Employee must execute such agreement within 30 days of the grant date as a condition of grant. 119,015 Company common shares (which is the nearest whole number that is equal to the quotient of $21.875 million divided by the Base Price) will be awarded under the 2018 RSA Grant. The vesting terms for the 2018 RSA Grant are provided in <u>Exhibit A</u>, subject to accelerated vesting pursuant to Sections 1(a), 1(b), 1(d) or 1(g) of the Standard Terms and Conditions. Except as may be otherwise provided under Sections 1(a), 1(b), 1(d) of 1(g) of the Standard Terms and Conditions, no shares under the 2018 RSA Grant will vest after Employee experiences a Termination of Employment and any then unvested shares will be forfeited without consideration as of such Termination of Employment. Except for shares that may be sold by Employee or retained by the Company, in each case, solely in order to satisfy applicable tax withholding, no vested 2018 RSA Grant shares may be sold, transferred or otherwise disposed of by Employee until the earlier of the fifth anniversary of the grant date of the 2018 RSA Grant or the earlier date of an event occurring under Sections 1(a), 1(b), or 1(d) of the Standard Terms and Conditions, or a Change of Control of the Company (as defined in this Agreement); provided, that Employee will be permitted to transfer (by gift) vested 2018 RSA Grant shares to a limited liability company owned by a trust solely for the benefit of Employee's heirs of which Employee is the managing member at any time. With respect to the 2018 RSA Grant, in the event of any conflict in terms between this Agreement and the 2018 RSA Grant agreement, the terms of the 2018 RSA Grant Agreement will prevail and govern.

(iii)        2017 Performance Option and Other January 20189 Equity Grants. With respect to issuing the Initial Grants, Employee will receive the following grants:

(1)        *2017 Performance Option*. The Company and Employee acknowledge and agree that, on the Base Date, Employee received a grant of a performance-based stock option (the "2017 Performance Option"). The 2017 Performance Option will be evidenced by the agreement substantially in the form attached as Exhibit B (the "2017 Performance Option Agreement") and Employee must execute such agreement on or prior to September 25, 2017 as a

condition of grant. The number of Company common shares subject to the 2017 Performance Option is 672,499 (which represents the maximum number of shares that may be earned). The 2017 Performance Option has a per share exercise price that is equal to the Base Price. The vesting terms for the 2017 Performance Option are provided in Exhibit B, subject to accelerated vesting pursuant to Sections 1(a), 1(b), 1(d) or 1(g) of the Standard Terms and Conditions. Except as may be otherwise provided under Sections 1(a), 1(b) or 1(d) of the Standard Terms and Conditions, no shares under the 2017 Performance Option will vest after Employee experiences a Termination of Employment and any then unvested shares will be forfeited without consideration as of such Termination of Employment. The 2017 Performance Option has a maximum exercise term of ten years from the grant date. With respect to the 2017 Performance Option, in the event of any conflict in terms between this Agreement and the 2017 Performance Option Agreement, the terms of the 2017 Performance Option Agreement will prevail and govern.

(iv)     *Other January 2018 Equity Grants*. On the Second Grant Date, Employee will receive a grant of a performance-based stock option (the "2018 Performance Option") and, if applicable, a grant of performance-based restricted stock (the "2018 Performance RSA") upon the following terms and conditions:

(1)     If the 2018 Price is equal to or less than the Base Price, then Employee will be entitled to the grant of the 2018 Performance Option (and, for the avoidance of doubt, Employee will not receive the grant of the 2018 Performance RSA) on the following terms: (1) the number of Company common shares subject to the 2018 Performance Option will be 96,877 shares (which represents the maximum number of shares that may be earned); (2) the 2018 Performance Option will have a per share exercise price that is equal to the Base Price; (3) the 2018 Performance Option will have the same vesting and exercisability conditions applicable to the 2017 Performance Option (subject to a maximum exercise term of ten years from the Base Date); and (4) the 2018 Performance Option will in all other respects be governed by the same terms and conditions applicable to the 2017 Performance Option. The 2018 Performance Option will be evidenced by an agreement substantially in the form attached as Exhibit B and Employee must execute such agreement within 30 days of the Second Grant Date as a condition of grant; or

(2)     If the 2018 Price is greater than the Base Price, then Employee will be entitled to grants of the 2018 Performance Option and the 2018 Performance RSA on the following terms: (1) the number of shares subject to the 2018 Performance RSA will be the nearest whole number that is equal to the quotient of (x) the difference between the 2018 Price and the Base Price, multiplied by 96,877, divided by (y) the 2018 Price (which number represents the maximum number of shares that may be earned under the 2018 Performance RSA); (2) the number of shares subject to the 2018 Performance Option will be equal to the excess of (I) 96,877 over (II) the number of shares subject to the 2018 Performance RSA determined pursuant to clause (1); (2) the 2018 Performance Option will have a per share exercise price that is equal to the 2018 Price; (3) the 2018 Performance Option will have the same vesting and exercisability conditions (subject to a maximum exercise term of ten years from the Second Gant Date) as applicable to the 2017 Performance Option; (4) the 2018 Performance Option will in all other respects be governed by the same terms and conditions applicable to the 2017 Performance Option; and (5) the 2018 Performance RSA will have the same vesting conditions as applicable to the 2017 Performance Option. The 2018 Performance Option will be evidenced by an agreement substantially in the form attached as Exhibit B, and, consistent with the foregoing, the 2017 Performance RSA will be evidenced by a restricted stock agreement in a form to be provided by the Company, and, in each case, Employee must execute such agreements within 30 days of the Second Grant Date as a condition of grant.

The 2018 Performance Option and, if applicable, the 2018 Performance RSA, are collectively referred to herein as the "2018 Performance Awards". With respect to the 2018 Performance Awards, in the event of any conflict in terms between this Agreement and the applicable award agreement(s) evidencing the 2018 Performance Awards, the terms of the applicable award agreement evidencing the 2018 Performance Awards will prevail and govern.

(v)     Additional Equity Compensation Awards. Additionally, in January of each of 2018, 2019 and 2020, the Company will issue Employee annual equity awards ("Future Equity Awards"), in each case, with a grant date value that is no less than the median equity compensation grant value for the calendar year preceding the date of grant for the chief executive officers of the Company's peer group that is approved by the Company's board of directors after consulting with Employee. Future Equity Awards may be in the form of cash or equity grants as determined by the Committee after consulting with Employee. It is expected that at least fifty percent of the annual grant date value for each Future Equity Award will be price-contingent stock options or similar price-contingent performance based awards but ultimately the Committee will determine the applicable terms and conditions of the Future Equity Awards; provided, that the performance goals for each Future Equity Award will be determined by the Committee after consulting with Employee. With respect to any grant of Future Equity Awards that are subject to time-based vesting conditions, it is expected that the normal vesting period for such grant shall not exceed four years from the applicable grant date, with the actual normal vesting period to be determined by the Committee after consulting with Employee.

(d)        Benefits. During the Term, Employee will be eligible to participate in any welfare, health, life insurance, pension benefit, incentive, fringe benefit, perquisite and benefit plans, programs, policies and practices as may be adopted from time to time by the Company Group on the same basis as that provided to similarly situated employees of LTLLC generally; provided, that, during the Term, Employee shall be provided with fringe benefits and perquisites (including, without limitation, reimbursement of country club dues) on a basis that is no less favorable than those provided to Employee as of the Agreement Date, provided however, that Employee's personal use of Company aircraft will continue to be subject to the Company Group's corporate aircraft policy and further provided that the Company retains the discretion as to whether or not to continue to have a Company aircraft (and what type of aircraft). Without limiting the generality of the foregoing, Employee will be eligible for the following benefits:

(i)        Reimbursement for Business Expenses. During the Term, the Company Group will reimburse Employee for all reasonable and necessary expenses incurred by Employee in performing Employee's duties for the Company Group, on the same basis as similarly situated employees of LTLLC generally and in accordance with the Company Group's policies as in effect from time to time.

(ii)        Vacation. During the Term, Employee will be eligible for paid vacation in accordance with the plans, policies, programs and practices of LTLLC applicable to similarly situated employees of LTLLC generally.

4.        Notices. All notices and other communications under this Agreement will be in writing and will be given by email, first-class mail, certified or registered with return receipt requested or hand delivery, with email or hand delivery acknowledged in writing by the recipient personally, and will be deemed to have been duly given three days after mailing or immediately upon duly acknowledged email or hand delivery, as applicable, to the respective persons named below:

If to the Company Group:        LendingTree, Inc.
                                11115 Rushmore Drive
                                Charlotte, NC 28277
                                Attention: Chair, Compensation Committee
                                Email: Legal3@lendingtree.com

If to Employee:        At the most recent address on file at the Company Group.

Any party may change such party's address for notices by notice duly given pursuant hereto.

5.        Governing Law, Jurisdiction; Dispute Resolution. This Agreement and the legal relations thus created between the parties hereto will be governed by and construed under and in accordance with the laws of the State of North Carolina without reference to the principles of conflicts of laws. Except as set forth in Subsection (c) below, the parties agree that any dispute arising under this Agreement or involving the subject matter of this Agreement shall first be mediated and, if not resolved by mediation, submitted to mandatory binding arbitration as set forth below. The costs of any such mediation or arbitration proceedings shall be borne equally by the Company and Employee and neither party shall be entitled to recover attorneys' fees or costs expended in the course of such mediation or arbitration or enforcement of the award rendered thereunder.

(a)        Mediation. No arbitration of any dispute between the parties shall occur until the parties' dispute has been submitted to mediation. If the mediation does not resolve the dispute within sixty (60) days of the commencement of mediation (which period may be extended by mutual agreement), then the parties agree to immediately submit the dispute to binding arbitration. Otherwise, the dispute shall be mediated in conformity with the rules governing court-ordered mediation in the State of North Carolina then in effect at the time of the mediation.

(b)        Arbitration. In the event the parties do not resolve their dispute by mediation as set forth in Subsection (a) above, either party may commence an arbitration by making a demand on the other. The demand shall contain a short and concise statement of the claims that the party seeks to arbitrate. Within ten (10) calendar days, the responding party shall reply to the claimant's demand with a short and concise statement of the responding party's defenses, offsets, and counterclaims. The claimant shall then have ten (10) calendar days in which to reply to any counterclaims raised by the responding party by serving a short and concise statement of the claimant's defenses and offsets. The arbitration shall be conducted in accordance with the employment arbitration rules of the American Arbitration Association ("AAA"), but not necessarily by or under the auspices of the AAA. Except as set forth in Subsection (c) below, the arbitration shall be the sole and exclusive means of resolving such disputes, and neither party shall initiate any

action, suit, or proceeding in any court in respect of this Agreement except as may be necessary to enforce any such arbitration determination. The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), shall govern the parties' obligation to arbitrate disputes. All awards of the arbitration will be non-appealable except as otherwise provided in the FAA.

(c)     Exclusions. Employee is not prohibited from pursuing an administrative claim with a federal or state administrative body that is authorized to enforce or administer laws related to employment. In addition, disputes arising under Section 2 of the Standard Terms and Conditions of this Agreement may be resolved either in court in the appropriate jurisdiction set forth above, or through mediation and arbitration as described above.

6.     Counterparts. This Agreement may be executed in several counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument. Employee expressly understands and acknowledges that the Standard Terms and Conditions attached hereto are incorporated herein by reference, deemed a part of this Agreement and are binding and enforceable provisions of this Agreement. References to "this Agreement" or the use of the term "hereof" will refer to this Agreement and the Standard Terms and Conditions attached hereto, taken as a whole.

7.     Effect on Prior Agreements. This Agreement, together with all Exhibits hereto, constitutes the entire agreement between the parties and supersedes any and all prior agreements, term sheets between the parties with respect to the subject matter hereof, including without limitation, the Term Sheet, Prior Agreement and Prior CiC Agreement (and such Prior CiC Agreement is hereby terminated as of the Agreement Date and is of no further force or effect).

8.     Legal Fees. LTLLC will pay for fifty percent of the reasonable legal and compensation consulting fees incurred Employee in connection with the negotiation, preparation and execution of this Agreement, provided however that LTLLC's payments under this Section 8 will not in the aggregate exceed $100,000. Employee will provide LTLLC with applicable invoices (that comply with LTLLC's expense reimbursement policies) reasonably promptly and in any event within 90 days after the Agreement Date and LTLLC will provide the reimbursement payment to Employee (or to the applicable service provider(s)) within 45 days after LTLLC's receipt of such invoices.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Company Group has caused this Agreement to be executed and delivered by its duly authorized officer and Employee has executed and delivered this Agreement as of the Agreement Date.

LENDINGTREE, INC.

By:    /s/ Claudette Parham

Name:    Claudette Parham

Title:    Chief Human Resources Officer

LENDINGTREE, LLC

By:    /s/ Claudette Parham

Name:    Claudette Parham

Title:    Chief Human Resources Officer

EMPLOYEE

By:    /s/ Douglas R. Lebda

Name:    Douglas R. Lebda

Title:    Chairman, Chief Executive Officer & Founder

## STANDARD TERMS AND CONDITIONS

1.    <u>Termination of Employee's Employment</u>.

    (a)    <u>Death</u>. Upon termination of Employee's employment prior to the expiration of the Term by reason of Employee's death, LTLLC will pay Employee's designated beneficiary or beneficiaries or Employee's estate (collectively, the "Beneficiary"), within 30 days of Employee's death (or earlier, to the extent required by applicable law) in a lump sum in cash, (i) Employee's Base Salary from the date of Employee's death through the end of the month in which Employee's death occurs and (ii) any Accrued Obligations (as defined in Section 1(f) below). Additionally, the Beneficiary will receive the payments and benefits described in clauses (A) through (E) below, but (with respect to clauses (A) through (E) below) only if the Beneficiary timely executes and does not revoke a general release of the Company Group and its affiliates substantially in the form attached hereto as Exhibit C (the "Release"). If the Beneficiary does not execute the Release within forty-five (45) days following Employee's Termination of Employment, or if the Beneficiary revokes the Release (the end of the permitted revocation period following execution without revocation being exercised, the "Release Effective Date"), Beneficiary's entitlement to the payments and benefits described in clauses (A) through (E) below will immediately become null and void.

        (A)    Full vesting of the 2018 RSA Grant as of Employee's Termination of Employment if such grant was outstanding as of Employee's Termination of Employment;

        (B)    If Employee's Termination of Employment preceded the issuance of the 2018 RSA Grant, then the Beneficiary will receive an amount equal to the value of the 2018 RSA Grant measured as of the close of business (applying the Company's closing per share price) on the date of Employee's Termination of Employment, payable in the form of cash and/or Company shares as determined by the Company (with shares issued only if in compliance with all applicable laws and rules of the Nasdaq Stock Market, and issued with appropriate restrictive legends reflecting the unregistered status of shares), within 60 days following the date of Employee's Termination of Employment;

        (C)    Shares subject to the 2017 Performance Option which were Performance Vested (as defined in the 2017 Performance Option Agreement) as of Employee's Termination of Employment will be fully vested and exercisable as of the date of Employee's Termination of Employment;

        (D)    If Employee's Termination of Employment precedes August 2, 2018, Shares subject to the 2017 Performance Option that were not Performance Vested as of Employee's Termination of Employment will become fully vested and exercisable to the extent that the VWAP increase over the Base Price hurdles (as set forth in the 2017 Performance Option Agreement) are attained on or before August 1, 2018, with each such performance measurement based on the highest trailing VWAP over any 30 consecutive day period ending between the date of Employee's Termination of Employment and August 1, 2018 (rather than the quarterly measurement dates included in the 2017 Performance Option Agreement); and

        (E)    If Employee's Termination of Employment precedes the grant of the 2018 Performance Option, then such award will be hypothetically treated as having been granted on the Base Date (with a hypothetical exercise price equal to the Base Price) and a hypothetical number of shares will be subject to vesting under the same vesting conditions expressed in Section 1(a)(D). Each hypothetical share that vests under this Section 1(a)(E) will have a value equal to the Company's closing share price on August 1, 2018 and the excess of this value (if any) over the Base Price for each such hypothetical share will be paid to the Beneficiary in August 2018 with payment of the aggregate number of hypothetical shares, to the extent vested, occurring in cash and/or Company shares as determined by the Company (with shares issued only if in compliance with all applicable laws and rules of the Nasdaq Stock Market, and issued with appropriate restrictive legends reflecting the unregistered status of shares).

    (b)    <u>Disability</u>. Upon termination of Employee's employment by the Company Group prior to expiration of the Term by reason of Employee's Disability, LTLLC will pay Employee, within 30 days of such termination (or earlier, to the extent required by applicable law) in a lump sum in cash, (i) Employee's Base Salary from the date of Employee's termination of employment due to Disability through the end of the month in which such termination occurs, offset by any amounts payable to Employee under any disability insurance plan or policy provided by LTLLC and (ii) any Accrued Obligations (as defined in Section 1(f) below). "Disability" means a condition, resulting from bodily injury or disease, that renders, and for a six consecutive month period has rendered, Employee unable to perform substantially the duties pertaining to his employment with LTLLC. A return to work of less than 14 consecutive days will not be considered an interruption in Employee's six consecutive months of disability. Disability will be determined by LTLLC on the basis of medical evidence satisfactory to LTLLC. Additionally, Employee will receive the payments and benefits described in Section 1(a) clauses (A) through (E) above, but (with respect to such above clauses (A) through (E) ) only if Employee timely executes and does not revoke the Release. If Employee does not execute the Release within forty-five

(45) days following Employee's Termination of Employment, or if Employee revokes the Release before the Release Effective Date, Employee's entitlement to the payments and benefits described in such above clauses (A) through (E) will immediately become null and void.

(c)    <u>Termination for Cause; Resignation by Employee Without Good Reason</u>. Subject to the terms of this Agreement, the Company Group may terminate Employee's employment under this Agreement with or without Cause at any time. Similarly, subject to the terms of this Agreement, Employee may terminate his employment under this Agreement with or without Good Reason at any time. Upon termination of Employee's employment prior to expiration of the Term by the Company Group for Cause or upon Employee's resignation without Good Reason, this Agreement will terminate without further obligation by the Company Group, except for the payment of any Accrued Obligations (as defined in Section 1(f) below) within thirty (30) days of such termination (or earlier, to the extent required by applicable law). As used herein, "Cause" means: (a) the plea of guilty or <u>nolo</u> <u>contendere</u> to, or conviction for, a felony offense; provided however that after indictment, the Company Group may suspend Employee from the rendition of services, but without limiting or modifying in any other way the Company Group's obligations to Employee under this Agreement; <u>provided</u> <u>further</u> that Employee's employment will be immediately reinstated if the indictment is dismissed or otherwise dropped and there is not otherwise grounds to terminate Employee's employment for Cause; (b) a material breach by Employee of a fiduciary duty owed to the Company Group; (c) a material breach by Employee of any of the covenants made by Employee in Section 2 hereof; or (d) the willful or gross neglect by Employee of the material duties required by this Agreement. Before a cessation of Employee's employment can be deemed to be a termination of Employee's employment for Cause, (A) the Company Group must provide written notice to Employee that identifies the conduct described in clauses (b), (c) or (d) above, as applicable, and (B) in the event that the event or condition is curable, Employee will have failed to remedy such event or condition within 30 days after Employee has received the written notice from the Company Group described above. As used herein, "Good Reason" means the occurrence of any of the following without Employee's written consent, (i) a material adverse change in Employee's, title at the Company, duties for the Company Group, operational authorities or reporting responsibilities as they relate to Employee's position as Chairman and Chief Executive Officer of the Company from those in effect immediately following the Agreement Date, excluding for this purpose any such change that is an isolated and inadvertent action not taken in bad faith and that is remedied by the Company Group promptly after receipt of notice thereof given by Employee and for purposes of this subclause it shall be considered a material adverse change if immediately following a Change of Control (as defined below) Employee is not the chief executive officer of the ultimate parent entity of the combined or surviving entity resulting from such Change of Control, (ii) a material reduction in Employee's annual base salary, (iii) a relocation of Employee's principal place of business more than 25 miles from the Charlotte, North Carolina metropolitan area, or (iv) a material breach by the Company Group of this Agreement, excluding for this purpose any such action that is an isolated and inadvertent action not taken in bad faith and that is remedied by the Company Group promptly after receipt of notice thereof given by Employee.

(d)    <u>Termination by the Company Other Than For Death, Disability or Cause; Resignation by Employee For Good Reason</u>. Subject to Section 1(g), upon termination of Employee's employment with the Company Group prior to expiration of the Term (i) by the Company Group without Cause (other than for death or Disability) or (ii) upon Employee's resignation for Good Reason (either such termination, a "Qualifying Termination"), Employee will receive (x) payment of the Accrued Obligations within thirty (30) days of such Qualifying Termination (or earlier, to the extent required by applicable law) and (y) the payments and benefits described in clauses (A) through (J) below, but (with respect to clauses (A) through (J) below) only if Employee timely executes and does not revoke the Release and Employee complies in all material respects with his obligations under Sections 2(a) through 2(e). If Employee does not execute the Release within forty-five (45) days following the date of such Qualifying Termination, or if Employee revokes the Release before the Release Effective Date, Employee's entitlement to the payments and benefits described in clauses (A) through (J) below will immediately become null and void.

(A)    An amount (the "Severance Amount") equal to the greater of: (i) the amount of Base Salary (calculated using Employee's then-current Base Salary) that Employee would have received had his employment continued over the period commencing on the date of the Qualifying Termination and ending on the second anniversary of the date of the Qualifying Termination, or (ii) the amount of Employee's then-current Base Salary plus Employee's target annual bonus for the bonus program in effect for Employee for the year in which Employee's employment terminates.

The Severance Amount will be paid in substantially equal payments over the two year period following the date of Qualifying Termination in accordance with LTLLC's normal payroll practices in effect at the time of Employee's termination of employment beginning on the regularly scheduled payroll date immediately following the Release Effective Date provided however that if the Severance Amount is determined to be "nonqualified deferred compensation" that is subject to 409A (as defined below), then the first installment will be paid on the sixtieth (60th) day following the date of the Qualifying Termination and will include the amount of all payments that would have been made after the Release Effective Date but before the sixtieth (60th) day following such Qualifying Termination, and the remaining Severance Amount will be payable in installments as specified above on LTLLC's regularly scheduled payroll dates following the sixtieth (60th) day following such Qualifying Termination;

(B)    A cash lump-sum payment in an amount equal to the pro-rated portion of Employee's annual bonus for the Company's fiscal year in which the Qualifying Termination occurs based on actual performance achieved for such year (as if the entire annual bonus was based solely on the applicable Company performance

metrics and without regard to any

assessment of personal performance), with such proration based on the ratio of the number of days employed during such year to 365 (the amount of such payment, the "Pro-Rated Annual Bonus"), and paid when annual bonuses are paid to other employees;

(C)        Subject to Employee timely making such requisite elections to continue such coverages, Employee will continue to receive group health and life insurance coverage by LTLLC for Employee and his dependents for up to 18 months after the Qualifying Termination on the same terms as if Employee was still a full-time active employee of LTLLC during such period (with Employee continuing to pay the same dollar amount for such coverage that he would need to pay if he were still an active employee), provided, that as soon as Employee is offered health insurance coverage in connection with new employment, then Employee's status for purposes of this clause (C) will solely be that of a former employee of LTLLC (and any further coverages will be provided on that basis and not as if Employee was still a full-time active employee of LTLLC).

Notwithstanding any provision of this Agreement to the contrary but subject to the same terms and conditions set forth in the preceding paragraph, if the Company determines, in its sole discretion, that it cannot provide such COBRA premium payment benefits without adverse tax consequences to Employee or the Company or for any other reason, then the Company shall, in lieu thereof, provide to Employee a taxable monthly amount equal to the monthly plan premium payment in substantially equal monthly installments over such 18-month period (or the remaining portion thereof). The benefits described in this clause (C) (both the continuation of benefits and taxable cash payment), including the applicable terms and conditions, are referred to herein as the "Continued Health Benefit;"

(D)        With respect to any performance-based equity compensation award (excluding the 2018 RSA Grant, 2017 Performance Options and 2018 Performance Awards) then-outstanding with respect to which Employee has not yet vested as of the date of termination, such award will remain eligible to vest in accordance with the terms of the applicable award agreement evidencing such award following the completion of the applicable performance period in an amount equal to (i) the total number of shares, if any, that would have been ultimately awarded thereunder following completion of the performance period applicable to such award, multiplied by (ii) a fraction, the numerator of which is the number of days Employee was employed from the grant date of the award to the date of Employee's Termination of Employment, and the denominator of which is the number of days from the grant date to the latest in time date of any performance period in the applicable award;

(E)        With respect to Employee's then-outstanding unvested Company compensatory equity awards held by Employee that vest solely based on Employee's continued service to the Company Group (the "Time-Based Equity Awards"), such portion of the Time-Based Equity Awards that would otherwise have become vested and exercisable by the second anniversary of the date of Qualifying Termination had Employee's employment not been terminated will become fully vested and immediately exercisable as of the date of Qualifying Termination;

(F)        With respect to Employee's then-outstanding vested stock options, (1) any restrictions on delaying Employee's ability to exercise otherwise vested stock options will be removed as of the date of Qualifying Termination and (2) Employee will be able to exercise such vested stock options until the earliest of (i) their applicable expiration date, (ii) the date of a Change of Control of the Company (as defined in this Agreement) in which the stock options are not being continued, assumed, converted, or otherwise substituted for, or (iii) the first anniversary of the Qualifying Termination;

(G)        If the 2018 RSA Grant is then-outstanding, then such portion of the 2018 RSA Grant that would otherwise have become vested by the second anniversary of the date of Qualifying Termination had Employee's employment not been terminated will become fully vested as of the date of Qualifying Termination; but if the date of Qualifying Termination occurs prior to the date of grant of the 2018 RSA Grant, then Employee will receive an amount equal to 40% of the value of the 2018 RSA Grant measured as of the close of business (applying the Company's closing per share price) on the date of Employee's Termination of Employment, payable in the form of cash and/or issuance of Company shares as determined by the Company (with shares issued only if in compliance with all applicable laws and rules of the Nasdaq Stock Market, and issued with appropriate restrictive legends reflecting the unregistered status of shares), within 60 days following the date of Termination of Employment;

(H)        Shares subject to the 2017 Performance Option which were Performance Vested as of the date of Qualifying Termination will be fully vested and exercisable as of such Qualifying Termination;

(I)        Shares subject to the 2017 Performance Option (and 2018 Performance Awards if they were outstanding) that were not Performance Vested as of the date of Qualifying Termination will become fully vested and exercisable as of such date to the extent that the VWAP increase over the Base Price hurdles (as set forth in the 2017 Performance Option Agreement) are attained as of the date of Qualifying Termination with such last performance measurement based on the VWAP for the 30 consecutive

day period ending on the date of Qualifying Termination (rather than at the end of the fiscal quarter in which Termination of Employment occurred as set forth in the 2017 Performance Option Agreement); and

(J)        If the date of Qualifying Termination precedes the grant of the 2018 Performance Option, then such award will be hypothetically treated as having been granted on the Base Date (with a hypothetical exercise price equal to the Base Price) and a hypothetical number of shares will be subject to vesting under the same vesting conditions expressed in Section 1(d)(I) above. Each hypothetical share that vests under this Section 1(d)(J) will have a value equal to the Company's closing share price on the date of Qualifying Termination and the excess of this value (if any) over the Base Price for each such hypothetical share will be paid to Employee within 60 days following the date of Qualifying Termination, with payment of the aggregate number of hypothetical shares, to the extent vested, occurring in cash and/or Company shares as determined by the Company (with shares issued only if in compliance with all applicable laws and rules of the Nasdaq Stock Market, and issued with appropriate restrictive legends reflecting the unregistered status of shares).

Notwithstanding the foregoing, in no event will Employee's resignation be for Good Reason unless (x) an event or circumstance set forth in any of clauses (i) through (iv) of the definition thereof will have occurred and Employee provides the Company with written notice thereof within forty-five (45) days after Employee has knowledge of the occurrence or existence of such event or circumstance, which notice specifically identifies the event or circumstance that Employee believes constitutes Good Reason, (y) the Company Group fails to correct the circumstance or event so identified within thirty (30) days after the receipt of such notice, and (z) Employee resigns within ninety (90) days after the date of delivery of the notice referred to in clause (x) above.

(e)        Mitigation; Offset. In the event of a termination of Employee's employment prior to the end of the Term, in no event will Employee be obligated to seek other employment or take any other action by way of mitigation of severance benefits or other compensation or benefits. If Employee obtains other employment during the Term, the amount of any severance payments to be made to Employee under Section 1(d) hereof after the date such employment is secured will be offset by the amount of compensation earned by Employee from such employment through the end of the Term. For purposes of this Section 1(e), Employee will have an obligation to inform the Company promptly regarding Employee's employment status following termination and during the period encompassing the Term.

(f)        Accrued Obligations. As used in this Agreement, "Accrued Obligations" will mean the sum of (i) any portion of Employee's accrued but unpaid Base Salary through the date of death or Employee's termination of employment for any reason, as the case may be; any annual bonus earned, but unpaid, as of the date of Employee's termination of employment for the immediately preceding fiscal year; (iii) any compensation previously earned but deferred by Employee (together with any interest or earnings thereon) that has not yet been paid, (iv) any reasonable and necessary business expenses incurred by Employee prior to the date of Employee's termination of employment but not yet reimbursed and (v) any benefits earned by Employee (excluding any then-outstanding equity compensation awards which will continue to be governed by their applicable terms and conditions) but unpaid or unused at the date of Employee's termination of employment provided that the payout of these benefits is consistent with the plans, policies, programs and practices of LTLLC at the date of Employee's termination of employment.

(g)        Change of Control.  For purposes of this Agreement, a "Change of Control" results when: (i) any person or entity, other than Employee or persons or entities having beneficial ownership of securities of the Company also beneficially owned by Employee (a "Lebda Beneficial Owner")), becomes a beneficial owner, directly or indirectly, of securities of the Company representing fifty percent or more of the total voting power of all of the Company's then outstanding voting securities, excluding such event occurring via the acquisition by such person or entity of beneficial ownership of securities from, or via the sharing of beneficial ownership with, a Lebda Beneficial Owner, (ii) a merger or consolidation of the Company in which the Company's voting securities immediately prior to the merger or consolidation do not represent, or are not converted into securities that represent, a majority of the voting power of all voting securities of the surviving entity immediately after the merger or consolidation, or (iii) a sale of all or substantially all of the assets of the Company or a liquidation or dissolution of the Company. For purposes of defining Change of Control, "Company" refers to LendingTree, Inc. as a whole and does not apply to events only affecting specific businesses or subsidiaries of LendingTree, Inc. To the extent necessary to comply with Section 409A (as defined below), a Change of Control must also constitute a "change in control event" within the meaning of Section 409A.

(A)        If a Change of Control occurs while Employee is employed by LTLLC then the benefits described in clauses (i) through (vi) below will be provided to Employee automatically upon the Change of Control:

(i)        All then-outstanding Time-Based Equity Awards held by Employee will become fully vested and immediately exercisable immediately prior to such Change of Control;

      (ii)        All then-outstanding unvested Company compensatory equity awards held by Employee that are subject to performance-based vesting (other than the 2018 RSA Grant, 2017 Performance Option and 2018 Performance Awards) will vest based on the actual level of achievement of the applicable performance goals measured as of (or within five business days before) the date of such Change of Control; provided, that any portion of the award that does not vest as of such date will be forfeited without consideration upon the Change of Control;

(iii)    Any then-outstanding unvested portion of the 2018 RSA Grant will become fully vested immediately prior to the Change of Control; provided, that if a Change of Control occurs prior to the issuance of the 2018 RSA Grant, then Employee will, immediately prior to the Change of Control, receive an amount equal to the value of the 2018 RSA Grant measured as of the close of business (applying the Company's closing per share price) immediately prior to the Change of Control, payable in the form of cash and/or issuance of Company shares as determined by the Company (with shares issued only if in compliance with all applicable laws and rules of the Nasdaq Stock Market, and issued with appropriate restrictive legends reflecting the unregistered status of shares);

(iv)    With respect to any then-outstanding 2017 Performance Option, 2018 Performance Option and 2018 Performance RSA, (x) any portion of those awards that are not Performance Vested as of immediately prior to such Change of Control will be measured as of the fifth business day before the Change of Control pursuant to the terms of the applicable award agreements evidencing such awards, except that the VWAP (as defined in the applicable award agreement) will be replaced with the Company's closing share price on the fifth business day before the Change of Control, and to the extent that the performance goals are achieved after giving effect to such measurement, the resulting Shares subject to those awards will become Performance Vested immediately prior to the Change of Control and any unvested portion of those awards will be forfeited without consideration upon the Change of Control;

(v)    After giving effect to clause (iv) above, shares subject to any then-outstanding 2017 Performance Option, 2018 Performance Option and 2018 Performance RSA which are Performance Vested will be fully vested and exercisable immediately prior to such Change of Control; and

(vi)    If the Change of Control precedes the grant of the 2018 Performance Option, then such award will be hypothetically treated as having been granted on the Base Date (with a hypothetical exercise price equal to the Base Price) and a hypothetical number of shares will be subject to vesting under the same vesting conditions expressed in clauses (iv) and (v) above. Each hypothetical share that vests under the previous sentence will have a value equal to the Company's closing share price on the fifth business day before the Change of Control and the excess of this value (if any) over the Base Price for each such hypothetical share will be paid to Employee immediately prior to the Change of Control, with payment of the aggregate number of hypothetical shares, to the extent vested, occurring in cash and/or Company shares as determined by the Company (with shares issued only if in compliance with all applicable laws and rules of the Nasdaq Stock Market, and issued with appropriate restrictive legends reflecting the unregistered status of shares).

(B)    In the event that Employee experiences a Qualifying Termination upon or at any time during the 12 month period following the occurrence of a Change of Control, then Employee will receive (x) payment of the Accrued Obligations within thirty (30) days of such termination (or earlier, to the extent required by applicable law) and (y) the payments and benefits described in clauses (i) through (iii) below, but (with respect to clauses (i) through (iii) below) only if Employee timely executes and does not revoke the Release and Employee complies in all material respects with his obligations under Sections 2(a) through 2(e). If Employee does not execute the Release within forty-five (45) days following the date of such Qualifying Termination, or if Employee revokes the Release before the Release Effective Date, Employee's entitlement to the payments and benefits described in clauses (i) through (iii) below will immediately become null and void. For avoidance of doubt, if Employee experiences a Qualifying Termination upon or at any time during the 12 month period following the occurrence of a Change of Control, then Employee will not be eligible to receive any payments or benefits under Section 1(d). There is no requirement for Employee to mitigate the benefits provided in clauses (i) through (iii) below.

(i)    A cash lump sum severance payment in an amount equal to the sum of (x) 200% of Employee's then-current Base Salary plus (y) 200% of Employee's target annual bonus for the bonus program in effect for Employee for the year in which Employee's employment terminates plus (z) the Pro-Rated Annual Bonus, payable on the regularly scheduled payroll date immediately following the Release Effective Date;

(ii)    With respect to Employee's then-outstanding vested stock options, Employee will be able to exercise such vested stock options until the earliest of (x) their applicable expiration date, (y) the date of a change of control of the Company in which the applicable stock option is not being assumed, continued, substituted for or otherwise replaced as of such change of control, or (z) the second anniversary of the date of Qualifying Termination; and

(iii)    Subject to the terms and conditions of Section 1(d)(C), Employee will be entitled to receive the Continued Health Benefit under Section 1(d)(C).

2.    Confidential Information; Non-Compete; Non-Solicitation; And Proprietary Rights. Employee covenants as follows:

(a)    <u>Confidentiality</u>. Employee acknowledges that while employed by the Company Group, Employee will occupy a position of trust and confidence and will have access to valuable, highly confidential, privileged and proprietary information relating to Company Group's business and/or its customers, lenders, suppliers, vendors and other business partners of Company Group (collectively, "Confidential Information"), including, without limitation: information about the Company Group or any of its subsidiaries or affiliates, and their clients and customers that is not disclosed by the Company Group or any of its subsidiaries or affiliates for financial reporting purposes and that was learned by Employee in the course of employment with the Company Group or any of its subsidiaries or affiliates, including without limitation any proprietary knowledge, business plans, marketing concepts, strategies and plans; sales methods and techniques; pricing structure and data; trade secrets, data, formulae, technologies and processes; information and client and customer lists; data furnished to the Company Group or its subsidiaries or affiliates by third parties that is subject to confidentiality obligations; all papers, resumes, and records (including computer records) of the documents containing such Confidential Information. During his employment and thereafter Employee may not, except as may be required to perform Employee's duties hereunder or as required by applicable law, disclose to others or use, whether directly or indirectly, any Confidential Information. Employee acknowledges and agrees: (i) that the Confidential Information and all copies thereof, as described herein, is sensitive, valuable, and proprietary information that is the sole and lawful property of the Company Group, or (as applicable) which has been entrusted to the Company Group subject to certain confidentiality obligations; (ii) that the Confidential Information represents a material investment of the Company Group's time, money, and other resources; (iii) that the Company Group has a legitimate need to protect such Confidential Information; (iv) that such Confidential Information is the subject of reasonable efforts on the Company Group's behalf to keep it confidential; (v) that Confidential Information to which Employee was exposed in the course of employment with the Company Group prior to the execution of this Agreement, if any, shall nevertheless constitute Confidential Information, and shall be subject to the terms, requirements, and restrictions herein; (vi) that Employee has no interest or rights with respect to any of the Confidential Information; and (vii) that the Confidential Information constitutes proprietary, sensitive, and confidential information and trade secrets (as such term is defined in N.C.G.S. § 66-152, et seq., and the Uniform Trade Secrets Act) of the Company Group. Employee agrees to deliver or return to the Company Group, at the Company Group's request at any time or upon termination or expiration of Employee's employment or as soon thereafter as possible, all documents, computer tapes and disks, records, lists, data, drawings, prints, notes and written information (and all copies thereof) furnished by the Company Group and its subsidiaries or affiliates or prepared by Employee in the course of Employee's employment by the Company Group and its subsidiaries or affiliates. In connection with the preceding sentence, Employee must certify to the Company Group that he has fully complied with its requirements and the Company Group will have the ability to take reasonable actions to confirm such compliance. As used in this Agreement, "affiliates" means any company controlled by, controlling or under common control with the Company Group. Employee understands that it is the Company Group's policy to respect all trade secrets and confidential information of other entities, including without limitation any entity where the Company Group's employees may previously have been employed. Employee represents that he has not at any time, and will not in the future: (1) disclose, expose, or otherwise make available to the Company Group; (2) use in the course and scope of his employment with the Company Group or on behalf of or for the benefit of the Company Group; or (3) induce or attempt to induce the Company Group to use, any trade secrets or other confidential information belonging to any entity other than the Company Group. In the event that Employee is subject or may be subject to any confidentiality, non-disclosure, non-compete or non-solicitation agreement of any kind, or any other covenant, agreement or policy that conflicts or may conflict with any provisions of this Agreement or Employee's work assignment, Employee agrees to immediately notify the Company Group's Human Resources Department in writing of its existence, and shall immediately furnish a copy of the same, if available, to the Company Group's Human Resources Department. Confidential Information shall not include any information which is in the public domain or becomes generally known in the public domain through no wrongful act on the part of Employee.

Notwithstanding any other provision herein, Employee understands and acknowledges that, pursuant to Section 7 of the Defend Trade Secrets Act of 2016 (which added 18 U.S.C. § 1833(b)), Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (A) (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Employee files a lawsuit for retaliation by Employer for reporting a suspected violation of law, Employee may disclose Company Group's trade secrets to Employee's attorney and use the trade secret information in the court proceeding if Employee: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such Section.

(b)    <u>Non-Competition</u>. In consideration of the Company Group's employment of Employee, and in order to protect the substantial time, money and effort invested by the Company Group in its selling, marketing, pricing and servicing strategies, the development of goodwill among its customers and other legitimate business interests, Employee agrees as follows:

(i)        During the period of Employee's employment with the Company, Employee shall not engage in the performance or attempted performance of any material activities or services performed in the course and scope of Employee's duties for the Company Group (whether for Employee's own benefit or for, on behalf of, as an employee of, as an independent contractor of, or at the request of any other entity or individual) except on behalf of the Company Group and only then in the course and scope of Employee's employment with the Company Group; and Employee shall not otherwise compete with the business of the Company Group during the Term, whether for Employee's own benefit or for the benefit of others. Notwithstanding the foregoing, this Section 2(b)(i) shall not be interpreted to impose greater restriction on Employee's activities than those applicable to Employee pursuant to Employee's fiduciary duty of loyalty as a director and executive officer of the Company, determined under the laws of the Company's domicile.

(ii)        For a period of 24 consecutive months immediately following Employee's date of termination of employment for any reason following the date hereof (the "Restricted Period"), Employee may not, without the prior written consent of the Company, engage in or become Associated with a Competitive Activity (together, "Restricted Activity"). For purposes of this Section 2(b): (i) a "Competitive Activity" means any business or other endeavor, in the Restricted Territory, involving products or services that are the same or substantially similar to the type of products or services that the Company Group is engaged in providing both (x) as of the date hereof or at any time during Employee's employment with the Company Group and (y) at any time during the twelve (12) month period preceding Employee's termination of employment, and (ii) Employee will be considered to have become "Associated with a Competitive Activity" if Employee performs or takes substantial steps to perform (whether for Employee's own benefit or for, on behalf of, as an employee of, as an independent contractor of, or at the request of any other entity or individual) any material activities performed in the course and scope of Employee's duties for the Company during the twelve (12) month period immediately preceding Employee's termination of employment, in a manner or role that directly competes with the Company Group or directly and materially assists others in engaging in a Competitive Activity. Notwithstanding the foregoing, (i) Employee may make and retain investments during the Restricted Period, for investment purposes only, in less than one percent (1%) of the outstanding capital stock of any publicly-traded corporation engaged in a Competitive Activity if the stock of such corporation is listed on a national stock exchange if Employee is not otherwise affiliated with such corporation and (ii) Employee may become employed by a partnership, corporation or other organization that is engaged in a Competitive Activity so long as Employee does not engage in or become Associated with a Competitive Activity. Notwithstanding the foregoing and exclusively with respect to Employee's termination of employment pursuant to Section 1(g)(B), the Restricted Period will be reduced from 24 months to 12 months following Employee's date of termination.

(iii)        For purposes of this Agreement, "Restricted Territory" means the largest territory which is described by one or more of the following subsections and is deemed enforceable by any court of competent jurisdiction, but only to extent that the Restricted Activity in which Employee is engaged therein is directed toward Competitive Activity inside the United States of America:

(1)        Any State, province, or similar political territory in any country;

(2)        Any State, province, or similar political territory in any country in which, as of the Cessation Date, Employee worked in or was based;

(3)        Any State, province, or similar political territory in any country in which Employee dealt with the Company Group's customers or lenders during Employee's employment with the Company Group during the Prior Period;

(4)        North Carolina; and/or

(5)        The geographical area within a radius of one hundred (100) miles from the Company Group's location where Employee primarily works as of the Cessation Date.

(c)        Non-Solicitation of Employees. During Employee's employment with Company Group and during the Restricted Period, Employee will not, without the prior written consent of the Company, hire, recruit, or solicit, attempt to hire, recruit, or solicit, or assist others in hiring, recruiting, or soliciting, the employment or services of (whether as an employee, officer, director, agent, consultant or independent contractor), any person who is (or was during the six months prior to Employee's date of termination) either an employee, officer, director, agent, consultant or independent contractor of the Company Group or any of its subsidiaries or affiliates (except for such employment or hiring by the Company Group or any of its subsidiaries or affiliates); provided however that this Section 2(c) will not apply to any hiring which results solely from a general solicitation of employment that was not directed to employees of the Company Group or any of its subsidiaries or affiliates. Notwithstanding the foregoing and exclusively with respect to

Employee's termination of employment pursuant to Section 1(g), with respect to the restriction in this Section 2(c) the Restricted Period will be reduced from 24 months to 12 months following Employee's date of termination.

(d)    <u>Non-Solicitation Of Business Partners</u>. During Employee's employment with Company Group and during the Restricted Period, Employee may not, except for the benefit of the Company Group, to perform Employee's duties hereunder or as required by applicable law, without the prior written consent of the Company, solicit, take substantial steps to solicit, materially assist in soliciting, take substantial steps to do business with, or do business with any business partners or business affiliates of the Company Group that are engaged in a Competitive Activity , or encourage (regardless of who initiates the contact) any of the business partners or business affiliates of the Company Group to discontinue or limit its relationship with Company Group in any manner or use the services of any competitor of the Company Group, its subsidiaries or affiliates. Notwithstanding the foregoing and exclusively with respect to Employee's termination of employment pursuant to Section 1(g), with respect to the restriction in this Section 2(d) the Restricted Period will be reduced from 24 months to 12 months following Employee's date of termination.

(e)    <u>Proprietary Rights; Assignment</u>.

(i)    In the event that Employee shall, individually or in conjunction with others, invent, create, discover, conceive, make, write, or reduce to practice any invention, modification, discovery, idea, design, development, process, improvement, system, work, manuscript, translation, transliteration, writing or intellectual property right of any kind whatsoever (whether or not patentable or registerable under any applicable copyright, trademark, or other intellectual property statute or code) (collectively referred to as an "Invention") that relates in any way to, is suggested by or results from, or is otherwise usable in the business or activities of the Company Group, whether: (a) at any time during any period of Employee's employment with the Company Group or after the cessation of Employee's employment with the Company Group, when such Invention directly or indirectly results from the exposure of Employee to any of the Confidential Information; or (b) at any time during any period of Employee's employment with the Company Group, when such Invention directly or indirectly: (1) was developed in the course and scope of Employee's employment with the Company Group, (2) was suggested by or resulted from Employee's job with the Company Group, (3) was suggested by or resulted from Employee's performance of tasks or work assigned by the Company Group, or (4) resulted from the use of premises or property of any kind owned, leased or while otherwise in the possession of or used by the Company Group (all of the foregoing being collectively referred to herein as "Work Product"), then any such Work Product and all benefits arising or accruing therefrom (including, without limitation, all rights of ownership, attribution, and royalties) shall immediately become the sole, exclusive, and absolute property of the Company Group, as provided herein; provided that if the Work Product was conceived after the cessation of Employee's employment with the Company Group under the circumstances described in Subpart (a) of this Section 2(e)(i) then the Confidential Information must still be considered to be Confidential Information at the time such Work Product was conceived or developed, unless the loss of such Confidential Information status was the result of any unauthorized disclosure by Employee.

(ii)    Employee agrees to assign and does hereby assign any and all rights, title and interest to any and all Work Product and all benefits arising or accruing therefrom to the Company Group without further consideration, and shall promptly notify the Company Group of all information related to any such Work Product. Employee agrees and acknowledges that at the moment any such Work Product is conceived, all rights, title and interest thereto shall immediately become the sole, exclusive and absolute property of the Company Group; and it shall further immediately become Confidential Information (and shall be treated as such), unless otherwise prohibited under the terms of this Agreement.

(iii)    If any Work Product may be protected by copyright and is deemed in any manner to constitute "work made for hire," as such term is defined in 17 U.S.C. § 101, then such Work Product shall be deemed "work made for hire," the copyright of which, and all other rights, title and interest thereto, shall immediately and by operation of this Agreement be owned solely, exclusively and completely by the Company Group. If any Work Product may be protected by copyright and is not considered to be included in the categories of works covered by the "work made for hire" definition contained in 17 U.S.C. § 101, then Employee shall, and hereby does by operation of this Agreement, irrevocably and without reservation assign and transfer all copyrights, rights of attribution and other associated rights thereto to the Company Group.

(iv)    Employee agrees that at the request and sole expense of the Company Group, Employee shall sign, execute, make and do all deeds, documents, assignments, transfers, instruments and acts as the Company Group may require to comply with or confirm the terms of this Agreement, including without limitation (as deemed necessary by the Company Group in its sole discretion) the transfer or confirmation of transfer of rights, title and interest to any and all Work Product, and the application for copyrights, patents or other intellectual property rights related to Work Product solely in the name of the Company Group or its assigns. If for any reason whatsoever the Company Group is unable to secure Employee's cooperation (as determined by the Company Group in its sole discretion) or execution of any such deed, instrument, or other document regarding a patent, copyright or other protection or registration of any right related to any Work Product, Employee hereby appoints the Company Group as his/her duly authorized agent and attorney in fact for the limited purposes of executing any such deed, instrument or other document and prosecuting any action for or otherwise obtaining legal protection or registration of any Work Product or right

or benefit arising or accruing therefrom, solely in the name of the Company Group or that of its assigns or as the Company Group otherwise desires.

        (v)      Notwithstanding the foregoing, Work Product shall not include any Invention that Employee developed solely on his/her own time without using the Company Group's equipment, supplies, facilities, and trade secrets and other Confidential Information, except for those Inventions that: (1) relate to the Company Group's business or actual or demonstrably anticipated research or development; or (2) result from any work performed by Employee for the Company Group.

        (f)      <u>Compliance With Policies And Procedures</u>. During the Term, Employee must adhere to the policies and standards of professionalism set forth in the Company Group's policies and procedures as they may exist from time to time.

        (g)      <u>Remedies For Breach</u>. Employee expressly agrees and understands that Employee will notify the Company in writing of any alleged breach of this Agreement by the Company Group, and the Company Group will have 30 days from receipt of Employee's notice to cure any such breach.

Employee expressly agrees and understands that the remedy at law for any breach by Employee of this Section 2 will be inadequate and that damages flowing from such breach are not usually susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon Employee's violation of any provision of this Section 2, in addition to any remedy that the Company Group may have at law, the Company Group will be entitled to obtain from any court of competent jurisdiction immediate injunctive relief and obtain a temporary order restraining any threatened or further breach as well as an equitable accounting of all profits or benefits arising out of such violation, in all cases without any requirement of posting a bond. Nothing in this Section 2 will be deemed to limit the Company Group's remedies at law or in equity for any breach by Employee of any of the provisions of this Section 2, which may be pursued by or available to the Company Group.

        (h)      <u>Survival of Provisions</u>. The obligations contained in this Section 2 will, to the extent provided in this Section 2, survive the termination or expiration of the Term and Employee's employment with the Company Group and will be fully enforceable in accordance with the terms of this Agreement. If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 2 is excessive in duration or scope or is unreasonable or unenforceable under the laws of that state, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state. If any of the covenants of this Section 2 are determined to be wholly or partially unenforceable in any jurisdiction, such determination will not be a bar to or in any way diminish the rights of the Company Group or its affiliates, as applicable, to enforce any such covenant in any other jurisdiction.

    3.      <u>Waiver of Prior Agreements</u>.

This Agreement constitutes the entire agreement between the parties, and Employee acknowledges that he has waived, effective as of the Agreement Date, any and all rights under prior agreements and understandings (whether written or oral and including without limitation the Term Sheet, Prior Agreement and Prior CiC Agreement) between Employee and the Company Group with respect to the subject matter of this Agreement. Employee acknowledges and agrees that neither the Company Group nor anyone acting on its behalf has made, and is not making, and in executing this Agreement, Employee has not relied upon, any representations, promises or inducements except to the extent the same is expressly set forth in this Agreement.

    4.      <u>Assignment; Successors</u>.

This Agreement is personal in its nature and none of the parties hereto may, without the consent of the others, assign or transfer this Agreement or any rights or obligations hereunder; provided that, in the event of a merger, consolidation, transfer, reorganization, or sale of all, substantially all or a substantial portion of the assets of the Company or LTLLC with or to any other individual or entity, this Agreement will, subject to the provisions hereof, be binding upon and inure to the benefit of such successor and such successor (including the Company upon assignment of this Agreement) must discharge and perform all the promises, covenants, duties, and obligations of the Company Group hereunder, and all references herein to the "Company" or "LTLLC" or "Company Group" will refer to such successor.

    5.      <u>Withholding</u>.

The Company Group will make such deductions and withhold such amounts from each payment and benefit made or provided to Employee hereunder, as may be required from time to time by applicable law, governmental regulation or order.

     6.        <u>Heading References</u>. Section headings in this Agreement are included herein for convenience of reference only and do not constitute a part of this Agreement for any other purpose. References to "this Agreement" or the use of the term "hereof" will refer to these Standard Terms and Conditions and the Employment Agreement attached hereto, taken as a whole.

---

7.      Waiver; Modification. Failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof will not be deemed a waiver of such term, covenant, or condition, nor will any waiver or relinquishment of, or failure to insist upon strict compliance with, any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times. This Agreement may not be modified in any respect except by a writing executed by each party hereto.

8.      Severability. In the event that a court of competent jurisdiction determines that any portion of this Agreement is in violation of any law or public policy, only the portions of this Agreement that violate such law or public policy will be stricken. All portions of this Agreement that do not violate any statute or public policy will continue in full force and effect. Further, any court order striking any portion of this Agreement will modify the stricken terms as narrowly as possible to give as much effect as possible to the intentions of the parties under this Agreement.

9.      Indemnification. The Company will indemnify and hold Employee harmless for acts and omissions in Employee's capacity as an officer, director or employee of the Company or LTLLC to the maximum extent permitted under applicable law; provided however that neither the Company Group, nor any of its subsidiaries or affiliates will indemnify Employee for any losses incurred by Employee as a result of acts that would constitute Cause under Section 1(c) of this Agreement. This Section 9 will survive the termination or expiration of Employee's employment with LTLLC and, as applicable, will be fully enforceable thereafter in accordance with the terms of this Agreement.

10.      Section 280G Limitation. Notwithstanding anything in this Agreement to the contrary, in the event that any payment or benefit received or to be received by Employee (all such payments and benefits being hereinafter referred to as the "Total Payments") would not be deductible (in whole or part) by the Company Group or any affiliates making such payment or providing such benefit as a result of Section 280G of the U.S. Internal Revenue Code of 1986, as amended (the "Code") then, to the extent necessary to make such portion of the Total Payments deductible (and after taking into account any reduction in the Total Payments required by any similar reduction or elimination provision contained in such other plan, arrangement or agreement), the portion of the Total Payments that does not constitute "nonqualified deferred compensation" under Section 409A of the Code will first be reduced (if necessary, to zero), and all other Total Payments will thereafter be reduced (if necessary, to zero) with, in each case, cash payments being reduced before non-cash payments (and, within each category, payments to be paid last being reduced first); provided however that such reduction will only be made if the amount of such Total Payments, as so reduced (and after subtracting the net amount of federal, state and local income taxes on such reduced Total Payments) is greater than or equal to the amount of such Total Payments without such reduction (but after subtracting the net amount of federal, state and local income taxes on such Total Payments and the amount of the excise tax imposed under Section 4999 of the Code on such unreduced Total Payments). Any determination required to be made under this paragraph will be made by independent tax counsel reasonably acceptable to both Employee and the Company, and will be paid for by the Company ("Tax Counsel").

It is possible that, after the determinations and selections made pursuant to the foregoing paragraph, Employee will receive payments and/or benefits that are, in the aggregate, either more or less than the amount determined under such paragraph (hereafter referred to as an "Excess Payment" or "Underpayment", as applicable). If Tax Counsel determines that an Excess Payment has been made, then Employee must promptly repay the Excess Payment to the Company, together with interest on the Excess Payment at the applicable federal rate (as defined in Section 1274(d) of the Code) from the date of Employee's receipt of such Excess Payment until the date of such repayment. If Tax Counsel determines that an Underpayment has occurred, Company Group will promptly (but in any event within ten (10) days of such determination) pay to Employee an amount equal to the Underpayment, together with interest on such amount at the applicable federal rate from the date such amount would have been paid to Employee had the provisions of the foregoing paragraph not been applied until the date of payment.

11.      Section 409A. The parties intend that any amounts payable hereunder will comply with or be exempt from Section 409A of the Code ("Section 409A") (including under Treasury Regulation §§ 1.409A-1(b)(4) ("short-term deferrals") and (b)(9) ("separation pay plans," including the exceptions under subparagraph (iii) and subparagraph (v)(D)) and other applicable provisions of Treasury Regulation §§ 1.409A-1 through A-6). For purposes of Section 409A, each of the payments that may be made under this Agreement will be deemed to be a separate payment. Employee and Company Group agree to negotiate in good faith to make amendments to the Agreement, as the parties mutually agree are necessary or desirable to avoid the imposition of taxes, penalties or interest under Section 409A. Neither Employee nor the Company Group will have the right to accelerate or defer the delivery of any such payments or benefits except (i) where payment may be made within a certain period of time, the timing of payment within such period will be in the sole discretion of Company Group, and (ii) to the extent specifically permitted or required by Section 409A. With respect to the time of payments of any amounts under the Agreement that are "deferred compensation" subject to Section 409A, references in the Agreement to "termination of employment" (and substantially similar phrases) will mean "separation from service" within the meaning of Section 409A. Notwithstanding anything in this Agreement to the contrary, if Employee is considered a "specified employee" under Section 409A upon his separation from service and if payment of any amounts on account of Employee's separation from service under this Agreement is required to be delayed for a

10/9/2020

08-13555-scc 21-Doc 0851431-30F   Filed 04/01/21 Exhibit Entered 04/01/21 14:23:28 of 45 Exhibit
Declaration    Pg 187 of 251

period of six months after separation from service in order to avoid taxation under Section 409A, payment of such amounts will be delayed as required by Section 409A, and the accumulated amounts will be paid in a lump sum payment within five business days after the end of the six-month delay period. If Employee dies during the six-month delay period prior to the payment of benefits, the amounts withheld on account of Section 409A will be paid to the personal representative of Employee's estate within 60 days after the date of Employee's death. For the avoidance of doubt, it is intended that any expense reimbursement made to Employee hereunder will be exempt from Section 409A. Notwithstanding the foregoing, if any expense reimbursement made hereunder is determined to be "deferred compensation" within the meaning of Section 409A, then (i) the amount of the expense reimbursement during one taxable year will not affect the amount of the expense reimbursement during any other taxable year, (ii) the expense reimbursement will be made on or before the last day of Employee's taxable year following the year in which the expense was incurred and (iii) the right to expense reimbursement hereunder will not be subject to liquidation or exchange for another benefit. While it is intended that all payments and benefits provided to Employee under this Agreement will be exempt from or comply with Section 409A, the Company Group makes no representation or covenant to ensure that such payments and benefits are exempt from or compliant with Section 409A. The Company Group will have no liability to Employee or any other party if a payment or benefit under this Agreement or otherwise is challenged by any taxing authority or is ultimately determined not to be exempt or compliant. Employee further understands and agrees that Employee will be entirely responsible for any and all taxes imposed on Employee as a result of this Agreement.

12.    Recoupment. Notwithstanding anything in this Agreement to the contrary, any payments made or granted pursuant to this Agreement will be subject to any recoupment or clawback policy that may be adopted by the Company Group from time to time and to any requirement of applicable law, regulation or listing standard that requires the Company Group to recoup or clawback compensation paid.

13.    Key-Person Insurance. The Company Group has the right to insure Employee's life for the sole benefit of the Company Group in such amounts, and with such terms, as it may determine. All premiums payable thereon will be the obligation of the Company Group. Employee will have no interest in any such policy, but Employee agrees to cooperate with the Company Group in taking out such insurance by submitting to physical examinations, supplying all information required by the insurance company, and executing all necessary documents.

**ACKNOWLEDGED AND AGREED:**

Date:　　September 20, 2017

 

                       LENDINGTREE, INC.
                       LENDINGTREE, LLC

| By: | /s/ Claudette Parham |
|---|---|
| Name: | Claudette Parham |
| Title: | Chief Human Resources Officer |

                       EMPLOYEE

| By: | /s/ Douglas R. Lebda |
|---|---|
| Name: | Douglas R. Lebda |
| Title: | Chairman, Chief Executive Officer & Founder |

# EXHIBIT A

## FORM OF RESTRICTED STOCK AGREEMENT

### RESTRICTED STOCK AWARD AGREEMENT

**Important Note: You must login to your account at to accept this Award and obtain other important information concerning this Award, such as a copy of the LendingTree, Inc. Fifth Amended and Restated 2008 Stock and Annual Incentive Plan as the same has been amended and restated from time to time up to the date of this Award and the Terms and Conditions for Restricted Stock Awards. Additional copies of these documents are also available on the MyEquity page of the Company intranet or upon request from your Human Resources Department. This Award will not become effective until you login and accept both documents.**

This Restricted Stock Award Agreement (the "Agreement") is made between LendingTree, Inc., a Delaware corporation ("LendingTree, Inc." or the "Company"), and Douglas Lebda ("you" or "Employee"). The Grant Date for the Restricted Shares awarded under this Agreement is January 2, 2018.

LendingTree, Inc. sponsors the LendingTree, Inc. Fifth Amended and Restated 2008 Stock and Annual Incentive Plan as the same has been amended and restated from time to time up to the date of this Award (the "2008 Plan"). This Agreement represents an award of Shares of Restricted Stock under the 2008 Plan.

Certain terms and provisions of your employment agreement with LendingTree, LLC, dated September 20, 2017 (the "Employment Agreement"), are applicable to this Restricted Stock Award Agreement as referenced herein. Capitalized terms used (but not defined) in this Award Notice shall have the meanings set forth in the 2008 Plan or in the Employment Agreement as applicable. This Award is the "2018 RSA Grant" as such term is defined in the Employment Agreement and is also referred to herein as the 2018 RSA Grant and this agreement is the Exhibit C that is referenced in the Employment Agreement.

The Shares of Restricted Stock covered by this Agreement are being awarded subject to the following terms and provisions:

1.      Subject to the terms and conditions of the 2008 Plan and this Agreement, LendingTree, Inc. awards to you 119,015 Shares of Restricted Stock (the "Restricted Shares"). None of the Restricted Shares are vested as of the date of grant.

2.      Nothing in this agreement, these Terms and Conditions, or the 2008 Plan shall confer upon you any right to continue in the employ or service of LendingTree, Inc. or any of its Subsidiaries or Affiliates or interfere in any way with their rights to terminate your employment or service at any time and for any or no reason.

3.      Restricted Shares can only become vested under (i) this Section 3 or (ii) Sections 1(a), 1(b), 1(d), or (1(g) of the Standard Terms and Conditions of the Employment Agreement. Until they become vested, the Restricted Shares shall be subject to cancellation and forfeiture in accordance with Section 5 below. You may not sell, transfer, pledge, assign or otherwise alienate or hypothecate any unvested Restricted Shares.

No shares under the 2018 RSA Grant can vest unless and until the "Predicate Vesting Condition" is satisfied. The Predicate Vesting Condition will be achieved if the Company's adjusted earnings before interest, taxes, depreciation, and amortization for either (1) the first fiscal quarter of 2018 is at least $1 million or (2) for the first and second fiscal quarters of 2018 in the aggregate exceeds $2 million. If the Predicate Vesting Condition is satisfied under the foregoing clause (1) then 25% of the 2018 RSA Grant will be vested as of the Committee's certification that the Predicate Vesting Condition was achieved and an incremental 5% of the 2018 RSA grant shall vest at the end of each fiscal quarter thereafter commencing with the first such vesting at the end of the second fiscal quarter in 2018. If the Predicate Vesting Condition is satisfied under the foregoing clause (2) then 30% of the 2018 RSA Grant will be vested as of the Committee's certification that the Predicate Vesting Condition was achieved and an incremental 5% of the 2018 RSA grant shall vest at the end of each fiscal quarter thereafter commencing with the first such vesting at the end of the third fiscal quarter in 2018. If the Predicate Vesting Condition is not satisfied then the 2018 RSA Grant will be entirely forfeited without consideration on July 1, 2018. Except for shares that may be sold by Employee or retained by the Company in each case solely in order to satisfy applicable tax withholding, no vested 2018 RSA Grant shares may be sold, transferred or otherwise disposed of by Employee until the earlier of January 2, 2023 or the earlier date of an event occurring under Sections 1(a) through 1(d) or 1(g) of the Standard Terms and Conditions of the Employment Agreement, or a Change of Control of the Company (as defined by the Employment Agreement); provided, that

Employee will be permitted to transfer (by gift) vested 2018 RSA Grant shares to a limited liability company owned by a trust solely for the benefit of Employee's heirs of which Employee is the managing member at any time.

Except as may be otherwise provided under Sections 1(a), 1(b), or 1(d) of the Standard Terms and Conditions of the Employment Agreement, no shares under the 2018 RSA Grant will vest after Employee experiences a Termination of Employment and any then unvested shares shall be forfeited without consideration as of such Termination of Employment. For the avoidance of doubt, transfers of employment among LendingTree, Inc. and its Subsidiaries and Affiliates, without any break in service, is not a Termination of Employment.

Any cash dividends declared on the Shares shall be held subject to the vesting of the underlying Restricted Shares in accordance with this Section (and shall be paid only if and when such vesting conditions are satisfied), and subject to any adjustment pursuant to Section 3 of the 2008 Plan, dividends payable in Shares shall be paid in the form of Restricted Shares and shall be similarly held subject to the vesting of the underlying Restricted Shares in accordance with this Section.

4.    You agree that you shall comply with (or provide adequate assurance as to future compliance with) all applicable securities laws and income tax laws as determined by LendingTree, Inc. with respect to your receipt of the Restricted Shares. In addition, you agree that, upon request, you will furnish a letter agreement providing that (a) you will not distribute or resell any of said shares in violation of the Securities Act of 1933, as amended, (b) you will indemnify and hold LendingTree, Inc. harmless against all liability for any such violation and (c) you will accept all liability for any such violation. You expressly acknowledge and agree to be bound by Section 14(o) of the 2008 Plan, which contains provisions addressing the Company's policy on recoupment of equity or other compensation.

You represent and warrant that you understand the federal, state and local income tax consequences of the granting of Restricted Shares. Under Section 83 of the Code, the Fair Market Value of the Restricted Shares on the date any forfeiture restrictions applicable to such Restricted Shares lapse will be reportable as ordinary income at that time. You may voluntarily elect to be taxed at the time the Restricted Shares are acquired to the extent that the Fair Market Value of the Restricted Shares exceeds the amount of consideration paid by you (if any) for such Restricted Shares at that time rather than when such Restricted Shares cease to be subject to such forfeiture restrictions, by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after the Grant Date. YOU ACKNOWLEDGE THAT IT IS YOUR SOLE RESPONSIBILITY, AND NOT LENDINGTREE, INC.'S, TO FILE A TIMELY ELECTION UNDER CODE SECTION 83(b), EVEN IF YOU REQUEST LENDINGTREE, INC. OR ITS REPRESENTATIVES TO MAKE THIS FILING ON YOUR BEHALF. MOREOVER, YOU ARE RELYING SOLELY ON YOUR OWN ADVISORS WITH RESPECT TO THE DECISION AS TO WHETHER OR NOT TO FILE A CODE SECTION 83(b) ELECTION.

5.    In order to facilitate the transfer to LendingTree, Inc. of any Shares pursuant to the terms hereof and as a condition of this Award, you shall timely execute the enclosed stock power (Assignment Separate from Certificate). The stock power may be used by LendingTree, Inc. to transfer any unvested Shares to LendingTree, Inc. in accordance with this Section. You further hereby irrevocably appoint (which appointment is coupled with an interest) LendingTree, Inc. as your agent and attorney-in-fact to take any necessary or appropriate action to cause Shares to be returned to LendingTree, Inc. in accordance with this Section, including without limitation executing and delivering stock powers and instruments of transfer, making endorsements and/or making, initiating or issuing instructions or entitlement orders, all in your name and on your behalf. Without limiting the foregoing, you expressly acknowledge and agree that any transfer agent for the Shares is fully authorized and protected in relying on, and shall incur no liability in acting on, any documents, instruments, endorsements, instructions, orders or communications from LendingTree, Inc. in connection with the Shares or the transfer thereof, and that any such transfer agent is a third party beneficiary of this Agreement.

6.    In the event of any conflict between this Agreement and the 2008 Plan, the 2008 Plan shall control; provided, that an action or provision that is permissive under the terms of the 2008 Plan, and required under this Agreement, shall not be deemed a conflict and this Agreement shall control. In the event of any ambiguity in this Agreement, or any matters as to which this Agreement are silent, the 2008 Plan shall govern.

7.    LendingTree, Inc. may modify, amend or waive the terms of your Restricted Shares, prospectively or retroactively, but no such modification, amendment or waiver shall materially impair your rights without your consent, except as required by applicable law, NASDAQ or stock exchange rules, tax rules or accounting rules.

8.    Your acceptance of the Restricted Shares constitutes your authorization of the release from time to time to LendingTree, Inc. or any of its Subsidiaries or Affiliates and to the Agent (together, the "Relevant Companies") of any and all personal or professional data that is necessary or desirable for the administration of your Restricted Shares and/or the 2008 Plan (the "Relevant Information"). Without limiting the above, this authorization permits your employing company to collect, process, register and transfer to the Relevant Companies all Relevant Information (including any professional and personal data that may be useful or necessary for the purposes of the administration of the Restricted Shares and/or the 2008 Plan

and/or to implement or structure any further grants of equity awards (if any)). The acceptance of the Restricted Shares also constitutes your authorization of the transfer of the Relevant Information to any jurisdiction in which LendingTree, Inc., your employing company or the Agent considers appropriate. You shall have access to, and the right to change, the Relevant Information, which will only be used in accordance with applicable law.

9. Your Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and the rules and regulations issued thereunder ("Section 409A"). In no event shall LendingTree, Inc. be required to pay you any "gross-up" or other payment with respect to any taxes or penalties imposed under Section 409A or Code Sections 280G or 4999 with respect to any amounts or benefits paid to you in respect of your Award.

10. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement and the 2008 Plan, constitutes the final understanding between you and LendingTree, Inc. regarding the Restricted Shares. Any prior agreements, commitments or negotiations concerning the Restricted Shares are superseded.

11. Any certificate(s) for the Restricted Shares may, in the discretion of LendingTree, Inc., be deposited in escrow with the Secretary of LendingTree, Inc. (or his/her designee) to be held until vesting. No stock certificates evidencing Shares free from a restrictive legend shall be delivered to you until you have paid to LendingTree, Inc. the amount that must be withheld with respect to those Shares under federal, state and local income and employment tax laws (the "Applicable Withholding Taxes") or you and LendingTree, Inc. have made arrangements that are agreed to in writing by LendingTree, Inc. for the payment of such taxes. Unless you inform LendingTree, Inc. in writing before the applicable date of vesting that you will timely pay the Applicable Withholding Taxes amount then due with cash, LendingTree, Inc. shall automatically retain that number of Shares (valued at their Fair Market Value as of the applicable date of vesting of the Restricted Shares) that would satisfy the Applicable Withholding Taxes.

12. On July 25, 2017, the Committee approved the material terms of the 2018 RSA Grant pursuant to a compensation term sheet for you, which term sheet was superseded and replaced in its entirety by the Employment Agreement effective as of September 20, 2017.

IN WITNESS WHEREOF, LendingTree, Inc. has caused this Agreement to be executed by its duly authorized officer, and you have hereunto set your hand, all effective as of the Grant Date listed above. By signing below, you are also acknowledging receipt of copies of the 2008 Plan and the 2008 Plan's prospectus.

LENDINGTREE, INC.

By: _____

Title: _____


_____
Douglas Lebda

**ASSIGNMENT SEPARATE FROM CERTIFICATE**

(Stock Power)

FOR VALUE RECEIVED, the undersigned does hereby assign and transfer unto

Name: Douglas Lebda

Address:

Social Security or
Taxpayer Identification Number:

shares of the Stock of

represented by Certificate No(s).

herewith, standing in the name of the undersigned, and does hereby appoint

attorney, with full power of substitution, to transfer said shares on the books of said corporation.

*Signature:*

Date: _____        _____

[NAME]

## EXHIBIT B

### FORM OF PERFORMANCE STOCK OPTION AGREEMENT

**Notice of Performance Stock Option Award Granted Under the
LendingTree, Inc. Fifth Amended and Restated 2008 Stock and Annual Incentive Plan**

**<u>Important Note</u>: You must login to your account at to accept this Award and obtain other important information concerning this Award, such as a copy of the LendingTree, Inc. Fifth Amended and Restated 2008 Stock and Annual Incentive Plan as the same has been amended and restated from time to time up to the date of this Award (the "2008 Plan") and the Terms and Conditions for Restricted Stock Unit Awards (the "Terms and Conditions"). Additional copies of these documents are also available on the MyEquity page of the Company intranet or upon request from your Human Resources Department. This Award will not become effective until you login and accept both documents. You acknowledge that you have received copies of the 2008 Plan and the 2008 Plan's prospectus.**

| | |
|---|---|
| **Award Recipient:** | Douglas Lebda (also referred to herein as "you" or "Employee") |
| **Performance Stock Option Award:** | Under the 2008 Plan: |
| | You have been awarded a nonqualified stock option to acquire **672,499** Shares of LendingTree, Inc. common stock at an "Exercise Price" of **$183.80** per Share ("Stock Option"). The "Target Shares" for purposes of this Stock Option is 402,694 shares. |
| **Award Date:** | July 26, 2017 |
| **Vesting Schedule:** | This Stock Option can, subject to the provisions of the 2008 Plan, vest and no longer be subject to any vesting restrictions as described below in the Vesting section. |
| **Expiration Date:** | The vested portion of this Stock Option will expire upon the earlier of (i) the expiration of the 12-month period following your Termination of Employment for any reason, (ii) the date of Change of Control of the Company (as defined in the Current CiC Letter which is defined below) if this Stock Option is not being assumed, replaced, substituted for or otherwise continued after the Change of Control, or (iii) 10 years from your Award Date (the "Expiration Date") or except as otherwise provided in the 2008 Plan or the attached Terms and Conditions. |
| | If you do not exercise your vested Stock Option before the Expiration Date, your unexercised Stock Option will be forfeited and canceled in its entirety. |
| **Impact of a Termination of Employment:** | Except as otherwise provided in the 2008 Plan or your Employment Agreement (as defined below) the unvested portion of this Stock Option will be forfeited without consideration and canceled in its entirety upon your Termination of Employment. |
| **Terms and Conditions:** | On July 25, 2017, the Compensation Committee of the Board approved the material terms of this Stock Option pursuant to a compensation term sheet for you (the "Term Sheet"). On September 20, 2017, you entered into an employment agreement with the Company and LendingTree, LLC (the "Employment Agreement"), which supersedes and replaces in its entirety the Term Sheet effective as of such date. |

Capitalized terms used (but not defined) in this Award Notice shall have the meanings set forth in the 2008 Plan or the Employment Agreement, as applicable.

Your Stock Option is subject to the Terms and Conditions attached hereto and to the 2008 Plan, which are posted on www.benefitaccess.com and incorporated herein by reference, and any employment agreement between you and LendingTree, Inc.. Copies of these documents are also available upon request from your Human Resources Department. In the event of a conflict between the Terms and Conditions and this Notice, this Notice shall control.

Without a complete review of these documents, you will not have a full understanding of all the material terms of your Stock Option.

### Terms and Conditions for Stock Option Award

#### Overview

These Terms and Conditions apply to the stock option (the "Award") awarded to you by LendingTree, Inc. ("LendingTree, Inc." or the "Company") pursuant to the LendingTree, Inc. Fifth Amended and Restated 2008 Stock and Annual Incentive Plan as the same has been amended and restated from time to time (the "2008 Plan"). You were notified of your Award by way of an award notice (the "Award Notice"). This Award is also referred to herein as the "2017 Performance Option".

#### Continuous Service

In order for shares subject to this Award to vest and be exercisable, you must not experience a Termination of Employment before the applicable vesting event as set forth in the Vesting section below, except as otherwise provided in the Employment Agreement. Nothing in your Award Notice, these Terms and Conditions, or the 2008 Plan shall confer upon you any right to continue in the employ or service of LendingTree, Inc. or any of its Subsidiaries or Affiliates or interfere in any way with their rights to terminate your employment or service at any time and for any or no reason.

#### Vesting

For purposes of this Award, "*Base Date*" means July 26, 2017 and "*Base Price*" means the Company's per common share closing price on the Base Date which was $183.80.

The 2017 Performance Option has both time and performance based vesting conditions. The performance vesting condition will be based on the Company's share price growth as compared to the Base Price as measured on a quarterly basis during the five year period after the Base Date and utilizing the below table. The volume weighted average closing per share price of the Company's stock will be measured during the final 30 trading days in each fiscal quarter commencing with the fourth fiscal quarter of 2017 and for each fiscal quarter through the third fiscal quarter of 2022 (each such measured value is the "VWAP"). To the extent the VWAP has increased over the Base Price for any given quarter per the below table then the applicable percentage of Target Shares (as a cumulative total number of shares) shall be deemed to be "Performance Vested". Shares that do not become Performance Vested at any time prior to the third fiscal quarter of 2022 shall never become exercisable and shall be forfeited without consideration.

| VWAP Increase over Base Price | Percentage of Target Shares That are Performance Vested |
|---|---|
| Less than 70% | 0% |
| 70% | 33% |
| 150% (or greater) | 167% |

Linear interpolation of vesting if VWAP increase over Base Price is between 70% and 150%.

Shares which are Performance Vested shall become vested and exercisable on September 30, 2022 if Employee has not previously experienced a Termination of Employment, subject to the "Termination of Employment" section below.

#### Termination of Employment

Except as may be otherwise provided under Section 1(a), 1(b) or 1(d) of the Standard Terms and Conditions in the Employment Agreement, no shares under the 2017 Performance Option will vest after Employee experiences a Termination of Employment and any then unvested shares shall be forfeited without consideration as of such Termination of

Employment. The then vested portion of this Stock Option may remain exercisable after your Termination of Employment to the extent provided in the "Expiration Date" section above.

For the avoidance of doubt, transfers of employment among the Company and its Subsidiaries and Affiliates, without any break in service, is not a Termination of Employment.

**Exercise**

When you wish to exercise this Award, you must notify the Company by filing a "Notice of Exercise" in the form prescribed by LendingTree, Inc. at the address given on the form. Your notice must specify how many Shares you wish to purchase and is

subject to the minimum purchase limitation set forth in Plan section 5(g). The notice can only become effective after it is received and approved by the Company. If someone else wants to exercise this Stock Option after your death, that person must prove to the Company's satisfaction that he or she is entitled to do so.

When you submit your Notice of Exercise, you must include payment of the aggregate Exercise Price for the Shares you are purchasing. Payment may be made in one (or a combination) of (i) certified or bank check or (ii) to the extent approved by the Committee by any of the methods described in Plan sections 5(g)(i), 5(g)(ii), or 5(g)(iii).

**Taxes and Withholding**

No later than the date as of which an amount in respect of any part of this Award first becomes includable in your gross income for federal, state, local or foreign income or employment or other tax purposes, LendingTree, Inc. or its Subsidiaries and/or Affiliates shall, unless prohibited by law, have the right to deduct any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount due to you, including deducting such amount from the delivery of Shares or cash (at the Company's sole discretion) issued upon settlement of the Award that gives rise to the withholding requirement. In the event Shares are deducted to cover tax withholdings, the number of Shares withheld shall generally have a Fair Market Value equal to the aggregate amount of LendingTree, Inc.'s withholding obligation on the date of exercise of the Stock Option. If the event that any such deduction and/or withholding is prohibited by law, you shall, prior to or contemporaneously with the settlement of your Award, be required to pay to LendingTree, Inc., or make arrangements satisfactory to LendingTree, Inc. regarding the payment of, any federal, state, local or foreign taxes of any kind required by law to be withheld with respect to such amount. To the extent approved by the Committee, you may satisfy the applicable tax withholding amounts as permitted under Plan section 14(d).

**Non-Transferability of the Award**

Your Award shall not be transferable by you by means of sale, assignment, exchange, encumbrance, pledge, hedge or otherwise except as may be permitted under Plan section 5(j).

**No Rights as a Stockholder**

Until your Award is exercised and settled with Shares, you shall not be entitled to any rights of a stockholder with respect to the Award (including the right to vote the underlying Shares or receive dividends). Moreover, if LendingTree, Inc. declares and pays dividends on the Common Stock during the Restriction Period, this Award will not be credited with any dividends.

**Other Restrictions**

The Award shall be subject to the requirement that, if at any time the Committee shall determine that (i) the listing, registration or qualification of the Shares of Common Stock subject or related thereto upon any securities exchange or under any state or federal law, or (ii) the consent or approval of any government regulatory body is necessary or desirable as a condition of, or in connection with, the delivery of Shares, then in any such event, the Award and/or any issuance of Shares under the Award shall not be effective unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

**Conflicts and Interpretation**

In the event of any conflict between these Terms and Conditions and the 2008 Plan, the 2008 Plan shall control; provided, that an action or provision that is permissive under the terms of the 2008 Plan, and required under these Terms and Conditions, shall not be deemed a conflict and these Terms and Conditions shall control. In the event of any ambiguity in these Terms and Conditions, or any matters as to which these Terms and Conditions are silent, the 2008 Plan shall govern. In the event of (i) any conflict between the Award Notice (or any information posted on LendingTree, Inc.'s intranet or given to you directly or indirectly through the Agent (including information posted on https://www.benefitaccess.com) and LendingTree, Inc.'s books and records, or (ii) ambiguity in the Award Notice (or any information posted on LendingTree, Inc.'s intranet or given to you directly or indirectly through the Agent (including information posted on https://www.benefitaccess.com), LendingTree, Inc.'s books and records shall control.

**Amendment**

LendingTree, Inc. may modify, amend or waive the terms of your Awards, prospectively or retroactively, but no such modification, amendment or waiver shall materially impair your rights without your consent, except as required by applicable law, NASDAQ or stock exchange rules, tax rules or accounting rules.

**Data Protection**

The acceptance of your Award constitutes your authorization of the release from time to time to LendingTree, Inc. or any of its Subsidiaries or Affiliates and to the Agent (together, the "Relevant Companies") of any and all personal or professional data that is necessary or desirable for the administration of your Award and/or the 2008 Plan (the "Relevant Information"). Without limiting the above, this authorization permits your employing company to collect, process, register and transfer to the Relevant Companies all Relevant Information (including any professional and personal data that may be useful or necessary for the purposes of the administration of your Award and/or the 2008 Plan and/or to implement or structure any further grants of equity awards (if any)). The acceptance of your Award also constitutes your authorization of the transfer of the Relevant Information to any jurisdiction in which LendingTree, Inc., your employing company or the Agent considers appropriate. You shall have access to, and the right to change, the Relevant Information, which will only be used in accordance with applicable law.

**Sections 409A, 280G and 4999 of the Code**

Your Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and related rules and regulations ("Section 409A"). In no event shall LendingTree, Inc. be required to pay you any "gross-up" or other payment with respect to any taxes or penalties imposed under Section 409A (or Code Section 280G or 4999) with respect to any amounts or benefits paid to you in respect of your Award.

**Notification of Changes**

Any changes to these Terms and Conditions shall either be posted on LendingTree, Inc.'s intranet or communicated (either directly by LendingTree, Inc. or indirectly through any of its Subsidiaries, Affiliates or the Agent) to you electronically via e-mail (or otherwise in writing) after such change becomes effective.

## EXHIBIT C

### FORM OF RELEASE AGREEMENT

This Release Agreement ("Release") is entered into as of this _____ day of _____, hereinafter "Execution Date", by and between Douglas R. Lebda (hereinafter "Employee"), and LendingTree, LLC (hereinafter, "LTLLC") and LendingTree, Inc. (hereinafter, the "Company"). Employee, LTLLC and the Company are collectively referred to herein as the "Parties".

1.    The Parties were parties to an "Employment Agreement" dated September 20, 2017. Employee's employment with LTLLC was terminated effective [Month, Day, Year] (hereinafter "Termination Date"). The Parties have agreed to avoid and resolve any alleged existing or potential disagreements between them arising out of or connected with Employee's employment with LTLLC including the termination thereof. The Company and LTLLC expressly disclaim any wrongdoing or any liability to Employee. The Company and LTLLC collectively are referred to herein as the "Company Group".

2.    The Company or LTLLC agrees to provide Employee the severance benefits provided for in [Section 1(a) of the Standard Terms and Conditions of the Employment Agreement] [Section 1(b) of the Standard Terms and Conditions of the Employment Agreement] [Section 1(d) of the Standard Terms and Conditions of the Employment Agreement] [Section 1(g) of the Standard Terms and Conditions of the Employment Agreement] (the "Severance Benefits") after he executes this Release and does not revoke it as permitted in Section 8 below, the expiration of such revocation period being the "Effective Date").

3.    Employee represents that he has not filed, and will not file, any complaints, lawsuits, administrative complaints or charges relating to her employment with, or resignation from, LTLLC, excluding any action to enforce the Employment Agreement as it relates to the provision of the Severance Benefits or to Sections 3A(d) or 9; provided however that nothing contained in this Section 3 will prohibit Employee from bringing a claim to challenge the validity of the ADEA Release in Section 8 herein. Employee hereby releases the Company Group, its subsidiaries, affiliates, and their respective parents, direct or indirect subsidiaries, divisions, affiliates and related companies or entities, regardless of its or their form of business organization, any predecessors, successors, joint ventures, and parents of any such entity, and any and all of their respective past or present shareholders, partners, directors, officers, employees, consultants, independent contractors, trustees, administrators, insurers, agents, attorneys, representatives and fiduciaries, including without limitation all persons acting by, through, under or in concert with any of them (collectively, the "Released Parties"), from any and all claims, charges, complaints, causes of action or demands of whatever kind or nature that Employee now has or has ever had against the Released Parties, whether known or unknown, arising from or relating to Employee's employment with or discharge from LTLLC, including but not limited to: wrongful or tortious termination; constructive discharge; implied or express employment contracts and/or estoppel; discrimination and/or retaliation under any federal, state or local statute or regulation, specifically including any claims Employee may have under the Fair Labor Standards Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964 as amended, and the Family and Medical Leave Act; the discrimination or other employment laws of the State of North Carolina; any claims brought under any federal or state statute or regulation for non-payment of wages or other compensation, including grants of stock options or any other equity compensation; and libel, slander, or breach of contract other than the breach of this Release. This Release specifically excludes claims, charges, complaints, causes of action or demand that post-date the Execution Date.

4.    Employee agrees to keep the fact that this Release exists and the terms of this Release in strict confidence except to his immediate family and his financial and legal advisors on a need-to-know basis.

5.    Employee warrants that no promise or inducement has been offered for this Release other than as set forth herein and that this Release is executed without reliance upon any other promises or representations, oral or written. Any modification of this Release must be made in writing and be signed by Employee, LTLLC and the Company.

6.    Employee will direct all employment verification inquiries to [HR Rep]. In response to inquiries regarding Employee's employment with LTLLC, LTLLC by and through its speaking agent(s) agrees to provide only the following information: Employee's date of hire, the date her employment ended and rates of pay.

7.    If any provision of this Release or compliance by Employee or LTLLC or the Company with any provision of the Release constitutes a violation of any law, or is or becomes unenforceable or void, then such provision, to the extent only that it is in violation of law, unenforceable or void, will be deemed modified to the extent necessary so that it is no longer in violation of law, unenforceable or void, and such provision will be enforced to the fullest extent permitted by law. If such modification is not possible, such

provision, to the extent that it is in violation of law, unenforceable or void, will be deemed severable from the remaining provisions of this Release, which provisions will remain binding on each of Employee, LTLLC and the Company. This Release is governed by, and construed and interpreted in accordance with the laws of the State of North Carolina, without regard to principles of conflicts of law. Employee consents to venue and personal jurisdiction in the State of North Carolina for disputes

arising under this Release. This Release represents the entire understanding with the Parties with respect to subject matter herein, no oral representations have been made or relied upon by the Parties.

8.    In further recognition of the above, Employee hereby releases and discharges the Released Parties from any and all claims, actions and causes of action that he may have against the Released Parties, as of the date of the execution of this Release, arising under the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), and the applicable rules and regulations promulgated thereunder. Employee acknowledges and understands that ADEA is a federal statute that prohibits discrimination on the basis of age in employment, benefits and benefit plans. Employee specifically agrees and acknowledges that: (A) the release in this Section 8 was granted in exchange for the receipt of consideration that exceeds the amount to which he would otherwise be entitled to receive upon termination of his employment; (B) his waiver of rights under this Release is knowing and voluntary as required under the Older Workers Benefit Protection Act; (B) that he has read and understands the terms of this Release; (C) he has hereby been advised in writing by the Company Group to consult with an attorney prior to executing this Release; (D) the Company Group has given him a period of up to twenty-one (21) days within which to consider this Release, which period will be waived by Employee's voluntary execution prior to the expiration of the twenty-one day period; and (E) following his execution of this Release he has seven (7) days in which to revoke his release as set forth in this Section 8 only and that, if he chooses not to so revoke, the Release in this Section 8 will then become effective and enforceable and the payment listed above will then be made to his in accordance with the terms of this Release. To cancel this Release, Employee understands that he must give a written revocation to the General Counsel of the Company at [   ], either by hand delivery or certified mail within the seven-day period. If he rescinds the Release, it will not become effective or enforceable and he will not be entitled to any benefits from the Company Group.

**9.    EMPLOYEE ACKNOWLEDGES AND AGREES THAT HE HAS CAREFULLY READ AND VOLUNTARILY SIGNED THIS RELEASE, THAT HE HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF HIS/HER CHOICE, AND THAT HE SIGNS THIS RELEASE WITH THE INTENT OF RELEASING LTLLC, THE COMPANY, THEIR AFFILIATES, SUBSIDIARIES AND THEIR RESPECTIVE SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM ANY AND ALL CLAIMS.**

**ACCEPTED AND AGREED TO:**

| | |
|---|---|
| LendingTree, Inc. | Douglas R. Lebda |
| LendingTree, LLC | |
| Dated: | Dated: |

# EXHIBIT C

EX-10.2 3 tree-2018331x10qexx102.htm EXHIBIT 10.2

Exhibit 10.2

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("Agreement") is made and entered into made this 2nd day of January 2018 by and between Neil Salvage ("Executive") and LendingTree, Inc. (the "Company") and LendingTree, LLC ("LTLLC" which as of the Effective Date, as defined below, is a wholly-owned subsidiary of the Company; LTLLC and the Company are collectively the "Company Group") (each a "Party" and collectively, the "Parties").

1.        Employment. LTLLC shall employ Executive and Executive agrees to be employed as President. Executive shall do and perform all services and acts necessary or advisable to fulfill the duties and responsibilities as are commensurate and consistent with Executive's position and shall render such services on the terms set forth herein. Further, Executive shall perform such different or other duties as may be assigned to Executive by LTLLC from time to time by its Chief Executive Officer. As a fiduciary of the Company Group, Executive will devote Executive's full working time and best efforts to the diligent and faithful performance of such duties as may be entrusted to Executive from time to time by Company Group, and shall observe and abide by the corporate policies and decisions of the Company Group in all business matters. Executive's principal place of employment shall be the offices of the Company Group located in Charlotte, North Carolina; provided, however, that travel to the Company Group's other offices or places of business activity may be required. Executive acknowledges that Company Group may, in its sole discretion from time to time, change Executive's responsibilities or Executive's direct/indirect reports without any effect hereunder.

2.        Term.

(a)        Initial Term. Executive's employment shall be governed by the terms of this Agreement for the period beginning on October 22, 2017 (the "Effective Date") and ending October 22, 2021, unless earlier terminated as provided herein (the "Initial Term"). This Agreement will expire by its terms unless renewed in the manner set forth in Section 2.b below.

(b)        Renewal Terms. Upon the written request of the Executive to extend the Executive's employment under this Agreement beyond the Initial Term or any Renewal Term at least ninety (90) days prior to the expiration of the Agreement, the Compensation Committee of the Company's Board of Directors (the "Compensation Committee") shall consider extending the term of this Agreement. If Executive's request for an extension is approved by the Compensation Committee, this Agreement shall be extended by one additional year. Any such additional one-year period shall be referred to as a "Renewal Term" and, together with the Initial Term, the "Term." In no event, however, shall Executive's employment under this Agreement extend beyond seven (7) years. For purposes of clarity, if the Agreement is not renewed in accordance with this Section 2.b, the Agreement shall automatically expire at the end of the Term. Such expiration shall not entitle Executive to any compensation or benefits except as earned by Executive through the date of expiration of the Term. For the avoidance of doubt, following the expiration of the Term, any continued employment of Executive by LTLLC will be on an "at will" basis.

3.        Compensation. LTLLC shall pay and Executive shall accept as full consideration for the services to be rendered hereunder compensation consisting of the items listed below. LTLLC shall have no obligation to pay any such compensation for any period after the termination of Executive's employment, except as otherwise expressly provided.

(a)        Base Salary. Base salary, paid pursuant to LTLLC's normal payroll practices, at an annual rate of $450,000 or such other rate as may be established prospectively by the Compensation Committee from time to time ("Base Salary"). All such Base Salary payments shall be subject to deduction and withholding authorized or required by applicable law.

(b)        Annual Bonus Award. During the Term, the Executive shall be eligible to receive a target annual bonus award ("Annual Bonus") of up to 100% of Executive's Base Salary ("Annual Bonus Percentage") with respect to each fiscal year of the Company (each a "Performance Year") during the Term. The terms and conditions of the Annual Bonus, including the applicable performance criteria for a Performance Year, and the amount of the Annual Bonus payable to the Executive for a Performance Year, if any, shall be determined by the Compensation Committee pursuant to an annual bonus plan for executive employees (the "Annual Bonus Plan"). If more than one Base Salary was

in effect during the Performance Year, the Annual Bonus Percentage (after it is determined pursuant to the Annual Bonus Plan), will be multiplied by each Base Salary in effect during the Performance Year, on a pro rata basis. The Company may amend the Bonus Plan from time to time in its sole discretion. Except as expressly provided in this Agreement, the Annual Bonus will be paid in accordance with the Annual Bonus Plan, and is subject to discretionary adjustments based on individual performance. Executive shall not earn an Annual Bonus or any portion thereof if Executive is not employed under this Agreement on the applicable date specified for payment in the Annual Bonus Plan, except as set forth in the Annual Bonus Plan.

(c)   <u>Equity Incentives</u>. Executive acknowledges receipt on October 22, 2017 of long-term equity incentive awards under the Company's Fifth Amended and Restated 2008 Stock and Annual Incentive Plan, as may be amended (or replaced) by the Company (the "2008 Plan"), in anticipation of entry into this Agreement.

During the Term, Executive shall be eligible to receive additional equity incentives, as determined in the sole discretion of the Compensation Committee, including, but not limited to awards under the 2008 Plan. Subject to the discretion of the Compensation Committee, equity incentives may be granted to Executive at the time the Company normally grants such incentives generally and otherwise in accordance with applicable policies, practices, terms and conditions (including, but not limited to, vesting requirements), and provided further that Executive is employed by LTLLC on the date such incentives are awarded.

4.   <u>Additional Terms</u>. Attached as <u>Exhibit A</u> hereto and deemed a part hereof is the LendingTree Additional Terms and Conditions of Employment Agreement (the "Additional Terms"), all of the terms of which are incorporated herein by reference and are binding on the Parties.

5.   <u>Entire Agreement; Amendments.</u> This Agreement, which includes the Additional Terms and the exhibits thereto, contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may be amended in whole or in part only by an instrument in writing setting forth the particulars of such amendment and duly executed by all Parties.

By their signature below, the Parties acknowledge and agree that they have carefully read each and every provision of this Agreement, including the Additional Terms and the exhibits thereto, that they understand its terms, that all understandings and agreements between them relating to the subjects covered in this Agreement are contained in it, and that they have entered into the Agreement voluntarily. Executive further acknowledges and agrees that Executive has been advised to and given the opportunity to discuss this Agreement with Executive's private legal counsel and Executive has taken advantage of that opportunity to the extent Executive wished to do so.

IN WITNESS WHEREOF, the Company Group has caused this Agreement to be executed and delivered by its duly authorized officer and Executive has executed and delivered this Agreement as of the Effective Date.

LENDINGTREE, INC.

By:        /s/ Claudette Parham
Name:      Claudette Parham
Title:     Chief Human Resources and Administrative Officer

LENDINGTREE, LLC

By:        /s/ Claudette Parham
Name:      Claudette Parham
Title:     Chief Human Resources and Administrative Officer

EXECUTIVE

By:        /s/ Neil Salvage
Name:      Neil Salvage

Title: President

**EXHIBIT A**

**LENDINGTREE ADDITIONAL TERMS AND CONDITIONS OF**

**EMPLOYMENT AGREEMENT**

1.    <u>Definitions</u>:

    (a)    "Accrued Obligations" means the sum of (i) Executive's earned but unpaid Base Salary through the date of termination, (ii) in the case of termination for Death or Disability only, any portion of Executive's unpaid Annual Bonus relating to a previously completed Performance Year, (iii) any compensation previously earned but deferred by Executive (together with any interest or earnings thereon) that has not yet been paid and that is not otherwise to be paid at a later date pursuant to the executive deferred compensation plan of the Company, if any, (the "Deferred Compensation", and (iv) reimbursements that Executive is entitled to receive under Section 8 of these Additional Terms.

    (b)    "Cause" shall be determined by LTLLC in its discretion and includes (i) Executive's fraud, dishonesty, theft, or embezzlement, (ii) misconduct by Executive injurious to the Company Group or any of its affiliates, (iii) Executive's conviction of, or entry of a plea of guilty or *nolo contendere* to, a crime that constitutes a felony or other crime involving moral turpitude, (iv) Executive's competition with the Company Group or any of its affiliates; (v) Executive's unauthorized use of any trade secrets of the Company Group or any of its affiliates or Confidential Information (as defined in the Confidentiality Agreement), (vi) a material violation by Executive of any policy, code or standard of ethics generally applicable to employees of the Company Group, (vii) Executive's material breach of fiduciary duties owed to the Company Group, (viii) Executive's excessive and unexcused absenteeism unrelated to a disability, (ix) following written notice and a reasonable opportunity to cure, gross neglect by Executive of the duties assigned to Executive, or (x) Executive's failure or refusal to cooperate in any Company investigation.

    (c)    "Disability" means a medical condition, whether physical or mental, that renders, and for a consecutive six-month period has rendered, Executive unable to perform the essential functions of Executive's position, with or without reasonable accommodation. A return to work of less than 14 consecutive days will not be considered an interruption in Executive's six consecutive months of disability. Disability will be determined by LTLLC on the basis of medical evidence satisfactory to LTLLC.

    (d)    "Good Reason" means the occurrence of any of the following without Executive's written consent: (i) material adverse change in the office to which Executive reports from that in effect immediately following the Effective Date, excluding for this purpose any such change that is an isolated and inadvertent action not taken in bad faith and that is remedied by the Company Group or that is authorized pursuant to this Agreement and further excluding a change in the office to which Executive reports due to internal restructuring, realignment or the resignation, promotion, demotion or a reorganization of managers within, or a sale of, the Company Group; (ii) material reduction in Executive's annual base salary (except as part of an enterprise wide reduction of salaries for all similarly situated executives); or (iii) relocation of Executive's principal place of business more than 50 miles from the location of the principal office from which Executive conducts Executive's principal activities. In order to resign employment for Good Reason, Executive must notify the Company Group in writing within fifteen (15) days of the initial existence of any event falling under (i) - (iv) and such notice shall describe in detail the facts and circumstances explaining why Executive believes a Good Reason event has occurred. The Company Group shall then have sixty (60) days following its receipt of such notice to cure or remedy such alleged Good Reason event such that Good Reason will not be deemed to exist for such event. If the event remains uncured or is not remedied by the Company Group within such sixty (60) day period and if Executive's employment has not otherwise been terminated, then a Qualifying Termination shall automatically occur on the first business day following the end of such sixty (60) day cure/remedy period.

    (e)    "Pro-Rated Annual Bonus" means a cash lump-sum payment in an amount equal to the pro-rated portion of Executive's Annual Bonus for the Company's fiscal year in which the Qualifying Termination occurs based on actual performance achieved for such year (as if the entire Annual Bonus was based solely on the applicable Company performance metrics and without regard to any assessment of personal performance), with such proration based on the ratio of the number of days employed during such year to 365.

    (f)    "Qualifying Termination" means a termination of Executive's employment with LTLLC prior to the expiration of the Term by Executive for Good Reason or by the Company Group without Cause (other than for death or Disability).

(g)        "Release of Claims" means a general release of all known and unknown claims against the Company Group and their affiliates in the form attached hereto as Exhibit 1, as updated by the Company to reflect changes in the law.

2.     <u>Resignation from Officer and Director Roles</u>. Effective as of the termination of Executive's employment with the Company, regardless of the reason for or the timing of such termination, Executive agrees to and shall be deemed to have resigned effective immediately from all roles Executive holds with the Company Group, including without limitation as an officer or director. Such resignations shall not limit or otherwise waive any rights Executive may have to payments and benefits under this Agreement.

3.     <u>Termination Due to Disability or Death</u>.

(a)     <u>Disability</u>. If at any time during the Term of this Agreement, Executive incurs a Disability, then Executive's employment shall be immediately terminated as of the date of Executive's Disability. Upon Executive's Disability, LTLLC shall pay Executive the Accrued Obligations; provided that Annual Bonus awards relating to a previously-completed Performance Year shall be paid on the date that such awards are paid by LTLLC to other similarly situated executives in accordance with the Annual Bonus Plan.

(b)     <u>Death</u>. If Executive should die during the Term, Executive's employment and the Company Group's obligations hereunder shall terminate as of Executive's death. In such event, LTLLC shall pay Executive's estate the Accrued Obligations; provided that Annual Bonus awards relating to a previously completed Performance Year shall be paid on the date that such awards are paid by LTLLC to other similarly situated executives in accordance with the Annual Bonus Plan.

4.     <u>Termination by the Company Group During the Term</u>.

(a)     <u>Cause</u>. The Company Group may terminate the employment of Executive under this Agreement during its Term for Cause. In such event, LTLLC shall pay Executive the Accrued Obligations. Executive shall retain only such rights to participate in other benefits as are required by the terms of those plans, the Company Group's policies, or applicable law.

(b)     <u>Termination by the Company Group other than for Death, Disability or Cause</u>. Upon a Qualifying Termination that is not upon or at any time during the 12-month period following the occurrence of a Change of Control, LTLLC shall pay Executive the amounts described below. For the avoidance of doubt, expiration of the Term is not a Qualifying Termination. Notwithstanding the foregoing, Executive shall receive the payments and benefits described in subsections (ii) - (iv) below only if Executive executes and does not revoke a Release of Claims and Executive complies with the restrictive covenants set forth in the Confidentiality Agreement attached hereto as Exhibit 1. If Executive does not execute the Release of Claims within sixty (60) days following the Qualifying Termination, or if Executive revokes the Release of Claims (the end of the permitted revocation period following execution without revocation being exercised, the "Release Effective Date"), Executive shall not be entitled to the payments and benefits described in subsections (ii) - (iv) below.

(i)     Any Accrued Obligations.

(ii)     An amount equal to one (1) year of Executive's then-current Base Salary, payable in installments on LTLLC's regularly scheduled payroll dates over the one (1) year period following the date of such Qualifying Termination ("Salary Continuation Payments") beginning on the regularly scheduled payroll date immediately following the effective date of the Release of Claims. Notwithstanding the foregoing, if the Salary Continuation Payments are determined to be "nonqualified deferred compensation" that is subject to Section 409A (as defined below), then the first installment shall be made on the sixtieth (60th) day following the date of Executive's Qualifying Termination and shall include the amount of all payments that would have been made after the effective date of the Release of Claims but before the sixtieth (60th) day following such Qualifying Termination, and the remaining Salary Continuation Payments shall be payable in installments on LTLLC's regularly scheduled paydays following the sixtieth (60th) day following such Qualifying Termination.

(iii)     If Executive properly elects COBRA continuation coverage, the Company will reimburse Executive for his COBRA premiums on the same terms and conditions, and at the same level in effect at the time of termination of Executive's employment, upon submission of proof of payment, until the earlier of: (1) one (1) year from the date of Executive's loss of coverage, or (2) the date Executive obtains replacement health care coverage through a new employer.

(iv)     Executive's (a) then outstanding unvested Restricted Stock Units ("RSUs") or Restricted Stock issued pursuant to the 2008 Plan and scheduled to vest within nine months of the Qualifying Termination, if any, shall become vested on the effective date of the Release of Claims, and (b) then outstanding unvested Options to purchase common stock ("Options") issued pursuant to the 2008 Plan and scheduled to vest within nine months of the Qualifying Termination, if any, shall become

vested and exercisable on the effective date of the Release of Claims. Notwithstanding the foregoing, this subsection (iv) shall not apply to any award under the 2008 Plan to the extent such award expressly states that its vesting acceleration terms take precedence over anything to the contrary in an employment agreement. All RSUs that vest pursuant to this subsection (iv) shall be settled in accordance with the grant terms of such RSUs. All Options that vest pursuant to this subsection (iv) shall remain

cat

exercisable only to the extent permitted under the grant terms of such Options. All other unvested RSUs, Restricted Stock and Options issued to Executive pursuant to the 2008 Plan and which are not covered by the foregoing clauses (a) and (b) shall terminate without consideration as of the date of such Qualifying Termination. Additionally, if the Release of Claims does not take effect, then the RSUs or Options that were covered by the foregoing clauses (a) and (b) shall terminate without consideration as of the 61st day following the date of such Qualifying Termination.

Notwithstanding the foregoing, if Executive obtains other employment or is otherwise compensated for services during the period in which Executive is receiving Salary Continuation Payments (the "Severance Period"), LTLLC's obligation to make future payments to Executive under subsections (ii) and (iii) above shall be offset against any compensation earned by Executive as a result of employment with or services provided to a third party; notwithstanding the above, Executive shall receive a guaranteed minimum Salary Continuation Payment of Five Hundred Dollars ($500.00) regardless of any compensation earned from third parties during the Severance Period ("Guaranteed Minimum Severance Payment"). Executive agrees to inform the Company Group promptly of Executive's employment status and any amounts so earned during the Severance Period. Further, LTLLC's obligation to make payments under subsections (ii) and (iii) above shall immediately cease in the event that Executive breaches the terms of this Agreement (including these Additional Terms) or the Confidentiality Agreement, including but not limited to Executive's obligations set forth in Section 9 of this Agreement. Executive acknowledges and agrees that the payments described in Section 3(b) above, or any portion thereof, including without limitation the Guaranteed Minimum Severance Payment, constitute good and valuable consideration for the Release of Claims.

5.      <u>Termination After the Term</u>. If Executive's employment continues beyond the Term, Executive's employment shall be at will. In other words, after the Term, the Company Group and Executive may terminate the employment relationship at any time, for any reason, with or without cause. The Company Group retains the right to transfer, demote, or suspend Executive without cause and without notice, at any time. If Executive's employment is terminated after the Term, regardless of whether the termination was with or without Cause, or by Executive for "Good Reason", Executive shall be entitled to receive only the Accrued Obligations.

6.      <u>Change of Control</u>. For purposes of this Agreement, a "Change of Control" results when: (i) any person or entity, other than Doug Lebda or persons or entities having beneficial ownership of securities of the Company also beneficially owned by Doug Lebda, becomes a beneficial owner, directly or indirectly, of securities of the Company representing fifty percent or more of the total voting power of all of the Company's then outstanding voting securities, (ii) a merger or consolidation of the Company in which the Company's voting securities immediately prior to the merger or consolidation do not represent, or are not converted into securities that represent, a majority of the voting power of all voting securities of the surviving entity immediately after the merger or consolidation, or (iii) a sale of all or substantially all of the assets of the Company or a liquidation or dissolution of the Company. For purposes of defining Change of Control, "Company" refers to LendingTree, Inc. as a whole and does not apply to events only affecting specific businesses or subsidiaries of LendingTree, Inc. To the extent necessary to comply with Section 409A (as defined below), a Change of Control must also constitute a "change in control event" within the meaning of Section 409A.

(a)      If a Change of Control occurs while Executive is employed by LTLLC then the following benefits will be provided to Executive automatically upon the Change of Control: (i) all then-outstanding unvested equity awards held by Executive that are scheduled to vest based solely on time will become fully vested and immediately exercisable immediately prior to such Change of Control; and (ii) all then-outstanding unvested Company compensatory equity awards held by Executive that are subject to performance-based vesting will vest based on the actual level of achievement of the applicable performance goals measured as of (or within five business days before) the date of such Change of Control; provided, that any portion of the award that does not vest as of such date will be forfeited without consideration upon the Change of Control;

(b)      In the event that Executive experiences a Qualifying Termination upon or at any time during the 12-month period following the occurrence of a Change of Control, then Executive will receive (x) payment of the Accrued Obligations within thirty (30) days of such termination (or earlier, to the extent required by applicable law) and (y) the payments and benefits described in clauses (i) through (iii) below, but (with respect to clauses (i) through (iii) below) only if Executive timely executes and does not revoke the Release of Claims and Executive complies in all material respects with Executive's obligations under the Confidentiality Agreement, as defined below. If Executive does not execute the Release of Claims within sixty (60) days following the date of such Qualifying Termination, or if Executive revokes the Release of Claims before the Release Effective Date, Executive will not be entitled to the payments and benefits described in clauses (i) through (iii) below. For avoidance of doubt, if Executive experiences a Qualifying Termination upon or at any time during the 12-month period following the occurrence of a Change of Control, then Executive will not be eligible to receive any payments or benefits under Section 3(b) herein. There is no requirement for Executive to mitigate the benefits provided in clauses (i) through (iii) below.

        (i)        A cash lump sum severance payment in an amount equal to the sum of (x) 200% of Executive's then-current Base Salary plus (y) 200% of Executive's target annual bonus for the bonus program in effect for Executive for the

year in which Executive's employment terminates plus (z) the Pro-Rated Annual Bonus, payable on the regularly scheduled payroll date immediately following the Release Effective Date;

(ii) With respect to Executive's then-outstanding vested stock options, Executive will be able to exercise such vested stock options until the earliest of (x) their applicable expiration date, (y) the date of a change of control of the Company in which the applicable stock option is not being assumed, continued, substituted for or otherwise replaced as of such change of control, or (z) the second anniversary of the date of Qualifying Termination; and

(iii) Subject to the terms and conditions of Section 3(b)(iii), Executive will be entitled to receive the continuation of health care coverage benefit under Section 3(b)(iii).

(c) To the extent that Executive and the Company are parties to a Change of Control Letter Agreement, such prior agreement is hereby superseded and terminated as of the Effective Date and is of no further force or effect.

7. <u>Confidentiality, Work Product and Restrictive Covenant Agreement</u>. As a condition of Executive's employment, Executive agrees to execute the Confidentiality, Work Product and Restrictive Covenant Agreement (the "Confidentiality Agreement") attached hereto as <u>Exhibit 2</u>. Executive agrees and acknowledges that the benefits received by Executive pursuant to this Agreement, including but not limited to those set forth in Section 3 of this Exhibit A, constitute good and valuable consideration for Executive's obligations under the Confidentiality Agreement.

8. <u>Employee Benefits</u>.

(a) <u>Paid Time Off</u>. During the Term, Executive shall be entitled to take paid time off, in accordance with applicable plans, policies, programs, practices and legal requirements applicable to similarly-situated employees generally.

(b) <u>Other</u>. Executive shall be entitled to such other benefits, payments, or items of compensation as are provided under the employee benefit plans of LTLLC or as are made available from time to time under compensation policies set by LTLLC for management employees of LTLLC having similar salary and level of responsibility. Employee acknowledges that Employee's eligibility for and participation in any such plan or program shall be subject to and controlled by the terms and conditions of such plans and programs, and that LTLLC makes no representation or agreement that any particular plan currently exists, will be maintained (in its present form, or at all), or will be established in the future.

9. <u>Reimbursement</u>. The Company Group shall reimburse Executive, in accordance with applicable law and the general policies and practices of the Company Group as in effect from time to time, for reasonable out-of-pocket expenses incurred by Executive in the ordinary course of business, including without limitation, the Company Group's standard mileage allowance for business use of any personal vehicle, business related travel, customer entertainment, and professional organizations.

10. <u>Actions After Termination</u>. Executive agrees that for one (1) year following Executive's termination of employment, regardless of the reason for the termination, Executive will continue to make himself or herself available for reasonable consultation with the Company Group and the Company Group's agents and employees regarding Executive's prior work for the Company Group. In addition, Executive shall make himself or herself reasonably available for interviews by the Company Group's counsel, depositions, and/or appearances before courts or administrative agencies upon the Company Group's reasonable request. Executive agrees that if at any time following termination Executive is contacted by any government agency, regulator or bureau, by any stock or listing exchange or any self-regulatory organization, or by any customer of the Company Group, with reference to the Company Group's business, or by any person contemplating or maintaining any claim or legal action against the Company or LTLLC, or by any agent or attorney of such person, Executive will, to the fullest extent permitted by law, promptly notify the Company Group of the substance of Executive's communications with such person and shall cooperate with the Company Group in defense of such claim or legal action. The Company Group agrees to reimburse any reasonable third party expenses incurred by Executive in connection with this Section 9, provided that such expenses shall have been preapproved in writing by the Company Group.

11. <u>Taxes</u>. All payments made under this Agreement shall be subject to the Company Group's withholding of all required foreign, federal, state and local income and employment/payroll taxes, and all payments shall be net of such tax withholding.

12.    <u>Recoupment</u>. Notwithstanding anything to the contrary in this Agreement, any payments made or granted pursuant to this Agreement shall be subject to any recoupment or clawback policy that may be adopted by the Company Group from time to time and to any requirement of applicable law, regulation or listing standard that requires the company to recoup or claw back compensation paid.

13.    <u>Non-Disparagement</u>. From and after a Qualifying Termination, Executive agrees not to disparage the Company Group or any officers, directors, employees, shareholders, parent companies, affiliates or agents of the Company Group (each an

"Employer Party"). For purposes of this Section, "disparage" means to make a negative statement in any manner that is intended to be or is likely to be harmful to an Employer Party, its business or business reputation or personal reputation; provided that nothing in this Agreement is intended to prohibit or shall prohibit Executive from providing truthful information or testimony in connection with any legal or regulatory investigation or proceeding. This Agreement shall cover all forms of disparagement, direct or indirect, through any medium or in any venue.

14.    Section 280G Limitation. Notwithstanding anything in this Agreement to the contrary, in the event that any payment or benefit received or to be received by Executive (all such payments and benefits being hereinafter referred to as the "Total Payments") would not be deductible (in whole or part) by the Company Group or any affiliates making such payment or providing such benefit as a result of Section 280G of the U.S. Internal Revenue Code of 1986, as amended (the "Code") then, to the extent necessary to make such portion of the Total Payments deductible (and after taking into account any reduction in the Total Payments required by any similar reduction or elimination provision contained in such other plan, arrangement or agreement), the portion of the Total Payments that does not constitute "nonqualified deferred compensation" under Section 409A of the Code shall first be reduced (if necessary, to zero), and all other Total Payments shall thereafter be reduced (if necessary, to zero) with, in each case, cash payments being reduced before non-cash payments (and, within each category, payments to be paid last being reduced first); provided, however, that such reduction shall only be made if the amount of such Total Payments, as so reduced (and after subtracting the net amount of federal, state and local income taxes on such reduced Total Payments) is greater than or equal to the amount of such Total Payments without such reduction (but after subtracting the net amount of federal, state and local income taxes on such Total Payments and the amount of the excise tax imposed under Section 4999 of the Code on such unreduced Total Payments). Any determination required to be made under this Section shall be made by independent tax counsel reasonably acceptable to both Executive and the Company, and shall be paid for by the Company ("Tax Counsel").

It is possible that, after the determinations and selections made pursuant to the foregoing paragraph, Executive will receive payments and/or benefits that are, in the aggregate, either more or less than the amount determined under such paragraph (hereafter referred to as an "Excess Payment" or "Underpayment", as applicable). If Tax Counsel determines that an Excess Payment has been made, then Executive shall promptly repay the Excess Payment to the Company, together with interest on the Excess Payment at the applicable federal rate (as defined in section 1274(d) of the Code) from the date of Executive's receipt of such Excess Payment until the date of such repayment. If Tax Counsel determines that an Underpayment has occurred, the Company Group shall promptly (but in any event within ten (10) days of such determination) pay to Executive an amount equal to the Underpayment, together with interest on such amount at the applicable federal rate from the date such amount would have been paid to Executive had the provisions of the foregoing paragraph not been applied until the date of payment.

15.    Section 409A. The Parties intend that any amounts payable hereunder shall comply with or be exempt from Section 409A of the Code ("Section 409A") (including under Treasury Regulation §§ 1.409A-1(b)(4) ("short-term deferrals") and (b)(9) ("separation pay plans," including the exceptions under subparagraph (iii) and subparagraph (v)(D)) and other applicable provisions of Treasury Regulation §§ 1.409A-1 through A-6). For purposes of Section 409A, each of the payments that may be made under this Agreement shall be deemed to be a separate payment. Executive and the Company Group agree to negotiate in good faith to make amendments to the Agreement, as the Parties mutually agree are necessary or desirable to avoid the imposition of taxes, penalties or interest under Section 409A. Neither Executive nor the Company Group shall have the right to accelerate or defer the delivery of any such payments or benefits except (i) where payment may be made within a certain period of time, the timing of payment within such period will be in the sole discretion of the Company Group, and (ii) to the extent specifically permitted or required by Section 409A. With respect to the time of payments of any amounts under the Agreement that are "deferred compensation" subject to Section 409A, references in the Agreement to "termination of employment" (and substantially similar phrases) shall mean "separation from service" within the meaning of Section 409A. Notwithstanding anything in this Agreement to the contrary, if Executive is considered a "specified employee" under Section 409A upon Executive's separation from service and if payment of any amounts on account of Executive's separation from service under this Agreement is required to be delayed for a period of six months after separation from service in order to avoid taxation under Section 409A, payment of such amounts shall be delayed as required by Section 409A, and the accumulated amounts shall be paid in a lump sum payment within five business days after the end of the six-month delay period. If Executive dies during the six-month delay period prior to the payment of benefits, the amounts withheld on account of Section 409A shall be paid to the personal representative of Executive's estate within 60 days after the date of Executive's death. For the avoidance of doubt, it is intended that any expense reimbursement made to Executive hereunder shall be exempt from Section 409A. Notwithstanding the foregoing, if any expense reimbursement made hereunder shall be determined to be "deferred compensation" within the meaning of Section 409A, then (i) the amount of the expense reimbursement during one taxable year shall not affect the amount of the expense reimbursement during any other taxable year, (ii) the expense reimbursement shall be made on or before the last day of Executive's taxable year following the year in which the expense was incurred and (iii) the right to expense reimbursement hereunder shall not be subject to liquidation or exchange for another benefit. While it is intended that all payments and benefits provided to

Executive under this Agreement will be exempt from or comply with Section 409A, the Company Group makes no representation or covenant to ensure that such payments and benefits are exempt from or compliant with Section 409A. The Company Group will have no liability to Executive

or any other party if a payment or benefit under this Agreement or otherwise is challenged by any taxing authority or is ultimately determined not to be exempt or compliant. Executive further understands and agrees that Executive will be entirely responsible for any and all taxes imposed on Executive as a result of this Agreement.

16.     <u>Confidentiality</u>. The Parties represent and agree they will keep the terms of this Agreement completely confidential, and that none of the Parties will hereafter disclose any information concerning the terms of this Agreement to anyone, including, but not limited to, the public, press and media representatives, investors, and any past, present or prospective employee or applicant for employment of the Company Group; provided that:

(a)     The Company Group may disclose the terms of this Agreement to the extent required by applicable securities laws, regulations and interpretations of the Securities and Exchange Commission or the rules of any stock exchange upon which the Company Group's securities trade;

(b)     Executive may disclose information regarding Executive's wages solely as permitted by under California Labor Code section 232, and information regarding this Agreement to Executive's immediate family, financial and tax advisors, and legal counsel, but Executive shall be responsible for any disclosure made by such persons in violation hereof;

(c)     The Company Group may disclose information as is necessary for the administration of the Agreement; and

(d)     Any Party may take any action authorized hereby or by law to enforce this Agreement or to recover damages for its breach, and no disclosure incidental thereto or made as a result of legal process (such as, for example, responses to interrogatories, subpoenas or other legal process) shall be deemed a violation hereof.

17.     <u>Agreement to Arbitrate</u>. The Parties agree to resolve all disputes with each other as set forth the Executive Dispute Resolution Agreement that is attached hereto as <u>Exhibit 3</u> and incorporated herein by reference.

18.     <u>Assignment</u>. This Agreement is personal in its nature and none of the Parties hereto may, without the consent of the others, assign or transfer this Agreement or any rights or obligations hereunder; provided that, in the event of a merger, consolidation, transfer, reorganization, or sale of all, substantially all or a substantial portion of the assets of the Company or LTLLC with or to any other individual or entity, this Agreement will, subject to the provisions hereof, be binding upon and inure to the benefit of such successor and such successor (including the Company upon assignment of this Agreement) must discharge and perform all the promises, covenants, duties, and obligations of the Company Group hereunder, and all references herein to the "Company" or "LTLLC" or "Company Group" will refer to such successor.

19.     <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be given by first-class mail, certified or registered with return receipt requested or by hand delivery, or by overnight delivery by a national recognized carrier, in each case to the applicable address set forth below, and any such notice is deemed effectively given which received by recipient (or if receipt is refused by recipient, when so refused):

If to the Company Group:       LendingTree, Inc.
                                 11115 Rushmore Dr.
                                 Charlotte, NC 28277
                                 Attn: Chief Human Resources Officer

If to Executive:                    At the most recent address for Executive on file with the Company Group.

Any Party may change such Party's address for notices by notice duly given pursuant hereto.

20.     <u>Invalid Provisions.</u> It is not the intention of any Party to violate any public policy, or any statutory or common law. If any sentence, paragraph, clause or combination of the same in this Agreement is in violation of the law of any State where applicable, such sentence, paragraph, clause or combination of the same shall be void in the jurisdictions where it is unlawful, and the remainder of the Agreement shall remain binding on the Parties. However, the Parties agree, and it is their desire that a court should

substitute for each such illegal, invalid or unenforceable covenant a reasonable and judicially-enforceable limitation in its place, and that as so modified the covenant shall be as fully enforceable as if set forth herein by the Parties themselves in the modified form.

21.    _Multiple Counterparts_. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.

22.    <u>Survival</u>. Upon any termination of this Agreement or of Executive's employment, the provisions of Sections 5, 7, and 10 through 23 of this Exhibit A to the Agreement, the General Release (Exhibit 1), the Confidentiality Agreement (Exhibit 2), and the Executive Dispute Resolution Agreement (Exhibit 3) shall survive to the extent necessary to give effect to the provisions thereof.

23.    <u>Governing Law; Jurisdiction</u>. The validity, construction, interpretation and enforceability of this Agreement and any dispute arising hereunder shall be determined and governed by the laws of the state in which the principal office from which Executive conducts Executive's principal activities is located at the time of Executive's termination of employment or at the time the dispute arises if prior to termination of employment ("Applicable State"). Any litigation in court permitted under this Agreement shall be brought by any Party exclusively in the Applicable State. In addition, and to the extent permitted by the law of the Applicable State, the Parties irrevocably waive any right to a trial by jury in any such action related to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed and delivered these Additional Terms and Conditions of Employment Agreement as of the date(s) written below.

LENDINGTREE, INC.

By:      /s/ Claudette Parham

Name:      Claudette Parham

Title:      Chief Human Resources and Administrative Officer

LENDINGTREE, LLC

By:      /s/ Claudette Parham

Name:      Claudette Parham

Title:      Chief Human Resources and Administrative Officer

EXECUTIVE

By:      /s/ Neil Salvage

Name:      Neil Salvage

Title:      President

## Exhibit 1

**General Release Agreement**

### Exhibit 2

**Confidentiality. Work Product and Restrictive Covenant Agreement**

## Exhibit 3

**Executive Dispute Resolution Agreement**

# EXHIBIT D

**Exhibit 10.1**

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made and entered into this 21st day of December 2017 by and between John David Moriarty ("Executive") and LendingTree, Inc. (the "Company") and LendingTree, LLC ("LTLLC" which as of the Effective Date, as defined below, is a wholly-owned subsidiary of the Company; LTLLC and the Company are collectively the "Company Group") (each a "Party" and collectively, the "Parties").

1.　　__Employment__. LTLLC shall employ Executive and Executive agrees to be employed as Chief Financial Officer. Executive shall do and perform all services and acts necessary or advisable to fulfill the duties and responsibilities as are commensurate and consistent with Executive's position and shall render such services on the terms set forth herein. Further, Executive shall perform such different or other duties as may be assigned to Executive by LTLLC from time to time by its Chief Executive Officer. As a fiduciary of the Company Group, Executive will devote Executive's full working time and best efforts to the diligent and faithful performance of such duties as may be entrusted to Executive from time to time by Company Group, and shall observe and abide by the corporate policies and decisions of the Company Group in all business matters. Executive's principal place of employment shall be the offices of the Company Group located in Charlotte, North Carolina; provided, however, that travel to the Company Group's other offices or places of business activity may be required. Executive acknowledges that Company Group may, in its sole discretion from time to time, change Executive's responsibilities or Executive's direct/indirect reports without any effect hereunder. The Parties acknowledge that Executive relocated to Charlotte, North Carolina in order to provide services to the Company under this Agreement.

2.　　__Term__.

(a)　　__Initial Term__. Executive's employment shall be governed by the terms of this Agreement for the period beginning on August 31, 2017 (the "Effective Date") and ending August 31, 2021, unless earlier terminated as provided herein (the "Initial Term"). This Agreement will expire by its terms unless renewed in the manner set forth in Section 2.b below.

(b)　　__Renewal Terms__. Upon the written request of the Executive to extend the Executive's employment under this Agreement beyond the Initial Term or any Renewal Term at least ninety (90) days prior to the expiration of the Agreement, the Compensation Committee of the Company's Board of Directors (the "Compensation Committee") shall consider extending the term of this Agreement. If Executive's request for an extension is approved by the Compensation Committee, this Agreement shall be extended by one additional year. Any such additional one-year period shall be referred to as a "Renewal Term" and, together with the Initial Term, the "Term." In no event, however, shall Executive's employment under this Agreement extend beyond seven (7) years. For purposes of clarity, if the Agreement is not renewed in accordance with this Section 2.b, the Agreement shall automatically expire at the end of the Term. Such expiration shall not entitle Executive to any compensation or benefits except as earned by Executive through the date of expiration of the Term. For the avoidance of doubt, following the expiration of the Term, any continued employment of Executive by LTLLC will be on an "at will" basis.

3.　　__Compensation__. LTLLC shall pay and Executive shall accept as full consideration for the services to be rendered hereunder compensation consisting of the items listed below. LTLLC shall have no obligation to pay any such compensation for any period after the termination of Executive's employment, except as otherwise expressly provided.

(a)　　__Base Salary__. Base salary, paid pursuant to LTLLC's normal payroll practices, at an annual rate of $400,000 or such other rate as may be established prospectively by the Compensation Committee from time to time ("Base Salary"). All such Base Salary payments shall be subject to deduction and withholding authorized or required by applicable law.

(b)　　__Annual Bonus Award__. During the Term, the Executive shall be eligible to receive a target annual bonus award ("Annual Bonus") of up to 75% of Executive's Base Salary ("Annual Bonus Percentage") with respect to each fiscal year of the Company (each a "Performance Year") during the Term. The terms and conditions of

the Annual Bonus, including the applicable performance criteria for a Performance Year, and the amount of the Annual Bonus payable to the Executive for a Performance Year, if any, shall be determined by the Compensation Committee pursuant to an annual bonus plan for executive employees (the "Annual Bonus Plan"). If more than one Base Salary was in effect during the Performance Year, the Annual Bonus Percentage (after it is determined pursuant to the Annual Bonus Plan), will be multiplied by each Base Salary in effect during the Performance Year, on a pro rata basis. The Company may amend the Bonus Plan from time to time in its sole discretion. Except as expressly provided in this Agreement, the Annual Bonus will be paid in accordance with the Annual Bonus Plan, and is subject to discretionary adjustments based on individual performance. Executive shall not earn an Annual Bonus or any portion thereof if Executive is not employed under this Agreement on the applicable date specified for payment in the Annual Bonus Plan, except as set forth in the Annual Bonus Plan.

(c)        Equity Incentives. Executive acknowledges receipt on August 30, 2017 and October 22, 2017 of long-term equity incentive awards under the Company's Fifth Amended and Restated 2008 Stock and Annual Incentive Plan, as may be amended (or replaced) by the Company (the "2008 Plan"), in anticipation of entry into this Agreement.

During the Term, Executive shall be eligible to receive additional equity incentives, as determined in the sole discretion of the Compensation Committee, including, but not limited to awards under the 2008 Plan. Subject to the discretion of the Compensation Committee, equity incentives may be granted to Executive at the time the Company normally grants such incentives generally and otherwise in accordance with applicable policies, practices, terms and conditions (including, but not limited to, vesting requirements), and provided further that Executive is employed by LTLLC on the date such incentives are awarded.

4.        Additional Terms. Attached as Exhibit A hereto and deemed a part hereof is the LendingTree Additional Terms and Conditions of Employment Agreement (the "Additional Terms"), all of the terms of which are incorporated herein by reference and are binding on the Parties.

5.        Entire Agreement; Amendments. This Agreement, which includes the Additional Terms and the exhibits thereto, contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof. This Agreement may be amended in whole or in part only by an instrument in writing setting forth the particulars of such amendment and duly executed by all Parties.

By their signature below, the Parties acknowledge and agree that they have carefully read each and every provision of this Agreement, including the Additional Terms and the exhibits thereto, that they understand its terms, that all understandings and agreements between them relating to the subjects covered in this Agreement are contained in it, and that they have entered into the Agreement voluntarily. Executive further acknowledges and agrees that Executive has been advised to and given the opportunity to discuss this Agreement with Executive's private legal counsel and Executive has taken advantage of that opportunity to the extent Executive wished to do so.

IN WITNESS WHEREOF, the Company Group has caused this Agreement to be executed and delivered by its duly authorized officer and Executive has executed and delivered this Agreement as of the Effective Date.

LENDINGTREE, INC.

By:        /s/ Claudette Parham
Name:        Claudette Parham
Title:        Chief Human Resources and Administrative Officer

LENDINGTREE, LLC

By:        /s/ Claudette Parham
Name:        Claudette Parham
Title:        Chief Human Resources and Administrative Officer

EXECUTIVE

| By: | /s/ J.D. Moriarty |
| Name: | J.D. Moriarty |
| Title: | Chief Financial Officer |

**EXHIBIT A**

**LENDINGTREE ADDITIONAL TERMS AND CONDITIONS OF
EMPLOYMENT AGREEMENT**

1.    <u>Definitions</u>:

    (a)    "Accrued Obligations" means the sum of (i) Executive's earned but unpaid Base Salary through the date of termination, (ii) in the case of termination for Death or Disability only, any portion of Executive's unpaid Annual Bonus relating to a previously completed Performance Year, (iii) any compensation previously earned but deferred by Executive (together with any interest or earnings thereon) that has not yet been paid and that is not otherwise to be paid at a later date pursuant to the executive deferred compensation plan of the Company, if any, (the "Deferred Compensation", and (iv) reimbursements that Executive is entitled to receive under Section 8 of these Additional Terms.

    (b)    "Cause" shall be determined by LTLLC in its discretion and includes (i) Executive's fraud, dishonesty, theft, or embezzlement, (ii) misconduct by Executive injurious to the Company Group or any of its affiliates, (iii) Executive's conviction of, or entry of a plea of guilty or *nolo contendere* to, a crime that constitutes a felony or other crime involving moral turpitude, (iv) Executive's competition with the Company Group or any of its affiliates; (v) Executive's unauthorized use of any trade secrets of the Company Group or any of its affiliates or Confidential Information (as defined in the Confidentiality Agreement), (vi) a material violation by Executive of any policy, code or standard of ethics generally applicable to employees of the Company Group, (vii) Executive's material breach of fiduciary duties owed to the Company Group, (viii) Executive's excessive and unexcused absenteeism unrelated to a disability, (ix) following written notice and a reasonable opportunity to cure, gross neglect by Executive of the duties assigned to Executive, or (x) Executive's failure or refusal to cooperate in any Company investigation.

    (c)    "Disability" means a medical condition, whether physical or mental, that renders, and for a consecutive six-month period has rendered, Executive unable to perform the essential functions of Executive's position, with or without reasonable accommodation.  A return to work of less than 14 consecutive days will not be considered an interruption in Executive's six consecutive months of disability.  Disability will be determined by LTLLC on the basis of medical evidence satisfactory to LTLLC.

    (d)    "Good Reason" means the occurrence of any of the following without Executive's written consent: (i) material adverse change in the office to which Executive reports from that in effect immediately following the Effective Date, excluding for this purpose any such change that is an isolated and inadvertent action not taken in bad faith and that is remedied by the Company Group or that is authorized pursuant to this Agreement and further excluding a change in the office to which Executive reports due to internal restructuring, realignment or the resignation, promotion, demotion or a reorganization of managers within, or a sale of, the Company Group; (ii) material reduction in Executive's annual base salary (except as part of an enterprise wide reduction of salaries for all similarly situated executives); or (iii) relocation of Executive's principal place of business more than 50 miles from the location of the principal office from which Executive conducts Executive's principal activities. In order to resign employment for Good Reason, Executive must notify the Company Group in writing within fifteen (15) days of the initial existence of any event falling under (i) - (iv) and such notice shall describe in detail the facts and circumstances explaining why Executive believes a Good Reason event has occurred. The Company Group shall then have sixty (60) days following its receipt of such notice to cure or remedy such alleged Good Reason event such that Good Reason will not be deemed to exist for such event. If the event remains uncured or is not remedied by the Company Group within such sixty (60) day period and if Executive's employment has not otherwise been terminated, then a Qualifying Termination shall automatically occur on the first business day following the end of such sixty (60) day cure/remedy period.

    (e)    "Pro-Rated Annual Bonus" means a cash lump-sum payment in an amount equal to the pro-rated portion of Executive's Annual Bonus for the Company's fiscal year in which the Qualifying Termination occurs based on actual performance achieved for such year (as if the entire Annual Bonus was based solely on the applicable Company performance metrics and without regard to any assessment of personal performance), with such proration based on the ratio of the number of days employed during such year to 365.

    (f)    "Qualifying Termination" means a termination of Executive's employment with LTLLC prior to the expiration of the Term by Executive for Good Reason or by the Company Group without Cause (other than for death or Disability).

(g)        "Release of Claims" means a general release of all known and unknown claims against the Company Group and their affiliates in the form attached hereto as Exhibit 1, as updated by the Company to reflect changes in the law.

2.        <u>Resignation from Officer and Director Roles</u>. Effective as of the termination of Executive's employment with the Company, regardless of the reason for or the timing of such termination, Executive agrees to and shall be deemed to have

resigned effective immediately from all roles Executive holds with the Company Group, including without limitation as an officer or director. Such resignations shall not limit or otherwise waive any rights Executive may have to payments and benefits under this Agreement.

3.        Termination Due to Disability or Death.

(a)        Disability. If at any time during the Term of this Agreement, Executive incurs a Disability, then Executive's employment shall be immediately terminated as of the date of Executive's Disability. Upon Executive's Disability, LTLLC shall pay Executive the Accrued Obligations; provided that Annual Bonus awards relating to a previously-completed Performance Year shall be paid on the date that such awards are paid by LTLLC to other similarly situated executives in accordance with the Annual Bonus Plan.

(b)        Death. If Executive should die during the Term, Executive's employment and the Company Group's obligations hereunder shall terminate as of Executive's death. In such event, LTLLC shall pay Executive's estate the Accrued Obligations; provided that Annual Bonus awards relating to a previously completed Performance Year shall be paid on the date that such awards are paid by LTLLC to other similarly situated executives in accordance with the Annual Bonus Plan.

4.        Termination by the Company Group During the Term.

(a)        Cause. The Company Group may terminate the employment of Executive under this Agreement during its Term for Cause. In such event, LTLLC shall pay Executive the Accrued Obligations. Executive shall retain only such rights to participate in other benefits as are required by the terms of those plans, the Company Group's policies, or applicable law.

(b)        Termination by the Company Group other than for Death, Disability or Cause. Upon a Qualifying Termination that is not upon or at any time during the 12-month period following the occurrence of a Change of Control, LTLLC shall pay Executive the amounts described below. For the avoidance of doubt, expiration of the Term is not a Qualifying Termination. Notwithstanding the foregoing, Executive shall receive the payments and benefits described in subsections (ii) - (iv) below only if Executive executes and does not revoke a Release of Claims and Executive complies with the restrictive covenants set forth in the Confidentiality Agreement attached hereto as Exhibit 1. If Executive does not execute the Release of Claims within sixty (60) days following the Qualifying Termination, or if Executive revokes the Release of Claims (the end of the permitted revocation period following execution without revocation being exercised, the "Release Effective Date"), Executive shall not be entitled to the payments and benefits described in subsections (ii) - (iv) below.

(i)        Any Accrued Obligations.

(ii)        An amount equal to one (1) year of Executive's then-current Base Salary, payable in installments on LTLLC's regularly scheduled payroll dates over the one (1) year period following the date of such Qualifying Termination ("Salary Continuation Payments") beginning on the regularly scheduled payroll date immediately following the effective date of the Release of Claims. Notwithstanding the foregoing, if the Salary Continuation Payments are determined to be "nonqualified deferred compensation" that is subject to Section 409A (as defined below), then the first installment shall be made on the sixtieth (60th) day following the date of Executive's Qualifying Termination and shall include the amount of all payments that would have been made after the effective date of the Release of Claims but before the sixtieth (60th) day following such Qualifying Termination, and the remaining Salary Continuation Payments shall be payable in installments on LTLLC's regularly scheduled paydays following the sixtieth (60th) day following such Qualifying Termination.

(iii)        If Executive properly elects COBRA continuation coverage, the Company will reimburse Executive for his COBRA premiums on the same terms and conditions, and at the same level in effect at the time of termination of Executive's employment, upon submission of proof of payment, until the earlier of: (1) one (1) year from the date of Executive's loss of coverage, or (2) the date Executive obtains replacement health care coverage through a new employer.

(iv)        Executive's (a) then outstanding unvested Restricted Stock Units ("RSUs") or Restricted Stock issued pursuant to the 2008 Plan and scheduled to vest within nine months of the Qualifying Termination, if any, shall become vested on the effective date of the Release of Claims, and (b) then outstanding unvested Options to purchase common stock ("Options") issued pursuant to the 2008 Plan and scheduled to vest within nine months of the Qualifying Termination, if any, shall become

vested and exercisable on the effective date of the Release of Claims. Notwithstanding the foregoing, this subsection (iv) shall not apply to any award under the 2008 Plan to the extent such award expressly states that its vesting acceleration terms take precedence over anything to the contrary in an employment agreement. All RSUs that vest pursuant to this subsection (iv) shall be settled in accordance with the grant terms of such RSUs. All Options that vest pursuant to this subsection (iv) shall remain exercisable only to the extent permitted under the grant terms of such Options. All other unvested RSUs, Restricted Stock and Options issued to Executive pursuant to the 2008 Plan and which are not covered by the foregoing clauses (a) and (b) shall terminate

without consideration as of the date of such Qualifying Termination. Additionally, if the Release of Claims does not take effect, then the RSUs or Options that were covered by the foregoing clauses (a) and (b) shall terminate without consideration as of the 61st day following the date of such Qualifying Termination.

       Notwithstanding the foregoing, if Executive obtains other employment or is otherwise compensated for services during the period in which Executive is receiving Salary Continuation Payments (the "Severance Period"), LTLLC's obligation to make future payments to Executive under subsections (ii) and (iii) above shall be offset against any compensation earned by Executive as a result of employment with or services provided to a third party; notwithstanding the above, Executive shall receive a guaranteed minimum Salary Continuation Payment of Five Hundred Dollars ($500.00) regardless of any compensation earned from third parties during the Severance Period ("Guaranteed Minimum Severance Payment"). Executive agrees to inform the Company Group promptly of Executive's employment status and any amounts so earned during the Severance Period. Further, LTLLC's obligation to make payments under subsections (ii) and (iii) above shall immediately cease in the event that Executive breaches the terms of this Agreement (including these Additional Terms) or the Confidentiality Agreement, including but not limited to Executive's obligations set forth in Section 9 of this Agreement. Executive acknowledges and agrees that the payments described in Section 3(b) above, or any portion thereof, including without limitation the Guaranteed Minimum Severance Payment, constitute good and valuable consideration for the Release of Claims.

       5.     <u>Termination After the Term</u>. If Executive's employment continues beyond the Term, Executive's employment shall be at will. In other words, after the Term, the Company Group and Executive may terminate the employment relationship at any time, for any reason, with or without cause. The Company Group retains the right to transfer, demote, or suspend Executive without cause and without notice, at any time. If Executive's employment is terminated after the Term, regardless of whether the termination was with or without Cause, or by Executive for "Good Reason, Executive shall be entitled to receive only the Accrued Obligations.

       6.     <u>Change of Control</u>. For purposes of this Agreement, a "Change of Control" results when: (i) any person or entity, other than Doug Lebda or persons or entities having beneficial ownership of securities of the Company also beneficially owned by Doug Lebda, becomes a beneficial owner, directly or indirectly, of securities of the Company representing fifty percent or more of the total voting power of all of the Company's then outstanding voting securities, (ii) a merger or consolidation of the Company in which the Company's voting securities immediately prior to the merger or consolidation do not represent, or are not converted into securities that represent, a majority of the voting power of all voting securities of the surviving entity immediately after the merger or consolidation, or (iii) a sale of all or substantially all of the assets of the Company or a liquidation or dissolution of the Company. For purposes of defining Change of Control, "Company" refers to LendingTree, Inc. as a whole and does not apply to events only affecting specific businesses or subsidiaries of LendingTree, Inc. To the extent necessary to comply with Section 409A (as defined below), a Change of Control must also constitute a "change in control event" within the meaning of Section 409A.

       (a)     If a Change of Control occurs while Executive is employed by LTLLC then the following benefits will be provided to Executive automatically upon the Change of Control: (i) all then-outstanding unvested equity awards held by Executive that are scheduled to vest based solely on time will become fully vested and immediately exercisable immediately prior to such Change of Control; and (ii) all then-outstanding unvested Company compensatory equity awards held by Executive that are subject to performance-based vesting will vest based on the actual level of achievement of the applicable performance goals measured as of (or within five business days before) the date of such Change of Control; provided, that any portion of the award that does not vest as of such date will be forfeited without consideration upon the Change of Control;

       (b)     In the event that Executive experiences a Qualifying Termination upon or at any time during the 12-month period following the occurrence of a Change of Control, then Executive will receive (x) payment of the Accrued Obligations within thirty (30) days of such termination (or earlier, to the extent required by applicable law) and (y) the payments and benefits described in clauses (i) through (iii) below, but (with respect to clauses (i) through (iii) below) only if Executive timely executes and does not revoke the Release of Claims and Executive complies in all material respects with Executive's obligations under the Confidentiality Agreement, as defined below. If Executive does not execute the Release of Claims within sixty (60) days following the date of such Qualifying Termination, or if Executive revokes the Release of Claims before the Release Effective Date, Executive will not be entitled to the payments and benefits described in clauses (i) through (iii) below. For avoidance of doubt, if Executive experiences a Qualifying Termination upon or at any time during the 12-month period following the occurrence of a Change of Control, then Executive will not be eligible to receive any payments or benefits under Section 3(b) herein. There is no requirement for Executive to mitigate the benefits provided in clauses (i) through (iii) below.

       (i)     A cash lump sum severance payment in an amount equal to the sum of (x) 200% of Executive's then-current Base Salary plus (y) 200% of Executive's target annual bonus for the bonus program in effect for Executive for the

year in which Executive's employment terminates plus (z) the Pro-Rated Annual Bonus, payable on the regularly scheduled payroll date immediately following the Release Effective Date;

(ii)      With respect to Executive's then-outstanding vested stock options, Executive will be able to exercise such vested stock options until the earliest of (x) their applicable expiration date, (y) the date of a change of control of the Company in which the applicable stock option is not being assumed, continued, substituted for or otherwise replaced as of such change of control, or (z) the second anniversary of the date of Qualifying Termination; and

(iii)      Subject to the terms and conditions of Section 3(b)(iii), Executive will be entitled to receive the continuation of health care coverage benefit under Section 3(b)(iii).

(c)      To the extent that Executive and the Company are parties to a Change of Control Letter Agreement, such prior agreement is hereby superseded and terminated as of the Effective Date and is of no further force or effect.

7.      <u>Confidentiality, Work Product and Restrictive Covenant Agreement</u>. As a condition of Executive's employment, Executive agrees to execute the Confidentiality, Work Product and Restrictive Covenant Agreement (the "Confidentiality Agreement") attached hereto as <u>Exhibit 2</u>. Executive agrees and acknowledges that the benefits received by Executive pursuant to this Agreement, including but not limited to those set forth in Section 3 of this Exhibit A, constitute good and valuable consideration for Executive's obligations under the Confidentiality Agreement.

8.      <u>Employee Benefits</u>.

(a)      <u>Paid Time Off</u>. During the Term, Executive shall be entitled to take paid time off, in accordance with applicable plans, policies, programs, practices and legal requirements applicable to similarly-situated employees generally.

(b)      <u>Other</u>. Executive shall be entitled to such other benefits, payments, or items of compensation as are provided under the employee benefit plans of LTLLC or as are made available from time to time under compensation policies set by LTLLC for management employees of LTLLC having similar salary and level of responsibility. Employee acknowledges that Employee's eligibility for and participation in any such plan or program shall be subject to and controlled by the terms and conditions of such plans and programs, and that LTLLC makes no representation or agreement that any particular plan currently exists, will be maintained (in its present form, or at all), or will be established in the future.

9.      <u>Reimbursement</u>. The Company Group shall reimburse Executive, in accordance with applicable law and the general policies and practices of the Company Group as in effect from time to time, for reasonable out-of-pocket expenses incurred by Executive in the ordinary course of business, including without limitation, the Company Group's standard mileage allowance for business use of any personal vehicle, business related travel, customer entertainment, and professional organizations.

10.      <u>Actions After Termination</u>. Executive agrees that for one (1) year following Executive's termination of employment, regardless of the reason for the termination, Executive will continue to make himself or herself available for reasonable consultation with the Company Group and the Company Group's agents and employees regarding Executive's prior work for the Company Group. In addition, Executive shall make himself or herself reasonably available for interviews by the Company Group's counsel, depositions, and/or appearances before courts or administrative agencies upon the Company Group's reasonable request. Executive agrees that if at any time following termination Executive is contacted by any government agency, regulator or bureau, by any stock or listing exchange or any self-regulatory organization, or by any customer of the Company Group, with reference to the Company Group's business, or by any person contemplating or maintaining any claim or legal action against the Company or LTLLC, or by any agent or attorney of such person, Executive will, to the fullest extent permitted by law, promptly notify the Company Group of the substance of Executive's communications with such person and shall cooperate with the Company Group in defense of such claim or legal action. The Company Group agrees to reimburse any reasonable third party expenses incurred by Executive in connection with this Section 9, provided that such expenses shall have been preapproved in writing by the Company Group.

11.      <u>Taxes</u>. All payments made under this Agreement shall be subject to the Company Group's withholding of all required foreign, federal, state and local income and employment/payroll taxes, and all payments shall be net of such tax withholding.

12.    <u>Recoupment</u>. Notwithstanding anything to the contrary in this Agreement, any payments made or granted pursuant to this Agreement shall be subject to any recoupment or clawback policy that may be adopted by the Company Group from time to time and to any requirement of applicable law, regulation or listing standard that requires the company to recoup or claw back compensation paid.

13.    <u>Non-Disparagement</u>. From and after a Qualifying Termination, Executive agrees not to disparage the Company Group or any officers, directors, employees, shareholders, parent companies, affiliates or agents of the Company Group (each an

"Employer Party"). For purposes of this Section, "disparage" means to make a negative statement in any manner that is intended to be or is likely to be harmful to an Employer Party, its business or business reputation or personal reputation; provided that nothing in this Agreement is intended to prohibit or shall prohibit Executive from providing truthful information or testimony in connection with any legal or regulatory investigation or proceeding. This Agreement shall cover all forms of disparagement, direct or indirect, through any medium or in any venue.

14.      Section 280G Limitation. Notwithstanding anything in this Agreement to the contrary, in the event that any payment or benefit received or to be received by Executive (all such payments and benefits being hereinafter referred to as the "Total Payments") would not be deductible (in whole or part) by the Company Group or any affiliates making such payment or providing such benefit as a result of Section 280G of the U.S. Internal Revenue Code of 1986, as amended (the "Code") then, to the extent necessary to make such portion of the Total Payments deductible (and after taking into account any reduction in the Total Payments required by any similar reduction or elimination provision contained in such other plan, arrangement or agreement), the portion of the Total Payments that does not constitute "nonqualified deferred compensation" under Section 409A of the Code shall first be reduced (if necessary, to zero), and all other Total Payments shall thereafter be reduced (if necessary, to zero) with, in each case, cash payments being reduced before non-cash payments (and, within each category, payments to be paid last being reduced first); provided, however, that such reduction shall only be made if the amount of such Total Payments, as so reduced (and after subtracting the net amount of federal, state and local income taxes on such reduced Total Payments) is greater than or equal to the amount of such Total Payments without such reduction (but after subtracting the net amount of federal, state and local income taxes on such Total Payments and the amount of the excise tax imposed under Section 4999 of the Code on such unreduced Total Payments). Any determination required to be made under this Section shall be made by independent tax counsel reasonably acceptable to both Executive and the Company, and shall be paid for by the Company ("Tax Counsel").

It is possible that, after the determinations and selections made pursuant to the foregoing paragraph, Executive will receive payments and/or benefits that are, in the aggregate, either more or less than the amount determined under such paragraph (hereafter referred to as an "Excess Payment" or "Underpayment", as applicable). If Tax Counsel determines that an Excess Payment has been made, then Executive shall promptly repay the Excess Payment to the Company, together with interest on the Excess Payment at the applicable federal rate (as defined in section 1274(d) of the Code) from the date of Executive's receipt of such Excess Payment until the date of such repayment. If Tax Counsel determines that an Underpayment has occurred, the Company Group shall promptly (but in any event within ten (10) days of such determination) pay to Executive an amount equal to the Underpayment, together with interest on such amount at the applicable federal rate from the date such amount would have been paid to Executive had the provisions of the foregoing paragraph not been applied until the date of payment.

15.      Section 409A. The Parties intend that any amounts payable hereunder shall comply with or be exempt from Section 409A of the Code ("Section 409A") (including under Treasury Regulation §§ 1.409A-1(b)(4) ("short-term deferrals") and (b)(9) ("separation pay plans," including the exceptions under subparagraph (iii) and subparagraph (v)(D)) and other applicable provisions of Treasury Regulation §§ 1.409A-1 through A-6). For purposes of Section 409A, each of the payments that may be made under this Agreement shall be deemed to be a separate payment. Executive and the Company Group agree to negotiate in good faith to make amendments to the Agreement, as the Parties mutually agree are necessary or desirable to avoid the imposition of taxes, penalties or interest under Section 409A. Neither Executive nor the Company Group shall have the right to accelerate or defer the delivery of any such payments or benefits except (i) where payment may be made within a certain period of time, the timing of payment within such period will be in the sole discretion of the Company Group, and (ii) to the extent specifically permitted or required by Section 409A. With respect to the time of payments of any amounts under the Agreement that are "deferred compensation" subject to Section 409A, references in the Agreement to "termination of employment" (and substantially similar phrases) shall mean "separation from service" within the meaning of Section 409A. Notwithstanding anything in this Agreement to the contrary, if Executive is considered a "specified employee" under Section 409A upon Executive's separation from service and if payment of any amounts on account of Executive's separation from service under this Agreement is required to be delayed for a period of six months after separation from service in order to avoid taxation under Section 409A, payment of such amounts shall be delayed as required by Section 409A, and the accumulated amounts shall be paid in a lump sum payment within five business days after the end of the six-month delay period. If Executive dies during the six-month delay period prior to the payment of benefits, the amounts withheld on account of Section 409A shall be paid to the personal representative of Executive's estate within 60 days after the date of Executive's death. For the avoidance of doubt, it is intended that any expense reimbursement made to Executive hereunder shall be exempt from Section 409A. Notwithstanding the foregoing, if any expense reimbursement made hereunder shall be determined to be "deferred compensation" within the meaning of Section 409A, then (i) the amount of the expense reimbursement during one taxable year shall not affect the amount of the expense reimbursement during any other taxable year, (ii) the expense reimbursement shall be made on or before the last day of Executive's taxable year following the year in which the expense was incurred and (iii) the right to expense reimbursement hereunder shall not be subject to liquidation or exchange for another benefit. While it is intended that all payments and benefits provided to

Executive under this Agreement will be exempt from or comply with Section 409A, the Company Group makes no representation or covenant to ensure that such payments and benefits are exempt from or compliant with Section 409A. The Company Group will have no liability to Executive

or any other party if a payment or benefit under this Agreement or otherwise is challenged by any taxing authority or is ultimately determined not to be exempt or compliant. Executive further understands and agrees that Executive will be entirely responsible for any and all taxes imposed on Executive as a result of this Agreement.

16.     <u>Confidentiality</u>. The Parties represent and agree they will keep the terms of this Agreement completely confidential, and that none of the Parties will hereafter disclose any information concerning the terms of this Agreement to anyone, including, but not limited to, the public, press and media representatives, investors, and any past, present or prospective employee or applicant for employment of the Company Group; provided that:

         (a)     The Company Group may disclose the terms of this Agreement to the extent required by applicable securities laws, regulations and interpretations of the Securities and Exchange Commission or the rules of any stock exchange upon which the Company Group's securities trade;

         (b)     Executive may disclose information regarding Executive's wages solely as permitted by under California Labor Code section 232, and information regarding this Agreement to Executive's immediate family, financial and tax advisors, and legal counsel, but Executive shall be responsible for any disclosure made by such persons in violation hereof;

         (c)     The Company Group may disclose information as is necessary for the administration of the Agreement; and

         (d)     Any Party may take any action authorized hereby or by law to enforce this Agreement or to recover damages for its breach, and no disclosure incidental thereto or made as a result of legal process (such as, for example, responses to interrogatories, subpoenas or other legal process) shall be deemed a violation hereof.

17.     <u>Agreement to Arbitrate</u>. The Parties agree to resolve all disputes with each other as set forth the Executive Dispute Resolution Agreement that is attached hereto as <u>Exhibit 3</u> and incorporated herein by reference.

18.     <u>Assignment</u>. This Agreement is personal in its nature and none of the Parties hereto may, without the consent of the others, assign or transfer this Agreement or any rights or obligations hereunder; provided that, in the event of a merger, consolidation, transfer, reorganization, or sale of all, substantially all or a substantial portion of the assets of the Company or LTLLC with or to any other individual or entity, this Agreement will, subject to the provisions hereof, be binding upon and inure to the benefit of such successor and such successor (including the Company upon assignment of this Agreement) must discharge and perform all the promises, covenants, duties, and obligations of the Company Group hereunder, and all references herein to the "Company" or "LTLLC" or "Company Group" will refer to such successor.

19.     <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be given by first-class mail, certified or registered with return receipt requested or by hand delivery, or by overnight delivery by a national recognized carrier, in each case to the applicable address set forth below, and any such notice is deemed effectively given which received by recipient (or if receipt is refused by recipient, when so refused):

If to the Company Group:         LendingTree, Inc.
                                       11311 Rushmore Dr.
                                       Charlotte, NC 28277
                                       Attn: Chief Human Resources Officer

If to Executive:                   At the most recent address for Executive on file with the Company Group.

Any Party may change such Party's address for notices by notice duly given pursuant hereto.

20.    <u>Invalid Provisions.</u> It is not the intention of any Party to violate any public policy, or any statutory or common law. If any sentence, paragraph, clause or combination of the same in this Agreement is in violation of the law of any State where applicable, such sentence, paragraph, clause or combination of the same shall be void in the jurisdictions where it is unlawful, and the remainder of the Agreement shall remain binding on the Parties. However, the Parties agree, and it is their desire that a court should substitute for each such illegal, invalid or unenforceable covenant a reasonable and judicially-enforceable limitation in its place, and that as so modified the covenant shall be as fully enforceable as if set forth herein by the Parties themselves in the modified form.

21. <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.

22. <u>Survival</u>. Upon any termination of this Agreement or of Executive's employment, the provisions of Sections 5, 7, and 10 through 23 of this Exhibit A to the Agreement, the General Release (Exhibit 1), the Confidentiality Agreement (Exhibit 2), and the Executive Dispute Resolution Agreement (Exhibit 3) shall survive to the extent necessary to give effect to the provisions thereof.

23. <u>Governing Law; Jurisdiction</u>. The validity, construction, interpretation and enforceability of this Agreement and any dispute arising hereunder shall be determined and governed by the laws of the state in which the principal office from which Executive conducts Executive's principal activities is located at the time of Executive's termination of employment or at the time the dispute arises if prior to termination of employment ("Applicable State"). Any litigation in court permitted under this Agreement shall be brought by any Party exclusively in the Applicable State. In addition, and to the extent permitted by the law of the Applicable State, the Parties irrevocably waive any right to a trial by jury in any such action related to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed and delivered these Additional Terms and Conditions of Employment Agreement as of the date(s) written below.

LENDINGTREE, INC.

By:      /s/ Claudette Parham
Name:    Claudette Parham
Title:   Chief Human Resources and Administrative Officer

LENDINGTREE, LLC

By:      /s/ Claudette Parham
Name:    Claudette Parham
Title:   Chief Human Resources and Administrative Officer

EXECUTIVE

By:      /s/ J.D. Moriarty
Name:    J.D. Moriarty
Title:   Chief Financial Officer

**Exhibit 1**

**General Release Agreement**

**Exhibit 2**

**Confidentiality, Work Product and Restrictive Covenant Agreement**

**Exhibit 3**

**Executive Dispute Resolution Agreement**

# EXHIBIT E

EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Gregg S. Kleiner (SBN 141311)
   RINCON LAW LLP
2  268 Bush Street, Suite 3335
   San Francisco, CA 94104
3  Tel. 415-672-5991
   Fax. 415-680-1712
4  gkleiner@rinconlawllp.com

5  Counsel for
   DORIS A. KAELIN,
6  Trustee in Bankruptcy

**The following constitutes the order of the Court.**
**Signed: June 11, 2020**

*M. Elaine Hammond*
_____
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

7

8                 UNITED STATES BANKRUPTCY COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  In re                              Case No. 19-51455 MEH
                                       Chapter 7
12      HOME LOAN CENTER, INC.,        Hon. M. Elaine Hammond

13          Debtor.                    **ORDER AUTHORIZING COMPROMISE**
                                       **OF CLAIM 20**
14                                     **(Lehman Brothers Holdings, Inc.)**

15

16          The Court having reviewed and considered: (i) Motion for Order Authorizing Compromise

17  of Claim ("Motion") (Docket 169) filed by Doris Kaelin, Chapter 7 Trustee ("Trustee") of the

18  above-captioned Debtor; (ii) the Trustee's request for order approving the Motion; and (iii) the

19  declaration of Gregg S. Kleiner in support thereof, notice of the Motion being adequate and proper

20  under the circumstances and other good cause appearing

21          IT IS HEREBY ORDERED THAT:

22          1.      The Motion is approved in all respects; and

23          2.      The Trustee is authorized to enter into an agreement with Lehman Brothers Holdings,

24  Inc. ("Lehman") regarding the allowance and priority of Claim No. 20 which Lehman filed in the

25  Debtor's case. Lehman shall have an allowed, non-priority, general unsecured claim in the amount

26  of $13.3 million.

27                         *** *END OF ORDER* ***

28

1                            *** *COURT SERVICE LIST* ***

2    No Court service required.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28