UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>  Debtors. | Chapter 11<br><br>Case No.<br>08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>  Plaintiff,<br><br>- against -<br><br>1ST ADVANTAGE MORTGAGE, L.L.C. *et al.*,<br><br>  Defendants. | Adversary Proceeding<br>No. 16-01019 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>  Plaintiff,<br><br>- against -<br><br>WALL STREET MORTGAGE BANKERS, LTD.,<br><br>  Defendant. | Adversary Proceeding<br>No. 18-01746 (SCC) |

**DECLARATION OF BRANT D. KUEHN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO
<u>GENERAL ORDER #M-452 AND THIS COURT'S ADR ORDERS</u>**

  I, Brant D. Kuehn, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

  1.  I am a partner at the law firm Wollmuth Maher & Deutsch LLP, counsel for

Plaintiff in the above-captioned proceeding. I am familiar with the facts set forth herein on the

basis of my personal knowledge and my review of documents in the possession of my firm.

2. I submit this declaration in support of Plaintiff's Motion for Sanctions.

3. On October 27, 2018, Lehman Brothers Holdings Inc. ("LBHI" or "Plaintiff") filed an adversary complaint (the "Complaint") against Wall Street Mortgage Bankers, Ltd. ("Wall Street"), seeking indemnification for liability it incurred to the trustees of hundreds of mortgage securitizations (the "RMBS Trustees").

4. The Complaint was one of more than 100 similar complaints filed around the same time and were coordinated before the Court along with more than 80 adversary complaints filed by LBHI earlier seeking indemnification for liability LBHI incurred to Fannie Mae and Freddie Mac (the "GSEs"). The Complaint scheduled 79 loans with aggregate losses of $20,674,124.79.

5. The Complaint did not seek that amount in damages, however, but rather sought the portion of LBHI's liability to the RMBS Trustees attributable to those loans, as well as Wall Street's allocable share of LBHI's costs and expenses in defending those claims, recoverable interest, and the costs and fees incurred by LBHI in enforcing Wall Street's contractual indemnification obligations, as provided for in the governing agreements.

6. Since the filing of the Complaint (and the other RMBS complaints), LBHI has negotiated a case management order and various amendments, produced millions of pages of documents, including documents related solely to Wall Street, and developed and publicly disclosed a method for allocating LBHI's liability among the defendants, including Wall Street.

7. Wall Street has produced no documents to LBHI and has taken a limited role in discussions and negotiations between the broader group of defendants and LBHI. Wall Street failed to file an answer to LBHI's complaint until October 13, 2021, after LBHI's counsel

notified Wall Street's counsel of the failure to answer the Complaint. LBHI has focused on working with Wall Street to achieve an amicable resolution of this litigation and avoid expensive and time-consuming motion practice.

8.  LBHI began efforts to voluntarily settle the RMBS cases almost immediately after it filed the adversary complaints. LBHI made direct party-to-party outreach efforts, as well as outreach through counsel. Many defendants engaged in discussions, and the first of the 103 cases was settled on December 14, 2018, only two months after the litigation was commenced.

9.  By August 28, 2019, LBHI had settled 28 of the RMBS cases.

10. On August 28, 2019, and November 19, 2019, LBHI held its first and second mediations pursuant to the ADR Orders and related to the RMBS claims.

11. From August 2019 through March 2020, LBHI participated in a total of four mediations pursuant to the ADR Orders and related to the RMBS claims. These mediations took place in Los Angeles, Chicago, and New York.

12. To date, LBHI has held mediations with 41 defendants, the vast majority via video conference, with one additional mediation scheduled for November 11, 2021. The vast bulk of those mediations have resulted in settlements, either at the mediation itself or following mediation. The Wall Street mediation is one of only five that have not resulted in settlement. Other than a very limited set of defendants, including Wall Street, even those mediations that have not resulted in settlement have been the subject of good faith discussions with prepared counterparties.

13. Settlement discussions between LBHI and Wall Street began no later than July 2019, when I, as counsel for LBHI, and Joshua Levin-Epstein, as counsel for Wall Street, discussed mediation. We continued our discussion in more detail in September 2019. Settlement

3

discussions did not proceed further until 2020, when I and Mr. Levin-Epstein first discussed specific potential mediation dates, as well as the logistics of mediation, such as the subject and length of the mediation submissions. On April 22, 2021, Mr. Levin-Epstein suggested short mediation submissions, of no more than five pages, focusing on business issues. The parties agreed to mediate on May 13, 2021.

14.    In or around April 2021, I engaged in discussions with Mr. Levin-Epstein about the process for mediation, including mediation submissions. The mediator, Mr. Marc Hirschfield, joined certain of those discussions.

15.    While these discussions were ongoing, Mr. Levin-Epstein asked me to send him the loan file documents LBHI had originally produced to Wall Street two years before, in the spring of 2019. LBHI had produced the loan files in April 2019 in a typical format used in litigation—single page TIFF images, text, and load files.

16.    On April 27, 2021, via e-mail, I noted to Mr. Levin-Epstein that the loan files were voluminous and offered to segregate a specific population of files if helpful. Mr. Levin-Epstein asked that LBHI simply re-upload the production. The same day, LBHI reproduced the loan files to Mr. Levin-Epstein in the same form as in 2019 and also produced the loan files in a "business-friendly" format used internally by LBHI. That "business-friendly" format included all of the same documents included in the original April 2019 production, but was organized as a single PDF for each loan, as well as a separate subfolder named "Claim_Files" that included only documents LBHI believed were most relevant to its claims. At no time did Wall Street or Mr. Levin-Epstein ask for a different format or population of documents.

17.    On May 6, 2021, Mr. Levin-Epstein confirmed that Wall Street would like a five-page limit on mediation submissions and suggested that LBHI focus on damages and LBHI's

4

allocation methodology. Mr. Levin-Epstein stated that LBHI should not focus on loans and loan-level breach claims. Mr. Levin-Epstein and I agreed to simultaneous exchange of submissions on May 10, 2021.

18. LBHI submitted its statement to the mediator and Wall Street at the close of business on May 10, 2021. Wall Street did not submit a mediation statement. The following day Mr. Levin-Epstein explained that for reasons out of his control, he needed more time to complete the statement, and that Wall Street needed to reschedule the mediation. Eventually, the parties agreed to reschedule the mediation for June 23, 2021.

19. On May 12, 2021, Mr. Levin-Epstein contacted me and said that he and his client understood the allocation methodology and were focused on "granular" loan-level issues. Thus, after preparing the initial mediation submission, LBHI spent additional resources on that subject.

20. On May 17, 2021, LBHI yet again reproduced to Wall Street the loan files. This time, LBHI also separately produced to Wall Street a collection of loan files relating to only the 13 loans at issue pursuant to LBHI's allocation methodology. Again, at no point did Wall Street or Mr. Levin-Epstein ask for a different format or population of the documents.

21. On June 23, 2021, the parties and mediator Marc Hirschfield gathered virtually for mediation. At the mediation, Mr. Levin-Epstein stated that he and his client had not fully reviewed the loan files in advance of the mediation. By this point, LBHI had long since made clear that it was focused on the 13 loans set forth in its allocation letter, sent on May 11, 2020—more than a year prior. At the mediation, Mr. Levin-Epstein again asked LBHI to provide him with the loan files in the "business-friendly" format.

22. After consulting with LBHI, I told Mr. Levin-Epstein that LBHI would again provide him copies of the loan files in the "business-friendly" format and that LBHI's last-best-

5

and-final offer would remain open for five additional weeks until the end of July so that Wall Street could review the loan files and determine whether to accept LBHI's offer. At the end of that period, Mr. Levin-Epstein asked for another extension, and I informed him that LBHI agreed to keep the offer open yet another week, until Friday, August 6, 2021.

23. On Wednesday, August 4, 2021, I sent Mr. Levin-Epstein an e-mail reiterating what I had already communicated to him by telephone, namely, that Wall Street's behavior in the mediation process did not show good faith, that LBHI's offer would expire on Friday, August 6, and that if resolution was not possible, LBHI would proceed with litigation and would pursue its rights under the ADR Orders, including the right to seek sanctions.

24. After this period expired, Mr. Levin-Epstein asked for another call to discuss potential settlement. I, along with LBHI's general counsel, had such a call with Mr. Levin-Epstein on Wednesday, August 11, 2021. I again reiterated my view, and frustration, that Wall Street had not participated in the mediation in good faith, as required by the ADR Orders.

25. During the August 11 call, Mr. Levin-Epstein agreed to provide a written explanation of its defenses to liability and damages on all or an agreed-upon subset of the 13 loans at issue and to make settlement offers at the loan level. I believed that this structured and "granular" process may help organize what had so far been an extremely disorganized set of responses from Wall Street. I also explained to Mr. Levin-Epstein that LBHI believed that a rational analysis of potential loan-level liability would easily justify LBHI's conservative final settlement demand, and that by addressing risk of liability and quantifying Wall Street's challenges to damages on even a subset of loans in a granular, but concrete, way, that perhaps the parties could make progress. Mr. Levin-Epstein agreed to do so within a week.

26. On August 18, 2021, Mr. Levin-Epstein provided me with Wall Street's purported

loan level responses. These responses were deficient for the following reasons. First, Wall Street's response completely left out two of the loans LBHI had identified as ones Wall Street should address if it had defenses.

27. Second, Wall Street's response challenged damages on only two loans, and even there it did not quantify the effect of the challenge.

28. Third, Wall Street failed to make any loan-level settlement offer or provide any loan-level risk analysis. This commitment was the core of the agreed-upon process.

29. I converted the Microsoft Word document Wall Street had provided into a spreadsheet to organize discussion and flagged many of these issues for Wall Street. On August 26, Mr. Levin-Epstein sent me a further revised spreadsheet tainted by the same flaws. On Tuesday, August 31, 2021, I had another discussion with Mr. Levin-Epstein. During this call I explained yet again the flaws in Wall Street's responses, pointing out in particular the failure, nearly three weeks after our call on August 11, for Wall Street to make even a single loan-level settlement offer. I noted that although I would of course be happy to present any settlement offer to LBHI, that LBHI would be moving forward with the litigation and would seek sanctions in connection with the mediation process.

30. Since then, Wall Street has not made any further substantive settlement efforts with LBHI, whether directly, through me, or through anyone else at my law firm.

31. Through October 31, 2021, LBHI has incurred legal fees and costs in the amount of $64,824.75 in connection with preparing for mediation with Wall Street, mediating with Wall Street, subsequent follow-up related to the failed mediation, and pursuing this motion. In addition, LBHI has incurred fees paid to the mediator of $7,500.

New York, New York
November 10, 2021

/s/ *Brant Duncan Kuehn*
Brant Duncan Kuehn