# EXHIBIT A

```
                                                      Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 14-12611(SCC)

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    NII HOLDINGS, INC. and NII

 8    INTERNATIONAL HOLDINGS S.A.R.L.,

 9

10            Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                    U.S. Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    March 31, 2015

19                    2:09 PM

20

21    B E F O R E :

22    HON SHELLY C. CHAPMAN

23    U.S. BANKRUPTCY JUDGE

24

25
```

Page 2

1    Hearing re:  Doc #522 Motion of the Ad Hoc Group of NII

2    Capital 2021 Noteholders for an Order Directing the Debtors

3    to Participate in Mediation

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

1    A P P E A R A N C E S :

2    JONES DAY

3         Attorneys for the Debtors

4         222 East 41st Street

5         New York, NY 10017-7306

6

7    BY:  SCOTT J. GREENBERG, ESQ.

8         ROBERT W. HAMILTON, ESQ.

9         MICHAEL J. COHEN, ESQ.

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for the Committee

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  KENNETH H. ECKSTEIN, ESQ.

17        BRAD O'NEILL, ESQ.

18        STEVEN ZIDE, ESQ.

19

20

21

22

23

24

25

Page 4

1    LATHAM & WATKINS LLP

2         Attorneys for the Ad Hoc Group of NII Capital

3         2021 Noteholders

4         53rd at Third

5         885 Third Avenue

6         New York, NY 10022-4834

7

8    BY:   MITCHELL A. SEIDER, ESQ.

9          ADAM JUSTIN GOLDBERG, ESQ

10

11   KIRKLAND & ELLIS LLP

12        Attorneys for the Ad Hoc Committee of Luxco Holders

13        601 Lexington Avenue

14        New York, NY 10022

15

16   BY:   CHRISTOPHER J. MARCUS, ESQ.

17         CHRISTINE PIRRO, ESQ.

18

19   AKIN GUMP STRAUSS HAUER & FELD LLP

20        Attorney for Aurelius

21        One Bryant Park

22        New York, NY 10036-6745

23

24   BY:   DANIEL GOLDEN, ESQ.

25

Page 5

```
 1   PAUL, WELSS, RIFLIND, WHARTON & GARRISON LLP

 2        Attorneys for Capital Research Group

 3        1285 Avenue of the Americas

 4        New York, NY 10019

 5

 6   BY:  ELIZABETH R. MCCOLM, ESQ.

 7        ANDREW N. ROSENBERG, ESQ.

 8

 9   QUINN EMANUEL URQUHART & SULLIVAN, LLP

10        Attorneys for Independent Manger

11        58 Madison Avenue

12        22nd Floor

13        New York, NY 10010

14

15   BY:  BENJAMIN I. FINESTONE, ESQ.

16        SCOTT WIN, ESQ.

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Okay.  Mr. Seider, how are you?

 3              MR. SEIDER:  Well, thank you, Your Honor.  And

 4    you?

 5              THE COURT:  Good.

 6              MR. SEIDER:  Good.  Good afternoon, and for the

 7    record, Mitchell Seider of Latham & Watkins on behalf of the

 8    ad hoc committee of holders of 2021 Capco (ph) notes.

 9              Your Honor, whether to grant today's motion is

10    soundly committed to the Court's discretion.  I will explain

11    why the Court should exercise that discretion --

12              THE COURT:  Okay.

13              MR. SEIDER:  -- and grant the motion.

14              The Capco 21 note group believes, Your Honor, that

15    negotiation is a matter of first principal and is preferable

16    to litigation at a contested confirmation hearing, and the

17    group also believes that it's likely that the group's issues

18    can be resolved through good faith negotiations among the

19    parties.

20              The issues, Your Honor, are straightforward, but

21    the Court's intersession here is necessary, and the

22    assistance of a mediator is likely to be needed if there is

23    to be a successful negotiation.

24              THE COURT:  Why is that though?

25              MR. SEIDER:  Your Honor, several reasons.
```

1          First, I think as we made plain in the papers that

2     we filed with the Court, we have tried to open the door and

3     invite ourselves into the room to discuss the merits of the

4     proposed plan and we have been rebuffed.

5          Additionally, Your Honor, if you consider the PSA

6     that's been filed with the Court, and specifically Sections

7     3.01 and 4.02 this are cited in footnotes to the debtors'

8     objection -- I don't recall the page number in the objection

9     -- but as quoted in the objection, Your Honor, the

10    consenting noteholder group, that would be Aurelius, Capree

11    (ph), and Luxco claim holders, are bound to not negotiate

12    with respect to any potential settlement resolution or other

13    culmination for these cases other than what is defined as to

14    that plan.

15         THE COURT:  So you said it was 3.01 and what use

16    was the other?

17         MR. SEIDER:  4.02, Your Honor.  Let me just

18    confirm that those are the right references.  4.02(e), which

19    goes to the debtors and the committee, and then 3.01(d),

20    which goes to the consenting noteholder group.

21         The debtors and the committee, Your Honor,

22    obviously and appropriately have fiduciary outs, but it's

23    our view that because the consenting noteholders are bound

24    to only this plan they would need instruction from the Court

25    in order to engage in negotiation towards a resolution other

1    than what is specifically provided for in the pending plan.

2          Your Honor of course I think is familiar with the

3    debtors' capital and debt structure.  There are five issues

4    of high yield notes, two of these are the Luxco notes, three

5    of these are the Capco notes.  The Luxco notes are

6    structurally senior, the Capco notes structurally junior.

7          On their face each of the three series of Capco

8    notes, Your Honor, are pari passu with one another.  They

9    are of equal dignity, and there is nothing in one issue that

10   purports to make it junior to any of the -- either of the

11   other two issues.

12         Under the debtors' proposed plan, Your Honor, one

13   series of the Capco notes will receive approximately

14   $150 million in value less than it would receive if each of

15   the three series of the Capco notes received a ratable

16   distribution.

17         At the same time, Your Honor, the holders of the

18   other two series of Capco notes will receive an additional

19   combined distribution of approximately $285 million.

20         The disadvantage notes are the capital 21 notes,

21   the favored notes are the Capco 16 notes and the Capco 19

22   notes.

23         Now the harm, Your Honor, to the Capco 21 group

24   from this distribution scheme is material.  The ad hoc group

25   of 21 notes --

Page 9

1              THE COURT:  You know, let me if I could stop you,

2      because I don't want to have a mini confirmation hearing.

3              MR. SEIDER:  Yes, Your Honor.

4              THE COURT:  And we're moving in that direction.

5      So, I don't want to cut you off, I don't want to cut off

6      your arguments, but I'm not going to have a preliminary

7      confirmation hearing, including giving any preliminary view

8      about the merits of what you're saying.

9              MR. SEIDER:  I certainly --

10             THE COURT:  It'd be inappropriate and I'd not

11     smart enough on all the facts to do that.

12             So, I very much want to stay focused on the issue

13     of mediation, what makes this case different from other

14     cases in which there's less than 100 percent consensus.

15             MR. SEIDER:  Yes.

16             THE COURT:  So --

17             MR. SEIDER:  Your Honor, and what I was about to

18     say about the plan was really prefatory so that Your Honor

19     understood --

20             THE COURT:  Okay, fair enough.

21             MR. SEIDER:  -- the alternatives to -- what the

22     litigation alternatives to mediation are.

23             THE COURT:  Okay.

24             MR. SEIDER:  And to go to Your Honor's question as

25     to what makes -- well seasonal climb -- what makes this case

Page 10

1    different from all other cases, Your Honor.

2            THE COURT:  A very good seasonal climb.

3            MR. SEIDER:  Yeah, thank you.

4            THE COURT:  I could also make a pun, I now have an

5    opening for a contested wireless Chapter 11.

6        (Laughter)

7            THE COURT:  That wouldn't be so funny.

8            MR. SEIDER:  Yeah, I understand, Your Honor, and

9    we are doing our best to avoid that.

10           Your Honor, I think the answer lies in a couple of

11   points as to Your Honor's question as to what makes this one

12   different, and I think the answers again are several fold.

13           First, the purported basis for the disparate

14   treatment of issues that are -- excuse me -- of note issues

15   that are of equal dignity is the settlement of claims, which

16   prior to this bankruptcy case appeared, based on the

17   debtors' public statements to the Securities and Exchange

18   Commission, and frankly reviewed by many parties outside of

19   the context of this case, to be without merit.  And we now

20   find ourselves in a position where the debtors' statement to

21   the securities and exchange commission says the claims are

22   without merit but they're being settled to approximately

23   $285 million in value.  That to us, Your Honor, is a very

24   wide delta and we think there must with room between the two

25   positions with respect to that point.

1          Additionally, Your Honor, as I mentioned at the

2     outset we have been trying, the Capco 21 group has been

3     trying for a considerable amount of time to finds its way

4     into the room to have principal discussions about the merits

5     of the proposed settlement and what can be done to make this

6     plan fully consensual.

7          THE COURT:  So on that point there were

8     statements, allegations, that you had been offered entree

9     into the room, but because certain of the holders -- perhaps

10    not all of them -- but certain of the holders had chosen to

11    not become restricted so that precluded their meaningful

12    participation.

13         MR. SEIDER:  Yes.

14         THE COURT:  Is that accurate?

15         MR. SEIDER:  Actually, Your Honor, it's not, and

16    I'll explain why.

17         THE COURT:  Okay.

18         MR. SEIDER:  Prior to the PSA that was filed with

19    the Court on November 24th, which was subsequently

20    terminated by the debtors --

21         THE COURT:  Right.

22         MR. SEIDER:  -- professional representatives of

23    the Luxco group asked two members of the current Capco 21

24    group if they would become restricted for purposes of

25    discussions.  One said yes, one said no.  The RSA that

Page 12

1    followed that outreach has since been withdrawn, there's

2    been a C change in the case, the sale of the Mexico

3    subsidiary --

4              THE COURT:  Right.

5              MR. SEIDER:  -- in a very successful manner, and

6    the joining into the discussions of the Luxco group.

7              And I would point out for Your Honor, as Your

8    Honor may recall from filings that occurred here I believe

9    in December, the Luxco group had to come before the Court

10   and essentially say we've been frozen out of discussions,

11   holders of Capco debt have gone off by themselves,

12   compromised issues, and the results of their private

13   compromise have a negative economic impact on us, we should

14   be part of the discussions too.

15             THE COURT:  Right.  So that led to the appointment

16   of Mr. Win.

17             MR. SEIDER:  Correct, Your Honor.  That's correct.

18             THE COURT:  Okay.

19             MR. SEIDER:  Now to flash forward and I think

20   perhaps pick up on the thread that Your Honor started with

21   respect to the outreach prior to the withdrawal of the

22   first --

23             THE COURT:  Right.

24             MR. SEIDER:  -- RSA.  In the first week of

25   February of this year we contacted the debtors' counsel and

Page 13

1    the committee counsel, and as you may have seen in our reply

2    on February 12th offered to sign NDAs so that our business

3    principals could become involved in discussions.  As Your

4    Honor will recall that was with respect to the offer on the

5    NDAs three weeks and with respect to the outreach four weeks

6    before the current RSA was filed.

7              There clearly was a window of time when if there

8    had been a will to bring the Capco 21 group into the process

9    that could have occurred.  It didn't.

10             We then filed the mediation motion, which we're

11   here on today.  After that mediation motion was filed we,

12   the professional -- well the law firm that represents the

13   Capco 21 group, was invited to meet with the law firms and

14   the financial advisors to the debtor and to the committee.

15   That meeting occurred on March 20th.

16             On March 22nd the ad hoc 21 Capco group made a

17   settlement proposal to the debtor and to the committee and

18   authorized them to share it with the other parties and with

19   their business people at will.  We have not had a response

20   to that settlement proposal since, and today is the 31st of

21   March, Your Honor, it's nine days.

22             Now from our perspective, Your Honor, we're really

23   at the fork.  We've got a confirmation schedule propounded

24   by the debtors for a confirmation hearing on June 3rd.

25             THE COURT:  June 3rd.  Right.

1          MR. SEIDER:  That's not that far, but it's also

2     not that close.

3          It is apparent to us from the RSA that I mentioned

4     to you and those sections and from the actions of the

5     consenting noteholders, the committee, and the debtors since

6     the 5th of February, that if we are in fact going to have

7     negotiation rather than litigation it's going to have to

8     come through this Court's intersession and requirement that

9     the parties see a neutral mediator who can pick up the

10    issues, which quite frankly, Your Honor, are relatively

11    small.  It's all about the transfer guarantee claim and the

12    composition that goes forward, and that claim in term, Your

13    Honor, is derived from a reading of a contract, and that's

14    basically it.  It is complicated, there's a lot of money

15    involved, but at bottom that's really what's at issue.

16         THE COURT:  Okay.  Why don't I hear from the

17    debtor and then we'll go from there.

18         MR. SEIDER:  Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.

20         MR. GREENBERG:  Good afternoon, Your Honor.

21         THE COURT:  Good afternoon.

22         MR. GREENBERG:  Scott Greenberg, Jones Day, on

23    behalf of the debtors.

24         Your Honor, before I get into our objection just

25    some preliminary remarks, one actually just echoes what you

Page 15

1   said, which is we don't view this as a confirmation hearing,

2   so --

3            THE COURT:  Right.

4            MR. GREENBERG:  -- we're going to try to focus on

5   the issue at hand.

6            THE COURT:  Okay.

7            MR. GREENBERG:  As Your Honor knows we filed our

8   amended plan on March 13th and a PSA motion on the 24th, and

9   both of those are set to be heard on June 3rd.  And so for

10  those reasons I'm going to avoid arguing the merits of those

11  two, the PSA and the plan.

12           Finally, Your Honor, and we made chambers aware of

13  this as well as Latham, we do have Homer Parkhill, who is

14  our managing director from Rothschild --

15           THE COURT:  Okay.

16           MR. GREENBERG:  -- in court with us today, and I

17  do think even if briefly it would be helpful for Your Honor

18  to spend a few minutes and put Homer on -- or Mr. Parkhill

19  on the stand.

20           He spent time at the center of this negotiation

21  from its inception, and could give the Court a little bit of

22  context of how we got to where we are, and quite frankly,

23  having sat in those negotiations whether he thinks a

24  mediation will actually change what's on the table.

25           THE COURT:  All right.  Does anyone have an

1    objection to the debtor putting Mr. Parkhill on the stand?

2    Mr. Seider?

3              MR. SEIDER:  No, Your Honor.

4              THE COURT:  Okay.  All right.

5              MR. GREENBERG:  So, Your Honor, I'm going to start

6    out with what we're not arguing, okay?  And what we're not

7    arguing is that mediation in any way is a bad thing or

8    inappropriate or doesn't help in certain cases, because I

9    don't believe that.  But what we do believe is that in these

10   circumstances, at this late stage in the game in these

11   cases, that there's not going to be a real benefit achieved

12   from forcing these parties.  And as you've seen from the

13   numerous objections you got from all the parties it truly

14   would be forcing these parties into a mediation.

15             You'll hear this from Mr. Parkhill when he

16   testifies on the stand, but the answer is, Your Honor,

17   there's really not anything more to go around at this point.

18             This deal, particularly the last round of

19   negotiations, were intense, and were as we said in a couple

20   of the pleadings, about hundreds of thousands of dollars in

21   a case of this magnitude.

22             People have really moved over the last year as far

23   as quite frankly those of us that have been involved for

24   over a year think they're going to.  And so, in our mind

25   forcing us into mediation, and we're not disputing that the

1    Court has that discretion, I don't think there's any

2    argument about that, but forcing us into it isn't going to

3    bear fruit.

4               THE COURT:  Although I'd say just anecdotally it's

5    highly unusual --

6               MR. GREENBERG:  To force --

7               THE COURT:  -- to force parties into mediation

8    over strenuous objections.

9               MR. GREENBERG:  Right.

10              THE COURT:  That being said, it's an open secret

11   that, I mean I ordered everyone into mediation in

12   LightSquared --

13              MR. GREENBERG:  Yep.

14              THE COURT:  -- without even giving the parties an

15   opportunity to object, but --

16              MR. GREENBERG:  I think that's right, Your Honor,

17   and I was going to get to that.

18              THE COURT:  So you don't have to pause a lot on

19   that.

20              MR. GREENBERG:  Right.  And with all due respect

21   and congratulations on having that case wrapped up.

22              THE COURT:  Don't say that word in my presence.

23              MR. GREENBERG:  I don't think we're LightSquared

24   by any stretch in terms of the complexities of the case.

25              And you saw we quoted in our case, which we

Page 18

1    thought was a helpful example the Longview Power case --

2            THE COURT:  Right.

3            MR. GREENBERG:  -- which is pending In Delaware

4    which is -- and Judge Shannon said, if I'm going to force

5    people in they're not really committed to the process, I

6    don't see the upside in forcing people into mediation.  And

7    we think that's what's more appropriate here given the level

8    of response, given the folks in the courtroom that you're

9    going to hear from with their view.

10           THE COURT:  So just -- Mr. Seider left --

11           MR. GREENBERG:  Right.

12           THE COURT:  -- with the statement that there was

13   something that came your way on March 22nd to which as of

14   today you hadn't responded.

15           MR. GREENBERG:  Fair enough, and I intend to

16   respond.

17           THE COURT:  Okay.

18           MR. GREENBERG:  Which is for the record --

19           THE COURT:  And without getting into settlement

20   negotiations.

21           MR. GREENBERG:  I won't violate 408, but I guess

22   on the eve of I guess it was last Sunday of the DIP hearing

23   and the sale hearing we did hear from Mr. Seider with the

24   framework of a proposal, and I will say it's -- and we've

25   talked to the parties that are parties to the PSA, it's a

1    non-starter, it's -- and that's kind of the fundamental

2    point.  You could put us in a mediation and those same

3    proposals are going to be made and we get to the same

4    result.  So, unfortunately I don't think that there's

5    anything there to work with from the parties in this room.

6            And, Your Honor, first and foremost after a year

7    plus of negotiations, and you've seen a lot of it post-

8    petition, there was six months of it prepetition, we've

9    finally gotten to a spot where we have north of 70 percent

10   of Luxco and north of 70 percent of Capco that are parties

11   to this PSA and support the plan.  We've surpassed the

12   requirements most importantly as Your Honor knows of

13   1126(c), in that we have greater than 66 and two-thirds in

14   amount.  Our major creditors support the deal.  The

15   creditors' committee is a co-proponent of the plan.  As Your

16   Honor knows, because we filed the PSA motion, the

17   independent manager that this Court appointed to come in and

18   take a look at this with his own counsel is supportive of

19   the plan, and actually I believe Quinn Emanuel is here

20   today --

21            THE COURT:  Okay.

22            MR. GREENBERG:  -- and they'll give you their view

23   and an update of where we are.

24            And, Your Honor, most importantly to us whether,

25   you know, people take their posturing in their positions is

Page 20

1    I kind of say look at the numbers, look at the math that was

2    the result of the new PSA as it relates to the old PSA.  I

3    think it's Exhibit B to the objection.  I have other copies

4    if people want it.  I wasn't trying to submit it into

5    evidence, but it just (indiscernible) comparison.  Sorry.

6         (Pause)

7              MR. GREENBERG:  May I approach?

8              THE COURT:  Yes, please.  I'm not sure I have

9    Exhibit B.  Great.  Thank you.  Oh, great.

10             MR. GREENBERG:  So we did a comparison, we filed

11   this with the papers, and it's also in the plan and

12   disclosure statement as amended that we filed, which shows

13   the relative pick ups from the deal we filed back in

14   November to the deal that was filed more recently post the

15   Mexico sale transaction, and let's focus on the 21s since

16   that's the argument in front of Your Honor.

17             Under the old deal, under the prior plan that was

18   filed in I guess November and the PSA December and the plan

19   the Capco 20 runs on a pre-rights offering basic we're

20   entitled to -- I'm just talking in dollars now instead of

21   percentages -- $268 million -- or $298 million on post-

22   rights.  The plan that was filed on 3/13 you'll see that

23   they're up to a $437 million recovery.

24             And so depending if you're using pre or post

25   rights they pick up somewhere between 140- and

Page 21

1    $170 million under the new deal, and it's roughly 47 to 63

2    percent pick up from the deal that we filed back in

3    November.

4             And what's ironic about who we're fighting now

5    here in court about the new deal is that no one did better

6    than the 21s in terms of comparing this to the prior PSA.

7    No one --

8             THE COURT:  On a percentage improvement basis?

9             MR. GREENBERG:  On a dollars basis, on a

10   percentage improvement basis, no one did better.

11            So for guys that were apparently frozen out and

12   not in the room I would contend that the 60 percent of 21

13   noteholders that were in the room were acutely aware of what

14   their recovery was and were making sure that it was

15   protected.

16            THE COURT:  Okay.

17            MR. GREENBERG:  So, Your Honor, just to -- and

18   I'll get through it briefly because I don't want to get into

19   the he said; she said about the process, but there's been a

20   lot of allegations about -- as Mr. Seider pointed out --

21   there are multiple requests to be included in plan

22   negotiations, and the truth of the matter is, and I don't

23   think we're ducking from this one at all, that all happened

24   very recently when this new formed group tried to inject

25   itself into very, very mature and far along negotiations in

1    mid February, and that was nearly a year after the creditor

2    negotiations commenced in this case, five months after the

3    commencement of the cases, about five months after the

4    creditors' committee was formed, three months after we

5    announced our prior PSA, and remember, our prior PSA these

6    guys were $170 million worse off.

7              So my question is, where have you been since

8    November?  And --

9              THE COURT:  Well, I guess one question is have

10   they been since November?  I mean we don't know -- I'm not

11   really following how the paper is trading, but --

12             MR. GREENBERG:  I think Mr. Seider will tell you

13   the first time that they reached out to us was mid February

14   -- or sorry, early February.  Mid February was the first

15   letter.

16             And as we disclosed in the pleadings while the PSA

17   was announced on March 5th and filed with the Court, and

18   you'll hear this from Mr. Parkhill, the agreement in

19   principal on the main economic terms, valuation, you know,

20   what are the settlement values, everything else were reached

21   basically in the first 10 or 11 days of February.  So done

22   by the time he had reached out to us.

23             And what took threes weeks to get to an

24   announcement quite frankly, Your Honor, just to understand

25   how fragile this deal was at the time, were fights over

Page 23

1    professional fees, hundreds of thousands of dollars, and

2    that's what held this thing up for three weeks in a case of

3    this size.  It was, you know, who's taking a hit on their

4    fees to make this work?

5            So those were the kind of dollars we were talking

6    about in reaching a deal, and so say that this wasn't an

7    easy deal it almost fell apart a couple times over minor

8    dollars is very, very accurate.

9            And I do want to address some points --

10           THE COURT:  But just to say it out loud though --

11           MR. GREENBERG:  Yeah.

12           THE COURT:  -- sometimes folks come in with a deal

13   that's 75 percent, 80 percent almost supported by the entire

14   capital structure percent --

15           MR. GREENBERG:  Right.

16           THE COURT:  -- and it doesn't get confirmed.

17           MR. GREENBERG:  That's right.

18           THE COURT:  I mean it's either going to get

19   confirmed or it's not going to get confirmed.

20           MR. GREENBERG:  All confirmation issues.

21           THE COURT:  Right?

22           MR. GREENBERG:  That's right.

23           THE COURT:  So, I mean I guess for Mr. Seider's

24   benefit just say it out loud.  You come in and there's a

25   plan and everyone makes their arguments about whether it's

Page 24

1    confirmable, and the amount of consensus that it has

2    garnered is --

3            MR. GREENBERG:  It still has to meet the

4    requirements in the code.

5            THE COURT:  -- it is what it is and it still has

6    the meet the requirements of the code, with respect to any

7    and all of the issues.

8            MR. GREENBERG:  I don't think anyone is

9    disagreeing with that --

10            THE COURT:  All right.

11            MR. GREENBERG:  -- and that's why I said at the

12    outset I think these are confirmation objections, and we'll

13    deal with them when the time comes, and we're confident that

14    we have a plan that we can confirm.

15            Your Honor, I do want to just touch upon the

16    process, because I do feel like the debtors' get some mud

17    thrown at them from time to time, so just to give you a bit

18    of history.

19            In my in my opinion, and obviously I have a bias,

20    I feel like these debtors have maintained transparency

21    throughout this process with respect to the negotiation

22    process, with respect to speaking to parties in interest and

23    everything else, and the idea that, you know, again quoting

24    from their letter in the -- that was attached to the motion,

25    the debtors' plan process has deliberately excluded the 21s

1    from the negotiating table and we've refused to include the

2    21 noteholders in plan negotiations.  They even offer up an

3    NDA.  I think is a bit misleading.

4              For over a year we've been at this, it started in

5    March of last year when we started to engage with our

6    creditors and told them to get organized.  We spell it out

7    in more detail in Mr. Parkhill's affidavit and other about

8    the various amount of meetings and negotiations we've had.

9              I'm sad to say this has been a seven day a week

10   job for over a year in getting very tough parties to get to

11   a deal.  The creditors' committee came in in October and

12   they took a look and did their own independent investigation

13   with FTI as you know looking at these claims so they could

14   help move this forward and get our creditors to a deal.

15             Back in November as we talked about went through,

16   and I think Kirkland filed a pleading as it relates to this

17   issue, we also worked with Kirkland and Milstein quite

18   frankly to try to round up 21 noteholders at that time.

19             So there had been an outreach, and in fairness to

20   Mr. Seider it wasn't when he was representing them --

21             THE COURT:  Right.

22             MR. GREENBERG:  -- but he came to this party a

23   little bit late.  But there was an effort.

24             THE COURT:  Didn't Mr. Neiger (ph) surface at one

25   point on behalf of one of these holders?

1              MR. GREENBERG:  One point.  Who is now a party --

2     part of --

3              THE COURT:  Right.

4              MR. GREENBERG:  -- Mr. Seider's group.

5              THE COURT:  Okay.

6              MR. GREENBERG:  Some of the 21 noteholders

7     actually signed NDAs, or at least one of them that's now a

8     party to Mr. Seider's group, others affirmatively declined

9     to sign NDAs at the time.  J Pam (ph), quite frankly who's I

10    think roughly 39 percent of the holdings of Mr. Seider's

11    group, was part of the Paul, Weiss cross holder group during

12    the course of the summer, which is the main body we were

13    negotiating this deal with all summer.  So not all these

14    faces are new faces to the party.

15             And I don't want to suggest something here, which

16    I'm not, which is people are free to remain restricted, I

17    mean we deal -- unrestricted, I'm sorry -- we deal with that

18    issue all the time and I totally understand that, that's a

19    choice people have to make at their funds, but it's not as

20    if --

21             THE COURT:  You can't have it both ways.

22             MR. GREENBERG:  Right.  It's not as if we were

23    hiding in the darkness and no one could reach out to us, we

24    were there.

25             Unfortunately most of our negotiations were in the

1    press constantly.  There was no mystery around what was

2    going on and that we were trying to negotiate with our

3    creditors to get to a confirmable plan, which was always our

4    goal was to get to a confirmable plan that we could bring

5    before this Court.

6            THE COURT:  The actual bid and asks were in the

7    press or the fact of the -- that the negotiations were going

8    on?

9            MR. GREENBERG:  There were a couple that actually

10   made its way to the press, which was a little disappointing

11   at times, but I prefer not to relive it.  But yes, I mean we

12   actually had bid and ask go out to the press.

13           So, I think it's a little unfair, especially when

14   you have a bunch of people that had opportunity to

15   participate in the past, to show up on February 12th, and

16   most importantly with no proposal, it was a call and a

17   request for a seat at the table but not hey and here's my

18   proposal, you should chew on it, just I want to get in the

19   room that unfortunately already had way too many cooks in

20   the kitchen and we were trying to hold together a fragile

21   deal.

22           THE COURT:  You got -- you're over metaphored.

23   We've got horses being led to water, we've got wheels on

24   carts.

25           MR. GREENBERG:  I'll try to tune back my

Page 28

1    metaphors.  Just having some fun with them.

2              THE COURT:  Just showing you that I read the

3    papers.

4              MR. GREENBERG:  Thank you.

5              But quite frankly, Your Honor, I think my

6    conclusion is because someone made a request at the eleventh

7    hour to sit down at the table and, you know, the debtors and

8    everyone else, the parties that had the requisite vote in

9    the room decided that it wasn't going to help, and

10   apparently -- and oh, you know, possibly impede our ability

11   to get to a deal, doesn't mean the process was flawed.

12             I spoke to Mr. Seider, and again, no he said; she

13   said, but I answered the calls pretty quickly, I thought I

14   was pretty candid about where we were in the process, and

15   quite frankly at the time the holdings have increased but it

16   was a five or six percent holder of Cap and a nine percent

17   holder of the 21s and we didn't see the benefit of adding

18   them in.

19             THE COURT:  So, I think though what you're telling

20   me is that you're not going to talk to them between now and

21   June 3rd.

22             MR. GREENBERG:  I didn't say --

23             THE COURT:  Is that what you're saying?

24             MR. GREENBERG:  No, I didn't say that actually,

25   because we have.  And as Mr. Seider noted we signed an NDA

Page 29

1    with Latham, we sat down with them at our offices, we had

2    some conversations, we got an initial proposal, I'm telling

3    you the proposal doesn't work, and it doesn't -- it's not

4    going to have any traction with the other holders, and quite

5    frankly simultaneously -- and this goes to cost savings and

6    everything else around mediation -- we've also already

7    agreed with Latham on a litigation schedule and on a

8    discovery schedule to work backwards from June 3rd.  And

9    quite frankly last night was the first exchange of initial

10   discovery requests.  So that process has started.

11            THE COURT:  And that schedule goes to the whole

12   panoply of potential things that may or may not be raised at

13   confirmation.

14            MR. GREENBERG:  Whatever they need.  I don't think

15   there's been any disputes so far as to among the litigators,

16   maybe I'll let the litigators talk about it in terms of

17   getting them whatever they need in connection with

18   confirmation.

19            The one other thing I do want to note though,

20   because it troubles me a bit, is there was a lot of

21   allegations about, you know, there's no unconflicted party

22   representing the interests of the 21s, and you know,

23   everyone is hedged all over the capital structure so they

24   just threw the 21s under the bus, right, which I think is

25   the takeaway from their pleadings, and I found it kind of

Page 30

1    ironic that after the 2019 was filed --

2              THE COURT:  Some of them are hedged too.

3              MR. GREENBERG:  These guys -- five out of eight I

4    think are hedged.  And again, I actually -- I don't have an

5    issue with that, I think that's most of the deals we work on

6    nowadays have that dynamic.  But the reality is it's not a

7    basis to disqualify, it's not a basis to designate, and I

8    haven't heard anyone say that there's a motion here, you

9    know, under 1126(e) to designate the PSA parties' votes,

10   right?  It happens all the time.

11             So -- and I just found that there was a certain

12   irony to the fact that somehow this group who's also hedged

13   was going to rectify that problem, the problem in our

14   process.

15             So as Your Honor already knows we provided them an

16   NDA, we met in person, as I said, not to repeat it, but we

17   have a litigation schedule, I think -- I don't think there's

18   been any problems, I think there's one potential date which

19   there's a little disagreement over, but everything else has

20   already started, we're going to give them what they need,

21   and you know, there's a proposal on the table that's been

22   rejected, which in my mind almost kind of gets me to why

23   mediation is not going to add anything.

24             I think our efforts are better focused on getting

25   to confirmation, getting Mr. Seider and his group what they

1    need to challenge confirmation, and getting on with it,

2    because this company needs to get out of bankruptcy.

3              THE COURT:  Well, I guess also if in the course of

4    preparing for confirmation -- if mediation is not conducted

5    and you're preparing for confirmation and something is

6    revealed to you or pointed out to you as something that

7    ought to give you pause or rethink or have the debtor as

8    fiduciary or Mr. Eckstein as fiduciary, turn to the plan

9    support parties and say --

10             MR. GREENBERG:  We have a problem.

11             THE COURT:  -- we have a problem.

12             MR. GREENBERG:  That's right.

13             THE COURT:  You're going to do that.

14             MR. GREENBERG:  That's right.  It's in our best

15   interest, we're not looking to put something in front of

16   Your Honor to have to take a second shot at it.  Right.

17             Your Honor, just to -- and I don't mean to over

18   pound it, but not to belabor the point, just one last point,

19   which is this whole idea that the 21s weren't adequately

20   represented and there was a bunch of letter writing

21   campaigns that were going on, and as I'm sure you saw in the

22   papers there was a request to --

23             THE COURT:  Right.

24             MR. GREENBERG:  -- Ms. Golden to appoint a 21

25   committee, and there's some back and forth where she asks

Page 32

1   both me and Mr. Eckstein to submit papers, and I'm sure you

2   saw, because we attached it to our pleadings, which is at

3   least the U.S. Trustee came out the same place we did on

4   this issue, which is that their position was that the 21s

5   were adequately represented on the committee as it stands.

6   So again, I don't think, you know, we have a problem with

7   lack of representation.

8             And, Your Honor, unless -- I mean there are bunch

9   of other issues, the transfer guarantor issue that they've

10  raised, this best interest test issue that they've raised

11  that I'd love to get into but I'm not going to get into

12  because they're confirmation issues.

13            THE COURT:  Right.  Okay.

14            MR. GREENBERG:  So that's all I have unless you

15  have other questions.

16            THE COURT:  All right.  So who else should I hear

17  from?

18            MR. GREENBERG:  Well up to you in terms of how

19  best you want to do this.  Is it better to hear from the

20  rest of the parties and then put Mr. Parkhill up, or would

21  you --

22            THE COURT:  Well, I don't know that I want to hear

23  from everybody saying --

24            MR. GREENBERG:  The same thing.

25            THE COURT:  -- me too.  I would like to hear if

1    the committee.

2              MR. GREENBERG:  Okay.

3              THE COURT:  And then maybe we can go to

4    Mr. Parkhill.

5              MR. GREENBERG:  Sounds great.  Thank you, Your

6    Honor.

7              THE COURT:  All right.  Thank you.

8              MR. ECKSTEIN:  Your Honor, good to see you.

9              THE COURT:  Good afternoon.  Good to see you.

10             MR. ECKSTEIN:  Kenneth Eckstein of Kramer Levin on

11   behalf of the official creditors' committee.

12             Your Honor, I will try not to repeat the

13   comprehensive presentation that Mr. Greenberg just

14   completed.  I think as Your Honor knows from reading the

15   pleadings the committee joins with the debtor in opposing

16   the request to compel the debtor and all the other parties

17   supporting the plan to enter into a mediation at this late

18   stage of the case.

19             THE COURT:  Let me ask you, I didn't ask

20   Mr. Greenberg, I mean you could put the question as, you

21   know, how could it hurt?

22             MR. ECKSTEIN:  How could it hurt, right, it's like

23   chicken soup.

24             THE COURT:  Chicken soup, right?

25             MR. ECKSTEIN:  Your Honor, I can address that

Page 34

1    point.  I mean let me make three basic points --

2              THE COURT:  Okay.

3              MR. ECKSTEIN:  -- and the third point is how can

4    it hurt, because I think in this case it could in fact hurt.

5              Number one, we all know mediation in some cases is

6    invaluable, and I've been involved in many cases where

7    mediation has frankly created consensus out of chaos.

8              THE COURT:  Residential Capital.

9              MR. ECKSTEIN:  Residential Capital, just can't

10   seem to leave my mind.

11             The fact is, and as Your Honor knows, this is

12   simply not that case.  This is a case where there in fact is

13   very substantial consensus around a plan that has support

14   throughout the capital structure both at Luxco and at Capco,

15   has frankly overwhelming support for a plan from a voting

16   standpoint, and while I recognize that Your Honor is going

17   to have to decide whether the plan satisfies all the

18   provisions of a Chapter 11 or 1129, the fact of the matter

19   is this is a case which frankly is poised to go to

20   confirmation.

21             It is true, this case, the plan will be premised

22   upon a compromise and settlement of the various litigation

23   issues, one of which is the transfer guarantee issue, there

24   are fraudulent conveyance allegations, there are

25   intercompany claim disputes, there are valuation issues, all

1    of which are subsumed into a plan and all of which were

2    delicately settled.

3           The alternative in this case was always

4    litigation, and if the plan fails, unless the parties can

5    find some other solution, the various issues will be

6    presented to the Court for adjudication.

7           The parties decided early on before the first

8    settlement was reached that it made sense to enter into a

9    settlement, and this plan will present to the Court the

10   basis for the settlement in great detail, and Your Honor at

11   confirmation, not today, will have the opportunity to assess

12   whether or not the plan is reasonable.

13          Your Honor, we believe that the Court will confirm

14   that plan and will find this plan amply satisfies the

15   requirements for 1129.

16          That said, we don't believe that at this point in

17   time this case is in a position where mediation is warranted

18   or necessary.  There is no stalemate and we have one

19   relatively small group, they're not unimportant, but are a

20   relatively small group that believes it should get more as

21   compared to other constituencies, and is going to object at

22   confirmation, and frankly that's what the process calls for

23   right now.  It's a pretty discreet objection, it'll be

24   presented, and as Mr. Greenberg said, we have a schedule and

25   we can get there.

Page 36

1              Number two, the Capco 21s in fact were very, very

2    carefully focused on and represented throughout the

3    negotiation process.  The indenture trustee is on the

4    creditors' committee, more than 50 percent of the 21s are on

5    the creditors' committee, and more than 60 percent of the

6    Capco notes are -- of the 21s are supporting the PSA.  And

7    as Mr. Greenberg indicated, the single largest beneficiary

8    of the amended PSA were the 21s.

9              So in fact what they really want to accomplish

10   through mediation was accomplished through the amended PSA.

11             We were fortunate to have the sale of Mexico,

12   which essentially sort of altered the fundamental premises

13   for the original PSA, and it allowed the parties to

14   restructure the PSA and ultimately garner the support of the

15   Luxco group.

16             But in addition to garnering the support of the

17   Luxco group all the parties to the case, recognizing that

18   the 21s were an important constituency, made sure that

19   substantial value over and above what was available through

20   the increased value from the sale of Mexico was essentially

21   shifted over to the 21s, and effectively the amended PSA

22   reflects a very substantial transfer of value from the Capco

23   16s and 19s to the Capco 21s, and frankly reduced the amount

24   of value that was being ascribed originally to the transfer

25   guarantee.

Page 37

1          THE COURT:  So the negotiating party that helped

2     accomplish that was yourself?  Was --

3          MR. ECKSTEIN:  Your Honor, I think the debtor and

4     the committee, but they were also actual holders of Capco

5     21s that were in the negotiations that fought vigorously to

6     make sure that additional value was transferred to the Capco

7     21s, and that is obvious from the change from November to

8     February in the amount of dollars that moved from

9     essentially the 16s and 19s to the 21s, recognizing exactly

10    the issues that are being complained about.

11         Now of course in every case I wish it was even

12    more value they say, but that's -- in some respects that's

13    what is the outcome of a settlement, which is never --

14    nobody gets everything they want, but they get a resolution.

15         This case was difficult, we were very fortunate to

16    have the Mexican sale, we're fortunate right now to have

17    more value going to everybody than people originally

18    expected.  But the fact of the matter is we now have an

19    excellent plan which has tremendous support.

20         And Your Honor, I am on behalf of the committee

21    we're going to lay out at confirmation why we believe this

22    plan is reasonable and satisfies 1129 and 9019.

23         And you're right, if the plan doesn't satisfy

24    confirmation the parties with have to go back to the drawing

25    board and we'll have to litigate or do it again.  But the

Page 38

1    fact of the matter is, the fact that one party is objecting

2    is not grounds for mediation.

3              Which then gets to so what's the harm?  The fact

4    of the matter is -- and I've been through mediation -- the

5    fact of the matter is mediation is not simple and we have a

6    schedule for confirmation and the confirmation schedule is

7    important -- and by the way it's still important that this

8    company emerge from Chapter 11, because we still have a very

9    substantial operating business in Brazil, we have non-debtor

10   entities with financings that have to be rolled over, and

11   people are counting on this company emerging from Chapter 11

12   within a timetable.

13             And so the fact of the matter is you have seven

14   parties involved in this case.  You have the debtor, you

15   have the committee, you have the Luxco bonds, you have the

16   independent manager, you have Capree, you have Aurelius, and

17   you now have the Latham ad hoc group.  And all of these

18   parties are going to have to agree on a mediator, are going

19   to have to submit mediation statements.  These mediation

20   statements are not going to be simple, they're going to be

21   all the work that was done on all the different disputes --

22             THE COURT:  No, there's another model, I mean the

23   other model of mediation and the assumption frankly that

24   somebody is available and has time is a big assumption, but

25   putting that to one side, there is the mediation model of

Page 39

1   everybody, you know, getting in a group of rooms and not the

2   more traditional mediation statements, et cetera.  So --

3              MR. ECKSTEIN:  Your Honor, based on my observation

4   firsthand I don't believe that that would be a useful use of

5   anybody's time in this case.  And the fact of the matter is,

6   the parties do have the ability to sit down and meet.

7   Mr. Greenberg and I and the financial advisors met with

8   Mr. Seider not that long ago, and without getting into

9   details suggestions were made both ways.  It was not just

10  that Mr. Seider has made a proposal that was accepted.  The

11  fact of the matter is a suggestion was made to Mr. Seider

12  that wasn't acceptable to him.  That's okay.  But the fact

13  of the matter is these parties don't need a third party to

14  get them to the table.  If people want to talk there is the

15  ability to talk.

16             But realistically I've observed the parties in

17  this case firsthand and I took Mr. Seider's proposal, I

18  distributed it to the committee, we discussed it with the

19  committee, and the fact of the matter is, Your Honor, while

20  I don't want to say the parties refused to talk, I think

21  it's fair to represent to the Court that court ordered

22  mediation will not give rise to a change in parties' views,

23  which is that they have compromised in a manner necessary to

24  get the plan to confirmation.  And I believe that's where

25  all the parties are right now, and I believe if you asked

1   the parties to the PSA to speak that's what they would all

2   say, is that we gave as much as we felt we could and as much

3   as we felt was required to get to a place where the plan was

4   agreed upon for confirmation.

5            THE COURT:  Okay.

6            MR. ECKSTEIN:  So --

7            THE COURT:  All right.

8            MR. ECKSTEIN:  -- we think that mediation would

9   not be useful in this case and we would request that the

10  motion be denied.

11           THE COURT:  Okay.  Thank you.

12           All right, shall we hear from Mr. Parkhill?

13           MR. GREENBERG:  My colleague, Mr. Hamilton, is

14  going to handle that.

15           THE COURT:  Okay.

16           MR. HAMILTON:  Good afternoon, Your Honor.

17           THE COURT:  Good afternoon.

18           MR. HAMILTON:  Robert Hamilton of Jones Day on

19  behalf of the debtors.

20           THE COURT:  Okay.  Mr. Parkhill, would you stand

21  up, please.  Would you raise your right hand.

22              HOMER DAVID PARKHILL, WITNESS SWORN

23           THE COURT:  All right, please have a seat.  Okay.

24           MR. HAMILTON:  Thank you, Your Honor.

25                    DIRECT EXAMINATION

1    BY MR. HAMILTON:

2    Q    Mr. Parkhill, can you tell the Court your full name?

3    A    I'm sorry, what?

4    Q    Tell the Court your full name.

5    A    Homer David Parkhill.

6    Q    Where do you work Mr. Parkhill?

7    A    I work at Rothschild.

8    Q    What is Rothschild?

9    A    Rothschild is an international financial advisor that

10   focuses on providing advice and merger and acquisitions,

11   restructuring, and debt advisory.

12   Q    And what do you do at Rothschild and how long have you

13   done it?

14   A    Well, I'm to managing director in the restructuring

15   practice.  I've been with Rothschild since 2001.

16             MR. HAMILTON:  Your Honor, may I approach?

17             THE COURT:  Yes.  Thank you.

18             THE WITNESS:  Thank you.

19   BY MR. HAMILTON:

20   Q    Mr. Parkhill, I've handed you a copy of a document

21   that's titled declaration of Homer Parkhill.  Do you

22   recognize this document?

23   A    I do.

24   Q    Did you sign this document?

25   A    I did.

Page 42

1    Q    All right.  And at the time when you signed it are the

2    statements in here that are attributed to you true and

3    accurate to -- did you believe they were true and accurate

4    at the time?

5    A    They are.

6    Q    All right.

7         MR. HAMILTON:  Your Honor, I would proffer the

8    declaration of Homer Parkhill into evidence as his direct

9    testimony here.

10        THE COURT:  All right.  Any objections?

11        MR. SEIDER:  No objection, Your Honor.

12        THE COURT:  Okay, it's in.

13        (Debtors' Exhibit No. 1 was admitted)

14   BY MR. HAMILTON:

15   Q    How did you first get involved in NII's restructuring,

16   Mr. Parkhill?

17   A    In November of 2013 we started working with the company

18   in an exercise evaluating strategic alternatives, which

19   covered the landscape of possible options from M&A

20   alternatives to exchange offers and the like.

21   Q    And then what happened next?

22   A    Given the company's financial position that quickly

23   migrated into more of a comprehensive restructuring

24   discussion to deal with the -- really the liquidity

25   challenges and the balance sheet challenges that were --

Page 43

1    that the company was facing.

2    Q    And did those discussions start to involve

3    constituencies of creditors of the debtors?

4    A    Yes.  Very early on we organized and encouraged the

5    organization of the bondholders to interface with -- to

6    start negotiations around potential plans to deal with our

7    challenges.

8    Q    And can you tell the Court what was your specific role

9    in those negotiations?

10    A    I led the team at Rothschild in interfacing with the

11    principals and the professionals for the ad hoc bondholder

12    groups that were formed.

13    Q    All right.  And were you able to negotiate a deal in

14    the summer -- last summer?

15    A    Despite, you know, exhaustive efforts and countless

16    hours of engagement and kind of a full open kimono approach

17    with the constituents involving, you know, loads of data and

18    information exchanges, we were not able to reach a -- you

19    know, a prearranged resolution.

20    Q    What was the principal issue that prevented you from

21    brokering an out-of-court deal?

22    A    The principal issues resolved around the allegations,

23    the transfer guarantee, the settlement -- or the issues of

24    the transfer guarantors, the intercompany allegations and

25    issues and the issues relating to fraudulent conveyance

1    claims.  They were really embodied in the letter that

2    Aurelius submitted in February of 2014.

3    Q    Okay.  Can you just generally describe the positions

4    that the different constituencies took during those

5    negotiations and your understanding of why it mattered to

6    them?

7    A    Well the largest issue was the transfer guarantor

8    issue.  That issue had the effect, to the extent that those

9    guarantees weren't properly released, really shifting value

10   from the constituents in the capital structure, primarily

11   shifting value away from the Luxco creditors and to the 16

12   and 19s who are the parties that have that claim.  That

13   issue and the issue of valuation, because as value moves the

14   waterfall recoveries for the constituents moves, but those

15   two primary issues were the issues that were the most

16   difficult.

17   Q    Did the negotiations continue after the debtors'

18   Chapter 11 cases were filed?

19   A    They did.  Just prior to filing the groups actually

20   split once again in terms of -- we had a crossover group

21   that we were primarily engaged with, as well as with the

22   group of 16s and 19s, the Aurelius group, prior to the

23   filing.  Right before filing the crossover group splinters

24   into two groups, Luxco group and a -- really a Luxco group

25   that represented just the Luxco interests.  And so post

Page 45

```
 1    filing we were engaged really with the Luxco group and then

 2    the we'll call the Capco group around potential plans of

 3    reorganization.

 4    Q    What was your involvement in the negotiations that led

 5    to the initial settlement and initial plan support

 6    agreement?

 7    A    The November settlement?

 8    Q    Yes.

 9    A    So, I led the team again in interfacing with the

10    principals and the professionals for those groups, including

11    the committee at that time who was formed and obviously

12    became very active in trying to broker a resolution of the

13    estates' issues and the settlement issues.

14    Q    Have you ever used the phrase dual track negotiations

15    that describe that time period?

16    A    Yes, we did, and we have, because in reality what was

17    going on was the Luxco group and the 16 and 19 group led by

18    Aurelius were in a dueling term sheets situation where we

19    were being -- negotiating simultaneously with each group the

20    terms of a potential plan of arrangement trying to move

21    really both groups to one proposal to try to unify both

22    sides, which we were unsuccessful in doing, but along the

23    way trying to find a plan that had a settlement of the

24    issues and that we could actually get confirmed.

25    Q    All right.  Can you describe for the Court what were
```

Page 46

1    the three key parameters that governed those negotiations?

2    A    Sure.  So --

3                 THE COURT:  I'm just going to say that I would

4    like this to stay at 30,000 feet, because I don't want

5    anyone after the fact to say that something that was put on

6    the record was part of settlement negotiations.

7                 So, Mr. Seider, I know that you know how to object

8    if there's something objectionable, but I'm just beginning

9    to feel like I'm getting close to that point.

10               MR. HAMILTON:  Thank you, Your Honor.

11               THE WITNESS:  I'll try to stay to highlights, Your

12    Honor.

13               THE COURT:  Okay.

14               THE WITNESS:  So the three issues, really I

15    mentioned one, it's the settlement of the three issues, the

16    transfer guarantor, the intercompany claims, and the

17    fraudulent conveyance issues.

18               So getting to a settlement of those issues, making

19    sure that that settlement could fit within the kind of

20    framework of reasonableness for the debtors and for the

21    other constituents, and making sure that that settlement

22    could actually have enough votes to carry a plan and

23    actually be confirmed and have an emergence.

24    BY MR. HAMILTON:

25    Q    So you needed to settle; is that right?

1    A    Settle, yes.

2    Q    Why did you need to settle the disputed claims?

3    A    So there was a lot of discussion around the possibility

4    of litigating these claims in the bankruptcy cases to some

5    final result.  There was real concern that the debtors had

6    that one, that litigation process would be very lengthy,

7    time consuming, and disruptive to the overall business.  We

8    have local debt of about a billion six of local debt in our

9    markets that also was experiencing defaults and we were

10   having negotiations simultaneously with them around a time

11   frame to get the cases resolved.  And it was clear to us

12   that an exhaustive, you know, litigation of these issues was

13   going to kind of push us well past the time frame that our

14   local creditors were going to be comfortable with.

15          So pretty quickly I think people were focused on

16   trying to get a resolution that would allow these issues to

17   be settled and protect the value of the business.

18   Q    All right.  And I think the second thing you said was

19   that the settlement had to be reasonable; is that right?

20   What do you mean by that?

21   A    Sure.  Well, I mean that the issues of the settlement

22   had to kind of fit within the framework of reasonableness

23   from the standard of, you know, if the issue -- we couldn't

24   settle the issues at a hundred percent probability one way

25   or the other, maybe it'd be the balance based on the facts

1    and circumstances that existed around each of those issues.

2    Q    And then the last parameter I think you mentioned was

3    acceptance by the creditors?

4    A    We were very focused on organizing and negotiating with

5    the requisite body of creditors that could actually carry a

6    class of votes so we could actually deliver the settlement

7    through the bankruptcy process.  So that was very much a

8    focus.

9    Q    How did the initial settlement and initial PSA fit

10   within these parameters?

11   A    It fit within those parameters, you know, very well.

12   We had a settlement of the transfer guarantor percentage at

13   27 and a half percent, the intercompany claims were settled

14   at 25 percent, and the fraudulent conveyance claims were

15   settled at 25 percent.

16   Q    Did the debtors make a business judgment as to whether

17   those percentage recoveries on those disputed claims was in

18   the range of reasonableness?

19   A    We did, and we also went a step further and set up a

20   process where whereby we had Scott Win, the independent

21   manager, appointed for the purposes of evaluating that

22   settlement and opining on that settlement on behalf of the

23   Luxco estate.  So that was another added reason why we were

24   comfortable with the process and the PSA that we signed was

25   one that we would be comfortable with.

1    Q    What happened next?

2    A    Well fortunately for all of us in the room the sale

3    discussions which we were leading as well culminated in the

4    bit from AT&T for Mexico, and in that event and the

5    implications of that event, which is raising the value of

6    the overall estates, you know, certainly shifted the

7    landscape in terms of the dialogue around how much value

8    there was to go around, and you know, the need to kind of go

9    back and look at the settlement and the overall plan in the

10   context of that event.

11   Q    How did the added value from the proposed Mexico sale

12   affect the anticipated recovery of the Luxco bondholders?

13   A    To the extent that the existing settlements were held

14   it would have a full recovery to the Luxco creditors.  And

15   so they went from recovering based on the plan settlement

16   value I think it was 96 percent to recovering, you know, par

17   plus accrued -- of par plus prepetition interest.

18   Q    So if as a result of the proposed Mexico sale the Luxco

19   bondholders are getting 100 percent was there anything left

20   to negotiate in terms of the settlement of the disputed

21   claims?

22   A    Sure there was.

23   Q    Why?

24   A    There was, you know, certainly a recognition that the

25   kind of efforts of the independent manager, Scott Win, and

Page 50

1    kind of his perspective had to be taken into account.

2          The 21s that were represented in the group that we

3    were negotiating with, you know, had a view on, you know,

4    what they would -- you know, their perspective on the

5    feedback they were getting.

6          And so in the context of that feedback and in the

7    context of, you know, the added value, really we had to kind

8    of go back to the drawing board and really start to

9    negotiate plan value and primarily transfer guarantor,

10   that's the only percentage that moved.

11   Q    All right.  And who were the different constituencies

12   that were involved after the amounts were in the Mexico sale

13   in renegotiating the transfer guarantor claims that you just

14   referred to?

15   A    So the different -- we had the Luxco group, we had the

16   16 and 19 group that we call the Aurelius group, the Capco

17   group, there was the committee, and then the individual

18   creditors that sat on the committee which had, you know,

19   sizable positions.

20   Q    And how did it get resolved?

21   A    It got resolved by the PSA and the plan that's in front

22   of the Court, the transfer guarantor percentage was shifted

23   downward by -- from 27 and a half percent to 21 percent,

24   which you know, materially shifted value from the 16 and 19

25   group to the 21 group for --

1    Q    How much value?

2    A    Well there was approximately 50 million of value based

3    on that discreet move that were shifted from the 21s -- to

4    the 21s from the 16 and 19s.

5    Q    What was the net result of shifting this value to the

6    21s from the 16 and 19s, what did it enable you to get?

7    A    The consensus of the parties that are in the room and

8    the votes that we have, you know, supporting this plan or

9    that we anticipate having supporting this plan that are

10   backing the PSA.

11   Q    Can you describe for the Court how difficult and

12   intense these negotiations were in the February and early

13   March time period?

14   A    Sure.  Post the sale order, you know, despite there

15   being a lot of value to go around, these negotiations around

16   the percentages were extremely difficult.  I think as

17   Mr. Greenberg has said involved countless hours of

18   negotiations back and forth around the percentage moves and

19   the relative impacts -- financial impacts of those moves.

20           And ultimately we reached an agreement on the

21   basic framework in mid February, but we had a host of other

22   issues, which I would call smaller economic issues primarily

23   around professional fees that at various points in time from

24   February to the March 5th signing of the PSA threatened to

25   up end the deal, and there were many evenings where, you

Page 52

1    know, we thought, you know, we were going the litigation

2    route despite our, you know, best efforts.

3          So it was a very tenuous period and it was one

4    that was very difficult to reach, but one that we obviously

5    reached.

6    Q    Mr. Parkhill, do you have any reason to believe that

7    court ordered mediation with the 2021 ad hoc group at this

8    point would result in any changes to the current settlement

9    or PSA?

10   A    I don't.

11   Q    Why not?

12   A    As has been said in the court I think the parties that

13   have signed up for this agreement made these moves in

14   contemplation of these moves being what would be required to

15   get to consensus, and getting to consensus means having the

16   requisite votes to confirm the plan.  And I think they're

17   comfortable with the moves that they've made, I can say, you

18   know, maybe comfortable is too storage of a term, I think

19   they're begrudgingly comfortable with the moves that they've

20   made, and I really don't see economically, you know, the

21   leverage of making a move or the positions that each of

22   these parties have.  They expect that this plan is going to

23   be presented and they have the votes and there's no reason

24   for them to give anymore economically.

25          MR. HAMILTON:  Thank you, Your Honor.  I have no

1      further questions.

2               THE COURT:  Okay.  Mr. Seider?

3               MR. SEIDER:  Your Honor, may I just ask a couple

4      questions for Mr. Parkhill?

5               THE COURT:  Sure.

6               MR. SEIDER:  Thank you.

7               THE COURT:  Absolutely.

8               MR. SEIDER:  For the record Mitchell Seider,

9      Latham & Watkins.

10              Your Honor, if you'll allow I have just a couple

11     of questions for Mr. Parkhill and then maybe I could have a

12     moment to respond to just a few of the comments --

13              THE COURT:  Yes.

14              MR. SEIDER:  -- Mr. Eckstein and Mr. Greenberg

15     made.

16              THE COURT:  That would be fine.

17              MR. SEIDER:  Thank you very much.

18                         CROSS-EXAMINATION

19     BY MR. SEIDER:

20     Q    Good afternoon, Mr. Parkhill.

21     A    Very well, Mr. --

22     Q    How are you today?

23     A    I'm well.

24     Q    Good.  Good.

25              Mr. Parkhill, on direct I think it was your

Page 54

1   testimony that your goal in negotiating a potential

2   settlement was to achieve acceptance by creditors and be

3   able to carry a class of votes.  Is that a fair summary?

4   A    Not just a class, but to be able to present a plan that

5   had a reasonable chance of being confirmed.

6   Q    Thank you.

7        I gathered from your testimony that you've become

8   intimately familiar with the parties with whom you've been

9   negotiating towards the current PSA?

10  A    Yes.

11  Q    Okay.  Mr. Parkhill, do you know among the signatories

12  to the current PSA what percentage of the Capco 21 notes

13  those signators hold?

14  A    I believe 60 percent, approximately.

15  Q    Less than two-thirds?

16  A    Sixty percent is less than two-thirds.

17  Q    All right.  Thank you.

18        MR. SEIDER:  I have no more questions for

19  Mr. Parkhill.

20        THE COURT:  Okay.  Mr. Parkhill, you can step

21  down.

22        THE WITNESS:  Thank you.

23        THE COURT:  Thank you.

24        All right.  So you wanted to respond a bit to the

25  arguments.

1          MR. SEIDER:  Yes, Your Honor.  And thank you.

2          THE COURT:  Let me start out -- I'm sorry, did you

3     want to say something else?

4          MR. HAMILTON:  Your Honor, we have -- there are

5     others that wanted to speak in support of our objection to

6     mediation.  It might be better to hear from them before --

7     so we don't have to have multiple rebuttals.

8          THE COURT:  Okay.  Let me ask Mr. Seider a

9     question, okay?  So sometimes mediation works, but sometimes

10    parties become very inspired by the looming deadline of a

11    confirmation hearing.

12         MR. SEIDER:  Yes.

13         THE COURT:  Don't you think that this might be one

14    of those cases where parties could be equally inspired by

15    the looming confirmation hearing -- which by the way,

16    looking at my calendar I seem to only have penciled you in

17    for one day, so we're going to have to talk about that,

18    because if there's not consensus by then one day sounds

19    woefully inadequate, to use the phrase that you guys like to

20    use all the time, so we're going to have to talk about that.

21         But it seems to me that sometimes even when

22    parties have engaged, for example, in months of mediation,

23    for example, in LightSquared, once you begin to face the

24    reality of a confirmation hearing people become more

25    motivated to have discussions and resolve open issues.  So

Page 56

1    might that not work as well here as mediation?

2              MR. SEIDER:  Your Honor, sometimes that does

3    happen, and Your Honor, sometimes it doesn't, and our read

4    of the environment in this case is that it's not going

5    happen unless an outside party, Your Honor, forces it to

6    happen.

7              I heard Mr. Greenberg and I heard Mr. Eckstein

8    respond today at the podium to the proposal that we had made

9    to them on March the 22nd.  It's nine days ago.

10             Now, Your Honor, I am not casting aspersions on

11   what their response is or how their clients reacted to it,

12   I'm sure that they've reported honestly how their clients

13   felt about it.  I will note though that if they were truly

14   serious about having negotiations with us I would have heard

15   from them before today, and it might have been as simple as

16   a phone call --

17             THE COURT:  But don't you think -- I mean there's

18   kind of a -- that's a little counterintuitive, because by

19   not responding to you before today it enabled you to stand

20   up and say we didn't hear from them.  So that's --

21             MR. SEIDER:  Your Honor --

22             THE COURT:  -- a negative --

23             MR. SEIDER:  Sorry.

24             THE COURT:  I'm sorry -- that's -- makes them look

25   bad, if you will.

1              MR. SEIDER:  Your Honor, I would have liked

2     nothing better than to walk in here today and say, Your

3     Honor, I think the motion may have had a salutary effect,

4     because we're engaged in discussions with the debtors and

5     the committee right now, there's no need to have this

6     hearing.  But that's not what happened.

7              THE COURT:  Okay.

8              MR. SEIDER:  All right.

9              THE COURT:  All right.  Go ahead.

10             MR. SEIDER:  And thank you.  And again, I

11    appreciate your patience --

12             THE COURT:  Sure.

13             MR. SEIDER:  -- I certainly understand.

14             I want to make one -- well two points really about

15    what Mr. Eckstein had to say.  Your Honor, yes, it's true

16    that the sale of the Mexico business was a success and that

17    put more value into the estate, but what our clients are

18    interested in is not more value.  What they're interested in

19    is receiving a quality of distribution on instruments that

20    are of equal dignity.

21             THE COURT:  But what about the issue that's been

22    identified, and this is not a observation that's intended to

23    be a negative observation, about parties being hedged, okay?

24             MR. SEIDER:  Yes.

25             THE COURT:  This happens all the time, people have

1    holdings in different parts of the capital structure, people

2    enter the capital structure at different points of time --

3              MR. SEIDER:  Yes.

4              THE COURT:  -- and their basis varies.

5              But so here you have a situation though because of

6    the highly hedged nature of the majority of your

7    constituency they're going to be taking money out of each

8    other's pockets, and it's --

9              MR. SEIDER:  No.

10             THE COURT:  -- an extremely delicate and highly

11   complex process, right?

12             MR. SEIDER:  It is, and I really have two things

13   to say, Your Honor.

14             First, Your Honor is actually --

15             THE COURT:  There's nothing -- I mean to be clear,

16   because I don't want to be quoted out of context.

17             MR. SEIDER:  No.

18             THE COURT:  There's -- it's allowed, it's done,

19   claims trade, all good.

20             MR. SEIDER:  Yes.

21             THE COURT:  It's just it complicates a lot of

22   things, including negotiations such as the one you're saying

23   that we ought to have under the auspices of a mediator.

24             MR. SEIDER:  Yes, and Your Honor, really two

25   things.

1           Your Honor has actually put her finger on the

2      point that I wanted to make with respect to what

3      Mr. Greenberg said as doing the math, and I'll get to that

4      in a moment.

5           The second point, Your Honor, is the holders of

6      the Capco 21s who we represent who do have cross holdings

7      understand very well, better than I ever will and perhaps

8      better than Your Honor ever will, where their economic

9      interests lie in this particular capital structure, and if

10     their view was that what's been put on the table was

11     sufficient with respect to their rights under their

12     instruments we wouldn't be here.

13           THE COURT:  But it's a closed system, right?  So,

14     I mean if we could get more money from the outside that

15     would be one thing, but if it's just -- it's a closed

16     system.  So if we give the 21s more then we have to take it

17     from someone at Luxco or the 16s or --

18           MR. SEIDER:  We're not interested in interfering

19     in any way with the Luxco distribution.  Our point is that

20     the 16s and the 19s are getting more.  Not that we're

21     getting the same and we want more, we're getting less and we

22     want what they're getting to put it in its most simple

23     terms.

24           On the point that Your Honor made and that

25     Mr. Greenberg made about doing the math, which also I think

1    ties in to the point that he made about this being late

2    stage, and this really goes to explaining how we got to be

3    at this late stage with the agreement that we would like to

4    work our way into.  Your Honor, if you look at the holdings

5    of the Aurelius group, the Capree group, and the Luxco group

6    -- and I'll explain that in a minute -- what you will see is

7    that this settlement that's baked into the current RSA is

8    really one that was achieved not at their expense

9    necessarily, but rather at the expense of the distributions

10   to creditors who were not in the room.

11          And I heard very well what Mr. Eckstein said about

12   the committees' participation, and I am sure that they

13   participated aggressively and fully.  The members of the

14   committee do include Capree and Aurelius, and I'll explain

15   this in a moment, who hold 21 notes, and also does include

16   the indenture trustee for the 21 notes, who also happens to

17   be the trustee on the 19 notes as well.

18          So with what as background, Your Honor.  Aurelius'

19   holdings in the Capco 21 notes are very small compared to

20   its holdings in the 16s and the 19s.  Based on its last 2019

21   it holds about 11 percent of the 21s and it holds a combined

22   46 percent among the 16s and the 19s.  Capree has very

23   extensive holdings across the structure, Your Honor.  It

24   holds about 37 percent of the combined 16s and 19s, and

25   holds about 42 percent of the 21s.  It also holds 36 percent

Page 61

1    of the combined Luxco notes.

2            The transfer guarantor settlement that's baked

3    into the RSA costs Capree about $7 million on its position

4    in the 21s, but it provides Capree with a path to recover

5    615 million on the 582 million face amount that it holds in

6    the combined Luxcos.  So said another way, Your Honor, it's

7    a small price of admission to pay from its perspective for a

8    path to exit.

9            Now the Luxco group, Your Honor, has a great

10   incentive as well here, that group holds 4 percent of the

11   21s and less than a quarter percent of the combined 16s and

12   19s and approximately 35 percent of the combined Luxcos.

13   The cost to the Luxco group on its 21s from the settlement

14   is a mere $6 million.

15           We were here last week on the DIP, I think the

16   fees flowing to the Luxco is from the DIP, it's about

17   $6.24 million.

18           And so what this all goes to, Your Honor, is we're

19   not casting aspersions, they're voting with their wallets,

20   and that's fine, they should, but when you unpack this a

21   little bit, Your Honor, what you see is it's really from

22   their perspective more a matter of moving from the right

23   pocket to the left --

24           THE COURT:  But you've -- but you're making my --

25   you're making the point that must be said in response to

1    you, which is they are voting with their wallets.

2              MR. SEIDER:  Yes.

3              THE COURT:  So, I can't order someone to vote

4    against their wallets.

5              MR. SEIDER:  Correct.

6              THE COURT:  And therefore that's why at

7    confirmation it doesn't depend on a, you know, demonstration

8    and we can fill in the complete picture of everything that

9    you've just said, who owns what, what it's getting for them,

10   we always -- you know, it's solving for simultaneous

11   equations.  We can't really solve for the mystery variable,

12   which is the basis, so we don't know what that is, right?

13             So, I can't order someone to act not in their

14   economic interest, I can only reiterate --

15             MR. SEIDER:  Yes.

16             THE COURT:  -- come to confirmation, you have to

17   satisfy the standards for confirmation, and I will say --

18   try to say this in exactly the right way, it's not just a

19   9019 hearing, okay, dressed up in confirmation clothing, it

20   is going to have elements of both, but the 1129 standards

21   are still real standards and they are not made any lighter

22   or less burdensome by the fact that there's settlements that

23   are part of it.

24             So, I'm beginning to sound like I'm ruling,

25   because I am, and I appreciate your making the issues so

Page 63

1    highly defined.  I don't think this is a situation in which

2    ordering so many people to engage in a mediation that

3    they're not interested in is really the best way to go, and

4    I simply would not be comfortable with that.

5           I think that anecdotally I would tell you that

6    besides the cases that you all know about there are many,

7    many cases that you don't know about in which I encourage,

8    cajole, kind of order people for go into mediation.  This is

9    not a case in which I feel that it's appropriate to do that.

10          That being said though, I am going to ask all the

11   professionals to continue to keep the lines of communication

12   open, fully consensual is better than highly contested

13   confirmation hearing.  No confirmation hearing is without

14   risk.  Let it not be just about professional fees.  I assume

15   that it's not, but I'll say that out loud too.  And to the

16   extent that you wish to reraise at confirmation as part of

17   good faith or anything else that you feel is appropriate,

18   the lack of negotiations by any or all the constituencies of

19   course I'll hear you.  But I think the best thing for this

20   case is to keep marching towards confirmation.

21          And just to be hedged from my calendar

22   perspective, I think we should talk about additional dates.

23          So, I'm going to deny the motion for mediation for

24   the reasons that I've indicated, and I'm going to remain

25   optimistic that if there's any movement that can be had that

1    you will accomplish that.

2               MR. SEIDER:  Okay.

3               THE COURT:  All right?

4               MR. SEIDER:  Your Honor, I certainly understand,

5    and on behalf of our clients I want to thank you for your

6    time --

7               THE COURT:  Certainly.

8               MR. SEIDER:  -- and consideration of this.

9               THE COURT:  Okay.

10              MR. SEIDER:  It's greatly appreciated.

11              THE COURT:  All right.

12              MR. SEIDER:  Thank you.

13              THE COURT:  Let's look at the calendar though,

14   because that is causing me some concern.  So you have the

15   3rd.

16              MR. GREENBERG:  A Wednesday.

17              THE COURT:  Right.  And I can give you the morning

18   of the 4th, but not the afternoon.  And I can give you

19   Monday the 8th.

20              MR. GREENBERG:  I'm sure we won't need it, but

21   okay.  That works.

22              THE COURT:  Okay.  I'll give you Monday the 8th

23   and then we will stop there.

24              But just for the stake of full disclosure, because

25   I know you have timing elements, the 9th I have a Lehman

Page 65

1   day, the 10th through the 12th I have the circuit conference

2   so I won't be in town, and the week of the 16th there are a

3   couple of Lehman days as well.  The week of the 22nd I am

4   out of town the entire week.  So it's challenging after the

5   -- those dates that I've given you, just keep it in mind.

6               MR. GREENBERG:  Okay.

7               THE COURT:  All right?  Will somebody send me an

8   order --

9               MR. GREENBERG:  Absolutely.

10              THE COURT:  -- with respect to today's motion?

11              Is there anything else that we need to take care

12   of today?

13              MR. SEIDMAN:  Oh, yes, thank you.  Your Honor, I

14   think there was one --

15              MR. GREENBERG:  One open issue.

16              THE COURT:  Okay.

17              MR. SEIDER:  May I --

18              THE COURT:  Sure.

19              MR. SEIDER:  -- stay here?

20              THE COURT:  Sure, you can stay there, that's fine.

21              MR. SEIDER:  Thank you.

22              I think there was one point that one of my

23   partners has been handling with the Jones Day firm, it has

24   to do with when the debtors' confirmation brief is due, I

25   think, and please correct me if I'm wrong, the schedule they

1    provided would have that brief being filed two days before

2    the start of the confirmation hearing.  We had asked that it

3    be provided earlier so we actually have a chance to read it

4    and respond to it.

5              THE COURT:  Earlier would be better.

6              MR. GREENBERG:  Which is fine.  The retort that we

7    had to that, Your Honor, just to be clear, is that we ask

8    that they would correspondingly move back their objection so

9    the debtors aren't getting jammed in terms of preparing for

10   a contested confirmation hearing.

11             THE COURT:  Okay.

12             MR. GREENBERG:  And so --

13             THE COURT:  So can everybody give a couple a days?

14   I mean we're pretty far out from those days.

15             MR. GREENBERG:  Yeah, if we can -- you know, we

16   can move it back, I think the request from your litigation

17   partner was the Friday, but I would like to see the

18   objection deadline come in correspondingly so the debtors

19   have enough time to prepare.

20             THE COURT:  So when are you proposing that the

21   debtors and the proponents brief in support would be?  I

22   love little calendars, little confirmation calendars if you

23   want to prepare one.

24             MR. GREENBERG:  So, Your Honor, this is --

25             THE COURT:  When do you -- when would you propose

1    to give us the brief in support?

2         (Pause)

3              MR. GREENBERG:  Just as long as we're not --

4              THE COURT:  Okay.  So --

5              MR. GREENBERG:  -- compressing our own timeline.

6              THE COURT:  -- when will you -- Mr. Greenberg,

7    when do you propose your papers come in?

8              MR. GREENBERG:  Okay.  So just to put it on the

9    record, the objection deadline as it stood now for

10   confirmation objections was the 20th, that would get pulled

11   to the 18th, which is a Monday of May.

12             THE COURT:  Okay.

13             MR. GREENBERG:  And the brief that would be filed

14   that would also address any objections would be on Friday,

15   May 29th.

16             THE COURT:  Okay.

17             MR. GREENBERG:  And then the hearing would start

18   the following Wednesday.

19             THE COURT:  Okay.  Another thing, maybe too much

20   information, but I have a daughter graduating from law

21   school the last week of May.  I will not take your phone

22   calls.

23             MR. GREENBERG:  Understood.  Understood.

24             THE COURT:  Okay?

25             MR. GREENBERG:  Okay.  Thank you, Your Honor.

Page 68

```
 1                MR. ECKSTEIN:  First, congratulations.

 2                THE COURT:  Thank you.

 3                MR. ECKSTEIN:  You shouldn't take the phone call

 4    at least then.

 5                Just for clarity, I'm -- the committee is planning

 6    on submitting papers in conjunction with when the debtors

 7    submit --

 8                THE COURT:  Sure.  Okay.

 9                MR. ECKSTEIN:  -- its papers, I just wanted to

10    make that clear.

11                THE COURT:  All right.  Okay.  That schedule works

12    very well for us.

13                MR. GREENBERG:  Okay.

14                THE COURT:  Okay.

15                MR. GREENBERG:  So, I think we have an agreed upon

16    schedule.

17                THE COURT:  All right.  Thank you all so much.

18                MR. GREENBERG:  Thank you, Your Honor.

19                UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20        (Whereupon these proceedings were concluded at 3:22 PM)

21

22

23

24

25
```

Page 69

```
 1                      I N D E X

 2                  T E S T I M O N Y

 3    DEBTORS'

 4    WITNESS                EXAM BY                    PAGE

 5    HOMER D. PARKHILL      MR. HAMILTON               41

 6                           MR. SEIDER                 53

 7

 8                      I N D E X

 9                  E X H I B I T S

10    PARTY     NO   DESCRIPTION            ID.      EVID.

11    Debtors   1    Affidavit of Homer D.

12                   Parkhill               --        42

13

14

15                       RULINGS

16                                                   PAGE

17    Doc #522 Motion of the Ad Hoc Group of NII Capital

18    2021 Noteholders for an Order Directing the Debtors

19    to Participate in Mediation                      62

20

21

22

23

24

25
```

Page 70

1                 C E R T I F I C A T I O N

2

3   I, Dawn South, certify that the foregoing transcript is a

4   true and accurate record of the proceedings.

5   Dawn South   Digitally signed by Dawn South
                 DN: cn=Dawn South, o, ou,
                 email=digital1@veritext.com, c=US
6   _____   Date: 2015.04.02 12:27:33 -04'00'

7   Dawn South

8   AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12   Date:  April 2, 2015

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501

[& - adjudication]                                                                                                    Page 1

| & | 2 | 39  26:10 | 96  49:16 |
|---|---|---|---|

**&**

**&**  3:11 4:1,11,19
  5:1,9 6:7 53:9

**1**

**1**  42:13 69:11
**10**  22:21
**100**  9:14 49:19
**10010**  5:13
**10017-7306**  3:5
**10019**  5:4
**10022**  4:14
**10022-4834**  4:6
**10036**  3:14
**10036-6745**  4:22
**10th**  65:1
**11**  10:5 22:21 34:18
  38:8,11 44:18 60:21
**1126**  19:13 30:9
**1129**  34:18 35:15
  37:22 62:20
**11501**  70:25
**1177**  3:13
**1285**  5:3
**12th**  13:2 27:15
  65:1
**13th**  15:8
**14-12611**  1:3
**140**  20:25
**150**  8:14
**16**  8:21 44:11 45:17
  50:16,24 51:4,6
**16s**  36:23 37:9
  44:22 59:17,20
  60:20,22,24 61:11
**16th**  65:2
**170**  21:1 22:6
**18th**  67:11
**19**  8:21 45:17 50:16
  50:24 60:17
**19s**  36:23 37:9
  44:12,22 51:4,6
  59:20 60:20,22,24
  61:12

**2**

**2**  70:12
**20**  20:19
**2001**  41:15
**2013**  42:17
**2014**  44:2
**2015**  1:18 70:12
**2019**  30:1 60:20
**2021**  2:2 4:3 6:8
  52:7 69:18
**20th**  13:15 67:10
**21**  6:14 8:20,23,25
  11:2,23 13:8,13,16
  21:12 25:2,18 26:6
  31:24 50:23,25
  54:12 60:15,16,19
**21s**  20:15 21:6
  24:25 28:17 29:22
  29:24 31:19 32:4
  36:1,4,6,8,18,21,23
  37:5,7,9 50:2 51:3,4
  51:6 59:6,16 60:21
  60:25 61:4,11,13
**222**  3:4
**22nd**  5:12 13:16
  18:13 56:9 65:3
**24th**  11:19 15:8
**25**  48:14,15
**268**  20:21
**27**  48:13 50:23
**285**  8:19 10:23
**298**  20:21
**29th**  67:15
**2:09**  1:19

**3**

**3.01**  7:7,15,19
**3/13**  20:22
**30,000**  46:4
**300**  70:24
**31**  1:18
**31st**  13:20
**330**  70:23
**35**  61:12
**36**  60:25
**37**  60:24

**3:22**  68:20
**3rd**  13:24,25 15:9
  28:21 29:8 64:15

**4**

**4**  61:10
**4.02**  7:7,17,18
**408**  18:21 70:8
**41**  69:5
**41st**  3:4
**42**  60:25 69:12
**437**  20:23
**46**  60:22
**47**  21:1
**4th**  64:18

**5**

**50**  36:4 51:2
**522**  2:1 69:17
**53**  69:6
**53rd**  4:4
**58**  5:11
**582**  61:5
**5th**  14:6 22:17
  51:24

**6**

**6**  61:14
**6.24**  61:17
**60**  21:12 36:5 54:14
**601**  4:13
**615**  61:5
**62**  69:19
**63**  21:1
**66**  19:13

**7**

**7**  61:3
**70**  19:9,10
**75**  23:13

**8**

**80**  23:13
**885**  4:5
**8th**  64:19,22

**9**

**9019**  37:22 62:19

**9th**  64:25

**a**

**aaert**  70:8
**ability**  28:10 39:6
  39:15
**able**  43:13,18 54:3,4
**absolutely**  53:7
  65:9
**acceptable**  39:12
**acceptance**  48:3
  54:2
**accepted**  39:10
**accomplish**  36:9
  37:2 64:1
**accomplished**  36:10
**account**  50:1
**accrued**  49:17
**accurate**  11:14 23:8
  42:3,3 70:4
**achieve**  54:2
**achieved**  16:11 60:8
**acquisitions**  41:10
**act**  62:13
**actions**  14:4
**active**  45:12
**actual**  27:6 37:4
**acutely**  21:13
**ad**  2:1 4:2,12 6:8
  8:24 13:16 38:17
  43:11 52:7 69:17
**adam**  4:9
**add**  30:23
**added**  48:23 49:11
  50:7
**adding**  28:17
**addition**  36:16
**additional**  8:18
  37:6 63:22
**additionally**  7:5
  11:1
**address**  23:9 33:25
  67:14
**adequately**  31:19
  32:5
**adjudication**  35:6

admission  61:7
admitted  42:13
advice  41:10
advisor  41:9
advisors  13:14 39:7
advisory  41:11
affect  49:12
affidavit  25:7 69:11
affirmatively  26:8
afternoon  6:6 14:20
  14:21 33:9 40:16,17
  53:20 64:18
aggressively  60:13
ago  39:8 56:9
agree  38:18
agreed  29:7 40:4
  68:15
agreement  22:18
  45:6 51:20 52:13
  60:3
ahead  57:9
akin  4:19
allegations  11:8
  21:20 29:21 34:24
  43:22,24
allow  47:16 53:10
allowed  36:13 58:18
altered  36:12
alternative  35:3
alternatives  9:21,22
  42:18,20
amended  15:8
  20:12 36:8,10,21
americas  3:13 5:3
amount  11:3 19:14
  24:1 25:8 36:23
  37:8 61:5
amounts  50:12
amply  35:14
andrew  5:7
anecdotally  17:4
  63:5
announced  22:5,17
announcement
  22:24
answer  10:10 16:16

answered  28:13
answers  10:12
anticipate  51:9
anticipated  49:12
anybody's  39:5
anymore  52:24
apart  23:7
apparent  14:3
apparently  21:11
  28:10
appeared  10:16
appoint  31:24
appointed  19:17
  48:21
appointment  12:15
appreciate  57:11
  62:25
appreciated  64:10
approach  20:7
  41:16 43:16
appropriate  18:7
  63:9,17
appropriately  7:22
approximately  8:13
  8:19 10:22 51:2
  54:14 61:12
april  70:12
arguing  15:10 16:6
  16:7
argument  17:2
  20:16
arguments  9:6
  23:25 54:25
arrangement  45:20
ascribed  36:24
asked  11:23 39:25
  66:2
asks  27:6 31:25
aspersions  56:10
  61:19
assess  35:11
assistance  6:22
assume  63:14
assumption  38:23
  38:24
at&t  49:4

attached  24:24 32:2
attorney  4:20
attorneys  3:3,12 4:2
  4:12 5:2,10
attributed  42:2
aurelius  4:20 7:10
  38:16 44:2,22 45:18
  50:16 60:5,14,18
auspices  58:23
authorized  13:18
available  36:19
  38:24
avenue  3:13 4:5,13
  5:3,11
avoid  10:9 15:10
aware  15:12 21:13

**b**

b  1:21 20:3,9 69:9
back  20:13 21:2
  25:15 27:25 31:25
  37:24 49:9 50:8
  51:18 66:8,16
background  60:18
backing  51:10
backwards  29:8
bad  16:7 56:25
baked  60:7 61:2
balance  42:25 47:25
bankruptcy  1:1,14
  1:23 10:16 31:2
  47:4 48:7
based  10:16 39:3
  47:25 49:15 51:2
  60:20
basic  20:19 34:1
  51:21
basically  14:14
  22:21
basis  10:13 21:8,9
  21:10 30:7,7 35:10
  58:4 62:12
bear  17:3
beginning  46:8
  62:24
begrudgingly  52:19
behalf  6:7 14:23
  25:25 33:11 37:20

40:19 48:22 64:5
belabor  31:18
believe  12:8 16:9,9
  19:19 35:13,16
  37:21 39:4,24,25
  42:3 52:6 54:14
believes  6:14,17
  35:20
beneficiary  36:7
benefit  16:11 23:24
  28:17
benjamin  5:15
best  10:9 31:14
  32:10,19 52:2 63:3
  63:19
better  21:5,10 30:24
  32:19 55:6 57:2
  59:7,8 63:12 66:5
bias  24:19
bid  27:6,12
big  38:24
billion  47:8
bit  15:21 24:17 25:3
  25:23 29:20 49:4
  54:24 61:21
board  37:25 50:8
body  26:12 48:5
bondholder  43:11
bondholders  43:5
  49:12,19
bonds  38:15
bottom  14:15
bound  7:11,23
bowling  1:15
brad  3:17
brazil  38:9
brief  65:24 66:1,21
  67:1,13
briefly  15:17 21:18
bring  13:8 27:4
broker  45:12
brokering  43:21
bryant  4:21
bunch  27:14 31:20
  32:8
burdensome  62:22

**bus** 29:24
**business** 13:2,19
    38:9 47:7,17 48:16
    57:16

**c**

**c** 1:22 3:1 6:1 12:2
    19:13 70:1,1
**cajole** 63:8
**calendar** 55:16
    63:21 64:13
**calendars** 66:22,22
**call** 27:16 45:2
    50:16 51:22 56:16
    68:3
**calls** 28:13 35:22
    67:22
**campaigns** 31:21
**candid** 28:14
**cap** 28:16
**capco** 6:8,14 8:5,6,7
    8:13,15,18,21,21,23
    11:2,23 12:11 13:8
    13:13,16 19:10
    20:19 34:14 36:1,6
    36:22,23 37:4,6
    45:2 50:16 54:12
    59:6 60:19
**capital** 2:2 4:2 5:2
    8:3,20 23:14 29:23
    34:8,9,14 44:10
    58:1,2 59:9 69:17
**capree** 7:10 38:16
    60:5,14,22 61:3,4
**care** 65:11
**carefully** 36:2
**carry** 46:22 48:5
    54:3
**carts** 27:24
**case** 1:3 9:13,25
    10:16,19 12:2 16:21
    17:21,24,25 18:1
    22:2 23:2 33:18
    34:4,12,12,19,21
    35:3,17 36:17 37:11
    37:15 38:14 39:5,17
    40:9 56:4 63:9,20

**cases** 7:13 9:14 10:1
    16:8,11 22:3 34:5,6
    44:18 47:4,11 55:14
    63:6,7
**casting** 56:10 61:19
**causing** 64:14
**center** 15:20
**certain** 11:9,10 16:8
    30:11
**certainly** 9:9 49:6
    49:24 57:13 64:4,7
**certified** 70:8
**certify** 70:3
**cet** 70:8
**cetera** 39:2
**challenge** 31:1
**challenges** 42:25,25
    43:7
**challenging** 65:4
**chambers** 15:12
**chance** 54:5 66:3
**change** 12:2 15:24
    37:7 39:22
**changes** 52:8
**chaos** 34:7
**chapman** 1:22
**chapter** 10:5 34:18
    38:8,11 44:18
**chew** 27:18
**chicken** 33:23,24
**choice** 26:19
**chosen** 11:10
**christine** 4:17
**christopher** 4:16
**circuit** 65:1
**circumstances**
    16:10 48:1
**cited** 7:7
**claim** 7:11 14:11,12
    34:25 44:12
**claims** 10:15,21
    25:13 44:1 46:16
    47:2,4 48:13,14,17
    49:21 50:13 58:19
**clarity** 68:5
**class** 48:6 54:3,4

**clear** 47:11 58:15
    66:7 68:10
**clearly** 13:7
**clients** 56:11,12
    57:17 64:5
**climb** 9:25 10:2
**close** 14:2 46:9
**closed** 59:13,15
**clothing** 62:19
**code** 24:4,6
**cohen** 3:9
**colleague** 40:13
**combined** 8:19
    60:21,24 61:1,6,11
    61:12
**come** 12:9 14:8
    19:17 23:12,24
    62:16 66:18 67:7
**comes** 24:13
**comfortable** 47:14
    48:24,25 52:17,18
    52:19 63:4
**commenced** 22:2
**commencement**
    22:3
**comments** 53:12
**commission** 10:18
    10:21
**committed** 6:10
    18:5
**committee** 3:12
    4:12 6:8 7:19,21
    13:1,14,17 14:5
    19:15 22:4 25:11
    31:25 32:5 33:1,11
    33:15 36:4,5 37:4
    37:20 38:15 39:18
    39:19 45:11 50:17
    50:18 57:5 60:14
    68:5
**committees** 60:12
**communication**
    63:11
**company** 31:2 38:8
    38:11 42:17 43:1
**company's** 42:22

**compared** 35:21
    60:19
**comparing** 21:6
**comparison** 20:5,10
**compel** 33:16
**complained** 37:10
**complete** 62:8
**completed** 33:14
**complex** 58:11
**complexities** 17:24
**complicated** 14:14
**complicates** 58:21
**composition** 14:12
**comprehensive**
    33:13 42:23
**compressing** 67:5
**compromise** 12:13
    34:22
**compromised** 12:12
    39:23
**concern** 47:5 64:14
**concluded** 68:20
**conclusion** 28:6
**conducted** 31:4
**conference** 65:1
**confident** 24:13
**confirm** 7:18 24:14
    35:13 52:16
**confirmable** 24:1
    27:3,4
**confirmation** 6:16
    9:2,7 13:23,24 15:1
    23:20 24:12 29:13
    29:18 30:25 31:1,4
    31:5 32:12 34:20
    35:11,22 37:21,24
    38:6,6 39:24 40:4
    55:11,15,24 62:7,16
    62:17,19 63:13,13
    63:16,20 65:24 66:2
    66:10,22 67:10
**confirmed** 23:16,19
    23:19 45:24 46:23
    54:5
**congratulations**
    17:21 68:1

**conjunction** 68:6
**connection** 29:17
**consensual** 11:6
  63:12
**consensus** 9:14 24:1
  34:7,13 51:7 52:15
  52:15 55:18
**consenting** 7:10,20
  7:23 14:5
**consider** 7:5
**considerable** 11:3
**consideration** 64:8
**constantly** 27:1
**constituencies**
  35:21 43:3 44:4
  50:11 63:18
**constituency** 36:18
  58:7
**constituents** 43:17
  44:10,14 46:21
**consuming** 47:7
**contacted** 12:25
**contemplation**
  52:14
**contend** 21:12
**contested** 6:16 10:5
  63:12 66:10
**context** 10:19 15:22
  49:10 50:6,7 58:16
**continue** 44:17
  63:11
**contract** 14:13
**conversations** 29:2
**conveyance** 34:24
  43:25 46:17 48:14
**cooks** 27:19
**copies** 20:3
**copy** 41:20
**correct** 12:17,17
  62:5 65:25
**correspondingly**
  66:8,18
**cost** 29:5 61:13
**costs** 61:3
**counsel** 12:25 13:1
  19:18

**counterintuitive**
  56:18
**counting** 38:11
**countless** 43:15
  51:17
**country** 70:23
**couple** 10:10 16:19
  23:7 27:9 53:3,10
  65:3 66:13
**course** 8:2 26:12
  31:3 37:11 63:19
**court** 1:1,14 6:2,5
  6:11,12,24 7:2,6,15
  7:24 9:1,4,10,16,20
  9:23 10:2,4,7 11:7
  11:14,17,19,21 12:4
  12:9,15,18,23 13:25
  14:16,19,21 15:3,6
  15:15,16,21,25 16:4
  17:1,4,7,10,14,18
  17:22 18:2,10,12,17
  18:19 19:17,21 20:8
  21:5,8,16 22:9,17
  23:10,12,16,18,21
  23:23 24:5,10 25:21
  25:24 26:3,5,21
  27:5,6,22 28:2,19
  28:23 29:11 30:2
  31:3,11,13,23 32:13
  32:16,22,25 33:3,7
  33:9,19,24 34:2,8
  35:6,9,13 37:1
  38:22 39:21,21 40:5
  40:7,11,15,17,20,23
  41:2,4,17 42:10,12
  43:8,21 45:25 46:3
  46:13 50:22 51:11
  52:7,12 53:2,5,7,13
  53:16 54:20,23 55:2
  55:8,13 56:17,22,24
  57:7,9,12,21,25
  58:4,10,15,18,21
  59:13 61:24 62:3,6
  62:16 64:3,7,9,11
  64:13,17,22 65:7,10
  65:16,18,20 66:5,11
  66:13,20,25 67:4,6

  67:12,16,19,24 68:2
  68:8,11,14,17
**court's** 6:10,21 14:8
**courtroom** 18:8
**covered** 42:19
**created** 34:7
**creditor** 22:1
**creditors** 19:14,15
  22:4 25:6,11,14
  27:3 33:11 36:4,5
  43:3 44:11 47:14
  48:3,5 49:14 50:18
  54:2 60:10
**cross** 26:11 53:18
  59:6
**crossover** 44:20,23
**culminated** 49:3
**culmination** 7:13
**current** 11:23 13:6
  52:8 54:9,12 60:7
**cut** 9:5,5

**d**

**d** 6:1 7:19 69:1,5,8
  69:11 70:8
**daniel** 4:24
**darkness** 26:23
**data** 43:17
**date** 30:18 70:12
**dates** 63:22 65:5
**daughter** 67:20
**david** 40:22 41:5
**dawn** 2:25 70:3,7
**day** 3:2 14:22 25:9
  40:18 55:17,18 65:1
  65:23
**days** 13:21 22:21
  56:9 65:3 66:1,13
  66:14
**deadline** 55:10
  66:18 67:9
**deal** 16:18 19:14
  20:13,14,17 21:1,2
  21:5 22:25 23:6,7
  23:12 24:13 25:11
  25:14 26:13,17,17
  27:21 28:11 42:24
  43:6,13,21 51:25

**deals** 30:5
**debt** 8:3 12:11
  41:11 47:8,8
**debtor** 13:14,17
  14:17 16:1 31:7
  33:15,16 37:3 38:9
  38:14
**debtors** 1:10 2:2 3:3
  7:7,19,21 8:3,12
  10:17,20 11:20
  12:25 13:24 14:5,23
  24:16,20,25 28:7
  40:19 42:13 43:3
  44:17 46:20 47:5
  48:16 57:4 65:24
  66:9,18,21 68:6
  69:3,11,18
**december** 12:9
  20:18
**decide** 34:17
**decided** 28:9 35:7
**declaration** 41:21
  42:8
**declined** 26:8
**defaults** 47:9
**defined** 7:13 63:1
**delaware** 18:3
**deliberately** 24:25
**delicate** 58:10
**delicately** 35:2
**deliver** 48:6
**delta** 10:24
**demonstration** 62:7
**denied** 40:10
**deny** 63:23
**depend** 62:7
**depending** 20:24
**derived** 14:13
**describe** 44:3 45:15
  45:25 51:11
**description** 69:10
**designate** 30:7,9
**despite** 43:15 51:14
  52:2
**detail** 25:7 35:10
**details** 39:9

dialogue   49:7
different   9:13 10:1
   10:12 38:21 44:4
   50:11,15 58:1,2
difficult   37:15
   44:16 51:11,16 52:4
dignity   8:9 10:15
   57:20
dip   18:22 61:15,16
direct   40:25 42:8
   53:25
directing   2:2 69:18
direction   9:4
director   15:14
   41:14
disadvantage   8:20
disagreeing   24:9
disagreement   30:19
disappointing
   27:10
disclosed   22:16
disclosure   20:12
   64:24
discovery   29:8,10
discreet   35:23 51:3
discretion   6:10,11
   17:1
discuss   7:3
discussed   39:18
discussion   42:24
   47:3
discussions   11:4,25
   12:6,10,14 13:3
   43:2 49:3 55:25
   57:4
disparate   10:13
disputed   47:2 48:17
   49:20
disputes   29:15
   34:25 38:21
disputing   16:25
disqualify   30:7
disruptive   47:7
distributed   39:18
distribution   8:16,19
   8:24 57:19 59:19

distributions   60:9
district   1:2
doc   2:1 69:17
document   41:20,22
   41:24
doing   10:9 45:22
   59:3,25
dollars   16:20 20:20
   21:9 23:1,5,8 37:8
door   7:2
downward   50:23
drawing   37:24 50:8
dressed   62:19
dual   45:14
ducking   21:23
due   17:20 65:24
dueling   45:18
dynamic   30:6

e

e   1:21,21 3:1,1 6:1,1
   7:18 30:9 69:1,2,8,9
   70:1
earlier   66:3,5
early   22:14 35:7
   43:4 51:12
east   3:4
easy   23:7
echoes   14:25
eckstein   3:16 31:8
   32:1 33:8,10,10,22
   33:25 34:3,9 37:3
   39:3 40:6,8 53:14
   56:7 57:15 60:11
   68:1,3,9
economic   12:13
   22:19 51:22 59:8
   62:14
economically   52:20
   52:24
effect   44:8 57:3
effectively   36:21
effort   25:23
efforts   30:24 43:15
   49:25 52:2
eight   30:3
either   8:10 23:18

electronic   70:8
elements   62:20
   64:25
eleventh   28:6
elizabeth   5:6
ellis   4:11
emanuel   5:9 19:19
embodied   44:1
emerge   38:8
emergence   46:23
emerging   38:11
enable   51:6
enabled   56:19
encourage   63:7
encouraged   43:4
engage   7:25 25:5
   63:2
engaged   44:21 45:1
   55:22 57:4
engagement   43:16
enter   33:17 35:8
   58:2
entire   23:13 65:4
entities   38:10
entitled   20:20
entree   11:8
environment   56:4
equal   8:9 10:15
   57:20
equally   55:14
equations   62:11
especially   27:13
esq   3:7,8,9,16,17,18
   4:8,9,16,17,24 5:6,7
   5:15,16
essentially   12:10
   36:12,20 37:9
estate   48:23 57:17
estates   45:13 49:6
et   39:2
evaluating   42:18
   48:21
eve   18:22
evenings   51:25
event   49:4,5,10
everybody   32:23
   37:17 39:1 66:13

evid   69:10
evidence   20:5 42:8
exactly   37:9 62:18
exam   69:4
examination   40:25
   53:18
example   18:1 55:22
   55:23
excellent   37:19
exchange   10:17,21
   29:9 42:20
exchanges   43:18
excluded   24:25
excuse   10:14
exercise   6:11 42:18
exhaustive   43:15
   47:12
exhibit   20:3,9 42:13
existed   48:1
existing   49:13
exit   61:8
expect   52:22
expected   37:18
expense   60:8,9
experiencing   47:9
explain   6:10 11:16
   60:6,14
explaining   60:2
extensive   60:23
extent   44:8 49:13
   63:16
extremely   51:16
   58:10

f

f   1:21 70:1
face   8:7 55:23 61:5
faces   26:14,14
facing   43:1
fact   14:6 27:7 30:12
   34:4,11,12,18 36:1
   36:9 37:18 38:1,1,3
   38:5,13 39:5,11,12
   39:19 46:5 62:22
facts   9:11 47:25
fails   35:4
fair   9:20 18:15
   39:21 54:3

fairness  25:19
faith  6:18 63:17
familiar  8:2 54:8
far  14:1 16:22
  21:25 29:15 66:14
favored  8:21
february  12:25 13:2
  14:6 22:1,13,14,14
  22:21 27:15 37:8
  44:2 51:12,21,24
feedback  50:5,6
feel  24:16,20 46:9
  63:9,17
fees  23:1,4 51:23
  61:16 63:14
feet  46:4
feld  4:19
fell  23:7
felt  40:2,3 56:13
fiduciary  7:22 31:8
  31:8
fighting  21:4
fights  22:25
filed  7:2,6 11:18
  13:6,10,11 15:7
  19:16 20:10,12,13
  20:14,18,22 21:2
  22:17 25:16 30:1
  44:18 66:1 67:13
filing  44:19,23,23
  45:1
filings  12:8
fill  62:8
final  47:5
finally  15:12 19:9
financial  13:14 39:7
  41:9 42:22 51:19
financings  38:10
find  10:20 35:5,14
  45:23
finds  11:3
fine  53:16 61:20
  65:20 66:6
finestone  5:15
finger  59:1
firm  13:12 65:23

firms  13:13
first  6:15 7:1 10:13
  12:22,24 19:6 22:13
  22:14,21 29:9 35:7
  42:15 58:14 68:1
firsthand  39:4,17
fit  46:19 47:22 48:9
  48:11
five  8:3 22:2,3
  28:16 30:3
flash  12:19
flawed  28:11
floor  5:12
flowing  61:16
focus  15:4 20:15
  48:8
focused  9:12 30:24
  36:2 47:15 48:4
focuses  41:10
fold  10:12
folks  18:8 23:12
followed  12:1
following  22:11
  67:18
footnotes  7:7
force  17:6,7 18:4
forces  56:5
forcing  16:12,14,25
  17:2 18:6
foregoing  70:3
foremost  19:6
fork  13:23
formed  21:24 22:4
  43:12 45:11
forth  31:25 51:18
fortunate  36:11
  37:15,16
fortunately  49:2
forward  12:19
  14:12 25:14
fought  37:5
found  29:25 30:11
four  13:5
fragile  12:25 27:20
frame  47:11,13
framework  18:24
  46:20 47:22 51:21

frankel  3:11
frankly  10:18 14:10
  15:22 16:23 22:24
  25:18 26:9 28:5,15
  29:5,9 34:7,15,19
  35:22 36:23 38:23
fraudulent  34:24
  43:25 46:17 48:14
free  26:16
friday  66:17 67:14
front  20:16 31:15
  50:21
frozen  12:10 21:11
fruit  17:3
fti  25:13
full  41:2,4 43:16
  49:14 64:24
fully  11:6 60:13
  63:12
fun  28:1
fundamental  19:1
  36:12
funds  26:19
funny  10:7
further  48:19 53:1

g

g  6:1
game  16:10
garner  36:14
garnered  24:2
garnering  36:16
garrison  5:1
gathered  54:7
generally  44:3
getting  18:19 25:10
  29:17 30:24,25 31:1
  39:1,8 46:9,18
  49:19 50:5 52:15
  59:20,21,21,22 62:9
  66:9
give  15:21 19:22
  24:17 30:20 31:7
  39:22 52:24 59:16
  64:17,18,22 66:13
  67:1
given  18:7,8 42:22
  65:5

giving  9:7 17:14
go  9:24 14:17 16:17
  27:12 33:3 34:19
  37:24 49:8,8 50:8
  51:15 57:9 63:3,8
goal  27:4 54:1
goes  7:19,20 14:12
  29:5,11 60:2 61:18
going  9:6 14:6,7
  15:4,10 16:5,11,24
  17:2,17 18:4,9 19:3
  23:18,19 27:2,7
  28:9,20 29:4 30:13
  30:20,23 31:13,21
  32:11 34:16 35:21
  37:17,21 38:18,19
  38:20,20 40:14
  45:17 46:3 47:13,14
  52:1,22 55:17,20
  56:4 58:7 62:20
  63:10,23,24
goldberg  4:9
golden  4:24 31:24
good  6:5,6,6,18
  10:2 14:20,21 33:8
  33:9,9 40:16,17
  53:20,24,24 58:19
  63:17
gotten  19:9
governed  46:1
graduating  67:20
grant  6:9,13
great  20:9,9 33:5
  35:10 61:9
greater  19:13
greatly  64:10
green  1:15
greenberg  3:7
  14:20,22,22 15:4,7
  15:16 16:5 17:6,9
  17:13,16,20,23 18:3
  18:11,15,18,21
  19:22 20:7,10 21:9
  21:17 22:12 23:11
  23:15,17,20,22 24:3
  24:8,11 25:22 26:1
  26:4,6,22 27:9,25

28:4,22,24 29:14
30:3 31:10,12,14,24
32:14,18,24 33:2,5
33:13,20 35:24 36:7
39:7 40:13 51:17
53:14 56:7 59:3,25
64:16,20 65:6,9,15
66:6,12,15,24 67:3
67:5,6,8,13,17,23
67:25 68:13,15,18
**grounds** 38:2
**group** 2:1 4:2 5:2
6:14,17 7:10,20
8:23,24 11:2,23,24
12:6,9 13:8,13,16
21:24 26:4,8,11,11
30:12,25 35:19,20
36:15,17 38:17 39:1
44:20,22,22,23,24
44:24 45:1,2,17,17
45:19 50:2,15,16,16
50:17,25,25 52:7
60:5,5,5 61:9,10,13
69:17
**group's** 6:17
**groups** 43:12 44:19
44:24 45:10,21
**guarantee** 14:11
34:23 36:25 43:23
**guarantees** 44:9
**guarantor** 32:9
44:7 46:16 48:12
50:9,13,22 61:2
**guarantors** 43:24
**guess** 18:21,22
20:18 22:9 23:23
31:3
**gump** 4:19
**guys** 21:11 22:6
30:3 55:19

### h

**h** 3:16 69:9
**half** 48:13 50:23
**hamilton** 3:8 40:13
40:16,18,18,24 41:1
41:16,19 42:7,14
46:10,24 52:25 55:4

69:5
**hand** 15:5 40:21
**handed** 41:20
**handle** 40:14
**handling** 65:23
**happen** 56:3,5,6
**happened** 21:23
42:21 49:1 57:6
**happens** 30:10
57:25 60:16
**harm** 8:23 38:3
**hauer** 4:19
**hear** 14:16 16:15
18:9,23 22:18 32:16
32:19,22,25 40:12
55:6 56:20 63:19
**heard** 15:9 30:8
56:7,7,14 60:11
**hearing** 2:1 6:16
9:2,7 13:24 15:1
18:22,23 55:11,15
55:24 57:6 62:19
63:13,13 66:2,10
67:17
**hedged** 29:23 30:2
30:4,12 57:23 58:6
63:21
**held** 23:2 49:13
**help** 16:8 25:14
28:9
**helped** 37:1
**helpful** 15:17 18:1
**hey** 27:17
**hiding** 26:23
**high** 8:4
**highlights** 46:11
**highly** 17:5 58:6,10
63:1,12
**history** 24:18
**hit** 23:3
**hoc** 2:1 4:2,12 6:8
8:24 13:16 38:17
43:11 52:7 69:17
**hold** 27:20 54:13
60:15
**holder** 26:11 28:16
28:17

**holders** 4:12 6:8
7:11 8:17 11:9,10
12:11 25:25 29:4
37:4 59:5
**holdings** 1:7,8
26:10 28:15 58:1
59:6 60:4,19,20,23
**holds** 60:21,21,24
60:25,25 61:5,10
**homer** 15:13,18
40:22 41:5,21 42:8
69:5,11
**hon** 1:22
**honestly** 56:12
**honor** 6:3,9,14,20
6:25 7:5,9,17,21 8:2
8:8,12,17,23 9:3,17
9:18 10:1,8,10,23
11:1,15 12:7,8,17
12:20 13:4,21,22
14:10,13,18,20,24
15:7,12,17 16:3,5
16:16 17:16 19:6,12
19:16,24 20:16
21:17 22:24 24:15
28:5 30:15 31:16,17
32:8 33:6,8,12,14
33:25 34:11,16
35:10,13 37:3,20
39:3,19 40:16,24
41:16 42:7,11 46:10
46:12 52:25 53:3,10
55:1,4 56:2,3,5,10
56:21 57:1,3,15
58:13,14,24 59:1,5
59:8,24 60:4,18,23
61:6,9,18,21 64:4
65:13 66:7,24 67:25
68:18,19
**honor's** 9:24 10:11
**horses** 27:23
**host** 51:21
**hour** 28:7
**hours** 43:16 51:17
**hundred** 47:24
**hundreds** 16:20
23:1

**hurt** 33:21,22 34:4
34:4

### i

**idea** 24:23 31:19
**identified** 57:22
**impact** 12:13
**impacts** 51:19,19
**impede** 28:10
**implications** 49:2
**important** 36:18
38:7,7
**importantly** 19:12
19:24 27:16
**improvement** 21:8
21:10
**inadequate** 55:19
**inappropriate** 9:10
16:8
**incentive** 61:10
**inception** 15:21
**include** 25:1 60:14
60:15
**included** 21:21
**including** 9:7 45:10
58:22
**increased** 28:15
36:20
**indenture** 36:3
60:16
**independent** 5:10
19:17 25:12 38:16
48:20 49:25
**indicated** 36:7
63:24
**indiscernible** 20:5
**individual** 50:17
**information** 43:18
67:20
**initial** 29:2,9 45:5,5
48:9,9
**inject** 21:24
**inspired** 55:10,14
**instruction** 7:24
**instruments** 57:19
59:12
**intend** 18:15

**intended** 57:22
**intense** 16:19 51:12
**intercompany** 34:5 43:24 46:16 48:13
**interest** 24:22 31:15 32:10 49:17 62:14
**interested** 57:18,18 59:18 63:3
**interests** 29:22 44:25 59:9
**interface** 43:5
**interfacing** 43:10 45:9
**interfering** 59:18
**international** 1:8 41:9
**intersession** 6:21 14:8
**intimately** 54:8
**invaluable** 34:6
**investigation** 25:12
**invite** 7:3
**invited** 13:13
**involve** 43:2
**involved** 13:3 14:15 16:23 34:6 38:14 42:15 50:12 51:17
**involvement** 45:4
**involving** 43:17
**ironic** 21:4 30:1
**irony** 30:12
**issue** 8:9 9:12 14:15 15:5 25:17 26:18 30:5 32:4,9,10 34:23 43:20 44:7,8 44:8,13,13 47:23 57:21 65:15
**issues** 6:17,20 8:3 8:11 10:14,14 12:12 14:10 23:20 24:7 32:9,12 34:23,25 35:5 37:10 43:22,23 43:25,25 44:15,15 45:13,13,24 46:14 46:15,17,18 47:12 47:16,21,24 48:1

51:22,22 55:25 62:25
**it'd** 9:10 47:25
**it'll** 35:23

**j**

**j** 3:7,9 4:16 26:9
**jammed** 66:9
**job** 25:10
**joining** 12:6
**joins** 33:15
**jones** 3:2 14:22 40:18 65:23
**judge** 1:23 18:4
**judgment** 48:16
**june** 13:24,25 15:9 28:21 29:8
**junior** 8:6,10
**justin** 4:9

**k**

**keep** 63:11,20 65:5
**kenneth** 3:16 33:10
**key** 46:1
**kimono** 43:16
**kind** 19:1 20:1 23:5 29:25 30:22 43:16 46:19 47:13,22 49:8 49:25 50:1,7 56:18 63:8
**kirkland** 4:11 25:16 25:17
**kitchen** 27:20
**know** 9:1 19:25 22:10,19 23:3 24:23 25:13 28:7,10 29:21 29:22 30:9,21 32:6 32:22 33:21 34:5 39:1 43:15,17,19 46:7,7 47:12,23 48:11 49:6,8,16,24 50:3,3,4,7,18,24 51:8,14 52:1,1,2,18 52:20 54:11 62:7,10 62:12 63:6,7 64:25 66:15
**knows** 15:7 19:12 19:16 30:15 33:14

34:11
**kramer** 3:11 33:10

**l**

**lack** 32:7 63:18
**landscape** 42:19 49:7
**largest** 36:7 44:7
**late** 16:10 25:23 33:17 60:1,3
**latham** 4:1 6:7 15:13 29:1,7 38:17 53:9
**laughter** 10:6
**law** 13:12,13 67:20
**lay** 37:21
**leading** 49:3
**leave** 34:10
**led** 12:15 27:23 43:10 45:4,9,17
**left** 18:10 49:19 61:23
**legal** 70:22
**lehman** 64:25 65:3
**lengthy** 47:6
**letter** 22:15 24:24 31:20 44:1
**level** 18:7
**leverage** 52:21
**levin** 3:11 33:10
**lexington** 4:13
**lie** 59:9
**lies** 10:10
**lighter** 62:21
**lightsquared** 17:12 17:23 55:23
**liked** 57:1
**lines** 63:11
**liquidity** 42:24
**litigate** 37:25
**litigating** 47:4
**litigation** 6:16 9:22 14:7 29:7 30:17 34:22 35:4 47:6,12 52:1 66:16
**litigators** 29:15,16
**little** 15:21 25:23 27:10,13 30:19

56:18 61:21 66:22 66:22
**llp** 3:11 4:1,11,19 5:1,9
**loads** 43:17
**local** 47:8,8,14
**long** 39:8 41:12 67:3
**longview** 18:1
**look** 19:18 20:1,1 25:12 49:9 56:24 60:4 64:13
**looking** 25:13 31:15 55:16
**looming** 55:10,15
**lot** 14:14 17:18 19:7 21:20 29:20 47:3 51:15 58:21
**loud** 23:10,24 63:15
**love** 32:11 66:22
**luxco** 4:12 7:11 8:4 8:5 11:23 12:6,9 19:10 34:14 36:15 36:17 38:15 44:11 44:24,24,25 45:1,17 48:23 49:12,14,18 50:15 59:17,19 60:5 61:1,9,13,16
**luxcos** 61:6,12

**m**

**m** 69:2
**m&a** 42:19
**madison** 5:11
**magnitude** 16:21
**main** 22:19 26:12
**maintained** 24:20
**major** 19:14
**majority** 58:6
**making** 21:14 46:18 46:21 52:21 61:24 61:25 62:25
**manager** 19:17 38:16 48:21 49:25
**managing** 15:14 41:14
**manger** 5:10

**manner**  12:5 39:23
**march**  1:18 13:15
    13:16,21 15:8 18:13
    22:17 25:5 51:13,24
    56:9
**marching**  63:20
**marcus**  4:16
**markets**  47:9
**material**  8:24
**materially**  50:24
**math**  20:1 59:3,25
**matter**  1:5 6:15
    21:22 34:18 37:18
    38:1,4,5,13 39:5,11
    39:13,19 61:22
**mattered**  44:5
**mature**  21:25
**mccolm**  5:6
**mean**  17:11 22:10
    23:18,23 26:17
    27:11 28:11 31:17
    32:8 33:20 34:1
    38:22 47:20,21
    56:17 58:15 59:14
    66:14
**meaningful**  11:11
**means**  52:15
**mediation**  2:3 9:13
    9:22 13:10,11 15:24
    16:7,14,25 17:7,11
    18:6 19:2 29:6
    30:23 31:4 33:17
    34:5,7 35:17 36:10
    38:2,4,5,19,19,23
    38:25 39:2,22 40:8
    52:7 55:6,9,22 56:1
    63:2,8,23 69:19
**mediator**  6:22 14:9
    38:18 58:23
**meet**  13:13 24:3,6
    39:6
**meeting**  13:15
**meetings**  25:8
**members**  11:23
    60:13
**mentioned**  11:1
    14:3 46:15 48:2

**mere**  61:14
**merger**  41:10
**merit**  10:19,22
**merits**  7:3 9:8 11:4
    15:10
**met**  30:16 39:7
**metaphored**  27:22
**metaphors**  28:1
**mexican**  37:16
**mexico**  12:2 20:15
    36:11,20 49:4,11,18
    50:12 57:16
**michael**  3:9
**mid**  22:1,13,14
    51:21
**migrated**  42:23
**million**  8:14,19
    10:23 20:21,21,23
    21:1 22:6 51:2 61:3
    61:5,5,14,17
**milstein**  25:17
**mind**  16:24 30:22
    34:10 65:5
**mineola**  70:25
**mini**  9:2
**minor**  23:7
**minute**  60:6
**minutes**  15:18
**misleading**  25:3
**mitchell**  4:8 6:7
    53:8
**model**  38:22,23,25
**moment**  53:12 59:4
    60:15
**monday**  64:19,22
    67:11
**money**  14:14 58:7
    59:14
**months**  19:8 22:2,3
    22:4 55:22
**morning**  64:17
**motion**  2:1 6:9,13
    13:10,11 15:8 19:16
    24:24 30:8 40:10
    57:3 63:23 65:10
    69:17

**motivated**  55:25
**move**  25:14 45:20
    51:3 52:21 66:8,16
**moved**  16:22 37:8
    50:10
**movement**  63:25
**moves**  44:13,14
    51:18,19 52:13,14
    52:17,19
**moving**  9:4 61:22
**mud**  24:16
**multiple**  21:21 55:7
**mystery**  27:1 62:11

**n**

**n**  3:1 5:7 6:1 69:1,2
    69:8 70:1
**naftalis**  3:11
**name**  41:2,4
**nature**  58:6
**nda**  25:3 28:25
    30:16
**ndas**  13:2,5 26:7,9
**nearly**  22:1
**necessarily**  60:9
**necessary**  6:21
    35:18 39:23
**need**  7:24 29:14,17
    30:20 31:1 39:13
    47:2 49:8 57:5
    64:20 65:11
**needed**  6:22 46:25
**needs**  31:2
**negative**  12:13
    56:22 57:23
**negotiate**  7:11 27:2
    43:13 49:20 50:9
**negotiating**  25:1
    26:13 37:1 45:19
    48:4 50:3 54:1,9
**negotiation**  6:15,23
    7:25 14:7 15:20
    24:21 36:3
**negotiations**  6:18
    15:23 16:19 18:20
    19:7 21:22,25 22:2
    25:2,8 26:25 27:7
    37:5 43:6,9 44:5,17

**45**:4,14 46:1,6
    47:10 51:12,15,18
    56:14 58:22 63:18
**neiger**  25:24
**net**  51:5
**neutral**  14:9
**never**  37:13
**new**  1:2,16,16 3:5
    3:14 4:6,14,22 5:4
    5:13 20:2 21:1,5,24
    26:14
**night**  29:9
**nii**  1:7,7 2:1 4:2
    69:17
**nii's**  42:15
**nine**  13:21 28:16
    56:9
**non**  19:1 38:9
**north**  19:9,10
**note**  6:14 10:14
    29:19 56:13
**noted**  28:25
**noteholder**  7:10,20
**noteholders**  2:2 4:3
    7:23 14:5 21:13
    25:2,18 26:6 69:18
**notes**  6:8 8:4,4,5,5,6
    8:8,13,15,18,20,20
    8:21,21,22,25 36:6
    54:12 60:15,16,17
    60:19 61:1
**november**  11:19
    20:14,18 21:3 22:8
    22:10 25:15 37:7
    42:17 45:7
**nowadays**  30:6
**number**  7:8 34:5
    36:1
**numbers**  20:1
**numerous**  16:13
**ny**  3:5,14 4:6,14,22
    5:4,13 70:25

**o**

**o**  1:21 6:1 69:2 70:1
**o'neill**  3:17
**object**  17:15 35:21
    46:7

objecting 38:1
objection 7:8,8,9
  14:24 16:1 20:3
  35:23 42:11 55:5
  66:8,18 67:9
objectionable 46:8
objections 16:13
  17:8 24:12 42:10
  67:10,14
observation 39:3
  57:22,23
observed 39:16
obvious 37:7
obviously 7:22
  24:19 45:11 52:4
occurred 12:8 13:9
  13:15
october 25:11
offer 13:4 25:2
offered 11:8 13:2
offering 20:19
offers 42:20
offices 29:1
official 33:11
oh 20:9 28:10 65:13
okay 6:2,12 9:20,23
  11:17 12:18 14:16
  15:6,15 16:4,6
  18:17 19:21 21:16
  26:5 32:13 33:2
  34:2 39:12 40:5,11
  40:15,20,23 42:12
  44:3 46:13 53:2
  54:11,20 55:8,9
  57:7,23 62:19 64:2
  64:9,21,22 65:6,16
  66:11 67:4,8,12,16
  67:19,24,25 68:8,11
  68:13,14
old 20:2,17 70:23
once 44:20 55:23
open 7:2 17:10
  43:16 55:25 63:12
  65:15
opening 10:5
operating 38:9

opining 48:22
opinion 24:19
opportunity 17:15
  27:14 35:11
opposing 33:15
optimistic 63:25
options 42:19
order 2:2 7:25
  51:14 62:3,13 63:8
  65:8 69:18
ordered 17:11
  39:21 52:7
ordering 63:2
organization 43:5
organized 25:6 43:4
organizing 48:4
original 36:13
originally 36:24
  37:17
ought 31:7 58:23
outcome 37:13
outreach 12:1,21
  13:5 25:19
outs 7:22
outset 11:2 24:12
outside 10:18 56:5
  59:14
overall 47:7 49:6,9
overwhelming
  34:15
owns 62:9

**p**

p 3:1,1 6:1
page 7:8 69:4,16
pam 26:9
panoply 29:12
paper 22:11
papers 7:1 20:11
  28:3 31:22 32:1
  67:7 68:6,9
par 49:16,17
parameter 48:2
parameters 46:1
  48:10,11
pari 8:8
park 4:21

parkhill 15:13,18
  16:1,15 22:18 32:20
  33:4 40:12,20,22
  41:2,5,6,20,21 42:8
  42:16 52:6 53:4,11
  53:20,25 54:11,19
  54:20 69:5,12
parkhill's 25:7
part 12:14 26:2,11
  46:6 62:23 63:16
participate 2:3
  27:15 69:19
participated 60:13
participation 11:12
  60:12
particular 59:9
particularly 16:18
parties 6:19 10:18
  13:18 14:9 16:12,13
  16:14 17:7,14 18:25
  18:25 19:5,10 24:22
  25:10 28:8 30:9
  31:9 32:20 33:16
  35:4,7 36:13,17
  37:24 38:14,18 39:6
  39:13,16,20,22,25
  40:1 44:12 51:7
  52:12,22 54:8 55:10
  55:14,22 57:23
partner 66:17
partners 65:23
parts 58:1
party 25:22 26:1,8
  26:14 29:21 37:1
  38:1 39:13 56:5
  69:10
passu 8:8
path 61:4,8
patience 57:11
paul 5:1 26:11
pause 17:18 20:6
  31:7 67:2
pay 61:7
penciled 55:16
pending 8:1 18:3
people 13:19 16:22
  18:5,6 19:25 20:4

26:16,19 27:14
  37:17 38:11 39:14
  47:15 55:24 57:25
  58:1 63:2,8
percent 9:14 19:9
  19:10 21:2,12 23:13
  23:13,14 26:10
  28:16,16 36:4,5
  47:24 48:13,14,15
  49:16,19 50:23,23
  54:14,16 60:21,22
  60:24,25,25 61:10
  61:11,12
percentage 21:8,10
  48:12,17 50:10,22
  51:18 54:12
percentages 20:21
  51:16
period 45:15 51:13
  52:3
person 30:16
perspective 13:22
  50:1,4 61:7,22
  63:22
petition 19:8
ph 6:8 7:11 25:24
  26:9
phone 56:16 67:21
  68:3
phrase 45:14 55:19
pick 12:20 14:9
  20:13,25 21:2
picture 62:8
pirro 4:17
place 32:3 40:3
plain 7:1
plan 7:4,14,24 8:1
  8:12 9:18 11:6 15:8
  15:11 19:11,15,19
  20:11,17,18,22
  21:21 23:25 24:14
  24:25 25:2 27:3,4
  31:8 33:17 34:13,15
  34:17,21 35:1,4,9
  35:12,14,14 37:19
  37:22,23 39:24 40:3
  45:5,20,23 46:22

49:9,15 50:9,21
51:8,9 52:16,22
54:4
**planning** 68:5
**plans** 43:6 45:2
**pleading** 25:16
**pleadings** 16:20
22:16 29:25 32:2
33:15
**please** 20:8 40:21
40:23 65:25
**plus** 19:7 49:17,17
**pm** 1:19 68:20
**pocket** 61:23
**pockets** 58:8
**podium** 56:8
**point** 10:25 11:7
12:7 16:17 19:2
25:25 26:1 31:18,18
34:1,3 35:16 46:9
52:8 59:2,5,19,24
60:1 61:25 65:22
**pointed** 21:20 31:6
**points** 10:11 23:9
34:1 51:23 57:14
58:2
**poised** 34:19
**position** 10:20 32:4
35:17 42:22 61:3
**positions** 10:25
19:25 44:3 50:19
52:21
**possibility** 47:3
**possible** 42:19
**possibly** 28:10
**post** 19:7 20:14,21
20:24 44:25 51:14
**posturing** 19:25
**potential** 7:12 29:12
30:18 43:6 45:2,20
54:1
**pound** 31:18
**power** 18:1
**practice** 41:15
**pre** 20:19,24
**prearranged** 43:19

**precluded** 11:11
**prefatory** 9:18
**prefer** 27:11
**preferable** 6:15
**preliminary** 9:6,7
14:25
**premised** 34:21
**premises** 36:12
**prepare** 66:19,23
**preparing** 31:4,5
66:9
**prepetition** 19:8
49:17
**presence** 17:22
**present** 35:9 54:4
**presentation** 33:13
**presented** 35:6,24
52:23
**press** 27:1,7,10,12
**pretty** 28:13,14
35:23 47:15 66:14
**prevented** 43:20
**price** 61:7
**primarily** 44:10,21
50:9 51:22
**primary** 44:15
**principal** 6:15 11:4
22:19 43:20,22
**principals** 13:3
43:11 45:10
**prior** 10:16 11:18
12:21 20:17 21:6
22:5,5 44:19,22
**private** 12:12
**probability** 47:24
**problem** 30:13,13
31:10,11 32:6
**problems** 30:18
**proceedings** 68:20
70:4
**process** 13:8 18:5
21:19 24:16,21,22
24:25 28:11,14
29:10 30:14 35:22
36:3 47:6 48:7,20
48:24 58:11

**professional** 11:22
13:12 23:1 51:23
63:14
**professionals** 43:11
45:10 63:11
**proffer** 42:7
**properly** 44:9
**proponent** 19:15
**proponents** 66:21
**proposal** 13:17,20
18:24 27:16,18 29:2
29:3 30:21 39:10,17
45:21 56:8
**proposals** 19:3
**propose** 66:25 67:7
**proposed** 7:4 8:12
11:5 49:11,18
**proposing** 66:20
**propounded** 13:23
**protect** 47:17
**protected** 21:15
**provided** 8:1 30:15
66:1,3
**provides** 61:4
**providing** 41:10
**provisions** 34:18
**psa** 7:5 11:18 15:8
15:11 18:25 19:11
19:16 20:2,2,18
21:6 22:5,5,16 30:9
36:6,8,10,13,14,21
40:1 48:9,24 50:21
51:10,24 52:9 54:9
54:12
**public** 10:17
**pulled** 67:10
**pun** 10:4
**purported** 10:13
**purports** 8:10
**purposes** 11:24
48:21
**push** 47:13
**put** 15:18 19:2
31:15 32:20 33:20
46:5 57:17 59:1,10
59:22 67:8

**putting** 16:1 38:25

**q**

**quality** 57:19
**quarter** 61:11
**question** 9:24 10:11
22:7,9 33:20 55:9
**questions** 32:15
53:1,4,11 54:18
**quickly** 28:13 42:22
47:15
**quinn** 5:9 19:19
**quite** 14:10 15:22
16:23 22:24 25:17
26:9 28:5,15 29:4,9
**quoted** 7:9 17:25
58:16
**quoting** 24:23

**r**

**r** 1:21 3:1 5:6 6:1
70:1
**raise** 40:21
**raised** 29:12 32:10
32:10
**raising** 49:5
**range** 48:18
**ratable** 8:15
**reach** 26:23 43:18
52:4
**reached** 22:13,20
22:22 35:8 51:20
52:5
**reaching** 23:6
**reacted** 56:11
**read** 28:2 56:3 66:3
**reading** 14:13 33:14
**real** 16:11 47:5
62:21
**realistically** 39:16
**reality** 30:6 45:16
55:24
**really** 9:18 13:22
14:15 16:17,22 18:5
22:11 36:9 42:24
44:1,9,24 45:1,21
46:14 50:7,8 52:20
57:14 58:12,24 60:2

60:8 61:21 62:11 63:3

**reason** 48:23 52:6 52:23

**reasonable** 35:12 37:22 47:19 54:5

**reasonableness** 46:20 47:22 48:18

**reasons** 6:25 15:10 63:24

**rebuffed** 7:4

**rebuttals** 55:7

**recall** 7:8 12:8 13:4

**receive** 8:13,14,18

**received** 8:15

**receiving** 57:19

**recognition** 49:24

**recognize** 34:16 41:22

**recognizing** 36:17 37:9

**record** 6:7 18:18 46:6 53:8 67:9 70:4

**recover** 61:4

**recoveries** 44:14 48:17

**recovering** 49:15,16

**recovery** 20:23 21:14 49:12,14

**rectify** 30:13

**reduced** 36:23

**references** 7:18

**referred** 50:14

**reflects** 36:22

**refused** 25:1 39:20

**reiterate** 62:14

**rejected** 30:22

**relates** 20:2 25:16

**relating** 43:25

**relative** 20:13 51:19

**relatively** 14:10 35:19,20

**released** 44:9

**relive** 27:11

**remain** 26:16 63:24

**remarks** 14:25

**remember** 22:5

**renegotiating** 50:13

**reorganization** 45:3

**repeat** 30:16 33:12

**reply** 13:1

**reported** 56:12

**represent** 39:21 59:6

**representation** 32:7

**representatives** 11:22

**represented** 31:20 32:5 36:2 44:25 50:2

**representing** 25:20 29:22

**represents** 13:12

**request** 27:17 28:6 31:22 33:16 40:9 66:16

**requests** 21:21 29:10

**required** 40:3 52:14

**requirement** 14:8

**requirements** 19:12 24:4,6 35:15

**requisite** 28:8 48:5 52:16

**reraise** 63:16

**research** 5:2

**residential** 34:8,9

**resolution** 7:12,25 37:14 43:19 45:12 47:16

**resolve** 55:25

**resolved** 6:18 43:22 47:11 50:20,21

**respect** 7:12 10:25 12:21 13:4,5 17:20 24:6,21,22 59:2,11 65:10

**respects** 37:12

**respond** 18:16 53:12 54:24 56:8 66:4

**responded** 18:14

**responding** 56:19

**response** 13:19 18:8 56:11 61:25

**rest** 32:20

**restricted** 11:11,24 26:16

**restructure** 36:14

**restructuring** 41:11 41:14 42:15,23

**result** 19:4 20:2 47:5 49:18 51:5 52:8

**results** 12:12

**rethink** 31:7

**retort** 66:6

**revealed** 31:6

**reviewed** 10:18

**riflind** 5:1

**right** 7:18 11:21 12:4,15,23 13:25 14:19 15:3,25 16:4 17:9,16,20 18:2,11 23:15,17,21,22 24:10 25:21 26:3,22 29:24 30:10 31:12 31:14,16,23 32:13 32:16 33:7,22,24 35:23 37:16,23 39:25 40:7,12,21,23 42:1,6,10 43:13 44:23 45:25 46:25 47:18,19 50:11 54:17,24 57:5,8,9 58:11 59:13 61:22 62:12,18 64:3,11,17 65:7 68:11,17

**rights** 20:19,22,25 59:11

**rise** 39:22

**risk** 63:14

**road** 70:23

**robert** 3:8 40:18

**role** 43:8

**rolled** 38:10

**room** 7:3 10:24 11:4 11:9 19:5 21:12,13 27:19 28:9 49:2

51:7 60:10

**rooms** 39:1

**rosenberg** 5:7

**rothschild** 15:14 41:7,8,9,12,15 43:10

**roughly** 21:1 26:10

**round** 16:18 25:18

**route** 52:2

**rsa** 11:25 12:24 13:6 14:3 60:7 61:3

**ruling** 62:24

**rulings** 69:15

**runs** 20:19

| s |
|---|

**s** 3:1 6:1 69:2,9

**s.a.r.l.** 1:8

**sad** 25:9

**sale** 12:2 18:23 20:15 36:11,20 37:16 49:2,11,18 50:12 51:14 57:16

**salutary** 57:3

**sat** 15:23 29:1 50:18

**satisfies** 34:17 35:14 37:22

**satisfy** 37:23 62:17

**savings** 29:5

**saw** 17:25 31:21 32:2

**saying** 9:8 28:23 32:23 58:22

**says** 10:21

**scc** 1:3

**schedule** 13:23 29:7 29:8,11 30:17 35:24 38:6,6 65:25 68:11 68:16

**scheme** 8:24

**school** 67:21

**scott** 3:7 5:16 14:22 48:20 49:25

**seasonal** 9:25 10:2

**seat** 27:17 40:23

**second** 31:16 47:18 59:5

secret  17:10

sections  7:6 14:4

securities  10:17,21

see  14:9 18:6 20:22
  28:17 33:8,9 52:20
  60:6 61:21 66:17

seen  13:1 16:12
  19:7

seider  4:8 6:2,3,6,7
  6:13,25 7:17 9:3,9
  9:15,17,21,24 10:3
  10:8 11:13,15,18,22
  12:5,17,19,24 14:1
  14:18 16:2,3 18:10
  18:23 21:20 22:12
  25:20 28:12,25
  30:25 39:8,10,11
  42:11 46:7 53:2,3,6
  53:8,8,14,17,19
  54:18 55:1,8,12
  56:2,21,23 57:1,8
  57:10,13,24 58:3,9
  58:12,17,20,24
  59:18 62:2,5,15
  64:2,4,8,10,12
  65:17,19,21 69:6

seider's  23:23 26:4
  26:8,10 39:17

seidman  65:13

send  65:7

senior  8:6

sense  35:8

series  8:7,13,15,18

serious  56:14

set  15:9 48:19

settle  46:25 47:1,2
  47:24

settled  10:22 35:2
  47:17 48:13,15

settlement  7:12
  10:15 11:5 13:17,20
  18:19 22:20 34:22
  35:8,9,10 37:13
  43:23 45:5,7,13,23
  46:6,15,18,19,21
  47:19,21 48:6,9,12
  48:22,22 49:9,15,20

52:8 54:2 60:7 61:2
  61:13

settlements  49:13
  62:22

seven  25:9 38:13

shannon  18:4

share  13:18

sheet  42:25

sheets  45:18

shelly  1:22

shifted  36:21 49:6
  50:22,24 51:3

shifting  44:9,11
  51:5

shot  31:16

show  27:15

showing  28:2

shows  20:12

side  38:25

sides  45:22

sign  13:2 26:9 41:24

signatories  54:11

signators  54:13

signed  26:7 28:25
  42:1 48:24 52:13

signing  51:24

simple  38:5,20
  56:15 59:22

simply  34:12 63:4

simultaneous  62:10

simultaneously
  29:5 45:19 47:10

single  36:7

sit  28:7 39:6

situation  45:18 58:5
  63:1

six  19:8 28:16 47:8

sixty  54:16

sizable  50:19

size  23:3

small  14:11 35:19
  35:20 60:19 61:7

smaller  51:22

smart  9:11

solution  35:5

solutions  70:22

solve  62:11

solving  62:10

somebody  38:24
  65:7

sorry  20:5 22:14
  26:17 41:3 55:2
  56:23,24

sort  36:12

sound  62:24

soundly  6:10

sounds  33:5 55:18

soup  33:23,24

south  2:25 70:3,7

southern  1:2

speak  40:1 55:5

speaker  68:19

speaking  24:22

specific  43:8

specifically  7:6 8:1

spell  25:6

spend  15:18

spent  15:20

splinters  44:23

split  44:20

spoke  28:12

spot  19:9

stage  16:10 33:18
  60:2,3

stake  64:24

stalemate  35:18

stand  15:19 16:1,16
  40:20 56:19

standard  47:23

standards  62:17,20
  62:21

standpoint  34:16

stands  32:5

start  16:5 43:2,6
  50:8 55:2 66:2
  67:17

started  12:20 25:4,5
  29:10 30:20 42:17

starter  19:1

statement  10:20
  18:12 20:12

statements  10:17
  11:8 38:19,20 39:2

42:2

states  1:1

stay  9:12 46:4,11
  65:19,20

step  48:19 54:20

steven  3:18

stood  67:9

stop  9:1 64:23

storage  52:18

straightforward
  6:20

strategic  42:18

strauss  4:19

street  3:4

strenuous  17:8

stretch  17:24

structurally  8:6,6

structure  8:3 23:14
  29:23 34:14 44:10
  58:1,2 59:9 60:23

submit  20:4 32:1
  38:19 68:7

submitted  44:2

submitting  68:6

subsequently  11:19

subsidiary  12:3

substantial  34:13
  36:19,22 38:9

subsumed  35:1

success  57:16

successful  6:23 12:5

sufficient  59:11

suggest  26:15

suggestion  39:11

suggestions  39:9

suite  70:24

sullivan  5:9

summary  54:3

summer  26:12,13
  43:14,14

sunday  18:22

support  19:11,14
  31:9 34:13,15 36:14
  36:16 37:19 45:5
  55:5 66:21 67:1

supported  23:13

**supporting** 33:17
36:6 51:8,9
**supportive** 19:18
**sure** 20:8 21:14
31:21 32:1 36:18
37:6 46:2,19,21
47:21 49:22 51:14
53:5 56:12 57:12
60:12 64:20 65:18
65:20 68:8
**surface** 25:24
**surpassed** 19:11
**sworn** 40:22
**system** 59:13,16

**t**

**t** 69:2,2,9 70:1,1
**table** 15:24 25:1
27:17 28:7 30:21
39:14 59:10
**take** 19:18,25 31:16
59:16 65:11 67:21
68:3
**takeaway** 29:25
**taken** 50:1
**talk** 28:20 29:16
39:14,15,20 55:17
55:20 63:22
**talked** 18:25 25:15
**talking** 20:20 23:5
**team** 43:10 45:9
**tell** 22:12 41:2,4
43:8 63:5
**telling** 28:19 29:2
**tenuous** 52:3
**term** 14:12 45:18
52:18
**terminated** 11:20
**terms** 17:24 21:6
22:19 29:16 32:18
44:20 45:20 49:7,20
59:23 66:9
**test** 32:10
**testifies** 16:16
**testimony** 42:9 54:1
54:7
**thank** 6:3 10:3
14:18,19 20:9 28:4

33:5,7 40:11,24
41:17,18 46:10
52:25 53:6,17 54:6
54:17,22,23 55:1
57:10 64:5,12 65:13
65:21 67:25 68:2,17
68:18,19
**thing** 16:7 23:2
29:19 32:24 47:18
59:15 63:19 67:19
**things** 29:12 58:12
58:22,25
**think** 7:1 8:2 10:10
10:12,24 12:19
15:17 16:24 17:1,16
17:23 18:7 19:4
20:3 21:23 22:12
24:8,12 25:3,16
26:10 27:13 28:5,19
29:14,24 30:4,5,17
30:17,18,24 32:6
33:14 34:4 37:3
39:20 40:8 47:15,18
48:2 49:16 51:16
52:12,16,18 53:25
55:13 56:17 57:3
59:25 61:15 63:1,5
63:19,22 65:14,22
65:25 66:16 68:15
**thinks** 15:23
**third** 4:4,5 34:3
39:13
**thirds** 19:13 54:15
54:16
**thought** 18:1 28:13
52:1
**thousands** 16:20
23:1
**thread** 12:20
**threatened** 51:24
**three** 8:4,7,15 13:5
22:4 23:2 34:1 46:1
46:14,15
**threes** 22:23
**threw** 29:24
**thrown** 24:17

**ties** 60:1
**time** 8:17 11:3 13:7
15:20 22:13,22,25
24:13,17,17 25:18
26:9,18 28:15 30:10
35:17 38:24 39:5
42:1,4 45:11,15
47:7,10,13 51:13,23
55:20 57:25 58:2
64:6 66:19
**timeline** 67:5
**times** 23:7 27:11
**timetable** 38:12
**timing** 64:25
**titled** 41:21
**today** 13:11,20
15:16 18:14 19:20
35:11 53:22 56:8,15
56:19 57:2 65:12
**today's** 6:9 65:10
**told** 25:6
**totally** 26:18
**touch** 24:15
**tough** 25:10
**town** 65:2,4
**track** 45:14
**traction** 29:4
**trade** 58:19
**trading** 22:11
**traditional** 39:2
**transaction** 20:15
**transcribed** 2:25
**transcriber** 70:8
**transcript** 70:3
**transfer** 14:11 32:9
34:23 36:22,24
43:23,24 44:7 46:16
48:12 50:9,13,22
61:2
**transferred** 37:6
**transparency** 24:20
**treatment** 10:14
**tremendous** 37:19
**tried** 7:2 21:24
**troubles** 29:20
**true** 34:21 42:2,3
57:15 70:4

**truly** 16:13 56:13
**trustee** 32:3 36:3
60:16,17
**truth** 21:22
**try** 15:4 25:18
27:25 33:12 45:21
46:11 62:18
**trying** 11:2,3 20:4
27:2,20 45:12,20,23
47:16
**tune** 27:25
**turn** 31:8
**two** 8:4,11,18 10:24
11:23 15:11 19:13
36:1 44:15,24 54:15
54:16 57:14 58:12
58:24 66:1

**u**

**u.s.** 1:14,23 32:3
**ultimately** 36:14
51:20
**unconflicted** 29:21
**understand** 10:8
22:24 26:18 57:13
59:7 64:4
**understanding** 44:5
**understood** 9:19
67:23,23
**unfair** 27:13
**unfortunately** 19:4
26:25 27:19
**unidentified** 68:19
**unify** 45:21
**unimportant** 35:19
**united** 1:1
**unpack** 61:20
**unrestricted** 26:17
**unsuccessful** 45:22
**unusual** 17:5
**update** 19:23
**ups** 20:13
**upside** 18:6
**urquhart** 5:9
**use** 7:15 39:4 55:19
55:20
**useful** 39:4 40:9

**[valuation - zide]**                                                                                        Page 15

| v | | |
|---|---|---|

**v**

**valuation** 22:19
34:25 44:13
**value** 8:14 10:23
36:19,20,22,24 37:6
37:12,17 44:9,11,13
47:17 49:5,7,11,16
50:7,9,24 51:1,2,5
51:15 57:17,18
**values** 22:20
**variable** 62:11
**varies** 58:4
**various** 25:8 34:22
35:5 51:23
**veritext** 70:22
**view** 7:23 9:7 15:1
18:9 19:22 50:3
59:10
**views** 39:22
**vigorously** 37:5
**violate** 18:21
**vote** 28:8 62:3
**votes** 30:9 46:22
48:6 51:8 52:16,23
54:3
**voting** 34:15 61:19
62:1

**w**

**w** 3:8
**walk** 57:2
**wallets** 61:19 62:1,4
**want** 9:2,5,5,12
20:4 21:18 23:9
24:15 26:15 27:18
29:19 32:19,22 36:9
37:14 39:14,20 46:4
55:3 57:14 58:16
59:21,22 64:5 66:23
**wanted** 54:24 55:5
59:2 68:9
**warranted** 35:17
**water** 27:23
**waterfall** 44:14
**watkins** 4:1 6:7
53:9

**way** 11:3 16:7 18:13
27:10,19 38:7 45:23
47:24 55:15 59:19
60:4 61:6 62:18
63:3
**ways** 26:21 39:9
**we've** 12:10 13:23
18:24 19:8,11 25:1
25:4,8 27:23,23
29:6
**wednesday** 64:16
67:18
**week** 12:24 25:9
61:15 65:2,3,4
67:21
**weeks** 13:5,5 22:23
23:2
**weiss** 26:11
**welss** 5:1
**went** 25:15 48:19
49:15
**wharton** 5:1
**wheels** 27:23
**wide** 10:24
**win** 5:16 12:16
48:20 49:25
**window** 13:7
**wireless** 10:5
**wish** 37:11 63:16
**withdrawal** 12:21
**withdrawn** 12:1
**witness** 40:22 41:18
46:11,14 54:22 69:4
**woefully** 55:19
**word** 17:22
**work** 19:5 23:4 29:3
29:8 30:5 38:21
41:6,7 56:1 60:4
**worked** 25:17
**working** 42:17
**works** 55:9 64:21
68:11
**worse** 22:6
**wrapped** 17:21
**writing** 31:20
**wrong** 65:25

| x | | |
|---|---|---|

**x**

**x** 1:4,12 69:1,8,9

**y**

**y** 69:2
**yeah** 10:3,8 23:11
66:15
**year** 12:25 16:22,24
19:6 22:1 25:4,5,10
**yep** 17:13
**yield** 8:4
**york** 1:2,16,16 3:5
3:14 4:6,14,22 5:4
5:13

**z**

**zide** 3:18