**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------- x
                                          :
In re                                     :   Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC.,            :   08-13555 (JMP)
et al.,                                   :
                                          :   (Jointly Administered)
                         Debtors.         :
--------------------------------------------------------- x
```

# REPORT OF
# ANTON R. VALUKAS, EXAMINER

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY 10022-3908
212-891-1600

March 11, 2010                      *Counsel to the Examiner*

## VOLUME 5 OF 9

### Section III.B: Avoidance Actions

### Section III.C: Barclays Transaction

# EXAMINER'S REPORT

## TABLE OF CONTENTS

## (SHORT-FORM)

**VOLUME 1**

**Introduction, Sections I & II:  Executive Summary & Procedural Background**

Introduction ............................................................................................................2

I.    Executive Summary of the Examiner's Conclusions ......................................15

    A.    Why Did Lehman Fail?  Are There Colorable Causes of Action That
        Arise From Its Financial Condition and Failure? ......................................15

    B.    Are There Administrative Claims or Colorable Claims For Preferences or
        Voidable Transfers? .................................................................................24

    C.    Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets To
        Barclays, or From the Lehman ALI Transaction? ....................................26

II.   Procedural Background and Nature of the Examination .............................28

    A.    The Examiner's Authority ........................................................................28

    B.    Document Collection and Review ............................................................30

    C.    Systems Access .......................................................................................33

    D.    Witness Interview Process .......................................................................35

    E.    Cooperation and Coordination With the Government and Parties .....................37

**Section III.A.1:  Risk**

III.  Examiner's Conclusions ...............................................................................43

    A.    Why Did Lehman Fail?  Are There Colorable Causes of Action That
        Arise From Its Financial Condition and Failure? ......................................43

        1.    Business and Risk Management ......................................................43

            a)    Executive Summary ......................................................................43

i

b)  Facts.................................................................................................58

c)  Analysis .........................................................................................163

## VOLUME 2

### Section III.A.2:  Valuation

2.  Valuation ........................................................................................203

a)  Executive Summary .....................................................................203

b)  Overview of Valuation of Lehman's Commercial Real Estate
Portfolio .......................................................................................215

c)  Senior Management's Involvement in Valuation....................................241

d)  Examiner's Analysis of the Valuation of Lehman's Commercial
Book...............................................................................................266

e)  Examiner's Analysis of the Valuation of Lehman's Principal
Transactions Group......................................................................285

f)  Examiner's Analysis of the Valuation of Lehman's Archstone
Positions.......................................................................................356

g)  Examiner's Analysis of the Valuation of Lehman's Residential
Whole Loans Portfolio.................................................................494

h)  Examiner's Analysis of the Valuation of Lehman's RMBS
Portfolio .......................................................................................527

i)  Examiner's Analysis of the Valuation of Lehman's CDOs ...................538

j)  Examiner's Analysis of the Valuation of Lehman's Derivatives
Positions.......................................................................................568

k)  Examiner's Analysis of the Valuation of Lehman's Corporate
Debt Positions .............................................................................583

l)  Examiner's Analysis of the Valuation of Lehman's Corporate
Equities Positions ........................................................................594

**Section III.A.3:  Survival**

3.    Lehman's Survival Strategies and Efforts..........................................................609

    a)    Introduction to Lehman's Survival Strategies and Efforts....................609

    b)    Lehman's Actions in 2008 Prior to the Near Collapse of Bear
Stearns.......................................................................................................622

    c)    Actions and Efforts Following the Near Collapse of Bear Stearns .......631

**VOLUME 3**

**Section III.A.4:  Repo 105**

4.    Repo 105..............................................................................................................732

    a)    Repo 105 – Executive Summary ..............................................................732

    b)    Introduction ..............................................................................................750

    c)    Why the Examiner Investigated Lehman's Use of Repo 105
Transactions .............................................................................................764

    d)    A Typical Repo 105 Transaction .............................................................765

    e)    Managing Balance Sheet and Leverage ..................................................800

    f)    The Purpose of Lehman's Repo 105 Program Was to Reverse
Engineer Publicly Reported Financial Results........................................853

    g)    The Materiality of Lehman's Repo 105 Practice ....................................884

    h)    Knowledge of Lehman's Repo 105 Program at the Highest Levels
of the Firm ................................................................................................914

    i)    Ernst & Young's Knowledge of Lehman's Repo 105 Program.............948

    j)    The Examiner's Conclusions ...................................................................962

## VOLUME 4

### Section III.A.5:  Secured Lenders

5.   Potential Claims Against Lehman's Secured Lenders .................................1066

    a)   Introduction and Executive Summary .....................................................1066

    b)   Lehman's Dealings With JPMorgan .......................................................1084

    c)   Lehman's Dealings With Citigroup .........................................................1224

    d)   Lehman's Dealings With HSBC ..............................................................1303

    e)   Lehman's Dealings With Bank of America .............................................1375

    f)   Lehman's Dealings With Bank of New York Mellon............................1376

    g)   Lehman's Dealings With Standard Bank.................................................1382

    h)   Lehman's Dealings With the Federal Reserve Bank of New York .....1385

    i)   Lehman's Liquidity Pool...........................................................................1401

### Section III.A.6:  Government

6.   The Interaction Between Lehman and the Government..............................1482

    a)   Introduction ...............................................................................................1482

    b)   The SEC's Oversight of Lehman .............................................................1484

    c)   The FRBNY's Oversight of Lehman ......................................................1494

    d)   The Federal Reserve's Oversight of Lehman ........................................1502

    e)   The Treasury Department's Oversight of Lehman ...............................1505

    f)   The Relationship of the SEC and FRBNY in Monitoring
       Lehman's Liquidity...................................................................................1507

    g)   The Government's Preparation for the "Lehman Weekend"
       Meetings at the FRBNY ...........................................................................1516

h) On the Evening of Friday, September 12, 2008, the Government
Convened a Meeting of the Major Wall Street Firms in an
Attempt to Facilitate the Rescue of Lehman ...........................................1523

i) Lehman's Bankruptcy Filing ...................................................................1535

## VOLUME 5

### Section III.B:  Avoidance Actions

B. Are There Administrative Claims or Colorable Claims for Preferences or
Voidable Transfers................................................................................................1544

1. Executive Summary ......................................................................................1544

2. Examiner's Investigation of Possible Administrative Claims Against
LBHI (First Bullet) .........................................................................................1546

3. Examiner's Investigation of Possible Avoidance Actions (Third,
Fourth and Eighth Bullets).............................................................................1570

4. Examiner's Investigation of Possible Breaches of Fiduciary Duty by
LBHI Affiliate Directors and Officers (Fifth Bullet) .....................................1894

5. Examiner's Analysis of Lehman's Foreign Exchange Transactions
(Second Bullet) ...............................................................................................1912

6. Examiner's Review of Intercompany Transactions Within Thirty
Days of LBHI's Bankruptcy Filing (Seventh Bullet)......................................1938

7. Examiner's Analysis of Lehman's Debt to Freddie Mac..............................1951

### Section III.C:  Barclays Transaction

C. Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to
Barclays, or From the Lehman ALI Transaction? ................................................1961

1. Executive Summary ......................................................................................1961

2. Facts...............................................................................................................1965

3. Whether Assets of LBHI Affiliates Were Transferred to Barclays .............1997

4. Lehman ALI Transaction...............................................................................2055

5.   Conclusions ...................................................................................................2063

6.   Barclays Transaction .....................................................................................2103

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

                           :

In re                          :    Chapter 11 Case No.

                           :

LEHMAN BROTHERS HOLDINGS INC.,    :    08-13555 (JMP)
*et al.*,                       :

                           :    (Jointly Administered)

                    Debtors.    :

---------------------------------------------------------- x

**REPORT OF**
**EXAMINER ANTON R. VALUKAS**

**Section III.B: Avoidance Actions**

## TABLE OF CONTENTS

B.  Are There Administrative Claims or Colorable Claims for Preferences or
    Voidable Transfers..................................................................................1544

1.  Executive Summary .................................................................................1544

2.  Examiner's Investigation of Possible Administrative Claims Against
    LBHI (First Bullet) .................................................................................1546

    a)  Summary ..........................................................................................1546

    b)  Introduction .....................................................................................1547

    c)  Lehman's Cash Management System ...............................................1549

        (1)  LBHI's Role as Central Banker .................................................1550

        (2)  Global Cash and Collateral Management ..................................1551

        (3)  Lehman's External and Virtual Bank Accounts..........................1554

        (4)  Bank Account Reconciliations....................................................1560

    d)  Effect of the Bankruptcy on the Cash Management System...............1562

    e)  Cash Transfers Giving Rise to Administrative Claims.......................1564

        (1)  Cash Transfers from LBHI Affiliates to LBHI..............................1565

        (2)  Cash Received by LBHI on Behalf of LBHI Affiliates..................1566

        (3)  Other Relevant Transactions .....................................................1568

3.  Examiner's Investigation of Possible Avoidance Actions (Third,
    Fourth and Eighth Bullets)......................................................................1570

    a)  Summary ..........................................................................................1570

    b)  LBHI Solvency Analysis...................................................................1570

        (1)  Introduction ..............................................................................1570

        (2)  Market-Based Valuation Analysis ...............................................1573

            (a)  Basis for Utilization of a Market-Based Valuation
                 Analysis............................................................................ 1573

            (b)  Market Value of Assets Approach ......................................... 1577

                (i)    Implied Asset Value........................................................ 1578

                (ii)   Small Equity Cushion ..................................................... 1580

                (iii)  Limitations of the Market-Based Approach.................. 1581

                    a.  Application of Retrojection......................................... 1583

                    b.  The Application of "Current Awareness" .............. 1584

        (3)  Conclusion ...............................................................................1587

    c)  LBHI Affiliate Solvency Analysis .......................................................1587

(1) Summary ...........................................................................1587

(2) Description of the Examiner's Analysis............................................1595

(3) Debtor-by-Debtor Analysis ............................................................1610

   (a) Lehman Commercial Paper Inc. ................................................ 1610

   (b) CES Aviation, CES Aviation V LLC, CES Aviation IX .......... 1615

   (c) LB Special Financing ................................................................ 1618

   (d) LB Commodity Services............................................................ 1622

   (e) Luxembourg Residential Properties Loan Finance
       S.A.R.L. .................................................................................... 1627

   (f) LB OTC Derivatives................................................................. 1628

   (g) LB 745 LLC .............................................................................. 1629

   (h) LB Derivative Products ............................................................ 1631

   (i) LB Financial Products .............................................................. 1633

   (j) LB Commercial Corporation .................................................... 1635

   (k) BNC Mortgage LLC ................................................................. 1638

   (l) East Dover Limited ................................................................... 1638

   (m) Lehman Scottish Finance ......................................................... 1640

   (n) PAMI Statler Arms .................................................................. 1641

d)  Unreasonably Small Capital .................................................................1642

(1) Summary ...........................................................................1645

(2) Analysis of the "Unreasonably Small Capital" Test ......................1648

   (a) Summary of Legal Standard ..................................................... 1648

   (b) Lehman's Countercyclical Strategy.......................................... 1650

   (c) Lehman's Repo Book and Liquidity Risk................................. 1654

      (i)    Bear Stearns Demonstrates the Liquidity Risk
             Associated with Repo Financing..................................... 1656

      (ii)   Quality and Tenor of Lehman's Repo Book ................. 1658

   (d) Deleveraging to "Win Back" Market Confidence ................. 1662

   (e) Beginning in the Third Quarter of 2008, Lehman Could
       Have Reasonably Anticipated a Loss of Confidence
       Which Would Have Triggered Its Liquidity Risk................. 1665

   (f) Lehman Was Not Sufficiently Prepared to Absorb a
       Liquidity Crisis Marked by a Sudden Loss of Non-
       Government, Non-Agency Repo Funding............................. 1674

        (i)    Lehman's Liquidity Pool ................................................. 1675

        (ii)   Liquidity Stress Tests ....................................................... 1678

        (iii)  Other Capital Adequacy Metrics ................................... 1687

             a.   Cash Capital Surplus ................................................. 1687

             b.   Equity Adequacy Framework .................................. 1688

             c.   CSE Capital Ratio ...................................................... 1690

    (g) LBHI Affiliate "Unreasonably Small Capital" Analysis ....... 1692

e)   Insider Preferences Against LBHI (Third Bullet) ................................1694

   (1) Summary ............................................................................1694

   (2) Legal Summary ...................................................................1696

   (3) Sources of Potential Preferential Activity...........................1698

   (4) Determinations and Assumptions on Section 547(b)
Elements .............................................................................1705

   (5) Scope of Defenses Under Section 547(c) ...........................1710

   (6) Findings for LBSF...............................................................1713

   (7) Findings for LBCS ..............................................................1718

   (8) Findings for LCPI...............................................................1722

f)   Preferences Against Non-LBHI Lehman Affiliates (Fourth Bullet)....1730

g)   Avoidance Analysis of LBHI and LBHI Affiliates Against
Financial Participants and Pre-Chapter 11 Lenders (Fourth and
Eighth Bullets) ........................................................................1731

   (1) Summary ............................................................................1731

   (2) APB Analysis .....................................................................1734

   (3) Cash Disbursement Analysis .............................................1737

   (4) Pledged Collateral Accounts Analysis...............................1738

   (5) Avoidance Analysis for Certain Pre-Chapter 11 Lenders and
Financial Participants .........................................................1739

    (a) JPMorgan Avoidance Analysis .................................. 1739

        (i)    Background ...................................................... 1739

        (ii)   Avoidability of the September Agreements and
Transfers in Connection with the September
Agreements ...................................................... 1742

             a.   Avoidability of the September Guaranty as a
Constructive Fraudulent Obligation ...................... 1743

    1.    There Is Evidence To Support A Finding That LBHI Incurred an Obligation Within the Applicable Look-Back Periods When it Executed the September Guaranty .................. 1743

    2.    There Is Evidence To Support A Finding That LBHI Received Less Than Reasonably Equivalent Value or Did Not Receive Fair Consideration in Exchange for Granting JPMorgan the September Guaranty ................. 1744

    3.    Insolvency as of September 10, 2008 ............... 1757

    4.    Undercapitalization as of September 10, 2008 ...................................................................... 1758

b.    Defenses to Avoidability of the September Guaranty ..................................................................... 1758

    1.    Applicability of the Good Faith Defense of Section 548(c) of the Bankruptcy Code and Section 279 of the N.Y. Debtor Creditor Law to the September Guaranty ...................... 1758

    2.    Applicability of the Safe Harbor Provisions of the Bankruptcy Code to the September Guaranty ............................................................ 1762

c.    Avoidability of Transfers of Collateral in Connection with the September Guaranty ............. 1767

    1.    LBHI's Collateral Transfers and Post-Petition Setoffs .................................................... 1767

    2.    Application of the Safe Harbors to the $8.6 Billion Cash Collateral Transfers ...................... 1776

    3.    There Is Evidence to Support Potential State Law Claims Available to LBHI Pursuant to Section 541 to Avoid the Transfers In Connection with the September Guaranty .......................................... 1781

    4.    To the Extent the September Guaranty Provided for a Guaranty of Non-Protected Contract Obligations, or to the Extent JPMorgan Liquidated Collateral Pursuant to Non-Protected Contract Exposure, a

Colorable Basis Exists That the Safe Harbor
Provisions Are Not Applicable ......................... 1787

(iii)   Avoidability of the August Agreements and
Transfers in Connection With the August
Agreements ...................................................... 1794

a.   Avoidability of the August Guaranty as a
Constructive Fraudulent Obligation ...................... 1794

1.   LBHI Incurred an Obligation Within the
Applicable Look-Back Periods When it
Executed the August Guaranty ........................ 1794

2.   There Is Evidence That LBHI Received
Less Than Reasonably Equivalent Value or
Did Not Receive Fair Consideration in
Exchange for Granting JPMorgan the
August Guaranty ............................................... 1795

3.   Insolvency as of August 29, 2008 ..................... 1797

4.   Undercapitalization and Inability to Pay
Debts as They Come Due as of August 29,
2008 ..................................................................... 1797

b.   Defenses to Avoidability of the August
Guaranty ...................................................................... 1797

c.   Avoidability of Transfers of Collateral in
Connection With the August Guaranty .................. 1798

(iv)   Avoidability of the August and the September
Security Agreements And Collateral Transfers
Pursuant to Section 548(a)(1)(A) ..................................... 1801

(v)   Avoidability of the Transfers of Collateral in
Connection with the September Guaranty Pursuant
to Section 547(b) of the Bankruptcy Code ..................... 1806

(vi)   Avoidability of Obligations of LBHI to Funds
Managed by JPMorgan ...................................................... 1813

(b)  Citi Avoidance Analysis ......................................................... 1817

(i)    Background ......................................................................... 1817

(ii)   Avoidability of the $2 Billion Deposit ............................ 1821

(iii)  Avoidability of the Amended Guaranty ......................... 1821

(iv)  Avoidability of the $500 Million Transfer From an
LBHI Account to an LBI Account ................................... 1827

(c)  FRBNY Avoidance Analysis ..................................................... 1829

(d)  HSBC Avoidance Analysis ........................................................ 1830

   (i)  Background ......................................................... 1830

   (ii)  The U.K. Cash Deed Transactions ................................... 1832

   (iii)  The Hong Kong Cash Deposit Transactions ................. 1833

   (iv)  September 9, 2009 Stipulation ......................................... 1834

   (v)  Avoidability of the January 4, 2008 Guaranty .............. 1835

   (vi)  Avoidability of the Hong Kong Cash Deed
Transactions ..................................................................... 1836

   (vii)  Avoidability of the U.K. Cash Deed .............................. 1836

   (viii) Avoidability of the Transfer of the Remaining
Collateral ......................................................................... 1837

(e)  Standard Bank Avoidance Analysis ......................................... 1837

(f)  BNYM Avoidance Analysis ....................................................... 1839

(g)  BofA Avoidance Analysis ......................................................... 1840

(h)  CME Avoidance Analysis .......................................................... 1841

   (i)  Summary ........................................................................ 1841

   (ii)  Background ...................................................................... 1843

      a.  Energy Derivatives ............................................ 1851

      b.  FX Derivatives ................................................... 1852

      c.  Interest Rate Derivatives ................................... 1852

      d.  Equity Derivatives ............................................ 1853

      e.  Agricultural Derivatives ................................... 1854

   (iii)  Defenses to Avoidability of Claims ................................. 1855

      a.  Applicability of CEA Preemption ............................ 1855

      b.  Applicability of Self-Regulatory Organization
Immunity ........................................................... 1862

      c.  Applicability of the Safe Harbor Provisions of
the Bankruptcy Code ........................................ 1870

h)  Avoidance Analysis of LBHI Affiliate Payments to Insider
Employees (Fourth Bullet) ..............................................................1871

(1)  Summary ..........................................................................................1871

(2)  Methodology.....................................................................................1873

(3)  Applicable Legal Standards.............................................................1874

(4) Findings ...................................................................................1882

    (a) LBHI Affiliate Severance Payments ........................................ 1882

    (b) LBHI Affiliate Bonus Payments .............................................. 1887

    (c) LBHI's Assumptions of Limited Partnership Interests ......... 1889

4.  Examiner's Investigation of Possible Breaches of Fiduciary Duty by
LBHI Affiliate Directors and Officers (Fifth Bullet) ...................................1894

  a)  Fiduciary Duty Standard for a Wholly-Owned Affiliate
Subsidiary under Delaware Law ...........................................................1896

  b)  Fiduciary Duty Standard for a Wholly-Owned Affiliate
Subsidiary under New York Law ..........................................................1902

    (1) LCPI's  Background and Officers and Directors ..........................1905

      (a)  Duty of Care ................................................................................. 1907

      (b)  Duty to Monitor ........................................................................ 1909

  c)  Breach of Fiduciary Duty for Aiding or Abetting Under
Delaware Law .......................................................................................1911

5.  Examiner's Analysis of Lehman's Foreign Exchange Transactions
(Second Bullet) .............................................................................................1912

  a)  Summary .................................................................................................1912

  b)  Foreign Exchange at Lehman ...............................................................1913

  c)  Foreign Exchange Transactions During the Stub Period ....................1923

6.  Examiner's Review of Intercompany Transactions Within Thirty
Days of LBHI's Bankruptcy Filing (Seventh Bullet)....................................1938

  a)  Summary .................................................................................................1938

  b)  Discussion...............................................................................................1939

  c)  Analysis ..................................................................................................1942

  d)  Analysis of Overall Net Intercompany Data for the 2007 and
2008 Periods of Analysis .......................................................................1942

    (1)  LBHI ................................................................................................1942

    (2)  LBIE ................................................................................................1945

    (3)  LBSF ................................................................................................1947

  e)  Analysis of Net Daily Intercompany Data for the 2007 and 2008
Periods of Analysis ................................................................................1949

7.  Examiner's Analysis of Lehman's Debt to Freddie Mac.............................1951

**B.    Are There Administrative Claims or Colorable Claims for Preferences or Voidable Transfers**

**1.    Executive Summary**

This Section of the Report addresses the first, second, third, fourth, seventh and eighth bullet points of the Examiner Order.  The Examiner's findings are as follows:

**Administrative Claims (First Bullet).**    The Examiner concludes that LBHI Affiliates may have administrative claims against LBHI related to "cash sweeps" totaling approximately $60 million.

**Transfers in Respect of Foreign Exchange Transactions (Second Bullet).**    The Examiner identified foreign exchange ("FX") transaction settlements involving LBHI Affiliates that took place between September 15, 2008 and the date upon which each applicable LBHI Affiliate commenced its Chapter 11 case.  The Examiner concludes that, (1) as a result of LBHI's bankruptcy, LBCC did not have sufficient funds to meet all of its obligations to its FX counterparties, and (2) operational disruption impacted whether, and in what order, counterparties were paid.

**Preference Claims Against LBHI (Third Bullet).**    The Examiner concludes that LBSF and LBCS have colorable preference claims against LBHI under Section 547(b) of the Bankruptcy Code, but there is also evidence to support LBHI's assertion of new value and ordinary course defenses.

**Potentially Voidable Transfers or Incurrences of Debt Claims (Fourth Bullet).**    The Examiner has not identified any fraudulent transfers under Section 548 of the

Bankruptcy Code or under state law based on the methodologies employed by the Examiner's financial advisors.  The Examiner's financial advisors reviewed the Debtors' expansive trading databases, SOFAs, and general ledger.  Ultimately, the Examiner identified several transfers in the Debtors' trading databases that may warrant further investigation, but any such potential claims belong to LBI.  The SIPA Trustee has been contacted about these transfers.  As for the other analytical approaches, the Examiner has not been able to complete his analyses because the Debtors have not been able to provide back-up material for certain transfers of interest.

**Intercompany Accounts and Transfers Thirty Days Prior to the Petition Date (Seventh Bullet).**    The Examiner has investigated and catalogued intercompany funding transfers not involving collateral between LBHI and certain LBHI Affiliates that took place between August 1, 2008 and September 12, 2008, as well as for the corresponding time period in 2007.

**Avoidance Transactions (Eighth Bullet).**    The Examiner reviewed various guaranties entered into by LBHI shortly before its bankruptcy filing and transfers of collateral in connection with those guaranties.  The Examiner concludes that there are colorable claims against JPMorgan and Citi to avoid the guaranties that they received from LBHI and to avoid certain of the transfers made in connection with those guaranties under Sections 547(b), 548 and 544 of the Bankruptcy Code and state law.  Such claims, however, are subject to substantial defenses including that the transfers of

collateral to JPMorgan or Citi are protected from avoidance based upon the safe-harbor provisions of the Bankruptcy Code. The Examiner concludes that the evidence does not support the existence of colorable claims against FRBNY, BNYM, HSBC and the CME Group ("CME"). The Examiner elected not to examine the BofA transactions for purposes of determining whether colorable claims exist with respect to such transactions because they are the subject of on-going litigation. The Examiner was unable to reach a conclusion with respect to a $200 million collateral transfer to Standard Bank because of the lack of information showing whether a Lehman Chapter 11 debtor was the source of this collateral transfer.[5997]

### 2. Examiner's Investigation of Possible Administrative Claims Against LBHI (First Bullet)

#### a) Summary

The Examiner investigated and identified cash transfers constituting post-petition extensions of credit that may give rise to administrative claims by LBHI Affiliates. Such transfers include those from LBHI Affiliates to LBHI, as well as receipts of cash by LBHI for the benefit of LBHI Affiliates. The Examiner concludes that cash transfers in a total amount of approximately $60 million may give rise to administrative claims.

---

[5997] The Examiner notes that the claims analyzed herein arising under Sections 547(b), 548 and 544 of the Bankruptcy Code and state law are dependent upon an analysis of Lehman's financial condition as of the time of these transfers. Because the Examiner was directed only to determine if these claims were colorable, the Examiner's financial advisors have limited their analysis to a determination as to whether evidence exists to support a finding of the requisite financial condition.

### b)  Introduction

This Section of the Report examines "whether LBCC or any other entity that currently is an LBHI Chapter 11 debtor subsidiary or affiliate ("LBHI Affiliate(s)") has any administrative claims against LBHI resulting from LBHI's cash sweeps of cash balances, if any, from September 15, 2008, the commencement date of LBHI's Chapter 11 case, through the date that such applicable LBHI Affiliate commenced its Chapter 11 case."[5998]

Neither the Examiner Order nor the Bankruptcy Code define the term "cash sweep."  However, in seeking authority to continue its pre-petition cash management system after the LBHI petition date, the Debtors described their practice of collecting, concentrating and disbursing cash, including intercompany funding and the sweeping of excess cash.[5999]   In a Cash Management Order, the Bankruptcy Court thereafter approved the Debtors' post-bankruptcy continuation of its cash management system, including intercompany funding, and provided that any post-petition intercompany cash sweep by the Debtors was a post-petition extension of credit entitled to superpriority status.[6000]   Specifically, the Court ordered that "from and after the

---

[5998] Examiner Order at p. 3, first bullet.

[5999] *See* Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) for Authorization to (i) Continue Using Existing Centralized Cash Management System, as Modified … ("Cash Management Motion"), at pp. 6-7, Docket No. 669, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 3, 2008).

[6000] Final Order Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) Authorizing the Debtors to (i) Continue to Use Existing Cash

Commencement Date, (i) the transfer of cash to or for the benefit of any Debtor directly or indirectly from any Debtor or non-Debtor affiliate shall entitle the transferring affiliate to an allowed claim in the recipient Debtor's Chapter 11 case, under Sections 364(c)(1) and 507(b) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code…."[6001]  Section 364(c) of the Bankruptcy Code allows a debtor to obtain credit or incur debt with priority over administrative expenses.[6002]

Thus, in light of the terms of the Cash Management Order, in this Section of the Report, "cash sweep" refers to any cash transfer that occurred between September 15, 2008 and the date that the applicable LBHI Affiliate commenced its Chapter 11 case (in each case, the "Stub Period"), from (1) an LBHI Affiliate to LBHI or (2) a third party to LBHI for the benefit of an LBHI Affiliate.  Excluded from the definition of "cash sweep" are post-petition cash transfers made in payment or settlement of existing obligations; such transfers would not be post-petition extensions of credit in accordance with Section 364(c)(1) of the Bankruptcy Code.

---

Management System, as Modified … (the "Cash Management Order"), at p. 6, Docket No. 1416, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Nov. 6, 2008).

[6001] *Id.*

[6002] Section 364(c)(1) of the Bankruptcy Code states, in relevant part, "the court… may authorize the obtaining of credit or the incurring of debt… with priority over any or all administrative expenses of the kind specified in section 503(b) … of this title." 11 U.S.C. § 364(c)(1).  Section 503(b) of the Bankruptcy Code states, in relevant part, that "there shall be allowed administrative expenses … including … the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b).

In order to provide the context for identifying cash sweeps giving rise to administrative claims, this Section of the Report begins with an overview of Lehman's pre-petition cash management system, which, as the Bankruptcy Court noted, "was extraordinarily complex and involved the regular movement of vast sums among affiliated entities."[6003]

### c) Lehman's Cash Management System

Lehman's Global Treasury Group (the "Treasury Group") was responsible for managing the firm's liquidity pool, funding the entities' business needs and ensuring effective use of the firm's capital.[6004]  The Treasury Group was subdivided into various departments,[6005] including the Cash and Collateral Management Group.[6006]  The Cash and Collateral Management Group, among other things, monitored the cash position of Lehman entities and managed their intra-day funding requirements.

---

[6003] Memorandum Decision Denying Relief from the Automatic Stay to Effectuate Setoff under 11 U.S.C. § 553(a), at p. 16, Docket No. 3551, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. May 12, 2009).

[6004] *See* Lehman, FSA Arrow Assessment - Treasury (Aug. 11, 2008), at p. 2 [LBHI_SEC07940_3272979].

[6005] The Treasury Group was comprised of the following departments: Cash and Collateral Management, Asset Liability Management, Financial Planning and Analysis, Creditor Relations, Treasury Controllers and Network Management.  *See id.*

[6006] *Id.* At the time of the LBHI bankruptcy filing, Daniel J. Fleming was Senior Vice President and Global Head of the Cash and Collateral Management Group.  Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 1.

### (1)  LBHI's Role as Central Banker

LBHI acted as the central banker for the Lehman entities, controlling the cash disbursements and receivables for itself, its subsidiaries and its affiliates.[6007]  In addition, through its central banking system, LBHI managed cash globally, allowing Lehman entities to use cash efficiently.  LBHI's cash management system was designed to track all cash activity, manage cash, maximize investment opportunities and minimize costs.[6008]   The firm-wide cash management system also streamlined Lehman's management and regulatory reporting process.[6009]

LBHI's cash management system was not completely integrated, and certain elements of the system functioned independently.[6010]   As such, in order to view Lehman's global cash picture, LBHI's cash management team gathered information from various financial software management tools,[6011] as opposed to retrieving the

---

[6007] Cash Management Motion, at p. 4 (¶ 10), Docket No. 669, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 3, 2008).  Notwithstanding LBHI's role as central banker, LBI paid expenses for the benefit of many U.S. Lehman entities.  However, LBHI was primarily responsible for funding the business operations of these entities.  *Id.* at pp. 4 (¶ 10), 8 (¶ 21).

[6008] *See* Lehman, GCCM System Description / Project Overview [LBEX-LL 385979]; Lehman, Introduction to GCCM; Concepts and Detail of GCCM Disbursements and Receipts Accounting, at p. 2 [LBEX-LL 029285].

[6009] While the cash management system was the same for regulated and non-regulated entities, regulated entities were subject to certain regulatory requirements which, among other things, caused such entities to account for some intercompany transactions differently and to retain more cash in their bank accounts than they would absent such regulatory requirements.  Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2.

[6010] Examiner's Interview of David Forsyth, Oct. 29, 2009, at p. 2.

[6011] LBHI used various applications and platforms including the Summit Treasury Workstation ("TWS") to manage its treasury functions.  With respect to cash management, LBHI also used a variety of software programs in conjunction with TWS, including the Global Cash and Collateral Management system, which

information from one integrated system.  Because the system was not fully integrated,

the cash management team could obtain only an approximation of Lehman's cash

position at any point in time.[6012]

### (2) Global Cash and Collateral Management

In 2006, LBHI began to implement the Global Cash and Collateral Management

("GCCM") system, an in-house banking platform.  GCCM was created to, among other

things: (1) generate real-time integrated views of cash positions across time zones; (2)

provide transparency into the generation and use of cash; (3) manage risk by calculating

real-time unsecured bank credit usage and minimize payment by systematically

releasing payment messages based on credit availability; and (4) forecast and fund

efficiently by providing start-of-day, intra-day and end-of-day projected and actual cash

positions across all currencies, legal entities and bank accounts.[6013]

While GCCM was intended by Lehman to facilitate efficient monitoring of the

cash activity of its entities, an entity may have used multiple source systems[6014] that may

or may not have been integrated into GCCM at the time of the LBHI bankruptcy

---

functioned as a gateway for cash flows to and from the firm, and Lehman's general ledger system (DBS). Lehman, Finance Systems Overview, pp. 8, 14 [LBEX-AM 004340].

[6012] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 5.

[6013] Lehman, GCCM System Description / Project Overview [LBEX-LL 385979].

[6014] Source systems are the applications in which business transactions were recorded, and which subsequently transmitted transaction information to DBS.  At the time of the LBHI bankruptcy petition, the source systems integrated with GCCM served various functions, including: (1) clearance, payment and settlement of trades; (2) loan product administration; (3) employee compensation, benefits and expenses; (4) cash netting and wire transfers; and (5) firm funding.  Examples of source systems include (1) ASAP, a payment and settlement system for fixed income and equity; (2) Loan IQ, a source system for loan product transactions and; (3) ITS, a multi-currency trade processing, settlement and book-keeping system.

filing.[6015]   Therefore, the Treasury Group was able to track only a portion of certain entities' cash activity using GCCM.

Lehman also used GCCM to consolidate cash for investment purposes, reduce the number of bank accounts at other financial institutions and manage its bank accounts more efficiently.[6016]  Cash consolidation within the GCCM system was unlike a traditional "cash sweep" system in that funds from individual accounts were not automatically transferred into a consolidation account on a daily basis.  Rather, the Treasury Group used GCCM to manually sweep cash from LBHI Affiliate accounts to an LBHI consolidation account on an intra-day or daily basis, as needed.[6017]

In other words, Treasury Group personnel monitored GCCM on a daily basis to determine whether affiliate bank accounts had excess cash that was not immediately needed for the affiliate's business operations.  If an affiliate had excess cash, the Treasury Group manually wired such cash to a designated consolidation account of

---

[6015] Integration into GCCM was done on a system-by-system basis, not on an entity-by-entity basis. Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 4.  The Examiner observed that Loan IQ, a global multi-currency system for the processing and administration of bank loan products utilized by LCPI, had been integrated into GCCM at the time of the LBHI bankruptcy filing, and therefore data from Loan IQ was transmitted to GCCM.  On the other hand, MTS (Mainframe Trading System), a securities trading system utilized by LBCC, had not been integrated into GCCM at the time of the LBHI bankruptcy filing, and therefore no data from MTS trades was included in GCCM.

[6016] *See* Lehman, Introduction to GCCM; Concepts and Detail of GCCM Disbursements and Receipts Accounting, at p. 4 [LBEX-LL 029285] (discussing Lehman's goal of creating an in-house bank model to, among other things, reduce the number of external bank accounts).

[6017] Cash Management Motion, at p. 5 (¶ 12), Docket No. 669, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 3, 2008).  The Treasury Group did not manually transfer cash between the External Bank Accounts of LBHI and its regulated subsidiaries on a daily basis.  Rather, LBHI prefunded the obligations of its regulated subsidiaries, and such subsidiaries periodically transferred funds to LBHI or made payments to third parties on behalf of LBHI to decrease their intercompany payable.  *See id.*

LBHI.  On the other hand, if an affiliate had a negative cash position, LBHI funded the

affiliate by wiring cash from its consolidation account to the affiliate's bank account.

The following diagram illustrates the paths of these cash transfers among LBHI and its

affiliates.



**Movement of Cash Among LBHI and its Affiliates**

As indicated in the diagram above, Lehman entities entered into transactions

with other Lehman entities in the ordinary course of business.  Such transactions may

have resulted in transfers of cash among Lehman entities.  However, in order to

minimize the need to transfer cash among affiliates, Lehman established intercompany

relationships in GCCM called "funding trees."[6018]   Lehman entities connected to the

same funding tree did not transfer cash to each other in connection with intercompany

---

[6018] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at pp. 3-4.

transactions. Instead, such intercompany transactions were recorded on the books of these entities as intercompany payables and receivables.[6019]

Because GCCM was not fully integrated with Lehman's source systems, some transactions related to cash management took place outside of GCCM. For instance, certain cash transfers between LBHI and LCPI were recorded in the MTS system,[6020] which was responsible for the trading of fixed-income securities.[6021] Because MTS was a trading system that was not designed to record cash transfers, cash transfers were recorded in MTS as securities repurchase transactions.[6022]

### (3) Lehman's External and Virtual Bank Accounts

LBHI maintained accounts at various banking institutions (collectively, the "External Bank Accounts"). Lehman tracked the movement and allocation of funds in External Bank Accounts using virtual accounts within GCCM. GCCM maintained two types of virtual accounts: (1) "Nostro Accounts," which mirrored External Bank Accounts,[6023] and (2) "In-House Accounts," which reflected the cash position, receivables and disbursements for each affiliate.[6024]

---

[6019] *Id*. at pp. 3-5.

[6020] In addition to cash transfers between LCPI and LBHI, the MTS system was also used to record cash transfers between LCPI and other Lehman entities. *Id*. at p. 7.

[6021] *Id*. at pp. 6-7.

[6022] *Id*. See Section III.B.3.e,8 of this Report, which discusses cash transfers recorded in MTS.

[6023] "Nostro" referred both to the actual accounts maintained at outside financial institutions and a representation of those actual accounts maintained within the GCCM system.

[6024] *See* Lehman, Introduction to GCCM; Concepts and Detail of GCCM Disbursements and Receipts Accounting, at pp. 3-4 [LBEX-LL 029285].

The In-House Accounts documented the amount of cash in LBHI's External Bank Account allocated to a particular entity.  When an affiliate transferred monies to LBHI, those monies would be recorded with an accounting entry as an "intercompany payable" by LBHI owed to the affiliate, and a corresponding "intercompany receivable" would be recorded on the books of the affiliate.[6025]  In this way, GCCM allowed LBHI to conduct its funding activity through a small number of External Bank Accounts, without segregating affiliate funds.

Furthermore, because Nostro Accounts and In-House Accounts within GCCM captured cash payment and receipt information, GCCM served as a conduit between the Lehman source systems and external banks.[6026]  The transactions recorded in GCCM were ultimately recorded on the books of the participating Lehman entities via Lehman's general ledger system (DBS).[6027]

GCCM also facilitated the process by which LBHI and its affiliates made and received payments for the benefit of other affiliates.[6028]  A receipt or payment of funds by one Lehman entity for the benefit of another was recorded in the Nostro Accounts and In-House Accounts within GCCM via an automated real-time process, and was

---

[6025] See id. at pp. 6-17. This recording of intercompany payables and receivables applied to cash transfers, but not necessarily to transactions, such as securities trades, where cash is exchanged for items of value.

[6026] See Yury Marasanov, Ernst & Young, Accounts Payable / Fixed Assets / NPE / Cash Mgmt. Process Walkthrough (Nov 30, 2008), at p. 11 [EY-SEC-LBHI-CORP-GAMX-08-056981].

[6027] Jay Chan, Lehman, GCCM Training Manual, at p. 5 [LBEX-LL 652833].

[6028] In later Sections of this Report, the Examiner refers to activity captured in GCCM when LBHI acted as central banker for affiliates, thereby receiving or extending value on their behalf, as "quasi-funding" activity. See Section III.B.3.e of this Report, which discusses insider preferences against LBHI, and Section III.B.6 of this Report, which discusses activity occurring in the thirty days before bankruptcy.

subsequently posted to the DBS system via an automated daily batch process.[6029]

Typically, the receipt of funds by one Lehman entity for the benefit of another was

recorded as follows: (1) the source system generated a notice that a receipt of funds was

expected, which was sent to GCCM; (2) upon receipt of this notice GCCM translated the

In-House account information associated with the transaction to the Nostro Account; (3)

GCCM then notified the bank that a receipt of cash was expected; (4) the bank received

the funds in an External Bank Account; (5) the bank transmitted the wire's SWIFT

data[6030] to GCCM, which provided the details of the transaction; (6) GCCM then

compared the SWIFT data against the notice generated by the source system, and

transmitted an acknowledgement of a receipt of funds to the source system; and (7) the

transaction information recorded in GCCM and the source system was thereafter

recorded in DBS.[6031]

The following diagram illustrates the electronic transmissions that took place

between the source systems, GCCM and banking institutions, as well as the subsequent

recording of the transaction information in DBS in connection with the receipt of cash

by LBHI for the benefit of an affiliate.

---

[6029] Jay Chan, Lehman, GCCM Training Manual, at pp. 2-6 [LBEX-LL 652833].

[6030] SWIFT (Society for Worldwide Interbank Financial Telecommunication) is the global standard by which banking customers automate and standardize financial transactions with banks.

[6031] *See* Jay Chan, Lehman, GCCM Training Manual, at pp. 3-5 [LBEX-LL 652833].

**Receipt of Funds by LBHI for the Benefit of an Affiliate**



The receipt of cash by one Lehman entity for the benefit of another was recorded with one journal entry in the source system and two journal entries in GCCM, which subsequently posted to DBS. The diagrams below illustrate the journal entries made in GCCM, the source system and the general ledger for the receipt of cash by LBHI for the benefit of LCPI, such as those received in connection with loan payments from third parties in the ordinary course of business.

**Receipt of Funds by LBHI for the Benefit of LCPI**
*GCCM and Source System Journal Entries*

|  | GCCM | | Source System | |
|---|---|---|---|---|
|  | Debit | Credit | Debit | Credit |
| Cash – LBHI | $100(a) | | | |
| Cash-LCPI | | $100(b) | $100(e) | |
| Receivable-LCPI | | | | $100(f) |
| Intercompany (Due from LBHI) | $100(c) | | | |
| Intercompany (Due to LCPI) | | $100(d) | | |
| Total | $200 | $200 | $100 | $100 |

As shown in the diagram above, the journal entries in GCCM were as follows: (a) a debit to cash for LBHI corresponding to the receipt of cash in LBHI's External Bank Account; (b) a credit to cash for LCPI corresponding to the allocation of cash to LCPI's In-House Account; (c) a debit to an intercompany receivable to LCPI from LBHI for cash received by LBHI; and (d) a credit to an intercompany payable from LBHI to LCPI for the cash owed by LBHI to LCPI.

The diagram above also illustrates the following journal entries in the source system: (e) a debit to cash for LCPI for the receipt of cash from the third party; and (f) a credit to receivables for LCPI for a reduction of the third party's liability to LCPI.

1558

These journal entries were subsequently recorded to the general ledger in a daily batch process. The diagram below illustrates the recording of these entries for LBHI and LCPI in the general ledger.

| Receipt of Funds by LBHI for the Benefit of LCPI *LBHI and LCPI General Ledger Entries* | | | | |
|---|---|---|---|---|
| | **LBHI General Ledger Activity** | | **LCPI General Ledger Activity** | |
| | Debit | Credit | Debit | Credit |
| Cash - LBHI | $100(a) | | | |
| Cash-LCPI | | | ~~$100~~ (1) | ~~$100~~ (2) |
| Receivable-LCPI | | | | $100(d) |
| Intercompany (Due from LBHI) | | | $100(c) | |
| Intercompany (Due to LCPI) | | $100(b) | | |
| Total | $100 | $100 | $200 | $200 |

This transaction was recorded in the general ledger as follows: (a) a debit to cash for LBHI, corresponding to the receipt of cash in an LBHI External Bank Account; (b) a credit to LBHI's intercompany payables owed to LCPI, corresponding to the allocation of this cash to LCPI's In-House Account; (c) a corresponding debit to LCPI's intercompany receivables reflecting an increase in intercompany receivables from LBHI;

and (d) a credit to LCPI's receivables reflecting the receipt of cash from the third party.[6032]

### (4)  Bank Account Reconciliations

Bank account reconciliations were a critical component of LBHI's cash management system, and were necessary for maintaining complete and accurate cash records.   A bank account reconciliation was performed by matching data from a financial institution with data recorded in both LBHI's internal cash management system and source systems to identify any inconsistencies or errors.[6033]   LBHI used a third-party-vendor bank account reconciliation system, Global Smart Stream Reconciliations ("GSSR"), which supplemented GCCM and automated the majority of the bank reconciliation process.[6034]

GSSR performed the following two key cash reconciliations on a daily basis: (1) the reconciliation of Nostro Accounts against External Bank Accounts; and (2) the reconciliation of In-House Accounts against source system records.[6035]   Reconciliations

---

[6032] There is also an entry in the general ledger related to LCPI with corresponding debit and credit amounts that offset each other.  These are: (1) a debit to cash reflecting the receipt of cash from a third party; and (2) a credit to cash reflecting the allocation of cash held by LBHI to LCPI's In-House Account.

[6033] *See* Yury Marasanov, Ernst & Young, Accounts Payable / Fixed Assets / NPE / Cash Mgmt. Process Walkthrough (Nov. 30, 2008), at pp. 12-13 [EY-SEC-LBHI-CORP-GAMX-08-056981].

[6034] Jim McMahon, Ernst & Young, Bank Reconciliation Process Walkthrough (Nov. 30, 2008), at pp. 9-12 [EY-SEC-LBHI-EED-GAMX-08-024858].

[6035] In addition, reconciliations of Nostro Account and In-House Account balances in GCCM against DBS were performed in GSSR.  In some cases, reconciliations of source systems against External Bank Accounts or against other source systems were also performed in GSSR.  *See* Yury Marasanov, Ernst & Young, Accounts Payable / Fixed Assets / NPE / Cash Mgmt. Process Walkthrough (Nov. 30, 2008), at pp. 12-13 [EY-SEC-LBHI-CORP-GAMX-08-056981].

of the Nostro Accounts against External Bank Accounts assessed the accuracy of the balances in an entity's External Bank Accounts at the end of the day.[6036]  Reconciliations of the In-House Accounts against source system records substantiated the cash balances documented in each entity's books and records.  In addition, reconciliations of Nostro Account and In-House Account balances in GCCM against DBS records ensured that all entries to GCCM were correct, serving as an additional safeguard against inaccuracies in the In-House Account and Nostro Account reconciliations.

As part of the reconciliation process, GSSR identified inconsistencies, or "breaks," between the data reported by financial institutions and the data reported in LBHI's cash management system.[6037]  Breaks were not an unusual occurrence.  A break report was created when listed items from either the bank system or GCCM did not have a corresponding match in the other system.[6038]  Each break was investigated and resolved by Treasury Group personnel.[6039]  For example, if an External Bank Account received a wire transfer from a third party, but the corresponding deposit had not been recorded in the corresponding Nostro Account within GCCM prior to the reconciliation, this transaction was listed on the break report.  Likewise, if a payment to a third party was recorded in a Nostro Account within GCCM, but the bank did not complete the

---

[6036] *See id.* at p. 13.

[6037] *See id.* at p. 12.

[6038] *See id.*

[6039] *See id.* at p. 13.

wire transfer until after the account reconciliation, the transaction would be listed on the break report.

### d)    Effect of the Bankruptcy on the Cash Management System

Just prior to the LBHI bankruptcy filing, financial institutions including Citibank and JPMorgan froze LBHI's bank accounts.[6040]    As a result, immediately following LBHI's bankruptcy filing: (1) funds could not be withdrawn from these accounts; (2) payments could not be made using funds in these accounts;[6041] and (3) the Treasury Group was unable to retrieve real-time account information.    Nonetheless, the banks continued to accept payments made to these accounts.

Because LBHI's bank accounts were frozen, the cash management processes of LBHI affiliates were also disrupted.    Funds were no longer transferred from LBHI's External Bank Accounts to the External Bank Accounts of its subsidiaries and affiliates.[6042]    In addition, LBHI stopped manually transferring cash from affiliate bank accounts to its accounts, as it had done prior to the bankruptcy petition.[6043]    On September 19, 2008, Lehman regained access to its bank accounts.

---

[6040] Examiner's Interview of David Forsyth, Oct. 29, 2009, at p. 3; Citigroup, Written Responses to Examiner's Inquiry (Jan. 12, 2010), at p. 3.

[6041] An exception was a payment of $23.5 million by LBHI to Weil on September 15, 2008.

[6042] The notable exception was pass-through principal and interest payments made to LCPI, which is discussed below in this Section of the Report.

[6043] Prior to the bankruptcy filing, LBHI treasury personnel transferred cash into LBHI accounts either daily or intra-day as needed.    *See* Cash Management Motion, at pp. 6-7 (¶ 16), Docket No. 669, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 3, 2008).

Following the LBHI bankruptcy filing and the bankruptcy filings of LBHI Affiliates, Lehman continued to use its cash management system, honored certain pre-petition obligations related to the cash management system and maintained and used certain existing External Bank Accounts.[6044]  In addition, the Debtors closed certain External Bank Accounts and established new External Bank Accounts ("New Accounts"), transferring cash into the New Accounts.  Further, the Debtors maintained certain pre-petition External Bank Accounts ("Legacy Accounts") because closing those accounts and opening new accounts would have required re-establishing the interfaces between such accounts and the various systems that Lehman operated pre-petition, and would thus have involved significant costs.  To the extent Legacy Accounts were not maintained, monies slated for deposit into such accounts were redirected to New Accounts.  The Debtors continue to use New Accounts and Legacy Accounts for all purposes of the estate, including collecting monies and making payments.[6045]

As an example of the changes described above, prior to September 15, 2008, LBHI received certain loan payments for the benefit of LCPI from third-party borrowers in the ordinary course of business.  LBHI then transferred these funds on behalf of LCPI directly to the third-parties, LCPI investment vehicles or Lehman non-Debtor affiliates

---

[6044] *See generally* Cash Management Order, Docket No. 1416, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Nov. 6, 2008).
[6045] Lehman Brothers Holdings Inc., LBHI Operational Issues and Challenges (Nov. 3, 2008), at pp. 11-12 [LBEX-OTS 000866].

that held the loans.[6046]   After the LBHI bankruptcy filing, funds received by LBHI on behalf of LCPI could not be transferred because LBHI's External Bank Accounts were frozen.

Consequently, on September 17, 2008, LCPI established new External Bank Accounts to collect such funds and LBHI no longer received such funds for the benefit of LCPI.   LCPI subsequently made payments directly to third-party investors in connection with such transactions.  On September 18 and 19, 2008, LBHI transferred the majority of the funds it previously received for the benefit of LCPI to an LCPI External Bank Account.[6047]

### e)   Cash Transfers Giving Rise to Administrative Claims

The methodology the Examiner used to identify cash transfers constituting post-petition extensions of credit that may give rise to administrative claims included a review of the Debtors' GCCM Records, Statements of Financial Affairs, cash transaction reports for Legacy Accounts and New Accounts, bank statement data[6048] and general ledger reports (collectively, the "Cash Transaction Records").  In addition, the Examiner conducted interviews with current and former Lehman personnel.

---

[6046] GCCM Intercompany Report, Sept. 1-15, 2008 [LBEX-LL 2551231- LBEX-LL 2564078].
[6047] *See* Section III.B.2.e.2 of this Report, which discusses the funds that remain in the LBHI External Bank Account.
[6048] Three separate data files including (1) Legacy Account data (2) New Account data and (3) a separate data file for LCPI Legacy Account data comprised the population of bank statement data.

Specifically, to identify (1) cash transfers from LBHI Affiliates to LBHI and (2) cash received by LBHI for the benefit of any LBHI Affiliate, for the period from September 15, 2008 through the date that the applicable LBHI Affiliate commenced its Chapter 11 case, the Examiner created queries and analyzed reports generated from Debtor bank statement data and GCCM.  Transactions with common characteristics were analyzed to determine whether such transactions met the definition of cash sweeps.[6049]  Finally, the Examiner reconciled the cash transfer information identified in the bank statement data against the GCCM funding report and intercompany report data.

The Examiner analyzed bank statement data for approximately 65 accounts, constituting the Debtors' U.S. and foreign bank accounts.[6050]  The Examiner's findings based on the methodology described above are as follows:

### (1)  Cash Transfers from LBHI Affiliates to LBHI

The Examiner has identified a transfer of $58,969,818 from LCPI to LBHI on October 1, 2008.[6051]

---

[6049] See Section III.B.2.b of this Report, which discusses cash sweeps that give rise to administrative claims.

[6050] The Debtors provided bank statement data for: (1) U.S. bank accounts of LBHI, East Dover, LB 745, LBCC, LBCS, LBDP, LBFP, LBSF, LCPI, LOTC and PAMI Statler; and (2) foreign bank accounts of LBHI (UK Branch), LBSF and LBCS.  E-mail from Lauren Sheridan, Lehman, to Heather D. McArn, Jenner & Block (Jan. 21, 2010) (noting that Lehman has provided the Examiner with the complete universe of all transaction activity for Debtor entities); e-mail from Lauren Sheridan, Lehman, to Heather D. McArn, Jenner & Block, *et al*. (Jan. 29, 2010) (indicating that Scottish Finance, CES, CES V, CES IX, Luxembourg LLC and BNC  had either minimal or no banking activity during the Stub Period).

[6051] *See* XO Jet LCPI Receipt Support Analysis [LBEX-AM-5641494 - LBEX-AM-5641497].

On September 30, 2008, LCPI received $58,969,818 from a third party in connection with an aircraft lease.[6052]    These funds were subsequently transferred to LBHI on October 1, 2008, three business days prior to the LCPI bankruptcy filing. According to Lehman, this transfer likely occurred in order to "protect" the funds from being seized by Citibank.[6053]    These funds have not been remitted by LBHI to LCPI as of the date of this Report.[6054]    The Examiner has determined that LCPI may be entitled to an administrative claim against LBHI in connection with this transfer.

### (2)  Cash Received by LBHI on Behalf of LBHI Affiliates

The Examiner has identified cash received by LBHI for the benefit of LBHI Affiliates in the total amount of $264,944,535.[6055]

LBHI received $258,903,936 of this total amount for the benefit of LCPI, relating to principal and interest payments from third parties.[6056]    On September 18 and 19, 2008, LBHI remitted a total of $258,745,279 to LCPI for these principal and interest payments.[6057]    LBHI has not remitted the remaining balance of $158,657 to LCPI in connection with these transactions, as of the date of this Report.    The Examiner has

---

[6052] *See id.*

[6053] E-mail from Lauren Sheridan, Lehman, to Ken Halperin, Duff & Phelps (Jan. 5, 2010).

[6054] *See* XO Jet LCPI Receipt Support Analysis [LBEX-AM-5641494 - LBEX-AM-5641497].

[6055] *See* Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389]; *see also* GCCM Intercompany Report [LBEX-LL 2040576 - LBEX-LL 2041244].

[6056] *See* Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389]; *see also* GCCM Intercompany Report [LBEX-LL 2040576 - LBEX-LL 2041244].

[6057] *See* Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389]; *see also* GCCM Intercompany Report [LBEX-LL 2040576 - LBEX-LL 2041244].

determined that LCPI may be entitled to an administrative claim against LBHI in connection with these transactions.

LBHI also received a total amount of $6,038,929 for the benefit of LBSF during the period from October 1 through October 3, 2008, related to interest rate swap coupon payments from third parties.[6058]    During 2009, LBHI remitted a total amount of $5,710,986 to LBSF in connection with these transactions.[6059]    LBHI has not remitted the remaining balance of $327,943 to LBSF as of the date of this Report.  The Examiner has determined that LBSF may be entitled to an administrative claim against LBHI in connection with these transactions.

In addition, the Examiner identified two receipts by LBHI for the benefit of LBCS and LBSF, which were *de minimis* in amount.  On September 15, 2008, LBHI received $1,484 for the benefit of LBCS and $186 for the benefit of LBSF.[6060]  As of the date of this Report, LBHI has not remitted these amounts to LBCS and LBSF.  The Examiner has determined that LBCS and LBSF may be entitled to administrative claims against LBHI in connection with these transactions.

---

[6058] LBHI bank statement data [LBEX-AM 5642390].

[6059] *Id.*

[6060] *See* Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389]; *see also* GCCM Intercompany Report [LBEX-LL 2040576 - LBEX-LL 2041244].

### (3)  Other Relevant Transactions

The Examiner identified two transfers in the total amount of 7,065,352 NOK from LBI (on behalf of LBCC) to LBHI (for the benefit of LBIE) on September 15, 2008.[6061]

This transaction was the subject of a Bankruptcy Court decision dated May 12, 2009, concerning DnB NOR Bank ASA's ("DNB") entitlement to setoff funds deposited to a LBHI bank account post-petition.[6062]  In its decision denying DNB's request for relief from the automatic stay to effectuate setoff, the Court noted that the transaction involved a transfer of funds from LBCC to LBHI.  The Court noted that:

> [T]he current record fails to provide any explanation concerning the reason that LBCC initiated the transfer of funds to LBHI, the consequence of the transfer (other than as it relates to the setoff question) or whether the transfer either satisfies or gives rise to an intercompany claim.  The Court also does not know whether the transfer is an example of ordinary course prepetition cash management procedures or represents an isolated transaction.[6063]

In investigating whether these NOK transfers constitute cash sweeps entitling LBCC to an administrative claim, the Examiner reviewed the record before the Court as well as Lehman's GCCM and RISC[6064] records.  These records provided additional information regarding the entities involved in this transaction.  Reflective of the

---

[6061] *See* GCCM transaction detail [LBEX-LL 3356465 - LBEX-LL 3356471, LBEX-LL 3356472 - LBEX-LL 3356479] (funds transfer by LBI (for LBCC) was to the UK branch of LBHI (for LBIE).)  The 7,065,352 Norwegian Kroner ("NOK") is equivalent to approximately $1.2 million.

[6062] *See* Memorandum Decision Denying Relief from the Automatic Stay to Effectuate Setoff Under 11 U.S.C. § 553(a), Docket No. 3551, *In re Lehman Brothers Holdings Inc.*, No. 08-13555, (Bankr. S.D.N.Y. May 12, 2009).

[6063] *Id*. at p. 15.

[6064] RISC stands for Real-time Information Systems for Commodities.

complicated nature of Lehman's cash management system, this data revealed that the transaction involved cash transfers made in settlement of foreign exchange transactions between LBCC and LBIE to exchange NOK for U.S. dollars.[6065]  The transfers of NOK originated from an LBI bank account at DNB (on behalf of LBCC) to an LBHI (UK Branch) bank account at DNB (for the benefit of LBIE).[6066]  Based on available information, the Examiner has determined that the corresponding U.S. dollar transfer from LBIE to LBCC was not consummated.[6067]

Because these cash transfers were made in settlement of existing obligations and were not post-petition extensions of credit, they do not constitute "cash sweeps" as defined in this Report.[6068]  Thus, any potential claims that may arise from this multi-entity transaction are outside the scope of the Examiner's investigation.

---

[6065] *See* RISC statement detail [LBEX-AM 5641773, LBEX-AM 5641774, LBEX-AM 564177 and LBEX-AM 564180] (listing the execution and scheduled settlement dates for these foreign exchange transactions); *see also* Francois Chu-Fong, Lehman, Written Responses to Examiner Inquiry Regarding DnB NOR Transaction, attached to e-mail from Lauren Sheridan, Lehman, to Heather D. McArn, Jenner & Block (Jan. 15, 2010).

[6066] The Examiner determined that because LBCC did not have foreign currency bank accounts, LBI paid and received foreign currencies on its behalf.  Likewise, in this transaction, LBHI UK served as LBIE's agent for the receipt of NOK.

[6067] *See* Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389] (reflecting that the U.S. dollar amounts were not transferred to LBCC).

[6068] The Examiner's review of these transfers focused on potential administrative claims by LBCC (an LBHI Affiliate) against LBHI arising from cash sweeps.  The Examiner has not assessed whether any non-Debtor affiliates including LBI and LBIE may have claims against any Debtor in connection with these transfers.

### 3. Examiner's Investigation of Possible Avoidance Actions (Third, Fourth and Eighth Bullets) [6069]

#### a) Summary

This Section includes a discussion of (1) LBHI and LBHI Affiliate solvency determinations, (2) unreasonably small capital determinations, (3) insider preferences against LBHI, and (4) potential avoidance claims available to LBHI and LBHI Affiliates against financial participants and pre-Chapter 11 lenders.

#### b) LBHI Solvency Analysis

##### (1) Introduction

The analysis of LBHI's solvency is necessary as part of the Examiner's investigation into potential preferential and fraudulent transfers made by LBHI in the time leading up to its bankruptcy filing. [6070] The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . ." [6071] This "definition of insolvency is the traditional bankruptcy balance sheet test of insolvency: whether debts are greater than assets, at a fair evaluation, exclusive of exempted property." [6072] Although GAAP is

---

[6069] This Section of the Report includes data extracted from Lehman's source systems, including, for example, GCCM, GSSR, and DBS.

[6070] Whether a debtor was insolvent at the time of a transfer affects the avoidability of that transfer as either a preference or a fraudulent transfer under the Bankruptcy Code. *See* 11 U.S.C. §§ 547(b)(3), 548(a)(1)(B)(ii)(I).

[6071] 11 U.S.C. § 101(32)(A).

[6072] *Akers v. Koubourlis* (*In re Koubourlis*), 869 F.2d 1319, 1321 (9th Cir. 1989).

relevant to a solvency analysis, it is not determinative.[6073]   A court should ask: "What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent."[6074]  Whether a company is insolvent is considered a mixed question of law and fact.[6075]

Valuation need not be exact:[6076] indeed, the "precise value of a company as a going concern is far from certain."[6077]  The Second Circuit, in *Roblin*, explained:

> The matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the "fair valuation" defined in § 101[32] by the most appropriate means.[6078]

As explained in *Iridium*, "[n]o rigid approach should be taken regarding the fair valuation of a company within the context of [a] solvency analysis, but rather courts should consider the totality of the circumstances."[6079]   Additionally, "though not

---

[6073] *Shubert v. Lucent Tech., Inc.* (*In re Winstar Comm'c., Inc.*), 348 B.R. 234, 274 (Bankr. D. Del. 2005), *aff'd* 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part on other grounds*, 554 F.3d 382 (3d Cir. 2009).

[6074] *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992).

[6075] *Travelers Int'l AG v. Trans World Airlines, Inc.* (*In re Trans World Airlines, Inc.*), 134 F.3d 188, 193 (3rd Cir. 1998), *cert. denied* 523 U.S. 1138 (1998).

[6076] *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir. 1985).

[6077] *Wolkowitz v. Am. Research Corp. (In re Dak Indus., Inc.),* 170 F.3d 1197, 1200 (9th Cir. 1999); *see also Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.),* 143 B.R. 468, 479 (Bankr. E.D. Tenn. 1992) ("Exactness is not required in determining solvency or insolvency."), *aff'd* 112 F.3d 234 (6th Cir. 1997).

[6078] *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 38 (2d Cir. 1996) (quoting *Porter v. Yukon Nat'l Bank*, 866 F.2d 355, 357 (10th Cir. 1989)).

[6079] *Iridium Capital Corp. v. Motorola, Inc. (In re Iridium Operating LLC*), 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (Peck, B.J.) (the Second Circuit has adopted a "flexible approach to insolvency analysis"); *see also Neuger v. Casgar (In re Randall Constr., Inc.),* 20 B.R. 179, 184 (N.D. Ohio 1981) (determination of fair valuation "is, at best, an inexact science, and may often be impossible. As a result, insolvency frequently

dispositive, expert appraisals and valuations should be considered, when possible, in a solvency analysis."[6080]

In order to perform this analysis, the Examiner's financial advisors utilized an approach based on the market prices for LBHI equity and debt. This approach was complemented by (1) the utilization of the technique of retrojection; and (2) the application of "current awareness," as explained below.

The Examiner's financial advisors did not perform either a discounted cash flow valuation ("DCF") or a market comparable valuation of Lehman for several reasons. First, such analyses would have required significant time and expense to perform, and each has significant shortcomings with regard to its dependability and applicability to the Examiner's analyses. Second, Lehman's assets were comprised mostly of financial assets for which a projection of cash flows would have been challenging. Further, the investigation done by the Examiner's financial advisors included numerous dates over which Lehman's financial health was fluctuating with some severity. As a result, a DCF performed on a single date would not necessarily be applicable to any other date, causing the Examiner's financial advisors to have to perform separate DCFs for each date in which there was a potentially avoidable transaction. Finally, due to the subjectivity necessary when projecting cash flows or determining appropriate

must be determined by proof of other facts or consideration of other factors from which insolvency may be inferred.")

[6080] *Iridium,* 373 B.R. at 344.

multiples, the Examiner's financial advisors found it more appropriate in this situation to rely on the contemporaneous analyses performed by all of the market participants. The presentation of price-book ratios, for example, indicates the collective, contemporaneous analysis of all market participants with regard to an appropriate discount that should be applied to Lehman relative to its peers.  Any comparable company valuation performed by the Examiner's financial advisors would merely serve to replicate this analysis a year later.

Utilizing a market-based approach, the Examiner first concluded that there is sufficient evidence to support a finding of insolvency of LBHI beginning on September 8, 2008.  Adjusting the market based approach pursuant to the technique of retrojection and the application of "current awareness," which would factor in information in existence but not known by the market, the Examiner concluded that there is sufficient evidence to support a finding of insolvency of LBHI beginning on September 2, 2008.

### (2)  Market-Based Valuation Analysis

#### (a)  Basis for Utilization of a Market-Based Valuation Analysis

Lehman was in an industry where it was required to mark many of its assets to market.  Although not all of Lehman's assets were marked with daily frequency,[6081] the book value of the firm's equity is typically a reasonable starting point

---

[6081] GAAP does not require firms to mark fixed assets to market.  Rather, it allows those assets to be reported at book or depreciated values.  Further, GAAP requires firms to perform goodwill impairment analyses, but it does not require firms to report appreciating values of goodwill or intangibles.  Finally, GAAP does not require firms to mark most debt to market.

for the assessment of the firm's true equity.  Despite the Examiner's financial advisor's determination that Lehman's valuation methodology for certain asset categories was reasonable,[6082] there is evidence indicating that Lehman's valuations were inaccurate or did not properly allow for firm-wide illiquidity and/or the appropriate levels of current distress.[6083]    Although Lehman's internal mark-to-market marking models have an advantage over the market owing to their access to extensive private information, the markings that are reported to the public occur relatively infrequently (quarterly), and quickly become outdated.    Quarterly mark-to-market values depend on quarterly accounting data and may not reflect the changing risk profile of the institution. Moreover, during the time period relevant to the Examiner's financial advisor's analyses, market values were declining rapidly and new information that impacted pricing was released frequently.    Thus, while fluid equity markets interpret public information and incorporate new data into prices very quickly, the quarterly accounting marks of Lehman lacked such timeliness.

An additional explanation for the discrepancy between the market values and Lehman's book values is that the firm's internal mark-to-market models focus on the riskiness of the individual assets, and therefore do not necessarily correctly reflect the overall riskiness of Lehman.    Often, large firms are less risky than the sum of their individual assets because of the benefit gained by diversification.    In Lehman's case,

---

[6082] See Section III.B.3.(c) of this Report, which discusses this determination.
[6083] See Section III.A.5.i of this Report for a discussion of Lehman's liquidity pool.

where the liquidity of the firm was questionable, the firm as a whole may have been seen as riskier than the sum of its individual assets.  Thus, the aggregate value of the firm's assets could be less than their sum, making it entirely reasonable and rational for the company's stock to trade below GAAP book value of equity.

Moreover, while Lehman's competitors and the investment banking community in general had equity market price-to-book ratios[6084] in excess of 1.0x throughout most of the summer of 2008, Lehman did not.  As displayed in the chart below, Lehman's price to book ratio was well below 1.0x at all times beginning June 1, 2008, and for most of July, August and September, it was between 0.4x and 0.6x.



---

[6084] Price to Book ratio is measured as the market capitalization of a firm divided by the firm's book value of equity.

Thus, reliance upon Lehman's balance sheet alone would be imprudent in an insolvency analysis.

Rather than relying on a corporation's own balance sheet valuations, some courts have indicated that a market capitalization valuation methodology is the appropriate solvency analysis for a large, publicly traded financial institution such as LBHI.[6085] According to the court in *Iridium*, "[a] company's stock price "is an 'ideal datapoint' for determining value."[6086] The advantage of such contemporaneous market evidence is that it is "untainted by hindsight or post-hoc litigation interests."[6087] The Third Circuit in *VFB*, in affirming the district court's "primary" reliance on market-based valuations as a measure of value, reasoned that "[e]quity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate,"[6088] and that absent some reason to distrust it, the market price is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses."[6089]

It is for these reasons that the Examiner and his financial advisors believe that a market-based approach to the valuation of LBHI's solvency is the most relevant, with other approaches providing further analysis.

---

[6085] *See Iridium*, 373 B.R. at 346; *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 631-33 (3rd Cir. 2007).
[6086] *Iridium*, 373 B.R. at 346.
[6087] *VFB LLC v. Campbell Soup Co.,*2005 WL 2234606, at *13 (D. Del. Sept. 13, 2005).
[6088] *VFB*, 482 F.3d at 631.
[6089] *Id.* at 663 (citing *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)).

### (b) Market Value of Assets Approach

While the courts in *Iridium* and *VFB* focused primarily, if not exclusively, on the market value of equity, the Examiner's financial advisors have included in their analysis the implication of solvency that results from an analysis of both the market value of equity and the market value of debt.

It is important to consider the market value of debt along with the market value of equity for several reasons.  First, in the case of a bankruptcy, the value achieved from selling the assets of the company would have to fund the repayment of both debt and equity.  To the extent that the creditors (and the debt market participants) feel that the value of the assets will not be sufficient to repay all of the debt, they will cause the debt to trade at a discount to par.  This was the case in the months leading up to Lehman's bankruptcy filing.

In addition to discounts in the debt markets, one must consider option value embedded in the equity prices.[6090] As an illustrative example, the following chart tracks the stock price for CIT Group in the period up to and after its bankruptcy filing on November 1, 2009:

---

[6090] For a more detailed discussion of the option value embedded in equity prices, see Appendix No. 21, Duff & Phelps, LBHI Solvency Analysis (Feb. 1, 2010).



CIT Group was a company that was widely known to be insolvent; however even two days before the company filed for bankruptcy, its stock was trading above $1 per share. This phenomenon illustrates the fact that equity – being non-recourse, which definitively caps potential downside – encourages speculative trading even at times where upside potential is highly unlikely.

### (i)  Implied Asset Value

Discounts in the bond market work in conjunction with optionality in the equities market. A solvency analysis consists of a view of a company at a single point in time. At that point in time, asset and debt prices are essentially fixed and, as a result, the total expected payout to equity and debt holders is fixed as well. For a given value of a firm's assets, any increase in expected payout to bond holders comes at the expense

of equity holders and vice versa.  As such, the Examiner's financial advisors considered both the equity and debt markets for Lehman in their analysis of implied asset value.

The valuation principal that establishes the framework for this analysis is, "The current value of assets minus the current value of liabilities equals the current value of the business owners' equity,"[6091] or:

$$Assets - Liabilities = Equity$$

Rearranging that formula, the current value of assets equals the current value of business owners' equity plus the current value of liabilities, or:

$$Assets = Equity + Liabilities$$

The exhibit below shows that the public market (for debt and equity) indicated that Lehman was insolvent on a balance sheet basis (1) between July 11 and July 15, 2008 (around the time of the IndyMac collapse); (2) on July 28, 2008; (3) on several dates between August 19 and August 28, 2008 (during certain KDB rumors and when certain customers were leaving); (4) on September 4, 2008; (5) and on all dates on and after September 8, 2008 (Fannie and Freddie failed on September 7;[6092] the termination of KDB talks[6093] became publicly known on September 9).[6094]  There is evidence, however, that

---

[6091] Shannon Pratt, *Valuing a Business*, Fifth Edition 350 (McGraw-Hill 5th ed. 2007) (1981).  This accounting formula holds true regardless of whether one is referring to book value or fair market value – provided that one maintains consistency across his evaluation.

[6092] Office of Federal Housing Enterprise Oversight Press Release, (Sept. 7, 2008) (available at http://www.treas.gov/press/releases/hp1129.htm).  Given that September 7, 2008 was a Sunday, September 8, 2008 was the first trading day thereafter.

[6093] See Section III.A.3.c for a discussion of the KDB negotiations.

the markets were not fully informed with regard to Lehman's true liquidity position, because of issues such as Repo 105 and Lehman's liquidity pool.[6095]  Accounting for this potential for misinformation would result in findings of less solvency on all dates impacted by the misinformation.



**(ii)  Small Equity Cushion**

As is true with many highly leveraged firms, Lehman's small margin of equity relative to assets meant it did not need much loss of asset value to render it insolvent.

---

[6094] For calculations supporting the exhibit below, see Appendix 21, Duff & Phelps, LBHI Solvency Analysis (Feb. 1, 2010).

[6095] See Section III.A.4 of this Report which discusses Repo 105; see also Section III.A.5.i of this Report, which discusses Lehman's liquidity pool.

Beginning July 10, 2008, on all dates but one (August 5, 2008), the value of Lehman's solvency equity (computed as the market value of assets minus the par value of debt) was less than 1% of the market value of assets.  This implies a very low margin for error.  Thus, while it appears that Lehman was marginally solvent on several dates throughout August 2008, a fact finder may conclude that, given Lehman's small equity cushion and the low margin for error, LBHI was insolvent on those dates as well.



### (iii) Limitations of the Market-Based Approach

A market value is not always a reliable measure of solvency, especially if the market is not aware of circumstances in existence which, if known, would adversely effect the market value.  For example, the Third Circuit noted in *VFB* that "if the market

capitalization was inflated by [former parent]'s manipulations it was not good evidence of value."[6096]

In *Adler I*, the bankruptcy court for the Southern District of New York held that in determining the solvency or insolvency of a bankrupt securities clearing firm, the court was not bound by the price at which the stock was trading at the time of the challenged transfers, to the extent that the price was being maintained due to massive manipulation of the market.[6097]  Instead, the court relied on stock prices one business day after the market manipulator closed, February 27, 1995, as a measure of the market price of the stock on the day of the challenged transfers, February 16, 1995.  The result was a stock price more than seventy-five percent lower than what it had been trading at under manipulation.[6098]  Because a solvency analysis must ascribe a price to the stock that "reflect[s] as nearly as possible a market untainted by [ ] manipulation," the court held that the stock prices after the market manipulator had closed were a more appropriate measure of value.[6099]  The Southern District of New York in *Adler II* agreed, holding that the most accurate reflection of the stock's fair market worth as of February

---

[6096] *VFB,* 482 F.3d at 632.

[6097] *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 110 (Bankr. S.D.N.Y. 1999) *(Adler I), aff'd* 263 B.R. 406 (S.D.N.Y. 2001*) (Adler II).*

[6098] *Id*.

[6099] *Id*. at 113.

16 was the stock price on February 27, after the market manipulator was out of business and thus unable to manipulate the market.[6100]

In order to adjust for the limits of market knowledge, the Examiner and his financial advisors analyzed how the valuation of LBHI might be affected if techniques of retrojection and "current awareness," described more fully below, were utilized to ascertain a more accurate value of LBHI, given its market capitalization prior to the filing.

### a.    Application of Retrojection

Because of the difficulty in valuing the assets and liabilities of a debtor on the exact date of a preferential or fraudulent transfer "courts often utilize the well-established bankruptcy principles of 'retrojection' and 'projection. . .'"[6101]  There are two types of retrojection: (1) where evidence of insolvency at a reasonable time subsequent to the date of a transfer can be used as competent evidence of the debtor's insolvency on the date of the transfer, and (2) where evidence of insolvency at an early date and evidence of insolvency at a later date can be used as competent evidence of the debtor's insolvency for all of the dates in between.  For both types of retrojection, courts

---

[6100] *Adler II*, 263 B.R. at 466-470.

[6101] *Coated Sales, Inc. v. First E. Bank (In re Coated Sales, Inc.)*, 144 B.R. 663, 666 (Bankr. S.D.N.Y. 1992) (citations omitted).

universally require proof that the debtor's financial situation did not change materially during the intervening period.[6102]

Accounting for the implied market value of LBHI's assets relative to its total liabilities, the exhibit in Section III.B.3.b.2.(i) demonstrates that LBHI was insolvent between July 11 and July 15, 2008, on July 28, 2008, on several dates between August 19 and August 28, 2008, on September 4, 2008, and on all dates beginning September 8, 2008.   In order to utilize retrojection, Lehman's financial situation must not have materially changed in the intervening periods.   Thus, the Examiner concludes that the earliest date to apply retrojection is September 2, 2008, the point at which KDB indicated that it relayed its decision not to continue talks with Lehman.[6103]

### b.   The Application of "Current Awareness"

The court in *Coated Sales* emphasized that although "a company's assets must be valued at the time of the alleged transfer and not what they turned out to be worth at some time after the bankruptcy court intervened," "it is not improper hindsight for a court to attribute 'current circumstances' which may be more correctly defined as

---

[6102] *See, e.g., Killips v. Schropp (In re Prime Realty, Inc.),* 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007) (recognizing validity of retrojection, but refusing to apply where trustee did not establish that debtor's financial condition had not substantially changed between the time of the transfer and when it may have become insolvent); *Briden,* 776 F.2d at 382, 382-83 (court found debtor insolvent at the time of a March and April transfer to sole stockholder where debtor's balance sheet for April overstated value of debtor's inventory; the court used retrojection to infer insolvency in March as well, given slow state of debtor's business).

[6103] For a more detailed account of circumstances surrounding the KDB deal, see Section III.A.3.c of this Report.

'current awareness' or 'current discovery' of the existence of a previous set of circumstances."[6104]  As described by *Coated Sales*:

> 'Fair market' or 'going concern' value, although presumed to be determined free of impermissible hindsight, is not determined in a vacuum — free of external stimuli.  In fact, fair market value presumes that all relevant information is known by seller and buyer.  It follows, that a party purchasing assets at the time of the alleged preferential transfer would be aware of all relevant factors, which would include knowledge of a massive business-wide fraud and environmental contamination: otherwise, that party would be the victim of fraud.  In sum, fair market valuation entails a hypothetical sale, not a hypothetical company.  Thus, it is not improper hindsight for a court to attribute 'current circumstances' which may be more correctly defined as 'current awareness' or 'current discovery' of the existence of a previous set of circumstances.[6105]

In order to apply such an analysis, described as a "current awareness" methodology, the Examiner's financial advisors identified and evaluated circumstances that existed, but were unknown to the investing public, and which would have materially impacted a valuation of LBHI if they had been known.  Such circumstances generally fall into one of two categories: (1) information that was made public by Lehman or other parties but was known or knowable as of an earlier date; and (2) information that was never made public, but has since been discovered during the course of the Examiner's investigation either through witness interviews or the review of either confidential or previously unreleased documents.

---

[6104] *Coated Sales*, 144 B.R. at 668 (citing *Cissel v. First Nat. Bank of Cincinnati*, 476 F. Supp. 474, 484 (S.D. Ohio 1979)); *Mutual Savings & Loan Ass'n v. McCants*, 183 F.2d 423, 425 (4th Cir. 1950)).
[6105] *Coated Sales*, 144 B.R. at 668.

For the first category, the Examiner has determined that there is sufficient evidence to support a finding to apply "current awareness" to circumstances surrounding the KDB deal.  Following the Korean government official's statement regarding the end of negotiations with Lehman, the cost of insuring Lehman's debt surged by almost 200 basis points, Lehman's hedge funds pulled out, short-term creditors cut lending lines, JPMorgan required Lehman to execute Security and Guaranty Agreements, and Citi sought a guarantee agreement to continue to clear in Asia.[6106]  Because Lehman was insolvent on the date that the public was informed of the end of negotiations between KDB and Lehman, and because this fact was in existence as of September 2, 2008 (the point at which KDB indicated that it relayed its decision not to continue talks with Lehman), the Examiner concludes that there is sufficient evidence to support a finding of insolvency beginning on September 2, 2008.

For the second category of information, information that has not yet become known to the public (at least prior to the publishing of this Report), the Examiner has determined that there is sufficient evidence to apply current awareness to the circumstances of Repo 105 and issues of liquidity.[6107]  Applying a current awareness methodology to such circumstances, however, is inherently complicated because of the difficulty in predicting how the stock market might react to information that has never

---

[6106] For a more detailed account of circumstances surrounding the KDB deal, see Section III.A.3.c of the Report.

[6107] See Section III.A.4 of this Report for a more detailed discussion of Repo 105; see Section III.A.5.i of this Report for a more detailed discussion of Lehman's liquidity pool.

become publicly known. Thus, this is an issue of fact that the Examiner has left unresolved due to the difficulty in reliably quantifying the result that such circumstances would have had on the fair market value of Lehman had they been known to the public.

### (3) Conclusion

Utilizing a market-based approach, the Examiner first concludes that there is sufficient evidence to support a finding of insolvency of LBHI beginning on September 8, 2008. Adjusting the market-based approach pursuant to the technique of retrojection and the application of "current awareness," which would factor in information in existence but not known by the market, the Examiner concludes that there is sufficient evidence to support a finding of insolvency of LBHI beginning on September 2, 2008.

### c) LBHI Affiliate Solvency Analysis

### (1) Summary

This Section of the Report addresses whether there is sufficient evidence to support a finding that an LBHI Affiliate was "insolvent," as such term is defined by the Bankruptcy Code and applicable state law, prior to the date that each LBHI Affiliate commenced its Chapter 11 case.[6108] The Bankruptcy Court has charged the Examiner with determining, among other things: (1) whether any LBHI Affiliate has colorable

---

[6108] Consistent with the Court's order, the Examiner has only addressed those LBHI Affiliates that commenced their bankruptcy cases prior to the appointment of the Examiner. *See* Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 3, Docket No. 2569, *In re Lehman Brothers Holdings Inc., et al.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

claims against LBHI for potentially insider preferences arising under the Bankruptcy Code or state law; and (2) whether any LBHI Affiliate has colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law.[6109]  In order to prevail on a preference claim, the plaintiff must establish that the debtor entity was insolvent at the time of the challenged transfer.[6110]  With respect to constructively fraudulent transfers, the plaintiff must establish that at the time of the transfer the debtor (1) was insolvent or became insolvent as a result of the transfer, (2) had unreasonably small capital for the purpose of continuing to engage in its business, or (3) incurred debts that were beyond the debtor's ability to pay as they matured.[6111]  Accordingly, the determination of whether there are colorable claims of either preferences or constructively fraudulent conveyances requires an examination of each LBHI Affiliate's solvency condition as of the date a challenged transfer occurred.[6112]

The Bankruptcy Code defines "insolvent," for entities other than a partnership and a municipality, as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."[6113]  Fair value is "the

---

[6109] *See id.*

[6110] *See* Appendix 1, Legal Issues, at Section IV.D.

[6111] *Id.*, at Section IV.A.2.

[6112] *Id.*, at Sections IV.A.2, IV.A.D.

[6113] 11 U.S.C. § 101(32)(A).  The solvency analysis is undertaken exclusive of property transferred with intent to hinder, delay or defraud the entity's creditors, and property exempt from the debtor's estate pursuant to Section 522 of the Bankruptcy Code.  *Id.*

price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[6114]  This Section of the Report addresses the "going concern" value of each LBHI Affiliate.[6115]

A debtor is presumed to be insolvent for purposes of a preferential transfer analysis under the Bankruptcy Code during the period beginning 90 days prior to the commencement of the debtor's bankruptcy case.[6116]  The following table sets forth the filing dates for each LBHI Affiliate, and the corresponding dates under Section 547(b)(4) of the Bankruptcy Code for the beginning of the 90-day preference period for non-insider transfers and for the one-year preference period for insider transfers.[6117]

---

[6114] Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, *Fair Value Measurements*, at 6. *See also* Appendix 1, Legal Issues, at Section IV.B.

[6115] An alternate means of valuation determines the "liquidation" value of the debtor.  Courts in the Southern District of New York have applied this valuation standard when it is determined that the debtor is "nominally extant" or on its "deathbed," at the time in question.  *Coated Sales, Inc. v. First E. Bank (In re Coated Sales)*, 144 B.R. 663, 667 (Bankr. S.D.N.Y. 1992).  The individual circumstances of each LBHI Affiliate present questions of fact, to be determined by the Court, as to whether "going concern" or "liquidation" value is most appropriate for any given solvency determination.  However, because each of the LBHI Affiliates was able to "continue day-to-day operations" in the months prior to commencing their bankruptcy cases, the Examiner deems it most appropriate to consider "going concern" value for the purpose of this analysis.  *Iridium Capital Corp. v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007).

[6116] 11 U.S.C. § 547(f).

[6117] These periods are calculated pursuant to Federal Rule of Civil Procedure 6(a) and the similar Federal Rule of Bankruptcy Procedure 9006(a).

| Debtor Entity | Date Filed | 90 Days Prior | One Year Prior |
|---|---|---|---|
| LB 745 LLC | 9/16/08 | 6/18/08 | 9/14/07 |
| PAMI Statler Arms LLC | 9/22/08 | 6/24/08 | 9/21/07 |
| Lehman Brothers Commodity Services Inc. | 10/3/08 | 7/3/08 | 10/3/07 |
| Lehman Brothers Special Financing Inc. | 10/3/08 | 7/3/08 | 10/3/07 |
| Lehman Brothers OTC Derivatives Inc. | 10/3/08 | 7/3/08 | 10/3/07 |
| Lehman Brothers Derivative Products Inc. | 10/5/08 | 7/7/08 | 10/5/07 |
| Lehman Commercial Paper Inc. | 10/5/08 | 7/7/08 | 10/5/07 |
| Lehman Brothers Commercial Corporation | 10/5/08 | 7/7/08 | 10/5/07 |
| Lehman Brothers Financial Products Inc. | 10/5/08 | 7/7/08 | 10/5/07 |
| Lehman Scottish Finance L.P. | 10/5/08 | 7/7/08 | 10/5/07 |
| CES Aviation LLC | 10/5/08 | 7/7/08 | 10/5/07 |
| CES Aviation V LLC | 10/5/08 | 7/7/08 | 10/5/07 |
| CES Aviation IX LLC | 10/5/08 | 7/7/08 | 10/5/07 |
| East Dover Limited | 10/5/08 | 7/7/08 | 10/5/07 |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | 1/7/09 | 10/9/08 | 1/7/08 |
| BNC Mortgage LLC | 1/9/09 | 10/10/08 | 1/9/08 |

While a debtor is presumed insolvent for the 90-day period identified above, this presumption is rebuttable. The Second Circuit has explained that "[a] creditor may rebut the presumption by introducing some evidence that the debtor was not in fact insolvent at the time of the transfer. If the creditor introduces such evidence, then the trustee must satisfy its burden of proof of insolvency by a preponderance of the evidence."[6118] A balance sheet showing that the debtor was solvent at the time of the

---

[6118] *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996).

transfer may be sufficient to rebut the presumption of insolvency.[6119]  A balance sheet

may be particularly effective if its accuracy can be confirmed by witness testimony from

experts or officers and directors of the debtor.[6120]  However, a court need not accept a

balance sheet at face value, and a balance sheet deemed to be inaccurate will not suffice

to overcome the presumption.[6121]  Accordingly, this analysis considers the nature of the

assets held by the debtor entities and notes when the possibility of misstatement affects

the solvency determination.

This Section addresses the solvency of each LBHI Affiliate in turn.  The following

analysis assesses whether the fair value of each LBHI Affiliate's assets exceeded the face

value of its liabilities during the period prior to its bankruptcy case.  The Examiner also

considered the risk that Lehman's valuation of each LBHI Affiliate's less liquid assets —

those identified as FASB Level 2 and 3 — was unreasonable, and whether any reduction

in the value of such assets would impact the determination as to the solvency of the

LBHI Affiliate.  Additionally, observations are provided on other factors impacting the

---

[6119] *See Jones Truck Lines, Inc. v. Full Service Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996) ("A financial statement showing positive net worth is sufficient to rebut the presumption of insolvency [under §547(f)]."); *cf. In re Ramba, Inc.*, 416 F.3d 394, 403 (5th Cir. 2005) (noting that balance sheet did address issue of solvency, but holding that presumption was not rebutted because balance sheet in question did not reflect status at time of transfer).

[6120] *See Toy King Distributors Inc. v. Liberty Sav. Bank, FSB* (*In re Toy King Distributors, Inc.*), 256 B.R. 1, 91 (Bankr. M.D. Fla. 2000) (relying on balance sheets in conjunction with expert testimony in finding rebuttal of § 547(f) presumption); *T.M. Sweeney & Sons v. Crawford* (*In re T.M. Sweeney & Sons, LTL Services, Inc.*), 120 B.R. 101, 103, 106 (Bankr. N.D. Ill. 1990) (holding that presumption was rebutted by balance sheet showing solvency and testimony of debtor's former president).

[6121] *See* Appendix 1, Legal Issues, at Section IV.D.

solvency of the debtor entities, including the credit ratings for the applicable LBHI Affiliates.[6122]

The Examiner has reached the following conclusions:

1.      There is sufficient evidence to support a finding that three LBHI Affiliates — LCPI, CES Aviation IX and CES Aviation V — were balance sheet insolvent as of May 31, 2008.  Two of these entities, CES Aviation IX and CES Aviation V, remained insolvent through the commencement of their bankruptcy cases.  LCPI was balance sheet insolvent through much of 2008, but received a $900 million capital infusion on August 29, 2008,[6123] which allowed it to become borderline solvent as of August 31, 2008. The Examiner concludes that there is insufficient evidence to rebut the presumption of insolvency for LCPI under Section 547(f) of the Bankruptcy Code after September 12, 2008, the last business day prior to the commencement of LBHI's bankruptcy case, for the reasons set forth in the following paragraph.

2.      Three LBHI Affiliates – LBSF, LBCS and CES Aviation – were borderline solvent as of May 31, 2008, meaning that their balance sheets showed assets just slightly in excess of liabilities such that a minimal write down of asset values or a small unaccounted-for liability would render these entities insolvent.  The small margin by

---

[6122] As will be explained in more detail, for certain entities, such as LBDP and LBFP, which were rated independently of LBHI, ratings of AAA were reflective of the solvency of the entity.  For other entities, such as LBSF and LBCS, investment-grade ratings were not dispositive of solvency.  LBHI was rated 'A' at the time it filed for bankruptcy.

[6123] E-mail from A. Jacob, Lehman, to Kristie Wong, Lehman, *et al.* (August 28, 2008) [LBEX-SIPA 005564].

which these entities were solvent creates a factual issue to be resolved by the court on a

case-by-case basis.[6124]    During the week following LBHI's bankruptcy and thereafter,

LBHI Affiliate counterparties terminated derivatives and other contracts at balance

sheet losses estimated to be in the tens of billions of dollars;[6125] the securities in which

certain LBHI Affiliates held an interest at LBI were transferred to Barclays;[6126] and

exchange-traded derivatives positions cleared by LBI for the benefit of LBHI Affiliates

(such as LBSF and LBCS) at clearing organizations such as the CME[6127] and OCC[6128] were

liquidated.    Moreover, after September 12, 2008, the collectability of intercompany

obligations reflected as assets on the balance sheets of LBHI Affiliates became

questionable.    The LBHI Affiliates continued to update their balance sheets to reflect

such activity, but based upon information made available to him to date, the Examiner

concludes that there is insufficient evidence to rebut the presumption of insolvency

---

[6124] The Examiner did not conduct an asset-by-asset valuation of each asset owned by LBHI Affiliates because of the time and cost required for such an exercise.  Rather, positions across a number of different asset classes were reviewed for several Debtors.  An entity's equity-to-total-assets ratio, as well as the relative likelihood of a misstatement of the value of an entity's assets, is considered in determining whether an entity that posted positive equity might nonetheless be borderline solvent.  As the term is used here, a low equity-to-total-assets ratio would make an entity borderline solvent unless the composition of its assets was such that misstatement of their value was very unlikely.  In light of the cost and time necessary to evaluate the valuation of all of the assets of each of the borderline solvent entities, the Examiner determined that it would not be a prudent use of Estate resources to perform such an exercise.  For purposes of analyzing whether these LBHI Affiliates have colorable avoidance claims, the Examiner assumed that the borderline entities were insolvent.

[6125] *See* Section III.C.4 of this Report.

[6126] *See* Section III.C.3.a.2.c.i of this Report.

[6127] *See* Section III.B.3.g.5.h of this Report for a description of the liquidation of the CME house positions.

[6128] *See* Section III.C.6.f.3.c of this Report.

under Section 547(g) of the Bankruptcy Code after September 12, 2008, with respect to any of these LBHI Affiliates.

3.    Nine LBHI Affiliates – LOTC, LB 745, LBDP, LBCC, BNC Mortgage LLC, LBFP, East Dover Limited, LSF and LRP – were solvent as of as May 31, 2008, and there is insufficient evidence to support a finding that any of these LBHI Affiliates became insolvent during the period ending August 31, 2008.  However, for the reasons set forth above, the Examiner concludes that there is insufficient evidence to rebut the presumption of insolvency under Section 547(g) of the Bankruptcy Code after September 12, 2008 with respect to LOTC and LBCC.[6129]

4.    There is insufficient evidence to reach a determination as to the solvency of debtor entity PAMI Statler Arms.[6130]  PAMI Statler Arms is a subsidiary of Property Asset Management, Inc. ("PAMI"), and its sole asset is an apartment complex in

---

[6129] LB 745's principal asset was Lehman's headquarters building at 745 Seventh Avenue in New York. *See* Section III.B.3.c.3.g of this Report.  Following LBHI's bankruptcy, LBDP and LBFP continued to maintain their AAA-ratings, and the balance sheets of these entities continued to reflect positive equity. *See* Section III.C.4 of this Report.  BNC Mortgage LLC's principal assets, as of August 31, 2008, were receivables owing by non-debtor Lehman subsidiaries. *See* Section III.B.3.c.3.k of this Report.  East Dover Limited, according to its August 31, 2008 balance sheet, had liabilities of $4 million and equity of approximately $105.4 million. *See* Section III.B.3.c.3.l.  LSF did not have any liabilities according to its May 31, 2008 and August 31, 2008 balance sheets. *See* Section III.B.3.c.3.m of this Report.  LRP was established in May 2008 and did not post a balance sheet until June 2008.  LRP was solvent as of August 31, 2008, and its assets consisted of one corporate loan whose value was protected by price flex. *See* Section III.B.3.c.3.e of this Report.

[6130] A motion to dismiss PAMI Statler Arms LLC's bankruptcy petition was filed on May 26, 2009. *See* Motion of Debtors Seeking Entry of an Order Pursuant to Section 1112(b) of the Bankruptcy Code Dismissing Chapter 11 Case of PAMI Statler Arms LLC, Docket No. 3650, *In re Lehman Bros. Holdings Co.*, No. 08-13555 (Bankr. S.D.N.Y. May 26, 2009).  The hearing on the motion has been adjourned without a date.  *See* Notice of Adjournment of Motion of Debtors Seeking Entry of an Order Pursuant to Section 1112(b) of the Bankruptcy Code Dismissing Chapter 11 Case of PAMI Statler Arms LLC, Docket No. 4060, *In re Lehman Bros. Holdings Co.*, No. 08-13555 (Bankr. S.D.N.Y. June 20, 2009).

Cleveland, Ohio. Lehman did not maintain separate financial statements for PAMI

Statler Arms in its general ledger software program.

## (2) Description of the Examiner's Analysis

The Examiner investigated the solvency of each of the LBHI Affiliates, taking as a

starting point the balance sheets of each entity as of May 31 and August 31, 2008.[6131] The

Examiner did not perform an audit, review, or examination (as defined by the American

Institute of Certified Public Accountants) of any of the historical financial information,

and therefore expresses no opinion with regard to same. The balance sheet information

provided below for each of the debtor entities was obtained from Lehman's Hyperion

system, which contains adjusted general ledger information. Lehman also used the DBS

general ledger system, accessed through EssBase, for internal management purposes,

but the Hyperion system was the source for all public financial statements.[6132] Balance

sheet information for LBHI Affiliates that had their own subsidiaries is presented on a

consolidated basis. Information regarding the composition of each debtor entity's

financial inventory, and the SFAS 157 level of individual assets of the financial

inventory, is available on Lehman's Global Finance System ("GFS"), a position-level

database. However, the Examiner's investigation has revealed that the GFS database is

---

[6131] The Examiner's analysis focuses on May 31, 2008 and August 31, 2008, because these were the end dates of Lehman's second and third quarter reporting periods. Although Lehman did not file a 10-Q statement for the third quarter of 2008, its finance employees created financial statements for the third quarter ending August 31, 2008. Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4.

[6132] Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4.

incomplete and inaccurate with respect to many of the assets held by LBHI Affiliates.[6133]

Accordingly, information from the GFS database is not relied upon in this Report unless

it has been reconciled to publicly disclosed financial statements to ensure its accuracy.

Based on interviews with former and current Lehman financial personnel, as

well as the Examiner's analysis of the systems and financial reports that were created by

Lehman prior to the bankruptcy filing, the Examiner has determined that there is

sufficient evidence to conclude that the LBHI Affiliates' balance sheets fairly represent

the financial condition of each LBHI Affiliate as of May 31 and August 31, 2008.[6134]

However, the Examiner has determined that the balance sheets of the LBHI

Affiliates created after August 31, 2008, which capture financial activity during the

remaining pre-petition period for each LBHI Affiliate, are not sufficient for purposes of

making a determination of the solvency of each LBHI Affiliate during this period.[6135]

The Examiner bases this conclusion on a review of financial information obtained from

various Lehman software systems.   For example, in September 2008, the financial

systems lacked information technology support and, contrary to normal operation,

were not consistently receiving certain daily feeds between systems carrying pricing

---

[6133] Id.

[6134] The Examiner did not conduct an investigation of each of the liabilities reported by the LBHI Affiliates and recognizes the possibility that there may be unreported or misstated liabilities which would be considered when determining the solvency of any given LBHI Affiliate.

[6135] This determination did not impact the use of balance sheet information for the limited purposes set forth in Section III.C.3.b.

and other information.[6136]   As a result, the financial statements produced by such systems are not sufficiently reliable for use as the basis of any solvency determination.

Additionally, financial statements prepared by Lehman in the course of the bankruptcy proceedings confirm that they differ materially from the public financial statements that Lehman created in the ordinary course of its business prior to bankruptcy.  The Monthly Operating Reports ("MOR"), which are filed with the U.S. Bankruptcy Court, specifically state that:

> The Debtors have prepared [the MORs], as required by the Office of the United States Trustee, based on the information available to The Debtors at this time, but note that such information may be incomplete and may be materially deficient in certain respects. This MOR is not meant to be relied upon as a complete description of the Debtors, their business, condition (financial or otherwise), results of operations, prospects, assets or liabilities. The Debtors reserve all rights to revise this report.[6137]

Among others, the MORs identify the following issues rendering the financials reported insufficient for the purposes of a solvency determination:

- They are not prepared in accordance with U.S. GAAP.

- They do not reflect normal quarterly adjustments that were generally recorded by the Debtor.

- Certain items are under research and may be accounted for differently in future monthly reports (no updates have been filed as of November 2009).

- Cash and restricted cash may not belong to the Debtor.

---

[6136] Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4.

[6137] Monthly Operating Report, Selected Debtor Balance Sheets, Docket 3916, *In re Lehman Bros. Holdings Inc., et al.*, No. 08-13555, at p. 11 (Bankr. S.D.N.Y. June 15, 2009).

- Securities and financial instruments are sometimes reported as of the last valuation recorded by Lehman and do not reflect realizable values of assets (i.e., they are not FAS 157 compliant).[6138]

Given the foregoing, and because of the extraordinary time and expense required to investigate the solvency of the LBHI Affiliates after August 31, 2008, the Examiner expresses no view of the solvency of the LBHI Affiliates after August 31, 2008. However, the Examiner notes that, of the evidence obtained, none suggests that the solvency status of the borderline solvent or insolvent LBHI Affiliates materially improved during the period beginning September 1, 2008, and ending on the commencement of the respective bankruptcy cases. Furthermore, as noted above, the Examiner finds that there is insufficient evidence to rebut the presumption of insolvency under Section 547(g) of the Bankruptcy Code after September 12, 2008 with respect to each of the borderline solvent LBHI Affiliates, LOTC, and LBCC.

Because the balance sheet solvency test asks whether the fair value of a debtor's assets exceeds its liabilities, the solvency analysis performed is not based on GAAP. Certain concepts that are not accounted for under GAAP, but which implicate the fair value of the Debtor's assets and its liabilities, are addressed here. For instance, the Examiner has investigated whether any LBHI Affiliate held intangible assets. Intangible assets are identifiable non-monetary assets that are not physical in nature, but contribute to the value of a firm. They do not appear on a balance sheet except in

---

[6138] *Id*. at 4.

certain circumstances, such as when an intangible asset is purchased in a transaction and recorded under GAAP purchase accounting rules.[6139]  Examples of intangible assets include customer lists, proprietary technology, internally developed software, and trade names.  For purposes of this Section of the Report, intangible assets are relevant to the extent that they would render an otherwise insolvent debtor solvent, or impairment of the book value of intangible assets would render a solvent debtor insolvent.  Therefore, the analysis has focused on identifying intangible assets for insolvent or borderline debtors as identified above.

Addressing the LBHI Affiliates on a consolidated basis, the Examiner has reviewed available documents and interviews with Legal Entity Controllers ("LEC") and identified intangible assets in the form of goodwill owned by LBSF and LBCS. However, the existence of these assets, discussed below, does not change the determination of those entities' solvency.  Furthermore, based on the analysis provided in Section III.C.3 of this Report, it is possible that additional intangible assets may be held by certain LBHI Affiliates in the form of customer lists, proprietary technology or a workforce-related asset, but such intangible assets are not of material value and would not change the solvency determination for any of the LBHI Affiliates.

---

[6139] *See* Financial Accounting Standards Board, Statement of Fin. Accounting Standards No. 141(R), *Business Combinations* (2007).

The following is a summary table of the Examiner's conclusions regarding the

solvency of LBHI Affiliates as of May 31, 2008:[6140]

| Entity | Primary Business | Shareholder Equity ($million) | Shareholder Equity as % of Total Assets[6141] | Balance Sheet Solvency as of May 31, 2008 |
|---|---|---|---|---|
| Lehman Commercial Paper Inc. | Originate and trade secured and unsecured loans; provide warehouse loans secured by mortgage loans and other assets | (62.0) | N/M | Insolvent (borderline as of August 2008) |
| CES Aviation IX LLC | Acquire and operate aircraft for Lehman | (0.9) | N/M | Insolvent |
| CES Aviation V LLC | Acquire and operate aircraft for Lehman | (3.5) | N/M | Insolvent |
| Lehman Brothers Special Financing Inc. | Lehman Brothers Inc.'s principal dealer in a broad range of derivative products including interest rate, currency, credit and mortgage derivatives | 475.1 | 0.4% | Borderline |
| Lehman Brothers Commodity Services Inc. | Trade power, natural gas, oil, and structured products | 26.0 | 0.4% | Borderline |
| CES Aviation LLC | Acquire and operate aircraft for Lehman | 0.1 | 0.6% | Borderline |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | Investment and financing vehicle, which held loans (typically commercial loans including Term B Archstone loans) | 2.6 | 0.4% | Solvent |
| Lehman Brothers OTC Derivatives Inc. | Over-the-counter derivatives dealer | 225.5 | 4.2% | Solvent |
| LB 745 LLC | Owner of Lehman's headquarters located at 745 Seventh Avenue in New York | 55.3 | 7.2% | Solvent |

---

[6140] Data is as of May 31, 2008, except in the case of Luxembourg Residential Properties Loan Finance S.a.r.l. whose data is as of August 31, 2008. Financial data is not available for PAMI Statler Arms LLC.

[6141] "N/M" indicates that the ratio is not meaningful due to the fact that the entity had negative equity.

| Entity | Primary Business | Shareholder Equity ($million) | Shareholder Equity as % of Total Assets[6141] | Balance Sheet Solvency as of May 31, 2008 |
|---|---|---|---|---|
| Lehman Brothers Derivative Products Inc. | AAA-rated termination derivative product company that intermediates interest rate and currency swaps between market counterparties and Lehman Brothers Special Financing | 47.4 | 8.9% | Solvent |
| Lehman Brothers Commercial Corporation | Dealer in over-the-counter foreign currency forwards and options and exchange-traded futures and futures options | 230.9 | 6.9% | Solvent |
| BNC Mortgage LLC | Subprime mortgage origination | 11.1 | 45.8% | Solvent |
| Lehman Brothers Financial Products Inc. | AAA-rated continuation derivative product company that engages in over-the-counter interest rate and currency swaps and options, purchasing or selling exchange-traded futures and options, or government bonds and options | 290.0 | 54.1% | Solvent |
| East Dover Limited | Historically purchased, leased and sold aircraft and related equipment; as of the bankruptcy filing, no longer performed these activities but held mostly intercompany receivables and payables | 101.1 | 92.9% | Solvent |
| Lehman Scottish Finance L.P. | Hold equity-linked notes of other Lehman entities | 57.4 | 100% | Solvent |

| Entity | Primary Business | Shareholder Equity ($million) | Shareholder Equity as % of Total Assets[6141] | Balance Sheet Solvency as of May 31, 2008 |
|---|---|---|---|---|
| PAMI Statler Arms LLC | Owner of Statler Arms Apartments, a 297-suite apartment complex in Cleveland | Unknown | Unknown | Unknown |

As indicated in the table above, while most of the 16 debtor entities maintained some degree of positive GAAP equity as of May 31, 2008, six entities posted negative or very low levels of capital in relation to their level of assets.[6142]  These entities were LCPI, CES Aviation V LLC, CES Aviation IX, CES Aviation, LBCS, and LBSF.

The following issues and concepts are common to the analysis of one or more LBHI Affiliates and are discussed at the outset for clarity.

**Fair Market Value of Balance Sheet Assets and SFAS 157 Assets.**  For the purpose of determining the balance sheet solvency of LBHI Affiliates, the asset values reported in financial statements must be representative of fair market value, or adjustments must be made to ensure that the fair value is captured.[6143]  In the case of the assets held by LBHI Affiliates, most reported values are representative of fair market

---

[6142] For the period May 31, 2008, through August 31, 2008, all of the Debtors, except one, posted net payables to LBHI.  The exception was LBDP, which posted a net $7.7 million receivable from LBHI in May 2008.  However, this accounted for only 1.4% of LBDP's total assets and even with a complete loss of the receivable from LBHI, LBDP would remain solvent.  Therefore, LBHI's potential failure to pay its receivables is not an issue in regard to the solvency of the LBHI Affiliates.

[6143] *See In re Roblin Indus., Inc.*, 78 F.3d at 36 ("It is also true that book values are not ordinarily an accurate reflection of the market value of an asset."); *In re Iridium Operating LLC*, 373 B.R. at 344 ("When a business is a going concern, fair value is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.") (internal quotation marks omitted).

value.  Following is a list of asset types owned by LBHI Affiliates, and the relationship

of the reported value to fair market value for each:

| Asset | Relationship to Fair Market Value |
| --- | --- |
| Cash | Presumed to be at Fair Market Value |
| Accounts Receivable | Presumed to be at Fair Market Value assuming no material change in the financial health of counterparties. |
| Prepaid and Deferred Expenses | Presumed to be at Fair Market Value pending investigation. The instances of debtors owning these assets are addressed on a case by case basis below. |
| Securities and Other Financial Inventory | Presumed to be at Fair Market Value considering the requirement to mark these assets to market under SFAS 157. These assets are discussed further below. |
| Plant, Property and Equipment | Unlikely to be at Fair Market Value.  Other than land, these assets are assumed to be wasting assets, meaning that their value decreases over time.  Accordingly, Fair Market Value for these assets will generally be less than the purchase price. Due to cost and time constraints, the Examiner did not pursue an independent valuation of these assets for any LBHI Affiliate.  As discussed below, certain LBHI Affiliates carried significant amounts of Plant, Property and Equipment, though in no case would a change from book value to Fair Market Value change the findings contained herein. |
| Goodwill and Intangibles | Unlikely to be at Fair Market Value.  Goodwill and Intangibles are the result of purchase accounting requirements and do not necessarily reflect Fair Market Value. |
| Off Balance Sheet Assets | As the name suggests, these are assets that do not appear on the balance sheet.  Based on interviews with LECs, no off-balance sheet assets have been identified for any debtor. |

In assessing the equity component of the LBHI Affiliates' balance sheets, an analysis of the components of each entity's Securities and Financial Instruments Owned has been performed in order to understand where there may be risks of misstatement of the value of the entity's assets. Under SFAS 157, a firm is required to assess the fair value of a financial instrument based on Level 1 (a market quoted price), Level 2 (measurement with no observable price, but based on observable inputs) and Level 3 (measurement using unobservable inputs).[6144] Level 2 and 3 assets are at the greatest risk of misstatement because their valuation is not based on a market-quoted price. Data from Lehman's GFS system, modified by Lehman's finance team,[6145] has been assessed in order to identify the amount of Level 2 and 3 assets held by each debtor. The ratio of equity to Level 2 and 3 assets is used as a measure of risk of possible insolvency as it represents the relative size of an entity's equity cushion as compared to the value of its assets subject to misstatement.

**Capital Infusions.** The task of monitoring the equity levels of Lehman's various legal entities was performed by LECs. While each legal entity required a different level of attention based on its activity, each was assigned an LEC who was responsible for

---

[6144] Statement of Fin. Accounting Standards No. 157, Fair Value Measurements, at SFAS 157-10 to -12.

[6145] Lehman's controllers indicated that GFS was inaccurate and, on a quarterly basis, GFS was reconciled to publicly filed financial statements for LBHI on a consolidated basis. When necessary, other source systems were considered to provide support. No such exercise was performed at the legal entity level. Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 4.

monitoring and producing entity financials.[6146]    Unlike product controllers, whose responsibilities were assigned along product and business lines, LECs' responsibilities were determined by which legal entities they were assigned.  The LECs were a critical part of the process whereby the financial data of each entity was assembled in a reportable form.  The Examiner has found no evidence of a formal written policy prior to 2008 or any consistent unwritten policy that LECs were to keep entities solvent.[6147]  However, when an operating entity did become balance sheet insolvent, LECs would often respond by proposing that a capital infusion be made into that entity.[6148]    In general, the LECs for non-regulated entities aimed to maintain enough capital so as to avoid negative capital.[6149]

In 2008, however, Lehman's regulatory group markedly changed the way it approached capitalization requirements for certain legal entities because those entities, or entities of which they were subsidiaries, were the subject of heightened scrutiny by regulators and third parties as a result of falling asset prices.  At least one witness has suggested that LBI, a broker/dealer, would be precluded from trading if one of its subsidiaries failed to meet a particular capital requirement.[6150]    This is because a broker/dealer was required to meet reporting requirements on a consolidated basis,

---

[6146] *See* Examiner's Interview of Michael Montella, Oct. 26, 2009, at pp. 2-7.

[6147] *Id*. at pp. 4-5.

[6148] *Id*.  In the case of LCPI, these infusions were, until August 2008, insufficient to actually establish solvency.

[6149] *Id*. at pp. 10-11.

[6150] Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 6.

which included the financial information of all its subsidiaries.[6151]  Moreover, LCPI had

a triparty repo clearing agreement with JPMorgan, pursuant to which LCPI was

obligated to maintain a particular equity-to-asset or leverage ratio.[6152]  Beginning in May

2008, therefore, the LECs would meet in the beginning or middle of each month to

identify projected profits and losses, write-offs, and other metrics.[6153]  The LECs would

then compare these figures to the previous month's equity and attempt to predict future

equity levels and any capital infusion needs.[6154]  It was not uncommon for front-office

traders to send e-mails noting capital levels for certain entities, such as LCPI.[6155]

LCPI and LBSF, both subsidiaries of LBI, were of considerable concern to

Lehman, regulators, and third parties because they were forced to take significant write-

downs during 2008.  Although there was a minor capital infusion in February 2008 of

$200,000,[6156] the first major capital infusion occurred in May 2008, which was in response

to a significant write-down of securities backed by real estate in California.[6157]  From

April through July 2008, LCPI continued to post negative equity levels and required

---

[6151] *Id.*

[6152] *Id.* at p. 7.

[6153] *Id.*

[6154] *Id.* at pp. 6-7.

[6155] *Id.*

[6156] *Id.* The LEC for LCPI was unaware of any capital infusion for LCPI before February 2008.

[6157] *Id.*

significant capital infusions.  The following chart shows capital infusions (in millions) received by LCPI, LBSF, and LBDP during 2008 in response to these concerns:[6158]

| Debtor | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug08 |
|--------|--------|--------|--------|--------|--------|--------|--------|-------|
| LCPI | - | 0.2 | 200.0 | - | 150.0 | - | 275.0 | 900.0 |
| LBSF | - | - | - | - | 100.0 | - | - | - |
| LBDP | - | - | - | - | - | 150.0 | - | - |

In terms of mechanics, the Examiner has identified three internal Lehman e-mails that describe the capital infusions for LCPI and LBSF and provide the relevant journal entries and wire transfers.[6159]  The Examiner has not located any e-mail with respect to the July 2008 capital infusion of LCPI.   As for LCPI, LBI would first request a "paydown" from LBHI to LBI, which was consummated by a wire transfer.   LBHI would record a reduction in cash and an increase in its investment asset in LBI.  Second, LBI would send the money back to LBHI because LCPI, according to internal e-mails, did not have a bank account.[6160]   In other words, LBHI accepted LCPI's money on its behalf.  Third, when LBHI received the money from LBI, it increased its cash account and reduced its intercompany receivable from LCPI.  Finally, LCPI reduced its debt obligation to LBHI and credited its paid-in capital account.  LCPI did not record a

---

[6158] Capital Infusions are determined by noting the change in Additional-Paid-In-Capital, as reported in Lehman's Hyperion financial system.

[6159] E-mail from Jeffrey Su, Lehman, to Arthur Hiller, Lehman, *et al.* (Mar. 27, 2008) [LBEX-BARLEG 0000001 to -03]; e-mail from Jeffrey Su, Lehman, to Arthur Hiller, Lehman, *et al.* (May 30, 2008) [LBEX-BARLEG 0000004]; e-mail from Hui Wang, Lehman, to Helen Chu, Lehman, *et al.* (Aug. 28, 2008) [LBEX-SIPA 003320].

[6160] This is inconsistent with observations of LCPI's books and records.  Dan J. Fleming, Lehman's former Global Head of Cash and Collateral Management, also stated in an interview that LCPI did have bank accounts.  Examiner's Interview of Dan J. Fleming, Dec. 17, 2009, at p. 8.

receivable on its books and records when the money was given back to LBHI.  In short, LCPI's liability in its intercompany account with LBHI decreased and LBHI kept the use of the money it originally transferred to LBI, causing no impact to its liquidity.  As for infusions into LBSF, the process was identical, except that LBSF received the funds on its own behalf (they were not immediately remitted back to LBHI).  The following illustrates the steps of the capital infusions received by LCPI and LBSF:

**Infusions into LCPI March, May and August 2008**



**Infusion into LBSF May 2008**

Step 1:  LBI requests paydown
from LBHI for the purpose of
infusing capital into LBSF

| LBHI |
|------|

Step 2:  LBHI wires money to
LBI *(LBI increases cash and
credits paid-in capital; LBHI
decreases cash and increases
investment asset in LBI)*

| LBI (subsidiary of LBHI) |
|--------------------------|

Step 3:  LBI wires money to
LBSF *(LBSF increases cash and
credits paid-in capital; LBI
decreases cash and increases
investment asset in LBSF)*

| LBSF (subsidiary of LBI) |
|--------------------------|

### (3)  Debtor-by-Debtor Analysis

### (a)  Lehman Commercial Paper Inc.

LCPI primarily engaged in the origination, trading, and servicing of secured and unsecured loans.[6161]  LCPI's monthly balance sheets as of May 31, 2008 through August 31, 2008 were as follows:[6162]

| Lehman Commercial Paper, Inc | | | | |
|---|---|---|---|---|
| Balance Sheet Items at: | May 31, 2008 | June 30, 2008 | July 31, 2008 | August 31, 2008 |
| CASH & CASH EQUIVALENTS | 675,756,009 | 725,929,267 | 2,708,432,808 | 961,859,857 |
| SEC. & OTHER FINANCIAL INSTRUMENTS OWNED | 29,433,762,189 | 28,305,430,247 | 25,718,241,256 | 23,593,952,592 |
| CASH & SECURITIES SEGR. AND ON DEPOSIT | (31) | (31) | (74) | (31) |
| SECURITIES PURCHASED UNDER AGREEMENT TO SELL | 19,578,651,244 | 22,275,502,285 | 21,168,272,398 | 21,366,118,677 |
| RECEIVABLES- BROKER/DEALER | 464,902,039 | 622,970,642 | 583,521,985 | 434,533,107 |
| RECEIVABLES- CUSTOMERS | 2,101,522,190 | 2,698,515,924 | 1,406,513,724 | 1,421,687,767 |
| RECEIVABLES- OTHER | 13,160,040,651 | 7,493,297,900 | 7,764,947,048 | 8,246,411,601 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 1,462,823 | 1,828,038 | 1,773,679 | 1,707,311 |
| TOTAL BRIDGE ACCOUNTS | 6 | 6 | 6 | 6 |
| DEFFERED EXPENSE & OTHER ASSETS | 328,525,248 | 330,203,124 | 371,986,965 | 285,342,973 |
| TOTAL ASSETS | 65,744,622,369 | 62,453,677,403 | 59,723,689,795 | 56,311,613,860 |
| COMMERCIAL PAPER & S.T. DEBT | 454,183,781 | 28,140,653 | 18,158,345 | 3,020,383,281 |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 1,105,104,778 | 2,122,362,958 | 2,369,393,978 | 3,369,552,952 |
| SECURITIES SOLD UNDER AGREEMENT TO REPURCHASE | 20,267,872,715 | 19,123,893,904 | 19,549,285,798 | 18,438,230,178 |
| SECURITIES LOANED | (8,857,059) | (13,412,434) | (15,791,168) | (18,248,658) |
| OTHER SECURED FINANCING | 6,684,055,232 | 6,745,696,751 | 6,430,902,517 | 6,729,268,740 |
| PAYABLES- BROKER/DEALER | 70,772,641 | 33,162,439 | 80,435,168 | 47,118,454 |
| PAYABLES- CUSTOMERS | 482,545,031 | 529,525,271 | 274,976,726 | 232,856,709 |
| ACCD LIABILITIES & OTHER PAY. | 36,750,913,611 | 34,026,234,430 | 31,177,301,584 | 24,285,597,683 |
| SENIOR DEBT | 0 | 0 | 0 | 0 |
| TOTAL LIABILITIES | 65,806,590,731 | 62,595,603,973 | 59,884,662,948 | 56,104,759,340 |
| COMMON STOCK | 10,000 | 10,000.00 | 10,000.00 | 10,000 |
| F/X TRANSLATION ADJUSTMENT | 22,422,006 | 18,600,078.01 | 22,624,113.30 | 45,165,409 |
| RETAINED EARNINGS | (940,598,231) | -1,016,734,510.84 | -1,314,805,129.27 | (1,869,518,752) |
| TOTAL ADDITIONAL PAID IN CAPITAL | 856,197,863 | 856,197,863.00 | 1,131,197,863.00 | 2,031,197,863 |
| TOTAL STOCKHOLDER'S EQUITY | (61,968,362) | (141,926,570) | (160,973,153) | 206,854,520 |
| TOTAL LIABILITIES & STOCKHOLDER'S EQUITY | 65,744,622,369 | 62,453,677,403 | 59,723,689,795 | 56,311,613,860 |
| CAPITAL INFUSION | 150,000,000 | | 275,000,000 | 900,000,000 |

[6161] Lehman, LCPI Corporate Description [LBEX-BARLCT 0000723].  However, LCPI was not always used for this purpose as it formerly traded in commercial paper.
[6162] All balance figures are presented on a consolidated LCPI basis.

As this table shows, from May through July 2008, LCPI reported negative equity by amounts ranging from $62 million to $161 million. In August 2008, LCPI reported $207 million in positive equity.

As of May 31, 2008, LCPI held approximately $29.4 billion in financial inventory, with the remaining assets on its balance sheet comprised largely of reverse repos and intercompany receivables. Following is a table of the financial inventory directly held by LCPI as of May 31, 2008 and August 31, 2008.[6163]

**Lehman Commercial Paper, Inc.**
**Total Financial Instruments Owned (Assets)**

| GAAP Asset Class | as of 5/31/08 | % of Total | as of 8/31/08 | % of Total |
|---|---|---|---|---|
| Commercial Paper & Money Market | 1,500,606,326 | 5.10% | 1,742,658,697 | 7.55% |
| Third Party Derivatives | 274,401,594 | 0.93% | 203,889,227 | 0.88% |
| Intercompany Derivatives | 712,018,593 | 2.42% | 2,831,028,078 | 12.26% |
| Total Derivatives | 986,420,187 | 3.35% | 3,034,917,305 | 13.15% |
| Corporate Debt | 17,332,854,996 | 58.89% | 12,442,838,192 | 53.90% |
| Corporate Equity | 1,034,329,176 | 3.51% | 88,723,365 | 0.38% |
| Governments & Agencies | 19,658,550 | 0.07% | 80,840,327 | 0.35% |
| Real Estate Held for Sale | 5,090,122,271 | 17.29% | 3,863,492,546 | 16.74% |
| Mortgages & Mortgage Backed | 3,469,770,683 | 11.79% | 1,831,526,818 | 7.93% |
| | 29,433,762,189 | 100.00% | 23,084,997,251 | 100.00% |

Source: Hyperion.

---

[6163] Information regarding the financial inventory held by each Debtor entity is obtained from Lehman's Hyperion reporting system. Note that there is an irreconcilable variance between the sum of the individual line items for financial instruments owned in this table and the total stated in Hyperion for August.

As of May 2008, approximately $17.3 billion, or 59%, of LCPI's financial instrument positions were corporate loans, dropping to approximately $12.4 billion, or 53%, by August 2008.    At the same time, the value of intercompany derivatives increased significantly from approximately $710 million, or 2.4% of total financial instruments in May 2008, to $2.8 billion, or 12.3%, in August 2008.

As of August 31, 2008, LCPI held approximately $23.6 billion in financial inventory, with the remaining assets on its balance sheet comprised largely of reverse repos and intercompany receivables.    Because over 99% of Corporate Debt and Mortgage and Mortgage Backed securities are SFAS levels 2 and 3, the Examiner estimates that approximately 60% of LCPI's financial inventory was FASB 157 levels 2 and 3.[6164]    The marks assigned these assets are not supported by a market quoted price and they have a high risk of misstatement.

Section III.C.3 of this Report analyzed potential intangible assets held by LCPI on a stand-alone (i.e., unconsolidated) basis.    While it is possible that additional intangible assets may exist in LCPI in the form of customer lists, proprietary technology and human capital, the Examiner has determined that such intangible assets are not of material value and would not change the solvency determination of LCPI.[6165]

---

[6164] Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on Jul. 10, 2008).

[6165] Due to the cost and time required by such an exercise, the Examiner did not perform an investigation into the possible intangible assets in each of LCPI's subsidiaries.

The majority of LCPI's Deferred Expenses and Other Assets relate to its investment of $225 million in its subsidiary Leveraged Loan Trading Holdings Partners ("LLTHP"). Based on a review of the consolidated balance sheets of LLTHP, the Examiner has concluded that the value of LCPI's investment in LLTHP should not have been impaired.[6166]

**LCPI Capital Infusions.** LCPI was significantly leveraged and posted negative equity from April 2008 through July 2008. In February, March, May, July and August 2008, LCPI obtained capital infusions from LBI in an attempt to post positive equity. According to internal documents, the negative equity in July was a result of $1 billion in losses in, among others, SunCal and TXU Energy positions.[6167] Losses in August 2008 were the result of write-downs in mortgage residual positions as well as write-downs of certain corporate loans.[6168] Interviews with Lehman finance personnel revealed that there was an effort to keep LCPI, as the subsidiary of LBI, balance sheet solvent.[6169]

---

[6166] LLTHP's consolidated balance sheets showed a level of assets that remained relatively steady throughout fiscal year 2008. Its largest asset was its investment in Luxembourg Trading Finance SARL, which, in turn, holds Archstone Term B loans. Because of the price flex feature of these loans, their value would not be impaired. Furthermore, LLTHP posted steady increases in retained earnings throughout fiscal year 2008, and, with few liabilities, posted significant positive equity.

[6167] E-mail from Kristie Wong, Lehman, to Anthony Stucchio, Lehman, *et al.* (July 29, 2008) [LBEX-SIPA 005520].

[6168] E-mail from Kristie Wong, Lehman, to Paolo Tonucci, Lehman (August 27, 2008) [LBEX-SIPA 005564].

[6169] Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 2; Examiner's Interview of Joselito Rivera, Oct. 13, 2009, at pp. 5-6. However, LEC Mike Montella stated that LECs may in some circumstances allow a non-regulated entity to post negative equity at month end. Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 10-12. This contradiction may be explained by the fact that Wong, who was head LEC, also stated that the capital infusions LCPI received in May and July of 2008 were intended to allow it to post positive equity, but that the amount of capital necessary to do so was underestimated.

While there were no capital guidelines other than the principle of avoiding negative equity, LECs were aware of the fact that an entity such as LCPI would be reviewed and questioned by regulators.[6170]

LCPI became balance sheet insolvent for the first time in February 2008. It posted positive equity by a small margin in March 2008, but then posted negative equity until August, despite the capital infusions it received during this time.[6171] In August 2008, LCPI received a $900 million capital infusion from LBI which was sufficient to allow it to maintain borderline balance sheet solvency apparently until its bankruptcy filing. Below is a table of LCPI's monthly equity in the year prior to its bankruptcy filing, along with its ratio of equity-to-total-assets, and the Examiner's solvency determination as of each month.

---

Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 3. Thus, LECs attempted to maintain positive equity in LCPI, but were occasionally unable to do so.

[6170] Examiner's Interview of Michael Montella, Oct. 26, 2009, at pp. 10-12; Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 2.

[6171] Wong stated that she did not know why this would be so. She surmised that the capital infusions were simply inadequate. Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 3.

|  | Equity | Solvency Determination | Ratio of Equity to Total Assets |
|---|---|---|---|
| September 30, 2007 | $372,928,608 | Borderline | 0.61% |
| October 31, 2007 | $484,906,910 | Borderline | 0.74% |
| November 30, 2007 | $310,007,656 | Borderline | 0.53% |
| December 31, 2007 | $302,649,926 | Borderline | 0.51% |
| January 31, 2008 | $132,490,100 | Borderline | 0.20% |
| February 29, 2008 | ($6,669,838) | Insolvent | N/M |
| March 31, 2008 | $255,994,138 | Borderline | 0.41% |
| April 30, 2008 | ($159,512,650) | Insolvent | N/M |
| May 31, 2008 | ($61,968,362) | Insolvent | N/M |
| June 30, 2008 | ($141,926,570) | Insolvent | N/M |
| July 31, 2008 | ($160,973,153) | Insolvent | N/M |
| August 31, 2008 | $206,854,520 | Borderline | 0.37% |

Note: N/M signifies "Not Meaningful" due to negative values of equity.
Source: Hyperion.

#### (b) CES Aviation, CES Aviation V LLC, CES Aviation IX

The CES Aviation entities – CES Aviation, CES Aviation V LLC, and CES Aviation IX – were established for the purpose of acquiring and operating aircraft for Lehman. Their balance sheets as of May 31, 2008 and August 31, 2008 are as follows:

| CES Aviation | | |
|---|---|---|
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| CASH & CASH EQUIVALENTS | 665,422 | 354,419 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 21,873,360 | 21,467,298 |
| DEFFERED EXPENSE & OTHER ASSETS | 49,778 | 19,911 |
| **TOTAL ASSETS** | **22,588,560** | **21,841,628** |
| ACCRUED LIABILITIES & OTHER PAYABLES | 22,456,891 | 21,913,826 |
| **TOTAL LIABILITIES** | **22,456,891** | **21,913,826** |
| RETAINED EARNINGS | (6,868,331) | (7,072,197) |
| TOTAL ADDITIONAL PAID IN CAPITAL | 7,000,000 | 7,000,000 |
| **TOTAL STOCKHOLDER'S EQUITY** | **131,669** | **(72,197)** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **22,588,560** | **21,841,628** |

## CES Aviation V LLC

| Balance Sheet Items at: | May 31, 2008 | August 31, 2008 |
|---|---|---|
| CASH & CASH EQUIVALENTS | 67,210 | 149,463 |
| RECEIVABLES- OTHER | 38,622 | 38,622 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 4,343,043 | 4,242,042 |
| DEFFERED EXPENSE & OTHER ASSETS | 51,572 | 20,629 |
| **TOTAL ASSETS** | **4,500,447** | **4,450,756** |
| ACCD LIABILITIES & OTHER PAY. | 7,954,035 | 8,003,875 |
| **TOTAL LIABILITIES** | **7,954,035** | **8,003,875** |
| RETAINED EARNINGS | (3,453,588) | (3,553,119) |
| **TOTAL STOCKHOLDER'S EQUITY** | **(3,453,588)** | **(3,553,119)** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **4,500,447** | **4,450,756** |

## CES Aviation IX

| Balance Sheet Items at: | May 31, 2008 | August 31, 2008 |
|---|---|---|
| CASH & CASH EQUIVALENTS | 237,092 | 247,444 |
| RECEIVABLES- OTHER | 7,934 | 7,934 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 7,865,753 | 7,686,986 |
| DEFFERED EXPENSE & OTHER ASSETS | 33,672 | 13,469 |
| **TOTAL ASSETS** | **8,144,451** | **7,955,833** |
| ACCRUED LIABILITIES & OTHER PAYABLES | 9,001,137 | 8,952,961 |
| **TOTAL LIABILITIES** | **9,001,137** | **8,952,961** |
| RETAINED EARNINGS | (856,686) | (997,128) |
| **TOTAL STOCKHOLDER'S EQUITY** | **(856,686)** | **(997,128)** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **8,144,451** | **7,955,833** |

These entities' assets consisted largely of aircraft, cash and prepaid insurance on aircraft. Liabilities are related to the use of the aircraft, such as transportation costs, and intercompany payables to LBHI and LBI. Because of the nature of their business, all three CES entities held exclusively fixed assets, and the Examiner concludes that none held significant intangible assets.

With no intangible assets associated with these entities, CES Aviation V LLC and CES Aviation IX were balance sheet insolvent as of May 31, 2008, and August 31, 2008. The entities' book value for property, equipment and lease improvements ("PEL") takes into account depreciation and does not reflect the fair market value of these entities' aviation equipment.  However, even assuming the PEL was worth its purchase price ($8.7 million), the entities' equity deficit is too significant to overcome any increase from the book value of the assets.

As of May 31, 2008, CES Aviation posted positive shareholders' equity by a very slim margin.  Accordingly, the Examiner concludes that CES Aviation was borderline solvent as of May 31, 2008.  In July 2008, CES Aviation posted negative equity and did so through August 31, 2008.  However, because its margin of negative equity was very small – $15,813 and $72,197 in July and August 2008, respectively – it is possible that the fair market value of PEL in this entity would be sufficiently above the value reported on its balance sheet to push CES into positive equity.  Accordingly, given the uncertainty of the market value of certain aviation assets in this entity, and their impact on the solvency of the entity, the Examiner concludes that CES Aviation remained borderline solvent as of August 2008.  In light of the time and expense to the Debtors' estates required to conduct an independent valuation of these assets, the Examiner has determined that it would be an imprudent use of the Estate's resources to do so.  The table below provides the monthly equity positions of each entity.

| | CES Aviation | | CES Aviation V | | CES Aviation IX | |
|---|---|---|---|---|---|---|
| | Equity | Solvency Determination | Equity | Solvency Determination | Equity | Solvency Determination |
| September 30, 2007 | $917,722 | Borderline | ($2,841,129) | Insolvent | ($465,808) | Insolvent |
| October 31, 2007 | $770,068 | Borderline | ($2,939,739) | Insolvent | ($524,954) | Insolvent |
| November 30, 2007 | $765,759 | Borderline | ($2,953,150) | Insolvent | ($589,790) | Insolvent |
| December 31, 2007 | $626,549 | Borderline | ($3,026,449) | Insolvent | ($648,527) | Insolvent |
| January 31, 2008 | $444,105 | Borderline | ($3,059,305) | Insolvent | ($701,748) | Insolvent |
| February 29, 2008 | $331,361 | Borderline | ($3,148,726) | Insolvent | ($720,203) | Insolvent |
| March 31, 2008 | $237,230 | Borderline | ($3,220,516) | Insolvent | ($761,657) | Insolvent |
| April 30, 2008 | $49,335 | Borderline | ($3,401,644) | Insolvent | ($802,240) | Insolvent |
| May 31, 2008 | $131,669 | Borderline | ($3,453,588) | Insolvent | ($856,686) | Insolvent |
| June 30, 2008 | $49,067 | Borderline | ($3,446,161) | Insolvent | ($909,705) | Insolvent |
| July 31, 2008 | ($15,813) | Borderline | ($3,494,369) | Insolvent | ($1,013,850) | Insolvent |
| August 31, 2008 | ($72,197) | Borderline | ($3,553,119) | Insolvent | ($997,128) | Insolvent |

Source: Hyperion.

### (c)  LB Special Financing

LBSF was Lehman Brothers Inc.'s principal dealer in a broad range of derivative products, including interest rate, currency, credit and mortgage derivatives.  For the reasons described below, the Examiner deems LBSF to have been borderline solvent as of May 31, 2008, and August 31, 2008.  LBSF's balance sheets as of April 30, 2008, through August 31, 2008 are as follows:[6172]

---

[6172] Note that all balance figures are presented on a consolidated LBSF basis.

## LB Special Financing Inc.

| Balance Sheet Items at: | April 30, 2008 | May 31, 2008 | June 30, 2008 | July 31, 2008 | August 31, 2008 |
|---|---|---|---|---|---|
| CASH & CASH EQUIVALENTS | 32,268,168 | 39,695,084 | 40,170,990 | 38,978,054 | 54,277,418 |
| CASH & SEC.SEGR. & ON DEPOSIT | 0 | 121,898,763 | 130,804,614 | 142,211,812 | 158,859,102 |
| SEC. & OTHER FINNANCIAL INSTRUMENTS OWNED | 78,574,785,243 | 71,822,087,467 | 81,038,596,170 | 77,021,236,554 | 66,005,066,729 |
| SECURITIES PURCHASED UNDER AGREEMENT TO SELL | 4,799,272,249 | 5,579,013,493 | 3,117,305,188 | 3,213,698,449 | 3,253,884,281 |
| SECURITIES BORROWED | 43,783,917,364 | 26,365,338,267 | 34,440,447,484 | 36,632,787,111 | 26,565,362,945 |
| RECEIVABLES- BROKER/DEALER | 4,553,931,571 | 6,946,351,256 | 3,907,417,323 | 6,618,862,372 | 4,083,561,521 |
| RECEIVABLES- CUSTOMERS | 1,462,805,597 | 1,584,409,453 | 1,503,468,998 | 2,306,493,702 | 2,230,283,390 |
| RECEIVABLES- OTHER | 2,581,362,186 | 2,159,122,186 | 2,162,547,954 | 2,394,986,043 | 3,549,323,316 |
| GOODWILL & INTANGIBLES | 284,765,999 | 284,763,199 | 287,253,790 | 287,250,990 | 291,248,190 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 11,460,586 | 10,919,044 | 12,549,216 | 12,328,440 | 10,108,220 |
| DEFFERED EXPENSE & OTHER ASSETS | 219,240,440 | 199,515,090 | 391,189,073 | 448,445,623 | 430,075,277 |
| TOTAL BRIDGE ACCOUNTS | 31 | 3 | 1 | 4 | 2 |
| **TOTAL ASSETS** | **136,303,809,375** | **115,113,113,305** | **127,031,750,801** | **129,117,279,154** | **106,632,050,391** |
| COMMERCIAL PAPER & S.T. DEBT | 188,128,111 | 184,568,237 | 185,291,739.29 | 190,472,213.47 | 176,893,415 |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 55,595,965,409 | 40,456,549,211 | 45,632,121,885.11 | 45,395,025,250.05 | 33,540,848,955 |
| SECURITIES SOLD UNDER AGREEMENT TO REPURCHASE | 4,347,510,621 | 2,936,970,849 | 2,887,343,577.67 | 3,698,729,925.45 | 4,249,528,937 |
| SECURITIES LOANED | 43,991,644,009 | 40,672,680,943 | 43,011,801,476.53 | 44,678,811,748.63 | 35,540,001,644 |
| OTHER SECURED FINANCING | 2,429,178,131 | 1,918,859,123 | 1,906,166,762.30 | 1,414,153,886.91 | 1,074,702,425 |
| PAYABLES- BROKER/DEALER | 3,696,490,806 | 3,304,690,852 | 3,956,473,979.96 | 4,240,558,371.16 | 5,253,116,854 |
| PAYABLES- CUSTOMERS | 3,689,374,176 | 4,268,820,487 | 3,154,191,489.04 | 2,980,868,156.83 | 2,657,840,130 |
| ACCD LIABILITIES & OTHER PAY. | 21,622,506,426 | 20,211,734,488 | 25,187,338,234.46 | 25,373,700,109.15 | 23,040,698,961 |
| SENIOR DEBT | 695,725,691 | 683,144,683 | 659,429,677.75 | 640,889,783.27 | 630,005,545 |
| **TOTAL LIABILITIES** | **136,256,523,382** | **114,638,018,874** | **126,580,158,822** | **128,613,209,445** | **106,163,636,866** |
| COMMON STOCK | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| F/X TRANSLATION ADJUSTMENT | (26,146) | (55,861) | (23,322) | (15,863) | (16,532) |
| RETAINED EARNINGS | (202,688,861) | 125,149,292 | 101,614,301 | 154,084,572 | 118,429,057 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 250,000,000 | 350,000,000 | 350,000,000 | 350,000,000 | 350,000,000 |
| **TOTAL STOCKHOLDER'S EQUITY** | **47,285,993** | **475,094,431** | **451,591,979** | **504,069,709** | **468,413,525** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **136,303,809,375** | **115,113,113,305** | **127,031,750,801** | **129,117,279,153** | **106,632,050,391** |
| CAPITAL INFUSION | 0 | 100,000,000 | 0 | 0 | 0 |
| EQUITY AS % OF TOTAL ASSETS | 0.03% | 0.41% | 0.36% | 0.39% | 0.44% |

As of May 31, 2008, LBSF held approximately $72 billion in financial inventory, with the remaining asset balance made up largely of receivables, reverse repos and securities borrowed. Of the financial inventory, nearly 80% is comprised of derivatives and government and agency securities, including 15% allocated to intercompany derivatives. Following is a table of the inventory directly held by LBSF as of May 31, 2008 and August 31, 2008.

**Lehman Brothers Special Financing**
**Total Financial Instruments Owned (Assets)**

| GAAP Asset Class | as of 5/31/08 | % of Total | as of 8/31/08 | % of Total |
|---|---|---|---|---|
| Commercial Paper & Money Market | 87,851,674 | 0.12% | 38,050,077 | 0.06% |
| Third Party Derivatives | 21,490,667,702 | 29.92% | 22,267,378,700 | 33.74% |
| Intercompany Derivatives | 11,124,364,636 | 15.49% | 10,977,690,112 | 16.63% |
| Total Derivatives | 32,615,032,338 | 45.41% | 33,245,068,813 | 50.37% |
| Physical Commodities | 526,763,622 | 0.73% | 413,833,886 | 0.63% |
| Corporate Debt | 3,279,571,273 | 4.57% | 5,215,184,322 | 7.90% |
| Corporate Debt & Other | 3,806,334,896 | 5.30% | 5,629,018,208 | 8.53% |
| Corporate Equity | 9,379,851,772 | 13.06% | 9,113,820,996 | 13.81% |
| Governments & Agencies | 24,877,048,749 | 34.64% | 17,668,641,729 | 26.77% |
| Mortgages & Mortgage Backed | 1,055,968,037 | 1.47% | 310,466,906 | 0.47% |
| | 71,822,087,467 | 100.00% | 66,005,066,729 | 100.00% |

As set forth in Section III.A.2 of this Report, the Examiner has determined that there is insufficient evidence to support a finding, for purposes of a solvency analysis, that Lehman's derivative instruments or corporate debt and equity positions were unreasonably marked.

LBSF was a warehouse for derivative positions and did not originate business activity or perform significant business operations. However, goodwill did appear on its consolidated balance sheet as of June 2007 in the amount of approximately $285 million due to the acquisition of Eagle Energy. Due to the cost and time required, the Examiner did not conduct an investigation of the reasonableness of the magnitude of the goodwill and intangibles; even if the goodwill was written off completely, LBSF would continue to post positive equity for all months in 2008 other than March and

April.  Moreover, Section III.C.3 of this Report analyzes potential intangible assets in LBSF on a stand-alone (i.e., unconsolidated) basis.  While it is possible that additional intangible assets may exist in the form of customer lists, proprietary technology and/or human capital, such intangible assets are not of material value and would not change the solvency determination of LBSF.[6173]  Below is a table of LBSF's monthly equity in the year prior to its bankruptcy filing, along with its ratio of equity-to-total-assets, and the Examiner's solvency determination as of each month.

| | Equity | Solvency Determination | Ratio of Equity to Total Assets |
|---|---|---|---|
| September 30, 2007 | $418,047,690 | Borderline | 0.51% |
| October 31, 2007 | $812,630,989 | Borderline | 0.85% |
| November 30, 2007 | $574,878,581 | Borderline | 0.60% |
| December 31, 2007 | $712,458,966 | Borderline | 0.64% |
| January 31, 2008 | $723,769,461 | Borderline | 0.55% |
| February 29, 2008 | $953,503,304 | Borderline | 0.73% |
| March 31, 2008 | $270,750,552 | Borderline | 0.19% |
| April 30, 2008 | $47,285,993 | Borderline | 0.03% |
| May 31, 2008 | $475,094,431 | Borderline | 0.41% |
| June 30, 2008 | $451,591,979 | Borderline | 0.36% |
| July 31, 2008 | $504,069,709 | Borderline | 0.39% |
| August 31, 2008 | $468,413,525 | Borderline | 0.44% |
| Source: Hyperion. | | | |

As with other LBHI Affiliates, LECs attempted to make sure that LBSF had positive equity.  Accordingly, while in February and March of 2008, LBSF paid dividends of $300 million and $500 million to LBI, just two months later, in May 2008,

---

[6173] Due to the cost and time required, the Examiner did not perform an investigation into the possible intangible assets in each of LBSF's subsidiaries.

LBSF received a capital infusion of $100 million from LBI.  Without this additional $100

million, LBSF would have been balance sheet insolvent as of May 2008.

As illustrated above, LBSF maintained an equity-to-total-assets ratio of no more

than 0.44% from March through August 2008.  Even though the Examiner concludes

that there is insufficient evidence to support a finding, for purposes of a solvency

analysis, that the assets held by LBSF were unreasonably marked, LBSF's assets would

only need to lose 0.45% of their value in order to render LBSF balance sheet insolvent.

Because of its small equity cushion, the Examiner deems LBSF to have been borderline

solvent as of May 31, 2008, and August 31, 2008.

### (d)  LB Commodity Services

LBCS's principal business was the trading of power, natural gas, oil, and

structured products.  The following table details LBCS's balance sheets as of May 31,

2008, and August 31, 2008:[6174]

---

[6174] Note that all balance figures are presented on a consolidated LBCS basis.

| LB Commodity Services Inc. | | |
| --- | --- | --- |
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| CASH & CASH EQUIVALENTS | 6,850,371 | 22,550,284 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 5,488,309,683 | 4,340,355,972 |
| SECURITIES PURCH. UNDER AGREEMENT TO SELL | 0 | 4,155,555 |
| RECEIVABLES- BROKER/DEALER | 1,263,880,051 | 1,085,836,004 |
| RECEIVABLES- CUSTOMERS | 265,921,188 | 86,194,370 |
| RECEIVABLES- OTHER | 106,985,698 | 280,851,379 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 7,718,516 | 7,034,975 |
| DEFFERED EXPENSE & OTHER ASSETS | 145,476,400 | 0 |
| GOODWILL & INTANGIBLES | 284,763,199 | 291,248,190 |
| TOTAL BRIDGE ACCOUNTS | 0 | 378,237,034 |
| **TOTAL ASSETS** | **7,569,905,106** | **6,496,463,763** |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 3,538,571,157 | 2,058,364,215 |
| COMMERCIAL PAPER & ST DEBT | 152 | 79,068 |
| PAYABLES- BROKER/DEALER | 145,550,384 | 8,834,794 |
| PAYABLES- CUSTOMERS | 207,624,790 | 115,438,486 |
| ACCD LIABILITIES & OTHER PAY. | 2,974,541,324 | 3,485,452,763 |
| SENIOR DEBT | 677,617,075 | 624,483,872 |
| **TOTAL LIABILITIES** | **7,543,904,882** | **6,292,653,199** |
| COMMON STOCK | 100 | 100 |
| F/X TRANSLATION ADJUSTMENT | (116,705) | (47,837) |
| RETAINED EARNINGS | (4,883,170) | 172,858,302 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 31,000,000 | 31,000,000 |
| **TOTAL STOCKHOLDER'S EQUITY** | **26,000,224** | **203,810,565** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **7,569,905,106** | **6,496,463,763** |
| EQUITY AS % OF TOTAL ASSETS | 0.34% | 3.14% |

The increase in stockholders' equity from May to August was due to an increase

of approximately $117 million in retained earnings between May and June 2008, and

another $60 million increase between June and July 2008. LBCS also posted a receivable

from LBI of $1.3 billion on May 31, 2008, and $1.1 billion on August 31, 2008. Given the

pending failure of LBI and LBHI, it is possible that the August 31 value of the receivable

from LBI should be valued at less than book value. However, in light of the cost and

expense of examining this issue, and because the Examiner deems LBCS to be borderline solvent even if the receivable from LBI is valued at full book value, the Examiner has determined that it would not be a prudent use of resources to investigate this issue further.

As shown above, as of May 31, 2008, LBCS's balance sheet showed $5.5 billion in financial inventory, decreasing to $4.3 billion by August 31, 2008. Following is a table of the inventory directly held by LBCS as of May 31, 2008, and August 31, 2008.

**LB Commodity Services**
**Total Financial Instruments Owned (Assets)**

| GAAP Asset Class | as of 5/31/08 | % of Total | as of 8/31/08 | % of Total |
|---|---|---|---|---|
| Commercial Paper & Money Market | 3,016,437 | 0.05% | 2,343,645 | 0.05% |
| Third Party Derivatives | 3,982,759,627 | 72.57% | 2,763,758,194 | 63.68% |
| Intercompany Derivatives | 914,611,931 | 16.66% | 1,009,617,031 | 23.26% |
| Total Derivatives | 4,897,371,558 | 89.23% | 3,773,375,225 | 86.94% |
| Physical Commodities | 526,763,622 | 9.60% | 413,833,886 | 9.53% |
| Corporate Debt | 61,158,066 | 1.11% | 150,801,915 | 3.47% |
| Corporate Debt & Other | 587,921,688 | 10.71% | 564,635,801 | 13.01% |
| Governments & Agencies | (0) | 0.00% | 1,301 | 0.00% |
| | 5,488,309,683 | 100.00% | 4,340,355,972 | 100.00% |

Of LBCS's financial inventory portfolio, almost 90% pertains to derivatives, with 17% and 23% allocated to intercompany derivatives in May and August, respectively. The Examiner's valuation analysis of derivative positions, described in Section III.A.2 of the Report, indicates that there is insufficient evidence to support a finding, for purposes of a solvency analysis, that they were unreasonably marked. Also, while LBCS did perform business operations and, as discussed in Section III.C.3, it is possible

that additional intangible assets may exist in the form of customer lists, proprietary technology and human capital, the Examiner has determined that such intangible assets are not of material value.[6175]  However, as noted above for LBSF, LBCS's parent entity, approximately $285 million in goodwill and intangibles did exist beginning in June 2007 due to the acquisition of Eagle Energy.  These same goodwill assets are reflected on LBCS's consolidated balance sheet.  The Examiner has determined that if this goodwill were entirely written off, LBCS would become balance sheet insolvent as of May and August 2008.  However, due to the expense and time required, the Examiner has not engaged in an investigation of the reasonableness of the magnitude of the goodwill and intangibles.[6176]

Below is a table of LBCS's monthly equity in the year prior to its bankruptcy filing, along with its ratio of equity-to-total assets, and the Examiner's solvency determination as of each month.

---

[6175] As noted above, the analysis in Section III.C.3 was performed on LBCS on a stand-alone (*i.e.*, unconsolidated) basis.  Due to the cost and time required, the Examiner did not perform an investigation into the possible intangible assets in each of LBCS's subsidiaries.

[6176] LBHI guaranteed certain of the obligations of LBCS, LBCC, LOTC and LBSF, pursuant to a Lehman Executive Committee Order dated June 9, 2005.  *See* Lehman, Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (June 9, 2005) [LBEX-AM 003415-003417].  LCPI and LOTC also received guaranties from LBHI for their activity with JPMorgan Chase on August 26, 2008.  JPMorgan, Guaranty [JPM-2004 0005879-0005884].  The Executive Committee Order stated that LBHI would guarantee "payment of all liabilities, obligations and commitments of the subsidiaries."  JPMorgan, Guaranty [JPM-2004 0005879-0005884].  Assuming that the guaranty is a legally enforceable obligation, it is not an asset of the Debtor entity, nor does it contribute to the solvency of the LBHI Affiliates.  See Section III.A.5 and III.B.3.g of this Report for additional information on LBHI guaranties.

|  | Equity | Solvency Determination | Ratio of Equity to Total Assets |
|---|---|---|---|
| September 30, 2007 | $90,229,685 | Borderline | 3.74% |
| October 31, 2007 | $124,441,423 | Borderline | 4.15% |
| November 30, 2007 | $132,927,603 | Borderline | 4.17% |
| December 31, 2007 | $111,784,670 | Borderline | 3.18% |
| January 31, 2008 | $123,068,926 | Borderline | 3.28% |
| February 29, 2008 | $83,838,341 | Borderline | 1.81% |
| March 31, 2008 | $54,934,471 | Borderline | 1.02% |
| April 30, 2008 | $25,662,935 | Borderline | 0.38% |
| May 31, 2008 | $26,000,224 | Borderline | 0.34% |
| June 30, 2008 | $143,082,271 | Borderline | 1.46% |
| July 31, 2008 | $203,052,519 | Borderline | 2.58% |
| August 31, 2008 | $203,810,565 | Borderline | 3.14% |
| Source: Hyperion. | | | |

LBCS's equity-to-total-assets ratio of 0.3% in May 2008 and 3.14% in August of 2008, rendered it vulnerable to small write-downs or unforeseen liabilities.[6177]   Accordingly, although LBCS's balance sheet indicates that it was solvent as of May 31 and August 31, 2008, the Examiner has determined that LBCS was borderline solvent during the period noted in the table above.[6178]

---

[6177] There is evidence that one of LBCS's subsidiaries, Eagle Energy Partners 1 L.P. ("Eagle Energy") may have been overvalued as of May and August of 2008. In May 2008, Eagle Energy's shareholder equity was $354 million. Hyperion report [LBEX-BARHYP 0000038-0000049]. In August, Eagle Energy's shareholder equity was $363 million. *Id.* The magnitude of Eagle Energy's book value of shareholder equity is relevant because in October 2008, LBCS sold Eagle Energy to Electricite de France SA for $230.5 million, over $100 million less than book value of the equity. Edvard Pettersson, *Lehman to Sell Eagle Energy Unit to EDF for $230.5 Million*, Bloomberg, October 1, 2008; Federal Energy Regulatory Commission, *FERC Authorizes Lehman-EDF Transaction*, October 30, 2008. Because of the narrow margin by which LBCS was balance sheet solvent in May 2008, a significant decrease in the equity of Eagle Energy, a Level 2 asset, would have rendered LBCS insolvent.

[6178] There were four Debtor entities that were reviewed and rated by rating agencies: LBCS, LBFP, LBDP and LBCC. Each entity obtained credit ratings of at least A. In light of the applicable precedent, the Examiner does not consider the rating itself to be dispositive of solvency.

### (e)  Luxembourg Residential Properties Loan Finance S.A.R.L.

LRP was established in May 2008 as an investment and financing vehicle to hold primarily commercial loans.[6179]   Balance sheet information was not available for this entity until June and its balance sheet as of August 31, 2008, is stated as follows:

| Luxembourg Residential Properties | |
|---|---|
| **Balance Sheet Items at August 31, 2008** | |
| CASH & CASH EQUIVALENTS | 20,000 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 596,624,913 |
| **TOTAL ASSETS** | **596,644,913** |
| ACCD LIABILITIES & OTHER PAY. | 593,998,140 |
| **TOTAL LIABILITIES** | **593,998,140** |
| COMMON STOCK | 20,000 |
| RETAINED EARNINGS | 2,626,773 |
| **TOTAL STOCKHOLDER'S EQUITY** | **2,646,773** |
| **Total Liabilities & Stockholder's Equity** | **596,644,913** |

LRP's assets consist entirely of one corporate loan; an Archstone Term B loan in the principal amount of $597 million.   As noted in Section III.A.2, the Examiner has determined that it was reasonable for Lehman to value its Archstone Term B loan at 99% of stated principal due to price flex.

Based on the fact that the Archstone Term Loan B was the only asset of LRP, and because there is no basis to expect any deterioration in the value of that asset, there is insufficient evidence to support a finding that LRP was insolvent as of August 31, 2008.

---

[6179] Examiner's Interview of Gerald Haupt, Oct. 13, 2009, at pp. 2-3.  LRP is a distinct and separate entity from Luxembourg Finance, S.a.r.l., which is not a Debtor LBHI Affiliate.

**(f) LB OTC Derivatives**

LOTC is an over-the-counter derivatives dealer and its balance sheets as of May 31, 2008 and August 31, 2008 are stated as follows:

## LB OTC Derivatives

| Balance Sheet Items at: | May 31, 2008 | August 31, 2008 |
|---|---|---|
| CASH & CASH EQUIVALENTS | 0 | 31,661 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 2,006,960,062 | 1,760,363,783 |
| SECURITIES PURCHASED UNDER AGREEMENT TO SELL | 99,617,347 | 759,230,174 |
| SECURITIES BORROWED | 99,412,565 | 53,742,524 |
| RECEIVABLES- BROKER/DEALER | 1,531,638,380 | 944,631,818 |
| RECEIVABLES- CUSTOMERS | 1,605,884,195 | 1,095,052,703 |
| RECEIVABLES- OTHER | 47,733,513 | 54,138,936 |
| DEFERRED EXPENSE & OTHER ASSETS | 0 | 2,559,784 |
| TOTAL BRIDGE ACCOUNTS | (0) | 0 |
| **TOTAL ASSETS** | **5,391,246,062** | **4,669,751,382** |
| COMMERCIAL PAPER & S.T. DEBT | 187,220,440 | 1,013,982,923 |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 3,900,934,006 | 2,274,803,899 |
| SECURITIES SOLD UNDER AGREEMENT TO REPURCHASE | 3,024,306 | 129,388 |
| PAYABLES- BROKER/DEALER | 48,967,601 | 14,091,730 |
| PAYABLES- CUSTOMERS | 196,846,122 | 199,396,799 |
| ACCD LIABILITIES & OTHER PAY. | 578,708,851 | 702,239,780 |
| SUBORDINATED INDEBTEDNESS | 250,000,000 | 250,000,000 |
| **TOTAL LIABILITIES** | **5,165,701,327** | **4,454,644,519** |
| COMMON STOCK | 100 | 100 |
| RETAINED EARNINGS | 125,544,736 | 115,106,863 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 99,999,900 | 99,999,900 |
| **TOTAL STOCKHOLDER'S EQUITY** | **225,544,736** | **215,106,863** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **5,391,246,062** | **4,669,751,382** |

Of its $5 billion in total assets as of May 31, 2008, approximately $2 billion was in the form of financial instruments owned by LOTC. Almost 40% of the financial inventory was derivatives, with the other 60% comprised of corporate equity and corporate debt positions. The Examiner's valuation review of these assets suggests that

there is insufficient evidence to support a finding that these assets were unreasonably

marked.[6180]  The following is a table of the financial inventory directly held by LOTC as

of May 31, 2008 and August 31, 2008:

**LB OTC DERIVATIVES**
**Total Financial Instruments Owned (Assets)**

| GAAP Asset Class | as of 5/31/08 | % of Total | as of 8/31/08 | % of Total |
|---|---|---|---|---|
| Commercial Paper & Money Market | (1,037,563) | -0.05% | (737,700) | -0.04% |
| Third Party Derivatives | 792,685,335 | 39.50% | 664,058,534 | 37.72% |
| Intercompany Derivatives | 263,105 | 0.01% | 51,169 | 0.00% |
| Total Derivatives | 792,948,439 | 39.51% | 664,109,703 | 37.73% |
| Corporate Debt | 911,345,248 | 45.41% | 775,426,806 | 44.05% |
| Corporate Equity | 303,715,608 | 15.13% | 321,564,974 | 18.27% |
| Governments & Agencies | (11,670) | 0.00% | (0) | 0.00% |
| | 2,006,960,062 | 100.00% | 1,760,363,783 | 100.00% |

Based on the positive equity cushion reflected on its balance sheet and the

reasonableness of the value of the financial assets it owned, there is insufficient

evidence to support a finding that LOTC was insolvent as of May 31, 2008 and August

31, 2008.

### (g)  LB 745 LLC

LB 745 is an entity established for the primary purpose of acquiring Lehman's

headquarters building at 745 Seventh Avenue in New York.  As of May 2008, the

entity's core assets included approximately $193 million in receivables and $576 million

---

[6180] See Section III.A.2 of this Report.

for the property and related equipment.[6181]  These values had not varied significantly by August 31, 2008.  Although the value of the property on LB 745's balance sheet is not fair market value, the value of commercial real estate property in New York would likely have experienced significant appreciation from its purchase in 2001 to May 2008 or August 2008.[6182]  The entity's largest liability is comprised of intercompany debt of approximately $600 million.  LB 745's balance sheets as of May 31, 2008 and August 31, 2008 are as follows:

| LB 745 LLC | | |
|---|---|---|
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| RECEIVABLES- OTHER | 193,404,492 | 197,484,533 |
| PROPERTY, EQUIPMENT & LEASE IMPROVEMENTS | 576,533,350 | 568,301,224 |
| DEFFERED EXPENSE & OTHER ASSETS | 1,206,427 | 6,028,918 |
| **TOTAL ASSETS** | **771,144,269** | **771,814,675** |
| SECURITIES SOLD UNDER AGREEMENT TO REPURCHASE | 4 | 4 |
| ACCD LIABILITIES & OTHER PAY. | 715,829,776 | 711,579,742 |
| **TOTAL LIABILITIES** | **715,829,780** | **711,579,746** |
| RETAINED EARNINGS | 55,314,488 | 60,234,928 |
| **TOTAL STOCKHOLDER'S EQUITY** | **55,314,488** | **60,234,928** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **771,144,269** | **771,814,675** |

Based on the assets held by LB 745, there is insufficient evidence to support a finding that LB 745 was insolvent as of May 31, 2008 and August 31, 2008.

---

[6181] Note that approximately $25 million of total receivables was an intercompany receivable from LCPI and $8 million from LBSF.

[6182] *See* Moody's/REAL Commercial Property Price Index, New York City Metro Area, Q4 2000-Q2 2009, *available at,* http://web.mit.edu/cre/research/credl/rca.html.

### (h)  LB Derivative Products

LBDP is a termination derivative product company that intermediates interest rate and currency swaps between market counterparties and LBSF.  In order for investment banks like Lehman, which are rated below AA or AAA, to trade with certain highly rated counterparties, banks establish derivative product companies that can maintain a high rating from the rating agencies.  In general, these AAA ratings are dependent on certain criteria, the most visible of which are: (1) hedging market risk through back-to-back transactions or "mirror transactions" with another corporate entity; (2) minimizing counterparty credit risk with the hedging counterparty by requiring collateral on negative mark-to-market exposures to the counterparty; and (3) maintaining strict capital requirements.[6183]

LBDP entered into a variety of derivative transactions and eliminated market risk by entering into "mirror transactions" with LBSF, which were guaranteed by LBHI. As a termination structure, LBDP would provide for the acceleration and cash settlement of all contracts before their maturity upon certain events.[6184]  Furthermore, LBDP purchased a surety bond from Ambac Assurance Corp., which guaranteed that its obligations to counterparties would be fulfilled.[6185]

---

[6183] Standard & Poor's Ratings Direct, Lehman Brothers Derivative Products Inc. (Feb. 4, 2000).

[6184] Lehman, Lehman Brothers Derivatives Products Operating Guidelines, Article X (July 16, 1998) [LBEX-BARLEG 0001824-0001885]; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5.

[6185] Standard & Poor's Ratings Direct, Lehman Brothers Derivative Products Inc., at p.2 (Feb. 4, 2000).

LBDP's assets consisted almost entirely of interest rate swaps and money market

instruments.  Its balance sheets as of May 31, 2008, and August 31, 2008, are as follows:

### LB Derivative Products Inc

| Balance Sheet Items at: | May 31, 2008 | August 31, 2008 |
|---|---|---|
| CASH & CASH EQUIVALENTS | 86,538,624 | 5,745,136 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 432,292,498 | 756,349,084 |
| RECEIVABLES- CUSTOMERS | 7,600,000 | 0 |
| RECEIVABLES- BROKER/DEALER | 0 | 0 |
| RECEIVABLES- OTHER | 7,720,095 | 99 |
| DEFFERED EXPENSE & OTHER ASSETS | 514,973 | 674,972 |
| **TOTAL ASSETS** | **534,666,190** | **762,769,292** |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 375,222,833 | 488,716,675 |
| PAYABLES- CUSTOMERS | 10,266,440 | 0 |
| ACCD LIABILITIES & OTHER PAY. | 91,767,234 | 66,595,639 |
| SUBORDINATED INDEBTEDNESS | 10,000,000 | 10,000,000 |
| **TOTAL LIABILITIES** | **487,256,507** | **565,312,314** |
| COMMON STOCK | 100 | 100 |
| RETAINED EARNINGS | 22,409,683 | 22,456,978 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 24,999,900 | 174,999,900 |
| **TOTAL STOCKHOLDER'S EQUITY** | **47,409,683** | **197,456,978** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **534,666,190** | **762,769,292** |

The increase in LBDP's stockholder equity between May 31, 2008, and August 31,

2008, was largely due to a capital infusion of $150 million received from LBI, through

LBHI, on June 12, 2008.[6186]  This capital infusion was in response to the downgrade of

Ambac, LBDP's insurer, and was required in order to maintain LBDP's AAA rating.[6187]

---

[6186] Lehman, Daily Treasury MIS as of 6/12/08 [LBEX-DOCID 552032].

[6187] E-mail from J. Palumbo, Ernst & Young, to W. Schlich and Jennifer Jackson, Ernst & Young, (Jun. 8, 2008) [EY-LE-LBHI-KEYPERS 257754]; e-mail from J. Goodman, Lehman, to C. O'Meara and V. DiMassimo, Lehman (June 6, 2008) [LBHI_SEC07940_781486].

LBDP was consistently rated AAA by S&P until it was placed on CreditWatch with negative implications on September 25, 2008. The entity's operating guidelines provide for the termination of all outstanding swaps should the following events occur:[6188]

- LBDP ceased to maintain an 'A' rating;

- LBSF fails to deliver the required collateral under the back-to-back transactions within a two-day cure period;

- LBDP fails to maintain the capital required; or

- LBHI or LBSF file for bankruptcy protection.

In this case, the termination trigger was the bankruptcy filing of LBHI on September 15, 2008.

Because the Examiner finds, for purposes of a solvency analysis, that there is insufficient evidence to conclude that LBDP's derivative assets were marked unreasonably, there is also insufficient evidence to support a finding that LBDP was insolvent during the period in question. The Examiner concludes that LBDP was balance sheet solvent on May 31, 2008, and August 31, 2008.

### (i) LB Financial Products

LBFP was established for the purpose of engaging in over-the-counter interest rate and currency swaps and options, as well as trading exchange-traded futures and options, and government bonds and options. Similar to its sister company LBDP, LBFP

---

[6188] Lehman, Lehman Brothers Derivatives Products Operating Guidelines, Article X, at p. 25 (July 16, 1998) [LBEX-BARLEG 0001824-0001885].

was a derivative product company.  As such, it eliminated market risk by entering into

offsetting "mirror transactions" with LBSF, which was unconditionally backed by LBHI,

and was bound by strict capital requirements.  However, unlike LBDP, which had a

termination structure, LBFP was a continuation derivative product company that would

maintain its derivative positions through maturity, even upon a trigger event.[6189]

LBFP's assets consisted almost entirely of interest rate swaps and money market

instruments.  Its balance sheets as of May 31, 2008, and August 31, 2008, are as follows:

| LB Financial Products Inc. | | |
|---|---|---|
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| CASH & CASH EQUIVALENTS | (56,027) | 1,430,613 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 530,169,151 | 548,897,873 |
| RECEIVABLES- OTHER | 106 | 3,504 |
| DEFFERED EXPENSE & OTHER ASSETS | 5,889,140 | 5,779,137 |
| **TOTAL ASSETS** | **536,002,370** | **556,111,126** |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 220,854,048 | 237,596,839 |
| ACCD LIABILITIES & OTHER PAY. | 25,142,974 | 29,705,786 |
| **TOTAL LIABILITIES** | **245,997,022** | **267,302,625** |
| COMMON STOCK | 10 | 10 |
| RETAINED EARNINGS | 39,871,006 | 38,674,159 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 250,134,332 | 250,134,332 |
| **TOTAL STOCKHOLDER'S EQUITY** | **290,005,348** | **288,808,502** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **536,002,370** | **556,111,126** |

LBHI's bankruptcy filing automatically placed LBFP into "continuation mode,"

forcing LBFP into a wind-down phase as the entities were intertwined to a great extent,

---

[6189] Lehman, Lehman Brothers Financial Products Inc. Operating Guidelines [LBEX-BARLEG 0001886-0001933]; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5.

with LBHI playing both operational and financial roles for LBFP.[6190]  LBFP's assets were primarily interest rate swaps and money market instruments.   As a continuation structure, LBFP would not terminate these positions with counterparties upon a triggering event.  Instead, a contingent manager would assist in managing the portfolio until final maturity and take responsibility for hedging the portfolio against interest rate movements.  At the time of LBFP's voluntary bankruptcy filing, however, the status of the outstanding derivatives positions was unclear.[6191]

The Examiner finds insufficient evidence to support a finding, for purposes of a solvency analysis, that the assets held by LBFP were unreasonably marked.  Therefore, the Examiner concludes that LBFP was balance sheet solvent on May 31, 2008, and August 31, 2008.

### (j)  LB Commercial Corporation

LBCC acted primarily as a dealer in over-the-counter ("OTC") foreign currency forwards and options and exchange-traded futures and futures options.   LBCC's balance sheets as of May 31, 2008, and August 31, 2008, were as follows:

---

[6190] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5; *Standard & Poor's, Lehman Bros Financial Prod Ratings Put on Watch; Lehman Bros Derivative Prod Ratings Affirmed*, Sept. 25, 2008.

[6191] Lehman, Lehman Brothers Financial Products Inc. Operating Guidelines, [LBEX-BARLEG 0001886-0001933]; Standard & Poor's, *Lehman Bros Derivative Product Rts Cut, Put on Watch Neg; Lehman Bros Financial Product Rts Cut*, Oct. 6, 2008.

| LB Commercial Corp. | | |
|---|---|---|
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| CASH & CASH EQUIVALENTS | 678,036 | 23,755 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 1,356,600,864 | 912,862,084 |
| RECEIVABLES- BROKER/DEALER | 1,250,349,674 | 1,264,899,973 |
| RECEIVABLES- CUSTOMERS | 13,541,462 | 1,716,562 |
| RECEIVABLES- OTHER | 702,816,861 | 939,587,074 |
| DEFFERED EXPENSE & OTHER ASSETS | (803) | (803) |
| **TOTAL ASSETS** | **3,323,986,094** | **3,119,088,646** |
| SEC.& OTHER INSTRUMENTS SOLD NOT YET PURCHASED | 773,420,701 | 1,301,089,939 |
| COMMERCIAL PAPER & S.T. DEBT | 0 | 9,402,088 |
| PAYABLES- BROKER/DEALER | 608,606,177 | 468,207,184 |
| PAYABLES- CUSTOMERS | 79,895,667 | 77,720,011 |
| ACCD LIABILITIES & OTHER PAY. | 1,631,146,162 | 1,058,172,121 |
| **TOTAL LIABILITIES** | **3,093,068,707** | **2,914,591,343** |
| COMMON STOCK | 1,000 | 1,000 |
| RSU MTM APPRECIATION | (211,560) | (211,560) |
| RETAINED EARNINGS | 219,827,971 | 193,407,886 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 11,299,976 | 11,299,976 |
| **TOTAL STOCKHOLDER'S EQUITY** | **230,917,387** | **204,497,303** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **3,323,986,094** | **3,119,088,646** |

A review of LBCC's balance sheet reveals that LBCC's financial inventory as of May 31, 2008, and August 31, 2008, was comprised entirely of derivatives. A sample of these derivatives was reviewed and are summarized below. The remainder of LBCC's assets as of these dates was largely receivables.

**LB Commercial Corporation**
**Total Financial Instruments Owned (Assets)**

| GAAP Asset Class | as of 5/31/08 | % of Total | as of 8/31/08 | % of Total |
|---|---|---|---|---|
| Commercial Paper & Money Market | (27,625,745) | -2.04% | (48,950,953) | -5.36% |
| Third Party Derivatives | 760,551,422 | 56.06% | 393,277,657 | 43.08% |
| Intercompany Derivatives | 623,334,582 | 45.95% | 568,535,577 | 62.28% |
| Total Derivatives | 1,383,886,004 | 102.01% | 961,813,234 | 105.36% |
| Corporate Debt | 887 | 0.00% | - | 0.00% |
| Governments & Agencies | 204,987 | 0.02% | - | 0.00% |
| Mortgages & Mortgage Backed | 134,731 | 0.01% | (197) | 0.00% |
| | 1,356,600,864 | 100.00% | 912,862,084 | 100.00% |

As described in Section III.A.2, the Examiner has found insufficient evidence to support a finding that Lehman's derivatives positions, as an asset class, were unreasonably marked. Additionally, the Examiner evaluated the reasonableness of the valuation of twelve option positions held by LBCC as of May 31, 2008.[6192]  Lehman's GFS quotes for price and total dollar value for these positions were evaluated by comparison to price quotes from either Bloomberg or MarketWatch. The Examiner has determined that Lehman's prices for these positions were reasonable.

Given the makeup of its assets and the reasonableness of their marks, the Examiner concludes that there is insufficient evidence to support a finding that LBCC was balance sheet insolvent as of May 31, 2008 and August 31, 2008.

---

[6192] The Examiner evaluated call and put options on American International Group, Apple Inc., BP PLC, Citigroup, Google Inc., and the S&P 500.  The GFS ticker symbols for the positions investigated were QWAPMG, QAPVAP, QQAAAR, QBPAN, QBPMM, QSXYUO, QBPMN, QSXYFS, QCIT, QBPSL, QGOOFN, and QVAFAO.

## (k)  BNC Mortgage LLC

BNC Mortgage LLC was a subprime mortgage originator.  As of May 31, 2008, and August 31, 2008, its balance sheets were as follows:

| BNC Mortgage LLC | | |
|---|---|---|
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| CASH & CASH EQUIVALENTS | 1,572 | 1,572 |
| RECEIVABLES- OTHER | 23,843,678 | 20,335,920 |
| DEFFERED EXPENSE & OTHER ASSETS | 436,122 | 427,302 |
| **TOTAL ASSETS** | **24,281,373** | **20,764,794** |
| ACCD LIABILITIES & OTHER PAY. | 13,155,418 | 10,316,050 |
| **TOTAL LIABILITIES** | **13,155,418** | **10,316,050** |
| COMMON STOCK | 25,000,000 | 25,000,000 |
| RETAINED EARNINGS | (56,305,764) | (56,982,974) |
| TOTAL ADDITIONAL PAID IN CAPITAL | 42,431,718 | 42,431,718 |
| **TOTAL STOCKHOLDER'S EQUITY** | **11,125,954** | **10,448,744** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **24,281,373** | **20,764,794** |

As detailed above, 98% of BNC's assets consisted of intercompany receivables, split between receivables from Lehman Brothers Bank and Aurora Loan Services. Given BNC's substantial equity cushion, as well as the fact that its largest assets were receivables from non-debtor entities, its balance sheet was relatively strong. Accordingly, the Examiner concludes that there is insufficient evidence to support a finding that BNC was balance sheet insolvent as of May 31, 2008 and August 31, 2008.

## (l)  East Dover Limited

East Dover Limited was established for the sole purpose of purchasing, leasing and selling aircraft and related equipment.  However, at the time of its bankruptcy filing, this entity was no longer used for this purpose and held mostly intercompany

receivables and payables. Its balance sheets as of May 31, 2008, and August 31, 2008, were as follows:

| East Dover Ltd | | |
| --- | --- | --- |
| **Balance Sheet Items at:** | **May 31, 2008** | **August 31, 2008** |
| CASH & CASH EQUIVALENTS | 59,605,203 | 100,373 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | (34) | (0) |
| RECEIVABLES- OTHER | 49,135,409 | 109,486,530 |
| DEFFERED EXPENSE & OTHER ASSETS | 117,344 | 117,344 |
| **TOTAL ASSETS** | **108,857,921** | **109,704,246** |
| ACCD LIABILITIES & OTHER PAY. | 7,686,388 | 4,215,167 |
| COMMERCIAL PAPER S.T. DEBT | 32,513 | 30,817 |
| **TOTAL LIABILITIES** | **7,718,901** | **4,245,983** |
| RETAINED EARNINGS | 25,139,020 | 29,458,263 |
| TOTAL ADDITIONAL PAID IN CAPITAL | 76,000,000 | 76,000,000 |
| **TOTAL STOCKHOLDER'S EQUITY** | **101,139,020** | **105,458,263** |
| **TOTAL LIABILITIES & STOCKHOLDER'S EQUITY** | **108,857,921** | **109,704,246** |

As of May 31, 2008, over 50% of East Dover's assets were derived from cash. The remaining assets consisted largely of $46 million of intercompany receivables from LBI and LCPI. An intercompany receivable from LCPI of $39.1 million comprised 37% of East Dover's total assets. However, even if LCPI were unable to repay its obligation, East Dover had sufficient equity, $101 million, to cover its loss.

By August 31, 2008, East Dover's cash had decreased to less than 1% of total assets and was replaced by a $99 million intercompany receivable from LCPI. However, in this instance as well, even if LCPI were unable to repay its obligation, East Dover had sufficient equity – $105 million – to cover its loss.

There is insufficient evidence to support a finding that East Dover was insolvent and the Examiner concludes that East Dover was balance sheet solvent as of May 31, 2008, and August 31, 2008.

### (m) Lehman Scottish Finance

LSF was established for the sole purpose of holding equity-linked notes of other Lehman entities.  Its balance sheets as of May 31, 2008, and August 31, 2008, were as follows:

| Lehman Scottish Finance LP | | |
|---|---|---|
| Balance Sheet Items at: | May 31, 2008 | August 31, 2008 |
| CASH & CASH EQUIVALENTS | 1,541,639 | 1,544,815 |
| SEC. & OTHER FININANCIAL INSTRUMENTS OWNED | 2,793,978 | 7,263,935 |
| RECEIVABLES- OTHER | 53,032,408 | 53,914,704 |
| TOTAL ASSETS | 57,368,026 | 62,723,454 |
| TOTAL LIABILITIES | - | - |
| COMMON STOCK | 50,000,000 | 50,000,000 |
| RETAINED EARNINGS | 7,368,026 | 12,723,454 |
| TOTAL STOCKHOLDER'S EQUITY | 57,368,026 | 62,723,454 |
| TOTAL LIABILITIES & STOCKHOLDER'S EQUITY | 57,368,026 | 62,723,454 |

LSF did not post any liabilities on its balance sheet as of May 31, 2008, or August 31, 2008.  This is consistent with its role as a non-operating entity that was not involved in transactions and which was created for the sole purpose of holding equity-linked notes of other Lehman entities.  At the same time, on May 31, 2008, LSF's assets consisted of $2.8 million in U.S. equities and $53 million in intercompany receivables. By August 31, 2008, its financial inventory, still consisting entirely of derivatives,

increased to $7.2 million.  The receivables reported by LSF are primarily comprised of

$9 million in Luxembourg Finance, S.a.r.l. redeemable common stock and $40 million in

subordinate debt purchased from Luxembourg Finance, S.a.r.l. in 2007.

Given the lack of any liabilities and the composition of its assets, 93% being

redeemable common stock and a subordinate loan, the Examiner concludes that there is

insufficient evidence to support a finding that LSF was balance sheet insolvent as of

May 31, 2008, and August 31, 2008.

### (n)  PAMI Statler Arms

PAMI was a Lehman entity created to own and manage a variety of real estate

properties.  One of its subsidiaries, PAMI Statler Arms, was established to hold title to

the Statler Arms Apartments, a 297-suite apartment complex in Cleveland, Ohio.  PAMI

Statler Arms took ownership of the building in May 2008.

According to the Chapter 11 petition filed by PAMI Statler Arms, it had $20

million in assets and $38.5 million in liabilities at the time of its bankruptcy filing.[6193]  No

financial information is available for PAMI Statler Arms in Lehman's financial systems.

Given the lack of data available on this entity, as well as the immaterial amount of

assets involved, the Examiner is unable to draw any conclusion regarding the solvency

of this entity.

---

[6193] Exhibit "A" to Voluntary Petition, Docket 1, *In re PAMI Statler Arms LLC*, No. 08-13664 (Bankr.
S.D.N.Y. Sept. 22, 2008).

### d) Unreasonably Small Capital

As set forth *supra,* the avoidance of a pre-petition transfer as constructively fraudulent requires, among other things, one of three measures of a debtor's financial condition to be satisfied: insolvency, "unreasonably small capital," or an inability to pay debts as they come due.[6194]    This Section addresses whether, and as of what date, there is evidence sufficient to establish a finding that LBHI or an LBHI Affiliate had "unreasonably small capital."  Because of the fact-intensive nature of the "unreasonably small capital" test, this Section draws extensively upon the facts and findings set forth more fully in other Sections of this Report, but repeats those facts to the extent necessary to provide clarity to the discussion of undercapitalization.

Given the relatively limited number of reported cases applying the unreasonably small capital test, as compared to the insolvency test, the unreasonably small capital test can fairly be characterized as an alternative test that a court may consider in the event that it determines that the debtor was not insolvent as of the date of the challenged transfer.  As noted by Judge Richard Posner in a recent Seventh Circuit decision, the "unreasonably small capital" test allows a court to assess the avoidability of a given pre-petition transfer without necessarily "haggling over whether at the moment of the

---

[6194] *See* 11 U.S.C. § 548(a)(1)(B)(ii).

transfer the corporation became 'technically' insolvent, a question that only accountants

could relish having to answer."[6195]

This test seems particularly apt in the Lehman matter, as the "unreasonably

small capital" test can allow a fact-finder to take a broader view of certain risks, such as

liquidity risk, that are not necessarily reflected on a balance sheet.  Financial institutions

such as Lehman have a relatively greater risk of failure due to a lack of liquidity, as

compared to a risk of failure due to the value of their liabilities exceeding the fair value

of their assets.  As noted by Paul Shotton, Lehman's Global Head of Risk Control, in the

aftermath of the near collapse of Bear Stearns, "[l]iquidity is more important than

capital; most entities which go bankrupt do so because they run out of financing, not

because the value of their assets falls below the value of their liabilities."[6196]

Accordingly, and in light of the purpose of the fraudulent conveyance laws – to

ensure that property transferred by the debtor for less than reasonably equivalent value

during the applicable period is available for distribution to the debtor's creditors – the

Examiner has determined that it is prudent to address the "unreasonably small capital"

test.

The Examiner emphasizes that a finding of "unreasonably small capital" is

germane only to the narrow question of evaluating the viability of certain claims to

---

[6195] *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794 (7th Cir. 2009).

[6196] *See* E-mail from Paul Shotton, Lehman, to Christopher O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467].

avoid transfers as constructively fraudulent under Section 548(a)(1)(B) of the Bankruptcy Code or under analogous sections of applicable state law. As "unreasonably small capital" denotes a financial condition short of insolvency, a finding of "unreasonably small capital" is not relevant to evaluating claims that require a finding of insolvency as one of their essential elements.[6197]  Moreover, a finding that a transfer is constructively fraudulent does not require or imply a finding that a party to the transfer committed any bad acts.[6198]  Rather, the purpose of fraudulent conveyance law is to protect creditors from "last-minute diminutions of the pool of assets in which they have interests" and not to identify or punish bad actors.[6199]  For these reasons, the Examiner's application of the "unreasonably small capital" test is relevant only to his consideration of constructively fraudulent avoidance claims and is discussed only in that context.

As set forth in detail below, the Examiner has identified evidence that would support a determination by a finder of fact that LBHI, and each of the LBHI Affiliates that relied on LBHI to provide funding or credit support, had "unreasonably small capital" beginning early in the third quarter of 2008 and continuing through to the applicable petition date.  The Examiner has also identified evidence that would support

---

[6197] *See Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) (holding that a cash flow-based analysis that "projects into the future to determine whether capital will remain adequate over time" is not relevant to "determining whether a corporation is insolvent under the applicable Delaware law."); *but see ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 395 (Bankr. S.D. Tex. 2008).

[6198] *See In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir. 1996).

[6199] *Bonded Fin. Servs., Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir. 1988).

a contrary finding.  As such, a future finder of fact would need to weigh carefully all evidence to determine whether the "unreasonably small capital" element is satisfied. Because conflicting evidence exists and because the "unreasonably small capital" test is "fuzzy"[6200] and infrequently considered by courts, the Examiner expresses no opinion as to how such a finder of fact would find.

### (1)  Summary

The "unreasonably small capital" test is a forward-looking analysis that considers whether, and at what point, a debtor could have reasonably projected that it faced an unreasonable risk of insolvency given its business model and financial condition.[6201]  As a highly leveraged investment bank that required tens of billions of dollars in overnight funding, Lehman's primary insolvency risk was that it would not have sufficient funds to satisfy its debts as they came due.[6202]  This risk, referred to as liquidity risk, differs from balance sheet insolvency, the condition where the fair value of the entity's assets is less than its liabilities.

---

[6200] *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009).

[6201] *See Boyer v. Crown Stock Distrib., Inc.*, No. 1:076-CV-409RM, 2009 WL 418275, at *11 (N.D. Ind. Feb. 17, 2009) (describing the "unreasonably small capital" test as "forward-looking, requiring consideration of liabilities the debtor would incur or contemplated transactions for which the remaining assets were unreasonably small"), *aff'd in part, rev'd in part, Boyer*, 587 F.3d at 787; *see also Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Inter'l)*, 208 B.R. 288, 302 (Bankr. D. Mass. 1997) (describing "unreasonably small capital" as "an unreasonable risk of insolvency, not necessarily a likelihood of insolvency" that is "similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to another's person or property"); *cf. In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (noting that "unreasonably small capital . . . encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future").

[6202] Although Lehman and other investment banks measured their "capital adequacy" according to metrics such as net leverage ratios and CSE Capital Ratios, as discussed below, these metrics do not adequately monitor or address an investment's bank's liquidity risk.

Lehman relied upon repo funding – a form of short-term secured financing – to support a substantial part of its less liquid assets.[6203]  After the near collapse of Bear Stearns, Lehman recognized that its ability to obtain such financing was more dependent on the market's confidence in Lehman's viability than the actual value of the underlying asset being financed.[6204]  After having engaged in a countercyclical strategy of increasing its real estate assets as well as increasing its positions in leveraged loans, private equity and other less liquid assets, by late 2007, Lehman recognized the need to reduce its firm-wide leverage.  By January 2008, Fuld had ordered Lehman to cut its balance sheet in half, and by the second quarter of 2008, Lehman reversed course and executed a deleveraging plan in the second quarter of 2008 to "win back" the confidence of the market and Lehman's lenders.[6205]  Notwithstanding Lehman's execution of this plan, the market did not respond as Lehman had anticipated.[6206]  As discussed below, sufficient evidence exists to support a determination that Lehman knew or should have known that, beginning early in the third quarter of 2008, there was a reasonable

---

[6203] Lehman defined "less liquid" inventory positions as including "derivatives, private equity investments, certain corporate loans, certain commercial mortgages and real estate positions."  Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2008 (Form 10-Q), at p. 68 (filed on Apr. 9, 2008) [LBEX-DOCID 1024435] ("LBHI 10-Q (Apr. 9, 2008)").

[6204] See, e.g., E-mail from Paul Shotton, Lehman, to Chris O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467].

[6205] Erin Callan, Lehman, Leverage Analysis [Draft] (Apr. 7, 2008), at p. 1 [LBEX-DOCID 1303158].

[6206] Starting in June 2008, Lehman's share price was approaching its 52-week low, would soon fall below $30 per share and would not again return to that level.  See also Ben Levisohn, Lehman: Independent for How Long?  The diversified investment bank does not have the requisite strength or size for the current environment.  But suitors are holding back - for now, Business Week, June 11, 2008, available at http://www.businessweek.com/investor/content/jun2008/pi20080610_650233.htm) ("The market believes Lehman hasn't fully cleaned up its balance sheet and that the worst is still to come, management's assurances notwithstanding.").

possibility, or risk, that Lehman would suffer a material loss of market confidence in its near future, and that this loss of confidence would manifest itself as a loss of ability to finance its less liquid assets through the repo market.

The next step is to assess whether Lehman was reasonably prepared to absorb or address this reasonably foreseeable risk. Following the Bear Stearns event, the SEC and the FRBNY requested that each of the CSEs develop liquidity stress tests that addressed, among other things, a significant loss of repo financing of less liquid assets.[6207] Although Lehman projected that it could survive such a stress event, there is sufficient evidence to support a determination that certain of these projections were based on assumptions that failed to take into account factors that Lehman knew, or should have known, would directly impact its liquidity position in a stress event. In particular, Lehman assumed that its clearing banks would provide unsecured credit on an intra-day basis and that operational friction would not have a material impact on its liquidity, in each case during the projected stress event.

For the reasons discussed below, the Examiner finds that sufficient evidence exists to support a finding that, beginning in the third quarter of 2008 and at all times through each applicable petition date, LBHI and each of the LBHI Affiliates that relied on LBHI to provide funding or credit support had "unreasonably small capital" to engage in their businesses.

---

[6207] Joint Request of SEC and FRBNY: Liquidity Scenarios for CSEs (May 20, 2008), [LBHI_SEC07940_505195].

### (2)  Analysis of the "Unreasonably Small Capital" Test

#### (a)  Summary of Legal Standard[6208]

Courts and commentators have recognized that the criteria for determining whether a company has "unreasonably small capital" are not clearly defined.[6209]  There is agreement, however, that the "unreasonably small capital" test is a forward-looking analysis that examines not only how a company is performing at a given point in time, but also whether the company had sufficient resources to withstand reasonably foreseeable downturns in its performance or in the broader market in which it operates.[6210]

To determine whether a company has "unreasonably small capital," courts have assessed "both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question."[6211]  In conducting this analysis, courts look at

---

[6208] The legal standard for "unreasonably small capital" is discussed more fully in Appendix 1, Legal Issues, at Section IV.A.2.b.

[6209] *In re Best Products Co., Inc.*, 168 B.R. 35, 54 (Bankr. S.D.N.Y. 1994) (noting that the test is "far from clear").  There is no statutory definition of the term "unreasonably small capital" (or its equivalent, "unreasonably small assets") under the Bankruptcy Code or applicable state law. The "unreasonably small capital" test requires "judicial consideration of the overall state of affairs surrounding the corporation and the challenged transfer itself," and thus is generally analyzed and applied on a "case-by-case" basis.  *In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 998-99 (Bankr. S.D. Ohio 1990); *see also Credit Managers Ass'n of So. Cal. v. Federal Co.*, 629 F. Supp. 175, 183 (C.D. Cal. 1985) (describing the "unreasonably small capital" test as "a question of fact that must be ascertained on a case by case basis"); *Barrett v. Continental Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989) ("'Unreasonably' is clearly a relative term and demands, for the purposes of [Section 5 of the UFCA], the sort of relative, contextual judgment which looks to both the ends served by § 5 and the overall state of affairs surrounding the transferor corporation and the challenged transfer itself.").

[6210] *Moody v. Sec. Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1074 (3d Cir. 1992) ("The critical question is whether the parties' projections were reasonable."); *see also Boyer*, 2009 WL 418275, at *11; *In re Healthco Int'l*, 208 B.R.at 302.

[6211] *Barrett*, 882 F.2d at 4.

"all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period."[6212]  In addition, a company "must account for difficulties that are likely to arise,"[6213] and otherwise "incorporate some margin for error."[6214]  The object of an "unreasonably small capital" analysis is to determine the "moment . . . that bankruptcy is a consequence both likely and foreseeable."[6215]

Application of the unreasonably small capital test to Lehman involves a fact-intensive two-step analysis.  The first inquiry is whether and at what point it was reasonably foreseeable that Lehman was at risk of losing access to the financing it required to operate its business and to satisfy its obligations as they came due.  The second inquiry is whether Lehman's liquidity stress tests, which projected that Lehman could survive a period during which it would obtain reduced levels of financing, were reasonably constructed.

---

[6212] *Moody*, 971 F.2d at 1072 n.24.

[6213] *Id; In re TOUSA, Inc.*, -- B.R. --, Bankr. No. 08-10928, Adv. No. 08-1435-JKO, 2009 WL 3519403, at *74 (Bankr. S.D. Fla. Oct. 30, 2009) (describing the test as "whether a company has sufficient capital to support operations *in the event that* performance is below expectations") (emphasis added); *Carpenter v. Roe*, 10 N.Y. 227, 232 (1851) (invalidating a pre-bankruptcy transfer made at a time when the debtor was indebted, and had reason to believe that "insolvency would be the inevitable or probable result of *want of success* in the business in which he was engaged"); *In re Iridium Operating LLC*, 373 B.R. at 344 (Bankr. S.D.N.Y. 2007 ).

[6214] *Moody*, 971 F.2d at 1073.

[6215] *Boyer*, 587 F.3d at 794.

## (b)  Lehman's Countercyclical Strategy

In August 2006, Lehman decided to pursue a strategy to significantly increase its

subprime lending and commercial real estate financing businesses.[6216]   In 2007, as the

sub-prime residential mortgage market deteriorated, Lehman made a countercyclical

bet on commercial real estate on the assumption that the subprime crisis would not spill

over into the commercial market.[6217]   A significant element of Lehman's strategy was to

monetize certain of these assets through syndication or securitization.[6218]   Lehman

described itself in its Form 10-Q for the third quarter of 2006 as the "market leader in

mortgage   and   asset   backed   securitizations   and   other   structured   financing

arrangements."[6219]

---

[6216] *See* E-mail from Jeffrey Goodman, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Aug. 23, 2006) [LBEX-DOCID 1368052]; *see also* Ronald Marcus, U.S. Department of the Treasury, Office of Thrift Supervision, Examiner's Report of Lehman Brothers Holdings Inc. (July 7, 2008), at pp. 1-2 (describing the strategic decision to grow the balance sheet as an "outsized bet on real estate.").

[6217] Examiner's Interview of Richard S. Fuld, Jr. Sept. 30, 2009, at pp. 14-15; Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at pp. 7-8; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at pp. 7-9.

[6218] *See* Lehman Brothers Holdings Inc., Annual Report for FY 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 104 ("LBHI 2007 10-K") (describing Lehman's "intent to sell through securitization or syndication activities, residential and commercial mortgage whole loans we originate, as well as those we acquire in the secondary market"); *see also* Binyamin Appelbaum, *et al.*, *Fed's approach to regulation left banks exposed to crisis*, Wash. Post, Dec. 21, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/12/20/AR2009122002580.html ("Rather than wait for borrowers to repay loans, banks were adopting a technique called securitization.  The banks created pools of loans and sold investors the right to collect portions of the inflowing payments.  The bank got its money upfront.  Equally important, under accounting rules it was allowed to report that the loans had been sold, and therefore it did not need to hold any additional capital.  But in many cases, the bank still pledged to cover losses if borrowers defaulted.").

[6219] Lehman Bros. Holdings Inc., Quarterly Report as of Aug. 31, 2006 (Form 10-Q) (filed on Oct. 10, 2006), at p. 18.

Timothy Geithner, the then-President of the FRBNY, described securitization in a June 9, 2008 speech as a $2.2 trillion parallel financial system outside of the traditional banking system.[6220]  The assets so financed were assumed to be readily saleable at fair values, and "the liquidity supporting them was assumed to be continuous and essentially frictionless, because it had been so for a long time."[6221]

In 2007, it became apparent that the market for asset-backed securities ("ABS") began to become more illiquid in light of the weak performance of such securities that were backed by subprime mortgages:

> Asset-backed securities . . . experienced the greatest degree of stress in 2007.  The loss of the value of subprime mortgages throughout the year led to growing uncertainty about the value of credit instruments such as collateralized debt obligations (CDOs) that often included such subprime mortgages in what investors and ratings agencies had previously considered high-quality assets.[6222]

FRBNY President Geithner described the state of the securitization markets beginning in late 2007 as follows: "The funding and balance sheet pressures on banks were intensified by the rapid breakdown of securitization and structured finance markets.  Banks lost the capacity to move riskier assets off their balance sheets, at the

---

[6220] FRBNY President Timothy F. Geithner, Reducing Systemic Risk In A Dynamic Financial System, Transcript of Remarks to The Economic Club (June 9, 2008), *available at* http://www.newyorkfed.org/newsevents/speeches/2008/tfg080609.html ("In early 2007, asset-backed commercial paper conduits, in structured investment vehicles, in auction-rate preferred securities, tender option bonds and variable rate demand notes had a combined asset size of roughly $2.2 trillion.").

[6221] *Id.*

[6222] Senior Supervisors' Group, *Observations on Risk Management Practices during the Recent Market Turbulence* (Mar. 6, 2008) at p. 1, *available at* http://www.newyorkfed.org/newsevents/news/banking/2008/ SSG_Risk_Mgt_doc_final.pdf.

same time they had to fund, or to prepare to fund, a range of contingent commitments

over an uncertain time horizon."[6223]

The disruptions in the securitization market put pressure on the balance sheets of

major investment banks, as noted by S&P in a November 2007 report:

> Recent disruptions in the subprime market and its contagion effects into
> the leveraged finance, asset-backed commercial paper (ABCP), and CDO
> spaces have substantially curtailed market liquidity.  The sudden loss of
> appetite for subprime and other high-yield exposure has significantly
> narrowed these markets, while uncertainty regarding asset valuations left
> many institutions unable to unwind exposures at fair market prices. . .  As
> a result, the markets for these assets have considerably shrunk, while the
> spiral effects have led to concerns with respect to the broker-dealers'
> funding liquidity risk. [6224]

Lehman, in a September 2007 presentation to the Finance Committee of its Board

of Directors, observed that the commercial paper, structured finance and other financial

markets had experienced "significant turmoil in 2007."[6225]  Such turmoil began with

initial tremors in the sub-prime mortgage market at the end of 2006, and then spread

with the failure of two hedge funds operated by Bear Stearns that were heavily exposed

to sub-prime mortgage loans in June 2007.[6226]  Lehman observed that, by July 2007, "the

fear of contagion" had spread "to other markets causing a rout in all credit products, of

---

[6223] FRBNY President Timothy F. Geithner, Transcript of Remarks to The Economic Club,  New York City, New York, Reducing Systemic Risk In A Dynamic Financial System, (June 9, 2008), *available at* http://www.newyorkfed.org/newsevents/speeches/2008/tfg080609.html.

[6224] Diane Hinton, S&P, *Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare,* S&P RatingsDirect, Nov. 8, 2007, at pp. 2-3 [LBHI_SEC07940_439424].

[6225] Lehman, Presentation to the Finance Committee of the Board of Directors, Risk, Liquidity, Capital & Balance Sheet Update: Risk Updat*e* (Sept. 11, 2007), at p. 4 [LBEX-DOCID 505941].

[6226] *Id.*

every rating including all the way up to AAA bonds."[6227] Lehman concluded that the asset-backed commercial paper market was "facing challenging conditions, with very little liquidity" and that "[f]unding for almost any type of mortgage or ABS product dried up."[6228]

As Lehman executed its countercyclical strategy and the securitization and structured finance markets deteriorated, the size of Lehman's balance sheet increased. Lehman's reported gross assets grew from $504 billion at the end of FY 2006 to $691 billion by the end of FY 2007,[6229] and its net assets grew by a similar proportion, from $269 billion to $373 billion over the same time period.[6230] Although by late 2007 certain senior Lehman personnel identified the need for Lehman to reduce the firm-wide leverage, Lehman's balance sheet continued to grow through the end of the first quarter of 2008, with gross assets of approximately $786 billion and net assets of approximately $397 billion.[6231] Lehman's net leverage ratio, which measured the ratio of Lehman's net assets against its tangible equity capital base,[6232] increased from 14.5x at the end of fiscal

---

[6227] *Id.*

[6228] *Id.*

[6229] LBHI 2007 10-K, at p. 29.

[6230] *Id.* Lehman calculated "net assets" by starting with "total assets" and excluding from that amount the following three categories: (i) cash and securities segregated and on deposit for regulatory reasons and other purposes; (ii) collateralized lending agreements; and (iii) identifiable intangible assets and goodwill. *Id.* at p. 30 n.3.

[6231] LBHI 10-Q (Apr. 9, 2008), at p. 72.

[6232] Lehman defined "tangible equity capital" as "stockholders' equity and junior subordinated notes minus identifiable intangible assets and goodwill." Tangible equity capital was used as the denominator in Lehman's net leverage ratio calculation. LBHI 2007 10-K, at p. 29.

year 2006 to 16.1x by the end of fiscal year 2007.[6233]  Lehman noted that its net leverage

ratio had "crept back toward the higher end of the peer group in recent years."[6234]

At the end of the second quarter of 2008, Lehman reported a quarter-over-

quarter reduction of $146.6 billion of gross assets, and $68.9 billion of net assets.[6235]  The

asset reductions, together with the issuance of equity capital, contributed to the

reduction in Lehman's gross leverage ratio to 24.3x and its net leverage ratio to 12.06x

as of the end of the second quarter of 2008.[6236]  As discussed elsewhere in this Report,

Lehman's reported leverage ratios were enhanced (that is lowered) by its use of Repo

105 transactions.[6237]  At the end of the second quarter of 2008, Lehman proclaimed,

based on its reported numbers, that it had its "lowest net leverage ratio in its history as

a public company,"[6238] and Lehman CEO Richard Fuld stated that Lehman's capital

position had "never been stronger."[6239]

### (c)  Lehman's Repo Book and Liquidity Risk

The reported deleveraging of Lehman's balance sheet during the second quarter

of 2008 allowed Lehman to project the appearance of capital adequacy to the extent

---

[6233] *Id.*

[6234] Erin Callan, Lehman, Leverage Analysis [Draft] (Apr. 7, 2008), at p. 5 [LBEX-DOCID 1303158].

[6235] Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at pp. 56, 86 ("LBHI 10-Q (July 10, 2008)").

[6236] *Id.* at pp. 55, 56, 89.

[6237] See Section III.A.4, which discusses Lehman's use of Repo 105/108 transactions.

[6238] Lehman, Capital Adequacy & Liquidity Update (June 4, 2008), at p. 7, [LBHI_SEC07940_513590] ("Despite a forecast loss in Q2 '08, the actions taken by Lehman in the quarter will result in the strongest capital and liquidity positions the Firm has ever had.").

[6239] Final Transcript of Lehman Brothers Holdings, Inc. Second Quarter 2008 Earnings Call (June 16, 2008), at p. 4 [LBHI_SEC07940_519082].

measured in terms of the ratio of its assets to its tangible equity capital base.  As noted

above, however, Lehman's Global Head of Risk Control stated that "[l]iquidity is more

important than capital,"[6240] and Lehman recognized that "[l]iquidity, that is ready access

to funds, is essential to our businesses."[6241]  Lehman was, like other investment banks,

"heavily reliant upon wholesale funding sources" to finance the inventory on its

balance sheet.[6242]  Callan, in an interview after the Bear Stearns event, stated that

"[l]iquidity is the thing that will kill you in a moment."[6243]

Accordingly, the analysis as to whether Lehman had "unreasonably small

capital" must begin with Lehman's exposure to liquidity risk, while taking into account

other metrics of capital adequacy.  Lehman's liquidity risk arose primarily from its

reliance upon short-term repo funding to support assets that would take longer to sell if

they could not be financed, particularly in a stressed environment.[6244]  The other metrics

of capital adequacy that Lehman measured, such as Lehman's reported cash capital

---

[6240] *See* E-mail from Paul Shotton, Lehman, to Chris O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467].

[6241] LBHI 2007 10-K, at p. 17.

[6242] Diane Hinton, S&P, *Liquidity Management In Times Of Stress: How The Major U.S. Broker-Dealers Fare*, S&P RatingsDirect, Nov. 8, 2007, at p. 2 [LBHI_SEC07940_439424].

[6243] Maria Bartiromo, *Lehman CFO Erin Callan:  Back from Ugly Monday*, Business Week, Mar. 20, 2008, *available at* http://www.businessweek.com/magazine/content/08_13/b4077023363140.htm?chan=magazine+channel_the+business+week.

[6244] *See, e.g,* Tobias Adrian, *et al.*, *The Federal Reserve's Primary Dealer Credit Facility*, 15 Current Issues In Economics and Finance, at pp. 3-4 (Aug. 2009) *available at* http://www.newyorkfed.org/research/current_issues ("Originally focused on the highest quality collateral—Treasury and agency debt—repo transactions by 2008 were making use of below-investment-grade corporate debt and equities and even whole loans and trust receipts. This shift toward less liquid collateral increased the risks attending a crisis in the market since, in the event of a crisis, selling these securities would likely take time and occur at a significant loss.").

surplus, its Equity Adequacy Framework and its CSE Capital Ratios, did not fully

account for the nature and extent of Lehman's liquidity risk, especially following the

Bear Stearns event.

### (i)    Bear Stearns Demonstrates the Liquidity Risk Associated with Repo Financing

Lehman was highly dependent upon repo funding,[6245] a form of secured lending

structured as a sale of assets and forward commitment to repurchase the same or

similar assets with a slight margin.[6246]  Because repo funding is typically short-term, and

credit is designed to be provided on an oversecured basis,[6247] it was generally viewed as

a reliable form of short-term financing, even in a stressed environment.[6248]   Robert

Azerad, Lehman's Global Head of Asset and Liability Management, stated that, prior to

the Bear Stearns event, liquidity risk managers were concerned that their firms would

---

[6245] LBHI 2007 10-K, at p. 17 (discussing Lehman's reliance on "continuous access" to the repo market).

[6246] FRBNY, *Repurchase and Reverse Repurchase Transactions*, Fedpoint, *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed04.html.  The repo market has a long pedigree, dating back to the early 20th century when the Federal Reserve used repos in government securities to either drain or add liquidity to the banking system.  *See* Moorad Choudhry, *The Repo Handbook* 6 (2002).

[6247] For each class or type of asset, there is a "haircut" provided by the liquidity provider.  For lesser quality collateral, the haircut would be larger.  In this manner, the repo counterparty in the event of a default was able to sell the collateral such that even if it was sold at less than par, so long as it was not sold for less than haircut, the repo counterparty would not suffer a loss.

[6248] *See* Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 8 [LBEX-DOCID 008608] (asserting that "[l]iquidity risk at the broker dealers is thought to be less of an issue" because the "[r]epo market is thought to be much more reliable than unsecured market" with a "[l]ow credit risk because of the collateral received by the lender and the haircut" and also due to the "[s]ophisticated nature  of most lenders.").

lose access to unsecured forms of financing, but not necessarily access to repo funding.[6249]

The near collapse of Bear Stearns in March 2008 was a paradigmatic event because it demonstrated that repo funding, even when supported by relatively high quality assets, could prove unreliable in a crisis.  In a number of presentations, Lehman quoted then-SEC Chairman Christopher Cox's observations and conclusions regarding the liquidity lessons learned from the Bear Stearns event, where he described the cause of the near collapse of Bear Stearns as beginning with a reluctance to deal with Bear on an unsecured basis, which extended to secured lending on less liquid and lower quality assets and later, an inability of Bear Stearns to obtain secured financing even on high-quality agency securities. [6250]  Chairman Cox also observed that "[t]he Bear Stearns experience has challenged the measurement of liquidity in every regulatory approach, not only here in the United States but around the world."[6251]  Azerad told the Examiner that the Bear Stearns event "shattered commonly held assumptions about the market."[6252]

---

[6249] Examiner's Interview of Robert Azerad, Sept. 23, 2009 (second interview), at p. 4.

[6250] Lehman, Liquidity Management At Lehman Brothers, Presentation to the S&P (May 15, 2008), at p. 20 [LBEX-DOCID 008669].

[6251] *Id.*; *see also* Lehman, Leverage, and Liquidity, Presentation to the Federal Reserve Update on Capital, (May 28, 2008), at  p. 6 [LBHI_SEC07940_062581]; Lehman, Project Green: Liquidity & Liquidity Management [Draft] (June 2008), at p. 19 [LBHI_SEC07940_844120].

[6252] Examiner's Interview of Robert Azerad, Sept. 23, 2009 (second interview), at p. 4.

### (ii)  Quality and Tenor of Lehman's Repo Book

The nature and extent of Lehman's liquidity risk is demonstrated through a basic analysis of the composition of Lehman's repo book.  Two key criteria that Lehman monitored were the quality of the repo collateral and the tenor, or term, of the repo agreements (*e.g.*, overnight).  Lehman disclosed in its quarterly report, or form 10-Q, for the second quarter of 2008 that it had $188 billion of repo financing, $105 billion of which was secured by non-government, non-agency collateral.[6253]  Lehman specifically tracked its repo collateral that was not government and agency fixed income securities — government and agency securities were perceived as highly liquid forms of collateral in virtually any market condition.[6254]  As of May 30, 2008, the composition of Lehman's non-government, non-agency repo book was as follows:[6255]

| Collateral Type | Amount  ($billion) |
| --- | --- |
| Asset Backs - Investment Grade | 25.4 |
| Asset Backs - Non-Investment Grade | 2.0 |
| C1 - Investment Grade Convertibles | 1.5 |
| C2 - Non-Investment Grade Convertibles | 2.3 |

---

[6253] LBHI 10-Q (Apr. 9, 2008), at pp. 84-85.  Lehman thus had $83 billion of government and agency inventory that was used to generate short-term funding through the repo market, although $71 billion of this funding was used in "matched book" transactions to provide financing to Lehman's prime broker clients (through reverse repo transactions).  The remaining $12 billion of cash generated through the repo market was cash for Lehman's liquidity pool. *See* E-mail from Robert Azerad, Lehman, to Thomas Luglio, Lehman, *et al.* (June 26, 2008) [LBHI_SEC07940_522788].

[6254] *See* FRBNY, *System Open Market Account*, Fedpoint (Mar. 2009), *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed27.html  (describing how the New York Fed uses Open Market Operations to control the money supply by lending money to primary dealers in government securities in exchange for high quality securities as general collateral against the repo funds); *see also* FRBNY, *Understanding U.S. Government Securities Quotes*, Fedpoint (Aug. 2007), *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed07.html ("Because the market for U.S. Government securities is both global and highly competitive, prices tend to be similar throughout the world.").

[6255] Lehman, Global Liquidity MIS (May 30, 2008) at p. 20 [LBEX-DOCID 1058911].  Note the total differs slightly from the sum of the parts, which we believe is due to rounding.

| | |
|---|---|
| Corporates - Investment Grade | 12.8 |
| Corporates - Non-Investment Grade | 8.2 |
| EMG (Emerging Markets bonds) | 7.1 |
| Equities | 23.4 |
| Money Markets | 7.3 |
| Muni | 2.2 |
| Private Labels - High Yield | 2.3 |
| Private Labels - Investment Grade | 9.9 |
| Residential Whole Loan | 1.1 |
| **Total** | **105.3** |

Lehman, for internal reporting purposes, divided its non-government, non-agency repo book into two categories: assets that were eligible to be funded by the Federal Reserve and European Central Bank (ECB), and non-central bank eligible assets. According to its internal analysis, from May 30, 2008 to July 3, 2008, Lehman's non-government, non-agency repo book ranged between $105 billion and $112 billion, and its non-government, non-agency repo book that was also non-central bank eligible ranged between $60 billion and $67 billion.[6256]  In other words, approximately 60 percent of its non-government, non-agency repo book was composed of non-central-bank eligible assets – assets that are less liquid, by definition, because central banks would not accept them as collateral.

Based on the categorization of its non-government, non-agency repo book in the above table, Lehman was relying upon repo funding to finance certain of its less liquid non-investment grade and high yield assets.  Further, by the fall of 2007, Lehman understood that the market was becoming less liquid for certain of its investment grade

---

[6256] Lehman, Liquidity Slides (July 29, 2008), at p. 8 [LBEX-DOCID 1300268].

assets.  In a September 11, 2007 presentation to the Finance Committee of the Board of Directors, Lehman noted that the "fear of contagion" had spread from subprime mortgage loans to other credit products "of every rating including all the way up to AAA bonds."[6257]  In February 2008, it was reported that "[t]he seizure in the credit markets caused by the collapse of subprime mortgages is making investors doubt even the AAA rated securities of companies with investment-grade credentials."[6258]

To the extent that repo funding, which is short-term in nature, was used to finance longer-term, less liquid assets, there was a maturity mismatch that could expose Lehman to liquidity risk.  Lehman monitored the tenor of its non-government, non-agency repo funding, and in an internal presentation noted that, as of the end of the first quarter 2008, 56% of its repo funding was overnight, and an additional 18% had a term of less than one week.[6259]  Lehman acknowledged that "[d]aily refinancing risk is higher than we would want."[6260]  By the end of the second quarter of 2008, of its $105 billion non-government, non-agency repo book, Lehman was funding 42% ($43.9 billion) on an

---

[6257] Lehman, Risk, Liquidity, Capital & Balance Sheet Update: Risk Update, Presentation to the Finance Committee of the Board of Directors (Sept. 11, 2007) at 4 [LBEX-DOCID 505941].

[6258] Abigail Moses, *Investment-Grade Defaults to Rise, Credit Models Show (Update 2),* Bloomberg.com (Feb. 15, 2008), *available at* http://www.bloomberg.com/apps/news?pid=20601087&sid=aIy82dumycXg&refer= home.

[6259] Lehman, Funding Lehman Brothers, (Sept. 10, 2008), at p. 13 [LBHI_SEC07940_739985].

[6260] Lehman, Liquidity Update (Apr. 1, 2008), at p. 6 [LBEX-DOCID 1300141].

overnight basis, and an additional 19% ($19.7 billion) with a term of less than two weeks.[6261]

The risk accompanying reliance upon short-term funding to support long-term, illiquid assets was well recognized, particularly in the aftermath of the Bear Stearns crisis. For example, FRBNY President Geithner noted in his June 2008 speech:

> The scale of long-term risky and relatively illiquid assets financed by very short-term liabilities made many of the vehicles and institutions in this parallel financial system vulnerable to a classic type of run, but without the protections such as deposit insurance that the banking system has in place to reduce such risks. Once the investors in these financing arrangements—many conservatively managed money funds—withdrew or threatened to withdraw their funds from these markets, the system became vulnerable to a self-reinforcing cycle of forced liquidation of assets, which further increased volatility and lowered prices across a variety of asset classes.[6262]

Lehman internally measured and monitored its "repo book at risk," which assessed its repo book in terms of asset quality and tenor of funding in order to determine how much secured funding Lehman could expect to lose in a crisis.[6263]  As of

---

[6261] Lehman, 2008 Q2 Liquidity Metrics, Version 2, (June 14, 2008), at p. 18 [LBHI_SEC07940_601022].

[6262] FRBNY President Timothy F. Geithner, Reducing Systemic Risk In A Dynamic Financial System, Transcript of Remarks to The Economic Club (June 9, 2008), *available at* http://www.newyorkfed.org/newsevents/speeches/2008/tfg080609.html.

[6263] Shortly after the Bear Stearns event, Lehman recognized that in a stress event, a substantial portion of its repo book would be at risk, and Lehman modeled this impact. Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608] (showing $25.3 billion net loss of secured funding on the first day of a stress event).  As of June 2008, Lehman began internally measuring its "repo book at risk" in its performance of stress tests. *See, e.g.* "Apocalypse Now" liquidity scenario as of June 12, 2008 [LBEX-DOCID 022363]; "Apocalypse Now" Liquidity Scenario as of July 10, 2008 [LBEX-DOCID 1300118].  As of August 1, 2008, Lehman began internally tracking "repo at risk" in its daily liquidity MIS reports. *See, e.g.*, Lehman, Global Liquidity MIS (Aug. 1, 2008), at p. 14 [LBEX-DOCID 1058944] (showing $55.7 billion of "repo at risk"); Lehman, Global Liquidity MIS (Aug. 4, 2008), at p. 14 [LBEX-DOCID 1058945] (showing $56.9 billion of "repo at risk").  Lehman continued to track this "repo book at risk"

June 12, 2008, for example, Lehman projected it could lose, in a stressed environment, approximately $56.7 billion of repo capacity out of its $107.9 billion total repo book for non-government, non-agency collateral.[6264]   Thus, after the Bear Stearns event, Lehman was increasingly aware of the nature and extent of its liquidity risk, both in terms of the quality of the repo book and the maturity mismatch.

### (d)  Deleveraging to "Win Back" Market Confidence

Notwithstanding the technical complexity of their day-to-day business, financial institutions cannot operate absent the fundamental ability to trade with third parties. That ability, in turn, requires those potential counterparties to have confidence in the financial institution — specifically, the institution's ability to satisfy its obligations to its counterparties.  In this manner, as S&P noted in a May 2008 report, investment banks "rely on their reputations in all aspects of their business," from facilitating trading and financial advisory work, to finding new investments, to borrowing capital.[6265]   Thus, the "most troublesome crisis that these firms can face … is a crisis of confidence in the firm."[6266]   The importance of confidence and credibility to Lehman's franchise is evident in the materials Lehman used to train its traders, which emphasized that "[c]redibility

---

metric through the week leading up to its bankruptcy filing on September 15, 2008. *See, e.g.,* Lehman, Liquidity Management MIS (Sept. 8, 2008), at p. 2 [LBEX-DOCID 022279] (showing $56.5 billion "repo at risk"); Lehman, Liquidity Update (Sept. 10, 2008), [LBHI_SEC07940_845894], at p. 8.

[6264] "Apocalypse Now" liquidity stress scenario as of June 12, 2008 [LBEX-DOCID 022363].

[6265] Matthew Albrecht, S&P, *Investment Services Industry Survey* (May 29, 2008), at p. 1.

[6266] *Id.*

takes years to earn, and one day to lose."[6267]  Azerad confirmed that confidence is a very

fleeting concept that could disappear in a day.[6268]

Given the nature and the extent of Lehman's liquidity risk, the next step in the

"unreasonably small capital" analysis is to assess whether (and if applicable, when)

Lehman could or should have anticipated that it could be faced with a loss of market

confidence that would materially impair its ability to obtain financing.

Immediately following the near collapse of Bear Stearns, Lehman was widely

viewed as one of the next most vulnerable investment banks.[6269]  Eric Felder, Lehman's

US head of Global Credit Products, in a March 26, 2008 e-mail to Herbert "Bart"

McDade, the then-Global Head of Lehman's Capital Markets-Equities Group, explained

the risk facing Lehman in light of Lehman's repo funding maturity mismatch and the

size and illiquidity of Lehman's real estate-related investments:

---

[6267] Kentaro Umezaki, Lehman, Lehman Brothers - 1998 Liquidity Risk Case Study, at p. 13 [LBEX-DOCID 251244].

[6268] Examiner's Interview of Robert Azerad, Sept. 23, 2009 (second interview), at p. 3.

[6269] The assessment that Lehman was seen as the next most vulnerable was noted by Federal Reserve chairman Ben S. Bernanke, former Treasury Secretary Henry M. Paulson, Jr., and present Treasury Secretary and former FRBNY President Timothy F. Geithner in their interviews with the Examiner. Examiner's Interview of Ben S. Bernanke, Dec. 23, 2009, at p. 3; Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 3; Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 11. This view reflects reports in the financial press immediately following Bear Stearns.  For example, on March 20, 2008, an article appeared on *Portfolio.com* stating, "After the [near] collapse [of Bear Stearns], Wall Street's attention naturally turned to the other investment banks, especially Lehman Brothers, perceived as the most vulnerable."  Jesse Eisinger, *The Debt Shuffle: Wall Street cheered Lehman's earnings, but there are questions about its balance sheet*, Portfolio.com (Mar. 20, 2008), *available at* http://www.portfolio.com/news-markets/top-5/2008/03/20/Lehmans-Debt-Shuffle.  Eric Felder forwarded the article to Ian Lowitt, with the note, "bunch of people looking at this article."  E-mail from Eric Felder, Lehman, to Ian Lowitt, Lehman (Mar. 23, 2008) [LBHI_SEC07940_625905].  Lowitt responded, "Doesn't help."  E-mail from Ian Lowitt, Lehman, to Eric Felder, Lehman (Mar. 23, 2008) [LBHI_SEC07940_625905].

Every financial failure has been the result of not being match funded. I'm scared our repo is going to pull and our 7b over overnight [commercial paper] is going to go away mid april. . . . We need to set up for [commercial paper] going to zero and a meaningful portion of our secured repo fading (not because it makes sense but just because). . . . The reality of our problem lies in our dependence on repo and the scale of the real estate related positions which will take longer to sell.[6270]

In response to Felder's warnings, Ian Lowitt, who was then Lehman's co-chief administrative officer (and who would later become Lehman's CFO), reassured Felder by emphasizing the availability of the liquidity pool, Lehman's expectation that it would be able to obtain temporary funding from central banks, as well as ongoing efforts to deleverage the balance sheet:

The [commercial paper] fading will just come out of the excess liquidity in holding company liquidity pool - so 32 bn goes to 24.  LBI will be able to fund itself via the fed window in one way or another to get flat cash.  LBIE is getting securities into form can pledge via bankhaus to the [European Central Bank], to the tune of 4 bn or so by mid April.  There is a lot of term in the secured funding book. The deleveraging focus is now real.  It will be tough but we are much more active than the others. . . .  People are on it.  Agree there will be another run, but believe it will be industry wide not Lehman specific.  You are not Cassandra, cursed by Apollo to be able to see the future but have no one believe you !![6271]

Lehman's balance sheet, in terms of its size and composition, was a main focus of the market in late 2007 and early 2008, and Lehman was focused upon reducing its leverage numbers by raising equity and selling or otherwise transferring assets off of its balance sheet in order to engender market confidence.  For example, Callan, Lehman's

---

[6270] E-mail from Eric Felder, Lehman, to Herbert "Bart" McDade, Lehman (Mar. 26, 2008) [LBHI_SEC07940_326400-01].

[6271] E-mail from Ian Lowitt, Lehman, to Eric Felder, Lehman (Mar. 26, 2008) [LBHI_SEC07940_326400].

CFO at the time, stated in an internal April 7, 2008 presentation that deleveraging was designed to "win back the confidence of the market, lenders and investors."[6272]   The presentation demonstrates that, as of April 2008, Lehman recognized that it had already lost some measure of market confidence, and in particular, the confidence of Lehman's lenders.

> **(e)   Beginning in the Third Quarter of 2008, Lehman Could Have Reasonably Anticipated a Loss of Confidence Which Would Have Triggered Its Liquidity Risk**

Prior to Lehman's earnings announcement for the second quarter of 2008, on June 2, 2008, S&P downgraded Lehman's long-term rating from "A+" to "A," expressing concern about "persistent dislocations in global capital markets [that] could further weigh on core operating performance for the securities industry as a whole."[6273] Although S&P acknowledged Lehman's "stable funding profile" and "excess liquidity position," S&P noted that Lehman's repo capacity "could be adversely affected if there is a change in market perception of the firm, however ill founded."[6274]

Lehman noted that in a June 3, 2008 conference call with S&P, the ratings agency referred to Lehman's capital raises during the quarter and stated that "Lehman does not

---

[6272] Erin Callan, Lehman, Leverage Analysis [Draft] (Apr. 7, 2008), at p. 1 [LBEX-DOCID 1303158]. She also noted that, in addition to deleveraging, Lehman needed to "use more conservative term structures to fund less liquid securities (EMG, high yield, E2 and E3 equities)." *Id.* at p. 14.

[6273] *See* Diane Hinton, S&P, *Research Update: Lehman Brothers Holdings Inc. Rating Lowered To 'A' From 'A+'; Outlook Negative*, S&P RatingsDirect, June 2, 2008, at p. 2 [LBHI_SEC07940_512922], *available at* http://www2.standardandpoors.com/spf/pdf/events/fiart56308.pdf.

[6274] *Id.*

have a capital issue at this time."[6275]    Lehman also stated its belief that the S&P

downgrade did not fully "reflect or acknowledge Lehman's material improvement[s]"

in its "all-time low for net leverage" or its significant reduction in its "exposure to high-

risk assets."[6276]

Lehman recognized and anticipated the impact of this downgrade, and on June

4, 2008, responded by preparing a written presentation entitled, "Capital Adequacy &

Liquidity," which was intended for Lehman's significant repo counterparties[6277] and in

which Lehman downplayed the anticipated action as reflecting "industry concerns,"

insofar its ratings "relative to most of its direct peers did not change."[6278]

Prior to the opening of business on June 9, 2008, Lehman announced that it

intended to raise $6 billion through offerings of common stock and non-cumulative

mandatory convertible preferred stock, and that it expected to report a net earnings loss

of $2.8 billion for the second quarter of 2008.[6279]    These announcements were reported

upon shortly before 7:00 a.m. EST on June 9, 2008 by the Wall Street Journal

---

[6275] Lehman, Capital Adequacy & Liquidity (June 4, 2008), at p. 19 [LBHI_SEC07940_513590].

[6276] *Id.*

[6277] *Id.* at p. 18.

[6278] *See* also Diane Hinton, S&P, *Research Update: Lehman Brothers Holdings Inc. Rating Lowered To 'A' From 'A+'; Outlook Negative,* S&P RatingsDirect (June 2, 2008), at p. 2 [LBHI_SEC07940_512922], *available at* http://www2.standardandpoors.com/spf/pdf/events/fiart56308.pdf (stating that ratings were also lowered for Morgan Stanley and Merrill Lynch & Co., Inc.).

[6279] Lehman, Press Release: Lehman Brothers Announces Expected Second Quarter Results (June 9, 2008), at p. 1 [LBHI_SEC07940_035278-287]; Lehman, Press Release: Lehman Brothers Announces Offerings of Common Stock and Mandatory Convertible Preferred Stock (June 9, 2008), at p. 1 [LBHI_SEC07940_2218262-63].

*MarketWatch.*[6280]   This loss was Lehman's first as a public company.[6281]   Although the

market had anticipated a loss, its size was nearly 10 times what many analysts had been

predicting for Lehman.[6282]   At 10:00 a.m., Lehman, led by its then-CFO Erin Callan,

hosted a preliminary earnings call regarding its second quarter performance and

financial condition.[6283]   To offset the negative earnings report, Lehman emphasized that

it had engaged in and successfully executed an "aggressive" deleveraging effort over

the course of the second quarter of 2008, that a "large part of the reduction" occurred

with "less liquid asset categories," and that it had raised $6 billion in new equity.[6284]

Lehman also stated that the effect of these efforts was to reduce Lehman's gross

leverage ratio to less than 25 times equity, and its net leverage ratio to less than 12.5

times equity.[6285]   Notwithstanding the earnings loss, Lehman's position was that its goal

for the quarter was to "bring down gross and net leverage," and that Lehman had

---

[6280] Steve Gilsi, *Lehman Brothers to post $3 bln loss; sets $6 bln stock sale*, Wall Street Journal MarketWatch, June 9, 2008, *available at*  http://www.marketwatch.com/story/lehman-brothers-to-post-3-bln-loss-sets-6-bln-stock-sale?siteid=bnbh.

[6281] Ben White, *et al*, *Lehman targets up to $6bn in fresh capital*, Financial Times (June 6, 2008), *available at* http://www.ft.com/cms/s/0/51c1624c-3417-11dd-869b-0000779fd2ac.html.

[6282] Susanne Craig, *Lehman Set to Raise $5 Billion Amid Losses*, Wall Street Journal, June 9, 2008, *available at* http://online.wsj.com/article/SB121296377617855623.html?mod=djemalertMARKET ("Until recently, most analysts who follow Lehman have been predicting a loss of about $300 million.").

[6283] Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Preliminary Earnings Call (June 9, 2008) [LBHI_SEC07940_592160].

[6284] *Id.* at p. 2.

[6285] *Id.*

accomplished this goal.[6286]   Thus, Lehman made its case for why the market should not lose confidence in its core franchise or capital position.

However, notwithstanding this presentation, on June 9, 2008, Fitch Ratings issued a ratings downgrade for Lehman, citing "increased earnings volatility, changes in its business mix due to contraction in the securitization and structured credit markets and the level of risky assets exposing earnings to challenges in hedge effectiveness."[6287] Fitch noted that "[d]espite [its] asset sales, Lehman's exposure to higher risk asset categories as a percent of Fitch core capital is higher than [its] peers."[6288]   Further, Fitch expressed concern that Lehman's deleveraging was removing its "most attractive assets" from its balance sheet, "leaving a concentrated level of least desirable or more problematic assets."[6289]   Moody's similarly changed Lehman's outlook from stable to negative on June 9, despite Lehman's June 6 announcement of its $6 billion equity raise.[6290]   Moody's stated that its decision reflected its concern about "risk management decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures in the recent quarter."[6291]

---

[6286] *Id.* at p. 3.

[6287] Fitch Ratings Press Release: Fitch Downgrades Lehman Brothers' L-T & S-T IDRs to 'A+/F1'; Outlook Negative (June 9, 2008), *available at* http://www.pr-inside.com/fitch-downgrades-lehman-brothers-l-t-r633111.htm.

[6288] *Id.*

[6289] *Id.*

[6290] Ruby McDermid, *Moody's downgrades Lehman to negative from stable*, Wall Street Journal MarketWatch June 9, 2008, *available at* http://www.marketwatch.com/story/moodys-downgrades-lehman-to-negative-from-stable.

[6291] *Id.*

Following the preliminary earnings call on June 9, the market had an opportunity to reflect on the earnings announcement, Lehman's reported deleveraging and Lehman's $6 billion equity raise. There is evidence sufficient to support a determination that, notwithstanding Lehman's plan to "win back" the confidence of the market, its plan had not succeeded.

The price of Lehman's common stock could support a determination that the steps taken by Lehman throughout the second quarter and the first part of June did not result in increased market confidence. From the beginning of 2008 through the end of the second quarter of 2008, Lehman's common stock traded in range between a high of $66 per share on February 1, 2008 to a low of $31.75 on March 17, 2008, immediately after the near collapse of Bear Stearns. Starting in June 2008, Lehman's share price was approaching its 52-week low, would soon fall below $30 per share and would not again return to that level.[6292] On June 12, 2008, Lehman's stock opened at $21.35/share, and closed at $21.17/share — lows that Lehman had not reached since 1996 — and the volume on trading of Lehman's shares reached an all-time high of over 173 million — a level of trading that would only be eclipsed in Lehman's final week prior to the bankruptcy filing.[6293]

---

[6292] The last time Lehman's stock had traded below $30/share was in September and October 1998 — in the aftermath of the collapse of Long-Term Capital Management and the Russian Sovereign Debt Crisis. All historical pricing information is publicly available from sites such as Yahoo! Finance.

[6293] *Id.*

Press reports at that time are also an indicator of the declining confidence in Lehman. On June 11, 2008, Robert Azerad forwarded to Paolo Tonucci two articles from that day.[6294] The first article from *Business Week*, entitled, "Lehman: Independent for How Long?" concluded with a quote from an analyst: "Lehman is next. When you have a pack of dinosaurs, the slowest gets picked off."[6295] The second article, a commentary from Jonathan Weil of Bloomberg.com, stated:

> Lehman reported a $2.8 billion quarterly loss on June 9, the same day it said it had raised $6 billion in fresh capital. Investors seemed surprised, judging by the stock's 15 percent decline since then. They shouldn't have been. Wall Street stock analysts were predicting a much smaller loss. Yet Lehman's market capitalization, at $19.2 billion, is now almost $7 billion less than the company's $26 billion book value, or assets minus liabilities. That suggests that the market believes Lehman hasn't fully cleaned up its balance sheet and that the worst is still to come, management's assurances notwithstanding.[6296]

In his e-mail to Tonucci, Azerad described these articles as "[r]epresentative of the tone of the market."[6297]

On June 12, Lehman announced that it was replacing its long-standing President and COO, Joseph Gregory, as well as Callan.[6298] As described in official Lehman talking

---

[6294] E-mail from Robert Azerad, Lehman, to Paolo Tonucci, Lehman (June 11, 2008) [LBHI_SEC07940_517806-809].

[6295] Ben Levisohn, *Lehman: Independent for How Long?* Business Week, June 11, 2008, attached to e-mail from Robert Azerad, Lehman, to Paolo Tonucci, Lehman (June 11, 2008) [LBHI_SEC07940].

[6296] E-mail from Robert Azerad, Lehman, to Paolo Tonucci, Lehman (June 11, 2008) [LBHI_SEC07940_517806-809] (Jonathan Weil, *Lehman's Greatest Value Lies In Lessons Learned*, Bloomberg.com (June 11, 2008), attached to email from Robert Azerad, Lehman, to Paolo Tonucci, Lehman (June 11, 2008) [LBHI SEC 07940].

[6297] E-mail from Robert Azerad, Lehman, to Paolo Tonucci, Lehman (June 11, 2008) [LBHI_SEC07940_517806].

points distributed to Lehman managers for internal distribution, these senior management changes were made in an effort to "regain the confidence" of investors and its business partners, and to repair the firm's "eroded" credibility.[6299]

Also, on June 12, 2008, one of Lehman's clearing banks, Citigroup, requested that Lehman provide it with a substantial cash deposit to cover its exposure to Lehman on an intra-day basis, in an initial amount of between $3 billion and $5 billion, which was later negotiated down to a $2 billion "comfort deposit."[6300]    In an e-mail sent internally between Citigroup personnel on that date, Citigroup risk manager Thomas Fontana stated:

---

[6298] *See* Alistair Barr, *et. al, Lehman CFO Callan, COO Gregory ousted from posts*, MarketWatch, June 12, 2008, *available at* http://www.marketwatch.com/story/lehmans-cfo-and-coo-ousted-as-turmoil-takes-a-new-turn-2008612111300.

[6299] Lehman, President, COO, CFO Changes: Internal Talking Points (June 12, 2008), at p. 1 [LBEX-DOCID 362070], e-mail from George Creppy, Lehman, to Steven Hash, Lehman, *et al.* (June 12, 2008) [LBEX-DOCID 362233] (subject line: "For Internal Use by Managers: TPs/FAWs on Senior Mgmt Changes.").

[6300] *See* E-mail from Thomas Fontana, Citigroup, to Christopher Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00074930] ("After speaking with the CFO and Treasurer, we made a request for $5B in a cash deposit."); *see also* e-mail from Christopher Foskett, Citigroup, to John Havens, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00074930] ("I have been on the phone this morning with Ian Lowitt, new CFO of Lehman and Paolo Tonucci, global Treasurer.  In order to keep our clearing capabilities at levels they require to efficiently operate, I have asked them to put up a cash deposit - as we did with Bear Stearns last summer - to offset any intra-day or end of day shortages that may occur.   While disappointed, they have directed their team to put it in place."); *cf.* e-mail from Daniel J. Fleming, Lehman, to Ian Lowitt, Lehman (June 12, 2008) [LBEX-AM 008609] ("Citibank is asking for a $3bn cash deposit tonight to cover intra-day exposures.").  Ultimately, Lehman provided and Citigroup accepted a deposit in the amount of $2 billion. *See* E-mail from Thomas Fontana, Citigroup, to Richard Blaszkowski, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00051023] ("A lot of stress on the Lehman name in the market today.  We took in a $2B deposit and re-sized the clearing lines."); e-mail from Daniel J. Fleming, Lehman, to Ian Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608] ("Will be depositing $2bn with Citi tonight.  No lien or right of offset, a straight overnight fed funds deposit.").

Fuld oust[ed the] CFO and COO . . . .  We have cut back clearing lines in Asia . . . .This is bad news.  Market is saying Lehman can not make it alone.  Loss of confidence is huge at the moment.[6301]

On the same date, Donald Kohn, the Federal Reserve Bank Vice Chairman, wrote to Federal Reserve Bank Chairman Ben Bernanke, noting that while Lehman had raised $6 billion through an equity offering that day, the additional injection of equity did not restore the market's confidence in Lehman, and that there was a "possibility" that "this is Thursday of BS [Bear Stearns] weekend, and equity holders could wake up Monday with no value."[6302]  Kohn also noted that "Fuld really [had] no alternative plan at this point."[6303]  Kohn provided Bernanke with a report of a joint call between the Federal Reserve, Treasury Department and the SEC that occurred on the afternoon on June 12, 2008 regarding Lehman, and noted that the discussion turned to "thinking about options in the event the slow erosion of confidence [in Lehman] turns into a rout and

---

[6301] E-mail from Thomas Fontana, Citigroup, to Christopher Foskett, Citigroup, *et al*. (June 12, 2008) [CITI-LBHI-EXAM 00081606].

[6302] E-mail from Donald Kohn, FRBNY, to Ben S. Bernanke, Federal Reserve, *et al*. (June 12, 2008) [FRB to LEH Examiner 00073].

[6303] *Id.* Coincidentally, on June 12, 2008, the Economist magazine published an article titled, "Litterbin of Last Resort," criticizing the ECB for allowing investment banks to dump asset-backed securities, "like so much radioactive waste," and for sticking to its pre-crisis acceptance rules that were being "'gamed' or arbitraged" by investment banks, who were creating asset-backed securities that had no publicly traded value but were designed solely for pledging to ECB windows. *See* E-mail from Robert Azerad, Lehman, to Paolo Tonucci, Lehman, *et al*. (June 12, 2008) [LBEX-DOCID 008040].  Lehman had been internally concerned about its increasing reliance on its strategy of creating ABS solely for the purpose of pledging to the ECB, even discussing the possible "reputational issue" if the extent of its reliance became public. *See* e-mail from Carlo Pellerani, Lehman, to Robert Azerad, Lehman (May 12, 2008) [LBHI_SEC07940_336321]; *cf.* Carlo Pellerani, Lehman, ECB Strategy (June 2008) [LBHI_SEC07940_345777-786].  At the same time, however, Lehman's contingency plan in the event of a loss of repo funding relied upon increased funding through the ECB. *See* Lehman, Presentation to the Federal Reserve: Update on Capital, Leverage, and Liquidity (May 28, 2008), at pp. 7, 16 [LBHI_SEC07940_062581].

liquidity fled quickly."[6304]  Kohn concluded that the Federal Reserve did not have "any options to provide confidence in the firm."[6305]

After the release of its second quarter 2008 financials, Fuld was receiving increasingly blunt pressure from Secretary Paulson and FRBNY President Geithner to sell Lehman or find a strategic partner.[6306]  Secretary Paulson told the Examiner that Lehman's "devastating" announcement of its first-ever earnings loss in the second quarter of 2008 convinced Fuld that dramatic action was necessary to save Lehman.[6307] According to Secretary Paulson, the release of the numbers served as a "wake-up call" to Fuld who, at that point, "appreciated Lehman's fragility and comprehended that the future portended nothing better."[6308]

The Examiner finds that there is evidence sufficient to support a determination that, beginning early in the third quarter of 2008, there was a reasonable likelihood of Lehman losing the confidence of the markets in the near term, such that its ability to

---

[6304] E-mail from Donald Kohn, FRBNY, to Ben S. Bernanke, Federal Reserve, *et al.* (June 12, 2008) [FRB to LEH Examiner 00073].

[6305] *Id.*

[6306] Examiner's Interview of Treasury Secretary Henry Paulson, June 25, 2009, at p. 14; Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 6.  However, Federal Reserve Chairman Ben S. Bernanke told the Examiner that he was not of the view in the summer of 2008 that Lehman's failure was "inevitable."  Examiner Interview of Chairman Ben S. Bernanke, Dec. 22, 2008, at p. 7.

[6307] Examiner's Interview of Treasury Secretary Henry Paulson, June 25, 2009, at pp. 13-14.

[6308] *Id.* at p. 14.

obtain financing to support its non-government, non-agency asset classes through the repo market was at risk.[6309]

### (f) Lehman Was Not Sufficiently Prepared to Absorb a Liquidity Crisis Marked by a Sudden Loss of Non-Government, Non-Agency Repo Funding

The next step of the analysis is to determine whether Lehman was adequately prepared to manage the liquidity risk posed by the reasonably foreseeable loss of market confidence. After the Bear Stearns event, Lehman conducted liquidity stress tests that assumed Lehman would lose a certain measure of repo funding for non-government, non-agency assets over a four-week period. Each of Lehman's stress tests, other than one, predicted that they would survive.[6310] If these stress scenarios were founded upon reasonable and prudent assumptions, the results support the conclusion that Lehman was adequately prepared to handle such risks and it did not have unreasonably small capital. Conversely, if Lehman was only able to project survival under these stress scenarios through the use of assumptions that were imprudent or

---

[6309] Selecting a precise date that a company has "unreasonably small capital" is a matter of judgment. As a matter of law, such precision is unnecessary: a fact-finder can examine the financial condition of the company for a "reasonable period of time" both before and after the date of the transfer in question. *See, e.g., Barrett v. Continental Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir. 1989). The Examiner has focused on June of 2008 in light of the applicable facts and governing law.

[6310] The April 21 stress test, which was the first that Lehman presented to the Federal Reserve and SEC, showed Lehman surviving a four-week stress scenario with less than $500 million of liquidity. Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608]. Lehman's next stress test, presented to the Federal Reserve and SEC on May 28, 2008, showed Lehman surviving the four-week stress event with more than $20 billion left in its liquidity pool. Lehman, Presentation to the Federal Reserve: Update on Capital, Leverage & Liquidity (May 28, 2008), at p. 13 [LBHI_SEC07940_062581]. However, Lehman Brothers was asked to restate its May 28th stress test results using more conservative assumptions, and as restated, Lehman Brothers would have shown failure by approximately $6 billion. *See* Lehman, Liquidity Stress Tests At Lehman Brothers (Aug. 8, 2008), at p. 3 [LBEX-DOCID 3211633].

unreasonable, then the result of these stress tests do not preclude a determination that Lehman was operating with unreasonably small capital.  Furthermore, notwithstanding the liquidity stress tests, the Examiner has evaluated other metrics of capital adequacy that Lehman monitored and that purported to show Lehman's strong capital position to determine whether these metrics preclude a conclusion that Lehman was operating with "unreasonably small capital."

### (i)  Lehman's Liquidity Pool

As noted above, Lehman was well aware that a loss of short-term financing could impair its ability to continue operations.  Lehman had experienced a liquidity crisis in 1998 following the Russian Sovereign Debt Crisis and the collapse of the hedge fund, Long-Term Capital Management.[6311]  In response, Lehman adopted a "three dimension[al] funding framework" to guide its funding of assets and mitigate its liquidity risk (the "Funding Framework").[6312]  One of the principal components of

---

[6311] *See* Kentaro Umezaki, Lehman Brothers, 1998 - Liquidity Risk Case Study, at p. 7 [LBEX-DOCID 251244], attached to e-mail from Kentaro Umezaki, Lehman, to Rebecca Miller, Lehman (Sept. 5, 2007) [LBEX-DOCID 427653].

[6312] Lehman, Project Green - Liquidity & Liquidity Management [Draft] (June 2008), at p. 2 [LBHI_SEC07940_844120].    The principal components of Lehman's Funding Framework were the liquidity pool, the cash capital surplus, and the reliable secured funding model.  The three components were designed to work in conjunction with each other.  *See* LBHI 10-Q (July 10, 2008), at pp. 81-82.  The reliable secured funding model was designed to address the risk of a loss of repo funding through a relationship-based strategy of Lehman obtaining a certain level of financing from counterparties the relationships of which with Lehman were sufficiently strong such that Lehman projected that these firms would continue to trade with Lehman during a stress event.    *See* Lehman, Secured Liquidity Risk Model (Jan. 2006) [LBEX-DOCID 1313333].  The cash capital surplus principally measured the amount by which the sum of Lehman's long-term debt and equity capital exceeded Lehman's estimates of its less liquid and illiquid assets as well as the aggregate haircuts applied to such assets.  In this sense, the cash capital model built upon the assumptions of the reliable secured funding model, insofar as the assessment of

Lehman's Funding Framework was the LBHI liquidity pool.[6313] The liquidity pool was designed to cover the loss of unsecured debt, specifically, the rolling off of commercial paper and the maturity of the current portion of long-term debt.[6314] Lehman reported a record liquidity pool of $44.6 billion and a record cash capital surplus of $15.0 billion as of May 31, 2008.[6315]

However, Lehman's liquidity pool was not, at least prior to the Bear Stearns event, primarily designed or sized to address a loss of repo funding. In its Annual Report for fiscal year 2007, Lehman disclosed that "[e]ven within the one-year time frame contemplated by our liquidity pool, *we depend on continuous access to secured financing in the repurchase and securities lending markets,* which could be impaired by factors that are not specific to Lehman Brothers, such as a severe disruption of the financial markets."[6316] In a March 2008 presentation to the Federal Reserve and the SEC, Lehman noted that the liquidity pool was primarily designed to cover the inability to

---

which assets were "less liquid" (and therefore needed to be match-funded with cash capital). The liquidity pool was designed to cover the loss of unsecured debt, specifically, the rolling off of commercial paper and the maturity of the current portion of long-term debt. *See* Lehman, Liquidity Management At Lehman Brothers, Presentation to the Chicago Mercantile Exchange, [Draft] (June 5, 2008), at p. 10 [LBEX-DOCID 1300305] (describing the MCO or "maximum cumulative outflow" assumptions).

[6313] Lehman, Project Green - Liquidity & Liquidity Management [Draft] (June 2008), at p. 2 [LBHI_SEC07940_844120].

[6314] Lehman, Presentation to the Chicago Mercantile Exchange, Liquidity Management At Lehman Brothers [Draft] (June 5, 2008), at p. 10 [LBEX-DOCID 1300305] (describing the MCO or "maximum cumulative outflow" assumptions).

[6315] LBHI 10-Q (July 10, 2008), at pp. 81-82.

[6316] LBHI 2007 10-K, at p. 17 (emphasis added).

roll maturing, unsecured debt for one year, not the loss or reduction of repo funding, which was to be addressed with "[o]verfunding of less liquid asset classes."[6317]

Following the Bear Stearns event, Lehman made a "series of modifications" to its funding framework to bolster its "liquidity fortress" and to manage the liquidity risk presented by short term secured funding.[6318]  Although Lehman acknowledged that a loss of short-term secured funding could result in "an impairment of the franchise," its liquidity pool was not part of its risk mitigation plan against the potential loss of secured funding: "Lehman Brothers manages its secured liquidity using a four-pronged risk mitigation strategy, which conservatively assumes: (a) *no reliance on Holdings' liquidity*; (b) no reliance on customer collateral or free credits."[6319]

---

[6317] Lehman, Presentation to Federal Reserve & SEC: Liquidity Management At Lehman Brothers (Mar. 26, 2008), at p. 10 [LBHI_SEC07940_057097].   Lehman would later describe "overfunding" as the "ability to absorb adverse changes in secured funding capacity in times of stress by reducing total collateral borrowed in or reallocating the higher quality, easy to fund treasury or agency securities." *See* LBHI 10-Q (July 10, 2008), at p. 84.

[6318] Lehman, Liquidity Management At Lehman Brothers (May 15, 2008), at pp. 12, 23 [LBEX-DOCID 008669].  Lehman stated that it would mitigate its secured funding risk by increasing "overfunding of less liquid asset classes," increasing its use of its captive banking entities, especially Lehman Brothers Bankhaus, and "transforming" its balance sheet through the use of securitization to "create liquid, investment grade securities out of a pool of less liquid collateral."  *Id* at p. 12. Of these three modifications, overfunding was a major part of Lehman's post-Bear Stearns funding framework.  In its Form 10-Q for the second quarter of 2008, Lehman reported that it had an overfunding cushion of $27 billion.  LBHI 10-Q (July 10, 2008), at p. 84.  By comparison, Lehman estimated that it could fund approximately $3 billion of its lost repo capacity through its captive banking entities, which is a fraction of the amount of "overfunding" it projected. *See* Lehman, Liquidity Management At Lehman Brothers (May 15, 2008), at pp. 12, 14 [LBEX-DOCID 008669].  Lehman noted that its ability to transform the balance sheet through the securitization and structured finance markets (which were largely moribund by summer 2008) would take 1 to 2 weeks. *Id.* at 24.

[6319] Lehman, Presentation to Federal Reserve & SEC: Liquidity Management At Lehman Brothers (Mar. 26, 2008), at p. 11 [LBHI_SEC07940_057097] (emphasis added); *see also* Lehman, Liquidity Management At Lehman Brothers (May 15, 2008), at p. 12 [LBEX-DOCID 008669].

However, in its quarterly report for the second quarter of 2008, Lehman disclosed, for the first time, that the LBHI liquidity pool could be available, "[a]s a last resort," as a mitigant against "the loss of secured funding capacity."[6320]  Lehman provided an assessment of its repo book at risk, starting with its non-government, non-agency repo book of $105 billion, and excluding certain asset classes that it considered to be relatively liquid even under stressed conditions, and disclosed that its projected loss of $32 billion of repo capacity "may be mitigated by the liquidity pool available to the Company."[6321]

### (ii)  Liquidity Stress Tests

Following the Bear Stearns event, Lehman met with the FRBNY and the SEC on several occasions to discuss the results of successive versions of its liquidity stress tests.[6322]  With one exception noted below, Lehman reported that it survived the stress tests, and beginning with its May 28, 2008 stress test report, Lehman reported that it

---

[6320] LBHI 10-Q (July 10, 2008), at p. 84.  Previously, Lehman had only made general statements that its liquidity pool was "sized to cover expected cash outflows" associated with an "anticipated impact of adverse changes on secured funding, either in the form of a greater difference between the market and pledge value of the assets (also known as 'haircuts') or in the form of reduced borrowing availability." *See, e.g.,* LBHI 2007 10-K, at p. 56; LBHI 10-Q (Apr. 9, 2008), at p. 65.

[6321] LBHI 10-Q (July 10, 2008), at pp. 84-85.

[6322] E-mail from Michael Hsu, SEC, to Paolo Tonucci, Lehman, *et al.* (Apr. 9, 2008) [LBHI_SEC07940_477096] (noting that the SEC was looking for Lehman and its peers to agree upon 'the principle of a new liquidity standard" which he described as "a 30-day 'bulletproof' liquidity survival window"); Joint Request of SEC and FRBNY: Liquidity Scenarios for CSEs (May 20, 2008) [LBHI_SEC07940_505195]; *see also* Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608]; Lehman, Presentation to the Federal Reserve Update on Capital, Leverage & Liquidity (May 28, 2008), at p. 13 [LBHI_SEC07940_062581]; Lehman, Presentation to the Federal Reserve & SEC: Updated Stressed Liquidity Scenario (July 2, 2008), at p. 10 [LBEX-DOCID 1300104];  Lehman, Liquidity Stress Tests At Lehman Brothers (Aug. 8, 2008), at p. 3 [LBEX-DOCID 3211633].

survived the stress tests by a margin exceeding $10 billion at the end of the four week

projection period.[6323]

These stress tests were based on Lehman's own projections, and in substantial

part, employed assumptions determined by Lehman.[6324]  Courts have recognized that a

company's own projections "tend to be optimistic," and therefore, a fact-finder should

not simply take them at face value.[6325] Accordingly, the key inquiry is whether the

projection itself was based upon prudent and reasonable assumptions.[6326]

The assumptions employed by the stress tests had a material impact on the test

results.  For example, Lehman's stress test presented to the FRBNY and the SEC on May

28, 2008, assumed that Lehman's liquidity position would benefit over the four-week

projection period due to the "positive impact" of $16.0 billion of "balance sheet

reduction," and a $10.0 billion reduction in prime broker customer funding.[6327]  This

---

[6323] The April 21 stress test, which was the first that Lehman presented to the Federal Reserve and SEC, showed Lehman surviving a four-week stress scenario with less than $500 million left of its original liquidity position.  Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608].  Lehman's next stress test, presented to the Federal Reserve and SEC on May 28, 2008, showed Lehman surviving the four-week stress event with more than $20 billion left in its liquidity pool. Lehman, Presentation to the Federal Reserve Update on Capital, Leverage & Liquidity (May 28, 2008), at p. 13 [LBHI_SEC07940_062581].  However, Lehman Brothers was asked to restate its May 28th stress test results using more conservative assumptions, and as restated, Lehman Brothers would have shown failure by approximately $6 billion.  *See* Lehman, Liquidity Stress Tests At Lehman Brothers (Aug. 8, 2008), at p. 3 [LBEX-DOCID 3211633].

[6324] Examiner's Interview of Irina Veksler, Sept. 11, 2009, at. p. 6; Examiner's Interview of Laura M. Vecchio Apr. 16, 2009, at p. 5.

[6325] *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3rd Cir. 1992).

[6326] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp 913, 944 (S.D.N.Y. 1995); *see also In Re Iridium Operating LLC*, 373 B.R. at 347.

[6327] Lehman, Presentation to the Federal Reserve Update on Capital, Leverage & Liquidity (May 28, 2008), at pp. 13-14 [LBHI_SEC07940_062581].

stress test projected that Lehman would survive a liquidity stress event with $20.7 billion of its available liquidity at the end of the four-week period.[6328]  At the request of the regulators, Lehman subsequently conducted the stress test without these assumptions.[6329]  Without the benefit of these assumptions, the restated stress test demonstrated that Lehman would have failed the May 28, 2008 stress test by $6 billion.[6330]  In this manner, altering two assumptions had a $26.7 billion effect on the test's result.

A second demonstration of the impact of a liquidity stress test's assumptions on the result can be found in the independent stress tests developed by the FRBNY.  In May 2008, the FRBNY generated two stress test scenarios which modeled how Lehman would respond to a "Bear Stearns" and "Bear Light" scenarios.[6331]  The "Bear Stearns" scenario assumed a run on the bank in all business areas, and the "Bear Light" scenario assumed that the run was 35 percent as strong as the "Bear Stearns" scenario.[6332]  These stress tests projected that Lehman would fail the "Bear Stearns" scenario by $84 billion and the "Bear Light" scenario by $15 billion.[6333] In June 2008, the FRBNY ran another

---

[6328] *Id*. at p. 13.

[6329] Lehman, Liquidity Stress Tests At Lehman Brothers (Aug. 8, 2008), at p. 3 [LBEX-DOCID 3211633]; *see also* e-mail from Robert Azerad, Lehman, to Laura M. Vecchio, Lehman, *et al.* (Aug. 8, 2008) [LBEX-DOCID 3207542] (noting that the restated stress test was "the follow-up to last week's meeting with the Fed.").

[6330] Lehman, Liquidity Stress Tests At Lehman Brothers (Aug. 8, 2008), at p. 1 [LBEX-DOCID 3211633].

[6331] Bill Brodows, FRBNY, *et al.*, Primary Dealer Monitoring:  Initial Assessment of CSEs (May 12, 2008), at p. 9 [FRBNY to Exam 000017].

[6332] *Id*.

[6333] *Id*. at p. 11.

stress test with assumptions that were generally consistent with the May 2008 Bear Light scenario.[6334]    According to the FRBNY's projections, the June 2008 stress test showed that Lehman would fail in a reasonably foreseeable stress event by a margin of $15 billion.[6335]

There is sufficient evidence to support the determination that certain of the material assumptions employed in Lehman's tests were not reasonable.  For example, Lehman assumed that it would not be able to issue any unsecured commercial paper during the term of the four-week stress event.  This assumption was based on the reasonable determination that Lehman would not be able to obtain unsecured debt during a liquidity stress event.  Lehman, however, did not apply this determination consistently throughout the scenario.  As discussed in Section III.A.5.i of this Report, at the time the stress tests were conducted, Lehman's clearing banks provided a measure of unsecured credit on an intra-day basis.[6336]    Given that Lehman deemed the loss of unsecured financing a reasonable and necessary assumption under its stress scenarios,[6337] it was inconsistent not to apply that assumption to the unsecured credit provided by the clearing banks.

---

[6334] FRBNY, Primary Dealer Monitoring: Liquidity Stress Analysis (June 25, 2008, revised June 26, 2008) [FRBNY to Exam 000033].

[6335] *Id.* at p. 2.

[6336] *See* Section III.A.5.b.1.b, noting that the Net Free Equity metric was "the market value of Lehman securities pledged to JPMorgan plus any unsecured credit line JPMorgan extended to Lehman minus cash advanced by JPMorgan to Lehman."

[6337] *See, e.g.,* LBHI 10-Q (July 10, 2008), at p. 85. ("Most of the Company's [stress] scenarios assume complete disruption of unsecured funding markets (*i.e.* the inability to issue new unsecured debt).")    *See*

Furthermore, there are sufficient facts to demonstrate that its assumption that its

clearing banks would continue to provide unsecured credit on an intra-day basis during

a stress event was unreasonable.   By February 2008, Lehman's primary clearing bank

JPMorgan had expressed concern to Lehman about its intra-day exposure to Lehman.[6338]

Additionally, as noted above, on June 12, 2008, Lehman's foreign exchange clearing

bank, Citigroup, initially requested that Lehman provide it a "comfort deposit" of

between $3 billion and $5 billion to mitigate Citigroup's perceived intra-day

exposure.[6339]   Further, on June 19, 2008, Lehman provided $5.4 billion in collateral to

---

*also* Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 3 [LBEX-DOCID 008608] (noting that loss of unsecured funding is a "key assumption."); Lehman, Presentation to the Federal Reserve Update on Capital, Leverage & Liquidity (May 28, 2008), at p. 6 [LBHI_SEC07940_062581] (distinguishing the Bear Stearns event by noting that Lehman had "[n]o reliance on short-term unsecured funding" and that its liquidity framework "assumes that unsecured debt cannot be rolled in a liquidity event"); Lehman, Presentation to the Federal Reserve & SEC: Updated Stressed Liquidity Scenario (July 2, 2008), at p. 5 [LBEX-DOCID 1300104] (noting a complete inability to roll unsecured debt such as commercial paper and letters of credit at maturity).

[6338] E-mail from Janet Birney, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Feb. 26, 2008) [LBHI_SEC07940_436414].   JPMorgan was specifically concerned that Lehman's repo counterparties were not valuing the collateral correctly, and assessed increasing haircuts against the repo collateral in the triparty repo book accordingly.

[6339] *See* e-mail from Thomas Fontana, Citigroup, to Christopher Foskett, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00074930] ("After speaking with the CFO and Treasurer, we made a request for $5B in a cash deposit."); *see also* e-mail from Christopher Foskett, Citigroup, to John Havens, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00074930] ("I have been on the phone this morning with Ian Lowitt, new CFO of Lehman and Paolo Tonucci, global Treasurer.   In order to keep our clearing capabilities at levels they require to efficiently operate, I have asked them to put up a cash deposit - as we did with Bear Stearns last summer - to offset any intra-day or end of day shortages that may occur.   While disappointed, they have directed their team to put it in place."); *cf.* e-mail from Daniel J. Fleming, Lehman, to Ian Lowitt, Lehman (June 12, 2008) [LBEX-AM 008609-008610] ("Citibank is asking for a $3bn cash deposit tonight to cover intra-day exposures.").   Ultimately, Lehman provided and Citigroup accepted a deposit in the amount of $2 billion. *See* e-mail from Thomas Fontana, Citigroup, to Richard Blaszkowski, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00051023] ("A lot of stress on the Lehman name in the market today.   We took in a $2B deposit and re-sized the clearing lines."); e-mail from Daniel J. Fleming, Lehman, to Ian Lowitt, Lehman, *et al.* (June 12, 2008) [LBEX-AM 008608] ("Will be depositing $2bn with Citi tonight.   No lien or right of offset, a straight overnight fed funds deposit.").

address JPMorgan's intra-day exposure.[6340]   In fact, at the time of LBHI's bankruptcy,

Lehman had provided more than $16 billion in the aggregate to its clearing banks to

secure their intra-day exposure — a liquidity outflow that Lehman failed to account for

in any amount in its liquidity stress tests.[6341]

Lehman also failed to take into account the temporary liquidity cost of

"operational friction," which Lehman knew would be present in a stress event.

Operational friction includes the temporary impact on liquidity arising from the

difference in timing between Lehman's delivery of payment of the account balance to

clients and the time it took Lehman to sell and process payment for these assets.[6342]

Azerad acknowledged that Lehman was aware that operational friction would

get worse in a stress event.[6343]   In the ordinary course of its business, Lehman employed

two sources of funding to address the temporary liquidity impact of operational friction

– commercial paper and the broker-dealer's "operational cash cushion."[6344]   While these

---

[6340] E-mail from Craig Jones, Lehman to John Feraca, Lehman (June 19, 2008) [LBEX-AM 001775].  Jones informed Feraca: "Today we moved several unencumbered assets (Sasco, Spruce, Pine, Fenway) to LCPI's DTC box at Chase to generate an additional $5.4 billion of NFE.  This will help us absorb the increase in intra-day margining that Chase wants us to implement."

[6341] Paolo Tonucci & Robert Azerad, Liquidity Of Lehman Brothers (Oct. 7, 2008), at p. 9[LBHI_SEC07940_844701].

[6342] Lehman, Presentation to S&P, Liquidity Management At Lehman Brothers (May 15, 2008), at p. 17 [LBEX-DOCID 008669] (defining operational friction as "change in lock ups, transfer of positions across depots, change in secured funding, etc.").

[6343] Examiner's Interview of Robert Azerad, Sept. 23, 2009 (second interview), at p. 9.

[6344] Lehman, Presentation to the Chicago Mercantile Exchange, Liquidity Management At Lehman Brothers [Draft] (June 5, 2008), at p. 24 [LBEX-DOCID 1300305] (Lehman assumed that it could "[u]se term commercial paper to mitigate short-term liquidity outflows such as unforeseen operational friction (fails)"); see also Lehman, Presentation to the Federal Reserve Update on Capital, Leverage, and Liquidity

sources were available outside of a stress event, Lehman's own stress tests assumed that neither of these would be available during a stress event.

As noted above, the tests assumed that Lehman would not be able to issue commercial paper during the stress event.[6345]  Lehman's broker-dealers were structured to not require liquidity infusions from LBHI in order to operate in the ordinary course of their business, and their prime broker business, in particular, was designed to be "self-sufficient."[6346]  However, in a stress event, Lehman projected that "the largest liquidity stress would be felt at the broker dealers, which because they could not roll maturing repos, would experience significant cash outflows."[6347]  For example, in the April 21 scenario, Lehman projected that its main broker-dealers, LBI and LBIE, would lose $33.1 billion of repo capacity on the first day of a liquidity stress event and a total of $57.3 billion after four weeks.[6348]  In an internal version of the stress test done on June 12, 2008, Lehman projected that LBI and LBIE would lose $21.8 billion of repo capacity

---

[6345] (May 28, 2008), at pp. 7, 16 [LBHI_SEC07940_062581] (stating that Lehman "[i]ncreased our CP program to mitigate risk of operational friction in a very volatile environment" following Bear Stearns).

[6345] *See, e.g.,* Lehman, Presentation to the Federal Reserve & SEC Updated Stressed Liquidity Scenario (July 2, 2008), at p. 3 [LBEX-DOCID 1300104] ("Inability to roll unsecured debt"); *see also* Joint Request of SEC and FRBNY: Liquidity Scenarios for CSEs (May 20, 2008), at p. 2 [LBHI_SEC07940_505195-96] (identifying commercial paper as an area of potential impact in a stress event).

[6346] Lehman, Presentation to S&P, Liquidity Management At Lehman Brothers (May 15, 2008), at p. 17 [LBEX-DOCID 008669].

[6347] Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608]; *see also* "Apocalypse Now" liquidity stress scenario as of June 12, 2008 [LBEX-DOCID 022363]; *cf.* Paolo Tonucci & Robert Azerad, Change In Liquidity Week Of September 8, 2008 (Sept. 24, 2008), at p. 4 [LBHI_SEC07940_740011] ("During the week of September 8, LBI and LBIE, Lehman's U.S. and European broker dealers, respectively, experienced a loss of liquidity, which required Holdings to provide liquidity support, resulting in an increase of their payables to Holdings.").

[6348] Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608].

on the first day of a liquidity event, and $33.9 billion over four weeks.[6349]  As Lehman

acknowledged in its April 21 stress test, LBI and LBIE would have to "borrow cash from

the Holding companies" to compensate for the lost repo funding.[6350]  Thus, it was

unreasonable for Lehman to assume that broker-dealers, which it projected would

require substantial infusions of liquidity during the stress event, would have the

necessary liquidity to mitigate the impact of operational friction.

Despite the absence of these funding sources, and the foreseeable logistical

challenges of covering the concurrent withdrawal of assets by Lehman's prime broker

customers in a stress event, Lehman's stress test projections made no allowance for

operational friction.  Azerad acknowledged that Lehman believed there would be a

liquidity impact due to operational friction, but because it was difficult for them to

model or estimate precisely, they did not take it into account at all in their

projections.[6351]  During the week prior to LBHI's bankruptcy filing, Lehman experienced

a $4 billion liquidity outflow arising from the "temporary impact of the unwinding of

the prime broker business."[6352]  On September 24, 2008, Tonucci and Azerad prepared a

post-mortem analysis after the bankruptcy petition showing that after it released its

---

[6349] "Apocalypse Now" liquidity stress scenario as of June 12, 2008 [LBEX-DOCID 022363].

[6350] Lehman, Liquidity Stress Scenario Analysis (Apr. 21, 2008), at p. 5 [LBEX-DOCID 008608].

[6351] Examiner's Interview of Robert Azerad, Sept. 23, 2009 (second interview), at pp. 9-10.

[6352] Paolo Tonucci & Robert Azerad, Change In Liquidity Week Of September 8, 2008 (Sept. 24, 2008), at p. 4 [LBHI_SEC07940_740011].  A post-mortem prepared by Azerad and Tonucci showed there was a total $9 billion loss attributable to operational friction, including the $4 billion prime broker unwind,  a $3 billion liquidity outflow due to "[p]ending payments between LBI and LBIE," a $1 billion "[i]ncrease in margin requirements," and a $1 billion effect of "repo rebalancing." *Id.*

third quarter 2008 earnings on September 9, 2008, its "prime broker customers started pulling their long and short balances from LBIE to other prime brokers," that the "speed of their withdrawal coupled with their request for same-day transfers . . . resulted in operational frictions as Lehman's operations group was struggling processing these requests," and that the resulting operational friction "worsened our liquidity position … at a critical point for Lehman."[6353]

Therefore, because there is sufficient evidence to support a determination that Lehman could have reasonably foreseen the substantial effect that operational friction arising from the withdrawal of customer accounts would have on its liquidity, even if on a temporary basis, it was unreasonable for Lehman not to take the impact of operational friction into account in its liquidity stress event planning.  Lehman knew or should have known that the factors that it assumed would mitigate an increase in operational friction would not have that effect in a stress event.  In view of the foregoing, there is sufficient evidence to support a determination that the stress tests employed two assumptions which, given the information available to Lehman when the tests were developed, were not reasonably constructed and that LBHI and the LBHI Affiliates identified below were operating with unreasonably small capital during the period beginning early in the third quarter of 2008 and ending the date of each respective bankruptcy filing.

---

[6353] *See* Paolo Tonucci & Robert Azerad, Liquidity Of Lehman Brothers (Oct. 7, 2008), at p. 13 [LBHI_SEC07940_844701].

### (iii) Other Capital Adequacy Metrics

There are other metrics bearing upon capital adequacy such as Lehman's cash capital surplus, which was at a record $15.0 billion as of September 2, 2008 and "near record levels" as of September 10, 2008,[6354] its Equity Adequacy Framework, which showed that it had sufficient equity to avoid bankruptcy provided it could liquidate all its assets in an orderly wind-down,[6355] and its CSE Capital Ratio, which had substantially improved by the end of the second quarter of 2008.[6356]    Although these metrics provide some evidence that Lehman could have reasonably believed it was engaged in business with adequate capital, these metrics do not preclude a determination that Lehman was not adequately capitalized against the specific, foreseeable and likely liquidity risk arising from its reliance on short-term repo funding to support less liquid and illiquid inventory, and the other contingent costs that might arise in a liquidity stress event.

### a.    Cash Capital Surplus

Lehman tracked and reported a metric of capital adequacy called its "cash capital surplus," which it defined as its measure of "long-term funding sources over long-term

---

[6354] Lehman, 2008 Q3 Liquidity Metrics, Version 1 (Sept. 2, 2008), at p. 8 [LBEX-DOCID 1300336]; Lehman, Funding Lehman Brothers (Sept. 10, 2008), at p. 10 [LBHI_SEC07940_739985].

[6355] Lehman, Equity Adequacy Framework (May 19, 2008), at p. 1 [LBEX-DOCID 1302799].

[6356] *Compare* LBHI 10-Q (July 10, 2008), at p. 103 (showing a Tier 1 CSE Capital ratio of 10.7 percent and a Total Risk-Based Capital Ratio of 16.1 percent), *with* Lehman, Presentation to the Executive Committee, The Firm's Equity Adequacy [Draft] (Oct. 2007), at p. 15 [LBEX-DOCID 2489685] (showing a Tier 1 Capital Ratio of 7.0 percent and a Total Capital Ratio of 10.5 percent).

funding requirements."[6357]    In theory, if a company's long-term capital needs are covered by sources of long-term capital (including debt and equity), its risk of a liquidity mismatch is manageable because its long-term needs mature with its long-term capital sources.[6358]

The existence of Lehman's "cash capital surplus" does not preclude a determination that Lehman was engaged in business with "unreasonably small capital" because it was based on assumptions about the normal functioning of the repo market to support less liquid inventory even under adverse market conditions.[6359]    Lehman's Cash Capital Model explicitly assumed that there would only be an impairment of secured funding, not a complete loss for certain asset classes, and that such impairment would be addressed by the liquidity pool.[6360]

### b.  Equity Adequacy Framework

Another measure of capital adequacy was Lehman's "Equity Adequacy Framework."    The Equity Adequacy Framework was an attempt to measure the "estimated amount of capital required to allow the Firm to reorganize and restructure

---

[6357] LBHI 10-Q (July 10, 2008), at p. 82.

[6358] Lehman, Presentation to the Chicago Mercantile Exchange, Liquidity Management At Lehman Brothers [Draft] (June 5, 2008), at p. 7 [LBEX-DOCID 1300305] (noting that under its principle of "match funding," its assets and liabilities would have "self-funding and self-liquidating characteristics.").

[6359] Lehman calculated the size of the "long inventory haircut" as the average difference between the market value of the collateral pledged and secured financing proceeds received for a specific asset category "in a normal market environment."  Lehman, GFS Training: Cash Capital Module (Jan. 2006), at pp. 4, 15 [LBEX-DOCID 1682556].    Lehman's cash capital model did not assume that Lehman's repo counterparties would simply stop funding certain asset classes entirely.

[6360] "Since Cash Capital is raised to fund only the normal market haircut . . . , Lehman funds contingent haircut widening requirement with short term funds (current portion of LTD or STD)."  *Id.* at 27.

without resorting to bankruptcy in case of a severe and prolonged crisis."[6361] An

important assumption behind this orderly liquidation scenario was that Lehman relied

upon the sufficiency of its liquidity pool to "ensure[] we have sufficient time (one year)

to arrange for disposition of assets or restructuring of liabilities."[6362]

Although the orderly liquidation scenario envisioned by the Equity Adequacy

Framework is some evidence that Lehman was adequately capitalized, the Equity

Adequacy Framework analysis did not properly account for the market reaction in a

stressed liquidity event, given Lehman's business model and the importance of market

confidence to its day-to-day operation and survival.[6363]   Lehman could not expect to

conduct an orderly and complete liquidation of its inventory and assets without a

market reaction, especially given the swiftness of the near collapse of Bear Stearns.[6364]

---

[6361] Lehman, Equity Adequacy Framework (May 19, 2008), at p. 2 [LBEX-DOCID 1302799].

[6362] *Id.* at 3.

[6363] Matthew Albrecht, S&P, *Investment Services Industry Survey* (May 29, 2008), at p. 1 (noting that investment banks "rely on their reputations in all aspects of their business," from facilitating trading and financial advisory work, to finding new investments, to borrowing capital, and that the "most troublesome crisis that these firms can face . . . is a crisis of confidence in the firm.").

[6364] Although following the Bear Stearns event, the Federal Reserve created new facilities designed to support the liquidity of non-commercial banks – namely, the Primary Dealer Credit Facility (PDCF) and the Term Securities Lending Facility (TSLF) – through which financial institutions holding less liquid collateral could obtain temporary loans or temporary exchanges for more liquid forms of collateral, such as government and agency securities, Lehman admitted that use of such facilities was seen as carrying a "stigma" that would undermine market confidence.  Examiner's Interview of Robert Azerad, Sept. 23, 2009 (second interview), at p. 11 (noting that use of the PDCF window carried a "stigma."); *see also* U.S. Department of the Treasury, Office of Thrift Supervision, Examiner-in-Charge Ronald S. Marcus, Report of Examination of Lehman Brothers Holdings Inc. (May 19, 2008), at p. 2 (describing the PDCF as a "last resort line of credit."); e-mail from Donald Kohn, FRBNY, to Ben S. Bernanke, Federal Reserve (June 11, 2008) [FRB to LEH Examiner 000069] (noting that if Lehman accessed the PDCF window, such usage "might be the kiss of death in any case.").  Further evidence shows that in its final week prior to its bankruptcy filing, Lehman did not utilize the PDCF window to stave off bankruptcy.  The SEC and Federal Reserve, in their joint request to CSEs to perform liquidity stress tests following the Bear Stearns

Thus, the mere fact of a reported equity adequacy surplus does not, without more, preclude a determination of "unreasonably small capital."

### c.    CSE Capital Ratio

In December 2005, Lehman submitted itself to supervision under the SEC as a CSE. This supervision subjected Lehman to certain minimum capital requirements, including the reporting of a capital adequacy measurement consistent with the standards adopted by the Basel Committee on Banking Supervision.[6365] By 2008, Lehman was required to measure and disclose its Total Risk-Based Capital Ratio, which was essentially a measure of Lehman's equity capital and subordinated debt divided by its risk-weighted assets, although it also measured its Tier 1 Capital Ratio, which was a similar metric that used a narrower definition of equity capital.[6366] Lehman was also required to notify the SEC if its Total Risk-Based Capital Ratio fell below 10 percent.[6367]

---

event, asked CSEs to model their stress test projections without reliance upon the PDCF or TSLF. *See* Joint Request of SEC and FRBNY: Liquidity Scenarios for CSEs (May 20, 2008), at p. 1 [LBHI_SEC07940_505195].

[6365] LBHI 10-Q (July 10, 2008), at p. 102.

[6366] *Id.* at p. 101.

[6367] *Id.* Total Risk Based Capital was the sum both Tier 1 and Tier 2 capital. Tier 1 Capital was composed of Lehman's common stockholders' equity, less (i) Lehman's identifiable intangible assets and goodwill; (ii) deferred tax assets dependent upon future taxable income; (iii) cumulative gains or losses, net of taxes, that arise from application of fair value accounting on Lehman's financial debt liabilities, and which are attributable to Lehman's credit spread, and (iv) other deductions, including Lehman's investments in insurance subsidiaries, but plus (x) unrestricted securities issued by Lehman, including perpetual, non-cumulative preferred securities and (y) restricted securities used by Lehman. Tier 2 Capital includes all components of Tier 1 Capital plus senior and subordinated notes, generally including qualifying senior and unsecured notes that are unsecured and have maturities greater than five years. *Id.* at 101-102.

There was substantial correlation between Lehman's Equity Adequacy, CSE Capital Adequacy and Net Leverage Ratio metrics.[6368]

However, like its improved net leverage ratios as of the second quarter of 2008, Lehman's CSE Capital Ratio metrics do not preclude a finding that Lehman was engaged in business with "unreasonably small capital." Given the nature of Lehman's enterprise, Lehman's ability to operate was primarily a function of its liquidity risk, not necessarily the value of its assets as compared to its liabilities.[6369] Metrics of capital adequacy such as the CSE Capital Ratio, the net leverage ratio, the Equity Adequacy Framework and the Cash Capital Surplus were essentially snapshots of Lehman's capital structure at a given point in time. However, it is difficult to measure liquidity risk with such metrics.[6370] As Paul Shotton, one of Lehman's most senior risk managers, recognized in the aftermath of the Bear Stearns event, "[e]quity-sufficiency metrics need

---

[6368] Lehman, Equity Adequacy Framework (May 19, 2008), at p. 8 [LBEX-DOCID 1302799] (recognizing a "close alignment between [the] EAF and CSE" metrics); Lehman, Presentation to the Executive Committee, The Firm's Equity Adequacy [Draft] (Oct. 2007), at p. 12 [LBEX-DOCID 2489685] (noting that the net leverage ratio and CSE Capital ratio were "complementary" capital adequacy metrics).

[6369] E-mail from Paul Shotton, Lehman, to Chris O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467] ("Liquidity is more important than capital; most entities which go bankrupt do so because they run out of financing, not because the value of their assets falls below the value of their liabilities.").

[6370] *See* Peter Neu & Leonard Maltz, *Liquidity Risk Management* 3 (John Wiley & Sons 2007) ("Retrospective and concurrent measures of liquidity have little value. Prospective views are critical."). *See also* Ethan Penner, "*Can the Financial Markets Make a Comeback*?" Wall Street Journal, Aug. 27, 2007, p. A11 (attributing maxim, "liquidity is an illusion … always there when you don't need it, and rarely there when you do," to former Drexel Burnham Lambert CEO Michael Milken). A similar statement was voiced by Lehman's Paul Shotton in his April 15, 2008 e-mail to Chris O'Meara: "Liquidity is the ultimate useless concept — plentifully available when it's not needed, never present when it is." *See* e-mail from Paul Shotton, Lehman, to Chris O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467]. Both comments illustrate the principle that liquidity cannot be measured with a static metric.

to be based on anticipated liquidity-availability during stressed market periods, not on normal-market experience."[6371]    Therefore, these static capital adequacy metrics do not preclude a determination that Lehman was engaged in business with "unreasonably small capital" to the extent they are not based upon projections of liquidity under stressed market conditions.

### (g)  LBHI Affiliate "Unreasonably Small Capital" Analysis

In the preceding Section of the Report, the Examiner concludes that, pursuant to a debtor-by-debtor analysis, there is sufficient evidence to support a determination that certain LBHI Affiliates were either solvent or insolvent, but that there was insufficient evidence to determine the solvency of others.[6372]    However, the financial condition of "unreasonably small capital" is distinct from insolvency, such that an entity might be solvent and yet still have "unreasonably small capital."[6373]    Thus, a separate debtor-by-

---

[6371] E-mail from Paul Shotton, Lehman, to Chris O'Meara, Lehman (Apr. 15, 2008) [LBHI_SEC07940_768467] ("Liquidity is more important than capital; most entities which go bankrupt do so because they run out of financing, not because the value of their assets falls below the value of their liabilities.").

[6372] See Section III.B.3.c of this Report for a discussion of LBHI Affiliate solvency.

[6373] *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) ("The difference between insolvency and 'unreasonably small' assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable."); *see also Moody*, 971 F.2d at 1070 ("Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they come due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency."); *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l)*, 208 B.R. 288, 302 (Bankr. D. Mass. 1997) (describing the "unreasonably small capital" standard as "connot[ing] a condition of financial debility short of insolvency (in either the bankruptcy or equity sense), but which makes insolvency reasonably foreseeable"); *MFS/Sun Life Trust*, 910 F. Supp. at 944 ("The test is aimed at transferees that leave the transferor technically solvent but doomed to fail."); *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (noting that "unreasonably small capital[] . . . encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future").

debtor analysis is warranted to determine which, if any, of the LBHI Affiliates was engaged in business with "unreasonably small capital."

A determination that LBHI was operating with "unreasonably small capital" has implications upon whether any of LBHI's Affiliates were also operating with "unreasonably small capital." Courts have held that where a parent company is left with "unreasonably small capital" to operate its business, its subsidiaries would also be left in that same financial condition to the extent they were not independently funded.[6374] This is especially true in cases where there is a centralized cash management system between parent company and affiliates on a consolidated enterprise basis,[6375] or where there is direct or indirect funding support from a parent to its subsidiaries or affiliates.[6376]

The Examiner's analysis of whether the LBHI Affiliates may have had "unreasonably small capital" focused on those entities that had significant operations dependent on funding and/or capital support from LBHI since the LBHI Affiliates' capital adequacy is directly linked to that of LBHI.[6377] The Examiner finds that the eight

---

[6374] *In re TOUSA, Inc.*, -- B.R. --, Bankr. No. 08-10928, 2009 WL 3519403, at 14 (Bankr. S.D. Fla. Oct. 30, 2009). *See also Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, Bankr. No. 04-16354-CAG, Adv. No. 06-1283, 2009 WL 2940161, at *56-58 (Bankr. W.D. Tex. Sept. 11, 2009).

[6375] *In re TOUSA, Inc.*, 2009 WL 3519403, at *31.

[6376] *See Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 392 B.R. 561, 602-603 (Bankr. D. Del. 2008) (holding that the test for subsidiary solvency should not exclude "the funding support actually given" by the immediate corporate parent until the point when it would no longer be reasonable to expect such support).

[6377] See Section III.B.3.c of this Report, which provides the Examiner's Debtor-by-Debtor analysis of the solvency of the LBHI Affiliates.

LBHI Affiliates that relied on LBHI for funding and/or credit support were CES Aviation, CES Aviation V, CES Aviation IX, LCPI, LBSF, LBCS, LOTC and LBCC. The Examiner therefore concludes that there is sufficient evidence to support a colorable basis for finding that these entities had "unreasonably small capital" beginning early in the third quarter of 2008 and at all times through each applicable petition date. The Examiner also observes that there exists evidence that would support a contrary finding. As conflicting evidence exists, a finder of fact will need to consider carefully all available evidence in determining whether LBHI and the LBHI Affiliates had "unreasonably small capital." The Examiner expresses no opinion as to what determination a finder of fact would make in considering this element.

### e)  Insider Preferences Against LBHI (Third Bullet)

#### (1)  Summary

This Section of the Report discusses insider preferences against LBHI. The Examiner identified LBSF, LBCS and LCPI as those LBHI Affiliates for which a determination could be made of insolvency or borderline solvency beginning on June 1, 2008. The Examiner tailored the preference analysis to colorable claims that these LBHI Affiliates might have against LBHI. Generally, the Examiner identified cash transfers to LBHI not in connection with safe-harbored activity as preferential if the cash was transferred "for or on account of an antecedent debt." The Examiner's findings are as follows:

There is evidence to support a finding for each element of a preference claim under Section 547(b) of the Bankruptcy Code in an action by LBSF against LBHI. There is also evidence to support a finding for each element of the new value and ordinary course defenses that LBHI could assert. Any conclusion would be determined by a trier of fact.

There is evidence to support a finding for each element of a preference claim under Section 547(b) of the Bankruptcy Code in an action by LBCS against LBHI. There is also evidence to support a finding for each element of the new value and ordinary course defenses that LBHI could assert. Any conclusion would be determined by a trier of fact.

The Examiner has been unable to determine whether there is evidence to support a finding for each element of a preference claim under Section 547(b) of the Bankruptcy Code in an action by LCPI against LBHI because the Examiner, as discussed below, has been unable to trace the material movement of money between LCPI and LBHI that was not in connection with a safe-harbored event.

The Examiner has not analyzed whether CES Aviation LLC, CES Aviation V LLC, and CES Aviation IX LLC have colorable preference claims against LBHI because these entities' claims would be relatively insignificant compared to the potential claims of other LBHI Affiliates; the Examiner determines that it would be an imprudent use of estate resources to further investigate any potential claims.

Because the Examiner determined that the remaining LBHI Affiliates were not insolvent or on the borderline of solvency on May 31, 2008, the Examiner, for reasons stated below, did not investigate whether there was evidence to support each element of a preference claim under Section 547(b) of the Bankruptcy Code in an action against LBHI.

### (2)  Legal Summary

This Section addresses whether any LBHI Affiliate has colorable claims against LBHI for potential insider preferences arising under the Bankruptcy Code or state law.[6378]  The LBHI Affiliate is the debtor seeking to avoid a preference payment; LBHI is the insider or creditor receiving that payment.[6379]  A successful preference claim under

---

[6378] Some courts have found that "state preference law is an adjunct to, and supplemental of, those powers specifically provided for in the Bankruptcy Code which enable the trustee to avoid certain transfers." *Perkins v. Petro Supply Co. (In re Rexplore Drilling, Inc.)*, 971 F.2d 1219, 1222 (6th Cir. 1992); *see also Provident Hosp. Training Ass'n v. GMAC Mortgage Corp. (In re Provident Hosp. & Training Ass'n)*, 79 B.R. 374, 379 (Bankr. N.D. Ill. 1987) (recognizing availability of state preference law as a means of attacking a transfer under section 544(b)); *Associated Grocers of Neb. Coop., Inc. v. Am Home Prod. Corp. (In re Associated Grocers of Neb. Coop., Inc.)*, 62 B.R 439, 445 (D. Neb. 1986).  *But see Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198 (9th Cir. 2005) (finding that state preference law was preempted by section 547).

The Examiner reviewed preference law in New York and Delaware.  The Examiner concluded that New York does not have a preference statute available to the trustee.  *Cf. Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54-55 (2d Cir. 2005) (explaining that preferential payments to non-insiders are not fraudulent conveyances and are not avoidable under New York law).  Delaware does have a preference statute, *see* DEL. CODE 10 § 7387 (1995), but it is unclear whether the Delaware statute could be used by the trustee in these cases because it has been applied narrowly by Delaware courts.  *See Dodge v. Wilmington Trust Co.*, 1995 WL 106380, at *2-4 (Del. Ch. 1995) (noting that Delaware's preference statute had "not been cited by a Delaware court since 1917" and refusing to broaden its reach beyond assignments in trust).  The Examiner's focus in identifying potentially preferential transfers, therefore, is on transfers subject to avoidance under Section 547 of the Bankruptcy Code.

[6379] *See* 11 U.S.C. §§ 101(2)(A), (31)(B)(iii), (31)(E).

Section 547 of the Bankruptcy Code requires[6380] the debtor[6381] to prove: "a transfer of an interest of the debtor in property-- (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the date of filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."[6382]   LBHI is an insider of LBHI Affiliates.  Consequently, the applicable reachback period for insider preferences is one year.

The Bankruptcy Code presumes insolvency "on and during the 90 days immediately preceding the date of the filing of the petition."[6383]  The creditor can rebut the presumption of insolvency "by introducing evidence that tends to suggest that the debtor was solvent at the time the transfer was made."[6384]

---

[6380] For a more detailed discussion of the law of preferences, see Appendix 1, Legal Issues, at Section IV.A.D.

[6381] Section 1107 of the Bankruptcy Code gives the debtor in possession all the rights of a trustee with exceptions not relevant here.

[6382] 11 U.S.C. § 547(b).

[6383] 11 U.S.C. § 547(f).  See Section III.B.3.c of this Report, which discusses each Debtor's solvency.

[6384] 5 Collier on Bankruptcy, ¶ 547.12 (15th ed. 2005).

The Examiner Order refers to "colorable claims against LBHI" and does not mention any potential defenses that LBHI could assert. The Examiner recognizes, however, that in the context of preference claims under Section 547(b) of the Bankruptcy Code, it is important to consider potential defenses that could be raised by a defendant under Section 547(c). The debtor has the burden of proving the elements of a preference claim, and the creditor has the burden of proving any defense to such a claim.[6385] There are many potential defenses that defendant-creditors may assert,[6386] but the Examiner has limited the discussion of potential defenses to those that appear to be colorable based on a review of the Debtors' books and records.

In addition to the defenses discussed above, the "safe harbors" of the Bankruptcy Code protect qualifying transfers from being avoided as preferential.[6387]

### (3)  Sources of Potential Preferential Activity

Upon initial investigation, most of the activity at Lehman was in respect of transfers that were protected, or exempt from avoidance, by the Bankruptcy Code's safe harbor provisions. Therefore, even if such transfers satisfied the criteria for preferential transfers pursuant to Section 547 of the Bankruptcy Code, they could not be avoided pursuant to Section 546. In light of this determination, the Examiner focused the investigation on activity not in connection with transfers protected by the safe harbors.

---

[6385] 11 U.S.C. § 547(g).

[6386] *See* 11 U.S.C. § 547(c).

[6387] For a more detailed discussion of the Bankruptcy Code's safe harbor provisions, see Appendix 1, Legal Issues, at Section IV.E.

The Examiner identified the movement of cash between LBHI and its Affiliates for or on account of an antecedent debt that was not in connection with securities contracts, commodities contracts, forward contracts, repo agreements, or swap agreements.[6388] The Examiner identified three sources of cash transfers that are potentially not in connection with safe-harbored activity: (1) "funding" activity[6389] in GCCM, which was the manual movement of cash between bank accounts owned by affiliates and bank accounts owned by LBHI; (2) "quasi-funding" activity, which was automatic funding-like activity occurring in GCCM when LBHI acted as central banker by receiving or extending value on behalf of its affiliates; and (3) "trust receipt" activity, which was the movement of money recorded through Lehman's MTS trading system. Each source of activity will be discussed in turn.

First, GCCM funding activity refers to the manual movement of cash between bank accounts owned by affiliates and bank accounts owned by LBHI.[6390]    Although

---

[6388] See Section III.B.2.c of this Report, which addresses the operation of Lehman's cash management system.

[6389] Funding activity, as referred to in this Section of the Report, is similar to what is often referred to as cash sweeps, but it is non-directional. As discussed in Section III.B.2.b of this Report, the Examiner defines "cash sweeps" to mean the transfer of cash that occurred between September 15, 2008 and the date that the applicable LBHI Affiliate commenced its Chapter 11 case from (i) an LBHI Affiliate to LBHI or (ii) a third party to LBHI for the benefit of an LBHI Affiliate (it does not include the settlement of pre-existing obligations).

[6390] The Examiner's investigation of potential preferences related to funding activity assumes that money transferred from an LBHI Affiliate to LBHI removed the money from the affiliate's estate. The Examiner, for the purposes of this preference analysis, assumes that the affiliate would not have a section 541/542 claim against LBHI. *See Amdura Nat'l Distrib. Co. v. Amdura Corp.* (*In re Amdura Corp.*), 75 F.3d 1447 (10th Cir. 1996) (concluding that money held by parent-debtor in a cash management system was not property of subsidiary-debtor under section 541 of the Bankruptcy Code); *Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111 (5th Cir. 1995) (concluding that money held by parent debtor pursuant to a cash

GCCM referred to such activity as funding activity, which this Section of the Report adopts, the Examiner bifurcates funding activity into the following two categories: up-funding, which refers to transfers of money from affiliates to LBHI (commonly referred to as cash sweeps), and down-funding, which refers to transfers from LBHI to affiliates. The purpose of up-funding was to concentrate Lehman's cash at LBHI. Lehman's Treasury Group sought to fund each affiliate's account to $0.00 by the end of the day.[6391] Although Lehman invested the concentrated money overnight, the Examiner has observed no evidence suggesting that up-funding activity was in connection with any safe-harbored event.[6392] The Examiner expresses no opinion in this Section of the Report, however, on whether down-funding is protected by the safe harbors, as the Examiner Order does not task the Examiner to investigate claims that LBHI may have against affiliates for potential insider preferences.[6393]

---

management system was property of parent-debtor's estate for purposes of preference analysis when parent-debtor made payment on behalf of subsidiary-debtor); *Enron Corp. v. Port of Houston Auth.* (*In re Enron Corp.*), 2006 WL 2385194, at *6-7 (Bankr. S.D.N.Y. June 2, 2006); *cf. R² Inv. v. World Access, Inc.* (*In re World Access, Inc.*), 301 B.R. 217, 263-71 (Bankr. N.D. Ill. 2003) (discussing at length ownership of concentration account); *Cassirer ex rel. Estate of Schick v. Herskowitz* (*In re Schick*), 234 B.R. 337 (Bankr. S.D.N.Y. 1999); *see generally* Derek Feagans, *Concentration Accounts and Bankruptcy: "Where O'Where did the Bankruptcy Estate Go?,"* 67 U. Mo. Kan. City L. Rev. 145 (1998).

[6391] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2. Fleming noted many exceptions to the general policy of funding accounts to zero. For example, if LBI had extra money at the end of the day it was "trapped" because LBI could not lend to LBHI on an unsecured basis like other Lehman entities.

[6392] *Id.* The Examiner has observed no evidence suggesting that up-funding is in connection with a Protected Contract. For a more detailed discussion of the Bankruptcy Code's safe harbor provisions, see Appendix 1, Legal Issues, at Section IV.E.

[6393] *See* 11 U.S.C. § 741(7)(A)(v) (extension of credit to settle a securities transaction is a "securities contract"). No reported cases have been found interpreting Section 741(7)(A)(v). The Examiner addressed down-funding in the context of LBHI's new value defense, however, because new-value calculations do not exclude safe-harbored activity. *See* 11 U.S.C. § 547(c)(4).

Second, quasi-funding activity refers to automatic funding-like activity occurring in GCCM when LBHI acted as central banker by receiving or extending value on behalf of affiliates. In other words, when LBHI acted as central banker, GCCM created many automatic quasi-funding transactions that were coupled with activity that is potentially protected by the safe harbors. Quasi-funding activity takes many forms, but it follows the basic premise that Lehman attempted to reduce the movement of cash between bank accounts that eventually up-funded to LBHI.[6394] Quasi-funding activity is coupled with an event that, absent GCCM, would have required the movement of cash in a different way.[6395] The Examiner and his financial advisors have been unable to catalogue all types of quasi-funding activity,[6396] but several examples are described in the following paragraphs.

---

[6394] See Section III.B.2 of this Report, which discusses the concept of funding trees in GCCM.

[6395] GCCM referred to this activity as "intercompany" activity. Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at pp. 3-4.

[6396] The Examiner has not categorically determined whether quasi-funding is in connection with safe-harbored activity because there are so many permutations of activity generated by GCCM. Whether the safe harbors apply to quasi-funding activity will depend on how expansively the phrase "in connection with" found in each of the safe harbor provisions of Sections 546(e), (f), (g), and (j) is interpreted. One court has stated that a "natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'" *Interbulk, Ltd. v. Louis Dreyfus Corp.* (*In re Interbulk Ltd.*), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999). Another court, in interpreting this phrase, held that prejudgment attachments that a party to pre-petition swap agreements obtained in state court actions brought to recover for the debtor's alleged breach of the swap agreements were transfers made "in connection with" swap agreements, and were therefore protected by Section 546(g) because the actions taken by the party stemmed from the failure of the swap agreements. *Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.* (*In re Casa de Cambio Majapara S.A. de C.V.*), 390 B.R. 595 (Bankr. N.D. Ill. 2008). Although no court has addressed any limitation on the "in connection with" language, it cannot be boundless. In any event, the Examiner notes the tension between the safe-harbor's expansive "in connection with" language and the general proposition that courts look to substance over form in the context of preference identification. *E.g., Dean v. Davis*, 242 U.S. 438, 443 (1917) ("Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such."); *Nat'l Bank of Newport v. Nat'l Herkimer County Bank*, 225 U.S. 178,

When Lehman implemented GCCM, it sought to limit the number of bank accounts that it needed to maintain. But Lehman determined that it was less cumbersome to convert existing affiliate bank accounts into "no-credit" accounts than it was to close them and provide new payment instructions to third-parties.[6397] When money was deposited into "no-credit" bank accounts, it was automatically forwarded to and deposited into an LBHI bank account. In substance, therefore, deposits into "no-credit" accounts represented two distinct transactions: a counterparty remits a payment to the affiliate (transaction number one, which is potentially a safe-harbored activity), and Lehman up-funds the money to LBHI at the end of the day (transaction number two, which is an up-funding activity).[6398] Indeed, Lehman employees noted that it would be a distinction without a difference to consider quasi-funding activity to be

---

184 (1912) ("It is not the mere form or method of the transaction that the [bankruptcy] act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted and the creditor obtains an advantage over other creditors."); *Pacific N. Oil, Inc. v. Erickson* (*In re Seaway Express Corp.*), 940 F.2d 669 (Table), 1991 WL 136238, at *2 (9th Cir. 1991) ("In determining whether a transfer has been a preference, a bankruptcy court must look through form to substance, and treat the transaction according to its real nature." (citations omitted)); *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964, 970-71 (2d Cir. 1977) (looking beyond form to substance in preference action); *cf. Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (noting in context of fraudulent transfer under New York law that "[i]n equity, substance will not give way to form, and technical considerations will not prevent substantial justice from being done" (citation omitted)).

[6397] The Examiner understands that these accounts may also be referred to as subaccounts.

[6398] Quasi-funding activity could work in the opposite direction - that is, LBHI could pay an obligation owed by an affiliate. In other words, this functioned in the same way as having LBHI forward the money on an unsecured basis to the LBHI Affiliate (transaction number one), and then having the LBHI Affiliate remit the payment to the counterparty (transaction number two).

anything other than funding activity,[6399] and the resulting accounting entries would be the same.  In fact, before Lehman implemented GCCM, activity occurred this way.[6400]

There are many other examples of quasi-funding activity outside the context of no-credit accounts.  For example, it was common practice for an affiliate to direct counterparties to remit settlement payments to LBHI because it was easier for LBHI to keep the cash and adjust the affiliate's intercompany obligation to LBHI than it was to direct counterparties to pay the affiliate and up-fund later.  Or, for example, if the payor and payee of a transaction were both Lehman affiliates, and their bank accounts were on the same funding tree (that is, their respective bank accounts would ultimately up-fund to LBHI at the end of the day), cash would not move in respect of that transaction and each affiliate's intercompany obligation to LBHI would be adjusted accordingly.

The Examiner bifurcates quasi-funding activity into the following two categories: quasi-up-funding, which refers to GCCM activity that caused an affiliate's antecedent debt to LBHI to shrink because LBHI kept money or value that was owed to an affiliate, and quasi-down-funding, which refers to GCCM activity that caused an affiliate's antecedent debt to LBHI to grow because it represents an extension of credit given by LBHI.

---

[6399] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 4.  See Section III.B.2.c.3 of this Report, which discusses the distinctions between in-house virtual bank accounts and real-world bank accounts.
[6400] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 4.

Third, the Examiner's financial advisors reviewed MTS, Lehman's age-old fixed income trading platform, for potential preferential activity that occurred outside of GCCM.   Although Lehman's goal was to move all of Lehman's cash management functions to GCCM,[6401] LBHI continued to fund its affiliates in different ways through a multitude of extraordinarily complex source systems and trading platforms at the time of its bankruptcy.[6402]   Lehman created securities known as "trust receipts" in MTS that funded certain affiliate bank accounts tied to that system.[6403]   The Examiner's financial advisors reviewed MTS, where appropriate, to identify potential preferential activity.

The identification of cash transfers not in connection with safe-harbored activity was very difficult outside of GCCM, and Daniel J. Fleming, Lehman's former Head of Global Cash and Collateral Management, could not identify all potential sources of funding activity, nor could he identify all the systems used to transfer money between Lehman's 3000-plus bank accounts.[6404]   Notwithstanding the scope and diligence of the investigation, the Examiner recognizes that the data available are likely incomplete and

---

[6401] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 3.

[6402] See Section III.B.2.c of this Report, which discusses Lehman's cash management system.  GCCM was fully integrated in Europe and partially integrated in the United States.  It was not integrated in Asia.

[6403] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 6; Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 8.  The Examiner has found no evidence that funding through "trust receipts" was improper.  The use of trust receipts is discussed in greater detail later in the Report.  The LEC for LCPI, which was a primary LBHI Affiliate that utilized trust receipts, would manually allocate the funding associated with trust receipts to the general ledger intercompany funding account between LCPI and LBHI at the end of each month.  Examiner's Interview of Ada Shek, Nov. 24, 2009, at pp. 8-9.  Moreover, the trade detail in the MTS system labels these transactions as "unsecured intercompany funding."  Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010).

[6404] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 8.

that money moved through Lehman in ways not identified in this Section of the Report.

Accordingly, it is possible that potential preferential activity may have occurred outside

what is captured by funding and quasi-funding activity in GCCM, and trust receipts in

MTS.

### (4) Determinations and Assumptions on Section 547(b) Elements

The Examiner determined that it was prudent to focus the preference analysis on

LBHI Affiliates that were either insolvent or on the borderline of insolvency, because

proof of insolvency at the time any preferential transfer is made is a required element of

a preference claim.  Only six LBHI Affiliates were insolvent or on the borderline of

insolvency for significant portions of the twelve months before their respective filing

dates, which is illustrated by the following chart:[6405]

**Balance Sheet Solvency for Borderline and Insolvent Debtor Entities**
**Fiscal Years 2007 and 2008**

|  | CES Aviation | CES Aviation V | CES Aviation IX | LBCS | LBSF | LCPI |
|---|---|---|---|---|---|---|
|  | Solvency Determination | Solvency Determination | Solvency Determination | Solvency Determination | Solvency Determination | Solvency Determination |
| September-07 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Borderline |
| October-07 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Borderline |
| November-07 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Borderline |
| December-07 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Borderline |
| January-08 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Borderline |
| February-08 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Insolvent |
| March-08 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Borderline |
| April-08 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Insolvent |
| May-08 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Insolvent |
| June-08 | Borderline | Insolvent | Insolvent | Borderline | Borderline | Insolvent |
| July-08 | Insolvent | Insolvent | Insolvent | Borderline | Borderline | Insolvent |
| August-08 | Insolvent | Insolvent | Insolvent | Borderline | Borderline | Borderline |

---

[6405] See Section III.B.3.c of this Report, which discusses each LBHI Affiliate's solvency during the pre-petition period.

Given the complexity of Lehman's numerous source systems and the substantial cost of analyzing them, the Examiner has determined that it would be prudent to limit the analysis to the period between June 1, 2008 and each debtor's respective filing date,[6406] which is referred to as the "Defined Preference Period." Moreover, because the assets of the aviation entities were relatively insignificant when compared to the other LBHI Affiliates, the Examiner focused the analysis on LBSF, LBCS, and LCPI. As the Examiner also focused his analysis on the Defined Preference Period, this Report does not address colorable preference claims that LBSF, LBCS, and LCPI may have against LBHI in respect of pre-Defined Preference Period transfers.

In light of the Examiner's conclusion that there is insufficient evidence to rebut the presumption of insolvency pursuant to Section 547(g) of the Bankruptcy Code with respect to LOTC and LBCC after September 12, 2008, the Examiner considered conducting a preference analysis with respect to those LBHI Affiliates. The Examiner notes, as the Defined Preference Period for LBSF, LBCS, and LCPI began on June 1, 2008, there was a sufficient universe of potentially preferential transfers to warrant the expenditure of resources to analyze such transfers. Conversely, the applicable period for LOTC and LBCC would only begin after September 12, 2008; thus the universe of

---

[6406] As discussed in greater detail in Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010), p. 4, there was no "funding" activity recorded in GCCM during October 2008. There was some activity in GCCM relating to quasi-funding in October 2008 that did not exceed $10 million for LBSF and LBCS combined. *Id.* at pp. 13, 16. The Examiner's financial advisors disregarded activity in October 2008 for the purposes of this preference analysis.

potential preferential transfers for LOTC and LBCC would be much smaller and would consist of a type likely to be shielded by the safe harbor provisions of the Bankruptcy Code.    At the same time, the cost of conducting such a review for LOTC and LBCC would be material because of the complexity of Lehman's financial reporting systems, the dislocation caused by LBHI's bankruptcy filing on September 15, 2008, and the resulting disruption in Lehman's financial reporting systems.    Consequently, the Examiner determined that it would not be a prudent use of resources to conduct a preference analysis for LOTC and LBCC.

The Examiner made the following determinations with respect to certain elements of a Section 547(b) claim (these determinations apply to all preference claims that could be asserted by LBSF, LBCS, and LCPI, as discussed herein).    First, the Examiner concludes, in the context of funding, that the transferring LBHI Affiliate had a colorable "interest . . . in [the] property" transferred.    This was evidenced by the accounting records[6407] (including virtual account titles in the cash management system[6408]), and the lack of any evidence suggesting that the transferring entity did not have an interest in the property transferred.

Second, LBSF, LBCS, and LCPI had significant antecedent debt obligations to LBHI.  This is evidenced by intercompany credit balances with, or obligations to, LBHI

---

[6407] *E.g.*, *In re Schick*, 234 B.R. at 342-43 (discussing whether funds in debtor's bank account were owned by debtor for purposes of section 541 of the Bankruptcy Code).
[6408] See Section III.B.2.c of this Report, which discusses in-house virtual accounts in GCCM.

on the books and records of LBSF, LBCS, and LCPI.  Similarly, the books and records of LBHI reflect debit balances with, or receivables from, LBSF, LBCS, and LCPI.  The Examiner has observed no evidence suggesting these intercompany payables to LBHI represented anything other than debt obligations.[6409]

Third, the Examiner concludes that up-funding and quasi-up-funding transactions represented payments "for or on account" of the antecedent debt because the liability on the books and records of LBSF, LBCS, and LCPI was reduced when the transfers were made.  Similarly, the receivable on the books and records of LBHI was reduced when the transfers were made.[6410]  For the same reason, the Examiner concludes that the payments made by LBSF, LBCS, and LCPI benefited LBHI.[6411]

Furthermore, the Examiner assumed for the purposes of this analysis that LBHI received more from any preferential activity than it would have received under a hypothetical Chapter 7 liquidation.  Before making this assumption, however, the Examiner first considered whether all or any part of the debt that was satisfied would have been on account of a secured obligation by virtue of Section 553's preservation of

---

[6409] *See, e.g., Celotex Corp. v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.)*, 176 B.R. 223, 248-50 (M.D. Fla. 1994) (finding that, under the circumstances of the case, the intercompany account payables were debt obligations and not equity investments); *cf. Amdura Corp. v. Ryder Truck Rental, Inc. (In re Amdura Corp.)*, 151 B.R. 557, 559-60 (Bankr. D. Colo. 1993).

[6410] LCPI, LBSF, and LBCS (as well as the other LBHI Affiliates) had multiple intercompany accounts with LBHI.  However, unsecured funding was always recorded in the same intercompany account on the books and records (the account numbers all began with "12620").  Ernst and Young Walkthrough Template (Nov. 30, 2009), at p. 6 [EY-SEC-LBHI-CORP-GAMX-07-033384].

[6411] *See generally Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (discussing "on account of" language in a different context under the Bankruptcy Code).

setoff rights.   *Braniff Airways, Inc. v. Exxon Co., U.S.A.*[6412] addressed the concept of

"permissible preference[s]" by virtue of Section 506(a) of the Bankruptcy Code, which

affords secured status to claims of setoff under Section 553(a).[6413]   The Examiner

concludes that LBHI does not have an argument that such preferential transfers would

be on account of a secured claim by virtue of any setoff right under the rationale of

*Braniff Airways.*[6414]

---

[6412] 814 F.2d 1030 (5th Cir. 1987).

[6413] *Id.* at 1034.

[6414] LBHI's books and records reflect multiple intercompany accounts with its affiliates.  Similarly, many of the affiliates' books and records reflect multiple intercompany accounts with LBHI.  In many cases, however, the books and records of an affiliate reflect both payables and receivables with LBHI and the books and records of LBHI reflect both payables and receivables with any particular affiliate.  The apparent mutuality of obligations raises the question of whether an LBHI Affiliate could prove the hypothetical liquidation analysis under Section 547(b)(5) of the Bankruptcy Code given the secured status of mutual debts under Sections 553 and 506.  In other words, if LBHI was indebted to an affiliate for more than the affiliate was indebted to LBHI, the affiliate may not satisfy its Section 547(b)(5) burden because LBHI's right of setoff under Section 553 would have encompassed any preference payment amount had the preference not been made.  *See Braniff Airways*, 814 F.2d at 1035; *cf. Brooks Farms v. U.S. Dep't of Agric.* (*In re Brooks Farms*), 70 B.R. 368, 372-73 (Bankr. E.D. Wis. 1987); *In re Revere Copper and Brass, Inc.*, 32 B.R. 577, 583 n.3 (Bankr. S.D.N.Y. 1983).  The Examiner reviewed the intercompany account balances on LBHI's books and records against the intercompany account balances on LBSF, LBCS, and LCPI's books and records for August and September 2008.  The Examiner also reviewed Schedules B and F from LBHI, LBSF, LBCS, and LCPI's Amended Schedules and Statements, which address *inter alia* intercompany receivables and unsecured intercompany payables, respectively.  The schedules for LBCS, LBSF, and LCPI can be found at docket numbers 3061, 3066, and 3067, respectively, and the Amended Schedules for LBCS, LBSF, and LCPI can be found at docket numbers 3939, 3921, and 3927, respectively.  As illustrated in Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at ex. 1, LBSF, LBCS, and LCPI all owed LBHI significantly more than LBHI owed LBSF, LBCS, or LCPI, respectively, at the end of September 2008.  As such, the Examiner has observed no evidence suggesting that LBHI owed LBSF, LBCS, and LCPI more than it was owed on September 15, 2008.  Therefore, the Examiner has concluded that LBSF, LBCS, and LCPI will not be precluded from proving a hypothetical liquidation analysis as required by Section 547(b)(5) of the Bankruptcy Code under the rationale of *Braniff Airways.*

### (5)  Scope of Defenses Under Section 547(c)

The Examiner analyzed the "new value" and "ordinary course" defenses under Sections 547(c)(4) and 547(c)(2) of the Bankruptcy Code, respectively, for funding and quasi-funding activity, where appropriate.[6415]

**New Value Defense.**    The new value defense provides that a creditor may deduct from any liability it owes a debtor as a result of a preferential transfer any amount of "new value" that it gave the debtor after the preferential transfer occurred.[6416] For example, if a debtor pays a creditor $100 on day one in respect of an antecedent debt and all other criteria for a preference are satisfied, and on day two, the creditor extends new credit worth $90 that is not subsequently repaid by the debtor, only $10 of the $100 payment is a preference.[6417]

---

[6415] The Examiner does not address whether LBHI may assert multiple defenses under Section 547(c) of the Bankruptcy Code.  *See G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 242 n.7 (5th Cir. 2006).

[6416] Section 547(c)(4) provides that "[t]he trustee may not avoid under this section a transfer -- . . . (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor— (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

[6417] If there were multiple extensions of new value, the Examiner applied the well-established rule that extensions can be applied to any preceding preferential transfer and not just the immediately preceding preferential transfer.  *See Williams v. Agama Sys., Inc. (In re Micro Innovations Corp.)*, 185 F.3d 329, 336-37 (5th Cir. 1999) (discussing the majority and minority rules for "new value," and adopting majority rule, which permits the crediting of new value against any prior preference and not only the immediately preceding one); *see also In re SGSM Acquisition Co., LLC*, 439 F.3d at 241-43; *Katz v. Stark Trust (In re Van Dyck/Columbia Printing)*, 289 B.R. 304, 315 (D. Conn. 2003); 5 Collier on Bankruptcy ¶ 547.04[4][d] (15th ed. 2008); *cf. In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 426 (Bankr. S.D.N.Y. 2003) (recognizing new value defense in the context of a cash management system).

How quasi-funding will be characterized in relation to the safe harbors, however, appears to be an issue of first impression - that is, whether such funding is safe-harbored, not safe-harbored, or somewhere in-between.[6418]  Therefore, the Examiner's financial advisors constructed three models to calculate LBHI's preference exposure net of new value.[6419]  First, the Examiner's financial advisors calculated LBHI's preference exposure solely by considering up-funding activity as preferential and down-funding activity as new value.  Second, the Examiner's financial advisors calculated LBHI's preference exposure by considering only up-funding activity as preferential, but gave LBHI new value credit for both down-funding and quasi-down-funding activity.  The following chart illustrates this calculation:



Third, the Examiner's financial advisors calculated LBHI's preference exposure by considering up-funding and quasi-up-funding as preferential, but gave LBHI new

---

[6418] Each day there were many quasi-funding transactions between LBHI and LBSF, LBCS and LCPI.  For the purposes of this analysis, however, the Examiner grouped them all together, even though each one is potentially unique.

[6419] These are referred to as models one, two, and three in Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010).

value credit for both down-funding and quasi-down-funding activity.  The following
illustrates this calculation:



**Ordinary Course Defense.**  The ordinary course defense permits creditors to
argue that debts were incurred in the ordinary course and payments on account of
those debts were made in the ordinary course of business between the parties.[6420]  The

---

[6420] Section 547(c)(2) provides that "[t]he trustee may not avoid under this section a transfer -- . . . (2) to
the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of
business or financial affairs of the debtor and the transferee, and such transfer was— (A) made in the
ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to
ordinary business terms."  11 U.S.C. § 547(c)(2).  The Examiner addressed subsection 547(c)(2)(A) and not
subsection (B), which discusses whether the payments were "made according to ordinary business
terms."

    The purpose of section 547(c)(2) "is to leave undisturbed normal financial relations, because it
does not detract from the general policy of the preference section to discourage unusual action by either
the debtor or his creditors during the debtor's slide into bankruptcy."  *Savage & Assocs., P.C. ex rel.
Teligent, Inc. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 340 (Bankr. S.D.N.Y. 2008) (quoting H.R. Rep. No.
95-595, at 373 (1977)).  In determining whether the debt was incurred in the ordinary course of business,
the court will look to other transactions between the parties.  *Jacobs v. Matrix Cap. Bank* (*In re
AppOnline.com, Inc.*), 315 B.R. 259, 283 (Bankr. E.D.N.Y. 2004).  "In determining whether a transfer is made
in the ordinary course of business, a court may consider (i) the prior course of dealing between the
parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the
payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of
payment."  *In re Teligent*, 380 B.R. at 340.  "[T]he cornerstone of this element of a preference defense is that
the creditor needs [to] demonstrate some consistency with other business transactions between the debtor
and the creditor."  *In re Schick*, 234 B.R. at 348 (quoting *WJM, Inc. v. Mass. Dep't of Pub. Welfare*, 840 F.2d
996, 1011 (1st Cir. 1988)) (alteration in original).  "The creditor must establish a 'baseline of dealings' to

Examiner has not located any authority that discusses ordinary course defenses in preference actions asserted by debtor-affiliates against their debtor-parents in the context of complex cash management systems, which is the primary source of potential preferential activity here.[6421]    Nonetheless, repeated transfers made to a debtor's corporate parent on account of an antecedent debt that resulted from continual extensions of credit for operating purposes have been upheld as unavoidable ordinary course transfers in other cases.[6422]

### (6)  Findings for LBSF

The following chart illustrates LBHI's preference exposure to LBSF during the Defined Preference Period:

---

enable the court to compare the payment practices during the preference period with the prior course of dealing." *Id.*

[6421] *Cf. In re Adelphia Bus. Solutions, Inc.,* 341 B.R. at 426 (recognizing ordinary course defense in the context of a cash management system); *In re Hillsborough Holdings Corp.,* 176 B.R. at 247-50 (recognizing ordinary course defense in context of piercing the corporate veil when parent swept cash from subsidiaries).

[6422] *E.g., Waldschmidt v. Ranier (In re Fulghum Constr. Corp.),* 872 F.2d 739 (6th Cir. 1989) (upholding ordinary course defense when debtor made repeated payments to parent-partnership to reduce antecedent debt obligation that was created by more than 100 extensions of credit for various purposes including operating expenses); *CCI Constr. Inc. v. Allfirst Bank (In re CCI Constr. Co.),* 371 B.R. 83 (Bankr. M.D. Pa. 2007) (discussing ordinary course defense in context of revolving unsecured cash management facility with bank lender); *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.),* 198 B.R. 365 (Bankr. D. Kan. 1996) (discussing ordinary course and new value defenses on running account balance between related companies).

| Preferential Activity | Preference Exposure without New Value during the Defined Preference Period | Preference Exposure Net of New Value during the Defined Preference Period | |
| --- | --- | --- | --- |
| | | Down-funding New Value Only | Down-funding and Quasi-down-funding New Value |
| Up-funding Only | $19.4 billion | $3.8 billion | $636 million |
| Up-funding and Quasi-up-funding | $29.4 billion | n/a | $718 million |

In addition, there is evidence supporting LBHI's ordinary course defense.  In short, there is evidence to support each element of a preference claim, but there is also evidence to support each element of the new value and ordinary course defenses.[6423]

**Discussion of Preferential Transfers.**  On June 1, 2008, LBSF had an antecedent debt owed to LBHI of approximately $7.5 billion.[6424]  The intercompany accounts between LBSF and LBHI experienced significant activity after that day.  The intercompany account activity resulted from funding and quasi-funding activity that

---

[6423] See Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) for a detailed and lengthy discussion of the models developed, methodologies used, and assumptions made in reaching these calculations.

[6424] As illustrated in Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at ex. 2, LBHI and LBSF had multiple intercompany accounts.  Not every intercompany account was used for funding activities - that is, some accounts represented repo or derivative liabilities or receivables, and they were generally in connection with safe-harbored activity.  The $7.5 billion obligation noted above was derived from the sum of the intercompany obligations based on the two accounts in the general ledger that were used for funding and quasi-funding activities in GCCM.  One account was between LBHI-New York and LBSF, and the other account was between LBHI (UK) and LBSF.  If the other intercompany accounts between LBSF and LBHI were included, the obligation would be larger.  Inclusion of the other accounts was unnecessary for the preference analysis, however, because the total dollar amount of every potential preferential transfer was less than the outstanding liability from the sum of these two funding accounts on the day each transfer was made.

was observed in GCCM.[6425]   The Examiner has observed nothing suggesting that up-funding was related to trades, repos, or similar activity, and the Examiner understands that it was performed on an unsecured basis for the purpose of concentrating cash at LBHI.  During the Defined Preference Period, there was $19.4 billion and $10.1 billion in up-funding and quasi-up-funding activity, respectively.[6426]   Together, this amounts to $29.4 billion in potentially preferential activity.

**New Value Defense.**  LBHI's new value defense captures the majority of LBSF's preference claim.   The Examiner's financial advisors calculated LBHI's new value defense in three ways as noted above.   First, the Examiner's financial advisors calculated LBHI's preference exposure solely by considering up-funding activity as preferential and down-funding activity as new value.  LBHI's exposure to LBSF during the Defined Preference Period under this calculation is $3.8 billion.[6427]  Second, the Examiner's financial advisors calculated LBHI's preference exposure by considering up-funding activity as preferential, but gave LBHI new value credit for both down-funding and quasi-down-funding activity.  LBHI's exposure to LBSF during the Defined

---

[6425] Daniel J. Fleming noted that "funding" activity for LBSF occurred in an LBI bank account in which LBSF was clearing its derivative payment activity from RISC, another Lehman trading platform (it is unclear whether LBHI or LBHI (UK) provided the funds for this account).  This "funding" activity would not be captured in the "funding" column because LBSF did not own the account into and from which the money was transferred.  Nonetheless, Fleming noted that this activity was likely captured in the quasi-funding activity column.  As for LBSF generally, Fleming noted that "funding" activity may have occurred in other regions, but he could not identify how it may have been captured by Lehman's systems. Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 8.

[6426] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010).

[6427] *Id.*

Preference Period under this calculation is $636 million.[6428]    Third, the Examiner's financial advisors calculated LBHI's preference exposure by considering up-funding and quasi-up-funding as preferential, but gave LBHI new value credit for both down-funding and quasi-down-funding activity.    LBHI's exposure to LBSF during the Defined Preference Period under this calculation is $718 million.[6429]

**Ordinary Course Defense.**    There is evidence for LBHI to assert an ordinary course defense even if the new value defense does not preclude recovery.

Based on LBHI and LBSF's books and records, the debts incurred by LBSF appear to be in the ordinary course of business between LBHI and LBSF.    There is consistent funding activity between LBHI and LBSF during the two years prior to LBSF's bankruptcy.    During the year prior to bankruptcy, the number of down-funding transactions ranged from thirty-two to sixty-three per month, and during the two years prior to bankruptcy, the number of down-funding transactions ranged from seven to sixty-three per month.[6430]    Such down-funding activity is consistent with LBHI's role as central banker within the Lehman enterprise.    Similarly, there is consistent quasi-down-

---

[6428] *Id.*

[6429] *Id.*    LBHI's preference exposure to LBSF under the second and third calculations resulted from up-funding that occurred at the end of the day on September 12, 2008.    Although such a potential preference may not be covered under the new value defense, this fact pattern is similar to that described in *In re Fulghum Constr. Corp.* 872 F.2d 739, which addressed this issue under the ordinary course defense.

[6430] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at exs. 18-21.    The low number of funding transactions (either up- or down-funding) prior to May 2007 is consistent with the Examiner's understanding that GCCM was in the implementation phases.

funding activity.[6431]   The Examiner has observed no evidence suggesting that down-funding or quasi-down-funding was not in the ordinary course of business between LBHI and LBSF.

Similarly, the Examiner has reviewed the non-exhaustive factors courts use when determining whether payments made on account of an antecedent debt are in the ordinary course of business between the debtor and the transferee.[6432]   Upon review of those factors, there is evidence to support LBHI's defense.   As a threshold matter, former Lehman employees stated that it was Lehman's goal to up-fund each affiliate's bank account to $0.00 at the end of each day,[6433] which is not inconsistent with the books and records.   The Examiner and his financial advisors reviewed funding activity dating back to June 2006; funding activity (both up- and down-funding) regularly occurred in significant amounts in every month before LBSF's bankruptcy.[6434]   The Examiner has not identified anything in the Defined Preference Period that deviated from this historical practice.   Finally, the Examiner has observed no evidence that LBSF's potentially preferential transfers were made in anticipation of bankruptcy, or that they were done because of unusual debt practices by LBHI.   In short, there is evidence to support a

---

[6431] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at ex. 1.

[6432] The Examiner has not reviewed the alternative grounds for relief under Section 547(c)(2)(B), namely whether the purported preference payments were "made according to ordinary business terms."

[6433] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2.  The notable exception to this practice was with LBI.

[6434] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at exs. 18-20.

finding that such activity was "recurring, customary, and designed" to facilitate LBSF's

business.[6435]   The Examiner has therefore determined that there is evidence for LBHI to

assert a defense under Section 547(c)(2) of the Bankruptcy Code.  Any conclusion would

be determined by a trier of fact.

### (7)  Findings for LBCS

The following chart illustrates LBHI's preference exposure to LBCS during the

Defined Preference Period:

| Preferential Activity | Preference Exposure without New Value during the Defined Preference Period | Preference Exposure Net of New Value during the Defined Preference Period | |
|---|---|---|---|
| | | Down-funding New Value Only | Down-funding and Quasi-down-funding New Value |
| Up-funding Only | $3.3 billion | $643 million | $15 million |
| Up-funding and Quasi-up-funding | $4.3 billion | n/a | $633 million |

In addition, there is evidence supporting LBHI's ordinary course defense.  In short,

there is evidence to support each element of a preference claim, but there is also

evidence to support each element of the new value and ordinary course defenses.[6436]

**Discussion of Preferential Transfers.**  On June 1, 2008, LBCS had an antecedent

debt owed to LBHI of approximately $2.2 billion.[6437]   The intercompany accounts

---

[6435] *In re Fulghum Constr. Corp.*, 872 F.2d at 745.

[6436] See Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) for a detailed and lengthy discussion of the models developed, methodologies used, and assumptions made in reaching these calculations.

between LBCS and LBHI experienced significant activity after that day.    The intercompany account activity resulted from funding and quasi-funding activity that was observed in GCCM.    The Examiner has observed nothing to suggest that up-funding was related to trades, repos, or similar activity, and evidence suggests that it was performed on an unsecured basis for the purpose of concentrating cash at LBHI.    During the Defined Preference Period, there was $3.3 billion and $1.0 billion in up-funding and quasi-up-funding activity, respectively.[6438]    Together, there was $4.3 billion in potentially preferential activity.

**New Value Defense.**    LBHI's new value defense captures the majority of the amount of LBCS's preference claim.    The Examiner's financial advisors calculated LBHI's new value defense in three ways as noted above.    First, the Examiner's financial advisors calculated LBHI's preference exposure solely by considering up-funding activity as preferential and down-funding activity as new value.    LBHI's liability to

---

[6437] As illustrated in Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at ex. 1, LBCS and LBHI had multiple intercompany accounts.  Not every intercompany account was used for funding activities - that is, some accounts represented repo or derivative liabilities or receivables, and they were generally in connection with safe-harbored activity.  The $2.2 billion obligation noted above was derived from the sum of the intercompany obligations based on the two accounts in the general ledger that were used for funding and quasi-funding activities in GCCM.  If the other intercompany accounts between LBCS and LBHI were included, the obligation would be larger.  Inclusion of the other accounts was unnecessary for the preference analysis, however, because the total dollar amount of every potential preferential transfer was less than the outstanding liability from the sum of these two funding accounts on the day each transfer was made.

[6438] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010), at ex. 6.

LBCS during the Defined Preference Period under this calculation is $642 million.[6439]

Second, the Examiner's financial advisors calculated LBHI's preference exposure by

considering up-funding activity as preferential, but gave LBHI new value credit for

both down-funding and quasi-down-funding activity.  LBHI's exposure to LBCS during

the Defined Preference Period under this calculation is $15 million.[6440]    Third, the

Examiner's financial advisors calculated LBHI's preference exposure by considering up-

funding and quasi-up-funding as preferential, but gave LBHI new value credit for both

down-funding and quasi-down-funding activity.  LBHI's exposure to LBCS during the

Defined Preference Period under this calculation is $633 million.[6441]

**Ordinary Course Defense.**    There is evidence for LBHI to assert an ordinary

course defense in the event that the new value defense does not preclude recovery.

Based on LBHI and LBCS's books and records, the debts incurred by LBCS

appear to be in the ordinary course of business between LBHI and LBCS.  There is

consistent funding activity between LBHI and LBCS during the sixteen months prior to

LBCS's bankruptcy.  During the sixteen months prior to bankruptcy, the number of

down-funding transactions ranged from nine to thirty-seven per month.[6442]  This down-

funding activity is consistent with LBHI's role as central banker within the Lehman

---

[6439] *Id.*

[6440] *Id.*

[6441] *Id.*

[6442] *Id.* at exhs. 9-11.  The low number of funding transactions (either up- or down-funding) prior to May 2007 is consistent with the Examiner's understanding that GCCM was in the implementation phases.

enterprise. Similarly, there is consistent quasi-down-funding, although such activity was less frequent before February 2008.[6443] The Examiner has observed no evidence suggesting that down-funding or quasi-down-funding was not in the ordinary course of business between LBHI and LBCS.

Similarly, the Examiner has reviewed the non-exhaustive factors courts use when determining whether payments made on account of an antecedent debt are in the ordinary course of business between the debtor and the transferee.[6444] Upon a review of those factors, there is evidence to support LBHI's ordinary course defense. As a threshold matter, former Lehman employees stated that it was Lehman's goal to up-fund each affiliate's bank account to $0.00 at the end of each day,[6445] which is not inconsistent with the books and records. The Examiner reviewed funding activity dating back to April 2007; funding activity (both up- and down-funding) regularly occurred in every month before LBCS's bankruptcy. The Examiner has not identified anything in the Defined Preference Period that deviated from this historical practice. The Examiner does note, however, that quasi-up-funding exceeds quasi-down-funding

---

[6443] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at ex. 12. The low number of quasi-funding transactions (either up- or down-quasi-funding) prior to February 2008 is consistent with the Examiner's understanding that GCCM was in the implementation phases.

[6444] The Examiner has not reviewed the alternative grounds for relief under Section 547(c)(2)(B), which is whether the purported preference payments were "made according to ordinary business terms."

[6445] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2. The notable exception to this practice was with LBI.

for the first time in August 2008, which deviates from the prior months.[6446]  Finally, the

Examiner has observed no evidence that LBCS's potentially preferential transfers were

made in anticipation of bankruptcy, or that they were done because of unusual debt

practices by LBHI.  In short, there is evidence to support a finding that such activity was

"recurring, customary, and designed" to facilitate LBCS's business.[6447]  The Examiner

thus determines that there is evidence for LBHI to assert a defense under Section

547(c)(2) of the Bankruptcy Code.  Any conclusion would be determined by a trier of

fact.

### (8)  Findings for LCPI

The Examiner has been unable to determine whether there is evidence to support

a finding for each element of a preference claim under Section 547(b) of the Bankruptcy

Code in an action by LCPI against LBHI because the Examiner's financial advisors have

been unable to trace the material movement of money between LCPI and LBHI that was

not in connection with a safe-harbored event.

**Discussion of Preferential Activity.**  On June 1, 2008, LCPI had an antecedent

debt of at least $35.2 billion to LBHI,[6448] and there was significant activity in the

---

[6446] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at ex. 22.

[6447] *In re Fulghum Constr. Corp.*, 872 F.2d at 745.

[6448] As illustrated in Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) ex. 3, LCPI and LBHI had multiple intercompany accounts.  Not every intercompany account was used for funding activities - that is, some accounts represented repo or derivative liabilities or receivables.  The $35.2 billion obligation noted above was derived from the sum of the intercompany obligations based on the two accounts in the general ledger that were used for funding and quasi-funding

intercompany accounts between LCPI and LBHI after that day.  Similar to LBSF and
LBCS, the Examiner attempted to identify funding and quasi-funding activity as the
primary source of potential preferential activity.  However, identifying and analyzing
potential preferential activity for LCPI proved considerably more complicated than for
LBSF and LBCS.  Consequently, the Examiner has been unable to identify and analyze
all potential sources of preferential activity.

As a threshold matter, LCPI's main operating account was not tied to GCCM,
and therefore, there was no "funding" activity in GCCM during the Defined Preference
Period.  There was, however, significant "quasi-funding" activity flowing through
GCCM, which primarily came from a source system called Loan IQ.[6449]  The Examiner
concludes not to include quasi-funding activity in the preference analysis for LCPI,
however, because payments flowing from Loan IQ through GCCM consisted of
principal and interest payments, among other things, on loans in which LCPI had a
nominal interest.  Moreover, other quasi-funding activity was *de minimis* when
compared to the other sources of potential preferential activity the Examiner identified.
Unlike LBSF and LBCS, the Examiner looked beyond GCCM and focused on two
specific sources of potential preferential activity:  transfers made on account of trust

---

activities.  Examiner's Interview of Ada Shek, Nov. 24, 2009, at pp. 8-9.  One account was between LBHI-
New York and LCPI, and the other account was between LBHI (UK) and LCPI.  If the other intercompany
accounts between LCPI and LBHI were included, the obligation would be larger.

[6449] Loan IQ "is a fully integrated global, multi-currency system for the processing and administration of
the commercial bank loan product."  Lehman, GTS: Operations Technology - Loan IQ Homepage on
Lehman Live, at p. 1 [LBEX-LL 3356457].

receipts in the MTS trading system, and payments made to LBHI resulting from capital infusions made into LCPI by LBI.

**Trust Receipts.**    As noted in Section III.B.2.c of this Report, prior to 2002, Lehman's infrastructure for cash management was decentralized and fragmented.[6450] There were numerous systems used to transfer and manage cash,[6451] and this fragmentation was a driving factor behind the creation of GCCM.  At the time of LBHI's bankruptcy, however, GCCM was only partially integrated, and the implementation process was rolled-out by source system or trading platform.  MTS, one of Lehman's primary trading platforms used primarily for domestic fixed-income securities, was not integrated into GCCM.  MTS was an antiquated trading platform[6452] and its functionality was limited to buys, sells, repos, reverse repos, borrowings, and pledgings.[6453]  MTS did not have payment functionality, and unlike some of Lehman's other trading platforms that settled transactions through GCCM, settlements from MTS flowed through FPS, an entirely separate payment and settlement system.

Because MTS was outdated, Lehman used "trust receipts," which were dummy securities created in MTS, to fund certain bank accounts that were tied to MTS.[6454]  Trust

---

[6450] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 3.

[6451] *Id.*

[6452] MTS was used by Lehman before it merged with Shearson in 1984.  *Id.* at 6.

[6453] *Id.*

[6454] *Id.* at p. 7.

receipts were used to overcome MTS's limited functionality as a trading system,[6455] and the Examiner has discovered no evidence suggesting that their use was for an improper purpose. Trust receipts had different security names or IDs, which were used for different funding and recordation purposes, and some examples include "Trust 01," "Trust 15," or "Trust 24."[6456] During the Defined Preference Period, LCPI primarily used "Trust 86" and "Trust 89."

Historically, LCPI's main operating account was resident in MTS, although LCPI opened accounts on other systems over time.[6457] Therefore, the Examiner understands that to move cash between LBHI and LCPI, a "funding" transaction needed to be executed in MTS. Because MTS had limited functionality, however, Lehman used the repo and reverse repo functions. The Examiner has discovered no evidence suggesting that anyone at Lehman considered trust receipts to be repos or reverse repos, and all evidence points to the contrary. The Examiner understands that settlements from the MTS system into LCPI's bank account occurred through the FPS settlement system.[6458] This process is roughly equivalent to the funding functions that existed in GCCM.

The Examiner's financial advisors identified all Trust 86 and Trust 89 activity in MTS during the Defined Preference Period and have performed an analysis on such

---

[6455] *Id.* at p. 6.

[6456] Lehman used more than a hundred different trust receipts and eventually started recycling them. *Id.* at p. 6 n.2.

[6457] *Id.* at p. 7.

[6458] The transaction was also booked in Treasury Workstation, a software platform utilized by Lehman's Treasury Group.

activity, which is discussed in considerable detail in the attached appendix.[6459]    The Examiner's financial advisors reviewed data in GCCM (for LBHI cash receipt information, even though MTS and GCCM were not tied together), GSSR (Lehman's bank account reconciliation software that showed bank account transactions), Treasury Workstation (a suite of applications utilized by Lehman Treasury Group for various funding functions), and MTS (Lehman's fixed income trading system).    The Examiner's financial advisors attempted to trace the movement of money and to identify the purpose associated with trust receipts used by LCPI.    To complete this task, access to certain FPS data, which contained settlement and payment data for MTS, as well as certain "pre-settlement" data, is required because this information is understood to contain netting information before transfer instructions were created between LCPI and LBHI bank accounts.    Barclays would not grant the Examiner's financial advisors access to FPS because the Examiner understands that Barclays could not adequately segregate Lehman legacy data.[6460]    The Examiner's financial advisors have further advised that a review of the "pre-settlement" data could potentially require a lengthy and costly investigation.    Accordingly, the Examiner cannot make a determination about whether LCPI has a colorable preference claim against LBHI on account of trust receipts.

---

[6459] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) at pp. 18-22.

[6460] Appendix 6, Duff & Phelps, Data Systems Access (Feb. 1, 2010), at p. 33.

**LCPI Capital Infusions.**    As noted above, LCPI received multiple capital infusions from LBI, its parent, over the course of the several months prior to its bankruptcy filing.[6461]   Generally, when a company receives a capital infusion it records an asset (in many instances cash) and paid-in capital on its books and records.   When LBI infused capital into LCPI, however, LCPI never received an asset on its books and records because the individuals instructing the transfer indicated that LCPI did not have a bank account to receive LBI's infusion.[6462]   Instead, LBI transferred the cash in respect of the capital infusion to LBHI, which received the cash on LCPI's behalf.[6463] Because LCPI had a significant intercompany obligation to LBHI, the transfer from LBI to LBHI was recorded as satisfying part of that obligation in the amount of the capital infusion.[6464]   The following illustrates the flow of cash and journal entries:

---

[6461] See Section III.B.3.c.3.a, which discusses capital infusions.

[6462] E-mail from Jeffrey Su, Lehman, to Arthur Miller, Lehman, *et al.*, (May 30, 2008), at p. 1 [LBEX-DOCID 276482]; e-mail from Hui Wang, Lehman, to Helen Chu, *et al.*, Lehman (Aug., 28, 2008), at p. 1 [LBHI_SEC07940_552712].   It was confirmed on multiple occasions, however, that LCPI did have its own bank accounts.   Examiner's Interview of Daniel F. Fleming, Dec. 17, 2009, at p. 8.   LCPI's schedules that were filed with the U.S. Bankruptcy Court also confirm that LCPI had bank accounts.   *See* Amended Schedules of Assets and Liabilities for Lehman Commercial Paper Inc., *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. June 15, 2009).

[6463] Daniel J. Fleming noted that if LCPI had received the cash it would have eventually up-funded to LBHI anyway.   In other words, he noted that it did not matter if LCPI or LBHI received the money because LBHI would eventually receive the money at the end of the day.   Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 8.

[6464] *See* E-mail from Hui Wang, Lehman, to Helen Chu Lehman, *et al.*, (Aug. 28, 2008), at pp. 1-2 [LBHI_SEC07940_552712].



There were two capital infusions during the Defined Preference Period: one in July 2008 for $275 million and one in August 2008 for $900 million.[6465] The Examiner has located internal e-mails relating to the $900 million infusion.[6466] The $900 million transfer could represent an indirect preference even if LCPI never had the infused cash in its bank account because the transfer reduced LCPI's antecedent debt owed to LBHI.[6467]

Although the Examiner Order did not direct the Examiner to analyze potential defenses to claims, it is important to note that money flowed between LCPI and LBHI (and between LBI and LBHI) in significant amounts on an almost daily basis through

---

[6465] As noted above, these amounts were determined by noting the change in Additional-Paid-In-Capital as reported in Lehman's Hyperion financial system.

[6466] The Examiner located documentation for the May 2008 capital infusion but it was outside the Defined Preference Period.  *See* E-mail from Jeffrey Su, Lehman, to Arthur Miller, Lehman, *et al.*, (May 30, 2008), at p. 1 [LBEX-DOCID 276482].

[6467] *E.g., Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir. 2001) ("As the explicit language of the Bankruptcy Code makes clear, however, the transfer need not be made directly by the debtor; indirect transfers made by third parities to a creditor on behalf of the debtor may also be avoidable under the Code." (citing *Dean v. Davis*, 242 U.S. 438, 443 (1917) ("Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such."))

trust receipts and potentially other means. For example, $900 million was a common dollar amount for transfers between affiliates, and the Examiner's financial advisors identified at least three $900 million payments from LBI to LBHI on August 28, 2008.[6468] The Examiner's financial advisors also identified two transfers from LCPI to LBHI on August 29, 2008 (one was for $900 million and one was for $104 million).[6469] As such, the $900 million potential indirect preference is likely one in a very large series of transfers between LCPI and LBHI (and between LBI and LBHI). This makes analyses of new value and ordinary course defenses very relevant for purposes of determining the benefit of a claim to recover these transfers. Because the costs of performing this accounting would be substantial, the Examiner did not trace the movement of cash associated with trust receipts (nor has it been confirmed whether the $900 million potential preference is mutually exclusive of transfers occurring through the use of trust receipts) or perform the other accounting necessary to conclude a new value or ordinary course analysis under Sections 547(c)(2) or (4) with respect to these transfers.[6470]

---

[6468] *See* Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010) , at ex. 25.

[6469] *Id.* The $900 million transfer from LCPI to LBHI was between different bank accounts than those identified on the e-mails instructing the wire transfers.

[6470] As discussed in Section III.B.3.c.3 of this Report, the Examiner concluded that the August 2008 capital infusion was sufficient to render LCPI solvent. Indeed, members of Lehman's LEC group would meet regularly to predict the amount of capital that LCPI and other entities needed. Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 7. The May and July 2008 infusions were insufficient to establish solvency, but in August 2008 infusion was sufficient. The Examiner concluded, however, that the August 2008 capital infusion was sufficient to render LCPI "borderline" solvent, such that its ratio of equity to assets was 0.4%. The Examiner has not, however, obtained sufficient and reliable post-August 2008 information to make a determination as to LCPI's solvency after August 31, 2008. Thus, the Examiner recognizes that

### f)    Preferences Against Non-LBHI Lehman Affiliates (Fourth Bullet)

As with the previous Section discussing insider preferences against LBHI, the Examiner identified LBSF, LBCS and LCPI as those LBHI Affiliates that were insolvent or on the borderline of insolvency beginning on June 1, 2008.  There is a significantly larger population of potential intercompany relationships from which potential preferences could be identified, however.  Although LBSF, LBCS and LCPI did not maintain extensive intercompany accounts with each affiliate, the list of potential intercompany relationships is extensive.

The approach for identifying non-LBHI preferences was similar to that with LBHI, as discussed above, but LBHI Affiliates generally did not provide funding to each other.[6471]  This created problems in identifying potential preferences that were not in connection with safe-harbored activity.  To be sure, the Examiner's financial advisors reviewed GCCM and confirmed that no "funding" activity for LBSF, LBCS, and LCPI was located in that system.  Fleming did note, however, that LCPI may have funded some of its subsidiaries through MTS, and there was significant trust receipt activity

---

all post-August 2008 transfers may be subject to an extensive solvency determination by a trier of fact. *See, e.g., Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 283 (Bankr. E.D. Va. 1999) (noting that "[e]vidence of insolvency on the date of the alleged preference is the critical issue and proof of insolvency on any other date is insufficient").  Because the Examiner has observed that Lehman may have over-marked some of its assets, the Examiner included post-infusion transfers within the preference analysis and makes no distinction between transfers made while LCPI was "insolvent" or while it was "borderline" solvent.

[6471] Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2.  Funding activities, as described under the section addressing insider preferences against LBHI, were the primary source of interest for insider preferences because most activity at Lehman was in respect of safe-harbored activity.  See Section III.B.3.e of this Report, which discusses the rationale for identifying funding activities.

involving LCPI with both LBHI and other affiliates.[6472]    The Examiner's financial advisors identified every counterparty for trust receipts involving LCPI and other Lehman entities during the Defined Preference Period, which can be found in the attached appendix.[6473]

The Examiner's financial advisors attempted to trace the movement of cash associated with trust receipts between LCPI and LBHI.  The Examiner's financial advisors primarily reviewed GCCM, GSSR, Treasury Workstation, and MTS.  The Examiner did not have access to certain FPS data, which would purportedly contain the settlement and payment data for MTS.  As explained above, the Examiner received data regarding Lehman's "pre-settlement" function very late in the investigation and has not reviewed such data for these purposes.

### g)  Avoidance Analysis of LBHI and LBHI Affiliates Against Financial Participants and Pre-Chapter 11 Lenders (Fourth and Eighth Bullets)

#### (1)  Summary

This Section of the Report addresses: (1) the fourth bullet of the Examiner Order, regarding whether any LBHI Affiliate has colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt; and (2) the eighth bullet of the Examiner Order, which covers "the transactions and transfers, including but not

---

[6472] See Section III.B.3.e.8 of this Report, which discusses trust receipt activity and how it was the result of a software limitation in MTS.

[6473] Appendix 22, Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010), at ex. 26.

limited to the pledging or granting of collateral security interest among the debtor and

the pre-Chapter 11 lenders and/or financial participants including but not limited to,

JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New

York and  others."[6474]  The Examiner has consulted with the parties in interest, reviewed

issues identified by those parties, conducted his own independent review and

examination and exercised his discretion as to which issues to include in this analysis.

*First*, with respect to the fourth bullet, the Examiner has not identified any LBHI

Affiliate that has a colorable claim against LBHI under Sections 548 or 544 and state law

for potentially voidable transfers or incurrences of debt.  Because of the magnitude of

the data and the costs involved in reviewing every transfer that occurred during the

applicable look-back periods, the Examiner and his financial advisors developed a set of

criteria designed to pull suspect transfers from the information contained in Lehman's

APB trading database ("APB").  The APB contains over five terabytes of data.  The

Examiner's financial advisors applied their methodology to determine whether any

trades or other activity could potentially be avoidable as against an identified group of

counterparties.  Upon review of that analysis, the Examiner did not find any colorable

claims belonging to an LBHI Affiliate or LBHI.  The Examiner did, however, identify

trades involving thirty-seven securities that belonged to LBI that warranted further

investigation and has provided that information to the SIPA Trustee.  The Examiner

---

[6474] A complete discussion of Lehman's dealings with pre-Chapter 11 lenders and/or financial participants and potential colorable state law claims against them is discussed in Section III.A.5 of this Report.

concluded that further analysis of data in the APB would not be cost-effective. The Examiner also sought to test his review of the Debtors' transfers by examining cash disbursements identified on the Debtors' Statement of Financial Affairs ("SOFA"). The Examiner was not able to complete his analysis because the Debtors have been unable to provide the back-up data for these transfers in the time-frame necessary to allow the Examiner to reach conclusions about the transfers identified on the SOFA.

*Second*, with respect to the eighth bullet, the Examiner reviewed various guaranties entered into by LBHI shortly before its bankruptcy filing and transfers of collateral in connection with those guaranties and concludes that there are colorable claims against JPMorgan and Citi to avoid the guaranties that they received from LBHI and certain related transfers under Sections 547(b), 548 and 544 and state law. The Examiner believes that such claims are subject to substantial defenses including, but not limited to, that the transfers of collateral to JPMorgan or Citi are protected from avoidance based upon the safe-harbor provisions of the Bankruptcy Code. The Examiner finds insufficient evidence to support the existence of colorable claims against FRBNY, BNYM, HSBC and the CME Group ("CME"). The Examiner elected not to examine the BofA transactions for purposes of determining whether colorable claims exist with respect to these transactions due to the fact that these transactions are the subject of ongoing litigation. The Examiner was unable to reach a conclusion with respect to a $200 million collateral transfer to Standard Bank because of the lack of

information showing whether a Lehman Chapter 11 Debtor was the source of this collateral transfer.[6475]

### (2)  APB Analysis

Lehman kept systematic records of trades in its APB database, which consolidated trade records from multiple Lehman trading systems.  The APB database is extensive and it contains over five terabytes of data.[6476]  When the Examiner's financial advisors obtained access to the database, the scope of information that the database contained was unclear.  The Examiner's objective was to identify patterns of trading behavior, trades of interest or other activity after August 1, 2008 that warranted further investigation, such as trades with indicia of actual fraud under Section 548(a)(1)(A) or other potentially avoidable activity.  The Examiner's financial advisors' methodology is described in detail in Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010).

The Examiner first identified a population of trading counterparties consisting of large banks and clearing houses, potentially related parties, and counterparties trading

---

[6475] The  Examiner notes that claims analyzed herein arising under Sections 547(b), 548 and 544 and state law are dependent upon an analysis of Lehman's financial condition as of the time of these transfers. Because the Examiner was directed only to determine if these claims were colorable, the Examiner's financial advisors have limited their analysis to a determination as to whether evidence exists to support a finding of the requisite financial condition.

[6476] Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010).

in illiquid assets.[6477]    The Examiner's financial advisors then applied two selection methodologies.    First, the Examiner's financial advisors excluded all non-principal trades, Level 1 and most Level 2 assets, and trades involving exchange-listed assets. This yielded 30,000 trades for further review.    Second, the Examiner's financial advisors identified trades involving either (1) asset-backed securities, (2) non-investment grade debt securities, or (3) Lehman's own debt or equity securities as being the most appropriate to review.    Further, the Examiner's financial advisors scrutinized individual transactions exceeding $50 million regardless of these criteria and generally included such trades for subsequent testing.    This yielded 5,100 trades for further review.

After this population of trades was identified, the Examiner's financial advisors classified the trades by counterparty; this analysis is discussed at length in Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010).    From these approximately 5,100 trades, the Examiner's financial advisors then identified those trades where a price discrepancy of over 30% to the then-current market value existed to Lehman's detriment.    This yielded thirty-seven trades of interest that required further investigation.

The first step in investigating these thirty-seven trades was to identify the prior owner of the securities to determine which Lehman entity received a potentially unfair

---

[6477] The fourteen selected counterparties were Bank of America, Barclays, Citi, HSBC, JPMorgan, BNYM, FRBNY, Standard Bank, R3 Capital Management, One William Street, Fortress Investment Group, Blackrock, BlueMountain Capital and Stark Investments.    Narrowing the field of APB by date only, beginning August 1, 2008, yielded over one million trades.

price (the APB database did not permit this query to be conducted in the first instance). The Examiner's financial advisors discovered, however, that no LBHI Chapter 11 Affiliate owned any of the thirty-seven securities identified under this methodology between August 1 and September 19, 2008. In many cases, however, LBI (a Chapter 7 Affiliate) was the owner. Because this matter is outside of the scope of the Examiner Order, the Examiner contacted the SIPA Trustee and provided him with the information that the Examiner discovered so that he may investigate these trades further. Because this methodology did not yield any LBHI Affiliate transactions warranting further review (*i.e.*, there was never an interest of the Debtor in the property), the Examiner ceased the analysis under the APB Approach as it did not appear that further analysis would be cost-effective or result in the identification of colorable claims.[6478]

---

[6478] The Examiner's financial advisors also attempted to analyze significant manual journal entries (with a gross balance of greater than $500 million) that were entered into the general ledger between September 1, 2007 and September 12, 2008. There were 138 manual journal entries that satisfied this criteria and it was determined that they potentially could represent one or more of the following activities: (1) third-party asset transfers; (2) forgiveness of debt; (3) equity transfers; or (4) any unusual or indistinguishable activity. Completion of this analysis was dependent upon assistance from Barclays and the Debtors with specific knowledge regarding the purpose of the entries. The Examiner attempted to gain such supporting documentation for the 138 selected entries and to schedule interviews with the controllers responsible for preparation of these entries. Based on communications with the Debtors and the conclusion that the Examiner's financial advisors would be too reliant on third parties to complete this analysis, the Examiner ceased this methodology prior to completion. For a complete discussion of the analysis conducted by the Examiner's financial advisors, see Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010).

### (3)  Cash Disbursement Analysis

In addition to the APB analysis, the Examiner and his financial advisors reviewed the Debtors' SOFA schedules.  In order to identify payments most likely to represent avoidable transactions, the following selection criteria were applied to identify activity of interest.  First, the Examiner's financial advisors identified payments made to counterparties that satisfy one or more of the following criteria: (1) the counterparty is a major bank/clearing house, (2) the counterparty conducts a significant volume of trades, and (3) the counterparty is involved in transactions with illiquid assets.  There were thirteen such counterparties.  Second, the Examiner's financial advisors identified payments to creditors that were opaquely described (for example, "ATTN FUNDS MANAGEMENT") or that received $1 billion or more in total payments during the period reflected in the SOFA Schedules 3b.  Third, the Examiner's financial advisors identified six additional payments because the term "collateral" was included in the creditor's name.

The foregoing selection criteria yielded 416 payments representing disbursements of approximately $160 billion.  The Debtors provided assistance to the Examiner's financial advisors in identifying the Lehman cash settlement system used to transact each payment.  Pursuant to an analysis of the cash settlement systems, however, the Examiner's financial advisors determined that 192 of the 416 payments were likely related to transactions subject to the safe-harbor provisions of the

Bankruptcy Code because there is evidence that these payments pertain to either repo transactions (51) or derivatives payments (141).  The Examiner's financial advisors were unable to resolve the remaining selected payments (224) because the Debtors' post-petition managers were unable to provide the Examiner with the necessary data prior to the filing of this Report.  For the complete discussion of the analysis conducted by the Examiner's financial advisors, see Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010).

### (4)  Pledged Collateral Accounts Analysis

In the period prior to the bankruptcy, certain counterparties that provided clearing services or other credit to Lehman requested increases in pledged collateral as a prerequisite for continuing to extend credit.  Such pledges of collateral often involved cash disbursements, which are subject to the Cash Disbursement Analysis.  However, in circumstances where assets were seized from accounts subject to lien, no cash or trade record exists.  With access to a firm's pledged collateral accounts, it is possible to identify seized assets and trace the assets back to the original legal entity that provided the assets used for collateral.  The Examiner was provided with limited access to certain Lehman pledged accounts at JPMorgan.  For a summary of findings relating to tracing certain securities believed to be held in pledged accounts at JPMorgan at September 12, 2008, see Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash

Disbursement and JPMorgan Collateral (Feb. 1, 2010).  This pledged collateral account

analysis also did not yield any colorable avoidance claims.[6479]

### (5)  Avoidance Analysis for Certain Pre-Chapter 11 Lenders and Financial Participants

#### (a)  JPMorgan Avoidance Analysis

##### (i)  Background

JPMorgan acted as LBI's (LBHI's U.S. broker-dealer subsidiary) principal

clearing bank for securities trading and triparty repo agreements.   In that role,

JPMorgan assisted LBI's clearance and settlement of securities and LBI's funding

through triparty repos.

Beginning in early 2008, JPMorgan began the process of revamping its approach

to dealing with its credit risk to Lehman.   To protect itself, JPMorgan requested

additional collateral, sought amendments to its agreements with Lehman to strengthen

its rights in the event of a Lehman default and made changes to its procedures for

dealing with Lehman.  The Examiner's analysis of claims arising under the Bankruptcy

Code to avoid the transfers of this additional collateral or the incurrence of obligations

focused on two sets of agreements that JPMorgan and LBHI entered into on August 29,

---

[6479] The pledged collateral account analysis provides further detail with respect to LBHI's pledge of Spruce, Freedom, Pine, Kingfisher, and Verano, all asset backed securities, to JPMorgan.  *See* Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010); *see also* Appendix 18, Lehman Collateral at JPM.  LCPI appears to have sold these securities to LBHI via principal trades.  *See* Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral (Feb. 1, 2010) (containing trade information for many of these securities).  As such, the transfers of these securities from LCPI to LBHI would be protected from avoidance by the safe-harbor provisions of the Bankruptcy Code as a "transfer" in connection with a "securities contract."

2008 and September 10, 2008.  The facts upon which this analysis is based are set forth in greater detail in Section III.A.5.b, but are summarized herein to the extent necessary to assist the reader in understanding the Examiner's conclusions.

In August 2008, JPMorgan requested that Lehman enter into new agreements in part because JPMorgan wanted a guaranty from LBHI.  In addition, JPMorgan requested the new agreements given concern by JPMorgan and Lehman counterparties that additional Lehman subsidiaries that were not party to the Clearance Agreement were conducting operations through JPMorgan's clearing system.[6480]  The parties ultimately executed three documents on August 29, 2008 (though dated August 26, 2008):[6481] (1) an amendment to a clearance agreement (the "August Amendment to the Clearance Agreement");[6482] (2) a guaranty (the "August Guaranty);[6483] and (3) a security agreement (the "August Security Agreement," collectively, the "August Agreements").[6484]

In late August and September 2008, Lehman's deteriorating financial condition became increasingly apparent.[6485]  Reports began to surface that The Korea

---

[6480] Examiner's Interview of Daniel J. Fleming, Apr. 22, 2009, at p. 5; Examiner's Interview of Paul W. Hespel, Apr. 23, 2009, at p. 3.

[6481] *See* e-mail from Paul W. Hespel, Goodwin Procter, to Nikki G. Appel, JPMorgan, *et al.* (Aug. 29, 2008) [JPM-2004 0004629].

[6482] *See* Amendment to Clearance Agreement (Aug. 26, 2008) [JPM-2004 0005856].

[6483] Guaranty (Aug. 26, 2008) [JPM-2004 0005879].

[6484] Security Agreement (Aug. 26, 2008) [JPM-2004 0005867].

[6485] *See e.g.*, Andrew Ross Sorkin, *Struggling Lehman Plans to Lay Off 1,500*, N.Y. Times, Aug. 28, 2008 (Lehman shares lost 73% of their value between January 2008 and the end of August 2008); *see also* e-mail from Ricardo S. Chiavenato, JPMorgan, to David A. Weisbrod, JPMorgan (Aug. 22, 2008) [JPM-2004

Development Bank ("KDB") had abandoned (or was likely to abandon) its acquisition

talks with Lehman,[6486] and Lehman's stock price had dropped significantly.[6487]   Shortly

before 9:00 p.m. on September 9, JPMorgan sent draft guaranty and security agreements

to Andrew Yeung, in-house counsel at Lehman.[6488]   A draft amendment to the Clearance

Agreement arrived later that night.[6489]   The parties ultimately executed three key

documents on September 10, 2008: (1) an Amendment to the Clearance Agreement (the

"September Amendment to the Clearance Agreement");[6490] (2) an amended Guaranty

(the "September Guaranty");[6491] and (3) an amended Security Agreement (the

"September Security Agreement," and collectively, the "September Agreements").[6492]

The Examiner concludes that there are colorable claims to avoid the September

and August Guaranties as constructive fraudulent obligations under Sections 548 and

---

0061226] ("Lehman may face serious problems next week if it is not acquired . . . and its losses are large.").

[6486] Francesco Guerrera, *et al.*, *Equities Suffer as Lehman Shares Fall 45%*, Fin. Times, Sept. 9, 2008 ("Lehman's shares fell after a newswire report cited an unnamed Korean government official as saying that Korea Development Bank, a state-run lender, had decided not to invest in Lehman."); Susanne Craig, *et al.*, *Korean Remarks Hit Lehman*, Wall St. J., Sept. 9, 2008 ("A KDB official said the comments [by the Chairman of South Korea's Financial Services Commission] would likely be strong enough to deter the bank from pursuing a Lehman deal . . . .").

[6487] Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11; Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at p. 4; Susanne Craig, *et al.*, *Lehman Faces Mounting Pressures*, Wall St. J., Sept. 10, 2008, at A1; Susanne Craig, *et al.*, *Korean Remarks Hit Lehman*, Wall St. J., Sept. 9, 2008.

[6488] E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 9, 2008) [JPM-2004 0005594]; Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4.

[6489] E-mail from Jeffrey Aronson, JPMorgan, to Andrew Yeung, Lehman, *et al.* (Sept. 9, 2008) [JPM-2004 0005039].  A draft Aurora Guaranty and draft Control Agreement were sent with the draft Amendment to the Clearance Agreement as well.  *See id.*

[6490] Amendment to Clearance Agreement (Sept. 9, 2008) [JPM-2004 0005861].

[6491] Guaranty (Sept. 9, 2008) [JPM-2004 0005813].

[6492] Security Agreement (Sept. 9, 2008) [JPM-2004 0005873].

544 and New York state law.[6493]    In addition, the Examiner concludes that there are

colorable claims to avoid as much as $6.9 billion of the $8.6 billion in collateral that

LBHI transferred to JPMorgan to secure the September Guaranty under Sections 547(b),

548 and 544 and state law, but that the claims to avoid the collateral transfers may be

defeated by the defenses under Sections 546(e), (f), (g) and (j).[6494]

### (ii) Avoidability of the September Agreements and Transfers in Connection with the September Agreements

The September Amendment to the Clearance Agreement expanded JPMorgan's

lien on the Lehman parties' accounts and secured their existing or future indebtedness,

obligations and liabilities of any kind to JPMorgan, whether arising under the Clearance

Agreement or not.[6495]  The September Guaranty expanded LBHI's liability to JPMorgan

making it the guarantor of all obligations and liabilities of all direct or indirect

subsidiaries of LBHI to JPMorgan and its affiliates of whatever nature, irrespective of

---

[6493] Although Section 548 of the Code authorizes the avoidance of the incurrence of an obligation as constructively fraudulent if less than reasonably equivalent value is exchanged and the debtor is either (a) insolvent, or (b) undercapitalized or (c) unable to pay its debts as such debts are expected to mature, the New York Uniform Fraudulent Conveyance Act only allows for the avoidance of the incurrence of an obligation if the debtor is insolvent or has a subjective intent not to pay such debts as such debts are expected to come due.  *Compare* 11 U.S.C. § 548(a), *with* McKinney's Debtor and Creditor Law § 274 (2010); *see also In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 734 n.13 (Bankr. S.D.N.Y. 2008) ("By its terms, section 274 ("unreasonably small capital") applies to conveyances but not obligations ....").  For a more detailed discussion of the elements of a fraudulent transfer or a preference claim, see Appendix 1, Legal Issues, at Sections IV.A, IV.D.

[6494] For a complete discussion of potential colorable state law claims against JPMorgan, *see* Section III.A.5.b.

[6495] Amendment to Clearance Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005861].

whether they accrued pursuant to the Clearance Agreement.[6496]   The September Security

Agreement expanded the definition of accounts in which JPMorgan held a security

interest to include all Lehman accounts at JPMorgan or its affiliates.[6497]

**a.    Avoidability of the September Guaranty as a Constructive Fraudulent Obligation**

**1.    There Is Evidence To Support A Finding That LBHI Incurred an Obligation Within the Applicable Look-Back Periods When it Executed the September Guaranty**

The Examiner has concluded that there is evidence to support a finding that

LBHI incurred an obligation within the applicable look-back periods set forth in Section

548 or New York state law when it entered into the September Guaranty.   *Rubin v.

Manufacturers Hanover Trust Co.*[6498] is the seminal decision addressing whether the

incurrence of obligations under a guaranty may be avoided as a constructive fraudulent

obligation.   *Rubin* held that the execution of a guaranty itself is not the incurrence of an

obligation but that the obligation is incurred when the loan is made to the primary

obligor, thereby creating a contingent liability for the guarantor.[6499]   Here, the September

Guaranty required LBHI to guarantee "all obligations and liabilities of the Borrowers to

the Bank of whatever nature, whether now existing or hereafter incurred."[6500]   As of

---

[6496] Guaranty (Sept. 9, 2008), at p. 1-2 [JPM-2004 0005813].

[6497] Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873].

[6498] *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981).

[6499] *Id.* at 990-91.

[6500] Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813].

September 9, 2008, the Lehman entities (which included LBI and all of LBHI's direct or indirect subsidiaries) owed obligations to JPMorgan. Thus, upon execution of the September Guaranty on September 10, 2008, LBHI had a contingent liability to repay JPMorgan if one of the Lehman entities could not repay JPMorgan. Thus, LBHI incurred an obligation to JPMorgan within the two-year look back period of Section 548(a) and the six-year look back period under New York law.[6501]

**2.    There Is Evidence To Support A Finding That LBHI Received Less Than Reasonably Equivalent Value or Did Not Receive Fair Consideration in Exchange for Granting JPMorgan the September Guaranty**

The Examiner has concluded that there is evidence to support a finding that LBHI did not receive reasonably equivalent value or fair consideration in exchange for incurring the additional obligations imposed upon it by the September Guaranty. Reasonably equivalent value or fair consideration "means more than just the 'good and valuable' consideration needed to support a simple contract."[6502] Instead, consideration is "fair" or "reasonably equivalent" if, in exchange for incurring the obligation, the debtor receives property of a reasonably equivalent value or is relieved of an antecedent obligation.[6503] The focus of this analysis is upon LBHI and whether LBHI and its

---

[6501] McKinney's Civil Practice Law and Rules § 213 (2010); *Island Holding, LLC v. O'Brien*, 775 N.Y.S.2d 72, 74 (Sup. Ct. 2004).

[6502] *Rubin*, 661 F.2d at 991.

[6503] *Id.*; *see also Liebowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 580 (7th Cir. 1998). Section 548 defines value to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor …" 11 U.S.C. § 548(d).

creditors received something of value when, on the eve of its Chapter 11 filing, LBHI took on additional debt. In this analysis, *Rubin* permits the consideration of both direct and indirect benefits received by the entity that incurs the obligation, and subsequent case law has expanded that concept.[6504] The economic benefits, both direct and indirect, "must be measured and then compared to the obligations that the bankrupt incurred."[6505] "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred [or obligation incurred]. Thus, when a debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received."[6506] In this case, that measurement would occur on September 10, 2008, because as of the execution of the September Guaranty on September 10, JPMorgan had made outstanding loans to LBHI subsidiaries.[6507]

Although LBHI became a "Customer" under the JPMorgan Clearance Agreement when that Agreement was amended on August 29, 2008, the clearance services provided under the August Amendments to the Clearance Agreement were provided to LBHI subsidiaries and affiliates. Because the services JPMorgan provided under the

---

[6504] *See, e.g., Liebowitz*, 139 F.3d at 577-82 (general discussion of direct and indirect benefits in the context of corporate family guaranties).

[6505] *Mellon Bank, N.A. v. Metro Comm'cns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991).

[6506] *Id.* at 647.

[6507] *Rubin*, 661 F.2d at 990-91.

Clearance Agreement were all used by LBHI's subsidiaries, the possible direct benefits to LBHI from the September Guaranty are limited to (1) the potential increase in the value of its subsidiaries' stock as a result of LBHI's credit support of the subsidiaries' obligations to JPMorgan and (2) any additional capital that the subsidiaries were able to access as a result of any loans that were guaranteed.  Possible indirect benefits to LBHI may include (1) the strengthening of the corporate group as a whole and (2) the increased ability to access other capital as a result of JPMorgan's continued agreement to extend credit to LBI in connection with clearing trades and otherwise.[6508]  Possible indirect benefits also may include the additional time provided to LBHI to find a solution to its financial problems as a result of forestalling JPMorgan's possible withdrawal of credit from LBI.[6509]  Prospective benefits, however, must be measured "by the likelihood that the debtor will actually realize those benefits."[6510]  Thus, a "buying of

---

[6508] *Cf. Liebowitz,* 139 F.3d at 581 (noting that in general courts uphold cross-stream guarantees when the transaction strengthens the viability of the corporate group).

[6509] *See Commerce Bank of Kansas City, N.A. v. Achtenberg,* No. 90-0950-CV-W-6, 1993 WL 476510, *4 n.5 (W.D. Mo. Nov. 10, 1993) (suggesting that a parent company may benefit in the form of giving a subsidiary a "'fighting chance' to escape insolvency" by guaranteeing "a large loan to marginally insolvent company."); *but see Liebowitz,* 139 F.3d at 581-82 (finding no reasonably equivalent value where, by paying of the affiliate's debts, the debtor kept the affiliate out of bankruptcy but bankrupted itself).

[6510] *Silverman v. Paul's Landmark (In re Nirvana Restaurant Inc.),* 337 B.R. 495, 504 (Bankr. S.D.N.Y. 2006) (citations omitted); *but see Official Committee of Unsecured Creditors of Tousa, Inc. v. Citicorp North America, Inc. (In re Tousa, Inc.),* No. 08-10928-JKO, 2009 WL 3519403 at *78 (Bankr. S.D. Fla. Oct. 30, 2009) ("hoped for" benefits insufficient).

time" benefit needs to be measured by the likelihood that LBHI would find a solution to its financial problems.[6511]

To be considered in a reasonably equivalent value analysis, indirect benefits, like direct benefits, must be quantifiable.[6512]  With respect to the benefits realized from the ability to borrow additional money, the Third Circuit has stated this additional borrowing ability

> has considerable value in the commercial world.  To quantify that value, however, is difficult.  Quantification depends on the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business.[6513]

In this case, LBHI provided a "downstream guaranty" – a guaranty by a parent corporation of the debts of its wholly-owned subsidiaries.  Downstream guaranties are typically viewed as less vulnerable to avoidance than fraudulent transfers as the parent corporation presumably increases its own value (through the increased value of its subsidiaries) by providing a guaranty to a lender so that capital can flow to its subsidiaries.[6514]

---

[6511] See 337 B.R. at 504. (holding that guaranty was a "sunk cost" and debtor "did not receive a benefit by throwing good money after bad" where chance that affiliate, a restaurant, would open and make enough to pay its own expenses, including those guaranteed by the debtor, was highly speculative).

[6512] See Liebowitz, 139 F.3d at 578; Metro Commc'ns, 945 F.2d at 646-48.

[6513] Metro Commc'ns, 945 F.2d at 646-48.  The Third Circuit found that by failing to present evidence of what the indirect benefit of an increased ability to borrow money was worth and instead contending, without expert support, that the indirect benefits had no value, the plaintiff failed to satisfy its burden of proof as to lack of reasonably equivalent value.  Id. at 650.

[6514] See Achtenberg, 1993 WL 476510 at *4 (downstream guaranties to a solvent subsidiary are presumed to be reasonably equivalent value); see also Lawrence Paperboard Corp. v. Arlington Trust Co. (In re Lawrence

If, however, the subsidiaries were insolvent at the time of the guaranty, the guaranty may not provide direct value to the parent as the guaranty would not increase the value of the subsidiaries and would instead only serve to create an additional claim against the parent that would dilute the recovery of the parent-guarantor's creditors.[6515] The Seventh Circuit noted in a recent case that "'[o]ne theme that permeates the authorities upholding guaranty obligations: that the guaranty at issue was the result of arm's length negotiations at a time when the common enterprise was commercially viable.'"[6516]

The first question to be asked is what LBHI gave up as a result of entering into the September Guaranty.   Previously, on August 29, 2008, LBHI had agreed to guarantee the obligations of only certain of its subsidiaries (LBI, LBCPI, LBOTC, LBIE and LBJ) under the August Amendment to the Clearance Agreement.   The September Guaranty expanded the subsidiaries covered by LBHI's guaranty to include all of its subsidiaries and expanded its obligations to include all of their obligations, not just those arising under the Clearance Agreement.[6517]   The *ex post* effect of the September

---

*Paperboard Corp.)*, 76 B.R. 866, 871 (Bankr. D. Mass. 1987); *Garrett v. Falkner (In re Royal Crown Bottlers of North Ala., Inc.)*, 23 B.R. 28, 30 (Bankr. N.D. Ga. 1982).

[6515] *See, e.g., Achtenberg*, 1993 WL 476510 at *4 (stating that it "can hardly be said that the debtor's net worth has been preserved and the interests of the creditors not injured when the debtor guarantees a loan to an insolvent entity").

[6516] *Liebowitz*, 139 F.3d at 577-78 (quoting Williams, *The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guaranties: Fraudulent Transfer Law as a Fuzzy System*, 15 Cardozo L. Rev. 1403, 1438 (1994)).

[6517] Examiner's Interview of Andrew Yeung, Mar. 13, 2009, at p. 4. *Compare* Guaranty (Sept. 9, 2008), at p. 1 [JPM-2004 0005813], with Guaranty (Aug. 26, 2008), at p.1 [JPM-2004 0005879].

Guaranty was an increase of LBHI's exposure by an estimated $4.2 billion, assuming the validity of JPMorgan's underlying claims.[6518]

LBHI's increased exposure as a result of the expanded September Guaranty occurred in two ways. First, in the case of LBHI's obligations with respect to JPMorgan derivatives contracts, LBHI had already guaranteed such claims on an unsecured basis and the September Agreements transformed this pre-existing obligation into a secured debt.[6519] Second, the September Guaranty imposed upon LBHI new obligations for which it previously had no responsibility. The estimated $4.2 billion increase in exposure was principally attributable to: (1) JPMorgan derivatives claims of $3.08 billion; (2) other investment bank and treasury and security services claims of $390 million; and (3) asset management exposure claims of $750 million.[6520]

The $4.2 billion increase in exposure (assuming the validity of JPMorgan's underlying claims) represents the total additional debt guaranteed, or that became secured, as a result of the September Agreements. In analyzing this increase in

---

[6518] JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009) [LBEX-JPMC 000199].

[6519] *See* ISDA Master Agreement between JPMCB and LBCC (Nov. 15, 1993), at p. 25 [JPM-2004 0000368] (providing a guaranty by LBHI); ISDA Master Agreement between JPMM and LBIE (Aug. 26, 1997), at p. 14 [JPM-2004 0086169] (providing a guaranty by LBHI); ISDA Master Agreement between JPMCB and LBFSA (Nov. 15, 1993), at p. 24 [JPM-2004 000850] (providing a guaranty by LBHI); Amendment to the ISDA Master Agreement between JPMM and LBFSA (July 11, 2008), at p. 35 [JPM-2004 0086103] (providing guaranty by LBHI); ISDA Master Agreement between JPMCB and LBSF (Dec. 20, 1995), at p. 22 [JPM-2004 0000345] (providing guaranty by LBHI); ISDA Master Agreement between JPMBD and LBIE (Feb. 23, 1998), at p. 21 [JPM-2004 0086072]; Guarantee of LBHI for ISDA Master Agreement between WMB and LBSF (May 28, 1998) [LBEX-JPM 0000210]; Guarantee of LBHI for ISDA Master Agreement between JPMM and LBSF (June 7, 2002) [LBEX-JPM 0000212].

[6520] *Id.* The asset management claims are discussed in detail in Section III.B.3.g.5.a.vi of this Report.

exposure, it is important to note that the September Guaranty was for payment, not collection, such that JPMorgan could look first to LBHI for payment without being required to exhaust its collection efforts against the subsidiaries.[6521]  As such, the $4.2 billion estimate of the exposure would find support in the September Agreements themselves.  This measure of exposure, however, does not account for collateral owned by LBHI's subsidiaries.  Although it is theoretically possible that JPMorgan could look to LBHI alone to satisfy the obligations, this would be unlikely.  The subsidiaries themselves had assets to pay JPMorgan and collateral pledged to support their direct obligations to JPMorgan.[6522]  Thus, JPMorgan would have no reason to look solely to LBHI, but would likely collect from all sources at once (which is what it in fact did to the extent it was able to apply its collateral to reduce its claims post-petition relying upon the safe-harbor provisions of Section 362).[6523]  Further, even if JPMorgan were to collect only from LBHI, LBHI would have a subrogation claim against its subsidiaries, reducing the September Guaranty's impact on LBHI and its creditors.[6524]  For this reason, the increased exposure should not be measured by the full difference in gross exposure, but should be discounted by two factors: (1) the probability that the

---

[6521] *See* Guaranty (Sept. 9, 2008) at p. 1 ("The Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of all obligations and liabilities of the Borrowers to the Bank.") [JPM-2004 0005813].

[6522] JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009) [LBEX-JMPC 000199].

[6523] *Id*.

[6524] Under Section 5 of the September Guaranty, LBHI's right of subrogation could not be exercised until JPMorgan was paid in full, all Lehman accounts were closed and all of Lehman's obligations under any agreements with JPMorgan were fulfilled.  *See* Guaranty (Sept. 9, 2008), at p. 2-3  [JPM-2004 0005813].

September Guaranty would be called at all; and (2) the value of the collateral that secured the obligations at the subsidiary level and the ability of each subsidiary to contribute to a JPMorgan deficiency claim arising under the September Guaranty.

Because of the potential overcollateralization of JPMorgan,[6525] the net exposure to LBHI, after accounting for the collateral pledged by the subsidiaries and assuming that the subsidiaries would not pay anything on account of any general unsecured deficiency claim held by JPMorgan after application of that collateral, was theoretically zero under the September Guaranty.

Conflicting evidence exists as to whether a zero value net exposure under the September Guaranty is reasonable. Some documents indicate that JPMorgan believed it was fully collateralized against Lehman, but those documents do not address all non-clearing obligations.[6526] In addition, interviews with JPMorgan personnel indicate that JPMorgan was concerned over the adequacy of Lehman's collateral, suggesting that JPMorgan believed the guaranties were necessary to protect itself.[6527] Other evidence suggests that JPMorgan was unsure how much collateral it needed at any given time to cover its exposure.[6528] Determining the amount of appropriate collateral was "art, not

---

[6525] See III.A.5.b. for a discussion of the issue of overcollateralization.

[6526] See JPMorgan, Tri-Party Repo Margin Gap Analysis – Lehman – 9/10/2008 (Sept. 10, 2008) [JPM-2004 0029886-89]; see also Section III.A.5.b of this Report.

[6527] Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at pp. 4-5; see also Section III.A.5.b of this Report for a more detailed discussion of the basis of JPMorgan's collateral demands.

[6528] Examiner's Interview of Gail Inaba, Apr. 28, 2009, at pp. 11-12.

science,"[6529] and was dependent upon estimates.[6530]   Even if LBHI's net exposure under

the September Guaranty could reasonably be valued at zero, the September Guaranty

still imposed a cost upon LBHI: namely, the risk that the actual sale of collateral would

generate proceeds less than the gross exposure to JPMorgan, triggering LBHI's liability

as a guarantor.

Post-bankruptcy events suggest that: (1) these values were incorrect, or (2) the

value of the collateral significantly declined following the execution of the September

Guaranty.  After September 15, 2008, JPMorgan liquidated approximately $1.95 billion

of the $8.6 billion in cash collateral LBHI posted on or after September 9, 2008.[6531]

JPMorgan claims a right to an additional $943 million of collateral in connection with

the September Guaranty.[6532]   As of October 27, 2009, JPMorgan asserted $7.6 billion in

remaining claims and had $7.14 billion remaining in cash, money market funds, and

other collateral.   Thus, if all the remaining collateral were liquidated to pay the

remaining obligations that JPMorgan asserts are still due, JPMorgan would have

approximately $459 million in remaining claims on account of obligations guaranteed

by the September Guaranty.  Given that approximately $1.95 billion of the $8.6 billion

LBHI collateral has been used to pay JPMorgan already and additional LBHI collateral

may be used to reduce the claim to zero, the net exposure on September 10, 2008 was

---

[6529] Examiner's Interview with Steven D. Black, Sept. 23, 2009, at p. 6.
[6530] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 3.
[6531] JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009) [LBEX-JPMC 000199].
[6532] Id.

either greater than zero (assuming that JPMorgan's claims and valuations of collateral are correct) or JPMorgan was overcollateralized pre-bankruptcy and the value of collateral posted by the subsidiaries fell after September 10, 2008 by these amounts. Thus, the Examiner concludes that there is evidence to support a finding that LBHI did in fact increase its exposure to JPMorgan by entering into the September Guaranty.

The next step of the "less than reasonably equivalent value" inquiry is to determine what LBHI received in exchange for increasing its exposure to JPMorgan and whether what it received was approximate in value to what it gave up. In analyzing the likely direct benefits, the starting point for determining whether the September Guaranty increased the value of the subsidiaries is to determine whether the subsidiaries had *any* value at the time of the September Guaranty. Section III.B.3.c discusses the findings of the Examiner with regard to the solvency of the subsidiaries of LBHI. To summarize, the Examiner has concluded that there is evidence to support a finding of insolvency for the following subsidiaries as of May 31, 2008: LCPI, CES Aviation IX and CES Aviation V. Two of these entities, CES Aviation IX and CES Aviation V, remained insolvent through filing for bankruptcy. LCPI was insolvent through much of 2008, but received a $900 million capital infusion on August 29, 2008, which allowed it to become borderline solvent and to apparently maintain this status until its bankruptcy filing.[6533] Three LBHI Affiliates – LBSF, LBCS and CES Aviation –

---

[6533] See Section III.B.3.c of this Report for a discussion of the solvency of LCPI.

were borderline solvent as of May 31, 2008, meaning that their balance sheets showed

assets just slightly in excess of liabilities and that a minimal write down of asset values

or a small unaccounted-for liability would render these entities insolvent.  The small

margin by which these entities were solvent creates a factual issue to be resolved by the

court on a case-by-case basis.[6534]  Nine LBHI Affiliates – LOTC, LB 745, LBDP, LBCC,

BNC Mortgage LLC, LBFP, East Dover Limited, LSF and LRP – were solvent as of as

May 31, 2008, and there is insufficient evidence to support a claim that any of these

LBHI Affiliates became insolvent during the period ending upon the commencement of

the applicable Chapter 11 case.[6535]    There is insufficient evidence to reach a

determination as to the solvency of Debtor entity PAMI Statler Arms.[6536]  PAMI Statler

Arms is a subsidiary of Property Asset Management, Inc. ("PAMI"), and its sole asset is

---

[6534] The Examiner did not conduct an asset-by-asset valuation of each asset owned by LBHI Affiliates because of the time and cost required for such an exercise.  Rather, positions across a number of different asset classes were reviewed for several Debtors.  An entity's equity-to-total-assets ratio, as well as the relative likelihood of a misstatement of the value of an entity's assets, is considered in determining whether an entity that posted positive equity might nonetheless be borderline solvent.  As the term is used here, a low equity-to-total-assets ratio would make an entity borderline solvent unless the composition of its assets was such that misstatement of their value was very unlikely.  In light of the cost and time necessary to evaluate the valuation of all of the assets of each of the borderline solvent entities, the Examiner determined that it would not be beneficial to perform such an exercise.  For purposes of analyzing whether these LBHI Affiliates have colorable avoidance claims, the Examiner assumed that the borderline entities were insolvent.

[6535] LRP was established in May 2008 and did not post a balance sheet until June 2008.  LRP was solvent as of August 31, 2008 and there is insufficient evidence to support a claim that it became insolvent at any time between its incorporation and the commencement of its Chapter 11 case.

[6536] A motion to dismiss PAMI Statler Arms LLC's bankruptcy petition was filed on May 26, 2009.  *See* Motion of Debtors Seeking Entry of an Order Pursuant to Section 1112(b) of the Bankruptcy Code Dismissing Chapter 11 Case of PAMI Statler Arms LLC, Docket No. 3650, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. May 26, 2009).  The hearing on the motion has been adjourned without a date.  *See* Notice of Adjournment of Motion of Debtors Seeking Entry of an Order Pursuant to Section 1112(b) of the Bankruptcy Code Dismissing Chapter 11 Case of PAMI Statler Arms LLC, Docket No. 4060, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. June 20, 2009).

an apartment complex in Cleveland, Ohio.  Lehman did not maintain separate financial statements for PAMI Statler Arms in its general ledger software program.

The Examiner did not make a finding as to the solvency of LBI in as much as this issue is likely being examined by the SIPA Trustee.  The Examiner, for the purposes of this analysis, assumes that LBI was insolvent on September 10, 2008.  As set forth in Section III.C, this assumption is supported by the sale of LBI to Barclays five days later that did not result in LBHI receiving any value for LBI.

Because there is evidence that supports a finding that some of LBHI's subsidiaries including LBI were insolvent and not likely to generate any value for LBHI, there is a colorable basis to claim that LBHI did not receive any direct quantifiable benefits from entering into the September Guaranty.

Apart from whether the September Guaranty may have increased the value of LBHI's subsidiaries, the September Guaranty may have benefited LBHI by allowing LBHI the ability to sell itself to Barclays or otherwise gain time to execute a rescue.  This purported benefit is subject to an indirect benefit analysis.  The burden is upon the plaintiff to prove the value – or lack of value – of any indirect benefits.[6537]  A plaintiff could value this indirect benefit by quantifying the "option" value of having additional time before the petition date to attempt to enter into a more favorable transaction.

---

[6537]*Metro Commc'ns*, 945 F.2d at 650; *but see Tousa*, 2009 WL 3261963 at *77-78 (holding if trustee meets burden that debtor did not receive indirect benefits, burden shifts to defendant to produce evidence that debtor received an indirect benefit that was tangible and concrete).

Quantifying this indirect benefit is difficult because it is unclear whether LBHI (as opposed to its subsidiaries) benefited from the opportunity to devise another solution to its problems. KDB relayed its decision not to continue talks with Lehman on September 2, 2008.[6538] In addition to KDB, Lehman pursued alternative transactions with Bank of America, Barclays, and MetLife.[6539] Only the Barclays transaction reached the point of fixing consideration for a sale, but this deal was expressly contingent upon approval by the Financial Services Authority and, thus, a definitive sales agreement had not been executed.[6540] Under the proposed transaction, Barclays would have purchased the operating subsidiaries of LBHI for $3 billion and guaranteed the debt of LBHI and its former subsidiaries.[6541] LBHI's remaining assets would equal the assets for the proposed SpinCo plus $3 billion from the Barclays sale.[6542] Post-sale, LBHI planned to seek $40 billion in new debt financing from a consortium of financial institutions.[6543] Given the speculative nature of the proposed Barclays transaction,[6544] a colorable

---

[6538] See Section III.A.3 of this Report for a discussion of the KDB deal.

[6539] See Section III.A.3 of this Report for a discussion of other deals pursued by Lehman.

[6540] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at p. 4; Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009, at p. 10; e-mail from John Varley, Barclays, to Frits Seegers, Barclays (Sept. 13, 2008) [BCI-EX-(S)-00053344]; Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at pp. 9-10.

[6541] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 8.

[6542] *Id.*

[6543] *Id.*

[6544] Notably, Lowitt stated that even if JPMorgan had agreed to return some collateral to Lehman, the larger issue for Lehman was that Lehman had lost enormous amounts of secured funding and the confidence of the market, suggesting, albeit with the benefit of hindsight, that additional time may not have benefitted LBHI. Examiner's Interview of Ian T. Lowitt, Oct. 28, 2009, at pp. 22-23.

argument exists that LBHI received no quantifiable indirect benefit from the additional time afforded by the September Guaranty.

Any "value of time" argument must also be discounted if the September Guaranty accelerated Lehman's demise.  Evidence exists that the September Guaranty caused LBHI's liquidity problems to become more acute.  By providing cash and money market funds to JPMorgan (in the form of collateral in connection with the September Guaranty), LBHI drained its rapidly depleting liquidity pool in the critical days prior to the bankruptcy filing.[6545]  If LBHI had declined to execute the September Guaranty, the additional liquidity may have extended LBHI's lifeline.  This additional time might have provided an opportunity for the parties to structure an out-of-court reorganization or at least a more orderly liquidation, as opposed to the "free-fall" bankruptcy that occurred.[6546]  Thus, there is evidence to support a finding that LBHI did not receive reasonably equivalent value by entering into the September Guaranty.

### 3.    Insolvency as of September 10, 2008

The Examiner has concluded that there is evidence to support a finding that LBHI was insolvent on September 10, the date the September Guaranty was executed.[6547]

---

[6545] Lehman, Minutes of Meeting of Board of Directors (Sept. 14, 2008) [LBEX-AM 003933].

[6546] Of course, if JPMorgan had pulled its credit, LBHI might have been forced to file bankruptcy before September 15.

[6547] See Section III.B.3.b of this Report for a more detailed discussion of the solvency analysis of LBHI.

### 4.    Undercapitalization as of September 10, 2008

The Examiner also has concluded that there is evidence to support a finding that

LBHI was undercapitalized as of September 10, 2008. [6548]   Undercapitalization is relevant

only to claims made to avoid the September Guaranty under Section 548(a).[6549]

### b.    Defenses to Avoidability of the September Guaranty

### 1.    Applicability of the Good Faith Defense of Section 548(c) of the Bankruptcy Code and Section 279 of the N.Y. Debtor Creditor Law to the September Guaranty

The Examiner has concluded that JPMorgan will have substantial contrary facts

to overcome if it raises the defense of good faith under Section 548(c) or Section 279 of

the N.Y. Debtor Creditor Law.   Under both Section 548(c) and New York law, a

transferee who acts in good faith may enforce an obligation to the extent that it gave

value to the debtor in exchange for the obligation.[6550]   The burden of proof for each

element of a Section 548(c) defense is on JPMorgan.[6551]

Courts apply an objective test when assessing good faith.[6552]   JPMorgan would

not be found to have taken the obligation in good faith if the circumstances would place

a reasonable person on inquiry of LBHI's fraudulent purpose, and a diligent inquiry

---

[6548] See Section III.B.d of this Report for a more detailed discussion of the undercapitalization analysis of LBHI.

[6549] *Compare* 11 U.S.C. § 548(a), *with* McKinney's Debtor and Creditor Law, § 274 (2010).

[6550] 11 U.S.C. § 548(c).

[6551] *See Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007); *McColley v. Rosenberg* (*In re Candor Diamond Corp.*), 76 B.R. 342, 351 (Bankr. S.D.N.Y. 1987).

[6552] *In re Bayou Group, LLC*, 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008) (citations omitted).

would have discovered the fraudulent purpose.[6553]  Good faith requires either that: (1) JPMorgan was not on "inquiry notice," or (2) if on notice, JPMorgan was "diligent in its investigation" of LBHI.[6554]  Whether JPMorgan was on "inquiry notice" may also be informed by its experience or sophistication.[6555]

Courts have found that a transferee was put on "inquiry notice" in a variety of contexts, including (1) fraudulent purpose of the transfer; (2) underlying fraud; (3) unfavorable financial condition of the transferor; (4) insolvency of the transferor; (5) improper nature of the transaction; and (6) voidability of the transfer.[6556]  The enumerated examples, however, "are not exhaustive and thus 'good faith' must be evaluated on a case-by-case basis."[6557]

Some interviews with JPMorgan personnel indicate that JPMorgan did not suspect that Lehman's bankruptcy was imminent.[6558]  JPMorgan stated that it did not believe its collateral requests would cause a crisis within Lehman and JPMorgan expressed concern with becoming known as the firm that caused Lehman's demise.[6559]

---

[6553] *See id.* (citing *Jobin v. McKay* (*In re M&L Bus. Machine Co., Inc.*), 84 F.3d 1330, 1338 (10th Cir. 1996)).

[6554] *See id.* (quoting *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007)).

[6555] *See id.* (citing *Jobin*, 84 F.3d at 1338).

[6556] *Id.* at 845-46 (citations omitted).

[6557] *Id.* at 846 (citations omitted).

[6558] Examiner's Interview of Mark G. Doctoroff, Apr. 29, 2009, at p. 15; Examiner's Interview of James L. Dimon, Sept. 29, 2009, at p. 10 (the first time he thought Lehman may not survive was Saturday, September 13); Examiner's Interview of John J. Hogan, Sept. 17, 2009, at p. 8 (the first time he thought Lehman may not survive was Sunday, September 14).

[6559] Examiner's Interview of Donna Dellosso, Feb. 27, 2009, at pp. 2, 5; Examiner's Interview of James L. Dimon, Sept. 29, 2009, at p. 10; Jane Buyers-Russo, JPMorgan, Unpublished Notes (Sept. 9, 2008), at p. 2 [JPM-EXAMINER00006052]; *see also* e-mail from Jane Buyers-Russo, JPMorgan, to Kelly A. Mathieson,

On the other hand, some JPMorgan personnel stated that JPMorgan was concerned about the status of Lehman and worried by a company [Lehman] that was hanging on to the edge.[6560] JPMorgan personnel stated that the rumor mill was rampant concerning firms no longer doing business with Lehman and Lehman's stock was "getting killed."[6561] In addition, JPMorgan executives had analyzed and expressed serious concerns about Lehman's survival plans,[6562] including the viability of Lehman's SpinCo proposal.[6563] JPMorgan similarly had expressed concerns about presentations that Lehman prepared for the rating agencies;[6564] in particular, JPMorgan was concerned about the treatment of Lehman's survival strategies in the presentations.[6565] In short, evidence exists to support a finding that, given JPMorgan's experience and sophistication,[6566] JPMorgan was on inquiry notice of Lehman's "unfavorable financial condition."[6567]

---

JPMorgan, *et al.* (Sept. 12, 2008) [JPM-2004 0050097] ("The goal was to protect jpm without pushing [Lehman] over the edge.").

[6560] Interview of James L. Dimon, Sept. 29, 2009, at p. 5.

[6561] Examiner's Interview with Steven D. Black, Sept. 23, 2009, at p. 6

[6562] See Section III.A.5.b of this Report.

[6563] *Id.*

[6564] E-mail from Paolo R. Tonucci, Lehman, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 4, 2008) [JPM-2004 0006302]. Lehman highlighted the sensitive nature of these documents multiple times. *See id.* ("There is a lot of confidential info . . . ."); e-mail from Ian T. Lowitt, Lehman, to Barry L. Zubrow, JPMorgan (Sept. 5, 2008) [JPM-2004 0006314] ("The materials we sent you are obviously very sensitive . . . "); e-mail from Ian T. Lowitt, Lehman, to Barry L. Zubrow, JPMorgan (Sept. 7, 2008) [JPM-2004 0006317]. JPMorgan limited the circulation of the materials. *See* e-mail from Barry L. Zubrow, JPMorgan, to Ian T. Lowitt, Lehman, *et al.* (Sept. 8, 2008) [JPM-2004 006317].

[6565] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7; *see* e-mail from Barry L. Zubrow, JPMorgan, to Mark G. Doctoroff, JPMorgan, *et al.* (Sept. 5, 2008) [JPM-2004 0006286].

[6566] *In re Bayou Group, LLC,* 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008) (citing *Jobin,* 84 F.3d at 1338).

[6567] *Id.* at 845-46 (citations omitted).

Once on inquiry notice, if JPMorgan "fail[ed] to conduct a 'diligent investigation'" it will lack a good-faith defense.[6568]  To prove "good faith," JPMorgan's "diligent investigation" must "ameliorate the issues that placed the transferee [or obligee] on inquiry notice in the first place."[6569]  There is evidence that JPMorgan made inquiries of Lehman regarding its financial condition.  James Dimon, JPMorgan's CEO, stated that, in every conversation he had with Fuld, he reiterated that JPMorgan wanted to help and that if anything JPMorgan was doing was hurting Lehman, Fuld should let Dimon know.[6570]  In addition, Donna Dellosso, a risk manager in JPMorgan's investment bank, was receiving daily liquidity pool updates from Lehman.[6571]

The Examiner has observed no evidence, however, that JPMorgan's investigation ameliorated the issues that put JPMorgan on inquiry notice in the first place.  The evidence suggests the opposite.[6572]  After meeting with Lehman on September 4, 2008 to discuss Lehman's third quarter earnings and the status of its SpinCo plans,[6573] JPMorgan left concerned about the viability of its plans.[6574]  In addition, after reviewing a draft copy of a presentation Lehman intended to give the rating agencies, executives at

---

[6568] *Id.* at 859.

[6569] *Id.* (citing *Jobin*, 84 F.3d at 1335-56).

[6570] Examiner's Interview of James L. Dimon, Sept. 29, 2009, at p. 2.

[6571] Examiner's Interview of Donna Dellosso, Oct. 6, 2009, at p. 11; e-mail from Edward A. Deleon, JPMorgan, to Donna Dellosso, JPMorgan (Sept. 4, 2008) [JPM-2004 0001065]; e-mail from Mark G. Doctoroff, JPMorgan, to Donna Dellosso, JPMorgan, *et al.* (Sept. 11, 2008) [JPM-2004 0002262].  See also Section III.A.5.b of this Report for a discussion of the daily liquidity reporting.

[6572] See Section III.A.5.b of this Report for a detailed discussion of the attempts of JPMorgan to investigate Lehman's financial condition and JPMorgan's increasing concerns.

[6573] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 10-11.

[6574] *Id.* at p. 11.

JPMorgan found the presentation to be too vague and were concerned about the strategies Lehman outlined.[6575]    Thus, there is evidence to support a finding that JPMorgan lacks a good-faith defense because JPMorgan was on inquiry notice and subsequent investigation did not ameliorate the issues that put JPMorgan on inquiry notice in the first place.

With respect to the question of value, this element of the good-faith defense raises the same inquiry as the reasonably equivalent value analysis.    If JPMorgan were to prove that it acted in good faith, JPMorgan would retain its rights under the Guaranty to the extent of the value it provided.    As described in Section III.B.3.g.5.a.ii.a.2 above, however, the Examiner has determined that there is sufficient evidence to conclude that JPMorgan did not transfer a quantifiable benefit to LBHI in connection with the September Guaranty.

### 2.    Applicability of the Safe Harbor Provisions of the Bankruptcy Code to the September Guaranty

The Examiner concludes that there is sufficient legal basis to support a determination that the September Guaranty is not protected under Sections 546(e), (f), (g) or (j), which provide that "the trustee may not avoid a *transfer*" made to a Protected Party in connection with Protected Contracts, except in the case of actual fraud.[6576]    In

---

[6575] Examiner's Interview of Barry L. Zubrow, Sept. 16, 2009, at p. 7; *see* e-mail from Mark G. Doctoroff, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 5, 2008) [JPM-2004 0006286].

[6576] *See* 11 U.S.C. §§ 546(e), (f), (g) and (j) (emphasis added).

contrast, Section 548 provides that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, *or any obligation* . . . incurred by the debtor."[6577]  The decision to include "obligations" within a trustee's avoidance powers under Section 548 but to exclude that same language from Section 546 suggests that the safe harbors do not protect the incurrence of obligations from avoidance.[6578]  Whether the safe harbors protect the September Guaranty turns on whether a debtor makes a transfer or incurs an obligation when a debtor executes a guaranty.

Courts have uniformly determined that when a debtor incurs an obligation under a guaranty, this incurrence of debt is not a transfer under the Bankruptcy Code or New York state law, both of which define a transfer to include disposing or parting with an interest in property.[6579]  These cases generally follow the rationale set forth in

---

[6577] 11 U.S.C. § 548(a)(1) (emphasis added).

[6578] The Examiner has not located any reported decisions directly addressing this issue.  However, this reading of Section 546 finds strong support in the case law.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) (interpreting differently the phrases "fair market value" in Section 522 and "reasonably equivalent value" in Section 548 of the Bankruptcy Code because "it is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.") (quoting *Chicago v. Envtl. Def. Fund*, 511 U.S. 328 (1994)); *In re Joelson*, 427 F.3d 700, 705 (10th Cir. 2005) ("Because the phrase 'respecting the debtor's . . . financial condition' is used in both § 523(a)(2)(A) and § 523(a)(2)(B) and both provisions were enacted as part of the same statute, this is 'a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'") (internal citations omitted); *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1356 (7th Cir. 1996) (applying same meaning to the phrase "fixing of liens" in Sections 522 and 545 of the Bankruptcy Code because "[t]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.") (internal citations omitted); *In re Revco D.S., Inc.*, No. 588-1308, 1990 Bankr. LEXIS 2966 (Bankr. N.D. Ohio Dec. 17, 1990) (comparing Section 544, which references attacking as fraudulent either the transfer of property or the incurrence of an obligation, with Section 502(d), which limits its application to fraudulent transfers and omits any reference to incurrence of an obligation).

[6579] 11 U.S.C. § 101(54); N.Y. DEBT & CRED. LAW § 270 (McKinney 2009); *see, e.g., Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a "transfer" for

the Supreme Court's decision in *Barnhill v. Johnson*.[6580]  In that case, the Court considered

whether, for purposes of Section 547, a preferential transfer occurs on the date a check is

written or on the date the drawee bank honors the check.  The Court first noted that

"'[w]hat constitutes a transfer and when it is complete' is a matter of federal law."[6581]

Nevertheless, because the Bankruptcy Code's definition of transfer includes references

to undefined terms such as "property" and an "interest in property," the Court had to

look to state law to determine when a transfer of property occurred.[6582]  After reviewing

applicable state law, the Court concluded that the issuance of a check merely creates a

promise to pay – *i.e.*, an obligation – for the maker and that the maker's property did

not transfer until the drawee bank honored the check.[6583]  The Court rejected the

argument that issuing the check created a "conditional transfer," determining that the

payee had no control over any of the maker's property until the check was honored:

> Until the moment of honor the debtor retains full control over disposition
> of the account and the account remains subject to a variety of actions by
> third parties. To treat petitioner's nebulous right to bring suit as a
> "conditional transfer" of the property would accomplish a near-limitless
> expansion of the term "conditional."  In the absence of any right against

---

purposes of 11 U.S.C. § 101(54) . . . both note and guarantee are obligations"); *In re Nirvana Restaurant Inc.*, 337 B.R. 495, 508 (citing *Covey* and holding that guaranty could not be avoided under N.Y.D.C.L § 274 because that statute did not apply to fraudulent obligations); *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005) (a guaranty is an "obligation" rather than a "transfer" within the meaning of 11 U.S.C. 101(54)); *see also Rubin v. Mfrs. Hanover Trust*, 661 F.2d 979, 990-91 (2d Cir. 1981) (granting of a guaranty is an "obligation incurred"); *accord In re Lawrence Paperboard Corp.*, 76 B.R. 866, 872 (Bankr. D. Mass. 1987).

[6580] 503 U.S. 393 (1992).

[6581] *Id.* at 397-98 (quoting *McKenzie v. Irving Trust Corp.*, 323 U.S. 365, 369-70 (1945)).

[6582] *Id.* at 398.

[6583] *Id.* at 400.

the bank or the account, we think the fairer description is that petitioner had received no interest in debtor's property, not that his interest was "conditional."[6584]

Relying upon *Barnhill*, the Bankruptcy Court in the Southern District of New York concluded that when a debtor executes a guaranty, it incurs an obligation. The court reasoned:

> Like the check in *Barnhill*, the Guaranty gave 360networks a chose in action against Asia Global, conditioned on the default by GC Bandwidth. It did not grant 360networks any interest in or right to Asia Global's property. As such, it was an "obligation" rather than a "transfer" within the meaning of § 101(54). *See Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("Although a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54) . . . both note and guaranty are obligations."); *cf. Barnhill*, 503 U.S. at 400 n. 8 (even if the delivery of a check gave rise to a cause of action against the debtor, it would still not be a "transfer" under the Bankruptcy Code).[6585]

Thus, a court may find that LBHI's incurrence of obligations under the September Guaranty is not protected by the safe harbors.

A contrary argument may be constructed based upon recent Congressional amendments to expand the protections of the safe harbors. Pursuant to the 2005 amendments to the Bankruptcy Code, the definition of Protected Contracts was

---

[6584] *Id*. at 401.

[6585] *Asia Global Crossing*, 333 B.R. at 204. In *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406 (S.D.N.Y. 2001), the issue of whether a guaranty was outside of the reach of the safe harbors because it was the incurrence of an obligation and a not a transfer was raised, but not decided. *Id*. at 472-73. The trustee argued that because 546(e) shelters only "transfers" and because the Trustee was attempting to avoid "obligations," those "obligations" were not protected by the safe harbor. The court held that it did not need to reach this issue because, "[r]egardless of how broadly or narrowly the term [transfer] is defined, this Court is persuaded that the transfers which [defendants] seek to enforce against Adler either did not constitute qualifying 'payments' or did not contemplate consummation of a bona fide securities 'settlement' in the relevant sense of these words." *Id*. at 480.

expanded to include "any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to [ ], including any guarantee or reimbursement obligation…."[6586]   An argument may also be made based upon the legislative history of the enactment of the safe-harbor provisions and the amendments thereto which evidence that Congress sought to reduce the systemic risk in the financial marketplace and prevent a "ripple effect" in which the insolvency of one financial firm triggers failures elsewhere in the market.[6587]

The Examiner observes that no decisions have been reported that apply the distinction between the avoidability of a transfer and an obligation in a case involving the safe harbor provisions of the Bankruptcy Code.   Consequently, this issue will ultimately have to be resolved by the Court.   If the September Guaranty is avoided, LBHI would not be liable for any unsecured deficiency claims that JPMorgan might assert based on the September Guaranty.

---

[6586] See §§ 11 U.S.C. 101(25) (forward contracts); 101(38)(A) (master netting agreements); 101(47) (repurchase agreements); 101(53)(B) (swap agreements) 761(4) (commodity contracts); and 741(7) (securities contracts).

[6587] See Section III.C.5.b.1 for a discussion of the application of the safe harbor provisions in light of recent Congressional amendments.   The issue addressed in that Section of the Report deals with an actual transfer of securities as opposed to the creation of an obligation, which is the issue the Examiner is addressing here.   An argument based upon legislative history and the discernment of perceived Congressional policy contravenes the instruction of various appellate court decisions requiring application of the plain meaning of the statute in the absence of ambiguity.   *See QSI Holdings, Inc., v Alford* (*In re QSI Holdings, Inc.*), 571 F.3d 545, 549 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 984-85 (8th Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc.* (*In re Resorts Int'l, Inc.*), 181 F.3d 505, 515 (3rd Cir. 1999); *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 952 F.2d 1230, 1237 (10th Cir. 1991).

### c.    Avoidability of Transfers of Collateral in Connection with the September Guaranty

While avoidance of the September Guaranty would eliminate any general unsecured deficiency claim filed by JPMorgan against LBHI for amounts owed to it in excess of its collateral, it would not automatically result in the return of the $8.6 billion pledged to secure the September Guaranty or an unwinding of the post-petition application of $1.95 billion of this pledge.    The more difficult issue is whether (1) the transfers made between September 9 and September 12 of additional collateral to JPMorgan in connection with the September Agreements can be avoided either as fraudulent transfers or preferences or based upon a common law claim belonging to the LBHI estate under Section 541, or (2) the approximately $1.95 billion in setoffs that JPMorgan took post-petition may be avoided as improper post-petition transfers.

### 1.    LBHI's Collateral Transfers and Post-Petition Setoffs

Between September 9 and the bankruptcy filing on September 15, 2008, LBHI transferred approximately $8.6 billion in cash collateral in connection with the September Agreements.[6588] Specifically, the following collateral transfers occurred during this period:[6589]

---

[6588] See Section III.A.5.b of this Report for a more detailed discussion of the transfers of collateral.

[6589] Appendix 18, Lehman Collateral at JPMorgan summarizes collateral posted by Lehman at JPMorgan from June 2008 through September 2008 in response to JPMorgan's margin requirements and collateral requests, which are discussed in detail at Section III.A.5.b of this Report.    The chart neither lists every collateral movement nor tracks every individual security, but summarizes significant collateral posts, transfers and returns.

| September 9, 2008 | Cash | Lehman posted $1 billion cash in response to JPMorgan's September 9 collateral request for $5 billion (of which Lehman agreed to post $3 billion immediately). |
|---|---|---|
| September 9, 2008 | Money Market Funds | Lehman posted approximately $1.7 billion in money market funds in response to JPMorgan's September 9 collateral request. |
| September 10, 2008 | Cash | Lehman posted $300 million cash in response to JPMorgan's September 9 collateral request for $5 billion (of which Lehman agreed to post $3 billion immediately). |
| September 10, 2008 | Corporate bonds | Lehman provided JPMorgan corporate bonds with a value of approximately $1.5 billion to value and possibly to substitute for some of the cash collateral Lehman posted in response to JPMorgan's September 9 collateral request. |
| September 11, 2008 | Cash | Lehman posted $600 million cash related to JPMorgan's September 9 collateral request. |
| September 11, 2008 | Corporate bonds | JPMorgan returned approximately $500 million of corporate bonds posted by Lehman. |
| September 12, 2008 | Cash | Lehman posted $5 billion cash in response to JPMorgan's September 11 collateral request for $5 billion cash. |
| September 12, 2008 | Corporate bonds | JPMorgan returned the remaining corporate bonds (approximately $1 billion) to Lehman. |
| September 12, 2008 | Pine | JPMorgan released $1 billion (Lehman's valuation) of the Pine CLO to Lehman. |

Of these transfers, the two that occurred on September 9 were made before the September Agreements were executed.  Although it may be claimed that these transfers fall under the August Agreements, the evidence suggests that they were made in connection with JPMorgan's requests of LBHI to enter into the September Agreements.[6590]

Following LBHI's bankruptcy, JPMorgan applied $10.6 million of the $8.6 billion in cash collateral that LBHI pledged to repay obligations that were not owed by LBHI prior to the execution of the September Guaranty and applied $1.94 billion of the $8.6 billion in cash collateral to repay obligations that LBHI had guaranteed prior to September 9 on an unsecured basis.   JPMorgan is holding the balance of the $8.6 billion in collateral (approximately $6.9 billion[6591]) and is asserting a right of offset in its Proofs of Claim.  The specific setoffs that JPMorgan has already taken to date, asserting that these repayments were allowed under the safe-harbor provisions, are listed as follows:

- JPMorgan liquidated $10.1 million of LBHI collateral to pay an LBI obligation to JPMSI arising from securities lending activity.[6592]

- JPMorgan liquidated $545,000 of LBHI collateral to pay an LBI obligation to JPMorgan Clearing arising from securities lending activity.[6593]

---

[6590] See Section III.A.5.b of this Report.

[6591] This amount includes subsequent interest earned.

[6592] *See* JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009), at p. 5 [LBEX-JMPC 000199]. This collateral liquidation repays an obligation that was not owed by LBHI before the execution of the September Guaranty.

[6593] *See id*. This collateral liquidation repays an obligation that was not owed by LBHI before the execution of the September Guaranty.

- JPMorgan liquidated $1.57 billion of collateral against a JPMCB derivative claim on LBSF.[6594]

- JPMorgan liquidated $80.3 million of collateral against a WMB derivative claim on LBSF.[6595]

- JPMorgan liquidated $138.5 million of collateral against a JPMCB derivative claim on LBCC.[6596]

- JPMorgan liquidated $3.4 million of collateral against a JPMM derivative claim on LBIE.[6597]

- JPMorgan liquidated $2.1 million of collateral against a JPMBD derivative claim on LBIE.[6598]

- JPMorgan liquidated $91.0 million of collateral against a JPMCB derivative claim on LBFSA.[6599]

- JPMorgan liquidated $10.2 million of collateral against a JPMM derivative claim on LBFSA.[6600]

- JPMorgan liquidated $3.9 million of collateral against a JPMCFI claim on LBIE for repo transaction exposure.[6601]

- JPMorgan liquidated $1.9 million of collateral against a JPMM claim on LBIE for repo transaction exposure.[6602]

---

[6594] *See id.* at p. 3. This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6595] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6596] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6597] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6598] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6599] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6600] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6601] *See id.* at p. 5. This collateral liquidation repays an obligation that was guaranteed by LBHI under the August Guaranty.

- JPMorgan liquidated $17.6 million of collateral against a JPMM derivative claim on LBSF.[6603]

- JPMorgan liquidated $18.9 million of collateral against a JPMM claim on LBREM II BS Financing Mezz Holdings LLC for repo transaction exposure.[6604]

In summary, JPMorgan has liquidated approximately $1.95 billion of the $8.6 billion in cash collateral; it is still holding approximately $6.9 billion of this collateral and it is asserting a right of setoff against the following obligations: (1) approximately $6.56 billion in exposures related to clearance advances; (2) approximately $75.6 million related to derivative contract claims; (3) approximately $228.8 million related to other investment bank and treasury and security services claims;[6605] and (4) $733.5 million related to asset management exposure.[6606]

Absent application of the safe harbors, the Examiner concludes that there is a colorable claim to avoid, at least in part, the collateral transfers LBHI made in connection with the September Guaranty. If the September Guaranty is avoided as a fraudulent obligation, it cannot serve as the underlying claim supporting the collateral

---

[6602] *See id.* This collateral liquidation repays an obligation that was guaranteed by LBHI under the August Guaranty.

[6603] *See id.* at p. 3. This collateral liquidation repays an obligation that was guaranteed by LBHI on an unsecured basis before the execution of the September Agreements.

[6604] *See id.* at p. 5. This collateral liquidation repays an obligation that was guaranteed by LBHI under the August Guaranty.

[6605] *See* Section III.B.3.g.5.a.ii.c.4, of this Report for a description of the investment bank and treasury and security services claims.

[6606] *See* Section III.B.3.g.5.a.vi of this Report for a description of asset management exposure claims.

pledges.[6607]  Because there would be no underlying debt owed by LBHI there would be no basis for JPMorgan to retain collateral posted by LBHI.  Thus, to the extent that JPMorgan declined to return the collateral voluntarily, the transfers of cash made solely in reliance upon the September Guaranty would be subject to claims for a return of the collateral under Article 9 of the UCC and New York common law,[6608] fraudulent transfer law[6609] and state law claims for unjust enrichment, money had and received and conversion.[6610]  Alternatively, as set forth in Section III.B.3.g.5.a.ii.b.2, absent application of the safe harbors, there is a colorable claim to avoid certain of the transfers made following the execution of the September Guaranty as preferences.

There are two important caveats to this analysis.  First, with respect to any collateral that is found to be posted in favor of JPMorgan to secure derivatives contracts, LBHI had previously guaranteed these obligations on an unsecured basis for certain of its subsidiaries and the September Agreements simply made LBHI's prior guaranty

---

[6607] *See Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant Inc.),* 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) ("if the Guaranty is avoided as a fraudulent obligation, it cannot serve as 'fair consideration' for the subsequent Transfers") (citing *Dempster v. Overview Equities, Inc.,* 4 A.D.3d 495 (N.Y. App. Div. 2004) (unenforceable obligation cannot constitute "fair consideration")).

[6608] For collateral where a secured party exerts control (deposit accounts, electronic chattel paper, investment property, letter of credit right, electronic document), Section 9-208 of the New York UCC requires the secured party to turn over the property if no further obligations are owed to the secured party "within 10 days after receiving an authenticated demand by the debtor." McKinney's Uniform Commercial Code Law § 9-208 (2010).  New York law further provides that when the underlying obligation is satisfied, the debtor is entitled to the property back. *Keshishian Bros. v. Deverian,* 279 A.D. 324 (N.Y. App. Div. 1952), *order amended by* 280 A.D. 910 (N.Y. App. Div. 1952); *Kirsh v. Provident Loan Soc. of N.Y.,* 71 N.Y.S.2d 241 (N.Y. App.. Term 1947).  If the property is not returned the creditor is liable for conversion. *Rutherford Nat. Bank v. Manniello,* 271 N.Y.S. 69 (N.Y. App. Div. 1934), *aff'd,* 195 N.E. 203 (N.Y. 1935).

[6609] *Nirvana Rest.,* 337 B.R. at 502

[6610] See III.B.3.g.5.a.v of this Report.

secured.[6611]  Thus, even if the September Guaranty is avoided, there remains in place a

contract that creates liability for LBHI on account of the derivatives contracts.  Because

transfers in favor of guaranties of derivatives contracts are safe-harbored,[6612] unless the

underlying unsecured derivatives guaranty can be avoided, this analysis does not

apply.  Although the Examiner has not undertaken to analyze whether any claims exist

to avoid LBHI's guaranties of its subsidiaries' obligations under various ISDA

agreements, he notes that these guaranties were all executed well outside of the time

period during which the Examiner has found evidence to support a finding of

insolvency or undercapitalization, and thus the Examiner does not believe that there

would be colorable claims to avoid these guaranties.

Second, on June 9, 2005, the Executive Committee of LBHI's Board of Directors

approved a Unanimous Written Consent pursuant to which LBHI "hereby fully

guarantees the payment of all liabilities, obligations and commitments of the

---

[6611] *See* ISDA Master Agreement between JPMCB and LBCC (Nov. 15, 1993), at p. 25 [JPM-2004 0000368] (providing a guaranty by LBHI); ISDA Master Agreement between JPMM and LBIE (Aug. 26, 1997), at p. 14 [JPM-2004 0086169] (providing a guaranty by LBHI); ISDA Master Agreement between JPMCB and LBFSA (Nov. 15, 1993), at p. 24 [JPM-2004 000850] (providing a guaranty by LBHI); Amendment to the ISDA Master Agreement between JPMM and LBFSA (July 11, 2008), at p. 35 [JPM-2004 0086103] (providing guaranty by LBHI); ISDA Master Agreement between JPMCB and LBSF (Dec. 20, 1995), at p. 22 [JPM-2004 0000345] (providing guaranty by LBHI); ISDA Master Agreement between JPMBD and LBIE (Feb. 23, 1998), at p. 21 [JPM-2004 0086072]; Guarantee of LBHI for ISDA Master Agreement between WMB and LBSF (May 28, 1998) [LBEX-JPM 0000210]; Guarantee of LBHI for ISDA Master Agreement between JPMM and LBSF (June 7, 2002) [LBEX-JPM 0000212].

[6612] 11 U.S.C. § 546 (e), (f), (g), and (j).

subsidiaries set forth on Schedule A."[6613]    The Schedule A guaranteed subsidiaries include LBJ, LBIE, LBCB, and Lehman Brothers Bankhaus AG.[6614]    Later Unanimous Written Consents of LBHI's Board of Directors provide for a guaranty of Lehman Brothers Treasury Co., LBCS, LBB, Lehman Brothers PTE, Ltd, and Lehman Brothers Finance Asia Pte. Ltd.[6615]    In addition, in at least one instance, LBHI revoked the guaranteed status of its subsidiary, Lehman Re Ltd.[6616]    The Examiner cannot conclude with certainty whether or to what extent other LBHI guaranties of subsidiaries were added or revoked.    There is evidence to support a conclusion, however, that LBI was not a guaranteed subsidiary of LBHI.[6617]    The Amended and Restated Code of Authorities for LBHI authorized LBHI upon resolution of the Executive Committee of

---

[6613] Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holding Inc. (June 9, 2005) [LBEX-AM 003415].

[6614] *Id.*

[6615] Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI (Feb. 24, 2005) [LBEX-WGM 1102366] (resolution to make Lehman Brothers Treasury Co. a guaranteed subsidiary of LBHI); Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI (Nov. 7, 2005) [LBEX-WGM 1104149] (resolution to make LBCS a guaranteed subsidiary of LBHI); Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI (May 14, 2007) [LBEX-WGM 965000] (resolution to make LBB a guaranteed subsidiary of LBHI); Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI (Apr. 9, 2008) [LBEX-AM 003644] (resolution to make Lehman Brothers Finance Asia Pte. Ltd a guaranteed subsidiary of LBHI); Lehman Brothers Holdings Inc. Minutes of the Board of Directors (Nov. 8, 2007) [LBHI_SEC07940_026649] (reflecting consent to make Lehman Brothers PTE Ltd. a guaranteed subsidiary of LBHI].

[6616] Lehman Brothers Holdings Inc. Minutes of the Board of Directors (Nov. 8, 2007) [LBHI_SEC07940_026649] (reflecting consent to revoke the guaranteed subsidiary status of Lehman Re Ltd.).

[6617] Alvarez & Marsal, Responses to Questions for Alvarez & Marsal/Weil, Gotshal & Manges (Dec. 7, 2009), at p. 1 (confirming that LBI was not a guaranteed subsidiary of LBHI).

its Board of Directors to provide a full guaranty of all of the obligations of its subsidiaries.[6618]

The Examiner has located no decision involving the enforceability of a guaranty contained only in a corporate resolution. This resolution, however, may be viewed as a unilateral contract for a general guaranty that may be enforced by "anyone to whom it is presented who acts upon it."[6619] The guaranty resolution appears to satisfy the basic general guarantee requirements of knowledge,[6620] acceptance (which can be implied) and consideration and therefore may be held to create an enforceable general guaranty obligation.[6621] To the extent this guaranty is upheld, it would serve as a pre-existing debt that would support the application of LBHI's collateral to the claim of entities covered by the guaranty resolution. As set forth in Section III.B.3.g.5.a.ii.c.4, some of the non-Protected obligations asserted in JPMorgan's proof of claim are obligations owed by subsidiaries covered by the guaranty resolution. As analyzed in Section III.B.3.g.5.a.v, this fact may make the transfers of collateral to secure obligations

---

[6618] The Amended and Restated Code of Authorities for LBHI As Amended Through July 1, 2004 [LBEX-AM 043802].

[6619] *FinanceAmerica Private Brands, Inc. v. Harvey E. Hall, Inc.*, 380 A.2d 1377, 1379 (Del. Super. Ct. 1977).

[6620] The LBHI 2006 10-K (Feb. 13, 2007) and 2007 10-K (Jan. 29, 2008) refer to the fact that LBHI "guarantee[s] all of the obligations of certain subsidiaries…."

[6621] *See APL, Inc. v. Ohio Valley Aluminum, Inc.*, 839 S.W. 2d 571, 573 (Ky. Ct. App. 1992) ("When the circumstances surrounding the issuance of an absolute guaranty and the terms of the writing itself evidence no indication that the guarantor anticipates notification of acceptance from the creditor, the guarantor will be held liable on the instrument from the time the creditor acts in reliance on it.").

covered by the guaranty resolution avoidable as preferences and not as fraudulent transfers or under state law.[6622]

### 2. Application of the Safe Harbors to the $8.6 Billion Cash Collateral Transfers

Whether the September Guaranty is protected by the safe harbors is, as noted above, a question of first impression that must be resolved by the Court. If the Court determines that a guaranty is an obligation not protected by the safe harbors and thus avoidable, the transfers of collateral pursuant to the September Agreements nevertheless may still be protected by the safe harbors. The safe-harbor provisions of Sections 546(e), (f), (g), and (j) protect transfers made to Protected Parties *in connection with* the Protected Contracts from avoidance.[6623] Protected Contracts include "any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to [ ], including any guarantee or reimbursement obligation. . . ."[6624] Thus a transfer made pursuant to a guaranty of a Protected Contract is also itself protected under the safe harbors. This would seem to insulate the transfers of collateral to JPMorgan to the extent that the transfers were made to secure obligations owed by LBHI or its affiliates on account of Protected Contracts. This results in the

---

[6622] Given the manner in which LBHI's liability under the August Guaranty is calculated, as explained in Section III.B.3.g.5.a.iii, LBHI's liability under the August Guaranty may have been minimal or zero as of September 15, 2008.

[6623] *See* §§ 11 U.S.C. 546(e), (f), (g) and (j).

[6624] *See* §§ 11 U.S.C. 101(25) (forward contracts); 101(38)(A) (master netting agreements); 101(47) (repurchase agreements); 101(53)(B) (swap agreements) 761(4) (commodity contracts); and 741(7) (securities contracts).

anomaly of the September Guaranty being subject to avoidance while the pre-petition

transfers of collateral made pursuant to the September Guaranty not being subject to

avoidance.

Nonetheless, the Examiner concludes that there are three different colorable

bases to assert that the safe-harbor provisions of the Bankruptcy Code do not apply.

First, the safe-harbor provisions do not create rights for JPMorgan that do not otherwise

exist in the parties' agreements.    If the September Guaranty is avoided, there is no

underlying debt owed by LBHI to JPMorgan (subject to the caveats noted above) and no

basis for JPMorgan to apply the $8.6 billion in LBHI collateral to repay the debts  owed

in the first instance by LBHI's subsidiaries.   Put another way, the safe-harbor provisions

do not grant a financial participant rights to collateral it does not enjoy under its

agreements.   Moreover, the safe-harbor provisions do not apply to Section 553 except in

certain circumstances or to Section 549 of the Code.[6625]    Thus, if JPMorgan seeks

permission to apply the collateral to its claims under Section 553, the Bankruptcy Court

is not constrained by the safe-harbor provisions in denying the request (except in the

circumstances set forth in Sections 362(b)(6), (7), (17), (27) and 561).   Because Section

553(a)(1) expressly provides that a right of setoff is not preserved if the "claim of such

---

[6625] 11 U.S.C. §§ 546(e), (f), (g), and (j).

creditor against the debtor is disallowed,"[6626] the Court would likely deny a request for leave to setoff LBHI's cash against the obligations owed by other Lehman entities.

Alternatively, if JPMorgan applies the LBHI collateral without first seeking Bankruptcy Court permission, the Bankruptcy Court will be entitled to examine that setoff under Section 549, again without being constrained by the safe-harbor provisions of the Code, except to the extent that the setoffs are covered by Sections 362(b) (6), (7), (17), (27) and 561.  Because the exceptions to the automatic stay only allow for collateral to be liquidated to pay claims in accordance with the parties' agreements and do not expand the rights of the financial participant, if the September Guaranty is avoided, there would be no authority in the Code to authorize the setoff and it would be recoverable under Section 549(a).

Second, the Enron bankruptcy produced several decisions involving the safe harbors of Section 546(e), including decisions that held that transfers made by Enron to acquire its own shares at a time when it was allegedly already insolvent or rendered insolvent by virtue of the transactions were not protected from avoidance by Section 546(e) because the transactions at issue were illegal and unenforceable, and therefore void from inception, pursuant to an Oregon statute that prohibits distributions by an

---

[6626] 11 U.S.C. § 553(a)(1).

insolvent corporation on account of its stock.[6627]  Thus, the argument here would be that transfers made pursuant to a void guaranty are not protected.

Third, the transfers of collateral in connection with the September Guaranty could be avoided under state law claims that belong to LBHI pursuant to Section 541. Although the safe-harbor provisions explicitly prohibit a trustee from avoiding transfers under Sections 544, 545, 547, 548(a)(1)(B) and 548(b), they apparently do not prohibit a trustee from asserting causes of actions that become property of a debtor's estate under Section 541, such as state law claims arising under the UCC, for conversion, unjust enrichment or money had and received, nor do they prohibit a trustee from bringing claims under  Sections 549 or 553 (subject to Sections 362(b)(6), (7), (17), (27) and 561) to unwind improper post-petition setoffs.[6628]  Therefore, because the safe harbors omit Section 541, the safe harbors may not protect against actions brought pursuant to Section 541 to avoid the transfers made pursuant to the September Agreements.[6629]

---

[6627] *See Enron Corp. v. UBS AG (In re Enron),* No. 01 B 16034 (AJG), 2005 WL 3873897 (Bankr. S.D.N.Y. Aug. 10, 2005); *Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.),* 328 B.R. 58 (Bankr. S.D.N.Y. 2005); *Enron v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),* 323 B.R. 857 (Bankr. S.D.N.Y. 2005).

[6628] A general canon of statutory construction is that "the enumeration of specific statutory sections subject to a rule implies that the omitted sections are excluded from that rule's application." *DiCello v. U.S.A. (In re Railway Reorganization Estate, Inc.),* 133 B.R. 578, 581 (Bankr. D. Del. 1991) (citations omitted). The Bankruptcy Code specifically provides that the terms "includes" and "including" are not limiting.  11 U.S.C. § 102(3).  Because the list of sections subject to the safe harbors is not set off by terms such as "includes" or "including," "it may be assumed Congress meant the list to be exhaustive."  *DiCello,* 133 B.R. at 581-82 (interpreting list of enumerated Sections subject to 546(a)).

[6629] In other contexts, courts have read Section 546 narrowly and limited its application expressly as written.  *See Hartvig v. Tri-City Baptist Temple of Milwaukee, Inc. (In re Gomes),* 219 B.R. 286, 296 (Bankr. D.

However, as set forth more fully in Appendix 1, Legal Issues, Section IV.F., any court addressing this issue will likely be faced with the argument that Section 546 preempts all state law claims, including those arising under Section 541, notwithstanding the lack of an express reference to Section 541 within Section 548.[6630] The case law on preemption is unsettled and the two leading decisions, neither of which would be controlling in this case, are distinguishable in that in one of these cases the state law claims asserted were not state law claims belonging to the estate under Section

---

Or. 1998) (bankruptcy court "is in no position to recognize an exception to avoidance powers where Congress did not create one."); *see also In re Nat'l Forge Co.*, 343 B.R. 340, 370 (W.D. Pa. 2006) (refusing to read into Section 546(e) "terms that are presently absent" where to do so "would result 'not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope.'") (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004); *see also El Paso City of Texas v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1167-68 (9th Cir. 2000) (objections to claims pursuant to Section 502(d) were not subject to Section 546(a) limitations even though trustee was precluded from filing Section 547 actions by Section 546(a) limitations); *In re Stoecker*, 143 B.R. 118, 131-38 (Bankr. N.D. Ill. 1992) (same), *order aff'd in part, rev'd in part on other grounds*, 143 B.R. 879 (N.D. Ill. 1992), *judgment aff'd in part, vacated in part on other grounds*, 5 F.3d 1022 (7th Cir. 1993); *Schwartz v. Pierucci*, 60 B.R. 397, 399 (E.D. Penn. 1986) (trustee's claims pursuant to Uniform Fiduciary Act were not brought pursuant to trustee's avoiding powers and therefore were not subject to Section 546(a) limitations); *Smith v. Morris R Greenhaw Oil and Gas, Inc. (In re Greenhaw Energy, Inc.)*, 359 B.R. 636, 640-42 (Bankr. S.D. Tex. 2007) (although trustee was barred by Section 546(a) limitations period from asserting wrongful foreclosure under Section 544, trustee had authority to pursue such claim under Section 541 which was not so time barred); *Miller v. Spitz, M.D. (In re CS Assoc.)*, 156 B.R. 755 (Bankr. E.D. Penn. 1993) (holding that trustee's proceeding under Section 723 was not subject to Section 546(a) limitations and rejecting argument that Section 723 actions were within the scope of Section 544 actions); *Mann v. Commonwealth Savings & Loan Assoc. (In re Ollada)*, 114 B.R. 654 (Bankr. E.D. Mo. 1990) (trustee's action for turnover pursuant to Sections 542 and 543 was not subject to Section 546(a) limitations); *Britton v. Fessler & Bowman, Inc. (In re Britton)*, 66 B.R. 572, 575 (Bankr. E.D. Mich. 1986) (debtor's claims categorized by the court as an "equitable action for restitution" were not subject to Section 546(a) limitations because the action was not brought by a trustee and because it did not arise under Section 544, 545, 547, 558 or 553).

[6630] *See Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (state law claims for unjust enrichment and illegal and/or excessive shareholder distributions preempted by § 546(e)); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. 71, 96 (D. Del. 2002) (unjust enrichment claim preempted by § 546(e)).

541.[6631]  Further, one of the cases relies upon the conclusion that the claim at issue was

effectively the same as an action to avoid a transfer under Sections 544 or 548, and

therefore, the court determined that the claim could not be brought.[6632]  Apart from the

fact that the preemption decisions are both distinguishable and not controlling, a valid

argument can be made, as set forth in Appendix 1, Legal Issues, Section IV.F, that

preemption does not apply to Section 546 because by its own terms Section 546 does not

apply to actions brought under Sections 541, 548(a)(1)(A), 549 and 553 (subject to certain

exceptions), suggesting that Congress did not intend to fully cover all types of claims

against financial participants when it enacted the safe-harbor provisions.[6633]  Thus, the

Examiner concludes that notwithstanding the existence of the preemption case law,

there is a colorable basis to conclude that state law claims belonging to LBHI under

Section 541 are not barred.

> **3.      There Is Evidence to Support Potential State
> Law Claims Available to LBHI Pursuant to
> Section 541 to Avoid the Transfers In
> Connection with the September Guaranty**

If the September Guaranty is avoided, and the Court finds that state law claims

that belong to LBHI under Section 541 are not preempted by the safe-harbor provisions

---

[6631] *Contemporary Indus.*, 564 F.3d at 984 (state law claims asserted pursuant to section 544).

[6632] *Hechinger*, 274 B.R. at 96.

[6633] See Appendix 1, Legal Issues, at Section IV.F. for a discussion of the issue of preemption of such state law claims.

of Section 546, then LBHI has three colorable state law claims to recover the transfers of collateral.

First, under Section 9-208 of the UCC, a secured creditor is under a duty to relinquish control over deposit accounts if the underlying obligation is satisfied.[6634] The Official Comments to Section 9-208 provide that a secured party also is required to relinquish possession of collateral when the underlying obligation is satisfied and the failure to do so would constitute conversion.[6635]

Conversion is "any unauthorized exercise of dominion or control over property by one who is not the owner of the property that interferes with and is in defiance of a superior possessory right of another in the property."[6636]   To maintain a claim for conversion, a plaintiff must show: "(1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."[6637]   A conversion claim "may only succeed if the party alleges a wrong that is distinct from any contractual obligations."[6638]   Rather, a

---

[6634] McKinney's Uniform Commercial Code Law § 9-208 (2010).

[6635] *Id*. at cmt. 4; *Rutherford Nat. Bank v. Manniello*, 240 A.D. 506, 508, 271 N.Y.S. 69, 72 (1934).

[6636] *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006).

[6637] *Id.*

[6638] *Id.* (quoting *Phensalker v. Anderson Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001), *vacated on other grounds,* 344 F.3d 184 (2d Cir. 2003) (internal quotations omitted)).

"plaintiff must show acts that were unlawful or wrongful as opposed to violations of contractual rights."[6639]

Evidence exists to support this claim because (1) LBHI had legal ownership or an immediate superior right of possession to the $8.6 billion in cash transfers made to JPMorgan in connection with the September Guaranty; and (2) if the September Guaranty is avoided and JPMorgan is not entitled to recover from LBHI, JPMorgan will have exercised unauthorized dominion over the funds, to the alteration of their condition and to the exclusion of LBHI's rights.  Although JPMorgan might argue that LBHI authorized JPMorgan's possession and control over the transfers, LBHI could not have consented to an agreement that violates the law.[6640]   Therefore, if the September Guaranty is found to be a fraudulent obligation, there is a colorable claim against JPMorgan for conversion to recover the $8.6 billion in collateral less an amount equal to any unpaid obligations covered under any other guaranties, such as the August Guaranty,[6641] the derivatives guaranties[6642] or the guaranty resolution.[6643]

---

[6639] *Id.*

[6640] *Smith v. Brown*, 778 N.E.2d 490, 496 (Ct. App. Ind. 2002) (finding that the defendant exerted unauthorized control, despite consent to an agreement, because a party cannot consent to an agreement that violates state law).

[6641] As set forth in Section III.B.3.g.5.a.iii, there are likely no claims covered by the August Guaranty.

[6642] The claims covered by the derivatives guaranties remaining after the application of subsidiaries' collateral total approximately $1.94 billion.  *See* JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009) [LBEX-JPMC 000199].

[6643] The guaranty resolution would appear to apply to a $95 million claim asserted by LBJ and contingent claims asserted by Lehman Brothers Bankhaus AG and Woodlands Commercial Bank (f/k/a/ Lehman Brothers Commercial Bank).  Unanimous Written Consent of the Executive Committee of the Board of

Second, LBHI may have a cause of action for unjust enrichment to remedy the

transfers made to JPMorgan in connection with the September Guaranty because: (1)

JPMorgan was enriched, (2) at Lehman's expense and (3) it would be against equity and

good conscience to permit JPMorgan to retain what is sought to be recovered.[6644]  Here,

if the September Guaranty is avoided, LBHI may have a colorable claim for unjust

enrichment because JPMorgan received a benefit on a contract later found to be void or

unenforceable.[6645]  The remedy for unjust enrichment is restitution.[6646]  Where a party has

a claim for unjust enrichment, the value of the claim will depend on the conduct of the

parties, but will not be less than the value of the property at the time it was transferred

unless the transferee is without fault.[6647]

If LBHI were to prevail on a claim for unjust enrichment, LBHI would likely

recover at least the value of the assets at the time of the transfer.  As the assets may have

---

Directors of Lehman Brothers Holding Inc. (June 9, 2005) [LBEX-AM 003415].  It also would cover the
LBIE line of credit but no amounts are claimed as due under that line of credit.  *Id.*

[6644] *See AHA Sales, Inc. v. Creative Bath Prods., Inc.,* 867 N.Y.S. 2d 169, 180 (N.Y. App. Div. 2008) (citations
omitted).

[6645] *See U.S. E. Telecomm., Inc. v. US W. Comm. Servs.,* 38 F.3d 1289, 1299 (2d. Cir. 1994) (holding that a
subcontractor could recover against a general contractor under unjust enrichment theory where the
contract between the parties was found to be unenforceable); *see also Taylor & Jennings, Inc. v. Bellino Bros.
Constr. Co. Inc.,* 483 N.Y.S. 2d 813 (N.Y. App. Div. 1984) (finding that where a subcontract was voided as
induced by fraud, recovery by the subcontractor against the contractor under the equitable doctrine of
quantum meruit was proper); *Aluminum Fare, Inc. v. Abdella,* 456 N.Y.S. 2d 184 (N.Y. App. 1982) (where no
valid agreement existed because written proposal was never signed and parties subsequently orally
altered proposal, contractor could still recover from owner on theory of quantum meruit for services
rendered).

[6646] *State of New York v. SCA Servs. Inc.,* 761 F. Supp. 14, 15 (S.D.N.Y. 1991) ("a plaintiff who establishes a
prima facie case of unjust enrichment is entitled to the equitable remedy of restitution.").

[6647] *See Vanleigh Carpet Corp. v. Gene Schoor's Iron Forge,* 318 N.Y.S.2d 402 (N.Y. Civ. Ct. 1971); *see also* 22A
N.Y. Jur. 2d Contracts § 587 (2009).

declined in value since the transfer, a court would have to determine their value as of the time of transfer. However, the amount of that value available to LBHI for recovery will depend on the Court's determination of LBHI and JPMorgan's behavior. If the court determines that JPMorgan was conscious that its demands that LBHI execute additional and expanded guaranties or that its subsequent demands for collateral under those guaranties were wrongful, then LBHI would be able to recover the full value of the assets plus any of JPMorgan's profits from them. If the court determines that JPMorgan's demands were not consciously wrongful, LBHI would be able to recover the value of the property up to the amount of its loss. If the court determines that LBHI is entitled to restitution for the assets but that JPMorgan acquired them innocently and with no more fault than LBHI, LBHI's recovery would be limited to the benefit JPMorgan received from the assets or the return of the transferred assets.

Finally, the Examiner has concluded that LBHI has a colorable claim against JPMorgan for money had and received. Such cause may lie to remedy the transfers made to JPMorgan in connection with the September Guaranty because (1) JPMorgan received money belonging to the claimant, (2) JPMorgan benefited from receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money.[6648] An action for money had and received is based upon unjust enrichment and therefore the analysis is similar. JPMorgan will likely

---

[6648] *Brewer v. State of New York*, 672 N.Y.S.2d 650, 656 (N.Y. Ct. Cl. 1998).

argue that there was a contract, and therefore unjust enrichment or money had and received cannot apply.  If the September Guaranty is avoided, however, there is no contract.[6649]  As in the case of *Friar,* there is evidence to support a finding that LBHI had no realistic alternative but to accept to JPMorgan's demands.[6650]  Therefore, the transfers at issue may be subject to a claim for money had and received.

The remedy for a cause of action for money had and received is restitution.[6651] Therefore, LBHI's recovery for claims for money paid and received will be governed by the principles of unjust enrichment and restitution set forth above.[6652]

---

[6649] Underlying contracts would exist with respect to the derivatives contracts and any obligations also falling within the scope of the August Guaranty or the LBHI guaranty resolution.  For this reason, avoiding the August Guaranty may also be necessary.

[6650] *Friar v. Vanguard Holding Corp.*, 434 N.Y.S.2d 698, 701-02 & n.2 (N.Y. App. Div. 1980) (holding that an action for money had and received was adequately pled where the seller of home alleged he was compelled to pay mortgage tax to lender or else sale would be aborted, and seller had no realistic alternative to surrender to lender's demands).

[6651] *Citipostal, Inc. v. Unistar Leasing,* 724 N.Y.S.2d 555, 559 (N.Y. App. Div. 2001).

[6652] Whether preemption applies may depend on whether the state law causes of action are in the nature of *avoidance* actions.  *See In re Fin. Mgmt. Servs., Inc.,* 261 B.R. 150, 156 (Bankr. W.D. Pa. 2001).  The remedy for an unjust enrichment or money had and received is restitution.  A person obtains restitution when he is restored to the position he formerly occupied either by the return of something that he formerly had or by the receipt of its equivalent in money.  *Restatement (First) of Restitution* (2009), Chap. 1, Topic 1, § 1. Even if JPMorgan acted tortiously, the most LBHI would be able to recover through restitution is the value of the property up to the full amount of LBHI's loss and the profits JPMorgan obtained.  Therefore, restitution is basically an avoidance of the benefit received by the wrongdoer, or a legal doctrine "designed to avoid unjust enrichment."  *In re Rezulin Prods. Liability Litig.,* 390 F. Supp. 2d 319, 340 (S.D.N.Y. 2005).  Because restitution can be equated to an avoidance action, the causes of action of unjust enrichment and money had and received could be deemed preempted by the safe harbors if a court applies the doctrine.  A state law cause of action for conversion, however, cannot be equated to an avoidance action.  The remedy for conversion is a damage remedy.  The property itself is not returned to the party who was wronged; rather, the party receives damages in the amount of the value of the property at the time of conversion.  *See Bank Brussels Lambert v. Credit Lyonnais (Suisse),* 192 B.R. 73, 76 n.3 (S.D.N.Y. 1996) ("recovery on a conversion claim will be an amount equal to the full value of the converted property, rather than return of the specific property").  Therefore, a state law cause of action for conversion cannot be equated to an avoidance action, and thus is arguably not preempted by the safe harbors.

In summary, if the safe harbors set forth in Section 546 do not protect the transfers of collateral in connection with a voided guaranty, or if, in the alternative, state law claims are not preempted, then there are colorable claims that transfers of collateral made in connection with the September Agreements totaling as much as $6.9 billion[6653] (the $8.6 billion in transfers less the $1.95 billion in setoffs JPMorgan has already taken on account of obligations that are both Protected Contracts and/or subject to the derivatives guaranties) would be avoidable as fraudulent transfers or preferences.

4.    **To the Extent the September Guaranty Provided for a Guaranty of Non-Protected Contract Obligations, or to the Extent JPMorgan Liquidated Collateral Pursuant to Non-Protected Contract Exposure, a Colorable Basis Exists That the Safe Harbor Provisions Are Not Applicable**

The Examiner concludes that LBHI has a colorable basis to claim that even if the safe harbors are generally applicable, not all of the collateral transfers made pursuant to the September Agreements are protected. The safe-harbor provisions of Sections 546(e), (f), (g), and (j) protect transfers made to the Protected Parties *in connection with* the Protected Contracts from avoidance.[6654]  Whether or not guaranties that secure both Protected Contracts and non-Protected Contracts fall within the safe-harbor provisions depends on a court's interpretation of the "in connection with" language.

---

[6653] *See* Appendix 23, Duff & Phelps, Analysis of APB, Journal Entry, Cash Disbursement and JPMorgan Collateral for a detailed listing of the amount, and timing, of the collateral transferred from LBHI to JPMorgan in connection with the September 9 Guaranty.

[6654] *See* 11 U.S.C. §§ 546(e), (f), (g) and (j).

The court in *American Home Mortgage* provides some guidance on this issue.[6655] There, the debtors entered into a repurchase agreement that governed the rights and obligations related to the sale and repurchase of mortgage loans or interests in mortgage loans from the debtors to counterparty Calyon.  The agreement also provided for the servicing of mortgage loans subject to the repurchase agreement.[6656]  Applying the plain meaning of the statute, the court held that the sale and repurchase of mortgage loans under the contract constituted a repurchase agreement under the criteria of Section 101(47).  Therefore, Section 559 applied and Calyon could enforce its rights under the contract triggered by a condition of the kind specified in Section 365(e)(1).[6657] The court also held that the contract was a securities contract and that Calyon was a financial institution and therefore Section 555 was also applicable.[6658]  Although it found portions of the contract subject to the safe harbors, the court held that the debtor's obligations relating to the servicing of mortgage loans under the contract were severable.[6659]  Because the servicing contract was neither a repurchase agreement nor a securities contract, it was not subject to Sections 555 or 559, and therefore the court held that this part of the contract was not subject to the safe harbors, and Calyon could not

---

[6655] *Calyon N.Y. Branch v. American Home Mortgage Corp. (In re American Home Mortgage, Inc.),* 379 B.R. 503 (D. Del. 2008).
[6656] *Id.* at 509.
[6657] *Id.* at 517-18.
[6658] *Id.* at 518-19.
[6659] *Id.* at 521.

enforce its rights relating to the servicing of the mortgage loans triggered by a condition of the kind specified in Section 365(e)(1).[6660]

A plausible reading of *American Home Mortgage* would be that if a contract is not severable and involves transactions or agreements that do not qualify for safe-harbor protection, then the entire agreement falls outside of the safe-harbor provisions. *American Home Mortgage*, however, first determined the subject contract was a repurchase agreement entitled to safe-harbor protection and then determined whether it could sever the protected portions of the contract from the part of the contract that was not safe-harbored.

Applying *American Home Mortgage's* rationale to this case, a court may first determine whether the September Guaranty overall qualifies for safe-harbor protection and *then* determine whether any portions of the September Guaranty could be severed and excluded from safe-harbor protection. Alternatively, a court may interpret Section 546's "in connection with" language more broadly, departing from *American Home Mortgage,* and hold that severable portions of a contract are still "in connection with" the Protected Contracts and entitled to protection. Still another possibility exists: a court may determine that, to the extent the September Guaranty is entitled to safe-harbor protection, it is entitled to protection only to the extent it guarantees Protected

---

[6660] *Id.* at 523.

Contract obligations, or to the extent JPMorgan liquidated collateral pursuant to Protected Contract exposure.

In any event, there is evidence to support a finding that JPMorgan liquidated collateral only pursuant to clearance and settlement obligations, derivative obligations, and repurchase transactions – all Protected Contracts.[6661]  Thus, even if a court were to limit the scope of the "in connection with" language, it appears that JPMorgan's post-petition collateral liquidations were all entitled to safe-harbor protection absent a conclusion that because September Guaranty is avoided, all of the collateral transfers may be avoided as well.

The Examiner has identified four categories of obligations incurred by LBHI pursuant to the September Guaranty that are not subject to the protection of the safe-harbor provisions of the Bankruptcy Code.

First, there is a $95.6 million loan to LBJ that was originally made on an unsecured basis.[6662]  In March 2008, JPMorgan requested that LBHI pledge $60 million as security for this loan.[6663]  Under the September Agreements, LBHI guaranteed this debt. As a result, this loan, which was originally partially unsecured, became fully secured on account of the September Agreements.  The Examiner has not found any basis to assert that this loan would be protected from avoidance by any of the safe-harbor exemptions.

---

[6661] JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009) [LBEX-JPMC 000199].

[6662] *Id.*

[6663] JPMorgan, Lehman Brothers Exposure Overview (Sept. 2008), at p. 3 [JPM-EXAMINER00005966].

There also is no evidence indicating that JPMorgan has liquidated LBHI's prior $60 million pledge, or applied any of the $8.6 billion in cash collateral to repay this loan. Based upon *American Home Mortgage*, a colorable claim exists that the transfer of collateral totaling at least $35.6 million to secure the LBJ loan should be returned to the LBHI estate.[6664]

Second, there is a $2 billion line of credit that JPMorgan extended to LBIE that was unsecured prior to the September Agreements, but became secured thereafter.[6665] The Examiner has uncovered no evidence of any outstanding obligations on this $2 billion line of credit owed as of the Petition Date,[6666] nor has JPMorgan asserted any claims in its Proofs of Claim against this line.  In addition, there is no evidence that JPMorgan applied any of the $8.6 billion of collateral to repay obligations owing under this line between September 9 and 15.   Thus, there are no collateral transfers made pursuant to the September Agreements that apply to this line of credit.

Third, JPMorgan has asserted a secured claim totaling $295,885,149 as to certain fees and expenses.[6667]   There is no clear basis on which JPMorgan can assert that the safe-harbor provisions would apply to these fees and expenses.  For example, one such

---

[6664] If the guaranty resolution is upheld, then the transfer of additional collateral to JPMorgan to secure the LBJ loan would be a transfer made on account of an antecedent debt (the guaranty resolution) and avoidable as preferential under 11 U.S.C. § 547(b).

[6665] *Id.* at p. 6 [JPM-EXAMINER 00005971].

[6666] *See* E-mail from Kelly Mathieson, JPMorgan, to Jeff Hack, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0069403] ("there is $0 credit in use with LBIE").

[6667] JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009), at p. 1 [LBEX-JPMC 000199].

fee, an operational overdraft fee of $23,500,000 in connection with a payment to a law firm, does not appear to be connected to any Protected Contract pursuant to the safe-harbor provisions of the Bankruptcy Code.[6668]  Other listed expenses, however, may be subject to safe-harbor provisions.  One is a claim of $54,041,439 for "Repo Agreement/Securities Lending Closeout Amounts."[6669]  This amount may arguably be protected by the safe-harbor provisions as being in connection with the Protected Contracts of repurchase contracts and/or securities contracts.  Thus, while some of these fees and expenses may be subject to the safe-harbor provisions, and therefore unavoidable, it appears that others may not be protected and therefore colorable claims exist to avoid the collateral transfers made to secure these fees and expenses.

Finally, JPMorgan has asserted contingent claims relating to (1) LCPI participation obligations in the amount of $687.8 million; (2) Aurora Bank FSB letters of credit in the amount of $587.3 million; (3) Lehman Brothers Bankhaus AG in the amount of $209.3 million;[6670] and (4) Woodlands Commercial Bank (f/k/a/ Lehman Brothers Commercial Bank) in the amount of $261.3 million.[6671]  The Examiner has not attempted to estimate the value of these claims.  To the extent that the claims are estimated as

---

[6668] *Id.*

[6669] *Id.*

[6670] *Id.*  This entity is a subsidiary covered by the guaranty resolution.  Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holding Inc. (June 9, 2005) [LBEX-AM 003415].

[6671] *Id.* at p. 10.  This entity is a subsidiary covered by the guaranty resolution.  Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holding Inc. (June 9, 2005) [LBEX-AM 003415].

having a positive value, the Examiner is not aware of facts to support a finding that these claims are subject to Section 546's safe-harbor provisions and any collateral pledged on account of these claims may be subject to avoidance.

To the extent that the collateral remaining in JPMorgan's hands is not sufficient to allow for the full return of the transfers made to secure non-Protected Contracts, a colorable basis exists to find that JPMorgan should not be permitted to "cherry pick" obligations in which to liquidate collateral to ensure safe-harbor protection. *American Home Mortgage* supports the conclusion that a court should assume that collateral transfers to JPMorgan were first posted to secure non-Protected Contracts and avoid those dollars first for the benefit of the estate.[6672]  In other contexts, courts assume, for example, that a payment to a creditor with a partially secured claim is first applied to the unsecured obligation to allow the trustee to avoid the transfer as a preference.[6673] While this analogy is not perfect, it supports a finding that, based, upon *American Home Mortgage*, of the $6.9 billion in cash still held by JPMorgan, JPMorgan must first return cash equal to the amounts owed on account of non-Protected Contracts before applying any of the funds to reduce obligations owed on account of Protected Contracts.

---

[6672] *See id.*

[6673] *Covey v. Comm'l Nat'l Bank of Peoria*, 960 F.2d 657, 662-63 (7th Cir. 1992) (interests of creditors dominate in determining whether a creditor may apply payments to avoid liability under Section 548); *see also Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1157 (D.C. Cir. 1986) (recognizing conclusive presumption that an undersecured creditor first applies any transfer it receives from the debtor to the unsecured portion of the debt); *Deutsche Bank Securities, Inc. v. Kendall (In re Consilient, Inc.)*, No. C 05-2430 CW, 02-40383 NK, 2006 WL 335415, *3 (N.D. Cal. 2006) (same); *Armstrong v. John Deere Co. (In re Gilbertson)*, 90 B.R. 1006, 1010 (Bankr. N.D. 1988) (same).

### (iii) Avoidability of the August Agreements and Transfers
### in Connection With the August Agreements

The August Agreements consisted of (1) the August Amendment to the Clearance Agreement, which expanded the reach of the Clearance Agreement by adding LBHI, LBIE, LOTC and LBJ as parties and adding language that the liability of the Lehman entities under the Clearance Agreement was several, not joint;[6674] (2) the August Guaranty, under which LBHI guaranteed the Lehman parties' obligations under the Clearance Agreement;[6675] and (3) the August Security Agreement, which secured LBHI's Guaranty, granting JPMorgan a security interest in a Cash Account, Securities Account and certain related accounts.[6676]

### a.    Avoidability of the August Guaranty as a Constructive Fraudulent Obligation

### 1.    LBHI Incurred an Obligation Within the Applicable Look-Back Periods When it Executed the August Guaranty

As described above, in Section III.B.3.g.5.a.ii.a.1, execution of a guaranty is not itself the incurrence of an obligation; rather, the obligation is incurred when the loan is made to the primary obligor, thereby creating a contingent liability for the guarantor.[6677] Here, the August Guaranty required LBHI to guarantee "all obligations and liabilities (including without limitation the "Obligations" as defined in the Clearance Agreement)

---

[6674] *See* Amendment to Clearance Agreement (Aug. 26, 2008), at p. 1 [JPM-2004 0005856].

[6675] Guaranty (Aug. 26, 2008), at p. 1 [JPM-2004 0005879].

[6676] Security Agreement (Aug. 26, 2008), at p. 2 [JPM-2004 0005867].    See Section III.A.5.b of this Report for a comprehensive account of the August Agreements.

[6677] *See Rubin*, 661 F.2d at 990-91.

of [the Lehman parties] to [JPMorgan] . . . pursuant to the Clearance Agreement."[6678]  As

of August 29, 2008, the Lehman parties (LBI, LCPI, LBIE, LOTC and LBJ) owed

obligations to JPMorgan.  Thus, upon execution of the August Guaranty on August 29,

2008, LBHI had a contingent liability to repay JPMorgan if one of the Lehman parties to

the August Amendment to the Clearance Agreement could not repay JPMorgan.

> **2.    There Is Evidence That LBHI Received Less
> Than Reasonably Equivalent Value or Did Not
> Receive Fair Consideration in Exchange for
> Granting JPMorgan the August Guaranty**

The Examiner has concluded that there is evidence to support a finding that

LBHI did not receive reasonably equivalent value or fair consideration in exchange for

incurring the additional obligations imposed upon it by the August Guaranty.  Prior to

August 29, 2008, LBHI had not guaranteed the obligations of LBI to JPMorgan under the

Clearance Agreement.[6679]  Under the August Agreements, LBHI guaranteed all of the

obligations that the Lehman parties owed to JPMorgan under the Clearance

Agreement.[6680]  LBHI's liability was capped at the amount of cash and securities held by

JPMorgan in two pledged accounts.[6681]  As LBHI had not guaranteed these obligations

previously, its gross exposure was adjusted "each day" "and for each such day shall be

equal to the dollar amount of cash and securities (based on the market value of such

---

[6678] Guaranty (Aug. 26, 2008), at p. 1 [JPM-2004 0005879].
[6679] *Compare* Amendment to Clearance Agreement (Aug. 26, 2008) [JPM-2004 0005856] *with* Clearance Agreement (June 15, 2000) [JPM-2004 0031786].
[6680] Guaranty (Aug. 26, 2008) at p.1-2 [JPM-2004 0005879].
[6681] *Id.*

securities as determined by the Bank in its reasonable discretion)" held in two accounts that were subject to the Clearance Agreement and the related Security Agreement.

For the same reasons as set forth in Section III.B.3.g.5.a.ii.a.2 with respect to the September Guaranty, the net increase in exposure to LBHI was theoretically zero under the August Guaranty because of the potential overcollaterization of JPMorgan. This preliminary conclusion is made taking into account the collateral pledged by the subsidiaries, and assumes that the subsidiaries would not pay anything on account of general unsecured deficiency claims held by JPMorgan after application of the collateral.[6682] This preliminary conclusion is also subject to the caveats and further analysis discussed in Section III.B.3.g.5.a.ii.a.2 above regarding the net exposure under the September Agreements.

After assessing LBHI's net exposure under the August Agreements, it is necessary to determine what benefit LBHI received in exchange. This analysis mirrors that set forth in Section III.B.3.g.5.a.ii.a.2, above with respect to the September Guaranty. Because the Examiner has determined that there is evidence to support a finding of insolvency for some of LBHI's subsidiaries, any benefit provided to those subsidiaries would not have resulted in a quantifiable increase in the subsidiary's value to LBHI. Whether or not reasonably equivalent value was exchanged will depend on whether the time between August 29, 2008 and September 15, 2008 had, as of August

---

[6682] See Section III.A.5.b of this Report for a discussion of the issue of overcollateralization

29, 2008, any quantifiable value to LBHI.    Moreover, as explained in Section III.B.3.g.5.a.ii.a.2 above, any benefit to LBHI could be discounted or eliminated entirely if entry into the August Guaranty in any way accelerated Lehman's demise.

### 3.    Insolvency as of August 29, 2008

The Examiner concludes that there is insufficient evidence to support a finding of insolvency on August 29, the date on which the August Guaranty was executed. [6683]

### 4.    Undercapitalization and Inability to Pay Debts as They Come Due as of August 29, 2008

The Examiner concludes that there is sufficient evidence to support a finding of undercapitalization of LBHI as of August 29, 2008, the date of the execution of the August Guaranty.[6684]   Undercapitalization is relevant only to claims made to avoid the August Guaranty under Section 548(a).[6685]

### b.    Defenses to Avoidability of the August Guaranty

As discussed in Section III.B.3.g.5.a.ii.b, which addresses the defenses to avoidability of the September Guaranty, the two primary defenses at issue are good faith pursuant to Section 548(c) and the safe-harbor provisions of Section 546 of the Bankruptcy Code.   The Examiner concludes that a colorable basis exists to avoid the August Guaranty notwithstanding these defenses, although with respect to the good-faith defense, because LBHI's troubled financial condition was less apparent on August

---

[6683] See Section III.B.3.b of this Report for a more detailed discussion of the solvency analysis of LBHI.

[6684] *See* Section III.B.3.d for a more detailed discussion of the undercapitalization analysis of LBHI.

[6685] *Compare* 11 U.S.C. § 548(a), *with* McKinney's Debtor and Creditor Law section 274 (2010)

29 than it was on September 10, JPMorgan's claim of good faith is stronger.  See Section

III.B.3.g.5.a.ii.b.1 above for a full discussion of this defense.

As discussed in Section III.B.3.g.5.a.ii.b.2, the Examiner has concluded that there

is a colorable basis to find that the August Guaranty is not protected by the safe-harbor

provisions.

### c.  Avoidability of Transfers of Collateral in Connection With the August Guaranty

Because the August Guaranty is limited to the value of the pledged collateral and

this cap changed to match the value of the pledged collateral held in two accounts,

avoidance of the August Guaranty would not benefit the LBHI estate by eliminating a

potential unsecured claim.[6686]  Further, LBHI did not pledge any additional collateral in

connection with the August Agreements.[6687]   However, because the September

Agreements did not replace the August Agreements, JPMorgan may claim that the

August Security Agreement and Guaranty also serve as a basis to retain the $8.6 billion

in collateral transferred between September 9 and September 12, 2008.

---

[6686] Guaranty (Aug. 26, 2008) at p.2 [JPM-2004 0005879].  The Guaranty provided that: "The Guarantor's maximum liability under this Guaranty shall adjust each day and for each such day shall be equal to the dollar amount of cash and securities (based on the market value of such securities as determined by the Bank in its reasonable discretion) (i) held on such day in the accounts of the guarantor subject to the Clearance Agreement and the Security Agreement and (ii) that the Bank has notified the Guarantor to be delivered to the Bank on such day in support of the Guaranty."  *Id.* at p. 2.

[6687] *See* Appendix 18, Lehman's Collateral at JPMorgan.  But see Section III.A.5.b. noting that LBHI transferred cash collateral to JPMorgan on September 9, 2008 before the execution of the September Security Agreement.

The August Security Agreement only granted JPMorgan a lien upon a Securities

Account, a Cash Account and certain related accounts.[6688] Of the $8.6 billion in collateral

transferred to JPMorgan from LBHI, cash totaling $6.9 billion was transferred to the

Cash Account in which JPMorgan would have had a lien pursuant to the August

Security Agreement and Guaranty.[6689] Following the receipt of this $6.9 billion in cash,

the cash was moved to other accounts and as of the Petition Date, there was a zero

balance in the Cash Account.[6690] If the $6.9 billion was moved from the Cash Account by

JPMorgan and not at LBHI's direction, then under the definition of "Accounts" found in

the August Security Agreement, JPMorgan may have lost its lien on the $6.9 billion.

Some evidence exists that JPMorgan controlled the movement of cash from the Cash

Account.[6691] In addition, JPMorgan witnesses stated that the September 9 collateral

requests were based primarily on its investment bank exposure, not in connection with

---

[6688] Security Agreement, (Aug. 26, 2009), at p.1-2 [JPM-2004 00058567]. The "Accounts" against which
JPMorgan had a lien under the August Security Agreement are defined as:

> (i) the securities account of [LBHI] at [JPMorgan] known as LCE or any subaccount or
> replacement accounts thereto (the "Securities Account"), (ii) DDA# 066-141-605 (the "Cash
> Account") and (iii) any other account at [JPMorgan] to which [LBHI] transfers (A) cash from the
> Cash Account, (B) any interest, dividends, cash, instruments and other property from time to
> time received, receivable (including without limitation sales proceeds) or otherwise distributed in
> respect of or in exchange for any or all of the cash or securities in the Securities Account or the
> Cash Account or (C) any cash or securities from the Securities Account or the Cash Account
> during such time as [LBHI] or an Other Obligor has an outstanding obligation or liability to
> [JPMorgan] under the Guaranty or the Clearance Agreement.

*Id*. at p. 1.

[6689] *See* LBHI Account Statement (Sept. 30, 2008) JPM-EXAMINER00006270-72]; *see also* Security
Agreement (August 26, 2008) [JPM-2004 0005867].

[6690] JPMorgan, Account Statement for Acct. No. XXX-605 (Aug. 30, 2008-Sept. 30, 2008), at pp. 2-4 [JPM-
Examiner00006269].

[6691] Memorandum of Teleconference between Harold Novikoff, Wachtell, Lipton, Rosen & Katz, *et al.* and
Jerome Epstein, Jenner & Block, *et al.*(Nov. 19, 2009) at p. 4.

the Clearance Agreement.[6692]    Because the stated basis for requesting a significant
portion of the $6.9 billion was not to secure obligations arising under the Clearance
Agreement and also because the definition of "Accounts" would appear to exclude
these funds once they were moved by JPMorgan out of the Cash Account, the August
Security Agreement would not appear to create a basis to retain these funds as they
were not in accounts covered by the August Security Agreement on LBHI's petition
date.  In addition, there is evidence that the remaining $1.7 billion, consisting of money
market funds, was transferred to accounts in which JPMorgan would not have a lien
pursuant to the August Security Agreement.[6693]    Thus, even if the September Guaranty is
avoided and the August Guaranty is not, there is a colorable basis to assert that the
August Security Agreement does not cover the $8.6 billion in cash transfers.  There also
is a colorable basis to claim that based upon the language limiting LBHI's liability under
the August Guaranty to the collateral held in the Securities Account and Cash Account
as adjusted on a daily basis that there is no claim arising under the August Guaranty to
collect from the $8.6 billion because this money was not held in the Cash Account or
Securities Account as of LBHI's September 15 bankruptcy filing.[6694]

---

[6692] See Section III.A.5.b.(1).(h) of this Report, which discusses the basis for the Sept. 9 collateral call.

[6693] *See* JPMorgan, Accounts Holding LBHC Collateral Pledged to JPM [JPM-2004 0083539]; *see also* Security Agreement (August 26, 2008) [JPM-2004 0005867].

[6694] The same analysis for avoiding the September collateral transfers applies to those transfers if they are considered as having been made under the August Security Agreement.  *See* Section III.B.3.g.5.a.ii.c.

### (iv) Avoidability of the August and the September Security Agreements And Collateral Transfers Pursuant to Section 548(a)(1)(A)

There is evidence to support a finding that some of the badges of fraud necessary to prove the requisite intent to state a claim under Section 548(a)(1) exist. Therefore, the Examiner concludes that there is a colorable claim to avoid the August and September Guaranties and the $8.6 billion of collateral transfers made pursuant to the September Guaranty as actual fraudulent obligations and transfers.[6695]  The Examiner, however, also notes that when these badges of fraud are viewed against the backdrop of events overtaking LBHI and in connection with its conduct in dealing with its creditors during this time-period, it is likely that the trier of fact may also conclude that LBHI did not have the requisite intent to hinder, delay or defraud its other creditors when it agreed to grant JPMorgan a guaranty under either the August or September Guaranties or when it transferred $8.6 billion of cash collateral to JPMorgan.

Under Section 548(a)(1)(A), any transfer of an interest of the debtor in property or the incurrence of an obligation that occurs within two years of the debtor's bankruptcy filing is subject to avoidance if the debtor made the transfer with an "actual

---

[6695] If successful, a claim made under Section 548(a)(1)(A) is not protected by the safe-harbor provisions of Section 546(e), (f), (g) or (j).  There is no comparable exclusion for actual fraudulent transfer claims made under 11 U.S.C. § 544 and state law and thus the Examiner's Report focuses only upon a claim based upon Section 548(a)(1).

intent to hinder, delay or defraud any entity to which the debtor was or became indebted, on or after such transfer was made or such obligation was incurred."[6696]

As set forth in connection with the Examiner's analysis of the constructive fraudulent transfer claims, LBHI incurred obligations and made transfers within the applicable look-back period. The only issue is whether LBHI did so with the requisite intent. Courts consider whether a debtor incurred an obligation or made a transfer with an actual intent to hinder, delay or defraud its creditors generally by looking to whether certain "badges of fraud" are present.[6697] The intent that matters here is the intent of LBHI.[6698] Because intent is rarely susceptible to direct proof, the courts have developed what are known as the "badges of fraud" to assess whether a debtor has the requisite intent. The badges of fraud include, but are not limited to: (1) the transfer of property by a debtor during the pendency of a suit; (2) a transfer of property that renders the debtor insolvent or greatly reduces its estate; (3) a series of contemporaneous transactions that strip the debtor of all property available for execution; (4) secret or hurried transactions not in the usual mode of doing business; (5) any transaction conducted in a manner differing from customary methods; (6) a transaction whereby the debtor retains benefits over the transferred property; (7) little or no consideration in

---

[6696] 11 U.S.C. § 548(a)(1)(A).

[6697] See Appendix 1, Legal Issues, at Section IV.A.1, which discusses of the legal elements of an actual fraudulent transfer claim in greater detail.

[6698] *See Rubin Bros. Footwear, Inc. v. Chem. Bank (In re Rubin Bros. Footwear, Inc.)*, 119 B.R. 416, 423 (S.D.N.Y. 1990) ("For purposes of 11 U.S.C. § 548(a)(1), plaintiff must show fraudulent intent on the part of the transferor, rather than on the part of the transferee.") (citations omitted).

return for the transfer; or (8) a transfer of property between family members or related entities.[6699]  A plaintiff is not required to prove all of the badges of fraud, but once the plaintiff establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent, shifting the burden to the obligee or transferee to prove some "legitimate supervening purpose" for the transfers and incurrences of obligations at issue.[6700]

The intent that is relevant is that of the debtor, not the recipient of the fraudulent transfer.[6701]  JPMorgan's intent is irrelevant unless it can be shown that JPMorgan so dominated or controlled LBHI so as to make its intent, LBHI's intent.[6702]  The doctrine of imputed intent is generally reserved for circumstances where: (1) the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other insider role; (2) the controlling person, standing in the position of either principal or agent on either side of the transaction, may be presumed to act with actual or apparent authority to effectuate the disposition of the relevant property from the debtor on behalf of and for the benefit of the transferee; (3) the controlling person is considered to stand in a

---

[6699] *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (identifying badges of fraud under 11 U.S.C. S 548) (citing *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980)); *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244, 248 (N.Y. App. Div. 1999) (identifying badges of fraud under N.Y. D.C.L. § 276).

[6700] *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994); *accord Tavenner v. Smoot*, 257 F.3d 401, 408 (4th Cir. 2001); *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998).

[6701] *Rubin Bros. Footwear*, 119 B.R. at 423.

[6702] *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983); *In re James River Coal Co.*, 360 B.R. 139, 161 (Bankr. E.D. Va. Feb. 8, 2007) (collecting cases); *Armstrong v. United Bank of Bismark (In re Bob's Sea Ray Boats, Inc.)*, 144 B.R. 451, 459 (Bankr. D.N.D. 1992).

fiduciary capacity or hold a position of trust in the transferor entity; (4) imputation is necessary in order to recognize and discourage the misuse of the corporate form by means of transferring property between affiliated entities.[6703]   While JPMorgan may have been in a superior bargaining position, cases indicate that such control is not sufficient to impute intent.[6704]   Thus, there does not appear to be evidence to support a colorable basis for its application in this case.   Therefore, only LBHI's intent should be considered in assessing whether a colorable claim exists to avoid the August and September Guaranties and the collateral transfers as actual fraudulent transfers and obligations exists.

As for LBHI's intent, the following badges of fraud are present: (1) LBHI did not incur the obligation or make the transfers during the pendency of one lawsuit, but it did so during the pendency of a market free-fall that was directly impacting LBHI's value. This free-fall was more pronounced at the time of the execution of the September Guaranty and the transfers of collateral in connection with the September Guaranty. (2) There is evidence to support a finding of insolvency of LBHI at the time of the execution of the September Guaranty. (3) There is evidence to support a finding that little or no value was given to LBHI in exchange for incurring the guaranty obligations or making the collateral transfers (this analysis mirrors the question of what value LBHI received

---

[6703] *Jackson,* 263 B.R. at 447-48.

[6704] *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y. (In re Andrew Velez Constr., Inc.),* 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007).

in exchange for guaranteeing its subsidiaries' debts, see Section III.B.3.g.5.a.ii.a.2, above).  (4) The negotiations that resulted in the incurrence of the obligations and the requests for collateral on September 9, 2008 were hurried transactions, executed overnight on a very rushed basis without key Lehman officers reviewing the September Agreements or understanding their scope before they were signed.[6705]  By way of contrast, the August Guaranty was negotiated over a period of more than a week, between August 18, 2008, when Doctoroff e-mailed a draft,[6706] and August 29, 2008 when the August Agreements were executed.[6707]  Thus, this badge of fraud is likely not present with respect to the August Guaranty.  (5)  The transfers of $8.6 billion of cash collateral were significant to Lehman's overall liquidity and were done in a manner designed to create the public impression that the cash pledged still counted as part of Lehman's liquidity pool.[6708]  Although it is an issue for the trier of fact to determine whether these badges of fraud are sufficient to shift the burden to JPMorgan to justify the transfers and the incurrence of the obligation, a colorable basis exists to find that they could shift the burden to JPMorgan.  The analysis of the common law claims set

---

[6705] See Section III.A.5.b. for a discussion of the hurried nature of the transactions.

[6706] E-mail from Mark G. Doctoroff, JPMorgan, to Daniel J. Fleming, Lehman (Aug. 18, 2008) [LBEX-DOCID 451527].

[6707] *See, e.g., id.*; e-mail from Daniel J. Fleming, Lehman, to Mark G. Doctoroff, JPMorgan (Aug. 21, 2008) [LBEX-DOCID 310528]; e-mail from Jeffrey Aronson, JPMorgan, to Paul W. Hespel, Goodwin Procter, *et al.* (Aug. 25, 2008) [JPM-2004 0003466]; e-mail from Nikki G. Appel, to Paul W. Hespel, Goodwin Procter, *et al.* (Aug. 28, 2008) [JPM-2004 0004408].  See Section III.A.5.b of this Report, which discusses the August Agreement negotiations in greater detail.

[6708] E-mail from Mark G. Doctoroff, JPMorgan, to Jane Buyers-Russo, JPMorgan, *et al.* (Sept. 9, 2008) [JPM-2004 0032520].

forth in Section III.A.5.b includes arguments that JPMorgan may employ to justify the transfers.

The Examiner notes that these badges of fraud must be viewed in the context of what was happening in the market and in light of the fact that LBHI granted similar guaranties and made similar collateral pledges in favor of other creditors of its subsidiaries as LBHI and the other Lehman entities slipped into bankruptcy. A reasonable inference could be drawn from this conduct that LBHI did not agree to all of these additional obligations or collateral pledges to hinder, delay or defraud its other creditors, *i.e.,* it was not making a transfer to one friendly creditor to avoid paying others or to protect its assets for later use, but rather was attempting to quell creditor concerns by granting parent guaranties and pledging collateral where necessary based upon its perception that failing to do so might cause the credit flowing to Lehman to dry up and its business to fail. Nonetheless, because the question of intent is fact intensive, and there exists evidence to support some of the badges of fraud, the Examiner concludes that a colorable claim exists, although that claim is subject to substantial contrary evidence and inferences drawn from the evidence.

### (v) Avoidability of the Transfers of Collateral in Connection with the September Guaranty Pursuant to Section 547(b) of the Bankruptcy Code

The Examiner concludes that there is not sufficient evidence to support a colorable claim to avoid the transfers of collateral from LBHI to JPMorgan on or after

September 9 that secured obligations that LBHI had previously guaranteed on an unsecured basis as avoidable preferences. Specifically, prior to the execution of the September Guaranty, LBHI had guaranteed, on an unsecured basis, JPMorgan derivatives claims totaling approximately $3.08 billion as of September 9.[6709] Thus, the pledge of collateral under the September Agreements was: (1) a transfer to or for the benefit of JPMorgan; (2) for or on account of an antecedent debt owed by LBHI before such transfer was made; (3) made while LBHI was insolvent;[6710] (4) made on or within 90 days of the date of the filing of LBHI's bankruptcy petition; and (5) enabled JPMorgan to receive more than it would have received if the case were under Chapter 7 of this title, the transfers had not been made and JPMorgan received payment of such debt to the extent provided by the provisions of this title.[6711] Transfers generally made in connection with derivatives contracts, however, are Protected Contracts, and thus

---

[6709] See ISDA Master Agreement between JPMCB and LBCC (Nov. 15, 1993), at p. 25 [JPM-2004 0000368] (providing a guaranty by LBHI); ISDA Master Agreement between JPMM and LBIE (Aug. 26, 1997), at p. 14 [JPM-2004 0086169] (providing a guaranty by LBHI); ISDA Master Agreement between JPMCB and LBFSA (Nov. 15, 1993), at p. 24 [JPM-2004 000850] (providing a guaranty by LBHI); Amendment to the ISDA Master Agreement between JPMM and LBFSA (July 11, 2008), at p. 35 [JPM-2004 0086103] (providing guaranty by LBHI); ISDA Master Agreement between JPMCB and LBSF (Dec. 20, 1995), at p. 22 [JPM-2004 0000345] (providing guaranty by LBHI); ISDA Master Agreement between JPMBD and LBIE (Feb. 23, 1998), at p. 21 [JPM-2004 0086072]; Guarantee of LBHI for ISDA Master Agreement between WMB and LBSF (May 28, 1998) [LBEX-JPM 0000210]; Guarantee of LBHI for ISDA Master Agreement between JPMM and LBSF (June 7, 2002) [LBEX-JPM 0000212]; see also JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009) [LBEX-JPMC 000199].

[6710] The Examiner has concluded that there is evidence to support a finding that LBHI was insolvent as of September 2, 2009. For the complete analysis of LBHI's solvency, see Section III.B.3.b of this Report. For purposes of a Section 547(b) claim insolvency is presumed. 11 U.S.C. § 547(f).

[6711] See 11 U.S.C. § 547(b). See Appendix 1, Legal Issues, at Section IV.D of this Report, which discusses Section 547(b) in greater detail.

there is not a colorable claim to avoid the transfer of collateral to secure these previously unsecured obligations of LBHI.[6712]

To the extent that LBHI's June 9, 2005 guaranty of certain subsidiaries' debts through its corporate resolution is enforceable by JPMorgan against LBHI, then that portion of the transfer of the $8.6 billion that secured obligations owed to subsidiaries covered by the resolution guaranty would be: (1) a transfer to or for the benefit of JPMorgan; (2) for or on account of an antecedent debt owed by LBHI before such transfer was made; (3) made while LBHI was insolvent; (4) made on or within 90 days of the date of the filing of LBHI's bankruptcy petition; and (5) enabled JPMorgan to receive more than it would have received if the case were under Chapter 7 of this title, the transfers had not been made and JPMorgan received payment of such debt to the extent provided by the provisions of this title.  Based upon JPMorgan's Proofs of Claim, there appear to be at least three claims implicated by this analysis:  (1) the LBJ of $95.6 million;[6713] (2) the Lehman Brothers Bankhaus AG contingent claim of $209.3 million; and (3) the Woodlands Commercial Bank (f/k/a Lehman Brothers Commercial Bank) contingent claim in the amount of $261.3 million.  In addition, some of the $391,490,210 in fees and expenses may be implicated as well; however, the JPMorgan Proofs of Claim

---

[6712] *See* 11 U.S.C. § 546(e).

[6713] The transfer subject to avoidance would be limited to $35 million as LBHI had posted approximately $60 million to secure this debt outside of the preference period and thus, LBHI's transfer of additional collateral in September, 2008 only secured $35.6 million of this debt.  *See* JPMorgan, Lehman Brothers Exposure Overview (Sept. 2008), at p. 3 [JPM-EXAMINER00005966].

are not clear in all respects as to which subsidiary owes these fees.    Because there is no evidence to suggest that any of these obligations fall under the safe harbors, they are not barred from avoidance and there is evidence to support a colorable preference claim.

In addition, the Examiner concludes that there are colorable claims to avoid as preferential the collateral transfers made on account of Non-Protected Contracts.  Much of the $8.6 billion in cash transfers took place following the execution of the September Agreements, and thus, there is a colorable basis to claim that the post-execution collateral transfers secured an antecedent debt owed by LBHI arising under the September Guaranty.  JPMorgan's counsel has asserted that the cap on liability contained in the September Guaranty defeats a preference claim because any transfer of collateral would not be on account of an antecedent debt.  The September Guaranty, however, provided that LBHI's "maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that [JPMorgan] has requested from time to time as further security in support of this Guaranty."[6714] Thus, LBHI's liability under the September Guaranty was always capped at the amount of additional collateral that JPMorgan had requested.  JPMorgan's counsel has asserted that this language means there is no antecedent debt as there is no LBHI liability under the September Guaranty until such time as additional collateral is actually posted.

---

[6714] Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813].

On September 9, however, JPMorgan requested $5 billion of collateral in connection with the agreements that it anticipated executing with LBHI.[6715]    The language of the September Guaranty does not tie the capping of liability to collateral in the hands of JPMorgan but only to "such greater amount that [JPMorgan] has requested from time to time as further security in support of this Guaranty."[6716]    Thus, as of the execution of the September Guaranty, LBHI's liability under the Guaranty was $5 billion.    As of the execution of the September Guaranty, LBHI had posted only $3 billion.    Thus, $2 billion of the cash collateral posted following the execution of the September Guaranty was on account of an antecedent debt.    Similarly, JPMorgan requested an additional $5 billion of collateral on September 11, increasing LBHI's liability under the September Guaranty to $10 billion.    The additional collateral was not pledged until the next day, making that pledge on account of an antecedent debt.

To the extent that the collateral transferred was on account of Protected Contracts, JPMorgan would have a defense under the safe-harbor provisions.    As set forth in Section III.B.3.g.5.a.ii.b, however, based upon *American Home Mortgage*, LBHI has a colorable basis for asserting that collateral transferred to secure the non-Protected Contracts discussed in Section III.B.3.g.5.a.ii.c.4 may be avoided as preferential transfers.

---

[6715] See Appendix 18, of this Report, which discusses Lehman's collateral at JPMorgan in greater detail.

[6716] Guaranty (Sept. 9, 2008), at p. 2 [JPM-2004 0005813].

With respect to those transfers of collateral not protected by the safe-harbor provisions outlined in Section III.B.3.g.5.a.ii.c.4, even if all of the elements set forth in Section 547(b) are satisfied, liability will not lie if JPMorgan can establish a defense under Section 547(c).[6717]  The three applicable defenses are found in Section 547(c)(1), (2), and (4). [6718]

In order to succeed with a contemporaneous exchange defense under Section 547(c)(1), JPMorgan must show (1) that the transfers of collateral were for new value given to LBHI; (2) that the transfers were intended to be a contemporaneous exchange; and (3) that the transfers were in fact substantially contemporaneous exchanges.[6719] Although the transfers were made within days of the execution of the September Guaranty and thus, JPMorgan may be able to show that the transfers were intended to be and were in fact contemporaneous, there is no evidence that JPMorgan extended new value in the form of "money or money's worth in . . . new credit" to LBHI in exchange for the transfers.  There is no evidence that JPMorgan lent additional amounts to LBHI as a result of the September Guaranty.  Instead, JPMorgan continued its extension of discretionary credit to LBHI's affiliates.  This same discretionary extension

---

[6717] 11 U.S.C. § 547(c).

[6718] *Id.* § 547(c)(1).

[6719] *The Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks (USA), Inc.),* 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005) (citing *In re Mid Atlantic Fund, Inc.,* 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986); *In re McLean Indus. Inc.,* 132 B.R. 247, 263-64 (Bankr. S.D.N.Y. 1991), *rev'd on other grounds,* 30 F.3d 385 (2d Cir. 1994); *Official Comm. of Unsecured Creditors of 360networks (USA), Inc. v. AAF-McQuay, Inc. (In re 360networks (USA), Inc.),* 327 B.R. 187, 191 (Bankr. S.D.N.Y. 2005)).

of credit existed prior to the execution of the September Guaranty and thus, even if the value JPMorgan provided to the other Lehman entities could be considered "new value given to LBHI," it could be construed as nothing more than its forbearance from withdrawing such credit. Because "[f]orbearance alone does not constitute new value," there is a colorable basis to conclude that there are claims to avoid the transfers as preferential notwithstanding a Section 547(c)(1) defense.[6720]

For similar reasons, it is questionable whether JPMorgan has a defense pursuant to Section 547(c)(4), which provides a defense to the extent of new value transferred to or for the benefit of the debtor following the transfer deemed preferential.[6721]  Although Section 547(c)(4), unlike Section 547(c)(1), contemplates that the new value may be to or for the debtor's benefit, forbearance also is not new value within the meaning of Section 547(c)(4).[6722]  Thus, since there is no evidence that JPMorgan increased its total exposure to all Lehman entities following the execution of the September Agreements, JPMorgan likely does not have a defense under Section 547(c)(4).

Finally, given the questionable timing of the transfers, the extraordinary nature and size of the transfers and other unique facts surrounding JPMorgan's request for additional collateral as set forth in Section III.A.5.b, JPMorgan likely does not have a

---

[6720] *Id.* at 205 (citations omitted).

[6721] 11 U.S.C. § 547(c)(4).

[6722] *In re ABC-NACO, Inc.,* 483 F.3d 470, 473-74 (7th Cir. 2007).

defense that the transfers of collateral were in the ordinary course of business pursuant

to Section 547(c)(2).[6723]

### (vi) Avoidability of Obligations of LBHI to Funds
### Managed by JPMorgan

Relying upon the September Guaranty, JPMorgan, in its Proof of Claims, has

asserted claims arising from obligations of Lehman to various funds managed by

JPMorgan.   JPMorgan asserts that these obligations are covered by the scope of the

September Agreements because such funds are "affiliates" of JPMorgan.    The

September Agreements cover exposure to JPMorgan "*and its affiliates*, subsidiaries,

successors and assigns."[6724]

The term "affiliate" is not defined in the applicable September Agreements.  Per

their terms, the September Agreements are governed by the laws of the state of New

York.  Further, the Security Agreement provides that "all terms used herein which are

defined in the Uniform Commercial Code shall have the meanings therein stated."[6725]

The Guaranties between the parties contain no similar provision.  Further, the Uniform

Commercial Code ("UCC"), which is referenced in the Security Agreements to provide

meaning to undefined terms, does not provide a definition of the term "affiliate."

---

[6723] 11 U.S.C. § 547(c)(2); *see* Appendix 1, Legal Issues, at Section IV.D.

[6724] *See* Amendment to Clearance Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005861]; Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873] (emphasis added).

[6725] Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873].

New York law, as the governing law of the September Agreements, provides several definitions of the term "affiliate."[6726]   However, there is no indication which definition, if any, represents the intent of the parties.

Likewise, several federal statutes define the term "affiliate."[6727]  Again, there is no indication that any such definition should be applied to the September Agreements in question.  Without more, the term "affiliate" has no plain meaning.

New York case law provides guidance on how to deal with instances of contract ambiguity.  First and foremost, "[w]hether a contract is ambiguous or, on the contrary, clear and unequivocal in its terms, is a question of law to be decided by the court in the first instance."[6728]  Furthermore, "[t]he objective in any question of the interpretation of a written contract…is to determine what is the intention of the parties as derived from the language employed."[6729]

Without further inquiry, it cannot be said that LBHI intended its September Agreements to extend to all obligations to the various funds managed by JPMorgan.  Similarly, it is not evident that JPMorgan sought to extend the September Agreements

---

[6726] *See, e.g.*, N.Y. Bus. Corp. Law § 912(a)(1); N.Y. Banking Law §6-l(1)(a); N.Y. Banking Law § 606(6)(b)(i).

[6727] *See, e.g.*, Bank Holding Company Act of 1956, 12 U.S.C. § 1841(k); Investment Company Act of 1940, 15 U.S.C. § 80a-2; Securities Exchange Act of 1934, 17 C.F.R. § 240.13e-3(a)(1); Securities Act of 1933, 17 C.F.R. § 230.405.

[6728] *Rice v. Miller*, 864 N.Y.S.2d 255, 258 (N.Y. Sup. Ct. 2008) (citing *In re Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995)).

[6729] *Id.* (citing *Hartford Accident & Indemnity Co. v. Wesolowski*, 305 N.E.2d 907, 909-10 (N.Y. 1973)); *see also Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (quoting *Brown Bros. Elec. Contrs. v. Bean Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977)) ("[p]ut another way, 'the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations'").

to such a degree at the time of contracting.  Possible arguments based on (1) definition of the term "Accounts" in the September Security Agreement or (2) JPMorgan's subsidiaries' role as promoter of and advisor to the funds are available, though neither provides a definitive answer.

The only specific mention of funds contained within any of the September Agreements is in the definition of the term "Accounts" as it describes what would serve as security under the September Security Agreement.[6730]  The Security Agreement provides that the term "Accounts" is to mean: "all accounts of the Guarantor at [JPMorgan] (including but not limited to . . . any nominee in any money market fund issued, managed, advised or subadvised by [the Bank])."[6731]

While this reference serves as a demonstration that money market funds were contemplated by the parties – at least in the sense that they would serve as security under the September Security Agreement – it also raises the argument that such a clause would not be necessary where obligations to these funds, as affiliates to JPMorgan, would be protected under the September Agreements.  Given this, it is difficult to glean the intent of the parties from this provision alone.

Based on the claims on file with the Court, subsidiaries of JPMorgan act as investment advisors to the funds in question.  In this capacity, JPMorgan's subsidiaries

---

[6730] Security Agreement (Sept. 9, 2008), at p. 1 [JPM-2004 0005873].
[6731] *Id.*

have the power in certain instances to take actions such as directing investment decisions of the funds, monitoring performance and compliance of the funds, and negotiating terms of agreements to be entered into on behalf of the funds.

Further, for certain funds, it appears a Form D – Notice of Sale of Securities filing is on file with the Securities and Exchange Commission. In some instances, a JPMorgan subsidiary is listed as a "Promoter" within these filings. Under the Investment Company Act of 1940, a "Promoter" is defined as "a person who, acting alone or in concert with other persons, is initiating or directing, or has within one year initiated or directed, the organization of such company."[6732] While some degree of control is evidenced by this relationship, that degree of control does not resolve whether this would qualify as an "affiliate" within the intended meaning of the parties in the applicable Agreements.

Given the lack of a plain meaning of the term "affiliate" and the ambiguity which results, extrinsic evidence of the reasonable intent of the contract parties would be necessary to determine whether various funds managed by subsidiaries of JPMorgan should be considered affiliates.

To summarize, the intent of the parties cannot be determined within the four corners of the applicable agreements. No provision contained in the September Agreements provides clarification as to whether a fund managed by a subsidiary of

---

[6732] 15 U.S.C. § 80a-2(a)(30).

JPMorgan qualifies as an affiliate.  As noted above, the UCC, which the September Agreements reference in order to define terms used but not defined, also lacks a definition of "affiliate."  The issue of whether various funds managed by subsidiaries of JPMorgan are affiliates of JPMorgan presents material issues of fact and law that cannot be resolved without further evidence regarding the reasonable intent of the parties and the precise relationship of JPMorgan to the money market funds in question.

Based on the above analysis, there is a colorable claim that these obligations are unsecured due to the ambiguity of the September Agreements.  On behalf of JPMorgan's various funds which it alleges are "affiliates," JPMorgan claims $746 million for which roughly $12.5 million has been paid through collateral held.  That leaves a net amount of $734 million.[6733]  Thus, assuming the scope of the September Guaranty does not cover the various funds alleged to be "affiliates," then these obligations will become unsecured, and the $12.5 million that has been paid will be subject to avoidance.

### (b)  Citi Avoidance Analysis

### (i)  Background

Citi was Lehman's designated settlement member on the Continuous Linked Settlement ("CLS") system.[6734]  In addition, Citi provided other financial services such as

---

[6733] JPMorgan, Exposure, Collateral and Setoff Summary (Oct. 27, 2009), at p. 1 [LBEX-JPMC 000199].

[6734] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, Ex. A, Docket No. 109, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).  The LBI-Citibank CLS relationship was established by a "CLS Settlement

"the establishment and maintenance of cash deposit and custodial accounts, the provision of credit facilities, trade clearing and settlement services, agency and trust services, foreign exchange-related services, and securities lending."[6735]  The CLS system is a trading platform, operated by a consortium of banks, for the clearance and settlement of foreign exchange trades.[6736]   After the market's negative reaction to Lehman's second quarter earnings announcement and Lehman's personnel changes, Citi sought to reduce its intra-day risk exposure to Lehman.[6737]  Consequently, on June 12, 2008, Citi obtained a $2 billion cash deposit from LBHI, to be deposited with Citi in an overnight call account.[6738]  On June 12, 2008, LBHI was a party to a Guaranty dated June 7, 2004 (the "2004 Guaranty") under which LBHI agreed to "unconditionally guarantee[] the punctual payment when due, whether upon maturity, by acceleration or otherwise, of all obligations (now or hereafter existing) of each Borrower to Citigroup, Inc."[6739]  Citigroup, Inc. is defined to include each of its subsidiaries or affiliates,

---

Services Agreement for CLS User-Members" dated December 19, 2003.  *Id*. at p. 1.  This CLS clearance agreement was amended and restated in a "Citibank CLS Settlement Services Amended and Restated Agreement for CLS User Members" dated October 28, 2004.  *Id*.  References to the "CLS Clearance Agreement" refer to the Agreement as amended and restated.

[6735] Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances, at p. 2, Docket No. 109, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).

[6736] *See* CLS, About CLS, http://www.cls-group.com/About /Pages/default.aspx (last visited Dec. 23, 2009).

[6737] E-mail from Brian R. Leach, Citigroup, to Vikram S. Pandit, Citigroup, *et al.* (June 12, 2008) [CITI-LBHI-EXAM 00114115] (stating that Citi initially asked for $3 billion segregated but Lehman sent $2 billion in a call account).

[6738] E-mail from Daniel J. Fleming, Lehman, to Ian T. Lowitt, Lehman (June 12, 2008) [LBEX-AM 008608].

[6739] Guaranty (Jan. 7, 2004) [LBEX-DOCID 1090071], attached to email from Michael Mauerstein, Citi, to Emil Cornejo, Lehman (Sept. 9, 2008) [LBEX-DOCID 1079084].

including Citi.[6740]  The Borrowers are defined to include only Lehman Brothers Holdings PLC, LB Securities Asia Ltd., LBSF, LBJ, LBIE, LBCC Asia Ltd., and Lehman Brothers Bankhaus AG.[6741]  LBI was not a Borrower under the 2004 Guaranty.

For two months, beginning in July 2008, the parties negotiated – without success – a formal pledge agreement with the understanding that LBHI would pledge securities to collateralize Citi's clearing and settlement credit lines in lieu of the cash deposit.[6742]  Those pledge agreement negotiations ceased when, instead, between September 9 and 12, LBHI and Citi amended the 2004 Guaranty to expand its scope by adding ten more LBHI subsidiaries to it, including LBI (the "Amended Guaranty").[6743]  LBI amended its Direct Custodial Services Agreement ("DCSA," together with the Amended Guaranty, the "September Agreements"),[6744] which provided Citi with a broad and explicit right of

---

[6740] *Id.*

[6741] *Id.*

[6742] *See* E-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup (Sept. 10, 2008) [CITI-LBHI-EXAM 00075863] (discussing how Citi spent two months negotiating the collateral arrangement and should have had it completed long ago instead of the "fire drill" of getting the Guaranty Amendment on September 9).

[6743] *See* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (executed version signed by Ian Lowitt and adding LBCC on September 11, 2008) attached to Rosa Garcia, Lehman to Emil Cornejo, Lehman *et al.* (Sept. 12, 2008) [LBEX-DOCID 065565].  In addition to LBI, the Amended Guaranty added LB Australia Securities Pty Ltd., LB Taiwan, LB Securities Private Ltd., Neuberger Berman, LBCS, LB Finance Japan, LB GCS, LB Securities Taiwan and LBCC.

[6744] The DCSA is alternatively titled the Direct Custody Agreement ("DCA") in the document signed on March 26, 1992, and referred to as the DCSA in the September 12, 2008 amendment.  However, the DCA and DCSA are the same document, amended by the Deed addendum on September 12, 2008.  For consistency, the Examiner refers to the 1992 version as the "DCSA," or "original DCSA," and the 2008 version as the "DCSA Amendment."  *See* Direct Custodial Services Agreement Deed (Sept. 12, 2008) [CITI-LBHI-EXAM 00005903] (referring to the DCSA entered into by LBI, then known as Shearson Lehman Brothers Inc., and Citibank on March 26, 1992), *and* Direct Custody Agreement for Citibank,

setoff and granted Citi a first fixed security interest in Lehman's cash and securities in

its Citi accounts, except for cash and securities in Lehman's customer accounts.[6745]   The

Amended Guaranty also provided Citi with cross-affiliate setoff rights.[6746]   Citi

continued thereafter to provide clearing and trade settlement services for Lehman,

albeit under reduced clearing limits, until LBHI filed for bankruptcy on September 15.

Early on September 15 or late on September 14,[6747] Citi transferred $500 million

from LBHI's account at Citi to LBI's account at Citi to fund Lehman's CLS obligations

after Fleming made the request on the afternoon of September 14.[6748]   See Section

III.A.5.c for a complete discussion of Lehman's dealings with Citi.

---

N.A., Subsidiaries and Affiliates and Shearson Lehman Brothers Inc. (Mar. 26, 1992) [CITI-LBHI-EXAM 00031437].

[6745] Direct Custodial Services Agreement Deed (Sept. 12, 2008), at p. 2 [CITI-LBHI-EXAM 00005903].

[6746]Guaranty (Jan. 7, 2004) [LBEX-DOCID 1090071], attached to Michael Mauerstein, Citi, to Emil Cornejo, Lehman (Sept. 9, 2008) [LBEX-DOCID 1079084].

[6747] Lehman Brothers, Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142]; e-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al*. (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (stating that the $500 million had moved by 9:42 p.m. that evening); e-mail from Roger Barnes, Citigroup, to Naresh N. Kumar, Citigroup, *et al*. (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (explaining that Citichecking opened at 9 p.m. that evening so the transfer could be made then); e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al*. (Sept. 14, 2008) [CITI-LBHI-EXAM 00101129] (approving the transfer); Lehman Brothers Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142 (Confidential For Settlement Purposes Only)] (account statement confirming that the transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to Lehman Brothers Inc. account 3054-4658 for value on September 15, 2008).

[6748] E-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman, *et al*. (Sept. 14, 2008) [LBEX-DOCID 457630].

### (ii)    Avoidability of the $2 Billion Deposit

Because the transfer of the $2 billion deposit from LBHI to Citi occurred on June 12, 2008, it is outside of the ninety-day preference period.[6749]  In addition because it was made on account of an antecedent obligation arising under the 2004 Guaranty, it would not be a fraudulent transfer, as value is received by a debtor if property is transferred to secure an antecedent obligation.[6750]  Thus, the Examiner concludes that the evidence does not support the existence of a colorable claim to avoid the transfer of the $2 billion deposit from LBHI to Citi as a preference or as a fraudulent transfer.

### (iii)    Avoidability of the Amended Guaranty

The Examiner concludes that a colorable claim exists to avoid the Amended Guaranty as constructively fraudulent, although the benefit to the estate from this avoidance action may not be significant.  The legal analysis of this claim and some aspects of the factual analysis underlying this conclusion mirror those contained in the Examiner's discussion of the potential claim to avoid the JPMorgan September Guaranty as a fraudulent obligation and thus, to streamline this discussion, the Examiner incorporates that analysis where appropriate.

---

[6749] See Appendix 1, Legal Issues, at Section IV.D. for a discussion of preference law pursuant to Section 547 of the Bankruptcy Code.
[6750] 11 U.S.C. § 548(d)(2)(A).

LBHI executed the Amended Guaranty on September 9, 2008 and added an additional party on September 11, 2008.[6751]  At that time, obligations were owed to Citi and thus, LBHI incurred obligations on those dates,[6752] which fall within the applicable look-back periods under Sections 548 and 544 and New York law.[6753]  In addition, there is evidence to support a finding that LBHI had unreasonably small capital and was insolvent on September 9, 2008.[6754]

As with the JPMorgan analysis, the likely key factual dispute in connection with this claim will be whether LBHI received reasonably equivalent value for the Amended Guaranty.  LBHI's subsidiaries cleared trades through Citi.  Thus, LBHI would directly benefit from the Amended Guaranty only if, by providing this credit support, the value of LBHI's interests in its subsidiaries increased by at least an amount reasonably approximate to the additional obligations that LBHI incurred.

As with the JPMorgan analysis, the starting point is what did LBHI give up by agreeing to guarantee the debts of the additional subsidiaries.  The *ex post* increased exposure to LBHI that resulted from LBHI entering into the Amended Guaranty was approximately $337 million, largely consisting of (1) claims against LBCC for $13.7

---

[6751] *See* Amendment 1 To Guaranty (Sept. 9, 2008) [LBEX-DOCID 090568] (executed version signed by Ian Lowitt and adding LBCC on September 11, 2008) attached to email from Rosa Garcia, Lehman, to Emil Cornejo, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 065565]..

[6752] *See Rubin*, 661 F.2d at 990-91.

[6753] 11 U.S.C. § 548(a); McKinney's Civil Practice Law and Rules § 213 (2010); *Island Holding LLC v. O'Brien*, 775 N.Y.S.2d 72, 74 (App. Div. 2004).

[6754] See Section III.B.3.b of this Report for the solvency analysis of LBHI.  *See* Section III.B.3.d of this Report for the unreasonably small capital analysis of LBHI.

million, of which a majority related to derivative termination payments; and (2) claims against LBI for $336 million, of which $260 million is pursuant to a CLS agreement.[6755]

As with the JPMorgan analysis, this theoretical increase in exposure of $337 million must be measured against any direct or indirect benefits LBHI received as a result of providing this credit support.  As detailed in the JPMorgan analysis there is evidence to support a finding that certain LBHI subsidiaries were insolvent.  The Examiner did not make a finding as to the solvency of LBI inasmuch as this issue is likely being examined by the SIPA Trustee.  The Examiner's conclusions, therefore, assume without independent investigation that LBI was insolvent on September 9-11, 2008.  The Examiner has not, however, found evidence to support a finding that LBCC was insolvent, but the increase in liabilities related to LBCC were a relatively small component of the increase in liability.[6756]  In light of the insolvency of the LBHI subsidiaries, the Examiner concludes that there is a colorable basis to find that LBHI did not receive quantifiable direct benefits as a result of signing the Amended Guaranty.

The analysis as to whether LBHI received any indirect benefits mirrors that of the JPMorgan analysis.[6757]  As with that analysis, the Examiner concludes that there is

---

[6755] Duff & Phelps Memorandum Regarding Review of Citibank Claims on Lehman Entities (Jan. 22, 2010).

[6756] LBCC is an entity covered by the resolution guaranty and thus, if it is valid, then LBHI was already liable for its obligations to Citi and the Amended Guaranty did not create this additional exposure.

[6757] See III.B.3.g.5.a.ii.a.2. for an analysis of the "buying of time" benefit as it relates to the agreements entered into with JPMorgan.

evidence to support a conclusion that the indirect benefit of additional time was not reasonably equivalent to the additional liabilities LBHI incurred.

With respect to the issues of both direct and indirect benefit to LBHI from the execution of the Amended Guaranty, Citi can be expected to present evidence to the contrary, including the fact that the Debtors filed the Motion of Debtors For Order Pursuant To Section 105 Of The Bankruptcy Code, Confirming Status Of Citibank Clearing Advances, seeking authority to continue clearing for certain Lehman entities and confirming that any claims arising from such clearing activities would be allowed as claims under the Amended Guaranty.[6758]   These issues will have to be resolved by a trier of fact.

Because LBHI incurred an obligation when it entered into the Amended Guaranty, as discussed in Section III.B.3.g.5.a.ii.b.2, it did not engage in a safe-harbored transaction, and the Amended Guaranty may be avoided.   Thus, the Examiner has determined that, if the Court adopts a narrow application of the safe harbors described above,[6759] then there is a basis for a colorable claim to avoid the Guaranty Agreement.  If the Guaranty Agreement is avoided, the 2004 Guaranty governs.[6760]  As such, if avoided,

---

[6758] Motion of Debtors For Order Pursuant To Section 105 Of The Bankruptcy Code, Confirming Status Of Citibank Clearing Advances, Docket No. 109, *In re Lehman Bros. Holding, Inc.* No. 08-13555 (Bankr. S.D.N.Y. Sept. 18, 2008).  The Motion, however, states that '[t]his Motion does not seek an order of this Court validating the Guaranty…." *Id.* at ¶ 15.

[6759] See III.B.3.g.5.a.ii.b.2. for the description of the legal question regarding the scope of the safe harbor amendments.

[6760] Guaranty (Jan. 7, 2004) [LBEX-DOCID 1090071], attached to e-mail from Michael Mauerstein, Citi, to Emil Cornejo, Lehman (Sept. 9, 2008) [LBEX-DOCID 1079084].

LBHI would no longer be obligated to cover the obligations of the ten Lehman subsidiaries added by the Amended Guaranty and any excess collateral would be returned to the LBHI estate.

Citi has asserted the following claims against LBHI on account of obligations of LBHI subsidiaries that were added to the list of borrowers pursuant to the Amended Guaranty:

- LBCS overdraft of account no. xxx-769 in the amount of $85,296.[6761]

- Amount owed by LBI under CLS Agreement in the amount of $260,326,894.[6762]

- Amount owed by LBI under securities lending transactions in the amount of $1,199,775.[6763]

- Custody fees owed by LBI under Direct Custody Agreement in the amount of $82,345.[6764]

- Pre-petition interest charged owed by LBI for the late settlement of securities lending and repurchase transactions in the amount of $207,624.[6765]

- LBI overdrafts in the amount of $12,199,628.[6766]

- Account service fees owed by LBI in the amount of $42,627.[6767]

- Amounts owed by LBI for misdirected wire claims in the amount of $12,795,775.[6768]

---

[6761] Summary of Citi Proofs of Claim Against Lehman Filed Before September 22, 2009 Bar Date, at p. 2 [LBEX-CITI 000001].

[6762] *Id.* at p. 4.

[6763] *Id.*

[6764] *Id.*

[6765] *Id.*

[6766] *Id.*

[6767] *Id.*

- LBI check mistakenly credited to JPMorgan in the amount of $35,389.[6769]

- Aggregate net amount owed by Lehman CLS parties (LBI, LBSF, LBCC and LBIE) under CLS agreement, after taking into consideration $1 billion setoff in the amount of $47,424,651.[6770]

- Amount owed by Neuberger Berman under December 6, 2004 securities lending agreement in the amount of $13,044.[6771]

- Face value of LBI note due 2026 in the amount of $8,132,177.[6772]

- Amount owed by LBI pursuant to FX transaction in the amount of $1,156,390.[6773]

- Amount owed by LBI for account service fees in the amount of $111,278.[6774]

- Amount owed by LBI under FX transactions in the amount of $2,676,721.[6775]

- Amount owed by LBI under Custody Agreements in the amount of $57,278.[6776]

In total, Citi claims an additional $346.5 million against LBHI based upon obligations owed by subsidiaries that were added under the Amended Guaranty. If the Amended Guaranty is avoided, the $2 billion deposit would not be subject to setoff on account of these claims, nor would Citi have an unsecured claim against the LBHI estate on account of these amounts. But because the total claims of Citi against LBHI are

---

[6768] *Id.*

[6769] *Id.*

[6770] *Id.* at p. 5. This claim is relevant to this analysis only to the extent of LBI and LBCCs portion of the claim.

[6771] *Id.* at p. 8.

[6772] *Id.*

[6773] *Id.* at p. 10.

[6774] *Id.*

[6775] *Id.* at p. 11.

[6776] *Id.* at p. 11.

approximately $2.8 billion,[6677] assuming the validity of these claims, avoidance of the

Amended Guaranty will not result in a return of any part of these funds and may serve

only to avoid a general unsecured claim against the LBHI estate of up to $346.5

million.[6678]

Because the DCSA was between LBI and Citi, the Examiner defers to the SIPA

Trustee to determine whether any claims arise as a result of the DCSA.

### (iv) Avoidability of the $500 Million Transfer From an LBHI Account to an LBI Account

Either late on September 14 or on September 15, 2008, after the filing of LBHI's

bankruptcy petition, Citi transferred $500 million from LBHI's account at Citi to LBI's

account at Citi[6679] to fund Lehman's CLS obligations.[6680]  An account statement dates the

transfer as of September 15;[6681] however, contemporaneous e-mails evidence that the

---

[6677] This amount excludes contingent claims. As such, the $2.8 billion total in claims against LBHI may be subject to increase on account of such claims.

[6678] If the LBHI resolution guaranty is valid, then claims attributable to LBIE, LBJ, LBCS and LBCC would be excluded from this analysis,  *See* Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holding Inc. (June 9, 2005) [LBEX-AM 003415]; Unanimous Written Consent of the Executive Committee of the Board of Directors of LBHI (Nov. 7, 2005) [LBEX-WGM 1104149] (resolution to make LBCS a guaranteed subsidiary of LBHI);

[6679] Lehman Brothers Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142] (account statement confirming that the transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to Lehman Brothers Inc. account 3054-4658).

[6680] E-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 14, 2008) [LBEX-DOCID 457630].

[6681] Lehman Brothers Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142] (account statement confirming that the transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to Lehman Brothers Inc. account 3054-4658).

transfer actually occurred on the evening of September 14.[6782]   Because transfers executed after 9 p.m. on Sunday night are batched with the Monday trades, Citi's counsel advised the Examiner that the account statement dated September 15 reflected that transfer.[6783]   Whether the transfer is found to have occurred on September 14, the day before LBHI filed its petition, or on September 15, following the filing, determines whether the transfer may be avoided.   If it occurred on September 14, the transfer would fall under the safe harbors.[6784]   If the transfer occurred after the filing of LBHI's bankruptcy, it is a post-petition transfer avoidable pursuant to Section 549.[6785]   This transfer was not authorized under either the Bankruptcy Code or by the Court,[6786] nor does it appear to have a defense provided by Section 549.[6787]   Moreover, the safe-harbor provisions of Section 546 do not protect transfers avoidable by Section 549.[6788]

---

[6782] E-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al*. (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (stating that the $500 million had moved by 9:42 p.m. that evening); e-mail from Roger Barnes, Citigroup, to Naresh N. Kumar, Citigroup, *et al*. (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (explaining that Citichecking opened at 9 p.m. that evening so the transfer could be made then); e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al*. (Sept. 14, 2008) [CITI-LBHI-EXAM 00101129] (approving the transfer).

[6783] E-mail from Claudia Hammerman, Paul Weiss, to Angela Allen, Jenner & Block, *et al*. (Jan. 26, 2010).

[6784] 11 U.S.C. § 546(e).

[6785] See Appendix 1, Legal Issues, at Section IV.G. for a more detailed discussion of Section 549.

[6786] *See* 11 U.S.C. § 549.

[6787] *See id.*

[6788] 11 U.S.C. § 546(e), (f), (g), (j).

### (c) FRBNY Avoidance Analysis

The Examiner has found no evidence that any transfers made to the FRBNY were made by or originated from any Lehman Chapter 11 entity.  Instead, the Examiner has found that all collateral Lehman transferred to the FRBNY originated from LBI.

To determine whether FRBNY, with LBI as a conduit, may have received collateral from the Lehman Chapter 11 entities, the Examiner analyzed the trading activity of 177 different CUSIPs in which FRBNY had trading activity with Lehman during the period of August 1, 2008 to September 19, 2008.  Of the 177 CUSIPs with direct trading activity between LBI and the FRBNY, a sample of 30 were analyzed to determine if any Lehman Chapter 11 entity was the source of these CUSIPs from LBI (*i.e.*, did LBI enter into any financing trades, such as reverse repo trades,[6789] whereby LBI loaned cash in return for a security) during the time period of June 1, 2008 to September 19, 2008.

The Examiner determined that LBI engaged in reverse repos with LBF, LBIE, and LBSF during the time period established above.  While 21 of the CUSIPs were included in reverse repos between LBI and the Lehman Chapter 11 entities, the FRBNY did not engage in any corresponding reverse repo activity with LBI for these same securities

---

[6789] A reverse repurchase agreement ("reverse repo") is a repo from the standpoint of the buyer/lender.  In a reverse repo, Party A (the buyer/lender) purchases a security from Party B (the seller/borrower) in exchange for cash for a predetermined period of time, after which Party A returns the security to Party B at a predetermined price (cash plus interest).  Reverse repos are a way for Party A to lend funds and hold the traded security as collateral.  In a repurchase agreement ("repo") Party A transfers a security to Party B in exchange for cash for a predetermined period of time, after which Party B returns it to Party A at a predetermined price (cash plus interest).

(*i.e.*, the FRBNY did not reverse in the corresponding securities from LBI). Therefore, it does not appear that FRBNY provided financing to LBI using collateral sourced from Lehman Chapter 11 entities.

To further this analysis, the Examiner reviewed the trading activity for all non-treasury related CUSIPs traded between FRBNY and LBI during the relevant time period of interest.[6790] After examining the trade data for these CUSIPs, the Examiner determined that there were no instances where LBI entered into any reverse repo trades for these CUSIPs with any non-LBI Lehman Chapter 11 entity as counterparty. Thereby, coupled with the sample analysis, the evidence shows that the FRBNY did not provide financing to LBI using collateral from any Lehman Chapter 11 entity.

Because the Examiner has identified no instances of a transaction between LBI and the FRBNY where LBI provided collateral to the FRBNY that originated from a Chapter 11 Lehman entity, the Examiner defers to the SIPA Trustee with regard to potentially avoidable transactions between FRBNY and LBI.

### (d)  HSBC Avoidance Analysis

#### (i)  Background

HSBC was a clearing bank, source of intra-day credit for settling trades, and counterparty to LBHI and related entities in transactions involving a variety of treasury

---

[6790] Approximately 50 of the 177 CUSIPs involved non-treasury which were deemed to have a higher likelihood of being repoed by LBI to the FRBNY.

products.[6791]  On January 4, 2008, LBHI guaranteed all of LBIE's payments, liabilities, and obligations to HSBC.[6792]  Approximately one month prior to the petition date, HSBC informed Lehman that HSBC would be completely, albeit gradually, exiting their relationship.[6793]

During the last week of August and the first week of September, HSBC demanded the equivalent of $945 million[6794] and received from various Lehman entities (described below) approximately GBP 435 million and approximately HKD 1.4 billion (for a total of the equivalent of approximately $947 million to $992 million[6795]) cash collateral in order to continue providing clearing and settlement services to Lehman.[6796]  HSBC also demanded that Lehman execute the U.K. and Hong Kong Cash Deeds to secure the collateral (collectively, including the deposits, the "Cash Deed Transactions"

---

[6791] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 3.

[6792] *See* Annex A to Proof of Claim of HSBC Private Bank (Suisse) SA, at p. 2, Claim No. 15603, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2009).

[6793] Nicholas J. Taylor, HSBC, Briefing Note — Project Milan (Aug. 18, 2008), at pp. 1-2 [HBUS 90]; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at p. 6; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 4.

[6794] This amount and some of the other monetary amounts discussed in this Section are of foreign currency.  To the extent there are conversions to USD, all such conversions are approximate.

[6795] The evidence is not conclusive as to the amount of such collateral.  For an explanation of this discrepancy, see Section III.A.5.d of this Report.

[6796] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3] (demanding combined deposits of $945 million in London and Hong Kong); e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Aug. 28, 2008) [HBUS 9250] (reporting initial receipt of GBP 435 million); e-mail from Carlo Pellerani, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Aug. 28, 2008) [LBEX-AM 008853] (reporting return of GBP 435 million to Lehman); e-mail from Martina C. W. Kung, HSBC, to Patricia Gomes, HSBC, *et al.* (Sept. 1, 2008) [HBUS 397] (reporting pending deposit of HKD 1.4 billion); e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 1, 2008) [HBUS 401] (reporting receipt of GBP 435 million).

and separately, including the deposits, the "U.K. Cash Deed Transactions" and the "Hong Kong Cash Deed Transactions," respectively).[6797]

### (ii)  The U.K. Cash Deed Transactions

The GBP 435 million deposit was made on September 1, 2008.[6798]  The Examiner's financial advisors have identified a GBP 435 million (the equivalent of approximately $800 million) transfer on September 1, 2008 from LBHI's London branch, LBHI(U.K.), to LBIE, after which LBIE and LBHI(U.K.) transferred GBP 435 million back and forth each day.[6799]  Meanwhile, as described in more detail in Section III.A.5.d of this Report, Lehman successfully negotiated with HSBC to narrow the proposed right of setoff and expand its own access to the cash secured by the cash deeds.[6800]  On September 9, 2008, both LBHI(U.K.) and LBIE executed a cash deed with HSBC plc (together, the "U.K. Cash Deeds")[6801] to secure whatever portions of the $435 GBP deposit HSBC determined were necessary to cover certain exposures to Lehman as specified by the deeds.[6802] HSBC returned EUR 200 million (the equivalent of approximately $282 million) of the

---

[6797] E-mail from Guy Bridge, HSBC, to Carlo Pellerani, Lehman, *et al.* (Aug. 27, 2008) [HBUS 3]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at pp. 5-6; Examiner's Interview of Nicholas J. Taylor, Oct. 15, 2009, at pp. 6-7 (discussing plan to require collateral).

[6798] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 1, 2008) [HBUS 401] (reporting receipt of GBP 435 million).

[6799] Duff & Phelps, Timeline of HSBC Cash Transfers (Nov. 13, 2009), at p. 1.

[6800] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6; *see* e-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 3, 2008) [HBUS 570] (discussing Lehman's refusal to sign the Cash Deeds without changes to the terms).

[6801] Cash Deed between HSBC and LBIE (Sept. 9, 2008) [HBUS 1180]; Cash Deed between HSBC and LBHI(U.K.) (Sept. 9, 2008) [HBUS 1190].

[6802] E-mail from Guy Bridge, HSBC, to Nicholas J. Taylor, HSBC, *et al.* (Sept. 9, 2008) [HBUS 1179]; Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 6.

deposit to a Lehman entity on September 11,[6803] but the Examiner's financial advisers have been unable to identify which Lehman entity received the funds because of the multiplicity of EUR 200 million transfers on that same day.[6804] Given the September 9, 2009 Stipulation between HSBC and the Debtors, described below, the Examiner did not continue to pursue additional avenues to determine which Lehman entity received the EUR 200 million.

### (iii) The Hong Kong Cash Deposit Transactions

On September 1, HSBC personnel reported a pending deposit from Lehman of approximately HKD 1.4 billion, or the equivalent of approximately $180 million[6805] and Lehman executed the Hong Kong Cash Deed on September 12.[6806]  The Examiner's financial advisors have identified potentially related transfers: an intercompany transfer of HKD 1,432,547,668.60 (approximately $183,400,000) on August 29, 2008 ordered by LBIE, and a transfer of HKD 1,515,153,863.02 (approximately $194,131,922) out of the Lehman Brothers Asia Holdings ("LBAH") Money Market Placement general ledger cash account (account no. XXXXXXX600) on September 1, 2008.[6807]  According to counsel

---

[6803] Examiner's Interview of Guy Bridge, Sept. 29, 2009, at p. 7.  According to Lehman's Daily Funding Call Update e-mail for September 11:  "Trsy have reduced cash deposit with HSBC to GBP200m to release liquidity in the firm."  E-mail from Maria Barrio, Lehman, to Neil Ullman, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 1898196].  The Examiner's financial advisors' analysis of Lehman's transactions during this period shows that this report was erroneous, and that Lehman received EUR 200 million on September 11. Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 1.

[6804] Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 1.

[6805] E-mail from Martina C. W. Kung, HSBC, to Patricia Gomes, HSBC, *et al.* (Sept. 1, 2008) [HBUS 397].

[6806] E-mail from Patricia Gomes, HSBC, to Agnes Y. L. Lau, HSBC, *et al.* (Sept. 12, 2008) [HBUS 1760].

[6807] Duff & Phelps, Preliminary Findings re: HSBC Deposits (Dec. 2, 2009), at p. 2.

for HSBC, however, the relevant LBAH deposit account held HKD 1.15 billion until September 16, 2008.[6808]

On September 12, 2008, LBAH executed a cash deed with HSBC Ltd. to secure these funds (the "Hong Kong Cash Deed"); however, because Lehman executed the Hong Kong Cash Deed too late in the day for HSBC Ltd to transfer the cash collateral to a secured account covered by the deed, and because of a September 15 public holiday in Hong Kong, HSBC Ltd. was unable to transfer the funds into such an account until September 16.[6809]

All but approximately $3.7 million of the Hong Kong funds were subsequently returned to an account designated by the provisional liquidators of Lehman's Asia-Pacific subsidiary.[6810]

### (iv) September 9, 2009 Stipulation

On September 9, 2009, HSBC and LBHI entered into a stipulation (the "Stipulation") regarding funds held by HSBC pursuant to deposits by LBHI in connection with the U.K. Cash Deed between LBHI(U.K.) and HSBC plc.[6811]   HSBC and Lehman agreed that HSBC was permitted to setoff (1) an overdraft in the amount of

---

[6808] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1.

[6809] E-mail from Patricia Gomes, HSBC, to Agnes Y. L. Lau, HSBC, *et al.* (Sept. 12, 2008) [HBUS 1760].

[6810] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1.

[6811] Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements Between Lehman Brothers Holdings Inc. and HSBC Bank plc, at p. 2, Docket No. 5089, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009).

GBP 99,992,714.37 (the equivalent of approximately $164 million) plus accrued interest in the amount of GBP 69,347.60 (the equivalent of approximately $144,070); and (2) a misdirected payment in the approximate amount of GBP 605,000.00 (the equivalent of approximately $999,516)[6812] (for a total setoff of approximately GBP 100,667,061.97, or approximately $164.6 million).[6813] In addition, HSBC agreed to transfer EUR 70 million (approximately $101 million) to an account designated by LBHI.[6814] As for any and all other and further claims, HSBC and Lehman agreed to "work in a commercially reasonable manner to address issues surrounding HSBC's additional alleged setoff rights against LBHI."[6815]

For a complete discussion of Lehman's dealings with HBSC, see Section III.A.5.d of this Report.

### (v)  Avoidability of the January 4, 2008 Guaranty

The Examiner cannot conclude that the January 4, 2008 Guaranty is avoidable as a constructively fraudulent incurrence of an obligation, because there is insufficient evidence to support a finding that LBHI had unreasonably small capital or was insolvent on this date.[6816]

---

[6812] *Id.*

[6813] The amount of setoff was subject to HSBC's final accounting.  *See id.*

[6814] *Id.*

[6815] *Id.*

[6816] *See* Section III.B.3.b. for the solvency analysis of LBHI; *see* Section III.B.3.d. for the unreasonably small capital analysis of LBHI.

### (vi) Avoidability of the Hong Kong Cash Deed Transactions

It is unnecessary to analyze the avoidability of the Hong Kong Cash Deed Transactions because (1) the funds have been returned to LBAH, except for approximately $3.7 million, exempted with the approval of the LBAH provisional liquidators,[6817] and (2) the Examiner and his financial advisers have not been able to identify a U.S. Debtor as the source of the funds for the Hong Kong Cash Deeds Transactions. The Hong Kong Cash Deed Transactions are included in the discussion below only insofar as they relate to the U.K. Cash Deed Transactions.

### (vii)    Avoidability of the U.K. Cash Deed

Because of the Stipulation entered into between HSBC and LBHI, the Examiner has determined it is unnecessary to analyze the avoidability of the U.K. Cash Deed, as it appears that the parties have resolved any outstanding issues pursuant to the U.K. Cash Deed.

According to the Stipulation, the balance of accounts in the name of LBHI (Collateral Accounts) was EUR 343,446,459.96 (approximately $495 million) as of April 28, 2009. Pursuant to the Stipulation, HSBC was permitted to offset approximately GBP 100,667,061.97 (approximately $164.6 million).[6818]

---

[6817] Memorandum from Ken Coleman, HSBC counsel, to Examiner, re: Transfers in Connection With the Hong Kong Cash Deed (Oct. 23, 2009), at p. 1.

[6818] The amount of setoff was subject to HSBC's final accounting. *See* Stipulation, Agreement and Order, Pursuant to Sections 362 and 553 of the Bankruptcy Code, Modifying the Automatic Stay for the Limited Purpose of Permitting HSBC Bank plc to Effect Setoff and Resolution of Certain Banking Arrangements

### (viii)  Avoidability of the Transfer of the Remaining Collateral

Under the terms of the Stipulation, HSBC and LBHI have agreed to work together to resolve issues regarding the remaining claims of HSBC.  For this reason, and the fact that the transfers of any collateral remaining pursuant to the Stipulation appear to be protected transactions under the safe-harbor provisions, the Examiner determined that it was unnecessary to form an opinion as to whether there are colorable claims in connection with the collateral that remains pursuant to the Stipulation.[6819]

### (e)  Standard Bank Avoidance Analysis

Standard Bank was Lehman's clearing and settlement bank for trades in South Africa.[6820]  Standard, like other clearing banks, demanded and received a collateral deposit shortly before Lehman's bankruptcy.[6821]  On September 5, 2008, Standard Bank informed Lehman that Lehman must pledge $200 million in collateral, and that Standard Bank would fail Lehman's trades that were not timely funded or supported by adequate collateral.[6822]  The next day, Standard Bank set a deadline of September 9 to

---

Between Lehman Brothers Holdings Inc. and HSBC Bank plc, at p. 2, Docket No. 5089, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 9, 2009).

[6819] 11 U.S.C. § 546(e).

[6820] E-mail from Jonathan Seeranj, Lehman, to Stirling Fielding, Lehman, *et al.* (Sept. 4, 2008) [LBEX-DOCID 455717].

[6821] E-mail from Joseph Igoe, Lehman, to Steve Durrant, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 455717].

[6822] E-mail from Steve Durrant, Lehman, to Shaun Lawrence, Lehman, *et al.* (Sept. 8, 2008) [LBEX-DOCID 1058390] (e-mail chain discussing how to respond to Standard Bank).

receive the funds or it would cease settling Lehman's trades.[6823]   On September 9, a

Lehman entity placed a $200 million deposit with Standard in response to Standard's

demand.[6824]   On September 11, LBIE executed and delivered a pledge agreement to

cover the deposit.[6825]   The pledge agreement allowed Standard Bank to setoff debts LBIE

or LBI owed Standard in connection with clearing and settlement in the South African

market.[6826]   On September 16, Standard Bank setoff $10,422,859.72 from LBIE's account

to cover advances for trades settling on September 15 and 16.[6827]   For a complete

discussion of Lehman's dealings with Standard Bank, see Section III.A.5.g.

To date, neither the Examiner nor the Examiner's financial advisors have been

able to identify a transfer from a Lehman Chapter 11 Debtor as the source of the

September 9 deposit of $200 million.   In order to determine whether the source of the

transfer of the equivalent of $200 million to Standard Bank[6828] was a U.S. Lehman

Debtor, the Examiner's financial advisors executed a search of the GCCM data set for

possible transfers from Lehman to Standard Bank, or to an intermediary that ultimately

transferred funds to Standard Bank.   The Examiner's financial advisors found that,

based upon a review of transfers that appeared relevant because of (1) the dates of the

---

[6823] E-mail from Joseph Igoe, Lehman, to Steve Durrant, Lehman, *et al.* (Sept. 9, 2008) [LBEX-DOCID 455717].

[6824] *Id.*

[6825] E-mail from Stirling Fielding, Lehman, to Maria Barrio, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 1777132].

[6826] Letter from Kenny Fihla, Standard Bank, to Huw Rees, Lehman, re: Notice of Enforcement of Pledge and Cession (Sept. 16, 2008), at p. 1 [LBEX-DOCID 1090737].

[6827] *Id.*

[6828] The transfer may have been in USD or it may have been in South African Rand (ZAR).

transfers and (2) the absolute amounts of the transfer (in both USD and ZAR), no transfers were identified in the GCCM data set that appear to match the transfer in question. Based upon this review, the evidence suggests that a non-Chapter 11 Lehman Entity was the source of the funds.

Accordingly, because there did not appear to be evidence to support a conclusion that the transfer involved property of a Lehman Chapter 11 Debtor, the Examiner did not analyze the avoidability of such transfer.

### (f) BNYM Avoidance Analysis

The Bank of New York Mellon ("BNYM") provided, among other services, account support to Lehman for Lehman's European commercial paper trading program and account and financing support for medium-term note issuances and redemptions.[6829] As a result, BNYM believed that it bore intra-day credit risk from Lehman, and in August of 2008, BNYM began requesting that Lehman place collateral with BNYM.[6830]

LBHI, through LBHI (U.K), eventually placed $170 million in collateral with BNYM through a series of transfers made between September 10 and 12, 2008 (the

---

[6829] E-mail from Graham Kettle, Lehman, to Joseph Igoe, Lehman, *et al.* (Aug. 21, 2008) [LBEX-DOCID 1066642] (explaining sources of BNYM's intra-day exposure to Lehman).
[6830] *Id.*

"BNYM Deposit").[6831]    The BNYM Deposit was secured with a collateral deposit
agreement that LBHI executed on September 11, 2008.[6832]

On December 3, 2009, the Court approved a stipulation among LBHI, LBSF, and
BNYM that provided that BNYM would return the BNYM Deposit to LBHI, plus
interest of $1,756,492.41 and minus bank fees of $306,641.36.[6833]    Due to this court
approved stipulation providing for a full return of LBHI's collateral, the Examiner has
determined that any avoidance analysis is rendered unnecessary.    For a more detailed
discussion of Lehman's dealings with BNYM, see Section III.A.5.f.

### (g)  BofA Avoidance Analysis

At the time of this writing, Lehman and BofA are before the Court in an
adversary proceeding.    The pending dispute stems from BofA's November 10, 2008,

---

[6831] E-mail from Graham Kettle, Lehman, to Scott Alvey, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1065130] (ordering the transfer of $125 million from LBHI to an account held for the benefit of BNYM); e-mail from Steven J. Engel, Lehman, to Graham Kettle, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 65930] (providing transaction details); e-mail from Craig L. Jones, Lehman, to Stirling Fielding, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 065919] (confirming outgoing payment); e-mail from Graham Kettle, Lehman, to Steven J. Engel, Lehman, *et al.* (Sept. 11, 2008) [LBEX-DOCID 065879] (reporting BNYM ordering the return of $75 million to Lehman); e-mail from Graham Kettle, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 12, 2008) [LBEX-DOCID 65923] (reporting deposit of $120 million with BNYM).

[6832] Collateral Deposit Agreement between Lehman Brothers Holdings, Inc. and the Bank of New York Mellon, London Branch (Sept. 11, 2008) [LBEX-DOCID 1031225] (final version for execution).

[6833] Stipulation and Agreed Order Between Lehman Brothers Holdings, Inc., Lehman Brothers Special Financing, Inc. and Bank of New York Mellon Regarding (1) Turnover of Collateral Deposit and (2) Return of Misdirected Wires, at pp. 1-2, Docket No. 6040, *In re Lehman Bros. Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Dec. 3, 2009).  The stipulation also provided for the return of $71,305890.63 in misdirected transfers that BNYM erroneously wired to an LBSF account at JPMorgan on April 16 and 20, 2009.  *Id.* at p. 2.

setoff of approximately $509 million from various LBHI accounts.[6834]  Specifically, BofA

setoff the funds against debts it claims Lehman Brothers Special Financing incurred

through derivative and swap agreements with BofA.[6835]  Lehman claims that this setoff

was improper.[6836]  Out of deference to the Court and to avoid interfering with active

litigation, the Examiner has limited his direct investigation of this claim and does not

reach conclusions about the relative merits of the parties' arguments.  For a complete

discussion of Lehman's dealings with BofA, see Section III.A.5.e.

### (h)  CME Avoidance Analysis

### (i)  Summary

This Section describes the circumstances surrounding the transfers by the CME

Group (the "CME") of more than $2.0 billion in LBI collateral (margin) and clearing

deposits, including margin pertaining to futures and options contracts cleared by LBI

for the benefit of LBHI affiliates, at the CME in connection with the CME's decision to

sell and transfer LBI's proprietary positions, including positions maintained for the

benefit of LBHI affiliates, to three entities, Barclays, Goldman Sachs and DRW Trading.

This Section also addresses whether any colorable common law or bankruptcy claims

arise from the transfers.

---

[6834] Joint Stipulation of Undisputed Facts, at ¶ 44, Docket No. 74, *Bank of Am., N.A. v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings, Inc.),* No. 08-01753 (Bankr. S.D.N.Y. Dec. 7, 2009).

[6835] *Id.* at ¶ 45.

[6836] *Id.* at ¶ 46.

The Examiner concludes that an argument can be made that the transfers at issue were fraudulent transfers avoidable pursuant to Section 548 of the Bankruptcy Code and Sections 273 through 275 of the New York Debtor and Creditor law[6837] because (1) the transfers were made during the applicable look-back period; and (2) Lehman received less than reasonably equivalent value or fair consideration for the transfers (a loss to Lehman exceeding $1.2 billion over the close-of-business liabilities associated with the positions and a net loss of close to $100 million over the SPAN Risk (margin) requirements).  Whether LBI had unreasonably small capital or was insolvent at the time of the transfer is an issue unresolved by this Report and the Examiner defers to the findings of the SIPA Trustee.[6838]  In any event, the Examiner concludes that the evidence does not support the existence of colorable claims because (i) the CME and its officers likely would be immune because the CME acted within its statutory role as a self-regulator of its exchanges, (ii) the Commodity Exchange Act ("CEA")[6839] likely would preempt most suits against both the CME or the transferees, and (iii) the transfers likely were protected from avoidance by the safe-harbor provisions of the Bankruptcy Code.

---

[6837] *See* Appendix 1, Legal Issues, at Sections IV.A., IV.C for a discussion of applicable fraudulent transfer law.

[6838] An argument could be made that it is the solvency or unreasonably small capital of LBHI and its affiliates (rather than LBI) that is relevant because LBI cleared for the benefit of LBHI and its affiliates.  *See* Section III.B.3.d for the analysis of unreasonably small capital of LBHI and its affiliates.  *See* Section III.B.3.b for the solvency analysis of LBHI.  *See* Section III.B.3.c for the solvency analysis of the affiliates of LBHI.

[6839] 7 U.S.C. § 1 *et seq.*

## (ii) Background

The CME Group is comprised of four designated contract markets: the Chicago Board of Trade ("CBOT"), the Chicago Mercantile Exchange, the New York Mercantile Exchange and COMEX (f/k/a Commodity Exchange, Inc.). The CME's Clearing House Division confirms, clears and settles all derivatives contracts traded at the CME exchanges, acts as the central counterparty and provides a performance guaranty for all futures and options contracts cleared through these exchanges. [6840]

LBI was a long-standing clearing member of all four of the CME exchanges. At the time of LBHI's bankruptcy, LBI maintained substantial proprietary – or "house" – positions in energy, interest rate, and equities (*i.e.*, S&P 500, etc.) futures and options traded on CME exchanges, along with smaller positions in metals, agriculture, and foreign exchange. At the time, LBI's combined margin requirements at the CME totaled roughly $2 billion for LBI's proprietary positions and an additional $2 billion for LBI's public customer positions.[6841]

LBI's proprietary positions included the domestic exchange-traded commodity futures and options positions of most LBI affiliates, such as LBCS and LBSF. Because they were not CME clearing members, affiliates such as LBCS entered into and cleared domestic exchange-traded commodities futures and options contracts through LBI,

---

[6840] Examiner's Interview of Timothy Doar, Oct. 16, 2009, at p. 2.
[6841] *Id.*

which was a registered futures commission merchant and clearing member of most

major exchanges.[6842]

LBI historically maintained very little excess margin at the CME and instead

managed its cash aggressively so that only a few million dollars in excess margin funds

would remain on deposit at the CME.[6843]   The CME began more actively monitoring

LBI's financial condition (and the financial condition of all other investment banks that

were clearing members of the CME) following the collapse of Bear Stearns.   During this

period, the CME was in regular contact with Lehman personnel and Lehman personnel

met with the CME on at least one occasion to provide assurances about LBHI and LBI's

liquidity.[6844]   The CME also regularly consulted with the CFTC (primarily through

Ananda Radhakrishnan and Robert Wasserman, director and associate director,

respectively, of the CFTC's Division of Clearing and Intermediary Oversight), the SEC

(primarily through Mike Macchiaroli) and the Federal Reserve Bank concerning the

financial condition of LBI and other investment banks on its watch list.[6845]

Sometime on Friday, September 12, 2008, the federal regulators made CME

aware that they expected Lehman either would be sold or in bankruptcy by Monday,

September 15.  The CME understood that in the event Lehman filed bankruptcy, it was

---

[6842] Examiner's Interview of Satu Parikh, Aug. 26, 2009, at pp. 9-10.
[6843] *Id.*
[6844] Examiner's Interview of Timothy Doar, Oct. 16, 2009, at p. 3.
[6845] *Id.*

expected to follow the "Refco model,"[6846] which involved an immediate holding company bankruptcy filing but no immediate bankruptcy filing for regulated subsidiaries.[6847]

On Saturday, September 13, 2008, the CME began preparations for a possible liquidation or transfer of LBI positions. Tim Doar, Managing Director of Risk Management in the CME Clearing House Division, stated in interviews with the Examiner that the CME believed it would not be prudent to conduct an open market liquidation of LBI's positions because of the size and complexity of the positions, as well as the credit and execution risk that would be associated with such a large open market liquidation.[6848] LBI was a major clearing member of the CME; the aggregate margin requirements for all CME clearing members was approximately $95 billion, of which roughly $4 billion was attributable to LBI alone.[6849] As a result, on Saturday, September 13, 2008, Kim Taylor, President of the CME Clearing House Division, contacted Jeff Jennings, Lehman's Global Head of Futures, for permission to disclose LBI's house positions to potential buyers and seek bids from firms that would assume responsibility for the positions. [6850] On Sunday, September 14, 2008, Tom Russo (Lehman's general

---

[6846] *Id.*

[6847] In the *Refco* case, its regulated futures commission merchant subsidiary, Refco, LLC, did not commence bankruptcy proceedings until it was ready to be sold and transfer all customer positions to Man Financial, Inc., n/k/a MF Global.

[6848] Examiner's Interview of Timothy Doar, Oct. 16, 2009, at p. 3.

[6849] *Id.* at p. 2.

[6850] *Id.* at p. 3.

counsel) contacted Taylor and consented to the CME's disclosure of LBI's house positions to potential buyers. [6851]

The CME selected a handful of firms from which to solicit contingent bids on LBI's house positions, including the positions of LBI affiliates such as LBCS that were cleared through LBI. The firms selected by the CME to participate in the bidding process were Barclays, Goldman Sachs, Morgan Stanley, JPMorgan, Citadel L.P. and DRW Trading. [6852] The CME selected these six firms based on their capital, market concentration considerations and risk management expertise. [6853]

The CME delivered the portfolio information regarding LBI's house positions to potential bidders on Sunday and, by Monday morning, had received bids on LBI's proprietary positions from five of the six firms. Some of the bids were for the entire portfolio; others were for segments of the portfolio, divided either by CME exchange or by product type.[6854] However, all of the bids involved substantial losses to LBI in the form of the transfer of the majority (and in several cases all) of the CME margin posted in connection with the positions.[6855] The CME delivered summaries of the bid results to

---

[6851] *Id.*

[6852] *Id.*

[6853] *Id.*

[6854] E-mail from Dale Michaels, CME Group, to Clearing House Senior Mgmt., CME Group, *et al.*, (Sept. 15, 2008) [CME 4767].

[6855] E-mail from Kim Taylor, CME Group, to Kaushik Amin, Lehman, *et al.* (Sept. 15, 2008) [CME 4750].

Kaushik Amin, Lehman's Global Head of Liquid Markets, during the day on Monday,

September 15, 2008 – Lehman's petition date.[6856]

On Monday morning, September 15, 2008, the members of the CME Emergency

Financial Group – Craig Donohue (CME Chief Executive Officer), Phupinder Gill (CME

President), Terrence Duffy (Chairman of the Board), Jim Oliff and Howard Siegel (Co-

Chairmen of the Clearing House Risk Committee) and Taylor – met and decided to (i)

place LBI on "liquidation only" status for its proprietary positions, and (ii) give the CME

Clearing House Division authority to sell or transfer LBI's house positions in bulk.[6857]

The CME "liquidation only" instructions were communicated to Jennings, who Doar

---

[6856] *Id.*

[6857] *See* Rule 975, Emergency Financial Conditions,
http://www.cmegroup.com/rulebook/CBOT/I/9/75.html.
CME Rule 975 (Emergency Financial Conditions) provides, in its entirety:

> If the President of the Exchange or the President of the Clearing House determines that the financial or operational condition of a clearing member or one of its affiliates is such that to allow that clearing member to continue its operation would jeopardize the integrity of the Exchange, or negatively impacts the financial markets by introducing an unacceptable level of uncertainty, volatility or risk, whether or not the clearing member continues to meet the required minimum financial requirements, he may empanel the Chief Executive Officer, the President of the Exchange, Chairman of the Board, the Chairman of the Clearing House Risk Committee and the President of the Clearing House. ("Emergency Financial Committee") Such panel shall be duly authorized and, upon a unanimous vote of the panel, be empowered to order (a) an immediate position limitation, (b) an immediate suspension of the clearing member, (c) that all open trades of said clearing member be for liquidation only, (d) the liquidation or transfer of all or a portion of the open positions of the clearing member, (e) additional performance bond to be deposited with the Clearing House and/or (f) any other action necessary to protect the financial integrity of the Clearing House. The clearing member affected by action taken shall be notified and may request a hearing before the Board as provided in Rule 412. In the event of suspension, the Chief Executive Officer shall, promptly after a suspension, set the matter for hearing before the Board for final determination. To the extent that the panel orders that all open trades of a clearing member be for liquidation only, or the panel orders the liquidation or transfer of all of the open positions of a clearing member, Rule 913.B. shall apply and the clearing member shall be treated as a withdrawing clearing member.

*Id.*

believes passed the instruction along to Amin and Parikh, along with instructions to attempt to sell LBI's house positions in bulk.[6858]   The CME did not give LBI a deadline to sell or liquidate its positions at the CME.[6859]   Rather than liquidating its positions, however, LBI modestly added to its positions over the next two days.[6860]  This continued trading activity was attributed to confusion and chaos at LBI.[6861]

The CME did not give "liquidation only" instructions to LBI because it was in default with respect to any CME margin requirements, but rather for general financial insecurity reasons related to LBHI's bankruptcy filing.[6862]   Doar stated that with the bankruptcy of LBHI and LBIE, even a significant increase in Lehman's cash and liquidity positions would not have enabled LBI to survive as a CME clearing member for long.[6863]  Rather, the CME viewed it as only a matter of time before LBI – which was ineligible for Chapter 11 relief – would need to commence a SIPC or Chapter 7 liquidation proceeding.[6864]   The CME also was concerned that JPMorgan might cease acting as LBI's settlement bank with the CME Clearing Division.   Although it was technically possible to conduct transactions with the CME without a settlement bank,

---

[6858] Examiner's Interview of Timothy Doar, Oct. 16, 2009, at p. 4.
[6859] *Id.*
[6860] *Id.*
[6861] *Id.*
[6862] *Id.*
[6863] *Id.*
[6864] *Id.*

no CME clearing member had ever done so.[6865]   Doar stated that it would have

presented an unprecedented situation and additional risk to the CME and noted that on

Wednesday, September 17, BofA ceased acting as LBI's settlement bank with respect to

the other dominant domestic derivatives clearing organization, the Options Clearing

Corporation ("OCC").[6866]

The CME was in regular contact on Monday, September 15 through Wednesday,

September 17, with Jennings, Amin and Parikh concerning the liquidation of LBI's

house positions.[6867]   On Wednesday, Parikh informed the CME that LBCS had arranged

for Goldman Sachs to purchase LBCS's natural gas positions, which it traded at the

NYMEX through LBI, in bulk.[6868]   LBI, however, did not find a buyer for any of its other

house positions.

Goldman agreed to assume the natural gas positions as of the close of business

on Tuesday, September 16, in consideration for the transfer to Goldman of

$622,104,458.98 from LBI's margin and collateral deposits at the CME.[6869]   The NYMEX

natural gas positions as of the close-of-business on Tuesday included options with a net

option value of negative $482,102,458.98 for which Goldman Sachs would assume

---

[6865] *Id.*

[6866] *Id.*

[6867] *Id.*

[6868] *Id.*

[6869] E-mail from Timothy Doar, CME Group, to Michelle Gold, Lehman et al. (Sept. 18, 2008) [CME 7959]; Spreadsheet [CME 8753]; e-mail from Michael Dawley, Goldman, to T. Doar, CME Group, *et al.* (Sept. 18, 2008) [CME 8754].

liability; consequently, the amount to be transferred to Goldman Sachs exceeded the Tuesday close-of-business position liabilities by $140 million.[6870]  The aggregate Span Risk[6871] – or margin requirements – associated with these positions, $129,270,361 was less than this amount.[6872]

Sometime on Wednesday, September 17, the CME learned that the proposed sale to Barclays would not include the assumption of risk associated with LBI proprietary positions, only LBI public customer positions.  The CME also learned on Wednesday that LBI was likely to file for bankruptcy on Friday, and that the Australian exchange was preparing to suspend Lehman's trading. [6873]  Consequently, that evening the CME Emergency Financial Group met and determined to re-solicit bids in LBI's house portfolio from five of the six firms from which it had solicited bids on Sunday, September 14, 2008, and to transfer the positions in bulk to the winning bidders the following morning (the sixth firm, Morgan Stanley, had not submitted an acceptable bid on September 14, and therefore the CME did not include Morgan Stanley in the

---

[6870] CME 7959; CME 8753; CME 8754.  The positions did not actually transfer to Goldman Sachs until Thursday morning.  In the interim, on Wednesday LBI funded a futures variation of $82,654,310 with respect to the natural gas portfolio, so the amount of LBI margin ultimately transferred to Goldman Sachs by the CME was reduced by this amount.

[6871] SPAN is a CME-developed system which evaluates overall portfolio risk by calculating the worst possible loss that a portfolio of derivative and physical instruments might reasonably incur over a specified time period (typically one trading day.) This is done by computing the gains and losses that the portfolio would incur under different market conditions.  SPAN is the industry standard for portfolio risk assessment, and is the official performance bond (margin) mechanism of 50 registered exchanges, clearing organizations, service bureaus and regulatory agencies throughout the world. *See* SPAN, www.cmegroup.com/clearing/risk-management/span-overview.html.

[6872] Spreadsheet [CME 8753].

[6873] Examiner's Interview of Timothy Doar, Oct. 16, 2009.

Wednesday bidding). [6874]    The CME communicated its intended course of action to

Jennings and Herbert "Bart" McDade.    Doar stated that McDade argued against the

CME's bulk liquidation but did not provide an alternative course of action other than

the *status quo*. [6875]

Overnight, the CME transmitted LBI's house position information to the five

firms and instructed them to submit bids on the following baskets of LBI positions: (i)

NYMEX/Clearport/COMEX (energy) derivatives; (ii) FX derivatives; (iii) interest rate

derivatives; (iv) equity derivatives; and (v) agricultural and alternative investment

derivatives.    On Thursday morning, September 18, 2008, the CME evaluated the bids

that it had received overnight and transferred LBI's house positions (including LBHI

affiliate positions cleared through LBI) to three firms, as follows:

### a.    Energy Derivatives

The highest bid for the NYMEX/Clearport/COMEX (energy) derivatives portfolio

was delivered by Barclays.    Barclays assumed the energy positions cleared through the

CME, as of close of business on Wednesday, in consideration for the transfer to Barclays

of $707,413,215 from LBI's margin and collateral deposits at the CME.    The energy

positions included options with a negative net option value of $372,413,215, so the

amount transferred to Barclays exceeded the Wednesday close-of-business position

---

[6874] CME 7959; CME 8753; CME 8754.
[6875] Examiner's Interview of Timothy Doar, Oct. 16, 2009.

liabilities associated with the positions by $335 million.[6876]  The aggregate Span Risk – or margin requirements – associated with these positions, $260,947,206, was less than this amount.[6877]

### b.    FX Derivatives

The highest bid for the FX derivatives portfolio was delivered by DRW Trading. DRW Trading assumed the FX positions cleared through the CME, as of close of business on Wednesday, in consideration for the transfer to DRW Trading of $2,289,375 from LBI's margin and collateral deposits at the CME.  The FX positions included options with a net option value of $3,710,625, so the amount transferred to DRW Trading exceeded the Wednesday close-of-business position liabilities associated with the positions by $6 million.[6878]  The aggregate Span Risk – or margin requirements – associated with these positions, $11,482,836, was greater than this amount.[6879]

### c.    Interest Rate Derivatives

The highest bid for the interest rate derivatives portfolio was delivered by DRW Trading.  DRW Trading assumed the interest rate positions cleared through the CME, as of close of business on Wednesday, in consideration for the transfer to DRW Trading of $333,489,665 from LBI's margin and collateral deposits at the CME.  The interest rate

---

[6876] E-mail from Timothy Doar, CME Group, to Michael Nielsen, Lehman, *et al*. (Sept. 18, 2008) [CME 8217]; Spreadsheet [CME 8753].

[6877] Spreadsheet [CME 8753].

[6878] E-mail from Timothy Doar, CME Group, to Michael Nielsen, Lehman, *et al*. (Sept. 18, 2008) [CME 8217]; Spreadsheet [CME 8753].

[6879] Spreadsheet [CME 8753].

positions included options with a negative net option value of $93,489,665 for which

DRW Trading assumed liability, so the amount transferred to DRW Trading exceeded

the Wednesday close-of-business position liabilities associated with the positions by

$240 million. [6880]   The aggregate Span Risk – or margin requirements – associated with

these positions, $129,949,964, was less than this amount.[6881]

### d.    Equity Derivatives

The highest bid for the equity derivatives portfolio was delivered by Goldman

Sachs.  Goldman Sachs assumed the equity positions cleared through the CME, as of

close of business on Wednesday, in consideration for the transfer to Goldman Sachs of

$445,132,487 from LBI's margin and collateral deposits at the CME.   The equity

positions included options with a net option value of $4,867,513 so the amount

transferred to Goldman Sachs exceeded the Wednesday close-of-business position

liabilities associated with the positions by $450 million.[6882] The aggregate Span Risk – or

margin requirements – associated with these positions, $737,443,448, was greater than

this amount. [6883]

---

[6880] E-mail from Timothy Doar, CME Group, to Michael Nielsen, Lehman, *et al*. (Sept. 18, 2008) [CME 8217]; Spreadsheet [CME 8753].
[6881] Spreadsheet [CME 8753].
[6882] E-mail from Timothy Doar, CME Group, to Michael Nielsen, Lehman, *et al*. (Sept. 18, 2008) [CME 8217]; Spreadsheet [CME 8753].
[6883] Spreadsheet [CME 8753].

### e.  Agricultural Derivatives

The highest bid for the agricultural derivatives portfolio was delivered by DRW Trading.  DRW Trading assumed the agricultural positions cleared through the CME, as of close of business on Wednesday, in consideration for the transfer to DRW Trading of $52,452,362 from LBI's margin and collateral deposits at the CME.  The agricultural positions included options with a net option value of $4,547,638, so the amount transferred to DRW Trading exceeded the Wednesday close-of-business position liabilities associated with the positions by $57 million.[6884]  The aggregate Span Risk – or margin requirements – associated with these positions, $55,230,535, was less than this amount.[6885]

These three firms accepted all going-forward risk associated with the positions. There were no bids for the smaller metals and agricultural positions, so those were liquidated by the CME in the open market on Friday.[6886]

The bulk sale process (including the Goldman Sachs sale arranged by LBCS) resulted in a substantial loss to LBI exceeding $1.2 billion over the close-of-business liabilities associated with the positions, and a net loss of close to $100 million over the SPAN Risk (margin) requirements.  This process represented the first and only time the

---

[6884] E-mail from Timothy Doar, CME Group, to Michael Nielsen, Lehman, *et al.* (Sept. 18, 2008) [CME 8217]; Spreadsheet [CME 8753].
[6885] Spreadsheet [CME 8753].
[6886] E-mail from Timothy Doar, CME Group, to Michael Nielsen, Lehman, *et al.* (Sept. 18, 2008) [CME 8217]; Spreadsheet [CME 8753].

CME had conducted a forced transfer/liquidation of a clearing member's positions.  The CME currently holds roughly $150 million of former LBI margin collateral remaining from the transfer and liquidation process.

Thus, LBI may have a colorable claim against CME, or any of the firms that bought LBI's positions at a steep discount during the liquidation ordered by the CME, for the losses that LBI sustained as a result of the forced sale of house positions held for the benefit of LBI and its affiliates.

### (iii)    Defenses to Avoidability of Claims

### a.    Applicability of CEA Preemption

The Supremacy Clause of the United States Constitution authorizes Congress to displace state law in any area that Congress has the power to regulate.  In general, a federal statute preempts state law in one of three instances:    (1) when Congress expressly states its intent to preempt or displace relevant state law ("express preemption");[6887] (2) when a federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"[6888] within an entire field of regulation ("field preemption"); or (3) when it is impossible to comply with both federal and state law, or where state law "stands as an obstacle to the

---

[6887] *Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 152-53 (1982).
[6888] *Id*. at 153 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

accomplishment and execution of the full purposes and objectives of Congress" ("conflict preemption").[6889]

The term "preemption" generally refers to whether a federal statute or regulation supersedes any *state* law to the contrary. Some of the potential claims against CME, however, are *federal* claims (*e.g.*, fraudulent transfer claims under Section 548 of the Bankruptcy Code). Because preemption law deals with federal-trumping-state-law situations, it may not apply to whether the CEA precludes non-CEA federal causes of action. However, the CEA could still foreclose other federal claims if a court concludes the CEA implicitly repealed those claims or that Congress intended the CEA to be the exclusive remedy for claims arising out of futures markets. Whatever the technical resolution of that question, courts analyzing whether the CEA forecloses non-CEA claims (state or federal) use similar standards for both federal and state claims.[6890] Indeed, the primary case upon which this section relies held that the CEA effectively preempts the Sherman Act.[6891] Therefore, the CEA provides the sole mechanism for regulating commodities, and any state or federal statute or claim that frustrates Congress' regulatory scheme is likely precluded by the CEA.

---

[6889] *Am. Agric. Movement, Inc. v. Bd. of Trade of the City of Chi.*, 977 F.2d 1147, 1155 (7th Cir. 1992), *abrogated on other grounds by Freightliner Corp. v. Myrick*, 514 U.S. 280, 288-89 (1995), *as recognized by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995).

[6890] *See, e.g., W & W Farms, Inc. v. Chartered Sys. Corp. of New York, Ltd.*, 542 F. Supp. 56, 60 (N.D. Ind. 1982) ("It logically follows that the Act preempts private actions based on *federal* or state statutory schemes. . ." (emphasis added)).

[6891] *See Am. Agric. Movement*, 977 F.2d at 1158.

Through the CEA, Congress "establishe[d] an ambitious scheme for the regulation of commodities trading."[6892]  The CEA is enforced by the Commodity Futures Trading Commission (the "CFTC"), which "shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery . . . ."[6893]  Though that provision would appear to expressly preempt any state law or claim that merely "involv[ed] contracts of a sale of a commodity for future delivery,"[6894] the CEA has a "savings clause" that protects at least some non-CEA claims:  "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."[6895]  Thus, Congress did not expressly preempt state law through the CEA.[6896]  Further, the savings clause "tells us that Congress did not intend to preempt the field of futures trading."[6897]  That leaves only conflict preemption as the means through which the CEA could preempt claims against the CME.

There are two variants of conflict preemption.  First, a state law is preempted where it would be impossible to comply with both the state and federal law.  Whether the CEA preempts state law because it is impossible to comply with both the state and

---

[6892] *Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984).

[6893] 7 U.S.C. § 2(a)(1)(A).

[6894] *Id.*  "Standing alone, this would appear to grant exclusive authority to the Commission over cases involving futures contracts, and to completely preempt state law as a result."  *Am. Agric. Movement*, 977 F.2d at 1155.

[6895] 7 U.S.C. § 2(a)(1)(A).

[6896] *Am. Agric. Movement*, 977 F.2d at 1154.

[6897] *Id.* at 1155.

federal law depends on the particular state law at issue. Most of the common law or statutory claims that could conceivably be brought against the CME (such as a fraudulent transfer claim) would not involve an unavoidable conflict with the CEA.

Second, conflict preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[6898] At least one federal appellate court has held that a state law claim, whether based on a statute or common law, can be preempted if it frustrates the "purposes and objectives of Congress" in passing the CEA.[6899] In *American Agricultural Movement, Inc. v. Board of Trade of the City of Chicago*, the Seventh Circuit held, in relevant part, that the CEA preempted a suit against the CBOT that was premised on the CBOT's adoption of an emergency resolution, pursuant to its self-regulatory powers, ordering the liquidation of excessively high short or long positions to ensure the stability of the soybean market. The order caused the long positions in the futures market to fall in value, with a proportionate decline in the cash market. Soybean farmers sued the CBOT, claiming that the CBOT acted in bad faith in adopting the emergency resolution because some of the members of the committee that approved the resolution had clients that would benefit from the drop in price.[6900]

---

[6898] *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).
[6899] *Id.*
[6900] *Id.* at 1150-51.

The Seventh Circuit held that the CEA preempted the farmers' claims.  The court

concluded that the combined effect of the savings clause (which kept alive some state

law claims) and the clause granting exclusive jurisdiction to the CFTC over claims "with

respect to accounts, agreements . . ., and transactions involving contracts of sale of a

commodity for future delivery, traded or executed on a contract market . . . ." led to a

conclusion that:    "[g]iving full effect to both clauses compels the conclusion that

Congress intended to preempt some, but not all, state laws that bear upon the various

aspects of commodity futures trading."[6901]

The court noted, however, that the statutory text did not resolve which particular

claims the CEA preempted.  Thus, the court declared, "we must take our guidance from

the goals and policies underlying the statute."[6902]    Examining the history of the 1974

amendments to the CEA, the court found that the purpose of the CEA was to ensure

uniform, national rules for the operation of commodities markets:

> The circumstances surrounding passage of the 1974 Act shed a great deal
> of light upon the preemptive scope of the CEA. It appears that a
> confluence of events in the early 1970s-including a drastic surge in
> commodities trading, rapidly rising food costs, and a highly publicized
> and costly futures trading scandal-led Congress to modernize and fortify
> the CEA and fill some fairly significant regulatory gaps. The Act's
> proponents were concerned that the states, in light of these circumstances,
> might step in to regulate the futures markets themselves. This, they
> feared, might have subjected the national futures trading apparatus to
> conflicting regulatory demands. The solution, the House Committee on
> Agriculture believed, was to put all exchanges and all persons in the

---

[6901] *Id.* at 1155.

[6902] *Id.*

industry under the same set of rules and regulations for the protection of all concerned. The Senate Committee on Agriculture and Forestry apparently concurred, as indicated by its deletion of a CEA provision which appeared to preserve the states' authority over futures trading.[6903]

Thus, the Seventh Circuit held that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and hence is preempted."[6904]   The emergency resolution adopted by CBOT was an exercise of its self-regulatory power under the CEA, which is at the very core of the comprehensive regulatory scheme Congress enacted over the futures market. "Accordingly, the [farmers'] state law claims against the CBOT for implementing the emergency Resolution are preempted by the CEA because they are intimately tied to the operation of a contract market."[6905]

The Seventh Circuit's decision, however, did not broadly sweep aside all state law claims that arose in the context of the futures' markets.  Rather, "[w]hen . . . the application of state law would affect only the relationship between brokers and investors or other individuals involved in the market, preemption is not mandated."[6906] Thus, the Seventh Circuit was concerned with ensuring that self-regulating commodity exchanges were subject only to the uniform commands of the CEA, rather than the

---

[6903] *Id.* at 1155-56 (citations and quotations omitted).
[6904] *Id.* at 1156-57 (citations and quotations omitted).
[6905] *Id.* at 1157.
[6906] *Id.*

patchwork of rules that would result from broad application from state common law or statutory claims against those exchanges.  Because claims among parties that are not the exchange itself (*e.g.*, brokers and investors) do not implicate the exchange's operation of its market, those claims are not preempted.

Neither the Second Circuit nor the Supreme Court has expressly adopted the holding or reasoning of the Seventh Circuit.  In an analogous context, however, the Second Circuit has held that federal law grants self-regulatory organizations immunity from suit when acting in their regulatory function.[6907]  Citing *American Agricultural Movement* with approval, the Second Circuit concluded immunity for officials was necessary to carry out Congress's regulatory goals under the CEA.[6908]  Further, lower courts (even those outside the Seventh Circuit) have followed the holding of *American Agricultural Movement*.[6909]  Thus, there is strong reason to conclude that *American Agricultural Movement* is a correct statement of the law of preemption under the CEA.

Applying the Seventh Circuit's reasoning to any claims against the CME for its liquidation of LBI's proprietary positions, the Examiner concludes that the CEA likely preempts any claims against CME.  As in *American Agricultural Movement*, any claim against the CME would attack a formal resolution made by an exchange as the

---

[6907] *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 59 (2d Cir. 1996).

[6908] *Id.*

[6909] *See DGM Invs, Inc. v. N.Y. Futures Exch., Inc.*, No. 01 CV 11602 (RWS), 2002 WL 31356362, at *4-5 (S.D.N.Y. Oct. 17, 2002); *W. Capital Design, LLC v. N.Y. Mercantile Exch.*, 180 F. Supp. 2d 438, 443 (S.D.N.Y. 2001).

regulator of its market.  The CME directed the liquidation of LBI's positions pursuant to an order from its Emergency Financial Committee to protect the integrity and stability of CME contract markets.  Any challenge to that decision in court would attack a decision of the CME that is "intimately tied to the operation of a contract market."[6910] Under *American Agricultural Movement*, that claim would be preempted.

There is no case law directly addressing whether the CEA also preempts claims against the firms that participated in the liquidation sale ordered by the CME, but those claims likely are also preempted.  After all, the claims would be predicated on the very same act as claims directly against the CME:  CME's liquidation order.  A court would likely hold that a claim against a third party for participating in a transaction ordered by an exchange in carrying out the exchange's regulatory function would be "intimately tied to the operation of a contract market," and thus preempted.  After all, it would frustrate the ability of an exchange to regulate its market if third-parties could not participate in an auction or other emergency process without fear of liability.  Thus, claims against the firms that participated in the CME-ordered liquidation sale would likely be preempted to the same extent that claims against CME are preempted.

### b.  Applicability of Self-Regulatory Organization Immunity

Even if the CEA did not preempt any claims against the CME or firms participating in the liquidation sale, the immunity provided to self-regulatory

---

[6910] *Am. Agric. Movement*, 977 F.2d at 1157.

organizations like the CME, and its officers, would likely foreclose any suit against the CME.

The CME is a "self-regulatory organization," or SRO. Congress gives SROs the authority to regulate, police, and discipline those who participate in their markets, subject to the supervision of federal agencies. Thus, SROs (*e.g.*, the NYSE, NASDAQ, and CME, among others) establish rules for their exchanges, license those who can participate in them, investigate violations of rules and laws, and discipline members through internal adjudications. All of those activities are subject to the oversight and regulation of federal administrative agencies like the SEC and CFTC.

SROs, as well as their officers personally in most situations, are absolutely immune from suit for acts taken within the scope of their regulatory or adjudicative functions. That immunity is premised on the notion that, when acting in such a capacity, an SRO is exercising quasi-governmental power, and should enjoy the same immunity from suit that a governmental organization would have. As the Second Circuit stated in *Barbara v. New York Stock Exchange*: "Although the [New York Stock] Exchange is a private, rather than a government entity, immunity doctrines protect private actors when they perform important governmental functions."[6911]

---

[6911] *Barbara v. N.Y. Stock* Exch., *Inc.*, 99 F.3d 49, 58 (2d Cir. 1996). The *Barbara* court expanded:

> We think that absolute immunity is particularly appropriate in the unique context of the self-regulation of the national securities exchanges. Under the Exchange Act, the Exchange performs a variety of regulatory functions that would, in other circumstances, be performed by a government agency. Yet government agencies, including the SEC, would be entitled to sovereign immunity from all suits for money damages. As a private corporation, the Exchange does not

As with the preemption analysis discussed above, courts have predicated SRO immunity on the fact that allowing suits against SROs and their officers would frustrate the purpose of Congress in authorizing SROs to exercise broad discretion in regulating exchanges:

> Furthermore, allowing suits against the Exchange arising out of the Exchange's disciplinary functions would clearly stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, namely, to encourage forceful self-regulation of the securities industry.  Other courts have relied upon this rationale in holding that state law claims against self-regulatory organizations are preempted by the Exchange Act. Although we do not rely on the doctrine of federal preemption in this case, we think that the reasoning of these cases supports our conclusion that the Exchange is immune from damages claims with respect to its conduct of disciplinary proceedings.[6912]

Early SRO immunity cases suggested that absolute immunity might only attach to the prosecutorial or adjudicative functions of the SRO, while qualified immunity would apply to other regulatory functions of the SRO.  In *Austin Mun. Secs., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.* ("*Austin*"), the Fifth Circuit became the first court to recognize SRO immunity.[6913]  The court based its holding on an SRO's quasi-governmental nature, and the cases that grant government officials some form of immunity for their official acts.[6914]  Only certain governmental functions are protected by absolute immunity; most

---

share in the SEC's sovereign immunity, but its special status and connection to the SEC influences our decision to recognize an absolute immunity from suits for money damages with respect to the Exchange's conduct of disciplinary proceedings.

[6912] *Id.* at 59 (citations omitted).

[6912] *Id.* (quotations and citations omitted).

[6913] 757 F.2d 676, 686 (5th Cir. 1985).

[6914] *Id.* at 686-88.

are subject only to qualified immunity, which provides more limited protection. The Fifth Circuit, therefore, engaged in an extensive analysis of which type of immunity a SRO should enjoy. The claims in *Austin* involved the investigation, charge, and prosecution of claims by NASD against one of its members.[6915] The *Austin* court held that the NASD was entitled to absolute immunity from the claims because governmental actors generally are entitled to absolute immunity for judicial or prosecutorial functions.[6916] But *Austin* suggested that SROs would not be completely protected from claims arising from *all* their official functions, as *Austin* denied absolute immunity to NASD staff for claims arising from their investigation (not prosecution) of the wrongdoing at issue.[6917] The Court left open the possibility that the NASD staff would be entitled to qualified immunity for their investigatory acts.[6918]

The Second Circuit, however, has rejected the claim that a SRO is entitled to less than absolute immunity for its non-prosecutorial and adjudicative functions. In *D'Alessio v. New York Stock Exchange*, the Second Circuit held that the NYSE was entitled to absolute immunity for claims that it improperly interpreted the Securities Exchange Act, improperly failed to alert the plaintiff he was violating the Act, and improperly cooperated and assisted the U.S. Attorney's Office in its investigation of the plaintiff.[6919]

---

[6915] *Id.* at 681-82.

[6916] *Id.* at 689.

[6917] *Id.* at 693.

[6918] *Id.*

[6919] 258 F.3d 93, 106 (2d Cir. 2001), *aff'g* 125 F. Supp. 2d 656 (S.D.N.Y. 2000).

The plaintiff argued the NYSE did not have absolutely immunity because the claims did not flow from the NYSE's prosecutorial or adjudicative authority, which the plaintiff argued were the only claims for which *Barbara* held SROs had absolute immunity.

The court rejected that argument.[6920]  "[A]lthough the immunity inquiry in *Barbara* was confined to the NYSE's conduct in connection with disciplinary proceedings, *Barbara* stood for the broader proposition that a SRO, such as the NYSE, may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions."[6921]  The court held that the NYSE's interpretation of the Act, and its decision to charge the plaintiff with misconduct and refer his case to the U.S. Attorney's office were "quasi-public adjudicatory" and "quasi-prosecutorial" acts, and thus fell even under the plaintiff's proposed limitation of absolute immunity.[6922]  The court then extended absolute immunity outside the adjudicatory or prosecutorial context to include the NYSE's alleged failure to monitor the plaintiff's compliance with the Act, because those acts related to the "proper functioning of the regulatory system."[6923]  Thus, *D'Alessio* stands for the broad proposition that an SRO has absolute immunity for all of its official actions within the scope of its delegated authority:  "[W]e hold that the NYSE, when acting in its capacity as a SRO, is entitled to immunity from suit when it engages in conduct consistent with

---

[6920] *Id.* at 104-05.
[6921] *Id.* at 105.
[6922] *Id.* at 106.
[6923] *Austin*, 757 F.2d at 687 (quoted in *D'Alessio*, 258 F.3d at 106).

the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder."[6924]

Where claims go to the heart of a SROs regulatory function, courts have not hesitated to immunize SROs and their officers from liability.  Thus, the Ninth Circuit threw out a suit arising from the NASDAQ's decision to de-list the plaintiff's stock on the first day of its public offering.[6925]  The court held that "there are few functions more quintessentially regulatory than suspension of trading," so the de-listing decision was immune from attack.[6926]

Immunity applies to decisions of an SRO under the CEA.  In *Mandelbaum v. New York Mercantile Exchange*, Mandelbaum sued NYMEX for what Mandelbaum alleged was NYMEX's improper use of its investigative and adjudicative authority to harass him and require him to have to sell his seat on the exchange.[6927]  The district court held that Mandelbaum's claims were foreclosed by NYMEX's absolute immunity as an SRO.[6928]

An SRO, however, is not absolutely immune from all suits.  If the SRO is acting in its private, rather than regulatory, manner, it is not immune from suit.  In *Weissman v.*

---

[6924] *D'Alessio*, 258 F.3d at 106; *see also DL Capital Group, LLC v. Nasdaq Stock Mkt, Inc.*, 409 F.3d 93, 97-98 (2d Cir. 2005) (holding Nasdaq absolutely immune from suit challenging manner in which Nasdaq publicly announced suspension or cancellation of trades); *MFS Sec. Corp. v. N.Y. Stock Exch., Inc.*, 277 F.3d 613, 617 (2d Cir. 2002) (holding NYSE immune from contract claim by securities firm that had been stripped of its NYSE membership).

[6925] *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1213-14 (9th Cir. 1998).

[6926] *Id.* at 1214.

[6927] 894 F. Supp. 676, 677 (S.D.N.Y. 1995).

[6928] *Id.* at 679-80.

*Nat'l Assoc. of Securities Dealers*, an owner of WorldCom stock (Weissman) sued NASDAQ for its advertising touting WorldCom stock, which plummeted when WorldCom imploded.[6929]   NASDAQ claimed it was immune from suit, but the Eleventh Circuit (sitting en banc) disagreed.   The Court held that "because immunity is appropriate only when an SRO is performing regulatory, adjudicatory, or prosecutorial functions that would otherwise be performed by a government agency, it follows that absolute immunity must be coterminous with an SRO's performance of a governmental function."[6930]   Thus, the question was whether the NASD was acting in its private or governmental capacity with respect to the advertisements at issue.   The Court held that the advertisements were of a private nature:   "These advertisements by their tone and content were in the service of NASDAQ's own business, not the government's, and such distinctly non-governmental conduct is not protected by absolute immunity."[6931]

Applying these standards here, CME likely has absolute immunity from any suit by LBI arising from CME's decision to liquidate LBI's proprietary positions.   CME was acting in its regulatory, not private, capacity when it ordered the liquidation.   The point of the forced sale was to wind down LBI's positions (which were large relative to the

---

[6929] 500 F.3d 1293, 1294 (11th Cir. 2007).

[6930] *Id.* at 1297.

[6931] *Id.* at 1299.   Four dissenting judges held that while NASDAQ was not entitled to immunity for most of the advertisements, it was immune from liability for its advertisement in the *Wall Street Journal*. "That advertisement communicated to investors that companies listed on NASDAQ must satisfy rigorous financial standards.   Because the establishment of those standards was a duty delegated to NASDAQ by the SEC, NASDAQ is entitled to absolute immunity for its communication of those standards to investors."  *Id.* at 1300 (Pryor, J., concurring in part and dissenting in part).

size of the CME market) without substantially disrupting the market. The CEA
expressly grants the CME the authority to promulgate rules for the emergency
liquidation of open positions in its market, which rules the CME implemented when
ordering the liquidation of LBI's positions.[6932] Whether the CME's decision was a wise
one is irrelevant; it is the nature of the SRO's acts, not the wisdom or legality of those
acts, that determines whether the SRO is immune from suit.[6933] Thus, because the CME
was acting pursuant to its obligations under the CEA, it is likely immune from suit.

SRO immunity probably does not preclude a suit, however, against the firms that
participated in the liquidation sale. There is scant case law on the liability of third
parties arising from their participation in an SRO-ordered transaction for which the
SRO would enjoy absolute immunity. The firms could claim that the structure and
purpose of the CEA suggest that third parties would be immune from suit as well.
CME's liquidation order was expressly contemplated by the CEA.[6934] The buyers in any
liquidation proceeding would almost always be private actors, not SROs. If those
private actors could be sued for participation in a liquidation for which the SRO is
immune, then the SRO's authority to order liquidation would be severely impeded: it
would be difficult to find buyers if those buyers fear their participation in the

---

[6932] See 7 U.S.C. § 7(d)(6)(A).
[6933] See *Barbara*, 99 F.3d at 58; *D'Alessio*, 258 F.3d at 104-05; *see also Mandelbaum*, 894 F. Supp. at 682
(immunity analysis "focuses solely on the function performed by the official, and not on the correctness
or even constitutionality of his or her actions").
[6934] See 7 U.S.C. § 7(d)(6)(A).

liquidation would subject them to liability.  However, there is no case law support for

this argument, and it conflicts with the notion that CEA immunity is premised on the

nature of the actor and its acts -- a quasi-governmental actor exercising governmental

power.  The participating firms, after all, were acting in their private interest when

participating in the sale.  Thus, CEA immunity likely does not apply to claims against

the private firms, but the Examiner can offer no definitive conclusion as to that issue.

### c.    Applicability of the Safe Harbor Provisions of the Bankruptcy Code

The  Bankruptcy  Code's  safe-harbor  provisions  provided  in  Section  546  are

described  in  detail  in  Appendix  1,  Legal  Issues,  Section  IV.E,  and  thus  will  not  be

described in detail here.  In summary, Section 546(e) protects from avoidance margin

payments, settlement payments, and transfers to certain protected parties in connection

with securities contracts, commodity contracts, or forward contracts.[6935]  Further,  the

Financial Netting Improvements Act of 2006 ("FNIA") substantially broadened Section

546(e) to protect not only settlement or margin payments, but also transfers made by, to,

or for the benefit of Protected Parties in connection with securities, commodity, or

forward contracts.  Recently, the courts of appeals have read the statute literally, and

---

[6935] *See* 11 U.S.C. § 546(e).

thus have broadly held that any transfer in connection with a securities or commodity contract is protected by Section 546(e).[6936]

The Examiner concludes that there is evidence to support a finding that the transfers at issue were in connection with the sale of commodity contracts, as defined by Section 761(4) and thus likely protected from avoidance pursuant to Section 546(e). Thus, because the transfers are likely protected from avoidance by the safe-harbor provisions, the Examiner has found the evidence does not support the existence of a colorable claim for their avoidance.

### h)   Avoidance Analysis of LBHI Affiliate Payments to Insider Employees (Fourth Bullet)

#### (1)   Summary

In connection with bullet four of the Examiner Order, which asks whether any LBHI Affiliate has colorable claims against LBHI or any other entities for potentially voidable transfers, the Examiner identified and investigated potential constructively fraudulent transfers made by LBHI Affiliates to insider employees.[6937]

The Examiner analyzed these transfers as potential constructively fraudulent transfers under Section 548 of the Bankruptcy Code, rather than as potential preferences

---

[6936] *See Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.),* No. 08-2616, 2009 WL 4912137, at *4 (3d Cir. Dec. 22, 2009) (safe harbors not intended to exclude privately held securities transactions); *Contemporary Indus.,* 564 F.3d at 986 (safe harbors are not limited to public securities transactions, nor is there a requirement that the financial intermediary involved have a "beneficial interest"); *QSI Holdings,* 571 F.3d at 550 (same) *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 952 F.2d 1230, 1240 (10th Cir. 1991) (*Kaiser II*) (rejecting notion that safe-harbor protected payments only to extent recipient was a participant in the clearance and settlement system).

[6937] Examiner Order at p. 3, fourth bullet.

under Section 547 of the Bankruptcy Code, because there was insufficient evidence to establish a finding that the respective LBHI Affiliates were insolvent at the time of the transfers. In addition, the Examiner did not investigate transfers made by LBHI to insider employees since that was not within the scope of the Examiner Order. Finally, the Examiner did not investigate transfers that constituted annual discretionary performance bonuses paid to insider employees on January 31, 2008 for the 2007 performance year[6938] because such transfers fell outside the pertinent statutory requirements for both preferences and fraudulent conveyances.

The transfers identified and investigated by the Examiner included severance payments LBHI Affiliates paid to insider employees pursuant to separation agreements, as well as bonus buyouts and bonuses guaranteed at hiring to insider employees made pursuant to employment contracts. The Examiner concludes that an argument can be made that certain transfers made by LOTC may be constructively fraudulent and avoidable pursuant to Section 548(a)(1)(B)(ii)(IV) of the Bankruptcy Code because the transfers were made (1) for less than reasonably equivalent value, (2) to or for the benefit of an insider, (3) under an employment contract and (4) not in the ordinary course of business.

Although the Examiner was not asked to investigate or make conclusions with respect to LBHI's transfers to insider employees, the Examiner does note two

---

[6938] *See e.g.,* Global Notes Pertaining to Debtors' Schedules and Statements, at 36-40, *In re Lehman Bros. Holdings, Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Mar. 13, 2009) (the "LOTC SOFA").

substantial transfers that LBHI made to Richard Fuld and Joseph Gregory two months

prior to LBHI's bankruptcy.  The Examiner sets forth the information gathered with

respect to these transfers, including evidence that appears to support a finding that

LBHI received reasonably equivalent value in exchange for those transfers.

## (2)  Methodology

Transfer information was collected from the Debtors' Statements of Financial

Affairs, Schedules 3c ("SOFA 3c"), which sets forth a list of payments made to insiders

within one year before bankruptcy.[6939]  The Debtors' SOFA 3cs revealed that the Debtors

made 47 different types of transfers to insiders during this period.[6940]  These transfers

fell within two major categories:  (1) payments made pursuant to employment contracts

and (2) non-contract-related payments.  For employment contract-related payments, the

Examiner focused on payments to insiders exceeding $50,000 in the applicable twelve-

---

[6939] The Examiner recognizes that the fraudulent transfer period extends back two years from the respective petition dates (2006-2008).  Because SOFA 3cs were not available during the first twelve months of such period (2006-2007), the Examiner would have had to derive the necessary payment data from the Debtors' accounting systems and underlying contractual documentation.  In light of the considerable time and expense necessary to do so, the Examiner limited the analysis to the 2007-2008 twelve-month period.

[6940] The Examiner confirmed that the insiders identified in the SOFA 3cs were insiders as defined under the Bankruptcy Code.  The SOFA 3cs define insiders as follows:  "[F]or its response to Statement questions 3c and 21, (i) LBHI has listed members of its Board of Directors and all employees that are, or were, Executive Officers (Chairman and Chief Executive Officer, Chief Financial Officer, Chief Administrative Officers, President and Chief Operating Officer, and Chief Legal Officer) and Global Heads and (ii) the remaining Debtors have listed Presidents, and certain Directors, Managing Directors, Senior Vice Presidents, and Vice Presidents, as appropriate for their particular personnel structure."  LOTC SOFA at 4; *see also id.* at 9 (citing 11 U.S.C. § 101 for the definition of "insider," but noting that a narrower list of insider employees was disclosed in view of the large number of employees who would have otherwise met the statutory definition of insider).  The Debtors' definition of "insider" is consistent with how the term is defined in the Bankruptcy Code.  11 U.S.C. § 101(31)(B) (defining "insider" to include, *inter alia,* "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . . .").

month time period leading up to each Debtor's respective petition date.  For the non-contract-related payments, the Examiner focused on payments to insiders exceeding $50,000 between the date on which there was sufficient evidence to establish a finding that the respective Debtor had unreasonably small capital and the date that entity filed its bankruptcy petition.

To understand these transfers, the Examiner collected and reviewed employment agreements, separation agreements, limited partnership agreements, Compensation Committee meeting minutes, employment manuals, expense memoranda, expense summary reports, receipts, and other relevant documentation.[6941]  The Examiner also conducted interviews with current and former Lehman employees.

### (3)  Applicable Legal Standards

Constructively fraudulent transfers may be avoided pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and under state law.[6942]  The Bankruptcy Code requires, as a threshold matter, that the potentially avoidable transfer have been made within two years of the debtor's petition date[6943] and that the debtor received less than reasonably equivalent value in exchange for such transfer.[6944]  Section 548 then sets

---

[6941] The Examiner notes that the Debtors were unable to produce all relevant employment contracts, including hiring and separation agreements, as well as other supporting documentation for many of the payments to insiders identified in the Debtors' respective SOFAs.

[6942] The Examiner did not review the payments discussed herein under state law.  *See* 11 U.S.C. § 544(b).  For a more detailed discussion of the law of fraudulent transfers, see Appendix 1, Legal Issues, at Sections IV.A., IV.C.

[6943] 11 U.S.C. § 548(a)(1).

[6944] 11 U.S.C. § 548(a)(1)(B)(i).

forth four alternative subsections outlining the factual scenarios under which a

particular transfer may be avoided, assuming the threshold requirements are met.  Two

of the subsections have potential relevance here.

Subsection II, relevant to the non-contract-related payments, allows for

avoidance when, at the time of transfer, the debtor had unreasonably small capital.[6945]

Subsection IV, relevant to the payments made pursuant to employment contracts,

allows for avoidance regardless of the financial condition of the Debtor when the

transfer was made (1) to or for the benefit of an insider, (2) under an employment

contract and (3) not in the ordinary course of business.[6946]   The relevant elements of

Section 548(a) are discussed below.

**"Reasonably Equivalent Value" as Used in Section 548(a)(1)(B)(i).**    The

Bankruptcy Code does not define "reasonably equivalent value" as that term is used in

Section 548(a)(1)(B)(i).[6947]   Courts interpreting this term, however, have indicated that

determination of whether a debtor received reasonably equivalent value is a two-step

---

[6945] 11 U.S.C. § 548(a)(1)(B)(ii)(II) (allowing for avoidance when the debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital").

[6946] 11 U.S.C. § 548(a)(1)(B)(ii)(IV) (allowing for avoidance when the debtor "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business").

[6947] *See, e.g., Official Employment-Related Issues Comm. of Enron Corp. v. Arnold (In re Enron Corp.)*, 2005 Bankr. LEXIS 3261, at *120 (Bankr. S.D.N.Y. Dec. 9, 2005); *Congrove v. McDonald's Corp. (In re Congrove)*, 45 Bankr. Ct. Dec. 59 at *9 (B.A.P. 6th Cir. 2005) (non-precedential); *see also* 11 U.S.C. § 101 (providing no definition for "reasonably equivalent value").

analysis: "(1) did the debtor receive value, and (2) was the payment reasonably equivalent to the value extended?"[6948]

If the debtor received "at least some value," reasonably equivalent value is then analyzed based upon the totality of the circumstances,[6949] which is a fact-intensive inquiry.[6950]   Courts have articulated a number of factors that may be considered under the "totality of the circumstances" analysis.   These include: (1) the fair market value of the benefit received from the transfer; (2) whether an arm's-length relationship existed between the debtor and the transferee; (3) "the economic circumstances and relationship of the parties"; and (4) "industry standards."[6951]   Moreover, whether a payment was reasonably equivalent to the value extended does not have to be "precisely calculated."[6952]   Rather, the issue is "whether the debtor got roughly the value it gave."[6953]   Courts have examined these and other factors in determining the existence of reasonably equivalent value in a variety of circumstances that appear relevant here.

---

[6948] *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 813 (Bankr. E.D. Va. 1999); *see also Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-13 (3d Cir. 2006).

[6949] *Id.* at 212-13.

[6950] *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.)*, 350 B.R. 559, 577 (Bankr. N.D. Okla. 2005).

[6951] *In re Fruehauf Trailer Corp.*, 444 F.3d at 213 (factors (1) and (2)); *Brandt v. nVidia Corp. (In re 3DFX Interactive, Inc.)*, 389 B.R. 842, 863 (Bankr. N.D. Cal. 2008) (factors (3) and (4)) (citations omitted).   *In re Fruehauf Trailer Corp.* recites an additional factor, "the transferee's good faith."  444 F.3d at 213.   However, at least one bankruptcy court in the Second Circuit has held that this factor is not relevant under Section 548.   *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 106-07 (Bankr. S.D.N.Y. 1999).

[6952] *In re Fruehauf Trailer Corp.*, 444 F.3d at 205.

[6953] *Id.*

For example, in holding that certain bonuses were avoidable due to lack of reasonably equivalent value, the bankruptcy court in *Arnold* considered, *inter alia*, that (1) the debtor knew that the profits from which to pay bonuses "would be significantly lower than in prior years or non-existent;" (2) certain defendants were aware that Enron would soon declare bankruptcy; (3) bonuses were "substantially higher" than in the preceding year, which was considered Enron's best; and (4) the bonuses were paid immediately and absent negotiation.[6954]  The court further agreed with expert testimony that "performance bonuses should not go up when performance goes down."[6955]  Bonus payments have also been avoided where, among other reasons, there was no explanation as to how the bonus amounts were calculated.[6956]  In holding that a modification to a pension plan lacked reasonably equivalent value and was therefore fraudulent, the court in *In re Fruehauf Trailer Corp.* noted that (1) the modification cost twice the amount of what a retention plan should cost (*i.e.*, the retention plan was not purchased for fair market value); (2) the "benefits inured substantially to corporate insiders"; and (3) the modification was reviewed by those who would gain most, suggesting that the modification was not conducted at arm's length.[6957]

---

[6954] *Arnold*, 2005 Bankr. LEXIS 3261, at *122-23.

[6955] *Id.* at *123.

[6956] *Lichtenstein v. Buttery (In re Computer Personalities Sys.)*, 2002 Bankr. LEXIS 1625, at *16 (Bankr. E.D. Pa. 2002).

[6957] 444 F.3d at 215-16.

The Examiner notes that the Second Circuit has not addressed whether a debtor has received reasonably equivalent value with respect to pre-petition severance payments in the context of Section 548 of the Bankruptcy Code.[6958]  As such, the Examiner has relied upon the "totality of the circumstances test."

**"Employment Contract" as Used in Section 548(a)(1)(B)(ii)(IV).**    Section 548(a)(1)(B)(ii)(IV) requires the transfer to be made "under an employment contract." To date, there are no reported decisions interpreting the term "employment contract" for purposes of this Section, nor is this term defined in the Bankruptcy Code.[6959] Notably, neither the Bankruptcy Code nor case law provides insight into whether an

---

[6958] The Second Circuit and others have extensively addressed separation agreements in the post-petition setting, namely whether a post-petition severance payment is entitled to priority as an administrative expense.  In *Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Brotherhood of Elec. Workers, AFL-CIO (In re Straus-Duparquet)*, the Second Circuit held that such post-petition severance payments are earned at the time of severance.  386 F.2d 649, 651 (2d Cir. 1967) (holding that employees had earned severance pay when terminated during pendency of bankruptcy were entitled to administrative claim, because such payment served to "recompense [them] for certain losses attributable to dismissal" (citation omitted)); *see also Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 174-75 (2d Cir. 2007).  Courts in other circuits, however, have held that such payments are earned over the course of employment. *See, e.g., United Steelworkers of Am., AFL-CIO, CLC v. Ohio Corrugating Co. (In re Ohio Corrugating Co.)*, 116 B.R. 572, 579 (Bankr. N.D. Ohio 1990); *In re Chicago Lutheran Hosp. Ass'n*, 75 B.R. 854, 856 (Bankr. N.D. Ill.). These cases have limited applicability to the pre-petition severance payments at issue here because (1) they address post-petition severance payments and (2) the *Duparquet* line of cases may be limited to an analysis of more modest severance payments than those at issue here.  *See, e.g., In re Hooker Investments, Inc.*, 145 B.R. 138, 146-150 (Bankr. S.D.N.Y 1992) (questioning vitality of *Duparquet* line of cases in view of intervening changes to the Bankruptcy Code and Supreme Court precedent, noting that the Second Circuit's rule conflicts with other circuits, and explaining that the rule may have "no continuing vitality when applied to high-powered, high-priced executives with individually negotiated contracts providing for substantial termination payments"); *cf. In re Jamesway Corp.*, 199 B.R. 836, 839-40 (Bankr. S.D.N.Y. 1996).

[6959] *See In re WorldCom, Inc.*, 361 B.R. 675, 681 (Bankr. S.D.N.Y. 2007); *see also* 11 U.S.C. § 101 (providing no definition for "employment contract").

agreement at the time of separation, as opposed to at the time of employment, constitutes an "employment contract" for purposes of Section 548(a)(1)(B)(ii)(IV).

While the text of the statute does not indicate whether separation agreements are a type of employment contract, the legislative history of Section 548(a)(1)(B)(ii)(IV) suggests that separation agreements could be interpreted to fall within the ambit of employment contracts. The legislative history generally notes that subsection IV was added to "make it easier for a trustee to avoid prepetition transfers."[6960] Moreover, Congress added subsection IV "to enhance the recovery of avoidable transfers and excessive pre-petition compensation, such as bonuses, paid to insiders of a debtor."[6961] The types of transfers that Congress sought to avoid include "golden parachutes" and other payments made to a debtor's executives.[6962] And, as one court has noted, golden parachutes and separation agreements share certain key similarities, such that a golden parachute may be viewed as a type of severance pay.[6963]

In view of the legislative intent behind Section 548(a)(1)(B)(ii)(IV) that suggests that this provision be construed broadly so as to facilitate the recovery of "excessive pre-petition compensation," the Debtors' severance payments made pursuant to

---

[6960] H.R. REP. NO. 109-31(I), § 1402 (2005).

[6961] *Id.*

[6962] *See* 5 Collier on Bankruptcy, ¶ 548.05[5] (15th ed. 2005). At the same time, "regular bonuses granted to a sales force, or to a division, will likely not be vulnerable under this section, even if the debtor did not receive reasonably equivalent value in exchange." *Id..*

[6963] *In re Hooker*, 145 B.R. at 149 ("Since the triggering events of a golden parachute include the severance of the employment relationship, characterization of a particular payment as a golden parachute would not preclude the possibility that a golden parachute could be viewed as a form of severance pay.").

separation agreements may be appropriately reviewed under subsection IV in the event that a court determined that such agreements qualify as "employment contracts."[6964]

**"Not in the Ordinary Course of Business" as Used in Section 548(a)(1)(B)(ii)(IV).**   As with the term "reasonably equivalent value," neither the Bankruptcy Code nor its legislative history provide any guidance as to how the term "not in the ordinary course of business" should be interpreted for purposes of Section 548(a)(1)(B)(ii)(IV).[6965]   Likewise, as of this writing, no Court has issued a decision interpreting this term for purposes of a constructive fraudulent transfer analysis.

Courts have interpreted "ordinary course of business" and related terms extensively in connection with preferences under Section 547,[6966] indicating that the ordinary course of business exception under Section 547(c)(2) is to be construed narrowly.[6967]   A narrow construction of the ordinary course of business exception in

---

[6964] The Examiner notes that the court *In re WorldCom* articulated a number of factors to consider in evaluating whether an agreement is an "employment contract" for purposes of 11 U.S.C. § 502(b)(7) (limiting the amount of a pre-petition claim arising from the termination of an employment contract). The *In re WorldCom* factors that support characterizing the agreements at issue here as "employment contracts" include:  (1) provision for compensation and benefits; (2) withholding for taxes and social security benefits; and (3) "constrain[t]s [on] the 'employee' from certain other activities."  361 B.R. at 682.

[6965] *See* 11 U.S.C. § 101 (providing no definition for "not in the ordinary course of business"); *see also* H.R. Rep. No. 109-31(I) (same).

[6966] For a more detailed discussion of the law of preferences, see Appendix 1, Legal Issues, at Section IV.D.

[6967] *Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 458 (Bankr. S.D.N.Y. 2007) ("Further, the [Section 547(c)(2)] defense is narrowly construed."); *see also Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir. 1996) ("Additionally, the defense should be narrowly construed."); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 96 B.R. 474, 476 (D.N.J. 1988) (noting that the court "should not give untrammeled access to section 547(c)(2), but should construe the statute narrowly").

Section 548(a)(1)(B)(ii)(IV) would likewise seem appropriate in view of Congress' intent to "make it easier" to recover "excessive prepetition compensation."[6968]

While the aim of the preference exception under Section 547(c)(2) is to leave ordinary financial relationships undisturbed, "the exception does not interfere with the goal of discouraging unusual action when the debtor is financially distressed and sliding into bankruptcy."[6969]  In addition, as particularly relevant here, the Bankruptcy Court for the Southern District of New York stated, in the context of whether severance payments were preferences, that "section 547(c)(2) is intended to protect recurring, customary trade transactions, but not one-time payments in settlement of contractual claims.  Thus, certain courts have refused to apply it when confronted with a single transaction between a creditor and a debtor."[6970]

Courts have noted that, as a general matter, evaluation of "ordinary course of business" under Section 547(c)(2) is a "peculiarly factual" analysis[6971] such that determination of whether a transfer occurred in the ordinary course of business depends on the "facts and circumstances surrounding the payments."[6972]

---

[6968] H.R. Rep. No. 109-31(I), at 154.

[6969] *Martin*, 376 B.R. at 459 (citing *McKay*, 84 F.3d at 1339-40).

[6970] *Id.* at 459-60; *see also id.* at 462-64 (not applying the ordinary course of business exception to severance payment); *see also Intercont'l Publ'ns, Inc. v. Perry (In re Intercont'l Publ'ns, Inc.)*, 131 B.R. at 550 (same).  The Examiner notes, however, that some courts have determined that a first-time transfer may be considered to have been within the ordinary course of business.  *See Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642-43 (7th Cir. 2003).

[6971] *McClarty v. Colletta (In re D.C.T. Inc.)*, 295 B.R. 236, 239 (Bankr. E.D. Mich. 2003).

[6972] *Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.)*, 315 B.R. 259, 284 (Bankr. E.D.N.Y. 2004) (citing *Tolz v. Signal Capital Corp.* (*In re Mastercraft Graphics, Inc.*), 157 B.R. 914, 919 (Bankr. S.D. Fla. 1993)); *see*

### (4) Findings

### (a) LBHI Affiliate Severance Payments[6973]

The Examiner's concludes that an argument can be made that severance payments made by LOTC to Director Mark C. Malin may be constructively fraudulent and avoidable pursuant to Section 548 of the Bankruptcy Code because they appear to have been made (1) for less than reasonably equivalent value, (2) to or for the benefit of an insider, (3) under an employment contract and (4) not in the ordinary course of business.

Malin had dual titles as a Director of LOTC[6974] and as a Vice President of LBHI.[6975] For his services in 2007, his previous full year at Lehman, Malin received $200,000 in base pay and $2.7 million in additional compensation.[6976] Pursuant to his May 13, 2008 separation agreement, Malin was to receive a total of $790,000 from LOTC in payments over two dates. Malin was to receive a $250,000 payment about four weeks after his "successful completion of [a] transition period," (the period from May 13, 2008 to July

---

also, e.g., *Everlock Fastening Sys., Inc. v. Health Alliance Plan* (*In re Everlock Fastening Sys.*), 171 B.R. 251, 254 (Bankr. E.D. Mich. 1994) (applying totality of circumstances test in evaluating ordinary course of business defense); *Richardson v. Phila. Hous. Auth. (In re Richardson)*, 94 B.R. 56, 62 (Bankr. E.D. Pa. 1988) (same).

[6973] For the severance payments discussed herein, the Examiner requested additional supporting documentation, including Malin's hiring agreement, but such information was not obtained.

[6974] LOTC SOFA at 37.

[6975] Statement of Financial Affairs of Lehman Brothers Holdings Inc., at 338, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 13, 2009) (hereinafter "LBHI SOFA").

[6976] Debtors' PeopleSoft HR System; e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather McArn, Jenner & Block, *et al.* (Jan. 4, 2010) (hereinafter "Sheridan E-mail"). Of Malin's $2.7 million in additional compensation, $1,250,000 was in cash and $1,450,000 was in stock. *Id.*

31, 2008), and "an additional lump separation payment" of $540,000 in January 2009.[6977]

In addition, Malin would continue to receive his regular salary through the earlier of

August 13, 2009 or his employment with another firm.[6978]   Finally, Malin's agreement

provided no details concerning any entitlement to equity awards.[6979]

In fact, LOTC paid Malin $250,000 on August 26, 2008, $135,000 on September 19,

2008, and a total of $50,000 in regular salary in payments between June and September

2008.[6980]   The Examiner notes that the $135,000 payment is exactly twenty five percent of

the $540,000 "additional lump sum separation payment" payable in January 2009

---

[6977] Letter from Anthony J. Collerton, Managing Dir., Lehman, to Mark Malin, Dir., Lehman, re: separation from employment (May 13, 2008) [LBEX-AM 340331], at ¶¶ 5, 6 (hereinafter "Malin Agreement"); LOTC SOFA at 37.

[6978] Malin Agreement, ¶¶ 2, 4 [LBEX-AM 340331].

[6979] However, Malin did receive equity awards at the time of his termination.  The Examiner's review of Malin's Executive Compensation Summary and Lehman's annual equity benefits plans setting forth eligibility and vesting provisions indicates that Malin's equity awards at termination were consistent with those benefits plans.  In more detail, prior to July 31, 2008, Malin had 15,327 vested restricted stock units ("RSUs") valued at approximately $264,207, and 6,850 stock options having no value at that point in time because their exercise price was above Lehman's stock price.  Pursuant to Lehman's policies set forth in its annual equity benefits plans for employees involuntarily terminated without cause, Malin became entitled as of his termination date to additionally receive vesting of 86,142 RSUs valued at approximately $1,493,707, and to exercise 24,417 options that, however, had no value at that point in time because their exercise price was higher than Lehman's stock price.  Lehman Brothers, Mark C. Malin Executive Compensation Summary as of September 12, 2008 [LBEX-AM 5641402]; Lehman Brothers, 2003 Equity Award Program Managing Director,  pp. 3, 9 [LBEX-AM 5641446]; Lehman Brothers, 2004 Managing Director Equity Award Program, p. 2 [LBEX-AM 5641442]; Lehman Brothers, 2005 Equity Award Program for Bonus-Eligible and Production-Based Employees, pp. 4, 8 [LBEX-AM 5641430]; Lehman Brothers, 2006 Equity Award Program for Bonus-Eligible and Production-Based Employees, pp. 4, 9 [LBEX-AM 5641417]; Lehman Brothers, 2007 Equity Award Program, pp. 2, 5 [LBEX-AM 5641408]; Lehman Brothers, 2003 Stock Option Award, p. 2 [LBEX-AM 5641466]; Lehman Brothers, 2004 Stock Option Award, p. 2 [LBEX-AM 5641404].  The Examiner notes that pursuant to Lehman's annual equity benefits plans, Malin would have received the same quantities and values of RSUs and stock options had he voluntarily terminated.  The Examiner also notes that Malin could not have received value for his RSUs at the time of his termination because, though they were vested, they were not issued.

[6980] LOTC SOFA at 37.

pursuant to his separation agreement.[6981]  In exchange for his payments and continued salary, Malin agreed (1) to remain an active employee for approximately two and a half months, (2) not to disparage Lehman and (3) to release Lehman from any employment-related claims.[6982]

**Reasonably Equivalent Value**.  The Examiner's review of the circumstances surrounding Malin's severance payments indicates that the conditions that Malin agreed to perform in his separation agreement may not have provided LOTC with "roughly the value it gave" in exchange for its payments.[6983]

Foremost, Malin was free to take employment at another firm at any point in time, yet would nonetheless "remain eligible" to receive the $250,000 and $540,000 separation payments.[6984]  Because Malin would not forfeit his separation payments even if he commenced employment at a different firm, he effectively did not provide LOTC with any guaranteed period of non-competition.[6985]  Had Malin been required to remain

---

[6981] The Examiner notes that the $135,000 payment could also represent a lump sum payment for the remainder of Malin's regular salary through August 13, 2009, minus applicable withholding.  Malin Agreement, ¶ 10 [LBEX-AM 340331].  Yet, pursuant to his agreement, Malin was only to receive his regular salary in a lump sum in the event that he became employed by another firm.  *Id.*  The Examiner also notes that both the $250,000 and the $135,000 payment are listed in the LOTC SOFA as "LB Special Term Pay," and that the term "special term" is used by LBHI to denote separation payments for other insider employees.  *See* LBHI SOFA at 246, 253.

[6982] Malin Agreement ¶ 3, Disparaging Remarks, Complete Release [LBEX-AM 340331].

[6983] *In re Fruehauf Trailer Corp.*, 444 F.3d at 205.

[6984] Malin Agreement, ¶ 10 [LBEX-AM 340331].  Moreover, Malin was only required to be "on call" during regular business hours during his transition period, and did not have to appear in the office otherwise.  *Id.* at ¶ 3.

[6985] In the course of the Examiner's investigation of potentially constructive fraudulent transfers made by LBHI Affiliates to insider employees, the Examiner received and reviewed information concerning severance payments made by LBHI to several insider employees.  The Examiner notes that, unlike Malin,

at LOTC or to have been unable to compete for a specific duration, his severance payments could be viewed as approximating the compensation Malin would otherwise have been paid for that same duration.[6986]

Moreover, Malin was aware of Lehman's failing financial condition and, by September 15, 2008, LBHI's bankruptcy. At the time Malin received the August 26, 2008 ($250,000) severance payment, LBHI was twenty days from filing its bankruptcy petition. At the time Malin received the accelerated September 19, 2008 ($135,000) severance payment, LBHI had already filed for bankruptcy. Courts have avoided bonus payments to insiders as lacking reasonably equivalent value where, in part, the parties were aware of the debtor's declining financial condition.[6987]

In addition, several courts have indicated that payments to insiders suggest the absence of an arm's length transaction between the debtor and its creditor, such that the

---

[6985] the LBHI insider employees were required to not compete with or disparage Lehman for the periods of time between their separation agreements and their severance payments. These insider employees would forfeit their severance payments if they commenced other employment prior to the scheduled payment dates. *See, e.g.,* Letter from Tracy Binkley, Managing Dir., Lehman, to Michael Gelband, Global Head, Lehman, re: separation from employment (May 1, 2007), at p. 2 [LBEX-AM 340311]; Letter from Tracy Binkley, Managing Dir., Lehman, to Alex Kirk, Co-Chief Operating Officer, Lehman, re: separation from employment (Feb. 4, 2008), at pp. 1-2 [LBEX-AM 340324].

[6986] Malin's total compensation for his previous full year was $2.9 million. Sheridan E-mail. For example, if Malin's agreement had a six month non-compete, a severance agreement of about $1.5 million could be viewed as approximating the compensation he otherwise would have earned during that time.

[6987] The court in *Arnold* avoided bonus payments to insiders as lacking reasonably equivalent value in part because "it was obvious to defendants and Enron that Enron's 2001 profits, if any, from which to pay any 2001 bonuses would be significantly lower than in prior years or non-existent." *Arnold*, 2005 Bankr. LEXIS 3261, at *122.

debtor has not received reasonably equivalent value in the course of the transaction.[6988]

Finally, the non-specific releases from claims or litigation contained in Malin's separation agreement do not appear to have provided LOTC with any significant value.[6989]  The Examiner in *In re Revco D.S., Inc.* questioned the value provided by such releases because they "did not relate to any specific claims or litigation."[6990]

**To or For the Benefit of an Insider Under an Employment Contract**.  The Examiner finds that, as a director of LOTC, Malin was likely an insider.[6991]  The Examiner also finds that, consistent with the legislative intent behind Section 548(a)(1)(B)(ii)(IV), Malin's separation agreement may be considered an employment contract.[6992]

**Not in the Ordinary Course of Business**.  While no court has interpreted "not in the ordinary course of business," the Examiner finds that the timing of Malin's severance payments does not appear to be ordinary.  The payments were made just prior to and just following LBHI's bankruptcy.  Moreover, the $135,000 September 19, 2008 payment was not made in accordance with Malin's separation agreement.  Such

---

[6988] *See, e.g., In re Fruehauf Trailer Corp.*, 444 F.3d at 216 (holding that benefit of amendment to pension plan reviewed and approved by insiders lacked reasonably equivalent value in part due to lack of arm's length transaction); *In re Computer Personalities Sys.*, 2002 Bankr. LEXIS 1625, at *14.

[6989] Malin Agreement, ¶ Complete Release [LBEX-AM 340331].

[6990] 1990 Bankr. LEXIS 2966, pt. 1 at *130 (Bankr. N.D. Ohio 1990).  The Examiner also notes that the separation agreements do not contain evidence of any calculation in support of the amounts of the severance payments.  The bankruptcy court in *In re Computer Personalities Sys.* held that a bonus lacked reasonably equivalent value in part due to the absence of evidence for its calculation.  2002 Bankr. LEXIS 1625, at *16.

[6991] LOTC SOFA at 4.

[6992] H.R. REP. NO. 109-31(I), § 1402 (2005).

payment, if it represented a portion of the $540,000 payable in January 2009, was paid more than three months in advance of the date set forth in Malin's separation agreement.[6993]    And if the $135,000 payment was not made pursuant to Malin's agreement, then it also appears to have been made not in the ordinary course of business.  Finally, in *Martin*, the U.S. Bankruptcy Court for the Southern District of New York stated, in the context of analyzing potential preferences, that one-time transfers such as severance payments are not "recurring, customary trade transactions" for which the ordinary course of business defense under Section 547 applies.[6994]

### (b)  LBHI Affiliate Bonus Payments

The Examiner concludes that there does not appear to be sufficient evidence to support colorable claims that bonus guarantees at hiring and bonus buyouts paid by LBHI Affiliates pursuant to employment contracts were constructively fraudulent and avoidable pursuant to Section 548 of the Bankruptcy Code.

Certain LBHI Affiliate insiders received bonus guarantees at hiring.  On January 31, 2008, LBDP paid Managing Director Locke Randall McMurray a $567,529 bonus guarantee at hiring pursuant to a June 27, 2007 employment contract.[6995]  On that same

---

[6993] Malin Agreement, ¶ 6 [LBEX-AM 340331].

[6994] *Martin*, 376 B.R. at 459 (citing *McKay*, 84 F.3d at 1339-40).

[6995] Letter from Scott Willoughby, Managing Dir., Lehman, to Locke McMurray, Managing Dir., Lehman, re: employment contract (June 27, 2007) [LBEX-AM 023996] (hereinafter "McMurray Agreement"); Global Notes Pertaining to Debtors' Schedules and Statements, at 31, *In re Lehman Bros. Holdings, Inc.*, No. 08-13899 (Bankr. S.D.N.Y. Mar. 13, 2009), (hereinafter "LBDP SOFA").

date, BNC Mortgage paid Managing Director Thomas Noto a $621,669 bonus guarantee at hiring pursuant to an April 2, 2007 employment contract.[6996]

McMurray and Noto also received bonus buyouts pursuant to their employment contracts. On September 21, 2007, McMurray received a $78,770 bonus buyout from LBDP pursuant to a June 27, 2007 employment contract.[6997] McMurray's employment contract provided him with this compensation in the form of "special cash awards" because McMurray would "forfeit certain [] awards as a result of [his] separation . . ." from his previous employer.[6998]

Similarly, on October 5 and December 28, 2007, Noto received a total of $1,219,167 from BNC Mortgage pursuant to an April 2, 2007 employment contract.[6999] Noto's contract provided him with compensation in the form of "Special Cash Awards" because Noto would "forfeit certain long-term incentive payments as a result of [his] separation . . ." from his previous employer.[7000] Noto's contract additionally provided him with $816,667 in the event of the sale or transfer of the stock or assets of his former

---

[6996] Letter from Scott Kimmel, Managing Dir., Lehman, to Thomas Noto, Dir., Lehman, re: employment contract (Apr. 2, 2007) [LBEX-AM 024128] (hereinafter "Noto Agreement"); Global Notes Pertaining to Debtors' Schedules and Statements, at 31, *In re Lehman Bros. Holdings, Inc.*, No. 09-10137 (Bankr. S.D.N.Y. Mar. 13, 2009) (hereinafter "BNC SOFA"). The Examiner notes that Noto is identified on BNC's Schedule 3c, though his hiring agreement indicates that he is an employee of LBI.

[6997] McMurray Agreement at p. 3 [LBEX-AM 023996]; LBDP SOFA at 31.

[6998] McMurray Agreement at p. 3 [LBEX-AM 023996].

[6999] Noto Agreement at p. 2 [LBEX-AM 024128]; BNC SOFA at 31.

[7000] Noto Agreement at p. 2 [LBEX-AM 024128].

employer, Ameriquest.[7001]   Ameriquest was sold to Citigroup on or around August 31, 2007.[7002]

The Examiner concludes that there is insufficient evidence to support colorable claims that transfers made by LBDP and BNC Mortgage were constructively fraudulent and avoidable pursuant to Section 548 of the Bankruptcy Code because LBDP and BNC Mortgage appear to have received reasonably equivalent value in exchange for the respective bonus payments.

McMurray and Noto's bonus buyouts and bonus guarantees at hiring appear to have served as inducements for them to leave their prior employment and to come work for LBDP and BNC Mortgage, respectively.[7003]   The Examiner also notes that McMurray and Noto's employment contracts specify what each insider forewent in leaving his prior employment, and how the particular bonus buyout was meant to compensate for that loss.[7004]

### (c)  LBHI's Assumptions of Limited Partnership Interests

The Examiner notes that LBHI assumed certain Fuld and Gregory limited partnership interests prior to LBHI's bankruptcy.   Specifically, approximately two

---

[7001] *Id.*

[7002] The amounts presented in Noto's employment contract dated April 2, 2007 were exactly 5% higher than the bonus buyout amounts disbursed to him.  The Examiner does not perceive this difference to materially impact the analysis.

[7003] *In re Intercont'l Publ'ns, Inc.,* 131 B.R. at 549 (holding that bonus payments were made in exchange for reasonably equivalent value in part when those payments were "necessary and reasonable to induce [the employee] to work for [them]").

[7004] *Cf. In re Computer Personalities Sys.,* 2002 Bankr. LEXIS 1625, at *16 (holding that a bonus lacked reasonably equivalent value in part due to the absence of evidence for its calculation).

months prior to the date of LBHI's bankruptcy petition, Fuld and Gregory received, by wire transfer from LBHI, cash payments in exchange for their individual ownership interests in limited partnerships.[7005] Significantly, both Fuld and Gregory sold their limited partnership interests to LBHI because they apparently faced financial difficulties and needed liquidity.[7006] Fuld noted that he sold his limited partnership interests rather than his stocks for fear of sending negative signals to the market.[7007] The Board employed this same reasoning in approving Fuld and Gregory's sale of their limited partnerships in lieu of stock.[7008] Before analyzing whether these payments constitute constructively fraudulent transfers, it is first necessary to understand how the partnership funds operated.

---

[7005] Those partnership funds were "Lehman Brothers Capital Partners I," "Lehman Brothers Capital Partners II," "Lehman Brothers Capital Partners III," "Lehman Brothers Capital Partners IV," "Lehman Brothers Merchant Banking Capital Partners VI (Global)," "Lehman Brothers Merchant Banking Capital Partners VI (Europe)," "Lehman Brothers Venture Capital Partners I," "Lehman Brothers Venture Capital Partners II," "Lehman Brothers Venture Capital Partners II (Escrow)," "Lehman Brothers Communication Capital Partners I," "Lehman Brothers Partnership Account 2000/2001, L.P.," "Lehman Brothers MLP Opp Cap Partners," and "Lehman Brothers Loan Opp Group Fund." Debtors, DF-JG Buyout Analysis, at pp. 2-9 [LBEX-AM 312390]; *see also* Debtors, Entries related to Richard Fuld & Joseph Gregory's Partnership Interest Disbursements (hereinafter "Disbursement Schedule") [LBEX-AM 312400]; Lehman Brothers, Assumption Agreement at p. 5 (hereinafter "Fuld Assumption Agreement") [LBEX-AM 154086]; Lehman Brothers, Assumption Agreement, at p. 6 (hereinafter "Gregory Assumption Agreement") [LBEX-AM 154232]; Memorandum of Conference between B. McCarthy and A. Rao, Alvarez & Marsal, and T. Fleming, Duff & Phelps, *et al.* (Oct. 1, 2009), at p. 2; Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and A. Kopelman, Jenner & Block, *et al.* (Oct. 20, 2009), at p. 1.
[7006] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at pp. 4, 16; Examiner's Interview of John Akers,  Apr. 22, 2009, at p. 9.
[7007] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at pp. 4, 16.
[7008] LBHI, Minutes of the Compensation and Benefits Committee, June 19, 2008, at p. 5 [LBEX-AM 003769] (discussing "potential disclosure implications" for a contemplated loan to "certain senior executives." *See also* LBHI, Minutes of the Compensation and Benefits Committee, July 1, 2008, at pp. 4-5 [LBEX-AM 003812] (discussing "Loan and Liquidity for Certain Executives").

The Debtors offered certain employees the opportunity to participate in employee-only investment funds structured as limited partnerships (hereinafter "employee-only funds").[7009]  These funds were only available to employees who were "accredited investors,"[7010] and included up to approximately 1,200 participants at a given time.[7011]  With one exception, the assets in those funds were identical to those in investment funds offered to third-party accredited investors by LBHI's Private Equity group (hereinafter "third-party funds").[7012]

Significantly, the limited partnership interests were considered "illiquid" investments.[7013]  The interests typically had ten-year terms and were not designed to be readily redeemed.    Indeed, a buyback of interests normally occurred only if a

---

[7009] Participation in limited partnerships required a commitment to invest a certain dollar amount in the fund.  Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and A. Kopelman, Jenner & Block, *et al.* (Oct. 20, 2009), at p. 1.  This amount was not collected in full at the initial funding.  *Id.*  Rather, portions of it were "called" or collected at various times from the initial funding onward.  *Id.*  Failure to provide a contribution on a "call" resulted in "default," i.e., forfeiture of 25% of the participant's total investment (not total commitment) back to the fund.  *Id.*  In addition, even after a participant experienced a 25% forfeiture penalty, the fund still exercised full discretion over the interest and could subject that interest to further forfeiture penalties for missed capital calls going forward.  *Id.*  The ability to invest in the employee-only funds was subject to the Compensation and Benefits Committee, as participation in these funds was a benefit to the participants.  *See* LBHI, Minutes of the Compensation and Benefits Committee, July 1, 2008, at pp. 4-5 [LBEX-AM 003812].

[7010] *See* 17 C.F.R. § 230.501 (1989); Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and A. Kopelman, Jenner & Block, *et al.* (Oct. 20, 2009), at p. 1.

[7011] *Id.*

[7012] *Id.*; Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and J. Molenda, Jenner & Block, *et al.* (Nov. 6, 2009), at p. 1 (stating that Lehman Brothers Capital Partners III, L.P. fund held one unique asset not held by a third-party fund).

[7013] Memorandum of Conference between B. McCarthy and A. Rao, Alvarez & Marsal, and T. Fleming, Duff & Phelps, *et al.* (Oct. 1, 2009), at p. 1.

participant left the company or passed away.[7014]   The only way for a participant to

monetize an interest was to sell it to another employee participant, or to LBHI, an LBHI

Affiliate, or another Lehman entity.

As for valuation of the private assets within the third-party and employee-only

funds, prices were determined by an internal valuation committee, which included

personnel in charge of private equity and merchant banking, as well as representatives

from risk management and the relevant product controller groups.[7015]   As for valuation

of the public assets within the third-party and employee-only funds, pricing

information was obtained from publicly available pricing sources.   Because the internal

committee valued the common assets in the employee-only and third-party funds on a

consistent basis, the Examiner did not investigate further the valuation of the

component assets of the employee-only funds.

**Payment Recipients and Amounts.**   Against this backdrop, on July 17, 2008 Fuld

and Gregory received wire payments of $3,933,929 and $4,614,564, respectively, from

LBHI on its own behalf and on behalf of other non-Debtor entities in exchange for their

limited partnerships interests.   The Compensation and Benefits Committee authorized

---

[7014] *Id.*; Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and J. Molenda, Jenner & Block, *et al.* (Nov. 6, 2009), at p. 1.

[7015] Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and A. Kopelman, Jenner & Block, *et al.* (Oct. 20, 2009), at p. 1; Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and J. Molenda, Jenner & Block, *et al.* (Nov. 6, 2009), at p. 1.

and directed LBHI's purchases of the interests.[7016]  The purchases of Fuld and Gregory's

interests appear to have been an exception to Lehman's rule that partnership interests

were not redeemable except on events such as death or severance.[7017]

**Analysis.**    The Examiner analyzed LBHI's purchases of Fuld and Gregory's

interests as potentially constructive fraudulent transfers under Subsection II of Section

548.[7018]

**Interest of the Debtor in Property.**    As a threshold matter, LBHI's purchases of

the Fuld and Gregory limited partnership interests involved a transfer "of an interest of

the debtor in property."    LBHI directly or indirectly funded the purchases of Fuld and

Gregory's limited partnership interests.    With respect to two of the funds, LBHI directly

purchased the limited partnership interests on behalf of itself as a general partner.[7019]

With respect to the remaining funds, LBHI indirectly funded the purchases of the

limited partnership interests by funding the general partners' purchases of those

interests.[7020]    In the latter case, LBHI then recorded intercompany receivables from each

---

[7016] Minutes from Compensation & Benefits Committee (July 1, 2008), at pp. 4-5 [LBEX-AM 003812]; *see also* Examiner's Interview of John Akers, Apr. 22, 2009, at p. 9 (discussing how LBHI Board of Directors did not want Fuld or Gregory to sell stock).

[7017] Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and A. Kopelman, Jenner & Block, *et al.* (Oct. 20, 2009), at p. 1 (stating that only Fuld and Gregory received limited partnership buyouts).  The only apparent exception to this rule was one buyout in which the owner of the limited partnership interests had divorced, and because the interests were not severable, Lehman agreed to purchase the interests.  *Id.*

[7018] 11 U.S.C. § 548(a)(1)(B)(ii)(II).

[7019] Fuld Assumption Agreement at p. 1 [LBEX-AM 154086]; Gregory Assumption Agreement at p. 1 [LBEX-AM 154232].

[7020] Disbursement Schedule, at p. 3 [LBEX-AM 312403].

of these general partners as a result of funding on their behalf.[7021]  As of November 2009, LBHI had not yet collected those receivables.[7022]

**Reasonably Equivalent Value.**  It appears that there is sufficient evidence to conclude that LBHI received reasonably equivalent value in exchange for the purchases of the Fuld and Gregory limited partnership interests.  LBHI valued the public assets in the employee-only investment funds in accordance with publicly available pricing sources.  LBHI valued the private assets in those funds in accordance with the values it derived by way of an internal valuation committee.  LBHI applied those private asset valuations consistently to both the employee-only investment funds and third-party funds available to accredited investors in the general public.

### 4. Examiner's Investigation of Possible Breaches of Fiduciary Duty by LBHI Affiliate Directors and Officers (Fifth Bullet)

This Section of the Report addresses the fifth bullet of the Examiner Order, which asks whether there exist any "colorable claims for breach of fiduciary duties and/or aiding or abetting any such breaches against the officers and directors of LBCC and/or other Debtors arising in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI Chapter 11 case on September 15,

---

[7021] *Id.*

[7022] Memorandum of Conference between B. McCarthy, Alvarez & Marsal, and J. Molenda, Jenner & Block, *et al.* (Nov. 6, 2009), at p. 1.

2008."[7023]    To carry out his investigation, the Examiner reviewed the actions of the officers and directors of the LBHI Affiliates[7024] and analyzed whether those officers and directors fulfilled or breached their fiduciary duties.  The Examiner concludes:

1. The evidence does not support the existence of colorable claims for breaches of fiduciary duty by the officers and directors of any of the LBHI Affiliates in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI Chapter 11 case.

2. The evidence does not support the existence of colorable claims for aiding and abetting a breach of fiduciary duty by the officers and directors of any LBHI Affiliates in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI Chapter 11 case.

Of the LBHI Affiliates considered in this Section, one entity – LCPI[7025] – was incorporated in New York, and the remaining seven entities – LOTC,[7026] LBDP,[7027] LBCC,[7028] BNC Mortgage LLC,[7029] LBFP,[7030] LBCS[7031] and LBSF[7032] – were incorporated in

---

[7023] Order signed on 1/16/09 Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 3, Docket No. 2659, *In re Lehman Brothers Holdings Inc., et al.*, No. 08-13555  (Bankr. S.D.N.Y. Jan. 16, 2009).

[7024] For this Section of the report the Examiner has excluded CES Aviation IX, CES Aviation V, CES Aviation and other LBHI Affiliate Single Purpose Entities.  Because these entities were relatively insignificant when compared to the other LBHI Affiliates, the Examiner concluded that it was an imprudent use of estate resources to investigate any potential claims further.  Thus, all references to LBHI Affiliates made in this Section III.B.4 should be construed as referring only to LOTC, LBDP, LBCC, BNC Mortgage LLC, LBFP, LBCS, LBSF and LCPI.
    This Section III.B.4 addresses only the fiduciary duties of the LBHI Affiliates enumerated above. It does not address the fiduciary duties of the directors and officers of LBHI, which is dealt with elsewhere in this Report.  See Section III.A.1 of this Report for a discussion of the fiduciary duties of the directors and officers of LBHI.

[7025] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL 027825].

[7026] Lehman, LOTC World Records Report (Sept. 15, 2008) [LBEX-LL 027852].

[7027] Lehman, LBDP World Records Report (Sept. 15, 2008)  [LBEX-LL 027856].

[7028] Lehman, LBCC World Records Report (Sept. 15, 2008) [LBEX-LL 027848].

[7029] Lehman, BNC Mortgage LLC World Records Report (Sept. 15, 2008) [LBEX-LL 027795].

[7030] Lehman, LBFP World Records Report (Sept. 15, 2008) [LBEX-LL 027860].

[7031] Lehman, LBCS World Records Report (Sept. 15, 2008) [LBEX-LL 027844].

Delaware. This Section first analyzes the actions taken by the directors and officers of

LOTC, LBDP, LBCC, BNC Mortgage LLC, LBFP, LBCS and LBSF under Delaware's

fiduciary duty laws. Then this Section analyzes the actions taken by directors and

officers of LCPI under New York's fiduciary duty laws. Finally, this Section analyzes

the actions taken by directors and officers of LBSF under Delaware's aiding and

abetting a breach of fiduciary duty laws.

### a) Fiduciary Duty Standard for a Wholly-Owned Affiliate Subsidiary under Delaware Law

Because LOTC, LBDP, LBCC, BNC Mortgage LLC, LBFP, LBCS and LBSF are

incorporated in Delaware, the actions of those entities are governed by Delaware law.[7033]

In Delaware, directors and officers have fiduciary duties of care, loyalty, and good

faith.[7034] Included in those duties are the duty to monitor and the duty of candor.[7035] The

fiduciary duties of the directors of a wholly-owned subsidiary normally flow directly to

the parent corporation as sole shareholder.[7036] Consequently, a director of a wholly-

owned subsidiary corporation may act in a way that benefits the parent but nonetheless

---

[7032] Lehman, LBSF World Records Report (Sept. 15, 2008) [LBEX-LL 027833].

[7033] *See Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 385-86 (3d Cir. 2007). Appendix 1, Legal Issues, at Section II.

[7034] *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (holding that fiduciary duties of officers are identical to those of directors); *See, e.g., Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356-63 (Del. Ch. 2008). Appendix 1, Legal Issues, at Section II.A.

[7035] *See, e.g., Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356-63 (Del. Ch. 2008). Appendix 1, Legal Issues, at Section II.A.

[7036] *See Anadarko Petrol. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

causes financial harm to the subsidiary, without violating that director's fiduciary duty.[7037]

The above analysis assumes, as it must, that the subsidiary is solvent when such actions are made. If the subsidiary is insolvent, however, the duties of the directors of the subsidiary cease to flow to the parent corporation and flow instead to the subsidiary corporation itself and, through the corporation, to its creditors and shareholders.[7038] If the subsidiary subsequently becomes insolvent, however, that does not retroactively call into question the propriety of actions taken for the benefit of the parent while the subsidiary was still solvent.[7039]

Regardless of solvency, to establish a breach of a duty, one must first overcome the presumption established by the business judgment rule. Under the traditional formulation of the business judgment rule as to directors, there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of

---

[7037] *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 366-67, n. 24 ("[T]here is nothing wrong (or even unusual) about a parent causing its wholly-owned subsidiary to act in a way that benefits the corporate family but harms the individual subsidiary.") (*citing Trenwick Am. Litig. Trust v. Ernst & Young.*, 906 A.2d 168, 192 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) ("[T]he final judgment of the Court of Chancery should be affirmed on the basis of and for the reasons assigned by the Court of Chancery. . . .")).

[7038] *In re Scott Acquisition Corp.*, 344 B.R. 283, 290 (Bankr. D. Del. 2006); *see also Trenwick*, 906 A.2d at 195, n. 75.

[7039] *Trenwick*, 906 A.2d at 202.

the company."[7040]  Thus, "a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'"[7041]

Directors or officers of an insolvent subsidiary still enjoy the protection of the business judgment rule in carrying out their duties, such that only grossly negligent actions or inactions will give rise to liability.[7042]  Insolvency does not subject directors to any greater scrutiny in acting on behalf of creditors than the scrutiny to which a director of a solvent corporation would be subjected in undertaking acts on behalf of its parent corporation.[7043]  While the party to whom the directors owe their fiduciary duties shifts upon insolvency, the degree of scrutiny applied to their actions and the applicability of the business judgment rule remains unchanged.[7044]

Directors or officers who hold obligations to parties other than the party to whom they owe fiduciary duties are not protected by the business judgment rule.[7045] The Delaware General Corporation Law, however, establishes that a transaction is not void or voidable solely because the party is interested if any one of the following three conditions is met: (1) the interested director's status is disclosed or known to the board of directors or committee, and the board authorizes the transaction; (2) the interested

---

[7040] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) (internal quotation marks omitted).

[7041] *Id.* (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); See Appendix 1, Legal Issues, at Section II.A.1 of this Report for a more detailed analysis of the business judgment rule.

[7042] *Trenwick*, 906 A.2d at 174.

[7043] *Id.* at 195, n. 75.

[7044] For a more detailed discussion of fiduciary duties of directors and officers of wholly-owned-subsidiaries, see Appendix 1, Legal Issues, at Section II.D.

[7045] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del.1993).

director's status is disclosed or known to the shareholders, and the transaction is approved in a good faith vote by the shareholders; or (3) the transaction is fair to the corporation.[7046] In *Trenwick*, the plaintiff – a litigation trust – attempted to argue that the directors and officers of the subsidiary were not disinterested in transactions with the parent corporation due to the directors' and officers' status as employees of the parent.[7047] At the point the subsidiary became insolvent, the litigation trustee argued, the directors were no longer disinterested in transactions with the parent because their relationship with the parent put them on both sides of the transaction.[7048] This placed the directors of the subsidiary in a position where their fiduciary duty to their parent-employer (transaction counterparty) conflicted with their fiduciary duty to the subsidiary's creditors. The court disagreed with the trustee's contention that the subsidiary was, in fact, insolvent at the time of the questioned transaction. The court did not reach the question of whether insolvency rendered the directors interested in a transaction with the parent but nonetheless commented in *dicta* that it was entirely reasonable in a parent-subsidiary relationship for the directors of the subsidiary to have a close relationship with the parent and interest in the parent's continued success.[7049]

The *Trenwick* Court recognized the unity of interest that exists between the directors of a wholly-owned subsidiary and the parent corporation when the subsidiary

---

[7046] Del. Code Ann. tit. 8, § 144(a)(1)-(3).

[7047] *Trenwick*, 906 A.2d at 200-01.

[7048] *Id.*

[7049] *Id.* at 201.

is solvent. However, where a director or officer of an insolvent subsidiary is also an

employee of the parent corporation, a court may find the loyalties of that director or

officer are divided between its parent-employer and its creditor-fiduciaries. A court

may find such director interested and not entitled to the business judgment rule's

protection. Absent the protection of the business judgment rule, a court would review a

transaction between parent and subsidiary under the heightened "entire fairness"

standard.

The entire fairness rule requires the court to take a stricter view of a challenged

transaction than under the more deferential business judgment rule. [7050] Under the

entire fairness standard, directors must show that the transaction was a product of fair

dealing and that the corporation received a fair price.[7051] The court will consider "all

relevant factors" to determine whether the transaction was fair.[7052] In order for a

transaction to satisfy entire fairness, directors must demonstrate "their utmost good

faith and the most scrupulous inherent fairness of the bargain."[7053] Hence, if a director is

interested, employment of proper procedures alone will not protect the director.

Applying the above-discussed framework, the Examiner analyzed the actions of

the LBHI Affiliates' directors and officers. The Examiner found five LBHI Affiliates –

LOTC, LBDP, LBCC, BNC Mortgage LLC, LBFP  – were solvent as of as May 31, 2008

---

[7050] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[7051] *Id.* 711.

[7052] *Id.*

[7053] *Id.*

and at least through August 31, 2008.[7054]   The Examiner concludes that, since directors and officers of wholly-owned subsidiaries owe duties to their parents while solvent, the evidence does not support the existence of a colorable claim for breaches of fiduciary duties by the directors and officers of these five LBHI Affiliates.

The Examiner found two LBHI Affiliates – LBCS and LBSF – to have been borderline solvent as of May 31, 2008 and as of August 31, 2008, meaning that their balance sheets showed assets just slightly in excess of liabilities and a minimal write-down of asset values or a small unaccounted for liability would render these entities insolvent.[7055]   Under Delaware law, becoming marginally solvent or entering the "zone of insolvency" does not broaden the fiduciary duties of a subsidiary's directors or officers to include a duty to creditors.[7056]   Rather, the directors and officers of a marginally-solvent wholly-owned subsidiary owe duties to their parents, just as would the directors and officers of a firmly solvent wholly-owned subsidiary.   For this reason, the Examiner concludes that the evidence does not support the existence of a colorable claim for breach of fiduciary duty against the directors and officers of LBCS or LBSF.

---

[7054] See Section III.B.3.c of this Report for an analysis of the solvency of the LBHI Affiliates.

[7055] See Section III.B.3.c of this Report for an analysis of the solvency of the LBHI Affiliates.

[7056] See *N. Am. Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007).

### b) Fiduciary Duty Standard for a Wholly-Owned Affiliate Subsidiary under New York Law

LCPI was incorporated in New York, and the actions of its directors and officers will be evaluated under New York law. Directors and officers of New York corporations owe the shareholders of the corporations the same general duties of care, loyalty and good faith that directors of Delaware corporations owe shareholders.[7057] Although New York courts have not delineated a duty to monitor within the same parameters as Delaware courts, New York law does hold officers and directors of New York corporations liable for the actions of subordinates that should have been discoverable by reasonable inquiry.[7058] Thus, courts evaluating claims against officers and directors of New York corporations for breaches of fiduciary duty would utilize a very similar framework to that established under Delaware law for breaches of the duty to monitor.

In New York, the business judgment rule protects the decisions of disinterested directors and officers against inquiry into the substance of a business decision.[7059]

---

[7057] *See Nechis v. Gramatan Gardens, Inc.*, 231 N.Y.S.2d 383, 385 (N.Y. Sup. 1962) (holding that directors and officers owe duties of care, good faith and loyalty and that their own personal interests must be beholden to those of the shareholders) (quoting *Winter v. Anderson*, 275 N.Y.S. 373, 375 (N.Y. App. Div. 1934)); see also N.Y. Bus. Corp. Law § 717 (McKinney 2009).

[7058] *Higgins v. N.Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 362 (N.Y. Sup. 2005) (holding that directors may be liable for the actions of another if they did not obtain material information or make a reasonable inquiry into material matters).

[7059] *See Jacobs v. Board of Ed., E. Meadow Union Free Sch. Dist.*, 409 N.Y.S.2d 234, 239 (N.Y. App. Div. 1978); *Dumont v. Raymond*, 49 N.Y.S.2d 865, 868 (N.Y. Sup. 1944); *Auerbach v. Klein*, No. 15391-02, 2008 WL 680730, at *10 (N.Y. Sup. Feb. 15, 2008).

Consequently, if the directors or officers of LCPI were disinterested and made a good faith decision on an informed basis, a court will not substitute its own judgment.

A director or officer is interested if that director has "dual relations that prevent an unprejudicial exercise of judgment."[7060]  "A director is interested (1) if he is an officer or director of another corporation involved in the challenged or questioned transaction, (2) if he receives a direct financial benefit from the questioned transaction that is different from the benefit received generally by the shareholders, and (3) even though he has no personal interest in the questioned transaction, he is controlled by a director who has an interest in the transaction."[7061]  New York law establishes that a transaction is not void or voidable solely because the party is interested if either of the following two conditions is met:  (1) the interested director's status is disclosed or known to the board of directors or committee and the board approves the transaction by a vote sufficient for such purpose once the votes of interested directors are excluded or, if there are insufficient votes to constitute a board action once interested voters are excluded, by unanimous vote of the disinterested directors; or (2) the interested directors' status as such is disclosed or known to the shareholders and the transaction is approved in a good faith vote by the shareholders.[7062]

---

[7060] *Auerbach*, 2008 WL 680730, at *11.

[7061] *Id.*

[7062] N.Y. Bus. Corp Law § 713 (McKinney 2009).

The evidence suggests that LCPI's directors and officers were employees of LBHI at all times relevant to this Section's inquiry.[7063]  LCPI was a wholly-owned subsidiary of LBI, which in turn was owned by LBHI.  LCPI's directors' and officers' status as LBHI employees ordinarily would not give rise to any conflict of interest; the directors' and officers' duty of loyalty as employees and as fiduciaries to shareholders was aligned.[7064] The analysis, however, may change once LCPI became insolvent, at which point the directors and officers also owed a duty of loyalty to LCPI's creditors.[7065]  Therefore, a party may argue that the directors and officers were not disinterested during 2008 and would not be entitled to rely on the business judgment rule.  In the discussion that follows, the Examiner analyzes whether the LCPI directors' and officers' breached their fiduciary duty absent the protections of the business judgment rule.  The LCPI directors and officers would only be deprived of the protection of the business judgment rule at times when LCPI was insolvent.

---

[7063] Lehman, spreadsheet, Employees as mapped to Legal Entities, (Sept. 20, 2008) [LBEX-AM 5642400-2997].

[7064] *RSP Communications PLC v. Bidirici*, 649 F.Supp.2d 184, 212-213 (S.D.N.Y. 2009) ("[W]hile [the subsidiary] was solvent, Defendant's fiduciary duties required that [the subsidiary] be managed to the benefit of [the parent corporation].") (applying New York law).

[7065] *Id.* at 213 ("[A]lthough the parties disagree as to the timing of [the subsidiary's] insolvency, there is no dispute that Defendants' fiduciary obligations changed when [the subsidiary] became insolvent and the interests of [the subsidiary's] creditors became relevant at that time.") (applying New York law).

### (1) LCPI's Background and Officers and Directors

LCPI is a wholly-owned subsidiary[7066] of LBI that Lehman used to book loans,[7067] including commercial loans, whole loans, real estate loans, and distressed debt purchases.[7068]   Lehman also used LCPI to originate and trade secured and unsecured loans.[7069]   LCPI had a board of directors comprised of three individuals at the time of the filing: Fred S. Orlan – elected to the Board on May 22, 2008; James P. Seery – elected to the Board on September 06, 2005; and Greg L. Smith – elected to the Board on August 25, 2005.[7070]   Additionally, Greg Smith had served as the president of LCPI since January 24, 2008.[7071]   Paolo Tonucci was elected treasurer on January 24, 2008.[7072]   Ada Shek was the LEC controller for LCPI.  Michael Montella assisted Shek in carrying out her duties in the weeks leading up to September 15, 2008.[7073]

---

[7066] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL 027825].

[7067] Examiner's Interview of Fred Orlan, Interview Summary, Sept. 21, 2009, at p. 3; Examiner's Interview of James Seery, Nov. 12, 2009, at p. 4.

[7068] Examiner's Interview of Joselito Rivera, Oct. 13, 2009, at p. 5; Examiner's Interview of James Seery, Nov. 12, 2009, at p. 4.

[7069] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL 027825]; Debtor's Motion Pursuant to Sections 105(a), 363(b), 363(c) and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authority to (A) Continue to Utilize Its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations, Docket No. 3, *In re Lehman Commercial Paper, Inc.*, Case No. 08-13900 (Bankr. S.D.N.Y. Oct. 6, 2008), at p. 3.

[7070] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL 027825].

[7071] *Id.*

[7072] *Id.*

[7073] Examiner's Interview of Ada Shek, Nov. 24, 2009 at p. 2; Examiner's Interview of Michael Montella, Oct. 26, 2009, at 2, 9.

LCPI relied on designated Lehman employees who were split among Lehman's various operating groups.[7074]  Lehman's records indicate that there were approximately 120 Lehman employees who performed functions for LCPI.[7075]  LCPI funded its operations through repurchase agreements, bank credit facilities, and borrowings from LBHI,[7076] but it was not a stand-alone entity.[7077]

LCPI's directors and officers owed duties both to its parent and to creditors when it became insolvent.  The Examiner found sufficient evidence to support a finding that LCPI was balance sheet insolvent during the interval of May 31, 2008 through August 28, 2008, on which date it received a $900 million capital infusion from LBI that rendered it borderline solvent.[7078]  In examining whether there is a colorable claim that LCPI's directors or officers breached their fiduciary duties, the Examiner considered: (1) whether the LCPI directors and officers breached their fiduciary duties to the creditors by authorizing transfers made by LCPI during its period of insolvency and (2) whether the LCPI directors and officers fulfilled their duty to monitor.

---

[7074] A&M, spreadsheet of employees mapped to legal entities (Sept. 20, 2008) [LBEX-AM 5642400]; e-mail from Paul Gregg, Lehman, to Peter Keavey, Lehman (Sept. 16, 2008) (employees allocated to LBCS discussing transfer of LBI employees to Barclays and noting "that's us") [LBEX-DOCID 3571486]; Examiner's Interview of Jonathan Williams, Aug. 5, 2009, at p. 4.

[7075] A&M, spreadsheet of employees mapped to legal entities (Sept. 20, 2008) [LBEX-AM 5642400]

[7076] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL 027825].

[7077] Examiner's Interview of Fred Orlan, Sept. 21, 2009, at p. 3; Examiner's Interview of James Seery, Nov. 24, 2009 at p. at 4.

[7078] E-mail from Anu Jacob to Kristie Wong, Lehman, *et al*. (August 28, 2008) [LBEX-SIPA 005564]; See Section III.B.3.c of this Report for an analysis of the solvency of the LBHI Affiliates.

### (a) Duty of Care

In accord with his duties set forth by the Examiner Order, the Examiner investigated whether LCPI's officers and directors breached their duty of care by failing to maintain LCPI's solvency.  Under New York law, the duty of care requires that directors act as "ordinarily prudent persons 'would do in similar circumstances being in possession . . . of the knowledge and information they possessed or could have possessed by diligent attention to their duties.'"[7079]

As early as September 2007, LCPI bordered on insolvency.[7080]  From April 2008 through July 2008, LCPI was actually balance sheet insolvent.[7081]  During that time period, LCPI made numerous transfers, the most significant of which was its June 19, 2008 transfer of $5.4 billion to LBHI, which LBHI in turn transferred to JPMorgan to cover LBHI's risk-based margin.[7082]  The Examiner has been advised in interviews that trades involving LBI and LBHI Affiliates always net settled cash.[7083]  Nevertheless, the

---

[7079] *Macnish-Lenox, LLC v. Simpson*, No. 26021/04, 2007 WL 3086028 (N.Y.Sup. Oct. 23, 2007) (quoting *Syracuse Tel. v. Channel 9, Syracuse*, 273 N.Y.S.2d 16, 27 (N.Y. Sup. 1966)).

[7080] See Section III.B.3.c of this Report for an analysis of the solvency of the LBHI Affiliates.

[7081] *Id.*

[7082] E-mail from Craig Jones, Lehman, to John Feraca, Lehman (June 19, 2008) [LBEX-AM 001775] (Jones informed Feraca: "Today we moved several unencumbered assets (Sasco, Spruce, Pine, Fenway) to LCPI's DTC box at Chase to generate an additional $5.4 billion of NFE.  This will help us absorb the increase in intra-day margining that Chase wants us to implement").

[7083] See Duff & Phelps' Interview of William Burke, Oct. 28, 2009 (trades between LBI and affiliates were "always settled," the settlement amount would be "net of margin;" and due to LBI's capital requirements, there would be no benefit to not settling trades). Essentially, LBI would have to keep an equivalent amount of assets on reserve for any unsettled trades; thus making it economically impractical.  Duff & Phelps' Interview of Daniel J. Fleming, Oct. 21, 2009 (trades between LBSF and LBI were at "arm's length," as was the case with other intercompany trading activity both with and among LBI, LBHI, and LBHI Affiliates).

Examiner was advised that any cash transferred to an LBHI Affiliate would be swept into LBHI's accounts at each day's end.[7084]

Throughout 2008, LBI made various infusions of capital to LCPI in an attempt to reestablish LCPI's solvency.[7085]  Despite the infusions, LCPI's solvency was not reestablished until August 2008. On August 28, 2008, LBI requested a capital infusion of $900 million from LBHI to LCPI to reestablish LCPI's solvency.[7086]  Tonucci approved the payment,[7087] and LCPI became borderline solvent and apparently maintained this status at least through August 31, 2008.[7088]  Therefore, LCPI creditors suffered no harm by reason of the earlier transfer of $5.4 billion dollars to LBHI on June 19, because the directors and officers of LCPI took the steps necessary to restore LCPI to solvency prior to LCPI's bankruptcy.  For this reason, the LCPI directors and officers did not breach their duty of care to the extent that they authorized or permitted the June 19 transfer. Therefore, the Examiner concludes that the evidence does not support the existence of a colorable claim that LCPI's officers and directors breached their fiduciary duty of care by authorizing or permitting transfers made by LCPI during its period of insolvency.

---

[7084] See Section III.B.2.c of this Report for an analysis of LBHI's use of "cash sweeps."

[7085] See Sections III.B.3.c.3.a and III.B.3.e.8 of this Report, which address the mechanics of the LCPI capital infusions.

[7086] E-mail from Hui Wang, Lehman, to Helen Chu, Lehman, *et. al* (Aug 28, 2008) [LBEX-SIPA 003320-1].

[7087] E-mail from Kristie Wong, Lehman, to William T. Burke, Lehman, *et. al* (Aug. 28, 2008) [LBEX-SIPA 005564-66].

[7088] See Sections III.B.3.c.3.a and III.B.3.e.8 of this Report, which address the mechanics of the LCPI capital infusions.  For a discussion of solvency of the LBHI Affiliates after August 31, 2008, see Section III.B.3.c of this Report.

### (b)  Duty to Monitor

The Examiner also analyzed whether the LCPI directors and officers breached their duty to monitor by allowing LCPI to fall into insolvency for a portion of 2008. Directors or officers of a New York corporation may be liable based on the actions of subordinates if they either fail to obtain material information or to make a reasonable inquiry into material matters.[7089]

Although LCPI was a separate corporate entity, Lehman did not operate it as a separate business but rather integrated LCPI's business affairs with LBHI's.[7090]  Though not operated as a separate business, LCPI maintained its own corporate hierarchy. LCPI had a board of directors and over 50 officers including multiple managing directors, vice presidents, and senior vice presidents.[7091]

Primary responsibility in monitoring LCPI's financial condition and reporting that information to superiors fell to Shek, as LEC.  Shek received assistance from Montella in the final weeks of Lehman.[7092]  Shek was charged with monitoring and reporting many entities as their LEC, but she said her responsibility for LCPI was more

---

[7089] *Higgins v. N.Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 362 (N.Y. Sup. 2005).

[7090] Examiner's Interview of James Seery, Nov. 12, 2009 at p. 4.

[7091] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL 027825].

[7092] Examiner's Interview of Ada Shek, Nov. 24, 2009 at pp. 2, 4; Examiner's Interview of Michael Montella, Oct. 26, 2009, at pp. 2, 9.

onerous than with the other entities because LCPI had its own separate repo facility at JPMorgan and was involved in many intercompany repos and reverse repos.[7093]

Interviews with Lehman finance personnel revealed that LECs generally were charged with monitoring the solvency of LBI's subsidiaries and reporting capital shortfalls to superiors, who would then authorize infusions from LBI.[7094]  However, Shek explained that LCPI's LECs only started to monitor capital levels vigorously in the April through July 2008 time period.[7095]  While there were no overall guidelines other than the principle of avoiding negative equity, LECs were aware of the fact that an entity such as LCPI would be reviewed and questioned by regulators.[7096]  While the directors and officers may in some instances have underestimated LCPI's equity needs and thus failed to adequately provide equity near the end of each month, management still observed and attempted to monitor the actions of LCPI and ultimately restored LCPI to solvency prior to the filing of Chapter 11 petitions.  Therefore, the Examiner concludes that the evidence does not support the existence of a colorable claim against the LCPI's officers and directors for breaching their fiduciary duty to monitor in

---

[7093] Examiner's Interview of Ada Shek, Nov. 24, 2009 at pp. 2, 4.

[7094] Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 2; Examiner's Interview of Josalito Rivera, Oct. 13, 2009, at pp. 5-6.  Wong, who was head LEC, also explained that the capital infusions LCPI received in May and July of 2008 were intended to allow it to post positive equity, but that the amount of capital necessary to do so was underestimated.  Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 3.  Thus, LECs attempted to maintain positive equity in LCPI, but were occasionally unable to do so.

[7095] Examiner's Interview of Ada Shek, Nov. 24, 2009 at p. 7.

[7096] Examiner's Interview of Michael Montella, Oct. 26, 2009, at pp. 10-12; Examiner's Interview of Kristie Wong, Dec. 2, 2009, at p. 2.

connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI Chapter 11 case on September 15, 2008.

### c) Breach of Fiduciary Duty for Aiding or Abetting Under Delaware Law

In accord with the fifth bullet of the Examiner Order, the Examiner analyzed whether there exist any colorable claims for aiding or abetting a breach of fiduciary duty by the LBHI Affiliates.  Delaware law recognizes a cause of action for aiding and abetting a breach of fiduciary duty.[7097]  There are four elements to this claim:  (1) an underlying fiduciary duty; (2) breach of that duty by the fiduciary; (3) knowing participation in the breach by a non-fiduciary; and (4) damages.[7098]  As set forth elsewhere in this Report in the section dealing with Repo 105,[7099] the Examiner concludes that the Repo 105 transactions give rise to colorable claims for breach of fiduciary duty on the part of certain LBHI officers for, among other things, causing or allowing Lehman to file misleading financial statements that misrepresented Lehman's treatment of repo transactions and omitted material information about Lehman's Repo 105 practice.  The Examiner has determined that certain of LBSF's securities were involved in the Repo 105 transactions.[7100]  Although the Examiner has uncovered

---

[7097] *See, e.g., Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  Some cases call an aiding and abetting breach of fiduciary duty claim a "civil conspiracy."  However labeled, the elements are the same.  *See Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986).

[7098] *Id.* For a more detailed discussion of the elements of an aiding and abetting breach of fiduciary duty claim, see Appendix 1, Legal Issues, at Section II.C.

[7099] See Section III.A.4 of this Report, which discusses Repo 105.

[7100] *Id.*

evidence that certain of the directors and officers of LBSF had knowledge of the purpose and effect of Repo 105 transactions, the Examiner has not discovered sufficient evidence that the directors and officers of LBSF themselves had any disclosure obligations vis-à-vis LBHI (which was the entity with public reporting obligations) or that they had knowledge that LBHI's public disclosures were materially misleading. Consequently, the Examiner concludes that the evidence uncovered during the course of his investigation does not support a finding that there are colorable claims against the LBSF directors or officers for aiding and abetting a breach of fiduciary duty for failure to disclose in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI Chapter 11 case on September 15, 2008.

### 5. Examiner's Analysis of Lehman's Foreign Exchange Transactions (Second Bullet)[7101]

#### a) Summary

The Examiner was asked to report on "[a]ll voluntary and involuntary transfers to, and transactions with, affiliates, insiders and creditors of LBCC or its affiliates, in respect of foreign exchange transactions and other assets that were in the possession or control of LBHI Affiliates at any time commencing on September 15, 2008 through the day that each LBHI Affiliate commenced its Chapter 11 case."[7102]    The Examiner identified and investigated post-petition cash transfers in respect of foreign exchange

---

[7101] This Section of the Report includes data extracted from Lehman's source systems, including, for example, GCCM, GSSR, and RISC.
[7102] Examiner Order at 3, second bullet.

("FX") transactions.   This Section of the Report provides an overview of Lehman's

foreign exchange business and describes the impact of LBHI's bankruptcy filing upon

the settlement of such transactions.   The Examiner analyzed cash transfers into and out

of LBCC bank accounts in connection with foreign exchange transactions that either

settled, in full, in part, or that failed to settle.   The Examiner concludes that timing and

operational disruption impacted the settlement of such transactions.

### b)   Foreign Exchange at Lehman

This Section of the Report addresses the relevant transfers and transactions in

respect of FX and begins with an overview of Lehman's FX business.   Lehman's FX

business was a global operation, organized around centers in Tokyo, Hong Kong,

London and New York, and, at the time of Lehman's bankruptcy filing in September

2008, was developing a presence in Singapore.[7103]   Lehman was a significant participant

in the global FX market.[7104]   Lehman engaged primarily in FX transactions on the

interbank market, which involved trading with other large financial institutions either

for Lehman's own account or on behalf of its customers.[7105]   However, Lehman also

conducted FX transactions with counterparties that were not financial institutions.

---

[7103] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 2.

[7104] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2.

[7105] Bank for International Settlements, Triennial Central Bank Survey: Foreign exchange and derivatives market activity in 2007 (December 2007), available at http://www.bis.org/publ/rpfxf07t.pdf.

Lehman's FX transactions were initiated either through telephone orders or through various e-commerce systems.[7106]

**Lehman Foreign Exchange Products.**    A typical FX transaction involves two counterparties exchanging one currency for another.[7107]   The trade date is the date on which the parties agree to the terms of the transaction including the exchange rate, the type and amount of the currencies and the value date.[7108]   The value date (or settlement date) is the date on which counterparties actually exchange the two currencies (*i.e.*, settle the transaction).[7109]

Lehman's FX business focused primarily on spots, forwards and options.[7110] Spots and forwards are trades in which counterparties exchange currencies in a single transaction rather than as part of a series of exchanges.[7111]   In a spot transaction, a specific amount of currency is exchanged at an agreed-upon price for delivery and

---

[7106] Most of Lehman's FX transactions were initiated through telephone orders.  However, as part of a major strategic initiative, Lehman also developed a FX e-commerce business, which allowed clients to place orders using different electronic systems.  These systems enabled Lehman's clients to access the interbank market and various other FX markets, including: (1) Electronic Communication Networks (ECNs), which allowed users to execute transactions with multiple banks; (2) Single Bank Platforms, which allowed users to trade with a single bank; and (3) Order Management Systems, which routed client orders to other markets based on pre-defined algorithms.  Lehman accessed client trade information and advertised to clients through its e-commerce business.

[7107] *See* Lehman, Lehman Brothers Foreign Exchange Training Manual, at p. 2 [LBEX-LL 3356480].

[7108] *See generally* Lehman, Lehman Brothers Foreign Exchange Training Manual [LBEX-LL 3356480].

[7109] *See id.* at p. 4.

[7110] Lehman was also involved in other FX transactions, such as structured notes, which comprised a small percentage of Lehman's FX business.  Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3.

[7111] *See* Lehman, Lehman Brothers Foreign Exchange Training Manual, at p. 34 [LBEX-LL 3356480].

settlement within a two-day period.[7112]  In a forward transaction, counterparties agree to exchange a specific amount of currency at a pre-determined rate on some future date, ranging between three days and several years from the trade date.[7113]  Options are derivative instruments giving holders the right, but not the obligation, to buy or sell the underlying currency at a future date at a pre-determined exchange-rate.[7114]

Lehman's FX business also included FX swaps, which involve the exchange and re-exchange of two currencies on two different value dates.[7115]  FX swaps consist of various combinations of spots and forwards.[7116]  Because Lehman's FX trading group only viewed the spots and forwards underlying these transactions, it did not distinguish between swaps and the spots and forwards related to such swaps.[7117]

Lehman's FX business did not include interest rate swaps or currency futures.[7118] Lehman's derivatives group engaged in interest rate swaps, which are agreements between two parties where one stream of payments is exchanged for another based on a specified principal amount.[7119]  Although interest rate swaps may involve payments in different currencies, Lehman did not characterize interest rate swaps as FX transactions

[7112] *See id.*

[7113] *See id.* at p. 40.  Lehman also transacted in a subset of forwards called non-deliverable forwards, which are contracts wherein no currencies are exchanged.  Instead, the settlement amount reflects the difference between the contract price and the prevailing currency exchange rate.  Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 2.

[7114] *See* Lehman, Lehman Brothers Foreign Exchange Training Manual, at p. 96 [LBEX-LL 3356480].

[7115] *See id.* at p. 71.

[7116] *See id.*

[7117] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 3.

[7118] *Id.*; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at pp. 2-3.

[7119] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3.

because interest rate swaps primarily involved interest rate risk rather than foreign exchange risk.[7120]   As such, interest rate swaps were not handled by Lehman's FX trading group.

Lehman entities also transacted in currency futures, which are regulated exchange-traded products that reflect the difference in the price of an underlying currency on the trade date and on the settlement date.[7121]  A future is generally settled in the underlying currency and does not reflect an exchange of currencies.[7122]   Thus, Lehman did not consider currency futures to be FX transactions.[7123]   The Examiner's analysis of Lehman's FX transactions thus excludes both interest rate swaps and currency futures.

**Lehman Entities that Offered Foreign Exchange Products.**   As part of its global FX operations, Lehman conducted FX transactions primarily through LBI and LBCC.[7124] As a broker/dealer, LBI was subject to regulation by the New York Stock Exchange, and conducted only spot and forward transactions, not options transactions.[7125]   LBCC was an unregulated entity that conducted spot, forward and options transactions.[7126]

---

[7120] *Id.*

[7121] *See* Federal Reserve Bank of New York:  All about the Foreign Exchange Market in the United States by Sam Cross (1998), at p. 59, *available at* http://www.newyorkfed.org/education/addpub/usfxm/chap6.pdf.

[7122] *Id.*

[7123] *Id.* However, Lehman used currency futures for hedging purposes in connection with FX transactions. *Id.*

[7124] *Id.* at pp. 3-5.

[7125] *Id.*

[7126] *Id.*

Other Lehman entities that engaged in FX transactions included LBIE, LBSF, LBJ LBBAG, LBF, LB Asia and LBCS.[7127]  These entities conducted spot, forward and options transactions incidental to their general business transactions or to accommodate their clients' FX trading needs.[7128]  LBHI also conducted spot and forward transactions for hedging purposes.[7129]

Lehman's FX business had a multi-entity structure, meaning that more than one Lehman entity was typically involved in a particular FX transaction.[7130]  Under this arrangement, the receipt and payment of funds was documented through intercompany accounting.[7131]  For instance, because LBCC only maintained U.S. dollar bank accounts, LBI received payments of foreign currencies from third parties on LBCC's behalf.[7132] LBCC made the corresponding U.S. dollar payments to third parties.[7133]  Upon the receipt of funds by LBI for the benefit of LBCC, an intercompany payable was recorded on LBI's books and a corresponding intercompany receivable was recorded on LBCC's books.[7134]  Consolidated journal entries for cash and intercompany activity in connection

---

[7127] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3.; RISC Monthly Statements [LBEX-LL 3357479 - LBEX-LL 3357496].

[7128] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at pp. 3-5.

[7129] Id.

[7130] Id.

[7131] Id.

[7132] Id.

[7133] Id.

[7134] Id. Typically, multi-entity FX transactions involved intercompany payables and receivables, rather than the transfer of funds.  However, FX transactions involving LBJ required a transfer of funds because of legal and/or regulatory requirements.  Examiner's Interview of Robert Eby, Jan. 06, 2010, at p. 5.

with FX transactions were recorded in Lehman's general ledger on a daily basis.[7135]

Journal entries related to customer accounts payable and accounts receivable were

recorded in Lehman's general ledger on a monthly basis.[7136]   Journal entries were not

recorded for individual transactions.[7137]

Although intercompany entries documented the amount owed by LBI to LBCC,

the funds were not immediately transferred to LBCC.[7138]   Instead, when the

intercompany receivable from LBI to LBCC became substantial, LBCC typically

requested that LBI transfer funds to pay down the receivable.[7139]   LBI then evaluated its

own liquidity needs to determine whether such payment should be made, and upon the

approval of an appropriate administrator, made such payment to LBCC.[7140]

**Lehman's Foreign Exchange Trading Services.**   Generally, Lehman offered the

following services in connection with FX transactions: execution, confirmation and

settlement.[7141]   Execution is the process by which an order to buy or sell a currency on

specific terms is consummated on a foreign exchange market.[7142]   Confirmation is the

process by which an organization acts as an intermediary, reviews transaction terms

---

[7135] GCCM Custom Report [LBEX-LL 3371357- LBEX-LL 3396034].

[7136] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 7.

[7137] *Id.* at p. 6.

[7138] *Id.* at p. 4. LBCC was funded primarily by receipts from third parties.  If LBCC's account had a shortfall at the end of the day, LBHI provided the necessary funding to cover the shortfall.  E-mail from Lauren Sheridan, Lehman to Ken Halperin, Duff and Phelps, *et al.* (Jan. 25, 2010).

[7139] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at pp. 3-4.

[7140] *Id.*

[7141] Examiner's Interview of Francois Chu-Fong, Dec. 18, 2009, at p. 2.

[7142] *Id.*

and assumes the role of a buyer and seller for transactions in order to reconcile orders

between transacting parties.[7143]  Settlement is the mutual delivery of currencies to the

parties to the transaction pursuant to the agreed-upon terms.[7144]

Lehman conducted FX transactions both as direct trades at the request of its

clients and as part of its FX prime brokerage business.[7145]  In a FX direct trade, the client

executed foreign exchange transactions exclusively with Lehman.[7146]  Lehman also

managed the confirmation and settlement functions in connection with the transaction

and allocated the client's funds to a designated account.[7147]

The FX prime brokerage business provided clients with the opportunity to

consolidate their portfolio in a single institution and leverage that institution's credit

rating to trade currencies.[7148]  Lehman either (1) served as the prime broker, confirming

and settling FX transactions that clients executed with other financial institutions; or (2)

executed FX transactions with clients that used the prime brokerage services of other

financial institutions.[7149]

In its capacity as prime broker, Lehman handled the confirmation and settlement

functions in connection with FX transactions that Lehman's clients executed with third

---

[7143] Examiner's Interview of Robert Eby, Jan. 6, 2010, at pp. 2-3.

[7144] Id. at p. 3.

[7145] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2.

[7146] Id. at p. 2.

[7147] Examiner's Interview of Robert Eby, Jan. 6, 2010, at pp. 2-3.

[7148] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2.

[7149] Examiner's Interview of Robert Eby, Jan. 6, 2010, at pp. 3-4.

parties.[7150]    In order to perform its confirmation and settlement functions, Lehman,

rather than the client, became the counterparty with the executing third party.  At the

same time, Lehman entered into an offsetting transaction with its client, for the purpose

of delivering the settlement amount to the client.[7151]

Alternatively, where clients used the prime brokerage services of other financial

institutions, Lehman executed FX transactions with its clients and notified the clients'

prime broker of such transactions.[7152]    The clients' prime broker then performed the

confirmation and settlement functions in connection with such transactions.[7153]

**Settlement of Lehman's Foreign Exchange Transactions.**    Lehman settled a

significant portion of its foreign exchange transactions through CLS.[7154]    Lehman was a

user member and shareholder of CLS, and relied on Citibank, as its settlement member,

to settle its FX transactions.[7155]    CLS was created to, among other things, eliminate

settlement risk associated with dual currency payment instructions related to foreign

exchange transactions.[7156]    CLS simultaneously settles two payments related to an FX

---

[7150] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2.

[7151] Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 4.

[7152] *Id*.

[7153] *Id*.

[7154] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3. See Sections III.A.5.c.1.a and III.A.5.c.1.f of this Report, which discuss Lehman's relationship with Citibank as it pertains to the settlement of FX transactions through CLS.

[7155] *Id.*

[7156] *See* CLS, http://www.cls-group.com/ForYou/CLSCorporates/Pages/default.aspx (last visited Jan. 28, 2010).

transaction, eliminating the risk that one party to an FX transaction pays out the currency it sold but does not receive the currency it bought (*i.e.*, the settlement risk).[7157]

CLS did not provide Lehman with statements listing individual transactions that settled through CLS.[7158]    Instead, CLS provided the net amount owed to all counterparties for each currency, and Lehman paid its total obligation rather than making piecemeal payments associated with individual transactions.[7159]

Transactions in currencies that were not eligible for CLS settlement, or with counterparties that were not directly or indirectly affiliated with CLS, were settled by direct payments between the parties to the transaction.[7160]    Unlike transactions settled through CLS, transactions settled by direct payments posed a certain degree of settlement risk because the exchange of currency was not simultaneous.[7161]    Lehman's risk management team managed such risk by requiring collateral to be held or by setting certain settlement risk limits based on a credit review of the transaction counterparties.[7162]

---

[7157] *See id*.

[7158] Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 5.

[7159] *Id.* at p. 6.  On or about September 15, 2008, LBHI transferred a total amount of $500 million to LBI in connection with FX transactions that settled through CLS.  Lehman's FX transactions conducted through CLS were either settled or unwound during the Stub Period.  Unlike transactions settled outside of CLS, transactions settled through CLS did not result in parties making payments without receiving corresponding payments in return.  *Id*.

[7160] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3.

[7161] *Id*.

[7162] *Id*.

Lehman's FX transactions scheduled to settle by direct payments outside of CLS could have failed for a variety of reasons. For example, a party could have failed to pay or to receive the funds in connection with the transaction. Alternatively, payment instructions could be documented incorrectly.[7163] Because the payment of funds in connection with FX transactions was an automated process that was independent of the receipt of funds, Lehman could deliver funds to a counterparty without receiving currencies in exchange.[7164] Lehman's Operational Control Group managed the reconciliation system that documented such fails, while the FX Operations Group reviewed and resolved such fails.[7165]

**Lehman's Risk Management with Regard to Foreign Exchange Transactions.**

FX transactions involve several discrete risks, including settlement risk (the risk that the opposing party may not deliver the appropriate amount of currency) and market risk (the risk that the currencies traded may lose value based on market fluctuations).[7166] To manage settlement risk, Lehman reviewed its clients' credit-worthiness and set settlement limits based on such credit reviews.[7167] Lehman monitored client transactions

---

[7163] Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 3.

[7164] *Id.*

[7165] *Id.*

[7166] *See* Foreign Exchange Committee, Federal Reserve Bank of New York, Foreign, *Guidelines for Foreign Exchange Trading Activities* (May, 2008), at pp. 18-21, *available at* http://www.newyorkfed.org/fxc/annualreports/ar2007/fxar07re.pdf.

[7167] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3.

to ensure compliance with such limits.[7168]  Lehman also required certain clients to post

collateral in connection with FX transactions.[7169]  Settlement risk was managed by the

LBHI risk management group, both regionally and globally.[7170]

With respect to market risk, Lehman established risk limits to keep potential

losses within acceptable risk tolerance levels.[7171]  To mitigate such risk, LBCC monitored

trader activity and its overall risk exposure to ensure that the risk limits were not

exceeded.[7172]  LBCC took additional steps to reduce its market risk, including hedging

its foreign currency exposure.[7173]

### c)    Foreign Exchange Transactions During the Stub Period

In order to identify all transfers to, and transactions with, affiliates, insiders and

creditors of LBCC or its affiliates, in respect of FX transactions during the Stub Period,

the Examiner reviewed RISC[7174] system statement and bank account statement data for

LBHI Affiliates, and reconciled such data to identify cash transfers related to the

settlement of FX transactions.

---

[7168] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at pp. 5-6.

[7169] Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3.

[7170] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at pp. 5-6.

[7171] *Id.*

[7172] *Id.*

[7173] *Id.*

[7174] RISC stands for Real-time Information Systems for Commodities.

The Examiner also reviewed LBI's payments and receipts of foreign currency to the extent these transfers related to certain FX transactions involving LBHI Affiliates.[7175] The Examiner's analysis excludes certain trading activity that took place during the Stub Period, which may have involved trade executions, but did not result in transfers of cash in settlement of FX transactions.

The Examiner focused his analysis of Lehman's Stub Period FX transactions on transfers of cash into and out of LBCC's bank accounts.[7176]   On the morning of September 15, 2008, LBCC's bank account balance was $0.00.[7177] The Examiner has determined that, as a result of the LBHI bankruptcy, three primary sources of funding that LBCC relied upon to settle FX transactions were compromised: (1) receipts from counterparties; (2) payments from LBI to reduce LBCC's intercompany receivable; and (3) cash transfers from LBHI to cover LBCC's shortfalls.   Consequently, LBCC did not have sufficient funds on September 15, 2008 to settle all of its FX obligations.[7178]

---

[7175] In working together with the LBI SIPA Trustee, the Examiner learned that LBI did not receive bank account statements, but rather received electronic transaction data that was electronically reconciled with LBI's books and records.   Consequently, the LBI Trustee was unable to provide the Examiner with general data related to LBI's FX transactions, including transactions that settled through CLS.   Instead, the Examiner received and reviewed LBI's payments and receipts in connection with specific FX transactions relevant to the investigation.   E-mail from Sarah L. Cave, Hughes Hubbard and Reed, to Heather D. McArn, Jenner & Block (Nov. 24, 2009).

[7176] RISC data indicates that FX transactions involving LBCS and LBSF were scheduled to settle during the Stub Period.   However, the Examiner's financial advisors determined that bank statement data for these entities contained no payments or receipts associated with the settlement of FX transactions.

[7177] With respect to unregulated entities such as LBCC, it was part of Lehman's cash management protocol to fund every bank account to $0.00 at the end of each day.   Examiner's Interview of Daniel J. Fleming, Dec. 17, 2009, at p. 2.

[7178] *Id*. at pp. 4-5.

The Examiner sets forth below a series of tables illustrating the amounts LBCC committed to pay in settlement of FX transactions and the actual payments made to its counterparties, as well as the amounts LBCC expected to receive in settlement of FX transactions and its actual receipts.

The Examiner's financial advisors determined, as illustrated in the table below, that LBCC committed to pay approximately $2.1 billion in settlement of non-CLS transactions during the Stub Period.[7179]    However, LBCC ultimately paid only approximately $400 million in connection with these transactions.[7180]

---

[7179] These settlements were scheduled to occur during the period from Sept. 15 through Sept. 19, 2008. GCCM Data Extraction [LBEX-BARGCM 010374 - LBEX-BARGCM 010395].

[7180] Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389].

**Scheduled and Actual Stub Period Payments by LBCC to FX Counterparties (a)[7181]**

| Date | Total Amt. Due (b) | Total Amt. Paid (c) | % Paid of Amt. Due | Total Unpaid Amt. |
|---|---|---|---|---|
| 9/15/2008 | $1,184,160,821 | $258,485,069 | 21.8% | $925,675,752 |
| 9/16/2008 | $126,503,789 | $50,562,787 | 40.0% | $75,941,003 |
| 9/17/2008 | $600,812,093 | $36,039,788 | 6.0% | $564,772,305 |
| 9/18/2008 | $50,650,176 | $38,150,176 | 75.3% | $12,500,000 |
| 9/19/2008 | $175,591,322 | $8,866,815 | 5.0% | $166,724,507 |
| **Totals** | **$2,137,718,201** | **$392,104,635** | **18.3%** | **$1,745,613,567** |

Notes:
(a) Based on payment request date and does not necessarily correlate to payment clearance date.
(b) Source: GCCM Data Extraction [LBEX-BARGCM 010374 - LBEX-BARGCM 010395].
(c) Source: Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389].

As noted in the table above, approximately 18% of the total amount LBCC owed to its counterparties during the Stub Period was paid to such counterparties in settlement of FX transactions. An analysis of individual transactions indicates that certain counterparties were paid in full; others, such as The Walt Disney Company ("Walt Disney Co."), received partial payment; and other counterparties were not paid any of the amounts owed to them. The table below presents all LBCC counterparties

---

[7181] LBCC made no wire transfer requests to Citibank in connection with FX transactions after Sept. 19, 2008.

identified by the Examiner's financial advisors that were owed amounts of $1 million or

more during the Stub Period, and indicates what percentage of the amount owed was

paid to such counterparties.

### LBCC Stub Period Payments to FX Counterparties (a)

| Counterparty (b) | Total Amt. Due (c) | % Paid (d) | Counterparty (b) | Total Amt. Due (c) | % Paid (d) |
|---|---|---|---|---|---|
| Ppl's Bank of China/Safe | $ 473,000,000 | 0.0% | JPMC Bank UK | $ 8,110,000 | 100.0% |
| LBIE - I/C | 232,723,911 | 32.0% | Std Chartered Bank, Ldn | 7,638,750 | 18.8% |
| Ford Global Treasury | 194,130,388 | 32.3% | RBS Ldn/Man Inv Ltd. | 7,595,608 | 100.0% |
| J. Aron & Co. | 154,402,344 | 1.0% | Lehman Brothers Japan | 7,540,327 | 0.0% |
| Walt Disney Co. | 120,978,393 | 12.3% | AIG Intl Inc | 6,707,111 | 0.0% |
| UBS AG | 90,403,104 | 5.9% | Calyon | 6,701,900 | 100.0% |
| Commerzbank AG Ffurt | 88,324,250 | 0.0% | LBCC - A/C Joint Trading | 6,524,412 | 0.0% |
| JPMC NY/FC Stone | 75,000,000 | 0.0% | HSBC Bank PLC UK | 6,283,510 | 100.0% |
| LB Aisa Holdings Ltd (019) | 64,288,000 | 0.0% | BNP Paribas SA Paris | 4,506,627 | 42.2% |
| LB Finance SA | 47,000,000 | 40.4% | Citibank NA London | 4,388,500 | 100.0% |
| Morgan Stanley Cptlgrp | 47,121,477 | 11.2% | LB Comm. Corp. Aisa Ltd. | 4,296,432 | 100.0% |
| Deutsche Bank AG Ldn | 37,512,061 | 14.9% | Fimat Altern. Strategies | 3,113,942 | 100.0% |
| Barclays Bank PLC | 33,637,712 | 11.4% | LB Comm. Corp. Asia | 3,034,417 | 34.3% |
| Bank Julius Baer Und Co. | 30,117,000 | 0.4% | Deutsche Bank Ldn - DE | 2,986,100 | 100.0% |
| Citibank Ldn/Julius Baer | 26,965,762 | 100.0% | RBS London | 2,765,656 | 100.0% |
| Citibank NA NY | 24,848,830 | 100.0% | Citigroup Treasury | 1,801,550 | 100.0% |
| ABN Amro/Chicago | 24,040,670 | 0.0% | LBIE | 1,759,486 | 100.0% |
| Cr. Suisse First Boston | 23,200,000 | 8.6% | BAE Systems PLC | 1,756,726 | 100.0% |
| Barclays Ldn/Rubicon | 22,586,146 | 0.4% | Banca Delle Marche Ancona | 1,694,580 | 100.0% |
| State St Bank & Trust/GS | 22,237,045 | 4.9% | LB Special Financing | 1,659,620 | 100.0% |
| ABN Amro Bank NV | 20,000,000 | 0.0% | Lux. Trading Finance | 1,611,000 | 100.0% |
| Cr. Suisse Ldn/GS Emerg. | 17,134,762 | 24.7% | JPMC Bank NY | 1,484,348 | 100.0% |
| Merrill Lynch Ldn | 15,657,500 | 46.2% | Zurcher Kantonalbank | 1,467,208 | 0.0% |
| HSBC Bank Ldn/GS | 13,830,398 | 26.3% | Merril Lynch Intl/GS | 1,447,643 | 100.0% |
| Merrill Lynch Captl Srvc | 13,057,000 | 23.4% | BWA/the Wm. & Flora | 1,412,037 | 0.0% |
| LB SEC Asia Ltd (130) | 12,294,605 | 0.0% | BWA - Railpen C1A | 1,358,025 | 0.0% |
| Phillip Morris Finance SA | 11,120,000 | 100.0% | BWA - Railpen C1Z | 1,296,296 | 0.0% |
| RBS Ldn/Lily Pond Capital | 10,845,771 | 0.0% | BWA - Brgwater Pure A | 1,239,637 | 100.0% |
| Bank of America NY | 10,657,675 | 6.2% | DBS Bank Ltd | 1,204,469 | 100.0% |
| Non-GCCM (e) | 10,634,396 | 100.0% | BWA - Teamster A1A | 1,149,691 | 0.0% |
| JPMC Bank Singapore | 10,000,000 | 0.0% | BWA / TFL Pension Fund | 1,149,012 | 0.0% |
| Merril Lynch Int Bank Ldn | 10,000,000 | 0.0% | ABN Amro/GS | 1,121,439 | 100.0% |
| ABN Amro/Mitsubishi | 9,834,300 | 64.8% | Amercian Express Bank Ltd Ldn | 1,000,000 | 100.0% |
| Intermobiliare Sim Spa | 8,952,000 | 100.0% | Other Counterparties < $1 million | 14,643,141 | 77.2% |
| LBCC vs. LBFAPL | 8,733,500 | 100.0% | **Total** | $ 2,137,718,201 | 18.3% |

Notes:

(a) This table only reflects counterparties that were owed amounts of $1 million or above.

(b) Source: RISC Monthly Statements [LBEX-LL 3357412 - LBEX-LL 3357674], [LBEX-LL 3371070 - LBEX-LL 3371355], [LBEX-LL 3396213 - LBEX-LL 3396252].

(c) Source: GCCM Data Extraction [LBEX-BARGCM 010374 - LBEX-BARGCM 010395].

(d) Source: Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389].

(e) Transaction amounts were not found in GCCM or in the RISC database.

The Examiner's financial advisors determined that during the Stub Period, LBCC

expected to receive approximately $2.9 billion in payments from counterparties,

primarily in connection with FX transactions.  However, it received only approximately

$400 million.[7182]  The table below compares these amounts.

Scheduled and Actual LBCC Stub Period Receipts From FX Counterparties (a)

| Date | Total Amt. Due (c) | Total Amt. Received (d) | % Received of Amt. Due | Total Amt. Not Received |
|---|---|---|---|---|
| **9/15/2008** | $931,977,932 | $154,022,750 | 16.5% | $780,955,182 |
| **9/16/2008** | $1,390,249,519 | $15,928,250 | 1.1% | $1,374,321,269 |
| **9/17/2008** | $104,620,891 | $593,416 | 0.6% | $104,027,475 |
| **9/18/2008** | $154,732,044 | $3,682,220 | 2.3% | $154,049,824 |
| **9/19/2008** | $50,851,891 | $- | 0.0% | $50,851,891 |
| **Non-GCCM (b)** | $235,545,263 | $235,545,263 | 100.0% | $- |
| **Totals** | **$2,867,977,539** | **$409,771,889** | **14.3%** | **$2,464,205,640** |

Notes:
(a) Based on wire date of expected receipt and does not necessarily correlate to date of actual receipt.
(b) Request date not available for these receipts.
(c) Source: GCCM Data Extraction [LBEX-BARGCM 004179 - LBEX-BARGCM 004215].
(d) Source: Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389].

The table below presents all LBCC FX counterparties identified by the

Examiner's financial advisors that owed amounts of $1 million or more to LBCC during

the Stub Period, and indicates what percentage of the amount owed was received by

LBCC.

---

[7182] The Examiner's analysis of LBCC bank statements and RISC system data suggests that approximately $235 million of this amount was unrelated to the settlement of FX transactions.

**LBCC Stub Period Receipts from FX Counterparties** (a)

| Counterparty (b) | Total Amt Due (c) | % Received (d) | Counterparty (b) | Total Amt Due (c) | % Received (d) |
|---|---|---|---|---|---|
| LB Aisa Holdings Ltd (019) | $ 1,418,356,045 | 0.0% | LB Comm. Corp. Asia | $ 13,205,115 | 0.0% |
| Non-GCCM (e) | 235,545,263 | 100.0% | AIG Intl Inc, FX for LBCC | 12,000,000 | 100.0% |
| LBIE - I/C | 177,340,208 | 57.8% | Bank Julius Baer Und Co. | 10,050,000 | 13.4% |
| Calyon | 87,541,093 | 0.0% | Barclays/Ellington - 3442 | 9,860,000 | 0.0% |
| LB Finance SA | 82,068,662 | 0.0% | LB SEC Asia Ltd (130) | 9,265,497 | 0.0% |
| Barclays Ldn/Rubicon | 74,242,355 | 0.0% | ABN Amro/Mitsubishi | 7,565,474 | 0.0% |
| LB Special Financing | 73,400,192 | 0.0% | Citibank NA London | 7,507,750 | 40.6% |
| Barclays Bank PLC | 59,147,237 | 0.0% | BWA - Pure Alpha - A2a | 7,392,435 | 0.0% |
| Bear Stearns FOREX | 58,744,908 | 0.0% | Ersel Sim SPA | 7,000,000 | 0.0% |
| Caceis Bank Lux/CAAM | 57,679,466 | 0.0% | Credit Suisse First Boston | 5,934,272 | 61.0% |
| UBS AG | 53,993,415 | 1.2% | RBS Ldn/Man Inv Ltd. | 5,921,395 | 0.0% |
| Morgan Stanley Cptlgrp | 38,901,801 | 0.0% | J. Aron & Co. | 5,879,603 | 0.0% |
| HSBC Bank PLC UK | 35,776,250 | 0.0% | RBS Ldn/Peregrine | 5,484,988 | 0.0% |
| JPMC Bank UK | 32,016,027 | 0.0% | Bayerische Hypo - und Vereins | 4,800,000 | 0.0% |
| Unidentified (f) | 26,144,050 | 38.2% | Citigroup Treasury | 4,086,550 | 0.0% |
| Deutsche Bank AG Ldn | 25,184,734 | 0.0% | BA BPATC, Pure Alpha | 3,099,190 | 0.0% |
| Commerzbank AG Ffurt | 24,874,500 | 0.0% | Citibank Ldn/Elk River | 2,589,950 | 0.0% |
| Bank of America NY | 23,324,375 | 0.0% | BWA - Pure Alpha - Euro | 2,385,792 | 0.0% |
| La Caixa Madrid | 21,885,000 | 100.0% | Dresdner Bank AG, Ffurt | 2,238,593 | 0.0% |
| HSBC Bank Ldn/GS | 21,227,721 | 0.0% | BWA-Exel Pensions C1A | 1,889,081 | 0.0% |
| ABN Amro/Chicago | 20,532,392 | 0.0% | RBS London | 1,846,179 | 0.0% |
| Merrill Lynch Ldn | 19,922,450 | 0.0% | Deutsche Bank Ldn - DE | 1,572,000 | 0.0% |
| Bank of New York NY | 17,731,728 | 0.0% | Barclays Bank Ldn/DeShaw | 1,366,400 | 0.0% |
| State St Bank & Trust/GS | 15,199,324 | 0.0% | JPMC NY /Koch Global | 1,169,799 | 0.0% |
| TD Bank - Toronto | 15,000,000 | 100.0% | Other Counterparties < $1 million | 18,088,281 | 23.1% |
| | | | **Total** | **$ 2,867,977,539** | **14.3%** |

Notes:

(a) This table only reflects counterparties that owed LBCC amounts of $1 million or above.

(b) Source: RISC Monthly Statements [LBEX-LL 3357412 - LBEX-LL 3357674], [LBEX-LL 3371070 - LBEX-LL 3371355], [LBEX-LL 3396213 - LBEX-LL 3396252].

(c) Source: GCCM Data Extraction [LBEX-BARGCM 004179 - LBEX-BARGCM 004215].

(d) Source: Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389].

(e) Transaction amounts were not found in GCCM or in the RISC database.

(f) The Examiner was unable to identify these counterparties through RISC statements.

The Examiner notes that approximately $1.7 billion of the approximately $2.5 billion shortfall in LBCC receipts from counterparties during the Stub Period was due to the nonpayment of funds by other Lehman entities. This amount accounts for approximately 96% of the unpaid amount LBCC owed to its counterparties in connection with FX transactions.

The Examiner further notes that Citibank, the paying agent for LBCC in connection with FX transactions, was also a counterparty in connection with certain

LBCC Stub Period FX transactions.  During this time, Citibank cleared 100% of the approximately $59 million LBCC owed to various Citibank entities.  However, various Citibank entities paid only 21% of the approximately $14 million they owed to LBCC.[7183]

**The Walt Disney Company Transaction.**  A noteworthy series of FX transactions, which did not completely settle as a result of the LBHI bankruptcy, took place between Lehman and Walt Disney Co.[7184]  In fact, Walt Disney Co. moved for the Examiner's appointment, in part, to investigate the circumstances related to the incomplete settlement of these transactions.[7185]

Walt Disney Co. entered into an ISDA[7186] master agreement ("the Master Agreement") with LBCC on May 8, 1998 for the purpose of conducting currency exchange transactions.[7187]  LBHI guaranteed the obligations of LBCC to Walt Disney Co. in connection with such transactions.[7188]  Because LBCC did not maintain foreign

---

[7183] The tables contained in Appendix 24 provide a full recitation of the information summarized in this Section: specifically, the expected and actual payments and receipts in connection with individual LBCC FX transactions.

[7184] This series of transactions consisted of twenty forward contracts.  Nineteen of these forward contracts were executed between June 12 and August 13, 2008.  The settlement date for such contracts was September 15, 2008.  An additional forward contract was executed on July 24, 2008.  The settlement date for this contract was September 16, 2008.  The Examiner's analysis suggests that a number of these forward contracts were executed as part of FX swap transactions.

[7185] *See* Motion of the Walt Disney Company for Appointment of Examiner pursuant to Section 1104(c)(2) of the Bankruptcy Code ("Examiner Motion"), at p. 6 (¶ 14), Docket No. 1143, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 20, 2008).

[7186] International Swaps and Derivatives Association, Inc.

[7187] ISDA Master Agreement [LBEX-AM 047043 - LBEX-AM 047059] (referring to the LBHI guaranty).

[7188] *See* ISDA Master Agreement at p. 22 [LBEX-AM 047043].

currency bank accounts, LBI served as an agent for LBCC for the receipt of foreign currencies.[7189]

During the period from September 11 through September 16, 2008, pursuant to the Master Agreement, Walt Disney Co. wired foreign currencies in various amounts into LBI Citibank foreign currency accounts for the benefit of LBCC.[7190]  According to the Examiner Motion, LBCC was required to pay Walt Disney Co. approximately $107 million in U.S. dollars on the same day.[7191]  Instead, LBCC paid Walt Disney Co. approximately $15 million on October 2, 2008.[7192]  No other payments were made to Walt Disney Co. in connection with these transactions.  The net unpaid amount owed to Walt Disney Co. is approximately $92 million.[7193]

The Examiner has endeavored to further understand the impact of the bankruptcy on Lehman's FX payments to counterparties, including Walt Disney Co. Generally, there were three steps involved in the payment of funds by Lehman to

---

[7189] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 3.

[7190] *See* schedule listing Walt Disney Co.'s foreign currency payments to Lehman in connection with these transactions [LBEX-AM 047073 - LBEX-AM 047074]. The foreign currency amounts are as follows: 20,000,000.00 Australian dollars; 20,000,000.00 Canadian dollars; 20,472,986.04 Euros; 17,061,453.56 British pounds sterling; 20,475,000.00 Singapore dollars; and 162,402,000.00 Japanese yen.  In addition, Walt Disney Co. instructed UBS to wire 4,302,101.92 Euros, 2,968,668.80 British pounds sterling, 1,118,000.00 Singapore dollars, and 162,402,000.00 Japanese yen to LBCC.  However, UBS did not consummate these transactions.  *Id.*

[7191] *See* Examiner Motion, at p. 2 (¶ 4), Docket No. 1143, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 20, 2008).

[7192] This payment was made in connection with the forward contract executed on June 12, 2008, selling Singapore dollars against U.S. dollars.  Debtor Bank Statement Data [LBEX-AM 5642207]; Walt Disney Co. September 2008 RISC Statement [LBEX-LL 3354476].

[7193] The determination of the exact amount owed to Walt Disney Co. is a factual question, dependent, in part, upon the appropriate currency exchange rate used to determine the value of currencies not delivered by Walt Disney Co. to Lehman pursuant to the forward contracts discussed above.

counterparties in these transactions: (1) the RISC system created a payment message, notifying GCCM that a payment was due to a counterparty; (2) GCCM released payment instructions to the paying bank (Citibank, in the case of LBCC) to send funds to the counterparty; and (3) the bank transferred the appropriate funds (*i.e.* cleared the payment) to the counterparty's designated bank account.

In addition to LBCC not having sufficient funds in its accounts to settle its FX obligations as a result of the bankruptcy filing, the timing, implementation and conclusion of the three step process outlined above was disrupted. The Examiner sets forth below examples of the impact that the bankruptcy and resulting operational disruption had on the settlement process of FX transactions with Lehman counterparties.

The following table summarizes the creation times for RISC payment messages and the release times for GCCM payment instructions to Citibank in connection with LBCC's payments to counterparties to settle FX transactions in amounts of $10 million or more during the Stub Period, as identified by the Examiner's financial advisors. The table also indicates whether Citibank in fact cleared payment.

**LBCC Requests to Citibank for Individual Payments $10 Million or Above to FX Counterparties**

| Party (a) | Amount (USD) (b) | RISC Payment Message Date (b) | RISC Created Payment Message (EST) (b) | GCCM Released Payment Instruction to Citi (EST) (b) | Result (c) |
|---|---|---|---|---|---|
| Walt Disney Co. | (33,364,108) | 09/15/08 | 12:27 AM | 12:33 PM | Not Paid |
| Walt Disney Co. | (19,218,700) | 09/15/08 | 12:27 AM | 12:33 PM | Not Paid |
| Walt Disney Co. | (19,537,241) | 09/15/08 | 12:27 AM | 12:33 PM | Not Paid |
| Walt Disney Co. | (32,453,441) | 09/15/08 | 12:27 AM | 12:33 PM | Not Paid |
| Walt Disney Co. | (14,891,429) | 09/15/08 | 12:27 AM | 12:33 PM | Paid 10/2/2008 |
| Ford Global Treasury | (62,733,340) | 09/15/08 | 12:36 AM | 12:43 PM | Paid 9/15/2008 |
| Cr. Suisse First Boston | (12,900,000) | 09/15/08 | 6:03 AM | 6:08 AM | Not Paid |
| LBIE - I/C | (11,035,656) | 09/15/08 | 6:03 AM | 6:08 AM | Not Paid |
| LBIE - I/C | (12,995,937) | 09/15/08 | 6:03 AM | 6:08 AM | Not Paid |
| LBIE - I/C | (11,903,565) | 09/15/08 | 6:03 AM | 6:08 AM | Not Paid |
| LB Finance SA | (20,000,000) | 09/15/08 | 6:03 AM | 6:09 AM | Not Paid |
| LBIE - I/C | (20,637,643) | 09/15/08 | 6:03 AM | 6:09 AM | Not Paid |
| LB Finance SA | (10,000,000) | 09/15/08 | 6:03 AM | 6:09 AM | Not Paid |
| JPMC Bank Singapore | (10,000,000) | 09/15/08 | 6:03 AM | 6:09 AM | Not Paid |
| JPMC NY / FC Stone | (75,000,000) | 09/15/08 | 6:03 AM | 6:09 AM | Not Paid |
| J. Aron & Co. | (150,860,219) | 09/15/08 | 6:03 AM | 6:09 AM | Not Paid |
| Citibank Ldn / Julius Baer | (26,965,762) | 09/15/08 | 6:03 AM | 6:10 AM | Paid 9/29/2008 |
| LB Aisa Holdings Ltd (019) | (24,179,500) | 09/15/08 | 6:03 AM | 6:10 AM | Not Paid |
| LB Aisa Holdings Ltd (019) | (40,108,500) | 09/15/08 | 6:03 AM | 6:10 AM | Not Paid |
| Bank Julius Baer Und Co. | (30,000,000) | 09/15/08 | 6:03 AM | 6:11 AM | Not Paid |
| Merril Lynch Int Bank Ldn | (10,000,000) | 09/15/08 | 6:03 AM | 6:11 AM | Not Paid |
| ABN Amro Bank NV | (20,000,000) | 09/15/08 | 6:03 AM | 6:11 AM | Not Paid |
| UBS AG | (27,086,689) | 09/15/08 | 6:03 AM | 6:12 AM | Not Paid |
| Commerzbank AG Ffurt | (36,218,000) | 09/15/08 | 9:22 AM | 9:28 AM | Not Paid |
| Commerzbank AG Ffurt | (52,106,250) | 09/15/08 | 9:22 AM | 9:28 AM | Not Paid |
| LBIE - I/C | (64,994,000) | 09/15/08 | 9:45 AM | 9:50 AM | Paid 9/15/2008 |
| Deutsche Bank AG Ldn | (11,651,680) | 09/15/08 | 10:49 AM | 10:55 AM | Not Paid |
| UBS AG | (20,337,500) | 09/15/08 | 10:49 AM | 10:55 AM | Not Paid |
| UBS AG | (37,650,000) | 09/15/08 | 10:49 AM | 10:55 AM | Not Paid |
| LBIE - I/C | (33,715,000) | 09/15/08 | 1:31 PM | 1:35 PM | Not Paid |
| Morgan Stanley Cptlgrp | (25,000,000) | 09/15/08 | 5:36 PM | 6:19 PM | Not Paid |
| Barclays Bank PLC | (12,500,000) | 09/16/08 | 6:04 AM | 10:15 AM | Not Paid |
| LB SEC Asia Ltd (130) | (12,294,605) | 09/16/08 | 6:04 AM | 10:15 AM | Not Paid |
| LB Finance SA | (10,000,000) | 09/16/08 | 6:04 AM | 10:15 AM | Paid 9/17/2008 |
| Barclays Bank PLC | (17,300,000) | 09/16/08 | 6:04 AM | 10:16 AM | Not Paid |
| Deutsche Bank AG Ldn | (20,281,250) | 09/16/08 | 10:19 AM | 10:54 AM | Not Paid |
| Ppl's Bank of China/Safe | (473,000,000) | 09/17/08 | 6:05 AM | 10:35 AM | Not Paid |
| Phillip Morris Finance SA | (10,000,000) | 09/17/08 | 9:42 AM | 12:00 PM | Paid 9/29/2008 |
| Citibank NA NY | (24,848,830) | 09/18/08 | 6:02 AM | 9:15 AM | Paid 9/19/2008 |
| Barclays Ldn/Rubicon | (10,000,000) | 09/18/08 | 9:15 AM | 6:02 AM | Not Paid |
| Bank of America NY | (10,000,000) | 09/19/08 | 6:08 AM | 10:12 AM | Not Paid |
| RBS Ldn / Lily Pond Capital | (10,845,771) | 09/19/08 | 6:08 AM | 10:12 AM | Not Paid |
| Ford Global Treasury | (131,397,048) | 09/19/08 | 6:08 AM | 10:12 AM | Not Paid |

Notes:

(a) Source: RISC Monthly Statements [LBEX-LL 3357412 - LBEX-LL 3357674], [LBEX-LL 3371070 - LBEX-LL 3371355],
[LBEX-LL 3396213 - LBEX-LL 3396252].

(b) Source: GCCM Data Extraction [LBEX-BARGCM 010374 - LBEX-BARGCM 010395].

(c) Source: Debtor Bank Statement Data [LBEX-AM 5642100 - LBEX-AM 5642389].

The timing set forth in the table above reveals certain anomalies.  Specifically, the time difference between the creation of payment messages in RISC and the generation of payment instructions in GCCM, for scheduled payments by LBCC to various counterparties on September 15, 2008, ranged from five minutes to 12 hours.  Prior to September 15, 2008, on the other hand, the time difference between the creation of the payment message in RISC and the release of the GCCM payment instruction to Citibank was typically less than 20 minutes.[7194]

The payment instructions from LBCC to Citibank on September 15, 2008 provide an illustration: RISC payment messages in connection with five scheduled payments from LBCC to Walt Disney Co. (ranging in amount from $14,891,429 to $33,364,108) were created at 12:27 a.m. EST.  Corresponding GCCM payment instructions were released approximately 12 hours later at 12:33 p.m.[7195]  Four of the five payments associated with these payment instructions did not clear.  The fifth payment in the amount of $14,891,429 cleared on October 2, 2008.

In contrast, a RISC payment message in connection with a scheduled payment of $64,994,000 from LBCC to LBIE was created at 9:45 a.m. EST (approximately nine hours after the creation of the Walt Disney Co. payment messages).  The corresponding

---

[7194] Citibank then typically cleared the payment on the same business day.  Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 6.

[7195] LBCC instructed Citibank to make an additional payment to Walt Disney Co. in the amount of $1,513,474 on Sept. 16, 2008, but that payment did not clear.  In any event, Walt Disney Co. did not pay LBCC the foreign currency funds related to this transaction.

GCCM payment instructions were released approximately five minutes later at 9:50 a.m. This payment cleared on September 15, 2008.[7196]

A RISC payment message for the payment of $62,733,340[7197] to Ford Global Treasury Inc. ("Ford") was created at 12:36 a.m. EST (approximately nine minutes after the creation of the Walt Disney Co. payment messages). The corresponding GCCM payment instructions were released approximately 12 hours later at 12:43 p.m. EST. This payment also cleared on September 15, 2008.[7198]

The RISC payment messages (and associated GCCM payment instructions) for the three transactions of $10 million or more listed below were generated one to three days after the payment messages and instructions for LBCC's payment to Walt Disney Co. These payments, which cleared during the period between September 17 and September 29, 2008, were as follows: (1) a payment of $10 million to LB Finance SA on September 17, 2008; (2) a payment of $10 million to Phillip Morris SA on September 29, 2008; and (3) a payment of $24,848,830 to Citibank (NY) on September 19, 2008. The

---

[7196] Similarly, a RISC payment message in connection with a payment of $26,965,762 to Citibank (London) was created at 6:03 a.m. EST (more than five hours after the creation of the Walt Disney Co. payment messages), and a GCCM payment instruction was released seven minutes later at 6:10 a.m. EST on September 15, 2008. This payment cleared on September 29, 2008.

[7197] An additional payment to Ford in the amount of $131,397,048 was requested on September 19, 2008, but did not clear. Ford Sept. 2008 Monthly RISC Statement [LBEX-LL 3261020 - LBEX-LL 3261033].

[7198] It should be noted that the five GCCM instructions for payment to Walt Disney Co. corresponded to the amounts of five foreign currencies paid by Walt Disney Co. to Lehman. Ford, on the other hand, paid various amounts in six foreign currencies to Lehman. However, LBCC's payment to Ford was made via one wire transfer. This netting of payments was typical of Lehman's arrangements with certain FX counterparties. Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 6.

Examiner further notes that 36 scheduled payments in amounts of $10 million or more to LBCC's counterparties during the Stub Period did not clear.

To further understand the priority in which payments made in connection with the transactions discussed above were cleared, the Examiner requested that Citibank provide an explanation of its policies and procedures in connection with the settlement of LBCC's FX transactions on and after September 15, 2008. According to Citibank, prior to September 15, in the ordinary course of business, Citibank would clear LBCC's FX payments to counterparties according to a FIFO (first-in, first-out) priority.[7199] According to Citibank, however, the payment clearing time did not necessarily match the GCCM payment instruction time discussed above because, under certain circumstances, scheduled payments to counterparties were held and not immediately paid.[7200] Citibank offered various reasons why a payment may have been held: (1) formatting errors in the payment instruction, (2) insufficient funds, (3) debit no-post restrictions or (4) sanction checks (e.g., the Office of Foreign Assets & Controls requires banks to hold payments going to Cuba or Iraq).[7201] These payments were directed to different queues in Citibank's systems and held there until they were cleared or cancelled.[7202]

---

[7199] Citigroup's Written Responses to Examiner's Inquiry (Jan. 12, 2010), at p. 2.
[7200] *Id.*
[7201] *Id.*
[7202] *Id.*

Citibank provided an overview of how the payment process for LBCC's accounts changed upon the LBHI bankruptcy filing.  On the morning of September 15, 2008, Citibank placed all of Lehman's accounts on "debit no-post" and "crisis management" status.[7203]  As a result, Citibank temporarily stopped processing all payments from LBCC's accounts.[7204]  Citibank resumed the payment process for LBCC's accounts later in the afternoon on September 15, clearing the largest payments that could be made with available funds.[7205]  Citibank recalled that payments that did not clear on that day because of insufficient funds were placed in a queue and cleared if the necessary funds became available.[7206]

According to Citibank, payments from LBCC's accounts continued without interruption from the late afternoon of September 15 through September 21, 2008.[7207] During this time, the separately queued LBCC payments that had not cleared on September 15 were processed simultaneously with LBCC's new payment instructions.[7208]  Citibank explained that it may have processed new payments before processing payments that had been pending since September 15 (because new payments may have cleared in between attempts to clear pending payments).[7209]

---

[7203] Id.

[7204] Id.

[7205] Id.

[7206] Id. at pp. 2-3.

[7207] Id. at p. 3.

[7208] Id.

[7209] Id.

Subsequently, on September 22 after an additional round of Lehman Affiliate bankruptcy filings, Citibank again imposed payment restrictions on Lehman's bank accounts. These restrictions were lifted on September 29, 2008.[7210] Citibank informed the Examiner that it did not receive any instructions from Lehman regarding the prioritization of LBCC's FX payments to counterparties.[7211]

As discussed above, as a result of LBHI's bankruptcy, LBCC did not have sufficient funds in its account to meet all of its obligations to its FX counterparties and operational disruption at both Lehman and Citibank impacted whether and in what order counterparties were paid.

### 6.    Examiner's Review of Intercompany Transactions Within Thirty Days of LBHI's Bankruptcy Filing (Seventh Bullet)

#### a)    Summary

This Section of the Report provides an overview of the intercompany accounts and transfers among LBHI and some of its direct and indirect subsidiaries, including LBIE, LBSF, and LBCS during the thirty-day period preceding the commencement of the Chapter 11 cases by each debtor on September 15, 2008 or thereafter or such longer period as the Examiner deemed relevant to the investigation.[7212] The Examiner was not asked to investigate the existence of potentially colorable claims, but rather to provide a

---

[7210] *Id.*

[7211] *Id.* at p. 2.

[7212] Examiner Order at p. 4, seventh bullet.

narrative relating to accounts and transfers among LBHI and various other Lehman entities of interest in the thirty days prior to LBHI's bankruptcy.

The Examiner found that certain Lehman entities of interest, particularly LBHI, LBIE, and LBSF, engaged in substantial intercompany funding and quasi-funding activity, as captured in Lehman's cash management system, GCCM, in the six weeks prior to LBHI's bankruptcy.  Notably, LBHI transferred a net amount of almost $22 billion to or on behalf of LBIE during that six-week period, including a net amount of at least $4 billion in the last week prior to LBHI's bankruptcy.

### b) Discussion

As an initial matter, the Examiner notes that other Sections of this Report address intercompany transfers relating to noteworthy events prior to, and during, this period. For example, the Examiner discussed collateral pledged to JPMorgan in August and September 2008 and the intercompany transfers from LCPI to LBHI preceding that pledge.  Similarly, the Examiner addresses insider preferences and discusses transfers between LBHI and certain LBHI Affiliates between June 1 and September 15, 2008.[7213]

To avoid duplication between this and other Sections of the Report, the Examiner analyzed intercompany "funding" and "quasi-funding"[7214] activity between LBHI and

---

[7213] See Appendix No. 22: Duff & Phelps, Preferences Against LBHI and Other Lehman Entities (Feb. 1, 2010).

[7214] For purposes of this discussion, the term "funding" refers to the movement of cash between bank accounts owned by the Lehman entities of interest.  "Quasi-funding" refers to activity where the Lehman entities of interest engaged in transfers and transactions with third parties on behalf of another Lehman

certain debtors in the days leading up to LBHI's bankruptcy on September 15, 2008.[7215]
The Examiner's financial advisors obtained from Barclays a report containing all
intercompany activity recorded in GCCM, including activity for August 1 through
September 15, 2008. The Examiner notes, however, that the data contains limited
information (and in some cases no information) relating to some entities, including LBI.
Moreover, as discussed in several Sections of this Report, money was transferred
between and among Lehman entities in ways not captured by GCCM (or contained in
the following analysis).

The Examiner analyzed such data for August 1, 2008 to September 12, 2008,[7216,]
and for comparison purposes, the corresponding time period in 2007, from GCCM.[7217] It
would have been impractical, in terms of time and resources, to identify and review
every means by which Lehman engaged in intercompany funding and quasi-funding
activity.[7218] Before turning to the intercompany funding and quasi-funding analysis,

---

entity of interest, thereby generating intercompany adjustments to the payable and receivable accounts
between them.

[7215] The Examiner did not investigate activity involving LCPI because its main bank account was tied to
the MTS trading system, which was not integrated into GCCM. See Section III.B.3.e.8 of this Report,
which discusses LCPI's funding activities.

[7216] The Examiner extended the look-back period to August 1 in order to capture a full accounting cycle.

[7217] The Examiner selected the corresponding 2007 time period as a useful benchmark for comparison.
While Lehman did have adverse economic events that year, such as closing BNC Mortgage in August
2007, Lehman posted positive net revenues in every quarter that year. Lehman Brothers Holdings, Inc.,
Fiscal Year 2007 Report (Form 10-K) (Jan. 29, 2008), at p. 135 n.16.

[7218] While GCCM captured Lehman's quasi-funding activity, the Examiner understands that GCCM did
*not* capture a considerable amount of Lehman's intercompany funding activity. Examiner's Interview of
Daniel J. Fleming, Dec. 17, 2009, at p. 8. See Section III.B.3.e.8 of this Report, which discusses alternate
mechanisms of intercompany funding-related transfers.

however, a brief overview of GCCM is necessary to provide context.[7219]    GCCM captured two types of intercompany activity:  (1) activity originating *outside* of GCCM by way of external feeder systems and (2) activity originating *inside* GCCM by way of internal GCCM payment functions.

With respect to activity originating outside of GCCM, four external feeder systems are relevant to this analysis.  Treasury Workstation (Summit) ("TWS") was a suite of applications that controlled Lehman's unsecured funding. TWSLON, a feeder system analogous to TWS, was employed for Lehman's European operations.  ASAP was a feeder system for payments and settlements related to fixed income and equity derivative transactions, in addition to consolidating the cash flows generated by those derivatives.  Finally, Prime Transaction Manager ("PTM") was a system for hedge fund-related prime brokerage activity.

As for activity originating inside of GCCM, two internal GCCM payment functions are relevant to this analysis.  MANPMT was used to denote certain transactions posted manually to the GCCM system.  FUNDING was an internal function that Lehman employed to initiate cash transactions, i.e., intercompany transfers between the bank accounts of the Lehman parties of interest.  For purposes of clarity, the Examiner notes that "funding" transfers, that is, transfers involving the

---

[7219] Lehman Brothers, Global Cash and Collateral Management Platform Initiative on Lehman Live [LBEX-LL 3356455] (hereinafter "GCCM Platform Initiative").

movement of cash between bank accounts of the Lehman entities of interest, was captured by GCCM from the internal FUNDING function.[7220]

### c)    Analysis

The Examiner conducted a two-fold analysis of intercompany funding and quasi-funding data captured in GCCM for the various Lehman entities of interest. First, the Examiner analyzed that data on a macro level by examining the net intercompany account activity for the entire 2007 and 2008 periods of analysis. From this analysis, the Examiner sought to understand each of the entity's roles in intercompany funding and quasi-funding activity relative to the other Lehman entities of interest. The Examiner then reviewed that data on a daily basis to identify any particularly notable intercompany activity occurring in the days immediately prior to LBHI's bankruptcy.

### d)    Analysis of Overall Net Intercompany Data for the 2007 and 2008 Periods of Analysis

#### (1)  LBHI

The Examiner observed that LBHI transferred a net amount of approximately $43 billion to or on behalf of certain other Lehman entities of interest in the 2007 period of analysis, and a net amount of approximately $28 billion to or on behalf of certain other Lehman entities of interest in the 2008 period of analysis. This activity included net funding transfers of about $8.1 billion and about $3.2 billion in the respective 2007 and 2008 periods of analysis, as well as net quasi-funding transfers of about $35 billion and

---

[7220] As discussed below, "funding" activity was also captured to some extent from MANPMT and TWS.

about $25 billion in the respective 2007 and 2008 periods of analysis. This activity is

presented in the chart below, with negative activity depicting net outflows of cash from

LBHI to or on behalf of other Lehman entities of interest with respect to the GCCM

source systems of interest:



In the 2007 and 2008 time periods of analysis, quasi-funding activity captured in

GCCM from the MANPMT source code comprised the vast majority of net transfers

(approximately $32.4 billion and approximately $21.8 billion in 2007 and 2008,

respectively).[7221]  LBHI transferred virtually all of that cash to or on behalf of LBIE in both years.  As for funding activity captured in GCCM from the FUNDING source code, the Examiner observed that LBHI transferred net amounts of approximately $8.1 billion and approximately $3.2 billion to various Lehman entities of interest in the respective 2007 and 2008 periods of analysis.  LBIE and LBSF were the primary recipients of these net transfers in the 2007 period of analysis.  In that period, LBHI transferred a net amount of approximately $4.0 billion to LBIE and approximately $4.4 billion to LBSF.  In the 2008 period of analysis, LBHI transferred a net amount of approximately $3.9 billion to LBIE.[7222]

These data show that LBHI transferred substantial cash to various Lehman entities of interest (funding) and made substantial payments on behalf of various Lehman entities of interest (quasi-funding), particularly LBIE.  These data are consistent with the Examiner's understanding that LBHI acted as "central banker" for the Lehman entities and that LBIE, in particular, required significant funding and quasi-funding during the period immediately prior to the bankruptcy filing as a result of unwinding prime brokerage services.[7223]  The Examiner understands that there is disagreement as to

---

[7221] The Examiner notes the possibility that MANPMT could have captured some funding-type transfers. In view of time and resource limitations, the Examiner did not attempt to quantify the amount of these funding-type transfers.

[7222] The LBHI transfers in 2008 were partially offset by transfers from LBSF to LBHI (roughly $0.6 billion).

[7223] Lehman Brothers, Liquidity of Lehman Brothers (Draft) (Oct. 7, 2008), at p. 16 [LBHI_SEC07940_844701] (presentation slide entitled "Broker Dealer Liquidity Positions" explaining that "[d]uring the week of September 8, LBIE lost $11.0 billion primarily as a result of [a] $4.2 billion decrease

whether substantial sums of cash flowed from LBIE to one or more Lehman entities in the days leading up to LBHI's bankruptcy.[7224]   The Examiner has not investigated this issue, and this analysis is not necessarily meant to answer that question.  The Examiner understands that there were ways to move money between entities not captured by the data contained in this analysis.

### (2)  LBIE

The Examiner observed that various Lehman entities of interest transferred a net amount of approximately $36.4 billion and $24.4 billion to or on behalf of LBIE in the respective 2007 and 2008 periods of analysis.   That activity included net funding transfers of about $4.0 billion and about $3.9 billion in the respective 2007 and 2008 periods of analysis, as well as net quasi-funding transfers of approximately $32.4 billion and approximately $20.5 billion in the respective 2007 and 2008 periods of analysis. This activity is set forth in the chart below:

---

in operational cash cushion of its prime broker business (although this cushion is meant to protect its prime broker business, it is commingled with and included in LBIE liquidity)").

[7224] Carrick Mollenkamp, et. al, *Outcry Grows Over Transfer of U.K. Funds By Lehman*, WALL ST. J., Sept. 22, 2008, at C1; *see also* Cassell Bryan-Low, *Lehman's Legacy: Lehman Europe Claims Begin to Come In*, WALL ST. J., Sept. 25, 2009, at C3.

**LBIE's Net Activity By GCCM Source System ($ in thousands)**
Positive denotes cash transferred to or on behalf of LBIE by all other Lehman entities of interest;
Negative denotes cash transferred by LBIE to or on behalf of all other Lehman entities of interest
*August 1, 2007 - September 12, 2007 and August 1, 2008 - September 12, 2008*



With respect to quasi-funding transfers, MANPMT activity comprised nearly all of these transfers, including net amounts of about $32.4 billion in the 2007 period of analysis and about $21.8 billion in the 2008 period of analysis. As discussed above, LBHI transferred virtually all of these amounts to or on behalf of LBIE. GCCM also captured notable quasi-funding activity from its ASAP source code in the 2008 period of analysis. In that period, LBIE transferred approximately $1.7 billion on behalf of LBSF. As for funding activity captured in GCCM from the FUNDING source code, the Examiner observed that LBHI transferred net amounts to LBIE of approximately $4.0

billion and approximately $3.9 billion in the respective 2007 and 2008 periods of analysis.

The foregoing data show that LBIE was the recipient of substantial funding and quasi-funding from various Lehman entities of interest, particularly LBHI. These data are consistent with the Examiner's understanding that LBIE required significant funding and quasi-funding during the period of this analysis as a result of unwinding prime brokerage services.[7225]

### (3)  LBSF

The Examiner observed that various Lehman entities of interest transferred net amounts of approximately $6.8 billion and approximately $4.0 billion to or on behalf of LBSF in the respective 2007 and 2008 periods of analysis. That activity included net funding transfers of nearly $4.4 billion into LBSF in the 2007 period of analysis and net funding transfers out of LBSF of nearly $600 million in the 2008 period of analysis. That activity also included net quasi-funding transfers of roughly $2.5 billion and roughly $4.7 billion to or on behalf of LBSF in the respective 2007 and 2008 periods of analysis. This activity is provided in the chart below:

---

[7225] Lehman Brothers, Liquidity of Lehman Brothers (Oct. 7, 2008), at p. 16 [LBHI_SEC07940_944701].





**LBSF's Net Activity By GCCM Source System ($ in thousands)**
Positive denotes cash transferred to or on behalf of LBSF by all other Lehman entities of interest;
Negative denotes cash transferred by LBSF to or on behalf of all other Lehman entities of interest
*August 1, 2007 - September 12, 2007 and August 1, 2008 - September 12, 2008*

With respect to TWS-related quasi-funding transfers, LBHI was the sole transferor in both the 2007 and 2008 periods of analysis. LBHI transferred net amounts of roughly $2.3 billion and roughly $2.5 billion, respectively, to or on behalf of LBSF.[7226] GCCM also captured notable quasi-funding activity, nearly $2.6 billion, from its ASAP source code in the 2008 period of analysis. In that period, LBIE and LBHI transferred net amounts of roughly $1.7 billion and roughly $750 million, respectively, on LBSF's behalf. As for funding activity captured in GCCM from the FUNDING source code, the Examiner observed that LBHI was the entity primarily associated with such net

---

[7226] The Examiner notes the possibility that TWS could have captured some funding-type transfers. In view of time and resource limitations, the Examiner did not attempt to quantify the amount of these funding-type transfers.

transfers.    In the 2007 period of analysis, LBHI transferred a net amount of approximately $4.4 billion to LBSF, while in the 2008 period of analysis LBSF transferred approximately $600 million to LBHI.

These data show that LBSF was the recipient of substantial net funding and net quasi-funding from various Lehman entities of interest.    The data showing LBSF's ASAP activity is consistent with the Examiner's understanding of LBSF's derivatives trading activities during the period of analysis.    In addition, the data showing LBHI's involvement in FUNDING activity with LBSF are consistent with the Examiner's understanding that LBHI acted as "central banker" for the Lehman entities.

### e)   Analysis of Net Daily Intercompany Data for the 2007 and 2008 Periods of Analysis

With few exceptions, the net daily intercompany data for the relevant periods in 2007 and 2008 revealed little notable activity in the last six weeks prior to September 15, 2008.[7227]    In many cases, an entity's level of net daily activity in 2008 generally mirrored the same level of net activity in the preceding year.    Moreover, in many cases, the Examiner observed that the net daily activity in the last two to three weeks prior to September 15, 2008 was either (1) minimal or nonexistent, or (2) consistent with prior weeks, suggesting the absence of notable activity.

---

[7227] The net daily data for the relevant periods in 2007 and 2008 are set forth in Appendix No. 25, Intercompany Transactions Occurring Within Thirty Days Before Bankruptcy (Feb. 1, 2010).

At the same time, the Examiner found several instances in which the net daily activity may be of particular note.  First, in reviewing LBHI's MANPMT activity with LBIE, the Examiner observed that in the 2008 period of analysis, LBHI transferred a net amount of roughly $12 billion to or on behalf of LBIE in the last two weeks prior to LBHI's bankruptcy, and a net amount of almost $9 billion in the last week alone.  The total activity for these two weeks comprised over half of the net activity for the entire 2008 period.  At the same time, in examining LBHI's FUNDING activity with LBIE, the Examiner observed that in the 2008 period of analysis, LBHI transferred a net amount of roughly $4 billion to LBIE in the last week prior to LBHI's bankruptcy.  As noted above, there is disagreement as to whether substantial sums of cash flowed from LBIE to one or more Lehman entities in the days leading up to LBHI's bankruptcy.[7228]

Second, in further reviewing LBHI's FUNDING activity, the Examiner also observed in the 2008 period of analysis that LBHI made sizeable net transfers of cash to LBSF and LBCS in the last week prior to LBHI's bankruptcy.  Those cash transfers included net amounts of approximately $2.7 billion to LBSF and nearly $250 million to LBCS.  Including the $4 billion in net transfers to LBIE discussed above, LBHI transferred a net amount of over $7 billion in cash during that last week in 2008.

---

[7228] Carrick Mollenkamp, *et. al, Outcry Grows Over Transfer of U.K. Funds By Lehman*, WALL ST. J., Sept. 22, 2008, at C1; *see also* Cassell Bryan-Low, *Lehman's Legacy: Lehman Europe Claims Begin to Come In*, WALL ST. J., Sept. 25, 2009, at C3.

Finally, in analyzing LBHI's ASAP activity with LBSF, the Examiner observed that in the 2008 period of analysis, LBHI transferred a net amount of roughly $650 million on behalf of LBSF on September 11, almost immediately prior to LBHI's bankruptcy.  The Examiner found this single net transfer particularly notable in view of the fact that it comprised almost 90% of the activity for the entire six-week period.

### 7.    Examiner's Analysis of Lehman's Debt to Freddie Mac

The Federal Housing Finance Agency ("FHFA"), Conservator for the Federal Home Loan Mortgage Corporation ("Freddie Mac"), requested the Examiner's assistance in investigating certain transactions between Freddie Mac and LBHI.[7229] Pursuant to the eighth bullet of paragraph 2 of the Examiner Order, the Examiner's investigation extends to "transactions . . . among the debtors and the pre-chapter 11 lenders and/or financial participants."[7230]   In this Section, the Examiner reports on his investigation concerning unsecured loans from Freddie Mac to LBHI in 2008 that LBHI did not repay.

---

[7229] *See* Letter from Alfred M. Pollard, FHFA, to Anton R. Valukas, Jenner & Block, re: In re Lehman Brothers Holdings, Inc., *et al.* (Feb. 23, 2009), at p. 2.  As Conservator for Freddie Mac, FHFA holds "all rights, titles, powers, and privileges" of Freddie Mac.  12 U.S.C. § 4617(b)(2).  Further, FHFA has the authority to avoid certain fraudulent transactions related to Freddie Mac.  *See id*. § 4617(b)(15).  FHFA claims superpriority to the proceeds of such transactions.  *See id*. § 4617(b)(15)(D).  The Examiner makes no legal conclusions as to FHFA's priority.

[7230] Further, the Examiner Order provides that "[t]he Examiner shall cooperate fully with any governmental agencies."  Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 6 (¶ 8), Docket No. 2569, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

Beginning in early 2008, Freddie Mac engaged in a series of privately negotiated short-term funding transactions with LBHI, typically advancing between $1 billion and $1.2 billion for approximately one month at a time.[7231]  Steven Engel, Lehman's Global Head of Funding, described LBHI's transactions with Freddie Mac as "plain vanilla:" Engel or another trader from Lehman's funding desk would speak with a broker, typically Tullett Prebon, which would indicate that Freddie Mac was looking to lend money and ask whether Lehman was interested in borrowing that money.[7232]  Lehman borrowed from Freddie Mac to take advantage of an attractive rate, and it would seek to roll the transaction when the rate was favorable.[7233]

On August 19, 2008, Freddie Mac transferred $450 million to LBHI and on August 20, 2008, Freddie Mac transferred $750 million to LBHI.[7234]  Both transfers were due to be repaid on the morning of September 15 – the day LBHI filed for bankruptcy –

---

[7231] Letter from David A. Felt, FHFA, to Anton R. Valukas, Jenner & Block, re: In re: Lehman Brothers Holdings, Inc., *et al.* (Apr. 17, 2009), at p. 2 & Attach. 2; Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 4.  Although FHFA and Lehman sometimes described these transactions as "fed funds" transactions, Steven Engel, Lehman's Global Head of Funding, explained that these transactions, though made through a fed funds broker, were not strictly fed funds transactions because LBHI was not a bank. Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at pp. 7-8.

[7232] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 4.

[7233] *Id.*  Engel never spoke with Freddie Mac directly about these transactions.  *Id.*  Richard Fuld interacted with Richard Syron, CEO of Freddie Mac, as a banking client, but Fuld had no recollection of discussing these transactions with Syron.  Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 14. According to FHFA, Syron also did not recall speaking with Fuld concerning these transactions.  Letter from David A. Felt, FHFA, to Anton R. Valukas, Jenner & Block, re: In re: Lehman Brothers Holdings, Inc., *et al.* (Apr. 17, 2009), at p. 4.  Although it appears that a call was scheduled among Lehman's Paolo Tonucci and others with Freddie Mac on August 1, 2008 "to discuss liquidity," e-mail from Daniel Malone, Lehman, to Paolo Tonucci, Lehman, *et al.* (July 31, 2008) [LBHI_SEC07940_53324], Tonucci could not recall whether the call took place, Examiner's Interview of Paolo Tonucci, Sept. 16, 2009, at p. 28.

[7234] *See* e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al.* (Aug. 19, 2008) [LBEX-DOCID 450084]; e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al.* (Aug. 20, 2008) [LBEX-DOCID 450083].

but never were.  The trades were executed through Tullett Prebon, at an interest rate of 2.55%, and the funds were initially placed into an LBHI account at Citibank.[7235]  This Citibank account was the cash account to which LBHI typically issued payment instructions.[7236]  Thus, the funds from Freddie Mac were not segregated from other LBHI funds and, upon receipt, they were managed as part of LBHI's liquidity pool.[7237]

Because Freddie Mac was due to be repaid on the morning of Monday, September 15, preparations for repayment should have occurred on Friday, September 12.[7238]  There is conflicting evidence as to whether preparations for repayment took place on September 12.  Engel explained that in order to prepare for repayment LBHI would have had to invest part of its liquidity pool Friday night in a product that would repay by Monday morning.  He did not think that such preparations were made on September 12.[7239]  In a letter dated October 16, 2008, Lehman's counsel stated that LBHI did not issue wire instructions to repay Freddie Mac on September 15.[7240]  However, Alvarez & Marsal has indicated that "[t]he payment request to repay this loan was systematically

---

[7235] E-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al*. (Aug. 19, 2008) [LBEX-DOCID 450084]; e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al*. (Aug. 20, 2008) [LBEX-DOCID 450083]; Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

[7236] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

[7237] *Id*. at pp. 5-6.

[7238] *Id*. at p. 6.

[7239] *Id*.

[7240] Letter from Diane Harvey, Weil, Gotshal & Manges, to Karen Wagner, Davis, Polk & Wardwell, re: Federal Home Loan Mortgage Corporation Funds Transfers (Oct. 16, 2008), at p. 2 (attached to Declaration of George Kielman in Supp. of Mot. of Federal Home Loan Mortgage Corp. for Leave to Conduct Rule 2004 Discovery, Docket No. 1181, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 22, 2008)).

generated and waiting to be released to the bank on Monday, 9/15/08."[7241]   Moreover,

some documentation over the course of the weekend indicated that Lehman planned to

repay Freddie Mac on September 15.[7242]

Despite the magnitude of Lehman's transactions with Freddie Mac, the

transactions were not governed by a formal written agreement.[7243]   Rather, LBHI

documented the transactions with "screenshots" from its accounting system.[7244]   In

addition, the broker Tullett Prebon would sometimes send Lehman e-mails confirming

the transactions and their basic terms.[7245]   Freddie Mac also maintained minimal trading

---

[7241] E-mail from Lauren Sheridan, Alvarez & Marsal, to Jerome L. Epstein, Jenner & Block, *et al*. (Oct. 20, 2009).  These wire instructions were issued by TWS (Treasury Workstation), an application used by LBHI to manage its treasury functions.  *See* e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Jenner & Block, *et al*. (Dec. 2, 2009); TWS Freddie Mac Payment Details [LBEX-AM 5640797]; *see also supra* Section III.B.2.c (discussing TWS).

[7242] *See* e-mail from Tamir Shafer, Lehman, to Daniel J. Fleming, Lehman, *et al*. (Sept. 13, 2008) [LBEX-DOCID 051810], attaching Spreadsheet [LBEX-DOCID 059347] (showing repayment to Freddie Mac scheduled for 9:00 a.m.); e-mail from Tamir Shafer, Lehman, to Christopher Tsuboi, FRBNY, *et al*. (Sept. 14, 2008) [LBEX-AM 049457], attaching Spreadsheet [LBEX-AM 049458] (showing repayment to Freddie Mac scheduled for 5:30 p.m.).

[7243] *See* e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Jenner & Block, *et al*. (Oct. 18, 2009); Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.  The Estate does not dispute the existence of these transactions.  Although Freddie Mac was not included on Lehman's initial list of its largest unsecured creditors, *see* Voluntary Petition, at Sched. 1, Docket No. 1, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008), it was later listed on Schedule F as a creditor holding an unsecured claim; that claim was listed as not contingent, not unliquidated, and not disputed, *see* Schedules, at p. 235, Docket No. 3078, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 12, 2009).  According to Alvarez & Marsal, Freddie Mac's exclusion from the initial list was inadvertent.  *See* e-mail from Lauren Sheridan, Alvarez & Marsal, to Jerome L. Epstein, Jenner & Block, *et al*. (Oct. 20, 2009).

[7244] *See* e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Jenner & Block, *et al*. (Oct. 18, 2009); Facsimile from Scott Alvey, Lehman, to Howard Comet, Weil, Gotshal & Manges (Oct. 30, 2008), at p. 2 [LBEX-SE 000001] (screenshot of August 20, 2008 transaction); Lehman, Screenshot of Aug. 19, 2008 Transaction [LBEX-AM 5640789].

[7245] *See, e.g.*, e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al*. (June 25, 2008) [LBEX-WGM 648915]; Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

records of these transactions.[7246]    Engel could not speak to whether such minimal

documentation was typical from Lehman's perspective, as Lehman did not engage in

similar transactions with other entities.[7247]

Although the Examiner is aware of multiple possible reasons that Freddie Mac

was not repaid on September 15,[7248] the critical fact is that LBHI had filed for bankruptcy

protection early on the morning of September 15 and thus did not have to make the

payment.[7249]    The Examiner is not aware of any basis to treat the Freddie Mac claim as

anything other than an unsecured claim that is not contingent, not unliquidated, and

---

[7246] Letter from David A. Felt, FHFA, to Anton R. Valukas, Jenner & Block, re: In re: Lehman Brothers Holdings, Inc., *et al.* (Apr. 17, 2009), at Attach. 4-5.

[7247] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

[7248] LBHI could not make wire transfers on September 15 because banks shut down its cash accounts. *See supra* Section III.B.2. In October 2008, however, Lehman's counsel offered a different reason for the nonpayment – that LBHI's Citibank account did not have sufficient funds to repay Freddie Mac on September 15.    Letter from Diane Harvey, Weil, Gotshal & Manges, to Karen Wagner, Davis, Polk & Wardwell, re: Federal Home Loan Mortgage Corporation Funds Transfers (Oct. 16, 2008), at pp. 1-2 (attached to Declaration of George Kielman in Supp. of Mot. of Federal Home Loan Mortgage Corp. for Leave to Conduct Rule 2004 Discovery, Docket No. 1181, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 22, 2008)).    Alvarez & Marsal, in turn, explained that "[t]he loan was not repaid because of the bankruptcy filing."    E-mail from Lauren Sheridan, Alvarez & Marsal, to Jerome L. Epstein, Jenner & Block, *et al.* (Oct. 20, 2009); Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 7.

[7249] It is true that a substantial amount of funds were withdrawn from LBHI's Citibank account on Friday, September 12, to meet JPMorgan's September 11 request for $5 billion cash collateral.    *See supra* Section III.A.5.b.1.k.    For a discussion of an avoidance analysis concerning Lehman's transactions with JPMorgan, *see supra* Section III.B.3.g.5.a.    LBHI also appears to have transferred $500 million from its Citibank account to LBI late on Sunday, September 14.    E-mail from Julius Silbiger, Citigroup, to Thomas Obermaier, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (stating that the $500 million had moved by 9:42 p.m. that evening); e-mail from Roger Barnes, Citigroup, to Naresh N. Kumar, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (explaining that Citichecking opened at 9 p.m. that evening so the transfer could be made then); e-mail from Thomas Fontana, Citigroup, to Christopher M. Foskett, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00101129] (approving the transfer).    An account statement, however, lists the transfer date as September 15.    Lehman Brothers Inc. Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142] (account statement confirming that the transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to Lehman Brothers Inc. account 3054-4658). See Sections III.C.5.c..1.d.iii and III.B.3.g.5.b for further discussion of this transfer.

not disputed – as indicated on the Debtor's Schedule F (Creditors Holding Unsecured

Nonpriority Claims).

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**


------------------------------------------------------------- x
                                                                :
In re                                                           :    Chapter 11 Case No.
                                                                :
LEHMAN BROTHERS HOLDINGS INC.,                                  :    08-13555 (JMP)
*et al.,*                                                       :
                                                                :    (Jointly Administered)
                                            Debtors.            :
------------------------------------------------------------- x


# REPORT OF
# EXAMINER ANTON R. VALUKAS


### Section III.C: Barclays Transaction

# TABLE OF CONTENTS

C.  Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to
Barclays, or From the Lehman ALI Transaction? .................................................1961
    1.  Executive Summary ...................................................1961
        a)  Purpose of Investigation ...............................................1961
          (1)  Barclays Sale Transaction...............................................1961
          (2)  Lehman ALI Transaction ...............................................1963
        b)  Summary of Conclusions.................................................1963
          (1)  Barclays Transaction...............................................1963
          (2)  Lehman ALI Transaction ...............................................1965
    2.  Facts..........................................................1965
        a)  Lehman Businesses and Assets .............................................1965
          (1)  LBHI Affiliate Operating Companies .................................1970
             (a)  LBCS .................................................. 1970
             (b)  LBCC.................................................. 1972
             (c)  LCPI .................................................. 1975
             (d)  LBSF .................................................. 1978
             (e)  LOTC .................................................. 1980
             (f)  LBDP and LBFP.................................................. 1981
             (g)  LBF .................................................. 1984
             (h)  BNC.................................................. 1986
          (2)  LBHI Affiliate Single Purpose Entities...........................1987
             (a)  LB 745 .................................................. 1987
             (b)  CES Aviation Entities .................................................. 1987
             (c)  PAMI Statler .................................................. 1988
             (d)  East Dover.................................................. 1988
             (e)  Scottish Finance .................................................. 1989
             (f)  Luxembourg S.A.R.L. .................................................. 1989
             (g)  Navigator .................................................. 1990
          (3)  Sale Transaction..................................................1991
    3.  Whether Assets of LBHI Affiliates Were Transferred to Barclays ............1997
        a)  Analysis of Securities Transferred to Barclays......................1998
          (1)  Securities Transferred to Barclays ...................................1999
             (a)  Lehman's Securities Trading Records and Systems ............. 2005
                (i)  General.................................................. 2005
                (ii)  GFS System Assessment.................................. 2008
                  a.  Comparison of GFS Data to Lehman's 10-Q
                     Filings.......................................... 2009

|  |  |  | b. | Comparison of GFS Data to Lehman's General Ledger | 2009 |
|  |  |  | c. | Reliability of September 12 Data | 2010 |
|  |  | (iii) | | GFS Data Extracted by Examiner | 2010 |
|  | (2) | Analysis of GFS Data | | | 2012 |
|  |  | (a) | CUSIPs Not Associated With LBHI Affiliate Entities | | 2014 |
|  |  | (b) | CUSIPs Associated Solely With an LBHI Affiliate Entity | | 2015 |
|  |  | (c) | CUSIPs Associated With Both LBI and LBHI Affiliate Entities | | 2016 |
|  |  |  | (i) | CUSIPs Associated With Subordinated Entities | 2016 |
|  |  |  | (ii) | Securities Financing Transactions | 2021 |
|  |  |  | (iii) | Alternative Analyses | 2024 |
|  |  | (d) | 817 CUSIPs With No GFS Data | | 2025 |
|  |  |  | (i) | September 19, 2008 GFS Dataset | 2026 |
|  |  |  | (ii) | Search by ISIN Number and Product ID | 2027 |
|  |  |  | (iii) | TMS Source System | 2027 |
|  |  |  | (iv) | Additional Data Sources | 2028 |
| b) | Analysis of Tangible Asset Transfers | | | | 2030 |
|  | (1) | LB 745 | | | 2033 |
|  | (2) | LBCS | | | 2035 |
|  | (3) | LCPI | | | 2036 |
|  | (4) | LBSF | | | 2038 |
|  | (5) | CES | | | 2039 |
|  | (6) | CES V | | | 2041 |
|  | (7) | CES IX | | | 2042 |
| c) | Analysis of Intangible Asset Transfers | | | | 2044 |
|  | (1) | Customer Information Assets | | | 2045 |
|  | (2) | Proprietary Software | | | 2051 |
|  | (3) | Assembled Workforce | | | 2054 |
| 4. | Lehman ALI Transaction | | | | 2055 |
| 5. | Conclusions | | | | 2063 |
| a) | Summary | | | | 2063 |
| b) | Colorable Claims Arising from Transfer of LBHI Assets | | | | 2064 |
|  | (1) | There Are No Colorable Claims Against Barclays Arising from Transfer of LBHI Affiliate Securities | | | 2064 |
|  | (2) | There Are Colorable, Limited Claims Against Barclays Arising from Transfer of LBHI Affiliate Office Equipment and LBCS Customer Information | | | 2076 |
|  |  | (a) | Bankruptcy Code Claims | | 2077 |
|  |  |  | (i) | Section 542 | 2077 |

          (ii)   Section 548 ........................................................ 2081
     (b) Common Law Claims ............................................. 2083
          (i)    Recovery of Chattel ................................ 2083
          (ii)   Conversion ................................................ 2086
          (iii)  Unjust Enrichment ................................... 2088
          (iv)  Trade Secret Misappropriation ...................... 2090
          (v)   Unfair Competition ................................. 2092
          (vi)  Tortious Interference With Employment Relations ..... 2094
   (3) Claims Against LBHI Affiliate Officers and Directors ................ 2096
     (a) Duty of Care ........................................................ 2098
     (b) Duty of Good Faith .............................................. 2100
     (c) Duty to Monitor ................................................... 2101
  c)  Lehman ALI Transaction .......................................... 2103
6.  Barclays Transaction ...................................................... 2103
  a)  Pre-Bankruptcy Negotiations ..................................... 2104
   (1) Barclays' Interest in a Transaction Involving Lehman ................ 2104
   (2) Negotiations Before September 15 ................................ 2110
  b)  LBHI Bankruptcy ...................................................... 2116
   (1) LBHI Files Chapter 11 ............................................. 2116
   (2) Post-Petition Clearing and Financing ......................... 2116
  c)  Negotiations Leading to APA ...................................... 2124
   (1) Participants ...................................................... 2127
   (2) Structure of Transaction .......................................... 2129
   (3) Negotiations Regarding Securities Positions to be Purchased
      by Barclays ....................................................... 2131
     (a) On September 15 and 16, Lehman and Barclays Review
        Lehman's Securities Positions and Marks ............... 2131
     (b) Barclays Agrees to Purchase "Long" Securities Positions
        With a Book Value of "Approximately $70 Billion" .............. 2138
   (4) Negotiations Regarding Contract Cure and Employee
      Compensation Liabilities ........................................ 2143
     (a) Contract Cure Costs .............................................. 2143
     (b) Compensation Liabilities ...................................... 2147
  d)  Consideration and Approval of Transaction Described in APA
    by LBHI and LBI Boards of Directors ............................ 2153
  e)  Transaction Described to the Court on September 17 ......... 2155
   (1) Sale Motion ........................................................ 2155
   (2) September 17 Sale Procedures Hearing ......................... 2157
  f)  Between September 17 and 19, the Securities Positions Being
    Acquired by Barclays Change ..................................... 2160

(1)  The "Replacement Transaction" ......................................................2160
(2)  $15.8 Billion Repo.........................................................................2170
(3)  September 19 Agreement to Transfer Additional Assets.............2175
    (a)  Excess 15c3-3 Assets ..............................................2178
    (b)  Additional Securities ..............................................2182
    (c)  OCC Margin ..........................................................2184
g)  The Court's Consideration and Approval of the Proposed
Transaction........................................................................................2188
(1)  September 19, 2008 Sale Hearing ......................................2188
(2)  The Sale Order .................................................................2192
h)  Transaction Closing ..........................................................................2194
(1)  JPMorgan/Barclays Disputes.............................................2194
(2)  The Committee's Role .......................................................2197
(3)  December 2008 Settlement Between Trustee, Barclays and
JPMorgan...........................................................................2208

### C.  Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to Barclays, or From the Lehman ALI Transaction?

#### 1.  Executive Summary

##### a)  Purpose of Investigation

###### (1)  Barclays Sale Transaction

By Order dated September 20, 2008, the Court approved, among other things, the sale of assets of LBHI, LBI and LB 745 to Barclays.  The Court did not authorize the transfer of non-debtor assets to Barclays.

After the September 22, 2008 closing of the sale transaction, certain creditors asserted that assets of LBHI affiliates (other than LBI and LB 745) may have been transferred to Barclays in connection with the sale transaction.[7250]

The Court directed the Examiner to investigate:

> Whether assets of any LBHI Affiliates (other than Lehman Brothers, Inc.) were transferred to Barclays Capital Inc. as a result of the sale to Barclays Capital Inc. that was approved by order of the Bankruptcy Court entered September 20, 2008, and whether consequences to any LBHI Affiliate as a result of the consummation of the transaction created colorable causes of action that inure to the benefit of the creditors of such LBHI subsidiary or affiliate.[7251]

---

[7250] *See, e.g.*, Motion of The Walt Disney Company for Appointment of Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 4 (¶ 10), Docket No. 1143, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 20, 2008); Motion of the Bank of New York Mellon Trust Company, N.A. as Indenture Trustee, for Order Pursuant to Bankruptcy Rule 2004 Directing Examination of, and Production by Lehman Brothers Holdings Inc., Lehman Brothers, Inc., Lehman Brothers Commodity Services Inc. and Barclays Capital Inc., Docket No. 1766, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Nov. 26, 2008).
[7251] Examiner Order, at p. 4 (sixth bullet).

The Examiner Order defines "LBHI Affiliate(s)" to include "LBCC [and] any other entity that currently is an LBHI chapter 11 debtor subsidiary or affiliate."[7252]  As of the date of the entry of the Examiner Order, those entities were:

- Lehman Brothers Commodity Services Inc.
- Lehman Brothers Commercial Corporation
- Lehman Commercial Paper Inc.
- Lehman Brothers OTC Derivatives Inc.
- Lehman Brothers Finance S.A.
- LB 745 LLC
- BNC Mortgage LLC
- Lehman Brothers Special Financing Inc.
- Lehman Brothers Derivative Products Inc.
- Lehman Brothers Financial Products Inc.
- Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior
- Lehman Scottish Finance L.P.
- PAMI Statler Arms LLC
- East Dover Limited
- Luxembourg Residential Properties Loan Finance S.A.R.L.
- CES Aviation LLC
- CES Aviation V LLC
- CES Aviation IX LLC

Additional affiliates of LBHI filed Chapter 11 petitions after the entry of the Examiner Order.[7253]  In addition, other affiliates of LBHI commenced foreign insolvency proceedings.[7254]  Because the definition of "LBHI Affiliates" in the Examiner Order includes neither entities that filed bankruptcy petitions after the entry of the Examiner

---

[7252] Examiner Order, at p. 3 (first bullet).

[7253] Those entities include Structured Asset Securities Corporation, LB Rose Ranch LLC, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC and LB Preferred Somerset LLC.

[7254] Those entities include LBIE, LBJ and LBAHL.

Order nor entities that commenced foreign insolvency proceedings, those entities were
not within the scope of the Examiner's investigation.

### (2)  Lehman ALI Transaction

On September 19, 2008, shortly before the commencement of the SIPA
proceeding for LBI, LBI transferred ownership of 25 subsidiaries (and their direct and
indirect subsidiaries) to Lehman ALI Inc. ("Lehman ALI"), pursuant to a PIK Note and
Security Agreement,[7255] an Assignment of Intellectual Property[7256] and a Transfer
Agreement.[7257]

The Court directed the Examiner to investigate:  "The transfer of the capital stock
of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc."[7258]

### b)  Summary of Conclusions

### (1)  Barclays Transaction

The Examiner investigated whether assets of any LBHI Affiliates were
transferred to Barclays in connection with the sale transaction.  The Examiner also
investigated certain aspects of the negotiation and consummation of the sale
transaction.  The Examiner concludes that there is sufficient evidence to support a
finding that limited assets of three LBHI Affiliates were transferred to Barclays in

---

[7255] PIK Note & Security Agreement between Lehman ALI Inc. and Lehman Brothers Inc. (Sept. 19, 2008).

[7256] Intellectual Property Assignment Agreement among Lehman Bros. Holdings Inc., Lehman Brothers
Inc., LB 745 LLC and Barclays Capital Inc. (Sept. 19, 2008) ("Intellectual Property Assignment").

[7257] Transfer Agreement among Lehman Brothers, Inc., LBI Group Inc., and Lehman ALI Inc. (Sept. 19,
2008) [LBEX-WGM 000227].

[7258] Examiner Order, at p. 4 (ninth bullet).

connection with the sale transaction,[7259] namely: (1) information identifying LBCS's

customers, the products those customers traded and prices for those products; and

(2) office equipment owned by LBCS, LBSF and LCPI.  The Examiner thus concludes

that colorable claims exist against Barclays arising from those transfers.  The Examiner

also concludes, however, that the value of those assets may not be material, particularly

in the context of the Debtors' Chapter 11 cases.  Specifically, the office equipment

transferred had a total net book value of less than $10 million (and an actual value that

was likely much less), and the customer information was of questionable value.  The

Examiner also concludes that there is no evidence to support a finding that any

securities transferred to Barclays in connection with the sale transaction were owned by

LBHI Affiliates.

To assist the parties and the Court, the Examiner sets forth below the facts he has

The Examiner concludes that the evidence does not support the existence of a

colorable claim that directors and officers of the LBHI Affiliates breached their fiduciary

duties in connection with the transfer to Barclays of the limited assets referenced

above.[7260]

To assist the parties and the Court, the Examiner sets forth below the facts he has

developed relating to the sale transaction.  However, in light of the pending litigation

between the Debtors, the SIPA Trustee and the Official Committee of Unsecured

Creditors ("Creditors Committee"), on the one hand, and Barclays on the other, relating

---

[7259] *See* Sections III.B.3.b & III.B.3.c of this Report.
[7260] *See* Section III.C.5.b.3 of this Report.

to the sale transaction, including the extensive discovery still underway, the Examiner has not reached any conclusions regarding whether LBHI or LBI have colorable claims arising from the acts and events relating to the sale transaction.[7261]  The Examiner sets forth below the facts relating to the sale transaction.[7262]  If the Court were to grant relief in connection with the motions and claims being brought by the Debtors, the SIPA Trustee or the Creditors Committee, however, the Examiner notes that such relief could inure in part to the benefit of creditors of the LBHI Affiliates.

### (2)  Lehman ALI Transaction

The Examiner analyzed documents and data and interviewed witnesses in order to develop an understanding of the Lehman ALI transaction and whether colorable claims arise from that transaction.  The Examiner concludes that the Lehman ALI transaction was the product of a good faith, well-grounded business judgment, and that the evidence does not support the existence of a colorable claim (other than claims arising from rights provided for in the PIK Note & Security Agreement itself) from the Lehman ALI transaction.[7263]

### 2.  Facts

### a)  Lehman Businesses and Assets

At the time LBHI filed its Chapter 11 bankruptcy petition on September 15, 2008, the Lehman organization consisted of thousands of entities that collectively supported

---

[7261] *See* Section III.C.6 of this Report.

[7262] *See id.*

[7263] *See* Section III.C.3.c of this Report.

its three primary business lines:  Capital Markets, Investment Banking and Investment

Management.[7264]

Lehman's Capital Markets division included secondary trading, financing,

mortgage origination and securitization, prime brokerage and research activities in

fixed income and equity products.  Lehman served as an agent, market-maker and

intermediary in the marketplace to facilitate these transactions on behalf of its clients.

The products that Lehman offered in connection with this business included a variety of

cash, derivative, secured financing, structured instrument and investment products.

The Capital Markets division also engaged in investing for principals and proprietary

trading activities, including real estate, private equity and other long-term

investments.[7265]

Lehman's Investment Banking division advised corporate, institutional and

government clients with respect to mergers, acquisitions and other financial matters.

This division also raised capital for these clients by underwriting public and private

debt offerings and equity instruments.  Lehman maintained investment banking hubs

in North America, Europe, the Middle East, Latin America and the Asia Pacific

region.[7266]

---

[7264] Examiner's Interview of Thomas E. Hommel, Apr. 29, 2009, at p. 3; Lehman Brothers Holdings Inc.,
Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 3 ("LBHI 2007 10-K").
[7265] LBHI 2007 10-K, at p. 4.
[7266] Id. at p. 7.

Lehman's Investment Management Division provided strategic investment advice and services to institutional and high net worth clients.[7267] Specifically, it offered asset management, private equity, wealth advisory and trust execution services.[7268]

Lehman functioned as an integrated company, and in general structured and managed its businesses along different product lines within the three divisions.[7269] Lehman and its subsidiaries typically presented themselves to the public as "Lehman" or "Lehman Brothers."[7270] Customers typically had a relationship with LBI, but Lehman employees would book certain trades to the legal entity within Lehman that corresponded to the product being traded, or that satisfied tax, financing or regulatory considerations.[7271] Multiple Lehman entities often were used to structure particular types of transactions.[7272] As a result, customers whose relationships were with LBI would, in fact, often have their business transacted through other Lehman entities. Those customers generally did not rely on the credit rating of those Lehman entities;

---

[7267] *Id.* at p. 8.

[7268] *Id.* at pp. 8-9.

[7269] Examiner's Interview of Peter A. Tennyson, Oct. 13, 2009, at pp. 2-3; Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 2; Examiner's Interview of Clifford Feibus, Mar. 12, 2009, at p. 2; Examiner's Interview of Thomas E. Hommel, Apr. 29, 2009, at p. 5.

[7270] *Cf.* Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 4; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 4.

[7271] Examiner's Interview of James P. Seery, Jr., Jan. 14, 2010, at p. 2; Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 2.

[7272] *See, e.g.,* Lehman, Confidential Memorandum re $660,000,000 Main Street Natural Gas, Inc., Gas Project Revenue Bonds Series 2008B (Jan. 14, 2008) [LBEX-AM 137776], attached to e-mail from Evette Saldana, Lehman, to Commitment Committee, Lehman (Jan. 11, 2008) [LBEX-AM 137775].

indeed, those customers sometimes were not even aware that Lehman entities other than LBI were involved in their transactions.[7273]

LBHI and LBI generally directed and managed the operations of the entire organization. These entities (and LBI in particular) hired, employed and compensated most Lehman employees.[7274] In certain cases, employees' compensation was booked as an expense at the legal entities for which they performed services.[7275] Those employees, however, generally regarded themselves as employees of LBI, rather than as employees of the subsidiary for which they performed functions.[7276] Most entities shared at least some common officers and directors.[7277]

---

[7273] Examiner's Interview of James P. Seery, Jr., Jan. 14, 2010, at p. 2; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 4. LBDP and LBFP, discussed in Section III.C.2.a.f, are exceptions to these general propositions.

[7274] Examiner's Interview of Tracy Binkley, Dec. 22, 2009; see, e.g., letter from Christopher O'Meara, Lehman, to John DeRosa, Lehman, re: employment offer (Nov. 10, 2006), at p. 2 [LBEX-AM 023144]; e-mail from Kaushik Amin, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [LBHI_SEC07940_656489].

[7275] Examiner's Interview of Clifford Feibus, Mar. 12, 2009, at p. 5.

[7276] E-mail from Paul Gregg, Lehman, to Peter Keavey, Lehman (Sept. 16, 2008) [LBEX-DOCID 3571486] (employees allocated to LBCS discussing transfer of LBI employees to Barclays and noting "that's us"); Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 4.

[7277] See, e.g., Lehman, LBCS World Records Report (Sept. 15, 2008) [LBEX-LL 027844]; Lehman, LBCC World Records Report (Sept. 15, 2008) [LBEX-LL 027848]; Lehman, LBSF World Records Report (Sept. 15, 2008) [LBEX-LL 027833]; Lehman, LBFP World Records Report (Sept. 15, 2008) [LBEX-LL 027860]; Lehman, LBDP World Records Report (Sept. 15, 2008) [LBEX-LL 027856]; Lehman, LBF World Records Report (Sept. 12, 2008) [LBEX-LL 027785]; Lehman, BNC World Records Report (Sept. 15, 2008) [LBEX-LL 027795]; Lehman, LB745 World Records Report (Sept. 15, 2008) [LBEX-LL 027840]; Lehman, CES World Records Report (Sept. 15, 2008) [LBEX-LL 027772]; Lehman, CES V World Records Report (Sept. 15, 2008) [LBEX-LL 027775]; Lehman, CES IX World Records Report (Sept. 15, 2008) [LBEX-LL 027779]; Lehman, PAMI Statler World Records Report (Sept. 15, 2008) [LBEX-LL 027790]; Lehman, East Dover World Records Report (Sept. 15, 2008) [LBEX-LL 027782]; Lehman, Navigator World Records Report (Sept. 15, 2008) [LBEX-LL 3668315]; Lehman, Scottish Finance World Records Report (Sept. 15, 2008) [LBEX-LL 027788]; Lehman, LOTC World Records Report (Sept. 15, 2008) [LBEX-LL 027852]. No World Records Report was available for Luxembourg LLC.

As a consequence of the functional approach that Lehman took to the operation of its day-to-day business, there was significant overlap between and among the operations of the various Lehman entities.   Nevertheless, the Lehman entities did observe basic corporate formalities, such as maintaining corporate record books and separate financial statements.   Legal entities typically were assigned a legal entity controller who was responsible for reviewing and verifying their financial statements, and monitoring their regulatory financial requirements, if any.[7278]   When entities required authorization from their directors to take certain actions, such authorization generally was provided through unanimous consent resolutions rather than board meetings.[7279]

In order to conduct his investigation of the operations and assets of the LBHI Affiliates, and of the possible transfer of assets to Barclays, the Examiner divided the businesses of LBHI Affiliates into two broad categories:  (a) operating companies; and (b) single purpose entities.[7280]

---

[7278] Examiner's Interview of Clifford Feibus, Mar. 12, 2009, at p. 2.

[7279] Examiner's Interview of James P. Seery, Jr.,  Nov. 12, 2009, at p. 4; Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 3; Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at p. 7.

[7280] Lehman's subsidiary and affiliate entities generally were organized into one of three tiers based on the type and value of assets that they held.  Lehman, Description of Lehman Subsidiary Tier Categories [LBEX-LL 001750].  Tier I entities generally held the most significant assets while Tier II and Tier III entities typically held much less substantial assets.  Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 2; Examiner's Interview of Tracy C. Tanaka, Oct. 21, 2009, at p. 2.  Most of Lehman's single purpose entities were in Tiers II or III, while the operating companies were typically Tier I.

## (1)  LBHI Affiliate Operating Companies

Several LBHI Affiliates were operating companies that regularly traded with Lehman customers and counterparties, including commodities, derivatives and foreign exchange trading transactions.  With the exception of LBCS, however, these entities generally were used by Lehman to book transactions related to customers of LBI.[7281] Lehman personnel asserted that customers did not rely on the credit ratings of these entities, with the exception of LBDP and LBFP, as discussed below.[7282]

### (a)  LBCS

Lehman Brothers Commodity Services, Inc. ("LBCS") housed Lehman's commodity trading business,[7283] which was focused on natural gas, oil and power trading.  LBCS also traded a variety of other commodities and commodities derivatives for Lehman, including products related to sulfur dioxide, carbon dioxide and nitrogen oxide emissions allowances,[7284] coal,[7285] metals and mining,[7286] chemicals,[7287] ethanol,

---

[7281] Examiner's Interview of James P. Seery, Jr.,  Jan. 14, 2010, at p. 2.  For background on Lehman's commodities operations generally, see Lehman, Global Commodities August 2008 YTD Performance [LBEX-DOCID 680728]; Lehman, Commodities Weekly Metrics As Of 9/4/08 [LBEX-DOCID 680596].

[7282] Examiner's Interview of James P. Seery, Jr.,  Jan. 14, 2010, at p. 2; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 4.

[7283] See Lehman, LBCS World Records Report (Sept. 15, 2008) [LBEX-LL 027844]; Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at p. 8.

[7284] See, e.g., e-mail from James Macintosh, Lehman, to Maximilian Coreth, Lehman (Aug. 25, 2008) [LBEX-DOCID 3628450]; e-mail from RGGI Auction Manager, World Energy, to James Macintosh, Lehman (Aug. 25, 2008) [LBEX-DOCID 3563294]; e-mail from James Macintosh, Lehman, to Adam Robinson, Lehman (Aug. 28, 2008) [LBEX-DOCID 3510886]; e-mail from James Macintosh, Lehman, to Robert Forgrave, CIBC (Sept. 15, 2008) [LBEX-DOCID 3567571].

[7285] See, e.g., e-mail from James Macintosh, Lehman, to Maximilian Coreth, Lehman (Aug. 25, 2008) [LBEX-DOCID 3567361].

[7286] See, e.g., Lehman, Commodities Priority List [LBEX-DOCID 3567397].

exotics (including index, single and multi-asset commodity derivatives and structured notes), agricultural products and uranium and nuclear products.[7288]

Although LBCS originally had focused on trading energy derivatives, at the time of Lehman's bankruptcy, it was in the process of building a physical trading presence and had acquired Houston-based Eagle Energy Partners as part of that growth strategy.[7289]  LBCS also engaged in a limited number of proprietary trading activities for Lehman.[7290]

The sophisticated parties with whom LBCS traded typically requested parent guarantees (from LBHI) when dealing with LBCS.[7291]

As of LBHI's bankruptcy filing, Lehman's records indicate that approximately 100 people who were employed by LBI performed functions for LBCS.[7292]  LBCS's primary operations were centralized on the seventh floor of Lehman's New York headquarters.[7293]

---

[7287] See, e.g., e-mail from Lawrence Jollon, Lehman, to Laurence Jollan, Lehman (Sept. 14, 2008) [LBEX-DOCID 3601573].

[7288] See, e.g., Max Coreth, North America Gas & Power Trading Power - New York [LBEX-DOCID 3458961], attached to e-mail from Paul Gregg, Lehman, to Satu S. Parikh, Lehman  (Sept. 16, 2008) [LBEX-DOCID 3460953].

[7289] Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at pp. 6-7; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 8.

[7290] Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at p. 9.

[7291] Id. at p. 8.

[7292] A&M, Spreadsheet of Employees Mapped to Legal Entities (Sept. 20, 2008) [LBEX-AM 5642400]; accord Examiner's Interview of David M. Perlman, July 10, 2009.

[7293] Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at p. 8.

LBCS's commodity trading business was separate and distinct from LBI's commodities business, which primarily executed domestic futures and options exchange-cleared trades for LBI's customer base.[7294]   LBI also cleared all domestic futures and exchange-traded options contracts for other Lehman entities.[7295]

### (b)  LBCC

Lehman Brothers Commercial Corporation ("LBCC") was the entity that Lehman used to book the majority of its foreign exchange ("FX") trades, including currency and FX options, spots and forwards.[7296]   LBCC also entered into swaps (particularly interest rate swaps) to hedge its transactions.[7297]

LBCC engaged solely in over-the-counter ("OTC") transactions. [7298]   It did not service a significant retail customer base, and instead typically dealt with sophisticated institutional clients and hedge funds.[7299]   LBCC also was involved in the interbank market, which meant that it engaged in OTC transactions with entities such as JPMorgan and Goldman Sachs.[7300]

---

[7294] Examiner's Interview of Satu S. Parikh, Jan. 4, 2010.

[7295] Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at p. 9.

[7296] Lehman, LBCC World Records Report (Sept. 15, 2008) [LBEX-LL 027848]; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 7.

[7297] Examiner's Interview of Peter A. Tennyson, Oct. 13, 2009, at p. 2; Examiner's Interview of Francois Chu-Fong, Dec. 18, 2009, at p. 2.

[7298] Examiner's Interview of Peter A. Tennyson, Oct. 13, 2009, at p. 2.

[7299] *Id.* at p. 3.

[7300] *Id.* at p. 3.

LBCC was used to book three primary types of FX transactions: spots, forwards and options.[7301]  Spot FX transactions consist of an agreement to exchange one currency for another within one to two business days.[7302]  A forward FX transaction is one in which counterparties agree to exchange currencies more than three days after the agreement date.[7303]  FX options are derivative instruments that give holders the right (though not the obligation) to buy or sell the underlying currency at a future date for a pre-determined price.[7304]

Although LBCC was used to book most of Lehman's FX and currency trades, it was not the only entity that engaged in these types of activities.  Many other entities engaged in such trades as well because hedge accounting rules often required that the hedge involve the same legal entity as the position being hedged.[7305]  Thus, LBSF also traded heavily in interest rate swaps; LBIE was engaged in FX trading through its role as the UK broker-dealer; and LBI engaged in spot FX transactions with Street counterparties such as other commercial banks.[7306]  LBI also handled some "vanilla" FX trades for highly rated or institutional counterparties,[7307] while trades with counterparties that presented some credit risk, including PIM customers, typically were

---

[7301] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 2.

[7302] Examiner's Interview of Francois Chu-Fong, Dec. 18, 2009, at p. 2.

[7303] *Id.*

[7304] *Id.*

[7305] Examiner's Interview of Peter A. Tennyson, Oct. 13, 2009, at pp. 2-3.

[7306] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 3.

[7307] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 3.

booked at LBCC.[7308]  LBI did not engage in FX options transactions, because its ability to

do so was constrained by regulatory requirements.[7309]  Rather, LBI booked FX options

transactions even for highly-rated counterparties at LBCC.[7310]

Some of LBCC's FX trades were done back-to-back with other Lehman entities.[7311]

If an existing customer already had an account with a Lehman entity, the customer

could engage in the FX trade with that entity, and LBCC would enter into a back-to-

back FX trade with the Lehman entity where the customer maintained the account.[7312]

This also worked in the opposite direction if LBCC was the entity where the customer

had a relationship.[7313]  Generally speaking, however, the primary Lehman interface for

most clients was LBI.[7314]

LBCC was wholly-owned and fully guaranteed by LBHI.[7315]  LBCC had a few

dedicated traders, and used LBHI and LBI employees to support its broader

---

[7308] Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 3; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at pp. 3, 5.

[7309] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at pp. 3, 5; Examiner's Interview of Francois Chu-Fong, Dec. 18, 2009, at p. 3; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3; Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 4.  For further discussion of Lehman's FX business, see Section III.B.5.

[7310] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 3; Examiner's Interview of Francois Chu-Fong, Dec. 18, 2009, at p. 3; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3; Examiner's Interview of Robert Eby, Jan. 6, 2010, at p. 4.

[7311] Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 3; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2.

[7312] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 3; Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 3.

[7313] Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 3.

[7314] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 4.

[7315] Lehman, LBCC World Records Report (Sept. 15, 2008) [LBEX-LL 027848]; Amended Corporate Ownership Statement Pursuant to Federal Rule of Bankruptcy Procedure 1007(a)(1) and Local Rule of

infrastructure requirements.[7316]  Generally, Lehman employees did not think of LBCC as

a distinct entity.[7317]  LBCC was thinly capitalized and could not have survived without

LBHI.[7318]

### (c)  LCPI

Lehman Commercial Paper, Inc. ("LCPI") was used by Lehman to book and hold

loans,[7319] including commercial loans,[7320] whole loans, real estate loans and distressed

debt purchases.[7321]  It also originated and traded secured and unsecured loans.[7322]  In a

typical origination transaction, LBHI or LBI would underwrite the loan, a different

Lehman entity would fund it, and the loan would be recorded at LCPI.[7323]  This was

done in part to obviate the need for regulated entities, such as LBI, to record capital

---

Bankruptcy Procedure 1007-3, Docket No. 8, *In re Lehman Bros. Commercial Corp.*, No. 08-13901 (Bankr. S.D.N.Y. Oct. 23, 2008); Lehman Unanimous Written Consent to the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (June 9, 2008) [LBEX-AM 003415].

[7316] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 5.

[7317] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 2; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 6.

[7318] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 2; Examiner's Interview of Peter A. Tennyson, Oct. 13, 2009, at p. 3; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 5.

[7319] Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 3; Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 4.

[7320] Examiner's Interview of Joselito M. Rivera, Oct. 13, 2009, at p. 5.

[7321] Examiner's Interview of James P. Seery, Jr.,  Nov. 12, 2009, at p. 4.

[7322] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL-027825]; Debtors' Motion Pursuant to Sections 105(a), 363(b), 363(c) and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authority to (A) Continue to Utilize Its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations, at p. 3, Docket No. 3, *In re Lehman Commercial Paper, Inc.*, No. 08-13900 (Bankr. S.D.N.Y. Oct. 6, 2008).

[7323] Examiner's Interview of James P. Seery, Jr.,  Nov. 12, 2009, at p. 4.

charges pertaining to the loan.[7324]    LCPI also extended warehouse loans that were

secured by mortgage loans and other assets.[7325]

In addition, LCPI was involved in the administration, syndication and trading of

commercial loans.[7326]  In the primary loan market, LCPI served as a lender, syndication

agent and administrative agent for commercial loans, and also bought and sold loans

that other financial institutions originated.[7327]  Its portfolio of loans included both fully

funded loans and unfunded loans (loans as to which it had future funding

obligations).[7328]

When LCPI acted as an administrative agent, it served as an intermediary

between lenders and borrowers and performed functions such as monitoring loans,

collecting advances from lending syndicate members and transferring these funds to

borrowers, and collecting payments of principal and interest from borrowers and

---

[7324] *Id.*

[7325] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL-027825].  The process of "warehousing" loans consisted of extending "warehouse" lines of credit to finance the operations of mortgage originators in exchange for the right to sell securities backed by a pool of mortgages. Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009, at p. 4.

[7326] Lehman, LCPI World Records Report (Sept. 15, 2008) [LBEX-LL-027825]; Debtors' Motion Pursuant to Sections 105(a), 363(b), 363(c) and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authority to (A) Continue to Utilize Its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations, at p. 3, Docket No. 3, *In re Lehman Commercial Paper, Inc.*, No. 08-13900 (Bankr. S.D.N.Y. Oct. 6, 2008).

[7327] Debtors' Motion Pursuant to Sections 105(a), 363(b) and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authority to (A) Continue to Utilize Its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations, at pp. 3-4, Docket No. 3, *In re Lehman Commercial Paper, Inc.*, No. 08-13900 (Bankr. S.D.N.Y. Oct. 6, 2008).

[7328] *Id.* at p. 4.

distributing the funds to syndicate members.[7329]   LCPI sometimes had no economic interest in a particular loan, while in other transactions it served both as lender and as an administrative agent.[7330]   LCPI received a fee for its services as an administrative agent.[7331]

When LCPI acted as a syndication agent, it originated commercial loans and sold interests in them to third parties.[7332]  These third parties pledged to fund a portion of the lenders' future obligations in exchange for a proportionate share of the proceeds from repayment of the loans.[7333]   In a typical syndication transaction, LCPI would sell a participation.  The participant would in turn receive the right to receive principal and interest payments from the loan.  The participant would assume an obligation to fund a proportional unfunded amount of the loan.[7334]  The participant did not become a lender of record, however, and there was no direct contractual relationship between the borrower and the participant in these transactions.[7335]   LCPI also would buy participations in loans that other financial institutions originated and sell sub-participations of its share to third parties.[7336]

---

[7329] *Id.*

[7330] *Id.*

[7331] *Id.*

[7332] *Id.*

[7333] *Id.*

[7334] *Id.*

[7335] *Id.* at pp. 4-5.

[7336] *Id.* at p. 5.

LCPI was the primary entity through which Lehman engaged in securitizations.[7337] LCPI maintained a repo facility at JPMorgan, and was actively involved in intercompany repo and reverse repo financing.[7338]

Early in its history, LCPI had been engaged in issuing commercial paper, but notwithstanding its name, was no longer active in that business line at the time of bankruptcy.[7339]

Lehman's records indicate that approximately 120 LBI and LBHI employees performed functions for LCPI.[7340] LCPI funded its operations through repo agreements, bank credit facilities and borrowings from LBHI.[7341] LCPI could not function as a stand-alone entity.[7342]

### (d)  LBSF

Lehman Brothers Special Financing, Inc. ("LBSF") was used by Lehman as its primary vehicle for trading in derivatives,[7343] and was fully guaranteed by LBHI.[7344]

---

[7337] Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 4.

[7338] *Id.*

[7339] Examiner's Interview of Joselito M. Rivera, Oct. 13, 2009, at p. 5; Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 4.

[7340] A&M, Spreadsheet of Employees Mapped to Legal Entities (Sept. 20, 2008) [LBEX-AM 5642400].

[7341] Lehman, LCPI, World Records Report (Sept. 15, 2008) [LBEX-LL-027825]; Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009, at p. 1.

[7342] Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 3.

[7343] Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009; Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 10; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 6.

[7344] Lehman, LBSF World Records Report (Sept. 15, 2008) [LBEX-LL-027825]; Lehman, Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (June 9, 2008) [LBEX-AM 003415].

LBSF was used to book transactions for products including interest rate swaps,[7345] interest rate and equity derivatives,[7346] mortgage-backed securities,[7347] currency derivatives,[7348] credit default swaps,[7349] total return swaps,[7350] collateralized debt obligations[7351] (including structured finance collateralized debt obligations and corporate-backed synthetic collateralized debt obligations)[7352] and municipal bonds and derivatives.[7353]

Although LBSF was Lehman's primary swap trading entity, other entities also were used to book swaps for, among other things, hedging purposes.[7354] LBSF also was used as a swap counterparty for trades originating at other Lehman entities.[7355] If a client maintained a relationship with a different Lehman entity, but wanted to execute a

---

[7345] Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 3; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 4; Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 2.

[7346] See, e.g., memorandum from Ajay Nagpal, Lehman, to Allyson Carine, Lehman (Nov. 4, 2004) [LBEX-DOCID 3525376]; memorandum from Janet Hurley, Lehman, et al., to Transaction Management Group, et al., Lehman (July 21, 2006) [LBEX-DOCID 3568131].

[7347] See, e.g., letter from Lehman Brothers Special Financing Inc. to Credit Industriel et Commercial (Nov. 16, 2006) [LBEX-DOCID 3678372].

[7348] E-mail from Jessica Laut, Lehman, to Kathleen Kalaher, Lehman, et al. (Aug. 28, 2008) [LBEX-DOCID 3620744].

[7349] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 6.

[7350] E-mail from Jonathan Lai, Lehman, to John Gatsos, Lehman, et al. (Sept. 15, 2008) [LBEX-DOCID 3621679].

[7351] E-mail from Terrence Glomski, Lehman, to Stephen Lukow, Lehman (Sept. 15, 2008) [LBEX-DOCID 3620796].

[7352] See, e.g., Lehman, CDO Entity List [LBEX-DOCID 3501971].

[7353] See, e.g., memorandum from Gerald Rizzieri, Lehman, et al., to Matthew Looney, re: Lehman, Closing Memorandum (Aug. 25, 2008) [LBEX-DOCID 3517551]; e-mail from Patrick Scott, Lehman, to Gerald Rizzieri, Lehman, et al. (Aug. 27, 2008) [LBEX-DOCID 3547534]; Lehman, Municipal Derivatives Business and Market Risk Overview, at p. 4 (Sept. 2008).

[7354] Examiner's Interview of Peter A. Tennyson, Dec. 2, 2009, at p. 2.

[7355] Examiner's Interview of Satu S. Parikh, Aug. 26, 2009, at p. 10.

trade in a product that LBSF typically booked, LBSF would often make the trade back-

to-back with the other Lehman entity.[7356]

LBSF had a dedicated trading desk that was used to trade and manage the

products described above.[7357]  However, LBSF did not have its own sales force.[7358]  LBSF

could not have survived as a stand-alone entity.[7359]

### (e)  LOTC

Lehman Brothers OTC Derivatives, Inc. ("LOTC") was an over-the-counter

("OTC") derivatives dealer regulated by the SEC.[7360]  It faced customers in the United

States, and was subject to lower capital requirements than a full-service broker-dealer

such as LBI.[7361]  By limiting its activities to eligible OTC derivative products and risk

mitigating transactions, LOTC was permitted to calculate its regulatory capital

requirement using VaR models.[7362]  The reduced capital requirements allowed Lehman

to offer lower prices on these transactions than a traditional broker-dealer with more

substantial capital requirements, such as LBI, could offer.  LOTC was subject to regular

---

[7356] *Id.*

[7357] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 6.

[7358] *Id* at p. 6.

[7359] Examiner's Interview of Kaushik Amin, Sept. 17, 2009, at p.10.

[7360] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 9.

[7361] *Id.*

[7362] Lehman Brothers Company Overview, Third Quarter 2007, at p. 4 [LBEX-LL 2165164].

reporting requirements, strict internal controls, and annual review by the SEC.[7363]  LOTC

was wholly-owned and fully guaranteed by LBHI.[7364]

### (f)  LBDP and LBFP

Lehman Brothers Derivative Products, Inc. ("LBDP") and Lehman Brothers

Financial Products, Inc. ("LBFP") were AAA-rated derivatives trading entities.[7365]  The

AAA-ratings were important because some OTC derivatives trading counterparties

required a AAA counterparty credit rating in order to do business with Lehman.[7366]

To maintain their AAA ratings, LBDP and LBFP were subject to numerous

requirements, including year-end audits, regular issuance of financial statements and

monitoring by on-site auditors.[7367]  Both had to comply with certain operating

guidelines, which Lehman shared with rating agencies and auditors.[7368]  They also were

required to submit verifications to the rating agencies confirming their compliance with

operating and capital requirements.[7369]

---

[7363] *Id.*

[7364] Lehman, LOTC World Records Report (Sept. 15, 2008) [LBEX-LL-027825]; Corporate Ownership Statement Pursuant to Federal Rule of Bankruptcy Procedure 1007(a)(1) and Local Rule of Bankruptcy Procedure 1007-3, Docket No. 2, *In re Lehman Bros. OTC Derivatives, Inc.*, No. 08-13893 (Bankr. S.D.N.Y. Oct. 3, 2008); Lehman, Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (June 9, 2008) [LBEX-AM 003415].  Further details about LOTC's business are found at Section III.C.2.a.1.c of this Report.

[7365] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 4; Lehman, LBFP World Records Report (Sept. 15, 2008), [LBEX-LL 027860]; LBDP World Records Report (Sept. 15, 2008) [LBEX-LL 027856].

[7366] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 4; Examiner's Interview of Murtaza Bhalloo, Sept. 14, 2009.

[7367] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 4; Examiner's Interview of Clifford Feibus, Mar. 12, 2009, at pp. 4-5.

[7368] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 4.

[7369] *Id.*

LBFP and LBDP monitored their capital levels daily to ensure that they fully complied with the formulas used to calculate their capital requirements.[7370]  The formulas established minimum capital requirements based on the credit ratings of LBFP's and LBDP's counterparties and their exposures to those counterparties.[7371]  As the market began to decline in the months leading up to LBHI's bankruptcy, these capital requirements increased, but LBFP and LBDP still retained their AAA ratings until their actual bankruptcy filings.[7372]

Both LBDP and LBFP were used to engage in swap and derivative transactions.[7373]  They were used primarily for interest rate swaps, and neither entity was involved in credit default swaps.[7374]  The entities' counterparty trades were mirrored and supported with margin and collateral from LBSF.[7375]  The LBDP and LBFP capital structures were very expensive to maintain, however, so Lehman traders were discouraged from booking trades through them.[7376]

Although LBFP and LBDP were used to trade similar products, they were designed to operate differently upon the occurrence of certain triggering events.

---

[7370] *Id.*

[7371] *Id.*

[7372] *Id.*

[7373] *Id.* at p. 5; Lehman, LBFP World Records Report (Sept. 15, 2008) [LBEX-LL 027860].

[7374] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5.

[7375] *Id.*; e-mail from Mahavir Saida, Lehman, to John E. Martinelli, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 3620842].

[7376] Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009, at p. 5.

LBFP was a bankruptcy remote vehicle[7377] and was created as a continuation structure, which meant that if certain triggering events occurred (such as its holding company filing for bankruptcy), a contingent manager would step in and continue to trade LBFP's positions.[7378]

In contrast, LBDP was organized as a termination structure[7379] that had a "hard termination feature."[7380]    Under this arrangement, all of LBDP's swaps terminated automatically if certain triggering events occurred.[7381]    LBDP's termination events included:  (1) a downgrade in LBDP's rating; (2) LBSF's failure to deliver or procure delivery of required collateral; (3) LBDP's failure to maintain designated capital requirements; and (4) bankruptcy of LBHI or LBSF.[7382]

Neither LBFP nor LBDP could have survived without LBHI or LBI because they had no independent ability to raise funds.[7383]

---

[7377] Lehman, LBFP World Records Report (Sept. 15, 2008) [LBEX-LL 027860]; e-mail from Seth L. Konheim, Lehman, to Alexander Pevzner, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 3620957].

[7378] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 6; Lehman, LBFP Operating Guidelines [LBEX-BARLEG 0001886].

[7379] Lehman, LBDP World Records Report (Sept. 15, 2008) [LBEX-LL 027856]; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5.

[7380] E-mail from Gerald Rizzieri, Lehman, to Brian Finnegan, Lehman (Sept. 17, 2008) [LBEX-DOCID 3592595].

[7381] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5; Lehman, LBDP Operating Guidelines, Article Ten (July 16, 1998), at pp. 24-30 [LBEX-BARLEG 00001824].

[7382] Lehman, LBDP Operating Guidelines, Article Ten (July 16, 1998), at pp. 25-26   [LBEX-BARLEG 00001824].

[7383] Examiner's Interview of Murtaza Bhalloo, Sept. 14, 2009, at p. 4.

### (g)  LBF

Former debtor Lehman Brothers Finance, S.A. ("LBF") was a wholly-owned and fully guaranteed subsidiary of LBHI, and was the entity through which Lehman conducted a substantial portion of its equity derivatives business.[7384]  Approximately 50 percent of Lehman's equity derivatives transactions were booked in LBF.[7385]  In general, LBF was used to structure and trade global OTC equity derivatives,[7386] including equity derivatives involving complex disbursement formulas.[7387]  Most of its counterparties were professional market participants.[7388]

LBF was organized in Switzerland, where it qualified to operate as an unregulated entity.[7389]  To maintain this status, LBF restricted its activities to the following:

- execution of OTC derivatives (*i.e.,* options, forwards and swaps) on underlying assets or products;

---

[7384] Lehman, LBF World Records Report (Sept. 15, 2008) [LBEX-LL 027785]; Joint Declaration of Pascal Portmann and Christiana Suhr Brunner, as Representatives of PricewaterhouseCoopers AG, Zurich, as Bankruptcy Liquidator of Lehman Brothers Finance AG, in Liquidation, a/k/a Lehman Brothers Finance SA, in Liquidation, in Support of Chapter 15 Petition and Motion to Dismiss, at p. 3, Docket No. 10, *In re Lehman Bros. Finance,* No. 09-B-10583, and *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Feb. 10, 2009); Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 9; Examiner's Interview of Kleber Rodriguez, Dec. 19, 2009, at p. 4.

[7385] PricewaterhouseCoopers AG, Zurich, First Report of PricewaterhouseCoopers AG, Zurich, as appointed liquidators to the creditors of Lehman Brothers Finance S.A., Zurich, in liquidation (Sept. 25, 2009), at p. 2.

[7386] Lehman, LBF World Records Report (Sept. 15, 2008) [LBEX-LL 027785].

[7387] PricewaterhouseCoopers AG, Zurich, First Report of PricewaterhouseCoopers AG, Zurich, as appointed liquidators to the creditors of Lehman Brothers Finance S.A., Zurich, in liquidation (Sept. 25, 2009), at p. 2.

[7388] *Id.*

[7389] Lehman, LBF World Records Report (Sept. 15, 2008) [LBEX-LL027785].

- issuance of warrants and certificates;

- trading of securities and listed derivatives only to the extent that it was hedging risk on its derivatives portfolio; and

- securities borrowing and lending or repos only when done with other Lehman entities and when related to the settlement or financing of securities hedging positions.[7390]

LBF was not permitted to borrow Swiss securities, and any trading activity that did not fall into the categories enumerated above was strictly forbidden.[7391]

LBF was highly integrated into the rest of the Lehman organization and relied on employees from other groups to process and book most of its transactions.[7392]   LBF relied on data processing systems used by other Lehman entities.[7393]

LBF filed for bankruptcy on October 3, 2008.[7394]   It subsequently moved to dismiss its United States bankruptcy proceeding on February 10, 2009.[7395]   LBF argued that it was involved in concurrent bankruptcy proceedings in Switzerland that should be recognized as foreign main proceedings under Chapter 15 of the Bankruptcy Code,

---

[7390] *Id.*

[7391] *Id.*

[7392] PricewaterhouseCoopers AG, Zurich, First Report of PricewaterhouseCoopers AG, Zurich, as appointed liquidators to the creditors of Lehman Brothers Finance S.A., Zurich, in liquidation (Sept. 25, 2009), at p. 3.

[7393] *Id.*

[7394] Voluntary Petition, at p. 1, Docket No. 1, *Lehman Bros. Finance S.A.*, No. 08-13887 (Bankr. S.D.N.Y. Oct. 3, 2008).

[7395] Motion Pursuant to Section 305 of the Bankruptcy Code for an Order Dismissing Chapter 11 Case upon Recognition of Foreign Main Proceeding Under Chapter 15, Docket No. 2789, *In re Lehman Bros. Finance AG, In Liquidation, a/k/a Lehman Bros. Finance SA, In Liquidation*, No. 09-B-10583, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 10, 2009).

and that dismissal of the Chapter 11 proceeding was therefore appropriate.[7396]    LBF asserted that the Chapter 11 proceeding had been filed on its behalf without appropriate board approval and that it had limited connections to the United States.[7397] On March 12, 2009, the Court recognized the Swiss proceedings as foreign main proceedings for purposes of Chapter 15 of the Bankruptcy Code, and dismissed LBF's Chapter 11 proceeding.[7398]    As a result of the dismissal, the Examiner conducted no investigation of this entity.

### (h)  BNC

BNC Mortgage, Inc., the predecessor to BNC Mortgage LLC ("BNC"), originated subprime mortgages.[7399]    BNC Mortgage, Inc. was converted to an LLC, which was organized in Delaware on March 1, 2007, in order to take advantage of certain state tax rules.[7400]    Despite this change in corporate structure, BNC continued to originate subprime mortgage loans for a period of several months.[7401]    As a result of the collapse

---

[7396] *Id.*

[7397] *Id.*

[7398] Order Dismissing Chapter 11 Case of Lehman Brothers Finance AG a/k/a Lehman Brothers Finance SA (No. 08-13887) and Granting Related Relief, at p. 3, *In re Lehman Bros. Finance AG, In Liquidation, a/k/a Lehman Bros. Finance SA, In Liquidation*, Chapter 15 No. 09-10583, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, at p. 3.

[7399] Examiner's Interview of Susan Harrison, Apr. 28, 2009, at p. 4; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at p. 4.

[7400] Lehman, BNC World Records Report (Sept. 15, 2008) [LBEX-LL 027795]; e-mail from Lauren Sheridan, A&M, to Heather D. McArn, Examiner's Counsel (Dec. 30, 2009).

[7401] Examiner's Interview of Susan Harrison, Apr. 28, 2009, at p. 4; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at p. 4 (describing the business of BNC Mortgage, Inc., which was a precursor to BNC Mortgage LLC).

of the market for sub-prime mortgages and related securitized products, Lehman shut

down BNC's mortgage origination business in August of 2007.[7402]

### (2)  LBHI Affiliate Single Purpose Entities

The other LBHI Affiliates were single purpose entities used as holding

companies for various real estate, physical and financial assets.

### (a)  LB 745

LB 745 LLC ("LB 745") was used to acquire and hold Lehman's headquarters

building at 745 Seventh Avenue in Manhattan.[7403]  According to Schedule 1(b) of the

Clarification Letter, LB 745 also owned Lehman's Cranford, New Jersey facility.[7404]

### (b)  CES Aviation Entities

The CES Aviation entities were part of Lehman's "Corporate Executive Services"

group.[7405]  CES Aviation LLC ("CES") was used to acquire and hold a Gulfstream G IV

jet[7406] for the use of Lehman's executives.[7407]  CES Aviation V LLC ("CES V") was used to

acquire and hold a Sikorsky S-76C+ helicopter[7408] for the use of Lehman's executives.[7409]

---

[7402] Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at p. 10; Examiner's Interview of Martha Evans, May 22, 2009, at p. 14; LBHI 2007 10-K at p. 5.

[7403] Lehman, LB 745 World Records Report (Sept. 15, 2008) [LBEX-LL 027840].

[7404] Letter agreement among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays Capital, Inc. (Sept. 20, 2008) ("Clarification letter"), at Schedule 1(b).

[7405] Examiner's Interview of Amy Lederer, Oct. 22, 2009, at p. 2.

[7406] Lehman, CES World Records Report (Sept. 15, 2008) [LBEX-LL 027772].

[7407] Examiner's Interview of Amy Lederer, Oct. 22, 2009, at p. 2; Debtors' Motion for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004 Authorizing Lehman Brothers Holdings Inc. to Enter into a Sale and Purchase Agreement, at pp. 3-4, Docket No. 1033, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 15, 2008).

[7408] Lehman, CES V World Records Report (Sept. 15, 2008) [LBEX-LL 027775]; Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004, and

CES Aviation IX LLC (CES IX) was used to acquire and hold a Falcon 50 jet[7410] for the use of Lehman's executives.[7411]

### (c)  PAMI Statler

PAMI Statler Arms LLC (PAMI Statler) was a holding company that owned and operated an apartment building located at 1127 Euclid Avenue in Cleveland, Ohio.[7412] PAMI Statler was a subsidiary of PAMI, the parent company for Lehman's real estate holding and asset management business.[7413]

### (d)  East Dover

East Dover Limited (East Dover) was an Irish company[7414] that leased aircraft to third parties.[7415]  By 2008, however, East Dover no longer owned those operating assets, and instead held only an intercompany payable and third party receivables.[7416]

---

9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules for Approval of the Sale of Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement and Payment of Related Fees at p. 2, Docket No. 3003, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 5, 2009).

[7409] Examiner's Interview of Amy Lederer, Oct. 22, 2009, at p. 2.

[7410] Lehman, CES IX World Records Report (Sept. 15, 2008) [LBEX-LL 027779]; CES IX Summary of Schedules, *In re Lehman Bros. Holdings Inc.*, No. 08-13907 (Bankr. S.D.N.Y.).

[7411] Examiner's Interview of Amy Lederer, Oct. 22, 2009, at p. 2; Debtors' Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules Approving the Sale of the Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement, at p. 3, Docket No. 1464, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Nov. 12, 2008).

[7412] Motion of Debtors Seeking Entry of an Order Pursuant to Section 1112(b) of the Bankruptcy Code Dismissing Chapter 11 Case of PAMI Statler, at pp. 3-4, Docket No. 3650, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. May 26, 2009).

[7413] Corporate Ownership Statement Pursuant to Federal Rule of Bankruptcy Procedure 1007(a)(1) and Local Rule of Bankruptcy Procedure 1007-3, Docket No. 2, *In re PAMI Statler Arms LLC*, No. 08-13664 (Bankr. S.D.N.Y. Sept. 23, 2008); Examiner's Interview of Joselito M. Rivera, Oct. 13, 2009, at p. 2.

[7414] Lehman, East Dover World Records Report (Sept. 15, 2008) [LBEX-LL 027782].

[7415] Lehman, East Dover World Records Report (Sept. 15, 2008) [LBEX-LL 027782]; Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 3; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 9.

### (e)  Scottish Finance

Lehman Scottish Finance L.P. ("Scottish Finance") was a single-purpose entity used to invest and hold equity in Luxembourg Finance S.A.R.L. (an entity distinct from LBHI Affiliate Luxembourg Residential Properties Loan Finance S.A.R.L., described below).[7417]  Luxembourg Finance S.A.R.L. was involved in the financing of an equity-linked note.[7418]   In that transaction, Luxembourg Finance S.A.R.L. entered into an agreement with Relationship Funding Company ("RFC"), pursuant to which RFC issued notes linked to a basket of equity securities.[7419]   RFC loaned the proceeds to Luxembourg Finance S.A.R.L., which then re-loaned the proceeds to LBIE and other Lehman affiliates.[7420]

### (f)  Luxembourg S.A.R.L.

Luxembourg Residential Properties Loan Finance S.A.R.L. ("Luxembourg S.A.R.L.") was a single-purpose entity that held loan assets as part of a financing and asset investment transaction.[7421]   As of its bankruptcy filing, S.A.R.L. held

---

[7416] Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 3.

[7417] Examiner's Interview of Joselito M. Rivera, Oct. 13, 2009, at p. 4; Examiner's Interview of Gerald Haupt, Nov. 12, 2009.

[7418] Examiner's Interview of Gerald Haupt, Nov. 12, 2009; Examiner's Interview of Joselito M. Rivera, Oct. 13, 2009, at p. 4.

[7419] Examiner's Interview of Gerald Haupt, Nov. 12, 2009, at p. 2; Loan Agreement between Luxembourg Finance S.A.R.L. and Relationship Funding Company (March 2, 2007), at pp. 4, 11 [LBEX-DOCID 1030326].

[7420] Loan Agreement between Luxembourg Finance S.A.R.L. and Relationship Funding Company (March 2, 2007), at pp. 1, 5, 11, 21 [LBEX-DOCID 1030326].

[7421] Examiner's Interview of Gerald Haupt, Oct. 13, 2009, at p. 2.

$596,884,125.52 in U.S. corporate loans,[7422] consisting of one tranche of loans from the multi-tranche Archstone loan transaction.[7423]

### (g) Navigator

Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior ("Navigator") was a Brazilian company that traded agricultural notes and commodities derivatives[7424] for Lehman's Emerging Markets Group trading desk.[7425]

Navigator filed for bankruptcy on October 5, 2008.[7426] It subsequently moved to dismiss its bankruptcy case on February 4, 2009.[7427] Navigator alleged that it had filed bankruptcy because it held a substantial cash balance at the time of Lehman's collapse, and an "inaccurate notation" in Lehman's internal records indicated that it was headquartered in Delaware, not Brazil.[7428] Navigator argued that its inclusion in the United States bankruptcy proceedings inhibited its ability to wind down its Brazilian

---

[7422] Luxembourg Residential Properties Loan Finance S.A.R.L. Summary of Schedules, at p. 13, *In re Lehman Bros. Holdings Inc.*, No. 09-10108 (Bankr. S.D.N.Y. Mar. 11, 2009).

[7423] Examiner's Interview of Gerald Haupt, Oct. 13, 2009, at p. 2; e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Examiner's Counsel (Dec. 30, 2009).

[7424] Examiner's Interview of Ada Shek, Nov. 24, 2009, at p. 9; Motion Seeking Entry of an Order Pursuant to Sections 1112(b) or 305 of the Bankruptcy Code Dismissing the Chapter 11 Case of Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior, at p. 3, Docket No. 9, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 4, 2009).

[7425] Lehman, Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior World Records Report (Sept. 15, 2008) at p. 1 [LBEX-LL 3660315].

[7426] Voluntary Petition, *In re Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior*, No. 08-13903 (Bankr. S.D.N.Y. Oct. 5, 2008).

[7427] Debtors' Motion Seeking Entry of an Order Pursuant to Sections 1112(b) or 305 of the Bankruptcy Code Dismissing the Chapter 11 Case of Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior, at p. 3, Docket No. 2726, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 4, 2009).

[7428] *Id.*

business, and dismissal was therefore appropriate.[7429]  The Court dismissed Navigator's

bankruptcy case on February 24, 2009.[7430]   As a result, the Examiner conducted no

investigation of this entity.

### (3)  Sale Transaction[7431]

After LBHI filed for bankruptcy, Lehman and Barclays reached an agreement  for

Barclays to buy certain assets of LBI, the broker/dealer.  Certain creditors have alleged

that Barclays may have received assets belonging to the LBHI Affiliates to which it was

not entitled.

Shortly after LBHI filed its petition under Chapter 11 of the Bankruptcy Code on

September 15, 2008, Lehman and Barclays began to negotiate the sale of LBI's business

and assets to Barclays.

On September 17, Lehman and Barclays executed an Asset Purchase Agreement,

which was dated as of September 16, 2008 (the "APA").  The APA provided for the sale

to Barclays of the following assets, among others:

- the Lehman headquarters building that was located at 745 Seventh Avenue in New York City and Lehman's two New Jersey data centers;[7432]

---

[7429] Debtors' Motion Seeking Entry of an Order Pursuant to Sections 1112(b) or 305 of the Bankruptcy Code Dismissing the Chapter 11 Case of Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior, at pp. 4-8, Docket No. 2726, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 4, 2009).

[7430] Order Dismissing the Bankruptcy Case of Fundo de Investimento Multimercado Credito Privado Navigator Investimento No Exterior, at pp. 1-2, Docket No. 2913, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 24, 2009).

[7431] The Examiner sets forth here the facts pertinent to the analysis of potential LBHI Affiliate asset transfers that follows.  A more detailed account of facts relating to the sale transaction is set forth below in Section III.C.6.

- the "business" of LBHI and LBI, which was defined to include "the U.S. and Canadian investment banking and capital markets business of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant";[7433]

- "all of the assets of [LBHI and LBI] and [their] subsidiaries used in connection with the Business (excluding the Excluded Assets)";[7434]

- "50% of each position in the residential real estate mortgage securities";[7435]

- long positions with a book value of approximately $70 billion;[7436] and

- the "Furniture and Equipment."[7437]

On September 17, the Debtors filed the Sale Motion[7438] asking the Court to schedule a sale hearing and establish sale procedures.

On September 19, certain creditors filed responses and objections to the Sale Motion. Several creditors alleged that the terms of the APA were ambiguous enough to permit assets of Lehman's non-debtor subsidiaries to be included in the sale.[7439]

---

[7432] Asset Purchase Agreement among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays Capital Inc. (Sept. 16, 2008) (the "APA"), at p. 6 (§ 1.1).

[7433] APA, at p. 2 (§ 1.1).

[7434] *Id.* at p. 6 (§ 1.1).

[7435] *Id.*

[7436] *Id.*

[7437] *Id.* The APA defines "Furniture and Equipment" to include: "all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including, all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies." "Hardware" is defined to include: "any and all computer and computer-related hardware, networks, and peripherals, including, but not limited to, information and communications systems, computers, file servers, facsimile servers, scanners, color printers, laser printers, and networks." *Id.* at 4 (§ 1.1).

[7438] Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, Docket No. 60, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008) ("Sale Motion").

On September 19, the Court held a sale hearing to consider the proposed transaction with Barclays. At the hearing, the Debtors represented that no assets of non-debtor affiliates were being sold, including those belonging to LBCS.[7440]

On September 20, 2008, the Court entered the Sale Order approving the terms of the sale as embodied in the APA, the First Amendment thereto and an additional "clarifying" document.[7441]

On September 22, 2008, the parties executed a Clarification Letter, which was dated as of September 20, 2008. The Clarification Letter provided, among other things, that the "Purchased Assets" Barclays was buying included "none of the assets of Subsidiaries of LBHI (other than assets of LBI) except as otherwise specifically provided."[7442]

On Monday, September 22, the sale transaction closed. In connection with the sale, almost all of LBI's assets and employees were transferred to Barclays.

---

[7439] *See, e.g.*, Response of The Walt Disney Company to Debtors' Motion Dated September 17, 2008 for Sale Approval, at pp. 2-4, Docket No. 183, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008); Limited Objection and Reservation of Rights of Ad Hoc Committee of Bondholders to Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, at p. 3, Docket No. 161, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008).

[7440] Transcript of hearing, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 19, 2008, at pp. 88-89, 226 (Fife).

[7441] Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, at pp. 1, 12, Docket No. 258, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 20, 2008).

[7442] Clarification Letter, at p. 1.

Barclays immediately took over Lehman's facilities at 745 Seventh Avenue.[7443]

Because many of the LBHI Affiliates conducted their operations out of the 745 Seventh

Avenue headquarters, when it took over the building, Barclays assumed possession of

many of the fixed assets used in LBHI Affiliate business operations, such as furniture

and computer and communications equipment.[7444]   Given the integrated manner in

which Lehman operated its business and the short period of time surrounding the sale,

the Examiner has concluded that it would have been nearly impossible for Lehman or

Barclays to identify which fixed assets belonged to which legal entities prior to the sale,

and the Debtors did not attempt to do so until later.[7445]

As part of the sale transaction, Barclays acquired various intellectual property

assets from Lehman.[7446]   Though Lehman separated some hardware and software

components for Nomura, and also segregated most of Neuberger Berman's intellectual

property assets, all other technology assets were transferred to Barclays wholesale.[7447]

The Examiner was advised that it would not have been feasible to isolate software

components in the limited time available during the week between the sale negotiations

---

[7443] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon, and Jeffrey Donaldson, Jan. 22, 2010.

[7444] *Id.*

[7445] *Id.*

[7446] APA at p. 8 (§ 1.1); *see also* Intellectual Property Assignment Agreement Among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays Capital Inc. (Sept. 22, 2008), at p. 1.

[7447] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

and the beginning of the transition.[7448]   As a result, any intangible assets of the LBHI

Affiliates that were housed in Lehman's consolidated computer systems and networks

would have been swept up in the transfer.

There was no effort made to segregate employees allocated to LBHI Affiliates

from the group to whom Barclays offered employment in the context of the sale.   As

part of its purchase of LBI's assets, Barclays was to purchase most of the businesses that

comprised Lehman's Fixed Income Division ("FID").   Lehman human resources

personnel compiled a list of all FID employees, identified a few who had already been

given notice of termination pre-bankruptcy, as well as certain corporate officers, legal

staff and human resources personnel who were essential to the wind down of the

Debtors' business, and designated the remainder for transfer to Barclays.[7449]   It would

have been difficult (if not impossible) to identify and hold back employees allocated to

the LBHI Affiliates during that time period, particularly given that most Lehman

employees were actually employed by LBI and did not understand that they were

employees of an LBHI Affiliate, even though they may have performed services for

them.[7450]

---

[7448] *Id.; Accord* Examiner's Interview of Jeffrey Osterman, Jan. 28, 2010.

[7449] Examiner's Interview of Tracy Binkley, Dec. 22, 2009; e-mail from Tracy Binkley, Lehman, to Steven Berkenfeld, Lehman (Sept. 23, 2008) [BCI-EX-(S)-00005498].

[7450] Examiner's Interview of Tracy Binkley, Dec. 22, 2009; *see, e.g.,* letter from Christopher M. O'Meara, Lehman, to John DeRosa, Lehman, re: employment offer (Nov. 10, 2006), at p. 2 [LBEX-AM 023144]; e-mail from Kaushik Amin, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [LBHI_SEC07940_656489]; e-mail from Paul Gregg, Lehman, to Peter Keavey, Lehman (Sept. 16, 2008) [LBEX-DOCID 3571486] (employees allocated to LBCS discussing transfer of LBI employees to Barclays

As a result, the Debtors were left with few legacy Lehman employees to assist in the wind down of their businesses, and only limited access to Lehman's books and computer systems in the immediate aftermath of LBHI's bankruptcy filing and the sale to Barclays.[7451]  The Debtors' lack of access to computer systems and personnel made it very difficult to manage the wind down of the Debtors' remaining businesses, and they had little institutional knowledge upon which to draw.[7452]

Throughout the fall and winter of 2008, the Debtors pushed Barclays to grant additional access to legacy Lehman systems that Barclays had received in the sale, and several disputes arose concerning transition service obligations.[7453]    The situation improved over time.

The Debtors and Barclays eventually engaged in discussions over who owned certain former assets of the Debtors.[7454]   In the summer of 2009, the Debtors ultimately moved the Bankruptcy Court to authorize a repurchase of certain equipment and other

---

and noting "that's us"); Examiner's Interview of Jonathan D. Williams, Aug. 5, 2009, at p. 4; transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at p. 32.

[7451] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

[7452] *Id.*; transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at pp. 29-30.

[7453] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010; transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at pp. 37-38; Alvarez & Marsal, Lehman Bros. Holdings Inc., Report to Unsecured Creditors Committee (Nov. 13, 2008), at pp. 29-31 [LBEX-AM 5641910].

[7454] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

physical assets from Barclays to allow it to renegotiate its lease.[7455]  That motion did not

address any LBHI Affiliate Assets that may have been transferred to Barclays.[7456]

Though Barclays and the Debtors have engaged in discussions and negotiations

to resolve asset ownership issues as between themselves, including in connection with

transition services disputes and negotiations relating to the summer 2009 repurchase of

furniture and equipment, the Examiner has investigated the assets of LBHI Affiliates

pursuant to the Court's charge.

### 3.    Whether Assets of LBHI Affiliates Were Transferred to Barclays

As indicated above, in the Examiner Order the Court directed the Examiner to

investigate:

> Whether assets of any LBHI Affiliates (other than Lehman Brothers, Inc.)
> were transferred to Barclays Capital Inc. as a result of the sale to Barclays
> Capital Inc. that was approved by order of the Bankruptcy Court entered
> September 20, 2008, and whether consequences to any LBHI Affiliate as a
> result of the consummation of the transaction created colorable causes of
> action that inure to the benefit of the creditors of such LBHI subsidiary or
> affiliate.[7457]

As instructed by the Court, with respect to each LBHI Affiliate, the Examiner performed

an investigation to determine the assets that each LBHI Affiliate owned prior to LBHI's

bankruptcy filing, and examined whether there were indications that any of those assets

were improperly transferred to Barclays in connection with the sale.  The Examiner

---

[7455] *See* Motion of Lehman Bros. Holdings Inc. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for Authorization to Purchase Certain Furniture, Fixtures and Equipment from Barclays Capital Inc., Docket No. 3774, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. June 4, 2009).

[7456] *Id*.

[7457] Examiner Order, at p. 4 (sixth bullet).

used the following methodologies to reach the factual conclusions set forth in this section of the Report.

### a) Analysis of Securities Transferred to Barclays

Most of the assets LBI transferred to Barclays in connection with the sale were securities. Several LBHI Affiliates were involved in securities trading and financing activities. Consequently, a natural area of inquiry for the Examiner was to determine whether any of the securities transferred to Barclays were not owned by LBI, but rather by LBHI Affiliates.

Some LBHI Affiliates owned or held majority interests in subsidiaries that were not the subject of bankruptcy proceedings, but were engaged in substantial securities trading and financing activities ("LBHI Affiliate Subsidiaries"). Transfers of their securities to Barclays, if made, would have negatively impacted the value of the LBHI Affiliates' assets – namely a reduction in the value of their stock or other ownership interests in the LBHI Affiliate Subsidiaries. For purposes of this Section of the Report, therefore, the Examiner also investigated whether securities owned by any LBHI Affiliate Subsidiaries were transferred to Barclays.[7458]

In order to evaluate whether any securities owned by LBHI Affiliates or LBHI Affiliate Subsidiaries ("LBHI Affiliate Entities") had been transferred to Barclays, the

---

[7458] The Examiner's financial advisors identified LBHI Affiliate Subsidiaries based upon organization charts sourced from Lehman's World Records [LBEX-LL 3668280-314]. Based upon this review, the only LBHI Affiliate Subsidiary associated with a security transferred to Barclays was L.B. Pass-Through Securities, Inc., which was identified as an LCPI subsidiary.

Examiner's financial advisors first tested the integrity of the various Lehman systems used to track ownership and transfers of securities held by Lehman entities.[7459]   The Examiner's financial advisors then used those systems to determine whether any securities owned by LBHI Affiliate Entities were transferred to Barclays.  The Examiner investigated not only whether any securities reflected in the securities inventories of LBHI Affiliate Entities were transferred to Barclays, but also (where applicable) how securities were transferred from LBHI Affiliate Entities to LBI in order to determine whether LBI had the right to in turn transfer the securities to Barclays.  As part of this inquiry, the Examiner also examined whether any securities transfers to LBI took place after September 12, 2008; after that date, it is questionable whether any LBHI Affiliate Entities should have continued to expect that LBI would be able to satisfy intercompany obligations arising from non-cash settled transfers of securities from an LBHI Affiliate Entity to LBI.  The Examiner also conducted interviews, and consulted with parties in interest in the Debtors' cases, to confirm his findings.

### (1)  Securities Transferred to Barclays

Securities worth tens of billions of dollars were transferred to Barclays in connection with the sale transaction.  However, those securities were not the same set of securities described in the APA and Sale Motion.  The APA and Sale Motion described the transfer to Barclays of a relatively balanced book of "short" and "long" securities

---

[7459] As explained in the introduction to this Section, this Report does not address LBHI Affiliate Entities whose chapter 11 cases have been dismissed, and which are no longer pending before this Court.

positions in which Barclays did not hold a pre-existing interest. In contrast, most of the securities that ultimately were transferred to Barclays were securities that were the subject of the Replacement Transaction,[7460] and thus were securities over which Barclays already exerted control prior to the sale; those securities were listed on Schedule A to the final version of the Clarification Letter. LBI also was supposed to transfer to Barclays the securities listed on Schedule B to the Clarification Letter (the so-called "bag of hammers").[7461]

Documents and witness interviews show that Schedules A and B to the Clarification Letter were not prepared and finalized contemporaneously with the September 22, 2008 closing of the sale to Barclays. Instead, a number of days elapsed after the sale closing during which Barclays, the SIPA Trustee and the Debtors continued to negotiate and reconcile precisely which securities had been transferred to Barclays as part of the sale. As late as September 29, 2008, according to an e-mail from Paolo R. Tonucci, Schedules A and B included "what we believe to have been transferred to Barclays, and what we expect to transfer to Barclays in the forthcoming

---

[7460] As described in Section III.C.6.f.1 of the Report, the Replacement Transaction was the September 18, 2009 pre-sale transaction pursuant to which Barclays replaced the FRBNY as the primary repo lender to LBI and stepped into the FRBNY's $45 billion repo lending position.

[7461] "Bag of hammers" was a phrase coined during the closing weekend to describe the basket of miscellaneous additional securities that were identified for transfer to Barclays. As explained in one interview, the miscellaneous securities were like a "bag of hammers" because although a single hammer might be a valuable tool, an entire bag of hammers would be clumsy and less desirable (and therefore less valuable) because a worker does not need an entire bag of hammers, and it would take significant time and effort for the worker to deal with all of the hammers. Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009.

days," and Tonucci was "awaiting final confirmation" of that fact.[7462]  Tonucci further

stated that Schedule B included "those assets that have not yet been transferred but we

expect to transfer, as well as assets transferred on Friday 19 September."[7463]  Thus, the

parties continued to refine which securities were included in Schedules A and B, and to

effectuate the transfer of certain of those securities to Barclays, well after the closing

date.

It appears that the parties finally settled upon the securities that were supposed

to comprise Schedule A and Schedule B in early October.  Schedule A consisted of 8,514

different CUSIP identifiers,[7464] and included a list of par amounts and brief

descriptions.[7465]  In total, $69.8 billion in par value is represented on Schedule A.

Schedule B consisted of 3,917 CUSIP identifiers, and also included par amounts and

brief descriptions.[7466]  In total, $2.8 billion in par value is represented on Schedule B.  The

total number of unique CUSIPs presented on Schedule A was 7,913, and the total

number of unique CUSIPs presented on Schedule B was 3,834.  Of the CUSIPs

appearing on Schedules A and B, 490 CUSIP identifiers appeared on both schedules.

The aggregate number of "unique" CUSIP identifiers on Schedules A and B was 11,257

---

[7462] E-mail from Paolo R. Tonucci, Lehman, to David Murgio, Weil, *et al.* (Sept. 29, 2008) [WGM-00002540].
[7463] *Id.*
[7464] "CUSIP stands for Committee on Uniform Securities Identification Procedures. A CUSIP identifies most securities, including: stocks of all registered U.S. and Canadian companies, and U.S. government and municipal bonds. . . . The [CUSIP] number consists of nine characters (including letters and numbers) that uniquely identify a company or issuer and the type of security."  *See* Securities and Exchange Commission, CUSIP Number, http://www.sec.gov/answers/cusip.htm (last visited Feb. 2, 2010).
[7465] Clarification Letter, at p. 1 (¶ 1(a)(ii)(A)) (providing for Schedule A).
[7466] *Id.* at p. 1 (¶ 1(a)(ii)(B)) (providing for Schedule B).

(the 11,747 total number of CUSIPs presented on Schedules A and B, less the 490 non-unique CUSIP identifiers appearing on both Schedules A and B).

A number of the securities listed on Schedule B apparently were never delivered to Barclays. On December 29, 2008, Barclays' counsel sent a letter to the SIPA Trustee indicating that under Section 1(a)(ii)(B) of the Clarification Letter, Barclays was expecting delivery in connection with the sale of not only the securities listed on Schedule B, but also "such securities and other assets held in LBI's 'clearance boxes' as of the time of Closing," which "are still in LBI's clearance boxes."[7467] Barclays' counsel stated that Barclays only was seeking such securities to the extent that there were no customer "long" positions associated with the CUSIPs, or to the extent that the security quantities in the clearance boxes exceeded the quantities of customer long positions.[7468]

Barclays confirmed to the Examiner shortly before the delivery of this Report that, as of January 22, 2010, the only Schedule B securities which had been delivered to Barclays were the securities delivered prior to and including September 30, 2008 ($1.035 billion on September 19, $269 million on September 29, and $161 million on September 30, all valued per Lehman's marks); that Barclays' position is that 814 CUSIPs listed on Schedule B either have not yet been delivered or were delivered in incorrect quantities; and that additional securities in the clearance boxes must still be delivered to Barclays

---

[7467] Letter from Lindsee P. Granfield, Cleary Gottlieb, to James B. Kobak, Jr., Hughes Hubbard (Dec. 29, 2008), at p. 1 [LBEX-AM 5641781].
[7468] Id.

in connection with the sale.[7469]  Because they were specifically identified in Schedule B, the Examiner's analysis of securities delivered (or to be delivered) to Barclays included the 814 CUSIPs on Schedule B which Barclays asserts either were not delivered or were delivered in incorrect quantities.  The Examiner has not included in this analysis any additional securities that may be in LBI clearance boxes.[7470]

In December 2008, additional securities were transferred to Barclays in settlement of certain claims arising from the sale, pursuant to the settlement agreement among JPMorgan, Barclays and the SIPA Trustee approved by Court Order dated December 22, 2008.[7471]  Those additional securities are identified in an attachment (Annex A to Settlement Agreement) to a December 5, 2008 letter from Barclays' counsel delivered to the Court in connection with the hearing on approval of the settlement.[7472]  Annex A identified – by CUSIP, class of security, type of security and face value of remaining par amount of the debt securities and the number of shares of the equity securities – the securities transferred to Barclays under the settlement.[7473]  In total, Annex A included 1,192 CUSIPs with a total par value of $19.9 billion.[7474]  Of the 1,192

---

[7469] Schedule B Securities List [LBEX-BAR 000421], attached to e-mail from Jack G. Stern, Boies Schiller, to Vincent E. Lazar, Examiner's Counsel (Jan. 22, 2010).

[7470] Whether any additional securities in the LBI clearance boxes will be delivered is the subject of dispute between Barclays and the SIPA Trustee.

[7471] *See* Section III.D.8.c.

[7472] *See* Annex A to Settlement Agreement (Dec. 5, 2008) [BCI-EX-00077246], attached to letter from Lindsee P. Granfield, Cleary Gottlieb, to Honorable James M. Peck, S.D.N.Y. Bankr., *In re Lehman Bros. Inc.*, No. 08-01420 (Dec. 5. 2008) [BCI-EX-00077244].

[7473] *See* Annex A to Settlement Agreement (Dec. 5, 2008) [BCI-EX-00077246].

[7474] *Id.*

CUSIPs appearing on Annex A, 53 are not unique and also appeared on either Schedule A or B.

Schedule A, Schedule B and Annex A (together, the "Securities Lists") did not specify the owner of the securities transferred to Barclays. Multiple Lehman entities held interests in securities bearing the same CUSIP identifiers, and thus in many cases ownership of the securities transferred to Barclays could not be determined (or excluded) simply by reference to data in the Global Funding System ("GFS") described below. As an example, a total of $9.2 million par value of Sirius XM Radio Inc. CUSIP No. 82967N108 appeared in GFS in the securities inventories of LBI and LBHI Affiliates. $7.6 million (par value) of this CUSIP was transferred to Barclays as part of the sale. GFS indicates $8,612,319 (par value) in securities bearing this CUSIP identifier were held in LBI's securities inventory, $586,665 (par value) were held by LBSF and $3,788 (par value) were held by LOTC. There is no way to determine simply by examining CUSIP identifiers whether the $7.6 million (par value) in securities bearing this CUSIP identifier transferred to Barclays were LBI, LBSF or LOTC securities, or even some combination thereof.

Because there were numerous circumstances like this in which CUSIP identifiers were not unique to only one Lehman entity, the Examiner performed several different factual and legal analyses to determine whether any LBHI Affiliate Entity securities were transferred to Barclays.

### (a)  Lehman's Securities Trading Records and Systems

### (i)  General

GFS is a robust Lehman-developed data warehouse that served as the primary system Lehman used (and Barclays still uses) to track financing requirements and capabilities, to track securities in Lehman's custody by legal entity and to feed legal entity balance sheet data for Lehman's financial assets into Lehman's corporate general ledger ("DBS").[7475]    While GFS was the system used to track Lehman's securities, multiple source systems fed relevant data into GFS.    As such, GFS reflected consolidated positions and balances for Lehman legal entities as aggregated from multiple Lehman source systems.

Generally speaking, trades were recorded in one of the following Lehman systems:  MTS (Mainframe Trading System), the system Lehman used to support the trade capture and settlement of U.S. dollar denominated fixed-income products;[7476] ITS, Lehman's multi-currency trade processing-system;[7477] TMS, a system Lehman used to process domestic LBI activity in listed and OTC equities, municipal bonds, corporate bonds and money market instruments[7478] and RISC, a commodity trade reporting system used to process (among other transactions) foreign exchange transactions, as well as futures and forward transactions related to fixed income products such as US

---

[7475] Global Funding System ("GFS") New User Training [LBEX-LL 3396270]; GFS System Description found on LehmanLive intranet.

[7476] MTS description in LehmanLive intranet.

[7477] ITS description in LehmanLive intranet.

[7478] TMS description in LehmanLive intranet.

treasuries or corporate bonds.[7479]   Data from these systems was aggregated in the Activity, Positions and Balances ("APB") system.   APB was primarily a central repository for data relating to several Lehman trading systems and contained end-of-day activities, trades, failed trades and positions for all listed products, including listed derivatives.[7480]  The APB system differs from GFS in that the APB system accumulated all of the daily trade history from various trading systems, while GFS provided balance sheet and financing positions, typically at month-end.

The Examiner's financial advisors used GFS as their primary source for information about the LBHI Affiliate Entities' securities inventories and positions.  The GFS information accessed by the Examiner's financial advisors not only included month-end data, but also data for two mid-month dates relevant to the Examiner's investigation – September 12, 2008 (the last trading day immediately preceding the LBHI petition date) and September 19, 2008 (which was the LBI petition date and the last trading date prior to the Barclays' sale transaction).   The Examiner used the September 12, 2008 dataset to perform the securities analyses presented herein.  The Examiner selected the September 12, 2008 dataset (as opposed to the September 19, 2008 dataset) after consultation with Lehman employees, Barclays personnel and A&M professionals, all of whom shared a common concern that standard daily protocols were

---

[7479] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 2; Examiner's Interview of Rob Eby, Jan. 6, 2010, at pp. 2-6.
[7480] APB description in Lehman Live intranet.

not consistently followed during the week ending September 19, 2008 as a consequence of the atypical market conditions and the extraordinary business disruption that occurred during that week.   There was sufficient concern about the quality of the September 19, 2008 dataset to justify the selection of the September 12, 2008 dataset as the basis for the Examiner's analysis.

Because the Examiner used the September 12, 2008 dataset, it was possible that some transfers of securities from LBHI Affiliate Entities to LBI took place between September 15 and September 19, 2008.   Although several sources indicated that no securities had been transferred from LBHI Affiliate Entities to LBI following LBHI's bankruptcy (other than transfers relating to public customer transactions), the Examiner's financial advisors reviewed trading activity during the week beginning September 15 and determined that two of the LBHI Affiliate Entities, LBSF and LCPI, continued to engage in a material amount of trading with LBI during that week.[7481]   The Examiner evaluated the LBSF and LCPI trading activity which occurred during the week of September 15, and, as described below, determined that the trading activity was not improper and did not improve LBI's position vis-à-vis these LBHI Affiliate Entities.

---

[7481] The Examiner's financial advisors' review did not indicate that other LBHI Affiliates engaged in significant securities trading activity with LBI after September 12, 2008.

### (ii)  GFS System Assessment

The Examiner conducted several interviews to assess the capabilities and reliability of GFS.  Criticisms of GFS included concerns regarding the reliability of valuation data and other data quality issues.[7482]  GFS reports, however, were prepared daily and identified the financial assets each Lehman entity was holding on its respective balance sheet.  The Legal Entity Controller group relied on these reports, in part, to monitor each legal entity's daily inventory positions.[7483]  In addition, GFS provided the "inventory subledger" that was used as the basis for creating quarterly consolidated financial statements[7484] and was consistently referred to as the primary system used to track security inventory data.[7485]

Because the Examiner's financial advisors relied heavily on electronic data (and in particular the GFS information) to determine ownership of securities, they performed two distinct tests in order to gain sufficient confidence that GFS contained reliable information for the purpose of this analysis.  The first test involved a comparison of the data reported by GFS to Lehman's 10-Q filings.  The second test, which provided an additional check, compared the GFS data to Lehman's general ledger.

---

[7482] Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009, at p. 4; e-mail from James Guarino, Barclays, to Akshay Bhargava, Duff & Phelps (Jan. 21, 2010).

[7483] Examiner's Interview of Kristie Y. Wong, Dec. 2, 2009, at p.4.

[7484] Id.

[7485] Global Funding System ("GFS") New User Training [LBEX-LL 3396270]; GFS System Description found on LehmanLive intranet.

### a.    Comparison of GFS Data to Lehman's 10-Q Filings

The Examiner's financial advisors obtained a copy of the reconciliation between the general ledger and GFS data that had been prepared by Lehman employees in connection with the Lehman financial statement consolidation for the first three quarters of 2008. This reconciliation was created for the purpose of supporting Lehman's FAS 157 Fair Value Balance Sheet footnote. The Examiner's ability to leverage the work performed by Lehman estate employees minimized the time and expense required to vet the data.

The Examiner's financial advisors prepared a comparison of the balances on the reconciliation worksheet with the balances reported on the 10-Qs. Only *de minimis* differences, which were determined to be immaterial relative to the overall balance sheet for those periods, were noted.

### b.    Comparison of GFS Data to Lehman's General Ledger

The Examiner's financial advisors also obtained GFS data for the first quarter (quarter ended February 29, 2008) and the second quarter (quarter ended May 31, 2008) of 2008 for a sample of two LBHI Affiliates, namely LBCC and LBCS. The Examiner's financial advisors summarized the GFS data for those periods by GAAP Asset Class.[7486] The Examiner's financial advisors then compared each of those GFS asset amounts to

---

[7486] Lehman categorized inventory in one of three "Asset Classes" based upon the apparent quality of inputs involved in determining valuation. Lehman's Asset Classes 1, 2 and 3 corresponded to the accounting literature's "Hierarchy Levels" 1, 2 and 3. This designation is required for reporting purposes according to the Statement of Fin. Accounting Standards No. 157, ¶ 22.

the corresponding accounts within the general ledger for each sample entity. The general ledger data was obtained using Essbase, which is a Lehman software program designed to extract general ledger data. The Examiner's financial advisors identified some differences for each entity, but determined that the differences were immaterial relative to the account balances in the general ledger. They further noted that the differences likely were attributable to closing adjustments subsequently made by Lehman personnel.

### c.    Reliability of September 12 Data

Based on the results of these sample tests (and the 10-Q filings reconciliation in particular) as well as several interviews, the Examiner's financial advisors maintained a sufficient level of confidence in the September 12, 2008 and earlier GFS data used for the purpose of this analysis.

### (iii) GFS Data Extracted by Examiner

The Examiner's financial advisors used GFS's search capabilities to extract information for each CUSIP appearing on the Securities Lists. They relied upon the GFS "Positions Group" (also referred to as the "Balance Sheet Module") reporting functions to extract that data.

The Examiner's financial advisors extracted all relevant data fields from the Balance Sheet Module. Because the Balance Sheet Module does not take into account the impact of repurchase agreements, reverse repurchase agreements, stock loans, or

stock borrowing trades (collectively, "Financing Positions"), the Examiner's financial advisors also extracted relevant fields from the GFS "Trades Group" (also referred to as the "Financing Module"), which does incorporate the impact of Financing Positions. Data from the Financing Module served as a quality control check for certain fields extracted from the Balance Sheet Module.[7487]    As explained in more detail below, data from the Financing Module was relevant to the Examiner's analysis because a security reflected in the securities inventory of an entity for balance sheet reporting purposes (and therefore appearing in the Balance Sheet Module) may have been traded to an affiliate in connection with a financing arrangement (for example, a repo).

A significant GFS limitation was that GFS did not capture certain Financing Positions for securities traded on Lehman's TMS trading system.[7488]    As of September 2008, TMS had not yet been fully integrated into GFS, and therefore for any CUSIP where the source system that captured positions at September 12, 2008 was TMS, the Financing Positions for that CUSIP would not be reflected in the GFS Financing Module data.[7489]    The Financing Positions for certain securities traded on Lehman's TMS are discussed in more detail below.

---

[7487] As explained below, the Examiner's financial advisors sampled 35 CUSIPs from the Securities List and examined the GFS data for these 35 CUSIPs in both the Balance Sheet Module and Financing Module. The data consistently demonstrated that GFS properly reflected open Financing Positions on September 12, 2008 between LBI and its affiliates.

[7488] *See* Duff & Phelps' Interview of Sven Farup, Sept. 24, 2009.

[7489] *Id*.

### (2)  Analysis of GFS Data

LBI was the primary broker/dealer through which Lehman entities conducted domestic securities trading activities.  As such, LBI served as a repository and through-way for much of Lehman's securities inventory, and securities under its control would have included securities belonging to an affiliate that LBI may not have had the right to transfer to third parties, such as securities LBI held in custody for an affiliate or which the affiliate had delivered to LBI in connection with a third party transaction.  The LBHI Affiliate Entities relied on LBI to provide a full range of broker/dealer services, including buying and selling securities, custodial services and financing using securities as collateral, and therefore securities were held by LBI in numerous different capacities.

The Examiner's financial advisors analyzed the data for the 11,257 unique CUSIPs presented in Schedules A and B, and the 1,192 CUSIPs presented in Annex A.[7490] The Examiner's financial advisors used GFS's search capabilities to extract, for each CUSIP appearing on the Securities Lists, both the Balance Sheet Module positions and Financing Module positions (consolidated by legal entity).  Using the data extracted from GFS, the Examiner's financial advisors were able to identify the balance sheet positions and value, par or market, for many (but not all) of the securities transferred to Barclays.

---

[7490] As noted above, no CUSIPs were repeated in the 1,192 securities listed in Annex A (each CUSIP was unique to that list); however, 53 of the CUSIPs listed in Annex A also were reflected in Schedules A and B.

Of the 11,257 unique CUSIPs presented in Schedules A and B, and the 1,192 CUSIPs presented in Annex A, the Examiner's financial advisors identified 9,472 CUSIPs that did not appear in the balance sheet inventories of the LBHI Affiliate Entities as of September 12, 2008. Because the balance sheet inventories of these LBHI Affiliate Entities included no record of ownership of any securities bearing those 9,472 CUSIPs, the Examiner's financial advisors concluded that there was a very low probability that securities bearing those 9,472 CUSIPs were owned by an LBHI Affiliate Entity. Of the remaining securities transferred to Barclays, securities bearing 14 CUSIPs sold to Barclays with a par value of $0.6 million were associated in GFS with only an LBHI Affiliate Entity as of September 12, 2008; securities bearing 2,136 CUSIPs with $6.1 billion in par value were associated in GFS with both LBI and at least one LBHI Affiliate Entity as of September 12, 2008;[7491] and securities bearing 817 of the CUSIPs transferred to Barclays (795 from Schedules A and B and 22 from Annex A) with a par value of $695.8 million were not reflected at all in the Positions Group within GFS as of September 12, 2008. Ten additional CUSIPs with $13.5 million in par value were associated in GFS with "blank" legal entity fields.[7492]

---

[7491] The Examiner did not consider further analysis of those securities because, based upon the aggregate par value of these securities and the various potential defenses to any claims described herein, they were deemed immaterial for purposes of the ownership analysis and unlikely to give rise to any colorable claims. A list of these securities is attached as Appendix 29, CUSIPs associated with both LBI and LBHI Affiliate Entities prepared by Duff & Phelps.

[7492] For a list of these CUSIPs, see Appendix 26.

### (a)  CUSIPs Not Associated With LBHI Affiliate Entities

To determine whether any securities reflected on the balance sheet inventories of LBHI Affiliate Entities might have been transferred to Barclays, the Examiner's financial advisors relied upon and used data extracted from Lehman's GFS application to trace CUSIPs to the respective balance sheets of the Lehman legal entities as of September 12, 2008, the last date for which reasonably accurate balance sheet and other financial information was available, and used that data to reduce the aggregate number of securities the Examiner's financial advisors would need to examine.

The Examiner's financial advisors reviewed the data extracted from GFS and identified (i) CUSIPs which had some association with an LBHI Affiliate Entity, and (ii) CUSIPs for which there was no data found in GFS.  The remaining CUSIPs were associated only with non-LBHI Affiliates (*i.e.*, CUSIPs that the LBHI Affiliate Entities did not reflect in their Balance Sheet inventories as of September 12, 2008). Understanding that GFS was the primary system used by Lehman to track balance sheet positions related to securities, the Examiner's financial advisors determined that this population of 9,472 CUSIPs presented a low probability that securities bearing such a CUSIP might have been owned by an LBHI Affiliate Entity at the time of the Barclays'

sale transaction.  As a result, the securities bearing those 9,472 CUSIPs associated only

with non-LBHI Affiliate Entities were excluded from further analysis.[7493]

### (b)  CUSIPs Associated Solely With an LBHI Affiliate Entity

Securities bearing 14 CUSIPs sold to Barclays with a par value of $0.6 million

were associated in the GFS Balance Sheet Module with only an LBHI Affiliate Entity as

of September 12, 2008.    All 14 CUSIPs were associated solely with LBSF.    The

Examiner's financial advisors found that trading information for all 14 CUSIPs was

captured by the TMS trading system which, as previously noted, was not fully

integrated into GFS as of September 2008.  As a result, GFS did not include complete

data regarding potential financing trades involving these CUSIPs.

It is quite possible that the securities bearing these 14 CUSIPs transferred to

Barclays were held by LBI in custody for LBSF, or were intended for delivery to a third

party; however, it is also possible that these securities had been delivered by LBSF to

LBI as part of a financing transaction.  Regardless of the reason, given the Examiner's

conclusions about Barclays' likely protected purchaser and securities intermediary

defenses (*see* Section III.5.b.1) and LBSF's subordination agreement with LBI described

below, as well as the immateriality ($0.6 million par value) of these securities to the

Debtors' estates, the Examiner determined that it would not be a prudent use of the

---

[7493] A summary of the 9,472 CUSIPs excluded on the basis of lack of a balance sheet or Financing Position connection in GFS to an LBHI Affiliate Entity is attached as Appendix 27, CUSIPs not associated with an LBHI Affiliated prepared by Duff & Phelps.

Estate's resources to further investigate whether these securities should have been available for LBI to transfer to Barclays.[7494]

### (c)  CUSIPs Associated With Both LBI and LBHI Affiliate Entities

Securities bearing 2,136 CUSIPs with $6.1 billion in par value were associated in GFS with both at least one LBHI Affiliate Entity and another Lehman entity (primarily LBI) as of September 12, 2008.  A list of these securities is included in Appendix 29 hereto.  These securities formed the basis for further review and investigation on the part of the Examiner.

### (i)  CUSIPs Associated With Subordinated Entities

Several LBHI Affiliate Entities – including LBSF, LBCC and LBF – were parties to subordination agreements with LBI that generally conformed to the format specified in federal regulations.[7495]  Under these regulations, subordination agreements are intended to "effectively subordinate any right of the lender to receive any Payment with respect thereto, together with accrued interest or compensation, to the prior payment or provision for payment in full of all claims of all present and future creditors of the

---

[7494] A list of these 14 securities is attached as Appendix 28, CUSIPs associated solely with an LBHI Affiliate proposed by Duff & Phelps.

[7495] See 17 C.F.R. §§ 240.15c3-1d; see also Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Special Financing, Inc. (Feb. 21, 1995), at p. 1 [LBEX-SIPA 007456]; Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Commercial Corporation (Feb. 21, 1995), at p. 1 [LBEX-SIPA 007450]; Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Finance S.A. (Oct. 13, 1995) [LBEX-SIPA 007471].

broker or dealer…."[7496]  In conformity with this rule, LBHI Affiliate Entity subordination agreements broadly provided that the affiliates' rights with respect to all securities the affiliates lent to LBI and all cash balances in securities or commodities accounts of the affiliates maintained at LBI were "subordinate in right of payment and subject to the prior payment or provision for payment in full of any indebtedness of any nature whatsoever which may now or hereafter be due to any present or future LBI creditor."[7497]  In addition, the subordination agreements specifically provided that, in the event of LBI's liquidation under SIPA or any other proceeding for the benefit of creditors, the applicable LBHI Affiliate Entities "will not be entitled … to participate or share ratably or otherwise in the distribution of LBI's assets" until all other debts have been fully satisfied.[7498]  In other words, LBI essentially had the right to pledge and dispose of securities in its custody belonging to affiliates that were parties to subordination agreements.[7499]  Although legal and regulatory personnel associated with the LBHI Affiliate Entities at issue typically would have been aware of these

---

[7496] 17 C.F.R. § 240.15c3-1d(b)(3) (2007).

[7497] Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Special Financing, Inc. (Feb. 21, 1995), at p. 3 [LBEX-SIPA 007456]; Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Commercial Corporation (Feb. 21, 1995), at p. 1 [LBEX-SIPA 007450]; Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Finance S.A. (Oct. 13, 1995) [LBEX-SIPA 007471].

[7498] *See, e.g.*, Subordination Agreement between Lehman Brothers Inc. and Lehman Brothers Special Financing, Inc. (Feb. 21, 1995), at ¶3 [LBEX-SIPA 007456].

[7499] Duff & Phelps' Interview of William Burke, Oct. 28, 2009, at p. 2; *see also* 17 C.F.R. § 240.15c3-1d(b)(4) ("The subordinated loan agreement shall provide that the cash proceeds thereof shall be used and dealt with by the broker or dealer as part of its capital and shall be subject to the risks of the business."); Attachment A to NASD Notice to Members 02-32 (June 2002) ("The funds or securities lent to a broker/dealer under a subordination agreement can be used by the broker/dealer almost entirely without restriction.").

subordination agreements and their provisions, many other personnel may not even have been aware of their existence.[7500]

LOTC also maintained a *de facto* subordinated position vis-à-vis LBI. LOTC was a registered broker/dealer.[7501] It was a subsidiary of LBHI whose trades were fully guaranteed by LBHI,[7502] and engaged in business as an over-the-counter derivatives dealer.[7503] Because LOTC's trading was limited to certain equity and fixed income derivatives products, including options on emerging market bonds,[7504] LOTC was authorized to apply to the SEC for permission to compute capital charges for market and credit risk pursuant to SEC Rule 15c3-1, Appendix F (value-at-risk) instead of SEC Rule 15c3-1(c)(2)(vi) (securities haircuts). This arrangement allowed Lehman to maintain lower net regulatory capital levels for the types of trading conducted through LOTC.[7505]

LOTC maintained an introducing broker relationship with LBI, with LBI serving as its clearing broker.[7506] As an introducing broker, LOTC's assets (including cash and securities) could be held in Proprietary Accounts of Introducing Brokers and Dealers (or

---

[7500] Duff & Phelps' Interview of William Burke, Oct. 28, 2009, at p. 2.

[7501] *See* Lehman Brothers OTC Derivatives, Inc., Financial Statements and Supplemental Information, Notes to Financial Statements, Note 7 (year ended Nov. 30, 2007) [LBEX-DOCID 4512677].

[7502] Lehman, Unanimous Consent of Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (June 9, 2005) [LBEX-AM 003415].

[7503] *See* Lehman Brothers OTC Derivatives, Inc., Financial Statements and Supplemental Information, Notes to Financial Statements, Note 1 (year ended Nov. 30, 2007) [LBEX-DOCID 4512677].

[7504] *Id*.

[7505] 17 C.F.R. § 240.15c3-1f. (2007).

[7506] Lehman Brothers Inc. Introducing Broker Agreement [LBEX-AM 5643193]; Duff & Phelps' Interview of William Burke, Oct. 28, 2009, at p. 2.

"PAIB") at LBI.[7507]  In the context of this relationship, LOTC's "proprietary account" was

an account carried by a broker/dealer for "a business affiliate that, directly or indirectly,

is controlled by or is under common control with" such broker/dealer.[7508]  The assets in

proprietary accounts of such an introducing broker (in this case, LOTC) are not subject

to the same protections as the assets of public customers (i.e. non-broker affiliates).[7509]

Therefore, LBI, as a clearing broker, was not required to maintain physical possession or

control over LOTC's PAIB assets, nor was it restricted in its use of LOTC's PAIB

assets.[7510]  Moreover, so long as LOTC provided a written notice to its customers, their

deposits could be repledged or used in the course of LOTC's business.[7511]  LOTC's

Financial Statement for year ended November 30, 2007, recognized that "[t]he Company

is typically permitted to sell or repledge securities received as collateral."[7512]

---

[7507] Lehman Brothers Inc. Introducing Broker Agreement, § 3(g) [LBEX-AM 5643193]; Duff & Phelps'
Interview of William Burke, Oct. 28, 2009, at p. 2; e-mail from William Burke, Barclays, to TC Fleming,
Duff & Phelps, Dec. 23, 2009; *see also* 17 C.F.R. § 240.15c3-3 (2007).

[7508] 17 C.F.R. § 1.3(y)(viii) (incorporated by 17 C.F.R. § 240.15c3-3(a)(1)).

[7509] *See* 17 C.F.R. § 240.15c3-3(a)(1)("[t]he term [customer] shall not include a broker or dealer"); The New
York Stock Exchange, Inc., SEC No-Action Letter, 1998 WL 879557, at *2 (Nov. 10, 1998) (a clearing broker
"is not subject to the restrictions of Rule 15c3-3 with regard to PAIB assets."); Duff & Phelps' Interview of
William Burke, Oct. 28, 2009, at p. 2.

[7510] *Id.*; *see also* NASD Notice To Members 98-99 (Dec. 1998) ("since clearing broker/dealers are free of
these customer-protection restrictions, it is possible for them to treat PAIB assets as their own.")

[7511] 17 C.F.R. § 240.15c3-3(a)(1) (providing that the term "customer" "shall not include a counterparty who
has delivered collateral to an OTC derivatives dealer pursuant to a transaction in an eligible OTC
derivative instrument" as long as the counterparty received a written notice that the dealer "may
repledge or otherwise use the collateral in its business," that the counterparty will be considered an
unsecured creditor, and that it does not receive SIPA protections).

[7512] Lehman Brothers OTC Derivatives, Inc. Financial Statements and Supplemental Information, Notes to
Financial Statements, (year ended Nov. 30, 2007) at Note 4 [LBEX-DOCID 4512677].

The Examiner's financial advisors analyzed the 2,136 CUSIPs (2,128 from Schedules A and B and 8 from Annex A) associated with both LBHI Affiliate Entities and other Lehman entities to assess how many of the CUSIPs were reflected on the September 12, 2008 balance sheet inventories as net asset positions of LBHI Affiliates that were parties to subordination agreements or similar arrangements with LBI.[7513]  As set forth in more detail in Appendices 29 and 30 hereto, of the 2,136 CUSIPs associated with both LBHI Affiliate Entities and other Lehman entities, 1,141 CUSIPs for securities with a par value of roughly $2.4 billion were associated with LBSF, and 778 of the CUSIPs for securities with a par value of $125.9 million were associated with LOTC. 316 of the CUSIPs linked to LBSF were also linked to LOTC (with a par value of $74.1 million).  Both LBSF and LOTC were parties to subordination agreements or similar arrangements with LBI.  Thus, based upon GFS data, 1,603 (or roughly 75 percent) of the 2,136 CUSIPs associated with both LBHI Affiliate Entities and other Lehman entities were associated with LBHI Affiliate Entities that were parties to subordination agreements or similar arrangements with LBI.  As a result, their securities likely were available for use by LBI irrespective of whether they were held in custody by LBI or had been delivered to LBI pursuant to a financing arrangement.

---

[7513] "Net asset positions" for the purpose of this analysis reflect positive net par values found in GFS for a given CUSIP on a selected LBHI Affiliate's balance sheet, per the Balance Sheet Module.

### (ii) Securities Financing Transactions

When securities were transferred by an LBHI Affiliate Entity to LBI as part of an intercompany financing transaction, that financing arrangement almost invariably took the form of a repurchase transaction.[7514]  Between the parties, a repurchase transaction typically is regarded as an outright transfer of ownership of the security, such that the transferee (in this example LBI) obtains good title to the security.[7515]  A failure on the part of the transferee to perform its obligations under the repurchase agreement (*i.e.* its promise to redeliver the security or its equivalent) is a breach of contract, but does not legally impair the transferee's right to sell or re-pledge the security that the transferee promised to redeliver.[7516]  For accounting purposes, however, prior to a default, repurchase transactions usually are treated as financing (loan) transactions; absent a

---

[7514] The Examiner's financial advisors reviewed the trading activity for the week of Sept. 12-19, 2008, and noted that approximately 95 percent of the trades involving LBI were repo or reverse repo trades.

[7515] *See, e.g.*, Master Repurchase Agreement between Lehman Brothers, Inc., Lehman Commercial Paper Inc. and Lehman Brothers OTC Derivatives, Inc. (Feb. 13, 2004), at p. 6 [LBEX-AM 060025] ("nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities….").

[7516] For instance, in *SEC v. Drysdale Securities Corp.*, 785 F.2d 38, 41 (2d Cir. 1986), the Second Circuit held that "a most significant difference between repos and standard collateralized loans" is that "repo 'lenders' take title to the securities received and can trade, sell or pledge them. The repo merely imposes a contractual obligation to deliver identical securities on the settlement date set by the repo contract."  *Id.* Likewise, in *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 302 (S.D.N.Y. 1998), a New York federal district court ruled that transactions governed by industry standard repurchase agreements were purchase and sale agreements, not secured loans: "Critical to the usefulness, flexibility, and liquidity of the repo market is the transfer of ownership of the repo securities to the repo buyer and the repo buyer's ability to sell, transfer, or pledge the securities purchased in a repo transaction during its term."  *Id. See also Bevill, Bresler & Schulan Asset Mgmt. Corp. v. Army Moral Support Fund*, 67 B.R. 557, 595-97 (D.N.J. 1986) (holding that repo transactions at issue were purchases and sales of securities, emphasizing "the repo buyer's unrestricted right to trade the securities during the term of the [repurchase] agreement").

default, the security that is the subject of the repurchase transaction usually remains on the balance sheet of the transferor as an asset.[7517]

The Examiner's financial advisors used data that had been extracted from GFS to determine how many of the 2,136 securities selected for further analysis were involved in financing transactions. Of the 2,136 CUSIPs that were included in the GFS data set on September 12, 2008, 2,043 (or all but 93 of the CUSIPs) were reflected in the Financing Module data set. Thus, per GFS information, the vast majority of the 2,136 CUSIPs associated with both LBHI Affiliate Entities and other Lehman entities had been delivered to LBI pursuant to a repo or other type of financing trade as of September 12, 2008.

Of the 93 CUSIPs that were not found in the Financing Module data set, 92 CUSIPs (all but one) were linked to an LBHI Affiliate Entity that was a party to a subordination agreement with LBI. The one remaining CUSIP was linked to LBCS, an entity that was not a party to a subordination agreement with LBI, but had an insignificant par value of only $388.[7518]

The Examiner's financial advisors also conducted further analysis beyond GFS, on a sample basis, of CUSIPs that had been identified in GFS as delivered pursuant to a financing transaction to determine (1) whether the securities actually had been

---

[7517] Statement of Fin. Accounting Standards No. 140, ¶ 15. *See also Nebraska Dep't Revenue v. Loewenstein,* 513 U.S. 123, 132-34 (1994) (for tax law purposes, repo transactions are secured loans rather than sales).
[7518] A chart detailing these 93 CUSIPs is attached as Appendix 31.

delivered to LBI pursuant to intercompany financing transactions, and (2) whether the

financing transactions were cash-settled, in which case LBI likely had the right to sell

those securities.  The Examiner's financial advisors found for a sample of these CUSIPs

evidence consistently demonstrating that LBI had the right to sell the securities.

Specifically, the Examiner's financial advisors were informed by several

witnesses that irrespective of whether LBI conducted a financing transaction with a

subordinated entity (such as LBSF and LOTC) or a non-subordinated entity, all

financing transactions involving LBI were settled in cash.[7519]  To test these assertions, the

Examiner's financial advisors examined a sample set of 35 open financing trades[7520]

during the week of September 15, 2008, and found sufficient evidence that 100 percent

of the trades involving LBI were netted and a corresponding wire transfer request was

created for the net settlement amount.  For these trades, the Examiner reviewed

Lehman records detailing the calculation of the net settlement amount, and also records

showing that wire transfer requests for the net settlement amount were submitted for

---

[7519] *See* Duff & Phelps' Interview of William Burke, Oct. 28, 2009 (trades between LBI and affiliates were "always settled," the settlement amount would be "net of margin," and due to LBI's capital requirements, there would be no benefit to not settling trades). Essentially, LBI would need to keep an equivalent amount of assets on reserve for any unsettled trades, thus making it economically impractical.  Duff & Phelps' Interview of Daniel J. Fleming, Oct. 21, 2009 (trades between LBSF and LBI were at "arm's length," as was the case with other intercompany trading activity with and among LBI, LBHI and LBHI Affiliates).

[7520] "Open financing trades" represent trades as to which GFS indicated that the security involved in a Financing Position remained open as of both September 12 and September 19, 2008.

payment in FPS (the cash settlement system). These findings support assertions by former Lehman personnel that trades involving LBI always net settled in cash.[7521]

As noted above, LBSF and LCPI continued to engage in a material amount of trading with LBI during the week of September 15, and that trading activity would not have been reflected in the September 12, 2008 GFS data set used by the Examiner's financial advisors to conduct their analysis.  The Examiner's financial advisors did not observe any instances where LCPI traded any of the CUSIPs transferred to Barclays during the week of September 12, 2008.  They did, however, observe that LBSF trade activity with LBI involved 32 CUSIPs transferred to Barclays.  The Examiner's financial advisors therefore examined the trade activity involving these 32 CUSIPs, and Lehman records showed that wire transfer requests for the net settlement amount were submitted for all of the examined trades.  Thus, the intercompany securities movements that occurred during the week of September 15, 2008 likely were not improper and did not improve LBI's position vis-à-vis any LBHI Affiliate Entity.

### (iii) Alternative Analyses

The Examiner's financial advisors also analyzed the 2,136 CUSIPs associated with both LBHI Affiliate Entities and other Lehman entities from a different perspective, namely to assess whether the source of the CUSIPs transferred to Barclays could have been solely non-LBHI Affiliate Entities.  Toward this end, the Examiner's

---

[7521] *See* Duff & Phelps' Interview of William Burke, Oct. 28, 2009; e-mail from William Burke, Barclays, to TC Fleming, Duff & Phelps (Dec. 23, 2009); Duff & Phelps' Interview of Daniel J. Fleming, Oct. 21, 2009.

financial advisors analyzed whether there was a sufficient quantity of each of the 2,136 CUSIPs at LBI to account for 100 percent of the balances transferred to Barclays.[7522] While this approach would not have absolutely excluded the possibility that securities of an LBHI Affiliate Entity had been transferred to Barclays, it would have corroborated that LBHI Affiliate Entity-owned securities were not included in the group of securities transferred to Barclays.    However, this alternative methodology did not provide meaningful results that could be applied to a large population of the securities.

### (d)  817 CUSIPs With No GFS Data

As of September 12, 2008, 795 of the CUSIPs listed on Schedules A and B and 22 of the CUSIPs listed on Annex A (817 total CUSIPs) did not exist in GFS.[7523]    The Examiner's financial advisors' work included (but was not limited to) the following investigation in an attempt to determine ownership of those securities.

---

[7522] To determine the quantity of relevant CUSIPs in the securities inventory of each legal entity, the Examiner's financial advisors used the Positions Group data in GFS to calculate "Net Inventory" for each CUSIP by legal entity.  As explained above, the Positions Group data do not present a complete picture of the securities in LBI's custody because it does not incorporate the value for Financing Positions, so the Examiner's financial advisors calculated a "Net Custody Value" for each CUSIP as of September 12, 2008 by combining three variables, as follows:  *Net Custody Value = Market Value (Net of Long and Short Inventory Positions) + [Net of Stock Borrows and Stock Loans] + [Net of Repos & Reverse Repos].*  If the par value for a given CUSIP on the Securities List was less than the Net Custody Value for that CUSIP, that indicated that as of September 12, 2008 there were sufficient securities to accomplish the securities transfer to Barclays without resorting to the use of securities that might have been held for the benefit of an LBHI Affiliate.

[7523] Because of the similarity in quantities, the Examiner compared the list of 814 Schedule B securities not delivered to Barclays against the 817 CUSIPs with no GFS data in order to determine whether there was any connection between the two lists.  Only five of the securities overlapped, so there was no strong correlation between the two lists.

### (i)    September 19, 2008 GFS Dataset

As an additional approach to gathering relevant information regarding the 817 CUSIPs, the Examiner's financial advisors searched the September 19, 2008 GFS dataset, which (as set forth above) due to some reliability concerns was not the primary dataset used by the Examiner's financial advisors to conduct their analysis. Of these 817 CUSIPs, 52 were present in the September 19, 2008 dataset. Of the 52 CUSIPs, only one CUSIP was linked to LBHI Affiliate Entities, specifically LBSF and LOTC (both of which are subordinated entities). The par amount for the securities bearing this one CUSIP was insignificant – $95,554. The remaining 51 CUSIPs were not linked to an LBHI Affiliate Entity.

The total par amount of the securities associated with this group of 52 CUSIPs was $284.1 million, representing 41 percent of the total par amount of securities associated with the 817 CUSIPs for which there was no GFS data. As a result, the par amount of securities associated with CUSIPs not represented in either the September 12 or September 19, 2008 GFS datasets (765 CUSIPs) comprises approximately only 0.5 percent of the total par value transferred to Barclays.[7524]

---

[7524] For a list of these CUSIPs, see Appendix 32.

### (ii) Search by ISIN Number and Product ID

Based upon suggestions from Barclays' personnel, the Examiner's financial advisors also analyzed the data associated with the 817 CUSIPS using ISIN numbers[7525] and Lehman-specific "Product Identifiers."[7526]

Initial results using ISIN numbers showed only 42 unique CUSIPs in GFS's Balance Sheet Module at September 12, 2008, and none in the Financing Module. Initial results using the Lehman-specific "Product Identifiers" showed only one unique CUSIP in GFS's Balance Sheet Module and only 14 CUSIPs in the Financing Module. Moreover, data from the initial results was insufficient to allocate the CUSIPs to Lehman legal entities. Thus, this analysis provided little insight into the ownership of the 817 CUSIPs.

### (iii) TMS Source System

TMS is the Lehman trading system that captured certain domestic LBI trading activity. The system accepted listed and OTC equities, municipal bonds, corporate bonds and money market instruments. Based on initial data provided as of

---

[7525] ISIN Numbers are the unique 12-digit numbers that are recognized by the International Standards Organization located in Geneva, Switzerland as security identifiers for cross-border securities transactions. *See* CUSIP Global Services, http://www.isin.cusip.com (last visited Feb. 2, 2010).

[7526] ISINs linked to these CUSIPs were sourced from A&M and Bloomberg, as available. The Examiner located ISINs for 779 of the 817 CUSIPs. The ISINs were then used to locate Lehman-specific "Product Identifiers" that could be used to query GFS. The corresponding Product Identifiers were sourced from Barclays and A&M. *See* e-mail from Lauren Sheridan, A&M, to Heather D. McArn, Examiner's Counsel (Oct. 2, 2009); Product Identifiers [LBEX-BARGFS 0000001], attached to e-mail from Uma Krishna, Barclays, to Ashkay Bhargava, Duff & Phelps (Sept. 28, 2009).

September 19, 2008, 755 of the missing 795 CUSIPs from the Schedules A and B were sourced from the TMS system.

Barclays' personnel provided stock reports related to these 755 CUSIPs.[7527] However, the data did not include fields identifying the corresponding legal entities associated with any of the securities. Moreover, the data provided was insufficient to allocate the corresponding market values or par amounts for these securities. Thus, the information provided was inconclusive for determining the ownership of the 817 CUSIPs.

### (iv) Additional Data Sources

The Examiner's financial advisors did not have access to the LoanNet source system.[7528] Reports provided in response to requests for support for the missing 817 CUSIPs with missing information also did not provide sufficient information to determine the legal ownership of the securities.

The Examiner also sought assistance from A&M, as well as the SIPA Trustee, to identify the sources of these 817 CUSIPs transferred by LBI to Barclays as to which ownership data was inconclusive, but they were unable to provide sufficient information concerning these securities, prior to the delivery of this Report, to enable the Examiner to definitively link these securities to specific Lehman legal entities.

---

[7527] TMS stock records were obtained by Barclays via a separate Lehman system, ADP.

[7528] LoanNet was the Lehman system used to capture certain stock borrow/loan positions. LoanNet is currently owned by Nomura, and not directly accessible through Barclays or the estate.

Shortly before the filing of this Report, however, the SIPA Trustee conducted a review of the 817 CUSIPs, and was able to confirm that most of the 817 CUSIPs appeared to be Financing Positions or LBI inventory.[7529]  At the Examiner's request, the SIPA Trustee's financial advisors examined a sample of the 20 largest CUSIPs, and were able to identify the accounts with which the CUSIP positions were associated.  All 20 CUSIPs reflected securities originating from LBI, LBIE or LBI customer accounts, and none of the CUSIPs were associated with accounts owned by an LBHI Affiliate Entity.[7530]  Thus, based upon this sample, it is unlikely that a material number of securities associated with the 817 CUSIPs were linked to an LBHI Affiliate Entity.

In the absence of records demonstrating the source of the securities, it is possible that some of the securities had been received by LBI but not yet allocated to a customer's account (that of either a Lehman affiliate or a third party).  This could occur, for example, in circumstances involving failed trades or when counterparty data is missing.[7531]  However, the Examiner was unable to conclusively determine whether either scenario was indeed the case.

The securities bearing these 817 CUSIPs that are not included in the September 12, 2009 GFS data set comprise a relatively small subset of the securities

---

[7529] E-mail from Sarah Cave, Hughes, Hubbard & Reed LLP, to Vincent Lazar, Examiner's Counsel (Jan. 28, 2010).

[7530] *Id.*; e-mail from Jordan Pace, Hughes, Hubbard & Reed LLP, to Vincent Lazar, Examiner's Counsel (Feb. 3, 2010).

[7531] Duff & Phelps' Interview of James Guarino, Oct. 28, 2009; Duff & Phelps' Interview of William Burke, Dec. 9, 2009.

transferred to Barclays ($695.8 million in par value, which represents less than 2 percent of the par value of all CUSIPs transferred to Barclays). After taking into account the September 19, 2008 GFS dataset, the number of CUSIPs not captured in GFS (765 CUSIPs) had a corresponding par value of $411.7 million, or approximately 0.5 percent of the par value of all CUSIPs transferred to Barclays.   In light of:  (1) the conclusions the Examiner has reached with respect to likely ownership of the remainder of the securities; (2) the various defenses (including formidable securities intermediary and securities settlement defenses) to the avoidance of any securities transfers to Barclays; and (3) the involvement of various estate and other professionals who were unable to secure the data necessary to conduct an analysis of these remaining CUSIPs, the Examiner concludes that further investigation into ownership of these remaining CUSIPs is not cost justified.

### b)  Analysis of Tangible Asset Transfers

The Examiner's financial advisors determined that tangible assets[7532] of four LBHI Affiliates – LB 745, LBCS, LCPI and LBSF – were transferred to Barclays in connection with the sale transaction.  The transfer of LB 745's assets was expressly provided for in the APA, and was approved by the Court.  As described below, the Examiner concludes that the LBCS, LCPI and LBSF tangible assets that were transferred to Barclays

---

[7532] The Examiner and his financial advisors focused on fixed assets, which include various types of real and personal property.  Tangible assets also could include certain types of financial assets, such as notes and loans.  The Examiner and his financial advisors uncovered no facts indicating that such financial assets of LBHI Affiliates were transferred to Barclays.

consisted of communications equipment, computer equipment and furniture with a net book value of less than $10 million, and an actual value likely materially less.

To evaluate whether tangible assets of LBHI Affiliates were transferred to Barclays in connection with the sale transaction, the Examiner investigated whether it was possible to identify and trace the specific tangible assets that Barclays received in connection with the sale to identify those that were owned by LBHI Affiliates.

Lehman did not operate its businesses in a way that would facilitate the identification of specific tangible assets owned by LBHI Affiliates. At the time of the transfer, operations of many of the LBHI Affiliates were conducted out of the 745 Seventh Avenue headquarters. Lehman's operations at this facility generally were organized by product line, rather than legal entity, so that fixed assets owned by a particular entity would have been intermingled with those of other entities. As a result, it would have been very costly and time-consuming to physically trace specific fixed assets to determine what belonged to the LBHI Affiliates.

The Examiner's financial advisors identified a Lehman "asset" database (ADb), but determined that this database did not contain sufficient reliable and pertinent information for this analysis. Among other things, that database was not regularly

updated to reflect asset acquisitions and transfers or office moves, and assets were not necessarily allocated to the entity that had title to them.[7533]

The Examiner's professionals determined that the only reliable way to identify specific assets that were transferred to Barclays would be to conduct an extensive physical inventory of fixed assets, based on a review of serial numbers or other unique identifiers. That analysis, however, would have been time-consuming and expensive. Given the limited value of the transferred assets, the Examiner concluded that such an approach would not be a prudent use of the estate's assets.

Because the Examiner's financial advisors concluded that the fixed asset information in the balance sheets appeared to be relatively accurate, the Examiner concluded that using the asset values identified in the balance sheet was the most efficient method to identify tangible assets of LBHI Affiliates that potentially were transferred to Barclays.

Accordingly, the Examiner's financial advisors obtained and analyzed balance sheet information[7534] for each LBHI Affiliate as of September 12, 2008 (*i.e.*, before the sale transaction), and as of September 30, 2008 (after the sale transaction closed), to identify

---

[7533] The Examiner confirmed that the Debtors and their financial advisors, A&M, also had evaluated the use of the ADb database to identify ownership of assets, but had concluded that it was not sufficiently reliable for that purpose. Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

[7534] The balance sheet information that the Examiner's financial advisors reviewed was obtained using the Debtors' Essbase system. Balance sheets for each of the individual LBHI Affiliates (except PAMI Statler, which was rolled up into the umbrella PAMI financial statements and did not have its own financial information) are available in Appendix 33.

whether the gross book value of any LBHI Affiliate's tangible assets declined during that period. A reduction in the value of tangible assets on the balance sheets of an LBHI Affiliate during that period might be attributable to transfers of assets, thus warranting further investigation to determine whether assets were transferred to Barclays in connection with the sale transaction. The Examiner also interviewed witnesses to gain an understanding of which tangible assets were transferred to Barclays, to confirm the accuracy of the balance sheet information and to confirm that the balance sheets had been adjusted to reflect all asset transfers.

The Examiner's financial advisors determined that the balance sheets of only seven LBHI Affiliates (LB 745, LBCS, LCPI, LBSF and the three CES Aviation asset holding companies) reflected tangible assets before the Barclays transaction. The balance sheets of the remaining LBHI Affiliates did not reflect any tangible assets as of Friday, September 12, 2008, and thus those entities likely did not own any tangible assets that might have been transferred to Barclays in connection with the sale transaction. Therefore, the Examiner and his financial advisors focused their analysis on the LBHI Affiliates that held tangible assets on their balance sheets as of September 12, 2008, that potentially could have been transferred to Barclays.

### (1)  LB 745

LB 745's balance sheet reflected several categories of tangible assets, including buildings, building and leasehold improvements, furniture, fine arts and antiques,

communications equipment (recorded as "equip-comm" on the balance sheet) and

computer equipment (recorded as "EDP & PC").[7535]  As expected, there were substantial

decreases in all but one of those asset categories at or about the time of the Barclays sale

transaction:

### LB 745

|  | 12-Sep-08 | 30-Sep-08 |  |  |
|---|---|---|---|---|
|  | A | B | B-A | % Change |
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | 522,920,456 | - | (522,920,456) | -100.0% |
| 104020SUM F/A-COST-FURNITURE | 30,079,193 | 19,893 | (30,059,300) | -99.9% |
| 14025SUM F/A-COST-EQUIP-COMM. | 28,990,441 | 0 | (28,990,441) | -100.0% |
| 14030SUM F/A-COST-EQUIP.-EDP & PC | 1,849,810 | 458,953 | (1,390,858) | -75.2% |
| 14040SUM F/A-COST-BLDNGS & L/H | 183,523,963 | 33,483 | (183,490,480) | -100.0% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | - | - | - | 0.0% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | 1,420,374 | 1,420,374 | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 768,784,237 | 1,932,703 | (766,851,534) | -99.7% |
| 14515SUM F/A-A/D-BUILDINGS | (85,821,463) | (435,853) | 85,385,610 | -99.5% |
| 14520SUM F/A-A/D-FURNITURE | (17,825,330) | (108,911) | 17,716,419 | -99.4% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | (23,381,422) | (144,411) | 23,237,011 | -99.4% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | (1,841,107) | (453,080) | 1,388,026 | -75.4% |
| 14540SUM F/A-A/D-BLDGS. & L/H | (72,685,815) | (414,044) | 72,271,772 | -99.4% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | - | - | - | 0.0% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71700SUM TOTAL F/A-A/D[7536] | (201,555,137) | (1,556,299) | 199,998,838 | -99.2% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 567,229,100 | 376,404 | (566,852,696) | -99.9% |

For example, the gross book value of "buildings" on LB 745's balance sheet was

$522,920,456 on September 12, 2008, and zero on September 30, 2008.[7537]  Similarly, the

value of furniture was $30,079,193 as of September 12, 2008, and $19,893 as of

September 30, 2008 – a decline of 99.9 percent.  Those declines in gross book value are

---

[7535] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations, at p. 4.

[7536] The Examiner's financial advisors concluded that the changes in accumulated depreciation that are reflected for LB 745 and the other LBHI Affiliates appear to represent the estimated monthly depreciation of the listed assets taken over their useful lives.

[7537] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations, at p. 4.

consistent with transfer of LB 745's real property and related assets pursuant to the

express provisions of the APA and approved by the Court.[7538]

### (2)  LBCS

LBCS's balance sheet reflected several categories of tangible assets, including

furniture, communications equipment, computer equipment and building and

leasehold improvements:

**LBCS**

|  | 12-Sep-08 | 30-Sep-08 |  |  |
|---|---|---|---|---|
|  | A | B | B-A | % Change |
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | - | - | - | 0.0% |
| 104020SUM F/A-COST-FURNITURE | 1,489,679 | 1,400,471 | (89,208) | -6.0% |
| 14025SUM F/A-COST-EQUIP-COMM. | 1,079,384 | 754,359 | (325,025) | -30.1% |
| 14030SUM F/A-COST-EQUIP-EDP & PC | 849,253 | 211,856 | (637,397) | -75.1% |
| 14040SUM F/A-COST-BLDNGS & L/H | 3,062,460 | 3,037,036 | (25,424) | -0.8% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | - | - | - | 0.0% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | - | - | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 6,480,774 | 5,403,721 | (1,077,053) | -16.6% |
| 14515SUM F/A-A/D-BUILDINGS | - | - | - | 0.0% |
| 14520SUM F/A-A/D-FURNITURE | (92,913) | (85,416) | 7,497 | -8.1% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | (362,579) | (169,238) | 193,342 | -53.3% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | (538,076) | (88,627) | 449,449 | -83.5% |
| 14540SUM F/A-A/D-BLDGS. & L/H | (232,360) | (245,805) | (13,445) | 5.8% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | - | - | - | 0.0% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71700SUM TOTAL F/A-A/D | (1,225,929) | (589,085) | 636,843 | -51.9% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 5,254,846 | 4,814,636 | (440,210) | -8.4% |

The gross book values in several of those asset categories decreased over the

period that the sale transaction closed.    For example, the gross book value of

communications equipment decreased by $325,025 between September 12, 2008, and

---

[7538] *See* APA, at p. 1.

September 30, 2008,[7539] and the gross book value of computer equipment decreased by

$637,397 between September 12, 2008, and September 30, 2008.[7540]    The Examiner's

financial advisors confirmed that these reductions were the result of the transfer of

assets in those categories to Barclays.[7541]  In addition, the Examiner determined (and the

Debtors confirmed) that, following publication of the September 30, 2008 balance sheet,

the Debtors continued to make adjustments to the book values reflected on the balance

sheet to reflect, among other things, transfers of assets to Barclays.[7542]  Based upon his

investigation, the Examiner has concluded that tangible assets of LBCS reflected on the

September 30, 2008 balance sheet also were transferred to Barclays.

### (3)  LCPI

LCPI's balance sheet reflected several categories of tangible assets, including

furniture, communications equipment and computer equipment:

---

[7539] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations, at p. 2.

[7540] *Id.*

[7541] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al.* (Jan. 22, 2010). The Examiner's financial advisors also identified a *de minimis* ($89,208) decrease in the gross book value of furniture during the relevant time frame.  That decline likely was due to the transfer of LBCS furniture assets to Barclays, particularly given that a substantial portion of LBCS' operations were conducted in the 745 Seventh Avenue headquarters building.

[7542] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al.* (Jan. 22, 2010).  In addition, by Order dated June 25, 2009, the Court authorized LBHI to repurchase from Barclays certain tangible assets that had been transferred to Barclays in connection with the sale.  *See* Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing Lehman Brothers Holdings Inc. to Purchase Certain Furniture, Fixtures and Equipment from Barclays Capital Inc., Docket No. 4171, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. June 25, 2009).  Those assets may have included tangible assets owned by LBCS.

**LCPI**

| | 12-Sep-08 | 30-Sep-08 | | |
|---|---|---|---|---|
| | A | B | B-A | % Change |
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | - | - | - | 0.0% |
| 104020SUM F/A-COST-FURNITURE | 70,905 | 70,905 | - | 0.0% |
| 14025SUM F/A-COST-EQUIP.-COMM. | 766,909 | 766,636 | (273) | 0.0% |
| 14030SUM F/A-COST-EQUIP-EDP & PC | 4,903,172 | 4,524,941 | (378,231) | -7.7% |
| 14040SUM F/A-COST-BLDNGS & L/H | 2,634 | 1,050 | (1,584) | -60.1% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | - | - | - | 0.0% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | - | - | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 5,743,621 | 5,363,533 | (380,087) | -6.6% |
| 14515SUM F/A-A/D-BUILDINGS | - | - | - | 0.0% |
| 14520SUM F/A-A/D-FURNITURE | (42,455) | (42,724) | (269) | 0.6% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | (443,871) | (397,841) | 46,030 | -10.4% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | (3,576,653) | (3,234,363) | 342,290 | -9.6% |
| 14540SUM F/A-A/D-BLDGS. & L/H | (102) | (106) | (4) | 4.3% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | - | - | - | 0.0% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71700SUM TOTAL F/A-A/D | (4,063,080) | (3,675,033) | 388,047 | -9.6% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 1,680,541 | 1,688,500 | 7,959 | 0.5% |

The gross book values in certain of those asset categories decreased over the period that the sale transaction closed.  For example, the gross book value of computer equipment declined by $378,231 between September 12, 2008, and September 30, 2008.[7543]  The Examiner determined that reduction, however, was not related to the transfer of computer equipment to Barclays.[7544]  The Examiner also determined (and the Debtors confirmed) that, following publication of the September 30, 2008 balance sheet, the Debtors continued to make adjustments to the book values reflected on the balance sheet to reflect, among other things, transfers of assets to Barclays.[7545]  Based upon his

---

[7543] Appendix 34, Tangible Asset Balance Sheet Variations Prepared By Duff & Phelps, at p. 1.

[7544] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al.* (Jan. 22, 2010).

[7545] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al*. (Jan. 22, 2010).  In addition, by Order dated June 25, 2009, the Court authorized LBHI to repurchase from Barclays certain

investigation, the Examiner has concluded that tangible assets of LCPI reflected on the

September 30, 2008 balance sheet also were transferred to Barclays.

### (4)  LBSF

LBSF's balance sheet reflected several categories of tangible assets, including

furniture, communications equipment, computer equipment and building and

leasehold improvements:

**LBSF**

|  | 12-Sep-08 | 30-Sep-08 |  |  |
|---|---|---|---|---|
|  | A | B | B-A | % Change |
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | - | - | - | 0.0% |
| 104020SUM F/A-COST-FURNITURE | 50,919 | 50,919 | - | 0.0% |
| 14025SUM F/A-COST-EQUIP-COMM. | 57,345 | 36,993 | (20,353) | -35.5% |
| 14030SUM F/A-COST-EQUIP-EDP & PC | 9,350,025 | 8,819,693 | (530,332) | -5.7% |
| 14040SUM F/A-COST-BLDNGS & L/H | 28,351 | 22,948 | (5,403) | -19.1% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | - | - | - | 0.0% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | - | - | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 9,486,641 | 8,930,553 | (556,088) | -5.9% |
| 14515SUM F/A-A/D-BUILDINGS | - | - | - | 0.0% |
| 14520SUM F/A-A/D-FURNITURE | (12,511) | (12,766) | (255) | 2.0% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | (20,716) | (11,128) | 9,587 | -46.3% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | (6,432,240) | (6,082,223) | 350,017 | -5.4% |
| 14540SUM F/A-A/D-BLDGS. & L/H | (12,602) | (12,836) | (234) | 1.9% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | - | - | - | 0.0% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | 0 | 0 | 0.0% |
| 71700SUM TOTAL F/A-A/D | (6,478,069) | (6,118,953) | 359,116 | -5.5% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 3,008,572 | 2,811,600 | (196,973) | -6.5% |

The gross book values in certain of those asset categories decreased over the

period that the sale transaction closed.  For example, the gross book value of computer

---

tangible assets that had been transferred to Barclays in connection with the sale.  *See* Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing Lehman Brothers Holdings Inc. to Purchase Certain Furniture, Fixtures and Equipment from Barclays Capital Inc., Docket No. 4171, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. June 25, 2009).  Those assets may have included tangible assets owned by LCPI.

equipment declined by $530,332 between September 12, 2008 and September 30, 2008.[7546]

The Examiner determined that these reductions, however, were not related to transfers of computer equipment to Barclays at the time of the sale.[7547]    The Examiner also determined (and the Debtors confirmed) that, following publication of the September 30, 2008 balance sheet, the Debtors continued to make adjustments to the book values reflected on the balance sheet to reflect, among other things, transfers of assets to Barclays.[7548]    Based upon his investigation, the Examiner has concluded that tangible assets of LBSF reflected on the September 30, 2008 balance sheet also were transferred to Barclays.

### (5)  CES

CES's balance sheet reflected one tangible asset – a Gulfstream G-IV corporate jet:

---

[7546] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations, at p. 1.

[7547] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al.* (Jan. 22, 2010).

[7548] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al*. (Jan. 22, 2010).  In addition, by Order dated June 25, 2009, the Court authorized LBHI to repurchase from Barclays certain tangible assets that had been transferred to Barclays in connection with the sale.  *See* Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing Lehman Brothers Holdings Inc. to Purchase Certain Furniture, Fixtures and Equipment from Barclays Capital Inc., Docket No. 4171, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. June 25, 2009).  Those assets may have included tangible assets owned by LBSF.

**CES**

| | 12-Sep-08 | 30-Sep-08 | | |
|---|---|---|---|---|
| | A | B | B-A | % Change |
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | - | - | - | 0.0% |
| 104020SUM F/A-COST-FURNITURE | - | - | - | 0.0% |
| 14025SUM F/A-COST-EQUIP-COMM. | - | - | - | 0.0% |
| 14030SUM F/A-COST-EQUIP-EDP & PC | - | - | - | 0.0% |
| 14040SUM F/A-COST-BLDNGS & L/H | - | - | - | 0.0% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | 32,169,194 | 32,169,194 | - | 0.0% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | - | - | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 32,169,194 | 32,169,194 | - | 0.0% |
| 14515SUM F/A-A/D-BUILDINGS | - | - | - | 0.0% |
| 14520SUM F/A-A/D-FURNITURE | - | - | - | 0.0% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | - | - | - | 0.0% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | - | - | - | 0.0% |
| 14540SUM F/A-A/D-BLDGS. & L/H | - | - | - | 0.0% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | (10,756,037) | (10,769,573) | (13,535) | 0.1% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71700SUM TOTAL F/A-A/D | (10,756,037) | (10,769,573) | (13,535) | 0.1% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 21,413,157 | 21,399,621 | (13,535) | -0.1% |

The G-IV was not transferred to Barclays in connection with the sale transaction; rather, CES sold the jet to a third party in a transaction approved by the Court in December 2008.[7549] Consistent with those facts, the gross book value of "trans. and car"

---

[7549] Supplement to Debtors' Motion for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004 Authorizing Lehman Brothers Holdings Inc. to Enter into an Amended a Sale and Purchase Agreement, at pp. 2-3, Docket No. 1257, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 29, 2008); Order Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004 Authorizing Lehman Brothers Holdings Inc. to Enter into an Amended Sale and Purchase Agreement, at p. 2, Docket No. 1399, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Nov. 5, 2008); Debtors' Motion to Amend (I) Order Authorizing Sale of G-IVSP Aircraft and (II) Order Authorizing Sale of Falcon 50 Aircraft, at pp. 7-8, Docket No. 2318, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Dec. 19, 2008); Amended Order Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004 Authorizing Lehman Brothers Holdings Inc. to Enter into an Amended Sale and Purchase Agreement, Docket No. 2359, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Dec. 23, 2008).

assets on the CES balance sheet did not decline over the period when the Barclays transaction occurred.[7550]

### (6) CES V

The only material tangible asset reflected on CES V's balance sheet was a Sikorsky S-76C+ helicopter:

**CES V**

| | 12-Sep-08 | 30-Sep-08 | | |
|---|---|---|---|---|
| | A | B | B-A | % Change |
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | - | - | - | 0.0% |
| 104020SUM F/A-COST-FURNITURE | - | - | - | 0.0% |
| 14025SUM F/A-COST-EQUIP-COMM. | - | - | - | 0.0% |
| 14030SUM F/A-COST-EQUIP-EDP & PC | - | - | - | 0.0% |
| 14040SUM F/A-COST-BLDNGS & L/H | - | - | - | 0.0% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | 6,043,710 | 4,518,502 | (1,525,208) | -25.2% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | - | - | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 6,043,710 | 4,518,502 | (1,525,208) | -25.2% |
| 14515SUM F/A-A/D-BUILDINGS | - | - | - | 0.0% |
| 14520SUM F/A-A/D-FURNITURE | - | - | - | 0.0% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | - | - | - | 0.0% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | - | - | - | 0.0% |
| 14540SUM F/A-A/D-BLDGS. & L/H | - | - | - | 0.0% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | (1,815,135) | (1,818,502) | (3,367) | 0.2% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71700SUM TOTAL F/A-A/D | (1,815,135) | (1,818,502) | (3,367) | 0.2% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 4,228,575 | 2,700,000 | (1,528,575) | -36.1% |

The helicopter was not transferred to Barclays in the sale transaction that the Court approved on September 20, 2008; rather CES V sold the helicopter in a transaction approved by the Court in March 2009.[7551] Though the gross book value of "trans. and

---

[7550] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations, at p. 2.

[7551] Lehman, CES V World Records Report (Sept. 15, 2008) [LBEX-LL 027775]; Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004, and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules for Approval of the Sale of

car" asset on the CES V balance sheet did decline during the period that the Barclays

transaction occurred,[7552] the Examiner confirmed that this reduction was the result of an

accounting adjustment (asset held for sale) to reflect the fair market value of the

helicopter based on its liquidation value, not a transfer of assets to Barclays or any other

entity.[7553]

### (7)  CES IX

The only material tangible asset reflected on the balance sheet of CES IX was a

Falcon 50 corporate jet:

---

Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement and Payment of Related Fees, at pp. 3-4, Docket No. 3003, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Mar. 5, 2009); Order Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004, and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules Approving the Sale of Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement and Payment of Related Fees, Docket No. 3219, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Mar. 25, 2009).

[7552] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations, at p. 3.

[7553] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, *et al.* (Jan. 22, 2010).

## CES IX

| | 12-Sep-08 | 30-Sep-08 | | |
| | A | B | B-A | % Change |
|---|---|---|---|---|
| 14010SUM F/A-COST-LAND | - | - | - | 0.0% |
| 14015SUM F/A-COST-BLDGS | - | - | - | 0.0% |
| 104020SUM F/A-COST-FURNITURE | - | - | - | 0.0% |
| 14025SUM F/A-COST-EQUIP-COMM. | - | - | - | 0.0% |
| 14030SUM F/A-COST-EQUIP-EDP & PC | - | - | - | 0.0% |
| 14040SUM F/A-COST-BLDNGS & L/H | - | - | - | 0.0% |
| 14045SUM F/A-COST-CONSTR.IN PROGRESS | - | - | - | 0.0% |
| 14050SUM F/A-COST-TRANS. & CAR | 8,700,000 | 6,702,538 | (1,997,462) | -23.0% |
| 14055SUM F/A-CST-FINE ARTS & ANTIQUES | - | - | - | 0.0% |
| 14060SUM CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71600SUM TOTAL F/A-COST | 8,700,000 | 8,702,538 | (1,997,462) | -23.0% |
| 14515SUM F/A-A/D-BUILDINGS | - | - | - | 0.0% |
| 14520SUM F/A-A/D-FURNITURE | - | - | - | 0.0% |
| 14525SUM F/A-A/D-EQUIP.-COMM. | - | - | - | 0.0% |
| 14530SUM F/A-A/D-EQUIP.-EDP & PC | - | - | - | 0.0% |
| 14540SUM F/A-A/D-BLDGS. & L/H | - | - | - | 0.0% |
| 14550SUM F/A-A/D-TRANS. & CAR COSTS | (1,036,849) | (1,042,808) | (5,959) | 0.6% |
| 14560SUM F/A-A/D CAPITALIZED SOFTWARE | - | - | - | 0.0% |
| 71700SUM TOTAL F/A-A/D | (1,036,849) | (1,042,808) | (5,959) | 0.6% |
| 71750SUM PROPERTY, EQUIP. & LEASE.IM | 7,663,151 | 5,659,730 | (2,003,421) | -26.1% |

The Falcon 50 was not transferred to Barclays in connection with the transaction; rather, CES IX sold the jet in a transaction approved by the Court in December 2008.[7554] Although the gross book value of "trans. and car" asset line on the CES IX balance sheet did decline over the period that the Barclays transaction occurred,[7555] the Examiner

[7554] Order Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules Approving the Sale of the Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement, Docket No. 2051, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Dec. 3, 2008); Debtors' Motion to Amend (I) Order Authorizing Sale of G-IVSP Aircraft and (II) Order Authorizing Sale of Falcon 50 Aircraft, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Dec. 19, 2008); Amended Order Pursuant to Sections 105 and 363 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, and Rules 6004-1, 9006-1 and 9014-1 of the Local Bankruptcy Rules Approving the Sale of the Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement, Docket No. 2362, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Dec. 23, 2008).

[7555] Appendix 34, Duff & Phelps, Tangible Asset Balance Sheet Variations Prepared By Duff & Phelps, at p. 3.

confirmed that this reduction was due to an accounting adjustment (asset held for sale) to reflect the fair market value of the aircraft based on its liquidation value, not a transfer of assets to Barclays.[7556]

### c)    Analysis of Intangible Asset Transfers

The Examiner and his financial advisors concluded that one LBCS intangible asset was transferred to Barclays in connection with the sale.  That asset consisted of information regarding the customers with whom LBCS traded that were not within LBI's customer base, including the identity of those customers, the products they traded and the prices of those products (the "LBCS Customer Information").  LBCS also had an assembled workforce prior to LBHI's bankruptcy, but that asset was not transferred to Barclays in the sale.

The Examiner's financial advisors focused on facts that might indicate whether any of the LBHI Affiliates owned intangible assets falling into three categories:

- customer information assets, including customer lists and product and pricing information;

- proprietary software; and

- a trained, experienced assembled workforce.[7557]

---

[7556] E-mail from Lauren Sheridan, A&M, to David C. Layden, Examiner's Counsel, et al. (Jan. 22, 2010).

[7557] See ROBERT F. REILLY & ROBERT P. SCHWEIHS, VALUING INTANGIBLE ASSETS 19-20 (McGraw Hill 1999); Statement Of Fin. Accounting Standards No. 142.  Firms also can own other categories of intangible assets, such as marketing-related intangibles (e.g., trademarks, trade names and brand names), artistic-related intangibles, engineering-related intangibles, and contract-related intangibles (e.g., favorable supplier contracts, license agreements and franchise agreements).  REILLY & SCHWEIHS, at 19.  Given the nature of their businesses, there is no reason to believe that the LBHI Affiliates owned artistic-related, engineering-related or contract-related intangibles, and the Examiner did not discover any facts

The Examiner's financial advisors reviewed the balance sheets of the LBHI Affiliates as of August 29, 2008, and September 12, 2008. Those balance sheets do not reflect any intangible assets.[7558] However, the absence of intangible assets on the balance sheets of the LBHI Affiliates would not necessarily indicate that those entities did not own intangible assets. Intangible assets typically are not reflected as assets on a firm's balance sheet unless the firm obtained them in connection with the acquisition of a business or otherwise (as opposed to developing the assets through its own efforts).[7559] Therefore, the Examiner and his financial advisors conducted a series of analyses to determine whether any LBHI Affiliates owned the types of intangible assets identified above.

### (1) Customer Information Assets

A business that expends substantial effort to develop a compilation of customer data and keeps that information confidential may have a protectable interest in that data in the form of a trade secret.[7560]

There is no directly applicable case law providing firm guidance for determining, within a group of affiliated legal entities, which entity owns an intangible asset such as

---

suggesting otherwise. With respect to marketing-related intangibles, the "Lehman" and "Lehman Brothers" marks were conveyed to Barclays by LBHI and LBI (and licensed by Barclays back to the Debtors' estates for use in the wind-down) in connection with the sale transaction. *See* APA, at pp. 8, (§ 1.1), 29-30 (§ 8.9). The Examiner did not discover any facts indicating that any LBHI Affiliates independently owned marks or trade names, and even if they arguably did, there is no reason to believe that any LBHI Affiliate mark or trade name was conveyed to Barclays.

[7558] Summary Balance Sheets of LBHI Affiliates Prepared by Duff & Phelps are available in Appendix 33.

[7559] *See, e.g.*, I.R.C. § 197 (2006); Statement Of Fin. Accounting Standards No. 142.

[7560] *E.g., Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985).

a customer list. However, the Examiner's financial advisors used guidance from analogous contexts in analyzing whether LBHI Affiliates owned protectable customer information:   the relationship between expenses incurred in the development of information, and the firm's ownership of that asset.[7561]

The Examiner's financial advisors determined that, although Lehman used LBI as the common "paymaster" for Lehman's employees in the United States (including, as described below, LBI employees who performed functions exclusively for certain LBHI Affiliates), Lehman allocated the compensation expenses relating to various legal entities within Lehman. Thus, certain LBHI Affiliates incurred employee expenses.[7562]

The Examiner also determined that, prior to the September 22, 2008 closing of the sale transaction, Lehman's consolidated computer systems contained information that could be used (and regularly was used) to generate lists of the counterparties with

---

[7561] See, e.g., Kimball Laundry Co. v. United States, 338 U.S. 1, 18 (1949) (holding, in context of Fifth Amendment takings claim, that it is legitimate to draw an "inference that expenditures for the purpose of soliciting business have resulted in a value which will continue to contribute to the earning capacity of the business in later years and which is therefore a value" that a purchaser may recognize); Metal & Salvage Ass'n, Inc. v. Siegel, 503 N.Y.S.2d 26, 28 (N.Y. App. Div. 1986) (noting that it is unlikely that a business has a protectable customer list if there is no indication that it "expended any sums on advertising or such efforts"); see also Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC, 80 F. Supp. 2d 25, 32 (N.D.N.Y. 1999) (determining that a business may not claim a trade secret in a product recipe if it does not actively contribute to its development or provide financial compensation to other parties who did); Leo Silfen, Inc. v. Cream, 278 N.E.2d 636, 640 (N.Y. 1972) (noting that customer lists are likely to be protectable when "the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money"); Hair Say, Ltd. v. Salon Opus, Inc., No. 5106-01, 2005 WL 697538, at *5 (N.Y. Sup. Ct. Mar. 17, 2005) (noting that a hair salon's alleged customer list was not protectable in part because there was no evidence that the salon incurred any expenses or engaged in any networking, advertising or marketing in compiling or maintaining the list).

[7562] See, e.g., FASB Statement of Financial Accounting Concepts No. 6: Elements of Financial Statements, at ¶ 24 (noting that elements, such as assets and expenses, that are reflected on financial statements "are defined in relation to a particular entity").

which the LBHI Affiliate "operating entities" – LBCS, LBCC, LCPI, LBSF, LOTC, LBDP

and LBFP[7563] – traded.[7564]  The information that could be, and was, generated using those

systems included more than simply the identity of the counterparties; it included

information such as the products traded (both currently and historically), historical

trading prices, and the revenue generated by those trades.[7565]

Although this information included many counterparty names that are readily

available to competitors in the industry, such as well-known investment banks,

financial services firms and hedge funds, some of the counterparty names were not

readily ascertainable from publicly-available sources of information,[7566] and specific

product and pricing information was, by its nature, not readily determinable from

sources outside of Lehman.

The Examiner also determined that, prior to the closing of the sale transaction on

September 22, 2008, Lehman took steps to protect the confidentiality of the information,

including corporate policies that prohibited the disclosure of such information to

---

[7563] The Examiner also determined that BNC did not have any valuable customer-information assets. Even if BNC might once have had these types of assets, their value would have been lost long before September 2008, given that BNC had stopped originating subprime mortgages in August of 2007.

[7564] *See, e.g.*, Lehman, Derivative Balance Sheet Details (Aug. 2008) [LBHI_SEC07940_2528640] and (Aug. 29, 2008) [LBHI_SEC07940_2531361], attached to e-mail from Michael McGarvey, Lehman, to Jennifer Fitzgibbon, Lehman (Sept. 13, 2008) [LBHI_SEC07940_2528253]; Lehman, Fixed Income FID Client Rankings Summary (July 2008) [LBHI_SEC07940_2277547], attached to e-mail from Alex Milner, Lehman, to Thomas P. Humphrey, Lehman, *et. al.*, (Aug. 7, 2008) [ LBHI_SEC07940_2277546].

[7565] Examiner's Interview of Satu S. Parikh, Jan. 4, 2010.

[7566] *Id.*

anyone outside of Lehman, and by requiring passwords to access Lehman's computer systems.[7567]

The fact that Lehman's computer systems held confidential customer-related information does not, without more, lead to the conclusion that an entity *owned* the customer-related information associated with the counterparties with which it traded.

Specifically, the Examiner's financial advisors determined that LBCS was the only LBHI Affiliate that incurred expenses relating to the development of a distinct and not readily accessible customer base. LBCS developed a commodity trading customer base that was, at least in part, separate and distinct from LBI's customer base.[7568] LBCS had been created by Lehman with the goal of developing a commodities and commodities derivative trading platform.[7569] As a result, while the trades booked in most LBHI Affiliates originated with the sales forces that served the umbrella business units,[7570] LBCS had its own dedicated sales staff.[7571] That sales force leveraged to some extent off of existing LBI customer relationships, but also was working to develop its own business opportunity leads at the time LBHI filed for bankruptcy.[7572] Therefore, although most of the customer information that LBCS used was known to competitors

---

[7567] *See, e.g.*, Lehman, Lehman Brothers Confidentiality Agreement [LBEX-LL 3668555].

[7568] Examiner's Interview of Satu S. Parikh, Jan. 4, 2010.

[7569] Examiner's Interview of James P. Seery, Jr., Jan. 14, 2010, at p. 2.

[7570] Examiner's Interview of Thomas E. Hommel, Apr. 29, 2009, at p. 4.

[7571] A&M, spreadsheet of employees mapped to legal entities as of Sept. 20, 2008 [LBEX-AM 5642400]; Lehman, FID Full Population Roster (Aug. 31, 2008) [LBEX-DOCID 3102619], attached to e-mail from John Cannady Jr., Lehman, to Joann DeMange, Lehman, *et al.* (Sept. 4, 2008) [LBEX-DOCID 2880236]; Examiner's Interview of James P. Seery, Jr., Jan. 14, 2010, at p. 2.

[7572] Examiner's Interview of Satu S. Parikh, Jan. 4, 2010.

or was largely derived from LBI's customer base, LBCS did generate some unique and secret customer information of its own.

In contrast, other LBHI Affiliates that traded with counterparties did not have distinct customer bases developed by an independent sales team, but instead served largely as product booking entities into which LBI's businesses recorded transactions.[7573] For example, compensation expenses and employees were allocated to LBSF and LCPI, but there is no evidence that the employees who performed functions for these entities contributed to the development of a customer base that was distinct from LBI's customer base.[7574]  Instead, employees allocated to LBSF and LCPI conducted activities primarily related to LBI transactions, with the resulting transactions booked to LBSF (for derivatives) and LCPI (for loans).[7575]

Therefore, the Examiner concludes that there was a sufficient basis to assert a colorable claim that LBCS owned the LBCS Customer Information, but that there are not sufficient facts to conclude that the other LBHI Affiliates owned customer information assets.

---

[7573] Examiner's Interview of James P. Seery, Jr.,  Jan. 14, 2010, at p. 2; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 3; Examiner's Interview of Peter A. Tennyson, Oct. 13, 2009, at p. 2; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 4; Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 5.

[7574] Examiner's Interview of James P. Seery, Jr.,  Jan. 28, 2010.  The other LBHI Affiliates, including LBCC, had no employees specifically allocated to them according to Lehman's internal records.  *See* A&M, Spreadsheet of Employees Mapped to Legal Entities (Sept. 20, 2008) [LBEX-AM 5642400].

[7575] *Id.*

The Examiner also concludes that the LBCS Customer Information was transferred to Barclays in connection with the sale transaction. The LBCS Customer Information all was stored in Lehman's consolidated computer systems, which were transferred to Barclays in connection with the sale closing.[7576] LBCS did not make any effort to remove the LBCS Customer Information from the consolidated systems, or to prevent Barclays from accessing or using that information, before the systems were transferred to the control of Barclays. Given the consolidated and interconnected nature of Lehman's computer system and the limited time available during the sale period, the Examiner concluded (and the Debtors confirmed) that it would not have been feasible to isolate or remove LBCS Customer Information before the Lehman systems were transferred to Barclays on September 22, 2008.[7577]

The LBCS Customer Information also likely was transferred to Barclays through the employees who performed functions exclusively for LBCS who were offered and accepted employment at Barclays.[7578]

---

[7576] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010. *See* APA, at pp. 4 (§ 1.1), 6 (§ 1.1) (definitions of "Furniture and Equipment," "Hardware" and "Purchased Assets"); *see also* transition Services Agreement between LBHI and Barclays (Sept. 22, 2008), at Section 3.01 (providing for rights of Debtors' estates to access information systems now in the possession of Barclays); Transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at pp. 25-26.

[7577] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010; Examiner's Interview of Jeffrey D. Osterman, Jan. 28, 2010.

[7578] LBI employees who performed functions exclusively for LBCS should not have been included within the group of "Offerees" that Barclays agreed to employ following the closing of the sale transaction. *See* APA, at p. 34 (§ 9.1(a)) (defining "Offeree" to include "each active employee employed primarily in connection with the Business at the Closing"); *id*. at p. 2 (§ 1.1) (defining "Business" as "the U.S. and

The Examiner thus concludes that LBCS Customer Information was transferred to Barclays in connection with the sale.  As discussed below, however, that information likely would have been of little value to Barclays, given the small number of customers both unique to LBCS and not readily-determinable by competitors, and Barclays' superior commodities market share and customer base.

### (2)  Proprietary Software

The Examiner and his financial advisors determined that Lehman's consolidated computer systems included:  (1) software developed or customized by Lehman's information technology (IT) department for product lines across numerous Lehman entities, or for a specific legal entity; and (2) "off-the-shelf" software.[7579]

Lehman's in-house IT department developed and customized software both for the entire Lehman organization, and also for individual legal entities.  For example, as described above, Lehman developed GFS to track financing requirements, MTS to settle

---

Canadian investment banking and capital markets businesses of [LBHI and LBI] including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.").  The Examiner determined that Lehman HR personnel identified the employees that would be transferred to Barclays, and included, among others, all employees within FID, which included all of the employees who performed services for LBCS.  E-mail from Tracy Binkley, Lehman, to Steven Berkenfeld, Lehman (Sept. 23, 2008) [BCI-EX-(S)-00005498]; Examiner's Interview of Tracy Binkley, Dec. 22, 2009.

[7579] Examiner's Interview of Michael Montella, Oct. 26, 2009, at p. 13; Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 2; Examiner's Interview of Jonathan D. Williams, Nov. 18, 2009, at p. 2.

certain fixed income products and ITS to process multi-currency trades.[7580]  It also

developed RISC as a front office derivatives trading system.[7581]

The Examiner's financial advisors evaluated whether any LBHI Affiliates owned

software that was developed or customized for that entity by Lehman's IT department.

The Examiner's financial advisors determined that software development costs meeting

certain software capitalization requirements were capitalized on LBHI's balance sheet,

and that no software development costs were capitalized on the balance sheets of the

LBHI Affiliates.

The Examiner's financial advisors determined that expenses relating to software

development and customization were booked to certain of the LBHI Affiliates.[7582]

Under applicable legal principles, however, an entity does not own computer software

simply because that entity pays for its development.   The Copyright Act of 1976

protects "original works of authorship fixed in any tangible medium of expression."[7583]

Computer programs may qualify for protection as a "literary work" under this

definition.[7584]  Though the Copyright Office grants registrations that serve as *prima facie*

---

[7580] *See* Section III.C.3.a.1.a.i.

[7581] Examiner's Interview of Kleber Rodriguez, Dec. 18, 2009, at p. 2.

[7582] The Examiner and his financial advisors determined that it would require incurring significant cost to attempt to specifically identify the software to which the expenses booked to the entity related, and that, in any event, such an analysis was unlikely to generate complete or reliable information.

[7583] 17 U.S.C. § 102(a) (2006).

[7584] *See Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 283 (S.D.N.Y. 2001); *Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*, No. CV 02-4887, 2005 WL 1262095, at *6 (E.D.N.Y. May 26, 2005).

evidence of valid copyrights,[7585] copyright protection exists automatically when an original work of authorship is created and fixed in a tangible medium.[7586] As a result, where software has been developed by one person for the benefit of another, the developer generally retains ownership of the software unless the parties have provided otherwise.[7587]

An exception to this rule exists when the software is produced as a "work for hire." In that case, the employer or other person for whom it was prepared is considered to be the owner.[7588] A "work for hire" can be either: (1) a work that an employee prepares in the scope of his or her employment; or (2) "a work specially ordered or commissioned for use . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."[7589]

Here, Lehman's IT department was employed by LBHI and LBI, not by the LBHI Affiliates. The Examiner's financial advisors also did not identify any evidence suggesting that LBHI Affiliates were parties to any work-for-hire agreements relating to software that was developed or customized exclusively for them by Lehman's IT department.

---

[7585] 17 U.S.C. § 410(c) (2006).

[7586] *Jamison*, 2005 WL 1262095, at * 6 (citing 17 U.S.C. § 102(a)).

[7587] 17 U.S.C. § 201(a) (2006); *Aymes v. Bonelli*, 980 F.2d 857, 860 (2d Cir. 1992).

[7588] 17 U.S.C. § 201(b) (2006).

[7589] 17 U.S.C. § 101 (2006).

As a result, the Examiner concludes that there is insufficient evidence to support a finding that the LBHI Affiliates owned proprietary software prior to the sale transaction.

Lehman also purchased off-the-shelf software that the LBHI Affiliates, among others, used in their operations. Numerous software licenses were assumed and assigned to Barclays pursuant to the Closing Date Contracts provisions in the APA.[7590] The Schedule of IT Closing Date Contracts, however, does not purport to assign to Barclays any software license agreements to which LBHI Affiliates are a party.[7591]

### (3)  Assembled Workforce

A trained and assembled workforce is a potentially valuable intangible asset.[7592] An assembled workforce has value because of the cost that would be incurred in replacing it.[7593]

The Lehman employees who moved to Barclays in connection with the sale were almost all employed by LBI.[7594]  Compensation expenses for certain of those employees

---

[7590] *See, e.g.,* APA, at p. 15 (§ 4.2(b)); List of IT Closing Date Contracts assumed and assigned under the APA (Oct. 1, 2008).

[7591] List of IT Closing Date Contracts assumed and assigned under the APA (Oct. 1, 2008).

[7592] ROBERT F. REILLY & ROBERT P. SCHWEIHS, VALUING INTANGIBLE ASSETS 400 (McGraw Hill 1999); *Ithaca Indus., Inc. v. Comm'r. of Internal Revenue*, 17 F.3d 684 (4th Cir. 1994); *Burlington N. R.R. Co. v. Blair*, 815 F. Supp. 1223 (S.D. Iowa 1993), *aff'd*, 60 F.3d 410 (8th Cir. 1995).

[7593] ROBERT F. REILLY & ROBERT P. SCHWEIHS, VALUING INTANGIBLE ASSETS 401 (McGraw Hill 1999); *La. Health Serv. & Indem. Co. v. United States*, Civil Action No. 05-914-JVP-DLD, 2009 WL 1916864, at *12 (M.D. La. July 2, 2009).

[7594] Transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at p. 32.

were booked to legal entities other than LBI, including LBCS, LBSF and LCPI.[7595]  Those

entities thus arguably owned an assembled workforce asset before the LBHI bankruptcy

filing.

The Examiner determined, however, that the transfer of employees to Barclays

does not provide a sufficient basis to conclude that a colorable claim arises from the

transfer of an assembled workforce.  While an assembled workforce may have

ascertainable value for accounting purposes in the context of the sale of a business, it is

not an asset that is subject to transfer in light of employees' inherent right to work

where and for whom they choose, particularly when the business itself is not being sold

as a going concern.[7596]

### 4.    Lehman ALI Transaction

Shortly before LBI commenced its SIPA proceeding, LBHI and LBI management

(in consultation with Weil) determined that all entities directly or indirectly owned by

LBI that were not being sold to Barclays should be moved to an LBHI subsidiary.  The

reasoning was that as LBHI subsidiaries, the entities would have better access to

personnel and working capital, and would be able to operate and/or wind down their

businesses in a more orderly fashion than they would as a subsidiary of LBI, which was

---

[7595] A&M, Spreadsheet of Employees Mapped to Legal Entities (Sept. 20, 2008) [LBEX-AM 5642400].

[7596] *See, e.g., In re 3dfx Interactive, Inc.*, 389 B.R. 842, 853 (Bankr. N.D. Cal. 2008) (terminated employees not subject to restrictive covenants were not property that could give rise to a fraudulent transfer action); *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358 (9th Cir. 1997); *Orthotec, LLC v. REO Spineline, LLC*, 438 F. Supp. 2d 1122, 1129-30 (C.D. Cal. 2006); *cf. Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 734 (1st Cir. 1982) (an assembled workforce may be property that is subject to transfer when it is sold as part of a business that is transferred virtually wholesale to a competitor).

soon to be a debtor in a SIPA liquidation proceeding. This movement would have the practical effect of transferring control of the liquidation of these entities from the SIPA Trustee (who had not yet been appointed) to LBHI's estate.

A meeting of the LBI Board of Directors was held on September 19, 2008, at which Rod Miller of Weil presented the plan to transfer subsidiaries of LBI to Lehman ALI, a non-debtor entity that had been selected to hold these companies because it was identified primarily as a holding company.[7597] He informed the Board that all of these subsidiaries were part of LBI's Investment Management Division and/or shared resources with LBHI entities.[7598] He also advised the Board that a secured payment-in-kind (PIK) note would be executed in consideration for the transfer, and that the initial value of the note would be determined by Lazard. Miller reported that the SIPA Trustee supported this plan and had asked for input into the valuation method.[7599] Miller explained the terms of the note, stating that the intention was to provide the SIPA Trustee with the same cash flows and protections as if LBI had continued to own the subsidiaries.[7600] The Board determined that a memo should be prepared by Weil memorializing their discussions with the SIPA Trustee and his approval.[7601] The Board

---

[7597] Lehman Brothers Inc., Minutes of Meeting of Board of Directors (Sept. 19, 2008), at pp. 1-2 [LBEX-AM 004030]; Examiner's Interview of Rod Miller, Feb. 27, 2009.

[7598] Lehman Bros. Inc., Minutes of Meeting of Board of Directors (Sept. 19, 2008), at p. 2 [LBEX-AM 004030].

[7599] Id.

[7600] Id.

[7601] Id.

also determined that the SIPA Trustee should be reminded of the plan to transfer the
LBI subsidiaries to Lehman ALI at the sale hearing.[7602]   The Board then authorized the
transfer.[7603]

Counsel to the SIPA Trustee told the Examiner that the SIPA Trustee was
informed about, but did not specifically approve, the transfer.   Counsel noted that
because LBI's SIPA proceeding had not yet been commenced and the SIPA Trustee had
not yet been formally appointed, the SIPA Trustee technically could not agree to
anything.   The SIPA Trustee was informed that the book value of the affected
subsidiaries was substantial, and believed the implication of this statement was that the
Lehman ALI transaction therefore would result in substantial value for the LBI estate.[7604]

On September 19, 2008, 25 legal entities and their subsidiaries were transferred
from LBI to Lehman ALI pursuant to a PIK Note & Security Agreement[7605] and Transfer
Agreement.[7606]   The legal entities transferred to Lehman ALI included:

a.   Blue JAY Realty Corp.
b.   FRAH Special Services Inc.
c.   LBI Group Inc. (holding company for Townsend Analytics)
d.   LBI India Holdings Mauritius III Limited
e.   LB Leasing Inc.
f.   Lehman Brothers (Israel) Inc.
g.   Lehman Brothers (Spain) S.A.

---

[7602] *Id.*

[7603] *Id.* at pp. 2-3.

[7604] Examiner's Interview of Kenneth E. Lee, Jan. 8, 2010, at p. 2.

[7605] PIK Note & Security Agreement between Lehman ALI Inc. and Lehman Brothers Inc. (Sept. 19, 2008).

[7606] Transfer Agreement among Lehman Brothers Inc., LBI Group Inc., and Lehman ALI Inc. (Sept. 19, 2008); Examiner's Interview of Rajesh Ankalkoti and William Fox, May 6, 2009, at p. 2.

| | |
|---|---|
| h. | Lehman Brothers de Venezuela C.A. |
| i. | Lehman Brothers Derivatives Products Inc. |
| j. | Lehman Brothers Europe Inc. |
| k. | Lehman Brothers Finance (Japan) Inc. |
| l. | Lehman Brothers Financial Products Inc. |
| m. | Lehman Brothers Investment Holding Company Inc. |
| n. | Lehman Brothers International Services, Inc. |
| o. | Lehman Brothers Holdings International Inc. |
| p. | Lehman Brothers Investment Management Asia Limited |
| q. | Lehman Brothers Overseas Inc. |
| r. | Lehman Brothers Securities Taiwan Limited |
| s. | Lehman Brothers South Asia Limited |
| t. | Lehman Brothers Special Financing Inc. (parent company of Lehman Brothers Commodity Services) |
| u. | Lehman Commercial Paper, Inc. and its subsidiaries |
| v. | Lehman Realty and Development Corp. |
| w. | MBR/GP Corp. |
| x. | RIBCO LLC |
| y. | RIBCO SPC, Inc. |

These 25 legal entities generally had no business operations other than trading and/or acting as holding companies for private equity (limited and/or general partner) investments.[7607]  Lazard believes that these entities had no going concern or other value over and above the value of their assets, and therefore has determined to value these entities based solely upon the value of the securities, derivatives, private equity investments and other assets held by them.[7608]  The SIPA Trustee generally agrees that this valuation methodology is appropriate.[7609]

---

[7607] Examiner's Interview of Rajesh Ankalkoti and William Fox, May 6, 2009, at p. 2.

[7608] Examiner's Interview of David Descoteaux, Matthew Whiting, Philip Kruse and Thomas E. Hommel, Mar. 26, 2009, at p. 2.

[7609] Examiner's Interview of Kenneth E. Lee, Jan. 8, 2010, at p. 2.

The PIK Note & Security Agreement calls for a valuation of the transferred subsidiaries by Lazard as of the transfer date (September 19th).[7610]  In connection with the Examiner's investigation into the Lehman ALI transaction, A&M provided to the Examiner a "PIK Note Analysis - Pro-forma Combining Balance Sheet," reflecting financial information for the transferred entities as of September 14, 2009.[7611]  The Pro-forma Combining Balance Sheet consists of *pro forma* balance sheets for the five largest entities transferred to Lehman ALI, as well as a sixth *pro forma* balance sheet consolidating the remaining twenty entities.[7612]  It shows approximately $175 billion in consolidated book value of assets on Sunday, September 14, 2008 (the last date on which Lehman's books were closed), and $173 billion in consolidated book value of liabilities.[7613]  It excludes Lehman ALI's pre-existing businesses before the transfer of the 25 legal entities.[7614]  A&M indicated that there are significant limitations to the values used in the Pro-forma Combining Balance Sheet, including the lack of marks current as

---

[7610] PIK Note & Security Agreement between Lehman ALI Inc. and Lehman Brothers Inc. (Sept. 19, 2008), at p. 1.

[7611] September 14 Pro-forma Combining Balance Sheet [LBEX-AM 086496-086499].  On January 28, 2010, A&M provided the Examiner with an updated version of the September 14 Pro-forma Combining Balance Sheet. [LBEX-AM 5643211-5643214].  The changes were modest in nature, and did not impact the Examiner's analysis or conclusions.

[7612] *Id.*

[7613] Examiner's Interview of Rajesh Ankalkoti and William Fox, May 6, 2009, at p. 2.

[7614] *Id.*

of September 14, 2008, in some cases, and limitations inherent to an out-of-cycle, mid-month close.[7615]

The Pro-forma Combining Balance Sheet organized the assets transferred to Lehman ALI into six groups: (1) LB Special Financing, Inc., which is the parent company of LBCS; (2) LCPI and its subsidiaries, which were the group of companies engaged in origination and trading of secured and unsecured loans; (3) LBI Group, Inc., which is the holding company for a number of private equity investments; (4) LBFP (one of the two stand-alone AAA-rated derivatives trading entities); (5) LBDP (the other stand-alone AAA-rated derivatives trading entity); and (6) Other, representing the remaining 20 legal entities.[7616]

None of the data in the September 14 Pro-forma Combining Balance Sheet reflects September 19 values, or indeed trading information from the week of September 15.[7617] Tens of thousands of derivatives and other trades were terminated by counterparties beginning the week of September 15, so by September 19, substantial value in these entities had been lost, very likely in the range of tens of billions of dollars.[7618]    In addition, many assets delivered to counterparties as collateral were

---

[7615] *Id.* at pp. 2-3; Examiner's Interview of William Fox, Brad Goldsmith and Michael Tarsatana, Jan. 28, 2010.

[7616] Examiner's Interview of William Fox, Brad Goldsmith and Michael Tarsatana, Jan. 28, 2010, at p. 3.

[7617] Because September 14 was a Sunday, values from September 12 (the preceding Friday) were used. *Id.* at p. 4.

[7618] *Id.*

liquidated during the week of September 15 at very disadvantageous prices.[7619]   As a result, the net book value of the transferred subsidiaries' assets, as marked by Lehman as of September 12, 2008, appears to be a very poor indicator of the value of those assets one week later.[7620]   For example, according to Lehman's September 12, 2008 marks, the security assets included $19 billion in government securities, several billion dollars in asset backed securities, $4 billion in real estate securities, and smaller amounts of securities in other categories.[7621]   Although Lazard has been unable to access much data for these securities for the period between September 12 and September 19, it is very likely that their values decreased significantly during this period.[7622]

More than 70,000 securities and derivatives were reflected on the books of the Lehman ALI entities, many of which were closed-out or liquidated by counterparties during the week of September 15.[7623]   Virtually every asset liquidated by a counterparty presents unique valuation issues pertaining to the values selected by the counterparty at liquidation, the commercial reasonableness of the counterparty liquidation, and setoff issues with respect to in-the-money liquidations.[7624]   It is likely that many of the valuations used by counterparties may be the subject of future litigation between the

---

[7619] Examiner's Interview of David Descoteaux, Matthew Whiting, Philip Kruse and Thomas E. Hommel, Mar. 26, 2009, at p. 2.

[7620] *Id.*

[7621] *Id.*

[7622] *Id.*

[7623] *Id.* at pp. 2-3.

[7624] *Id.*

counterparties and the Debtors, and thus there appears to be no realistic scenario under

which Lazard will be able to perform a meaningful valuation of the Lehman ALI assets

until these complicated issues are sorted out during the course of administration of the

Debtors' estates.[7625]

After taking into account the termination of derivatives positions, the

consolidated balance sheets for the entities transferred to Lehman ALI will be severely

negative.[7626]  If one looks at individual entities rather than all 25 as a package, however,

two of the entities (LBFP and LBDP, the AAA-rated derivatives trading entities)

managed to maintain positive value.[7627]  However, the PIK Note & Security Agreement

does not specify whether the entities should be valued on an entity-by-entity or

consolidated basis, and the Debtors and the SIPA Trustee are in disagreement on this

issue.  The SIPA Trustee maintains that any positive value attributable to LBFP and

LBDP should be paid to the LBI estate under the PIK Note & Security Agreement,[7628]

while the Debtors assert that any positive value in LSFP and LBDP should be offset

---

[7625] *Id.*

[7626] Examiner's Interview of Rajesh Ankalkoti and William Fox, May 6, 2009, at p. 5; Examiner's Interview of Kenneth E. Lee, Jan. 8, 2010, at p. 2; Examiner's Interview of William Fox, Brad Goldsmith and Michael Tarsatana, Jan. 28, 2010, at p. 2.

[7627] Examiner's Interview of Kenneth E. Lee, Jan. 8, 2010, at pp. 2-3 (noting that a third entity might have inconsequential positive value); Examiner's Interview of William Fox, Brad Goldsmith and Michael Tarsatana, Jan. 28, 2010, at p. 2.

[7628] Examiner's Interview of Kenneth E. Lee, Jan. 8, 2010, at p. 3; Lehman, Lehman Brothers, Inc. and Principal Subsidiaries as of November 30, 2007 [LBEX-DOCID 003813].

against the negative value attributable to other LBI entities transferred to Lehman ALI.[7629]

### 5. Conclusions

#### a) Summary

As described above, the Examiner concludes that there is insufficient evidence to support a finding that there were any transfers to Barclays of securities owned by LBHI Affiliates in connection with the sale transaction. There are, however, as noted above, a limited number of securities associated with 817 CUSIPs that were transferred to Barclays for which the Examiner has been unable to obtain definitive ownership information. It therefore is possible that some of those securities were owned by LBHI Affiliates at the time they were transferred to Barclays.

With respect to the potential transfer of securities owned by LBHI Affiliates to Barclays, the Examiner concludes that, unless there is a determination that Barclays engaged in actual fraud or colluded with LBI in connection with the sale transaction (issues with respect to which the Examiner is not reaching conclusions, in light of the current litigation), the evidence does not support the existence of a colorable claim against Barclays.

The Examiner concludes that some assets of LBHI Affiliates were transferred to Barclays that were not supposed to be included in the sale transaction, namely: (1) the

---

[7629] Examiner's Interview of William Fox, Brad Goldsmith and Michael Tarsatana, Jan. 28, 2010.

LBCS Customer Information (information identifying customers of LBCS who were not part of LBI's customer base, the products that those customers traded and the prices at which the products were traded); and (2) communications equipment, computer equipment and furniture of LBCS, LBSF and LCPI (the "LBHI Affiliate Office Equipment").

The Examiner concludes that the transfers of LBCS Customer Information and LBHI Affiliate Office Equipment (together, the "LBHI Affiliate Assets") to Barclays in connection with the sale transaction give rise to colorable claims against Barclays under the Bankruptcy Code.

The Examiner also concludes that the evidence does not support the existence of a colorable claim against the officers and director of the LBHI Affiliates arising from the transfer to Barclays of the LBHI Affiliate Assets.

The Examiner concludes that the Lehman ALI transaction was undertaken in good faith, and properly disclosed under the circumstances.

### b) Colorable Claims Arising from Transfer of LBHI Assets

#### (1) There Are No Colorable Claims Against Barclays Arising from Transfer of LBHI Affiliate Securities

As discussed in Section III.C.3.a of this Report, the Examiner's financial advisors did not identify any securities transferred to Barclays that were associated with LBHI Affiliates, which LBI did not own or have the authority to transfer.  The Examiner was not able to verify that LBI held for its own account, or had the authority to transfer to

Barclays, a relatively small group of securities and securities entitlements that might be attributable to LBHI Affiliate Entities.[7630]    Even if LBI did not have authorization from LBHI Affiliates to transfer securities held for their account, however, the securities intermediary and protected purchaser rules of Article 8 of the Uniform Commercial Code (the "UCC"), as well as the safe harbor provisions of the Bankruptcy Code, preclude claims by LBHI Affiliates against Barclays arising from transfers of securities unless Barclays had actual or constructive notice that the transfers were unauthorized, or Barclays engaged in fraud, collusive conduct or otherwise did not act in good faith in connection with the sale.  Because those matters are the subject of litigation before this Court, the Examiner has not reached any conclusions with respect to such issues.

The LBHI Affiliates may use the Bankruptcy Code to compel Barclays to turn over to their estates any property in which they have an interest, potentially including LBHI Affiliate securities.  Section 542 of the Bankruptcy Code provides that a debtor may compel the turnover of any property that a debtor is permitted to use, sell or lease under Section 363 of the Bankruptcy Code.[7631]    Section 363, in turn, provides that a debtor may use "property of the estate."

---

[7630] As explained above in Section III.c.3.a.2.d, there is a relatively small number of securities (consisting of 817 CUSIPs) that were transferred to Barclays, for which the Examiner was unable to obtain sufficient information to make a definitive determination regarding ownership.

[7631] 11 U.S.C. § 542(a) (2006).  Although these sections by their express terms refer to a trustee, section 1107(a) of the Bankruptcy Code makes them applicable to a debtor in a Chapter 11 case.  Consequently, this Section refers interchangeably to a debtor and a trustee.

Section 541 of the Bankruptcy Code defines "property of the estate" broadly to encompass "all legal or equitable interests of the debtor in property as of the commencement of the case."[7632] In the absence of controlling federal law, "'property' and 'interests in property' are creatures of state law."[7633]  In enacting the Bankruptcy Code, Congress "generally left the determination of property rights in the assets of a bankrupt's estate to state law."[7634]

New York – whose laws apply to the transactions at issue[7635] – has enacted Revised Article 8 of the Uniform Commercial Code, which sets forth rules governing, among other things, property rights and obligations of parties in connection with securities and securities entitlements.[7636]   The LBHI Affiliates' rights to securities maintained at LBI are governed by Article 8 of the Uniform Commercial Code as adopted by New York.

---

[7632] 11 U.S.C. § 363(b), 541(a) (2006).

[7633] *Barnhill v. Johnson*, 503 U.S. 393, 398  (1992).

[7634] *Butner v. United States*, 440 U.S. 48, 54 (1979).

[7635] Under NY U.C.C. § 8-110 (2001), New York law is likely to govern an action by LBHI Affiliates in connection with LBI's transfers of the affiliates' securities, if any, to Barclays.  *Id.*  NY U.C.C. § 8-110(b)(4) states that "[t]he local law of the securities intermediary's jurisdiction" governs "whether an adverse claim can be asserted against a person who acquires a security entitlement from the securities intermediary…"  *Id.* NY U.C.C. § 8-110(e)(5) defines "securities intermediary's jurisdiction" to include "the jurisdiction in which the chief executive office of the securities intermediary is located." *Id.*  Here, LBI was headquartered in New York.

[7636] *See S.E.C. v. Credit Bancorp, Ltd.*, 386 F.3d 438, 447 (2d Cir. 2004).  All states have adopted Revised Article 8 of the Uniform Commercial Code, the Official Text of which was promulgated in 1994 by the National Commissioners of Uniform State Laws and the American Law Institute.  New York adopted the Official Text of Revised Article 8 on October 10, 1997.  Revised Article 8 recognizes the indirect holding system for securities and provides rules governing entitlements held and transferred by securities intermediaries which are the subject of this section of the Examiner's Report.

UCC § 8-503 governs transfers made by "securities intermediaries" of "financial assets," in which "entitlement holders" have property interests. Here, LBI was a "securities intermediary" that held LBHI Affiliates' securities.[7637]  The LBHI Affiliates were "entitlement holders"[7638] that held "security entitlements"[7639] to their securities through LBI acting as their securities intermediary.

The concept of "security entitlement" under Article 8 is not the same as the common law concept of property ownership:  "the incidents of this property interest are established by the rules of Article 8, not by common law property concepts … it is a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary."[7640] Article 8 substantially limits the rights of "entitlement holders," such as the LBHI Affiliates, to recover from third parties losses resulting from wrongful transfers of their securities by a securities intermediary.   An entitlement holder "cannot assert rights directly against other persons, such as … third parties to whom the intermediary may have wrongfully transferred interests, except in extremely unusual circumstances where the third party

---

[7637] U.C.C. § 8-102(a)(14) (1994) (defining "securities intermediary" to include "a broker that in the ordinary course of its business maintains securities accounts for others").
[7638] U.C.C. § 8-102(a)(7) (1994) (defining "an entitlement holder" as "a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary").
[7639] U.C.C. § 8-102(a) (1994) (defining "a security entitlement" as "the rights and property interest of an entitlement holder with respect to a financial asset" held by a securities intermediary).
[7640] U.C.C. § 8-503 cmt. 2 (1994).

was itself a participant in the wrongdoing."[7641] This broad protection of purchasers that acquire securities from securities intermediaries reflects "the general policy of the commercial law of the securities holding and transfer systems" to eliminate legal rules that might induce purchasers "to conduct investigations of the authority of persons transferring securities on behalf of others for fear that they might be held liable for participating in a wrongful transfer."[7642]

UCC § 8-503(d) provides that an "entitlement holder's property interest" with respect to financial assets held by a securities intermediary may be enforced against a purchaser of the financial assets only if:  (1) the securities intermediary is insolvent, (2) it cannot satisfy the security entitlements of all of its entitlement holders to the financial asset, (3) it wrongfully transferred the financial assets to the purchaser and (4) the purchaser is not protected under subsection 8-503(e).  UCC § 8-503(e) in turn, provides that an entitlement holder cannot assert any common law claims, including conversion, replevin, constructive trust or equitable lien, against the purchaser of the financial assets which were held by the securities intermediary, as long as the purchaser: (1) gives value, (2) obtains control and (3) does not act in collusion with the

---

[7641] *Id.*

[7642] U.C.C. § 8-503 cmt. 3 (1994); Egon Guttman, Modern Securities Transfers §§ 11A-3; 11A-4 (Thompson 2009).

securities intermediary in violating the securities intermediary's obligations to the entitlement holder.[7643]

Similarly, the protected purchaser provisions of UCC § 8-303 provide that a purchaser of a certificated or uncertificated security, or of an interest therein, acquires its interest in the security free of any adverse claim if the purchaser: (1) gives value, (2) does not have notice of any adverse claim to the security and (3) obtains control of the certificated or uncertificated security.[7644]  A person gives "value" for rights if he or she acquires them "in return for any consideration sufficient to support a simple contract."[7645]

With respect to obtaining control, "[t]he key to the control concept is that the purchaser has the present ability to have the securities sold or transferred without further action by the transferor."[7646] If a certificated security is in bearer form, control is obtained by delivery to the purchaser.  Where certificated securities are in registered form, there must be both delivery and either an effective endorsement or registration of the transfer by the issuer.[7647]  A purchaser has "control" of an uncertificated security if either the uncertificated security is delivered to the purchaser, or the issuer has agreed

---

[7643] U.C.C. § 8-503(e) (1994).

[7644] U.C.C. § 8-303 (1994).

[7645] U.C.C. § 1-201(44)(d) (1994).

[7646] 17 Williston on Contracts § 51:57 (4th ed. 2004).

[7647] U.C.C. § 8-106(b) (1994).

that it will comply with instructions originated by the purchaser without further consent by the registered owner.[7648]

Under UCC § 8-105(a), a person has "a notice of an adverse claim" if the person: (1) has actual knowledge of the adverse claim, (2) is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim or (3) has a duty, imposed by statute or regulation, to investigate whether an adverse claim exists, and the investigation so required would establish the existence of the adverse claim.[7649] UCC § 8-105 cmt. 6 explains that, "[k]nowledge of the existence of the representative relation is not enough in itself to constitute 'notice of an adverse claim' that would disqualify the purchaser from protected purchaser status.  A purchaser may take a security on the inference that the representative is acting properly."[7650]

The UCC § 8-303 protected purchaser rule applies only to directly held securities.[7651]  Purchasers of securities entitlements from securities intermediaries benefit from the protections as set forth in Part 5 of Article 8 of the UCC.

---

[7648] U.C.C. § 8-106(c) (1994); 17 Williston on Contracts § 51:57 (4th ed. 2004).

[7649] *See also* Egon Guttman, Modern Securities Transfers § 11A-3 (Thompson 2009).

[7650] Barclays would be deemed to have had a notice of an adverse claim if "the security certificate: (1) whether in bearer or registered form, has been indorsed 'for collection' or 'for surrender' or for some other purpose not involving transfer, or (2) is in bearer form and has on it an unambiguous statement that it is the property of a person other than the transferor, but the mere writing of a name on the certificate is not such a statement." 17 Williston on Contracts § 51:57 (4th ed. 2004).

[7651] 17 Williston on Contracts § 51:58 (4th ed. 2004).

Here, under both the securities intermediary rule of UCC § 8-503 and the protected purchaser rule of UCC § 8-303, Barclays "gave value" for the LBHI Affiliates' securities, if any, and "obtained control" of them.[7652]  Barclays also "gave value" because it acquired any LBHI Affiliates' securities "in return for any consideration sufficient to support a simple contract."[7653]  Finally, Barclays obtained control of those securities when it took delivery of them, registered them in its name, settled the entries on the books of its clearing corporation, or by other means.[7654]

The Examiner has not found material evidence that, prior to any transfers, Barclays had either actual or constructive notice of any adverse claims to the securities, or of collusion or other improper conduct specifically directed at violating LBI obligations to an LBHI Affiliate with respect to securities held by LBI in which an LBHI Affiliate may have had some interest or claim.  Therefore, the Examiner concludes that even if any securities were transferred to Barclays in which an LBHI Affiliate held an interest and LBI lacked authority to make the transfer, in the absence of a showing of fraud or collusion on the part of Barclays, or Barclays' actual or constructive notice of the LBHI Affiliates' adverse claims, Article 8 of the UCC protects Barclays against common law claims to those securities that the LBHI Affiliates might assert.

---

[7652] The Examiner found no evidence that Barclays did not obtain control of the securities transferred to it by LBI by one of the methods contemplated by U.C.C. § 8-106 (1994).

[7653] U.C.C. § 1-204(d) (1994).

[7654] U.C.C. § 8-301 cmt. 3 (1994).

Because Article 8 of the UCC prevents LBHI Affiliates from asserting an interest or adverse claim under state law against LBHI Affiliate securities transferred to Barclays, any such securities, after their transfer to Barclays pursuant to the APA, likely were not property of the LBHI Affiliates' estates under Section 541 of the Bankruptcy Code at the time the LBHI Affiliates commenced their respective bankruptcy cases. Therefore, such securities (if any) could not be recovered from Barclays under Section 542 of the Bankruptcy Code.

The Examiner also concludes that, absent fraud or bad faith, any transfers of LBHI Affiliate securities also may not be avoided under applicable Bankruptcy Code avoidance provisions. By the weight of current judicial authority, in the absence of a showing of actual fraud on the part of LBI, LBI's securities transfers to Barclays would be protected from avoidance under Section 544 (transfers avoidable by debtor standing in the shoes of certain hypothetical or actual creditors), Section 545 (avoidance of statutory liens), Section 547 (preferences) and Section 548 (fraudulent transfers) of the Bankruptcy Code.

The Bankruptcy Code's safe harbor provision, Section 546(e) (as amended by the Financial Netting Improvements Act of 2006), provides:

> [T]he trustee may not avoid a transfer that is a margin payment … or settlement payment … made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with

a securities contract … commodity contract … or forward contract, that is made before the commencement of the case, except under Section 548(a)(1)(A) of this title.

Section 548(a)(1)(A) allows a debtor to avoid only those transfers of the debtor's property that were made by the debtor "with actual intent to hinder, delay, or defraud." Fraudulent intent refers to the intent of the debtor transferor (LBI), not the intent of the transferee (Barclays).[7655]

The legislative history of the safe harbor provisions indicates that Congress sought to reduce the systematic risk in the financial marketplace and prevent a "ripple effect" in which the insolvency of one financial firm triggers failures elsewhere in the market.[7656]   Many courts have interpreted the safe harbor provisions expansively, emphasizing that the phrase "in connection with" has a broad meaning.[7657]   Courts have also construed the term "settlement payments" broadly,[7658] extending the safe harbor protections to purely private securities transactions, such as LBOs[7659]

---

[7655] See Rubin Bros. Footwear, Inc. v. Chem. Bank (In re Rubin Bros. Footwear, Inc.), 119 B.R. 416, 423 (S.D.N.Y. 1990) ("For the purposes of 11 U.S.C. § 548(a)(1), plaintiff must show fraudulent intent on the part of the transferor, rather than on the part of the transferee." (citation omitted)).

[7656] H.R. Rep. No. 97-420 (1982); U.S. Code Cong. & Admin. News (1982).

[7657] See Interbulk, Ltd. v. Louis Dreyfus Corp., 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("in connection with" is similar to related to); In re Casa de Cambio Majapara, 390 B.R. 595 (Bankr. N.D. Ill. 2008) (prejudgment attachments obtained in state court actions as a result of debtor's breach of swap agreements were transfers made "in connection with" swap agreements).

[7658] The Bankruptcy Court for the Southern District of New York recently ruled that, in determining whether a transfer constituted a "settlement payment" entitled to safe harbor protection, courts should consider, among other things, whether the transactions have long settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption in the securities industry; whether consideration was paid out in exchange for the securities or property interest as part of settlement of the transaction; and whether the transfers were made to financial intermediaries involved in the national clearance and settlement systems. Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re

The Financial Netting Improvements Act of 2006 ("FNIA") substantially broadened the safe harbor protections by extending them not only to settlement and margin payments, but also to transfers "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract … commodity contract … or forward contract."[7660]  Consequently, absent a showing that LBI made the securities transfers to Barclays with "actual intent to hinder, delay, or defraud" the LBHI Affiliates or other creditors, the Bankruptcy Code's safe harbor provisions likely protect Barclays from avoidance claims that might be asserted by the LBHI Affiliates' estates.[7661]

Even if LBI made the transfers with actual fraudulent intent, however, Section 548(c) still may provide a limited defense to Barclays against any avoidance claims. Under Section 548(c), a transferee that "takes for value and in good faith" has a lien or may retain an interest transferred (or enforce an obligation incurred) to the extent it

---

*Enron Creditors Recovery Corp.),* Bankruptcy No. 01-16034 (AJG) 2009 WL 5174119 at *16 (S.D.N.Y. Nov. 20, 2009) (transactions in which notes were redeemed by debtor prior to maturity, using the customary mechanism of the Depository Trust Company for trading in commercial paper, constituted "settlement payments").

[7659] *In re QSI Holdings Inc.,* 571 F.3d 545 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost,* 564 F.3d 981 (8th Cir. 2009); *In re Resorts Int'l, Inc.,* 181 F.3d 505 (3d Cir. 1999); *In re Kaiser Steel Corp.,* 952 F.2d 1230 (10th Cir. 1991); *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.,* 913 F.2d 846 (10th Cir. 1990).

[7660] 11 U.S.C. § 546(e).

[7661] For a more detailed discussion see Section D.2 of Appendix 1.

gave value to the debtor in exchange for such transfer or obligation.[7662]   The Bankruptcy Code does not define "good faith" as used in Section 548(c).   Nonetheless, "federal courts have reached a consensus that 'good faith' as used in Section 548(c) must be determined according to an 'objective' or 'reasonable person' standard, and does not turn on the subjective knowledge or belief of the transferee."[7663]   Consequently, a "transferee cannot be found to have taken a transfer in good faith if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose."[7664]

So long as the securities transfers were not made with the actual intent to hinder, delay, or defraud LBHI Affiliates or other creditors, or Barclays acted in good faith (issues as to which the Examiner reaches no conclusions in light of the ongoing Barclays litigation), the safe harbor provisions of the Bankruptcy Code likely would protect Barclays from an avoidance action or claim arising from transfers, if any, to Barclays of securities in which an LBHI Affiliate may have held an interest.[7665]

---

[7662] *See* 11 U.S.C. §548(c); *see also In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 471 (Bankr. S.D.N.Y. 2001) ("As a threshold matter, by its very terms § 548(c) provides that, in order to invoke this defense, the transferee must satisfy three standards: take (1) for value *and* (2) in good faith, and (3) claim the applicable right to the interest only to the extent the transferee gave value to the debtor in exchange").

[7663] *In re Bayou Group, LLC, et al.*, 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008) (citations omitted).

[7664] *Id.* at 845.

[7665] In addition, cases have held that state law causes of action based upon the same underlying facts as the federal bankruptcy causes of action are preempted by federal law.  *See Contemporary Indus.*, 564 F.3d at 988 (state law claims for unjust enrichment and illegal and/or excessive shareholder distributions preempted by Section 546(e)); *Official Comm. Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. 71, 96 (D. Del. 2002) (unjust enrichment claim preempted by

As noted above, whether fraudulent or improper conduct occurred in connection with the sale of LBI's business to Barclays is the subject of ongoing litigation, including extensive fact and expert discovery.  The Examiner is not reaching conclusions in this Report pertaining to the matters that are the subject of that litigation.  The Examiner's findings here are limited solely to whether additional claims, independent of the claims that are the subject of the Barclays sale litigation, may be asserted against Barclays for the transfer of LBHI Affiliate securities to Barclays.

> **(2)    There Are Colorable, Limited Claims Against Barclays Arising from Transfer of LBHI Affiliate Office Equipment and LBCS Customer Information**

The Examiner concludes that the transfer to Barclays of LBHI Affiliate Assets gives rise to colorable claims against Barclays.  However, in the context of the Debtors' cases, the transferred assets may not be of material value to the Debtors' estates, and the costs of pursuing recovery of those assets may even exceed their value.

The Examiner notes that whether fraud or improper conduct occurred in connection with the sale of LBI's assets to Barclays is the subject of ongoing litigation. Except for the facts reported in Section III.C.6 of the Report, the Examiner is not addressing facts or reaching conclusions in this Report pertaining to the matters that are the subject of that litigation.  Thus, the Examiner's findings here are limited solely to whether additional claims, independent of the claims that are the subject of the Barclays

---

section 546(e)).  Thus, the safe harbor provisions also may preempt a trustee or debtor from proceeding on alternative state law theories to recover on account of otherwise unavoidable transfers.

sale litigation, may be asserted against Barclays for the transfer of LBHI Affiliate Assets

to Barclays.

### (a)  Bankruptcy Code Claims

#### (i)  Section 542

Colorable claims against Barclays exist under Section 542 of the Bankruptcy Code

arising from the transfers of LBHI Affiliate Assets to Barclays in connection with the

sale transaction.

Section 542(a) provides that "an entity, other than a custodian, in possession,

custody, or control, during the case, of property" of the estate "shall deliver to the

trustee, and account for, such property or the value of such property, unless such

property is of inconsequential value or benefit to the estate."[7666]   Section 541 of the

Bankruptcy Code, in turn, provides that the debtor's estate consists of "all legal and

equitable interests of the debtor in property as of the commencement of the debtor's

[bankruptcy] case."[7667]   Even property transferred by the debtor to a third party may be

subject to Section 542's mandatory turnover provisions, if the debtor retains its interest

in the property.[7668]   Thus, under this framework, if a debtor's assets were stolen or

otherwise improperly transferred without the debtor's authorization, the debtor could

---

[7666] 11 U.S.C. § 542(a) (2006).

[7667] 11 U.S.C. § 541(a) (2006).

[7668] *See, e.g., U.S. v. Whiting Pools*, 462 U.S. 198, 206 (1983) ("While there are explicit limitations on the reach of § 542(a), none requires that the debtor hold a possessory interest in the property at the commencement of the [bankruptcy case]."); *In re Pyatt*, 486 F.3d 423 (8th Cir. 2007) (debtor's postpetition transfer of funds recoverable pursuant to § 542); *In re U.S.A. Diversified Prods., Inc.*, 193 B.R. 868 (Bankr N.D. Ind. 1995) (trustee may recover debtor's prepetition transfer of funds to trust account).

compel the return of the property pursuant to Section 542 as the debtor would retain a non-possessory interest in the property.[7669] In *Whiting Pools*, the Second Circuit held that even if Section 542 were narrowly construed, it would, at a minimum, authorize the debtor to recover property "from persons in wrongful possession following theft or conversion."[7670]

As indicated above in Sections III.C.3.b and III.C.3.c, the Examiner concludes that (1) LBHI Affiliate Office Equipment owned by LBCS, LCPI and LBSF; and (2) LBCS Customer Information, were transferred to Barclays as part of the sale. As was made clear in the Sale Order and at the sale hearing, the Bankruptcy Court did not authorize the transfer to Barclays of any assets owned by LBHI Affiliates, and Barclays specifically disclaimed any expectation that it would receive such assets. Because the assets are property of LBCS, LBSF and LCPI, those estates have colorable claims under Section 542 to recover the assets, or their value.[7671]

In response to such a claim, Barclays might argue, among other things, that a claim does not exist under Section 542 because the assets were transferred to Barclays before the LBHI Affiliates' respective petition dates, and that therefore the assets do not constitute "property of the estate." That argument, however, may not preclude a Section 542 claim with respect to those assets. The assets were owned by LBCS, LBSF

---

[7669] *United States v. Whiting Pools, Inc.*, 674 F.2d 144 (2d Cir. 1982), *aff'd by* 462 U.S. 198 (1983).

[7670] *Id*. at 155; *see also In re Vogt*, 245 B.R. 53 (Bankr. E.D. Va. 2000).

[7671] 11 U.S.C. § 542(a) (2006); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983); *Braunstein v. McCabe*, 571 F.3d 108, 116 (1st Cir. 2009).

and LCPI at the time of the sale transaction. The transfers of those assets were neither authorized by the owners of the assets (LBCS, LBSF and LCPI) nor by the Court's Sale Order, and Barclays asserted that it would not be buying any LBHI Affiliate assets. LBCS, LBSF and LCPI thus likely maintained interests in the LBHI Affiliate Assets at the time they filed their respective Chapter 11 petitions, and those assets remain property of their bankruptcy estates.[7672]

With respect to the LBCS Customer Information, it is possible that any protectable property rights were lost in connection with consummation of the sale transaction. LBCS may have waived the secrecy necessary to possess legally protectable rights in the LBCS Customer Information when that information was transferred to Barclays without any confidentiality restrictions. Because one of the elements required for the legal protection of a competitively valuable trade secret or customer-related asset is that the holder take reasonable steps to maintain its secrecy,[7673] the Second Circuit has held that when a business sells most of its assets to a competitor, even when it does not intend to include otherwise protectable customer lists in the sale, the failure to take adequate measures to remove the lists from assets that are transferred constitutes legal abandonment of the trade secret.[7674] Because Lehman and its employees made no effort to extract or segregate the LBCS Customer Information from

---

[7672] 11 U.S.C. § 542(a) (2006) (property of the estate includes "property that the trustee may use, sell or lease under Section 363").

[7673] *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985).

[7674] *Id.* at 1063-64.

the other assets transferred to Barclays,[7675] the secrecy of this intangible could have been lost, thus stripping it of legally protectable property rights.

Nonetheless, the terms of the Transition Services Agreement ("TSA") likely preserved the secrecy of the LBCS Customer Information and other proprietary assets transferred in the sale transaction. The TSA specifically provided for the "Treatment of Confidential Information" that might have been exchanged in the course of the sale.[7676] Pursuant to this agreement, the parties were obligated to keep confidential any secret or proprietary information of the other party to which they obtained access,[7677] though the TSA did not purport to transfer rights to this information or specify the information to which it applied. The LBCS Customer Information likely retained its protected status, therefore, because the parties took reasonable steps to maintain its secrecy despite the transfer to Barclays.[7678]

In any event, the Examiner concludes that this asset has little value. As discussed above, most of the customer information that LBCS possessed related to customers that were well known in the industry and easily identifiable.[7679] In addition, Barclays had a more established and robust commodities business than LBCS, which

---

[7675] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

[7676] Transition Services Agreement between Lehman Brothers Holdings Inc. and Barclays Capital Inc. (Sept. 22, 2008), at p. 17.

[7677] *Id.*

[7678] *Cf. Defiance*, 759 F.2d at 1063-64 (noting that a business failed to protect its rights when it took no steps to protect secrecy of confidential information in connection with a transfer of assets).

[7679] Examiner's Interview of Joe Gold, Jan. 15, 2010; Examiner's Interview of Satu S. Parikh, Jan 4, 2010.

was still building its business at the time of the bankruptcy, and as a result already independently knew much of the information that may have been included in the LBCS Customer Information.[7680]

A limited number of LBCS customers were unknown to the public and Barclays, and the identity and historical trading information for such customers would have had some value.  However, without LBI and LBHI's credit and other support, none would have maintained their relationships with LBCS.  Any value in the LBCS Customer Information would have dissipated almost immediately following LBHI's bankruptcy, as customers terminated safe-harbored derivatives transactions, and sought new trading counterparties and shared their trading information with them.  Thus, to the extent LBCS had a protectable interest in the LBCS Customer Information, the Examiner concludes that the value of this asset would have been minimal by September 19, 2009.

### (ii)  Section 548

If a court were to find that any of the LBHI Affiliate Assets were not property of the bankruptcy estates of the LBHI Affiliates at the time of the commencement of their respective bankruptcy cases – a finding that could preclude a Section 542 claim – colorable claims might still exist for the benefit of the LBCS, LBSF and LCPI's estates against Barclays under Section 548 of the Bankruptcy Code.

---

[7680] Examiner's Interview of Joe Gold, Jan. 15, 2010.

Section 548 permits a debtor to avoid any transfer made within two years of the bankruptcy filing that is actually or constructively fraudulent.[7681]   A transfer is constructively fraudulent if the debtor received less than reasonably equivalent value or fair consideration for the transfer or obligation, and, *inter alia*, (1) the debtor was insolvent or rendered insolvent as a result of the transfer or obligation or (2) the debtor was undercapitalized.[7682]

Here, the Examiner concludes that there is credible evidence sufficient to establish that the LBHI Affiliates did not receive anything in exchange for the transfer of any of their assets to Barclays in connection with the sale transaction, and therefore they received "less than reasonably equivalent value or fair consideration for the transfer or obligation."   There also is credible evidence to support a finding that LCPI, LBSF and LBCS were insolvent as of September 22, 2008, the date on which their assets were transferred to Barclays.[7683]   Barclays might argue that the LBHI Affiliates received indirect benefits from the sale transaction to establish the receipt of reasonably equivalent value, and also might contest insolvency.   A trier of fact would need to resolve these conflicts.

---

[7681] 11 U.S.C. § 548(a)(1) (2006).

[7682] 11 U.S.C. § 548(a)(1)(B)(2006).  For a more detailed discussion of the law applicable to constructively fraudulent transfers, see Appendix 1.

[7683] In particular, as of September 22, 2008, counterparties had closed out as many of their positions with these entities at prices that were very unfavorable to LCPI, LBSF and LBCS.  For a discussion of the counterparty terminations and their effect on LBHI Affiliates' businesses, see Section III.C.6.b.2.

The Examiner concludes that, in the event a court were to determine that the LBHI Affiliate Assets transferred to Barclays were no longer property of their estates at the time of the commencement of their bankruptcy cases, the LCPI, LBSF and LBCS estates nonetheless may assert claims under Section 548 of the Bankruptcy Code for the transfer of the LBHI Affiliate Assets to Barclays.  As explained above, however, the Examiner concludes that the value of such assets is limited, and that the cost of pursuing any claims may exceed the value of the transferred assets.[7684]

### (b)  Common Law Claims

The Examiner also evaluated whether colorable claims against Barclays exist for recovery of chattel, conversion, unjust enrichment, misappropriation of trade secrets, unfair competition or tortious interference with employment relations in connection with the transfer of the LBHI Affiliate Assets to Barclays.  The Examiner concludes that the evidence does not support the existence of a colorable claim on any of these grounds with respect to the transfer of those assets to Barclays.

### (i)  Recovery of Chattel

The Examiner evaluated whether the LBHI Affiliates have a colorable claim against Barclays for recovery of chattel transferred to Barclays.[7685]  An action to recover chattel provides a plaintiff with the right to seek possession of chattel on the basis of the

---

[7684] *See* Section III.C.5.b.2.

[7685] For a further discussion of the applicable law, *see* Appendix 1.

plaintiff's superior right of possession to it.[7686]  Even if a court finds that the defendant's

original assertion of possession of the chattel was "lawful," if the plaintiff has superior

right of possession, the plaintiff is entitled to recovery.  The plaintiff must demand

return of the chattel, and the defendant must refuse the demand, in order for the

plaintiff to sustain an action to recover chattel.[7687]  There is an exception to this demand

requirement when demand would be futile or useless.

Here, Barclays obtained the LBHI Affiliate Assets in the wholesale transfer of

LBHI and LBI assets that occurred following the closing of the sale transaction.  Though

Barclays was entitled only to LBHI, LBI and LB 745 assets under the terms of the sale

documents, certain assets of the LBHI Affiliates were so intermingled with LBHI's and

LBI's property that it would have been exceedingly difficult to identify and segregate

them in the short time before the sale closing.  When the sale was consummated,

Lehman delivered to Barclays in bulk all of the facilities, communications and computer

equipment and furniture in the Lehman headquarters building and the other properties

---

[7686] *See* N.Y. C.P.L.R. § 7101 (McKinney 2009) ("An action under this article may be brought to try the right of possession of a chattel."); *see also Byrne Compressed Air Equip. Co. v. Sperdini*, 506 N.Y.S.2d 593, 594 (App. Div. 1986).

[7687] *See N.Y. City Transit Auth. v. N.Y. Historical Soc'y*, 635 N.Y.S.2d 998, 1001 (Sup. Ct. 1995) ("A demand is only a substantive requirement of a cause of action to recover chattels where one in possession of the chattels acquired such possession lawfully or where . . . the initial possession of the chattels is not considered wrongful" (citations omitted)); *Borneo Sumatra Trading Co. v. Sec. Door & Panel Corp.*, 183 N.Y.S.2d 137, 138 (Sup. Ct. 1959).

it had purchased, and neither LBHI nor the LBHI Affiliates made any effort to segregate or retain the LBCS Customer Information or the LBHI Affiliate Office Equipment.[7688]

Further, there is evidence that would support a finding that, at the time of the consummation of the Barclays sale, Lehman and Barclays personnel believed that all of the property Barclays was acquiring actually belonged to LBHI and LBI, and was being transferred pursuant to the terms of the sale.  In the days preceding the consummation of the sale, Barclays interviewed LBI employees who had performed work solely for LBCS.  Those employees had been designated by Lehman for transfer to Barclays. Thus, Barclays was left by Lehman with the impression that those employees were to be transferred to Barclays in connection with the sale.[7689]   Some of those employees possessed LBCS Customer Information, and shared it with Barclays during the course of their employment interviews.  As a result, although Barclays received customer information to which it may not have been entitled under the sale documents, Barclays' conduct in this respect was not wrongful or unlawful.[7690]

Because there is evidence to suggest a finding that Barclays' possession of the LBHI Affiliate assets was not wrongful or unlawful, in order to recover chattel that was improperly transferred to Barclays, the LBHI Affiliates would need to make a demand

---

[7688] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

[7689] *See, e.g.,* e-mail from Satu S. Parikh, Lehman, to Joe Gold, Barclays (Sept. 19, 2008) [LBEX-DOCID 3456032]; Examiner's Interview of Joe Gold, Jan. 15, 2010.

[7690] *N.Y. City Transit Auth.,* 635 N.Y.S.2d at 1001.

for its return.  Though the Debtors have evaluated claims they might have to property

that was transferred to Barclays,[7691] the Examiner has uncovered no evidence that the

LBHI Affiliates have requested or demanded, to date, that Barclays actually return the

LBHI Affiliate assets addressed here.  The facts thus do not support the existence of a

colorable claim against Barclays to recover chattel, unless the LBHI Affiliates determine

to seek recovery of the LBHI Affiliate assets.

### (ii) Conversion

The Examiner evaluated whether the LBHI Affiliates have a colorable claim for

conversion against Barclays.  Conversion is "the unauthorized assumption and exercise

of the right of ownership over goods belonging to another to the exclusion of the

owner's rights."[7692]  The defendant must commit some affirmative act of ownership over

the property without the right to do so,[7693] and the defendant's action (or refusal to act)

must interfere with the plaintiff's rights of ownership (such as possession, control, or

dominion) over its property.[7694]  Although, as a general rule, a plaintiff need not demand

---

[7691] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

[7692] *Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso*, 660 N.E.2d 1121, 1126 (N.Y. 1997); *see also Hoffman v. Unterberg*, 780 N.Y.S.2d 617, 619 (App. Div. 2004), *abrogated on other grounds by Tzolis v. Wolff*, 885 N.Y.S.2d 6 (App. Div. 2008).  *See* Appendix 1, Section V.N to the Report, which discusses the law applicable to conversion claims in greater detail.

[7693] *See N.Y. City Transit Auth.*, 635 N.Y.S.2d at 1001; *New York v. Seventh Regiment Fund, Inc.*, 774 N.E.2d 702, 711 (N.Y. 2002); *see Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).

[7694] *See Colavito*, 860 N.E.2d at 717; *Galtieri v. Kramer*, 648 N.Y.S.2d 144, 145 (App. Div. 1996); *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 404 (2d Cir. 2006).

the return of the property from the defendant to prevail in an action for conversion,[7695] where the defendant's original possession was lawful, the plaintiff must first demand the return of property from the defendant.[7696]

As discussed above, it is unlikely that Barclays' possession of the LBHI Affiliate assets would qualify as unlawful. At the time of the consummation of the sale transaction, Lehman transferred assets to Barclays in bulk form and did not make any effort to segregate the LBCS Customer Information or the LBHI Affiliate Office Equipment assets from the LBHI and LBI assets that were being transferred in connection with the sale transaction.[7697] There is sufficient evidence to establish that Barclays believed that the assets it received in connection with the sale were those of LBHI and LBI, to which Barclays was entitled under the terms of the sale documents, and that Barclays did not target any assets of LBHI Affiliates.[7698] If, as the evidence indicates, Barclays' possession of any LBHI Affiliates' assets was lawful, then the LBHI Affiliates would need to make a demand for the return of their assets before they could state a claim for conversion. No evidence was presented to the Examiner that they have done so to date.

---

[7695] *See N.Y. City Transit Auth*, 635 N.Y.S.2d at 1001; *see also D'Amico v. First Union Bank*, 728 N.Y.S.2d 146, 151 (App. Div. 2001).

[7696] *See Heneghan v. Cap-A-Radiator Shops*, 506 N.Y.S.2d 132, 134 (App. Div. 1986); *Johnson v. Gumer*, 464 N.Y.S.2d 318, 319 (App. Div. 1983); *Lawrence v. Meloni*, 558 N.Y.S.2d 360, 361 (Sup. Ct. 1990).

[7697] Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

[7698] Examiner's Interview of Joe Gold, Jan. 15, 2010.

Even if Barclays' original possession or control of the LBHI Affiliate Assets was unlawful, or if the LBHI Affiliates did make the required demand, there is no indication that Barclays has asserted such continued ownership or control over the assets that the LBHI Affiliates would have a colorable conversion claim against Barclays.  While a defendant need not act in bad faith in holding or controlling an asset to be liable for conversion, the defendant must exercise dominion over the property to the exclusion of the plaintiff.[7699]  If Barclays denied the LBHI Affiliates access to their assets, Barclays could be liable for conversion,[7700] but there is no indication that Barclays has done so. Although the Debtors have evaluated whether or not Barclays currently has property that belongs to the LBHI Affiliates, they have not asserted any such claims to date against Barclays arising from that analysis.[7701]  For these reasons, the facts do not support the existence of a colorable claim against Barclays for conversion.

### (iii) Unjust Enrichment

The Examiner also considered whether the LBHI Affiliates would have a colorable claim for unjust enrichment arising from the transfer of the LBHI Affiliate Assets to Barclays.  A defendant is liable for unjust enrichment when:  (1) the plaintiff conferred a benefit on the defendant; (2) without being adequately compensated by the

---

[7699] *Dywer v. Citizens United Bank, N.A.*, 470 N.Y.S.2d 200, 202 (App. Div. 1983); *N.Y. City Transit Auth.*, 635 N.Y.S.2d at 1001.

[7700] *Thyroff*, 460 F.3d at 403-05.

[7701] Transition Services Agreement between Lehman Brothers Holdings Inc. and Barclays Capital Inc. (Sept. 22, 2008), at p. 17; Examiner's Interview of Thomas E. Hommel, Kelly L. Gargiulo, Lauren Sheridan, William B. Gordon and Jeffrey Donaldson, Jan. 22, 2010.

defendant for the conferred benefit; and (3) equity and good conscience require restitution.[7702]  Unjust enrichment "does not require wrongful conduct by the one enriched[,] only that the enrichment be unjust."[7703]  Even a defendant that did not take any action to obtain the benefit can be unjustly enriched.[7704]

In order to be unjustly enriched by an acquisition of property, the "benefit" received must actually be of value to the defendant.[7705]  Moreover, where a defendant that did not engage in tortious conduct and was not at fault, or at least not more at fault than the plaintiff for the conferral of the benefit, the measure of recovery is limited to the value of the benefit in advancing the interests of the defendant.[7706]

Here, the LBHI Affiliate assets that were transferred conferred limited benefit on Barclays, particularly in the context of the billions of dollars of assets acquired and liabilities assumed under the sale transaction.  For example, the LBCS Customer Information was largely either readily-determinable or duplicative of what Barclays

---

[7702] *See Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 13 (App. Div. 1998); *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 129-30 (2d Cir. 2002); *see also Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970); *Whitman Realty Group, Inc. v. Galano*, 838 N.Y.S.2d 585, 588 (App. Div. 2007).  *See* Appendix 1, Section V.E to this Report, which discusses the law applicable to claims for unjust enrichment in greater detail.

[7703] *Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 579 N.Y.S.2d 353, 355 (App. Div. 1992) (citations omitted).

[7704] *See Aetna Cas. & Sur. Co. v. LFO Constr. Corp.*, 615 N.Y.S.2d 389, 391 (App. Div. 1994); *Ultramar Energy*, 579 N.Y.S.2d at 355.

[7705] *Cyberchron Corp. v. Calldata Sys. Dev.*, 831 F. Supp. 94, 110-12 (E.D.N.Y. 1993); *McGrath v. Hilding*, 41 N.Y.2d 625, 630 (1977).

[7706] *See* 22A N.Y. JUR. 2D, *Contracts* § 587 (2009) (citing RESTATEMENT (FIRST) OF RESTITUTION § 142 cmt. b (1937).

already possessed through its much larger existing commodities trading business.[7707] Given such comparatively limited benefit, and the facts indicating that Barclays did not target any LBHI Affiliate assets or otherwise play a role in causing their transfer, the Examiner concludes that there are insufficient facts to support a finding that equity and good conscience require restitution by Barclays and that there is no colorable claim for unjust enrichment.

### (iv) Trade Secret Misappropriation

The Examiner also evaluated whether LBCS has a colorable claim for trade secret misappropriation arising from Barclays' acquisition of the LBCS Customer Information. To prevail on a claim for misappropriation of trade secrets, a plaintiff must demonstrate (1) that it had a protectable trade secret; and (2) that the trade secret was misappropriated in violation of a confidentiality obligation or agreement, or was used or disclosed with the knowledge it was obtained through improper means.[7708]

It is well-established that a customer list developed by a business through substantial effort, and kept in confidence, may be a trade secret protected against disclosure to a competitor.[7709]  Whether a customer list is entitled to protection typically turns on whether the information on the list is readily ascertainable from other

---

[7707] Examiner's Interview of Satu S. Parikh, Jan. 4, 2010; Examiner's Interview of Joe Gold, Jan. 15, 2010.

[7708] *See* Appendix 1, Section V.K to this Report, which discusses the law that applies to trade secret misappropriation claims in greater detail.

[7709] *E.g., Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985).

sources.[7710]  Even if it is obtainable from readily accessible sources, a compilation of

customer names may be protectable if a company has catalogued those customers'

buying practices and preferences in such a way that would be difficult, time-consuming

or expensive to replicate.[7711]

The Examiner concludes that there is a colorable claim that the LBCS Customer

Information constituted a trade secret.  Through the efforts of its dedicated sales force,

LBCS developed a list of customer identities and product and pricing information that

was separate and distinct from the LBI customer base.[7712]  At least some of that

information was unknown to others in the industry.[7713]  Lehman took steps to maintain

the secrecy of that information by establishing corporate confidential information

---

[7710] *E.g., Meyers Assocs. v. Conolog Corp.*, No. 600824/07, 2008 WL 711702, at *1 (N.Y. Sup. Ct. Mar. 5, 2008); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 40-47 (2d Cir. 1999) (concluding that even though the sizable companies on a customer list were easily identifiable, a compilation of the identities of the one or two engineers within those companies who would purchase a specialized device was protectable); *Velo-Bind, Inc. v. Scheck*, 485 F. Supp. 102, 103-07 (S.D.N.Y. 1979) (a customer list designating the specific companies that used a particular type of document binding machine was protectable even though the names of those companies all appeared in publicly available sources).

[7711] *See, e.g., Garvin GuyButler Corp. v. Cowen & Co.*, 548 N.Y.S. 2d 56, 57 (Sup. Ct. 1992); *IKON Office Solutions, Inc. v. Usherwood Office Tech., Inc.*, No. 9202-08, 2008 WL 5206291, at *5 (N.Y. Sup. Ct. Dec. 12, 2008); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 538 (S.D.N.Y. 2004); *Am. Building Maint. Co. of N.Y. v. Acme Property Servs., Inc.*, 515 F. Supp. 2d 298, 308 (N.D.N.Y. 2007) (noting that "information related to [an employer's] clients' preferences and the customization of its services undertaken to address those preferences are trade secrets").

[7712] Examiner's Interview of Satu S. Parikh, Jan. 4, 2010.

[7713] *Id.*

policies, and by requiring employees to sign confidentiality agreements.[7714]  As a result, there is a colorable claim that the LBCS Customer Information was a trade secret.[7715]

To establish a colorable claim for trade secret misappropriation, however, LBCS would need to show that Barclays either obtained the LBCS Customer Information by improper means, or used or disclosed the information knowing it had been obtained by improper means.  The Examiner has uncovered no facts indicating that Barclays did so.  The facts the Examiner found indicate that Barclays believed the LBCS Customer Information it received belonged to LBI.[7716]  In light of the confusion surrounding the closing of the sale and the integrated manner in which Lehman ran its businesses, that belief was reasonable.  Further, to date LBCS has not requested and is unlikely to request at this late date that Barclays return the LBCS Customer Information, and Barclays therefore never was put on fair notice that the information was not its to use.  As a result, there are not sufficient facts to support a colorable claim for trade secrets misappropriation claim against Barclays.

### (v)  Unfair Competition

The Examiner also considered whether LBCS would have a colorable claim for unfair competition against Barclays.  An unfair competition claim allows a plaintiff to

---

[7714] *See, e.g.*, Lehman, Lehman Brothers Confidentiality Agreement [LBEX-LL 3668555].

[7715] *See infra* Section III.C.5.b.2.a.i of the Report, which discusses that an argument could be made that LBCS waived protection of the Customer Information by failing to segregate it from the assets that were properly transferred to Barclays, thereby relinquishing its secrecy.  It is likely, however, that the confidentiality provisions in the TSA would have preserved the secrecy of the information, which would allow LBCS to proceed with a trade secrets misappropriation claim.

[7716] Examiner's Interview of Joe Gold, Jan. 15, 2010, at p. 2.

recover when competitively useful information it has spent time, resources and effort to create is acquired by a defendant through actions rising to the level of bad faith.[7717]  Bad faith typically is found where a party acquires information through trespass, fraud or similar wrongdoing.[7718]

Here, the Examiner has found no facts that would indicate Barclays, or Lehman employees acting on Barclays' behalf, took wrongful actions to cause the LBCS Customer Information to be transferred to Barclays.   The facts uncovered by the Examiner suggest that Barclays believed that the LBCS Customer Information it received belonged to LBI, and therefore was properly included in the sale.[7719]  In the days preceding the consummation of the sale, Barclays and Lehman personnel discussed some of the information that comprised LBCS Customer Information, but appear to have been unaware that the information was not LBI's to sell.[7720]  Given the immense time pressures and the complexity of Lehman's organization and operations, it would have been exceedingly difficult for the parties to evaluate ownership issues in the few days that they had to negotiate the sale, and there is no indication that either Barclays or Lehman employees acting on Barclays' behalf deliberately transferred the

---

[7717] *See* Appendix 1, Section V.L of this Report, which discusses the law that applies to unfair communications in greater detail.

[7718] *Demetriades v. Kaufman*, 698 F. Supp. 521, 526-28 (S.D.N.Y. 1988); *Robotic Vision Sys., Inc. v. General Scanning, Inc.*, No. 96-CV-3884 JG, 1997 WL 1068696 at *5-6 (E.D.N.Y. Sept. 8, 1997); *LinkCo, Inc. v. Fujitsu, Ltd.*, 230 F. Supp. 2d 492, 501-02 (S.D.N.Y. 2002).

[7719] Examiner's Interview of Joe Gold, Jan. 15, 2010.

[7720] *See, e.g.,* e-mail from Satu S. Parikh, Lehman, to Joe Gold, Barclays (Sept. 19, 2008) [LBEX-DOCID 3456032]; Examiner's Interview of Joe Gold, Jan. 15, 2010.

information with the knowledge it belonged to LBCS. As a result, the Examiner

concludes that there are insufficient facts to support a colorable claim for unfair

competition against Barclays.

### (vi) Tortious Interference With Employment Relations

As discussed above, the Examiner concludes that the LBHI Affiliates did not

have assembled workforces that were transferred to Barclays in connection with the

sale. The Examiner did consider, however, whether there is a colorable claim against

Barclays for tortious interference with employment relations for hiring the LBI

employees that performed functions solely for the LBHI Affiliates.[7721]

To prevail on a claim for tortious interference with contractual employment

relations, a plaintiff must establish that: (1) there is a valid contract; (2) a third party

knew of the contract; (3) the third party intentionally and improperly procured the

breach of the contract; and (4) the plaintiff was damaged by the breach.[7722] If the

employee did not have a contract and was an at-will employee, however, the plaintiff

would have to show that the third party engaged in "fraud or misrepresentation or

acted with malice" in interfering with the employment relationship in order to

recover.[7723]

---

[7721] See Appendix 1, Section V.M to this Report, which discusses the law that applies to tortious
interference with employment relations claims in greater detail.
[7722] Siotkas v. LabOne, Inc., 594 F. Supp. 2d 259, 274-75 (E.D.N.Y. 2009).
[7723] Id. at 275; see also Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001) (recognizing that an at-will employee
may not recover for tortious interference with employment relations under New York law unless he or

The facts identified by the Examiner indicate that LBI employees who performed functions solely for LBHI Affiliates were not subject to restrictive covenants.[7724]  Even if those employees were parties to contracts with such clauses, Barclays would only be liable if it actually knew that those provisions existed.  Given the confusion surrounding the sale and the sheer volume of employees transferred, there are insufficient facts to conclude that Barclays had knowledge of the existence or terms of employment contracts with restrictive covenants (if any exist) to possess the requisite intent to establish a claim for tortious interference with employment relations.

The Examiner's sampling of Lehman employment offers confirms that employees were hired on an at-will basis.[7725]  As discussed in the previous subsections, there is no indication that Barclays knew that the employees it was hiring were anything other than LBI employees who "were employed primarily in connection with

---

she demonstrates that the interference was procured by fraud, misrepresentation, or threats or that the defendant acted with malice or in violation of a duty).

[7724] See e.g., letter from Scott Kimmel, Lehman, to Thomas J. Noto, Lehman, re: employment offer (Mar. 26, 2007) [LBEX-DOCID 024128]; letter from Christopher M. O'Meara, Lehman, to John DeRosa, Lehman, re: employment offer (Nov. 10, 2006) [LBEX-AM 023144]; letter from Karen Dennehy, Lehman, to Peter Keavey, Lehman, re: employment offer (Dec. 12, 2005) [LBEX-AM 017535]; letter from Christine Thomson, Lehman, to Roy Salame, Lehman (May 5, 2007) [LBEX-AM 027429]; letter from Christine Thomson, Lehman, to Jeff Frase, Lehman (May 10, 2007) [LBEX-AM 011714]; Examiner's Interview of Tracy Binkley, Dec. 22, 2009.

[7725] See letter from Scott Kimmel, Lehman, to Thomas J. Noto, Lehman, re: employment offer (Mar. 26, 2007), at p. 3 [LBEX-DOCID 024128]; letter from Christopher M. O'Meara, Lehman, to John DeRosa, Lehman, re: employment offer (Nov. 10, 2006), at p. 2 [LBEX-AM 023144]; letter from Karen Dennehy, Lehman, to Peter Keavey, Lehman, re: employment offer (Dec. 9, 2005), at p. 2 [LBEX-AM 017535]; letter from Christine Thomson, Lehman, to Roy Salame, Lehman (May 5, 2007), at p. 3 [LBEX-AM 027429]; letter from Christine Thomson, Lehman, to Jeff Frase, Lehman (May 10, 2007), at p. 4 [LBEX-AM 011714].

the Business,"[7726] to whom Barclays was contractually obligated to offer employment.[7727]

The LBI employees at issue believed that they were employed by LBI rather than any

LBHI Affiliate,[7728] which was reasonable in light of the fact that LBI hired and paid

almost all Lehman employees regardless whether they performed services for a

particular subsidiary.[7729]   Moreover, it was Lehman, not Barclays, that identified the

employees to be offered employment at Barclays.[7730]   There is no indication that Barclays

intended to harm the LBHI Affiliates by offering employment to the LBI employees that

Lehman identified (which included LBI employees who performed work solely for

LBHI Affiliates).   As a result, the facts uncovered by the Examiner do not support the

existence of a colorable claim for tortious interference with employment relations

against Barclays.

### (3)  Claims Against LBHI Affiliate Officers and Directors

The Examiner concludes that the facts do not support the existence of a colorable

claim against the LBHI Affiliate officers and directors for breach of the duty of care,

duty of good faith or duty to monitor arising from the transfer of LBHI Affiliate assets

to Barclays.

---

[7726] APA, at p. 35 (¶ 9.1(a)).

[7727] *Id.*

[7728] *See, e.g.,* e-mail from Paul Gregg, Lehman, to Peter Keavey, Lehman (Sept. 16, 2008) [LBEX-DOCID 3571486] (employees allocated to LBCS discussing transfer of LBI employees to Barclays and noting "that's us").

[7729] E-mail from Kaushik Amin, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [LBHI_SEC07940_656489].

[7730] Examiner's Interview of Tracy Binkley, Dec. 22, 2009.

The circumstances of Lehman's collapse and the LBHI bankruptcy made it difficult, if not impossible, for LBHI Affiliate officers and directors to focus their attention before the sale closing on Monday, September 22 on potential transfers of LBHI Affiliate Assets to Barclays.  As just one example, during this period, LBHI Affiliate officers and directors were attempting to preserve the value of (or at least to limit losses pertaining to) derivatives positions worth billions of dollars.  The LBHI Affiliate Assets that were ultimately transferred to Barclays – office equipment and customer information – were of limited value by comparison.  Taking the circumstances surrounding Lehman's collapse as a whole, it would have been unreasonable to expect LBHI Affiliate officers and directors to shift their focus from the other pressing matters that required their immediate and undivided attention.

As noted elsewhere herein, except for the facts described in Section III.C.6 of this Report, the Examiner is not addressing facts or reaching conclusions in this Report pertaining to the matters that are the subject of the litigation arising from the sale.  The Examiner's findings here are limited solely to whether additional claims, independent of the claims that are the subject of the sale litigation, may be asserted against LBHI Affiliate officers and directors as a result of the LBHI Affiliate assets that were transferred to Barclays.

### (a) Duty of Care

As explained above, the Examiner concluded that certain assets of LBCS, LBSF and LCPI were transferred to Barclays in the sale.  LBCS and LBSF were Delaware corporations.  LCPI was a New York corporation.  The Examiner therefore primarily addresses Delaware law here, and discusses New York law only to the extent there is a difference.

Under Delaware law, disinterested directors of an insolvent subsidiary enjoy the protection of the business judgment rule in carrying out their duties, such that only grossly negligent actions or inactions will give rise to liability.[7731]  While the party to whom the directors owe their fiduciary duties expands upon insolvency to embrace creditors of the company, the degree of scrutiny applied to the directors' actions and the applicability of the business judgment rule remains unchanged.[7732]

A director of a wholly owned subsidiary who also is an employee of the parent entity is treated as disinterested, and entitled to the protection of the business judgment rule, so long as the subsidiary is solvent.[7733]  This is so because a solvent wholly owned subsidiary's interests are aligned with those of the parent.[7734]  If the subsidiary is insolvent, however, the subsidiary's directors owe duties to creditors as well as to the

---

[7731] *Trenwick*, 906 A.2d at 174.

[7732] *See* Appendix 1, Section II.D to this Report, which discusses fiduciary duties for officers and directors of wholly-owned subsidiaries in greater detail.

[7733] *Trenwick*, 906 A.2d at 174; *see* Appendix 1, Section II.D to this Report, which discusses in detail the fiduciary duties of the directors of a wholly-owned subsidiary.

[7734] *Id.*

parent, which renders the directors who are employees of the parent interested and deprives them of the protection of the business judgment rule.[7735]

Absent the protection of the business judgment rule, a court will examine a challenged transaction under the stricter "entire fairness" standard.[7736]  Under that standard, a director must show that the transaction was a product of fair dealing and that the corporation received a fair price.[7737]  The court will consider "all relevant factors" to determine whether the transaction was fair.[7738]  In order for a transaction to satisfy entire fairness, directors must demonstrate "their utmost good faith and the most scrupulous inherent fairness of the bargain."[7739]

Even if the officers and directors of LBCS, LBSF and LCPI were interested as a result of the insolvency of those entities and their employment relationships with LBHI or LBI, the Examiner concludes that there is sufficient evidence to support the conclusion that the officers' and directors' actions were, in their entirety, fair to LBCS, LBSF and LCPI.

In light of all the circumstances, it would have been unreasonable, in the brief window before the closing of sale, to expect the LBHI Affiliate officers and directors to

---

[7735] *Id.*

[7736] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[7737] *Id.* at 711.

[7738] *Id.*

[7739] *Id.* at 710; New York law does not differ:  "[W]hen there is an inherent conflict of interest, the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness" of the transaction.  *Alpert v. 28 Williams St. Corp.*, 473 N.E.2d 19, 26 (N.Y. 1984).

divert their attention from, among other things, attempting to prevent (or at least limit) losses in the billions of dollars arising primarily from the termination of derivatives contracts, to identifying LBHI Affiliate assets that potentially would be transferred to Barclays.  The actions of the officers and directors were vital to preserving billions of dollars in value for the LBHI Affiliates, compared to the relatively limited value of LBHI Affiliate assets that were transferred to Barclays.  Indeed there is no evidence that the LBHI Affiliate officers and directors made any conscience decision to permit the LBHI Affiliate Assets to be transferred to Barclays.  The Examiner thus concludes that the evidence does not support the existence of a colorable claim against the LBHI Affiliate officers and directors for breach of the duty of care.

### (b)  Duty of Good Faith

The facts do not support a colorable claim that the LBHI Affiliate officers and directors breached their duty of good faith.  "A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[7740] Because the facts uncovered by the Examiner do not suggest that any LBHI Affiliate officer or director acted – with respect to the LBHI Affiliate Assets – with a purpose

---

[7740] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

other than that of advancing the best interests of LBCS, LBSF and LCPI, or ignored a known duty to act to prevent the transfer of the LBHI Affiliate Assets to Barclays, there are not sufficient facts to support a colorable claim against the officers and directors for breach of the duty of good faith.

### (c)  Duty to Monitor

Finally, the Examiner concludes that, in light of the circumstances surrounding the sale, the LBHI Affiliate officers and directors did not breach their duty to monitor LBHI Affiliate operations.  Directors breach the duty to monitor if "'(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.'"[7741]  "[I]mposition of liability [for breach of the duty to monitor] requires a showing that the directors knew that they were not discharging their fiduciary obligations."[7742]  A duty to monitor claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[7743]

Here, the officers and directors of the LBHI Affiliates had only a very short period of time before the September 22 closing of the transaction to implement systems

---

[7741] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

[7742] *Stone*, 911 A.2d at 370.

[7743] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). *See* Appendix 1, Section II.A.4 to this Report, which discusses the duty to monitor in greater detail

or controls intended to prevent the transfer of LBHI Affiliate assets to Barclays in connection with the sale. That was also the period during which those same officers and directors were called upon to deal with far more pressing matters. It would have been unreasonable for the LBHI Affiliate officers and directors to have diverted resources necessary to set up systems and controls to monitor the sale, and then to actually engage in that monitoring.

Whether there was any fraudulent or improper conduct in connection with the sale of LBI's business to Barclays is the subject of ongoing litigation, including extensive fact and expert discovery. Except for the facts reported in Section III.C.6 of the Report, the Examiner is not addressing facts or reaching conclusions in this Report pertaining to the matters that are the subject of litigation. The Examiner's findings here are limited solely to whether additional claims, independent of the claims that are the subject of the Barclays sale litigation, may be asserted against the LBHI Affiliate officers and directors for the transfer of LBHI Affiliate Assets to Barclays.

Subject to the above qualifications, the Examiner concludes that the facts do not support the existence of a colorable claim for breach of the duty of care, good faith or the duty to monitor against LBHI Affiliate officers and directors arising from the transfer of the LBHI Affiliate Assets to Barclays.

### c) Lehman ALI Transaction

The Examiner concludes that the decision to transfer certain subsidiaries of LBI to Lehman ALI shortly before the commencement of LBI's SIPA proceeding was the result of a good-faith, well-grounded business judgment, and that therefore no colorable claim (other than claims arising under the PIK Note & Securities itself) arises from that decision.    The Examiner notes that the valuation of the subsidiaries transferred to Lehman ALI (and therefore the consideration to be paid to LBI's estate under the PIK Note & Security Agreement) will be exceedingly challenging if not resolved by agreement.

### 6.    Barclays Transaction

The facts set forth in this Section pertain to matters that are the subject of pending litigation involving the Debtors, the SIPA Trustee, the Creditors Committee and Barclays.    Because these matters are the subject of pending litigation before this Court with respect to which discovery is ongoing, with limited exceptions the Examiner does not discuss in this Section of the Report the law or the parties' arguments, and expresses no view on the merits of the parties' positions or whether the evidence supports the existence of colorable claims.

### a)  Pre-Bankruptcy Negotiations

### (1)  Barclays' Interest in a Transaction Involving Lehman

Barclays' interest in a transaction involving Lehman dated back to at least April 2008.[7744]  Robert E. Diamond, Jr., the President of Barclays PLC and chief executive of Barclays' investment banking and investment management (IBIM) businesses, received a telephone call from Robert Steel, who at the time was Undersecretary for Domestic Finance at the United States Department of the Treasury.[7745]  Steel inquired whether, if there was a situation with Lehman similar to what had happened with Bear Stearns, there was a price at which Barclays would be interested in purchasing Lehman, and if so, what Barclays would need in terms of a working relationship with the Treasury Department.[7746]  Diamond told Steel that the question was interesting and thought-provoking, and thanked him for the call.[7747]

In July 2008, Barclays prepared a "Discussion Document," apparently for its board of directors, regarding a potential Lehman transaction.[7748]  The document's executive summary notes that "Long Island [the Barclays code name for Lehman] had been a prime victim of the recent market turmoil, and consequently might be 'on the

---

[7744] Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 9.

[7745] *Id.*

[7746] *Id.*

[7747] *Id.* at p. 10.

[7748] Barclays, Project Long Island Discussion Document (July 2008) [BCI-EX(S)-00026269], attached to e-mail from Richard Haworth, Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Sept. 9, 2008) [BCI-EX-(S)-00026268].

block.'"[7749]    The summary analyzes a potential acquisition under two "aggressive

scenarios given the possibility of a distressed sale," including "Bear Stearns valuation

metrics" and a 50 percent discount to current market value, and opines that

"[s]trategically, Long Island would be an excellent fit for [Barclays'] IBIM business," but

notes that "[f]urther due diligence is needed to get comfort around their book and

exposures."[7750]

Following the Barclays board meeting, Diamond contacted Treasury to advise

that, if there was a distressed situation involving Lehman, Barclays would like to get a

call.[7751]

In August and early September 2008, as Lehman's distress became more

apparent, and the company actively shopped itself to potential suitors,[7752] Barclays took

steps toward entering into discussions with Lehman.    Barclays spoke with Lazard,

which was advising Lehman with respect to strategic alternatives, including the sale of

part or all of the company.[7753]    Those communications were focused on whether Barclays

would be interested in purchasing Lehman's asset management business, which

---

[7749] *Id.*

[7750] *Id.*

[7751] Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at pp. 28-29.

[7752] *See* Section III.A.3.C of the Report, which discusses Lehman's efforts to find a strategic partner in greater detail.

[7753] E-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays, *et al.* (Aug. 24, 2008) [BCI-EX-00078686]; e-mail from John Varley, Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Aug. 25, 2008) [BCI-EX-00078684]; e-mail from Robert E. Diamond, Jr., Barclays, to Richard Haworth, Barclays, *et al.* (Aug. 25, 2008) [BCI-EX-00078653].

included the Neuberger Berman business.[7754]  Lazard advised Barclays that Lehman needed to do something to add stability and capital, and was looking for someone to purchase more than 50 percent, but less than all, of the asset management business.[7755] Barclays' response was that Barclays' prime goal in the United States was a high net worth business, and that while Neuberger Berman was not a "pure play" in that regard, Barclays did not want to be "on the outside," as there were pieces of Neuberger Berman that would be of interest to Barclays.[7756]

During the first two weeks of September, Barclays was in contact with senior officials at Treasury and the FRBNY.[7757]  Secretary Henry M. Paulson, advised Diamond that Treasury would be pleased to have Barclays take a look at Lehman, but, according to Diamond, "was very clear" that there would be no government money for a deal.[7758] FRBNY President Timothy F. Geithner encouraged Diamond to call Fuld.[7759]  According to Diamond, he resisted because he believed the only way Barclays would pursue an

---

[7754] E-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays, *et al*. (Aug. 24, 2008) [BCI-EX-00078686]; e-mail from John Varley, Barclays, to Robert E. Diamond, Jr., Barclays, *et al*. (Aug. 25, 2008) [BCI-EX-00078684]; e-mail from Robert E. Diamond, Jr., Barclays, to Richard Haworth, Barclays, *et al*. (Aug. 25, 2008) [BCI-EX-00078653].

[7755] E-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays, *et al*. (Aug. 24, 2008) [BCI-EX-00078686].

[7756] *Id.*

[7757] Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 24; Henry M. Paulson, Jr., U.S. Dept. of Treasury, Call Log, (Sept. 11, 2008), available at http://www.scribd.com/doc/21221123/Too-Big-To-Fail-Paulson-Call-Logs-and-Calendar-Sept-2008 (noting that Paulson spoke to Diamond from 5:10 p.m. to 6:00 p.m.).

[7758] Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 29.

[7759] *Id.* at p. 30.

acquisition of Lehman was at a distressed price, "and at a distressed price this is a rescue and you are not going to want Dick Fuld there."[7760]

On Wednesday, September 10, Diamond e-mailed John Varley, Group Chief Executive for Barclays PLC, and Christopher Lucas, Group Finance Director for Barclays PLC, and stated, in the subject line of his message: "Geithner called, long conversation, call when convenient."[7761]  Varley replied to Diamond's e-mail, stating: "One further thought: given pattern so far, fuld will ring.  Think we should push him off.  If we engage with him, he will use it.  That's why I'm cautious about the 'marriage broker' phrase.  Think the [U.S.] authorities need to be more activist than that if we are to be prepared to play."[7762]  Diamond, in turn, responded to Varley's e-mail, saying "[y]es, but given my conversation with Geithner do not think [Fuld] will[] ring."[7763]

Later in the day on September 10, Diamond e-mailed Varley, Jerry del Missier, Lucas, and Rich Ricci, Chief Operating Officer for Barclays' IBIM division, and said "[g]ood conversation with both Fed and Treasury, talk in am."[7764]

---

[7760] Id.

[7761] E-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays, *et al.* (Sept. 10, 2008) [BCI-EX-00078635]; *see also* transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 30.

[7762] E-mail from John Varley, Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 10, 2008) [BCI-EX-00078635]; *see* e-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays (Sept. 10, 2008) [BCI-EX-00078643].

[7763] E-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays (Sept. 10, 2008) [BCI-EX-00078643].

[7764] E-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays, *et al.* (Sept. 10, 2008) [BCI-EX-00078630]; *see* e-mail from John Varley, Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 10, 2008) [BCI-EX-00078655].

Diamond also had been discussing the potential Lehman acquisition with Steel, who had left Treasury, and was the president and CEO of Wachovia.  On Wednesday, September 10, Diamond e-mailed Steel and said "can u call me, rather important."[7765] Steel responded that "[he] spoke with HMP [Paulson], he will call you."[7766]  Diamond replied that he "had substantive and interesting calls with Tim G [Geithner] and Tony R. [presumably Anthony Ryan, Steel's successor as Undersecretary for Domestic Finance at the Treasury Department] . . . did not hear from Hank, disappointing but probably understandable. . . .  Bob, your help has been perfect, thanks!!  there may be a way forward, we will know very soon."[7767]

Others at Barclays also were in contact with Lehman during that time.  On Wednesday, September 10, Archibald Cox, Jr., Chairman of Barclays Americas, sent an e-mail to Diamond that stated:

> I got an email and a call last night from Long Island after another call late in the afternoon.  (No names, please.) In the afternoon call I was asked whether you had talked with their CEO.  I said I didn't know, but that if you had I didn't think it was substantive.  In the evening call I was further questioned about whether you had talked with their CEO as their impression was that you had.  I was asked to check on this, because they wanted to make sure you had and, if not, to make sure that happened.  I

---

[7765] E-mail from Robert E. Diamond, Jr., Barclays, to Robert K. Steel, Wachovia (Sept. 10, 2008) [BCI-EX-00078662].

[7766] E-mail from Robert K. Steel, Wachovia, to Robert E. Diamond, Jr., Barclays (Sept. 10, 2008) [BCI-EX-00078662].

[7767] E-mail from Robert E. Diamond, Jr., Barclays, to Robert K. Steel, Wachovia (Sept. 10, 2008) [BCI-EX-00078662].

said I would get in touch with you early this morning.  I think their CEO is under the impression we have no interest.[7768]

On Wednesday, September 10, and Thursday, September 11, Cox was passing on to Diamond requests to contact Fuld[7769] and the word that "apparently many at LI [Long Island] think Barclays would be the best home for them.  That would help in keeping people."[7770]

The Barclays Board of Directors met by conference call on Thursday afternoon (London time), September 11, to discuss whether to authorize the company to enter into a due diligence process with the goal of potentially acquiring Lehman.[7771]

At 10:00 a.m. London time on Friday, September 12 (5:00 a.m. in New York), Varley, Diamond, Lucas and Ricci participated in a conference call to prepare for the board meeting scheduled for 2:00 p.m. London time that day.[7772]  A board presentation

---

[7768] E-mail from Archibald Cox, Jr., Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Sept. 10, 2008) [BCI-EX-00078697].

[7769] *See* e-mail from Archibald Cox, Jr., Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 10, 2008) [BCI-EX-00078661]; e-mail from Archibald Cox, Jr., Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 11, 2008) [BCI-EX-00078769].

[7770] E-mail from Archibald Cox, Jr., Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 11, 2008) [BCI-EX-00078660].

[7771] *See, e.g.*, e-mail from Lawrence Dickinson, Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 10, 2008) [BCI-EX-00078637]; e-mail from Robert E. Diamond, Jr., Barclays, to Lawrence Dickinson, Barclays (Sept. 10, 2008) [BCI-EX-00078626]; e-mail from Marie Smith, Barclays, to Marcus Agius, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00081498].

[7772] *See* e-mail from Richard Haworth, Barclays, to John Varley, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-(S)-00053305].  Diamond, del Missier, Ricci and other senior Barclays executives had flown from London to New York on Thursday evening, September 11.  Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 24; e-mail from Robert E. Diamond, Jr., Barclays, to Patrick Durkin, Barclays (Sept. 11, 2008) [BCI-EX-00078759] (informing Patrick Durkin at 11:26 p.m. on September 11 that Diamond "just landed in ny").

was circulated in advance of the call, which set forth two acquisition scenarios, both involving transactions for $5 per share of Lehman stock.[7773]

During the board meeting on Friday, September 12, beginning at 2:00 p.m. (London time), the Barclays Board of Directors authorized the company to pursue due diligence to determine whether there was an opportunity for a transaction with Lehman.[7774]

### (2) Negotiations Before September 15

Diamond and Fuld met face-to-face on Friday morning, September 12.[7775]  In order to avoid the TV cameras that were stationed outside Lehman's Manhattan headquarters, Fuld sent his driver to pick up Diamond and take him into Lehman's building through the garage.[7776]

Diamond explained to Fuld that there could be "no deal at . . . the current market price, because of the risk and because of the overlap [between Barclays and Lehman],"

---

[7773] Barclays, Long Island Transaction Overview (Sept. 12, 2008) [BCI-EX-(S)-00053305], attached to e-mail from Richard Haworth, Barclays, to John Varley, Barclays, *et. al* (Sept. 12, 2008) [BCI-EX-(S)-00053306].

[7774] Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 24; e-mail from Marie Smith, Barclays, to Marcus Agius, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00081498].

[7775] E-mail from Heidi Smith, Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078716]; transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 25.

[7776] E-mail from Heidi Smith, Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078716]; transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at pp. 25-26.

but that Barclays had "an interest if this is a rescue situation, meaning if this is a very,

very distressed price."[7777]

At 2:26 p.m. New York time on September 12, Varley e-mailed Diamond and

Ricci to prepare for a call that afternoon with Secretary Paulson:

Bob

Ahead of our next chat, my thoughts on the gist of the hp [Secretary Paulson] call would be:

1.   Since we last spoke bob has met dick.  That meeting went well.

2.   We've also had a further meeting of the board

3.   That meeting went well.

4.   We see a way forward but there are two areas where we will need help.

5.   Both are areas of potential concern to the fsa.

6.   First is the subject of long term funding.  We need to know that we would continue to have access in such size as we need to run the business prudently.

7.   Second is the subject of certain risk assets, which you and we referred to in our conversation of yesterday.  Bob's team has been analyzing the data and let me hand over to him to give you our thoughts.

8.   Red [Diamond] covers, including the ask.

9.   Although we have further work to do in many areas, we believe that if you can give us the help we need in these two areas, we can get this done, and will continue to work round the clock to that end

---

[7777] Transcript of deposition testimony of Robert E. Diamond, Jr., *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at pp. 26-27, 32.

to get to a position where there can be an announcement ahead of market opening at the beginning of next week.[7778]

On Friday, September 12, Barclays retained Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") to represent Barclays in its negotiations with Lehman.[7779] Victor Lewkow and Robert Davis led the Cleary Gottlieb team.[7780]

Barclays and Cleary began negotiations with Lehman and its legal counsel, Simpson Thacher, on Friday morning, September 12th.[7781] John Finley led the Simpson Thacher team. Those negotiations continued until Sunday, September 14, at about noon.[7782]

The Barclays team included Diamond Cox, Jerry del Missier, Ricci, Michael Klein, Gerard LaRocca, Michael Keegan, Stephen King, Michael Evans, and Patrick Clackson.[7783] The principal negotiators for Lehman were Bart McDade, Mark G. Shafir,

---

[7778] E-mail from John Varley, Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078748]. That evening, between 5:10 p.m. and 6:00 p.m., Varley and Diamond participated in a conference call with Paulson and Geithner. *See* Henry M. Paulson, Jr., U.S. Dept. of Treasury, Call Log (Sept. 12, 2008), available at http://www.scribd.com/doc/21221123/Too-Big-To-Fail-Paulson-Call-Logs-and-Calendar-Sept-2008.

[7779] E-mail from Richard Smith, Barclays, to Gerard LaRocca, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078725]. Barclays requested and received from Lehman a conflict waiver that allowed Cleary Gottlieb to work on Barclays' behalf in connection with the transaction. E-mail from Victor I. Lewkow, Cleary Gottlieb, to Thomas A. Russo, Lehman (Sept. 12, 2008) [BCI-CG00000004].

[7780] *See, e.g.*, e-mail from Richard Smith, Barclays, to Gerard LaRocca, Barclays, *et al.* (Sept. 12, 2008) [BARCLAYS-LB00042759] forwarding Cleary Gottlieb contact list); e-mail from Richard Smith, Barclays, to Gerard LaRocca, Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078725].

[7781] Examiner's Interview of Lindsee P. Granfield and Robert Davis, Mar. 10, 2009, at p. 2.

[7782] *Id.*

[7783] *See* e-mail from Hans-Joerg Rudloff, Barclays, to Robert E. Diamond, Jr., Barclays, *et al.* (Sept. 12, 2008) [BCI-EX-00078742] (noting Michael Klein's interest in assisting Barclays); e-mail from Hans-Joerg Rudloff, Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 12, 2008) [BCI-EX-00078729] (passing along Klein's statement that he did not have any conflicts); e-mail from Rich Ricci, Barclays, to Robert E. Diamond, Jr.,

Michael Gelband and Alex Kirk.[7784]  McDade did not "engage with" Diamond and his

team until late Friday evening, September 12; before then, McDade, Hugh E. "Skip"

McGee, III and others were focused on the due diligence in which Bank of America was

engaged.[7785]   Barclays already had begun assembling its due diligence team and

requesting due diligence information on the afternoon of Thursday, September 11, but

Lehman was not able to begin delivering the bulk of the information until

September 12.[7786]

On Saturday morning, Richard Haworth of Barclays circulated to Clackson and

LaRocca a document on "'key' DD [due diligence] findings to date" as part of a "pre-

Board briefing" going to Varley and Diamond.[7787]  The summary stated, among other

---

Barclays (Sept. 12, 2008) [BCI-EX-00078740] (advising that Citigroup had agreed to permit Klein to advise Barclays, notwithstanding that Klein was within his "gardening leave" period after leaving Citigroup); transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 10-11; transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at p. 28; transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at p. 7.

[7784] Transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at p. 28; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 11-12.

[7785] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 8-9, 10.

[7786] *See, e.g.*, e-mail from Diahann Turner, Barclays, to Haejin Baek, Barclays, *et al.* (Sept. 11, 2008) [BARCLAYS-LB 00023235]; e-mail from Haejin Baek, Barclays, to Gerard LaRocca, Barclays, *et al.* (Sept. 11, 2008) [BCI-EX-(S)-00033903]; e-mail from James Walker, Barclays, to Patrick Clackson, Barclays (Sept. 11, 2008) [BCI-EX-(S)-00021957]; e-mail from Gerard LaRocca, Barclays, to Rich Ricci, Barclays (Sept. 11, 2008) [BCI-EX-00078752]; e-mail from Gerard LaRocca, Barclays, to Rich Ricci, Barclays (Sept. 11, 2008) [BCI-EX-00078770]; e-mail from Erin Mansfield, Barclays, to Haejin Baek, Barclays, *et al.* (Sept. 11, 2008) [BARCLAYS-LB 00023388]; transcript of deposition testimony of Gerard LaRocca, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at pp. 13-15, 17-18.

[7787] E-mail from Richard Haworth, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 13, 2008) [BCI-EX-00081257]. Barclays had gone "through business by business . . . looking at those assets and ascribing what [Barclays] thought were the fair values to those assets."  Transcript of deposition testimony of

things, that "[i]n the previous report to the Board, we estimated a total of $7.5 bn in

further write-downs to Long Island assets based on a high level analysis of the risks of

the valuation of key assets," but that "[b]ased upon due diligence undertaken in the last

24 hours, this estimate of the further immediate write-downs to L.I.'s book has

increased significantly to $23bn-$27bn . . . [including] $3-5bn trading write-downs,

primarily relating to RMBS."[7788]  The summary further states that "[t]hese revisions are

based upon: [b]ringing L.I. marks in line with [Barclays'] valuation policies . . . [and]

[f]or the most material segments (*e.g.* CMBS) this estimate is based on an asset-by-asset

basis, while elsewhere, where markets are highly illiquid, these are conservative top-

down estimates."[7789]

During that weekend, Barclays and Lehman reached agreement in principle on a

transaction under which Barclays would purchase certain "good" assets of Lehman and

---

Patrick Clackson, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at p. 13. Transcript of deposition testimony of Jerry del Missier, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 1, 2009, at pp. 25-28; transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at pp. 13-16; transcript of deposition testimony of Jerry del Missier, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 1, 2009, at p. 26.  The teams were instructed "to get a genuine, realistic value of what . . . this stuff was worth."  *Id.*

[7788] Barclays, Long Island key exposures – key due diligence findings (Sept. 13, 2008), at p. 1 [BCI-EX-00081255], attached to e-mail from Richard Haworth, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 13, 2008) [BCI-EX-00081257].  Barclays made "very clear" to Lehman that they were not interested in purchasing Lehman's private equity and commercial real estate assets because of the impact on Barclays' balance sheet, and because of the difficulty in valuing those assets.  Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 14; transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at pp. 10-11.

[7789] Barclays, Long Island key exposures – key due diligence findings (Sept. 13, 2008), at p. 1 [BCI-EX-00081255] attached to e-mail from Richard Haworth, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 13, 2008) [BCI-EX-00081257].

leave certain "bad" assets (the private equity and commercial real estate assets) behind in a shell that would be financed by a consortium of Wall Street firms.[7790]

On Sunday, September 14, it became clear that the proposed transaction would not go forward.[7791]  That afternoon, Lehman personnel started working on an "orderly" liquidation plan, which contemplated a six-month period to effect an orderly unwinding of Lehman's positions.  During that time, Lehman would continue to employ a substantial number of people, and would pay bonuses to keep them.[7792]  The plan assumed that the FRBNY would provide financing support throughout the wind-down process.[7793]

Work on an orderly six month liquidation plan came to an abrupt halt when word circulated that, as described in Section III.A.3, LBHI would file bankruptcy that evening.[7794]

---

[7790] Examiner's Interview of Lindsee P. Granfield and Robert Davis, March 10, 2009, at pp. 2-3; Share Exchange Agreement [Draft] [STB-LEH 0001507], Acquisition Agreement [Draft] [STB-LEH 0001518], and Stockholder Voting Agreement [Draft] [STB-LEH 0001567], attached to e-mail from Michael Salerno, Cleary Gottlieb, to H. Rodgin Cohen, Sullivan & Cromwell, *et al*. Sept. 14, 2008 [STB-LEH 0001506]; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 14-15.

[7791] *See* Section III.A.3 of the Report, which discusses in greater detail the interactions between the FSA, Treasury and the FRBNY.

[7792] Examiner's Interview of James P. Seery, Jr.,  Nov. 12, 2009, at p. 2.

[7793] *Id.*

[7794] *Id.*; Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at pp. 12-13; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at pp. 7-8; Examiner's Interview of Scott Alvarez, Nov. 12, 2009, at p. 8 (explaining that the FRBNY did not consider bankruptcy inevitable until Sunday night when it was apparent there was no buyer for Lehman). *See* Section III.A.3 of this Report, which describes 'Lehman's decision to file bankruptcy in greater detail.

### b) LBHI Bankruptcy

### (1) LBHI Files Chapter 11

At 1:45 a.m. on the morning of Monday, September 15, LBHI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.[7795]  The case was assigned to the Honorable James M. Peck.

### (2) Post-Petition Clearing and Financing

Prior to LBHI's bankruptcy, LBI relied on clearing banks and organizations to settle and clear its trading activity.  Clearing banks and organizations advanced substantial amounts intraday to LBI in order to clear trades, and held the assets they cleared as collateral for LBI obligations.[7796]  Lehman also relied on short-term repo financing to fund its business operations.[7797]  These clearing and financing arrangements were vital to LBI's continued viability following LBHI's bankruptcy, because LBI could not conduct its core business without an ability to clear and finance securities and derivative trades.  JPMorgan acted as LBI's principal clearing bank for securities trading and triparty repo transactions.[7798]  LBI could not continue to operate its business without the services provided by JPMorgan.

---

[7795] *See* Introduction to this Report.

[7796] *See* Section III.A.5 of this Report which discusses clearing in greater detail.

[7797] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 4, 8.

[7798] *See* Section III.A.5.b of this Report, which discusses LBI's relationship with JPMorgan in greater detail.

LBI did not file a bankruptcy petition at the same time as LBHI.  Rather, as Lehman advised JPMorgan when LBHI filed its bankruptcy proceedings, Lehman's plan was to conduct an "orderly" liquidation of LBI by unwinding LBI's repos and its matched book, while at the same time attempting to find a buyer for LBI's broker-dealer business.[7799]

The FRBNY had been a primary source of short-term financing for Lehman.[7800] On Sunday, September 14, the FRBNY publicly announced that it would expand the categories of collateral accepted through the Primary Dealer Credit Facility ("PDCF").[7801] Previously, the FRBNY had accepted only investment-grade securities; on Monday, September 15, the FRBNY announced that it would accept any collateral that was acceptable for triparty repos.[7802]

---

[7799] E-mail from Jane Buyers-Russo, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al.* (Sept. 14, 2008) [JPM-2004 0006506] (recounting conversation between Jane Buyers-Russo and Paolo R. Tonucci); Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at pp. 4-5.

[7800] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at pp. 4-5; Declaration of Shari D. Leventhal in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, ¶ 6, *In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Dec. 5, 2008) (the "Leventhal Decl."), attached to Motion Under 11 U.S.C. §§ 105 and 363 Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, Docket No. 387, *In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Dec. 5, 2008).

[7801] Federal Reserve Press Release (Sept. 14, 2008) available at http://www.federalreserve.gov/newsevents/press/ monetary/20080914a.htm; Examiner's Interview of Christopher R. Burke, July 7, 2009, at p. 3; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 8; Examiner's Interview of Scott Alvarez, Nov. 12, 2009, at p. 9.

[7802] Examiner's Interview of Christopher R. Burke, July 7, 2009, at p. 3; e-mail from Christopher Killian, Securities Industry and Financial Markets Association, to Jack Fondacaro, Lehman (Sept. 14, 2008) [LBEX-DOCID 30719] (attaching the FRBNY's announcement); e-mail from Ricardo Chiavenato, JPMorgan, to Christopher Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329].

The FRBNY advised Lehman that it would not allow Lehman to access the PDCF as a means of avoiding a bankruptcy filing.[7803]  The FRBNY, however, advised Lehman that it would provide up to two weeks of overnight secured financing through the PDCF to allow LBI to accomplish an orderly liquidation.[7804]

The FRBNY anticipated that LBI ultimately would need to be placed in a SIPA proceeding, but that most of LBI's customers would move their accounts to other broker-dealers during the "orderly unwinding" of LBI, leaving a relatively small portion of LBI's customer accounts when the SIPA proceeding was commenced (which the FRBNY hoped could be delayed until approximately two weeks after the LBHI filing).[7805]  Without FRBNY funding an orderly unwind of LBI's business, customers might be forced to wait months to gain access to their money in a SIPA proceeding.[7806]

The FRBNY and Lehman believed, correctly, that it would be necessary for the FRBNY to provide expanded PDCF financing to Lehman because, with the filing of the LBHI's bankruptcy petition, parties that previously had provided Lehman with

---

[7803] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at p. 5 (explaining the FRBNY would provide up to two weeks of funding for an orderly unwind of LBI); Examiner's Interview of Richard S. Fuld, Jr. Apr. 28, 2009, at p. 13.

[7804] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at pp. 4-5; Leventhal Decl. ¶ 6.  Some at the FRBNY believed that the FRBNY was risking too much exposure with the two week funding timeframe. Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at p. 5.

[7805] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at p. 5.

[7806] *Id.*

overnight secured financing through repos would refuse to "roll" (*i.e.*, renew) those repos beginning on Monday, September 15.[7807]

Although the FRBNY had expanded the categories of collateral generally eligible for pledge through the PDCF, the FRBNY limited the collateral that LBI could pledge to the collateral that had been in LBI's clearance box at JPMorgan as of Friday, September 12.[7808] This restriction was referred to as the "Friday criteria."[7809] In addition, the FRBNY imposed larger PDCF borrowing haircuts on LBI than it did on other investment banks.[7810] These haircuts also were larger than the haircuts applied under

---

[7807] Leventhal Decl. ¶ 6; Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at p. 5; e-mail from Robert Azerad, Lehman, to Monique Wise, Lehman, *et al.* (Sept. 21, 2008) [BCI-EX-(S)-00013154] (explaining the Federal Reserve "extended the PDCF to a much wider range of asset classes Sunday night – thereby providing a backup source of funding to mitigate any loss of repo capacity, which was bound to happen once LBHI filed for bankruptcy"); *see also* JPMorgan Analysis (Sept. 11, 2008), at p. 3 [JPM-2004 0032965] (analyzing a "worst-case scenario," in which triparty investors did not renew their repos and Lehman was forced to rely on the PDCF for overnight financing); e-mail from David Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, *et. al.* (Sept. 15, 2008) [JPM-2004 0080146] (reporting that Lehman's triparty repo borrowing fell from $87 billion on Friday evening to $51 billion ($28 billion from the PDCF, $2 billion from Barclays, and $21 billion from other investors) on Monday evening).

[7808] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; Examiner's Interview of Christopher R. Burke, July 7, 2009, at p. 3.

[7809] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; Examiner's Interview of Christopher R. Burke, July 7, 2009, at p. 3; *see also* e-mail from Timothy G. Lyons, Lehman, to Ian T. Lowitt, Lehman (Sept. 14, 2008) [LBEX-DOCID 70210] (stating "the [FRBNY] is letting the other eighteen broker dealers fund a much broader range of collateral than us").

[7810] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5; *see also* e-mail from Ricardo Chiavenato, JPMorgan, to Christopher Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329] (noting the FRBNY "set a Lehman-specific PDCF schedule . . . with higher margin than for other dealers"); Chase Triparty Haircut Summary of Trades Maturing Sept. 15, 2008, as of Sept. 12, 2008 [LBEX-DOCID 428627] (listing an estimate haircut impact at approximately $4 billion), attached to e-mail from Sindy Aprigliano, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 4146462]; e-mail from Sindy Aprigliano, Lehman, to George V. Van Schaick, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 077028] (discussing the larger haircuts imposed by the FRBNY on Lehman's PDCF borrowing); e-mail from Robert Azerad, Lehman, to Susan E. McLaughlin, Lehman, *et al.* (Sept. 15, 2008) [LBEX-DOCID 457643] (explaining the PDCF haircuts would "result in a $4 billion drain in liquidity . . ."); PDCF Schedule of Eligible Securities (Sept. 14, 2008) [LBEX-DOCID 405695] (detailing the PDCF haircuts applied to Lehman

Lehman's pre-bankruptcy triparty borrowing facilities. The increased haircuts reduced the liquidity generated by Lehman's PDCF borrowing.[7811]

The FRBNY's post-LBHI bankruptcy financing of LBI began Monday evening, September 15, with Lehman borrowing approximately $28 billion via the PDCF,[7812] and continued through Thursday morning, September 18.[7813]   In addition to the PDCF, Lehman also continued to borrow under two other FRBNY programs, Open Market Operations ("OMO") and the Term Securities Lending Facility ("TSLF").[7814]   On Monday, the FRBNY advanced approximately $18.5 billion to LBI under the TSLF, and approximately $2.8 billion in OMO,[7815] and continued to advance funds to LBI under these programs through Thursday morning, September 18, when Barclays replaced the FRBNY pursuant to the Replacement Transaction described below.

---

for the various categories of accepted securities); e-mail from Ricardo Chiavenato, JPMorgan, to Christopher Carlin, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055329].

[7811] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5.  *See* e-mail from Robert Azerad, Lehman, to Susan E. McLaughlin, FRBNY, *et al.* (Sept. 15, 2008) [LBEX-DOCID 457643] (explaining the PDCF haircuts would "result in a $4 billion drain in liquidity . . .").

[7812] *See* e-mail from Edward J. Corral, JPMorgan, to William Walsh, FRBNY, *et al.* (Sept. 15, 2008) [JPM-2004 0031195] (notifying the FRBNY that the Lehman assets used in LBI's $28 billion PDCF repo on Monday night satisfied the Friday criterion).  Earlier on Monday, Lehman estimated that it would borrow up to $35 billion through the PDCF on Monday night.  *See* e-mail from Sindy Aprigliano, Lehman, to Robert Azerad, Lehman (Sept. 15, 2008) [LBEX-DOCID 1071653] (providing Feraca's PDCF estimate of $27 billion plus a buffer of $8 billion); e-mail from Robert Azerad, Lehman, to Susan E. McLaughlin, FRBNY, *et al.* (Sept. 15, 2008) [LBEX-DOCID 071550] (estimating $34 billion of PDCF borrowing); e-mail from Paolo R. Tonucci, Lehman, to Susan E. McLaughlin, FRBNY, *et al.* (Sept. 15, 2008) [LBEX-DOCID 071550] (estimating $28.3 billion for the collateral value of the PDCF borrowing).

[7813] Examiner's Interview of Robert Azerad, Apr. 20, 2009, at p. 5.

[7814] *Id.*

[7815] A&M's Interview of James W. Hraska, Oct. 8, 2008, at p. 1.

On Sunday, September 14, JPMorgan was immediately advised of the fact that the FRBNY had agreed to extend PDCF financing to LBI.[7816]  LBI's ability to obtain PDCF financing from the FRBNY was critical to JPMorgan because Lehman needed to pay JPMorgan on a daily basis for clearing advances (which were, in effect, intraday extensions of credit), or JPMorgan would refuse to continue to clear trades and act as a triparty repo agent for LBI.[7817]

By late Sunday evening, internal JPMorgan e-mails indicate that it had decided to "continue as the operating bank for [LBI] as long as it didn't file and was doing an orderly liquidation . . . .  [JPMorgan also] would unwind tri-party and return cash to investors."[7818]  Early Monday morning, however, the extent to which JPMorgan would continue to provide clearing and settlement services for LBI was unclear.[7819]  Kevin Murphy of JPMorgan said in an internal e-mail, "So our stance will be that we are not going to facilitate an orderly unwind but that we are rather going to potentially put Lehman in default of its obligations to the various clearing houses?  Is this the message

---

[7816] E-mail from Jane Buyers-Russo, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al*. (Sept. 14, 2008) [JPM-2004 0054242]; e-mail from Barry L. Zubrow, JPMorgan, to Bill T. Winters, JPMorgan, *et al*. (Sept. 15, 2008) [JPM-2004 0006510].

[7817] *See* e-mail from Robert Azerad, Lehman, to Monique Wise, Lehman, *et al*. (Sept. 21, 2008) [BCI-EX-(S)-00013154] (explaining that because of the LBHI bankruptcy filing, LBI needed a backup source of funding, the PDCF, "to collateralize the clearing banks against their intraday exposure to Lehman Brothers").

[7818] E-mail from Jane Buyers-Russo, JPMorgan, to Jamie L. Dimon, JPMorgan, *et al*. (Sept 14, 2008) [JPM-2004 0054242].

[7819] *See* e-mail from Scott Sandler, JPMorgan, to Edward J. Corral, JPMorgan, *et al*. (Sept. 15, 2008) [JPM-2004 0030786] (conveying confusion regarding what Lehman trades were cancelled and what Lehman trades were permitted to settle).

our senior management wants us to send?"[7820]    The FRBNY also grew concerned on

Monday morning that JPMorgan would not continue to extend intraday credit to LBI,

prompting an e-mail from Thomas C. Baxter, Jr., General Counsel to the FRBNY, to

Stephen Cutler at JPMorgan.[7821]

Throughout the morning, Scott Sandler and Jane Buyers-Russo at JPMorgan,

among others, emailed back and forth regarding why Lehman trades were cancelled

and whether trades, if any, should have been cancelled.[7822]    By mid-morning on

Monday, JPMorgan clarified its position, and determined that "JPM [would] continue to

act as the operating bank for [LBI] which include[d] being settlement bank for the

various exchanges and the fed wire . . .," but limited its aggregate exposure to $1

billion.[7823]

Other clearing banks and organizations also continued to provide clearing

services and financing to LBI during the week following LBHI's bankruptcy.    From

Monday, September 15 through Wednesday, September 17, Barclays provided LBI with

secured financing pursuant to an overnight repo facility.    Barclays' financing under that

repo facility grew from approximately $2 billion on Monday to $15.8 billion by

---

[7820] E-mail from Kevin Murphy, JPMorgan, to Henry Steward, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0047736].

[7821] *See* e-mail from Thomas C. Baxter, Jr., FRBNY, to Stephen Cutler, JPMorgan (Sept. 15, 2008) [JPM-2004 0055286] (expressing the FRBNY's concern that JPMorgan was not willing to provide intraday credit to LBI).

[7822] *See* e-mail from Scott Sandler, JPMorgan, to Edward J. Corral, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0030786].

[7823] E-mail from Jane Buyers-Russo, JPMorgan, to Barry L. Zubrow, JPMorgan, *et al.* (Sept. 15, 2008) [JPM-2004 0055008].

Wednesday evening.[7824]  Barclays also agreed to provide LBHI with $450 million in DIP financing.[7825]

Depository Trust & Clearing Corporation ("DTCC") entities, which provided clearing and settlement services for a range of equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments and OTC derivatives, continued to clear transactions for LBI during the week following LBHI's bankruptcy.[7826]  The CME Group, which was comprised of four commodities markets (the Chicago Board of Trade, the Chicago Mercantile Exchange, the New York Mercantile Exchange and COMEX), also continued to clear customer transactions; however, when on Wednesday, September 17, the CME learned that Barclays would not be assuming any LBI house positions as part of the sale, the CME liquidated all of LBI's house positions at the CME at a substantial loss to LBI and its affiliates.[7827]  The Options Clearing Corporation ("OCC"), the clearing organization for most domestic exchange-traded commodities options, also continued to clear option transactions for LBI even after BofA, LBI's settlement bank for OCC transactions, refused to continue acting for LBI and the OCC had to settle directly with LBI by wire.[7828]

---

[7824] Examiner's Interview of James W. Hraska, Oct. 8, 2008, at p. 4; e-mail from Teri Scott, Barclays, to Jonathan Stone, Barclays, et al. (Sept. 18, 2008) [BCI-EX-(S)-00038011].

[7825] See Senior Secured Superpriority Debtor in Possession Credit Agreement among LBHI, Barclays Bank PLC and Barclays Capital (Sept. 17, 2008).

[7826] Examiner's Interview of Isaac Montal, May 19, 2009, at p. 5.

[7827] Examiner's Interview of Timothy Doar, Oct. 16, 2009, at pp. 4-5.

[7828] See Section III.C.6.f.3 of this Report, which discusses the OCC in greater detail.

Citi,[7829] Lehman's provider of Continuous Linked Settlement, or "CLS," services for transactions conducted in more than one currency, also continued to provide clearing services to LBI post-petition, albeit only after LBI posted a deposit with Citi. As with JPMorgan, Citi provided short-term financing to Lehman to facilitate its multi-currency transactions. Citi terminated LBI's access to Citi's CLS services on September 17, 2008, but withdrew that termination after Barclays pledged $700 million to Citi on Lehman's behalf.[7830]

LBI also was party to triparty term repos that had not yet expired, and also continued to obtain overnight funding through GCF (General Collateral Finance) repos, a triparty dealer-to-dealer program offered by Fixed Income Clearing Corporation (a DTCC subsidiary) on an anonymous basis.[7831]

Together, these sources of clearing and secured repo financing permitted LBI to survive while a sale to Barclays was negotiated and consummated.

### c)    Negotiations Leading to APA

As news of the impending LBHI bankruptcy spread through Lehman on Sunday, September 14, Lehman began to consider whether a sale of only the broker/dealer (LBI)

---

[7829] *See* Section III.A.5.c of this Report, which discusses Citi in greater detail.

[7830] *See* Section III.A.5 of this Report, which discusses Citi's termination of C&S Services in greater detail.

[7831] *See* e-mail from David Weisbrod, JPMorgan, to Jamie L. Dimon, JPMorgan, *et. al.* (Sept. 15, 2008) [JPM-2004 0080146] (listing $21 billion in "mainly term repos" as part of LBI's triparty borrowing for September 15).

in bankruptcy was possible.[7832]  At about 6:00 p.m. on Sunday, September 14, Mark J. Shapiro, the head of the restructuring group at Lehman, went to McDade's office to "make sure that [McDade] understood that" Barclays could purchase Lehman in bankruptcy.[7833]

McDade called Diamond and asked if Barclays was interested.[7834]  Diamond called McDade back a short time later, said that Barclays was, and that Lehman should have its team ready to meet with Barclays' team at 7:00 a.m. the next morning.[7835]  Calls also were made to Bank of America, HSBC and Nomura, but Barclays was the only entity interested in pursuing a transaction with LBI.[7836]

Around 10:30 p.m. that evening, Shapiro called Bryan Marsal of A&M and asked Marsal to serve as the chief restructuring officer of LBHI.[7837]

---

[7832] Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 2.

[7833] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at p. 16.  Shapiro had not been involved in the previous negotiations between Lehman and Barclays; he had been preparing for a possible bankruptcy filing.  *Id.* at pp. 14-15.

[7834] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 16-17; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 16; transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 18-19; transcript of deposition testimony of Jerry del Missier, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 1, 2009, at pp. 42-43.

[7835] E-mail from Michael Klein, consultant retained by Barclays, to Robert E. Diamond, Jr., Barclays (Sept. 15, 2008) [BCI-EX-(S)-00110306] (discussing the 7:00 a.m. meeting scheduled for that morning with Lehman); transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at p. 20; transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at p. 21.

[7836] Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 2.

[7837] Transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at pp. 6-7; transcript of deposition testimony of Philip Kruse, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at p. 8.  A&M's first day at

Barclays had anticipated that there might be an opportunity to negotiate a deal

with Lehman after LBHI filed its Chapter 11 petition.  In a memorandum to the Barclays

Board of Directors dated September 15, Varley stated:

> We mentioned at the telephone meeting of the Board on Sunday evening
> that we would seek to pursue vigorously opportunities coming to out of
> Long Island going into Chapter 11 in the US and into administration
> elsewhere around the world.

> As we anticipated, [Diamond] was contacted overnight by the Long Island
> leadership team asking whether we might be in a position to acquire large
> parts of the business from the administrators; and that if so they would
> seek to protect as much of the business as they could as a going concern.
> We received assurance from them that this was a conversation taking
> place only with Barclays and we have no reason to doubt that assurance
> although, of course, Long Island staff are being raided freely around the
> world as I write.

> We are urgently dimensioning what we think may be available.  The core
> would be the US broker deal[er] (securities trading, investment banking
> and wealth management).  We are assessing what this might imply in
> terms of balance sheet take-on and associated WRA's [risk-weighted
> assets] and capital requirements; and people take-on.  We are also seeking
> to form a view – which is much less scientific now that there is no Long
> Island share price – as to the consideration that we might be prepared to
> pay to the administrator.

> We have had contact with the US authorities today and they are, as you
> would expect, very supportive of this initiative . . . .[7838]

---

Lehman was on Sept. 15, 2008.  Transcript of deposition testimony of Bryan P. Marsal, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 22, 2009, at pp. 6-7.

[7838] Memorandum from John Varley, Barclays, to Barclays Board of Directors, re: Long Island (Sept. 15, 2008) [BCI-EX-00079170]; *see also* e-mail from Marie Smith, Barclays, to Marcus Agius, Barclays, *et al.* (Sept. 15, 2008) [BCI-EX-00079168] (transmittal e-mail to board members); transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.,* Case *No.* 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at p. 36 (testifying that, after word spread on Sunday that the proposed transaction between Barclays and Lehman was not going forward, the Barclays team had a number of calls to determine "how dead is dead," and what could be done next).

The post-bankruptcy negotiations between Lehman and Barclays began in earnest with a telephone call early Monday morning between McDade, McGee and Shafir for Lehman, and Diamond, del Missier and Klein for Barclays.[7839]  During that call, Barclays expressed concern about whether Barclays would be buying an intact business, given media reports about Lehman employees leaving the headquarters building in droves.[7840]  Lehman responded that it was confident that, if the deal was done quickly enough, it could keep a large part of the business together and deliver it to Barclays.[7841]

### (1)  Participants

The negotiations between Lehman and Barclays principally were conducted on the 32nd floor of Lehman's headquarters building.[7842]  That floor included a main dining room that housed the principal negotiators and various others who came and went during the negotiations; fifteen or so other dining rooms were assigned to the teams that Lehman, Barclays and others had formed to address various aspects of the deal.[7843]

---

[7839] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 16; *see also* transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at p. 38 (recalling call).

[7840] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 17.

[7841] *Id.*

[7842] Transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at p. 37.

[7843] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 21-22; transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at p. 42.

McDade, Shapiro, Shafir and McGee of Lehman, and Harvey R. Miller, Lori Fife, Thomas A. Roberts and Michael Lubowitz of Weil were the principal negotiators for Lehman.[7844]  They were supported by a number of senior Lehman personnel, including Steven Berkenfeld, Gerald Donini, Eric Felder, Michael Gelband, Martin Kelly, Alex Kirk, Ian Lowitt, James Seery and Paolo Tonucci.[7845]  Lazard, which was advising Lehman, also sent several people, including Barry Ridings, to participate in the negotiations.[7846]

Ricci, Cox, and Klein of Barclays, and Lewkow of Cleary Gottlieb, were the principal negotiators for Barclays.[7847]  They were supported by a number of Barclays employees as well as Cleary Gottlieb and Sullivan & Cromwell lawyers.

---

[7844] *See* Lehman, Project Green Working Group List (Sept. 15, 2008) [BCI-CG00001917], attached to e-mail from Elizabeth Dayton, Lehman, to Archibald Cox, Jr., Barclays, *et al.* (Sept. 15, 2008) [BC1-CG00001916] (contact list for negotiations); *see also* transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 46-48; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 18-19; transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at pp. 37-39.

[7845] Transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at pp. 52-53; transcript of deposition testimony of Hugh E. McGee, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 10, 2009, at pp. 11-13; transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 46-54; transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 47-48; transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at pp. 37-40.

[7846] *See, e.g.*, e-mail from Arthur Bruhmuller, Lazard, to Stephen Campbell, Lazard, *et al.* (Sept. 15, 2008) [LAZ-C-00044714].

[7847] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 47-48;  *see* Lehman, Project Green Working Group List (Sept. 15, 2008) [BCI-CG00001917], attached to e-mail from Elizabeth Dayton, Lehman, to Archibald Cox, Jr., Barclays, *et al.* (Sept. 15, 2008) [BCI-CG00001916].

The parties negotiated through the day Monday and through the night into Tuesday morning, and reached an agreement on a general structure and terms. It then took another day to finish negotiating and drafting the APA.

### (2) Structure of Transaction

The principal difference between the failed proposal that had been negotiated prior to LBHI's bankruptcy, and the transaction Lehman and Barclays began negotiating on September 15, was that the pre-bankruptcy proposal called for Barclays' acquisition of the worldwide Lehman enterprise – with the exception of commercial real estate and private equity assets – while the bankruptcy transaction involved the acquisition of only Lehman's United States broker-dealer business. That was reflected, *inter alia*, in the size of the balance sheets of the businesses that Barclays was negotiating to acquire: approximately $600 billion in the pre-bankruptcy proposal, compared to approximately $70 billion in the post-bankruptcy proposal.[7848]

The structure of the post-bankruptcy transaction began to take shape over the course of the afternoon of September 15.[7849] Barclays would acquire the Lehman headquarters building in Manhattan and two data centers in New Jersey, at appraised

---

[7848] Lehman, LBI Balance Sheet (Sept. 15, 2008), at p. 1 [LBHI_SECO7940_382574], attached to e-mail from Ryan Traversari, Lehman, to Archibald Cox, Jr., Barclays, *et al.* (Sept. 15, 2008) [LBHI-SEC07940 382573]; Lehman, LBI Summary Balance Sheet (Sept. 17, 2008), at p. 1 [LBEX-DOCID46613], attached to e-mail from James Walker, Barclays, to Martin Kelly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 464234]; transcript of deposition testimony of John Varley, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at p. 27.

[7849] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 18.

values, and would pay $250 million to acquire the "rights to operate" Lehman's broker/dealer business and the assets and liabilities "directly associated with and necessary to the operation of the business."[7850]

Early in the afternoon of September 15, Diamond e-mailed Varley and Lucas to update them on the negotiation, saying:

> High level numbers
>
> 10,000 people (of 26,000), maybe some separately from Europe and Asia, say 2,000 related to US businesses
>
> 100 b dollar balance sheet (of 600)
>
> Tech, indexes
>
> IBD and M and A staff
>
> Probably lease space, but maybe buy some buildings.
>
> Need US business, broker/dealer capitalized at $5 billion, we have 2 in barcap.  So need 3 to 5 billion equity raising I think
>
> Price minimal, we think.[7851]

Witnesses advised the Examiner that the negotiations on Monday, September 15, and Tuesday, September, 16, were arm's length and vigorous negotiations.  Ridings, for example, indicated that notwithstanding the LBHI bankruptcy and the fact that Barclays was the only bidder, Lehman nonetheless retained bargaining power in its

---

[7850] Transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 47-53, 54; transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 52-53, 60-61.

[7851] *See* e-mail from Robert E. Diamond, Jr., Barclays, to John Varley, Barclays, *et al.* (Sept. 15, 2008) [BCI-EX-(S)-00025361]; *see also* e-mail from Rich Ricci, Barclays, to Robert Le Blanc, Barclays, *et al.* (Sept. 15, 2008) [BCI-EX-00082251].

negotiations with Barclays.  Ridings stated that the negotiations were genuine, in part,

because there was a credible threat that the Court would refuse to approve the

transaction if "things were not handled appropriately."[7852]

### (3)  Negotiations Regarding Securities Positions to be Purchased by Barclays

#### (a)  On September 15 and 16, Lehman and Barclays Review Lehman's Securities Positions and Marks

During the negotiations on Monday and Tuesday, "asset experts" from Lehman

and Barclays focused on reviewing the various classes of LBI securities positions, and

the marks associated with those assets.[7853]

That process began with determining the population of securities positions that

was held by LBI and available for transfer.[7854]  On Monday afternoon and evening,

Lehman assembled information regarding the LBI securities positions available to be

---

[7852] Examiner's Interview of Barry W. Ridings, Oct. 1, 2009, at p. 2.

[7853] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 24-27; transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 23-24, 26-33; transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 25-29; *see* transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at pp. 34-35 (describing involvement in assembly of information related to assets to be sold to Barclays).

[7854] Transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 23-25; transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 97-102. Determining whether a particular securities position on LBI's books was available for transfer to Barclays was an important task, because, LBI held securities in a variety of capacities.  LBI did not have the legal right to transfer all of the securities in its possession and control.  *See* Section III.C.3.a.1 of this Report, which discusses LBI's holding of securities.

sold, including both long and short positions.[7855]  The result was captured in a summary

document entitled "Lehman Brother[s] Inc Balance Sheet by GAAP Asset Type

9/12/08."[7856]  The document described LBI's total long and short securities positions as

follows:

| GAAP Asset Class | Net Long Inventory | Net Short Inventory |
|---|---|---|
| Total CDs and Other Mon Mkt Instr. Total | $1,014,274,052 | $0 |
| Total Corp. Obligations & Spot Total | $5,141,203,903 | ($2,003,710,797) |
| Corporate Stocks & Options Total | $8,431,893,804 | ($6,951,162,769) |
| Total Derivatives & Other Contr. Total | $4,838,239,449 | ($4,535,705,348) |
| Total Governments & Agencies Total | $39,173,255,499 | ($35,003,084,874) |
| Total Mortgages & Mortgage Backed Total | $6,556,460,569 | ($15,959,609) |
| **Grand Total** | **$65,155,327,276** | **($48,509,623,397)** |

Lehman provided that summary of LBI securities positions to Barclays.[7857]

Lehman also provided Barclays with voluminous listings of long and short securities

positions as of September 12, 2008.[7858]

---

[7855] *See, e.g.,* e-mail from Kevin Horan, Lehman, to Gerard M. Reilly, Lehman, *et al.* (Sept. 15, 2008) [LBHI_SEC07940_2543309].

[7856] *See* Lehman, Balance Sheet by GAAP Asset Type (Sept. 12, 2008) [LBEX-DOCID 999276], attached to e-mail from Gerard M. Reilly, Lehman, to Michael Gelband, Lehman (Sept. 15, 2008) [LBEX-DOCID 818160].

[7857] *See id.*; transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 34-37 (testifying that he saw the summary schedule on

Lehman also provided Barclays with an LBI "balance sheet summary" that reflected an estimate of the securities assets and liabilities of the firm as of September 15. That balance sheet summary was provided to Barclays at 9:39 p.m. on September 15; a revised version was provided to Barclays at 10:04 p.m.[7859] The revised LBI balance sheet summary listed estimated total assets as of September 15 of $75.3 billion, consisting of $65.3 billion of securities inventory and cash assets, and $10 billion of "matched book" assets.[7860] The revised balance sheet summary listed total liabilities as of September 15 of $73 billion.[7861] The balance sheet summary is reproduced below:

September 15 and 16); Barclays, Balance Sheet by GAAP Asset Type (Sept. 12, 2008) [BCI-EX-(S)-00074257] (with handwritten notes), attached to e-mail from Jasen Yang, Barclays, to James Walker, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-(S)-00074256].

[7858] *See* Lehman, LBI long position inventory (Sept. 15, 2008) [LBHI_SEC07940_2547489], attached to e-mail from Michael Garvey, Lehman, to Stephen King, Barclays, *et al.* (Sept. 15, 2008) [LBHI_SEC07940_2547488]; Lehman, LBI short balance sheet detail (excluding equities) as of Sept. 12, 2008 (Sept. 12, 2008) [BCI-EX-(S)-00054319], attached to e-mail from Michael Garvey, Lehman, to Stephen King, Barclays, *et al.* (Sept. 15, 2008) [BCI-EX-(S)-00054317]. Barclays subsequently determined that the total values listed for the categories of securities on the summary chart did not "tie-out" in every instance to the sum of the individual values of the securities in the detail; for example, the summary sheet indicated that the "Total Corp. Obligations & Spot Total" long positions totaled $5,141,203,903, but the securities included in the detailed listing for that category did not sum to that amount. *See* e-mail from Jasen Yang, Barclays, to James Walker, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-(S)-00074256]; transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 39-40.

[7859] Lehman, Balance Sheet (Sept. 15, 2008) [LBHI-SEC 07940-382490], attached to e-mail from Ryan Traversari, Lehman, to Archibald Cox, Jr., Barclays, *et al.* (Sept. 15, 2008) [LBHI_SEC07940_382489]; e-mail from Ryan Traversari, Lehman, to Archibald Cox, Jr., Barclays, *et al.* (Sept. 15, 2008) [LBHI_SEC07940_382573] and attachment [LBHI_SEC07940_382573] (revised balance sheet).

[7860] Lehman, Balance Sheet (Sept. 15, 2008) [LBHI-SEC 07940-382573] attached to e-mail from Ryan Traversari, Lehman, to Archibald Cox, Jr., Barclays, *et al.* (Sept. 15, 2008) [LBHI_SEC07940_382573].

[7861] *Id.*

| LBI | | | |
| In US$ billion | | | |
| | | | |
| | | | 9/15/2008 estimate |
| | Cash and Cash Equivalents | | 1.3 |
| | Cash and Securities Segregated | | 0.0 |
| | Inventory | | 64.0 |
| | Matched Book | | 10.0 |
| | Receivables | | 0.0 |
| | Investments in Subsidiaries | | 0.0 |
| | Intercompany Receivables | | 0.0 |
| Total Assets | | | 75.3 |
| | | | |
| | Short Positions | | 56.0 |
| | Matched Book | | 10.0 |
| | Payables | | 0.0 |
| | Intercompany Payables | | 0.0 |
| | Subordinated Notes | | 7.0 |
| Total Liabilities | | | 73.0 |
| | | | |
| | Shareholders Equity | | 2.3 |
| Total Liabilities & Shareholders Equity | | | 75.3 |

From Monday evening through early Tuesday morning, the Lehman and Barclays teams discussed the marks associated with LBI's securities portfolio.[7862] McDade testified that there was a "bottoms-up process, albeit in a very quick time period, of establishing a fair market value for the individual assets."[7863] King described

---

[7862] *See* e-mail from Stephen King, Barclays, to Ryan Babcock, Barclays, *et al.* (Sept. 15, 2008) [BCI-EX-(S)-00054291] (stating, "[n]eed to look just at securities. Do we have line by line pricing on all cusips?"); transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 23-24, 26-33; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 25-27; transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 25-29; *see also* transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at pp. 34-35 (describing involvement in assembly of information related to assets be sold to Barclays).

[7863] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 26.

a process on September 15 and 16 in which Barclays went through the LBI securities

and estimated values.[7864]

    As the discussions regarding the securities progressed, Martin Kelly and Paolo

Tonucci were preparing schedules of assets and liabilities pertaining to the transaction,

which were used in the negotiations.[7865]   Several versions of the schedules were

created.[7866]   The last schedule is dated September 16, 2008 at 11:18 a.m., and includes a

handwritten notation "9/16/08 Final," with the initials "SB" underneath.[7867]   "SB" is

Steven Berkenfeld, who made the handwritten notes.[7868]   Berkenfeld, head of the Legal,

Compliance and Audit Division at Lehman, characterized the schedule as "the final

schedule of the estimate of assets and liabilities that would be transferred over" to

Barclays.[7869]   The final schedule is reproduced below:

---

[7864] Transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 27-33.

[7865] Transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at pp. 34-37, 47; *see also* e-mail from James Walker, Barclays, to Martin Kelly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 464234] (referring to "attached balance sheet [that] was used by the LEH side in the overnight discussions of Monday"), Schedule (Sept. 16, 2008) [BCI-EX-00115595]; Schedule (Sept. 16, 2008) [BCI-CG00033789].

[7866] E-mail from Patrick Clackson, Barclays, to Bill Castell, Barclays, *et al.* (Sept. 16, 2008) [BCI-EX-(S)-00023848]; Final Schedule (Sept. 16, 2008) [BCI-CG00033742].

[7867] Lehman Final Balance Sheet (Sept. 16, 2008) [BCI-CG00033742]; transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at p. 48 (explaining why two versions of the schedule bear his initials and the word "final").

[7868] Transcript of deposition testimony of Steven Berkenfeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 6, 2009, at pp. 47-48.

[7869] *Id*. at p. 49; *see* transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 80 (testifying that the schedule was designed to track the assets and liabilities that Barclays would take); transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 53-

|  | **ASSETS** | |  | **LIABILITIES** | |
|---|---|---|---|---|---|
| Gov & Ag | $40.0 |  | ST Borrowings | $0.0 |
| Commercial Paper | 1.1 |  | Gov & Ag | 21.0 |
| Mortgages | 2.7 |  | Commercial Paper | 0.0 |
| Total Corp Debt | 4.9 |  | Mortgages | 0.0 |
| Corp Equity | 8.8 |  | Corp Debt | 2.1 |
| Derivatives | 4.5 |  | Corp Equities | 6.3 |
| Cash | 0.7 |  | Derivatives | 4.5 |
| **Total** | **$62.7** |  | **Total** | **$33.9** |
| Collateralized ST Agr | 10.0 |  | Collateralized ST Fund | 34.5 |
| Receivables | 0.0 |  | Payables | 0.0 |
| Other Assets | 0.0 |  | Deposits | 0.0 |
| Inv In Con Subs | 0.0 |  | Due to Subs | 0.0 |
| Due From Subs | 0.0 |  | Sub Notes | 0.0 |
| **Total** | **10.0** |  | **Total** | **34.5** |
|  |  |  | **Total** | **68.4** |
|  |  |  | Cure pmt | 2.25 |
|  |  |  | Comp | 2.0 |
| **Adj. Total Assets** | **$72.65** |  | **Total** | **$72.65** |

Witnesses interviewed by the Examiner have different impressions of whether the sale transaction was supposed to be a "wash" (other than $250 million for the goodwill).   For example, Thomas Roberts of Weil described the sale transaction, as closed, as very similar to the transaction contemplated in the APA.[7870]   Roberts indicated that both deals entailed (1) Barclays' acquisition of assets and liabilities at a "wash"; (2) the purchase of the 745 Seventh Ave. headquarters and other real estate assets at appraised values; (3) the payment of $250 million for goodwill; and (4) job protection

---

55 (testifying that the schedule represented a summation of the liabilities that Barclays would assume and the assets it would acquire).

[7870] Examiner's Interview of Thomas A. Roberts, Apr. 28, 2009.

for roughly 10,000 employees for 90 days.[7871]   Roberts stated that Barclays eventually

bought the assets and liabilities generally at a wash, albeit in a smaller amount than

originally contemplated.    The "final schedule" of assets and liabilities dated

September 16 circulated in connection with the transaction showed an equal amount of

financial assets and liabilities being transferred to Barclays,[7872] as did the manila folder

used by Michael Klein during the closing weekend to sketch out the terms of the

transaction for the Creditors Committee.[7873]

James Seery indicated, however, that the sale transaction was intended to

maintain the broker/dealer enterprise value.[7874]  In Seery's mind, the transaction did not

involve the concept of a "wash" sale or transfer of a balanced book of assets and

liabilities; rather, he viewed the transaction to simply involve the purchase of all

securities positions (no matter the value) relating to the broker/dealer business.[7875]  Seery

indicated that when the Debtors and Barclays reached an agreement on Tuesday,

September 16, all of the parties understood that the population of long and short

positions would change before the transaction closed because, among other things,

counterparties were closing out their trades with LBI.[7876]  Seery indicated that he did not

know, however, whether there was an agreement concerning what would happen if the

---

[7871] *Id.*

[7872] Lehman, Final Balance Sheet (Sept. 16, 2008) [BCI-CG00033742].

[7873] Michael Klein, consultant retained by Barclays, Notes on Folder [Deposition Exhibit 338B].

[7874] Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at p. 2.

[7875] *Id.*

[7876] *Id.*

approximately $1 billion "spread" between the long and short securities positions identified in the APA increased significantly beyond $1 billion (or vanished).[7877]

### (b) Barclays Agrees to Purchase "Long" Securities Positions With a Book Value of "Approximately $70 Billion"

While Lehman and Barclays negotiators were addressing the categories of assets to be conveyed in the deal, Weil and Cleary lawyers were drafting and negotiating the APA. The first draft of the APA was circulated by e-mail shortly before midnight on Monday, September 15,[7878] and the document was finalized early in the morning on Wednesday, September 17.[7879]

In the APA, Barclays agreed to purchase "all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code."[7880] "Purchased Assets" were defined as "all of the assets of Seller and its Subsidiaries[7881] used in connection with the Business (excluding the Excluded Assets), including:

---

[7877] Id.

[7878] Asset Purchase Agreement [Draft] [BCI-CG00002116], attached to e-mail from Andy R. Keller, Simpson Thacher, to Duane McLaughlin, Cleary Gottlieb (Sept. 15, 2008) [BCI-CG00002115]. That is the first time that a draft of the APA was circulated by e-mail. It is possible that earlier drafts were circulated by hand or otherwise reviewed by the lawyers who were on the 32nd floor of the Lehman headquarters building. Examiner's Interview of Lindsee P. Granfield and Robert Davis, Mar. 3, 2009, at p. 2; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 10.

[7879] Asset Purchase Agreement [Finalized Draft] [BCI-CG00008018], attached to e-mail from Lillian Raben, Cleary Gottlieb, to Daniel Chin, Weil, *et al.* (Sept. 17, 2008) [BCI-CG00008016].

[7880] APA, at p. 11 (§ 2.1).

[7881] *See* Section III.C.2.a.c of this Report, which discusses the definition of "Purchased Assets." The definition was amended in the Clarification Letter to provide, among other things, that assets of Subsidiaries were not to be conveyed to Barclays in connection with the transaction. *Id.*

(a)    the Retained Cash;

[. . .]

(d)    government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, "Long Positions");

(e)    50% of each position in the residential real estate mortgage securities;

[. . .]"[7882]

No securities, other than 50% of each position in residential real estate mortgage securities ("RMBS"), were "Excluded Assets."[7883]

In addition, the APA provided that Barclays would assume certain "Liabilities of Seller and its Subsidiaries," including, among other things, "(i) all short positions and 'repos' relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion (collectively, 'Short Positions' and, together with Long Positions, 'Positions')."[7884]

The APA thus provided that Barclays would purchase all of LBI's long securities positions – with the exception of 50% of each position in RMBS – and assume all short

---

[7882] APA, at p. 6 (§ 1.1).

[7883] Id.

[7884] Id. at pp. 12-13 (§ 2.3(i)).

securities positions relating to those long positions.[7885] Presumably, by including both long and short securities positions, Barclays would receive some protection against risks associated with market movement; if the market values of the securities dropped, the value of the long positions would drop, but would be offset by the reduction in the cost of fulfilling Barclays' short obligations.[7886]

The Lehman and Barclays negotiators anticipated that the securities comprising the Long Positions and Short Positions would change between execution of the APA and the closing of the transaction, as LBI unwound its matched book and delivered securities to complete trades.[7887]

---

[7885] *Id.* at p. 3 (§ 1.1) (definition (k) of "Excluded Assets"), 6 (§ 1.1) (definitions (d) and (e) of "Purchased Assets"), 11 (§§ 2.1, 2.2); *see also* e-mail from Gerard M. Reilly, Lehman, to Eric Felder, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 070268] (stating that "[t]he only assets that are not going from my understanding which is 2nd hand are 50% of the resi and abs books"); e-mail from Ian T. Lowitt, Lehman, to Gerard M. Reilly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 070268] (replying to Gerard M. Reilly e-mail and stating, "That is my understanding. But check with whoever drafted the purchase agreement."); e-mail from Gerard M. Reilly, Lehman, to Martin Kelly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 464049] (stating, "[m]y understanding of the deal is that they will purchase our assets that remain in LBI on the closing date which will not be the same as the assets on the 12th."); e-mail from John Mahon, Barclays, to Michael Keegan, *et al.* (Sept. 17, 2008) [BCI-EX-00079087] (stating, "LBI has borrowed and lent stock and securities that were not on the balance sheet we saw on Monday night. . . . The assets we saw, and said we were going to buy, may have been lent out and liabilities we saw would have been covered by borrowing those securities."); e-mail from Stephen King, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-(S)-00023992] (stating, "[a]lso, can you[] think if there would be any securities which would have been good collateral for the fed facilities which also would have been excluded assets, other than the securities that I excluded? I don't think so but would like to be sure."); e-mail from Patrick Clackson, Barclays, to Stephen King, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-(S)-00023992] (responding to King e-mail, stating, "The only excluded assets are the ones you excluded, nothing else, so no other collateral."); transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 227-28.

[7886] Examiner's Interview of James P. Seery, Jr., Nov. 12, 2009, at pp. 2-3.

[7887] *Id.* at p. 2; transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 97-100; e-mail from Jasen Yang, Barclays, to Charles Spero, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-(S)-00054403]; e-mail from Gerard M. Reilly, Lehman, to

At issue in the litigation arising from the sale transaction is whether the "approximately $70 billion" in "book value" of Long Positions referenced in the APA reflects a negotiated price below the actual book value of those securities, and whether the transaction included a "buried" discount that was retained through the closing.  As explained above, the Examiner is not reaching conclusions regarding those issues, but does set forth below certain facts relating to the negotiations.

At 5:10 a.m. on Tuesday morning, September 16, Kelly sent an e-mail to Lowitt and Tonucci, stating:

> Well it took all night and lots of back and forth but the deal is done and ready for the Board.  Final price did not change meaningfully – approx a $5 b all in economic loss versus our marks and $3.6b of resi assets left behind.  Assume we can fund this after everything else winds down but Paolo you need to review this.  Also, an extra $1b of comp beyond our accrual and assumption of all trade payables in LBI and LBHI.  Took 745 for $1b and several data centers for $400mm.  Bart reviewed all of it before final agreement . . . .[7888]

On Wednesday, September 17, Gerard Reilly e-mailed Kelly, and said:  "My understanding of the deal is that they will purchase our assets that remain in LBI on the closing date which will not be the same as the assets on the 12th.  That purchase will be

---

Martin Kelly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 464049] (stating, "[m]y understanding of the deal is that they will purchase our assets that remain in LBI on the closing date which will not be the same as the assets on the 12th.").

[7888] E-mail from Martin Kelly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 16, 2008) [LBEX-DOCID 132844].  When Kelly was asked in his deposition what he meant when he wrote in his e-mail "approx $5b all in economic loss versus our marks," he testified that he "recall[ed] that the 5 billion represents the difference between the negotiated price and the values of those assets on Lehman's books."  Transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at pp. 46; *see also id.* at pp. 66, 143-44, 156, 158-59.

at a fixed discount on the assets that remain to reflect the bulk size of the purchase."[7889]

Some of the Lehman participants in the negotiations testified that it was their understanding that Barclays was going to purchase the securities positions from Lehman at a negotiated price that was less than Lehman's book value.[7890]

Other participants in the negotiations, however, described a process in which the negotiated price of the securities reflected an adjustment from Lehman marks from Friday, September 12, which were outdated.  For example, McDade testified that the

---

[7889] E-mail from Gerard M. Reilly, Lehman, to Martin Kelly, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 464049]; e-mail from Gerard M. Reilly, Lehman, to Ian T. Lowitt, Lehman (Sept. 17, 2008) [LBHI_SEC07940_383258] (referring to "price haircut," and noting that "[i]f we want conservative marks to reflect block nature we need to know how much and then we can allocate to most logical assets"); Martin Kelly, Lehman, Handwritten Notes (Sept. 17, 2008) [BCI-EX-00115169]; transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at pp. 221-29 (testifying that $5.25 billion figure in his handwritten notes likely refers to the difference between the book value of the securities and the negotiated price); e-mail from Dirk Haseruck, Lehman, to Eric Felder, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 182777] (referencing the "gap between current MV and purchase price"); e-mail from Charles Spero, Lehman, to Michael Gelband, Lehman, *et al.* (Sept. 18, 2008) [LBHI_SEC07940_732682] (stating that, "I think they categorized mortgage as all abs, cdo, private label, etc.  They view the bulk/liquidity discount as roughly 1.5bln on that half of the total book."); e-mail from Arthur Bruhmuller, Lazard, to Daniel Flores, Lazard, *et al.* (Sept. 17, 2008) [LAZ-C-00048526] (stating, "[w]e are trying to get a sense for how the marks have evolved since Friday.  I think the first priority would be to see the inventory of what's being sold, how the marks have evolved and info on the buyer "discount."); Net Asset and Funding Estimates (Sept. 2008) [BCI-EX-00166340] (document from John Varley's files, which includes an apparent reference to a "negotiated discount" of $5 billion); transcript of deposition testimony of John Varley, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 11, 2009, at pp. 155-57.

[7890] *See* transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at pp. 41-42; transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at p. 66; transcript of deposition testimony of Paolo R. Tonucci, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 27-28.

agreed upon price was different from Lehman's book value "because Lehman hadn't marked the books since Friday," September 12.[7891]

### (4) Negotiations Regarding Contract Cure and Employee Compensation Liabilities

During the negotiations, Lehman and Barclays also addressed whether Barclays would assume (a) "cure cost" liabilities relating to contracts assigned to Barclays pursuant to Section 365 of the Bankruptcy Code; and (b) compensation liabilities associated with the Lehman employees offered employment at Barclays.

### (a) Contract Cure Costs

Shapiro of Lehman addressed the issue of contract cure costs with Cox and Klein of Barclays.[7892]  Shapiro insisted that, with respect to contracts that Barclays would designate to be assumed and assigned to it, the APA must provide that Barclays would be responsible for cure costs.[7893]

---

[7891] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 30-31; *see also* transcript of deposition testimony of Barry W. Ridings, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Jan. 15, 2010, at p. 29; transcript of deposition testimony of Stephen King, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at p. 153 (testifying that Lehman marks "were old, they were what we call stale"); *Id.* at pp. 28-33 (describing process used by Barclays to estimate revised values for Lehman securities); transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 25-26 (describing process in which, where Barclays team determined that assets were materially mismarked on Lehman's books, Barclays would present Lehman with proposed revised mark).

[7892] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 55-57.

[7893] *Id.*

Cox and Klein asked for an estimate of cure costs.[7894]  Shapiro asked George Mack and others at Lehman to develop an estimate of cure costs.[7895]  The method they used to develop an estimate was to look at a "snapshot" of Lehman's ordinary payables run, and then exclude compensation-related payables in order to develop an estimate.[7896]  Shapiro recalled that the process produced an estimate of $1.5 billion.[7897]

In the Sale Motion filed on September 17, the Debtors represented that, in connection with the proposed transaction, Barclays would assume an estimated $1.5 billion of liabilities under assumed contracts.[7898]  During the sale procedures hearing on Wednesday, September 17, the Court noted that Barclays was taking on "1.5 billion dollars in cure amounts."[7899]

The summary schedule of assets and liabilities dated September 16 discussed above included a $2.25 billion estimate for cure costs.[7900]  Shapiro did not recall why the

---

[7894] *Id.* at p. 59.

[7895] *Id.* at pp. 62-65.

[7896] *Id.; see also* transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 63-64 (describing how the cure estimate grew out of work done to estimate amount of DIP financing Lehman would need).

[7897] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 153-55.

[7898] Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, at p. 6, Docket No. 60, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008).

[7899] Transcript of hearing, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 17, 2008, at p. 23.

[7900] Lehman, Final Balance Sheet (Sept. 16, 2008) [BCI-CG00033742] transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 92, 282 (explaining that the estimate for cure liability came from Lehman).  According to Thomas A. Roberts, the

summary schedule reflected $2.25 billion in those costs, rather than the $1.5 billion estimate.[7901]

The APA provided:

> For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "Related Contracts") as either (1) a Purchased Contract or (2) a Contract not designated as a Purchase[d] Contract (a "Rejected Contract").  Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof.  If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract. If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof . . . .[7902]

Thus, the actual amount of cure liability for which Barclays would be responsible was dictated by Barclays' decisions about which of Lehman's contracts Barclays determined to assume and assign.

---

cure amount of the Sept. 16 balance sheet was calculated by Martin Kelly, and McDade and Lowitt confirmed the cure amount.  Examiner's Interview of Thomas A. Roberts, Apr. 28, 2009.

[7901] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 148-49; *see also* transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 63-64 (testifying that the cure cost estimate he recalled was "in the neighborhood" of the figure in the summary schedule).

[7902] APA, at p. 13 (§ 2.5).

Shapiro does not know whether anyone at Lehman developed a better estimate of Barclays' cure cost liability between September 17 (the date of the Sale Motion) and the September 22 closing.[7903]

Barclays did not expect to incur cure cost liability of the magnitude ($1.5 billion) estimated in the Sale Motion. In an internal Barclays e-mail on Friday, September 19, Clackson stated, "Cure payments are optional and [though] some will be incurred, most will be covered by our ongoing supplier relationships and fall into monthly expenses[.]"[7904] Clackson later testified that Barclays' calculations of its anticipated cure cost liability during the week of September 14 reflected little to no liability because Clackson thought at the time that many of the potential cure liabilities would be minimized through negotiations with Barclays' current suppliers and the synergies from combining Barclays and Lehman.[7905]

---

[7903] Transcript of deposition testimony of Mark J. Shapiro, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at pp. 67-68.

[7904] E-mail from Patrick Clackson, Barclays, to Rich Ricci, Barclays (Sept. 19, 2008) [BCI-EX-(S)-00024271].

[7905] Transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at p. 101; *see also* Barclays, Long Island Acquisition Summary [Draft] (Sept. 22, 2008) [BCI-EX 00079341], attached to e-mail from Gary Romain, Barclays, to Rich Ricci, Barclays, *et. al* (Sept. 22, 2008) [BCI-EX 00079340] (listing the bonus accrual at $1.7 billion and the cure payment at $800 million); *see also* Barclays, Synopsis of Barclays' "Synergy and Integration Assumptions" (Sept. 18, 2008) [BCI-EX-(S)-0002460], attached to e-mail from Syal Vivek, Barclays, to Rich Ricci, Barclays, *et al*. (Sept. 18, 2008) [BCI-EX-(S)-00024689]. *But see* Barclays Synopsis of Barclays' "Synergy and Integration Assumptions" (Sept. 18, 2008) [BC1-EX-(S)-00024129], attached to e-mail from Syal Vivek, Barclays, to Rich Ricci, Barclays, *et al*. (Sept. 18, 2008) [BCI-EX(S)-00024128].

The Court was not provided with a revised estimate of Barclays' anticipated cure cost liability before the September 19 sale hearing, or before the September 22 sale hearing.

As of July 2009, Barclays had made approximately $220 to $240 million in cure payments.[7906]    As explained above, in light of the litigation arising from the sale transaction, the Examiner is not reaching a conclusion regarding whether the Court should have been provided with a revised cure cost estimate.

### (b)  Compensation Liabilities

Under the APA, Barclays agreed to offer employment to "each active employee employed primarily in connection with the Business."[7907]    Barclays further agreed that, with respect to each Lehman employee who accepted Barclays' offer of employment, Barclays would:

> . . . pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are

---

[7906] Barclays, Aggregate Cure Payments (July 14, 2009) [BCI-EX-00077272] (listing a total of $238 million in cure payments), attached to letter from Jack G. Stern, Boies Schiller, to Robert W. Gaffey, Jones Day, re: Compensation Amounts for Transferred Employees and Aggregate Cure Payments (July 16, 2009); Gary Romain, Barclays, Lehman Acquisition Accounting Interim 2009 Update [Draft] (July 23, 2009), at p. 2 [BCI-EX-00218490] (estimating Barclays' total cure payments at approximately $226 million as of May 29, 2009), attached to e-mail from Gary Romain, Barclays, to Michael Guarnuccio, Price Waterhouse Coopers, *et al*. (July 23, 2009) [BCI-EX-00218489]; *cf.* transcript of deposition testimony of Gary Romain, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 10, 2009, at pp. 133-34 (explaining the cure accrual was approximately $224 million); transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at p. 141 (explaining the total cure payments were approximately $220 million).

[7907] APA, at p. 34 (§ 9.1(a)).  "Business" was defined as "the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant."  *Id.* at p. 2 (§ 1.1).

equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability"). . . .[7908]

Section 9.1(c) of the APA refers to a "financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser."[7909]  In connection with litigation arising from the sale transaction, Barclays has asserted that "[t]here was in fact no version of any financial schedule that was initialed by an officer of Barclays, as referenced in Section 9.1(c) of the APA."[7910]  Prior to the closing of the sale transaction, however, Lehman's and Barclays' counsel identified the final schedule initialed by Berkenfeld as the document referenced in Section 9.1(c) of the APA.[7911]  That final schedule, which is reproduced in Section III.C.6.c.3.a above, includes a line item stating "Comp 2.0 [billion]."

McDade and Kelly testified that the $2 billion compensation accrual for Lehman employees who would be moving to Barclays was a negotiated number.[7912]  According

---

[7908] APA, at p. 35 (§ 9.1(c)).

[7909] *Id.*

[7910] Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, at p. 37 (¶ 92), Docket No. 6815, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 29, 2010).

[7911] Balance Sheet (Sep. 16, 2008) [STB-LEH 0000682], attached to e-mail from Elizabeth Cooper, Simpson Thacher, to David Leinwand, Cleary Gottlieb, *et al.* (Sept. 19, 2008) [STB-LEH 0000679].

[7912] Transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at pp. 82-83; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 44, 47, 72, 101 (according to McDade, Lehman's compensation accrual by Aug. 1, 2008, was $1 billion, and Barclays used Lehman's compensation data to estimate its compensation liability for the transferred employees and derived $2 billion.).

to McDade and Kelly, that negotiated figure was the result of Barclays adding an additional $1 billion of compensation liability to a $1 billion estimate provided by Lehman, and was reflected in the September 16 summary schedule initialed by Berkenfeld.[7913]  Clackson and Ricci, however, testified that it was Lehman that provided the $2 billion compensation figure.[7914]

In the Sale Motion, the Debtors stated that Barclays would assume an estimated $2.5 billion in compensation liability by offering employment to "approximately ten thousand-plus U.S.-based employees of LBI for a period of 90 days" and providing "such employees severance benefits equal to what would have been received under

---

[7913] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 100, 104-05; e-mail from Martin Kelly, Lehman, to Ian T. Lowitt, Lehman, *et al.* (Sept. 16, 2008) [LBEX-DOCID 132844] ("Well it took all night and lots of back and forth but the deal is done and ready for the Board.  Also, an extra $1b of comp beyond our accrual . . . ."); transcript of deposition testimony of Martin Kelly, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 18, 2009, at p. 56 ("[T]he liability that Barclays would recognize for all forms of compensation would be a billion dollars more than what Lehman had reflected on its books for certain components of compensation."); transcript of deposition testimony of Philip Kruse, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 203-04 (explaining that there "was real confusion in the record . . . as to whether [the compensation number] was derived by Lehman people . . . or whether it was a negotiated amount").  McDade and Lowitt testified that Lehman's $1 billion figure was an estimate of only the cash portion of Lehman's bonus accrual.  Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 286; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at pp. 53-54.   According to McDade and Lowitt, Lehman paid bonuses through a mix of cash and equity.  Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 286; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 54.

[7914] Transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at pp. 75-77 (stating that Lehman presented Barclays with the $2 billion compensation liability number); transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 37, 282 (stating that Lehman presented the $2 billion figure).

LBI's severance policy."[7915]    During the September 17 hearing, the Court noted that Barclays was taking on "as much as $2.5 billion dollars in certain employee related severance expenses which may or may not be triggered."[7916]

On Tuesday, September 16,  Barclays created various estimates of its assumed compensation liability in connection with the sale, which ranged between $1 billion and $1.3 billion based on the percentage of LBI employees assumed to transfer to Barclays.[7917]  That Tuesday, Clackson sent an e-mail to Evans and Ricci, stating: "[t]his is a problem, they have $2bn in the agreement, I was relying on you guys telling me I

---

[7915] Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, at p. 6, Docket No. 60, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008).

[7916] Transcript of hearing, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 17, 2008, at p. 23.

[7917] E-mail from Mark Kurman, Barclays, to Michael Evans, Barclays (Sept. 16, 2008) [BCI-EX-(S)-00029672]; e-mail from Mark Kurman, Barclays, to Michael Evans, Barclays, *et al.* (Sept. 16, 2008) [BCI-EX-(S)-00029682].  On Wednesday, Barclays' estimates for the compensation liability ranged from $1.3 billion to $1.5 billion.  E-mail from Patrick Clackson, Barclays, to Michael Evans, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-00077621] (listing $1.35 billion for the compensation liability); e-mail from Michael Evans, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-00077621] (listing an accrued compensation liability of $1.5 billion); Barclays, Long Island Acquisition Summary [BCI-EX-(S)-00023999] (listing a compensation liability of $1.3 billion), attached to e-mail from Gary Romain, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-(S)-00023997].  On Thursday, a Barclays synopsis of their "synergy and integration assumptions" for the Sale listed its required compensation liability at $1.5 billion, providing a $500 million gain.  Barclays, Synopsis of Synergy and Integration Assumptions (Sept. 18, 2008) [BCI-EX-(S)-00024129], attached to e-mail from Syal Vivek, Barclays, to Rich Ricci, Barclays, *et al.* (Sept. 18, 2008) [BCI-EX-(S)-00024128].  In an e-mail on Friday by Clackson, Barclays estimated its compensation liability at $1.35 billion.  E-mail from Patrick Clackson, Barclays, to Rich Ricci, Barclays (Sept. 19, 2008) [BCI-EX-(S)-00024707].

needed $1.35bn which gave me $650m of the goodwill but the para[graph] below says we have to pay it to them/can't use[.]")[7918]

On Friday, September 19, Clackson in an e-mail to Ricci explained Barclays' "official line" regarding compensation amounts.[7919]   According to Clackson, the difference between Barclays' estimates of its compensation liability and the $2 billion in compensation liability listed in the Sept. 16, 2008 balance sheet was "[s]ome of the comp related to deferred plans so [some compensation] is accounted for over the deferral period."[7920]

At the sale hearing on Friday, September 19, Debtors' counsel explained the changes to the transaction since the September 17 hearing.[7921]   Among other things, Debtors' counsel noted that "Barclays is . . . agreeing to the same employee compensation arrangements."[7922]   The McDade testimony proffered at the hearing represented that "Barclays [would] also assume exposure for the employees that

---

[7918] E-mail from Patrick Clackson, Barclays, to Michael Evans, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-00077621]; *see also* e-mail from Rich Ricci, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX-00077651] (referring to Section 9.1(c) of the APA, and stating, "[n]ever agreed to it.  Archie this is the problem.  We can't have this clause I don't think."); e-mail from Michael Evans, Barclays, to Patrick Clackson, Barclays, *et al.* (Sept. 17, 2008) [BCI-EX000077621].

[7919] E-mail from Patrick Clackson, Barclays, to Rich Ricci, Barclays (Sept. 19, 2008) [BCI-EX-(S)-00024271].

[7920] *Id.  But see* e-mail from Patrick Clackson, Barclays, to Rich Ricci, Barclays (Sept. 18, 2008) [BCI-EX-00077466] (stating "so it looks like we have to pay them $2bn min bonuses").  Also on Friday, Ricci asked Clackson whether they could "increase comp accrual" because another 300 employees were coming to Barclays.  E-mail from Rich Ricci, Barclays, to Patrick Clackson, Barclays (Sept. 19, 2008) [BCI-EX-(S)-00024707].  Clackson responded that if Barclays "get[s] the 2.25 and the 2 and the real bonuses are 1.35[,] I can spare some but otherwise I cant[.]"  E-mail from Patrick Clackson, Barclays, to Rich Ricci, Barclays (Sept. 19, 2008) [BCI-EX-(S)-00024707].

[7921] Transcript of hearing, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 19, 2008, at pp. 45-46.

[7922] *Id.* at p. 47.

accept[ed] offers of employment, which [was] estimated to [be] . . . an exposure of approximately two billion dollars."[7923]

By the time of the closing on September 22, Barclays was estimating that it needed to accrue $1.7 billion for bonus payments.[7924] Clackson testified that the estimate was lower than the $2 billion "Comp" entry in the September 16 schedule of assets and liabilities because the $2 billion figure included all compensation, and that in its bonus accrual Barclays was attempting to estimate only the bonus portion of Barclays' $2 billion in compensation liability.[7925]

The use of the $2 billion "Comp" figure in the September 16 schedule, and whether, following the closing, Barclays satisfied its obligations with respect to employee compensation under the APA, are disputed issues in the litigation arising from the sale transaction. In light of the sale litigation pending before this Court, the Examiner is not reaching a conclusion regarding those issues.

---

[7923] *Id.* at p. 99.

[7924] Barclays, Long Island Acquisition Summary [BCI-EX-00079341] (listing the bonus accrual at $1.7 billion), attached to e-mail from Gary Romain, Barclays, to Rich Ricci, Barclays, *et al.* (Sept. 22, 2008) [BCI-EX-00079340]; *see also* Long Island Acquisition Summary [BCI-EX-(S)-00024690] (listing the bonus accrual at $1.7 billion), attached to e-mail from Gary Romain, Barclays, to Patrick Clackson, Barclays (Sept. 24, 2008) [BCI-EX-(S)-00024689].

[7925] Transcript of deposition testimony of Patrick Clackson, *In re Lehman Bros Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 4, 2009, at pp. 75, 78-79.

### d) Consideration and Approval of Transaction Described in APA by LBHI and LBI Boards of Directors

At a joint telephonic board meeting held beginning at 6:00 a.m. on September 16, 2008, the boards of directors of LBI and LBHI approved the terms of the APA and the sale of assets to Barclays.[7926]

The LBHI board members attending the board meeting included Michael L. Ainslie, John F. Akers, Roger Berlind, Thomas Cruikshank (also an LBI board member), Marsha Johnson Evans, Richard S. Fuld, Jr. (also an LBI board member), Sir Christopher Gent, Jerry A. Grundhofer, Roland A. Hernandez, Dr. Henry Kaufman, and John D. Macomber.    The LBI board members in attendance (in addition to Cruikshank and Fuld) included Howard Clark, Jr. and Frederick Frank.    Lehman personnel who were present included Ian T. Lowitt, Herbert H. McDade, III, Hugh E. McGee, III, Thomas A. Russo, Mark Shafir, and Jeffrey A. Welikson.    Michael E. Lubowitz and Thomas A. Roberts of Weil attended the board meeting, as did three Simpson Thacher lawyers: Alvin H. Brown, John G. Finley, and Andrew R. Keller.    Also in attendance were Andrew J. Levander of Dechert and Barry Ridings of Lazard.[7927]

Roberts and Shafir advised the board members that the proposed transaction would involve:

---

[7926] Lehman Brothers Holdings Inc. and Lehman Brothers Inc., Minutes of Meeting of Boards of Directors (Sept. 16, 2008), at pp. 2-5, 6-7 [LBEX-AM 003940].
[7927] *Id.*

- The sale to Barclays of the Lehman headquarters building at 745 Seventh Avenue in Manhattan for its appraised value–estimated at $1 billion;

- The sale to Barclays of two Lehman data centers in New Jersey for their appraised value–estimated at $450 million;

- The transfer of approximately 10,000 Lehman employees to Barclays;

- The payment by Barclays of $250 million for the goodwill of Lehman;

- The transfer of "most assets" of the U.S. broker dealer – LBI – to Barclays; and

- The assumption by Barclays of liabilities, "including employee liabilities and contract cure amounts, basically equivalent to the assets" being transferred to Barclays.[7928]

Roberts also explained that the transaction required that (1) eight specified Lehman employees would enter into employment agreements with Barclays; and (2) a minimum percentage (around 75 percent) of Lehman's top 200 employees would agree to stay at Barclays post-sale.[7929]

The board members were advised that "this transaction would benefit the creditors" of Lehman, would "save the franchise and many jobs" and that "LBI would not be able to fund itself that day without this deal."[7930]

Ridings explained "that the applicable standards for this sale (under Section 363 of the Bankruptcy Code) are to obtain the highest and best price and a price greater than

---

[7928] *Id.* at pp. 2-4.

[7929] *Id.* at p. 3.

[7930] *Id.* at p. 2.

liquidation value."[7931]    According to Ridings, "it [would] be a close decision for the Bankruptcy Court judge."[7932]

The board members were advised that the APA would be signed that morning, followed by a public announcement of the transaction.[7933]  That afternoon, Weil expected to seek Bankruptcy Court approval of the sale procedures.[7934]  The sale hearing was expected to occur either that Friday or the following Monday.[7935]

At the end of the meeting, the LBHI and LBI boards approved the APA.[7936]

### e)  Transaction Described to the Court on September 17

#### (1)  Sale Motion

On Wednesday, September 17, the Debtor filed a motion (the Sale Motion) requesting that the Court, among other things, schedule a sale hearing for Friday, September 19, establish sale procedures and approve a proposed breakup fee.[7937]

In the Sale Motion, the Debtor described the circumstances that led to the proposed sale, including significant liquidity problems, heavily depressed financial

---

[7931] *Id.* at p. 4.

[7932] *Id. Accord* Examiner's Interview of Barry W. Ridings, Oct. 1, 2009, at p. 4 (explaining that his concern was with the process rather than the sale itself, and whether the Court would approve such a massive sale transaction on less than five days notice).

[7933] Lehman Brothers Holdings Inc. and Lehman Brothers Inc., Minutes of Meeting of Boards of Directors (Sept. 16, 2008), at p. 4 [LBEX-AM 003940].

[7934] *Id.* at pp. 3-4.

[7935] *Id.* at p. 2.

[7936] *Id.* at pp. 6-8.

[7937] Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets, at p. 1, Docket No. 60, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 17, 2008).

asset prices and credit downgrades,[7938] all of which led to Lehman being unable to maintain normal business operations.[7939]   The Debtor stated:   "[A]ttempts to pursue strategic alternatives were thwarted by [Lehman's] financial deterioration and lack of support from other entities."[7940]

LBHI and LB 745 represented in the Sale Motion that Barclays would pay approximately "$1.7 billion in cash for the Purchased Assets plus assume other obligations and expenses."[7941]   The purchased assets would include "designated assets relating to LBI's business, which [were] owned by LBI as well as certain assets which [were] owned by LBHI and related to the business of LBI."[7942]   Barclays would "assume ownership of substantially all operations of LBI, including . . . performance under [the Seller's] obligations as to securities and other transactions."[7943]   In addition, "[a]ll remaining customer accounts [would be] transferred to [Barclays]."[7944]   The purchased assets would include Lehman's headquarters building in Manhattan, two New Jersey data centers, and the "Lehman" name and associated trademarks.[7945]

The Sale Motion stated that Barclays would, in addition to the cash payment of $1.7 billion, assume an estimated $1.5 billion of liabilities under assumed contracts, an

---

[7938] *Id.* at p. 4.
[7939] *Id.*
[7940] *Id.*
[7941] *Id.*
[7942] *Id.* at pp. 4-5.
[7943] *Id.* at p. 5.
[7944] *Id.*
[7945] *Id.* at pp. 5-6.

estimated $2.5 billion in compensation liability relating to LBI's employees, and other liabilities such as transfer taxes and accounts payable in the ordinary course of business.[7946]

LBHI and LB 745 asserted in the Sale Motion that the "proposed sale [would] result in the highest and best recovery for the Debtors."[7947]  The Debtor also stated that, although "the financial community [was] well aware that the Purchased Assets were for sale[,] the only serious offeror" was Barclays.[7948]  LBHI and LB 745 contended that Barclays was a good-faith purchaser because "[t]he terms and conditions of the Purchase Agreement were negotiated by the Debtors and Purchaser at arm's length and in good faith," and "[e]ach party was represented by sophisticated counsel."[7949]

### (2)  September 17 Sale Procedures Hearing

An initial hearing on the Sale Motion took place on the afternoon of September 17.[7950]

Debtors' counsel explained that, during the preceding months, Lehman had focused on strategic alternatives "to protect the public customers, preserve values, and assist in avoiding the deterioration of the financial markets."[7951]  The Debtors noted that

---

[7946] *Id.*

[7947] *Id.* at p. 11.

[7948] *Id.*

[7949] *Id.* at p. 17.

[7950] Transcript of hearing, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 17, 2008, at p. 1.

[7951] *Id.* at p. 18.

the market had known for months that Lehman was for sale (in parts and in its entirety), yet only Barclays had made a bid.[7952]

Debtors' counsel explained that the goal of the Barclays transaction was to "save the value of the franchise, protect the public customers and interest and employees," and provide continued employment for 10,000 to 12,000 Lehman employees for a length of time.[7953]

The Debtors emphasized the importance of quick approval of the proposed transaction.[7954]    Lehman was a "wasting asset," and "if the transaction is not consummated the notional cost in connection with the transaction will be in the trillions."[7955]  Debtors' counsel advised the Court that witnesses would testify that "if this transaction is not approved, Friday night there will be nobody in the building.  And it will just disappear."[7956]

There was a dispute at the hearing over the amount of the proposed breakup fee. The Debtors argued that the proposed breakup fee should be evaluated against a transaction with a fair value of $5.7 billion, consisting of:  (1) the $1.7 billion of cash that

---

[7952] *Id.* at p. 25.
[7953] *Id.* at pp. 19-20.
[7954] *Id.* at pp. 19-21.
[7955] *Id.*
[7956] *Id.* at p. 26.

was paid to Lehman; (2) Barclays' assumption of $2.5 billion in compensation liability; and (3) Barclays' assumption of $1.5 billion in contract cure liability.[7957]

The SEC advised the Court that it strongly supported the proposed transaction,[7958] and emphasized the importance that the deal be completed by week's end.[7959]  The FRBNY urged that it was vital for the transaction "to go forward as quickly as possible in order to preserve financial stability."[7960]

The Creditors Committee objected to the timing and sought a continuance of the Sale Hearing.  Earlier in the hearing, the Court had expressed some concern "as to the adequacy of notice as to the substance of the transaction for purposes of basic constitutional due process . . . ."[7961]  In response, the Debtors reiterated that Lehman was a "quickly wasting asset,"[7962] which would have little value remaining if a normal sale process was followed.[7963]  Debtors' counsel advised the Court that "[t]he consensus among all the business people . . . and the professionals was there would be nothing to sell in two weeks."[7964]

---

[7957] *Id.* at pp. 23-24.

[7958] *Id.* at pp. 65-66.

[7959] *Id.* at p. 67.

[7960] *Id.* at p. 65.  The Commodity Futures Trading Commission supported the positions of the SEC and the FRBNY.  *Id.* at p. 69.  The United States Trustee expressed her support for the position of the Debtors and the regulatory agencies.  *Id.* at p. 67.

[7961] *Id.* at p. 27.

[7962] *Id.* at p. 29.

[7963] *Id.*

[7964] *Id.*

After taking judicial notice of the packed courtroom, the experience and sophistication of counsel and the availability of many of the proposed deal's terms and conditions in the media, the Court concluded that due process was satisfied.[7965]

The Court, recognizing the "critical timing imperative," approved the bid procedures and the breakup fee, subject to adjustments needed to harmonize the bidding procedures with changes announced during the hearing.[7966]    The Court explained that Barclays appeared to be the logical purchaser for the assets and expressed doubt that another bidder would emerge.[7967]

### f)    Between September 17 and 19, the Securities Positions Being Acquired by Barclays Change

#### (1)  The "Replacement Transaction"

As described above in Section III.C.6.b.2, on Sunday, September 14, the FRBNY agreed to provide LBI with financing through the PDCF in order to facilitate an "orderly unwind of [LBI's] trading positions."[7968]    Although the FRBNY advised Lehman that it was willing to fund the broker/dealer for up to two weeks following LBHI's bankruptcy, the FRBNY was concerned about its exposure to LBI as a result of the extension of overnight financing.[7969]

---

[7965] Id. at pp. 31-32.

[7966] Id. at p. 72.

[7967] Id. at p. 73.

[7968] Leventhal Decl. ¶ 6.  At that time, LBI already was receiving financing through two other FRBNY programs, the TSLF and OMO.  A&M's Interview of James W. Hraska, Oct. 8, 2008, at p. 1.

[7969] Examiner's Interview of Shari D. Leventhal, Apr. 30, 2009, at p. 5.

On Tuesday, September 16, the FRBNY contacted Barclays to request that Barclays "step into the shoes" of the FRBNY with respect to overnight financing of LBI.[7970]  The FRBNY advised Barclays that the FRBNY's September 14 agreement to allow LBI to access the PDCF to obtain overnight financing had been based on the assumption that the FRBNY was facilitating an orderly wind-down of the broker-dealer.[7971]  The FRBNY explained that, if Barclays wanted the FRBNY to continue funding LBI during the week of September 15 to facilitate an orderly transition of the broker/dealer assets to Barclays, the FRBNY needed Barclays to "take out" the FRBNY's exposure to LBI prior to the closing of the transaction.[7972]

Tuesday evening, September 16, Barclays and Lehman representatives met at the FRBNY to discuss how Barclays would "step into the shoes" of the FRBNY.[7973]  The FRBNY advised Barclays that it could use the PDCF to finance the LBI securities that

---

[7970] *Id.*; transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 133-34 (testifying that Barclays received a call from Thomas C. Baxter, Jr., General Counsel of the FRBNY); Leventhal Decl. ¶ 7; *see* transcript of deposition testimony of Gerard LaRocca, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at pp. 28-29 (testifying that Jonathan Hughes, Global General Counsel for Barclays Capital, had advised him on Monday, September 15 that the FRBNY had contacted Barclays to advise that the FRBNY wanted to have Barclays help with LBI's financing with the FRBNY's financing of LBI); transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 53, 67-68; transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 33.

[7971] Leventhal Decl. ¶ 6.

[7972] *Id.*

[7973] Transcript of deposition testimony of Gerard LaRocca, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at p. 30; transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 80-88; *see also id.* at p. 53; David Petrie, Barclays, Handwritten Notes of David Petrie (Sept. 16, 2008) [BCI-EX-00115847] (notes of meeting at FRBNY).

Barclays would receive as collateral in the transaction, because the FRBNY anticipated that it would take Barclays time to find third party financing sources.[7974]   Barclays advised the FRBNY that Barclays believed it could finance the collateral through the triparty repo market within two weeks.[7975]

Barclays and the FRBNY, and their respective counsel, worked Tuesday evening and the following morning to document an agreement under which Barclays would "step into the shoes" of the FRBNY (the "Replacement Transaction").[7976]   On Wednesday, September 17, Barclays and the FRBNY signed a letter agreement governing their respective obligations under the Replacement Transaction.[7977]   The letter agreement provided, among other things, that:

> By not later than the opening of business on Monday, September 22, 2008 (or, if the Court extends the date of the Sale Hearing beyond

---

[7974] Transcript of deposition testimony of Gerard LaRocca, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at pp. 31-32; transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 88-89; e-mail from Lucinda M. Brickler, FRBNY, to Bill Dudley, FRBNY, *et al.* (Sept. 17, 2008) [FRBNY to Exam. 003415].

[7975] Transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp 84-86.

[7976] *E.g.*, e-mail from Hydee R. Feldstein, Sullivan & Cromwell, to Jay W. Clayton III, Sullivan & Cromwell, *et al.* (Sept. 17, 2008) [BCI-SC00009285] (referencing conference call at 9:30 a.m. on September 17 regarding letter agreement, and forwarding e-mail attaching draft of letter agreement); letter agreement [Draft] [BCI-EX-0078810], attached to e-mail from David Aman, Cleary Gottlieb, to Hydee R. Feldstein, Sullivan & Cromwell, *et al.* (Sept. 17, 2008) [BCI-EX-00078818]; e-mail from Hydee R. Feldstein, Sullivan & Cromwell, to James Bergin, FRBNY, *et al.* (Sept. 17, 2008) [BCI-EX-00078990] (indicating that Barclays was in process of executing letter agreement as of 1:49 p.m.); *see also* transcript of deposition testimony of Gerard LaRocca, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at p. 32.  After the meeting with the FRBNY, Barclays also met with the DTCC to discuss the transfer of assets under the Replacement Transaction that would require use of the DTCC wire.  *See* Transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 84-87.

[7977] *See* letter agreement among Barclays and the FRBNY (Sept. 17, 2008) [FRBNY to Exam 000043]; Leventhal Decl. ¶ 7.

September 19, 2008, the earlier of September 29, 2008 (or such later date as
may be designated by the FRBNY in its sole discretion) and the business
day following the date on which an order (which has not been stayed)
approving a Successful Bidder has been entered (the "Take-Out Date"),
Barclays agrees (i) to purchase from the FRBNY, without recourse, the
entirety of the FRBNY's position under all of the Agreements [under
which the FRBNY had been providing financing to LBI] . . . and
(ii) simultaneously cause the release or termination of the FRBNY's
obligations under all Agreements. Upon receiving such purchase price
and release or termination, the FRBNY shall deliver all LBI Collateral to
Barclays. Alternatively, at Barclays' option, each of the Agreements
outstanding immediately prior to the filing of any petition under Title 11
of the United States Code with respect to LBI shall be novated to
substitute Barclays (or one of its affiliates) in place of the FRBNY
thereunder.[7978]

The letter agreement thus provided that, in return for taking over FRBNY's

financing position with respect to LBI, Barclays would receive the LBI securities that

had been pledged to the FRBNY.[7979]  Those pledged LBI securities, however, included

---

[7978] Letter agreement between Barclays and the FRBNY (Sept. 17, 2008) [FRBNY to Exam 000043] at p. 2.
The letter agreement also provided that, "[a]t the hearing before the Court on the [Sale] Motion, the
FRBNY shall support the Motion."

[7979] *See id.*; *see also* Declaration of Gerard LaRocca in Support of the Trustee's Motion for Entry of an Order
Approving a Settlement Agreement, ¶ 9, *In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Dec. 5,
2008) (the "LaRocca Decl."), attached to Motion Under 11 U.S.C. §§ 105 and 363 Fed. R. Bankr. P. 9019(a)
for Entry of an Order Approving Settlement Agreement, Docket No. 387, *In re Lehman Bros. Inc.*, No. 08-
01420 (Bankr. S.D.N.Y. Dec. 5, 2008); e-mail from John N. Palchynsky, Lehman, to James W. Hraska,
Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 459816]; e-mail from Lucinda M. Brickler, FRBNY, to Bill
Dudley, FRBNY, *et al.* (Sept. 17, 2008) [FRBNY to Exam. 017511]; e-mail from Ian T. Lowitt, Lehman, to
Paolo R. Tonucci, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 70146]; e-mail from John N. Palchynsky,
Lehman, to Sindy Aprigliano, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 77086]; e-mail from Michael
Keegan, Barclays, to Archibald Cox, Jr., Barclays (Sept. 19, 2008) [BCI-EX-00077814]; transcript of
deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y.,
Aug. 26, 2009, at pp. 39-41, 67-68, 93, 132; transcript of deposition testimony of John Rodefeld, *In re
Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at p. 24.

residential mortgage-backed securities ("RMBS") that Barclays was not purchasing under the APA.[7980]

Wednesday evening, September 17, Barclays, Lehman, JPMorgan, BNYM and FRBNY representatives met to prepare for implementation of the Replacement Transaction on Thursday, September 18.[7981]   Shortly after midnight on Thursday, September 18, Lehman sent an e-mail to Barclays, BNYM and JPMorgan that "outlined . . . the key tasks necessary to move the collateral currently being used to support the three Fed programs (TSLF, OMO, and PDCF) from Lehman to Barclays on Thursday, 9/18."[7982]  The Lehman e-mail stated that "[t]he end of day collateral files for each of the above mentioned programs are being provided on Wednesday night, 9/17, to both Barclays and BNYM . . . [t]he collateral files will be cross referenced versus the list of excluded cusips that was provided by Barclays to remove positions not intended

---

[7980] *See* APA, at p. 6 (§ 1.1) (definition (e) of "Purchased Assets") (defining "Purchased Assets" to include "50% of each position in the residential mortgage securities"); Excluded Mortgage Assets 09-17-2008.xls [BCI-EX-00000735], attached to e-mail from David Aronow, Lehman, to Richard Policke, Lehman, *et al.* (Sept. 17, 2008) [BCI-EX-0000732] (e-mail body addressed to Lehman, BNYM and Barclays stating that "[a]ttached are the cusips associated with the book that we were told on the call will be excluded from the movements tomorrow.  These cusip[s] should not be part of the pledge to [BNYM] according to our earlier conversation").

[7981] *See* e-mail from Lucinda M. Brickler, FRBNY, to Bill Dudley, FRBNY, *et al.* (Sept. 17, 2008) [FRBNY to Exam. 003416]; e-mail from David Aronow, Lehman, to John Haley, Barclays, *et al.* (Sept. 18, 2008) [BCI-EX-(S)-00037617] (referring to meeting); transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 62-63 (discussions of the mechanics of the Replacement Transaction started on Sept. 17 and continued into the early morning on Sept. 18).

[7982] E-mail from David Aronow, Lehman, to John Haley, Barclays, *et al.* (Sept. 18, 2008) [BCI-EX-(S)-00037617].

to be transferred."[7983]  The Lehman e-mail did not address whether the parties intended to substitute any collateral that had been pledged to the FRBNY, but which appeared on Barclays' list of excluded collateral.[7984]

To effect the Replacement Transaction, on Thursday morning, September 18, JPMorgan advanced cash to the FRBNY, and the FRBNY's financing of LBI under the three FRBNY programs was unwound.[7985]  JPMorgan advanced $46.22 billion to the FRBNY, and the LBI collateral was delivered by the FRBNY to LBI's clearance box at JPMorgan.[7986]

The parties then began to implement the second stage of the Replacement Transaction, a repo transaction between LBI and Barclays under which Barclays would send $45 billion in cash to JPMorgan for the benefit of LBI, and Lehman would pledge securities to Barclays.[7987]  Barclays planned to wire the $45 billion cash to JPMorgan in $5 billion components,[7988] and Barclays (actually, Barclays' triparty custodian bank, BNYM) would receive collateral to secure each $5 billion cash transfer.[7989]

---

[7983] E-mail from Richard Policke, Lehman, to David Aronow, Lehman, *et al.* (Sept. 18, 2008) [BCI-EX-00007640] (forwarding, shortly after midnight on Sept. 18, lists identifying the LBI securities that had been pledged to the FRBNY).

[7984] *Id.*

[7985] *See* e-mail from Christopher R. Burke, FRBNY, to Lucinda M. Brickler, FRBNY, *et al.* (Sept. 18, 2008) [FRBNY to Exam. 017484]; Leventhal Decl. ¶ 10.

[7986] Leventhal Decl. ¶¶ 9-10.

[7987] *See* e-mail from Lucinda M. Brickler, FRBNY, to Bill Dudley, FRBNY, *et al.* (Sept. 17, 2008) [FRBNY to Exam. 017569]; e-mail from Ian T. Lowitt, Lehman, to Paolo R. Tonucci, Lehman, *et al.* (Sept. 17, 2008) [LBEX-DOCID 70146].

[7988] *See* e-mail from Lucinda M. Brickler, FRBNY, to Christopher R. Burke, FRBNY, *et al.* (Sept. 18, 2008) [FRBNY to Exam. 017483]; e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.*

Shortly after noon on Thursday, Barclays wired the initial $5 billion of cash to

JPMorgan for the benefit of LBI.[7990]   LBI then released collateral to be transferred to

Barclays,[7991] but only approximately $1.5 billion of that collateral initially made it to

BNYM for the benefit of Barclays.[7992]   Barclays advised Lehman that Barclays was

unwilling to send additional cash until it received sufficient collateral to secure the $5

billion already wired to JPMorgan.[7993]  A dispute arose between Barclays and JPMorgan

over whether JPMorgan would deliver repo collateral with a marked value equivalent

to the cash Barclays had advanced, or would send that collateral plus additional

---

(Sept. 26, 2008) [BCI-EX-00082581]; transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 77-78; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at p. 28.

[7989] *See* e-mail from Neal Ullman, Lehman, to David Aronow, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 091226]; e-mail from James W. Hraska, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 459816]; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at pp. 27-28.

[7990] *See* Fedwire Transfer Receipt (Sept. 18, 2008) [FRBNY to Exam. 021198]; *see also* e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581]; transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at p. 100; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at p. 28.

[7991] *See* e-mail from Neal Ullman, Lehman, to Alastair Blackwell, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 077879] (stating, at 12:22 p.m., that "Releases for 5b are loaded").

[7992] *See* e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581]; e-mail from Lucinda M. Brickler, FRBNY, to Bill Dudley, FRBNY, *et al.* (Sept. 18, 2008) [FRBNY to Exam. 017510]; transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 99-100; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at pp. 28-29.

[7993] *See* e-mail from David Aronow, Lehman, to Peter Hadington, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 091226]; e-mail from James W. Hraska, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 459816]; transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at p. 80.

collateral sufficient to provide Barclays a margin.[7994]   Ricci testified that a senior executive from JPMorgan then contacted Diamond, and asked Barclays to send the $40 billion in cash all at once to expedite the process.[7995]   According to Ricci, the JPMorgan executive provided Diamond with assurances that, if Barclays sent the $40 billion in cash, JPMorgan would follow up promptly in delivering the remaining collateral.[7996] Early Thursday evening, Barclays wired the remaining $40 billion in cash.[7997]

Barclays did not receive $49.6 billion in securities that evening.   Although both the FRBNY and DTCC kept their securities transfer facilities open long after their usual closing times,[7998] by 11:00 p.m. on Thursday evening, September 18, Barclays had received collateral with a marked value of only approximately $42 billion.[7999]

---

[7994] Examiner's Interview of Stephanie A. Heller, July 8, 2009.

[7995] Transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 135-36.

[7996] *Id.; see* e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581] (asserting that "senior executives at [Barclays] ask for and receive an oral commitment from [JPMorgan] that $49.6 billion of collateral would be delivered" to Barclays).

[7997] *See* e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581]; Fedwire Transfer Receipts (Sept. 18, 2008) [FRBNY to Exam. 021198]; *see also* Leventhal Decl. ¶ 11 (stating that "[b]y early evening, the entire sum of $45 billion in cash had been transferred by Barclays to LBI"); e-mail from John Haley, Barclays, to Jai Westwood, Barclays (Sept. 18, 2008) [BCI-EX-(S)-00088051]; transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 103-04; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at pp. 29-30, 80-81.

[7998] *See* e-mail from Lawrence P. Servidio, Lehman, to James W. Hraska, Lehman, *et al.* (Sept. 18, 2008) [LBEX-DOCID 110339]; transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 103-05; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at pp. 29-30; transcript of deposition testimony of Nancy Denig, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at pp. 54-55.

[7999] E-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581]; e-mail from Jonathan Hughes, Barclays, to Stephanie A. Heller, FRBNY (Oct. 1, 2008) [FRBNY to

There appear to be a number of reasons why Barclays did not receive all of the collateral that LBI had pledged to the FRBNY.  First, some of the securities LBI had pledged to the FRBNY had been obtained by Lehman through the GCF Repo dealer-to-dealer triparty repo program.  As a result of daily settlement activity, a significant portion of the securities that LBI had pledged to the FRBNY was transferred out of LBI's clearance boxes at JPMorgan.[8000]

Second, some of the RMBS that were Excluded Assets under the APA (and that Barclays also had requested be excluded from the Replacement Transaction), were included in the securities that the FRBNY had been financing the night before, and were delivered to Barclays on Thursday.[8001]  By 7:40 p.m. on Thursday evening, BNYM had identified and returned to Lehman $371 million of RMBS that Barclays had identified

Exam. 015344]; e-mail from Paolo R. Tonucci, Lehman, to Gerard M. Reilly, Lehman, *et al.* (Sept. 20, 2008) [LBEX-DOCID 69255]; e-mail from Daniel J. Fleming, Lehman, to David Aronow, Lehman (Sept. 21, 2008) [LBEX-DOCID 77821]; e-mail from John Haley, Barclays, to Teri Scott, Barclays (Sept. 19, 2008) [BCI-EX-(S)-00088070] (stating that collateral was still moving to Barclays); e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581]; Leventhal Decl. ¶ 14 (noting that although the DTC and FRBNY "remained open for several hours past their normal closing times . . . operational issues interfered with the ability to transfer all of the intended securities to Barclays"); transcript of deposition testimony of David Petrie, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at p. 105; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at pp. 29-30; transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 40-41, 46; transcript of deposition testimony of Nancy Denig, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at p. 54; transcript of deposition testimony of Alastair Blackwell, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at p. 59.

[8000] Transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 71-73; e-mail from Alastair Blackwell, Lehman, to Ian T. Lowitt, Lehman (Sept. 18, 2008) [LBEX-DOCID 77882].

[8001] Transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 32-33, 107.

for exclusion, $366 million of which had been pledged to the FRBNY Wednesday night and returned to LBI's clearance box at JPMorgan on Thursday morning.[8002] By 9:15 p.m. that evening, BNYM identified an additional $289.4 million in RMBS that Barclays had identified for exclusion, and which had been included in the securities it received; although some were sent back, Barclays retained $289 million of those RMBS.[8003]  $75 million of that collateral had been pledged to the FRBNY Wednesday night.[8004]

Third, a large volume of pending securities orders were in queue, including orders from customers who had directed that LBI move their accounts to other firms. [8005] When the LBI securities that had been pledged to the FRBNY were delivered to LBI's clearance boxes at JPMorgan, or attempted to be delivered to Barclays through DTCC clearing entities, some of those securities were automatically used to satisfy pending orders or netted against offsetting positions.[8006]

The end result was that, when the securities transfer and clearing facilities shut down on late Thursday evening, Barclays had delivered $45 billion in cash for LBI's benefit, but had received securities with a marked value of only $42 billion.  Barclays requested that Lehman deliver $7 billion to Barclays until the remaining securities could

---

[8002] See e-mail from John Haley, Barclays, to Gerard LaRocca, Barclays, et al. (Sept. 29, 2008) [BCI-EX-(S)-00034913].

[8003] See e-mail from John Haley, Barclays, to Gerard LaRocca, Barclays, et al. (Sept. 29, 2008) [BCI-EX-00080299].

[8004] See e-mail from John Haley, Barclays, to Gerard LaRocca, Barclays, et al. (Sept. 29, 2008) [BCI-EX-(S)-00034913].

[8005] See transcript of deposition testimony of James W. Hraska, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 75-76.

[8006] Id.

be delivered.[8007]   Shortly after midnight on Friday, September 19, JPMorgan credited an

account with $7 billion for the benefit of Barclays, and recorded an LBI "box loan" for

that amount.[8008]

### (2) $15.8 Billion Repo

In addition to the overnight financing LBI received from the FRBNY, from

Monday, September 15, through Wednesday, September 17, Barclays also provided

overnight funding to Lehman via a triparty repo, with JPMorgan acting as the triparty

agent.[8009]   Michael Keegan of Barclays testified that Barclays extended the triparty repo

financing to LBI at the request of JPMorgan.[8010]   According to Keegan, on Monday,

September 15, JPMorgan asked Barclays to provide overnight financing for a portion of

---

[8007] See id. at pp. 59-60; transcript of deposition testimony of Gerard LaRocca, In re Lehman Bros. Holdings Inc., No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at pp. 42-43; transcript of deposition testimony of Rich Ricci, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 136-37.

[8008] See e-mail from James W. Hraska, Lehman, to Alastair Blackwell, Lehman (Sept. 18, 2008) [LBEX-DOCID 077930]; e-mail from John Haley, Barclays, to Teri Scott, Barclays, et al. (Sept. 19, 2008) [BCI-EX-(S)-00038010]; e-mail from Robert Azerad, Lehman, to Martin Kelly, Lehman, et al. (Sept. 20, 2008) [LBEX-DOCID 069255]; transcript of deposition testimony of James W. Hraska, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 52-53; Leventhal Decl. ¶¶ 15-16; LaRocca Decl. ¶ 8.  On Friday, September 19, Barclays sent a notice of termination of the repo agreement relating to the Replacement Transaction.  Letter from Michael Montgomery, Barclays, to Robert H. Bing, Lehman, et al., re: Notice of Termination (Sept. 19, 2008) [BCI-EX-00109164].  The legal effect of this notice is in dispute in the Barclays sale litigation.

[8009] See e-mail from Teri Scott, Barclays, to Jonathan Stone, Barclays, et al. (Sept. 18, 2008) [BCI-EX-(S)-00038010]; transcript of deposition testimony of David Petrie, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 26, 2009, at pp. 53-55; transcript of deposition testimony of Nancy Denig, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at pp. 135-36; transcript of deposition testimony of James W. Hraska, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 96-97; transcript of deposition testimony of Michael Keegan, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 44-45.

[8010] Transcript of deposition testimony of Michael Keegan, In re Lehman Bros. Holdings Inc., Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2008, at pp. 44-45.

the securities that Barclays would be purchasing from Lehman, and Barclays agreed to do so.[8011]

Thursday morning, September 18, the Barclays repo with Lehman from Wednesday night – under which Barclays had advanced $15.8 billion – unwound. JPMorgan wired $15.8 billion in cash to BNYM Barclays, and Barclays returned the securities that had been pledged under the repo to LBI's clearance box at JPMorgan.[8012]

When the $15.8 billion repo unwound on Thursday morning, JPMorgan understood that Barclays would renew the repo Thursday evening. On Thursday morning, in an e-mail to JPMorgan regarding the unwinding of the $15.8 billion repo, Jim Beckenhaupt of Barclays stated: "[Can] we get these funds returned ASAP and we'll let you know what the new amount is going to be for today."[8013] JPMorgan e-mailed Barclays wire instructions to renew the triparty repo with Lehman Thursday evening.[8014] Lehman also was assuming that Barclays would renew the $15.8 billion repo that evening, and was considering increases to the amount of the repo.[8015]

---

[8011] *Id.*

[8012] *See* e-mail from Marco Brandimarte, JPMorgan, to Keith Kochie, Barclays, *et al.* (Sept. 18, 2008) [JPM-EXAMINER00000669] (e-mail exchange reflecting (1) Barclays' request for the $15.8 billion triparty repo to be unwound, with Barclays' funds wired to Barclays account at BNYM and (2) JPMorgan's acknowledgment that Barclays' funds had been released).

[8013] *See* e-mail from Jim Beckenhaupt, Barclays, to Keith Kochie, Barclays, *et al.* (Sept. 18, 2008) [JPM-EXAMINER00000669].

[8014] *See* e-mail from Marco Brandimarte, JPMorgan, to Keith Kochie, Barclays, *et al.* (Sept. 18, 2008) [JPM-EXAMINER00000669].

[8015] *See* e-mail from Ian T. Lowitt, Lehman, to Alastair Blackwell, Lehman (Sept. 18, 2008) [LBEX-DOCID 077881]; *see also* transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.,*

Late Thursday afternoon, however, Barclays made the decision not to renew the $15.8 billion repo. At 4:00 p.m., Teri Scott of Barclays circulated an e-mail within Barclays regarding the $15.8 billion repo that stated: "[W]ho is making the decision on whether we would extend financing? Is there a move to ensuring that what we are financing is collateral that we have agreed, as a part of the asset purchase, to buy?"[8016] Keegan testified that, on Thursday afternoon at around 4:00 p.m., Rich Ricci asked him to come over to Lehman to review the securities positions that Barclays was receiving in connection with the Replacement Transaction.[8017] According to Keegan, after he arrived, Jerry del Missier asked him to review the securities associated with the $15.8 billion repo, and recommend whether Barclays should renew the repo.[8018] Keegan testified that he "got the list of collateral that was in repo and there was a $5 billion security. I have no idea what it was but I know we didn't purchase any $5 billion notional amount of security. So I advised Jerry this is not what we agreed on Monday night. It was not what we purchased . . . [a]nd . . . my recommendation would be not to roll a repo with JPMorgan."[8019]

---

[8016] E-mail from Teri Scott, Barclays, to Kevin Walker, Barclays, *et al.* (Sept. 18, 2008) [BCI-EX-(S)-00037993].

Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 98-99 (stating that "Lehman believed at the time that [the repo] was also rolling").

[8017] Transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2008, at pp. 21-22.

[8018] *Id.* at p. 45.

[8019] *Id.* Barclays had received the list of securities associated with the $15.8 billion repo shortly after midnight on Thursday, September 18. *See* e-mail from Richard Policke, Lehman, to David Aronow, Lehman, *et al.* (Sept. 18, 2008) [BCI-EX-00007640].

At 5:38 p.m., LaRocca sent an e-mail to Ricci that stated (in the subject line): "JPM will BE ANNOYED with several billion of collateral tonight that we will not finance."[8020] At 5:48 p.m., LaRocca sent an e-mail to Diamond and Ricci that said (in the subject line): "Urgent WE NEED TO TALK, JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED THAT WILL SAVE BARCLAYS SIZE."[8021]

Thursday night, Barclays did not wire the funds to renew the $15.8 billion repo.[8022] Late Thursday evening and into Friday morning, JPMorgan booked a hold-in-custody (HIC) repo transaction for Lehman.[8023] Friday morning, JPMorgan changed the beneficiary of the HIC transaction to itself, essentially providing Lehman with a box loan to cover the overdraft.[8024]

---

[8020] E-mail from Gerard LaRocca, Barclays, to Rich Ricci, Barclays (Sept. 18, 2008) [BCI-EX-00077444].

[8021] E-mail from Gerard LaRocca, Barclays, to Robert E. Diamond, Barclays, *et al.* (Sept. 18, 2008) [BCI-EX-00077441].

[8022] Transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 97-99; transcript of deposition testimony of Nancy Denig, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at pp. 135-36; transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009 at pp. 45-47.

[8023] Transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 98-100. *See* e-mail from Angelo Gabriele, Lehman, to John Feraca, Lehman (Sept. 19, 2008) [LBEX-DOCID 53093] (explaining that a $15.8 billion HIC trade was conducted Thursday night); transcript of deposition testimony of Daniel J. Fleming, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 177-79 (explaining that JPMorgan booked a HIC repo to cover the overdraft); transcript of deposition testimony of Alastair Blackwell, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at p. 260.

[8024] Transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 98-102; e-mail from John N. Palchynsky, Lehman, to Neal Ullman, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 3331072]; transcript of deposition testimony of Nancy Denig, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at pp. 143-44; transcript of deposition testimony of Daniel J. Fleming, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 178-79.

Rather than financing approximately $58 billion of LBI securities ($42 billion in securities under the Replacement Transaction plus a $15.8 billion repo), by not renewing the repo Barclays limited its LBI securities financing exposure to approximately $42 billion in LBI's securities. This was significant because, with a SIPA proceeding looming for LBI, the parties that financed LBI collateral on Thursday evening would very likely end up owning the financed securities after LBI commenced a SIPA proceeding.

On Friday morning, September 19, JPMorgan froze LBI's clearing accounts and prevented LBI from accessing JPMorgan's dealer securities trading systems because of the overdrafts in LBI's accounts.[8025] Until the situation was resolved, LBI was unable to access its clearing accounts at JPMorgan, or to settle outstanding trades and collateral movements.[8026] JPMorgan's actions also eliminated LBI's visibility into the JPMorgan

---

[8025] E-mail from Edward J. Corral, JPMorgan, to Murray Pozmanter, DTCC (Sept. 19, 2008) [JPM-EXAMINER00000493] (explaining that JPMorgan shut Lehman out of JPMorgan's system because of a $15.8 billion overdraft by Lehman); e-mail from Daniel J. Fleming, Lehman, to Alastair Blackwell, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 077808] ("Chase will not do anything until we resolve the 15.8bn problem from last night"); transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at p. 52; e-mail from John N. Palchynsky, Lehman, to Neal Ullman, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 3331072]; transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at pp. 54-55, 63.

[8026] E-mail from Daniel J. Fleming, Lehman, to Alastair Blackwell, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 077808] (explaining that JPMorgan's action prevented Lehman from funding the DTC settlements); e-mail from John N. Palchynsky, Lehman, to Neal Ullman, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 3331072] (describing the impact of JPMorgan's decision to freeze LBI); transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at p. 52.

BDAS system used by LBI,[8027] and prevented LBI from reconciling its trades and bank accounts.

Between Friday, September 19 and Monday, September 22, Barclays believed that the $7 billion in cash that JPMorgan had advanced to provide Barclays additional collateral under the Replacement Transaction was in a Barclays account at JPMorgan.[8028] At some point, however, JPMorgan, without advising Barclays, removed the $7 billion from the account, and transferred it to LBI's clearance account at JPMorgan, where it was applied against JPMorgan's outstanding box loan to LBI.[8029]

### (3) September 19 Agreement to Transfer Additional Assets

On Friday morning, September 19, Rich Ricci instructed Michael Klein to investigate whether additional unencumbered Lehman assets existed, and to demand

---

[8027] JPMorgan's counsel represented to the Examiner that the only way to limit LBI's ability to transfer securities was to eliminate LBI's access to the BDAS system. While "read-only" access was feasible, JPMorgan's counsel represented that it would have taken an estimated two days to establish. E-mail from Amy Wolfe, Wachtell, to Vincent E. Lazar, Examiner's Counsel, *et. al.* (Jan. 28, 2010).

[8028] *See* Leventhal Decl. ¶¶ 19-21 (stating that Barclays first learned that it did not have the $7 billion cash on or about September 23); e-mail from Jonathan Hughes, Barclays, to Stephanie A. Heller, FRBNY (Oct. 1, 2008) [FRBNY to Exam. 015346]; e-mail from Gerard LaRocca, Barclays, to Stephanie A. Heller, FRBNY, *et al.* (Sept. 26, 2008) [BCI-EX-0082581]; transcript of deposition testimony of Gerard LaRocca, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 19, 2009, at p. 79; transcript of deposition testimony of John Rodefeld, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 27, 2009, at pp. 73-74 (testifying that Barclays received statements on Friday, September 19 and Monday, September 22 indicating that the $7 billion remained in a Barclays account at JPMorgan).

[8029] Examiner's Interview of Shari Leventhal, Apr. 30, 2009, at p. 6; Leventhal Decl. ¶ 16 (stating that the $7 billion in cash was transferred to an LBI account at JPMorgan); LaRocca Decl. ¶¶ 11-12; e-mail from James W. Hraska, Lehman, to John N. Palchynsky, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 77721]; e-mail from Jonathan Hughes, Barclays, to Stephanie A. Heller, FRBNY (Oct. 1, 2008) [FRBNY to Exam. 015346].

those assets for Barclays in order to provide what Ricci described as a sufficient "cushion [for Barclays] given the uncertainties in the market."[8030]

That morning, Klein, Cox, Ricci and Keegan met with McDade, Kirk, Lowitt and Tonucci.[8031]    The Barclays team expressed discomfort with the assets Barclays had received in connection with the $45 billion Replacement Transaction, asserted that they were concerned that Barclays might be undercollateralized, and demanded additional assets.[8032]    McDade concluded that Lehman needed to provide more value in order to close the deal, and directed Kirk, Lowitt and Tonucci to lead an effort to identify more assets for Barclays.[8033]

---

[8030] Transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at p. 155.

[8031] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 165-67; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 102.

[8032] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 162-65; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 60; transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at p. 165; transcript of deposition testimony of Paolo R. Tonucci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at p. 55.

[8033] Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 165-66, 169-70; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 60; transcript of deposition testimony of Paolo R. Tonucci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 50-51, 55 (explaining that his instructions came from Ian T. Lowitt); transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Jan. 15, 2010, at pp. 67-69 (explaining that Tonucci requested via Alastair Blackwell that Hraska and others find additional assets that could be delivered to Barclays); *see* e-mail from Ian T. Lowitt, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [LBEX-DOCID 138017] (reporting the results of his search for additional assets to McDade).

Several Lehman witnesses stated that a specified amount of additional assets were needed.[8034]  Barclays witnesses, however, testified that Barclays did not seek particular additional assets or specify the amount of additional assets.[8035]  According to Ricci, he "felt [he] needed as much as [he] could get to protect the firm" and "wasn't sure what Lehman had left."[8036]

At a second meeting on the afternoon of September 19 among Ricci, Keegan, McDade and Kirk, Barclays explained that, without additional assets from Lehman, the transaction could not take place.[8037]  Lehman then identified two additional assets:

[8034] Transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at p. 103 (explaining that the amount of additional assets needed was between $2 and $5 billion); transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 188-89 (explaining that Barclays was looking for a particular amount of additional assets although he could not recall the specific amount); transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at pp. 62-63 (explaining that McDade gave him a target of $3 to $4 billion in addition value); transcript of deposition testimony of Nancy Denig, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at pp. 64-65 (explaining that Hraska said the goal was $1.9 billion in unencumbered collateral); transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Jan. 15, 2010, at pp. 68-69 (explaining that Tonucci was responsible for the instruction to find at least $1.9 billion of clearance box assets); transcript of deposition testimony of Alastair Blackwell, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Aug. 7, 2009, at p. 144.

[8035] Transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 156-57; transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 97-98; transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 35-36.

[8036] Transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 156-57.

[8037] Transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at p. 95; transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at p. 100 (explaining Barclays' view that, without additional assets the transaction could not take place).  In Ricci's deposition, he could not recall if he said the transaction would not go through without additional assets, although he "certainly [had] those thoughts."  Transcript of deposition testimony of Rich Ricci, *In re Lehman Bros.*

(1) excess amounts in 15c3-3 customer reserve accounts, estimated to have a value of approximately $750 million, and (2) certain unencumbered securities (sometimes referred to as the "bag of hammers") estimated to have a value of $1.9 billion.[8038]

### (a)    Excess 15c3-3 Assets

As explained above, after Barclays met with Lehman on Friday morning, September 19, McDade directed Kirk, Lowitt and Tonucci to lead an effort to identify more assets that might be available for transfer to Barclays.[8039]   As part of that process, Lowitt and his team worked to quantify the amount of assets in LBI's 15c3-3 accounts (over and above the amounts required to be held for the benefit of customers) that

---

*Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at p. 157.  McDade understood that "in order to transact the deal, we had to find more in the way of ideas that would provide value . . . .  both of which I've just mentioned to you, [unencumbered assets in the clearance boxes and the 15c3]."  Transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 165.

[8038] Transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at pp. 105-13; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 60; transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 107-09; transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at pp. 164-65; transcript of deposition testimony of Paolo R. Tonucci, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 54-57; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at p. 175.

[8039] *See* e-mail from Ian T. Lowitt, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [LBEX-DOCID 138017] (reporting the results of his search for additional assets to McDade); transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.,* No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 165-66, 169-70; transcript of deposition testimony of Ian T. Lowitt, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 20, 2009, at p. 60; transcript of deposition testimony of Paolo R. Tonucci, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 50-51, 55 (explaining that his instructions came from Ian T. Lowitt); transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Jan. 15, 2010, at pp. 67-69 (explaining that Tonucci requested via Alastair Blackwell that Hraska and others find additional assets that could be delivered to Barclays).

might be available to transfer to Barclays.[8040]  LBI had difficulty, however, determining the precise amount of excess assets in its 15c3-3 accounts.  LBI's estimates of the excess assets varied with the changing market conditions, customer withdrawals and the identification of numerous "breaks" in customer clearing transactions.[8041]

The first e-mails reflecting LBI's efforts to determine the amount and transferability of excess 15c3-3 assets were sent shortly after the September 19 meeting discussing additional assets to be transferred to Barclays.  At approximately 10:15 am on September 19, Anna Yu of Lehman e-mailed Tonucci and Kelly, among others, to report that "[t]he 15c3-1 seg cash remaining is currently $1 bn.  Tony is waiting on the answer back from the SEC regarding the transferability of seg cash funds from Lehman to Barclays."[8042]  Later that day, at 2:27 p.m., Lowitt reported to McDade that over $1.3 billion in 15c3-3 assets were available.[8043]

That afternoon and evening, the parties appeared before the Court for the hearing on the Sale Motion.  At the hearing, Debtors' counsel told the Court that, since

---

[8040] SEC Rule 15c3-3, known in the industry as the Customer Segregation Rule or the Customer Protection Rule, requires broker-dealers to maintain a reserve account for the exclusive benefit of customers (also known as an "EBOC Account") that is used to hold assets for the benefit of customers.  As the amount of customer assets fluctuates, so does the amount the broker must hold in that reserve account.  *See* 17 C.F.R. § 240.15c3-3(e); *see also* Affidavit of Daniel McIsaac, at p. 5 (¶ 14), Docket No. 1867, *In re Lehman Bros. Holdings Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Oct. 5, 2009).

[8041] *See* transcript of deposition testimony of Daniel J. Fleming, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, S.D.N.Y., Aug. 28, 2009, at pp. 189-90.

[8042] E-mail from Ann Yu, Lehman, to Kristie Y. Wong, Lehman, *et al.* (Sept. 19, 2008) [LBEX-DOCID 4572388].

[8043] E-mail from Ian T. Lowitt, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [LBEX-DOCID 138017].

the initial presentation of the APA to the Court on Wednesday, "there ha[d] been some major changes in the transaction."[8044]    Debtors' counsel told the Court that the agreement had been finalized only about 30 minutes before the hearing began, and a letter agreement was being drafted to memorialize the new agreement.[8045]  There was no mention at the hearing that Barclays was to receive any excess cash or securities held in LBI's 15c3-3 accounts.

During the weekend, Lehman employees continued to attempt to identify excess 15c3-3 assets that might be available for transfer.    An estimate from Saturday, September 20, placed the excess 15c3-3 assets at between $700 and $800 million.[8046]  By that evening, Lehman had reverted to its earlier estimate that $1 billion in excess 15c3-3 assets were available for transfer to Barclays.[8047]

On Sunday evening, Azerad sent Kelly, Tonucci and Christopher M. O'Meara a PowerPoint presentation describing LBI's available, excess 15c3-3 assets for transfer to Barclays, as follows:

> We last calculated the 15c3 lockup on Wednesday, September 17.   The amounts segregated on that date were $1.769 billion for the customers and $492 million for the PAIB.   During this weekend, we recalculated the lockup as of Friday, September 19.   The amounts to be segregated as of

---

[8044] *Id.*

[8045] Transcript of hearing, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 19, 2008, at p. 43.

[8046] Transcript of deposition testimony of Robert Azerad, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Aug. 17, 2009, at pp. 101-04.

[8047] *See* e-mail from Brett Beldner, Lehman, to Martin Kelly, Lehman, *et al.* (Sept. 21, 2008) [LBEX-DOCID 456031].

Friday were $1.011 billion for the customers and $97 million for the PAIB –
i.e., a reduction of $1.123 billion, which can be immediately transferred to
Barclays.[8048]

On Sunday, Barclays estimated it would receive $1 billion of excess 15c3-3 assets.[8049]

As explained in Section III.C.6.h.2 of this Report, the transfer of excess 15c3-3

assets to Barclays was the subject of negotiations with the Creditors Committee on

Sunday, September 21.   The Clarification Letter executed on the morning of the sale

closing provided that Barclays was to receive, "to the extent permitted by applicable

law," $769 million in excess 15c3-3 securities, or "securities of substantially the same

nature and value,"[8050] while LBI retained an estimated $1 billion in excess 15c3-3 cash as

a compromise.[8051] The $1 billion in estimated excess 15c3-3 cash and $769 million in

excess securities specified in the Clarification Letter matched Lehman's Friday estimate

of the amount in its reserve lock-up as of Wednesday the 17th.[8052]

The eventual transfer of excess 15c3-3 securities required SEC approval.[8053]   On

September 20, Tonucci e-mailed Michael A. Macchiaroli of the SEC regarding the need

for quick SEC approval for the transfer of 15c3-3 securities:

---

[8048] Lehman Brothers: The 15c3 Lockup (Sept. 21, 2008), at p. 1 [LBEX-DOCID 57002], attached to e-mail from Robert Azerad, Lehman, to Martin Kelly, Lehman, *et al.* (Sept. 21, 2008) [LBEX-DOCID 69281].

[8049] *See* Long Island - Acquisition Summary [Draft] [BCI-EX-(S)-00052479], attached to e-mail from Samantha J. King, Barclays, to Iain Mackinnon, Barclays (Sept. 21, 2008) [BCI-EX-(S)-00052478].

[8050] Clarification Letter, at p. 4 (¶ 8).

[8051] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 6; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 307-09.

[8052] E-mail from Joel Potenciano, Lehman, to Joseph Abate, Lehman (Sept. 19, 2008) [BCI-CG00033812].

[8053] E-mail from Paolo R. Tonucci, Lehman, to Daniel J. Fleming, Lehman, *et al.* (Sept. 20, 2008) [LBHI_SEC07940_562928]; e-mail from William Burke, Lehman, to Anthony Stucchio, Lehman, *et al.*

We may need your quick response to a rerun of the 15c3 calc as of Friday. We expect that there will be a further reduction in the requirement because of the transfer of clients and continued reduction in client exposures.

Consequently we hope to release some cash which would become part of the sale. This has been documented in the bankruptcy filing.

. . . It would be great if you could review, or have your team review, quickly when the calc is completed.[8054]

The SEC ultimately gave its approval for the transfer of the 15c3-3 securities.[8055]

The propriety of the transfer of excess 15c3-3 securities to Barclays is the subject of pending litigation involving the Debtors, the SIPA Trustee, the Creditors Committee and Barclays. Because this issue is the subject of active, pending litigation before this Court with respect to which discovery is not complete, the Examiner has limited this section of the Report to setting out a short record of the facts he has developed on this issue.

### (b)  Additional Securities

In addition to the excess 15c3-3 assets, on Friday Lehman also identified a mix of additional securities that could be transferred to Barclays. Barclays asserted that it believed that the true value of the additional assets, and in particular the unencumbered

---

(Sept. 23, 2008) [LBEX-DOCID 056115]; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, S.D.N.Y., Sept. 2, 2009, at pp. 282-83.

[8054] E-mail from Paolo R. Tonucci, Lehman, to Michael A. Macchiaroli, SEC (Sept. 20, 2008) [LBEX-DOCID 457721].

[8055] E-mail from Paolo R. Tonucci, Lehman, to Daniel J. Fleming, Lehman, *et. al* (Sept. 20, 2008) [LBHI_SEC07940_562928]; *see* transcript of deposition testimony of Daniel J. Fleming, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, S.D.N.Y., Aug. 28, 2009, at pp. 167-68.

assets, was questionable.[8056]    Ricci expressed his discomfort with the amount

available.[8057]    Kirk explained that there was nothing left to give Barclays,[8058] and Ricci

responded that he "did not want to be a pig."[8059]    With the additional assets, Ricci

acknowledged that Barclays was willing to proceed with the transaction.[8060]

That weekend, Lehman continued to identify unencumbered securities that

could be transferred to Barclays, and updated its valuations of the unencumbered

securities that could be delivered to Barclays.[8061]    On Saturday, September 20, estimates

of the value of the additional securities ranged from $1.6 billion[8062] to $2.18 billion.[8063]

---

[8056] Transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at pp. 106-10 (explaining that Michael Keegan considered the additional assets even harder to value than the assets in the Replacement Transaction); transcript of deposition testimony of Michael Keegan, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 28, 2009, at pp. 87-89.

[8057] Transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at p. 158.

[8058] *Id.*

[8059] *Id.*; e-mail from Alex Kirk, Lehman, to Herbert H. McDade, III, Lehman (Sept. 19, 2008) [Deposition Exhibit 326] ("Rich Richie just told me he won't blow up this trade by being a pig").

[8060] Transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 110-11; transcript of deposition testimony of Rich Ricci, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 8, 2009, at p. 158; transcript of deposition testimony of Alex Kirk, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at pp. 111-12; transcript of deposition testimony of Herbert H. McDade, III, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 2, 2009, at pp. 177-78.

[8061] Transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 107-09; transcript of deposition testimony of James W. Hraska, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 14, 2009, at pp. 212-13, 221-22, 227-28; *see* e-mail from Ian T. Lowitt, Lehman, to Monty Forrest, Lehman, *et al.* (Sept. 20, 2008) [LBEX-DOCID 77857] (reflecting Lehman's attempts to find additional securities to transfer to Barclays).

[8062] *See* e-mail from Monty Forrest, Lehman, to Alastair Blackwell, Lehman, *et al.* (Sept. 20, 2008) [LBEX-DOCID 463886].

[8063] E-mail from Monty Forrest, Lehman, to Alastair Blackwell, Lehman, *et al.* (Sept. 20, 2008) [LBEX-DOCID 463886]; transcript of deposition testimony of Nancy Denig, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 21, 2009, at pp. 190-91.

### (c)  OCC Margin

The OCC[8064] requires that each of its clearing members post collateral (margin)

sufficient to secure its obligations to the OCC.[8065]  The minimum required OCC margin

consists of an amount equal to (1) the mark-to-market value of the member's positions,

plus (2) a risk component to cover roughly two days of market movement.[8066]  The OCC

also requires that clearing members post a clearing deposit based on the size of their

positions.

LBI was one of the top ten to fifteen clearing members at the OCC, typically

maintaining $2 - 3 billion dollars in net positions and associated margin.[8067]  LBI usually

provided margin somewhat in excess of what the OCC required.[8068]  LBI also maintained

a clearing deposit at the OCC.[8069]

From September 15 through September 19, 2008, LBI's options positions at the

OCC were in the aggregate "short," and the market generally declined during the week

following LBHI's bankruptcy, so LBI's positions at the OCC moved in LBI's favor

---

[8064] The OCC is the clearing organization for most domestic exchange-traded commodities options, as well as futures on financial assets such as stocks and currencies.  It clears options for a number of exchanges.  Examiner's Interview of John Fennell and Jean Cawley, Dec. 18, 2009, at p. 2.

[8065] *Id.* at pp. 2-3.

[8066] In general, increased market volatility means that clearing members must post more margin (collateral). *Id.* at p. 2.

[8067] *Id.*

[8068] *Id.*

[8069] Declaration of Craig L. Jones, at p. 3 (¶ 7), *In re Lehman Bros. Holdings Inc.*, No. 08-13555, (Bankr. S.D.N.Y. Jan. 8, 2010) (the "Jones Decl."), attached as Ex. 354 to Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, Docket No. 6815, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 29, 2010).

during this period.[8070]   As a result, the collateral LBI had posted at the OCC prior to

LBHI's bankruptcy was sufficient to meet the OCC's typical margin requirements, and

the OCC did not make any special margin calls upon LBI.[8071]  However, the OCC did not

permit LBI to access any "excess" margin that was being created as a result of market

movements.   Instead, that week the OCC insisted that all excess margin remain on

deposit at the OCC.[8072]

Beginning on Friday, September 19, in connection with its review of whether

additional assets might be available for transfer to Barclays, LBI reviewed its exchange-

traded positions.   That day, Lehman estimated the amount of excess OCC margin at

$401 million.[8073] On Sunday, Fleming emailed Tonucci with a higher amount:   "The

statement from the OCC reflects a large excess position in house and customer.  House

has excess of $444mm and customer $244.  I do not know how accessible this is."[8074]

It is not clear whether the magnitude of the excess OCC margin was clearly

communicated to Barclays prior to the closing.   As of Monday, internal Barclays'

e-mails were complaining about the lack of information about LBI's positions at the

---

[8070] Examiner's Interview of John Fennell and Jean Cawley, Dec. 18, 2009, at pp. 2-3.

[8071] *Id*.

[8072] *Id*.

[8073] Declaration of Sharon Blake, Ex. 1, *In re Lehman Bros. Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 8, 2008), attached as Ex. 350 to Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, Docket No. 6815, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 29, 2010).

[8074] E-mail from Daniel J. Fleming, Lehman, to Paolo R. Tonucci, Lehman (Sept. 21, 2008) [Deposition Exhibit 161A].

OCC: "It is clear lb has absolutely no idea what its occ risk position is. We know it is between 2bn short and 4bn long. They do not know what has been booked to what entity. We cannot see. We are now 4 days into making zero progress on this with them."[8075]

The OCC did not actively participate in negotiations between Barclays and Lehman.[8076]  However, the OCC made clear that it would not continue clearing LBI's accounts post-sale unless Barclays assumed LBI's obligations to the OCC: "OCC's willingness to transfer the LBI accounts to Barclays is conditioned upon obtaining Barclays' signature on the 'Transfer and Assumption Agreement' among OCC, the [SIPA] Trustee and Barclays."[8077]  The OCC proposed to implement the transfer by simply renaming "the LBI accounts as accounts of Barclays and it would then be Barclays obligation to make settlement in respect of those accounts on Monday [September 22, 2008] morning."[8078]

On Monday, September 22, the OCC, the SIPA Trustee and Barclays executed the Transfer and Assumption Agreement referenced in the OCC's e-mail.[8079]  The agreement provided that LBI transferred to Barclays "(ii) all margin deposits held by OCC with

---

[8075] E-mail from Stephen King, Barclays, to Elizabeth James, Barclays, *et al.* (Sept. 22, 2008) [BCI-EX-(S)-00110544].

[8076] Examiner's Interview of John Fennell and Jean Cawley, Dec. 18, 2009, at p. 7.

[8077] E-mail from James R. McDaniel, Sidley Austin, to Edward J. Rosen, Cleary Gottlieb (Sept. 21, 2008) [BCI-CG00064703].

[8078] E-mail from James R. McDaniel, Sidley Austin, to Ronit J. Berkovich, Weil (Sept. 20, 2008) [BCI-CG00023904].

[8079] Transfer and Assumption Agreement among LBI, THE OCC and Barclays (Sept. 19, 2008), at p. 1 (§ 1(a)).

respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts. . . ."[8080]   In exchange, Barclays assumed and agreed to perform "each obligation arising out of or to be performed with respect to the activity in the Account."[8081]   In the agreement, the SIPA Trustee authorized JPMorgan to transfer "all rights in securities, cash, and other property ("Collateral") pledged by LBI to [the OCC] and held for OCC's benefit at" JPMorgan.[8082]

As of the close of business on Friday, September 19, the OCC's aggregate margin requirements across all LBI accounts (customer and house) was $1,693,367,422.[8083]   The OCC estimates that LBI's posted collateral, including the clearing fund deposit, had a value of $2,301,351,807,[8084] consisting of $1,081,685,547 in cash (including $80,797,001 in proceeds from letters of credit that had been drawn upon by the OCC earlier that week); securities with an estimated market value of $967,466,259[8085] and undrawn letters of credit in the aggregate face amount of $252 million.   Thus, the OCC calculates that LBI's collateral at the OCC (including drawn and undrawn letters of credit) exceeded

---

[8080] *Id.*

[8081] *Id.* at p. 2 (§ 1(b)).

[8082] *See* letter agreement among Barclays, LBI and JPMorgan (Sept. 19, 2008) [BCI-CG00063905].

[8083] Letter from William J. Nissen, Sidley Austin, to Vincent E. Lazar, Examiner's Counsel, re: The Options Clearing Corporation (Jan. 13, 2010); Jones Decl. Ex. 1.

[8084] E-mail from William J. Nissen, Sidley Austin, to Vincent E. Lazar, Examiner's Counsel (Feb. 1, 2010).

[8085] OCC, Collateral Inventory by CMO: Government Securities (GS & GE) (Sept. 19, 2008) [LBEX-OCC 000001].

the OCC's margin requirements by $607,984,385 ($355,784,385 excluding undrawn letters of credit).[8086]  Barclays values the collateral somewhat differently.[8087]

The propriety of the transfer of OCC margin (including excess margin) to Barclays and its subsequent actions, including Barclays' subsequent liquidation of options positions attributable to LBI and its affiliates,[8088] is the subject of pending litigation involving the Debtors, the SIPA Trustee, the Creditors Committee and Barclays.  Because this issue is the subject of active, pending litigation before this Court with respect to which discovery is not complete, the Examiner has limited this section of the Report to setting out a short record of the facts he has developed on this issue.

### g)  The Court's Consideration and Approval of the Proposed Transaction

#### (1)  September 19, 2008 Sale Hearing

On September 19 at approximately 4:30 p.m., the sale hearing commenced.[8089]  At the beginning of the hearing, Debtors' counsel requested a recess to explain to those in attendance how the deal had changed since the APA was filed with the Court.  The

---

[8086] E-mail from William J. Nissen, Austin, to Vincent E. Lazar, Examiner's Counsel (Feb. 1, 2010).

[8087] Jones Decl. Ex. 1.

[8088] The margin deposits transferred to the OCC included margin associated with LBI positions attributable to at least one LBHI Affiliate, LOTC.  The options positions associated with LOTC's accounts at LBI were subsequently liquidated by Barclays.  Declaration of Daniel Dziemian, at pp. 2-5 (¶¶ 7-10), *In re Lehman Bros. Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 8, 2008), attached as Ex. 352 to Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, Docket No. 6815, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 29, 2010).

[8089] Transcript of hearing, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 19, 2008, at p. 1.

Court granted the request, and Debtors' counsel spent approximately an hour describing the changes to those in the courtroom.[8090]

When the hearing recommenced, Debtors' counsel advised the Court that the precipitous drop in the markets in the preceding days had reduced the value of the securities that would be conveyed in the transaction;[8091] and because of the LBIE insolvency proceeding in the United Kingdom, LBI was unable to deliver to Barclays the intended assets pursuant to the APA.[8092]

With respect to the securities to be transferred, Debtors' counsel stated:

[Lehman was] selling assets that had a value of seventy -- approximately seventy billion dollars. And today, Your Honor, [Lehman is] only selling assets that have a value of 47.4 billion dollars.

Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets. So that has not changed from the original transaction.[8093]

Debtors' counsel also informed the Court that: "Barclays basically stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral that Lehman had posted therewith."[8094]

---

[8090] *Id.* at p. 45.

[8091] *Id.* at p. 46.

[8092] *Id.* at pp. 63-65.

[8093] *Id.* at p. 47.

[8094] *Id.* at p. 63.

Debtors' counsel informed the Court that the changes in the proposed transaction did not fundamentally alter the basic agreement set forth in the APA,[8095] pointing to the cash consideration, the $250 million payment and the sale of the building at 745 Seventh Avenue and the two New Jersey data centers as evidence of the general continuity of the deal.[8096]   Counsel noted, however, that the cash consideration would change somewhat due to new appraisals of the real estate assets.[8097]

Following a brief description by Debtors' counsel of the RMBS that were included in the assets to be transferred to Barclays, the DTCC described how the treatment of the $6 billion in RMBS in the proposed transaction had changed.[8098]   As explained by the DTCC, under the original proposal LBI and Barclays were to split the RMBS 50/50[8099] under the revised proposal, Barclays would take all of the RMBS and pledge them to the DTCC to secure clearing.[8100]   DTCC's counsel indicated that Barclays already had posted the RMBS as collateral to the DTCC that morning, and that DTCC was using the RMBS to protect itself as it settled trades to effect the transfer of LBI accounts to Barclays.[8101]   According to the DTCC, trading would have stopped had

---

[8095] *Id.* at p. 64.

[8096] *Id.*

[8097] *Id.* at pp. 64-65.

[8098] *Id.* at pp. 49-51.

[8099] *Id.* at pp. 51-52.

[8100] *Id.* at pp. 51-53.

[8101] *Id.* at pp. 51-52.   During the Examiner's interview of Isaac Montal from DTCC, DTCC's counsel Sheldon Hirshon indicated that he recalled making the statement but did not recall the source of this information, and in hindsight believes that he may have been incorrect and simply speculating that the RMBS already had been moved to DTCC.  Examiner's Interview of Isaac Montal, May 19, 2009 at p. 2.

collateral not been posted.[8102]  The DTCC further explained that the First Amendment to

the APA provided that after LBI's accounts at the DTCC were settled, fifty percent of

the remaining RMBS would be returned to LBI.[8103]

The Creditors Committee's counsel explained that the Creditors Committee

neither supported nor objected to the proposed transaction.[8104]  The Creditors

Committee indicated that it had insufficient time to conduct a proper due diligence

review of the proposed transaction, but did not see a viable alternative.[8105]

The Court concluded:  "I have to approve the transaction because it's the only

available transaction."[8106]  The Court explained that if it did not approve the transaction

"[t]he harm to the debtor, its estates, the customers, creditors, generally, the national

economy and the global economy could prove to be incalculable."[8107]  The Court noted

that its approval of the transaction would save 9,000 jobs for at least ninety days.[8108]

---

[8102] *Id.* at p. 52.

[8103] *Id.* at pp. 52-53; First Amendment to the Asset Purchase Agreement among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc. (Sept. 19, 2008), at p. 1.  These provisions in the First Amendment to the APA were deleted by the Clarification Letter.  Clarification Letter, at p. 3 (¶ 4(d)).

[8104] Transcript of hearing, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 19, 2008, at p. 67.

[8105] *Id.*

[8106] *Id.* at p. 248.

[8107] *Id.* at p. 250.

[8108] *Id.*

### (2)  The Sale Order

On September 20, 2008, the Court entered the Sale Order authorizing the sale of the Purchased Assets to Barclays.[8109]  The Sale Order for the most part conformed to the proposed form of order LBHI had attached to its Sale Motion.

In the Sale Order, the Court found:

- LBHI and its debtor subsidiaries would suffer irreparable harm without the sale;[8110]

- "Good and sufficient reasons" were given to satisfy the Court that the sale was in the best interests of the debtors;[8111]

- The debtors demonstrated both (1) good business judgment, and (2) compelling reasons to authorize the sale outside the ordinary course of business under Bankruptcy Code section 363(b) (namely, that it was necessary to maximize the value of the Purchased Assets);[8112]

- The Purchase Agreement was negotiated at arms length and in good faith; Barclays was not an "insider" of the debtors, and no party engaged in conduct that could cause the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  "Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders;"[8113]

---

[8109] At the time of the sale hearing, the final version of the Clarification Letter had not been drafted, and it was not presented to the Court.

[8110] Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Lines and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases at p. 3, Docket No. 258, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y., Sept. 20, 2008) ("Sale Order").

[8111] *Id.* at p. 5.

[8112] *Id.* at p. 6.

[8113] *Id.* at pp. 5-6.

- Barclays "is a good faith Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore, entitled to all of the protections afforded thereby;"[8114]

- The Purchase Agreement was the highest and best offer for the Purchased Assets, and LBHI's determination of that is "a valid and sound exercise of the Debtors' business judgment;"[8115] and

- The Purchase Agreement must be consummated "promptly in order to preserve the viability of the businesses subject to the sale as going concerns, to maximize the value of the estates. Time is of the essence in consummating the Sale."[8116]

Based on these findings, the Court ruled:

- "The Debtors are hereby authorized and directed to (1) execute the Purchase Agreement,[8117] along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement."[8118]

- "The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse

---

[8114] *Id.*

[8115] *Id.* at p. 6.

[8116] *Id.* at p. 11.

[8117] The Sale Order defines the Purchase Agreement as the: "Asset Purchase Agreement, dated Sept. 16, 2008, among the Debtors, Lehman Brothers Inc. . . . and Barclays . . . , collectively with that First Amendment Clarifying Asset Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008 (as may be subsequently modified or amended or clarified . . . ." *Id.* at p. 1.

[8118] *Id.* at p. 12.

effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.[8119]

### h) Transaction Closing

#### (1) JPMorgan/Barclays Disputes

Over the closing weekend, significant disputes arose between JPMorgan and Barclays. According to several parties, those disputes consumed much of the weekend and threatened to derail the transaction.[8120]

JPMorgan objected to Barclays' decision on Thursday, September 18, not to renew its $15.8 billion triparty repo with Lehman. JPMorgan's position was that Barclays had agreed to buy all of LBI's securities, including the securities associated with the $15.8 billion repo.[8121] On Saturday, September 20, JPMorgan threatened to lock down all of LBI's accounts at JPMorgan and apply the cash and securities in LBI's

---

[8119] *Id.* at p. 21. On September 20, 2009, Bay Harbour, an LBIE creditor, appealed the Sale Order and a related order entered in LBI's SIPA proceedings. Bay Harbour argued that there was insufficient evidence for the Bankruptcy Court to find that Barclays was a good faith purchaser, that the Bankruptcy Court's decision violated the Due Process Clause because Bay Harbour was not afforded a sufficient opportunity to be heard, and that the Bankruptcy Court erred in finding that Barclays took LBI's assets free and clear of any interests third parties had in those assets.

The District Court affirmed the Sale Order, holding that there was sufficient evidence to find that Barclays was a good faith purchaser, that under Section 363(m) of the Bankruptcy Code any challenge to the sale, other than to Barclays' status as a good faith purchaser, was moot, and that because Bay Harbour did not seek and receive a stay pending its appeal, Section 363(m) precluded it from challenging anything other than whether Barclays was a good faith purchaser. *See generally In re Lehman Bros. Holdings Inc.*, 415 B.R. 77, 84 (S.D.N.Y. 2009).

[8120] Examiner's Interview of Harvey R. Miller, Lori Fife and Thomas Roberts, Feb. 3, 2009; Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 5.

[8121] *See* letter from Jamie Dimon, JPMorgan, to John Varley, Barclays, re: Settlement Discussion (Oct. 11, 2008) [BCI-CG-00059720].

accounts against LBI's obligations to JPMorgan.[8122]   Barclays was not yet aware that JPMorgan had applied the $7 billion JPMorgan had advanced for Barclays' benefit in connection with the Replacement Transaction against LBI's box loan.

On Sunday, September 21, negotiations between Barclays and JPMorgan reached a breaking point.[8123]   To resolve the dispute, the FRBNY hosted a conference call beginning around 3 p.m., which included, among others, the FRBNY, Lehman, the Creditors Committee, DTCC, the SEC, JPMorgan and Barclays, as well as numerous counsel and financial advisors.[8124]   The conference call continued on-and-off through most of the night.

During the call, Heidi Miller of JPMorgan spoke of a "problem" involving $7.4 billion.[8125]   Stephanie Heller of the FRBNY told the Examiner that the FRBNY and Barclays' representatives participating in the call understood that Miller was referring to the $7 billion that JPMorgan had deposited into an account for the benefit of Barclays on Friday, September 19, in connection with the Replacement Transaction.[8126] According to Heller, she later concluded that there was a misunderstanding:  Miller was

---

[8122] *See* e-mail from Philip Mindlin, Wachtell, to James W. Giddens, SIPA Trustee, *et al.* (Sept. 20, 2008) [BCI-CG00025435].

[8123] Examiner's Interview of Stephanie A. Heller, July 8, 2009; *see* e-mail from Archibald Cox, Jr., Barclays, to Rich Ricci, Barclays, *et al.* (Sept. 21, 2008) [BCI-EX-00081149] (stating that there was a major issue with JPMorgan).

[8124] Examiner's Interview of Stephanie A. Heller, July 8, 2009; e-mail from Alastair Blackwell, Lehman, to Jennifer Becker, Lehman (Sept. 21, 2008) [LBEX-SIPA 005309] ("I am in a room with fed/dtc/sec/jp morgan and barcap.  Sucks soooooo bad.  This deal is coming down to clearing."); Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 14.

[8125] Examiner's Interview of Stephanie A. Heller, July 8, 2009.

[8126] *Id.*

referring to a $7.4 brokered loan between JPMorgan and Lehman that JPMorgan wanted Barclays to assume, rather than the $7.0 billion relating to the Replacement Transaction.[8127]

During the early morning hours of Monday, Barclays and JPMorgan reached an apparent resolution of their disputes, which was memorialized in a Services and Settlement Agreement dated as of September 22, 2008.[8128]  The Services and Settlement Agreement provided that JPMorgan would continue to clear and settle transactions for LBI in order to facilitate the SIPA Trustee's liquidation of the broker/dealer.[8129]  The Services and Settlement Agreement also provided that Barclays would have no interest in cash, securities or other property in LBI's clearance and other accounts at JPMorgan.[8130]  Earlier drafts of the Services and Settlement Agreement had provided that Barclays would pay JPMorgan $7.4 billion for LBI securities that JPMorgan asserted were worth $8.55 billion.[8131]  The final version of the Services and Settlement Agreement

---

[8127] *Id.*; *see also* e-mail from Stephanie A. Heller, FRBNY, to Gerard LaRocca, Barclays, *et al.* (Sept. 25, 2008) [BCI-EX-00077452] (explaining her belief that there was a misunderstanding between Barclays and JPMorgan).

[8128] *See* Services and Settlement Agreement among JPMorgan Chase Bank, N.A., Barclays Capital, Inc., James W. Giddens as Trustee for the Liquidation of Lehman Brothers Inc., the Securities Investor Protection Corporation, and Lehman Brothers Holdings Inc. (Sept. 22, 2008) (the "Services and Settlement Agreement").

[8129] *Id.* § 1.

[8130] *Id.* § 2.

[8131] *Compare* Services and Settlement Agreement [Draft] (Sept. 22, 2008) [BCI-CG00027059] *with* Services and Settlement Agreement [Draft] (Sept. 22, 2008) [BCI-CG00027292] and Services and Settlement Agreement [executed]; *see also* e-mail from Nathaniel Hartley, Barclays, to Stephen King, Barclays, *et al.* (Sept. 22, 2008) [BCI-EX-(S)-00039229] (providing description of the $8.55 billion of securities that Barclays would purchase, which included RACERS).

did not include a purchase of securities by Barclays, apparently because Barclays had determined that part of the $8.55 billion was the RACERS security position with a marked value of $5 billion, which Barclays did not believe was worth $5 billion, and did not want.[8132]

Early in the morning on September 22, Don Donahue, CEO of the DTCC, received a call from either the SEC or the FRBNY.[8133]  Donahue was informed that JPMorgan and Barclays had resolved their dispute, and JPMorgan would continue to settle LBI's trades.  However, the $6 billion in RMBS were no longer available for the DTCC to use as collateral for its clearing activities.[8134]  Donahue was told that the DTCC would only receive $250 million in cash to secure clearing.  DTCC nonetheless decided to clear LBI's trades through Wednesday, September 24, which gave the parties enough time to consummate the sale transaction.[8135]

## (2)  The Committee's Role

What the Creditors Committee was told about the sale transaction and the changes to the transaction between the APA and the sale closing, and whether the Creditors Committee consented to the transaction that closed on Monday, September 22, are disputed issues in the ongoing litigation relating to the sale transaction.  As

---

[8132] Transcript of deposition testimony of Harvey R. Miller, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Jan. 7, 2010, at p. 27.

[8133] Examiner's Interview of Isaac Montal, May 19, 2009, at p. 7.

[8134] *Id.*

[8135] *Id.*

explained above, the Examiner is not reaching any conclusions regarding those factual

disputes, but sets forth below facts pertinent to the Creditors Committee's role in the

sale transaction.

On Thursday, September 18, Seery, Shapiro, Miller and Richard P. Krasnow (a

partner at Weil) met with Burian, Bradley Geer, Eric Siegert and Michael Fazio of

Houlihan, and Michael C. Eisenband and other representatives of FTI, another financial

advisory firm retained by the Creditors Committee.[8136]

Seery testified that, during the meeting, the participants discussed "the deal, . . .

[t]he risk in the market, . . . [t]he transfer of assets."[8137]  According to Seery, "it was a

diligence meeting on their part where they asked a lot of questions."[8138]

Burian described the September 18 meeting to the Examiner as a "big picture"

meeting.[8139]  Burian stated that he came to the meeting with a prepared list of questions

regarding the transaction.[8140]  According to Burian, Krasnow walked the group through

the transaction.[8141]  Burian advised the Examiner that very little explanation was

provided regarding the securities positions to be transferred, apart from a "balance

---

[8136] Transcript of deposition testimony of James P. Seery, Jr.,  *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 119-20; Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 2; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 15, 198.

[8137] Transcript of deposition testimony of James P. Seery, Jr.,  *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at p. 120.

[8138] *Id.*

[8139] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 2.

[8140] *Id.*

[8141] *Id.*

sheet" document that was distributed that included totals of $70 billion on one side and

$68 billion on the other, and included contract cure and employee cost estimates.[8142]

Burian testified that although the Houlihan team asked specific questions during

the meetings, it did not receive sufficient details.[8143]   In addition, Burian advised the

Examiner that, during the September 18 meeting, there was no discussion of

modification of the transaction to convey securities to Barclays through a repo

transaction (*i.e.*, the Replacement Transaction).[8144]

On Friday, September 19, prior to the sale hearing, Seery participated in a call

with Creditors Committee advisors from Houlihan and Milbank.[8145]   Seery testified that

during the call, he discussed with the Creditors Committee advisors several aspects of

the sale transaction, including: (1) the structure of the Replacement Transaction and

using the transaction as a mechanism to transfer assets to Barclays;[8146] (2) that the repo

with Barclays would be terminated at the closing, leaving Barclays with the securities

---

[8142] *Id.;* transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case. No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 198-04.  Seery testified that "[t]here was definitely discussion of assets," but did not recall specifics.  Transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 121-22.

[8143] Transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 203-04; Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 3.

[8144] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 3.  Seery testified that he did not recall whether the Replacement Transaction was discussed during the September 18 meeting.  Transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at p. 122.

[8145] Transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at p. 126.

[8146] *Id.* at pp. 126, 128-29.  Seery testified that, as of the conference call on September 19, the Committee already was aware that Barclays had "stepped into the shoes" of the FRBNY through a repo, although he did not know how they knew.  *Id.* at p. 127.

that had been pledged as collateral;[8147] (3) the haircut on the repo collateral (the difference between what Barclays advanced in cash and the market value of the securities pledged under the repo);[8148] and (4) that Barclays was concerned about the value of the securities that had been received under the repo, and that Lehman was attempting to identify additional assets to transfer to Barclays.[8149]

Burian's notes from the September 19 call appear to refer to a "Collateralized Repo of Barclays Fed Loan," and to "$50.65 billion Assets" and "Total extension $45.5 B."[8150] Those notes, however, were crossed out.[8151] Burian testified that he was told either on that call or in a follow up call on September 19, that the information contained in that portion of his notes was incorrect.[8152] Burian's notes from another subsequent call refer to "45.5 Long" and "Loan @ $45.5."[8153]

Shortly after midnight on September 20, the Court entered the Sale Order.[8154] The Sale Order provided, in part:

---

[8147] *Id.* at pp. 130-31.

[8148] *Id.* at p. 131.

[8149] *Id.* at pp. 114, 126-27, 132.

[8150] Transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 226-40; Saul Burian, Houlihan, handwritten notes of Saul Burian (Sept. 19, 2008), at p. 3 [Deposition Exhibit 472B].

[8151] Transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 226, 240.

[8152] *Id.* at pp. 237, 239-42; Saul Burian, Houlihan, handwritten notes of Saul Burian (Sept. 19, 2008), at p. 4 [Deposition Exhibit 472B].

[8153] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 4; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 239-42.

[8154] Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other

The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.[8155]

There were a limited number of meetings among the Creditors Committee, Lehman and Barclays on Saturday, September 20, and there does not appear to be any significant disagreement about any of the communications that occurred that day.

Seery testified that, on Sunday, September 21, he "spent a lot of time" with the Creditors Committee advisors and Weil.[8156]  According to Seery, they discussed the marked value of the assets that were being transferred to Barclays in connection with the Replacement Transaction, and how that marked value compared to the amount of cash that Barclays advanced.[8157]  Seery testified that the difference between the marked value they discussed on the call and the $45 billion Barclays paid in connection with the Replacement Transaction was a "significant amount of money."[8158]

Burian advised the Examiner that on Sunday, he was told that there was not enough value in the securities that had been transferred to Barclays in connection with the Replacement Transaction, and that additional "B-list" assets therefore were being

---

Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Docket No. 258, *In re Lehman Bros. Holdings Inc.,* No. 08-13555 (Bankr. S.D.N.Y. Sept. 20, 2008).

[8155] *Id.* at p. 21 (¶ 25).

[8156] Transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at pp. 147-49.

[8157] *Id.*

[8158] *Id.* at pp. 149-50.

identified to "fill up" Barclays.[8159]   Burian also advised the Examiner that on Sunday

evening, he demanded from Miller a complete description of the transaction.[8160]   Miller

called in Klein, and Klein provided Burian with an explanation of the deal, in part by

writing on a manila folder.[8161]   Roberts and Fazio also participated in that discussion.[8162]

Burian advised the Examiner that Klein stated that what he sketched on the

folder "was the deal," and that "none of the details mattered."[8163]   According to Burian,

Klein said that the securities and cash transferred to Barclays in connection with the

Replacement Transaction were marked as of Friday at $49.9 billion, but that the marked

value as of Sunday was between $44 billion and $45 billion, and that the $45 billion

mark was "charitable."   Burian also advised the Examiner that Klein stated that

additional assets totaling $1.9 billion, which were not originally contemplated to be

transferred, were now included in the transaction, and that the additional $1.9 billion in

assets brought the total assets being transferred to about $47 billion.[8164]   According to

Burian, Klein said that Barclays would "forgive" Lehman's $45 billion in "repo debt"

---

[8159] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 6.

[8160] *Id.* at p. 7.

[8161] *Id.;* Michael Klein, consultant retained by Barclays, Manila Folder [Deposition Exhibit 3388]; *see also* transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 138, 244; transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 161-63.

[8162] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 7; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 138-39, 254-55.

[8163] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 7.

[8164] *Id.* at pp. 7-8; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at p. 255.

and assume $4.25 billion in additional liabilities, bringing the total liabilities to $49.75 billion.[8165] Burian further advised the Examiner that Klein stated that this deal was $2 to $2.5 billion better for Lehman than the original deal.[8166]

On Sunday, September 21, according to Burian, he also learned that the Debtors planned to transfer excess 15c3-3 cash and securities to Barclays.[8167] Burian indicated that he was upset by this information and demanded that Miller and Krasnow explain what, if any, excess 15c3-3 assets were going to Barclays.[8168] During their discussion, Krasnow told Burian that Barclays was to receive some excess 15c3-3 assets from Lehman.[8169] Burian indicated that he demanded to see the terms of the purchase agreement, became frustrated and told Miller that he would not sign off on the deal.[8170] Burian explained that Miller informed him that he would propose a compromise with Barclays in which Lehman would retain all the excess 15c3-3 cash, and Barclays would get the excess 15c3-3 securities.[8171] According to Burian, he did not learn until the

---

[8165] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 8; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 135-37 (explaining that he was told the $7 billion in cash was included in the transaction as a substitute for securities that, for whatever reason, did not transfer to Barclays).

[8166] Transcript of deposition testimony of Michael Klein, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Sept. 12, 2009, at pp. 161-63.

[8167] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 6.

[8168] *Id.*

[8169] *Id.* at p. 6; transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 307-09.

[8170] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 6.

[8171] *Id.* at p. 6.

following morning, after the sale had closed, that this compromise had worked its way into the final sale transaction.[8172]

Dennis C. O'Donnell, in his capacity as a Rule 30(b)(6) witness for Milbank, testified that Milbank was provided with a draft of the "clarification letter" on Saturday afternoon, and while Milbank may have seen subsequent drafts on Sunday night and early Monday morning, "primarily [Milbank] had access to only the draft provided on Saturday."[8173]  Burian testified that he received a draft letter on "Saturday night and Sunday morning."[8174]

Late Sunday and into Monday morning, the Creditors Committee's advisors, Lehman and Weil discussed whether (a) it was necessary for the Creditors Committee to consent to the deal as set forth in the draft Clarification Letter; and (b) the Creditors Committee would provide that consent.  The recollections of those involved in those communications diverge.

Miller testified that, in his view, the Clarification Letter represented in substance the deal that the Court approved on Friday evening, September 19, and that therefore there was no need to return to the Court for approval.[8175]  He stated that there was a

---

[8172] *Id.* at p. 6.

[8173] Transcript of deposition testimony of Dennis C. O'Donnell, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Jan. 6, 2010, at p. 58.

[8174] Transcript of deposition testimony of Saul Burian, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at p. 80.

[8175] Transcript of deposition testimony of Harvey R. Miller, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Jan. 7, 2010, at p. 33; *see also* transcript of deposition testimony of Saul Burian, *In re*

discussion among Weil lawyers either late Sunday night or Monday morning about whether it was necessary to take the letter back to Judge Peck for further approval, and that they concluded it was not necessary to do so, because the letter did not change the deal that was presented to the Court.[8176]

Miller also testified that the Creditors Committee consented to the transaction that closed on Monday, September 22.[8177] According to Miller, as the Creditors Committee's legal and financial advisors left Weil between 3:00 a.m. and 5:00 a.m. on Monday, September 22, Burian advised him that: "[e]verything's fine, and going forward, if it's okay with you, it's okay with us," and Despins said, "[i]f you guys are satisfied with it, we're satisfied.[8178]

Burian advised the Examiner that, following a conference call with the Creditors Committee late on Sunday night, the Creditors Committee advisors left Lehman.[8179] Burian stated that as they left, he and Despins approached Miller, and Burian advised

---

*Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Dec. 17, 2009, at pp. 327-29 (testifying that Miller advised him that he did not need Creditors Committee consent).

[8176] Transcript of deposition testimony of Harvey R. Miller, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Jan. 7, 2010, at p. 49; *see also* transcript of deposition testimony of James P. Seery, Jr., *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Sept. 3, 2009, at p. 156 (testifying that the Creditors Committee's advisors approved the transaction).

[8177] Transcript of deposition testimony of Harvey R. Miller, *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555, Bankr. S.D.N.Y., Jan. 7, 2010, at pp. 29, 101-02.

[8178] *Id.*

[8179] Examiner's Interview of Saul Burian, Sept. 29, 2009, at p. 8.

Miller that the Creditors Committee was not signing off on the deal, even though everything Burian had heard "sounded okay."[8180]

Despins also advised the Examiner that the Creditors Committee never consented to the transaction that closed on Monday.[8181]  According to Despins, in the early morning hours of Monday, the Creditors Committee legal and financial advisors departed Lehman's offices following a conference call with the Creditors Committee.[8182] Despins advised the Examiner that, as the Creditors Committee advisors left Lehman, they made it very clear to Miller and Roberts that the Creditors Committee was not consenting to the transaction.[8183]  Despins explained that the advisors deliberately left the closing to prevent their presence from being interpreted as consent.[8184]

Over the early morning hours on Monday, Barclays, Lehman, JPMorgan and the SIPA Trustee reached sufficient consensus to close the sale and finalize the remaining sale documents, including the Services and Settlement Agreement and the Clarification Letter.[8185]  The Clarification Letter modified the agreement between Barclays and Lehman in several ways.  The Clarification Letter deleted from the definition of "Purchased Assets" the approximately $70 billion in "Long Positions" and added:

---

[8180] *Id.*

[8181] Examiner's Interview of Luc Despins, Nov. 23, 2009, at p. 2.

[8182] *Id.*

[8183] *Id.*

[8184] *Id.*

[8185] E-mail from Michael Klein, consultant retained by Barclays, to Rich Ricci, Barclays, *et al.* (Sept. 22, 2008) [BCI-EX-00080663]; Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 14.

(1) the securities specified on "Schedule A," which were the securities that had been transferred to Barclays in connection with the Replacement Transaction,[8186] (2) $1.9 billion in unencumbered assets specified on "Schedule B,"[8187] (3) exchange-traded derivatives and collateralized short term agreements,[8188] (4) LBI's customer accounts and related assets,[8189] (5) $769 million of LBI's excess 15c3-3 securities,[8190] (5) the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA,[8191] and (6) the prime brokerage business and accounts.[8192]   In addition, the Clarification Letter terminated the repo agreement executed in connection with the Replacement Transaction.[8193]

The sale transaction between Barclays and Lehman closed around 8:00 a.m. on Monday morning.[8194]   Sometime before 8:00 a.m., the deed to 745 Seventh Avenue was recorded.   Barclays wired the money for the buildings to Lehman, and wired $250 million to DTCC to collateralize Lehman trades that were in the process of clearing.[8195]

---

[8186] Clarification Letter, at p. 1 (¶ 1(a)(ii)(A)).

[8187] *Id.* at pp. 1-2 (¶ 1(a)(ii)(B)).

[8188] *Id.* at p. 2 (¶ 1(a)(ii)(C)).

[8189] *Id.* at p. 4 (¶ 8).

[8190] *Id.*

[8191] *Id.* at p. 2 (¶ 1(a)(iii)).

[8192] *Id.* at p. 2 (¶ 1(a)(iv)).

[8193] *Id.* at p. 5 (¶ 13).

[8194] Examiner's Interview of Harvey R. Miller, Apr. 23, 2009, at p. 14; Examiner's Interview of Lindsee P. Granfield and Robert Davis, March 3, 2009, at p. 4.

[8195] *Id.*

### (3) December 2008 Settlement Between Trustee, Barclays and JPMorgan

Following the closing of the sale transaction, Barclays discovered that JPMorgan had moved the $7 billion advanced in connection with the Replacement Transaction and applied it against LBI's box loan. Barclays and JPMorgan engaged in an intense series of discussions, mediated in part by the FRBNY, and in December 2008, reached a settlement of their disputes. That settlement was memorialized in a Settlement Agreement among Barclays, JPMorgan and the SIPA Trustee.[8196] The Settlement Agreement provided that JPMorgan would deliver to Barclays: (1) the LBI securities that had been pledged to the FRBNY on Wednesday evening, September 17, and which JPMorgan retained when it locked down LBI's accounts on Friday, September 19 (those securities were identified on Annex A to the Settlement Agreement); and (2) $1.25 billion in cash from LBI's account at JPMorgan to compensate it both for undelivered FRBNY program securities that had been liquidated by JPMorgan, and the decline in the value of the undelivered securities that JPMorgan did not liquidate.[8197]

\* \* \*

To assist the parties and the Court, the Examiner has set forth this narrative of the facts he has developed relating to the sale transaction. However, in light of the pending litigation between the Debtors, the SIPA Trustee and the Creditors Committee,

---

[8196] Settlement Agreement among JPMorgan, Barclays, and the SIPA Trustee, at pp. 2-3, Docket No. 387, *In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Dec. 5, 2008).

[8197] *Id.*

on the one hand, and Barclays on the other, relating to the sale transaction, including

the extensive discovery still underway, the Examiner has not reached any conclusions

regarding whether LBHI or LBI have colorable claims arising from the acts and events

relating to the sale transaction.  The Examiner expects that in the course of that litigation

the parties will continue to develop additional facts pertinent to this narrative.

Respectfully Submitted,

*Anton R. Valukas*

Examiner

March 11, 2010

By Examiner's Counsel:

Robert L. Byman
Daniel R. Murray
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-9350
312-222-9350

Patrick J. Trostle
Heather D. McArn
Jenner & Block LLP
919 Third Avenue
37th Floor
New York, NY 10022-3908
212-891-1600