Party: First Applicant
Witness: Russell Downs
Statement No: 4
Exhibit: "RD1"
Date: 2 August 2013

**Nos. 7942 and 7945 of 2008 and No. 429 of 2009**

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>CHANCERY DIVISION</u>
<u>COMPANIES COURT</u>

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

**BETWEEN:**

**(1) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**
**(2) THE JOINT ADMINISTRATORS OF LEHMAN BROTHERS LIMITED (IN ADMINISTRATION)**
**(3) THE JOINT ADMINISTRATORS OF LB HOLDINGS INTERMEDIATE 2 LIMITED (IN ADMINISTRATION)**

<u>**Applicants**</u>

**- and -**

**(1) LEHMAN BROTHERS HOLDINGS, INC**
**(2) LYDIAN OVERSEAS PARTNERS MASTER FUND LIMITED**

<u>**Respondents**</u>

---

**FOURTH WITNESS STATEMENT OF**

**RUSSELL DOWNS**

---

I, **RUSSELL DOWNS** of PricewaterhouseCoopers LLP ("**PwC**") of 7 More London Riverside, London, SE1 2RT say as follows:

1    I am a Partner in the firm of PwC of the above address and am one of the joint administrators of Lehman Brothers International (Europe) (in administration) ("**LBIE**").

2    I make this statement in relation to the Application for directions issued on behalf of
the Administrators of LBIE (the "**LBIE Administrators**"), the administrators of
Lehman Brothers Limited ("**LBL**") and the administrators of LB Holdings
Intermediate 2 Limited ("**LBHI2**") on 14 February 2013 pursuant to paragraph 63 of
Schedule B1 to the Insolvency Act 1986 (the "**Act**") and as amended on 2 May
2013 (the "**Joint Application**").

3    There is now produced and shown to me a paginated bundle of documents marked
"**RD1**" and a paginated bundle of documents and correspondence marked "**AVL1**"
(previously exhibited to the witness statement of Anthony Victor Lomas dated 14
February 2013 in support of the Joint Application (the "**Lomas Witness
Statement**")), to which I shall refer. Save where otherwise stated, page references
in this statement are to the contents of these exhibits.

4    Save where otherwise stated this witness statement is made from facts and
matters that are within my own knowledge.

5    Certain background to the Joint Application is set out in the Lomas Witness
Statement. I do not repeat in this witness statement the matters already set out in
the Lomas Witness Statement.

6    As part of the process of preparing LBIE's case in the Joint Application, the LBIE
Administrators have:

6.1    conducted a disclosure exercise in which LBIE searched, on behalf of the
Applicants, certain sources of documents (agreed among the Applicants and
the Respondents (the "**Parties**")) for certain search terms (agreed among
the Parties) and, having reviewed the search results for documents relevant
to the factual topics identified in the Court's order of 2 May 2013, disclosed
the resulting documents to the Parties (the "**Disclosure Exercise**"); and

6.2    participated (by their solicitors, Linklaters LLP ("**Linklaters**")) in a number of
interviews, attended also by representatives of LBL, LBHI2 and Lehman
Brothers Holdings, Inc. ("**LBHI**"), with the following individuals identified by
the Parties as having been involved in the events to which the Application
relates and/or potentially having knowledge relevant to the issues in the
Application:

(i)    Marcus Jackson (who was, prior to leaving Lehman Brothers in
May 2008, European Financial Controller and a director of LBIE
and LBHI2);

(ii)    Jackie Dolby (who was, prior to LBIE's entry into administration, head of European Corporate Tax);

(iii)   Antony Rush (who was, prior to LBIE's entry into administration, International Tax Director and a director of LBIE and LBHI2);

(iv)   Peter Sherratt (who was, prior to LBIE's entry into administration, Chief Legal Officer);

(v)    Dave Rushton (who was, prior to LBIE's entry into administration, employed in the Treasury function);

(vi)   Dominic Gibb (who was, prior to LBIE's entry into administration, European Financial Controller); and

(vii)   Margaret Smith (who was, prior to LBIE's entry into administration, in-house counsel and LBIE Company Secretary),

(the "**Joint Interviews**" and each a "**Joint Interview**").

7    I refer in this witness statement to information obtained during those interviews; in each case I identify the name of the individual who provided that information.

(A)   **LBIE CORPORATE BACKGROUND AND STRUCTURE**

8    LBIE was the principal trading company within the European Lehman Brothers group of companies (the "**European Lehman Group**") and is (and was, at the time of its entry into administration) an English unlimited company. LBL and LBHI2 (the second and third Applicants to the Joint Application) are the only shareholders of LBIE. LBL holds one ordinary share of $1. LBHI2 holds:

8.1   6,273,113,999 ordinary shares of $1 each;

8.2   2 million 5% redeemable preference shares of $1,000 each; and

8.3   5.1 million 5% redeemable Class B preference shares of $1,000 each.

A copy of LBIE's most recent Articles and Memorandum of Association appears at **pages 1 to 24 of AVL1**. Copies of previous versions of LBIE's Articles and Memorandum of Association insofar as there were material differences in those versions at the time of the events relevant to the Joint Application are at **pages 1-77 of RD1**. A copy of LBIE's most recent Annual Return, dated 23 April 2008, is at **pages 78-92 of RD1**.

9    LBIE was incorporated on 10 September 1990, as a limited company named
"Lehman Brothers International Limited" ("**LBIL**") and with the registered company
number 02538254. A copy of LBIE's original Certificate of Incorporation is at **page
116 of RD1**.

*LBIE's re-registration as an unlimited company*

10    On 21 December 1992, LBIE was re-registered as an unlimited liability company
and renamed as "Lehman Brothers International (Europe)". A copy of the relevant
Certificate of Incorporation on Change of Name and Re-Registration of a Limited
Company as Unlimited is at **page 117 of RD1**.

11    In the course of the Disclosure Exercise and the Joint Interviews, one of the factual
topics on which the Parties sought information was the rationale behind the
decision to re-register LBIE as an unlimited company in December 1992. I
understand that those processes have revealed little information that sheds light on
that decision. However, I am informed that during the Joint Interview with Ms Dolby
(who was employed in various roles within the Lehman Brothers European Tax
department from August 1996 until LBIE's entry into administration on 15
September 2008), Ms Dolby explained that it was her understanding that the re-
registration of LBIE as an unlimited company was undertaken for US tax reasons.
In particular, Ms Dolby was of the understanding that at the relevant time US tax
law allowed a company, provided certain conditions were met, to be treated as a
"branch" of another company for tax purposes. One benefit of such treatment was
the potential for a taxable profit in the "parent" to be set off against a loss in the
"branch" (or vice versa) for US tax purposes (a concept similar to "group relief"
under UK corporate tax law).

12    It is Ms Dolby's understanding that re-registration as an unlimited company was
considered to be one of the means by which a company could be deemed a
branch of another under the relevant US tax law. I understand that Ms Dolby is of
the view that LBIE was re-registered as an unlimited liability company so that LBIE
could be treated as a branch of its then parent, Lehman Brothers Holdings Plc
("**LBHPLC**"), for US tax purposes. At **pages 118-119 of RD1** is a copy of a file
note written by Ms Dolby on 27 December 2000 in which she recorded her
understanding of the reasons for LBIE's re-registration as an unlimited company in
December 1992. I understand that Ms Dolby does not recall the circumstances in
which she wrote the file note.

*LBIE's minority shareholder*

13    I am informed by Linklaters that, from the date of its incorporation and throughout most (but not all) of its corporate history, LBIE had a shareholder holding one ordinary $1 share (a "**Single Dollar Share**") or one ordinary £1 share (a "**Single Sterling Share**" and, together with a Single Dollar Share, a "**Single Share**")) in LBIE. In particular, LBIE's corporate records show that:

13.1    LBIE was incorporated with an issued share capital of $2. The original subscribers were Alistair Francis Bird and Colleen Ann Harney (each holding a Single Dollar Share) (LBIE's memorandum and articles of association showing the original subscribers is at **pages 1-19 of RD1**).

13.2    On 5 October 1990, the original subscribers transferred their shareholdings as follows (a copy of board minutes of LBIE (then LBIL) dated 5 October 1990 approving the transfers is at **pages 120-123 of RD1**):

(i)      Mr Bird transferred his Single Dollar Share to LBHPLC (which was, at that time, named Shearson Lehman Brothers Holdings PLC); and

(ii)     Ms Harney transferred her Single Dollar Share to Martin William Cornish (a solicitor then employed within the Lehman Brothers group who was Chief Legal Officer and the LBIE Company Secretary until 2 October 1991);

13.3    On 30 November 1990, 59,999,998 ordinary shares of $1 were allotted to LBHPLC, making LBHPLC the majority shareholder (a copy of a board minute of LBIE (then LBIL) dated 29 November 1990 approving the allotment is at **pages 124-127 of RD1**). From that point until the 2006 Restructuring (see Section C below), LBHPLC was LBIE's majority shareholder;

13.4    Mr Cornish held a Single Dollar Share until 2 October 1991, when it was transferred to Mr Sherratt (who was also a solicitor employed within the Lehman Brothers group and who succeeded Mr Cornish as Chief Legal Officer and LBIE's Company Secretary on 2 October 1991) (a copy of board minutes of LBIE (then LBIL) approving the transfer is at **page 128 of RD1**);

13.5    Mr Sherratt held the Single Share until 22 September 1992, when it was transferred to LBHPLC (a copy of the stock transfer form dated 22

September 1992 is at **page 129 of RD1** and a copy of board minutes of LBIE (then LBIL) dated 1 October 1992 approving the transfer is at **pages 131-140 of RD1**). It appears that, although the stock transfer form purports to transfer a Single Sterling Share, this is an error and the stock transfer form ought to refer to a Single Dollar Share because:

(i)  the LBIE share register (the "**Share Register**") reflects a transfer of a Single Dollar Share (a copy of the Share Register is at **pages 149-158 of RD1**);

(ii)  LBIE has found no evidence of a Single Sterling Share ever having been transferred or allotted to Mr Sherratt; and

(iii)  LBIE's memorandum and articles of association at that time did not allow for LBIE's share capital to be denominated in sterling;

13.6   between 22 September 1992 and 23 November 1994 LBIE had only one shareholder, being LBHPLC;

13.7   on 10 December 1992, LBIE's memorandum and articles of association were amended and its authorised share capital increased by the creation of 50,000,000 shares of £1 each;

13.8   on 18 December 1992, LBIE (by its sole shareholder, LBHPLC) adopted a written shareholder resolution amending its articles of association to, amongst other things, limit its number of shareholders to one unless otherwise determined by special resolution (a copy of the written resolution is at **pages 356-360 of RD1** and a copy of LBIE's new memorandum and articles of association adopted on 18 December 1992 is at **pages 23-43 of RD1**);

13.9   on 23 November 1994, LBIE (by its sole shareholder, LBHPLC) adopted a written shareholder resolution amending its articles of association to, amongst other things, remove the restriction on LBIE having more than one shareholder which had been entered into its articles on 18 December 1992. A copy of the written resolution is at **pages 361-362 of RD1** and LBIE's new memorandum and articles of association adopted on 23 November 1994 is at **pages 44-60 of RD1**;

13.10  on 23 November 1994, LBL acquired from LBHPLC a Single Sterling Share to be held as nominee on behalf of LBHPLC. A copy of the stock transfer

form dated 23 November 1994 effecting that transfer is at **pages 141-142 of RD1**. A copy of board minutes of LBL resolving to hold the Single Sterling Share as nominee for LBHPLC is at **page 143 of RD1**. A copy of board minutes of LBIE approving the transfer is at **page 144 of RD1**;

13.11    on 1 May 1997, LBIE resolved to cancel and extinguish all sterling shares, including the Single Sterling Share held by LBL, and the LBIE board resolved to allot to LBL a Single Dollar Share. I understand that, unlike LBL's earlier holding of a Single Sterling Share as nominee for LBHPLC, there is nothing in the documents effecting the allotment of the Single Dollar Share to indicate that LBL would be holding the Single Dollar Share as a nominee. A copy of the minutes of the meeting of shareholders cancelling and extinguishing the Single Sterling Share is at **page 145 of RD1**. A copy of LBL board minutes approving an application for the allotment to LBL of a Single Dollar Share is at **page 146 of RD1**, a copy of a letter from LBL to LBIE making that application is at **page 147 of RD1** and a copy of the LBIE board minutes approving the allotment of the Single Dollar Share is at **page 148 of RD1**. A copy of the Share Register is at **pages 149-158 of RD1**.

14    In the course of the Disclosure Exercise and the Joint Interviews, the LBIE Administrators (together with the other Parties) have sought information as to:

14.1    why LBIE had a shareholder holding a Single Share from its incorporation until 22 September 1992 and from 23 November 1994 until the present; and

14.2    why LBL was LBIE's minority shareholder from 23 November 1994.

15    I understand from Linklaters that the Disclosure Exercise and the Joint Interviews have revealed little information that sheds light on those questions. Furthermore, I am advised by Linklaters that there is no obvious correlation between the corporate law applicable to LBIE at the relevant times and LBIE's shifts between:

15.1    having two shareholders until 22 September 1992;

15.2    having a single shareholder between 22 September 1992 and 23 November 1994; and

15.3    having two shareholders from 23 November 1994.

16    However, Mr Sherratt (who was LBIE's Company Secretary and the holder of a Single Share between 2 October 1991 and 22 September 1992, and Chief Legal Officer from 2 October 1991 until LBIE's entry into administration), suggested in his

Joint Interview that one possible reason for LBL (as opposed to another entity) holding a Single Share in LBIE from 23 November 1994 was that LBL was an unregulated entity and the Lehman Brothers group would have preferred the Single Share to be held in an unregulated entity so as not to attract the adverse regulatory consequences that would potentially result from a regulated entity holding the Single Share and the unlimited liability that attached to it.

(B)   **CAPITAL ADEQUACY REQUIREMENTS**

17   In Section C (The 2006 Restructuring) below, I refer at various points to the capital adequacy requirements to which LBIE was subject at relevant times. In this Section I set out my broad understanding of those capital adequacy requirements.

18   I understand that capital adequacy denotes the amount of capital that a bank or other financial institution is required to hold under the rules set down by its financial regulator. The purpose of capital adequacy rules is to ensure that firms provide financial resources to protect the firm, its customers and other stakeholders against premature failure and enable it to withstand some level of loss.

19   In LBIE's case the relevant financial regulator was the Financial Services Authority ("**FSA**") (which has since been replaced, for the purposes of capital adequacy regulation, by the Prudential Regulation Authority). The FSA, like many regulators worldwide, devised capital adequacy rules based on the Basel Accords, which are published from time to time by the Basel Committee on Banking Supervision at the Bank for International Settlements.

20   I am advised by Linklaters that on 31 December 2006, the FSA introduced the General Prudential Sourcebook ("**GENPRU**") which set out the capital adequacy requirements applicable to LBIE from that date until its entry into administration. GENPRU set out rules to ensure that a regulated firm would *"at all times maintain overall financial resources, including capital resources and liquidity resources, which are adequate, both as to amount and quality, to ensure that there is no significant risk that its liabilities cannot be met as they fall due"* (GENPRU 1.2.26). In order to categorise the "quality" of a firm's capital resources, GENPRU set out three "tiers" of capital (based on the Second Basel Accord (known as "Basel II") then in effect) which a firm was required to identify separately in its regulatory capital reporting to the FSA (GENPRU 1.2.36).

21    However I am advised by Linklaters that the tier ranking of a particular capital instrument was not necessarily decided solely based on its characteristics. In particular, FSA rules limited the amount of capital that a regulated firm could designate as tier 2 capital to a value no greater than 50% of the value of tier 1 capital held, with any excess capital being designated as tier 3 capital. As a result, capital instruments which, on their terms, were capable of constituting tier two capital might in fact be classified as tier 3 capital if a firm had already reached its tier 2 capital capacity.

22    I am advised by Linklaters that the three tiers of capital set out by GENPRU are as described below:

22.1    Tier 1 capital

GENPRU described tier 1 capital as typically having the following characteristics:

(i)    it is able to absorb losses;

(ii)    it is permanent;

(iii)    it ranks for repayment upon winding up, administration or similar procedures after all other debts and liabilities; and

(iv)    it has no fixed costs (i.e. no inescapable obligation to pay dividends or interest).

I am advised that the most obvious example of tier 1 capital is ordinary share capital.

22.2    Upper and lower tier 2 capital

GENPRU described tier 2 capital as capital which does not meet the requirements of permanency and lack of fixed servicing costs which are required for tier 1 capital. In particular, there are two types of tier 2 capital:

(i)    upper tier 2 capital is capital which is perpetual (i.e. which has no fixed repayment term) but which carries servicing costs which cannot be waived at the firm's option (but may be deferred). Upper tier 2 capital specifically includes cumulative preference shares; and

(ii)    lower tier 2 capital is capital which is either not perpetual (i.e. which has a fixed repayment term) or has fixed servicing costs that cannot generally be either waived or deferred. Lower tier 2 capital should

normally have an original maturity of at least five years. Lower tier 2 capital specifically includes medium to long-term subordinated debt (with an original maturity of at least five years)

**22.3**  Tier 3 capital

GENPRU describes tier 3 capital as forms of capital conforming least well to the characteristics of tier 1 capital. Tier 3 capital specifically includes "*subordinated debt of short maturity*".

23  Regulated firms such as LBIE were required to hold certain levels of regulatory capital based upon ratios reflecting the level of risk they faced from time to time. Given the lower "quality" of tier 2 and tier 3 capital, LBIE was limited in the amount of its capital base that could be constituted of tier 2 and tier 3 capital instruments.

(C)  **THE 2006 RESTRUCTURING**

24  In late 2006, the Lehman Brothers group conducted a restructuring of its European business aimed at reducing the global effective tax rate of the Lehman Brothers group as a whole (the "**2006 Restructuring**"). This restructuring saw LBHI2 become LBIE's majority shareholder, holding all but one of the ordinary shares in LBIE.

25  LBIE was the UK broker dealer of the Lehman Brothers group, providing a wide range of financial services including trading and broking fixed income and equity instruments, participation in the syndication and underwriting of new security issues and stock broking in relation to securities issued in many major and emerging markets around the world. I am informed by Ms Dolby and Mr Jackson (who was, prior to leaving Lehman Brothers in May 2008, European Financial Controller) that during the 2000s, there was a significant expansion of Lehman Brothers' activities in Europe, resulting in an increase in business booked to LBIE.

26  I am informed by Ms Dolby that this increase in LBIE's trading activity gave rise to a need for the Lehman Brothers group to ensure:

**26.1**  that its tax planning was always up-to-date to allow this increased activity to be conducted as efficiently as possible from a global tax perspective; and

**26.2**  that LBIE would continue to meet its regulatory capital requirements as an FSA-regulated entity.

27    Ms Dolby and Mr Jackson have explained that, as a result of the Lehman Brothers group's growing European trading activities, by 2006 LBIE was accumulating a significant volume of foreign tax credits (that is, in respect of amounts paid in taxation in relation to its trades) (the "**LBIE FTCs**"), and that the global Lehman Brothers group wanted to be able to utilise these LBIE FTCs in the United States, to avoid double taxation and thereby reduce the Group's global effective tax rate.

28    Ms Dolby has also explained that in order for the LBIE FTCs to be available to the Lehman Brothers group for the purposes of its financial reporting in the US, LBIE needed to be profitable. Ms Dolby's recollection is that, at that time, LBIE was not profitable, for two main reasons:

28.1    much of LBIE's profitable business had previously been transferred to Lehman Brothers Europe Limited (for other tax reasons that are not relevant for the purposes of the Joint Application); and

28.2    LBIE was paying interest on the amounts outstanding under certain subordinated debt agreements it had in place at that time with its parent LBHPLC (the "**LBHPLC Sub-Debt Agreements**", and the debt issued under those agreements the "**LBHPLC Sub-Debt**") which formed part of its regulatory capital base.

29    Therefore one way to increase LBIE's profitability was to restructure LBIE's regulatory capital base in such a way that it would no longer need to pay interest on the funding it received under the LBHPLC Sub-Debt Agreements.

*The LBHPLC Sub-Debt Agreements*

30    The LBHPLC Sub-Debt Agreements were three subordinated debt agreements entered into between LBHPLC (as lender) and LBIE (as borrower):

30.1    a €3,000,000,000 Long Term Subordinated Loan Facility dated 19 July 2004, a copy of which is at **pages 159-176 of RD1** (the "**Long Term Euro LBHPLC Facility**");

30.2    a $4,500,000,000 Long Term Subordinated Loan Facility dated 19 July 2004, a copy of which is at **pages 177-194 of RD1** (the "**Long Term Dollar LBHPLC Facility**" and, together with the Long Term Euro LBHPLC Facility, the "**Long Term LBHPLC Facilities**"); and

**30.3** a $8,000,000,000 Short Term Subordinated Loan Facility dated 31 October 2005, a copy of which is at **pages 195-213 of RD1** (the "**Short Term LBHPLC Facility**").

31    I am informed by Dominic Gibb that the Short Term LBHPLC Facility was entered into later than the Long Term LBHPLC Facilities because it became clear that some of the LBHPLC Sub-Debt under the Long Term LBHPLC Facilities would, notwithstanding the fact that it was designated "long-term" subordinated debt, be treated as tier 3 (rather than lower tier 2) regulatory capital for FSA reporting purposes (due to FSA rules limiting the amount of capital that a regulated firm could designate as tier 2 capital to a value no greater than 50% of the value of tier 1 capital held, with any excess capital being designated as tier 3 capital). In the circumstances, it was advantageous for LBIE to repay such amounts outstanding under the Long Term LBHPLC Facilities, enter into the Short Term LBHPLC Facility and draw down replacement LBHPLC Sub-Debt under that agreement. Specifically, the regulatory treatment of the LBHPLC Sub-Debt would be unchanged, but LBIE would benefit from the greater flexibility offered by the Short Term LBHPLC Facility.

32    I am informed by staff working on the LBIE administration that the LBHPLC Sub-Debt Agreements were the final link in a chain of subordinated debt arrangements that allowed for the flow of subordinated debt through the corporate chain between LBIE (the primary regulated trading entity in the European Lehman Group) and its ultimate US parent, LBHI, which is one of the Respondents to the Joint Application. A diagram showing the entities through which this subordinated debt funding flowed prior to the 2006 Restructuring is at **page 214 of RD1**.

*The 2006 Restructuring*

33    Ms Dolby has explained that planning and effecting the 2006 Restructuring was a joint process among, principally, three functions in the European Lehman Group:

**33.1** the Tax function, whose concern was to ensure that the restructuring achieved the aim of releasing the LBIE FTCs for use in the US without other adverse tax implications;

**33.2** the Regulatory function, whose concern was to ensure that the restructuring was achieved without jeopardising LBIE's ability to meet its regulatory capital requirements as an FSA-regulated entity; and

33.3    the Treasury function, whose concern was to ensure that the restructuring did not jeopardise LBIE's (and, more broadly, the Lehman Brothers group's) general funding requirements.

34    Ms Dolby also explained that, following discussions among those three functions, LBIE took the steps described below.

34.1    LBIE replaced $2 billion of its LBHPLC Sub-Debt with $2 billion non-cumulative preference shares ("**Preference Shares**"). The Preference Shares, unlike the LBHPLC Sub-Debt, carried no interest obligation and, unlike cumulative preference shares, carried no obligation to pay dividends. Replacement of the LBHPLC Sub-Debt with such instruments freed LBIE from the burden of paying funding costs on this part of its regulatory capital and thereby improved LBIE's profitability. I am advised by Linklaters and by LBIE staff working on the LBIE administration (specifically, Ms Dolby and Mr Jackson) that the Preference Shares constituted lower tier 2 capital for the purposes of the FSA's regulatory capital requirements (a legal opinion dated 23 October 2006 advising on the regulatory treatment of the Preference Shares is at **pages 215-220 of RD1**).

34.2    Rather than directly replace the LBHPLC Sub-Debt with Preference Shares issued to LBHPLC, a new intermediary holding company was inserted between LBHPLC and LBIE to hold the Preference Shares. The purpose of doing so was, again, to realise a tax benefit. Ms Dolby has explained that the purchase of the Preference Shares by the intermediary company would be funded by the subordinated debt funding that flowed down through the corporate chain from LBHI (see paragraph 32 above and the diagram at **page 214 of RD1**). The intermediary company would pay interest on that subordinated debt funding. Since the intermediary company would be paying interest on that subordinated debt, but receiving no interest or dividends on the Preference Shares, it would make a significant loss in respect of its holding of the Preference Shares. This simple (or "clean") loss was desirable for tax planning purposes (that is, it could potentially be offset against taxable profits generated elsewhere in the Lehman Brothers group). The intermediary company that was inserted into the group structure to hold the Preference Shares was LBHI2. A copy of the LBIE board minutes dated 1 November 2006 approving the allotment of 2,000,000 Preference Shares to LBHI2 of $1,000 each is at **pages 221-222 of RD1**.

**34.3** Finally, again (according to Ms Dolby) for US tax purposes, it was necessary to insert into the group structure a further intermediary company between LBHPLC and LBHI2. This company was required simply to hold the share capital in LBHI2, and was otherwise dormant. This company was LB Holdings Intermediate 1 Limited.

**35** In addition, I understand that, at the same time as replacing the LBHPLC Sub-Debt with the Preference Shares, it was decided that LBIE should enter into new subordinated loan agreements with its new direct parent company, LBHI2. Ms Dolby and Mr Rushton (who, prior to LBIE's entry into administration, was employed in the Treasury function) recall that this was done because the Treasury function wanted to retain the flexibility that having some subordinated debt as part of LBIE's regulatory capital base allowed. In particular, I am informed by LBIE staff working on the LBIE administration (specifically, Ms Dolby and Mr Jackson) that the drawdown and repayment of subordinated debt under a subordinated debt facility could be conducted more quickly than preference shares can be issued and redeemed.

**36** Accordingly, on 1 November 2006 LBIE entered into the following three subordinated loan agreements with LBHI2:

**36.1** a €3,000,000,000 Long Term Subordinated Loan Facility, a copy of which is at **pages 210 to 224 of AVL1** (the "**Long Term Euro Facility**");

**36.2** a $4,500,000,000 Long Term Subordinated Loan Facility, a copy of which is at **pages 225 to 240 of AVL1** (the "**Long Term Dollar Facility**" and, together with the Long Term Euro Facility, the "**Long Term Facilities**"); and

**36.3** a $8,000,000,000 Short Term Subordinated Loan Facility, a copy of which is at **pages 241 to 260 of AVL1** (the "**Short Term Facility**"),

(together, the "**LBHI2 Sub-Debt Agreements**"). It can be seen from the LBHI2 Sub-Debt Agreements that, in respect of currency, amount and term, the LBHI2 Sub-Debt Agreements were direct replacements for the LBHPLC Sub-Debt Agreements.

**37** I am informed by staff working on the LBIE administration that the relevant accounts of the Lehman Brothers group show that, in terms of LBIE funding, the overall effect of the 2006 Restructuring was that:

**37.1** LBIE repaid $6.275 billion of LBHPLC Sub-Debt;

**37.2**    LBIE repaid EUR 200 million of LBHPLC Sub-Debt; and

**37.3**    replaced the LBHPLC Sub-Debt with new funding in the form of:

(i)    the $2 billion of Preference Shares issued to LBHI2 on 1 November 2006; and

(ii)    $5.7 billion of LBHI2 Sub-Debt drawn down under the Short Term Facility in November 2006.

A diagram illustrating these movements as part of the 2006 Restructuring and showing the new flow of subordinated debt funding through the corporate chain from LBHI to LBIE following the 2006 Restructuring is at **page 223 of RD1**. The data contained in these diagrams is extracted from a Lehman Brothers finance system called Dun & Bradstreet Software ("**DBS**"). I am informed by staff working on the LBIE administration that DBS is the system that provides the most complete picture of the LBHI2 Sub-Debt transactions between the execution of the LBHI2 Sub-Debt Agreements on 1 November 2006 and LBIE's entry into administration on 15 September 2008. DBS was used within the Lehman Brothers group as the general ledger and is the principal source for the financial statements. The information concerning the split between preference shares and subordinated debt is extracted from the finance system Treasury Workstation ("**TWS**") which was used to book and manage trades.

(D)    **THE TERMS OF THE LBHI2 SUB-DEBT AGREEMENTS**

**38**    I am informed by Linklaters that the LBHI2 Sub-Debt Agreements all contain essentially the same subordination provision. Specifically, the LBHI2 Sub-Debt Agreements subordinate all present and future sums, liabilities and obligations, and all interest payable thereon, payable or owing by LBIE to the Lender under the agreements to all other sums, liabilities and obligations payable or owing by LBIE (apart from sums owed by LBIE which are expressed to be and, in the opinion of the administrators of LBIE do, rank junior to the subordinated liabilities).

**39**    Clause 5(1) of Schedule 2 of each LBHI2 Sub-Debt Agreement provides:

*"Notwithstanding the provisions of paragraph 4, the rights of the Lender in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities…".*

**40**    The relevant definitions are as follows:

""*Excluded Liabilities*" means Liabilities which are expressed to be and, in the opinion of the Insolvency Officer of the Borrower, do, rank junior to the Subordinated Liabilities in any Insolvency of the Borrower.

"*Insolvency*" means and includes liquidation, winding up, bankruptcy, sequestration, administration, rehabilitation and dissolution (whichever term may apply to the Borrower) or the equivalent in any other jurisdiction to which the Borrower may be subject.

"*Insolvency Officer*" means and includes any person duly appointed to administer and distribute assets of the Borrower in the course of the Borrower's insolvency.

"*Liabilities*" means all present and future sums, liabilities and obligations payable or owing by the Borrower (whether actual or contingent, jointly or severally or otherwise howsoever).

"*Senior Liabilities*" means all Liabilities except the Subordinated Liabilities and the Excluded Liabilities.

"*Subordinated Liabilities*" means all Liabilities to the Lender in respect of each Advance made under this Agreement and all interest payable thereon."

**41**    In the course of the Disclosure Exercise and the Joint Interviews, the LBIE Administrators sought information as to the process by which the LBHI2 Sub-Debt Agreements were entered into and the process by which the subordination wording in the agreements was agreed. Based on the Disclosure Exercise and the Joint Interviews, it appears that relevant Lehman Brothers personnel (including directors of the relevant companies), in putting in place the LBHI2 Sub-Debt Agreements:

**41.1**    were focused on the objective of ensuring LBIE's capital adequacy requirements would be met; and

**41.2**    did not give consideration to the possibility of a LBIE insolvency.

**42**    Mr Rushton recalls that the LBHI2 Sub-Debt Agreements were based heavily on templates provided by the FSA. Ms Dolby also explained that it was her understanding that the LBHPLC Sub-Debt Agreements would have been based on FSA templates, and the LBHI2 Sub-Debt Agreements would likely simply have been based on the LBHPLC Sub-Debt Agreements which they replaced.

**43**     The approach recalled by Mr Rushton and Ms Dolby is reflected in the LBHI2 Sub-Debt Agreements themselves. In particular:

**43.1**     there are only minimal, insignificant differences between the LBHI2 Sub-Debt Agreements and the LBHPLC Sub-Debt Agreements they replaced (comparison documents showing the LBHI2 Sub-Debt Agreements as compared against the LBHPLC Sub-Debt Agreements are at **pages 363-420 of RD1**); and

**43.2**     there are only minimal differences between the terms of the subordination provision in the LBHI2 Sub-Debt Agreements and the subordination provision in the FSA standard form subordinated debt agreement (copies of the FSA standard form agreements are at **pages 214-254 of RD1**).

**44**     Finally, it appears that no consideration was given, prior to LBIE's administration, to the effect of the subordination wording in the LBHI2 Sub-Debt Agreements upon the priority ranking of the LBHI2 Sub-Debt relative to LBIE's other obligations in the event of a LBIE insolvency (including the payment of statutory interest to ordinary unsecured creditors in the event that there were to be a surplus remaining after those creditors had been paid in full). In the course of the Disclosure Exercise and the Joint Interviews, the LBIE Administrators sought documents and information that might reveal any such consideration. Those exercises have resulted in no evidence at all that any such consideration was given to this point. Indeed, the recollections of several witnesses in the Joint Interviews was that it is highly unlikely that anyone within the Lehman Brothers group would have considered this issue prior to LBIE's entry into administration.

(E)     **TREATMENT OF THE LBHI2 SUB-DEBT BETWEEN LBIE AND LBHI2**

**45**     The LBIE Administrators have (including during the course of the Disclosure Exercise and Joint Interviews) sought information as to how the LBHI2 Sub-Debt was treated between LBIE and LBHI2. In this section I set out the LBIE Administrators' understanding based on the work they have conducted.

*Role of LBHI2 Sub-Debt*

**46**     I am informed by LBIE staff working on the LBIE administration (specifically, Ms Dolby and Mr Jackson) that the role of the LBHI2 Sub-Debt was essentially two-fold (albeit those roles are inter-related):

**46.1**  The LBHI2 Sub-Debt formed part of LBIE's regulatory capital for the purposes of the FSA's capital adequacy requirements. This is evident from relevant accounting records, internal correspondence and LBIE's dealings with the FSA.

**46.2**  The LBHI2 Sub-Debt was a particularly flexible form of regulatory capital funding. The terms of the LBHI2 Sub-Debt Agreements (see Section D above) allowed for rapid drawdown and repayment of LBHI2 Sub-Debt, which allowed the European Lehman Group:

(i)  rapidly to put LBIE in funds to the extent required in order to meet LBIE's capital adequacy requirements as they varied from time to time; and

(ii)  rapidly to release from LBIE excess funding that was no longer required to meet LBIE's capital adequacy requirements as they varied from time to time, so that it could be put to more efficient use elsewhere in the global Lehman Brothers group.

**47**  Accordingly, drawdowns and repayments of LBHI2 Sub-Debt generally shared the characteristics set out below:

**47.1**  Movements of LBHI2 Sub-Debt occurred quickly, often over a matter of days.

**47.2**  Movements of LBHI2 Sub-Debt involved an assessment on the part of the Lehman Brothers group of LBIE's capital adequacy requirements to determine whether LBIE required a drawdown or had spare LBHI2 Sub-Debt funding in excess of its capital adequacy requirements.

*Accounting treatment of the LBHI2 Sub-Debt*

**48**  I am informed by staff working on the LBIE administration that, in the general ledger accounts in DBS, the LBHI2 Sub-Debt was accounted for together with the Preference Shares into which any LBHI2 Sub-Debt (or, formerly, LBHPLC Sub-Debt) had been converted. As at the date of LBIE's entry into administration, for example, the DBS balance between LBIE and LBHI2 was $9,325,000,000, consisting of $7,100,000,000 of Preference Shares and $2,225,000,000 of LBHI2 Sub-Debt. A chart prepared by my staff based on the data extracted from the DBS system, showing the DBS balance as at 15 September 2008, is at **page 255 of RD1**.

A16825003

**49**    In addition to DBS accounting for the LBHI2 Sub-Debt and the Preference Shares together, I am informed by PwC staff working on the LBIE administration that the relevant Lehman Brothers finance systems did not link trades in LBHI2 Sub-Debt to specific LBHI2 Sub-Debt Agreements. I am informed that the process of determining whether, at any given date, the outstanding amount of LBHI2 Sub-Debt was long term or short term LBHI2 Sub-Debt is, therefore, a forensic process involving analysis of the relevant finance systems alongside other relevant documents and information.

**50**    In LBIE's statutory accounts, which had been prepared in accordance with UK GAAP, it appears that all LBHI2 Sub-Debt (whether drawn down under the Short Term Facility or one of the Long Term Facilities) was treated in the same way. Specifically, all LBHI2 Sub-Debt was accounted for as "*Creditors: amounts falling due within one year*". The notes to the accounts state that amounts owing under the LBHI2 Sub-Debt Agreements are "repayable at any time at the Company's option" (see notes 13 and 14 respectively to LBIE's 2006 and 2007 audited accounts, copies of which are at **pages 256-275 and 276-300 of RD1**).

**51**    I understand from staff working on the LBIE administration that this accounting treatment was a result of the fact that both the Short Term Facility and the Long Term Facilities had, essentially, the same repayment terms, which provided for LBIE, at its option, to repay LBHI2 Sub-Debt drawn thereunder in whole or in part at any time on giving only two business days' notice to LBHI2.

**52**    The Preference Shares were accounted for in LBIE's audited accounts as "*Creditors: amounts falling due over one year*" (see note 15 to LBIE's 2006 and 2007 audited accounts, copies of which are at **pages 256-275 and 276-300 of RD1**).

*2007 Restructuring*

**53**    As part of a further restructuring which took effect on 1 May 2007, the majority of the then-outstanding LBHI2 Sub-Debt was converted into Preference Shares (the "**May 2007 Restructuring**"). Specifically:

**53.1**    LBIE was discharged from the obligation to repay $5.1 billion of LBHI2 Sub-Debt (being the majority of the balance of LBHI2 Sub-Debt outstanding as at 1 May 2007); and

**53.2**    LBIE allotted to LBHI2, as consideration for the discharge of the LBHI2 Sub-Debt, $5.1 billion of Preference Shares.

A copy of the LBIE board minutes approving the allotment to LBHI2 of the $5.1 billion Preference Shares is at **pages 301-303 of RD1**. A copy of the LBHI2 board minutes approving the its subscription of the $5.1 billion Preference Shares is at **pages 304-305 of RD1**.

54    Ms Dolby has explained that the May 2007 Restructuring was essentially a "refinancing" of the LBHI2 Sub-Debt. Converting the majority of the LBHI2 Sub-Debt into Preference Shares (as with the 2006 Restructuring) freed LBIE from the burden of paying interest on the LBHI2 Sub-Debt, and crystallised further losses in LBHI2 (which, as explained above at paragraph 34.2, was beneficial to the Lehman Brothers group for US tax purposes).

55    The sums outstanding at the date of Administration in respect of the LBHI2 Sub-Debt held by LBIE are $2.225 billion (see diagram at **page 255 of RD1**.)

(F)    **LBIE CREDITOR OUTLOOK**

56    The LBIE Administrators' ninth progress report to creditors covering the six month period to 14 March 2013 was issued on 12 April 2013 (a copy of the report is at **pages 306-352 of RD1**). The estimated outcome (that is, dividend payment) for unsecured creditors set out in that report ranged from 61 pence in the pound to 116 pence in the pound (subject to important assumptions and caveats). These figures do not reflect:

56.1    any provision for the payment of statutory interest to unsecured creditors in the event that their claims are paid in full;

56.2    any provision for claims from LBIE's members, LBHI2 and LBL; or

56.3    the rights of contribution claims which LBIE has against LBHI2 and LBL in the event that LBIE has insufficient assets to meet unsecured creditors' claims in full.

57    The prices quoted anecdotally for ordinary unsecured LBIE debt in the secondary debt market are currently in excess of 100p in the pound, suggesting that the market anticipates that there will be a payment of statutory interest to unsecured creditors. LBIE has paid dividends to date amounting to 68.5 pence.

(G)    **ESTIMATED IMPACT ON CREDITORS OF JOINT APPLICATION**

58    If it is held in the Application that, in the event of there being a surplus available after LBIE has paid ordinary unsecured creditors in full, statutory interest ranks ahead of the subordinated claim from LBHI2 (in the sum of £1.3 billion), there will be no monies available to meet LBHI2's subordinated claim based on the estimated outcome in paragraph 56 above.

59    If it is decided that LBHI2's subordinated claim should rank ahead of the payment of statutory interest on the claims of the unsecured creditors in the event of a surplus, then LBHI2's subordinated debt claim would, in the high estimated outcome, be paid in full and the amount of funds available to pay statutory interest to ordinary unsecured creditors would be reduced by a corresponding amount.

(H)    **LBL CREDITOR STATUS**

60    LBL has lodged an unsecured claim in the LBIE administration in the sum of £363 million. A copy of LBL's proof of debt is at **pages 177 to 194 of AVL1.**

61    Discussions have begun between LBIE and LBL as to the quantum of LBL's claim. At the present time it is LBIE's view that LBL's claim is overstated and could be reduced to a sum not exceeding £100 million.

(I)    **LBHI2 CREDITOR STATUS**

62    LBHI2 has lodged an unsecured claim in the LBIE administration in the sum of £38 million. A copy of LBHI2's s proof of debt is at **pages 196 to 209 of AVL1.**

63    The quantum of the claim accords with the value stated in both estates' statement of affairs. The transactions comprising the balance are to be the subject of a more detailed review over the coming weeks but the LBIE Administrators' current view is that this amount will not be subject to change.

(J)    **LBIE FUTURE**

64    I understand that, depending upon the outcome of certain issues in the Joint Application, it may, at some stage, be in the interests of LBIE's creditors for LBIE to enter into liquidation.

65    The LBIE Administrators consider that all options are available with regard to whether LBIE might in due course go into liquidation. The LBIE Administrators will consider whether, and if so when, to place LBIE into liquidation, including in light of the Court's determination of the issues in the Joint Application. The LBIE Administrators' Proposals (as approved by creditors) expressly contemplate the possibility of a liquidation (a copy of the Proposals is at **pages 353-355 of RD1**). Further, if it is in the interests of creditors to do so, the costs of moving into liquidation are (relative to the potential sums at stake) de minimis.

(K)    **CONCLUSION**

66    For the reasons set out above, the Court is respectfully requested to provide directions for the determination of the issues identified in the Application.

67    I believe that the facts stated in this witness statement are true.

**Dated 2 August 2013**

.................................................

**Russell Downs**

Party: First Applicant
Witness: Russell Downs
Statement No: 4
Exhibit: "RD1"
Date: 2 August 2013

**IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
COMPANIES COURT**

**IN THE MATTER OF LEHMAN BROTHERS
INTERNATIONAL (EUROPE)
(IN ADMINISTRATION)**

**AND IN THE MATTER OF THE INSOLVENCY ACT
1986**

**BETWEEN:**

**(1) THE JOINT ADMINISTRATORS OF LEHMAN
BROTHERS INTERNATIONAL (EUROPE) (IN
ADMINISTRATION)
(2) THE JOINT ADMINISTRATORS OF LEHMAN
BROTHERS LIMITED
(IN ADMINISTRATION)
(3) THE JOINT ADMINISTRATORS OF LB
HOLDINGS INTERMEDIATE 2 LIMITED
(IN ADMINISTRATION)**

**Applicants**

**- and -**

**(1) LEHMAN BROTHERS HOLDINGS, INC
(2) LYDIAN OVERSEAS PARTNERS MASTER
FUND LIMITED**

**Respondents**

---

**FOURTH WITNESS STATEMENT OF**

**RUSSELL DOWNS**

---

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Tel:  (+44) 20 7456 2000
Fax: (+44) 20 7456 2222
Solicitors for the Applicants
Ref: Tony Bugg/Euan Clarke/Jared Oyston