Lani Adler Partners LLC
275 West 96th Street, Suite 15G
New York, New York 10025
Telephone (646) 732 3260
Ladler@LaniAdlerPartners.com

*Attorneys for Defendant Suburban Mortgage, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                          Debtors.

Chapter 11
Case No. 08-13555 (SCC)

---

LEHMAN BROTHERS HOLDINGS INC.,

                          Plaintiff,

      v.

1ST ADVANTAGE MORTGAGE, LLC *et al.*,

                          Defendants.

Central Adversary Proceeding
No. 16-01019 (SCC)

---

LEHMAN BROTHERS HOLDINGS INC.,

                          Plaintiff,

      v.

SUBURBAN MORTGAGE, INC.,

                          Defendant.

Adv. Proc. Nos. 16-01295 and
18-01825 (SCC)

---

**OBJECTIONS OF SUBURBAN MORTGAGE, INC. TO THE
BANKRUTPCY COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW IN
DETERMINING THAT LEHMAN BROTHERS HOLDINGS INC. HAS STANDING TO
BRING "CONTRACTUAL INDEMNIFICATION" COMPLAINT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

THE FACTS ............................................................................................................................... 1

    The Bankruptcy Decision to Which SMI Objects ............................................................. 1

    Jurisdiction of the District Court with Respect to These Objections .................................. 2

    Standard of Review ............................................................................................................ 3

    Legal Standard .................................................................................................................. 4

PRELIMINARY STATEMENT ................................................................................................. 5

OBJECTIONS ............................................................................................................................ 7

I.    SMI'S OBJECTIONS TO THE BANKRUPTCY COURT'S CONCLUSION THAT
    LBB ASSIGNED ITS INDEMNIFICATION RIGHTS AND REMEDIES TO
    LBHI AT THE TIME LBB SOLD THE LOANS TO LBHI ............................................. 9

        A.    SMI Objects to the Bankruptcy Court's Finding That LBHI Ever Held the
               Notes (Mixed Question of Law and Fact) ............................................................... 9

        B.    SMI Objects to the Bankruptcy Court's Reading of Section 711 of the Seller's
               Guide (Question of Law) ...................................................................................... 12

        C.    The Bankruptcy Court Erred in Reading the Sellers Guide Definition of
               Purchaser into the LPA in Finding that LBHI was a Purchaser Who Therefore
               Received the Indemnification Rights When The Loans were Sold by LBB to
               LBHI (Question of Law and/or Mixed Question of Law and Fact) ...................... 16

        D.    The Bankruptcy Court Erred in Failing to Address the Distinction in the
               Language in Section 711 of the Sellers Guide, Providing that a Subsequent
               Noteholder is a "Third Party Beneficiary," as compared to the Language in
               Sections 701 and 713.3 Which Provides that an Assignee of the Seller's
               Representations and Warranties is an "Intended Third Party Beneficiary"
               (Question of Law) ................................................................................................ 19

        E.    The Bankruptcy Court Erred in  Relying on the Desens Affidavit, the Template
               PPTL and Blank Bill of Sale Form in Holding that LBHI Received the
               Indemnification Rights and Remedies from LBB Pre-Petition (Question of
               Law and/or Question of Mixed Fact and Law) .................................................... 21

        F.    The Bankruptcy Court Erred in Ignoring Actual Signed Agreements and Finding
               That LBHI was an Assignee of LBB's Indemnification Rights and Remedies Pre-
               Petition (Question of Law and/or Question of Mixed Fact and Law) .................. 25

1.  The Court Erred in Disregarding and Mischaracterizing the Actual
Language of the Assignment Agreements ................................................25

2.  The Bankruptcy Court Erred In Disregarding the Actual Language of
the Assignment and Assumption Agreements and of the Mortgage Loan
Sale and Assignment Agreements (Question of Law and/or Mixed
Question of Law and Fact)........................................................................32

II.  THE COURT ERRED IN IGNORING THE MANY DIVESTITURE CASES
HOLDING THAT LBHI'S TRANSFER OF ALL OF ITS RIGHT, TITLE AND
INTEREST IN THE LOANS TO SASC IN SECURITIZING THE LOANS
DIVESTED LBHI OF STANDING (QUESTION OF LAW) ..........................................35

CONCLUSION .................................................................................................................37

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## <u>Cases</u>

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*,
57 F.3d 146 (2d Cir. 1995)...................................................................................6, 35

*Carter v. HealthPort Technologies, LLC*,
822 F.3d 47 (2d Cir. 2016)............................................................................ *passim*

*CIT Bank, N.A. v. Covino*,
17 Civ. 9579, 2022 WL 4234575 (S.D.N.Y. Sept. 14, 2022)..................................10

*Commerzbank AG v. U.S. Bank Nat'l Assn.*,
457 F.Supp.3d 233 (S.D.N.Y. 2020)...................................................................6, 36

*Cortlandt Street Recover Corp v. Hellas Telecommunications, S.A.R.L.*,
790 F.3d 411 (2d Cir. 2015)............................................................................. 22-23

*Diaz v. Lobel's of N.Y., LLC*, 16-cv-6349,
2019 WL 3429774 (E.D.N.Y. Jul. 30, 2019)............................................................4

*Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*,
544 F.2d 1126 (2d Cir. 1976)...................................................................................3

*Hollander v. American Cyanamid Co.*,
172 F.3d 192 (2d Cir. 1999)................................................................................2, 12

*In re Ames Dep't Stores, Inc.*,
582 F.3d 422 (2d Cir. 2009).....................................................................................3

*In re Ferguson*,
17 Civ. 2051, 2018 WL 99963877 (S.D.N.Y. Mar. 27, 2018) .................................3

*In re Lehman Brothers Holdings*,
Adv. Pro. 16-01019, 2018 WL 386966 (Bankr. S.D.N.Y. Aug. 13, 2018) ..............8

*In re Markus*,
629 B.R. 31 (S.D.N.Y. 2020).....................................................................................4

*In re Moskowitz*,
14 B.R. 677 (Bankr. S.D.N.Y. 1981)......................................................................22

*In re Vebeliunas*,
332 F.3d 85 (2d Cir. 2003)........................................................................................4

*John v. Whole Foods Mkt. Grp., Inc.,*
   858 F.3d 732 (2d Cir. 2017)............................................................................................4

*J.S. ex rel. N.S. v. Attica Central Schs.,*
   386 F.3d 107 (2d Cir. 2004)............................................................................................4

*Kamen v. Am. Tel. & Tel Co.,*
   791 F.2d 1006 (2d Cir. 1986).......................................................................................4-5

*Lebovits v. Cavalry Portfolio Services, LLC,*
   20-CV-01116, 2021 WL 1198967 (S.D.N.Y. Mar. 29, 2021)...............................................14

*Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.,*
   916 F.3d 116 (2d Cir. 2019)..............................................................................9, 11, 15

*Leon v. Martinez,*
   84 N.Y.2d 83 (1994)...............................................................................................22, 23

*Pacific Life Ins. Co. v. Bank of N.Y. Mellon,*
   17-cv-1388, 2022 WL 1446552 (S.D.N.Y. Feb. 22, 2022) ....................................................36

*Peoples Democratic Rep. of Yemen v. Goodpasture, Inc.*
   782 F.2d 346 (2d Cir. 1986)..........................................................................................16

*Phoenix Light SF Ltd. v. U.S. Bank Nat. Assn.,*
   14-cv-10116, 2015 WL 2359358 (S.D.N.Y. May 18, 2015).............................................6, 35

*Phoenix Light SF DAC v. U.S. Bank Nat'l Assoc.,*
   20-1312-cv, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) .........................................................6

*Process America, Inc. v. Cynergy Holdings, LLC,*
   839 F.3d 125 (2d Cir. 2016)..........................................................................................32

*Property Asset Mgment., Inc. v. Chicago Title Ins. Co., Inc.,*
   173 F.3d 84 (2d Cir. 1999)................................................................................. *passim*

*OneWest Bank, N.A. v. Melina,*
   827 F. 3d 214 (2d Cir. 2016)..........................................................................................10

*Rhythm & Hues, Inc. v. The Terminal Mkting Co., Inc.,*
   01 Civ. 4697, 2004 WL 941908 (S.D.N.Y.  May 4, 2004)......................................................7

*Security Nat'l Mortg. Co.v. Aurora Bank FSB,*
   No. 2:11-CV-00434 DN, 2014 WL 7366063 (D.Utah, Dec. 24, 2014)..................................14

*Shipping Fin. Servs. Corp. v. Drakos,*
   140 F.3d 129 (2d Cir. 1998)............................................................................................4

*S.T.A. Parking Corp. v. General Star Indemnity Co.*,
    19-cv-4250, 2019 WL 7115307 (S.D.N.Y. Dec. 23, 2019).....................................................19

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000)....................................................................................................13

*Triaxx Prime CDO 2006-1, LTD v. Bank of N.Y. Mellon*,
    16 Civ. 1597, 2017 WL 1103033 (S.D.N.Y. Mar. 21, 2017) .............................................6, 35

*Wells Fargo Bank, N.A. v. 390 Park Ave. Assocs., LLC*,
    16 Civ. 9112, 2018 WL 4373996 (S.D.N.Y. Sept. 12, 2018)......................................... *passim*

## Rules and Statutes

Fed. R. Bank. P. 7012 .................................................................................................................2

Fed. R. Bank. P. 9033 ............................................................................................................1, 2

Fed. R. Civ. P. 12(b)(1)....................................................................................................1, 2, 3, 4

N.Y.G.O.L. §13-107 ..............................................................................................................6, 36

S.D.N.Y. Amended Standing Order of Reference, M10-468, 12 Misc. 00032 ..............................3

Pursuant to Federal Rule of Bankruptcy Procedure 9033, Suburban Mortgage, Inc. ("SMI")

states the following objections to the August 16, 2022 decision of the Bankruptcy Court (Chapman,

J.) denying SMI's motion to dismiss, argued October 16, 2019, on the grounds that the plaintiff,

Lehman Brothers Holdings, Inc. ("LBHI") lacked standing.  SMI files these objections to the findings

of fact and conclusions of law made by the Bankruptcy Court in that portion of the Bankruptcy

Court's decision, *In re Lehman Brothers Holdings Inc*., Case No. 08-13555, Adv. Pro. Nos. 16-

01019, 18-01825, 2022 WL 3386473 (Bankr. S.D.N.Y. Aug. 16, 2022) ("the Decision")[1], which

denied SMI's fact-based challenge to standing.

## THE FACTS

The underlying facts of the litigation are set forth in full in SMI's moving and reply papers,

including the exhibits attached to the moving and reply affidavits, submitted by SMI to the

Bankruptcy Court on the motion to dismiss.[2]

## The Bankruptcy Court Decision to Which SMI Objects

The Bankruptcy Court heard oral argument on SMI's motion to dismiss on October 16, 2019,

---

[1] Citations herein to the Bankruptcy Court's decision denying SMI's motion to dismiss are referenced as Decision,
with the starred page number reflecting the page in the published decision available on Westlaw, 2022 WL 3386473.

[2] These were  the Memorandum of Law in Support of Certain Defendants' Motion to Dismiss RMBS Complaints
Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction and Standing, filed May 13, 2019, Adv. Pro. 16-01019,
ECF 915-14 ("SMI Mem."); the accompanying Declaration of Lani Adler in Support of Moving Defendants' Motion to
Dismiss RMBS Complaints, dated May 13, 2019, ("Adler Aff."),  and the exhibits to it, ECF Nos. 915-1-915-8; the
Declaration of Tracy L. Henderson in support of Motion to Dismiss for Lack of Subject Matter and Standing, dated May
13, 2019, ("Henderson Dec.") and the exhibits to it, ECF Nos. 915-9-915-13; the Reply Memorandum of Law of
Suburban Mortgage, Inc. and Certain Moving Defendants in Further Support of Motion to Dismiss RMBS Complaints for
Lack of Subject Matter Jurisdiction and Lack of Standing, ECF No. 1259 ("SMI Reply Mem."); the Declaration of Lani
A. Adler in Further Support of Motion to Dismiss ("Adler Reply Aff.") and the exhibits attached to it, dated September
18, 2019, ECF No. 1260; and  the Declaration of Vernon Rupp in Further Support of Motion to Dismiss, dates September
17, 2019, ("Rupp Dec.") and the exhibits to it, ECF No. 1261. Each is included in the record  that will be transmitted to
the District Court with these Objections,  along with the papers submitted by LBHI in opposition to the motion, the
transcript of the October 16, 2019 oral argument on the motion, ECF No. 1284; and correspondence submitted by counsel
for LBHI immediately before following the oral argument and that submitted by counsel for SMI in response.   ECF
Nos.1277, 1293, and 1299.  The transcript of the October 16, 2019 hearing on the motion to dismiss was filed as  ECF
No. 1284. A copy of the Decision is also included in the record.  ECF references to documents herein are to the ECF
filing number for documents filed in Adv. Pro. 16-01019, unless otherwise indicated.

almost three years ago.  It did not hold any evidentiary hearing.  At the oral argument, based on a

letter filed by counsel for LBHI the evening before, the Court struck the entire the Rupp Reply

Declaration submitted by SMI and the exhibits attached to it, based on the Court's objections to one

sentence in that affidavit.  *See* Oct. 16, 2019 hearing transcript, ECF No. 1284, at 14-17.  The Court

would not permit counsel for SMI to make a record with respect to its striking of the Rupp Reply

Declaration.  *Id.* 17-19.  After the oral argument counsel for LBHI and SMI filed correspondence

with the Court addressing this, in which counsel for SMI cited authority to the Court for striking only

the offending portions of the affidavit.  ECF No. 1299.  *See Hollander v. American Cyanamid Co*.,

172 F.3d 192, 198 (2d Cir. 1999) (*quoted in* ECF No. 1299 at 2).  The Court did not respond and did

not consider Mr. Rupp's affidavit.

The Bankruptcy Court's Decision did not describe its findings as findings of fact and

conclusions of law.

The Bankruptcy Court issued the decision denying SMI's motion on August 16, 2022, and

granted SMI's request, pursuant to Fed. R. Bankr. 9033, for an extension of time though September

21, 2022, to respond to it.  ECF No. 1724.  SMI has not consented to adjudication by the Bankruptcy

Court of any claims brought by LBHI against SMI in the underlying matter, which contains a single

state law claim labelled as one for "contractual indemnification." ECF No. 886.

**Jurisdiction of the District Court with Respect to These Objections**

A defendant, such as SMI in the Bankruptcy proceeding, is permitted to make a fact-based

challenge to standing pursuant to Rule 12(b)(1), Fed. R. Civ. P., made applicable to the bankruptcy

adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, at which the Court

may consider evidence beyond the pleading.  *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47,

57 (2d Cir. 2016).  "In opposition to such a motion, the plaintiffs will need to come forward with

evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Id.* (quoting *Exchange Nat'l Bank of Chicago v. Touche Ross & Co*., 544 F.2d 1126, 1131 (2d Cir. 1976)). The plaintiff may rely on the allegations in the complaint "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id.* If, however "the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Id.* While here the Bankruptcy Court did not denominate any of its determinations as findings of fact or conclusions of law, this Court should treat the Bankruptcy Court's order as "proposed findings of fact and conclusions of law," since in situations such as this, where there is a fact-based challenge to standing based on material and controverted extrinsic evidence, the Bankruptcy Court was obligated to issue findings of fact and conclusions of law. *Carter*, 822 F.3d at 57. *See* S.D.N.Y. Amended Standing Order of Reference, M10-468, 12 Misc. 00032.

## Standard of Review

On review, if the Bankruptcy Court "resolved disputed facts," the court's findings may be accepted unless they are "clearly erroneous." *Carter*, 822 F.3d at 57. "A finding is 'clearly erroneous" when the reviewing court is 'left with the definite and firm conviction that a mistake has been made.' " *In re Ames Dep't Stores, Inc*., 582 F.3d 422, 426 (2d Cir. 2009) (internal citation omitted); *In re Ferguson,* 17 Civ. 2051, 2018 WL 99963877, *4 (S.D.N.Y. Mar. 27, 2018). The Bankruptcy Court's conclusions of law are reviewed de novo, " ' as well as findings that are based on undisputed facts evidenced in the record, and decisions in which 'the [court below] engaged in no fact-finding in support of its dismissal order.' " *Carter,* 822 F.3d at 57 (internal citation omitted).

Mixed questions of law and fact are also reviewed de novo. *In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003); *In re Markus*, 629 B.R. 31, 34 (S.D.N.Y. 2020).

The Bankruptcy Court acknowledged that SMI made both facial and factual challenges to standing. Decision *5. SMI's objections are to the Bankruptcy Court's findings of fact and conclusions of law, regardless of the fact that the Bankruptcy Court did not label its findings as findings of fact conclusions of law, and to the Bankruptcy Court's resolution of mixed questions of law and fact, with respect to SMI's fact challenge to standing.

A dismissal for lack of Article III standing is a dismissal for lack of subject matter jurisdiction. *John v. Whole Foods Mkt. Grp., Inc.,* 858 F.3d 732, 735 (2d Cir. 2017).

## Legal Standard

LBHI has (and had) the burden of proving subject matter jurisdiction and standing by a preponderance of the evidence. *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir. 2000). In assessing the motion to dismiss for lack of standing, the Bankruptcy Court was not to "rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Central Schs*., 386 F.3d 107, 110 (2d Cir. 2004). "[Jurisdiction must be shown affirmatively , and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). On a fact-based challenge to standing, when considering the evidence outside the pleadings, such as affidavits and exhibits, "the court is guided by the body of decisional law that has developed under Rule 56 of the Federal Rules of Civil Procedure." *Diaz v. Lobel's of N.Y., LLC*, 16-cv-6349, 2019 WL 3429774, *3 (E.D.N.Y. Jul. 30, 2019). *See Kamen v. Am. Tel. & Tel Co*., 791 F.2d 1006, 1011 (2d Cir. 1986) ("While a 12(b)(1) motion cannot be converted into a Rule 56 motion, Rule 56 is relevant to the jurisdictional challenge

in that the body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings.")

## **PRELIMINARY STATEMENT**

As shown below, in determining that LBB had assigned its "indemnification" rights to sue SMI for breaches of SMI's selling representations and warranties before LBHI filed its Bankruptcy Petition on September 15, 2008 ("the Petition Date"), the Bankruptcy Court accepted the conclusory statements in the affidavits submitted by LBHI, which were directly controverted by explicit language in the post-Petition Assignment Agreements, other LBHI securitization agreements and LBHI's own sworn statements in other federal court cases, submitted by SMI.  In concluding that SMI's evidence did not controvert LBHI's bald statements, the Bankruptcy Court addressed neither the specific language in these agreements, which expressly stated that LBB did not assign the indemnification rights and remedies pursuant to which LBHI insisted it had standing until those Agreements were entered – which was, with respect to SMI, after the Petition was filed, nor LBHI's statements in other federal cases, in which LBHI stated that, contrary to the position it took in opposing SMI's motion, which the Bankruptcy Court accepted, it received the indemnification rights and remedies pursuant to a September 2, 2008 Assignment Agreement from LBB – not at the time that LBB sold LBHI the loans.

Nor did the Decision ever address the well-established case law in this Circuit that SMI briefed and argued holding that one party's conveyance of all of its "right, title and interest," in property, such as LBHI 's transfer of all of its right, title and interest in and to the SMI-originated loans to the securitization depositor, Structured Asset Securities Corporation ("SASC") and the RMBS Trustees before the Petition Date, transfers to the assignee the right to sue under the underlying contract including the right to sue concerning the representations and warranties, and

divests the assignor, here LBHI, of those rights – such that LBHI was divested, pre-petition, of the rights to sue SMI based on SMI's purported breaches of the representations and warranties it made to LBB when LBHI securitized the loans and sold them to SASC before the Petition was filed. *See Phoenix Light SF DAC v. U.S. Bank Nat'l Assoc.*, 20-1312-cv, 2021 WL 4515256, *1 (2d Cir. Oct. 4, 2021); *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 152 (2d Cir. 1995); *Triaxx Prime CDO 2006-1, LTD v. Bank of N.Y. Mellon,* 16 Civ. 1597, 2017 WL 1103033, *3 (S.D.N.Y. Mar. 21, 2017); *Phoenix Light SF Ltd. v. U.S. Bank Nat. Assn.*, 14-cv-10116, 2015 WL 2359358, *2 (S.D.N.Y. May 18, 2015); SMI Mem. at 25-34, ECF No. 915-14.

The Bankruptcy Court did not reference any language in the agreements pursuant to which LBHI transferred all of its right, title and interest in the SMI-originated loans to the depositor, SASC and to the RMBS Trustees, that expressly reserved to LBHI (and did not grant to the assignees) the right to sue SMI for indemnification based on SMI's purported breaches of representations and warranties – because there is no such language in the securitization agreements. See N.Y.G.O.L. §13-107 ("Unless expressly reserved in writing," any transfer of an interest in a mortgage under which securities are issued vests in the transferee all claims or demands for damages against obligor and against guarantor of the obligation of the obligor). Absent the requisite express reservation of the right to sue for SMI's alleged breaches of its selling representations and warranties, LBHI was, under the controlling law, divested of standing. *See Commerzbank AG v. U.S. Bank Nat'l Assn.*, 457 F.Supp.3d 233, 243 (S.D.N.Y. 2020).

As the party claiming that it had a valid assignment of the indemnification remedy at the time the bankruptcy petition was filed, LBHI had the burden of establishing, by a preponderance of the evidence, that, before the Petition Date, that LBB had assigned to LBHI the right to sue SMI for the damages purportedly incurred by LBHI when LBHI made representations and warranties to the

RMBS Trusts which, LBHI alleged, it did in relying, "in part," on the representations and warranties made by SMI to LBB when SMI sold the loans to LBB between 2004-2007. Adv. Compl. ¶35, Adler Aff. Ex. A, ECF No. 915-2, and that LBHI was not divested of those rights, pre-petition, when LBHI assigned all of its right, title and interest in the loans to SASC and the RMBS Trusts. *Rhythm & Hues, Inc. v. The Terminal Mkting Co., Inc.,* 01 Civ. 4697, 2004 WL 941908, *10 (S.D.N.Y. May 4, 2004). *See Property Asset Mgmnt.*, *Inc. v. Chicago Title Ins. Co., Inc.*, 173 F.3d 84 (2d Cir. 1999).

SMI raised two baskets of arguments as to why LBHI lacked standing: First, that, as set forth in the specific language in the post-petition written Assignment Agreements that listed on SMI on the schedules attached to them, and the securitization documents, LBB did not convey any indemnification rights or remedies with respect to the SMI loans until after the Petition date; and second that, even if LBHI did have indemnification rights against SMI before the Petition Date, LBHI was divested of those rights when, pre-Petition, LBHI transferred all of its "right, title and interest" in the SMI-originated loans to SASC and the RMBS Trustees.

## OBJECTIONS

The dispositive question raised on SMI's motion to dismiss for lack of standing in the Bankruptcy Court, and addressed by the SMI, LBHI and the Bankruptcy Court in its decision, is whether LBHI had any actionable rights to sue SMI and/or enforce the representations and warranties made by SMI to LBB in the LPAs and Broker Agreement on September 15, 2008, the date on which LBHI filed its bankruptcy petition ("the Petition Date").

The Bankruptcy Court has held that LBHI "obtained contingent, unmatured indemnification rights against SMI prior to the Petition Date, which rights "ripened" into the RMBS Indemnification Claims following the Bankruptcy Court's entry of the Estimation Order allowing the RMBS Trustee Claims, giving the Court subject matter jurisdiction over the RMBS Indemnification claims."

Decision *4.  This determination has not been substantively reviewed by any Article III court.  Such "contingent, unmatured rights," if acquired by LBHI pre-petition were "Litigation Claims" within the meaning of the Plan, which the Bankruptcy Court determined enabled it to exercise subject matter jurisdiction over them.  *Id.* *5.  *See In re Lehman Brothers Holdings*, Adv. Pro. No. 16-01019, 2018 WL 386966 (Bankr. S.D.N.Y. Aug. 13, 2018).  If, as SMI has argued, and demonstrated through contracts *signed by LBHI*, LBHI did not hold these indemnification rights at the time the Petition was filed, either because LBB did not assign them to LBHI until after the Petition was filed (as reflected in the Assignment Agreements and in the Assignment and Assumption Agreements), or because LBHI was divested of these indemnification rights when, pre-Petition,  LBHI transferred all of its right, title and interest to SASC and the RMBS Trusts, as set forth in the Mortgage Sale and Assignment Agreements ("MSLAAS"), and with that transfer, LBHI was divested of its ability to pursue claims for breaches of SMI's selling representations and warranties, then LBHI was divested of its rights to sue LBHI – such that LBHI lacks standing.

According to the Bankruptcy Court, these "contingent, unmatured rights" predicated LBHI's claim for "contractual indemnification" against SMI and hundreds of other mortgage originators and brokers, because LBHI (supposedly) held these contingent, unmatured rights pre-petition – which then "ripened" into "indemnification" claims when LBHI "settled" with the RMBS Trustees.  This "settlement," according to the Bankruptcy Court, occurred when, in 2018, following an "Estimation Proceeding,"  the Bankruptcy Court selected of one of two estimated damage numbers reflecting, at least for purposes of effectuating a settlement between LBHI and the RMBS Trust, the estimated aggregate of damages incurred by the RMBS Trusts that had sued LBHI; one number was  submitted by LBHI, and the other by the RMBS Trustees.  Consequently, according to the Bankruptcy Court, LBHI's "contractual indemnification" claims against SMI and the other mortgage originators/brokers

were timely inasmuch as, according to the Bankruptcy Court, they did not accrue until 2018 when the Bankruptcy Court chose the settlement number.  (A claim for breach of contract by LBHI against the mortgage originators for breach of the originators' selling reps and warranties would have been barred by the statute of limitations.) The Court selected the liability number proposed by LBHI, and explicitly told one mortgage originator that "nothing . . . in the estimation proceeding will in any way change, diminish, expand, affect your rights in any way.  It can't be used against you.  It can't be used.  It can't change anything." *See* accompanying Affirmation of Lani Adler in Support of Suburban Mortgage, Inc.'s Objections, dated September 21, 2022 ("Adler Obj. Aff.") Ex. A ( July 6, 2017 Tr. 37-39, Case No. 08-13555).  The issue of whether what LBHI has characterized as its "contractual indemnification" claims against SMI and the other mortgage/originators is, in actuality, a breach of contract claim for which the statute of limitations expired before LBHI sued the mortgage originators/brokers and/or whether these claims properly can be considered indemnification claims has not yet been reviewed by an Article III court.  *See generally Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, 916 F.3d 116 (2d Cir. 2019).

I.    **SMI OBJECTS TO THE BANKRUPTCY COURT'S CONCLUSION THAT LBB ASSIGNED ITS INDEMNIFICATION RIGHTS AND REMEDIES TO LBHI AT THE TIME LBB SOLD THE LOANS TO LBHI**

   A.    **SMI Objects to the Bankruptcy Court's Finding That There Was Evidence Showing That LBHI Had Held the Notes (Mixed Question of Law and Fact)**

The Bankruptcy Court concluded that the language of the LPA and of Section 711 of the Sellers Guide, which states that "Seller shall indemnify purchaser and Purchaser's designee (including without limitation, any subsequent holder of any Note)" from losses "that the Purchaser may sustain in any way related to or resulting from" "any breach of any warranty, obligation, representation or covenant" provided LBHI, before the Petition Date, with "the

RMBS Indemnification Claims as both a "Purchaser" and "subsequent holder of any Note." Decision *6.

However, because there is no allegation in the Complaint, and LBHI did not submit any evidence showing, that LBHI ever in fact held the note, the Bankruptcy Court erred in finding that LBHI acquired indemnification rights as a purported "note holder." Under New York law, which governs this action, "either a written assignment of the underlying note or the physical delivery of the note" prior to the commencement of the action is required for a foreclosure plaintiff to demonstrate standing sufficient to enforce the note and the underlying agreement. *CIT Bank, N.A. v. Covino*, 17 Civ. 9579, 2022 WL 4234575 (S.D.N.Y. Sept. 14, 2022*); Wells Fargo Bank, N.A. v. 390 Park Ave. Assocs., LLC*, 16 Civ. 9112, 2018 WL 4373996, *5 (S.D.N.Y. Sept. 12, 2018*). See OneWest Bank, N.A. v. Melina*, 827 F. 3d 214, 222 (2d Cir. 2016). While here, LBHI likewise seeks to enforce the underlying agreement, it has proffered neither any written assignment of any note concerning any of the SMI-originated loans, nor evidence reflecting physical delivery of the note from LBB to LBHI for these loans.

The only "evidence" LBHI submitted to show that it held the note, its unilaterally created "Whole Loan Tracking System," Osborne Aff. Ex. D, purported to show the dates of the purchases by LBHI and of the sales by LBHI of the particular SMI-originated loans. However, this document does not reflect a written assignment signed by LBB to LBHI, nor any physical delivery of any notes. While once a note is transferred, " 'the mortgage passes as incident to the note' . . . 'an entity with a mortgage but no note lack[s] standing.'" *Aurora Loan Services v. Taylor,* 25 N.Y.3d 355, 366 (2015). The Bankruptcy Court appears to have presumed that LBHI's holding of the loans meant that LBHI likewise held the notes pre-Petition, since the Decision states that LBHI was "a subsequent holder of the mortgage loans at issue," Decision *8.

However, for LBHI to have owned the loans without the notes would not have been sufficient, in the absence of a written assignment of the particular loans or physical delivery of the notes, to generate standing. Moreover, the Whole Loan Tracking exhibit does not evidence that, in fact, LBHI ever even held all of the SMI-sourced loans , since for 16 of the total of the 39 SMI-originated loans at issue, the Whole Loan Tracking exhibit shows that at the identical moment the particular loans were sold by LBB to LBHI, they were also sold – at the same moment – by LBHI to SASC, and by SAC to the RMBS Trust. Rupp Aff. ¶16.[3]

Indeed, the Whole Loan Tracking exhibit, which was credited by the Bankruptcy Court as evidence of a standing-predicating assignment to LBHI, does not show that LBHI ever purchased or sold 23 of the total of 39 SMI-originated loans at issue in the Adversary Complaint. Rupp Reply Dec. ¶23. Neither does the Whole Loan Tracking exhibit show evidence that LBB assigned any indemnification rights or remedies to LBHI when LBB purported sold the loans to LBHI – it contains no reference whatsoever to the transfer of such rights. It does not address that at all.

However, the Bankruptcy Court refused to even consider these facts about the Whole Loan Tracking exhibit, because the Bankruptcy Court struck the entire Rupp affidavit, based on eleven lines in a letter counsel for LBHI sent the Bankruptcy Court late on October 15, 2019, literally the night before the October 16, 2019 hearing on the motion – though Mr. Rupp's affidavit was filed on September 18, 2019, so counsel had had 28 days before then in which LBHI could have timely filed objections to it. *See* ECF No. 1277. At the hearing, the Bankruptcy Court refused to permit counsel for SMI to address or even to make a record

---

[3] *See Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, 916 F.3d 116, 120n.6 (2d Cir. 2019) (noting that "[i]n the same moment" that the mortgage originator sold the loans to LBB, SASC, the depositor, which was the depositor for the at issue loans here, transferred "all the right title and interest" in the loans in to the RMBS Trusts.

concerning the purported issues with the Rupp affidavit. The *only* portion of the Rupp affidavit to which the Court objected on the record was Mr. Rupp's comment that because the Whole Loan Tracking exhibit reflected that loans were simultaneously transferred by LBB to LBHI, and by LBHI to SASC and to the RMBS Trust – a fact that LBHI has not challenged, "[i]t appears that the transfer of these loans, in reality, went from LBB to the Trust and that LNHI may never have actually held the loans, or actually possessed the notes – but instead engaged in effectively a virtual fiction, possibly for book-keeping or net cash settlement trueing-up purposes." Rupp Dec. ¶24. *See* Oct. 16, 2019 Tr. at 16-17, ECF No. 1284.

While SMI disagrees that this sentence warranted striking, as SMI pointed out to the Bankruptcy Court, the Bankruptcy Court properly should have struck that portion of the Rupp Affidavit the Court believed improper, and not the whole affidavit. *See Hollander v. American Cynamid Co.,* 173 F.3d 192, 198 (2d Cir. 1999) (cited in letter dated Nov. 13, 2019 sent by counsel for SMI to the Bankruptcy Court, ECF No. 1299, at page 2n.1)). As a matter of law, the Bankruptcy Court erred in striking the entire Rupp Affidavit and by doing so it failed to consider explicit contract language in LBHI's securitization contracts, as well as facts about the Whole Loan Tracking exhibit the Bankruptcy Court credited as controverting SMI's arguments, which show that LBB did not assign its indemnification rights to LBHI prior to LBHI's securitization of the loans – such that LBHI did not have such indemnification rights before the Petition Date and therefore could not have properly relied on them when LBHI securitized the loans because these indemnification rights were not assigned by LBB to LBHI when LBB sold the loans to LBHI – contrary to the Bankruptcy Court's Decision.

**B.    SMI Objects to the Bankruptcy Court's Reading of Section 711 of the Seller's Guide (Question of Law)**

1.    The Bankruptcy Court erred in its reading and application of Section 711 of the

Sellers Guide in finding that it provided LBHI with standing.  At the threshold, the one sentence on which the Court relied in Section 711 defined Purchaser as LBB, and, according to the Court, defined "Purchaser's Designee" as LBHI, since LBHI was, according to the Bankruptcy Court, a subsequent holder of a note.  Decision *6-7.  However, the same sentence goes on to provide that the Seller (SMI) "shall indemnify Purchaser and Purchaser's designee (including, without limitation, any subsequent holder of any Note) from and hold them harmless against all claims, etc. . . . that *the Purchaser* may sustain in any way related to" a seller's breach of reps, warranties contained in or made in the Seller's Guide or LPA (emphasis added).  Since "Purchaser" cannot mean only LBB in the first portion of the sentence, but include LBHI when used later in the same sentence to reference the party incurring the losses for which the Seller is obligated to indemnify, this means at most that LBHI, as the Purchaser's designee, would be entitled to indemnification for losses sustained by LBB, the Purchaser – but that LBHI cannot sue for damages incurred by Purchaser's designee, which is LBHI – meaning that LBHI is not entitled to indemnification for damages that it, LBHI, sustained.

Here, LBHI seeks "indemnification" from SMI for LBHI's own damages, not for damages incurred by LBB for whicht LBHI had to pay  the RMBS Trustees.  LBB was not a debtor in the underlying LBHI bankruptcy proceeding, Chapter 11, Case No. 08-13555, and therefore could not have been properly sued in it by the RMBS Trustees, in the proceeding that LBHI alleges gave rise to its entitlement for indemnification (for damages caused by LBHI's actions in making actionable representations and warranties to the RMBS Trusts, not for damages caused by LBB's actions) from SMI.  The Bankruptcy Court was obligated to interpret Section 711 "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).

The definition of Purchaser in Section 711 therefore precludes LBHI's claim against SMI for damages that LBHI, rather than LBB, incurred – as there is no allegation that LBB ever paid any third party for losses that LBB incurred or that LBHI paid the RMBS Trusts to settle claims the Trusts had against LBB.

Indeed, because LBB sold the loans to LBHI without recourse and was fully paid for them, LBB had no losses for which it or LBHI could seek compensation.  SMI Mem.at 4n.4. ECF No. 915-14.  *See Security Nat'l Mortg. Co. v. Aurora Bank FSB*, No. 2:11-CV-00434 DN, 2014 WL 7366063, *4 (D. Utah, Dec. 24, 2014) ("Not only was LBB fully compensated for the sale of the loans to LBHI, but all of the loans were purchased by LBHI from LBB "without recourse" so that LBHI did not have any remedies against LBB for deficiencies in the loans)).

"Since an assignee can obtain no greater rights than the assignor had at the time of the assignment," *Lebovits v. Cavalry Portfolio Services, LLC*, 20-CV-01116, 2021 WL 1198967, *5 (S.D.N.Y. Mar. 29, 2021), the Bankruptcy Court's reliance on this sentence in Section 711 to generate standing for LBHI's claim against SMI for damages that LBHI sustained (and caused) is misplaced.  The Bankruptcy Court's reading of Section 711 would enable LBHI to be indemnified for damages it sustained  as well as for damages sustained by LBB.  That reading affords LBHI greater rights than what LBB had and expands the scope of  LBHI's rights to indemnification beyond the limitation set forth in the express language of 711.  The Bankruptcy Court erred as matter of law in determining that, under Section 711 of the Sellers Guide because LBHI was "Purchaser's Designee" as a subsequent noteholder (assuming, for purposes of argument, that LBHI did in fact hold the SMI loan notes), LBHI had standing to sue SMI for indemnification for LBHI's own damages.

2.      The Bankruptcy Court independently misread Section 711 in presuming that it provides a basis for LBHI's alleged "contractual indemnification" claim against SMI, rather than a claim for breach of contract.  Section 711, titled "Indemnification and Third Party Claims, has two paragraphs.  The first paragraph uses the word "indemnify" and describes indemnification as an additional remedy, in addition to the repurchase and cure obligations set out in Section 710 of the Sellers Guide, that the Purchaser, defined as LBB and arguably, LBHI as LBB's "designee" (assuming LBHI was, in fact, a note holder) had against the mortgage originator ("the Seller) for losses suffered by LBB as a consequence of the Seller's breach of reps and warranties.

The second paragraph of Section 711 addresses an entirely distinct subject – it explicitly sets forth the Seller's and Purchaser's obligations if a claim is made by a third party *to the Seller* "with respect to this Seller's Guide."  This second paragraph only mentions indemnification when it exempts the Purchaser's obligation to reimburse the Seller for defending such a third party claim, if the third-party claim against the Seller is "related to" a breach by the Seller of it its representations or warranties.  *See Frontline Communications Inter'l, Inc. v. Sprint Communications*, 178 F.Supp.2d 432, 436 (S.D.N.Y. 2001) ("a contract must be interpreted in accordance with the intent of the parties as revealed by the language and structure of the contract.") The actual text of 711 does not support LBHI's assertion that its claim against SMI is for "contractual indemnification," rather than for breach of an agreement between SMI, on the one hand, and LBHI, as LBB's designee, on the other hand.  LBHI could not and has not plead a claim for breach of contract against SMI because such a claim would be untimely.  The Bankruptcy Court erred in interpreting the first paragraph of Section 711 to create standing for LBHI to litigate a claim other than one for breach of contract – which raises a question of law. *See Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, 916 F.3d 116, 125-

127 (2d Cir. 2019).  LBHI's complaint against SMI alleges that LBHI had to settle the RMBS

Trustees' claims that LBHI breached reps and warranties when LBHI sold them the loans, and

that the actionable representations and warranties made to the Trusts were made by LBHI

"based, in part," Adv. Compl.¶ 35, on the reps and warranties made by SMI to LBB.[4] LBHI is

suing SMI to recover for damages that *LBHI caused*; there is no allegation that the RMBS

Trustees relied on SMI's reps and warranties.  "An action does not become one for indemnity

merely because the pleader has so denominated it." *Peoples Democratic Rep. of Yemen v.*

*Goodpasture, Inc.*, 782 F.2d 346, 350 (2d Cir. 1986) (internal quotation omitted.) *See* Oct. 16,

2019 Tr. at 106-107, 115.  This is a question of law since it is based on the Bankruptcy Court's

interpretation of contractual language in Section 711.

    3.    If the Bankruptcy Court were correct that under Section 711 of the Sellers Guide,

SMI agreed to indemnify any subsequent noteholder,  and that all subsequent noteholders are

intended beneficiaries of the representations and warranties made by SMI to LBB, then SMI

would have not only agreed to indemnify LBHI (assuming, for purposes of argument, that LBHI

was in fact a subsequent noteholder), but it would also have agreed to indemnify the RMBS

Trustees who were subsequent noteholders; and each of these subsequent noteholders, including

LBHI, would have been parties to the LPA agreement between SMI and LBB, which

incorporated the Sellers Guide.  Under the Bankruptcy Court's reading of Section 711, all

subsequent noteholders are intended third party beneficiaries of SMI's indemnity obligation,

with the right to enforce the mortgage originator's selling reps and warranties.  Since each

subsequent note holder, therefore, is substantively a party to the underlying LPA agreement

---

[4] To date, LBHI has not disclosed what representations and warranties it made to the RMBS Trustees, over which the Trustees sued LBHI, that were not based on those representations and warranties made by SMI to LBB.  Nor has LBHI disclosed what due diligence it undertook or represented it undertook to the Trusts in connection with the representations made by LBHI to the Trusts about the quality and characteristics of the loans that LBHI determined to securitize to them.

between SMI and LBB, with the right to be indemnified by SMI, the settlement payment made

by LBHI, one note holder and/or one intended third party beneficiary of the LPA/Sellers Guide,

to the RMBS Trusts, who were also subsequent noteholders and/or intended third party

beneficiaries of the LPA/Sellers Guide, was not a payment to or from a third party but rather was

a payment by one party to the LPA agreement, to another party to the same agreement, each of

whom had the same rights under that agreement.  Accordingly, under this reading of Section 711,

adopted by the Bankruptcy Court in the Decision, there could be no predicate for LBHI's claim

based on its alleged payment to the RMBS Trustees, whom LBHI has characterized – as one for

"contractual indemnification," rather than for breach of contract – because was no underlying

payment by LBHI to a "third party." *See* Decision *7.

      C.      **The Bankruptcy Court Erred in Reading the Sellers Guide Definition of Purchaser into the LPA in Finding that LBHI was a Purchaser Who Therefore Received the Indemnification Rights When The Loans were Sold by LBB to LBHI (Question of Law and/or Mixed Question of Law and Fact)**

The Bankruptcy Court also determined that LBHI had rights to sue SMI for

indemnification because LBHI was a "purchaser under the definition of "Purchaser" in Section

800 of the Seller's Guide.  Decision *6.  However, the Bankruptcy Court erred in applying that

Sellers Guide definition, which raises a question of law.  While the Sellers Guide defines

Purchaser as "Refers to the entity set forth on the related Purchase Advice as the Purchaser, its

successors and/or assigns for a particular Mortgage Loan," Osborne Aff. Ex. C, the LPA

specifies, in Section 5, that "Capitalized terms used but not defined herein shall have the

respective meanings set forth in Section 8 of the Seller's Guide."  Since the LPA defines LBB as

the Purchaser in the signature portion of the LPA, the definition of Purchaser in the Sellers Guide

does not apply.

Further, as discussed below, because LBHI did not become an "assign" of the indemnification rights for the SMI-originated loans until after the Petition Date, when, under the Assignment Agreements, these rights were assigned by LBB to LBHI, the definition of Purchaser in Section 8 does not support the Bankruptcy Court's finding that LBHI received the indemnification rights from LBB before the Petition date. LBHI did not become an "assign" of any rights to enforce the SMI loans until at least 2012, long after the Petition Date, when the first of the Assignment Agreements that names SMI in the schedule of mortgage originators attached to it, was executed between LBB and LBHI. Adler Aff. Ex. D.

Though the Adversary Complaint states that "In conjunction with the sale by LBB to LBHI of the Defective Loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the loans," Adv. Compl. ¶20, ECF No. 915-2, the Adversary Complaint conspicuously fails to state *when* LBB assigned its rights under the agreements pertaining to the SMI loans to LBHI. Accordingly, the Bankruptcy Court could not have relied on the supposedly "well-pleaded allegations" in the Adversary Complaint against SMI, as the Decision states, Decision *8, because there is no allegation in the Adversary Complaint as to when LBB assigned the indemnification rights to LBHI. LBHI could not have properly or actionably relied, "in part" or otherwise, on the representations and warranties made by SMI to LBB in the Broker Agreement and LPA, when LBHI " made certain representations and warranties regarding the quality and characteristics of certain of the loans that were co-extensive with those made by" SMI, Adv. Compl. ¶2, absent a valid assignment of the indemnification remedies. *See id.* ¶35 ("In connection with such securitizations, LBHI relied on information that Defendant provided to LBB, and it made representations and warranties to the securitization trusts, based, in part, on the representations Defendant made to LBB.").

18

**D.    The Bankruptcy Court Erred in Failing to Address the Distinction Between the Language in Section 711 of the Sellers Guide, Providing that a Subsequent Noteholder is a "Third Party Beneficiary," and the Language in Sections 701 and 713.3 Which Provides that an Assignee of the Seller's Representations and Warranties is an "Intended Third Party Beneficiary" (Question of Law)**

The Bankruptcy Court determined that LBHI had standing because it was a third-party beneficiary of the LPA. Decision *8. However, the Bankruptcy Court did not address the fact that while Section 711 of the Sellers Guide states that "any subsequent holder of any note acquired hereunder by Purchase shall be a third party beneficiary of the Loan Purchase Agreement and this Seller's Guide," this language i) would make the RMBS Trustees likewise third party beneficiaries – with all of the same rights against SMI as noteholders as LBHI (regardless of whether LBHI did or did not assign its indemnification rights to SASC and the RMBS Trusts in the MSLAAs, *see* Point II below); and ii) would make LBHI and the RMBS Trusts parties to the agreement with SMI such that there would be no payment by LBHI to any third party, with the consequence that LBHI's claim against SMI would clearly be for breach of contract (and therefore untimely, since the same statute of limitations for breach of contract applies to a third party beneficiary of the contract as applies to a named party to the contract, *see S.T.A. Parking Corp. v. General Star Indemnity Co*., 19-cv-4250, 2019 WL 7115307,*4 (S.D.N.Y. Dec. 23, 2019)), rather than a claim for indemnification.

Nor did the Bankruptcy Court address the fact that, in contrast to Section 711, Sections 701 and 713.3 of the Sellers Guide , which expressly address assignment of the Seller's representations and warranties and the assignment by LBB of all of Purchaser's remedies against SMI for SMI's "breach of any representation, warranty or covenant hereunder, including without limitation, the repurchase and indemnification remedies," states that the assignee of SMI's reps and warranties and  of  LBB's remedies for a seller's breach of reps and warranties "shall be an

19

*intended t*hird party beneficiary of those representations, warranties, covenants and remedies."[5]

Obviously, the Lehman-related author(s) of the Seller's Guide knew the difference between an "intended third party beneficiary, as Sections 701 and 713.3 specify that the assignee of the Seller's reps and warranties and of LBB's remedies against a seller for breach of any rep and warranty will be an "intended third party beneficiary," as compared to Section 711's provision that a subsequent note holder will be "a third party beneficiary." Had the Lehman author of the Sellers Guide intended for a subsequent note holder to be an intended third party beneficiary pursuant to Section 711, the Sellers Guide would have – and should have – said so. The fact that a subsequent note holder under Section 711 is not described as an "intended" third party beneficiary, given the governing New York law requirement for third party beneficiaries to be named in the agreement as "intended" third party beneficiaries in order to enforce the contract, SMI Mem. at 23, *Rajamin v. Deutsche Bank Nat'l Trust Co.,* 757 F.3d 79, 85 (2d Cir. 2014), while the assignee of LBB's ability to enforce its indemnification rights and remedies "shall be an intended third party beneficiary" upon assignment to it of LBB's indemnification rights and remedies, is strong evidence that absent the specific assignment of the indemnification rights and remedies described in Section 701 and 713.3, a party that got the benefit of the loans as subsequent note holder and third party beneficiary was not necessarily and/or automatically an *intended* third party beneficiary of the seller's reps and warranties with standing to enforce LBB's indemnification rights and remedies, since under Sections 701 and 713.3, one party could have acquired the seller's reps and warranties and LBB"s indemnification rights to enforce them, while a wholly different party could have acquired the loans under Section 711. Here, as shown

---

[5] Although the Decision quotes the language of Section 713.3, Decision *7, its quotation omits the last sentence of this section, which states that "Any such party [to which LBB separately assigned the Seller's representations, warranties or covenants and the LBB's remedies against the Seller for Seller's breach of those representations, warranties or covenants] shall be an intended third party beneficiary of those representations, warranties, covenants and remedies."

by the four written assignment agreements discussed below, LBB did not assign the SMI's reps and warranties, or LBB's remedies for breach of them, until after the Petition Date.

Further, that Sections 701 and 713.3 explicitly contemplates the possibility that LBB could assign the Seller's reps and warranties, and LBB's indemnification rights and remedies, to a party other than the party to which LBB sold the loans, undermines, if it doesn't negate,  the Bankruptcy Court's reading of Section 711 to provide that LBB's indemnification rights and remedies were "automatically" and contemporaneously transferred to LBHI as "Purchaser's designee," a subsequent note holder and assignee of the loans, when – and simply because – LBB sold LBHI the loans.  Decision *12.  This determination by the Bankruptcy Court did not properly read, interpret or take into account the language of Sections 701 and 713.3,  when juxtaposed with that of Section 711.

> **E.** **The Bankruptcy Court erred in Relying on the Desens Affidavit, the Template PPTL and Blank Bill of Sale Form in Holding that LBHI Received the Indemnification Rights and Remedies from LBB Pre-Petition (Question of Law and/or Question of Mixed Fact and Law)**

As discussed above, the Court accepted the Whole Loan Tracking exhibit as showing evidence of pre-Petition assignment, Decision *8-10, though this exhibit did not reflect or even mention when, if ever, LBB assigned to LBHI its indemnification rights and remedies.  The Court also credited the testimony of LBHI affiant Desens who stated, conclusorily, that at the time LBB sold the loans to LBHI, LBB also transferred the indemnification rights and remedies for those loans to LBHI.  Desens Aff. ¶5, ECF No. 1279.  However, Mr. Desens admitted that LBHI did not execute loan-specific assignment documents.  *Id.* ¶9.  The only evidence LBHI offered to support Desens' wholly conclusory statement was a generic unfilled-out template form "Purchase Price and Terms Letter," dated January 1, 2005, Desens Aff. Ex. A, which Mr. Desens admitted "does not expressly provide for the assignment of the rights from LBB to LBHI," *id.*

¶10, to which were attached two blank and unsigned Bills of Sale.  Nothing in these documents references SMI or any SMI loans.  Such undated, unfilled-out and/or blank documents do not constitute sufficient evidence of any assignment of anything, much less the indemnification rights and remedies.  *See Wells Fargo Bank, N.A. v. 390 Park Ave. Assocs., LLC,* 16 Civ. 9112, 2018 WL 4373996, *7 (S.D.N.Y. Sept. 12, 2018).  This document does not reflect the transfer of any rights concerning the SMI-originated loans, or even the actual  transfer of  any SMI-originated loans by LBB to LBHI.  *See id.* ("An ineffective written mortgage assignment has no effect on the plaintiff's status as owner and holder of the note and mortgage through its possession of the note at the time of the commencement of the action.")  A valid assignment requires that the property being assigned "must be sufficiently identifiable." *In re Moskowitz,* 14 B.R. 677, 681 (Bankr. S.D.N.Y. 1981); SMI Rep. Br. at 5-6n.5, Adv. Pro. No. 16-01019, ECF No. 1259.  Nor does the language relied upon by Mr. Desens in the PPTL, which states that LBHI "has the right to assign of all its rights" under this PPTL to others, give any indication of what rights, other than the loan itself, LBHI acquired from LBB, if any, under the PPTL with respect to any SMI-originated (or other ) loans.  Desens Aff. Ex. A ¶7.

A valid assignment requires "that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." *Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994).  Neither the Court nor LBHI offered any evidence that LBB, pre-petition, vested in LBHI *a present right*, as opposed to a possible future right, in the indemnification rights and remedy.  *See id.* ("there is a different in legal effect between the words 'I will pay you a fee equal to one third of the amount collected from the defendant' and the words 'I now *give* you a one third interest in the claim as your fee' . . .") (*quoting* 4 Corbin, Contracts §879, at 530 [1951]; emphasis in original).  *See Cortlandt Street*

*Recover Corp v. Hellas Telecommunications, S.A.R.L.*, 790 F.3d 411,420 (2d Cir. 2015) (the ability of a putative assignee to pursue a claim in the future does not give that putative assignee standing or support the existence of an actual assignment). The unfilled-out form PPTL and blank, unsigned Bill of Sales hardly demonstrated the requisite "perfected transaction" to evidence assignment by LBB to LBHI of LBB's "present right" in the indemnification rights and remedies for the SMI-originated loans. *See* Decision *11 (*quoting Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994)). LBHI did not submit a single executed PPTL for any SMI loan or any other loan.

Absent any evidence of an actual assignment of LBB's present right to assign to LBHI its indemnification rights and remedies with respect to the SMI-originated loans, the Bankruptcy Court erred in accepting a template form, to which was attached an unsigned and blank Bill of Sale, neither of which referenced particular loans or even particular loan-originators, as evidence that LBB assigned, pre-Petition, any indemnification rights with respect to any of SMI's loans to LBHI. *See Wells Fargo Bank, N.A. v. 390 Park Avenue Assocs., LLC,* 16 Civ. 9112, 2018 WL 4373996, *7 (S.D.N.Y. Sept. 12, 2018) ("the existence of an undated and blank version of the Mortgage Assignment is immaterial precisely because it is undated and blank.") While the Bankruptcy Court discounted this authority, it accepted LBHI's theory that the indemnification remedies and rights were orally transferred by LBB to LBHI at the same time LBB sold the loans to LBHI. Decision *12.

The Bankruptcy Court's determination violated clear Second Circuit law forbidding retroactive assignments and/or assignment "based on unmemorialized intention" where the assignor and assignee are "sister corporations." *Property Asset Management, Inc. v. Chicago Title Ins. Co.,* 173 F.3d 84 (2d Cir. 1999). Although SMI discussed this case in its moving brief, the Decision does not mention it.

Nor was Mr. Desens competent to testify about the intent of LBB under the PPTL. The

uncommunicated subjective intent of an LBHI officer does not provide evidence of an

assignment. *See Property Asset Management, Inc. v. Chicago Title Ins. Co,* 173 F.3d 84, 87 (2d

Cir. 1999), a case the Decision does not mention though it was discussed at length in SMI's

moving papers. Documents produced by LBHI in discovery after the oral argument on the

motion to dismiss took place, show that Mr. Desens was sent an internal memorandum in

December 2005, which specified that as of that time and before then for bank-originated

"covered loans," like those of SMI at issue in this case, *LBB assigned to LBHI* "*the loans but not*

*the related Correspondent Agreements, or any rights against the Correspondents, pursuant to an*

*Assignment and Assumption Agreement.*" (emphasis added). LBHI-OMNI _ 8462345 (copy

attached as Adler Obj. Aff. Ex. B); and that Mr. Desens was sent another internal document on

February 16, 2006, which recommended that, in the future, LBB should "assign rights from

correspondents through to LBHI," precisely because those rights had not been assigned by LBB

to LBHI as of that date – contrary to Mr. Desens' conclusory affidavit testimony. LBHI-

OMNI_8524553 (copy attached as Adler Obj. Aff. Ex. C).

Regardless, then, of Mr. Desens' self-serving, conclusory statements in his affidavit, the

truth, articulated internally at Lehman, was that when LBB sold the loans to LBHI, LBB did *not*

assign rights under the LPAs' or Sellers Guide – and that LBB did not, pre-petition, transfer the

indemnification rights and remedies to LBHI.

Likewise, discovery produced by LBHI after the oral argument contained deposition

testimony excerpts from the 2010 deposition of one of LBHI's senior executives, Heston Gray,

who stated that in his experience at Lehman, "I've never seen a prepared [or actually filled out,

signed] bill of sale." LBHI-OMNI_014245602 (copy attached in Adler Obj. Aff. Ex. D).

The Bankruptcy Court erred in accepting Mr. Desens' unsupported conclusory assertion, based on the PPTL, that LBB assigned its indemnification rights and remedies to LBHI at the time LBB sold LBHI the loans, which presents a mixed question of law and fact.

      **F.**      **The Bankruptcy Court Erred in Ignoring Actual Signed Agreements and Finding that LBHI was an Assignee of LBB's Indemnification Rights and Remedies Pre-Petition (Question of Law and/or Question of Mixed Fact and Law)**

            1.      The Court Erred in Disregarding and Mischaracterizing the Actual Language of the Assignment Agreements

SMI submitted four "Assignment Agreements" entered between LBB and LBHI, in support of its motion, dated September 8, 2008, June 25, 2010, February 14, 2012 and May 13, 2014, Adler Aff. Exs. B, C, D, E.  In each of these ("the Assignment Agreements"), LBB represented that it was "hereby," as of the time of each particular Assignment Agreement, transferring those rights it had under the LPAS and Broker Agreement to LBHI which it had *not* previously transferred when LBB sold LBHI the loans that had been sold or brokered to LBB by various mortgage originators or brokers, including SMI.  None of the Assignment Agreements specifies which loans are covered by that particular agreement.  SMI is not listed on the schedule attached to the September 8, 2008 Assignment Agreement, which is the only one of these Assignment Agreements that was entered prior to the Petition Date, which attachment lists, individually, the names of literally thousands of mortgage originators.  Had LBB and LBH intended the September 8, 2008 Assignment Agreement to apply to any of the loans that SMI originated, the parties would have included SMI's name in the list of the mortgage originators set forth in the Schedule attached to this Assignment Agreement to whom it did apply.  The September 8, 2008 Agreement states that the Assignor, LBB, "*hereby* assigns, transfers and conveys to the Assignee all of its rights in and to the Agreements [defined as the LPAs],

including rights in and to any or all representations, warranties or covenants made by Sellers to Assignor in the Sellers' Guide and/or Agreements, along with any or all of the Assignor's remedies available against the Sellers for Sellers' breach of any representation, warranty or covenant under the Sellers Guide and/or agreements, including, without limitation, the repurchase and indemnifications remedies." Adler Aff. Ex. B §1(a).

SMI also offered an assignment agreement between the successor to LBB, Aurora Bank FSB, as Assignor and LBHI, as Assignee dated June 25, 2010. *Id.* Ex. C. This Assignment Agreement stated that LBB was a party to certain Broker Agreements, and that as Assignor, "Aurora Bank FSB (formerly known as[LBB]" "*hereby* assigns, transfers and conveys to the Assignee any rights it may have under the {Broker} Agreements with respect to the Mortgage Loans [already conveyed by LBB to LBHI], *including any rights it may have in and to any or all representations, warranties or covenants made by the Brokers to the Assignor in the Agreements with respect to the Mortgage Loans, along with any or all of the remedies Assignor may have against the Brokers for the Brokers' breach of any representation, warranty or covenant under the Agreements with respect to the Mortgage Loans*." It also states that LBHI, the Assignee "hereby accepts such assignment . . ." *Id.* §1(b); and is signed by each of LBB and LBHI. Adler Aff. Ex. C. While there is no schedule or other indication of the mortgage brokers to whom this 2010 Assignment Agreement applied, if it did apply to SMI, which as alleged in the Adversary Complaint, brokered certain of the loans at issue to LBB, it shows that the assignment of the indemnifications rights by LBB to LBHI with respect to brokered loans that LBB had earlier sold to LBHI did not occur until *after* the Petition Date.

SMI submitted another Assignment and Assumption Agreement, dated Feb. 13, 2012, which referenced the earlier Sept. 2, 2008 Assignment Agreement that did not have SMI in the

schedule of originators of loans covered by the Sept. 2, 2008 Assignment Agreement, and which stated that Aurora Bank, formerly known as LBB, as Assignor and Aurora Loan Services each "*hereby* grant, transfer and assign to the Assignee [LBHI], all of its rights, title, obligations and other interests with respect to [never defined] "transferred Mortgage Loans that have not previously been assigned to the Assignee pursuant to the Assignment Agreements . . ."  This Agreement too was signed by both LBHI and LBB.  SMI is mentioned in the schedule attached to this Agreement.

Additionally, SMI submitted a Second Amended and Restated Assignment and Assumption Agreement," dated May 14, 2014, between Aurora Bank's successor and LBHI, which stated that Aurora and ALS "each *hereby* grant, transfer and assign to the Assignee, all of its rights, title, obligations and other interests under the Loan Purchase Agreements with respect to the Transferred Mortgage Loans that have not been previously assigned to the Assignee . . ." SMI is also listed in the schedule to this agreement, which is signed by Aurora and by LBHI. Adler Aff. Ex. E., ECF 915-6.  Presumably, LBB would not have assigned indemnification rights to LBHI in these written agreements, and stated that it was assigning them as of the date each of these agreements, if LBB had previously validly assigned the same rights to LBHI.

The burden was on LBHI to specify what rights were transferred for which loans, in each of their agreements.  Mr. Desens, who is not a lawyer, opined, without personal knowledge, that these Assignment Agreements were "mere surplusage." Desens Aff. ¶12.  The Bankruptcy Court did not strike the Desens affidavit; on the contrary, the Bankruptcy Court accepted the conclusory statements in the Desens affidavit in holding that these statements refuted the Assignment Agreement evidence proffered by SMI.  Astoundingly, LBHI argued that the Bankruptcy Court should disregard the Assignment Agreements due to "their preparation post-bankruptcy in the

27

chaotic litigation of the largest bankruptcy filing in American history." LBHI Opp. Mem. at
24n.26, ECF 1236.

Finally, SMI also submitted another Assignment Agreement, that was not signed, dated
as of September 2009, which LBHI filed with the SEC in November 2010, and which stated that
with respect to certain, unspecified loans that had been brokered to LBB, which loans LBB sold
to LBHI, LBB "hereby assigns, transfers and conveys to the Assignee all of its rights and
remedies in and to the [Broker] Agreements, including rights in and to any or all promises,
representations, warranties or covenants made to Assignor in the Agreements to the extent they
relate to the Mortgage Loans, along with any or all of the Assignor's remedies available against
other parties to the Agreements for their breach of any promise, representation, warranty or
covenant under the Agreements to the extent they relate to the Mortgage Loans.  Adler Aff. Ex.
F. ¶1(a).

The Bankruptcy Court disregarded the plain language of these agreements in determining
that, notwithstanding their unambiguous language stating that LBB was transferring rights it had
not earlier transferred, these Assignment Agreements were simply an after-the-fact "belt and
suspenders" memorialization of earlier admittedly unwritten assignments that automatically
occurred when LBB sold the loans to LBHI.  Decision *10-11.

In coming to this conclusion, the Bankruptcy Court ignored not only the clear,
unambiguous language of these Assignment Agreements, which specified that LBB was, in each
of these agreements, *assigning what it had not earlier assigned,* but also failed to even
acknowledge the multiple other sworn statements made by LBHI executives in other federal
cases in which these individuals swore and/or LBHI took the affirmative position that LBHI
received the rights and remedies requisite to suing mortgage originators under the September 2,

2008 Assignment Agreement – not earlier when the loans were sold by LBB to LBHI, as the

LBHI affiants contended in opposing the SMI motion to dismiss, *see* SMI Reply Mem. at 2n.3,

Adler Reply Aff. Exs. I, J.  The Decision makes no mention of the fact that LBHI took the

position in other federal courts that it received the mortgage originators' selling representations

and warranties pursuant to the September 2, 2008 Assignment Agreement (the one in which SMI

is not listed) – as distinguished from the position LBHI took in the instant case and argued on the

motion to dismiss, which the Bankruptcy Court accepted, that LBHI acquired its indemnification

rights from LBB at the time that LBB sold LBHI the loans.  Nor did the Bankruptcy Court take

into account or discuss in the Decision the express representations LBHI made about its

assignment from LBB in the agreements it used to securitize the loans at issue and sell them to

the RMBS Trusts.  This issue raises a question of law or a mixed question of law and fact.

The Bankruptcy Court's Decision nowhere addressed *Property Asset Management, Inc.*

*v. Chicago Title Ins. Co., Inc.,* 174 F.3d 84 (2d Cir. 1999), discussed in SMI's reply brief, in

which the Second Circuit specifically held that oral assignments, such as those referenced by the

LBHI affiants, between corporate affiliates, such as LBB or LBHI here, are ineffective to

establish standing in a case in which two officers of the assignee who were also officers of the

plaintiff stated in affidavits, as did the LBHI affiants whose testimony the Bankruptcy Court

accepted (and which the Bankruptcy Court determined was not controverted by the post-petition

Assignment Agreements, Decision, *12), "that there had been an intention all along to assign the

loan to [plaintiff]."  173 F.3d at 87.  Like that affiant, whose testimony the Second Circuit found

inadequate to evidence any standing-predicating assignment in *Property Asset Management*, Mr.

Trumpp, one of LBHI's affiants opposing SMI's motion to dismiss, stated in his affidavit that he

had been employed at LBB for about seven years, and then immediately thereafter at LBHI, and

that the post-Petition Assignment Agreements were entered to head off a problem if a loan seller

in the collection litigation LBHI anticipated against them objected to the pre-Petition oral

assignments.  Trumpp Aff. ¶24.[6] As should have been controlling in this case, and at the very

least considered by the Bankruptcy Court, in *Property Asset Management*, the Second Circuit

specified that:

> The reason for not permitting assignments based on unmemorialized
> intentions is especially strong in cases like this one, where the putative
> assignor and assignee are sister corporations.  If intent alone were enough
> to assign, and to do so retroactively, then the holder of a contract could
> choose at will which of its corporate personalities would be the beneficiary
> of any given contract on any given day.  This could be accomplished
> simply by adducing insider officers' testimony that they had meant to
> assign the contract from its nominal holder to the appropriate corporate
> shell before the relevant date.  We do not suggest that the Lehman
> corporations in the present case had any sinister design in mind.  But even
> if we assume that the present plaintiff had no manipulative motive, it is
> easy to see how recognizing unrecorded assignments based on retrospective
> testimony about intent alone would, in many cases permit, the unfair
> manipulation of contract rights.

173 F.3d at 87.

The Bankruptcy Court appears to have ignored SMI's discussion of the *Property Asset*

*Management case* in its moving brief , since the Decision states that "the Court has been

presented with no precedent for SMI's suggestion that a later-executed agreement serves to

eradicate and earlier [oral] assignment." Decision *12.  *Property Asset Management* is authority

---

[6] Mr. Trumpp's affidavit contained other misstatements of fact,, such as that Assignment and Assumption Agreements
were generally not used by LBB to transfer to LBHI the type of "covered loans" at issue in this case.  Trumpp Aff. ¶22.
This is belied by the explicit language in each of the MSLAAs pursuant to which LBHI securitized the SMI-originated
loans to SASC and the RMBS Trusts, in which LBHI stated that it received from LBB each of the covered loans it was
securitizing pursuant to that MLSAA pursuant to a particular Assignment and Assumption Agreement, dated as of a
specific date.  Each of these MLSAAs, which contains this language in which LBHI states that it acquired the covered
loans it is securitizing in the MSLAA from LBB pursuant to a particular Assignment and Assumption Agreement, is
attached in Exhibit A to the Rupp Affidavit – which the Bankruptcy Court struck and did not consider though neither the
Court nor LBHI articulated any objection to these MLSAA documents.  Nonetheless, the Court's insistence on striking
the entire Rupp Affidavit, and not only the purportedly objectionable sentence in it, precluded the Court from considering
this MSLAA contract language, which squarely contradicted Mr. Trumpp's affidavit and could have caused the
Bankruptcy Court to reconsider its acceptance of his conclusory statements.  Again, the Court erred in striking all of Mr.
Rupp's affidavit and the exhibits to it, which raises a question of law.

for the fact that the purported pre-petition oral assignment between corporate affiliates, as LBB and LBHI indubitably were, was invalid and insufficient to create standing, and was not made retroactively valid as of a pre-Petition date by the post-Petition written Assignment Agreements.

The Bankruptcy Court offered no explanation for its refusal to consider the plain language of the Assignment Agreements as to what and when LBB was transferring to LBHI – which language refutes the conclusory testimony of LBHI's affiants that LBHI had received unwritten assignments of the indemnification rights and remedy under the LPAs or Broker Agreements at the time LBB sold LBHI the loans.  How could LBHI have filed a document with the SEC that, according to Mr. Trumpp, contained the false representation that before September 2010, LBB had not transferred the indemnity rights and remedies to LBHI in connection with loans that had been brokered to LBB, which loans LBB had previously sold to LBHI? The Bankruptcy Court erred in ignoring the actual language of these five Assignment Agreements, agreement, and in crediting the factually unsupported affidavits of the three LBHI employees, Osborne, Desens and Trumpp, to controvert them.  Decision *9-10, 12.

Here, then, the Assignment Agreements are affirmative evidence that the loans were assigned by LBB to LBHI at one point in time, and the indemnification remedy and the reps and warranties of SMI were assigned to LBHI at a later point in time, after the Petition Date.  The Bankruptcy Court's view that these Assignment Agreements were just "belt and suspenders" a) ignores the plain language of the Assignment Agreements in which LBB states that it is now assigning rights that it did not assign when it earlier sold the loans to LBB; and b) effectively means the Bankruptcy Court considered these  Assignment Agreements  to be meaningless and fraudulent since if LBB had already, when it sold the loans to LBHI pre-petition, assigned the indemnification rights and remedies, to LBHI, as the Court determined, then LBB had nothing to

31

assign when it and LBB entered into the Assignment Agreements and affirmatively

misrepresented in the Assignment Agreements that it, LBB, was now assigning rights it had not

earlier assigned to LBHI.  *See Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125,

133

 (2d Cir. 2016) ("In interpreting a contract under New York law, 'words and phrases . . .

should be given their plain meaning, and the contract should be construed so as to give full

meaning and effect to all of its provisions.' 'An interpretation of a contract that has the effect of

rendering at least one clause superfluous or meaningless is not preferred and will be avoided if

possible.'") (internal citations omitted)).

        2.        The Bankruptcy Court Erred In Disregarding the Actual Language of the Assignment and Assumption Agreements and of the Mortgage Loan Sale and Assignment Agreements (Question of Law and/or Mixed Question of Law and Fact)

Similarly, the documents that LBHI used to securitize and sell the loans to the depositor,

SASC, and to the RMBS Trustees, that SMI submitted on its motion to dismiss, explicitly

reflected that LBB did not assign the indemnification rights and remedies to LBHI at the time

LBB sold the loans to LBHI.  When LBHI securitized loans into a trust and sold those loans to

an RMBS Trustee through a depositor, LBHI entered into a Mortgage Loan Sale and Assignment

Agreement ("MSLAA") for each such trust.  An example was attached as Exhibit 2 to the

moving declaration of Tracy Henderson.  Exhibit A to the Rupp Declaration contained portions

of language from each of the MSLAAS for the 28 trusts in which SMI's 39 loans were

securitized.  As reflected in Rupp Ex. A, each of these MSLAAs stated that the loans being

securitized pursuant to it, including the SMI-originated loans, were obtained by LBHI from LBB

"pursuant to an Assignment and Assumption Agreement" dated as of a particular date.  Rupp

Dec. ¶2 & Ex. A.  An example of such an Assignment and Assumption agreement between LBB as Assignor and LBHI as Assignee was attached to the Adler Reply Declaration as Exhibit H. The language in Section 1(a) of each of the Assignment and Assumption Agreements, pursuant to which LBHI obtained from LBB the SMI-originated loans that LBHI then securitized into the RMBS Trusts, states that: "The Assignor [LBB] hereby assigns to the Assignee [LBHI] all of its right, title and interest in and to the Mortgage Loans and the Sale/Servicing Agreements, to the extent relating to the Mortgage Loans (*other than the rights of the Assignor to indemnification thereunder*) . . ." Adler Reply Aff. Ex. H; Rupp. Dec. Ex. A (emphasis added).  This language made clear that LBB had not assigned any indemnification rights or the LPAs to LBHI for the SMI-originated loans that LBHI then securitized, since the language states that LBB was expressly *not* assigning its rights to indemnification to LBHI.  The Bankruptcy Court decision erred in making no mention, and apparently failing to consider, this language in which LBB withheld indemnification rights from LBHI, which, notwithstanding the Court's improper striking of all of Mr. Rupp's affidavit, was discussed in SMI's reply brief. SMI Reply Mem. at 21.  Necessarily this language undermines the conclusory and unsupported statements in the affidavits submitted by LBHI in opposition to the motion stating that LBB conveyed the indemnification rights to LBHI at the time LBB sold the loans to LBHI.

Further, while the Bankruptcy Court concluded that because the SMI LPA was not within the Sale/Servicing Agreements that LBB assigned to LBHI in the Assignment and Assumption Agreements, this meant that LBHI could not have assigned the LPA rights to SASC, the Bankruptcy Court did not address the fact that the language of the Assignment and Assumption Agreements shows that the SMI LPA was never assigned by LBB to LBHI before LBHI securitized SMI's loans.  Accordingly, LBHI never had the SMI LPA to withhold or to assign,

33

because that same Assignment and Assumption Agreement specified that other agreements, the Sale/Servicing Agreements, were in fact transferred by LBB to LBHI in the Assignment and Assumption Agreements.

To the extent that the Court accepted LBHI's argument that LBHI had earlier obtained the indemnification rights and remedies from LBB as part and parcel of LBB's sale of "all of its right, title and interest in and to the Mortgage Loans," to LBHI, *see* Adler Reply Dec. Ex. H¶1(a), that same argument necessarily would mean that would LBHI's sale of "all of its rights, title and interest in and to the Mortgage Loans to the Depositor," in the MSLAA, *see* Henderson Aff. Ex. 2 at page 3, Rupp Aff. Ex. A, likewise transferred the indemnification rights and remedy from LBHI to SASC, such that LBHI was divested of it and did not have the indemnification rights to sue LBHI before the Petition Date. *See* Point II, below.

Although the Bankruptcy Court concluded that reading the Assignment Agreements, the MSLAAs and the Assignment and Assumption Agreements as SMI proposed, in accordance with their unambiguous language, defied "commercial" sense and logic, Decision*17, the Bankruptcy Court Decision failed to note that the MSLAAs and the Assignment and Assumption agreements each had integration clauses providing that each contained "the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducement and conditions, express or implied, oral or written of any nature whatsoever with respect to the subject matter hereof. *The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of* the terms hereof." MSLAA §2.02, Henderson Dec. Ex. 2; Rupp. Reply Dec. Ex. A; Assignment and Assumption Agreement §14, Adler Reply Dec. Ex. H (emphasis added). Accordingly, the Bankruptcy Court erred in its invocation of "commercial

sense" to contravene the plain language of the Assignment and Assumptions Agreements and the MSLAAs since doing so was precluded by the explicit language in their respective integration clauses.

## II.    THE COURT ERRED IN IGNORING THE MANY DIVESTITURE CASES HOLDING THAT LBHI'S TRANSFER OF ALL OF ITS RIGHT, TITLE AND INTEREST IN THE LOANS TO SASC IN SECURITIZING THE LOANS DIVESTED LBHI OF STANDING (QUESTION OF LAW)

SMI argued at length based on the many cases holding that transfer of all right, title and interest in the property transferred divests the transferor of standing to sue under the contract pursuant to which it obtained the property transferred.  *See TriaxxPrime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon,* No. 16 Civ. 1597, 2017 WL 1103033, *3-4 (S.D.N.Y. Mar. 21, 2017); *Phoenix Light SF Ltd v. U.S. Bank Nat'l Assn*., No 14-cv-10116, 2015 WL 2359358 (S.D.N.Y. May 18, 2015); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 151 (2d Cir. 1995); SMI Mem. at 31-34 (and cases cited therein).  The Bankruptcy Court erred in failing to address these cases.  While the Bankruptcy Court apparently agreed that in the MSLAA, LBHI specified that it was selling to SASC all of LBHI's right, title and interest in the loans is not in dispute, *see* MSLAA §1.01(a),, Henderson Dec. Ex. 2: Rupp Dec. Ex. A; Decision *16, the Bankruptcy Court determined that because the MSLAA specifies that in it LBHI is assigning to SASC certain rights with respect to "Transferor" loans, but is silent as to whether LBHI is assigning SASC rights with respect to "Covered Loans," such as those originated by SMI, this means that LBHI did not transfer to SASC the SMI LPA rights. Decision *16.  No language in the MSLAA supports this conclusion or contains any express reservation by LBHI withholding from SASC the rights to enforce against a mortgage originator or broker of a "Covered loan" that representations and warranties made by that originator or broker to LBB.

Under N.Y.G.O.L. §13-107, "claims travel with the security unless expressly reserved in writing." *CommerzBank AG v. U.S. Bank Nat'l Assn*., 457 F.3d 233, 243 (S.D.N.Y. 2020). *See Pacific Life Ins. Co. v. Bank of N.Y. Mellon,* 17-cv-1388, 2022 WL 1446552, *6 (S.D.N.Y. Feb. 22, 2022); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co*., 14-cv-10103, 2022 WL 384748, *12 (S.D.N.Y. Feb. 8, 2022).  Here, there is no express reservation by LBHI in writing of the indemnification rights in LBHI's transfer, in the MSLAA, of all of its right, title and interest in the loans at issue to SASC – and the Bankruptcy Court cited none.  No authority supports the Bankruptcy Court's strained reading of the MSLAA, and the Court does not provide any supporting evidence for its conclusion or authority.  In coming to this conclusion, the Court failed to consider or address the many divestiture cases cited above which state that transfer of all right, title and interest in property transfers the right to bring contract claims concerning that property and divests the transferor of standing to bring such claims.  The Court erred in overlooking and failing to credit this authority, which compels the conclusion that LBHI was divested of the right to sue SMI, if LBHI ever had that right, when, pre-petition, LBHI transferred all of its right title and interest in the SMI loans to SASC in the securitizations as to which LBHI has sued SMI.

The Court appears to have accepted LBHI's inconsistent positions that, on the one hand, when, pre-Petition, LBB transferred all right, title and interest in the loans to LBHI, LBB likewise, at the same time, transferred the indemnification rights and remedies to LBHI – although no writing specifically reflects this; but that, on the other hand, when LBHI transferred all of its right, title and interest in the same loans to SASC, LBHI did not – though no writing specifically reflects this – transfer its indemnification rights and remedies to SASC.  Likewise, the Court has accepted LBHI's unsupported position that it was effectively in privity with SMI

36

for purposes of, pre-petition, having the rights under the Seller's Guide, to indemnification for SMI's alleged selling breaches of reps and warranties, but that LBHI and/or the RMBS Trusts, both subsequent note holders, are third parties with respect to LBHI's claim for indemnification from SMI for LBHI's purported losses based on the representations that LBHI (and not SMI) admittedly made to the RMBS Trustees.

## CONCLUSION

The Court erred in crediting the conclusory testimony of LBHI's affiants, which was controverted by the clear signed contract language in the Assignment Agreements, the MSLAAs and the Assignment and Assumption Agreements, which stated that that LBHI did not receive the indemnification rights and remedies from LBB until after the Petition was filed, if indeed LBHI ever did. The Court erred in failing to look at the actual language in these agreements and as to what was transferred and when, and in striking the Rupp Affidavit in its entirely and failing to consider the testimony and exhibits in it. The Court erred in presuming that LBHI held the notes and had rights as a note holder under the Sellers Guide since LBHI did not offer any evidence reflecting that it ever held the notes for the SMI-originated loans. Under the express provisions of the Seller's Guide, LBHI's rights as an intended third party beneficiary to enforce LBB's indemnification rights against SMI did not become effective until LBHI became an assignee – which, as the contracts make clear, it did not do before the Petition Date. In the alternative, regardless of whether LBHI did in fact receive the indemnification rights and remedies before the Petition Date, LBHI was divested of those rights and remedies, and of standing, when, pre-petition, LBHI transferred all of its right, title and interest in the loans to SASC. The Court erred in failing to consider any of the many divestiture cases holding that transfer of all right, title and interest in property transfers with it to the transferee, and divests the

transferor of, the right to bring contractual claims concerning the transferred property.  For these and all of the foregoing reasons, and those stated on the record in SMI's moving and reply papers, at the October 16, 2019 hearing on the motion to dismiss, and in the parties' correspondence with the Court shortly afterward, the District Court should review these questions of law and/or of mixed law and fact de novo, and dismiss the instant complaint for lack of standing.

Dated: New York, New York
      September 21, 2022

LANI ADLER PARTNERS LLC

/s/Lani A. Adler
Lani A. Adler
275 West 96th Street, Suite 15G
New York, New York 10025
(646) 732-3260
LAdler@LaniAdlerPartners.com

*Attorneys for Defendant Suburban Mortgage, Inc.*

Lani Adler Partners LLC
275 West 96th Street, Suite 15G
New York, New York 10025
Telephone (646) 732 3260
Ladler@LaniAdlerPartners.com

*Attorneys for Defendant Suburban Mortgage, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                    Debtors.

―――――――――――――――――――――――

LEHMAN BROTHERS HOLDINGS INC.,

                    Plaintiff,

    v.

1ST ADVANTAGE MORTGAGE, LLC *et al.*,

                    Defendants.

―――――――――――――――――――――――

LEHMAN BROTHERS HOLDINGS INC.,

                    Plaintiff,

    v.

SUBURBAN MORTGAGE, INC.,

                    Defendant.

―――――――――――――――――――――――

Chapter 11
Case No. 08-13555 (SCC)

Central Adversary Proceeding
No. 16-01019 (SCC)

Adv. Proc.  Nos.  16-01295 and
18-01825 (SCC)

**AFFIRMATION OF LANI A. ADLER IN SUPPORT OF OBJECTIONS OF
SUBURBAN MORTGAGE, INC. TO FINDINGS OF FACT AND CONCLUSIONS OF LAW IN
BANKRUPTCY COURT'S DECISION DENYING MOTION TO DISMISS FOR LACK OF
STANDING, MADE PURSUANT TO F. BANKR. RULE PRO. 9033**

LANI A. ADLER, under penalty of perjury, hereby declares:

1.      I am an attorney duly admitted to practice in the State of New York and in this

Court.  My firm is counsel to Suburban Mortgage, Inc. ("SMI) in this matter.  I make this

affirmation on personal knowledge, except as stated otherwise, in support of SMI's Objections to

the findings of fact and conclusions of law in the Bankruptcy Court's Decision, dated August 16,

2022, which denied SMI's motion to dismiss the RMBS Complaint filed against it by Lehman

Brothers Holdings Inc. ("LBHI") for lack of standing, based on SMI's fact-based challenge to

standing in Adv. Pro. Nos. 16001019, 18-01825 ("the instant Adversary Proceeding").  The

Bankruptcy Court's Decision is published on Westlaw at 2022 WL 3386473.

2.      Attached as Exhibit A hereto is a true and accurate copy of each of certain pages

from the transcript of a hearing held July 6, 2017 before the Honorable Shelley C. Chapman in *In

the Matter of Lehman Brothers Holdings, Inc*., Case No. 08-13555.

3.      Attached as Exhibit B hereto is a true and accurate copy of a document produced

by LBHI in discovery in the instant Adversary Proceeding, bates-stamped LBHI-

OMNI_8462333-8462352, which was produced by LBHI after October 16, 2019, when the oral

argument on SMI's motion to dismiss took place.

4.      Attached as Exhibit C hereto is a true and accurate copy of a document produced

by LBHI in discovery in the instant Adversary Proceeding, bates-stamped LBHI-

OMNI__85424538-8524557, which was produced by LBHI after October 16, 2019, when the

oral argument on SMI's motion to dismiss took place.

5.      Attached as Exhibit D hereto is a true and accurate copy of a document produced

by LBHI in the instant Adversary Proceeding entitled "Deposition Testimony of Heston Gray –

Excerpts," bates-stamped LBHI-OMNI_014245596-014245605, which was produced by LBHI

after October 16, 2019, when the oral argument on SMI's motion to dismiss took place.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      September 21, 2022

                                   /s/Lani A. Adler
                                   Lani A. Adler

# EXHIBIT A

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - x

4   In the Matter of:

5   LEHMAN BROTHERS HOLDINGS INC.,    CASE NO. 08-13555-scc

6                  Debtor.

7   - - - - - - - - - - - - - - - - - x

8                        United States Bankruptcy Court

9                        One Bowling Green

10                       New York, New York

11

12                       July 6, 2017

13                       9:02 AM

14

15

16

17

18

19

20

21   B E F O R E:

22   HON. SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO - MATTHEW

08-13555-mg   Doc 61499-1   Filed 09/21/22   Entered 09/21/22 22:52:09   Responses
and Objections of Suburban Mortgage   Inc. to Decision dated Aug. 16      Pg 50 of 120

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Please have a seat.

3      Good morning everyone.

4          (A chorus of good morning)

5              THE COURT:  So we are still set up in trial mode

6      with the podium tilted, so probably be best if you speak

7      from counsel table.

8              MR. COSENZA:  Sure.

9              THE COURT:  All right?  Mr. Cosenza, how are you?

10             MR. COSENZA:  Good morning, Your Honor.  Todd

11     Cosenza from Willkie Farr & Gallagher for the plan

12     administrator, Lehman Brothers Holdings Inc.

13             We are here before Your Honor on the plan

14     administrator's motion for entry of an order approving the

15     RMBS settlement agreement to resolve the RMBS claims the

16     trustee submitted through the protocol.

17             For background, Your Honor, I can give some

18     background if you want me to speed things up let me know, I

19     just want to -- we'll go through it in various situations.

20             THE COURT:  I know that you know that I'm familiar

21     with the background.

22             MR. COSENZA:  Yes.

23             THE COURT:  But I think for the purposes of the

24     record --

25             MR. COSENZA:  Sure.

Page 36

```
 1   want to argue and that I should just resolve this objection

 2   based on what you put in your papers?

 3           MR. GWILLIAM:  Well our objection does speak for

 4   itself.  I do think that if you allow me to that we do feel

 5   that the BNC debtor claims are impacted by this.  As the

 6   Court knows from our case that that's been --

 7           THE COURT:  Mr. Gwilliam, I think it was

 8   communicated to you that if you wished to make an argument

 9   in this courtroom, which is quite full, that you needed to

10   be here in person.  Those are my rules and I'm not inclined

11   to depart from them today.  So I have --

12           MR. GWILLIAM:  I was informed of that yesterday

13   morning.

14           THE COURT:  All right.  Well I -- those are my

15   rules, I have read your objection, and I've listened to

16   Mr. Cosenza's argument and read the submission by the plan

17   administrator, and for all of the reasons that the plan

18   administrator has set forth your objection will be overruled

19   in the order that will be entered.

20           Go ahead, Mr. Cosenza.

21           MR. GWILLIAM:  All right.

22           MR. COSENZA:  Thank you, Your Honor.

23           The last objection is the iFreedom objection.  I

24   think this one is in a state of flux, Your Honor, because we

25   had thought that we had alleviated iFreedom's concern, but
```

08-13555-mg   Doc 61499-1   Filed 09/21/22   Entered 09/21/22 22:52:09   Responses
and Objections of Suburban Mortgage   Inc. to Decision dated Aug. 16      Pg 52 of 120

Page 37

1    let me go through the background on this and see if there's

2    still an objection that's in place.

3              THE COURT:  Okay.  Well just to expedite things

4    since I do have any eye on the clock, I have read the

5    iFreedom objection, I have read in the proposed order the

6    language that has been asserted which -- in paragraph K on

7    page 13 which as far as I can tell tries to make it crystal

8    clear that the entry of this order is totally without

9    prejudice to any rights that iFreedom may have with respect

10   to subsequent proceedings that may or may not occur.

11             So I frankly am at a loss to understand why this

12   wouldn't resolve the objection.  Hello, Ms. Adler.

13             MR. ADLER:  Good morning, Your Honor.  May I speak

14   to the question that you just posed?

15             THE COURT:  Sure.

16             MS. ADLER:  Okay.  There are -- the objection was

17   about two things.  One you've just addressed, which was we

18   wanted the record to be clear that no rights were being

19   objected.

20             But the second piece of it is that LBHI by serving

21   copies of the RMBS motion papers on iFreedom purported to

22   give iFreedom "notice," notice in quotes, of this

23   proceeding.

24             What we wanted to make clear was that this

25   proceeding is not a proceeding in which iFreedom is being

Page 38

1   afforded an opportunity to come in and defend against claims

2   that it may have breached loans that are the subject of the

3   RMBS motion and the estimation proceeding.

4          THE COURT:  Well I think that that goes without

5   saying, because this is a 9019 motion that is procedural, it

6   is not settling any -- it is not dealing with any of the

7   underlying claims.  There is no opportunity, there is no

8   piece of this that would conceivably allow or enable you to

9   engage in that exercise.  So it's a bit of ships passing in

10   the night.

11          I hear your concern and that's why this language I

12   think fully protects you, because it's impossible to imagine

13   a way in which you could do what you've just outlined here

14   today or in connection with the settlement.

15          When we get to the estimation proceeding itself

16   you of course are free to raise -- file whatever you believe

17   you can file.  I don't even believe it would be ripe at that

18   moment, but I understand where you're coming from.

19          So my intent, and I think the plan administrator's

20   intent, speaking for the plan administrator, who can speak

21   for himself, is to assure you that nothing that's happening

22   here today or in the estimation proceeding will in any way

23   change, diminish, expand, affect your rights in any way.  It

24   can't be used against you.  It can't be used.  It can't

25   change anything.  So --

Page 39

1            MS. ADLER:  Subject to the Court's assurance, Your

2     Honor --

3            THE COURT:  You had it.

4            MS. ADLER:  -- that's acceptable.  Then we can

5     withdraw the objection.  The language that was in there left

6     issues at least in our view unclear.  But subject to the

7     assurances --

8            THE COURT:  Well the language --

9            MS. ADLER:  -- on the record --

10           THE COURT:  All right.

11           MS. ADLER:  -- we can live with that.

12           THE COURT:  Well I will so order the record in

13     that regard because I'd like to make a few changes to the

14     order as possible.  But you have my assurance on the record.

15     And I think the language does it, I think that's what it's

16     intended to do, but I understand that you wanted to be 101

17     percent sure.

18           MS. ADLER:  Thank you, Your Honor.

19           THE COURT:  All right?

20           MS. ADLER:  Appreciate that.

21           THE COURT:  Thank you.

22           MS. ADLER:  Thank you.

23           THE COURT:  Okay.  Mr. Cosenza?

24           MR. COSENZA:  Yeah.  With that, Your Honor, I just

25     have one minute and I will complete my presentation.

# EXHIBIT B

Message

| | |
|---|---|
| **From**: | Gollin, Mark D [MGollin@alservices.com] |
| **Sent**: | 12/21/2005 7:05:43 PM |
| **To**: | Kritikos, Dimitrios [dimitrios.kritikos@lehman.com] |
| **Subject**: | As requested - DRAFT |
| **Attachments**: | Aligning Roles and Responsibilities Memo 120505.pdf |


For your eyes only....

 <<Aligning Roles and Responsibilities Memo 120505.pdf>>

Enjoy...

Mark D. Gollin
Senior Vice President
Aurora Loan Services/Lehman Brothers
10350 Park Meadows Drive
Littleton, CO  80124
(800) 880-0128 ext. 5247
(720) 945-5247 (direct)
(303) 594-4170 (cell)
mgollin@alservices.com
mgollin@lehman.com

LBHI-OMNI_8462333

# LOWENSTEIN SANDLER PC

### *Attorneys at Law*

## MEMORANDUM
## D R A F T

| | |
|---|---|
| **FROM:** | Gary M. Wingens |
| **TO:** | Jack E. Desens |
| | Mark Gollin |
| | Jordan Dorchuck |
| **DATE:** | December 5, 2005 |
| **SUBJECT:** | Aligning Lehman Business Unit Roles and Responsibilities in Investigating and Pursuing Mortgage Loans Containing Potential Origination Defects |

*Tel  973.597.2558  Fax  973.597.2559*
*gwingens@lowenstein.com*

Over the past five years, questions have arisen from time to time about the appropriate roles and responsibilities of various Lehman business units in investigating and pursuing origination defects in loans originated or acquired by Lehman and sold to securitization trusts.  With the dramatic increase in loan volumes over the past few years, combined with both an increase in the complexity of the Mortgage Capital Division and the more recent increase in defaults on underlying loans, these issues have come to the fore.

The fundamental concern is whether the various business units involved in monitoring and investigating loan quality and performance issues are performing functions that provide a reasonable return for the investment in those functions.

The purpose of this analysis is to assist Lehman and its business units in aligning appropriate roles and responsibilities of the various MCD units with the economic risks and rewards to which they relate.  For purposes of this analysis, we have reviewed the roles of the following groups: Contract Administration, Master Servicing and Quality Control.  A simplistic



*65 Livingston Avenue* | *Roseland, New Jersey 07068-1791* | *Telephone  973.597.2500 Fax  973.597.2400* | *www.lowenstein.com*

CONFIDENTIAL

LBHI-OMNI_8462334

operating assumption is that each function that is performed by a Lehman business unit should have a business reward (which may include risk avoidance) that justifies that function.

In addition, this analysis will describe the goals of various business units to help management in its decision-making as to if and how to achieve those goals within the current business structure.

This analysis is broken down to the following parts for this inquiry:

I.      Current Legal Liability Chain in Lehman Securitization Platform
II.     Description of Current Business Functions of the Affected Units
III.    Issues for Discussion/Analysis
IV.     Possible Alternative Frameworks ("straw man conversations")
V.      Suggested Next Steps

PART I.
LEGAL LIABILITY CHAIN IN LEHMAN SECURITIZATION PLATFORM

Attachment 1 is an outline of the legal chain that mortgage loans typically follow from the point of origination or purchase by Lehman through securitization by Lehman.   For purposes of this analysis, there are two main categories of loans: (1) *Lehman Bulk Loans*" – which are loans purchased in bulk purchases by Lehman Bank or Lehman Holdings from generally large originators, where the underlying origination representation and warranties are passed through to the securitization trust and (2) *Aurora Wholesale Loans*"  – which are loans originated or acquired by Lehman Bank through Aurora's retail and wholesale origination channels, such as the correspondent and broker programs.

Attachment 2 is an analysis performed in 2004 of actions required by various parties in connection with loan-level breaches under typical Lehman securitizations.

For purposes of this analysis, the significant facts to bear in mind are the following:

-2-

CONFIDENTIAL

LBHI-OMNI_8462335

Discussion Draft
12/5/2005

- For *Lehman Bulk Loans*:
  - the securitization trustee is the assignee of all recourse against the whole loan Seller (for this purpose, called the "Transferor"). In the event of an origination defect, Lehman has no obligation to repurchase the loan from the trust – that obligation remains solely with the Transferor;
  - on the basis of the documents, only the trustee has the right to enforce breaches of representations against the Transferor;
  - while Aurora, as master servicer, has no express obligation or right to pursue these repurchases, certain trustees have taken the position that the master servicer is intended to pursue the rights of the trustee against the Transferor and historically Aurora (acting through Contract Administration) has done so;
  - there is no recourse to Lehman Holdings or Lehman Bank for breaches of origination reps by a Transferor.

- For *Aurora Wholesale* loans:
  - Lehman Holdings retains liability to the trust for breaches of origination reps; but, there is no recourse to Lehman Bank for breaches of these reps, even though Lehman Bank originated or acquired the loans;
  - Lehman Bank retains rights against brokers and correspondents for breaches of origination reps;
  - Aurora, as master servicer, and Lehman Holdings, as seller to securitizations, have an obligation to notify the trustee upon discovery of an origination breach;

-3-

CONFIDENTIAL

LBHI-OMNI_8462336

o   Lehman Bank has no contractual obligation to notify Holdings upon
    discovery of a breach (but there is no prohibition on it doing so).

## PART II.
### Description of Current Business Functions of the Affected Units

[to be added in an attachment]

## PART III.
### ISSUES FOR DISCUSSION/ANALYSIS

**MASTER SERVICING**

#### Fundamental Business/Alignment Tension

- Securitization Documents do not authorize or require Master Servicer to pursue
  origination breaches -- and Master Servicer is not compensated for doing so; yet it
  incurs substantial expense, through Contract Admin, in pursuing breaches

- As a business objective, Master Servicing believes that it is the appropriate party
  in the securitization chain to pursue breaches -- and that that function makes it a
  better Master Servicer

- Master Servicer anticipates investor inquiries by proactively referring to Contract
  Administration loans that meet certain expected loss threshholds

- Master Servicer can become "tainted" with knowledge of findings of breach by
  other business units that are part of the Aurora entity(QC or CA), in cases where
  it is not pursuing breaches

#### Questions for Discussion

1. Should the Master Servicer be investigating or enforcing origination breaches
   (whether on its own or through Contract Admin) if not contemplated or required by
   the securitization documents?

CONFIDENTIAL                                                  LBHI-OMNI_8462337

- Securitization documents typically only require that MS give notice to other parties if it becomes aware of a misrepresentation that has a material adverse affect on the value of a mortgage loan. There is no affirmative requirement that the MS enforce rights against the Transferor, in the case of Lehman Bulk loans, or Lehman Holdings, in the case Aurora Wholesale loan.

- MS not compensated for pursuing claims.

- MS not required to pursue origination claims against Transferors or Lehman Holdings, but it has undertaken a practice of doing so (through Contract Admin).

- MS believes that undertaking these actions results in better performance on deals that it master services, as opposed to its competitors. Believes that enforcement of breaches is a value added service that it is in a unique position to provide to investors.

- As to *Lehman Bulk* loans, if MS does not pursue defects on behalf of the trustee who will? (Answer: no one). MS could simply refer inquiries directly to the Transferor, but without an advocate, unlikely to get much action or protection.

- As to *Aurora Wholesale* loans, Lehman Holdings retains liability, so MS should simply refer loans back to Holdings for repurchase or dispute.

- MS must treat all securitizations equally -- cannot differentiate among deals by factors such as the identity of any particular investor or residual holder. If a rule is adopted (or continued) requiring MS to investigate and pursue loan level issues, it must do so without regard to identity of investors.

2. Should the Mater Servicer be contained in a separate legal entity from QC and Contract Admin?

- The Master Servicer is required to notify the Trustee upon discovering a breach of an origination rep that materially and adversely affect the value of a loan.

- Since the Master Servicer (i.e., Aurora Loan Services LLC) is part of the same legal entity as QC and CA, it may be charged with knowledge of breaches that are discovered by those business units (whether or not a MS officer has actual knowledge), thereby triggering its notice requirement--and ultimately requiring repurchase of a loan by Lehman Holdings (in the case of Aurora Wholesale loans) or the Transferor (in the case of Lehman Bulk loans).

CONFIDENTIAL

LBHI-OMNI_8462338

- However, the risk would remain that, even if MS were contained in a separate legal entity, that a court, applying equitable principles, would attribute knowledge of one Lehman subsidiary to another -- especially since Lehman is the sponsor of the related securitization.

- An "ethical wall" may provide certain protections to the Master Servicer if applied consistently.

- Also consider whether post-closing QC unit should be contained in its own entity, in order to "wall off" knowledge from CA and MS.


## QUALITY CONTROL

### Fundamental Business Alignment Tension

- If post-closing QC review is more extensive than legally necessary, QC ends up making findings that result in repurchase requirements for loans that have a low likelihood of default and will adversely affect securitization transactions by speeding prepayments. Tension particularly strong in cases where loan is sold into securitization without risk retention by Lehman.

- If QC is less extensive, the risk is in missing non-quality loans, which ultimately negatively impacts performance of securitizations. Also, it is easier to enforce a repurchase demand while the loan is still performing, rather than waiting for default or post-liquidation review.

- QC performs a necessary and valuable risk management and regulatory compliance function.

- If QC determines that loans contain material origination defects, knowledge of that finding may be attributable to Master Servicer (as part of same legal entity) and may expose Master Servicer to liability if it fails to notify trustee of breach.

- Who does the QC "Lehman Team" represent in its investigations?

- Ongoing tension regarding attempts to verify income on stated income product -- and conclusions drawn from inability to verify.

CONFIDENTIAL

LBHI-OMNI_8462339

Discussion Draft
12/5/2005

<u>Questions for Discussion</u>

3. What is the appropriate scope of QC post-closing group investigations?

- QC performs an important regulatory compliance and risk management function. Helps identify "bad" originators and fraudulent loans.

- To the extent that QC performs post-funding reviews, it is doing so on behalf of Lehman Bank, as originator or purchaser of the related loan. However, Lehman Bank sells the loans to Lehman Holdings without any loan level representations or warranties, so Lehman Bank retains no risk.

- Is the current scope and significance level of QC's reviews properly tailored to manage the actual business risk to Lehman Bank?

- Track who is benefited by different QC functions -- and who pays for those functions.

4. Could QC post-closing investigations be concluded earlier, prior to loan securitization?

- o Post-closing QC material breach discovery can negatively impact securitization prepayment speeds if loans are required to be repurchased soon after securitization.

- o Lehman typically securitizes loans at 60 days after purchase, which is around the same time that QC completes its review.

- o Many QC issues would be solved if loans with questionable findings could be held back from deals prior to be included in securitization population.

- o This solution has associated costs that may make it prohibitive.

5. Does QC unit have sufficient information to reach conclusion as to whether an origination defect rises to the level of a breach that materially and adversely affects the value of a mortgage loan?

- QC tests as to whether a loan is a "quality" or "non-quality" loan and whether there is an origination defect that "would have changed the decision to make the loan" -- which is a different standard than the breach of an origination representation.

CONFIDENTIAL                                                                 LBHI-OMNI_8462340

- QC does not have access to underlying purchase documents to determine whether the defect rises to the level of a breach that materially and adversely affects the value of a mortgage loan.

- Is there another unit that should take QC's findings and apply against the applicable purchase documents to determine if the QC findings rise to level of a breach? If so, which unit? -- CA.

6. Who does the QC "Lehman Team" really serve?

- Reports to Aurora QC -- which presumably supports the Bank.

- Lehman Team generally reviews Lehman Bulk loans for which recourse is solely by trustee back against the Transferor. Important function if (i) this is a service that Master Servicer should be providing (in which case Lehman Team is working for Master Servicer, which in turn is pursing trustee's remedies) or (ii) Lehman Team is representing an investor, including Lehman as residual holder.

- Who should pay for this service?

7. To the extent that Lehman or one of its affiliates is an investor/residual holder in a security, is there a mechanism for additional vigilance of loans in those securities?

- Residual holder prefers additional QC and investigation, since it bears losses.

- Lehman Bank QC does not generally perform post-closing reviews on loans included in subprime securitizations, as they are not Aurora Wholesale loans.

- As described above, Master Servicer must act in a non-discriminatory manner across all securitizations. Should not impose a lower threshold for losses it investigates.

- Structurally, a credit risk manager included in securitization documents, can provide extra diligence on certain transactions.

- Perhaps Lehman Holdings, as Seller and residual holder could have a QC function in subject transactions.

8. Should QC attempt to verify borrower income on "stated income" product?

- Ambiguous as to whether conclusions drawn from inability to verify income means that there is a an origination breach.

CONFIDENTIAL

LBHI-OMNI_8462341

## CONTRACT ADMINISTRATION

<u>Fundamental Business Alignment Tension</u>

- Constant issue of who is CA serving -- Master Servicing, Lehman Bank, Trustees, Lehman Holdings?

- Who pays for CA services?  Who benefits from the services?

- If CA determines that loans contain material origination defects, knowledge of that finding may be attributable to Master Servicer (as part of same legal entity) and may expose Master Servicer to liability if it fails to notify trustee of breach.

<u>Questions for Discussion</u>

9. Who does Contract Admin support/serve?

- When CA "Aurora Team" pursues correspondents/brokers as a result of post-closing QC review, it is supporting Lehman Holdings (which has the obligation to repurchase the defective loan from the trust).

- When CA "Lehman Team" pursues referrals from master servicing (including based on inquiries from rating agencies, credit risk manager, servicers or investors), it is supporting Aurora, as Master Servicer, which may in fact be acting on behalf of the trustee (in the case of Lehman Bulk loans) or Lehman Holdings (in the case of Aurora Wholesale loans).

- When pursuing MI rescissions, CA is supporting Lehman Holdings in the case of Aurora Wholesale loans or Trustee, in the case of Lehman Bulk loans.

    o Should MI rescissions relating to Lehman Bulk loans simply be passed through to the Seller?

- When pursuing a whole loan investor demand for repurchase, CA is supporting the Lehman entity that sold the loan to that investor (Lehman Holdings or Lehman Bank).

CONFIDENTIAL

LBHI-OMNI_8462342

Discussion Draft
12/5/2005

PART IV.
POSSIBLE ALTERNATIVE FRAMEWORK

1.     Post-closing QC function to solely serve Lehman Bank in analyzing its Correspondents and Brokers (perhaps QC could even be moved into the Bank?).  Lehman Bank has no contractual obligation to notify Lehman Holdings of breaches.  On a loan-level basis, QC to report findings to Lehman Bank senior management, which will adopt rules for determining types of breaches that would be referred to Contract Administration. Contract Admin to make materiality determination and notify Master Servicing and appropriate counterparties as necessary.

2.     Lehman Team QC and CA to serve Lehman Holdings in reviewing *Aurora Wholesale* loans referred to it by Master Servicer.

3.     Determine whether it is appropriate to also have a Lehman QC and CA Team to serve Master Servicer (on behalf of the Trustee) with respect to *Lehman Bulk* loans that contain Transferor breaches--especially in cases where Lehman does not hold risk of loss.  In the alternative, Master Servicer could simply refer inquiries to the Transferor and seek explanations.

PART V.
NEXT STEPS

[to be discussed after review of analysis above]

18466/1
12/05/05 1819653. 01

CONFIDENTIAL

LBHI-OMNI_8462343

Attachment 1

I. *Mortgage Loan and Recourse Lifecycle*

A. *Lehman Whole Loan Purchase Channel*

1. Acquisition by Lehman Bank from various Originators of whole loans pursuant to Flow Seller's Warranties Agreement, which generally contains complete loan-level representations and warranties. Originator retains obligation to notify Lehman Bank upon obtaining knowledge of any breach that materially and adversely affects value of loans.

2. Assignment by Lehman Bank to Lehman Holdings of the Loans and the related Sale Agreements (as well as all rights against the Originator) pursuant to an Assignment and Assumption Agreement. Lehman Bank retains no liability to Lehman Holdings for any breach of a loan-level rep and has *no contractual obligation to advise Lehman Holdings if it discovers a breach*.

3. Assignment by Lehman Holdings to SASCO (as Depositor) of the Loans and rights under the related Sale Agreement (as well as all rights against the Seller) pursuant to a Mortgage Loan Sale and Assignment Agreement. Generally, Lehman Holdings retains no liability to SASCO for loan level representations made by the Originator. Rather, Lehman Holdings assigns to SASCO its right to enforce representations against the Originator. However, Lehman Holdings agrees that upon discovery of a breach of a loan level rep made by LBH, that is not also a breach of an Originator loan level rep, it will give prompt written notice to SASCO.

4. Pursuant to the Trust Agreement for each securitization, SASCO assigns to the Trustee all of its rights under the Loans as well as its rights under the Mortgage Loan Sale and Assignment Agreement.

5. Also pursuant to the Trust Agreement, upon discovery by the Depositor, the Master Servicer or the Trustee of a breach of loan-level representations made by Lehman Holdings in the Sale and Assignment Agreement or by the Originator and assigned to the Trustee, which breach adversely and materially affects the value of the related Mortgage Loan, the party discovering the breach is required to notify the others. Within 90 days of that discovery, the Depositor, Originator or Lehman Holdings are obligated to either cure, repurchase or, in certain cases may substitute another qualified loan. To the extent the breach is an Originator breach, *the Trustee* shall enforce its rights under the related purchase agreement.

*Accordingly, through operation of the documents described above, the Trustee is the assignee of the right to enforce loan level reps made by the Originator. Under Section 2.04 of the Trust Agreement, the Trustee is required to enforce Originator breaches directly against the Originators. Conversely, none of SASCO, Lehman Holdings or Lehman Bank retain the right to enforce representations and warranties against the Originator.*

CONFIDENTIAL

Discussion Draft
12/5/2005

*Further, by virtue of assignments, the Originator is required to advise the Trustee if it discovers a breach of a loan-level representation.  Lehman Bank does not have a contractual obligation to advise anyone if it discovers such a breach.*

B.  *Aurora Origination Channels*

1.  Acquisition by Lehman Bank from various Correspondents pursuant to Seller's Guide, which contains complete loan-level representations and warranties.  In addition, loans may be originated directly by Lehman Bank through its retail channel or broker wholesale channel, in which case Lehman Bank receives no loan level reps.  Correspondents retain obligation to notify Lehman Bank upon obtaining knowledge of any breach that materially and adversely affects value of loans.

2.  Assignment by Lehman Bank to Lehman Holdings of the Loans but not the related Correspondent Agreements, or any rights against the Correspondents, pursuant to an Assignment and Assumption Agreement.  *Lehman Bank retains no liability to Lehman Holdings for any breach of a loan-level rep., nor does it have any obligation to notify Holdings upon discovery of a breach*.  [NOTE:  NEED TO CONFIRM CURRENT FORM OF ASSIGNMENT AND ASSUMPTION WITH McKEE]

3.  Assignment by Lehman Holdings to SASCO (as Depositor) of the Loans (but not any rights against Aurora's Correspondents) pursuant to a Mortgage Loan Sale and Assignment Agreement.  Under the MLSA, *Lehman Holdings makes full, loan level reps directly to SASCO with respect to the Aurora-originated loans, and Lehman Holdings retains liability for breaches of those reps*.  Lehman Holdings agrees that upon discovery of a breach of a loan level rep made by LBH, it will give prompt written notice to SASCO, and will cure or repurchase the loan.

4.  Pursuant to the Trust Agreement for each securitization, SASCO assigns to the Trustee all of its rights under the Loans as well as its rights under the Mortgage Loan Sale and Assignment Agreement.  Accordingly, through operation of the documents described above, the Trustee is the assignee of the right to enforce loan level reps made by the Lehman Holdings.

5.  Also pursuant to the Trust Agreement, upon discovery by the Depositor, the Master Servicer or the Trustee of a breach of loan-level representations made by Lehman Holdings in the Sale and Assignment Agreement, which breach adversely and materially affects the value of the related Mortgage Loan, the party discovering the breach is required to notify the others.  Within 90 days of that discovery, the Depositor, Originator or Lehman Holdings are obligated to either cure, repurchase or, in certain cases may substitute another qualified loan. Unlike in the Lehman Bulk channel, the document does not explicitly give the Trustee the obligation to enforce reps against Holdings (it assumes that upon receiving notice of a breach from the Master Servicer, Depositor or Trustee, LBH will either cure or repurchase).

-Attachment 1-2-

CONFIDENTIAL

LBHI-OMNI_8462345

Discussion Draft
12/5/2005

For Aurora originated loans:

- Holdings retains liability to the Trust for breaches of loan level representations;

- Aurora, as Master Servicer, and Holdings, as Seller to SASCO, have an obligation to notify Trustee upon discovery of a breach;

- Lehman Bank has an obligation, as originator and purchaser of loans, to maintain a regulatory-compliant quality control program (see below) in which it reviews a sample of all mortgage loans originated or acquired by the Bank;

- Lehman Bank has _no contractual obligation_ to notify Holdings upon discovery of a breach (there is no prohibition on it doing so);

- Presumably, Lehman Bank retains recourse rights against the Correspondent; unclear under current documentation how loan would get back to Lehman Bank for enforcement. [Consider revisions to program documents to place rights against Correspondents in the hand of Lehman Holdings.]

## II. _Quality Control Function_

As an OTS-regulated institution, as well as a Fannie Mae and Freddie Mac approved Seller/Servicer, Lehman Bank must maintain an effective loan review/quality assurance system. Among other things, the quality assurance program:

- Must be independent of mortgage production/origination, underwriting and closing groups;

- Must report directly to senior management and/or Board of Directors;

- Must be designed to assure that mortgages originated or acquired by Lehman Bank conform to the Bank's policies, are of a quality acceptable to institutional and secondary market investors and comply with insurer or guarantor requirements;

- Must apply to loan originated by the Bank, as well as those originated by TPOs and acquired by the Bank;

- May use outsourced vendors -- as long as they are supervised and internal department has procedures to measure the quality of an outside vendor's work;

- May employ a combination of pre- and post-funding reviews.

-Attachment 1-3-

CONFIDENTIAL

LBHI-OMNI_8462346

## II. *Master Servicing Function*

The Master Servicer's function is to "master service" the mortgage loans in accordance with the terms of the Trust Agreement and the underlying servicing agreements.  No underlying servicing agreements require any servicer to seek out or pursue claims against originators of mortgage loans.

Section 9.04 of each Trust Agreement, which generally speaks of the Master Servicer's Powers to Act, includes the following sentence:

> "The Master Servicer shall represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio <u>in any claim, proceeding or litigation</u> regarding a Mortgage Loan and shall not make or knowingly permit the Servicer to make any modification, waiver or amendment of any term of any Mortgage Loan that would cause an Adverse REMIC Event."

[Trustees seem to believe that this provision may require the Master Servicer to pursue breaches and claims against Transferors? It certainly does not seem to require the making of a claim]

Section 9.30 of each Trust Agreement includes the following:

> "(a)  The Master Servicer undertakes to perform such duties and only such duties as are specifically set forth in this Agreement."

> "(c)  . . . The Master Servicer, the Seller and the Depositor <u>shall be under no obligation</u> to appear in, prosecute or defend any legal action that is not incidental to its duties to master service the Mortgage Loans in accordance with this Agreement and that in its opinion may involve it in any expenses or liability; provided, however, that <u>the Master Servicer may in its sole discretion</u> undertake any such action that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder.  In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund and the Master Servicer shall be entitled to be reimbursed therefor out of the Collection Account it maintains as provided by Section 4.02."

We could read Section 9.04, together with Section 9.30 to permit (but not require) the Master Servicer to enforce Trustee remedies against Originators (but not Correspondents), and perhaps even to be reimbursed therefor from the Trust Fund.  [Do we want to go down this path?]

-Attachment 1-4-

CONFIDENTIAL                                                                 LBHI-OMNI_8462347

Attachment 2

## AURORA LOAN SERVICES
## MASTER SERVICING/CONTRACT ADMINISTRATION
## RECOURSE ANALYSIS

| Case | Investor | Channel | Issue/Defect | Action |
|---|---|---|---|---|
| 1 | Securitization | Lehman Bulk | Breach of Rep & Warranty in Transfer Agreement or in MLSA | **Master Servicer** has obligation to provide notice of discovery of a breach to the other parties.<br><br>**Trustee** has obligation to enforce its rights under the applicable Transfer Agreement and the MLSA (including repurchase).<br><br>The **Depositor, Transferor or Seller**, as applicable, has the obligation to cure, repurchase or substitute (substitution available only within first two years). |
| 2 | Securitization | ALS Wholesale | Breach of Lehman Bank Rep & Warranty in MLSA[1] (whether or not a breach under Correspondent Agreement) | **Master Servicer** has obligation to provide notice of discovery of a breach to the other parties.<br><br>**Trustee** has obligation to enforce its rights under the MLSA (including repurchase).<br><br>The **Seller** has the obligation to cure, repurchase or substitute (substitution available only within first two years).<br><br>Once loan is repurchased from Trust, **Contract Administration** may pursue any available remedies against correspondent/broker. |
| 3 | Securitization | ALS Wholesale | Breach of Rep & Warranty by Correspondent (but | **No Action**.<br><br>If there is a breach of a rep & warranty |

[1]  The representation of Lehman Bank contained in the MLSA with respect to ALS Wholesale loans, are typical, market-standard loan level representations and warranties.  However, the Aurora Seller's Guide contains different representations and warranties that are made by Correspondents at the time of loan sale to Lehman.  We have initiated a separate project to review the representations and warranties that Lehman Bank receives on the "buy" side of transactions and compare them to those given on the "sell" side.

CONFIDENTIAL

Discussion Draft
12/5/2005

| Case | Investor | Channel | Issue/Defect | Action |
|---|---|---|---|---|
| | | | not under MLSA) | under the applicable Correspondent Agreement, but not under the MLSA, there is no requirement or authority of any party to repurchase a loan from the Trust. |
| 4 | Securitization | Lehman Bulk | Breach of Covenant (including EPD/FPD) | Generally[2], **No Action**.<br><br>**Trustee** is holder of *right* to enforce Transfer Agreement.[3]<br><br>Except where specifically provided in the Trust Agreement, **no** party to the Trust Agreement has any *obligation* to enforce the Transfer Agreements. |
| 5 | Securitization | ALS Wholesale | Breach of Covenant (including EPD/FPD) | **No Action**.<br><br>Except where specifically provided in the Trust Agreement, no EPD/FPD rights against Correspondents are transferred to the Trustee. |
| 6 | Securitization | Lehman Bulk | Material Defect[4] | **No Action** explicitly required of **Master Servicer.** However, no other party is required to pursue Transferor or Depositor in the event of a loss arising from Material Defect.<br><br>**Trustee** or **Custodian** to identify Material Defect in Interim Certification delivered to Depositor and Master Servicer.<br><br>Within 90 days of its receipt of such notice[5], the **Transferor**, or, if the |

---

[2]  We have been advised that there are two particular 2003 Household transactions in which EPD/FPD remedies were specifically passed through to the Trusts.  In those cases, reference should be made to the actual Trust Agreements.  On a going forward basis, the issue of whether EPD/FPD protection is to be passed through to the Trust will be addressed on a deal by deal, and Seller by Seller, basis.  System needs to be developed to track which loans should be pursued.

[3]  Prior to pursuing repurchase, must review disclosure issues with securitization counsel.

[4]  A "Material Defect" occurs if the Custodian discovers any document or documents constituting a part of a Mortgage File that is missing, does not appear regular on its face (i.e., is mutilated, damaged, defaced, torn or otherwise physically altered) or appears to be unrelated to the Mortgage Loans identified in the Mortgage Loan Schedule.

-Attachment 2-2-

CONFIDENTIAL

LBHI-OMNI_8462349

| Case | Investor | Channel | Issue/Defect | Action |
|------|----------|---------|--------------|--------|
| | | | | Transferor does not do so, the **Depositor** shall be required to **cure** such Material Defect (and, in such event, the Depositor shall provide the Trustee with an Officer's Certificate confirming that such cure has been effected). |
| | | | | If the applicable Transferor or the Depositor, as applicable, does not cure a Material Defect, the **Transferor**, or, if the Transferor does not do so, the **Depositor**, shall, *if a loss has been incurred with respect to such Mortgage Loan* that would, if such Mortgage Loan were not purchased from the Trust Fund, constitute a Realized Loss, and such loss is attributable to the failure of the Depositor to cure such Material Defect, **repurchase** the related Mortgage Loan from the Trust Fund at the Purchase Price. |
| 7 | Securitization | ALS Wholesale | Material Defect | **No Action** explicitly required of **Master Servicer.** However, no other party is required to pursue Depositor in the event of a loss arising from Material Defect. |
| | | | | **Trustee** or **Custodian** to identify Material Defect in Interim Certification delivered to Depositor and Master Servicer. |
| | | | | Within 90 days of its receipt of such notice, the **Depositor** shall be required to **cure** such Material Defect (and, in such event, the Depositor shall provide the Trustee with an Officer's Certificate confirming that such cure has been effected). |
| | | | | If the Depositor does not cure a Material Defect, the **Depositor**, shall, *if a loss has been incurred with respect to such Mortgage Loan* that would, if such Mortgage Loan were not purchased from the Trust Fund, constitute a Realized Loss, and such loss is attributable to the failure of the Depositor to cure such |

[5] Trust Agreement is silent on how notice is to be provided to Transferor. Presumably, Depositor, or someone acting on its behalf is to advise Transferor of Defects noted by Custodian.

-Attachment 2-3-

CONFIDENTIAL

LBHI-OMNI_8462350

Discussion Draft
12/5/2005

| Case | Investor | Channel | Issue/Defect | Action |
|------|----------|---------|--------------|--------|
|      |          |         |              | Material Defect, **repurchase** the related Mortgage Loan from the Trust Fund at the Purchase Price. |

## Glossary of Terms/Abbreviations:

**ALS Wholesale**   Refers to loans acquired by Lehman Bank through the Aurora correspondent conduit or broker channels. Correspondent loans have EPD or FPD protection, depending on type of correspondent (i.e., delegated underwriting correspondents provide EPD protection, all others provide FPD only). Loans originated through the broker channel do not have EPD or FPD protection. Under existing MLSAs, Lehman Bank does not assign its rights against correspondents and brokers to SASCO. Accordingly, rights against correspondents and brokers are not passed through to the Trusts. Generally, as used herein ALS Wholesale transactions include ALS "mini-bulk" transactions.

**Depositor**   Structured Asset Securities Corporation (SASCO)

**EPD/FPD**   Refers to an early payment default or first payment default under a mortgage loan, which, in some cases, would give Lehman Holdings or Lehman Bank, as applicable, the right to require the originator (or seller) of the loan to repurchase the loan.

**Lehman Bulk**   Refers to loans acquired by Lehman Holdings or Lehman Bank, as applicable, from originators or consolidators on typical forms of Purchase and Warranties Agreements. Depending on the product type and individual agreement, loans may be acquired with EPD/FPD protection. The analysis in this document assumes that the representations and warranties of a seller in a bulk transaction are assigned to SASCO through the MLSA and the seller is a "Transferor".

**MLSA**   Refers to the Mortgage Loan Sale and Assignment Agreement, pursuant to which loans are sold by Lehman Holdings or Lehman Bank, as applicable, to SASCO. SASCO assigns all of its rights under this agreement to each Trust.

**Securitization**   Refers to loans owned by securitization trusts formed under various Lehman shelf facilities, including SASCO, SAIL, ARC, SARM…

**Seller**   Lehman Bank or Lehman Brothers Holdings, as applicable, in its capacity as seller of whole loans to the depositor under a MLSA

**Transfer Agreement**   Refers to the agreement under which Lehman Holdings or Lehman Bank, as applicable, purchased the loans from a seller in a bulk whole loan transaction. The seller under a Transfer Agreement is a "Transferor". Pursuant to the MLSA,

-Attachment 2-4-

CONFIDENTIAL

LBHI-OMNI_8462351

the applicable Lehman entity assigns all of its rights under the applicable Transfer Agreement to SASCO.

**Transferor**          The seller of whole loans to Lehman in bulk under a Transfer Agreement.

-Attachment 2-5-

CONFIDENTIAL                                                          LBHI-OMNI_8462352

# EXHIBIT C

Appointment

| | |
|---|---|
| **From**: | Lederman, Nadine [NLederman@alservices.com] |
| **Sent**: | 2/16/2006 7:19:53 PM |
| **To**: | Skogg, Rick [RSKOGG@alservices.com]; Witherell, Bruce M [bwithere@lehman.com]; Desens, Jack E [jdesens@lehman.com]; McKinney, Richard [rmckinne@lehman.com]; Franks, Lana [lfranks@lehman.com]; Gentry, Terry L [tgentry@alservices.com]; Gollin, Mark D [MGollin@alservices.com]; Dorchuck, Jordan D [jdorchuck@alservices.com]; Browning III, Roy [rbrowning@alservices.com]; Kritikos, Dimitrios [dimitrios.kritikos@lehman.com] |

| | |
|---|---|
| **Subject**: | Updated: Overview of CA/MS/QC -Pls print attachment |
| **Attachments**: | Functional Roundtable(Shortform) (2).ppt |
| **Location**: | Aspen Board Room/Call in number listed below |

| | |
|---|---|
| **Start**: | 2/16/2006 8:00:00 PM |
| **End**: | 2/16/2006 10:00:00 PM |
| **Show Time As**: | Busy |

| | |
|---|---|
| **Recurrence**: | (none) |

```
Please print out attachment for meeting

 <<Functional Roundtable(Shortform) (2).ppt>>

Call In Number:  1-866-779-0771
Room Number:  *6487745*
```

CONFIDENTIAL                                                              LBHI-OMNI_8524538

# Overview

This presentation addresses the primary concerns regarding Aurora's current legal and operating structure and identifies the scope of business for our Contract Administration, Quality Control and Master Servicing Departments. Some of the questions regarding these areas include:

◆ What are our roles and responsibilities within Quality Control, Contract Administration and Master Servicing?

◆ How far do we 'cast the proverbial net'? How should we define the scope of our review process?

◆ What is the role of Master Servicing and what type of master servicer do we want to be? Are we looking to offer our services externally to non-affiliated clients or is this solely a proprietary operation?

◆ What is the most optimal legal structure for what we are trying to achieve? Why are our origination, contract administration and master servicing businesses under the same corporate umbrella, given the different risks associated with each of the respective businesses?

AURORA LOAN SERVICES
*A Lehman Brothers Company*

1

CONFIDENTIAL

# Objective

This objective of this presentation is to highlight some of the key issues and areas of concern that currently exist within today's construct and to offer recommendations on how best to remedy these areas

◆ Brief overview of roles and responsibilities of the Contract Administration, Quality Control and Master Servicing areas

◆ Outline of current parameters

◆ Discussion of legal structures; current structure in comparison to two detailed proposals

AURORA LOAN SERVICES
A Lehman Brothers Company

2

CONFIDENTIAL

LBHI-OMNI_8524541

**Scope of Contract Administration and Quality Control**

CONFIDENTIAL

# Contract Administration

## Function of  Contract Admin

### Situational Analysis

Contract Administration (CA) works for several parties within the same legal infrastructure who may have different interests and obligations.  Some of these parties include (i) the master servicer, (ii) the loan originator, (iii) the investor(s), (iv) the desk, (v) LBB, (vi) a securitization trust or (vii) any combination thereof.

| Issues | Recommendations |
|---|---|
| ◆ Many of CA's responsibilities, as they relate to loans that have been securitized, are performed on behalf of the Master Servicer (MS).  However, under our pooling and servicing agreements, Aurora is not compensated for these services and we are not entitled to remit expenses back to the Trust | *Revise contracts to allow MS to charge the appropriate Trust for any services completed on its behalf.  Additionally, allow Master Servicer to be compensated for any additional services performed on behalf of the Trust* |
| ◆ Based on the arrangement currently in place, all EPD/FPD analysis completed on Lehman Whole Loans is performed for the benefit of LBHI | *LBHI should perform these services on its own behalf, and not a representative of LBB.  This exercise is solely for the benefit of LBHI* |
| ◆ Other than the limited services performed as it relates to Aurora's production, prior to securitization, the majority of CA's responsibilities are for the benefit of the Trust | *Legally structure Contract Administration under LBHI, as the majority of its services are performed for the benefit of the Trust* |

AURORA LOAN SERVICES
*A Lehman Brothers Company*

3

LBHI-OMNI_8524543

# Quality Control

### How Do We Define The Scope of Our Review?

| Scope of Review |
| --- |

- Aurora/LBB is not a portfolio investor, and through securitization it transfers and diversifies its risk
- Aurora strives to originate quality assets while recognizing that this business contains inherent risks
- Aurora encumbers additional risk as a result of its QC investigations, and takes losses which would have otherwise been absorbed through the over-collateralization mechanisms of the trust
- LBB has no contractual obligation to advise LBHI of origination breaches; however it must comply with regulatory requirements and is committed to a meaningful QC process and sound business practices, which also take into account its reputation in the market
- The risk is borne by LBHI as depositor to the Trust, not by Aurora/LBB

| Issues / Recommendations |
| --- |

- LBB sells/transfers loans to LBHI on a non-recourse basis; therefore, LBB has no legal or contractual obligation to inform any party of its findings
  - *Recommendation*: Define parameters as to what constitutes fraud/misrepresentation as it relates to a security and define the thresholds of materiality that should be noticed to LBHI or any purchaser of Aurora originated whole loans
- As it relates to loans acquired by non-affiliated originators, such originators rarely send us notification of their QC fraud or misrep findings
  - *Recommendation*: Redefine our policies and procedures to be better aligned and more consistent with other large loan originators. Allow for secondary management approval to apply risk-based testing in order to serve as an intermediary between the Bank and the purchaser of its loans

- To the extent we are queried on a particular loan, we run the loan through our normal 'reactive' channels and process the claim accordingly
  - *Recommendation*: Continue to be reactive; No reason to be proactive other than what we deem appropriate under Generally Accepted Master Servicing practices
- The "Lehman QC Team" that works alongside with Contract Admin works solely for the benefit of the related Trust. In its current structure, it serves as Contract Admin's due diligence resource and is more closely aligned with and works on behalf of our Master Servicer
  - *Recommendation*: This function should (i) be removed from LBB and realigned with Master Servicing and (ii) rename itself the "MS Due Diligence Team." This would disassociate any connection to the LBB QC function from a regulatory perspective and allow them to solely focus on issues related to the Trust

AURORA LOAN SERVICES
A Lehman Brothers Company

4

LBHI-OMNI_8524544

## Fraud and Misrepresentation Buckets

**An Internal Sub-committee Will Review Misrep Findings Which Are Less Conclusive**

### <u>Financial Fraud</u>

– Defined as air loans, double sold notes, illegal flips and builder bailouts. *These findings should be referred immediately to Contract Administration or other WL Purchasers, as applicable*

### <u>Material Fraud/Non-quality Loans</u>

– Defined as identity theft, fraudulent appraisals, misrepresented employment, altered or falsified credit documents, straw-buyers between non-family members, special investigations with a pattern of misrepresentation, title deficiencies including improper lien priority not corrected by title company, TIL restitution in amounts greater than $15,000 , incurable "high cost" loans, and loans with other incurable disclosure or regulatory violations. *These findings should be referred immediately to Contract Administration or other WL Purchasers, as applicable*

### <u>Loans with Other Misrepresentation</u>

– Isolated loans with inflated income, incorrect occupancy status, family-related straw-buyers, undisclosed debts. *These findings will be handled on a case by case basis via referral to an independent group within the Bank for their review and decision of referral to Contract Administration or other WL Purchasers, as applicable*

AURORA LOAN SERVICES
*A Lehman Brothers Company*

5

LBHI-OMNI_8524545

**Master Servicing Analysis**

CONFIDENTIAL
LBHI-OMNI_8524546

# Master Servicing

## Role of Master Servicing...

| Situational Analysis |
| --- |

- ◆ In addition to our legal and contractual obligations, we have the tendency to go above and beyond to provide better service levels to our investors
- ◆ This may favorably influence (i) agency ratings, (ii) investors' perceptions and desire to invest in our portfolios, and ultimately (iii) our bottom line as we mitigate losses which we ultimately incur as a result of our ownership of the residual pieces
- ◆ We need to come to a decision on whether we want to be 'bare-bones', all inclusive or something in-between
- ◆ Contractually, our MS obligations are limited to notification and oversight; however, we retain the right to act as we deem necessary to protect the underlying interests of the Trust

| Issues | Recommendations |
| --- | --- |
| ◆ Most of our MS peers do very little in excess of their contractual obligations, because there is little economic incentive to do so | *Agree on strategy and define operational policies and procedures to reflect goals and objectives* |
| ◆ In securities where a Credit Risk Manager (CRM) has been included, one could argue that the roles and responsibilities of the Master Servicer are somewhat marginalized, as the CRM is tasked with the oversight portion of the responsibilities | *Make the determination of whether or not the Master Servicer should be providing those services to the Trust, and then price and structure those responsibilities accordingly* |

AURORA LOAN SERVICES
*A Lehman Brothers Company*

6

# Master Servicing Comparison

**Aurora's Master Servicing platform exceeds traditional MS expectations**

| Contractual Obligations | Aurora Master Servicing* |
|---|---|
| ◆ Reporting and Remittance | ◆ Reporting and Remittance |
|   – Servicer status reports |   – Servicer remittance balancing with confirmation of principal, interest, Loan balances and P&I Constants |
|   – Remittance balancing and reporting |   – Recalculation of ARM adjustments |
|   – Trustee notification |   – ID of Loans for Buyout/Repurchase |
|   – Responsibility and oversight of interim Servicers |   – Remittance of excess yield |
| ◆ Default Advisory | ◆ Default Advisory |
|   – Reporting of default characteristics by Servicer |   – Review for missing and incomplete data |
|   – Liquidation reporting and remittance |   – Tracking of all 90+ DQs |
|   – Notification of R/W breaches |   – Oversight of Servicers as it relates to DQ tracking |
| ◆ Transaction Management |   – Review of Loss Mitigation requests |
|   – Notification of breaches |   – REO Oversight |
| ◆ Sub-prime deals not MS by Aurora |   – Liquidation Oversight |
|   – No obligations |   – Valuation oversight and watchdog for material declines |
| ◆ Information Management | ◆ Transaction Management |
|   – No obligations |   – Rolled balance reporting |
| ◆ Servicer Oversight |   – Data integrity and loan edits |
|   – Remittance and reporting of prepayment penalties provided by Servicers |   – Due Diligence coordination |
| |   – Reconciliations |
| | ◆ Miscellaneous Information Management, Servicing Oversight and Whole Loan Master Servicing |
| | ◆ Comprehensive on-site and limited desk reviews |

\* *In addition to contractual obligations, as identified above.  Note:  MS does not currently earn any additional income yet it incurs substantial expenses in performing these additional services*

**AURORA LOAN SERVICES**
*A Lehman Brothers Company*

7

CONFIDENTIAL

LBHI-OMNI_8524548

**Legal Structure and Considerations**

CONFIDENTIAL

LBHI-OMNI_8524549

# Legal Objectives

To develop a structure which allows for the flexibility around our various business functions yet protects us legally and alleviates any concern around our susceptibility to increased legal and financial liability

- ◆ Clearer definition of functional roles and responsibilities
- ◆ Proper alignment within business units
- ◆ Better control of information and proprietary data
- ◆ Reduction of economic and legal liability as it relates to current structure
- ◆ Construction of *Chinese Walls*, as necessary
- ◆ Disentanglement of commingled responsibilities
- ◆ Separation of regulatory banking risk (OTS) from capital markets risk (SEC) associated with our securities business
- ◆ Desire to retain P&L within MCD construct
- ◆ Establishment of parallel and independent business functions

AURORA LOAN SERVICES
*A Lehman Brothers Company*

8

LBHI-OMNI_8524550

## Legal Structure

### Comparison between current structure and Proposals A and B

| Current Structure | Proposed Structure A | Proposed Structure B |
|---|---|---|
|  |  |  |

| Considerations | Rationale | Rationale |
|---|---|---|
| ◆ Commingling of assets, data and information could subject us to difficulties given the affiliation between our QC efforts and our MS platform.<br><br>◆ Irrespective of MS's direct knowledge, information is imputed upon them as a result of being situated within the same entity<br><br>◆ Economic benefit should not be a driver as it relates to policies and procedures. While today we capitalize on our current approach, we would be significantly disadvantaged (cost, liability and financial burden) if we opted to flip the ownership of the residual interests (which is discussed regularly on the sub-prime side)<br><br>◆ Excess costs, liabilities and expenditures<br><br>◆ Unclear division of labor and uncertainty around who "we" are working for at what time | ◆ Ability to properly situate business functions within the organization<br><br>◆ Less confusion around roles and obligations<br><br>◆ Allows for Master Servicing to market their services to 3rd parties<br><br>◆ Differentiates functions from one another and allows more flexibility around available service levels<br><br>◆ Reduces potential legal and economic liabilities by separating QC from MS and allowing the legal defense that knowledge QC has is not to be imputed to MS | ◆ This structure keeps Master Servicing within the LBB family<br><br>◆ Lessens "separateness" of Master Servicing to some degree, but entity can have separate directors and establish ethical wall (as with Neuberger Berman)<br><br>◆ Bank licensing and approval benefits; net worth part of Bank regulatory core capital; easier to make structural changes within Bank structure<br><br>◆ Keeps Master Servicing within OTS purview<br><br>◆ Aurora Contract Admin works w/in LB Contract Finance group<br><br>◆ Retains Master Servicing revenues in LBB |

**AURORA LOAN SERVICES**
*A Lehman Brothers Company*

9

CONFIDENTIAL

LBHI-OMNI_8524551

# Comparison of Corporate Structures

**Current Structure Is Based On Historical Evolution of Aurora's Business; Not Optimized To Manage the Risks and Rewards of Today's Business**

| Current Approach |
|---|
| ◆ Unclear division of labor |
|   – Lack of alignment of business functions with risks/rewards and costs of performing such functions |
|   – Business unit confusion over who they are "working for" and whose interests they are protecting |
|   – Business units not always performing functions they are authorized or required to perform, or that have been analyzed w/ a view to return on the cost of those functions |
| ◆ Improper management of responsibilities |
| ◆ Workload redundancies and inefficient processes |
| ◆ Increased legal and economic liability |
| ◆ Imputed knowledge across divisions |
| ◆ Perceived ownership of economic liabilities, irrespective of legal construct; assumption of excess costs and expenses |
| ◆ Current securitization documentation does not reflect current operational practices |
| ◆ Risk of Master Servicer discriminating in its analysis based on investor identity |

| Proposed Revisions |
|---|
| ◆ Better defined divisions of labor |
| ◆ Cleaner organizational structure |
| ◆ Improved management capabilities |
| ◆ Enhanced compensation potential |
| ◆ Increased expense management capabilities |
| ◆ Revised documentation to reflect realities of operational practices |
|   – LBB to assign to LBHI rights to pursue remedies against wholesale correspondents and brokers |
|   – Securitization Trust documents to explicitly authorize Master Servicer to pursue remedies against Lehman Bulk sellers, on the Trust's behalf and expense |
| ◆ Better defines QC business rules relating to loans referred for repurchase |
| ◆ Uses collateral value as a key determinant to materiality, and not loan performance |
| ◆ Provides framework around the legal and organizational structure of MS, QC and CA |
| ◆ Properly aligns risk/reward, costs and expenses |

AURORA LOAN SERVICES
*A Lehman Brothers Company*

10

CONFIDENTIAL

LBHI-OMNI_8524552

# Action Items

◆ LBB to assign rights from correspondents through to LBHI (Legal)

◆ Trust to explicitly authorize Master Servicing to pursue on its behalf and at the Trusts' expense (Legal)

◆ Properly align business units across Aurora and Lehman (Business)

◆ Finalize QC materiality bucket analysis review (Business)

◆ Determine cost considerations around legal structures (Business)

◆ Assess risk and liabilities associated with each of the scenarios and develop structure which addresses such concerns (Legal / Business)

◆ Define impact as in relates to head count, P&L, risk exposure and capitalization costs (Business)

AURORA LOAN SERVICES
A Lehman Brothers Company

11

LBHI-OMNI_8524553



**Appendix I:**
**Analysis of Alternative Structures for Stand-alone Master Servicer**

CONFIDENTIAL

LBHI-OMNI_8524554

# Stand-Alone Master Servicer

**Analysis of Alternative Structures**

| | Subsidiary of Lehman Holdings ("Holdings" or "LBHI") (Alt. 1) | Subsidiary of Lehman Bank (the "Bank" or "LBB") (Alt. 2) | Recommendation |
|---|---|---|---|
| Business Alignment | Arguably, the activities of the Master Servicer in supervising primary servicers in securitizations are aligned strategically with Lehman's mortgage-backed capital markets business, rather than the production and servicing focus of Lehman Bank. For example, securities laws risks associated with master servicing publicly-issued asset-backed securities are a risk more effectively handled away from Lehman Bank. | | Alt. 1 is clearly preferable. This is a business decision. |
| Separateness | As a subsidiary of Holdings, the entity would be further separated through corporate structure from Lehman Bank's production platform. However, facts on the ground may be considered in determining whether the entity is susceptible to arguments that it had knowledge of events occurring within units of the Bank. | As a subsidiary of the Bank, the Master Servicer would be deemed to have a separate existence with limited liability, but may be somewhat more susceptible to arguments that it had knowledge of events occurring within other units of the Bank. | Alt. 1 is somewhat preferable. Cannot quantify the benefit, but Alt. 1 offers a legal defense that would be stronger in a litigation context. |
| OTS Approval | Spinning Master Servicer out of the Bank would likely require OTS approval, which might take up to four to five months. As a subsidiary of Holdings, the Master Servicer would not be directly subject to OTS examination in the same manner as an operating subsidiary of a bank. | Creating a separate subsidiary of the Bank for Master Servicing purposes would only require notice to the OTS. Relatively quick time frame (approx. 30 days). A hybrid alternative would create the Master Servicer as a subsidiary of the Bank initially, and then subsequently spin the subsidiary out of the Bank once consent is obtained. | Alt. 1 is preferable if the timing is acceptable. |
| State Licensing | Licensing as a servicer may be required in a handful of States. | In the handful of States that may require Master Servicer to be licensed, many may exempt an operating subsidiary of a federal savings bank from licensing requirements. | Alt. 2 is preferable if we accept the very conservative view that licensing is necessary. Alt. 1 is preferable if, upon further review, we take the view that the state servicing license statutes require primary servicers to obtain licenses and not master servicers. |
| Other Consents and Approvals | New entity will be required to be a Fannie Mae and Freddie Mac approved seller/servicer. Pending deal structure, the entity may also be required to be an FHA/VA approved mortgagee. | New entity will be required to be a Fannie Mae and Freddie Mac approved seller/servicer. Pending deal structure, the entity may also be required to be an FHA/VA approved mortgagee. | Alt. 2 may be marginally preferable to the extent that Agency approvals are somewhat easier to obtain for a subsidiary of a bank. |
| Capital Requirement (new entity will require at least $15 million of capital) | As a subsidiary of Holdings, the new entity will require independent net worth. | As an operating subsidiary of Bank, capital would be counted toward Bank's core capital requirement -- thereby lessening cost of maintaining separate capitalization. | Alt. 2 is preferable. This is a cost of funds issue. |

**AURORA LOAN SERVICES**
*A Lehman Brothers Company*

12

CONFIDENTIAL



**Appendix II:**
**Contract Administration**

CONFIDENTIAL

LBHI-OMNI_8524556

# Contract Administration

**Roles and Responsibilities**

◆ Protection of both LBHI and the related Trusts

◆ Performance enhancement of all related Trusts

◆ Coordination of loan repurchases, make-wholes and other remedies

◆ Facilitation of seller put-backs

◆ Investigation into the validity of findings sent to us through a multitude of sources

◆ Reporting and analytics behind claim related data

◆ Trending and portfolio analytics

◆ Loss mitigation and exposure management

◆ Mortgage Insurance rescission review

◆ Incoming/Outgoing claim management

◆ Loss recovery management

◆ Master Servicing's internal agent for its 'Full-Service' operations

AURORA LOAN SERVICES
A Lehman Brothers Company

13

CONFIDENTIAL

LBHI-OMNI_8524557

# Contract Administration Organization Chart



AURORA LOAN SERVICES
A Lehman Brothers Company

14

CONFIDENTIAL

LBHI-OMNI_8524558



**Product Development**

CONFIDENTIAL

LBHI-OMNI_8524560



# Product Development Expansion Completed

PRODUCT DEVELOPMENT ORGANIZATION CHART

**AURORA LOAN SERVICES**
*A Lehman Brothers Company*

njgisnap004\Creative Services\Client Submissions\O\O'Donnell, Andrew C\20040114\Map\20040114_USStates.WOR

CONFIDENTIAL                                                                              LBHI-OMNI_8524561

# Product Development Responsibilities

**Product Development**

**Implementation:**
Manage IT Relationship
Loan Program Set up-LOS System
Management of Loan Documents
Set-up/Maintain Eligibility Rules
Implement Compliance functions
Assist Production System procedures
AU

**Communications:**
Technical Communications
Owns' the Seller Guide
Internal and External Announcements
Internal and External Web Postings
Track Corporate-wide Approvals through
PDSC
Organize and chair CAT and PDCD meetings
and materials

**Research and Development:**
Competitor Analysis
Solicit Sales Force Feedback
Work with Clients Advisory Group
Develop New Products
Enhance Existing Products
Training Focused on Sales and the Client

AURORA LOAN SERVICES
A Lehman Brothers Company

CONFIDENTIAL

## Product Development's Progress

◆ Presentation delivered in June on PD's role through the integration and a detailed overview of the final Product Line

◆ Participating in AU roll out as eligibility expert and testing resource

◆ Participated in the East Coast Client Advisory and have since used that group to solicit product feedback

◆ Rolled out the Aurora Mortgage Maker in July; effective 8/1

◆ Rolled out the Credit Solutions with some enhancements in July to wholesale; effective 8/1

◆ 8/1 Completed Product Integration

◆ Embarked on Heloc lending in August

◆ Completed Pricing Improvement to the Aurora Mortgage Maker Seconds in August

◆ Rolled out Enhanced Parameters on the Aurora Mortgage Maker Seconds in September; effective October

AURORA LOAN SERVICES
A Lehman Brothers Company

CONFIDENTIAL

LBHI-OMNI_8524563

# Product Development's Q1 Goals

◆ Complete the design of a competitive Heloc program
  – Enhance and update TMO and LQ to accommodate Helocs
  – Complete relationship with third party vendor to handle Aurora Heloc loan documents
  – Assist Servicing, IT and Compliance/Legal with any Heloc related items
  – Assist in the development of operations training for Helocs
  – Develop training for Sales
  – Finalize pricing

◆ Play an integral role with the PMO group in getting the Heloc program rolled out

◆ PD initiated and chairs a weekly meeting regarding training; ultimate goal  improve training internally and externally with respect to Aurora Products

◆ Initiate the Broker Manual

◆ Solicit feedback on Mortgage Maker performance and work with Credit/Risk on any recommended changes/enhancements

◆ Participating in AU roll out as eligibility expert and testing resource

◆ Identify new software package to manage sellers guide and broker manual

◆ Participate in evaluation of new LOS system

AURORA LOAN SERVICES
A Lehman Brothers Company

CONFIDENTIAL

## Product Development's Q2 Goals

◆ Complete  roll out of the  Heloc
  – Deliver training
  – Marketing
  – Complete system testing
  – Complete roll out of documents with third party vendor

◆ Roll out Phase I of an enhanced training plan internally and externally as it relates to product

◆ Complete the Broker Manual

◆ Continue to solicit feedback on Mortgage Maker performance and work with Credit/Risk on any recommended changes/enhancements

◆ Complete participation for Phase I AU roll out as eligibility expert and testing source

◆ Complete roll out of new software package to manage sellers guide and broker manual

◆ Continued participation in evaluation of new LOS system

AURORA LOAN SERVICES
A Lehman Brothers Company

## Focus

◆ Helocs

 – Executive Summary of the Project Plan Roll Out (attached)

 – Project Plan Roll Out (attached)

 – Starting weekly update with PMO group

◆ Training

◆ AU

◆ New LOS

◆ Management of the Aurora Mortgage Maker Product

◆ Partner more efficiently with IT and Compliance/Legal to carry out
the 80-100 open projects PD consistently manages

AURORA LOAN SERVICES
A Lehman Brothers Company





CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

LBHI-OMNI_8524570

# EXHIBIT D

# DEPOSITION TESTIMONY

## OF

## HESTON GRAY

## EXCERPTS



CONFIDENTIAL

LBHI-OMNI_014245596

Deposition of Heston Gray
July 26, 2010

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   LEHMAN BROTHERS HOLDINGS, INC., )
                       Plaintiff,    )
 4                                   )
     vs.                             ) Civil Action No.
 5                                   ) H-09-0672
     CORNERSTONE MORTGAGE            )
 6   COMPANY,                        )
                       Defendant.    )
 7

 8

 9

10          - - - - - - - - - - - - - - - - - -

11          ORAL AND CONFIDENTIAL DEPOSITION OF

12                      HESTON GRAY

13                    July 26, 2010

14          - - - - - - - - - - - - - - - - - -

15

16

17              ORAL DEPOSITION OF HESTON GRAY produced as

18   a witness at the instance of the Defendant and duly

19   sworn, was taken in the above-styled and numbered cause

20   on the 26th day of July, 2010, from 9:00 a.m. to 5:10

21   p.m., before Karla K. Clark, CSR, in and for the State of

22   Texas, reported by oral stenography, at the Bloom Murr &

23   Accomazzo, P.C., 410 Seventeenth Street, Suite 2400,

24   Denver, Colorado, 80202, pursuant to the Federal Rules of

25   Civil Procedure.
```

CONFIDENTIAL                                          LBHI-OMNI_014245597

Deposition of Heston Gray
July 26, 2010

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3        Mr. Jason L. Sanders
          LOCKE LORD BISSELL & LIDDELL, LLP
 4        2200 Ross Avenue, Suite 2200
          Dallas, Texas 75201
 5        Telephone:  (214) 740-8437
          Fax:  (214) 756-8437
 6        jsanders@lockelord.com

 7        Mr. Jamie Grant Siler
          BLOOM MURR & ACCOMAZZO, P.C.
 8        410 Seventeenth Street, Suite 2400
          Denver, Colorado 80202
 9        Telephone:  (303) 534-2277
          Fax:  (303) 534-1313
10        jsiler@bmalaw.com

11   FOR THE DEFENDANT:

12        Mr. Jeffrey W. Hurt
          HURT & BERRY, LLP
13        10670 North Central Expressway, Suite 450
          Dallas, Texas 75231
14        Telephone: (214) 382-5656
          Fax: (214) 382-5657
15        jwhurt@hurtberry.com

16

17

18   ALSO PRESENT:

19        Ms. Suzanne U. Johnson, CPA
          HURT & BERRY, LLP
20        10670 North Central Expressway, Suite 450
          Dallas, Texas 75231
21        Telephone: (214) 382-5656
          Fax: (214) 382-5657
22        sjohnson@hurtberry.com

23

24

25
```

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL                    LBHI-OMNI_014245598

Deposition of Heston Gray
July 26, 2010

1  documents they found.

2       Q.   Okay.  And under which of these agreements

3  being the April '99, the December '04, or the November

4  '01, agreements did Lehman Brothers Bank purchase the

5  Harris loans?

6       A.   They would have been purchased under the most

7  recent agreement which would be December 31, 2004.

8       Q.   The one that looks like there's been something

9  changed on it?

10      A.   Yes.  That's the same document.

11      Q.   Let me show you what's been marked as ALS 7622;

12 what is that document?

13      A.   That's a declaration of intention to sell to

14 Lehman Brothers Bank.

15      Q.   And how's that document used in -- in LBB

16 business?

17      A.   That's just a note when Aurora Loan Services

18 and Lehman Brothers Banks were integrating their loan

19 purchases to let them know that their intention was to

20 sell their loan to Lehman Brothers Bank.

21      Q.   And was that declaration honored by

22 Lehman Brothers Bank that's in 7622?

23      A.   Yes.

24      Q.   I'll show you a document that's been marked ALS

25 7624 through 7630 and what is -- what is that document?

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL                                                          LBHI-OMNI_014245599

Deposition of Heston Gray
July 26, 2010

1       A.    That is a purchase price and terms letter

2   between LBHI and Lehman Brothers Bank.

3       Q.    Okay.  And what's the date on it?

4       A.    It's January 1st, 2005.

5       Q.    And is the document or the agreement that

6   starts at 7624 -- is it the document under which Lehman

7   Brothers Bank sold these five mortgages to LBHI?

8       A.    It's my understanding that it is the agreement.

9   We made a diligent search to see if there was anything

10  more recent and this is the agreement that I was able to

11  locate.

12      Q.    I'm going to show you the document that's ALS

13  7631 through 7634, and it's similarly an agreement

14  entitled, "Purchase Price and Terms Letter," dated

15  October 26, 2005, between LBHI and LBB.  Why were there

16  two agreements -- one in January of '05 and one in

17  October?

18      A.    It looks like -- in my understanding of the

19  situation is they made a second agreement that was

20  specifically for government loans that came through the

21  FHA, VA.

22      Q.    Okay.  All right.  I'm -- I'm looking at page

23  7631 and it looks like it -- this agreement is dealing

24  with FHA, VA and RHS.  And when I look at 7624, it's

25  dealing with first lien conventional, one to four family

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL                                          LBHI-OMNI_014245600

Deposition of Heston Gray
July 26, 2010

1  residentials, correct?

2      A.   Correct.

3      Q.   All right.  And, for example, the Harris loan

4  was not government guaranteed, it was a conventional

5  loan?

6      A.   That's right.

7      Q.   First and second, correct?

8      A.   Uh-huh.

9      Q.   Yes?

10      A.   Yes.

11      Q.   And so is it your understanding that the Harris

12  first and second loans were sold from LBB to LBHI

13  pursuant to the agreement that's ALS 7624 through 7630?

14      A.   That's my understanding.

15      Q.   And the other three loans at issue, King,

16  Pendleton, and Piazzola are these relationships?

17      A.   Right.

18      Q.   Was it -- were they sold pursuant to the

19  agreement that's 7631 through 7634?

20      A.   It's my judgment in reading the documents that

21  they would be under the 7624.

22      Q.   Okay.  So all --

23      A.   I would say all eight loans.

24      Q.   Okay.  All eight loans that you looked at that

25  are part of the exhibit we introduced at the beginning

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL                                        LBHI-OMNI_014245601

Deposition of Heston Gray
July 26, 2010

1   were -- were sold pursuant to the January 1st, 2005,

2   agreement, ALS 7624 through 7630, correct?

3       A.   Correct.

4       Q.   Now, the -- further your understanding that

5   when loans were sold from LBHI -- excuse me, from LBB to

6   LBHI pursuant to the January 1st, 2005, ALS 7624

7   agreement, there would be an Exhibit A, bill of sale

8   prepared?

9       A.   The agreement states that there would be a bill

10  of sale prepared.  In my experience at Aurora Loan

11  Services, I've never seen a prepared bill of sale.

12      Q.   Okay.  All right.  Have you seen any

13  modifications to the -- let me rephrase that.  Are you

14  aware of any modifications to the agreement that's been

15  marked as ALS 7624?

16      A.   No.  I'm not aware of any alterations or

17  modifications.

18      Q.   So the ALS 7624 agreement is the complete

19  agreement that governed the sale between LBB and LBHI

20  related to the eight loans you studied?

21      A.   Yes.

22              MR. HURT:  Time for another bathroom

23  break.

24              (Off the record.)

25              MR. HURT:  Back on the record.

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL

Deposition of Heston Gray
July 26, 2010

| 1 | | | CHANGES AND SIGNATURE | |
|---|---|---|---|---|
| 2 | PAGE | LINE | CHANGE | REASON |
| 3 | 52 | 16 | "ABP" to "AYP" | ABP isn't a title |
| 4 | 71 | 17 | "mid summary" to "Min Summary" | |
| 5 | 77 | 19 | "sale to Fannie Mae" | Proper description of Action |
| 6 | 79 | 19 | "Loan Crowns" to "Loan Counts" | non-sensical |
| 7 | 85 | 5 | "no rate" to "note rate" | typo |
| 8 | 106 | 7 | "on side" to "on site" | clearer |
| 9 | 106 | 5 | "on sides" to "on site" | typo |
| 10 | 106 | 9 | "On side" to "on site" | typo |
| 11 | 113 | 7 | "unspoken" to "unwritten" | The intended word |
| 12 | 113 | 11 | "unspoken" to "unwritten" | repetition of my previous mistake |
| 13 | 161 | 25 | "333222983" to "33322983" | Correct Loan number |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL

LBHI-OMNI_014245603

Deposition of Heston Gray
July 26, 2010

1          I, HESTON GRAY, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4    _____

5    Heston Gray

6

7

8    THE STATE OF COLORADO          )

9    COUNTY OF DOUGLAS         )

10

11          Before me, HEIDI LONG          , on this

12   day personally appeared HESTON GRAY, known to me (or

13   proved to me under oath or through _____)

14   to be the person whose name is subscribed to the

15   foregoing instrument and acknowledged to me that they

16   executed the same for the purposes and consideration

17   therein expressed.

18          Given under my hand and seal of office this

19   22 day of SEPTEMBER, 2010.

20

21

22   | Heidi Long
23   | NOTARY PUBLIC       NOTARY PUBLIC IN AND FOR THE
     | State of Colorado       STATE OF COLORADO
24   My Commission Expires Dec 15, 2012

25

PRECISION COURT REPORTING
(214) 908-0222

CONFIDENTIAL                                        LBHI-OMNI_014245604

CONFIDENTIAL

LBHI-OMNI_014245605